UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------x
In re:                                                    )
                                                          )        Case No. 20-12345
The Roman Catholic Diocese of Rockville                   )
Centre, New York,[1]                                      )        Chapter 11
                                                          )
         Debtor.                                          )
                                                          )
-------------------------------------------------------x

**DECLARATION OF CHARLES MOORE, MANAGING DIRECTOR OF ALVAREZ
& MARSAL NORTH AMERICA, LLC, PROPOSED RESTRUCTURING ADVISOR
TO THE ROMAN CATHOLIC DIOCESE OF ROCKVILLE CENTRE, NEW YORK,
IN SUPPORT OF CHAPTER 11 PETITION AND FIRST DAY PLEADINGS**

   I, Charles Moore, declare, pursuant to 28 U.S.C. § 1746, under penalty of perjury

that:

   1.  I am a Managing Director within the Restructuring & Turnaround division

of Alvarez & Marsal North America, LLC ("A&M"), a professional services firm specializing in

turnaround management and performance improvement.  I serve as an advisor to The Roman

Catholic Diocese of Rockville Centre, New York (the "Diocese" or the "Debtor").  I have over

twenty-five years of experience in operational and financial restructuring, turnaround consulting,

performance improvement, and interim management.

   2.  The Diocese is the seat of the Roman Catholic Church on Long Island.[2]

The Diocese has been under the leadership of Bishop John O. Barres since February 2017.

---

[1]  The last four digits of the Debtor's federal tax identification number are 7437.  The Debtor's mailing address is 50 North Park Avenue, Rockville Centre, New York 11571.

[2]  The Diocese serves the entirety of Suffolk and Nassau counties, excepting Fishers Island, which is a part of the Diocese of Norwich.  The area served by the Diocese is referred to herein as Long Island.

3.      Bishop Barres has initiated a review of the Diocese's finances and operations, and a review of its insurance history and coverage levels going back to its creation. The stated purpose of this review is to assure that: (i) the Diocese maintains and continues to strengthen its efforts to prevent abuse of children and young people; (ii) existing Diocese resources not otherwise restricted or reasonably required for the Diocese to serve the faithful and others in need are identified, preserved and made available to assist the Diocese in providing care and compensation to the victims of clerical abuse (the "abuse survivors"); and (iii) there remains adequate financial support to serve the faithful and those in need on Long Island, and to continue to improve such ministry over time.

4.      To further those ends, the first objective of my engagement has been to provide transparency in the Diocese's finances and operations and to evaluate whether resources, including cash, are managed in conformity with the Diocese's commitments and obligations.

5.      The second objective of my work has been to analyze the Diocese's resources, obligations and ongoing operations in order to assess the operating model of the Diocese and make recommendations for improvement. Bishop Barres seeks to improve efficiency within the Diocese, and the operating model reflects those efficiency improvements. The model also quantifies and forecasts the resources reasonably required for the Diocese to fulfill its mission and give effect to its prior and continuing commitments to donors and others supporting and relying upon its mission. This objective was pursued with a view to providing financial support for the compensation and care for the abuse survivors utilizing existing Diocesan resources. It also aims to provide for the ongoing needs of the Diocese to continue its ministry to the faithful and the needy on Long Island, and to discharge its obligations.

6.     On the date hereof (the "Petition Date"), the Diocese caused its attorneys to file a voluntary petition for chapter 11 bankruptcy relief under title 11 of the United States Code (the "Bankruptcy Code") in this Court (the "Bankruptcy Court"). Pursuant to 11 U.S.C §§ 1107(a) and 1108, the Diocese continues to operate its ministry and manage its properties as a debtor in possession.

7.     To enable the Diocese to minimize the adverse effects of the commencement of this chapter 11 case on its operations, the Diocese has requested various types of relief in its first-day motions (collectively, the "First Day Motions"). The First Day Motions seek relief aimed at, among other things:  facilitating a smooth transition to this chapter 11 case; continuing the ministry of the Catholic Church to the nearly 1.5 million Catholics in the Diocese; maintaining employee compensation; maintaining the good will and morale of the approximately 188 priests, lay employees and others who work on the programs and services provided by the Diocese; preserving and maximizing the Diocese's property, including its insurance assets, to satisfy Diocesan creditors; and maintaining services for those Catholics and non-Catholics alike who benefit from the many critical services provided by the charitable, educational and other service organizations affiliated with the Diocese.  All of the First Day Motions are vital to the Diocese's reorganization efforts, and expedited approval of the First Day Motions is important to the Diocese's success in this chapter 11 case.

8.     I submit this declaration (the "Declaration") pursuant to Rule 1007 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York (the "Local Rules") (a) in support of the relief requested in the First Day Motions; (b) to explain to the Court and interested parties the

circumstances that compelled the Diocese to seek relief under the Bankruptcy Code; and (c) to provide certain information as required by Local Rule 1007-2.

9.     As the lead Managing Director at A&M responsible for this engagement, I have become familiar with the Diocese's day-to-day operations, financial affairs, and books and records through review of certain financial documents, discussions with Diocese management, and discussions with the Diocese's other professionals.  Except as otherwise noted, all facts set forth in this Declaration are based upon my personal knowledge, information supplied to me by others associated with the Diocese and/or colleagues of mine at A&M, my review of relevant documents or my opinion based on my experience with and knowledge of the Diocese's operations, financial condition and financial outlook.  If called upon to testify, I could and would testify competently to the facts set forth herein.  I am authorized by the Diocese to submit this Declaration.

10.     This Declaration provides background on the Diocese's operations relevant to this chapter 11 case, and further provides factual information relevant to and in support of the First Day Motions.  Part I of this Declaration provides background regarding the Diocese, its mission, its charitable, educational and religious-service affiliates, and its Parishes and their schools in order to contextualize long-standing operational practices of the Diocese. Part II provides information from the financial and operational analysis conducted by A&M of the Diocese, its affiliates and the plans and programs it administers.  Part III sets forth the events that precipitated commencement of this case.  Part IV discusses the objectives of the filing and the actions that the Diocese has taken to reduce expenses and operate more efficiently.  Part V provides a summary of the First Day Motions.  Part VI identifies the annexed schedules that contain information required by Local Rule 1007-2.

# I.   BACKGROUND

## A.   Organization of the Catholic Church

11.   I understand that there are around 1.3 billion baptized Catholics worldwide, of whom around 70 million reside in the United States.  As a general matter, the Catholic community is composed of the ordained clergy (i.e., bishops, priests and deacons) and the laity.  The Catholic Church[3] operates though dioceses, each working within a specific geography, under the leadership of archbishops or bishops responsible to the Holy See in the Vatican.  In turn a diocese provides administrative functions to, supports, and serves, among others:  (i) local churches, known as parishes, and parish schools;[4] and (ii) other charitable, educational, and religious-service affiliates that are critical to the ministry of the Church within that diocese and that are supported and often administered by the diocese.[5]

## B.   Structure of the Diocese, the Parishes and the Diocese Affiliates

12.   As explained above, the Diocese is the seat of the Church on Long Island.  The Diocese was established by the Vatican in 1957 from territory that was formerly part of the Diocese of Brooklyn.

13.   The State of New York established the Diocese as a religious corporation in 1958.  *See* 1958 N.Y. Sess. Laws Ch. 70 (1958), § 1.  Under the New York statute, the purpose of the Diocesan corporation is "to support, maintain, aid, advise and cooperate with any charitable, religious, benevolent, recreational, welfare or educational corporation, association,

---

[3]  As used in this Declaration, the term "Church" refers to the Roman Catholic Church.

[4]  Each parish and parish school is generally supervised by a pastor.

[5]  In addition to those listed, there is another type of organization within the Catholic community known as a religious order.  Religious orders are largely autonomous and governed by the statutes and constitutions of the particular order.  The priests, religious women and brothers of religious orders do not normally report directly to or take ultimate direction from diocesan bishops.  The principal authority for supervising, reassigning or punishing members of religious orders are the superiors of those orders.

institution, committee, agency, or activity . . . within the state of New York or elsewhere . . . ."

*Id.* § 4.[6]   The statute provides that "[t]he bishop, vicar-general and chancellor of the [Diocese] . . . shall, by virtue of their offices, be the members and trustees of the corporation."   *Id.* § 8.

14.     The Diocese is one of eight Catholic dioceses in New York, including the Archdiocese of New York.  The Diocese's total Catholic population is approximately 1.4 million, roughly half of Long Island's total population of 3.0 million.  The Diocese is the eighth largest diocese in the United States when measured by the number of baptized Catholics.

15.     The Diocese has 135 parishes (each a "<u>Parish Corporation</u>" or "<u>Parish</u>," and collectively, the "<u>Parish Corporations</u>" or "<u>Parishes</u>").  The Diocese's administrative offices are in Rockville Centre. In the Diocese, there are 553 priests (active and retired), 801 religious women, 34 brothers, and 285 permanent deacons.

16.     Parishes are the epicenter of the Church's mission, and play a central role in the lives of Catholics by administering key aspects of the Catholic Faith, including:  baptism, education, communion, Mass, confirmation, marriage, and bereavement, including last rites, funeral services and grief support.[7]  In this way, a parish is the critical connection of the Church to the faithful, from the beginning of life to the end.

17.     The Diocese's Parishes are separate religious corporations, formed under Article 5 of the New York's Religious Corporations Law, N.Y. RELIG. CORP. § 90.  Under the

---

[6]  Pursuant to the statute, the Diocese has the power to take and hold, by bequest, devise, gift, purchase or lease, either absolutely or in trust for any of its purposes, any property real or personal, without limitation as to amount or value; to sell, mortgage, lease or otherwise convey or transfer such property, and to invest and reinvest any principal and income and to deal with, use, apply and expend any property and the income derived therefrom in such a manner as in the judgment of its trustees will best promote its objects.  1958 N.Y. SESS. LAWS Ch. 70 (1958), § 5.

[7] In response to the COVID-19 pandemic and in accordance with government directives and guidance from the Centers for Disease Control, Parishes temporarily transitioned many of these activities to virtual formats, reduced in-person gatherings or suspended them altogether.  As of the Petition Date, Parishes on Long Island have begun to re-open at reduced capacity.

Religious Corporations Law, the trustees of each Parish Corporation are the Diocese's bishop and vicar-general, the Parish pastor and two laypersons from the Parish. *Id.* § 91.

18.     Parishes own and operate twenty-six elementary schools and two high schools in the Diocese.  There are also four private Catholic elementary schools and five private Catholic high schools operating in the Diocese.  The Diocese does not own or operate any of the Parish schools or private Catholic schools.  The Department of Education, Diocese of Rockville Centre owns and operates two additional high schools and supervises nine regional elementary schools in the Diocese.

19.     In addition, the Diocese has fourteen primary charitable, educational and other religious-service affiliates (each such organization, a "Diocese Affiliate").  Generally, each of these affiliates is a separate, not-for-profit charitable member corporation that has its own board and governance.  Each has a role in furthering the ministry of the Church and serving the Parishes and the communities of Long Island.  There may be additional Catholic Faith-based entities that provide charitable, educational and other religious services on Long Island.

20.     The fourteen Diocese Affiliates are:  Catholic Charities of the Diocese of Rockville Centre; Catholic Community Foundation of Long Island, Inc.; Unitas Investment Fund, Inc.; Mission Assistance Corporation; Catholic Cemeteries of the Roman Catholic Diocese of Rockville Centre, Inc.; Diocese Rockville Centre Catholic Cemetery Permanent Maintenance Trust; Department of Education, Diocese of Rockville Centre; Tomorrow's Hope Foundation, Inc.; Seminary of the Immaculate Conception; Catholic Faith Network; Catholic Press Association of the Diocese of Rockville Centre, Inc.; Diocesan Service, Inc.; Ecclesia Assurance Company; and Society for the Propagation of Faith and Mission Office.  The Diocese provides

administrative support to many of the Diocese Affiliates pursuant to administrative services agreements.[8]  Each Diocese Affiliate is discussed in greater detail in Section II.B below.

21.     In sum, within the geographic territory of the Diocese on Long Island, there are 135 Parishes, 39 schools, and the fifteen Diocese Affiliates (each, a "Ministry Member," and collectively, the "Ministry Members," or the "Ministry").  Though the Ministry, the Diocese furthers its mission and serves the faithful and those in need in communities across Long Island.

22.     None of the Ministry Members have sought relief under chapter 11 or are debtors herein.

## C.     Diocese Support of Ministry:  Administrative Support for Insurance, Health, Welfare and Retirement Programs

23.     To support the Ministry, the Diocese provides administrative support for and participates in plans providing retirement, health and welfare benefits for clergy and lay persons employed by the Diocese and by Ministry Members.  The plans for employee and clergy benefits are the Diocese of Rockville Centre 403(b) Employee Retirement Plan, the Diocese of Rockville Centre Health and Welfare Benefits Program, the Diocese of Rockville Centre Pension Plan, the Diocese of Rockville Centre Qualified Retirement Plan for Diocesan Priests and the Diocese of Rockville Centre Health Care and Other Assistance Plan for Retired and Disabled Diocesan Priests (collectively, the "Benefit Plans").  The Benefit Plans are each funded by separate trusts for the benefit of their participants.[9]  The insurance program maintained for the

---

[8] The Diocese has, as of March 2019, administrative services agreements in place with the following Ministry Members:  Ecclesia Assurance Company; Catholic Community Foundation of Long Island, Inc.; Unitas Investment Fund, Inc.; Department of Education; Mission Assistance Corporation; Catholic Faith Network; Catholic Press Association of the Diocese of Rockville Centre, Inc.; Diocesan Service, Inc.; and Tomorrow's Hope Foundation, Inc.

[9] The 403(b) Employees' Retirement Plan is funded by custodial accounts and annuity contracts held by an insurance company, which are in the nature of trusts, but not technically trusts.  For ease of reference, these funding vehicles will be referred to herein as "trusts" along with the other trusts funding plans.

insurance needs of the Diocese and Ministry Members is the Protected Self Insurance Program of

the Diocese of Rockville Centre (the "Protected Self Insurance Program" and collectively with

the Benefit Plans, the "Benefit and Insurance Plans").

24.     Each of the Benefit and Insurance Plans is primarily funded by its

participating Ministry Members other than the Diocese, with the Diocese contributing a modest

portion of annual funding for its own employees and insurance needs as an entity.  Participating

Ministry Members make contributions to the Benefit and Insurance Plans on behalf of their

employees in the case of the Benefit Plans and on behalf of themselves in the case of the

Protected Self Insurance Program.  The Diocese provides administrative services to the Benefit

and Insurance Plans and receives reimbursement for the costs incurred by the Diocese to

administer these arrangements.  The Diocese acts as contribution agent for the Benefit Plans,

collecting contributions from all participants and remitting them to the plan trusts or paying plan-

specific administrative expenses.  The premiums or Benefit Plan contributions paid by the

Ministry Members assure coverage and benefit Ministry Members and employees of Ministry

Members.

## II.     FINANCES AND OPERATIONS OF THE DIOCESE

### A.     Our Analysis of the Diocese's Finances and Operations

25.     Members of my team and I have worked with the financial staff at the

administrative office of the Diocese to analyze the Diocese's finances.  Specifically, we have

reviewed certain financial statements since 2014, treasury records, bank accounts, and human

resources records.  This review has focused on the Diocese's operational efficiency, financial

condition, and its current and historical cash management practices.

26.     The Diocese has no indebtedness for borrowed money.

27.     The Diocese's recurring revenues are limited and largely dependent on donors and parishioners.  They are also unpredictable and have more recently been declining due to the impacts on the Diocese from the COVID-19 pandemic.  The Diocese's recurring revenues are:  (i) a share of the weekly offertory made by the faithful at every Parish; (ii) other bequests and donor-directed gifts; (iii) investment income; (iv) revenue for administrative services provided to Ministry Members; and (v) revenues from the Diocese's sublease to third parties of a portion of the spectrum within its educational broadcast license.[10]

28.     Other than the spectrum revenue, administrative services revenue and investment income described above, recurring revenues depend on the Diocese's ability to raise revenues from the faithful.  These revenues are unpredictable and have more recently been declining due to disruptions caused by the COVID-19 pandemic, the impact of which is further described in Section IV.F below.  The Diocese depends on these revenues to continue its mission of ministering to the faithful and providing charity to those in need.  In turn, the faithful make donations in anticipation of the Diocese continuing its mission.

29.     Separate from the principal pastoral and temporal functions of the Diocese is the Catholic Ministries Appeal (the "CMA"), an annual campaign to support particular charitable, religious and educational missions undertaken by the Diocese and entities that are sponsored by and/or affiliated with the Diocese.  CMA donations collected in a given calendar year are designated for use in the following calendar year.  For the CMA and other non-offertory donations, the Diocese asks its donors to provide these revenues to fund areas of particular

---

[10]   The Diocese also assists Parishes and the furtherance of Catholic education by acting as an agent to collect a "non-school assessment" from Parishes that do not have schools.  The money collected is used to fund efforts related to Catholic education.  The primary function is to fund parish schools.  This money goes through an identified, segregated account used solely for this purpose.  Monies collected though the non-school assessment are remitted to the Department of Education, which then disburses the funds to the parish schools that receive this support and for other operational needs.

importance to the mission of the Church.  These areas of particular importance include the provision of religious education for thousands of students on Long Island; affordable and safe housing for seniors, veterans and adults with mental and physical disabilities; food programs for seniors, low-income families and women and their children; foster care; youth, campus and young adult ministries; priests', deacons' and lay leaders' education and formation; faith formation, including baptismal preparation, pre-Cana marriage preparation and Rite of Christian Initiation of Adults programs; hospital ministry to those who are ill and their families; prison ministry; substance abuse services and day treatment programs; and Catholic Diversity initiatives (collectively, the "CMA Missions").  In order to incentivize participation in the CMA, any Parish that raises more than its fundraising goal set by the Diocese in that year's campaign is eligible for a refund from the CMA in the amount of the excess.

30.    Our financial and treasury review included reviewing the handling of monies received by the Diocese from the Parishes as part of the weekly offertory by parishioners, its administrative services revenues, its investment income and its spectrum revenues.  The Diocese uses these revenues to provide ongoing, ordinary-course administrative support and services to the Parishes, their schools and the affiliated charitable, educational and service organizations.

31.    We separately reviewed and analyzed revenues derived from the CMA. CMA donations are made into a separate bank account and, for the most part, remain in that account until the following calendar year.  At the beginning of each calendar year, funds from the previous year's CMA are disbursed from this account in one of four ways:  (i) through transfers to the Diocese to support its engagement in CMA Missions; (ii) as direct contributions to Diocesan Affiliates that engage in CMA Missions; (iii) through transfers to the Diocese to

fund the administrative support it provides such Diocesan Affiliates; and (iv) as refunds to parishes that raised funds in excess of their goal amount for that year's CMA.  Typically, contributions to Catholic Charities of the Diocese of Rockville Centre, a Diocese Affiliate, occur prior to the end of the CMA campaign year.  In addition, some refunds to parishes occur prior to the end of the campaign year based on collections.  All funds raised in a given calendar year's CMA are disbursed in the following calendar year and the CMA has no endowment.  In each year of the Review Period (as defined below), the Diocese's expenditures in support of CMA Missions exceeded the funds raised by the CMA.

32.    In fiscal year 2019, ended August 31, 2019, the Diocese operated with a $2.1 million deficit.[11]

33.    We also separately reviewed the receipts and disbursements of the five insurance, health and retirement plans or programs administered by the Diocese.  These plans and programs, described in greater detail in Section II.C below, operate for the benefit of the Diocese, its charitable, educational and religious-service affiliates, its Parishes, their schools and the employees and clergy of each of the foregoing.  These receipts and disbursements are premised upon financial support and direct funding (whether premiums or contributions) from each participating Parish, school or affiliate.

34.    We have worked with the Diocese's financial staff to provide a rolling thirteen-week cash forecast, and we will continue to work with the Diocese to identify cost

---

[11]  In its calculation of operating income, the Diocese excludes certain non-cash items, non-recurring items or items that are pass-through in nature. Excluded items include, but are not limited to: investment income, gains/(losses) on the sale of assets, restructuring charges, depreciation & amortization, bad debt expense and changes in restricted asset balances.

Monetary figures provided in this Declaration are rounded approximations, as appropriate.

savings and opportunities for efficiencies in order to enhance the Diocese's ability to preserve its

cash and investment assets for the benefit of creditors, including abuse survivors.

**B.      Diocese Affiliates and the Ministry**

35.      The Diocese provides centralized human resources, accounting, and

financial management services to certain Diocese Affiliates in support of their religious,

educational and charitable missions.  The Diocese historically has also made significant financial

contributions to several of its affiliates.  However, even prior to the financial challenges imposed

by the recent pandemic, these contributions have been eliminated or significantly curtailed in

light of the Diocese's declining financial health, the causes of which are described in Section IV

below.

36.      Independent accountants have conducted annual financial audits of the

Diocese and the Diocese Affiliates.  I, or others working under my direction, have reviewed the

financial statements of the administrative office of the Diocese for its fiscal years from 2014

through 2019 (the "Review Period") and of certain Diocese Affiliates for the years within the

Review Period for which such financial statements are available.  In addition, I, or others

working under my direction, have reviewed the performance and status of the Protected Self

Insurance Program and the Diocesan high schools, which have historically been reported

separately from the administrative office of the Diocese.  The Parish Corporations also prepare

their own financial statements.

*(a)      Catholic Charities*

37.      Catholic Charities of the Diocese of Rockville Centre ("Catholic

Charities") is a non-profit organization with three affiliated corporations:  Catholic Charities

Support Corporation, which holds the organization's investments and certain real property;

Regina Maternity Services Corporation, which provides services to pregnant women, mothers

and infants; and Catholic Charities Health Systems of the Diocese of Rockville Centre, Inc. Catholic Charities also administers Cleary Deaf Child Center, Inc. (the "Cleary Center"), which is an organization that runs a school for children who are deaf.

38.     To support the charitable mission of the Church, Catholic Charities' mission is broad, addressing social issues ranging from homelessness, foster care, chemical dependence and food insecurity to mental health, HIV/AIDS support and family and senior services.  Many of the charitable services delivered by Catholic Charities are the only services reasonably accessible and effective in the communities served by the Diocese, offering help and creating hope for self-reliance for Catholics and non-Catholics alike, whether resident, immigrant or temporarily present.

39.     Since its inception, Catholic Charities has had its own independent board of trustees and has been responsible for its own financials.  It participates in the Benefit and Insurance Plans.  The trustees of Catholic Charities also direct its investments.  Catholic Charities leases space from Ministry Members.  Catholic Charities is donor dependent and relies upon such donations and contracts under various government programs to provide its services.

### (b)     *Catholic Community Foundation of Long Island*

40.     Catholic Community Foundation of Long Island, Inc. (the "Catholic Foundation") is a New York, non-profit corporation established to develop financial resources to support the Diocese, the apostolic activities of the Church and the charitable mission locally and across the globe.  The Catholic Foundation has its own board and audited financial statements.

41.     Led by former Bishop William Murphy, the Diocesan Task Force for the Formation of a Catholic Foundation identified in Spring 2011 certain "critical areas of need" related to faith formation, charitable service for the poor and support to needy parishes.  To support these ends, the Catholic Foundation was incorporated on March 1, 2016.

(c)     *Unitas*

42.     Unitas Investment Fund, Inc. ("Unitas") is a separately incorporated, non-regulated investment fund organized for the purpose of offering the Diocese and Ministry Members the opportunity, but not the obligation, to invest in harmony with the teachings of the Church.  Unitas serves as a non-profit fund manager for investments of the Diocese and other Ministry Members, to the extent any Ministry Member chooses to participate.  Certain of the Diocese Affiliates and the Benefit and Insurance Plans administered by the Diocese participate in Unitas.

43.     Unitas has its own board and audited financial statements.  Unitas does not have employees.  The Diocese provides administrative support to Unitas, and Unitas reimburses the Diocese for the cost of that support.

44.     Unitas charges investor-participants investment fees, fees for general expenses and what is known as a "mission fee."  A mission fee is a performance fee charged as a percentage of assets in periods generating investment returns above a certain threshold.  Mission fees are remitted to the Mission Assistance Corporation, discussed below.

45.     Investments with Unitas are reflected on the financial statements of Unitas and on the separate financial statements of the Diocese and each other investor-participant. There are approximately 105 investor-participants in Unitas, each of which has its own separate account and receives its own separate account statements.  Each investor-participant has an individual account agreement with Unitas, executed upon account opening, and has control over the extent and timing of its participation in Unitas (i.e., the decision to invest and to withdraw funds remains within the sole discretion of the investor-participant).  Each investor-participant in Unitas is forbidden from assigning or transferring any part of its interest in Unitas.

### (d)   Mission Assistance Corporation

46.   Mission Assistance Corporation ("MAC") is a New York, non-profit corporation that primarily provides loans to Parishes in need.  Interest rates on the loans it offers to Parishes are generally below market.  MAC also offers loan forgiveness and grants to Parishes that, without such assistance, would be unable to fulfill the mission of the Church.  Funds are earmarked for short-term bridge financing and capital improvement projects, especially in aging Parish buildings.  MAC has its own board and audited financial statements.

47.   MAC was originally incorporated on November 17, 2003 and funded on September 1, 2005 by an initial transfer of approximately $5.4 million and subsequent transfers prior to 2010 totaling $7 million.  Such transfers came from the segregated funds of the deposit loan account of the Diocese (the "Deposit Loan Account").  The Deposit Loan Account was a predecessor program within the Diocese that had provided many of the same services now provided by MAC and Unitas.

48.   Continued funding of MAC comes from mission fees imposed on Unitas investments and from MAC's own investment returns.  In fiscal year 2019, ended August 31, 2019, mission fees amounted to $0.5 million, of which approximately $7,000 was attributable to the Diocese.

### (e)   Cemetery Corporation and Cemetery Trust

49.   Catholic Cemeteries of the Roman Catholic Diocese of Rockville Centre, Inc. ("Cemetery Corporation"), a New York corporation, owns three and operates four Diocesan cemeteries located on Long Island (collectively, the "Cemeteries"):  Cemetery of the Holy Rood in Westbury, New York; Holy Sepulchre Cemetery in Coram, New York; Queen of All Saints Cemetery in Central Islip, New York; and the Queen of Peace Cemetery in Old Westbury, New

York.[12]   Cemetery Corporation operates the Cemeteries together with Diocese Rockville Centre

Catholic Cemetery Permanent Maintenance Trust ("Cemetery Trust"), a New York permanent

maintenance trust.   Cemetery Corporation and Cemetery Trust each has its own board and

audited financial statements.

50.   Cemetery Corporation and Cemetery Trust together provide for the burial

of the faithful according to the Catholic tradition.   They also have the obligation to provide

"perpetual care."   Such obligation is central to the operating structure of Catholic cemeteries and

is part of the contractual arrangements for every interment.   Funds from every interment are set

aside for a permanent maintenance fund to be held, invested, and used to provide perpetual care.

51.   The current organizational structure of Cemetery Corporation and

Cemetery Trust arose out of the need to fulfill the Diocese's canonical obligations to provide for

Catholic burial of the deceased.   Prior to September 1, 2017, three of the Diocese's four

Cemeteries (i.e., excluding the Queen of Peace Cemetery in Old Westbury, New York) and their

associated permanent maintenance fund were administered as a self-contained operation within

the Diocese ("Cemetery Division").   During the Review Period, Cemetery Division had at all

times segregated its funds from those of the Diocese and had at all times maintained separate

accounts and financial statements.   Cemetery Division held and invested such segregated funds,

and also bore the related obligation to provide perpetual care for the deceased.

52.   The Diocese engaged outside consultants to assess the financial needs of

the Cemeteries and to identify means to optimize their operation.   Based on those studies, the

consultants determined that the Cemetery Division would be more appropriately structured as an

---

[12]   The establishment of the Queen of Peace Cemetery was delayed due to litigation brought by the Village of Old
Westbury, New York (the "Village").   Such litigation between the Village and the Diocese, which lasted for more
than twenty years, was successfully resolved in 2016.

independent corporation and permanent maintenance trust.  The consultants also determined through those studies that the cash reasonably necessary for the Cemeteries to discharge their perpetual care obligation did not require the full amount of the cash held in Cemetery Division and its permanent maintenance fund.

53.     Accordingly, on September 1, 2017, the Diocese transferred the operations, certain of the assets (including certain cemeteries) and all of the liabilities of Cemetery Division to Cemetery Corporation and Cemetery Trust (the "Cemetery Transaction"). Specifically, under the Cemetery Transaction:  (a) Cemetery Corporation assumed, and the Diocese was relieved of, all obligations to provide perpetual care for the deceased; (b) the Diocese retained $47.6 million of the amount previously segregated in the Cemetery Division; and (c) Cemetery Corporation purchased the Queen of Peace Cemetery in Old Westbury, New York for its appraised value of $15.3 million.  In addition, the Diocese retained the $7.5 million payment it received from the Village of Old Westbury in settlement of its litigation with the Village to operate and put into service the Queen of Peace Cemetery.

54.     In each of the fiscal years 2014 through 2017 prior to the Cemetery Transaction, Cemetery Division provided $3.25 million annually to the Diocese.  Since the Cemetery Transaction, Cemetery Corporation and Cemetery Trust have not provided financial support to the Diocese.

55.     Cemetery Corporation, like Cemetery Division before it, participates in the Benefit and Insurance Plans.  Cemetery Trust relies upon Unitas for the investment of its permanent maintenance funds.

### (f)     Department of Education

56.     The Department of Education, Diocese of Rockville Centre (the "Department of Education") owns, supervises and manages the two Diocesan high schools, Holy

Trinity and St. John the Baptist.  The Department of Education also supervises and helps manage

the many Parish and regional Catholic elementary schools, but it does not own or operate the

Parish or regional schools.  The Department of Education does not oversee the two Parish High

Schools.  The teachers in the high schools are unionized and their employment is governed by a

collective bargaining agreement.

57.     The Department of Education was incorporated by the Regents of the

University of the State of New York on April 26, 1974.  Its primary purpose is to provide

educational and financial support to the Parish and Diocesan schools operating within the

Diocese.  The Department of Education also manages relationships, grants, subsidies and

funding with the State of New York and the federal government on behalf of all the Parish and

Diocesan schools.

58.     The Department of Education has its own board and audited financial

statements.  The Diocese provides administrative support to the Department of Education in

exchange for reimbursement of costs pursuant to an administrative services agreement.

59.     As of September 1, 2017, the Diocese transferred the operations, real

estate assets and related liabilities of three Diocesan high schools—Holy Trinity, St. John the

Baptist and Bishop McGann-Mercy—to the Department of Education.  In the deed providing for

the transfer of the real estate from the Diocese to the Department of Education, the Diocese

retained a reversionary interest in the event the property was no longer used as a school.  In

summer 2018, Bishop McGann-Mercy was shut down.  In May 2020, the McGann-Mercy

property was sold to Peconic Bay Medical Center Foundation for $14 million.  The Diocese

received the proceeds from the sale.

60.     Consistent with past practice, the audit and financial reporting for the two operational schools remains separate from the audit and financial reporting for the Department of Education in order to provide transparency regarding the operations and financial standing of the high schools.  The financial statements of Bishop McGann-Mercy were consolidated with those of the Department of Education on July 1, 2018.

61.     The Department of Education has undertaken an efficiency review of its operations in order to reduce, and ultimately eliminate, its financial dependence on the Diocese.

### (g)     Tomorrow's Hope Foundation

62.     Tomorrow's Hope Foundation, Inc. ("THF") is a non-profit corporation whose mission is to ensure the excellence and continuance of Catholic education on Long Island. It provides support through student scholarships and program funding.  THF has its own board and audited financial statements.

63.     THF solicits and receives direct donations to enable it to grant scholarships.  For the 2019-2020 school year,  THF paid roughly $1.7 million for student scholarships directly to schools.

### (h)     Seminary of the Immaculate Conception

64.     The Seminary of the Immaculate Conception of the Diocese of Rockville Centre (the "Seminary") is an institution of formation in the Catholic Faith, originally established by the Diocese of Brooklyn in 1930 as an institution of higher learning for the purpose of training men for the priesthood.  The Diocese of Brooklyn transferred the Seminary to the Diocese in 1957 when the Diocese was formed out of territory that was formerly within of the Diocese of Brooklyn.  The Seminary is a religious, non-profit corporation ("Seminary Corporation").  The Seminary has an independent Board of Governors, and Seminary Corporation has its own board and audited financial statements.

65.     On November 10, 2011, the Diocese, the Archdiocese of New York and the Diocese of Brooklyn created an interim Inter-Diocesan Partnership with a view towards establishing a single program for priestly formation for their three dioceses located at St. Joseph's Seminary in Dunwoodie, New York.  Since 2014, the Diocese, the Diocese of Brooklyn and the Archdiocese of New York have jointly conducted seminary programs for the ongoing formation of priests and deacons for the three dioceses at Saint Joseph's Seminary, under the control and authority of the cardinal and two bishops of the three dioceses.

66.     Since the consolidation, the Seminary has conducted or overseen the conduct of retreats, education and similar programs at its facilities.

67.     The Seminary has substantial real estate assets in Huntington, New York, consisting of more than 220 acres on the north shore of Lloyd's Neck.  It is also the burial site for the bishops of the Diocese.  Bishops John Raymond McGann and James Thomas McHugh are buried there.

68.     In January 2017, the Diocese transferred the Seminary's land and buildings to Seminary Corporation in order to align title with the organization and operations of the Seminary.  The expenses of maintaining the Seminary have historically exceeded the revenue it generates from its various events, retreats and conferences.  Given the advent of COVID-19 and the inability to pursue conferences, retreats and similar hosted events, the Seminary has suffered a loss of its primary revenue source.

### (i)     Catholic Faith Network

69.     The Catholic Faith Network ("CFN") is the single largest outreach effort of the Diocese on Long Island, reaching 1.5 million homes via television broadcasts.  The broadcasts include live religious services, devotional programs, Catholic education, and youth programs.  CFN is incorporated as a non-profit New York Educational Corporation, and was

formerly known as Telecare of the Diocese of Rockville Centre.  CFN has its own Board of

Trustees and audited financial statements.

70.     CFN's operations center on education broadband service spectrum

licenses held by the Diocese.  The Diocese and CFN are party to lease agreements leasing use of

certain portions of this spectrum to third parties.  The U.S. Federal Communications Commission

conditions the licenses on continued educational broadcasting.  The Diocese meets this

requirement by retaining CFN, pursuant to a services agreement, to create and broadcast

programming over the spectrum.  In consideration for these services, this agreement provides

that the Diocese will perform certain administrative services for CFN, provide rent-free

operating space to CFN, and share a portion of the spectrum lease revenues with CFN.  CFN has

separate agreements to provide programming services to third parties.

### (j)     *Catholic Press Association*

71.     Catholic Press Association of the Diocese of Rockville Centre, Inc.

("Catholic Press") is a non-profit corporation that publishes the monthly magazine of the

Diocese, *The Long Island Catholic*, and a Spanish-language newspaper, *Fe Fuerza Vida*.

Catholic Press has its own board and audited financial statements.

### (k)     *Diocesan Service and Ecclesia Assurance Company*

72.     Diocesan Service, Inc. ("Diocesan Service") is an insurance broker that

helps the Diocese and related organizations purchase insurance coverage.  It is a 501(c)(3)

corporation with common stock held by a nonprofit trust for which the Bishop of the Diocese is

the sole trustee.  As of August 31, 2019, Diocesan Service had minimal revenues and expenses.

73.     Ecclesia Assurance Company ("Ecclesia") is a captive property and

casualty insurance company that provides insurance to the Diocese and other Ministry Members.

It is a separate corporation that is wholly owned by the Diocese.  Ecclesia was incorporated in

New York in December 2003.  The company is a licensed insurer and reinsurer.  It is subject to

the supervision of the New York State Department of Financial Services.  Ecclesia has its own

board and its own audited financial statements.

74.     Since 1986, Ecclesia has provided insurance to the Diocese and the

Ministry Members.  The sexual abuse liability coverage provided by Ecclesia is subject to self-

insured retentions (or deductibles) of $250,000 per occurrence and an aggregate coverage limit

for sexual abuse claims of (i) $15 million for claims made before October 31, 2020 based on

alleged incidents that occurred on or after September 1, 1986 and prior to October 31, 2019 and

(ii) $7.5 million for claims made, and based on alleged incidents that occurred on or after

October 31, 2019.

75.     Ecclesia works closely with the Protected Self Insurance Program (as

hereinafter defined), which historically insured the $250,000 self-insured retention layer,

assessed and collected premiums and paid deductibles on all Ecclesia policies.  However,

effective November 1, 2019, the Diocese's insurance regime underwent certain changes that

reduce the role of the Protected Self Insurance Program.  First, the Protected Self Insurance

Program ceased to provide the $250,000 self-insured retention layer.  Following this change,

only historical liabilities remain with the Protected Self Insurance Program.  Second, Ecclesia

began to provide first-dollar coverage for various types of insurance policies including,

difference in conditions, general liability, directors and officers liability, employment practices

liability, professional liability, and medical professional liability.  Third, Ecclesia began to

provide property, boiler, and crime coverage after a $5,000 deductible per incident.

76.     In calendar year 2019, Ecclesia received income from insurance premiums, net after reinsurance, of $3.5 million, and returns on invested premiums of $2.9 million.

### (l)     *Society for the Propagation of Faith and Mission Office*

77.     The Society for the Propagation of Faith, Diocese of Rockville Centre (the "Society") and the Mission Office are two entities administered together.  They provide support for Catholic missionaries.  The Society and Mission Office have their own board and audited financial statements consolidated with one another.  The Society is a member of a national organization of the same name.

## C.     Benefit and Insurance Plans

78.     As with the Diocese Affiliates, independent accountants have conducted annual financial audits of each of the five Benefit and Insurance Plans.  I, or others working under my direction, have reviewed the financial statements for the Benefit and Insurance Plans during the Review Period.

### (a)     *The Priests' Pension and Benefits Plans*

79.     The Diocese of Rockville Centre Qualified Retirement Plan for Diocesan Priests (the "Priests' Pension Plan") is a defined benefit retirement plan that provides for the basic income needs of priests in old age as well as certain housing benefits for these priests.  The Priests' Pension Plan is tax-qualified under section 401(a) of the Internal Revenue Code (the "Tax Code") and maintains a separate trust that is tax-qualified under section 501(a) of the Tax Code.  All priests incardinated in the Diocese or on official assignment within the Diocese are eligible to participate in the Priests' Pension Plan.  Priests are eligible to receive benefits under the plan after reaching age 72 and having at least 10 years of service to the Diocese.  Retirement

from service must be approved by the Bishop. The plan also provides benefits for priests who become disabled prior to the normal age of retirement.

80.    Contributions to the Priests' Pension Plan totaled $1.9 million in calendar year 2019. The Diocese funded $303,000 or 15.7% of such contributions. Ministry Members with priests in their service contributed the remaining 84.3%.

81.    The Diocese of Rockville Centre Health Care and Other Assistance Plan for Retired and Disabled Diocesan Priests (the "Priests' Benefits Plan") is a separate plan to provide for health benefits and other assistance to retired and disabled priests. The Priests' Benefits Plan is funded with a separate trust that provides benefits including, but not limited to, medical, dental, life insurance, automobile insurance, supplemental disability, housing and annual retreat and education reimbursement. Diocesan priests are eligible to receive benefits in the Priests' Benefits Plan if they are eligible to receive benefits under the Priests' Pension Plan or otherwise have permission from the Bishop.

82.    Contributions to the Priests' Benefits Plan in calendar year 2019 totaled $1.5 million. The Diocese funded $229,000 or 15.7% of such contributions. Ministry Members with priests in their service contributed the remaining 84.3%.

83.    Both the Priests' Pension Plan and the Priests' Benefits Plan are governed by the Priests' Sickness, Disability and Retirement Board, a committee of active and senior priests incardinated within the Diocese.

### (b)    Employees' Pension Plan and 403(b) Employees' Retirement Plan

84.    The Diocese of Rockville Centre Pension Plan (the "Employees' Pension Plan"), a separate trust, is a Tax Code section 401(a) tax-qualified, defined benefit retirement plan for lay employees of the Diocese as an employer, Ministry Members and Catholic Health Services. Catholic Health Services, an integrated health system on Long Island, is not a Ministry

Member and does not receive administrative support from the Diocese other than through its

participation in certain Benefit Plans.  Catholic Health Services has the most participating

employees and accounts for the majority of contributions to the Employees' Pension Plan.  The

Employees' Pension Plan is governed by the Lay Pension Committee, whose members are senior

leaders of the various employer groups that are participating employers in the plan.

85.    In 2015, the Employees' Pension Plan froze accruals for employees with

under 30 years of service and who are not employed by Catholic Health Services.  For those

employees, the Employees' Pension Plan was replaced by the Diocese of Rockville Centre

403(b) Employees' Retirement Plan (the "403(b) Employees' Retirement Plan").  The 403(b)

Employees' Retirement Plan is a Tax Code section 403(b) tax-qualified, defined contribution

retirement plan for employees of the Diocese and the Ministry Members.  The 403(b) plan is

open to employees of the Diocese and Ministry Members.  Contributions to the 403(b)

Employees' Retirement Plan are held in various annuity contracts and custodial accounts in the

plan's name.[13]  The standard employer contribution is 3% with an additional 1% match of

employee contributions.[14]  The employer contribution and match are provided by the employee's

employer, either the Diocese or a Ministry Member.  The Diocese has 134 participating

employees.  There are another 2,316 participating employees of the Ministry Members.  The

403(b) Employees' Retirement Plan is governed by the 403(b) Plan Committee, whose members

are senior leaders of the various employer groups that are participating employers in the plan.

---

[13]  Contributions from 2015 onward have been held in annuity contracts and custodial accounts with Mutual of
America.  Contributions from earlier years were made to T. Rowe Price, Trans America and other institutions.

[14]  In response to the financial impact of the COVID-19 pandemic, the 403(b) Plan Committee temporarily
suspended all employer contributions to the 403(b) Employees' Retirement Plan for all participating employers for
covered services performed by employees from April 1, 2020 through June 30, 2020.

86.     During calendar year 2019, contributions to the Employees' Pension Plan were $100.1 million.  The Diocese funded $707,000 or 0.7% of such contributions.  The remainder of the contributions were made by other participating employers and employees.

87.     During the same year, contributions to the 403(b) Employees' Retirement Plan totaled $11.7 million.  The Diocese funded $404,000 or 3.4% of such contributions.  The remainder of the contributions were made by other participating employers and employees.

(c)     **Employees' Benefits Program**

88.     The Diocese of Rockville Centre Health and Welfare Benefits Program (the "Employees' Benefits Program") provides medical coverage, dental coverage, life insurance, disability insurance and similar welfare benefits for employees of the Diocese and of the Ministry Members (including predominantly active lay employees but also active priests). Employees who are regularly scheduled to work 28 or more hours per week may participate in the Employees' Benefits Program.

89.     The Employees' Benefits Program is governed by the Diocesan Health Plan Committee, whose members are senior leaders of the various employer groups that are participating employers in the plan.  The Diocese administers certain financial activities for the Employees' Benefits Program, including assessing and directing premiums to the program's trust and arranging for the program trust to fund a segregated medical operating account used by Empire Blue Cross as plan insurance administrator to pay benefits.  The program's medical and dental benefits are self-insured by its participating employers, and the plan purchases stop-loss coverage for catastrophic claims over certain limits.

90.     Contributions from 169 different employers and employees totaled $36 million in fiscal year 2019, ended August 31, 2019.  The Diocese contributed $2.3 million or 6.3% of the total annual contribution.

91.     Premiums contributed from employees and participating employers, as well as reimbursements from insurance companies for expenditures over the individual stop-loss cap, are held in trust for the plan.  This trust is tax-exempt under section 501(c)(3) of the Tax Code.

### (d)      *The Protected Self Insurance Program*

92.     The Protected Self Insurance Program is a program to provide insurance coverage and risk management services to the Diocese and Ministry Members.  The program currently secures coverage for the following categories of insurance: (i) workers' compensation, (ii) property, (iii) boiler and machinery; (iv) general liability, (v) automobile liability and physical damage; (vi) crime; (vii) directors' and officers' liability; (viii) employment practices liability; (ix) employee benefits liability; (x) professional liability; (xi) medical professional liability; (xii) sexual abuse liability; (xiii) fiduciary liability; (xiv) student accident; and (xv) cyber.

93.     The Protected Self Insurance Program historically provided for the self-indemnification of property, casualty, automobile and other losses of the Diocese and Ministry Members.  However, as described above, the Protected Self Insurance Program transitioned in 2019 to purchasing first-dollar coverage from Ecclesia for these losses.  The program also covered workers' compensation on a self-insured basis until 2012, when, in response to a change in New York law, the Diocese arranged for third-party coverage for itself and the Ministry Members and placed its self-insurance program for workers' compensation into runoff.  The Diocese maintains a security deposit of $7.6 million in cash with the New York State Workers' Compensation Board for the benefit of the employees of the Ministry.

94.     The Protected Self Insurance Program has funded expenses relating to (i) the Independent Reconciliation and Compensation Program, described in detail below, (ii) the

care for those who suffered clergy sexual abuse, (iii) the Diocesan Child Protection Policy,[15] (iv)

the annual expenses of audits by StoneBridge Business Partners, an outside expert, of the

Diocese and Ministry Members to ensure compliance with the Charter for the Protection of

Children and Young People established by the U.S. Conference of Catholic Bishops (the

"Charter");[16] and (v) investigations, including responding to the Attorney General inquiries.

95.     The Protected Self Insurance Program is funded by assessments on

Ministry Members and the Diocese, which are used to fund the insurance coverage purchased by

the program and other program expenses.  As part of its oversight, the Diocese supports risk-

reduction efforts at Ministry Members.  Third-party administrators administer claims settlement

and make recommendations on reserves for historical liabilities that remain with the Protected

Self Insurance Program.

96.     In fiscal year 2019, ended August 31, 2019, program revenues amounted

to $14.6 million.  Of those revenues, $13.9 million were sourced from assessments to Ministry

Members, with the remaining $0.7 million derived from investment income realized by the

Protected Self Insurance Program.  The Diocese funded $203,000, or 1.5%, of such assessment.

## III.     THE DIOCESE'S MISSION TO EFFECT RECONCILIATION AND COMPENSATION

### A.     Zero Tolerance, Vigilant Child Protection and Reconciliation and Healing

97.     In keeping with the Diocese's mission, including "embracing Christ's

healing power and the Mission of Mercy of the Catholic Church," the Diocese undertook a

---

[15]  *See* Diocesan Child Protection Policy (Revised 2012), *available at* https://www.drvc.org/policies-and-procedures/.

[16]  *See* Diocese of Rockville Centre, Efforts to Protect Children and Young People, *available at* https://www.drvc.org/efforts-to-protect-children-and-young-people/ (last visited August 26, 2019); *see also* U.S. Conference of Catholic Bishops, Charter for the Protection of Children and Young People, *available at* http://www.usccb.org/issues-and-action/child-and-youth-protection/charter.cfm (last visited August 26, 2019).

review of its policies relating to safety of children and instituted new programs as part of its

"commitment and vigilance to the protection of children in our Church and in society."[17]

98.    In 2003, while under the leadership of Bishop Murphy, the Diocese

created the Office for the Protection of Children and Young People (the "Office for the

Protection of Children") and established standards and protocols to ensure that the most

vulnerable parishioners would be safe.[18]  In furtherance of this goal, the Office for the Protection

of Children created a Diocesan Child Protection Policy which established a procedure for

screening individuals to ensure that they do not pose a risk of harm to children, and protocols for

reporting and investigating alleged incidents of abuse.[19]  As Bishop Barres has publicly stated,

the Office for the Protection of Children has worked to "put[] the safety and well-being of

children first" and it "seeks to reach out to and support victims and survivors of abuse."[20]

99.    Upon his arrival in February 2017, Bishop Barres took steps to ensure that

the Diocesan Child Protection Policy was effective and vigilantly enforced in order to confirm

zero tolerance for sexual misconduct and strict adherence to Diocese-wide requirements for the

safety of children and young people.  This policy has been applied to all personnel, including

clerics, as well as all volunteers.  If a credible allegation of sexual misconduct is made against a

cleric, the policy mandates that such cleric be removed from his assignment and prohibited from

the public exercise of ministry pending the outcome of the full investigation.  Further, the policy

requires that any cleric found to have committed an act of sexual abuse be permanently removed

from ministry.  Other requirements under the policy include screening, background checks by an

---

[17] *See* https://www.drvc.org/statement-hidden-disgrace-ii-report/.

[18] *See* drvc.org/efforts-to-protect-children-and-young-people/.

[19] *See* https://www.drvc.org/wp-content/uploads/2018/12/child_protection_manual.pdf.

[20] *See* https://d2y l pz2y630308.cloudfront.net/22803/documents/2019/8/CV A %20letter--English-2.pdf.

outside expert firm, and training regarding a safe environment for both children and adults, all subject to periodic renewal and reevaluation.  Bishop Barres also instituted weekly staff meetings to bring to his attention any allegations of clerical misconduct or misconduct relating to other Diocesan personnel.  He personally ensured that, following any allegation of abuse, appropriate actions would be taken in addition to mandatory reporting to the appropriate law enforcement officials.

100.    Bishop Barres further sought to enhance the Diocesan Review Board, which was established under the Diocesan Child Protection Policy and is responsible for investigating and assessing allegations of sexual abuse of minors and in determining a cleric's suitability for ministry.  In assessing an allegation, the Diocesan Review Board reviews:  (i) the complete written record of the allegation; (ii) detailed descriptions of interviews of the alleged victim and the response of the accused; (iii) pertinent information from the personnel files; (iv) any presentation the accused or the alleged victim chooses to make; and (iv) the findings of the independent investigation conducted by an outside expert firm.  Further, the Diocesan Review Board may conduct its own interviews of the accused or the alleged victim.

101.    In addition to increasing membership on the Diocesan Review Board from five to seven members, Bishop Barres increased the frequency of the Diocesan Review Board's regular meetings.  He also required outside expert investigators to circulate their reports in advance of meetings with the board in order to assure a thorough, timely and robust consideration of any reported misconduct, especially incidents in respect of active or retired clerics who prior to such report were still in ministry.

102.    In furtherance of these improvements, Bishop Barres also shifted and refocused the responsibility for conducting investigations.  Specifically, Bishop Barres relieved

the Victim Assistance Coordinator at the Diocese, Mary F. McMahon, of the responsibility to

conduct an investigation, directing her instead to focus on caring for victims.  This responsibility

now rests with the Chief Operating Officer of the Diocese, who oversees the retention of an

outside expert firm to conduct the investigation.

103.    In addition, and as described below, Bishop Barres implemented a

reconciliation, assistance and compensation program.  Under the program, a leading outside

independent expert evaluates claims and, if appropriate, sets compensation for individuals

alleging clergy sexual abuse ("Abuse Claimants").

**B.    Independent Reconciliation and Compensation Program**

104.    The Diocese adopted and announced the Independent Reconciliation and

Compensation Program (the "IRCP") on October 16, 2017.  The IRCP, which remained open

until shortly before the Petition Date, was directed at individual reconciliation and compensation

based on the independent review by and judgement of nationally recognized fund administrators

in other multiple-victim situations.

105.    The Diocese chose Kenneth Feinberg and Camille Biros (the

"Administrators") to provide independent review and neutral administration of the IRCP.  Mr.

Feinberg is known for his work as administrator of the September 11th Victim Compensation

Fund and the Deepwater Horizon Oil Spill Trust, which resulted from the oil spill in the Gulf of

Mexico in April 2010.  He and Ms. Biros also administer similar compensation programs in the

Archdiocese of New York, the Diocese of Brooklyn and the Diocese of Pittsburgh, among

others.

106.    Through the IRCP, Bishop Barres delegated to the Administrators the

authority to investigate and evaluate claims of abuse survivors brought under the IRCP and to

offer compensation to claimants who are eligible.  The protocols of the IRCP defined the process

by which claims were to be evaluated and eligible claimants compensated. In general, claims as to the actual occurrence and extent of sexual abuse, if any, were accepted or rejected based on the weight and credibility of the evidence, as determined independently by the Administrators. Compensation decisions were made according to a number of factors, including the nature, extent and frequency of the abuse, again as determined solely by the Administrators.

107. The Diocese pledged to honor the resolutions reached by the IRCP. In contrast, an Abuse Claimant was not bound by an Administrator's eligibility and compensation determination unless the claimant chose to accept the compensation awarded. Abuse survivors were eligible to participate in the IRCP regardless of when their alleged abuse occurred. Participation in the IRCP was completely voluntary, and participation did not affect any rights of the abuse survivor unless and until he or she accepted compensation and signed a release. In addition, the Diocese has committed to all participants in the IRCP that their claims and associated information will remain confidential without regard to whether a resolution is reached. The participants, however, remain free to disclose or discuss their claim and/or the compensation determination of their own claim.

108. As a condition of accepting the compensation offer determined by the Administrators, abuse survivors under the IRCP were required to sign a release. The release states that the abuse survivor waives all claims or potential claims of sexual abuse against the Diocese and any related entities. Before signing releases, all abuse survivors were required to consult with an attorney selected by the abuse survivor, or, if requested by the abuse survivor, an attorney provided by the Administrators free of charge.

109. As of September 29, 2020, 445 abuse claimants filed claims and a total of about 350 of them accepted compensation totaling approximately $62 million, with about 25

claims still being processed as of the Petition Date and 18 outstanding determinations. The Diocese paid compensation to every claimant who was deemed eligible by the Administrators and who accepted the compensation offered and submitted a signed release prior to the Petition Date.

## IV.   EVENTS LEADING TO THE FILING: THE NEW YORK CHILD VICTIMS ACT

### A.   The New York Child Victims Act

110.   On February 14, 2019, New York Governor Andrew Cuomo signed New York Senate Bill S.2440, known as the Child Victims Act (the "CVA"), into law.  The CVA extends the statute of limitations under which certain criminal and civil actions arising out of the sexual abuse of minors may be brought.  The CVA also revives certain previously time-barred causes of action.

111.   Specifically, the CVA amends the statute of limitations for bringing civil actions against any party whose intentional or negligent acts or omissions are alleged to have resulted in the commission of child sexual offenses.  Such actions must now be commenced on or before the plaintiff reaches the age of 55.  The CVA also revives all civil actions that allege child sexual offenses that were time-barred as of February 14, 2019, the date the bill was signed into law (the "Effective Date").  The CVA originally provided that revived actions may be commenced during the twelve-month period that runs from six months after the Effective Date (i.e., August 14, 2019) to eighteen months after the Effective Date (i.e., August 14, 2020).  On August 3, 2020, Governor Cuomo signed New York Senate Bill S.7082 into law, which extends the window for bringing revived actions by one year (i.e., until August 21, 2021).

### B.   Insurance Assets of the Diocese

112.   As a consequence of the CVA's passage, claims of sexual abuse that allegedly occurred decades ago have now been asserted against the Diocese, Ministry Members

and persons working for or otherwise affiliated with and under the authority of the Diocese
and/or Ministry Members.  The Diocese has acted to identify and preserve insurance policies in
effect when such abuse allegedly occurred, including, at various points, primary and excess
insurance policies.

113.   In the period leading up to the effective date of the CVA, the Diocese
expended substantial effort to pull together insurance policies and secondary evidence of
insurance coverage from the late 1950s to the present. Due to the passage of time and the
disposal of documents in the ordinary course of business, several documents regarding coverage
were no longer available in the files. Accordingly, among other measures, the Diocese engaged
insurance coverage counsel at Reed Smith to assist the Diocese in finding relevant insurance
policies covering what are in many cases decades-old claims. Among the sources searched in
connection with this effort were court dockets for litigation between the Diocese and Royal
Insurance Company in the early 1990s, which is how the Diocese was able to uncover pertinent
insurance policies issued by this carrier from approximately 1960 to 1976.

114.   During the periods prior to September 1, 1976, Royal Indemnity Insurance
(now known as Arrowood Indemnity Company, "Royal") provided general liability coverage,
including primary and excess coverage, to the Diocese and the Ministry Members (the "Royal
Period").  Following the Royal Period and continuing up to September 1, 1986, the Diocese
purchased insurance coverage, including primary and excess insurance coverage, for itself and
the Ministry Members from a syndicate of insurers known as the "London Market Insurers,"
with various other insurers, including Interstate Fire & Casualty Company, an indirect subsidiary
of Allianz Global Risks U.S. Insurance Co., providing excess coverage as well (the "Bishop's
Program Period").  Critically, in many of these coverage years, there were no aggregate policy

limits, exposing certain insurers to unlimited aggregate liability for claims arising during those

years. For claims alleging sexual abuse that took place after September 1, 1986, coverage is

provided by the Diocese's captive insurer, Ecclesia, as described above.

115.    On February 19, 2019, the Diocese sent notice to its various insurers of all

reported sexual abuse claims that had been time-barred prior to the CVA's effect date.  These

claims, which included claims made in the IRCP, alleged abuse that dated back to as early as

1946.  The Diocese has continued to provide notice of all additional reported claims since the

original notices.

116.    In addition, the Diocese has provided notice to its various insurers of all

cases commenced on or after August 14, 2019 (as well as two cases commenced previously and

stayed until that date).  For claims alleging abuse during the Royal Period, the Diocese has

requested that Royal honor its obligation to reimburse the Diocese's defense costs.  The Diocese

similarly has invoked its rights and requested that the London Market Insurers honor their

obligation to reimburse the Diocese's defense costs for claims alleging abuse during the Bishop's

Program Period, to the extent that the applicable self-insured retention has been met.

117.    However, as of the time of this motion, despite ongoing discussions with

the Diocese, the Diocese's insurers have reserved their rights and have not agreed to indemnify

the Diocese for any liability determinations.  While the Diocese's insurers have in some cases

agreed to reimburse the Diocese's defense costs, these reimbursements have been far below the

amounts to which the Diocese is entitled under the policies.

118.    Because the Diocese and certain insurers have not reached a resolution of

certain disputes, the Diocese is filing an adversary proceeding in this case against certain of the

Diocese's insurers seeking, among other things, a declaratory judgment with respect to the

Diocese's rights and the insurers' obligations under such insurance policies for the benefit of the abuse survivors.

119.    The Diocese believes that there is substantial value in the insurance policies that it purchased over many decades. These assets are an important resource to further the Diocese's goals of compensating and reconciling with abuse survivors.

120.    Concurrently with this Declaration, the Diocese has filed an application to retain Reed Smith as its coverage counsel. The Diocese seeks to engage coverage counsel to assist and advise it in protecting, pursuing and enforcing its rights to recover from its insurance assets. Further detail regarding the work and reputation of Reed Smith is set forth in the application.

## C.    Independent Review of Significant Transactions

121.    To fulfill its obligations as a debtor in possession in the above-captioned chapter 11 case, the Diocese has appointed an independent committee (the "Independent Advisory Committee") to review certain transactions between the Diocese and the Diocese Affiliates outside the ordinary course of administration and support that the Diocese provides to the Diocese Affiliates. Specifically, the Independent Advisory Committee was charged with reviewing all such transactions in excess of $2.5 million that occurred on or after January 1, 2014 (the "Affiliate Transactions").

122.    Because the Affiliate Transactions took place between affiliates, they are subject to a conflict analysis, which the Diocese has addressed as a governance matter meriting independent review. Bishop Barres delegated to the Independent Advisory Committee his authority to determine whether there are colorable claims related to any given Affiliate Transaction and, if so, to pursue recovery and resolution on behalf of the Diocese.

123.    The Independent Advisory Committee identified the following Affiliate
Transactions for its review:  (i) the Cemetery Transaction; (ii) the January 2017 transfer of the
real property parcel located in Huntington, New York to Seminary Corporation; (iii) the
September 2017 transfer of assets, operations and liabilities of the Diocesan high schools to the
Department of Education; and (iv) the 2018 transfer of $3 million to the Catholic Foundation.

124.    The Independent Advisory Committee consists of three members, each
having an impeccable reputation and well-recognized experience in bankruptcy, investigations
and restructuring.  The members of the Independent Advisory Committee are:  (1) Arthur J.
Gonzalez, formerly Chief Judge of the U.S. Bankruptcy Court for the Southern District of New
York and currently Senior Fellow at New York University School of Law and a member of the
Financial Oversight and Management Board for Puerto Rico; (2) Melanie L. Cyganowski,
formerly Chief Judge of the U.S. Bankruptcy Court for the Eastern District of New York and
currently a partner at Otterbourg, P.C. in New York; and (3) Harrison J. Goldin, a Senior
Managing Director at Goldin Associates, LLC,[21] formerly the Comptroller for the City of New
York.  Mr. Gonzalez chairs the Independent Advisory Committee.

125.    The members of the Independent Advisory Committee are compensated
on a monthly, fixed-fee basis for their services, but with an hourly or per diem amount for
extraordinary services, such as days in mediation, testimony, depositions or preparation for the
same.  The monthly fixed fees are $25,000 to the chair and $20,000 to the two other members.

126.    The Independent Advisory Committee has been in place since May 2019.
It has retained its own professionals.  The Independent Advisory Committee and its advisors
have had access to over 220,000 documents, consisting of Diocese records, such as minutes,

---

[21] On August 24, 2020, Goldin Associates was acquired by Teneo.

financial statements, reports and other materials prepared for the Finance Council of the Diocese.

Such documentation includes emails relevant to Affiliate Transactions of key Diocese personnel,

including the current and former bishops, the Chief Operating Officer, the Chief Financial

Officer, the Director of Communications, and others.

127.    The Independent Advisory Committee has had access to Diocese

personnel and their full cooperation, including interviewing Bishop Barres, Bishop Murphy, the

Diocese's Chief Financial Officer, the Diocese's Chief Operating Officer, and the Diocese's

Director of Risk Management.

128.    The Independent Advisory Committee has access to me, my firm and

other advisors to the Diocese, primarily for confirmation of facts (i.e., cash movements,

holdings, accounts).  To date, I have participated in at least five meetings and calls with the

Independent Advisory Committee or their advisors.  The Independent Advisory Committee also

has had access to the analysis of operations and treasury review conducted by me and my firm.

Neither my firm nor Jones Day was engaged or otherwise retained by the Diocese at any time

before Fall 2018, and neither had any role in any of the Affiliate Transactions.

**D.    Operational Review and Cost-Savings Measures**

129.    Beginning in 2019, the Diocese undertook a strategic review, with A&M's

assistance, of its operations.  This review focused on opportunities to enable the Diocese to

operate more efficiently and save costs.  The Diocese was motivated by its twin goals of

providing compensation and support to abuse survivors and continuing its ministry to the faithful

and the needy on Long Island.

130.    The Diocese has considered and implemented many cost-saving initiatives

pursuant to this review of its operations.  The first phase of implementation, which began in

October 2019, has resulted in an average annual savings of $3.5 million.  These initiatives

include:  (i) transitioning financial support of a retirement home for priests to the Priests'

Benefits Plan; (ii) eliminating financial support to the Department of Education; and (iii)

reducing the financial support given to Catholic Faith Network.

131.    Implementation of a second phase of initiatives began in August 2020.

This second phase has required even deeper budget cuts and is expected to result in an average

annual savings of $5.0 million.  Initiatives implemented in the second phase include a reduction

in the size of the Dioceses' administrative office workforce, and transitioning certain costs

related to the care of priests to the Priests' Benefits Plan.

132.    Despite already implementing significant cost reduction measures, the

Diocese's net assets are anticipated to further deteriorate in light of the impact of COVID-19 and

the ongoing and increasing expenses of the CVA litigation, addressed in more detail below.

**E.      Revived Abuse Cases and Resolution of Litigation**

133.    As anticipated by the CVA, the Office of Court Administration (the

"OCA") of the New York State Unified Court System (the "New York Courts") adopted rules

that govern the administration of all cases commenced under the CVA.  *See* N.Y. COMP. CODES

R. & REGS. tit. 22, § 202.72 (entitled "Actions Revived Pursuant to CPLR 214-g") (effective July

31, 2019).  Section 202.72 provides for an aspirational timeline that includes, among other

things, a preliminary conference within 30 days of filing of a Request for Judicial Intervention

("RJI") and completion of discovery within one year after the conference.  *Id.*  On August 13,

2019, the Hon. Lawrence K. Marks, Chief Administrative Judge of the New York Courts, stated

in a press release that all such cases were to be immediately assigned, based on region, to one of

five judges for pretrial proceedings, including conferences and motions.[22]  All cases filed in the

Tenth Judicial District, which comprises Nassau and Suffolk counties, together with cases filed

in Ninth Judicial District, which comprises Westchester, Putnam, Duchess, Orange and Rockland

counties, were assigned to Justice Steven M. Jaeger.  All cases filed in New York City were

assigned to Justice George Silver, Deputy Chief Administrative Judge for the New York City

Courts.

134.    Starting on August 14, 2019, civil actions were commenced against the

Diocese and certain Parish Corporations in the Supreme Court of the State of New York alleging

sexual abuse that, but for the passage of the CVA, would have been time barred (the "Revived

Abuse Cases").[23]  As of September 29, 2020, there have been a total of 223 cases filed against

the Diocese, with 194 filed in the Ninth and Tenth Judicial Districts, 28 in the New York City

CVA regional court and one case removed to federal district court.  In many of these cases, the

plaintiffs sought to proceed anonymously.

135.    In September, 2019, given the high number of cases (46) then pending

against the Diocese before Justice Jaeger in the Ninth and Tenth Judicial Districts (and which

have since quadrupled), the Diocese sought, pursuant to CPLR 602, an order providing for pre-

trial proceedings in all of the CVA actions in which the Diocese is named as a defendant.  The

court granted the Diocese's motion on November 19, 2019, issuing a Case Management Order

("CMO"), "applicable to all cases filed pursuant to CPLR 214-g where the Diocese is a named

---

[22]  *See* New York Courts, Hon. Lawrence K. Marks, "New York State Courts Prepare for Influx of Cases as Key Provision of New York's New Child Victims Act Takes Effect," Press Release dated August 13, 2019, *available at* https://ww2.nycourts.gov/sites/default/files/document/2019-09/PR19_18.pdf (last visited August 27, 2019).

[23]  There were 2 cases commenced before August 14, 2019.  Upon consent of the plaintiffs, those cases were stayed until August 14, 2019, except with respect to a motion filed by the plaintiffs, which the plaintiffs later withdrew.

party-defendant in the Ninth and Tenth Judicial Districts."[24]  The CMO states that "[i]t is in the interest of justice to encourage and bring about the fair, expedient and inexpensive resolution of these cases."  The CMO provides for "coordination of motions practice," as well as discovery and pretrial conferences, among other procedures to streamline the administration of all the cases.

136.    In accordance with the CMO, the Diocese filed two separate motions to dismiss pursuant to CPLR 3211(a)(5) and (a)(7); first on November 12, 2019, in 44 cases, and second on January 10, 2020, in 22 cases.  Each of the motions to dismiss raise the identical issue of whether the claim revival period of the CVA violates the Diocese's right to due process of law under the New York State Constitution.  On May 11, 2020, the court denied the first motion to dismiss with respect to the constitutional arguments, however the court granted the Diocese's motions to dismiss with respect to many individual claims made across these 44 cases.  Based on the court's rulings, plaintiffs in additional cases that were not subject to the motions to dismiss have agreed to drop individual claims similar to those for which the motions to dismiss were granted.

137.    On May 29, 2020, the Diocese appealed Judge Jaeger's denial of the Diocese's motions to dismiss to the Supreme Court of the State of New York, Appellate Division Second Judicial Department (the "Appellate Division").  These appeals remain pending before the Appellate Division, however, on September 21, 2020 the Diocese's request that the cases be stayed pending the outcome of the appeal was denied.

138.    There are also currently 28 cases pending before Justice Silver as the CVA regional court for all of the boroughs in New York City.  Justice Silver entered Case

---

[24] *ARK3 DOE v. Diocese of Rockville Centre a/k/a The Roman Catholic Diocese of Rockville Centre, New York, et al.*, No. 900010/2019, Case Management Order (N.Y. Sup. Ct. Nov. 19, 2019).

Management Order No. 1 on February 24, 2020. Pursuant to that case management order on May 8, 2020 the Diocese moved to dismiss those CVA cases on substantially the same constitutional and other grounds as in the proceedings before Justice Jaeger. The case management order in the New York City CVA regional court provides for a stay of discovery while those motions to dismiss are pending.

139.     During the course of the CVA litigation process, and subject to reasonable confidentiality agreements, the plaintiffs through their lead counsel had access to vast amounts of information including: (i) insurance policies in effect over a period of approximately 50 years; (ii) six years of financial records reflecting the financial condition of the Diocese, including its assets and liabilities; (iii) six years of financial records respecting the Diocese's dealing with the Ministry Members; and (iv) financial records of the Diocese's cash management and collections practices. I also made a presentation on September 21, 2020 explaining financial information contained in the Diocese's document productions to the plaintiffs' counsel responsible for approximately 75 percent of the CVA cases against the Diocese.

140.     This access and exchange of information was effected through the electronic production of over 13,000 pages of documents, which were complete and well organized for review by counsel to the plaintiffs. The Diocese is committed to financial transparency as well as transparency on its mandates respecting zero tolerance, protection of children and reconciliation and compensation to abuse survivors. The data room(s) serve as evidence of that commitment.

## F.     The Financial Impact of the COVID-19 Pandemic

141.     The COVID-19 pandemic has provided further and extraordinary pressure on the Diocese's financial condition. The COVID-19 pandemic and resulting precautions taken to mitigate its impact have led to the closing or significantly reduced operations of all Parishes,

schools and non-essential businesses for a still-indefinite period, massive loss of jobs on Long Island and elsewhere, as well as uncertainty as to the region's overall economic prospects. The pandemic has had a particularly devastating impact on the Diocese.

142.    The Diocese receives a portion of its income from the Parishes' offertory collections. This share of the Parish's collection typically represents approximately 40% of the Diocese's annual revenue. In the second half of March 2020, after masses and other church gatherings ceased to occur due to the pandemic, the Parish offertory payments to the Diocese declined 77% compared to the first half of March. For the two week period from March 23 to April 3, 2020, the Diocese did not receive any deposits related to the Parish offertory. During the month of April 2020, despite the month containing Holy Week and Easter Sunday, with continued fundraising efforts and the availability of televised masses, the Diocese collected from Parishes only approximately $363,000, down approximately 60% from the average of the prior 10 months. Although Parish offertory payments have since recovered somewhat in a number of Parishes, for the current fiscal year through July 2020, Parish offertory collections across the Diocese are estimated to be down approximately 9 – 11% in aggregate compared to the previous fiscal year. Like many organizations impacted by the pandemic, the material drop in revenues received has placed enormous additional financial pressures on the Diocese and its Parishes and schools.

143.    At this time, the Diocese is taking steps to gradually re-open at least some of the services, while ensuring full compliance with all the governmental directives and health standards. That requires significant re-working of the customary procedures at great expense to the Diocese. The scope and the timing of re-opening will also depend heavily on local

conditions at individual Parishes and their ability to implement new protocols, especially as the situation remains fluid.

## V.     SUMMARY OF FIRST DAY MOTIONS[25]

144.    To enable the Diocese to operate effectively and to minimize adverse effects from its chapter 11 filing, the Diocese has filed, or will file upon scheduling of a further hearing by this Court, the motions and applications described below.

145.    In connection with preparing for this case, I have reviewed each of the First Day Motions referenced below.  The First Day Motions were prepared with my input and assistance, or the input and assistance of employees working under my supervision.  The information contained in the First Day Motions is accurate and correct to the best of my knowledge.  I believe that the entry of orders granting the relief requested in these motions and applications is critical to the Diocese's ability to preserve the value of its estate, succeed in its reorganization efforts, and continue to provide ministry to the faithful, Catholic education to children and charity to the community.

## A.     Debtor's Motion Pursuant to 11 U.S.C. § 105(a) and Fed. R. Bankr. P. 1015(c), 2002(m) and 9007 for an Order Implementing Certain Notice and Case Management Procedures

146.    Implementing the Case Management Procedures will maximize the efficiency of this chapter 11 case and reduce the costs associated with traditional case management procedures.  Granting the relief requested will also limit the administrative burdens and costs associated with preparing for hearings and serving and mailing documents.  In addition, the Case Management Procedures will assist the Diocese and its personnel and professionals in organizing and prioritizing the numerous tasks attendant to this case.

---

[25]  Capitalized terms used but not defined in this section have the meanings given them in the relevant First Day Motion.

Implementing the Case Management Procedures will yield significant savings to this estate and will also avoid unnecessary costs or delays.

147.    This chapter 11 case will be complex and will move quickly.  As a result, the demands on the Diocese and its personnel and professionals are great.  In addition to performing their ordinary duties, the Diocese's personnel now carry the substantial additional burdens imposed by this chapter 11 case.  The Case Management Procedures, by authorizing the Diocese to schedule omnibus hearing dates and by establishing clear timelines for the filing of Court papers, will assist the Diocese's management and professionals (and, indeed, all parties in interest) in organizing their time and directing the attention of their personnel to issues raised by this chapter 11 case.

148.    The Diocese anticipates that hundreds of interested parties may request service of Court papers in this chapter 11 case.  Consequently, service by e-mail by the Core Parties is the most efficient, cost-effective method for service.  To serve the Diocese's hundreds of creditors with each Motion could easily cost the Diocese tens of thousands of dollars in printing, mailing and service costs.  In comparison, the cost of e-mail service is de minimis.  Considering the vast number of Court papers that are likely to be filed and served in this chapter 11 case, the process proposed herein will save this estate significant amounts of money.

149.    Pursuant to the Case Management Procedures, hearings shall be conducted only when necessary to the resolution of disputes between the Diocese and third parties.  This process will reduce the administrative burdens and costs to the estate associated with preparing for and attending hearings, and will minimize the burden on the Court.  The Case Management Procedures, by authorizing the Diocese to maintain a Case Website and employ the Claims and Noticing Agent, will also preserve the Diocese's goodwill by providing a vehicle to keep

interested parties informed of the restructuring process by providing easy and affordable access to information.

**B.      Debtor's Motion for an Order Authorizing the Debtor to (I) Pay Prepetition Employee Wages, Salaries, Benefits and Other Related Items; (II) Reimburse Prepetition Employee Business Expenses; (III) Continue Employee Benefit Programs; and (IV) Continue Such Programs in the Ordinary Course**

150.     As of the Petition Date, the Debtor employed approximately 160 full-time and 28 part-time employees (each an "Employee" and collectively, the "Employees"), including members of clergy.  Approximately 61 of the Employees are non-exempt employees and approximately 127 are exempt employees.  In addition, the Debtor also utilizes the services of certain independent contractors and temporary employees (collectively, the "Contractors").

151.     In the summer of 2020, the Debtor undertook a series of cost-savings measures focused on its internal organization.  Among these measures were a reorganization of certain departments and headcount reductions, which reduced the size of the Debtor's workforce by 17 employees.  The Debtor anticipates that these actions, along with other cost savings measures, will result in approximately $5 million in annual savings, of which approximately $1.2 million is related to headcount reductions.  As a result of the headcount reductions, the Debtor estimates that it incurred approximately $203,000 in potential state and federal unemployment insurance obligations (the "Unemployment Obligations"), depending on the length of time the impacted individuals remain unemployed.

152.     The Employees and Contractors perform a variety of critical functions for the Debtor, including administration of programs essential to the Debtor's charitable, religious and educational mission and a variety of services related to finance, legal, corporate governance and human resources.  The Employees and Contractors also provide administrative services to affiliates of the Debtor in exchange for reimbursements pursuant to administrative services

agreements.  The Employees' and Contractors' skills, along with their knowledge and

understanding of the Debtor's operations and infrastructure are essential to the effective

operation of the Debtor's ministry.  Disruption of the Employees' and Contractors' continued

services would jeopardize the Debtor's efforts to reorganize.

153.   Any interruption in payment of the Employee Obligations will impose

additional hardship on Employees and Contractors and is certain to jeopardize their continued

performance during this critical time.  As of the Petition Date, many Employees and Contractors

may be owed or have accrued various sums for wages, salaries, various employee benefits,

contractual compensation and other accrued compensation and related costs and expenses

(collectively, the "Prepetition Employee Compensation"), unreimbursed and unpaid prepetition

Business Expenses (collectively, the "Prepetition Business Expenses") and certain payroll

deductions as described below.

154.   ***Compensation and Prepetition Deductions***.  The Debtor pays the

Employees' wages semimonthly.  The Employees accrue additional compensation through the

Benefits Programs described below.  The Debtor estimates that its Employee compensation costs

total approximately $1.3 million per month.

155.   The compensation for the Employees hired on or after July 1, 2009 is paid

semimonthly on a two week delay.  The compensation for the Employees hired before that date

is paid on a current basis, meaning that their semimonthly pay includes accrued compensation up

to and including the date of the payroll issuance.  The Debtor makes employer contributions

earned by the Employees to the various Benefits Programs monthly at the same times as the

second payroll payment of each month.  The Debtor makes certain deductions from the

Employees' paychecks for the purpose of (a) making payments on behalf of the Employees in

connection with, among other things, the Benefit Programs; (b) garnishing Employee wages

pursuant to court orders, including for tax levies, child support obligations and spousal support

obligations; and (c) remitting, on the Employees' behalf, various federal, state, or local income,

Social Security, Medicare/Medicaid, and other taxes to the appropriate taxing authority ((a)

through (c), collectively, the "Prepetition Deductions").  The Debtor must then match the

withheld amounts from its own funds for Social Security and Medicare taxes and pay, based on a

percentage of gross payroll, additional amounts for federal and state unemployment insurance

(collectively, the "Employer Payroll Taxes").  The Debtor also makes payments to Contractors

and staffing agencies on account of their Contractors for the Contractors' services.

156.    The Debtor estimates that the Prepetition Employee Compensation and

Prepetition Deductions total $884,000 and $77,000, respectively, as of the Petition Date.  Of

these amounts, the Debtor estimates that $36,000 of Prepetition Employee Compensation and

$4,000 of Prepetition Deductions are attributable to insiders of the Debtor.  The Debtor believes

that the amount of Prepetition Employee Compensation owing to or on account of any particular

Employee will not exceed $13,650.

157.    ***Business Expenses***.  In the ordinary course of its business, the Debtor

reimburses Employees and Contractors for certain reasonable and customary expenses

necessarily incurred in the scope of their service to the Debtor (collectively, the "Business

Expenses").  Reimbursement for work travel, including prison ministry and other field ministry

programs, comprise the majority of the Business Expenses.  To obtain reimbursement of

Business Expenses, an Employee or Contractor is required to submit receipts in an electronic

expense report for approval through accounts payable.  In addition, the Debtor has arrangements

with a number of financial institutions to issue corporate credit cards to Employees for Business

Expenses.  These credit card arrangements are described in detail below.  Employees and Contractors are similarly required to submit expense reports and obtain approval for Business Expenses paid with the corporate credit cards.

158.    In the aggregate, the Debtor's Employees and Contactors incur, on average, approximately $33,000 per pay period in Business Expenses.  Although the Debtor requests that the Employees and Contractors submit reimbursement requests promptly, there is inevitably some lag time between the incurrence of a Business Expense and processing the Debtor's reimbursement thereof.  Based on historical figures, the Debtor estimates that it owes approximately $49,000 on account of Prepetition Business Expenses.

159.    ***The Benefit Programs***.  The Debtor provides administrative support for and participates in the Benefit Plans, which are described in detail above.  The Debtor acts as contribution agent for the Benefit Plans, collecting contributions from all participants and remitting them to the plan trusts or paying plan-specific administrative expenses.  The Debtor maintains five segregated bank accounts for this purpose (the "Contribution Agent Accounts"), one for each Benefit Plan, in order to ensure that contributions from participants are not comingled with contributions to other Sponsored Plans or funds of the Debtor.  The Debtor also acts as paying agent for the Employees' Benefits Program, receiving funds from the Employees' Benefits Program trust and using those funds to pay covered benefits.  The Debtor maintains a segregated bank account for this purpose (the "Paying Agent Account" and, collectively with the Contribution Agent Accounts, the "Agent Accounts").  The Debtor also maintains various other benefit programs for its Employees, including the following:  (a) health, dental, life and disability insurance benefits provided under the Benefit Plans; (b) COBRA benefits; (c) paid time off; (d) severance; (e) housing for priests; and (d) various other benefits.

160.    Priests' Pension Plan.  The Diocese administers and participates in the Priests' Pension Plan, which is described in detail above.  The Debtor contributes approximately $26,000 per month to the Priests' Pension Plan as an element of the total compensation of priests who are Employees.  This represents approximately 15.7% of the total contributions to the Priests' Pension Plan by the Debtor and Participating Employers.  The Debtor estimates that, as of the Petition Date, it owes $31,000 in Prepetition Employee Compensation on account of the Priests' Pension Plan.

161.    Priests' Benefits Plan.  The Diocese administers and participates in the Priests' Benefits Plan, which is in detail described above.  The Debtor pays approximately $20,000 per month on account of the Priests' Benefits Plan as an element of the total compensation of priests who are Employees.  This represents approximately 15.7% of the total contributions to the Priests' Benefits Plan by the Debtor and Participating Employers.  The Debtor estimates that, as of the Petition Date, it owes $23,000 in Prepetition Employee Compensation on account of the Priests' Benefits Plan.

162.    Employee Retirement Plans.  The Diocese administers and participates in the Employees' Pension Plan and the 403(b) Employees' Retirement Plan, each of which are described in detail above.  As an element of the total compensation of its Employees, the Debtor contributes approximately $59,000 per month to the Employees' Pension Plan and approximately $34,000 per month to the 403(b) Employees' Retirement Plan.  These contributions represent approximately 0.7% and 3.4%, respectively, of the total contributions to these plans by the Debtor, participating employees and Participating Employers.  The Debtor estimates that, as of the Petition Date, it owes $112,000 in Prepetition Employee Compensation on account of the Employees' Pension Plan and 403(b) Employees' Retirement Plan.

163.   <u>Employees' Benefits Program</u>.  The Debtor administers and participates in the Employees' Benefits Program, which is described in detail above.  The Debtor shares the cost of premiums and administrative expenses of the Employees' Benefits Program with participating Employees and Participating Employers.  The Debtor's share of such costs and expenses is approximately $190,000 per month, or approximately 6.3% of the total.  The Debtor estimates that, as of the Petition Date, it owes $228,000 in Prepetition Employee Compensation on account of the Employees' Benefits Program.

164.   <u>Housing for Priests</u>.  The Debtor provides a housing benefit (the "<u>Housing Benefit</u>") for priests who are Employees of the Diocese to live in parish rectories.  The Housing Benefit pays $500 per month for each participating priest, which is the monthly rent for a priest living in a parish rectory.  The amount is paid directly to parishes on behalf of the participating Employees.  The Debtor estimates that, as of the Petition Date, it owes $24,000 in Prepetition Employee Compensation on account of the Housing Benefit for Employees.

165.   <u>Severance</u>.  The Debtor maintains a severance program for all of its full-time Employees.  Pursuant to the program, the Debtor provides Employees who are terminated in certain covered circumstances with one weeks' pay for each full year of service, subject to a minimum of four weeks' pay.  The Debtor estimates that it owes $4,300 in Prepetition Employee Compensation on account of the severance program related to terminations that occurred prior to the Petition Date.

166.   <u>COBRA</u>.  Pursuant to the Consolidate Omnibus Budget Reconciliation Act of 1985, the Debtor offers eligible former employees the opportunity to elect to continue insurance coverage under certain of the insurance plans maintained by the Debtor (the "<u>COBRA Benefits</u>").  Following eligible employee termination, such former employees are billed directly

and are solely responsible for payment of premiums.  As of the Petition Date, the Debtor does

not believe that it owes any accrued and unpaid amounts in respect of the COBRA Benefits,

apart from *de minimis* costs associated with the administration thereof.

167.    <u>Paid Time Off</u>.  The Debtor provides certain Employees with various

types of paid time off ( "<u>Paid Time Off</u>"), including (a) a number of paid vacation days (the

"<u>Vacation Days</u>"), (b) paid holidays, and (c) paid personal and sick time (the "<u>Sick Time</u>").  The

Vacation Days accrue each month and up to two years of unused Vacation Days may be rolled

over from one calendar year to the next.  At the end of a calendar year, any unused Vacation

Days in excess of this cap are automatically converted into Sick Time.  When an Employees

retires or is terminated, the Debtor's policy is to pay that Employee for all accrued but unused

Vacation Days.  Additionally, when an Employee retires, if that Employee has at least ten years

of service and 60 or more days of accrued but unused Sick Time, the Debtor pays that Employee

for half of their accrued Sick Time, up to a maximum of 30 days.  The Debtor estimates that, as

of the Petition Date, the total value of the Paid Time Off accrued by Employees but not yet used

is $1,629,000.

168.    <u>Training for Clergy</u>.  The Debtor is responsible for the formation of

clergy, which it accomplishes in part through educational sponsorship of seminarians studying to

become priests, individuals studying to become deacons and continuing education for priests and

deacons.  Providing for the training of priests and deacons is critical to the Debtor's ability to

continue its mission.  This sponsorship includes the payment of tuition, and, in some cases, room

and board (the "<u>Tuition Payments</u>").  As of the Petition Date, there were approximately 30

seminarians studying at a number of universities under the sponsorship of the Diocese, along

with smaller numbers of priests, deacons and individuals studying to become deacons.  The

Debtor estimates that, as of the Petition Date, it owes approximately $164,000 on account of

Tuition Payments.  The vast majority of this amount represents payments invoiced, but not yet

due, for the Fall 2020 semester, which is in progress as of the Petition Date.  If the Tuition

Payments are not made, the seminarians and others may be unable to continue attending classes.

The Debtor expects that the Tuition Payments for the Spring 2021 semester will total

approximately $450,000.

169.    Benefits for Diocesan Priests.  The Debtor provides other benefits to

clergy assigned within the territory of the Debtor, including treatment for addiction, including

stays at an outpatient treatment center, and sponsorship of sabbaticals.  As of the Petition Dater,

there were no clergy in addiction treatment centers sponsored by the Debtor and no clergy on

sabbatical sponsored by the Debtor.

170.    ***Costs and Expenses Incident to the Foregoing***.  The Debtor accrues

certain costs and expenses (the "Payroll Costs") attendant to its compensation and benefit

programs, including (a) payments to ADP, Inc., which provides payroll and other services, (b)

payments to its insurance providers, (c) the Employer Payroll Taxes, including the

Unemployment Obligations, and (d) other charges for administration of the Prepetition

Employee Compensation, Prepetition Deductions and Benefit Programs.  The Debtor's payments

to ADP, Inc. include payroll processing costs for itself and participants in the Sponsored Plans.

The Sponsored Plans, in turn, reimburse approximately 73% of this processing cost.  By having

all participants in the Sponsored Plans use a single payroll provider, the Debtor's costs of

administering the Sponsored Plans are reduced.  If participants in the Sponsored Plans were to

use different payroll processors, administration would be impractical.  The Debtor estimates that

there are approximately $170,000 Employer Payroll Taxes, excluding the Unemployment

Obligations, that were accrued but unpaid as of the Petition Date.  The Unemployment

Obligations are payable over a period of up to 26 weeks, and the total amount of such obligations

depends on the length of time impacted individuals remain unemployed.

171.    The Debtor estimates that the aggregate amount of Payroll Costs accrued

but unpaid as of Petition Date (the "Prepetition Payroll Costs"), is approximately $183,000 plus

up to $203,000 in Unemployment Obligations.  Payment of the Prepetition Payroll Costs is

necessary because the failure to pay any such amounts might disrupt services provided by

third-party providers with respect to payment of Employee compensation, deductions related to

the same and Benefit Programs.

**C.    Debtor's Motion for Interim and Final Orders Establishing Adequate Assurance
        Procedures With Respect to Debtor's Utility Providers**

172.    The Diocese currently uses various types of utility services, including, but

not limited to, electric, phone and telecommunications, water, waste, and other similar utility

services (collectively, the "Utility Services") provided by, among others, the utility companies

identified on Exhibit C to the utilities motion (the "Utility Companies").   The Diocese estimates

that its average total monthly obligations to the Utility Companies on account of services

rendered is approximately $25,454.

173.    The Utility Companies provide services essential to the Diocese's

operations.  As such, any interruption in Utility Services could prove damaging.  Any disruption

in this service would disrupt an essential element of the Diocese's organization.  Temporary or

permanent discontinuation of Utility Services could irreparably disrupt the Diocese's operations

and fundamentally undermine the Diocese's efforts in this chapter 11 case.

174.    Section 366(c)(2) of the Bankruptcy Code requires the Diocese to provide

the Utility Companies with adequate "assurance of payment" within thirty days of the

commencement of this chapter 11 case to prevent a utility from altering, refusing or

discontinuing a Diocese's utility service.  The Diocese proposes to satisfy the requirement to

provide "adequate assurance" in two ways.

175.    *First*, the Diocese intends to pay any postpetition obligations to the Utility

Companies in a timely fashion and in the ordinary course, as it has substantially done prior to the

Petition Date.

176.    *Second*, the Diocese also proposes to deposit, as adequate assurance of

payment, approximately $11,748, equal to two weeks of the Diocese's average cost of services

for the Utility Services, into a segregated, interest bearing account (the "Adequate Assurance

Deposit") within 20 days of the Petition Date.  The Diocese estimates that the proposed

Adequate Assurance Deposit is sufficient under the circumstances, particularly in light of any

prepetition deposits, letters of credit, surety bonds or other similar forms of adequate assurance

already provided to the Utility Companies.

**D.     Debtor's Motion for Entry of an Order Authorizing the Debtor to Continue Its
         Insurance Programs and Pay Related Obligations**

177.    ***Protected Self Insurance Program and Ecclesia.***  The Debtor has

implemented an insurance program as a means of ensuring that the Debtor and certain other non-

debtor related entities (collectively, the "Insured Parties") are protected by adequate insurance

coverage at a reasonable price.  The Debtor accomplishes this in part by spreading risk among a

large number of participants and leveraging their collective buying power to secure coverage at

favorable rates.  Although the Debtor's insurance program was originally designed and styled as

a self-insurance program, over time it has transitioned such that the vast majority of the

insurance now obtained through and administered by the Protected Self Insurance Program is

provided by third-party insurers.

178.    Under the Protected Self Insurance Program, the Debtor coordinates and administers an insurance program providing coverage and risk management services for itself and each of the Insured Parties.  The Protected Self Insurance Program currently secures coverage for the following categories of insurance: (i) workers' compensation, (ii) property, (iii) boiler and machinery; (iv) general liability, (v) automobile liability and physical damage; (vi) crime; (vii) directors' and officers' liability; (viii) employment practices liability; (ix) employee benefits liability; (x) professional liability; (xi) medical professional liability; (xii) sexual abuse liability; (xiii) fiduciary liability; (xiv) student accident; (xv); cyber; and (xvi) life insurance for priests (the "Insurance Policies").  Maintaining such insurance coverage is essential to preserve the value of the Debtor's estate.  In some instances, the insurance coverage must be maintained as required by various laws, regulations or contracts.[26]

179.    The Protected Self Insurance Program is funded by the Debtor and the Insured Parties.  Assessments to cover the costs of providing insurance coverage under the Protected Self Insurance Program are collected from each of the Insured Parties, including the Debtor (the "Assessments").  The Assessments are calculated in coordination with the Debtor's broker, Porter & Curtis (discussed further below), using allocation methodologies that take into account several variables, including, among other things, replacement values by construction type, square footage, payroll, and automobile count by type.  In calculating each Insured Party's contribution to the Assessments, the Protected Self Insurance Program strives to achieve a fair and consistent allocation of costs among the Insured Parties.  The Protected Self Insurance

---

[26] As described in this Declaration, prior to the Petition Date, the Protected Self Insurance Program funded expenses relating to (i) the Independent Reconciliation and Compensation Program, (ii) the care for those who suffered clergy sexual abuse, (iii) the Diocesan Child Protection Policy, (iv) the annual expenses of audits by StoneBridge Business Partners, an outside expert, of the Debtor and Insured Parties to ensure compliance with the Charter for the Protection of Children and Young People established by the U.S. Conference of Catholic Bishops;  and (v) investigations, including responding to the Attorney General inquiries.

Program collects Assessments from the Insured Parties in a segregated account on a monthly

basis.  Such Assessments are used to pay the expenses of the program.

180.   In fiscal year 2019, ended August 31, 2019, program revenues amounted

to $14.6 million.  Of those revenues, $13.9 million were sourced from the Assessments, with the

remaining $0.7 million derived from investment income realized by the Protected Self Insurance

Program.  The Debtor funded 1.5% of such Assessments.  If there are surplus funds remaining at

the end of a fiscal year after payment of all costs and expenses related to the Protected Self

Insurance Program, such surplus funds remain in separate accounts and are held for the benefit of

the Debtor and the Insured Parties and used to offset future obligations under the program.

181.   The Debtor also owns a captive insurance company known as Ecclesia.

Ecclesia is a property and casualty insurance company that, in coordination with the Protected

Self Insurance Program, insures certain risks for the Debtor and the Insured Parties.  It is a

separate corporation that is wholly-owned by the Debtor.  Ecclesia was incorporated in New

York in December 2003.  The company is a licensed insurer and is subject to the supervision of

the New York State Department of Financial Services.

182.   ***Self-Insured Retention and Policy Limits.***  In the past, the Protected Self

Insurance Program was responsible under the property and liability policies for paying self-

insured retention ("SIR") claim payments for the Debtor and all Insured Parties from the

Assessments and the buildup of retained funds.  In order to reduce the risk of claims variance and

quantify premium amounts, the Debtor obtained a policy from Ecclesia on November 1, 2019

that covers the SIR obligations of the Protected Self Insurance Program for claims occurring on

or after November 1, 2019.[27]  Under the policy, the Protected Self Insurance Program pays the

---

[27] The Ecclesia SIR policy does not cover SIR payments associated with the Debtor's insurance coverage for sexual abuse claims described below.  Similarly, the Ecclesia SIR policy does not cover the $5,000 SIR associated with

SIR and then receives reimbursement of the SIR payment from Ecclesia on a monthly basis.  The

insurance provides the Debtor with first-dollar coverage for SIR payments that may be due and

payable for claims occurring on or after November 1, 2019.  The Debtor retains the SIR liability

prior to November 1, 2019 for (i) claims already made and in-process and (ii) general liability

and auto claims that were incurred but not yet reported.

183.    If the Protected Self Insurance Program does not make SIR payments for

claims occurring before November 1, 2019, the Protected Self Insurance Program may

jeopardize insurance coverage for the Debtor and the Insured Parties for amounts above the

SIR.[28]  As a consequence, receiving court authorization to continue to make such SIR payments

in the ordinary course of business is an important aspect of maintaining insurance coverage for

the Debtor and the Insured Parties.

184.    As part of the Protected Self Insurance Program's insurance program, it

may advance amounts on account of claims in excess of the SIR to the Insured Parties before it

receives reimbursements on account of such amounts.  Depending on the nature of the coverage

involved, the Protected Self Insurance Program receives reimbursements from Ecclesia or from

an insurance carrier on account of such advances.  Such payment advances are generally

designed to protect properties by enabling the Debtor and the Insured Parties to engage

contractors and repair properties quickly, and thus to mitigate further damage, in the event that

payment from the insurance carrier is delayed.  In such circumstances, the Protected Self

Insurance Program may also requests interim payments from the insurance carriers to offset such

advances.  The Protected Self Insurance Program generally receives reimbursements from

---

the Debtor's insurance coverage for crime.  The Debtor chose not to pay for such coverage due to the small size of the crime coverage SIR.

[28] The Debtor reserves all rights with respect to the terms of its insurance policies.

Ecclesia and insurance carriers on account of such payments within a matter of months, and the

delay on account of such reimbursements is rarely longer than six months.[29]   The Debtor is

seeking authority to continue such payment advances as part of the Protected Self Insurance

Program's insurance program.

185.    The Debtor and the Insured Parties' insurance coverage includes a $200

million limit for property (including excess coverage).   The insurance coverage also includes a

$125 million limit for general liability and auto liability (including excess coverage).   The

insurance coverage contains separate limits for sexual abuse.   After 1986, the Debtor and the

Insured Parties generally have $15 million in aggregate sexual abuse liability coverage (this is

the total coverage amount from 1986 to date for claims made during the current policy period).

Such coverage for sexual abuse claims is subject to a $250,000 SIR and $1 million per claim

limits (including the SIR).   The Debtor is not seeking authority herein to make any payments for

SIRs associated with the Debtor's insurance coverage for sexual abuse claims.

186.    ***Insurance Program Administration.***   The Protected Self Insurance

Program employs four full-time professionals with several decades of insurance experience to

oversee the Protected Self Insurance Program's risk management programs.   The Assessments

charged to the Insured Parties include amounts necessary to cover the Protected Self Insurance

Program's operating expenses, including wages for the employees that are dedicated full-time to

the Protected Self Insurance Program's risk management program.

187.    The Protected Self Insurance Program and Ecclesia rely on the staff of the

Debtor to provide financial and technology services.   In connection with these services, the

---

[29] In rare circumstances, insurance carriers have denied coverage for claims after PSIP has advanced funds to
Insured Parties.   In such circumstances, PSIP has not sought to claw back advanced funds from the Insured
Parties.   Such denials of coverage are rare and are not expected to occur during this chapter 11 case.

Protected Insurance Program and Ecclesia each pay fees to the Debtor on a quarterly basis.  Such amounts are funded by the Assessments.

188.   The Protected Self Insurance Program and Ecclesia utilize third-party insurance brokers to assist them in purchasing appropriate coverage and administering various aspects of its risk management programs.  The Protected Self Insurance Program's third-party insurance broker is Porter & Curtis.  Ecclesia's third-party reinsurance broker is Trinity Reinsurance Intermediaries ("Trinity" and together with Porter & Curtis, the "Brokers").  In connection with these services, the Protected Self Insurance Program and Ecclesia each owe fees to the Brokers on a quarterly basis (the "Brokers' Fees").  The Brokers' Fees are funded by the Assessments.  The Debtor does not believe that any Brokers' Fees are currently due.

189.   The Protected Self Insurance Program and Ecclesia use two third-party administrators for assistance in administering various aspects of the risk management program.  The Protected Self Insurance Program and Ecclesia utilize Network Adjusters, Inc. ("Network Adjusters") for administration of workers' compensation coverage, all property and crime coverage, and for first reports of all losses.  Additionally, the Protected Self Insurance Program and Ecclesia use Claims Service Bureau of New York ("CSB") for administration of liability claims.  The Protected Self Insurance Program and Ecclesia each owe amounts to Network Adjusters and CSB based on the services provided.  Such amounts, which reflect the claim activity, are funded by the Assessments and are paid on a monthly basis.  The Debtor does not believe that any payments to Network Adjustors or CSB are currently due.

190.   The Protected Self Insurance Program and Ecclesia utilize a third-party actuary to estimate the ultimate value of unpaid claims and claim related amounts.  Ecclesia also utilizes the third party actuary to forecast projected retained claims and claim related amounts.

The actuary is Actuarial Technical Solutions ("ATS").  In connection with these services, the Protected Self Insurance Program and Ecclesia each periodically pay fees to ATS.  Such amounts are funded by the Assessments and are paid as services are rendered.  The Debtor does not believe that any payments to ATS are currently due.

191.     The Protected Self Insurance Program and Ecclesia utilize a third party auditor to produce annual audited financial statements. The auditor is Crowe LLP ("Crowe"). In connection with these services, the Protected Self Insurance Program and Ecclesia each periodically pay fees to Crowe. Such amounts are funded by the Assessments and are paid as services are rendered. The Debtor does not believe that any payments to Crowe are currently due.

192.     Ecclesia also utilizes a third-party captive manager to operate the captive and interface with regulators. The captive manager is Marsh Captive Solutions ("Marsh"). In connection with these services, Ecclesia pays fees to Marsh on a quarterly basis. Such amounts are funded by the Assessments.

193.     As of the Petition Date, the Debtor anticipates that no prepetition insurance premiums are currently due.  Director and Officer liability insurance coverage was renewed prior to the Petition Date.  The Debtor's workers' compensation coverage is expected to renew on January 1, 2021, and the Debtor's property insurance coverage is expected to renew on April 1, 2021.

194.     The Protected Self Insurance Program and Ecclesia provide a practical, cost-effective way to manage risk for the Debtor and the Insured Parties under a single, comprehensive insurance program.  If the Protected Self Insurance Program and Ecclesia are not continued, the Debtor and each of the Insured Parties will be forced to purchase separate

Insurance Policies covering each entity and their respective properties. Moreover, it is likely that the Debtor and each of the other Insured Parties would incur substantially higher costs to obtain their own individualized insurance (with or without a retention or deductible) than what they are currently assessed under the Protected Self Insurance Program. Without the broad collective risk profile provided by the Protected Self Insurance Program and Ecclesia, certain types of coverage and available coverage limits may simply not be available on an individualized basis or on commercially reasonable terms.

195.    ***Automobile Insurance and Associated Letter of Credit.*** One aspect of the Debtor's insurance coverage program is automobile liability and physical damage coverage. Prepetition, the Debtor contracted with Old Republic Insurance Company ("Old Republic") for this coverage. The Debtor and Old Republic agreed that Old Republic would issue automobile liability and physical damage insurance coverage for the statutory obligations of the Debtor and the Insured Parties. The Debtor agreed to pay Old Republic premium charges in exchange for the coverage and the Debtor effectively self-insured its statutory obligation by holding Old Republic harmless from and against all claims, losses, costs and expenses which Old Republic may incur under the automobile insurance.

196.    As part of the automobile insurance, the Debtor also agreed to provide Old Republic with a letter of credit (or other security acceptable to Old Republic) in Old Republic's favor. The issuance of the letter of credit shifts the risk of the Debtor's non-performance or non-payment. Thus, if Old Republic incurs a loss that is not reimbursed by the Debtor, Old Republic is entitled to recover the full amount of that loss from the issuing bank. This right to recovery is set forth in the automobile insurance and is a condition to issuance of the policy. In satisfaction of its obligation under the automobile insurance, the Debtor obtained such a letter of credit from

JPMorgan Chase Bank, N.A., and the Debtor has renewed the letter of credit in the ordinary course.  The letter of credit is currently secured by a Certificate of Deposit in the amount of approximately $929,875.34 (plus any accrued interest).  The Debtor believes that all premiums and related fees that were due as of the Petition Date have been paid.

197.     On September 1, 2020, the Debtor's automobile insurance was up for renewal.  The Debtor declined to renew its automobile insurance with Old Republic and instead opted to obtain automobile insurance through a new insurance provider in order to lock in the substantially reduced premium rates available in the market at that time.  The new insurance policy entered into by the Debtor thus allowed the Debtor to realize substantial cost savings. Furthermore, the new insurance provider did not require the Debtor to post a letter of credit.

198.     As a consequence, the Debtor expects to eventually receive back funds from the Certificate of Deposit in the amount of approximately $929,875.34 (plus any accrued interest) held at JPMorgan Chase Bank, N.A. to secure the old letter of credit provided the Debtor pays the entirety of its claim obligations due under the prior insurance and then only after both the statute of limitations runs out following the expiration of the last covered period on September 1, 2020 and all claims are closed.  The Debtor is not seeking authority to pay any prepetition insurance claims or other amounts that may be due to Old Republic on account of the Debtor's Old Republic automobile insurance.

199.     ***Workers' Compensation Insurance.***  As required by applicable law, the Debtor and the Insured Parties must maintain workers' compensation insurance coverage (the "Workers' Compensation Program") for its employees for claims arising from, or related to, their employment by the Debtor or the Insured Parties.

200.     Historically, the Protected Self Insurance Program covered workers' compensation on a self-insured basis, but on January 1, 2012, the Debtor arranged for third-party coverage for itself and the Insured Parties with the New York State Insurance Fund.  As required by the State of New York, the Debtor posted security in the amount of $7.6 million in cash with the New York State Workers' Compensation Board for the benefit of the pre-2012 self-insured claims.  The Debtor makes payments to pre-2012 claimants (the "Legacy Payments") in the amount of approximately $126,819 per month on average, including the expenses for Network Adjustors described above.  The Debtor requests authority to continue to make these Legacy Payments and amounts associated with administering the Workers' Compensation Program in the ordinary course of business.

201.     For the current coverage periods, the Debtor's and Insured Parties' aggregate annual premium for the Workers Compensation Program totaled approximately $1.8 million, paid to New York State Insurance Fund ("NYSIF").  These premiums for the current coverage period have been paid in full and, accordingly, the Debtor does not believe any prepetition amounts are outstanding on account of the Workers Compensation Program.

202.     The Debtor seeks to continue to maintain the Protected Self Insurance Program, Ecclesia, and the Workers' Compensation Program for itself and on the behalf of the Insured Parties and to pay claims, premiums, obligations, legacy workers' compensation obligations, and other administrative costs under the Protected Self Insurance Program, Ecclesia, and the Workers' Compensation Program in accordance with past practice and in the ordinary course of business.  The Debtor believes that the maintenance of the Protected Self Insurance Program, Ecclesia, and the Workers' Compensation Program is in the best interest of the estate and its creditors.

E.      **Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing the
Continued Use of the Debtor's Cash Management System, Bank Accounts and
Business Forms and (II) Granting Related Relief**

203.    In the ordinary course of business, the Diocese utilizes a centralized cash
management system (the "Cash Management System") to collect, manage, invest and disburse
funds in support of its mission.  The Diocese holds accounts with a number of financial
institutions (the "Banks") in order to facilitate the Cash Management System.  A list of the
Diocese's bank accounts can be found attached hereto as Exhibit C to the Cash Management
Motion (the "Bank Accounts").

204.    A diagram setting forth the flow of funds among the Bank Accounts and
summarizing the Cash Management System, as it exists on the Petition Date, is attached hereto
as Exhibit D.

205.    *The Diocese's Bank Accounts*.  In the ordinary course of business, the
Diocese maintains the Bank Accounts described herein to facilitate the financial operations of its
central administrative offices.

206.    *The Main Accounts*.  As of the Petition Date, the Diocese maintained the
following accounts (the "Main Accounts") with JPMorgan Chase Bank, N.A. ("JPMorgan
Chase"):  (a) its primary operating account (the "Main Operating Account"); and (b) a money
market account (the "Main Money Market Account").  The Main Money Market Account is
invested in short-term U.S. Government securities.

207.    *The Main Investment Accounts*.  Historically, the Diocese maintained its
long-term investments in accounts with Unitas Investment Fund, Inc. and The Vanguard Group
Inc. (the "Main Investment Accounts").  The Main Investment Accounts held a diversified
portfolio of securities.  Similarly, the Diocese maintained long-term investments subject to donor
restrictions, such as endowments and bequests, in separate Main Investment Accounts.  As of the

Petition Date, the Diocese no longer maintained any funds for long-term investment in the Main

Investment Accounts.  Instead, the Diocese's long-term investments are held in the Main Money

Market Account.  The long-term investments subject to donor restrictions are held in separate

FHO Accounts (as defined herein), including Legacy Endowment Funds (as defined herein) held

with Unitas Investment Fund, Inc.

208.    *The Utilities Adequate Assurance Account.*  The Diocese maintains an

account with JPMorgan Chase (the "Utilities Adequate Assurance Account") in which it intends

to place a deposit, in an amount approved by the Court, as adequate assurance of payment for the

Diocese's utility services.

209.    *The IOR Accounts.*  The Diocese maintains two accounts (the "IOR

Accounts") with the Institute for the Works of Religion, a financial institution located inside

Vatican City.  As of the Petition Date, the IOR Accounts had *de minimis* balances.  The Diocese

is in the process of closing the IOR Accounts and expects they will be closed soon after the

Petition Date.

210.    *Other Deposit Accounts.*  The Diocese maintains a number of other

deposit accounts for a variety of other purposes in order to facilitate its Cash Management

System.  Each account is listed in Exhibit C to the Cash Management Motion.

211.    ***The Insurance Accounts.***  The Diocese maintains a number of Bank

Accounts (the "Insurance Accounts") in support of its insurance programs.  The Insurance

Accounts are denoted as such in Exhibit C to the Cash Management Motion.  The funds in the

Insurance Accounts are held on behalf of the participants in and the beneficiaries of the

Diocese's insurance programs.

212.    *The PSIP Accounts.*  The Diocese maintains two accounts (the "<u>PSIP</u>

<u>Accounts</u>") with JPMorgan Chase related to its Protected Self Insurance Program, which is

described in the Insurance Motion:  (a) a primary operating account (the "<u>PSIP Operating</u>

<u>Account</u>"); and (b) a money market account utilized to generate interest for short periods if there

are excess funds in the PSIP Operating Account (the "<u>PSIP Money Market Account</u>").

213.    The PSIP Operating Account is used to collect insurance premiums on

behalf of the entities that participate in the Protected Self Insurance Program.  Claim payments

disbursed by Network Adjusters (as defined herein) to participating entities that have suffered

losses are funded by these PSIP Operating Account premium deposits.  In addition, the Protected

Self Insurance Program uses those premiums, in part, to obtain insurance coverage from Ecclesia

Assurance Company and other third party insurers for Protected Self Insurance Program

participants.  As a result, the PSIP Operating Account receives recovery payments from

insurance carriers to, in some instances, offset claim payments processed by Network Adjusters.

214.    *The Network Adjusters Disbursement Account*.  The Diocese maintains an

account (the "<u>Network Adjusters Disbursement Account</u>") with JPMorgan Chase to fund

payments to entities that have suffered a loss that is either covered by the Protected Self

Insurance Program or for which the Protected Self Insurance Program has received coverage

from a third-party insurer on behalf of such entity.  Network Adjusters, Inc. ("**Network**

**Adjusters**") is a third-party claims administrator that manages claims and pays claimants using

funds drawn from the Network Adjusters Disbursement Account.

215.    *The NYS Workers Comp Deposit Account*.  As required by the State of

New York in respect of the Diocese's former self-insurance program for workers' compensation,

the Diocese has posted cash security with the New York State Workers' Compensation Board

(the "NYS Workers Comp Deposit Account").  As of the Petition Date, the balance in the NYS

Workers Comp Deposit Account was approximately $7.6 million.  More information about the

obligations that the funds in the NYS Workers Comp Deposit Account support can be found in

the Insurance Motion.

216.    *The Letter of Credit Account*.  As of the Petition Date, the Diocese

maintained a certificate of deposit (the "PSIP LC Collateral Account") with JPMorgan Chase as

collateral for an irrevocable letter of credit (the "Letter of Credit") issued by JPMorgan Chase in

favor of Old Republic Insurance Company.  As of the Petition Date, the PSIP LC Collateral

Account had a market value of approximately $972,000.  More information about the Letter of

Credit and the PSIP LC Collateral Account can be found in the Insurance Motion.

217.    ***Restricted Funds and Funds Held for Others***.  In the ordinary course of

business, the Diocese holds funds on behalf of other entities that work with the Diocese to

advance its mission or funds with donor restrictions limiting their use.  As described further

herein, the Diocese maintains separate Bank Accounts (the "FHO Accounts") for the funds it

holds for others and the funds it holds with donor restrictions.  The FHO Accounts are denoted as

such in Exhibit C to the Cash Management Motion.  Funds held in the FHO Accounts are

accounted for individually and kept separate from the general operating funds of the Diocese.

218.    *The CMA Accounts*.  The Diocese maintains the following two accounts

(the "CMA Accounts") for CMA purposes, as described in greater detail above, with JPMorgan

Chase for funds raised through the CMA in order to keep such funds segregated from the

Diocese's general operating funds: (a) a primary operating account (the "CMA Operating

Account"); and (b) a money market account utilized to generate interest for short periods if there

are excess funds in the CMA Operating Account (the "CMA Money Market Account").

219.   *Contribution and Disbursement Agent Accounts.*  The Diocese sponsors one healthcare plan for employees, one plan for healthcare and other assistance for retired priests, and three retirement plans (collectively, the "Benefit Plans") for employees and retirees of the Diocese and certain affiliated employers.  Each of the Benefit Plans is a separate trust. More information about the Benefit Plans can be found in this Declaration.  In order to facilitate payments into and out of the Benefit Plans, the Diocese maintains a number of contribution and paying agent accounts (the "Agent Accounts").  The Diocese also maintains money market agent accounts associated with the Agent Accounts utilized to generate interest for short periods if there are excess funds in the Agent Accounts.  The Agent Accounts permit the Diocese to collect contributions from participating employers and make consolidated transfers to the Benefit Plans on behalf of all participants.  Similarly, the Agent Accounts permit the Diocese to draw funds from the Benefit Plans and make payments to certain vendors.  Using the Agent Accounts reduces the administrative costs of the Benefit Plans.

220.   *Non-School Assessment Accounts.*  The Diocese assists its parishes and the furtherance of Catholic education by acting as an agent to collect a "non-school assessment" from parishes in the territory of the Diocese that do not have schools.  The money collected is used to fund efforts related to Catholic Education.  The primary function is to fund the parish and regional schools.  This money goes through one of two identified, segregated accounts (the "Non-School Assessment Accounts") used solely for this purpose: (a) a primary operating account (the "NSA Operating Account"); and (b) a money market account utilized to generate interest for short periods if there are excess funds in the NSA Operating Account (the "NSA Money Market Account").  Funds collected into the Non-School Assessment Accounts are transferred to the Department of Education, Diocese of Rockville Centre (the "Department of

Education"), which was incorporated by the Regents of the University of the State of New York

on April 26, 1974.  The Department of Education then disburses the funds to the parish and

regional schools that receive this support and for other operational needs.

221.    *The Legacy Endowment Funds*.  The Diocese maintains nineteen separate

accounts (the "Legacy Endowment Funds") with Unitas Investment Fund, Inc. to hold

endowment funds donated to the Diocese subject to donor-restrictions on their use.  The average

balance in each account as of the Petition Date was approximately $32,600.  The costs and

administrative burden of moving the Legacy Endowment Funds to new accounts at banks that

are authorized depositories under the U.S. Trustee Guidelines would be unreasonably high

compared to the small balances that exist in many of these accounts.

222.    *Restricted Donations/Collections Account*.  The Diocese maintains an

additional account (the "Restricted Donations/Collections Account") with JPMorgan Chase to

hold other funds that it holds on behalf of others and funds with donor-restrictions that are not

held in any of the other accounts described above.  The Restricted Donations/Collections

Account also, from time to time, holds contributions to the Benefit Plans made by participating

employers when such contributions first need to be allocated among the Agent Accounts.  The

purpose of this account is to ensure such funds are never comingled with the Diocese's general

operating funds.  The Diocese tracks the funds held in the Restricted Donations/Collections

Account according to the beneficial owner of the funds or the restriction, as applicable, such that

it can trace the origin and use of each dollar held in or transferred from the Restricted

Donations/Collections Account.

223.    ***Non-Diocese Accounts***.  As of the Petition Date, there were three Bank

Accounts (the "Non-Diocese Accounts") in the Diocese's name that belong to non-Diocese

entities (the "Non-Dioceses").  The Non-Diocese Accounts are denoted as such in Exhibit C to the Cash Management Motion.  The Diocese does not maintain any of its funds in any of the Non-Diocese Accounts and does not exercise operational control over them.  Activity in the Non-Diocese Accounts is not included in the Diocese's financial accounting.

224.  *High School Accounts*.  Holy Trinity Diocesan High School (the "High School") in Hicksville, New York maintains two accounts (the "High School Accounts") with Citibank, N.A. ("Citibank"):  (a) a primary operating account (the "High School Operating Account"); and (b) a money market account utilized to generate interest for short periods if there are excess funds in the High School Operating Account (the "High School Money Market Account").  As of the Petition Date, the High School Accounts bore the Diocese's name and tax identification number.  However, the Diocese does not maintain any of its funds in the High School Accounts and does not exercise operational control over them.  The High School is working to open new accounts in its own name to replace the High School Accounts as quickly as it can.  In the meantime, the High School requires use of the High School Accounts in order to pay its teachers and staff, the vendors that support the High School's operations and all the other expenses incident to running the High School.

225.  *Cursillo de Cristianidad Operating Account*.  Cursillos de Cristianidad is an independent, non-Diocese organization that maintains an account with JPMorgan Chase (the "Cursillo de Cristianidad Operating Account").  The Cursillo de Cristianidad Operating Account bears the Diocese's name and tax identification number, however the Diocese does not maintain any funds in or exercise control over this account.  As of the Petition Date, the Cursillo de Cristianidad Operating Account had a *de minimis* balance.

226.   ***Credit Card Programs***.  In the ordinary course of its business, the Diocese maintains four different credit card accounts (the "Credit Card Accounts") to provide credit cards for employees of the Diocese to use to make business purchases.  The Diocese generally pays the balance for each of the Credit Card Accounts in full on a monthly basis.  Debt incurred under each of the Credit Card Accounts is unsecured.  As of the Petition Date, the aggregate balance on the Credit Card Accounts was $585.  The Diocese generally incurs approximately $17,000 per month in charges and fees in aggregate under the Credit Card Accounts.  Use of the Credit Card Accounts gives the Diocese greater flexibility in making necessary purchases.

227.   *American Express Corporate Cards*.  The Diocese has 27 American Express corporate credit cards used by employees of the Diocese for general business expenses.

228.   *Visa Corporate Cards*.  The Diocese has four additional corporate credit cards issued by Signature Bank on the Visa network used by employees of the Diocese for general business expenses.

229.   *Exxon Mobile Fuel Cards*.  The Diocese has 13 Exxon Mobile fuel cards used by employees of the Diocese to purchase fuel for work-related travel.

230.   *Home Depot Credit Card*.  The Diocese has one credit card issued by Home Depot Credit Services used to purchase construction and property-maintenance products from Home Depot.

231.   ***Existing Business Forms and Checks***.  In the ordinary course of business, the Diocese uses numerous business forms, including, without limitation, checks, business cards, letterhead, purchase orders and invoices (the "Business Forms").  Ordering new Business Forms would cause the Diocese to incur additional expenses and delay actions that require use of the Business Forms.

232.   ***Bank Fees***.  In the ordinary course of business, the Diocese incurs and

pays, honors, or allows to be deducted from the appropriate Bank Accounts certain monthly

service fees and other charges, costs, and expenses charged by the Banks (collectively, the "Bank

Fees").  The Diocese estimates that approximately $12,000 in monthly Bank Fees are due and

owing as of the Petition Date.

F.     **Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing and
       Approving Special Noticing and Confidentiality Procedures, (II) Authorizing and
       Approving Procedures for Providing Notice of Commencement, and (III) Granting
       Related Relief**

233.   ***Confidentiality Procedures***.  To protect the confidentiality of the identities

and personal contact information of certain holders of claims against the Diocese arising from

allegations of abuse ("Abuse Claims"), including certain litigants that have commenced

prepetition lawsuits against the Diocese using a Doe or other pseudonym (collectively, "Doe

Claimants"), minors, and current and former employees of the Diocese, the Diocese is requesting

authorization to redact the Creditor Matrix, the schedules of assets and liabilities, and any

pleadings or other documents, including affidavits of service, filed in these chapter 11 cases

containing such information in accordance with certain procedures (the "Confidentiality

Procedures").

234.   The Diocese is a defendant in approximately 209 prepetition lawsuits

asserting Abuse Claims and the Diocese is aware of certain other holders of Abuse Claims that

have not commenced lawsuits prepetition, but may, for example, have been participating in the

IRCP prior to the Petition Date.  While some abuse victims have made their Abuse Claims

public, many of the lawsuits alleging Abuse Claims have been filed by Doe Claimants who wish

to remain anonymous.

235.     Due to the nature of the allegations by holders of Abuse Claims, including the Doe Claimants, which pertain to sexual abuse, the redaction of the identities and personal contact information from all documents filed in these chapter 11 cases will aid in protecting such persons against the disclosure of a scandalous matter in publicly filed Court documents.

236.     The Confidentiality Procedures are also consistent with certain of the Diocese's other confidentiality obligations.  With regard to certain Doe Claimants, and as reflected in certain court-ordered stipulations filed in prepetition lawsuits, the Diocese has agreed to designate certain Doe Claimants with pseudonyms in public filings in New York state court to preserve the anonymity of such Doe Claimants.  As described above, the Confidentiality Procedures will preserve the anonymity of such Doe Claimants.

237.     Additionally, and as described in further detail in this Declaration, the Diocese has committed to all participants in the IRCP that their claims and associated information will remain confidential without regard to whether a resolution is reached.  The participants, however, remain free to disclose or discuss their claim and/or the compensation determination of their own claim.  Certain holders of Abuse Claims may have participated in the IRCP and failed to reach a resolution of their claim.  The Diocese will include any such Abuse Claims in its Creditor Matrix.  The Confidentiality Procedures will preserve the confidentiality of such Abuse Claims.

238.     ***Creditor Matrix***.  The Creditor Matrix will also include current and retired employees of the Diocese.   In order to protect against the risk of identity theft and the disclosure of personal identifying information, the Diocese is requesting authority to redact the home addresses and other personal contact information for these individuals.

239.     In recognition of the sensitivity of disclosure related to these parties, the Confidentiality Procedures will protect the privacy of such creditors and preserve their identities from public disclosure.

**G.     Debtor's Motion for Interim and Final Orders Authorizing the (I) Payment of Certain Prepetition Invoices for Psychological Counseling, Therapy and Related Treatment, (II) Continuation of its Prepetition Practice of Paying for Certain Psychological Counseling, Therapy and Related Treatment, and (III) Granting Certain Related Relief**

240.     As part of the Diocese's comprehensive efforts to provide care and compensation to individuals who have been the victims of clerical abuse, the Diocese provides psychological counseling and related medical treatment, including medications where appropriate ("Pastoral Care"), for certain individuals who have been impacted by clerical abuse. The Diocese has maintained a program to provide Pastoral Care since at least 2003.

241.     The Diocese considers the provision of Pastoral Care for any requesting individual who makes a credible allegation of clerical abuse as a minor.  The Diocese will also consider the provision of Pastoral Care for individuals alleging abuse by non-clergy affiliated with the Diocese and for family members who have been affected by the abuse of a loved one. The majority of recipients of Pastoral Care are individuals who have made claims and received monetary compensation from the Diocese through the Diocese of Rockville Centre Independent Reconciliation and Compensation Program.

242.     The Pastoral Care is administered by psychologists, psychiatrists, licensed clinical social workers and licensed marriage and family therapists selected by the recipient (each, a "Counselor").  The Diocese requires each Counselor to provide evidence that he or she is a state-licensed mental health professional with at least a master's degree in a relevant field. The Diocese recommends Counselors who have a background in trauma therapy, but does not require it.  The Counselors are not employed by or otherwise affiliated with the Diocese.  In

order to receive compensation, Counselors invoice the Diocese on a monthly basis for Pastoral Care services provided to recipients, which the Diocese then pays directly to the Counselor.

243.    Each recipient of Pastoral Care is required to sign a confidentiality agreement that provides for the release of information to the Diocese in order to confirm active participation.  The Diocese also annually requests updates from the Counselors on the goals of the therapy and the progress toward those goals.

244.    As part of the Pastoral Care, the Diocese also provides medications and medication management services for recipients of Pastoral Care who require medication as a result of clerical abuse.

245.    The Diocese estimates that payments for Pastoral Care will total approximately $25,000 per month going forward.  The Diocese estimates that the aggregate amount of the unpaid invoices for Pastoral Care provided before the Petition Date is approximately $37,500.

## VI.    INFORMATION REQUIRED BY LOCAL RULE 1007-2

246.    In accordance with Local Rule 1007-2, the schedules attached hereto provide certain information related to the Debtor.

247.    Schedule 1 hereto provides a diagram of the Debtor's corporate structure.

248.    Pursuant to Local Rule 1007-2(a)(3), there has been no committee organized prior to the order for relief in this chapter 11 case.

249.    Pursuant to Local Rule 1007-2(a)(4), Schedule 2 hereto provides a list of the holders of the thirty five (35) largest unsecured claims, excluding insiders.

250.    Pursuant to Local Rule 1007-2(a)(5), Schedule 3 hereto provides a list of the holders of the five (5) largest secured claims.

251.     Pursuant to Local Rule 1007-2(a)(6), Schedule 4 hereto provides a summary of the assets and liabilities of the Diocese.

252.     Pursuant to Local Rule 1007-2(a)(7), there are not any shares of stock, debentures or other securities of the Diocese that are publicly held.

253.     Pursuant to Local Rule 1007-2(a)(8), Schedule 5 hereto provides a list of the Diocese's property that is in the possession or custody of any custodian, public officer, mortgagee, pledgee, assignee of rents or secured creditor, or agent for any such entity.

254.     Pursuant to Local Rule 1007-2(a)(9), Schedule 6 hereto provides a list of the premises owned, leased or held under other arrangement from which the Diocese operates its business.

255.     Pursuant to Local Rule 1007-2(a)(10), Schedule 7 hereto provides the location of the Diocese's substantial assets, the location of its books and records, and the nature, location and value of any assets held by the debtor outside the territorial limits of the United States.

256.     Pursuant to Local Rule 1007-2(a)(11), Schedule 8 hereto provides a list of the nature and present status of each action or proceeding, pending or threatened, against the Diocese or its property where a judgment against the debtor or a seizure of its property may be imminent.

257.     Pursuant to Local Rule 1007-2(a)(12), Schedule 9 hereto provides a list of the names of the individuals who comprise the Diocese's existing senior management, their tenure with the Diocese, and a brief summary of their relevant responsibilities and experience.

258.     Pursuant to Local Rule 1007-2(b)(1)-(2)(A), Schedule 10 hereto the estimated amount of weekly payroll to the Debtor's employees (not including officers, directors,

and stockholders) and the estimated amount to be paid to officers, stockholders, directors, and

financial and business consultants retained by the Debtor for the 30-day period following the

filing of the chapter 11 petition.

259.    Pursuant to Local Rule 1007-2(b)(3), Schedule 11 hereto provides, for the

thirty (30) day period following the filing of this chapter 11 petition, an estimate of the cash

receipts and disbursements, net cash gain or loss, obligations and receivables expected to accrue

but remain unpaid, other than professional fees.

Dated:  October 1, 2020

> The Roman Catholic Diocese of Rockville
> Centre, New York
> Debtor and Debtor in Possession
>
> */s/ Charles Moore*
> Charles Moore
> Managing Director of Alvarez & Marsal
> North America, LLC, proposed restructuring
> advisor to The Roman Catholic Diocese of
> Rockville Centre, New York

## <u>Schedule 1</u>

### Debtor's Corporate Structure



= legal entity

= program (not a legal entity)

## Schedule 2

### List of Holders of the Debtor's 35 Largest Unsecured Claims

Pursuant to Local Rule 1007-2(a)(4), the following is a list of the Debtor's creditors holding the 35 largest unsecured claims based on the Debtor's unaudited books and records as of the Petition Date. This list has been prepared in accordance with Bankruptcy Rule 1007(d) and does not include (i) persons who come within the definition of "insider" set forth in section 101(31) of the Bankruptcy Code or (ii) secured creditors, unless the value of the collateral is such that the unsecured deficiency places the creditor among the holders of the 35 largest unsecured claims.  In order to protect the anonymity of abuse claimants, who comprise all holders of the 35 largest unsecured claims against the Debtor, the Debtor has only identified the counsel representing these claimants in the following list.  The information contained herein shall not constitute an admission of liability by, nor is it binding on, the Debtor. The Debtor reserves all rights to assert that any debt or claim included herein is a disputed claim or debt, and to challenge the priority, nature, amount, or status of any such claim or debt.

| Name of counsel representing creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim | Indicate if claim is contingent, unliquidated, or disputed | Amount of Unsecured Claim |
|---|---|---|---|---|
| JEFF ANDERSON & ASSOCIATES, P.A. 55 WEST 39TH STREET, 11TH FLOOR NEW YORK, NY 10018 | ATTN: JEFFREY R. ANDERSON EMAIL - Jeff@AndersonAdvocates.com PHONE - 646-759-2551 FAX - | Litigation | Contingent, Unliquidated, and Disputed | Undetermined |
| PFAU COCHRAN VERTETIS AMALA PLLC 403 COLUMBIA STREET SUITE 500 SEATTLE, WA 98104 31 HUDSON YARDS, 11TH FLOOR, SUITE 36 NEW YORK, NY 10001-2170 | ATTN: MICHAEL T. PFAU EMAIL - michael@pcvalaw.com PHONE - 206-462-4335 FAX - 206-623-3624 | Litigation | Contingent, Unliquidated, and Disputed | Undetermined |
| MARSH LAW FIRM PLLC 151 EAST POST ROAD SUITE 102 WHITE PLAINS, NY 10601 | ATTN: JAMES A. MARSH EMAIL - jamesmarsh@marsh.law PHONE - 212-372-3030 FAX - 833-210-3336 | Litigation | Contingent, Unliquidated, and Disputed | Undetermined |
| SIMMONS HANLY CONROY LLC 112 MADISON AVENUE, 7TH FLOOR NEW YORK, NY 10016 | ATTN: PAUL J. HANLY, JR. EMAIL - phanly@simmonsfirm.com PHONE - 212-784-6401 FAX - 212-213-5949 | Litigation | Contingent, Unliquidated, and Disputed | Undetermined |

| Name of counsel representing creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim | Indicate if claim is contingent, unliquidated, or disputed | Amount of Unsecured Claim |
|---|---|---|---|---|
| CERTAIN & ZILBERG PLLC 488 MADISON AVENUE 20TH FLOOR NEW YORK, NY 10022 | ATTN: GARY CERTAIN EMAIL - gcertain@certainlaw.com PHONE - 212-687-7800 FAX - | Litigation | Contingent, Unliquidated, and Disputed | Undetermined |
| SLATER SLATER SCHULMAN LLP488 MADISON AVENUE 20TH FLOORNEW YORK, NY 10022 | ATTN: ADAM SLATER EMAIL - aslater@sssfirm.com PHONE - 212-922-0906 FAX - | Litigation | Contingent, Unliquidated, and Disputed | Undetermined |
| HERMAN LAW 434 W. 33RD STREET, PENTHOUSE NEW YORK, NY 10001 | ATTN: JEFF HERMAN EMAIL - jherman@hermanlaw.com PHONE - 212-390-0100 FAX - | Litigation | Contingent, Unliquidated, and Disputed | Undetermined |
| MICHAEL G. DOWD 1981 MARCUS AVENUE, SUITE 200 LAKE SUCCESS, NY 11042 | ATTN: MICHAEL G. DOWD EMAIL - michaelgdowd@gmail.com PHONE - 212-751-1640 FAX - 212-872-1777 | Litigation | Contingent, Unliquidated, and Disputed | Undetermined |
| SWEENEY, REICH & BOLZ, LLP 1981 MARCUS AVENUE, SUITE 200 LAKE SUCCESS, NY 11042 | ATTN: GERARD J. SWEENEY EMAIL - cxuereb@srblawfirm.com PHONE - 718-459-9000 FAX - | Litigation | Contingent, Unliquidated, and Disputed | Undetermined |
| LAW OFFICES OF MITCHELL GARABEDIAN 100 STATE STREET, 6TH FLOOR BOSTON, MA 02109 | ATTN: MITCHELL GARABEDIAN EMAIL - mgarabedian@garabedianlaw.com PHONE - 617-523-6250 FAX - | Litigation | Contingent, Unliquidated, and Disputed | Undetermined |
| MERSON LAW PLLC 150 EAST 58TH STREET, 34TH FLOOR NEW YORK, NY 10155 | ATTN: JORDAN K. MERSON EMAIL - jmerson@mersonlaw.com PHONE - 212-603-9100 FAX - 347-441-4171 | Litigation | Contingent, Unliquidated, and Disputed | Undetermined |
| JAMES, VERNON & WEEKS, P.A.1626 LINCOLN WAYCOEUR D'ALENE, ID 83815 | ATTN: LEANDER L. JAMES IV EMAIL - ljames@jvwlaw.net PHONE - 208-667-0683 FAX - 208-664-1684 | Litigation | Contingent, Unliquidated, and Disputed | Undetermined |
| PATRICK NOAKER, NOAKER LAW FIRM, LLC 1600 UTICA AVENUE S, 9TH FLOOR ST. LOUIS PARK, MN 55416 | ATTN: PATRICK NOAKER EMAIL - patrick@noakerlaw.com PHONE - 952-491-6798 FAX - | Litigation | Contingent, Unliquidated, and Disputed | Undetermined |
| TOLMAGE, PESKIN, HARRIS, & FALICK 20 VESEY ST., SUITE | ATTN: STEPHAN H. PESKIN EMAIL - peskin@tolmagepeskinlaw.com | Litigation | Contingent, Unliquidated, and Disputed | Undetermined |

| Name of counsel representing creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim | Indicate if claim is contingent, unliquidated, or disputed | Amount of Unsecured Claim |
|---|---|---|---|---|
| 700 NEW YORK, NY 10007 | PHONE - 212-964 1390 FAX - 212-608-4959 | | | |
| PHILLIPS & PAOLICELLI, LLP 747 THIRD AVENUE, 6TH FLOOR NEW YORK, NY 10027 | ATTN: DIANE PAOLICELLI EMAIL - dpaolicelli@p2law.com PHONE - 212-388-5100 FAX - 212-388-5100 | Litigation | Contingent, Unliquidated, and Disputed | Undetermined |
| DELL & DEAN PLLC 1225 FRANKLIN AVENUE, SUITE 450 GARDEN CITY, NY 11530 | ATTN: JOSEPH G. DELL EMAIL - JTipa@d2triallaw.com PHONE - 516-880-9700 FAX - 516-880-9707 | Litigation | Contingent, Unliquidated, and Disputed | Undetermined |
| BETTI & ASSOCIATES 30 WALL STREET, 8TH FLOOR NEW YORK, NY 10005 | ATTN: MICHELE M. BETTI, ESQ.EMAIL - mbettilaw@gmail.comPHONE - 646-895-0939FAX - | Litigation | Contingent, Unliquidated, and Disputed | Undetermined |
| DESIMONE & ASSOCIATES, LLC745 FIFTH AVENUE, SUITE 500NEW YORK, NY 10151 | ATTN: RALPH DESIMONE EMAIL - rdesimone@dlaw.net PHONE - 646-776-7425 FAX - | Litigation | Contingent, Unliquidated, and Disputed | Undetermined |
| GAIR, GAIR, CONASON, RUBINOWITZ, BLOOM, HERSHENHORN, STEIGMAN & MACKAUF 80 PINE STREET, 34TH FLOOR NEW YORK, NY 10005 | ATTN: RACHEL L. JACOBS & PETER SAGHIR EMAIL - rjacobs@gairgair.com; psaghir@gairgair.com PHONE - 212-943-1090 FAX - 212-425-7513 | Litigation | Contingent, Unliquidated, and Disputed | Undetermined |
| JANET, JANET & SUGGS LLC 4 RESERVOIR CIRCLE, SUITE 200 BALTIMORE, MD 21208 | ATTN: ANDREW S. JANET EMAIL - asjanet@jjsjustice.com PHONE - 410-653-3200 FAX - 410-653-9030 | Litigation | Contingent, Unliquidated, and Disputed | Undetermined |
| LEVY KONIGSBERG, LLP 800 THIRD AVENUE, 11TH FLOOR NEW YORK, NY 11231 | ATTN: HELENE M. WEISS & VARA LYONS EMAIL - vlyons@levylaw.com; PHONE - 212-605-6200 FAX - | Litigation | Contingent, Unliquidated, and Disputed | Undetermined |
| RHEINGOLD GIUFFRA RUFFO & PLOTKIN LLP 551 FIFTH AVENUE 29TH FLOOR NEW YORK, NY 10016 | ATTN: THOMAS P. GIUFFA EMAIL - tgiuffra@Rheingoldlaw.com PHONE - 212-684-1880 FAX - | Litigation | Contingent, Unliquidated, and Disputed | Undetermined |
| THE LAW OFFICE OF JOSHUA W. SKILLMAN 111 JOHN STREET, | ATTN: JOSHUA W. SKILLMAN EMAIL - Josh@skillmanlaw.nyc | Litigation | Contingent, Unliquidated, and Disputed | Undetermined |

| Name of counsel representing creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim | Indicate if claim is contingent, unliquidated, or disputed | Amount of Unsecured Claim |
|---|---|---|---|---|
| SUITE 1050 NEW YORK, NY 10038 | PHONE - 212-785-0808 FAX - 212-785-0177 | | | |
| BUTTAFUOCO & ASSOCIATES, PLLC144 WOODBURY ROADWOODBURY, NY 11797 | ATTN: JAMES S. MCCARTHY & ELLEN BUCCHOLZ EMAIL - jmccarthy@buttafuocolaw.com PHONE - 516-746-81000 FAX - | Litigation | Contingent, Unliquidated, and Disputed | Undetermined |
| HACH ROSE SCHIRIPPA & CHEVERIE 112 MADISON AVENUE, 10TH FLOOR NEW YORK, NY 10016 | ATTN: MICHAEL ROSE & HILLARY NAPPI EMAIL - mrose@hrsclaw.com; Hnappi@hrsclaw.com PHONE - 212-213-8311 FAX - | Litigation | Contingent, Unliquidated, and Disputed | Undetermined |
| HAMBURGER, MAXSON, YAFFE & MCNALLY, LLP 225 BROADHOLLOW ROAD, SUITE 301E MELVILLE, NY 11747 | ATTN: RICHARD HAMBURGER, DAVID N. YAFFE, & DOUGLAS MCNALLY EMAIL - rhamburger@hmylaw.com; dmcnally@hmylaw.com; dyaffe@hmylaw.com PHONE - 631-694-2400 FAX - 631-694-1376 | Litigation | Contingent, Unliquidated, and Disputed | Undetermined |
| HURLEY MCKENNA & MERTZ P.C. 33 N. DEARBORN STREET, SUITE 1430 CHICAGO, IL 60602 | ATTN: CHRISTOPHER HURLEY, EVAN SMOLA, & MARK MCKENNA EMAIL -  churley@hurley-law.com; esmola@hurley-law.com; mmckenna@hurley-law.com PHONE - 312-553-4900 FAX - | Litigation | Contingent, Unliquidated, and Disputed | Undetermined |
| LAURA A. AHEARN, ESQ. PLLC3075 VETERAN'S MEMORIAL HWY., SUITE 200RONKONKOMA, NY 11779 | ATTN: LAURA A. AHEARN EMAIL - lahearn@lauraahearn.com PHONE - 631-320-5204 FAX - | Litigation | Contingent, Unliquidated, and Disputed | Undetermined |
| LAW OFFICES OF RONALD J. KIM, PC P.O. BOX 318 SARATOGA SPRINGS, NY 12866 | ATTN: RONALD J. KIM EMAIL - ron@ronaldkimlaw.com PHONE - 518-581-8416 FAX - | Litigation | Contingent, Unliquidated, and Disputed | Undetermined |
| PARKER WAICHMAN LLP 6 HARBOR DRIVE PORT WASHINGTON, NY 11050 | ATTN: BRETT ZEKOWSKI & FRED ROSENTHAL EMAIL - bzekowski@yourlawyer.com; frosenthal@yourlawyer.com | Litigation | Contingent, Unliquidated, and Disputed | Undetermined |

| Name of counsel representing creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim | Indicate if claim is contingent, unliquidated, or disputed | Amount of Unsecured Claim |
|---|---|---|---|---|
| | PHONE - 516-466-6500<br>FAX - | | | |
| ROMANO & ASSOCIATES 350 OLD COUNTRY ROAD, SUITE 205 GARDEN CITY, NY 11530 | ATTN: MICHAEL J. ROMANOEMAIL - mjr@romanofirm.comPHONE - 516-248-8880FAX - | Litigation | Contingent, Unliquidated, and Disputed | Undetermined |
| RUSSO, KARL, WIDMAIER & CORDANO PLLC 400 TOWNLINE ROAD, SUITE 170 HAUPPAUGE, NY 11788 | ATTN: CHRISTOPHER GERACE EMAIL - cg@rkwclaw.com PHONE - 631-265-7200 FAX - 631-265-7578 | Litigation | Contingent, Unliquidated, and Disputed | Undetermined |
| SILBERSTEIN, AWAD & MIKLOS, P.C. 600 OLD COUNTRY ROAD SUITE 505 GARDEN CITY, NY 11530 | ATTN: MICHAEL LAUTERBORN EMAIL - mlaw@ask4sam.net PHONE - 516-832- 7777 FAX - 516-832-7877 | Litigation | Contingent, Unliquidated, and Disputed | Undetermined |
| SULLIVAN PAPAIN BLOCK MCGRATH & CANNAVO P.C.120 BROADWAY 18TH FLOORNEW YORK, NY 10271 | ATTN: ERIC K. SCHWARZ EMAIL - Eschwarz@triallaw1.com PHONE - 212-266-4116 FAX - 212-266-4141 | Litigation | Contingent, Unliquidated, and Disputed | Undetermined |
| THE ZALKIN LAW FIRM, P.C. AND BARASCH MCGARRY SALZMAN & PENSON 11 PARK PLACE NEW YORK, NY 10007 | ATTN: BRUCE KAYE, DOMINIQUE PENSON, ELIZABETH CATE, DEVIN STOREY, IRWIN ZALKIN, DANA COHEN EMAIL - elizabeth@zalkin.com dms@zalkin.com irwin@zalkin.com PHONE - 212-385-8000 FAX - 212-385-7845 | Litigation | Contingent, Unliquidated, and Disputed | Undetermined |

### Schedule 3

**List of Holders of the Debtor's Five Largest Secured Claims**

Pursuant to Local Rule 1007-2(a)(5), the following is a list of creditors holding the five largest secured claims against the Debtor as of the Petition Date. The information contained herein shall not constitute an admission of liability by, nor is it binding on, the Debtor. The Debtor reserves all rights to assert that any debt or claim included herein is a disputed claim or debt, and to challenge the priority, nature, amount, or status of any such claim or debt. The descriptions of the collateral securing the underlying obligations are intended only as brief summaries. In the event of any inconsistencies between the summaries set forth below and the respective corporate and legal documents relating to such obligations, the descriptions in the corporate and legal documents shall control.

| | Name of Creditor | Creditor Mailing Address | Amount of Claim (as of Petition Date) | Collateral Description and Value |
|---|---|---|---|---|
| 1. | New York State Workers' Compensation Board | 328 State Street Schenectady, NY 12305 | Undetermined | $7,600,000 bond in support of statutory workers' compensation obligations |
| 2. | JPMorgan Chase Bank, N.A. | JPMorgan Chase 4 New York Plaza, 17th Floor New York, NY 10004 | Undetermined | $972,000 CD in support of letter of credit issued to Old Republic Insurance Company |
| 3. | Dominican Village Inc. | 565 Albany Ave. Amityville, NY 11701 | Undetermined | $25,000 security deposit in support of lease obligations |
| 4. | Apple Inc. | 2600 Grand Blvd. Kansas City, MO 64108 | Undetermined | Computer Equipment and Fixtures |
| 5. | CIT Bank, N.A. | 10201 Centurion Parkway North Jacksonville, FL 32256 | Undetermined | 2 Konica Minolta Copiers |

**Schedule 4**

**Summary of Assets and Liabilities**

Pursuant to Local Rule 1007-2(a)(6), the following are estimates of the assets and liabilities of the Debtor as of August 31, 2020. As of the Petition Date, the Debtor is in the process of conducting its accounts close for its fiscal year ended August 31, 2020. As such, these estimates do not reflect the final accounting, including certain actuarial reports, for the Debtor's past fiscal year. The Debtor has not included in these estimates the total potential liability arising from claims made under the Child Victims Act in the 223 cases that were pending as of the Petition Date. Any potential liability arising from these claims is contingent, unliquidated and disputed. Nor has the Debtor included in these estimates the value of its insurance assets that provide coverage for both defense and payment on such claims. The Debtor keeps financial records for its Protected Self Insurance Program separate from those the Debtor's Administrative Offices, which includes chancery operations and plant, its diocesan loan account and Catholic Ministries Appeal. The estimates below do not include the assets or liabilities of the Diocesan Affiliates, which are not debtors in this chapter 11 case.

| Assets and Liabilities | Amount |
|---|---|
| Assets | Administrative Offices: $90.9 million<br>Protected Self Insurance Program: $113.0 million |
| Liabilities | Administrative Offices: $12.9 million<br>Protected Self Insurance Program: $88.4 million |

## <u>Schedule 5</u>

### Debtor's Property Held by Others

Pursuant to Local Rule 1007-2(a)(8) the following is a list of property that is in the possession or custody of any custodian, public officer, mortgagee, pledgee, assignee of rents, secured creditor, or agent for any such entity.

1) The Debtor has posted security in the amount of $7.6 million in cash with the New York State Workers' Compensation Board.  This security is required by state law to support the Debtor's legacy workers' compensation obligations.
2) The Debtor has a certificate of deposit held by JPMorgan Chase Bank, N.A. in support of a letter of credit issued by JPMorgan Chase in favor of Old Republic Insurance Company.  The Debtor estimates that market value of the CD is approximately $972,000 as of the Petition Date.
3) Dominican Village Inc. holds $25,000 of the Debtor's funds as security in support of the Debtor's lease obligations.
4) Electronic media containing backups of certain of the Debtor's records are located in offsite storage facilities in Port Washington, New York operated by Iron Mountain, Inc.
5) Certain claims files related to the Debtor's insurance programs are held by Network Adjusters, Inc. in its facilities in Farmingdale, NY.
6) The Debtor stores certain archive files and furniture with Our Lady of Lourdes Roman Catholic Church in Massapequa, NY.
7) The Debtor stores certain archive files with the Seminary of the Immaculate Conception in Huntington, NY.

**<u>Schedule 6</u>**

**Debtor's Leased and Owned Properties**

Pursuant to Local Rule 1007-2(a)(9), the following lists the property or premises owned, leased, or held under other arrangement from which the Debtor operates its businesses.

1) The Debtor's headquarters and base of operations is an office building it owns located at 50 North Park Avenue, Rockville Centre, NY 11570.

2) To the extent there are additional real properties that the Debtor owns or leases, such information will be provided during these chapter 11 cases.

## Schedule 7

**Location of the Debtor's Substantial Assets, Books and Records, and Nature and
Location of Debtors' Assets Outside the United States**

Pursuant to Local Bankruptcy Rule 1007-2(a)(10), the following provides the location of
the Debtor's substantial assets, books and records, and the nature, location, and value of any
assets held by the Debtor outside the territorial limits of the United States as of the Petition Date.

### Location of the Debtor's Substantial Assets

As of October 1, 2020, the Debtor had substantial assets at 50 North Park Avenue,
Rockville Centre, NY 11570.

### Location of the Debtor's Books and Records

The Debtor's books and records are located at 50 North Park Avenue, Rockville Centre,
NY 11570.

### Debtor's Assets Outside the United States

The Debtor maintains two bank accounts (the "IOR Accounts") with the Institute for the
Works of Religion, a financial institution located inside Vatican City.  One account is
denominated in U.S. Dollars and the other in Euros.  As of the Petition Date, the combined
balances in the IOR Accounts totaled approximately $70,000, based upon prevailing exchange
rates.  The Debtor is in the process of repatriating these funds and closing the IOR Accounts.
The Debtor expects the IOR Accounts will be closed soon after the Petition Date.

## <u>Schedule 8</u>

### Legal Actions Against the Debtor in which Judgment is Imminent

Pursuant to Local Rule 1007-2(a)(11), to the best of the Debtor's knowledge, belief, and understanding, there are no actions or proceedings pending or threatened against the Debtors or their property, as of the Petition Date, where a judgment against the Debtors or a seizure of their property may be imminent.  As described in Section IV.E of this declaration, as of the Petition Date, the Debtor is a defendant in 223 cases commenced under the Child Victims Act.  The Debtor does not believe that judgement is imminent in any of these cases.  Additional information on these cases, including a list of claimants, will be provided in the schedules to be filed by the Debtor in this chapter 11 case.

## Schedule 9

### Debtor's Senior Management

Pursuant to Local Rule 1007-2(a)(12), the following is a list of the names of the individuals who comprise the Debtor's existing senior management, their tenure with the Debtor, and a brief summary of their relevant responsibilities and experience.

| Name / Position | Relevant Experience / Responsibility | Tenure |
|---|---|---|
| Most Rev. John O. Barres - Bishop, Diocese of Rockville Centre | Bishop Barres is responsible for directing and overseeing the mission of the Diocese. He became Bishop of the Diocese in January 2017. Prior to serving as Bishop of the Diocese, Bishop Barres served as the Bishop of the Diocese of Allentown from 2009 to 2016. Previously, he served as a priest in the Diocese of Wilmington for over 20 years. | 1/31/2017 - Present |
| Rev. Eric Fasano - Vicar General and Moderator of the Curia | Fr. Fasano is Co-Chancellor and Secretary to Bishop Barres. Bishop Barres in February of 2019 named Fr. Fasano as Vicar General and Moderator of the Curia. Prior to being named Co-Chancellor, Fr. Fasano served on the Diocesan Tribunal. Fr. Fasano has a Licentiate of Canon Law. | 7/1/2008 - Present |
| Sr. Maryanne Fitzgerald, SC - Co-Chancellor | Sr. Maryanne Fitzgerald is Co-Chancellor of the Diocese.  Sr. Maryanne was named Vicar for Religious of the Diocese in 1998 and then became Chancellor.  In 2008, she transitioned to a leadership role with Sisters of Charity, Halifax, and continued to serve the Diocese as a volunteer.  In 2014 Sr. Maryanne was named Co-Chancellor. | 9/1998 – 6/2008 10/2014 - Present |
| Rev. John McCartney - Co-Chancellor, Assoc. Mod. of the Curia and Secr. to the Bishop | In February of 2019, Bishop Barres appointed Fr. McCartney as Co-Chancellor, Associate Moderator of the Curia and Secretary to Bishop Barres. Fr. McCartney has served as parochial vicar and pastor for a number of parishes in the Diocese since 1999. Fr. McCartney practiced law for several years before he was ordained a priest. | 3/1/2010 - Present |
| Thomas Renker - Chief Operating Officer and General Counsel | Thomas Renker has been the Diocese's General Counsel since 2007.  In 2017, Mr. Renker assumed the Chief Operating Officer role in addition to remaining General Counsel.  As Chief Operating Officer, he has responsibility for all temporal functions of the Diocese. The position works closely with the Bishop and Vicar General. | 10/22/2007 - Present |
| William G. Chapin - Director of Facilities and Risk Management | William Chapin oversees all risk management and insurance programs for the Diocese, including its captive insurer. | 1/5/1998 - Present |

|  | The programs Mr. Chapin oversees include the shared programs that Ministry Members participate in and the Diocese supports.  Mr. Chapin has served with the Diocese since 1998 |  |
| --- | --- | --- |
| Thomas Doodian - Chief Financial Officer - Director of Finance | Thomas Doodian oversees all financial and accounting functions for the Diocese, including financial administrative services provided to Ministry Members.  Prior to joining the Diocese, Mr. Doodian was Chief Operating Officer and Chief Financial Officer of Hyperion Brookfield Asset Management. | 8/17/2009 - Present |

## Schedule 10

**Payroll**

Pursuant to Local Rule 1007-2(b)(1)-(2)(A) and (C), the following provides the estimated amount of weekly payroll to the Debtor's employees (not including officers, directors, and stockholders) and the estimated amount to be paid to officers, stockholders, directors, and financial and business consultants retained by the Debtor for the 30-day period following the filing of the chapter 11 petition.

| Payments | Payment Amount |
|---|---|
| Payments to employees (exclusive of officers, and directors) | $344,000 |
| Payments to officers and directors | $70,000 |
| Payments to financial and business consultants | $0 |

## Schedule 11

**Cash Receipts and Disbursements, Net Cash Gain or Loss, Unpaid Obligations and Receivables**

Pursuant to Local Rule 1007-2(b)(3), Schedule 11 hereto provides, for the thirty (30) day period following the filing of this chapter 11 petition, an estimate of the cash receipts and disbursements, net cash gain or loss, obligations and receivables expected to accrue but remain unpaid, other than professional fees.

| Type | Protected Self Insurance Program Amount | Administrative Offices Amount | Total Amount |
|---|---|---|---|
| Cash Receipts | $0.9 million | $1.9 million | $2.8 million |
| Cash Disbursements | $1.2 million | $3.2 million | $4.4 million |
| Net Cash Loss | $0.3 million | $1.3 million | $1.6 million |