PACHULSKI STANG ZIEHL & JONES LLP
James I. Stang, Esq. (admitted *pro hac vice*)
Linda Cantor, Esq.
10100 Santa Monica, Boulevard, 11th Floor
Los Angeles, California 90067
Telephone:     (310) 277-6910
Facsimile:     (310) 201-0760
Email:         jstang@pszjlaw.com
               lcantor@pszjlaw.com

-and-

Ilan D. Scharf, Esq.
Karen B. Dine, Esq.
Brittany M. Michael, Esq.
780 Third Avenue, 36th Floor
New York, New York 10017
Telephone:     (212) 561-7700
Facsimile:     (212) 561-7777
Email:         ischarf@pszjlaw.com
               kdine@pszjlaw.com
               bmichael@pszjlaw.com

Counsel for the Official Committee
of Unsecured Creditors of The Roman Catholic Diocese
of Rockville Centre, New York

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>THE ROMAN CATHOLIC DIOCESE OF<br>ROCKVILLE CENTRE, NEW YORK,<br><div align="center">Debtor.</div> | Chapter 11<br>Case No. 20-12345 (SCC) |

**THE OFFICIAL COMMITTEE OF UNSECURED**
**CREDITORS' (A) OBJECTION TO THE MOTION OF THE DEBTOR FOR AN**
**ORDER ESTABLISHING DEADLINES FOR FILING PROOFS OF CLAIM**
**AND GRANTING RELATED RELIEF AND**
**(B) RESPONSE TO LMI'S RESPONSE TO THE MOTION**

The Official Committee of Unsecured Creditors (the "**Committee**") of The Roman

Catholic Diocese of Rockville Centre, New York (the "**Diocese**" or the "**Debtor**") in the above-

captioned case (the "**Case**") under chapter 11 of Title 11 of the United States Code (the

"**Bankruptcy Code**"), by and through its undersigned proposed counsel, hereby objects (the

"**Objection**") to the *Motion of the Debtor for an Order Establishing Deadlines for Filing Proofs*

*of Claim and Granting Related Relief* [Docket No. 174] (the "**Motion**") and responds (the

"**Response**") to *LMI's Response to the Motion* [Docket No. 199] (the "**LMI Response**")[1].

In support of this Objection, the Committee submits concurrently herewith the following:

(i) the Declaration of Jon R. Conte, Ph.D. (the "Conte Decl."); (ii) the Declaration of Shannon R.

Wheatman, Ph.D. (the "Wheatman Decl."); and (iii) the Declaration of Karen B. Dine, Esq. (the

"Dine Decl."); and respectfully represents as follows:

## PRELIMINARY STATEMENT

1.      The Committee objects to the Motion because it (a) requests a Bar Date that falls

almost six months before the expiration of the window to file claims for sexual abuse established

by the New York legislature in the Child Victims Act (the "**CVA**") and (b) proposes a wholly

inadequate noticing program for the Bar Date.

2.      Sexual abuse survivors' claims are vastly different from claims held by

commercial creditors or other claimants asserting tort claims in chapter 11 cases.  The nature of

the abuse and societal and personal stigmas associated with sexual acts make disclosure of abuse

– even in a confidential setting – difficult for abuse survivors.  As such, a deadline to file sexual

abuse claims must provide reasonable time for survivors to process their abuse in a manner that

allows them to disclose the details of the claim.  The sixty days proposed by the Diocese is

---

[1] LMI was also joined in its objection by Interstate Fire & Casualty Company. *See Interstate Fire & Casualty Company's Joinder in LMI'S Response* [Docket No. 200].

wholly inadequate. Moreover, in this case, the New York State legislature and Governor have already determined that August 14, 2021 is the appropriate deadline for child abuse survivors to assert claims against the Diocese.[2] *See* CPLR 214-g. There is no reason for this Court to curtail the will of the legislature and shorten the CVA window that has given survivors hope for justice after decades of waiting. The Diocese had the benefit of a protective statute of limitations from its founding until August 14, 2019. It should not be permitted to deny any survivors the full extent of the limited window opened by New York.

3.      The notice program proposed by the Debtor (the "**Debtor's Notice Program**") is wholly inadequate for reaching claimants. The Debtor's Notice Program does not reach an adequate number of abuse survivors, does not properly cue recall for abuse survivors and does not provide enough opportunities to see the notice. In addition, the notice of the abuse claim deadline (the "**Abuse Bar Date Notice**") should be specifically tailored to potential survivor claimants and should not be part of an omnibus notice to all creditors. Moreover, the requirement that abuse claimants file both a general claim form and an abuse claim form is unnecessary, burdensome and creates risks to the confidentiality of claims filed by sexual abuse survivors.

4.      Finally, the question that LMI seeks to impose in the LMI's Response is a wholly inappropriate addition to the claim form. That question, in effect, would alter the claim allowance procedure by requiring creditors to provide extensive information as a precondition to

---

[2] Although originally the CVA window was a one-year period ending on August 14, 2020, the COVID-19 public-health emergency arose during that one-year period. In response to that public health emergency, on August 3, 2020, Governor Cuomo signed S7082; thereby amending CPLR 214-g to create a two-year window in which to file CVA claims. 2020 Sess. Law News of N.Y. Ch. 130, §1; *see Governor Cuomo Signs Legislation Extending Look Back Window for Child Victims Act*, Governor Andrew M. Cuomo (Aug. 3, 2020) https://www.governor.ny.gov/news/governor-cuomo-signs-legislation-extending-look-back-window-child-victims-act. When he signed the bill extending the window for another year, Governor Cuomo explained, "The Child Victims Act brought a long-needed pathway to justice for people who were abused, and helps right wrongs that went unacknowledged and unpunished for far too long and we cannot let this pandemic limit the ability for survivors to have their day in court." *Id.*

having their claims deemed properly filed under Bankruptcy Rule 3001. This is an inappropriate

abrogation of the Bankruptcy Rules.

## OBJECTION

### A.    The Bar Date Should Be August 14, 2021

5.    The Court should set a bar date of August 14, 2021, which is coterminous with

the "window" to file claims pursuant to the CVA.

6.    New York has made it clear that survivors of child sexual abuse should be given

until August 14, 2021 to file a claim regarding their abuse. CPLR 214-g. Thus, the Committee

seeks to ensure that the will of the people of the State of New York (as enacted by its Legislature

and Governor) is implemented, and to ensure that the abuse survivors with claims against the

Diocese are, from a statute of limitations perspective, treated equally with all other New York

abuse survivors.

7.    Sexual abuse survivors have been inundated with a well-publicized extended

CVA deadline of August 14, 2021, and are likely relying on that date as a milestone to prepare

themselves emotionally for filing a claim against the Diocese.[3] Imposing an earlier deadline also

threatens survivors' ability to disclose their abuse to family members in a time and manner of

their choosing, and would serve to take away control over their own stories. Loss of control is a

---

[3] *See, e.g., New York Gov. Cuomo Announces Extension of 'Look Back' Window for Filing Under Child Victims Act*,
Law.com (May 8, 2020), https://www.law.com/newyorklawjournal/2020/05/08/ny-gov-cuomo-accounces-
extension-of-look-back-window-for-filing-under-child-victims-act; Rob Abruzzese, *Child Victims Act gets one-year
extension, giving child sex abuse survivors more time to sue*, Brooklyn Daily Eagle (Aug. 4, 2020)
https://brooklyneagle.com/articles/2020/08/04/child-victims-act-gets-one-year-extension-giving-child-sex-abuse-
survivors-more-time-to-sue/; *New York State Lawmakers Pass Coronavirus Relief Package*, CBSN (May 28, 2020
at 6:15am), https://newyork.cbslocal.com/2020/05/28/nys-covid-relief-package/; Robert Pozarycki, *Time limit
extended for sex abuse victims to file claims under New York Child Victims Act*, AMNY,
https://www.amny.com/manhattan/time-limit-extended-for-sex-abuse-victims-to-file-claims-under-new-york-child-
victims-act/ (last visited July 10, 2020); Editorial Board, *Justice extended, not denied: Gov. Cuomo extends the
Child Victims Act deadline for survivors seeking closure*, New York Daily News (May 9, 2020),
https://www.nydailynews.com/opinion/ny-edit-cva-20200509-dspoar6olzg6ja2h6s6impn3w4-story.html; Bernadette
Hogan and Priscilla DeGregory, *Child Victims Act lawsuit deadline extended due to coronavirus*, NY Post (May 8,
2020, 3:55pm), https://nypost.com/2020/05/08/child-victims-act-lawsuit-deadline-extended-amid-coronavirus/.

central issue for sexual abuse survivors, and limiting their control over disclosure of their abuse could re-traumatize survivors.[4]  Additionally, an earlier deadline will result in a substantial likelihood of confusion among survivors regarding their deadline to file claims.[5]

8.    Finally, an earlier bar date will provide no material benefit for the Case.  A bar date coterminous with the CVA deadline will enhance the likelihood that the true universe of claims against the Debtor will be known for purposes of developing a plan of reorganization that appropriately addresses survivors.  Even if the Bar Date is fixed at an earlier time for the Diocese, the Bar Date does not limit the time for the assertion of claims against the Parishes and other Debtor affiliates and related parties that are the subject of the same abuse, and who may also be contributing parties in a global resolution.  Thus, the earlier bar date for the Diocese does not establish the universe of claims against non-debtors, who may be co-liable with the Diocese or who may assert claims under the same insurance policies as the Diocese.   Until the universe of potential claims subject to the insurance policies is known, it will be impossible to engage in meaningful and substantive negotiations towards a consensual plan of reorganization because parties will want to know the universe of potential claims against them before negotiating any contribution to a global settlement.

9.    In order to address these concerns and ensure a fair claims process for survivors, the Court should not shorten the existing deadline set by the State of New York for survivors to file claims under the CVA and should establish August 14, 2021 as the bar date in this Chapter 11 Case.

---

[4] Conte Decl., ¶ 18.

[5] *Id*., ¶ 16.

B.     **The Debtor's Proposed Noticing Procedures Fail to Address the Specific Attributes of Abuse Survivors**

10.     Despite productive negotiations and the Debtor making certain changes to the proposed notice, claim form and order, the Committee and the Debtor were unable to resolve all of their differences regarding the remainder of the relief requested in the Motion.  The Committee intends to continue to work with the Debtor to consensually resolve as many issues as possible.

11.     The Committee requests changes to the Debtor's Notice Program, including: (a) the provision of direct notice to all known and reasonably ascertainable abuse survivors, and (b) expansion of the publication notice program to include additional media sources, following the recommendations of Dr. Wheatman as the Committee's noticing expert.

12.     In addition, the Committee submits that the form of abuse notice be direct and specifically targeted to abuse claimants.  Moreover, because of the significant psychological defenses utilized by many abuse survivors to avoid memories of abuse, cued recall must be employed.  The Debtor's abuse notice must include the names, photographs and other identifying information of all individuals against whom an abuse accusation has been made, regardless of the manner or forum in which the accusation has been made.[6]

13.     The Committee has engaged two expert witnesses whose opinions form the basis for the Committee's Proposed Order (appended as **Exhibit A** hereto), including the Abuse Bar Date Notices (appended as **Annex 3** and **5** to the Proposed Order) (collectively, the "**Bar Date Documents**").

14.     Dr. Jon R. Conte, Doctor of Social Work, is professor emeritus at the University of Washington in Seattle. Dr. Conte has almost four decades in the study of childhood sexual

---

[6] *Id.*, ¶¶ 23–27.

abuse, is published in that area, and has trained multidisciplinary audiences on various aspects of childhood sexual abuse. Dr. Conte has served on national panels on child abuse, and has evaluated thousands of child, youth, and adult victims of sexual abuse. Dr. Conte has provided the following expert opinions that inform the Committee's Objection: (i) the length of time between notice and the bar date must be longer than typical in order to allow for individuals sexually abused as children to overcome psychological barriers to make sexual abuse claims; (ii) competing deadlines will likely lead to confusion and other difficulties for sexual abuse survivors; (iii) direct notice should be provided not only to persons who complained of abuse but also to people who attended organizations and facilities where known pedophile priests (and other perpetrators) lived and worked; (iv) repeated notice and information that will "cue" recall is likely to increase responsiveness to notices; and (v) the question of fair notice should be addressed in the context of the unique needs of survivors who have suffered the effects of childhood sexual abuse by clergy.

15.    Kinsella Media, LLC: Dr. Shannon R. Wheatman, President of Kinsella Media, LLC, holds a doctorate in Social Psychology and a master's degree in Legal Studies. She has extensive experience in designing, developing, analyzing, and implementing large-scale legal notification plans in class action and bankruptcy cases. Dr. Wheatman has reviewed the Debtor's Notice Program and has provided her opinion as to the inadequacy of the Debtor's Notice Program insofar as it (i) will reach fewer abuse claimants than appropriate, (ii) does not provide enough opportunities for abuse claimants to see notice, and (iii) fails to use media, such as television, that is critical to reaching older abuse claimants who should be the primary target of this notice effort. Dr. Wheatman has proposed an alternative notice program to maximize the reach of notice to potential creditors.

## THE CVA

16.     On January 28, 2019, the New York State Legislature passed the CVA, which

New York Governor Andrew Cuomo signed on February 14, 2019.  The CVA modified the

statute of limitations and created a one-year "window" during which victims of child sexual

abuse, whose claims may have otherwise been time-barred, may commence a timely civil action.

In addition, the CVA extends the statute of limitations for claims that were not time-barred on its

date of passage, permitting such child victims to commence timely civil actions until they reach

55 years of age.

17.     As a result of the COVID-19 pandemic, New York's legislature voted with near

unanimity to extend the CVA statute of limitations deadline from August 14, 2020 to August 14,

2021 (the "**CVA Deadline**").[7]  On August 3, 2020, Governor Cuomo signed the extended CVA

Deadline into law.  Notably, in response to the first extension of the CVA's statute of limitations,

the CVA's sponsor, State Senator Brad Hoylman, noted:

> Coming forward as a survivor of child sexual abuse takes courage, focus and lots
> of time.  As the unemployment rate spikes above 14%, it's unreasonable to expect
> survivors of child sexual abuse to do the emotional and legal work necessary to
> file CVA lawsuits while simultaneously fighting to pay rent and put food on the
> table.[8]

---

[7] *See Senate Bill S7082*, The New York State Senate, *available at*
https://www.nysenate.gov/legislation/bills/2019/s7082 (last visited November 30, 2020).

[8] *Senator Hoylman Responds To Announced Extension Of CVA Look-Back Window*, Friday May 8, 2020  ISSUE:
SD 27 Child Victims Act COVID-19 (https://www.nysenate.gov/newsroom/press-releases/brad-hoylman/senator-
hoylman-responds-announced-extension-cva-look-back) (Senator Hoylman made these comments in response to
Governor Cuomo's extension of the CVA deadline to January 14, 2021, prior to the legislature's further extension to
August 14, 2021).

## ARGUMENT

### I.  THE BAR DATE SHOULD BE COTERMINOUS WITH THE CVA DEADLINE

#### A.    A Coterminous Bar Date Accounts for the Unique Experience of Sexual Abuse Survivors

18.    Any bar date that is not coterminous with the CVA deadline gives too little regard for the difficulty encountered by an adult survivor who is compelled to file a claim by a date certain regardless of whether he is emotionally or psychological ready to do so.  The Debtor's Motion notes that its proposed General Bar Date exceeds the minimum bar 21-day notice period established under the Bankruptcy Rules.[9]  While this is the bare minimum required for ordinary creditors, "[w]hat constitutes fair notice for the average person may not constitute fair notice for a person abused by a priest."[10]  Notably, survivors of child sexual abuse are not ordinary creditors in the overwhelming majority of chapter 11 cases.  Typically, creditors are commercial actors whose claims arose because of a commercial relationship with a debtor.  In contrast, adult survivors of child sexual abuse are creditors by virtue of nonconsensual acts by perpetrators of abuse.  Just as it takes great "emotional and legal work" to file a lawsuit under the CVA, so too does it take great emotional and legal work to file a Sexual Abuse Claim against the Diocese.[11]

          a.    *Survivors' Preparations to File Claims are Already Focused on August 14, 2021*

19.    Survivors of sexual abuse may be relying on the August 14, 2021 deadline as a benchmark to prepare themselves emotionally for filing a claim against the Diocese.  There are significant psychological hurdles that survivors of sexual abuse, and particularly survivors of

---

[9] Debtor's Motion, p. 19 of 71, ¶ 30.

[10] Conte Decl., ¶ 29.

[11] *Id.*, ¶ 17.

clergy childhood sexual abuse, must overcome in order to come forward and file a claim.[12]  The

decision to file a claim takes time.[13]  This is why legislatures in many states, including New

York, have either reformed or removed civil statutes of limitation for claims of childhood sexual

abuse.[14]  Once a potential claimant has received an official notice of a deadline to assert claims,

many will need a period of reflection and consideration before determining whether to assert

their claims and submit to a legal process.[15]  The current pandemic may overshadow the claim

filing process as the seasons change and the virus gains prevalence, but also may trigger abuse

memories and feelings, making a determination to file a claim even more difficult.[16]

20.    Many survivors target their decision to pursue a claim to clearly established

deadlines to do so.[17]  Based on that target date, survivors begin the steps necessary to come

forward, including emotional preparation for themselves as well as disclosure to family.[18]  Some

survivors may also require therapy to prepare.[19] For many, they are articulating and disclosing

their abuse for the first time.[20]

21.    Here, a deadline has been set by New York's government, and survivors are likely

timing their decision to come forward in reliance on that deadline.[21]  Given the clearly

---

[12] *Id.*, ¶ 12.

[13] *Id.*, ¶¶ 11–15.

[14] As of 2020, thirty states had introduced bills for reform of statutes of limitation for childhood sexual abuse, and as of 2019 twenty-three states and the District of Columbia reformed their statutes of limitation for childhood sexual abuse.  *See Child Sex Abuse Statute of Limitations Reform*, ChildUSA, https://www.childusa.org/sol (last visited Dec. 1, 2020).

[15] Conte Decl., ¶ 13.

[16] *Id*., ¶ 14.

[17] *Id*., ¶ 17.

[18] *Id.*

[19] *Id.*

[20] *Id.*

[21] *Id*., ¶ 18.

established deadline imposed by the New York State legislature, some survivors may be irreparably harmed if the current oft-repeated deadline is replaced with an earlier deadline.

b.    *Multiple Deadlines Could Confuse Survivors*

22.    Sexual abuse survivors include many elderly and vulnerable adults, who may have trouble understanding the difference between the CVA Deadline and an earlier bar date established by the Bankruptcy Court, especially in light of the publicity of the extension of the CVA deadline.[22]  The high risk of some abuse survivors falling between the cracks and missing the deadline to file claims is diametrically opposed to the purpose of this Chapter 11 Case – to bring fair compensation to survivors.

23.    Survivors of child sexual abuse are not typical bankruptcy creditors.   Addressing the traumatic experience that is the basis of a sexual abuse claim raises a host of emotional issues that may cloud apprehension even among those with otherwise impeccable cognitive abilities. Making an earlier deadline separate from the CVA Deadline may easily confuse many claimants facing this very stressful process, regardless of their age.  Given these potential hardships for survivors, there is no justification for a bar date other than August 14, 2021.

**B.    An Earlier Bar Date Will Not Expedite the Case Because Insurers or Parishes Will Avoid Making Substantial Offers Until the Later Deadline Passes**

24.    The Diocese insists a bar date earlier than August 14, 2021 is necessary to keep this case moving forward.[23]  However, an earlier bar date will likely have no impact on the length of this case.  The Bar Date does not apply to the Diocese's parishes and other related-entities, and the deadline to commence CVA actions against them is August 14, 2021.  Many of these entities reportedly are insured under the same insurance policies as the Diocese and some

---

[22] *Id.*, ¶ 16.

[23] Motion, ¶ 9.

of them may have their own insurance policies to contribute toward an eventual global

settlement.[24]  There is a strong possibility that those non-debtor entities and insurers will not be

willing to negotiate a meaningful settlement while additional claims may still be filed.  As Judge

Bucki noted in the Diocese of Buffalo case: "The common deadline of August 14, 2021, will

reduce the likelihood of the problem that might occur if a plaintiff were to commence a timely

action against a parish but file a late claim against the Diocese."[25]  If there is a disparity between

the CVA deadline and a bar date, negotiations could be hampered as insurers or parishes wait for

the window to close.  As such, the likely dynamic of lackluster participation by insurers and non-

debtor entities while they wait for the CVA window to close does not support Debtor's

justification for truncating the time for survivors to file claims.

    25.    Based on precedent in other diocese cases, there is substantial likelihood that

claims will be filed in the gap period between an earlier bar date and the CVA deadline leading

to additional litigation and confusion in the Bankruptcy Case.  The Archdiocese of Saint Paul

and Minneapolis filed its chapter 11 case after a window for out of statute sexual abuse claims

was opened in Minnesota.  The bar date for the Archdiocese occurred prior to the deadline

---

[24] *Memorandum of Law in Support of Motion for a Preliminary Injunction Under Sections 362 and 105(a) of the Bankruptcy Code*, Adv. Pro. 20-01226 [Docket No. 3], p. 12–13.

[25] Dine Decl., Ex. 11, *In re. The Diocese of Buffalo, N.Y.,* Case No. 20-10322 CLB (Bankr. W.D. N.Y.) [Docket No. 546] at p. 11.  Judge Warren in the Diocese of Rochester case also set the bar date to be coterminous with the then-CVA Deadline (August 13, 2020), which was eleven months from the petition date (September 12, 2019).  Dine Decl., Ex. 12, *In re. The Diocese of Rochester*, Case No. 19-20905 (PRW) (Bankr. W.D. N.Y.) [Docket No. 425].  Judge Warren denied the Diocese of Rochester Committee's request post-COVID 19 to extend the bar date, noting that he had initially warned the parties that the bar date would not be a "shifting target" and would remain static once set and noticed.  Dine Decl., Ex. 13, *In re. The Diocese of Rochester*, Case No. 19-20905 (PRW) (Bankr. W.D. N.Y.) [Docket No. 700].  Judge Warren ruled on the possible extension prior to the New York State Legislature's extension of the CVA Deadline. *Id.*  Additionally, Judge Warren noted that attorneys were already heavily advertising the August 13, 2020 deadline, which is not an applicable consideration in this Case, in which all advertising and reporting is focused on the current August 14, 2021 deadline. *See id.*  The Committee is also aware that a bar date of April 15, 2021 was set in the Diocese of Syracuse case, providing 300 days from the petition date to bar date. Dine Decl., Ex. 14, *In re. The Roman Catholic Diocese of Syracuse, New York*, Case No. 20-30663 (Bankr. N.D. N.Y.) [Docket No. 214]. 300 days is approximately the time between the petition date and August 14, 2021 in this Case.

established by the Minnesota legislature. There were 438 sexual abuse claims asserted against

the Archdiocese, of which 33 were filed after the bar date but before the Minnesota window

closed.[26] In that case, which did not occur during a national pandemic, approximately seven and

one-half percent (7.5%) of claims were filed after the bar date. Thus, there is a substantial

likelihood that a material number of claims may be filed after a bar date that precedes the CVA

deadline.

26.    In addition to these issues and delays that may result from a non-coterminous

deadline, there is no correlation between the length of the claims filing period and the length of a

case. This is evidenced by the seventeen Catholic diocese or religious order cases that have

achieved confirmed plans in bankruptcy. For example, in the Archdiocese of Saint Paul and

Minneapolis case, although the survivors' time period to file claims was shortened in comparison

to the Minnesota CVA window, the case was the third longest Catholic bankruptcy, lasting

almost four years.[27] The Diocese of Duluth and the Diocese of New Ulm cases also rank among

the longest cases, lasting almost five years and over three years respectively, despite having

some of the shortest claims filing periods.[28]

---

[26] *See* Dine Decl., Ex. 2, *In re The Archdiocese of Saint Paul and Minneapolis*, Case No. 15-30125 (Bankr. D. Minn.) [Docket No. 656] at p. 39. Although this proposed disclosure statement was ultimately superseded by a disclosure statement that accompanied a different plan, the information regarding claims filed in a gap period between a bar date and a later window deadline is illustrative for this Court's determination of when an appropriate bar date would fall.

[27] *See, e.g.,* Dine Decl., Ex. 3, *In re The Archdiocese of Saint Paul and Minneapolis*, Case No. 15-30125 (Bankr. D. Minn.) [Docket No. 1] (voluntary petition filed on Jan. 16, 2015); Dine Decl., Ex. 4, *In re The Archdiocese of Saint Paul and Minneapolis*, Case No. 15-30125 (Bankr. D. Minn.) [Docket No. 1278] (order confirming plan on Sept. 25, 2018).

[28] *See* Dine Decl., Ex. 5, *In re Diocese of Duluth*, Case No. 15-50792 (Bankr. D. Minn.) [Docket No. 1] (voluntary petition filed on Dec. 7, 2015); Dine Decl., Ex. 6, *In re Diocese of Duluth*, Case No. 15-50792 (Bankr. D. Minn.) [Docket No. 420] (order confirming plan on Oct. 21, 2019); *see also* Dine Decl., Ex. 7, *In re Diocese of New Ulm,* Case No. 17-30601 (Bankr. D. Minn.) [Docket No. 1] (voluntary petition filed on Mar. 3, 2017); Dine Decl., Ex. 8, *In re Diocese of New Ulm,* Case No. 17-30601 (Bankr. D. Minn.) [Docket No. 371] (order confirming plan on Mar. 10, 2020). Both cases had among the shortest time periods to file claims in Catholic bankruptcies, with bar dates coterminous to the Minnesota CVA window or significant after CVA deadline. Dine Decl., Ex. 9, *In re Diocese of Duluth*, Case No. 15-50792 (Bankr. D. Minn.) [Docket No. 35] (order setting bar date for May 25, 2016); *see also*

27.     Simply put, an earlier bar date will not advance the Case.  Instead, it will confuse and harm abuse survivors who may be relying on the August 14, 2021 date or never process the existence of a second relevant date.  It will also unnecessarily complicate the case by forcing parties to calculate timely-filed claims against just non-Diocesan entities versus timely-filed claims against both the Debtor and non-debtors.  Judge Bucki ruled that "[i]n reopening the statute of limitations, the CVA expressed a policy decision that deserves the respect of this Court.  Unless good cause is otherwise demonstrated, we should appropriately honor the decision of New York to allow the assertion of claims through August 14, 2021."[29]  Judge Bucki found that no such good cause existed in Buffalo, which filed for bankruptcy seven months prior to the Diocese of Rockville Centre, and equally no such good cause exists here.  Therefore, the Committee respectfully requests the Court set August 14, 2021 as the bar date.

## II. DEBTOR'S PROPOSED NOTICING PROGRAM DOES NOT ADEQUATELY REACH SURVIVORS

### A.     The Debtor's Proposed Publication Notice Program Is Not Adequate

28.     The Debtor's Notice Program does not afford survivors with the notice required by due process.  First, the Debtor proposes very limited print publication notice with no discussion of the persons or potential claimants that such publication will reach.[30]  Second, the Debtor also does not include any television ads that are critical to reaching claimants over the age of 50, who are likely a significant demographic in this case.[31]  Finally, the Debtor provides no radio outreach, which Dr. Wheatman notes is particularly effective at reaching the Spanish-

---

Dine Decl., Ex. 10, *In re Diocese of New Ulm,* Case No. 17-30601 (Bankr. D. Minn.) [Docket No. 33] (order setting bar date for July 10, 2017).

[29] Dine Decl., Ex. 11, *In re. The Diocese of Buffalo, N.Y.,* Case No. 20-10322 CLB (Bankr. W.D. N.Y.) [Docket No. 546] at p. 11.

[30] *See* Motion, ¶¶ 32–38.

[31] Wheatman Decl., ¶¶ 24, 58.

speaking group of potential creditors.[32]  For these reasons, among others, Dr. Wheatman

concludes that the Debtor's Notice Program is insufficient to reach claimants and to provide due

process notice of the bar date.[33]  As discussed below, Dr. Wheatman proposes a notice program

that will reach a significant percentage of potential creditors.  Specifically, Dr. Wheatman

advises the Debtor adopt a national notice program, based on the very substantial out-migration

data of individuals from the Diocese's region, but at a minimum use a regionally targeted

program designed to reach many more potential claimants.[34]  The Committee urges that the

Court approve the publication notice program outlined in the Bar Date Documents, in addition to

the direct notice program discussed below.

29.     In her analysis of the publication component of the Debtor's Notice Program, Dr.

Wheatman analyzed the reach, or estimated percentage of the "target audience" that would be

exposed to publication notice under the Debtor's Notice Program.[35]  Next, Dr. Wheatman

evaluated the frequency, or estimated average number of times someone may see the publication

notice.[36]  Dr. Wheatman found the reach and frequency lacking in the Debtor's proposal to

provide publication notice.[37]

30.     Because of its extensive reach in the age group of many potential abuse claimants,

Dr. Wheatman favors television as a notice medium.[38]  Dr. Wheatman seeks to bolster the paid

---

[32] *Id.*, ¶ 65.

[33] *See id.,* ¶¶ 24–35.

[34] *Id.*, ¶ 52.

[35] *See id.*, ¶ 28.

[36] *See id.*, ¶ 31.

[37] *See id.*, ¶¶ 28–31.  Specifically, Dr. Wheatman found that notice published in the national editions of the *The New York Times, The Wall Street Journal,* and *USA Today*, as well as every daily newspaper in New York would achieve only less than 30% reach in adults over eighteen and less than 35% reach in adults over fifty within Long Island and New York, and less than 5% of adults nationwide. *Id.*, ¶ 28.

[38] *See id.*, ¶ 58.

media exposure that is intrusive (uses visual elements to convey a message).[39]  Dr. Wheatman

presents data that Latinx and Caribbean populations are significant within the Church, and that

survivors of abuse may be more likely not to engage with Church-related media (such as parish

websites).[40]  Based on this examination of the data, Dr. Wheatman proposes—and the

Committee presents to the Court for its consideration—a minimum of the below "heavy New

York" robust publication notice program but ideally the expanded national program that

incorporates the following components:[41]

| NOTICE PROGRAM COMPONENT | EXPANDED NATIONWIDE + HEAVY NEW YORK | HEAVY NEW YORK + LIMITED NATIONWIDE |
|---|---|---|
| *Reach/Frequency* | • 70%/3.0 (Nationwide)<br>• 80% to 87%/3.0 to 3.8 (New York)<br>• 88% to 95%/3.7 to 4.9 (Long Island) | • 1.8%/1.1 (Nationwide)[42]<br>• 80% to 87%/3.0 to 3.8 (New York)<br>• 88% to 95%/3.7 to 4.9 (Long Island) |
| *Television (NY)* | • Heavy TV in Long Island media market | • Heavy TV in Long Island media market |
| *Ethnic Radio (NY)* | • Hispanic/Creole | • Hispanic/Creole |
| *Consumer Magazines* | • National edition of 5 consumer magazines | • National edition of 5 consumer magazines |
| *National Newspaper* | • New York Times | • New York Times |
| *Community Newspapers (NY)* | • Top 5 newspapers in Nassau & Suffolk counties | • Top 5 newspapers in Nassau & Suffolk counties |
| *Religious Newspapers (NY)* | • 4 Catholic newspapers | • 4 Catholic newspapers |
| *Ethnic Newspapers (NY)* | • 3 Hispanic<br>• 3 Caribbean newspapers | • 3 Hispanic<br>• 3 Caribbean newspapers |
| *State Newspapers* | N/A | • Top newspaper in FL,NC, PA, & NJ |

---

[39] *See id.*, ¶ 59.

[40] *See id.*, ¶¶ 41–49.

[41] *See id.*, ¶ 52.

[42] If all of the national newspapers included in the Debtor's bar date program were implemented, the nationwide reach would be 4.0% and the frequency would be 1.6. *Id.*, ¶ 28.

| | | |
|---|---|---|
| *National Online* | • 300 million gross impressions[43]<br>• Catholic Audience Network<br>• Keyword Search Ads | • 3 million gross impressions<br>• Keyword Search Ads |
| *New York Online* | • 28 million gross impressions<br>• Targeted Online | • 28 million gross impressions<br>• Catholic Audience   Network<br>• Targeted Online |
| *Social Media* | • Facebook, Twitter & LinkedIn | • Facebook, Twitter & LinkedIn |
| *Earned Media* | • National Press Release | • National Press Release |
| *Community Outreach* | • Catholic Churches in NY, FL, NC, PA, & NJ<br>• U.S. Prisons<br>• Sexual Abuse Support Groups | • Catholic Churches in NY, FL, NC, PA, & NJ<br>• U.S. Prisons<br>• Sexual Abuse Support Groups |
| **TOTAL COST[44]** | **$1.9 million** | **$950,000** |

31.    Because publication notice is targeted in great part to people over the age of 50, television is a better means of reaching unknown creditors than the alternatives, is not exorbitantly priced, and can be quantified in terms of reach and frequency.[45]  The addition of a page on the claims agent's website providing sexual abuse creditor FAQs is also a component of Dr. Wheatman's program that the Committee wants to highlight here as important once notice reaches unknown (and, for that matter, known) creditors.[46]  For these reasons, the Committee has incorporated Dr. Wheatman's recommendations into its proposed Bar Date Documents, including the translation of the Bar Date Documents into Spanish and Creole.[47]

---

[43] Gross impressions are the total number of times a digital ad will be shown. *Id.* This figure does not represent the total number of unique viewers of the ad, as some viewers will see the ad more than once. *Id.*

[44] These are hard costs and do not include production costs or agency commissions. *Id.*  Those would need to be provided by the firm implementing the program.  *Id.*

[45] *See id.*, ¶¶ 58–63.

[46] *See id.*, ¶ 84.

[47] *See id.*, ¶ 89.

**B.**    **Direct Notice Should Be Sent to All Reasonably Ascertainable Abuse Survivors**

32.    The case law construing due process requires that "reasonably ascertainable"
people are "known" creditors who must receive actual notice of the Bar Date.  Due process
requires an assessment of "the sufficiency of notice against the backdrop of the factual
circumstances in each case." *In re Kendavis Hldg. Co.*, 249 F.3d 383, 387 (5th Cir. 2001)
(holding that putative claimant's actual knowledge of bankruptcy did not satisfy due process
requirements that he be provided actual notice of bar date to object to termination of pension
payments).  In the case at bar, the Debtor has written records, such as personnel files, tracking
the location of perpetrators of sexual abuse against children.  The Debtor must exercise
reasonably diligent efforts in tracking those perpetrators' locations and in reviewing their records
for actual information about potential sex abuse within the Diocese.

33.    Not all potential abuse survivors are unknown creditors.  *Placid Oil* stands for the
proposition that creditors are reasonably ascertainable and thus entitled to actual notice of the bar
date, if they "can be discovered through 'reasonably diligent efforts.'" *Williams v. Placid Oil Co.
(In re Placid Oil Co.), 753 F.3d 151, 154 (citing Tulsa Prof. Collection Svcs., Inc. v. Pope*, 485
U.S. 478, 490 (1988)).  A claimant is reasonably ascertainable if the Debtor knows the type of
claim at issue and the entity potentially liable for the claim.  *See id.* at 155.  Here, the claim at
issue is clearly sexual abuse for which the Diocese is potentially liable.  Children exposed to
perpetrators, and thus potential sexual abuse survivors are ascertainable from the Debtor's
records of dates of employment for perpetrators cross-referenced to school alumni, church
membership, and orphanage residency lists.  Therefore, the survivors of childhood sexual abuse
whom the Committee seeks to have served with actual notice of the bar date are reasonably
ascertainable.

34.     It is common for dioceses to have "clusters" of sexual abuse: institutions at which multiple sexual abuse claims arose around the same time period.  Indeed, in Dr. Conte's long history evaluating survivors of abuse committed by those in religious life, he has never "seen a case where only one child is known to have been abused by an offender."[48]  There is no credible argument that "reasonably ascertainable" creditors cannot be found amongst the children involved in locations where there were clusters of sexual abuse. The Debtor is in possession of the state court complaints and the Independent Reconciliation and Compensation Program ("**IRCP**") claims. Additionally, the Debtor could likely identify additional claims by reviewing all of its priest personnel files.  Therefore, the Debtor can ascertain when and where abuse clusters existed.

35.     Further, the Debtor knows the abusers' pastoral assignments.  Any other students or children under the supervision or control of these abusers during the length of their assignments are reasonably identifiable potential claimants who must be served with actual notice of the bar date.  The Committee is informed and believes that the Debtor has records of Social Security numbers for students who have attended their schools.  Current addresses of these children can be located through a social security number search for minimal cost.[49] Current addresses of former student can also be located using names and birthdates, information the Debtor should have readily available.  Moreover, Dr. Wheatman's recommendations for updating non-deliverable or outdated addresses should be included in the actual notice program: third-party vendors provide this service at minimal expense.[50]

---

[48] Conte Decl., ¶ 22.

[49] Wheatman Decl., ¶¶ 19–23.

[50] *Id.*

36.    Other courts have recognized the importance of maximizing notice and have imposed such very broad bar date direct notice programs to reach potential survivors of sexual abuse. For example, in the bar date order entered in the bankruptcy case of *The Christian Brothers' Institute, et al.*, direct notice of the bar date was given to alumni of schools or other institutions in which the debtors were aware that alleged and/or credibly accused abusers taught or performed ministry.[51]  This was in addition to the notice provided to sexual abuse victims who (1) filed, or threatened to file, lawsuits against the debtors that allege they were abused; (2) contacted the debtors to report they were victims of abuse, whether or not that claim was considered to be substantiated and whether or not the report was written or verbal; (3) entered into a settlement agreement with the debtors stemming from allegations of abuse; and (4) received payment from the debtors as a result of allegations of abuse.  Extensive publication notice was also provided, along with website notice and posting of notices of the bar date at various agencies, hospitals and governmental entities.

37.    In the bankruptcy case of *The Roman Catholic Bishop of Stockton*, the bar date order required direct notice of the bar date to be given to all known sexual abuse claimants, counsel to such claimants, and each household on the current mailing list of each parish as well as the alumni list for any parish schools which permitted the debtor to mail that notice to their alumni.[52]  In addition to this broad direct notice and publication notice, the Court ordered that a bar date notice be posted at each school, post office, parish, survivors center, regional corporation and tribal council.

38.    In the bankruptcy case of the *Archdiocese of Milwaukee*, the debtor not only sent notice to persons who had made claims of abuse, and persons who participated in mediation and

---

[51] *See* Dine Decl., Ex. 15, Case No. 11-22820 (RDD) (Bankr. S.D.N.Y.) [Doc. #244].

[52] *See id.*, Ex. 16, Case No. 14-20371 (Bankr. E.D. Cal.) [Docket No. 262].

persons whose abuse was known to the debtor, but the debtor also requested schools in the

region to provide the debtor with current alumni mailing lists, if any, so that the debtor could

send notice to any individual that appeared on those lists; the debtors contacted each parish to

obtain email addresses so that the debtors could provide notice to such persons by email.[53]  The

debtor was also required to review its files and data bases and the files of the Diocesan Review

Board, Safe Environment Coordinator Office, Victims Assistance Coordinator, Eisenberg

Commission and Project Benjamin to locate additional abuse survivors, provide to the creditors'

committee the names of additional abuse victims located, and engage in due diligence to assess if

it had access to closed files for notice purposes.

39.    The Debtor has the resources to serve direct notice on all children who had

contact with institutions that were abuse clusters, on all children referenced as potential victims

in personnel files, and on all children who were under the supervision of abusers.  By only

targeting the persons who made formal abuse claims in the past decade, it is inevitable that other

reasonably ascertainable survivors of abuse will be missed.

40.    For example, assume that a priest who worked at a Catholic elementary school

molested four children.  Child One reports the abuse to a teacher who puts a note in the child's

school file.  When the principal talks to Child One, the Child says that he saw the priest take

Child Two into the coat closet alone, which is what he had done with Child One.  The principal

decides the child has fabricated the abuse and does not report the allegations to the Diocese (or to

any civil authorities).  Child Three's parents report abuse to the Diocese and threaten to sue.

Child Four, abused at the school, never reports the abuse.  Under the Debtor's proposal, only

Child Three would receive actual notice of the Bar Date even though the Catholic school where

---

[53] *See id.*, Ex. 17, Case No. 11-20059 (Bankr. E.D. Wis.) [Docket No. 331].

Children One, Two, and Four were abused should have records of the names and addresses of the students who attended.

41.     By providing a targeted direct notice to all students and children in the proximity of accused clergy, there is greater chance of reaching claimants.[54]

**C.     The Debtor Must Publish a List of Accused Perpetrators**

42.     In addition to reaching a greater number of survivors, notices that include the name of accused perpetrators can help overcome the damage done by the abuse that may make survivors avoidant, unaware, or reluctant to disclose.[55]  As Dr. Conte explains, "[w]hen sexual abuse is perpetrated by a person in authority, especially God's representative on earth in the person of the Catholic priest, the child is unable or unwilling to tell others about the abuse."[56] Compounding that reticence, many survivors initially reported their abuse and were not believed or, even worse, punished for "saying such bad things about a man of God."[57]  The use of recollection cues—such as the name or, better yet, photos of abusers—are important tools to trigger the memory of abuse or identify relevant experiences.[58]

43.     This is not an unprecedented concept and has been imposed in other church bankruptcy cases. For example, in *In re The Roman Catholic Church of the Archdiocese of New Orleans*, the Court required that the bar date notice include: (a) the name of each priest and clergy member against whom the Archdiocese or a Parish vetted reports of Sexual Abuse against; (b) the name of the parish, school, or orphanage within the Archdiocese that the

---

[54] Conte Decl., ¶¶ 20–22.

[55] *Id.*, ¶ 23.

[56] *Id.*, ¶ 24.

[57] *Id.*

[58] *Id.*, ¶ 25.

individual worked; (c) the dates of each assignment; (d) a picture, at least 3" by 5" of the individual; and (e) a disclaimer that the list is not exhaustive.[59]

44.     Fair notice involves multiple steps: First, the survivors must actually see the notice.[60]  Next, the survivors must acknowledge that to themselves that they were abused.[61] Finally, the survivors must make the decision to file a claim.[62]  To accomplish that second step in the process, "stimulated" or "cued recall" is incredibly important.[63]  Survivors unconsciously develop a powerful defense mechanism that "pushes the sexual abuse from conscious memory."[64]  Because of this common phenomenon, lists of priests and other perpetrators are vital to assisting survivors, many of whom have endured decades of denial from the Diocese and its affiliates, in recognizing the validity of their own recollections and in taking the final difficulty step of coming forward to file a claim.

45.     The Debtor has, at a minimum, a list of all priests or deacons whom the Debtor knows are the subject of an adverse determination by the Debtor's Diocesan Review Board that an allegation of clergy abuse against such priest or deacon was credible or against whom an allegation of clergy abuse was made through the IRCP.[65]  Additional names are ascertainable from the Debtor's records and recent state court litigation.

---

[59] *See* Dine Decl., Ex. 18 (Bankr. E.D. La., Case No. 20-10846) [Doc. #461].

[60] Conte Decl., ¶ 23.

[61] *Id.*

[62] *Id.*

[63] *Id*., ¶ 25.

[64] *Id*., ¶ 24.

[65] The Debtor agreed that no such priests or deacons would receive payments under the *Debtor's Motion for an Order Authorizing the Debtor to (I) Pay Prepetition Employee Wages, Salaries, Benefits and Other Related Items; (II) Reimburse Prepetition Employee Business Expenses; (III) Continue Employee Benefit Programs; and (IV) Pay All Costs and Expenses Incident to the Foregoing. See Final Order Authorizing the Debtor to (I) Pay Prepetition Employee Wages, Salaries, Benefits and Other Related Items; (II) Reimburse Prepetition Employee Business Expenses; (III) Continue Employee Benefit Programs; and (IV) Pay All Costs and Expenses Incident to the Foregoing*, Docket No. 126, p. 4, ¶ 12.

46.    The Debtor has repeatedly committed to transparency in this Case.  Yet it is one

of only 41 out of 219 United States dioceses that do not disclose a list of accused priests.[66]

Including such a list with notice of the bar date is not just a minimal first step towards

transparency but is vital to ensuring the effectiveness of the bar date notice.

### III.    ABUSE CLAIAMANTS SHOULD NOT BE REQUIRED TO FILE TWO PROOF OF CLAIM FORMS

47.    The Debtor would require holders of abuse claims to file a general proof of claim

and an abuse proof of claim.  The Bar Date Motion provides at para 14 as follows:

> Given that Sexual Abuse Claims differ from other claims to be
> filed against the Debtor, the Debtor requests that the Court approve
> a customized and confidential proof of claim form for holders of
> Sexual Abuse Claims (the "Sexual Abuse Proof of Claim Form")
> in addition to the General Proof of Claim Form (as defined below).
> For the avoidance of doubt, **holders of Sexual Abuse Claims
> must fill out a General Proof of Claim Form and a Sexual
> Abuse Proof of Claim Form**. The Debtor is also seeking approval
> of certain specialized confidentiality procedures for the submission
> and handling of Sexual Abuse Proofs of Claim, which are
> described in greater detail herein.

(Emphasis added.)

48.    This is an extremely unusual requirement and completely unnecessary, as the

Sexual Abuse Proof of Claim Form is comprehensive and contains the information otherwise set

forth in the General Proof of Claim Form.  Moreover, it is bound to create confusion and trip up

many abuse claimants.  It is also inconsistent with other language in the Debtor's proposed bar

date order stating that an abuse claimant that previously filed a General Proof of Claim Form

**may** be required to fill out an addition form.

---

[66] *See* Ellis Simani and Ken Schwencke, *Credibly Accused*, ProPublica (Jan. 28, 2020),
https://projects.propublica.org/credibly-accused/; Alex Costello, *List Released of Catholic Clergy Accused of Sexual Assault in NY*, Patch (Feb. 4, 2020, 4:23p.m. ET); https://patch.com/new-york/rockvillecentre/list-released-catholic-clergy-accused-sexual-assault-ny.

49.     Furthermore, the confidentiality provisions governing Abuse Claims are clear.
General Proof of Claim Forms will be filed by non-abuse claimants and there is a real possibility
that an abuse claimant's "General Proof of Claim Form" could be misplaced or misfiled in the
public claims register, undermining the confidentiality to be imposed for the protection of abuse
claimants.  The Debtor has provided no basis for requiring that abuse claimants file two separate
claims in this case; this unreasonable and unnecessary requirement should not be approved by
the Court.

## RESPONSE TO LMI RESPONSE

50.     The Debtor's proposed Sexual Abuse Proof of Claim Form elicits all necessary
information to assess a sexual abuse claim against the Debtor without subjecting survivors to a
confusing, complicated examination.

51.     A properly filed and executed claim constitutes prima facie validity of the claim.
Thus, Official Form 410 – the form mandated by Bankruptcy Rule 3001 – only asks for basic
information about a claim.  In contrast, the LMI Additional Question[67] is burdensome, complex
and contains pitfalls for survivors to fall into traps that could open the door for motions to
disallow survivors' claims for failure to respond to a question even if the survivors otherwise
allege a sufficient basis for allowance of the claim.

52.     Moreover, under the Bankruptcy Rules, Official Form 410 suffices for proofs of
claim and does not require detailed information (as proposed by LMI) for unliquidated tort
claims.[68]  For example, Official Form 410, Question 8 requires that a claimant need only state

---

[67] The LMI Response includes a request to add the following question (the "**LMI Additional Question**"): "Please
provide all facts you are aware of that suggest that the Diocese, or any of its officers or employees, knew or should
have known that the abuser was abusing you or others before or during the period of time when the abuse or other
wrongful conduct took place." LMI Response, p. 4.

[68] "A proof of claim is a written statement setting forth a creditor's claim" that "*shall conform substantially* to the
appropriate Official Form [10]."  Fed. R. Bankr. P. 3001(a) (emphasis added).

"personal injury" in response to the question "What is the basis of the claim?" Official Form 410, Question 8; *see also In re Evans*, 2012 Bankr. LEXIS 3163 (Bankr. S.D. Ind. July 10, 2012) ("A proof of claim that contains sufficient information to support it satisfies the claimant's initial burden of proof, and the burden then shifts to the objector to rebut the claim.").

53.    Once a claim is properly filed in conformance with Bankruptcy Rule 3001, the burden shifts to the Debtor (or any party in interest) to object to the claim. *See Gently v. Siegel*, 668 F.3d 83, 92 (4th Cir. 2012) (stating that "a 'contested matter' does not arise from a proof of claim until an objection to the claim has been interposed").  The LMI Additional Question, in effect, alters the claims allowance procedure by requiring creditors to provide extensive information as a precondition to have their claims deemed properly filed under Bankruptcy Rule 3001.  This is an inappropriate abrogation of the Bankruptcy Rules.  If the survivor fails to provide some or all of this information, then the Debtor (or LMI) may move to disallow the claim by default as "not properly filed" rather than having to contest the claim on the merits.  As has been the case in other sexual abuse bankruptcy cases, any court-approved proof of claim form should be tailored to substantially conform to Official Form 410 with any discovery to take place as part of a claims' objection and adjudication process.

54.    For example, a person asserting a non-sexual abuse tort claim against the Debtor (such as a slip and fall claim) would merely have to complete the Official Form 410 to state a *prima facie* claim thereby shifting the burden to formally object to the claim.  The Committee acknowledges that more information may be needed in order to negotiate a settlement among survivors, the Debtor and its insurers.  However, the LMI Additional Question goes too far. There is no reason to utilize a form that will discourage survivors from filing claims and set traps for survivors.

## REQUEST TO ADMIT EVIDENCE

55.    The Committee respectfully requests that the Court admit the Conte Declaration and Wheatman Declaration into evidence.  Dr. Conte and Dr. Wheatman are also available to testify at the December 9, 2020 hearing on this matter should the Court or Debtor request such an opportunity to question either expert.

## CONCLUSION

56.    At the 341 meeting, Bishop Barres committed to work "to ensure that all survivors of clergy sexual abuse may receive some measure of healing and support."[69]  A bar date coterminous with the CVA Deadline of August 14, 2021 is necessary to ensure maximum participation of survivors in this Case.  Dr. Conte's expert opinion supports the Committee's position explaining the psychological reasons why a coterminous deadline will allow survivors the time necessary to come forward and avoid potential disruption and confusion amongst survivors.  Dr. Wheatman provides a proposed noticing program that will maximize reach and impact among potential survivor populations.  The Bishop's pledge to provide healing and support to *all* survivors begins with this first step of taking all necessary measures to reach potential survivors and invite them to participate in this process.

[Remainder of Page Intentionally Blank]

---

[69] Dine Decl., Ex. 19 (Transcript of 341 meeting, p. 113, lns. 16-18).

WHEREFORE, the Committee respectfully requests that the Court sustain the

Committee's Objection, enter the Proposed Order establishing the deadline by which Sexual

Abuse Claims must be filed in this Chapter 11 Case on August 14, 2021, in the form of **Exhibit**

**A** attached hereto, and granting such other and further relief as the Court deems just and proper.

Dated:  New York, New York
       December 1, 2020

               PACHULSKI STANG ZIEHL & JONES LLP

               */s/ James I. Stang*
               James I. Stang, Esq. (admitted *pro hac vice*)
               Linda Cantor, Esq.
               10100 Santa Monica, Boulevard, 11th Floor
               Los Angeles, California 90067
               Telephone:    (310) 277-6910
               Facsimile:    (310) 201-0760
               Email:        jstang@pszjlaw.com
                             lcantor@pszjlaw.com

               -and-

               Ilan D. Scharf, Esq.
               Karen B. Dine, Esq.
               Brittany M. Michael, Esq.
               780 Third Avenue, 36th Floor
               New York, New York 10017
               Telephone:    (212) 561-7700
               Facsimile:    (212) 561-7777
               Email:        kdine@pszjlaw.com
                             ischarf@pszjlaw.com
                             bmichael@pszjlaw.com

               Counsel for the Official Committee
               of Unsecured Creditors of The Roman Catholic
               Diocese of Rockville Centre, New York

EXHIBIT "A"

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | : | |
| In re: | : | Chapter 11 |
| | : | |
| THE ROMAN CATHOLIC DIOCESE OF | : | |
| ROCKVILLE CENTRE, NEW YORK,[1] | : | Case No. 20-12345 (SCC) |
| | : | |
| Debtor. | : | |
| | : | |

### ORDER ESTABLISHING DEADLINE FOR FILING PROOFS OF CLAIM AND APPROVING THE FORM AND MANNER OF NOTICE THEREOF

Upon the *Motion of the Debtor for an Order Establishing Deadlines for Filing Proofs of Claim and Granting Related Relief* (the "Motion")[2], pursuant to Federal Rule of Bankruptcy Procedure ("Bankruptcy Rule") 3003(c)(3), fixing a deadline and establishing procedures for filing proofs of claim and approving the form and manner of service thereof, and it appearing that the relief requested is in the best interests of the Debtor, its estate, and creditors and that adequate notice has been given and that no further notice is necessary; and after due deliberation and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

1.      Except as otherwise provided herein, all persons and entities, (including, without limitation, individuals, partnerships, corporations, joint ventures, and trusts) that assert a claim, as defined in Section 101(5) of the Bankruptcy Code, against the Debtor which arose on or prior to the filing of the Chapter 11 petition on October 1, 2020 (the "Petition Date"), shall file a proof

---

[1] The Debtor in this chapter 11 case is The Roman Catholic Diocese of Rockville Centre, New York, the last four digits of its federal tax identification number are 7437, and its mailing address is 50 North Park Avenue P.O. Box 9023, Rockville Centre, NY 11571-9023.

[2] Capitalized terms not otherwise defined herein shall have the meanings given to them in the Motion.

of such claim in writing or electronically in accordance with the procedures below so that it is

received on or before **February 17, 2021 at 5:00 p.m. (prevailing Eastern Time)** (the "General

Bar Date").  The General Bar Date applies to all claims other than claims of governmental units

and Sexual Abuse Claims.[3]

2.        Notwithstanding any other provision hereof, (a) proofs of claim filed by

governmental units must be filed so that the claim is received on or before **March 30, 2021 at**

**5:00 p.m. (prevailing Eastern Time)** (the "Governmental Bar Date"), and (b) proofs of claim

for Sexual Abuse Claims, must be filed so that the claim is received on or before **August 14,**

**2021 at 5:00 p.m. (prevailing Eastern Time)** (the "Sexual Abuse Claim Bar Date").

3.        Notwithstanding any other provision hereof, claimants must file proofs of claim

with respect to amendments or supplements to the Debtor's schedules of assets and liabilities on

or before the later of (i) the General Bar Date or the Governmental Bar Date, as applicable and

(ii) 5:00 p.m. (prevailing Eastern Time) on the date that is thirty (30) days from the date on

which the Debtor provides notice of previously unfiled schedules of assets and liabilities or an

amendment or supplement to the schedules of assets and liabilities (the "Amended Schedules Bar

Date").

4.        Notwithstanding any other provision hereof, any person or entity that holds a

claim that arises from the rejection of an executory contract or unexpired lease must file a proof

of claim based on such rejection on or before the later of (i) the General Bar Date or the

---

[3]  A "Sexual Abuse Claim" is any claim (as defined in section 101(5) of the Bankruptcy Code) against the Debtor resulting or arising in whole or in part, directly or indirectly from any actual or alleged sexual conduct or misconduct, sexual abuse or molestation, indecent assault and/or battery, rape, pedophilia, ephebophilia, or sexually related physical, psychological, or emotional harm, or contacts, or interactions of a sexual nature between a child and an adult, or a nonconsenting adult and another adult, sexual assault, sexual battery, sexual psychological or emotional abuse, humiliation, or intimidation, or any other conduct constituting a sexual offense, incest, or use of a child in a sexual performance (as such terms are defined in the New York Penal Law), and seeking monetary damages or any other relief, under any theory of liability, including vicarious liability, any negligence-based theory, contribution, indemnity, or any other theory based on any acts or failures to act by the Diocese or any other person or entity for whose acts or failures to act the Diocese is or was allegedly responsible.

Governmental Bar Date, as applicable, and (ii) 5:00 p.m. (prevailing Eastern Time) on the date

that is thirty (30) days after entry of the order authorizing such rejection (the "Rejection Bar

Date").  For the avoidance of doubt, a counterparty to an executory contract or unexpired lease is

permitted to file a single proof of claim on account of its claims arising under the applicable

contract or unexpired lease agreement (including claims for prepetition defaults and rejection

damages) by the Rejection Bar Date.

5.      The forms of the General Bar Date Notice, attached hereto as **Annex 1**; the

General Proof of Claim Form, attached hereto as **Annex 2**; the Sexual Abuse Bar Date Notice

attached hereto as **Annex 3**, the Sexual Abuse Proof of Claim Form, attached hereto as **Annex 4**;

the Publication Notice, attached hereto as **Annex 5**; the Confidentiality Agreement, attached

hereto as **Annex 6**; the clergy list, attached hereto as **Annex 7**; the Publication Notice Plan,

attached hereto as **Annex 8**, and the manner of providing notice of the Bar Dates proposed in the

Motion, are approved in all respects.

6.      The following procedures for the filing of proofs of claim shall apply:

(a)     General Proofs of Claim must conform substantially to Official
        Bankruptcy Form No. 410, attached hereto as **Annex 2**;

(b)     Sexual Abuse Proofs of Claim must conform substantially to the Sexual
        Abuse Proof of Claim Form, attached hereto as **Annex 4**;

(c)     Proofs of claim must be submitted (i) electronically through Epiq
        Corporate Restructuring, LLC's (the "Claims Agent") website for this case
        at https://dm.epiq11.com/drvc by following instructions for filing proofs
        of claim electronically; or (ii) by delivering the original proof of claim
        either by U.S. Postal Service mail to The Roman Catholic Diocese of
        Rockville Centre, New York Claims Processing Center c/o Epiq Corporate
        Restructuring, LLC P.O. Box 4421 Beaverton, OR 97076-4421, or by
        hand delivery or overnight mail to The Roman Catholic Diocese of
        Rockville Centre, New York Claims Processing Center c/o Epiq Corporate
        Restructuring, LLC 10300 SW Allen Blvd. Beaverton, OR 97005;

(d)     Proofs of claim will be deemed filed only when received by the Claims
        Agent on or before the applicable Bar Date;

(e)     General Proofs of claim must (i) be signed, (ii) include supporting documentation (if voluminous, attach a summary) or an explanation as to why documentation is not available; and (iii) be in the English language;

(f)     Sexual Abuse Proofs of claim will be available in English and also in Spanish because of the large Hispanic communities in the geographic territory of the Debtor.  Sexual Abuse Proofs of claim must (i) be signed, (ii) be in the English or the Spanish language, as applicable, and (iii), if applicable, include supporting documentation;

(g)     To be valid, a proof of claim form must be signed by the Claimant. Electronic signatures will be accepted as valid. If the Claimant is deceased or incapacitated, the form must be signed by the Claimant's court-appointed representative or attorney for the Claimant's estate. If the Claimant is a minor, the form must be signed by the Claimant's parent or legal guardian or attorney. Any proof of claim form signed by a representative or legal guardian must attach documentation establishing such person's authority to sign the proof of claim form for the Claimant. The Debtor, in consultation with the Committee, may agree to waive any defects or irregularities as to any Sexual Abuse Proof of Claim; and

(h)     Proofs of claim sent by facsimile, telecopy, or electronic mail transmission **will not** be accepted.

7.     The following persons or entities need not file a proof of claim on or prior to the

Bar Date:

(a)     any person or entity that already has filed a General Claim against the Debtor in a form substantially similar to Official Bankruptcy Form No. 410, provided, however, that any holder of a Sexual Abuse Claim who files a proof of claim on account of a Sexual Abuse Claim using a form substantially similar to Official Bankruptcy Form No. 410 may subsequently be required to complete the Sexual Abuse Proof of Claim Form or otherwise answer additional questions regarding such Sexual Abuse Claim, including the questions set forth in the Sexual Abuse Proof of Claim Form, in connection with the administration of his or her Sexual Abuse Claim;

(b)     any person or entity whose claim is listed on the Schedules filed by the Debtor, provided that (i) the claim is not scheduled as "disputed", "contingent", or "unliquidated" and (ii) the claimant does not disagree with the amount, nature and priority of the claim as set forth in the Schedules;

(c)     any holder of a claim that heretofore has been allowed by Order of this Court;

(d)    any person or entity whose claim has been paid in full by the Debtor; and

(e)    any holder of a claim for which specific deadlines have previously been fixed by this Court.

8.    Any person or entity that holds a claim that arises from the rejection of an executory contract or unexpired lease, as to which the order authorizing such rejection is dated on or before the date of entry of this Order, must file a proof of claim based on such rejection on or before the Bar Date, and any person or entity that holds a claim that arises from the rejection of an executory contract or unexpired lease, as to which an order authorizing such rejection is dated after the date of entry of this Order, must file a proof of claim on or before such date as the Court may fix in the applicable order authorizing such rejection.

9.    If the Debtor amends or supplements the Schedules subsequent to the date hereof, the Debtor shall give notice of any amendment or supplement to the holders of claims affected thereby, and such holders shall be afforded thirty (30) days from the date of such notice to file proofs of claim in respect of their claims and shall be given notice of such deadline.

10.    Nothing in this Order shall prejudice the right of the Debtor or any other party in interest to dispute or assert offsets or defenses to any claim reflected in the Schedules.

11.    Pursuant to Bankruptcy Rule 3003(c)(2), all holders of claims that fail to comply with this Order by timely filing a proof of claim in appropriate form shall not be treated as a creditor with respect to such claim for the purposes of voting and distribution.  For the avoidance of doubt, nothing contained in this Order shall preclude a claimant from seeking relief from the Court to file a late-filed claim in accordance with Bankruptcy Rule 9006.

12.     Parties asserting General Claims against the Debtor that arose before the Petition Date must use the General Proof of Claim Form substantially in the form attached hereto as **Annex 2**.

13.     Parties asserting Sexual Abuse Claims that arose before the Petition Date must use the Sexual Abuse Proof of Claim Form substantially in the form attached hereto as **Annex 4**. The filing of a Sexual Abuse Proof of Claim shall not constitute a waiver of the claimant's right to a jury trial.

14.     Due to the sensitive nature of the information requested in the Sexual Abuse Proof of Claim Form, the following confidentiality protocol (the "Confidentiality Protocol") shall apply to all Proof of Claim Forms submitted by holders of Sexual Abuse Claims (the "Sexual Abuse Claimants"):

a)      All claimants asserting a Sexual Abuse Claim are directed to submit such claims directly to Epiq Corporate Restructuring, LLC (the "Claims Agent"), the claims and noticing agent.  Such claims should not be filed with the Court.

b)      Sexual Abuse Claims received by the Claims Agent will be treated as confidential and will be made available only to Authorized Parties (as defined below) unless a Sexual Abuse Claimant affirmatively elects to have their Sexual Abuse Claim disclosed publicly.  The Confidentiality Protocol is for the benefit of the Sexual Abuse Claimants.  Accordingly, Sexual Abuse Claimants may elect to make information contained in their Sexual Abuse Claim public, even if they do not elect to have their Sexual Abuse Claim disclosed publicly.

c)      Sexual Abuse Claims received by the Claims Agent shall be held and treated as confidential by the Claims Agent, and copies thereof shall be provided or made available only to the following parties (the "Authorized Parties"):

i.      The member trustees and officers of the Debtor, and such other employees of the Debtor who are necessary to assist the Debtor in reviewing and analyzing the Sexual Abuse Proofs of Claim.

ii. Any counsel to the Debtor or the Unsecured Creditors' Committee (the "<u>Committee</u>") retained pursuant to an order of the Bankruptcy Court;

iii. Members of the Committee and their counsel (after the Proof of Claim Forms have been redacted to remove the claimant's name, address, and other information identified in Part 2(a) of the Sexual Abuse Proof of Claim Form, the signature block and any other information which could reasonably be used to personally identify a Sexual Abuse Claimant);

iv. Any insurance company that provided insurance that may cover the claims described in any Sexual Abuse Proof of Claim, together with their respective successors, reinsurers, administrators, and counsel;

v. Any person appointed pursuant to an order of the Court to serve as a mediator, as a representative for unknown or future claimants, or as a special arbitrator/claims reviewer appointed to review and resolve Sexual Abuse Claims;

vi. Any trustee, or functional equivalent thereof, appointed to administer payments to Sexual Abuse Claimants, including pursuant to a plan of reorganization or a proposed plan of reorganization;

vii. Authorized representatives of a department of corrections, if a Sexual Abuse Claimant is incarcerated, but only with respect to any Proof of Claim Form filed by such claimant and only to the extent disclosure is required under applicable non-bankruptcy law;

viii. Upon consent of the Debtor and the Committee, and upon 10 business days' notice to the Sexual Abuse Claimant and its counsel of record, any person identified in a Sexual Abuse Proof of Claim who is alleged to have witnessed, committed, or otherwise had knowledge of, any act of abuse against the claimant;

ix. Any person who is alleged by the Sexual Abuse Claimant to be responsible, financially or otherwise, whether in the Sexual Abuse Proof of Claim or in any complaint or other filings in any lawsuit, for the consequences of any such act of sexual abuse, and any such person's counsel of record;

x. Any person with the express written consent of the Debtor and the Committee, upon 10 business days' notice to the affected claimants and their counsel of record; and

xi.    Such other persons as the Court may pursuant to subsequent order authorize to access to the Proof of Claim Forms; provided, however, that any such determination shall be made on no less than 10 business days' notice to the affected claimant(s) and their counsel of record.

d)    Notwithstanding the designation of Authorized Parties above, no person or entity may obtain copies of any Proof of Claim Forms submitted by a Sexual Abuse Claimant prior to the execution of a confidentiality agreement substantially in the form attached to the Bar Date Order as **Annex 6** (the "Confidentiality Agreement").  Counsel to the Debtor and the Committee shall only be required to execute a single Confidentiality Agreement on behalf of those entities and their respective clients, which shall be deemed binding on their entire firm and their respective clients. Access to the Proof of Claim Forms submitted by Sexual Abuse Claimants for all other Authorized Parties shall be restricted to the natural person who executes a Confidentiality Agreement and a separate Confidentiality Agreement must be signed by each natural person seeking access to the Proof of Claim Forms submitted by Sexual Abuse Claimants on behalf of an Authorized Party.

e)    Authorized Parties in possession of any Proof of Claim Forms submitted by Sexual Abuse Claimants shall keep the Proof of Claim Forms confidential and shall not use or disclose any information provided in any Proof of Claim Forms submitted by Sexual Abuse Claimants except in accordance with the terms of the Confidentiality Agreement or pursuant to an order of this Court, unless the claimant has elected to make his or her Proof of Claim Forms public by indicating such consent in Part 1 of the Sexual Abuse Proof of Claim Form.

f)    In addition, information in Sexual Abuse Proofs of Claim may be required to be disclosed to governmental authorities under mandatory reporting laws in many jurisdictions.  If any such disclosures to governmental authorities are required to be made under this paragraph (f), Sexual Abuse Claimants will be notified at the time of such disclosure.

15.    The Claims Agent shall assign to each claimant asserting a Sexual Abuse Claim a unique identifier code and shall maintain a confidential list of the identities of the Sexual Abuse Claimants, their corresponding identifier code, and their respective Proof of Claim Forms.

16.    A copy of the General Bar Dates Notice Package, including a copy of the General Bar Date Notice and the General Proof of Claim Form substantially in the forms attached hereto

as **<u>Annex 1</u>** and **<u>Annex 2</u>**, is approved and shall be deemed adequate and sufficient if served by

first-class mail at least sixty (60) days prior to the Bar Date on:

      (a)     the United States Trustee;

      (b)     counsel to each official committee;

      (c)     all persons or entities that have requested notice of the proceedings in this chapter 11 case;

      (d)     all persons or entities that have filed claims;

      (e)     all creditors and other known holders of claims as of the date of this Order, including all persons or entities listed in the Schedules as holding claims;

      (f)     all parties to executory contracts and unexpired leases of the Debtor;

      (g)     the Internal Revenue Service for the district in which the case is pending; and

      (h)     such additional persons and entities as deemed appropriate by the Debtor.

17.    The Debtor shall make the following available to the public by posting on the

Claims Agent website for this case at <u>https://dm.epiq11.com/drvc</u> and by posting on the Debtor's

website homepage via a "one click" link under "Diocesan News" and labeled "Claim Deadline

Notices and Forms": (i) a notice of the Sexual Abuse Bar Date substantially in the form attached

hereto as **Annex 3** (the "<u>Sexual Abuse Bar Date Notice</u>," and together with the General Bar Date

Notice, each a "<u>Bar Date Notice</u>" and collectively, the "<u>Bar Date Notices</u>"); (ii) a Sexual Abuse

Proof of Claim Form, substantially in the form attached hereto as **Annex 4**; (iii) a list of all

priests, deacons and other clergy whom the Debtor knows are the subject of an adverse

determination by the Debtor's Diocesan Review Board that an allegation of clergy abuse was

made through the Debtor's Independent Reconciliation and Compensation Program, and a list of

priests and clergy who served within the Diocese against whom sexual abuse lawsuits have been

filed (collectively, the "<u>Accused Clergy</u>") in substantially the form attached hereto as **Annex 7,**

and (iv) the Bar Date Order (together with the Sexual Abuse Bar Date Notice and the Sexual

Abuse Proof of Claim Form, the "Sexual Abuse Bar Date Notice Package," and together with the

General Bar Date Package, the "Bar Date Packages").

18.    The Debtor shall provide notice of the Sexual Abuse Bar Date by causing the

Sexual Abuse Bar Date Notice Package to be served on the individuals identified in paragraph

19(i)-(viii) below (the "Sexual Abuse Notice Parties") no later than fifteen (15) business days

after entry of the Bar Date Order and by causing the Sexual Abuse Bar Date Notice Package,

Sexual Abuse Bar Date Notice, or other notice authorized herein, as applicable, to be published

as set forth below.

19.    The Sexual Abuse Notice Parties shall include the following:

(i)    All individuals who have filed or ever threatened in writing to file

lawsuits against the Diocese that allege Sexual Abuse.

(ii)    All individuals known to the Diocese who contacted the Diocese to

report that they were Sexually Abused, whether or not that

individual's claim was considered to be substantiated or

unsubstantiated and whether or not the report was written or verbal.

(iii)    All individuals known to the Diocese to whom payment or counseling

reimbursement has ever been made by or on behalf of the Diocese or

as a result of an allegation of Sexual Abuse, as well as all individuals

who participated in any mediation or settlement process with the

Diocese but did not enter into a settlement agreement.

(iv)    All individuals known to the Debtor whose names were provided by

an Accused Clergy or by any other person who has been alleged to

have sexually abused a minor (an "<u>Alleged Abuser</u>") (a) in connection
with any interviews, or (b) as part of an investigation of Sexual Abuse.

(v)   All individuals identified on the latest mailing lists of congregants,
members, students and residents, as applicable, for (a) each Parish, (b)
each School operating within the Diocese including, without
limitation, Parish schools, private schools, and schools operated by the
Department of Education, Diocese of Rockville Centre, and (c) each
affiliated Diocesan ministry. To the extent that the foregoing mailing
lists do not include mailing addresses but email addresses, email will
be sufficient provided that such e-mail notifications shall be sent no
less than six (6) times.

(vi)   To the extent the Diocese has a record thereof, all individuals who
contacted the Diocese about their children or other children being in
close contact with an Accused Clergy or an Alleged Abuser or about
some problem with the Accused Clergy or the Alleged Abuser and
their child or another child.

(vii)   All individuals whom the Debtor has ever provided or referred to for
counseling, spiritual direction, or therapy support related to Sexual
Abuse.

(viii)   Where any of the Sexual Abuse Notice Parties listed above have an
attorney of record, notice shall also be sent to the attorney of record.

20.   To obtain the information requested above, the Debtor will review all records and
documents it has within its possession, custody or control including but not limited to the

archives under Canon 490 related to all Accused Clergy and Alleged Abusers and any Sexual

Abuse allegations related to such Accused Clergy and Alleged Abusers as well as the records of

the Diocesan Review Board and the Debtor's Independent Reconciliation and Compensation

Program.  The Debtor will also make a written request (an "Information Request") to each of the

Schools, Parishes and Diocesan affiliated ministries (collectively, the "Diocesan Non-Debtor

Entities") requesting that they conduct the same review, by letter signed by Bishop John Oliver

Barres, in his capacity as the Debtor's officer/director and, if applicable, in his capacity as an

officer of the Diocesan Non-Debtor Entity (in the case of any Diocesan Non-Debtor Entity in

which Bishop Barres is an officer or director, such request shall be phrased as an instruction).

The Debtor shall provide the Committee with copies of any responses to such request/instruction

promptly after receipt.

21.     Promptly after entry of this Order, the Debtor will search for current addresses

and will use third-party mailing list vendors, such as TransUnion or LexisNexis, to update old or

outdated mailing information using social security numbers or names and birthdates, and

otherwise use reasonable efforts to find current addresses for each individual identified by

paragraph 19 and will promptly serve each such individual with the Sexual Abuse Bar Date

Notice Package or, with respect to those individuals identified by paragraph 19(v), a Post Card

Notification.[4]  Notices that are returned as non-deliverable will be re-mailed to any address

indicated by the USPS in the case of an expired automatic forwarding order.  Notices returned as

non-deliverable, but for which a new address is not indicated by the USPS, will be further

searched through a third-party vendor to obtain a more current address.  If any such address is

found, the notice will be re-mailed to such addresses.  The Debtor will file a declaration (the

---

[4] Prior to mailing, all addresses will be checked against the National Change of Address ("NCOA") database
maintained by the United States Postal Service ("USPS").

"Declaration") attesting to the efforts it made to comply with these procedures (which will include copies of each Information Request sent by the Debtor and each of the responses from the Diocesan Non-Debtor Entities) with the Court and serve it on counsel to the Committee within thirty (30) days of service of the Sexual Abuse Bar Date Packages, and shall file additional Declarations and reports monthly thereafter until service on all individuals listed in paragraph 19 has been effectuated. The Declarations shall be filed under seal and shall be subject to Attorneys-Eyes Only. At the same time, the Debtor will provide the counsel to the Committee the names and addresses of all Sexual Abuse Notice Parties and all Accused Clergy. If additional Sexual Abuse Claimants or Accused Clergy or Alleged Abusers are identified to the Debtor after entry of this Order, the Debtor shall, within ten (10) days of conducting the review of the records and documents referenced above and the identification of additional Sexual Abuse Claimants or Accused Clergy or Alleged Abusers, serve a copy of the Sexual Abuse Bar Date Package on the additional Sexual Abuse Notice Parties. The Debtor will provide counsel to the Committee the names and addresses of all subsequently identified Sexual Abuse Notice Parties and Accused Clergy.

22.     The Sexual Abuse Bar Date Notice will include the name of each Accused Clergy, identified on **Annex 7**, as well as the name of the Parish or School or other Diocesan Non-Debtor Entity for which the Accused Clergy worked or served, the Accused Clergy's position within said Parish, School or other Diocesan Non-Debtor Entity, and the time period during which such clergy worked or served. For the purpose of this Order and for notice of the Sexual Abuse Bar Date, Accused Clergy include but are not limited to the individuals listed on **Annex 7**, as well as any others identified during the course of the due diligence efforts required by paragraphs 19 and 20 above. The Sexual Abuse Bar Date Notice shall also include a picture,

at least 3" by 5" in dimension, of each Accused Clergy taken at or close to the time of the Sexual

Abuse, to the extent that the Debtor has such a picture.  If a picture from such time period is not

available, a photograph from a different time period will suffice.  It shall also include the

following disclaimer:

> This list is not exhaustive.  There may be additional priests or
> clergy who may have committed acts of Sexual Abuse but on
> whom the Diocese does not have a report or for whom the Diocese
> determined that an allegation of Sexual Abuse was not
> substantiated.  In addition, the list does not include other potential
> offenders who are not members of the clergy, such as teachers,
> nuns, or religious order priests. The fact that this list may not
> include the name of the Accused Clergy who sexually abused you
> does not mean that you should not file a Sexual Abuse Proof of
> Claim Form.

23.    For Sexual Abuse Claimants who are represented, the Debtor shall serve the

Sexual Abuse Bar Date Packages to their attorneys of record.  All other Sexual Abuse Claimants

shall be served, first class mail, at their last known home address, after the Debtor has used

reasonable efforts to locate a current address for each Sexual Abuse Claimant by social security

number, name and birthdate, or otherwise.  The names and addresses of all parties served

(including any updated addresses which were discovered when mail was returned or otherwise)

shall be included on the proof of service, and the proof of service should be filed under seal, with

a copy provided to counsel to the Committee, pursuant to Attorneys Eyes Only Designation.

24.    Beginning no later than ten (10) days after the date of entry of this Order and

through and including the Bar Date, the Debtor, any Parish and each Diocesan affiliated ministry

will post a link on their respective websites to the General Claims Bar Date Notice and General

Proof of Claim form, and to the Sexual Abuse Claims Bar Date Notice and the Sexual Abuse

Proof of Claim form.  In addition, sixty (60) days prior to the Bar Date, the Debtor will send a

direct email to the registered Catholic households within the Diocese with a direct link to the

General Claims Bar Date Notice and General Proof of Claim form, and to the Sexual Abuse

Claims Bar Date Notice and the Sexual Abuse Proof of Claim form.

25.     Service of the Bar Dates Notice Package in the manner set forth in this Order is

and shall be deemed to be good and sufficient notice of the Bar Dates to all known claimants.

26.     The Debtor shall also mail a copy of the Bar Date Notice to the following on the

Debtor's stationary and shall request that the party post the Bar Date Notice in a prominent place

until the expiration of the Bar Date: (a) the Attorney General of the State of New York, and (b)

for each of the counties of Queens, Suffolk, and Nassau, the district attorney's office, the

sheriff's office, any county government center, at least one public health agency (if any), and at

least one substance abuse agency or hospital (if any).

27.     The Debtor shall also provide notice of the Sexual Abuse Claims Bar Date and the

General Claims Bar Date by implementation of the notice plan (the "Publication Notice Plan")

set forth on **Annex 8** hereto, within approximately 14 days of entry of this Order.

28.     The Debtor and the Claims Agent are authorized and empowered to take such

steps and perform such acts as may be necessary to implement and effectuate the terms of this

Order.

29.     The entry of this order is without prejudice to the right of the Debtor to seek a

further order of this Court fixing a date by which holders of claims or interests not subject to the

Bar Dates established herein must file proofs of claim or be barred from doing so.

30.     This Court shall retain jurisdiction to hear and determine all matters arising from

or related to this Order.

Dated: _____, 2020        _____
        New York, NY                    United States Bankruptcy Judge

## <u>ANNEX 1</u>

**General Bar Date Notice**

[The Committee is proposing no changes to this document]

## <u>ANNEX 2</u>
### General Proof of Claim Form

[The Committee is proposing no changes to this document]

**<u>ANNEX 3</u>**
**Sexual Abuse Bar Date Notice**

## Notice of Deadline for Filing Sexual Abuse Claims in The Roman Catholic Diocese of Rockville Centre, New York Bankruptcy Case

### *All Sexual Abuse Survivors Need to File Claims by <u>August 14, 2021</u>*

*This is an official notice approved by the Bankruptcy Court.*
*This is not a solicitation from a lawyer.*

Una versión en español de este aviso está disponible en www.LongIslandChurchClaims.com
o llamando al 1-888-490-0633.

- Please read this notice carefully as it may impact your rights, including the right to compensation, against the Roman Catholic Diocese of Rockville Centre, New York (the "<u>Diocese</u>") and against its parishes, schools and affiliated ministries ("<u>Diocese Related Entities</u>").

- Regardless of how old you are today, if you have a claim for Sexual Abuse for which you believe the Diocese is or may be responsible, that occurred before **October 1, 2020**, you must file a claim in this bankruptcy case to preserve your rights.

- A list of diocesan and religious order priests and clergy in the Diocese and Parishes against whom the Debtor or Parishes has vetted reports of Sexual Abuse through the internal processes of the Diocese (the "<u>Accused Clergy</u>") can be found at www.LongIslandChurchClaims.com.

- You can file a claim using the Sexual Abuse Proof of Claim Form approved by the court (1) by logging on to the following website: [_____] or (2) by mailing or delivering a hard copy of your Sexual Abuse Proof of Claim to the address listed below.

- No plan of reorganization has been filed as of the date of this notice.  However, if a plan to reorganize the Diocese is approved, it could release claims you hold against certain third parties, including against churches, parishes, schools, and other Diocese Related Entities that operate within the Diocese.

- If you have a claim against any such church, parish, school, or other Diocese Related Entity, you may have a claim against the Diocese.

- Your rights and options – **and the deadline to exercise them by** – are explained in more detail in this notice.

### BASIC INFORMATION

| 1. | Why was this notice issued? |
|----|------------------------------|

The Diocese filed a chapter 11 bankruptcy case.  The Bankruptcy Court has set a deadline of **August 14, 2021 at 5:00 p.m. (Eastern Time)** for filing claims against the Diocese for sexual abuse.

The Diocese case is filed in the U.S. Bankruptcy Court for the Southern District of New York, and the case is known as *In re: The Roman Catholic Diocese of Rockville Centre, New York* (Bankr. S.D. NY.) The Bankruptcy Court judge overseeing the case is the Honorable Shelley C. Chapman.

The Bankruptcy Court authorized the Diocese to send out this notice.  You have the right to file a Sexual Abuse Claim in this bankruptcy case if you were Sexually Abused by persons associated with the Diocese regardless of how old you are today.  This includes Sexual Abuse in connection with any entity or activity associated with the Diocese, including schools, churches, parishes, or an affiliated ministry.  You are required to file a Sexual Abuse Proof of Claim on or before **August 14, 2021 at 5:00 p.m. (Eastern Time)**.

## SEXUAL ABUSE CLAIMS

| | |
|---|---|
| **2.** | **What is considered sexual abuse?** |

You have a Sexual Abuse Claim if you experienced sexual abuse.  A **Sexual Abuse Claim** is defined as follows:

A "Sexual Abuse Claim" is any claim (as defined in section 101(5) of the Bankruptcy Code) against the Debtor resulting or arising in whole or in part, directly or indirectly from any actual or alleged sexual conduct or misconduct, sexual abuse or molestation, indecent assault and/or battery, rape, pedophilia, ephebophilia, or sexually related physical, psychological, or emotional harm, or contacts, or interactions of a sexual nature between a child and an adult, or a nonconsenting adult and another adult, sexual assault, sexual battery, sexual psychological or emotional abuse, humiliation, or intimidation, or any other conduct constituting a sexual offense, incest, or use of a child in a sexual performance (as such terms are defined in the New York Penal Law), and seeking monetary damages or any other relief, under any theory of liability, including vicarious liability, any negligence-based theory, contribution, indemnity, or any other theory based on any acts or failures to act by the Diocese or any other person or entity for whose acts or failures to act the Diocese is or was allegedly responsible.

If you have a claim from other types of abuse, including non-sexual physical abuse, non-sexual emotional abuse, bullying or hazing, you should file a General Proof of Claim (Official Bankruptcy Form 410).

| | |
|---|---|
| **3.** | **Who should file a Sexual Abuse Proof of Claim?** |

You should file a Sexual Abuse Proof of Claim if you have a Sexual Abuse Claim as defined above.  You should file a Sexual Abuse Proof of Claim regardless of whether you:

- Did or did not report your Sexual Abuse to the Diocese or to anyone else;

- Previously filed a lawsuit or asserted claims in connection with the Sexual Abuse;

- Previously had your Sexual Abuse Claim paid in full by the Diocese under a settlement, but you believe you may have additional claims beyond what was agreed to in the settlement agreement;

- Are included in, or represented by, another action with respect to your Sexual Abuse Claim.

You should submit a Sexual Abuse Proof of Claim regardless of your age now or the length of time that has passed since the Sexual Abuse took place.

Do not file a Sexual Abuse Proof of Claim if your claim is based on anything other than Sexual Abuse as defined above. If you have a claim arising from other types of abuse, including non-sexual physical abuse, non-sexual emotional abuse, bullying or hazing, you should consult the *Notice Of Bar Dates For Filing Of General Proofs Of Claim* and file a General Proof of Claim (Official Bankruptcy Form 410).

| 4. | What if I am still not sure if I have a Sexual Abuse Claim? |
|---|---|

You should consult with an attorney if you have any questions, including whether you should file a Sexual Abuse Proof of Claim.

| 5. | How can I file my Sexual Abuse Proof of Claim? |
|---|---|

**A copy of the Sexual Abuse Proof of Claim Form is enclosed. You may also obtain a copy of the form by following the instructions below.**

For additional copies of the Sexual Abuse Proof of Claim Form: (a) photocopy the enclosed Sexual Abuse Proof of Claim form; (b) contact the Debtor's claims agent Epiq Corporate Restructuring, LLC's (the "Claims Agent") website for this case at https://dm.epiq11.com/drvc or by e-mail at _____ or phone, toll free at 1-888-490-0633 between the hours of 9:00 a.m. and 5:00 p.m. (Eastern Time), Monday through Friday, or (c) visit the Debtor's website at: [_____].

The Sexual Abuse Proof of Claim must be completed by you and mailed or submitted to the Claims Agent Epiq Corporate Restructuring, LLC's, **by no later than August 14, 2021 at 5:00 p.m. (Eastern Time)** as follows:

(i)    If sent by mail, to U.S. Postal Service mail to The Roman Catholic Diocese of Rockville Centre, New York Claims Processing Center c/o Epiq Corporate Restructuring, LLC P.O. Box 4421 Beaverton, OR 97076-4421, or

(ii)    If sent by hand delivery or overnight courier, send to: hand delivery or overnight mail to The Roman Catholic Diocese of Rockville Centre, New York Claims Processing Center c/o Epiq Corporate Restructuring, LLC 10300 SW Allen Blvd. Beaverton, OR 97005; or

DOCS_LA:334231.1 68700/001

(iii)  If submitted electronically, by using the interface available at https://dm.epiq11.com/drvc by following instructions for filing proofs of claim electronically..

Sexual Abuse Proofs of Claim sent by any other means (such as facsimile transmission or email through a different manner than described in (iii) above) **will not** be accepted.

If you have questions you can contact your attorney or call 1-888-490-0633 to speak to the Claims Agent.  The Claims Agent can provide information about how to file a claim, but cannot offer any legal advice.

Please note that the Diocese's staff is not permitted to give legal advice. You should consult your own attorney for assistance regarding any other inquiries, such as questions concerning the completion or filing of a proof of claim.

| 6. | **Will my information be kept confidential?** |
|----|----|

Yes, subject to the limitations described below.  The Bankruptcy Court has set up a procedure to protect your privacy.  In order to protect your privacy, <u>please do not file your Sexual Abuse Proof of Claim with the Bankruptcy Court</u>.  Instead, you must file according to the directions above.

Sexual Abuse Proofs of Claim will <u>not</u> be available to the public unless you choose to release that information by checking the box in Part 1 of the Sexual Abuse Proof of Claim. However, information about your Sexual Abuse Claim will be confidentially provided, pursuant to Bankruptcy Court-approved guidelines, to the following parties:

- The Diocese and its attorneys;
- Certain insurers of the Diocese including authorized claims administrators of such insurers and their reinsurers and counsel;
- Attorneys for the Official Creditors' Committee and its members;
- Attorneys at the Office of the United States Trustee for the Southern District of New York;
- The Claims Agent (Epiq Corporate Restructuring, LLC);
- Any special arbitrator, mediator, or claims reviewer appointed to review and resolve Sexual Abuse Claims;
- Any trustee, or functional equivalent thereof, appointed to administer payments to holders of Sexual Abuse Claims; and
- Such other persons that the Court determines need the information in order to evaluate Sexual Abuse Claims.

4

Please note that information in your Sexual Abuse Proof of Claim may be disclosed to governmental authorities under mandatory reporting laws in many jurisdictions.

## ADDITIONAL INFORMATION

| | |
|---|---|
| **7.** | **How do I report my sexual abuse to the authorities?** |

Reporting the Sexual Abuse protects other persons.  You can learn more about how to report Sexual Abuse at[_____]

Please know that reporting Sexual Abuse is different than filing a claim in the Diocese's bankruptcy case.

| | |
|---|---|
| **8.** | **What happens if I do not file a Sexual Abuse Proof of Claim?** |

If you fail to submit a completed Sexual Abuse Survivor Proof of Claim to the Claims Agent on or before **August 14, 2021 at 5:00 p.m. (Eastern Time)**, you may not be able to:

- vote on the Diocese's plan of reorganization; or
- receive any compensation in the Diocese's bankruptcy case for your Sexual Abuse Claim.

---

**YOU MAY WANT TO CONSULT WITH AN ATTORNEY REGARDING THIS NOTICE AND WHETHER YOU SHOULD FILE A SEXUAL ABUSE SURVIVOR PROOF OF CLAIM.**

---

DOCS_LA:334231.1 68700/001

**<u>ANNEX 4</u>**
**Sexual Abuse Proof of Claim Form**

[The Committee is proposing no changes to this document]

**<u>ANNEX 5</u>**
**The Publication Notice**

# Sexual Abuse Claims in The Roman Catholic Diocese of Rockville Centre, New York Bankruptcy

**Regardless of how old you are today or when the sexual abuse occurred, you need to file your claim so that it is received by 5 p.m. (Eastern Time) on August 14, 2021.**

The Diocese of Rockville Center ("Diocese" or "Debtor") has filed bankruptcy in order to restructure its nonprofit organization. Please read this notice carefully as it may impact your rights against the Diocese and against its parishes, schools and affiliated ministries ("Diocese Related Entities") and provides information about the case, In re: The Roman Catholic Diocese of Rockville Centre, New York (Bankr. S.D.N.Y.). This notice is a short summary. For more detail, including lists of names of clergy that have been identified in connection with sexual abuse claims, go to www.LongIslandChurchClaims.com or call 1-888-490-0633.

### Who Should File a Sexual Abuse Claim?

**Anyone who was sexually abused, on or before October 1, 2020, and believes the Diocese may be responsible for the sexual abuse must file a claim.** This includes sexual abuse in connection with any entity or activity associated with the Diocese, including schools, parishes, or an affiliated ministry. Sexual Abuse Claims include, but are not limited to: sexual misconduct, touching, inappropriate contact, or sexual comments about a person or other behaviors that led to abuse, and regardless of whether you thought the behavior was sexual abuse or not.

### When and How Should I File a Sexual Abuse Claim?

You should file a claim using the Sexual Abuse Survivor Proof of Claim so that it is received by **August 14, 2021 at 5:00 p.m. (Eastern Time). If you do not file a timely Sexual Abuse Claim, you may lose rights against the Diocese and against Diocese Related Entities, including any right to compensation.** If you have a sexual abuse claim against any such Diocesan parish, school or affiliated ministry, you may have a claim against the Diocese. Note that only the Diocese is in bankruptcy. If you have a claim against any Diocese Related Entity, you must take separate action to preserve your rights.

<u>**Your information will be kept private.**</u>  You can download and file a claim at the website or call the toll-free number listed below for help on how to file a claim by mail.

### ACT NOW Before Time Runs Out:





| File a Sexual Abuse Survivor Proof of Claim. | Have questions? Call or visit the website for more information. | If your claim is approved, you may receive compensation from the bankruptcy. |

<u>**Your information will be kept private.**</u>

**www.LongIslandChurchClaims.com      1-888-490-0633**

## <u>ANNEX 6</u>
**Confidentiality Agreement**

[The Committee is proposing no changes to this document]

## <u>ANNEX 7</u>
### The Clergy List

[To be provided by the Debtor]

**<u>ANNEX 8</u>**
**Publication Notice Plan**

[See Declaration of Dr. Shannon Wheatman]

# **DECLARATION OF JON R. CONTE, PH.D.**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| | : | |
| In re: | : | Chapter 11 |
| | : | |
| THE ROMAN CATHOLIC DIOCESE OF | : | |
| ROCKVILLE CENTRE, NEW YORK,[1] | : | Case No. 20-12345 (SCC) |
| | : | |
| Debtor. | : | |
| | : | |
| | : | |

### DECLARATION OF JON R. CONTE, Ph.D.

I, Jon R. Conte, Ph.D., submit the following declaration as my testimony in this matter and state, under penalty of perjury, the following:

1.     I am an individual over the age of 21 years and suffer no disability that would interfere with my ability to testify truthfully to the matters set forth herein.

2.     I am a Professor Emeritus in the School of Social Work at the University of Washington in Seattle, Washington and Director of the Joshua Center on Child Sexual Abuse Prevention at the University.  My academic Curriculum Vitae is attached to this declaration.

3.     I have almost four decades in the study of childhood sexual abuse, am published in that area and have trained multidisciplinary audiences on various aspects of childhood sexual abuse, including issues in forensic practice nationally and internationally.

4.     Over the course of my career, I have served on a Panel on Child Abuse and Neglect at the National Academy of Sciences; on a research review committee at the National Institute of Mental Health; was the founding President of the American Professional Society on the Abuse of Children; was on the Board of Councilors of the International Society for the

---

[1] The Debtor in this chapter 11 case is The Roman Catholic Diocese of Rockville Centre, New York, the last four digits of its federal tax identification number are 7437, and its mailing address is 50 North Park Avenue P.O. Box 9023, Rockville Centre, NY 11571-9023.

Prevention of Child Abuse and Neglect; and served on State and local committees in Illinois, Washington, and Kentucky.

5.      I maintained a small private clinical practice specializing in the treatment of children, youth, and adults with histories of child sexual abuse first in Chicago and then in Seattle after returning to Seattle in 1990.  I have evaluated literally thousands of child, youth and adult victims of childhood sexual abuse who allege harms and damages resulting from childhood sexual abuse from the mid-1980s to the present.

6.      I have testified as an expert over one hundred and sixty times in Washington, Oregon, California, Arizona, Colorado, Nebraska, New Hampshire, Florida, South Carolina, and British Columbia Canada. I have previously served as an expert to Creditors' Committees in the Bankruptcies of the Archdioceses of Portland and Milwaukee, the Boy Scouts of America and the Roman Catholic Church of the Archdiocese of New Orleans.  A partial list of my expert testimony is attached as Appendix 1 to my Curriculum Vitae.

7.      I am the Editor of the Journal of Interpersonal Violence and the journal Trauma, Violence, and Abuse.  I am generally aware of the research on various aspects of childhood sexual abuse.  I have coauthored four manuscripts in the last 12 months.  All manuscripts have been based on a review of extensive research on various issues surrounding childhood sexual abuse.

8.      I have been retained by the Official Committee of Unsecured Creditors (the "Committee"), subject to Court approval, in this matter to provide expert testimony of various aspects of the current matter.

9.      I have reviewed the *Motion of the Debtor for an Order Establishing Deadlines for Filing Proofs of Claim and Granting Related Relief* (the "Bar Date Motion") filed on November

19, 2020 by the Roman Catholic Diocese of Rockville Centre, New York (the "Diocese" or the

"Debtor").

10.    The opinions I have reached regarding the Bar Date Motion and the effectiveness

of the notice and claim procedures proposed therein summarized below are based on well-

established facts about the nature of childhood sexual abuse, its impact on child victims when

they become adults, the complexity of the processes involved in individuals making a connection

between historical events such as abuse and the ultimate injury, and the nature of abuse by

Catholic priests and its impact on victims.

## Opinion I.    The Bar Date Notice Period Proposed by the Debtor is Not Sufficient.

11.    The Debtor has proposed a bar date of February 17, 2021, for which notice will be

given following the December 9, 2020 hearing on the Bar Date Motion.  The proposed notice

period, less than 70-days for the filing of claims, is not sufficient.   It establishes an unrealistic,

too short in the future date, which does not allow an adult survivor of childhood abuse enough

time to consider the potential emotional and other impacts of and ultimately filing a claim.  It

also does not take into account lead time that it may take to implement a fulsome notice program,

as further discussed below.

12.    Survivors of abuse are reluctant to disclose their abuse. The research is clear.

Delay in disclosure is the norm with only thirty percent of child victims I have studied disclosing

immediately.  It is well known that most child victims do not disclose until adulthood, often well

into adulthood and often even in adulthood disclosure is a difficult and emotionally complex

process. Reasons for that are often multiple and there may be more than one reason for

reluctance to disclose abuse operative in any given survivor's experience.  My evaluation of

child and adult survivors indicates that reasons for non-disclosure include:  fear of the

consequences of reporting, stigma associated with being a victim, protecting aging parents who did not know or protect the survivor when the abuse was taking place, not wanting partners or children to know about the abuse or the survivor's own avoidance of the pain associated with memories of the abuse, psychological defenses including denial, dissociation, and other internal defensive process which protect the individual from the pain and distress associated with the memories of abuse or maladaptive coping such as substance abuse which also keeps painful memories and feelings out of awareness.

13.    For a survivor of sexual abuse, the act of knowing that he or she was abused, being willing to identify as an abuse survivor, and deciding to take some action is difficult and complex.   As is generally understood, disclosure is not a single step but rather a process.  Once a claimant has received the notice it is likely that for many it will take a period of reflection.  That reflection will include the difficult and painful process of weighting the reasons that they have not previously disclosed or identified themselves as a victim, and considering the implications and enormously significant consequences of completing the Proof of Claim.

14.    In addition, it is important to recognize the fact of COVID-19, which is a source of worry and preoccupation, is likely to take mental energy away from the survivor's decision making process about filing a claim.  I have had contact with several prior clients who report that the isolation and fear of social distancing has triggered abuse memories and feelings.  This time has caused many people to alter how they work and live and what they think about.  Therapists have switched clients to video or phone therapy.  Millions of Americans including probably some who are claimants are unemployed and preoccupied with how they are going to feed their families.

15.    Given these concerns I can see no reason to further abuse Survivors by not

allowing a reasonable time period after they receive notice to reflect seriously and make a decision which one way or the other is likely to have a significant impact on their lives. The August 14, 2021 bar date proposed by the Committee both comports with the window to file claims under the New York Child Victims Act (the "<u>CVA</u>"), and is a reasonable and fair time period assuming the Notice plan is revised to increase targeting of creditors.

### <u>Opinion II.    The Bar Date Should Be Coterminous with the CVA Claim Deadline.</u>

16.     I am informed and believe that sexual abuse survivors have been inundated with a well-publicized extended CVA deadline of August 14, 2021. Imposing an earlier deadline separate from the CVA deadline may easily confuse many claimants who are already facing the very stressful process of acknowledging and filing a claim. The likelihood of confusion is even greater for sexual abuse survivors who may be elderly and / or vulnerable adults, who may have trouble understanding the difference between the CVA Deadline and an earlier bar date established by the Bankruptcy Court, especially in light of the publicity of the extension of the CVA deadline. I believe that setting a bar date earlier than the CVA deadline will result in a substantial likelihood of confusion among survivors regarding their deadline to file claims.

17.     Many survivors target their decision to pursue a claim to clearly established deadlines to do so. Based on that target date, survivors begin the steps necessary to come forward including emotional preparation for themselves as well as disclosure to family. Some survivors may also require therapy to prepare. For many, they are articulating and disclosing their abuse for the first time. Just as it takes great emotional and legal work to file a lawsuit asserting abuse, so too does it take great emotional and legal work to file a Sexual Abuse Claim against the Diocese.

18.    In this case, survivors may be relying on the extended CVA deadline of August 14, 2021 as a milestone to prepare themselves emotionally for filing a claim against the Diocese. Imposing an earlier deadline gives too little regard for the difficulty encountered by an adult survivor who is compelled to file a claim by a date certain regardless of whether he is emotionally or psychological ready to do so and, after preparing for the CVA deadline, learns that deadline has been shortened by six months.   Setting a much earlier bar date also threatens survivors' ability to disclose their abuse to family members in their own time and manner, and takes away the control over their own stories.  Loss of control is a central issue for sexual abuse survivors, and limiting their control over disclosure of their abuse could re-traumatize survivors.

19.    Given these potential hardships for survivors, it is my opinion that there is no justification for setting a bar date in this Case other than August 14, 2021, the claim deadline established by the CVA.

## Opinion III.  An  Effective  Notice  Process  Should  Directly  Target  Known  and Ascertainable Claimants.

20.    The search for claimants may be general and non-targeted or targeted.  A targeted search is one that takes the names of individuals who were in institutions, organizations, or parishes where known pedophile priests worked and lived. A targeted means of notice directs notice efforts and resources to individuals who have a higher potential of having a claim than those in large general populations. Non-targeted efforts publish notice to the general population with a large number of people who may not have lived in areas or attended institutions, organizations, or parishes where pedophile priests worked or lived. Non-targeted publication processes are akin to looking for the needle in a haystack.  Targeted processes are akin to looking in an area of the haystack where the needle was dropped.

21.      A targeted notice procedure has a greater chance of reaching abuse claimants. The Bar Date Motion proposes to serve direct notice of the bar date on all parties to pending litigation with the Debtor, and otherwise utilize publication notice to reach claimants including abuse claimants.[2] Debtor has the names of parish families and children who attended parish schools, church camps and other facilities and likely has personally identifying information that can be used to obtain current addresses. In particular, they have this information and they also have information where a pedophile Priest or other adult for whom the Diocese is responsible was abusing children; these families and individuals should be targeted for notice. Identifying the cumulative lists of alumni of schools, parishes, and other organizations/facilities where accused and known pedophile priests lived and worked is what I would call a targeted notice. This targeted notice effort allows Debtor to invest in a notice process which in fact has a high potential of contacting claimants and avoids providing notice which either goes unnoticed by claimants (*e.g.* because it is lost in the overload of the current information explosion) or is noticed by individuals who have no claim.

22.      The importance of identifying families and children who attended organizations and facilities where known pedophile priests lived and worked cannot be overlooked in seeking to identify claimants.  Far from being an impulsive act by offenders, sexual abuse of children is most typically undertaken by individuals who have long histories of practicing their predilections, identifying vulnerable children, and repeatedly using their power to abuse multiple children.  In my experience evaluating victims of those in religious life, never have I seen a case where only one child is known to have been abused by an offender.  These offenders take efforts to use their position of power and authority and the significant role they play in family and

---

[2] The Debtor will also serve "all known potential claimants", which are not identified as including abuse claimants.  Bar Date Motion, p. 14 and 71, ¶16.

community life to form relationships with adults who would otherwise protect children, to lull the adults into believing that their children are safe with the offender; and by using their position, authority and the relationship with the child to gain sexual access to the child and maintain secrecy.

**Opinion IV.   Direct Notice and Cued Recall are Likely to Increase Responses.**

23.    Fair notice requires that first the claimant be in fact exposed to the notice. Then it requires that the claimant identify himself as a person belonging to the group of people for whom the notice is intended. Then the individual must realize whether s/he in fact experienced abuse and that s/he has been harmed by it (*i.e.* that it did in fact cause problems in his/her life), and in order to do any of this s/he must be able to overcome the natural avoidance and defense mechanisms which has afforded a feeling of protection over a lifetime from dealing with the pain and negative effects of the abuse. Finally, s/he has to come to a decision that making a claim will outweigh all the negative costs (*e.g.*, feelings of guilt or shame, or demands on psychological energy and time) of acknowledging and being identified as a victim of childhood sexual abuse. Notice must be sufficiently powerful, frequent, and culturally and psychologically sensitive so as to overcome the damage done by the abuse that serves to make claimants avoidant, unaware, or reluctant to disclose; otherwise it will fail to trigger the remembering or identifying of relevant experiences.

24.    When sexual abuse is perpetrated by a person in authority, especially God's representative on earth in the person of the Catholic priest, the child is unable or unwilling to tell others about the abuse.  In some cases the priest who has abused the child has then instructed the child to make a confession to him for the abuse as if the child were the person who had sinned. At the same time, occasionally in my evaluation of individuals abused by priests, the individual

reports having told someone, such as a parent, and not having been believed or having been punished for saying such bad things about a man of God. Like all mental skills, denial, minimization, avoidance and rationalization become ways that the child victim pushes the sexual abuse from conscious memory. Many people I have evaluated report that they did not think about the sexual abuse for years, even decades, after the last incident of sexual abuse.

25.     Stimulated or cued recall is likely to increase responses by Survivors.  Survivors who sees a list of pedophile priests that includes their abuser are more likely to trust their recollection of the abuse and have more confidence that their own credibility will not be challenged, thereby encouraging them to file a claim.  The Diocese should make available the names of all priests and clergy against whom abuse claims were made, including pictures of such priests and clergy as they looked at the time of the reported abuse, names of specific parishes or schools or other institutions where the Debtor knows such priests or clergy were or where numerous allegations have already arisen and the time periods over which abuse was likely to have taken place.  That information will increase the ability of claimants to know what conduct, taken place in what setting, and by which individuals is the focus of the notice. For example, one preamble to a notice might read "If you were a student at (Name of School) during the years X to Y and had contact with Father W, this information may apply to you."

26.     Debtor proposes to publish the announcement twice in 21 local newspapers in New York and in the national editions of The New York Times, The Wall Street Journal, and USA Today.  Certainly small advertisements in newspapers are going to be inadequate. Repeated notice in behaviorally specific language will be necessary before claimants understand that it is in fact what happened to them in childhood that is being addressed in the notice and provide them ample time to overcome resistance to disclosure and to consider the impact of disclosure.

Non-targeted means of publication such as newspapers or church bulletins and bulletin boards are of necessity going to require publication on a more frequent basis and over a longer duration before claimants are likely to notice and decide to respond to such notices. Importantly, publication in newspapers is not likely to connect with a large number of claimants. Only a small percentage of the adult population gets information from newspapers.

27.     The use of websites and direct communication with alumni should be implemented. Direct contact via U.S. Mail, email, or social media with these alumni individuals and families is likely the most productive, fair, and reliable procedure for notice. Notice should include a statement that alumni or their families who do not themselves have claims but know of individuals who may have been abused but moved away from the area should be encouraged to forward information to those individuals.

**Opinion V.    Considerations of Reasonable Person vs. Average Abuse Survivor Standard.**

28.     The notice of bar date for proof of abuse claims has to be powerful and relatively persistent for it to come to the awareness or attention, and then be understood, by claimants. It can be argued that the claimants in most need of powerful targeted notice are those most significantly damaged by the abuse and therefore more likely to suffer symptoms that make seeing and understanding the notice most difficult.

29.     What constitutes fair notice for the average person may not constitute fair notice for a person abused by a priest. As outlined above, the nature of sexual abuse, its impact on the individual, abuse by a religious figure to a Catholic child in a Catholic family, and the efforts of the abused person to manage or defend against the impact of the abuse (e.g. by denying that what was done to him/her was in fact "abuse" or the use of drugs to obliterate memories of the abuse)

makes the position of the abuse survivor unlike that of a reasonable average person. In my expert opinion, the standard is not that of an average person but rather the typical abused person. Accordingly, the question of fair notice should be addressed in the context of the unique needs of survivors who have suffered the effects of childhood sexual abuse by clergy.

Pursuant to 28 U.S.C. sec. 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of knowledge and belief. I executed this Declaration on November 30ᵗʰ, 2020 at Whidbey Island, WA .

Jon R. Conte, Ph.D.

# <u>DECLARATION OF SHANNON R. WHEATMAN, PH.D</u>

**IN THE UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

---

In re:

THE ROMAN CATHOLIC DIOCESE OF
ROCKVILLE CENTRE, NEW YORK,[1]

          Debtor.

Chapter 11

Case No. 20-12345 (SCC)

---

**DECLARATION OF SHANNON R. WHEATMAN, PH.D. IN SUPPORT OF THE
OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS
TO THE MOTION OF THE DEBTOR FOR AN ORDER ESTABLISHING
DEADLINES FOR FILING PROOFS OF CLAIMS AND GRANTING RELATED
RELIEF**

I, Shannon R. Wheatman, being duly sworn, hereby declare as follows:

1.       I am the President of Kinsella Media, LLC ("KM"), an advertising and notification

consulting firm in Washington, D.C. specializing in the design and implementation of class action

and bankruptcy notification programs.  My business address is 2101 L Street NW, Suite 800,

Washington, D.C. 20037.

2.       I submit this declaration ("Declaration") in support of the *Objection* of *the Official*

*Committee Of Unsecured Creditors to the Motion of the Debtor For An Order Establishing*

*Deadlines For Filing Proofs Of Claims; And Granting Related Relief* (the "Objection").

3.       The Official Committee of Unsecured Creditors (the "Committee") asked KM: (i)

to review the Debtor's Notice Plan with respect to the overall adequacy and efficacy of the selected

media, as well as the readability and effectiveness of the notice itself, and (ii) if appropriate, to

provide recommendations for a more effective media program.

---

[1] The Debtor in this chapter 11 case is The Roman Catholic Diocese of Rockville Centre, New York, the last four
digits of its federal tax identification number are 7437, and its mailing address is 50 North Park Avenue P.O. Box
9023, Rockville Centre, NY 11571-9023.

4.      In my opinion, the Debtor's Notice Plan does not adequately notify unknown Sexual Abuse Claimants.  The Debtor's Notice Plan reaches fewer Sexual Abuse Claimants than appropriate; does not provide enough opportunities for Sexual Abuse Claimants to see an actual notice; and fails to use media, such as television, that is critical to reaching older Sexual Abuse Claimants – who should be a primary target of this notice effort.

5.      It is my strong professional belief that claims arising from a personal injury are the most serious claims that can be filed in bankruptcy and that any attempt to set a time deadline to bar these claims requires the appropriate standard of notification.

6.      For this reason, I find the Debtor's Notice Plan inadequate in notifying Sexual Abuse Claimants.

7.      This Declaration will describe my experience in designing and implementing notices and notice programs, as well as my credentials to opine on the overall adequacy of the notice effort.

8.      Except as otherwise noted herein, the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, the information provided by the Committee, and my associates and staff.  The information set forth herein is of a type reasonably relied upon in the fields of advertising, media, and communications.  If called upon to testify, I would testify competently to the facts set forth in this Declaration.  I am authorized to submit this Declaration.

## **RELEVANT EXPERIENCE**

9.      KM has developed and directed some of the largest and most complex national notification programs in the United States.  The scope of KM's work includes notification programs in bankruptcy, antitrust, consumer fraud, mass tort, and product liability litigation.  I

have developed or consulted on over 600 notification programs, and KM has placed over $450 million in media notice. KM has implemented notice programs reaching people in 72 languages in 214 countries.

10.    I have served as a qualified legal notice expert in litigations involving class actions and bankruptcies. State and federal courts have accepted my analyses and expert testimony regarding whether the information is effectively communicated to people.

11.    I have worked as an expert with respect to legal noticing in the following bankruptcy cases: In re The Roman Catholic Church of The Archdiocese of New Orleans, No. 20-10846 (Bankr. E.D. La.); In re Boy Scouts of America and Delaware BSA, LLC, No. 20-10343 (Bankr. D. Del.); In re PG&E Corp., No. 19-30088 (Bankr. N.D. Cal.); In re Think Fin., LLC, No. 17-33964 (Bankr. N.D. Tex. Oct. 23, 2017); In re Energy Future Holdings Corp., No. 14-10979 (Bankr. D. Del.); In re Garlock Sealing Tech. LLC, No. 10-31607 (Bankr. W.D.N.C.); In re SCBA Liquidation, Inc., f/k/a Second Chance Body Armor, Inc., No. 04-12515 (Bankr. W.D. Mich.); and In re W.R. Grace & Co., No. 01-01139 (Bankr. D. Del.).

12.    In addition to this bankruptcy case experience, I have testified in court as an expert in legal noticing in the following cases: In re The Roman Catholic Church of The Archdiocese of New Orleans, No. 20-10846 (Bankr. E.D. La.); In re Boy Scouts of America and Delaware BSA, LLC, No. 20-10343 (Bankr. D. Del.); In re Chinese-Manufactured Drywall Prods. Liab. Litig., MDL No. 2047 (E.D. La.); In re Think Finance, LLC, No. 17-33964 (Bankr. N.D. Tex.); In re Volkswagen "Clean Diesel" Marketing, Sales Practices & Prods. Liab. Litig., MDL No. 2672 (N.D. Cal.); State v. Farmer Grp. Inc., No. D-1-GV-02-002501 (D. Ct. Tex., Travis Cty.); Scharfstein v. BP West Coast Prods., LLC, No. 1112-17046 (Cir. Ct. Or.); Spillman v. RPM Pizza, Inc., No. 10-349 (M.D. La.); PRC Holdings, LLC v. East Res., Inc., No. 06-C-81 (Cir. Ct. W. Va.);

Guidry v. Am. Pub. Life Ins. Co., No. 2008-3465 (14th Jud. Dist. Ct., Calcasieu Parish); Webb v.

Liberty Mut. Ins. Co., No. CV-2007-418-3 (Cir. Ct. Ark); and Beasley v. Reliable Life Ins. Co.,

No. CV-2005-58-1 (Cir. Ct. Ark).

13.     I have been deposed as an expert in legal noticing in In re Think Finance, LLC, No.

17-33964 (Bankr. N.D. Tex.); Hale v. CNX Gas Co., LLC, No. 10-CV-59 (W.D. Va.); and Thomas

v. A. Wilbert Sons, LLC, No. 55,127 (18th Jud. Dist. Ct., Iberville Parish).

14.     I have worked as an expert in the following cases in New York: Blessing v. Sirius

XM Radio, Inc., No. 09-CV-10035 HB (S.D.N.Y.); In re LIBOR-Based Financial Instruments

Antitrust Litig. (Barclays Bank, Citibank, Deutsche Bank and HSBC settlements), MDL No. 2262

(S.D.N.Y.); In re NYC Bus Tour Antitrust Litig., No. 13-CV-0711 (S.D. N.Y.); Precision

Associates, Inc. v. Panalpina World Transport, No. 08-CV-00042 (E.D.N.Y.); In re Parking

Heaters Antitrust Litigation, No. 1:15-mc-00940 (E.D. N.Y.); and In re Municipal Derivatives

Antitrust Litig., MDL No. 1950 (S.D.N.Y.).

15.     I have worked as an expert in the following cases involving sexual abuse survivors:

In re The Roman Catholic Church of The Archdiocese of New Orleans, No. 20-10846 (Bankr.

E.D. La.); In re Boy Scouts of America and Delaware BSA, LLC, No. 20-10343 (Bankr. D. Del.);

Dolmage v. Province of Ontario, No. CV-09-376927 (Ont. S.C.J.) (involving former residents of

the Huronia Regional Centre, open from 1945-2009, for people with disabilities); Clarke v.

Province of Ontario, No. CV-10-411911 (Ont. S.C.J.) (involving former residents of the Rideau

Regional Centre, open from 1969-2009, for people with disabilities); and In re Residential Schools

Class Action Litig., No. 00-CV-19259 (Ont. S.C.J.) (involving individuals who attended a

Canadian Indian residential school system since 1879 and their heirs).

16.     I have worked as an expert on some of the largest and most complex national

4

notification programs in the country, including, without limitation: In re Domestic Airline Travel Antitrust Litig., MDL No. 2656 (D.D.C.) (involving notice to over 100 million airline passengers); In re Volkswagen "Clean Diesel" Marketing, Sales Practices & Prods. Liab. Litig., MDL No. 2672 (N.D. Cal.) (involving notice to over 700,000 Volkswagen, Porsche, and Audi owners/lessees); Precision Assocs., Inc. v. Panalpina World Transport, No. 08-CV-00042 (E.D.N.Y.) (involving notice to millions of freight forwarding customers); In re Transpacific Passenger Air Transp. Antitrust Litig., MDL No. 1913 (N.D. Cal.) (involving notice to millions of international airline passengers); In re Dynamic Random Memory Antitrust Litig., MDL No. 1486 (N.D. Cal.) (involving notice to over 100 million consumers); In re TFT-LCD (Flat Panel) Antitrust Litig., MDL No. 1827 (N.D. Cal.) (involving notice to millions of indirect purchasers); In re Target Corp. Customer Data Sec. Breach Litig., MDL No. 14-2522 (D. Minn.) (involving notice to over 40 million consumers); In re Sony Gaming Networks & Customer Data Sec. Breach Litig., No. 11-MD-2258 (S.D. Cal.) (involving notice to over 70 million user accounts).

17.    My qualifications include expertise with respect to the form and content of notice. For example, while serving with the Federal Judicial Center ("FJC"), I played an integral part in the development of the illustrative, "model" forms of notice designed to satisfy the plain language requirements of Federal Rule of Civil Procedure 23(c)(2). This research formed the basis for my doctoral dissertation, *The Effects of Plain Language Drafting on Layperson's Comprehension of Class Action Notices* (2001) (Ph.D. dissertation, University of Georgia). To assist judges and attorneys, both in state and federal courts, the FJC posted the notices at www.fjc.gov.

18.    In addition to extensive experience in the design and implementation of noticing programs in a variety of bankruptcy and class action litigation, I have authored and co-authored articles on notice and due process. I believe that notice and due process depend upon clear

communication with the affected people and have stated this position in my publications. See, e.g., Shannon R. Wheatman & Katherine M. Kinsella, *International Class Action Notice*, WORLD CLASS ACTION: A GUIDE TO GROUP AND REPRESENTATIVE CLASS ACTIONS AROUND THE GLOBE 673–86 (Paul Karlsgodt ed., 2012); Katherine Kinsella & Shannon Wheatman, *Class Notice and Claims Administration*, PRIVATE ENFORCEMENT OF ANTITRUST LAW IN THE UNITED STATES: A HANDBOOK 338–48 (Albert A. Foer & Randy M. Stutz eds., 2012); Shannon R. Wheatman & Terri R. LeClercq, *Majority of Class Action Publication Notices Fail to Satisfy Rule 23 Requirements*, 30 REV. LITIG. 53 (2011); Katherine Kinsella & Shannon R. Wheatman, *Class Notice and Claims Administration*, THE INTERNATIONAL PRIVATE ENFORCEMENT OF COMPETITION LAW 264–74 (Albert A. Foer & Jonathan W. Cuneo eds., 2010); Todd B. Hilsee, Shannon R. Wheatman & Gina M. Intrepido, *Do you really want me to know my rights? The ethics behind due process in class action notice is more than just plain language: A desire to actually inform*, 18 GEO. J. LEGAL ETHICS 1359 (2005); and Todd B. Hilsee, Gina M. Intrepido & Shannon R. Wheatman, *Hurricanes, Mobility and Due Process: The "Desire-to-Inform" Requirement for Effective Class Action Notice Is Highlighted by Katrina*, 80 TULANE LAW REV. 1771 (2006).

## DEBTOR'S NOTICE PLAN

### *Direct Notice*

19.    The Notice Procedures for this chapter 11 case with respect to holders of Sexual Abuse Claims should successfully reach and inform known and unknown claimants of the deadline and process for filing proofs of claim.

20.    The Debtor's Notice Plan proposes mailing the Bar Dates Notice Package by first-class United States mail, postage prepaid (or equivalent service), to: (a) all known potential claimants, including all entities listed in the Schedules as potentially holding claims; (b) the U.S.

Trustee; (c) counsel to the Committee; (d) all parties that have requested notices in this chapter 11

case pursuant to Bankruptcy Rule 2002; (e) all counterparties to executory contracts and unexpired

leases of the Debtor listed in the Schedules or their designated representatives (including all parties

to rejected executory contracts and unexpired leases); (f) all parties to pending litigation with the

Debtor; (g) the Internal Revenue Service for this District; (h) the attorney general for the State of

New York; (i) all other entities listed on the Debtor's matrix of creditors; and (j) all parties that

have filed proofs of claim in this chapter 11 case as of the date of entry of the Bar Date Order.

21.    No address updating protocols are mentioned in the Debtor's Notice Plan.  I

recommend the following:

(a)    Prior to mailing, all addresses should be checked against the National

Change of Address ("NCOA")[2] database, which is maintained by the United States Postal

Service ("USPS").

(b)    Notices that are returned as non-deliverable should be re-mailed to any

address indicated by the USPS in the case of an expired automatic forwarding order.

Notices returned as non-deliverable, but for which a new address is not indicated by the

USPS, should be further searched through a third-party vendor to obtain a more current

address.  If any such address is found, the notice should be re-mailed to such addresses.

22.    I have designed hundreds of notice programs that included some form of direct

notice.  In many cases, notice is sent via mail or email to an over-inclusive population that may

include potential claimants.  In these instances, a postcard notice is often used to provide cost-

efficiency.    Based  on  information  provided  by  Rust  Consulting,  Inc.  ("Rust"),    a  claims

---

[2] The NCOA database contains records of all permanent changes of address submissions received by the USPS for
the last four years.

administration firm who is a sister company of KM, the cost to print and mail a postcard is 0.38 cents per record.

23.    Additionally, third-party mailing list vendors, such as TransUnion or LexisNexis, can be useful in updating old or outdated mailing information.  These vendors can take the name and social security number or name and birthdate of a former student and provide a current mailing address.  Based on information provided to me by Rust, the cost for this address search is 0.25 cents per record.

### Publication Notice

24.    The Debtor's Notice Plan includes limited paid media to reach potential claimants who do not receive direct notice.  The Debtor's paid media program includes two insertions in three national newspapers (*The New York Times*, *The Wall Street Journal*, and *USA Today)* and two insertions in 21 local daily, community, religion, and ethnic newspapers (*Newsday*, *The National Catholic Register*, *The National Catholic Reporter*, *Long Island Catholic*, *Fe Fuerza Vida*, *Long Island Business News*, *The Northport Observer*, *Port Times-Record*, *Merrick Herald Life*, *The Smithtown News*, *The Village Times Herald*, *The Garden City News*, *Bellmore Herald Life*, *Smithtown Messenger*, *The East Hampton Press*, *The Suffolk Times*, *The Southampton Press-Eastern*, *Long Beach Herald*, *Mineola American*, *Rockville Centre Herald*, and *Long Island Herald*).

### Reach of Claimants

25.    As explained in further detail below, credentialed and experienced notice experts use industry–vetted data and methodologies to calculate how well selected media penetrates a target audience and the average number of opportunities that the audience has to see the notice.  A target audience is a group of people with shared demographic characteristics such as age, income,

or purchasing habits, for example, that is the intended recipient of an advertising message or notice. Paid media is purchased and measured based on demographic targets because people with similar demographics consume similar forms of media.

26.     These calculations are estimates expressed as *reach* and *frequency*.  *Reach* is the estimated percentage of a target audience that is exposed one or more times through a specific media vehicle or a combination of media vehicles within a given period.  *Frequency* is the estimated average number of opportunities an audience member has to see the notice (such as seeing a notice in a newspaper or on television).

27.     Because the identities of many Sexual Abuse Claimants are unknown, notice professionals rely on paid media to provide notice.  Notice programs (i) identify "target" audiences by demographics, such as age; and (ii) seek to "reach" as high a percentage of individuals in that age bracket, providing as many opportunities to see the notice as is reasonable.

28.     The Debtor's Notice Plan did not provide reach and frequency measurements for the Court to consider in evaluating its notice program.  KM reviewed media survey data and found that if notice is published in the national editions of *The New York Times, The Wall Street Journal*, and *USA Today*, and every daily newspaper in New York,[3] you would achieve the following:[4]

---

[3] There are 37 daily accredited local New York newspapers.

[4] KM subscribes to media survey data through MRI-Simmons.  MRI-Simmons is a nationally accredited media and marketing research firm that provides syndicated data on audience size, composition, and other relevant factors pertaining to major media.  MRI-Simmons provides a single-source of major media, products, services, and in-depth consumer demographic and lifestyle/psychographic characteristics.  MRI-Simmons produces an annual Doublebase, a study of more than 50,000 adults providing two full years of data.  It provides the combined reach and frequency for all daily and Sunday newspapers in New York but does not break out the newspapers individually.  There are only 37 newspapers in New York that have their circulation and readership audited by third-party verification.  The Debtor has included one newspaper in its plan that is audited.

| Target Audience | Geography | Reach | Frequency |
|---|---|---|---|
| Adults 18+ | Long Island[5] | 22.9% | 1.1 |
| | New York | 24.4% | 1.1 |
| | Nationwide | 4.0% | 1.6 |
| Adults 35+ | Long Island | 26.8% | 1.1 |
| | New York | 28.3% | 1.1 |
| | Nationwide | 4.0% | 1.6 |
| Adults 50+ | Long Island | 33.3% | 1.1 |
| | New York | 32.2% | 1.1 |
| | Nationwide | 4.5% | 1.7 |

29.    Of course, the Debtor is only publishing in 21 local newspapers in New York, and only one of them is a daily newspaper, *Newsday* that is included in our media survey data.[6]

30.    Even if the paid media portion of the Debtor's Notice Plan achieves the entire reach noted above, it is my opinion that the reach is insufficient when compared to the reach of other notice programs targeting personal injury claimants.

| CASE | REACH | FREQUENCY |
|---|---|---|
| In re The Roman Catholic Church of The Archdiocese of New Orleans | 95% | 4.0 |
| In re Boy Scouts of America & Delaware BSA, LLC, No. 20-10343 (Bankr. D. Del.) | 96% | 6.5 |
| In re PG&E Corp., No. 19-30088 (Bankr. N.D. Cal.) | 95% | 8.0 |
| In re Garlock Sealing Tech. LLC, No. 10-31607 (Bankr. W.D.N.C.) | 95% | 4.4 |
| In re Dow Corning, No. 95-20512 (Bankr. E.D. Mich.) | 95% | 4.0 |

---

[5] Long Island is part of the New York media market which includes the following counties in New York: Bronx, Dutchess, Kings, Nassau, New York, Orange, Putnam, Queens, Richmond, Rockland, Suffolk, Sullivan, Ulster, and Westchester. This media market also covers counties in Connecticut (Fairfield), New Jersey (Bergen, Essex, Hudson, Hunterdon, Middlesex, Monmouth, Morris, Ocean, Passaic, Somerset, Sussex, Union, and Warrant), and Pennsylvania (Pike).

[6] MRI-Simmons.

| CASE | REACH | FREQUENCY |
|---|---|---|
| In re W.R. Grace & Co., No. 01-01139 (Bankr. D. Del.) | 91% | 3.7 |
| In re Babcock & Wilcox Co., No. 00-10992 (Bankr. E.D. La.) | 94% | 4.4 |

### *Opportunities to See the Notice*

31.    In addition to my concern about the insufficient reach of the target audiences, equally critical is the low frequency of opportunities to see the notice provided by the Debtor's Notice Plan.  As outlined in the cases cited above, the primary target audience had an average of four opportunities or more to see the notice.  It is my strongly held position that the opportunities to see the notice under the Debtor's Notice Plan are well below what is effective to get the attention of claimants.

### *Other Notice Procedures*

32.    The Debtor's Notice Plan has other components that are not included in the estimate measurements noted above, including posting information on The Roman Catholic Diocese of Rockville Centre, New York's social media pages and on the case website established by the claims agent.

33.    KM agrees that additional notice should occur through the efforts outlined immediately above, but with the exception of the paid media (*i.e.*, newspapers), there is no way to quantify what that reach would be or even guarantee additional reach.

34.    Direct mail is important because it is the most effective form of notice when it is actually received by the Sexual Abuse Claimant.  However, as discussed below, I have not seen any information that would allow me to quantify the percentage of Sexual Abuse Claimants that would be reached through mail as compared to the reach of a publication notice program to a percentage of the overall population.  In comparison, I can quantify the percentage of the overall population that would be reached by a publication notice program.

35.    The additional components of the Debtor's Notice Plan identified in paragraph 32 above are certainly worthwhile, but without the ability to measure their reach, they can only be considered supplemental to the paid media program.

## DEMOGRAPHICS AND TARGET AUDIENCE SELECTION

I.    **Demographics and Location of Potential Sexual Abuse Claimants**

36.    To develop the recommendations for the Publication Notice Plan and to determine how best to reach potential claimants, including those who may no longer reside in Long Island, I reviewed and analyzed various sources of information and data as detailed below.  It is my understanding that claims may go back to the late 1950s.

37.    In many bankruptcy cases where I have been retained as an expert, I had access to data from the Debtor that provided information on known claimants (*i.e.*, age, gender, city and state of residence).  This information would be invaluable in developing an effective media program.

A.    **Geographic Location**

38.    The Roman Catholic Diocese of Rockville Centre has parishes in Nassau and Suffolk counties in New York.

39.    To determine migration patterns of people who may have moved outside of Nassau and Suffolk counties, I analyzed available U.S. Census data (2005 to 2018).[7]  Migration data is not available for earlier years.  The data revealed:

(a)  284,752 people moved from Nassau and Suffolk counties,

(b)  46.6% of movers remained in New York,

---

[7]    United States Census Bureau, *County to County Migration Flows*, available at https://www.census.gov/topics/population/migration/guidance/county-to-county-migration-flows.html (last visited Nov. 24, 2020).

(c) 14.0% of people moved within Nassau and Suffolk counties,

(d) 53.4% moved out-of-state, and

(e) 23.5% of out-of-state movers went to Florida, Pennsylvania, North Carolina, and New Jersey.

40.    Given the time period involved and the fact that 86.0% of movers moved away from Nassau and Suffolk counties, any bar date notice program that satisfies the minimum requirements of due process will need to ensure that Sexual Abuse Claimants, wherever they live, have an adequate opportunity to learn about the bar date deadline.

**B.    Demographics**

41.    The Pew Research Center conducted a survey of Catholics in New York in 2014, which provided information on age distributions.[8]



42.    Additionally, data about the Diocese of Rockville Centre for 2016 provide information about the ethnicity of Catholics by age.[9]

---

[8] Pew Research Center, *Adults in New York who are Catholic*, available at https://www.pewforum.org/religious-landscape-study/religious-tradition/catholic/state/new-york/ (last visited Nov. 24, 2020).
[9] V Encuentro, *Key Demographic, Social, and Religious Statistics for the Diocese of Rockville Centre*, available at https://vencuentro.org/wp-content/uploads/2018/02/214-Rockville-Centre-EN.pdf (last visited Nov. 24, 2020).



43.     The Hispanic population on Long Island is growing. Data indicate 27% of the Diocese of Rockville Centre members are Hispanic. A large number of Hispanics/Latinos speak Spanish, and the older generations are less likely to be fluent in English. The Diocese of Rockville Centre has offered masses in Spanish since the 1950's and developed programs and ministries for Hispanics since 1968.[10]



44.     Today, the Diocese of Rockville Center also has an Office of Multicultural Diversity that includes the Ministries to Catholics of African Ancestry, the Haitian American

---

[10] The Roman Catholic Diocese of Rockville Centre, *Hispanic Ministry and Evangelization*, available at https://www.drvc.org/hispanic/ (last visited Nov. 24, 2020).

14

Apostolate Ministry, and the Nigerian (Igbo) Apostolate.  The Diocese offers masses in Creole.

**C.    Church Membership Shifts**

45.    It is important to note that a large number of individuals who were raised Catholic have left the church.  In 2015 the Pew Research Center found a high percentage of people raised in the church leave at some point.[11]   People who left the church are less likely to come across notice on a website or social media page run by the Debtor.   Additionally, survivors and their families may be more likely to have left the church because of their experiences.



**II.    Target Audience: Selection Methodology and Demographics**

46.    KM employs methodology and measurement tools used in the media planning and advertising industry for designing and measuring the adequacy of a paid media program to reach a particular audience.   To design the paid media notice segment of the Publication Notice Plan, KM identified and selected demographics that encompass the characteristics of potential claimants.   KM analyzed and selected media vehicles for their strength and efficiency in reaching

---

[11] Pew Research Center, *Half of U.S. adults raised Catholic have left the church at some point*, available at https://www.pewresearch.org/fact-tank/2015/09/15/half-of-u-s-adults-raised-catholic-have-left-the-church-at-some-point/ (last visited Nov. 24, 2020).

these demographic targets and then quantified results to be used in determining the adequacy of the notice.

47.    For the purpose of developing profiles of the demographics and the media habits of potential claimants, KM analyzed syndicated data available from MRI-Simmons 2020 Doublebase Study,[12] comScore,[13] and Nielsen.[14]

48.    Based on the data analysis provided above, three target audiences were chosen:

(a)    The first target is Adults 18 years of age and older ("Adults 18+").

(b)    The second target is Adults 35 years of age and older ("Adults 35+").

(c)    The third target is Adults 50 years of age and older ("Adults 50+").

49.    These target audiences will effectively reach potential claimants, as well as parents/guardians of minor children who are not reached through direct notice of the Sexual Abuse Claims Bar Date.

## III.    Target Audiences: Media Usage

50.    Individuals spend varying amounts of time with different types of media.    The following table reflects the target audiences' media consumption habits:

| Media | Adults 18+ | | Adults 35+ | | Adults 50+ | |
|---|---|---|---|---|---|---|
| | Long Island Media Market | | | | | |
| | Average Use | % of target | Average Use | % of target | Average Use | % of target |
| Magazines (# read in month) | 9.2 | 70.4% | 9.2 | 75.5% | 8.9 | 77.0% |
| Newspapers (# read in month) | 18.6 | 40.5% | 20.0 | 45.4% | 21.4 | 50.9% |

---

[12] *Supra* note 4.

[13] comScore, Inc. is a source of Internet audience measurement for advertising agencies, publishers, marketers, and financial analysts.  comScore measures Internet usage and other activity through monitoring software installed on the computers of a panel of approximately two million people.  Active in 170 countries, comScore tracks more than three million unique websites.

[14] Nielsen Company is the leading provider of audience measurement and related services worldwide.  In the United States, Nielsen's National TV People Meter service provides audience estimates for all national program sources, including broadcast networks, cable networks, Spanish language networks, and national syndicates.

| | | | | | | |
|---|---|---|---|---|---|---|
| **Radio** (hours per week) | 15.2 | 71.6% | 14.8 | 73.4% | 15.6 | 71.3% |
| **Television** (hours per week) | 32.0 | 90.0% | 35.4 | 93.6% | 40.4 | 95.7% |
| **Internet** (hours per week) | 24.7 | 87.8% | 20.6 | 82.7% | 17.9 | 75.0% |

| **Media** | **Adults 18+** | | **Adults 35+** New York State | | **Adults 50+** | |
|---|---|---|---|---|---|---|
| | **Average Use** | **% of target** | **Average Use** | **% of target** | **Average Use** | **% of target** |
| **Magazines** (# read in month) | 7.7 | 72.9% | 7.8 | 77.6% | 7.4 | 80.7% |
| **Newspapers** (# read in month) | 17.2 | 42.1% | 18.5 | 45.0% | 19.3 | 49.5% |
| **Radio** (hours per week) | 16.2 | 74.4% | 16.1 | 76.0% | 14.5 | 73.8% |
| **Television** (hours per week) | 32.4 | 89.3% | 35.7 | 93.0% | 39.1 | 94.5% |
| **Internet** (hours per week) | 26.9 | 87.6% | 22.3 | 84.2% | 20.3 | 78.5% |

## PUBLICATION NOTICE PLAN OVERVIEW

51.     The objective of the Publication Notice Plan is to provide fair and adequate notice of the Sexual Abuse Claims Bar Date to potential Sexual Abuse Survivors who may hold Sexual Abuse Claims but whose names, addresses, and identities are not known to the Debtor.  Outlined below are components that I believe are necessary to replace the Debtor's Publication Notice Plan in order to satisfy due process.

52.     Considering the high rate of out-of-state moves, I recommend implementing an Expanded Nationwide media program.  This would provide due process to potential claimants who live outside of New York.  I have provided two options in the chart below.

| NOTICE PROGRAM COMPONENT | EXPANDED NATIONWIDE + HEAVY NEW YORK | HEAVY NEW YORK + LIMITED NATIONWIDE |
|---|---|---|
| *Reach/Frequency* | • 68% to 71%/2.0 to 3.0 (Nationwide)<br>• 80% to 87%/3.0 to 3.8 (New York)<br>• 88% to 95%/3.7 to 4.9 (Long Island) | • 1.7% to 1.9%/1.0 to 1.1 (Nationwide)<br>• 80% to 87%/3.0 to 3.8 (New York)<br>• 88% to 95%/3.7 to 4.9 (Long Island) |
| *Television (NY)* | • Heavy TV in Long Island media market | • Heavy TV in Long Island media market |
| *Ethnic Radio (NY)* | • Hispanic/Creole | • Hispanic/Creole |
| *Consumer Magazines* | • National edition of 5 consumer magazines | • National edition of 5 consumer magazines |
| *National Newspaper* | • New York Times | • New York Times |
| *Community Newspapers (NY)* | • Top 5 newspapers in Nassau & Suffolk counties | • Top 5 newspapers in Nassau & Suffolk counties |
| *Religious Newspapers (NY)* | • 4 Catholic newspapers | • 4 Catholic newspapers |
| *Ethnic Newspapers (NY)* | • 3 Hispanic<br>• 3 Caribbean newspapers | • 3 Hispanic<br>• 3 Caribbean newspapers |
| *Out of State Newspapers* | N/A | • Top newspaper in FL, NC, PA, & NJ |
| *National Online* | • 300 million gross impressions[15]<br>• Catholic Audience Network<br>• Keyword Search Ads | • 3 million gross impressions<br>• Keyword Search Ads |
| *New York Online* | • 28 million gross impressions<br>• Targeted Online | • 28 million gross impressions<br>• Catholic Audience Network<br>• Targeted Online |
| *Social Media* | • Facebook, Twitter & LinkedIn | • Facebook, Twitter & LinkedIn |
| *Earned Media* | • National Press Release | • National Press Release |
| *Community Outreach* | • Catholic Churches in NY, FL, NC, PA, & NJ<br>• U.S. Prisons<br>• Sexual Abuse Support Groups | • Catholic Churches in NY, FL, NC, PA, & NJ<br>• U.S. Prisons<br>• Sexual Abuse Support Groups |
| ESTIMATED COST[16] | **$1.9 million** | **$950,000** |

---

[15] Gross impressions are the total number of times a digital ad will be shown. This figure does not represent the total number of unique viewers of the ad, as some viewers will see the ad more than once.

[16] These are hard costs and do not include production costs or agency commissions. Those would need to be provided by the firm implementing the program.

53.    Considering the high rate of out-of-state moves, I recommend implementing the Expanded Nationwide media program.  This would provide due process to potential claimants who live outside of New York.

54.    More details about each component of the Publication Notice Plan and how the program was developed are described below.

55.    Based on the target audiences' media consumption habits, KM researched the most appropriate media vehicles for this chapter 11 case.  KM also reviewed available television, radio, print, and online opportunities to reach the target audiences.

56.    The proposed Publication Notice Plan includes placements in media vehicles whose audiences are more likely to include potential claimants, ensuring coverage across all segments of the target audiences.

IV.    **Media Components**

57.    The core of the Publication Notice Plan is paid media,[17] which includes television, radio, print, and online.   An earned media[18] program and community outreach are also recommended to amplify the paid media notice and provide additional coverage to allow potential claimants to learn more.

A.    **Local Television**

58.    In my opinion, television should be the primary medium used to reach the target audience.  Television is not cost-prohibitive on the facts of this case and is essential to ensuring appropriate notice is provided.

59.    Television is intrusive, uses audio and visual elements to convey a message, and

---

[17] Publishers have the right to refuse the Debtor's advertisements.  The firm implementing the media program will need to make every effort to have the advertisements placed in the publications but substitutions may be necessary.
[18] Earned media, as opposed to paid media, occurs by disseminating a message about the bankruptcy to the media through a press release without a guarantee that it will appear.

can provide an urgent call to action.  Print, although valuable, is informational, passive, and not intrusive.  In all of the previous bankruptcy cases noted above in paragraph 30, television was a prominent notice delivery vehicle.  Most importantly, consumers trust television more than any other medium.[19]  This sentiment is critical when trying to get people who have potential claims to pay attention to the notice and understand the bar date deadline.

60.     Television is the most effective and cost-efficient media vehicle to notify potential claimants across all target audiences.  Every proposed target audience spends more time with television than with any other type of recommended media.

61.     Notice in the form of 30-second local television spots is recommended to be aired throughout the day on local stations covering Long Island.  Television spots should run for four to five weeks.

62.     Delivery estimates are based on purchasing 187 Adults 50+ Target Rating Points ("TRPs").[20]  Television should be bought against the older segment of the target audience since they are the heaviest consumers of this medium.  If my recommendations are implemented, television advertising will reach 75% of Adults 50+, 59% of Adults 35+, and 47% of Adults 18+ in the media market covering Long Island.[21]  We recommend also purchasing spots on New Evangelization Television (NET), which offers religious programming in New York.

63.     Broadcast channels could include all or some of the following, depending upon availability at the time media is purchased:

---

[19] "Advertising through traditional mediums is seen as the most trustworthy: 61% of consumers trust TV, print (58%), radio/podcast (45%), and out-of-home (42%)."  Clutch, *How Consumers View Advertising: 2017 Survey*, available at https://clutch.co/agencies/resources/how-consumers-view-advertising-survey-2017 (last visited Nov. 24, 2020).

[20] Target Rating Points represent the sum of the ratings delivered by a media vehicle in a schedule.  A rating is the percentage of persons in the target who have been exposed to the media vehicles in the schedule.  One TRP equals 1% of a given target population.

[21] Inventory is subject to change at the time of actual placement based on availability and market conditions.  Should television delivery fall short due to inventory issues, budget should be re-allocated to radio/Internet in order to make-up delivery.

| PROGRAMMING | CHANNELS |
|---|---|
| Broadcast Network |   |
| Religious |  |

**B.     Ethnic Local Radio**

64.     Notice in the form of 30-second local radio spots in Spanish and Creole is recommended to run for three to four weeks.

65.     Hispanic radio should be used to reach potential claimants who speak Spanish. Radio is the leading reach vehicle/medium used by Hispanics in the U.S., reaching 96% of users on a weekly basis.[22]   We recommend purchasing 50 spots on WXNY-FM, WSKQ-FM, and WQBU-FM.

66.     Radio should also be used to reach potential claimants who speak Creole.   We recommend purchasing two million gross impressions on the local streaming radio station, NYK-FM, in New York that offers programming in Creole.

**C.     Nationwide Print[23]**

67.     KM chose the specific consumer publications listed below for the Publication Notice Plan because they are among the highest-ranking in coverage of the various target audiences.

68.     The following consumer publications are recommended:

---

[22] Entercom, *Nielsen's Q2 2019 Total Audience Report: Audio Consumption Stronger Than Ever*, available at https://entercom.com/insights/nielsens-q2-2019-total-audience-report-audio-consumption-stronger-than-ever/    (last visited Nov. 24, 2020).

[23] New York State editions of these consumer magazines can be purchased.

| PUBLICATION | AD SIZE | NATIONAL CIRCULATION | SUMMARY |
|---|---|---|---|
| Better Homes & Gardens | 7.375" x 10" | 7,600,000 | Published monthly and is the largest-circulating home service magazine in the U.S., featuring a wide-range of home and family subjects. |
| Good Housekeeping | 7.25" x 10" | 4,000,000 | Published 10x a year providing food, nutrition, fashion , beauty, relationships, home decorating and home care, health and child care, and consumer and social issues. |
| The New York Times | 7.65" x 10" | 877,463 | Published daily and provides comprehensive coverage of the news, from arts and entertainment to sports and science, and from business and technology to dining and home design. |
| Parade | 8" x 9.125" | 18,000,000 | Sunday newspaper magazine carried in over 750 newspapers (includes 31 newspapers in New York). Carrier newspapers serve major urban and suburban markets in the U.S. |
| People | 7.125" x 10" | 3,400,000 | Bi-weekly publication covering personalities in entertainment, politics, business, and other current events. |
| Sports Illustrated | 7" x 10" | 1,700,000 | Published 15 times a year and reports about sports through in-depth articles, photography, and stories. |

**D.    New York Print**

69.    It is recommended that the Sexual Abuse Publication Notice also appear in the top community newspapers in Nassau and Suffolk counties.  Five of these newspapers, noted with an asterisk, were included in the Debtor's Notice Plan.

| NEWSPAPER | CIRCULATION |
|---|---|
| Gateway Newspapers | 12,000 |
| Floral Park Bulletin | 8,500 |
| Franklin Square Bulletin | 8,500 |
| Port Washington News | 8,256 |
| Garden City News* | 8,000 |

| | |
|---|---|
| *Smithtown News** | 11,600 |
| *Northport Observer** | 10,600 |
| *Village Times Herald** | 9,731 |
| *Suffolk Times** | 9,689 |
| *Long Islander* | 9,000 |

70.    The Sexual Abuse Publication Notice should also appear in ethnic newspapers in Nassau and Suffolk counties.  None of these newspapers were included in the Debtor's Notice Plan.

| NEWSPAPER | LANGUAGE | CIRCULATION |
|---|---|---|
| *Noticia* | Spanish | 10,000 |
| *La Tribuna* | Spanish | 25,000 |
| *Bilingual News* | Spanish | 75,000 |
| *Everybody's Magazine* | English | 29,000 |
| *Weekly Star* | English | 15,000 |
| *Caribbean Life* | English | 46,608 |

71.    The Sexual Abuse Publication Notice should also appear in four Catholic newspapers.  All of these newspapers were included in the Debtor's Notice Plan.

| NEWSPAPER | CIRCULATION |
|---|---|
| *The National Catholic Register* | 41,000 |
| *The National Catholic Reporter* | 100,000 |
| *Long Island Catholic* | 10,000 |
| *Fe Fuerza Vida* | 88,000 |

**E.    Online**

72.    Internet advertising delivers an immediate message and allows the viewer to click on a banner advertisement and instantly be directed to the Claim's Agent's website for further information.  Banner ads are typically located either at the top or side of a website page.  I recommend using animated banner ads, which are more likely to capture viewers' attention because they include moving images and text.

73.    The Expanded Nationwide media program would include delivery of 300 million gross impressions nationally and 28 million gross impression in New York across four online

networks.   The limited Nationwide media program would only include three million gross impression delivered nationally which represents a minimum buy.   These impressions should be targeted to reach Adults 18+ across various websites.

74.    Banner ads should appear on the following online networks[24] over four to six weeks.   Each network listed below partners with thousands of websites to distribute online ads across their network.

| NETWORK | SUMMARY |
|---------|---------|
| CONVERSANT | Online advertising company and comScore Top 20 Ad Network. |
| verizon media | A global digital media platform that connects advertisers and audiences across all media channels. |
| Google | Provides banner and/or video ad placement on a variety of websites, blogs, and other niche sites in Google's network. |
| facebook | A free, global social networking website that helps people communicate with friends, family, and coworkers. |

75.    Banner ads should be delivered across devices (desktop, mobile, and tablet). English and Spanish should be delivered on Facebook.

76.    Online impressions should also be delivered using the following targeting strategies:

a)    <u>Geo-Targeting</u>: Ads targeted to people visiting areas around Catholic churches with a focus on Long Island.

b)    <u>Behavioral Targeting</u>: Ads targeted to people based on their previous online habits (*i.e.*, if they viewed or searched content related to Roman Catholic Diocese of Rockville Centre, bible studies, Catholicism, Catholic church sexual abuse, sexual abuse, or other related items).

---

[24] Delivery of Internet impressions to specific sites are subject to availability at the time the media is purchased.

      c)    <u>Channel/Contextual Targeting</u>: Ads targeted to websites with editorial content that may include Roman Catholic Diocese of Rockville Centre or Catholic church content. Ads would also be targeted to websites that have religious lifestyles, sports, or business/finance/news content.

      d)    <u>Re-targeting</u>: Ads targeted to users who previously clicked on an ad about the bankruptcy or previously visited the chapter 11 case website.

      e)    <u>Third Party Data</u>: Ads targeted to people based on standard third-party data sources that identify website users as having Catholic beliefs.

77.    A third-party ad management platform, such as Integral Ad Science, should be used to audit the digital ad placements. This type of platform helps reduce the investment wasted on fraudulent or otherwise invalid traffic (*e.g.*, ads being seen by 'bots' or non-humans, ads not viewable, etc.) and ensure brand safety through the use of whitelisting.[25]

78.    Banner ads should also be delivered via the Catholic Audience Network, a premium ad network consisting of over 500 family-friendly Catholic-oriented sites. This network serves ads to members of Catholic and Christian communities.

**F. Social Media to Potential Claimants**

79.    We recommend delivering ads on three social media networks. In the New York market, 80.4% of Adults 18+, 72.9% of Adults 35+, and 62.8% of Adults 50+ have visited or used social media in the last 30 days. In the Limited Nationwide media program, ads should be targeted to New York as well as the top move to states (Florida, Pennsylvania, North Carolina, and New Jersey). Text, image, and video ads should be purchased on social media networks as follows:

| NETWORK | DETAILS |
| --- | --- |
|  | Newsfeed ads targeted to: (1) users who have an interest in the Catholic Church; Catholicism; Catholic School; Catholic and Proud; Catholic Bible; Catholic Church in the United States; Catholic News Agency; Roman Catholic Devotions; Catholic Relief Services; Archdiocese; and (2) the list of affected churches, ministry centers, and schools. |

---

[25] Whitelisting places the ad on selected website domains that are vetted for audience delivery and performance.

| NETWORK | DETAILS |
|---------|---------|
| twitter | Ads targeted to: (1) Catholic related handles (*e.g.*, (@archdisceseofno, @ClarionHerald, @cnalive, @Catholics4Choice, @CatholicNewsSvc, @USCCB, @CatholicHerald, @CatholicRelief, etc.) and (2) the list of affected churches, ministry centers, schools, etc. |

80.    To help search engine users locate the Debtor's chapter 11 case website, we recommend sponsoring links to appear on Google, Bing, and other search partners when searchers enter certain terms (*e.g.*, "Long Island Catholic Church bankruptcy" and "Diocese of Rockville lawsuit").    When a user searches online for one of the specified search terms or phrases, an advertisement will appear on the results page that will point users to the chapter 11 case website.

### G.  Social Media to Third Parties

81.    We recommend ads be delivered on two social media networks to reach professionals who may have contact with potential claimants, including therapists/clinicians, social service agencies/social workers, law enforcement/prison officials, and veterans' health administrators.

| NETWORK | DETAILS |
|---------|---------|
| facebook / Instagram | Newsfeed ads targeted to people with job titles in these categories: (1) Therapist/Clinician, (2) Police Departments/Police and Law Enforcement, (3) Social Service Agencies, and (4) Veterans Health Administration. |
| LinkedIn | Ads targeted to people with job titles or that belong to groups in the following categories: (1) Therapist/Clinician, (2) Police Departments/Police and Law Enforcement, and (3) Veterans' Affairs. |

### V.    U.S. Paid Media Delivery

82.    For the purpose of evaluating the strength and efficiency of the Publication Notice Plan, KM measured the television, radio, print, and online advertising against the target audiences

to establish the estimated reach of the media program and the estimated frequency of exposure to the media vehicles.

| Target Audience | Geography | Reach | Frequency |
|---|---|---|---|
| Adults 18+ | Long Island | 88.3% | 3.7 |
| | New York | 80.1% | 3.0 |
| | Nationwide[26] | 68.1% | 2.3 |
| Adults 35+ | Long Island | 91.7% | 4.2 |
| | New York | 83.4% | 3.4 |
| | Nationwide | 70.5% | 3.0 |
| Adults 50+ | Long Island | 95.2% | 4.9 |
| | New York | 87.0% | 3.8 |
| | Nationwide | 71.4% | 2.0 |

## VI.   Community Outreach

83.   We recommend that the following groups be contacted and asked to share information via email with their members:

| GROUP | EST. NUMBER OF CONTACTS |
|---|---|
| Catholic Churches in New York, New Jersey, North Carolina, Pennsylvania, and Florida | 1,572[27] |
| U.S. Correctional Facility Contacts (wardens, pastors, etc.) | 5,086[28] |
| Sexual Abuse Support Groups | 44[29] |

---

[26] This reach would only be achieved if the Expanded Nationwide media program was implemented.
[27] KM assumes the Diocese could create this list from internal sources.  The count was provided by the list vendor, InfoUSA.
[28] The number of contacts was provided by the list vendor, Exact Data.
[29] The Sexual Abuse Support Groups list was created by KM and would be provided to the Debtor.

## VII.    Earned Media

84.    We recommend a nationwide press release be distributed on PR Newswire's US1 news circuit. A current list of media outlets and websites is available at https://prnewswire.mediaroom.com/index.php.

## **PROPOSED NOTICES**

85.    I have drafted an alternative Sexual Abuse Publication Notice that is written in plain language. This proposed notice is similar to the ones I helped draft for the Archdiocese of New Orleans and Boy Scouts of America chapter 11 cases.

86.    I strongly recommend that the Claim's Agent set up a subpage on the official website specifically for Sexual Abuse Survivors. This page could include all of the notice materials and a list of frequently asked questions. Please see www.OfficialBSAclaims.com for an example. Additionally, a shorter URL that is easy for potential claimants to remember would be preferred (*e.g.*, LongIslandChurchClaims.com). This URL could be redirected to the Sexual Abuse Survivors page of the Claim's Agent's website.

87.    One overarching comment I have is to avoid excessive capitalization of text in any of the notices or form because it is detrimental to readability since people recognize words based on their shape, not the actual letters in the words.[30]

88.    The Sexual Abuse Publication Notice is designed to capture the attention of potential claimants with a clear headline and plain language text. This notice provides important information regarding the chapter 11 case and the legal rights available to claimants with respect

---

[30] Ruth Anne Robbins, *Painting with Print: Incorporating Concepts of Typographic and Layout Design into the Text of Legal Writing Documents*, J. Ass'n L. Writing Directors, 109, 115 (2004), available at https://rucore.libraries.rutgers.edu/rutgers-lib/51105/PDF/1/play/ (last visited Nov. 24, 2020).

to the Sexual Abuse Claims Bar Date and directs readers to the website and toll-free phone number for more information.

89.     The Sexual Abuse Bar Date Notice, Sexual Abuse Publication Notice, and the Sexual Abuse Proof of Claim Form should also be translated into Spanish and Creole.

## TIMING

90.     Implementation of the Publication Notice Plan should commence within approximately 14 days of entry of the Bar Date Order approval, and notice will be completed within approximately 120 days thereof.

91.     In order to give potential claimants enough time to learn about the bankruptcy and submit their proof of claim, I recommend that the media program end at least 30 days before the bar date deadline.

## CONCLUSION

92.     For the foregoing reasons, it is my professional opinion that the Debtor's Notice Plan is inadequate and that the recommendations set forth herein be incorporated in the Debtor's Notice Plan.

I declare under penalty of perjury that, after reasonable inquiry, the foregoing is true and correct to the best of my knowledge, information, and belief.


Dated:  December 1, 2020
        Souderton, Pennsylvania

Shannon R. Wheatman, Ph.D.
President
KINSELLA MEDIA, LLC