**Adj. Hearing Date:  April 30, 2021 at 10 a.m. (Prevailing Eastern Time)**
**Adj. Objection Deadline:  April 21, 2021**

CULLEN AND DYKMAN LLP
100 Quentin Roosevelt Boulevard
Garden City, NY 11530
(516) 357-3700
Matthew G. Roseman
Thomas R. Slome
Amanda Tersigni

*Counsel for Certain Diocesan Parishes*


**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| THE ROMAN CATHOLIC DIOCESE OF | : | Case No. 20-12345 (SCC) |
| ROCKVILLE CENTRE, NEW YORK, | : | |
| | : | |
| Debtor.[1] | : | |

**DECLARATION OF THOMAS R. SLOME IN SUPPORT OF OBJECTION OF**
**PARISHES TO MOTION OF THE OFFICIAL**
**COMMITTEE OF UNSECURED CREDITORS FOR ENTRY OF AN**
**ORDER PURSUANT TO BANKRUPTCY RULE 2004 DIRECTING DEBTOR**
**TO PRODUCE ELECTRONICALLY STORED ACCOUNTING INFORMATION**

     I, THOMAS R. SLOME, declare as follows pursuant to 28 U.S.C. § 1746:

     1.     I am a partner in the law firm Cullen and Dykman LLP, counsel for certain

parishes of The Roman Catholic Diocese of Rockville Centre, New York (the "Diocese" or

"Debtor").

     2.     I submit this declaration to provide certain factual information in connection with

the *Objection Of Parishes To Motion Of The Official Committee Of Unsecured Creditors For*

---

[1] The Debtor in this chapter 11 case in The Roman Catholic Diocese of Rockville Centre, New York and the last four digits of its federal tax identification number are 743723.

*Entry Of An Order Pursuant To Bankruptcy Rule 2004 Directing Debtor to Produce Electronically Stored Accounting Information* (the "Objection") being filed contemporaneously with this declaration (the "Declaration"). The Objection and Declaration are being filed in opposition to the *Motion Of The Official Committee Of Unsecured Creditors For Entry Of An Order Pursuant To Bankruptcy Rule 2004 Directing Debtor to Produce Electronically Stored Accounting Information* (the "Motion") [Dkt. No. 437].

3.        Attached hereto at **Exhibit "A"** is a true and correct copy of an e-mail sent on March 19, 2019 to most of the Parish Counsel (as defined in the Objection) from attorney Christopher J. DiPompeo of Jones Day ("Diocesan Counsel") forwarding an email from attorney Brittany M. Michael of Pachulski Stang Ziehl & Jones LLP ("Committee Counsel"), counsel for the Official Committee of Unsecured Creditors (the "Committee"), dated March 18, 2021. Ms Michael's email conveyed Committee demands for eleven categories of information (the "Informal Demands") that it wanted from or about the parishes of the Diocese.

4.        Later in that day, Mr. DiPompeo and other Diocesan Counsel asked Parish Counsel if they would consider agreeing to participate in a "meet and confer" with the Committee to discuss the Informal Demands. The request was related to negotiations between the Committee and the Diocese over an extension of the existing preliminary injunction against prosecution of the Child Victims Act ("CVA") litigation pending in state courts against the Diocese and certain of the parishes, among others. Parish Counsel expressed their willingness but also some concerns about timing issues considering the then upcoming Holy Week and the Easter Holiday and their combined representation of 136 parishes.

5.        Between the time of that request and the filing of the Motion on April 1, 2021, Parish Counsel agreed with the Diocese and Committee on the timing of a meet and confer with

2

the Committee and for providing the Committee with informal objections, if any, to the Informal Demands, with the first meet and confer to occur on or before April 14, 2021 and informal objections to be provided by May 15, 2021. That agreement resulted in a consensual extension of the preliminary injunction, which agreement and extension are reflected in the *Stipulation and Agreed Order Extending the Termination date of the Preliminary Injunction Staying Continued Prosecution of Certain Lawsuits*, ("PI Stipulation," AP Dkt. No. 69), ¶¶ 3-4.

6.    Later on the day the PI Stipulation was "So-Ordered" (*i.e.,* April 1, 2021), the Committee filed the Motion, which requests a "backed-up copy of the accounting system" of the Debtor, which seeks from the Diocese much of the same information in the Informal Demands such as bank and investment account balances.

7.    The next day, April 2, 2021, Parish Counsel inquired of Diocesan Counsel about what parish financial information was included in the backed-up accounting system.  Diocesan Counsel informed Parish Counsel that the Debtor's backed-up accounting system contains extensive amounts of information relating to the parishes, including all financial data of certain parishes that utilize bookkeeping services of the Debtor, as well as other financial information regarding all parishes. Parish Counsel were informed such information may contain details about all the cash, investments and bank account information about parishes.

8.    On Friday, April 9, 2021, during the first meet and confer, Committee Counsel advised Parish Counsel and Diocesan Counsel that the discovery the Committee seeks about parishes' finances through the backed-up accounting system and the Informal Demands would be used by the Committee to ascertain the cash and assets of the parishes for the Committee's evaluation of any substantial contribution that the parishes might make as part of any plan that would include a channeling injunction of the CVA litigation against the parishes.

9.      At the meet and confer, Parish Counsel asked for an explanation of what they perceived to be certain ambiguities in the eleven categories comprising the Informal Requests and indicated that Parish Counsel would need to discuss with their parish clients the requests, including if their clients had or could readily assemble such information or had objection to providing some of it, and to convey any such objections prior to the May 15th agreed deadline. The parties to the meet and confer agreed to keep that dialog going and scheduled a second and third meet and confer for April 23rd and 28th respectively. The parties noted that the deadline for the Diocese and parishes to object to the Motion was April 21, 2021 and that the meet and confer scheduled for April 23rd could be used to discuss any objections to the Motion.

10.      Parish Counsel have communicated the Informal Demands to their clients and have begun the process of having them consider what information covered by the Informal Demands would be available to the parishes and what steps it would take to find and assemble such information. With 136 parishes represented by the four Parish Counsel, the process is going to be time-consuming, particularly given the non-uniform way that the parishes keep financial records, and parishes' differing levels of financial sophistication and resources, among other things. In addition, with the Motion pending and its much shorter deadline for a response than May 15th (*i.e.,* April 21st), Parish Counsel have had to concentrate primarily on obtaining feedback from their clients about the Motion and addressing their concerns adequately through the Objection.

11.      The pastors of those parishes to whom I have spoken about the Motion and/or the Informal Demands have raised concerns about why the Committee would be entitled to receive all or virtually all financial information about their parishes. I have tried to explain the Committee's view and the legal context in which it is made. It is all very hard for many of them

to understand (including why they would need or want a channeling injunction or why they would give up anything to obtain one when their parishes have, in their view—and particularly the ones not sued—done nothing wrong, and they have insurance).

12.     Pastors have expressed to me sentiments along the lines of the Committee's desire for their parishes' financial information as being "intrusive" and being an invasion of their parishes' and parishioners' privacy.  Perhaps most importantly, some of them have expressed great concern about how parishioners might react to a Committee made up primarily of CVA plaintiffs obtaining such private information to use against them to extract money from their parishes and parishioners when in the view of the pastors and parishioners, their parishes have done nothing to hurt anyone, but rather quite the opposite.  One pastor told me that the most valuable asset they have is the trust put in them by their parishioners to protect their parishes' ability to carry out the mission of the Church and they must protect their parishes to retain the trust of their parishioners.

13.     Based on input from pastors and other parish leadership, I believe that the reorganization process in this case is extremely delicate and that, while I am hopeful and confident that the professionals on all sides will do everything possible to move the case toward a constructive resolution, the views and the feelings of the people involved in the parishes and their mission (along with victims of abuse of course) must be paramount.

14.     Attached hereto at **Exhibit "B"** is a true and correct copy of page 21-25 from the transcript of the October 1, 2020 (*i.e.,* first day) hearing in this case.

15.     Attached hereto at **Exhibit "C"** is a true and correct copy of pages 66-69 from the transcript of the November 18, 2020 hearing in this case (relating mainly to the Debtor's motion

to approve the retention of certain professionals by the "Independent Review Committee" formed by the Diocese).

16.     Attached hereto at **Exhibit "D"** is a true and correct copy of pages 156-159, 167-169 and 227-228 from the transcript of the October 11, 2019 hearing in *In re Purdue Pharma L.P.*, Case No. 19023649, Adv. Pro. No. 19-08289 (Bankr. S.D.N.Y. Oct. 11, 2019) [Dkt. No. 87].

17.     Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed in Garden City, New York, on April 21, 2021.

_____s/Thomas R. Slome____
THOMAS R. SLOME

# <u>EXHIBIT A</u>

## Slome, Thomas

| | |
|---|---|
| **From:** | DiPompeo, Christopher J. <cdipompeo@jonesday.com> |
| **Sent:** | Friday, March 19, 2021 9:11 AM |
| **To:** | Slome, Thomas; tdriscoll@moritthock.com; Roseman, Matthew; wheuer@westermanllp.com; jwesterman@westermanllp.com; aladd@westermanllp.com; gdiconza@archerlaw.com; mtroiano@moritthock.com |
| **Cc:** | Stephens, Eric P.; Rosenblum, Benjamin; Butler, Andrew M.; Geremia, Todd R.; Ball, Corinne |
| **Subject:** | [EXTERNAL] FW: DRVC - PI Extension Notice |

All,

We look forward to speaking with you this morning. We received the email below yesterday from the Committee. It includes the Committee's parish-related document requests. We are still thinking through these issues, but we can have an initial discussion this morning.

Best,
Chris


Christopher DiPompeo (Bio)
Partner
JONES DAY® - One Firm Worldwide℠
51 Louisiana Ave., N.W.
Washington, D.C. 20001
Office: +1.202.879.7686
Fax: +1.202.626.1700
cdipompeo@jonesday.com


---

**From:** Brittany M. Michael <bmichael@pszjlaw.com>
**Date:** Thursday, Mar 18, 2021, 3:04 PM
**To:** Butler, Andrew M. <abutler@jonesday.com>, Karen B. Dine <kdine@pszjlaw.com>, Ilan D. Scharf <ischarf@pszjlaw.com>
**Cc:** Stephens, Eric P. <epstephens@jonesday.com>, DiPompeo, Christopher J. <cdipompeo@jonesday.com>
**Subject:** RE: DRVC - PI Extension Notice

** External mail **

All,

As we discussed on Tuesday, the Committee will agree to a 60-day extension of the preliminary injunction, with the requirement that the Diocese and the Parishes produce the below information to us, in addition to the CVA documents from the initial stipulation that are still pending, before the stipulation is further extended beyond those 60 days. We are also open to including a mechanism that automatically extends the stipulation another 45 days as to any entity for which all of the below information has been provided. While we understand that some of the below information must come directly from the Parishes, and will ultimately want a certification from each Parish that it has produced all of the relevant information in its possession, we also expect the Diocese to provide all of the below information that is in its possession.

1

Many thanks,
Brittany

1. Annual financial reports to the Diocese for the past 10 years

2. Copy of electronic accounting system(s) in native format(s) (e.g. electronic data files).

3. Year-end unaudited or internal financial statements and annual reports for the last ten years.

4. Audited Financial Statements for the last 10 years, if they exist.

5. List of all general ledger accounts (i.e. chart of accounts for each Parish)

6. Listing of all bank, money market, investment or other accounts maintained by Parishes over the past 10 years (whether currently open or closed), including institution, account name, account type, account description, account number, general ledger account number, open date, close date and current balance.

7. All inventories of Parish real property from 2014 to present.

8. All inventories of Parish personal property from 2014 to present.

9. If real property was transferred in last 6 years, the date, transferee, consideration and a copy of transfer transaction documents.

10. All agreements between Diocese and Parishes for the last 10 years. If identical agreements were entered into with multiple agreement, one sample agreement and a schedule of other parties to similar agreements is sufficient.

11. Schedule of transfers between Parishes and any Diocese, affiliate, or other Parish from 2014 to the Petition Date.

**Brittany M. Michael**
Pachulski Stang Ziehl & Jones LLP
Tel: 212.561.7700 | Fax: 212.561.7777
bmichael@pszjlaw.com



PACHULSKI
STANG
ZIEHL
JONES

Los Angeles | San Francisco | Wilmington, DE | New York | Houston

**From:** Butler, Andrew M. [mailto:abutler@jonesday.com]
**Sent:** Friday, March 12, 2021 4:01 PM
**To:** Karen B. Dine; Ilan D. Scharf; Brittany M. Michael

**Cc:** Stephens, Eric P.; DiPompeo, Christopher J.
**Subject:** DRVC - PI Extension Notice

Karen, Ilan, and Brittany,

As we discussed on Tuesday, attached is a draft extension notice for the preliminary injunction. We look forward to discussing this with you at our regularly scheduled discovery call on Tuesday next week. In terms of timing, we think it makes sense to aim to have approval from our respective clients by 3/24, to allow us to file this extension notice on the docket in advance of the 3/31 termination date.

As we also discussed on Tuesday, below is a condensed status report on discovery. This includes some additional milestones we expect to reach in the near term.

1.  6 productions to date, over 1.25 million pages, more than 220,000 documents.
2.  Productions include all priest and parish cards for Diocesan priests who are either on the published list or named in a CVA complaint.
3.  Productions also include all audited financials for DRVC and affiliates back to 2014.
4.  The IAC report, exhibits, and appendices were all produced immediately upon entry of the stipulation and order resolving the IAC 2004 motion.  The production of underlying materials is already underway and will be completed today.
5.  DRVC has gathered and is reviewing personnel files for all Diocesan priests who are either on the published list or named in a CVA complaint and will begin rolling productions of that material shortly.
6.  DRVC is also prioritizing the production of the subset of IAC materials that are corporate and organization documents responsive to the UCC's priority RFPs, so as to avoid any inadvertent over-designation.

Thanks,

Andrew M. Butler
Associate
JONES DAY® - One Firm Worldwide℠
250 Vesey Street
New York, NY 10281
Direct: +1.212.326.8308
Mobile: +1.757.230.3717

***This e-mail (including any attachments) may contain information that is private, confidential, or protected by attorney-client or other privilege. If you received this e-mail in error, please delete it from your system without copying it and notify sender by reply e-mail, so that our records can be corrected.***

CONFIDENTIALITY
This e-mail message and any attachments thereto is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this e-mail message, you are hereby notified that any dissemination, distribution or copying of this e-mail message, and any attachments thereto is strictly prohibited. If you have received this e-mail message in error, please immediately notify me by telephone and permanently delete the original and any copies of this email and any prints thereof.

NOT INTENDED AS A SUBSTITUTE FOR A WRITING
Notwithstanding the Uniform Electronic Transactions Act or the applicability of any other law of similar substance and effect, absent an express statement to the contrary hereinabove, this e-mail message, its contents, and any attachments hereto are not intended to represent an offer or acceptance to enter into a contract and are not otherwise intended to bind the sender, Pachulski Stang Ziehl & Jones LLP, any of its clients, or any other person or entity.
***This e-mail (including any attachments) may contain information that is private, confidential, or protected by attorney-client or other privilege. If you received this e-mail in error, please delete it from your system without copying it and notify sender by reply e-mail, so that our records can be corrected.***

# **EXHIBIT B**

Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 20-12345-scc

4    Adv. Case No. 20-01226-scc

5    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

6    In the Matter of:

7

8    THE ROMAN CATHOLIC DIOCESE OF ROCKVILLE CENTRE, NEW YORK,

9

10          Debtor.

11   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

12   THE ROMAN CATHOLIC DIOCESE OF ROCKVILLE CENTRE, NEW YORK,

13              Plaintiff,

14        v.

15   ARK 320 DOE, et al.,

16              Defendants.

17   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

18

19

20

21

22

23

24

25

1     United States Bankruptcy Court

2     One Bowling Green

3     New York, NY   10004

4

5     October 1, 2020

6     5:30 PM

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21 B E F O R E :

22 HON SHELLEY C. CHAPMAN

23 U.S. BANKRUPTCY JUDGE

24

25 ECRO:  UNKNOWN

Page 3

```
 1    HEARING re First Day Hearing

 2

 3    HEARING re Doc #4 Debtor's Motion for Entry of Interim and

 4    Final Orders (I) Authorizing and Approving Special Noticing

 5    and Confidentiality Procedures, (II) Authorizing and

 6    Approving Procedures for Providing Notice of Commencement,

 7    and (III) Granting Related Relief

 8

 9    HEARING re Doc #5 Debtor's Motion For Interim and Final

10    Orders Authorizing the Debtor to (I) Pay Prepetition

11    Employee Wages, Salaries, Benefits and Other Related Items;

12    (II) Reimburse Prepetition Employee Business Expenses; (III)

13    Continue

14

15    HEARING re Doc #6 Debtor's Motion For Interim and Final

16    Orders Authorizing the (I) Payment of Certain Prepetition

17    Invoices For Psychological Counseling, Therapy and Related

18    Treatment, (II) Continuation of Its Prepetition Practice of

19    Paying For Certain Psychological Counseling, Therapy and

20    Related Treatment, and (III) Granting Certain Related Relief

21

22    HEARING re Doc #21 Application of Debtor For Authorization

23    to Retain and Employ Epiq Corporate Restructuring, LLC as

24    Claims and Noticing Agent Nunc Pro Tunc to the Petition Date

25
```

Page 4

1    HEARING re Doc #7 Debtor's Motion For Entry of Interim and

2    Final Orders (I) Authorizing the Continued Use of the

3    Debtor's Cash Management System, Bank Accounts and Business

4    Forms and (II) Granting Related Relief

5

6    HEARING re Doc #10 Debtor's Motion For Entry of Interim and

7    Final Orders Authorizing the Debtor to Continue Its

8    Insurance Programs and Pay Related Obligations

9

10   HEARING re Adversary proceeding 20-01226-scc The Roman

11   Catholic Diocese of Rockville Centre Ne v. ARK 320 DOE et

12   al. Doc #5 Debtor's Motion For Entry of a Scheduling Order

13   With Respect to Its Motion For Preliminary Injunction Under

14   Sections 361 and 105(a) for the Bankruptcy Code

15

16

17

18

19

20

21

22

23

24

25   Transcribed by:  Sonya Ledanski Hyde

Page 21

```
 1    there might, tragically, be people even younger who were

 2    abused by people for whom the Diocese is responsible.

 3             But even if it was the last century, those men and

 4    women are alive today.  They suffer today.  Their memories

 5    are very clear today.  And the fact that this happened a

 6    while ago doesn't change the pain and the suffering, the

 7    trauma, and the loss of faith that to one degree or another

 8    all of them have experienced.

 9             To us, it's very important to the survivors.  It

10    is extremely important that you come to an understanding --

11    and it will take some time, I suspect -- of the perspective

12    of an abuse survivor.  So it speaks volumes to us -- allow

13    me to use that pronoun occasionally -- that the Bishop

14    apparently is not at today's hearing.  There is no clergyman

15    that's been introduced at today's hearing.  The Bishop's

16    letter, which is available on the diocesan website, offers

17    no apology to anyone, including those that have reached

18    settlements with the Dioceses from whom the insurance

19    coverage issues do not pose a threat or a risk.  And that

20    perspective is hurtful to survivors.

21             This is not case solely about property.  This is

22    not a case solely about insurance coverage.  We appreciate,

23    the Pachulski firm appreciates and the state court counsel

24    that have been through several of these cases understand

25    that you as a bankruptcy judge in this proceeding can only
```

1    do so much.  IT's a legal proceeding, and it's very

2    specialized legal proceeding.  But this case, to be

3    successful, needs to appreciate the perspective of a

4    survivor.

5           And so when we hear the characterization of the

6    diocese as essentially a buyer's club for parishes, be it

7    insurance or services, it really in our opinion does not

8    properly characterize the true relationship between a

9    Catholic bishop, the pastors who he appoints to parishes,

10   the parishes, and these non-debtor Catholic entities, be

11   they schools or nursing homes, or other facilities, that

12   this is not some CEO that sits upon a corporate structure.

13   The relationship between the Bishop and all of those

14   entities is entirely different than simply corporations that

15   have some relationship to one another.

16          And then finally, Your Honor -- and I'll wait as

17   Ms. Ball goes through the individual motions, because we

18   have some comments -- we would ask you to make clear that

19   there will be no finding -- or I hope you'll say this --

20   that there will be no finding today as to what constitutes

21   property of the bankruptcy estate, and there will be no

22   finding regarding the relationship that exists between the

23   Diocese and these various entities that are referenced in

24   Mr. Moore's declaration.  We appreciate that orders will be

25   entered today, that some if not all of the relief that is

Page 23

1   sought will be granted today, that the Court may clear that

2   it's not making determinations at least as to those two

3   areas.

4            Thank you, Your Honor.  I appreciate your giving

5   me the chance to give you our overview of the Debtor.

6            THE COURT:  All right.  Thank you, Mr. Stang.  Let

7   me start with your last point, which is a technical legal

8   point.  Of course I won't be making any findings about what

9   is or is not property of the estate or anything having to do

10   with the nature of the relationship between the diocese and

11   the related entities, the parishes, the schools, catholic

12   charities, or anything of that nature.

13            Secondly, let me share with you a little bit about

14   my philosophy, the way I handle cases.  I've certainly had

15   the pleasure of your firm appearing before me many times.  I

16   don't know that you have personally.  But these bankruptcy

17   cases that appear before me -- and this one is indeed

18   different -- they may involve property, but they are always

19   about people.  And many times they involve, although perhaps

20   not on this scale, people who have experienced hurt in

21   various contexts as a result of power imbalances and the

22   like.  So, I approach every case, and I will approach this

23   case, as being one about the people involved.  And I will

24   apply the law with that in mind.

25            We are living in a divided world right now.  So on

Page 24

1    this first day, which is a very important day in a case, I

2    want to try to recognize the very different perspective that

3    you have, but I want to keep an optimistic outlook that by

4    working together in this collective proceeding there is

5    going to be an outcome that will accomplish all parties'

6    objectives as well as possible.

7           If I might be so presumptuous, last week we lost

8    one of the greatest jurists of all time.  Written on the

9    walls of Justice Ginsburg's chambers was the saying in

10   Hebrew, I'll translate, "Justice, justice shall you pursue".

11   It's not a typo.  The word appears twice in the Torah to

12   emphasize the importance of focusing on justice and what it

13   means, and looking around and being aware of everyone's

14   perspective.  I try to live up to that standard as well in

15   everything that I do.

16          There are two important things that we'll deal

17   with in the very first motion that Ms. Ball alluded to.  I

18   wrote it down on my preparation pad in big letters.  And

19   it's the word transparency.  Transparency.  When you can be

20   unsure as to the extent of which you can offer monetary

21   compensation, which is often not sufficient to compensate

22   creditors, victims, you absolutely can offer them utter and

23   complete transparency.  That's what we're going to do.

24   That's the way of bankruptcy proceedings here in the United

25   States.  And at every turn in this case, I am going to make

Page 25

1    sure that there is absolute transparency.

2          Secondly, that dovetails into the first motion,

3    and I'll turn it back to Ms. Ball in a moment.  I want

4    everyone to make sure that as broad as possible notice is

5    going to be disseminated throughout this case so that those

6    affected and the family of those affected have every

7    opportunity to make a claim, to participate, whether or not

8    they have a claim related to something that occurred last

9    year or last century.  What that looks like exactly, I'm

10   going to need everyone's help to do that.  Where notice is

11   published, how it's published, how it's communicated, et

12   cetera.

13         And the final thing that I'll say is that fully

14   recognizing the need to respect the privacy of the

15   individual victims, we should create a way for any victim on

16   an anonymous basis to be able to listen in to a hearing.

17   And we can do that a number of ways.  We can do that through

18   you, Mr. Stang, or any of the other attorneys so that if --

19   and again, I am by no means an expert.  I would never

20   suggest doing something that would make anyone experience

21   any more pain.  But to the extent that parties tell me that

22   they'd like to have their clients listen in, then that's

23   what you ought to do.  That's also towards the end of there

24   being absolutely transparency and folks not having to always

25   rely on lawyers telling them what happened.

# <u>EXHIBIT C</u>

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 20-12345-scc

4    - - - - - - - - - - - - - - - - - - - - - - - - - - x

5    In the Matter of:

6

7    THE ROMAN CATHOLIC DIOCESE OF ROCKVILLE CENTRE, NEW YORK,

8

9             Debtor.

10   - - - - - - - - - - - - - - - - - - - - - - - - - - x

11   Adv. Case No. 20-01226-scc

12   - - - - - - - - - - - - - - - - - - - - - - - - - - x

13   THE ROMAN CATHOLIC DIOCESE OF ROCKVILLE CENTRE, NEW YORK,

14                Plaintiff,

15            v.

16   ARK 320 DOE, et al.,

17                Defendants.

18   - - - - - - - - - - - - - - - - - - - - - - - - - - x

19

20

21

22

23

24

25

Page 2

1 Adv. Case No. 20-01227-scc

2 - - - - - - - - - - - - - - - - - - - - - - x

3 THE ROMAN CATHOLIC DIOCESE OF ROCKVILLE CENTRE, NEW YORK,

4     Plaintiff,

5     v.

6 ARROWOOD INDEMNITY COMPANY, et al.,

7     Defendants.

8 - - - - - - - - - - - - - - - - - - - - - - x

9

10

11     United States Bankruptcy Court

12     One Bowling Green

13     New York, NY  10004

14

15     November 18, 2020

16     11:02 AM

17

18

19

20

21 B E F O R E :

22 HON SHELLEY C. CHAPMAN

23 U.S. BANKRUPTCY JUDGE

24

25 ECRO:  UNKNOWN

Page 3

1 HEARING re Doc #60 Application to Employ Otterbourg P.C. as

2 Counsel to the Independent Advisory Committee

3

4 HEARING re Doc #61 Application to Employ Goldin, A Teneo

5 Company as Financial Advisor to the Independent Advisory

6 Committee

7

8 Adversary proceeding: 20-01226-scc The Roman Catholic

9 Diocese Of Rockville Centre v. ARK 320 DOE, et al.,

10 Pre-trial Conference

11

12 Adversary proceeding: 20-01227-scc The Roman Catholic

13 Diocese Of Rockville Centre v. Arrowood Indemnity Company,

14 et al

15 Pre-trial Conference

16

17

18

19

20

21

22

23

24

25 Transcribed by:  Sonya Ledanski Hyde

Page 4

1 A P P E A R A N C E S :

2

3 JONES DAY LLP

4     Attorneys for the Debtor

5     250 Vesey Street

6     New York, NY 10281

7

8 BY:  CHRISTOPHER DIPOMPEO (TELEPHONICALLY)

9     CORINNE BALL (TELEPHONICALLY)

10     BENJAMIN ROSENBLUM (TELEPHONICALLY)

11     TODD R. GEREMIA (TELEPHONICALLY)

12     ERIC P. STEPHENS (TELEPHONICALLY)

13     ANDREW BUTLER (TELEPHONICALLY)

14     BENJAMIN THOMPSON (TELEPHONICALLY)

15

16 PACHULSKI STANG ZIEHL & JONES LLP

17     Attorneys for the Committee of Unsecured Creditors

18     780 Third Avenue, 34th Floor

19     New York, NY 10017

20

21 BY:  JAMES STANG (TELEPHONICALLY)

22

23

24

25

Page 5

1 REED SMITH LLP

2     Special Insurance Counsel

3     599 Lexington Avenue

4     New York, NY 10022

5

6 BY:  JOHN BERRINGER (TELEPHONICALLY)

7

8 COUGHLIN DUFFY

9     Attorneys for Arrowood

10     350 Mount Kemble Avenue

11     Morristown, NJ 07962

12

13 BY:  KEVIN COUGHLIN (TELEPHONICALLY)

14

15 CLYDE & CO

16     Attorneys for Lloyd's London & London Market Companies

17     55 W. Monroe

18     Chicago, IL 60603

19

20 BY:  CATHY SUGAYAN (TELEPHONICALLY)

21

22

23

24

25

2 (Pages 2 - 5)

1 OTTERBOURG PC

2    Proposed Counsel to the Independent Advisory Committee

3 230 Park Avenue

4 New York, NY 10169

5

6 BY:  PETER FELDMAN (TELEPHONICALLY)

7

8 UNITED STATES DEPARTMENT OF JUSTICE

9    Attorneys for the U.S. Trustee

10    201 Varick Street, Suite 1006

11 New York, NY 10014

12

13 BY:  GREG ZIPES

14

15 ALSO PRESENT TELEPHONICALLY:

16

17 KAREN MORIARTY

18 LEANDER JAMES

19 JOSHUA WEINSTOCK

20 ARTHUR GONZALEZ

21 BRENDA ADRIAN

22 ILAN SCHARF

23 HARRIS J. GOLDIN

24 CHARLES JONES

25 JEFF ANDERSON

1 MELANIE CYGANOWSKI

2 JENNIFER FEENEY

3 TRUSHA GOFFE

4 PATRICK STONEKING

5 JAMES MOFFITT

6 MATIN BUNIN

7 JILLIAN DENNEHY

8 LAUREN LIFLAND

9 BRENDA HARKAVY

10 JARED BORRIELLO

11 ANDREW BUTLER

12 ANDREW CIRIELLO

13 MICKEE HENNESSY

14 WARREN MARTIN

15 BRETT MOORE

16 CHARLES MOORE

17 BENJAMIN ROSENBLUM

18 AMANDA TERSIGNI

19 BENJAMIN THOMSON

20 BRITTANY MICHAEL

21 GEORGE CALHOUN

22 PETER MCNAMARA

23 ELIZABETH CATE

24 KAREN DINE

25 FRANK OSWALD

1 JEFF KAHANE

2 SHARA CORNELL

3 THOMAS SLOME

1       P R O C E E D I N G S

2     THE COURT:  Good morning, everyone.  This Judge

3 Chapman.  We're here this morning for a hearing in the case

4 of the Roman Catholic Diocese of Rockville Centre, case

5 number 20-12345.  This hearing is being conducted entirely

6 telephonically via the Court Solutions platform.  A

7 recording is being made of the proceedings.  No individual

8 or private recordings are permitted.

9     I have a lengthy roster of those who have signed

10 up to participate this morning.  Please identify yourself

11 for the record when you speak and identify the party on

12 whose behalf you are appearing and please do so each time

13 you speak so that we can create an accurate record.

14     I am looking at an agenda that was filed on the

15 docket on November 16th at docket number 160.  So that's my

16 starting point. If I could please ask everyone to keep your

17 phones on mute unless and until you speak, that would help.

18 Thank you very much.  And who would like to start on behalf

19 of the debtor today?

20     MR. DIPOMPEO:  Good morning, Your Honor.  This is

21 Christopher DiPompeo of Jones Day for the debtor.

22     THE COURT:  Good morning.

23     MR. DIPOMPEO:  I'm joined this morning -- morning.

24 I'm joined this morning by my colleagues Corinne Ball, Ben

25 Rosenblum, Todd Geremia, Eric Stephens, Andrew Butler, and

3 (Pages 6 - 9)

Page 66

1  trustee and the committee how this would all be set up,
2  because a number of issues have been raised today that
3  really weren't addressed by the papers.
4        On the specific issues of the trustee's
5  objections, Your Honor raised the point of employees and
6  persons in control. I think the case law and persons in
7  control is fairly well-established, that it has to be
8  extensive control over the Debtor's day-to-day operations,
9  and these IAC members simply don't have that. They have a
10  narrow charge with respect to past transactions. Since
11  2014, two affiliates over threshold amount, that --
12        THE COURT: Yes, I agree with you. I agree with
13  you. Again, this is, you know, this is a very unique set of
14  facts that we have, but I don't disagree with you in terms
15  of the ordinary and the meaning of those words in the
16  statute.
17        I want to make one more point, that frankly I
18  thought Mr. Stang would make, but I'm going to make it, and
19  I'm not putting words in this mouth, but these are just an
20  observation that I want to make. So first principles for me
21  are number one, there's obviously been a great deal of
22  important, thoughtful and difficult work that's been done,
23  and it behooves us all to find a way to take advantage of
24  that, and not have to repeat that work.
25        Secondly, we're all struggling, and it's almost --

Page 67

1  it will almost be two hours, with, you know, it's like a law
2  school exercise, parsing the words of the statute, trying to
3  deal with the unique facts and challenges that this
4  religious nonprofit presents us with and how to overlay that
5  into the requirements of the code. And we're having a hard
6  time, I'm having a hard time making it fit. You know, I
7  feel like I'm just trying to jam apart into a machine and
8  it's really not exactly the right part, and the right fit.
9        But finally, I don't want to lose sight of the
10  fact that one of the important goals of this case is to
11  provide as impeccable a process as is possible, for the
12  benefit of the victims. That's the point of this. And also
13  to enable the diocese to emerge from Chapter 11, and
14  continue its mission and all the important work that it does
15  on behalf of so many people. And because of that, it's
16  important for there not to be any question mark, any cloud,
17  any level of discomfort about how it is that we go about
18  creating a recovery pool, and that includes pursuing
19  litigation that involves transactions in which the diocese
20  was a party. And that's important.
21        So to that extent that this is a close call,
22  and I certainly appreciate that the Jones Day folks have
23  done an excellent job in advocating for why I shouldn't
24  think that it's a close call, along with Mr. Feldman, and
25  Mr. Stang has been creative, and evidence of willingness to

Page 68

1  think outside the box. But I think, you know, in a
2  situation where, you know, I often say you know, there's an
3  expression in baseball, the tie goes to the runner, so here
4  I think, you know, in a close case, one thing that we ought
5  to put on the scale, thumb on the scale is the appearance of
6  it, and making sure that it's absolutely squeaky-clean and
7  provides the victims with the feeling that it's a really
8  good process that's being conducted in a way that serves
9  their interest, and serves the interest of this case.
10        I am intrigued, and admit that it's one of the
11  things that I was thinking about coming into this hearing as
12  to whether or not using the device, or the role of someone,
13  an examiner, or someone like an examiner, possibly, whether
14  that would be one or more of the members of the IAC, and
15  then looking to a new firm, to pursue the litigation,
16  whether that doesn't check a lot of the boxes, and
17  accomplish a lot of the goals that I would like to
18  accomplish, and that I hope many of you share.
19        So I think it was Mr. Geremia who suggested that
20  perhaps it would be a good idea to take this offline, and
21  let you folks talk, and see what you come up with, and then
22  we can resume the conversation, and then if you come up with
23  something to present that's acceptable to the Court and
24  acceptable to the U.S. Trustee, we could go from there, and
25  if not, I'll render a decision. Was that you, Mr. Geremia

Page 69

1  who suggested that you still need to talk? Go ahead.
2        MR. GEREMIA: Yes, I did. I think that will be
3  fruitful.
4        THE COURT: Okay. Mr. Stang, is that okay --
5        MR. GEREMIA: (indiscernible) I'm sorry, go ahead.
6        THE COURT: Go ahead, I'm sorry. No, go ahead,
7  I'm sorry.
8        MR. GEREMIA: I was going to say, that should be
9  fruitful. And in the event it's not, we would just ask for
10  the opportunity to submit a response to the surreply,
11  because some of the issues that we've confronted today have
12  come about as a consequence of the fact that the diocese
13  hasn't submitted a written response to Your Honor, to that
14  surreply. But I think we should be able to work out the
15  issues offline, talking to the trustee and the committee
16  counsel. So hopefully will not come to that.
17        THE COURT: Okay, all right. That's fine, with
18  respect to the, I guess it's a sur-surreply. And I'm
19  hopefully that you'll have some fruitful discussion. So let
20  me look at the calendar. Would it be useful to all of you
21  to have a date and a time certain to return, or do you want
22  me to leave it more open-ended? I know there's some urgency
23  in getting this resolved.
24        MR. GEREMIA: Let me defer to Ms. Ball, or Mr.
25  Rosenblum, who have other aspects of the schedule in mind.

18 (Pages 66 - 69)

# EXHIBIT D

Page 1

1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   Case No. 1923649-rdd

4   Adv. Case No. 19-08289-rdd

5   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

6   In the Matter of:

7

8   PURDUE PHARMA L.P.,

9

10          Debtor.

11  - - - - - - - - - - - - - - - - - - - - - - - - - - - x

12  PURDUE PHARMA L.P., et al.,

13              Plaintiffs,

14          v.

15  COMMONWEALTH OF MASSACHUSETTS, et al.,

16              Defendants.

17  - - - - - - - - - - - - - - - - - - - - - - - - - - - x

18

19

20

21

22

23

24

25

Page 2

1    United States Bankruptcy Court

2    300 Quarropas Street, Room 248

3    White Plains, NY 10601

4

5    October 11, 2019

6    10:11 AM

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21  B E F O R E :

22  HON ROBERT D. DRAIN

23  U.S. BANKRUPTCY JUDGE

24

25  ECRO:  A. VARGAS

Page 3

1   HEARING re Adversary proceeding: 19-08289-rdd Purdue Pharma

2   L.P. et al v. Commonwealth of Massachusetts et al  Motion

3   for Preliminary Injunction (document #2)

4

5   Opposition by the Consortium of Some Massachusetts and Other

6   Municipalities (ECF 31)

7

8   Objection of Nevada Counties (ECF 33)

9

10  Objection of The Multi-State Governmental Entities Group

11  (ECF 37)

12

13  Opposition Brief Matthew J. Gold on behalf of State of

14  Washington (ECF 38)

15

16  Limited Objection and Response of Arkansas and Tennessee

17  Public Officials (ECF 39)

18

19  The States' Coordinated Opposition to the Debtors Motion

20  (ECF 41) The States' Coordinated Opposition to the Debtors'

21  Motion (ECF 42) Objection and Response State of Arizona (ECF

22  51)

23

24

25

Page 4

1    Statement I Ad Hoc Committee's Statement in Support of a

2    Limited and Conditional Stay (ECF 62)

3    Statement Of The Raymond Sadder Family And Beacon Company In

4    Support Of The Debtors' Motion (ECF 63)

5

6    Response to Motion for Preliminary Injunction by Christopher

7    B Spuches on behalf of State of Florida (ECF #64)

8

9    Opposition /Joinder to the States' Coordinated Oppositions

10   to Debtors' Motion (ECF 66)

11

12   The Debtors have received informal responses from the

13   Official Committee of Unsecured Creditors. A number of

14   letters addressed to the court have been filed on the lead

15   case docket joining in the opposition of Massachusetts

16   Attorney General Maura Healey and 24 other attorneys general

17   to the Preliminary Injunction Motion.

18

19   HEARING re Adversary proceeding: 19-08289-rdd Purdue Pharma

20   L.P. et al v. Commonwealth of Massachusetts et al

21   Debtors' Motion for Entry of a Scheduling Order and a

22   Protective Order in Connection with the Preliminary

23   Injunction Motion (related document(s)2)

24

25

1    HEARING re Adversary proceeding: 19-08289-rdd Purdue Pharma

2    L.P. et al v. Commonwealth of Massachusetts et al

3    Opposition Brief (related document(s)2)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Sonya Ledanski Hyde

Page 156

1   Purdue in 2007.  And part of that was submitted with our

2   papers based upon the New York Attorney General's

3   investigation showing how $1 billion has been transferred

4   through different shell corporations through different Swiss

5   accounts and wound up purchasing a beach house in Amagansett

6   and a townhouse in New York for millions of dollars, but not

7   in the Sackler's names.

8           So the problem with what's been happening here is

9   that the Sacklers are getting -- in the proposed settlement

10  structure, the Sacklers, who have $13 to $14 billion but who

11  have largely hidden it, are getting a free pass for putting

12  in $3 billion.

13          THE COURT:  Well, you're assuming I think, ma'am,

14  that because of your -- and this is consistent with your

15  reference to Metromedia -- that we are at the plan

16  confirmation stage and that the settlement term sheet is the

17  plan.  That's not the case.

18          MS. KASWAN:  Yes, Your Honor. Which brings me to

19  your inquiry during the last conversations.  And that is

20  what more do we want from the Sacklers now for an

21  injunction?

22          THE COURT:  Right.

23          MS. KASWAN:  What I would like to see from the

24  Sacklers now is financial statements.  I would like to see

25  an accounting of all of those different bank accounts that

1   they have in all of the shell corporate names.  I would like

2   to see that prepared under oath so that if in fact they do

3   secrete assets during the pendency of this preliminary

4   injunction, I'll be able to tell.  How will I know if they

5   are further secreting and transferring assets that are

6   already in shell corporate names and in foreign countries,

7   or in this country, and then get transferred overseas if I

8   don't know what accounts they have, what names they are

9   using, what balances are in those accounts, and who is

10   holding those accounts and what are those account numbers.

11   So, Your Honor, with respect to that --

12             THE COURT:  Could I ask you a question, ma'am?  I

13   appreciate that the stipulation between the Committee and

14   the Debtors came out this morning, but isn't that what it's

15   supposed to address?

16             MS. KASWAN:  But it doesn't, Your Honor.  And the

17   reason it doesn't is because it uses the same language as

18   the terms sheet.  And the terms sheet has no provision in it

19   to disclose the Sackler's assets.  It doesn't have that in

20   it.

21             THE COURT:  Well, at least when I read it, that's

22   not the case.  But --

23             MS. KASWAN:  Well, I can show Your Honor the

24   language.  Because the same language is in Exhibit B --

25             THE COURT:  I have another question of you also,

```
 1     which is in the litigation that is pending, is any of that

 2     financial disclosure part of the discovery that you're

 3     entitled to?

 4              MS. KASWAN:  Well, Your Honor, as I said, the New

 5     York Attorney General has brought action against the

 6     Sacklers as well as the company and the Court, and as well

 7     as some of the other officers for Purdue who also were

 8     personal counsel to the Sacklers --

 9              THE COURT:  So I'll talk to the New York counsel.

10     But in your litigation, is that -- I mean, usually that type

11     of pre-remedy discovery is not permitted.  And if anything

12     it is permitted in the context of avoidance litigation.

13              MS. KASWAN:  If I could respond, Your Honor.  The

14     decision from the new York Supreme Court held that the

15     liability issues and the avoidance issues in terms of

16     secreting the assets are on the liability issues.  So that

17     there -- so that the decision -- and this was with respect

18     to the claims against Stuart Baker, that those two were

19     combined so that that type of inquiry was at least being

20     contemplated by that court.

21              And, Your Honor asked, as I said, with respect to

22     the proposed voluntary injunction, that the Sacklers have

23     said or the representation was made in this court that the

24     Sacklers have not been secreting their assets.  All I'm

25     asking is that they prove it.  That's all I'm asking.  And
```

Page 159

1    that included -- and that if there is a provision in the

2    voluntary injunction or in this Court's injunction, that is

3    going to say that the Sacklers cannot further secrete their

4    assets, we need to have a mechanism to enforce that

5    provision.

6            And, Your Honor, in connection with that -- and

7    again, Your Honor, we just attempted to come up with a few

8    provisions.  If I could approach the Court?

9            THE COURT:  Well, I think this is better done in

10   discussions among the parties.

11           MS. KASWAN:  All right.  Well, in other words,

12   Your Honor, what we are proposing is that it's not merely

13   the company that submits financial statements, but parties

14   who are the real debtors here are the Sacklers.  And to the

15   extent there are going to be financial statements, we need

16   it from them.  And because there is a history of secreting

17   assets, those should be signed under oath so that we don't

18   find out six months from now that their assertions about not

19   further frustrating judgements have not continued.  I mean,

20   it seems to me that that is the base requirement for being

21   able to determine whether that provision is simply flawed.

22           And, Your Honor, I'm happy to give at least our

23   initial outline to Counsel at this table.  I would --

24           THE COURT:  Why don't you do that?

25           MS. KASWAN:  Thank, you, Your Honor.  And the

Page 167

```
 1    that's not enough.  That's not enough to extent the Section

 2    105 injunction, much less the --

 3             THE COURT:  No, you're missing my point.  And no

 4    one factor in the caselaw is sufficient.  Collateral

 5    estoppel alone is insufficient.  But if you're facing over

 6    2,600 lawsuits and two or three go ahead, albeit where the

 7    plaintiff in that lawsuit waives collateral estoppel but is

 8    similarly situated as to the plaintiffs in even half of

 9    those 2,600, then the debtors are going to have to defend

10    them.

11             MR. MACLAY:  And, Your Honor, I understand what

12    Your Honor's thinking is on that point. Obviously our briefs

13    take a different position.

14             THE COURT:  Based on what though?

15             MR. MACLAY:  Based on the fact that the discovery

16    obligations on the Debtors would not be or have not been

17    shown to be substantial.

18             THE COURT:  But that's -- that's a subset of the

19    issue.  The issue is whether they would be litigating it,

20    because it's going to set the claim against them.

21             MR. MACLAY:  But it wouldn't, Your Honor. I don't

22    think that a --

23             THE COURT:  If it doesn't, then it's not really a

24    test case, is it?

25             MR. MACLAY:  I'm not arguing for a test case, Your
```

Page 168

1    Honor.

2              THE COURT:  Some of your colleagues have.

3              MR. MACLAY:  But I have a different position on

4    behalf of the municipalities that I represent, Your Honor.

5              THE COURT:  All right.

6              MR. MACLAY:  My position is and has always been

7    one of the purposes served by continuing the litigation

8    against the Sacklers is an evidentiary one, as you yourself

9    commented on earlier today.  It's to get information from

10   the Sacklers.  And our concern, having balanced at Exhibit B

11   this morning --

12             THE COURT:  It comes back to information.

13             MR. MACLAY:  It does.

14             THE COURT:  All right, I understand that point.

15   And I'll hear the Debtors and the Committee on that issue.

16             MR. MACLAY:  Right.  And the stipulation that

17   you've been presented talks about the UCC; it doesn't talk

18   about the 40 million people that my clients represent.

19             THE COURT:  I understand that point.

20             MR. MACLAY:  Thank you, Your Honor.

21             THE COURT:  On the other hand, in your litigation

22   against the Sacklers, will you be able to get disclosure of

23   their financials and of their companies before winning?

24             MR. MACLAY:  Before winning, potentially not.

25   After winning, you certainly would, Your Honor.  And this is

Page 169

1    one of the things that of course is precluded by such an

2    injunction.

3            THE COURT:  In terms of the timeline, when do you

4    think you would win?

5            MR. MACLAY:  When in terms of timing from now?

6            THE COURT:  Yeah.

7            MR. MACLAY:  It's hard for me to say, Your Honor.

8    I know that my clients have a variety of actions against the

9    Sacklers.  I don't know how far along all of those are.

10           THE COURT:  Not 180 days.

11           MR. MACLAY:  Probably not, Your Honor.

12           THE COURT:  Okay.

13           MR. MACLAY:  And with respect to going back to the

14   caselaw for a second, Your Honor, the kind of legal backdrop

15   against which we're speaking, before extending injunctions

16   to protect non-debtors in Caesars, United Health, and third,

17   89th Associates, the court required assessing the enterprise

18   value of the non-debtor, examining the non-debtor's tax

19   returns, having evidence as to the effect of a judgement

20   against those entities.  And none of that information is

21   available to us or has been presented to you.

22           THE COURT:  It depends.  If the premise of the

23   injunction is that they are going to be contributing and

24   nothing else, I agree with you.  But I don't think that's

25   the premise here.  We don't know what they are -- I mean, no

1   as well as the Ad Hoc Group on information sharing.

2          MR. HUEBNER:  Your Honor, here's what I would say,

3   and I was -- I chose my words by the low point of the day

4   for me --

5          THE COURT:  Well, you've been up for 24 hours.

6          MR. HUEBNER:  I -- well, I've actually been up for

7   about 72 hours, but --

8          THE COURT:  All right.

9          MR. HUEBNER:  So, Your Honor, here's what I would

10  say.  There are several things, that while people arguably

11  should've called us before, everybody's working around the

12  clock and they have different situations.  Right?  If there

13  are provisions in the self-injunction that people -- as you

14  noted yourself, Your Honor, and I'm not criticizing, I'm

15  just noting what I think the Court said -- whatever, it was

16  Paragraph 73 or 74 in their objection --

17         THE COURT:  Yeah.

18         MR. HUEBNER:  -- didn't give us what we needed to

19  --

20         THE COURT:  That's less of a point.

21         MR. HUEBNER:  -- what issues were.

22         THE COURT:  That's important, too, but I think,

23  frankly, the information sharing issue would be important to

24  resolve, hopefully on a consensual basis.  And I think it'd

25  be worth -- you know, Monday's a holiday.  Saturday and

Page 228

1    Sunday, people might benefit from a little sleep on all

2    sides and then I would enjoin activity for two weeks while

3    you hopefully, well before then, come back and see if you

4    can agree as you have with the Committee on some further

5    protocol.

6              And I'm not saying it has to be the same protocol

7    as the Committee.  I think Mr. Eckstein quite reasonably

8    understood as did some of the objectors that it wouldn't be

9    exactly the same.  But a way so that the AGs could be

10   assured that albeit that this is just a 180-day injunction

11   that's being proposed and it's not to lock in a settlement

12   agreement but that on the other hand the Sacklers are not

13   getting a free ride on disclosure.

14             MR. HUEBNER:  Yeah, Your Honor, I would say that's

15   -- it would be tempting and maybe if I were wiser than I am

16   I would say absolutely but I think I need to say absolutely

17   but, because as I said this morning, the level of

18   information including current attorney-client --

19             THE COURT:  No, I understand that.  But I think

20   reasonable attorneys understand that, too.  On the other

21   hand --

22             MR. HUEBNER:  Do we --

23             THE COURT:  -- you don't want to have attorney-

24   client privilege be abused, either.  So --

25             MR. HUEBNER:  Your Honor --