ALSTON & BIRD LLP
James J. Vincequerra, Esq.
William Hao, Esq.
Dylan S. Cassidy, Esq.
Kimberly J. Schiffman, Esq.
90 Park Avenue
New York, New York 10016
Telephone: (212) 210-9400
Facsimile: (212) 210-9444
Email: James.Vincequerra@alston.com
        William.Hao@alston.com
        Dylan.Cassidy@alston.com
        Kimberly.Schiffman@alston.com

*Counsel to T-Mobile US, Inc. and WBSY Licensing, LLC*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| THE ROMAN CATHOLIC DIOCESE OF ROCKVILLE CENTRE, NEW YORK,[1] | ) Case No. 20-12345 (MG) |
| | ) |
| Debtor. | ) |

**OBJECTION OF THE T-MOBILE ENTITIES
TO THE MOTION OF THE DEBTOR FOR ENTRY OF AN ORDER
(I) AUTHORIZING AND APPROVING THE SALE OF THE DEBTOR'S ASSETS
FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES,
(II) APPROVING THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY
CONTRACTS AND UNEXPIRED LEASES, AND (III) GRANTING RELATED RELIEF**

---

[1]    The Debtor in this chapter 11 case is The Roman Catholic Diocese of Rockville Centre, New York. The last four digits of its federal tax identification number are 7437, and its mailing address is P.O. Box 9023, Rockville Centre, New York 11571-9023.

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ............................................................................................1

RELEVANT BACKGROUND............................................................................................4

    I.     The Debtor's Prepetition Relationship With Clearwire Spectrum. ...........................4
    II.    Clearwire Spectrum And The Debtor's Postpetition Relationship. .........................5
    III.   The T-Mobile Entities Relationship With The Debtor Concerning The
          Towers. ..................................................................................................................6

ARGUMENT .....................................................................................................................6

    I.     The Debtor Cannot Sell The FCC Licenses Free And Clear Of The FCC
          Leases. ..................................................................................................................6
          1.     Applicable Non-Bankruptcy Law Does Not Permit The Sale Of The FCC
                 Licenses Free And Clear Of The Lessee's Interests Therein. ................. 6
          2., 3.  11 U.S.C. § 363(f)(2) And (3) Are Inapplicable. ............................ 7
          4.     There Is No Bona Fide Dispute Concerning The Lessee's Interests In The
                 FCC Licenses. ........................................................................ 8
          5.     The Lessee Could Not Be Compelled To Accept A Money Satisfaction Of
                 Its Leasehold Interests. ............................................................. 9
    II.    To Adequately Protect The Lessee, Pursuant To 11 U.S.C. § 363(e),
          Retention Of The Lessee's Exclusive Right To Use The Spectrum Is
          Required. ..............................................................................................................11
          a.     The Lessee Cannot Be Adequately Protected Absent The Continued
                 Exclusive Right To Use The Spectrum. ....................................................11
          b.     Rejection Does Not Terminate Or Revoke The Lessee's Exclusive
                 Rights. ..................................................................................................16
    III.   Any Sale Seeking Rejection Of The FCC Leases Would Create A High
          Hurdle For Approval. ...........................................................................................18
          a.     The Debtor May Not Be Able To Demonstrate A Sound Business
                 Justification For A Sale Transaction Involving Rejection Of The
                 FCC Leases. ..........................................................................................18
          b.     Rejection Of The FCC Leases May Not Benefit The Estate Or The
                 Debtor's Stakeholders, Including General Unsecured Creditors. ...............20
    IV.   There Is No Basis For The Debtor To Sell The Leased Tower Assets Free
          And Clear Of The Tower Lessees' Interests Therein.............................................22

RESERVATION OF RIGHTS...........................................................................................23

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**CASES**

*Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship,*
    526 U.S. 434 (1999) ........................................................................................... 19

*Clear Channel Outdoor, Inc. v. Knupfer (In re PW, LLC),*
    391 B.R. 25 (B.A.P. 9th Cir. 2008) ...................................................................... 9

*Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.),*
    722 F.2d 1063 (2d Cir. 1983) ............................................................................. 18

*Crest One SpA v. TPG Troy, LLC (In re TPG Troy, LLC),*
    793 F.3d 228 (2d. Cir. 2015) ................................................................................ 8

*Dishi & Sons v. Bay Condos LLC,*
    510 B.R. 696 (S.D.N.Y. 2014) ...................................................................*passim*

*In re Ames Dep't Stores, Inc.,*
    306 B.R. 43 (Bankr. S.D.N.Y. 2004) .................................................................. 20

*In re Dial-A-Mattress Operating Corp.,*
    Nos. 1-09-41966-dem, 1-09-42201-dem, 1-09-42203-dem, 2009 Bankr. LEXIS 1801
    (Bankr. E.D.N.Y. June 24, 2009) .............................................................. 18, 19, 20

*In re Enron Corp.,*
    No. 01 B 16034 (AJG), 2006 WL 898033 (Bankr. S.D.N.Y. Mar. 24, 2006) ...................... 20

*In re Family Christian LLC,*
    533 B.R. 600 (Bankr. W.D. Mich. 2015) ............................................................. 19

*In re Flour City Bagels, LLC,*
    557 B.R. 53 (Bankr. W.D.N.Y. 2016) .................................................................... 6

*In re G. Survivor Corp.,*
    171 B.R. 755 (Bankr. S.D.N.Y. 1994) ................................................................. 20

*In re Gulph Woods Corp.,*
    No. 87-03093, 1988 WL 134688 (Bankr. E.D. Pa. Dec. 18, 1988) ....................... 19

*In re Haskell L.P.,*
    321 B.R. 1 (Bankr. D. Mass. 2005) .............................................................. 9, 10, 12

*In re Jaussi,*
    488 B.R. 456 (Bankr. D. Colo. 2013) .................................................................... 7

*In re Marko,*
    11-31287, 2014 Bankr. LEXIS 934 (Bankr. W.D.N.C. 2014) ................................. 8

*In re Octagon Roofing*,
   123 B.R. 583 (Bankr. N.D. Ill. 1990) ............................................................. 8

*In re Patriot Place, Ltd.*,
   486 B.R. 773 (Bankr. W.D. Tex. 2013) .......................................................... 23

*In re Realty Sw Assocs.*,
   140 B.R. 360 (Bankr. S.D.N.Y. 1992) ............................................................ 12

*In re Ricco, Inc.*,
   No. 10-23, 2014 WL 1329292 (Bankr. N.D. W. Va. Apr. 1, 2014) ..................... 9

*In re Scott*,
   No. 13-51169, 2013 WL 4498987 (Bankr. E.D. Ky. Aug. 21, 2013) ................... 9

*Key Mech. Inc. v. BDC 56 LLC (In re BDC 56 LLC )*,
   330 F.3d 111 (2d Cir.2003), *abrogated on other grounds by In re Zarnel*, 619 F.3d 156
   (2d. Cir. 2010) ............................................................................................. 8

*Lawsky v. Condor Cap. Corp.*,
   No. 14 CIV. 2863 (CM), 2015 U.S. Dist. LEXIS 96347 (S.D.N.Y. July 21, 2015) .............. 18

*Licensing by Paolo, Inc. v. Sinatra (In re Gucci)*,
   126 F.3d 380 (2d Cir. 1997) .......................................................................... 18

*Mancuso v. Meadowbrook Mall Co. Ltd. P'ship (In re Rest. Assocs., L.L.C.)*,
   No. 1:06CV53, 2007 U.S. Dist. LEXIS 23308 (N.D.W. Va. Mar. 28, 2007) .......... 7

*Med. Malpractice Ins. Ass'n v. Hirsch (In re Lavigne)*,
   114 F.3d 379 (2d Cir. 1997) .......................................................................... 16

*Mission Product Holdings, Inc. v. Tempnology, LLC*,
   139 S. Ct. 1652 (2019) ....................................................................... 3, 16, 17

*Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC)*,
   478 F.3d 452 (2d Cir. 2007) .......................................................................... 18

*NLRB v. Bildisco & Bildisco*,
   465 U.S. 513 (1984) ..................................................................................... 20

*Nostas Assocs. v. Costich (In re Klein Sleep Prods., Inc.)*,
   78 F.3d 18 (2d Cir. 1996) ............................................................................. 20

*Orion Pictures Corp. v. Showtime Networks (In re Orion Pictures Corp.)*,
   4 F.3d 1095 (2d Cir. 1993) ........................................................................... 20

*PCTV Gold, Inc. v. SpeedNet LLC*,
   508 F.3d 113 (8th Cir. 2007) ........................................................................ 10

*Reltron Corp. v. Voxakis Enters., Inc.*,
  395 N.Y.S.2d 276 (App. Div. 4th Dep't 1977) ................................................................ 22

*Sumitomo Tr.& Banking Co. v. Holly's, Inc. (In re Holly's, Inc.)*,
  140 B.R. 643 (Bankr. W.D. Mich. 1992) ..................................................................... 12

## STATUTES

11 U.S.C. §§ 101-1532 *et seq* ............................................................................................. 1

11 U.S.C § 303 ........................................................................................................................ 8

11 U.S.C § 361 ................................................................................................................. 11, 12

11 U.S.C § 362(d)(1) ............................................................................................................ 12

11 U.S.C § 363 ............................................................................................................... *passim*

11 U.S.C § 364 ...................................................................................................................... 11

11 U.S.C § 365 ............................................................................................................... *passim*

11 U.S.C § 503(b)(1) ............................................................................................................ 12

## OTHER AUTHORITIES

*2022 Communications Marketplace Report*, FCC 22-103 (rel. Dec. 30, 2022) ........................... 13

*Expanding Flexible Use of the 3.7 to 4.2 GHz Band,* Report and Order and Order of
  Proposed Modification, 35 FCC Rcd 2343 (2020) ............................................................... 13

*Transforming the 2.5 GHz Band*,
  Report and Order, 34 FCC Rcd 5446 (2019) ....................................................................... 13

T-Mobile US, Inc. ("T-Mobile US") and WBSY Licensing, LLC (the "Lessee"), on their own behalf and on behalf of certain of their affiliates and subsidiaries (collectively with T-Mobile US and the Lessee, the "T-Mobile Entities"), by and through their undersigned counsel, hereby file this objection (the "Sale Objection") in the above-captioned case under chapter 11, of Title 11, of the United States Code, 11 U.S.C. §§ 101-1532 *et seq.* (the "Bankruptcy Code"), to the above-captioned debtor's (the "Debtor) proposed sale (the "Sale Transaction") of its "Assets"[1]—(i) four (4) Federal Communication Commission (the "FCC") licenses with call signs KNZ65, KNZ67, KNZ68, and WHR845 (collectively, the "FCC Licenses" and each, an "FCC License"); (ii) Cell Towers; and (iii) Related Contracts.[2]

In support of this Sale Objection, the T-Mobile Entities rely upon and incorporate by reference the *Declaration of Paul McCarthy in Support of the T-Mobile Entities' Sale Objection* (the "McCarthy Declaration"), filed concurrently herewith. In further support of this Sale Objection, the T-Mobile Entities respectfully represent as follows:

## **PRELIMINARY STATEMENT**[3]

1.      This Sale Objection is protective in nature. The Debtor designed its sale process so that objections to a sale of any of the Assets, free and clear of liens, claims, interests, and encumbrances are due on the same date as the Final Bid Deadline.[4] As a result, it is unclear at this

---

[1]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the *Motion of the Debtor for Entry of an Order (I)(A) Approving Bidding Procedures for the Sale of the Debtor's Assets, (B) Authorizing the Debtor to Enter into One or More Stalking Horse Agreements and to Provide Bid Protections Thereunder, (C) Scheduling an Auction and Approving the Form and Manner of Notice Thereof, (D) Approving Assumption and Assignment Procedures and (E) Scheduling a Sale Hearing and Approving the Form and Manner of Notice Thereof; (II)(A) Approving the Sale of the Debtor's Assets Free and Clear of Liens, Claims, Interests and Encumbrances and (B) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases; and (III) Granting Related Relief* [Docket No. 1355] (the "Sale Motion").

[2]    Subsequent to entry of the order approving the Bidding Procedures [Docket No. 1471], the Debtor added the Real Property (as defined in Docket No. 1514) as assets for sale.

[3]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the remainder of this Sale Objection or the Sale Motion, as applicable.

[4]    On January 7, 2023, the Debtor revised the Bidding Procedures for the second time, thereby extending the date Qualified Bids are due and the Sale Objection Deadline from January 9, 2023 to January 20, 2023. *See* Docket No. 1550.

time whether or not a bidder for the Assets will seek to acquire the FCC Licenses free and clear of the FCC Leases or the Leased Tower Assets free and clear of the Tower Leases. Further, the Debtor's inclusion of any Related Contract, including the FCC Leases, on the Assumption and Assignment Notice does not guarantee that such contract ultimately will be assumed and assigned. Under the Bidding Procedures, it is not until after the conclusion of the Auction that the Successful Bidder and the Debtor must commit to assumption and assignment. And the Debtor expressly reserves its right to reject any Related Contract.

2.      Consequently, the T-Mobile Entities are compelled to file this Sale Objection before the structure of a proposed Sale Transaction becomes clear or if an Auction will even be held. Many of the arguments set forth herein may be moot if a proposed Sale Transaction includes the assumption and assignment of the FCC Leases and Tower Leases to a successful bidder. This Sale Objection addresses any potential transactions where the Debtor attempts to sell the FCC Licenses and Tower Leases free and clear of the Lessee's and Tower Lessees' respective interests therein.

3.      Pursuant to the FCC Leases, the Lessee holds the exclusive right to utilize the capacity on the EBS Channels (each as defined herein) that are the subject of the FCC Licenses (the "Spectrum"). The Lessee objects to any Sale Transaction to the extent it purports to abrogate the Lessee's right to exclusively utilize the Spectrum for the following reasons.

4.      First, the Debtor cannot sell the FCC Licenses free and clear of the Lessee's interests therein because the Debtor cannot satisfy any of the prerequisites for such a sale under sections 363(f)(1)-(5) of the Bankruptcy Code.

5.      Second, even assuming, *arguendo*, that the Debtor could satisfy one of the section 363(f) prerequisites (which it cannot), the Lessee is entitled to adequate protection of its interests in connection with any such sale pursuant to section 363(e) of the Bankruptcy Code, which, under

these facts and circumstances, can only be achieved through preservation of its rights under the FCC Leases, including continued utilization.

6.      Third, rejection of the FCC Leases would not change the result. As the Supreme Court confirmed in *Mission Product Holdings, Inc. v. Tempnology*, *LLC*, 139 S. Ct. 1652 (2019), rejection of contracts like the FCC Leases does not terminate them—it simply constitutes a material breach of such contracts by the Debtor. As discussed further below, under these circumstances, a breach by the Debtor of the FCC Leases would not provide any basis to terminate any of the Lessee's rights under the FCC Leases, including its right to exclusive use of the Spectrum.

7.      Finally, the Lessee submits that any proposed sale that would purport to abrogate the Lessee's exclusive right to utilize the Spectrum should not be approved for the additional reason that it more likely than not would not constitute  a valid exercise of the Debtor's business judgment. As noted above, the Lessee would be entitled to continue its exclusive utilization of the Spectrum whether the Debtor attempts to sell free and clear of the FCC Leases, through adequate protection, or whether the Debtor attempts to reject the FCC Leases, by virtue of the fact that rejection does not result in termination. However, even in the event that this Court determines, over the Lessee's objection, that the Lessee could be dispossessed, such a proposed sale should not be approved because it is all but a certainty that the Lessee's resulting claim for either adequate protection or rejection damages would significantly dilute creditor recoveries and negate the benefits to the estate of any such sale and, therefore, would not be an appropriate exercise of the Debtor's business judgment.

8.      Similarly, the Debtor also cannot sell the Leased Tower Assets free and clear of the Tower Lessees' interests therein because the Debtor cannot satisfy any of the requirements of section 363(f). Further, in the event that the Debtor seeks to reject the Tower Leases, the Tower Lessees would exercise their rights to continued possession pursuant to section 365(h).

9.      The T-Mobile Entities have and continue to constructively engage with the Debtor and its professionals in connection with the sale process. To be clear, the T-Mobile Entities have and will continue to work cooperatively with the Debtor, any "stalking horse" or other bidders and other interested parties to achieve a successful sale of the Assets. To be successful, however, it is the T-Mobile Entities' view that any such sale must provide for the continuation of the FCC Leases and the Tower Leases.

## RELEVANT BACKGROUND

**I.      The Debtor's Prepetition Relationship With Clearwire Spectrum.**

10.     Prior to the Petition Date, the FCC authorized the Debtor to transmit on Educational Broadband Service ("EBS") channels (the "Channels") under the FCC Licenses in the New York, New York area.

11.     On March 18, 2013, Clearwire Spectrum Holdings III, LLC ("Clearwire Spectrum"),[5] on the one hand, and the Debtor, on the other hand, entered into four EBS Long-Term *De Facto* Lease Agreements (in each case, amended, modified or supplemented) (collectively, the "Initial Leases" and each, an "Initial Lease") whereby the Debtor leased to Clearwire Spectrum the exclusive right to use the capacity on the EBS Channels (*a/k/a* the Spectrum) under the Initial Leases. *See* FCC Leases § 3.

12.     Clearwire Spectrum and the Debtor's entry into each Initial Lease required FCC approval. On April 20, 2013, the FCC announced its approval, via a Public Notice, and granted to the Lessee an instrument of authorization, which enabled the Lessee to use the Spectrum.

13.     As a result, the Lessee is permitted to provide mobile wireless coverage to all of Long Island, Queens, and certain other areas in New York and Connecticut (the "Coverage Area").

---

[5]     On April 1, 2020, T-Mobile US completed its merger with Sprint Corporation ("Sprint"). The combined company operates under the name T-Mobile. Clearwire Spectrum was previously a Sprint affiliate and was acquired by T-Mobile US in the merger.

## II.    Clearwire Spectrum And The Debtor's Postpetition Relationship.

14.    In connection with an internal T-Mobile reorganization affecting certain wireless licenses, leases and other assets, Clearwire Spectrum's leasehold interest in the Spectrum was to be transferred to the Lessee.

15.    In connection with such transfers, applicable FCC rules and regulations dictated that the Debtor and Lessee would need to apply for _new_ leases (collectively, the "FCC Leases") on the same terms as the prepetition Initial Leases and that the prepetition Initial Leases would thereafter be cancelled.

16.    On October 1, 2020 (the "Petition Date"), the Debtor filed a voluntary petition for relief under the Bankruptcy Code.

17.    On November 5, 2020, the Lessee and Debtor jointly submitted to the FCC applications for new long-term _de facto_ transfer spectrum leasing arrangements to account for the transfer of the leased interests in the Spectrum to the Lessee, a different wholly-owned indirect subsidiary of T-Mobile US.

18.    On November 16, 2020, the Debtor filed an involuntary assignment notice with the FCC retroactively notifying it of the bankruptcy. Accordingly, on or about that time, the Debtor's name under each Call Sign/Lease ID was amended to include the descriptor, "Debtor-In-Possession."

19.    On January 8, 2021, the new lease applications were granted by the FCC, which subsequently issued new lease identification numbers.

20.    After the new lease applications were granted, Clearwire Spectrum and the Debtor, consistent with the transaction contemplated by Clearwire Spectrum, the Lessee and Debtor, requested termination of the Initial Leases, and on January 12, 2021, the FCC granted the request and the Initial Leases were terminated.

III.    **The T-Mobile Entities Relationship With The Debtor Concerning The Towers.**

21.    Certain T-Mobile Entities (the "Tower Lessees") are tenants under a number of wireless tower leases (collectively, the "Tower Leases") providing the Tower Lessees leasehold interests in wireless towers located in Long Island, New York (the "Leased Tower Assets").

## ARGUMENT

I.    **The Debtor Cannot Sell The FCC Licenses Free And Clear Of The FCC Leases.**

22.    Under 11 U.S.C. § 363(f), a debtor may sell property of the estate under sections 363(b) or (c) free and clear of another entity's interest in such property only if at least one of the following requirements are met:

1. Applicable nonbankruptcy law permits the sale of such property free and clear of such interest;

2. Such entity consents;

3. Such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

4. Such interest is in bona fide dispute; or

5. Such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f)(1)-(5).

23.    The Debtor bears the burden of proof to show that at least one of the requirements is met. *See generally In re Flour City Bagels, LLC*, 557 B.R. 53, 57; 85; 88 (Bankr. W.D.N.Y. 2016) (denying free and clear sale motion after finding that the debtor "has not carried its burden of proof" under section 363(f)). As discussed further below, the Debtor cannot meet this burden as none of the 11 U.S.C. § 363(f) requirements can be met here.

1. **Applicable Non-Bankruptcy Law Does Not Permit The Sale Of The FCC Licenses Free And Clear Of The Lessee's Interests Therein.**

The trustee may sell property under subsection (b) or (c) of this section free and clear of any [interest] in such property of an entity other than the estate,

> only if—applicable nonbankruptcy law permits sale of such property free and clear of such interest.

11 U.S.C. § 363(f)(1).

24.    Section 363(f)(1) is interpreted narrowly in this district to include "only situations where the owner of the asset may, under nonbankruptcy law, sell an asset free and clear of an interest in such asset[.]" *Dishi & Sons v. Bay Condos LLC*, 510 B.R. 696, 710 (S.D.N.Y. 2014) (internal quotations omitted). Other courts are in accord. *See, e.g., In re Jaussi*, 488 B.R. 456, 458 (Bankr. D. Colo. 2013) (Section 363(f)(1) "applies only to situations where the owner of the asset may, under nonbankruptcy law, sell an asset free and clear of an interest in such asset."); *Mancuso v. Meadowbrook Mall Co. Ltd. P'ship (In re Rest. Assocs., L.L.C.)*, No. 1:06CV53, 2007 U.S. Dist. LEXIS 23308, at *29-30 (N.D.W. Va. Mar. 28, 2007) ("[T]he narrow language of § 363(f)(1) . . . permits trustees to sell free and clear 'only if' specific conditions are met," and "[i]f § 363(f)(1) contemplated the use of eminent domain as a relevant type of 'applicable nonbankruptcy law,' there would be no need for the limiting 'only if' language.").

25.    The Lessee is unaware of any applicable nonbankruptcy law which would permit the Debtor to sell the FCC Licenses free and clear of the FCC Leases and, therefore, section 363(f)(1) does not provide a basis for the sale of the FCC Licenses free and clear of the FCC Leases.

### 2. and 3. <u>11 U.S.C. § 363(f)(2) And (3) Are Inapplicable.</u>

> The trustee may sell property under subsection (b) or (c) of this section free and clear of any [interest] in such property of an entity other than the estate, only if—(2) such entity consents; [or] (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property.

11 U.S.C. § 363(f)(2) and (3).

26.    Paragraphs two (2) and three (3) of section 363(f) would not authorize a sale free and clear of the Lessee's interests in the FCC Licenses. The Lessee has not consented to the sale of the

Assets free and clear of its interests therein, and the Lessee's interest in the Assets is not a lien. *See*

11 U.S.C. § 363(f)(2) and (3).

### 4. There Is No Bona Fide Dispute Concerning The Lessee's Interests In The FCC Licenses.

> The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if—such interest is in bona fide dispute.

11 U.S.C. § 363(f)(4).

27.     The Bankruptcy Code does not define the term "bona fide dispute." Courts have

generally determined that a bona fide dispute exists when there is an objective basis for a factual or

legal dispute as to the validity of the asserted interest. *See* 3 Collier on Bankruptcy ¶ 363.06 (16th

ed. 2022); *Crest One SpA v. TPG Troy, LLC (In re TPG Troy, LLC)*, 793 F.3d 228, 234 (2d. Cir.

2015); *Key Mech. Inc. v. BDC 56 LLC (In re BDC 56 LLC )*, 330 F.3d 111, 117-18 (2d Cir.2003),

*abrogated on other grounds by In re Zarnel*, 619 F.3d 156 (2d. Cir. 2010).

28.     "Although some courts have not agreed on a precise definition of bona fide dispute,

it entails some sort of meritorious, *existing conflict*."  *In re Marko*, No. 11-31287, 2014 Bankr.

LEXIS 934, at *9 (Bankr. W.D.N.C. 2014) (emphasis added) (internal quotation marks omitted).

The debtor's burden to show the existence of a bona fide dispute cannot be met unless either a factual

or legal basis is proffered which objectively challenges the validity of the interest disputed. *See In

re Octagon Roofing*, 123 B.R. 583, 590 (Bankr. N.D. Ill. 1990) (analyzing "bona fide dispute" in

the context of Section 303 of the Bankruptcy Code).

29.     The Lessee's interests in the FCC Licenses have not been, and cannot seriously be,

challenged. The Debtor, to date, has not raised a single issue or point of concern regarding the FCC

Leases. Indeed, the Lessee's payments under the FCC Leases for the FCC Licenses have been

integral to the Debtor's ability to continue to fund this chapter 11 case. *See In re The Roman Catholic

Diocese of Rockville Centre, New York,* No. 20-12345, Transcript of Hearing Held November 16,

8

2022, at 26:62-26:10 ("MR. MORIN: "[W]e just do want to highlight for Your Honor that . . . [t]he revenue from these leases that we're trying to sell is currently being used to fund the Debtor's ongoing charitable operations."); Sale Motion at ¶ 8 (Debtor's counsel describing the revenue stream as "critically important" and "currently used to pay certain operating costs (including, among other things, expenses for certain media services provided by an affiliate of the Debtor)").

30.      Accordingly, the Lessee's interests in the FCC Licenses are not in bona fide dispute, and the Debtor has not satisfied and cannot satisfy section 363(f)(4).

### 5. The Lessee Could Not Be Compelled To Accept A Money Satisfaction Of Its Leasehold Interests.

> The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if—such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f)(5).

31.      "[T]he scope of paragraph (5) [is limited] to those scenarios where the trustee or debtor, not any third party, is the actor." *Dishi & Sons*, 510 B.R. at 711; *see also In re Ricco, Inc.*, No. 10-23, 2014 WL 1329292, *3 (Bankr. N.D. W. Va. Apr. 1, 2014) ("'[T]he only logical interpretation of . . . § 363(f)(5) is that the statute requires that the trustee or debtor be the party able to compel monetary satisfaction for the interest which is the subject of the sale.'") (quoting *In re Haskell L.P.*, 321 B.R. 1, 9 (Bankr. D. Mass. 2005)); *In re Scott*, No. 13-51169, 2013 WL 4498987, *2-3 (Bankr. E.D. Ky. Aug. 21, 2013) (paragraph (5) does not refer to foreclosure proceedings because they are initiated by creditors, not the debtor); *In re Haskell L.P.*, 321 B.R. at 9 (paragraph (5) does not encompass eminent domain proceedings because the trustee must be the party capable of compelling the interest holder to accept a money satisfaction). Any broader interpretation renders the remaining four sub-paragraphs of section 363(f) mere surplusage. *See Dishi & Sons*, 510 B.R. at 11; *Clear Channel Outdoor, Inc. v. Knupfer (In re PW, LLC)*, 391 B.R. 25, 44 (B.A.P. 9th Cir.

2008) ("[A]ny interpretation of paragraph (5) must satisfy the requirement that the various paragraphs of subsection (f) work harmoniously and with little overlap.").

32.     Thus, in order for section 363(f)(5) to apply here, the Debtor must show the existence of a legal or equitable proceeding that it itself could bring to compel the Lessee to accept a money satisfaction of its interests in the FCC Licenses. No such proceeding exists, and, therefore, section 363(f)(5) does not provide a basis to approve a sale free and clear of the Lessee's interests.

33.     Moreover, even if such a proceeding existed, section 363(f)(5) would not be applicable under these circumstances because the Lessee's claim for use of the Spectrum cannot be reduced to a money judgment. Indeed, the FCC Leases themselves are replete with evidence and acknowledgements by the Debtor of the unique nature of the Lessee's interests and the insufficiency of money damages in connection with any breach by Debtor or any sale of the FCC Licenses. As this Court is aware, the FCC Leases include extensive provisions such as rights of first refusal, no-shop clauses, and exclusivity, all of which were designed to maintain the Lessee's contractual rights with respect to the FCC Licenses, including, but not limited to, utilization of the Spectrum.

34.     Further, pursuant to the specific performance provision set forth at section 20(e) of the FCC Leases (the "Specific Performance Provision"), the Debtor specifically agreed that "the Licenses and Channels subject to the [FCC Leases] *are unique* and the loss to [the Lessee] due to [the Debtor's] failure to perform under the [FCC Leases] *could not be easily measured with damages*." FCC Leases § 20(e). Thus, the evidence is clear that the Lessee cannot be compelled to accept a money satisfaction and section 363(f)(5) is inapplicable here. *See In re Haskell L.P.*, 321 B.R. 1, 9 (Bankr. D. Mass. 2005) (holding that section 363(f)(5) does not provide a basis for sale free and clear of tenant's possessory interests because, among other reasons, tenant's resulting claim could not be quantified); *see also PCTV Gold, Inc. v. SpeedNet LLC*, 508 F.3d 113, 1143 (8th Cir. 2007) (affirming preliminary injunction preventing a contract counterparty from consummating a

10

joint venture that would have imperiled [lessee's] access to spectrum channels on the basis that "spectrum has unique characteristics that make its loss one which cannot be fully compensated by an award of money damages.").

35.    Accordingly, the Debtor has not satisfied and cannot satisfy section 363(f)(5), as the Lessee could not be compelled under any circumstances to accept a money satisfaction of its interests, a fact that the Debtor effectively conceded when it agreed to the Specific Performance Provision in each of the FCC Leases.

**II.    To Adequately Protect The Lessee, Pursuant To 11 U.S.C. § 363(e), Retention Of The Lessee's Exclusive Right To Use The Spectrum Is Required.**

    **a.    The Lessee Cannot Be Adequately Protected Absent The Continued Exclusive Right To Use The Spectrum.**

36.    Assuming, *arguendo*, that the Debtor could satisfy one of the section 363(f)(1)-(5) requirements (which it cannot), any such sale must be conditioned upon the Debtor providing the Lessee with adequate protection of its interests under section 363(e). Because the Lessee's interests are unique and irreplaceable, adequate protection would require continued possession by the Lessee and the continuation of its exclusive right to use the Spectrum, as well as other bargained for lease terms, including the Lease Preservation Rights (as defined herein).

37.    Where property is to be sold free and clear of an interest, the court <u>*must*</u> provide 'adequate protection of such interest' upon request." *Dishi & Sons*, 510 B.R. at 701 (quoting 11 U.S.C. § 363(e)). As set forth in section 361, "adequate protection" may be provided to a holder of an interest in property by:

> (1) requiring the trustee to make a cash payment or periodic cash payments to such entity, to the extent that the stay under section 362 of this title, use, sale, or lease under section 363 of this title, or any grant of a lien under section 364 of this title results in a decrease in the value of such entity's interest in such property;
>
> (2) providing to such entity an additional or replacement lien to the extent that such stay, use, sale, lease, or grant results in a decrease in the value of such entity's interest in such property; or

(3) granting such other relief, other than entitling such entity to compensation allowable under section 503(b)(1) of this title as an administrative expense, as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property.

11 U.S.C. § 361(1)-(3).

38.     The District Court has stated that "[w]here 'it is improbable that the lessee will receive any compensation for its interest from the proceeds of the sale, and it is difficult to value the lessee's unique property interest . . . 'adequate protection can be achieved *only* through continued possession . . . .'" *Dishi & Sons*, 510 B.R. at 711-12 (quoting *In re Haskell*, 321 B.R. at 10) (emphasis added); *In re Realty Sw Assocs.*, 140 B.R. 360, 366 (Bankr. S.D.N.Y. 1992) ("Adequate protection is a question of fact because it has as its linchpin the concept of value, and therefore is determined on a case-by-case basis.").

39.     The adequate protection analysis under section 363(e) requires a bankruptcy court to consider only how to adequately protect "the entity whose interest is threatened, not other creditors or purchasers." *Dishi & Sons*, 510 B.R. at 711. Accordingly, courts reject any arguments "that a bankruptcy court must 'fairly' allocate the burden of adequate protection," *id.*, and balance the interests to be protected with the effect of protecting such interests. In addition, adequate protection is provided both as a matter of policy and as a matter of constitutional law. *See, e.g.*, *Sumitomo Tr.& Banking Co. v. Holly's, Inc. (In re Holly's, Inc.),* 140 B.R. 643, 686 (Bankr. W.D. Mich. 1992) (section 362(d)(1) serves to protect a secured creditor's Fifth Amendment rights).

40.     Here, adequate protection can only be accomplished by providing the Lessee with continued exclusive access to the Spectrum conferred by the FCC Leases because both the Spectrum and the Lessee's utilization of it for its 5G Ultra Capacity network are unique, difficult to value, and impossible to either replace or acquire. *See* McCarthy Declaration at ¶¶ 8, 10. Such property interests cannot be adequately protected absent continued utilization of this Spectrum.

41.     EBS spectrum licenses are valuable rights regulated by the FCC and may be used by national wireless carriers, such as the Lessee and its affiliates to provide their customers with mobile wireless coverage nationwide. In fact, T-Mobile is the only national carrier using EBS spectrum. Only some spectrum frequencies can be used for mobile wireless communications as different bands have different characteristics. That is, not all spectrum is created equal. *See* McCarthy Declaration at ¶ 5; *Expanding Flexible Use of the 3.7 to 4.2 GHz Band*, Report and Order and Order of Proposed Modification, 35 FCC Rcd 2343, ¶ 5 (2020) ("Mid-band spectrum is well-suited for next generation wireless broadband services given the combination of favorable propagation characteristics (as compared to high bands) and the opportunity for additional channel re-use (as compared to low bands)."); *2022 Communications Marketplace Report*, FCC 22-103, ¶¶ 471-74 (rel. Dec. 30, 2022) (discussing the FCC's efforts to make available more mid-band spectrum, including spectrum in the 2.5 GHz band, for 5G services because of the spectrum's technical characteristics); *Transforming the 2.5 GHz Band*, Report and Order, 34 FCC Rcd 5446, ¶ 2 (2019) ("The demand for mid-band spectrum for 5G networks has especially increased in recent years, as more countries have recognized that mid-band spectrum offers favorable characteristics for enabling wireless networks to achieve coverage and capacity.").

42.     The Spectrum allows the Lessee to provide its customers with mobile wireless coverage in the Coverage Area. Indeed, the Lessee provides mobile wireless coverage to over one million of its customers on a daily basis through utilization of the Spectrum, which includes those located in the Debtor's Rockville Centre, New York community. The FCC regulates the use of radio frequencies in the United States to ensure, *inter alia,* that multiple users are not utilizing the same frequencies in the same geographic regions at the same time resulting in interference between uncoordinated users. The FCC Licenses are the only licenses for use of these specific frequencies in the Coverage Area and are thus inherently unique. *See* McCarthy Declaration at ¶¶ 6-7.

43.    Moreover, the leased Spectrum is impossible to replace. As an initial matter, the Spectrum could not be replaced with other mobile wireless bands in the Coverage Area for the simple fact that the FCC is not issuing any more 2.5 GHz band spectrum in the Coverage Area (and none is otherwise available in the open market). Even if other mobile wireless bands were available in the Coverage Area, they would not provide the Lessee with adequate protection because no other spectrum would allow the Lessee to provide the same optimal, fast and efficient mobile wireless service to customers in the Coverage Area. *See* McCarthy Declaration at ¶ 8.

44.    Relatedly, national wireless providers like the Lessee rely upon contiguous spectrum to ensure seamless service for their customers. The Lessee has built a nationwide network on the 2.5 GHz spectrum and loss of the Spectrum would create a gap in the Lessee's broader spectrum portfolio and harm the Lessee's superior bandwidth capacity. Thus, damage to the Lessee's business would be substantial, including, *inter alia*, loss of broadband wireless capacity impairing its ability to provide 5G service to its customers, loss of market share to its competitors and reputational damage arising therefrom. Further, the EBS Spectrum is used by the Lessee to meet certain FCC and Department of Justice approved merger commitments made in connection with the Sprint merger, and those commitments may not be met with loss of the Spectrum. *See* McCarthy Declaration at ¶ 9.

45.    In fact, the Lessee and Debtor's inclusion of the Specific Performance Provision in the FCC Leases is indicative of the fact that the Spectrum is so unique in kind and quality that suitable substitutes are unobtainable. Recognizing the substantial harm that the Lessee would suffer from, *inter alia,* the loss of the Spectrum access and Lease Preservation Rights conferred by the FCC Leases, the Debtor and Lessee agreed to the identical Specific Performance Provision in each of the FCC Leases, which state:

> [Debtor] acknowledges that the License and Channels subject to this Agreement are unique and the loss to [Lessee] due to Licensee's failure to perform this Agreement

14

could not be easily measured with damages. [Lessee] will be entitled to injunctive relief and specific enforcement of this Agreement in a court of equity.

FCC Leases at § 20.

46.     Based on the T-Mobile Entities' understanding of the market for the Spectrum assets and the Debtor's proposed sale order, it is improbable that the Lessee will receive compensation, adequate or otherwise, for its interest from proceeds of a Sale Transaction. Pursuant to the proposed sale order, the first $50 million of sale proceeds are to be divvied up between an "Administrative Expense Reserve Account," the sole purpose of which is to satisfy the ongoing expenses of administering this chapter 11 case and/or repayment of any debtor-in-possession financing incurred by the Debtor in this chapter 11 case,[6] and a "Reorganized Debtor Reserve Account," which will go toward funding the Debtor's post-emergence operations. *See* Docket No. 1526 at ¶ 27. *See also* Docket No. 1416 at ¶ 8 ("The Committee is also concerned by . . . the extraordinary administrative expenses incurred by the Diocese to date. The Diocese should be maximizing the value of its assets to fulfill its fiduciary duty to its creditors, including fairly compensating sexual abuse survivors, not expending more resources on the continuation of this bankruptcy case or setting aside funds now for the Diocese's post-petition operations.").

47.     While it is unclear at this point whether the Debtor actually intends to sell the FCC Licenses free and clear of the FCC Leases, in the event the Debtor does seek a free and clear sale of the Lessee's interests in the FCC Licenses, the Lessee hereby requests adequate protection of its interests in the form of specific performance of the FCC Leases and reserves its rights to file additional documents and information in support of its request.

---

[6]    The Debtor recently filed a motion seeking to expand the Jefferies retention to include assistance in obtaining a debtor-in-possession loan (a "DIP Loan") [Docket No. 1537], to which the Committee objected [Docket No. 1548]. While it is premature to make any arguments against a theoretical DIP Loan at this time, the T-Mobile Entities would strenuously object to any proposed DIP Loan that might negatively impact the T-Mobile Entities' rights.

**b.**    **Rejection Does Not Terminate Or Revoke The Lessee's Exclusive Rights.**[7]

48.    As discussed above, a sale free and clear of the Lessee's interests in the FCC Licenses is unavailable here because none of the section 363(f)(1)-(5) requirements can be met and, further, even if one of requirements could be met (which they cannot be), adequate protection of the Lessee's interests would require the Debtor to specifically perform under the FCC Leases. Any potential Sale Transaction whereby the Debtor seeks to sell the FCC Licenses free and clear of the Lessee's interests would presumably be accompanied by attempted rejection of the FCC Leases. However, even if the Debtor were to reject the FCC Leases in connection with a sale, it would not change the result.

49.    As the Supreme Court has made clear, "[a] rejection breaches a contract but *does not rescind it*. And that means all the rights that would ordinarily survive a contract breach . . . remain in place." *Tempnology, LLC*, 139 S. Ct. at 1657-68 (emphasis added); *see also Med. Malpractice Ins. Ass'n v. Hirsch (In re Lavigne)*, 114 F.3d 379 (2d Cir. 1997). The Supreme Court's holding in *Tempnology* is not limited to the trademark licensing context. Rather, the decision was clear that:

> Section 365(a) and (g) speak broadly to *any* 'executory contract[s].' Many licensing agreements involving . . . other property are of that kind . . . [T]he breach does not revoke the license or stop the licensee from doing what it allows . . . And because rejection 'constitutes a breach,' . . . the same consequences follow in bankruptcy. The debtor can stop performing its remaining obligations under the agreement. But the debtor cannot rescind the license already conveyed. So the licensee can continue to do whatever the license authorizes.

*Tempnology, LLC,* 139 S. Ct. at 1662-63 (emphasis added) (citations omitted).

50.    The following analogy put forth by the Supreme Court in *Tempnology* is particularly informative in conceptualizing the result of a potential rejection by the Debtor of the FCC Leases:

> Consider a made-up executory contract to see how the law of breach works outside bankruptcy. A dealer leases a photocopier to a law firm, while agreeing to service it every month; in exchange, the firm commits to pay a monthly fee. During the lease term, the dealer decides to stop servicing the machine, thus breaching the agreement

---

[7]    For the avoidance of doubt, the Lessee would contest any effort by the Debtor to reject the FCC Leases.

in a material way. The law firm now has a choice . . . . The firm can keep up its side of the bargain, continuing to pay for use of the copier, while suing the dealer for damages from the service breach. Or the firm can call the whole deal off, halting its own payments and returning the copier, while suing for any damages incurred. But to repeat: The choice is to terminate the agreement and send back the copier is for the *law firm*. By contrast, the *dealer* has no ability, based on its own breach, to terminate the agreement. Or otherwise said, the dealer cannot get back the copier just by refusing to show up for a service appointment. The contract gave the law firm continuing rights in the copier, which the dealer cannot unilaterally revoke.

And now to return to bankruptcy: If the rejection of the photocopier contract 'constitutes a breach,' as the Code says, *then the same results should follow* . . . . Because the rejection is deemed to occur 'immediately before' bankruptcy, the firm's damages suit is treated as a pre-petition claim on the estate . . . And *most important, it means that assuming the law firm wants to keep using the copier, the dealer cannot take it back*. A rejection does not terminate the contract. When it occurs, the debtor and counterparty do not go back to their pre-contract positions. Instead, the counterparty retains the rights it has received under the agreement. As after a breach, so too after a rejection, those rights survive.

*Id.* at 1662 (emphasis added) (citations omitted).

51.    Here, pursuant to section 3 of the FCC Leases, the Lessee has the exclusive right to use the capacity of the Channels. Section 11(b) of the FCC Leases provides that the *non-breaching* party has the option, not an obligation, to terminate the FCC Leases following a material breach by the other party. Nothing contained in the FCC Leases allows the Debtor to terminate the FCC Leases or otherwise rescind the Lessee's exclusive right to use the Spectrum upon the Debtor's own breach. The Debtor may elect to breach the FCC Leases, but just like in the Supreme Court's hypothetical where it was the law firm's decision whether to keep using the copier post-rejection, it is the Lessee's decision alone whether to terminate or continue utilizing the Spectrum. *See id.* at 1666 ("[A] debtor's rejection of an executory contract under Section 365 of the Bankruptcy Code has the same effect as a breach of that contract outside of bankruptcy. Such an act cannot rescind rights that the contract previously granted.").

52.    If the Debtor were to reject the FCC Leases, the Lessee would not terminate on account of such breach and its interests in the FCC Licenses would remain undisturbed by the Debtor's material breach.

17

**III.    Any Sale Seeking Rejection Of The FCC Leases Would Create A High Hurdle For Approval.**

**a.    The Debtor May Not Be Able To Demonstrate A Sound Business Justification For A Sale Transaction Involving Rejection Of The FCC Leases.**

53.    Section 363(b) of the Bankruptcy Code provides that a debtor "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). In the Second Circuit, a debtor must demonstrate a sound business justification for a sale or use of assets outside the ordinary course of business. *See, e.g, Licensing by Paolo, Inc. v. Sinatra (In re Gucci)*, 126 F.3d 380, 387 (2d Cir. 1997); *In re Dial-A-Mattress Operating Corp.*, Nos. 1-09-41966-dem, 1-09-42201-dem, 1-09-42203-dem, 2009 Bankr. LEXIS 1801, at *12 (Bankr. E.D.N.Y. June 24, 2009) ("The business judgment test is the standard for Section 363 asset sales in this Circuit . . .The standard requires the directors of a corporation to act on an informed basis, in good faith and in the honest belief that the action is in the best interest of the company) (citations omitted); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.),* 722 F.2d 1063, 1071 (2d Cir. 1983) ("The rule we adopt requires that a judge determining a [Bankruptcy Code section] 363(b) application expressly find from the evidence presented before him at the hearing a good business reason to grant such an application.").

54.    A bankruptcy court must "find from the evidence presented before him at the hearing a good business reason to grant such an application." *In re Lionel Corp.,* 722 F.2d at 1071; *see also Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452, 466 (2d Cir. 2007) (a judge determining a section 363(b) application must expressly find from the evidence presented a good business reason to grant the application).

55.    The Debtor's fiduciary duty to maximize the value of their estates does not mandate that a debtor "mechanically accept" the bid with the highest dollar amount. *See Lawsky v. Condor Cap. Corp.,* No. 14 CIV. 2863 (CM), 2015 U.S. Dist. LEXIS 96347, at *24 (S.D.N.Y. July 21, 2015)

18

(citing *In re Family Christian LLC,* 533 B.R. 600, 622 (Bankr. W.D. Mich. 2015)). Instead, a debtor

must demonstrate that the contemplated purchase price is the highest or otherwise best offer, which

includes considerations of good faith and feasibility. *See Family Christian,* 533 B.R. at 626-27; *In

re Gulph Woods Corp.,* No. 87-03093, 1988 WL 134688, at *4 (Bankr. E.D. Pa. Dec. 18, 1988)

(noting that "there must be a strong showing of adequate notice and good faith, as well as feasibility,

of the transaction, to prompt us to approve a pre-confirmation" sale pursuant to Bankruptcy Code

section 363) (internal quotations omitted). While preserving a debtor as a going concern is a laudable

goal of chapter 11, it must be balanced with—and cannot override—the equally fundamental tenet

of maximizing value for a debtor's creditors. *See Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N.

LaSalle St. P'ship*, 526 U.S. 434, 435 (1999) (describing "the two recognized policies underlying

[c]hapter 11" as "preserving going concerns and maximizing property available to satisfy

creditors").

57.    Particularly relevant here, potential rejection damages claims are an "important factor

to be considered in the business judgment analysis." *In re Dial–A–Mattress Operating Corp.*, 2009

Bankr. LEXIS 1801, at *15 (Bankr. E.D.N.Y. June 24, 2009). And such a figure must be

"incorporated into the determination [of] factors at the auction as an indication [that] the debtors

valued the potential rejection damages claim" in considering the highest or otherwise best bid. *Id.*

57.    Here, the Debtor's stated goal and justification for the approval of any Sale

Transaction is to "monetize the Assets for the benefit of all stakeholders" and maximize "the value

of the Assets for the benefit of all of the Debtor's stakeholders." Sale Motion ¶¶ 2, 7; *see also id.* at

¶ 39 ("The Bidding Procedures were carefully designed to provide the Debtor with the ability to

maximize the value of the Assets."). And the Bidding Procedures require the Debtor to determine,

in its business judgment "which bid constitutes the highest or otherwise best bid(s) for the applicable

Assets." Bidding Procedures § VI.C.1. In all probability, a Sale Transaction that contemplates the

rejection of the FCC Leases would not benefit the Debtor's stakeholders. Instead, under such circumstances, entry into such a transaction may not be a sound exercise of the Debtor's business judgment because of the (a) dilution to creditor recoveries that would necessarily be caused by the claim created by the Lessee's loss of its rights to utilize the Spectrum, and (b) uncertainty of closing any such proposed transaction over the Sale Objection and any appellate rights that the T-Mobile Entities may have.

**b.    Rejection Of The FCC Leases May Not Benefit The Estate Or The <u>Debtor's</u> <u>Stakeholders, Including General Unsecured Creditors.</u>**

58.    Like the approval of a proposed bankruptcy sale pursuant to section 363, rejection of an executory contract pursuant to section 365 of the Bankruptcy Code is governed by the "business judgment" standard. *See Orion Pictures Corp. v. Showtime Networks (In re Orion Pictures Corp.),* 4 F.3d 1095, 1098-99 (2d Cir. 1993); *In re Ames Dep't Stores, Inc.,* 306 B.R. 43, 51 (Bankr. S.D.N.Y. 2004); *see also NLRB v. Bildisco & Bildisco,* 465 U.S. 513, 523 (1984) (recognizing the "business judgment" standard used to approve rejection of executory contracts); *Nostas Assocs. v. Costich (In re Klein Sleep Prods., Inc.),* 78 F.3d 18, 25 (2d Cir. 1996) (same).

59.    A court should not approve a debtor's request to reject an executory contract under section 365(a) if such rejection is not in the best interests of the debtor's creditors and other stakeholders. *See In re Dial-A-Mattress Operating Corp.*, 2009 Bankr. LEXIS 1801, at *12 ("[T]he court for the most part must only determine that the rejection benefit the estate and generally will defer to the business judgment of the debtor's management."); *In re Enron Corp.,* No. 01 B 16034 (AJG), 2006 WL 898033, at *4 (Bankr. S.D.N.Y. Mar. 24, 2006) ("In determining whether to approve a [debtor's] decision to reject such lease or contract, a court applies the 'business judgment' test which is met if the rejection is beneficial to the estate."); *In re G. Survivor Corp.*, 171 B.R. 755, 758 (Bankr. S.D.N.Y. 1994) ("[T]he bankruptcy court places itself in the position of the trustee or

debtor-in-possession and determines whether assumption or rejection of the contract is a reasonable business decision.").

60.     As shown above, rejection would not terminate the Lessee's right of exclusive access to the Spectrum.

61.     However, in the event it was determined that the Lessee's rights could be terminated through rejection of the FCC Leases, rejection, in all probability, would not benefit the Debtor's stakeholders. In that case, rejection would likely result in outsized rejection damages claims by the Lessee, which would negate any value received in connection with the sale.[8] As discussed above, the Lessee would suffer substantial damages if it no longer possessed the right to utilize the Spectrum. Additionally, the Lessee's rejection damages would include damages arising from the Lessee being stripped of other invaluable bargained for contractual rights under the FCC Leases— rights of first refusal, exclusivity/no-shop provisions and anti-assignment provisions (collectively, the "Lease Preservation Rights" and each, a "Lease Preservation Right")—that facilitate the Lessee's national growth strategy. Specifically, the Lease Preservation Rights, prohibit the Debtor from both negotiating or entering into any contract for any sale or transfer of the FCC Licenses, even a sale that is subject to the FCC Leases. And the Debtor is even prohibited from assigning any of the few rights it retains related to the Spectrum under the FCC Leases. These protections are designed to ensure the Lessee's use of the Spectrum for at least the next two decades and are necessary because access to the Spectrum provided by each FCC Lease is a unique part of the Lessee's broader national strategy. *See* McCarthy Declaration at ¶ 11. A rejection damages claim

---

[8]     Quantifying the Lessee's rejection damages would be a highly complex exercise for the Lessee. Any rejection damages claims filed by the Lessee would almost certainly result in highly contentious, if not litigated, issues between the parties. That simple fact alone would create further delay in the administration of this chapter 11 case and increase the already excessive administrative expenses occurred therein. While the cost and the implications of any rejection damages claims of the Lessee are unknown today, it is all but a certainty that they would be negative for fulcrum creditors, potentially in a material manner.

component would include damages suffered by the Lessee as a result of the Debtor's hinderance of the Lessee's national broadband deployment.

62.     Thus, the Lessee's rejection damages claim stands to be so large that it will severely dilute, if not deplete, recoveries for general unsecured creditors, including those filed by victims of sexual assault.

**IV.     There Is No Basis For The Debtor To Sell The Leased Tower Assets Free And Clear Of The Tower Lessees' Interests Therein.**

63.     In addition to the FCC Leases, the Tower Lessees are tenants under the Tower Leases, which provide the Tower Lessees leasehold interests in the Leased Tower Assets. While it is also unclear at this point whether the Debtor intends to sell any of the Leased Tower Assets free and clear of the applicable Tower Lessee's leasehold interests therein, the Tower Lessees object to such relief to the extent it is requested for the reasons set forth below.

64.     The Debtor cannot sell the Leased Tower Assets free and clear of the applicable Tower Lessee's interests therein because the Debtor cannot satisfy any of the prerequisites for such a sale under section 363(f)(1)-(5) of the Bankruptcy Code.

65.     With respect to section 363(f)(1), the Tower Leases are governed by New York law. Applicable nonbankruptcy law in New York law governing the voluntary transfer of property provides that a purchaser takes property subject to a lease if he had actual or constructive notice of its existence. *See Dishi & Sons*, 510 B.R. at 709; *see also Reltron Corp. v. Voxakis Enters., Inc.*, 395 N.Y.S.2d 276, 279 (App. Div. 4th Dep't 1977). Since prospective bidders for the Assets have all been provided notice of the Tower Leases, the sale of the Leased Tower Assets by the Debtor would be subject to the Tower Leases under New York law. *See Dishi & Sons*, 510 B.R. at 709-10. Sections 363(f)(2) and (3) are inapplicable. The Tower Lessees do not consent to the sale of the property and their leasehold interests in the Leased Tower Assets are not liens. With respect to section 363(f)(4), the Tower Lessees' interests in the Leased Tower Assets have not been challenged, and thus there

is no bona fide dispute in the Tower Lessees' interests in the Leased Tower Assets. Last, the Tower Lessees here cannot be compelled by the Debtor under New York law to accept a money satisfaction for their leaseholder interests as, for example and as in *Dishi,* the Tower Leases are devoid of any buyout or similar provision, and, therefore, the Debtor cannot satisfy section 365(f)(5). *See Dishi & Sons*, 510 B.R. at 710-11; *see also In re Patriot Place, Ltd.*, 486 B.R. 773, 816 (Bankr. W.D. Tex. 2013) (in the real property context, courts have concluded that 11 U.S.C. §363(f)(5) does not support the sale of property free and clear of a leasehold interest where the subject lease contains no such provisions).

66.     Additionally, in the event that the Debtor rejects the Tower Leases, the Tower Lessees, pursuant to section 365(h)(1)(A)(ii), would retain their appurtenant rights to possession under the Tower Leases for the remainder of the Tower Leases terms and any extensions thereof. *See* 11 U.S.C. § 365(h)(1)(A)(i) and (ii). Accordingly, the mere rejection/material breach of any of the Tower Leases by the Debtor would provide no basis to extinguish any Tower Lessees' leasehold interest in the Tower Assets conferred thereby.

## **RESERVATION OF RIGHTS**

67.     The T-Mobile Entities expressly reserve their rights to supplement and/or amend this Sale Objection from time to time and at any time. The T-Mobile Entities further reserve any and all rights to raise any additional objections with respect to the Sale Motion or otherwise with respect to any relief as it may affect the interests of the T-Mobile Entities.

68.     The T-Mobile Entities further expressly reserve their rights to file, supplement and/or amend their request(s) for adequate protection on account of their interests in connection with the FCC Licenses and/or Leased Tower Assets.

WHEREFORE, the T-Mobile Entities respectfully request that the Court sustain the Sale

Objection and:

i.   Prohibit the sale of the FCC Licenses and Leased Tower Assets free and clear of the Lessee's respective interests therein; in the alternative, should the Court find that the Debtor has satisfied 11 U.S.C. § 363(f), and is prepared to approve the sale of the Assets free and clear of the Lessee's interests therein, order the Debtor to provide adequate protection to the Lessee in the form of continued access of the Spectrum, as well as specific performance of, *inter alia*, the Lease Preservation Rights, under the FCC Leases, or in a form otherwise ordered by the Court, and continued possession of the Leased Tower Assets.

ii.  Prohibit the assumption and assignment of the FCC Leases and Tower Leases unless and until the Debtor assumes and assigns to the buyer the FCC Leases and Tower Leases *cum onere* and satisfy the requirements of section 365 of the Bankruptcy Code with respect to such contracts.

iii. Grant such other and further relief to the T-Mobile Entities as the Court may deem proper.

Dated: January 18, 2023                          ALSTON & BIRD LLP
     New York, New York              By:   */s/ James J. Vincequerra*
                                                  James J. Vincequerra, Esq.
                                                  William Hao, Esq.
                                                  Dylan S. Cassidy, Esq.
                                                  Kimberly J. Schiffman, Esq.
                                                  90 Park Avenue
                                                  New York, New York 10016
                                                  Telephone: (212) 210-9400
                                                  Facsimile: (212) 210-9444
                                                  Email:  James.Vincequerra@alston.com
                                                            William.Hao@alston.com
                                                            Dylan.Cassidy@alston.com
                                                            Kimberly.Schiffman@alston.com

                                                  *Counsel to T-Mobile US, Inc. and WBSY Licensing, LLC*