PACHULSKI STANG ZIEHL & JONES LLP
James I. Stang, Esq. (admitted *pro hac vice*)
10100 Santa Monica Boulevard, 11th Floor
Los Angeles, California 90067
Telephone:     (310) 277-6910
Facsimile:     (310) 201-0760
Email:         jstang@pszjlaw.com

-and-

Ilan D. Scharf, Esq.
Karen B. Dine, Esq.
Brittany M. Michael, Esq.
780 Third Avenue, 36th Floor
New York, New York 10017
Telephone:     (212) 561-7700
Facsimile:     (212) 561-7777
Email:         ischarf@pszjlaw.com
               kdine@pszjlaw.com
               bmichael@pszjlaw.com

*Counsel for the Official Committee*
*of Unsecured Creditors of The Roman Catholic Diocese*
*of Rockville Centre, New York*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br>THE ROMAN CATHOLIC DIOCESE OF<br>ROCKVILLE CENTRE, NEW YORK,<br>　　　　　　　　　　　Debtor. | Chapter 11<br>Case No. 20-12345 (MG) |

**OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS TO PROPOSED ORDER (I) APPROVING THE SALE OF DEBTOR'S
ASSETS FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS AND
ENCUMBRANCES; (II) APPROVING THE ASSUMPTION AND ASSIGNMENT OF
EXECUTORY CONTRACTS AND UNEXPIRED LEASES IN CONNECTION
<u>THEREWITH; AND (III) GRANTING RELATED RELIEF</u>**

The Official Committee of Unsecured Creditors (the "Committee") of The Roman Catholic Diocese of Rockville Centre, New York (the "Diocese" or the "Debtor") in the above-captioned case (the "Case") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), by and through its undersigned counsel, makes this limited objection (the "Limited Objection") to the Debtor's *Proposed Order (I) Approving the Sale of Debtor's Assets Free and Clear of Liens, Claims, Interests and Encumbrances; (II) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection Therewith; and (III) Granting Related Relief* [Docket No. 1526-1] (the "Proposed Sale Order"). In support of its Limited Objection, the Committee respectfully states:

## PRELIMINARY STATEMENT

1. The Diocese is the eighth largest in the country and, based on the Committee's review of the financial information received over two long and hard-fought years of discovery, *has hundreds of millions of dollars* available to fund payments to survivors. Yet, rather than negotiate towards a consensual resolution that fairly compensates survivors, the Diocese has stopped negotiating with the survivors' representatives with respect to a mutually agreeable plan.

2. The Diocese filed this bankruptcy to protect itself and its assets in the face of hundreds of child sexual abuse lawsuits. More than that though, the Diocese filed this bankruptcy to protect the assets of its 135 parishes and at least 14 affiliates,[1] many of which are named as defendants in lawsuits and claims asserted by victims of child sexual abuse. None of the parishes or affiliates filed bankruptcy, and none are subject to the disclosure requirements and other protections for creditors of the Bankruptcy Code.

---

[1] *See Declaration of Charles Moore, Managing Director of Alvarez & Marsal North America, LLC, Proposed Restructuring Advisor to the Roman Catholic Diocese of Rockville Centre, New York, in Support of Chapter 11 Petition and First Day Pleadings* [Docket No. 3] (the "Moore Declaration") ¶¶ 15, 19.

2

3. Though the Diocese has yet to file a plan of reorganization,[2] the Diocese will undoubtedly seek third-party releases for its parishes and affiliates, as has *every* other diocese that has confirmed a reorganization plan. As the Diocese itself admits in the Moore Declaration, the Diocese, its parishes, and other affiliates operate as a collective and integrated enterprise (the "Enterprise") even though the parishes and affiliates are separately incorporated.

4. One of the Bishop's financial objectives leading up to the filing of this case was to ensure that "existing Diocese resources *not otherwise restricted or reasonably required* for the Diocese to serve the faithful and others in need are identified, [and are] preserved and made available to assist the Diocese *in providing care and compensation to the victims of clerical abuse* (the 'abuse survivors')."[3] Throughout this case, the Bishop and the Diocese have been true to their word and have prioritized their mission over the abuse survivors. Tragically, the Bishop and the Diocese do not consider their mission to include justice to the children who were sexually abused by priests and laypersons under the Diocese's control and supervision.

5. In furtherance of the Diocese putting its mission before the children it failed, the Diocese made several prepetition fraudulent transfers. Even after it fraudulently transferred hundreds of millions of dollars and property, the Diocese continues to make every effort to limit the financial resources available to compensate abuse victims, and instead to funnel assets to its mission, its affiliates, and its defensive army of professionals.

6. In 2017, with the looming risk of passage of the Child Victims Act extending the statute of limitations for childhood sexual abuse claimants, the Diocese transferred hundreds of

---

[2] The Committee filed a proposed plan of reorganization for the Diocese shortly before the filing of this Objection [Docket No. 1574] (the "Committee Plan"). Under the terms of the Committee Plan, the parishes and other affiliates may receive releases if they agree to make the contributions described in the Committee Plan.

[3] Moore Decl. ¶ 3 (emphasis added).

millions of dollars to existing or newly-created affiliates, attempting to place the funds beyond the reach of the victims of sexual abuse (the "IAC Transactions").[4] The Diocese's own Independent Advisory Committee (the "IAC"),[5] chaired by the Honorable Arthur J. Gonzalez (ret.),[6] determined that certain of the transfers "give rise to colorable claims on behalf of the Diocese."[7]

7. Now, having engaged in fraudulent transfers to reduce the assets for compensating victims, and in connection with a critical sale that should generate significant cash that should be "otherwise unrestricted" (the "Sale Proceeds"), the Diocese seeks to reserve tens of millions of dollars from the Sale Proceeds for its own administrative expenses, and tens of millions of dollars more from the Sale Proceeds for the Diocese's operations *upon emergence* from bankruptcy. Proposed Sale Order ¶¶ P, 27.

8. The reservation of these funds for the Diocese's stated uses serves absolutely no purpose and cannot be justified under any circumstances. *See* Financial Accounting Standards Board, Statement of Financial Accounting Standards No. 117, Financial Statements of Not-for-Profit Organizations ¶ 168 (June 1993) ("An organization's governing board may earmark a portion of its unrestricted net assets as a board-designated endowment . . . . The principal of a board-designated endowment, which results from an internal designation, is not donor restricted and is classified as unrestricted net assets."). The Sale Proceeds are property of the estate and are no different than any other unrestricted property of the estate. If the Diocese has

---

[4] The Diocese and Committee reached an agreement providing standing to the Committee to pursue the IAC Transactions. *See generally Joint Stipulation and Order Concerning the Independent Advisory Committee and the Investigation and Pursuit of Certain Claims* [Docket No. 512].

[5] *See* Moore Decl. ¶ 121.

[6] *See Application for Entry of an Order Authorizing the Employment and Retention of Otterbourg P.C. Effective as of October 1, 2020 as Counsel to the Independent Advisory Committee* [Docket No. 60] ¶ 11.

[7] *Debtor's Reply in Support of the Retention Applications* [Docket No. 150] at 7.

4

administrative expenses that must be paid, these unrestricted funds can be used to pay them. If the Diocese intends to subsidize its mission and its enterprise after confirmation of a plan, it should file a plan that proposes the diversion of unrestricted funds from creditors to the beneficiaries of the subsidy.

9. In effect, the Diocese is seeking the Court's approval of a board-designated restricted fund which really is a *sub rosa* plan to the extent it takes value from creditors and gives it to the charitable mission. The Proposed Sale Order effectively restricts otherwise unrestricted assets, with no disclosure of the myriad other sources of funds available to the Diocese from its own assets and from the assets of the Enterprise to fund the Diocese during this case or after bankruptcy. The Diocese presents no financial information or evidence to support its request for such extraordinary relief.

10. The Diocese will likely argue that funds belonging to other members of the Enterprise are not funds that the Court can compel the Diocese to access. However, the Diocese should not be able to hide behind these excuses as a justification to funnel yet more funds away from the abuse survivors and to itself and its affiliates after the bankruptcy.

11. This especially is true when the Diocese disclaims any ability to access the funds of its affiliates while seeking to subsidize an affiliate with the proceeds of the sale from the FCC Licenses.[8] This Court cannot permit the Diocese to have it both ways.

12. The Diocese has no plan on file and has provided no projections of or analysis related to its and its Enterprise's operation after bankruptcy and the actual need for the tens of millions of dollars in funds otherwise readily available to survivors. The Sale Proceeds should

---

[8] The Diocese seeks to use the $20 million of reserved funds for post-petition operations including, as it notes in a parenthetical, "funding expenses for certain media services provided by an affiliate of the Debtor." Proposed Sale Order ¶ 27.

5

not be foreclosed from use by the survivors in a plan, whether proposed by the Diocese, the Committee, or another party.

13. This Court should not countenance the Diocese's continued machinations purportedly to move money out of the Diocese's immediate reach so it can turn around and claim that it lacks funds to compensate fairly the victims of abuse and to claim it is offering the victims all it can.

14. If the Diocese seeks to emerge from this bankruptcy with a consensual plan providing for third-party releases of its parishes, affiliates, and other members of its Enterprise, then it needs to be frank with this Court and the survivors about the funds actually available to satisfy the claims of survivors and to support the Diocese's Enterprise and its mission into the future. It should not be allowed to sequester funds for its post-bankruptcy Enterprise without a creditors' vote.

15. Further, the Court should try to protect the victims of abuse from the Debtor's unfettered dissipation of the Sale Proceeds. This Court should limit the funds that can be used for administrative expenses based on *actual* financial information provided by the Diocese as to its (and not its Enterprise's) *reasonable* administrative funding needs. The Diocese should not be permitted to spend the Sale Proceeds without the consent of the Committee and without notice and a hearing by this Court to determine that the use of the Sale Proceeds is actually necessary for the continued administration of this Case.

DOCS_NY:46887.9 18491/002

**BACKGROUND**

16. On October 1, 2020 (the "Petition Date"), the Debtor commenced this Case by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code. Pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, the Debtor continues to operate as debtor in possession.

17. No trustee or examiner has been appointed in this Case.

18. On October 16, 2020, the United States Trustee for Region 2 appointed nine members to the Committee. The Committee comprises eight survivors of childhood sexual abuse by individuals for whom the Diocese is responsible and one representative of a minor with a tort claim pending against the Diocese.

19. On November 22, 2022, this Court entered the *Order (I)(A) Approving Bidding Procedures for the Sale of the Debtor's Assets, (B) Authorizing the Debtor to Enter into One or More Stalking Horse Purchase Agreements and to Provide Bid Protections Thereunder, (C) Scheduling an Auction and Approving the Form and Manner of Notice Thereof, (D) Approving Assumption and Assignment Procedures and (E) Scheduling a Sale Hearing and Approving The Form and Manner of Notice Thereof; and (II) Granting Related Relief* [Docket No. 1471] (the "Bidding Procedures Order"), attaching the Bidding Procedures (as defined in the Order) as Exhibit 1.[9]

20. As set forth in the Bidding Procedures, the Diocese is seeking to sell certain assets (the "FCC Assets"), including:

---

[9] The Bidding Procedures were subsequently modified with the revised version attached as Exhibit A to the *Notice of Revised Bidding Procedures* [Docket No. 1514].

- the Debtor's entire right, title and interest in the four Federal Communication[s] Commission Licenses with call signs KNZ65, KNZ67, KNZ68, and WHR845 (the "FCC Licenses");

- the Debtor's entire right, title and interest in (x) three antenna structures and associated improvements owned with FCC Antenna Registration Numbers 1006408 (Syosset), 1006409 (Uniondale), and 1006410 (Islip) (the "Cell Towers") and (y) the real property on which the Syosset and Islip Cell Towers sit (collectively, the "Syosset and Islip Real Property");

- the Debtor's entire right, title and interest in the real property on which the Uniondale Cell Tower sits (for which the Debtor is exploring sale options) (the "Uniondale Real Property" and, with the Syosset and Islip Real Property, the "Real Property"); and

- the Debtor's entire right, title and interest in . . . all of the Debtor's contracts, leases and other documents and agreements related to the FCC Licenses and Cell Towers, including, but not limited to, FCC Lease ID numbers L000042788, L000042789, L000042790, and L000042791 (collectively, the "Related Contracts" and, together with the FCC Licenses, the Cell Towers, and the Real Property, the "Assets").[10]

21. The FCC Assets are among the Debtor's most valuable non-restricted assets that can be monetized quickly. The cash generated by the FCC Assets will functionally be the most readily available source of cash for funding recoveries to the victims of childhood sexual abuse.

22. The Sale Proceeds will be cash readily available to compensate fairly victims of childhood sexual abuse. They are unlike certain restricted funds available to fund the Diocese's operations, funds that the Diocese placed out of the immediate reach of its creditors, or funds held by the Parishes and affiliates of the Diocese.

23. Recognizing this, the Diocese seeks through the Proposed Sale Order to preempt the survivors from having access to those funds by restricting them in advance and determining their use.

---

[10] Bidding Procedures [Docket No. 1514-1] at 2–3.

24. With its requests in paragraphs P and 27 of the Proposed Sale Order (set forth below), the Debtor has provided no information, let alone evidence, as to the necessity for restricting the use of those funds in the self-serving way it proposes, or why such restrictions are in the best interests of the estate.

25. Pursuant to the Bidding Procedures, the Debtor filed the Proposed Sale Order on December 26, 2022.

26. The Proposed Sale Order contains, verbatim, these provisions and proposed judicial findings:

- Loss of Income Stream. Throughout this chapter 11 case, the Assets have provided the Debtor with a valuable source of income that (a) the Debtor has been utilizing to satisfy its ongoing administrative expenses in this chapter 11 case, and (b) absent the Sale Transaction, would have played a key part in funding the operations of the Debtor's charitable mission upon the emergence of the Debtor from this chapter 11 case. Upon the Closing Date, due to the Sale Transaction, the Debtor will no longer have access to this valuable income stream, either for (a) satisfying its ongoing administrative expenses or (b) funding its post-emergence charitable operations. ***The Court thus finds it necessary and appropriate, and in the best interests of the Debtor, its estate, its creditors and all parties in interest, to require the Debtor to fund, upon the Closing Date, and from the proceeds of the Sale Transaction, the Administrative Expense Reserve Account (as defined below) and the Reorganized Debtor Reserve Account (as defined below).***[11]

- Reserve Accounts. On the Closing Date, the Debtor shall deposit (a) [$30,000,000] of the proceeds of the Sale Transaction in a segregated account (the "Administrative Expense Reserve Account"), and the sole purpose of the funds so deposited (unless otherwise agreed by the Debtor in writing) shall be for the Debtor to use such funds to satisfy the Debtor's ongoing expenses of administration in this chapter 11 case and/or repayment of any debtor-in-possession financing incurred by the Debtor in this chapter 11 case;[12] and (b) [$20,000,000] of the proceeds of the Sale

---

[11] Proposed Sale Order ¶ P (emphasis added).

[12] The Committee does not believe that any debtor-in-possession financing is necessary for the Diocese, and any request for the same is just a further ploy by the Diocese to support its pretense that it lacks funds meaningfully to compensate survivors of child sexual abuse. *See Objection of the Official Committee of Unsecured Creditors to Debtor's Application for an Order Approving Amendment to the Terms and Conditions of the Debtor's Retention of Jefferies LLC as Investment Banker nunc pro tunc to December 1, 2022* [Docket No. 1548].

9

>       Transaction in a segregated account (the "Reorganized Debtor Reserve
>       Account"), and the funds so deposited shall be held by the Debtor (unless
>       otherwise agreed by the Debtor in writing) solely for the funding of the
>       operations of the Debtor's charitable mission upon the emergence of the
>       Debtor from this chapter 11 case (including, but not limited to, ***funding
>       expenses for certain media services provided by an affiliate*** of the
>       Debtor).[13]

27.     While busy making sure it has money for its lawyers and its affiliate, the Diocese is silent about providing the proceeds of the sale to compensate survivors of childhood sexual abuse.

28.     The Committee therefore objects to the purported finding in paragraph P of the Proposed Sale Order that it is appropriate and in the best interests of the estate to reserve funds for use by the Diocese after emergence from bankruptcy.

29.     The Committee further objects to the creation and funding of the Reserve Accounts in paragraph 27 of the Proposed Sale Order.

## OBJECTION

30.     The Debtor should not be permitted to reserve portions of the Sale Proceeds for administrative expenses or for the Diocese's exclusive use after its emergence from this Case, as doing so effectively dictates critical components of any plan of reorganization for the Debtor with none of the protections to the creditors, largely survivors of childhood sexual abuse, afforded by the Bankruptcy Code. *See Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452, 466 (2d Cir. 2007) (noting that "the trustee is prohibited from such use, sale or lease" of property of the estate under section 363(b) of the Bankruptcy Code "if it would amount to a *sub rosa* plan of reorganization"); *In re LATAM Airlines Grp. S.A.*, 620 B.R. 722, 812–13 (Bankr. S.D.N.Y. 2020) (stating that the concern of a

---

[13] Proposed Sale Order ¶ 27 (emphasis added).

*sub rosa* plan is that it deprives creditors of the protections of the chapter 11 plan process); *In re Crowthers McCall Pattern, Inc.*, 114 B.R. 877, 885 (Bankr. S.D.N.Y. 1990) (finding that the court cannot approve a transaction that is a "'creeping' or *de facto* plan if timely objection is made that the transaction, either in fact or in effect, encroaches on a right afforded creditors or equity holders in the Chapter 11 plan process, particularized by the objector").

31.     Reserving funds for post-emergence use raises *sub rosa* plan concerns, as restricting significant, otherwise-free cash funds for use post-emergence may materially—albeit artificially—limit cash available to pay pre-petition creditors, impairing their recovery for the sake of allowing post-discharge creditors the cushion of estate assets. Reserving funds for post-emergence operations, before there is a plan and a disclosure statement, deprives creditors of critical information to evaluate whether those funds are actually necessary for such post-emergence operation, including whether there are other sources of funds for those operations. *See Contrarian Funds, LLC v. Westpoint Stevens, Inc. (In re Westpoint Stevens, Inc.)*, 333 B.R. 30, 52 (S.D.N.Y. 2005) (finding that the allocation of sale proceeds among creditors usurped the role of the plan confirmation process, and stating that "[w]here it is clear that the terms of a section 363(b) sale would preempt or dictate the terms of a Chapter 11 plan, the proposed sale is beyond the scope of section 363(b) and should not be approved under that section"), *aff'd in part and rev'd in part*, 600 F.3d 231 (2d Cir. 2010).

32.     In a plan process, the Diocese will need to demonstrate the feasibility of its proposed plan. It will need to provide adequate financial information to justify its need for any amount of otherwise unrestricted cash to the detriment of its creditors post-emergence for feasibility, and creditors can question and challenge that information. The burden will be on the

Debtor to demonstrate its need to reserve those funds for itself rather than providing them to its creditors.

33. The Debtor is using the Proposed Sale Order to circumvent the strictures of the Bankruptcy Code plan process to predetermine the use of otherwise unrestricted funds. There is no justification for the Diocese's proposed end-run around the Bankruptcy Code, and this Court should not permit it.

34. In this case, the Committee anticipates that the Diocese will maintain that it does not control the assets of its affiliates and that such assets are not available to the Diocese to fund a plan. Yet in the Proposed Sale Order, the Debtor seeks to use its otherwise unrestricted cash for subsidizing an affiliate post-emergence. The Debtor should not be permitted to have it both ways. If the assets of affiliates cannot be accessed to fund the claims, then funds otherwise available to pay claims should not be turned over to affiliates.

35. The Diocese, having divested itself of assets in pre-bankruptcy "planning," should not in bankruptcy be permitted to receive money and cache it in the crypt, only to turn around and claim poverty to avoid compensating the survivors of childhood sexual abuse.

36. Similarly, though the Diocese's unrestricted cash can be used for payment of ongoing administrative expenses, it is premature to restrict funds for that purpose as part of the Proposed Sale Order. As with the funds the Diocese will need for post-emergence operations, there are other sources of funds available to the Diocese to satisfy its administrative expenses. Using the Sale Proceeds for administrative expenses should not be predetermined and artificially restricted.

37. The unfortunate reality of this case is that there may be another $30 million of professional expenses before there is a viable plan of reorganization. The Committee submits

that rather than pre-funding a war chest for the professionals by setting aside an express amount of the Sale Proceeds for administrative expenses, a limit should be set on the amount of the Sale Proceeds to be used for administrative expenses, and the balance of the Sale Proceeds should be reserved and only accessible for uses that effectuate the purposes of this Case after notice and a hearing.  As the amount of the Sale Proceeds is not yet known, the Committee submits that any such amounts should be determined based on the actual Sale Proceeds.

## RESERVATION OF RIGHTS

38.    The Committee reserves the right to supplement and amend this Objection and introduce evidence at any hearing on entry of the Proposed Sale Order.  To the extent the Diocese or any other party seeks to introduce evidence supporting the entry of the Proposed Sale Order at a hearing, the Committee reserves its right to seek discovery regarding such evidence.  Further, the Committee reserves the right to respond, further object, join in, or amend any objection made by any person relating to the Sale Order.

## CONCLUSION

39.    The Committee supports the sale of the FCC Assets for the greatest amount possible and recognizes that the Sale Proceeds can be used by the Diocese to satisfy certain administrative expenses.  The Committee objects to any specific reservation of the Sale Proceeds.  Additionally, rather than establishing a "reserve" for payment of administrative claims, the Sale Proceeds that can be used for administrative expenses should be limited to an amount to be determined based on the anticipated Sale Proceeds, and the Diocese or other interested party should have to seek the approval of this Court, upon notice and a hearing, of the release of any further amounts of the Sale Proceeds.

WHEREFORE, the Committee respectfully requests this Court not approve paragraphs **P** and **27** of the Proposed Sale Order. The Court should direct the Diocese to amend the Proposed Sale Order to provide that the Sale Proceeds are reserved, provided that upon notice and a hearing the Court may determine a specified portion of the Sale Proceeds that may be used by the Diocese for the payment of administrative expenses. Any further use of the Sale Proceeds should be subject to the approval of the Bankruptcy Court after notice and a hearing. The Committee further requests that the Court grant such other and further relief as the Court deems just and proper.

Dated: New York, New York
January 19, 2023

PACHULSKI STANG ZIEHL & JONES LLP

*/s/ James I. Stang*
James I. Stang, Esq. (admitted *pro hac vice*)
10100 Santa Monica Boulevard, 11th Floor
Los Angeles, California 90067
Telephone:   (310) 277-6910
Facsimile:    (310) 201-0760
Email:          jstang@pszjlaw.com

-and-

Ilan D. Scharf, Esq.
Karen B. Dine, Esq.
Brittany M. Michael, Esq.
780 Third Avenue, 36th Floor
New York, New York 10017
Telephone:   (212) 561-7700
Facsimile:    (212) 561-7777
Email:          kdine@pszjlaw.com
                    ischarf@pszjlaw.com
                    bmichael@pszjlaw.com

*Counsel for the Official Committee
of Unsecured Creditors of The Roman Catholic
Diocese of Rockville Centre, New York*

14