**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Case No. 20-12345 (MG) |
| | ) |
| THE ROMAN CATHOLIC DIOCESE OF | ) Chapter 11 |
| ROCKVILLE CENTRE, NEW YORK, | ) |
| | ) |
| Debtor. | ) |
| | ) |

**FIRST AMENDED CHAPTER 11 PLAN OF REORGANIZATION PROPOSED BY THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS**

PACHULSKI STANG ZIEHL & JONES LLP
James I. Stang, Esq.
Ilan D. Scharf, Esq.
Iain Nasatir, Esq.
Karen Dine, Esq.
Brittany M. Michael, Esq.
780 Third Avenue, 36th Floor
New York, NY 10017-2024
Telephone: 212/561-7700
Facsimile: 212/561-7777
jstang@pszjlaw.com

BURNS BAIR LLP
Timothy W. Burns (*pro hac vice*)
Jesse J. Bair (*pro hac vice*)
10 E. Doty St., Suite 600
Madison, Wisconsin 53703
608-286-2808

*Attorneys for Official Committee of Unsecured Creditors.*

Dated: New York, New York
          February 3, 2023

# TABLE OF CONTENTS

**Page**

SECTION I . RULES OF INTERPRETATION......................................................................... 1

SECTION II DEFINITIONS ................................................................................................. 2

SECTION III PLAN OBJECTIVES AND MEANS OF FUNDING ....................................... 16

SECTION IV TREATMENT OF UNCLASSIFIED CLAIMS.................................................. 18

SECTION V CLASSIFICATION OF CLAIMS. ...................................................................... 19

SECTION VI TREATMENT OF UNIMPAIRED CLASSES OF CLAIMS.............................. 20

SECTION VII TREATMENT OF IMPAIRED CLAIMS ........................................................ 22

SECTION VIII ACCEPTANCE OR REJECTION OF PLAN ................................................. 27

SECTION IX TRUST........................................................................................................... 27

SECTION X LIQUIDATION AND PAYMENT OF ABUSE CLAIMS .................................. 28

SECTION XI INSURANCE MATTERS................................................................................. 31

SECTION XII MEANS FOR IMPLEMENTATION OF THE PLAN ...................................... 36

SECTION XIII LITIGATION ............................................................................................... 43

SECTION XIV CONDITIONS PRECEDENT ....................................................................... 44

SECTION XV EFFECTS OF PLAN CONFIRMATION AND DISCHARGE ......................... 45

SECTION XVI TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED
LEASES................................................................................................................ 54

SECTION XVII NON-MONETARY COMMITMENTS......................................................... 54

SECTION XVIII MISCELLANEOUS PROVISIONS. ........................................................... 54

SECTION XIX RECOMMENDATIONS AND CONCLUSION ............................................. 62

The Official Committee of Unsecured Creditors proposes the following Plan under Chapter 11 of the Bankruptcy Code.

Refer to the Disclosure Statement for this Plan for a discussion of the Debtor's history, businesses, assets, Case, risk factors, summary and analysis of the Plan, and certain other related matters.

Subject to section 1127 of the Bankruptcy Code and those restrictions on modification in Section XVIII, the Committee reserves the right to amend, alter or modify the Plan one or more times before its substantial consummation.

## SECTION I.
## RULES OF INTERPRETATION

1.1    The rules of construction in Bankruptcy Code section 102 apply to this Plan to the extent not inconsistent with any other provision in this Section I.

1.2    In computing any period prescribed or allowed by the Plan, unless otherwise provided, Bankruptcy Rule 9006(a) shall apply.  If any act is required to be performed on a date that is not a Business Day, then the performance of such act may be completed on the next succeeding Business Day, but shall be considered to have been completed as of the required date. Enlargement of any period prescribed or allowed by the Plan shall be governed by Bankruptcy Rule 9006(b).

1.3    A term used in this Plan and not defined in this Plan has the meaning attributed to that term in the Bankruptcy Code or the Bankruptcy Rules.

1.4    The definition given to any term or provision supersedes and controls any different meaning that may be given to that term or provision in the Bankruptcy Code, the Bankruptcy Rules, the Disclosure Statement or the Trust Documents.

1.5    Whenever it is appropriate from the context, each term, whether stated in the singular or the plural, includes both the singular and the plural.

1.6    Any reference to a document or instrument being in a particular form or on particular terms means that the document or instrument will be substantially in that form or on those terms.  No material change to the form or terms may be made after the Confirmation Date without the consent of any party materially affected.

1.7    Any reference to an existing document means the document as it has been, or may be, amended or supplemented.

1.8    Unless otherwise indicated, the phrase "under the Plan" and the words "herein" and "hereto" and similar words or phrases refer to this Plan in its entirety rather than to only a part of the Plan.

1.9    Unless otherwise specified, all references to sections, clauses or exhibits are references to this Plan's sections, clauses or exhibits.

1

1.10    Section captions and headings are used only as convenient references and do not affect the Plan's meaning.

1.11    All definitions in the Bankruptcy Code and below will be subject to the rules of construction in section 102 of the Bankruptcy Code.  In addition, using the words "includes" or "including" is not limiting, and means "including but not limited to" and "including without limitation;" "and/or" means either or both, and the words "related to" or "relating to" mean regarding, from, based on, arising out of, or connected with.

1.12    Nothing in this Plan is an admission or denial by any party of liability for, or the validity, priority, amount, or extent of any Claim, lien, or security interest asserted against the Debtor or against any third party.

## SECTION II
## DEFINITIONS

2.1    "Abuse" means any actual or alleged sexual conduct or misconduct, sexual abuse or molestation, indecent assault and/or battery, rape, pedophilia, ephebophilia, or sexually-related physical, psychological, or emotional harm, or contacts, or interactions of a sexual nature between a child and an adult, or a nonconsenting adult and another adult, sexual assault, sexual battery, sexual psychological or emotional abuse, humiliation, or intimidation, or any other conduct constituting a sexual offense, incest, or use of a child in a sexual performance (as such terms are defined in the New York Penal Law).

2.2    "Abuse Claim" means any claim (as defined in section 101(5) of the Bankruptcy Code), including, but not limited to any Future Abuse Claim, against the Debtor resulting or arising in whole or in part, directly or indirectly from Abuse, and seeking monetary damages or any other relief, under any theory of liability, including vicarious liability, any negligence-based theory, contribution, indemnity, or any other theory based on any acts or failures to act by the Diocese or any other person or entity for whose acts or failures to act the Diocese is or was allegedly responsible.  "Abuse Claim" does not include any Abuse Related Contingent Contribution/Reimbursement/Indemnity Claims, Extra-Contractual Claims, or Insurance Claims. To avoid doubt, Abuse Claim includes no Claims first arising after the Petition Date or based only on conduct following the Petition Date.

2.3    "Abuse Claims Reviewer" means the person, including the designee of such person, whose role is defined in the Trust Allocation Protocol.  Subject to the Plan's provisions for replacement of the Abuse Claims Reviewer, the Abuse Claims Reviewer is _____.

2.4    "Abuse Claimant" means the holder of an Abuse Claim, the estate of a deceased Abuse Claimant, or the personal executor or personal representative of the estate of a deceased Abuse Claimant and under the Trust Allocation Protocol and the Future Abuse Claim Trust Allocation Protocol.

2.5    "Abuse Litigation" means a lawsuit asserting an Abuse Claim against the Debtor or any Participating Party.

2

2.6    "Abuse Related Contingent Contribution/Reimbursement/Indemnity Claim" means any Entity's Claim against any other Entity for contribution, indemnity, or reimbursement arising because of such Entity having paid or defended against any Abuse Claim including but not limited to a joint tortfeasor or the like.    To avoid doubt, an Abuse Related Contingent Contribution/Reimbursement/Indemnity Claim is not an Abuse Claim.

2.7    "Administrative Claim" means a Claim for payment of an administrative expense of a kind specified in section 503(b) of the Bankruptcy Code and entitled to priority under section 507(a)(2) of the Bankruptcy Code, including (a) any actual and necessary costs and expenses, incurred after the Petition Date, of preserving the Estate and operating the business of the Debtor, (b) Professional Fee Claims, (c) any Claim specified in section 503(b)(9) of the Bankruptcy Code and (d) all fees and charges assessed against the Estate under chapter 123 of title 28 of the United States Code.

2.8    "Administrative Claimant" means the holder of an Administrative Claim.

2.9    "Allianz Insurers" means, collectively, Interstate Fire & Casualty Company, Fireman's Fund Insurance Company, and National Surety Corporation.

2.10    "Allowance Date" means the date a Claim becomes Allowed.

2.11    "Allowed" means a Claim or part of it:  (a) that has been allowed by a Final Order; (b) which has been scheduled by the Debtor as not disputed, not contingent and not unliquidated, for which no proof of claim has been timely filed and as to which no objection has been filed by the Claims Objection Deadline; (c) as to which a proof of claim in a liquidated and non-contingent amount has been timely filed and as to which no objection has been filed by the Claims Objection Deadline or any objection has been settled or withdrawn, or has been denied by a Final Order; (d) that is expressly allowed by the terms of this Plan; or (e) that is deemed allowed under the Trust Allocation Protocol.

2.12    "Arrowood" means Arrowood Indemnity Company, formerly known as Royal Indemnity Company, as successor by merger to Royal Insurance Company of America.

2.13    "Arrowood Insurance Claims" means Insurance Claims against Arrowood.

2.14    "Arrowood Insurance Recoveries" means Insurance Recoveries regarding Arrowood Insurance Claims.

2.15    "Avoidance Rights" means those rights to avoid and recover transfers, liens, or obligations, described in sections 544 – 553, inclusive, of the Bankruptcy Code, and any other rights provided for under applicable law that avoid certain transfers.

2.16    "Award" means the amount payable to an Abuse Claimant as determined in accordance this Plan.

2.17    "Ballot" means the ballot used by a Creditor to accept or reject the Plan, and under which Claimants will make certain elections regarding the treatment of their Claims as provided in the Plan.

DOCS_NY:46991.4 18491/002

2.18    "Bankruptcy Code" means Title 11 of the United States Code, 11 U.S.C. §§ 101-1532, and any amendments thereto applicable to this Case.

2.19    "Bankruptcy Court" means the United States Bankruptcy Court for the Southern District of New York, or such other court having jurisdiction over this Case or any proceeding within.

2.20    "Bankruptcy Rules" means the Rules and Forms of Practice and Procedures in Bankruptcy promulgated under 28 U.S.C. § 2075, as amended, and the local rules and general orders of the Bankruptcy Court, as applicable to the Case, with all amendments and modifications thereto.

2.21    "Bishop" means Bishop John O. Barres, or such other individual who may become the acting diocesan bishop of the Diocese.

2.22    "Business Day" means any day other than Saturday, Sunday, or a "legal holiday," as that term is defined in Bankruptcy Rule 9006(a).

2.23    "Canon Law" means and refers to the 1983 Code of Canon Law applicable to the Roman Catholic Church.  References to Canon Law in the Plan are for discussion purposes only.  Nothing in the Plan or any Plan Document shall make Canon Law binding on any Person; nor shall Canon Law govern any provision of the Plan or any Plan Document.

2.24    "Case" means the case under Chapter 11 of the Bankruptcy Code commenced by The Roman Catholic Diocese of Rockville Centre on October 1, 2020, Case No. 20-12345.

2.25    "Cash" means cash, cash equivalents, bank deposits, and negotiable instruments payable on demand.

2.26    "Causes of Action"  means any claims, demands, rights, actions, causes of action and suits of the Debtor's Estate, of any kind or character, known or unknown, suspected or unsuspected, matured or unmatured, whether arising before, on or after the Petition Date, in contract or in tort, at law or in equity or under any other theory of law, of the Debtor's Estate, including but not limited to (1) rights of setoff, counterclaim or recoupment, and Claims on contracts or for breaches of duties imposed by law; (2) the right to object to Claims or interests; (3) Claims under section 362 of the Bankruptcy Code; (4) such Claims and defenses as fraud, negligence, breach of fiduciary duty, corporate waste, unlawful dividends, mistake, duress and usury; (5) all Avoidance Rights; (6) claims for tax refunds; (7)  and (8) any other claims which may be asserted against third parties or insiders.

2.27    "Cemetery" means the Catholic Cemeteries of the Roman Catholic Diocese of Rockville Centre, Inc. and Diocese of Rockville Centre Catholic Cemetery Permanent Maintenance Trust.

2.28    "Channeled Claim" means any Abuse Claim, and/or Claim against a Participating Party or Settling Insurer arising from, in connection with, or related to an Abuse Claim or any of the Settling Insurer Policies, including any Related Insurance Claim.  Each Claim described in this Section shall include all such Claims whenever and wherever arising or asserted, whether sounding

4

in tort, contract, warranty or any other theory of law, equity or admiralty, including without limitation all Claims by way of direct action, subrogation, contribution, indemnity, alter ego, statutory or regulatory action, or otherwise, Claims for exemplary or punitive damages, for attorneys' fees and other expenses, or for any equitable remedy. A Channeled Claim does not include an Abuse Claim against: a Person having personally committed an act or acts of Abuse, and the Holy See. A Channeled Claim includes any Claim against a Participating Party or Settling Insurer based on allegations it is an alter ego of an Entity that is not a Participating Party or Settling Insurer or that the Participating Party's or Settling Insurer's corporate veil should be pierced as to Claims against an Entity that is not a Participating Party or Settling Insurer. If Ecclesia funds the Agreed Amount under the Full or Partial Settlement Alternatives, the Civil Rights Claims become Channeled Claims.

2.29    "Channeling Injunction" means the injunction provided for under Section 16.9 and any injunction provided for in, or required by, any Bankruptcy Court-approved agreement with a Participating Party or a Settling Insurer.

2.30    "Chapter 11 Professionals" means, collectively, the Debtor's Professionals, the Future Claims Representative, the Future Claims Representative's Professionals, the Special Mediator, the Special Mediator's Professionals, the Mediator, and the Committee's Professionals.

2.31    "Civil Rights Claim" means the Claims listed on Exhibit J. To avoid doubt, no Abuse Claim is a Civil Rights Claim.

2.32    "Claim" means any past, present or future claim, demand, action, requests Cause of Action, suit, proceeding or liability of any kind or nature, whether at law or equity, known or unknown, asserted or unasserted, expected or unexpected, accrued or unaccrued, fixed or contingent, which has been or may be asserted by or on behalf of any Person, whether seeking damages (including compensatory, punitive, or exemplary damages) or equitable, required, injunctive, or any other relief, including cross-claims, counterclaims, third-party claims, suits lawsuits, administrative proceedings, notices of liability or potential liability, arbitrations, actions, rights Causes of Action, orders, or  claims, as that term is defined in section 101(5) of the Bankruptcy Code; despite any statute of limitations defense.

2.33    "Claimant" means a holder of a Claim.

2.34    "Claims Bar Date" means any date set by Final Order of the Bankruptcy Court as the last date for filing Claims against the Estate, including (i) March 30, 2021 (General Bar Date), (ii) August 14, 2021 (Sex Abuse Claim Bar Date), and (iii) October 10, 2022 (Adult Abuse Claims Bar Date).

2.35    "Claims Objection Deadline" means, unless extended by the Court, the first Business Day that follows the sixtieth (60th) day after the Effective Date, by which any objection to a Claim (excluding Class 4 Claims) must be filed with the Bankruptcy Court or such objection will be forever barred.

2.36    "Closing" means the payments and transfers to the Trust of those assets required to be paid and transferred under Section 10.10.2.

5

2.37    "Co-Defendant" means a defendant in a lawsuit in which the Debtor is also named as a defendant, and/or who is alleged to be fully or partially responsible for a Claim asserted, or which may be asserted in the future, against both such defendant and the Debtor, including Co-Debtor as described in section 509 of the Bankruptcy Code.  A Participating Party or Settling Insurer is not a Co-Defendant.

2.38    "Committee" means the Official Committee of Unsecured Creditors appointed by the United States Trustee in the Case, as such committee may be reconstituted occasionally.

2.39    "Committee's Professionals" means all professionals that the Committee has retained or may retain to provide professional services under section 1103(a) of the Bankruptcy Code and/or retained by Bankruptcy Court order, including the *Order Authorizing the Retention of Experts* (Docket No. 783).

2.40    "Confirmation Date" means the date of the entry of the Confirmation Order.

2.41    "Confirmation Hearing" means the hearing held by the Bankruptcy Court regarding confirmation of the Plan, as such may be continued occasionally.

2.42    "Confirmation Order" means a Final Order confirming the Plan.

2.43    "Contingent" means, regarding a Claim, a Claim that has not accrued or is not otherwise payable and the accrual of which or the duty to make payment on which depends upon a future event that might occur.

2.44    "Contribution Date" means the fifteenth (15th) day after entry of the Confirmation Order.

2.45    "Current Obligations" means (a) all accounts payable and other liabilities or obligations of the Debtor that arose or accrued in the ordinary course of the Debtor's business after the Petition Date and before the Confirmation Date (excluding any Abuse Claims) and (b) any taxes incurred after the Petition Date and became or become legally due by the Debtor after the Petition Date and before the Confirmation Date.

2.46    "Debtor" means The Roman Catholic Diocese of Rockville Centre, a New York not-for-profit corporation.

2.47    "Debtor's Professionals" means all professionals that the Debtor has retained or may retain to provide professional services under section 1103(a) of the Bankruptcy Code and/or retained by Bankruptcy Court order, including the *Order Authorizing the Retention of Experts* (Docket No. 783).

2.48    "Department of Education" means the Department of Education, Diocese of Rockville Centre.

2.49    "Diocese" means The Roman Catholic Diocese of Rockville Centre, the Debtor or the Reorganized Debtor.

6

2.50    "Disallowed Claim" means (i) a Claim, or any part of it, that has been disallowed by a Final Order; (ii) a Claim listed in the Schedules at zero or as contingent, disputed, or unliquidated and as to which no proof of Claim has been timely filed or considered timely filed with the Bankruptcy Court under the Bankruptcy Code, Final Order, or other applicable law; or (iii) a Claim not listed in the Schedules and as to which no proof of Claim has been timely filed or considered timely filed with the Bankruptcy Court under the Bankruptcy Code, Final Order, or other applicable law.

2.51    "Disclosure Statement" means the Disclosure Statement relating to this Plan, as it may be amended occasionally.

2.52    "Disclosure Statement Order" means the order entered by the Bankruptcy Court approving the Disclosure Statement.

2.53    "Disputed Claim" means a Claim as to which a proof of Claim is filed or is considered filed under Bankruptcy Rule 3003(b)(1) and as to which an objection: (1) has been timely filed; (2) has neither been overruled nor been denied by a Final Order; and (3) has not been withdrawn.

2.54    "Distribution" means any transfer of Cash or other property or instruments to a Claimant by the Debtor, Reorganized Debtor, or the Trustee.

2.55    "Direct Action Claim" means any Claim by any Entity against a Settling Insurer identical or similar to, or relating to, any Abuse Claim.

2.56    "Ecclesia" means Ecclesia Assurance Company.

2.57    "Effective Date" means the first Business Day after the Confirmation Date on which (i) all conditions to effectiveness specified in Section 14.1 have been satisfied or waived and (ii) no stay of the Confirmation Order is in effect.

2.58    "Estate" means the bankruptcy estate of the Debtor as created under section 541 of the Bankruptcy Code.

2.59    "Evanston" means Evanston Insurance Company, successor by merger to Associated International Insurance Company.

2.60    "Exculpated Parties" means the Participating Parties; the Released Parties; the Settling Insurers, the Committee and each of its members and each of their representatives; the Debtor's Professionals; the Committee's Professionals; the Future Claimant Representative; the Future Claimant Representative's Professionals; the Special Mediator; the Special Mediator's Professionals; the Mediator; the Settling Insurers; and all of their respective Related Parties.

2.61    "Extra-Contractual Claim" means any Claim against any Settling Insurer relating to: (a) allegations that any Settling Insurer acted in bad faith or in breach of any express or implied duty, obligation or covenant, contractual, statutory or otherwise, including any Claim because of alleged bad faith; (b) failure to act in good faith; (c) failure to provide Insurance Coverage under any Insurance Policy; (d) violation or breach of any covenant or duty of good faith and fair dealing,

7

whether express, implied or otherwise; (e) violation of any statute, regulation or code governing unlawful, unfair, or fraudulent competition, business, or trade practices, and/or untrue or misleading advertising, including any violation of any unfair claims practices act or similar statute, regulation, or code; (f) failure to investigate or provide a defense or an adequate defense; (g) any other act or omission of any Settling Insurer of any type for which the claimant seeks relief other than coverage or benefits under a policy of insurance; (h) any Settling Insurer's handling of any Claim or any request for Insurance Coverage, including any request for coverage for and/or defense of any Claim, including any Abuse Claim; (i) any Claim that, directly or indirectly relates to the Insurance Policies and any contractual duties arising therefrom, including any contractual duty to defend any party thereto against any Abuse Claims; and/or (j) the conduct of the parties regarding the negotiation of any Insurance Settlement Agreement.

2.62    "Final Order" means an order, judgment, or other decree (including any modification of amendment thereof) of the Bankruptcy Court, a U.S. District Court, or any other court having jurisdiction that remains in effect and has not been reversed, withdrawn, vacated, or stayed, and as to which the time to appeal or seek review, rehearing, or writ of certiorari has expired or, if such appeal or review has been taken, (i) it has been resolved and no longer remains pending or (ii) the Debtor, the Committee, or the Trustee (after the Effective Date) and a Participating Party or Settling Insurer, as applicable, have mutually agreed in writing that the order from which such appeal or review is taken should be deemed to be a Final Order.

2.63    "Full Settlement Alternative" means the implementation and operation of the Plan if there is a full settlement among the Debtor, the Committee, the Non-Debtor Affiliates and the Insurers in SECTION III hereof.

2.64    "Future Abuse Claim" means an Abuse Claim that occurred before the Petition Date, but was not filed by the Sexual Abuse Bar Date and for which a valid legal excuse for not filing by the Sexual Abuse Bar Date exists. For the avoidance of doubt, Future Abuse Claims are not classified in Class 4 (Abuse Claims) and are classified as Future Abuse Claims in Class 7.

2.65    "Future Abuse Claims Trust" means the trust to be established under the Plan and the Future Abuse Claims Trust Agreement. For the avoidance of doubt, "Future Abuse Claims Trust" does not include the Trust.

2.66    "Future Abuse Claims Trust Agreement" means the agreement attached as Exhibit B to the Plan.

2.67    "Future Abuse Claims Trust Allocation Protocol" means the protocol for the allocation, treatment and distribution of Future Abuse Claims Trust Assets substantially in the form attached as Exhibit B-1 to the Plan.

2.68    "Future Abuse Claims Trust Assets" means all property funded to the Future Abuse Claims Trust under the Plan.

2.69    "Future Abuse Claims Trust Documents" means the Future Abuse Claims Trust Agreement, the Future Abuse Claims Trust Allocation Protocol, and other documents defined as "Future Abuse Claims Trust Documents" in the Future Abuse Claims Trust Agreement and shall include any documents reasonably necessary or desirable to implement the Plan that relate to the

8

creation, administration, operation and funding of the Future Abuse Claims Trust, as any of the same may be amended, modified, or supplemented

2.70    "Future Abuse Claims Trustee" means _____, the trustee of the Future Abuse Claims Trust, and any successor trustee appointed under the Future Abuse Claims Trust Agreement.

2.71    "Future Claimants Representative" means Robert E. Gerber in his role as Future Claimant Representative in accordance with the *Order Appointing a Legal Representative for Future Claimants* (Docket No. 799), or such other individual who may be appointed to succeed Robert E. Gerber.

2.72    "Future Claimants Representative's Professionals" means all professionals that the Future Claimants Representative has retained or may retain to provide professional services under section 1103(a) of the Bankruptcy Code and/or retained by Bankruptcy Court order, including the *Order Authorizing the Retention of Experts* (Docket No. 783).

2.73    "General Unsecured Claim" means any Claim against the Debtor not otherwise separately classified under the Plan.

2.74    "Insurance Claims" means all Claims against any Non-Settling Insurer whether sounding in contract, tort, or otherwise, including equity and bad faith, held by:

(a) the Debtor related to an Abuse Claim including those for (i) indemnity and payment of any Abuse Claim; (ii) failure or refusal to provide Insurance Coverage of an Abuse Claim under any insurance policy; (iii) tortious or wrongful Claims handling including the failure or refusal to timely compromise and settle any Abuse Claims against the Debtor under any insurance policy; and (iv) the interpretation or enforcement of the terms of any insurance policy; and/or

(b) the Participating Parties or Settling Insurers related to an Abuse Claim against the Participating Party or Settling Insurer, whether independently or jointly liable with the Debtor on such Abuse Claim, including (i) indemnity and payment of any Abuse Claim; (ii) failure or refusal to provide Insurance Coverage under any Insurance Policy for an Abuse Claim against the Debtor, a Participating Party or a Settling Insurer; (iii) tortious or wrongful Claims handling including the failure or refusal to timely compromise and settle any Abuse Claims against the Debtor, a Participating Party, or a Settling Insurer under any insurance policy; and (iv) the interpretation or enforcement of the terms of any insurance policy.

The term "Insurance Claims" includes any Claims against a Non-Settling Insurer for reimbursement of defense costs or related expenses under any Non-Settling Insurer's Insurance Policy incurred by the Debtor or a Participating Party through or after the Effective Date.

2.75    "Insurance Coverage" means insurance available under any Insurance Policy, whether known or unknown to the Debtor or the Committee, to indemnify and/or defend all or any part of an Abuse Claim asserted against (a) the Debtor and/or (b) a Participating Party.

2.76    "Insurance Coverage Adversary Proceeding" means the adversary proceeding docketed as Adversary Proceeding No. 19-02021 pending in the Bankruptcy Court and any related

9

proceedings in the District Court, including case Nos. 20-cv-11011-JLR (S.D.N.Y.); 21-cv-00071-JPC (S.D.N.Y.); 21-cv-09304-JLR (S.D.N.Y.); and 21-cv-007706-AKH (S.D.N.Y.) pending in the District Court;  the Court of Appeals; or the United States Supreme Court.

2.77   "Insurance Policy" means an insurance policy providing Insurance Coverage, including, without limitation, those policies on Exhibit C.

2.78   "Insurance Recoveries" means the rights to any proceeds, including any interest or income earned thereon, and other relief, from (a) any award, judgment, relief, or other determination entered or made as to any Insurance Claims, including regarding any Causes of Action related to or arising in connection with any Insurance Claims; (b) any amounts payable by an Insurer under any settlement agreement with the Debtor, a Participating Party or a Settling Insurer regarding Insurance Claims; and (c) any proceeds of any Insurance Policy paid or payable to the Debtor, a Participating Party or a Settling Insurer regarding Insurance Claims.  Insurance Recoveries do not include any recoveries of a Settling Insurer under any agreement or contract providing reinsurance to the Settling Insurer.

2.79   "Insurance Settlement Agreements" means, collectively or separately any agreements between the Debtor and/or the Trust and any Settling Insurer that resolve Insurance Claims under Section 11.8.

2.80   "Insurer" means a Person (including all of its affiliates, successors, and assigns) that has, or is alleged to have, issued, subscribed any interest in, assumed any liability for, or underwritten any risk in an Insurance Policy, except that Insurer does not include Arrowood.

2.81   "Interest" means all liens, Claims, encumbrances, interests, and other rights of any nature, whether at law or in equity, including any rights of contribution, indemnity, defense, subrogation, or similar relief.

2.82   "Lay Pension Plan" means the Diocese of Rockville Centre Pension Plan on the terms and conditions set forth in the Diocese of Rockville Centre Pension Plan Amendment and Restatement as of January 1, 2020, as the same may from time to time be restated or amended.

2.83   "Litigation Only Alternative" means the operation and implementation of the Plan if there are no settlements among the Committee, the Non-Debtor Affiliates, and the Insurers or the Committee otherwise elects not to accept the Partial Settlement Alternative in Section III.

2.84   "Lexington" means Lexington Insurance Company.

2.85   "LMI" means, collectively, Certain Underwriters at Lloyd's, London subscribing various Insurance Policies; Ancon Insurance Co. (UK) Ltd.; Assicurazioni Generali T.S.; Dominion Insurance Co. Ltd.; Catalina Worthing Insurance Ltd f/k/a HFPI (as Part VII transferee of Excess Insurance Co. Ltd. and London & Edinburgh Insurance Co. Ltd. as successor to London & Edinburgh General Insurance Co. Ltd.); River Thames Insurance Company Limited (as the legal successor to Unionamerica Insurance Company Limited, which was itself the legal successor to: (i) St. Paul Reinsurance Company Limited (formerly known as Mercury Reinsurance Company (UK) Limited and St. Paul Fire & Marine Insurance Company (UK) Limited) and (ii) certain business of St. Paul Travelers Insurance Company Limited (formerly known as St. Katherine

10

Insurance Company Limited, St. Katherine Insurance Company Public Limited Company and St Paul International Insurance Company Limited); Riverstone Insurance (UK) Limited (as successor in interest to Terra Nova Insurance Ltd.); Harper Insurance Ltd. (formerly known as Turegum Insurance Company); and Sompo Japan Nipponkoa Insurance Company of Europe Limited (formerly known as Yasuda). "LMI" does not include any other Insurers, including insolvent Insurers, who subscribed to Insurance Policies attributable to LMI.

2.86    "Mediator" means Paul J. Van Osselaer in his role under the Mediation Order or such other individual that may be appointed to mediate the Case.

2.87    "Mediation Order" means the *Order Appointing a Mediator*, (Docket No. 794).

2.88    "Medicare Beneficiary" means an Abuse Claimant who has received, applied for, or is eligible to receive Medicare or Medicaid benefits.

2.89    "Non-Debtor Affiliates" means those Persons on Exhibit D that are insured or covered or allegedly insured or covered under an Insurance Policy. "Non-Debtor Affiliates" does not include a Person having personally committed an act or acts of Abuse resulting in a Claim against the Debtor or a Participating Party, the Seminary, the Cemetery, the Department of Education, and the Holy See.

2.90    "Non-Insurance Trust Assets" means all funds and assets received by the Trust from the Diocese and any Participating Parties.

2.91    "Non-Settling Insurer" means Arrowood and any Insurer that is not a Settling Insurer.

2.92    "Other Priority Claims" are all Priority Claims except Priority Tax Claims, Professional Claims, and U.S. Trustee Fees.

2.93    "Partial Settlement Alternative" means the operation or implementation of the Plan if the Committee elects to accept less than all the settlements with the Non-Debtor Affiliates and any Insurers at set forth in SECTION III.

2.94    "Participating Party" means Non-Debtor Affiliates, the Seminary, the Cemetery, the Department of Education or any other Persons or Entities providing consideration in exchange for (a) the release of any Abuse Related Contribution/Indemnity Claim by the Debtor against such Participating Party, (b) the benefit of the Channeling Injunction, and/or (c) any other benefits for Participating Parties under the Plan. For clarity, the Persons and Entities listed on Exhibit E are the Participating Parties. Upon the sole consent of the Trustee, a Person or Entity may become a Participating Party after the Effective Date if the Bankruptcy Court approves the agreement between the Person or Entity and the Trustee under its retained jurisdiction. Upon the Bankruptcy Court's final approval of such an agreement, Exhibit E will be amended by the Trustee to include such Person or Entity. For the purposes of defining a Participating Party, the Entities on Exhibit E shall include their respective predecessors, successors, assigns, employees, officers, agents, attorneys, Representatives, and directors. A Settling Insurer is not a Participating Party. In no event shall a Person having personally committed an act or acts of Abuse resulting in a Claim against the Debtor or a Participating Party or the Holy See become a Participating Party.

11

2.95    "Penalty Claim" means a Claim for a fine, penalty, forfeiture, multiple damages, punitive damages, or exemplary damages, including any Claim not meant to compensate the Claimant for actual pecuniary loss.

2.96    "Pension Plans" means the Lay Pension Plan and the Priest Pension Plan.

2.97    "Person" means an individual or entity, a corporation, limited liability company, partnership, general partnership, limited partnership, limited liability partnership, limited liability limited partnership, proprietorship, association, joint stock company, joint venture, estate, trust, trustee, personal executor or personal representative, unincorporated organization or association, federal, international, foreign, state, or local governmental or quasi-governmental entity, body, or political subdivision or any agency or instrumentality of it; and any other individual or entity within the definitions of (i) "person" in section 101(41) of the Bankruptcy Code or (ii) "entity" in section 101(15) of the Bankruptcy Code.

2.98    "Personal Injury Claim" means the Claims listed on Exhibit F. To avoid doubt, no Abuse Claim is a Personal Injury Claim.

2.99    "Petition Date" means October 1, 2020, the date the Debtor filed its petition commencing the Case.

2.100    "Plan" means this Plan of Reorganization (and all exhibits annexed thereto), Plan Documents and any modifications and/or amendments thereto.

2.101    "Plan Documents" means all agreements, documents and exhibits, as the same may be amended, modified, supplemented, or restated occasionally, that are necessary or appropriate to implement the Plan, the Trust, and the Future Abuse Claims Trust.

2.102    "Priest Pension Plan" means the Diocese of Rockville Centre Qualified Retirement Plan for Diocesan Priests on the terms and conditions set forth in the Diocese of Rockville Centre Qualified Retirement Plan for Diocesan Priests amendment and restatement effective as of January 1, 2020, as the same may from time to time be restated or amended.

2.103    "Post-Confirmation Notice Parties" means the Reorganized Debtor, the Trust, the Office of the U.S. Trustee and any Person that files a request to be a Post-Confirmation Notice Party.

2.104    "Priority Claim" means any Claim which, if Allowed, would be entitled to priority under section 507 of the Bankruptcy Code.

2.105    "Priority Claimant" means the holder of a Priority Claim.

2.106    "Priority Tax Claim" means a claim of the kind specified in section 507(a)(8) of the Bankruptcy Code.

2.107    "Professional" means any Person or Entity that is a Debtor's Professional, Committee's Professional, Future Claimant Representative, Future Claimant Representative's Professional, Special Mediator, Special Mediator's Professional, or Mediator.

12

2.108    "Professional Fee Claim" means a Claim under Bankruptcy Code sections 326, 327, 328, 330, 331, 503(b), 1103, or 1104 for compensation for services rendered or expenses incurred by any of the Professionals before the Effective Date.

2.109    "Pro Rata" means proportionate, and when applied to a Claim means the ratio of the amount distributable because of an Allowed Claim in a Class to the amount distributable because of all Allowed Claims in such class.

2.110    "Proponent" means the Committee.

2.111    "Punitive Damages" means the part of a Claim for punitive or exemplary damages.

2.112    "Related Insurance Claim" means (i) any Claim against any Settling Insurer for defense, indemnity, reimbursement, contribution, subrogation, or similar relief that, directly or indirectly, relates to an Abuse Claim; (ii) any Extra-Contractual Claim that, directly or indirectly, relates to any Abuse Claim, including any Claim that, directly or indirectly, relates to the Settling Insurers' handling of any Abuse Claim; (iii) any Direct Action Claim; and (iv) any Abuse Related Contingent Contribution/Reimbursement/Indemnity Claim.

2.113    "Related Parties" means, regarding any Entity, such Entity's present or former members, parents, indirect parents, principals, shareholders, managers, claims managers, officers, directors, employees, representatives, attorneys, or agents acting in such capacity and the predecessors, successors, assignors and assigns of each of the foregoing.

2.114    "Released Parties" means (a) the Participating Parties and their Related Parties and (b) a Settling Insurer and such Settling Insurer's Related Parties to the extent that the liability of such Related Party arises under Insurance Policies issued by the Settling Insurer.  The term "Released Parties" does not include: a Person having personally committed an act or acts of Abuse resulting in a Claim against the Debtor or a Participating Party and the Holy See.

2.115    "Reorganized Debtor" means the Debtor on and after the Effective Date.  Unless otherwise expressly stated or the context otherwise requires, references to "the Debtor" and "the Reorganized Debtor" throughout the Plan are an effort to anticipate whether an event may occur before or after the Effective Date.  In this regard, and generally for the Plan, any written agreement made by the Diocese as part of the Plan before the Effective Date (unless provided otherwise) will survive the Confirmation Date and the Effective Date and will bind the Reorganized Debtor and every other party to such (including, but not limited to, the Plan as confirmed).

2.116    "Representatives" means the current and former officers, directors, agents, attorneys, employees, financial advisors and legal representatives of a Person or Entity, but excluding (i) a Person having personally committed an act or acts of Abuse resulting in a Claim against the Debtor, a Participating Party or a Settling Insurer, (ii) a successor or predecessor of the Debtor for such successor's or predecessor's independent liability for an act or acts of Abuse, and (iii) the Holy See.

2.117    "Revested Assets" means all assets and/or property, real or personal, owned by the Debtor that are not transferred to the Trust under the Plan.  Revested Assets includes any Insurance Policy of a Settling Insurer. Notwithstanding the foregoing, any Insurance Policy of a Non-Settling

13

Insurer is not treated as a Revested Asset except in the following situations (1) under the Full Settlement Alternative; or (2) with respect to the Arrowood Insurance Policies only, under the Partial Settlement Alternative.

2.118 "S/A/P Claims" means, collectively, Secured Claims, Administrative Claims, Priority Claims, and Priority Tax Claims.

2.119 "S/A/P Claims Reserve" means the reserve to be established by the Reorganized Debtor for Administrative Claims, Priority Claims, and Priority Tax Claims.

2.120 "Schedules" means the Debtor's Schedules of Assets and Liabilities and Statement of Financial Affairs filed pursuant to section 521 of the Bankruptcy Code, the Official Bankruptcy Forms and the Bankruptcy Rules, including any supplements or amendments thereto through the Confirmation Date.

2.121 "Section 363 Sale" means a sale of property under section 363 of the Bankruptcy Code.

2.122 "Secured Claims" means a Claim (i) secured by a lien on collateral to the extent of the value of such collateral as (a) set forth in the Plan, (b) agreed to by the Holder of such Claim and the Debtors, or (c) determined by a Final Order in accordance with section 506(a) of the Bankruptcy Code, or (ii) secured by the amount of any right of setoff of the Holder thereof in accordance with section 553 of the Bankruptcy Code.

2.123 "Seminary" means the Seminary of the Immaculate Conception of the Diocese of Rockville Centre.

2.124 "Settled" means, regarding a Claim, a Claim resolved by agreement, and if required, approved by Final Order of the Bankruptcy Court or a U.S. District Court.

2.125 "Settlement Fund" means a fund established to pay Abuse Claims and costs and expenses of the Trust. The assets of the Settlement Fund will include cash; personal property; real property, or proceeds of property sales; Avoidance Rights, except those against Participating Parties and the Settling Insurers compromised and released under the Plan; and certain Causes of Action.

2.126 "Settlement Offer" means each settlement offer made to the Non-Debtor Affiliates and each Insurer in Section 3.1 and represents an offer to compromise with a particular Entity and its Related Parties.

2.127 "Settling Insurer" means: (a) each of those Insurers on Exhibit G to the Plan, as the same may be amended under this Plan; and (b) such Insurer's predecessors, successors and assigns, but only to the extent that: (i) such predecessor's liability was assumed by the Insurer on Exhibit G to the Plan, and (ii) such successor's or assign's liability is derivative of the liability of the Insurer on Exhibit G to the Plan and not independent of the liability of the Insurer on Exhibit G to the Plan. For purposes of defining the releases, injunctions, exculpation provisions, and other provisions and protections provided to Settling Insurers herein, the terms "Settling Insurer," "Released Parties," and "Exculpated Parties" herein also include all Related Parties, if their

14

liability arises out of, or is related to, any Settling Insurer Policy. Upon the sole consent of the Trustee, a Person or Entity may become a Settling Insurer after the Effective Date if the Bankruptcy Court approves the agreement between the Person or Entity and the Trustee under its retained jurisdiction. Upon the Bankruptcy Court's final approval of such an agreement, Exhibit G will be amended by the Trustee to include such Person or Entity. Under the Full Settlement Alternative, all Insurers will be Settling Insurers.

2.128    "Settling Insurer Injunction" means the injunction(s) provided in Section 15.10 and any injunction provided in an agreement whereby an Insurer becomes a Settling Insurer.

2.129    "Settling Insurer Policies" means "Policies" as defined in any settlement agreement between a Settling Insurer and the Debtor (or the Trust for any settlement agreements entered into after the Effective Date).

2.130    "Special Mediator" means Arthur J. Gonzalez in his role as special mediator under the *Joint Stipulation and Order Concerning the Independent Advisory Committee and the Investigation and Pursuit of Certain Claims* (Docket No. 512).

2.131    "Special Mediator's Professionals" means professionals that the Special Mediator has retained or may retain to provide professional services under section 1103(a) of the Bankruptcy Code and/or retained by Bankruptcy Court order, including the *Order Authorizing the Retention of Experts* (Docket No. 783).

2.132    "Total Settlement Demand Amount" means the aggregate of the Settlement Offers.

2.133    "Trust" means the trust to be established under the Plan and the Trust Agreement. For the avoidance of doubt, "Trust" does not include the Future Abuse Claims Trust.

2.134    "Trust Agreement" means the agreement attached as Exhibit A to the Plan.

2.135    "Trust Allocation Protocol" means the protocol for the allocation, treatment and distribution of Trust Assets substantially in the form attached as Exhibit A-1 to the Plan.

2.136    "Trust Assets" means all property funded to the Trust under the Plan.

2.137    "Trust Documents" means the Trust Agreement, the Trust Allocation Protocol, and other documents defined as "Trust Documents" in the Trust Agreement and shall include any documents reasonably necessary or desirable to implement the Plan that relate to the creation, administration, operation and funding of the Trust.

2.138    "Trustee" means _____, the trustee of the Trust, and any successor trustee appointed under the Trust Agreement.

2.139    "U.S. District Court" means a United States District Court.

2.140    "Unclaimed Property" means any Cash or other property unclaimed for one hundred and eighty (180) days after the Distribution.

2.141  "U.S. Trustee" means the Office of the United States Trustee for the Southern District of New York.

2.142  "Unresolved" means, regarding a Claim, a Claim that has neither been Allowed or Disallowed nor liquidated.

## SECTION III
## PLAN OBJECTIVES AND MEANS OF FUNDING

3.1  **Committee's Offer To Non-Debtor Affiliates and Insurers to Resolve Abuse Claims**.

The below chart sets forth the Settlement Offer to certain non-Debtor entities to resolve Abuse Claims. The deadline for each Entity to either accept or reject its Settlement Offer is the date set for the hearing on approval of the Disclosure Statement, or such later date as agreed to by the Committee in its sole discretion. The deadline for each Entity to fund its Settlement Offer, or such other settlement amount as agreed to by the Committee in its sole discretion (the "**Agreed Amount**"), is the Contribution Date.

| Party | Settlement Offer |
|---|---|
| Non-Debtor Affiliates | $200,000,000.00 |
| Cemetery | $80,000,000.00 |
| Seminary | 85% of the net proceeds of the sale of 206 acres of the real property owned by the Seminary[1] |
| Department of Education | $6,000,000.00 |
| LMI | Amount provided directly to LMI under the Mediation Order |
| Allianz Insurers | Amount provided directly to Allianz Insurers under the Mediation Order |
| Lexington | Amount provided directly to Lexington under the Mediation Order |
| Evanston | Amount provided directly to Evanston under the Mediation Order |
| Ecclesia | $15,000,000.00 for Abuse Claims (the "**Ecclesia Abuse Claim Contribution**"); $500,000 for Civil Rights Claims (the "**Ecclesia Civil Rights Claim Contribution**") |

---

[1] The Seminary shall be entitled to retain possession and title to the buildings and approximately sixteen (16) acres associated with the operations of the Seminary; provided however, that if any portion of this property is leased, sold, or subject to an option for lease or sale on or before the date that is six months after the termination of the Future Abuse Claims Trust for the benefit of Abuse Claimants, 85% of the net proceeds of such transaction shall be paid to the Trust.

16

3.2    **Deadline To Accept and Fund Settlement Offer**.

The deadline for each Entity to either accept or reject its Settlement Offer is the date first set for the hearing on approval of the Disclosure Statement, or such later date as agreed to by the Committee in its sole discretion.  The deadline for each Entity to fund its Settlement Offer, or such other settlement amount as agreed to by the Committee in its sole discretion, is the Contribution Date.

3.3    **Full Settlement Alternative**

The Full Settlement Alternative occurs if all of the Other Insured Entities; the Cemetery, Seminary, and Department of Education; and all of the Insurers commit to fund an Agreed Amount.  Under the Full Settlement Alternative, all Other Insured Entities, Cemetery, Seminary, and Department of Education become Participating Parties and all Insurers become Settling Insurers.  The Trust Assets will consist of the Settlement Fund, including contributions from the Diocese, the Participating Parties, and the Settling Insurers.  Trust Assets will fund Distributions to Abuse Claimants, under the Trust Allocation Protocol. The Diocese and Participating Parties will retain their Arrowood Insurance Claims.

3.4    **Partial Settlement Alternative**

Only in the Committee's sole and absolute discretion, the Partial Settlement Alternative occurs if, by the first date set for the hearing on approval of the Disclosure Statement, (a) the Other Insured Entities, Seminary, Cemetery, and Department of Education commit to fund an Agreed Amount and (b) less than all of the Insurers commit to fund an Agreed Amount.  Under the Partial Settlement Alternative, all Other Insured Entities, Cemetery, Seminary, and Department of Education become Participating Parties.  Only those Insurers that accept their respective Settlement Offers or for whom the Committee agrees to accept a different amount in lieu thereof become Settling Insurers.  The Diocese's, the Participating Parties' and the Settling Insurers' Insurance Claims against any Non-Settling Insurer, except Arrowood, shall be transferred to the Trust and shall be a Trust Asset.  The Trust Assets will consist of the Settlement Fund, including contributions from the Diocese, the Participating Parties, and the Settling Insurers, if any, and the assignment of Insurance Claims (except Arrowood Insurance Claims) held by the Diocese, the Settling Insurers, and the Participating Parties.  The Diocese and the Participating Parties will retain their Arrowood Insurance Claims.  Trust Assets will fund Distributions to Abuse Claimants, under the Trust Allocation Protocol.  Under the Partial Settlement Alternative, Abuse Claimants whose Claims occurred during the coverage period of a Non-Settling Insurers' policy may, subject to the Trustee's consent and the Trust Documents, pursue their Abuse Claims in a court of competent jurisdiction against the Debtor and any other defendant; *provided, however*, that any such Claims are subject to the terms of this Plan and that Claims against the Debtor or a Participating Party may be paid only from the proceeds of an Insurance Policy issued by a Non-Settling Insurer.

The Diocese, each Participating Party, and Settling Insurer will receive the benefit of injunctions and releases provided under this Plan.  Nothing in this Plan is intended to replace and does not affect, diminish, or impair the liabilities of any Non-Settling Insurer or any Person that is

17

not a Participating Party under applicable non-bankruptcy law, including the law governing joint and several liabilities.

3.5    **Litigation Only Alternative**

The Litigation Only Alternative occurs if the Non-Debtor Affiliates do not commit to fund an Agreed Amount.  The Non-Debtor Affiliates and the Non-Settling Insurers will not be released from any of their obligations and/or liabilities and shall not benefit from any injunctions.  The Trust Assets will consist of the Settlement Fund, including contributions from the Diocese and the assignment of the Diocese's Insurance Claims.  For clarity, the Insurance Claims of the Non-Debtor Affiliates who are not Participating Parties will not be assigned under the Litigation Only Alternative.  Trust Assets will fund Distributions to Abuse Claimants, under the Trust Allocation Protocol.  Under the Litigation Only Alternative, Abuse Claimants may elect to pursue their Abuse Claims in any court of competent jurisdiction against the Debtor and any other defendant; *provided, however*, that any such Claims and the pursuit of any such litigation are subject to the terms of this Plan and the Trust Allocation Protocol and that Claims against the Debtor may recover only from the proceeds of an Insurance Policy and may not recover from any Revested Assets.

## SECTION IV
## TREATMENT OF UNCLASSIFIED CLAIMS.

4.1    **Administrative Claims**.

Each holder of an Allowed Administrative Claim against the Debtor shall, in full satisfaction, receive settlement, release, and extinguishment of such Claim, Cash equal to the Allowed amount of such Administrative Claim, either (a) on or as soon as possible following the Effective Date or, if later, the Allowance Date; or (b) upon such terms as agreed to in writing by the Administrative Claimant.  Provided, however, that any Administrative Claim incurred post-petition by the Debtor in the ordinary course of its operations or arising under one or more post-petition agreements or transactions entered into by the Debtor with Bankruptcy Court approval, shall be paid or performed under the terms of the particular transaction(s) and any agreement(s) relating thereto, or as otherwise agreed by the Diocese, on the one hand, and the holder of such Administrative Claim, on the other.

4.2    **Professional Claims**.

4.2.1    **Bar Dates for Professional Claims**.  All Professionals or other Persons requesting compensation or reimbursement of expenses under any of sections 327, 328, 330, 331, 503(b) and 1103 of the Bankruptcy Code for services rendered on or before the Effective Date (including, among other things, any compensation requested by any Professional or any other Person for making a substantial contribution in the Case) shall file and serve on the Post-Confirmation Notice Parties an application for final allowance of compensation and reimbursement of expenses accruing from the Petition Date to the Effective Date, no later than (a) forty-five (45) days after a notice of the Effective Date is filed with the Bankruptcy Court, or (b) such later date as the Bankruptcy Court shall order upon application made before the end of such 45-day period (the "Professional Claims Bar Date")

18

4.2.2    **Objections to Professional Claims**.  Objections to Professional Claims or Claims of other Persons for compensation or reimbursement of expenses must be filed and served on the Post-Confirmation Notice Parties and the Professionals or other Persons to whose application the objections are addressed on or before  (a) forty-five (45) days after the Professional Claims Bar Date or (b) such later date as (i) the Bankruptcy Court shall order upon application made before the end of such 45-day period or (ii) is agreed between the Debtor (if before the Effective Date) or the Reorganized Debtor (on and after the Effective Date), as applicable, and the affected Professional or other Person.

4.2.3    Notwithstanding anything in Section 4.2, the allowance of a Professional Claim shall not affect, impair, diminish or be an adjudication of any claim excepted from the exculpation in Section 15.8.

4.3    **U.S. Trustee Fees.**

All fees due and payable under 28 U.S.C. § 1930 and not paid before the Effective Date shall be paid in Cash as soon as practicable after the Effective Date.  After the Effective Date, the Reorganized Debtor shall pay quarterly fees to the U.S. Trustee, in Cash, until the Case is closed, and a Final Decree is entered.  In addition, the Reorganized Debtor shall file post-Confirmation Date reports in conformance with the U.S. Trustee guidelines.  The U.S. Trustee shall not be required to file a request for payment of its quarterly fees, which will be deemed Administrative Claims against the Diocese.  The Trust will have no liability for U.S. Trustee fees.

4.4    **Priority Tax Claims**.

As for each Allowed Priority Tax Claim not paid before the Effective Date, the Reorganized Debtor shall (i) pay such Claim in Cash as soon as practicable after the Effective Date, or (ii) provide such other treatment agreed to by the holder of such Allowed Priority Tax Claim and the Diocese, in writing.

4.5    Holders of Administrative Expense Claims and Priority Tax Claims who do not object to confirmation of the Plan shall be deemed to have consented to treatment, as set forth in the Plan, that differs from that set forth in 11 U.S.C. § 1129(a)(9).

**SECTION V**
**CLASSIFICATION OF CLAIMS.**

5.1    All Claims except Administrative Claims and Priority Tax Claims are placed in these classes for all purposes including voting, confirmation of the Plan and distribution under the Plan.  A Claim is classified in a particular class only to the extent the Claim qualifies within the description of that class and is classified in a different class to the extent the Claim qualifies within the description of that different class.  If a Claim is acquired or transferred, the Claim will be placed in the class where it would have been placed if it were owned by the original holder of such Claim.  If a Claimant has more than one Claim in the same class, such Claims will be aggregated and treated as a single Claim.  If a Claimant has Claims in different classes, such Claims will be aggregated only within the same class and not between classes.

19

| CLASS | DESCRIPTION | IMPAIRMENT | VOTING |
|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | Deemed to Accept |
| 2 | Secured Claims | Unimpaired | Deemed to Accept |
| 3 | RESERVED | Not Applicable | Not Applicable |
| 4 | Abuse Claims (except Future Abuse Claims) | Impaired | Yes |
| 5 | General Unsecured Claims | Unimpaired | Deemed to Accept |
| 6 | Personal Injury Claims | Impaired | Yes |
| 7 | Future Abuse Claims | Impaired | Yes |
| 8 | Abuse Related Contingent Contribution/Reimbursement/ Indemnity Claims | Impaired | Deemed to Reject |
| 9 | Civil Rights Claims | Impaired | Yes |

5.2     Except regarding Abuse and Personal Injury Claims, the treatment in this Plan is in full and complete satisfaction of the legal, contractual, and equitable rights that each holder of a Claim (regardless of the type of non-Abuse or Personal Injury Claim) may have against the Debtor or its property.  This treatment supersedes and replaces any agreements or rights those holders have in or against the Debtor or its property.  All Distributions under the Plan will be tendered to the entity holding the Claim.  EXCEPT AS SET FORTH IN THIS PLAN, NO DISTRIBUTIONS WILL BE MADE FROM AND NO RIGHTS WILL BE RETAINED AGAINST THE DEBTOR OR ITS PROPERTY ON ACCOUNT OF ANY CLAIM THAT IS NOT AN ALLOWED CLAIM.

## SECTION VI
## TREATMENT OF UNIMPAIRED CLASSES OF CLAIMS.

6.1     **Class 1:  Other Priority Claims.**

The holders of Allowed Other Priority Claims will receive either (a) payment from the Reorganized Debtor of the full amount of their Allowed Claims in Cash, without interest on or as soon as practicable following the Effective Date or, if later, the Allowance Date; or (b) payment of their Allowed Claims upon such terms as may be agreed in writing by the Claimant and the Reorganized Debtor.

6.2     **Class 2: Secured Claims.**

6.2.1     **Impairment and Voting**.  Class 2 is unimpaired under the Plan.  Holders of Secured Claims are deemed to have accepted the Plan under section 1126(f) of the Bankruptcy Code and are not entitled to vote on the Plan.  For purposes of distributions under the Plan, each holder of a Secured Claim in Class 2 is considered to be in its own separate subclass within Class

2 (i.e., Class 2-1, Class 2-2, etc.), and each such subclass is deemed to be a separate Class for the Plan.

6.2.2    **Alternative Treatment**.   On or as soon as practicable following the Effective Date, the Reorganized Debtor in its discretion may select one of these alternative treatments for each Allowed Secured Claim in Class 2, which treatment shall be in full and final satisfaction, settlement and release of, and in exchange for, such Allowed Secured Claim:

(a)    *Abandonment or Surrender*. The Reorganized Debtor shall abandon or surrender to the holder of such Claim the property securing such Claim, in full satisfaction and release of such Claim.

(b)    *Cash Payment*.   The Reorganized Debtor shall pay to the holder of such Claim Cash equal to the Allowed amount of such Claim upon the sale of the collateral, or such lesser amount to which the holder of such Claim and Reorganized Debtor or the Trust shall agree, in full satisfaction and release of such Claim.

(c)    Unimpairment.  The Reorganized Debtor may leave the rights of the holder of such Claim unimpaired or provide for such other treatment as necessary to otherwise satisfy the Bankruptcy Code.

6.2.3    **Unsecured Deficiency Claim**.  Any unsecured deficiency Claim asserted by a holder of an Allowed Secured Claim in Class 2 shall be filed with the Bankruptcy Court within thirty (30) days following the date of the abandonment or surrender of such Creditor's collateral or such Creditor's receipt of its distribution under the Plan.  Any Allowed unsecured deficiency Claim shall be treated under Section 6.3 of the Plan.

6.3    **Class 5:  General Unsecured Claims.**

General Unsecured Claims shall be unimpaired under the Plan.  On, or as soon as reasonably practicable after, the later of (a) the Effective Date or (b) the date on which a General Unsecured Claim becomes an Allowed General Unsecured Claim, each Holder of an Allowed General Unsecured Claim shall receive, in full satisfaction, settlement, and release of, and in exchange for, such Allowed General Unsecured Claim, (i) Cash equal to the unpaid part of such Allowed General Unsecured Claim; (ii) reinstatement of such claim to be paid in the ordinary course of business of the Reorganized Debtor; (iii) such other treatment such that it will not be impaired under section 1124 of the Bankruptcy Code; or (iv) such other less favorable treatment as to which the Debtor or the Reorganized Debtor and the Holder of such Allowed General Unsecured Claim shall have agreed upon in writing.

If a General Unsecured Claim is unliquidated and was subject to existing litigation pending in state or federal court before the Petition Date, if the Diocese does not object to such Claim before the Claims Objection Deadline, then following the Claims Objection Deadline, such litigation shall no longer be stayed and such litigation may be continued against the Diocese as the Reorganized Debtor and such litigation shall continue as the same existed on the Petition Date.

21

## SECTION VII
## TREATMENT OF IMPAIRED CLAIMS

**7.1    Class 4: Abuse Claims (Except Future Abuse Claims)**

      7.1.1    **Impaired and Voting**.  Class 4 is impaired under the Plan. The Class 4 Claimants are entitled to vote on the Plan. Only for purposes of voting, each Claim in Class 4 is deemed to be Allowed in the amount of $1.00.

      7.1.2    **Treatment of Class 4.**  On the Effective Date, and subject to the Plan provisions, the Trust shall pay all Abuse Claims (except Future Abuse Claims) in accordance with and under the Plan and Trust Documents.  The payment of the Class 4 Claims by the Trust is not a release, accord or novation of the Debtor's or the Participating Parties' liability because of the Class 4 Claims; provided, however, that the Debtor's liability because of the Class 4 Claims shall be discharged under Bankruptcy Code section 1141(d), subject to Sections 7.1.5 and 15.1 and all of the Participating Parties' liabilities are subject to the Channeling Injunction and releases under the Plan.  Under no circumstance shall the Abuse Claims Reviewer's review of a Class 4 Claim affect the rights of a Non-Settling Insurer.  Class 4 Claimants shall have their Claims treated under the Trust Allocation Protocol.  Neither the Trust nor the Diocese have any obligation to take any action to enforce an Insurance Policy of a Non-Settling Insurer, including any obligation to commence/prosecute any action against any Non-Settling Insurer or to defend an action commenced by a Non-Settling Insurer, though the Trust (or the Diocese, as applicable), may choose to do so.

      The Non-Settling Insurers remain fully liable for their obligations related in any way to the Abuse Claims, and their obligations are not reduced by the Diocese being in bankruptcy or by the distributions Class 4 Claimants receive, or are entitled to receive, based on the Plan. For the avoidance of doubt, determinations by the Abuse Claims Reviewer and/or any distributions entitled to be received from the Trust shall not constitute a determination of the Diocese's or any Participating Party's liability or damages for Class 4 Claims.

      7.1.3    **Diocese Cooperation with Trustee and Abuse Claims Reviewer.**  The Diocese and its counsel shall reasonably cooperate with the Trustee and the Abuse Claims Reviewer with any inquiries by either in the administration of the Trust Allocation Protocol.

      7.1.4    **Class 4 Claim Objections**.  No Class 4 Claimant may challenge the merit, validity, or amount of any other Class 4 Claim.  Except for any objection to a Class 4 Claim filed by the Committee, any objection to a Class 4 Claim pending as of the Effective Date is deemed withdrawn with prejudice.  The Trustee has the exclusive right to object to a Class 4 Claim and shall succeed to the rights of the Committee because of the Committee's objection to a Class 4 Claim.  The Reorganized Debtor shall not have the right to object to a Class 4 Claim.  The Trustee shall succeed the Debtor for any pending objections to Class 4 Claims.

      7.1.5    **Diocese Discharge of Class 4 Claim Liability.**  The Debtor shall be discharged as set forth in Section 15.1 herein of any liability because of all Class 4 Claims, even if the Claimant rejects the Plan.  As provided in Bankruptcy Code section 524(e), unless otherwise provided in this Plan, such discharge shall not affect the liability of any other Person or Entity on,

or the property of any other Person or Entity for, the Class 4 Claims including the liability of any Co-Defendant or Non-Settling Insurer, which liability shall continue unaffected by the terms of this Plan or the discharge granted to the Debtor or the Reorganized Debtor under this Plan and Bankruptcy Code section 1141(d). Nothing in this Plan is intended to affect, diminish or impair any Class 4 Claimant's rights against a Co-Defendant, including that Co-Defendant's joint and several liability for Abuse.

Notwithstanding the above, to preserve coverage under any Non-Settling Insurer's Insurance Policies, Class 4 Claimants specifically reserve, and do not release, any claims they may have against the Diocese, the Reorganized Debtor, or any other Participating Party that implicate coverage under any Non-Settling Insurer's Insurance Policies, but recourse is limited to the proceeds of the Non-Settling Insurer's Insurance Policies and all other damages (including extra-contractual damages), awards, judgments in excess of policy limits, penalties, punitive damages and attorney's fees and costs that may be recoverable against any Non-Settling Insurers because of their conduct regarding insurance coverage for, or defense or settlement of, any Class 4 Claim, and any such judgments or awards will be handled under the Plan and the Trust Allocation Protocol. The Class 4 Claims will not be released or enjoined as against the Diocese, the Reorganized Debtor, or any other Participating Party for any Abuse that may be covered under any Non-Settling Insurer's Insurance Policies until such claims are settled with the Diocese, the Reorganized Debtor, any other Participating Party and such Non-Settling Insurer or are fully adjudicated, resolved, and subject to Final Order, but recourse is limited as described above.

7.1.6  **Remand of State Court Actions**.  On the thirtieth (30th) day after the Effective Date, all actions related to Class 4 Claims removed to the Bankruptcy Court shall be remanded to the state courts where the actions originally were commenced; provided that an action shall not be remanded if the plaintiff files a written request to the contrary with the Bankruptcy Court prior thereto.  The Bankruptcy Court shall enter an order in each of the removed actions remanding them under the Plan.

7.1.7  **Litigation of Class 4 Claims Against Non-Settling Insurers.**  Under the Partial Settlement or Litigation Only Alternatives, a Class 4 Claimant, with the consent of the Trustee and under the Trust Allocation Protocol and Trust Agreement, may commence an action against the Diocese and, if applicable, one or more Participating Parties, solely for liquidating a Class 4 Claim in order to pursue Insurance Recoveries regarding such Class 4 Claim from Non-Settling Insurers.  The Diocese will not have to expend any funds regarding such defense, except to the extent required by the terms of any Insurance Policy issued by a Non-Settling Insurer. Consistent with the discharge provided for in Section 15.1 and the rights of a Participating Party, any judgment obtained in such action may not be enforced against the Diocese, a Participating Party and/or any of the non-insurance assets of the Diocese or such Participating Party, including, but not limited to, the Revested Assets or any assets acquired by the Reorganized Debtor after the Effective Date, and such judgment shall be paid under the Plan and the Trust Allocation Protocol and shall be fully enforceable solely against and paid by any Non-Settling Insurer under the terms of that Non-Settling Insurer's Insurance Policy.  Any recovery from the prosecution of such an action is deemed assigned to the Trust to the extent provided in the Plan, including as provided in Trust Allocation Protocol.

7.2  **Class 6: Personal Injury Claims**

DOCS_NY:46991.4 18491/002

7.2.1    **Impaired and Voting.**    Class 6 is impaired under the Plan.    Class 6 Claimants are entitled to vote on the Plan.    Only for purposes of voting, the claims in Class 6 are deemed to be $1.00.

7.2.2    **Treatment.**    On the Effective Date, the Class 6 Claimants may elect to litigate against the non-Debtor Co-Defendants or select to receive from the Trust $250,000 minus any amounts already expended by the Diocese or the non-Debtor Co-Defendants on pre-petition defense costs relating to litigation of such Class 6 Claim.    If a Class 6 Claimant elects to litigate, the Trust shall provide the Reorganized Debtor with $250,000 minus any amounts already expended by the Diocese or the non-Debtor Co-Defendants on pre-petition defense costs relating to litigation of such Class 6 Claim to satisfy the self-insured retention under the relevant Ecclesia policy.    Nothing herein shall enlarge the rights or Claims of Class 6 Claimants or limit or waive any defenses to the Class 6 Claims.    Unless otherwise provided in this Plan, the Plan shall not affect the liability of any other Person on, or the property of any other Person for, the Class 6 Claims, which liability shall continue unaffected by the terms of this Plan or the discharge granted to the Diocese under this Plan and Section 1141(d) of the Bankruptcy Code.    Nothing in the Plan is intended to affect, diminish, or impair the Class 6 Claimant's right against any other parties, including such party's joint and several liability.

7.3    **Class 7: Future Abuse Claims**

7.3.1    **Impaired and Voting.**    Class 7 is impaired under the Plan.    The Future Claims Representative is entitled to vote on this Plan on behalf of Class 7 Claimants. Only for purposes of voting, the Future Claims Representative is deemed to have an Allowed Claim in the amount of $1.00.

7.3.2    **Treatment.**    The Future Abuse Claims Trust will be funded by the Trust with six percent (6 %) of the Non-Insurance Trust Assets pursuant to the provisions of this Plan. On the Effective Date, the Future Abuse Claims Trust shall pay all Future Abuse Claims in accordance with and the Plan and Future Abuse Claims Trust Documents.    The payment of the Future Abuse Claims by the Future Abuse Claims Trust is not a release, accord or novation of the Debtor's or the Participating Parties' liability because of the Future Abuse Claims; provided, however, that the Debtor's liability because of the Future Abuse Claims shall be discharged under Bankruptcy Code section 1141(d), subject to Sections 7.1.5 and 15.1 and all of the Participating Parties' liabilities are subject to the Channeling Injunction and releases under the Plan.    Under no circumstance shall the Abuse Claims Reviewer's review of a Future Abuse Claim affect the rights of a Non-Settling Insurer. Future Abuse Claimants shall have their Claims treated under the Future Abuse Claims Trust Allocation Protocol.

The Non-Settling Insurers remain fully liable for their obligations related in any way to the Future Abuse Claims, and their obligations are not reduced by the Diocese being in bankruptcy or by the distributions Future Abuse Claimants receive, or are entitled to receive, based on the Plan. For the avoidance of doubt, determinations by the Abuse Claims Reviewer and/or any distributions entitled to be received from the Future Abuse Claims Trust shall not constitute a determination of the Diocese's or any Participating Party's liability or damages for Future Abuse Claims.

24

### 7.3.3    Diocese Cooperation with Future Abuse Claims Trustee and Abuse Claims Reviewer.

The Diocese and its counsel shall reasonably cooperate with the Future Abuse Claims Trustee and the Abuse Claims Reviewer with any inquiries by either in the administration of the Future Abuse Claims Trust Allocation Protocol.

### 7.3.4    Future Abuse Claim Objections.

No Class 7 Claimant may challenge the merit, validity, or amount of any other Class 7 Claim. Except for any objection to a Class 7 Claim filed by the Committee, any objection to a Class 7 Abuse Claim pending as of the Effective Date is deemed withdrawn with prejudice. The Future Abuse Claims Trustee has the exclusive right to object to a Class 7 Claim and shall succeed to the rights of the Committee because of the Committee's objection to a Class 7 Claim. The Reorganized Debtor shall not have the right to object to a Class 7 Claim.

### 7.3.5    Diocese Discharge of Future Abuse Claim Liability.

The Debtor shall be discharged as set forth in Section 15.1 herein of any liability because of all Class 7 Claims, even if the Claimant rejects the Plan. As provided in Bankruptcy Code section 524(e), unless otherwise provided in this Plan, such discharge shall not affect the liability of any other Person or Entity on, or the property of any other Person or Entity for, the Future Abuse Claims including the liability of any Co-Defendant or Non-Settling Insurer, which liability shall continue unaffected by the terms of this Plan or the discharge granted to the Debtor or the Reorganized Debtor under this Plan and Bankruptcy Code section 1141(d). Nothing in this Plan is intended to affect, diminish or impair any Future Abuse Claimant's rights against a Co-Defendant, including that Co-Defendant's joint and several liability for Future Abuse Claims.

Notwithstanding the above, to preserve coverage under any Non-Settling Insurer's Insurance Policies, Class 7 Claimants specifically reserve, and do not release, any claims they may have against the Diocese or any other Participating Party that implicate coverage under any Non-Settling Insurer's Insurance Policies, but recourse is limited to the proceeds of the Non-Settling Insurer's Insurance Policies and all other damages (including extra-contractual damages), awards, judgments in excess of policy limits, penalties, punitive damages and attorney's fees and costs that may be recoverable against any Non-Settling Insurers because of their conduct regarding insurance coverage for, or defense or settlement of, any Future Abuse Claim, and any such judgments or awards will be handled under the Plan and the Trust Allocation Protocol. The Class 7 Claims will not be released or enjoined as against the Diocese or any other Participating Party for any Future Abuse Claim that may be covered under any Non-Settling Insurer's Insurance Policies until such claims are settled with the Diocese, the Reorganized Debtor, any other Participating Party and such Non-Settling Insurer or are fully adjudicated, resolved, and subject to Final Order, but recourse is limited as described above.

### 7.4    Class 8: Abuse Related Contingent Contribution/Reimbursement/Indemnity Claims.

Each Abuse Related Contingent Contribution/Reimbursement/Indemnity Claim held by (a) any Person or Entity against the Debtor shall be disallowed and will receive no distribution under the Plan. Notwithstanding the disallowance of an Abuse Related Contingent Contribution / Reimbursement / Indemnity Claim, an Abuse Claimant who liquidates his or her claim in an amount greater than $0, consents to application of its portion of the reserve established by the

Trustee under the Trust Agreement to pay any Co-Defendant for its contribution / reimbursement / indemnity claim, if any, against the Debtor.

7.5 **Class 9: Civil Rights Claims**

7.5.1 **Impaired and Voting.** Class 9 is impaired under the Plan. Class 9 Claimants are entitled to vote on the Plan. Only for purposes of voting, the claims in Class 9 are deemed to be $1.00.

7.5.2 **Treatment.** The Trust shall create the Civil Rights Claim Reserve with $300,000 from Non-Insurance Trust Assets. Under the Full Settlement Alternative, or the Partial Settlement Alternative if Ecclesia funds the Agreed Amount and becomes a Settling Insurer, the Civil Rights Claim Reserve shall also include the Ecclesia Civil Rights Claim Contribution. On the Effective Date, the Trust shall pay all Civil Rights Claims their pro-rata share of the Civil Rights Claim Reserve. The payment of the Civil Rights Claims by the Trust is not a release, accord or novation of the Debtor's or the Participating Parties' liability because of the Civil Rights Claims; provided, however, that the Debtor's liability because of the Civil Rights Claims shall be discharged under Bankruptcy Code section 1141(d), subject to Sections 7.1.5 and 15.1 and all of the Participating Parties' liabilities are subject to the Channeling Injunction and releases under the Plan.

The Non-Settling Insurers remain fully liable for their obligations related in any way to the Civil Rights Claims, and their obligations are not reduced by the Diocese being in bankruptcy or by the distributions Civil Rights Claimants receive, or are entitled to receive, based on the Plan.

7.5.3 **Civil Rights Claim Objections**. No Class 9 Claimant may challenge the merit, validity, or amount of any other Class 9 Claim. Except for any objection to a Class 9 Claim filed by the Committee, any objection to a Class 9 Claim pending as of the Effective Date is deemed withdrawn with prejudice. The Trustee has the exclusive right to object to a Class 9 Claim and shall succeed to the rights of the Committee because of the Committee's objection to a Class 9 Claim. The Reorganized Debtor shall not have the right to object to a Class 9 Claim.

7.5.4 **Litigation Option.** If Ecclesia does not fund the Agreed Amount, the Class 9 Claimants may elect to litigate against the non-Debtor Co-Defendants or select to receive from the Trust $250,000 minus any amounts already expended by the Diocese or the non-Debtor Co-Defendants on pre-petition defense costs relating to litigation of such Class 9 Claim. If a Class 9 Claimant elects to litigate, the Trust shall provide the Reorganized Debtor with $250,000 minus any amounts already expended by the Diocese or the non-Debtor Co-Defendants on pre-petition defense costs relating to litigation of such Class 9 Claim to satisfy the self-insured retention under the relevant Ecclesia policy. Nothing herein shall enlarge the rights or Claims of Class 9 Claimants or limit or waive any defenses to the Class 9 Claims. Unless otherwise provided in this Plan, the Plan shall not affect the liability of any other Person on, or the property of any other Person for, the Class 9 Claims, which liability shall continue unaffected by the terms of this Plan or the discharge granted to the Diocese under this Plan and Section 1141(d) of the Bankruptcy Code. Nothing in the Plan is intended to affect, diminish, or impair the Class 9 Claimant's right against any other parties, including such party's joint and several liability.

26

# SECTION VIII
## ACCEPTANCE OR REJECTION OF PLAN

8.1    **Impaired Classes to Vote.**

Each holder of a Claim in an impaired Class shall be entitled to vote separately to accept or reject the Plan unless such Holder is deemed to accept or reject the Plan.

8.2    **Acceptance by Class of Creditors**.  An impaired Class of holders of Claims, shall have accepted the Plan if the Plan is accepted by at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Allowed Claims of such Class that have voted to accept or reject the Plan.

# SECTION IX
## TRUST AND FUTURE ABUSE CLAIMS TRUST

9.1    **Establishment of Trusts**.  On the Confirmation Date, the Trust shall be established under the Trust Documents and the Future Abuse Claims Trust shall be established under the Future Abuse Claims Trust Documents.  The Trust Documents and Future Abuse Claims Trust Documents, including the Trust Agreement and Future Abuse Claims Trust Agreement, are incorporated herein by reference.

9.2    **Trust Funding**.  The Trust will be funded as follows:

9.2.1    On the Effective Date the Diocese, by wire transfer, will pay or deliver to the Trust the sum of $[41] million and, further, the Diocese shall transfer, assign or otherwise deliver the assets identified in Sections 12.2 - 12.4 to the Trust. The Participating Parties, if any, by wire transfer, will pay or deliver to the Trust their agreed upon amount.

9.2.2    Under the Full or Partial Settlement Alternatives, the Settling Insurers shall pay the trust in accordance with any applicable settlement agreements.

9.2.3    On the Effective Date, with no further act by any party, the Diocese and the Committee will be deemed to have assigned to the Trustee and the Trust all Avoidance Rights (not otherwise released, time-barred, compromised, enjoined or discharged under the Plan).

9.2.4    Under the Litigation Only Alternative, on the Effective Date, with no further act by any party, the Diocese and the Participating Parties shall be deemed to have assigned the Insurance Claims and the proceeds of such Insurance Claims to the Trust and such assignment shall immediately be deemed effective.  On the Effective Date, the Trust will be empowered to receive assignment of Litigation Awards and to take all steps necessary to pursue recovery from Non-Settling Insurers.

9.2.5    Under the Partial Settlement Alternative, on the Effective Date, with no further act by any party, the Diocese and the Participating Parties, if any, shall be deemed to have assigned the Insurance Claims, except the Arrowood Insurance Claims, and the proceeds of such

27

Insurance Claims to the Trust and such assignment shall immediately be deemed effective. On the Effective Date, the Trust will be empowered to receive assignment of Litigation Awards and to take all steps necessary to pursue recovery from Non-Settling Insurers.

9.2.6    The Trust shall transfer six percent (6 %) of the Non-Insurance Trust Assets to the Future Abuse Claims Trust.

9.3    **Reserve Accounts.**

As set forth in the Trust Agreement and Future Abuse Claims Trust Agreements, the Trustee and Future Abuse Claims Trustee shall establish reserves for various purposes.

9.4    **No Execution**. All funds held in the Trust will remain property of the Trust until the funds have been actually paid to and received by a Person or Entity entitled to receive payment under the Plan, Confirmation Order and Trust Documents. Except as provided in the Plan, Confirmation Order and the Trust Documents, the Trust shall not be responsible for any Claims against the Debtor. All funds held in the Future Abuse Claims Trust will remain property of the Future Abuse Claims Trust until the funds have been actually paid to and received by a Person or Entity entitled to receive payment under the Plan, Confirmation Order and Future Abuse Claims Trust Documents. Except as provided in the Plan, Confirmation Order and the Future Abuse Claims Trust Documents, the Future Abuse Claims Trust shall not be responsible for any Claims against the Debtor.

**SECTION X**
**LIQUIDATION AND PAYMENT OF ABUSE CLAIMS**

10.1    **Liquidation and Payment of Abuse Claims.**

10.1.1    The Trust and Future Abuse Claims Trust shall pay Abuse Claims under the terms of the Plan, Confirmation Order, the Trust Agreement, the Trust Allocation Protocol, the Future Abuse Claims Trust Agreement, and the Future Abuse Claims Trust Allocation Protocol, as applicable.

10.1.2    The Abuse Claims Reviewer's determinations shall not be a finding or fixing of the fact or liability or the amount payable for any Abuse Claim with any binding legal effect, other than for distribution purposes by the Trust under the Trust Allocation Protocol or the Future Abuse Claims Trust under the Future Abuse Claims Trust Allocation Protocol. The Trustee's, Future Abuse Claims Trustee's or Abuse Claims Reviewer's determination of qualification of an Abuse Claim, payment on account of an Abuse Claim or reserve for payment on account of an Abuse Claim is not an admission of liability by the Debtor, a Participating Party, the Trust, or the Future Abuse Claims Trust regarding any Abuse Claims and has no *res judicata* or collateral estoppel effect on the Debtor, any Participating Party, the Trust, the Future Abuse Claims Trust, any Non-Settling Insurer or Settling Insurer. Trust and Future Abuse Claims Trust distributions do not release the Debtor or any other Participating Party nor are Trust Distributions or Future Abuse Claims Trust Distributions an agreement or novation of the Debtor's or other Participating Party's liability because of the Abuse Claims. The Trust's or Future Abuse Claims Trust's act of making a distribution is immaterial to, and shall not be construed as, a determination or admission of the Diocese's or any Participating Party's liability for, or damages regarding, any

28

Abuse Claim. The determination of qualification, estimation of Abuse Claims, and payment of distributions is not a settlement, release, accord, or novation of any Abuse Claims and cannot be used by any Joint Tortfeasor as a defense to any alleged joint liability. The Trustee's, Future Abuse Claims Trustee's or Claims Reviewer's determination of qualification of an Abuse Claim, payment on account of an Abuse Claim or reserve for payment on account of an Abuse Claim does not impair an Abuse Claimant's rights to obtain a judgment, including a judgment based on joint and several liability, against the Diocese, a Participating Party, or any Non-Settling Insurer, to establish the Diocese's and/or a Participating Party's liability on the Abuse Claim, but any such judgment awarded to an Abuse Claimant will be reduced by the Trust Distributions or Future Abuse Claims Trust Distributions already paid by the Trust or Future Abuse Claims Trust to such Abuse Claimant on his or her Abuse Claim(s).

10.1.3  Nothing in the Trust Documents or Future Abuse Claims Trust Documents shall (i) impose any costs, directly or indirectly, upon the Estate, any Participating Party or any Settling Insurer relating to the treatment of Abuse Claims or (ii) otherwise modify the rights or obligations of the Estate, any Participating Party or Settling Insurer as otherwise in the Plan.

10.1.4  Neither the Debtor's or the Participating Parties' obligations to Abuse Claimants shall be deemed to have been paid in full, nor their liability to Abuse Claimants satisfied, because of reserves for, distributions because of or payments received by Abuse Claimants from the Trust or Future Abuse Claims Trust, except as modified by the discharge provisions in Section 15. The Trust, Future Abuse Claims Trust or the Diocese and Participating Parties may continue efforts to obtain recoveries from Non-Settling Insurers related to the Abuse Claims. In addition, the Non-Settling Insurers remain fully liable for their obligations related to the Abuse Claims, and their obligations are not reduced by the Diocese being in bankruptcy or by the amount of distributions Abuse Claimants receive, or are entitled to receive, based on the Plan. For the avoidance of doubt, determinations by the Abuse Claims Reviewer and/or any distributions entitled to be received from the Trust or Future Abuse Claims Trust shall not constitute a determination of the Diocese's or any Participating Party's liability or damages for Abuse Claims.

## 10.2    Effect of No Award on Abuse Claims.

If an Abuse Claim is denied payment under the Trust Allocation Protocol or Future Abuse Claims Trust Allocation Protocol, the holder of such Abuse Claim will have no further rights against the Diocese, Participating Parties, the Trust, Trustee, Future Abuse Claims Trust, or Future Abuse Claims Trustee relating to such Abuse Claim.

## 10.3    Treatment of Punitive Damages.

Claims for punitive or exemplary damages in connection with any of the Claims will be treated as Penalty Claims and will receive no distribution under the Plan.

## 10.4    Withdrawal of Abuse Claims.

An Abuse Claimant may withdraw an Abuse Claim at any time on written notice to the Trustee or Future Abuse Claims Trustee, as applicable. If withdrawn, the Claim will be withdrawn with prejudice and may not be reasserted.

DOCS_NY:46991.4 18491/002

10.5    **Medicare Reimbursement and Reporting Obligations.**

10.5.1  The Trust and Future Abuse Claims Trust shall register as a Responsible Reporting Entities ("RRE") under the reporting provisions of section 111 of MMSEA

10.5.2  The Trust and Future Abuse Claims Trust shall timely submit all reports required under MMSEA because of any claims settled, resolved, paid, or otherwise liquidated by the Trust or Future Abuse Claims Trust. The Trust or the Future Abuse Claims Trust, as an RRE, shall follow all applicable guidance published by the Centers for Medicare & Medicaid Services of the United States Department of Health and Human Services and/or any other agency or successor entity charged with responsibility for tracking, assessing, or receiving reports made under MMSEA (collectively, "CMS") to determine whether, and, if so, how, to report to CMS under MMSEA.

10.5.3  For Abuse Claims that occurred after December 5, 1980, before remitting funds to Claimants' counsel, or to the Claimant if such Claimant is acting pro se, regarding any Abuse Claim, the Trustee or Future Abuse Claims Trustee shall obtain (i) a certification that said Claimant (or such Claimant's authorized representative) has provided or will provide for the payment and/or resolution of any obligations owing or potentially owing under 42 U.S.C. § 1395y(b), or any related rules, regulations, or guidance, in connection with, or relating to, such Abuse Claim and (ii) that the Claimants' counsel or Claimant (if Claimant is acting pro se) indemnifies the Trust for any such obligations.

10.6    **No Admission.**

Section 10.5 does not imply, and shall not be an admission that the Debtor, any Participating Party or any Settling Insurer are "applicable plans" within the meaning of Medicare, Medicaid and SCHIP Extension Act of 2007, or that they have any legal obligation to report any actions undertaken by the Trust or Future Abuse Claims Trust or contributions to the Trust or Future Abuse Claims Trust under Medicare, Medicaid and SCHIP Extension Act of 2007 or any other statute or regulation.

10.7    **Delay Regarding Failure To Comply**.

The failure by one or more Medicare Beneficiaries or other Abuse Claimants to follow these provisions shall not delay or impair the payment by the Trustee or Future Abuse Claims Trustee to any other Medicare Beneficiary or other Abuse Claimant following these provisions.

10.8    **Documentation by Estate of Abuse Claimant.**

If the Abuse Claimant is the estate of an Abuse Claimant, then the letters or documentation required under Section 10.5 need not be dated within 120 days of payment by the Trustee or the Future Abuse Claims Trustee to such Claimant.

## SECTION XI
## INSURANCE MATTERS

### 11.1    Applicability.

This Article only applies under the Partial Settlement and Litigation Only Alternatives.

### 11.2    Transfer of Insurance Rights under the Partial Settlement Alternative

On the Effective Date, and with no further action by any party, but subject to this Plan, the Diocese and each of the Participating Parties will be deemed to have assigned to the Trust the Diocese's and the Participating Parties' rights to all Insurance Claims, except the Arrowood Insurance Claims, and Insurance Recoveries, except Arrowood Insurance Recoveries, against the Non-Settling Insurers. The foregoing transfer shall be effective to the maximum extent permissible under applicable law and the terms of the Insurance Policies and shall not be construed: (a) as an assignment of the Insurance Policies or (b) to entitle any person or entity to Insurance Coverage other than those Persons or entities entitled to such coverage under the terms of the Insurance Policies. The determination of whether the assignment of Insurance Claims provided for in this Section is valid, and does not defeat or impair the Insurance Coverage shall be made by the Bankruptcy Court at the Confirmation Hearing. If a party in interest fails to timely file an objection to the proposed assignment by the deadline for filing objections to confirmation of this Plan, that party in interest shall be deemed to have irrevocably consented to the assignment and will be forever barred from asserting that the assignment in any way affects the ability of the Trust to pursue Insurance Claims, Insurance Coverage, and/or Insurance Recoveries from the Non-Settling Insurers. If the Bankruptcy Court determines that the assignment of the Insurance Claims and Insurance Recoveries is valid and does not defeat or impair the Insurance Coverage, following the Effective Date, the Trust shall assume responsibility for, and be bound by, only such obligations of the Diocese or the Participating Parties under the Non-Settling Insurer Insurance Policies as are necessary to enforce the Transferred Insurance Claims; provided, however, that the Trust's assumption of such responsibility shall not relieve the Diocese or the Participating Parties from any duty that such entities may have under the Non-Settling Insurer Insurance Policies.

### 11.3    Transfer of Insurance Rights under the Litigation Only Alternative

On the Effective Date, and with no further action by any party, but subject to this Plan, the Diocese and each of the Participating Parties will be deemed to have assigned to the Trust the Diocese's and the Participating Parties' rights to all Insurance Claims and Insurance Recoveries against the Non-Settling Insurers. The foregoing transfer shall be effective to the maximum extent permissible under applicable law and the terms of the Insurance Policies and shall not be construed: (a) as an assignment of the Insurance Policies or (b) to entitle any person or entity to Insurance Coverage other than those Persons or entities entitled to such coverage under the terms of the Insurance Policies. The determination of whether the assignment of Insurance Claims provided for in this Section is valid, and does not defeat or impair the Insurance Coverage shall be made by the Bankruptcy Court at the Confirmation Hearing. If a party in interest fails to timely file an objection to the proposed assignment by the deadline for filing objections to confirmation of this Plan, that party in interest shall be deemed to have irrevocably consented to the assignment and will be forever barred from asserting that the assignment affects the ability of the Trust to pursue

31

Insurance Claims, Insurance Coverage, and/or Insurance Recoveries from the Non-Settling Insurers.  If the Bankruptcy Court determines that the assignment of the Insurance Claims and Insurance Recoveries is valid and does not defeat or impair the Insurance Coverage, following the Effective Date, the Trust shall assume responsibility for, and be bound by, only such obligations of the Diocese or the Participating Parties under the Non-Settling Insurer Insurance Policies as are necessary to enforce the Transferred Insurance Claims; provided, however, that the Trust's assumption of such responsibility shall not relieve the Diocese or the Participating Parties from any duty that such entities may have under the Non-Settling Insurer Insurance Policies.

11.4    **Appointment of Trustee as Estate Representative to Enforce Insurance Rights and Obtain Insurance Recoveries.**

Under section 1123(b)(3)(B) of the Bankruptcy Code, the Trustee is appointed as the representative of the Diocese and Participating Parties to retain and enforce the Diocese's and Participating Parties' Insurance Coverage and for Insurance Claims regarding the Abuse Claims against the Diocese and Participating Parties for any Insurance Claims transferred to the Trust. The determination of whether the appointment of the Trust as the Debtor's and the Debtor's Estate's representative provided for in Section 11.2 is valid and does not defeat or impair the Insurance Coverage, shall be made by the Bankruptcy Court at the Confirmation Hearing.  If a party in interest fails to timely file an objection to the proposed appointment by the deadline for filing objections to confirmation of this Plan, that party in interest shall be deemed to have irrevocably consented to the appointment and will be forever barred from asserting that the appointment in any way affects the ability of the Trust to pursue Insurance Claims identified as transferred to the Trust under Sections 11.2 and 11.3 (the "**Transferred Insurance Claims**"), Insurance Coverage, and/or Insurance Recoveries related to Transferred Insurance Claims from the Non-Settling Insurers.  If the Bankruptcy Court determines that the appointment is valid and does not defeat or impair the Insurance Coverage, following the Effective Date, the Trust shall assume responsibility for, and be bound by, only such obligations of the Diocese or the Participating Parties under the Non-Settling Insurer Insurance Policies as are necessary to enforce the Transferred Insurance Claims; provided, however, that the Trust's appointment shall not relieve the Diocese or the Participating Parties from any duty that such entities may have under the Non-Settling Insurer Insurance Policies.

11.5    **Consequences of Determination That Assignment or Appointment is Invalid.**

If a Final Order is entered holding that the assignment of Insurance Claims provided for in Sections 11.2 and 11.3, or that the appointment of the Trust as the Diocese's and Participating Parties' representative provided for in Section 11.4, is invalid or would defeat or impair the Insurance Coverage regarding an Insurance Policy, as to such Insurance Policy, the assignment and/or appointment, as the case may be, will be deemed not to have been made.  If the assignment and/or appointment is not deemed to have been made, the Diocese and each of the Participating Parties will retain the Insurance Claims under such Insurance Policy.

11.5.1  The Trust, the Reorganized Debtor, and any Participating Parties shall enter into a common interest agreement related to pursuing any Transferred Insurance Claims.

11.5.2 The Reorganized Debtor and the Participating Parties will assert their Insurance Claims to the extent requested by the Trust against any Non-Settling Insurer. All Insurance Recoveries identified as transferred to the Trust under Sections 11.2 and 11.3 received by the Reorganized Debtor and the Participating Parties will be immediately paid to the Trust. The Reorganized Debtor and Participating Parties will select and retain counsel to pursue their Insurance Claims under this Section, subject to the Trustee's approval, which approval shall not be unreasonably withheld.

11.5.3 The Reorganized Debtor and Participating Parties shall cooperate with the Trust regarding the Transferred Insurance Claims, including that the Reorganized Debtor and Participating Parties will provide the Trustee and its counsel with all discovery requests, pleadings, moving documents and other papers that the Reorganized Debtor or Participating Parties intend to make or file regarding the Transferred Insurance Claims and any related counterclaims against the Non-Settling Insurers before making such requests or filing. The Reorganized Debtor and Participating Parties shall keep the Trustee advised of any settlement discussions regarding any litigation against a Non-Settling Insurer and will involve the Trust's counsel in all settlement discussions with any Non-Settling Insurer.

11.5.4 The Trust shall pay the reasonable attorneys' fees, costs and expenses allowed by the Bankruptcy Court incurred by the Reorganized Debtor and Participating Parties in pursuing the Transferred Insurance Claims under this Section 0, subject to a monthly cap to be established by the Trustee, in consultation with the Reorganized Debtor and Participating Parties.

11.5.5 The Trust shall, in addition to reasonable attorneys' fees, costs and expenses provided for in Section 11.5.4, reimburse the Reorganized Debtor and Participating Parties for any reasonable out of pocket costs and expenses it incurs as a direct consequence of pursuing such Transferred Insurance Claims, but will not compensate the Reorganized Debtor and Participating Parties for any time any of its employees spends. All Insurance Recoveries received by the Reorganized Debtor or Participating Parties because of such Transferred Insurance Claims shall be held in trust to benefit the Trust and shall be immediately remitted by the Reorganized Debtor or Participating Parties to the Trust.

### 11.6    Preservation of Insurance Rights.

Nothing in this Plan shall be construed to impair or diminish any Non-Settling Insurer's obligations under any Insurance Policy. No provision of this Plan shall impair or diminish any Non-Settling Insurer's legal, equitable, or contractual obligations relating to the Insurance Policies issued by the Non-Settling Insurers or the Insurance Claims against the Non-Settling Insurers. If any court determines that any provision of this Plan impairs or diminishes any Non-Settling Insurer's obligations regarding the Insurance Claims or Insurance Recoveries, such provision shall be given effect only if it shall not cause such impairment or diminishment.

### 11.7    Post-Judgment Actions Against Non-Settling Insurers.

If the Trust or any Abuse Claimant obtains a judgment against the Reorganized Debtor or Participating Parties, the Reorganized Debtor or Participating Parties will cooperate with the Trust or Abuse Claimant in the pursuit of any action brought by the Trust or Abuse Claimant against a

33

Non-Settling Insurer that the Trust contends provides Insurance Coverage for such judgment. The Reorganized Debtor and/or Participating Parties will provide the Trust or Abuse Claimant with any non-privileged and relevant documents and information reasonably requested by the Trust or Abuse Claimant in pursuit of such an action. The Trust will reimburse the Reorganized Debtor and Participating Parties for any reasonable out of pocket costs they incur, including attorneys' fees, as a direct consequence of such cooperation, but will not compensate the Reorganized Debtor and Participating Parties for any time their employees spend.

### 11.8 Settlement with Non-Settling Insurers Under the Partial Settlement Alternative.

Following the Effective Date, the Reorganized Debtor and the Participating Parties shall not enter into a settlement agreement affecting any Insurance Policy with any Non-Settling Insurer, except Arrowed, without the express written consent of the Trustee, which consent may be granted or withheld at the Trustee's sole and absolute discretion. Following the Effective Date, the Trust shall exclusively act on the Reorganized Debtor's and Participating Parties' behalf to negotiate a settlement with any Non-Settling Insurer, except Arrowood, because of such Insurance Claims, unless Section 0 apply. The Diocese and Participating Parties shall retain authority to negotiate and enter into a settlement agreement with Arrowood. Such settlements may provide for the Non-Settling Insurer to become a Settling Insurer.

### 11.9 Settlement with Non-Settling Insurers Under the Litigation Only Alternative.

Following the Effective Date, the Reorganized Debtor and the Participating Parties shall not enter into a settlement agreement affecting any Insurance Policy with any Non-Settling Insurer without the express written consent of the Trustee, which consent may be granted or withheld at the Trustee's sole and absolute discretion. Following the Effective Date, the Trust shall exclusively act on the Reorganized Debtor's and Participating Parties' behalf to negotiate a settlement with any Non-Settling Insurer because of such Insurance Claims, unless Section 0 applies. Such settlements may provide for the Non-Settling Insurer to become a Settling Insurer.

### 11.10 Cooperation with Non-Settling Insurer in Defense of Claims.

Without limiting the Diocese and/or Participating Party's obligations under Section 0, if any Abuse Claimant prosecutes an action against the Diocese and/or Participating Party, the Diocese and/or Participating Party will cooperate, under the terms of any applicable Insurance Policy, with a Non-Settling Insurer providing a defense to such a Claim. The Trust will reimburse the Reorganized Debtor and/or the Participating Party the reasonable attorneys' fees, costs and expenses allowed by the Bankruptcy Court incurred as a direct consequence of such cooperation, subject to a monthly cap to be established by the Trustee, in consultation with the Reorganized Debtor and Participating Parties, but the Trust will not compensate the Reorganized Debtor or Participating Parties for any time their employees spend. To the extent a Non-Settling Insurer has refused to defend an Abuse Claim, the Reorganized Debtor and/or Participating Party will not cooperate with such Insurer and may enter into stipulated judgments with the Abuse Claimant or the Trustee. The Trust will not reimburse the Reorganized Debtor or Participating Party for any out-of-pocket costs if the Non-Settling Insurer has refused to defend the Abuse Claim.

34

If the Trust asserts any claim that the Diocese has breached such duties or obligations under the Non-Settling Insurer Insurance Policies causing a loss of coverage, it shall give the Diocese notice and an opportunity to cure any alleged breach, and the Diocese shall not be liable for any alleged breach causing a loss of coverage except when (i) the breach relates to post-Effective Date conduct of the Diocese, and (ii) the Diocese willfully or intentionally violates its continuing obligations under the Non-Settling Insurer Insurance Policies. In addition, any such claim will not be automatically allowed; the Diocese may defend against such claim.

### 11.11   **Insurance Neutrality.**

Other than as expressly provided in this Section, no provision of this Plan shall diminish or impair the right of any Insurer to assert any defense to any Insurance Claim.  That the Trust is liquidating and paying/reserving monies because of the Abuse Claims shall not be construed to diminish any duty of any Insurer under any Insurance Policy to provide Insurance Coverage to the Diocese for Abuse Claims.  The duties and obligations, if any, of the Non-Settling Insurers under each Non-Settling Insurer's Insurance Policy shall not be impaired, altered, reduced or diminished by: (a) the discharge granted to the Debtor under the Plan under section 1141(d) of the Bankruptcy Code, (b) the exonerations, exculpations and releases in the Plan or (c) the Channeling Injunction.

### 11.12   **Judgment Reduction**

In connection to any action by the Trust to enforce Insurance Claims regarding an Insurance Policy issued by a Non-Settling Insurer, if any Insurer obtains a judicial determination or binding arbitration award that, it would be entitled to obtain a sum certain from a Settling Insurer because of a claim for contribution, subrogation, indemnification, or other similar claim against a Settling Insurer for such Settling Insurer's alleged share or equitable share, or to enforce subrogation rights, if any, of the defense and/or indemnity obligation of such Settling Insurer for any Claims released or resolved under any settlement agreement with a Settling Insurer, the Diocese, the Trustee or other Participating Party, as applicable, shall be deemed to have reduced its judgment or Claim against, or settlement with, such other Insurer to the extent necessary to satisfy such contribution, subrogation, indemnification, or other claims against such Settling Insurer.  To make sure such a reduction is accomplished, such Settling Insurer shall be entitled to assert this Section as a defense to any action against it brought by any other Insurer for any such portion of the judgment or Claim and shall be entitled to request that the court or appropriate tribunal issue such orders as are necessary to effectuate the reduction to protect such Settling Insurer and the Released Parties under a settlement agreement with a Settling Insurer from any liability for the judgment or Claim.  If a Non-Settling Insurer asserts that it has a Claim for contribution, indemnity, subrogation, or similar relief against a Settling Insurer, such Claim may be asserted as a defense against the Trust or Diocese in any litigation of Insurance Claims (and the Trust or Diocese may assert the legal and equitable rights of such Settling Insurer in response thereto); and to the extent such a Claim is found to be valid by the court presiding over such action, the liability of such Non-Settling Insurer to the Trust, the Diocese or other Participating Party shall be reduced dollar for dollar by the amount so determined.  The Bankruptcy Court shall retain non-exclusive jurisdiction to determine the amount, if any, of any judgment reduction under this Section.  In addition, any court of competent jurisdiction may determine the amount, if any, of any judgment reduction under this Section.

## SECTION XII
## MEANS FOR IMPLEMENTATION OF THE PLAN

12.1    **Debtor's Funding of Plan**.

On or before the Effective Date, Cash in the total amount of $[41] million shall be transferred by wire transfer to the Trust by or on behalf of the Debtor.

12.2    **Sale of Telecommunication Assets**.

If the sale contemplated in the *Motion of the Debtor for Entry of Orders (I)(A) Approving Bidding Procedures for the Sale of the Debtor's Assets, (B) Authorizing The Debtor To Enter Into One Or More Stalking Horse Purchase Agreements and To Provide Bid Protections Thereunder, (C) Scheduling an Auction and Approving the Form and Manner of Notice Thereof, (D) Approving Assumption and Assignment Procedures and (E) Scheduling A Sale Hearing and Approving the Form and Manner of Notice Thereof; (II)(A) Approving the Sale of the Debtor's Assets Free and Clear of Liens, Claims, Interests and Encumbrances and (B) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases; and (III) Granting Related Relief* [Docket No. 1459] closes prior to the Effective Date, the Diocese shall transfer the net proceeds from that sale to the Trust.  If the sale is still pending on the Effective Date, the Diocese shall transfer the net proceeds no later than five business days following its receipt of such funds.  If no such sale is pending on the Effective Date, the Diocese shall take all steps necessary to effectuate transfer of ownership of the assets to the Trust, subject to regulatory approval if applicable.

12.3    **Transfer of Real Property and Reversionary Interests**.

On the Effective Date, the Diocese shall take all steps necessary to effectuate transfer of ownership to the Trust of all real property titled to the Diocese.  If any real property is sold prior to the Effective Date, the net proceeds from such sale shall be transferred to the Trust on the Effective Date. On the Effective Date, the Diocese shall also take all steps necessary to effectuate transfer of all reversionary interests in the real and/or personal property listed in the Diocese's schedules, as they may be amended, if any portion of the properties are leased, sold, or subject to an option for lease or sale on or before the Trust Termination Date (as that term is defined in the Trust Documents).

12.4    **Sale of Ecclesia**.

The Diocese will, in consultation with the Committee or Trustee as applicable, sell Ecclesia, subject to regulatory approval.  Upon the closing of such a sale, the Diocese shall transfer the net proceeds to the Trust. To the extent such sale is not pending prior to the Effective Date, the Diocese shall take all steps necessary to effectuate transfer of ownership of the Ecclesia assets to the Trust, subject to regulatory approval if applicable

12.5    **Participating Party or Settling Insurer Settlement Contribution.**

On or before the Effective Date, transfers to the Trust by or on behalf of a Participating Party or Settling Insurer shall be made by wire transfer to the Trust.

12.6    **Debtor and Trust Waiver and Release of Estate's Causes of Action Against Participating Parties and Settling Insurers.**

In consideration of the contributions and other consideration to be provided by each Participating Party and Settling Insurer, the Debtor and Trust, as applicable, irrevocably and unconditionally, without limitation, shall release, acquit, and forever discharge such Participating Party and Settling Insurer from any Causes of Action of the Estate against any Participating Party or Settling Insurer, or the property thereof, such release to be effective upon the Effective Date.

Notwithstanding the above, to preserve coverage under any Non-Settling Insurer's Insurance Policies, Abuse Claimants specifically reserve, and do not release, any claims they may have against the Diocese, the Reorganized Debtor, or any other Participating Party that implicate coverage under any Non-Settling Insurer's Insurance Policies, but recourse is limited to the proceeds of the Non-Settling Insurer's Insurance Policies and all other damages (including extra-contractual damages), awards, judgments in excess of policy limits, penalties, punitive damages and attorney's fees and costs that may be recoverable against any Non-Settling Insurers because of their conduct concerning insurance coverage for, or defense or settlement of, any Abuse Claim, and any such judgments or awards will be handled under the Plan and the Trust Allocation Protocol. The Abuse Claims will not be released or enjoined as against the Diocese, the Reorganized Debtor, or any other Participating Party for any Abuse that may be covered under any Non-Settling Insurer's Insurance Policies until such claims are settled with the Diocese, the Reorganized Debtor, any other Participating Party and such Non-Settling Insurer or are fully adjudicated, resolved, and subject to Final Order, but recourse is limited as described above.

12.7    **Debtor and Participating Party Contributions**

The Debtor's and Participating Party's contributions are being made in respect of the uninsured or underinsured  exposure of the Debtor and the Participating Parties for Abuse Claims and, to the extent required under applicable law, to satisfy self-insured retentions or deductibles under Non-Settling Insurer Insurance Policies.

12.8    **Reorganized Debtor's Members and Senior Management.**

In accordance with § 1129(a)(5) of the Bankruptcy Code, the identities and affiliations of the persons proposed to serve as the members and trustees of the Reorganized Debtor and the persons proposed to serve as officers of the Reorganized Debtor on and after the Effective Date are set forth on Exhibit I.

12.9    **Additional Documentation; Non-Material Modifications.**

From and after the Effective Date, the Trustee, the Future Abuse Claims Trustee, the Reorganized Debtor, and the Participating Parties are authorized to enter into, execute, adopt, deliver and/or implement all contracts, leases, instruments, releases, and other agreements or documents necessary to effectuate or memorialize the settlements in this Plan without further Order of the Bankruptcy Court.  Also, the Trustee, the Reorganized Debtor, and the Participating Parties may make technical and/or immaterial alterations, amendments, modifications or supplements to the terms of any settlement in this Plan, without Bankruptcy Court approval,

provided that the amendment or modification does not materially and adversely change the treatment of any holder of a Class 4 Claim without the prior written agreement of such holder. A Class of Claims that has accepted the Plan shall be deemed to have accepted the Plan, as altered, amended, modified or supplemented under this Section, if the proposed alteration, amendment, modification or supplement does not materially and adversely change the treatment of the Claims within such Class. An Order of the Bankruptcy Court approving any amendment or modification made under this Section shall constitute an Order in aid of consummation of the Plan and shall not require the re-solicitation of votes on the Plan.

### 12.10   Non-Settling Insurers Unaffected.

The rights and obligations of Non-Settling Insurers and Co-Defendants shall be unaffected by this Section.

### 12.11   Closing.

Closing will be conducted in the New York offices of Pachulski, Stang, Ziehl & Jones LLP, or at such other location designated by the Committee, including remotely, as soon as reasonably practicable following the Effective Date for the Diocese and the Participating Parties to execute and deliver the Plan Documents and completing those actions necessary for the Reorganized Debtor and the Participating Parties to establish and fund the Trust and make other distributions required to be made upon, or promptly following, the Effective Date. As soon as practicable after conditions in Section 14.1 have been satisfied or waived under Section 14.2, the Diocese shall file notice of the Closing and the occurrence of the Effective Date.

### 12.12   Obligations of the Reorganized Debtor and Participating Parties.

The Reorganized Debtor and the Participating Parties will:

a)      In the exercise of their respective business judgment, review all Claims filed against the Estate except for Abuse and Personal Injury Claims and, if advisable, object to such Claims;

b)      After the Effective Date, not object to any Abuse Claims or Personal Injury Claims. Despite the foregoing, the Reorganized Debtor shall timely provide the Abuse Claims Reviewer with information regarding Abuse Claims as may be requested by the Abuse Claims Reviewer.

c)      Fulfill the Diocese's obligations under the Insurance Policies issued by the Non-Settling Insurers and under applicable non-bankruptcy law, with the Diocese's reasonable attorneys' fees, costs and expenses, if any, incurred in doing so to be paid by the Non-Settling Insurers and/or the Trust, as provided under the Insurance Policies, this Plan, or the Trust Documents, as applicable;

d)      Honor the Diocese's obligations arising under any settlement agreement between the Diocese and any Participating Party approved by the Bankruptcy Court; and,

38

e)      Perform all of their obligations under this Plan and Plan Documents, in each case, as and when the same become due or are to be performed.

### 12.13    Objections to Claims.

Objections to a Claim (except for Abuse and Personal Injury Claims) as to which no objection is pending as of the Effective Date, must be filed by the Claims Objection Deadline, provided that the Reorganized Debtor may request extensions of the Claims Objection Deadline, or of any Bankruptcy Court approved extensions thereof, by Filing a motion with the Bankruptcy Court. A motion seeking to extend the deadline to object to any Claim is not an amendment to the Plan. No party in interest other than the Trustee may object to a Class 4. Class 6, or Class 9 Claim. No party in interest other than the Future Abuse Claims Trustee may object to a Class 7 Claim. The process and deadlines for any objections to Abuse Claims are as set forth in the Trust Allocation Protocol or the Future Abuse Claims Trust Allocation Protocol.

### 12.14    Provisions Governing Distributions.

**12.14.1 Distribution Only to Holders of Allowed Claims.**  Except as otherwise provided in the Plan, distributions under this Plan and the Plan Documents will be made only to the holders of Allowed Claims and in the case of Abuse Claims, pursuant only to the Plan and the Trust Documents or Future Abuse Claims Trust Documents, as applicable.  Until a Disputed Claim becomes an Allowed Claim, the holder of that Disputed Claim will receive no distribution otherwise provided to the Claimants under this Plan or the Plan Documents.

**12.14.2 Transmittal of Distributions.**  Except as otherwise provided in this Plan, in the Plan Documents, or in an order of the Bankruptcy Court, distributions to be made under this Plan, Confirmation Order, Trust Documents, or Future Abuse Claims Trust Documents, as applicable, to Abuse Claimants and Personal Injury Claimants that opt to not litigate will be made by the Trustee or Future Abuse Claims Trustee, as applicable, and distributions to all other Claimants will be made by the Reorganized Debtor.  Distributions to Abuse Claimants and Personal Injury Claimants will be made (a) to the client trust account for attorneys of record of Abuse Claimants, (b) if the Abuse Claimant does not have an attorney of record, to the latest mailing address set forth in a proof of claim filed with the Claims Agent or the Bankruptcy Court by or on behalf of such Claimant, or to such other address as may be provided to the Reorganized Debtor or Trustee, as applicable, by such Claimant in writing, or (c) if no such proof of claim has been filed and no written notice setting forth a mailing address is provided by or on behalf of such Claimant to the Reorganized Debtor, Trustee, or Future Abuse Claims Trustee to the mailing address in the schedules filed by the Debtor in this Case.  Distributions to other Claimants will be made by wire or first class United States mail, postage prepaid, (a) to the client trust account for attorneys of record of the Claimant, (b) if the Claimant does not have an attorney of record, to the latest mailing address in a proof of claim filed with the Claims Agent or the Bankruptcy Court by or on behalf of such Claimant, or to such other address as may be provided to the Reorganized Debtor, as applicable, by such Claimant in writing, or (c) if no such proof of claim has been filed and no written notice setting forth a mailing address is provided by or on behalf of such Claimant to the Reorganized Debtor, to the mailing address in the schedules filed by the Debtor in this Case. If a Claimant's distribution is not mailed or is returned to the Reorganized Debtor, Trustee, or Future Abuse Claims Trustee because of the absence of a proper mailing address, the Reorganized

39

Debtor, Trustee, or Future Abuse Claims Trustee, as the case may be, shall make a reasonable effort to locate or ascertain the correct mailing address for such Claimant from information generally available to the public and from such party's own records, but shall not be liable to such Claimant for having not found a correct mailing address. The Trustee or the Future Abuse Claims Trustee, as applicable, shall have no liability to an Abuse Claimant because of distributions made to the client trust account of an Abuse Claimant's attorney.

12.14.3 **Timing of Distributions.** Unless otherwise agreed by the Reorganized Debtor, Trustee, or Future Abuse Claims Trustee, as applicable, and the recipient of a distribution under this Plan or the Plan Documents, whenever any payment to be made is due on a day other than a Business Day, such payment will instead be made on the next Business Day, with interest to the extent expressly contemplated by this Plan or any applicable agreement or instrument.

Any Claimant otherwise entitled to an undeliverable Distribution and that does not, within thirty (30) days after a Distribution is returned to the Trustee, Future Abuse Claims Trustee, or Diocese as undeliverable, or is deemed to be an undeliverable Distribution, provide the Trustee or Diocese with a written notice asserting its claim to that undeliverable Distribution and setting forth a current, deliverable address will be deemed to waive any claim to such undeliverable Distribution and will be forever barred from receiving such undeliverable Distribution or asserting any Claim against the Reorganized Debtor, the Trust, the Trustee, the Future Abuse Claims Trust, the Future Abuse Claims Trustee, or their property. Any undeliverable Distributions not claimed under this Section will become available to distribute to other Claimants or be retained by the Reorganized Debtor under the Plan. Nothing in the Plan requires the Reorganized Debtor, the Trust, the Trustee, the Future Abuse Claims Trust, or the Future Abuse Claims Trustee to attempt to locate any Claimant whose Distribution is undeliverable.

12.14.4 **Time Limit on Negotiation of Instruments**. If an instrument delivered as a Distribution to a Claimant is not negotiated within one hundred and twenty (120) days after such instrument was sent to the Claimant, then the instrument shall be null and void, the Claimant shall be deemed to have waived such Distribution, and it shall become cash available to the Trustee for any Trust purpose, the Future Abuse Claims Trustee for any Future Abuse Claims Trust purpose, or the Reorganized Debtor, as the case may be.

12.14.5 **Form of Distributions.** Unless otherwise agreed by the Reorganized Debtor or Trustee, as applicable, and the recipient of a distribution under this Plan or the Plan Documents, all distributions will be made, at the option of the Reorganized Debtor or Trustee, by a check by first class mail, postage prepaid or wire transfer.

12.14.6 **No Professional Fees or Expenses.** No professional fees or expenses incurred by a Claimant will be paid by the Debtor, the Reorganized Debtor, or the Trustee regarding any Claim except as specified in this Plan or the Trust Documents.

12.15 **Reservation of Rights to Object to Claims Other Than Abuse or Personal Injury Claims.**

Unless a Claim is expressly described as an Allowed Claim under the Plan, or otherwise becomes an Allowed Claim before the Effective Date, upon the Effective Date, the Reorganized

Debtor shall be deemed to have a reservation of any rights, interests and objections of the Debtor to any Claims and motions or requests for the payment of or because of Claims, whether administrative expense, priority, secured or unsecured (but not Abuse or Personal Injury Claims), whether under the Bankruptcy Code, other applicable law or contract. Subject to the Claims Objection Deadline, the Debtor's failure to object to any Claim in the Case shall be without prejudice to the Reorganized Debtor's rights to contest or otherwise defend against such Claim in the Bankruptcy Court in this Section when and if such Claim is sought to be enforced by the holder of such Claim.

### 12.16   Service of Objections.

An objection to a Claim shall be deemed properly served on the holder of such Claim if the objector effects service by any of the following methods: (i) under Rule 4 of the Federal Rules of Civil Procedure, as modified and made applicable by Bankruptcy Rule 7004; (ii) to the extent counsel for such holder is unknown, by first class mail, postage prepaid, on the signatory on the Proof of Claim or other representative identified on the Proof of Claim or any attachment thereto; or (iii) by first class mail, postage prepaid, on any counsel that has appeared on the behalf of such holder in the Case.

### 12.17   Determination of Claims.

From and after the Effective Date, any Claim (except for Abuse or Personal Injury Claims) as to which a Proof of Claim or motion or request for payment was timely filed in the Case or deemed timely filed by Order of the Bankruptcy Court, may be determined and (so long as such determination has not been stayed, reversed or amended and as to which determination (or any revision, modification or amendment thereof) the time to appeal or seek review or rehearing has expired and as to which no appeal or petition for review or rehearing was filed or, if filed, remains pending) liquidated under (i) an Order of the Bankruptcy Court, (ii) applicable bankruptcy law, (iii) agreement of the parties with no Bankruptcy Court approval, (iv) applicable non-bankruptcy law or (v) the lack of (a) an objection to such Claim, (b) an application to equitably subordinate such Claim and (c) an application to otherwise limit recovery regarding such Claim, filed by the Diocese or any other party in interest on or before any applicable deadline for Filing such objection or application regarding such Claim. Any such Claim so determined and liquidated shall be deemed to be an Allowed Claim for such liquidated amount and shall be satisfied under the Plan. Nothing in this Section shall be or be deemed a waiver of any Claims, rights, interests or Causes of Action that the Diocese may have against any Person in connection with or arising out of any Claim or Claims, including any rights under 28 U.S.C. § 157.  Notwithstanding the foregoing, no party in interest other than the Trustee or Future Abuse Claim Trustee, as applicable, may object to an Abuse Claim or a Personal Injury Claim.

### 12.18   No Distributions Pending Allowance.

No payments or distributions will be made regarding all or any part of a Disputed Claim unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by a Final Order, and the Disputed Claim has become an Allowed Claim; provided, however, that if only a portion of such Claim is an Allowed Claim, the Reorganized Debtor may, in their discretion, make a distribution because of the part of such Claim that is an Allowed Claim.

DOCS_NY:46991.4 18491/002

### 12.19  Claim Estimation.

To effectuate distributions under the Plan and avoid undue delay in the administration of the Case, the Diocese, after notice and a hearing (which notice may be limited to the holder of such Disputed Claim), shall have the right to seek an Order of the Bankruptcy Court or the District Court under section 502(c) of the Bankruptcy Code, estimating or limiting, because of a Disputed Claim, the amount of (i) property that must be withheld from or reserved for distribution purposes because of such Disputed Claim(s), (ii) such Claim for allowance or disallowance purposes, or (iii) such Claim for any other purpose allowed under the Bankruptcy Code; provided, however, that the Bankruptcy Court or the District Court, as applicable, shall determine (i) whether such Claims are subject to estimation under section 502(c) of the Bankruptcy Code and (ii) the timing and procedures for such estimation proceedings, if any, such matters being beyond the scope of the Plan.  Notwithstanding the foregoing, no party in interest except the Trustee may seek to estimate a Class 4 or Class 9 Claim and no party in interest except the Future Abuse Claim Trustee may seek to estimate a Future Abuse Claim.

### 12.20  Timing of Distributions S/A/P Claims.

On the Effective Date, the Reorganized Debtor shall establish the S/A/P Claims Reserve for all Disputed S/A/P Claims and Allowed S/A/P Claims not paid before the Effective Date. As soon as practicable after (and to the extent) that a Disputed S/A/P Claim becomes an Allowed S/A/P Claim, the Reorganized Debtor shall make a payment from the S/A/P Claims Reserve to the holder of such Claim in the Allowed amount of such Claim. After (and to the extent) a Disputed S/A/P Claim is determined not to be an Allowed S/A/P Claim, the part of the S/A/P Claims Reserve reserved for such Claim shall be released from the S/A/P Claims Reserve and distributed or retained by the Reorganized Debtor, as applicable, under the Plan.

### 12.21  Setoffs.

The Diocese may, to the extent permitted under applicable law, set off against any Allowed Claim and the distributions to be made under the Plan because of such Allowed Claim, the Claims, rights and Causes of Action of any nature that the Diocese may hold against the holder of such Allowed Claim not otherwise waived, released or compromised under the Plan; provided, however, that neither such a setoff nor the allowance of any Claim under the Plan shall constitute a waiver or release by the Diocese of any such Claims, rights and Causes of Action that the Dioceses possesses against such holder.

### 12.22  No Interest on Claims.

Unless otherwise specifically provided for in the Plan, the Confirmation Order, or a postpetition agreement in writing between the Diocese and a holder of a Claim and approved by an Order of the Bankruptcy Court, postpetition interest shall not accrue or be paid on any Claim, and no holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim. In addition, and without limiting the foregoing or any other provision of the Plan, Confirmation Order, Trust Agreement, or Future Abuse Claims Trust Agreement interest shall not accrue on or be paid on any Disputed Claim regarding the period from the Effective Date to the date a final distribution is made when and if such Disputed Claim becomes an Allowed Claim.

42

12.23   **Withholding Taxes.**

The Diocese shall comply with all withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority, and all distributions under the Plan shall be subject to any such withholding and reporting requirements. As a condition to making any distribution under the Plan, the Diocese may require that the holder of an Allowed Claim provide such holder's taxpayer identification number and such other information and certification as may be deemed necessary to comply with applicable tax reporting and withholding laws.

12.24   **Closing of the Case.**

As soon as practicable after the Effective Date, when the Diocese deems appropriate, the Diocese will seek authority from the Bankruptcy Court to close the Case under the Bankruptcy Code and the Bankruptcy Rules; provided, however, that entry of a final decree closing the Case shall, whether or not specified therein, be without prejudice to the right of the Diocese, the Trustee, Future Abuse Claim Trustee, or any other party in interest to reopen the Case for any matter over which the Bankruptcy Court or the U.S. District Court for the Southern District of New York has retained jurisdiction under this Plan.  Any order closing this Case will provide that the Bankruptcy Court or the U.S. District Court for the Southern District of New York, as appropriate, will retain (a) jurisdiction to enforce, by injunctive relief or otherwise, the Confirmation Order, any other orders entered in this Case, and the obligations created by this Plan and the Plan Documents; and (b) all other jurisdiction and authority granted to it under this Plan and the Plan Documents.

12.25   **No De Minimis Distributions.**

Notwithstanding anything to the contrary in this Plan, no cash payment of less than $100 will be made by the Reorganized Debtor, the Trustee, or Future Abuse Claim Trustee, as applicable, to any Holder of an Allowed Claim.  No consideration will be provided in lieu of the de minimis distributions not made under this Section.  Allowed Claims entitled to a Pro Rata distribution of less than $100 shall continue to accrue until the Pro Rata distribution because of such Claim will be $100 or more.

12.26   **Manner of Cash Payments.**

Cash payments to domestic Claimants will be denominated in U.S. dollars and will be made by checks drawn on a domestic bank selected by the Trustee or Future Abuse Claim Trustee, as applicable, or at the Trustee's or Future Abuse Claim Trustee's option, by wire transfer from a domestic bank. Cash payments to foreign Claimants may be paid, at the Trustee's or Future Abuse Claim Trustee's option, either in the same manner as payments to domestic entities or in any funds and by any means that are necessary or customary in the particular foreign jurisdiction.

## SECTION XIII
## LITIGATION

13.1   **Preservation of Causes of Action.**

The Trustee, on behalf of the Trust, shall retain the Trust's Causes of Action, whether arising before or after the Petition Date, in any court or other tribunal, including, without limitation,

43

the Bankruptcy Court. The Trustee, on behalf of the Trust, shall have the exclusive right, authority, and discretion to institute, prosecute, abandon, settle, or compromise any such Causes of Action, subject to the requirements of the Bankruptcy Code. To the extent the Committee is the named plaintiff in any Cause of Action vested in the Trust, the Trustee may be substituted as the named plaintiff without additional notice to the parties in such Cause of Action.

13.2    The Reorganized Debtor shall retain and exclusively enforce the Debtor's Causes of Action, whether arising before or after the Petition Date, in any court or other tribunal, including, without limitation, the Bankruptcy Court. The Reorganized Debtor shall have the exclusive right, authority, and discretion to institute, prosecute, abandon, settle, or compromise any such Causes of Action, without obtaining Bankruptcy Court approval.

## SECTION XIV
## CONDITIONS PRECEDENT

14.1    **Conditions to Effectiveness.**

The Effective Date will occur when each of the following conditions have been satisfied or waived under Section 14.2:

(a)    The Bankruptcy Court shall have entered a Final Order or Final Orders approving all settlement agreements involving the Participating Parties and Settling Insurers (for agreements executed before the Confirmation Date) and any appropriate judgments consistent therewith, in form and substance reasonably acceptable to each party, and no stay of such Orders shall be in effect;

(b)    the Bankruptcy Court shall have entered the Confirmation Order in form and substance reasonably acceptable to the Committee and no stay of such Order shall be in effect;

(c)    The Future Abuse Claims Trustee and Debtor have signed the Future Abuse Claims Trust Agreement;

(d)    The Trustee and Debtor have signed the Trust Agreement; and

(e)    The Debtor, the Participating Parties (if applicable), and the Settling Insurers (if applicable) have made the transfers to the Trust described in Section 12.1 and 12.5.

14.2    **Waiver of Conditions.**

Any condition in Section 14.1 may be waived by the mutual written consent of the Proponent, the Debtor and the Participating Parties.

14.3    **Non-Occurrence of Effective Date.**

Subject to further order of the Bankruptcy Court, if the Effective Date does not occur within ninety (90) days of entry of a Final Order confirming the Plan, the Plan shall become null and void.

DOCS_NY:46991.4 18491/002

A statement shall be filed with the Court within three (3) Business Days after either the Effective Date or the occurrence of any event that renders the Plan null and void.

## SECTION XV
## EFFECTS OF PLAN CONFIRMATION AND DISCHARGE

15.1    **Discharge.**

Except as otherwise expressly provided in the Plan or in the Confirmation Order, on the Effective Date under section 1141(d) of the Bankruptcy Code, the Diocese will be discharged from all liability for any and all Claims and Debts, known or unknown, whether or not giving rise to a right to payment or an equitable remedy, that arose, directly or indirectly, from any action, inaction, event, conduct, circumstance, happening, occurrence, agreement, or obligation of the Debtor, or the Debtor's Representatives before the Confirmation Date, or that otherwise arose before the Confirmation Date, including all interest, if any, on any such Claims and Debts, whether such interest accrued before or after the date of commencement of this Case, and including all Claims and Debts based upon or arising out of an Abuse Claim and from any liability of the kind specified in sections 502(g), 502(h), and 502(i) of the Bankruptcy Code, whether or not (a) a proof of claim is filed or is deemed filed under section 501 of the Bankruptcy Code; (b) such Claim is Allowed under this Plan; or (c) the holder of such Claim has accepted this Plan.

Abuse Claimants specifically reserve, and do not release, any claims they may have against the Diocese or any other Participating Party that implicate coverage under any Non-Settling Insurer's Insurance Policies, but recourse is limited to the proceeds of the Non-Settling Insurer's Insurance Policies and all other damages (including extra-contractual damages), awards, judgments in excess of policy limits, penalties, punitive damages and attorney's fees and costs that may be recoverable against any Non-Settling Insurers because of their conduct regarding insurance coverage for, or defense or settlement of, any Abuse Claim, and any such judgments or awards will be handled under the Plan and the Trust Allocation Protocol. The Abuse Claims will not be released or enjoined as against the Diocese or any other Participating Party for any Abuse that may be covered under any Non-Settling Insurer's Insurance Policies until such claims are settled with the Diocese, any other Participating Party and such Non-Settling Insurer or are fully adjudicated, resolved, and subject to Final Order, but recourse is limited as described above.

Abuse Claimants and the Trust shall be permitted to name the Diocese or any other Participating Party in any proceeding to resolve whether the Diocese or any other Participating Party has liability for Abuse Claims and the amount of any such liability, solely for the purpose of obtaining insurance coverage from Non-Settling Insurers. The discharge hereunder does not apply to, and shall not limit in any way the obligations of Non-Settling Insurers to defend and pay, the Diocese's or any other Participating Party's liability for Abuse Claims under Non-Settling Insurer Insurance Policies.

Personal Injury Claimants and Civil Rights Claimants if Ecclesia does not fund an Agreed Amount specifically reserve, and do not release, any claims they may have against the Diocese that implicate coverage under any insurance policies issued by Ecclesia, but recourse is limited to Co-Defendants and the proceeds of the Ecclesia insurance policies and all other damages (including extra-contractual damages), awards, judgments in excess of policy limits, penalties,

45

punitive damages and attorney's fees and costs that may be recoverable against Ecclesia because of its conduct regarding insurance coverage for, or defense or settlement of, any Personal Injury Claim or Civil Rights Claims, if Ecclesia does not fund an Agreed Amount. The Personal Injury Claims and Civil Rights Claims if Ecclesia does not fund an Agreed Amount, will not be released or enjoined as against the Diocese until such claims are settled with the Diocese, any Co-Defendants and Ecclesia or are fully adjudicated, resolved, and subject to Final Order, but recourse is limited as described above.

Personal Injury Claimants and Civil Rights Claimants, if Ecclesia does not fund an Agreed Amount, shall be permitted to name the Diocese in any proceeding to resolve whether the Diocese has liability for Personal Injury Claims or Civil Rights Claims and the amount of any such liability, solely for the purpose of obtaining insurance coverage from Ecclesia. The discharge hereunder does not apply to, and shall not limit in any way the obligations of Ecclesia to defend and pay, the Diocese's or any other Participating Party's liability for Personal Injury Claims or Civil Rights Claims, if Ecclesia does not fund an Agreed Amount, under any insurance policies issued by Ecclesia.

15.2 **NOTHING CONTAINED IN THIS PLAN SHALL CONSTITUTE A RELEASE OF ANY ABUSE CLAIM AGAINST A PERSON HAVING PERSONALLY COMMITTED AN ACT OR ACTS OF ABUSE RESULTING IN A CLAIM AGAINST THE DEBTOR, A PARTICIPATING PARTY OR A SETTLING INSURER; A SUCCESSOR OR PREDECESSOR OF THE DEBTOR TO THE EXTENT OF SUCH SUCCESSOR'S OR PREDECESSOR'S INDEPENDENT LIABILITY FOR AN ACT OR ACTS OF ABUSE; AND THE HOLY SEE.**

15.3 **FOR AVOIDANCE OF DOUBT, EXCEPT AS REQUIRED BY THE INSURANCE POLICIES OF NON-SETTLING INSURERS, THE DEBTOR MAY ELECT NOT TO DEFEND ANY ABUSE LITIGATION THAT IS AUTHORIZED TO BE PROSECUTED AGAINST THE DEBTOR PURSUANT TO THIS PLAN AND NO JUDGMENT OBTAINED AGAINST THE DEBTOR IN SUCH ABUSE LITIGATION CAN BE EXECUTED AGAINST THE REVESTED ASSETS OR FROM ANY ASSETS ACQUIRED BY THE REORGANIZED DEBTOR SUBSEQUENT TO THE EFFECTIVE DATE.**

15.4 **SCOPE OF DISCHARGE.**

**SECTION 15.1 DOES NOT APPLY TO (A) THE OBLIGATIONS OF ANY NON-SETTLING INSURERS FOR ANY CLAIMS; (B) THE OBLIGATIONS ARISING UNDER ANY SETTLEMENT AGREEMENT BETWEEN THE DEBTOR, ANY PARTICIPATING PARTY OR ANY SETTLING INSURER APPROVED BY THE BANKRUPTCY COURT (INCLUDING THE DEBTOR'S INDEMNIFICATION OBLIGATIONS, IF ANY), WHICH ARE NOT AND WILL NOT BE DISCHARGED; (C) THE PERFORMANCE BY THE REORGANIZED DEBTOR OF ANY AND ALL OBLIGATIONS DUE TO THE NON-SETTLING INSURERS UNDER THEIR INSURANCE POLICIES WITH RESPECT TO ANY ABUSE CLAIM; (D) A PERSON HAVING PERSONALLY COMMITTED AN ACT OR ACTS OF ABUSE RESULTING IN A CLAIM AGAINST THE DEBTOR, A PARTICIPATING PARTY OR A SETTLING INSURER; (E) A SUCCESSOR OR**

DOCS_NY:46991.4 18491/002

**PREDECESSOR OF THE DEBTOR TO THE EXTENT OF SUCH SUCCESSOR'S OR PREDECESSOR'S INDEPENDENT LIABILITY FOR AN ACT OR ACTS OF ABUSE; AND (F) THE HOLY SEE.**

15.5    **POSTPETITION ABUSE CLAIMS.**

**EXCEPT TO THE EXTENT PROVIDED FOR IN A SETTLEMENT AGREEMENT WITH A PARTICIPATING PARTY OR A SETTLING INSURER, ABUSE CLAIMS ARISING OR OCCURRING AFTER THE PETITION DATE WILL NOT BE DISCHARGED, RELEASED, IMPAIRED AGAINST THE DEBTOR OR A PARTICIPATING PARTY, OR THE SUBJECT OF THE CHANNELING INJUNCTION OR SETTLING INSURER INJUNCTION.**

15.6    **Vesting of Assets.**

Under sections 1141 and 1123(a)(5) of the Bankruptcy Code, and except as otherwise provided in the Plan or the Confirmation Order, the Revested Assets on the Effective Date shall be free and clear of all liens, Claims, and interests of Creditors, including successor liability Claims. On and after the Effective Date, the Reorganized Debtor may operate and manage its affairs and may use, acquire and dispose of property without notice to any Person, and without supervision or approval by the Bankruptcy Court and free of any restrictions imposed by the Bankruptcy Code, Bankruptcy Rules, or the Bankruptcy Court, other than those restrictions imposed by the Plan or the Confirmation Order.

15.7    **Continued Existence of Reorganized Debtor.**

The Debtor will, as the Reorganized Debtor, continue to exist after the Effective Date as separate entities under the applicable laws of the State of New York, with all the powers of a not-for-profit, non-stock member corporation having tax-exempt status under 26 U.S.C. § 501(c)(3) under applicable law and without prejudice to any right to alter or terminate such existence under applicable state law, except as such rights may be limited and conditioned by the Plan and the documents and instruments executed and delivered in connection therewith.

15.8    **EXCULPATION AND LIMITATION OF LIABILITY.**

**EXCEPT AS EXPRESSLY PROVIDED IN THIS PLAN, NONE OF THE EXCULPATED PARTIES WILL HAVE OR INCUR ANY LIABILITY TO, OR BE SUBJECT TO ANY RIGHT OF ACTION BY, ANY HOLDER OF A CLAIM, ANY OTHER PARTY IN INTEREST, OR ANY OF THEIR RELATED PARTIES, FOR ANY ACT OR OMISSION IN CONNECTION WITH, RELATING TO, OR ARISING OUT OF THE CASE, INCLUDING THE EXERCISE OF THEIR RESPECTIVE BUSINESS JUDGMENT AND THE PERFORMANCE OF THEIR RESPECTIVE FIDUCIARY OBLIGATIONS, THE PURSUIT OF CONFIRMATION OF THE PLAN, OR THE ADMINISTRATION OF THE PLAN, THE TRUST OR THE FUTURE ABUSE CLAIMS TRUST, EXCEPT LIABILITY FOR THEIR WILLFUL MISCONDUCT OR GROSS NEGLIGENCE (PROVIDED HOWEVER THE DIOCESE WILL BE DISCHARGED FROM ANY SUCH LIABILITY FOR SUCH ACTS OR OMISSIONS OCCURRING PRIOR TO THE CONFIRMATION DATE) OR, EXECEPT AS PROVIDED BELOW,**

47

ANY CAUSES OF ACTION ARISING FROM OR RELATED TO DENIALS OF COVERAGE OR COVERAGE DEFENSES RAISED BY NON-SETTLING INSURERS, AND IN ALL RESPECTS, SUCH PARTIES WILL BE ENTITLED TO REASONABLY RELY UPON THE ADVICE OF COUNSEL WITH RESPECT TO THEIR DUTIES AND RESPONSIBILITIES UNDER THE PLAN OR IN THE CONTEXT OF THE CASE. FOR THE AVOIDANCE OF DOUBT, THIS SECTION AND THE DEFINITION OF "EXCULPATED PARTIES" SHALL NOT, DIRECTLY OR INDIRECTLY, INURE TO OR FOR THE BENEFIT OF (I) A PERSON OR PERSONS HAVING PERSONALLY COMMITTED AN ACT OR ACTS OF ABUSE RESULTING IN A CLAIM AGAINST THE DEBTOR, A PARTICIPATING PARTY OR A SETTLING INSURER, (II) A SUCCESSOR OR PREDECESSOR OF THE DEBTOR TO THE EXTENT OF SUCH SUCCESSOR'S OR PREDECESSOR'S INDEPENDENT LIABILITY FOR AN ACT OR ACTS OF ABUSE, (III) THE HOLY SEE, OR (IV) ANY NON-SETTLING INSURER.

IF THE TRUST ASSERTS ANY CLAIM THAT THE DIOCESE HAS BREACHED DUTIES OR OBLIGATIONS UNDER ANY NON-SETTLING INSURER INSURANCE POLICIES RESULTING IN A LOSS OF COVERAGE, IT SHALL GIVE THE DIOCESE NOTICE AND AN OPPORTUNITY TO CURE ANY ALLEGED BREACH, AND IN ANY EVENT, THE DIOCESE SHALL NOT BE LIABLE FOR ANY ALLEGED BREACH RESULTING IN A LOSS OF COVERAGE EXCEPT TO THE EXTENT THAT (I) THE BREACH RELATES TO POST-EFFECTIVE DATE CONDUCT OF THE DIOCESE, AND (II) THE DIOCESE WILLFULLY OR INTENTIONALLY FAILS TO COMPLY WITH ITS CONTINUING OBLIGATIONS UNDER THE NON-SETTLING INSURER INSURANCE POLICIES. IN ADDITION, ANY SUCH CLAIM WILL NOT BE AUTOMATICALLY ALLOWED; THE DIOCESE WILL HAVE THE RIGHT TO DEFEND AGAINST SUCH CLAIM.

PARTICIPATING PARTIES, SETTLING INSURERS, THE REORGANIZED DEBTOR, THE TRUST, THE TRUSTEE, THE FUTURE ABUSE CLAIMS TRUST, THE FUTURE ABUSE CLAIMS TRUSTEE, THE FUTURE CLAIMANT REPRESENTATIVE, THE MEDIATOR, THE SPECIAL MEDIATOR AND PROFESSIONALS EMPLOYED BY THE FOREGOING SHALL NOT HAVE ANY LIABILITY TO ANY GOVERNMENTAL ENTITY OR INSURER ON ACCOUNT OF PAYMENTS MADE TO AN ABUSE CLAIMANT, INCLUDING BUT NOT LIMITED TO LIABILITY UNDER THE MEDICARE SECONDARY PAYER ACT.

15.9    **EFFECTIVE DATE INJUNCTIONS.**

ON THE EFFECTIVE DATE, THE INJUNCTIONS PROVIDED FOR IN THIS PLAN SHALL BE DEEMED ISSUED, ENTERED, VALID AND ENFORCEABLE ACCORDING TO THEIR TERMS. THE INJUNCTIONS SHALL BE PERMANENT AND IRREVOCABLE AND MAY ONLY BE MODIFIED BY THE BANKRUPTCY COURT.

15.10    **CHANNELING INJUNCTION PREVENTING PROSECUTION OF ABUSE CLAIMS AGAINST PARTICIPATING PARTIES AND SETTLING INSURERS.**

DOCS_NY:46991.4 18491/002

15.10.1 **APPLICABILITY. THIS SECTION 15.10- IS ONLY APPLICABLE UNDER THE FULL OR PARTIAL SETTLEMENT ALTERNATIVE.**

15.10.2 **IN CONSIDERATION OF THE UNDERTAKINGS OF THE PARTICIPATING PARTIES AND SETTLING INSURERS, PURSUANT TO THEIR RESPECTIVE SETTLEMENTS WITH THE DEBTOR OR THE TRUSTEE, THE FUNDING OF THE TRUST, OTHER CONSIDERATION, AND TO FURTHER PRESERVE AND PROMOTE THE AGREEMENTS BETWEEN AND AMONG THE PARTICIPATING PARTIES, SETTLING INSURERS AND THE DEBTOR OR THE TRUSTEE, AND THE PROTECTIONS AFFORDED THE PARTICIPATING PARTIES AND SETTLING INSURERS, AND PURSUANT TO SECTIONS 105, 363 AND 1123 OF THE BANKRUPTCY CODE AND SUBJECT TO THE PROVISIONS OF THE PLAN AND EXCEPT AS OTHERWISE PROVIDED IN THE PLAN:**

a) **ANY AND ALL CHANNELED CLAIMS ARE CHANNELED INTO THE TRUST; AND**

b) **ALL PERSONS OR ENTITIES THAT HAVE HELD OR ASSERTED, HOLD OR ASSERT, OR MAY IN THE FUTURE HOLD OR ASSERT, ANY CHANNELED CLAIM (INCLUDING ALL DEBT HOLDERS, GOVERNMENTAL, TAX AND REGULATORY AUTHORITIES, LENDERS, TRADE AND OTHER CREDITORS, ABUSE CLAIMANTS, OTHER INSURERS, AND ALL OTHERS HOLDING CLAIMS OR INTERESTS OF ANY KIND OR NATURE WHATSOEVER) ARE HEREBY PERMANENTLY STAYED, ENJOINED, BARRED AND RESTRAINED FROM TAKING ANY ACTION, DIRECTLY OR INDIRECTLY, FOR THE PURPOSES OF ASSERTING, ENFORCING, OR ATTEMPTING TO ASSERT OR ENFORCE ANY CHANNELED CLAIM, INCLUDING:**

(i) **COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND WITH RESPECT TO ANY CHANNELED CLAIM AGAINST ANY PARTICIPATING PARTY, SETTLING INSURERS THEIR RESPECTIVE PREDECESSORS, SUCCESSORS, AND ASSIGNS, OR THEIR RESPECTIVE EMPLOYEES, OFFICERS, AND DIRECTORS, OR AGAINST THE PROPERTY OF ANY PARTICIPATING PARTY OR SETTLING INSURER;**

(ii) **ENFORCING, ATTACHING, COLLECTING OR RECOVERING, BY ANY MANNER OR MEANS, FROM ANY PARTICIPATING PARTY OR SETTLING INSURER OR FROM THE PROPERTY OF ANY PARTICIPATING PARTY OR SETTLING INSURER, WITH RESPECT TO ANY SUCH CHANNELED CLAIM, ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST ANY PARTICIPATING PARTY OR SETTLING INSURER;**

(iii) **CREATING, PERFECTING OR ENFORCING ANY LIEN OF ANY KIND AGAINST ANY PARTICIPATING PARTY, OR SETTLING**

**INSURER OR THE PROPERTY OF ANY PARTICIPATING PARTY OR SETTLING INSURER WITH RESPECT TO ANY SUCH CHANNELED CLAIM (EXCEPT AS PROVIDED IN THE PLAN; AND**

**(iv)    ASSERTING, IMPLEMENTING OR EFFECTUATING ANY CHANNELED CLAIM OF ANY KIND AGAINST:**

**(1)    ANY OBLIGATION DUE ANY PARTICIPATING PARTY OR SETTLING INSURER;**

**(2)    ANY PARTICIPATING PARTY OR SETTLING INSURER; OR**

**(3)    THE PROPERTY OF ANY PARTICIPATING PARTY OR SETTLING INSURER WITH RESPECT TO ANY SUCH CHANNELED CLAIM.**

**15.11  ANY INJUNCTION CONTAINED IN A BANKRUPTCY-COURT APPROVED AGREEMENT WITH A PARTICIPATING PARTY OR SETTLING INSURER IS INCORPORATED INTO THE PLAN BY REFERENCE, IS DEEMED FULLY SET FORTH IN THIS PLAN AND IS IN ADDITION TO THE CHANNELING INJUNCTION. ANY DIFFERENCES BETWEEN THE CHANNELING INJUNCTION IN SECTION 15.10 AND THE INJUNCTION(S) DEEMED SET FORTH BY THIS SUBPARAGRAPH ARE NOT INTENDED TO AFFECT, DIMINISH OR IMPAIR THE INJUNCTION(S) INCORPORATED HEREIN AND CONTAINED IN SUCH AGREEMENT.**

**15.12  NOTWITHSTANDING ANY PROVISION OF THIS PLAN, THE FOREGOING "CHANNELING INJUNCTION PREVENTING PROSECUTION OF ABUSE CLAIMS AGAINST PARTICIPATING PARTIES OR SETTLING INSURERS" PROVIDES ABSOLUTELY NO PROTECTION TO (I) A PERSON HAVING PERSONALLY COMMITTED AN ACT OR ACTS OF ABUSE RESULTING IN A CLAIM AGAINST THE DEBTOR, A PARTICIPATING PARTY OR A SETTLING INSURER, (II) THE HOLY SEE; (III) ANY PERSON OR ENTITY ON ACCOUNT OF CLAIMS EXCEPTED FROM THE EXCULPATION UNDER SECTION 15.8; AND (IV) ANY NON-SETTLING INSURER.**

**15.13  TO THE EXTENT NOT OTHERWISE ENJOINED IN SECTION 15.10, ASSERTION AND ENFORCEMENT OF CHANNELED CLAIMS, AND ANY ATTEMPT TO ASSERT OR ENFORCE SUCH CLAIMS, BY ANY PERSON OR ENTITY, AGAINST A PARTICIPATING PARTY OR SETTLING INSURER IS HEREBY PERMANENTLY STAYED, ENJOINED, BARRED, AND RESTRAINED.**

**15.14  NOTWITHSTANDING ANY PROVISION OF THIS PLAN, THE FOREGOING "CHANNELING INJUNCTION PREVENTING PROSECUTION OF ABUSE CLAIMS AGAINST PARTICIPATING PARTIES AND SETTLING INSURERS" IS NOT INTENDED TO AFFECT, DIMINISH OR IMPAIR THE RIGHTS OF ANY ABUSE CLAIMANT TO COMMENCE OR PROSECUTE AN ABUSE CLAIM AGAINST**

50

**THE DEBTOR OR A PARTICIPATING PARTY PROVIDED THAT SUCH COMMENCEMENT OR PROSECUTION IS SUBJECT TO THE TERMS AND CONDITIONS OF THE DEBTOR'S DISCHARGE, THE TRUST AGREEMENT, THE TRUST ALLOCATION PROTOCOL, THE FUTURE ABUSE CLAIM TRUST AGREEMENT, AND THE FUTURE ABUSE CLAIM TRUST ALLOCATION PROTOCOL.**

**ABUSE CLAIMANTS SPECIFICALLY RESERVE, AND DO NOT RELEASE, ANY AND ALL CLAIMS THAT THEY MAY HAVE AGAINST THE DIOCESE OR ANY OTHER PARTICIPATING PARTY THAT IMPLICATE COVERAGE UNDER ANY NON-SETTLING INSURER'S INSURANCE POLICIES, BUT RECOURSE IS LIMITED TO THE PROCEEDS OF THE NON-SETTLING INSURER'S INSURANCE POLICIES AND ALL OTHER DAMAGES (INCLUDING EXTRA-CONTRACTUAL DAMAGES), AWARDS, JUDGMENTS IN EXCESS OF POLICY LIMITS, PENALTIES, PUNITIVE DAMAGES AND ATTORNEY'S FEES AND COSTS THAT MAY BE RECOVERABLE AGAINST ANY NON-SETTLING INSURERS BECAUSE OF THEIR CONDUCT CONCERNING INSURANCE COVERAGE FOR, OR DEFENSE OR SETTLEMENT OF, ANY ABUSE CLAIM, AND ANY SUCH JUDGMENTS OR AWARDS WILL BE HANDLED IN ACCORDANCE WITH THE PLAN AND THE TRUST ALLOCATION PROTOCOL. THE ABUSE CLAIMS WILL NOT BE RELEASED OR ENJOINED AS AGAINST THE DIOCESE OR ANY OTHER PARTICIPATING PARTY FOR ANY ABUSE THAT MAY BE COVERED UNDER ANY NON-SETTLING INSURER'S INSURANCE POLICIES UNTIL SUCH CLAIMS ARE SETTLED WITH THE DIOCESE, ANY OTHER PARTICIPATING PARTY AND SUCH NON-SETTLING INSURER OR ARE FULLY ADJUDICATED, RESOLVED, AND SUBJECT TO FINAL ORDER, BUT RECOURSE IS LIMITED AS DESCRIBED ABOVE.**

**ABUSE CLAIMANTS AND THE TRUST SHALL BE PERMITTED TO NAME THE DIOCESE OR ANY OTHER PARTICIPATING PARTY IN ANY PROCEEDING TO RESOLVE WHETHER THE DIOCESE OR ANY OTHER PARTICIPATING PARTY HAS LIABILITY FOR ABUSE CLAIMS AND THE AMOUNT OF ANY SUCH LIABILITY, SOLELY FOR THE PURPOSE OF OBTAINING INSURANCE COVERAGE FROM NON-SETTLING INSURERS. THE DISCHARGE HEREUNDER DOES NOT APPLY TO, AND SHALL NOT LIMIT IN ANY WAY THE OBLIGATIONS OF NON-SETTLING INSURERS TO DEFEND AND PAY, THE DIOCESE'S OR ANY OTHER PARTICIPATING PARTY'S LIABILITY FOR ABUSE CLAIMS UNDER NON-SETTLING INSURER INSURANCE POLICIES.**

15.15  **SETTLING INSURER INJUNCTION.**

**IN CONSIDERATION OF THE UNDERTAKINGS OF THE SETTLING INSURERS, PURSUANT TO THEIR RESPECTIVE SETTLEMENTS WITH THE DEBTOR OR THE TRUSTEE, THE FUNDING OF THE TRUST, OTHER CONSIDERATION, AND TO FURTHER PRESERVE AND PROMOTE THE AGREEMENTS BETWEEN AND AMONG THE SETTLING INSURERS AND THE DEBTOR OR THE TRUSTEE, AND THE PROTECTIONS AFFORDED THE SETTLING**

51

INSURERS, AND PURSUANT TO SECTIONS 105, 363 AND 1123 OF THE BANKRUPTCY CODE, AND EXCEPT AS OTHERWISE PROVIDED IN THE PLAN, ANY AND ALL PERSONS OR ENTITIES (INCLUDING, WITHOUT LIMITATION, ALL DEBT HOLDERS, ALL EQUITY HOLDERS, GOVERNMENTAL, TAX, AND REGULATORY AUTHORITIES, LENDERS, TRADE AND OTHER CREDITORS, ABUSE CLAIM HOLDERS, OTHER INSURERS, AND ALL OTHERS HOLDING CLAIMS OR INTERESTS) ARE PERMANENTLY ENJOINED AND BARRED FROM ASSERTING AGAINST A SETTLING INSURER ANY CLAIM (INCLUDING, WITHOUT LIMITATION, ANY INSURANCE COVERAGE CLAIM OR EXTRA-CONTRACTUAL CLAIM) OR INTEREST OF ANY KIND OR NATURE WHATSOEVER ARISING FROM OR RELATING IN ANY WAY TO (i) ANY ABUSE CLAIM OR (ii) ANY OF THE SETTLING INSURER POLICIES OR (iii) ANY CLAIM AGAINST ANY SETTLING INSURER FOR CONTRIBUTION, INDEMNITY, DEFENSE, SUBROGATION, OR SIMILAR RELIEF THAT ARISES DIRECTLY OR INDIRECTLY FROM ANY CLAIM AGAINST THE DEBTOR OR ANY PARTICIPATING PARTY.

NOTHING CONTAINED IN THIS SECTION IS INTENDED TO AFFECT, DIMINISH OR IMPAIR ANY INJUNCTIONS CONTAINED IN AN AGREEMENT BETWEEN THE DEBTOR OR THE TRUSTEE AND ANY SETTLING INSURER. SUCH INJUNCTIONS ARE INCORPORATED HEREIN BY REFERENCE AND ARE DEEMED FULLY SET FORTH HEREIN.

NOTWITHSTANDING THE ABOVE, ECCLESIA AND THE ECCLESIA INSURANCE POLICIES ARE NOT RELEASED WITH RESPECT TO THE CLASS 6 CLAIMS.

15.16 **TERM OF INJUNCTIONS OR STAYS AND CONFIRMATION OF SETTLEMENTS WITH PARTICIPATING PARTIES AND SETTLING INSURERS.**

ALL INJUNCTIONS AND/OR STAYS PROVIDED FOR IN THIS PLAN, THE INJUNCTIVE PROVISIONS OF SECTIONS 524 AND 1141 OF THE BANKRUPTCY CODE, AND ALL INJUNCTIONS OR STAYS PROTECTING PARTICIPATING PARTIES AND ANY SETTLING INSURER THAT HAS PURCHASED ITS INSURANCE POLICY OR POLICIES IN A SECTION 363 SALE, ARE PERMANENT AND WILL REMAIN IN FULL FORCE AND EFFECT FOLLOWING THE EFFECTIVE DATE AND ARE NOT SUBJECT TO BEING VACATED OR MODIFIED. DEBTOR'S SETTLEMENT AGREEMENTS, IF ANY, WITH THE SETTLING INSURERS, AND THE PARTICIPATING PARTIES PREVIOUSLY AUTHORIZED BY THE BANKRUPTCY COURT ARE HEREBY AFFIRMED AND ANY OBLIGATIONS OF DEBTOR WITH RESPECT TO SUCH SETTLEMENT AGREEMENTS ARE EXCEPTED FROM THE DEBTOR'S DISCHARGE AND SHALL BE ASSUMED BY THE REORGANIZED DEBTOR AND TRUSTEE, AS APPLICABLE, ON THE EFFECTIVE DATE.

15.17 **RELEASE OF AVOIDANCE RIGHTS AGAINST PARTICIPATING PARTIES AND SETTLING INSURERS.**

**ON THE EFFECTIVE DATE, ALL AVOIDANCE RIGHTS, INCLUDING THOSE ARISING UNDER SECTIONS 544, 547, 548, 549, 550, AND 553 OF THE BANKRUPTCY CODE, AGAINST EACH OF THE PARTICIPATING PARTIES AND SETTLING INSURERS AND THE DEBTOR AND REORGANIZED DEBTOR SHALL BE DEEMED SETTLED, COMPROMISED, AND RELEASED BY THIS PLAN.**

15.18 **RELEASE OF CLAIMS AGAINST PARTICIPATING PARTY OR SETTING INSURER.**

**EXCEPT FOR OBLIGATIONS ARISING UNDER ANY EXECUTORY CONTRACT ASSUMED BY THE REORGANIZED DEBTOR PURSUANT TO SECTION XVII, OBLIGATIONS UNDER ANY SETTLEMENT AGREEMENT AND CLAIMS EXCEPTED FROM EXCULPATION AND DISCHARGE UNDER SECTION 16.4 AND 16.7, ON THE EFFECTIVE DATE, THE DEBTOR, REORGANIZED DEBTOR AND THE ESTATE WAIVE, RELEASE AND DISCHARGE ANY AND ALL CLAIMS OR CAUSES OF ACTION OF EVERY KIND AND NATURE THAT DEBTOR, REORGANIZED DEBTOR, OR THE ESTATE HAVE OR MAY HAVE AGAINST A PARTICIPATING PARTY OR SETTLING INSURER, INCLUDING AVOIDANCE RIGHTS, AND ANY CLAIM THAT SUCH PARTICIPATING PARTY OR SETTLING INSURER OR ITS ASSETS ARE A PART OF OR OWNED BY THE DEBTOR OR THE ESTATE. NO SUCH CLAIM WILL SURVIVE THE EFFECTIVE DATE OR BE DEEMED TO BE ASSIGNED TO THE TRUST. WITH RESPECT TO ANY RELEASES IN A BANKRUPTCY COURT-APPROVED AGREEMENT WITH A PARTICIPATING PARTY OR SETTLING INSURER, NOTHING CONTAINED IN THIS PLAN IS INTENDED TO AFFECT, DIMINISH OR IMPAIR SUCH RELEASES.**

15.19 **Pension Plan**. No provision in the Plan, Confirmation Order, the Bankruptcy Code (including section 1141 of the Bankruptcy Code), or any other document filed or order entered in the Chapter 11 Cases shall be construed to exculpate, discharge, release or relieve the Debtor, the Non-Debtor Affiliates, or any other party, in any capacity, from any liability or responsibility to any Person regarding the Pension Plans under any law, governmental policy, or regulatory provision. The Pension Plans shall not be enjoined or precluded from enforcing any such liability or responsibility because of the provisions of the Plan (including those provisions providing for exculpation, satisfaction, release and discharge of Claims against the Debtor), the Confirmation Order, the Bankruptcy Code (including section 1141 of the Bankruptcy Code), or any other document filed or order entered in the Chapter 11 Case. The Trust shall not have any liability to any Person on account of the Pension Plans, including liability as a member of a "Controlled Group" as defined in 29 U.S.C. § 1301(a)(14)(A) or on any other basis.

As of the Effective Date, the Reorganized Debtor shall assume and continue the Pension Plans to the extent of its obligations under the Pension Plans and applicable law. Notwithstanding the foregoing, the Reorganized Debtor reserves all of its rights under the Pension Plan. For the avoidance of doubt, any claims asserted by any beneficiary of the Pension Plan shall be reinstated and shall remain with the same priority and validity as before the Petition Date.

## SECTION XVI
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### 16.1    Assumed Employee and Retiree Benefit Plans.

To the extent not previously assumed, all employee and retiree benefit plans to which the Debtor are a party will be deemed assumed by the Reorganized Debtor on the Effective Date.

### 16.2    General; Assumed if Not Rejected.

Subject to the requirements of Section 365, all executory contracts and unexpired leases of the Debtor not rejected by order of the Bankruptcy Court or are not the subject of a motion to reject pending on the Confirmation Date will be deemed assumed by the Reorganized Debtor on the Effective Date. If any party to an executory contract or unexpired lease that is being assumed objects to such assumption, the Bankruptcy Court may conduct a hearing on such objection on any date that is either mutually agreeable to the parties or fixed by the Bankruptcy Court. All payments to cure defaults that may be required under section 365(b)(1) of the Bankruptcy Code will be made by the Reorganized Debtor. In the event of a dispute regarding the amount of any such payments, or the ability of the Debtor to provide adequate assurance of future performance, the Reorganized Debtor will make any payments required by section 365(b)(1) of the Bankruptcy Code after the entry of the Final Order resolving such dispute.

### 16.3    Claims for Contract Rejection.

All proofs of claim regarding Claims arising from the rejection of executory contracts or unexpired leases must be filed with the Bankruptcy Court within 30 days after the Effective Date or such Claims will be forever barred. If any order providing for the rejection of an executory contract or unexpired lease did not provide a deadline for filing Claims arising from such rejection, proofs of Claim with respect thereto must be filed within 30 days after the later to occur of (a) the Effective Date or, (b) if the order is entered after the Effective Date, the date such order becomes a Final Order, or such Claims will be forever barred.

## SECTION XVII
## NON-MONETARY COMMITMENTS

### 17.1    Non-Monetary Commitment to Healing and Reconciliation.

To further promote healing and reconciliation, and to continue its efforts to prevent Abuse and other injury to children from occurring in the Diocese in the future, the Committee requests the Diocese agree that it will undertake the commitments in Exhibit H attached hereto and incorporated herein. The Diocese must inform the Committee which commitments it will adopt at least seven (7) days before the first date set for the hearing on approval of the Disclosure Statement.

## SECTION XVIII
## MISCELLANEOUS PROVISIONS.

### 18.1    Retention of Jurisdiction.

Notwithstanding entry of the Confirmation Order or the occurrence of the Effective Date:

18.1.1  Except as otherwise stated in this Plan or in the Confirmation Order, the Bankruptcy Court will retain jurisdiction over all matters arising under, to further, or in connection with this Plan, including the following:

a)      The determination of objections to Disputed Claims; the determination of requests for payment of Claims entitled to priority under section 507 of the Bankruptcy Code, including compensation of and reimbursement of expenses of parties entitled thereto;

b)      The resolution of controversies and disputes regarding interpretation and implementation of this Plan and the Plan Documents;

c)      The compelling of the Diocese and/or a Participating Party to cooperate with the Trust as required under this Plan;

d)      The granting of relief in aid of this Plan and the Plan Documents including the entry of appropriate orders (which may include removal of actions in non-Bankruptcy Court forums to the Bankruptcy Court, contempt or other sanctions) to protect the Reorganized Debtor, the Participating Parties, the Settling Insurers, and the Released Parties from actions prohibited under this Plan or the Plan Documents;

e)      Amendments to and modifications of this Plan;

f)      Subject to the limitations and exclusions described above, the determination of any and all applications, adversary proceedings, and contested or litigated matters pending on the Effective Date;

g)      Allowance of post-confirmation fees provided for in the Plan, including but not limited to in Section 11.5.4;

h)      The approval of a settlement agreement whereby a Person or Entity, including a Non-Settling Insurer, may become a Participating Party or Settling Insurer and whereby the Bankruptcy Court may appoint a future claims representative and provide for treatment of future claims; and

i)      The closing of this Case.

## 18.2    Remand of Removed Actions and Relief From Automatic Stay/Discharge.

On the Effective Date and without further order of the Bankruptcy Court or the District Court, (a) all actions removed by the Debtor or any other Co-Defendant during the Case are remanded to the Court from which they were removed and (b) such actions are not subject to the automatic stay or the injunction in Bankruptcy Code section 524(a)(2).  Nothing herein is intended to affect, diminish or impair those provisions of this Plan that prohibit execution of any judgment against the Reorganized Debtor's Revested Assets or assets the Reorganized Debtor acquire after the Effective Date.

DOCS_NY:46991.4 18491/002

18.3    **Modification of Plan.**

The Committee reserves the right, under the Bankruptcy Code, to amend, modify or withdraw this Plan prior to the entry of the Confirmation Order.   After the entry of the Confirmation Order, the Proponent may, upon order, amend or modify this Plan under section 1127(b) of the Bankruptcy Code, or remedy any defect or omission or reconcile any inconsistency in this Plan in such manner as may be necessary to carry out the purpose and intent of this Plan.

18.4    **Severability.**

If, before confirmation, the Bankruptcy Court holds that any Plan term or provision is invalid, void, or unenforceable, the Bankruptcy Court may alter or interpret that term or provision so it is valid and enforceable to the maximum extent possible consistent with the original purpose of that term or provision.   That term or provision will then be applicable as altered or interpreted, unless such term or provision is inconsistent with the intent of the Committee, in which case the Plan may be unilaterally withdrawn by the Committee.   Notwithstanding any such holding, alteration, or interpretation, the Plan's remaining terms and provisions will remain in full force and effect and will in no way be affected, impaired, or invalidated.   The Confirmation Order will constitute a judicial determination providing that each Plan term and provision, as it may have been altered or interpreted under this Section, is valid and enforceable under its terms.   In the event of a successful collateral attack on any provision of this Plan (i.e., an attack other than through a direct appeal of the Confirmation Order), the remaining provisions of this Plan will remain binding on the Diocese, the Participating Parties, the Settling Insurers, the non-Settling Insurers, the Trustee, the Future Abuse Claims Trustee, the Committee, all Claimants, all Creditors, and all other parties in interest.

18.5    **Headings.**

The headings of the Sections of this Plan are inserted for convenience only and will not affect the interpretation hereof.

18.6    **Notices.**

All notices or requests to the Reorganized Debtor in connection with this Plan shall be in writing and served either by (i) United States mail, postage prepaid, (ii) hand delivery, or (iii) reputable overnight delivery service, all charges prepaid, and shall be deemed given when received by the following parties:

If to the Debtor or Reorganized Debtor:

With a copy to:

If to the Trustee:

With a copy to:

56

If to the Future Abuse Claims Trustee:

With a copy to:

18.7    **Notices to Claimants.**

All notices and requests to a Person or Entity holding any Claim will be sent to them at the last known address listed for such Person or Entity with the Bankruptcy Court or with the Debtor's Claims Agent, or to the last known address of their attorney of record. The holder of a Claim may designate in writing any other address, which designation will be effective upon actual receipt by the Reorganized Debtor, the Trustee, and the Future Abuse Claims Trustee. Any Person or Entity entitled to receive notice under this Plan will have the obligation to provide the Reorganized Debtor, the Trustee, and the Future Abuse Claims Trustee with such Person's or Entity's current address for notice purposes. The Reorganized Debtor, the Trustee, and the Future Abuse Claims Trustee will have no obligation to attempt to locate a more current address if any notice proves to be undeliverable to the most recent address provided to the Reorganized Debtor, the Trustee, and the Future Abuse Claims Trustee.

18.8    **Post-Confirmation Court Approval.**

Any action requiring Bankruptcy Court, U.S. District Court or state court approval after the Effective Date will require the Person or Entity seeking such approval to file an application, motion, or other request with the Bankruptcy Court, U.S. District Court, or state court, as applicable, and obtain a Final Order approving such action before the requested action may be taken. The Person or Entity filing such application, motion, or other request shall serve such application, motion, or other request, together with a notice setting forth the time in which objections must be filed with the court, on the Reorganized Debtor, the Committee, the Trustee, and the Future Abuse Claims Trustee by first-class mail, electronic mail, ECF, overnight courier, facsimile, or hand delivery.  Unless the court orders otherwise, all notices shall provide the recipients at least 21 days in which to file an objection to the application, motion, or other request. If no objection is timely filed, the court may authorize the proposed action without further notice or a hearing.  If an objection is timely filed, the court will determine whether to conduct a hearing, or to require the submission of further documentation, prior to ruling on the application, motion, or other request.

18.9    **Election Under Section 1129(b) of the Bankruptcy Code.**

The Proponent requests confirmation of the Plan under section 1129(b) of the Bankruptcy Code if the requirements of all provisions of section 1129(a) of the Bankruptcy Code, except section (a)(8) thereof, are met regarding the Plan.  In determining whether the requirements of section 1129(a)(8) of the Bankruptcy Code have been met, any Class that does not have as an element of it an Allowed Claim or a Claim temporarily allowed under Bankruptcy Rule 3018 as of the date fixed by the Bankruptcy Court for filing acceptances or rejections of this Plan shall be

deemed deleted from this Plan for purposes of voting to accept or reject this Plan and for purposes of determining acceptance or rejection of this Plan by such Class.

### 18.10   Consummation of the Plan.

The Proponent reserves the right to request that the Confirmation Order include a finding by the Bankruptcy Court that Bankruptcy Rule 3020(e) shall not apply to the Confirmation Order.

### 18.11   Exemption from Transfer Taxes.

Under section 1146(a) of the Bankruptcy Code, Trustee's, Debtor's or Reorganized Debtor's  delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with this Plan, whether occurring before or after the Confirmation Date , including any deeds, bills of sale or assignments executed  with any sale or  disposition of assets contemplated by this Plan (i.e. the Properties), shall not be subject to any stamp tax, real estate transfer tax, excise tax, sales tax, use tax or other similar tax.

### 18.12   Waivers.

Except as otherwise provided in the Plan or in the Confirmation Order, any term of the Plan may be waived by the party benefited by the term to be waived.

### 18.13   Setoffs, Recoupments, and Defenses.

Except for the Sections of the Plan about the Abuse Claims, nothing in the Plan shall constitute a waiver or release by the Debtor, Reorganized Debtor, Participating Parties, the Trustee, or the Future Abuse Claims Trustee of any rights of setoff or recoupment, or of any defense, they may have regarding any Claim (including rights under section 502(d) of the Bankruptcy Code). Except as otherwise provided in the Plan or in the Confirmation Order or in agreements previously approved by a Final Order, the Debtor, Reorganized Debtor, Participating Parties, the Trustee, or the Future Abuse Claims Trustee may, but will not be required to, set off against any Claim or any distributions regarding such Claim, any of the Claims, rights and Causes of Action of any nature that the Debtor, the Reorganized Debtor, Participating Parties, the Trustee, or the Future Abuse Claims Trustee, as applicable, may hold against the holder of such Claim; provided, however, that neither the failure to effect such a setoff, the allowance of any Claim hereunder, the payment of any distribution hereunder or any other action or omission of the Debtor, Reorganized Debtor, Participating Parties, the Trustee, or the Future Abuse Claims Trustee, nor any provision of the Plan, shall constitute a waiver or release by the Debtor, the Reorganized Debtor, Participating Parties, the Trustee, or the Future Abuse Claims Trustee, as applicable, of any such Claims, rights and Causes of Action that the Debtor, the Reorganized Debtor, Participating Parties, the Trustee, or the Future Abuse Claims Trustee, as applicable, may possess against such holder.

### 18.14   Compromise of Controversies.

#### 18.14.1      Bankruptcy Court Approval of Settlements

In consideration for the classification, distributions and other benefits provided under the Plan, the Plan shall constitute a good faith compromise and settlement of all Claims or

controversies resolved under the Plan. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of each compromise and settlement provided for in the Plan, and the Bankruptcy Court's findings shall constitute its determination under the standards of Bankruptcy Rule 9019 that such compromises and settlements are in the best interests of the Debtor and the Estates.

18.14.2        Settlement with Participating Parties and Settling Insurers.

Specifically included within the Bankruptcy Court's approval of compromises and settlements of Claims and controversies is the Bankruptcy Court's approval of the agreements with Participating Parties and Settling Insurers. If a conflict exists between the Plan and such agreements, the agreements control such conflict. Such agreements contain the protections and benefits afforded the Participating Party and Settling Insurer, as well as the rights and obligations of the parties thereto, to the extent of any conflict with the Plan. Such agreements bind the Trust.

18.15   **Withdrawal or Revocation of the Plan.**

The Proponent reserves the right to revoke or withdraw the Plan prior to the Confirmation Date but the consent of the Proponent is required. If the Plan is revoked or withdrawn, or if the Confirmation Date does not occur, the Plan shall have no force and effect and in such event nothing herein shall be deemed to constitute a waiver or release of any Claims by or against the Estate or any other Person or Entity, or to prejudice in any other manner the rights of a Proponent, whether one or more, or any other entity in further proceedings involving a Proponent and specifically shall not modify or affect the rights of any party under any prior orders of the Bankruptcy Court.

18.16   **Default.**

Except as otherwise provided in the Plan or in the Confirmation Order, if the Reorganized Debtor, a Participating Party, a Settling Insurer, or the Trustee shall default in the performance of any of their respective obligations under the Plan or under the Plan Documents and shall not have cured such a default within any applicable cure period (or, if no cure period is specified in the Plan or Plan Documents or in any instrument issued to or retained by a Claimant under the Plan, then within 30 days after receipt of written notice of default), then the entity to whom the performance is due may pursue such remedies as are available at law or in equity. An event of default occurring with respect to one Claim shall not be an event of default regarding any other Claim.

18.17   **Governing Law.**

Except when federal law (including the Bankruptcy Code or Bankruptcy Rules) is applicable, the rights and obligations arising under the Plan or under the Plan Documents shall be governed by and construed and enforced under the laws of the State of New York without giving effect to the principles of conflicts of laws.

18.18   **Reservation of Rights.**

If the Plan is not confirmed by a Final Order, or if the Plan is confirmed and the Effective Date does not occur, the rights of all parties in interest in the Case are and will be reserved in full. Any concessions or settlement reflected, if any, are made for purposes of the Plan only, and if the

59

Plan does not become effective, no party in interest in the Case shall be bound or deemed prejudiced by any such concession or settlement.

18.19  **Controlling Documents.**

To the extent any provision of a settlement agreement with a Participating Party or Settling Insurer is inconsistent with this Plan, such settlement agreement, as applicable, shall control.

18.20  **Successors and Assigns.**

The Plan shall be binding upon and inure to the benefit of the Debtor, the Reorganized Debtor, all Claimants and all other parties in interest affected thereby and their respective successors, heirs, legal representatives and assigns.

18.21  **Direction to a Party.**

On and after the Effective Date, the Trust, the Future Abuse Claims Trust or the Reorganized Debtor, as applicable, may apply to the Bankruptcy Court for entry of an Order directing any Person to execute or deliver or to join in the execution or delivery of any instrument or document reasonably necessary or reasonably appropriate to effect a transfer of properties dealt with by the Plan, and to perform any other act (including satisfaction of any lien or security interest) that is reasonably necessary or reasonably appropriate for the consummation of the Plan.

18.22  **Certain Actions.**

By reason of entry of the Confirmation Order, prior to, on or after the Effective Date (as appropriate), all matters provided for under the Plan that would otherwise require approval of the officers of the Debtor under the Plan, including (a) the adoption, execution, delivery, and implementation of all contracts, leases, instruments, releases, and other agreements or documents related to the Plan, and (b) the adoption, execution, and implementation of other matters provided for under the Plan involving the Debtor or organizational structure of the Debtor, shall be deemed to have occurred and shall be in effect prior to, on or after the Effective Date (as appropriate), under applicable non-bankruptcy law, with no requirement of further action by the officers of the Debtor.

18.23  **Rounding of Fractional Numbers.**

All fractional numbers, including payments or distributions under the Plan, Trust Documents, and Future Abuse Claims Trust Documents shall be rounded (up or down) to the nearest whole number.

18.24  **Dissolution of the Committee.**

On the Effective Date, the Committee shall dissolve automatically, whereupon its members, Professionals and agents shall be released from any further duties and responsibilities in the Case and under the Bankruptcy Code, except that such parties shall continue to be bound by any obligations arising under confidentiality agreements, joint defense/common interest agreements (whether formal or informal), and protective Orders entered during the Case, which

shall remain in full force and effect according to their terms, provided that such parties shall have a right to be heard regarding any (i) applications for Professional Claims and (ii) requests for compensation and reimbursement of expenses under section 503(b) of the Bankruptcy Code for making a substantial contribution in the Case.

18.25   **Saturday, Sunday or Legal Holiday.**

If any payment or act under the Plan should be required to be made or performed on a day that is not a Business Day, then the payment or act may be completed on the next succeeding day that is a Business Day, in which event the payment or act will be deemed to have been completed on the required day.

18.26   **Exhibits.**

All Exhibits to this Plan are incorporated into and are a part of this Plan as if set forth in full herein.

[Remainder of Page Intentionally Left Blank]

61

## SECTION XIX
## RECOMMENDATIONS AND CONCLUSION

The Committee strongly believes that Plan confirmation and implementation are preferable to any feasible alternative because the Plan will provide Creditors holding Claims with recoveries significantly greater than any available alternatives.

Dated: New York, New York
February 3, 2023

DOCS_NY:46991.4 18491/002

**EXHIBIT A**

**TRUST AGREEMENT**

DOCS_NY:46991.4 18491/002

**TRUST AGREEMENT**

**DATED AS OF _____, 2023**

**PURSUANT TO CHAPTER 11 PLAN OF**

**REORGANIZATION FOR**

**THE DIOCESE OF ROCKVILLE CENTRE**

i

## Table of Contents

**ARTICLE 1. AGREEMENT OF TRUST** ................................................................. **6**

Section 1.1    Creation and Name. .................................................................**6**

Section 1.2    Purposes. ...................................................................................**6**

Section 1.3    Transfer of Assets. ..................................................................**6**

Section 1.4    Acceptance of Assets. .............................................................**6**

Section 1.5    Receipt of Proceeds. ..............................................................**7**

Section 1.6    Beneficiaries. ...........................................................................**7**

Section 1.7    Jurisdiction. ..............................................................................**7**

Section 1.8    Privileged and confidential information. ...........................**7**

Section 1.9    Relation-back election. ...........................................................**8**

Section 1.10    Employer identification number .......................................**8**

Section 1.11    Relationship to Plan. ............................................................**8**

**ARTICLE 2. POWERS AND TRUST ADMINISTRATION** .................................. **8**

Section 2.1    Powers. ......................................................................................**8**

Section 2.2    Limitations on the Trustee and TAC. ...............................**11**

Section 2.3    General Administration. .......................................................**12**

Section 2.4    Accounting. .............................................................................**12**

Section 2.5    Financial Reporting. .............................................................**13**

Section 2.6    Names and addresses. ...........................................................**13**

Section 2.7    Transfers of the Trust Assets. ...........................................**13**

**ARTICLE 3. ACCOUNTS, INVESTMENTS, EXPENSES** .................................... **13**

Section 3.1    Accounts. .................................................................................**13**

Section 3.2    Investment Guidelines. .........................................................**14**

Section 3.3    Payment of Trust Operating Expenses. ............................**14**

ii

Section 3.4    Payment to Future Abuse Claims Trust ...................................................................14

**ARTICLE 4. CLAIMS ADMINISTRATION AND DISTRIBUTIONS ............................... 14**

Section 4.1    Claims Administration and Distributions.................................................................14

Section 4.2    Manner of Payment. ................................................................................................15

Section 4.3    Delivery of Distributions. .......................................................................................15

Section 4.4    Medicare Reimbursement and Reporting Obligations. ...........................................15

**ARTICLE 5. TRUSTEE ......................................................................................................... 16**

Section 5.1    Initial Trustee. ........................................................................................................16

Section 5.2    Term of Service, Successor Trustee. .......................................................................16

Section 5.3    Appointment of Successor Trustee. .........................................................................17

Section 5.4    Trustee Meetings. ....................................................................................................17

Section 5.5    Compensation and Expenses of Trustee. .................................................................18

Section 5.6    Trustee's Independence. ..........................................................................................18

Section 5.7    Standard of Care; Exculpation. ...............................................................................18

Section 5.8    Protective Provisions. .............................................................................................19

Section 5.9    Indemnification. ......................................................................................................20

Section 5.10    Bond. .....................................................................................................................21

**ARTICLE 6. GENERAL PROVISIONS............................................................................... 21**

Section 6.1    Irrevocability...........................................................................................................21

Section 6.2    Term; Termination. .................................................................................................22

Section 6.3    Outgoing Trustee Obligations.................................................................................23

Section 6.4    Taxes. ......................................................................................................................23

Section 6.5    Modification. ...........................................................................................................24

Section 6.6    Severability..............................................................................................................25

Section 6.7    Notices.....................................................................................................................25

Section 6.8    Successors and Assigns............................................................................................25

iii

**Section 6.9**    **Limitation on Transferability; Beneficiaries' Interests.**......................................**25**

**Section 6.10**    **Exemption from Registration**.........................................................................**26**

**Section 6.11**    **Entire Agreement; No Waiver.** .....................................................................**26**

**Section 6.12**    **Headings**.........................................................................................................**26**

**Section 6.13**    **Governing Law.**...............................................................................................**26**

**Section 6.14**    **Settlor's Representative.**...............................................................................**27**

**Section 6.15**    **Independent Legal and Tax Counsel.**...........................................................**27**

**Section 6.16**    **Waiver of Jury Trial.**....................................................................................**27**

**Section 6.17**    **Effectiveness.** ..................................................................................................**27**

**Section 6.18**    **Counterpart Signatures.**................................................................................**27**

**EXHIBIT 1  TRUST ALLOCATION PROTOCOL** ........................................................ **30**

iv

# TRUST AGREEMENT

This Trust Agreement (this "**Trust Agreement**"), dated as of _____, 2023, and effective as of the Confirmation Date, is entered in accordance with the *Committee's _____ Amended Plan of Reorganization Dated _____, 2023* (as it may be amended, modified, or supplemented, the "**Plan**"),[1] by The Roman Catholic Diocese of Rockville Centre, New York (the "**Diocese**," also known as  the "**Debtor**" or the "**Settlor,**" in its capacity as settlor of the Trust), on the one hand, and _____ as trustee (together with any successor serving in such capacity, the "**Trustee**") and the Trust Advisory Committee, who are the individuals identified in Exhibit 2 (together with any successors serving in such capacity, the "**TAC**"), on the other hand;

## RECITALS

(A)    The Diocese has reorganized or will reorganize under the provisions of chapter 11 of the Bankruptcy Code in a case filed in the Bankruptcy Court, administered and known as *In re The Roman Catholic Diocese of Rockville Centre, New York,* Case No. 20-12345-mg (Bankr. S.D.N.Y. (the "**Chapter 11 Case**").

(B)    The Plan and the Confirmation Order in the Chapter 11 Case provide, among other things, for the creation of the Trust.

(C)    This Trust Agreement is deemed executed by the Confirmation Order to implement the Plan and to create the Trust (the "**Trust**") for the exclusive benefit of the holders of Class 4 Abuse Claims and Class 9 Civil Rights Claims.

(D)    The Bankruptcy Court held in the Confirmation Order that all the prerequisites for the Channeling Injunction have been satisfied, and such Channeling Injunction is fully effective and enforceable as provided in the Plan and Confirmation Order with respect to the Channeled Claims.

(E)    The Plan and Confirmation Order provide that, on the Effective Date and continuing thereafter until fully funded by the Diocese in accordance with the Plan, the Aggregate Settlement Consideration (as defined in Section 1.3) shall be transferred to and vested in the Trust free and clear of all liens, encumbrances, charges, claims, interests or other liabilities of any kind of the Debtor or their affiliates, any creditor or any other entity, other than as provided in the Channeling Injunction with respect to the Channeled Claims and as provided in Section 1.3.

**NOW, THEREFORE**, it is hereby agreed as follows:

---

[1]    All capitalized terms used but not otherwise defined herein shall have their respective meanings as set forth in the Plan or in the Confirmation Order, as applicable, or, if not defined therein, as set forth in the Trust Allocation Protocol (as defined in Section 1.2 below).

5

## ARTICLE 1.
## AGREEMENT OF TRUST

Section 1.1    *Creation and Name.* Diocese as Settlor hereby creates a trust known as the "**DRVC Abuse Claim Trust**" which is the Trust provided for and referred to in the Plan.  The Trustee may transact the business and affairs of the Trust in the name of the DRVC Abuse Claim Trust and references herein to the Trust shall include the Trustee acting on behalf of the Trust.   The Confirmation Order, the Plan and this Trust Agreement, including the Exhibits hereto, including the Trust Allocation Protocol as defined in Section 1.2, (collectively, the "**Trust Documents**"), constitute the governing instruments of the Trust.  The Trustee is hereby authorized to execute and file a Certificate of Trust with the New York Secretary of State.

Section 1.2    *Purposes.* The purposes of the Trust are (i) to assume all liability for the Channeled Claims, except for Future Abuse Claims and other Channeled Claims related to such Future Abuse Claims; (ii) to administer the Class 4 Abuse Claims and Class 9 Civil Rights Claims.; and (iii) to make Distributions to holders of Class 9 Civil Rights Claims, based on their pro rata share of the Civil Rights Claims Reserve, and Class 4 Abuse Claims, in accordance with the Trust Allocation Protocol attached hereto as **Exhibit 1** (the "**Trust Allocation Protocol**").  In connection therewith, the Trust shall hold, manage, protect and monetize the Trust Assets (as defined in Section 1.3 below) in accordance with the terms of the Trust Documents for the benefit of the Beneficiaries (as defined in Section 1.6(a) below). All Class 4 Abuse Claims shall be resolved exclusively in accordance with the Trust Allocation Protocol.

Section 1.3    *Transfer of Assets.* Pursuant to the Plan, the Debtor and any Participating Parties or Settling Insurers shall pay all funds to the Trust by wire transfer or otherwise effectuate the transfers of assets required under the Plan. The Trust will receive and hold all right, title and interest in and to the funds transferred (the "**Aggregate Settlement Consideration**" and together with any income or gain earned thereon and proceeds derived therefrom, collectively, the "**Trust Assets**"). The Aggregate Settlement Consideration shall be transferred to the Trust free and clear of any liens, encumbrances, charges, claims, interests or other liabilities of any kind of the Debtor or its affiliates, any creditor or any other person or entity, other than as provided in the Channeling Injunction with respect to Channeled Claims.  The Debtor or Reorganized Debtor shall execute and deliver such documents to the Trust as the Trustee reasonably requests to transfer and assign any assets comprising all or a portion of the Aggregate Settlement Consideration to the Trust.  On the Effective Date, Pachulski Stang Ziehl & Jones LLP shall also transfer its contribution of 10% of its case fees (the "**PSZJ Contribution**").

Section 1.4    *Acceptance of Assets.*  In furtherance of the purposes of the Trust, the Trustee, on behalf of the Trust, hereby expressly accepts the transfer to the Trust of the Aggregate Settlement Consideration, subject to the terms of the Trust Documents and the Plan Documents. The Trust shall succeed to all of the Diocese and Participating Parties' respective rights, title, and interest, including all legal privileges, in the Aggregate Settlement Consideration and neither the Debtor nor any other person or entity transferring such Aggregate Settlement Consideration will have any

6

further equitable or legal interest in, or with respect to, the Trust Assets, including the Aggregate Settlement Consideration, or the Trust.

(b)    Except as otherwise provided in the Plan, Confirmation Order or Trust Documents, the Trust shall have all defenses, cross-claims, offsets, and recoupments, as well as rights of indemnification, contribution, subrogation, and similar rights, regarding Channeled Claims that the Debtor or the Reorganized Debtor have or would have had under applicable law.

(c)    No provision herein or in the Trust Allocation Protocol shall be construed or implemented in a manner that would cause the Trust to fail to qualify as a "qualified settlement fund" under the QSF Regulations (as defined in Section 8.4(a) below).

(d)    Nothing in this Trust Agreement shall be construed in any way to limit the scope, enforceability, or effectiveness of the Channeling Injunction, the Supplemental Injunction or other terms of the Plan or Confirmation Order.

(e)    In this Trust Agreement and the Trust Allocation Protocol, the words "must," "will," and "shall" are intended to have the same mandatory force and effect, while the word "may" is intended to be permissive rather than mandatory.

Section 1.5    _Receipt of Proceeds._

The proceeds of any recoveries from any litigation or claims of the Trust (including the Actions) will be deposited in the Trust's accounts and become the property of the Trust.

Section 1.6    _Beneficiaries._

(a)    The Trust is established for the benefit of the holders of Class 4 Abuse Claims and Class 9 Civil Rights Claims. (the "**Beneficiaries**").

(b)    The Beneficiaries shall be subject to the terms of this Trust Agreement and Trust Documents, including without limitation, the Trust Allocation Protocol.

Section 1.7    _Jurisdiction._ The Bankruptcy Court shall have continuing jurisdiction with respect to the Trust; provided however, the courts of the State of New York, including any federal court located therein, shall also have jurisdiction over the Trust only if and to the extent the Bankruptcy Court cannot exercise or properly abstains from exercising jurisdiction over the Trust.

Section 1.8    _Privileged and confidential information._

The transfer or assignment of any information subject to an attorney-client or similar privilege to the Trustee shall not result in the destruction or waiver of any applicable privileges pertaining thereto.  Further, with respect to any such privileges: (a) they are transferred to or contributed for the purpose of enabling the Trustee to perform his or her duties to administer the Trust and (b) they are vested solely in the Trustee and not in the Trust, or any other person, committee or subcomponent of the Trust, or any other person (including counsel and other

7

professionals) who has been engaged by, represents, or has represented any holder of a Channeled Claim.

Section 1.9    *Relation-back election.*

Upon request of the Trustee, the Settlor shall fully cooperate in filing a relation-back election under Treasury Regulation Section 1.468B-1(j)(2), to treat the Trust as coming into existence as a settlement fund as of the earliest possible date.

Section 1.10    *Employer identification number.*

Upon or in anticipation of establishment of the Trust, the Trustee shall apply for an employer identification number for the Trust in accordance with Treasury Regulation Section 1.468B-2(k)(4).

Section 1.11    *Relationship to Plan.*

The principal purpose of this Trust Agreement is to aid in the implementation of the Plan and the Confirmation Order and therefore, this Trust Agreement incorporates the provisions of the Plan and the Confirmation Order (which may amend or supplement the Plan). To the extent that there is conflict between the provisions of this Trust Agreement, the Trust Allocation Protocol, the provisions of the Plan or the Confirmation Order, each document shall have controlling effect in the following order: (1) the Confirmation Order; (2) the Plan; (3) this Trust Agreement; and (4) the Trust Allocation Protocol.

## ARTICLE 2.
## POWERS AND TRUST ADMINISTRATION

Section 2.1    *Powers.*

(a)    The Trustee is empowered to take all actions, including such actions as may be consistent with those expressly set forth above, as the Trustee deems necessary to reasonably ensure that the Trust is treated as a "qualified settlement fund" under Section 468B of the Tax Code and the regulations promulgated pursuant thereto. Further, the Trustee may, unilaterally and without court order, amend, either in whole or in part, any administrative provision of this Trust Agreement which causes unanticipated tax consequences or liabilities inconsistent with the foregoing.

(b)    The Trustee is and shall act as the fiduciary to the Trust Assets in accordance with the provisions of the Trust Documents. The Trustee shall administer the Trust, the Trust Assets, and any other amounts to be received under the terms of the Trust Documents in accordance with the purposes set forth in Section 1.2 above and in the manner prescribed by the Trust Documents. Subject to the limitations set forth in the Trust Documents, the Trustee shall have the power to take any and all actions that in the judgment of the Trustee are necessary or advisable to fulfill the purposes of the Trust, including, without limitation, each power expressly granted in this Section 2.1, any power reasonably incidental thereto and any trust power now or hereafter permitted under the laws of the State of New York. Nothing in the Trust Documents or

8

any related document shall require the Trustee to take any action if the Trustee reasonably believes that such action is contrary to law. In addition to all powers enumerated in the Trust Documents, including, but not limited to, the Trustee's powers and authority in respect of the interpretation, application of definitions and rules of construction set forth in the Plan to the fullest extent set forth therein, from and after the Effective Date, the Trust shall succeed to all of the rights and standing of the Debtor with respect to the Aggregate Settlement Consideration in its capacity as a trust administering assets for the benefit of the Beneficiaries.

(c)     Except as required by applicable law or the Trust Documents, the Trustee need not obtain the order or approval of any court in the exercise of any power or discretion conferred hereunder.

(d)     Without limiting the generality of Sections 2.1(a) and (b) above, and except as limited in the Trust Documents and by applicable law, the Trustee shall have the power to:

(i)     supervise and administer the Trust in accordance with the Trust Documents, including the Trust Allocation Protocol;

(ii)     receive and hold the Trust Assets, and exercise all rights with respect thereto including the right to vote and sell any securities that are included in such funds;

(iii)     invest the monies held from time to time by the Trust in accordance with Section 3.2;

(iv)     sell, transfer or exchange any or all of the Trust Assets at such prices and upon such terms as the Trustee may determine proper and consistent with the other terms of the Trust Documents;

(v)     enter into leasing, financing or other agreements with third parties, as determined by the Trustee, in his or her discretion, to be useful in carrying out the purposes of the Trust;

(vi)     determine and pay liabilities and pay all fees and expenses incurred in administering the Trust, managing the Trust Assets and making Distributions in accordance with the Trust Documents (the "**Trust Operating Expenses**");

(vii)     establish accounts and reasonable reserves within the Trust, in her/his discretion, to be necessary, prudent or useful in administering the Trust;

(viii)     sue, be sued and participate, as a party or otherwise, in any judicial, administrative, arbitrative or other proceeding, however nothing herein shall be deemed to either (a) affect, limit or expand any party's rights to sue or otherwise commence a case or proceeding against a trustee in a case under chapter 11 of the Bankruptcy Code or (b) allow any party asserting a Class 4 Abuse Claim, Future Abuse Claim and/or Channeled Claim to commence any action against the Trustee or the Trust with respect to such claim;

9

(ix)    appoint such officers and retain such employees, consultants, advisors, independent contractors, experts and agents and engage in such legal, financial, administrative, accounting, investment, auditing and alternative dispute resolution services and activities as the Trust requires, which may be those formerly retained by the Committee, and delegate to such persons such powers and authorities as this Trust Agreement provides or the fiduciary duties of the Trustee permits and as the Trustee, in his or her discretion, deems advisable or necessary in order to carry out the terms of this Trust Agreement;

(x)    pay reasonable compensation and reimbursement of expenses to any of the Trust's employees, consultants, advisors, independent contractors, experts and agents for legal, financial, administrative, accounting, investment, auditing and alternative dispute resolution services and activities as the Trust requires;

(xi)    compensate the TAC members for all reasonable out-of-pocket costs and expenses incurred by such persons in connection with the performance of their duties hereunder;

(xii)    compensate the Trust's professionals for services, costs and expenses incurred prior to the Effective Date in accordance with the terms of the Trust Documents;

(xiii)    execute and deliver such instruments as the Trustee considers advisable or necessary in administering the Trust;

(xiv)    timely file such income tax and other tax returns and statements required to be filed and timely pay all taxes, if any, required to be paid from the Trust Assets and comply with all applicable tax reporting and withholding obligations;

(xv)    require, in respect of any Distribution of Trust Assets, the timely receipt of properly executed documentation (including, without limitation, IRS Form W-9) as the Trustee determines in his or her discretion necessary or appropriate to comply with applicable tax laws;

(xvi)    resolve all applicable lien resolution matters with respect to Beneficiaries that may be subject to liens arising pursuant to the MMSEA (as defined in the Plan) in accordance with the Plan; provided, however, that for claims where there is an open chapter 7 bankruptcy case, such lien resolution is subject to the approval of the chapter 7 bankruptcy trustee and applicable bankruptcy court; and provided further, however, that in such cases, the chapter 7 bankruptcy trustee shall have sole responsibility to seek court approval for such lien resolution;

(xvii)    register as a responsible reporting entity ("**RRE**") and timely submit all reports under the reporting provisions of section 111 of the Medicare, Medicaid, and SCHIP Extension Act of 2007 (Pub. L. 110-173) ("**MMSEA**") as required under Section 4.6 below and the terms of the Plan;

(xviii)    enter into such other arrangements with third parties as are deemed by the Trustee to be useful in carrying out the purposes of the Trust, provided such arrangements do not conflict with any other provision of the Trust Documents;

10

(xix)    in accordance with Section 5.9 below, defend, indemnify, and hold harmless (and purchase insurance indemnifying) the Trust Indemnified Parties (as defined in Section 5.7(a) below) solely from the Trust Assets and to the fullest extent permitted by law;

(xx)    delegate any or all of the authority herein conferred with respect to the investment of all or any portion of the Trust Assets to any one or more reputable investment advisors or investment managers without liability for any action taken or omission made because of any such delegation;

(xxi)    delegate any or all of the authority conferred with respect to the protection, preservation, and monetization of the non-cash Trust Assets;

(xxii)    initiate, prosecute, defend, settle, maintain, administer, preserve, pursue, and resolve, pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, all legal actions and other proceedings related to any asset, liability, or responsibility of the Trust;

(xxiii)    enter into structured settlements and other similar arrangements with any Beneficiary (including a minor or other person in need of special consideration) or any Attorney of any Beneficiary, upon such terms as the Trustee and such Beneficiary (or such Beneficiary's counsel or other authorized person) agree, in all cases in accordance with the Trust Allocation Protocol;

(xxiv)    take any and all actions appropriate or necessary in order to carry out the terms of the Trust Documents; and

(xxv)    except as otherwise expressly provided in the Trust Documents, exercise any other powers now or hereafter conferred upon or permitted to be exercised by a trustee under the laws of the State of New York.

(e)    The Trustee shall have the power, under the Partial Settlement and Full Litigation Alternatives, to (i) authorize the commencement or continuation of a lawsuit by a Class 4 Claimant against the Diocese and/or Participating Parties in accordance with the Trust Allocation Protocols (a "**Litigation Claim**"), and (ii) enter into any settlement that causes an Insurer to become a Settling Insurer (an "**Insurance Settlement**") or an Other Insured Entity to become a Participating Party (a "**PP Settlement**"), provided however, the powers set forth in this Section 2.1(e) shall in each case be subject to the provisions of the Trust Documents including Sections 5.13, 5.14 and 5.15(a) below.

(f)    The Trustee, in his or her sole discretion, may shall take all actions necessary or advisable for the enforcement of the non-monetary commitments of Diocese with respect to Child Protection as set forth in the Plan and Confirmation Order.

(g)    The Trustee shall consult with the TAC on the matters set forth in in the Trust Documents.

Section 2.2    *Limitations on the Trustee and TAC.*

11

(a)      Notwithstanding anything in the Trust Documents to the contrary, the Trustee shall not do or undertake any of the following:

(i)      guaranty any debt;

(ii)      make or enter into any loan of Trust Assets;

(iii)      make any transfer or Distribution of Trust Assets other than those authorized by the Trust Documents;

(iv)      engage in any trade or business with respect to the Trust Assets or proceeds therefrom, other than managing such assets;

(v)      engage in any investment of the Trust Assets, other than as explicitly authorized by this Trust Agreement; and

(vi)      engage in any activities inconsistent with the treatment of the Trust as a "qualified settlement fund" within the meaning of Treasury Regulations issued under section 468B of the Tax Code.

(b)      <u>Insurance Settlements</u>.

(1)      The Trustee may effectuate proposed Insurance Settlements without Bankruptcy Court approval.  Notwithstanding the foregoing, if a TAC member dissents from approval of the proposed Insurance Settlement and wants the Trustee to seek Bankruptcy Court approval of the proposed settlement, such settlement shall be conditioned on the Bankruptcy Court finding that the proposed settlement is in the best interest of the Trust.

(c)      <u>PP Settlements</u>.

No Other Insured Entity may become a Participating Party under a PP Settlement:  (1) absent a separate contribution to the Settlement Trust in an amount that the Trustee finds acceptable after taking into account the value of the claims against the Other Insured Entity and the Other Insured Entity's ability to pay (from assets and separate insurance) and (2) absent approvals by the TAC and/or Bankruptcy Court required by the Trust Documents.

Section 2.3      *.General Administration.*

The Trustee shall act in accordance with the Trust Documents.  The Trustee shall establish the location of the principal office of the Trust and may change the location of the principal office or establish other offices at other locations in his or her discretion.

Section 2.4      *Accounting.*

The fiscal year of the Trust shall begin on January 1 and shall end on December 31 of each calendar year, except that the first fiscal year shall run from the Confirmation Date to December 31.  The Trustee shall maintain the books and records relating to the Trust Assets and income and

12

the payment of Trust Operating Expenses and other liabilities of the Trust. The detail of these books and records and the duration of time during which the Trustee shall keep such books and records shall be such as to allow the Trustee to make a full and accurate accounting of all Trust Assets, as well as to comply with applicable provisions of law and standard accounting practices necessary or appropriate to produce an annual report containing special-purpose financial statements of the Trust, including, without limitation, the assets and liabilities of the Trust as of the end of such fiscal year and the additions, deductions and cash flows for such fiscal year (the "**Annual Report**"); provided however, that the Trustee shall maintain such books and records until the wind-up of the Trust's affairs and satisfaction of all of Trust liabilities.

Section 2.5    *Financial Reporting.*

(a)    Within one hundred twenty (120) days following the end of each calendar year, the Trustee shall file with the Bankruptcy Court the Annual Report.

(b)    All materials filed with the Bankruptcy Court pursuant to this Section 2.5 need not be served on any parties in the Chapter 11 Case.

Section 2.6    *Names and addresses.*

The Trustee shall keep a register (the "**Register**") in which the Trustee shall at all times maintain the names and addresses of the Beneficiaries and the awards made to the Beneficiaries pursuant to the Trust Documents. The Trustee may rely upon this Register for the purposes of delivering Distributions or notices. In preparing and maintaining this Register, the Trustee may rely on the name and address of each Class 4 Abuse Claim holder as set forth in a proof of claim filed by such holder, or proper notice of a name or address change, which has been delivered by such Class 4 Abuse Claim holder to the Trustee. The Trustee may deliver Distributions and notices to counsel for any Class 4 Abuse Claimant identified in such Beneficiary's proof of claim or proper notice of a name or address change.

Section 2.7    *Transfers of the Trust Assets.*

To the fullest extent permitted by law, neither the principal nor income of the Trust, in whole or part, shall be subject to any legal or equitable claims of creditors of any Beneficiary or others, nor to legal process, nor be voluntarily or involuntarily transferred, assigned, anticipated, pledged or otherwise alienated or encumbered except as may be ordered by the Bankruptcy Court or other competent court of jurisdiction.

**ARTICLE 3.**
**ACCOUNTS, INVESTMENTS, EXPENSES**

Section 3.1    *Accounts.*

(a)    The Trustee shall maintain one or more accounts ("**Trust Accounts**") on behalf of the Trust, including at the Trustee's discretion a disputed claims trust reserve, with one or more financial depository institutions (each a "**Financial Institution**").

13

(b)    The Trustee may replace any retained Financial Institution with a successor Financial Institution at any time.

(c)    The Trustee may, from time to time, create such accounts and reasonable reserves within the Trust Accounts, including a disputed claim trust reserve, as authorized in this Section 3.1 and as he or she may deem necessary, prudent or useful in order to provide for Distributions to the Beneficiaries and the payment of Trust Operating Expenses and may, with respect to any such account or reserve, restrict the use of money therein for a specified purpose (the "**Trust Subaccounts**"). Any such Trust Subaccounts established by the Trustee shall be held as Trust Assets and are not intended to be subject to separate entity tax treatment as a "disputed claims reserve" or a "disputed ownership fund" within the meaning of the Internal Revenue Code ("**IRC**") or Treasury Regulations.

Section 3.2    _Investment Guidelines._

(a)    The Trustee may invest the Trust Assets and monetize such non-liquid assets in accordance with the Trust Documents.  This Section 3.2(b) is intended to modify the application to the Trust of the "prudent person" rule, "prudent investor" rule and any other rule of law that would require the Trustee to diversify the Trust Assets.

Section 3.3    _Payment of Trust Operating Expenses._

All Trust operating expenses shall be payable out of the Trust Assets.  None of the Trustee, the TAC, the Beneficiaries nor any of their officers, agents, advisors, professionals or employees shall be personally liable for the payment of any Trust operating expense or any other liability of the Trust.

Section 3.4    _Payment to Future Abuse Claims Trust ._

In accordance with the Plan, the Trustee shall pay to the Future Abuse Claims Trust an amount no less than six percent (6 %) of the Non-Insurance Trust Assets.


# ARTICLE 4.
## CLAIMS ADMINISTRATION AND DISTRIBUTIONS

Section 4.1    _Claims Administration and Distributions._

The Trust shall fairly and reasonably compensate Class 4 Abuse Claims and Class 9 Civil Rights Claims. and shall pay up to the full value of such claims, solely in accordance with the Trust Documents, including the Trust Allocation Protocol.

14

Section 4.2     _Manner of Payment._

   Distributions from the Trust to the Beneficiaries may be made by the Trustee on behalf of the Trust or by a disbursing agent retained by the Trust to make Distributions on behalf of the Trust.

Section 4.3     _Delivery of Distributions._

   (a)  Distributions shall be payable to the Beneficiary (or to counsel for the Beneficiary) on the date approved for Distribution by the Trustee (the "**Distribution Date**") in accordance with the terms of the Trust Documents, including the Trust Allocation Protocol. With respect to each Class 4 Abuse Claim approved for payment, Distributions shall be made only after all conditions to the Distribution with respect to each such Class 4 Abuse Claim have been satisfied. In the event that any Distribution to a Beneficiary is returned as undeliverable, no further Distribution to such Beneficiary shall be made unless and until the Trustee has been notified of the then current address of such Beneficiary, at which time such Distribution shall be made to such Beneficiary without interest; provided however, that all Distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of six (6) months from the applicable Distribution Date. After such date, (i) all unclaimed Distributions shall revert to the Trust (notwithstanding any applicable federal or state escheat, abandoned or unclaimed property laws to the contrary), (ii) the Abuse Claim of such Beneficiary shall be released, settled, compromised and forever barred as against the Trust, and (iii) all unclaimed property interests shall be distributed to other Beneficiaries in accordance with the Trust Documents, as if the Abuse Claim of such Beneficiary had been disallowed as of the date the undeliverable Distribution was first made. The Trustee shall take reasonable efforts to obtain a current address for any Beneficiary with respect to which any Distribution is returned as undeliverable.

   (b)  In the event the Trust holds cash after paying all Trust Operating Expenses and making all Distributions contemplated under the Trust Documents, such remaining cash shall be distributed to a national recognized charitable organization of the Trustee's choice to the extent economically feasible, which charitable organization shall be independent of the Trustee and, to the extent possible, shall have a charitable purpose consistent with the protection of children from sexual abuse or its ramifications. No Trust Asset or any unclaimed property shall escheat to any federal, state, or local government or any other entity.

   (c)  Notwithstanding any provision in the Trust Documents to the contrary, no payment shall be made to any Beneficiary on account of any Abuse Claim if the Trustee determines that the costs of making such Distribution is greater than the amount of the Distribution to be made.

Section 4.4     _Medicare Reimbursement and Reporting Obligations._

   (a)  The Trust shall register as a Responsible Reporting Entity ("**RRE**") under the reporting provisions of section 111 of MMSEA (as defined in the Plan); provided that this shall apply only to Channeled Claims that occurred after December 5, 1980.

15

(b)    The Trust shall timely submit all reports that are required under MMSEA on account of any claims settled, resolved, paid, or otherwise liquidated by the Trust. The Trust, in its capacity as an RRE, shall follow all applicable guidance published by the Centers for Medicare & Medicaid Services of the United States Department of Health and Human Services and/or any other agency or successor entity charged with responsibility for monitoring, assessing, or receiving reports made under MMSEA (collectively, "**CMS**") to determine whether or not, and, if so, how, to report to CMS pursuant to MMSEA.

(c)    Before remitting funds to Claimants' counsel, or to the Claimant if such Claimant is acting *pro se*, in respect of any Channeled Claim, the Trustee shall obtain (i) a certification from said Claimant (or such Claimant's authorized decedent's estate representative) that said Claimant has provided or will provide for the payment and/or resolution of any obligations owing or potentially owing under 42 U.S.C. § 1395y(b), or any related rules, regulations, or guidance, in connection with, or relating to, such Channeled Claim and (ii) that the Claimant indemnifies the Trust for any such obligations.

## ARTICLE 5.
## TRUSTEE

Section 5.1    *Initial Trustee.*  The initial Trustee shall be _____.

Section 5.2    *Term of Service, Successor Trustee.*

(a)    The Trustee shall serve from the Effective Date until the earliest of (i) his or her death, (ii) his or her resignation pursuant to Section 5.2(b) below, (iii) his or her removal pursuant to Section 5.2(c) below, and (iv) the termination of the Trust pursuant to Section 6.2 below.

(b)    The Trustee may resign at any time upon written notice to the TAC and filed with the Bankruptcy Court.  Such notice shall specify a date when such resignation shall take effect, which shall not be less than ninety (90) days after the date such notice is given, where practicable.

(c)    The Trustee may be removed by consent of (i) at least two/thirds (2/3) majority of the TAC or (ii) an order from the Bankruptcy Court, in the event that the Trustee becomes unable to discharge his or her duties hereunder due to accident, physical deterioration, mental incompetence or for other good cause, provided the Trustee has received reasonable notice and an opportunity to be heard.  Other good cause shall mean gross negligence, fraud, self-dealing, intentional misrepresentation, willful misconduct, indictment for or conviction of a felony in each case whether or not connected to the Trust, any substantial failure to comply with the administration of the Trust or a consistent pattern of neglect and failure to perform or participate in performing the duties of the Trustee hereunder.  For the avoidance of doubt, any removal of the Trustee pursuant to this Section 5.2(c) shall require the approval of the Bankruptcy Court and shall take effect at such time as the Bankruptcy Court shall determine.

DOCS_NY:47033.2 18491/002

Section 5.3    _Appointment of Successor Trustee._

(a)    In the event of any vacancy in the office of the Trustee, including the death, resignation or removal of any successor Trustee, such vacancy shall be filled by the TAC as set forth herein. The TAC will nominate an individual to serve as successor Trustee. If the majority of the TAC then in office agree upon a successor Trustee, then, subject to the approval of the Bankruptcy Court, such individual shall become the Trustee.

(b)    Immediately upon the appointment of any successor Trustee pursuant to Section 5.3(a) above, all rights, titles, duties, powers and authority of the predecessor Trustee hereunder shall be vested in and undertaken by the successor Trustee without any further act. No successor Trustee shall be liable personally for any act or omission of his or her predecessor Trustee. No predecessor Trustee shall be liable personally for any act or omission of his or her successor Trustee. No successor Trustee shall have any duty to investigate the acts or omissions of his or her predecessor Trustee.

(c)    Each successor Trustee shall serve until the earliest of (i) his or her death, (ii) his or her resignation pursuant to Section 5.2(b) above, (iii) his or her removal pursuant to Section 5.2(c) above, and (iv) the termination of the Trust pursuant to Section 6.2 below.

Section 5.4    _Trustee Meetings._

(a)    **Regular Meeting**.  The Trustee shall hold regular meetings with the TAC not less than quarterly, which may be held at such times and at such places as may be determined from time to time by the Trustee, including remotely.

(b)    **Special Meetings**.  Special meetings of the Trustee with the TAC may be called by the Trustee by giving written notice to the TAC not less than one (1) business day prior to the date of the meeting.  Any such notice shall include the time, place and purpose of the meeting, given by overnight courier, personal delivery, facsimile, electronic mail or other similar means of communication.  Notice shall be addressed or delivered to the address as shown upon the records of the Trust or as may have been given to the Trustee for purposes of notice.  Notice by overnight courier shall be deemed to have been given one (1) business day after the time that written notice is provided to such overnight courier.  Any other written notice shall be deemed to have been given at the time it is personally delivered to the recipient or actually transmitted by the person giving the notice by electronic means to the recipient.

(c)    **Participation in Meetings by Telephone Conference**.  The Trustee may convene, and persons may participate in, a meeting by conference telephone or similar communications equipment (which shall include virtual meetings via video conferencing software), as long as all persons participating in such meeting can hear one another.  Participation in a meeting pursuant to this Section 5.4(c) shall constitute presence in person at such meeting.

(d)    **Waiver of Notice**. Notice of a meeting need not be given to any person who signs a waiver of notice, whether before or after the meeting. All such waivers shall be filed with the Trust records or made a part of the minutes of the meeting. Attendance at a meeting shall

17

constitute a waiver of notice of such meeting. Neither the business to be transacted at, nor the purpose of, any Trustee meeting need be specified in any waiver of notice.

Section 5.5    _Compensation and Expenses of Trustee._

The Trustee shall receive compensation from the Trust for his or her services as Trustee. The initial amount of the Trustee's compensation shall be [●] and shall be adjusted annually thereafter as reasonably determined by the majority of the TAC. The Trust shall also, upon receipt of appropriate documentation, reimburse all reasonable out-of-pocket costs and expenses incurred by the Trustee in the course of carrying out his or her duties as Trustee in accordance with reasonable policies and procedures as may be adopted from time to time, including in connection with attending meetings of the Trustee. The amounts paid to the Trustee for compensation and expenses shall be disclosed in the Annual Report.

Section 5.6    _Trustee's Independence._

(a)    The Trustee shall not, during his or her service, hold a financial interest in, act as attorney or agent for or serve as any other professional for Reorganized Debtor or its affiliated persons, or any Non-Settling Insurer. No Trustee shall act as an attorney for, or otherwise represent, any Person who holds a claim in the Chapter 11 Case.

(b)    The Trustee shall be indemnified by the Trust in acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order or other paper or document believed by them to be genuine and to have been signed or presented by the proper party or parties.

(c)    Persons dealing with the Trust and the Trustee, respect to the affairs of the Trust, shall have recourse only to the Trust Assets to satisfy any liability incurred by the Trust or the Trustee to such Person in carrying out the terms of this Trust Agreement, and neither the Trustee, the Beneficiaries, nor any of their professionals, advisors, officers, agents, consultants or lawyers shall have any personal obligation to satisfy any such liability.

Section 5.7    _Standard of Care; Exculpation._

(a)    As used herein, the term "**Trust Indemnified Party**" shall mean the Trustee, the Abuse Claims Reviewer, the TAC, and each of their respective members, officers, employees, agents, consultants, lawyers, advisors or professionals (collectively, the "**Trust Indemnified Parties**").

(b)    No Trust Indemnified Party shall be liable to the Trust, any other Trust Indemnified Party, any Beneficiary or any other Person for any damages arising out of the creation, operation, administration, enforcement or termination of the Trust, except in the case of such Trust Indemnified Party's willful misconduct, bad faith, or fraud as finally judicially determined by a court of competent jurisdiction. To the fullest extent permitted by applicable law, the Trust Indemnified Parties shall have no liability for any action in performance of their duties under this Trust Agreement taken in good faith with or without the advice of counsel, accountants, appraisers and other professionals retained by the Trust Indemnified Parties. None of the provisions of this

18

Trust Agreement shall require the Trust Indemnified Parties to expend or risk their own funds or otherwise incur personal financial liability in the performance of any of their duties hereunder or in the exercise of any of their respective rights and powers. Any Trust Indemnified Party may rely, without inquiry, upon writings delivered to it under any of the Trust Documents, which the Trust Indemnified Party reasonably believes to be genuine and to have been given by a proper person. Notwithstanding the foregoing, nothing in this Section 5.7 shall relieve the Trust Indemnified Parties from any liability for any actions or omissions arising out of the willful misconduct, bad faith, or fraud as finally judicially determined by a court of competent jurisdiction; provided that in no event will any such person be liable for punitive, exemplary, consequential or special damages under any circumstances. Any action taken or omitted by the Trust Indemnified Parties with the approval of the Bankruptcy Court, or any other court of competent jurisdiction, will conclusively be deemed not to constitute willful misconduct, bad faith, or fraud.

(c)    The Trust Indemnified Parties shall not be subject to any personal liability whatsoever, whether in tort, contract or otherwise, to any Person in connection with the affairs of the Trust or for any liabilities or obligations of the Trust except for those acts that are finally judicially determined by a court of competent jurisdiction to have arisen out of their own willful misconduct, bad faith, or fraud, and all Persons claiming against the Trust Indemnified Parties, or otherwise asserting claims of any nature in connection with affairs of the Trust, shall look solely to the Trust Assets for satisfaction of any such claims.

(d)    To the extent that, at law or in equity, the Trust Indemnified Parties have duties (including fiduciary duties) or liability related thereto, to the Trust or the Beneficiaries, it is hereby understood and agreed by the parties hereto and the Beneficiaries that such duties and liabilities are eliminated to the fullest extent permitted by applicable law, and replaced by the duties and liabilities expressly set forth in this Trust Agreement with respect to the Trust Indemnified Parties, provided however, that the duties of care and loyalty are not eliminated but are limited and subject to the terms of this Trust Agreement, including but not limited to this Section 5.7 and its subparts.

(e)    The Trust Indemnified Parties shall be indemnified to the fullest extent permitted by law by the Trust against all liabilities arising out of the creation, operation, administration, enforcement or termination of the Trust, including actions taken or omitted in fulfillment of their duties with respect to the Trust, except for those acts that are finally judicially determined by a court of competent jurisdiction to have arisen out of their own willful misconduct, bad faith, or fraud.

(f)    The Trust will maintain appropriate insurance coverage for the protection of the Trust Indemnified Parties, as determined by the Trustee in his or her discretion.

Section 5.8    *Protective Provisions.*

(a)    Every provision of this Trust Agreement relating to the conduct or affecting the liability of or affording protection to Trust Indemnified Parties shall be subject to the provisions of this Section 5.8.

19

(b)     In the event the Trustee retains counsel (including at the expense of the Trust), the Trustee shall be afforded the benefit of the attorney-client privilege with respect to all communications with such counsel, and in no event shall the Trustee be deemed to have waived any right or privilege including, without limitation, the attorney-client privilege even if the communications with counsel had the effect of guiding the Trustee in the performance of duties hereunder.  A successor to any Trustee shall succeed to and hold the same respective rights and benefits of the predecessor for purposes of privilege, including the attorney-client privilege. No Beneficiary or other party may raise any exception to the attorney-client privilege discussed herein as any such exceptions are hereby waived by all parties.

(c)     To the extent that, at law or in equity, the Trustee has duties (including fiduciary duties) and liabilities relating hereto, to the Trust or to the Beneficiaries, it is hereby understood and agreed by the Parties and the Beneficiaries that such duties and liabilities are eliminated to the fullest extent permitted by applicable law, and replaced by the duties and liabilities expressly set forth in this Trust Agreement with respect to the Trustee, provided however, that the duties of care and loyalty are not eliminated but are limited and subject to the terms of this Trust Agreement, including but not limited to Section 5.7 herein.

(d)     No Trust Indemnified Party shall be personally liable under any circumstances, except for their own willful misconduct, bad faith, or fraud as finally judicially determined by a court of competent jurisdiction.

(e)     No provision of this Trust Agreement shall require the Trust Indemnified Parties to expend or risk their own personal funds or otherwise incur financial liability in the performance of their rights, duties, and powers hereunder.

(f)     In the exercise or administration of the Trust hereunder, the Trust Indemnified Parties (i) may act directly or through their respective agents or attorneys pursuant to agreements entered into with any of them, and the Trust Indemnified Parties shall not be liable for the default or misconduct of such agents or attorneys if such agents or attorneys have been selected by the Trust Indemnified Parties in good faith and with due care, and (ii) may consult with counsel, accountants and other professionals to be selected by them in good faith and with due care and employed by them, and shall not be liable for anything done, suffered or omitted in good faith by them in accordance with the advice or opinion of any such counsel, accountants or other professionals.

Section 5.9   *Indemnification.*

(a)     Without the need for further court approval, the Trust hereby indemnifies, holds harmless, and defends the Trust Indemnified Parties in the performance of their duties hereunder to the fullest extent that a trust, including a statutory trust organized under the laws of the State of New York, is entitled to indemnify, hold harmless and defend such persons against any and all liabilities, expenses, claims, damages or losses (including attorneys' fees and costs) incurred by them in the performance of their duties hereunder or in connection with activities undertaken by them prior to or after the Effective Date in connection with the formation, establishment, funding or operations of the Trust except for those acts that are finally judicially

20

determined by a court of competent jurisdiction to have arisen out of their own willful misconduct, bad faith, or fraud.

(b)     Reasonable expenses, costs and fees (including attorneys' fees and costs) incurred by or on behalf of the Trust Indemnified Parties in connection with any action, suit or proceeding, whether civil, administrative or arbitrative, from which they are indemnified by the Trust shall be paid by the Trust in advance of the final disposition thereof upon receipt of an undertaking, by or on behalf of the Trust Indemnified Parties, to repay such amount in the event that it shall be determined ultimately by final order of the Bankruptcy Court that the Trust Indemnified Parties or any other potential indemnitee are not entitled to be indemnified by the Trust.

(c)     The Trustee may purchase and maintain appropriate amounts and types of insurance on behalf of the Trust Indemnified Parties, as determined by the Trustee, which may include liability asserted against or incurred by such individual in that capacity or arising from his or her status as a Trust Indemnified Party, and/or as an employee, agent, lawyer, advisor or consultant of any such person.

(d)     The indemnification provisions of this Trust Agreement with respect to any Trust Indemnified Party shall survive the termination of such Trust Indemnified Party from the capacity for which such Trust Indemnified Party is indemnified. Termination or modification of this Trust Agreement shall not affect any indemnification rights or obligations in existence at such time. In making a determination with respect to entitlement to indemnification of any Trust Indemnified Party hereunder, the person, persons or entity making such determination shall presume that such Trust Indemnified Party is entitled to indemnification under this Trust Agreement, and any person seeking to overcome such presumption shall have the burden of proof to overcome the presumption.

(e)     The rights to indemnification hereunder are not exclusive of other rights which any Trust Indemnified Party may otherwise have at law or in equity, including common law rights to indemnification or contribution.

Section 5.10     *Bond.*

The Trustee shall not be required to post any bond or other form of surety or security unless otherwise ordered by the Bankruptcy Court.

## ARTICLE 6.

## GENERAL PROVISIONS

Section 6.1     *Irrevocability.*

To the fullest extent permitted by applicable law, the Trust is irrevocable. The Settlor shall not (i) retain any ownership or residual interest whatsoever with respect to any Trust Assets, including, but not limited to, the funds transferred to fund the Trust, and (ii) have any rights or role

21

with respect to the management or operation of the Trust, or the Trustee's administration of the Trust.

Section 6.2    *Term; Termination.*

      (a)    The term for which the Trust is to exist shall commence on the date of the filing of the Certificate of Trust and shall terminate pursuant to the following provisions.

      (b)    The Trust shall automatically dissolve as soon as practicable but no later than ninety (90) days after the date on which the Bankruptcy Court approves the dissolution of the Trust because (i) all reasonably expected assets have been collected by the Trust, (ii) all Distributions have been made to the extent set forth in the Trust Allocation Protocol, (iii) necessary arrangements and reserves have been made to discharge all anticipated remaining Trust obligations and Trust Operating Expenses in a manner consistent with the Trust Documents, and (iv) a final accounting has been filed and approved by the Bankruptcy Court (the "**Dissolution Date**").  For the avoidance of doubt, the Dissolution Date shall be no sooner than six months after the dissolution of the Future Abuse Claim Trust.

      (c)    Following the dissolution and Distribution of the Trust Assets, the Trust shall terminate, and the Trustee shall execute and cause a Certificate of Cancellation of the Certificate of Trust to be filed in accordance with the Act. Notwithstanding anything to the contrary contained in this Trust Agreement, the existence of the Trust as a separate legal entity shall continue until the filing of such Certificate of Cancellation.

      (d)    After termination of the Trust and solely for the purpose of liquidating and winding up its affairs, the Trustee shall continue to act as Trustee until its duties hereunder have been fully performed.  The Trustee shall retain the books, records, documents and files that shall have been delivered to or created by the Trustee until Distribution of all the Trust Assets.  For purposes of this provision, Trust Assets will be deemed distributed when the total amount remaining in the Trust is less than $50,000 and no further actions are pending or have yet to be brought.  At the Trustee's discretion, all of such books, records, documents and files may be destroyed at any time following the later of: (i) the first anniversary of the final Distribution of the Trust Assets, and (ii) the date until which the Trustee is required by applicable law to retain such books, records, documents and files; provided however, that, notwithstanding the foregoing, the Trustee shall not destroy or discard any books, records, documents or files relating to the Trust without giving Reorganized Debtor the opportunity to take control of such books, records, documents and/or files.

      (e)    Upon termination of the Trust and accomplishment of all activities described in this agreement, the Trustee and its professionals shall be discharged and exculpated from liability (except for acts or omissions resulting from the recklessness, gross negligence, willful misconduct, knowing and material violation of law or fraud of the Trustee or his agents or representatives). The Trustee may, at the expense of the Trust, seek an Order of the Bankruptcy Court confirming the discharges, exculpations and exoneration referenced in the preceding sentence.

Section 6.3     *Outgoing Trustee Obligations.*

In the event of the resignation or removal of the Trustee, the resigning or removed Trustee shall:

(a)     execute and deliver by the effective date of resignation or removal such documents, instruments, records and other writings as may be reasonably requested by the successor Trustee to effect such resignation or removal and the conveyance of the Trust Assets then held by the resigning or removed Trustee to the successor Trustee;

(b)     deliver to the successor Trustee all documents, instruments, records and other writings relating to the Trust Assets as may be in the possession or under the control of the resigning or removed Trustee;

(c)     otherwise assist and cooperate in effecting the assumption of the resigning or removed Trustee's obligations and functions by the successor Trustee; and

(d)     irrevocably appoint the successor Trustee (and any interim trustee) as its attorney-in-fact and agent with full power of substitution for it and its name, place and stead to do any and all acts that such resigning or removed Trustee is obligated to perform under this Trust Agreement. Such appointment shall not be affected by the subsequent disability or incompetence of the Trustee making such appointment. The Bankruptcy Court also may enter such orders as are necessary to effect the termination of the appointment of the Trustee and the appointment of the successor Trustee.

Section 6.4     *Taxes.*

(a)     The Trust is intended to qualify as a "qualified settlement fund" within the meaning of section 1.468B-1 et seq. of the Treasury Regulations promulgated under section 468B of the IRC, as amended (the "**QSF Regulations**"), with respect to which Reorganized Debtor shall timely make an election to treat the Trust as a "grantor trust" for U.S. federal income tax purposes and, to the extent permitted under applicable law, for state and local income tax purposes.

(b)     The Trustee shall be the "administrator" of the Trust within the meaning of section 1.468B-2(k)(3) of the Treasury Regulations and, in such capacity, such administrator shall (i) prepare and timely file, or cause to be prepared and timely filed, such income tax and other tax returns and statements required to be filed and shall timely pay all taxes required to be paid by the Trust out of the Trust Assets, which assets may be sold by the Trustee to the extent necessary to satisfy tax liabilities of the Trust, (ii) comply with all applicable tax reporting and withholding obligations, (iii) satisfy all requirements necessary to qualify and maintain qualification of Trust as a qualified settlement fund and a grantor trust, within the meaning of the QSF Regulations, and (iv) take no action that could cause the Trust to fail to qualify as a qualified settlement fund and a grantor trust within the meaning of the QSF Regulations.  The Trustee may request an expedited determination under section 505(b) of the Bankruptcy Code for all tax returns filed by or on behalf of the Trust for all taxable periods through the Dissolution Date.

23

(c)      As soon as reasonably practicable after the Effective Date, but in no event later than one hundred twenty (120) days thereafter, the Trust shall make a good faith valuation of the Aggregate Settlement Consideration and such valuation shall be used consistently by all parties for all U.S. federal income tax purposes. In connection with the preparation of the valuation contemplated hereby, the Trust shall be entitled to retain such professionals and advisors as the Trustee shall determine to be appropriate or necessary, and the Trustee shall take such other actions in connection therewith as he or she determines to be appropriate or necessary.

(d)      The Trustee may withhold and pay to the appropriate tax authority all amounts required to be withheld pursuant to the IRC or any provision of any foreign, state or local tax law with respect to any payment or Distribution. All such amounts withheld and paid to the appropriate tax authority (or placed in escrow pending resolution of the need to withhold) shall be treated as amounts distributed or paid for all purposes of this Trust Agreement. The Trustee shall be authorized to collect such tax information (including tax identification numbers) as in his or her sole discretion is deemed necessary to effectuate the Plan, the Confirmation Order and this Trust Agreement. In order to receive Distributions, all Beneficiaries shall be required to provide tax information to the Trustee to the extent the Trustee deems appropriate in the manner and in accordance with the procedures from time to time established by the Trustee for these purposes. The Trustee may refuse to make a payment or Distribution unless or until such information is delivered; provided however, that, upon the delivery of such information, the Trustee shall make such delayed payment or Distribution, without interest. Notwithstanding the foregoing, if a person fails to furnish any tax information reasonably requested by the Trustee before the date that is three hundred sixty-five (365) calendar days after the request is made, the amount of such Distribution shall irrevocably revert to the Trust. In no event shall any escheat to any federal, state or local government or any other entity.

Section 6.5    *Modification.*

(a)      Material modifications to this Trust Agreement, including Exhibits hereto, may be made only with the consent of the Trustee and the majority of the TAC and subject to the approval of the Bankruptcy Court; provided however, that the Trustee may amend this Trust Agreement from time to time without the consent, approval or other authorization of, but with notice on the Bankruptcy Court docket, to make minor corrective or clarifying amendments necessary to enable the Trustee to effectuate the provisions of this Trust Agreement, provided such minor corrective or clarifying amendments shall not take effect until ten (10) days after notice to on the Bankruptcy Court docket, subject to any objection by a Beneficiary. Except as permitted pursuant to the preceding sentence, the Trustee shall not modify this Trust Agreement in any manner that is inconsistent with the Plan or the Confirmation Order without the approval of the Bankruptcy Court. The Trustee shall file notice of any modification of this Trust Agreement with the Bankruptcy Court.

(b)      Notwithstanding anything set forth in this Trust Agreement to the contrary, none of this Trust Agreement, nor any document related thereto shall be modified or amended in any way that could jeopardize or impair (i) the applicability of section 105 of the Bankruptcy Code to the Plan and the Confirmation Order, (ii) the efficacy or enforceability of the Channeling Injunction or any other injunction or release issued or granted in connection with the Plan and

DOCS_NY:47033.2 18491/002

Confirmation Order or (iii) the Trust's qualified settlement fund status and grantor trust status under the QSF Regulations.

Section 6.6        _Severability._

If any provision of this Trust Agreement or application thereof to any person or circumstance shall be finally determined by a court of competent jurisdiction to be invalid or unenforceable to any extent, the remainder of this Trust Agreement, or the application of such provisions to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and such provision of this Trust Agreement shall be valid and enforced to the fullest extent permitted by law.

Section 6.7        _Notices._

Any notices or other communications required or permitted hereunder to the following parties shall be in writing and delivered at the addresses designated below, or sent by email or facsimile pursuant to the instructions listed below, or mailed by overnight courier, addressed as follows, or to such other address or addresses as may hereafter be furnished in writing to each of the other parties listed below in compliance with the terms hereof.

To the Trustee:

with a copy (which shall not constitute notice) to:

All such notices and communications, if mailed, shall be effective when physically delivered at the designated addresses, or if electronically transmitted, shall be effective upon transmission.

Section 6.8        _Successors and Assigns._

The provisions of this Trust Agreement shall be binding upon and inure to the benefit of the Trust, the Trustee, the TAC and their respective successors and assigns, except that none of such persons may assign or otherwise transfer any of its, or their, rights or obligations under this Trust Agreement except, in the case of the Trust and the Trustee, as contemplated by Section 2.1 and Section 5.2 above.

Section 6.9        _Limitation on Transferability; Beneficiaries' Interests._

The Beneficiaries' interests in the Trust shall not (a) be assigned, conveyed, hypothecated, pledged or otherwise transferred, voluntarily or involuntarily, directly or indirectly and any purported assignment, conveyance, pledge or transfer shall be null and void _ab initio_; (b) be evidenced by a certificate or other instrument; (c) possess any voting rights; (d) give rise to any right or rights to participate in the management or administration of the Trust or the Trust Assets; (e) entitle the holders thereof to seek the removal or replacement of any Trustee, whether by petition to the Bankruptcy Court or any other court or otherwise; (f) entitle the holders thereof to receive any interest on Distributions; and (g) give rise to any rights to seek a partition or division of the Trust Assets. Beneficiaries shall have no interest of any kind in any of the Trust Assets;

25

rather, the Beneficiaries shall have an undivided beneficial interest only in cash assets of but only to the extent such cash assets are declared by the Trustee to be distributable as Distributions in accordance with the Trust Documents. For the avoidance of doubt, the Beneficiaries shall have only such rights as expressly set forth in the Trust Documents.

Section 6.10    *Exemption from Registration.*

The Parties hereto intend that the rights of the Beneficiaries arising under this Trust Agreement shall not be "securities" under applicable laws, but none of the Parties hereto represent or warrant that such rights shall not be securities or shall be entitled to exemption from registration under applicable securities laws. If it should be determined that any such interests constitute "securities," the Parties hereto intend that the exemption provisions of section 1145 of the Bankruptcy Code will be satisfied and the offer and sale under the Plan of the beneficial interests in the Trust will be exempt from registration under the Securities Act, all rules and regulations promulgated thereunder, and all applicable state and local securities laws and regulations.

Section 6.11    *Entire Agreement; No Waiver.*

The entire agreement of the parties relating to the subject matter of this Trust Agreement is contained herein and in the documents referred to herein, and this Trust Agreement and such documents supersede any prior oral or written agreements concerning the subject matter hereof. No failure to exercise or delay in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege hereunder preclude any further exercise thereof or of any other right, power or privilege. The rights and remedies herein provided are cumulative and are not exclusive of rights under law or in equity.

Section 6.12    *Headings.* The headings used in this Trust Agreement are inserted for convenience only and do not constitute a portion of this Trust Agreement, nor in any manner affect the construction of the provisions of this Trust Agreement.

Section 6.13    *Governing Law.*

This Trust Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, without regard to the conflicts of law provisions thereof which would purport to apply the law of any other jurisdiction. For the avoidance of doubt, none of the following provisions of New York law shall apply to the extent inconsistent with the terms of the Trust Documents: (a) the filing with any court or governmental body or agency of trustee accounts or schedules of trustee fees and charges, (b) affirmative requirements to post bonds for trustees, officers, agents or employees of a trust, (c) the necessity for obtaining court or other governmental approval concerning the acquisition, holding or disposition of property, (d) fees or other sums payable to trustees, officers, agents or employees of a trust, (e) the allocation of receipts and expenditures to income or principal, (f) restrictions or limitations on the permissible nature, amount or concentration of trust investments or requirements relating to the titling, storage or other manner of holding of Trust Assets, (g) the existence of rights or interests (beneficial or otherwise) in Trust Assets, (h) the ability of beneficial owners or other persons to terminate or dissolve a trust, and (i) the establishment of fiduciary or other standards or responsibilities or limitations on the

26

acts or powers of trustees or beneficial owners that are inconsistent with the limitations on liability or authorities and powers of the Trustee or the TAC set forth or referenced in this Trust Agreement.

Section 6.14    *Settlor's Representative.*

Pursuant to the Trust Documents, the Reorganized Debtor is hereby irrevocably designated as the "**Settlor's Representative**" and is hereby authorized to take any action consistent with Reorganized Debtor's obligations under the Trust Documents that is reasonably requested of the Settlor by the Trustee pursuant to the Trust Documents.  Pursuant to the Trust Documents, the Settlor's Representative shall cooperate with the Trustee and the Trust's officers, employees and professionals in connection with the Trust's administration of the Aggregate Settlement Consideration, including, but not limited to, providing the Trustee or his or her officers, employees and professionals, upon written request (including e-mail), reasonable access to information related to the Aggregate Settlement Consideration, including, without limitation, delivery of documents in the possession of, or witnesses under the control of, Reorganized Debtor to the extent that the Trustee could obtain the same by subpoena, notice of deposition or other permissible discovery request, without the need for a formal discovery request.

Section 6.15    *Independent Legal and Tax Counsel.*

All parties to this Trust Agreement have been represented by counsel and advisors of their own selection in this matter. Consequently, the parties agree that the language in all parts of this Trust Agreement shall in all cases be construed as a whole according to its fair meaning and shall not be construed either strictly for or against any party. It is specifically acknowledged and understood that this Trust Agreement has not been submitted to, nor reviewed or approved by, the IRS or the taxing authorities of any state or territory of the United States of America.

Section 6.16    *Waiver of Jury Trial.*

Each party hereto and each Beneficiary hereof hereby irrevocably waives, to the fullest extent permitted by applicable law, any and all right to a trial by jury in any legal proceeding arising out of or relating to this Trust Agreement.

Section 6.17    *Effectiveness.*

This Trust Agreement shall not become effective until it has been executed and delivered by all the parties hereto.

Section 6.18    *Counterpart Signatures.*

This Trust Agreement may be executed in any number of counterparts, each of which shall constitute an original, but such counterparts shall together constitute but one and the same instrument. A signed copy of this Trust Agreement or any amendment hereto delivered by facsimile, email or other means of Electronic Transmission, shall be treated in all manner and respects as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.

27

*[SIGNATURE PAGES TO FOLLOW]*

28

DOCS_NY:47033.2 18491/002

IN WITNESS WHEREOF, the parties have executed this Trust Agreement as of the date first set forth above to be effective as of the Effective Date.

**SETTLOR:**

The Diocese of Rockville Centre, New York

By: _____

**TRUSTEE:**

By: _____

**TAC MEMBERS:**

**EXHIBIT 1**
**TRUST ALLOCATION PROTOCOL**

DOCS_NY:47033.2 18491/002

**EXHIBIT 1**

# TRUST ALLOCATION PROTOCOL

## 1.   PURPOSE

The Trust Allocation Protocol is to provide for the distribution of funds to Abuse Claimants.  **This protocol does not apply to the distribution of funds to any other creditors, including Future Abuse Claimants.**

## 2.   DEFINITIONS

### 2.1   Capitalized Terms.

Capitalized terms used shall have the meanings given them in the Plan or the Bankruptcy Code, unless otherwise defined, and such definitions are incorporated herein by reference.

"**Abuse Claimants**" means, collectively, Holders of Class 4 Abuse Claims.

"**Perpetrator of the Debtor**" Means a person: (1) who was an employee or other agent of the Debtor or any other Participating Party (as defined in the Plan) when such person committed an act of Abuse; or (2) for whom or for whose actions the Debtor or any other Participating Party (as defined in the Plan) was otherwise responsible.

"**Litigation Award**" means a final, nonappealable judgment or verdict determining that the Diocese and/or any Participating Party is/are liable to a Litigation Claimant because of such Litigation Claimant's Abuse Claim.

"**Litigation Claimant**" means any Abuse Claimant whose Abuse Claim the Trustee believes in good faith to be covered, in whole or in part, by policies of insurance issued by one or more Non-Settling Insurers, and who is authorized by the Trustee to liquidate their Abuse Claim under the Plan regarding litigation of Abuse Claims. The Trustee may, but is not required to, consult the Diocese prior to making such a determination.

## 3.   RULES OF INTERPRETATION AND GENERAL GUIDELINES

### 3.1   Sole and Exclusive Method.

The Plan and the Trust Agreement contemplate that the Trust will be established for payment of Abuse Claims.  The Plan and this protocol shall together be the sole and exclusive method by which an Abuse Claimant (and not a Future Abuse Claimant) may seek distribution because of an Abuse Claim against the Debtor.  The Plan and the Trust Agreement further contemplate that a separate trust will be established for payment of Future Abuse Claims.

3.2     **Conflict with Plan.**

The terms of the confirmed Plan (as it may be amended) or the Confirmation Order shall prevail if there is any conflict between the terms of the Plan and the terms of this allocation protocol.

3.3     **Non-Compensatory Damages and Other Theories of Liability.**

In determining the distribution to any Abuse Claimant, punitive damages and damages that can be classified as economic damages that do not compensate the Abuse Claimant for bodily injury and/or emotional distress or mental anguish attributable to their bodily injury shall not be considered or allowed, even if these damages could have been considered or allowed under applicable non-bankruptcy law.  Any distribution to an Abuse Claimant shall be solely because of bodily injury and/or emotional distress or mental anguish attributable to the bodily injury to such Abuse Claimant.

3.4     **Withdrawal of Claims.**

An Abuse Claimant can irrevocably withdraw an Abuse Claim at any time upon written notice to the Trustee and the Diocese.  Once withdrawn, the Abuse Claim may not be reasserted against the Trust (including filing a Future Abuse Claim by an Abuse Claimant who withdrew his or her Abuse Claim).

3.5     **Res Judicata Effect.**

The Abuse Claims Reviewer's determination regarding an Abuse Claim shall have no preclusive, res judicata judicial estoppel or similar effect outside of this Case as to any third party.  The Abuse Claims Reviewer's determination shall not be used against any Abuse Claimant in any other matter, case or proceeding.

3.6     **Confidentiality and Privilege.**

All information that the Abuse Claims Reviewer receives from any source about any Abuse Claimant shall be held in strict confidence and shall not be disclosed absent an Order of the Bankruptcy Court or the written consent of the Abuse Claimant (or such Claimant's counsel of record).   All information that the Abuse Claims Reviewer received from any Abuse Claimant (including from counsel to such Claimant) shall be subject to a mediation privilege and receipt of such information by the Abuse Claims Reviewer shall not constitute a waiver of any attorney-client privilege or attorney work-product claim or any similar privilege or doctrine.

4.     **ABUSE CLAIMS REVIEWER**



_____ is the "Abuse Claims Reviewer" (the "Abuse Claims Reviewer") under the terms of this protocol and an order of the Bankruptcy Court.  The Abuse Claims Reviewer shall review each of the Abuse Claims (as and when such Claims may be filed) and, according to the guidelines in section 5 below, make determinations upon which individual monetary distributions will be made subject to the Plan and the Trust

Documents.  The Abuse Claims Reviewer's review as to each Abuse Claimant shall be the final review, subject only to reconsideration as set forth in section 7 below.

The Debtor shall provide electronic copies of all Abuse Proof of Claim forms (including any attachments thereto and as the same may have been amended from time to time) to the Abuse Claims Reviewer.

5. **PROCEDURE FOR ALLOCATION AMONG ALLOWED ABUSE CLAIMS**

5.1  **Proof of Abuse.**

The Abuse Claims Reviewer shall consider all of the facts and evidence presented by the Abuse Claimant in the Abuse Claimant's filed proof of claim.  Abuse Claimants may provide supplemental evidence and information to the Abuse Claims Reviewer pursuant to the below procedures.

The Abuse Claims Reviewer may request additional information from an Abuse Claimant. Failure to respond to such request shall not be construed against the Abuse Claimant.

Each Abuse Claimant can submit a written statement (a "**Supplemental Submission**") to the Abuse Claims Reviewer.  The Abuse Claims Reviewer shall establish a deadline (the "**Submission Deadline**") of no less than 30 days for Abuse Claimants to submit Supplemental Statements to the Abuse Claims Reviewer.  Notice of the Submission Deadline (the "**Supplement Notice**") shall provide, among other things, the method for submission of Supplemental Statements.  All notices by the Abuse Claims Reviewer to Abuse Claimants, including the Supplement Notice, shall be sent to each Abuse Claimant's counsel of record via email and first class mail at the address(es) provided in the applicable Abuse Proof of Claim Form.

The Supplemental Submission shall be no longer than 10 pages, single sided, double spaced with 12-point font; provided, however, that an Abuse Claimant not represented by counsel may submit a handwritten Supplemental Submission not to exceed 10 single sided pages in length.  A Supplemental Submission shall be submitted by the Submission Deadline unless the Abuse Claims Reviewer determines, in his sole discretion, there is good cause for delay.  The Abuse Claims Reviewer, in his sole discretion, may allow an Abuse Claimant to exceed the page limit for the Supplemental Submission.  Abuse Claimant may submit a Supplemental Submission to the Abuse Claims Reviewer, instead of a written statement, via video that is no more than ten minutes.  An Abuse Claimant may submit either a written or video Supplemental Submission, but not both.  A video submission may only record the Abuse Claimant and may record no other person, including an agent or representative of an Abuse Claimant; provided, however, a video may include recording the Abuse Claimant's deposition if such recording is not more than ten minutes.  If an Abuse Claimant declines to submit a written or video Supplemental Submission, such declination shall not be held against the Abuse Claimant or be used as grounds to discount the claim.  **The medium of the Supplemental Submission (whether in writing or by video) shall not advantage or disadvantage an Abuse Claimant.**

**5.2**     **Guidelines for Allocation for Allowed Abuse Claims.**

**(a)**     **Initial Evaluation.**

The Abuse Claims Reviewer shall consider whether the Abuse Claimant has proven by credible evidence that the Abuse was perpetrated by a Perpetrator of the Debtor. The Abuse Claims Reviewer shall give notice to the Abuse Claimant and the Trustee if he determines that the Abuse Claimant has not met the burden of proof and will provide the Abuse Claimant a reasonable opportunity to provide facts and/or legal basis to establish that the burden of proof has been met. The Debtor and any Participating Party (other than a Settling Insurer) must cooperate with any information or discovery request by an Abuse Claimant related to the Abuse Claims Reviewer's determination that the Abuse Claimant has not met the burden of proof. On request of the Trustee, the Abuse Claims Reviewer shall evaluate the Claim under Section 5.2(d) to let the Trustee reserve sufficient amounts to pay the Abuse Claimant if the Abuse Claims Reviewer determines that the Abuse Claimant has met the burden of proof.

**(b)**     **Released Abuse Claims.**

As for any Abuse Claim filed by an Abuse Claimant who previously released the Diocese from liability (a "**Releasor**"), the Abuse Claims Reviewer shall assess whether such Releasor has proven by credible evidence that:

> (a) such Releasor was not represented by counsel when such release was executed (the "**Release Date**"); and

> (b)    (i) any payment received by such Claimant in consideration of the release was unjust under the circumstances; or
> (ii) such Releasor was incapacitated or disabled as of the Release Date; or
> (iii) such Releasor was fraudulently induced to execute the release.

A Releasor must submit a written statement (no longer than 10 pages, single sided, double spaced with 12-point font) regarding an Abuse Claim asserted after such Abuse Claimant executed a release in favor of the Diocese. The Abuse Claims Reviewer shall award zero (0) points for any applicable Releasor that fails to submit such statement. Releasors who must submit such statement are listed on Schedule _____. The deadline to submit such statement shall be the Submission Deadline provided upon notice by the Abuse Claims Reviewer to the Releasor. The Trustee shall deduct the amount received by any Releasor in exchange for the release from such Claimants award. Any Releasor that fails to provide written evidence of the amount received in exchange for executing such a release within 30 days of a written request for such information by the Trustee shall be awarded zero (0) points.

(c)    **Evaluation Factors**

Each Abuse Claim will be evaluated by the Abuse Claims Reviewer.  Each Claim will be scored on a scale of up to 100 based on these factors:

(i)    **Nature of the Sexual Abuse:**

(1)    Duration;

(2)    Frequency/number of instances;

(3)    Degree of intrusiveness into child's body (*e.g.* clothed/unclothed, masturbation by or of perpetrator, oral penetration, anal penetration, vaginal penetration);

(4)    Level or severity of force/violence/coercion/threats;

(5)    Control of environment (*e.g.* boarding school, orphanage, trip under supervision of perpetrator, day school, employment relationship with Perpetrator of the Debtors);

(6)    Number of Perpetrators of the Debtors that abused the Claimant;

(7)    Physical pain suffered;

(8)    Grooming; and/or

(9)    Additional factors that may be provided by the Claimant.

(ii)    **Impact of Abuse:**

(1)    School behavior problems;

(2)    School academic problems;

(3)    Getting into legal trouble as a minor;

(4)    Loss of faith;

(5)    Damage to family relationships/ interpersonal difficulties;

(6)    Mental health symptoms, including:

a.    Depression;

b.    Suicide Attempt and suicidal ideation;

c.    Anxiety;

d.      Substance abuse;

e.      Sexual acting out;

f.      Runaway;

g.      Flashbacks; and/or

h.      Nightmares; and/or

(7)      Adult and current functioning:

a.      Criminal record as an adult;

b.      Underemployment/unemployment;

c.      Relationship problems

d.      Substance abuse; and/or

(8)      The risk of the foregoing factors affecting the Abuse Claimant in the future based on the Abuse Claimant's age at the present time; and/or

(9)      Additional factors that may be provided by the Claimant.

The Abuse Claims Reviewer shall not consider the mere fact that a Claimant has been or is incarcerated in the review of the claim unless an element of the crime for which the Claimant was convicted includes any fraud or misrepresentation.

**(iii)    Additional Factors:**

Level of participation by the Abuse Claimant in public/litigation events related to the Abuse Claims, including but not limited to:

a.      leadership role in organizations dedicated to helping sexual abuse survivors;

b.      participation in litigation against the Diocese before the Petition Date;

c.      participation in criminal proceedings against a Perpetrator of the Debtor;

d.      testimony at the Suffolk County Grand Jury; and/or

e.      filing of a lawsuit naming an Other Insured Entity in state court.

**5.3**     There will be no consideration of an Abuse Claimant's claims against any other entity that may be liable for the abuse to the Abuse Claimant.

## 6.     <u>MONETARY DISTRIBUTION.</u>

The Abuse Claims Reviewer will arrive at a point total for each Abuse Claimant considering the above factors.

The Trustee shall calculate the value of an individual "point" after all Abuse Claims have been reviewed.  The point value will be determined by dividing (a) the total dollars in the amount funded to the Trust for the Abuse Claims by (b) the total of points among the individual Abuse Claims.  For example, if there are 50 claimants awarded 10,000 points within a Claimant Pool, with a total settlement fund of $2 million, each point would be valued at $200.

## 7.     DETERMINATIONS BY THE ABUSE CLAIMS REVIEWER<br>AND REQUESTS FOR RECONSIDERATION AND APPEAL.

The Trustee shall notify each Abuse Claimant in writing of the monetary distribution regarding the Abuse Claimant's Claim (the "**<u>Allocated Payment</u>**"), which distribution may be greater or smaller than the actual distribution to be received based on reserves established by the Trustee and the outcome of any reconsideration of claims. The Trustee shall mail this preliminary determination to the Abuse Claimant's counsel of record, or in the case of unrepresented parties, to the last address based on the Abuse Claimant's filed proof of claim.  The Abuse Claims Reviewer's determination shall be final unless the Abuse Claimant makes a timely request for the point award to be reconsidered by the Abuse Claims Reviewer.  The Abuse Claimant shall not have a right to any other appeal of the Abuse Claims Reviewer's point award.  The Abuse Claimant may request reconsideration of the Abuse Claims Reviewer's point award by delivering a written request for reconsideration to the Abuse Claims Reviewer within 10 calendar days after mailing of the preliminary monetary distribution.   The Abuse Claimant, with the request for reconsideration, may submit additional evidence and argument supporting such request upon a showing that such additional information could not have been provided under this protocol.  The Abuse Claims Reviewer shall have sole discretion to determine how to respond to the request for reconsideration.  The Abuse Claims Reviewer's determination of such request for reconsideration shall be final and not subject to any further reconsideration, review or appeal by any party, including a court.

## 8.     <u>ADJUSTMENTS.</u>

The Abuse Claims Reviewer shall adjust all Reviewed Claims:

**a.**     **No Award for Non-Abuse**.

The Abuse Claims Reviewer shall allocate points only for Abuse Claims, subject to paragraph 3.3 above.  Zero (0) points shall be allocated for any Claim that is not an Abuse Claim.

9.      **PROCEDURE FOR LITIGATION UNDER PARTIAL SETTLEMENT OR LITIGATION ONLY ALTERNATIVES**

### 9.1     Abuse Claims Covered by Non-Settling Insurers

Attached as Exhibit ___ is a non-exclusive list of Abuse Claims and the Non-Settling Insurers who may have coverage obligations with respect thereto.

### 9.2     Notice of Interest in Litigation.

Under the Partial Settlement or Litigation Only Alternatives, Abuse Claimants who believe their claim is covered, in whole or in part, by Insurance Policies issued by one or more Non-Settling Insurers must submit to the Trustee written notice ("**Litigation Election Claimants**") of their election to move forward with litigation against the Diocese and/or Participating Parties, under the limitations and provisions of the Plan, by the Submission Deadline.  To avoid doubt, all Abuse Claimants may pursue litigation against Co-Defendants without restriction by the Trustee.

### 9.3     Designation as Litigation Claimant.

The Trustee will confirm which Litigation Election Claimants allege Abuse covered, in whole or in part, by Insurance Policies issued by one or more Non-Settling Insurers ("**Litigation Claimants**").  The Trustee may, but is not required to, consult with the Diocese before making such a determination. The Trustee shall give written notice to all Litigation Election Claimants whether their claims are covered, in whole or in part, by Insurance Policies issued by one or more Non-Settling Insurers.  Litigation Election Claimants may appeal the Trustee's determination to the Bankruptcy Court.

### 9.4     Litigation Authorization.

The Trustee may authorize up to twenty Litigation Claimants per month, at such Litigation Claimants' expense, to pursue their Claims in any court of competent jurisdiction, under the Plan, only to determine any liability that the Diocese and/or any Participating Party may have regarding an Abuse Claim and the amount of that liability. Within sixty days of the Submission Deadline, the Trustee shall, in consultation with the Trust Advisory Committee, prepare a six-month schedule of the claims authorized to begin litigation and provide notice of such schedule to all Litigation Claimants ("**Notice of Litigation Schedule**").  The Trustee shall prioritize claims with the highest valuations according to the Committee's valuation expert, but may consider additional factors such as age of Claimant and legal merits of Claimant's case.

### 9.5     Just Cause for Expedition of Litigation.

Litigation Claimants may, within 10 business days of receipt of the Notice of Litigation Schedule, submit a written statement to the Trustee explaining any specific cause requiring earlier authorization of their claims for pursuit of litigation.  The Trustee, in consultation

with the Trust Advisory Committee, shall review such statements and, if needed, provide an amended Notice of Litigation Schedule to all Litigation Claimants. If the Trustee does not schedule a Litigation Claimant to pursue his or her litigation on the Notice of Litigation Schedule, the Litigation Claimant may request mediation with the Trustee. If the mediation is unsuccessful, the Litigation Claimant may appeal to the Bankruptcy Court for just cause to be authorized to pursue his or her claim against the Diocese and/or Participating Party.

**9.6    Litigation Claims Enhancements.**

To the extent the Trustee enters into a settlement agreement (such settlement, a "**Trust Insurance Settlement**") with any Non-Settling Insurer that covers a Litigation Claimant's Abuse Claim (the policy or policies that cover such Claim(s) are a "**Target Policy**"), such Litigation Claimants shall receive a point enhancement (the "**Claim Enhancement**") to his or her point allocation. The Claim Enhancement shall be payable only from the proceeds of the applicable Trust Insurance Settlement. The Claim Enhancements are independent of one another and are not intended to be cumulative. The Trustee shall reserve sufficient amounts to fund such enhanced payments before distribution of Trust Insurance Settlement proceeds to Abuse Claimants who are not Litigation Claimants.

Claim Enhancements shall be applied as follows:

a.  A Litigation Claimant shall receive an enhancement of 1.1 times their Allocated Payment if the Trust Insurance Settlement is entered into before the Litigation Claimant files a post-Notice of Litigation Schedule pleading or propounds post-Notice of Litigation Schedule discovery.

b.  A Litigation Claimant shall receive an enhancement of 1.5 times their Allocated Payment if the Trust Insurance Settlement is entered into after a Litigation Claimant files a post-Notice of Litigation Schedule pleading or propounds post-Notice of Litigation Schedule discovery but before a post-Notice of Litigation Schedule deposition or interview of the Litigation Claimant by opposing counsel.

c.  A Litigation Claimant shall receive an enhancement of 2 times their Allocated Payment if the Trust negotiates a Trust Insurance Settlement for a Target Policy if the Trust Insurance Settlement is entered into after a post-Notice of Litigation Schedule deposition of the Litigation Claimant by opposing counsel has occurred but before commencement of a trial in such Litigation Claimant's case.

d.  A Litigation Claimant shall receive an enhancement of 3 times their Allocated Payment if the Trust negotiates a Trust Insurance Settlement for a Target Policy if the Trust Insurance Settlement is entered into on or after the first day of a trial in such Litigation Claimant's case.

e.  A Litigation Claimant shall receive an enhancement of 4 times their Allocated Payment if the Trust negotiates a Trust Insurance Settlement for a Target Policy

if the Trust Insurance Settlement is entered into after a Litigation Award is entered in favor of the Litigation Claimant in such litigation.

**9.7**    **Withdrawal of Litigation Election.**

A Litigation Claimant may withdraw his or her election to be a Litigation Claimant at any time.

**9.8**    **Withholding of Litigation Claimant's Allocated Payment.**

A Litigation Claimant's Allocated Payment shall be held in reserve by the Trustee until one of the below occur ("**Release Events**").  Following a Release Event, each Litigation Claimant shall receive his or her Allocated Payment (including any enhancement described above).

    a.   A court of competent jurisdiction enters a final, nonappealable order determining that the Diocese and/or any Participating Party (as applicable) has no liability on account of such Litigation Claimant's Abuse Claim (any such order, a "**Denial Order**");

    b.   The Trust enters into a Trust Insurance Settlement regarding the applicable Target Policy, in which case the Litigation Claimant's Abuse Claim shall be treated as a Channeled Claim under the Plan;

    c.   A court enters a Litigation Award, in which case, at the election of the Litigation Claimant: (a) the Litigation Claimant retains the entirety of his or her Litigation Award and the Trustee shall release such Litigation Claimant's Allocated Payment reserve for distribution to other Abuse Claimants and the Litigation Claimant shall not be entitled to (i) any enhancement of his or her award and/or (ii) any Trust Insurance Settlement proceeds; or (b) the Litigation Claimant shall assign his or her Litigation Award to the Trust and participate in all distributions from the Trust with enhancement.  Such election must be made within 30 days of the Litigation Award or the Litigation Claimant shall be deemed to have elected option (a) of this Paragraph. Notwithstanding the forgoing, 10% of any Litigation Award, if collected from any Non-Settling Insurer shall be paid by the Litigation Claimant to the Trust because of costs and expenses incurred by the Trust in connection with the Litigation Claimant's claim;

    d.   The Litigation Claimant enters into a settlement regarding his or her Abuse Claim, in which case: at the election of the Litigation Claimant: (a) the Litigation Claimant retains the entirety of his or her Litigation Award and Trustee shall release such Litigation Claimant's Allocated Payment reserve for distribution to other Abuse Claimants and the Litigation Claimant shall not be entitled to (i) any enhancement of his or her award and/or (ii) any Trust Insurance Settlement proceeds; or (b) the Litigation Claimant shall assign his or her settlement to the Trust and participate in all distributions from the Trust with enhancement.  Such election must be made within 30 days of the

settlement or the Litigation Claimant shall be deemed to have elected option (a) of this Paragraph. Notwithstanding the forgoing, 10% of any settlement, if collected from any Non-Settling Insurer, shall be paid by the Litigation Claimant to the Trust because of costs and expenses incurred by the Trust in connection with the Litigation Claimant's claim.

If the Trustee, upon consultation with the Litigation Claimant, determines there is no reasonable risk to the Litigation Claimant's and/or the Trust's ability to recover from a Target Insurer, then the Trustee may, in his or her discretion, release the Litigation Claimant's Allocated Payment to the Litigation Claimant; provided, however, that if the Litigation Claimant's and/or the Trust's claim against a Target Insurer is not viable because of such distribution to the Litigation Claimant, then the Litigation Claimant may not receive any enhancement of his or her award.

**EXHIBIT B**

**FUTURE ABUSE CLAIMS TRUST AGREEMENT**

[TO BE FILED AT A LATER DATE]

# EXHIBIT C

## SCHEDULE OF INSURANCE POLICIES

DOCS_NY:46991.4 18491/002

**Exhibit C**

**Diocese of Rockville-Centre Insurance Policies**[1]

**Allianz Insurers**

Upon information and belief, the Allianz Insurers issued at least the following policies to the Diocese:

1.  A liability policy with a policy period from October 1, 1978, to October 1, 1979, which the Committee believes bears Policy No. 183-152625.

2.  A liability policy with a policy period from October 1, 1979, to October 1, 1980, which the Committee believes bears Policy No. 183-152625.

3.  A liability policy with a policy period from October 1, 1980, to October 1, 1981, which the Committee believes bears Policy No. 183-152625.

4.  A liability policy with a policy period from October 1, 1981, to October 1, 1982, which the Committee believes bears Policy No. 183-152625-2.

5.  A liability policy with a policy period from October 1, 1982, to September 1, 1983, which the Committee believes bears Policy No. 83-0169764.

6.  A liability policy with a policy period from October 1, 1982, to September 1, 1983, which the Committee believes bears Policy No. XLX 1395363.

7.  A liability policy with a policy period from September 1, 1983, to September 1, 1984, which the Committee believes bears Policy No. 83-0170072.

8.  A liability policy with a policy period from September 1, 1983, to September 1, 1984, which the Committee believes bears Policy No. XLX 1395219.

9.  A liability policy with a policy period from September 1, 1984, to September 1, 1985, which the Committee believes bears Policy No. 83-183-0170072.

10. A liability policy with a policy period from September 1, 1985, to September 1, 1986, which the Committee believes bears Policy No. 83-0172315.

11. A liability policy with a policy period from October 15, 1985, to October 22, 1986, which the Committee believes bears Policy No. AXL5206661.

---

[1] This Exhibit C is based on the Committee's present knowledge, information, and belief, as informed by information and documents currently available to the Committee. Exhibit C is meant to be illustrative only and does not in any way limit the definition of Insurance Policy contained in the Plan. To the extent that the statements made herein in any way conflict with or are expanded upon by the insurance policies, the language in the insurance policies control.

**Arrowood**

Upon information and belief, Arrowood issued at least the following policies to the Diocese:

1. A liability policy with a policy period from April 6, 1956, to October 1, 1957, which the Committee believes bears Policy No. RLG 050000.

2. A liability policy with a policy period from October 1, 1957, to October 1, 1958, which the Committee believes bears Policy No. RLG 055000.

3. A liability policy with a policy period from October 1, 1958, to October 1, 1959, which the Committee believes bears Policy No. RLG 059700.

4. A liability policy with a policy period from October 1, 1959, to October 1, 1960, which the Committee believes bears Policy No. RLG 001059.

5. A liability policy with a policy period from October 1, 1960, to October 1, 1961, which the Committee believes bears Policy No. RLG 001060.

6. A liability policy with a policy period from October 1, 1961, to October 1, 1962, which the Committee believes bears Policy No. RLG 001061.

7. A liability policy with a policy period from October 1, 1962, to October 1, 1963, which the Committee believes bears Policy No. RLG 001062.

8. A liability policy with a policy period from October 1, 1963, to October 1, 1964, which the Committee believes bears Policy No. RLG 001063.

9. A liability policy with a policy period from June 4, 1964, to June 4, 1967, which the Committee believes bears Policy No. RLX 100035.

10. A liability policy with a policy period from October 1, 1964, to October 1, 1965, which the Committee believes bears Policy No. RLG 001064.

11. A liability policy with a policy period from October 1, 1965, to October 1, 1966, which the Committee believes bears Policy No. RLG 001065.

12. A liability policy with a policy period from October 1, 1966, to October 1, 1967, which the Committee believes bears Policy No. RLG 604826.

13. A liability policy with a policy period from June 4, 1967, to June 4, 1970, which the Committee believes bears Policy No. RLA 100629.

14. A liability policy with a policy period from October 1, 1967, to October 1, 1968, which the Committee believes bears Policy No. RTG 604827.

15. A liability policy with a policy period from October 1, 1968, to October 1, 1969, which the Committee believes bears Policy No. RTG 604828.

16. A liability policy with a policy period from October 1, 1969, to October 1, 1970, which the Committee believes bears Policy No. RTG 604829.

17. A liability policy with a policy period from June 4, 1970, to October 1, 1971, which the Committee believes bears Policy No. RLA 101501.

18. A liability policy with a policy period from October 1, 1970, to October 1, 1971, which the Committee believes bears Policy No. RTG 604820.

19. A liability policy with a policy period from October 1, 1971, to October 1, 1972, which the Committee believes bears Policy No. RTG 604821.

20. A liability policy with a policy period from October 1, 1971, to October 1, 1972, which the Committee believes bears Policy No. RLA 101877.

21. A liability policy with a policy period from October 1, 1972, to October 1, 1973, which the Committee believes bears Policy No. PTG 604822.

22. A liability policy with a policy period from October 1, 1972, to October 1, 1973, which the Committee believes bears Policy No. PLA 102188.

23. A liability policy with a policy period from October 1, 1973, to October 1, 1974, which the Committee believes bears Policy No. PTG 604823.

24. A liability policy with a policy period from October 1, 1973, to October 1, 1974, which the Committee believes bears Policy No. PLA 102553.

25. A liability policy with a policy period from October 1, 1974, to October 1, 1975, which the Committee believes bears Policy No. PTG 604824.

26. A liability policy with a policy period from October 1, 1974, to October 1, 1975, which the Committee believes bears Policy No. PTQ 302591.

27. A liability policy with a policy period from October 1, 1975, to October 1, 1976, which the Committee believes bears Policy No. PTG 604825.

28. A liability policy with a policy period from October 1, 1975, to October 1, 1976, which the Committee believes bears Policy No. PTQ 306461.

## Centennial Insurance Company

Upon information and belief, Centennial issued at least the following policies to the Diocese:

1. A liability policy with a policy period from October 1, 1976, to October 1, 1979, which the Committee believes bears Policy No. 291-68-71-16.

2. A liability policy with a policy period from October 1, 1979, to October 1, 1982, which the Committee believes bears Policy No. 291-69-65-01.

3. A liability policy with a policy period from October 1, 1982, to September 1, 1985, which the Committee believes bears Policy No. 291-71-14-76.

4. A liability policy with a policy period from September 1, 1985, to September 1, 1986, which the Committee believes bears Policy No. 287-00-36-20.

## Colonial Penn Insurance Company

Upon information and belief, Colonial Penn issued at least the following policy to the Diocese:

1. A liability policy with a policy period from September 1, 1985, to September 1, 1986, which the Committee believes bears Policy No. XL150029.

**Ecclesia**

Upon information and belief, Ecclesia issued at least the following policies to the Diocese:

1. A liability policy with a policy period from November 1, 2018, to October 31, 2019, which the Committee believes bears Policy No. PKG-2018-1.

2. A liability policy with a policy period from November 1, 2018, to October 31, 2019, which the Committee believes bears Policy No. EX-SA-2018-1.

**Evanston**

Upon information and belief, Evanston issued at least the following policy to the Diocese:

1. A liability policy with a policy period from January 18, 1978, to October 1, 1978, which the Committee believes bears Policy No. AEL 050530.

**Lexington**

Upon information and belief, Lexington underwrote a portion of the risk covered by at least the following policy issued to the Diocese:

1. A liability policy with a policy period from October 1, 1976, to October 1, 1977, which the Committee believes bears Policy No. SLC 5173.

**London Market Insurers (LMI)**

Upon information and belief, LMI underwrote a portion of the risk covered by at least the following policies issued to the Diocese:[2]

1. A liability policy with a policy period from October 1, 1976, to October 1, 1979, which the Committee believes bears Policy No. SL 3152 / SLC 5163.

2. A liability policy with a policy period from September 30, 1976, to October 1, 1977, which the Committee believes bears Policy No. MW 23017.

3. A liability policy with a policy period from October 1, 1976, to October 1, 1977, which the Committee believes bears Policy No. SL 3161 / SLC 5172.

4. A liability policy with a policy period from October 1, 1976, to October 1, 1977, which the Committee believes bears Policy No. SL 3162 / SLC 5173.

5. A liability policy with a policy period from January 18, 1978, to October 1, 1978, which the Committee believes bears Policy No. SL 3294 / SLC 5330.

---

[2] The Policies identified below are collectively referred to as the "**LMI Policies**."

6.  A liability policy with a policy period from January 18, 1978, to October 1, 1978, which the Committee believes Policy No. SL 3311 / SLC 5334.

7.  A liability policy with a policy period from October 1, 1978, to October 1, 1979, which the Committee believes bears Policy No. SL 3445 / SLC 5462.

8.  A liability policy with a policy period from October 1, 1978, to October 1, 1979, which the Committee believes bears Policy No. SL 3452 / SLC 5469.

9.  A liability policy with a policy period from October 1, 1978, to October 1, 1979, which the Committee believes bears Policy No. SL 3463 / SLC 5480.

10. A liability policy with a policy period from October 1, 1979, to October 1, 1982, which the Committee believes bears Policy No. SL 3574 / SLC 5630.

11. A liability policy with a policy period from October 1, 1979, to October 1, 1980, which the Committee believes bears Policy No. SL 3606 / SLC 5656.

12. A liability policy with a policy period from October 1, 1979, to October 1, 1980, which the Committee believes bears Policy No. SL 3607 / SLC 5657.

13. A liability policy with a policy period from October 1, 1979, to October 1, 1980, which the Committee believes bears Policy No. SL 3608 / SLC 5658.

14. A liability policy with a policy period from October 1, 1980, to October 1, 1981, which the Committee believes bears Policy No. SL 3725 / SLC 5746.

15. A liability policy with a policy period from October 1, 1980, to October 1, 1981, which the Committee believes bears Policy No. SL 3726 / SLC 5747.

16. A liability policy with a policy period from October 1, 1980, to October 1, 1981, which the Committee believes bears Policy No. SL 3731 / SLC 5754.

17. A liability policy with a policy period from October 1, 1981, to October 1, 1982, which the Committee believes bears Policy No. SL 3887 / SLC 5894.

18. A liability policy with a policy period from October 1, 1981, to October 1, 1982, which the Committee believes bears Policy No. SL 3888 / SLC 5895.

19. A liability policy with a policy period from October 1, 1982, to September 1, 1985, which the Committee believes bears Policy No. SL 4063 / SLC 6043.

20. A liability policy with a policy period from October 1, 1982, to September 1, 1983, which the Committee believes bears Policy No. SL 4065 / SLC 6045.

21. A liability policy with a policy period from October 1, 1982, to September 1, 1983, which the Committee believes bears Policy No. SL 4066 / SLC 6046.

22. A liability policy with a policy period from September 1, 1983, to September 1, 1986, which the Committee believes bears Policy No. ISL 3125 / ICO 4082.

23. A liability policy with a policy period from September 1, 1983, to September 1, 1984, which the Committee believes bears Policy No. ISL 3114 / ICO 4073.

24. A liability policy with a policy period from September 1, 1984, to September 1, 1985, which the Committee believes bears Policy No. ISL 3289 / ICO 5133.

25. A liability policy with a policy period from February 19, 1985, to September 1, 1985, which the Committee believes bears Policy No. ISL 3322 / ICO 5162.

26. A liability policy with a policy period from September 1, 1985, to September 1, 1986, which the Committee believes bears Policy No. ISL 3401 / ICO 5239.

27. A liability policy with a policy period from October 15, 1985, to October 22, 1986, which the Committee believes bears Policy No. ISL 3482 / ICO 5326.

28. A liability policy with a policy period from September 1, 1986, to September 1, 1987, which the Committee believes bears Policy No. ISL 3631 / ICO 5423.

29. A liability policy with a policy period from September 1, 1988, to September 1, 1989, which the Committee believes bears Policy No. ISL 4119 / ICO 5709.

30. A liability policy with a policy period from September 1, 1989, to September 1, 1990, which the Committee believes bears Policy No. ISL 4358 / ICO 5940.

31. A liability policy with a policy period from September 1, 1993, to September 1, 1994, which the Committee believes bears Policy No. ISL 5642 / ICO 7352.

**Insolvent LMI**

Upon information and belief, Allianz International Ltd., Bellafonte Insurance Company, Compagnie d'Assurances Maritimes et Terresteres, Folksam Int'l (UK) Ltd., Heddington Insurance Co. (UK) Ltd., Pine Top Insurance Company, Ltd., Mentor Insurance Co. (UK) Ltd., North Atlantic Insurance Co. Ltd., Sovereign Marine & General, Storebrand Insurance Ltd., Stronghold Insurance Company Ltd., Taisho Marine & Fire (UK) Ltd., and Tokio Marine & Fire (UK) Ltd. (collectively, "**Insolvent LMI**") underwrote a portion of the risk covered by at least some of the LMI Policies.

**Midland Insurance Company**

Upon information and belief, Midland issued at least the following policies to the Diocese:

1. A liability policy with a policy period from October 1, 1976, to October 1, 1977, which the Committee believes bears Policy No. UL388732.

2. A liability policy with a policy period from January 18, 1978, to October 1, 1978, which the Committee believes bears Policy No. UL390749.

**EXHIBIT D**

**SCHEDULE OF NON-DEBTOR AFFILIATES**

1. St. Christopher, Baldwin

2. Our Holy Redeemer, Freeport

3. St. Joseph, Garden City

4. Our Lady of Loretto, Hempstead

5. St. Ladislaus R.C. Church, Hempstead

6. St. Agnes, Rockville Centre

7. Queen of the Most Holy Rosary, Roosevelt

8. St. Martha, Uniondale

9. St. Thomas the Apostle, West Hempstead

10. St. Aloysius, Great Neck

11. St. Mary, Manhasset

12. Our Lady of Fatima, Manorhaven

13. Corpus Christi, Mineola

14. Holy Spirit, New Hyde Park

15. Notre Dame, New Hyde Park

16. St. Pater of Alcantara, Port Washington

17. St. Aidan, Williston Park

18. St. Gertrude, Bayville

19. St. Patrick, Glen Cove

20. St. Rocco, Glen Cove

21. St. Hyacinth, Glen Head

22. St. Paul the Apostle, Brookville

23. St. Dominic, Oyster Bay

24. St. Mary, Roslyn

25. St. Boniface Martyr, Sea Cliff

26. St. Edward the Confessor, Syosset

27. Holy Name of Jesus, Woodbury

66

28. St. Boniface, Elmont

29. Our Lady of Victory, Floral Park

30. St. Hedwig, Floral Park

31. St. Catherine of Sienna, Franklin Square

32. St. Anne, Garden City

33. Our Lady of Peace, Lynbrook

34. Our Lady of Lourdes, Malverne

35. Blessed Sacrament, Valley Stream

36. Holy Name of Mary, Valley Stream

37. St. Joachim, Cedarhurst

38. St. Raymond, East Rockaway

39. St. Joseph, Hewlett

40. Our Lady of Good Counsel, Inwood

41. Sacred Heart, Island Park

42. St. Ignatius Martyr, Long Beach

43. St. Mary of the Isle, Long Beach

44. St. Anthony, Oceanside

45. Our Lady Miraculous Medal, Point Lookout

46. St. Barnabas the Apostle, Bellmore

47. St. Rose of Lima, Massapequa

48. Our Lady of Lourdes, Massapequa Park

49. Cure' of Ars, Merrick

50. Sacred Heart, North Merrick

51. Maria Regina, Seaford

52. St. William the Abbot, Seaford

53. St. Frances de Chantal, Wantagh

54. St. Martin of Tours, Bethpage

55. Our Lady of Hope, Carle Place

56. St. Raphael, East Meadow

57. St. Kilian, Farmingdale

DOCS_NY:46991.4 18491/002

58. Holy Family, Hicksville

59. Our Lady of Mercy, Hicksville

60. St. Ignatius Loyola, Hicksville

61. St. Bernard, Levittown

62. St. Pius X, Plainview

63. St. James, Seaford

64. St. Brigid, Westbury

65. Our Lady of Queen of Martyr, Centerport

66. Christ the King, Commack

67. St. Matthew, Dix Hills

68. St. Anthony of Padua, East Northport

69. St. Francis of Assisi, Greenlawn

70. St. Patrick, Huntington

71. St. Hugh of Lincoln, Huntington Station

72. St. Joseph, Kings Park

73. St. Elizabeth of Hungary, Melville

74. St. Philip Neri, Northport

75. St. Martin of Tours, Amityville

76. St. Joseph, Babylon

77. Our Lady of the Assumption, Copiague

78. SS. Cyril & Methodius, Deer Park

79. Our Lady of Perpetual Help, Lindenhurst

80. Our Lady of Grace, West Babylon

81. Our Lady of Lourdes, West Islip

82. Our Lady of Miraculous Medal, Wyandanch

83. St. Patrick, Bay Shore

84. St. John Nepomucene, Bohemia

85. St. Anne, Brentwood

86. St. Luke, Brentwood

87. St. John of God, Central Islip

DOCS_NY:46991.4 18491/002

88. St. Mary, East Islip

89. St. Peter the Apostle, Islip Terrace

90. St. Lawrence the Martyr, Sayville

91. Assumption of the BVM, Centereach

92. St. Thomas More, Hauppauge

93. Holy Cross, Nesconset

94. St. Elizabeth Ann Seton, L. Ronkonkoma

95. St. Joseph, Ronkonkoma

96. SS. Philip & James, St. James

97. St. James, Setauket

98. St. Patrick, Smithtown

99. St. Frances Cabrini, Coram

100. Infant Jesus, Port Jefferson

101. St. Gerard Majella, Port Jefferson Station

102. St. Anthony of Padua, Rocky Point

103. St. Margaret of Scotland, Selden

104. St. Mark, Shoreham

105. St. Louis de Montfort, Sound Beach

106. St. John the Baptist, Wading River

107. Mary Immaculate, Bellport

108. Our Lady of the Snow, Blue Point

109. St. John the Evangelist, Center Moriches

110. St. Joseph the Worker, East Patchogue

111. Resurrection, Farmingville

112. Good Shepherd, Holbrook

113. St. Jude, Mastic Beach

114. St. Sylvester, Medford

115. Our Lady of Mount Carmel, Patchogue

116. St. Francis de Sales, Patchogue

117. Queen Most Holy Rosary, Bridgehampton

DOCS_NY:46991.4 18491/002

118. Our Lady of Ostrabrama, Cutchogue

119. Sacred Heart, Cutchogue

120. Most Holy Trinity, East Hampton

121. St. Agnes, Greenport

122. St. Rosalie, Hampton Bays

123. SS. Peter & Paul, Manorville

124. St. Therese of Lisieux, Montauk

125. St. John the Evangelist, Riverhead

126. St. Isidore, Riverhead

127. St. Andrew, Sag Harbor

128. Our Lady of the Isle, Shelter Island Heights

129. Our Lady of Poland, Southampton

130. Sacred Hearts of Jesus & Mary, Southampton

131. St. Patrick, Southold

132. Immaculate Conception, Westhampton Beach

133. Our Lady of the Magnificent Catholic Church

134. Our Lady Star of the Sea

135. Church of the Most Precious Blood

DOCS_NY:46991.4 18491/002

**EXHIBIT E**

**SCHEDULE OF PARTICIPATING PARTIES**

**[The remainder of the page is purposefully left blank]**

DOCS_NY:46991.4 18491/002

**EXHIBIT F**

**SCHEDULE OF PERSONAL INJURY CLAIMS**

Listed by Claim Number

| | | |
|---|---|---|
| 10227 | 41 | 71 |
| 7 | 42 | 73 |
| 8 | 43 | 10010 |
| 10008 | 46 | 10011 |
| 10024 | 48 | 10014 |
| 11 | 49 | 10017 |
| 17 | 52 | 10019 |
| 19 | 57 | 10020 |
| 29 | 59 | 10118 |
| 32 | 62 | 10199 |
| 34 | 63 | 10224 |
| 40 | 66 | 10245 |

72

**EXHIBIT G**

**SCHEDULE OF SETTLING INSURERS**

**[The remainder of the page is purposefully left blank]**

DOCS_NY:46991.4 18491/002

**EXHIBIT H**

**REQUESTED NON-MONETARY COMMITTMENTS**

DOCS_NY:46991.4 18491/002

CONFIDENTIAL-SUBJECT TO ATTORNEY-CLIENT PRIVILEGE/WORK PRODUCT DOCTRINE

Diocese of Rockville Centre
**[Draft] Non-Monetary Provisions**

### A. <u>Definitions</u>[1]

1. "Additional Publications" means Newsday, [other local news outlets].

2. "Child Protection Consultant" means one or more third-party experts in the field of child protection and safe environment that is acceptable to both the Committee and the Diocese.

3. "Clergy" means any priest operating within the Diocese, including but not limited to the bishop(s), auxiliary bishops, bishop(s) emeritus, vicars general, vicars for clergy, chancellors, pastors, priests, provincials and Religious.

4. "Committee" means the Committee of Unsecured Creditors, appointed by the U.S. Trustee. To the extent the Committee is disbanded by a plan of reorganization or otherwise, any responsibility designated for the Committee shall be performed by any successor to the Committee, including the trustee of any trust created for the benefit of Sexual Abuse Claimants, in consultations with the members of the Committee.

5. "Diocesan Party" means any entity receiving a release under the Plan.

6. "Diocesan Publications" means publication in [Local Catholic Publication], inclusion in Parish and School bulletins, posting on all social media accounts controls by the Diocese and the Parishes, and posting on the Diocese's website and any Parish and School websites.

7. "Diocesan School" means any school of the Diocese at any time, including parish schools, private Catholic schools, and including without limitation, any school that has merged or closed.

8. "Non-Diocesan School" means any Roman Catholic school operating within the Diocese that is not a Diocesan School.

9. "Religious" means any individual whom a diocesan bishop, the Apostolic See, religious superior, or other authority of the Roman Catholic Church has considered, treated, or determined is a member of a Roman Catholic religious institute, society, house, or order and should be treated as religious, and includes but is not limited to, nun, postulant, novice, temporary professed, perpetually professed, religious brother, religious sister, superior, major superior, prior, abbot, abbot primate, abbot superior, supreme moderator, superior of a monastic congregation, provincial, prior provincial, provincial superior, supreme superior, monk, and member of religious institute, and may include cardinal, archbishop, bishop, auxiliary bishop, regional bishop, titular bishop vicar general, chancellor, episcopal vicar, vicar forane, dean, archpriest, priest, simplex, pastor, prior, sub-prior, rector, parochial vicar, assistant pastor, associate pastor, deacon, vicar,

---

[1] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Plan.

CONFIDENTIAL-SUBJECT TO ATTORNEY-CLIENT PRIVILEGE/WORK PRODUCT DOCTRINE

moderator, director, counselor, councilor, president, and master.

## A. **Prevention**

1.     **Child Protection Consultant.**  The Diocese[2] shall hire, at its sole cost and expense, a Child Protection Consultant for: evaluating the systemic roots of child sexual abuse in the Diocese and recommending policies and procedures to prevent further child sexual abuse.  Such Child Protection Consultant shall have full access to the Diocese's records and the Diocese will make all of its current and past employees available for interviews with such Child Protection Consultant. Each Diocesan Party shall provide full access to its records and it will make all of its current and past employees available for interviews with such Child Protection Consultant.  Each Child Protection Consultant shall publish a report of its findings, which shall not be subject to approval by any Diocesan Party.  The Diocese shall post such findings on its website.  The policy review shall include recommendations regarding appropriate credentials for any adult that interacts with children within the Diocese and the ongoing requirements for the Diocese's disclosure of future abuse claims.

2.     **Third-Party Child Protection Audits.**  The Diocese Parties shall conduct annual third-party audits of their child safety programs, as well as the Diocese Parties' compliance with the findings and recommendations of the Child Protection Consultant, by an auditor acceptable to the Committee for a period of not less than twenty-five years.  The Diocese shall post each such audit on (a) any social media account (*e.g.*, Facebook, Twitter or Instagram) controlled by the Diocese within sixty (60) days of completion of each audit and (b) the Diocese's website for a period of not less than five (5) years after such audit is completed.  The auditor shall provide a full written report regarding the Diocese's compliance with its child safety programs, including

---

[2] References herein to the Diocese include all of its Parishes and any other entity that is the beneficiary of a channeling injunction under a plan of reorganization for the Diocese.

CONFIDENTIAL-SUBJECT TO ATTORNEY CLIENT PRIVILEGE/WORK PRODUCT DOCTRINE

the rubric and scores for each category.  The Diocese shall maintain a record of such audits for not less than fifty (50) years and shall make them available to any person or entity upon request.

3.   **Abuse History Disclosure.**  Upon request by any interested individual, each Diocesan Party must disclose the history of abuse claims related to its location.

4.   **Improved Reporting Mechanism.**  The Diocese shall, through a prominent ("one-click") link on its website's home page, provide a phone number and email to which *anonymous* abuse complaints can be made. If a report of abuse is made to anyone in the Diocese or through the phone number, email or direct report to the Diocese, the Diocese will encourage the survivor or reporting person to report the information to law enforcement and the Diocese will promptly report the information to law enforcement as well.  Additionally, each such report will be shared with all relevant child protection personnel and committees with the Diocesan Parties.  The Diocese Parties will require all adults who supervise minors—including Clergy, teachers, counselors and volunteers—to follow the same requirements regarding reporting as those subject to mandatory reporting obligations.  The Diocese shall require Non-Diocesan Schools and Religious operating within the Diocese to follow the same requirements regarding reporting as those subject to mandatory reporting obligations.  For reporting abuse by a bishop, the Diocese shall, also through a prominent ("**one-click**") link on its website, provide the reporting link (https://reportbishopabuse.org/) and phone number for the Catholic Bishop Abuse Reporting Service.

5.   **Whistle-Blower Policy.**  The Diocese Parties shall adopt a whistle-blower policy concerning the method by which a report concerning abuse within the Diocese can be made and expressly providing that the Diocese Parties will not take any retaliatory actions against person(s) who have reported or will report such information.

6.    **Continued Protection Initiatives.**    The Diocese will continue the protection of children initiatives it is currently implementing —including the VIRTUS training program, background checks, and psychological evaluations for seminarians—as well as any initiatives recommended by the Child Protection Consultant.

7.    **Prohibition on Being Alone With a Child.**    The Diocese's child protection policies will continue to prohibit Diocese Parties' Clergy, employees and adult volunteers from being alone (*i.e.*, out of sight of at least one other adult) with any unrelated minors while serving as an employee or volunteer of the Diocese or a parish, subject to common sense exceptions, such as emergency situations, interactions with a minor that are incidental and not extended, and transporting the children of friends and neighbors.  The Diocese's child protection policies will also continue to prohibit Clergy from being alone with any unrelated minors except when a cleric is hearing confession, provided, however, that another adult must be nearby at the time. The policies will continue to prohibit: (a) adults from traveling alone with or taking overnight trips alone with any unrelated minors; and (b) adults from sleeping in the same private space (*e.g.*, room, tent, bed, vehicle, etc.) with any unrelated minors.

8.    **Encourage Reporting.**    The Diocese shall publish in Diocesan Publications and Additional Publications four times per year (approximately three months apart), a prominent statement urging persons sexually abused or those aware of a person being sexually abused by Clergy, employees, volunteers, or any other individual serving within the Diocese to come forward and contact law enforcement.  For purposes of this paragraph, publication in an Additional Publication includes a paid advertisement in Newsday and may include issuance of a press release to the publication.

CONFIDENTIAL-SUBJECT TO ATTORNEY-CLIENT PRIVILEGE/WORK PRODUCT DOCTRINE

9.    **Anti-Abuse Plaque.**  The Diocese shall prominently and visibly display a plaque (no small than 8.5 inches by 11 inches) in each operating Parish and Diocesan School within the geographic boundaries of the Diocese stating that abuse of children will not be tolerated.  The Diocese shall request that each Non-Diocesan School display such plagues and shall provide them to such schools at the Diocese's expense.  Such plaques shall be ordered within sixty days of the Effective Date and will promptly deliver the plaques to Parishes and Schools after received by the Diocese.

10.    **Disclosure Requirement.**  Public disclosure of claims[3] of sexual abuse of minors by Clergy and those facing pending claims that are under investigation shall be ongoing.  The disclosures will be updated when a claim is determined to be substantiated, whether from the review of Clergy files by outside experts or otherwise.  In every such case, the Diocese will add the name of the Clergy member to the disclosure section of its website.  The Diocese will also disclose the names of Clergy deemed unsuitable for ministry under circumstances that arise, in whole or in part, out of accusations or risk of sexual abuse of a minor.  Public disclosures under this paragraph shall be made as soon as reasonably practicable but, in any event, no later than forty-five (45) days after the relevant determination.  The Diocese will also share this information with the public by issuing and posting a press release on its website.

11.    **Ongoing Document Disclosure Requirement.**  With regard to a substantiated claim of sexual abuse of a minor, at the conclusion of the canonical process for determination of clerical status, documents pertaining to the accusation and the Diocese's response to the claim will be

---

[3] A "credible claim" is one that, as determined by the Diocese, is "not implausible, and there exists a reasonable suspicion or belief supported by circumstances to justify a prudent and cautious person's belief that the allegation may be or probably is true." A "substantiated claim" is one for which, as determined by the Diocese, sufficient credible evidence exists that a reasonable person might accept as adequate to substantiate the allegation or support the conclusion that the allegation can be substantiated. The Diocese shall continue to provide information in writing to parishes and schools regarding the prevention of abuse, training to identify signs of abuse, statements that the abused are not at fault and encouraging the reporting of abuse.

CONFIDENTIAL-SUBJECT TO ATTORNEY-CLIENT PRIVILEGE/WORK PRODUCT
DOCTRINE

made added to the Diocese's document database with [bishop-accountability.org], *provided
however*, that no Survivor's identity shall be released or revealed without his or her express
permission.

**B. Transparency**

1. **Document Publication.** In order to further promote healing and reconciliation and
in order to continue efforts to prevent sexual abuse from occurring in the future, the Diocese will
provide to [bishop-accountability.org; local university] all non-privileged documents in its
possession related to sexual abuse by, and/or supervision of, abusive Clergy and lay employees.
The Diocese acknowledges that a doctor-patient, HIPAA or similar privilege or protection does
not apply to any such document.  The Diocese shall waive the attorney-client or any other
protective privilege or doctrine with respect to any such documents.  The Diocese shall pay
[$_____] to [bishop-accountability.org; local university] to maintain such documents on its
website in a manner accessible to the public.  Such documents will include priest personnel files,
all communications related to priests regarding whom there are admitted, corroborated or
otherwise substantiated allegations of sexual abuse of minors, between the bishop and other
officials, including, but not limited to Clergy, and lay employees, transcripts and video
depositions of all defendants, plaintiffs and witnesses, all exhibits and other non-privileged
documents of any type related to sexual abuse tort litigation, all documents produced to the
Committee in this Chapter 11 Case, and the Canon Law 489 files; *provided however*, that no
Survivor's identity shall be released or revealed without his or her express permission.

2. **Survivor Access to Documents.**  The Diocese will produce to Sexual Abuse
Claimants or to anyone who has stated that they are a survivor of sexual or physical abuse within
the Diocese, or their designee, any and all personal records of the survivor, including but not

CONFIDENTIAL-SUBJECT TO ATTORNEY-CLIENT PRIVILEGE/WORK PRODUCT DOCTRINE

limited to school records and sacramental records within thirty (30) days of request, and such documents shall not redact the identity of the requesting sexual abuse survivor's identity.

3. **Improved Terminology.**    The Diocese Parties shall prohibit their employees, representatives, agents and spokesperson, including any individuals communicating with the media on the Diocese Parties' collective or individual behalf, from referring either verbally or in print to sexual abuse survivors as "alleged" claimants, "alleged" victims, or "alleged" survivors and will require the same to refer to sexual abuse claimants as "survivors" or "survivors of sexual abuse."

4. **Publication of Accused List.**  Within ten (10) days of the effective date of a chapter 11 plan, the Diocese will prominently ("one-click") post on its website's homepage the names of all known past and present alleged perpetrators of the Diocese identified in any proof of claim filed in the Case.  The Diocese shall maintain this list on its website in perpetuity.

5. **Release from Confidentiality.**  The Diocese will publicly announce and post on the website the complete release of all sexual abuse survivors from any confidentiality requirement in the sex abuse settlements they have signed as a condition of settlement with the Diocese. No survivor's identity may be released or revealed without his or her permission. Any future settlement related to sexual abuse entered into by the Diocese shall contain no confidentiality provision except at the written request of the settling survivor.

C. <u>Recognition</u>

1. **Individual Bishop Meetings.**  The Bishop of the Diocese will be available upon reasonable notice to privately confer with any survivor of sexual abuse.  The Diocese will reimburse reasonable travel expenses for any survivor that no longer lives on Long Island but wishes for a meeting with the Bishop.

CONFIDENTIAL-SUBJECT TO ATTORNEY-CLIENT PRIVILEGE/WORK PRODUCT DOCTRINE

2. **Group Bishop Meetings.** Within one hundred eighty (180) days of the effective date of a plan, the Bishop of the Diocese will personally visit each parish and school in which abuse occurred or where known perpetrators served with a schedule to be published in the Diocesan Publications at least thirty days in advance as well as the subject of a press release sent to the Additional Publications and a paid advertisement in Newsday, inviting all survivors of abuse in that parish or geographic area to attend and shall provide a forum/discussion during his visit to address questions and comments. Neither the Bishop nor any Diocesan representative may prevent a survivor from speaking or stop a survivor from continuing to speak at such a meeting.

3. **Individual Apology Letters.** Within thirty (30) days after the effective date of a plan, the Diocese will send letters of apology to all Sexual Abuse Claimants. Letters of apology shall state that survivors were not at fault for the abuse and that the Diocese takes responsibility for the abuse. The Committee must approve the final language of the letters. The Bishop will personally sign the letters of apology.

4. **Public Apology Letter.** Within thirty (30) days after the effective date of a plan, the Diocese will send a letter of apology to all Sexual Abuse Claimants. The Diocese will also buy advertising space to print the letter in Newsday and will issue a press release regarding the apology that is circulated to [list]. The letter of apology shall state that survivors were not at fault for the abuse and that the Diocese takes responsibility for the abuse. The Committee must approve the final language of the letter and the related press release. The Bishop will personally sign the letter of apology.

CONFIDENTIAL-SUBJECT TO ATTORNEY-CLIENT PRIVILEGE/WORK PRODUCT DOCTRINE

5.    **Remove Perpetrator Recognitions.**  The Diocese Parties will remove all plaques, pictures, statutes or other public recognitions of all known past and present identified perpetrators of sexual abuse who are identified in any proof of claim filed in the Chapter 11 Case or have otherwise been deemed credibly accused of sexual abuse of a child or vulnerable adult.

6.    **Publish Survivor Stories.**  The Diocese will make available reasonable space, but not more than one printable page per quarter on the Diocese's website, www.drvc.org, for four (4) years after resolution of the case to allow survivors to tell their stories of abuse, if they desire to publish their stories.

7.    **Place of Remembrance.**  The Diocese, in consultation with individuals designated by the Committee, will design and install a place of remembrance for all child sexual abuse survivors at a prominent location within the Diocese.

D.  **Miscellaneous**

1.    **Removal**.  All perpetrators of Sexual Abuse shall be removed from active ministry and shall not represent the Diocese at public events.

2.    **Anti-Lobbying.**  The Diocese Parties will never seek to, direct, pay or hire any agent or employee or third party to retract, oppose or challenge the constitutionality or legitimacy of any reform of a civil or criminal statute of limitations; or to eliminate the New York existing mandatory child abuse reporting statutory requirements or other laws which serve to shield child sexual abusers from investigation, apprehension, prosecution and conviction in New York or similar legislation or law in any other state or jurisdiction.  Nor will the Diocese Parties contribute to or otherwise fund any organization that seeks to do so.

CONFIDENTIAL-SUBJECT TO ATTORNEY-CLIENT PRIVILEGE/WORK PRODUCT
DOCTRINE

3.   **Jurisdiction and Standing.**   The Bankruptcy Court shall retain jurisdiction to adjudicate disputes that arise with respect to these non-monetary undertakings.  The Committee and any trust created for the benefit of Sexual Abuse Claimants shall have standing and shall be authorized, but not directed, to seek enforcement of any of the terms of these non-monetary undertakings.  Any Sexual Abuse Claimant whose claim has not been disallowed shall have standing to enforce the terms of these non-monetary provisions.

**EXHIBIT I**

**REORGANIZED DEBTOR'S MEMBERS AND SENIOR MANAGEMENT**

| Name | Title | Affiliation |
|---|---|---|
| Most Rev. John O. Barres | Bishop, Diocese of Rockville Centre | - Corporate Member of the Mother Cabrini Health Foundation<br>- Board of Directors of Catholic University of America<br>- Board of Directors of the National Catholic Bioethics Center<br>- Board of Trustees of the Basilica of the National Shrine of the Immaculate Conception<br>- Board of Trustees of Saint Joseph's Seminary<br>- By statute the Bishop, Vicar General and Chancellor are the trustees of the Debtor. These individuals hold various other affiliations with Ministry Members by virtue of their office. |
| Rev. Eric Fasano | Vicar General and Moderator of the Curia | - By statute the Bishop, Vicar General and Chancellor are the trustees of the Debtor. These individuals hold various other affiliations with Ministry Members by virtue of their office. |
| Sr. Maryanne Fitzgerald, SC | Chancellor | - By statute the Bishop, Vicar General and Chancellor are the trustees of the Debtor. These individuals hold various other affiliations with Ministry Members by virtue of their office.<br>- Member of the Board of Trustees of Catholic Charities Housing Corporation |
| Thomas Renker | Chief Operating Officer and General Counsel | None. |
| Thomas Doodian | Chief Financial Officer - | - President of Unitas |

| | Director of Finance | Investment Fund, Inc.<br>- Board of Directors of Department of Education, Diocese of Rockville Centre<br>- Member of Tomorrow's Hope Foundation II, Inc.<br>- Vice President of Ecclesia Assurance Company |
| --- | --- | --- |
| Allison Cannon | Chief Human Resources Officer | None. |

**EXHIBIT J**

**SCHEDULE OF CIVIL RIGHTS CLAIMS**

Listed by Claim Number

10248

67

10000

DOCS_NY:46991.4 18491/002