PACHULSKI STANG ZIEHL & JONES LLP
James I. Stang, Esq. (admitted *pro hac vice*)
10100 Santa Monica, Boulevard, 11th Floor
Los Angeles, California 90067
Telephone:    (310) 277-6910
Facsimile:    (310) 201-0760
Email:        jstang@pszjlaw.com

-and-

Ilan D. Scharf, Esq.
Karen B. Dine, Esq.
Brittany M. Michael, Esq.
780 Third Avenue, 36th Floor
New York, New York 10017
Telephone:    (212) 561-7700
Facsimile:    (212) 561-7777
Email:        ischarf@pszjlaw.com
              kdine@pszjlaw.com
              bmichael@pszjlaw.com

*Counsel for the Official Committee*
*of Unsecured Creditors of The Roman Catholic Diocese*
*of Rockville Centre, New York*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>THE ROMAN CATHOLIC DIOCESE OF<br>ROCKVILLE CENTRE, NEW YORK,<br>        Debtor. | Chapter 11<br>Case No. 20-12345 (MG) |

**MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED**
**CREDITORS TO DISMISS CHAPTER 11 CASE**

The Official Committee of Unsecured Creditors (the "Committee") of The Roman Catholic Diocese of Rockville Centre, New York (the "Diocese" or the "Debtor"), through its undersigned counsel, hereby moves pursuant to sections 105(a) and 1112(b) of the Bankruptcy Code for entry of an order dismissing this case.  In support of this Motion, the Committee respectfully represents:

**PRELIMINARY STATEMENT**

1.      Section 1112(b) of the Bankruptcy Code requires that a chapter 11 case be dismissed or converted to chapter 7 upon demonstrating "cause," which includes a "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation."[1]  Such cause exists here.

2.      After nearly two and a half years in chapter 11, the Diocese has no likelihood of rehabilitation.  It cannot confirm the plan it has proposed[2] and will not propose the only plan it can confirm: one that only treats claims against the Diocese.  Its proposed plan releases its affiliates for a mere $11.1 million, or $22,653 per filed abuse claim.  As the joinders to this Motion will evince, Survivors will not approve such a plan, rendering it unconfirmable.  These affiliates (parishes and related parties that the Diocese insists are all independent but for which it seeks releases) did not elect to file their own bankruptcy cases.  While a plan that does not contain coercive releases of those affiliates might be confirmable, the Diocese refuses to propose it.  At the same time, the Committee anticipates that the Diocese will vigorously oppose a Committee sponsored plan that addresses only the Diocese's liability, needlessly expending funds and further delaying and reducing Survivor recoveries.  After all this time, the case is gridlocked with absolutely no indication of movement toward a consensual confirmable plan.

---

[1] 11 U.S.C. § 1112(b)(4)(A).

[2] On January 27, 2023, without the support of the Committee and after refusing to engage in further negotiation with the Committee, the Diocese filed the proposed *Chapter 11 Plan of Reorganization for The Roman Catholic Diocese of Rockville Centre, New York* [Docket No. 1614] (the "Diocese Plan").

20-12345-mg    Doc 1912    Filed 03/27/23    Entered 03/27/23 15:28:17    Main Document
Pg 3 of 21


3.     Meanwhile, the estate is incurring substantial and continuing losses.  The Diocese has consistently lost over *$1 million per month*, primarily due to professional fees spent on a bankruptcy that is not furthering the interests of the estate or its creditors and has no prospect of doing so.  In fact, it has lost *$58 million in unrestricted assets* during this case.

4.     The Diocese's actions demonstrate that it has an irreconcilable conflict of interest between the interests of its affiliates and those of its creditors, and that the Diocese has "resolved" that conflict by elevating the interests of its affiliates over those of its creditors, in derogation of its fiduciary duties.  Both before and during this case it has aggressively shifted assets to affiliates it insists are independent, and sought to protect those putatively independent affiliates from claims by Survivors, rather than recovering those assets and maximizing creditor recoveries.  That conflict of interest is driving its administration of this case, a breach of its fiduciary obligations as a debtor-in-possession that constitutes additional cause for dismissal.

5.     There is no prospect of successfully resolving this case.  Meanwhile, Survivors are aging and dying awaiting their day in court, and the estate is hemorrhaging funds while the Diocese fights to reduce rather than maximize its assets and creditor recoveries.  These losses, inability to reorganize and disregard of fiduciary obligations constitute cause for dismissal under section 1112(b)(4)(A) of the Bankruptcy Code.

## JURISDICTION AND VENUE

6.     This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

7.     Venue of this proceeding and this Motion is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

DOCS_NY:47222.14 18491/002                    3

8.      This statutory predicates for the relief requested herein are sections 105(a) and 1112(b) of the Bankruptcy Code.

## RELEVANT FACTS

9.      On October 1, 2020 (the "<u>Petition Date</u>"), the Debtor commenced a voluntary case (the "<u>Case</u>") under chapter 11 of the Bankruptcy Code. The Debtor is authorized to continue to operate its business and remain in possession of its properties as a debtor in possession pursuant to section 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in this Case.

10.     On October 16, 2020, the United States Trustee for Region 2 appointed the Committee pursuant to section 1102 of the Bankruptcy Code.  The Committee consists of nine individuals who hold claims against the Debtor, including eight individuals who were sexually abused as minors by perpetrators for whom the Debtor was responsible and one representative of a minor with a civil rights claim against the Debtor.  *See Notice of Appointment of Official Committee of Unsecured Creditors* [Docket No. 71].

## A.      Operating Losses During the Case

11.     The estate has been operating at a significant loss throughout the Case.  With the exception of one month in 2021 when certain restricted assets were released from their restriction, the Diocese has consistently spent over $1 million more each month than it has earned.[3]

---

[3] The information in the graph is directly derived from the Diocese's monthly operating reports. The Committee's financial advisor will directly testify to the information in the chart, which should not be subject to dispute.



12.    Over the pendency of the Case, the Diocese has cumulatively lost over $58 million in unrestricted assets. [4]



---

[4] Id.

**B.      The Bishop's Conflicted Roles in Relation to the Parishes and Related Entities**

13.      Under New York law, Bishop Barre has ultimate control over the parishes. Specifically, New York law states that "[n]o act or proceeding of the trustees of any such incorporated church shall be valid without the sanction of the archbishop or bishop of the diocese to which such church belongs, or in case of their absence or inability to act, without the sanction of the vicar-general or of the administrator of such diocese." *Blaudziunas v Egan*, 18 NY3d 275, 282 (2011) (quoting N.Y. Relig. Corp. Law § 91 ).

14.      Under New York law, the Bishop's authority over parishes also includes the ability to "suppress" a Parish. *Id.* at 279.  Suppressing is "an ecclesiastical decision to close the church building and extinguish the parish," *id.,* and New York law "recognizes the bishop's authority to divide parishes and grants him the 'right and power, of himself' to dispose of the original Roman Catholic church corporation's property, including real property, without the consent of its board of trustees." *Comm. to Save St. Brigid v Egan,* 2007 NY Slip Op 34473, *18 (Sup Ct, NY County 2007).   The Bishop is therefore conflicted.   He is the president of each parish, allegedly independent parties in this case who have filed their own proofs of claim against the Debtor, and he controls each parish. He is also the leader of the Debtor.[5]

**C.      Litigation for the Benefit of Parishes and Related Entities**

15.      The petition was filed in the wake of hundreds of lawsuits filed by Survivors of sexual abuse under the New York Child Victims Act ("CVA") and in anticipation of the assertion of more sexual abuse claims.  The CVA changed the statute of limitations and created a "window"

---

[5] See Declaration of Charles Moore, Managing Director of Alvarez & Marsal North America, LLC, Proposed Restructuring Advisor To The Roman Catholic Diocese Of Rockville Centre, New York, In Support Of Chapter 11 Petition And First Day Pleadings [Docket No. 3] ("Moore Dec.") ¶ 2; see also Act of Feb. 25, 1958, ch. 70, 1958 N.Y. Laws 181st Sess. (incorporating the Roman Catholic Diocese of Rockville Centre, New York) ("The bishop or administrator shall be presiding officer of the corporation and of the trustees thereof").

beginning August 14, 2019, during which victims of child sexual abuse whose claims may have

been time-barred could bring a timely civil action.[6]

16.    On July 21, 2022, the Diocese filed a *Motion for a Preliminary Injunction Under

Sections 362 and 105(a) of the Bankruptcy Code* [Docket Nos. 126-127], seeking a stay of state

court litigation against the Diocese, parishes and other related parties.   The Diocese was not a

defendant in 228 of the 490 non-duplicative state court actions it sought to enjoin.[7]   The Committee

opposed the injunction as it related to actions that did not name the Diocese as a defendant or

reduce the insurance coverage available to the Diocese.  Although the Court has repeatedly

indicated to the parties that the stay of non-debtor litigation cannot last forever,[8] the Diocese

continues to seek such protection, for what appears to be no purpose beyond shifting leverage to

non-debtors, certainly not for the nominal purpose of facilitating a reorganization.  An evidentiary

hearing on the motion for preliminary injunction is scheduled to commence on April 19, 2023,

engendering yet more significant expenditures purely for the benefit of non-debtor affiliates.

17.    On November 17, 2020, the Committee provided the Diocese with a list of diligence

requests, including requests for certain parish financial information.   After months of discussions

with the Diocese and the parishes, the Committee filed the *Motion of the Official Committee of

Unsecured Creditors for Entry of an Order Pursuant to Bankruptcy Rule 2004 Directing the

Debtor to Produce Parish Information* [Docket No. 540] ("Parish 2004 Motion"), seeking

---

[6] The bar date for filing of sexual abuse claims against the Diocese expired on August 14, 2021.  Six hundred fifty-three (653) unique, non-duplicative proofs of claim for sexual abuse were filed prior to the expiration of the bar date. *Opposition of the Official Committee of Unsecured Creditors to Debtor's Motion for a Preliminary Injunction Under Sections 362 and 105(a) of the Bankruptcy Code* ("Preliminary Injunction Opposition"), Adv. Pro. 20-01226-mg, Docket No. 172, ¶ 13.

[7] Motion for Preliminary Injunction at 15 (stating that "the Diocese is a defendant in 234 of the 503 cases subject to the current preliminary injunction.").

[8] Declaration of Brittany M. Michael ("Michael Decl."), ¶¶ 5–6, Ex. 1 (Transcript, 1/4/23 Hearing, 24:10-14), Ex. 2 (Transcript, 2/21/23 Hearing, 31:13-15).

financial information in the possession of the Diocese concerning the parishes.  *Id.* at 9-10.

Although Bishop Barre has ultimate control over the parishes under New York law, the Diocese

claimed to lack the ability to agree to production of the parish financial information.  *Id.* After the

Court ruled that production of parish financials was not ripe, the parties agreed to mediate

regarding the production of parish financial information.  When the parishes eventually became

mediation parties, the parishes declined to form an ad hoc committee and instead each joined as

individual mediation parties, in total represented by five counsel groups.[9]  Finally, almost two

years into the case, the parishes permitted the Diocese to provide the Committee with the bare

minimum financial reporting and under strict confidentiality conditions.[10]  Notably, this stands in

contrast to the more cooperative approach taken by dioceses in other New York diocesan

bankruptcy cases, in which the dioceses, on behalf of themselves and their parishes, produced the

parish financial information to the Committee[11] and the dioceses and parishes coordinated for one

counsel to represent all the parishes with authority to negotiate on their behalf.[12]

---

[9] Notice of Additional Mediation Parties (Certain Parishes), Docket No. 1170.

[10] See Stipulation and Agreed Order Extending the Termination Date of the Preliminary Injunction Staying Continued Prosecution of Certain Lawsuits, Adv. Pro. Case No. 20-01226-mg, Docket No. 157.

[11] *In re The Diocese of Rochester*, Case No. 19-20905, *Motion for Entry of Stipulation and Order Staying the Continued Prosecution of Certain Lawsuits*, Doc. No. 428, pg. 27 ("26. All parish financial statements from 2009 to present. 27. Minutes of meetings of the boards of directors of each parish from 2017 to present. 28. All inventories of parish property from 2009 to present."); *In re. The Diocese of Buffalo*, Case No. 20-10322, Adv. Pro. 20-01016, Doc. No. 79-1, pg. 65 (41. All parish financial statements from 2009 to present. 42. Minutes of meetings of the boards of directors (or similar governing body regardless of nomenclature) of each parish from 2009 to present. 43. All inventories of parish property from 2009 to present.").

[12] *See In re The Diocese of Buffalo*, Case No. 20-10322, Doc. Nos. 283, 284, 290 (notices of appearances for counsel for the Parish Steering Committee); *In re The Diocese of Rochester*, Case No. 19-20905, Doc. No. 360 (notice of appearance for counsel for the Ad Hoc Parish Committee); *In re. The Roman Catholic Diocese of Syracuse, New York*, Case No. 20-30663, Doc. Nos. 175, 212, 215 (notices of appearances for counsel for the Parish Steering Committee).

### D.    Transfers of Assets to Parishes and Related Entities

18.    In 2016 and 2017, in response to intensifying efforts to pass the CVA, and in anticipation of significant lawsuits that would be filed against the Diocese, its parishes, and related entities, the Diocese commenced a massive asset protection scheme to put its assets beyond the reach of Survivors.  The scheme involved the transfer of over $250 million worth of real property and cash and financial assets to affiliated entities controlled by the Diocese, including three high schools, a 220-acre parcel of prime real property with extensive waterfrontage, four cemeteries and significant cash and investments.[13]

19.    Post-petition, the Diocese has continued its efforts to move valuable assets to controlled affiliates and out of its creditors' reach.  The Diocese has engaged in a process to sell its FCC Licenses as well as the Cell Tower Assets (together the "Spectrum Assets").[14]  The Diocese lodged a sale order relating to the Spectrum Assets proposing to set aside $20,000,000 of the sale proceeds "solely for the funding of the operations of the Debtor's charitable mission upon the emergence of the Debtor from this chapter 11 case (including, but not limited to, *funding expenses for certain media services provided by an affiliate* of the Debtor)."[15]

---

[13] The transfers involved in the asset protection scheme are described in more detail in the following documents: Disclosure Statement for the First Amended Chapter 11 Plan of Reorganization Proposed by the Official Committee of Unsecured Creditors of the Roman Catholic Diocese of Rockville Centre, Docket No. 1644, at 42–46; Moore Dec. ¶¶ 121-128; Reply Declaration of Arthur J. Gonzalez in Further Support of (1) Application for Entry of an Order Authorizing the Employment and Retention of Otterbourg P.C. as Counsel to the Independent Advisory Committee and (2) Application for Entry of an Order Authorizing the Retention and Employment of Goldin, a Teneo Company, as Financial Advisor to the Independent Advisory Committee, Docket No. 153.

[14] See Motion of Debtor for an Order (I)(A) Approving Bidding Procedures for the Sale of the Debtor's Assets, (B) Authorizing the Debtor to Enter into One or More Stalking Horse Purchase Agreements and to Provide Bid Protections Thereunder, (C) Scheduling an Auction and Approving the Form and Manner of Notice Thereof, (D) Approving Assumption and Assignment Procedures and (E) Scheduling a Sale Hearing and Approving The Form and Manner of Notice Thereof; and (II) Granting Related Relief entered by the Bankruptcy Court on November 22, 2022 [Docket No. 1355] (the "Sale Motion"). Terms not defined here have the meaning ascribed to them in the Sale Motion.

[15] Proposed Order (I) Approving the Sale of Debtor's Assets Free and Clear of Liens, Claims, Interests and Encumbrances; (II) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection Therewith; and (III) Granting Related Relief [Docket No. 1526-1], ¶ 27 (emphasis added).

20.    Although the sale of the FCC Licenses was adjourned, the Diocese is now seeking to directly transfer $5,000,000 of the $13,750,000 sale price of the Cell Tower Assets to Catholic Faith Network ("CFN"), a non-debtor affiliate providing certain media services to the Diocese.[16]

21.    The Diocese controls CFN through CFN's corporate governance structure.  The members of CFN are (i) the Bishop, (ii) the Vicar General of the Diocese (the "Vicar General"), (iii) the Chancellor for Business Affairs of the Diocese (the "Chancellor") and (iv) a member of the Corporation's Board of Trustees, to be nominated by the Trustees at a meeting of the Board by vote of a majority of the Trustees present at the time of the vote, if a quorum is present at such time, **whose nomination shall be approved by the Bishop** and who shall serve as a Member for only so long as he or she (i) is a Trustee of the Corporation and (ii) is **reappointed by the Bishop** at the Annual Meeting of the Members.[17]

22.    While CFN does have a Board of Trustees, the Members have the exclusive authority to make all major business decisions of CFN and decisions by anyone else on major decisions are void.  CFN's officers and its Trustees are elected by the Members.[18]

---

[16] See Proposed Order (I) Approving the Sale of Debtor's Assets Free and Clear of Liens, Claims, Interests and Encumbrances; (II) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection Therewith; and (III) Granting Related Relief (the "Proposed Cell Tower Sale Order"), which is attached to the Debtor's Notice of (I) Successful Bidder and Backup Bidder and (II) Proposed Assumed and Assigned Executory Contracts and Unexpired Leases in Connection with the Sale of Certain of the Debtor's Assets [Docket No. 1736] (the "Notice of Successful Bidder").

[17] See Michael Decl. ¶ 11, Ex. 4 (By-Laws of Telecare ("CFN By-Laws") of the Diocese of Rockville Centre (now known as CFN)) at §1 (emphasis added).  The Diocese is governed by the Bishop, the Vicar General and the Chancellor. Moore Dec. ¶ 13; see also Act of Feb. 25, 1958, ch. 70, 1958 N.Y. Laws 181st Sess. (incorporating the Roman Catholic Diocese of Rockville Centre, New York).

[18] CFN By-Laws §§ 1, 2(o) and 3(b).

23.     The Diocese leadership apparently negotiated with itself regarding the $5 million

payment based on the self-interested assumption that CFN's consent to the sale was required.[19]

**E.     The Unconfirmable Diocese Plan**

24.     On January 27, 2023, the Diocese filed its *Chapter 11 Plan of Reorganization for*

*The Roman Catholic Diocese of Rockville Centre, New York* [Docket No. 1614] (the "Diocese

Plan") and the related Disclosure Statement [Docket No. 1615] (the "Diocese Disclosure

Statement").

25.     The Diocese Plan provides for full releases for its parishes (and potentially

hundreds of other) "Co-Insured Parties" and other release recipients (collectively, the "Covered

Parties").  The Covered Parties (or some subset thereof) are contributing $11.1 million,[20] which

amounts to $22,653 per pending state court action.[21]

26.     Remarkably, the Diocese *refuses to disclose the identities of the Covered Parties*

under the Diocese Plan.[22]  The Committee has asked the Diocese repeatedly to publicly disclose

the list of entities it considers released under its plan, but it has refused, leaving creditors and the

Court to dig through the voluminous docket and hundreds of pages of insurance policies to connect

these dots.[23]  It is highly likely that the Diocese's intended release recipients include entities with

---

[19] See Reply of Debtor in Support of the Sale Motion [Docket No. 1778] (the "Debtor Sale Reply").

[20] Diocese Plan, §I.A.34.

[21] *See* Preliminary Injunction Opposition, ¶ 2.

[22] "Co-Insured Party" is defined in the Diocese Plan as "any Entity that is an insured (whether primary or as an additional insured) under an Insurance Policy or is otherwise afforded rights, benefits, indemnity or insurance coverage under an Insurance Policy upon which any claim has been or may be made with respect to any Abuse Claim. For purposes of the Plan, all Parishes shall be Co-Insured Parties. For the avoidance of doubt, an individual that holds an Abuse Claim (other than an Indirect Abuse Claim) shall not be construed as a Co-Insured Party." Diocese Plan, §I.A.33

[23] Despite repeated requests, the Diocese has not agreed to allow that identity of those entities is considers Co-Insured Parties to be made public. Michael Dec. ¶ 7, Ex. 3.

which it disavows any relationship, while effectively hiding that fact from creditors and the Court.

For instance, the Diocese has taken the position that it has no affiliation with certain Catholic

organizations operating on Long Island and has filed claims objections on the grounds that the

"abuse occurred at, and by individuals associated with and controlled by, entities that are separate

from the Diocese and not supervised, controlled, managed, or directed by the Diocese."[24]   But

several of those entities are listed on the Diocese's insurance policies, including but not limited to

Chaminade High School, Little Flower Children and Family Services, Mercy Hospital, and St.

Mary of the Angels Home,[25] meaning they are very likely to be proposed Covered Parties under

the Diocese Plan.  Concealing the identifies of affiliates that it intends to protect through the

Diocese Plan is unfortunately par for the course in this Case, in which the Diocese has consistently

favored its non-debtor affiliates in derogation of its fiduciary duties to the Estate and its creditors.

27.     The Diocese Plan cannot be confirmed without the support of the Survivors.  As

evinced by the joinders to be filed in support of the Motion, Survivors will not support the Diocese

Plan.

**F.     The Committee Has Made a Good Faith Effort to Settle this Case**

28.     The Committee has been fully engaged in efforts to reach a consensual resolution

to this Case.  Over the course of the past year, the Committee has participated in five in-person

mediations, with four to five committee members attending in person while others participated

---

[24] See, e.g., The Debtor's Sixth Omnibus Claim Objections [Docket No. 1677], at 10.

[25] *See, e.g.,* Declaration of Kenneth F. Porter In Support Of The Debtor's Motion for a Preliminary Injunction Under
Sections 362 and 105(a) of the Bankruptcy Code [Docket No. 6] ("First Porter Dec.") at 1535 (listing Chaminade
High School as an additional insured under the Ecclesia Policy); Declaration of Kenneth F. Porter In Support Of The
Debtor's Motion for a Preliminary Injunction Under Sections 362 and 105(a) of the Bankruptcy Code [Docket No.
129] ("Second Porter Dec.") at 210, 245, 284, 330, and 394 (listing Little Flower as an additional insured under various
Royal Policies);  Second Porter Decl. at 209, 244, 343, 386 (listing Mercy Hospital as an insured under certain Royal
Policies); First Porter Decl. at 449, 507, 880 (listing St. Mary of the Angels Home as an additional insured for certain
London Policies).

remotely, and an additional six Zoom mediation sessions.[26]  Further, the Committee agreed to

eight extensions of the stay of parish litigation throughout the Case in order to further negotiations

in the hopes of reaching a consensual plan of reorganization.[27]

## ARGUMENT

29.    Under section 1112(b) of the Bankruptcy Code, upon a party in interest's motion,

a court must dismiss a chapter 11 case or convert it to chapter 7 if there is "cause" to do so.[28]

Cause includes "substantial or continuing loss to or diminution of the estate and the absence of a

reasonable likelihood of rehabilitation."[29]  If the Court determines there is cause to dismiss or

convert, it must also: (i) decide whether dismissal, conversation, or the appointment of a trustee or

examiner is in the best interests of creditors and the estate; and (ii) identify whether there are

"unusual circumstances" that establish that dismissal or conversion is not in the best interests of

creditors and the estate.[30]  The moving party must demonstrate cause for dismissal or conversion.[31]

Bankruptcy judges have wide discretion to determine whether cause exists to dismiss or convert a

case under section 1112(b).[32]

---

[26] *See* Michael Decl., ¶¶ 8–10.

[27]  *See Stipulation and Order Pursuant to 11 U.S.C. § 105(a) Staying Continued Prosecution of Certain Lawsuits*, Adv. Pro. 20-01226, Docket No. 59.  The extensions of the stipulation are available at Docket Nos. 69, 88, 98, 105, 112, 120, 137 and 157 for the adversary proceeding.

[28] 11 U.S.C. § 1112(b)(1).

[29] 11 U.S.C. § 1112(b)(4)(A).

[30] 11 U.S.C. § 1112(b)(1), (b)(2)

[31] *In re Loco Realty Corp.*, No. 09-11785 (AJG), 2009 Bankr. LEXIS 1724, 2009 WL 2883050, at *2 (Bankr. S.D.N.Y. June 25, 2009).

[32] *In re BH S&B Holdings, LLC*, 439 B.R. 342, 346 (Bankr. S.D.N.Y. 2010).

## A.    Substantial or Continuing Losses or Diminution of the Estate

30.    The first prong of establishing cause under section 1112(b)(3)(A) is indisputably met.  The substantial negative cash flow alone is sufficient.[33]  In the *twenty-eight months* since its filing, the Diocese has had only one month with positive cash flow.[34]  And, as also shown above, the estate is being diminished: since the inception of the Case, $58,778,000 in unrestricted assets have been expended.[35]

## B.    No Reasonable Likelihood of Rehabilitation

31.    "When visionary schemes for rehabilitation entail significant risk to creditors without any reasonable probability that the debtor can successfully rehabilitate, conversion or dismissal is generally in order."[36]  Debtors are required to "do more than manifest unsubstantiated hopes for a successful reorganization." *Brown*, 951 F.2d at 572 (quoting *In re Canal Place Ltd. Partnership*, 921 F.2d 569, 577 (5th Cir. 1991)).

32.    A plan such as the Diocese Plan that contains third-party releases requires the affected creditors' consent to be confirmed.  *See In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 141-42 (2d Cir. 2005) (nondebtor releases may "be tolerated if the affected creditors consent," but such releases should be the exception rather than the rule); *see also In re Aegean Marine Petroleum Network, Inc.,* 599 B.R. 717 (Bankr. S.D.N.Y. 2019) (denying confirmation of a chapter

---

[33] *In re AdBrite Corp.*, 290 B.R. 209, 215-16 (Bankr. S.D.N.Y. 2003) (collecting cases).

[34] *See* Appendix 1.

[35] Id.

[36] *In re Great Am. Pyramid Joint Venture*, 144 B.R. 780, 791 (Bankr. W.D. Tenn. 1992); *see also Tennessee Publishing Co. v. American Nat'l Bank*, 299 U.S. 18, 22 (1936) ("[H]owever honest in its efforts the debtor may be, and however sincere its motives, the District Court is not bound to clog its docket with visionary or impracticable schemes for resuscitation."); *In re Brown*, 951 F.2d 564, 572 (3d Cir. 1991) ("There must be 'a reasonable possibility of a successful reorganization within a reasonable time.'") (quoting *United Sav. Ass'n v. Timbers of Inwood Forest Assocs.*, 484 U.S. 365, 376 (1988)).

11 plan containing non-consensual third party releases)*; In re Dreier LLP*, 2010 WL 1707737 (Bankr. S.D.N.Y. Apr 28, 2010) (noting that the Second Circuit is skeptical about third party releases); *In re Master Mortg. Inv. Fund, Inc.,* 168 B.R. 930, 937 (Bankr. W.D. Mo. 1994) (creditor support for proposed releases is considered the "single most important factor"). Consistent with this view, many courts have expressly premised their approval of third-party releases on the affirmative acceptance of affected creditors.[37]

33.     The coercive releases imposed by the Diocese Plan and Survivor opposition to such releases virtually eliminate any likelihood that the Diocese Plan can be confirmed. *See, e.g., Rochester,* 2022 Bankr. LEXIS 1469 at *18 ("[T]he Diocese also points to the serious possibility that it may seek to confirm a nonconsensual Chapter 11 plan—a plan that does not have the consent of the Abuse Survivors. While obtaining confirmation of a non-consensual plan is not impossible, it makes the likelihood of a successful reorganization much more difficult. Given the Diocese's suggestion that it may seek to confirm a Chapter 11 plan without the consent of the Abuse Survivors, *the Court cannot conclude that a successful reorganization is likely*."); *see also In re Mariner Health Cent., Inc.,* Bankr. LEXIS 95 at *32 (debtor's likelihood of confirming a plan was "highly uncertain" and debtor failed to meet its burden on this prong (likelihood of successful reorganization) where tort claimants could block confirmation of any plan that does not pay them

---

[37] *See, e.g., Matter of Specialty Equip. Co., Inc*., 3 F.3d 1043 (7th Cir. 1993) (allowing release if those creditors who rejected the plan or abstained from voting could still pursue claims against third-parties); *In re Washington Mutual, Inc.*, 442 B.R. 314, 354–55 (D. Del. 2011) ("[T]he court concludes that any third party release is effective only with respect to those who affirmatively consent to it by voting in favor of the Plan and not opting out of the third party releases."); *In re Digital Impact, Inc*., 223 B.R. 1 (Bankr. N.D. Okla. 1998) (ruling that plan could not be confirmed if any party who would be bound by the release did not vote in favor of the plan); *In re W. Coast Video Enters., Inc*., 174 B.R. 906, 911 (Bankr. E.D. Pa. 1994) ("[E]ach creditor bound by the terms of the release must individually affirm same . . . ."); *Ocean Carriers Ltd*., 251 B.R. 31, 43 (D. Del. 2000) (requiring that the affected class accept the plan by at least the percentages required by section 1126 of the Bankruptcy Code); *In re Flintkote Co*., 04-11300 (MFW), 2015 WL 4762580, at *10 (Bankr. D. Del. Aug. 12, 2015) (finding the plan was overwhelmingly accepted when between 94% and 99% of affected creditors voted in favor of the Plan).

in full while retaining ownership of assets).  Both of the foregoing cases considered the likelihood of plan confirmation in the context of a motion for an injunction to stay litigation against non-debtors.

34.    Members of the Committee are represented by state court counsel who also represent over half of the total abuse claimant constituency.  The joinders to this Motion will reflect that this constituency does not support the Diocese Plan or any plan like it.  Survivors will be far better off pursuing their claims in state court and leaving the Diocese and the Co-Insured Parties to seek coverage from the insurers for any judgments levied against them.  The Committee also expects that many state court counsel to non-Committee members, representing an overwhelming majority of the abuse creditor class, will join in this Motion.  The single diocesan debtor that sent a plan to vote without the survivor committee's support failed to receive the necessary votes to confirm a plan with third-party releases.[38]  While affiliate releases may be needed by insurers, the Committee's plan[39] reflects that the Committee's members (and, they believe, their constituency) would rather forego the ability to settle with insurers than release the parishes and other affiliates for anything remotely close to what is offered.

35.    Courts have found that creditor opposition to, or delays in, a debtor's reorganization can render a debtor's reorganization unrealistic or unlikely and have dismissed or converted such cases. *See, e.g., In re Tiana Queen Motel, Inc.,* 749 F.2d 146, 151-52 (2d Cir. 1984), *cert. denied*, 471 U.S. 1138, 105 S. Ct. 2681, 86 L. Ed. 2d 699 (1985) (finding section 1112(b) relief warranted where debtor did not demonstrate a realistic possibility of rehabilitation after 15 months and any

---

[38] *In re Archdiocese of Saint Paul & Minneapolis,* Case No. 15-30125, *Report of Ballot Tabulation,* Docket No. 1041 (Archdiocese's plan that lacked the survivor committee's support received only 6.4% accepting vote from Class 6 (abuse survivors)).

[39] First Amended Chapter 11 Plan of Reorganization Proposed by the Official Committee of Unsecured Creditors, Docket No. 1643.

further delay would be at the expense of the secured creditor); *In re Greene*, 57 B.R. 272, 277 (Bankr. S.D.N.Y. 1986) (finding relief 1112(b) relief warranted where holder of the largest secured and unsecured claims against the debtors has unequivocally stated it will not accept the debtor's plan or any plan that delays the creditor's right to realize on its collateral leaving the debtor without the prospect of a confirmable plan); *In re Sal Caruso Cheese, Inc.*, 107 B.R. 808, 820-21 (Bankr. N.D.N.Y. 1989) (finding section 1112(b) "is to provide relief where the debtor's efforts, however heroic, have proven inadequate to the task of reorganizing his affairs effectively within a reasonable amount of time")(quoting *Tiana Queen Motel*, 749 F.2d at 152)*; Milford Conn. Assocs., L.P. v. Adams (In re Milford Conn. Assocs., L.P.),* 404 B.R. 699, 708-09 (D. Conn. 2009) (finding cause exists under section 1112(b) "where reorganization seems unlikely or unrealistic based on the Debtor's track record as debtor-in-possession and where the risk of delay falls entirely on the creditors.")*; ; In re Ledges Apartments*, 58 B.R. 84, 87-88 (Bankr. D. Vt. 1986) (holding dismissal under section 1112(b) warranted where there was negative cash flow resulting from payments being made to non-debtor entity in which partners of debtor had an interest and there was no possibility of rehabilitation where secured creditors opposed proposed plan).

C.    **The Diocese's Conflict of Interest and Favoritism Toward Affiliates is Further Cause for Dismissal**

36.    "[D]ebtors-in-possession have a fiduciary duty to maximize the value of the estate." *In re Reliant Energy Channelview LP*, 594 F.3d 200, 210 (3rd Cir. 2010). "Indeed, the willingness of courts to leave debtors in possession is premised upon an assurance that the officers and managing employees can be depended upon to carry out the fiduciary responsibilities of a trustee." *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 355, 105 S. Ct. 1986, 1994, 85 L. Ed. 2d 372 (1985) (internal quotation omitted). "A dereliction [of fiduciary duties]

could subject the case to dismissal or conversion." *In re Fed. Roofing Co.*, 205 B.R. 638, 640 (Bankr. N.D. Ala. 1996) (citation omitted).

37.    The main reason that rehabilitation is not a "realistic prospect" is that the Diocese is not working toward increasing the value of the estate, but is instead advancing the interests of its nominally independent affiliates over those of its creditors.  Tens of millions of dollars have been spent on this bankruptcy, two and one-half years have passed, and the Diocese is no closer to reorganization than it was on the October 1, 2020 petition date.  Rather, the Diocese is dissipating substantial assets on a continuing effort to protect affiliates from litigation, and divert assets to them.  The evidence that the Diocese has surrendered to this conflict is overwhelming and has manifested both pre- and post-petition.  Examples include the pre-bankruptcy asset protection scheme by which the Diocese transferred over $250 million of its real estate and financial assets to its affiliates, the post-bankruptcy plan by which it seeks to recover only a small portion of those assets[40] and give the recipients a full release, giving these solvent non-debtors the most important substantive and procedural benefits of filing a bankruptcy, while incurring only a fraction of the associated burdens and none of the costs.  The conflict is pervasive and ongoing, extending to the recent effort to divert assets to an affiliate through the sale of the Cell Tower Assets.

38.    Such conflicts of interest and failure to comply with fiduciary duties are often a key component of fact patterns supporting dismissal or conversion. *See, e.g., 15375 Mem'l Corp. v. BEPCO, LP (In re 15375 Mem'l Corp.)*, 589 F.3d 605, 624 (3d Cir. 2009) (dismissing where "the Debtors' representative was primarily concerned with protecting the GSF Entities, not the Debtors"

---

[40] Under the terms of the Diocese Plan: (i) CemCo can settle claims against it for a current payment of $5 million and a $29 million non-recourse cash-flow note with a ten-year term (Diocese Plan Exhibit G-2), (ii) the Seminary can settle for 65% of the sale proceeds from the sale of certain property allegedly owned by the Seminary (*Id.* at Exhibit G-1); (iii) the DOE can settle for $2.5 million (*Id.* Exhibit G-3).  These proposed settlements are a small fraction of the value of the assets the Diocese transferred to these entities for no or nominal consideration, as part of its pre-petition asset protection scheme.

and "mixed allegiances prevented him from adequately protecting the Debtors' interests."); *United States v. Scott Cable Communs., Inc. (In re Scott Cable Communs., Inc.),* No. 3:02CV01725 (AWT), 2007 U.S. Dist. LEXIS 65514, at *8 (D. Conn. Sep. 6, 2007) ("Where a debtor-in-possession has a conflict of interest or may have failed to fulfill its fiduciary responsibility to the estate, conversion of a Chapter 11 case to Chapter 7 may be appropriate."); *In re Natrl Plants & Lands Mgmt. Co.*, 68 B.R. 394, 396 (Bankr. S.D.N.Y. 1986) (converting where there was "a question as to whether the debtor would be as impartially motivated to collect the amounts due from its affiliates and to determine whether or not preferential or otherwise avoidable transfers had been made to these affiliates or to its principal shareholder. . . . The debtor's principal shareholder is in no position to exercise undivided loyalty to the rights of all interested parties."). *Cf. In re Picacho Hills Util. Co.*, 518 B.R. 75, 81-82 (Bankr. D.N.M. 2014) ("A number of courts have found 'cause' to convert or dismiss where the debtor in possession has a conflict of interest in properly investigating and pursuing potential fraudulent transfers.").

39.    The Bishop is the head of the Diocese, with a fiduciary obligation to maximize the estate.  The Bishop is also the president of each parish, allegedly independent parties that wish to contribute funds to the Diocese Plan and obtain a release of all claims against them.  The parishes assert claims against the Diocese, and the Diocese has (or should have) cross-claims against the parishes, inasmuch as the Diocese has filed claims objections on the grounds that the "abuse occurred at, and by individuals associated with and controlled by, entities that are separate from the Diocese and not supervised, controlled, managed, or directed by the Diocese."[41]   The Bishop is on both sides, but has consistently sided with the parishes and related parties over the interests

---

[41] See, e.g., The Debtor's Sixth Omnibus Claim Objections [Docket No. 1677], at 10.

of the Diocesan estate and its creditors.  Without any prospect of a consensual plan, that conflict becomes untenable.

**D.      Dismissal is the Proper Remedy Under Section 1112(b) Rather Than Conversion or Appointment of a Chapter 11 Trustee**

40.      Rather than dismiss a case under 1112(b)(1) of the Bankruptcy Code, a court may convert a case or appoint a chapter 11 trustee if to do so "is in the best interests of creditors and the estate."  The Diocese is a non-profit entity and hence the Case cannot be converted to a chapter 7 proceeding,[42] and a prolonged battle over the appointment of a trustee in a religious entity bankruptcy would not be in the best interest of creditors.

**E.      Related Relief**

41.      The Committee requests that the Court's order dismissing the Case provide the following related relief:

(a) The Court should retain jurisdiction regarding any matters, claims, rights or disputes arising from or relating to implementing the Dismissal Order.

(b) The Court should retain jurisdiction over (i) the hearing on and resolution of any fee applications that have been or will be filed (including after dismissal) and (ii) the entry and enforcement of any Court orders relating to fee applications (including compelling the Diocese to pay all approved fees and expenses). For the avoidance of doubt, the Debtor shall remain responsible for all estate professionals' fees up to and including the dismissal date.

42.      The Committee respectfully submits that the foregoing related relief is reasonable and necessary to adequately protect the interests of the Survivors and the Committee (including its

---

[42] *See* 11 U.S.C. 1112(c) ("The court may not convert a case under this chapter to a case under chapter 7 of this title if the debtor is . . . a corporation that is not a moneyed, business, or commercial corporation, unless the debtor requests such conversion.").

professionals).  Numerous bankruptcy courts have recognized the propriety of and need for such

protective and other administrative provisions in the event of a chapter 11 case dismissal.[43]

### NOTICE

43.    Notice of this Motion has been provided in accordance with the procedures of the

Case Management Order.  The Committee respectfully submits that no further notice is required.

44.    No previous request for the relief sought has been made by the Committee to this

or any other Court.

WHEREFORE the Committee respectfully requests entry of an order granting the relief

requested and such other and further relief as the Court may deem just and appropriate.

Dated:    March 27, 2023                PACHULSKI STANG ZIEHL & JONES LLP

                                        */s/ James I. Stang*
                                        James I. Stang, Esq.
                                        Ilan D. Scharf, Esq.
                                        Iain Nasatir, Esq.
                                        Karen Dine, Esq.
                                        Brittany M. Michael, Esq.
                                        780 Third Avenue, 36th Floor
                                        New York, NY  10017-2024
                                        Telephone: 212/561-7700
                                        Facsimile: 212/561-7777
                                        jstang@pszjlaw.com

                                        *Counsel for the Official Committee of Unsecured Creditors*

---

[43] *See, e.g., In re Coach Am Group Holdings* Corp., Case No. 12-10010 (KG) (Bankr. D. Del. May 31, 2013) (order, Doc 1568); *In re 155 Route 10 Associates, Inc.*, Case No. 12-24414 (NLW) (order, Doc 30); *In re Trade Secret, Inc.*, Case No. 10-12153 (KG) (Bankr. D. Del. Jan. 31, 2011) (order, Doc 767); *In re Foamex Int'l Inc.*, Case No. 09-10560 (KJC) (Bankr. D. Del. Jan. 20, 2010) (order, Doc 761); *In re Dawarhare's of Lexington, LLC*, Case No. 08-51381 (Bankr. E.D. Ky. Dec. 30, 2008) (order, Doc 316); *In re Cornell Trading, Inc.*, Case No. 06-10017-JNF (Bankr. D. Mass. June 5, 2007) (order, Doc 770); *In re Felda Plantation*, LLC, 2012 WL 1965964 (Bankr. M.D. Fla. May 29, 2012); *In re Inverness Distribution Ltd.*, Case No. 11-12106 (SCC) (Bankr. S.D.N.Y. May 4, 2015) (order, Doc 86); *In re Omaha Standing Bear Pointe, LLC*, Case No. 10-81413 (Bankr. D. Neb. March 11, 2011) (order, Doc 52).