**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | **FOR PUBLICATION** |
| THE ROMAN CATHOLIC DIOCESE OF ROCKVILLE | ) | |
| CENTRE, NEW YORK, | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | Case No. 20-12345 (MG) |
| | ) | |

**MEMORANDUM OPINION SUSTAINING DEBTOR'S FOURTH OMNIBUS**
**OBJECTION TO CLAIMS**

*A P P E A R A N C E S :*

JONES DAY
*Attorneys for the Debtor*
250 Vesey Street, Floor 32
New York, NY 10281
By:     Andrew Butler, Esq.
        Benjamin Rosenblum, Esq.

MERSON LAW, PLLC
*Counsel for Certain Claimants*
950 Third Avenue, 18th Floor
New York, NY 10022
By:     Jordan K. Merson, Esq.
        Sarah R. Cantos, Esq.
        Alice A. Bohn, Esq.

HERMAN LAW
*Counsel for Certain Claimants*
225 West 34th Street, 9th Floor
New York, NY 10122
By:     Stuart S. Mermelstein

MARSH LAW FIRM PLLC
*Counsel for Certain Claimants*
31 Hudson Yards, 11th Floor
New York, NY 10001
By:     James R. Marsh

PFAU COCHRAN VERTETIS AMALA PLLC
*Counsel for Certain Claimants*
31 Hudson Yards, 11th Floor
New York, NY 10001
By:     Jason P. Amala

**MARTIN GLENN**
**CHIEF UNITED STATES BANKRUPTCY JUDGE**

Pending before the Court is the fourth omnibus claims objection (this "Objection" ECF Doc. # 1646) of The Roman Catholic Diocese of Rockville Centre, New York (the "Debtor") that is the debtor in possession in the above-captioned chapter 11 case.  The Objection seeks to disallow eighteen claims included in Schedule 1 to a proposed order appended to the Objection ("Proposed Order").  The Debtor contends that the Objection should be sustained because these eighteen claims are either subject to releases or have already been dismissed or adjudicated in other proceedings.  In support of the Objection, the Debtor submits the Declaration of Thomas G. Renker.  ("Renker Decl.," ECF Doc. # 1647.)  The Renker Declaration contains Exhibits 1 through 13, which Debtor contends show that the claims at issue have been released, dismissed, or adjudicated.

Eight response briefs were filed on behalf of nine claimants ("Responding Claimants").[1] The Debtor filed a reply brief in support of the Objection.  ("Reply," ECF Doc. # 1740.)

For the reasons discussed below, the Court **SUSTAINS** the Objection in its entirety, and **DISALLOWS** and **EXPUNGES** the claims listed in Schedule 1 to the Proposed Order.

---

[1]     Those filed responses and corresponding claims are: (1) ECF Doc. # 1705, for Claim No. 90142; (2) ECF Doc. # 1704, for Claim No. 90552; (3) ECF Doc. # 1703, for Claim No. 90360; (4) ECF Doc. # 1702, for Claim No. 90280; (5) ECF Doc. # 1701, for Claim No. 90410; (6) ECF Doc. # 1700, for Claim No. 90414; (7) ECF Doc. # 1697, for Claim No. 90434; (8) ECF Doc. # 1696, for Claim Nos. 90433 and 90448.

2

# I.  BACKGROUND

## A.    The Claims Process

On October 9, 2020, the Debtor filed its schedules of assets and liabilities and statements of financial affairs (ECF Doc. ## 57, 58), which were thereafter amended. (*See* ECF Doc. ## 299, 635, 977, 1649.)  On January 27, 2021, the Court entered the *Order Establishing Deadlines for Filing Proofs of Claim and Approving the Form and Manner of Notice Thereof* ("Bar Date Order," ECF Doc. # 333).  Under the Bar Date Order, the Court set (a) March 30, 2021 as the deadline for each person or entity to file a proof of claim (the "General Bar Date"), and (b) August 14, 2021 at 5:00 p.m. as the deadline for each individual holding a Sexual Abuse Claim[2] to file a proof of such claim (the "Sexual Abuse Bar Date").  By subsequent order, the Court established October 10, 2022 as a supplemental bar date for certain holders of Sexual Abuse Claims that had their claims revived pursuant to the Adult Survivors Act (the "Adult Survivors Sexual Abuse Bar Date"). (*See* ECF Doc. # 1262.)

On January 10, 2023, the Court entered the *Order Approving Claim Objection Procedures and Granting Related Relief* (the "Claim Objection Procedures Order," ECF Doc. # 1554).[3]  That Claim Objection Procedures Order allows the Debtor to assert omnibus claim objections on the grounds set forth in Bankruptcy Rule 3007(d), which include that the claims are duplicates or have been amended, and also on the grounds that the Debtor is not liable to the claimant for the amount or claim stated. (*See* Claims Objection Procedures Order § 3(a).)

---

[2]      "Sexual Abuse Claim" has the same meaning as the term is defined in the Bar Date Order.

[3]      After the Debtor filed the Objection, the Court entered an *Amended Order Approving Claim Objection Procedures and Granting Related Relief* (ECF Doc. # 1679) on February 21, 2023.

### B.    The Instant Claim Objection

The instant Objection, which is Debtor's fourth omnibus claims objection, is directed at eighteen claims.  (*See* Objection, Schedule 1.)  All eighteen of those claims were filed by sexual abuse survivors ("Claimants") seeking to recover against the Debtor for its role in allegedly enabling the abuse that occurred years or decades before the bankruptcy case was filed.  For sixteen of the claims, the Debtor objects on the basis that the Claimants granted releases to the Debtor for their claims before the commencement of the bankruptcy.  For the two remaining claims, the Debtor objects on the basis that the claims have already been dismissed or adjudicated in other proceedings.

These eighteen claims are among the hundreds of sex abuse claims that have been filed against the Debtor in this bankruptcy for abuse spanning back decades.  For background, it is necessary to understand how and why such claims were released or adjudicated before the commencement of the bankruptcy case.  Many of the claims submitted in this case, including the eighteen that are the subject of the instant Objection, arose from abuse that occurred decades ago.  Many claims were never asserted against the Debtor within the applicable statute of limitations following the abuse and became time barred long before the bankruptcy case was filed.

In the years leading up to the bankruptcy case, however, public and legislative support was building for proposed legislation that would allow abuse survivors to seek recovery for their sex abuse claims that had become time barred.  That growing interest resulted in two events detailed below that bear directly on the objections and responses to the eighteen claims at issue here: (1) the Debtor's implementation of the Independent Reconciliation Compensation Program

4

("IRCP") in 2017; and (2) the enactment of the Child Victims Act ("CVA") by the New York

State legislature in 2019.

### C.    The IRCP & CVA

The IRCP was announced and adopted by the Debtor on October 16, 2017. (Objection ¶

21.) It allowed an abuse survivor to submit a claim to the program, and depending on the

allegations in the claim, obtain an offer for cash compensation. (*Id.* ¶ 24.) Aspects of the

program that are important for present purposes are discussed below.

### 1.    IRCP Releases

To accept and receive compensation offered as a result of the IRCP, a claimant was

required to execute a general release ("General Release"). (*Id.*) The releases recite that the

Claimant:

> "[R]eleases and forever discharges" the Diocese and "all of its current and
> former bishops, priests or deacons, its parishes, schools and institutions,
> religious corporations and not for profit corporations, respective officers,
> directors, trustees, administrators, agents, employees, their predecessors,
> successors, assigns and affiliates (jointly and severally, the 'Releasees')"
> from "all claims, demands, actions, causes of action, suits, debts, dues, sums
> of money, accounts, variances, trespasses, damages and judgments, whether
> sounding in tort, contract, statutory regulation or otherwise and whether
> now existing or revived in the future whatsoever in law, admiralty or equity"
> from "the beginning of the world and in the future."

(*Id.* (quoting Renker Decl. Exs. 1–10).)

The releases also recited that each claimant:

- "'[C]ompletely read and fully understands' the agreement as a 'full and final
  compromise, adjustment and resolution of any and all claims he/she may now have,
  or ever will have against Releasees.'"

- Was "voluntarily and freely entering into this General Release in exchange for the
  Compensation Offer;"

- Was "represented by legal counsel and has received legal advice prior to entering into this Release and that Releasor has been advised by said attorney regarding the terms and conditions of this Release."

(*Id.* ¶ 25 (quoting Renker Decl. Exs. 1–10).)

The IRCP remained open until shortly before the Debtor filed its bankruptcy petition. As of September 29, 2020, just before the Diocese filed its petition for bankruptcy protection in this case, 445 abuse survivors filed claims as part of the IRCP and a total of about 350 abuse survivors accepted compensation and executed releases, totaling approximately $62 million. (*Id.* ¶ 23.)

### 2. IRCP Purpose & Function

Certain responses for seven of the Claimants, defined as the Merson Response and Herman Response,[4] rely on allegations about the IRCP's purpose and function. The responses claim that the IRCP was implemented "in response to the existential threat" of proposed legislation that sought to revive time-barred claims for survivors of sexual abuse. (*See* Merson Response ¶ 18.) This proposed legislation refers to the CVA, discussed below, which was eventually enacted in 2019 and revived the statute of limitations for otherwise barred claims. (*Id.*) The Debtor does not acknowledge any specific impetus for the IRCP, and simply states that the program was directed at individual reconciliation and compensation based on the independent review and evaluation of claims by nationally recognized fund administrators ("Administrators") who had experience in other multiple-victim situations. (Objection ¶ 21.) The Administrators for the IRCP were Kenneth Feinberg and Camille Biros, who also

---

[4] The responses for these seven claimants were filed by two law firms, Merson Law (three claims) and Herman Law (four claims). Each law firm makes the same arguments for each of its respective claimants with respect to the IRCP. For ease of reference, one representative brief will be referred to for each firm's arguments, as the Merson Response (ECF Doc. # 1697) and Herman Response (ECF Doc. # 1700).

administered similar compensation programs for claims against the Archdiocese of New York, the Diocese of Brooklyn, the Diocese of Pittsburgh, and other dioceses. (*Id.*)

The Debtor further explains that it delegated to the Administrators the authority to investigate and evaluate claims of abuse claimants who voluntarily asserted their claims through the IRCP and to offer compensation to claimants whom the administrators deemed eligible. (*Id.* ¶ 22.) The Debtor claims that it was bound to provide compensation in the amount determined by the IRCP for any claimant who decided to accept the award and executed a general release. (*Id.*) An abuse claimant was not bound by the Administrators' eligibility and compensation determinations unless he chose to accept the compensation awarded. (*Id.*) Claimants' participation in the IRCP was completely voluntary, and their participation did not affect any of their rights unless and until they accepted the compensation awarded by the Administrators and signed the General Release. (*Id.*) Debtor also asserts that claimants were required to consult with an attorney and have the attorney review and approve the General Release, and if the claimant did not have an attorney, the Administrators provided for an attorney to advise the claimant at no cost concerning the language of the General Release. (*Id.*)

The responses attach various materials issued by the Debtor that discuss the IRCP.[5] In support of their various legal theories explained *infra*, the responses claim that representations regarding the "independence" of the Administrators in these materials were false. The responses

---

[5]    The Merson Response attaches: Exhibit 3 (an October 15, 2017 letter from the Debtor discussing the IRCP); Exhibit 4 (an October 2, 2017 letter from the Debtor discussing the IRCP); Exhibit 9 (an October 16, 2017 press release from the Debtor discussing the IRCP); Exhibit 10 (a protocol for Phase I of the IRCP issued by the Debtor on October 16, 2017 ("IRCP Protocol")); and Exhibit 11 (an FAQ for Phase I of the IRCP issued by the Debtor on October 16, 2017).
       The Herman Response attaches: Exhibit B (an online FAQ for the IRCP dated October 12, 2016 and published by "Catholic NY"); Exhibit C (a letter identical to Exhibit 3 to the Merson Response); Exhibit F (a letter identical to Exhibit 10 to the Merson Response, the IRCP Protocol).

rely on a "leaked transcript" of a December 2017 teleconference involving Kenneth Feinberg and

Camille Biros, and "leaders and lawyers from the Dioceses of Syracuse, Buffalo, and

Rochester." (*See* "ABC News Article," Merson Response, Ex. 4; Herman Response, Ex. D.)

The Responses allege that this transcript belies the Debtor's claims of the Administrators'

"independence" because it contains:

- A reported statement by Ms. Biros that "[w]e are constantly on the phone with New York, Brooklyn, and now Rockville Center [sic]. If we have any questions about the priests, the file, the claimant, they are an incredible resource to us."

- A reported statement by Mr. Feinberg that one of the "benefits" of the IRCP is that "it would create a 'compensation matrix,' or a range of possible payouts depending upon the severity of the alleged abuse, agreed upon by the program's administrators and the dioceses, Feinberg said, that 'affords us wide leeway, wide range, so we could govern the amount of compensation' to victims." Mr. Feinberg is also reported to have added, "'Right now, we have not paid any claim, however horrific, at more than $500,000.'"

(*See id.*)

As further discussed below, Debtor contends that these statements do not belie its

descriptions of the program's independence. The Debtor contends that these statements are

consistent with documents like the IRCP Protocol attached by the Merson and Herman

Responses.

### 3.  The CVA

In February 2019, the New York State legislature enacted the Child Victims Act, or

CVA. (Merson Response ¶ 18.) The enacted legislation is in section 214-g of the New York

Civil Practice Law and Rules. The CVA opened a one-year lookback window to allow victims

of child sexual abuse to file civil lawsuits for previously time-barred claims. (*Id.*)

### D.    Current Claims and Objections

According to Debtor, each of the eighteen Claims that are the subjects of the objection falls into one of the following grounds for objection: (1) Claims that are subject to a release executed by the Claimant (both before, and via, the IRCP); and (2) Claims that have been adjudicated or dismissed.  All responses filed were for Claims (nine) that fall into the first category are allegedly subject to releases.  None of the Claimants whose Claims had been adjudicated or dismissed filed responses.

## II.    <u>LEGAL STANDARD</u>

### A.    Claim Allowance

Section 501(a) of the Bankruptcy Code provides that "[a] creditor . . . may file a proof of claim" to claim an interest in a debtor's bankruptcy estate.  11 U.S.C. § 501(a).  Section 502(a) provides that a claim or interest, properly filed, "is deemed allowed, unless a party in interest . . . objects."  11 U.S.C. § 502(a).  "The proof of claim, if filed in accordance with section 501 and the pertinent Bankruptcy Rules, constitutes *prima facie* evidence of the validity and amount of the claim under Federal Rule of Bankruptcy 3001(f) and Code section 502(a)."  4 COLLIER ON BANKRUPTCY ¶ 502.02[3][e] (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2019). Pursuant to Federal Bankruptcy Rule 3001(f), a claimant establishes a *prima facie* case against a debtor upon filing a proof of claim alleging facts sufficient to support the claim.  *See* FED. R. BANKR. P. 3001(f).

Under section 502 of the Bankruptcy Code, if an objection is made, the court shall determine the amount of such claim "as of the petition date."  *In re Solutia, Inc.*, 379 B.R. 473, 483 (Bankr. S.D.N.Y. 2007) (citing 11 U.S.C. § 502(a)).  Section 502(b)(1) provides that claims may be disallowed if they are "unenforceable against the debtor and property of the debtor, under

any agreement or applicable law." 11 U.S.C. § 502(b)(1).

"To overcome this *prima facie* evidence, an objecting party must come forth with evidence which, if believed, would refute at least one of the allegations essential to the claim." *Sherman v. Novak* (*In re Reilly*), 245 B.R. 768, 773 (2d Cir. B.A.P. 2000). If the objector does not "introduce[] evidence as to the invalidity of the claim or the excessiveness of its amount, the claimant need offer no further proof of the merits of the claim." 4 COLLIER ON BANKRUPTCY ¶ 502.02[3][e] (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2019). But by producing "evidence equal in force to the *prima facie* case," an objector can negate a claim's presumptive legal validity, thereby shifting the burden back to the claimant to "prove by a preponderance of the evidence that under applicable law the claim should be allowed." *Creamer v. Motors Liquidation Co. GUC Trust* (*In re Motors Liquidation Co.*), No. 12 Civ. 6074 (RJS), 2013 WL 5549643, at *3 (S.D.N.Y. Sept. 26, 2013) (internal quotation marks omitted); *see also In re Allegheny Int'l, Inc.*, 954 F.2d 167, 173–74 (3d Cir. 1992) (reciting identical burden-shifting framework).

To determine whether a claim is allowable by law, bankruptcy courts look to "applicable nonbankruptcy law." *In re W.R. Grace & Co.*, 346 B.R. 672, 674 (Bankr. D. Del. 2006). Accordingly, federal pleading rules also apply in assessing a proof of claim's validity. *See Morse v. Rescap Borrower Claims Tr.*, No. 14 Civ. 5800 (GHW), 2015 WL 353931, at *4 (S.D.N.Y. Jan. 26, 2015) (citing *In re DJK Residential LLC*, 416 B.R. 100, 106 (Bankr. S.D.N.Y. 2009)). Procedurally, in this case, the Claims Objection Procedures Order specifically identifies and limits certain objections to such federal pleading rules:

> For a non-evidentiary hearing to address whether the Contested Claim has failed to state a claim against the Debtor which can be allowed and should be dismissed pursuant to Bankruptcy Rule 7012(b) (a "Sufficiency

Hearing"). Unless the Debtor serves the holder of the claim (the "Claimant") with a Notice of Merits Hearing (as defined herein), the Sufficiency Hearing shall go forward at the return date set in accordance with (f)(i) above (or such other date as may be scheduled by the Debtor). The legal standard of review that will be applied by the Court at a Sufficiency Hearing will be equivalent to the standard applied by the Court upon a motion to dismiss for failure to state a claim upon which relief can be granted, in accordance with Bankruptcy Rule 7012(b).

(Claims Objection Procedures Order ¶ 3(g)(iii).)

Bankruptcy Rule 7012(b) makes applicable Federal Rule of Civil Procedure 12(b)–(i). *See* FED. R. BANKR. P. 7012(b). In turn, Federal Rule of Civil Procedure 12(b)(6) addresses motions to dismiss for failure to state a claim upon which relief can be granted. FED. R. CIV. P. 12(b)(6). In other words, the Claims Objection Procedures Order limits the bases for Debtor's objections in non-evidentiary hearings to challenges under Rule 12(b)(6). This is consistent with law in this Circuit stating that where a party objects to a claim as facially defective, the analysis of the claim "is guided by the familiar standards applicable to a motion to dismiss." *In re Residential Capital, LLC*, 563 B.R. 477, 487 (S.D.N.Y. 2016).

### B.    Motion to Dismiss Standard

To survive a motion to dismiss, a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557). A district court must "accept[ ] all factual claims in the complaint as true, and draw[ ] all reasonable inferences in the plaintiff's

11

favor." *Lotes Co. v. Hon Hai Precision Indus. Co.*, 753 F.3d 395, 403 (2d Cir. 2014) (quoting *Famous Horse Inc. v. 5th Ave. Photo Inc.*, 624 F.3d 106, 108 (2d Cir. 2010)).

This tenet, however, is "inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* "[R]ather, the complaint's '[factual] allegations must be enough to raise a right to relief above the speculative level,' i.e., enough to make the claim 'plausible.'" *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (quoting *Twombly*, 500 U.S. at 555, 570). A complaint is properly dismissed when, as a matter of law, "the allegations in [the] complaint, however true, could not raise a claim of entitlement to relief . . . ." *Twombly*, 550 U.S. at 558.

\* \* \* \* \*

The analysis of claim objections is divided into two sections below: (I) claims for which responses were filed; and (II) claims for which no responses were filed. The Court **SUSTAINS** all the Debtor's claim objections and **DISALLOWS** all of the claims identified in Schedule 1 to the Proposed Order annexed to the Objection.

### III.    ANALYSIS: CLAIMS FOR WHICH RESPONSES WERE FILED

Responses were filed on behalf of nine Claimants. The Debtor submits releases executed by all nine Responding Claimants as exhibits to the Renker Declaration. None of the Responding Claimants dispute that they executed the releases offered by the Debtor; instead, they offer various arguments against the applicability or enforceability of those releases here, which are addressed below. But as an initial matter, the Court considers the general principles surrounding releases and their enforceability, as they will similarly apply to each of the arguments made by the Responding Claimants. As one treatise summarizes:

12

> The law favors the settlement of disputes and because of this policy releases
> are accorded a presumption of validity. That is, the law favors compromise,
> and thus, when parties have entered into a definite, certain, and
> unambiguous agreement to settle, it should be enforced. . . . A release is a
> jural act of high significance without which the settlement of disputes would
> be rendered all but impossible.

AM. JUR. 2D RELEASE § 2 (footnotes omitted). "Under New York law, a release is governed by

principles of contract law and a court should enforce a valid release by its clear terms." *Gupta v.

Headstrong, Inc.*, No. 17-cv-5286, 2018 WL 1634870, at *3 (S.D.N.Y. Mar. 30, 2018) (citation

and quotes omitted).

Consequently, it is appropriate to grant a motion to dismiss based on a binding release

agreement where the terms of the agreement are clear and unambiguous, absent some colorable

defense to its enforcement. *See id.* With respect to defenses, a release "should never be

converted into a starting point for renewed litigation except under circumstances and under rules

which would render any other result a grave injustice." *Id.* (quoting *Mangini v. McClurg*, 249

N.E.2d 386, 390 (N.Y. 1969)). "[A]t the motion-to-dismiss stage, once a defendant demonstrates

the existence of a clear and unambiguous signed release, the burden shifts to the plaintiff to

establish some cause 'sufficient to void the release.'" *Id.* (quoting *Centro Empresarial

Cempresa S.A. v. Am. Movil, S.A.B. de C.V.*, 952 N.E.2d 995, 1000 (N.Y. 2011)). "To do so, a

plaintiff must plausibly allege 'the basic elements' of that cause." *Id.* (quoting *Centro

Empresarial Cempresa S.A.*, 952 N.E.2d at 1000).

Under non-bankruptcy law, a party that seeks to render a release unenforceable must state

a valid cause of action for doing so, and the motion to dismiss standard governs the

determination whether a party states such a cause of action.

Here, the Responding Claimants can be grouped into one of three categories based on their arguments about why their releases do not preclude their claims: (A) one Claimant argues that their claim is not within the scope of the IRCP release they executed with the Debtor; (B) seven Claimants argue that the Court should find their IRCP releases unenforceable; and (C) one Claimant argues that the Court should find the release they obtained before the implementation of the IRCP unenforceable.

### C.    IRCP Release: Scope Argument

One Responding Claimant opposes the Objection ("Marsh Response," ECF Doc. # 1705),[6] arguing that the release he granted the Debtor via the IRCP was limited to claims for abuse by Brother Finian Magee, a religious order member.  (Marsh Response ¶ 5.) Claimant argues that the claim he submitted in this bankruptcy pertains to abuse by a second individual, Father Steven Peterson, a Diocesan priest.  For that reason, Claimant argues that his claim is not subject to the IRCP release.

To analyze the Marsh Response's arguments, it is important to identify the two distinct documents the response relies on.  First, the Marsh Response attaches the Claimant's declaration with a three-page document entitled "General Release" which was executed by the Claimant. (*See* "Survivor Decl.," ECF Doc. # 1708, Ex. 2, at 1–3.)  Immediately following the General Release is a "Payment Determination Letter," dated April 16, 2019, from the Fund Administrators.  (*See id.* at 4–5.)

---

[6]    This refers to the Claimant that filed Claim No. 90142.  This Claimant will be referred to as "Claimant" for purposes of this subsection A only.  The brief is referred to as the "Marsh Response" because the Claimant is represented by the Marsh Law Firm PLLC.  The law firm of Pfau Cochran Vertetis Amala PLLC also signed the Marsh Response, and Mr. Jason P. Amala from that firm argued on behalf of the Claimant at oral argument.

To obtain the General Release, the Claimant observes that he only submitted a claim pertaining to abuse by Brother Magee. (Marsh Response ¶ 5.) The Claimant quotes the language of the General Release, arguing that he was only releasing his "claims or causes of action that arise or may arise from the underlying acts of sexual abuse by the Accused Member identified by Claimant." (*See id.* ¶ 8 (quoting Survivor Decl. Ex. 2 at 1).) Because the Claimant only identified Brother Magee as an "Accused Member," the Claimant argues that the release only pertains to claims for abuse by Brother Magee.

The General Release is not so limited. The Claimant's citation to the General Release critically omits that he released "all claims . . . including, *but not limited to*, all claims or causes of action that arise or may arise from the underlying acts of sexual abuse by the Accused Member identified by Claimant." (Survivor Decl. Ex. 2 at 1 (emphasis added).) The clause pertaining to claims arising from abuse by an Accused Member is illustrative, not exhaustive. Indeed, that is what makes this release a general release.

Debtor is correct that in the General Release, the Claimant agreed to release "all claims" against the Debtor, regardless of who the Claimant did or did not identify as the abuser in the IRCP process. In support, the Debtor cites to *Ark92 v. Archdiocese of N.Y.*, where a plaintiff's claims of abuse were dismissed based on the existence of a general release. *See* Index No. 950064/2019, 2021 WL 4350248, at *1–2 (Sup. Ct. N.Y. Cty. 2021). There, the plaintiff brought claims against the Archdiocese of New York for abuse by one priest. He argued that a prior general release he granted to the Archdiocese only pertained to abuse by a different priest. *See id.* In dismissing the claim, the court reasoned that because the plaintiff granted a general release to the Archdiocese of New York for "all claims," that release applied to any suit, irrespective of

15

the specific perpetrators connected to the claims. *Id.* The same is true here—the Claimant granted a broad release, and that releases the Debtor from liability for all abuse claims.

The Claimant attempts to distinguish his Claim by arguing that he executed the original release after participating in the phase ("Phase III") of the IRCP that exclusively pertained to claims involving "members of religious orders." (Marsh Response ¶¶ 23–24.) The Claimant now submits a claim for abuse by a Diocesan priest, who was not a member of a religious order, and thus, could not have been the subject of a claim in Phase III. (*Id.*) In fact, the Claimant alleges that Phases I and II, which addressed abuse by Diocesan priests, were closed at the time the Claimant submitted the Phase III claim. (*Id.*) The Claimant attempts to distinguish *Ark92* on the basis that both abusers there were priests, would have been part of the same IRCP phase, and thus, would have been covered by the same release.

This argument lacks merit. First, the Claimant reads in reasoning to the *Ark92* opinion that is not there. The opinion does not even mention IRCP, its phases, or the claim submission process. Rather, the opinion concluded that "all claims" meant exactly that—all claims—and that it had no abuser-specific language that would support the limited scope proffered by plaintiff there. The language of the broad general release controlled in the *Ark92* case, and it is similarly controlling here. *See* 2021 WL 4350248, at *1–2. The *Ark92* opinion applied settled principles of contract interpretation law. The Claimant cites nothing to support the proposition that the process and history by which the Claimant and the Debtor arrived at that release—i.e., whether the Claimant only submitted a claim regarding one abuser, whether the Debtor was accepting claims for other abusers to begin the compensation assessment, etc.—is relevant to the analysis when there is an otherwise unambiguous general release barring all claims.

16

The Claimant makes additional arguments that lack merit. First, the Marsh Response argues that language from the Payment Determination Letter also constrains the scope of the released claims because it stated that:

> The Release waives and releases all claims that you have or may have in the future against the Diocese of Rockville Centre or any other Release, as defined in the attached Release, with regard to the above-referenced claim, and prevent you from submitting any claim seeking payment to a court.

(*See* Marsh Response ¶ 8 (quoting Survivor Decl. Ex. 2 at 4).)

Claimant fails to explain why this compels a different result given the language in the General Release. Claimant quoted this language in the response, but for the first time at oral argument, counsel for the Claimant insisted that this Payment Determination Letter was actually part of an integrated agreement along with the General Release. The Claimant fails to provide any support to explain why the Payment Determination Letter should be considered a part of the parties' written agreement alongside the General Release. Conversely, the Debtor observes that the General Release states that it "contains the entire understanding of the parties." (*See* Reply ¶ 11 (quoting Renker Decl., Exs. 1–10)). Because the Claimant fails to show that the Payment Determination Letter is part of the parties' written agreement, the Court cannot refer to the letter to inform its interpretation of the General Release that is otherwise clear and unambiguous. *See Fontana v. Sanchez*, No. 19-cv-1735, 2021 WL 3556932, at *2 (2d Cir. 2021).

Finally, while the Marsh Response largely frames its argument as an interpretive one to limit the scope of the General Release, the Marsh Response also contends that the Court should find the agreement unenforceable with respect to his asserted claim. While this argument functionally seeks the same result as the interpretative arguments, it relies on different caselaw, and the Court addresses it as a distinct theory. Specifically, the Marsh Response cites to the New

17

York Court of Appeals decision in *Mangini v. McClurg* for the proposition that a release "is not

binding as a 'general release' and is not valid regarding transactions that were not contemplated

by the parties, even if the release uses general language." (*See* Marsh Response ¶ 21 (citing

*Mangini v. McClurg*, 24 N.Y.2d 556, 563 (1969)).)

   *Mangini* does not alter the outcome here.  First, the issue in *Mangini* was whether an

unknown injury at the time two parties executed a release constituted a mutual mistake sufficient

to set aside the release for claims resulting from the unknown injury.  *Mangini*, 24 N.Y.2d at

559–60.  Here, the Claimant fails to allege that there was any similar mutual mistake at the time

the release was granted.  And the Claimant cannot do so because the claim that he asserts was

not covered by the release was certainly not unknown—it was completely within his knowledge.

Yet he failed to raise it and signed a general release instead.  Furthermore, *Mangini*

acknowledged that absent circumstances like mistake, parties generally do have the ability to

execute broad, general releases, even for claims unknown to the parties at the time the release is

executed.[7]  More importantly, the New York Court of Appeals has reaffirmed the validity of

such general releases in the five-plus decades since *Mangini* was decided.  *See Centro

Empresarial Compress S.A. v. America Movil, S.A.B. de C.V.*, 17 N.Y.3d 269, 276 (2011); *Booth

v. 3669 Delaware, Inc.*, 662 N.Y.S.2d 642, 643 (4th Dep't 1997) (rejecting plaintiff's argument

to avoid the release, noting that "[a]t best, plaintiffs have established a mere unilateral mistake

on the part of [plaintiff] with respect to the meaning and effect of the release.  Such a mistake

---

[7]      "As already observed, there are many reasons, including doubtful liability, the willingness to take a
calculated risk, the desire to obtain an earlier rather than a later settlement, and perhaps others, why releasors may
wish to effect a settlement and intend to give the releasee a discharge of liability for any unknown injuries -- in short
to bargain for general peace. When general peace is the consideration there can be no mutual mistake as to the extent
of the injuries, known or unknown." *Id.* at 566.

does not constitute an adequate basis for invalidating a clear, unambiguous and validly executed

release."), *aff'd*, 92 N.Y.2d 934 (1998).

In sum, Claimant does not adequately state a claim that would withstand a motion to

dismiss. For that reason, the Court **SUSTAINS** the objection to Claim No. 90142.

### D.    IRCP Releases: Enforceability Arguments by Merson and Herman Firms

Seven Claimants filed responses to the claim objections arguing that the releases for their

claims obtained via the IRCP are unenforceable. The responses for these seven Claimants were

filed by two law firms, Merson Law, PLLC (three claims) and Herman Law (four claims).[8] Each

law firm makes the same substantive arguments for each of its respective Claimants. One

representative brief will be referred to for each firm's arguments, as the Merson Response (ECF

Doc. # 1697) and Herman Response (ECF Doc. # 1700). Together, they are referred to as "the

Responses" for purposes of this subsection B.

Between the two Responses, the Claimants make the following arguments why the

releases are unenforceable:

1. The releases were against public policy. (Merson and Herman Responses).
2. The releases were obtained by fraud. (Merson and Herman Responses).
3. The releases were obtained by negligent misrepresentation. (Herman Response).
4. The releases were overbroad. (Merson Response).
5. The releases are unjustly enriching the Debtor. (Merson Response).
6. The Debtor should be estopped from objecting to the claims. (Merson Response).

These arguments are addressed in turn below. Ultimately, the Court finds that none of

these arguments state an adequate basis for finding the releases unenforceable.

---

[8]    Merson filed responses on behalf of Claim Nos. 90433 and 90448 (ECF Doc. # 1696) and Claim No. 90434 (ECF Doc. # 1697). Herman filed responses on behalf of Claim Nos. 90414, 90410, 90280, 90360, 90414. (*See* ECF Doc. ## 1700, 1701, 1702, and 1703, respectively.)

1.  <u>Public Policy</u>

Both Responses argue that the IRCP releases are unenforceable as against public policy.
The main thrust of both arguments is that the IRCP releases are an attempt to thwart the policy
objectives embodied by the CVA.  The Claimants argue that the CVA is "comprehensive
remedial legislation intended to allow victims of child sexual abuse to bring their claims, and to
hold perpetrators and their institutional enablers accountable."  (*See, e.g.,* Herman Response ¶
37.)  They contend that the IRCP releases purporting to stop the Claimants from bringing their
claims violate that policy objective.

While the Claimants may be correct about the general objectives of the CVA, they fail to
provide any support for the specific notion that the CVA—either explicitly or implicitly—
modifies the legal rights of parties that have entered into settlements in the past or sought to enter
into settlements post-enactment for revived claims.  The CVA simply changed the time bar
defenses available to defendants for certain types of sexual abuse claims.  *See* N.Y. C.P.L.R. §
214-g.  Debtor's Objection does not rely in any way on a time bar argument.

The Claimants cite to no specific language in the statute itself nor anything in the
legislative history that supports the CVA having any effect on releases or settlement agreements.
The Claimants also fail to cite caselaw showing that the CVA has been construed to have any
effect—let alone a voiding effect—on existing releases or settlement agreements.

Indeed, the Debtor notes that these specific arguments have been made and rejected by at
least one appellate court in New York.  *See M.M. v. Church of Our Lady of the Annunciation*,
162 N.Y.S.3d 598, 601 (3d Dep't 2022) ("[T]he fact that the statute of limitations was modified
following the [execution of the] release to remove a bar to pursuing those claims does not alter
that conclusion, as plaintiff 'may not reopen a voluntary settlement agreement to take advantage

20

of a subsequent change in the law.'").[9]  The Claimants fail to cite any instance where a statute

passed by the New York legislature was construed to have any effect on the enforceability of

releases or settlement agreements reached earlier in time.  Courts in New York recognize that

"freedom of contract is itself a strong public policy interest," and that contract terms should only

be found unenforceable where that freedom is "overridden by another weighty and

countervailing public policy."  *Matter of New Brunswick Theological Seminary v. Van Dyke*, 125

N.Y.S.3d 153, 159 (2d Dep't 2020) (citations omitted).

The general policy objective that the Claimants have identified does not support the

drastic result they seek here: rendering the agreements reached between the Debtor and survivors

before the enactment of the CVA unenforceable.

Finally, the Merson Response makes the separate argument that releases preventing a

party from litigating claims for gross negligence and egregious conduct are against public policy.

(*See* Merson Response ¶ 110 (citing *Gross v. Sweet*, 49 N.Y.2d 102 (1979)).)  This argument is

incorrect.  Claimants' argument suggests that parties cannot enter releases of claims for any

conduct rising above the level of negligence.  Debtor seizes on this and observes an important

distinction missed by the Claimants: "[w]hile a release of claims arising from future conduct of

the parties may violate public policy as consent to foregoing legal protection, a settlement with

---

[9]        The *Church of Our Lady of the Annunciation* decision relied on settled New York case law, including
decisions by the New York Court of Appeals.  *See id.* at 60, *leave to appeal denied*, 38 N.Y.3d 911 (2022) (citing
*Cutler v. Travelers Ins. Co.*, 552 N.Y.S.2d 998 (4th Dep't 1990), *leave to appeal denied* 76 N.Y.2d 768 (1990);
*Ianielli v. North Riv. Ins. Co.*, 506 N.Y.S.2d 970 (2d Dep't 1986), *leave to appeal denied* 69 N.Y.2d 606 (1987)
*Krichmar v. Krichmar,* 42 N.Y.2d 858, 859–860 (1977)).
        In resolving the issues raised in the Claim Objections, this Court is applying settled principles of New York
law.  Therefore, no "prediction" of how the New York Court of Appeals would resolve the issues is necessary. *See
Caronia v. Philip Morris USA, Inc.*, 715 F.3d 417, 449 (2d Cir. 2013) ("In cases . . . in which state law controls and
the governing principles are uncertain or ambiguous, we attempt to predict how the highest court of the state would
resolve the uncertainty or ambiguity.").

respect to past conduct is not contrary to public policy." (Reply ¶ 16 (citing 76 C.J.S. RELEASE §

23; 57 N.Y. JUR. 2D ESTOPPEL § 85 ("As a rule, and excepting instances where there are

transgressions of public policy, all rights and privileges to which one is legally entitled may be

waived. One may waive such right whether secured by contract, conferred by statute, or

guaranteed by the state or federal constitution.") (footnote omitted)).)[10]

   In conclusion, the Claimants have failed to adequately allege that the IRCP releases at

issue are unenforceable as against public policy.

   2.   Fraud

   The Merson and Herman Responses both argue that the IRCP releases are unenforceable

because they were obtained via fraud. Specifically, the Claimants argue that the Debtor's

representations that the IRCP was "independent" were false. This theory is identical to the one

pressed in *Caldwell v. Archdiocese of New York*, No. 20-cv-01090, 2021 WL 1999421 (S.D.N.Y.

May 19, 2021), which is instructive for the analysis here.[11]

   In *Caldwell*, the court recited that in order to properly assert a claim for fraudulent

misrepresentation, a plaintiff must allege facts showing: "'(1) the defendant made a material

false representation, (2) the defendant intended to defraud the plaintiff thereby, (3) the plaintiff

reasonably relied upon the representation, and (4) the plaintiff suffered damage as a result of

---

[10]    The Merson Response does not limit the acts complained of to the abuse, but seems to imply that the
Debtors acted wrongfully during the settlement process. (*See* Merson Response ¶ 111) ("It is clear that the acts of
the Debtor and the attempts to absolve their liability from wrongdoing were both willful and grossly negligent"). To
the extent that this can be construed as an argument regarding the independent acts of the Debtor in connection with
the settlement process itself, these are foreclosed as discussed *infra*, as the Responses fail to show that there is any
validly stated cause of action pertaining to Debtor's conduct in obtaining the releases that would render them
unenforceable.

[11]    Notably, the Herman Law Firm also represented the plaintiffs in that action. *See id.*

such reliance.'" *Id.* at *5 (quoting *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 186–87 (2d Cir. 2004)).

The court also observed that pursuant to Federal Rule of Civil Procedure 9(b), plaintiffs are required to set out the elements of a claim for fraudulent misrepresentation with specificity. *See id.* This requires the party pleading the fraud claim to: "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Id.* (quoting *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir. 2006)). As to the last element, a party "must not only allege that the content is false, but they must demonstrate with specificity why and how that is so." *Tradeshift, Inc. v. Smucker Services Co.*, No. 20-cv-3661, 2021 WL 4463109, at *5 (S.D.N.Y. 2021) (internal quotes and citations omitted).

In *Caldwell*, the court dismissed the fraud allegations, finding that plaintiffs insufficiently pled: (i) the existence of representations about independence; and (ii) that such representations were false. *See Caldwell*, 2021 WL 1999421, at *6–7 ("[E]ven assuming that Plaintiffs have identified with specificity the time, place, and speakers of Defendants' allegedly fraudulent statements regarding the independence of the Programs—which they do not—the Amended Complaint does not raise sufficient facts to suggest that the statements were indeed false.") (footnotes omitted). The Claimants here purport to have stronger allegations. While they are correct that they have added some factual bases for their allegations, they are still insufficient, particularly under the standards recited in *Caldwell*. The Court addresses the two requirements that the *Caldwell* court found insufficient in turn—representations and falsity.

23

a.    *Representations*

As a threshold issue, the court in *Caldwell* analyzed the fraud claims assuming that there had been representations as to "independence," and that those could potentially be considered actionable statements of fact. *See id.* at *6. Ultimately, however, the court concluded that the plaintiffs failed to adequately identify any specific statements regarding independence. While the Court did not explain its reasoning in detail, it apparently considered that the program's title and other references to the Administrators as "independent" in communications like payment determination letters were insufficient. *See id.* at *3 (detailing the alleged "multiple false representations that the IRCP was 'independent'").

The Claimants have done a better job identifying statements regarding independence in their pleadings here. The Claimants attach a number of exhibits that contain statements by the Debtor regarding the IRCP's independence.[12] While many of these statements are simply cursory descriptions of the program as "independent," on par with what the court was presented with in *Caldwell*, there are a number of these representations and they are attributable to Debtor. Moreover, certain of the documents, like the IRCP Protocol, attached to both the Merson and Herman Responses, make more substantial representations regarding what aspects of the program were independently administered and how. Even the Debtor does not appear to contest that it made representations that certain aspects of the program were "independent." Thus, the Claimants have adequately pleaded the existence of representations regarding independence.

---

[12]    The Merson Response attaches: Exhibit 3 (an October 15, 2017 letter from the Debtor discussing the IRCP); Exhibit 4 (an October 2, 2017 letter from the Debtor discussing the IRCP); Exhibit 9 (an October 16, 2017 press release from the Debtor discussing the IRCP); Exhibit 10 (a protocol for Phase I of the IRCP issued by the Debtor on October 16, 2017 ("IRCP Protocol")); and Exhibit 11 (an FAQ for Phase I of the IRCP issued by the Debtor on October 16, 2017).
    The Herman Response attaches: Exhibit B (an online FAQ for the IRCP dated October 12, 2016 and published by "Catholic NY"); Exhibit C (a letter identical to Exhibit 3 to the Merson Response); Exhibit F (a letter identical to Exhibit 10 to the Merson Response, the IRCP Protocol).

24

### b. Falsity

The disputed issue here is whether the Claimants have adequately pled that representations regarding independence were false. The Claimants argue that representations regarding independence were false specifically because: (a) the administrators of the program were operating under restrictions and limitations imposed by the Diocese, primarily in the form of a "compensation matrix"; and (b) the most the administrators would pay to a survivor was $500,000, which was a hard "cap" applicable regardless of "how horrific" the sexual abuse may have been. (*See* Herman Response ¶ 29.) This theory is similar to the one used by plaintiffs in *Caldwell*, where the court held that the plaintiffs failed to adequately allege that any representations regarding independence were false. *See Caldwell*, 2021 WL 1999421, at *6–7.

The Claimants argue that *Caldwell* does not require dismissal of their claims here. They observe that the court in *Caldwell* generally acknowledged that "well-pled facts that Defendants directed and limited the settlement amounts obtainable by IRCP participants *might belie* Defendants' assertions of the Programs' independence." *Id.* at *7 (emphasis added). While the court ultimately found that plaintiffs' allegations were "bare assertions," and that the plaintiffs "fail[ed] to plead facts that would explain 'why the statements were fraudulent,'" *see id.* (quoting *Lerner*, 459 F.3d at 290), the Claimants argue that they have provided additional facts supporting their allegations here.

Both Responses point to a news article issued on January 14, 2021, that purports to quote from a transcript of a December 2017 teleconference involving Kenneth Feinberg and Camille Biros, Administrators of the IRCP, and "leaders and lawyers from the Dioceses of Syracuse,

Buffalo, and Rochester." (*See* ABC News Article.)[13]   The Responses argue that the transcript

contains statements by the Administrators (discussed in detail *infra*) that belie the Debtor's

claims of the Administrators' "independence."   The Claimants have at least provided more

support for their allegations compared to the plaintiffs in *Caldwell*; the opinion of the court in

that case did not reference the transcript in support of the alleged falsity, but a review of the

docket in that case shows that the transcript of the ABC News Article was provided to the court

before it issued its decision.  *See* Letter Request for Status Conference, *Caldwell v. Archdiocese

of New York*, No. 20-cv-01090 (S.D.N.Y. May 12, 2021), ECF Doc. # 31.

The Debtor argues that even with the transcript, Claimants still fail to adequately plead

fraud.  While the *Caldwell* opinion is unclear whether that article was considered as part of the

decision, this fact certainly cuts against Claimants' arguments that these factual allegations are

completely new and distinct.[14]

Next, the Debtor takes issue with contents of the ABC News Article as supporting

allegations of falsity.  The transcribed call did not include any representatives for the Debtor or

contain any statements attributable to the Debtor.  The Debtor accurately distills the information

in the article involving the Debtor or that could possibly be inferred as involving the Debtor

down to two statements:

- A reported statement by Ms. Biros that "[w]e are constantly on the phone with New York, Brooklyn, and now Rockville Center [sic]. If we have any questions about the priests, the file, the claimant, they are an incredible resource to us."

---

[13]      The ABC News Article is attached to the Merson Response as Exhibit 4 and the Herman Response as Exhibit D.

[14]      As the Debtor observes, the *Caldwell* plaintiffs were given the opportunity to amend their complaint, and thus expressly include the ABC News Article, but chose not to do so in *Caldwell*. *See Caldwell*, 2021 WL 1999421, at *10.

- A reported statement by Mr. Feinberg that one of the "benefits" of the IRCP is that "it would create a 'compensation matrix,' or a range of possible payouts depending upon the severity of the alleged abuse, agreed upon by the program's administrators and the dioceses, Feinberg said, that 'affords us wide leeway, wide range, so we could govern the amount of compensation' to victims." Mr. Feinberg is also reported to have added, "'Right now, we have not paid any claim, however horrific, at more than $500,000.'"

(*See* ABC News Article at 6–7.)

Mr. Feinberg's alleged statements in the ABC News Article that the compensation matrix was "agreed upon" by the program's administrators and the dioceses does not actually attribute any statement to Feinberg about such an agreement, or involvement by the dioceses in creating such a compensation matrix. Likewise, Feinberg's alleged statement that no claim had been paid in excess of $500,000 does not plausibly allege the existence of a diocese-imposed "cap." The only plausible inference from that statement is that $500,000 was the highest amount that had been offered under the program. None of Mr. Feinberg's statements reveal anything about "independence," one way or the other.

Debtor further argues that even if the Feinberg statements could be construed as creating an inference of the Debtor's involvement in approving or creating general parameters for compensation, this would not indicate falsity considering the actual representations made in documents like the IRCP Protocol. The same is also true for Ms. Biros' statements regarding communications between the Administrators and dioceses.

The IRCP Protocol was not mentioned in *Caldwell*. Presumably, Claimants added it to their allegations here to ensure that they adequately alleged the existence of statements regarding independence, and they have succeeded in that regard. However, the Debtor is correct that the IRCP Protocol's description of the program negates any plausible allegations of falsity that are based on the ABC News Article.

27

The Debtor effectively argues that it was obvious from the IRCP Protocol that the Debtor would have *some* involvement with the program, notwithstanding certain independent facets of IRCP.  (*See generally* IRCP Protocol.)  According to Debtor, this is clear because the IRCP Protocol stated that:

- The Diocese was required to submit certain information to the Administrators, including "information from the accused and any other information contained in the claim files maintained by the Diocese," with respect to each claimant's submission. (*Id.* at 3.)

- The Diocese and claimants were permitted to "request face-to-face personal meeting or telephone meeting with the Administrators prior to the time a claimant makes his or her decision to accept or reject compensation." (*Id.* at 7.)

- "[T]he individual claimant and the Diocese reserve the right to submit to the Administrators any information deemed relevant to the Administrators' evaluation and determination of any individual claim" before its determination. (*Id.*)

- "In addition, the Administrators may request separate meetings with either or both the claimant or his or other representative and/or officials of the Diocese at a reasonable mutually convenient location." (*Id.*)

- Seven factors would be used to evaluate individual claims, and further additional factors would be considered to determine the amount of compensation to be provided to an eligible claimant. (*See id.* at 5.)

Debtor is correct that the Administrators' statements in the ABC News Article do not support that representations about the independent function of the Administrators were false.

First, Ms. Biros' statements did no more than establish that the Administrators were in frequent contact with the dioceses.  The Protocol showed that communication between the Debtor and the Administrators was to be expected for a variety of reasons, including the ones allegedly listed by Ms. Biros, like Administrator "questions about the priests, the file, the claimant."  (ABC News Article at 7.)  Ms. Biros' statements do not support allegations of falsity.

28

Second, the IRCP Protocol is not inconsistent with respect to the ABC News Article's supposition of a compensation matrix that was "agreed upon" by the Administrators and the Dioceses. Based on the Protocol that the Debtor issued, the Debtor had some participation in creating and ultimately agreeing to the parameters for the program in the protocol, like factors that would be used to evaluate individual claims. In turn, the Debtor observes that those parameters "create[d] . . . a range of possible payouts depending on the severity of the alleged abuse," which is how the "compensation matrix" is defined in the ABC News Article. (*Id.* at 6.) This does not controvert the Administrators' ultimate "independence." In fact, in the very next sentence in the ABC News Article, Feinberg was attributed as saying that such a matrix "affords [the Administrators] wide leeway, wide range, so we could govern the amount of compensation." (*Id.*)

And indeed, the Debtor points out that the IRCP Protocol explicitly detailed what made the program independent, namely that:

- The Administrators were "responsible for all decisions related to the administration, processing, and evaluation of individual claims submitted to the Program;"

- The Administrators' determinations "will be fully binding on the Diocese;" and

- "[T]he Diocese has no authority to reject any final decisions rendered by the Administrators."

(IRCP Protocol at 3.)

The Claimants do not contend that the Debtor violated any of these specific representations regarding independence such that they would be false. Put differently, the Debtor contends that the Protocol provided a clear explanation about what was meant by "independence," and that there are no allegations that it violated the independent facets of the program defined in the same document that Claimants allege contained misrepresentations.

29

Furthermore, the Debtor identifies that each Claimant entered into the releases voluntarily, represented that they carefully reviewed the agreement, consulted with counsel, and were fairly compensated.  (*See* Reply ¶ 31 (quoting Renker Decl., Exs. 1–10).)[15]

Comparing the alleged misstatements and corrective information, the Claimants have failed to plausibly plead falsity.  *Caldwell* remains instructive, and while the court there left open the possibility of pleading falsity, the court also found that falsity was not pled with the ABC News Article before it.  Regardless of the weight that article was given in *Caldwell*, the Debtor here also provides sensible explanations why the statements in the ABC News Article do not necessarily support allegations that representations regarding independence were false.

Furthermore, the Debtor shows that the IRCP Protocol, which did not appear in the *Caldwell* decision, explains the full context of what was meant by "independent."  The Court is entitled to review the full context of the alleged misstatements made to determine if falsity is in fact properly alleged.  *See, e.g., Bondar v. LASplash Cosmetics*, No. 12-cv-1417, 2012 WL 6150859, at *9 (S.D.N.Y. 2012) (dismissing fraudulent misrepresentation claim because plaintiff's assertion was "conclusory, and belied by the full context provided by the emails" annexed to defendant's answer).  In the context of the IRCP Protocol, "independence" is a much more limited concept than the expansive idea of independence Claimants purport to have relied on.  The Claimants' theory of independence ostensibly would not allow the Debtor any communication with Administrators or role in defining the program parameters, but that is not the standard the Debtor held itself to when making representations about the IRCP's independence.

---

[15]    The Merson Firm represented the three claimants that it represents here in reviewing the releases.  (Reply ¶ 19 (quoting Renker Decl., Exs. 8–10).)

The Responses also suggest that other statements were fraudulent, although much less effort and specificity is devoted to these allegations. The allegations are completely lacking in merit, but the Court briefly addresses them here. Specifically, the Merson Response suggests that statements that the IRCP was intended to promote healing and reconciliation were fraudulent because it was actually created and implemented for the Debtor's benefit. (*See* Merson Response ¶ 83.) The Merson Response provides no support for the proposition that these statements are even material statements of fact, let alone that they are false. Presumably, providing compensation to survivors does more to promote reconciliation than no action by the Debtor, and the allegation that the Debtor considered that it could also benefit from the process does not make statements about healing or reconciliation false. Furthermore, it seems dubious that the Claimants would be able to properly allege reasonable reliance on the fact that the program was implemented with absolutely no benefit to the Debtor, or that representations regarding reconciliation created an obligation for the Debtor to comprehensively disclose the benefits it thought might be attainable through the IRCP.

In sum, the Court finds that the Claimants have failed to adequately allege that the releases were obtained by fraud and are thus unenforceable.[16]

---

[16]    While the Court need not reach the argument, the Debtor also contends that some of the Claimants alleging fraud as discussed in this subsection (Claim Nos. 90280, 90360, 90433, 90434, and 90448) also ratified any releases by failing to tender the compensation or challenge the enforceability of their releases when filing their proofs of claims, which were all submitted more than six months after the ABC News Article was published. "Upon learning that a contract is voidable (*i.e.* once the duress is removed or the fraud uncovered), the releasing party must 'promptly repudiate the contract or release or she will be deemed to have ratified it.'" *Nicodemez v. AIG*, No. 12-cv-490, 2012 WL 5264560, at *4 (S.D.N.Y. Oct. 16, 2012) (quoting *VKK Corp. v. Nat'l Football League*, 244 F.3d 114, 122–23 (2d Cir. 2001)) (emphasis added). "It is well established that where money paid as consideration for a release acquired by fraud or duress is retained after the releaser becomes aware of the fraud or the duress is removed, ratification may be found." *Id.*

### 3.  Negligent Misrepresentation

The Herman Brief also argues that the releases are unenforceable because they were

obtained by negligent misrepresentation.  It recites the elements of the claim as follows:

> (1) the existence of a special or privity-like relationship imposing a duty on
> the defendant to impart correct information to the plaintiff; (2) that the
> information was incorrect; and (3) reasonable reliance on the information.

*Crawford v. Franklin Credit Mgmt., Corp.*, 758 F.3d 473, 490 (2d Cir. 2014) (quoting *J.A.O.*

*Acquisition Corp. v. Stavitsky*, 8 N.Y.3d 144, 148 (2007)).

While the Herman Brief does not thoroughly explain the second and third elements (it

only devotes two paragraphs total to the negligent misrepresentation argument), the basis for

these allegations appears to be the same misrepresentations and reliance that underlie the fraud

claim.

With respect to the first element, the Claimants recognize that the critical difference

between a claim of fraudulent misrepresentation and a claim of negligent misrepresentation is the

presence of a "special relationship" between the parties that gives rise to a duty to disclose.

(Herman Response ¶ 34.)  The Claimants argue that because the IRCP was intended to further

the survivors' "reconciliation and healing" and provide compensation for abuse, that this created

a special relationship.  (*Id.* ¶ 35.)  They argue that is more special than the normal relationship

between a church and its parishioners, which they concede is normally insufficient under the

negligent misrepresentation caselaw.  (*Id.* (citing *Bouchard v. New York Archdiocese*, No. 04

CIV. 9978 (CSH), 2006 WL 1375232, at *6 (S.D.N.Y. May 18, 2006) (observing that the

"general relationship between a church or religious body and a congregant . . . is insufficient in

law to support the finding of a fiduciary duty")).)

As Debtor argues, this is the exact theory presented and rejected in *Caldwell*, where the court also dismissed a negligent misrepresentation claim pressed by the Herman firm. (Reply ¶ 33 (citing *Caldwell*, 2021 WL 1999421, at *9).) Debtor is correct, and the negligent misrepresentation claim is dismissed here for the same reasons.

The court in *Caldwell* dismissed nearly identical allegations for multiple reasons. First, the court in *Caldwell* noted that any allegations of negligent misrepresentation that overlapped with the fraud claims needed to be pled with particularity. *Caldwell*, 2021 WL 1999421, at *7. Plaintiffs failed to do so in *Caldwell*, and the Claimants failed to do so here. Second, the court in *Caldwell* found that the plaintiffs failed to plead a special relationship. *Id.* at *8. In reaching that conclusion, the court first found that plaintiffs had not established a special relationship with the church solely based on their status as survivors of abuse by the defendant's employees. *Id.* at *8–9. Because the plaintiffs' only other interactions with the defendant were with the IRCP, that would be the only other potential basis for a relationship. But, the court said, the "requisite relationship between the parties must have existed before the transaction from which the alleged wrong emanated, and not as a result of it." *Id.* at *9 (quoting *Burton v. Label, LLC*, 344 F. Supp. 3d 680, 698 (S.D.N.Y. 2018)). That posed a problem for plaintiffs as any relationship they could have alleged would have been as a result of the IRCP, and not a pre-existing one.

The *Caldwell* opinion is well-reasoned, has not been distinguished or cited negatively, and is virtually identical to the case at hand. As a result, the Court finds that the Claimants have failed to adequately allege that the releases were obtained by negligent misrepresentation and are thus unenforceable.

4. <u>Overbreadth</u>

The Merson Response also argues that the releases are unenforceable because they are overbroad, ambiguous, and vague. (*See* Merson Response ¶¶ 101–109.) This argument lacks any merit whatsoever. The Merson Response cites no authorities that directly support any of the assertions made in support of this argument. Furthermore, the Merson Response's arguments would effectively invalidate any general release, which is obviously inconsistent with the favorable treatment of releases under the caselaw recited and applied *supra*.

First, the Merson Response states that similar releases with "expansive language" have been "struck down"; but the support offered in the Merson Response quotes an excerpt from a case that acknowledged and upheld the *validity* of multiple broad releases. (Merson Response ¶ 104 (citing *In re WorldCom, Inc.*, 2007 WL 608113, at *3 (Bankr. S.D.N.Y. 2007)).)

The Merson Response argues that the scope of a release should be determined based on the intent of the parties. (*Id.* (quoting *Golden Pacific Bancorp v. F.D.I.C.*, 273 F.3d 509, 515 (2d Cir. 2001).) While this general proposition is correct, the Merson Response, without support, argues that the release should be invalidated because the intent of the release is to "excuse the Debtor of its responsibility for misconduct." (*Id.* ¶ 105.) The Merson Response clearly misses the point that excusing one party's responsibility for misconduct in exchange for consideration is the purpose and function of a release. The Response selectively takes language from the caselaw to argue that the "law looks with disfavor upon agreements intended to absolve [a party] from the consequences of his [wrongdoing]," as a reason for invalidating general releases outright. (*See* Merson Response ¶ 104 (quoting *Golden Pacific Bancorp*, 273 F.3d at 515).) Rather, the caselaw reveals that this is a principle of interpretation for releases where the releasing party's intent to grant a broad release is not clear. *See, e.g.*, *Golden Pacific*, 273 F.3d at 515 (finding

34

that a release of claims "arising from or with respect to the decision of the [party] to close the Bank on June 21, 1985" did not constitute an unambiguous general release)).)  The release here, however, was clearly intended to be broad—the Merson Response performs no analysis to explain otherwise.

Instead, the Merson Response focuses on the breadth of the release, asserting in conclusory fashion that the release is ambiguous and vague as a result.  There are multiple problems with that argument.  First, the Merson Response suggests, without any legal support, that ambiguity is a reason to invalidate an agreement entirely.  The Merson Response does not point to any specific language in the releases that is ambiguous or susceptible to multiple interpretations; nor does it set forth how any alternative interpretations would support their Claimants' ability to disregard the releases and bring these claims again after accepting compensation, signing the releases, all while represented by counsel.  Finally, this entire argument equates breadth with ambiguity and vagueness, again with no citation.  Adopting this argument would make it impossible to obtain a general release that is not subject to challenge.  As discussed *supra*, general releases are common.  The Debtor cites cases where courts have found that similar releases are both clear and unambiguous.[17]

The Claimants fail to establish a legal basis for rendering the releases unenforceable due to "overbreadth."

---

[17]    (Reply ¶ 18 n. 3 (citing to *Braxton/Obed-Edom v. City of N.Y.*, 2019 WL 8955261, at *4 (S.D.N.Y.  Sept. 17, 2019) (finding that general release with similar provision "clearly and unambiguous provide[d] that [claimant] release[d] [defendant] and all past and present employees and representatives from … all federal civil rights claims that [claimant] had at the time"); *Hui-Wen Chang v. N.Y. City Dep't of Educ.*, 412 F. Supp. 3d 229, 244 (E.D.N.Y. 2019) (holding plaintiff's claims were barred where "[t]he release plaintiff signed [was] unambiguous," and "[p]laintiff agreed to 'release and forever discharge . . . any and all claims . . . which [plaintiff] had, now has or hereafter can, shall or may have against the [defendants] for, upon by reason of any matter, cause or thing whatsoever that occurred through the date of this release'") (internal quotation marks omitted).)

5. <u>Unjust Enrichment</u>

The Merson Response also argues that the Debtor is being unjustly enriched by the releases it obtained from the respective Claimants. The theory is that by obtaining releases before the enactment of the CVA, the Debtor obtained a benefit (a release in exchange for less compensation) that it would have not been able to obtain otherwise, to Claimants' detriment. (*See* Merson Response ¶ 89.)

There is a fundamental problem with the unjust enrichment argument: it is not clear that unjust enrichment constitutes a basis (like fraud or negligent misrepresentation) for finding a contract unenforceable. The Merson Response cites no authority for the proposition that unjust enrichment permits the Claimants to avoid enforcement of the releases.

Debtor's first (of two) arguments is that any claim of unjust enrichment is barred by the general release itself. (Reply ¶ 7.) Debtor cites no caselaw supporting this argument, which is unsurprising since the Merson Response cites no caselaw supporting its theory.

Both parties appear to be missing an important point: not only is there an absence of cases showing that unjust enrichment can be used to render a contract unenforceable; but, in fact, courts *dismiss* claims for unjust enrichment claims outright when they pertain to subject matter governed by a contract. *See ECD NY Inc. v. 616 First Avenue Developer LLC*, 135 N.Y.S.3d 85, 86 (1st Dep't 2020). The Court rejects the Claimants' argument for this reason alone.

The Debtor makes a second independent argument that the unjust enrichment cause of action must fail because no Claimant received "less than what he bargained for." (Reply ¶ 8 (quoting *In re Canon Cameras*, 237 F.R.D. 357, 359–60 (S.D.N.Y. 2006)).) This argument is less compelling. In the single case cited, *Canon Cameras*, the court stated that proposition of law to reject certification of a consumer class action against a camera manufacturer, where the

36

plaintiffs failed to establish that all of the class members' cameras had in fact malfunctioned. *See* 237 F.R.D. at 359–60. The Claimants here *do* allege that they received less than the post-CVA enactment fair value of their claims as a result of the general releases. Standing alone, *Canon Cameras* does not warrant dismissal of the unjust enrichment claims. In any event, the Court need not reach that determination as the Claimants have failed to show that their unjust enrichment claim constitutes a basis for rendering a contract unenforceable.

      6. <u>Estoppel</u>

      Finally, the Merson Response argues that the Debtor should be estopped from enforcing the releases against Claimants to whom it sent proof of claim forms.

      Claimants accurately recite that equitable estoppel "exists to prevent a party from taking a position or asserting a right that is contrary to their prior position, if doing so will result in harm to another party who was led to reasonably rely on the prior position." (Merson Response ¶ 98.) While this is a fair recitation of the elements of equitable estoppel, *see Shondel J. v. Mark D.*, 7 N.Y.3d 320, 326 (2006), Claimants fail to adequately plead estoppel here.

      First, the Merson Response argues that sending claim forms to potential claimants urging them to file proofs of claim constituted "taking a position or asserting a right" that was contrary to a prior position. (Merson Response ¶¶ 88–89.) The prior position referred to is that the Debtor was no longer liable for any claims covered by the releases. It is unclear, however, that the Debtor's sending of claim forms constitutes taking a contrary position, as opposed to an administrative attempt to provide notice to all potential claimants. Certainly, a process that is sufficient to reach all potential claimants will also reach parties whose claims should not be allowed for one reason or another. But Claimants cite no authorities that this act alone

constitutes "taking a position" for purposes of equitable estoppel, let alone to estop a party from asserting a validly executed release.

Second, the Merson Response fails to show that there was reasonable reliance on the claim forms that caused harm to the Claimants. The Merson Response argues that the Claimants were harmed because they were required to relive their traumatic abuse in completing the forms. (*Id.* ¶ 100.) The Court does not doubt that completing a claim form for sexual abuse can be a difficult experience for Claimants. Nevertheless, the Merson Response fails to explain with facts or caselaw why completing the form constitutes "reliance," i.e., why it would be reasonable to expect that completing the form would guarantee allowance of the claim, without any scrutiny of the claim by the Debtor or the Court.

The Court rejects the estoppel arguments. Because the seven Claimants discussed in this subsection have failed to state a cause for finding the IRCP releases unenforceable, the Objection is **SUSTAINED** with respect to their claims.

### E.    Pre-IRCP Release: Enforceability Argument by Herman

The Herman Firm also filed a response for Claim No. 90552. ("Pre-IRCP Response," ECF Doc. # 1704.) This Claimant executed a release in 1998, long before the implementation of the IRCP. (*See* Renker Decl., Ex. 11.) The Pre-IRCP Response argues that the release is unenforceable for two reasons: (1) it was obtained by fraud; and (2) it was obtained by negligent misrepresentation. Neither argument has merit. The same legal standards that were applied to the Herman Response for the IRCP claims apply here and are not recited again.

#### 1.    Fraud

The Pre-IRCP Response is inadequate in alleging a fraud claim. The theory revolves around a grand jury report that found that the Diocese generally "acted to conceal clergy sexual

abuse and evade civil liability." (Pre-IRCP Response ¶ 18.)  The Pre-IRCP Response argues that

"[i]t may be inferred that the Diocese lied to the Survivor, concealing the extensive and

ignominious history it knew" about the Claimant's alleged abuser. (*Id.*)

The Pre-IRCP Response does not make any other connection between the general activity

detailed in the grand jury report and the Claimant's abuse or release.  The Response does not

identify any statements of fact by the Debtor, or why any such statements were false.  Reliance

on a misstatement is not properly pled.  Further, the Response fails to articulate why the

Claimant would have been relying on the Debtor's knowledge about the alleged abuser's history

of abuse in granting the release for his own personal claim.

The Claimant fails to address multiple elements for the fraud claim in the pleading.  The

elements of a fraud claim are not pled with particularity.  The Court rejects the argument as a

basis to render the release unenforceable.

### 2. Negligent Misrepresentation

The Claimant fails to plead any of the three elements for negligent misrepresentation.

For the same reasons that the fraud claim fails, the Claimant fails to adequately plead a false

statement or reasonable reliance on that statement.  The Claimant fails to plead a special

relationship for the same reasons that the IRCP Claimants failed to plead a special relationship.

The Claimant pleads that a special relationship was created by nature of his abuse and the fact

that the Claimant and the Debtor entered negotiations to settle the claim.  As previously

discussed, this is inadequate to create a special relationship.

Therefore, the Debtor's Objection to Claim 90552 is **SUSTAINED.**

### IV.    ANALYSIS: CLAIMS FOR WHICH NO RESPONSE WAS FILED

There were nine claims for which no response was filed by the Claimants. Three grounds for objecting to these claims are asserted: (A) Claims that have been adjudicated or dismissed (two claims); (B) Claims that have been released by the Claimants before the IRCP (two claims); and (C) Claims that were released as part of the IRCP (five claims). The Debtor has shown that these Claimants are precluded from asserting their claims as a matter of law. Because the Claimants have failed to respond with any evidence or argument to contest the objection, the objection to all nine of these claims is **SUSTAINED**.

#### A.    Adjudicated and Dismissed Claims

The Debtor has established that two Claimants (Claim Nos. 90059 and 20080) are barred from asserting their claims as a matter of law; the same claims were already adjudicated and/or dismissed by other courts.

Claim No. 90059 is brought by the same Claimant, naming the same perpetrator, and on the same set of facts as a case that was dismissed as against the Debtor on a motion for summary judgment. (*See* Renker Decl., Ex. 12.) In that case, the New York State Supreme Court, Nassau County, granted the Diocese's motion for summary judgment on two grounds, and dismissed the claim with prejudice. (*See id.*)

Claim No. 20080 is asserted by a Claimant who previously filed a complaint against the Diocese alleging abuse by the same alleged perpetrator. (*See* Renker Decl. Ex. 13.) The suit was dismissed with prejudice by court-ordered stipulation. (*See id.*)

The Debtor argues that both claims should be barred under the doctrines of *res judicata* and collateral estoppel. The Debtor provides legal support for application of both doctrines to

40

claims dismissed at summary judgment,[18] and claims dismissed by court-ordered stipulation.[19] These Claimants are precluded from asserting their claims as a matter of law. The Claimants have put forth no evidence or argument in response.

As a result, the Court **SUSTAINS** the Objection with respect to Claim Nos. 90059 and 20080.

### B.     Non-IRCP Releases with No Response

No responses were filed to the Objection for two claims (Claim Nos. 90190, 90499) that are subject to releases obtained by the Debtor before implementation of the IRCP. These two claim forms appear to be identical and duplicative of each other, aside from the fact that one attaches the Claimant's complaint filed against the Debtor in New York State Supreme Court. Furthermore, these two claims are also identical to a third claim that is included in this omnibus objection, and for which the Claimant *did* file a response to the Debtor's objection. (*See* Renker Decl., Ex. 11; Pre-IRCP Response.) The Claimant did not include these two claims in that response, and the Debtor did not include these in its other omnibus objection targeting duplicative claims.

---

[18]     *See Monahan v. N.Y. City Dep't of Corr.*, 214 F.3d 275, 285 (2d Cir. 2000) (recognizing *res judicata* bars claims where there was a final adjudication on the merits, the previous action involved the same parties, and the claims asserted in the subsequent action could have been raised in the prior action); *Evans v. Ottimo*, 469 F.3d 278, 281 (2d Cir. 2006) (holding that collateral estoppel bars re-litigation of an issue necessarily decided in a prior action and decisive of the present action where the party bringing the subsequent action had a full and fair opportunity to litigate the issue in the prior action).

[19]     *See Amid v. Chase*, 720 Fed. App'x 6, 8–9 (2d Cir. 2017) (on challenge to district court's dismissal of plaintiff's claims based on *res judicata*, affirming district court decision that stipulation between the parties "ha[d] the preclusive effect of a final judgment"); *DeMarco v. City of New York*, 2011 WL 1104178, at *7 (E.D.N.Y. 2011) (holding that stipulation of discontinuance with prejudice barred plaintiff had a "collateral estoppel effect when used defensively to bar [p]laintiff from relitigating issues raised [in the prior action] in subsequent actions").

The Court **SUSTAINS** the Objection to these claims on the basis that they are duplicative. The Court has already addressed the release arguments, as well as the Claimant's response, on an identical claim *supra*.

### C.    IRCP Releases with No Response

Finally, there are five claims (Claim Nos. 20015, 20045, 20050, 20093, 90081) for which no responses were filed that are subject to releases obtained by the Debtor in the IRCP.

Three of these claims (Claim Nos. 20045, 20050, 20093) again appear to be identical to claims for which responses have been filed, and were already addressed *supra*.[20] Similarly, the Debtor has not included these in its other omnibus objection targeting duplicative claims. The Court **SUSTAINS** the Objection to these claims on the basis that they are duplicative. The Court has already addressed the release arguments, as well as the Claimant's response, on identical claims *supra*.

There are still two claims (Claim Nos. 20015 and 90081) for which the Debtor argues an IRCP release was obtained and for which no responses were filed by the Claimants. The Debtor attaches Exhibit 1 and Exhibit 5 to the Renker Declaration, which shows a general release executed by the same Claimants that filed Claim Number 20015 and 90081, respectively. (*See* Renker Decl. Exs. 1, 5.)

Claim Numbers 20015 and 90081 contain allegations of abuse that specify the abuser's identity and periods of time when abuse occurred. The corresponding releases offered by the Debtor were signed by the Claimants long after the alleged abuse occurred; these are the same

---

[20]    Specifically: (1) Claim No. 20045 is identical to Claim No. 90410; (2) Claim No. 20050 is identical to Claim No. 90280; and (3) Claim No. 20093 is identical to Claim No. 90360.

IRCP general releases discussed *supra*, and they do not limit the releases to certain acts or periods of time.[21]

The Debtor supported its Objection with caselaw specifically showing that New York state courts have found that the IRCP releases are broad, and that they are enforceable to preclude Claimants from litigating their released claims. *See M.M. v. Church of Our Lady of the Annunciation*, 162 N.Y.S.3d 598 (3d Dep't 2022); *Ark92 v. Archdiocese of New York et al.,* No. 950064/2019, 2021 WL 4350248 (Sup. Ct. N.Y. Cty. Sep. 20, 2021).

Factually, the abuse that is the subject of Claim Numbers 20015 and 90081 falls within the scope of the broad releases in the Renker Exhibits under this caselaw. The Debtor has also cited to direct legal authorities supporting the breadth and enforceability of the IRCP release's terms, as discussed *supra*. The Debtor has shown that these Claimants are precluded from asserting their claims as a matter of law. The Claimants have put forth no evidence or arguments in response.

Therefore, the Court **SUSTAINS** the Objection to Claim Numbers 20015 and 90081.

---

[21]    Furthermore, the Claim No. 90081 itself acknowledges that "the claimant accepted compensation from the Rockville Centre Diocese" for the abuse detailed in the claim. (Claim No. 90081 at 11.) This appears to refer to the compensation exchanged for the general release that the Debtor offers in Exhibit 5 to the Renker Declaration.

## V.   **CONCLUSION**

For the reasons discussed herein, the Court **SUSTAINS** the Objection in its entirety, and

**DISALLOWS** the claims listed in Schedule 1.

**IT IS SO ORDERED.**

Dated:   March 30, 2023
         New York, New York

*Martin Glenn*

MARTIN GLENN
Chief United States Bankruptcy Judge