**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**FOR PUBLICATION**

In re:

THE ROMAN CATHOLIC DIOCESE OF
ROCKVILLE CENTRE, NEW YORK,

　　　　　　　　　　　　Debtor.

Chapter 11

Case No. 20-12345 (MG)

---

### MEMORANDUM OPINION SUSTAINING DEBTOR'S
### FIFTH OMNIBUS OBJECTION TO CLAIMS

*A P P E A R A N C E S :*

JONES DAY
*Attorneys for the Debtor*
250 Vesey Street, Floor 32
New York, NY 10281
By:　　Andrew Butler, Esq.
　　　　Benjamin Rosenblum, Esq.

JEFF ANDERSON & ASSOCIATES, PA
*Counsel for Certain Claimants*
363 7th Avenue, Floor 12
New York, NY 10001
By:　　Patrick Stoneking, Esq.

**MARTIN GLENN**
**CHIEF UNITED STATES BANKRUPTCY JUDGE**

　　　　Pending before the Court is the fifth omnibus claims objection (the "Objection," ECF Doc. # 1655) of the above-captioned debtor (the "Debtor" or the "Diocese"). This Objection raises the issue of whether a group of claims asserted against the Debtor, all of which involve allegations of sexual abuse at schools *in the Brooklyn Diocese* (not in the Rockville Center Diocese) operated by the Franciscan Brothers—a separate religious order—and, also, one claim arising from allegations of sexual abuse at a parish located *in the New York Archdiocese* (not in the Rockville Center Diocese) should be expunged. As explained below, the Court concludes

that the claims should be expunged because the disputed claims fail to raise plausible claims against the Debtor where the abuse occurred in a different diocese.

Submitted with the Objection is the declaration of Thomas G. Renker, the Debtor's Chief Operating Officer and General Counsel.  ("Renker Declaration," ECF Doc. # 1656.)  Annexed as exhibits to the Renker Declaration are property records and articles or certificates of incorporation for the entities where the alleged abuse occurred (each, an "Exhibit," and collectively, the "Renker Exhibits").

The Debtor seeks entry of an order disallowing the eleven proofs of claim listed on Schedule 1 to a proposed order ("Proposed Order") appended to the Objection (each, a "Claim [number]," and collectively, the "Disputed Claims").  The Debtor states that the Disputed Claims allege abuse that occurred at Catholic high schools and parishes or parish schools that are purportedly not supervised, controlled, managed, or directed by the Diocese.  Of those eleven claims, ten claims allege abuse that occurred at entities within the geographic territory of the Diocese of Brooklyn (the "Brooklyn Claims[1]").  Those entities are (i) Bishop Ford High School; (ii) St. Brigid's Church; (iii) St. Francis Preparatory Academy; (iv) St. Francis Preparatory School; (v) St. Francis Xavier Church and School; and (vi) St. Teresa of Avila Church and School (collectively, the "Brooklyn Entities").  The remaining claim occurred at the Church of St. Catherine of Genoa ("St. Catherine," and collectively with the Brooklyn Entities, the "Subject Entities"), which is within the geographic territory of the Archdiocese of New York (the "St. Catherine Claim[2]").

---

[1]    Claim Nos. 90469, 90470, 90471, 90474, 90475, 90476, 90477, 90478, 90518, and 90528.

[2]    Claim No. 90535.

A response was filed on behalf of the Brooklyn Claims (the "Brooklyn Response," ECF

Doc. # 1745).  The Brooklyn Response raises both substantive and procedural challenges to the

Objection.  No response was filed to the St. Catherine Claim.  The Debtor filed a reply.

("Reply," ECF Doc. # 1773.)

For the reasons discussed below, the Court **SUSTAINS WITH PREJUDICE** the

Objection in its entirety and **DISALLOWS AND EXPUNGES** the Disputed Claims.

## I.    BACKGROUND

### A.  The Claim Objection Procedures

On October 9, 2020, the Debtor filed its schedules of assets and liabilities and statements

of financial affairs (ECF Doc. ## 57, 58), which were thereafter amended.  (*See* ECF Doc. ##

209, 635, 977, 1649.)  On January 27, 2021, the Court entered the *Order Establishing Deadlines*

*for Filing Proofs of Claim and Approving the Form and Manner of Notice Thereof* ("Bar Date

Order," ECF Doc. # 333).  Under the Bar Date Order, the Court set (a) March 30, 2021 as the

deadline for each person or entity to file a proof of claim (the "General Bar Date"), and (b)

August 14, 2021 at 5:00 p.m. as the deadline for each individual holding a Sexual Abuse Claim[3]

(each, a "Claimant") to file a proof of such claim (the "Sexual Abuse Bar Date").  By subsequent

order, the Court established October 10, 2022 as a supplemental bar date for certain holders of

Sexual Abuse Claims that had their claims revived pursuant to the Adult Survivors Act (the

"Adult Survivors Sexual Abuse Bar Date").  (*See* ECF Doc. # 1262.)

On January 10, 2023, the Court entered the *Order Approving Claim Objection*

*Procedures and Granting Related Relief* (the "Claim Objection Procedures Order," ECF Doc. #

1554).  That Claim Objection Procedures Order allows the Debtor to assert omnibus claim

---

[3]    "Sexual Abuse Claim" has the same meaning as the term is defined in the Bar Date Order.

objections on the grounds set forth in Bankruptcy Rule 3007(d), which include that the claims

are duplicates or have been amended, and also on the grounds that the Debtor is not liable to the

claimant for the amount or claim stated.  (*See* Claims Objection Procedures Order § 3(a).)

### B.  The Debtor's Objection

The Objection focuses on proofs of claim that allege abuse that occurred at, and by

individuals associated with, high schools and parishes or parish schools that the Debtor asserts

are not supervised, controlled, managed, or directed by the Debtor.  (Objection ¶ 15.)  The

Debtor contends that the abuse alleged in the Brooklyn Claims occurred at Brooklyn Entities

within the Diocese of Brooklyn, and that the alleged abusers were members of the religious order

named the Franciscan Brothers of Brooklyn and separately incorporated or doing business as the

Franciscan Brothers, Inc., Brooklyn, New York (the "Franciscan Brothers").  (*Id.* ¶ 17.)

Each Brooklyn Claim appends to the proof of claim a complaint filed in a New York state

court action (each, a "State Court Complaint," and collectively, the "State Court Complaints"),

which bring causes of action under the Child Victims Act ("CVA").  The State Court Complaints

are filed against the Diocese of Brooklyn, the Franciscan Brothers, the entity at which the alleged

abuse took place, and anonymous individuals associated with the abuse.[4]  The complaints

contain the following, or similar, affirmative allegations of abuse by entities that are not the

Debtor:

> At all times material, Defendant Bishop Ford High School was under
> the direct authority, control, and province of Defendant Diocese [of
> Brooklyn], the Bishop of Defendant Diocese, and the Franciscan
> Brothers. At all times material, Defendants Bishop Ford High School,

---

[4]    *See, e.g., Ark35 Doe v. Diocese of Brooklyn a/k/a The Roman Catholic Diocese of Brooklyn, New York;
Bishop Ford High School a/k/a Bishop Ford Central Catholic High School a/k/a Bishop Ford Catholic High School;
Franciscan Brothers of Brooklyn a/k/a Congregation of the Religious Brothers of the Third Order of Regular of St.
Francis a/k/a/ and d/b/a Franciscan Brothers, Inc., Brooklyn, NY; and Does 1-5 whose identities are unknown to
Plaintiff*, Index No. 517890/2019 (Sup. Ct. Kings Cty.) (filed Aug. 14, 2019).

Diocese and the Franciscan Brothers owned, operated, managed, maintained, and controlled Bishop Ford High School.

(Compl. ¶ 11, *Ark35 Doe v. Diocese of Brooklyn*, Index No. 517890/2019 (Sup. Ct. Kings Cty.)

(filed Aug. 14, 2019).)

With respect to the St. Catherine Claim, the Debtor asserts that the alleged abuse occurred at a parish that is either in Manhattan or Brooklyn by a priest associated with that parish who is not alleged to be directed or controlled by the Diocese. Unlike the Brooklyn Claims, the St. Catherine Claim does not have a State Court Complaint appended to the proof of claim. The only entity and individual named in the proof of claim are the parish itself and the alleged abuser who purportedly was the priest at the parish. The Claimant lists only "Church of St. Catherine of Genoa" in Part 4, Question C of the Debtor's proof of claim form, which asks "[i]f the abuser was affiliated with a church, parish, school, or Diocesan organization, please identify such church, parish, school, or organization."

The Debtor contends that the Disputed Claims are not allowable under the Bankruptcy Code because the Diocese is not properly alleged to be responsible for the alleged abuse, while other, distinct entities are alleged to be responsible. (Objection ¶ 25.) The Renker Declaration disclaims control over, association with, and responsibility for the Subject Entities, and includes copies of publicly available certificates of incorporation and property deeds. The Debtor argues that its submissions show that the Diocese is not in any way associated with the schools and parishes where the abuse alleged in these Disputed Claims is alleged to have occurred. (*See* Renker Exhibits 1–12; *see also* Objection ¶ 27.) For example, Exhibit 1 is a certified copy of the Certificate of Incorporation for Bishop Ford High School and Exhibit 2 is the property deed for the same. (*See* Renker Exhibits 1, 2.) The Diocese is not mentioned in either document.

The Debtor submits that the Disputed Claims fail to allege the Debtor's control over the Subject Entities, and that the Exhibits to the Renker Declaration further establish that the Disputed Claims should be disallowed as a matter of law.

### C. The Brooklyn Response

#### 1. Substantive Objection to the Objection

Substantively, the Brooklyn Response submits that the Debtor, because of its position as a diocese in the Roman Catholic Church, has significant control over the Catholic organizations that operate within its geographical confines. (Brooklyn Response ¶ 1.) The Brooklyn Response explains that the Franciscan Brothers were organized as a religious congregation of "diocesan right,"[5] which renders them subject to control by each of the bishops in the geographic areas in which they operate. (*Id.* ¶ 7.) The Claimants assert that that the Franciscan Brothers have operated within the Diocese's geographic territory since 1858—well before, and after, the Diocese's inception. (*Id.* ¶ 5.)

The Brooklyn Response contends that it is "beyond serious dispute" that the Debtor took over the Roman Catholic organization within Nassau and Suffolk Counties, New York when it was created, including oversight of parishes, schools, and other Catholic organizations operating there that were formerly under the supervision and oversight of the Diocese of Brooklyn, including the Franciscan Brothers. (*Id.* ¶ 10.)

The Claimants argue that the Debtor has not set forth any facts pertaining to the division of responsibility between itself and the Diocese of Brooklyn when the Diocese was created. (*Id.* ¶ 11.) Moreover, the Brooklyn Response disputes the Debtor's denial that there is any

---

[5]     (Brooklyn Response ¶ 6 (citing http://www.franciscanbrothersosf.org/ourcommunity/history (August 28, 2015: currently viewable at archive.org) ("From its beginning, the Brooklyn Congregation, as well as communities of Franciscan Brothers in the U.S., sought to advance from Diocesan to Pontifical Right.").)

connection between the Diocese and the Franciscan Brothers.  (*Id.* ¶ 12.)  Specifically, the

Brooklyn Response disagrees with Renker's assertion that the Franciscan Brothers "is an

independent religious order which is not affiliated with the Diocese" and "[r]eligious orders,

such as the Franciscan Brothers of Brooklyn, are independent of the Diocese and have autonomy

of life and governance."  (*Id.* (citing Renker Decl. ¶ 7).)

The Claimants believe these statements are demonstrably false and should be the subject

of discovery.  (*Id.*)  With respect to the Renker Exhibits, the Claimants argue that the documents

are irrelevant to the Disputed Claims because the documents do not bear on the Debtor's actual

ability to control the Franciscan Brothers.  (*Id.* ¶ 1.)  In contrast, the Brooklyn Response claims

that there is public evidence that some of the Franciscan Brothers' property was transferred from

the Diocese of Brooklyn to the Debtor.[6]

The Brooklyn Response acknowledges that the State Court Complaints name the Diocese

of Brooklyn, the Franciscan Brothers, and other associated entities and defendants, if applicable.

(*Id.* ¶ 14.)  The Claimants explain that this chapter 11 case was filed prior to the close of the

CVA statutory filing window, which the Claimants submit made it impossible for them to add

the Debtor as a party to their lawsuits.  (*Id.*)

---

[6]      The Brooklyn Response states:

> Newspaper reports from Suffolk County describe the closure of the Brothers' Camp Molloy in
> Mattituck: "Camp Molloy, a former Catholic boys' summer camp on the edge of the lake,
> operated from 1928 until the mid- 1970s.  In 1985, it was purchased from the Diocese of
> Rockville Centre by Jack and Mary McFeely."  In other words, there is at least one report of
> the Debtor owning and selling one of the [Franciscan] Brothers' properties, contradicting the
> Debtor's assertion that it lacks any connection to the Brothers whatsoever.

(Brooklyn Response ¶ 13 (citing https://suffolktimes.timesreview.com/2010/11/a-last-goodbye-for-camp-molloy/
(Feb. 28, 2023).)

2.  <u>Procedural Objection to the Objection</u>

Procedurally, the Brooklyn Response represents that Rule 12(b)(6) ("Rule 12(b)(6)") of the Federal Rules of Civil Procedure (the "Civil Rules"), made applicable through Rule 7012(b) of the Federal Rules of Bankruptcy Procedure (each, a "Bankruptcy Rule," and collectively, the "Bankruptcy Rules"), is the relevant standard of review that the Court should apply to the Disputed Claims.  (*Id.* ¶ 23.)  Under Rule 12(b)(6), the Claimants argue that the Court should assess the sufficiency of the facts alleged in support of the Disputed Claims according to the pleading requirements of Rule 8(a) ("Rule 8(a)") of the Civil Rules.  (*Id.*)  The appropriate legal standard is discussed below.

The Claimants argue that under the appropriate legal standard a party is not permitted to submit evidence outside of the pleadings, including affidavits, without converting the motion to one for summary judgment.  (*Id.* ¶ 24.)  Thus, the Brooklyn Response asserts that the Renker Declaration and Exhibits constitute impermissible evidence outside of the pleadings under a Rule 12(b)(6) standard.  (*Id.* ¶ 33.)  The Claimants contend that presenting evidence outside of the pleadings raises significant issues of fairness because the Claimants have not had the opportunity to conduct discovery.  (*Id.* ¶ 35.)  The Brooklyn Response submits that the Court should look at the proofs of claim alone, and that doing so shows a clear assertion of the connection between the Debtor and the Franciscan Brothers—a fact that the Debtor disputes—but a fact to which the Claimants are entitled discovery.  (*Id.* ¶ 36.)

**D.  The Debtor's Reply**

The Debtor asserts that the Court need not delve into the issues of Roman Catholic Church hierarchy or Catholic Canon Law, but even if it did, the Claimants fail to demonstrate a legitimate claim of the Debtor's liability.  The Debtor offers evidence that contradicts the

Claimants' position that the Franciscan Brothers were under the control of the bishop in each

diocesan territory in which they operated.  For example, the Diocese states:

> "From the time of their founding, the Brothers had lived as a religious
> congregation of diocesan right, which put them entirely under the authority of
> the Bishop of Brooklyn, who served as their Superior General."  Canon Law in
> particular provides that an institute of diocesan right enjoys "autonomy of life,
> especially of governance" (1983 Code c.586, § 1), that without prejudice to this
> right the institute remains "under the special care of the diocesan bishop" (*id.*
> c.594), and that it is for the "bishop of the principal seat," which is the *Diocese
> of Brooklyn* for the Franciscan Brothers of Brooklyn, to address any affairs that
> exceed the institute's internal authority, after consulting with other diocesan
> bishops where the institute has spread (*id.* c.595, § 1).

(Reply ¶ 4 (citations omitted) (emphasis in Reply).)

## II.   LEGAL STANDARD

### A.  Allowance and Disallowance of a Claim

Section 101 of the Bankruptcy Code provides that a creditor holds a claim against a

bankruptcy estate only to the extent that (a) it has a "right to payment" for the asserted liabilities

and (b) is otherwise allowable.  11 U.S.C. §§ 101(5)(A) & 101(10).  Section 501(a) of the

Bankruptcy Code provides that "[a] creditor . . . may file a proof of claim" to claim an interest in

a debtor's bankruptcy estate.  11 U.S.C. § 501(a).  Section 502(a) provides that a claim or

interest, properly filed, "is deemed allowed, unless a party in interest . . . objects."  11 U.S.C. §

502(a).

Under section 502(b)(1), claims may be disallowed if they are "unenforceable against the

debtor and property of the debtor, under any agreement or applicable law."  11 U.S.C. §

502(b)(1).  To determine whether a claim is allowable by law, bankruptcy courts look to

"applicable nonbankruptcy law."  *In re W.R. Grace & Co.*, 346 B.R. 672, 674 (Bankr. D. Del.

2006).

"The proof of claim, if filed in accordance with section 501 and the pertinent Bankruptcy

Rules, constitutes *prima facie* evidence of the validity and amount of the claim under Federal Rule of Bankruptcy 3001(f) and Code section 502(a)." 4 COLLIER ON BANKRUPTCY ¶ 502.02[3][f] (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2019). Pursuant to Federal Bankruptcy Rule 3001(f), a claimant establishes a *prima facie* case against a debtor upon filing a proof of claim alleging facts sufficient to support the claim. If the objector does not "introduce[] evidence as to the invalidity of the claim or the excessiveness of its amount, the claimant need offer no further proof of the merits of the claim." 4 COLLIER ON BANKRUPTCY ¶ 502.02 (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2019).

"To overcome this *prima facie* evidence, an objecting party must come forth with evidence which, if believed, would refute at least one of the allegations essential to the claim." *Sherman v. Novak* (*In re Reilly*), 245 B.R. 768, 773 (2d Cir. B.A.P. 2000). By producing "evidence equal in force to the *prima facie* case," an objector can negate a claim's presumptive legal validity, thereby shifting the burden back to the claimant to "prove by a preponderance of the evidence that under applicable law the claim should be allowed." *Creamer v. Motors Liquidation Co. GUC Trust* (*In re Motors Liquidation Co.*), No. 12 Civ. 6074 (RJS), 2013 WL 5549643, at *3 (S.D.N.Y. Sept. 26, 2013) (internal quotation marks omitted). The claimant must assert a plausible basis for imposing a right to payment of an allowed claim. *See In re Residential Cap., LLC*, 531 B.R. 1, 12 (Bankr. S.D.N.Y.) ("Federal pleading standards apply when assessing the validity of a proof of claim."), *on reconsideration in part*, 537 B.R. 161 (Bankr. S.D.N.Y. 2015); *In re MF Glob. Inc.*, No. 11-2790 (MG) SIPA, 2015 WL 1239102, at *3 (Bankr. S.D.N.Y. Mar. 16, 2015) (same).

While these controlling principles contemplate the possibility of an objection that refutes essential allegations required to state a claim, thereby shifting the burden to the claimant to prove

10

by a preponderance of the evidence that the claim should be allowed, the Claim Objection

Procedures adopted in this case separates procedures applicable for claim objections that can be

resolved as a matter of law (a "Sufficiency Hearing") and those applicable to claim objections

that raise disputed issues of fact (a "Merits Hearing").  The Claim Objections Procedures Order

states that Bankruptcy Rule 7012(b) provides the applicable legal standard for a Sufficiency

Hearing.[7]  Claims Objections and Responses that raise disputed issues of fact must be heard at a

Merits Hearing.

---

[7]     The Debtor may object to claims in accordance with the following Claim Objection Procedures:
. . . .

g) Orders and Hearings Procedures.

i. If no Response to a claim objection is timely filed and served by the established deadline regarding
any particular claim(s), the Debtor may submit a form of order sustaining the claim objection regarding
such claim(s) without any further notice or hearing.

ii. The hearing to consider a claim objection as to which a Response is properly filed and served (each,
a "Contested Claim") shall be set for a contested hearing (each, a "Claim Hearing") to be scheduled by
the Debtor, in its discretion, as set forth herein. The Debtor shall schedule a Claim Hearing for a
Contested Claim as follows:

iii. For a non-evidentiary hearing to address whether the Contested Claim has failed to state a claim
against the Debtor which can be allowed and should be dismissed pursuant to Bankruptcy Rule
7012(b) (a "Sufficiency Hearing"). Unless the Debtor serves the holder of the claim (the "Claimant")
with a Notice of Merits Hearing (as defined herein), the Sufficiency Hearing shall go forward at the
return date set inaccordance with (f)(i) above (or such other date as may be scheduled by the Debtor).
The legal standard of review that will be applied by the Court at a Sufficiency Hearing will be
equivalent to the standard applied by the Court upon a motion to dismiss for failure to state a claim
upon which relief can be granted, in accordance with Bankruptcy Rule 7012(b).

iv. For an evidentiary hearing on the merits of a Contested Claim (a "Merits
Hearing"), the Debtor, in its discretion, may serve upon the relevant
Claimant (by email or overnight delivery) and file with the Court, a
notice that the hearing will be a Merits Hearing (a "Notice of Merits
Hearing") at least thirty (30) calendar days prior to the date of such
Merits Hearing. The rules and procedures applicable to such Merits
Hearing will be set forth in any scheduling order issued by the Court in
connection therewith.

v. In advance of a Sufficiency Hearing and/or Merits Hearing, the Debtor
and the claimant shall meet and confer with respect to the appropriate
confidentiality procedures, if any, that shall govern the hearing on the
matter.

11

**B.  The Court's Authority to Enter Final Judgment on a Claim Objection**

Bankruptcy courts have jurisdiction over cases "arising under title 11, or arising in or related to cases under title 11."  28 U.S.C. § 1334(b).  However, "the manner in which a bankruptcy judge may act on a . . . matter[,] depends on the type of proceeding involved."  *Stern v. Marshall*, 584 U.S. 462, 473 (2011).  The Bankruptcy Court has limited power with respect to personal injury tort claims.  Under 28 U.S.C. 157(b)(1) and (2), a bankruptcy court may hear "core proceedings arising under title 11" ("core matters"), including:

> allowance or disallowance of claims against the estate or exemptions from property of the estate, and estimation of claims or interests for the purposes of confirming a plan under chapter 11, 12, or 13 of title 11 [11 USCS §§ 1101 et seq., 1201 et seq. or 1301 et seq.] but not the liquidation or estimation of contingent or unliquidated personal injury tort or wrongful death claims against the estate for purposes of distribution in a case under title 11.

28 U.S.C. 157(b)(1); *id.* § 157(b)(2)(B).

Additionally, section 157(b)(5) provides that:

> The district court shall order that personal injury tort and wrongful death claims shall be tried in the district court in which the bankruptcy case is pending, or in the district court in the district in which the claim arose, as determined by the district court in which the bankruptcy case is pending.

---

vi. Discovery with respect to a Contested Claim will not be permitted until either a) the Debtor has served the relevant Claimant a Notice of Merits Hearing with respect to the Contested Claim or b) further Court order.

vii. In advance of a Merits Hearing, the Debtor and the Claimant shall meet and confer with respect to the appropriate discovery, if any, that shall govern the Merits Hearing on the matter.

viii. Given the number of claims, orders resolving claim objections could have inadvertent errors. If an order resolving a claim objection has such an error, the Court may enter an amended, corrected or replacement order about such claim without further notice or hearing, upon confirmation by the Debtor and the holder of the claim.

. . . .

(Claim Objection Procedures Order at 3-4.)

*Id.* § 157(b)(5). Section 157(b)(2)(B) distinguishes between estimation of claims for the purposes of confirming a plan versus for distribution under a plan. Section 157(b)(2)(B) is clear that the former is a core proceeding and may take place in bankruptcy court, but the latter may not.

Importantly, although section 1334 is jurisdictional, section 157(b)(5) is not. In *Stern*, the Supreme Court held that the parties may consent to the trial of personal injury and wrongful death claims in the bankruptcy court. *In re Residential Capital, LLC*, 536 B.R. 566 (citing *Stern*, 584 U.S. at 479 ("We need not determine what constitutes a 'personal injury tort' in this case because we agree with Vickie that § 157(b)(5) is not jurisdictional, and that Pierce consented to the Bankruptcy Court's resolution of his defamation claim.")). Absent consent of claimants to the jurisdiction of the Bankruptcy Court, a Bankruptcy Court may not hear and finally determine a personal injury tort claim. *Id.*

A bankruptcy court may determine whether the claims should be disallowed for other reasons. *In re Residential Cap., LLC*, 519 B.R. 890, 902 (Bankr. S.D.N.Y. 2014); *see also In re Alper Holdings USA, Inc.,* 398 B.R. 736, 749 (S.D.N.Y.2008) ("28 U.S.C. § 157(b)(2)(B) expressly provides that allowance or disallowance of claims is a core proceeding (over which the bankruptcy court has jurisdiction), but excludes the 'liquidation or estimation of contingent or unliquidated personal injury . . . claims.' The bankruptcy court clearly had jurisdiction to disallow the personal injury claim."); *In re Chateaugay Corp.,* 111 B.R. 67, 76 (Bankr. S.D.N.Y. 1990) ("[A] finding that the claim is subject to disallowance as a matter of law is not tantamount to a determination on the merits of the personal injury tort or wrongful death claim.").

While a Bankruptcy Court cannot assess the substantive merits of a personal injury tort claim, the Court can make a threshold finding whether the claim is sustainable as a matter of law,

which "leaves it open for trial elsewhere for 'liquidation or estimation' for purposes of

distribution." *In re Chateaugay Corp.,* 111 B.R. 67, 76–77 (Bankr. S.D.N.Y. 1990), *aff'd,* 130

B.R. 403 (S.D.N.Y. 1991), *aff'd in part, rev'd in part,* 961 F.2d 378 (2d Cir. 1992), *aff'd,* 146

B.R. 339 (S.D.N.Y. 1992).[8] Thus, there is no such proscription for summarily disposing of

claims which have no basis in law, on a motion to dismiss under Rule 12(b)(6) or a motion for

summary judgment under Rule 56.

### C. The Court Evaluates the Objection Under the Federal Rule 12(b)(6) Standard

Under section 502(b)(1), claims may be disallowed if they are "unenforceable against the

debtor and property of the debtor, under any agreement or applicable law." 11 U.S.C. §

502(b)(1). To determine whether a claim is allowable by law, bankruptcy courts look to

"applicable nonbankruptcy law." *In re W.R. Grace & Co.*, 346 B.R. 672, 674 (Bankr. D. Del.

2006). Here, whether the Debtor "controlled" the Subject Entities, and similarly, the alleged

abusers, is an essential element of a claim holding the Debtor accountable for sexual abuse that

occurred there. *Cf. Pulka v Edelman*, 40 N.Y.2d 781, 783-84 (1976).[9]

---

[8]  [Section 157(b)(5)] "unequivocally states that the forum for *trying* a personal injury tort or wrongful death claim is limited to the district court. However, there is no such proscription for summarily disposing of claims which have no basis in law, for instance, pursuant to Rules 12(b)(6) or 56 of the Federal Rules of Civil Procedure (the "Federal Rules") where a trial would not be necessary. Thus, a finding that the claim is subject to disallowance as a matter of law is not tantamount to a determination on the merits of the personal injury tort or wrongful death claim. On the other hand, a threshold finding that the claim is sustainable as a matter of law leaves it open for trial elsewhere for "liquidation or estimation" for purposes of distribution.

*Id.* at 76–77.

[9]  Commentators have pointed out that the duty to control others arises only in the following relationships: (1) "[t]he relationship between the defendant and the person who threatens the harm to the third person may be such as to require the defendant to attempt to control the other's conduct" or (2) "there may be a relationship between the defendant and the person exposed to harm which requires the defendant to afford protection from certain dangers including the conduct of others" (Harper & Kime, Duty to Control the Conduct of Another, 43 Yale LJ 886, 887-888). While either of the above relationships may superficially appear to be applicable in the case before us, an examination of the situations in which these principles have been applied shows that there is no duty owed here.

With respect to the first relationship described above, one example of a situation in which there is a duty to use care to control another's conduct is the master and servant relationship.

14

The Claims Objection Procedures Order states that a hearing to consider a claim objection as to which a Response is properly filed and served shall be set for a contested hearing. (Claim Objection Procedures Order § 3(g)(ii).)  A non-evidentiary hearing to address whether a Contested Claim[10] has failed to state a claim against the Debtor which can be allowed and should be dismissed pursuant to Bankruptcy Rule 7012(b) is a "Sufficiency Hearing."  (*Id.* § 3(g)(iii).) The "legal standard of review that will be applied by the Court at a Sufficiency Hearing will be equivalent to the standard applied by the Court upon a motion to dismiss for failure to state a claim upon which relief can be granted, in accordance with Bankruptcy Rule 7012(b)."  (*Id.*) Bankruptcy Rule 7012(b) applies Rule 12(b)–(i) of the Federal Rules of Civil Procedure to adversary proceedings.  FED. R. BANKR. P. 7012(b).

Under Rule 12(b)(6) , a party need only plead "a short and plain statement of the claim with sufficient factual "heft to sho[w] that the pleader is entitled to relief."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007) (internal quotation omitted).  Under this standard, the pleading's "[f]actual allegations must be enough to raise a right of relief above the speculative level," *id.* at 555, and present claims that are "plausible on [their] face," *id.* at 570. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).

The court assumes that *all non-conclusory factual allegations* in the complaint are true and draws all reasonable inferences in the plaintiff's favor.  *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).

---

*Id.* at 783.

[10]    "Contested Claim" has the same meaning as that term is defined in the Claim Objection Procedures Order.

> Under Federal Rule of Civil Procedure 8(a)(2), a complaint must contain a
> 'short and plain statement of the claim showing that the pleader is entitled to
> relief.' '[D]etailed factual allegations' are not required, but the Rule does call
> for sufficient factual matter, accepted as true, to state a claim to relief that is
> plausible on its face. A claim has facial plausibility when the pleaded factual
> content allows the court to draw the reasonable inference that the defendant is
> liable for the misconduct alleged. *Two working principles underlie Twombly.*
> *First, the tenet that a court must accept a complaint's allegations as true is*
> *inapplicable to threadbare recitals of a cause of action's elements, supported*
> *by mere conclusory statements. Second, determining whether a complaint*
> *states a plausible claim is context specific, requiring the reviewing court to*
> *draw on its experience and common sense. A court considering a motion to*
> *dismiss may begin by identifying allegations that, because they are mere*
> *conclusions, are not entitled to the assumption of truth. While legal conclusions*
> *can provide the complaint's framework, they must be supported by factual*
> *allegations.* When there are well-pleaded factual allegations, a court should
> assume their veracity and then determine whether they plausibly give rise to an
> entitlement to relief."

*Id.* at 663–64. (emphasis added; internal citations omitted).

The Second Circuit has repeatedly adopted the principals established by *Twombly* and

*Iqbal*, namely, that conclusory allegations which merely recite the elements of a cause of action

are insufficient. *See Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014) (quoting *Iqbal*, 556 U.S. at

678) (adopting and quoting the standards proscribed by *Iqbal* and *Twombly*); *Krys v. Pigott*, 749

F.3d 117, 128 (2d Cir. 2014) (same); *see also Read v. Corning Inc.*, 371 F. Supp. 3d 87, 92

(W.D.N.Y. 2019) (holding that "Plaintiffs need not plead evidence, but that does not mean they

can proceed on the basis of conjecture, based on a few scraps of information, or broad,

conclusory allegations . . .").

The Court must apply federal pleading standards under Rule 12(b)(6) and Rule 8(a) to

determine whether the Claimants have set forth non-conclusory factual allegations which, if

proved, would entitle the Claimants to relief. If the Objection sets forth facts which would refute

one essential element of the claim, the burden shifts to the Claimants to prove by a

preponderance of the evidence that the claim should be allowed.  But that dispute would have to be addressed at a Merits Hearing, initially applying a summary judgment standard.[11]

### III.   DISCUSSION

**A.  The Court May Evaluate Whether the Disputed Claims Fail as a Matter of Law**

As explained in Section II.B., above, the Court may summarily dispose of claims which have no basis in law, on a motion to dismiss under Rule 12(b)(6), or a motion for summary judgment under Rule 56.  Only Rule 12(b)(6) will be considered here as this was a Sufficiency Hearing.

**B.  Evidence That May Be Considered by the Court**

1. <u>Public Records</u>

The Brooklyn Response asserts that the Renker Declaration and Exhibits constitute unsupported and impermissible evidence outside of the pleadings under a Rule 12(b)(6) standard. In deciding a motion to dismiss, courts in the Second Circuit may consider, *inter alia*, "matters of which judicial notice may be taken[.]"  *Thomas v. Westchester Cty. Health Care Corp.*, 232 F. Supp. 2d 273, 275–76 (S.D.N.Y. 2002) (citing *Leonard F. v. Israel Discount Bank of New York*, 199 F.3d 99, 107 (2d Cir. 1999)) (other citation omitted) (holding that the Court may take judicial public records without converting a motion to dismiss to one for summary judgment).

In *Awan v. Ashcroft*, the court held that courts may take judicial notice of public records, such as properly recorded deeds, on a motion to dismiss.  No. 09-CV-1653 JS AKT, 2010 WL 3924849, at *2 (E.D.N.Y. Sept. 28, 2010) (granting a motion to dismiss where movant submitted a sales contract and title deed to show that it did not own or operate the subject property during

---

[11]     If the claim survives a summary judgment review on the issue of "control," the issue will then be whether a bankruptcy court may resolve that issue, or whether because the claim asserts a personal injury tort 28 U.S.C. § 157(b)(5) requires the issue to be resolved in the district court.  It is unnecessary to address that issue now.

the relevant time period).  Accordingly, the Court concludes that it may properly consider the

property records and other public records submitted with the Renker Declaration in support of

the Debtor's Objection, but as explained in the next section, the Court will *not* consider the facts

regarding "control" alleged in the Renker Declaration.

      2.  <u>Renker Declaration</u>

The Renker Declaration makes conclusory statements with respect to the Diocese's

affiliation with the Subject Entities.  It states:

> The Subject Parishes and Schools were separate and distinct from the Diocese
> and were not supervised, controlled, operated, managed, or directed by the
> Diocese at any time relevant to the allegations at issue here. The Diocese did
> not hire, retain, oversee, or control any of the staff or faculty in their positions
> for the Subject Parishes and Schools. The Diocese did not own the property
> where the Subject Parishes and Schools were located. Neither the Subject
> Parishes and Schools, nor their staff or faculty, served as the agents of the
> Diocese.

(Renker Decl. ¶ 6.)

While the Court may take judicial notice of the deed and certificate of incorporation

attached to the Renker Declaration, in considering a claim objection applying a Rule 12(b)(6)

standard, no additional facts in the declaration may be considered on the issue of the Diocese's

control over the Subject Entities or the individuals working at or operating the entities.

      3.  <u>Catholic Canon Law</u>

Courts routinely hold that the Free Exercise Clause and Establishment Clauses of the

United States Constitution bar courts from interpreting issues of religious canon law to resolve

disputes.  In *Kraft v. Rector, Churchwardens Vestry of Grace Church*, a plaintiff-priest sought

damages for breach of contract and other employment claims against a church and former

employer.  No. 01-CV-7871 (KMW), 2004 WL 540327, at *6 (S.D.N.Y. Mar. 17, 2004).  The

church terminated the minister "for cause" on the basis that certain of her actions violated canon

law.  *Id.*  The defendant-church moved to dismiss the complaint under Rule 12(b)(1) or,

alternatively, Rule 12(b)(6).  *Id.*  The Court dismissed the priest's breach of contract and

wrongful discharge claims because the court concluded that it lacked subject matter jurisdiction

to interpret religious law in the process of adjudicating the employment dispute.  *Id.*  In so

holding, the court explained,

> In order to decide whether canon law applies in this suit, the Court would have
> to resolve the parties' dispute about the meaning and reach of canon law. The
> Court entanglement with religion that this decision would require is
> underscored by the parties' submissions of Affidavits from experts disputing
> the scope and meaning of canon law. A court is barred by the Free Exercise
> Clause from resolving such disputes.

No. 01-CV-7871 (KMW), 2004 WL 540327, at *6 (S.D.N.Y. Mar. 17, 2004) (citing *Martinelli v.*

*Bridgeport Roman Catholic Diocesan Corp.,* 196 F.3d 409, 431 (2d Cir.1999) ("First

Amendment values are plainly jeopardized when . . . litigation is made to turn on the resolution

by civil courts of controversies over religious doctrine and practice"); *see also Hartwig v.*

*Albertus Magnus College*, 93 F. Supp. 2d 200, 213 (D. Conn. 2000) (holding that the court could

adjudicate an employment claim where doing so "does not require the Court to address questions

concerning the validity or plausibility of religious beliefs or choose between competing views of

religious doctrine").

 Broadly, the court in *Kraft* held that the Establishment Clause bars courts from exercising

jurisdiction in cases where resolution of the dispute would result in the "entanglement" of

government with religion.[12]  2004 WL 540327, at *5 (internal citations omitted).   Entanglement

occurs when a court is called upon to resolve disputed issues of "religious doctrine and

---

[12] A traditional Establishment Clause analysis involves the applicability of a federal statute to a religious institution, but Courts have applied the doctrine to state common law claims too. *See, e.g., Hartwig v. Albertus Magnus College*, 93 F. Supp. 2d 200, 212 n.16 (D. Conn. 2000) ("Courts, however, have also assessed common law rights in light of the Establishment Clause prohibition against 'excessive entanglement,' although not using the traditional three-part test fashioned by the Supreme Court in *Lemon* for the analysis of statutes.").

practice." *Id.* (citing *Martinelli,* 196 F.3d at 431).  The Court noted that the "key difference

between a Free Exercise Clause analysis and an Establishment Clause analysis, is that the former

focuses on the nature of the parties involved in the dispute, whereas the latter focuses on the

issues that would have to be addressed in order to resolve the suit." *Id*. at *3.

For the reasons stated above, the Court concludes that it may not consider arguments or

corresponding evidence that rely on differing interpretations of Catholic Canon Law.[13]

### C.  Liability for Entities and Individuals Under Diocesan "Control"

The Brooklyn Claimants contend that the Diocese had control over the Franciscan

Brothers religious organization which operated the Subject Entities, and therefore had control

over the individual alleged abusers.  This allegation of control is what, the Brooklyn Claimants

argue, imposes liability on the Diocese.

A federal court must decide an issue of state law in the way that the state's highest court

would.  *In re Enron Corp.,* 367 B.R. 384, 403–04 (Bankr. S.D.N.Y. 2007) (citing *In re*

*Eurospark Indus., Inc.,* 288 B.R. 177, 182 (Bankr.E.D.N.Y.2003)).  Where there is no decision

on point by the state's highest court, the federal court "must apply what they find to be

the state law after giving 'proper regard' to relevant rulings of other courts of the

State." *See Comm'r of Internal Revenue v. Estate of Bosch,* 387 U.S. 456, 465 (1967).  *See also*

*re Eurospark,* 288 B.R. at 182 ("In predicting how the highest state court would rule,

the federal court should look to the trends displayed by prior rulings of that court, to rulings of

the lower state courts, to relevant rulings from other jurisdictions and to secondary materials.").

---

[13]    The Court is not barred from adjudicating certain types of disputes involving a church where secular,
neutral principles of law can be applied.  *See, e.g., Evans v. Criss,* 39 Misc.2d 314 (N.Y. Sup. Ct. 1963) (stating that
courts may "rely on [a religious entity's] accepted and honored custom, policies, and usage to determine the rights
of the parties") (internal quotations omitted).  The "neutral principles approach" is well-established for resolving
church cases with secular laws.  *Jones v. Wolf*, 443 U.S. 595, 604 (1979) (noting that states may "adopt neutral
principles of law as a means of adjudicating a church property dispute").

Importantly, a federal court must apply the law of the state as it exists but should not attempt to change or expand state substantive law. *In re Enron,* 367 B.R. at 404 (citing *Burris Chem. v. USX Corp.,* 10 F.3d 243, 247 (4th Cir.1993)).

Although this Court applies the federal pleading standard to this claim objection, it looks to the decisions of New York State Courts to determine what claimants must plead to allege "control" by the Diocese over the Subject Entities, religious orders, and the alleged abusers implicated by the Objection.  Likewise, this Court evaluates what New York courts deem sufficient to dismiss claims similar to those at issue here.

It is well-established under New York law that for the Diocese to be liable for torts of alleged abusers, the Diocese must have had a duty to control them.  The duty to control arises only when "the relationship between the defendant and the person who threatens the harm to the third person . . . require[s] the defendant to attempt to control the other's conduct"—for instance, in an employment relationship—or when the "relationship between the defendant and the person exposed to harm . . . requires the defendant to afford protection from certain dangers including the conduct of others." *Pulka v Edelman,* 40 N.Y.2d at 783–84.  A defendant cannot be held liable for tortious conduct by individuals who are outside its control.  *See Bautista v. Archdiocese of New York,* 84 N.Y.S.3d 47, 49 (1st Dep't 2018) (concluding no legal liability because defendant did not have "the authority to supervise or control" individual); *Farrulla v. Happy Care Ambulette Inc.,* 5 N.Y.S.3d 12, 12 (1st Dep't 2015) (stating that defendant "did not cause plaintiff's alleged injuries and was not legally responsible for the person who did").

An organization may, accordingly, be held liable for a person's sexual misconduct only when the alleged perpetrator's conduct is connected to the organization.  *See Sheila C. v. Povich*, 781 N.Y.S.2d 342, 349 (1st Dep't 2004) (concluding that defendant could not be held liable for

sexual assault that occurred after she "had left defendants' physical custody and control"); *K.I. v. New York Cty. Bd. of Educ.,* 683 N.Y.S.2d 228, 230 (1st Dep't 1998) (concluding that school not responsible for sexual assault which "was severed by time, distance and [perpetrator's] intervening independent actions"). The upshot of these cases is that New York law imposes substantial barriers to imposing liability on a diocese for the acts of a priest or teacher working in a parish or school, as reprehensible as the conduct may have been. Conclusory allegations of "control" will not suffice. And, the Court concludes, the conclusory allegations of control cannot pass the logical boundaries of "plausibility" when the abuse occurred outside the geographical boundaries of the Diocese of Rockville Centre, as is the case for the Disputed Claims in the Debtor's Fifth Omnibus Objection.

Although the pleading requirements for complaints filed in New York State courts are less exacting than federal pleading standards, New York courts have also dismissed sexual abuse complaints asserting liability against a diocese supported only by conclusory allegations. *See Kenneth R. v. Roman Cath. Diocese of Brooklyn*, 229 A.D.2d 159, 162 (1997) ("There is no statutory requirement that causes of action sounding in negligent hiring, negligent retention, or negligent supervision be pleaded with specificity. However, a complaint which contains bare legal conclusions and/or factual claims which are "flatly contradicted by documentary evidence" should be dismissed pursuant to CPLR 3211 (a) (7)") (internal citations omitted).[14]

---

[14] Some New York State Courts have found complaints with conclusory allegations about the defendant's control over the tortfeasor sufficient. *See, e.g., ARK283 Doe v. Archdiocese of New York et. al*., No. 950312/2020, 2022 WL 4180825 (Sup. Ct. New York Cnty. Sept. 2, 2022) (holding that plaintiff should be afforded a reasonable opportunity for discovery because "[t]he court finds the plaintiffs[sic] arguments persuasive as to there still being a question as to the full relationship between parties."). The defendants in the action were the Archdiocese of New York *and* the Sisters of Charity of St. Vincent de Paul of New York, St. Agatha's Home for Children, and the New York Foundling i/s/a St. Agatha home of the New York Foundling Hospital. *See id.* at *1. In *ARK283 Doe,* the court could not decipher the documentary evidence submitted by the defendant—a property deed and Certificate of Incorporation—which purportedly demonstrated that the defendant did not own the property where the alleged abuse took place. Here, the Court can decipher the evidence submitted by the Debtor and considers *Ark283*

### D. The Disputed Claims Fail as a Matter of Law

#### 1. The Claimants Fail to Allege a Claim Against the Debtor

The Brooklyn Claims and the State Court Complaints that support them do not state a

claim against the Debtor or any institution within the Diocese's geographical territory.  The

Disputed Claims name the Subject Entity, the Franciscan Brothers, and, importantly, the Diocese

of *Brooklyn*, not the Diocese of Rockville Centre.  On the face of the proofs of claim, the

Brooklyn Claimants simply do not state a claim against the Debtor.

The Brooklyn Response does not move the needle on whether the Brooklyn Claimants

properly state a claim against the Debtor.  The Brooklyn Claimants' position is that the Objection

fails to settle the question of "control" as a matter of law considering the internal rules of the

Catholic Church, and therefore there is a disputed fact that warrants discovery.  The parties agree

that the Franciscan Brothers operated the five schools and parishes at issue in the Brooklyn

Claims, and the Brooklyn Claimants focus solely on whether the Debtor had control over the

---

distinguishable.  Importantly, all of the defendants in *ARK283 Doe* operated within the geographical area covered by the New York Archdiocese, unlike the circumstances here.

In *J.D v. The Archdiocese of New York, et al.*, the complaint named the Archdiocese of New York, Fordham Preparatory School, and the USA Northeast Province of the Society of Jesuits as defendants.  Fordham Preparatory School operated within the Archdiocese of New York and the alleged abuse took place within the geographical area of the Archdiocese.  The trial court granted the Archdiocese motion to dismiss, concluding based on documentary evidence (property deed) and the affidavit of the Archdiocese's Associate General Counsel that the school was independent of the Archdiocese and the Archdiocese did not have the requisite control over Fordham Preparatory School or its employees.  *See* 2021 WL 4307226 (2021).  But, on March 23, 2023, the Appellate Division reversed the dismissal against the Diocese.  *J. D. v. The Archdiocese of New York, et al.*, 2022-01595 (1st Dept.) (NYSCEF Doc. # 16).  The Appellate Division held that the Archdiocese's documentary evidence did not conclusively resolve the allegations in the complaint that plaintiff's alleged abuser was an agent of the Archdiocese, that the Archdiocese exercised supervision and control over the abuser's appointment or employ, and that there were special relationships between plaintiff, the Archdiocese, and the abuser.  *Id.* at 1–2.  The affidavit of the Archdiocese's Associate General Counsel, the Appellate Division held, does not constitute "sufficient documentary evidence for the purpose of" a motion to dismiss, and that the affidavit consists "mainly of legal conclusions and denials."  *Id.* at 2.  The Court here reaches a similar conclusion with respect to the Renker Declaration (other than with respect to the property deed and certificate of incorporation).

To be clear, in sustaining the Fifth Omnibus Objection, the Court is *not* resolving the issues raised by the Sixth Omnibus Objection, whether the claims against the Debtor should survive a Rule 12(b)(6) standard where the alleged abuse occurred at a location *within* the Diocese of Rockville Center at a facility operated by a religious order, similar to the issue addressed by the Appellate Division in *J.D v. The Archdiocese of New York*.

23

Franciscan Brothers.  They contend that the Diocese had control over the Subject Entities through its control over the Franciscan Brothers.

The Brooklyn Claimants assert that the Franciscan Brothers operated in the geographical territories of both the Debtor and the Diocese of Brooklyn.  Therefore, they argue, Catholic Canon Law puts the Diocese's Bishop in control, for both Catholic and legal purposes, of the Franciscan Brothers and all entities within the Diocese's territories which the Franciscan Brothers operated.

The additional allegations in the Brooklyn Response frame Catholic Canon Law as a set of rules that govern employer-employee or principal-agent liability outside of secular legal principles governing these relationships.  Not so.  As discussed above, there is a clear constitutional prohibition on this Court weighing in on the parties' dispute over Catholic Canon Law.  *See Martinelli v. Bridgeport Roman Catholic Diocesan Corp.,* 196 F.3d 409, 431 (2d Cir.1999).

New York courts have rejected the argument that Catholic Canon Law imposes diocesan liability where secular law would not.  *Ark270 Doe v. Archdiocese of New York*, 2022 WL 2316696 at *2 (adopting the defendant's argument that "Canon Law is not the law of the State of New York and an alleged violation of Canon Law is not a violation of New York civil or statutory law").

In *Ark263 v. Archdiocese of New York et al.,* the plaintiff alleged abuse under the CVA and brought negligence, negligent training and supervision, and negligent retention actions against the defendants—the same causes of action alleged in the State Court Complaints.  The defendant-archdiocese moved to dismiss the complaint, arguing that the plaintiff failed to allege

24

control over the high school at which the alleged abuse occurred. *See generally* No.

950294/2020, 2022 WL 2916781 (Sup. Ct. N.Y. Cty. July 18, 2022).

In response, the plaintiffs advanced similar arguments as the Brooklyn Claimants—

namely, that "policies that govern the structure of the Catholic Church place responsibility on

dioceses . . . for activities, programs, and employees working within its geographic territory." *Id.*

(internal citations omitted). The plaintiffs submitted that "all schools [in the archdiocese] are

under the authority of the bishop." *Id.* The court rejected this argument as insufficient to

establish a plausible claim for relief under New York law. The court reached the same

conclusion on nearly identical facts in *Ark270 Doe v. Archdiocese of New York,* 2022 WL

2316696.

The Brooklyn Response ignores that, though the specific entities and organizations

involved may differ, assertions of control based on Catholic Canon Law do not create a factual

dispute. Thus, although Brooklyn Claimants insist that there is a factual dispute requiring

discovery regarding the extent of the Debtor's "control" over the Franciscan Brothers, relevant

legal precedent holds that, as a matter of law, there is no factual dispute on these assertions

alone. The Court concludes, considering the totality of allegations contained in the proofs of

claim and the Brooklyn Response, that the Brooklyn Claimants fail to properly allege claims

against the Debtor.

The Brooklyn Claimants additionally submit that it was "impossible" to add the Debtor

as a party to the lawsuits because the Debtor had filed for Chapter 11 bankruptcy. The Brooklyn

Response does not elaborate on why it was "impossible" to add the Debtor as a party to these

lawsuits, but the Court presumes that the Claimants imply that the automatic stay imposed by

section 362 of the Bankruptcy Code prevented the Claimants from including the Debtor as a

defendant in the State Court Complaints.  This argument is inapposite.

The Debtor had filed a bankruptcy petition triggering the automatic stay under section 362.  While the automatic stay prevented the Claimants from naming the Diocese in state court litigation, it did not prevent the Claimants from asserting a factual basis for a claim against the Diocese in its proof of claim in this case.  The Brooklyn Claims make no mention of the Debtor as a responsible entity where specifically asked if the alleged abuser identified with a "Diocesan organization," among other categories of entities.[15]

### 2.  The Debtor's Documentary Evidence

Next, the Court turns to the certificates of incorporation and property deeds submitted by the Debtor with its Objection.  The Court may take judicial notice of these public records.  *See Awan v. Ashcroft*, 2010 WL 3924849, at *2.  The claims at issue in this Objection are not premises liability claims—they are personal injury tort claims.  While property ownership is central to liability for a premises liability claim, they can shed light but not completely resolve the issue of control for a personal injury claim.  Ownership of the property at which the alleged abuse took place is not a legally essential component to claims of abuse at an institution located on that property.  For example, if the alleged abuser was a diocesan priest, assigned by the Diocese to work at school operated by a religious order in the geographical area of the Diocese, liability of the Diocese cannot be ruled out based on a property deed.

The Court finds that the Claimants at issue in the Fifth Omnibus Objection fail to allege a *plausible* basis for relief against the Debtor.  Accordingly, the Court finds that the Objection is **SUSTAINED** with respect to the Brooklyn Claims.

---

[15]     *See, e.g.,* Claim No. 90469 § 4(c) (listing "Bishop Ford High School, Brooklyn, New York and Franciscan Brothers of Brooklyn" in response to the question asking the claimant to identify if the "abuser was affiliated with a church, parish, school, or *Diocesan organization*").

      3.   <u>The St. Catherine Claim Fails as a Matter of Law</u>

For the reasons discussed above with respect to the Brooklyn Claims, the St. Catherine Claim also fails as a matter of law.  The proof of claim does not name the Debtor and therefore does not state a claim for which the Debtor could be liable.  The Objection is similarly **SUSTAINED** with respect to the St. Catherine Claim.

## IV.     <u>CONCLUSION</u>

For the reasons discussed above, the Court **SUSTAINS** the Objection with prejudice in its entirety and **DISALLOWS AND EXPUNGES** the claims listed in Schedule 1 of the Proposed Order.

**IT IS SO ORDERED.**

Dated:    April 19, 2023
           New York, New York

                           *Martin Glenn*
                           MARTIN GLENN
              Chief United States Bankruptcy Judge