**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>THE ROMAN CATHOLIC DIOCESE OF<br>ROCKVILLE CENTRE, NEW YORK,<br><br>                    Debtor. | **FOR PUBLICATION**<br><br>Chapter 11<br><br>Case No. 20-12345 (MG) |

**MEMORANDUM OPINION SUSTAINING**
**THE DEBTOR'S NINTH OMNIBUS OBJECTION TO CLAIMS**

*A P P E A R A N C E S :*

JONES DAY
*Counsel for the Debtor*
250 Vesey Street, Floor 32
New York, NY 10281
By:    Todd Geremia, Esq.
          Corrinne Ball, Esq.
          Andrew Butler, Esq.
          Benjamin Rosenblum, Esq.

JEFF ANDERSON & ASSOCIATES, PA
*Counsel for Certain Claimants*
363 7th Avenue, Floor 12
New York, NY 10001
By:    Patrick Stoneking, Esq.

KETTERER BROWNE, & ASSOCIATES, LLC
*Counsel for Claimant No. 90526*
336 South Main Street, Suite 2A-C
Bel Air, MD 21014
By:    Derek T. Braslow, Esq.

LAW OFFICES OF MITCHELL GARABEDIAN
*Counsel for Certain Claimants*
100 State Street, Floor 6
Boston, MA 02109
By:    Mitchell Garabedian, Esq.

MARSH LAW FIRM PLLC
PFAU COCHRAN VERTETIS AMALA PLLC
*Counsel for Claimant No. 90154*
31 Hudson Yards, Floor 11
New York, NY 10001
By:    James R. Marsh, Esq.
        Jason P. Amala, Esq.

MERSON LAW, PLLC
*Counsel for Claimant No. 90183*
950 Third Avenue, Floor 18
New York, NY 10022
By:    Jordan K. Merson, Esq.

NOAKER LAW FIRM LLC
*Counsel for Claimant No. 20018*
1600 Utica Avenue South, Floor 9
St. Louis Park, MN 55416
By:    Patrick Noaker, Esq.

SHELLIST LAZARZ SLOBIN LLP
*Counsel for Claimant No. 90543*
11 Greenway Plaza, Suite 1515
Houston, TX 77046
By:    Dorian Vanderberg-Rodes, Esq.

SLATER SLATER SCHULMAN LLP
*Counsel for Certain Claimants*
445 Broad Hollow Road, Suite 419
Melville, NY 11747
By:    Stephanie Lannigan Bross, Esq.

**MARTIN GLENN**
**CHIEF UNITED STATES BANKRUPTCY JUDGE**

Pending before the Court is the Debtor's ninth omnibus claims objection (the

"Objection," ECF Doc. # 1744). The Debtor seeks to disallow thirteen proofs of claim[1] (each, a

"Claim," and collectively, the "Disputed Claims") because, the Debtor argues, the claims arise

from conduct that pre-dates the Diocese's formation as a religious corporation.

---

[1]    *See* "Schedule 1," Motion, Ex. A

The Debtor contends that the New York statute incorporating the Diocese ("Incorporating Statute[2]) established the Diocese on February 25, 1958 (the "Incorporation Date"). The Debtor asserts that it cannot be held liable for acts purportedly committed when the Debtor's territory belonged to its predecessor, the Diocese of Brooklyn. Responses (collectively, the "Responses") were filed on behalf of all claimants, many of whom argue that the Debtor existed in some form, albeit not as a religious corporation, as early as April 6, 1957.

The Debtor submitted a reply ("Reply," ECF Doc. # 1976). Following a hearing April 5, 2023 (the "Hearing"), the Debtor submitted the declaration of the Debtor's Chief Operating Officer and General Counsel, Thomas G. Renker ("Renker Decl.," ECF Doc. # 2029) stating that the Debtor did not assume any liabilities from the Diocese of Brooklyn.

For the reasons discussed herein, the Court: 1) **SUSTAINS** the Objection **WITH PREJUDICE** with respect to certain claimants and 2) **SUSTAINS** the Objection **WITH LEAVE TO AMEND** for certain claimants who allege conduct that purportedly occurred between April 6, 1957 and February 25, 1958.

## I.    BACKGROUND

### A.  Case Background

The Debtor commenced this bankruptcy case on October 1, 2020. (*See* ECF Doc. # 1.) On January 27, 2021, the Court entered the *Order Establishing Deadlines for Filing Proofs of Claim and Approving the Form and Manner of Notice Thereof* ("Bar Date Order," ECF Doc. # 333). Under the Bar Date Order, the Court set (a) March 30, 2021 as the deadline for each person or entity to file a proof of claim (the "General Bar Date"), and (b) August 14, 2021 at

---

[2]       1958 N.Y. SESS. LAWS Ch. 70 (1958), § 1, attached as Exhibit B to the Motion.

5:00 p.m. as the deadline for each individual holding a Sexual Abuse Claim[3] (each, a

"Claimant") to file a proof of such claim (the "Sexual Abuse Bar Date").  By subsequent order,

the Court established October 10, 2022 as a supplemental bar date for certain holders of Sexual

Abuse Claims that had their claims revived pursuant to the Adult Survivors Act (the "Adult

Survivors Sexual Abuse Bar Date").  (*See* ECF Doc. # 1262.)

### B.  Claims at Issue

The Debtor was established by the Vatican on April 6, 1957 from territory encompassing

Nassau and Suffolk Counties that was formerly part of the Diocese of Brooklyn.  The State of

New York established the Diocese as a religious corporation on February 25, 1958.  (*See*

Incorporating Statute.)  When the Debtor was established, it acquired various assets including

parishes, schools, camps, and other religious organizations that formerly belonged to the Diocese

of Brooklyn.  As discussed below, the distinction between when the Debtor was established by

the Vatican (April 6, 1957) and incorporated by New York (February 25, 19) is an important

issue for certain claims implicated by the Objection.

Each proof of claim form was filed by a Claimant alleges that they were sexually abused

by an adult ("abuser") that was employed by a religious institution, such as a parish, that

formerly belonged to the Diocese of Brooklyn and was acquired by the Debtor upon its creation.

Roughly half of the Claimants append civil complaints filed in New York state courts (the "State

Court Complaints") stating the same.  The claims at issue allege sexual abuse that occurred

before the Diocese was incorporated.

Of the thirteen Disputed Claims, nine allege conduct that occurred in 1956 or earlier,

*before* the Vatican established Debtor (the "Pre-Establishment Claims").  The Pre-Establishment

---

[3]      "Sexual Abuse Claim" has the same meaning as the term is defined in the Bar Date Order.

claims generally contend that the Debtor is liable for torts committed before the Debtor was established because the Debtor acquired the assets and liabilities of the religious institutions, operations, and personnel that transferred from the Diocese of Brooklyn to the newly established Diocese of Rockville Centre.

The remaining four claims allege conduct that occurred *after* the Vatican established the Debtor in 1957 but before the Debtor was incorporated in 1958 (the "Post-Establishment Claims"). The Post-Establishment Claims argue that the Debtor *did* exist for tort liability purposes during the period between its establishment by the Vatican and its incorporation under New York law.

### C. Claim Objection Procedures

On February 21, 2023, the Court entered the *Amended Order Approving Claim Objection Procedures and Granting Related Relief* (the "Claim Objection Procedures," ECF Doc. # 1679). The Claim Objection Procedures allow the Debtor to assert omnibus claim objections on the grounds set forth in Bankruptcy Rule 3007(d), which include that the claims are duplicates or have been amended, and on the grounds that the Debtor is not liable to the claimant for the amount or claim stated. (*See* Claims Objection Procedures § 3(a).)

The Claims Objection Procedures state that a non-evidentiary hearing to address whether a Contested Claim[4] has failed to state a claim against the Debtor and should be dismissed pursuant to Bankruptcy Rule 7012(b) is a "Sufficiency Hearing."[5] (*Id.* § 3(g)(iii).) The "legal

---

[4]   "Contested Claim" has the same meaning as that term is defined in the Claim Objection Procedures Order.

[5]   The Debtor may object to claims in accordance with the following Claim Objection Procedures:
. . . .

g) Orders and Hearings Procedures.

 i. If no Response to a claim objection is timely filed and served by the established deadline regarding

standard of review that will be applied by the Court at a Sufficiency Hearing will be equivalent

to the standard applied by the Court upon a motion to dismiss for failure to state a claim upon

---

any particular claim(s), the Debtor may submit a form of order sustaining the claim objection regarding such claim(s) without any further notice or hearing.

ii. The hearing to consider a claim objection as to which a Response is properly filed and served (each, a "Contested claim") shall be set for a contested hearing (each, a "claim Hearing") to be scheduled by the Debtor, in its discretion, as set forth herein. The Debtor shall schedule a claim Hearing for a Contested claim as follows:

iii. For a non-evidentiary hearing to address whether the Contested claim has failed to state a claim against the Debtor which can be allowed and should be dismissed pursuant to Bankruptcy Rule 7012(b) (a "Sufficiency Hearing"). Unless the Debtor serves the holder of the claim (the "claimant") with a Notice of Merits Hearing (as defined herein), the Sufficiency Hearing shall go forward at the return date set in accordance with (f)(i) above (or such other date as may be scheduled by the Debtor). The legal standard of review that will be applied by the Court at a Sufficiency Hearing will be equivalent to the standard applied by the Court upon a motion to dismiss for failure to state a claim upon which relief can be granted, in accordance with Bankruptcy Rule 7012(b).

iv. For an evidentiary hearing on the merits of a Contested claim (a "Merits Hearing"), the Debtor, in its discretion, may serve upon the relevant claimant (by email or overnight delivery) and file with the Court, a notice that the hearing will be a Merits Hearing (a "Notice of Merits Hearing") at least thirty (30) calendar days prior to the date of such Merits Hearing. The rules and procedures applicable to such Merits Hearing will be set forth in any scheduling order issued by the Court in connection therewith.

v. In advance of a Sufficiency Hearing and/or Merits Hearing, the Debtor and the claimant shall meet and confer with respect to the appropriate confidentiality procedures, if any, that shall govern the hearing on the matter.

vi. Discovery with respect to a Contested claim will not be permitted until either a) the Debtor has served the relevant claimant a Notice of Merits Hearing with respect to the Contested claim or b) further Court order.

vii. In advance of a Merits Hearing, the Debtor and the claimant shall meet and confer with respect to the appropriate discovery, if any, that shall govern the Merits Hearing on the matter.

viii. Given the number of claims, orders resolving claim objections could have inadvertent errors. If an order resolving a claim objection has such an error, the Court may enter an amended, corrected or replacement order about such claim without further notice or hearing, upon confirmation by the Debtor and the holder of the claim.

. . . .

(Claim Objection Procedures Order at 3-4.)

which relief can be granted, in accordance with Bankruptcy Rule 7012(b)." (*Id.*) This standard

of review is provided by Rule 12(b)(6) of the Federal Rules of Civil Procedure (the "Rule

12(b)(6) Standard"). *See* FED. R. CIV. PRO. 12(b)(6).[6]

### D. The Ninth Omnibus Objection

As indicated above, the Debtor asserts that it cannot be liable for acts that committed

before its inception as a religious corporation on February 25, 1958. All the claims challenged

by this Objection allege conduct occurring before that date. The Debtor argues that no claimant

properly alleges, either in the proofs of claim or State Court Complaint, where applicable, a basis

for holding the Diocese liable for conduct that pre-dates its existence.

The Objection states that in six of the Disputed Claims there is no allegation supporting

why the Debtor is liable for conduct that predated its existence[7]; in two of the Disputed Claims

the Debtor states that there is a conclusory, unsupported assertion that the "Liability of

Defendant Diocese of Brooklyn were transferred to, or assumed by, Defendant Diocese of

Rockville Centre"[8]; and in the remaining five Disputed Claims the claimant alleges only that the

Diocese of Brooklyn is liable.[9] (*Id.*)

Nothing in the statute indicates, expressly or impliedly, whether the Diocese of Rockville

Centre assumed any of the Diocese of Brooklyn's liabilities. (*Id.*) The Debtor argues that under

---

[6]     For a more extensive discussion of the application of the 12(b)(6) standard to the Debtor's Claim Objection
Procedures see *Memorandum Opinion Sustaining Debtor's Fifth Omnibus Objection to Claims ("Fifth Omnibus
Objection Opinion*," ECF Doc. # 2024 at 14–17. *See also Memorandum Opinion Sustaining in Part and Overruling
in Part Debtor's Eighth Omnibus Objection to Claims*, ECF Doc. # 2062 at 13–15.

[7]     Claim Nos. 90035, 90067, 90154, 90183, 90526, and 90543.

[8]     Claim Nos. 90009 and 90010.

[9]     Claim Nos. 20018, 90192, 90333, 90366 and 90402.

New York law, it cannot be held liable for the torts of its predecessor—the Diocese of Brooklyn.

(Objection ¶ 18.)

### E.  Responses to the Objection

The Claimants filed eight responses.  Responses (defined by the names of the filing firms

for ease of reference) on behalf of Pre-Establishment Claimants include:

- The Slater Slater Schulman LLP response ("Slater Response," ECF Doc. # 1885) for Claim Nos. 90035 and 90067 (each, a "Slater Claim").

- The Noaker Law Firm LLC response ("Noaker Response," ECF Doc. # 1887) for Claim No. 20018 (the "Noaker Claim")

- The Marsh Law Firm PLLC and Pfau Cochran Vertetis Amala PLLC response ("Marsh Response," ECF Doc. # 1905) for Claim No. 90154 (the "Marsh Claim").

- The Law Offices of Mitchell Garabedian response ("Garabedian Response," ECF Doc. # 1908) for Claim Nos. 90009 and 90010 (each, a "Garabedian Claim").

- The Ketterer Browne, & Associates, LLC response ("Ketterer Response," ECF Doc. # 1909) for Claim No. 90526 (the "Ketterer Claim").

Responses on behalf of Post-Establishment Claimants include:

- The Merson Law, PLLC response ("Merson Response," ECF Doc. # 1893) for Claim No. 90183 (the "Merson Claim").

- The Shellist Lazarz Slobin LLP response ("Shellist Response," ECF Doc. # 1907) for Claim No. 90543 (the "Shellist Claim").

One Response was filed on behalf of Pre- and Post-establishment claims:

- The Jeff Anderson & Associates response (the "Anderson Response," ECF Doc. # 1899) for Claim Nos. 90333 and 90402, which occurred pre-establishment (the "Anderson Pre-Establishment Claims")

- The Jeff Anderson & Associates response (the "Anderson Response," ECF Doc. # 1899) for Claim Nos. 90366 and 90192, which occurred post-establishment (the "Anderson Post-Establishment Claim").

The Responses make similar arguments, which are summarized below. The Pre-Establishment Claimants generally acknowledge that the default rule under New York law is that a successor corporation is not liable for the torts of its predecessors (*see, e.g.,* Ketterer Response ¶ 35.) They nonetheless argue that the Debtor has successor liability under two exceptions to this rule.

First, Claimants contend that the Debtor may have expressly or impliedly assumed the liabilities of the Diocese of Brooklyn when it acquired the parishes formerly under its control (the "Express/Implied Assumption Argument"). (*See, e.g.,* Ketterer Response ¶¶ 38–44.) Claimants argue that the Debtor impliedly assumed tort liabilities because it was unilaterally granted all properties, employees, clergy, operations, assets, and good will of the parishes, without any carveout of liability. (*Id.* ¶ 25–26 ("[T]he Debtor, in completely assuming all operations of the Roman Catholic Church within the defined geographic area and without making any payment or agreement to the Diocese of Brooklyn, impliedly assumed tort liabilities.").) The Express/Implied Assumption Argument is made by the Garabedian, Ketterer, Marsh, Merson, and Noaker Responses.

Second, Claimants argue that the *de facto* merger exception (discussed below) applies (the "*De Facto* Merger Argument"). In support of this argument, Claimants assert that the management and employees within the parishes likely continued uninterrupted when the Diocese took over the parishes from the Diocese of Brooklyn. (*See, e.g.,* Shellist Response ¶ 25.) The

*De Facto* Merger Argument is made by the Noaker, Shellist, Merson, Ketterer, and Garabedian Responses.

Finally, the Post-Establishment Claimants dispute the Debtor's statement that it was formed in 1958. These Claimants allege abuse occurring in 1957 and note that the Debtor itself has represented that it was established in 1957. (*See* Anderson Response ¶ 1 (asserting that the "Debtor has represented to the world for over sixty years that it was established on April 6, 1957").) Even if the Debtor does not have successor liability for torts that occurred at the parishes before 1957, the Claimants argue that the Debtor has successor liability for whatever form the Diocese took between its creation by the Vatican in 1957 and the Incorporating Statute. (*Id.*)

### F. Debtor's Reply

The Reply makes three primary arguments. First, the Debtor argues that it is both the Claimants' burden to allege successor liability and that Claimants failed to do so under federal pleading standards. (*Id.* ¶ 6.) Second, the Debtor contends that Claimants' argument that the *de facto* merger exception applies is not supported by the relevant case law. Finally, the Debtor frames the Claimants' dispute over when the Diocese was actually formed for liability purposes (1957 versus 1958) as an issue of Catholic Canon Law. (*Id.* ¶ 5.) Relying on this Court's comments in prior hearings and opinions, the Debtor asserts that the Court must accept the secular Incorporating Statute as the Debtor's creation date. (*Id.* ¶¶ 10–17; *see also id.* at 7 n. 7 (quoting transcript from the March 14, 2021 hearing).)

### G. The Renker Declaration

Following the Hearing and at the Court's request, the Debtor submitted the Renker Declaration. The declaration states that the Diocese did not assume any liabilities from the

Diocese of Brooklyn with respect to the parishes and all entities within the territory that formerly

belonged to the Diocese of Brooklyn. (Renker Decl. ¶ 3.) Renker is unaware of any agreement

between the two parties and asked the Debtor's Archivist and Chancellor to determine if any

such agreement existed. (*Id.*) Renker confirms that after searching the Debtor's records, there is

no agreement by which the Debtor assumed the liabilities of the Diocese of Brooklyn for the

entities it acquired. (*Id.*)

## II.    LEGAL STANDARD

### A. Allowance and Disallowance of a Claim

Section 502(a) provides that a claim or interest, properly filed, "is deemed allowed,

unless a party in interest . . . objects." 11 U.S.C. § 502(a). Under section 502(b)(1), claims may

be disallowed if they are "unenforceable against the debtor and property of the debtor, under any

agreement or applicable law." 11 U.S.C. § 502(b)(1). To determine whether a claim is

allowable by law, bankruptcy courts look to "applicable nonbankruptcy law." *In re W.R. Grace

& Co.*, 346 B.R. 672, 674 (Bankr. D. Del. 2006).

"The proof of claim, if filed in accordance with section 501 and the pertinent Bankruptcy

Rules, constitutes *prima facie* evidence of the validity and amount of the claim under Federal

Rule of Bankruptcy 3001(f) and Code section 502(a)." 4 COLLIER ON BANKRUPTCY ¶

502.02[3][f] (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2019). If the objector does not

"introduce[] evidence as to the invalidity of the claim or the excessiveness of its amount, the

claimant need offer no further proof of the merits of the claim." 4 COLLIER ON BANKRUPTCY ¶

502.02 (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2019).

"To overcome this *prima facie* evidence, an objecting party must come forth with

evidence which, if believed, would refute at least one of the allegations essential to the claim."

*Sherman v. Novak* (*In re Reilly*), 245 B.R. 768, 773 (2d Cir. B.A.P. 2000).  By producing

"evidence equal in force to the *prima facie* case," an objector can negate a claim's presumptive

legal validity, thereby shifting the burden back to the claimant to "prove by a preponderance of

the evidence that under applicable law the claim should be allowed."  *Creamer v. Motors*

*Liquidation Co. GUC Trust* (*In re Motors Liquidation Co.*), No. 12-CV-6074 (RJS), 2013 WL

5549643, at *3 (S.D.N.Y. Sept. 26, 2013) (internal quotation marks omitted).  The claimant must

assert a plausible basis for imposing a right to payment as an allowed claim.  *See In re*

*Residential Cap., LLC*, 531 B.R. 1, 12 (Bankr. S.D.N.Y.) ("Federal pleading standards apply

when assessing the validity of a proof of claim."), *on reconsideration in part*, 537 B.R. 161

(Bankr. S.D.N.Y. 2015); *In re MF Glob. Inc.*, No. 11-2790 (MG) SIPA, 2015 WL 1239102, at

*3 (Bankr. S.D.N.Y. Mar. 16, 2015) (same).

### B.  Evaluating Omnibus Objections Under the Rule 12(b)(6) Standard

As noted above, this Court's Fifth Omnibus Objection Opinion extensively discussed

how this Court applies the 12(b)(6) Standard to the Diocese's Claim Objection Procedures and

the Court presumes familiarity with the Court's approach.  Pursuant to those procedures, the

Hearing was a non-evidentiary Sufficiency Hearing to determine whether the Disputed Claims

failed to state a claim against the Debtor which can be allowed.  (*See* Claim Objections

Procedures § 3(g)(iii).)

Under Rule 12(b)(6), a party need only plead "a short and plain statement of the claim

with sufficient factual "heft to sho[w] that the pleader is entitled to relief."  *Bell Atl. Corp. v.*

*Twombly*, 550 U.S. 544, 557 (2007) (internal quotation omitted).  The pleading's "[f]actual

allegations must be enough to raise a right of relief above the speculative level," *id.* at 555, and

present claims that are "plausible on [their] face," *id.* at 570.  "The plausibility standard is not

akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant

has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).  The court

assumes that all factual allegations in the complaint are true and draws all reasonable inferences

in the plaintiff's favor. *EEOC v. Staten Island Sav. Bank,* 207 F.3d 144, 148 (2d Cir. 2000).

### C.  Successor Liability

The general rule in New York is that a successor is not responsible for the liabilities of its

predecessor. *See Schumacher v. Richards Shear Co.*, 451 N.E.2d 195, 198 (1983); *see also New*

*York v. Nat. Serv. Indus., Inc.*, 460 F.3d 201, 206 (2d Cir. 2006); *New York v. Town of*

*Clarkstown*, 95 F.Supp.3d 660, 682 (S.D.N.Y. 2015); *Douglas v. Stamco*, 363 F.App'x 100,

101–02 (2d Cir. 2010).

This general rule is subject to four exceptions where (i) a successor expressly or

impliedly assumed the predecessor's liabilities; (ii) there was a consolidation or "*de facto*"

merger of predecessor and successor; (iii) the successor corporation was a mere continuation of

its predecessor; or (iv) the transaction between successor and predecessor was entered into

fraudulently to escape obligations.  *See Town of Clarkstown*, 95 F. Supp. 3d at 682; *Douglas*,

363 F. App'x at 102.

A claimant must also plead a non-speculative basis for imposing successor liability

within the framework of these exceptions.  *See Town of Clarkstown*, 95 F. Supp. 3d at 683

(holding that plaintiffs "must, at the very least, set forth the basis for their conclusory claim that

successor liability is appropriate as to [defendant] before the Court may consider allowing

[plaintiffs] to engage in limited discovery on the issue").  "Because the 'general rule' is that a

purchaser of assets does not assume the predecessor's liability, it follows that the proponent of

successor liability must offer proof that one of the aforementioned exceptions to the general rule

13

applies." *Call Ctr. Techs., Inc. v. Grand Adventures Tour & Travel Pub. Corp.*, 635 F.3d 48, 52 (2d Cir. 2011).

### III.    <u>DISCUSSION</u>

The Court sustains the objection with prejudice with respect to most of the claimants. However, because the Diocese was formed by the Vatican before it was established as a religious corporation, the Court will allow certain claimants, discussed below, to amend their proofs of claim. The Court's analysis will proceed in the following manner. First, the Court finds that the First Amendment, and its intersection with canon law, is not a bar to the Court's ruling on this Objection. Second, the Court finds that the Objection must be sustained for Pre-Establishment Claims because the Diocese i) did not assume the prior liabilities and ii) the *de facto* merger exception does not apply. Finally, the Court finds that fairness requires allowing the Post-Establishment Claimants an opportunity to amend their claims.

### A.  Pre-Establishment Claims

The Pre-Establishment Claims allege conduct that occurred before the Debtor existed in any form. As a category, these claims allege conduct that occurred at institutions or by staff that, at the time the conduct purportedly occurred, belonged to the Diocese of Brooklyn. When the Debtor was created from the territory of the Diocese of Brooklyn, it acquired the institutions in question. Accordingly, the Debtor cannot have liability for these acts without imputing successor liability.

The general rule in New York is that a successor is not responsible for the liabilities of its predecessor. *See Schumacher*, 451 N.E.2d at 198. The general rule prohibiting successor

liability is a common law principle with four exceptions.[10]   The Debtor, as a successor

corporation to the Diocese of Brooklyn,[11] may be held liable for the torts of its predecessor if:

> (1) it expressly or impliedly assumed the predecessor's tort liability, (2)
> there was a consolidation or merger of seller and purchaser, (3) the
> purchasing corporation was a mere continuation of the selling corporation,
> or (4) the transaction is entered into fraudulently to escape such obligations.

*Schumacher*, 451 N.E.2d at 198.

It is well-settled under New York law that the burden to prove successor liability falls on

the party claiming that an exception to the general rule applies—here, the Claimants.  *Desclafani*

*v. Pave-Mark Corp.,* No. 07-CV-4639 (HBP), 2008 WL 3914881, at *3 (S.D.N.Y. Aug. 22,

2008) ("The party asserting successor liability has the burden of proving facts which bring the

case within one of these exceptions.") (quoting *Marenyi v. Packard Press Corp.,* 90-CV-4439

(CSH), 1994 WL 16000129 at *6 (S.D.N.Y. June 9, 1994)).

The Pre-Establishment Claimants principally argue that two of these exceptions—the

express/implicit assumption and/or *de facto* merger theories—apply.  Not a single proof of claim

---

[10]     *New York v. Nat'l Serv. Indus., Inc.*, 380 F. Supp. 2d 122, 128 (E.D.N.Y. 2005), *aff'd*, 460 F.3d 201 (2d
Cir. 2006) ("[U]nder traditional common law principles, a corporation acquiring the assets of another does not
succeed to the liabilities of the successor corporation . . . .").

[11]     Addressing the Ketterer Response's argument that the Debtor is not truly a "successor" to the Diocese of
Brooklyn (*see* Ketterer Response ¶ 26 (arguing that "the Diocese of Rockville Centre was not . . . a successor
corporation.  Debtor and the Diocese of Brooklyn are related parties, each created by the same entity."), New York
courts frequently conflate whether an entity is a successor corporation with whether successor liability exists.
Courts have held that the four *Schumacher* exceptions to the general rule are also the bases for finding that a
corporation is a successor corporation to begin with.  *See Beck v. Roper Whitney, Inc.,* 190 F. Supp. 2d 524, 531
(W.D.N.Y. 2001) (holding that "fulfillment of any one of the four exceptions is adequate to classify the
purchasing corporation as a successor corporation").
        Here, the Debtor did not acquire all of the assets of the Diocese of Brooklyn—only certain properties and
operation of entities (e.g., parishes, schools, and other institutions or programs) on those properties within a defined
territory carved out from the Diocese of Brooklyn.  The Court need not decide whether the Debtor is a successor
corporation because the Court reaches the same conclusion regardless.  If the Debtor is not a successor corporation,
the Claimants have provided no basis for imputing liability on the Debtor.  Alternatively, if the Debtor is a successor
corporation, the Court determines that the Debtor does not have successor liability.

or State Court Complaint sets forth a theory of successor liability.[12] Thus, in considering

allegations, the Court must rely entirely on those contained in the Responses.

 The Noaker Response presents a common argument made by Claimants in support of

express or implied liability.  The Noaker Response contends that the Noaker Claimant

successfully pled facts supporting express or implied assumption of liability by stating "on or

about 1957, the Diocese of Rockville Centre was formed from the geographical jurisdiction

and/or parishes and/or assets and/or liabilities of the Diocese of Brooklyn."  (Noaker Response ¶

26 (citing complaint appended to proof of claim).)  The Garabedian Response asserts a similar

basis for express or implied liability—that the claimants, in State Court Complaints, plead that

"[l]iabilities of the Diocese of Brooklyn were transferred to, or assumed by, Defendant Diocese

of Rockville Centre following the formation of the Diocese of Rockville Centre."  (Garabedian

Response ¶ 34.)  The Marsh Response misstates the law entirely, claiming that the burden of

proof is on the Debtor to prove the absence of its successor liability.  (Marsh Response ¶ 34

("[T]he Debtor misapplies New York law and puts the burden on the Survivor to prove that it

expressly or impliedly assumed the Diocese of Brooklyn's tort liability.").)  The Ketterer

Response offers no additional facts to support express or implied assumption of liability, and

instead relies entirely on the proposition that the proof of claim form assumes that the Claimant

alleges successor liability, and that the Debtor failed to refute it.  (Ketterer Response ¶ 38.)

 With respect to the *De Facto* Merger Argument, the Noaker Response again provides a

representative model of Claimants' allegations.  The Noaker Response states that the Noaker

---

[12] Some Claimants argue that the Debtor did not ask for theories of successor liability on its Claim Form and therefore it is not fair to objection to claims on the basis that no successor liability applies.  (*See* Noaker Response ¶ 19.)  True, the Claim Form did not require Claimants to plead facts in support of a successor liability theory. However, the Claimants needed to do so in a response to the Objection.  The Court will not permit discovery into the Debtor's documents on the theory, without a factual predicate, that documents might exist that explicitly transfer liabilities from the Diocese of Brooklyn to the Debtor.

Claimant alleges facts that support successor liability under the *de facto* merger doctrine because, in the State Court Complaint appended to the proof of claim form, the Claimant alleges "on or about 1957, the Diocese of Rockville Centre was formed from the geographical jurisdiction and/or parishes and/or assets and/or liabilities of the Diocese of Brooklyn." (Noaker Response ¶ 40.)

The Shellist Response provides the strongest argument in support of a *de facto* merger. The Shellist Response alleges that ownership and management continued from the Diocese of Brooklyn to the Diocese of Rockville Centre because both were member branches of the Roman Catholic Church, thus the diocesan entity operation in Nassau and Suffolk counties continued to operate under the same overarch corporate umbrella under different names. (Shellist Response ¶ 25.) The Shellist Response also argues that the Debtor assumed the liabilities of the Diocese of Brooklyn because it assumed "all operations of the Roman Catholic Church within the defined geographic area and without making any payment or agreement to the Diocese of Brooklyn." (*Id.* ¶ 26.)

### 1. Express or Implied Assumption of Liability

The Express/Implied Assumption Argument contends that the Debtor likely expressly or impliedly assumed the tort liability of the Diocese of Brooklyn via agreements containing transfers of assets and liabilities from the Diocese of Brooklyn to the Debtor. The Court disagrees. These Claimants assert that the details of rights and obligations transferred from the Diocese of Brooklyn to the Diocese of Rockville Centre are not and would not be in the Debtor's Incorporating Statute. (Slater Response ¶ 23.) The flaw with this argument is that the allegations amount to barebones statements of a legal conclusion, which is insufficient to state a claim for relief under the 12(b)(6) standard. *Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the

elements of a cause of action, supported by mere conclusory statements, do not suffice.")  The threadbare assertions in State Court Complaints provided by the Noaker and Garabedian Responses merely amount to legal conclusions regarding successor liability.  They do not allege facts.

The remainder of these Claimants' argument is that the Debtor's Incorporating Statute is insufficient to show that the Debtor did not assume the liabilities of its predecessor when it acquired the parishes.  (*See, e.g.,* Slater Response ¶ 22 ("[The Incorporating Statute] certainly does not conclusively resolve the allegations of the claims . . . since it does not detail the manner in which assets or liabilities were transferred between the [Diocese of Brooklyn] and the Debtor.").)  At the time the Claimants filed the Responses the Debtor's only proffered evidence was the Incorporating Statute, which at most establishes when the Debtor was created as a religious corporation under New York law.  The Incorporating Statute is silent about how, when, and the conditions pursuant to which assets formerly belonging to the Diocese of Brooklyn were transferred to the Diocese of Rockville Centre.

But this prong of the Express/Implied Assumption Argument is misguided.  Under both the law of succession liability and Rule 12(b)(6), it is the Claimants burden to plead liability and not the Debtor's burden to refute all possibility of liability.  *See Sherman*, 245 B.R. at 773; *see also Xue Ming Wang v. Abumi Sushi Inc.,* 262 F. Supp. 3d 81, 92 (S.D.N.Y. 2017) (explaining that "the party advocating for successor liability bears the burden of proof") (citation omitted).

Claimants have not met their burden.  The proofs of claim and State Court Complaints make no allegations whatsoever as to successor liability, let alone any of the exceptions providing for it.  In their Responses, the Claimants simply pointed to the insufficiency of the Debtor's Incorporating Statute but assert no facts to support an argument that that the Debtor

18

expressly or impliedly assumed liabilities of the Diocese of Brooklyn. (*See, e.g.,* Slater Response ¶ 44 ("The [Incorporating Statute] relied upon by the Debtor, does not 'refute' anything regarding whether the Debtor expressly or impliedly assumed the liabilities of the Diocese of Brooklyn for its operations in Nassau and Suffolk counties.").)

As the Hearing was not evidentiary, the Court did not expect Claimants to submit evidence *proving* successor liability. But to prevail at a Sufficiency Hearing, the Claimants needed to plead facts which, if true, provide a basis for explicit or implicit successor liability. *Twombly*, 550 U.S. at 558 (holding that a complaint is properly dismissed where "the allegations in [the] complaint, however true, could not raise a claim of entitlement to relief.")

The Claimants instead focused on the inadequacy of the Debtor's Incorporating Statute and hypothesize that agreements must exist that more clearly delineate the Debtor's assumption of assets and/or liabilities from the Diocese of Brooklyn, but that argument alone does not support express or implied assumption of liability. *See Town of Clarkstown*, 95 F. Supp. 3d at 683; *see also Andres v. Town of Wheatfield*, No. 1:17-CV-0377, 2020 WL 7764833, at *11 (W.D.N.Y. 2020) ("Plaintiffs' argument that '(a)ny dispute about successor liability would require a fact-intensive inquiry,' is unavailing because even where successor liability is difficult to determine, Plaintiffs must still properly allege a nonspeculative basis for liability." (internal citation omitted)).

To give the Court additional comfort that the liabilities were not explicitly assumed, the Court asked the Debtor to search its records and to file a declaration attesting that it did not enter into any agreement to assume the liabilities of the Diocese of Brooklyn. Following the Hearing, the Debtor submitted the Renker Declaration which attests that there is no agreement by which the Debtor assumed the liabilities of the Diocese of Brooklyn for the entities it acquired.

(Renker Decl. ¶ 3.)  The Court accepts Renker's statements and concludes that there was no

explicit transfer of liabilities from the Diocese of Brooklyn to the Debtor when the Debtor

acquired assets formerly belonging to the Diocese of Brooklyn.  Even if this were a Merits

Hearing that required the Debtor to refute an essential element of the Claim with evidence, the

Debtor has done so with the Renker Declaration.

### 2. *De Facto* Merger

Certain Claimants contend that the *de facto* merger exception to the general rule

prohibiting successor liability applies.  The Court disagrees.  New York courts consider the

following factors in determining whether a *de facto* merger has occurred:

> (1) continuity of ownership; (2) a cessation of ordinary business and
> dissolution of the predecessor as soon as practically and legally possible;
> (3) assumption by the successor of the liabilities ordinarily necessary for the
> uninterrupted continuation of the business of the predecessor; and (4) a
> continuity of management, personnel, physical location, assets, and general
> business operation.

*Sweatland v. Park Corp.,* 181 A.D.2d 243, 245–46.  "Not all of these factors are needed to

demonstrate a merger; rather, these factors are only indicators that tend to show a de facto

merger."  *Id.* at 246 (internal citation and quotation omitted).

New York courts apply a more flexible approach to the continuity of ownership factor for

non-profit corporations such as the Diocese.  *See Dutton v. Young Men's Christian Ass'n of*

*Buffalo Niagara*, 207 A.D.3d 1038, 1040, 1043, *leave to appeal denied,* 210 A.D.3d 1456,

(2022) (stating that "with respect to the continuity of ownership factor, '[s]ince, unlike for-profit

corporations, nonprofits do not have owners, . . . continuity of ownership is not a sine qua non of

de facto merger of nonprofits.'") (internal citation omitted).  *See Ring v. Elizabeth Foundation*

*for Arts*, 136 A.D.3d 525, 527 (1st Dept 2016).

Again, the Noaker Claimant pleads no allegations in support of the *De Facto* Merger

Argument.  After reciting conclusory assertions that the Debtor was formed from the assets and

liabilities of the Diocese of Brooklyn and that the relevant parish and abuser transferred from one

diocese to the other, the Noaker Response simply concludes: "[t]hese facts can provide the

foundation for successor liability of the Debtor under the doctrine de facto merger.  For this

reason, Debtor's Objection must be denied." (*Id.* ¶ 41.)  The Court disagrees.  The Noaker

Response has done nothing more than assert that a parish and abuser transferred from the

Diocese of Brooklyn to the Diocese of Rockville Centre.

Though not clear which of the *Sweatland* factors the Noaker Claimant implicates, the

Court assumes that it is the "continuity of management, personnel, physical location, assets, and

general business operation" prong.  But the Noaker Response merely asserts that a single parish

and abuser were transferred, not the broad transfer of substantially all management, personnel,

physical location, assets, and general business operations.

The Shellist Response introduces a somewhat novel theory, which is that the first and

fourth *Sweatland* factors—continuity of ownership and of management, personnel, physical

location, assets, and general business operation—are satisfied because the ownership, operations,

and management of the parishes and other religious institutions in that territory continued

unchanged as branches of the Roman Catholic Church.  (Shellist Response ¶ 25.)  Put

differently, the Shellist Response argues that it is the Roman Catholic Church, not either diocese,

that is the constant corporate entity underlying the transfer of assets and liabilities from one

diocese to another.  (*Id.*)  This argument fails because the Shellist Response provides no basis for

the proposition that the Roman Catholic Church, as a global entity, is recognized as a corporation

in New York.

Applying the 12(b)(6) standard, the Shellist Response does not plead sufficient facts which, if true, weigh in favor of finding a *de facto* merger here. The response raises a novel argument framing the Roman Catholic Church as the corporation that continued from one predecessor corporation to the next, under different names, but fails to plead facts which support a finding that the Roman Catholic Church is the overarching *corporate* entity and that the dioceses of Brooklyn and Rockville Centre are merely branches thereof.

Additionally, the Shellist Response draws a legal conclusion—that the Debtor impliedly acquired liabilities from the Diocese of Brooklyn—because it acquired, purportedly without payment, the assets and operations of religious institutions from the Diocese of Brooklyn. But the response pleads no facts which demonstrate *why* the response draws this conclusion.

In sum, the proofs of claim and State Court Complaints fail to make any allegations regarding successor liability. The additional allegations made in responses indicate that the Claimants would not be able to cure these deficiencies if given an opportunity to amend their claims. For the reasons set forth above, the Objection is **SUSTAINED WITH PREJUDICE** with respect to the Pre-Establishment Claims.

### B. Post-Establishment Claims

#### 1. The Role of Canon Law in Establishing the Debtor for Tort Liability Purposes

The parties dispute when the Diocese was created for the purpose of the Debtor's tort liability. The Debtor states that the Incorporating Statute, dated February 25, 1958, marks the beginning of its existence. The Post-Establishment Claimants assert that the Debtor was established as early as April 6, 1957. (*See, e.g.,* Anderson Response.) The Claimants state that the Debtor was created by the Vatican or "carved out of, or in the language of the Vatican, 'separated' from" the Diocese of Brooklyn. (Ketterer Response ¶ 26.) The Debtor frames the Claimants' position as an argument rooted in Catholic Canon Law and argues that these attempts

22

at deciphering what "separated" means under canon law and the Vatican's perspective are prohibited by the First Amendment.  (Reply ¶ 11.)

The Court disagrees with the Debtor that when the Diocese was established for the secular purpose of tort liability is necessarily an issue of Catholic Canon Law.  The Debtor's own filings in this case represent that the Debtor was established in 1957.  (*See, e.g.,* ECF Doc. # 25 at 7, ("From at least 1957, when the Diocese was formed . . ."); ECF Doc. # 3 at 5 ("The Diocese was established by the Vatican in 1957 from territory that was formerly part of the Diocese of Brooklyn.").)[13]  This Court's prior comments regarding the constitutional prohibition on deciding issues of Catholic Canon Law relied on clear precedent[14] preventing courts from deciding *disputes between parties* on interpretations of canon law.  *See, e.g.*, March 14, 2023 Hr'g Tr. at 100:5–10 (stating that "one thing I want to be crystal clear about is the Establishment Clause of the First Amendment . . . does not permit me to interpret canon law or decide this on the basis of canon law . . . [T]his is going to be resolved on the basis on New York state law").

For example, the Court has noted that it cannot resolve a dispute between the Diocese and Claimants over what canon law says about the Diocese's control of other religious orders.[15]  But here this dispute does not require the Court to decide the Diocese's incorporation date by choosing between two different interpretations of canon law.  This dispute stems not from canon law but from the Debtor's own inconsistent statements in this case.  Thus, the Court finds it is

---

[13]    The Diocese's website states that "The Diocese of Rockville Centre was formed from the Diocese of Brooklyn in 1957."  History, THE ROMAN CATHOLIC DIOCESE OF ROCKVILLE CENTRE (https://drvc.org/history) (last accessed Apr. 3, 2023).

[14]    *See Martinelli v. Bridgeport Roman Catholic Diocesan Corp.,* 196 F.3d 409, 431 (2d Cir.1999).

[15]    *See* March 14, 2023 H'rg Tr. at 100:1-8 (noting that if there was an issue over what control the Bishop had over a Franciscan priest, the Court could not resolve that dispute by looking to canon law).

not prohibited from addressing questions regarding the Diocese's creation merely because the Diocese is a creature of canon law.

Even if determining the Debtor's establishment for tort liability did require an interpretation of canon law, the Court finds it is not necessary at this juncture for the Court to determine when the Vatican formally established the Debtor nor when the Diocese of Rockville Centre came into existence because the Post-Establishment Claims do not adequately plead a basis for Debtor's liability based on conduct that occurred when the Diocese of Rockville Centre was a pre-incorporation entity.

### 2. The Post-Establishment Claims

Assuming, *arguendo*, that the Diocese was established as a pre-incorporation religious organization by the Vatican on the earliest date suggested by Claimants—April 6, 1957—the Pre-Establishment Claims allege conduct that falls during the time period where the Debtor existed in some form, albeit not as a religious corporation under New York law. The Merson Claim alleges conduct that began in September 1956 and ended in July 1957, and an Amerson Post-Establishment Claim alleges conduct spanning from 1954 to 1957 (*see* Claim No. 90366). Another Amerson Post-Establishment Claim alleges conduct that occurred in either 1956 or 1957. The Shellist Claim alleges conduct that occurred during the summer of 1957—entirely after April 6, 1957.

*Hwang v. Grace Rd. Church (in New York)* provides a helpful framework to address these Claimants' argument. *See generally* No. 14-CV-7187 (KAM) (RML), 2016 WL 1060247, at *10–12 (E.D.N.Y. Mar. 14, 2016). New York Courts generally interpret the state's religious corporation law to automatically transfer assets of the pre-incorporation religious entity to the resulting religious corporation. *See Hwang* at 10 (listing cases). But the court noted that "[t]he

24

determination that a religious corporation assumes the assets of the pre-incorporation religious entity, however, does not resolve the more decisive question of whether the religious corporation also assumes the liabilities of the earlier entity." *Id.*

Non-profit corporation law applies where New York's religious corporation law is silent, as it is to this question. *See id.* (citing N.Y. Relig. Corp. Law § 2-b(1)(a) (providing that "not-for-profit corporation law applies to every corporation to which this chapter applies" except where the two bodies of law conflict)). None of the Claimants argue that applicable not-for-profit corporation law creates liability for the Debtor in these circumstances, nor does it appear that such an argument would succeed.[16] Under the Rule 12(b)(6) standard, Claimants have plead no facts whatsoever to support the transfer of liability from the Diocese as a pre-incorporation entity to its current religious corporate form.

Nonetheless, in consideration of fairness and particularly because the Debtor itself has provided conflicting representations of when it was established in its own filings in this case, the Court finds that the Post-Establishment Claimants should be granted leave to amend their claims. These Claimants may amend their claims to incorporate arguments consistent with the guidance provided in this section of the opinion—i.e., that relevant non-profit law creates liability for the Diocese of Rockville Centre's pre-incorporation entity which carries over to the Debtor as a religious corporation.

---

[16]    For example, Claimants could argue that promoter liability, which imputes liability to a corporation for pre-incorporation acts committed by its promoters, applies. However, a corporation is generally "not liable for the torts of its promoters" (*Gianino v. Panacya, Inc.*, No. 00-CV-1584, 2000 WL 1224810, at *7 (S.D.N.Y. Aug. 29, 2000), unless the corporation knowingly accepts benefits of (or otherwise ratifies) a promoter's contractual agreement or tortious conduct." *Hwang*, 2016 WL 1060247, at *9 (internal citations omitted). Here, even if the Court determined that the alleged abusers acted as the Debtor's promoters, it cannot be said that the Debtor knowingly accepted the benefits of or ratified the tortious conduct of those individuals.

25

## IV.    CONCLUSION

For the reasons explained above, the Objection is **SUSTAINED WITH PREJUDICE** with respect to the Pre-Establishment Claims.  It is **ORDERED** that these claims be expunged. The Objection is **SUSTAINED WITH LEAVE TO AMEND** with respect to the Post-Establishment Claims.  These claimants may amend their claims to plead facts which would allege liability consistent with the applicable law discussed in this Memorandum Opinion. Within seven (7) days from the date of this Order, counsel for the Debtor, the Committee, and the Claimants shall confer and submit any order required to grant the relief requested in the Objection consistent with the terms of this Opinion.  The Court will enter a separate order scheduling a case conference.

Dated:    May 26, 2023
          New York, New York

_Martin Glenn_____
MARTIN GLENN
Chief United States Bankruptcy Judge

26