**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>THE ROMAN CATHOLIC DIOCESE OF<br>ROCKVILLE CENTRE, NEW YORK,<br><br>       Debtor. | <u>**FOR PUBLICATION**</u><br><br>Chapter 11<br><br>Case No. 20-12345 (MG) |

### MEMORANDUM OPINION AND ORDER SUSTAINING THE DEBTOR'S SIXTH OMNIBUS OBJECTION TO CLAIMS

*A P P E A R A N C E S :*

JONES DAY
*Counsel for the Debtor*
250 Vesey Street, Floor 32
New York, NY 10281
By: Todd Geremia, Esq.
   Corrinne Ball, Esq.
   Andrew Butler, Esq.
   Benjamin Rosenblum, Esq.

HERMAN LAW
*Counsel for Certain Claimant(s)*
225 West 34th Street, Floor 9
New York, NY 10122
By: Stuart S. Mermelstein, Esq.
   Andrew Silvershein, Esq.

JEFF ANDERSON & ASSOCIATES, PA
*Counsel for Certain Claimant(s)*
363 7th Avenue, Floor 12
New York, NY 10001
By: Patrick Stoneking, Esq.

MATTHEWS & ASSOCIATES
*Counsel for Certain Claimant(s)*
2905 Sackett Street
Houston, TX 77098
By: Marla Briscoe, Esq.

SIMMONS HANLY CONROY LLC
*Counsel for Certain Claimant(s)*
112 Madison Avenue, Floor 7
New York, NY 10016
By:   Richard Lee Kroger, Esq.
       William Gordon, Esq.

SWEENEY, REICH & BOLZ, LLP
*Counsel for Certain Claimant(s)*
1981 Marcus Avenue, Suite 200
Lake Success, NY 11042
By:   Michael H. Reich, Esq.

LAW OFFICES OF MICHAEL G. DOWD
*Counsel for Certain Claimant(s)*
1981 Marcus Avenue, Suite 200
Lake Success, NY 11042
By:   Michael G. Dowd, Esq.

MERSON LAW, PLLC
*Counsel for Certain Claimant(s)*
950 Third Avenue, 18th Floor
New York, NY 10022
By:   Jordan K. Merson, Esq.
       Sarah R. Cantos, Esq.
       Alice A. Bohn, Esq.

SLATER SCHULMAN LLP
*Counsel for Certain Claimant(s)*
445 Broad Hollow Road, Suite 419
Melville, NY 11747
By:   Stephanie Lannigan Bross, Esq.

THOMAS COUNSELOR AT LAW, LLC
*Counsel for Certain Claimant(s)*
One World Trade Center, Floor 85
New York, NY 10007
By:   Kathleen R. Thomas, Esq.

**MARTIN GLENN**
**CHIEF UNITED STATES BANKRUPTCY JUDGE**

Pending before the Court is the sixth omnibus claims objection (the "Objection," ECF

Doc. # 1677) of the above-captioned debtor (the "Debtor" or the "Diocese"). The Objection

seeks to disallow and expunge claims for sexual abuse that occurred at religious institutions

2

within the bounds of the Debtor's geographical diocesan territory, but that the Debtor contends were exclusively controlled by separate religious order entities.

This Objection picks up with issues left open in the Court's *Memorandum Opinion Sustaining Debtor's Fifth Omnibus Objection to Claims.  See In re Roman Cath. Diocese of Rockville Ctr., New York ("Fifth Omnibus Opinion")*, No. 20-12345 (MG), 2023 WL 2993304 (Bankr. S.D.N.Y. Apr. 19, 2023).  In that opinion, the Court sustained the Debtor's Fifth Omnibus Objection to claims for sexual abuse that occurred at religious institutions located within the geographical diocesan territory of the Brooklyn and New York Dioceses.  Because those religious institutions were outside the geographical diocesan territory of the Debtor (i.e., the Rockville Centre Diocese), the Court found that Debtor's alleged "control" over the institutions or abusers—a central issue in any claims against the Debtor—was simply not plausible. *Id.* at *12–13.  That opinion left open the issue whether claims against the Debtor should survive where the Debtor disclaims having any control over the abuser or religious institution where the abuse occurred, but the religious institution is nevertheless located *within* the Debtor's diocesan territory.[1]  As explained below, the Court concludes that the claims here fail to adequately allege that the Debtor had control over the respective abusers or religious institutions at issue for each claim, notwithstanding the fact that those religious institutions are located within the Debtor's diocesan territory.

---

[1]        The Court stated the following in the *Fifth Omnibus Opinion*:

> . . . .  To be clear, in sustaining the Fifth Omnibus Objection, the Court is *not* resolving the issues raised by the Sixth Omnibus Objection, whether the claims against the Debtor should survive a Rule 12(b)(6) standard where the alleged abuse occurred at a location *within* the Diocese of Rockville Center at a facility operated by a religious order . . . .

*Id.* at *11 n.14.

In this Objection, the Debtor specifically seeks entry of an order disallowing 39 proofs of claim[2] (each, a "Claim" and collectively, the "Disputed Claims"). The Debtor contends that disallowance is warranted because the abuse alleged in the Disputed Claims occurred at institutions including: (i) schools, a retreat center, a group home, and a family services provider that are not Diocesan institutions and are operated and controlled by independent religious orders that are separate from and not affiliated with the Debtor; and (ii) an orphanage and family services provider that is purportedly headquartered in Brooklyn, operates a campus in Wading River, on Long Island, and is not affiliated with the Debtor, is not operated or controlled by the Debtor, and is a ministry of the Diocese of Brooklyn.

In support of its Objection, the Debtor submitted the declaration of Thomas G. Renker, the Debtor's Chief Operating Officer and General Counsel. ("Renker Declaration," ECF Doc. # 1678.) Attached as exhibits to the Renker Declaration are property records and articles or certificates of incorporation for the institutions where the alleged abuse occurred (each, an "Exhibit," and collectively, the "Renker Exhibits").

Responses were filed on behalf of 38 of the 39 claimants, as further detailed herein. Those responses were filed by a total of eight different law firms; certain firms that represent multiple claimants jointly submitted responses on behalf of all claimants, while other firms submitted separate responses for different claimant(s). The Debtor submitted a reply ("Reply," ECF Doc. # 1847) and supplemental declaration of Thomas G. Renker (the "Supplemental Renker Declaration," ECF Doc. # 1848).

For the reasons discussed below, the Court **SUSTAINS** the Objection. With respect to the 38 claims for which a response was filed, the Objection is **SUSTAINED WITHOUT**

---

[2]    Claim No. 90508, which alleged abuse occurring at St. Dominic's Catholic School & Group Home, was withdrawn. (*See* ECF Doc. # 1793).

**PREJUDICE**. With respect to the remaining claim (Claim No. 20048), the Objection is **SUSTAINED WITH PREJUDICE**.

## I.    BACKGROUND

### A.  Case Background and Bar Date for Claims

The Debtor commenced this bankruptcy case on October 1, 2020. (*See* ECF Doc. # 1.) On October 9, 2020, the Debtor filed its schedules of assets and liabilities and statements of financial affairs (ECF Doc. ## 57, 58), which were thereafter amended. (*See* ECF Doc. ## 209, 635, 977, 1649.) On January 27, 2021, the Court entered the *Order Establishing Deadlines for Filing Proofs of Claim and Approving the Form and Manner of Notice Thereof* ("Bar Date Order," ECF Doc. # 333). Under the Bar Date Order, the Court set (a) March 30, 2021 as the deadline for each person or entity to file a proof of claim (the "General Bar Date"), and (b) August 14, 2021 at 5:00 p.m. as the deadline for each individual holding a Sexual Abuse Claim[3] (each, a "Claimant") to file a proof of such claim (the "Sexual Abuse Bar Date"). By subsequent order, the Court established October 10, 2022 as a supplemental bar date for certain holders of Sexual Abuse Claims that had their claims revived pursuant to the Adult Survivors Act (the "Adult Survivors Sexual Abuse Bar Date"). (*See* ECF Doc. # 1262.)

### B.  The Claims at Issue

This omnibus objection is directed at 39 proofs of claim that were filed in the bankruptcy case pursuant to the bar date orders. Each proof of claim form was filed by a claimant that alleges they attended one of the following religious institutions: (1) Chaminade High School ("Chaminade"); (2) Coindre Hall School ("Coindre Hall"); (3) La Salle Military Academy ("La Salle"); (4) St. Ignatius Retreat House ("St. Ignatius"); (5) St. Mary of Angels Home ("St. Mary"); (6) Cormaria Retreat Center ("Cormaria"); (7) St. Dominic's Group Home ("St.

---

[3]    "Sexual Abuse Claim" has the same meaning as the term is defined in the Bar Date Order.

Dominic's"); and (8) Little Flower Children and Family Services ("Little Flower," and together

with Chaminade, Coindre Hall, La Salle, Cormaria, St. Dominic's, and St. Mary, the "Religious

Institutions").

With respect to the first seven Religious Institutions, the Debtor contends that they are

not Diocesan institutions, and that they are operated and controlled by independent religious

orders ("Religious Orders")[4] that are separate from and not affiliated with the Debtor.  With

respect to Little Flower, the Debtor contends that it is an orphanage and family services provider

that is headquartered in Brooklyn and is a ministry of the Diocese of Brooklyn, and is not

affiliated with, operated, or controlled by, the Debtor, despite operating a campus in Wading

River, on Long Island.

Each Claimant alleges that they were sexually abused by an adult ("abuser") that was

staffed at the Religious Institutions they attended.  While each of the Claimants recognizes that

the Religious Institutions in question are separate entities from the Debtor, the Claimants

generally assert that the Debtor is liable in tort for the abuse given its relationship with the

abusers, Religious Institutions, or Religious Orders.  In critical part, this liability allegedly stems

from the fact that the Religious Institutions are located within the Debtor's diocesan territory.

Each claimant detailed the abuse suffered in a proof of claim form created by the Debtor

and submitted in this case.  As further discussed *infra*, some claimants also attached to their

claims civil complaints filed in New York State court which relate to the same incidents of

abuse.

---

[4]    The specific Religious Orders and the Religious Institutions they allegedly control are as follows, according to Debtor: (1) Society of Mary (Marianists)—Chaminade; (2) Brothers of the Sacred Heart—Coindre; (3) Christian Brothers—La Salle; (4) Society of Jesus (Jesuits)—St. Ignatius; (5) Convent of the Sisters of Mercy, in Brooklyn—St. Mary; (6) Religious of the Sacred Heart of Mary—Cormaria; and (7) Dominican Sisters of Blauvelt—St. Dominic's.

### C. Claim Objection Procedures

On January 10, 2023, the Court entered the *Order Approving Claim Objection*

*Procedures and Granting Related Relief* (the "Claim Objection Procedures," ECF Doc. # 1554).[5]

The Claim Objection Procedures allow the Debtor to assert omnibus claim objections on the

grounds set forth in Bankruptcy Rule 3007(d), which include that the claims are duplicates, have

been amended, or that the Debtor is not liable to the claimant for the amount or claim stated.

(*See* Claims Objection Procedures § 3(a).)  As further detailed herein, the Claim Objection

Procedures also provide a procedure allowing the Debtor to contest whether a claim has stated a

claim under Bankruptcy Rule 7012(b) at a non-evidentiary hearing, and dismissal of the claim if

it fails state a claim for relief.  (*See id.* ¶ 3(g)(iii).)

### D. Fifth Omnibus Objection

The Debtor filed the Sixth Omnibus Objection less than two weeks after filing the Fifth

Omnibus Objection, which sought the disallowance of a different set of claims on an argument

similar to the one presented here.

As prefaced above, the Fifth Omnibus Objection sought disallowance of claims for abuse

that had occurred at Catholic high schools and parishes or parish schools that were purportedly

not supervised, controlled, managed, or directed by the Debtor.  Importantly, all of the

institutions in question where the abuse occurred were outside the Debtor's diocesan territory,

and within the territory of two other Dioceses.  *See Fifth Omnibus Opinion*, 2023 WL 2993304,

at *1.  The Court issued the *Fifth Omnibus Opinion* on April 19, 2023, sustaining the Debtor's

Fifth Omnibus Objection to the claims at issue.  *See id.*

---

[5]    These were the operative Claim Objection Procedures in place at the time the instant Objection was filed,
and thus the ones that are controlling here.  For clarity, however, the Court notes that on February 21, 2023, it
entered the *Amended Order Approving Claim Objection Procedures and Granting Related Relief* (the "Amended
Claim Objection Procedures," ECF Doc. # 1679).  In any event, the Amended Claim Objection Procedures are
identical to the operative Claim Objection Procedures for present purposes, and the entry of the former while the
Objection was pending does not alter the outcome here in any way.

The *Fifth Omnibus Opinion* included three conclusions that are again relevant here.  First, the Court concluded that in order to adequately assert state law tort claims, the claimants were required to plead that the Debtor had some control over the abusers or religious institutions where the abuse occurred.  *See id.* at *10–11.  Second, the Court concluded that the claimants were required to meet the federal, as opposed to state, pleading standard under the Claim Objection Procedures.  *See id.* at *7.  Third and finally, the Court concluded that because the abusers and institutions were outside of the Debtor's diocesan territory, the allegations of the Debtor's control over the abusers and institutions failed to meet the federal pleading standard, which requires plausible and non-conclusory factual allegations that support a claim for relief.  *See id.* at *12–13.

### E.  The Debtor's Objection

The Objection requests that the Court disallow and expunge each of the Disputed Claims because the Debtor contends that neither the abusers nor the Religious Institutions in question were supervised, controlled, managed, or directed by the Debtor, despite the Religious Institutions' location within its diocesan territory.  (Objection ¶ 17.)  The Debtor contends that these claims may not be asserted under straightforward principles of New York law because the Diocese lacked the duty to control the alleged abusers.  (*Id.* ¶¶ 18–19.)

The Debtor represents that all of the Religious Institutions are distinct entities that are not controlled by the Debtor.  The Debtor further contends that such Religious Institutions, if controlled by any other party, are exclusively controlled and operated by Religious Orders that are not controlled by the Debtor.  (*Id.* ¶ 22.)  The Debtor states that the alleged abusers are either members of these Religious Orders, non-Diocesan clerics, or employees or agents associated with the institutions run by these religious orders.  (*Id.*)  The Debtor submits that the accused abusers are not Diocesan clerics, employees, or agents, and the institutions with which the

abusers are allegedly affiliated are neither controlled by nor subject to supervisory authority of the Debtor.  (*Id.* ¶¶ 22–23.)

Furthermore, the Debtor asserts that Little Flower is affiliated with a separately incorporated institution with its headquarters in Brooklyn, New York.  (*Id.* ¶ 24 (citing Renker Decl. ¶¶ 27–28, Exs. 6–7).)  The Debtor submits that Little Flower is not affiliated with the Debtor and is a ministry of the Diocese of Brooklyn, and the alleged abusers are either lay persons or diocesan priests associated with the Diocese of Brooklyn, not the Diocese of Rockville Centre.  (*Id.* ¶ 24.)  The Debtor argues that it should not be held responsible for abuse that occurred at, or under the alleged control of, a separately incorporated entity with which the Debtor has no affiliation, over which it has no supervisory authority, and where the Debtor had no control over the alleged abusers.  (*Id.*)

In support of the Objection, the Debtor submitted the declaration of Thomas G. Renker, the Debtor's Chief Operating Officer and General Counsel.  (*See* Renker Decl.)  The Renker Declaration offers two sources of supporting evidence.  First, it offers the statements of Mr. Renker himself, who avers that:

> The Diocese did not, and does not, manage, supervise, control, direct, or operate the Subject Institutions, as addressed below on an institution-by-institution basis.  The Diocese did not appoint, hire, employ, train, control, or supervise the members of the religious orders, lay employees, or others who are alleged abusers in their work at these Subject Institutions

(Renker Decl. ¶ 6.)

Second, the Renker Declaration attaches property records and articles or certificates of incorporation for the entities where the alleged abuse occurred (each, an "Exhibit," and collectively, the "Renker Exhibits").  According to Debtor, the property records show that the Religious Institutions in question are not owned by the Debtor, and in many cases are owned by the Religious Orders that they contend are actually in control of the institutions.  The Debtor also

relies on its Schedule of Assets and Liabilities,[6] publicly disclosed in this bankruptcy case, to affirm that the Debtor does not own the real property where the Subject Institutions operated. (*Id.*)  Further, the Debtor contends that its lack of inclusion in the organizational documents for the Religious Institutions shows that it does not control those entities.

### F.  Responses

Responses were filed on behalf of 38 of the 39 claimants.  Those responses were filed by a total of eight different law firms; certain firms that represent multiple claimants jointly submitted responses on behalf of all claimants, while other firms submitted separate responses on behalf of different claimant(s).  Those responses (defined by the names of the filing firms for ease of reference) and the claims they represent are:

1. The Anderson Response (ECF Doc. # 1799), filed on behalf of Claim Nos. 90310, 90321, 90363, 90191, 90215, 90403, 90301, 90214 (the "Anderson Claims").

2. The Dowd Response (ECF Doc. # 1807), filed on behalf of Claim Nos. 90283, 90247, 90255 (the "Dowd Claims").

3. The Simmons Response (ECF Doc. # 1812), filed on behalf of Claim No. 90130 (the "Simmons Claim").

4. The First Merson Response (ECF Doc. # 1796) filed on behalf of Claim Nos. 90430 and 90447, and the Second Merson Response (ECF Doc. # 1810) filed on behalf of Claim No. 90424 (together with Claim Nos. 90430 and 90447, the "Merson Claims").

5. The Thomas Response (ECF Doc. # 1781), filed on behalf of Claim No. 90483 (the "Thomas Claim").

6. The Matthews Response (ECF Doc. # 1811), filed on behalf of Claim No. 90465 (the "Matthews Claim").

7. The Slater Response (ECF Doc. # 1794), filed on behalf of Claim Nos. 90036, 90456, 90455, 90454, 90450, 90451 , 90452, 90453, 90522, 90083, 90021 , 90166, 90023 (the "Slater Claims").

8. The Herman Responses (ECF Doc. ## 1795, 1798, 1800, 1801, 1802, 1805, 1808) filed on behalf of Claim Nos. 90494, 90358, 90413, 90261, 90379, 90380, and 90429, respectively (the "Herman Claims").

---

[6]    *See* ECF Doc. ## 57, 299, 1649, Schedule A/B, Part 9, Question 55 & associated rider.

The Anderson, Dowd, Simmons, and Merson Claimants attached civil complaints that were filed in New York State court by the respective claimants relating to the same incidents of abuse that form the basis of their claims in the bankruptcy case.  The remainder of claimants, i.e., the Thomas, Matthews, Slater, and Herman Claimants, only submitted the proof of claim form.  As such, the former fifteen claims/claimants will be referred to *infra* as the "Complaint Claims/Claimants," while the remaining claims/claimants will be referred to as the "Form Claims/Claimants."

In the responses, the Complaint Claimants all generally defended the adequacy of the allegations in the complaints attached to their proof of claim forms.  Obviously, the Form Claimants did not take the same approach, as they had not attached any complaints enumerating allegations or causes of action.

In any event, both the Complaint Claimants and Form Claimants asserted a host of new allegations in their responses in an attempt to bolster their arguments that they had adequately stated claims.  The Court goes into significant detail examining the new allegations posed by the responses, but generally, they premise the Debtor's legal liability on allegations pertaining to: (1) the Debtor's authority pursuant to the organization and practices of the Catholic Church, including the operation of Canon Law; and (2) public representations about the relationship between the Debtor, orders, and institutions, and the Debtor's performance of certain functions for the orders and institutions.  Furthermore, nearly every response disputes that the Court can consider the Debtor's Renker Declaration and accompanying exhibits to foreclose the possibility that the Debtor exercised control over the abusers or Religious Institutions at issue.  (*See, e.g.,* Slater Response ¶¶ 38–39.)

## II.    <u>LEGAL STANDARD</u>

### A.  Default Claim Allowance Procedure

Section 501(a) of the Bankruptcy Code provides that "[a] creditor . . . may file a proof of claim" to claim an interest in a debtor's bankruptcy estate.  11 U.S.C. § 501(a).  Section 502(a) provides that a claim or interest, properly filed, "is deemed allowed, unless a party in interest . . . objects."  11 U.S.C. § 502(a).  Pursuant to Federal Bankruptcy Rule 3001(f), a claimant establishes a *prima facie* case against a debtor upon filing a proof of claim alleging facts sufficient to support the claim.  *See* FED. R. BANKR. P. 3001(f); *see also* 4 COLLIER ON BANKRUPTCY ¶ 502.02[3][e] (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2019) ("The proof of claim, if filed in accordance with section 501 and the pertinent Bankruptcy Rules, constitutes *prima facie* evidence of the validity and amount of the claim under Federal Rule of Bankruptcy 3001(f) and Code section 502(a).").

Under section 502 of the Bankruptcy Code, if an objection is made, the court shall determine the amount of such claim as of the petition date.  *In re Solutia, Inc.*, 379 B.R. 473, 483 (Bankr. S.D.N.Y. 2007) (citing 11 U.S.C. § 502(b); FED. R. BANKR. P. 3007).  Section 502(b)(1) provides that claims may be disallowed if they are "unenforceable against the debtor and property of the debtor, under any agreement or applicable law . . . ."  11 U.S.C. § 502(b)(1).

"To overcome this *prima facie* evidence, an objecting party must come forth with evidence which, if believed, would refute at least one of the allegations essential to the claim." *Sherman v. Novak* (*In re Reilly*), 245 B.R. 768, 773 (2d Cir. B.A.P. 2000).  If the objector does not "introduce[] evidence as to the invalidity of the claim or the excessiveness of its amount, the claimant need offer no further proof of the merits of the claim."  4 COLLIER ON BANKRUPTCY ¶ 502.02[3][e] (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2019).  But by producing "evidence equal in force to the *prima facie* case," an objector can negate a claim's presumptive

legal validity, thereby shifting the burden back to the claimant to "prove by a preponderance of the evidence that under applicable law the claim should be allowed." *Creamer v. Motors Liquidation Co. GUC Trust* (*In re Motors Liquidation Co.*), No. 12 Civ. 6074 (RJS), 2013 WL 5549643, at *3 (S.D.N.Y. Sept. 26, 2013) (internal quotation marks omitted); *see also In re Allegheny Int'l, Inc.*, 954 F.2d 167, 173–74 (3d Cir. 1992) (reciting identical burden-shifting framework).

To determine whether a claim is allowable by law, bankruptcy courts look to "applicable nonbankruptcy law." *In re W.R. Grace & Co.*, 346 B.R. 672, 674 (Bankr. D. Del. 2006). Accordingly, federal pleading rules also apply in assessing a proof of claim's validity. *See Morse v. Rescap Borrower Claims Tr.*, No. 14 Civ. 5800 (GHW), 2015 WL 353931, at *4 (S.D.N.Y. Jan. 26, 2015) (citing *In re DJK Residential LLC*, 416 B.R. 100, 106 (Bankr. S.D.N.Y. 2009)).

## B.  Claim Allowance Procedure Order

The Claims Objection Procedures specifically identify and limit certain objections to such federal pleading rules:

> For a non-evidentiary hearing to address whether the Contested Claim has failed to state a claim against the Debtor which can be allowed and should be dismissed pursuant to Bankruptcy Rule 7012(b) (a "Sufficiency Hearing"). Unless the Debtor serves the holder of the claim (the "Claimant") with a Notice of Merits Hearing (as defined herein), the Sufficiency Hearing shall go forward at the return date set in accordance with (f)(i) above (or such other date as may be scheduled by the Debtor). The legal standard of review that will be applied by the Court at a Sufficiency Hearing will be equivalent to the standard applied by the Court upon a motion to dismiss for failure to state a claim upon which relief can be granted, in accordance with Bankruptcy Rule 7012(b).

(Claims Objection Procedures ¶ 3(g)(iii).)

Bankruptcy Rule 7012(b) makes applicable Federal Rule of Civil Procedure 12(b)–(i). *See* FED. R. BANKR. P. 7012(b).  In turn, Federal Rule of Civil Procedure 12(b)(6) addresses motions to dismiss for failure to state a claim upon which relief can be granted.  FED. R. CIV. P.

12(b)(6). In other words, the Claims Objection Procedures limit the bases for Debtor's objections in non-evidentiary hearings, i.e., Sufficiency Hearings, to challenges under Rule 12(b)(6). This is consistent with law in this Circuit stating that where a party objects to a claim as facially defective, the analysis of the claim "is guided by the familiar standards applicable to a motion to dismiss." *In re Residential Capital, LLC*, 563 B.R. 477, 487 (S.D.N.Y. 2016).

### C. Motion to Dismiss Standard

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In determining the plausibility of the allegations, courts must assess the complaint by "accepting all factual claims in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor." *Lotes Co. v. Hon Hai Precision Indus. Co.*, 753 F.3d 395, 403 (2d Cir. 2014) (quoting *Famous Horse Inc. v. 5th Ave. Photo Inc.*, 624 F.3d 106, 108 (2d Cir. 2010)). This tenet, however, is "inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory, do not suffice." *Id.*

In order to be plausible, "the complaint's '[factual] allegations must be enough to raise a right to relief above the speculative level.'" *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (quoting *Twombly*, 500 U.S. at 555, 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557). Similarly, a complaint is properly dismissed when, as a matter of law, "the allegations in

[the] complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558.

### D. State Law Tort Liability

In their state court complaints, the Complaint Claimants included various causes of action against the Debtor sounding in tort.[7] While the Form Claimants did not enumerate any specific causes of action, the Court assumes that they allege similar causes of action sounding in tort.[8]

None of the Claimants have explained the substantive differences between these causes of action. Instead, the Court understands that the arguments whether any of the causes of action will lie focus on the common element of a duty under any of the causes. Indeed, certain of the causes explicitly allege a breach of duty by the Debtor; the remaining claims are all for negligence, which similarly require the breach of a duty.

On that element, the parties here have further narrowed the issue of the duty to prevent the abuse as turning on the Debtor's "control" over the abusers, Religious Institutions, and/or Religious Orders in question. "Control" itself is not actually an independent theory that allows a plaintiff to hold a defendant liable in tort for the actions of a third party. Instead, "control" is effectively nothing more than a shorthand used by the litigants to describe the range specific of relationships that could give rise to a tort duty—namely, that the Debtor was either an employer, or principal in a principal-agent relationship, with the abusers, Religious Institutions, and/or Religious Orders. Indeed, every case cited by the claimants in the responses on the "control"

---

[7]    Specifically, the Claimants alleged: (1) Negligence or Gross Negligence (Anderson, Simmons, and Merson Claims); (2) Negligent Training/Supervision (Anderson, Simmons, Dowd, and Merson Claims); (3) Negligent Retention (Anderson, Simmons, and Merson Claims); (4) Negligent Infliction of Emotional Distress (Simmons and Merson Claims); (5) Negligent Failure to Warn (Dowd Claims); (6) Negligent Failure to Provide a Safe and Secure Environment (Dowd Claims); (7) Breach of Duty of in Loco Parentis (Simmons Claims); (8) Beach of Non-Delegable Duty (Simmons Claims); (9) Breach of Fiduciary Duty (Simmons Claims).

[8]    The definition of "Sexual Abuse Claim" on the proof of claim form defines such claims as for abuse "under any theory of liability, including vicarious liability, any negligence-based theory, contribution, indemnity, or any other theory based on any acts or failures to act by the Diocese or any other person or entity for whose acts or failures to act the Diocese is or was allegedly responsible." *See, e.g.*, Claim No. 90843.

issue relates to the existence of employment or agency relationships. Thus, the Court considers that pleading the existence of agency and employment relationships under state law will be wholly determinative on the disputed issue of "duty" here.

### 1. Existence of Employment Relationship

"[T]he critical inquiry in determining whether an employment relationship exists pertains to the degree of control exercised by the purported employer over the results produced or the means used to achieve the results." *Bynog v. Cipriani Grp., Inc.*, 1 N.Y.3d 193, 198, 770 N.Y.S.2d 692, 695 (2003). "Factors relevant to assessing control include whether the worker (1) worked at his own convenience, (2) was free to engage in other employment, (3) received fringe benefits, (4) was on the employer's payroll and (5) was on a fixed schedule." *Id.* In considering whether an employment relationship exists, the predominant factor is "the extent of the employer's power to order and control the employee's performance of work." *Sokola v. Weinstein*, No. 950250/2019, 187 N.Y.S.3d 493, 500 (Sup. Ct. N.Y. Cty. Feb. 7, 2023). Courts have refused to find that defendants employed tortfeasors where "[t]he alleged tortfeasor came and went as [they] pleased, worked at their own convenience, were free to hold other employment, were never placed on defendant's payroll, received no fringe benefits, and had no taxes withheld from the flat rate, single payment for all three." *Lazo v. Mak's Trading Co.*, 644 N.E.2d 1350, 1350–51, 84 N.Y.2d 896, 897 (1994).

Finally, the Court recognizes that an employee may be in the joint employment of more than one employer. *See Poppenberg v. Reliable Maintenance Corp.*, 89 A.D.2d 791, 453 N.Y.S.2d 519 (4th Dep't 1982) (denying summary judgment where insufficient facts to determine who controls the workers on a particular job); *see also Halkias v. Otolaryngology-Facial Plastic Surgery Assoc.*, 282 A.D.2d 650, 724 N.Y.S.2d 432 (2d Dep't 2001) (finding triable issues as to degree of control where doctor was employed by another entity).

16

### 2. Existence of Agency Relationship

Agency is defined as:

> [A] legal relationship between a principal and an agent. It is a fiduciary relationship which results from the manifestation of consent of one person to allow another to act on his or her behalf and subject to his or her control, and consent by the other so to act. The agent is a party who acts on behalf of the principal with the latter's express, implied, or apparent authority.

*Faith Assembly v. Titledge of New York Abstract, LLC*, 106 A.D.3d 47, 58, 961 N.Y.S.2d 542, 551 (2d Dep't 2013) (quoting *Maurillo v. Park Slope U-Haul*, 194 A.D.2d 142, 146, 606 N.Y.S.2d 243 (2d Dep't 1993)).

"[A]n agency relationship results from a manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and the consent by the other to act." *Bigio v. Coca-Cola Co.*, 675 F.3d 163, 175 (2d Cir. 2012) (internal quotation marks omitted). "Essential to the finding of an agency is a determination that the agent acts subject to the principal's direction and control." *Oparaji v. Atl. Container Line*, No. 07-CV-2124 (GEL), 2008 WL 4054412, at *11 (S.D.N.Y. Aug. 28, 2008) (internal quotation marks omitted). However, "[c]ontrol alone is insufficient to establish the existence of an agency relationship . . . . The agent's power to alter legal relations between the principal and third persons is also an essential element of the agency relationship." *Mouawad Nat'l Co. v. Lazare Kaplan Int'l Inc.*, 476 F. Supp. 2d 414, 422 (S.D.N.Y. 2007).

### 3. Bases for Liability Where Existence of Employment or Agency is Pled

The Court assumes based on the scope of the dispute presented by the parties that properly pleading the existence of an employment or agency relationship *could* potentially give rise to claims for liability against the Debtor. While the Court ultimately need not reach the issue here, for purposes of reciting a full and correct legal standard for liability on the relevant tort claims, the Court emphasizes that while establishing an employment or agency claim may be

*necessary* to assert certain claims against the Debtor, doing so will not necessarily be *sufficient* to assert all stated claims against the Debtor.

For instance, where a claimant properly pleads an employment relationship, New York law has long held that an employer can be held liable for the sexual abuse of a minor by one of its employees by nature of its employment relationship under theories of negligent retention, negligent training, and negligent supervision. *Kenneth R. v. Roman Catholic Diocese of Brooklyn*, 229 A.D.2d 159, 161, 654 N.Y.S.2d 791, 793 (2d Dep't 1997) (citing *Hall v. Smathers*, 240 N.Y. 486 (1925)); *Sharon B. v. Reverend S.*, 244 A.D.2d 878, 879, 665 N.Y.S.2d 139, 140 (4th Dep't 1997); *Hicks ex rel. Nolette v. Berkshire Farm Ctr. & Services for Youth*, 999 N.Y.S.2d 879, 881, 123 A.D.3d 1319, 1321 (3d Dep't 2014); *see also In re Roman Cath. Diocese of Rockville Ctr., New York*, No. 20-12345 (MG), 2023 WL 3158940 at *8 (Bankr. S.D.N.Y. 2023) (hereinafter, the "*Eighth Omnibus Opinion*").

Beyond these types of tort claims, i.e., claims that hold an employer liable for its own negligence in overseeing an employee, the Court is less certain about the other bases for liability posited by the claimants—like vicarious liability.  Specifically, the claimants also cite cases for the proposition that liability may be imputed to an employer or principal for the acts of its employees or agents.  *See Kavanaugh v. Nussbaum*, 523 N.E.2d 284, 287–88, 71 N.Y. 2d 535, 546 (1988) ("Underlying the doctrine of vicarious liability—the imputation of liability to defendant for another person's fault, based on defendant's relationship with the wrongdoer—is the notion of control . . . .  A classic example is liability of an employer for the acts of its employees within the course of employment . . . ."); *Faith Assembly*, 106 A.D.3d at 58, 961 N.Y.S.2d at 551 ("[A] principal must answer to an innocent third person for the misconduct of an agent acting within the scope of its authority.") (quotation omitted).

The Court expresses doubt about the ultimate applicability of vicarious liability on the facts alleged here, as courts have routinely held that it cannot be used to impute liability for intentional torts committed outside the scope of any employee or agent's duties, particularly like sexual assault.[9]  The claimants have cited nothing that would inform this Court of a change in the controlling legal principles.

In any event, the Court need not ultimately address these issues, as the claimants ultimately fail to establish the existence of an employment or agency relationship in the first place, as discussed below.

### III.    OVERVIEW OF CLAIMS AND ANALYSIS

At this procedural stage, the Court must evaluate whether each claimant has stated a claim.  This exercise requires careful claim-by-claim review and consideration, particularly given the different ways in which abuse claims have been submitted and supported in this case so far.  Namely, certain proofs of claim consist solely of a completed claim form (that was created by the Debtor), that detail the facts of alleged abuses without articulating any legal causes of action.  Yet, other proofs of claim forms attach state court complaints that were drafted by attorneys, filed in state court, and plead specific causes of action.  Further, all but one of the claimants have filed responses containing additional allegations against the Debtor.

As a result, determining whether any of the thirty-nine claimants have stated a claim— and whether they should be entitled to amend their claim if they do not—poses a unique challenge here.  At the outset, the Court considers it most efficient to divide the analysis of the claims into two sections—the Complaint Claims, i.e, the claims that attached a complaint (Section IV), and those claims that did not, i.e., the Form Claims (Section V).

---

[9]      *See Doe v. Alsaud*, 12 F. Supp. 3d 674, 680 (S.D.N.Y. 2014) ("No decision in New York has been cited to date in which the doctrine of respondeat superior was held to apply to sexual assault.").  Courts have uniformly rejected vicarious liability claims from plaintiffs in sexual abuse cases on the grounds that sexual assault is personal and thus not in furtherance of an employer's business.'  *See Eighth Omnibus Opinion* at *7 n.5 (collecting cases).

This analytical division is used in this Opinion for purposes of efficiency only. The Court does not penalize parties that simply filled out the proof of claim form without attaching a complaint or addendum resembling a pleading. Indeed, given the procedural circumstances for claim submission and allowance in this case, the Court treats any allegations filed in the responses as part of the filed claims, which gave parties that did not file or attach a complaint to their proofs of claim form an additional opportunity to make allegations and arguments in support of their alleged bases for liability.[10] Furthermore, the Court ultimately concludes that any claimants that filed responses but failed to adequately state a cause of action will be entitled to amend their proofs of claim for reasons discussed below.

Analyzing the Complaint Claims first allows the Court to better explain the potential bases for liability for all abuse survivors. Thus, dividing the claims into these groups will best serve the purposes of efficiently analyzing whether claimants have stated causes of action.

## IV.    ANALYSIS OF COMPLAINT CLAIMS

There are fifteen Complaint Claimants. Four law firms filed a total of five responses on behalf of the Complaint Claimants. Those responses and the claims they represent are:

1. The Anderson Response (ECF Doc. # 1799), filed on behalf of Claim Nos. 90310, 90321, 90363, 90191, 90215, 90403, 90301, 90214 (each an "Anderson Claim").

2. The Dowd Response (ECF Doc. # 1807), filed on behalf of Claim Nos. 90283, 90247, 90255 (each a "Dowd Claim").

3. The Simmons Response (ECF Doc. # 1812), filed on behalf of Claim Nos. 90130 (the "Simmons Claim").

4. The First Merson Response (ECF Doc. # 1796) filed on behalf of Claim Nos. 90430 and 90447.

---

[10]    Debtor's counsel agreed that the Court may consider all allegations made against the Debtor in connection with this Objection, including additional allegations in a claimant's response to the Objection. (*See* March 28, 2023 Hr'g Tr. at 36:8–37:2.)

5. The Second Merson Response (ECF Doc. # 1810) filed on behalf of Claim No. 90424.[11]

**A.  The Legal Theories Pled by the Claimants**

As enumerated above (*see supra* n.7), the Complaint Claims assert nine purportedly distinct causes of action.  All nine asserted causes of action sound in tort; certain of the causes explicitly allege a breach of duty by the Debtor, while the remaining causes allege different types of negligence claims that also commonly require the breach of some duty.  Thus, despite whatever differences there may be between such causes of action, the Court observes that they all rely on the same element—a duty on the part of the Debtor.  This also happens to be the same element that is disputed by the claimants and Debtor on this Objection.  The Court thus concludes that the adequacy of the pleaded causes of action can be determined in tandem by analyzing whether the allegations support the existence of a duty.

To state the obvious, all of the abuses alleged here were committed by individuals in the first instance, and not the Debtor entity directly.  As a result, all causes of action here are premised on the Debtor's duty to prevent the abuse in question, based on its relationships with other individuals or entities.  The alleged duty owed to the survivors on any given cause of action stems from one or both of the following theories: (1) the Debtor's duty arose via its direct relationship with the abuser in question ("Abuser Control Theory"); and/or (2) the Debtor's duty arose via its direct relationship with Religious Institutions or Orders (the "Institution Control Theory").

The relationship that allegedly gives rise to the Debtor's duty under either theory is based on the Debtor's "control" of either the abuser, Religious Institution, or Religious Order in

---

[11]     The First Merson Response largely makes the same material allegations and arguments as the Second Merson Response; any citation to one of the Responses for the allegations and arguments made therein also should be considered to have been made in the other, unless otherwise noted.  Likewise, Claim Nos. 90430, 90447, and 90424 will be referred to collectively as "Merson Claims."

question.  The parties have consistently framed the issue on this Objection as whether the claimants have adequately alleged the Debtor's "control" over such parties.  The Court adopts this framing of the issue with one large caveat noted in the Legal Standards section, which is that "control" itself is not actually an independent theory that allows a plaintiff to hold a defendant liable in tort for the actions of a third party.  Instead, "control" is a shorthand adopted by the parties that ultimately describe two types of legal relationships (based on the caselaw cited by the claimants) that could form the basis for the Debtor's liability—employment and agency.

More simply stated, the Court considers that to state any of the causes of action here, the claimants must adequately plead that: (1) the Debtor was the employer or principal of the abuser under the Abuser Control Theory; and/or (2) the Debtor was the employer or principal of the Religious Institutions or Orders under the Institution Control Theory.[12]

### B.  The Complaints Do Not Adequately Plead a Claim for Relief

While each of the complaints asserts a host of different causes of action, all the complaints make a series of similar allegations that bear on the Abuser Control and Institution Control Theories defined above that are central to the analysis.  The Court's analysis proceeds as follows: (1) first, the Court catalogues the types of similar allegations made in the complaints filed by each law firm[13]; and (2) second, the Court analyzes whether the complaints state a claim for relief under the relevant federal pleading standard.

---

[12]    In the legal arguments regarding the Debtor's control over the Religious Institutions and Religious Orders, the claimants exclusively rely on principles of agency, and do not provide any citation for the proposition that such Religious Institutions or Orders were the Debtor's employees.  Thus, the Court only analyzes such allegations in the context of agency.

[13]    Again, complaints filed by the same law firms have substantially similar allegations.  For that reason and ease of reference, the Court designates the following complaints as exemplary: (1) the "Anderson Complaint," *see* Compl. attached to Claim No. 90191; (2) the "Dowd Complaint," *see* Compl. attached to Claim No. 90283; (3) the "Simmons Complaint," *see* Compl. attached to Claim No. 90130; and (4) the "Merson Complaint," *see* Compl. attached to Claim No. 90430.  References to such complaints are representative of other complaints filed by the same law firms.

1.  <u>Summary of Common Allegations</u>

First, most of the complaints name the Debtor as one of multiple defendants liable for the abuse in question.[14]  (*See* Anderson Complaint at 1; Dowd Complaint at 1; Simmons Complaint at 1; Merson Complaint at 1.)  Second, each complaint names a separate Religious Institution as a co-defendant, which was attended by the Claimant, and where the abuser was alleged to have worked.  (Anderson Complaint ¶ 8; Dowd Complaint ¶ 8; Simmons Complaint ¶ 9; Merson Complaint ¶¶ 12–13.)  Third, each complaint alleges that the Debtor employed the abuser and placed the abuser in the positions they occupied at the Religious Institution(s).  (Anderson Complaint ¶¶ 18–19, Dowd Complaint ¶¶ 11, 18; Simmons Complaint ¶¶ 10, 15; Merson Complaint ¶¶ 3–5, 10, 16.)  Fourth, each complaint alleges that the Religious Institution itself was under the authority, control, or supervision of the Debtor.  (Anderson Complaint ¶ 9, Dowd Complaint ¶ 14; Simmons Complaint ¶ 5; Merson Complaint ¶ 2.)

Finally, each of the Claimants other than the Merson Claimants[15] also name as a defendant a Religious Order entity that is distinct from both the Debtor and Religious Institutions where the abuse occurred.  (Anderson Complaint ¶ 7, Dowd Complaint ¶ 6; Simmons Complaint ¶¶ 6–8.)  These claims then repeat the allegations made against the Debtor against the Religious Orders, namely that the: (1) the abuser was employed by and placed in their positions in by the

---

[14]     The complaints attached to two of the Dowd Claims (Claim Nos. 90247, 90255) and one of the Anderson Claims (Claim No. 90403) do not name the Debtor.  These were filed after the commencement of the bankruptcy case, and the Court affords these claimants the benefit of the assumption that the Debtor was not named for that reason, and it would have likely been named absent the bankruptcy case.  Given that responses have been filed by the Dowd and Anderson firms without distinction between the claimants that did and did not name the Debtor in their complaints, the Court considers that the Dowd and Anderson firms are effectively proposing an amendment of the complaints not naming the Debtor to match the ones that do for purposes of stating their claims in this bankruptcy.  Furthermore, given that the Objection to all the Dowd and Anderson claims are ultimately sustained without prejudice, a separate analysis of these three claims would serve no purpose here.  For those reasons, they are considered in the same analysis as the Dowd and Anderson claims that do name the Debtor in a complaint.

[15]     While the complaints attached to the Merson Claims do not specifically list any Religious Orders as defendants (likely to avoid the very issue raised in this Objection), it is clear from the allegations in the Merson Responses that the claimants recognize there were Religious Orders operating the respective Religious Institutions, as discussed further in Section V.C.

Religious Order, as well as the Debtor (*see* Anderson Complaint ¶¶ 18–19, Dowd Complaint ¶¶ 18, 33, 36; Simmons Complaint ¶¶ 10, 15); and (2) the Religious Institution was also under the authority, control, or supervision of the Religious Order, as well the Debtor.  (Anderson Complaint ¶ 9, Dowd Complaint ¶ 16; Simmons Complaint ¶ 6.)

        2.  <u>Analysis of the Allegations under the Federal Pleading Standard</u>

The allegations recited above comprise the full extent of allegations in the complaints bearing on either the Abuser Control or Institution Control theories of liability.  The Court must determine whether the allegations are sufficient to support such theories and state a claim for relief under the federal pleading standards.  The Court concludes that the allegations in the complaints are insufficient to state a claim.

As discussed above, allegations regarding "control" are only significant insofar as those they support a legally cognizable relationship between the Debtor and another party (i.e., the abuser or Religious Institutions/Orders), such that a duty arises on the part of the Debtor with respect to the actions or inaction of those parties.  This is the root of two problems with the allegations in the claimants' complaints.

The first problem is that despite the claimants' sweeping allegations of the Debtor's liability based on broad notions of "control," they only cite cases where courts have imposed a duty on a "controlling" party as an employer or principal of a separate tortfeasor.  Put differently, the claimants have no legal support under New York law for any allegations of liability against the Debtor that do not hinge on the existence of an employment or agency relationship with either the Abusers or Religious Orders and Institutions.  Obviously, this alone does not foreclose their ability to allege liability of the Debtor.

Nevertheless, this is where claimants run into a second and critical problem: all of their allegations pertaining to employment and agency are wholly conclusory legal assertions.  After careful review of the allegations in each complaint, the claimant's allegations amount to nothing

more than conclusory labels regarding the legal relationships between the Debtor and the abusers

and/or Religious Institutions and Orders.  None of the complaints contain any accompanying

factual allegations that would support these legal labels of employment or agency under either

the Abuser Control or Institution Control Theories here, as further discussed below.

> a.  *There are no non-conclusory allegations to support the Abuser Control Theory*

With respect to the first theory that the abusers were employees or agents of the Debtor,

none of the complaints actually allege any facts that bear on an employment or agency

relationship.  The foundational allegations in the complaints on this point merely assert that the

abuser was:

- "[A]n agent, servant and/or employee operating under the direction and control of [the Diocese] and its agents, servants and/or employees."  (Merson Complaint ¶ 10.)

- "[A] Roman Catholic cleric employed by the [Diocese and co-defendants] . . . [Abuser] remained under the direct supervision, employ, and control of the [Diocese and co-defendants]."  (Anderson Complaint ¶¶ 18–19; *see also id.* ¶ 6. ("The Diocese has the power to appoint, train, supervise, monitor, remove, and terminate each and every person working with children within the Diocese.").)

- "[W]as an employee of, and acting as an agent of [Diocese and co-defendants]." (Dowd Complaint ¶ 33.)

- "[U]nder the management, supervision, employ, direction and/or control of Defendants."  (Simmons Complaint ¶ 15.)[16]

These are all bare statements regarding a legal conclusion (i.e., the existence of an

employment and/or agency relationship).  The only other sorts of allegations in the complaints

that potentially bear some relation to employment or agency are allegations that the Debtor (as

well as Religious Institution/Order co-defendants):

---

[16]     Similar allegations may go unchallenged when there is no dispute about employment or agency relationships.  But such allegations are not sufficient in a case such as this one where the existence of an employment or agency relationship is at the very heart of the dispute.

- "[P]laced [abuser] in positions where he had access to and worked with children as an integral part of his work." (Anderson Complaint ¶ 19.)

- "[A]ssign[ed]" as well as "hired and otherwise approved [abuser] to work at [institution co-defendant]." (Dowd Complaint ¶¶ 18, 36.)

- "[A]llowed [abuser] to continue to have their positions of authority and power with unfettered access to children." (Merson Complaint ¶ 28.)

These allegations are not as conclusory as the labels of "employment" or "agency."

Nevertheless, terms like "placed," "assigned," "hired," or "allowed [the abuser] to continue to

have their positions," are effectively nothing more than conclusory ways of attempting to restate

that the abusers were employed by or agents of the Debtor without providing any factual heft.

        *b.   There are no non-conclusory allegations to support the Institution Control Theory*

The allegations directed at establishing an agency relationship between the Debtor and

Religious Institutions/Orders fare no better under the alternative Institution Control Theory. In

this vein, the complaints allege that:

- "At all times material, [co-defendant institution] was and continues to be under the direct authority, control, and province of [the Diocese and religious order co-defendants]." (Anderson Complaint ¶ 9.)

- "The Bishop is the Chief Executive Officer of all Catholic programs and corporations operating in the DIOCESE and as part of said responsibilities authorized the operation of said Catholic corporations." (Dowd Complaint ¶ 10.) "[T]he DIOCESE and BISHOP were in charge of supervising all Catholic organizations and corporations within its geographical boundaries including [co-defendant institution]." (*Id.* ¶ 14.)

- "At all relevant times, the Diocese of Rockville Centre created, oversaw, managed, supervised, controlled, directed and/or operated various institutions in the Diocese of Rockville Centre, including, at all relevant times, [co-defendant institution] in Nassau County, New York." (Simmons Complaint ¶ 5.)

- "[Abuser] was an agent, servant and/or employee of [co-defendant institution] which operated under the exclusive control of the Diocese." (Merson Complaint ¶ 2).

Even if the Court assumes that the abusers were employees or agents of the co-defendant

Religious Institutions/Orders, the complaints similarly fail to allege any facts that could give rise

to the existence of an agency relationship between those co-defendants and the Debtor.  The

allegations regarding "control" consist of nothing more than vague and general synonyms that do

not actually bear on the facts related to agency.

### c. The allegations are insufficient to state a claim under the federal pleading standard

It is well-settled that the Court is not entitled to consider bare legal assertions when

determining whether a claimant has stated a claim for relief under the federal pleading standard.

*See Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported

by mere conclusory, do not suffice.")  Indeed, legal claims must be supported with factual

assertions.  And here, the law is clear on the types of factual allegations that would support

claims resting on the existence of employment or agency relationships.  *See Bynog v. Cipriani

Grp., Inc.*, 1 N.Y.3d 193, 198, 770 N.Y.S.2d 692, 695 (2003) ("[T]he critical inquiry in

determining whether an employment relationship exists pertains to the degree of control

exercised by the purported employer over the results produced or the means used to achieve the

results."); *Bigio v. Coca-Cola Co.*, 675 F.3d 163, 175 (2d Cir. 2012) (reciting that "an agency

relationship results from a manifestation of consent by one person to another that the other shall

act on his behalf and subject to his control, and the consent by the other to act" under New York

law) (internal quotation marks omitted).

The Court concludes that all of the allegations examined above are simply conclusory

recitals of the legal relationships that the claimants seek to establish here.  The Debtor points to

caselaw showing that similarly conclusory allegations regarding employment and agency are

insufficient to state claims for relief under the federal pleading standards.  First, the Debtor cites

federal caselaw showing that where a plaintiff alleges that an entity's liability hinges on its status

as an employer, that the plaintiff must do more than allege that an employment relationship

exists in conclusory fashion to state a claim.  *Kudatzky v. Minskoff*, 709 F. Supp. 2d 217, 217

(S.D.N.Y. 2010); *Chui-Fan Kwan v. Sahara Dreams Co. II Inc.*, No. 17-CV-4058, 2018 WL

6655607, at *2 (S.D.N.Y. 2018).[17]  The same goes for plaintiffs pleading causes of action that

depend on the existence of agency relationships.  *See DeAngelis v. Corzine*, 17 F. Supp. 3d 270,

286 (S.D.N.Y. 2014) (finding that plaintiff failed to establish that one defendant was liable for

the acts of a co-defendant via an agency relationship, where the plaintiff merely alleged that the

defendant had compensated the co-defendant but did not plead any other facts bearing on control

over the alleged co-defendant agent).  The Court considers that these are straightforward

applications of the federal pleading standard under *Twombly* and *Iqbal* where the liability alleged

against a defendant is entirely dependent on some legal relationship with a primary wrongdoer.

The claimants' legal arguments offered in defense of their allegations do not alter the

result.  Glaringly, none of the four responses cite *any* federal case addressing claims premised on

the existence of an employment, agency, or any other control-based relationship, let alone a case

where comparable claims have survived a motion to dismiss.

Instead, every case cited by the Claimants in which allegations based on similar theories

of control proceeded beyond the motion to dismiss stage were New York state court cases.[18]

While those cases may have involved the same type of substantive claims, this ignores the

distinct issue at hand, which is that the claimants need to state their claims under the federal

---

[17]     In both *Kudatzky* and *Chui-Fan Kwan*, the plaintiffs were each attempting to plead that the defendants in question employed the plaintiffs themselves.  While the claimants here seek to plead that a third-party tortfeasor was the employee of the Debtor, the court considers these cases are still generally applicable for the proposition that where a plaintiff's cause of action against a defendant depends entirely on the existence of an employment relationship, that a plaintiff must plead the plausible existence of such a relationship.

[18]     *See ARK283 Doe v. Archdiocese of New York et. al.*, Index No. 950312/2020, 2022 WL 4180825 (Sup. Ct. N.Y. Cty. September 2, 2022); *ARK61 v. Archdiocese of New York, et. al.*, Index No. 950053/2019, 2021 WL 2719320 (Sup. Ct. N.Y. Cty. July 21, 2021); *Gosselin v. Archdiocese of New York et. al.*, Index No. 950145/2019, 2021 WL 2719324 (Sup. Ct. New York Cty. July 1, 2021).  *ARK283*, *ARK61*, and *Gosselin* were each highlighted by the Dowd, Simmons, and Anderson Responses for the proposition that that their claims should proceed beyond the motion to dismiss.

pleading standard here.[19]  And importantly, the New York pleading standard is less demanding

than the federal pleading standard under *Twombly* and *Iqbal*.  *See Fire Ins. Co. v. American*

*Home Assur. Co.*, 19 A.D.3d 191, 191, 796 N.Y.S.2d 603, 605 (1st Dep't 2005) (stating that the

test on a motion to dismiss is not whether a plaintiff has stated a claim in his complaint but

whether the plaintiff "has one in the first place").  For that reason, the state court decisions on a

motion to dismiss are inapposite on this issue, despite whatever factual similarities there may be

between the underlying facts and allegations.

     In sum, the Court has combed each of the complaints, and they fail to include any

allegations that actually bear on the factual circumstances of the Debtor's alleged employment or

agency relationships with the abusers or Religious Institutions/Orders in this case.  Because such

allegations are necessary to the plead the causes of action asserted here, the complaints filed in

the state court cases do not state a claim for relief under Rule 12(b)(6).[20]

### C.  The Additional Allegations in the Responses Do Not Cure the Pleading Deficiencies

     Having concluded that none of the Complaint Claimants have stated a claim for relief in

their original state court complaints, the Court next considers whether they have offered

additional factual allegations in their respective responses that state a claim under Rule 12(b)(6).

---

[19]     The Court notes that the Debtor submitted the Renker Declaration and Exhibits in support of the Objection and its position that it lacks control over the Religious Institutions/Orders. Likewise, the Debtor cited to New York state cases where courts have dismissed complaints alleging a defendant's control over an abuser where defendants have presented similar evidence. (*See* Objection ¶ 25 (collecting New York state cases).)  Understandably, much of the claimants' briefing on the New York state pleading standard was in response to this argument.

     In any event, neither of the parties' arguments on this point pertain to the issue of whether the claimants have adequately stated a claim for relief under the federal pleading standard.  Thus, the Court need not and does not consider the Renker Declaration or Exhibits to decide the instant Objection.

[20]     The Merson Complaint alleges in conclusory fashion that the Debtor and Religious Institutions in question were alter egos of one another.  (*See, e.g.*, Merson Complaint ¶ 14.)  This type of claim similarly has specific elements that were not pled anywhere in the Merson Complaints.  *See HSM Holdings, LLC v. Mantu I.M. Mobile Ltd.*, No. 20 Civ. 967 (LJL), 2021 WL 918556, at *9–10 (S.D.N.Y. Mar. 10, 2021) (reciting pleading requirements for alter ego liability).  Furthermore, the Court considers that the Merson Claims do not actually press this as a basis for withstanding the Objection, as the Merson Responses do not add any allegations regarding this claim or cite to any caselaw on the issue.

While each response filed on behalf of the Complaint Claimants offered different factual allegations in support of the respective complaints they seek to bolster, there is a considerable overlap and similarity between commonly alleged facts. As a result, the Court groups similar allegations into two categories, such that allegations in each category can be analyzed together across the five responses. Specifically, these allegations pertain to: (1) the organization and practices of the Catholic Church, including the operation of Canon Law (included in the Dowd, Merson, and Simmons Responses); (2) public representations about the relationship between the Debtor, institutions, and orders and the Debtor's performance of certain functions for the institutions and orders (included in the Dowd, Anderson, and Merson Responses).

The two categories of allegations are analyzed in turn in the corresponding subsections below. In sum, the Court concludes that neither category of allegations helps to state a plausible claim for relief against the Debtor under the federal pleading standard. Thus, any combination of these allegations offered by the responses in support of the original state court complaints are insufficient to survive the Objection here. Finally, the Court also disposes of other arguments that were uniquely made by a single law firm or with respect to specific Religious Institutions and concludes that they do not alter any of these conclusions.

1. <u>Analysis of the Organizational & Canon Law Allegations under the Federal Pleading Standard</u>

The Dowd, Simmons, and Merson Responses all argue that the organization of and normal practices within the Catholic Church, including the operation of Canon Law, provide factual support for the allegations that the Debtor was an employer or principal of the abusers or the Religious Institutions/Orders ("Organizational and Canon Law Allegations"). The Court considers that the Dowd Response provides the most comprehensive factual support and legal discussion in support of such allegations, such that it is fairly representative of the other responses' allegations and arguments on this point. For ease of reference then, the Court will

30

frame the analysis around the Dowd Response's allegations and arguments for this category, unless otherwise noted.

In support of the Organizational and Canon Law Allegations, the Dowd Response offers two affidavits from Father Thomas P. Doyle, an Ordained Catholic priest from the Dominican Order, on behalf of claimants abused at two different institutions.  (*See* Ex. G to Dowd Response, offered on behalf of Claim No. 90283, "Doyle Cormaria Decl.;" Ex. H to Dowd Response, offered on behalf of Claim Nos. 90247 & 90255, "Doyle LaSalle Decl.")[21]  To be clear, Father Doyle does not claim to have had any association with or knowledge that is specific to the Debtor's particular diocese.  Instead, Father Doyle's declaration explains the operation of the Catholic Church and Canon Law at large, explaining that the latter "is a system of laws or canons that is created, interpreted, and enforced by the competent authorities in the Catholic Church to regulate the Church's external organization and government and to direct the lives of Catholics toward the mission of the Church."  (Doyle Cormaria Decl. ¶ 35.)  The Dowd Response does significant work explaining the organizational structure and hierarchy of the Catholic Church, and explains that Canon Law is "promulgated by the Vatican and binding on all Catholic organizations."  (Dowd Response ¶ 76.)  The Dowd Response goes into further detail regarding the authority of the Diocese over all Catholic organizations within its territory, which are best exemplified by the assertion that:

> All religious institutes conduct their work (practice their ministry, whatever that might be) within the context of a local diocese. The bishop of the diocese is the source of all authority and power in the diocese and this involves everything that is done in the diocese no matter who does it. The local bishop has authority over all works of ministry conducted in a diocese whether this be by individuals or groups. This includes parishes that are

---

[21]      The Simmons Response includes a declaration from Father Doyle that was specifically drafted and offered in support of the Simmons Claimant.  (*See* "Doyle St. Igantius Decl.," Ex. A to Simmons Response, ECF Doc. # 1812-1.)  Father Doyle's opinions and allegations regarding Canon Law and the operation of the Catholic Church are identical in all material respects for present purposes.  The Merson Responses did not offer any similar type of declarations by Father Doyle or anyone else in support of its Canon Law arguments.

> managed by members of religious institutes, schools of any type run by
> religious institutes, retreat houses and summer camps.

(Dowd Response ¶ 75 (quoting Doyle Cormaria Decl. ¶ 55).)

The Court analyzes whether such allegations help to state a cause of action against the Debtor, and its analysis proceeds as follows: (a) as a threshold matter, the Court determines that constitutional principles do not prevent it from considering the Organizational and Canon Law Allegations in its analysis; (b) the Court determines that the Organizational and Canon Law Allegations do not help establish a plausible claim against the Debtor on an Abuser Control Theory; and (c) the Court determines that the Organizational and Canon Law Allegations do not help establish a plausible claim against the Debtor on an Institution Control Theory.

### a. The Court Can Refer to the Allegations Pertaining to Canon Law

As a threshold issue, the parties disagree whether the Court can consider the Organizational and Canon Law Allegations. As this Court explained in the *Fifth Omnibus Opinion*, the Free Exercise Clause and Establishment Clause of the United States Constitution bar courts from interpreting issues of religious Canon Law to resolve disputes. *See* 2023 WL 2993304 at *9–10 (citing *Kraft v. Rector, Churchwardens Vestry of Grace Church*, No. 01-CV-7871 (KMW), 2004 WL 540327, at *6 (S.D.N.Y. Mar. 17, 2004)). Ultimately, there was no need for this Court to interpret Canon Law to resolve a dispute for purposes of the *Fifth Omnibus Opinion*, as the Court concluded that the allegations of diocesan control over entities outside of the Debtor's geographical territory were simply not plausible. Here, however, the allegations pertain to diocesan control *inside* of the Debtor's geographical territory. These allegations are not as facially implausible as those addressed in the *Fifth Omnibus Opinion*. Nevertheless, and as was the case in the *Fifth Omnibus Opinion*, the Court considers that it can resolve the instant Objection without interpreting Canon Law and without raising Establishment Clause issues for three reasons.

32

First, not all of the allegations in the responses and Doyle Declarations constitute interpretations of Canon Law. Certain of the allegations would appear to be based on Father Doyle's experience with the Catholic Church and its practices. Furthermore, the Court considers that Father Doyle's independent factual observations and allegations about the operation of the Church are not rendered off-limits simply by nature of being consistent with his opinions regarding the operation of Canon Law.

Second, the Court observes that resolution of any disputes here will not actually turn on the interpretation of Canon Law. The Debtor effectively argues that the Court must shield itself from considering the existence of Canon Law entirely, but the precedents it cites draw a finer distinction. The Supreme Court has held that courts cannot adjudicate whether a denomination has departed from its prior doctrine, *see Presbyterian Church in U.S. v. Mary Elizabeth Blue Hull Mem'l, Presbyterian Church*, 393 U.S. 440, 442–44 (1969), interpret internal religious documents and determine whether the church complied with its own procedures, *see Serbian E. Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 717 (1976), or meddle with "control" of churches. *See Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 116 (1952).

The Court need not do any of these things here. The ultimately disputed issues in this case—the existence of employment or agency relationships—will not depend on any interpretation of Canon Law that would violate those precedents. In that respect, this case falls squarely within the scenario contemplated by *Martinelli v. Bridgeport Roman Catholic Diocesan Corp.*, 196 F.3d 409 (2d Cir.1999). There, the Second Circuit held that in finding that there was a fiduciary relationship between a sexual abuse claimant and the Catholic Diocese of Bridgeport, it was not a violation of the First Amendment for the jury to consider testimony about the status and responsibilities of the Bishop under Canon Law. *Id.* at 430. The Court reasoned that:

>To the extent that the jury did consider religious teachings and tenets, moreover, it did so to determine not their validity but whether, as a matter of fact, [claimant's] following of the teachings and belief in the tenets gave rise to a fiduciary relationship between [claimant] and the Diocese. The First Amendment does not prevent courts from deciding secular civil disputes involving religious institutions when and for the reason that they require reference to religious matters.

*Id.*

The same is true here. Put simply, the claimants must show that an employment or agency relationship existed between the Debtor and abuser or Religious Institutions/Orders, based on facts relevant to those theories as they are normally established in the secular context. If they can in fact prove the existence of such a relationship, whether the Debtor had the authority or obligation to maintain (or not maintain) such relationships under Canon Law will not matter. Conversely, if claimants cannot prove the existence of such relationships based on underlying secular facts pertaining to employment and agency, the Court considers that they will not be able to rely exclusively on Canon Law to prove their claims.

Third and most importantly, the Court is further assured that there is no need to interpret Canon Law to resolve a dispute here because even under the claimants' proffered interpretations of Canon Law, they fail to state a claim for relief under the federal pleading standard. The claimants' allegations regarding the structure of the Catholic Church and Canon Law do not state plausible claims for relief under either an Abuser Control or Institution Control Theory, as the Court explains in corresponding subsections below. In settling this threshold issue first, however, the Court concludes that it may consider the Organizational and Canon Law Allegations to assess the allegations in the complaint, without resolving disputes based on interpreting issues of Canon Law

   b.   *The Allegations Do Not Help to Plead a Cause of Action Pursuant to
        the Abuser Control Theory*

With respect to the Abuser Control Theory asserted against the Debtor, i.e., that it was

the employer or principal of the abusers, the Organizational and Canon Law Allegations do

nothing to plausibly allege that the Debtor had such relationships with any given abuser.  On the

Court's review, the most specific allegation that potentially bears on such legal relationships is

the assertion that: "Everyone who works in a diocese including pastors, assistant pastors and

anyone holding any other position, is appointed by the bishop.  This includes members of

religious institutes who hold positions in the government of the diocese."  (Dowd Response ¶ 72

(quoting Doyle Cormaria Decl. ¶ 45).)  Neither these allegations, nor any of the more generalized

allegations of the Debtor's control over personnel within its territory support a plausible

inference of employment or agency between the Debtor and abusers here.  (*See, e.g.*, Dowd

Response ¶ 75 ("The local bishop has authority over all works of ministry conducted in a diocese

whether this be by individuals or groups.") (quoting Doyle Cormaria Decl. ¶ 55).)

These types of allegations do not say anything directly about whether the Debtor

employed any of the individual abusers here.  Instead, the claimants attempt to create the

inference that the abusers must have been employed by the Debtor based on the blanket

operation of Canon Law and the Church's normal practices.  Even taking such allegations as

true, however, they do not create a plausible inference that the abusers were employees or agents

of the Debtor.

With respect to what *is* plausibly alleged, the allegations make clear that the Bishop,

acting on behalf of the Debtor, has some potential authority to hire or appoint personnel to

positions throughout the Debtor's diocesan territory.  Specifically, the Court takes as true the

allegation that pursuant to this authority, the Debtor *may* in certain instances appoint personnel to

positions at other entities that exist within the Debtor's territory, but are not part of the diocesan entity as an organizational matter.

What is less clear under these allegations, however, is exactly when this authority is exercised, or more specifically, whether there is an inference that such authority was in fact exercised for the relevant abusers here.  In fact, the Court finds that inherent in the allegations that the Debtor *may* hire and appoint *some* personnel to other Catholic entities within the diocesan territory, is the recognition that the Debtor does not hire and appoint *all personnel* at every entity within diocesan territory.  Put differently, the Court understands the allegation that "[e]veryone who works in a diocese . . . is appointed by the Bishop" to apply to the individuals employed directly by the Diocesan entity—and not every single person employed by the separate entities that operate within the Debtor's territory.  Indeed, based on the pleadings, the Court understands that this would likely include thousands of non-clergy members working in schools and other religious order-run institutions, and does not consider this to be a fair reading of the allegations, let alone plausible.

By the same reasoning, the Court considers that the current allegations do not even raise the inference that the Debtor appoints all *clergy* members at the various Catholic entities within the Debtor's territory.  For instance, immediately after stating that "[e]veryone who works in a diocese . . . is appointed by the Bishop," the Doyle Declaration states that this includes "members of religious institutes *who hold positions in the government of the diocese*."  (Dowd Response ¶ 72 (quoting Doyle Cormaria Decl. ¶ 45) (emphasis added).)  But what about the members of religious institutes that *do not* also hold positions with the Diocese?  By negative implication, they are presumably not appointed by the Bishop, at least on the present allegations.

The Dowd Response highlights other facts it frames as supportive, but that raise similar questions for the Court.  For instance, the Dowd Response alleges that the order-run institutions

in question were "staffed with certain Diocesan employees," which included a "Diocesan chaplain always present or otherwise permanently stationed at [the institution]." (*See* Dowd Response ¶¶ 21, 24; *see also* First Merson Response ¶ 35 (alleging that president of one institution was also appointed as the "Chief Revitalization Officer" for a Diocesan effort to revitalize Catholic elementary schools and named as the as the chairperson for Catholic Charities, which was advertised as being in to addition "to his list of duties in the Diocese of Rockville Centre").)  To be clear, none of these Diocesan appointees are alleged abusers—they are simply offered as illustrative examples of the Debtor's ability to appoint personnel to or staff its own employees at Religious Institutions.  But again, what does this say about the plausibility of the allegations against abusers when the claimants can only allege that such authority was infrequently exercised, and only exercised for a limited group of non-abusers?

The single abuser-specific allegation that appears among the responses and Doyle Declarations was made in the Doyle Cormaria Declaration.  There, Father Doyle states:

> Fr. James Verity, the alleged perpetrator of the abuse, was a member of the Congregation of the Passion of Jesus Christ, a religious congregation that is world-wide in scope. Fr. Verity was engaged by the Religious sisters who ran Cormaria to provide ministry at Cormaria. To do so, he required the permission of his own superior in the Passionists. *He also required the permission of the Bishop of Rockville Centre who, at that time, was Bishop Walter Philip Kellenberg.* Although he was a member of a religious institute (the Passionists), working at an established ministry (Cormaria) of another religious institute (The Religious of the Sacred Heart), he was under the direct authority of the Bishop of Rockville Centre.

(Doyle Cormaria Decl. ¶ 71 (emphasis added).)

This single allegation (the "Verity Allegation") is insufficient to state a claim for relief for two reasons.  First, it is not clear that the Verity Allegation is anything more than a conclusory legal statement.  Father Doyle's factual basis for the allegation is unclear, and the remainder of his declaration speaks only of the blanket authority for the Bishop to appoint or approve *some* personnel.  In that sense, it is hard to see how this is any different from the

conclusory statements in the original state court complaints that the Bishop and/or Diocese "placed," "assigned," "hired," or "allowed [the abuser] to continue to have their positions." *See, supra,* Section IV.B.2(a).

Second, even if the Court considers the Verity Allegation factual in nature, the notion that the Bishop granted some form of permission for Verity to provide ministry at a separate entity does not plausibly state a basis for liability. Recall that the Claimants rely exclusively on the existence of an agency or employment relationship between the Debtor and Verity to create liability. And to establish either legal basis, the Claimants would eventually need to show that the Debtor actually exercised some level of control over Verity over the course of their relationship, and in the case of agency, mutual consent for Verity to act on the Debtor's behalf. *See Bynog v. Cipriani Grp., Inc.*, 1 N.Y.3d 193, 198, 770 N.Y.S.2d 692, 695 (2003) ("[T]he critical inquiry in determining whether an employment relationship exists pertains to the degree of control exercised by the purported employer over the results produced or the means used to achieve the results.") ; *Bigio*, 675 F.3d at 175 ("[A]n agency relationship results from a manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and the consent by the other to act.") (internal quotation marks omitted).

On the current allegations, however, the Debtor and Verity's relationship effectively began and ended with the single act of permitting him to conduct ministry. The responses are completely devoid of any facts suggesting that the Debtor exercised control over Verity beyond that point. From a plausibility perspective, the remainder of the allegations admit why—the permission was granted so that Verity could conduct ministry under the admittedly closer day-to-day supervision of *completely separate* Religious Institutions/Orders. The Court points out that does not foreclose the possibility that Verity was employed by or an agent of the Debtor simply because the Claimants allege he was also employed by separate Religious Institutions/Orders.

38

Of course, an individual may be employed by two different employers. *See Poppenberg v.*

*Reliable Maintenance Corp.*, 89 A.D.2d 791, 792 453 N.Y.S.2d 519, 520 (4th Dep't 1982)

("Even though two or more associated employers are not engaged in a joint venture, an

employee, although nominally in the employment of one employer, may be in the joint

employment of more than one. It is also possible for an employee in the general employment of

one employer to be in the special employment of another.") (citations omitted).

However, even under a multiple employer theory, the Claimants would still be required

to allege that the Debtor acted as an employer in some capacity alongside the Religious

Institutions/Orders. *See id.* ("A key factor in determining the existence of either a joint or a

special employment is control over the employee.") But Claimants have no other allegations of

control. And the Court finds that the Debtor's single act of agreeing that Verity could work for a

separate entity, without more, is hardly consistent with the control that an employer would

exercise, either as an exclusive or joint employer. As a result, the Court considers that the Verity

Allegations do not help to establish a plausible claim for relief.

Despite these issues with the allegation regarding Verity, it is also the only abuser-

specific allegation made in the responses or Doyle Declarations. None of the other responses or

Doyle Declarations were able to make even a similar conclusory allegation for the other abusers

in question.

In sum, while the Court finds it plausible that the Debtor has the general authority to staff

certain of its own employees at Religious Institutions, or even appoint clergy members to work

for other Religious Institutions/Orders, the Court is troubled by the general lack of non-

conclusory allegations stating that is actually what occurred for the abusers at issue. There are

no other allegations that support the conclusion that the Bishop formed agency or employment

relationships with the abusers here as a matter of normal practice, or that irrespective of normal

practice, the Bishop formed agency or employment relationships with the abusers.  The Court

considers that any remaining allegations in this category are too vague and general to support the

factual underpinnings of whether employment or agency relationships were formed with the

abusers, and they create no inferences that control was in fact exercised over those abusers.  (*See,*

*e.g.*, Dowd Response ¶ 75 ("The local bishop has authority over all works of ministry conducted

in a diocese whether this be by individuals or groups.") (quoting Dowd Response Ex. G ¶ 55).)

> c.  *The Allegations Do Not Help to Plead a Cause of Action Pursuant to*
>     *the Institution Control Theory*

Alleging that the Debtor was the direct employer or principal of the abusers is not the

only path to stating a claim against the Debtor here.  As the Court noted at the outset, the Court

assumes that the Institution Control Theory could provide a potential alternative path to pleading

the Debtor's liability even if the claimants cannot allege that the Debtor was the employer or

principal of the abusers.  Under this theory, the Court will assume for the sake of analysis that

the claimants have properly pled that the abusers are employees or agents of the Religious

Institutions/Orders.  The liability for the claims stated against the Debtor then turns on its status

as the principal of those Religious Institutions/Orders, as opposed to the abusers directly.

The Dowd Response states that agency is defined as:

> [A] legal relationship between a principal and an agent. It is a fiduciary
> relationship which results from the manifestation of consent of one person
> to allow another to act on his or her behalf and subject to his or her control,
> and consent by the other so to act. The agent is a party who acts on behalf
> of the principal with the latter's express, implied, or apparent authority.

*Faith Assembly v. Titledge of New York Abstract, LLC*, 106 A.D.3d 47, 58, 961 N.Y.S.2d 542,

551 (2d Dep't 2013) (quoting *Maurillo v. Park Slope U-Haul*, 194 A.D.2d 142, 146, 606

N.Y.S.2d 243 (2d Dep't 1993)).

This is an accurate description of the substantive elements of agency under New York law.[22]  In order to complete the legal foundation for the Institution Control Theory, the Dowd Response observes that a principal's liability for its agent's torts also extends to subagents, or agents of agents, whose negligent conduct is imputed to the principal where third parties are injured.  *See Whalen v. DeGraff, Foy, Conway, Holt-Harris & Mealey*, 53 A.D.3d 912, 914, 863 N.Y.S.2d 100 (3d Dep't 2008) (citing Restatement (3d) Agency, § 3.15; Restatement (2d) Agency, §§ 5, 406); *Connell v. Hayden*, 83 A.D.2d 30, 51, fn. 2, 443 N.Y.S.2d 383 (2d Dep't 1981) (citing Restatement (2d) Agency, § 361).

Under these authorities, the Dowd Response argues that the Organizational and Canon Law Allegations support its legal assertions that the Religious Institutions/Orders are the Debtor's agents.  Specifically, they allege that affirmative Debtor approval or input is needed for certain actions taken by the institutions or orders.  (*See* Dowd Response ¶ 90 ("[A] religious order cannot perform religious services in the Debtor's territory without the Bishop's consent, and the scope of authority they are vested with is exclusively determined by the Bishop.").)  More broadly, the claimants also allege that the agency relationship stems from the Debtor's general background authority to control nearly everything that occurs within the diocesan territory.  (*See* Dowd Response ¶ 75 ("The bishop of the diocese is the source of all authority and power in the diocese and this involves everything that is done in the diocese no matter who does it.  The local bishop has authority over all works of ministry conducted in a diocese whether this be by individuals or groups.") (quoting Doyle Cormaria Decl. ¶ 55).)

The claimants' allegations regarding the relationship between the Debtor and the Religious Institutions/Orders under Canon Law do not plausibly state that Religious Institutions/Orders are agents of the Debtor.  The Canon Law allegations, if believed, do

---

[22]     Such state court decisions are inapposite whether those elements are adequately pled under the federal pleading standard here.

establish that the Debtor and Religious Institutions/Orders work closely in various functions, with the Debtor having an ability to exercise significant influence over those entities for certain matters. Such a relationship, however, is not necessarily indicative of an agency relationship between two distinct entities. Specifically, with respect to the Religious Institutions/Orders' hiring and supervision of the abusers, the claimants fail to allege the elements of both control and consent. *See Bigio*, 675 F.3d at 175 ("[A]n agency relationship results from a manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and the consent by the other to act.") (internal quotation marks omitted).

As discussed above, it is unclear from the allegations that the Religious Institutions and Orders are acting on the behalf of the Debtor, or subject to their control, when they hire or supervise their own employees or agents. *Oparaji*, 2008 WL 4054412, at *11 (S.D.N.Y. Aug. 28, 2008) ("Essential to the finding of an agency is a determination that the agent acts subject to the principal's direction and control.") (internal quotation marks omitted). Hiring and supervision is not in the enumerated series of actions that require diocesan approval in the allegations. Furthermore, the general allegations of diocesan ability to control all aspects of the religious orders and institutions says nothing about whether the Debtor actually exercised that control with respect to hiring and supervision of the abusers in question.

General allegations of "control" are not a theory for holding one party liable for another's wrongdoing. The Debtor and relevant institutions are separate entities, and "control" is only relevant insofar as it can be used as a factual matter to support a legally cognizable theory for doing so, like agency.

Under New York law, however, allegations about one entity's general ability to control and influence a separate entity are insufficient to support agency claims where the claimant cannot establish that control was in fact exercised over the separate entity with respect to the

42

conduct in question. *See Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1455, 1459–62 (2d Cir. 1995)

(finding no agency relationship even though the parent and subsidiary utilized a centralized cash

management system and parent's approval was required for subsidiary's "real estate leases,

major capital expenditures, [and] negotiations for a sale of minority stock ownership"); *Bigio*,

675 F.3d at 175–76 (finding that plaintiff failed to show agency relationship between parent and

subsidiary where the plaintiffs alleged that the parent invested in the subsidiary, continued to do

business with the subsidiary through the case, and advised the subsidiary on the subject of

profitability, and that the allegations "amount[ed] to nothing more than the usual concomitants of

the relationship between a parent and a partially-owned subsidiary"). The claimants fail to allege

that the Debtor exercised control over the religious orders and institutions in their hiring and

supervision of the abusers such that they could support claims of agency under New York law.[23]

Furthermore, the claimants do not allege that there was the mutual consent for the

religious orders to act on the Debtor's behalf in this regard. "Control alone is insufficient to

establish the existence of an agency relationship . . . . The agent's power to alter legal relations

between the principal and third persons is also an essential element of the agency relationship."

*Mouawad Nat'l Co. v. Lazare Kaplan Int'l Inc.*, 476 F. Supp. 2d 414, 422 (S.D.N.Y. 2007)

(citations omitted). The responses are simply devoid of any allegations pertaining to consent

---

[23]    The Dowd Response makes a superficially improved but similarly defective argument regarding the Diocese's control over Cormaria under New York Religious Corporation Law. (*See* Dowd Response ¶¶ 50–59.) The Dowd Response posits that at all relevant times, N.Y.R.C.L. §§ 90–92, which govern certain operations of Catholic entities, applied to Cormaria, and gave the Debtor a statutory right to exercise authority over their property and affairs. Without even examining the propriety of the Dowd Response's assertions on the applicability of the statute, the Court finds that this would not establish that Cormaria was an agent of the Diocese for the same reasons that Canon Law's purported grant of blanket authority to the Diocese does not establish that was Cormaria was an agent of the Diocese.

The Dowd Response cites no authority that operation of the statute creates an agency relationship, and the Court concludes that to the extent the legislature intended to do so, that result would have been explicitly stated in the statutory provision. The Court refuses to read such a serious legal consequence into a statute that is otherwise silent with respect to the establishment of agency relationships.

43

between the Debtor and Religious Institutions/Orders for the latter to act on the former's behalf to alter its legal relations with any third persons.

2.  <u>Analysis of the Public Representation and Debtor Performance of Functions Allegations Under the Federal Pleading Standard</u>

In addition to the Organization and Canon Law allegations, the claimants attempt to allege that an agency relationship exists between the Debtor and Religious Institutions/Orders based on the Debtor's performance of certain functions for the Religious Institutions/Orders and public representations made about the relationship between the entities.  Specifically, the responses allege that:

- Certain of the Religious Institutions in question were listed as "part of" or "under" the Diocese of Rockville Centre in the Official Catholic Directory.  (*See* Dowd Response ¶¶ 37–42; *see also* Anderson ¶¶ 5–6.)  Furthermore, the claimants allege that the Debtor's practice was to process and handle the tax filings for the institutions.  (Dowd Response ¶¶ 37–42.)

- One of the institutions, La Salle was under the authority of the Debtor's Department of Education ("DOE"), because the DOE's marketing materials include students enrolled in schools run by religious orders in its headcount, conducts marketing campaigns for such schools, funnels federal and state funding from the Debtor to such schools, and determines the budgets for such schools and whether to close insufficiently performing schools.  (*Id.* ¶¶ 43–48.)

- The institution that "was home to" St. Mary is listed in the "Blue Book 2020, The Official Directory for the Diocese of Brooklyn and the Diocese of Rockville Centre," in its section on "Programs and Services of Rockville Centre Schools" under the subcategory "Children's Services."  (Second Merson Response ¶¶ 31–33.)

- Certain institutions (namely, La Salle) conducted sporting and social events with other schools within the Debtor's Catholic school system, and were visited frequently by Diocesan personnel.  (Dowd Response ¶¶ 25–28.)

- Various social media posts show that members of the Diocese frequently visited religious order-run schools or events (namely, Chaminade), promoted the same on social media, and that religious order-run institutions post about the Diocese and events they hold for the Diocese on their social media.  (First Merson Response ¶¶ 30–33.)

The Court concludes that these allegations do not provide sufficient support in conjunction with the other allegations to state a claim against the Debtor.  None of the

allegations in this category bear on the factual relationships between the Debtor and any of the abusers or individuals occupying similar positions as the abusers.  Thus, the Court considers that these allegations do nothing to support any claims under an Abuser Control Theory. Furthermore, while the allegations are clearly geared toward the Debtor's relationships with the Religious Institutions and Orders, they also fail to plausibly allege an agency relationship between the Debtor and the Religious Institutions and Orders in question under an Institution Control Theory.

It is clear on the current allegations that the Debtor and Religious Institutions within its territory likely had close working relationships on many matters, and frequent communications and interactions as a result.  While these close relationships between the entities are somewhat unique given the surrounding religious, social, and academic contexts in which they arise, they are not so different from the close relationships that arise between entities in the same corporate families in the secular context, and on which most of the applicable caselaw regarding agency arises, as discussed *supra* in Section IV.C.1(c).

The Court has already observed that generalized allegations regarding the close operation between two distinct legal entities—even where that close operation refers to an overlap in management and ownership—is insufficient to establish the existence of an agency relationship. *See Fletcher*, 68 F.3d at 1455, 1459–62; *Bigio*, 675 F.3d at 175–76.  Instead, the Court considers it necessary to state factual allegations showing that there was mutual consent for the agent to act on behalf of the principal with respect to certain actions, and that the principal exercised control over the agent with respect to those actions.  The relevant actions at issue here are the hiring and supervision of the abusers in question.  With that focus, it is clear from a review of the allegations above that none of them have anything to do with the hiring or supervision of the abusers.

For instance, the fact that the Debtor coordinated certain activities with respect to tax filings, the Diocese's Department of Education participated in the marketing and advertising for institutions like schools, or was involved in the budgeting, funding allocation, or closure decisions for schools does nothing to reflect that the institutions had consented to act on behalf of the Debtor or subject to its control in any capacity, let alone in a way where it could alter the Debtor's legal relations with third parties. *Mouawad Nat'l Co.*, 476 F. Supp. 2d at 422. If anything, many of these activities would appear to involve the Debtor acting on the behalf of the Religious Institutions in many respects.

The other allegations regarding public representations about the Debtor and Religious Institutions are even further afield. The fact that one entity is involved in the same social, academic, or athletic events as another entity, or publicly promotes that involvement does absolutely nothing to create any inference of an agency relationship between two entities. Relatedly, the creation of directories, websites, or other publications that list Religious Institutions in a way that makes them appear to be "a part of" or "under" the Diocese do not move the needle either. While a principal in certain contexts might advertise agents as being organizationally related to the principal, in the absence of any other allegations independently supporting the existence of an agency relationship, this does nothing to help the claimants. *Iqbal*, 556 U.S. at 678 ("Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'") (quoting *Twombly*, 550 U.S. at 557). Indeed, the Court considers the only plausible inference raised by these representations is that they simply accurately reflect that the Religious Institutions are within the Debtor's diocesan territory, and that the Debtor sought to facilitate the public's ability to obtain information about those Religious Institutions. But neither of those

facts help to establish plausible allegations that two distinct entities ever formed an agency relationship.

On the whole, this category of allegations amounts to nothing more than a disjointed series of observations about the miscellaneous ways the Debtor interacts with various Religious Institutions/Orders.  But so long as the claimants continue to avoid the actual elements of agency in their pleadings, they will not state a claim by simply heaping on allegations about how frequently the Debtor and Religious Institutions communicate, promote one another, or collaborate on matters unrelated to the Religious Institutions' own hiring and supervision of its employees.

### 3.  Other Miscellaneous Arguments Do Not Alter the Outcome

For completeness of analysis, the Court addresses two other arguments that uniquely pertain to a particular Religious Institution or were made by a single firm in the responses.  The Court concludes that neither of these specific arguments alter the conclusions above.

#### a.  *Debtor's Little Flower Argument*

One of the Complaint Claimants alleges that the abuse in question occurred as a result of having attended Little Flower.  Recall that beyond the arguments that the Debtor makes for all Religious Institutions, the Debtor has additional arguments regarding a lack of control over the Little Flower.  Specifically, the Diocese of Rockville Centre is not named in the Little Flower civil complaints associated with the Proofs of Claim at issue on this Objection.  (*See* Claim No. 90403; Objection ¶ 36.)  As noted above, certain of the Complaint Claimants that did not name the Debtor in their complaints filed those complaints after the commencement of the bankruptcy, which the Court considered may have explained why the Debtor was omitted.  (*See supra* n.14.) Furthermore, given the arguments in the responses, the Court construed those responses as effectively adding the Debtor to the allegations made in the complaints, despite the initial omission.

47

However, with respect to Little Flower, the Debtor further argues that in addition to not naming the Debtor, Claim No. 90403 should also fail because of who it *does name*—the Diocese of Brooklyn.  In this regard, and by extension of the reasoning from the *Fifth Omnibus Opinion*, the Court considers that this potentially causes additional issues of plausibility for the Little Flower Complaint Claimant that may be relevant when the claims are amended.  The Court need not reach this issue, however, considering that it has already concluded that Claim No. 90403 has failed to state a claim along with the other Complaint Claims.

### b.  The Merson Responses' Spoliation Argument

Finally, the Merson Responses blame any pleading shortcomings on the Debtor's modifications to its website, which the Merson Responses allege constitute "spoliation."  This argument has no merit but the Court addresses it given the considerable effort the Merson Responses expend on it.  The crux of the Merson Responses' argument is that the Debtor's former website created an impression that certain high schools at issue here were "Diocesan" high schools, but that the Debtor changed the website to reflect a distinction between "parish and private high schools" and "Diocesan high schools."  (*See* First Merson Response ¶¶ 28, 76–79.)

First and foremost, the Merson Responses' argument that any factual deficiencies in their pleading result from the change to the Debtor's website is clearly belied by the fact that the claimants were in fact able to access and capture the contents of the old website before the alleged change.  (*See* Ex. 1 to First Merson Response.)  Quite obviously, they cannot blame their lack of factual allegations on a website change when they documented the contents of the website before the change occurred.[24]

---

[24]    In the Second Merson Response, the claimants state that they were not able to retrieve similar representations from the old website pertaining to St. Mary's.  They contend that "the deleted website surely would have provided information concerning the control the Diocese had over St. Mary's."  (Second Merson Response ¶ 4.)  The response then goes on to use the representations it located related to Chaminade on the former website in the First Merson Response as an example of what might have been proved.  For the sake of argument, the Court affords the relevant claimant the inference that older iterations of the Debtor's website would have contained representations regarding St. Mary's that were similar to the representations pertaining to Chaminade.

Furthermore, the Court took into account the allegations that the Merson Responses made based on the representations on the old website, and as discussed above, find that they do not help to allege claims against the Debtor.  Furthermore, the Court finds that the weight the Merson Response gives to the information on the website (and thus, the excuse for its shortcomings) is misplaced; as alluded to above, while the Court considers that certain information in a published list of schools might be presented in a way that is consistent with the underlying existence (or non-existence) of an agency relationship, the actual agency relationship depends on facts pertaining to control and consent that have nothing to do with how a high school is ultimately listed on the Debtor's website.

As a result, the Merson Responses' arguments that they frame as "spoliation" fail to cure or excuse their pleading deficiencies.  Furthermore, the Court doubts that the Debtor's actions constitute "spoliation" based on the conduct alleged.[25]  In any event, the Merson Responses fail to cite any support for the proposition that independent legal consequences should flow from the Debtor having changed its website, whether framed as spoliation or not.

* * * * * *

For the reasons stated above, the Court concludes that the Complaint Claimants have failed to state any claims for relief against the Debtor under the federal pleading standard.[26]  As a

---

[25]    The claimants' own citations suggest that spoliation applies when "a party negligently loses or intentionally destroys key evidence."  (First Merson Response ¶ 75 (citing *Igoglia v. Barnes & Noble Coll. Booksellers, Inc.*, 48 A.D.3d 636, 852 N.Y.S.2d 337 (2nd Dep't 2008).)  The Merson Responses do not cite any authority that changing what is publicly available on a website constitutes "loss" or "destruction"; as previously discussed, the claimants were able to access the former versions of the website suggesting that it was not lost or destroyed.  Furthermore, the Court considers that the Debtor's ability to produce prior versions of website in discovery, notwithstanding what is publicly available on its website, could similarly foreclose arguments regarding spoliation.

[26]    The parties expended significant effort here in their papers arguing about the impact of the Renker Declaration (including the attached exhibits) for purposes of deciding the Objection.  Because the Court was able to conclude that the allegations in the complaints, proof of claim forms, and responses failed to state a claim against the Debtor, it was ultimately unnecessary to consider the Renker Declaration or Exhibits.

result, the Court **SUSTAINS** the Objection to such claims under the Claim Objection

Procedures.

### D. The Objection is Sustained Without Prejudice

Having concluded that the Complaint Claimants have failed to state any claims for relief

against the Debtor, the Court next consider whether the objection should be sustained with

prejudice.  The Court concludes that it should not be based on several considerations.

First, to the extent that its decision rests on the analysis of the complaints, the claimants

did not have notice that their complaints would ultimately be assessed by the bankruptcy court in

the context of a dispositive motion when they drafted and filed those complaints in state court.

Second, the Debtor's current omnibus Objection, which effectively seeks dismissal of the

claims under the federal pleading standard, was only made possible as a procedural matter by the

Claim Objection Procedures.  In the absence of specific procedures like the Claim Objection

Procedures in this case, a claimant normally establishes a *prima facie* case against a debtor upon

filing a proof of claim alleging facts sufficient to support the claim.  *See* FED. R. BANKR. P.

3001(f).  In turn, "[t]o overcome this *prima facie* evidence," an objecting debtor is then required

to "come forth with evidence which, if believed, would refute at least one of the allegations

essential to the claim." *Sherman v. Novak* (*In re Reilly*), 245 B.R. 768, 773 (2d Cir. B.A.P.

2000).  Here, however, the Claim Objection Procedures added the intermediate procedural step

of a Sufficiency Hearing, whereby the Debtor does not need to come forward with evidence, but

can challenge the claim's sufficiency as a pleading under Rule 12(b)(6) standards.

The proofs of claim and complaints at issue here were filed before the Claim Objection

Procedures were entered in this case.  Thus, the Court considers that in filing their proof of

claims forms and attached complaints, the claimants did not have notice that their claims would

be assessed via the federal pleading standard at this intermediate step, as opposed to the normal

claim objection procedure under the bankruptcy rules. While this shields the claimants from having to offer evidentiary proof on the instant claim objection, the Claim Objection Procedures also effectively impose a pleading burden that was not explicitly contemplated at the time the proof of claim forms were filed.

Indeed, the claimants in this case have cited the two considerations above in their responses as the basis for requesting that the Court: (1) consider additional allegations asserted for the first time in their responses as part of their claims; and (2) allow the claimants to amend their proofs of claim form, in the event that the Court determines they have failed to meet the required pleading standards. As the Court has explained, the Debtor did not oppose on the first point, and as such, the Court did in fact construe additional allegations made in responses as if they were part of the complaint and proof of claim form.

Notwithstanding that accommodation, the Court has concluded that the current allegations have failed to state a claim for relief; this brings into focus the claimants' second alternative request to amend their claims. Importantly, in its Reply, the Debtor did not oppose the Claimant's request to amend. Because the result here is based on the application of Rule 12(b)(6), it is instructive to consider cases where parties request leave to replead pursuant to Rule 15(a)(2) in the event that they fail to withstand a motion to dismiss under Rule 12(b)(6). *See, e.g.*, *Shih v. Petal Card, Inc.*, 2019 WL 11276687, at *1 (S.D.N.Y. Aug. 21, 2019). "[T]he Court is mindful that Federal Rule of Civil Procedure 15(a)(2) directs it to 'freely give' a party leave to amend its pleading when justice so requires." *Id.*

The Court concludes that justice requires allowing the claimants to amend their claims because: (1) portions of the relevant pleadings were filed without notice of the exact standard that would be applied on the first dispositive motion; (2) this Court's opinion will serve as the first opportunity for the claimants to identify and attempt to fix their pleading deficiencies, *cf.*

*Transeo S.A.R.L. v. Bessemer Venture Partners VI L.P.*, 936 F. Supp. 2d 376, 415 (S.D.N.Y. 2013) (holding that "[p]laintiff's failure to fix deficiencies in its previous pleadings is alone sufficient ground to deny leave to amend sua sponte" and collecting similar cases); (3) due to the procedural peculiarities in this case, the claimants that have not yet been afforded the opportunity to assert and contextualize all allegations in a single pleading, and as a result, the Court was put in the position of analyzing the sufficiency of allegations made in piecemeal fashion; and (4) the Debtor has not explicitly opposed affording the opportunity to replead in its papers, nor could it given the guidance of Rule 15.

The Court concludes that the Objection to the Complaint Claims should only be sustained without prejudice.

## V.  ANALYSIS OF FORM CLAIMS

There are 22 Form Claimants for whom responses were filed.  Responses were filed on behalf of these claims by four different law firms.  Each of the firms makes the same substantive arguments on behalf of its claimants, and the same allegations with respect to each Religious Institution addressed in its response(s).  Those firms and responses are as follows:

1. The Thomas Response (ECF Doc. # 1781), filed on behalf of Claim No. 90483.

2. The Matthews Response (ECF Doc. # 1811), filed on behalf of Claim No. 90465.

3. The Slater Response (ECF Doc. # 1794), filed on behalf of Claim Nos. 90036, 90456, 90455, 90454, 90450, 90451 , 90452, 90453, 90522, 90083, 90021 , 90166, 90023.

4. The Herman Responses (ECF Doc. ## 1795, 1798, 1800, 1801, 1802, 1805, 1808) filed on behalf of Claim Nos. 90494, 90358, 90413, 90261, 90379, 90380, and 90429, respectively.[27]

In only submitting the proofs of claim form, there are no pleading documents that set out the causes of action asserted by the Form Claimants.  The definition of "Sexual Abuse Claim" on

---

[27]    Because the arguments and allegations offered in the Herman Responses are substantially similar, the Court will refer to the Herman Response filed at ECF Doc. # 1808 as illustrative of the Herman Responses' position for ease of reference.

the proof of claim form defines such claims as abuse "under any theory of liability, including

vicarious liability, any negligence-based theory, contribution, indemnity, or any other theory

based on any acts or failures to act by the Diocese or any other person or entity for whose acts or

failures to act the Diocese is or was allegedly responsible." *See, e.g.*, Claim No. 90843.

Based on the claim forms and the arguments raised in the Form Claim Responses, the

Court considers that the asserted claims consist of a range of tort causes of action similar to those

that have been asserted by the Complaint Claimants.  Furthermore, the Court considers that the

Form Claimant's arguments regarding the Debtor's liability are founded on the same allegations

regarding control as the Complaint Claimants, and also depend on either an Abuser Control or

Institution Control theory to succeed.  As such, they will be subject to the same legal standards

and caselaw discussed for the Complaint Claims.

With that in mind, the Court examines the allegations in the original proof of claim form,

as well as any allegations added in the responses, to evaluate whether the Form Claimants have

stated a cause of action.  The Court concludes that they have not.

**A.  The Form Claimants Fail to Adequately Plead a Claim for Relief**

As it did for the Complaint Claims, the Court performed a claim-by-claim review of the

Form Claims alongside the responses filed on behalf of the Form Claims.  On the Court's review,

it appears that the Form Claimants offered no allegations or distinct legal arguments different

from the Complaint Claimants, and thus their claims fail for the same reasons.

    1.  <u>The Form Claimants Fail to Adequately Plead a Claim for Relief Under the
       Abuser Control Theory</u>

Specifically, the Court first concludes that none of the Form Claimants have made any

allegations about the relevant abusers at issue, either in their proof of claim forms or responses,

that would support the claim that the Debtor was the employer or principal of such abusers.

The proof of claim forms provide little to no supporting allegations for such theories. The Thomas and Matthews Claims both list the relevant abusers as being "affiliated" with the Debtor in response to question 4(c) in the proof of claim form. (*See* Thomas Claim No. 90465 at 6; Matthews Claim No. 90483 at 8.) The responses for the Herman and Slater claims are mixed; certain of the claim forms filed by each firm also make similar allegations of affiliation, while others do not list the Debtor at all. (*Compare* Herman Claim No. 90380 at 9 *with* Herman Claim No. 90379 at 8.) The Court considers that even the proof of claim forms that state the abuser was "affiliated" with the Debtor do not include non-conclusory allegations with respect to agency or employment.

Furthermore, the responses do not make any non-conclusory allegations regarding the Debtor's employment or agency relationship with the abusers in question. The only response that actually makes an affirmative allegation regarding employment and agency is the Thomas Response, which does so in completely conclusory terms. (*See* Thomas Response ¶ 52 ("[Abuser] was the agent, servant, and/or employee of the Diocese.").) The Matthews response attempts to draw some connection between the abuser and the Debtor by alleging that the abuser needed to have permission from the Bishop to work at the Debtor. But for the same reasons discussed *supra* with respect to similar allegations in the Doyle Cormaria Declaration, this still does not actually allege the existence of an employment or agency relationship. Furthermore, the Matthews Claim does not even include the name of any particular abuser due to the claimant's lack of recollection, which strongly suggests that the allegation was simply made in conclusory fashion in any event.

The strongest position taken by the responses beyond these allegations are that any issues of supervision, control, employment, or agency are ones of fact. (Slater Response ¶¶ 22, 40; Matthews Response ¶ 45; Herman Response ¶ 9.) The Court does not consider these to be

allegations. Furthermore, these are only supported via indirect arguments regarding the Debtor's control over the Religious Orders and Institutions themselves, which as discussed below, lack merit.

2. <u>The Form Claimants Fail to Adequately Plead a Claim for Relief Under the Institution Control Theory</u>

The Court further finds that none of the Form Claimants make any allegations about the specific institutions or orders at issue that would support the claim that the Debtor was the principal of such entities under an Institution Control Theory.

Again, the Court finds that the proof of claim forms provide no allegations that the Debtor controlled the specific institutions or orders in question, conclusory or otherwise. Thus, the responses provide the only potential source of factual allegations on this theory. Yet, the responses also fail to state any factual allegations that would support the claim that the Religious Institutions or Orders at issue were employees or agents of the Debtor.

In reviewing all of the allegations made in the responses, the Court reaches this conclusion after observing that the Form Claimant Responses almost exclusively offer the same allegations that were made by the Complaint Claimants and their responses, and thus they fail for the same reasons.

To summarize, the claimants contend that the following factual allegations regarding the relationship between the Debtor and Religious Institutions/Orders in question support their claims regarding agency:

- The authority of the Diocese under the organization and practices of the Catholic Church, including the operation of Canon Law, as supported by Declarations from Father Thomas P. Doyle. (Matthews Response ¶¶ 3, 8–10; Herman Response (ECF Doc. # 1808) ¶ 9).[28]

---

[28]     The Matthews Response attaches a declaration from Mr. Doyle that was specifically drafted for the Matthews Claim, while the Herman Response attaches a declaration from Mr. Doyle filed in another case for the general Canon Law propositions it attempts to support.

- Certain of the Religious Institutions in question were listed as "part of" or "under" the Diocese of Rockville Centre in the Official Catholic Directory. (Matthews Response ¶ 15; Herman Response (ECF Doc. # 1808) ¶ 10; Slater Response ¶ 12.)

- The Debtor was involved with providing insurance coverage to certain of the Religious Institutions. (Matthews Response ¶¶ 11–12; Slater Response ¶¶ 26–29.)

- The Debtor assigned certain clergy members to work at Religious Institutions that are not alleged to be abusers. (Thomas Response ¶ 10.)

- The Debtor hosted events, like athletic competitions, at La Salle. (Thomas Response ¶ 14.)

- The Debtor promoted enrollment in Religious Institutions like La Salle by holding events where La Salle officials could meet with students and parents (*see* Thomas Response ¶ 15), and advertising for those Religious Institutions on its website without notifying readers that it is a separate school. (*See* Slater Response ¶¶ 19–21.) The Debtor also lists other schools that are run by the religious order that used to operate La Salle before it closed on the Debtor's website. (*See id.* at 16–18.)

- When La Salle closed in 2001, school officials coordinated with the Debtor about the placement of students in other Catholic diocesan elementary and secondary schools. (Thomas Response ¶ 16.) The Religious Order that ran La Salle has an archive that is "filled with hundreds, if not thousands, of pages of correspondence, memoranda, reports, and financial statements between the two entities." (*Id.* ¶ 17.)

In reviewing these allegations versus what was offered by the Complaint Claimants, these do not provide any different types of factual allegations that would bear any differently on the elements of agency beyond what the Court has already considered. Thus, for the same reasons discussed above in the context of the Complaint Claims, the Court finds that these allegations fail to state a claim on which relief can be granted under Rule 12(b)(6), and that the Objection to these claims should be sustained as a result.

### B. The Objection is Sustained Without Prejudice For All But One of the Form Claims

Nevertheless, the Court considers that all Form Claims that filed a response to the Objection should be afforded an opportunity to amend their claims for the reasons discussed above in the context of the Complaint Claims. The Court provides leave to amend for all Form Claims except for Claim No. 20048, as to which leave to amend is DENIED, since it did not

attach a state court complaint, name the Debtor as an affiliate of the Religious Institution at issue in its proof of claim, or respond to the Objection.

## VI.    <u>CONCLUSION</u>

For the reasons explained above, the Court **SUSTAINS** the Objection.  With respect to the 38 claims for which a response was filed, the Objection is **SUSTAINED WITHOUT PREJUDICE**.  With respect to the remaining claim (Claim No. 20048), the Objection is **SUSTAINED WITH PREJUDICE**.  Within seven (7) days from the date of this Order, counsel for the Debtor, the Committee, and the Claimants shall confer and submit any order required to grant the relief requested in the Objection consistent with the terms of this Opinion.

**IT IS SO ORDERED.**

Dated:    June 2, 2023
            New York, New York

*Martin Glenn*
_____
MARTIN GLENN
Chief United States Bankruptcy Judge
