PACHULSKI STANG ZIEHL & JONES LLP
James I. Stang, Esq. (admitted *pro hac vice*)
Alan J. Kornfeld, Esq.
Karen B. Dine, Esq.
Brittany M. Michael, Esq.
780 Third Avenue, 36th Floor
New York, NY 10017-2024
Tel: 212-561-7700; Fax: 212-561-7777
jstang@pszjlaw.com
akornfeld@pszjlaw.com
kdine@pszjlaw.com
bmichael@pszjlaw.com

*Counsel to the Official Committee of Unsecured Creditors*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>THE ROMAN CATHOLIC DIOCESE OF ROCKVILLE CENTRE, NEW YORK,<br><br>Debtor. | ) Chapter 11<br>)<br>) Case No. 20-12345 (MG)<br>)<br>) |

**DECLARATION OF CHARLES D'ESTRIES IN SUPPORT OF
MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS TO DISMISS CHAPTER 11 CASE [D.I. 1912]**

I, Charles D'Estries, pursuant to 28 U.S.C. § 1746 and under penalty of perjury, declare:

1. I am over twenty-one years of age and am competent to make this declaration (this "Declaration") in support of the *Motion of the Official Committee of Unsecured Creditors to Dismiss Chapter 11 Case* [D.I. 1912] ("Motion to Dismiss"), filed by the Official Committee of Unsecured Creditors (the "Committee") appointed in the chapter 11 case of The Roman Catholic Diocese of Rockville Centre, New York (the "Debtor" or "Diocese").

2.     Except as otherwise stated in this Declaration, all facts set forth herein are based on my personal experience, knowledge or understanding.

## I. INTRODUCTION AND BACKGROUND

3.     Beginning when I was 13 years old, I was sexually abused by a Diocesan priest.

4.     Following the passage of New York's Child Victims Act in 2019 which opened the statutory window for asserting sexual abuse claims (the "CVA"), my personal lawyer, Jason P. Amala, a member of the law firm Pfau Cochran Vertetis Amala PLLC ("PCVA"), filed a complaint on my behalf in New York state court against the Diocese and St. Patrick's Parish in connection with the abuse to which I had been subjected during 1968-1970 (the "State Court Case").  My State Court Case is pending, but has been stayed because of the commencement of the Diocese's bankruptcy case and the preliminary injunction entered in the bankruptcy case staying state court litigation against non-debtors.

## II. THE COMMENCEMENT OF THE DIOCESE'S BANKRUPTCY CASE AND APPOINTMENT AND ROLE OF THE COMMITTEE

5.     On October 1, 2020 (the "Petition Date"), the Diocese filed a bankruptcy case under chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Case").  On October 16, 2020, the Office of the United States Trustee formed the Committee, and I was appointed to serve as a member of the Committee. *See Notice of Appointment of Official Committee of Unsecured Creditors* [D.I. 71].  I have served on the Committee since its formation.  Following its formation, the Committee selected Pachulski Stang Ziehl & Jones LLP ("PSZJ") as its bankruptcy counsel, Burns Bair LLP ("Burns Bair") as its special insurance counsel, and Berkeley Research Group, LLC ("BRG") as its financial advisor.  I have continued to be represented in my personal capacity by Mr. Amala and PCVA.

6. The Committee has at all times since its formation had nine (9) members, including eight individuals who were sexually abused as minors (myself included) and one representative of a minor with a civil rights claim against the Diocese. My duties as a Committee member, and those of the other Committee members, are to be responsible for unsecured creditors of the estate, including the 600-plus survivors that that have filed claims against the Diocese in the Bankruptcy Case (the "Survivors"). While the Committee is responsible for the Survivors as a constituency, the Committee does not represent any Survivor directly in his or her individual capacity.

7. The Committee works closely with our advisors and considers information regarding the Diocese, the Bankruptcy Case and the claims of Survivors and other unsecured creditors. Based largely on this information and the education provided to the Committee, the Committee votes on positions regarding issues in the Bankruptcy Case. A number of state court counsel representing certain members of the Committee also participate in our meetings, each bringing a wealth of experience and expertise relevant to the issues facing the Committee. Once the Committee votes on an issue, counsel to the Committee executes on the decisions made by the Committee.

8. I have attended over one hundred Committee meetings since the commencement of the Bankruptcy Case over 2½ years ago in October 2020. On average, I spend over 6 hours per week preparing for and attending Committee meetings (generally conducted over Zoom or by telephone). Our counsel attends and provides information and advice at each meeting. My personal counsel also attends the majority of these meetings. I receive and read emails from Committee advisors regarding Committee business regularly, generally several times a week, depending on case activities or developments. I prepare for Committee meetings in advance of

each meeting, and review information provided by the Committee's advisors regarding the issues to be discussed and/or determined by the Committee.

9. As a Committee member, when deciding on behalf of the Committee, the impact of the Committee's decision on my personal claim does not affect my decision. As a Committee member, I work for the Survivor constituency as a whole. I take very seriously, and so do my colleagues on the Committee, our responsibility not to ourselves, but to the people who are trying to find resolution in the form of a fair compensation settlement so their lives can go on. As Committee members, we cannot think about our own personal situations, but must think, as a whole, about the enormity of all of the varying situations, severity and difficulties faced by the 600-plus Survivors, each of whom faces impacts from the abuse he or she suffered and who seeks fair compensation for such abuse.

10. The Committee recognizes that the 600-plus Survivors are people. People who have suffered horrific circumstances no one should ever face. And this case is not just about the 600-plus Survivors. Thousands of people are impacted because each Survivor has people who love them, who are trying to support them, and who are also working through the impacts the abuse has had on *their* lives. The Survivors are not simply a number, nor are they faceless "claims" seeking undue recompense.

11. The Committee's goal is to do its best to help Survivors obtain fair and adequate compensation on account of their abuse claims.

### III. THE DIOCESE PLAN AND THE TREATMENT OF SURVIVOR CLAIMS

12. In early 2023, I learned the Diocese filed its *Chapter 11 Diocese Plan of Reorganization for The Roman Catholic Diocese of Rockville Centre, New York* [D.I. 1614] (the "Diocese Plan") and related Disclosure Statement [D.I. 1615] (the "Diocese Disclosure

4

Statement"). I have generally reviewed the Diocese Plan and Diocese Disclosure Statement, and have specifically reviewed certain aspects of these documents that impact the Survivors and the treatment of their claims. The Committee and its advisors have discussed the Diocese Plan and Diocese Disclosure Statement at length. Based on my review and these discussions, I understand that the Diocese seeks through the Diocese Plan to provide full releases for its approximately 135 parishes and potentially hundreds of other non-debtor affiliates whose identities the Diocese has yet to disclose (the "Non-Debtor Entities"). I understand that the Diocese will not support a plan that does not include full releases for the Non-Debtor Entities.

13. The Committee filed its own *First Amended Chapter 11 Diocese Plan of Reorganization* [D.I. 1643] (the "Committee Plan") and related Disclosure Statement [D.I. 1644]. The Committee Plan provides the Non-Debtor Entities with the opportunity to settle for $200 million, an amount the Committee proposed based on our understanding of fair compensation for the claims against Non-Debtor Entities to be released and the assets available to pay such claims. I understand that the Diocese will object to the Committee Plan on various grounds, including that it does not require a release for the Non-Debtor Entities and that the confirmation of the Committee Plan violates the Diocese's religious freedom.

14. The Diocese Plan also proposes low value settlements with certain affiliates to whom the Diocese transferred significant assets prior to its bankruptcy filing to shelter those assets from Survivors. The Diocese Plan includes settlements for approximately $7.5 million with an additional $29 million over ten years and 65% of the proceeds from the sale of property. In contrast, the Committee Plan offers to settle with the same affiliates for $86 million now and 85% of the proceeds from the property sale.

15. Finally, the Diocese Plan fails to provide the Committee fair value for the Diocese captive insurance company and unnecessarily retains unrestricted cash that should be used to compensate Survivors.

16. It is the Committee's position that the monetary compensation proposed to the Survivors is wholly inadequate. Under these circumstances, neither the Committee, nor the Survivors (as reflected by the joinders to the Motion to Dismiss filed by Survivors), will support the Diocese Plan, even as it belatedly promises to revise it further.

**IV. THE MEDIATION PROCESS**

17. Since the Petition Date, the Committee has been engaged in significant efforts to reach a consensual resolution to this Bankruptcy Case, but has faced delay after delay, waiting for the information necessary to bring this case to resolution. The Committee has been slow-walked and stonewalled by the Diocese at virtually every turn.

18. During the past year, the Committee has participated in five mediation sessions, with four to five Committee members attending in person while others participated remotely. I have travelled to New York City to be present at every mediation session.

19. I attended the last mediation session that occurred over May 18 and 19, 2023 in New York City. Towards the end of the May 19th session, the mediators told the Committee that the Non-Debtor Entities would increase their offer from $11.1 million to $40 million. Before the conclusion of the May 19th session, the Committee promptly gave a counter-offer which has not received a response to this day. Since the conclusion of the mediation on May 19th, the Committee has not received any substantive communication from either of the mediators setting additional mediation sessions or raising mediation topics.

20. In addition, the Committee was in close contact with its advisors during all of the mediation sessions to discuss the issues raised in connection with mediations and the Committee's strategy and positions regarding those issues. To date, mediation has not resulted in a consensual resolution of the Bankruptcy Case and, after nearly 3 years, the parties remain at an impasse.

21. It has been a terrible experience to be involved in a resolution process where there has been no response, much less movement, by the Diocese and the Non-Debtor Entities in response to an offer. The Diocese's and Non-Debtor Entities' silence and lack of response to the Committee's latest proposal has been exceedingly frustrating. While the Committee remains open to an immediate resolution based on the fair treatment of Survivor's claims, the Committee is not interested in further delay through the continued pursuit of a process in this Bankruptcy Case in which the Diocese and the Non-Debtor Entities remain unwilling to engage in productive, substantive and timely discussions and resolution of Survivor's claims through the provision of real and fair value.

## V. THE COMMITTEE'S MOTION TO DISMISS THE BANKRUPTCY CASE

22. Following the filing of the Diocese Plan, and in light of the Diocese's and Non-Debtor Entities' unwillingness to engage in the mediation process with the Committee or provide fair value to the Survivors, in or around March 2023, the Committee and its advisors began serious discussion of whether the dismissal of the Bankruptcy Case would be in the best interests of the Survivors. Ultimately, the Committee determined that, based on the Diocese's approach taken in the Bankruptcy Case and the utter lack of progress in the resolution of Survivor's claims, there was no real alternative to a dismissal of the Bankruptcy Case and a return to the state court process. The Committee, therefore, unanimously voted to file and pursue the Motion

to Dismiss. At times after that unanimous vote, the Committee agreed to continue the hearing on the Motion to Dismiss because it believed that a continuance would result in substantive movement from the Diocese and the Non-Debtor Entities. Its belief was misplaced.

23. The Committee has considered the best interest of Survivors and their questioning of, and frustration with, the process. We are tired of the way we have been treated in the Bankruptcy Case and, at this juncture, we are frustrated with a bankruptcy process where the Debtor and the Non-Debtor Entities use time as a strategy against Survivors. Survivors are asking why the process has taken so long and why the Bankruptcy Case continues without progress or resolution. We, the Survivors, want to go back to where we were before the bankruptcy. We want our day in court and want to undertake discovery to move forward with our claims. We want to pursue the parishes and others responsible for our abuse. We want to tell our story, describe what happened to us, not just when we were young but the impact it had on our whole lives and the lives of our families. Survivors want to stop the money that should be available to pay our claims from going to bankruptcy professionals; finally ending the Diocese spending tens of millions of dollars in legal fees while penny-pinching when it comes to survivor recompense. It is mind-boggling that the attorneys for the Diocese and the Diocese listening to their advice would rather stay on the current course and stall Survivors instead of providing Survivors the fair treatment to which they are entitled. The Diocese had almost three years to address these issues during the Bankruptcy Case, but has failed to do so. The Diocese's most recent offer to amend the Diocese Plan is wholly insufficient and only serves to highlight the utter failure of its case strategy.

24. Survivors are not only the 50, 60, 70 and 80 year olds that have filed claims now, but are also the innocent children who were abused years ago. Please do not see me only as a

69-year old testifying witness, but also as the 13-year old boy who was abused by his priest. And look at those other Survivors not as old men and women, but as the children they were when they were abused, some as young as 4-years old. We were blameless children when we were abused. The Bankruptcy Case has resulted in a nearly 3-year delay with Survivors being no closer to resolution than we were on the Petition Date, only now we face a much depleted pool of assets. The time and money wasted by the Diocese is astonishing, as is the Diocese's failure to listen to our voices, the voices of the Survivors. There is no reasonable basis to believe that continuance of the Bankruptcy Case will work for any Survivor in terms of the timing of resolution of their claims.

25. The Committee understands that dismissal of the Bankruptcy Case is not a panacea, will present challenges and may have an impact on Survivors different from that in the Bankruptcy Case in certain respects. However, as compared to the negative and stalled experience of the bankruptcy process endured by Survivors, it is the Committee's position that dismissal, and a return to state court and the forward movement lacking in the Bankruptcy Case, is the best interests of its constituency.

26. There are two primary reasons for the Committee's – and Survivor's – support for dismissal of the Bankruptcy Case.

27. *First*, the Bankruptcy Case has been pending for nearly 3 years without real progress in resolving the claims of Survivor Claimants, notwithstanding numerous mediation sessions and attempts by the Committee to "bring the Diocese to the table." The Diocese, for reasons unknown to the Committee, is not taking the lives of the Survivors and the resolution of our claims as seriously as it should. The Committee has done its job, but the Committee's efforts in this Bankruptcy Case have gone largely unanswered and unmatched by the Diocese. The

parties are at an impasse with no visible prospect of an immediate acceptable change in position by the Diocese and the Non-Debtor Entities. As evidenced by the joinders filed to the Motion to Dismiss, the vast majority of the Survivors will not support the Diocese Plan. The Committee and Survivors will not support the Diocese Plan that provides inadequate compensation from the Diocese itself and gifts releases to Non-Debtor Entities and recipients of fraudulent transfers for a pittance. There is, therefore, no reasonable prospect of rehabilitation for the Diocese.

28. *Second,* the Diocese's estate is hemorrhaging money. The Committee's financial advisor, BRG, has advised the Committee that the estate has incurred significant losses after reorganization items/professional fees, and has cumulatively lost over $70 million in unrestricted net assets, in the period from the Petition Date through April 2023. Because of the Diocese's lack of engagement with the Committee regarding a resolution of the Bankruptcy Case, there is no end in sight to the burn. The Committee believes this bleeding of Diocese assets – assets that should rightly pay Survivors for the abuse committed – needs to cease. As there is no settlement in prospect, dismissal is the only way to stop incurrence of expenses at this extraordinary rate.

29. It is, therefore, the Committee's position that returning to state court is a better alternative than what is going on in the Bankruptcy Case, which is nothing.

30. I think of this like our house is on fire. Is it better to step out of the house and walk onto the driveway, or is it better to stay in the house that's on fire? Maybe there are not a lot of reasons to be in the driveway, but if your house is on fire, you want to get out. Similarly, we feel like the house is on fire. There is no progress and the case is not going anywhere – it is burning down. It is time to get out.

31. Moving forward in state court, and moving toward justice and our "day in court" is preferable to the stagnant nearly 3-year period of inertia that Survivors have faced in this

Bankruptcy Case. The Committee thus believes that dismissal of the Bankruptcy Case is in the best interests of Survivors.

## VI. ATTENDANCE AT HEARING ON MOTION TO DISMISS AND AVAILABILITY FOR CROSS-EXAMINATION

32. I plan to attend the hearing on the Motion to Dismiss scheduled for July 10th and 11th in person and will be available for cross-examination regarding my direct testimony provided by this Declaration.

I declare under penalty of perjury that the foregoing is true and correct to the best of knowledge and belief. I executed this Declaration on June 30, 2023 at Buffalo, New York.

*/s/ Charles D'Estries*
Charles D'Estries