PACHULSKI STANG ZIEHL & JONES LLP
James I. Stang, Esq. (admitted *pro hac vice*)
Alan J. Kornfeld, Esq.
Karen B. Dine, Esq.
Brittany M. Michael, Esq.
780 Third Avenue, 36th Floor
New York, NY 10017-2024
Tel: 212-561-7700; Fax: 212-561-7777
jstang@pszjlaw.com
akornfeld@pszjlaw.com
kdine@pszjlaw.com
bmichael@pszjlaw.com

*Counsel to the Official Committee of Unsecured Creditors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| THE ROMAN CATHOLIC DIOCESE OF ROCKVILLE CENTRE, NEW YORK, | Case No. 20-12345 (MG) |
| Debtor. | |

**MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO EXCLUDE CERTAIN DIRECT TESTIMONY AND EVIDENCE OFFERED BY OR THROUGH THE DIOCESE'S TESTIFYING EXPERT IN CONNECTION WITH THE COMMITTEE'S MOTION TO DISMISS THE CHAPTER 11 CASE AND CORRESPONDING EVIDENTIARY OBJECTIONS AND MOTION TO STRIKE**

The Official Committee of Unsecured Creditors (the "Committee") of The Roman Catholic Diocese of Rockville Centre, New York (the "Diocese"), requests that the Court preclude the Diocese's testifying expert, Charles Moore, from offering any testimony or evidence, including expert or other opinions, related to his self-styled "dismissal/liquidation analysis" and underlying litigation cost assumption set forth in the *Direct Testimony of Charles M. Moore* dated June 30, 2023 [D.I. 2224] (the "Moore Testimony"), filed by the Diocese in support of its opposition to the Committee's motion to dismiss the bankruptcy case (the "Motion

to Dismiss"), and requests that the Court sustain and grant the Committee's corresponding evidentiary objections and motion to strike.

## I. PRELIMINARY STATEMENT

1. The Diocese opposes dismissal of the bankruptcy case, asserting that – notwithstanding the lack of progress in the bankruptcy case and its failure to provide a realistic alternative to dismissal – survivors are better off in bankruptcy. As sole support for its assertion, the Diocese provides testimony of its restructuring advisor, Charles Moore. Mr. Moore opines that dismissal will result in a lower recovery for many creditors because there would be incremental costs in a dismissal scenario which would not be present in a chapter 11 plan scenario. Mr. Moore's opinion is based on what he styles a "dismissal analysis" – a term he has recently invented to describe his unique version of "liquidation analysis" as a "proxy" for valuing assets of the Diocese following dismissal ***notwithstanding that the Diocese will continue as an operating entity and will not liquidate***. Mr. Moore's novel approach is methodologically flawed, has admittedly never been previously used by anyone, in any known context, and is unreliable and unhelpful to the issues facing the Court in the context of the Motion to Dismiss. Moreover, Mr. Moore's opinion is based on an untested (and previously undisclosed) assumption provided to him by Diocese counsel at Jones Day regarding litigation costs – which by far provides the largest input into his opinion that there would be significant additional costs in a dismissal scenario.

2. The references to the dismissal/liquidation analysis and litigation costs in Mr. Moore's testimony are flawed both methodologically and in their application. His testimony on these matters is thus meaningless and does not meet the standards under the Federal Rules or even common sense. *See e.g., In re Young Broad., Inc.,* 430 B.R. 99, 111-12, n.15, 126-28 (Bankr. S.D.N.Y. 2010) (excluding expert valuation opinion labeled a levered discounted cash

flow (DCF) analysis because the expert did not undertake the necessary steps for an appropriate DCF analysis, and finding that "although [the expert] use[d] DCF terminologies, there are practically no substantive similarities between the generally accepted DCF method and the Levered DCF method," and that the expert had made multiple novel assumptions that do not exist in a DCF analysis and altered a key component in the DCF method, rendering it an inappropriate analysis and unreliable and inadmissible under *Daubert* and granting evidentiary objections and motion to strike the expert's testimony under Rule 26(a)(2)(B) and 37(c)(1) as containing statements of purported fact and opinion that were not included in the expert report); *Feltman v. Culmin Staffing Grp., Inc. (In re Corporate Res. Servs.),* 603 B.R. 888, 896-97 (Bankr. S.D.N.Y. 2019) (this Court disqualified expert testimony where valuation relied exclusively on EBITDA multiples taken from an article prepared by others, with no independent diligence as to the reasonableness of the numbers or their applicability to the circumstances of this case).

3. Regarding his opinions here, Mr. Moore conceded the following at his deposition on June 27, 2023:[1]

- ***His methodology in connection with the Motion to Dismiss was to use a "liquidation analysis" as a "proxy" for the value of the assets that could be available for claimants that pursue claims against the Diocese outside of bankruptcy.***[2]

- ***No court has held that his methodology is appropriate.*** [3]

---

[1] The Moore Deposition Transcript (marked to show the references in this Motion), and Exhibits 1 and 2 thereto, are attached to the Declaration of Alan J. Kornfeld filed concurrently herewith as Exhibit A, Exhibit B and Exhibit C, respectively.

[2] Moore Deposition Transcript, 30:12-18. *See* paragraph 7, fn. 16, *infra*.

[3] *Id.* at 31:23-32:1. *See* paragraph 14, fn. 18, *infra*.

- *He has never seen a liquidation analysis used as a proxy for the value of assets available to creditors outside of chapter 11 against operating entities whose bankruptcy cases were dismissed.*[4]

- *Before this case, he has never prepared a liquidation analysis as a proxy for the value of assets available to creditors outside of chapter 11 against operating entities whose bankruptcy cases were dismissed.*[5]

- *He is unaware of anyone else using his methodology.* [6]

- *His methodology is untested and has not been reviewed.* For example, he has never written or spoken about his methodology; has never seen or heard anyone speak or write about his methodology; and he has not seen it discussed in any books, publications, articles, educational materials or at any industry conferences.[7]

- *He uses a liquidation analysis-based methodology but acknowledges that it is not contemplated that Diocese will liquidate,*[8] *and there is no evidence that the Diocese would not continue to operate if the Motion to Dismiss was granted.*[9]

- *He did not follow valid and established liquidation analysis methodology and his own typical practices in preparing his liquidation/dismissal analysis here.*[10]

- *The Diocese's lawyers at Jones Day – who are not named as expert witnesses in this contested matter – instructed Mr. Moore to use the $250,000 litigation cost figure assumption that provides the basis for the most significant "swing" in his entire analysis – a $162 million incremental increase in a dismissal scenario.*[11]

---

[4] *Id.* at 34:8-18. *See* paragraph 14, fn. 19, *infra.*

[5] *Id.* at 34:20-35:1. *See* paragraph 14, fn. 20, *infra.*

[6] *Id.* at 42:5-43:16. *See* paragraph 14, fn. 21, *infra.*

[7] *Id.* at 35:2-11; 35:16-36:1; 36:7-25; 37:1-38:11. *See* paragraph 14, fn. 22, *infra.*

[8] *Id.* at 18:10-15; 19:20-23. *See* paragraph 14, fn. 23, *infra.*

[9] *Id.* at 20:5-16. *See* paragraph 14, fn. 24, *infra.*

[10] *Id.* at 51:24-53:16; 54:6-17. *See* paragraph 16, fn. 30, *infra.*

[11] *Id.* at 72:15-21; 77:16-20; 93:11-18. *See* paragraphs 18 and 19, fns. 33 and 40, *infra.*

- *Counsel's litigation cost assumption was not disclosed in Mr. Moore's expert report – and was only revealed upon questioning at Mr. Moore's June 27, 2023 deposition*.[12]

- *Mr. Moore himself is not qualified to estimate litigation costs and relied on the input from Jones Day without independent diligence*.[13]

4. Mr. Moore does not meet the applicable standard to offer expert testimony and opinions regarding the dismissal/liquidation analysis or incremental litigation costs. Any such opinions, if offered, would run afoul of the *Daubert* requirement that the methodology underlying an expert's testimony must be scientifically valid and properly applied to the facts at issue. In addition, Rules 26 and 37 of the Federal Rules of Civil Procedure preclude him from offering these opinions as they are materially based on a previously undisclosed and untested input. Allowing such testimony would be inapposite and prejudicial and would deprive the Committee of its ability to cross-examine witnesses not testifying before the Court. The fact that this is a bench trial does not alter the analysis because the complete absence of any methodologically sound expert opinion by Mr. Moore relating to the dismissal/liquidation analysis and litigation cost issues makes any testimony or evidence offered through him on these subjects unduly prejudicial, nonsensical and a complete waste of the Court's time and the parties' resources.

5. The Diocese and any objecting party to the Motion to Dismiss should be prohibited from offering any testimony or statement from Mr. Moore concerning the dismissal/litigation analysis and litigation costs, whether set forth in the Moore Testimony or otherwise, and any such testimony related to the litigation costs should be stricken. Specifically,

---

[12] *Id.* at 74:1-4; 81:24-82:24; 87:11-88:9. *See* paragraph 19, fn. 41, *infra*.

[13] *Id.* at 82:25-84:6; 84:22-85:2. *See* paragraph 19, fn. 34, *infra*.

this requires excluding pages 4 through 8 of the Moore Testimony referencing his dismissal/liquidation analysis and the chart set forth in page 9 (Figure 1: Dismissal Analysis), and excluding and striking paragraph 2.Q (pages 14-15) relating to the previously undisclosed and unsubstantiated assumption provided to Mr. Moore by the Diocese's counsel at Jones Day that, in a dismissal, each state court suit would cost an additional $250,000 to resolve (resulting in Moore's conclusion that there would be total of $162 million more in litigation costs in a dismissal), and any testimony based thereon.

## II. RELEVANT FACTUAL BACKGROUND

6. On April 4, 2023, the Court entered the *Stipulation and Agreed Scheduling Order With Respect to the Official Committee of Unsecured Creditors' Motion to Dismiss Chapter 11 Case* [D.I. 1992] (the "Initial Scheduling Order"). The Initial Scheduling Order provided that the deadline to exchange affirmative expert witness reports was April 17, 2023. On June 12, 2023, the Court entered the *First Amended Stipulation and Agreed Scheduling Order With Respect to the Official Committee of Unsecured Creditors' Motion to Dismiss Chapter 11 Case* [D.I. 2144] (the "Amended Scheduling Order"). Pursuant to the Amended Scheduling Order, the deadline to file written direct testimony in connection with the Motion to Dismiss was June 30, 2023. Trial is scheduled for July 10-11, 2023.

7. On April 17, 2023, the Diocese served its *Expert Report of Charles M. Moore* (the "Moore Report"). Consistent with the recently submitted Moore Testimony, the Moore Report set forth Mr. Moore's opinion that "[d]ismissal of the Chapter 11 case will result in a lower recovery for many creditors than a confirmed plan of reorganization, making a plan of reorganization a better outcome for creditors than dismissal."[14] Mr. Moore described in the

---

[14] Moore Testimony, ¶ 13; Moore Deposition Transcript, Ex. 1, p. 3.

Moore Report the use of a "liquidation analysis" as his methodology utilized to reach his opinion.[15] Mr. Moore further stated in his expert report that he utilized a liquidation analysis methodology notwithstanding that the Diocese was not expected to liquidate.[16]

8. Regarding litigation costs, the Moore Report provided the following assumption (which assumption resulted in a differential of $162 million, by far the largest factor in his opinion that chapter 11 would be more favorable than dismissal) – ***without any discussion of, or disclosure regarding, the origin of or basis for the assumption***.[17]

9. On June 27, 2023, Mr. Moore was deposed. At his deposition, Mr. Moore testified regarding his opinions in the Moore Report.

10. On June 30, 2023, pursuant to the Amended Scheduling Order, the Diocese submitted the Moore Testimony, setting forth Mr. Moore's opinion that dismissal would result in a more favorable recovery to creditors. Presumably in response to the shortcomings of his expert report and opinion revealed at his deposition and in a last-minute attempt to distance himself (at least optically) from his flawed liquidation analysis methodology, the Moore Testimony made certain nomenclature changes from the Moore Report, including shifting from the use of the term "liquidation analysis" to "dismissal analysis" (but notably not changing his substantively flawed

---

[15] Moore Deposition Transcript, Ex. 1, p. 3 ("To estimate the value of the Debtor's assets that may be available if the case is dismissed, I prepared a liquidation analysis of the Debtor. A liquidation analysis is a process used to estimate the value of a debtor's assets and the proceeds that could be generated in the event of a liquidation.").

[16] *Id.* at pp. 3-4 ("While it is not expected that the Debtor would be liquidating if the case is dismissed, the liquidation analysis is a reasonable proxy for the value of assets that could be available for claimants that successfully pursue claims against the Dioceses outside of chapter 11."). *See also* Moore Deposition Transcript, 30:12-18 ("Q: Did you, as your methodology, use the liquidation analysis as a reasonable proxy for the value of assets that could be available for claimants that pursue claims against the diocese outside of Chapter 11? A: Yes.").

[17] Moore Deposition Transcript, Ex. 1, p. 8 ("Litigation Costs – assumed to be an additional $250,000 per case in defense costs associated with CVA suits, on top of the cost of administering claims through a settlement trust established as part of a chapter 11 plan of reorganization.").

approach) (pp. 1-9), and to formally disclose Jones Day's role in the litigation cost assumption and to back-fill information in an belated attempt to rehabilitate the untimely disclosed litigation cost assumption (paragraph 2.Q.i and ii, pp. 14-15).

## III. APPLICABLE LEGAL STANDARD

### A. The *Daubert* Standard

11. Rule 702 of the Federal Rules of Evidence, made applicable to these proceedings pursuant to Rule 9017 of the Federal Rules of Bankruptcy Procedure, "embodies a trilogy of restrictions on expert testimony: qualification, reliability and fit." *See Young Broad.*, 430 B.R. at 121 (quoting *Schenider v. Fried,* 320 F.3d 396, 404 (3d Cir. 2003)). Under *Daubert* and its progeny, a trial judge must ensure that (1) the witness is qualified as an expert by virtue of knowledge, training, education, skill and experience; and (2) the expert testimony or evidence admitted is relevant and reliable. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993); *see also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999) (applying the standard set forth in *Daubert* to all expert testimony); *Nimely v. City of New York*, 414 F.3d 381, 396-97 (2d. Cir. 2005). *See also Amorgianos v. Amtrak,* 303 F.3d 256, 266 (2d Cir. 2002) ("[W]hen an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony."). As the Second Circuit explained in *Amorgianos,* the standard is meant to ensure that junk science is excluded while admitting reliable expert testimony that will assist a trier of fact. *Amorgianos,* 303 F.3d at 267. In determining reliability, the trial court must rigorously examine the methodology, the facts drawn upon, and how the expert applies the facts and methodology to reach the proffered conclusion. *Id.* Expert opinions based on insufficient facts or data are not acceptable. *Souther v. Eli Lilly & Co. (In re Zyprexa Prods. Liability Litigation),* 489 F.Supp. 2d 230, 283 (E.D.N.Y. 2007) (citing *United States v. Aminy,* 15 F.3d 258, 261 (2d

Cir. 1994)). The party proffering the expert witness has the burden of meeting these criteria. *Young Broad.*, 430 B.R. at 121.

  **B.**  **Disclosure Requirements**

  12. Under Rule 26 of the Federal Rules of Civil Procedure, an expert witness who provides a written report must include, *inter alia*, "(i) a complete statement of all opinions the witness will express and the basis and reasons for them; and (ii) the facts or data considered by the witness in forming them." Fed. R. Civ. P. 26(a)(2)(B); *St. Paul Fire & Marine Ins. Co. v. Heath Fielding Ins. Broking*, 1995 U.S. Dist. LEXIS 19847, *41-48 (S.D.N.Y. Dec. 30, 1995). If a party fails to provide the information required under Rule 26(a), it is not allowed to use that information at trial unless this failure was substantially justified or harmless. Fed. R. Civ. P. 37(c)(1); *see also Vioni v. Providence Inv. Mgmt., LLC*, 750 F. App'x 29, 32 (2d Cir. 2018) (affirming the district court's decision to preclude expert witness due to delay in disclosure and dilatory party's failure to show substantial justification and harmlessness). Statements by an expert of fact and opinion that were not included in the report are the proper subjects of evidentiary objections and a motion to strike. As set forth in *Young Broad.*:

> The Lenders filed an Evidentiary Objections and Motion to Strike numerous statements in Kuhn's Declaration on the basis that they violate Federal Rules of Civil Procedure 26(a)(2)(B) and 37(c)(1) as containing statements of purported fact and opinion that were not included in Kuhn's expert report. Courts have held that where an expert affidavit "'expound[ed] a wholly new and complex approach,'" as opposed to "'merely support[ing] an initial position,'" the expert's affidavit should be stricken. ... Lenders' objection to P 12 of Kuhn's Declaration is SUSTAINED because Kuhn cannot rely on the qualifications of his colleagues at A&C to buttress the reliability of his expert opinion. To rule otherwise would deprive the Lenders of their ability to cross-examine witnesses who are not testifying before the Court.
>
> *Young Broad.*, 430 B.R. at 111-12, n.15.

## IV. ARGUMENT

### A. Moore's Testimony Regarding His Dismissal/Liquidation Analysis and Incremental Litigation Costs Are Unreliable Because They are Flawed in Methodology and Application

13. *Daubert* establishes that an expert's testimony is admissible only if "the reasoning or methodology underlying the testimony is scientifically valid and . . . that reasoning or methodology properly can be applied to the facts in issue." 509 U.S. at 592-93. Mr. Moore's statements and testimony related to his dismissal/liquidation analysis are unreliable, irrelevant and methodologically unsound – and therefore inadmissible – for at least two interrelated, yet distinct, reasons.

14. *First*, using a liquidation analysis in this context is not a reliable, tested or generally-accepted methodology. *See Young Broad.*, 430 B.R. at 126-28 (rejecting expert's novel use of a DCF analysis as unreliable under *Daubert*). As Mr. Moore admits, his dismissal/liquidation analysis has never been utilized – by him or anyone else – to assess the value of assets available to creditors outside of chapter 11 against operating entities whose bankruptcy cases were dismissed. Nor is his novel approach been peer-reviewed or tested. When questioned regarding his use of a liquidation analysis as a methodology to value assets in a dismissal where an entity would continue to operate, Mr. Moore testified that: (1) no court has held that his methodology is appropriate;[18] (2) he has never seen a liquidation analysis used as a proxy for the value of assets available to creditors outside of chapter 11 against operating entities

---

[18] Moore Deposition Transcript at 31:23-32:1 ("Q: You're not aware of any court that has held that your methodology is appropriate, are you? A: In your specific context, again, given my response, the answer is no.").

whose bankruptcy cases were dismissed;[19] (3) prior to this case, he has never prepared a liquidation analysis as a proxy for the value of assets available to creditors outside of chapter 11 against operating entities whose bankruptcy cases were dismissed;[20] (4) he is unaware of anyone else using his methodology;[21] and (5) his methodology is untested and has not been reviewed (*e.g.,* he has never written or spoken about his methodology; has never seen or heard anyone speak or write about his methodology; and he has not seen it discussed in any books, publications, articles, educational materials or at any industry conferences).[22] Mr. Moore further testified that, although he uses a liquidation analysis-based methodology, he

---

[19] *Id.* at 34:8-18 ("Q: My question, sir, is very simple: Have you ever seen a liquidation analysis that was used as a proxy for the value of assets that would be available to creditors that pursue claims outside of Chapter 11 against operating entities whose Chapter 11 cases were dismissed by bankruptcy courts? A: No.").

[20] *Id.* at 34:20-35:1 ("Q: Prior to this case, did you ever prepare a liquidation analysis as a proxy for the value of assets that would be available to creditors that pursue claims outside of Chapter 11 against operating entities whose Chapter 11 cases were dismissed by the bankruptcy courts? A: No.").

[21] *Id.* at 42:5-43:16 ("Q: Have you ever seen anybody other than you use that methodology? A: In the context, specifically, that you're referring to? Q: Yes, sir. A: No. Q: So far as you know, you're the first and only person to have ever used that methodology, correct? A: I – I couldn't say if it's been used by other people or not. I'm not aware of another instance where that has happened. Q: You're not aware of anybody else using that methodology, correct? A: Specifically in the context as you have described it, that's correct. Q: And the context we're taking about is the context of evaluating what happens in the event of a dismissal of a Chapter 11 case and the entity that is dismissed continues to operate. Is that the context you're referring to? A: I believe that the questions that you have continued to ask me is using a liquidation analysis to estimate assets that may be available to creditors who pursue claims against an operating company whose Chapter 11 case has been dismissed. Q: That is the context. A: And in that regard, I'm not aware of any other parties that have used that approach. Q: But that is the approach and methodology that you used here, correct? A: Yes.").

[22] *Id.* at 35:2-9 (has not written articles); 35:10-11 (has not read articles); 35:16-23 (has not spoken at professional conferences); 35:24-36:1; 38:9-11 (has not heard anyone speak at conferences or seminars); 36:7-19; 37:1-14 (methodology never been discussed at industry conferences, including those of the Turnaround Management Association or American Bankruptcy Institute); 36:20-25 (methodology not found in educational materials or publications); 38:3-8 (not found in journals or books); 37:15-38:2 (not found in bankruptcy blogs).

acknowledges that it is not contemplated that the Diocese will liquidate,[23] and that there is no evidence that the Diocese would not continue to operate if the Motion to Dismiss was granted.[24]

15. Mr. Moore's methodology meets none of the *Daubert* factors: it has not been tested or relied upon by other experts, it had never been subjected to peer review or discussed in any publication, the potential rate of error is unknown, and there is no evidence that this method was ever employed, discussed, and certainly not generally accepted in any academic or professional community. *Young Broad.,* 430 B.R. at 127 (holding that an expert's use of an inappropriate and novel DCF analysis in his valuation report was unreliable and met none of the aforementioned *Daubert* factors).

16. ***Second***, even assuming that a dismissal/liquidation analysis were somehow relevant to an assessment of the value of assets in a dismissal where the entity will not liquidate (it is not), Mr. Moore did not even purport to undertake the customary and standard liquidation analysis – such as one finds in most bankruptcy scenarios under the best interest test of section 1129(a)(7) of the Bankruptcy Code – comparing the recovery to creditors, in dollar amounts and percentages, under the proposed chapter 11 plan as compared to a liquidation under chapter 7.[25]

---

[23] *Id.* at 18:10-15 ("Q: Do you expect that the debtor will liquidate in the event that the court grants the motion to dismiss? A: As I indicate at the bottom of Page 3 in my report, it's not expected that the debtor would liquidate."); 19:20-23 ("Q: Did anybody from the debtor's senior management tell you that the debtor would liquidate if the motion to dismiss was granted? A: No.").

[24] *Id.* at 20:5-16 ("Q: Did anybody who is part of the diocese tell you that the debtor would not operate outside of Chapter11 if the motion to dismiss was granted? A: No. Q: Did you read any documents, ever, that said if the motion to dismiss was granted, the debtor would not operate outside of chapter 11? A: No. Q: Did you attend any meetings where anybody said if the motion to dismiss was granted, the debtor would not operate outside of Chapter 11? A: No.").

[25] *Id.* at 56:13-16 ("Q: The best interest test evaluates recoveries for creditors under a Chapter 11 versus recovery for creditors under a Chapter 7, correct? A: Yes."); 58:19-59:5 ("Q: When we talked about the best interest test, you testified – if I understood you correctly – that the best interest test shows Chapter 11 results for creditors versus Chapter 7 results for creditors? Did I get that right? A: Generally, yes. Q: And your analysis doesn't do that, correct? Correct, I am not, in this analysis, comparing the results to a class of creditors under a Chapter 7 versus a Chapter 11."). *See also In re Enron Corp.*, 2004 Bankr. LEXIS 2549, *228 (Bankr. S.D.N.Y. July 15, 2004) ("The

Mr. Moore admits that his hypothetical dismissal scenario is not tied to the numbers actually presented in the Diocese's proposed plan,[26] nor did he prepare a chapter 7 liquidation analysis comparing creditor recoveries if the Diocese's chapter 11 plan could be confirmed.[27] Mr. Moore did not estimate the value of survivors' claims,[28] even though the Diocese's Disclosure Statement estimates a 100% recovery percentage on account of survivor claims.[29] In sum, Mr. Moore did not undertake a typical liquidation analysis – not even following his own typical

---

purpose of a best interest liquidation analysis is to compare recoveries in a chapter 7 liquidation to a chapter 11 plan – not to compare different legal outcomes to disputed issues.").

[26] *Id.* at 129:24-130:7 ("Q: So You're – you're not trying to show, with respect to the chart that is on Page 9, what creditors are projected to recover under the diocese plan, correct? A: Correct. And as we've been talking about, this is not a best interest test. This also is not comparing the diocese's plan that's on file with a dismissal. This is just comparing a plan scenario with a dismissal scenario.").

[27] *Id.* at 130:8-22 ("Q: Did you analyze the recovery for creditors in the event the diocese's Chapter 11 plan was confirmed? A: And by 'recovery,' are you referring to dollar amounts or percentages? Q: Both. A: I have not done that analysis based on the diocese's plan. Q: And you didn't do that analysis assuming a Chapter 7 liquidation of the diocese, correct? A: In terms of what the recovery would be if the diocese converted to a Chapter 7? Q: Yes, sir. A: That's correct, I did not.").

[28] *Id.* at 45:14-20 ("Q: Did you focus, in any way, on the value of the survivor claims that have been filed in this case? A: Not the value of survivor claims. Q: Did you estimate the value of survivor claims in this case? A: No."); 46:5-8 ("Q: You told me that you did not estimate the value of survivor claims. Did I understand you correctly? A: Yes.").

[29] *Id.* at 47:20-48:1 ("Q: Do you know the value of survivor claims against the diocese? Just yes or no. A: No. Q: Do you expect all survivors to recover 100 percent of the value of their claims? A: That's impossible for me to know at this point."); 51:2-22 ("Q: What is the estimated recovery of each of those [survivor] classes [in the Diocese Disclosure Statement]. A: It says 100 percent. … Q: Do you know how that estimated recovery percentage was computed? A: No. Q: Do you know who did the analysis of the estimated recovery for those classes of survivor claims? A: No. Q: Did A & M have any role in that? A: I don't believe so. Q: Did A & M have any role in calculating the value of the survivor claims? A: No.").

practices.[30] He did not include the amount of the claims, the value of the claims, the estimated dollar amount of recovery for those claim, or the recovery percentage for the claims.[31]

17. Moore's approach is novel and unprecedented. He has attempted to utilize his unique version of a liquidation analysis as a "proxy" to value assets in a dismissal scenario even though the Diocese is not anticipated to liquidate. Like the novel and inappropriate DCF analysis in *Young Broad.,* the Moore Testimony regarding his novel and inappropriate dismissal/ liquidation analysis here is methodologically unsound, devoid of a factual nexus to this case, unhelpful to this Court, and should be excluded.

18. In addition, Mr. Moore's references to the incremental costs of litigation at $250,000 per suit[32] – for total incremental litigation costs of ***$162 million*** – rely on speculation

---

[30] *Id.* at 51:24-53:16 ("Q: Was the estimated value of projected allowed survivor claims important for you to know in connection with the preparation of your liquidation analysis that is used as the methodology for your [] Opinion No. 1? A: No. Q: Why not? A: My – as I indicate in my report, the purpose of that analysis is to estimate the amount of assets that would potentially be available for creditors as of a specific date. Q: When A & M prepares liquidation analyses, typically, does – do those analyses include an estimate of the value of claims? A: I would say, most often that would be the case. The liquidation analysis has a waterfall to it where the proceeds that are available are then distributed amongst different classes of creditors. Q: And the liquidation analysis that A & M prepares typically looks at the value of the claims and how much in proceeds will be allotted to each class of claims, correct? A: That is generally the case, yes. A: And then the A & M liquidation analysis would typically have a percentage recovery for each class of claims, correct? A: Yes. Q: And that percentage recovery is computed by looking at the value of claims and how much the claims recover and then doing a percentage calculation and saying unsecured claims get, hypothetically, X percentage; secured claims get, hypothetically, Y percentage, et cetera, correct? A: Yes. Q: You didn't do that in your liquidation analysis here, did you? A: Correct. Q: It's correct that you did not provide that analysis in your liquidation analysis. Did I understand you correctly? A: That's correct. I did not include values of claims or that recovery that you indicated in this analysis."); 54:6-17 ("Q: So the only liquidation that A & M did was the analysis in your report that has been marked as Exhibit 1; is that correct? A: This is the dismissal analysis using the approach of the liquidation analysis. There is no other liquidation analysis. Q: There's no calculation of the amount of claims, how much each class of claims will recover in dollars and the percentage recovery of each class of claims in this case that you're aware of, correct, sir? A: Correct.").

[31] *Id.* at 55:11-20 ("Q: So summing up, in your liquidation analysis, you did not include the amount of claims, correct? A: Value of the claims, that's correct. Q: You did not include the estimated dollar amount of recovery for those claims, correct? A: Correct. Q: You did not include the estimated recovery percentage for those claims, correct? A: Correct.").

[32] Moore Testimony, ¶ 2.Q (pp. 14-15).

and information provided by counsel rather than any articulated sound methodology.[33]  This is disqualifying.  As this Court held in *Corp. Res. Servs.*:

> The lack of any support for Gardner's methodology in deriving and expressing his opinion of value is more troublesome.  Gardner essentially admitted that his valuation relied exclusively on EBITDA multiples taken from an article prepared by others, with no independent diligence as to the reasonableness of the numbers or their applicability to the circumstances of this case; this is disqualifying.  The applicable law explained by the Tenth Circuit's decision in *TK-7 Corp.*, 993 F.2d at 732-33, discussed above, applies here.  Therefore, Gardner's opinion on value is not admissible.

*Id.* at 896-97.

19.  So too here.  Mr. Moore's reliance on counsel's input without independent diligence is inadmissible.  Mr. Moore has no basis to opine that each survivor would incur an additional, average cost of $250,000 per case in defense costs above the costs involved in administering claims through a settlement trust.  Mr. Moore is not a lawyer, has never been retained as a fee examiner, has never qualified as a witness regarding litigation costs in a mass tort case or sexual abuse case, and has no training in estimating costs of sexual abuse cases.[34]  Moreover, Mr. Moore was not provided with any documents showing the basis for counsel's instruction,[35] and did not review the costs to defend sexual abuse claims in other sexual abuse

---

[33] *Id.* at 72:15-21 (Q: "Why did you assume that there would be an additional $250,000 per case in defense costs on top of the cost of administering claims through a settlement trust established as part of a Chapter 11 plan of reorganization?  A: That was the number provided to me by counsel."); 77:16-20 ("Q: Your testimony is that the basis for that assumption was what counsel, Jones Day, told you; is that correct?  A: Yes. Jones Day provided me with that number."); 93:11-18 ("Q: In your analysis under a dismissal scenario, you assume an incremental defense cost increase of 250,000 per case for a total of $162 million, correct?  A: Correct.  Q: To be clear, that $162 million is not incurred under a Chapter 11 scenario, correct?  A: Correct.").

[34] *Id.* at 82:25-84:6 (Mr. Moore is not a lawyer, has never been retained as a fee examiner, has never qualified as a witness regarding litigation costs in a mass tort case or sexual abuse case, and has no training in estimating costs of sexual abuse cases); 84:22-85:2 ("Q: Thank you so much for that general answer. My question is specific. I'll ask it again.  In what sexual abuse cases do you have experience in estimating the cost of litigation?  A: I don't.").

[35] *Id.* at 96:25-97:5 ("Q: Did the Jones Day attorneys who provided you with the 250,000-per-case assumption in incremental additional defense costs provide you with any documents that showed the basis for that assumption? A: No.").

cases, including diocesan bankruptcies, and he did not review defense costs for purposes of his testimony in this case.[36] Mr. Moore only considered one document in making his opinion as to the incremental litigation cost (an affidavit he provided in May 29, 2020 related to defense costs for CVA actions brought against the Diocese, which worked out to less than $35,000 per claim),[37] which provides no support for the $250,000-per-claim assumption used here.[38] He also did not analyze whether insurance might cover the incremental defense costs.[39] Instead, the Diocese's lawyers at Jones Day – who are not named as expert witnesses in this contested matter – instructed Mr. Moore to use the $250,000 figure that forms the basis for the entire analysis.[40] This was nowhere disclosed in Mr. Moore's expert report.[41] Mr. Moore's methods are not

---

[36] *See generally id.* at 85:17-87:10; 88:11-89:20; 97:6-99:23.

[37] *Id.* at Ex. 2, ¶¶ 37 and 56.

[38] *Id.* at 101:5-15 ("Q: Exhibit 2, your affidavit, is the only document you considered in connection with your opinion that increased incremental litigation costs would be on average $250,000 per claim for a total of $162 million; is that correct, sir? A: Correct. Q: Where in your affidavit does it say, in sum or substance, that the cost per claim is $250,000 over and above what a settlement trust would occur? A: Is doesn't say that specifically."); 111:21-112:1 ("Q: So the only information in your affidavit about per-claim cost of defense leads to a conclusion that as of the date of your affidavit, the per-claim cost of defense was $34,906 on average per claim? A: To that point, yes.").

[39] *Id*. at 93:25-94:3 ("Q: Is it possible, sir, that there would be insurance proceeds available for defense costs in both a dismissal scenario and a Chapter 11 scenario? A: Yes."); 94:11-19 ("Q: Under a dismissal scenario, did you analyze how much in insurance proceeds would be available for defense costs? A: I did not. Q: Is it correct then that the $162 million of incremental defense costs under a dismissal scenario might be, at least in part, covered by insurance under a dismissal scenario? A: It's possible.").

[40] *Id.* at 72:15-21 ("Q: Why did you assume that there would be an additional $250,000 per case in defense costs on top of the cost of administering claims through a settlement trust established as part of a Chapter 11 plan of reorganization? A: That was the number provided to me by counsel."); 77:16-20 ("Q: Your testimony is that the basis for that assumption was what counsel, Jones Day, told you; is that correct? A: Yes. Jones Day provided me with that number.").

[41] *Id.* at 74:1-4 ("Q: The question, sir, is, where in your report does it say that the $250,000 estimate was provided by counsel? A: It does not say those specific words."); 81:24-82:24 ("Q: Okay. So you've testified here to a somewhat extensive conversation with Jones Day, correct? A: I would say it was, depending on how you define 'extensive,' a fair amount of back-and-forth on this. Q: Okay. And where in your report does it say you had a 'fair amount of back-and-forth' with Jones Day about your $250,000-per-case increased litigation costs conclusion? A: It does not. … Q: But your conversation with Jones Day was a key part of your 250,000-per-claim assumption; is that correct? A: Yes."); 87:11-88:9 ("Q: Was it important to you to look at any other large number of survivor

simply unreliable, they are non-existent. It is, therefore, impossible to cross-examine Mr. Moore on the methods by which he valued litigation costs because he simply relied on the number provided to him by counsel. His untimely attempt to shore up his testimony through written direct following these shortcomings being revealed in his deposition (with the addition of new paragraphs 2.Q.i and ii that were not in his expert report), does not remedy this fundamentally flawed approach. *See AmTrust N. Am., Inc. v. KF&B, Inc.*, 2020 U.S. Dist. LEXIS 170464, *7 (S.D.N.Y. Sept. 16. 2020) ("[Rule 26] is intended to ensure that the party opposing an expert has his report, and the assumptions forming the bases for that report, before the deposition so that the deposition can be effective and counsel can develop material to probe the witness during cross-examination."), *citing Taylor v. Evans*, 1997 U.S. Dist. LEXIS 3907 (S.D.N.Y. Apr. 1, 1997) ("An expert cannot testify on a matter not disclosed in his preliminary report"; otherwise, "it would undermine the rationale for requiring the report in the first instance: to provide sufficient notice of an expert's testimony so that the opposing party may prepare for cross-examination or rebuttal"). Even if this information had been divulged on a timely basis, as discussed above, Mr. Moore is unqualified to value such costs and failed to undertake "independent diligence as to the reasonableness of the numbers or their applicability to the circumstances of this case; this is disqualifying." *Corporate Res. Servs.*, 603 B.R. at 896.

20.     Moore's references to the dismissal analysis, and specifically the incremental litigation cost assumption of $162 million, which is by far the largest component contributing to his opinion, also fail to satisfy the relevance standard under *Daubert* because they are speculative

---

sexual abuse claims in order to analyze what the cost of defense was? A: I think my discussions with Jones Day around the specifics of these cases was more relevant that some of the other cases that you mentioned where I think the facts and circumstances are different. Q: Those are the secret discussions with Jones Day that you don't reference in your report, correct? A: I don't refer to them as 'secret conversations.' Q: No. No. I referred to them as 'secret conversations' because you don't mention them in your report. You don't mention them in your report, correct? A: I don't mention my conversations with Jones Day in my report.").

and will not assist the trier of fact. "When an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Ruggiero v. Warner-Lambert Co.*, 424 F.3d 249, 255 (2d Cir. 2005). Moore's statements and testimony related to what would happen in a dismissal scenario fall squarely into this camp and thus any testimony by him on these subjects is inadmissible.

> B. **Any Opinions or Testimony Regarding Incremental Litigation Costs That Mr. Moore Attempts to Offer At Trial Violates Rule 26 and Should Be Excluded and Striken**

21. Any testimony or opinions that Mr. Moore offers at trial on the subject of incremental litigation costs would violate the disclosure requirements of Rule 26 of the Federal Rules of Civil Procedure. Under Rule 26, expert witnesses must submit a written report outlining both "the basis and reasons" for forming their opinions and the underlying "facts or data" they considered. Fed. R. Civ. P. 26(a)(2)(B)(i) and (ii). Where an expert has failed to comply with Rule 26, his testimony is properly excluded unless this failure "was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). Statements of purported fact and opinion that violate Rule 26 and 37 are properly excluded and stricken and evidentiary objections to such testimony are properly sustained. *See Young Broad.*, 430 B.R. at 111-12, n.15 (striking expert affidavit that "'expound[ed] a wholly new and complex approach,'" as opposed to "'merely support[ing] an initial position;'" sustaining evidentiary objections to the expert's affidavit on the grounds that the expert could not rely on the qualifications of his colleagues to buttress the reliability of his expert opinion because this would "deprive the [objecting party] of their ability to cross-examine witnesses who are not testifying before the Court;" and sustaining objection and excluding from the record new opinion and new information); *Morritt v. Stryker Corp.*, 2011

U.S. Dist. LEXIS 98218, *16 (N.D.N.Y. Sept. 1, 2011) (excluding previously undisclosed expert testimony that was "designed to fill a significant and logical gap" in the expert report).

22. Here, Mr. Moore has provided no explanation for his failure to adequately disclose the source of his $250,000 per case litigation cost assumption. It was only when deposed on June 27, 2023 that Mr. Moore disclosed that the source of the assumption was Diocese counsel. Then just three days later, on June 30th, he attempted to buttress this information by way of the expanded Moore Testimony (paragraph 2.Q.i and ii). This is by far the most significant input resulting in Mr. Moore's opinion that survivors would be worse off in a dismissal. Yet there was no expert report from counsel regarding the critical litigation cost assumption, and the Committee has had no opportunity to question an appropriate expert regarding the reasonableness of this assumption. It would therefore be highly prejudicial to the Committee to admit testimony now on this issue and it should be excluded and stricken.

23. Mr. Moore's failure to adequately disclose either the factual basis or rationale for his statements that relate to litigation costs precludes meaningful review of his analysis and runs afoul of Rule 26. Mr. Moore obtained his $250,000-per-claim litigation cost assumption from the Diocese's counsel at Jones Day. Jones Day attorneys, however, are not experts in these proceedings and are not witnesses testifying before the Court. Allowing testimony regarding litigation costs would deprive the Committee of its ability to cross-examine Jones Day attorneys – precisely the situation that warranted exclusion and striking of testimony in *Young Broad. Id.*, 430 B.R. at 111-12, n.15 (holding that expert could not rely on the qualifications of his colleagues to buttress the reliability of his expert opinion because this would "deprive the [objecting party] of their ability to cross-examine witnesses who are not testifying before the Court"); *Morritt v. Stryker,* 2011 U.S. Dist. LEXIS 98218, at *16 ("Rule 37(c)(1) provides that a

party who fails to provide information required by Rule 26(a) is not permitted 'to use that information . . . to supply evidence on a motion, at a hearing, or at trial, unless the failure was substantially justified or is harmless.' Fed. R. Civ. P. 37(c)(1). 'The purpose of the rule is to prevent the practice of 'sandbagging' an opposing party with new evidence."). Mr. Moore did not even attempt to accurately and reliably estimate litigation costs. Rather, he relied on speculation and subjective opinions provided by counsel. The failure to disclose the source of, and basis for, this assumption was neither justified nor harmless and any testimony relating to litigation costs is properly excluded and stricken under Rule 37(c)(1).

## V. CONCLUSION

24. The portions of the Moore Testimony relating to his dismissal/liquidation analysis and the incremental litigation costs are flawed, unsound and unreliable and, for the reasons set forth herein, this Court should exclude and strike any and all of his opinions or testimony concerning these issues at the evidentiary hearing on the Motion to Dismiss, as set forth in the proposed order attached as Exhibit A hereto.

Dated: July 5, 2023

PACHULSKI STANG ZIEHL & JONES LLP

*/s/ Alan J. Kornfeld*
James I. Stang, Esq.
Alan J. Kornfeld, Esq.
Karen B. Dine, Esq.
Brittany M. Michael, Esq.
780 Third Avenue, 36th Floor
New York, NY 10017-2024
Telephone: 212-561-7700
Facsimile: 212-561-7777
akornfeld@pszjlaw.com

*Counsel for the Official Committee of Unsecured Creditors*