# **EXHIBIT A**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - x
In re:                           :
                                 :
THE ROMAN CATHOLIC DIOCESE OF    :
ROCKVILLE CENTRE, NEW YORK,      :
                                 :
Debtor.                          :
- - - - - - - - - - - - - - - - - x

       MAGNA Deposition of CHARLES MOORE, taken
on Tuesday, June 27, 2023, held at the Law Firm of
Jones Day, 250 Vesey Street, New York, New York,
commencing at 11:01 a.m., before Jamie I. Moskowitz,
a Certified Shorthand Reporter and Certified
Livenote Reporter.



## Page 2

1    A P P E A R A N C E S:
2
     PACHULSKI STANG ZIEHL & JONES
3    BY:  ALAN J. KORNFELD, ESQUIRE
     akornfeld@pszjlaw.com
4    BY:  BRITTANY MITCHELL MICHAEL, ESQUIRE
     bmichael@pszjlaw.com
5    780 3rd Avenue - 34th Floor
     New York, New York 10017
6    212.561.7700
     Counsel for the Official Committee of Unsecured
7    Creditors
8
     PACHULSKI STANG ZIEHL & JONES
9    BY:  TAVI C. FLANAGAN, ESQUIRE
     tflanagan@pszjlaw.com
10   10100 Santa Monica Boulevard - 13th Floor
     Los Angeles, California 90067-4003
11   310.277.6910
     Counsel for the Official Committee of Unsecured
12   Creditors
13
     JONES DAY
14   BY:  ERIC P. STEPHENS, ESQUIRE
     epstephens@jonesday.com
15   250 Vesey Street
     New York, New York 10281
16   212.326.3939
     Counsel for the Roman Catholic Diocese of
17   Rockville Centre
18   ALSO PRESENT:
19   TAVI C. FLANAGAN
     Paralegal for Pachulski Stang Ziehl & Jones
20
21
22
23
24
25

## Page 3

```
1                    E X H I B I T S
2
     EXHIBIT NUMBER      DESCRIPTION              PAGE
3
     Exhibit-1      Expert Report of C. Moore       7
4
     Exhibit-4      Disclosure Statement           48
5
     Exhibit-2      Affidavit                     100
6
7
8    *Exhibits are marked in the order they were received
9    *Exhibits are maintained in Agile Law
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 4

```
1     REQUEST PAGE
2
3     INSTRUCTIONS NOT TO ANSWER:
4     Page  Line
5     None
6     REQUEST FOR PRODUCTION OF DOCUMENTS:
7     Page  Line         Description
8     None
9     STIPULATIONS:
10    Page  Line
11    None
12    QUESTIONS MARKED:
13    Page  Line
14    None
15
16
17
18
19
20
21
22
23
24
25
```

## Page 5

```
1              TABLE OF CONTENTS
2    Charles Moore
3
     Examination
4
     By Mr. Kornfeld....................Page  6
5
     Index of Exhibits..................Page  3
6
     Request Page.......................Page  4
7
     Notice to Read and Sign............Page 138
8
     Reporter Certificate...............Page 140
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```



```
1                    * * *
2          CHARLES MOORE, after having been first
3    duly sworn, was examined and testified as
4    follows:
5                    * * *
6    EXAMINATION BY MR. KORNFELD:
7          Q      Good morning.  Would you state your
8    full name for the record, please?
9          A      Good morning.  My name is
10   Charles Moore, M-o-o-r-e.
11         Q      Mr. Moore, have you been deposed
12   before?
13         A      Yes, I have.
14         Q      Approximately how many times?
15         A      I'm gonna estimate 15 to 20 times in
16   terms of total testimony.  Just from a deposition
17   standpoint, probably 10 times.
18         Q      So 10 times in deposition, 5 to 10 in
19   court?
20         A      Yes, that would be about right.
21         Q      Is there any reason you can't give
22   complete, accurate and truthful testimony here
23   today?
24         A      No.
25         Q      Is there anybody in the room with you
```

```
1    today?
2          A      Yes, Eric Stephens and Anoop -- I'm
3    not even going to try to pronounce Anoop's last
4    name -- both with Jones Day.
5          Q      I'm not gonna go through most of the
6    deposition rules given the counsel that you had and
7    your experience.  Just one thing to keep in mind
8    since we're remote, I'm gonna do my best to let you
9    finish your answers before I ask my next question.
10   If you could do your best to let me finish my
11   questions before you give your answer.
12                Is that okay with you?
13         A      Yes.
14         Q      Let's publish your report, which is
15   Exhibit 1 marked for this deposition.
16                Do you have that in front of you
17   Agile Law?
18         A      I do.
19         Q      Let me authenticate that.
20                Is Exhibit 1 the expert report that
21   you have prepared and provided in this case?
22                (Whereupon, Exhibit 1 was marked for
23   Identification.)
24                THE WITNESS:  Yes, this appears to be
25   my expert report.
```

```
1    BY MR. KORNFELD:
2          Q      You said it "appears to be."
3                 Do you have any reason to believe that
4    it is not?
5          A      I do not.
6          Q      Let's turn to Page 3 of your report,
7    and I want to call your attention to the paragraph
8    marked D, which is "Report Qualifications."
9                 Let me know when you're there.
10         A      I'm there.
11         Q      The first sentence of Paragraph D says
12   that the information in this report is presented as
13   of the date of this report."
14                Is the date of your report
15   April 17, 2023?
16         A      Yes.
17         Q      The second sentence of Paragraph D of
18   the report provides, "Opinions and conclusions
19   expressed herein are subject to change based on
20   additional data, facts and information that may be
21   received subsequent to the date of this report."
22                My question, sir, is, have you
23   received any additional data, facts and information
24   that caused you to change the opinions in your
25   report, which has been marked as Exhibit 1?
```

```
1          A      No, I have not.
2          Q      Are all the opinions that you intend
3    to provide at the evidentiary hearing on July 10th
4    and 11th opinions that are contained in your report
5    marked as Exhibit 1?
6          A      Yes.
7          Q      Let's go to your report at Page 25,
8    please.
9          A      Okay.
10         Q      Why don't you take a look at the
11   paragraph headed "Reservation of Rights"?  I'm gonna
12   have a couple of questions for you regarding the
13   points you make in that paragraph.
14         A      Okay.
15         Q      In that paragraph, you say, in sum and
16   substance, that you reserve the right to supplement
17   your opinion should further information be produced.
18                Have you supplemented the opinions
19   contained in your report that has been marked as
20   Exhibit 1?
21         A      I have not.
22         Q      In that second sentence that begins,
23   "I reserve the right," you also say that you're
24   "reserving the right to respond to any expert
25   opinions offered by or on behalf of the parties to
```



1    this matter."
2        Are you offering an expert opinion in
3    response to any opinions offered by the committee's
4    expert?
5        A    I am not.
6        Q    You also say in the last sentence of
7    the first paragraph under "Reservation of Rights,"
8    that, "This report is therefore subject to change or
9    modification should additional relevant information
10   become available that bears on the analyses,
11   opinions or conclusions contained therein."
12       Have you modified or changed your
13   report in any way since April 17, 2023?
14       A    I have not.
15       Q    Have you received additional relevant
16   information that bears on the analyses, opinions or
17   conclusions contained in your report?
18       A    I have received additional
19   information, but they have not changed my opinions
20   contained in this report.
21       Q    What additional information have you
22   received, first, in general?
23       A    In the debtor's objection to the
24   motion to dismiss that was filed last night, it
25   references a contribution from parishes of at least

1    $40 million.  That is new information to me since
2    the time I published this report.
3        Q    Have you received any other
4    information?
5        A    From time to time, I get updates on
6    claims that exist in the case.  Again, it does
7    not -- that information does not impact my opinions
8    in this report.
9        Q    Was last night the first time you
10   became aware that the parish and affiliate
11   contribution was $40 million?
12       MR. STEPHENS:  And I will just caution
13   the witness not to reveal anything you learned
14   in the course of parties' mediation.
15       So if you can answer without revealing
16   what you learned in connection with the
17   mediation, please answer.
18   BY MR. KORNFELD:
19       Q    It's a yes or no, and the 40 million
20   was disclosed to the opposition, but you may answer.
21       A    In the objection, that was not the
22   first time that I had heard that the parish
23   contribution was at least $40 million.
24       Q    When was the first time you heard
25   that?

1        A    In mid to later May 2023.
2        Q    Did you hear that at a mediation?
3        A    Yes, sir.
4        Q    As of April 17, 2023, the date of your
5    report, do you recall what the parish contribution
6    was?
7        A    At that point, it was $11.1 million.
8        Q    You said the additional information
9    that you received, in general, since April 17, 2023,
10   was the contribution had increased from 11.1 to
11   $40 million.  You also received updates on claims.
12       Did you receive any other additional
13   information that bears on the analyses, opinions or
14   conclusions contained in your report?
15       A    No, sir.
16       Q    What did you do to prepare for your
17   deposition here today?
18       A    I reread my report.  I reviewed a
19   number of the documents that are listed in the
20   exhibit documents that are -- that I relied upon.  I
21   met with attorneys from Jones Day.  I had a meeting
22   with one of my colleagues from Alvarez & Marsal and
23   had a few calls with that colleague.
24       Q    When was your preparation for
25   deposition meeting with attorneys from Jones Day?

1        A    Yesterday.
2        Q    How long did the meeting last?
3        A    I believe that meeting went about
4    2-and-a-half hours.
5        Q    Who were the attorneys that were
6    present?
7        A    Eric Stephens, Todd Geremia and Anoop.
8        Q    Who was present from A & M at that
9    meeting?
10       A    Besides myself, Andrew Ciriello.
11       Q    Anybody else?
12       A    No, sir.
13       Q    You said you also met with some of
14   your colleagues at A & M.
15       When was that meeting or meetings?
16       A    The meeting that I referred to was
17   yesterday with counsel.  That was Andrew Ciriello,
18   and then I had a couple of calls with Mr. Ciriello
19   as well.
20       Q    When did those calls take place?
21       A    I had a call with Mr. Ciriello this
22   past Saturday, which would have been June 24th, and
23   another call with Mr. Ciriello yesterday.
24       Q    In the calls with Mr. Ciriello without
25   Jones Day being present, what did you discuss?

MAGNA ▶
LEGAL SERVICES

1    **Let's take the Saturday call first.**
2        A        The Saturday call revolved around a
3    few of the assumptions that were used in the
4    dismissal or liquidation analysis.  I don't recall
5    specifically which assumptions.  And similarly, my
6    call with Mr. Ciriello yesterday related to
7    assumptions in the business plan projections.
8        **Q        What do you recall about the**
9    **assumptions that were discussed on Saturday?**
10       A        I don't recall specifically which
11   assumptions we discussed.
12       **Q        Yesterday, what assumptions were**
13   **discussed with Mr. -- I'm going to butcher his**
14   **name -- Ciriello?**
15       A        Yes, that's correct.
16           The assumptions discussed in
17   yesterday's call related to some of the changes in
18   fiscal year 2024 for the business plan projections
19   included in Opinion Number 2 for both the
20   administrative office and PSIP.
21           (Whereupon, the court reporter
22   requested clarification.)
23           THE WITNESS:  Yes, P-S-I-P.  That
24   stands for "protected self-insurance plan."
25

1    BY MR. KORNFELD:
2        **Q        Let's go to your Opinion Number 1, and**
3    **that is on Page 3 of your expert report, which has**
4    **been marked as Exhibit 1.**
5        A        I'm there.
6        **Q        For the record, would you tell us what**
7    **is your Opinion Number 1?**
8        A        You would like me to read that into
9    the record?
10       **Q        I think that would be fine.  For those**
11   **who are reading the transcript without the report,**
12   **that's helpful.**
13       A        Opinion Number 1 is, "Dismissal of the
14   Chapter 11 case will result in a lower recovery for
15   many creditors than a confirmed plan of
16   reorganization, making a plan of reorganization a
17   better outcome for creditors than dismissal."
18       **Q        In connection with Opinion Number 1,**
19   **did you estimate the value of the debtor's assets**
20   **that may be available to claimants if the case is**
21   **dismissed?**
22       A        Yes.
23       **Q        What methodology did you use to make**
24   **that estimation?**
25       A        I used the preparation of a

1    liquidation analysis to estimate that.
2        **Q        What is a "liquidation analysis"?**
3        A        A liquidation analysis is an analysis
4    that attempts to estimate the potential amount of
5    proceeds that may be available as of a specific
6    date.
7        **Q        You've been advising the debtor since**
8    **2018; is that correct?**
9        A        Our -- the Alvarez & Marsal engagement
10   letter is dated December of 2018.  I believe work
11   began in earnest in January of 2019.
12       **Q        And Alvarez & Marsal has been the**
13   **debtors' financial advisor in this case from the**
14   **very beginning of the case, October 1st, 2020; is**
15   **that correct?**
16       A        Yes.
17       **Q        During your experience with the**
18   **debtor, have any debtor personnel ever told you that**
19   **the debtor intended to liquidate?**
20       A        No, I don't believe so.
21       **Q        You've worked closely with the**
22   **debtor's senior management over the years, correct?**
23       A        Yes.
24       **Q        You've worked with the bishop,**
25   **correct?**

1        A        Yes.
2        **Q        Have you worked with the vicar**
3    **general?**
4        A        Yes.
5        **Q        Have you worked with chief operating**
6    **officer and general counsel?**
7        A        Yes.
8        **Q        Have you worked with other members of**
9    **the debtor's senior management team?**
10       A        Yes.
11       **Q        Have any of those members of the**
12   **debtor's senior management team told you that the**
13   **debtor would liquidate if the court grants the**
14   **committee's motion to dismiss?**
15       A        No.
16       **Q        Have you seen any emails from any**
17   **member of the debtor's senior management in which,**
18   **in sum or substance, they wrote that if the court**
19   **granted the motion to dismiss, the debtor would**
20   **liquidate?**
21       A        No.
22           MR. KORNFELD:  Excuse me for one
23   minute.  There is somebody whose name is, I
24   think, Mike Hogan?
25           THE COURT REPORTER:  Do you want me to



```
 1    leave this off the record?
 2         MR. KORNFELD:  You can leave this off
 3    the record.
 4         (Whereupon, a discussion was held off
 5    the record.)
 6         MR. KORNFELD:  Let's go back on,
 7    please.
 8         THE COURT REPORTER:  Sure.
 9  BY MR. KORNFELD:
10         Q      Do you expect that the debtor will
11    liquidate in the event that the court grants the
12    motion to dismiss?
13         A      As I indicate at the bottom of Page 3
14    in my report, it's not expected that the debtor
15    would liquidate.  However, I don't have an opinion
16    as to whether that would happen or not.
17         Q      Do you have a reason to believe that
18    the debtor would liquidate in the event the court
19    grants the motion to dismiss?
20         A      I could see a scenario where if enough
21    judgments were obtained against the debtor outside
22    of Chapter 11, that it could be forced to liquidate.
23         Q      Has anybody who is part of the
24    debtor's senior management told you that the debtor
25    might have to liquidate based on that scenario?
```

```
 1         A      I do recall, in at least one
 2    conversation, that concept being thrown out, not
 3    specifically related to if the motion to dismiss is
 4    granted, but as a scenario that the debtor could
 5    face.
 6         Q      When was that meeting where that
 7    concept was thrown out?
 8         A      I believe that was in the last
 9    three months or thereabouts.
10         Q      Did the debtor's -- did any member of
11    the debtor's senior management tell you that that
12    was a scenario that the debtor expected to be
13    realistic?
14         A      No.
15         Q      Did anybody who was a member of the
16    debtor's senior management tell you the liquidation
17    scenario was a scenario that the debtor viewed as
18    being in its interest?
19         A      No.
20         Q      Did anybody from the debtor's senior
21    management tell you that the debtor would liquidate
22    if the motion to dismiss was granted?
23         A      No.
24         Q      So as far as you know, the diocese
25    will continue to operate outside of Chapter 11 if
```

```
 1    the motion to dismiss is granted; is that correct?
 2         A      I don't make an opinion or have an
 3    opinion as to how the diocese would operate outside
 4    of a Chapter 11.
 5         Q      Did anybody who is part of the diocese
 6    tell you that the debtor would not operate outside
 7    of Chapter 11 if the motion to dismiss was granted?
 8         A      No.
 9         Q      Did you read any documents, ever, that
10    said if the motion to dismiss was granted, the
11    debtor would not operate outside of Chapter 11?
12         A      No.
13         Q      Did you attend any meetings where
14    anybody said if the motion to dismiss was granted,
15    the debtor would not operate outside of Chapter 11?
16         A      No.
17         Q      Did you analyze the value of assets
18    that would be available for creditors outside of
19    Chapter 11 if the motion to dismiss was granted and
20    the debtor continued to operate?
21         A      I believe that the liquidation
22    analysis, as I highlight in my report, is a
23    reasonable proxy for the amount of assets of the
24    debtor's that would be available outside of a
25    Chapter 11.  So my report makes it clear that it is
```

```
 1    not necessarily a liquidation, but the approach of
 2    using a liquidation analysis is to get at what you
 3    just indicated, which is an estimation of the amount
 4    of assets that may be available to creditors outside
 5    of a Chapter 11 filing.
 6         Q      I appreciate that long answer, sir,
 7    but that's not my question.  Let me ask my question
 8    again, and let's see if you can answer that
 9    question.
10         Did you analyze the value of assets
11    that would be available for creditors outside of
12    Chapter 11 if the motion to dismiss was granted and
13    the debtor continued to operate?
14         MR. STEPHENS:  Objection, asked and
15    answered.
16         THE WITNESS:  Yes.
17  BY MR. KORNFELD:
18         Q      Where is that analysis?
19         A      That's in this liquidation analysis.
20         Q      So you did a -- the liquidation
21    analysis makes assumptions, doesn't it?
22         A      Yes.
23         Q      The liquidation assumes that if the
24    motion to dismiss was granted, the debtor would
25    liquidate, correct?
```

MAGNA
LEGAL SERVICES

1      MR. STEPHENS: Objection.
2      THE WITNESS: Not necessarily. The
3  debtor realizes proceeds from these assets, but
4  it does not say that the debtor would no longer
5  operate.
6  BY MR. KORNFELD:
7      Q      But it's a liquidation analysis. A
8  liquidation analysis means the debtor is
9  liquidating, correct?
10      MR. STEPHENS: Objection.
11      THE WITNESS: No, that is not correct,
12  and that's not how I use this in my report. I
13  make it clear that my goal is to estimate the
14  proceeds that may be available to creditors.
15  And I use a liquidation analysis to do that, to
16  estimate those proceeds as of a particular
17  point in time.
18  BY MR. KORNFELD:
19      Q      Did you estimate the proceeds that
20  would be available if the debtor continued to
21  operate?
22      MR. STEPHENS: Objection, asked and
23  answered.
24      THE WITNESS: As I indicated, this
25  analysis doesn't distinguish between whether

1  the debtor would continue to operate or not.
2  BY MR. KORNFELD:
3      Q      This analysis assumes a liquidation
4  that would occur over approximately a 9-month time
5  period, correct?
6      A      A liquidation of these assets, a
7  monetization of the assets, but that doesn't
8  necessarily mean that the debtor would no longer
9  operate.
10      Q      What's -- could you read into the
11  record, please, on Page 5 of your report the first
12  sentence of the first full paragraph that begins, "I
13  have assumed"?
14      A      "I have assumed that the liquidation
15  would occur over an approximately 9-month time
16  period."
17      Q      That was an assumption you made,
18  correct?
19      A      Yes.
20      Q      Did you assume that the debtor would
21  operate after that 9-month period?
22      A      I did not distinguish between whether
23  the debtor would continue to operate or not after
24  that time period.
25      Q      Did you prepare any analyses about

1  what would happen to the debtor after that 9-month
2  period?
3      A      I did not.
4      Q      So after that 9-month period, based on
5  your analyses in your report, the debtor would not
6  continue to operate, correct?
7      MR. STEPHENS: Objection.
8      THE WITNESS: No. I don't say that
9  specifically one way or another.
10  BY MR. KORNFELD:
11      Q      But you don't -- you don't have any
12  projections or calculations or analyses that show
13  the debtor operating after that 9-month period in
14  your report, do you?
15      A      I do, but not in the context of
16  continuing to operate assuming a dismissal occurs.
17      Q      So you don't have any of those
18  analyses in the context of the debtor assuming to
19  operate if a dismissal occurs.
20      Did I understand you correctly?
21      A      Just to be clear, what I have
22  estimated here is the amount of proceeds that may be
23  available to creditors as of a specific point in
24  time if the case is dismissed.
25      Q      If the case is dismissed and

1  liquidation occurs over an approximately 9-month
2  time period, correct?
3      A      One thing to distinguish,
4  Mr. Kornfeld, is what I'm referring to here is a
5  liquidation of certain assets in order to realize
6  proceeds. I do not say specifically that the whole
7  debtor entity would liquidate.
8      Q      How would the debtor continue to
9  operate if the assets that you show as being
10  liquidated were, in fact, liquidated?
11      A      The debtor has, as its mission, to
12  essentially carry out the Catholic teachings and the
13  mission of caring for others in this specific
14  geographic area. It could continue to do that after
15  realizing on these assets. There is not a set
16  amount of assets or a set operation that would be
17  required for it to continue, at least that's from my
18  standpoint.
19      Q      So you used liquidation analysis in
20  your report even though you expect the debtor to
21  continue to operate; is that correct?
22      A      No. As I've indicated, I don't have a
23  view, and I don't express an opinion as to whether
24  the debtor would continue to operate or not.
25      Q      I asked you if you expected that the

MAGNA
LEGAL SERVICES

1 debtor would continue to operate.
2     A    And I believe that I responded, I
3 don't have a view one way or another.
4     Q    Is it true that it -- that it's not
5 expected that the debtor would be liquidated if the
6 case is dismissed?
7     A    I don't know that.
8     Q    Let's take a look at your report,
9 second line from the bottom on Page 3.
10     You wrote in the beginning of the
11 sentence that begins "While," "While it is not
12 expected that the debtor would be liquidated if the
13 case is dismissed" -- let me stop there and ask you,
14 do you expect the debtor to be liquidated if the
15 case is dismissed?
16     A    I don't take a position one way or
17 another.
18     Q    Okay. The debtor does not expect to
19 liquidate if the case is dismissed, correct?
20     A    That has not been a discussion that
21 I've been a part of.
22     Q    But you wrote in your report, "It is
23 not expected that the debtor would be liquidated if
24 the case is dismissed."
25     Why did you write that?

1     A    Going back to some of the questions
2 that you asked previously, it has not been a topic
3 that has been discussed previously. I mentioned it
4 came up in one conversation. However, what I am not
5 taking a position on is whether that would happen or
6 not.
7     I think, because of the fact that it
8 hasn't been discussed so far, that doesn't
9 necessarily mean that it won't happen. However, as
10 I continue on, following that sentence, the whole
11 purpose is to say the liquidation analysis is meant
12 to estimate proceeds as of a specific point in time,
13 not to make a determination as to whether the debtor
14 itself would liquidate.
15     Q    My question, sir, is a yes or -- yes
16 or no question.
17     Do you expect the debtor to liquidate
18 if the case is dismissed?
19     MR. STEPHENS: Objection, asked and
20 answered.
21     THE WITNESS: I have not taken any
22 position on that.
23 BY MR. KORNFELD:
24     Q    Does the debtor expect to liquidate if
25 the case is dismissed?

1     MR. STEPHENS: Same objection.
2     THE WITNESS: I don't think that
3 determination has been made.
4 BY MR. KORNFELD:
5     Q    But you wrote in your report that "It
6 is not expected that the debtor would be liquidated
7 if the case is dismissed."
8     Is that still your view?
9     A    I haven't been part of conversations
10 that have discussed that, but that doesn't mean that
11 those conversations haven't taken place.
12     Q    My question, sir, is, you wrote in
13 your report that "It is not expected that the debtor
14 would be liquidated."
15     Is that still your opinion?
16     A    To be clear, I don't have an opinion
17 as to whether the debtor will liquidate if this case
18 is dismissed. At the time that I published this
19 report in mid-April, it was not something that had
20 been discussed. I have not been involved in all
21 discussions that the debtor has had.
22     If the motion to dismiss is granted, I
23 certainly would expect that the debtor will monitor
24 what's happening and make a decision at that time.
25     Q    As of the date of your report that has

1 been marked as Exhibit 17 -- I'm sorry.
2     As of the date of your report that has
3 been marked as Exhibit 1 -- the date is April 17,
4 2023 -- did you have any reason to believe that the
5 debtor would be liquidated if the case is dismissed?
6     A    Yes.
7     Q    That was the one meeting that you
8 attended where the concept was floated?
9     A    Plus, just in general, I have been
10 involved in multiple cases where judgments are
11 granted against a company; and as a result of that,
12 the company eventually then liquidates.
13     So it is certainly possible that the
14 debtor could liquidate in that scenario.
15     Q    Did anybody employed or affiliated
16 with the debtor, tell you that the liquidation
17 scenario was something the debtor was considering as
18 a possibility other than in one meeting that you
19 mentioned?
20     A    No.
21     Q    As you've said, at least several
22 times, you used the liquidation analysis as a
23 reasonable proxy for the value of assets that could
24 be available for claimants that successfully pursue
25 claims against the diocese outside of Chapter 11; is

1    that correct?

2        A    Yes.

3        Q    And that was your methodology,

4    correct?

5        A    Using the liquidation analysis as a

6    proxy for determining the value of assets that could

7    be available for claimants, yes.

8        Q    Yes, that was your methodology.

9        Did I understand you correctly?

10        A    Just to be clear, you're saying using

11    a liquidation analysis was my methodology?

12        Q    My question, again, to be clear: Did

13    you, as your methodology, use the liquidation

14    analysis as a reasonable proxy for the value of

15    assets that could be available for claimants that

16    pursue claims against the diocese outside of

17    Chapter 11?

18        A    Yes.

19        Q    Has any court ever held, to your

20    knowledge, that a liquidation analysis is a

21    reasonable proxy for the value of assets that could

22    be available for creditors that successfully pursue

23    claims outside of Chapter 11 against an operating

24    debtor whose bankruptcy case was dismissed?

25        MR. STEPHENS: Objection to the extent

1    it calls for a legal conclusion.

2        You can answer.

3        THE WITNESS: Could you restate the

4    question, please?

5    BY MR. KORNFELD:

6        Q    Sure.

7        Has any court ever held that

8    liquidation analysis is a reasonable proxy for the

9    value of assets that could be available for

10    creditors that successfully pursue claims outside of

11    Chapter 11 against an operating debtor whose

12    bankruptcy case was dismissed?

13        MR. STEPHENS: Same objection.

14        THE WITNESS: I would first point out,

15    obviously, I don't have visibility to all court

16    cases.

17        Secondly, in my time in the

18    restructuring world, a dismissal of a case is a

19    fairly rare occurrence. I am not aware of a

20    situation, as you have described, recognizing

21    those two items that I indicated in my answer.

22    BY MR. KORNFELD:

23        Q    You're not aware of any court that has

24    held that your methodology is appropriate, are you?

25        A    In your specific context, again, given

1    my response, the answer is no. However, courts

2    find, very often, a liquidation analysis is a good

3    proxy for estimating the amount of proceeds that

4    could be available to creditors as of a specific

5    point in time. And I don't believe that the --

6    whether a case is dismissed or not necessarily has

7    bearing on that.

8        Q    Well, a liquidation analysis is, in

9    fact, used in every Chapter 11 case where a plan of

10    reorganization is proposed, correct?

11        A    Typically, as part of the best

12    interest test, yes.

13        Q    Exactly.

14        So the liquidation analysis is used as

15    part of the best interest test that is required by

16    Section 1129(a)(7) of the Bankruptcy Code, correct?

17        MR. STEPHENS: Object to the extent it

18    calls for a legal conclusion.

19        But you can answer based on your

20    experience.

21        THE WITNESS: I am familiar with the

22    requirements of getting a plan confirmed, yes.

23    BY MR. KORNFELD:

24        Q    So the liquidation analysis is used,

25    to be clear, in connection with the court evaluating

1    whether the plan meets the best interest test,

2    correct?

3        A    Yes.

4        Q    What is the "best interest test"?

5        MR. STEPHENS: Objection to the extent

6    it calls for a legal conclusion.

7        THE WITNESS: From a layperson's

8    standpoint, it is the court assessing whether

9    the outcome in the proposed plan of

10    reorganization is at least as good as what

11    creditors would realize or recover if the case

12    was converted to a Chapter 7 and liquidated.

13    BY MR. KORNFELD:

14        Q    You've seen liquidation analyses for

15    those purposes many times in your career, correct?

16        A    Yes.

17        Q    Have you ever seen a liquidation

18    analysis that was used as a proxy for the value of

19    assets that would be available to creditors that

20    pursue claims outside of Chapter 11 against

21    operating entities whose Chapter 11 cases were

22    dismissed by bankruptcy courts?

23        A    Again, I used this as an estimation of

24    proceeds available as a -- as of a specific point in

25    time. That is what is commonly done in a

liquidation analysis, and I don't believe that the
specifics of the context that you mentioned has any
bearing on this.
    Q    Okay.  Well, I don't -- I understand
what you don't believe, but please listen to my
question and answer my question.  Your counsel will
give you an opportunity to talk about your beliefs.
    My question, sir, is very simple:
Have you ever seen a liquidation analysis that was
used as a proxy for the value of assets that would
be available to creditors that pursue claims outside
of Chapter 11 against operating entities whose
Chapter 11 cases were dismissed by bankruptcy
courts?
    MR. STEPHENS:  Objection, asked and
answered a number of times.
    Answer again.
    THE WITNESS:  No.
BY MR. KORNFELD:
    Q    Prior to this case, did you ever
prepare a liquidation analysis as a proxy for the
value of assets that would be available to creditors
that pursue claims outside of Chapter 11 against
operating entities whose Chapter 11 cases were
dismissed by the bankruptcy courts?

    A    No.
    Q    Have you written any articles in which
you stated, in sum or substance, that a liquidation
analysis may be used as a reasonable proxy for the
value of assets that could be available for
claimants that successfully pursued claims outside
of bankruptcy against operating entities whose
Chapter 11 cases have been dismissed?
    A    No.
    Q    Have you read any such articles?
    A    No.
    Q    You've spoken at numerous
conference -- conferences having to do with
restructuring and bankruptcy, correct?
    A    Yes, I have.
    Q    Have you ever, at any of those
speaking opportunities, stated at a conference that
a liquidation analysis is a reasonable proxy for the
value of assets that could be available for
claimants that successfully pursue claims outside of
a Chapter 11 against operating entities whose
Chapter 11 cases have been dismissed by the court?
    A    No.
    Q    Have you ever heard anybody say that
at a conference?

    A    No.
    Q    You're a past president and former
member of the board of directors of the Detroit
Chapter of the Turnaround Management Association,
correct?
    A    Yes.
    Q    Have you ever attended a TMA
conference where the subject of a liquidation
analysis being used is a reasonable proxy for the
value of assets that could be available for
creditors that successfully pursue claims against
operating entities whose Chapter 11 cases have been
dismissed was discussed?
    A    I attended a lot of TMA events and
conferences over the last couple of decades, but I
don't recall offhand.
    Q    Do you recall that subject being
discussed at any TMA conference?
    A    Not that I recall.
    Q    Have you seen any TMA educational
materials where that subject was discussed?
    A    Not that I recall.
    Q    Have you seen any TMA publications
where that subject was discussed?
    A    Not that I recall.

    Q    Have you attended numerous American
Bankruptcy Institute conferences over the years?
    A    I have.
    Q    Are you a member of ABI?
    A    I am.
    Q    At any ABI conference, have you heard
any speaker, whether keynote speaker or panel
member, who stated, in sum or substance, that a
liquidation analysis is a reasonable proxy for the
value of assets that could be available for
claimants that potentially pursue claims outside of
Chapter 11 against operating entities whose
Chapter 11 cases have been dismissed?
    A    Not that I can recall.
    Q    Do you read bankruptcy blogs like
Law360, Reorg, PETITION, et cetera?
    A    Yes, I do.
    Q    You pretty much do that every day,
like the rest of us?
    A    Yes, I do.
    Q    Have you seen any blog post that
stated that a liquidation analysis is a reasonable
proxy for the value of assets that could be
available for claimants that successfully pursue
claims outside of Chapter 11 against operating

1 entities whose Chapter 11 cases have been dismissed?
2     A    Not that I recall.
3     Q    Did you read any journals in which the
4 author of an article said that?
5     A    Not that I can recall.
6     Q    Read any books in which the author
7 said that?
8     A    Not that I can recall.
9     Q    Did you attend any seminars where the
10 participants said that?
11     A    Not that I can recall.
12     Q    Did you speak on any panel in which
13 that subject was even discussed?
14     A    I believe I responded to that before.
15 Not that I can recall.
16     Q    Is your use of liquidation analysis as
17 a reasonable proxy for the value of assets that
18 could be available for claimants that successfully
19 pursue claims outside of Chapter 11 against
20 operating entities whose Chapter 11 cases have been
21 dismissed the very first time that you have seen
22 that methodology used in the context of a dismissal?
23     A    I don't know about that. I have been
24 involved in a structured dismissal before, and I
25 believe that I may have prepared a liquidation

1 analysis as part of that.
2     Q    What case was that?
3     A    Noranda Aluminum.
4     Q    Did the court approve the structured
5 dismissal?
6     A    Yes.
7     Q    What court was that?
8     A    That was Eastern District of Missouri.
9     Q    Did you submit an expert report to
10 that court?
11     A    I don't believe so.
12     Q    Did you testify regarding the use of a
13 liquidation analysis as a reasonable proxy for what
14 happens in connection with the dismissal of
15 Noranda's Chapter 11 case?
16     A    I don't believe so.
17     Q    Did you give a deposition on that
18 subject?
19     A    I don't believe so.
20     Q    Did you provide your liquidation
21 analysis to the court in that case?
22     A    I believe so.
23     Q    But you didn't testify?
24     A    Correct.
25     Q    You didn't qualify as an expert in

1 that case, correct?
2     A    Correct.
3     Q    Did the court approve the structured
4 dismissal of the Noranda case?
5     A    Yes.
6     Q    Did the court write an opinion
7 approving that structured dismissal?
8     A    I don't recall.
9     Q    Did the court hold that your
10 methodology, that is, that a liquidation analysis is
11 a reasonable proxy for the value of assets that
12 could be available for claimants that successfully
13 pursued claims outside of bankruptcy against
14 operating entities, was appropriate?
15     A    I don't recall.
16     Q    When was Noranda?
17     A    That case filed in February of 2016,
18 and I believe that the structured dismissal was
19 October or November of that year.
20     Q    The liquidation analysis in that case
21 that you prepared, did you prepare it for the
22 debtor?
23     A    Yes.
24     Q    Did you provide your liquidation
25 analysis that you prepared for the debtor in Noranda

1 to any other party besides the debtor?
2     A    I haven't looked at that case in a
3 while, so I can't recall. I believe that was filed
4 with the court, which would have made it available
5 to other parties, but I don't recall exactly.
6     Q    But you didn't -- strike that.
7     But the court didn't make any
8 determination about that liquidation analysis that
9 you recall, correct?
10     A    I don't recall.
11     Q    Did you -- was there any litigation
12 about whether that liquidation analysis was an
13 appropriate methodology in that case?
14     A    I don't recall.
15     Q    Did the court in that case say
16 anything about your liquidation analysis?
17     A    I don't recall.
18     Q    Did anybody in that case say anything
19 about whether your liquidation analysis as a
20 methodology was appropriate in that case?
21     A    I don't recall.
22     Q    Other than this case and Noranda, have
23 you ever seen your methodology, that is the use of a
24 liquidation analysis as a reasonable proxy for the
25 value of assets that could be available for

```
 1    creditors that successfully pursue claims outside of
 2    bankruptcy against operating entities, has been
 3    used?
 4         A     No.
 5         Q     Have you ever seen anybody other than
 6    you use that methodology?
 7         A     In the context, specifically, that
 8    you're referring to?
 9         Q     Yes, sir.
10         A     No.
11         Q     So as far as you know, you're the
12    first and only person to have ever used that
13    methodology, correct?
14              MR. STEPHENS:  Objection.
15              You can answer.
16              THE WITNESS:  I -- I couldn't say if
17    it's been used by other people or not.  I'm not
18    aware of another instance where that has
19    happened.
20    BY MR. KORNFELD:
21         Q     You're not aware of anybody else using
22    that methodology, correct?
23         A     Specifically in the context as you
24    have described it, that's correct.
25         Q     And the context we're talking about is
```

```
 1    in the context of evaluating what happens in the
 2    event of the dismissal of a Chapter 11 case and the
 3    entity that is dismissed continues to operate.
 4              Is that the context you're referring
 5    to?
 6         A     I believe that the question that you
 7    have continued to ask me is using a liquidation
 8    analysis to estimate assets that may be available to
 9    creditors who pursue claims against an operating
10    company whose Chapter 11 case has been dismissed.
11         Q     That is the context.
12         A     And in that regard, I'm not aware of
13    any other parties that have used that approach.
14         Q     But that is the approach and
15    methodology that you used here, correct?
16         A     Yes.
17         Q     Mr. Moore, I'm about to move on to
18    another topic.  We've been going about an hour.
19              Do you want a break now, or do you
20    want to keep going?
21         A     I'm fine to keep going.
22         Q     In preparing the liquidation analysis
23    contained in your report, did you, on behalf of the
24    diocese, estimate the value of projected allowed
25    survivor claims?
```

```
 1         A     Mr. Kornfeld, you used the word
 2    "allowed," and that has a context in Chapter 11.
 3              Are you referring to within Chapter 11
 4    or outside Chapter 11?
 5         Q     Now, we're talking about -- I'm
 6    talking about in doing the liquidation analysis.
 7    Let's just talk broadly first.
 8              So I'll rephrase the question.
 9              In doing your liquidation analysis,
10    did you estimate the value of projected survivor
11    claims?
12         A     Could you clarify what you mean by the
13    "value" of survivor claims.
14         Q     Sure.  Actually, let me ask you, do
15    you understand what "aggregate value of claims"
16    means?
17         A     You're using the word "value."  I
18    understand, especially in mass tort cases,
19    oftentimes there are value estimates that are
20    assigned to claims.  More often than not, however,
21    I'm looking at numbers of claims in this context.
22         Q     When you said "value estimates," what
23    did you mean?
24         A     In a typical corporate Chapter 11,
25    claims -- proofs of claim will be filed.  There may
```

```
 1    be an agreement on those amounts.
 2              In the end, there is -- I believe you
 3    used the term an "aggregate value of claims," and
 4    oftentimes those claims are put into classes.  And
 5    so there are claims that exist related to a class.
 6              In this type of case, the value of the
 7    claim is certainly something that is disputed.  And
 8    so in this case, we don't -- I don't use a value of
 9    the claims, but I focus more on the number of
10    claims.
11         Q     So using your understanding -- and I
12    thank you -- I thank you for that.  It's been
13    helpful.
14              Did you focus, in any way, on the
15    value of the survivor claims that have been filed in
16    this case?
17         A     Not on the value of survivor claims.
18         Q     Did you estimate the value of survivor
19    claims in this case?
20         A     No.
21         Q     Did you review any of the claims
22    survivors have filed against the diocese in this
23    case?
24         A     I have reviewed claims registers in
25    this case, yes.
```



```
 1        Q        Did you review any particular claims?
 2        A      I have not reviewed the underlying
 3    proofs of claim form or any other supplemental
 4    information for any claims.
 5        Q        You told me that you did not estimate
 6    the value of survivor claims.
 7              Did I understand you correctly?
 8        A      Yes.
 9        Q      Did anybody estimate the value of
10    survivor claims?
11              MR. STEPHENS:  Objection.
12              To the extent that you have any
13    information on that that came from counsel,
14    that's work product.  So if you can answer
15    without reference to conversations you had with
16    counsel, you can answer.
17    BY MR. KORNFELD:
18        Q       Well, first, let's -- let's get a yes
19    or no, and then we can go further.  And we will
20    avoid conversations with counsel.
21              My question is, sir, yes or no -- not
22    any more -- did anybody on behalf of the diocese
23    estimate the amount of survivor claims?
24              MR. STEPHENS:  Again, Alan, my
25    objection is if the only way he knows that is
```

```
 1    through the scope of instructions that counsel
 2    has been giving to other experts, that's all --
 3    that's all work product in terms of the scope
 4    of what the diocese experts have been
 5    instructed to do by counsel.
 6              So my caution remains.  If you can
 7    answer while respecting that caution, please
 8    answer.
 9              THE WITNESS:  My knowledge only comes
10    from conversations I've been involved with --
11    in with counsel.
12    BY MR. KORNFELD:
13        Q        Did anybody at A & M estimate the
14    value of survivor claims?
15        A      No.
16        Q        Putting aside conversations with
17    counsel, have you seen any documents where there is
18    an estimation of survivor claims?
19        A      No.
20        Q        Do you know the value of survivor
21    claims against the diocese?  Just yes or no.
22        A      No.
23        Q        Do you expect all survivors to recover
24    100 percent of the value of their claims?
25        A        That's impossible for me to know at
```

```
 1    this point.
 2        Q      Have you read the diocese's disclosure
 3    statement?
 4        A      Yes.
 5        Q      Does the diocese expect that all
 6    survivors will recover 100 percent of the value of
 7    their claims?
 8              MR. STEPHENS:  I'll just object as
 9    beyond the scope of the witness' disclosed
10    opinions.
11              But to the extent you know, you can
12    answer.
13              THE WITNESS:  I don't recall
14    specifically how that was addressed or if it
15    was addressed in the disclosure statement.
16    BY MR. KORNFELD:
17        Q      Let's see if we can refresh your
18    recollection.
19              MR. KORNFELD:  Can we publish
20    Exhibit 4, please, which is the disclosure
21    statement?
22              This will be Exhibit 4.
23              (Whereupon, Exhibit 4 was marked for
24    Identification.)
25              MR. STEPHENS:  Alan, just as a
```

```
 1    technical matter, on my screen, it's showing as
 2    being marked as Exhibit 2, so that may lead to
 3    some confusion.
 4              MR. KORNFELD:  Yeah, it should be
 5    marked as Exhibit 4.
 6              MS. CANTY:  Sorry.  I'll fix it now.
 7              MR. KORNFELD:  Eric, do you have it as
 8    Exhibit 4 now?
 9              MR. STEPHENS:  Just for -- yes, just
10    in that moment it went from 2 to 4.
11              MR. KORNFELD:  Okay.
12    BY MR. KORNFELD:
13        Q       Mr. Moore, do you have Exhibit 4 in
14    front of you?
15        A      I do.
16        Q      Let me represent to you Exhibit 4 is a
17    long document.  It's the diocese's disclosure
18    statement, Docket Number 1615.
19              Do you have any reason to believe that
20    Exhibit 4 is not the diocese's disclosure statement?
21        A      No.
22        Q      Let's turn to Page 7.  Heading C is
23    entitled, "Parties Entitled to Vote on the Plan."
24              Are you with me there?
25        A      Yes.
```

```
 1        Q       The last paragraph on Page 7 of the
 2   diocese's disclosure statement marked as Exhibit 4
 3   reads, "The following table sets forth which classes
 4   are entitled to vote on the plan and which are not
 5   and sets forth an estimated recovery and/or the
 6   impairment status for each of the separate classes
 7   of claims provided for in the plan."
 8        Then we go onto Page 8, and there's a
 9   table.
10        Do you see that table?
11        A    I do.
12        Q       What are the classes of survivor
13   claims that are listed on the table that appears on
14   the top of Page 8 of the diocese's disclosure
15   statement marked as Exhibit 4?
16        MR. STEPHENS:  Just note my objection
17   that this is beyond the scope of Mr. Moore's
18   expert report.
19   BY MR. KORNFELD:
20        Q       You may answer.
21        MR. STEPHENS:  If you have an answer,
22   you may answer.
23        THE WITNESS:  Abuse claims would fall
24   into Classes 4 through 8 and possibly 9.
25
```

```
 1   BY MR. KORNFELD:
 2        Q       What is the estimated recovery of each
 3   of those classes?
 4        A    It says 100 percent.
 5        Q    Do you have any reason to believe that
 6   100 percent estimated recovery for those classes is
 7   not correct?
 8        A    No.
 9        Q    Do you know how that estimated
10   recovery percentage was computed?
11        A    No.
12        Q    Do you know who did the analysis of
13   the estimated recovery for those classes of survivor
14   claims?
15        A    No.
16        Q    Did A & M have any role in that?
17        A    I don't believe so.
18        Q    Did A & M have any role in calculating
19   the value of the survivor claims?
20        MR. STEPHENS:  Objection, asked and
21   answered.
22        THE WITNESS:  No.
23   BY MR. KORNFELD:
24        Q       Was the estimated value of projected
25   allowed survivor claims important for you to know in
```

```
 1   connection with the preparation of your liquidation
 2   analysis that is used as the methodology for your
 3   exhibit -- for your Opinion Number 1?
 4        A    No.
 5        Q    Why not?
 6        A    My -- as I indicate in my report, the
 7   purpose of that analysis is to estimate the amount
 8   of assets that would potentially be available for
 9   creditors as of a specific date.
10        Q    When A & M prepares liquidation
11   analyses, typically, does -- do those analyses
12   include an estimate of the value of claims?
13        A    I would say, most often that would be
14   the case.  The liquidation analysis has a waterfall
15   to it where the proceeds that are available are then
16   distributed amongst different classes of creditors.
17        Q    And the liquidation analysis that
18   A & M prepares typically looks at the value of the
19   claims and how much in proceeds will be allotted to
20   each class of claims, correct?
21        A    That is generally the case, yes.
22        Q    And then the A & M liquidation
23   analysis would typically have a percentage recovery
24   for each class of claims, correct?
25        A    Yes.
```

```
 1        Q       And that percentage recovery is
 2   computed by looking at the value of claims and how
 3   much the claims recover and then doing a percentage
 4   calculation and saying unsecured claims get,
 5   hypothetically, X percentage; secured claims get,
 6   hypothetically, Y percentage, et cetera, correct?
 7        A    Yes.
 8        Q    You didn't do that in your liquidation
 9   analysis here, did you?
10        A    Correct.
11        Q    It's correct that you did not provide
12   that analysis in your liquidation analysis.
13        Did I understand you correctly?
14        A    That's correct.  I did not include
15   values of claims or that recovery that you indicated
16   in this analysis.
17        Q    Have you ever done that analysis for
18   the debtor in this case?
19        A    I believe that there were multiple
20   times that A & M began work on a liquidation
21   analysis; however, that was never completed.
22        Q    Why not?
23        MR. STEPHENS:  Objection.  Just to the
24   extent that -- I'll just caution you not to
25   reveal any instruction you received from
```

1      counsel.
2            THE WITNESS:  It was not -- a
3      completed liquidation analysis was not
4      requested.
5      BY MR. KORNFELD:
6            Q      So the only liquidation that A & M did
7      was the analysis in your report that has been marked
8      as Exhibit 1; is that correct?
9            A      This is the dismissal analysis using
10     the approach of the liquidation analysis.  There is
11     no other liquidation analysis.
12           Q      There's no calculation of the amount
13     of claims, how much each class of claims will
14     recover in dollars and the percentage recovery of
15     each class of claims in this case that you're aware
16     of, correct, sir?
17           A      Correct.
18           MR. KORNFELD:  Let's take our break
19     now.  We're about at 20 minutes after the hour.
20     Let's come back in about 10 minutes.
21           Is that okay with you?
22           THE WITNESS:  Yes.
23           MR. STEPHENS:  On the half hour, Alan?
24           MR. KORNFELD:  On the half hour.  If
25     you want longer and you need a lunch break, for

1      example, just let me know.
2            THE WITNESS:  I'm okay for now.
3            MR. KORNFELD:  Fair enough.  We'll see
4      you on the half hour.
5            MR. STEPHENS:  Thank you.
6            (Whereupon, a short break was taken.)
7            MR. KORNFELD:  Let's go on.  Good
8      afternoon, now, Mr. Moore.
9            THE WITNESS:  Good afternoon.
10     BY MR. KORNFELD:
11           Q      So summing up, in your liquidation
12     analysis, you did not include the amount of claims,
13     correct?
14           A      Value of the claims, that's correct.
15           Q      You did not include the estimated
16     dollar amount of recovery for those claims, correct?
17           A      Correct.
18           Q      You did not include the estimated
19     recovery percentage for those claims, correct?
20           A      Correct.
21           Q      Why didn't you include any of that in
22     the liquidation analysis that is part of Exhibit 1?
23           A      The purpose of this analysis was
24     twofold.  One was to estimate the value that may be
25     available to creditors as of a specific point in

1      time and then also to compare how that value may
2      differ between a dismissal scenario and a confirmed
3      plan of reorganization scenario.
4            So it's more focused on the assets and
5      what would be made available to creditors, the
6      amount of their claims, the number of the claims.
7      But more importantly, the value of those claims is
8      not relevant for that analysis.
9            Q      You talked with me about the best
10     interest test that is used.
11           Do you recall that discussion?
12           A      Yes.
13           Q      The best interest test evaluates
14     recoveries for creditors under a Chapter 11 versus
15     recovery for creditors under a Chapter 7, correct?
16           A      Yes.
17           Q      Does your liquidation analysis
18     estimate recovery for creditors under a Chapter 11?
19           A      It does not.  From the standpoint of
20     how much an individual claim may recover, it does
21     focus on the amount of proceeds that may be
22     available to satisfy those claims.
23           Q      Does your recovery analysis that is
24     part of your liquidation analysis focus on how much
25     a class of creditors will recover?

1            A      In a way, it does.  There are no
2      secured claims here.  I do make note of the fact
3      that I removed any secured claims, which are zero.
4      And then after that, the entire amount that I
5      identify is what would be available for general
6      unsecured claims.
7            Q      Does your recovery analysis, as part
8      of your liquidation analysis, focus on the amount of
9      survivor claims?
10           A      The number of claims does factor into
11     this analysis.
12           Q      I'm asking about the amount, the
13     dollar amount of the claims, not the number of
14     claims.
15           A      Not the dollar amount.
16           Q      Does your recovery analysis attempt to
17     show the percentage recovery for each class of
18     survivor claims?
19           A      No.
20           Q      It doesn't show the percentage
21     recovery for either a Chapter 11 scenario or a
22     Chapter 7 scenario, correct?
23           A      It distinguishes between the assets
24     available, the value of the claims, and therefore,
25     the calculation of what recovery would be is



```
 1   potentially the same under each of the scenarios in
 2   terms of creditors asserting claims.
 3        Q     My question, sir, is, does your
 4   analysis show the percentage recovery for each class
 5   of survivor claims?
 6        A     No.
 7        Q     Your liquidation analysis is contained
 8   on Page 9 of your report that has been marked as
 9   Exhibit 1; is that correct?
10        A     Yes, what I refer to as my dismissal
11   analysis, that's correct.
12        Q     Is the analysis on Page 9 of your
13   report a Chapter 7 analysis?
14        A     No.
15        Q     How is it different from a Chapter 7
16   analysis?
17        A     Well, one example is I don't include
18   any costs for a Chapter 7 trustee in this analysis.
19        Q     When we talked about the best interest
20   test, you testified -- if I understood you
21   correctly -- that the best interest test shows
22   Chapter 11 results for creditors versus Chapter 7
23   results for creditors?
24              Did I get that right?
25        A     Generally, yes.
```

```
 1        Q     And your analysis doesn't do that,
 2   correct?
 3        A     Correct.  I am not, in this analysis,
 4   comparing the results to a class of creditors under
 5   a Chapter 7 versus a Chapter 11.
 6        Q     Have you ever seen that analysis that
 7   the debtor has prepared, if they prepared it?
 8        A     No.
 9        Q     Do you know if the debtor has prepared
10   that analysis?
11        A     No.
12        Q     In a Chapter 7, you said there would
13   be a trustee, right?
14        A     Yes.
15        Q     What is, typically, the role of
16   management where there's a Chapter 7 trustee?
17              MR. STEPHENS:  Objection to the extent
18   it calls for a legal answer.
19              But answer based on your experience.
20              THE WITNESS:  In Chapter 7s that I
21   have seen, typically, management continues to
22   be utilized to the extent that they are
23   critical to the liquidation of those assets.
24   BY MR. KORNFELD:
25        Q     Typically, in a Chapter 7, who
```

```
 1   fulfills the functions of the CEO?  That's the
 2   trustee, isn't it?
 3        A     It all depends.  The trustee,
 4   Chapter 7 trustee, would be the fiduciary; however,
 5   the CEO could remain involved even after a Chapter 7
 6   trustee is appointed.
 7        Q     And that's up to the Chapter 7 trustee
 8   whether the CEO remains involved, correct?
 9        A     Yes.
10        Q     And the Chapter 7 trustee may
11   terminate management, may keep management or may
12   keep some management, correct?
13        A     Yes.
14        Q     You said you didn't include Chapter 7
15   trustee fees in your analysis on Page 9.
16              Do you know what those fees would be?
17        A     Not offhand.
18        Q     Did you estimate that in connection
19   with the preparation of analysis that's on Page 9 of
20   your report?
21        A     I did not because that is not the
22   scenario that I am including on this dismissal
23   analysis.
24        Q     Have you ever seen a liquidation
25   analysis prepared for purposes of the best interest
```

```
 1   test that did not include projected Chapter 7
 2   trustee fees?
 3        A     I don't believe so.
 4        Q     Other than in this case, have you ever
 5   prepared a liquidation analysis that does not
 6   include Chapter 7 trustee fees?
 7        A     Yes.
 8        Q     Is that Noranda?
 9        A     That's been multiple cases.
10   Liquidation analysis doesn't always have to come to
11   play in Chapter 7.
12        Q     Have you prepared a liquidation
13   analysis for purposes of the best interest test that
14   does not include Chapter 7 trustee fees?
15        A     I don't believe so.
16        Q     Have you ever seen a liquidation
17   analysis prepared for purposes of the best interest
18   test that do not include -- that did not include
19   Chapter 7 trustee fees?
20        A     Not that I recall.
21        Q     Looking at your analysis on Page 9 of
22   your report, I will call your attention to the
23   "Insurance Proceeds (Abuse Claims)" line.
24              What is the amount of insurance
25   proceeds that you're projecting will be available
```

1      **under both a Chapter 11 plan and in the event of a**
2      **liquidation?**
3            A     Just to be clear, Mr. Kornfeld -- this
4      goes back to our conversation earlier -- what I am
5      discussing here in this dismissal analysis is the
6      comparison of a Chapter 11 plan versus the case
7      being dismissed not necessarily a liquidation of the
8      debtor.  I just wanted to clarify based on your
9      question.
10            So in this dismissal analysis, I do
11     not make an estimate for insurance proceeds, and I
12     make the assumption that the insurance proceeds
13     would be available under either scenario and the
14     same.
15            I also highlight, though, in a
16     dismissal that there are certainly items that could
17     impact the amount of insurance available that may
18     not be -- that may not exist in a Chapter 11
19     confirmed plan scenario.
20          Q     **Where do you say that in your report?**
21          A     I believe it's in my assumptions.
22          Q     **Is that on Page 7?**
23          A     Let me just go to that.
24             Yes, bottom of Page 6, Letter J.
25          Q     **Let's talk about that.**

1      **So that's your note regarding**
2      **insurance proceeds relating to abuse claims; is that**
3      **right?**
4            THE COURT REPORTER:  "Relating to"...
5            MR. KORNFELD: I'm sorry.  It's
6     insurance proceeds related to abuse claims.
7     Sorry, Jamie.
8            THE COURT REPORTER:  Okay.  And your
9     answer, Mr. Moore?
10           THE WITNESS:  Now I've forgotten the
11     question.  If you could restate the question,
12     please.
13           MR. KORNFELD:  Absolutely.
14     BY MR. KORNFELD:
15          Q     **Basically, all I was doing was calling**
16     **your attention to Note J.  We're there, right?**
17          A     Yes.
18          Q     **Note J begins at the bottom of 6 and**
19     **goes over to Page 7, right?**
20          A     Yes.
21          Q     **Note J is titled "Insurance Proceeds**
22     **Related to Abuse Claims," correct?**
23          A     Yes.
24          Q     **My first question is, have you**
25     **determined the value of insurance assets that may be**

1      **available for purposes of satisfying abuse**
2      **claimants?**
3          A     No.
4          Q     **Has anybody on behalf of the debtor**
5     **determined that?**
6           MR. STEPHENS:  I just object to the
7     extent that you know that from counsel.
8           THE WITNESS:  Not that I'm aware of.
9     BY MR. KORNFELD:
10          Q     **Is it your conclusion that the value**
11     **of insurance proceeds is assumed to be approximately**
12     **equal in a dismissal to the value realized under a**
13     **Chapter 11 plan of reorganization?**
14          A     That it is the assumption I've made in
15     this dismissal, correct.
16          Q     **Why did you make that assumption?**
17          A     I do believe that there is risk in a
18     dismissal scenario that insurance may not be the
19     same amount.  It was impossible for me to quantify
20     that amount, and so I used a conservative assumption
21     that they would be the same.
22          Q     **What is your belief that there is more**
23     **risk in a dismissal context based upon?**
24          A     A few items.  One is that in the
25     context of a Chapter 11 confirmed plan, the insurers

1     would have finality.
2           And I believe that it is more likely
3     that insurers would come to the table with that
4     finality, as compared to in a dismissal scenario,
5     where insurers are paying proceeds based on
6     individual lawsuits, there may be more litigation
7     around each of those insurance recoveries, which may
8     end up eating up -- first of all, the insurers may
9     not put forward as much, but then they also eat up
10     some areas where there are limits in the policies.
11          Q     **But despite that belief, your**
12     **determination, for purposes of this analysis, is**
13     **that the value of insurance proceeds is**
14     **approximately equal in a dismissal to the value that**
15     **would be realized under a Chapter 11 plan?**
16          A     Correct.  As I indicated, the value
17     would be difficult to determine; and so, to be
18     conservative, I made this assumption.
19          Q     **Insurance proceeds is an important**
20     **source of recovery, isn't it?**
21          A     Yes.
22          Q     **It's not a stretch to say that**
23     **insurance proceeds may be the most important source**
24     **of recovery, correct?**
25          A     Correct.  Again, just to be clear, I

1 stated my answer the other way, but I don't
2 contemplate a scenario where insurance proceeds
3 would be more in a dismissal scenario than they
4 would be in a Chapter 11.
5     **Q**    **I understand. Thank you.**
6         **You're not an insurance expert, are**
7 **you?**
8     A    No, sir.
9     **Q**    **Did you speak to any insurance experts**
10 **before you reached your conclusion regarding**
11 **insurance proceeds --**
12     A    Yes.
13     **Q**    **-- being approximately equal in a**
14 **dismissal to those that might be realized under a**
15 **plan?**
16         MR. STEPHENS: And I just want to
17 object. Alan, you keep using words like
18 "conclusion" and "determination," and the words
19 that are quoted are "assumption," and those are
20 words that the witness keeps using.
21         But with that objection, Chuck, you
22 can answer.
23         MR. KORNFELD: You know, Eric, you've
24 been very good about not making speaking
25 objections, but now you're making a speaking

1 objection. So please don't.
2 BY MR. KORNFELD:
3     **Q**    **Do you have my question in mind, sir?**
4     A    Yes. My answer is yes.
5     **Q**    **Which insurance experts did you speak**
6 **to?**
7     A    I spoke with my colleague, my partner,
8 at A & M that heads up our insurance group. And
9 I've also had conversations with counsel.
10     **Q**    **Putting aside conversations with --**
11 **well, let me just ask you, "conversations with**
12 **counsel," you mean Jones Day or other counsel?**
13     A    Jones Day and Reed Smith.
14     **Q**    **Very good.**
15         **Was your colleague present during**
16 **those conversations?**
17     A    No.
18     **Q**    **Who is your colleague that heads up**
19 **your insurance group?**
20     A    James McDermott.
21     **Q**    **When did you speak to Mr. McDermott**
22 **regarding insurance proceeds in this case?**
23     A    I've spoken to Mr. McDermott many
24 times throughout the case. My last conversation
25 with him would have been in the week before I

1 published my report.
2     **Q**    **Did you ask Mr. McDermott whether your**
3 **conclusion that the value of insurance proceeds is**
4 **assumed to be approximately equal in a dismissal to**
5 **value realized under a Chapter 11 plan of**
6 **reorganization was correct?**
7     A    I don't believe I asked Mr. McDermott
8 that specific question.
9     **Q**    **What did you ask Mr. McDermott?**
10     A    We talked about Ecclesia and
11 Ecclesia's ability to -- or the ability to realize
12 more than $15 million from Ecclesia under different
13 scenarios, whether Ecclesia could be marketed and
14 how its claims may -- or claims against Ecclesia may
15 impact that.
16     **Q**    **Did you talk to Mr. McDermott about**
17 **anything else?**
18     A    I think just general insurance
19 recoveries.
20     **Q**    **Is your opinion that the value of**
21 **insurance proceeds is assumed to be approximately**
22 **equal in a dismissal to value realized under a**
23 **Chapter 11 plan of reorganization based on anything**
24 **other than conversations with counsel?**
25     A    My experience dealing with insurers as

1 well.
2     **Q**    **Anything else?**
3     A    No.
4     **Q**    **Do you have experience dealing with**
5 **insurers in a Chapter 7 scenario?**
6     A    I believe that I have had experience
7 with insurers in a Chapter 7, but I can't recall
8 specific cases.
9     **Q**    **Have you had experience dealing with**
10 **insurers in a Chapter 7 scenario where there was a**
11 **coverage dispute between the Chapter 7 trustee and**
12 **his or her estate and the insurers?**
13     A    That would have likely been the
14 context of when I had experience with insurers in a
15 Chapter 7, but I don't recall specific cases.
16     **Q**    **Do you recall anything about the**
17 **experience other than you may have had it?**
18     A    Not at this time.
19     **Q**    **Let's go back to Page 9 of your**
20 **report. Under the section highlighted "Less**
21 **Dismissal Deductions," the second line is**
22 **"Incremental Litigation Costs."**
23         **First, for the record, what is the**
24 **amount of those incremental litigation costs?**
25     A    That's $162 million under each of the

1   low, medium and high scenarios.
2       Q       Those are scenarios that would, in
3   your view, be part of the dismissal analysis,
4   correct?
5       A       Yes.
6       Q       How did you arrive at that
7   $162 million number?
8       A       That is a number of cases which is, I
9   believe, 648 multiplied by an incremental cost to
10  defend and litigate each case of $250,000.
11      Q       648 times 250,000 equals 162 million.
12              Did I get that right?
13      A       You did.
14      Q       Why did you assume 648 allowed claims?
15      A       Based on the claims registered around
16  the time of my report and conversations with
17  counsel.
18      Q       How many allowed claims does the
19  debtor assume in its disclosure statement?
20      A       For which type of claim?
21      Q       The survivor claim, sir.
22      A       The debtor doesn't specify a
23  particular number around those claims.  For
24  calculation purposes, some of the calculations that
25  are performed use a number of 500.

1       Q       The number of 500 is used in the
2   disclosure statement; is that correct?
3       A       For those calculations.  But it also
4   highlights the eventual number of abuse claims could
5   be higher or lower than that.
6       Q       You said the number of claims for
7   purposes of calculation that is used by the debtor
8   in the disclosure statement is 500.
9               My question, sir, is, what
10  calculations?
11      A       There are calculations that indicate
12  the recovery per claim.  So based on each individual
13  claim and the assets that are being put forward in
14  the plan that the debtor filed, which is 185 to
15  200 -- estimated at 185 to $200 million prior to
16  insurance.
17      Q       You said "185 to 200 million prior to
18  insurance."
19              What do you mean by that?
20      A       Within the debtor's plan, there is a
21  list of assets that would be proposed to be
22  contributed to a trust that would be used to pay
23  claims -- pay abuse claims.  Those assets are
24  estimated to have a value of 185 million to
25  $200 million.

1       Q       I understand.
2               And then the debtor did various
3   calculations that are included in its plan that
4   deal, in general, with the amount being contributed
5   per claim; is that correct?
6       A       A recovery -- an average recovery per
7   claim, yes.  Per abuse claim.
8       Q       The number of claims that the debtor
9   used in its calculations was 500 claims, correct?
10      A       Correct.
11      Q       The number of claims you used in your
12  calculation of incremental abuse claims is 648
13  claims; is that correct?
14      A       Correct.
15      Q       Why did you assume that there would be
16  an additional $250,000 per case in defense costs on
17  top of the cost of administering claims through a
18  settlement trust established as part of a Chapter 11
19  plan of reorganization?
20      A       That was the number provided to me by
21  counsel.
22      Q       In any place in your report, do you
23  say that $250,000 was a number provided to you by
24  counsel?
25      A       I would have to go back and look and

1   see if I used those specific words.
2       Q       Why don't you take a look -- take your
3   time -- and let me know if you disclosed in your
4   expert report that the $250,000 per case was a
5   number that was provided by counsel.
6       A       At the very last page of my report --
7   this is Page 33 -- Number 8 is an affidavit that was
8   filed -- an affidavit of mine that was filed
9   pre-petition that factored into this.
10              Number 8 on Page 33 of my report is an
11  affidavit that I filed pre-petition that
12  specifically relates to this and that was developed
13  with counsel.  That affidavit doesn't specify
14  $250,000 in it; however, it is part of similar
15  conversations that I've had with counsel.
16      Q       Where does the words "developed with
17  counsel" appear in Item 8 on Page 33 of your report?
18      A       They don't.
19      Q       My question, sir:  Would the reader of
20  your report -- and you have -- the debtor has
21  submitted your report to the court -- know, after
22  reading your report, that the $250,000 estimate was
23  an estimate provided by counsel?
24      A       I can't say what a reader would think
25  or not think based on reading this.

MAGNA ▶
LEGAL SERVICES

```
 1       Q      The question, sir, is, where in your
 2   report does it say that the $250,000 estimate was
 3   provided by counsel?
 4       A      It does not say those specific words.
 5       Q      Does it say those words in sum or
 6   substance, sir?
 7       A      One could imply, based on looking at
 8   the additional materials considered, Number 8, that
 9   that would have been developed with counsel.
10       Q      When your report was provided to the
11   court yesterday, did you provide those additional
12   materials, in particular, the affidavit that is
13   cited in materials considered, Item Number 8, to the
14   court?
15           MR. STEPHENS:  Objection.  Mr. Moore
16       didn't provide anything to the court yesterday,
17       Jones Day provided files to the court
18       yesterday.
19   BY MR. KORNFELD:
20       Q      Did anybody provide that affidavit to
21   the court?
22       A      That affidavit was filed with a court
23   in May of 2020.
24       Q      Was that the bankruptcy court?
25       A      No, a different court.
```

```
 1       Q      Let me ask a precise question, and I
 2   do appreciate your precision.
 3           To your knowledge, did anybody provide
 4   to the bankruptcy court in this case Item Number 8
 5   on materials considered?
 6       A      I don't know if that's been included
 7   in other pleadings or not.
 8       Q      Do you have any reason to believe that
 9   it was?
10       A      It certainly could have been.
11       Q      You didn't attach it to any of the
12   declarations that you submitted or the debtors
13   submitted that you signed, correct?
14       A      I don't recall if it was attached to
15   any of my declarations.  It may have been attached
16   to pleadings that were associated with other
17   declarations of mine filed in the bankruptcy case.
18       Q      But you don't know whether it was or
19   wasn't, correct?
20       A      I don't know.
21       Q      What methodology did you use, other
22   than taking a number that counsel provided to you,
23   to conclude that additional litigation costs, on top
24   of what would be incurred by a settlement trust
25   established as part of a Chapter 11 reorganization,
```

```
 1   would be 250,000 per case?
 2       A      There were a few things that I did.
 3           One, I had follow-up questions for
 4   counsel to understand the reasonableness of that
 5   number; and then, secondly, I was working with the
 6   debtor on a pre-petition basis and had visibility to
 7   some of the litigation activities -- defense
 8   activities that were going on, on a pre-petition
 9   basis.
10       Q      What did you ask counsel about the
11   reasonableness of the 250,000-per-case estimate?
12           MR. STEPHENS:  And I'll just caution
13       you, you can testify to the basis of the
14       assumption, but don't testify to any of the --
15       any legal advice or any legal conclusions that
16       took place in the course of that conversation.
17       But certainly relay to Mr. Kornfeld the factual
18       basis of that assumption.
19           MR. KORNFELD:  Let me ask the question
20       again so it's clear for the record.
21           I'm asking -- and, Eric, I appreciate
22       your comment, but let me be clear to you about
23       what I'm getting at and you can make your
24       objection.  And if you want to make an
25       instruction, that's up to you.
```

```
 1           I would not think, however, that when
 2       the witness has opened the door to advice of
 3       counsel, that it would be appropriate to
 4       instruct him -- and we might have a dispute
 5       that would need to be decided about that based
 6       on instructions -- but not to engage in more
 7       colloquy than that.
 8   BY MR. KORNFELD:
 9       Q      Sir, first, let's get on the same
10   page, or back to the same page.
11           We're talking about the 250,000 per
12   case in incremental costs that would be over and
13   above the fees that would be incurred by a
14   Chapter 11 settlement trust, correct?
15       A      Yes.
16       Q      Your testimony is that the basis for
17   that assumption was what counsel, Jones Day, told
18   you; is that correct?
19       A      Yes.  Jones Day provided me with that
20   number.
21       Q      You also testified that you followed
22   up with Jones Day once you had that 250,000-per-case
23   number, and you asked them questions so you could
24   understand the reasonableness of the
25   $250,000-per-case assumption.
```

1 **Did I get that right?**
2 A    Yes.
3 **Q     What did you ask Jones Day, and what**
4 **did Jones Day tell you?**
5        MR. STEPHENS:  Just in the context of
6 answering Alan's question about the assumption,
7 please answer.
8        THE WITNESS:  Some of the questions
9 that I recall asking Jones Day after receiving
10 that number were, first of all, I wanted to
11 understand what steps would be involved with a
12 party reviving and pursuing these cases in
13 state court, what are the various activities
14 that would occur all the way through a
15 potential trial and judgment.
16        I sought to understand how the
17 different cases -- the sequencing of the cases,
18 how that may occur.  I sought to understand
19 how -- if there are multiple parties that are
20 named in a lawsuit, how that would come into
21 play.
22        I sought to understand how -- after a
23 judgment may be granted, how or what activities
24 would have to occur to the point where a
25 plaintiff would eventually receive a payment.

1        Those are some of the general
2 categories of questions that I recall asking.
3 BY MR. KORNFELD:
4 **Q     What did Jones Day tell you?**
5 A     We discussed, as it relates to the
6 first item, different scenarios on how cases would
7 be revived.
8        But when I say "different scenarios,"
9 it's more in the context of a lot of this is up to a
10 judge on how quickly a judge would move.  But,
11 generally, there would be the normal activities that
12 I have observed in other litigation, where there
13 would be extensive discovery that would be involved,
14 depositions that would be taken.
15        Eventually, there may be trials that
16 would occur, and those trials could have information
17 that would impact other cases, and so there would be
18 extensive involvement from other parties, likely, in
19 each of the cases.
20        To the extent that someone received a
21 judgment against the diocese, then there would be
22 other activities that would be undertaken to
23 potentially eventually receive payment, and that
24 also would factor into this estimate.
25 **Q     That's a pretty long and protracted**

1 **process you described; is that correct?**
2 A     Well, it was in the context of a
3 conversation or two.  But, yes, these are the types
4 of questions that I asked.
5 **Q     Did Jones Day tell you that every one**
6 **of the 648 cases would go through that long and**
7 **protracted process?**
8 A     In fact, Jones Day indicated it could
9 be even more than 648 because if the case is
10 dismissed -- and I think -- I think counsel for the
11 committee may have used these words -- it's a reset.
12 And so claims that may have been disallowed at this
13 point could be revived as well.
14        And so I felt comfortable -- it was my
15 decision to use the 648 cases, but certainly it was
16 indicated that the number of cases could be even
17 higher than 648 that would be brought in state
18 court.
19 **Q     You focused on something I really**
20 **wasn't interrogating you on.**
21        **What I was asking you, sir, was, did**
22 **Jones Day tell you that all of the cases, whether**
23 **it's 648 or a number over and above 648, would go**
24 **through the long and protracted litigation process**
25 **that you just discussed?**

1 A     I don't know if anyone had -- in fact,
2 I'm certain that no one said, this is the number of
3 cases that will go through that process.
4 **Q     I'm not asking about the number.  I'm**
5 **asking, was the question, that -- would all of the**
6 **cases go through the process?  Because your analysis**
7 **assumes that all 648 cases go through the same**
8 **process, doesn't it?**
9 A     Yes.
10 **Q     Why did you assume that all of the**
11 **cases would go through that long and protracted**
12 **litigation process as opposed to some case -- some**
13 **cases settled early, some cases settled midstream,**
14 **and some cases settle in the courthouse steps -- on**
15 **the courthouse steps or even in the courthouse?**
16        **Why did you assume all of the cases go**
17 **through that long, protracted process?**
18 A     Well, to be clear, the $250,000 is an
19 average.  So I'm certain that there may be some
20 cases that are less than $250,000 in incremental
21 costs, and there are likely going to be some cases
22 that are even more.  But the 250,000 is an average
23 across all the cases.
24 **Q     Okay.  So you've testified here to a**
25 **somewhat extensive conversation with Jones Day,**

MAGNA ›
LEGAL SERVICES

1    correct?
2    A    I would say it was, depending on how
3    you define "extensive," a fair amount of
4    back-and-forth on this.
5    Q    Okay.  And where in your report does
6    it say you had a "fair amount of back-and-forth"
7    with Jones Day about your $250,000-per-case
8    increased litigation costs conclusion?
9    A    It does not.
10    Q    Don't you think that would have been
11    important to put in your report, sir?
12    MR. STEPHENS:  Objection.
13    THE WITNESS:  No.  I believe that I
14    have included in the report a good amount of
15    information.  There is a lot that goes into
16    each one of these assumptions, and I have not
17    included every conversation or every experience
18    that I have that potentially goes into coming
19    to these assumptions.
20    BY MR. KORNFELD:
21    Q    But your conversation with Jones Day
22    was a key part of your 250,000-per-claim assumption;
23    is that correct?
24    A    Yes.
25    Q    You're not a lawyer, are you, sir?

1    A    I am not.
2    Q    Have you ever been retained as a fee
3    examiner?
4    A    No.
5    Q    Have you ever qualified as an expert
6    regarding the cost of litigation in a mass tort
7    case?
8    A    There is one case that I had,
9    FirstEnergy Solutions, where I did file, I believe,
10    multiple expert reports, and some of the claims
11    related to environmental claims that I believe could
12    fall into the category of mass tort.  And part of
13    those expert reports did relate to cost to defend.
14    Q    Are you using your background from
15    FirstEnergy Solutions in connection with your
16    conclusions regarding litigation costs in this case?
17    A    No.  Other than just as my general
18    experience.  I've been involved in a lot of
19    litigation.  I understand the process.  I understand
20    what goes into cases.
21    Q    Has any court ever said you're
22    qualified to opine regarding the costs of litigation
23    in a mass tort case?
24    A    No.
25    Q    Have you ever qualified as an expert

1    regarding the cost of litigation in a sexual abuse
2    case?
3    A    No.
4    Q    Do you have any training regarding the
5    estimation of the costs of sexual abuse litigation?
6    A    No.
7    Q    Do you have any experience doing that?
8    A    Other than the process that I just
9    described, no.
10    Q    The process that you just described is
11    only a process in this case, correct, sir?
12    A    The process that I described is the
13    process I have followed in other cases as well as it
14    relates to estimating litigation costs or costs to
15    defend.
16    Q    In what other sexual abuse cases have
17    you estimated the cost to defend?
18    A    That was my response.  It wasn't
19    specifically on sexual abuse cases.  It was, in
20    general, the process -- litigation process and the
21    cost to defend lawsuits.
22    Q    Thank you so much for that general
23    answer.  My question is specific.  I'll ask it
24    again.
25    In what sexual abuse cases do you have

1    experience in estimating the costs of litigation?
2    A    I don't.
3    Q    So prior to this case, you have never
4    analyzed the cost per claim to defend in a sexual
5    abuse bankruptcy, correct?
6    A    That is incorrect.  I have analyzed
7    estimated cost to defend in sexual abuse cases in
8    other matters.
9    Q    What matters, sir?
10    A    I work with other Catholic dioceses,
11    and as part of that work, I have come across
12    estimates of costs to defend and litigate cases.
13    Q    And what matters are those?
14    A    Only one I can disclose that is
15    public, and that is the Roman Catholic Bishop of
16    Oakland, California.
17    Q    Did you review the costs to defend in
18    the Michigan State-Larry Nassar case?
19    A    I did not.
20    Q    Have you heard of that case?
21    A    Yes.  Well, there are multiple cases
22    against Larry Nassar.  I think you're specifically
23    referring to Michigan State University.
24    Q    I'm actually referring to the case by
25    the survivors of Larry Nassar's abuse against

```
 1    Michigan State University that settled for
 2    approximately $500 million.
 3             My question, sir:  Did you review the
 4    cost to defend in that case?
 5        A    I did not.
 6        Q    Did you review the cost to defend
 7    against the University of Southern California in the
 8    George Tyndall cases that involve approximately 700
 9    survivors?
10        A    I did not.
11        Q    Did you review the cost to defend in
12    the University of Michigan-Anderson case that
13    involved approximately 1,000 survivors?
14        A    I did not.
15        Q    Did you hear of the USC case before
16    today?
17        A    I generally recall that, yes.
18        Q    Do you know what the settlement amount
19    was?
20        A    No, I do not.
21        Q    Does $852 million refresh your
22    recollection?
23        A    It does not.
24        Q    You didn't look at the USC case in
25    connection with your work in this case, correct?
```

```
 1        A    I did not.
 2        Q    And you didn't look at the
 3    University of Michigan case in connection with your
 4    work in this case, correct?
 5        A    Correct.
 6        Q    You don't -- you don't know anything
 7    about the $490 million settlement in that case or
 8    the costs to defend in that case, correct?
 9        A    I know of the settlement.  I don't
10    know the costs to defend.
11        Q    Was it important to you to look at any
12    other large number of survivor sexual abuse claims
13    in order to analyze what the cost of defense was?
14        A    I think my discussions with Jones Day
15    around the specifics of these cases was more
16    relevant than some of the other cases that you
17    mentioned where I think the facts and circumstances
18    are different.
19        Q    Those are the secret discussions with
20    Jones Day that you don't reference in your report,
21    correct?
22        MR. STEPHENS:  Objection.
23        THE WITNESS:  I don't refer to them as
24    "secret conversations."
25
```

```
 1  BY MR. KORNFELD:
 2        Q    No.  No.  I referred to them as
 3    "secret conversations" because you don't mention
 4    them in your report.
 5             You don't mention them in your report,
 6    correct?
 7        MR. STEPHENS:  Objection.
 8        THE WITNESS:  I don't mention my
 9    conversations with Jones Day in my report.
10  BY MR. KORNFELD:
11        Q    In the UCLA-Dr. Heaps litigation --
12    have you heard of that litigation.
13        A    That is generally familiar.  I
14    couldn't recall if there was one with USC and one
15    with UCLA or if they both had cases.  So it's
16    something that sounds generally familiar, but I
17    don't know the specifics.
18        Q    You don't know the settlement amount,
19    correct?
20        A    Correct, do I not.
21        Q    You didn't look at what the cost to
22    defend the cases in the UCLA litigation was,
23    correct?
24        A    Correct.
25        Q    Did you look at any other sexual abuse
```

```
 1    cases in connection with your conclusion that the
 2    incremental costs on top of what a settlement trust
 3    would incur would be 250,000 per case?
 4        MR. STEPHENS:  Objection.
 5        You can answer.
 6        THE WITNESS:  As I indicated,
 7    knowledge that I obtained through other cases,
 8    factors into my over- -- my general knowledge.
 9    But this was specifically focused on my
10    conversations with Jones Day and the facts and
11    circumstances in this case.
12  BY MR. KORNFELD:
13        Q    Again, my question was specific.  Did
14    you look at any other sexual abuse cases, sir?
15        A    As I indicated, I am aware of costs to
16    defend in other sexual abuse cases.
17        Q    Besides the cases that you can't
18    discuss, what do you know about costs to defend in
19    other sexual abuse cases?
20        A    Nothing further beyond those cases.
21        Q    Do you know of any case where you can
22    tell us, today, under oath, what the costs to
23    defend -- I'm asking about any sexual abuse case.
24    Any case that you can tell us what the cost of
25    defending claims was, either per claim or total?
```

```
 1      A     I believe all the cases that you
 2 referenced all reached settlements.  And I don't
 3 believe that any of them went to trial.  So I don't
 4 think any of the cases that you mentioned, I would
 5 be able to come up with a cost to defend all the way
 6 through trial.
 7      Q     You didn't look at any of those cases,
 8 though, did you?
 9      A     I have knowledge of some of those
10 cases that you mentioned.
11      Q     Did you analyze any documents in
12 connection with those cases?
13      A     No.
14      Q     Did you attempt to ascertain what the
15 cost of defense was in any of those cases?
16      A     No.
17      Q     Did you attempt to ascertain what the
18 cost of defense was in any sexual abuse case other
19 than this one?
20      A     Just from a numbers perspective,
21 again -- being aware of some of the settlements --
22 and, presumably, parties settle because they want to
23 avoid the cost of litigation.
24            You mentioned the first one with
25 Larry Nassar and Michigan State.  If I recall
```

```
 1 correctly, the -- there were around 300 survivors in
 2 that case, and you mentioned there was a
 3 $500 million settlement.
 4            So these are the numbers that I'm
 5 generally aware of, that, on average, I think that
 6 would lead to over a million dollars per survivor.
 7 Those are some of the numbers I'm aware of that,
 8 again, factors into my overall assessment of
 9 reasonableness.
10      Q     Sir, let's talk about what you just
11 said.
12            In Michigan State, we can agree that
13 there are 300 victims and the settlement was
14 $500 million approximately.  That's the total
15 settlement cost.  It's not the cost per case to
16 depend.
17            Do you understand that?
18      A     I understand that there were costs
19 that would have been incurred and then there was a
20 settlement on top of that.
21      Q     So what were the costs, the litigation
22 costs that were incurred?  Do you know that?
23      A     I don't know the costs that were
24 incurred prior to them getting to that settlement.
25      Q     That was what my question went to.
```

```
 1            Did you attempt to find out what the
 2 costs, the defense costs, that were incurred to get
 3 to the settlement in the Michigan State case were?
 4      A     No.  Again, that was a settlement.
 5      Q     So you're assuming 250,000 per case
 6 based on an assumption that, on average, that will
 7 be the cost to fully litigate those cases, correct,
 8 over and above what a settlement trust will incur?
 9      A     That's correct.
10      Q     Did you consider whether insurance
11 covers any of the defense costs in this case?
12      A     We discussed previously the line item
13 as it relates to potential proceeds from insurance.
14 And I did not include any item here because, again,
15 I've assumed the same amount under a dismissal as we
16 would have in a confirmed plan of reorganization.
17            Part of what could come from insurance
18 is defense costs.  And again, I treat that as the
19 same under both scenarios.
20      Q     You treat the defense costs the same
21 under both scenarios, but you do not treat the
22 incremental costs of defense the same under both
23 scenarios; is that correct, sir?
24            MR. STEPHENS:  Objection.  Alan, you
25 used the word "defense costs" there twice.  I
```

```
 1 think you meant insurance and then defense
 2 costs.  So the question was unclear.
 3            MR. KORNFELD:  I'll rephrase.
 4 BY MR. KORNFELD:
 5      Q     Let's step back a moment before I
 6 rephrase.
 7            In your analysis, sir, you treat
 8 insurance proceeds the same under a dismissal
 9 scenario and a Chapter 11 scenario, correct?
10      A     Correct.
11      Q     In your analysis under a dismissal
12 scenario, you assume an incremental defense cost
13 increase of 250,000 per case for a total of
14 $162 million, correct?
15      A     Correct.
16      Q     To be clear, that $162 million is not
17 incurred under a Chapter 11 scenario, correct?
18      A     Correct.
19      Q     So while you treat insurance proceeds
20 the same under a dismissal in a Chapter 11 scenario,
21 you treat incremental litigation costs differently
22 under a dismissal scenario and Chapter 11 scenario,
23 correct?
24      A     Yes.
25      Q     Is it possible, sir, that there would
```

1  be insurance proceeds available for defense costs in
2  both a dismissal scenario and a Chapter 11 scenario?
3      A      Yes.  This is directly related to what
4  I indicated on insurance.  To directly answer your
5  question, it is possible that there could be
6  additional insurance proceeds available to pay
7  defense costs.  And similarly, on my assumption of
8  treating the proceeds the same, it is possible that
9  there would be less under a dismissal scenario than
10 in a plan.
11     Q      Under a dismissal scenario, did you
12 analyze how much in insurance proceeds would be
13 available for defense costs?
14     A      I did not.
15     Q      Is it correct then that the
16 $162 million of incremental defense costs under a
17 dismissal scenario might be, at least in part,
18 covered by insurance under a dismissal scenario?
19     A      It's possible.
20     Q      Did you analyze any insurance policies
21 to ascertain whether that was likely?
22     A      I am generally aware of the policies
23 that have limitations on defense costs.  I am not an
24 expert in the policies that existed over the decades
25 that the diocese has been in existence.

1      Q      Did any of the policies that you're
2  generally aware of say that we only cover defense
3  costs in a Chapter 11 scenario as opposed to a
4  dismissal scenario where the claims would be in
5  state court?
6      A      I'm not aware of a term like that.
7      Q      This is no such term like that, right?
8      A      Not that I'm aware of.
9          MR. STEPHENS:  Alan, if we're closing
10 out this topic, we've been going for about an
11 hour and ten.  A lunch break would be good, but
12 if you still have more on this topic, I don't
13 mean to cut you off.
14         THE COURT REPORTER:  Do you want to
15 stay on the record for this?
16         MR. KORNFELD:  We can stay on the
17 record.
18         I do have more on this topic, but I
19 don't want to keep anybody from lunch.  So why
20 don't we take the lunch break.  How much would
21 y'all want?
22         MR. STEPHENS:  Why don't we make it
23 35 minutes?  Come back at quarter after the
24 hour?
25         MR. KORNFELD:  That works for me.

1          Is that good, Mr. Moore?
2          THE WITNESS:  Yes, thank you.
3          MR. KORNFELD:  Okay.  Thanks,
4  everybody.
5          (Whereupon, a lunch recess was taken.)
6          MR. KORNFELD:  Let's go back on the
7  record, please.
8  BY MR. KORNFELD:
9      Q      Mr. Moore, you understand you're still
10 under oath, right?
11     A      I do.
12     Q      We were talking about Jones Day
13 providing you with the 250,000 per case on average
14 assumption that you used to arrive at $162 million
15 in incremental additional costs over and above the
16 settlement trust.
17         Do you recall that?
18     A      Yes.
19     Q      Which Jones Day attorneys provided you
20 with that assumption?
21     A      I believe that was Ben Rosenblum, and
22 it may have been Todd Geremia and/or Eric Stephens.
23     Q      Anybody else?
24     A      I don't believe so.
25     Q      Did the Jones Day attorneys who

1  provided you with the 250,000-per-case assumption in
2  incremental additional defense costs provide you
3  with any documents that showed the basis for that
4  assumption?
5      A      No.
6      Q      I was asking you about large sexual
7  abuse cases before lunch.
8          Do you recall that discussion?
9      A      Yes.
10     Q      And if I understood your testimony
11 correctly, you didn't attempt to ascertain what the
12 cost per defense -- strike that.
13         You didn't attempt to ascertain what
14 the cost of defense per claim was in any of those
15 cases, correct?
16     A      Correct.
17     Q      You didn't attempt to ascertain what
18 the total costs to defend the claims in any of those
19 cases was, correct?
20     A      Correct.
21     Q      Did you consider the costs of defense
22 in any other diocese bankruptcy?
23     A      Could you clarify that question?
24     Q      Well, you're working on one diocese
25 bankruptcy right now, correct, that is public?

1    A    Apart from Rockville Centre?
2    Q    Yes.
3    A    Yes.
4    Q    What bankruptcy is that?
5    A    That's the Roman Catholic Bishop of
6 Oakland.
7    Q    Did you consider the pre-petition
8 costs of defense in the Oakland Diocese case in
9 connection with rendering your opinion in this case?
10    A    Not specifically.
11    Q    Generally, did you look at the cost of
12 defense in the Oakland Diocese case?
13    A    I didn't analyze that, but, again,
14 it's information that I am aware of that factors
15 into how I approach some of these analyses.
16    Q    Very good.
17    What was the cost per claim of defense
18 in the Oakland case prior to the bankruptcy?
19    A    That was part of discussions with
20 counsel.
21    Q    Do you know what the cost was?
22    A    I am aware of estimates, but I don't
23 have the specific dollar amounts that were incurred
24 prior to that bankruptcy.
25    Q    That was -- my question was on

1 specific dollar amounts incurred prior to the
2 Oakland Diocese bankruptcy.
3    You don't know those specific dollar
4 amounts, correct?
5    A    I don't know the specific dollar
6 amount.
7    Q    And you didn't -- you didn't ask
8 anybody about that in connection with your work in
9 this case, correct?
10    A    Correct.
11    Q    Did you look at any other documents in
12 arriving at the 250,000 per case, $162 million
13 total, incremental cost of defense line item?
14    A    Nothing other than what I disclosed in
15 my report.
16    Q    The only thing you disclosed in your
17 report is one authority, correct?
18    A    You're referring to Number 8?
19    Q    Correct.
20    A    Yes, that's right.
21    Q    And that one authority is your own
22 affidavit, correct?
23    A    Yes.
24    MR. KORNFELD: Let's publish
25 Exhibit 2, please.

1    (Whereupon, Exhibit 2 was marked for
2 Identification.)
3 BY MR. KORNFELD:
4    Q    Let me know when you have Exhibit 2 up
5 on your screen.
6    Do you have it, Mr. Moore?
7    A    I don't.
8    MR. STEPHENS: I don't either. I'm
9 not sure if La Asia is there.
10    MR. KORNFELD: Oh, that will be
11 important to have La Asia there.
12    MS. CANTY: Sorry, Alan. Which number
13 did you call? I'm sorry, Alan.
14    MR. KORNFELD: I'm sorry, La Asia. I
15 should have checked and made sure you were
16 there before I started this. But I'm sure I'll
17 get a talking to afterwards.
18    We're going to Exhibit 2.
19    MS. CANTY: Okay, no problem. One
20 second.
21    (Whereupon, a discussion was held off
22 the record.)
23 BY MR. KORNFELD:
24    Q    Let me know when you have Exhibit 2.
25    A    I have it.

1    Q    What is Exhibit 2?
2    A    This is the affidavit referred to as
3 Number 8 in my materials considered in my expert
4 report.
5    Q    Exhibit 2, your affidavit, is the only
6 document you considered in connection with your
7 opinion that increased incremental litigation costs
8 would be on average $250,000 per claim for a total
9 of $162 million; is that correct, sir?
10    A    Correct.
11    Q    Where in your affidavit does it say,
12 in sum or substance, that the cost per claim is
13 $250,000 over and above what a settlement trust
14 would incur?
15    A    It doesn't say specifically.
16    THE COURT REPORTER: What was the
17 objection? I didn't hear it.
18    MR. STEPHENS: I don't think there was
19 one. I think there was just some crosstalk
20 between the lawyer and the witness.
21 BY MR. KORNFELD:
22    Q    Let's -- let me go back and make sure
23 we have a clean record.
24    Where in your affidavit marked as
25 Exhibit 2 does it say that increased litigation

1    costs in the dismissal scenario would be 250,000 per
2    claim for a total of $162 million?
3         A    It does not say that specifically.
4         Q    Where does it say that in general,
5    sir?
6         A    I pointed to a few items in here that
7    all, again, tie into my assessment of the
8    reasonableness of that number that I received from
9    Jones Day.  Part of that also relates to the
10   diocese's results from the IRCP program.
11        Q    Tell me where the $250,000 is
12   mentioned generally, sir.
13        A    It is not mentioned -- the $250,000
14   number is not mentioned in this document.
15        Q    Tell me where the cost per claim is
16   analyzed in your May 29, 2020 affidavit that we
17   marked as Exhibit 2 and that you reference in your
18   report as the only item considered in connection
19   with your conclusion that increased litigation costs
20   would be $162 million.
21        A    The primary item that I referred to,
22   as I indicated, is the diocese's results under the
23   IRCP program.
24        Q    Where is that, sir?  What paragraph?
25        A    There are a few instances, but one in

1    particular is Paragraph 29.
2         Q    Let's talk about Paragraph 29 of your
3    affidavit.  You talk about 400 abuse claimants that
4    have filed claims with the IRCP, correct?
5         A    Yes.
6         Q    You talk about 320 claimants have
7    accepted compensation totaling just over
8    $57 million, correct?
9         A    Correct.
10        Q    And when you say, "accepted
11   compensation," that's the amount the diocese paid to
12   settle those 320 claims, correct?
13        A    Yes.
14        Q    Where in Paragraph 29 do you talk
15   about the diocese's cost to defend those claims,
16   their attorneys' fees, their expert fees, their
17   court costs?  Where is that mentioned in
18   Paragraph 29?
19        A    That's not mentioned in Paragraph 29.
20        Q    Where is anything having to do with
21   the cost of defense mentioned in Paragraph 29?
22        A    It's not.
23        Q    Okay.  What other paragraphs -- well,
24   let me ask you this, sir:  Why did you reference
25   Paragraph 29 as being informative in any way with

1    respect to the cost of defense of the claims?
2         A    Again, a principle that I indicated
3    earlier, it doesn't make sense for someone to settle
4    a claim unless they believe that the cost that they
5    may pay out would be more.  And so I use this as one
6    item in assessing here there was a willingness to
7    pay $57 million out on these 320 claims just as a
8    settlement.  That doesn't include any sort of
9    defense costs.
10             I also indicate in this declaration
11   that the diocese separately had spent just about
12   $4 million in defense costs.  So these are just data
13   points that factor into, again, my assessment of the
14   reasonableness of the $250,000.
15        Q    Understood.
16             But as a data point, Paragraph 29
17   doesn't say anything about defense costs, correct,
18   sir?
19        A    It does not say those specific words,
20   but again, it's a data point that you can look at in
21   assessing the reasonableness of what the defense
22   costs might be.
23        Q    You don't know if the costs to defend
24   those 320 claims was anything close to 250,000 per
25   claim, do you?

1         A    It was a different process, the IRCP
2    process.
3         Q    My question, sir:  What was the
4    diocese's cost to defend those 320 claims that
5    settled?
6         A    I don't know that the diocese incurred
7    any costs as -- to defend itself in the IRCP
8    program.
9         Q    Thank you.
10             Let's move to the next reference in
11   your affidavit.  You mentioned cases filed against
12   the diocese in state court.
13             Did I understand you correctly?
14        A    Yes.
15        Q    And you start talking about those
16   cases in Paragraph 33 of your affidavit on Page 12,
17   right?
18        A    Yes.
19        Q    And you refer to Paragraph 33 in your
20   answer to my question because that paragraph, you
21   say, informs your conclusion that the cost of
22   defense -- the incremental cost of defense is
23   250,000 per claim for a total of $162 million; is
24   that true, sir?
25        A    This entire affidavit informs that

```
1   opinion, but I was referring to a different
2   paragraph when I referenced the defense costs.
3       Q       What paragraph are you referring to?
4       A       Paragraph 37.
5       Q       And that says, "in the course of
6   defending the CVA actions brought against it" --
7           (Whereupon, the court reporter
8       requested clarification.)
9   BY MR. KORNFELD:
10      Q       Paragraph 37 reads, in its entirety,
11  "In the course of defending the CVA actions brought
12  against it, the diocese has spent more than
13  $3.7 million to date."
14          Did I read that correctly?
15      A       Yes.
16      Q       The CVA actions that have been brought
17  against the diocese as of the date of your affidavit
18  are referenced in Paragraph 33 of your affidavit
19  marked as Exhibit 2, correct?
20      A       Yes.
21      Q       As of the date of your affidavit,
22  which was 5/29/2020, there had been 106 cases filed
23  against the diocese under the CVA, correct?
24      A       Correct.
25      Q       If you divide 3.7 million by 106
```

```
1   cases, what's the answer?  How much per case?
2       A       I'd have to pull out my calculator,
3   but I will just point out, Mr. Kornfeld, as I'm sure
4   you're aware, this is at the very beginning of the
5   case.  And I would direct your attention to, then,
6   Paragraph 38, which is the continuation of that.
7           So $3.7 million spent to date, but
8   then the reference is made to hundreds of thousands
9   of dollars in legal fees and production costs per
10  month that the diocese anticipated it would be
11  incurring.
12      Q       Sir, did you understand my question?
13      A       I did.
14      Q       So my question asked you for what is
15  the answer of $3.7 million of fees incurred as of
16  May 29, 2020, divided by 106 cases?
17      A       I would have to do that calculation
18  with a calculator.
19      Q       I get approximately $34,906.  Why
20  don't you tell me whether that's right or wrong.
21      A       It sounds about right.
22      Q       Even though you know I wasn't a math
23  major.
24      A       I don't know that for certain.
25      Q       Have you met a --
```

```
1       A       Based on how quickly you did that
2   calculation in your head, I'm beginning to think
3   that maybe it was the case.
4       Q       Well, honestly, if I was under oath
5   and you asked me if I did that under -- in my head,
6   you know what the answer would be.
7       A       I suspected that.
8       Q       Okay.  So the answer is 34,906,
9   approximately; and you agree with me that sounds
10  about right, correct?
11      A       That calculation does, yes.
12      Q       So where is the $250,000 per claim
13  referenced in your affidavit?
14      A       As I indicated before, that number is
15  not referenced in this affidavit.
16      Q       And what you testified to was that in
17  Paragraph 41, you say -- in Paragraph 41 of your
18  affidavit marked as Exhibit 2, last sentence --
19  "Finally, for those cases that are not disposed
20  through summary judgment or other pretrial motions,
21  the diocese will be forced to expend hundreds of
22  thousands of dollars to defend itself at trial."
23          Did I read that correctly?
24      A       Yes.
25      Q       Is that the sentence that you were
```

```
1   referring to a couple of answers ago?
2       A       There are two points that I was
3   referring to.  I mentioned the first one, which I
4   believe is Paragraph 38, about the diocese expecting
5   to continue to defend these actions and conducting
6   discovery, hundreds of thousands of dollars in legal
7   fees and production costs per month.  And then you
8   referenced the next area that I was going to go to,
9   which is Paragraph 41.
10      Q       And Paragraph 41 makes, in essence,
11  the same point as made in Paragraph 38, right?
12      A       In essence, yes.
13      Q       Do you discuss the cost to defend
14  cases anywhere else in your May 29, 2020 affidavit
15  marked as Exhibit 2?
16          MR. STEPHENS:  I'll object.  The
17      document speaks for itself.
18          But, Chuck, take the time you need to
19      review it.
20          THE WITNESS:  That is it.  At the very
21      end of the document, I make reference to these
22      same points without those specific numbers, but
23      that's it.
24  BY MR. KORNFELD:
25      Q       Is there anywhere in your affidavit
```

**MAGNA**
LEGAL SERVICES

1   marked as Exhibit 12 where you discuss the per-claim
2   costs of defense?
3      A    Could you restate that question,
4   please?
5      Q    Sure.
6          Is there anywhere in the affidavit
7   marked as Exhibit 2 that you discuss the per-claim
8   costs of defense?
9      A    As we indicated before, or as I
10  pointed out, I referenced the $3.7 million spent to
11  date at the time of this affidavit.
12     Q    That's not a per-claim cost; that's a
13  total cost of defense. I'm asking per claim. And
14  I'll ask again.
15         Is there anywhere in your affidavit
16  that you discuss the per-claim cost of defense?
17     A    In -- as an average? Because we've
18  already gone through this in terms of dividing the
19  3.7 million by 106.
20     Q    Either in an average or specifically.
21     A    Then that's what you have, is the
22  $3.7 million. And at that point, at the time of
23  this affidavit, there were 106 cases that had been
24  filed.
25     Q    And, to be precise, you didn't discuss

1   anywhere in your affidavit the per-claim cost of
2   defense. My questions were based on my division of
3   3.7 divided by 106.
4         You don't discuss that in the
5   affidavit, do you?
6      A    I would say that I do, because I
7   include that specific information.
8      Q    You include that information. So
9   somebody who comes along that reads your affidavit
10  can derive the per-claim cost of defense by dividing
11  3.7 million by 106, correct?
12     A    Yes.
13     Q    Is there anywhere else in your
14  affidavit that you discuss the per-claim cost of
15  defense?
16     A    I think it makes it pretty clear. I
17  reference a very specific actual dollar amount
18  incurred, and I also reference the specific number
19  of cases. I'm not sure there would be any other
20  information that I could include.
21     Q    So the only information in your
22  affidavit about per-claim cost of defense leads to a
23  conclusion that as of the date of your affidavit,
24  the per-claim cost of defense was $34,906 on average
25  per claim?

1     A    To that point, yes.
2     Q    Thank you.
3         When you spoke to Misters Rosenblum,
4  Geremia, and Stephens about the incremental costs of
5  defense, did you ask those attorneys what the
6  per-claim cost of defense had been as of the date of
7  your report, which is April 17, 2023?
8     A    No. I know that these cases have been
9  stayed since October 1st of 2020.
10     Q    Well, there's been some claims
11  litigation going on in the bankruptcy court, hasn't
12  there?
13     A    Are you referring to claims
14  objections?
15     Q    Yes, sir.
16     A    Yes, there have been claim objections,
17  but there has not been any litigation activity
18  related to these claims.
19     Q    Well, claims objections would be
20  litigation activity, wouldn't it?
21     A    I'll give you an example. If there
22  are duplicate claims that are filed in the
23  bankruptcy court and the debtor files a motion to
24  have certain claims disallowed because they're
25  duplicates, I don't view that as litigation

1   activity.
2     Q    So that's not litigation activity, in
3   your view. If the debtor objects to a claim on any
4   grounds, that's not litigation activity?
5         Is that your opinion, sir?
6     A    I'm not -- I didn't say that. There
7   are certain claim objections that could start on
8   some of that, but this is -- bankruptcy and claim
9   objections don't follow the same rigor as it relates
10  to a litigation -- state court litigation process.
11     Q    So you didn't look at the per-claim
12  cost of defense that has been incurred by the
13  diocese in the bankruptcy case in connection with
14  the opinions you provide in your report; is that
15  true, sir?
16     A    I don't believe that there have been
17  defense costs that have been incurred during the
18  Chapter 11 case.
19     Q    Have you looked at any fee
20  applications to see what the cost of all the claims
21  objections has been?
22     A    I have not.
23     Q    Have you looked at any fee
24  applications at all?
25     A    Early on in the case, I recall

1 tracking some of the fee applications for our
2 projections. But, other than that, I have not
3 looked at fee applications in a long time.
4 **Q    So in connection with your report, you**
5 **did not look at any fee applications for any**
6 **purpose; is that correct?**
7 A    That's correct.
8 **Q    Just to sum up here, we talked about**
9 **Paragraphs 37 and Paragraphs 41 and Paragraphs 33 --**
10 **sorry, I didn't do it in order -- of your affidavit.**
11 **My question, sir:  Is there any other**
12 **paragraph -- or are there any other paragraphs of**
13 **your declaration that you say you relied upon for**
14 **purposes of your report that deal with the per-claim**
15 **cost of litigation?**
16 MR. STEPHENS: Alan, I'll just object
17 that I believe you're mischaracterizing the
18 witness' testimony, because I do believe the
19 record will show there has been testimony on
20 Paragraph 29 as well.
21 MR. KORNFELD: You know, you're
22 absolutely right. That's a good objection.
23 MR. STEPHENS: Thank you, Alan.
24 MR. KORNFELD: I wouldn't expect any
25 less from you.

1 BY MR. KORNFELD:
2 **Q    So let's just sum this up.**
3 **Paragraph 29 talks about abuse claims**
4 **that were filed with the IRCP, right?**
5 A    Yes.
6 **Q    And, as far as you know, with respect**
7 **to those abuse claims, the diocese did not incur any**
8 **cost of defense, right?**
9 A    As far as I'm aware, once the IRCP
10 program began for those, yes.
11 **Q    Paragraph 33, we discussed, talks**
12 **about 160 cases filed --**
13 MR. STEPHENS: Objection. I'm sorry,
14 Alan. I believe -- you said "160." I believe
15 the document reflects 106.
16 MR. KORNFELD: You're right again.
17 BY MR. KORNFELD:
18 **Q    Paragraph 33 talks about 106 cases**
19 **filed against the diocese as of May 29, 2020,**
20 **correct?**
21 A    Yes.
22 **Q    Paragraph 37 of your affidavit talks**
23 **about the cost as of May 29, 2020, the diocese has**
24 **incurred in defending those 106 cases, correct?**
25 A    Correct.

1 **Q    And Paragraph 41 talks about the**
2 **diocese being forced to expend hundreds of thousands**
3 **of dollars to defend itself at trial if those cases**
4 **proceed to trial, correct?**
5 A    Correct.
6 **Q    What did you base your conclusion on**
7 **that the diocese would be forced to expend hundreds**
8 **of thousands of dollars to defend itself at trial,**
9 **the conclusion that is in Paragraph 41 of your**
10 **affidavit marked as Exhibit 2?**
11 A    If you look at that entire section
12 that begins on Page 14 -- this is Letter B --
13 "Expenses incurred by the diocese thus far in the
14 CVA litigation and projected litigation expenses,"
15 there are paragraphs that you did not mention that
16 talk a little bit about some of the activities.
17 **Q    Where did you obtain that information**
18 **about some of the activities?  Did you pull dockets,**
19 **or did you talk to attorneys?**
20 A    I talked to attorneys.
21 **Q    Did you look at any other documents in**
22 **connection with Exhibit Number 2?**
23 MR. STEPHENS: Objection, Alan,
24 just -- are you asking him on this topic
25 specifically or the entire affidavit?

1 MR. KORNFELD: On the topic of
2 attorneys' fees incurred and projected.
3 THE WITNESS: I don't recall if I
4 would have looked at anything else at this
5 point.
6 BY MR. KORNFELD:
7 **Q    As you sit here today, in connection**
8 **with your 5/29/2020 affidavit, which is referenced**
9 **as support for your expert report in this case, you**
10 **do not recall whether you looked at any documents**
11 **having to do with attorneys' fees incurred or**
12 **projected; is that correct?**
13 A    That's correct.
14 **Q    Where did you get the information**
15 **about attorneys' fees incurred and projected that is**
16 **provided in your 5/29/2020 affidavit marked as**
17 **Exhibit 2?**
18 A    You're referring to the 3.7 million?
19 **Q    Yes.**
20 A    That would have come from counsel.
21 **Q    Is that Jones Day?**
22 A    Yes.
23 **Q    Where did you get the information**
24 **about the number of actions that had been filed?**
25 **Did that come from Jones Day too?**

```
1        A     Yes.
2        Q     Where did you get the information
3   about projected costs of cases that might go to
4   trial could be in the hundreds of thousands of
5   dollars?
6             Did that come from Jones Day, too?
7        A     Yes.
8        Q     Do you tell the bankruptcy court
9   anywhere in your report that's been marked as
10  Exhibit 1 that all of your information about
11  attorneys' fees comes from Jones Day?
12            MR. STEPHENS:  Objection.
13            THE WITNESS:  As I indicated before, I
14  was provided the number of $250,000 from
15  Jones Day; however, I also sought to assess the
16  reasonableness of that through inquiry as well
17  as my knowledge of the litigation process.  So
18  I did not take $250,000 blindly as a number.
19  BY MR. KORNFELD:
20        Q     But you didn't look at any documents
21  that had that $250,000 in it, correct?
22        A     Correct.
23        Q     And you didn't attempt to talk to any
24  attorneys from other firms about what Jones Day was
25  telling you as being reasonable or not, did you?
```

```
1        A     No.
2        Q     You didn't look at any other sexual
3   abuse bankruptcies to determine what Jones Day was
4   telling you was reasonable or not?
5        A     Well, the bankruptcy would not be
6   relevant.  What we're talking about here is the cost
7   to defend and litigate outside of the bankruptcy.
8        Q     Well, bankruptcy might be relevant if,
9   pre-petition, counsel had filed a claim for
10  attorneys' fees they were owed.
11            That might be one example of
12  relevancy, correct?
13       A     That would probably be akin to looking
14  for a needle in a haystack.
15       Q     Okay.  So you didn't, bottom line,
16  look at any other diocese cases to find out what the
17  pre-petition costs of defense were, correct?
18       A     I don't think it's very likely that
19  that number would be disclosed in other diocese
20  bankruptcies.
21       Q     My question, sir, is, did you look at
22  other diocese bankruptcies to determine if that
23  number was disclosed?
24       A     I did not, for the reason that I gave
25  you.
```

```
1        Q     So Jones Day provided information that
2   was used in connection with your 5/29/2020
3   affidavit, correct?
4        A     The $250,000 number, yes.
5        Q     Oh, no, no.  Listen carefully.  I'm
6   asking about the 5/29/2020 affidavit, which has been
7   marked as Exhibit 2.  I'll ask the question again.
8   I don't want to -- this is not a "gotcha"
9   deposition.
10            My question, sir, is, did Jones Day
11  provide the information regarding the costs incurred
12  and projected costs to be incurred in your 2020
13  affidavit?
14       A     Yes.
15       Q     Did Jones Day provide the projected
16  costs to be incurred over and above what would be
17  incurred by a settlement trust that is contained in
18  your April 17, 2023 report?
19       A     The $250,000 number, yes.
20       Q     $250,000-per-claim number, which
21  equals, multiplied by 648 claims, $162 million,
22  correct?
23       A     Yes.
24       Q     What's the largest line item on the
25  chart that is at Page 9 of your expert report in
```

```
1   this case?
2        A     Other than the "Total" lines, that is
3   the avoidance of incremental litigation cost, the
4   162 million that you're referring to.
5        Q     Thank you.
6             Let's go in your report to -- let's
7   stay on Page 9, actually.  We're there.
8             Under "Dismissal Deductions," you have
9   operational wind-down expense of -- on a low
10  $6.3 million; mid, $5.4 million; and high,
11  $4.5 million.
12            Can you explain how you derived those
13  amounts, please.
14       A     That's based on a period of 9 months
15  to realize the proceeds identified above, the
16  estimated proceeds, and it is based on a percentage
17  of the diocese's current operating expenses, monthly
18  operating expenses.
19       Q     What percentage is that?
20       A     It ranges between 25 and 35 percent.
21       Q     Jumping back to the incremental
22  litigation costs for one moment, the 250,000, on
23  average, is over and above the cost to defend that
24  would be incurred by a settlement trust, correct?
25       A     Yes.
```

1    Q    What is the average cost per claim
2 that would be incurred by a settlement trust that
3 you project?
4    A    I don't include that because it's not
5 a relevant number. The relevant number is the
6 incremental amount.
7    Q    How did you make the determination
8 that it wasn't a relevant number?
9    A    Similar to some of the other items
10 that we've discussed in this dismissal analysis, the
11 primary focus is on the incremental change.
12        So you had referred to a best interest
13 test. This is not comparing a Chapter 11 versus a
14 Chapter 7. What I'm comparing here is, and what I'm
15 focused specifically on, are the incremental costs.
16    Q    But if you were preparing a best
17 interest test, you would focus on the total costs to
18 defend, correct?
19    A    I may.
20    Q    But you didn't here.
21    A    Correct. Just like I mentioned on the
22 insurance and also the value of the spectrum as
23 examples where I have treated those as the same
24 under both scenarios. So what it is under each
25 scenario doesn't matter for the conclusion that I

1 reach.
2    Q    And, again, this is a dismissal
3 analysis of a kind that you've never done before,
4 right?
5        MR. STEPHENS: Objection.
6        THE WITNESS: Correct. I would say
7    this is the first time I've been in a
8    Chapter 11 case where there has been a motion
9    to dismiss filed.
10 BY MR. KORNFELD:
11    Q    And this is a dismissal analysis that
12 you've never seen anybody in any other Chapter 11
13 case where there has been a motion to dismiss filed
14 used, correct?
15    A    Correct. I'm actually not aware of
16 any other cases where motions to dismiss have been
17 filed that the debtor did not agree with.
18    Q    Have you heard of LTL?
19    A    I have heard of LTL.
20    Q    What do you -- what do you know about
21 a motion to dismiss in that case?
22    A    I'm generally aware that creditors
23 sought to remove that from bankruptcy.
24        (Whereupon, the court reporter
25    requested clarification.)

1        THE WITNESS: Creditors sought to
2    remove that case from bankruptcy.
3 BY MR. KORNFELD:
4    Q    And how did they do that?
5    A    Thank you for refreshing my memory,
6 Mr. Kornfeld.
7        I believe that was through a motion to
8 dismiss.
9    Q    So you do know something about another
10 motion to dismiss that was filed in a bankruptcy
11 case, correct?
12    A    Yes.
13    Q    Did any of the numerous experts in LTL
14 use a dismissal analysis that is in any way similar
15 to the analysis that you're using in this case?
16    A    I haven't reviewed any of the
17 documents filed in the LTL case.
18    Q    Let's go to Page 9 of your chart that
19 is part of Exhibit 1.
20        You have a line item for broker fees.
21 What is that?
22    A    These are fees that may be paid to a
23 third party as part of realizing proceeds for these
24 assets.
25    Q    And those fees go from 990,000,

1 approximately, to 1.3 million, approximately.
2        Did I read the right line?
3    A    Yes.
4    Q    How did you arrive at those fees?
5    A    That is based on 2 percent of the
6 total gross liquidation proceeds above.
7    Q    Moving down to administrative
8 expenses, which go from approximately 12.5 million
9 under a low scenario -- actually, they stand exactly
10 $12,461,162 under low, mid and high case
11 projections.
12        First, what are those administrative
13 expenses?
14    A    These are amounts -- it's made up of a
15 few categories of items, but the largest portion of
16 that is made up of expenses that have been incurred
17 as part of the Chapter 11 case that were estimated
18 to be outstanding as of the dismissal date.
19        So that includes accrued but unpaid
20 professional fees, post-petition accounts payable,
21 as well as some funds held for others.
22    Q    Those dismissal deductions of
23 administrative expenses are shown in the dismissal
24 scenario only, correct?
25    A    No.

1      **Q**     So my question was going to be, where
2  are they in the Chapter 11 scenario?
3          And, to make it simple, I ask that
4  **question because administrative expenses are showing**
5  **in the "Less Dismissal Deductions" section of your**
6  **analysis.**
7      A    Correct.
8      **Q**     So my question is, why are they shown
9  **in that section only?  And if they're not shown**
10  **only, there -- I'll put a couple of questions**
11  **together so you can talk about this one.**
12         **If they're not shown there only, where**
13  **are they under the "Chapter 11 Assumption" section**
14  **above?**
15      A    Okay.  So the way that this works in
16  this analysis, that section less dismissal
17  deductions, that's the amount of cost that is
18  subtracted from the gross estimated liquidation
19  proceeds, so the 49.5 up to 63.4 million.
20         Now, below that.  Adjustments for a
21  Chapter 11 plan, this is where I add back items that
22  would be beneficial from a Chapter 11 standpoint.
23  So the avoidance of those incremental litigation
24  costs, as an example, note that I don't add back any
25  of those other three dismissal deduction rows.  And

1  so those three items, the operational wind down
2  expense, the broker fees and the administrative
3  expenses hold in both scenarios.
4      **Q**     Why don't you add back any of those
5  **three rows of expenses?**
6      A    My assumption is that, as an example,
7  on the $12.4 million in administrative expenses,
8  those are going to get paid as part of a Chapter 11
9  plan as well.
10      **Q**     And the 990,707 for broker fees, that
11  **escalates to 1.268, they get paid as part of a**
12  **Chapter 11 as well?**
13      A    I treated this, again, as somewhat
14  conservative that -- for this analysis, that those
15  costs would still be incurred.  They may or may not
16  in a Chapter 11.  But again, to be conservative, I
17  kept them in both the dismissal and plan scenarios.
18      **Q**     In the "Asset" section of your
19  **analysis on Page 9, you show under "Cash" --**
20  **actually, in the Cash row, book value of**
21  **$20.3 million roughly, correct?**
22      A    Yes.
23      **Q**     Okay.  And the estimated recovery for
24  **creditors in the Chapter 11 scenario is exactly**
25  **that, $20.3 million under the three scenarios that**

1  **are shown on the chart on Page 9; is that correct?**
2      A    Yes.
3      **Q**     How much working capital does the
4  **diocese retain under your analysis as opposed to**
5  **cash that is available for creditor recoveries?**
6      A    There are a couple of parts to that
7  answer.  In the diocese's plan, one of the elements
8  is that any cash in excess of $10 million would go
9  to the settlement trust.  So that is how the plan is
10  currently worded.  In this scenario, because, again,
11  I'm looking at the assets that could be available
12  under a plan versus a dismissal scenario, I'm not
13  specifically addressing how much cash the diocese
14  would retain.
15         This is an asset that could be
16  available under a plan scenario as well as a
17  dismissal scenario.  So there are two aspects that I
18  looked at as it relates to cash.
19      **Q**     If I understand, that 20.347439 of
20  **cash could be available to creditors under your**
21  **analysis that is contained on Page 9 of your report.**
22      **Did I get that right?**
23      A    What I want to be very clear about is
24  the numbers that appear here are not in any way
25  trying to present a plan structure or a plan

1  proposal.  The diocese has one plan on file right
2  now, and that has a provision for how much cash
3  would be retained by the diocese.
4         In order to show, just for this
5  analysis, the amount of or the value of assets that
6  could be available to claimants, I have used
7  100 percent of the cash balance.
8      **Q**     That 100 percent of the cash balance
9  **is not what the diocese is proposing to make**
10  **available to creditors under its plan, correct?**
11      A    That is correct.
12      **Q**     In fact, if we use the cash analysis
13  **that is part of the plan, that cash analysis**
14  **involves $10 million of working capital being**
15  **retained by the diocese for its operations, correct?**
16      A    Yes.
17      **Q**     And that $10 million that is being
18  **retained by the diocese for its operations is not**
19  **reflected on your Chapter 11 scenario that is part**
20  **of Page 9 of Exhibit 1, correct?**
21      A    Correct.  There -- just to be clear,
22  again, there are other aspects of the plan that the
23  diocese has filed that are not reflected here.
24      **Q**     So you're -- you're not trying to
25  **show, with respect to the chart that is on Page 9,**

1  what creditors are projected to recover under the
2  diocese plan, correct?
3      A    Correct.  And as we've been talking
4  about, this is not a best interest test.  This also
5  is not comparing the diocese's plan that's on file
6  with a dismissal.  This is just comparing a plan
7  scenario with a dismissal scenario.
8      Q    Did you analyze the recovery for
9  creditors in the event the diocese's Chapter 11 plan
10 was confirmed?
11     A    And by "recovery," are you referring
12 to dollar amounts or percentages?
13     Q    Both.
14     A    I have not done that analysis based on
15 the diocese's plan.
16     Q    And you didn't do that analysis
17 assuming a Chapter 7 liquidation of the diocese,
18 correct?
19     A    In terms of what the recovery would be
20 if the diocese converted to a Chapter 7?
21     Q    Yes, sir.
22     A    That's correct.  I did not.
23     Q    Is PSIP accounted for under any of the
24 line items that are contained on the chart on Page 9
25 of your report?

1      A    Yes, PSIP's cash is in that projected
2  cash balance.
3      Q    And again, for the record, what is
4  PSIP?
5      A    That stands for "protected
6  self-insurance program."
7      Q    What is that?
8      A    That is -- it's not a separate entity
9  at the diocese.  It's part of the debtor, and it is
10 a department that facilitates insurance.
11          At this point, it is primarily focused
12 on runoff of old Worker's Compensation claims as
13 well as placing coverage for property and casualty
14 and auto and various types of general liability
15 insurance for the diocese and other
16 Catholic-affiliated organizations, non-debtor
17 organizations.
18     Q    How much cash do you assume that PSIP
19 contributes to the cash line items that are on
20 Page 9?
21     A    In that amount, the 20.3 million
22 projected as of May 31st, I believe that the PSIP
23 cash was projected to be in the $10 million range.
24     Q    Do you make assumptions about Ecclesia
25 in connection with your analysis that is on Page 9?

1      A    I do include an assumption around
2  Ecclesia.  I believe it's on the prior -- two pages
3  before it, Page 7.
4      Q    And with reference to Page 7, which is
5  absolutely fine, can you tell us what that
6  assumption is?
7      A    Ecclesia is a captive insurance
8  company owned by the debtor.  I don't have an amount
9  included in this analysis because, again, I've
10 treated this as, if it is marketed for sale, under
11 either a plan scenario or a dismissal scenario, that
12 the proceeds from a sale would be the same.
13          I highlight here that there may be
14 significant challenges to actually trying to sell
15 Ecclesia as a going concern.  And I also -- I don't
16 mention this here, but I just want to highlight,
17 similar to our conversation around cash, I know that
18 the debtor's plan contemplates something
19 specifically on Ecclesia.
20     Q    Did you look into the availability of
21 whether distributions and/or dividends due can be
22 made by a captive insurance company?
23     A    Yes.
24          (Whereupon, the court reporter
25      requested clarification.)

1  BY MR. KORNFELD:
2      Q    Did you reach a conclusion about that?
3      A    No.
4      Q    Do you have any opinion about whether
5  those distributions and/or dividends may be made?
6      A    I know that both the debtor and
7  committee have discussed a special dividend from
8  Ecclesia.  I think the debtor has indicated that it
9  is supportive of pursuing that.  The question really
10 revolves around whether the state insurance agency
11 would allow that dividend to occur.
12     Q    Do you know what the available surplus
13 from Ecclesia, that could be used to fund a dividend
14 to the diocese, is?
15     A    I don't know Ecclesia's cash position
16 today, nor do I know, as I indicated, what amount
17 the state insurance agency would allow for a
18 dividend if they would allow it.
19     Q    Why do you say in your Note I on
20 Page 7 of your report that there is some prospect
21 for a dividend by Ecclesia through a consensual
22 Chapter 11 plan, but there's no clear path to
23 monetization and dismissal except for perhaps a loss
24 portfolio transfer to a third party?
25          (Whereupon, the court reporter

```
1          requested clarification.)
2          THE WITNESS:  Ecclesia provided
3    insurance related to sex abuse claims.  To the
4    extent that there is a dismissal scenario,
5    there's a question as to how and when Ecclesia
6    would pay on those claims.
7          So it is unclear in a dismissal
8    scenario how, number one, payments from
9    Ecclesia would occur.  And because of the
10   ongoing exposure, I think that that makes it
11   much more difficult for the state insurance
12   agency to be supportive or allow for a
13   dividend, given the uncertainty, that would
14   otherwise be resolved presumably in a
15   consensual Chapter 11 plan.
16   BY MR. KORNFELD:
17        Q     In your last sentence under Note I on
18   Page 7, you say, "The outcome" -- and you're
19   referring, when you say "the outcome," to
20   monetization of Ecclesia assets that could be used
21   as a dividend, correct?
22              Is that what you're referring to?
23        A     Yes.
24        Q     Why do you say that outcome is likely
25   similar in both a Chapter 11 scenario and a
```

```
1    dismissal scenario?
2          A     I also indicate that it's a
3    conservative assumption.  I believe that the
4    uncertainty associated with the dismissal would make
5    it more difficult to get approval for a special
6    dividend.
7          Q     Have you done any analysis of whether
8    that's the case?
9          A     Whether a dividend under a dismissal
10   scenario...
11        Q     Would be -- would be more difficult
12   than under a plan scenario?
13        A     Based on conversations that I've had
14   with my colleague, James McDermott, as well as the
15   diocese's insurance person, William Chapin, and
16   outside insurance -- the insurance broker,
17   conversations with those individuals, this has been
18   discussed.
19        Q     Have there been any conclusions that
20   have been discussed other than they might be the
21   same, but dismissal might be more difficult?
22        A     That's the general conclusion.
23              THE COURT REPORTER:  Alan, when you
24   get to a good point, can we take 5 minutes,
25   please?
```

```
1          MR. KORNFELD:  Sure.  Let's do it now.
2          (Whereupon, a short break was taken.)
3          MR. STEPHENS:  A rough today and a
4    final tomorrow would be great.
5          MR. KORNFELD:  Let's go back on the
6    record.
7    BY MR. KORNFELD:
8          Q     Do you have Page 9 of Exhibit 1, your
9    report, in front of you, sir?
10        A     Yes.
11        Q     Do you recall when we talked about
12   cash, we talked about the plan providing for the
13   diocese to retain $10 million for working capital?
14        A     Yes.
15        Q     Under a dismissal scenario, would the
16   diocese need working capital to continue to operate
17   up to the dismissal date, which is 9 months away?
18        A     The dismissal analysis that I have
19   prepared here on Page 9 only contemplates what would
20   be necessary, first of all, to pay liabilities -- as
21   we talked about -- the administrative expenses that
22   are estimated to be incurred at that point and then
23   some costs as it relates to continued employee
24   obligations, as an example.  So I subtract that
25   already.
```

```
1          Whether there would be any additional
2    cash that would be required beyond what I've
3    contemplated here, it would have to depend on what
4    the specific scenario would be as to how or if the
5    diocese was operating after the dismissal.
6          Q     How much in operation capital did you
7    assume that the diocese would need after dismissal
8    up to the 9-month liquidation date after the order
9    of dismissal?
10        A     That's the 4.5 to $6.3 million range.
11        Q     And that is the operational wind-down
12   expense?
13        A     Correct.
14        Q     And that, in essence, is a working
15   capital need for whatever operational expenses there
16   are for that 9-month period, correct?
17        A     That's right.
18        Q     Did the debtors prepare, to your
19   knowledge, a Chapter 7 liquidation analysis?
20        A     No.
21        Q     Did A & M prepare a Chapter 7
22   liquidation analysis for the debtors?
23        A     No.
24        Q     Did anybody, to your knowledge,
25   prepare a Chapter 7 liquidation analysis for the
```

1  **debtor?**
2      A    No.
3          MR. KORNFELD:  I have no further
4  questions at this time.
5          MR. STEPHENS:  Thank you, Alan.  Other
6  than noting for the record that the witness
7  will read and sign the transcript, I have no
8  questions either.
9          MR. KORNFELD:  Thank you so much, sir.
10  We appreciate it.
11          THE COURT REPORTER:  Alan, would you
12  like the rough copy?
13          MR. KORNFELD:  I'd like a rough today
14  and a final tomorrow.
15          THE COURT REPORTER:  You got it.
16          MR. KORNFELD:  We can go off the
17  record.  Thank you, Jamie.
18          (Whereupon, the deposition concluded
19  at 3:55 p.m.)
20
21
22
23
24
25

1              DEPOSITION REVIEW
             CERTIFICATION OF WITNESS
2
   ASSIGNMENT REFERENCE NO: 994857
3  NAME OF CASE:  In re:  Roman Catholic Diocese
   DATE OF DEPOSITION:  June 27, 2023
4  WITNESS:  Charles Moore
         In accordance with the Rules of Civil
5  Procedure, I have read the entire transcript of my
   testimony or it has been read to me.
6        I have listed my changes on the attached
   Errata Sheet, listing page and line numbers as well
7  as the reason(s) for the change(s).
        I request that these changes be entered as
8  part of the record of my testimony.
        I have executed the Errata Sheet, as well
9  as this Certificate, and request and authorize that
   both be appended to the transcript of my testimony
10  and be incorporated therein.
11  _____    _____
   Date                      Charles Moore
12
        Sworn to and subscribed before me, a
13  Notary Public in and for the State and County, the
   referenced witness did personally appear and
14  acknowledge that:
        They have read the transcript;
15        They have listed all of their corrections
   in the appended Errata Sheet;
16        They signed the foregoing Sworn Statement;
   and
17        Their execution of this Statement is of
   their free act and deed.
18        I have affixed my name and official seal
19  this_____day of_____, 20_____.
20
21  _____
   Notary Public
22
23  _____
   Commission Expiration Date
24
25

1          DEPOSITION ERRATA SHEET
2  Page   Line    From      to
3  _____
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____
22  _____
23  _____
24  _____
25  SIGNATURE:_____DATE:_____

1          C E R T I F I C A T E
2
3      I, Jamie I. Moskowitz, a Shorthand
4  (Stenotype) Reporter and Notary Public, do hereby
5  certify that the foregoing Deposition, of the
6  witness, Charles Moore, taken at the time and place
7  aforesaid, is a true and correct transcription of my
8  shorthand notes.
9      I further certify that I am neither
10  counsel for nor related to any party to said action,
11  nor in any way interested in the result or outcome
12  thereof.
13      IN WITNESS WHEREOF, I have hereunto set
14  my hand this _____ day of_____, 2023.
15
16  _____
17  Jamie Ilyse Moskowitz
   License No. XI01658
18
19
20
21
22
23
24
25

**MAGNA** ▶
**LEGAL SERVICES**

## A

**a.m**
1:10
**ABI**
37:4,6
**ability**
68:11,11
**able**
90:5
**absolutely**
63:13 114:22 132:5
**abuse**
50:23 61:23 63:2,6
    63:22 64:1 71:4,23
    72:7,12 84:1,5,16
    84:19,25 85:5,7,25
    87:12 88:25 89:14
    89:16,19,23 90:18
    97:7 103:3 115:3,7
    119:3 134:3
**accepted**
103:7,10
**accounted**
130:23
**accounts**
125:20
**accrued**
125:19
**accurate**
6:22
**acknowledge**
139:14
**act**
139:17
**action**
141:10
**actions**
106:6,11,16 109:5
    117:24
**activities**
76:7,8 78:13,23
    79:11,22 116:16,18
**activity**
112:17,20 113:1,2,4
**actual**

111:17
**add**
126:21,24 127:4
**additional**
8:20,23 10:9,15,18
    10:21 12:8,12 72:16
    74:8,11 75:23 94:6
    96:15 97:2 137:1
**addressed**
48:14,15
**addressing**
128:13
**Adjustments**
126:20
**administering**
72:17
**administrative**
14:20 125:7,12,23
    126:4 127:2,7
    136:21
**advice**
76:15 77:2
**advising**
16:7
**advisor**
16:13
**affidavit**
3:5 73:7,8,11,13
    74:12,20,22 99:22
    101:2,5,11,24
    102:16 103:3
    105:11,16,25
    106:17,18,21
    108:13,15,18
    109:14,25 110:6,11
    110:15,23 111:1,5,9
    111:14,22,23
    114:10 115:22
    116:10,25 117:8,16
    120:3,6,13
**affiliate**
11:10
**affiliated**
29:15
**affixed**
139:18

**aforesaid**
141:7
**afternoon**
55:8,9
**agency**
133:10,17 134:12
**aggregate**
44:15 45:3
**Agile**
3:9 7:17
**ago**
109:1
**agree**
91:12 108:9 123:17
**agreement**
45:1
**akin**
119:13
**akornfeld@pszjla...**
2:3
**Alan**
2:3 46:24 48:25
    54:23 66:17 92:24
    95:9 100:12,13
    114:16,23 115:14
    116:23 135:23
    138:5,11
**Alan's**
78:6
**allotted**
52:19
**allow**
133:11,17,18 134:12
**allowed**
43:24 44:2 51:25
    70:14,18
**Aluminum**
39:3
**Alvarez**
12:22 16:9,12
**American**
37:1
**amount**
16:4 20:23 21:3
    24:22 25:16 32:3
    46:23 52:7 54:12

55:12,16 56:6,21
57:4,8,12,13,15
61:24 62:17 64:19
64:20 69:24 72:4
82:3,6,14 86:18
88:18 92:15 99:6
103:11 111:17
122:6 126:17 129:5
131:21 132:8
133:16
**amounts**
45:1 98:23 99:1,4
121:13 125:14
130:12
**analyses**
10:10,16 12:13 23:25
24:5,12,18 33:14
52:11,11 98:15
**analysis**
14:4 16:1,2,3,3 20:22
21:2,18,19,21 22:7
22:8,15,25 23:3
25:19 27:11 29:22
30:5,11,14,20 31:8
32:2,8,14,24 33:18
34:1,9,21 35:4,18
36:9 37:9,22 38:16
39:1,13,21 40:10,20
40:25 41:8,12,16,19
41:24 43:8,22 44:6
44:9 51:12 52:2,7
52:14,17,23 53:9,12
53:12,16,17,21 54:3
54:7,9,10,11 55:12
55:22,23 56:8,17,23
56:24 57:7,8,11,16
58:4,7,11,12,13,16
58:18 59:1,3,6,10
60:15,19,23,25 61:5
61:10,13,17,21 62:5
62:10 64:15 65:12
70:3 81:6 93:7,11
122:10 123:3,11
124:14,15 126:6,16
127:14,19 128:4,21
129:5,12,13 130:14



130:16 131:25
132:9 135:7 136:18
137:19,22,25
**analyze**
20:17 21:10 87:13
90:11 94:12,20
98:13 130:8
**analyzed**
85:4,6 102:16
**and/or**
50:5 96:22 132:21
133:5
**Andrew**
13:10,17
**Angeles**
2:10
**Anoop**
7:2 13:7
**Anoop's**
7:3
**answer**
4:3 7:11 11:15,17,20
21:6,8 31:2,21 32:1
32:19 34:6,17 42:15
46:14,16 47:7,8
48:12 50:20,21,22
59:18,19 63:9 66:1
66:22 67:4 78:7
84:23 89:5 94:4
105:20 107:1,15
108:6,8 128:7
**answered**
21:15 22:23 27:20
34:16 51:21
**answering**
78:6
**answers**
7:9 109:1
**anticipated**
107:10
**anybody**
6:25 13:11 18:23
19:15,20 20:5,14
29:15 35:24 41:18
42:5,21 46:9,22
47:13 64:4 74:20

75:3 95:19 96:23
99:8 123:12 137:24
**Apart**
98:1
**appear**
73:17 128:24 139:13
**appears**
7:24 8:2 50:13
**appended**
139:9,15
**applications**
113:20,24 114:1,3,5
**appointed**
60:6
**appreciate**
21:6 75:2 76:21
138:10
**approach**
21:1 43:13,14 54:10
98:15
**appropriate**
31:24 40:14 41:13,20
77:3
**approval**
135:5
**approve**
39:4 40:3
**approving**
40:7
**approximately**
6:14 23:4,15 25:1
64:11 65:14 66:13
68:4,21 86:2,8,13
91:14 107:19 108:9
125:1,1,8
**April**
8:15 10:13 12:4,9
29:3 112:7 120:18
**area**
25:14 109:8
**areas**
65:10
**arrive**
70:6 96:14 125:4
**arriving**
99:12

**article**
38:4
**articles**
35:2,10
**ascertain**
90:14,17 94:21 97:11
97:13,17
**Asia**
100:9,11,14
**aside**
47:16 67:10
**asked**
21:14 22:22 25:25
27:2,19 34:15 51:20
68:7 77:23 80:4
107:14 108:5
**asking**
57:12 76:21 78:9
79:2 80:21 81:4,5
89:23 97:6 110:13
116:24 120:6
**aspects**
128:17 129:22
**asserting**
58:2
**assess**
118:15
**assessing**
33:8 104:6,21
**assessment**
91:8 102:7 104:13
**asset**
127:18 128:15
**assets**
15:19 20:17,23 21:4
21:10 22:3 23:6,7
25:5,9,15,16 29:23
30:6,15,21 31:9
33:19 34:10,22 35:5
35:19 36:10 37:10
37:23 38:17 40:11
41:25 43:8 52:8
56:4 57:23 59:23
63:25 71:13,21,23
124:24 128:11
129:5 134:20

**assigned**
44:20
**ASSIGNMENT**
139:2
**associated**
75:16 135:4
**Association**
36:4
**assume**
23:20 70:14,19 72:15
81:10,16 93:12
131:18 137:7
**assumed**
23:13,14 64:11 68:4
68:21 92:15
**assumes**
21:23 23:3 81:7
**assuming**
24:16,18 92:5 130:17
**assumption**
23:17 62:12 64:14,16
64:20 65:18 66:19
76:14,18 77:17,25
78:6 82:22 92:6
94:7 96:14,20 97:1
97:4 126:13 127:6
132:1,6 135:3
**assumptions**
14:3,5,7,9,11,12,16
21:21 62:21 82:16
82:19 131:24
**attach**
75:11
**attached**
75:14,15 139:6
**attempt**
57:16 90:14,17 92:1
97:11,13,17 118:23
**attempts**
16:4
**attend**
20:13 38:9
**attended**
29:8 36:7,14 37:1
**attention**
8:7 61:22 63:16



107:5
**attorneys**
12:21,25 13:5 96:19
96:25 112:5 116:19
116:20 118:24
**attorneys'**
103:16 117:2,11,15
118:11 119:10
**authenticate**
7:19
**author**
38:4,6
**authority**
99:17,21
**authorize**
139:9
**auto**
131:14
**availability**
132:20
**available**
10:10 15:20 16:5
20:18,24 21:4,11
22:14,20 24:23
29:24 30:7,15,22
31:9 32:4 33:19,24
34:11,22 35:5,19
36:10 37:10,24
38:18 40:12 41:4,25
43:8 52:8,15 55:25
56:5,22 57:5,24
61:25 62:13,17 64:1
94:1,6,13 128:5,11
128:16,20 129:6,10
133:12
**Avenue**
2:5
**average**
72:6 81:19,22 91:5
92:6 96:13 101:8
110:17,20 111:24
121:23 122:1
**avoid**
46:20 90:23
**avoidance**
121:3 126:23

**aware**
11:10 31:19,23 42:18
42:21 43:12 54:15
64:8 89:15 90:21
91:5,7 94:22 95:2,6
95:8 98:14,22 107:4
115:9 123:15,22

---
**B**

**B**
3:1 116:12
**back**
18:6 27:1 54:20 62:4
69:19 72:25 77:10
93:5 95:23 96:6
101:22 121:21
126:21,24 127:4
136:5
**back-and-forth**
82:4,6
**background**
83:14
**balance**
129:7,8 131:2
**bankruptcies**
119:3,20,22
**bankruptcy**
1:1 30:24 31:12
32:16 33:22 34:13
34:25 35:7,14 37:2
37:15 40:13 42:2
74:24 75:4,17 85:5
97:22,25 98:4,18,24
99:2 112:11,23
113:8,13 118:8
119:5,7,8 123:23
124:2,10
**base**
116:6
**based**
8:19 18:25 24:4
32:19 59:19 62:8
64:23 65:5 68:23
70:15 71:12 73:25
74:7 77:5 92:6
108:1 111:2 121:14

121:16 125:5
130:14 135:13
**Basically**
63:15
**basis**
76:6,9,13,18 77:16
97:3
**bearing**
32:7 34:3
**bears**
10:10,16 12:13
**began**
16:11 53:20 115:10
**beginning**
16:14 26:10 107:4
108:2
**begins**
9:22 23:12 26:11
63:18 116:12
**behalf**
9:25 43:23 46:22
64:4
**belief**
64:22 65:11
**beliefs**
34:7
**believe**
8:3 13:3 16:10,20
18:17 19:8 20:21
26:2 29:4 32:5 34:1
34:5 38:14,25 39:11
39:16,19,22 40:18
41:3 43:6 45:2
49:19 51:5,17 53:19
61:3,15 62:21 64:17
65:2 68:7 69:6 70:9
75:8 82:13 83:9,11
90:1,3 96:21,24
104:4 109:4 113:16
114:17,18 115:14
115:14 124:7
131:22 132:2 135:3
**Ben**
96:21
**beneficial**
126:22

**best**
7:8,10 32:11,15 33:1
33:4 56:9,13 58:19
58:21 60:25 61:13
61:17 122:12,16
130:4
**better**
15:17
**beyond**
48:9 50:17 89:20
137:2
**bishop**
16:24 85:15 98:5
**bit**
116:16
**blindly**
118:18
**blog**
37:21
**blogs**
37:15
**bmichael@pszjlaw...**
2:4
**board**
36:3
**book**
127:20
**books**
38:6
**bottom**
18:13 26:9 62:24
63:18 119:15
**Boulevard**
2:10
**break**
43:19 54:18,25 55:6
95:11,20 136:2
**BRITTANY**
2:4
**broadly**
44:7
**broker**
124:20 127:2,10
135:16
**brought**
80:17 106:6,11,16



**business**
14:7,18
**butcher**
14:13

---
**C**
---

**C**
2:1,9,19 3:3 49:22
141:1,1
**calculating**
51:18
**calculation**
53:4 54:12 57:25
70:24 71:7 72:12
107:17 108:2,11
**calculations**
24:12 70:24 71:3,10
71:11 72:3,9
**calculator**
107:2,18
**California**
2:10 85:16 86:7
**call**
8:7 13:21,23 14:1,2,6
14:17 61:22 100:13
**calling**
63:15
**calls**
12:23 13:18,20,24
31:1 32:18 33:6
59:18
**CANTY**
49:6 100:12,19
**capital**
128:3 129:14 136:13
136:16 137:6,15
**captive**
132:7,22
**career**
33:15
**carefully**
120:5
**caring**
25:13
**carry**
25:12

**case**
7:21 11:6 15:14,20
16:13,14 24:24,25
26:6,13,15,19,24
27:18,25 28:7,17
29:5 30:24 31:12,18
32:6,9 33:11 34:20
39:2,15,21 40:1,4
40:17,20 41:2,13,15
41:18,20,22 43:2,10
45:6,8,16,19,23,25
52:14,21 53:18
54:15 61:4 62:6
67:22,24 70:10
72:16 73:4 75:4,17
76:1 77:12 80:9
81:12 83:7,8,16,23
84:2,11 85:3,18,20
85:24 86:4,12,15,24
86:25 87:3,4,7,8
89:3,11,21,23,24
90:18 91:2,15 92:3
92:5,11 93:13 96:13
98:8,9,12,18 99:9
99:12 107:1,5 108:3
112:23 113:13,18
113:25 117:9 121:1
123:8,13,21 124:2
124:11,15,17
125:10,17 135:8
139:3
**cases**
29:10 31:16 33:21
34:13,24 35:8,22
36:12 37:13 38:1,20
44:18 61:9 69:8,15
70:8 78:12,17,17
79:6,17,19 80:6,15
80:16,22 81:3,6,7
81:11,13,13,14,16
81:20,21,23 83:20
84:13,16,19,25 85:7
85:12,21 86:8 87:15
87:16 88:15,22 89:1
89:7,14,16,17,19,20
90:1,4,7,10,12,15

92:7 97:7,15,19
105:11,16 106:22
107:1,16 108:19
109:14 110:23
111:19 112:8
115:12,18,24 116:3
118:3 119:16
123:16
**cash**
127:19,20 128:5,8,13
128:18,20 129:2,7,8
129:12,13 131:1,2
131:18,19,23
132:17 133:15
136:12 137:2
**casualty**
131:13
**categories**
79:2 125:15
**category**
83:12
**Catholic**
1:3 2:16 25:12 85:10
85:15 98:5 139:3
**Catholic-affiliated**
131:16
**caused**
8:24
**caution**
11:12 47:6,7 53:24
76:12
**Centre**
1:4 2:17 98:1
**CEO**
60:1,5,8
**certain**
25:5 81:2,19 107:24
112:24 113:7
**certainly**
28:23 29:13 45:7
62:16 75:10 76:17
80:15
**Certificate**
5:8 139:9
**CERTIFICATION**
139:1

**Certified**
1:11,11
**certify**
141:5,9
**cetera**
37:16 53:6
**challenges**
132:14
**change**
8:19,24 10:8 122:11
**change(s)**
139:7
**changed**
10:12,19
**changes**
14:17 139:6,7
**Chapin**
135:15
**Chapter**
15:14 18:22 19:25
20:4,7,11,15,19,25
21:5,12 29:25 30:17
30:23 31:11 32:9
33:12,20,21 34:12
34:13,23,24 35:8,21
35:22 36:4,12 37:12
37:13,25 38:1,19,20
39:15 43:2,10 44:2
44:3,4,24 56:14,15
56:18 57:21,22
58:13,15,18,22,22
59:5,5,12,16,20,25
60:4,5,7,10,14 61:1
61:6,11,14,19 62:1
62:6,18 64:13,25
65:15 66:4 68:5,23
69:5,7,10,11,15
72:18 75:25 77:14
93:9,17,20,22 94:2
95:3 113:18 122:13
122:14 123:8,12
125:17 126:2,13,21
126:22 127:8,12,16
127:24 129:19
130:9,17,20 133:22
134:15,25 137:19



MAGNA
LEGAL SERVICES

137:21,25
**Charles**
1:7 5:2 6:2,10 139:4
139:11 141:6
**chart**
120:25 124:18 128:1
129:25 130:24
**checked**
100:15
**chief**
17:5
**Chuck**
66:21 109:18
**circumstances**
87:17 89:11
**Ciriello**
13:10,17,18,21,23,24
14:6,14
**cited**
74:13
**Civil**
139:4
**claim**
44:25 45:7 46:3
56:20 70:20,21
71:12,13 72:5,7,7
85:4 89:25 97:14
98:17 101:8,12
102:2,15 104:4,25
105:23 108:12
110:13 111:25
112:16 113:3,7,8
119:9 122:1
**claimants**
15:20 29:24 30:7,15
35:6,20 37:11,24
38:18 40:12 64:2
103:3,6 129:6
**claims**
11:6 12:11 29:25
30:16,23 31:10
33:20 34:11,23 35:6
35:20 36:11 37:11
37:25 38:19 40:13
42:1 43:9,25 44:11
44:13,15,20,21,25

45:3,4,5,9,10,15,17
45:19,21,24 46:1,4
46:6,10,23 47:14,18
47:21,24 48:7 50:7
50:13,23 51:14,19
51:25 52:12,19,20
52:24 53:2,3,4,5,15
54:13,13,15 55:12
55:14,16,19 56:6,6
56:7,22 57:2,3,6,9
57:10,13,14,18,24
58:2,5 61:23 63:2,6
63:22 68:14,14
70:14,15,18,23 71:4
71:6,23,23 72:8,9
72:11,12,13,17
80:12 83:10,11
87:12 89:25 95:4
97:18 103:4,12,15
104:1,7,24 105:4
112:10,13,18,19,22
112:24 113:20
115:3,7 120:21
131:12 134:3,6
**clarification**
14:22 106:8 123:25
132:25 134:1
**clarify**
44:12 62:8 97:23
**class**
45:5 52:20,24 54:13
54:15 56:25 57:17
58:4 59:4
**classes**
45:4 50:3,6,12,24
51:3,6,13 52:16
**clean**
101:23
**clear**
20:25 22:13 24:21
28:16 30:10,12
32:25 62:3 65:25
76:20,22 81:18
93:16 111:16
128:23 129:21
133:22

**close**
104:24
**closely**
16:21
**closing**
95:9
**Code**
32:16
**colleague**
12:23 67:7,15,18
135:14
**colleagues**
12:22 13:14
**colloquy**
77:7
**come**
54:20 61:10 65:3
78:20 85:11 90:5
92:17 95:23 117:20
117:25 118:6
**comes**
47:9 111:9 118:11
**comfortable**
80:14
**coming**
82:18
**commencing**
1:10
**comment**
76:22
**Commission**
139:23
**committee**
2:6,11 80:11 133:7
**committee's**
10:3 17:14
**commonly**
33:25
**company**
29:11,12 43:10 132:8
132:22
**compare**
56:1
**compared**
65:4
**comparing**

59:4 122:13,14 130:5
130:6
**comparison**
62:6
**compensation**
103:7,11 131:12
**complete**
6:22
**completed**
53:21 54:3
**computed**
51:10 53:2
**concept**
19:2,7 29:8
**concern**
132:15
**conclude**
75:23
**concluded**
138:18
**conclusion**
31:1 32:18 33:6
64:10 66:10,18 68:3
82:8 89:1 102:19
105:21 111:23
116:6,9 122:25
133:2 135:22
**conclusions**
8:18 10:11,17 12:14
76:15 83:16 135:19
**conducting**
109:5
**conference**
35:13,17,25 36:8,18
37:6
**conferences**
35:13 36:15 37:2
**confirmed**
15:15 32:22 56:2
62:19 64:25 92:16
130:10
**confusion**
49:3
**connection**
11:16 15:18 32:25
39:14 52:1 60:18



83:15 86:25 87:3
89:1 90:12 98:9
99:8 101:6 102:18
113:13 114:4
116:22 117:7 120:2
131:25
**consensual**
133:21 134:15
**conservative**
64:20 65:18 127:14
127:16 135:3
**consider**
92:10 97:21 98:7
**considered**
74:8,13 75:5 101:3,6
102:18
**considering**
29:17
**contained**
9:4,19 10:11,17,20
12:14 43:23 58:7
120:17 128:21
130:24
**contemplate**
66:2
**contemplated**
137:3
**contemplates**
132:18 136:19
**CONTENTS**
5:1
**context**
24:15,18 31:25 34:2
38:22 42:7,23,25
43:1,4,11 44:2,21
64:23,25 69:14 78:5
79:9 80:2
**continuation**
107:6
**continue**
19:25 23:1,23 24:6
25:8,14,17,21,24
26:1 27:10 109:5
136:16
**continued**
20:20 21:13 22:20

43:7 136:23
**continues**
43:3 59:21
**continuing**
24:16
**contributed**
71:22 72:4
**contributes**
131:19
**contribution**
10:25 11:11,23 12:5
12:10
**conversation**
19:2 27:4 62:4 67:24
76:16 80:3 81:25
82:17,21 132:17
**conversations**
28:9,11 46:15,20
47:10,16 67:9,10,11
67:16 68:24 70:16
73:15 87:24 88:3,9
89:10 135:13,17
**converted**
33:12 130:20
**copy**
138:12
**corporate**
44:24
**correct**
14:15 16:8,15,22,25
20:1 21:25 22:9,11
23:5,18 24:6 25:2
25:21 26:19 30:1,4
32:10,16 33:2,15
35:14 36:5 39:24
40:1,2 41:9 42:13
42:22,24 43:15 51:7
52:20,24 53:6,10,11
53:14 54:8,16,17
55:13,14,16,17,19
55:20 56:15 57:22
58:9,11 59:2,3 60:8
60:12 63:22 64:15
65:16,24,25 68:6
70:4 71:2 72:5,9,10
72:13,14 75:13,19

77:14,18 80:1 82:1
82:23 84:11 85:5
86:25 87:4,5,8,21
88:6,19,20,23,24
92:7,9,23 93:9,10
93:14,15,17,18,23
94:15 97:15,16,19
97:20,25 99:4,9,10
99:17,19,22 101:9
101:10 103:4,8,9,12
104:17 106:19,23
106:24 108:10
111:11 114:6,7
115:20,24,25 116:4
116:5 117:12,13
118:21,22 119:12
119:17 120:3,22
121:24 122:18,21
123:6,14,15 124:11
125:24 126:7
127:21 128:1
129:10,11,15,20,21
130:2,3,18,22
134:21 137:13,16
141:7
**corrections**
139:15
**correctly**
24:20 30:9 46:7
53:13 58:21 91:1
97:11 105:13
106:14 108:23
**cost**
70:9 72:17 83:6,13
84:1,17,21 85:4,7
86:4,6,11 87:13
88:21 89:24 90:5,15
90:18,23 91:15,15
92:7 93:12 97:12,14
98:11,17,21 99:13
101:12 102:15
103:15,21 104:1,4
105:4,21,22 109:13
110:12,13,16 111:1
111:10,14,22,24
112:6 113:12,20

114:15 115:8,23
119:6 121:3,23
122:1 126:17
**costs**
58:18 69:22,24 72:16
75:23 77:12 81:21
82:8 83:16,22 84:5
84:14,14 85:1,12,17
87:8,10 89:2,15,18
89:22 91:18,21,22
91:23 92:2,2,11,18
92:20,22,25 93:2,21
94:1,7,13,16,23
95:3 96:15 97:2,18
97:21 98:8 101:7
102:1,19 103:17
104:9,12,17,22,23
105:7 106:2 107:9
109:7 110:2,8 112:4
113:17 118:3
119:17 120:11,12
120:16 121:22
122:15,17 126:24
124:15 136:23
**counsel**
2:6,11,16 7:6 13:17
17:6 34:6 46:13,16
46:20 47:1,5,11,17
54:1 64:7 67:9,12
67:12 68:24 70:17
72:21,24 73:5,13,15
73:17,23 74:3,9
75:22 76:4,10 77:3
77:17 80:10 98:20
117:20 119:9
141:10
**County**
139:13
**couple**
9:12 13:18 36:15
109:1 126:10 128:6
**course**
11:14 76:16 106:5,11
**court**
1:1 6:19 14:21 17:13
17:18,25 18:8,11,18



30:19 31:7,15,23
32:25 33:8 35:22
39:4,7,10,21 40:3,6
40:9 41:4,7,15 63:4
63:8 73:21 74:11,14
74:16,17,21,22,24
74:25 75:4 78:13
80:18 83:21 95:5,14
101:16 103:17
105:12 106:7
112:11 113:10
118:8 123:24
132:24 133:25
135:23 138:11,15
**courthouse**
81:14,15,15
**courts**
32:1 33:22 34:14,25
**cover**
95:2
**coverage**
69:11 131:13
**covered**
94:18
**covers**
92:11
**creditor**
128:5
**creditors**
2:7,12 15:15,17
20:18 21:4,11 22:14
24:23 30:22 31:10
32:4 33:11,19 34:11
34:22 36:11 42:1
43:9 52:9,16 55:25
56:5,14,15,18,25
58:2,22,23 59:4
123:22 124:1
127:24 128:20
129:10 130:1,9
**critical**
59:23
**crosstalk**
101:19
**current**
121:17

**currently**
128:10
**cut**
95:13
**CVA**
106:6,11,16,23
116:14

---

**D**

**D**
8:8,11,17
**data**
8:20,23 104:12,16,20
**date**
8:13,14,21 12:4 16:6
28:25 29:2,3 52:9
106:13,17,21 107:7
110:11 111:23
112:6 125:18
136:17 137:8 139:3
139:11,23 140:25
**dated**
16:10
**day**
1:9 2:13 7:4 12:21,25
13:25 37:18 67:12
67:13 74:17 77:17
77:19,22 78:3,4,9
79:4 80:5,8,22
81:25 82:7,21 87:14
87:20 88:9 89:10
96:12,19,25 102:9
117:21,25 118:6,11
118:15,24 119:3
120:1,10,15 139:19
141:14
**deal**
72:4 114:14
**dealing**
68:25 69:4,9
**debtor**
1:5 16:7,18,18,19
17:13,19 18:10,14
18:18,21,24 19:4,12
19:17,21 20:6,11,15
20:20 21:13,24 22:3

22:4,8,20 23:1,8,20
23:23 24:1,5,13,18
25:7,8,11,20,24
26:1,5,12,14,18,23
27:13,17,24 28:6,13
28:17,21,23 29:5,14
29:16,17 30:24
31:11 40:22,25 41:1
53:18 59:7,9 62:8
64:4 70:19,22 71:7
71:14 72:2,8 73:20
76:6 112:23 113:3
123:17 131:9 132:8
133:6,8 138:1
**debtor's**
10:23 15:19 16:22
17:9,12,17 18:24
19:10,11,16,20
20:24 71:20 132:18
**debtors**
75:12 137:18,22
**debtors'**
16:13
**decades**
36:15 94:24
**December**
16:10
**decided**
77:5
**decision**
28:24 80:15
**declaration**
104:10 114:13
**declarations**
75:12,15,17
**deduction**
126:25
**deductions**
69:21 121:8 125:22
126:5,17
**deed**
139:17
**defend**
70:10 83:13 84:15,17
84:21 85:4,7,12,17
86:4,6,11 87:8,10

88:22 89:16,18,23
90:5 97:18 103:15
104:23 105:4,7
108:22 109:5,13
116:3,8 119:7
121:23 122:18
**defending**
89:25 106:6,11
115:24
**defense**
72:16 76:7 87:13
90:15,18 92:2,11,18
92:20,22,25 93:1,12
94:1,7,13,16,23
95:2 97:2,12,14,21
98:8,12,17 99:13
103:21 104:1,9,12
104:17,21 105:22
105:22 106:2 110:2
110:8,13,16 111:2
111:10,15,22,24
112:5,6 113:12,17
115:8 119:17
**define**
82:3
**department**
131:10
**depend**
91:16 137:3
**depending**
82:2
**depends**
60:3
**deposed**
6:11
**deposition**
1:7 6:16,18 7:6,15
12:17,25 39:17
120:9 138:18 139:1
139:3 140:1 141:5
**depositions**
79:14
**derive**
111:10
**derived**
121:12



described
31:20 42:24 80:1
84:9,10,12
Description
3:2 4:7
despite
65:11
determination
27:13 28:3 41:8
65:12 66:18 122:7
determine
65:17 119:3,22
determined
63:25 64:5
determining
30:6
Detroit
36:3
developed
73:12,16 74:9
differ
56:2
different
52:16 58:15 68:12
74:25 78:17 79:6,8
87:18 105:1 106:1
differently
93:21
difficult
65:17 134:11 135:5
135:11,21
diocese
1:3 2:16 19:24 20:3,5
29:25 30:16 43:24
45:22 46:22 47:4,21
48:5 79:21 94:25
97:22,24 98:8,12
99:2 103:11 104:11
105:6,12 106:12,17
106:23 107:10
108:21 109:4
113:13 115:7,19,23
116:2,7,13 119:16
119:19,22 128:4,13
129:1,3,9,15,18,23
130:2,17,20 131:9

131:15 133:14
136:13,16 137:5,7
139:3
diocese's
48:2 49:17,20 50:2
50:14 102:10,22
103:15 105:4
121:17 128:7 130:5
130:9,15 135:15
dioceses
85:10
direct
107:5
directly
94:3,4
directors
36:3
disallowed
80:12 112:24
disclose
85:14
disclosed
11:20 48:9 73:3
99:14,16 119:19,23
disclosure
3:4 48:2,15,20 49:17
49:20 50:2,14 70:19
71:2,8
discovery
79:13 109:6
discuss
13:25 89:18 109:13
110:1,7,16,25 111:4
111:14
discussed
14:9,11,13,16 27:3,8
28:10,20 36:13,18
36:21,24 38:13 79:5
80:25 92:12 115:11
122:10 133:7
135:18,20
discussing
62:5
discussion
18:4 26:20 56:11
97:8 100:21

discussions
28:21 87:14,19 98:19
dismiss
10:24 17:14,19 18:12
18:19 19:3,22 20:1
20:7,10,14,19 21:12
21:24 28:22 123:9
123:13,16,21 124:8
124:10
dismissal
14:4 15:13,17 24:16
24:19 31:18 38:22
38:24 39:5,14 40:4
40:7,18 43:2 54:9
56:2 58:10 60:22
62:5,10,16 64:12,18
64:23 65:4,14 66:3
66:14 68:4,22 69:21
70:3 92:15 93:8,11
93:20,22 94:2,9,11
94:17,18 95:4 102:1
121:8 122:10 123:2
123:11 124:14
125:18,22,23 126:5
126:16,25 127:17
128:12,17 130:6,7
132:11 133:23
134:4,7 135:1,4,9
135:21 136:15,17
136:18 137:5,7,9
dismissed
15:21 24:24,25 26:6
26:13,15,19,24
27:18,25 28:7,18
29:5 30:24 31:12
32:6 33:22 34:13,25
35:8,22 36:13 37:13
38:1,21 43:3,10
62:7 80:10
disposed
108:19
dispute
69:11 77:4
disputed
45:7
distinguish

22:25 23:22 25:3
distinguishes
57:23
distributed
52:16
distributions
132:21 133:5
District
1:1 39:8
divide
106:25
divided
107:16 111:3
dividend
133:7,11,13,18,21
134:13,21 135:6,9
dividends
132:21 133:5
dividing
110:18 111:10
division
111:2
Docket
49:18
dockets
116:18
document
49:17 101:6 102:14
109:17,21 115:15
documents
4:6 12:19,20 20:9
47:17 90:11 97:3
99:11 116:21
117:10 118:20
124:17
doing
44:6,9 53:3 63:15
84:7
dollar
55:16 57:13,15 98:23
99:1,3,5 111:17
130:12
dollars
54:14 91:6 107:9
108:22 109:6 116:3
116:8 118:5



door
77:2
due
132:21
duly
6:3
duplicate
112:22
duplicates
112:25

**E**

E
2:1,1 3:1 141:1,1
earlier
62:4 104:3
early
81:13 113:25
earnest
16:11
Eastern
39:8
eat
65:9
eating
65:8
Ecclesia
68:10,12,13,14
131:24 132:2,7,15
132:19 133:8,13,21
134:2,5,9,20
Ecclesia's
68:11 133:15
educational
36:20
either
57:21 62:13 89:25
100:8 110:20
132:11 138:8
elements
128:7
emails
17:16
employed
29:15
employee

136:23
engage
77:6
engagement
16:9
entered
139:7
entire
57:4 105:25 116:11
116:25 139:5
entirety
106:10
entities
33:21 34:12,24 35:7
35:21 36:12 37:12
38:1,20 40:14 42:2
entitled
49:23,23 50:4
entity
25:7 43:3 131:8
environmental
83:11
epstephens@jones...
2:14
equal
64:12 65:14 66:13
68:4,22
equals
70:11 120:21
Eric
2:14 7:2 13:7 49:7
66:23 76:21 96:22
Errata
139:6,8,15 140:1
escalates
127:11
especially
44:18
ESQUIRE
2:3,4,9,14
essence
109:10,12 137:14
essentially
25:12
established
72:18 75:25

estate
69:12
estimate
6:15 15:19 16:1,4
22:13,16,19 27:12
43:8,24 44:10 45:18
46:5,9,23 47:13
52:7,12 55:24 56:18
60:18 62:11 73:22
73:23 74:2 76:11
79:24
estimated
24:22 50:5 51:2,6,9
51:13,24 55:15,18
71:15,24 84:17 85:7
121:16 125:17
126:18 127:23
136:22
estimates
44:19,22 85:12 98:22
estimating
32:3 84:14 85:1
estimation
15:24 21:3 33:23
47:18 84:5
et
37:16 53:6
evaluates
56:13
evaluating
32:25 43:1
event
18:11,18 43:2 62:1
130:9
events
36:14
eventual
71:4
eventually
29:12 78:25 79:15,23
everybody
96:4
evidentiary
9:3
exactly
32:13 41:5 125:9

127:24
Examination
5:3 6:6
examined
6:3
examiner
83:3
example
55:1 58:17 112:21
119:11 126:24
127:6 136:24
examples
122:23
excess
128:8
Excuse
17:22
executed
139:8
execution
139:17
exhibit
3:2 7:15,20,22 8:25
9:5,20 12:20 15:4
29:1,3 48:20,22,23
49:2,5,8,13,16,20
50:2,15 52:3 54:8
55:22 58:9 99:25
100:1,4,18,24 101:1
101:5,25 102:17
106:19 108:18
109:15 110:1,7
116:10,22 117:17
118:10 120:7
124:19 129:20
136:8
Exhibit-1
3:3
Exhibit-2
3:5
Exhibit-4
3:4
Exhibits
3:8,9 5:5
exist
11:6 45:5 62:18



**existed**
94:24
**existence**
94:25
**expect**
18:10 25:20 26:14,18
27:17,24 28:23
47:23 48:5 114:24
**expected**
18:14 19:12 25:25
26:5,12,23 28:6,13
**expecting**
109:4
**expend**
108:21 116:2,7
**expense**
121:9 127:2 137:12
**expenses**
116:13,14 121:17,18
125:8,13,16,23
126:4 127:3,5,7
136:21 137:15
**experience**
7:7 16:17 32:20
59:19 68:25 69:4,6
69:9,14,17 82:17
83:18 84:7 85:1
**expert**
3:3 7:20,25 9:24 10:2
10:4 15:3 39:9,25
50:18 66:6 73:4
83:5,10,13,25 94:24
101:3 103:16 117:9
120:25
**experts**
47:2,4 66:9 67:5
124:13
**Expiration**
139:23
**explain**
121:12
**exposure**
134:10
**express**
25:23
**expressed**

8:19
**extensive**
79:13,18 81:25 82:3
**extent**
30:25 32:17 33:5
46:12 48:11 53:24
59:17,22 64:7 79:20
134:4

**F**

**F**
141:1
**face**
19:5
**facilitates**
131:10
**fact**
25:10 27:7 32:9 57:2
80:8 81:1 129:12
**factor**
57:10 79:24 104:13
**factored**
73:9
**factors**
89:8 91:8 98:14
**facts**
8:20,23 87:17 89:10
**factual**
76:17
**fair**
55:3 82:3,6
**fairly**
31:19
**fall**
50:23 83:12
**familiar**
32:21 88:13,16
**far**
19:24 27:8 42:11
115:6,9 116:13
**February**
40:17
**fee**
83:2 113:19,23 114:1
114:3,5
**fees**

60:15,16 61:2,6,14
61:19 77:13 103:16
103:16 107:9,15
109:7 117:2,11,15
118:11 119:10
124:20,22,25 125:4
125:20 127:2,10
**felt**
80:14
**fiduciary**
60:4
**file**
83:9 129:1 130:5
**filed**
10:24 40:17 41:3
44:25 45:15,22
71:14 73:8,8,11
74:22 75:17 103:4
105:11 106:22
110:24 112:22
115:4,12,19 117:24
119:9 123:9,13,17
124:10,17 129:23
**files**
74:17 112:23
**filing**
21:5
**final**
136:4 138:14
**finality**
65:1,4
**Finally**
108:19
**financial**
16:13
**find**
32:2 92:1 119:16
**fine**
15:10 43:21 132:5
**finish**
7:9,10
**Firm**
1:8
**firms**
118:24
**first**

6:2 8:11 10:7,22 11:9
11:22,24 14:1 23:11
23:12 31:14 38:21
42:12 44:7 46:18
63:24 65:8 69:23
77:9 78:10 79:6
90:24 109:3 123:7
125:12 136:20
**FirstEnergy**
83:9,15
**fiscal**
14:18
**fix**
49:6
**FLANAGAN**
2:9,19
**floated**
29:8
**Floor**
2:5,10
**focus**
45:9,14 56:21,24
57:8 122:11,17
**focused**
56:4 80:19 89:9
122:15 131:11
**follow**
113:9
**follow-up**
76:3
**followed**
77:21 84:13
**following**
27:10 50:3
**follows**
6:4
**forced**
18:22 108:21 116:2,7
**foregoing**
139:16 141:5
**forgotten**
63:10
**form**
46:3
**former**
36:2



**forth**
50:3,5
**forward**
65:9 71:13
**free**
139:17
**front**
7:16 49:14 136:9
**fulfills**
60:1
**full**
6:8 23:12
**fully**
92:7
**functions**
60:1
**fund**
133:13
**funds**
125:21
**further**
9:17 46:19 89:20
138:3 141:9

---
### G
**general**
10:22 12:9 17:3,6
29:9 57:5 68:18
72:4 79:1 83:17
84:20,22 89:8 102:4
131:14 135:22
**generally**
52:21 58:25 79:11
86:17 88:13,16 91:5
94:22 95:2 98:11
102:12 123:22
**geographic**
25:14
**George**
86:8
**Geremia**
13:7 96:22 112:4
**getting**
32:22 76:23 91:24
**give**
6:21 7:11 34:7 39:17

112:21
**given**
7:6 31:25 134:13
**giving**
47:2
**go**
7:5 9:7 15:2 18:6
46:19 50:8 55:7
62:23 69:19 72:25
80:6,23 81:3,6,7,11
81:16 96:6 101:22
109:8 118:3 121:6
124:18,25 125:8
128:8 136:5 138:16
**goal**
22:13
**goes**
62:4 63:19 82:15,18
83:20
**going**
7:3 14:13 27:1 43:18
43:20,21 76:8 81:21
95:10 100:18 109:8
112:11 126:1 127:8
132:15
**gonna**
6:15 7:5,8 9:11
**good**
6:7,9 32:2 33:10 55:7
55:9 66:24 67:14
82:14 95:11 96:1
98:16 114:22
135:24
**gotcha**
120:8
**granted**
17:19 19:4,22 20:1,7
20:10,14,19 21:12
21:24 28:22 29:11
78:23
**grants**
17:13 18:11,19
**great**
136:4
**gross**
125:6 126:18

**grounds**
113:4
**group**
67:8,19

---
### H
**H**
3:1
**half**
54:23,24 55:4
**hand**
141:14
**happen**
18:16 24:1 27:5,9
**happened**
42:19
**happening**
28:24
**happens**
39:14 43:1
**haystack**
119:14
**head**
108:2,5
**headed**
9:11
**Heading**
49:22
**heads**
67:8,18
**Heaps**
88:11
**hear**
12:2 86:15 101:17
**heard**
11:22,24 35:24 37:6
85:20 88:12 123:18
123:19
**hearing**
9:3
**held**
1:8 18:4 30:19 31:7
31:24 100:21
125:21
**helpful**
15:12 45:13

**hereunto**
141:13
**high**
70:1 121:10 125:10
**higher**
71:5 80:17
**highlight**
20:22 62:15 132:13
132:16
**highlighted**
69:20
**highlights**
71:4
**Hogan**
17:24
**hold**
40:9 127:3
**honestly**
108:4
**hour**
43:18 54:19,23,24
55:4 95:11,24
**hours**
13:4
**hundreds**
107:8 108:21 109:6
116:2,7 118:4
**hypothetically**
53:5,6

---
### I
**Identification**
7:23 48:24 100:2
**identified**
121:15
**identify**
57:5
**Ilyse**
141:17
**impact**
11:7 62:17 68:15
79:17
**impairment**
50:6
**imply**
74:7



**important**
51:25 65:19,23 82:11
  87:11 100:11
**importantly**
56:7
**impossible**
47:25 64:19
**include**
52:12 53:14 55:12,15
  55:18,21 58:17
  60:14 61:1,6,14,18
  61:18 92:14 104:8
  111:7,8,20 122:4
  132:1
**included**
14:19 72:3 75:6
  82:14,17 132:9
**includes**
125:19
**including**
60:22
**incorporated**
139:10
**incorrect**
85:6
**increase**
93:13
**increased**
12:10 82:8 101:7,25
  102:19
**incremental**
69:22,24 70:9 72:12
  77:12 81:20 89:2
  92:22 93:12,21
  94:16 96:15 97:2
  99:13 101:7 105:22
  112:4 121:3,21
  122:6,11,15 126:23
**incur**
89:3 92:8 101:14
  115:7
**incurred**
75:24 77:13 91:19,22
  91:24 92:2 93:17
  98:23 99:1 105:6
  107:15 111:18

113:12,17 115:24
116:13 117:2,11,15
120:11,12,16,17
121:24 122:2
125:16 127:15
136:22
**incurring**
107:11
**Index**
5:5
**indicate**
18:13 52:6 71:11
  104:10 135:2
**indicated**
21:3 22:24 25:22
  31:21 53:15 65:16
  80:8,16 89:6,15
  94:4 102:22 104:2
  108:14 110:9
  118:13 133:8,16
**individual**
56:20 65:6 71:12
**individuals**
135:17
**information**
8:12,20,23 9:17 10:9
  10:16,19,21 11:1,4
  11:7 12:8,13 46:4
  46:13 79:16 82:15
  98:14 111:7,8,20,21
  116:17 117:14,23
  118:2,10 120:1,11
**informative**
103:25
**informs**
105:21,25
**inquiry**
118:16
**instance**
42:18
**instances**
102:25
**Institute**
37:2
**instruct**
77:4

**instructed**
47:5
**instruction**
53:25 76:25
**instructions**
4:3 47:1 77:6
**insurance**
61:23,24 62:11,12,17
  63:2,6,21,25 64:11
  64:18 65:7,13,19,23
  66:2,6,9,11 67:5,8
  67:19,22 68:3,18,21
  71:16,18 92:10,13
  92:17 93:1,8,19
  94:1,4,6,12,18,20
  122:22 131:10,15
  132:7,22 133:10,17
  134:3,11 135:15,16
  135:16
**insurers**
64:25 65:3,5,8 68:25
  69:5,7,10,12,14
**intend**
9:2
**intended**
16:19
**interest**
19:18 32:12,15 33:1
  33:4 56:10,13 58:19
  58:21 60:25 61:13
  61:17 122:12,17
  130:4
**interested**
141:11
**interrogating**
80:20
**involve**
86:8
**involved**
28:20 29:10 38:24
  47:10 60:5,8 78:11
  79:13 83:18 86:13
**involvement**
79:18
**involves**
129:14

**IRCP**
102:10,23 103:4
  105:1,7 115:4,9
**item**
73:17 74:13 75:4
  79:6 92:12,14 99:13
  102:18,21 104:6
  120:24 124:20
**items**
31:21 62:16 64:24
  102:6 122:9 125:15
  126:21 127:1
  130:24 131:19

---

**J**

**J**
2:3 62:24 63:16,18
  63:21
**James**
67:20 135:14
**Jamie**
1:10 63:7 138:17
  141:3,17
**January**
16:11
**Jones**
1:9 2:2,8,13,19 7:4
  12:21,25 13:25
  67:12,13 74:17
  77:17,19,22 78:3,4
  78:9 79:4 80:5,8,22
  81:25 82:7,21 87:14
  87:20 88:9 89:10
  96:12,19,25 102:9
  117:21,25 118:6,11
  118:15,24 119:3
  120:1,10,15
**journals**
38:3
**judge**
79:10,10
**judgment**
78:15,23 79:21
  108:20
**judgments**
18:21 29:10



**July**
9:3
**Jumping**
121:21
**June**
1:8 13:22 139:3

---
**K**

**keep**
7:7 43:20,21 60:11
60:12 66:17 95:19
**keeps**
66:20
**kept**
127:17
**key**
82:22
**keynote**
37:7
**kind**
123:3
**know**
8:9 19:24 26:7 38:23
42:11 47:20,25
48:11 51:9,12,25
55:1 59:9 60:16
64:7 66:23 73:3,21
75:6,18,20 81:1
86:18 87:6,9,10
88:17,18 89:18,21
91:22,23 98:21 99:3
99:5 100:4,24
104:23 105:6
107:22,24 108:6
112:8 114:21 115:6
123:20 124:9
132:17 133:6,12,15
133:16
**knowledge**
30:20 47:9 75:3 89:7
89:8 90:9 118:17
137:19,24
**knows**
46:25
**Kornfeld**
2:3 5:4 6:6 8:1 11:18

15:1 17:22 18:2,6,9
21:17 22:6,18 23:2
24:10 25:4 27:23
28:4 31:5,22 32:23
33:13 34:19 42:20
44:1 46:17 47:12
48:16,19 49:4,7,11
49:12 50:19 51:1,23
54:5,18,24 55:3,7
55:10 59:24 62:3
63:5,13,14 64:9
66:23 67:2 74:19
76:17,19 77:8 79:3
82:20 88:1,10 89:12
93:3,4 95:16,25
96:3,6,8 99:24
100:3,10,14,23
101:21 106:9 107:3
109:24 114:21,24
115:1,16,17 117:1,6
118:19 123:10
124:3,6 133:1
134:16 136:1,5,7
138:3,9,13,16

---
**L**

**La**
100:9,11,14
**large**
87:12 97:6
**largest**
120:24 125:15
**Larry**
85:22,25 90:25
**Law**
1:8 3:9 7:17
**Law360**
37:16
**lawsuit**
78:20
**lawsuits**
65:6 84:21
**lawyer**
82:25 101:20
**layperson's**
33:7

**lead**
49:2 91:6
**leads**
111:22
**learned**
11:13,16
**leave**
18:1,2
**legal**
31:1 32:18 33:6
59:18 76:15,15
107:9 109:6
**let's**
7:14 8:6 9:7 14:1
15:2 18:6 21:8 26:8
44:7 46:18,18 48:17
49:22 54:18,20 55:7
62:25 69:19 77:9
91:10 93:5 96:6
99:24 101:22 103:2
105:10 115:2 121:6
121:6 124:18 136:1
136:5
**letter**
16:10 62:24 116:12
**liabilities**
136:20
**liability**
131:14
**License**
141:17
**limitations**
94:23
**limits**
65:10
**line**
4:4,7,10,13 26:9
61:23 69:21 92:12
99:13 119:15
120:24 124:20
125:2 130:24
131:19 139:6 140:2
**lines**
121:2
**liquidate**
16:19 17:13,20 18:11

18:15,18,22,25
19:21 21:25 25:7
26:19 27:14,17,24
28:17 29:14
**liquidated**
25:10,10 26:5,12,14
26:23 28:6,14 29:5
33:12
**liquidates**
29:12
**liquidating**
22:9
**liquidation**
14:4 16:1,2,3 19:16
20:21 21:1,2,19,20
21:23 22:7,8,15
23:3,6,14 25:1,5,19
27:11 29:16,22 30:5
30:11,13,20 31:8
32:2,8,14,24 33:14
33:17 34:1,9,21
35:3,18 36:8 37:9
37:22 38:16,25
39:13,20 40:10,20
40:24 41:8,12,16,19
41:24 43:7,22 44:6
44:9 52:1,10,14,17
52:22 53:8,12,20
54:3,6,10,11 55:11
55:22 56:17,24 57:8
58:7 59:23 60:24
61:5,10,12,16 62:2
62:7 125:6 126:18
130:17 137:8,19,22
137:25
**list**
71:21
**listed**
12:19 50:13 139:6,15
**listen**
34:5 120:5
**listing**
139:6
**litigate**
70:10 85:12 92:7
119:7



litigation
41:11 65:6 69:22,24
75:23 76:7 79:12
80:24 81:12 82:8
83:6,16,19,22 84:1
84:5,14,20 85:1
88:11,12,22 90:23
91:21 93:21 101:7
101:25 102:19
112:11,17,20,25
113:2,4,10,10
114:15 116:14,14
118:17 121:3,22
126:23
little
116:16
Livenote
1:12
long
13:2 21:6 49:17
79:25 80:6,24 81:11
81:17 114:3
longer
22:4 23:8 54:25
look
9:10 26:8 72:25 73:2
86:24 87:2,11 88:21
88:25 89:14 90:7
98:11 99:11 104:20
113:11 114:5
116:11,21 118:20
119:2,16,21 132:20
looked
41:2 113:19,23 114:3
117:4,10 128:18
looking
44:21 53:2 61:21
74:7 119:13 128:11
looks
52:18
Los
2:10
loss
133:23
lot
36:14 79:9 82:15

83:18
low
70:1 121:9 125:9,10
lower
15:14 71:5
LTL
123:18,19 124:13,17
lunch
54:25 95:11,19,20
96:5 97:7

___

## M

M
13:8,14 47:13 51:16
51:18 52:10,18,22
53:20 54:6 67:8
137:21
M-o-o-r-e
6:10
MAGNA
1:7
maintained
3:9
major
107:23
making
15:16 66:24,25
management
16:22 17:9,12,17
18:24 19:11,16,21
36:4 59:16,21 60:11
60:11,12
marked
3:8 4:12 7:15,22 8:8
8:25 9:5,19 15:4
29:1,3 48:23 49:2,5
50:2,15 54:7 58:8
100:1 101:24
102:17 106:19
108:18 109:15
110:1,7 116:10
117:16 118:9 120:7
marketed
68:13 132:10
Marsal
12:22 16:9,12

mass
44:18 83:6,12,23
materials
36:21 74:8,12,13
75:5 101:3
math
107:22
matter
10:1 49:1 122:25
matters
85:8,9,13
McDermott
67:20,21,23 68:2,7,9
68:16 135:14
mean
23:8 27:9 28:10
44:12,23 67:12
71:19 95:13
means
22:8 44:16
meant
27:11 93:1
mediation
11:14,17 12:2
medium
70:1
meeting
12:21,25 13:2,3,9,15
13:16 19:6 29:7,18
meetings
13:15 20:13
meets
33:1
member
17:17 19:10,15 36:3
37:4,8
members
17:8,11
memory
124:5
mention
88:3,5,8 116:15
132:16
mentioned
27:3 29:19 34:2
87:17 90:4,10,24

91:2 102:12,13,14
103:17,19,21
105:11 109:3
122:21
met
12:21 13:13 107:25
methodology
15:23 30:3,8,11,13
31:24 38:22 40:10
41:13,20,23 42:6,13
42:22 43:15 52:2
75:21
MICHAEL
2:4
Michigan
85:18,23 86:1 87:3
90:25 91:12 92:3
Michigan-Anderson
86:12
mid
12:1 121:10 125:10
mid-April
28:19
midstream
81:13
Mike
17:24
million
11:1,11,19,23 12:7
12:11 68:12 69:25
70:7,11 71:15,17,24
71:25 86:2,21 87:7
91:3,6,14 93:14,16
94:16 96:14 99:12
101:9 102:2,20
103:8 104:7,12
105:23 106:13,25
107:7,15 110:10,19
110:22 111:11
117:18 120:21
121:4,10,10,11
125:1,8 126:19
127:7,21,25 128:8
129:14,17 131:21
131:23 136:13
137:10



MAGNA
LEGAL SERVICES

mind
7:7 67:3
mine
73:8 75:17
minute
17:23
minutes
54:19,20 95:23
135:24
mischaracterizing
114:17
mission
25:11,13
Missouri
39:8
Misters
112:3
MITCHELL
2:4
modification
10:9
modified
10:12
moment
49:10 93:5 121:22
monetization
23:7 133:23 134:20
Monica
2:10
monitor
28:23
month
107:10 109:7
monthly
121:17
months
19:9 121:14 136:17
Moore
1:7 3:3 5:2 6:2,10,11
43:17 49:13 55:8
63:9 74:15 96:1,9
100:6 139:4,11
141:6
Moore's
50:17
morning

6:7,9
Moskowitz
1:10 141:3,17
motion
10:24 17:14,19 18:12
18:19 19:3,22 20:1
20:7,10,14,19 21:12
21:24 28:22 112:23
123:8,13,21 124:7
124:10
motions
108:20 123:16
move
43:17 79:10 105:10
Moving
125:7
multiple
29:10 53:19 61:9
78:19 83:10 85:21
multiplied
70:9 120:21

N
N
2:1
name
6:8,9 7:4 14:14 17:23
139:3,18
named
78:20
Nassar
85:18,22 90:25
Nassar's
85:25
necessarily
21:1 22:2 23:8 27:9
32:6 62:7
necessary
136:20
need
54:25 77:5 109:18
136:16 137:7,15
needle
119:14
neither
141:9

never
53:21 85:3 123:3,12
new
1:1,4,9,9 2:5,5,15,15
11:1
night
10:24 11:9
non-debtor
131:16
Noranda
39:3 40:4,16,25
41:22 61:8
Noranda's
39:15
normal
79:11
Notary
139:13,21 141:4
note
50:16 57:2 63:1,16
63:18,21 126:24
133:19 134:17
notes
141:8
Notice
5:7
noting
138:6
November
40:19
number
3:2 12:19 14:19 15:2
15:7,13,18 34:16
45:9 49:18 52:3
56:6 57:10,13 70:7
70:8,23,25 71:1,4,6
72:8,11,20,23 73:5
73:7,10 74:8,13
75:4,22 76:5 77:20
77:23 78:10 80:16
80:23 81:2,4 87:12
99:18 100:12 101:3
102:8,14 108:14
111:18 116:22
117:24 118:14,18
119:19,23 120:4,19

120:20 122:5,5,8
134:8
numbers
44:21 90:20 91:4,7
109:22 128:24
139:6
numerous
35:12 37:1 124:13

O
Oakland
85:16 98:6,8,12,18
99:2
oath
89:22 96:10 108:4
object
32:17 48:8 64:6
66:17 109:16
114:16
objection
10:23 11:21 21:14
22:1,10,22 24:7
27:19 28:1 30:25
31:13 33:5 34:15
42:14 46:11,25
50:16 51:20 53:23
59:17 66:21 67:1
74:15 76:24 82:12
87:22 88:7 89:4
92:24 101:17
114:22 115:13
116:23 118:12
123:5
objections
66:25 112:14,16,19
113:7,9,21
objects
113:3
obligations
136:24
observed
79:12
obtain
116:17
obtained
18:21 89:7



**obviously**
31:15
**occur**
23:4,15 78:14,18,24
79:16 133:11 134:9
**occurrence**
31:19
**occurs**
24:16,19 25:1
**October**
16:14 40:19 112:9
**offered**
9:25 10:3
**offering**
10:2
**offhand**
36:16 60:17
**office**
14:20
**officer**
17:6
**official**
2:6,11 139:18
**oftentimes**
44:19 45:4
**Oh**
100:10 120:5
**okay**
7:12 9:9,14 26:18
34:4 49:11 54:21
55:2 63:8 81:24
82:5 96:3 100:19
103:23 108:8
119:15 126:15
127:23
**old**
131:12
**once**
77:22 115:9
**ongoing**
134:10
**opened**
77:2
**operate**
19:25 20:3,6,11,15
20:20 21:13 22:5,21

23:1,9,21,23 24:6
24:16,19 25:9,21,24
26:1 43:3 136:16
**operating**
17:5 24:13 30:23
31:11 33:21 34:12
34:24 35:7,21 36:12
37:12,25 38:20
40:14 42:2 43:9
121:17,18 137:5
**operation**
25:16 137:6
**operational**
121:9 127:1 137:11
137:15
**operations**
129:15,18
**opine**
83:22
**opinion**
9:17 10:2 14:19 15:2
15:7,13,18 18:15
20:2,3 25:23 28:15
28:16 40:6 52:3
68:20 98:9 101:7
106:1 113:5 133:4
**opinions**
8:18,24 9:2,4,18,25
10:3,11,16,19 11:7
12:13 48:10 113:14
**opportunities**
35:17
**opportunity**
34:7
**opposed**
81:12 95:3 128:4
**opposition**
11:20
**order**
3:8 25:5 87:13
114:10 129:4 137:8
**organizations**
131:16,17
**outcome**
15:17 33:9 134:18,19
134:24 141:11

**outside**
18:21 19:25 20:3,6
20:11,15,18,24 21:4
21:11 29:25 30:16
30:23 31:10 33:20
34:11,23 35:6,20
37:11,25 38:19
40:13 42:1 44:4
119:7 135:16
**outstanding**
125:18
**over-**
89:8
**overall**
91:8
**owed**
119:10
**owned**
132:8

P

**P**
2:1,1,14
**P-S-I-P**
14:23
**p.m**
138:19
**Pachulski**
2:2,8,19
**page**
3:2 4:1,4,7,10,13 5:4
5:5,6,6,7,8 8:6 9:7
15:3 18:13 23:11
26:9 49:22 50:1,8
50:14 58:8,12 60:15
60:19 61:21 62:22
62:24 63:19 69:19
73:6,7,10,17 77:10
77:10 105:16
116:12 120:25
121:7 124:18
127:19 128:1,21
129:20,25 130:24
131:20,25 132:3,4
133:20 134:18
136:8,19 139:6

140:2
**pages**
132:2
**paid**
103:11 124:22 127:8
127:11
**panel**
37:7 38:12
**paragraph**
8:7,11,17 9:11,13,15
10:7 23:12 50:1
102:24 103:1,2,14
103:18,19,21,25
104:16 105:16,19
105:20 106:2,3,4,10
106:18 107:6
108:17,17 109:4,9
109:10,11 114:12
114:20 115:3,11,18
115:22 116:1,9
**paragraphs**
103:23 114:9,9,9,12
116:15
**Paralegal**
2:19
**parish**
11:10,22 12:5
**parishes**
10:25
**part**
18:23 20:5 26:21
28:9 32:11,15 39:1
55:22 56:24 57:7
70:3 72:18 73:14
75:25 82:22 83:12
85:11 92:17 94:17
98:19 102:9 124:19
124:23 125:17
127:8,11 129:13,19
131:9 139:8
**participants**
38:10
**particular**
22:16 46:1 70:23
74:12 103:1
**parties**



9:25 41:5 43:13
49:23 78:19 79:18
90:22
**parties'**
11:14
**partner**
67:7
**parts**
128:6
**party**
41:1 78:12 124:23
133:24 141:10
**path**
133:22
**pay**
71:22,23 94:6 104:5
104:7 134:6 136:20
**payable**
125:20
**paying**
65:5
**payment**
78:25 79:23
**payments**
134:8
**people**
42:17
**per-claim**
110:1,7,12,16 111:1
111:10,14,22,24
112:6 113:11
114:14
**percent**
47:24 48:6 51:4,6
121:20 125:5 129:7
129:8
**percentage**
51:10 52:23 53:1,3,5
53:6 54:14 55:19
57:17,20 58:4
121:16,19
**percentages**
130:12
**performed**
70:25
**period**

23:5,16,21,24 24:2,4
24:13 25:2 121:14
137:16
**person**
42:12 135:15
**personally**
139:13
**personnel**
16:18
**perspective**
90:20
**PETITION**
37:16
**place**
13:20 28:11 72:22
76:16 141:6
**placing**
131:13
**plaintiff**
78:25
**plan**
14:7,18,24 15:15,16
32:9,22 33:1,9
49:23 50:4,7 56:3
62:1,6,19 64:13,25
65:15 66:15 68:5,23
71:14,20 72:3,19
92:16 94:10 126:21
127:9,17 128:7,9,12
128:16,25,25 129:1
129:10,13,22 130:2
130:5,6,9,15 132:11
132:18 133:22
134:15 135:12
136:12
**play**
61:11 78:21
**pleadings**
75:7,16
**please**
6:8 9:8 11:17 18:7
23:11 31:4 34:5
47:7 48:20 63:12
67:1 78:7 96:7
99:25 110:4 121:13
135:25

**Plus**
29:9
**point**
12:7 22:17 24:23
27:12 31:14 32:5
33:24 48:1 55:25
78:24 80:13 104:16
104:20 107:3
109:11 110:22
112:1 117:5 131:11
135:24 136:22
**pointed**
102:6 110:10
**points**
9:13 104:13 109:2,22
**policies**
65:10 94:20,22,24
95:1
**portfolio**
133:24
**portion**
125:15
**position**
26:16 27:5,22 133:15
**possibility**
29:18
**possible**
29:13 93:25 94:5,8
94:19
**possibly**
50:24
**post**
37:21
**post-petition**
125:20
**potential**
16:4 78:15 92:13
**potentially**
37:11 52:8 58:1
79:23 82:18
**pre-petition**
73:9,11 76:6,8 98:7
119:9,17
**precise**
75:1 110:25
**precision**

75:2
**preparation**
12:24 15:25 52:1
60:19
**prepare**
12:16 23:25 34:21
40:21 137:18,21,25
**prepared**
7:21 38:25 40:21,25
59:7,7,9 60:25 61:5
61:12,17 136:19
**prepares**
52:10,18
**preparing**
43:22 122:16
**present**
2:18 13:6,8,25 67:15
128:25
**presented**
8:12
**president**
36:2
**presumably**
90:22 134:14
**pretrial**
108:20
**pretty**
37:18 79:25 111:16
**previously**
27:2,3 92:12
**primarily**
131:11
**primary**
102:21 122:11
**principle**
104:2
**prior**
34:20 71:15,17 85:3
91:24 98:18,24 99:1
132:2
**probably**
6:17 119:13
**problem**
100:19
**Procedure**
139:5



**proceed**
116:4
**proceeds**
16:5 22:3,14,16,19
24:22 25:6 27:12
32:3 33:24 52:15,19
56:21 61:23,25
62:11,12 63:2,6,21
64:11 65:5,13,19,23
66:2,11 67:22 68:3
68:21 92:13 93:8,19
94:1,6,8,12 121:15
121:16 124:23
125:6 126:19
132:12
**process**
80:1,7,24 81:3,6,8,12
81:17 83:19 84:8,10
84:11,12,13,20,20
105:1,2 113:10
118:17
**produced**
9:17
**product**
46:14 47:3
**production**
4:6 107:9 109:7
**professional**
125:20
**program**
102:10,23 105:8
115:10 131:6
**project**
122:3
**projected**
43:24 44:10 51:24
61:1 116:14 117:2
117:12,15 118:3
120:12,15 130:1
131:1,22,23
**projecting**
61:25
**projections**
14:7,18 24:12 114:2
125:11
**pronounce**

7:3
**proofs**
44:25 46:3
**property**
131:13
**proposal**
129:1
**proposed**
32:10 33:9 71:21
**proposing**
129:9
**prospect**
133:20
**protected**
14:24 131:5
**protracted**
79:25 80:7,24 81:11
81:17
**provide**
9:3 39:20 40:24
53:11 74:11,16,20
75:3 97:2 113:14
120:11,15
**provided**
7:21 50:7 72:20,23
73:5,23 74:3,10,17
75:22 77:19 96:19
97:1 117:16 118:14
120:1 134:2
**provides**
8:18
**providing**
96:13 136:12
**provision**
129:2
**proxy**
20:23 29:23 30:6,14
30:21 31:8 32:3
33:18 34:10,21 35:4
35:18 36:9 37:9,23
38:17 39:13 40:11
41:24
**PSIP**
14:20 130:23 131:4
131:18,22
**PSIP's**

131:1
**public**
85:15 97:25 139:13
139:21 141:4
**publications**
36:23
**publish**
7:14 48:19 99:24
**published**
11:2 28:18 68:1
**pull**
107:2 116:18
**purpose**
27:11 52:7 55:23
114:6
**purposes**
33:15 60:25 61:13,17
64:1 65:12 70:24
71:7 114:14
**pursue**
29:24 30:16,22 31:10
33:20 34:11,23
35:20 36:11 37:11
37:24 38:19 42:1
43:9
**pursued**
35:6 40:13
**pursuing**
78:12 133:9
**put**
45:4 65:9 71:13
82:11 126:10
**Putting**
47:16 67:10

**Q**

**Qualifications**
8:8
**qualified**
83:5,22,25
**qualify**
39:25
**quantify**
64:19
**quarter**
95:23

**question**
7:9 8:22 21:7,7,9
27:15,16 28:12
30:12 31:4 34:6,6,8
43:6 44:8 46:21
58:3 62:9 63:11,11
63:24 67:3 68:8
71:9 73:19 74:1
75:1 76:19 78:6
81:5 84:23 86:3
89:13 91:25 93:2
94:5 97:23 98:25
105:3,20 107:12,14
110:3 114:11
119:21 120:7,10
126:1,4,8 133:9
134:5
**questions**
4:12 7:11 9:12 27:1
76:3 77:23 78:8
79:2 80:4 111:2
126:10 138:4,8
**quickly**
79:10 108:1
**quoted**
66:19

**R**

**R**
2:1 141:1
**range**
131:23 137:10
**ranges**
121:20
**rare**
31:19
**reach**
123:1 133:2
**reached**
66:10 90:2
**read**
5:7 15:8 20:9 23:10
35:10 37:15 38:3,6
48:2 106:14 108:23
125:2 138:7 139:5,5
139:14

**reader**
73:19,24
**reading**
15:11 73:22,25
**reads**
50:3 106:10 111:9
**realistic**
19:13
**realize**
25:5 33:11 68:11
  121:15
**realized**
64:12 65:15 66:14
  68:5,22
**realizes**
22:3
**realizing**
25:15 124:23
**really**
80:19 133:9
**reason**
6:21 8:3 18:17 29:4
  49:19 51:5 75:8
  119:24
**reason(s)**
139:7
**reasonable**
20:23 29:23 30:14,21
  31:8 35:4,18 36:9
  37:9,22 38:17 39:13
  40:11 41:24 118:25
  119:4
**reasonableness**
76:4,11 77:24 91:9
  102:8 104:14,21
  118:16
**recall**
12:5 14:4,8,10 19:1
  36:16,17,19,22,25
  37:14 38:2,5,8,11
  38:15 40:8,15 41:3
  41:5,9,10,14,17,21
  48:13 56:11 61:20
  69:7,15,16 75:14
  78:9 79:2 86:17
  88:14 90:25 96:17

97:8 113:25 117:3
  117:10 136:11
**receive**
12:12 78:25 79:23
**received**
3:8 8:21,23 10:15,18
  10:22 11:3 12:9,11
  53:25 79:20 102:8
**receiving**
78:9
**recess**
96:5
**recognizing**
31:20
**recollection**
48:18 86:22
**record**
6:8 15:6,9 18:1,3,5
  23:11 69:23 76:20
  95:15,17 96:7
  100:22 101:23
  114:19 131:3 136:6
  138:6,17 139:8
**recover**
33:11 47:23 48:6
  53:3 54:14 56:20,25
  130:1
**recoveries**
56:14 65:7 68:19
  128:5
**recovery**
15:14 50:5 51:2,6,10
  51:13 52:23 53:1,15
  54:14 55:16,19
  56:15,18,23 57:7,16
  57:17,21,25 58:4
  65:20,24 71:12 72:6
  72:6 127:23 130:8
  130:11,19
**Reed**
67:13
**refer**
58:10 87:23 105:19
**reference**
46:15 87:20 102:17
  103:24 105:10

107:8 109:21
  111:17,18 132:4
  139:2
**referenced**
90:2 106:2,18 108:13
  108:15 109:8
  110:10 117:8
  139:13
**references**
10:25
**referred**
13:16 88:2 101:2
  102:21 122:12
**referring**
25:4 42:8 43:4 44:3
  85:23,24 99:18
  106:1,3 109:1,3
  112:13 117:18
  121:4 130:11
  134:19,22
**reflected**
129:19,23
**reflects**
115:15
**refresh**
48:17 86:21
**refreshing**
124:5
**regard**
43:12
**regarding**
9:12 39:12 63:1
  66:10 67:22 83:6,16
  83:22 84:1,4 120:11
**registered**
70:15
**registers**
45:24
**relate**
83:13
**related**
14:6,17 19:3 45:5
  63:6,22 83:11 94:3
  112:18 134:3
  141:10
**relates**

73:12 79:5 84:14
  92:13 102:9 113:9
  128:18 136:23
**relating**
63:2,4
**relay**
76:17
**relevancy**
119:12
**relevant**
10:9,15 56:8 87:16
  119:6,8 122:5,5,8
**relied**
12:20 114:13
**remain**
60:5
**remains**
47:6 60:8
**remote**
7:8
**remove**
123:23 124:2
**removed**
57:3
**rendering**
98:9
**Reorg**
37:16
**reorganization**
15:16,16 32:10 33:10
  56:3 64:13 68:6,23
  72:19 75:25 92:16
**rephrase**
44:8 93:3,6
**report**
3:3 7:14,20,25 8:6,8
  8:12,13,14,18,21,25
  9:4,7,19 10:8,13,17
  10:20 11:2,8 12:5
  12:14,18 15:3,11
  18:14 20:22,25
  22:12 23:11 24:5,14
  25:20 26:8,22 28:5
  28:13,19,25 29:2
  39:9 43:23 50:18
  52:6 54:7 58:8,13



60:20 61:22 62:20
68:1 69:20 70:16
72:22 73:4,6,10,17
73:20,21,22 74:2,10
82:5,11,14 87:20
88:4,5,9 99:15,17
101:4 102:18 112:7
113:14 114:4,14
117:9 118:9 120:18
120:25 121:6
128:21 130:25
133:20 136:9
**reporter**
1:11,12 5:8 14:21
17:25 18:8 63:4,8
95:14 101:16 106:7
123:24 132:24
133:25 135:23
138:11,15 141:4
**reports**
83:10,13
**represent**
49:16
**request**
4:1,6 5:6 139:7,9
**requested**
14:22 54:4 106:8
123:25 132:25
134:1
**required**
25:17 32:15 137:2
**requirements**
32:22
**reread**
12:18
**Reservation**
9:11 10:7
**reserve**
9:16,23
**reserving**
9:24
**reset**
80:11
**resolved**
134:14
**respect**

104:1 115:6 129:25
**respecting**
47:7
**respond**
9:24
**responded**
26:2 38:14
**response**
10:3 32:1 84:18
**rest**
37:19
**restate**
31:3 63:11 110:3
**restructuring**
31:18 35:14
**result**
15:14 29:11 141:11
**results**
58:22,23 59:4 102:10
102:22
**retain**
128:4,14 136:13
**retained**
83:2 129:3,15,18
**reveal**
11:13 53:25
**revealing**
11:15
**review**
45:21 46:1 85:17
86:3,6,11 109:19
139:1
**reviewed**
12:18 45:24 46:2
124:16
**revived**
79:7 80:13
**reviving**
78:12
**revolved**
14:2
**revolves**
133:10
**right**
6:20 9:16,23,24
58:24 59:13 63:3,16

63:19 70:12 78:1
95:7 96:10 97:25
99:20 105:17
107:20,21 108:10
109:11 114:22
115:4,8,16 123:4
125:2 128:22 129:1
137:17
**Rights**
9:11 10:7
**rigor**
113:9
**risk**
64:17,23
**Rockville**
1:4 2:17 98:1
**role**
51:16,18 59:15
**Roman**
1:3 2:16 85:15 98:5
139:3
**room**
6:25
**Rosenblum**
96:21 112:3
**rough**
136:3 138:12,13
**roughly**
127:21
**row**
127:20
**rows**
126:25 127:5
**rules**
7:6 139:4
**runoff**
131:12

———————————
**S**
———————————
**S**
2:1 3:1
**sale**
132:10,12
**Santa**
2:10
**satisfy**

56:22
**satisfying**
64:1
**Saturday**
13:22 14:1,2,9
**saying**
30:10 53:4
**says**
8:11 51:4 106:5
**scenario**
18:20,25 19:4,12,17
19:17 29:14,17 56:2
56:3 57:21,22 60:22
62:13,19 64:18 65:4
66:2,3 69:5,10 93:9
93:9,12,17,20,22,22
94:2,2,9,11,17,18
95:3,4 102:1 122:25
125:9,24 126:2
127:24 128:10,12
128:16,17 129:19
130:7,7 132:11,11
134:4,8,25 135:1,10
135:12 136:15
137:4
**scenarios**
58:1 68:13 70:1,2
79:6,8 92:19,21,23
122:24 127:3,17,25
**scope**
47:1,3 48:9 50:17
**screen**
49:1 100:5
**seal**
139:18
**second**
8:17 9:22 26:9 69:21
100:20
**secondly**
31:17 76:5
**secret**
87:19,24 88:3
**section**
32:16 69:20 116:11
126:5,9,13,16
127:18



**secured**
53:5 57:2,3
**see**
18:20 21:8 48:17
50:10 55:3 73:1
113:20
**seen**
17:16 33:14,17 34:9
36:20,23 37:21
38:21 41:23 42:5
47:17 59:6,21 60:24
61:16 123:12
**self-insurance**
14:24 131:6
**sell**
132:14
**seminars**
38:9
**senior**
16:22 17:9,12,17
18:24 19:11,16,20
**sense**
104:3
**sentence**
8:11,17 9:22 10:6
23:12 26:11 27:10
108:18,25 134:17
**separate**
50:6 131:8
**separately**
104:11
**sequencing**
78:17
**set**
25:15,16 141:13
**sets**
50:3,5
**settle**
81:14 90:22 103:12
104:3
**settled**
81:13,13 86:1 105:5
**settlement**
72:18 75:24 77:14
86:18 87:7,9 88:18
89:2 91:3,13,15,20

91:24 92:3,4,8
96:16 101:13 104:8
120:17 121:24
122:2 128:9
**settlements**
90:2,21
**sex**
134:3
**sexual**
84:1,5,16,19,25 85:4
85:7 87:12 88:25
89:14,16,19,23
90:18 97:6 119:2
**Sheet**
139:6,8,15 140:1
**short**
55:6 136:2
**shorthand**
1:11 141:3,8
**show**
24:12 25:9 57:17,20
58:4 114:19 127:19
129:4,25
**showed**
97:3
**showing**
49:1 126:4
**shown**
125:23 126:8,9,12
128:1
**shows**
58:21
**sign**
5:7 138:7
**SIGNATURE**
140:25
**signed**
75:13 139:16
**significant**
132:14
**similar**
73:14 122:9 124:14
132:17 134:25
**similarly**
14:5 94:7
**simple**

34:8 126:3
**sir**
8:22 12:3,15 13:12
21:6 27:15 28:12
34:8 42:9 46:21
54:16 58:3 66:8
67:3 70:21 71:9
73:19 74:1,6 77:9
80:21 82:11,25
84:11 85:9 86:3
89:14 91:10 92:23
93:7,25 101:9 102:5
102:12,24 103:24
104:18 105:3,24
107:12 112:15
113:5,15 114:11
119:21 120:10
130:21 136:9 138:9
**sit**
117:7
**situation**
31:20
**Smith**
67:13
**Solutions**
83:9,15
**somebody**
17:23 111:9
**somewhat**
81:25 127:13
**sorry**
29:1 49:6 63:5,7
100:12,13,14
114:10 115:13
**sort**
104:8
**sought**
78:16,18,22 118:15
123:23 124:1
**sounds**
88:16 107:21 108:9
**source**
65:20,23
**Southern**
1:1 86:7
**speak**

38:12 66:9 67:5,21
**speaker**
37:7,7
**speaking**
35:17 66:24,25
**speaks**
109:17
**special**
133:7 135:5
**specific**
16:5 24:23 25:13
27:12 31:25 32:4
33:24 52:9 55:25
68:8 69:8,15 73:1
74:4 84:23 89:13
98:23 99:1,3,5
104:19 109:22
111:7,17,18 137:4
**specifically**
14:5,10 19:3 24:9
25:6 42:7,23 48:14
73:12 84:19 85:22
89:9 98:10 101:15
102:3 110:20
116:25 122:15
128:13 132:19
**specifics**
34:2 87:15 88:17
**specify**
70:22 73:13
**spectrum**
122:22
**spent**
104:11 106:12 107:7
110:10
**spoke**
67:7 112:3
**spoken**
35:12 67:23
**stand**
125:9
**standpoint**
6:17 25:18 33:8
56:19 126:22
**stands**
14:24 131:5



**Stang**
2:2,8,19
**start**
105:15 113:7
**started**
100:16
**state**
6:7 78:13 80:17
85:23 86:1 90:25
91:12 92:3 95:5
105:12 113:10
133:10,17 134:11
139:13
**State-Larry**
85:18
**stated**
35:3,17 37:8,22 66:1
**statement**
3:4 48:3,15,21 49:18
49:20 50:2,15 70:19
71:2,8 139:16,17
**STATES**
1:1
**status**
50:6
**stay**
95:15,16 121:7
**stayed**
112:9
**Stenotype**
141:4
**step**
93:5
**Stephens**
2:14 7:2 11:12 13:7
21:14 22:1,10,22
24:7 27:19 28:1
30:25 31:13 32:17
33:5 34:15 42:14
46:11,24 48:8,25
49:9 50:16,21 51:20
53:23 54:23 55:5
59:17 64:6 66:16
74:15 76:12 78:5
82:12 87:22 88:7
89:4 92:24 95:9,22

96:22 100:8 101:18
109:16 112:4
114:16,23 115:13
116:23 118:12
123:5 136:3 138:5
**steps**
78:11 81:14,15
**STIPULATIONS**
4:9
**stop**
26:13
**Street**
1:9 2:15
**stretch**
65:22
**strike**
41:6 97:12
**structure**
128:25
**structured**
38:24 39:4 40:3,7,18
**subject**
8:19 10:8 36:8,17,21
36:24 38:13 39:18
**submit**
39:9
**submitted**
73:21 75:12,13
**subscribed**
139:12
**subsequent**
8:21
**substance**
9:16 17:18 35:3 37:8
74:6 101:12
**subtract**
136:24
**subtracted**
126:18
**successfully**
29:24 30:22 31:10
35:6,20 36:11 37:24
38:18 40:12 42:1
**sum**
9:15 17:18 35:3 37:8
74:5 101:12 114:8

115:2
**summary**
108:20
**summing**
55:11
**supplement**
9:16
**supplemental**
46:3
**supplemented**
9:18
**support**
117:9
**supportive**
133:9 134:12
**sure**
18:8 31:6 44:14
100:9,15,16 101:22
107:3 110:5 111:19
136:1
**surplus**
133:12
**survivor**
43:25 44:10,13 45:15
45:17,18 46:6,10,23
47:14,18,20 50:12
51:13,19,25 57:9,18
58:5 70:21 87:12
91:6
**survivors**
45:22 47:23 48:6
85:25 86:9,13 91:1
**suspected**
108:7
**sworn**
6:3 139:12,16

—————————————
                T
—————————————
**T**
3:1 141:1,1
**table**
5:1 50:3,9,10,13 65:3
**take**
9:10 13:20 14:1 26:8
26:16 54:18 73:2,2
95:20 109:18

118:18 135:24
**taken**
1:7 27:21 28:11 55:6
79:14 96:5 136:2
141:6
**talk**
34:7 44:7 62:25
68:16 91:10 103:2,3
103:6,14 116:16,19
118:23 126:11
**talked**
56:9 58:19 68:10
114:8 116:20
136:11,12,21
**talking**
42:25 44:5,6 77:11
96:12 100:17
105:15 119:6 130:3
**talks**
115:3,11,18,22 116:1
**TAVI**
2:9,19
**teachings**
25:12
**team**
17:9,12
**technical**
49:1
**tell**
15:6 19:11,16,21
20:6 29:16 78:4
79:4 80:5,22 89:22
89:24 102:11,15
107:20 118:8 132:5
**telling**
118:25 119:4
**ten**
95:11
**term**
45:3 95:6,7
**terminate**
60:11
**terms**
6:16 47:3 58:2
110:18 130:19
**test**



32:12,15 33:1,4
56:10,13 58:20,21
61:1,13,18 122:13
122:17 130:4
**testified**
6:3 58:20 77:21
81:24 108:16
**testify**
39:12,23 76:13,14
**testimony**
6:16,22 77:16 97:10
114:18,19 139:5,8,9
**tflanagan@pszjla...**
2:9
**thank**
45:12,12 55:5 66:5
84:22 96:2 105:9
112:2 114:23 121:5
124:5 138:5,9,17
**Thanks**
96:3
**thereabouts**
19:9
**thereof**
141:12
**thing**
7:7 25:3 99:16
**things**
76:2
**think**
15:10 17:24 27:7
28:2 68:18 73:24,25
77:1 80:10,10 82:10
85:22 87:14,17 90:4
91:5 93:1 101:18,19
108:2 111:16
119:18 133:8
134:10
**third**
124:23 133:24
**thousands**
107:8 108:22 109:6
116:2,8 118:4
**three**
19:9 126:25 127:1,5
127:25

**thrown**
19:2,7
**tie**
102:7
**time**
11:2,5,5,9,22,24
22:17 23:4,15,24
24:24 25:2 27:12
28:18,24 31:17 32:5
33:25 38:21 56:1
69:18 70:16 73:3
109:18 110:11,22
114:3 123:7 138:4
141:6
**times**
6:14,15,17,18 29:22
33:15 34:16 53:20
67:24 70:11
**titled**
63:21
**TMA**
36:7,14,18,20,23
**today**
6:23 7:1 12:17 86:16
89:22 117:7 133:16
136:3 138:13
**Todd**
13:7 96:22
**told**
16:18 17:12 18:24
46:5 77:17
**tomorrow**
136:4 138:14
**top**
50:14 72:17 75:23
89:2 91:20
**topic**
27:2 43:18 95:10,12
95:18 116:24 117:1
**tort**
44:18 83:6,12,23
**total**
6:16 89:25 91:14
93:13 97:18 99:13
101:8 102:2 105:23
110:13 121:2

122:17 125:6
**totaling**
103:7
**tracking**
114:1
**training**
84:4
**transcript**
15:11 138:7 139:5,9
139:14
**transcription**
141:7
**transfer**
133:24
**treat**
92:18,20,21 93:7,19
93:21
**treated**
122:23 127:13
132:10
**treating**
94:8
**trial**
78:15 90:3,6 108:22
116:3,4,8 118:4
**trials**
79:15,16
**true**
26:4 105:24 113:15
141:7
**trust**
71:22 72:18 75:24
77:14 89:2 92:8
96:16 101:13
120:17 121:24
122:2 128:9
**trustee**
58:18 59:13,16 60:2
60:3,4,6,7,10,15
61:2,6,14,19 69:11
**truthful**
6:22
**try**
7:3
**trying**
128:25 129:24

132:14
**Tuesday**
1:8
**turn**
8:6 49:22
**Turnaround**
36:4
**twice**
92:25
**two**
31:21 80:3 109:2
128:17 132:2
**twofold**
55:24
**Tyndall**
86:8
**type**
45:6 70:20
**types**
80:3 131:14
**typical**
44:24
**typically**
32:11 52:11,18,23
59:15,21,25

---
**U**
---

**UCLA**
88:15,22
**UCLA-Dr**
88:11
**uncertainty**
134:13 135:4
**unclear**
93:2 134:7
**underlying**
46:2
**understand**
24:20 30:9 34:4
44:15,18 46:7 53:13
66:5 72:1 76:4
77:24 78:11,16,18
78:22 83:19,19
91:17,18 96:9
105:13 107:12
128:19



understanding
45:11
understood
58:20 97:10 104:15
undertaken
79:22
UNITED
1:1
University
85:23 86:1,7,12 87:3
unpaid
125:19
unsecured
2:6,11 53:4 57:6
updates
11:5 12:11
USC
86:15,24 88:14
use
15:23 22:12,15 30:13
38:16 39:12 41:23
42:6 45:8 70:25
75:21 80:15 104:5
124:14 129:12
utilized
59:22

---
V
---

value
15:19 20:17 21:10
29:23 30:6,14,21
31:9 33:18 34:10,22
35:5,19 36:10 37:10
37:23 38:17 40:11
41:25 43:24 44:10
44:13,15,17,19,22
45:3,6,8,15,17,18
46:6,9 47:14,20,24
48:6 51:19,24 52:12
52:18 53:2 55:14,24
56:1,7 57:24 63:25
64:10,12 65:13,14
65:16 68:3,5,20,22
71:24 122:22
127:20 129:5
values

53:15
various
72:2 78:13 131:14
versus
56:14 58:22 59:5
62:6 122:13 128:12
Vesey
1:9 2:15
vicar
17:2
victims
91:13
view
25:23 26:3 28:8 70:3
112:25 113:3
viewed
19:17
visibility
31:15 76:6
vote
49:23 50:4

---
W
---

want
8:7 17:25 43:19,20
54:25 66:16 76:24
90:22 95:14,19,21
120:8 128:23
132:16
wanted
62:8 78:10
wasn't
75:19 80:20 84:18
107:22 122:8
waterfall
52:14
way
10:13 24:9 26:3,16
45:14 46:25 57:1
66:1 78:14 90:5
103:25 124:14
126:15 128:24
141:11
We'll
55:3
we're

7:8 42:25 44:5 54:19
63:16 77:11 95:9
100:18 119:6 121:7
we've
43:18 95:10 110:17
122:10 130:3
week
67:25
went
13:3 49:10 90:3
91:25
WHEREOF
141:13
William
135:15
willingness
104:6
wind
127:1
wind-down
121:9 137:11
witness
7:24 11:13 14:23
21:16 22:2,11,24
24:8 27:21 28:2
31:3,14 32:21 33:7
34:18 42:16 47:9
48:13 50:23 51:22
54:2,22 55:2,9
59:20 63:10 64:8
66:20 77:2 78:8
82:13 87:23 88:8
89:6 96:2 101:20
109:20 117:3
118:13 123:6 124:1
134:2 138:6 139:1,4
139:13 141:6,13
witness'
48:9 114:18
word
44:1,17 92:25
worded
128:10
words
66:17,18,20 73:1,16
74:4,5 80:11 104:19

work
16:10 46:14 47:3
53:20 85:10,11
86:25 87:4 99:8
worked
16:21,24 17:2,5,8
Worker's
131:12
working
76:5 97:24 128:3
129:14 136:13,16
137:14
works
95:25 126:15
world
31:18
wouldn't
112:20 114:24
write
26:25 40:6
written
35:2
wrong
107:20
wrote
17:18 26:10,22 28:5
28:12

---
X
---

x
1:2,5 3:1 53:5
XI01658
141:17

---
Y
---

Y
53:6
y'all
95:21
Yeah
49:4
year
14:18 40:19
years
16:22 37:2
yesterday



13:1,17,23 14:6,12
74:11,16,18
**yesterday's**
14:17
**York**
1:1,4,9,9 2:5,5,15,15

---
**Z**
---

**zero**
57:3
**Ziehl**
2:2,8,19

---
**0**
---

---
**1**
---

**1**
7:15,20,22 8:25 9:5
9:20 15:2,4,7,13,18
29:3 52:3 54:8
55:22 58:9 118:10
124:19 129:20
136:8
**1,000**
86:13
**1.268**
127:11
**1.3**
125:1
**10**
6:17,18,18 54:20
128:8 129:14,17
131:23 136:13
**100**
3:5 47:24 48:6 51:4,6
129:7,8
**10017**
2:5
**10100**
2:10
**10281**
2:15
**106**
106:22,25 107:16
110:19,23 111:3,11
115:15,18,24

**10th**
9:3
**11**
15:14 18:22 19:25
20:4,7,11,15,19,25
21:5,12 29:25 30:17
30:23 31:11 32:9
33:20,21 34:12,13
34:23,24 35:8,21,22
36:12 37:12,13,25
38:1,19,20 39:15
43:2,10 44:2,3,4,24
56:14,18 57:21
58:22 59:5 62:1,6
62:18 64:13,25
65:15 66:4 68:5,23
72:18 75:25 77:14
93:9,17,20,22 94:2
95:3 113:18 122:13
123:8,12 125:17
126:2,13,21,22
127:8,12,16,24
129:19 130:9
133:22 134:15,25
**11.1**
12:7,10
**11:01**
1:10
**1129(a)(7)**
32:16
**11th**
9:4
**12**
105:16 110:1
**12,461,162**
125:10
**12.4**
127:7
**12.5**
125:8
**138**
5:7
**13th**
2:10
**14**
116:12

**140**
5:8
**15**
6:15 68:12
**160**
115:12,14
**1615**
49:18
**162**
69:25 70:7,11 93:14
93:16 94:16 96:14
99:12 101:9 102:2
102:20 105:23
120:21 121:4
**17**
8:15 10:13 12:4,9
29:1,3 112:7 120:18
**185**
71:14,15,17,24
**1st**
16:14 112:9

---
**2**
---

**2**
14:19 49:2,10 99:25
100:1,4,18,24 101:1
101:5,25 102:17
106:19 108:18
109:15 110:7
116:10,22 117:17
120:7 125:5
**2-and-a-half**
13:4
**20**
6:15 54:19 139:19
**20.3**
127:21,25 131:21
**20.347439**
128:19
**200**
71:15,15,17,25
**2016**
40:17
**2018**
16:8,10
**2019**

16:11
**2020**
16:14 74:23 102:16
107:16 109:14
112:9 115:19,23
120:12
**2023**
1:8 8:15 10:13 12:1,4
12:9 29:4 112:7
120:18 139:3
141:14
**2024**
14:18
**212.326.3939**
2:16
**212.561.7700**
2:6
**24th**
13:22
**25**
9:7 121:20
**250**
1:9 2:15
**250,000**
70:10,11 72:16,23
73:4,14,22 74:2
76:1 77:11 81:18,20
81:22 89:3 92:5
93:13 96:13 99:12
101:8,13 102:1,11
102:13 104:14,24
105:23 108:12
118:14,18,21 120:4
120:19 121:22
**250,000-per-case**
76:11 77:22,25 82:7
97:1
**250,000-per-claim**
82:22 120:20
**27**
1:8 139:3
**29**
102:16 103:1,2,14,18
103:19,21,25
104:16 107:16
109:14 114:20



115:3,19,23

___

**3**

**3**
5:5 8:6 15:3 18:13
26:9

**3.7**
106:13,25 107:7,15
110:10,19,22 111:3
111:11 117:18

**3:55**
138:19

**300**
91:1,13

**310.277.6910**
2:11

**31st**
131:22

**320**
103:6,12 104:7,24
105:4

**33**
73:7,10,17 105:16,19
106:18 114:9
115:11,18

**34,906**
107:19 108:8 111:24

**34th**
2:5

**35**
95:23 121:20

**37**
106:4,10 114:9
115:22

**38**
107:6 109:4,11

**3rd**
2:5

___

**4**

**4**
5:6 48:20,22,23 49:5
49:8,10,13,16,20
50:2,15,24 104:12

**4.5**
121:11 137:10

**40**
11:1,11,19,23 12:11

**400**
103:3

**41**
108:17,17 109:9,10
114:9 116:1,9

**48**
3:4

**49.5**
126:19

**490**
87:7

___

**5**

**5**
6:18 23:11 135:24

**5.4**
121:10

**5/29/2020**
106:22 117:8,16
120:2,6

**500**
70:25 71:1,8 72:9
86:2 91:3,14

**57**
103:8 104:7

___

**6**

**6**
5:4 62:24 63:18

**6.3**
121:10 137:10

**63.4**
126:19

**648**
70:9,11,14 72:12
80:6,9,15,17,23,23
81:7 120:21

___

**7**

**7**
3:3 33:12 49:22 50:1
56:15 57:22 58:13
58:15,18,22 59:5,12
59:16,25 60:4,5,7

**60:10,14 61:1,6,11**
61:14,19 62:22
63:19 69:5,7,10,11
69:15 122:14
130:17,20 132:3,4
133:20 134:18
137:19,21,25

**700**
86:8

**780**
2:5

**7s**
59:20

___

**8**

**8**
50:8,14,24 73:7,10
73:17 74:8,13 75:4
99:18 101:3

**852**
86:21

___

**9**

**9**
50:24 58:8,12 60:15
60:19 61:21 69:19
120:25 121:7,14
124:18 127:19
128:1,21 129:20,25
130:24 131:20,25
136:8,17,19

**9-month**
23:4,15,21 24:1,4,13
25:1 137:8,16

**90067-4003**
2:10

**990,000**
124:25

**990,707**
127:10

**994857**
139:2

