# **EXHIBIT C**

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NASSAU**

-----------------------------------------------------------------X

ARK3 DOE,

                Plaintiff,

                v.

DIOCESE OF ROCKVILLE CENTRE AKA
THE ROMAN CATHOLIC DIOCESE OF
ROCKVILLE CENTRE, NEW YORK; ST.
HUGH OF LINCOLN AKA ST. HUGH OF
LINCOLN ROMAN CATHOLIC CHURCH AKA
ST. HUGH'S AND DOES 1-5 WHO IDENTITIES
ARE UNKNOWN TO PLAINTIFF,

                Defendants.

-----------------------------------------------------------------X

**Index No. 900010/2019**

**AFFIDAVIT OF CHARLES MOORE**

MOORE

002

I, Charles Moore, state under penalty of perjury that:

1.     I am a Managing Director within the Restructuring & Turnaround division of Alvarez & Marsal North America, LLC ("A&M"), a professional services firm specializing in turnaround management and performance improvement. I serve as an advisor to The Roman Catholic Diocese of Rockville Centre, New York (the "Diocese"). I have over twenty-five years of experience in operational and financial restructuring, turnaround consulting, performance improvement, and interim management. As the lead Managing Director at A&M responsible for this engagement, I have become familiar with the Diocese's day-to-day operations, financial affairs, and books and records through review of certain financial documents, discussions with Diocese management, and discussions with the Diocese's other professionals.

2.     I submit this affidavit (the "Affidavit") in support of the Diocese's motion for a stay pending appeal from the Court's order on the Diocese's motion to dismiss. I provide here background information about the structure and finances of the Diocese, including its charitable missions, its current resources, and its obligations, especially as a result of litigation filed pursuant to New York Senate Bill S.2440, known as the Child Victims Act (the "CVA"), and, most recently, the COVID-19 pandemic.

3.     Part I of this Affidavit provides background regarding the Diocese; its mission; its charitable, educational, and religious-service affiliates; and its Parishes and their schools. Part I also summarizes the sources and the decline of the Diocese's revenues, even before the COVID-19 pandemic and the litigation against the Diocese pursuant to the CVA, and the Diocese's recent efforts to reduce its costs. Part II sets forth the Diocese's efforts, as part of its mission, relating to reconciliation and compensation of those alleging abuse, including its Independent Reconciliation and Compensation Program ("IRCP"). Through the IRCP, the

Diocese has paid out through March 2020 over $57 million to abuse survivors, satisfying every

eligibility determination that the Program Administrators have made and that the claimants have

accepted. The Diocese's IRCP has continued during this CVA litigation, and the Diocese

currently plans to have it remain open while it remains financially feasible.

4.       Part III describes the CVA litigation against the Diocese, related expenses

(especially in connection with the pre-trial proceedings), and potential liabilities. In contrast to

the IRCP, where the Diocese has been paying in full all of the awards, the Diocese's potential

exposure in the approximately 94 CVA cases pending against it – the vast majority of which seek

both compensatory and punitive damages, many in the multiple millions of dollars – far exceeds

the Diocese's assets, excluding insurance. Part III also explains that the Diocese's insurers have

not, to date, provided coverage or reimbursement of significant expenses relating to the CVA

litigation, nor, in any event, can insurers provide coverage for any punitive damages

determinations. Part IV describes the further detrimental effect on the Diocese's revenues due to

the COVID-19 pandemic, which has caused a precipitous drop in collections at the Diocese's

parishes that, in turn, has adversely impacted the Diocese's financial condition.

5.       Part V summarizes the Diocese's assets, revenues, potential liabilities, and

the current financial situation, again excluding insurance coverage for the CVA lawsuits. This

financial data shows that, absent insurance coverage (which, again, is unavailable for any

punitive damages determination), the Diocese's potential exposure in the CVA litigation brought

against it far outweighs the Diocese's assets, and that the Diocese will likely be unable to satisfy

an appreciable number of adverse judgments against it if the lawsuits were to proceed through

trial. In light of this current financial situation and the Diocese's current situation with its

insurers, it is not practicable, nor would it be consistent with the Diocese's commitment to

reconcile with and provide fair compensation to all abuse survivors—and not just those who win

the race to a judgment—for the Diocese to continue litigating through discovery and to judgment

all of the CVA cases brought against it. The financial pressure that the CVA litigation creates

and the drain on the Diocese's resources from it is particularly onerous in light of the

simultaneous decimating effect on the Diocese's finances due to the COVID-19 pandemic.

6.    Absent a stay of these proceedings pending the Diocese's appeal from the

Court's order on the motions to dismiss, the Diocese's practical reality will be that it will have to

end the IRCP and file for protection under Chapter 11 of the U.S. Bankruptcy Code.

## I.    THE DIOCESE'S ORGANIZATION, SOURCES OF REVENUE AND SUPPORT OF CHARITABLE MISSIONS

### A.    The Organization of the Diocese

7.    I understand that there are around 1.3 billion baptized Catholics

worldwide, of whom around 70 million reside in the United States. As a general matter, the

Catholic community is composed of the ordained clergy (i.e., bishops, priests, and deacons) and

the laity. The Church[1] operates through dioceses, each working within a specific geography,

under the leadership of archbishops or bishops responsible to the Holy See in the Vatican. In

turn, a diocese supports and serves, among others: (i) local churches, known as parishes, and

parish schools;[2] and (ii) other charitable, educational, and religious-service affiliates that are

critical to the ministry of the Church within that diocese and that are supported and often

administered by the diocese.

---

[1] As used in this Affidavit, the term "Church" refers to the Roman Catholic Church seated in the Vatican and headed by Pope Francis.

[2] Each parish and parish school is generally supervised by a pastor.

3

8.      The Diocese is the seat of the Roman Catholic Church on Long Island, responsible to the Holy See in the Vatican.[3] The Diocese was established by the Vatican in 1957 from territory that was formerly part of the Diocese of Brooklyn, and it was incorporated as a religious corporation in 1958. *See* 1958 N.Y. SESS. LAWS Ch. 70 (1958), § 1. Under the New York religious incorporation statute, the purpose of the Diocesan corporation is "to support, maintain, aid, advise and cooperate with any charitable, religious, benevolent, recreational, welfare or educational corporation, association, institution, committee, agency, or activity . . . within the state of New York or elsewhere . . . ." *Id.* § 4.[4] The statute provides that "[t]he bishop, vicar-general and chancellor of the [Diocese] . . . shall, by virtue of their offices, be the members and trustees of the corporation." *Id.* § 8.

9.      The Diocese is one of eight Roman Catholic dioceses in the State of New York, including the Archdiocese of New York. The Diocese of Rockville Centre's total Catholic population is approximately 1.4 million, roughly half of Long Island's total population of 3.0 million. The Diocese of Rockville Centre is the eighth largest diocese in the United States when measured by the number of baptized Catholics.

10.     There are 133 parishes in the Diocese and one campus parish (each a "Parish"). The Diocese's administrative offices are in Rockville Centre, New York. The

---

[3] The Diocese serves the entirety of Suffolk and Nassau counties, excepting Fishers Island, which is a part of the Diocese of Norwich. The area served by the Diocese is referred to herein as Long Island.

[4] Pursuant to the statute, the Diocese has the power to take and hold, by bequest, devise, gift, purchase or lease, either absolutely or in trust for any of its purposes, any property real or personal, without limitation as to amount or value; to sell, mortgage, lease or otherwise convey or transfer such property, and to invest and reinvest any principal and income and to deal with, use, apply and expend any property and the income derived therefrom in such a manner as in the judgment of its trustees will best promote its objects. 1958 N.Y. SESS. LAWS Ch. 70 (1958), § 5.

4

parishes in the Diocese are separate religious corporations, formed under Article 5 of the New York's Religious Corporations Law, N.Y. RELIG. CORP. § 90. Parishes own and operate 41 elementary schools and two high schools in the Diocese. There are also four private, Catholic elementary schools and five private, Catholic high schools operating in the Diocese. The Diocese does not own or operate any of the Parish schools or private Catholic schools.

11. The Diocese also has a number of charitable, educational and other religious-service affiliates. I understand each of these affiliates is a separate legal entity, which is generally organized as a not-for-profit charitable member corporation, that has its own board and governance. Each has a role in furthering the ministry of the Church and serving the Parishes and the communities of Long Island. The Diocese has recurring outstanding obligations to several of them in aid of their charitable mission, as detailed below.

**B.    The Diocese's Revenues And Its Expenditures on Charitable Missions**

12. The Diocese provides centralized human resources, accounting, and financial management services to Diocesan affiliates in support of their religious, educational, and charitable missions. The Diocese historically has also made significant financial contributions to several of its affiliates. However, even prior to the recent pandemic, these contributions have been eliminated or significantly curtailed in light of the Diocese's declining financial health.

13. The Diocese's recurring revenues are limited and largely dependent on donors and parishioners. They are also unpredictable and have more recently been declining due to the impacts on the Diocese from the COVID-19 pandemic (addressed in Part IV, below). The Diocese's recurring revenues are: (i) a share of the weekly offertory made by the faithful at every Parish; (ii) other bequests and donor-directed gifts; (iii) investment income; (iv) revenue for administrative services provided to Diocesan affiliates, including the parishes; and (v)

5

revenues from the Diocese's sublease to third parties of a portion of the spectrum within its educational broadcast license.[5]

      14.    The Diocese uses revenues received from the Parishes, investment income, and income from its licensing of certain spectrum, to provide ongoing, ordinary-course administrative support and services to the Parishes, their schools and the affiliated charitable, educational and service organizations.

      15.    Separate from the principal pastoral and temporal functions of the Diocese is the Catholic Ministries Appeal or "CMA," an annual campaign to support particular charitable and educational missions undertaken by entities that are sponsored by and/or affiliated with the Diocese. For the CMA and other non-offertory donations, the Diocese asks its donors to provide these designated revenues to fund areas of particular importance to the mission of the Church. These areas of particular importance include the provision of religious education for thousands of students on Long Island; affordable and safe housing for seniors, veterans and adults with mental and physical disabilities; food programs for seniors, low-income families and women and their children; youth, campus and young adult ministries; priests', deacons' and lay leaders' education and formation; faith formation, including baptismal preparation, pre-Cana and RCIA programs; hospital ministry to those who are ill and their families; prison ministry; substance abuse services and day treatment programs; and Catholic Diversity initiatives. Many of these charitable services are the only services reasonably accessible and effective in those Long Island communities, offering help and creating hope for self-reliance for Catholics and non-Catholics alike, whether resident, immigrant or temporarily present.

---

[5] The Diocese also assists Parishes and the furtherance of Catholic education by acting as an agent to collect a "non-school assessment" from Parishes that do not have schools. The money collected is used to fund schools that are not tied to a particular parish.

## C. The Diocese's Cost-Cutting Measures

16. In 2019, the Diocese undertook a strategic review, with A&M's assistance, of its operations and considered a series of cost-savings initiatives. Financial information of the Diocese presented herein excludes CMA and the Protected Self Insurance Program ("PSIP"), a captive insurance division of the Diocese that provides certain insurance coverage for the Diocese. The use of CMA funds is restricted to the purposes for which the funds are raised. To the extent that the Diocese provides services to a CMA-sponsored program, such costs are reimbursed by the CMA and represent revenue to the Diocese.

17. The Diocese has considered and implemented many cost-saving initiatives pursuant to this review of its operations, resulting in an average annual savings of $2.7 million. These initiatives include: (i) eliminating financial support to a retirement home for priests and transitioning that financial support to the Priest Health and Welfare plan; (ii) eliminating subsidies to the Department of Education; and (iii) reducing the subsidy given to Catholic Faith Network, the Diocesan affiliate that maintains a Catholic television station for televised mass and other Catholic programming.

18. CMA has also reduced the scope of several of its programs in an effort to reduce costs. These efforts have resulted in annual savings of $1.1 million and include: (i) reducing annual contributions to Catholic Charities, which implements many of the programs outlined in paragraph 15, above; (ii) eliminating all subsidies to Tomorrow's Hope Foundation, a non-profit organization that provides student scholarships and program funding; and (iii) eliminating subsidies to Catholic high schools.

19. Despite already implementing significant cost reduction measures, the Diocese's net assets are anticipated to further deteriorate in light of the impact of the COVID-19

7

pandemic and the ongoing and increasing expenses of the CVA litigation, addressed in more detail below.

## II.     THE DIOCESE'S MISSION TO EFFECT RECONCILIATION AND COMPENSATION

### A.     Past Tragedies: Zero Tolerance, Vigilant Child Protection, and Reconciliation and Healing

20.     In keeping with the Diocese's mission, including "embracing Christ's healing power and the Mission of Mercy of the Catholic Church," the Diocese has undertaken a review of its policies relating to safety of children and instituted new programs as part of its "commitment and vigilance to the protection of children in our Church and in society." *See* https://www.drvc.org/statement-hidden-disgrace-ii-report/.

21.     In 2003, while under the leadership of Bishop Murphy, the Diocese created the Office for the Protection of Children and Young People ("Office for the Protection of Children") and established standards and protocols to ensure that the most vulnerable parishioners would be safe. *See* drvc.org/efforts-to-protect-children-and-young-people/. In furtherance of this goal, the Office for the Protection of Children created a Diocesan Child Protection Policy which establishes a procedure for screening individuals to ensure that they do not pose a risk of harm to children, and protocols for reporting and investigating alleged incidents of abuse. *See* https://www.drvc.org/wp-content/uploads/2018/12/ child_protection_manual.pdf. As Bishop Barres has publicly stated, the Office for the Protection of Children has worked to "put[] the safety and well-being of children first" and it "seeks to reach out to and support victims and survivors of abuse." *See* https://d2y1pz2y630308. cloudfront.net/22803/documents/2019/8/CVA%20letter--English-2.pdf.

22.     Upon his arrival as the leader of the Diocese in February 2017, Bishop Barres took further steps to assure that the Diocese's Child Protection Policy was effective and

8

enforced. Bishop Barres reiterated the Diocesan commitment to zero tolerance for sexual misconduct and adherence to the Diocese's Child Protection Policy. That Policy outlines standards to be met by all clergy, employees, and volunteers in the Diocese, which include required background screening executed by an expert outside firm, specific and detailed Codes of Behavioral Conduct, and participation in Safe Environment educational programs. In addition to programs for adults, the Diocese provides Safe Environment programs to youth participating in Faith Formation programs in each parish or attending Diocesan schools.

23.     Bishop Barres further sought to enhance the Diocesan Review Board, which was established under the Diocese's Child Protection Policy and is responsible for investigating and assessing allegations of sexual abuse of minors and offering recommendations to the Bishop regarding the cleric's suitability for ministry. In addition to increasing membership on the Board from five to seven members, Bishop Barres established a regular schedule of Review Board meetings and provided for an independent team of expert investigators to report to the Review Board prior to each scheduled meeting.[6]

**B.      Independent Reconciliation and Compensation Program**

24.     On October 16, 2017, Bishop Barres also implemented a reconciliation, assistance and compensation program, called the Independent Reconciliation and Compensation Program (the "IRCP"). The IRCP is directed at individual reconciliation and compensation based on the independent review by and judgment of nationally recognized fund administrators in other multiple-victim situations.

---

[6] The Diocesan Policy mandates that a cleric will be removed from his assignment when there is a credible allegation of sexual misconduct against him. *See* https://www.drvc.org/wp-content/uploads/2018/12/child_protection_manual2012.pdf.

25. The Diocese chose Kenneth Feinberg and Camille Biros (the "Administrators") to provide independent review and neutral administration of the IRCP. Mr. Feinberg is known for his work as administrator of the September 11th Victim Compensation Fund and the Deepwater Horizon Oil Spill Trust, which resulted from the oil spill in the Gulf of Mexico in April 2010. He and Ms. Biros also administer similar compensation programs in the Archdiocese of New York, the Diocese of Brooklyn, and the Diocese of Pittsburgh, among others.

26. Through the IRCP, Bishop Barres delegates to the Administrators the authority to investigate and evaluate claims of abuse survivors brought under the IRCP and to offer compensation to claimants who are deemed eligible. The protocols of the IRCP define the process by which claims are to be evaluated and eligible claimants provided with compensation on a confidential basis. In general, claims as to the actual occurrence and extent of sexual abuse, if any, are deemed eligible or ineligible for compensation based on the weight and credibility of the evidence, as assessed independently by the Administrators. Eligibility and compensation decisions are made according to a number of factors, including the nature, extent and frequency of the abuse, again as determined solely by the Administrators.

27. A compensation decision cannot be contested by the Diocese if it is accepted by the abuse survivor. In contrast, an abuse claimant is not bound by an Administrators' eligibility and compensation determination unless the claimant chooses to accept the compensation awarded. Abuse survivors are also eligible to participate in the IRCP regardless of when their alleged abuse occurred. Participation in the IRCP is completely voluntary, and participation does not affect any rights of the abuse survivor unless and until he or she accepts compensation and signs a release. In addition, the Diocese has committed to all

10

participants in the IRCP that their claims and associated information will remain confidential without regard to whether a resolution is reached. The participants, however, remain free to disclose or discuss their claim and/or the compensation determination of their own claim.

28. As a condition of accepting the compensation offer determined by the Administrators, abuse survivors under the IRCP are required to sign a release. The release states that the abuse survivor waives all claims or potential claims of sexual abuse against the Diocese and any related entities. The release is not binding unless and until the abuse survivor has reviewed the compensation offer with the assistance of counsel and executed the release. Before signing releases, all abuse survivors are required to consult with an attorney selected by the abuse survivor, or, if requested by the abuse survivor, an attorney provided by the Administrators free of charge.

29. Through March 30, 2020, about 400 abuse claimants have filed claims with the IRCP and a total of about 320 of them have accepted compensation totaling just over $57 million, with about 50 claims still being processed and some offers outstanding. The Diocese has paid compensation to every claimant who has been deemed eligible by the Administrators and who has accepted the compensation offered.

30. The Diocese's IRCP remains open to abuse claimants. Indeed, eleven plaintiffs who filed CVA actions assigned to this Court have accepted compensation through the IRCP and voluntarily discontinued their lawsuits against the Diocese. The Diocese currently plans to maintain its IRCP while it remains financially feasible. The Diocese's IRCP will end, however, if the Diocese files for protection pursuant to Chapter 11 of the U.S. Bankruptcy Code.

11

## III. THE ADVERSE IMPACT OF THE CVA LITIGATION ON THE DIOCESE'S FINANCIAL CONDITION

### A. The Diocese's Mounting Expenses in the CVA Litigation

31. As this Court is aware, on February 14, 2019, New York Governor Andrew Cuomo signed the CVA into law. The CVA, by its terms, extends the statute of limitations under which certain criminal and civil actions arising out of the sexual abuse of minors may be brought. The CVA also purports to revive certain previously time-barred causes of action. Revived actions may be commenced during the twelve-month period that runs from August 14, 2019 through August 14, 2020, and Governor Cuomo recently signed an Executive Order extending the revival period for an additional five months.

32. As set forth below, so far, during this window, the Diocese has incurred and will continue to incur substantial and increasing litigation expenses, while facing potential exposure to plaintiffs in the hundreds of millions of dollars.

#### (a) Overview of CVA Cases Brought Against the Diocese

33. Starting on August 14, 2019, civil actions were commenced against the Diocese and certain of its Parishes in the Supreme Court of the State of New York alleging sexual abuse that, but for the passage of the CVA, would have been time barred (the "Revived Abuse Cases").[7] As of time of the filing of this motion, there have been a total of approximately 106 cases filed against the Diocese, with approximately 91 filed in this Court, approximately 15 filed in the New York City CVA Regional Court, and one case (originally filed in Kings County) removed to federal district court.

---

[7] There was one case commenced before August 14, 2019. Upon consent of the plaintiff, this case was stayed until August 14, 2019.

12

34.    In this Court, in September, 2019, given the high number of cases (46) then pending against the Diocese (and which have since almost doubled), the Diocese sought, pursuant to CPLR 602, an order providing for pre-trial proceedings in all of the CVA actions in which the Diocese is named as a defendant. This Court granted the Diocese's motion on November 19, 2019, issuing a Case Management Order ("CMO"), "applicable to all cases filed pursuant to CPLR 214-g where the Diocese is a named party-defendant in the Ninth and Tenth Judicial Districts." Opinion & Order at 1. The CMO states that "[i]t is in the interest of justice to encourage and bring about the fair, expedient and inexpensive resolution of these cases." The CMO provides for "coordination of motions practice," as well as discovery and pretrial conferences, among other procedures to streamline the administration of all the cases.

35.    In accordance with the CMO, the Diocese filed two separate sets of motions to dismiss pursuant to CPLR 3211(a)(5) and (a)(7); the first on November 12, 2019, in 44 cases, and the second on January 10, 2020, in 22 cases. This Court has issued its orders denying the first set of motions to dismiss as to the Due Process ground asserted by the Diocese, and from which the stay pending appeal from those orders is sought by this motion. The second set of motions to dismiss is not yet fully briefed. There also remain approximately 22 cases in this Court where the Diocese has not yet moved to dismiss because its response to the complaints is not yet due. All these cases brought against the Diocese will raise the identical issue of whether the claim revival provision of the CVA violates the Diocese's right to due process of law under the New York State Constitution.

36.    There are also currently approximately 13 cases pending before J. Silver as the CVA Regional Court for all of the boroughs in New York City. Justice Silver entered Case Management Order No. 1 on February 24, 2020. Pursuant to that CMO, on May 8, 2020

13

the Diocese moved to dismiss those 13 CVA cases on substantially the same constitutional and

other grounds as in this Court. The CMO in the New York City CVA Regional Court provides

for a stay of discovery while those motions to dismiss are pending. *See* CMO No. 1, Section

VII.10.

#### (b) Expenses Incurred By the Diocese Thus Far In the CVA Litigation And Projected Litigation Expenses

37. In the course of defending the CVA actions brought against it, the Diocese

has spent more than $3.7 million to date.

38. The Diocese expects that continuing to defend these actions and conduct

discovery in them will cost hundreds of thousands of dollars in legal fees and production costs

per month. Preparing the cases for possible summary judgment motions, and then trial, will

compound the legal fees that the Diocese would incur.

39. Pursuant to the CMO, parties in the Ninth and Tenth District cases began

exchanging requests for the information called for in the Standard Consolidated Disclosures in

January 2020. Plaintiffs' Standard Consolidated Disclosures directed to the Diocese are made up

of 24 requests for production and ten interrogatories in each case. As a result, the Diocese faces

more than 1,000 broad and voluminous requests for production and hundreds of detailed

interrogatories across these cases. Pursuant to the CMO, the Diocese began serving its responses

and objections to Plaintiffs' Standard Consolidated Disclosures directed to the Diocese in March

2020. The Diocese incurred considerable expense to investigate the information required to

respond to Plaintiffs' Standard Interrogatories and the documents available to the Diocese that

may be produced in these matters. The Diocese continues to incur these expenses as additional

Plaintiffs serve requests for Standard Consolidated Disclosures in each of the remaining cases

proceeding in the Ninth and Tenth Judicial Districts. And, in connection with its CVA cases in

14

this Court, the Diocese has already produced thousands of pages related to its insurance coverage and its financial condition.

40. Absent a stay pending the Diocese's appeal from the Court's order denying its motions to dismiss, the Diocese will be required to gather and organize hundreds of thousands of pages of documents spanning a period of almost 50 years, hire and train a contract attorney review team, and produce documents to nearly 100 different Plaintiffs in the coming weeks and months. The Diocese will also be faced with taking and defending dozens of party and non-party depositions, and to incur attendant legal and vendor fees. This discovery process is going to be particularly challenging and expensive due to the passage of time since the alleged claims arose.

41. After expending what will become additional millions of dollars to continue to defend these actions through discovery, the Diocese will also be faced with evaluating each case on the basis of the record to determine which cases are ripe for summary judgment motions and then preparing those motions. Finally, for those cases that are not disposed through summary judgment or other pre-trial motions, the Diocese will be forced to expend hundreds of thousands of dollars to defend itself at trial.

**B. Lack of Payments By Insurers For The CVA Litigation**

42. As shown above, as a consequence of the CVA's passage, claims of sexual abuse that allegedly occurred decades ago have now been asserted against the Diocese. The Diocese has acted to identify and preserve insurance policies in effect when such abuse allegedly occurred, including, at various points, first, second, and additional levels of coverage.

43. In the period leading up to the effective date of the CVA, the Diocese expended substantial effort to pull together insurance policies and secondary evidence of insurance coverage from the late 1950s to the present. Due to the passage of time and the

15

disposal of documents in the ordinary course of business, several documents regarding coverage were no longer available in the files. Accordingly, among other measures, the Diocese engaged insurance coverage counsel at Reed Smith to assist the Diocese in finding relevant insurance policies covering what are in many cases decades-old claims. Among the sources searched in connection with this effort were court dockets for litigation between the Diocese and Royal Insurance Company in the early 1990s, which is how the Diocese was able to uncover pertinent insurance policies issued by this carrier from approximately 1960 to 1976. These insurance policies obligate Royal to defend and indemnify the Diocese and its parishes and affiliated entities for liability on account of bodily injury during their respective policy periods. The Diocese has also made claims for insurance coverage under what was known as the "Bishop's Program," a series of umbrella and excess insurance policies covering the period from 1976 to 1986.

44. Reed Smith has also interacted with the Diocese's insurance companies. The Diocese, Jones Day, and Reed Smith have met with representatives of all of the relevant insurance companies. In addition, Reed Smith has corresponded with the insurance companies in an effort to ensure that the carriers meet their full obligations under their insurance policies.

45. However, as of the time of this motion, despite ongoing discussions with the Diocese, the Diocese's insurers have reserved their rights and have not paid anything toward the Diocese's litigation expenses or agreed to indemnify the Diocese for any liability determinations.

### C. Potential Liabilities If Claims Are Litigated To Judgment Successfully And Unavailability Of Insurance Coverage For Punitive Damages

46. Without the proceeds from the Diocese's insurance coverage—that, to date, have not been forthcoming—to reimburse the Diocese's litigation expenses for the CVA

16

lawsuits, the Diocese does not have the assets to satisfy adverse judgments in an appreciable number of the CVA lawsuits brought against it. And, notably, insurance would not cover any punitive damages awards against the Diocese. Currently, there are a total of approximately 94 CVA actions pending against the Diocese, alleging various claims and seeking damages against the Diocese. Approximately 79 of those cases seek punitive damages against the Diocese. In this Court, there are approximately 80 CVA lawsuits pending against the Diocese and approximately 66 of those seek punitive damages.

47. In contrast to the IRCP, these CVA cases threaten the Diocese's long-term viability, and, without insurance coverage, it does not have the resources to satisfy judgments for the plaintiff in an appreciable number of them. For example, one plaintiff whose case is pending in this Court demanded in the course of a settlement discussion over $35 million, which was allocated by plaintiff's counsel in the amounts of $10 million for the alleged abuse, $10 million in claimed lost wages, and $15 million in sought-after punitive damages. Other individual Plaintiffs have informed the Diocese in recent discovery responses that in their cases, they are seeking tens of millions in compensatory damages and hundreds of millions of dollars in punitive damages.

48. Given the approximately 94 pending cases against the Diocese, more than 80% of which include demands for punitive damages, the Diocese simply does not have the resources—as explained further in Part V—should plaintiffs prevail in an appreciable number of these lawsuits, to satisfy the ensuing judgments.

## IV. THE EFFECT OF THE PANDEMIC ON THE DIOCESE'S REVENUES

49. The COVID-19 pandemic has provided further and extraordinary pressure on the Diocese's financial condition. As the Court is aware, the COVID-19 pandemic and resulting precautions taken to mitigate its impact have led to the closing of all parishes, schools

17

and non-essential businesses for a still-indefinite period, massive loss of jobs, a downturn in the stock market, as well as uncertainty as to the region's overall economic prospects. The pandemic has had a particularly devastating impact on the Diocese.

50.     The Diocese receives a portion of its income from the Parishes' offertory collections. This share of the parish's collection, or assessment on the parish, typically represents approximately 40% of the Diocese's annual revenue. In the second half of March 2020, after masses and other church gatherings ceased to occur due to the pandemic, the parish assessment payments to the Diocese declined 77% compared to the first half of March. For the two week period from March 23 to April 3, 2020, the Diocese did not receive any deposits related to Parish assessment. During the month of April 2020, despite the month containing Holy Week and Easter Sunday, with continued fundraising efforts and the availability of televised masses, the Diocese collected from parishes only approximately $363,000, down approximately 60% from the average of the prior 10 months. Like many organizations impacted by the pandemic, the precipitous drop in revenues received has placed enormous additional financial pressures on the Diocese and its Parishes and schools.

51.     As of the date of executing this Affidavit, the Diocese is taking steps to gradually re-convene at least some masses, in compliance with governmental directives and health standards. This requires significant re-working of customary practices. The scope and timing of this re-opening effort will also vary in parishes across the Diocese on the basis of, among other things, local conditions at individual parishes and their practical ability to implement revised practices.

18

## V.  CONTINUING WITH THE CVA LITIGATION THROUGH TO TRIAL PRESSURES THE DIOCESE TO FILE FOR BANKRUPTCY

### A.  The Diocese's Potential Liabilities Due To The CVA Litigation Far Exceed Its Assets And Its Current Financial Condition Is Dire

52.  In light of the developments described above, it is not surprising that there is a significant detrimental change in the Diocese's financial condition from 2018 and 2019 fiscal years (which end in August of each year) to the present.

53.  In fiscal year 2019, ended August 31, 2019, the Diocese had approximately $27 million in revenue. As described above, the Diocese's revenue comes from several sources, including: (i) a share of the weekly offertory made by the faithful at every Parish, (ii) other bequests and donor-directed gifts, (iii) investment income, (iv) revenue for administrative services provided to Diocesan affiliates, including the parishes, and (v) revenues from the Diocese's sublease to third parties of a portion of the spectrum within its educational broadcast license, among others.

54.  The Diocese's expenses, meanwhile, have far outpaced its revenues in light of the recent pressures brought to bear on it. In fiscal year 2019, the Diocese had total expenses of approximately $29 million. The Diocese's expenses fall into the following main categories: (i) payroll and benefits, (ii) professionals and contractors, (iii) rent, facilities, and utilities, (iv) grants, (v) contributions, (vi) IRCP-related expenses, and (vii) professional fees, among others.

55.  While the Diocese had approximately $82 million in unrestricted assets at the end of fiscal year 2019, it experienced a total change in net unrestricted assets of approximately negative $10.2 million during fiscal year 2019. At this time, in fiscal year 2020, the Diocese is expected to experience a total change in net unrestricted assets of approximately negative $15.2 million. These total changes in net unrestricted assets demonstrate the extent of

19

the Diocese's financial difficulties at this time, even after undertaking significant cost reduction measures.

56.     As detailed above, the Diocese's current financial condition is further deteriorating due to the Diocese's litigation expenses incurred in defending against the CVA litigation. As noted, cash spent by the Diocese on CVA-related litigation currently exceeds $3.7 million and is projected to cost hundreds of thousands of dollars on a monthly basis if individualized discovery were to proceed in these cases pending the Diocese's appeal from the Court's order on the motions to dismiss. The Diocese's insurance carriers have thus far not provided reimbursements for these mounting expenses. The situation is further aggravated by the COVID-19 pandemic's impact on the Diocese and its parishes.

## B.     The Prospect of a Bankruptcy Filing in the Absence of a Stay

57.     In light of its financial condition, the Diocese will not be able to satisfy judgments against it in an appreciable number of the CVA lawsuits brought against it absent insurance coverage; and, even if and when the Diocese obtains insurance proceeds on their available policies, they cannot cover punitive damages. By contrast, the Diocese has provided compensation and reconciliation to hundreds of survivors of clergy sexual abuse through the IRCP and has thus far paid compensation to every victim who has been deemed eligible for the IRCP by the Administrators. It is, in these current circumstances, neither consistent with the Diocese's approach to treat all abuse claimants fairly nor practicable for the Diocese to continue to litigate these actions through pre-trial discovery and then to trial.

58.     Because the Diocese's insurance carriers have not to date reimbursed the Diocese's litigation expenses for the CVA cases—and due to the unavailability of insurance coverage for punitive damages—the Diocese will, absent a stay pending its appeal from the Court's order on the motion to dismiss, be faced with the reality of filing for protection pursuant

20

to Chapter 11 of the U.S. Bankruptcy Code. The alternative—incurring ever-increasing

expenses for discovery and to defend itself through trial in scores of lawsuits—is not practicable

for the Diocese in light of the Diocese's current financial condition, exacerbated by the COVID-

19 pandemic, the stance adopted by its insurers, the unavailability of insurance coverage for

punitive damages, and the sheer number of CVA lawsuits brought against the Diocese.

     59.    While the Diocese seeks to avoid having to file for bankruptcy protection,

it would not be the first in this State. Already two other dioceses in New York State—the

Diocese of Rochester and the Diocese of Buffalo—have filed bankruptcy petitions as a direct

result of pressures on their financial condition brought to bear by having to defend against large

numbers of CVA lawsuits. *See In re Diocese of Rochester*, No. 19-20905 (Bankr. W.D.N.Y.

Sept. 12, 2019); *In re Diocese of Buffalo*, No. 20-1009 (Bankr. W.D.N.Y. Feb. 28, 2020).

21

Dated: May 28, 2020

_____
CHARLES MOORE

5/28/2020

NATALIE LYNN CORBETT
NOTARY PUBLIC - STATE OF MICHIGAN
COUNTY OF WAYNE
My Commission Expires November 19, 2025
Acting in the County of _Wayne_

Notarized using electronic/remote technology