**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

In re:

THE ROMAN CATHOLIC DIOCESE OF
ROCKVILLE CENTRE, NEW YORK,[1]

Debtor.

Chapter 11

Case No. 20-12345 (MG)

**DECLARATION OF TIMOTHY W. BURNS IN SUPPORT OF MOTION OF THE
OFFICIAL COMMITTEE OF UNSECURED CREDITORS FOR ENTRY OF AN
ORDER PURSUANT TO BANKRUPTCY RULE 2004 AUTHORIZING
EXAMINATION OF WITNESSES AND THE PRODUCTION OF DOCUMENTS**

I, Timothy W. Burns, pursuant to 28 U.S.C. § 1746 and under penalty of perjury, declare:

1.      I am a partner with the law firm Burns Bair LLP, special insurance counsel for the Official Committee of Unsecured Creditors ("the Committee")  appointed in the chapter 11 case of The Roman Catholic Diocese of Rockville Centre, New York (the "Diocese").

2.      I submit this Declaration in support of the *Motion of the Official Committee of Unsecured Creditors for Entry of an Order Pursuant to Bankruptcy Rule 2004 Authorizing Examination of Witnesses and the Production of Documents* (the "Motion").

3.      Except as otherwise stated in this Declaration, all facts set forth herein are based on my personal experience and knowledge or information obtained from my review of relevant documents or the review of professionals under my direct supervision.

4.      Attached as **Exhibit 1** is a true and correct copy of the Decision and Final Order issued on February 20, 2007, by Matthew Denn, the Insurance Commissioner for the State of Delaware, in *In the Matter of The Proposed Acquisition of Royal Indemnity Company, a Delaware*

---

[1] The Debtor in this chapter 11 case is The Roman Catholic Diocese of Rockville Centre, New York, the last four digits of its federal tax identification number are 7437, and its mailing address is P.O. Box 9023, Rockville Centre, NY 11571-9023.

*domiciled property/casualty insurance company, Security Insurance Company of Hartford, a Delaware domiciled property/casualty insurance company, Guaranty National Insurance Company, a Delaware domiciled property/casualty insurance company, and Royal Surplus Lines Insurance Company, a Delaware domiciled property/casualty insurance company by Arrowpoint Capital Corp., a Delaware Corporation, and Arrowpoint Capital, LLC, a Delaware limited liability company, John Tighe, Sean Beatty and Dennis W. Cahill*, Dkt. No. 313 (Del. Ins. Dep't).

5.      Attached as **Exhibit 2** is a true and correct copy of the Order of Supervision by Consent issued on February 25, 2022, by Trinidad Navarro, the Insurance Commissioner for the State of Delaware, in *In the Matter of Arrowood Indemnity Company, a Delaware Domestic Insurance Company*, Dkt. No. 4633-2022 (Del. Ins. Dep't).

6.      Attached as **Exhibit 3** is a true and correct copy of an email exchange between Burns Bair LLP, special insurance counsel for the Committee, and Reed Smith LLP, special insurance counsel for the Diocese, dated May 12, 2023.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on   August 15, 2023, in Madison, Wisconsin.


By:     */s/ Timothy W. Burns*
        Timothy W. Burns

# EXHIBIT 1

# THE INSURANCE DEPARTMENT OF THE STATE OF DELAWARE

IN THE MATTER OF: )
)
**The Proposed Acquisition of Royal Indemnity** )
**Company, a Delaware domiciled** )
**property/casualty insurance company, Security** )
**Insurance Company of Hartford, a Delaware** )     Docket No. 313
**domiciled property/casualty insurance company,** )
**Guaranty National Insurance Company, a** )
**Delaware domiciled property/casualty insurance** )
**Company, and Royal Surplus Lines Insurance** )
**Company, a Delaware-domiciled** )
**property/casualty insurance company by** )
**Arrowpoint Capital Corp., a Delaware** )
**Corporation, and Arrowpoint Capital, LLC, a** )
**Delaware limited liability company, John Tighe,** )
**Sean Beatty and Dennis W. Cahill** )

## DECISION AND FINAL ORDER

Today I enter a Decision and Final Order in connection with the above-captioned Application. I have not approved the Application as it was submitted, because I believe that approval as submitted would be prejudicial to the insurance-buying public, claimants and policyholders. Instead, I have imposed a number of conditions upon my approval of the Application, satisfaction of which will resolve the defects in the Application. Upon satisfaction of those conditions, the proposed transaction is approved.[1] With those

---

[1] There has been some suggestion made, based upon dicta in *In re BCBSD, Inc.*, C.A. No. 04A-07-004 (Del. Super., Oct. 4, 2004) (Slights, J.), that I must either approve the pending Application precisely as submitted or reject it, *i.e.,* that I am barred from imposing any conditions upon approval other than those that were included in the Applicants' Form A submission. It has long been the law in Delaware, though, that if an administrative agency has a right to license, it generally has the additional right to attach conditions to that license. *Carroll v. Tarburton*, 209 A.2d 86, 90 (Del. Super. 1965). *See also Application of Wonstelholme*, C.A. No. No. 92M-04-006, (Del. Super., Aug. 20, 1992) (Bifferato, J.) (If there is express or implied authority to revoke a license then, in respect of that authority, an agency may impose reasonable conditions on the license). *Cf. Medical Malpractice Joint Underwriting Assoc. v. Marques*, C.A. No. PC/05-5253 (R.I. Super., Nov. 3, 2006) (upholding right of Insurance Commissioner to impose conditions on effective date of rate filing). In the context of this case, Title 18, Chapter 50 gives me express responsibility for protecting the rights of policyholders and the insurance buying public, and gives me the authority to approve or disapprove a transaction based solely upon its impact upon the insurance buying public. In a circumstance such as this one, where policyholders and the insurance buying public are best protected by neither approval nor disapproval of the Application as submitted, this legal responsibility must imply that I have the authority to impose conditions upon approval designed to protect policyholders and the insurance buying public. *See* 18 *Del.C.* § 310(b). To read the law otherwise would require that I affirmatively act in a manner that I know to be contrary to the best interests of policyholders.

conditions, consummation of the transaction will be in the best interests of policyholders—including those smaller policyholders who were not represented by counsel in these proceedings, but who deserve the same protection from my office as the large, commercial entities represented by lawyers.

I adopt Professor Hamermesh's summary of the evidence and proposed findings of fact in their entirety. I also adopt, except where specifically noted herein, his conclusions of law and recommended decision, attached hereto as Exhibit A. I want to thank Professor Hamermesh for the extraordinary service that he rendered to the state in acting as the hearing officer for this time-consuming and contentious matter. Delaware is lucky to have someone of his caliber willing to serve the public.[2]

Before addressing the specific statutory factors implicated by this Application, I will briefly explain my view of my responsibility in this case. In this transaction and in all matters I undertake as Insurance Commissioner, I view the protection of insurance policyholders as my overriding responsibility. In this case, I have a responsibility not just to the policyholders who have the resources to hire skilled legal counsel to represent them, but also to the much larger group of policyholders—many of them workers compensation policyholders and beneficiaries around the country—who do not.

Although this case is complex in its details, the broad issue before me is easily explained. Royal and Sun Alliance Insurance Group plc ("Royal UK"), a British insurance holding company, is seeking to sever its legal relationship with its American subsidiaries. It has offered to infuse $287.5 million into those American subsidiaries as one of the conditions of consummating that transaction. Conversely, it has stated that it will not continue its practice of infusing capital into the American subsidiaries if the transaction is not approved. There appears to be no disagreement that Royal UK has no legal duty to provide more capital to the American subsidiaries.[3] Therefore, a primary issue in this case is whether Royal UK is being candid when it claims that it will not

---

[2] In general, I am also grateful to the attorneys for all of the interested persons in this case for providing me with the background necessary to reach a decision in the best interest of policyholders. But I am compelled to comment upon the appalling conduct of some of the attorneys of record. While this case has been pending, my staff has received dozens of press inquiries generated by inflammatory statements made outside of the formal proceedings by these attorneys, and received advocacy letters from nationally known public officials days after those letters were provided to the press. The effort by these attorneys to intimidate me into making a decision based on something other than the facts and law was shameful. For the benefit of persons who may appear before the Department in future matters, let me be clear: I make decisions based upon my obligation to protect insurance policyholders—*all* insurance policyholders, not just those wealthy enough to hire lawyers to represent their interests. I do not make decisions in reaction to publicity stunts or demands from political celebrities. This is not American Idol, where the people who generate the most phone calls win. And future conduct of this type will generate a more formal response from the Department. I have not undertaken a formal investigation in this case only because I know and respect the law firms in question, and I do not wish to see them embarrassed by what I assume was the conduct of unsupervised subordinates.

[3] A separate issue of whether the British company has made past representations that render it legally liable for some claims against the American companies is addressed below.

continue to subsidize the American companies. A number of large commercial policyholders who oppose approval of this Application (collectively "the objectors") argue that Royal UK is "bluffing," and that it will continue to subsidize its American subsidiaries even if the Application is denied. Were I convinced that Royal UK would continue subsidizing its American subsidiaries indefinitely, in spite of its unequivocal statements to both the Department and its own shareholders that it will not, I would deny the Application. But after reviewing all of the evidence, including the submissions of the objectors, I am not convinced that Royal UK will continue funding American subsidiaries that it has no legal obligation to subsidize. For that reason, I have concluded that approval of the Application with sufficient conditions to protect policyholders is the action that best protects the interests of those policyholders.

I do have sufficient concerns about the manner in which the Applicants will handle policyholders' claims going forward that I am imposing a number of additional conditions upon my approval of the Application. Those conditions are designed to ensure that the Applicant's managers have no financial incentive to handle claims improperly, and to ensure that those policyholders who believe that their claims are being improperly handled have a swift, effective, and inexpensive way to have the Delaware Insurance Department address their concerns. I have also imposed conditions to ensure that Royal UK will continue to be subject to the jurisdiction of American courts and the Delaware Insurance Department for the purpose of answering claims that policyholders may have against it. A complete list of the Conditions of this Order is attached hereto as Exhibit B, which I incorporate in its entirety.

## Professor Hamermesh's Conduct of the Hearing

Before addressing the substance of the Application, I will address the objectors' argument that Professor Hamermesh should have permitted them to take discovery, cross-examine witnesses, and engage in other activities commonly associated with parties to traditional civil litigation.

I agree with Professor Hamermesh that there is no way reasonably to interpret 18 *Del.C.* § 5003(d)(2) to allow every policyholder the right to a traditional civil trial with accompanying discovery, given that the same code section also requires that an application be brought to a hearing within 30 days of filing. I also agree with Professor Hamermesh that the statute contemplates a thorough pre-hearing investigation by the Department of Insurance staff designed to protect policyholders, and I agree with his conclusion (undisputed by any of the objectors) that the Department staff carried out that investigation in utmost good faith. I therefore adopt and incorporate his decision with respect to the objectors' pre-hearing applications and his analysis supporting that decision.

As Professor Hamermesh noted, the objectors have not lacked for the opportunity to comment upon the Application. I have reviewed hundreds of pages of materials from the objectors in connection with my decision, and some of them have been helpful in rendering my opinion.

## Application of Section 5003

Section 5003(d) of the Insurance Code requires that I approve an application for merger or change of control unless, after conducting a public hearing, I conclude that the application fails to satisfy any of the six statutory factors contained in that section. Because none of the Applicants, the Department or the objectors has raised serious issues with respect to Section 5003(d)(1)(b) or Section 5003(d)(1)(d), I address only four of those conditions herein and adopt all of Professor Hamermesh's findings and conclusions with respect to the two undisputed statutory factors.

### Satisfaction of Requirements for Issuance of License

I am required to reject the Application if, after the change of control, the Applicant would not be able to satisfy the requirements for the issuance of a license to write the lines of insurance for which it is presently licensed. 18 *Del.C.* § 5003(d)(1)(a). The only provision related to licensure which is disputed in this case is the Delaware Code's surplus requirements for licensure.

The surplus requirements for licensure under the Delaware Code are objective and relatively unambiguous. First, there is a requirement for initial capital and surplus. 18 *Del.C.* § 511(a). Second, on a going-forward basis, the Department has an obligation to ensure that the carrier maintains reasonable surplus, and to make that determination while giving "due consideration to any applicable standards approved or adopted by the National Association of Insurance Commissioners and to the desirability of substantial uniformity as to such requirements among the respective states." 18 *Del.C.* § 511(a)(2). Professor Hamermesh analyzed both prongs of Section 511 (along with other non-surplus provisions affecting licensure eligibility), and determined that the Applicants would be eligible for licensure after the transaction was completed. I agree with his conclusions. Hamermesh Report at ¶¶ 129-148.

The objectors have attempted to superimpose requirements and definitions from other portions of the Insurance Code to question Professor Hamermesh's conclusion with respect to surplus. For example, the objectors have attempted to argue that because factors other than Risk Based Capital can be considered by the Department in determining whether a domestic insurer subject to Chapter 50 has sufficient capital to pay dividends, Professor Hamermesh was barred from relying upon Risk Based Capital and measures of statutory capital in assessing whether the Applicant would be qualified for licensure under 18 *Del.C.* § 511. But the objectors cite no statutory or case law to support their argument. If anything, Delaware law requires that the Department focus almost exclusively for purposes of 18 *Del.C.* § 5003(d)(1)(a) on the sufficiency of the Applicants' initial capitalization. *Levinson v. First Delaware Ins. Co.*, 549 A.2d 296 (Del. 1988) (initial licensure of applicant must be based upon Section 511(a), whereas ongoing regulation of licensed insurer is subject to more discretionary standard of Section 511(a)(2)). Beyond that, 18 *Del.C.* § 511 allows only for an ongoing analysis using a broader measure of policyholder surplus based upon applicable NAIC and other uniform

standards. Risk Based Capital is the only standard that meets that description with respect to uniformity. Section 511 (and, as a consequence, Section 5003(d)(1)(a)) does not support the objectors' demand for a different measurement of surplus.

Similarly, the objectors argue that because Deputy Commissioner Vild concluded that the Applicant, absent a capital infusion, would be unable to pay its claims over the long term, the Applicant was per se ineligible for licensure. In addition to being a mischaracterization of Deputy Commissioner Vild's testimony, this contention is a straw man: the required analysis is the Applicant's status after the transaction is complete, and that transaction involves an infusion of $287.5 million, which Deputy Commissioner Vild testified would allow the Applicant to pay unresolved claims. Moreover, as Professor Hamermesh noted, the technical application of 18 *Del.C.* § 511 involves a wholly different analysis than the one the Department staff conducted in connection with analyzing whether the transaction would be prejudicial to policyholders.

## Financial Condition of Acquirer

The second statutory factor that I am required to examine is whether the financial condition of the acquiring party is such as might jeopardize the financial stability of the insurer or prejudice the interest of its policyholders. Professor Hamermesh has thoroughly examined the facts under this standard, and I concur with his conclusions. Hamermesh Report at ¶¶ 157-168.

The objectors dispute Professor Hamermesh's interpretation of 18 *Del.C.* § 5003(d)(1)(c); they effectively claim that it should be synonymous with 18 *Del.C.* § 5003(d)(1)(f), but with a higher hurdle for approval ("might be" prejudicial rather than "likely to be" prejudicial). This interpretation of the statute, of course, is directly contradictory to long-standing rules of statutory interpretation in Delaware and elsewhere. *Oceanport Indus., Inc. v. Wilmington Stevedores, Inc.*, 636 A.2d 892, 900 (Del.1994).

Once the objectors' effort to create an artificially high legal barrier is eliminated, their objections to approval with respect to this provision of the Code are essentially identical to their objections to approval under Section 5003(d)(1)(f), and I address them below.

## Change in Business/Corporate Structure/Management

The third factor I am required to examine is whether the Applicant's plans to make any material change in Royal USA's business or corporate structure or management are unfair and unreasonable to policyholders of the insurer and not in the public interest. I agree with Professor Hamermesh that the commitments in the Applicants' Form A Application provide reassurance that changes in structure will not be unfair or unreasonable to policyholders.[4] However, given the Department's conclusion

---

[4]     As the testimony has indicated, the Department has had examiners on site at the Insurance Companies, reviewing all matters, including claims handling practices and procedures. While the

that, in the event of continued adverse development beyond that projected by the Applicants (but consistent with the stressed financial conditions considered by the Department in its financial analysis), the British parent's $287.5 million capital infusion may be barely sufficient to cover all outstanding claims, I believe that additional safeguards on management conduct are necessary to ensure that every dime intended for policyholders actually reaches the policyholders.

Accordingly, my approval of the Application is subject to the following additional conditions, all of which are reflected in this Final Order. First, the insurers shall not pay any dividends or other distributions to the holding company until the Delaware Insurance Department has determined, in a formal case decision conducted under the Administrative Procedures Act, that all policyholder claims reasonably capable of resolution have been paid and that sufficient additional funds exist to pay timely and properly all claims that by their nature cannot be resolved in a timely fashion. Second, no management personnel will receive any compensation beyond his or her base salary until the aforementioned determination has been made. Management compensation must be approved by the Delaware Insurance Department, which shall approve it based upon comparable industry compensation packages. Third, I will name a Claims Monitor to be available to the Policyholders to receive all complaints, and to continually monitor indemnity reserve adequacy, litigation management, claims denials, and all other aspects of sound claims practice. The Claims Monitor will encourage and monitor the insurers' good faith participation in alternative dispute resolution forums. The Claims Monitor will report to the Insurance Commissioner on a monthly basis, and the Claims Monitor's reports shall specifically indicate whether any regulatory action against the insurers is warranted.

The imposition of these conditions will ensure that the Applicants treat the claims of current Royal USA policyholders in a fair, prompt fashion. Additional conditions that I impose below will ensure that Royal UK cannot escape any responsibilities it may have to American policyholders from conduct predating the consummation of this transaction.

Except as noted above, I accept all of Professor Hamermesh's fact findings and recommendations with respect to this statutory provision.

## Hazard/Prejudice to the Insurance Buying Public

The final factor that I am required to review in evaluating this Application is whether it is likely to be hazardous or prejudicial to the insurance buying public. 18 *Del.C.* § 5003(d)(1)(f).

---

Department has reviewed a large percentage of claims, and litigation arising from those claims, including those of the objectors, and has found the procedures to be within industry norms, the Department will continue to monitor these areas to assure faithfulness to the best practices of resolving policyholder disputes.

Professor Hamermesh correctly noted that an actuarial review performed by INS Consultants, Inc., an actuarial firm retained by the Department of Insurance[5], determined that with the capital influx associated with the transaction, the insurers are likely to continue to operate as a solvent and viable run-off insurance company, with the ability to withstand stress and adversity while still meeting policyholder obligations. Hamermesh Opinion at ¶ 200. I adopt Professor Hamermesh's findings found at ¶¶ 186-200 of his opinion, and his findings in ¶ 201 subject to the additional condition imposed below.

The objectors raise two funding issues with respect to Professor Hamermesh's report, which would only be relevant if they were both true. Those arguments are: (a) that the capital infusion will not be sufficient to pay all outstanding claims, and (b) that the British parent will continue pouring capital into its American subsidiaries even if the Application is denied. Based upon this two-part argument, the objectors seek rejection of the Application.

As I indicated at the outset of this opinion, if there were evidence sufficient to allow me to accept both of the objectors' funding arguments, I would deny the Application. But there is no evidence whatsoever in the record that Royal UK will— contrary to its sworn testimony, contrary to its public statements, and contrary to its commitments to its own shareholders—continue funding the American subsidiaries if the Application is denied. The only materials submitted by the objectors to support their argument are opinions from persons that they have offered as experts stating that Royal UK would not dare cut off the subsidies, because doing so would impugn its reputation with respect to funding its other core subsidiaries and thereby damage its other global business. That argument strikes me as incongruous in light of the existence of these

---

[5]     The World Trade Center lessees, in their post-hearing submission, breathlessly describe circumstances that they claim call into question the "independence" of the "independent actuary" upon whose opinions Professor Hamermesh relied. But to claim that Professor Hamermesh assumed the existence of an independent actuarial report is to twist his words. Professor Hamermesh specifically rejected a pre-hearing motion seeking the appointment of an independent actuary in this case ("independent" meaning an additional actuary beyond the one hired and charged by the Department of Insurance with analyzing the transaction on behalf of policyholders). And in his report, Professor Hamermesh accurately describes the actuarial witness in this case as "actuarial consultants to the DID [Delaware Department of Insurance]," Hamermesh Report at ¶ 108. (The statute specifically contemplates the Department hiring an actuary for this purpose. 18 *Del.C.* § 5003(d)(3)) In the testimony of the actuarial witness, the witness specifically described for Professor Hamermesh the ongoing relationship between his actuarial firm and the Delaware Department of Insurance—that the firm reviews rate applications submitted by insurers to the Department (Tr. At 252), and that the firm had performed past examinations of Royal and SunAlliance USA on behalf of the Delaware Department of Insurance and other state insurance departments. *Id.* at 253-254. In short, both Professor Hamermesh's report and the evidence he heard indicate that he was aware of precisely who the actuary was and to whom the actuary reported, *i.e.*, a consultant regularly retained by the Department of Insurance, responsible to the Department of Insurance. The objectors have correctly noted that Professor Hamermesh may have been unaware that John Tinsley, another contractor with the Insurance Department who testified in this case, and the principles of INS Consultants, Inc. have ownership interests in another business that provides regulatory and actuarial services to other state insurance departments. But I fail to see how this information alters the actuary's role or casts doubt upon his conclusions. The actuary reported to the Department of Insurance staff, which is charged with protecting policyholders and—as Professor Hamermesh has noted throughout his report and even the objectors do not dispute—has carried out its policyholder protection duties with utmost good faith.

proceedings. By proclaiming to the world in connection with this Application that its $287.5 million capital infusion is the end of its subsidies for the American subsidiaries, Royal UK has already demonstrated that it is willing to, in the words of the objectors' expert, "abandon[ ] a formerly core subsidiary" and "fail[ ] to step in and provide sufficient capital to assure that all outstanding claims would be paid...." So to a significant degree, Royal UK has already done precisely what the objectors' experts claim it would never dare to do.

The truth of the matter, after sifting through the rhetoric, is that no one—not the Insurance Department staff, not the objectors' experts, and not me—knows with certainty what Royal UK would do if I denied the Application. The Insurance Department staff negotiated with Royal UK and the Applicants, to obtain a capital contribution in connection with the Application that the staff believes sufficient to pay outstanding claims. The objectors—all of them large, sophisticated, well-funded commercial entities—would like me to gamble that I can get an even better deal by rejecting the Application. They may be right, they may be wrong. The evidence suggests that they are much more likely wrong than right, but there is no definitive proof either way. Nevertheless, the objectors are not the only policyholders with whom I must be concerned in this case. There are a vast number of other policyholders, many of them smaller businesses and (indirectly) working people injured on the job—who stand to lose everything if I accept the objectors request to 'roll the dice' and end up being wrong. The most vociferous objectors to this Application, the business entities leasing the World Trade Center sites, have claims against the Royal subsidiaries that, according to press reports, amount to about 3% of the rebuilding costs of the World Trade Center properties. New York Times, Feb. 8, 2007 at page B3. Rolling the dice may make economic sense for them—if they lose, they still have at least 97% of what they need. But for a small business that may suddenly be without the resources to pay its legal obligations to its injured workers, or worse for injured workers who may suddenly be without money to pay mortgages or seek necessary medical care, rolling the dice does not make economic sense.[6] Those smaller policyholders have not been heard from in this case, because they do not have the resources to hire expensive attorneys and experts to represent their interests. I have a duty to protect them. I decline to accept the objectors' offer to gamble those smaller policyholders' futures based on what the evidence suggests is a long-shot bet that denial of the Application could result in additional capital funds from the British parent.[7]

With respect to the portion of the objectors' argument relating to the adequacy of the $287.5 million capital infusion, I agree with Professor Hamermesh's analysis at paragraphs 204-225 of his report. The Department's staff was quite candid with

_____

[6] Of course, some of the claims that would be asserted against the Royal US companies in the event of their insolvency would be entitled to coverage by various state guaranty funds. But such coverage would effectively impose a broad-based rate increase on insurance policyholders across the country.

[7] Professor Hamermesh has ably summarized the evidence with regard to this issue at paragraphs 226 – 237 of his report. In so doing, he has also addressed an additional question raised by the objectors as to why the British parent was willing to accede to the Department's demand that it contribute $287.5 million to its American subsidiaries as part of this Application rather than abandoning them outright.

Professor Hamermesh in indicating that the $287.5 million was a "close call," but it is one supported by the Department's actuary. One significant fact has changed since the hearing before Professor Hamermesh: the most significant potential claim against the Royal USA subsidiaries, a lawsuit in which General Motors asserted a claim against Royal USA of upwards of $1 billion, has been dismissed by a Michigan trial court. *See General Motors Corp. v. Royal and Sun Alliance Ins. Group, plc*, Case No. 05-063-863-CK (Jan. 18. 2007, Mich. Cir. Ct. County of Oakland). In the initial economic analysis prepared by the objectors' economic experts, those experts concluded that the $287.5 million capital infusion would leave the Royal USA subsidiaries almost $1 billion short of reserves, with that entire $1 billion consisting of the General Motors claim. Now that the General Motors claim has been dismissed (subject, obviously, to appeal), even the economic analysis originally presented by the objectors' own experts suggests (once the inevitable caveats and reservations are stated) that the $287.5 million capital infusion is sufficient.

All that said, there are two issues that require that additional conditions be placed upon approval of this Application. First, the objectors have claimed that Royal UK is legally liable for payment of policies issued by the American subsidiaries because it directly or indirectly suggested to customers that it would 'back' those policies. Professor Hamermesh correctly concluded that this Application is not the forum in which 'veil piercing' claims of this nature should be resolved. Nevertheless, I do want to ensure that such a forum is available to policyholders, and that Royal UK does not attempt to resist appearing in American courts to answer to American policyholders with respect to this issue. Therefore, a condition of my approving this transaction is agreement from Royal UK and its relevant subsidiaries and affiliates to submit to personal jurisdiction in the courts of this state for the purpose of resolving any legal claims brought by policyholders. Second, although one of the commitments made by the Applicants as part of their Form A Application is the continued cooperation of Royal UK in making reinsurance claims, Hamermesh Report at ¶ 40, there is no means of enforcing that obligation against Royal UK. Therefore, a final condition of my approving this transaction is that Royal UK and its relevant subsidiaries and affiliates submit to the ongoing jurisdiction of the Delaware Department of Insurance, including but not limited to application of the state's unfair insurance practices statute, with respect to the obligations it has made as part of this transaction.

## Conclusion

As I noted at the outset, I am extraordinarily grateful to Professor Hamermesh for the outstanding work he did on this case, and except in those few instances where I have specifically noted otherwise I adopt all of his factual findings and legal conclusions. I am also very grateful for the work of the Department of Insurance staff, who strived to obtain the best outcome possible for policyholders of the American subsidiaries. I have also stayed this order for a period of five business days, so that any persons wishing to seek judicial relief from it may do so in an orderly way. If appeals from this order are filed and the parties to those appeals wish to discuss resolution of their differences while those

appeals are pending, I will make myself available to assist with those discussions to the extent the parties find it useful and appropriate.

Although I am approving this transaction with conditions because doing so is in the best interest of policyholders in the face of the existing facts and law, my approval should not be mistaken for an endorsement of the business practices of the British parent company. The actions of Royal UK, though legal, are unfortunate and not the actions of fair businesspeople. I intend to use all of the power of my office to ensure that policyholders of the American subsidiaries are paid their claims in a prompt, fair fashion, and I trust that persons who do future business with affiliates of Royal and Sun Alliance Group plc will do so with an appropriate measure of caution.

Matthew Denn
Insurance Commissioner

Date:    February 20, 2007

# THE INSURANCE DEPARTMENT OF THE STATE OF DELAWARE

| | |
|---|---|
| **IN THE MATTER OF:** ) | |
| ) | |
| **The Proposed Acquisition of Royal Indemnity** ) | |
| **Company, a Delaware domiciled** ) | |
| **property/casualty insurance company, Security** ) | |
| **Insurance Company of Hartford, a Delaware** ) | **Docket No. 313** |
| **domiciled property/casualty insurance company,** ) | |
| **Guaranty National Insurance Company, a** ) | |
| **Delaware domiciled property/casualty insurance** ) | |
| **Company, and Royal Surplus Lines Insurance** ) | |
| **Company, a Delaware-domiciled** ) | |
| **property/casualty insurance company by** ) | |
| **Arrowpoint Capital Corp., a Delaware** ) | |
| **Corporation, and Arrowpoint Capital, LLC, a** ) | |
| **Delaware limited liability company, John Tighe,** ) | |
| **Sean Beatty and Dennis W. Cahill** ) | |

## PROPOSED ORDER WITH RECOMMENDED FINDINGS OF FACT AND CONCLUSIONS OF LAW PURSUANT TO 29 *DEL. C.* § *10126*

Lawrence Hamermesh, appointed as Hearing Officer in this matter by Delaware Insurance Commissioner Matthew Denn ("Commissioner") by Order dated December 7, 2006, hereby respectfully recommends, this 2nd day of February, 2007, that the Commissioner adopt the following Findings of Fact and Conclusions of Law, and that the Commissioner approve the acquisition of Royal Indemnity Company, Security Insurance Company of Hartford, and Royal Surplus Lines Insurance Company by the following Applicants: Arrowpoint Capital Corp., Arrowpoint Capital LLC, John Tighe, Sean Beatty, and Dennis W. Cahill (collectively the "Applicants").

## FINDINGS OF FACT

## I.    IDENTITY OF ENTITIES INVOLVED

### A.    Identity of Applicants

1.    Arrowpoint Capital Corp. is a holding and investment company incorporated under the laws of the State of Delaware on June 19, 2006.  Docket No. 62, Exhibit 4, Arrowpoint Capital Form A Supplemental Materials, Arrowpoint Capital Corp. Formation Documents.

2.    Arrowpoint Capital LLC is a single-member limited liability company organized under the laws of the State of Delaware on September 5, 2006, in which Arrowpoint Capital Corp. is the sole member.  Docket No. 62, Exhibit 4, Arrowpoint Capital Form A Supplemental Materials, Arrowpoint Capital LLC Formation Documents.  Arrowpoint Capital Corp. and Arrowpoint Capital LLC are referred to herein collectively as "Arrowpoint Capital."

3.    John Tighe is a Co-Applicant and the President and Chief Executive Officer of Royal & SunAlliance USA, Inc. ("RSA-USA"), Arrowpoint Capital Corp., and the insurers to be acquired.  Mr. Tighe owns 20.41% of the voting stock of Arrowpoint Capital Corp.  Docket No. 1, Exhibit 4, Form A Application, at 3; Exhibit E.

4.    Sean Beatty is a Co-Applicant and the Chief Financial Officer of RSA-USA, Arrowpoint Capital Corp., and the insurers to be acquired.  Mr. Beatty owns 13.06% of the voting stock of Arrowpoint Capital Corp.  Id.

5.    Dennis Cahill is a Co-Applicant and the Chief Operating Officer of RSA-USA, Arrowpoint Capital Corp., and the insurers to be acquired.  Mr. Cahill owns 13.06% of the voting stock of Arrowpoint Capital Corp.  Id.

**B.** **Identity of Sellers**

6.      RSA Overseas Holdings (No. 1) is a corporation functioning as a holding and investment company organized under the laws of Ireland.  Docket No. 1, Exhibit 4, Form A Application, Ex. A, Purchase Agreement, at 1.

7.      RSA Overseas Holdings (No. 2) is a corporation functioning as a holding and investment company organized under the laws of Ireland.  Id.  RSA Overseas Holdings (No. 1) and RSA Overseas Holdings (No. 2) are referred to herein collectively as "Seller."

**C.** **Identity of the Delaware Domiciled Insurers to be Acquired**

8.      Royal Surplus Lines Insurance Company ("RSLI") is a domestic insurance company organized under the laws of the State of Delaware with its principal place of business in Charlotte, North Carolina.  Docket No. 1, Exhibit 4, Form A Application, at 3.

9.      Security Insurance Company of Hartford ("SICH") is a domestic insurance company organized under the laws of State of Delaware with its principal place of business in Charlotte, North Carolina.  Guaranty National Insurance Company ("GNIC"), formerly a domestic insurance company organized under the laws of the State of Delaware, was merged with and into SICH, effective December 28, 2006.  Docket No. 1, Exhibit 4, Form A Application, at 3; see In the Matter of The Proposed Merger of Guaranty National Insurance Co. with and into Security Insurance Company of Hartford, Insurance Department of the State of Delaware, Docket No. 312, Final Order, at 2.

10.      Royal Indemnity Company ("RIC") is a domestic insurance company organized under the laws of the State of Delaware with its principal place of business in Charlotte, North Carolina.  RIC is the direct parent of RSLI and SICH.  Docket No. 1, Exhibit 4, Form A Application, at 3.   RIC, SICH, and RSLI are referred to herein collectively as "the Insurers."

**D.** **Identity of Other Relevant Entities**

11.     Royal & Sun Alliance Insurance Group plc ("Royal UK") is a corporation organized under the laws of England with its principal place of business in London, England. Royal UK is the ultimate parent of the Seller and Arrowpoint General Partnership ("AGP"). Docket No. 1, Exhibit 4, Form A Application, Ex. A, Purchase Agreement, Section 10.1; p.2.

12.     AGP is a general partnership organized under the laws of the State of Delaware with its principal place of business in Wilmington, Delaware.  AGP is the direct parent corporation of RSA-USA.  Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Tighe Test., 7:12-18.

13.     RSA-USA, a corporation organized under the laws of Delaware, is a parent company of the Insurers.  Id.

14.     Royal Group, Inc. ("RGI"), a corporation organized under the laws of Delaware and a wholly-owned subsidiary of RSA-USA, is the direct parent company of RIC.

15.     Organizational charts illustrating the ownership structure of the Insurers currently and as proposed by Applicants if the acquisition is approved were admitted into evidence as Exhibits 5 and 6 and are attached hereto.

16.     Michael Crall, Edward Muhl, and Larry Simmons, outside directors of Arrowpoint Capital Corp., own shares totaling less than 13% of the voting stock of Arrowpoint Capital Corp.  Docket No. 1, Exhibit 4, Form A Application, at 5.

## II.     BACKGROUND

### A.     Restructuring of RSA-USA

17.     In September 2003, Royal UK determined that its United States operation was no longer core to its business and announced its intent to withdraw from the United States.  Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Culmer Test. at 118:13-14.

18.     In September 2003, RSA-USA and the Insurers were essentially closed to new business and a restructuring plan was initiated with the objective of bringing stability to the

Insurers and finality to Royal UK's exposure in the United States. Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Culmer Test. at 118:14-18.

19. In September 2003, the Insurers replaced their existing management team with a new one. Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Culmer Test. at 118:18-22. This management team has stated that it will continue at RSA-USA and the Insurers post-acquisition. Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Tighe Test. at 8:18-21.

20. The Insurers ceased writing new business in 2003 and are in run-off. The objective of RSA-USA management is to achieve a solvent run-off. Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Tighe Test. at 7:17-18.

**B.     The 2006 Bermuda Regulatory Approval**

21. On November 16, 2006, the Bermuda Monetary Authority approved the acquisition of Century Insurance Company (Bermuda) Ltd. and Financial Structures Limited, wholly owned subsidiaries of RGI, by Arrowpoint Capital. Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Tighe Test. at 32:20-21.

**III.     THE PROPOSED ACQUISITION**

**A.     The  Form A Filing**

22. In February 2006, the individual Applicants approached the Delaware Insurance Department ("DID" or "Department") with an informal proposal for a management buyout of the RSA-USA operations. This informal initial proposal would have relied exclusively on the existing capital and surplus of RSA-USA to meet the obligations of the Insurers. Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Vild Test. at 204:5-14; Brown Test. at 250:13-16.

23. The DID, the Applicants, and the Seller engaged in discussions and analyses that resulted in changes to the initial informal acquisition proposal that were viewed as beneficial to

the Insurers and the Insurers' policyholders.  Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Vild Test. at 206:13-207:17.

24.     These discussions and negotiations ultimately resulted in Royal UK's agreement to, among other benefits: (1) provide to RIC a capital infusion of 151,000,000 pounds, which was the equivalent of $287.5 million at the prevailing exchange rate; and (2) improve an existing letter of credit facility that secures the collection of the Insurers' reinsurance assets.  Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Vild Test. at 207:3-9.

25.     With these changes, the DID concluded that it made sense to for the Applicants to move forward with the Form A process.  Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Vild Test. at 207:10-12.

26.     On September 28, 2006, the Applicants filed with the DID a Statement Regarding the Acquisition of Control of or Merger with a Domestic Insurer ("Form A Application"), for the acquisition of control of RIC, SICH, GNIC, and RSLI, under which Arrowpoint Capital Corp. would acquire 90% of the interest of AGP and Arrowpoint Capital LLC would acquire 10% of the interest of AGP from the Seller, subject to the approval of the Commissioner pursuant to 18 *Del. C.* § 5003.  Docket No. 1, Exhibit 4, Form A Application, at 6.

27.     On September 28, 2006, Arrowpoint Capital and the Seller executed a Purchase Agreement for the sale of AGP ("Purchase Agreement").  Docket No. 1, Exhibit 4, Form A Application, Ex. A.

**A. Description of Proposed Acquisition**

28. As described in the Form A Application, Arrowpoint Capital will acquire from the Seller 100% of the partnership interests in AGP, pursuant to the terms of the Purchase Agreement ("Proposed Transaction"). Docket No. 1, Exhibit 4, Form A Application, at 6.

29. Pursuant to the Purchase Agreement, Arrowpoint Capital Corp. and Arrowpoint Capital LLC will provide the Seller with subordinated notes in the aggregate principal amount of $300 million as consideration for the purchase of the interests in AGP (the "$300 Million Subordinated Debt"). Docket No. 1, Exhibit 4, Form A Application, at 6; Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Tighe Test. at 28:15-22.

30. The $300 Million Subordinated Debt carries no interest and has no maturity date, and the Applicants are required to repay the $300 Million Subordinated Debt only if the Insurers are able to pay dividends in accordance with the commitments set forth in the Form A and under applicable law, and in the reasonable judgment of the Insurers' Boards of Directors. Docket No. 120, Exhibit 4, Arrowpoint Amendments to ancillary agreements in Form A, Subordinated Debt Instruments; Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Tighe Test. at 28:22- 29:1 (As described in ¶¶ 45, 128, 167 and 255, *infra*, the Applicants have committed to several restrictions relating to the payment of dividends). Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Tighe Test. at 29:1-5.

31. Immediately prior to closing the Proposed Transaction, Royal UK will make a capital contribution of $287.5 million to RIC. Docket No. 1, Exhibit 4, Ex. A, Purchase Agreement, Section 5.9.

32. Prior to closing of the Proposed Transaction, the Seller is required to eliminate a $279 million RGI indebtedness. Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Tighe Test. at 29:6-10.

33.     Upon consummation of the Proposed Transaction, AGP will direct $27.5 million of capital to Arrowpoint Capital Corp. to be used for Arrowpoint Capital Corp.'s operating expenses through the run-off of the Insurers.  Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Tighe Test. at 20:5-11.

34.     A list and description of the agreements that comprise the Proposed Transaction was admitted into evidence as Exhibit 7 and is annexed hereto.

35.     The Proposed Transaction is designed to financially strengthen the Insurers; facilitate the continuation of overall operating goals; provide for stable management throughout the run-off period; and put in place important policyholder protections.  Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Tighe Test. at 39:14-20.

**B.      Continuation of Insurers' Current Managerial, Corporate Governance, and Financial Practices**

36.     After the acquisition of control of the Insurers by the Applicants, Messrs. Tighe, Beatty, and Cahill will continue to serve as the President and Chief Executive Officer, Chief Financial Officer, and Chief Operating Officer, respectively, of RSA-USA, each of the Insurers, and Arrowpoint Capital Corp.  Docket No. 1, Exhibit 4, Form A Application, at 6.

37.     The Board of Directors of Arrowpoint Capital Corp. will include three outside directors for at least four years following the closing.  Messrs. Crall, Muhl, and Simmons will be outside members of the boards of directors of RSA-USA, each of the Insurers, and Arrowpoint Capital Corp.  Docket No. 1, Exhibit 4, Form A Application, Ex. A, Purchase Agreement, Section 5.8; Docket No. 1, Exhibit 4, Form A Application, at 5.

38.     Management will maintain and establish compensation levels that are within the range of total cash compensation for management employees holding comparable positions at

comparable companies within the property and casualty insurance industry. Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Tighe Test. at 34:18-23.

39. Compensation will be subject to the approval of the compensation committees of Arrowpoint Capital and the Insurers, which will be comprised of outside directors. Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Tighe Test. at 34:23-35:1.

40. After the closing and at Royal UK's expense, Royal UK will be obligated to cooperate with the Insurers to make reinsurance claims, including assisting with processing or submitting claims, under Royal UK reinsurance treaties that have historically benefited U.S. insurers. Docket No. 1, Exhibit 4, Form A Application, Ex. A, Purchase Agreement, Section 4.11.

41. Pursuant to the Purchase Agreement, for four years following the closing, the Applicants must obtain Royal UK's consent for Arrowpoint Capital Corp. equity holder sales of stock, except in certain circumstances such as estate planning. Docket No. 1, Exhibit 4, Form A Application, Ex. A, Purchase Agreement, Section 5.3(b).

42. In addition, the Applicants must cause the Insurers to continue providing severance benefits, in accordance with existing practices, for any employees terminated during the year following the closing. Docket No. 1, Exhibit 4, Form A Application, Ex. A, Purchase Agreement, Section 5.1(a).

43. The Applicants have no current plans or proposals to cause the Insurers to declare an extraordinary dividend, to liquidate the Insurers, to sell the Insurers' assets, or to merge any of the Insurers with any person or persons, or to make any other material change in the Insurers' business operations or corporate structure or management. Docket No. 1, Exhibit 4, Form A Application at 6.

44.    The foregoing evidence demonstrates that the Proposed Transaction will not result in any material changes to the current managerial, corporate governance, and financial practices of the Insurers.  Docket No. 1, Exhibit 4, Form A Application, at 6.  This finding was actively challenged in oral and written comments submitted in this matter by certain of the Insurers' policyholders who oppose the Proposed Transaction, and those comments in this regard are reviewed in Part X below.

### C.    Binding Commitments Made by the Applicants to the Commissioner and Policyholders

45.    The Applicants make the following commitments to the Commissioner in the Form A Application:

i.    All payments of shareholder dividends declared by the Insurers shall be subject to the prior written approval of the DID.

ii.    No request for approval of payments of dividends will be made by the Insurers prior to the fourth anniversary of the Applicants' acquisition of the Insurers.

iii.    After the fourth anniversary and prior to the sixth anniversary of the Applicants' acquisition of the Insurers, no request for approval of the payment of dividends shall be made by the Applicant or by any of the Insurers unless the risk-based capital ("RBC") ratio of the applicable Insurer exceeds 300% of its authorized control level.

iv.    The Insurers will not materially alter their respective existing affiliate agreements or enter into any new affiliate agreements that would materially adversely affect the Insurers' policyholder surplus.

v.    Neither Arrowpoint Capital nor its subsidiaries will sell any assets of Arrowpoint Capital or its subsidiaries, or acquire any additional operating assets, without prior regulatory approval, until the earlier of the third anniversary of the closing of the Proposed Transaction or such time as the $300 Million Subordinated Debt issued to the Seller has been redeemed in full, provided, however, that the restrictions set forth in this clause will not apply to:

(A)  reinsurance transactions that do not require regulatory approval under laws governing "bulk" or "extraordinary" reinsurance arrangements;

(B)  transactions in progress or previously contemplated involving leased or owned real estate;

(C)  transactions that would (a) in the reasonable judgment of the board of directors or applicable governing body of Arrowpoint Capital or an Insurer be unlikely to materially adversely affect the financial position of Arrowpoint Capital or such subsidiary; (b) not require external financing for Arrowpoint or its subsidiaries; and (c) in the case of acquisitions, be acquisitions of entities not incurring underwriting risk;

(D)  transactions involving investment or other assets that are in the ordinary course of business;

(E)  transactions for which the purchase or sale price represents less than five percent of Arrowpoint Capital's insurance company subsidiaries on a combined basis; or

(F)  the issuance of appeal bonds or any other insurance policies which an Insurer is required to issue by law.

vi.  The Applicants will not permit any expansion of operations of Arrowpoint Capital or its subsidiaries beyond the current scope (other than ownership of the entities to be acquired as a result of the Proposed Transaction).  After the first anniversary of the closing of the Proposed Transaction, these restrictions will not apply to engaging in administration or management activities with third parties and any activities incidental thereto, or to the acquisition of persons engaged in such activities that do not involve assumption of underwriting risk.

vii.  The Insurers will continue to maintain corporate governance, compliance structures, and controls consistent with those currently being maintained.

viii.  Management will establish and maintain compensation (base salary and annual bonus opportunity) levels for management that are within the range of total cash compensation for management employees holding comparable positions at comparable companies within the property or casualty insurance industry, all subject to the approval of the Compensation Committees of the respective boards of directors.

Docket No. 1, Exhibit 4, Form A Application, at 10-11.

## IV.  DEPARTMENT PROCEDURES RELATING TO THE APPLICATION

46.  Immediately after the Form A Application and related documents were filed by the Applicants on September 28, 2006, the DID began reviewing the information submitted and implemented its applicable procedures as follows:

a. The application was logged in and transmitted to the assigned Financial Analyst, Rylynn Brown, for review. Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Brown Test. at 227:23-24; 228: 1-2;

b. As described in greater detail below, in making her determinations and recommendations concerning the application under the applicable statutory requirements of 18 *Del. C.* § 5003(d), Analyst Brown reviewed the application and any relevant, related documents and relied on the prior knowledge she gained of the Insurers, while functioning as their DID-assigned analyst. Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Brown Test. at 231:1-21;

c. Analyst Brown asked questions of the Applicants and the Insurers and requested additional information from the Applicants as needed. Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Brown Test. at 232:10-16;

d. During the review process, Analyst Brown also interacted with other professionals at the DID, such as the Assistant Chief Examiner, the Chief Examiner and the Deputy Attorney General. Analyst Brown also used the outside expertise of actuaries, claims professionals and attorneys. Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Brown Test. at 229:9-24, 230:1;

e. Upon completion of her review, Analyst Brown made her recommendation for approval of the application which, along with the application and other supporting documentation, was subsequently reviewed by the Assistant Chief Examiner, the Chief Examiner, the Director of the Bureau of Examination, Rehabilitation and Guaranty ("BERG") and the Deputy Attorney General assigned to the DID for their determination as to whether to approve or reject the application. Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Brown Test. at 246:14-24; 247:1-22.

47.    The review process was conducted in a manner that was consistent, and in accordance with, existing DID internal procedures for review of Form A applications. Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Vild Test. at 202:2-4; 203:1-23.

48.    In addition, as a consequence of the original proposal, the DID initiated a targeted financial examination of RSA-USA. The examination included:

a. An actuarial review of the adequacy of the Insurers' reserves;

b. A claims review of reserve adequacy and claims handling processes;

c. A legal review of all of the Insurers' material litigation and contingencies; and

d. A review of the quality and collectibility of the Insurers' reinsurance assets.

Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Vild Test. at 205:15-23.

49.     The examination was, and continues to be, a substantial undertaking involving dozens of DID employees, contractors and consultants, who collectively have spent thousands of hours on this project.  The bulk of the work on the examination was completed over a period of six to seven months; nevertheless, the examination is ongoing.  Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Vild Test. at 205:24-206:6.

50.     The DID procedures concerning the Form A application further included maintaining a public file that may be reviewed by the public, publishing notices relating to the filing and subsequent activity, seeking additional information and documents from the Applicants, allowing for comments, and conducting a public hearing.

51.     The public file has been maintained by the DID at its Dover office and has been available to any person for inspection and copying.

52.     The public file is comprised of all documents filed with the DID by Applicants, except those documents which were designated as confidential and for which the DID determined that confidential treatment was appropriate.

53.     The public file also contains all comments and documents received by the DID, responses to those comments and documents, correspondence and the transcripts of any proceedings and the public hearing that was conducted.

54.     All materials in the public file have been indexed in a docket, in part to aid interested persons who wish to obtain copies of any of the public documents.  The index was posted on the DID website and was routinely updated as new documents became available for public inspection.

55.     As a courtesy, the DID at various time sent e-mails to persons who had requested documents from the public file, or who attended the hearing, or who requested such notification, to advise them that additional documents had been received by the DID and were available.

56.     Several documents relating to the transaction that are included in the public file were also scanned and made available directly from the DID website without the need for any copying request.

57.     As of January 19, 2006, the public file consisted of 126 documents amounting to approximately 5,000 pages.

## V.     PRE-HEARING NOTICES AND MOTIONS

58.     18 *Del. C.* §§ 323(b) and 5003(d)(1) require that a hearing be held in this matter. 18 *Del. C.* § 5003(d)(1) requires that the hearing be public.  18 *Del. C.* § 325 provides that the Commissioner or his designee may preside over such a hearing.

59.     On October 16, 2006, Michael L. Vild, Deputy Insurance Commissioner for the State of Delaware, entered an Order on behalf of the Commissioner appointing Linda S. Kaiser as Hearing Officer in the captioned matter.  Docket No. 2.

60.     On October 17, 2006, the Commissioner issued a Notice of Public Hearing ("Notice") of this matter.  Docket No. 3.  As required by 29 *Del. C.* § 10124, the notice was published in The Delaware News Journal, Docket No. 7, Exhibit 1, and The Delaware State News, Docket No. 8, Exhibit 2, and posted on the Department's website.

a.  The Notice scheduled the hearing in this matter for November 21, 2006.

b.  The Notice provided that any person seeking a determination of any pre-hearing issue relating to this matter must file a written application by 4:30 p.m. on November 3, 2006.

c.  The Notice provided that any person wishing to file written comments on the proposed transaction do so no later than 4:30 p.m. on November 17, 2006.

d. The Notice provided that any person wishing to make oral comments on the proposed transaction at the public hearing must file a written notification no later than 4:30 p.m. on November 17, 2006, identifying the name and contact information of the person desiring to make such comments, as well as a short description of the topics to be addressed.

61.     On November 3, 2006, General Motors Corporation ("GM"), The Student Loan Corporation ("SLC"), DaimlerChrysler Corporation ("DC"), and Federal-Mogul Corporation ("FM") each filed a pre-hearing motion seeking party status in the captioned matter. Docket Nos. 15, 31, 37, and 41. They also filed various requests for discovery and continuance of the November 21, 2006 hearing. Docket Nos. 16, 20-30, 32, 38 and 41.

62.     SLC filed a request for the recusal or withdrawal of Hearing Officer Kaiser on November 3, 2006. Docket No. 33. GM and DC joined this motion. Docket Nos. 17 and 39.

63.     On November 14, 2006, the Applicants filed opposition to the motions for party status of GM, SLC, DC, and FM and the motion for recusal of Hearing Officer Kaiser filed by SLC and joined by GM and DC. Docket Nos. 52-57.

64.     On November 14, 2006, the DID filed responses to the motions for party status of GM, SLC, DC, and FM and the motion for recusal filed by SLC and joined by GM and DC. Docket Nos. 49-51.

65.     On November 14, 2006, MBIA Insurance Corporation ("MBIA") and Wells Fargo Bank, in its capacity as Trustee of eight separate grantor trusts ("Wells Fargo"), filed pre-hearing materials seeking admission as parties, discovery, continuance of the November 21, 2006 hearing and recusal of Hearing Officer Kaiser. Docket Nos. 45-47.

66.     On November 16, 2006, the Applicants filed opposition to the motions filed by MBIA and Wells Fargo for party status, discovery, continuance, and recusal or withdrawal. Docket No. 58.

67.     On November 16, 2006, the DID filed opposition to the motion for admission as parties and recusal of Hearing Officer Kaiser of MBIA and Wells Fargo.  Docket No. 60.

68.     On November 17, 2006, Hearing Officer Kaiser issued an Order on Pre-Hearing Matters denying the various motions for party status, discovery, continuance, and recusal, and designating such pre-hearing motions as written comments to be considered in the proposed acquisition.  Docket No. 78.

69.     On November 17, 2006, several entities submitted written comments concerning the Proposed Transaction, Docket Nos. 68, 71, 73, and 74, as well as notices of intent to offer oral comments at the November 21, 2006 hearing, Docket Nos. 70 and 72.

70.     On November 17, 2006, World Trade Center Properties LLC, Silverstein Properties Inc., Silverstein WTC Mgmt. Co. LLC, 2 World Trade Center LLC, 4 World Trade Center LLC, and 5 World Trade Center LLC (collectively, "World Trade Center Properties" or "WTC"), filed pre-hearing materials seeking admission as parties, discovery, continuance of the November 21, 2006 hearing, and recusal or withdrawal of Hearing Officer Kaiser.  Docket Nos. 64-66.

71.     On November 17, 2006, NetBank Inc., joined already-filed requests to continue or adjourn the November 21, 2006 hearing.  Docket No. 75.

72.     On November 20, 2006, the Applicants filed opposition to the World Trade Center Properties' motions for party status, discovery, continuance, and recusal and to NetBank, Inc.'s request to continue or adjourn the November 21, 2006 hearing, Docket Nos. 80-81.

73.     On November 21, 2006, Hearing Officer Kaiser presided over a public hearing in the captioned matter (the "November 21 Hearing").  After opening the record, taking attendance, requesting e-mail addresses of those in attendance and completing other administrative tasks, she

adjourned the hearing until November 28, 2006 to, among other things, discuss the matter of her continued service as Hearing Officer with Commissioner Denn.  Docket No. 83, Tr. of November 21, 2006 Hearing, at 8:9-13.

74.     On November 27, 2006, Hearing Officer Kaiser notified those who provided e-mail addresses at the November 21, 2006 Hearing that, in lieu of a continued hearing on November 28, 2006, there would be a conference call regarding the captioned matter on that date and provided details for those desiring to participate in the call.

75.     On November 28, 2006, Hearing Officer Kaiser convened a conference call with the Applicants, the DID, and other persons who provided their e-mail addresses at the November 21, 2006 Hearing.  During that call, Hearing Officer Kaiser stated that she would not sit as the Hearing Officer in this matter, and further adjourned the hearing to December 14, 2006.  Docket No. 84A, Transcript of November 28, 2006 Conference Call, at 7:10-18.

76.     Also on November 28, 2006, The Port Authority of New York and New Jersey ("Port Authority") and 1 World Trade Center LLC moved to join the World Trade Center Properties' motions for party status, discovery, continuance, and recusal or withdrawal of Hearing Officer Kaiser.  Docket No. 84.

77.     On December 7, 2006, Deputy Commissioner Vild, acting on behalf of the Commissioner, entered an Order appointing Lawrence A. Hamermesh as Hearing Officer in this matter.  Docket No. 85.

78.     The Pre-Hearing Order entered by the Hearing Officer on December 7, 2006 scheduled a status conference in this matter for December 14, 2006.  That Pre-Hearing Order further provided that "[e]fficiency and fairness suggested that previous written motions, applications and supporting writings in this matter be taken into consideration by the Hearing

Officer going forward, provided that those persons who have made such submissions be afforded an opportunity to supplement those submissions while avoiding unnecessary duplication." Docket No. 86. Toward this end, the Pre-Hearing Order set a deadline for filing applications to the Hearing Officer no later than December 11, 2006 and advised that any submissions made pursuant to the Order would be considered at a status conference conducted by the Hearing Officer on December 14, 2006. Id.

79. On December 11, 2006, DC and SLC submitted a letter reiterating their requests for admission as parties and for discovery. Docket No. 87. On the same day, GM reiterated its requests for party status and a continuance of the public hearing in the above-captioned matter. Docket No. 88.

80. On December 11, 2006, World Trade Center Properties submitted (1) a reply submission in further support of their application for party status; (2) a motion for leave to file the Joint Declaration of David Babbel and Robert Wilcox; (3) a Declaration of Prof. David F. Babbel and Hon. Robert E. Wilcox ("Babbel/Wilcox Declaration"), and (4) a Motion for the appointment of an independent actuary. Docket Nos. 91-94.

81. On December 11, 2006, Westfield WTC LLC (n/k/a WTC Retail LLC), Westfield WTC Holding LLC, Westfield Corporation, Inc., and Westfield America, Inc. (collectively, the "Westfield Entities") moved to join the World Trade Center Properties' motion for party status and their reply submission in further support thereof. Docket No. 89. The policyholders that have submitted notices, requests, and comments are referred to in this Section V collectively as "Moving Policyholders."

82. On December 14, 2006, a telephonic status conference was held, in which the Applicants, the DID, and the Moving Policyholders addressed, through oral argument, the

pending motions and issues raised therein. Argument on the pre-hearing application lasted approximately two hours. See Docket No. 98, Status Conference Transcript.

83. At the Hearing Officer's invitation, the Moving Policyholders made additional submissions on the motions on December 15 and December 19, and the Applicants and the DID each made an additional submission on December 18, 2006. Docket Nos. 99-102.

84. The December 20, 2006 Order on Pre-Hearing Motions ("December 20 Order") included preliminary findings of fact and conclusions of law for the purpose of ruling on such Pre-Hearing Motions. Docket No. 103. A copy of the December 20 Order is annexed hereto. The December 20 Order denied the Moving Policyholders' motions for admission as parties, discovery, a continuance, and appointment of an independent actuary for the reasons set forth therein. The parties did not oppose submission of the Babbel/Wilcox Declaration as commentary, and leave was granted to submit it as such. The December 20 Order specifically found that:

    a. 18 *Del. C.* §5003 "contemplates a relatively expedited proceeding for action on applications for approval of a change of control of a Delaware domestic insurer." ¶ 7(a).

    b. "[N]one of the Moving Policyholders has articulated and demonstrated such a distinct interest of the sort that would justify their intervention as parties in this matter." ¶7(b).

    c. "There is no substantiated conflict, however, between [Royal UK]'s directors and officers on one hand, and the Insurers' policyholders, on the other … ." ¶ 9(a).

    d. "Denial of the Moving Policyholders' applications for party status does not deny them a meaningful opportunity to call attention to their concerns about the proposed Royal US Acquisition." ¶ 10.

    e. "The determination of the completeness of [the Form A] filing is the responsibility of the DID." ¶ 13.

85. On December 20, 2006, a separate Order Establishing Public Hearing Time and Procedures was issued, setting the continued public hearing in this matter for January 19, 2007,

at 9:30 a.m. (the "Order Establishing Public Hearing Time and Procedures"). Docket No. 104. The Order Establishing Public Hearing Time and Procedures provided as follows:

86. The December 20 Order stated that all materials previously submitted by the Moving Policyholders would be considered written comments on the Proposed Transaction, and that the Moving Policyholders could submit additional materials in accordance with the separate Order Establishing Public Hearing Time and Procedures (described in the following paragraph). Docket Nos. 103-104.

    a. That any person seeking a determination of any pre-hearing issue relating to this matter, not previously determined, must file a written application, not to exceed ten pages, including exhibits, by 4:30 p.m. on January 2, 2007. Docket No. 104, at 2.

    b. That notice of the new hearing date be published in accordance with statute. Docket No. 104 at 2.

    c. That the published notice provide that any person wishing to file written comments on the Proposed Transaction do so before 4:30 p.m. on January 15, 2007. Docket No. 104 at 1.

    d. That the published notice provide that any person wishing to make oral comments on the Proposed Transaction at the public hearing must file a written notification before 4:30 p.m. on January 15, 2007, identifying the name and contact information of the person desiring to make such comments, as well as a short description of the topics to be addressed, specifying that such notification not exceed five pages, and that during the public hearing, "[t]he Hearing Officer may direct, prior to the hearing, that oral comment be limited in time or coordinated with other oral comments on the same subject." Docket No. 104 at 2.

87. As directed in the Order Establishing Public Hearing Time and Procedures, additional notice was published in <u>The Delaware News Journal</u>, Docket No. 122, Exhibit 14, and <u>The Delaware State News</u>, Docket No. 123, Exhibit 15, and posted on the Department's website.

88. On January 2, 2007, the Moving Policyholders submitted a Joint Request for Determination of Pre-Hearing Issues (the "Joint Request"), requesting that the record remain open for at least two weeks after the hearing, that they be permitted to object to the Hearing Officer's proposed findings and conclusions before their presentation to the Commissioner, that

the record remain open pending any appeal, and that the Moving Policyholders be allowed to examine witnesses and present documentary evidence at the hearing.  Docket No. 105.

89.      The Applicants submitted a response to the Joint Request on January 9, 2007.  Docket No. 108.  The DID also submitted a response to the Joint Request on January 9, 2007.  Docket No. 109.  On January 12, 2007, the Moving Policyholders submitted a Reply in Support of the Joint Request.  Docket No. 111.

90.      On January 16, 2007, an order was entered that for the most part denied the Joint Request for the reasons, and based on the preliminary findings of fact and conclusions of law, set forth therein (the "January 16 Order").  Docket No. 112. A copy of the January 16 Order is annexed hereto.

91.      Due to an intervening holiday, the comment period was extended to January 17, 2007.

92.      In response to the initial and subsequent published notice, on or before January 17, 2007, the DID received numerous documents and comments by mail and e-mail from, or on behalf of, a variety of persons and entities.  Docket Nos. 106-107; 110; 113-119.

93.      All such documents were received by the Applicants and the DID.

94.      The DID received two comment letters after the January 17, 2007 closing of the comment period.  Docket Nos. 121 and 126.

95.      The Hearing Officer has reviewed and considered all documents and comments filed in this matter, including those received after the close of the comment period.

96.      On January 18, 2007, the Hearing Officer issued guidelines for oral comments by persons other than parties at the January 19, 2007 hearing.  A copy of those guidelines is attached hereto.  Those guidelines requested, among other things, that the commenters attempt to

avoid duplication of presentations as well as repetition of material from written comments, and set forth a proposed order for oral comments. The guidelines also established an order for the commenters' presentations, which included all commenters that had requested an opportunity to present oral comment on the proposed transaction as well as consultants who were retained by those non-parties opposed to the transaction.

## VI. PUBLIC HEARING

97. On January 19, 2007, the continued public hearing was convened with regard to the Form A Application as provided for in 18 *Del. C.* § 5003 ("January 19 Hearing"). The January 19 Hearing began at 9:30 a.m. and concluded at 6:40 p.m. Docket No. 125, Tr. of Jan. 19, 2007 Hearing, at 1:17, 390:12.

98. The Applicants, the Seller, representatives of the DID, and approximately 25 additional persons attended the January 19 Hearing. Attendance at the Hearing is reflected in the attendance sheet admitted into evidence as Exhibit 16 and attached hereto.

99. At the outset of the January 19 Hearing, the DID determined that the Form A Application was complete. Docket No. 125, Tr. of Jan. 19, 2007 Hearing, at 2:23-3:2.

100. The DID and the Applicants stipulated to the admission of Exhibits 1 through 16 as evidence. Docket No. 125, Tr. of Jan. 19, 2007 Hearing, at 3:2-24; 384:21-385:6.

101. Exhibits 1 through 16 were admitted into evidence. Docket No. 125, Tr. of Jan. 19, 2007 Hearing, at 3:15-24; 385:3-5.

102. Representatives of the Applicants: (a) provided an overview of the Proposed Transaction, including the goals of the Applicants, RSA-USA management's accomplishments and the post-acquisition commitments the Applicants have made to the DID; (b) described the financial condition of Arrowpoint Capital and the Insurers; and (c) discussed the background of management and their plans for the management of the Insurers. E.g., Docket No. 125, Tr. of

Jan. 19, 2007 Hearing, Tighe Test. at 19:14 – 21:21; 13:16 – 17:19; Beatty Test. at 61:20 – 62;
Keddie Test. at 76:11-14.

103.   A representative of the Seller described the capital infusion that would be provided

by the Seller as part of the Proposed Transaction, Royal UK's prior capital contributions to the

Insurers and Royal UK's intent not to make further capital contributions in the event the

transaction is not consummated.  Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Culmer Test. at

124:9-11; 126:20.

104.   An outside director of Arrowpoint Capital and the Insurers, who is a former

Superintendent of Insurance of New York and Commissioner of Insurance of Maryland,

described the benefits of the Proposed Transaction to policyholders.  Docket No. 125, Tr. of Jan.

19, 2007 Hearing, Muhl Test. at 138:3-8.

105.   A former New York Deputy Superintendent of Insurance and Federal Insurance

Administrator, with nearly 50 years of insurance regulatory experience, described the history of

the Model Insurance Holding Company System Regulatory Act (upon which 18 *Del. C.* chapter

50 is based), its statutory purpose and its application to the Proposed Transaction.  Docket No.

125, Tr. of Jan. 19, 2007 Hearing, Bernstein Test. at 143:2 – 166:19.

106.   Representatives of the DID, including Deputy Insurance Commissioner Michael

Vild, discussed: (a) the DID's responsibilities with respect to Delaware-domiciled insurers; (b)

the process that the DID follows when an application for approval of an acquisition of an insurer

is received; (c) the DID's analysis of, and involvement with, the present Form A Application;

and (d) the DID's view that the Proposed Transaction satisfies the statutory criteria and should

be approved.  Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Vild Test. at 199:16 – 214:16;

Brown Test.; 199:2-250:24; Tinsley Test. at 260:10-273:10.

107. More particularly, Rylynn Brown, a Certified Public Accountant, Certified

Financial Examiner and the Level III DID Analyst assigned to the Insurers, testified that:

a. She had prior experience with the Insurers. She had been the financial analyst assigned to them since March 2004 and had reviewed and analyzed every filing that they submitted to the Department since that time. She had also closely monitored the restructuring of the U.S. operations. Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Brown Test. at 228:5-10.

b. As the DID Analyst assigned to the Insurers, she had reviewed the three previous merger filings involving Delaware domiciled insurers in the Group, the holding company annual registration statements and amendments to them, the statutory quarterly and annual financial statements; the audit reports and dividend requests; the requests for a Certificate of Authority for Royal Surplus Lines Insurance Company and Guaranty National Insurance Company; the request to re-domesticate Royal Surplus Lines Insurance Company, Guaranty National Insurance Company and Security Insurance Company of Hartford to Delaware; the financial examination reports; the Management Discussion and Analysis filings; the business plans and changes to them; the financial *pro formas* and actuarial reports; the Form A exemption requests related to reorganization of the U.S. operations; and the requests for prior approval to enter into affiliated transactions. Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Brown Test. at 228:13-24; 229:1-5.

c. She reviewed the application for completeness and to determine whether any of the statutory bases for disapproval that are contained in § 5003(d) were implicated by the transaction. Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Brown Test. at 231:1-4.

d. She reviewed the documentation and information provided to the DID by the Applicants including the Form A application itself, any attachments or exhibits to it, and any supplemental documents provided by the Applicants either on their own or in response to inquiries from the DID concerning the application. Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Brown Test. at 231:7-13.

e. After the Form A application was filed, she had several telephone conferences with the Applicants and also participated in some meetings with them concerning the application. Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Brown Test. at 232:14-16.

f. For the reasons stated more specifically below, based on her review of the Form A application, her experience as a financial analyst for the DID, her training and education and her knowledge and experience as the financial analyst for the Insurers involved in the proposed acquisition, she determined that the Form A application met the requirements of Chapter 50 of Title 18 of the Delaware Insurance Code. Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Brown Test. at 245:10-20.

g. She recommended, on behalf of the DID, that the proposed acquisition be approved in accordance with 18 *Del. C.* Chapter 50 as being in the best interests of policyholders,

subject to the conditions referenced below.  Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Brown Test. at 246:16-19.

108.  A representative of INS Consultants, Inc. ("INS Consultants" or "INS") described the work INS was retained to perform as actuarial consultants to the DID and presented INS' actuarial findings.  Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Macesic Test. at 253:2-259:21.

109.  During the January 19 Hearing, a number of persons and their representatives, all of whom had previously submitted substantial written comments, presented oral comments, and in some cases, responded to questions posed by the Hearing Officer.  Docket No. 125, Tr. of Jan. 19, 2007 Hearing, 275:12-384:10.  All persons who requested an opportunity to present oral comment were permitted to do so and no one was denied an opportunity to be heard.  The oral comment period lasted nearly three hours.  Docket No. 125, Tr. of Jan. 19, 2007 Hearing, 274:8-384:17.  The substance of these comments will be addressed below.

110.  The January 19 Hearing was transcribed by a stenographer.  The transcript of the January 19 Hearing spans 393 pages.  Docket No. 125.

## VII.  ACTUARIAL ANALYSIS

111.   RSA-USA conducts interim actuarial reviews each quarter, and a full year-end review and actuarial report are completed in support of the Statement of Actuarial Opinion and preparation of Schedule P to the Annual Statement.  Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Keddie Test. at 78:22-79:2.

112.   The Insurers' historical loss experience is grouped into four broad segments: core, workers' compensation, specialty, and special situations.  Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Keddie Test. at 77:3-6.  The special situations group includes environmental and asbestos, general litigation and contingent liabilities, financial product risks, involuntary pools

and associations, corporate reinsurance recoverables, and unallocated loss and adjustment expense reserves. Id. at 78:16-21.

113. The in-house actuarial process includes development of projected claims pay-out patterns for each of the major lines of business. The pay-out patterns are then used to project major cash payments in the financial projections and underlie the projections for recoveries of the reinsurance assets. These claims pay-out patterns have been independently reviewed, along with the underlying claims reserving estimates. Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Beatty Test. at 58:5-15.

114. Loss reserves are frequently reviewed independently by external parties, including the companies' independent auditors as part of the statutory audit process and by actuarial consultants engaged by insurance regulators as part of the regulatory financial examinations. Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Keddie Test. at 79:5-12.

115. RSA-USA management has also periodically engaged external actuarial consultants to confirm the reasonableness of the internal reviews. Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Keddie Test. at 79:10-12.

116. INS Consultants performed reserve reviews of the Royal Indemnity pool of insurers for the DID in conjunction with triennial examinations for the periods ending in 1989, 1992, 1995, 1998, 2001, and 2004. Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Macesic Test. at 253:24-254:5. Mr. Macesic was the lead actuary for the reviews of the periods ending in 1992, 2001, and 2004. Id. at 254:5-8.

117. INS Consultants determined that RSA-USA's "book net loss and loss adjustment expense reserves were reasonably stated" as part of the DID's triennial examination as of

December 31, 2004.  Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Macesic Test. at 254:23-255:10.

118.    The DID called for an ongoing targeted examination reserve review of RSA-USA as of December 31, 2005.  Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Macesic Test. at 254:13-16.  This review involves the performance of loss and loss adjustment expense reserve reviews, individual cash flow analyses, stress test analyses on the Insurers' financial model, and a review of the viability of RSA-USA's financial model.  Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Macesic Test. at 255:24-256:17.  Mr. Macesic is the lead actuary for this review.  Id. at 264:13-16.

119.    INS concluded that, based on a thorough analysis of RSA-USA's finances, "with the influx of [$]287.5 million of capital, Royal & SunAlliance USA is likely to continue to operate as a solvent and viable run-off insurance company.  The [$]287.5 million gives the company the ability to withstand additional stress and adversity while still meeting policyholder obligations."  Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Macesic Test. at 259:16-21.

120.    INS Consultants also has been engaged by the Insurance Departments of the states of Connecticut, Colorado, and California in various actuarial reviews of the Insurers.  Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Macesic Test. at 253:4-23, 254:17-22.

121.    The DID continually monitors the financial condition of the Insurers.  Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Brown Test. at 233:12-20.

## VIII.    OTHER SUBMISSIONS BY APPLICANTS

122.    At various times throughout the application process, the Applicants voluntarily provided additional information and documentation.  This information includes, among other things:

a. On November 10, 2006, the Applicants de-designated as confidential certain exhibits to the Form A. Docket No. 43.

b. On November 17, 2006, the Applicants consented to include in the docket copies of various agreements previously submitted to the Department as part of a Form D filing on a confidential basis pursuant to 18 *Del. C.* § 5007. Docket No. 76.

c. On November 17, 2006 and January 18, 2007, the Applicants submitted to Hearing Officer Kaiser copies of certain exhibits to the Form A that were amended by the parties to the Proposed Transaction. Docket Nos. 62, 77, 120.

d. On November 17, 2006, the Applicants submitted *curricula vitae* for each of the directors and senior executive officers of Arrowpoint Capital Corp., and ten-year financial projections and audited financial statements for each of Arrowpoint Capital Corp. and Arrowpoint Capital LLC. Docket No. 77.

e. On January 18, 2007, the Applicants filed two amendments to documents related to the Form A, addressing certain commitments to be made by Royal UK relating to pension funding matters. Docket No. 120; Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Tighe Test. at 30:19-32:17.

123. These additional documents further explain the Proposed Transaction, the future management and control of Arrowpoint Capital after the acquisition, and the financial transactions involved in the Proposed Transaction. In particular, the amended documents submitted on January 18, 2007 (Docket No. 120) reflect that Royal UK will supply a letter of credit of up to $65 million to the U.S. Pension Benefit Guaranty Corporation to secure necessary contributions to RIC's defined benefit pension plan (although management does not expect that there will be a call on that letter of credit). Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Tighe Test. at 31:6-23.

124. Throughout the application process, the DID reviewed and analyzed information and materials provided by the Applicants in support of the Proposed Transaction, as well as comments from policyholders.

## IX. STANDARDS FOR REVIEW

125. 18 *Del. C.* § 5003(d) establishes the standards for approval of an application for change in control of a domestic insurer:

The Commissioner <u>shall approve</u> any merger or other acquisition of control . . . <u>unless</u>, after a public hearing thereon, <u>the Commissioner finds</u> that:

a. After the change of control, the domestic insurer referred to in subsection (a) of this section would not be able to satisfy the requirements for the issuance of a license to write the line or lines of insurance for which it is presently licensed;

b. The effect of the merger or other acquisition of control would be substantially to lessen competition in insurance in this State or tend to create a monopoly therein. In applying the competitive standard in this paragraph:

    1. The informational requirements of § 5003A(c)(1) of this title and the standards of § 5003A(d)(2) of this title shall apply;

    2. The merger or other acquisition shall not be disapproved if the Commissioner finds that any of the situations meeting the criteria provided by § 5003A(d)(3) of this title exist; and

    3. The Commissioner may condition the approval of the merger or other acquisition on the removal of the basis of disapproval within a specified period of time;

c. The financial condition of any acquiring party is such as might jeopardize the financial stability of the insurer, or prejudice the interest of its policyholders;

d. The plans or proposals which the acquiring party has to liquidate the insurer, sell its assets or consolidate or merge it with any person, or to make any other material change in its business or corporate structure or management, are unfair and unreasonable to policyholders of the insurer and not in the public interest;

e. The competence, experience and integrity of those persons who would control the operation of the insurer are such that it would not be in the interest of policyholders of the insurer and of the public to permit the merger or other acquisition of control; or

f. The acquisition is likely to be hazardous or prejudicial to the insurance buying public.

18 *Del. C.* § 5003(d)(1)(emphasis added). The central task of the Commissioner in this proceeding is to evaluate the Form A Application to determine whether any of the conditions identified in subparagraphs (a) through (f) of §5003(d)(1) exists.

126. The DID has determined that the Form A application meets the requirements of Chapter 50 of Title 18 of the Delaware Code, including 18 *Del. C.* § 5003(b). Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Brown Test. at 245:19-20.

127.     The DID has recommended that the Proposed Transaction be approved

with several conditions:

i.      $287.5 million in cash must be received by Royal Indemnity Company at or before the closing of the transaction;

ii.     No dividends and/or other distributions may be paid by the Insurers to the acquirers without prior Department approval;

iii.    Any changes to the management compensation plan must be approved by the Department;

iv.     Any changes to existing agreements with current affiliated entities must be approved by the Department;

v.      The sale or distribution of insurance subsidiary assets, not in the ordinary course of business, must be approved by the Department;

vi.     Any changes to the existing letters of credit must be approved by the Department;

vii.    Any arrangements to engage in administrative or management activities with third parties requires approval by the Department;

viii.   After the transaction closes, any proposed commutations of existing aggregate excess of loss agreements to which the insurers are party must be on terms favorable to RIC;

ix.     The stock of the insurance companies may not be pledged without Department approval;

x.      The applicants may not change the terms of the subordinated notes payable without Department approval;

xi.     Any proposed changes to the current business plan, including entering into new reinsurance arrangements requires prior Department approval; and

xii.    Any changes to existing reinsurance agreements must be approved by the Department.

Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Brown Test. at 246:16-247:22; see also id.,

Tinsley Test. at 270:19-271:1.

128.    The following findings are based upon careful consideration of the Proposed

Transaction in view of each of the conditions that 18 *Del. C.* § 5003 establishes as a basis for

disapproval of the Proposed Transaction.

**A.      Ability to Satisfy Requirements for Licensure – 18 *Del. C.* § 5003(d)(1)(a)**

129.    When analyzing an application for change in control under Section 5003 of the Delaware Insurance Code, the Commissioner reviews the requirements for continued licensure of the domestic insurers being acquired.

130.    The line or lines of insurance for which an insurance company may be incorporated and become licensed to write insurance are set out in 18 *Del. C.* § 501 *et seq*.

131.    The statutorily required paid-in capital for the Insurers is $1.85 million and the statutorily required free surplus is $925,000.  18 *Del. C.* §§ 511(a) and (b); Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Bernstein Test. 162:23-163:3.

132.    On a consolidated basis, the combined policy surplus of the Insurers as of September 30, 2006 was $730,000,000.  Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Bernstein Test. 163:19-20.

133.    The Insurers currently have sufficient paid-up capital and paid-up surplus to satisfy the requirements to write the lines of insurance for which they are licensed.  *Id.* at 163:23–164:2.

134.    Upon closing of the Proposed Transaction, the Insurers will continue to have sufficient capital necessary to maintain required Delaware statutory deposits for the protection of policyholders.  They will have sufficient financing and liquid assets to meet their currently known obligations, and to endure a significant amount of adversity.  Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Beatty Test. at 44:2-11.

135.    Management of the Insurers states that they will continue to maintain trustworthy management personnel and to file documents, as required, with respect to any new executive officers or directors who may join the Insurers in the future.  Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Beatty Test. at 64:22-65:3.

136     Management of the Insurers states that the composition of the Insurers' boards of directors will continue to comply with applicable state laws.  Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Beatty Test. at 65:4-5.

137.    Management of the Insurers states that they will continue to make all required Delaware Holding Company Act filings, including, but not limited to, the annual "Form B" filing (annual holding company registration statement).  Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Beatty Test. at 65:6-10.

138.    Management of the Insurers states that they will continue to maintain permissible investments that are in accordance with qualitative and quantitative investment limits prescribed by statute.  Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Beatty Test. at 65:11-14.

139.    Management of the Insurers states that they will continue to cooperate with regulators in connection with periodic financial condition and market conduct examinations. Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Beatty Test. at 65:15-17.

140.    Management of the Insurers states that they will continue to file all required annual, quarterly, and other financial statements, including required annual audited financial statements and reporting information regarding their statutory financial condition.  Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Beatty Test. at 65:22-66:2.

141.    Management of the Insurers states that they will continue to file an annual actuarial opinion as required by applicable state law.  Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Beatty Test. at 66:3-5.

142.    Management of the Insurers states that they will maintain all required designations appointing any State Insurance Commissioner or a resident agent to receive service

of process on behalf of the Insurers.  Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Beatty Test. at 65:18-21.

143.    The DID continually monitors the financial condition of these Insurers and finds that each of these Insurers is in compliance with the Delaware Insurance Code.  The DID has concluded that because the financial effect of this transaction will be to strengthen the financial condition of the Insurers and for the reasons outlined above, the Proposed Transaction will not jeopardize the Insurers' ability to meet licensing requirements.  Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Brown Test. at 233:12-20.

144.    The DID has concluded that the insurers' RBC ratios currently are, and will remain, above levels that would require the DID to take supervisory action against the Insurers. See Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Brown Test. at 233:21-234:4.

145.    The DID has taken no action with respect to the Insurers' licenses, indicating that licensing requirements are being met.  Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Bernstein Test. at 158:14-19, 163:21-164:2.

146.    In connection with the Form A Application, the DID reviewed the Insurers' current financial information as well as the *pro forma* financial information expected to result after closing of the Proposed Transaction.  Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Brown Test. at 228:13 – 229:5; Macesic Test. at 258:19; *see* Brown Test. at 244:13-16.

147.    The DID has concluded that the Proposed Transaction will not call into question the ability of the insurers, after the change of control, to satisfy the requirements for the issuance of a license to write the line or lines of insurance for which they are presently licensed.  Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Brown Test. at 234:2-4; *see also id.* at 235:14-18.

148.     Based on all relevant facts of record including the foregoing, it appears from a preponderance of the evidence of record that the approval of the Application would not result in the Insurers' inability to satisfy requirements for licensure.  That conclusion is not and cannot be a warranty that the Insurers will continue indefinitely to be able to satisfy the requirements for licensure or that the Insurers' run-off will be solvent, and the DID has candidly recognized this uncertainty.  Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Vild Test. at 208:7-10, 210:14-16. The existence of sufficient statutory surplus to satisfy licensure requirements does not establish *per se* that equivalent surplus exists for all economic and financial purposes.  Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Babbel Comments ("Cmts.") at 316:18-318:2.  Nevertheless, insurance licensure requirements involve statutory definitions of assets, liabilities and surplus, and in any event, and as the DID recognizes, the Proposed Transaction will enhance prospects for the Insurers' continued licensure eligibility in the future, and for a solvent run-off.  Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Vild Test. at 208:13-16, 210:18-22.

**B.     Substantial Lessening of Competition – 18 *Del. C.* § 5003(d)(1)(b)**

149.     The acquisition of control of the Insurers is subject to review and analysis under 18 *Del. C.* § 5003 to determine whether the effect of the acquisition of control would be to substantially lessen competition in insurance or tend to create a monopoly.

150.     Given that the Insurers are in run-off, they are not competing to write insurance in Delaware or any other state.  See Docket No. 1, Exhibit 4, Form A Application, at 9; Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Cahill Test. at 98:6-10.

151.     There is no plan to combine the Insurers.  Rather, the Insurers will continue to operate in the same manner as they currently operate.  Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Cahill Test. at 98:10-11.

152.    The Insurers constitute a very small fraction of the more than 1750 insurance companies licensed in Delaware.  Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Cahill Test. at 98:19-22.

153.    In 2005, the Insurers wrote negative $941,000 direct premium in Delaware because of deductions for return premiums.  Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Brown Test. at 237:16-18.

154.    There is no evidence that the Applicants own a controlling interest in an insurance entity.  Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Brown Test. at 237:18-20.

155.    The DID has determined that there is no evidence to indicate that the effect of the acquisition of control would be substantially to lessen the competition in insurance in the State of Delaware or tend to create a monopoly.  Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Brown Test. at 237:12-15.

156.    Based on all relevant facts of record including the foregoing, it appears from a preponderance of the evidence of record that the Proposed Transaction will not lessen competition or tend to create a monopoly.

### C.    Financial Condition of the Acquiring Party – 18 *Del. C.* § 5003(d)(1)(c)

157.    When analyzing an application for acquisition of control under 18 *Del. C.* § 5003, the Commissioner reviews whether the financial condition of the acquiring party is such as might jeopardize the financial stability of the insurer or prejudice the interests of its policyholders.  In asserting that such jeopardy precludes approval of the Proposed Transaction, those who have submitted comments opposing the transaction claim that the Applicants (as acquiring parties) have trivial financial resources of their own, trivial at least in relation to the financial resources of the selling parties in the Proposed Transaction (principally Royal UK).  WTC Jan. 17, 2007 Written Comments (Docket No. 119) at 11.  The sellers, according to those opposing the

Proposed Transaction, have been and will be committed, as a matter of fact if not as a matter of law, to continue to provide financial support to the Insurers sufficient to fulfill all of the Insurers' obligations to their policyholders.  Id.; Nov. 17, 2006 Comments of Jonathan Terrell (Docket No. 73) at 13-17.   On the other hand, if the Proposed Transaction is completed, its opponents continue, the sellers (principally Royal UK) will be relieved of any legal or practical obligation to continue to provide financial support to the Insurers, and the interests of the Insurers' policyholders will suffer significantly as a result.  WTC Jan. 17, 2007 Written Comments (Docket No. 119) at 14-17.  This line of reasoning, however, misconceives the literal meaning and evident purpose of the pertinent statutory provision.  Section 5003(d)(1)(c) does not focus on the post-acquisition financial condition of the acquired insurer; rather, it focuses only on whether the financial condition of the *acquirer* will itself harm the insurer.  The evil addressed by this provision is simply the prospect that the acquirer will be financially constrained to appropriate assets of the acquired insurer for its own benefit.  Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Bernstein Test. at 144:24-145:24.

158.    For the reasons reviewed below, that prospect does not appear from the evidence of record relating to the Proposed Transaction.  Immediately prior to closing the Proposed Transaction, the Seller will make a capital infusion of $287.5 million directly into RIC.  Docket No. 1, Exhibit 4, Form A Application, Ex. A, Purchase Agreement, Section 5.9.

159.    Upon closing, Arrowpoint Capital will have access to $27.5 million from AGP to fund Arrowpoint Capital's operating costs.  Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Tighe Test. at 25:1-10.

160.     Arrowpoint Capital's operating costs include legal and consulting fees, an apportionment of directors' fees, and the accrual of the cost of management retention agreements.  Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Beatty Test. at 71: 23-72: 3.

161.     Arrowpoint Capital is projected to have sufficient capital and cash available upon consummation of the Proposed Transaction to enable it to stand alone for the period of run-off without requiring any additional capital infusion or being reliant on any dividend or service fees from the Insurers.  See Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Tighe Test. at 25:16-20; Beatty Test. at 69:11-15.

162.     Arrowpoint Capital is not taking on any debt as a part of this transaction, other than the purchase consideration obligation under the $300 Million Subordinated Debt, which is interest-free with no maturity date and is to be repaid only if and when regulatory approval for a dividend is granted.  Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Beatty Test. at 71:2-6.  Consequently, Arrowpoint Capital will not have any debt service obligations by virtue of the $300 Million Subordinated Debt.  Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Bernstein Test. at 181:4-9.

163.     Under the terms of the Proposed Transaction, the Seller is required to eliminate a $279 million RGI indebtedness.  Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Tighe Test. at 29:6-10.

164.     Arrowpoint Capital is appropriately capitalized for the Proposed Transaction and will not be reliant on the Insurers to fund its operation either by dividend or service fees.  See Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Tighe Test. at 20: 2-5.

165. It is not uncommon for an acquisition to be structured with an acquirer with limited capitalization. Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Bernstein Test. at 181:10 - 182:12.

166. Where, as here, the acquiring holding company capitalization does not include debt service obligations that would impact or place financial demands on the insurers, this limited capitalization is sufficient. Id. at 181:4-9.

167. The DID reviewed the financial condition and projections of Arrowpoint Capital and the Insurers, and concluded that the Proposed Transaction will not jeopardize the financial stability of the Insurers or prejudice U.S. policyholders. Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Brown Test. at 238:10-239:3, 10-22. More specifically, the DID found that:

a. $27.5 million will be directed from AGP to Arrowpoint Capital to provide liquidity to fund the current and future operating expenses at the holding company level during the run-off;

b. The subordinated notes in the amount of $300 million bear no interest and require no payments to the parent unless the operating income of the acquirer is such that payments can be made. Thus, there will be no involuntary cash payments from the acquirer to the Seller;

c. The policyholder surplus in RIC, which is the parent company of RSLI and SICH, is insulated and protected by the safeguards built into the Delaware Insurance Code regarding dividend distributions. For example, currently, any potential dividends from RIC to the holding company would be classified as "Extraordinary" in accordance with Chapters 49 and 50 of Title 18. "Extraordinary" dividends require prior DID review and approval. However, as an additional safeguard, the DID recommends that any future dividends and/or distributions from the Insurers require prior DID approval, and the Applicants have committed to seek such prior approval of any such dividend; and

d. The $287.5 million capital contribution that will be made to RIC just prior to closing will improve the policyholder surplus of RIC which will be beneficial to the policyholders.

Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Brown Test. at 238:4-241:22.

168. Based on all the relevant facts, including the foregoing, it appears from a preponderance of the evidence of record that the financial condition of the acquiring company, Arrowpoint Capital, does not pose any impediment to the change of control, jeopardize the financial stability of the Insurers or prejudice the interests of their policyholders.

**D.    The Plans or Proposals of the Acquiring Party to Make Changes to the Insurers - 18 *Del. C.* § 5003(d)(1)(d)**

169. When analyzing an application for change in control under 18 *Del. C.* § 5003, the Commissioner reviews whether the plans or proposals of the acquiring party to liquidate the insurer, sell its assets, or consolidate or merge it, or any other material change would be unfair and unreasonable to policyholders and not in the public interest.

170. Arrowpoint Capital has stated that it has no plans to liquidate the Insurers, sell their assets, or consolidate or merge them, or make any other material change in the business or corporate structure or management of the Insurers after the Proposed Transaction is consummated.  Docket No. 1, Exhibit 4, Form A Application at 6; Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Cahill Test. at 101:8-12.

171. In addition, the Applicants have included several commitments in their Form A Application, which ensure that no material changes will be made in the business of the Insurers. The commitments relevant to future planning, which will not be modified without DID approval, include:

    a.  The Insurers will continue the corporate governance, compliance structures, and controls practices that are currently in place, including the multi-disciplinary governance council and regular risk assessment and control reviews;

    b.  The Applicants will not alter affiliate agreements or enter into new affiliate agreements that would materially adversely affect the Insurers' policyholder surplus;

    c.  With limited, ordinary course of business exceptions, the Applicants will not sell the Insurers' assets or buy additional operating assets on their behalf for three years without prior regulatory approval;

d.  The Applicants will not expand their operations beyond the current scope (other than in connection with this Proposed Transaction), subject to limited exceptions such as engaging in certain administrative activities that do not involve the underwriting of insurance risk; and

e.  The Applicants will not materially change their claims handling practices.

Docket No. 1, Exhibit 4, Form A Application, at 10-11; Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Tighe Test. at 17:14-17.

172.    The DID has concluded that "there is no evidence that the plans the acquiring party has concerning the insurers is unfair and unreasonable to policyholders of the insurer and not in the public interest."  Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Brown Test. at 242:17-22.  This finding was based, in part, on the fact that there was no evidence in the Form A application that this standard was violated, that there were no other filings or applications to the DID that were inconsistent with the representations made in the Form A and that the insurers are in run-off and there is no evidence that their operations will change from run-off.  Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Brown Test. at 241:23-242:22.

173.    Based on the foregoing facts, it appears from a preponderance of the evidence of record that the Applicants do not have any plans to manage the Insurers that would be unfair and unreasonable to policyholders and/or that would be contrary to the public interest.  Some of those who have submitted comments in opposition to the Proposed Transaction have asserted, in essence, that management of the Insurers will relinquish efforts to look to Royal UK to fund payments to policyholders, and will more aggressively resist legitimate policyholders claims following the Proposed Transaction.  *E.g.*, WTC Jan. 17, 2007 Written Comments (Docket No. 119) at 12-13.  For reasons discussed in Part X(D) below, however, that claim is unpersuasive.

**E.      Competence, Experience and Integrity of Those Who Would Control the Operation - 18 *Del. C.* § 5003(d)(1)(e)**

174.     When analyzing an application for change in control under 18 *Del. C.* § 5003, the Commissioner reviews the competence, experience, and integrity of those persons who will control the operations of the Insurers.

175.     The entire senior management team of RSA-USA and the Insurers will remain with Arrowpoint Capital after the acquisition.  Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Tighe Test. at 8:18-21.  This management team has nearly 200 years of combined experience in the insurance industry.  Id. at 11:20-21.

176.     The 12 executive officers and 13 directors of Arrowpoint Capital Corp. are listed in Exhibit E to the Form A.  Docket No. 1, Exhibit 4, Form A Application, Exhibit E.

177.     Curriculum vitae for all directors and executive officers of Arrowpoint Capital Corp. were provided as a supplement to the Form A Application on November 17, 2006, Docket No. 77, and the DID reviewed all *curricula vitae* submitted.  Those *curricula vitae* reflect the following:

a.   Mr. Tighe is CEO, President, and a director of Arrowpoint Capital Corp.  He has been with the Royal group of companies for more than 25 years, holding various positions increasing in seniority.  Mr. Tighe became a member of the Board of Directors in 2000, and was promoted to President in 2003 when RSA-USA management was replaced.

b.   Mr. Beatty is CFO, Executive Vice President, and a director of Arrowpoint Capital Corp.  He has been with Royal for over 12 years, serving in various positions within the financial reporting areas in the U.S. and the U.K.  Mr. Beatty joined the new management of RSA-USA in 2004.  Prior to that, he was a senior audit manager at the accounting firm of Coopers and Lybrand (now PriceWaterhouseCoopers).

c.   Mr. Cahill is Chief Operating Officer, Executive Vice President, and a director of Arrowpoint Capital Corp.  He has been with RSA-USA for nearly 15 years, starting as an Account Executive in 1991.  In late 2003, Mr. Cahill was promoted to the position of COO.  Before joining RSA-USA, he spent five years at Hartford Insurance Company in various underwriting and management positions.

d.  James Meehan is the Senior Vice President, General Counsel, Secretary, and a director of Arrowpoint Capital Corp.  Mr. Meehan joined RSA-USA as Senior Vice President and General Counsel in January 2005.  He has been licensed to practice law for over

26 years and has focused exclusively on the insurance industry for the past 16 years. Mr. Meehan was previously the General Counsel of Kemper Casualty Insurance Company and assisted that company with the beginning of its run-off. Previously, Mr. Meehan served as the Tax Commissioner and Consumer Counsel of the State of Connecticut.

e. Andre Lefebvre is a Senior Vice President, Financial Risk Officer, and a director of Arrowpoint Capital Corp., who joined Royal in September 2001 as the Financial Risk Officer. He has over 18 years of experience in the insurance industry with extensive background and expertise in the areas of actuarial science, reinsurance, alternative risk financing, and risk management. Mr. Lefebvre is a fellow of the Casualty Actuarial Society, and began his career as a consulting actuary with Tillinghast.

f. Julie Fortune is a Senior Vice President, Chief Claims Officer, and a director of Arrowpoint Capital Corp. She joined Royal in 2004 as Chief Claims Officer. Ms. Fortune has been licensed to practice law for more than 20 years and has more than 18 years of experience in insurance and claims management services. Before joining Royal, Ms. Fortune was the Vice President for Corporate Legal Services at Fireman's Fund, the Senior Vice President and Chief Claim Officer at Zurich Canada, and Vice President of Customer Quality Service and Litigation Management at Zurich North America.

g. Catherine Carlino is a Senior Vice President and a director of Arrowpoint Capital Corp. She joined Royal in 1997 after working five years at Coopers & Lybrand. Ms. Carlino is a CPA, and has held a variety of positions with Royal, increasing in seniority, including Assistant Comptroller to Director and Senior Vice President of Corporate Operations and Planning.

h. Robert Dixon is the Chief Human Resources officer, a Senior Vice President, and a director of Arrowpoint Capital Corp. He joined Royal over 25 years ago as an employment manager in a regional office. He attained his current position as Senior Vice President and Chief Human Resources Officer in 2003.

i. David Payseur is a Senior Vice President of Arrowpoint Capital Corp. He is a CPA and has been Royal's Chief Audit Executive since December 1998. Mr. Payseur was a Finance Manager for such companies as Solectron and IBM for 16 years before joining Royal.

j. David Davenport is a Vice President and the Controller of Arrowpoint Capital Corp. He joined as an Assistant Controller in 1991, and has since been promoted to Assistant Finance Officer and then Vice President and Controller. Mr. Davenport was Assistant Vice President and Finance Manager at Crum & Foster prior to joining Royal.

k. Daniel Keddie is the Chief Actuary, a Vice President, and a director of Arrowpoint Capital Corp. He has been with Royal since 1985 in a variety of actuarial positions. Mr. Keddie was previously a pension consultant at L.T. Watkins & Associates.

l   Michael J. Crall, former CEO of Equitas and former President and CEO of Argonaut Insurance Company, is a director of Arrowpoint Capital Corp.

m.  David Shumway is the Chief Investment Officer, a Vice President, and a director of Arrowpoint Capital Corp.  Since joining Royal in 1999, Mr. Shumway has served as Director of Fixed Income and Chief Investment Officer.  For the 12 years before joining Royal, Mr. Shumway held a variety of management positions at various investment funds and banks, including Bear Sterns, Lehman Brothers, and Merrill Lynch.

n.  Edward J. Muhl, former Superintendent of Insurance for the State of New York, former Commissioner of Insurance for the State of Maryland, and former President of the National Association of Insurance Commissioners, is a director of Arrowpoint Capital Corp.

o.  Larry G. Simmons, former President and CEO of Royal & SunAlliance Insurance Company of Canada and Western Assurance Company, is a director of Arrowpoint Capital Corp.

178.    Applicants have stated that throughout the transition to run-off, the management team of RSA-USA, which will remain as the management team of Arrowpoint Capital, has:

a.  Ensured that policyholder obligations are met;

b.  Put into place competent people to manage claims, resulting in very few policyholder complaints;

c.  Reduced the workforce in line with what is appropriate for run-off companies, with no resultant lawsuits;

d.  Found new markets for its producers;

e.  Cooperated with regulators and fully responded to inquiries;

f.  Divested RSA-USA of its non-standard auto business, which had a $140 million positive impact;

g.  Taken a multi-disciplinary approach to looking at complex litigation; and

h.  Increased the focus on the reserving process and reinsurance collections.

Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Tighe Test. at 12:2-13:6.

179.    Applicants have stated that RSA-USA has achieved many of management's financial goals for the Insurers since 2003, including:

a. Eliminating virtually all of the Insurers' written premium volume with minimal disruption to policyholders and minimal complaints;

b. Generating investment income in excess of management's original plan in each of the years since the restructuring;

c. Reducing balance sheet risk through the development and implementation of a rigorous asset/liability management process that has matched expected cash inflows with plan outflows;

d. Maintaining a conservative investment portfolio focused in high-quality fixed income instruments;

e. Reducing outstanding claims inventory since year end 2003 from 121,000 to fewer than 31,000; and

f. Collecting $4.7 billion in insurance recoveries from 2003 through 2006.

Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Beatty Test. at 47:21-48:16.

180.    Applicants have stated that RSA-USA management has made progress in six general areas since September 2003: (i) expense management; (ii) claims management; (iii) collection of reinsurance recoverables; (iv) investment management; (v) management of litigation risk; and (vi) consolidation of the Insurers' operations.  Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Tighe Test. at 13:18-14:4.

181.    Applicants stated that management intends to continue these initiatives throughout the run-off:

a. *Expense Management Initiatives:* Management reduced the aggregate number of employees from 6,317 in December 2002 to 543 in December 2006.  No lawsuits have been filed by the employees whose jobs were eliminated.

b. *Claims Management:* Additional experienced claims executives were added to the management team.  In addition, the claims division was consolidated in a centrally managed location, and claims were reorganized by complexity and common characteristics.  Overall claims inventory was reduced from approximately 121,000 in December 2003 to fewer than 31,000 in December 2006.

c. *Reinsurance Collections:* In 2004, management adopted a program to regularly review and escalate efforts to resolve disputed reinsurance business, resulting in collections of $1.44 billion.  From 2003 through December 2006, RSA-USA has collected $4.7 billion in reinsurance recoverables.  Mr. Tighe testified that

management intends to continue post-acquisition early intervention and proactive practices that have brought about successful reinsurance collections.

d. *Investment Management:* Management created a high return investment portfolio and reduced risk, as demonstrated by an overall weighted average of Aa2, market value of $3.5 billion as of year-end 2006, and gross investment income of $201.5 million.

e. *Management of Litigation Risk:* Management introduced a multi-disciplinary legal review process focused on developing and implementing case-specific mitigation strategies. RSA-USA's major litigation cases have been reduced from 12 in 2003 to 5 currently.

f. *Consolidation of the Insurers' Operations:* Management divested most of the Insurers' commercial and standard/preferred books of business, decreasing net written premium from over $3.1 billion in 2002 to less than $5 million in 2006.

Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Tighe Test. at 14:9-17:11.

182.    Management has expertise in claims handling, reinsurance collections, investment management and liquidity management. Docket No. 1, Exhibit 4, Form A Application, at 7-8.

183.    Management has stated that its ultimate goal is the completion of a solvent run-off. E.g., Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Tighe Test. at 22:20-21; Beatty Test. at 45:5-6; 49:4-5; 70:1-2.

184.    The DID found that "there is no evidence to indicate that the competence, experience and integrity of those persons who would control the operations of the insurer was such that it would not be in the best interest of the policyholders of the insurer and of the public to permit the acquisition of control." This finding was based on several considerations:

a. The fact that the current management group led the operations since September 20, 2003 and will remain unchanged;

b. First hand observations by DID Analyst Brown of the actions taken by the current management team and interaction with them in meetings raised no concerns regarding this standard; and

c. The management team will also be the owners and the biographical affidavits included in the Form A application as well as third-party background checks raised no concerns regarding this standard.

Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Brown Test. at 242:2-244:8.

185.    Based on all relevant facts of record including the foregoing, a preponderance of the evidence of record establishes that the competence, experience, and integrity of the persons who would control the operations of the Insurers are such that the interests of policyholders and the public would not be jeopardized.  Some of the persons opposing the Proposed Transaction have asserted, in essence, that the Proposed Transaction will jeopardize the interests of the Insurers' policyholders because it will confer upon management of the Insurers additional incentives to resist legitimate policyholder claims.  WTC Jan. 17, 2007 Written Comments (Docket No. 119) at 13.  For reasons discussed in Part X(D) below, however, that claim is unpersuasive.

### F.    Hazard or Prejudice to the Insurance Buying Public-18 *Del. C.* § 5003(d)(1)(f)

186.    When analyzing an application for acquisition of control under 18 *Del. C.* § 5003, the Commissioner reviews whether the proposed acquisition would likely be hazardous or prejudicial to the insurance buying public. It is at least arguable that this condition in §5003(d)(1)(f) is inherently inapplicable in respect of an acquisition of an insurer, like the Insurers here, that is in run-off and is no longer selling insurance policies to public buyers (and hence, there is no prospect of hazard or prejudice to "the insurance <u>buying</u> public").  One could, however, read this statutory provision more broadly, to preclude approval of an acquisition of an insurer in run-off, where the acquisition itself would be prejudicial to policyholder interests and thus prejudicial to "the insurance buying public" in general.  Fortunately, for the reasons set forth below, it is unnecessary to choose between these two competing constructions of subsection (d)(1)(f).

187.    The Insurers are in run-off and do not service the insurance-buying public. Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Cahill Test. at 98:6-10.

188.    The current senior management will remain in place and current claims handling practices will continue.  Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Tighe Test. at 7:21-13 and 8:18-21.

189.    The Applicants have made several commitments, which will protect the interests of policyholders.  These commitments are detailed at ¶¶ 45, 127, and 171, *supra*).

190.    Royal UK will direct $287.5 million to RIC immediately prior to closing the Proposed Transaction.  Docket No. 1, Exhibit 4, Form A Application, Ex. A, Purchase Agreement, Section 5.9.

191.    Upon consummation of the Proposed Transaction, RGI, the direct parent of RIC, will be relieved of a $279 million indebtedness.  Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Tighe Test. at 29:6-10.

192.    Royal UK has explicitly stated that, absent this transaction, it will make no further contributions to RSA-USA or the Insurers if the Proposed Transaction is not approved, regardless of whether the Insurers' financial resources ultimately prove insufficient to meet their obligations.  Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Culmer Test. at 126:20; 127:4-10.

193.    The DID undertook analysis of the adequacy of the proposed capital structure of the Insurers when the Proposed Transaction is concluded.  Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Vild Test: 210:18-22.

194.    The assessment of the adequacy of the capital structure is a difficult task, since its most important component is a prediction of future loss development.  Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Tinsley Test. at 270:17-18.

195.    RSA-USA and the Insurers' projected liabilities were analyzed by the DID's outside actuarial consultant, INS. Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Macesic Test. at 255:20-259:21.

196.    INS, an independent actuarial firm, was engaged by the DID in connection with the ongoing December 31, 2005 targeted examination of the Insurers. Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Macesic Test. at 254:13-16.

197.    Prior to its engagement in connection with the ongoing December 31, 2005 targeted examination, INS had been retained to conduct a reserve review of the Royal Indemnity pool in connection with the triennial examination as of December 31, 2004. INS found that the Insurers' book net loss and loss adjustment expense reserves were reasonably stated. Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Macesic Test. at 255:8-10.

198.    In connection with its current engagement, INS performed: (1) a loss and loss adjustment expense review of the Insurers; (2) an individual cash flow analysis using the Insurers' financial model; (3) stress test analysis on the Insurers' financial model, including scenarios involving possible reserve variability in targeted categories, including but not limited to asbestos and environmental, general litigation, workers' compensation, and reinsurance collectibility; and (4) a review of the viability of the Insurers' financial model. Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Macesic Test. at 255:24-256:17.

199.    Because of the adverse development built into the model, INS' financial projections are more conservative than that of the Insurers. Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Macesic Test. at 259:2-6.

200.    Based on its financial projections, INS concluded that, with the influx of $287.5 million in capital, the Insurers are likely to continue to operate as a solvent and viable run-off

insurance company.  Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Macesic Test. at 259: 16-19.

INS also concluded that the $287.5 million capital influx gives the Insurers the ability to

withstand additional stress and adversity while still meeting policyholder obligations.  Id. at

259:19-21.

201.    The DID found that there is "no evidence that the acquisition would be hazardous

or prejudicial to the insurance buying public."  Docket No. 125, Tr. of Jan. 19, 2007 Hearing,

Brown Test. at 244:24-245:2.

202.    Based on all the relevant facts, it appears from a preponderance of the evidence of

record that the Proposed Transaction will not be hazardous or prejudicial to the insurance buying

public.  To the contrary, and whatever uncertainty may exist with respect to the Insurers'

ultimate ability to pay legitimate policyholder claims, the Proposed Transaction will only

enhance that ability.  Certain comments submitted in opposition to the Proposed Transaction

contest this conclusion, arguing principally that if the Proposed Transaction were not approved,

Royal UK would continue to supply capital to the Insurers sufficient to avoid insolvency.  *E.g.*,

Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Wolinsky Cmts. at 310:1-13.  For reasons

reviewed in Part X(B) below, however, this argument is unpersuasive.

## X.    REVIEW OF PUBLIC COMMENTS

203.    A number of issues were raised in the written comments and oral comments at the

January 19, 2007 Hearing by representatives of certain of the Insurers' policyholders and others.

The comments are addressed below, grouped into the principal contentions they advance.

**A.      The Contention that the Proposed Transaction Will Leave The Insurers With Insufficient Capital to Meet Their Potential Obligations**

204.      One concern of the commenters is that the Insurers' surplus is insufficient to meet future obligations.  See, e.g., Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Wolinsky Cmts. at 281:2-13; id., Wilcox Cmts. at 338:4-10.

205.      As explained *supra*, ¶¶ 31 and 190, Royal UK will infuse Arrowpoint with $287.5 million of capital, for the benefit of the Insurers, upon completion of the Proposed Transaction.

206.      There has been some question as to how the $287.5 million figure was derived and whether such a contribution is large enough.  *E.g.*, Docket No. 105, Joint motion for determination of pre-hearing issues, at ¶5.

207.      The $287.5 million contribution was derived from a three-way, contested negotiation between the DID, the Applicants and Royal UK after the DID determined that the Insurers would be unlikely to achieve a solvent run-off without an infusion of capital.  Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Vild Test. at 206:7-12, 206:19-23; *see also id.*, Brown Test. at 250:17-22; Culmer Test. at 124: 7-11; Tinsley Test. at 271:12-272:4.

208.      $287.5 million represented the amount that the Seller was willing to finance, the buyer was willing to accept, and what RSA-USA management thought the Insurance Department would accept in a Form A process.  Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Tighe Test. at 22:15-19; see also id., Vild Test. at 206:24-207:9.

209.      The DID has determined that the possibility of insolvency is greatly reduced by the infusion of capital in the amount of $287.5 million.  Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Vild Test. at 207:21-24; 208:13-16; 210:18-22; 212:1-8; Macesic Test. at 259:19-21. Indeed, that determination is virtually self-evident.  Only if one believed that even greater capital support from Royal UK would be forthcoming if the Proposed Transaction were not approved

could one credibly contend that the Insurers' policyholders would be worse off if the Proposed Transaction occurred. As discussed below, however, the evidence of record does not support such a belief.

210.     Some commenters have pointed to poor ratings that the Insurers have recently received from ratings agencies as an indication of their future inability to meet policyholder obligations. <u>See</u> Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Babbel Cmts. at 328:6-9; Terrell Cmts. at 346:8-10.

211.     Rating agency ratings are not relevant to insurers in run-off. The ratings are relevant only to companies competing with other insurers to attract and retain business. <u>See</u> Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Bernstein Test. at 175:4-16.

212.     The DID has access to non-public information to which ratings agencies do not have access. Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Bernstein Test. at 176:10-16, Wilcox Cmts. at 333:19-334:3.

213.     Decreased surplus is expected when insurers cease writing new policies and generating premium and enter run-off. This fact therefore does not militate against the Proposed Transaction. <u>See</u> Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Beatty Test. at 45:20 - 46:3.

214.     Certain commenters have posited that RSA-USA is insolvent or on the verge of becoming insolvent because RIC's 2005 Actuarial Opinion states that several factors could result in a material impact on the RBC ratio and/or the surplus of the Insurers. Docket No. 94, WTC declarations by Messrs. Babbel and Wilcox, at ¶¶ 33-34; <u>see, e.g.</u>, Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Terrell Cmts. at 356:20-21.

215.	In evaluating an Insurers' financial condition, it is not reasonable to assume that all contingencies will develop to a material level of adversity. Such an event is highly unlikely. See Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Keddie Test. at 88:15 –89:1.

216.	In any event, the commenters' concerns are directed to the current financial condition of the Insurers, not how the Proposed Transaction will change the financial condition of RSA-USA. See Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Bernstein Test. at 156:8-17.

217.	The purpose of the present proceeding is not to make a determination as to solvency, but to determine whether Applicants meet the statutory requirements for acquisition found in 18 *Del. C.* § 5003(d). Insolvency is determined under separate procedures of the Insurance Code. See 18 *Del. C.* § 5901 *et seq.*

218.	The Insurers have been scrutinized by the DID on a regular basis, and the DID has not made a determination that any of them are insolvent, nor has it found cause to initiate insolvency-related proceedings. See Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Vild Test. at 207:18-21.

219.	An independent actuary, INS, has concluded that with the influx of $287.5 million in capital, the Insurers are likely to continue to operate as a solvent and viable run-off insurance company. Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Macesic Test. at 259:16-21. In any event, and as noted above, the capital infusion contemplated by the Proposed Transaction can only substantially enhance the likelihood that the Insurers will continue to operate a solvent and viable run-off.

220.	Some of the commenters who are involved in litigation against one or more of the Insurers have suggested that the Proposed Transaction should not be approved because the Insurers may not be able to satisfy any potential judgment that the policyholders may win. See,

e.g., Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Wolinsky Cmts. at 282:16-283:12; id., Henry Cmts. at 381:14-383:9.

221.    In the course of the January 19, 2007 Hearing, the Hearing Officer discouraged discussion of these individual coverage litigations because the Form A process is not the proper forum in which to resolve the various litigations that are pending in other fora.  Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Cahill Test. at 110:2-14; see Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Bernstein Test. at 177:15-18; Wilcox Cmts. at 341:15 – 342:2 (acknowledging that analyzing the GM claim is a type of issue from which actuaries "have traditionally backed away").

222.    These litigations have been addressed by the Insurers, and their reserves and reserving practices with respect to such litigations have been reviewed by outside auditors and actuaries and have been determined to be reasonable by the Insurers and the DID.  Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Macesic Test. at 255:8-10; Cahill Test. at 114:9-15; Keddie Test. at 86:23-87:1, 92:8-15.

223.    Specifically with respect to GM's assertion that its litigation claim is worth $1 billion dollars, the DID stated that its "financial and accounting staff and consultants have advised that the GM contingency has not matured to the point that a reserve is required under the relevant accounting rules."  Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Vild Test. at 211:9-12.

224.    If policyholders have claims against the Insurers and/or the U.K. parent company, they may pursue those claims notwithstanding the Proposed Transaction.  Docket No. 125, Tr. of Jan. 19, 2007 Hearing,  Cahill Test. at 107:24-108:4; Tighe Test at 39:8-10; Bernstein Test. at

177:15-18; id., Wilcox Cmts. at 341:15 – 342:2 (acknowledging that analyzing the GM claim is a type of issue from which actuaries "have traditionally backed away").

225.    In any event, and as previously noted, the contribution of $287.5 million in capital will enhance the Insurers' ability to honor the policyholders' legitimate claims and continue operating as a solvent and viable run-off insurance company.  Neither the Insurers' current financial condition nor the pending coverage claims of the policyholders provide a basis for withholding approval of the Proposed Transaction.

**B.    The Contention that Disassociation of Royal UK from Arrowpoint and the Insurers Will Adversely Affect the Insurers**

226.    The commenters assert that Royal UK is responsible for the Insurers' liabilities and that the Proposed Transaction should not be permitted because if it takes place, Royal UK will not stand behind the Insurers' obligations and will no longer provide further support to the Insurers.  See, e.g., Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Wolinsky Cmts. at 299:12-301:24; id., Wilcox Cmts. at 331:5-20, 338:21-339:2; id., Terrell Cmts. at 345:15-346:10.  The premise of this assertion is necessarily that if the Proposed Transaction is not approved, Royal UK will provide additional capital to the Insurers, sufficient at least to avoid any insolvency of the Insurers and therefore sufficient to fund any currently contingent claim against the Insurers.  That premise is unfounded as a matter of law and as a matter of fact.

227.    To begin with, there is no legal obligation on the part of Royal UK to provide additional capital to the Insurers, because, consistent with principles of corporate law, generally, a parent corporation is not liable for the debts or obligations of its subsidiaries.  Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Bernstein Test. at 154:13-15.  *See* 18 *Del. C.* §4903; 8 *Del. C.* §102(b)(6).

228. It is unreasonable, moreover, for a policyholder to assume that the structure of an insurer's holding company system will remain unchanged. <u>See</u> Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Bernstein Test., at 173:15-24. Corporate parent changes occur with frequency in the insurance industry. <u>See</u> Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Muhl Test., at 134: 1-5.

229. Likewise, a parent is not legally obligated to continue to own an insurance company subsidiary, and there is nothing improper in a parent of an insurance licensee choosing to surrender ownership of an insurer. Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Bernstein Test. at 171:21-172:10.

230. Royal UK has publicly stated that it is not in the business of managing run-off companies; that the U.S. operation is not core to its business; and that it will not contribute any additional capital to the Insurers if the Proposed Transaction is not consummated, irrespective of the future ability of the Insurers to meet financial obligations. Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Culmer Test. at 118:13-18; 121:18-10; 122:5-6; 126:16-20; 127:4-10; Tighe Test. at 24:7-12.

231. Certain commenters have challenged the credibility of Royal UK's statement that it will not contribute additional capital to RSA-USA absent the Proposed Transaction and characterized Royal UK's statement as a "threat." Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Wolinsky Cmts. at 305:19-306:4, 310:8-10; <u>see also</u> <u>id.</u>, Terrell Cmts. at 354:2-11, 358:11-13. These commenters suggest that Royal UK will contribute capital in the future to preserve its reputation. <u>See, e.g.</u>, <u>id.</u>, Wolinsky Cmts. at 306:10 - 307:6.

232. Royal UK's history of diminishing capital contributions since 2003 substantiates Royal UK's intent to cease making capital contributions to RSA-USA. Docket No. 125, Tr. of

Jan. 19, 2007 Hearing, Culmer Test. at 123:12-15; Bernstein Test. 170:22-171:8.  All of the evidence presented at the Hearing supports the contention that Royal UK would not contribute any more capital to the Insurers absent the approval of the Proposed Transaction.  Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Culmer Test. at 195:5-7; id., Tighe Test. at 24:8-12; id., Vild Test. at 209:18 – 210:10.

233.    Nevertheless, the truth regarding the willingness of Royal UK to supply further capital to the Insurers is likely more nuanced than either the Applicants or the opponents of the Proposed Transaction have urged.  It is not clearly established, despite Mr. Culmer's testimony, that Royal UK would not find it advantageous to supply at least some additional capital to the Insurers in the future if the Proposed Transaction were rejected, particularly if doing so could avoid a liquidation or receivership of the Insurers.  *See* WTC Jan. 17. 2007 Written Comments (Docket No. 119) at 9, and the accompanying Declarations of Jeffrey McKinley and Neil Shaw. By the same token, any such willingness is clearly limited:  the evidence of record amply establishes that Royal UK does not wish to continue in the insurance business in the U.S., and that it wishes to terminate any pattern of further capital support for the Insurers.

234.    It is important, therefore, to focus on why Royal UK would be willing to contribute $287.5 million of capital to the Insurers as a concluding act in connection with the Proposed Transaction, in exchange for a $300 million subordinated note the repayment of which effectively depends on the success of the Insurers' pending run-off.  The most plausible answer supported by the evidence of record is that Royal UK's reputation in the event of a failure of the Insurers' run-off would be less impaired – but only marginally so – if such a failure followed approval of the Proposed Transaction in this proceeding than if such approval were not forthcoming.  See Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Wolinsky Cmts. at 307:2-22.

In essence, then, the DID has agreed to, and is supporting, a bargain with Royal UK and the Applicants in which Royal UK is supplying $287.5 million in equity capital for the Insurers in exchange for the marginal reputational benefit that may be derived from the Commissioner's approval of the Proposed Transaction.

235.     Whether the DID could or should have bargained for a larger capital contribution, or conversely whether the deal struck with Royal UK represents a windfall for the Insurers (and potentially, indirectly, for their policyholders) is impossible to evaluate definitively. For present purposes, however, it is sufficient to note that the record is devoid of any evidence that the DID or its staff has conducted this difficult negotiation in anything other than the utmost good faith and with the interests of the Insurers' policyholders firmly in mind. Their determination that a $287.5 million equity contribution represents a sound business judgment under the circumstances is not a determination that the evidence of record demonstrates to have been unwise or ill-considered. To the contrary, that record more convincingly supports the conclusion that the Insurers and their policyholders will be significantly better off as a result of the capital infusion and management commitments contemplated by the Proposed Transaction, than they would be if that transaction did not occur.

236.     The difference in ratings between the U.K. parent and the Insurer subsidiaries confirms that the ratings agencies do not expect the U.K. parent to provide support absent the Proposed Transaction. Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Bernstein Test. at 176:24 – 177:3.

237.     Based on Royal UK's statements to the DID and to the financial markets, and the DID's discussions with Royal UK's regulator, the U.K. Financial Services Authority, the DID has concluded that the argument that the U.S. companies would be better off with the U.K.

parent in place must be rejected. Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Vild Test. at 209:18-210:3. The preponderance of the evidence of record amply supports this conclusion.

### C. The Contention that the Proposed Transaction Will Prejudice the Policyholder Commenters

238. Some of the commenters have suggested that the Proposed Transaction will prejudice them as policyholders. In particular, they have suggested that the transaction would violate public policy because it would permit Royal UK to avoid commitments it has assertedly made, in public and private statements and conduct, to fully protect the claims of the policyholders of the Insurers. Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Wolinsky Cmts. at 304:7-23. To allow the Proposed Transaction to go forward, it is said, would defeat the reasonable expectations of the Insurers' policyholders arising from such statements and conduct. Id.

239. This line of argument is unpersuasive because it does not adequately take into account the strong adherence under Delaware law to the concept of distinct corporate identity. *See, e.g.*, *Pauley Petroleum Inc. v. Continental Oil*, 231 A.2d 450 (Del. Ch. 1967), *aff'd*, 239 A.2d 629 (Del. 1968); *In re Sunshine Corp. Shareholder Litig.*, 788 A.2d 530 (Del. Ch. 2001).

240. In view of that strong public policy, there can be no "reasonable expectation," least of all on the part of sophisticated insurance purchasers like the opponents of the Proposed Transaction, that the Insurers' parent companies committed, through imprecise advertisements or similar public statements, to provide ongoing capital support to the Insurers in unlimited amounts and for an indefinite time period so that all of the Insurers' policyholders would be fully paid.

241. This proceeding is not the appropriate occasion on which to make a conclusive determination of the merits of any such direct claim against Royal UK, based either in contract (promissory estoppel or fraudulent inducement) or in theories of piercing the corporate veil of

the Insurers or RSA-USA. It is sufficient at this point, however, simply to conclude that the evidence of record, even giving full credit to the factual assertions proffered in written and oral public comments, does not satisfy the weighty burden of proving such theories of direct liability on the part of Royal UK, and in any event nothing in the determination of the Application could resolve or preclude pursuit of such claims by any of the opponents of the Proposed Transaction.

242.    There is no evidence that the Proposed Transaction will affect the rights of policyholders under the terms of existing policies. Applicants have stated that they do not intend to make any material changes to the business of the Insurers. Docket No. 1, Exhibit 4, Form A Application at 10-11; Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Cahill Test at 101:8-20. If policyholders have valid claims against the Insurers and/or the U.K. parent company, they may pursue such claims notwithstanding the Proposed Transaction. Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Cahill Test. at 107:24-108:4; Tighe Test. at 39:8-10.

243.    Moreover, the DID has determined that the likelihood of an insolvency on the part of the Insurers is greatly reduced by the $287.5 million capital infusion. Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Vild Test. at 207:21-24; Macesic Test. at 259:19-21.

244.    The DID has determined that the "likelihood of all claims being paid is substantially enhanced with the infusion of this additional capital." Docket No. 125, Tr. of Jan 19, 2007 Hearing, Vild Test. at 210:18-22.

245.    Policyholders would be prejudiced by the loss of $287.5 million of capital that would eventuate absent the Proposed Transaction.

246.    Consummation of the Proposed Transaction would not be prejudicial to policyholders. Thus, the contention of prejudice does not provide a basis for disapproving the Proposed Transaction.

**D.  The Contention that This Is A Conflict Transaction**

247.    Some of the commenters have suggested that the Proposed Transaction presents a conflict because: (1) management of RSA-USA has an equity interest in Arrowpoint Capital that will incentivize them to withdraw assets from the Insurers and/or to minimize payment of claims; and (2) Arrowpoint Capital will benefit to some degree from the $27.5 million that will be directed to it by AGP.  See, e.g., Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Wolinsky Cmts. at 290:14-22; id., Babbel Cmts. at 320:24 – 321:5.

248.    Any concern about the prospect that management will withdraw assets from the Insurers is unfounded.  Management's commitments, as set forth in the Form A Application, prohibit them from seeking any dividends for four years, and then only if the RBC of the particular Insurer exceeds 300% of its authorized control level.  Management of the Insurers must seek permission of the DID to issue any dividends.  Docket No. 1, Exhibit 4, Form A Application, at 10.

249.    Moreover, as pointed out in the December 20 Order, "even disregarding the limitations on distributions by the Insurers established in the proposed Royal US Acquisition, … [the] stated concern is significantly addressed by statutes that would require the Insurers to give notice to the DID of proposals to declare and pay dividends to the Insurers' owners (see 18 Del. C. §§ 5004(e), 5005(b))."  Docket No. 103, Dec. 20, 2006 Order ¶ 9.c.

250.    The stated concern that management will have an incentive to minimize payouts to policyholders because there will be no countervailing reputational incentive to write additional policies (Docket No. 94, WTC declarations by Messrs. Babbel and Wilcox, at ¶ 54), reflects a generalized fear of insurance companies in run-off.  In particular, some of the commenters urge that the Insurers, no longer operating under the "Royal" name, will be freed of a countervailing reputational incentive to promote policyholder satisfaction.  WTC Jan. 17, 2007 Written

Comments (Docket No. 119) at 12-13. In addition, it is suggested that the removal of ongoing financial support from Royal UK will change the bargaining dynamics with policyholders and effectively force them to accept inferior resolutions of their claims, in light of likely implicit or even explicit threats of insolvency on the part of the Insurers going forward if the Proposed Transaction is implemented. *Id*.

251. There have been successful run-off operations, however, despite the fact that they necessarily involved similar managerial incentives as would be and have been present with the Insurers and the management of RSA-USA. See Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Bernstein Test. at 170:3-7; Muhl Test. at 136:1-4.

252. There is no evidence that Applicants have any intention of minimizing payouts. To the contrary, the Applicants have stated that they will continue the Insurers' past claims payment practices. E.g., Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Tighe Test. at 17:14-17. There are strong factual and legal circumstances that lend credibility to this statement.

253. As a factual matter, the evidence of record shows that outstanding claims have been reduced significantly from 2003, reflecting the Insurers' commitment to resolving policyholder claims. Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Tighe Test. at 15:2-8; Beatty Test. at 38:7-11; Keddie Test. at 90:9-12; Cahill Test. at 103:20-24.

254. Moreover, the assertion that the Insurers will become excessively aggressive in resisting legitimate policyholder claims if the Proposed Transaction occurs insufficiently acknowledges the legal and regulatory constraints on such resistance. Delaware law establishes both public/regulatory and private enforcement mechanisms to combat wrongful resistance to legitimate policyholder claims. On the regulatory side, 18 *Del. C.* §2304(16) provides in part:

(16) Unfair claim settlement practices. -- No person shall commit or perform with

such frequency as to indicate a general business practice any of the following:

a. Misrepresenting pertinent facts or insurance policy provisions relating to coverages at issue;

b. Failing to acknowledge and act reasonably promptly upon communication with respect to claims arising under insurance policies;

c. Failing to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies;

d. Refusing to pay claims without conducting a reasonable investigation based upon all available information;

e. Failing to affirm or deny coverage of claims within a reasonable time after proof of loss statements have been completed;

f. Not attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear; …

h. Attempting to settle a claim for less than the amount to which a reasonable person would have believed that person's own self was entitled by reference to written or printed advertising material accompanying or made part of an application;

i. Attempting to settle claims on the basis of an application which was altered without notice to or knowledge or consent of the insured; …

m. Failing to promptly settle claims, where liability has become reasonably clear under one portion of the insurance policy coverage in order to influence settlements under other portions of the insurance policy coverage; …

255.    Similarly, Delaware law, and the law in general, have long recognized a cause of action for bad faith refusal to honor the terms of an insurance policy.  *See, e.g., Dunlap v. State Farm Ins. Co.*, 878 A.2d 434, 440 (Del. 2005).

256.    It has nevertheless been suggested that management of the Insurers, after the Proposed Transaction, will have an even stronger than usual incentive to resist policyholder claims, on the theory that their new equity interests would be enhanced by reducing or eliminating policyholder claims as cheaply as possible.  WTC Jan. 17, 2007 Written Comments (Docket No. 119) at 13.   Those equity interests are by no means the only incentives and

motivations that will guide the Insurers' management post-acquisition. For one thing, the Applicants' outside directors have been, and can be expected to continue to be, repeat players in the insurance industry (on both the management and regulatory side, see ¶177 above), and are unlikely to wish to cultivate a reputation for encouraging extraction of economic rents from policyholders for the benefit of themselves and other managers. The Applicants' senior officers have similar reputational motivations.

257. In short, the evidence of record does not establish that the Proposed Transaction will adversely alter the treatment of the Insurers' policyholders, and the commenters' stated concerns in this regard are not persuasive.

### E. The Contention that the DID's Review Of This Transaction Is Insufficient

258. Several commenters have objected to the DID's review of the Proposed Transaction on the grounds that it was not objective and thus, the Moving Policyholders should have been granted a greater degree of participation in this matter. See, e.g., Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Henry Test. at 380:5-17.

259. The Moving Policyholders sought to participate in this proceeding as parties and to conduct this administrative proceeding in the same fashion as a trial. E.g., Docket No. 105, Joint motion for determination of pre-hearing issues, at ¶ 5.

260. The statutory framework for this proceeding does not contemplate that it will be a fully litigated trial. Docket No. 103, Hearing Officer's Order on Pre-Hearing Issues, ¶ 7(a), citing 18 *Del. C.* § 5003(d)(2).

261. The Moving Policyholders have had ample opportunity to present their view of, and comment on, the Proposed Transaction. The Moving Policyholders have submitted substantial written comments in opposition to the Proposed Transaction through the three rounds

of motions and two rounds of comments that were invited during the course of this proceeding. See ¶¶ 61-62; 65, 69-71, 76, 79-81, 83, 88, 92 and 94, *supra*.

262. The Moving Policyholders were given the opportunity to make oral comments at the January 19 Hearing and 9 persons registered to make, and made, such comments. The Moving Policyholders' oral comments occupied over three hours of an eight hour hearing. Docket Nos. 114, 116-117, 119; Docket No. 125, Tr. of Jan. 19, 2007 Hearing, 274:9 –384:17.

263. The Moving Policyholders also claim that the record will be incomplete absent discovery. See, e.g., Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Wolinsky Cmts. at 281:13-282:15; id., Wilcox Cmts. at 334:20-22.

264. The Applicants and the Insurers provided a significant volume of information to the public record as detailed above in ¶ 122, *supra* and responded to all inquiries by the DID.

265. As reflected by the thorough written and oral comments, the publicly-available information was sufficient to allow interested persons to analyze and comment on the Proposed Transaction.

266. In connection with the Form A Application, the DID initiated a detailed financial examination of RSA-USA and the Insurers. The examination "included an actuarial review of the adequacy of the company's reserves, a claims review of reserve adequacy and claims handling processes, a legal review of all the companies' material litigation and contingencies, and a review of the quality and collectibility of the company's reinsurance assets." Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Vild Test. at 205:15-23, 206:6.

267. The DID submits Form A applications to three levels of review to ensure statutory compliance. Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Brown Test. at 229:9-16.

268.     The DID requested and received additional information from the Applicants regarding the Form A Application, the Applicants' financial models and underlying assumptions, reserves, claims practices, and other related matters.  Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Tighe Test. at 189:7-191:17.

269.     The DID engaged independent actuary INS to analyze the financial condition of Insurers and their liabilities.  Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Macesic Test. at 252:21-259:21.  INS Consultants determined that "with the influx of [$]287.5 million of capital, Royal & SunAlliance USA is likely to continue to operate as a solvent and viable run-off insurance company.  The [$]287.5 million gives the company the ability to withstand additional stress and adversity while still meeting policyholder obligations."  Docket No. 125, Tr. of Jan. 19, 2007 Hearing, Macesic Test. at 259:16-21.

270.     There is no evidence that the DID was not thorough and objective in its consideration and review of the Proposed Transaction.

271.     As a corollary to the contention that the DID's process has been faulty, certain commenters suggested that the Form A Application is incomplete, and that the DID should require Applicants to submit further information.  See, e.g., Docket No. 61, GM Letter concerning additional deficiencies in Form A Statement, at 1; Docket No. 67, WTC and Affiliates Letter Joining in Statement of GM dated 11/17/06 noting deficiencies in Form A, at 1.

272.     As explained in the December 20 Order, the completeness of the Form A is a decision for the DID.  Docket No. 103, Hearing Officer's Order on Pre-Hearing Issues, at ¶ 13; Docket No. 79, Black Letter to Hearing Officer concerning inquiries about completeness of Form A file.

273. The DID has determined that the Form A Application is complete. Docket No. 125, Tr. of Jan. 19, 2007 Hearing, at 2:23-3:2; <u>id.</u>, Brown Test. at 231:24-232:2.

274. For all of these reasons, the record establishes that the DID has objectively reviewed and considered the Proposed Transaction in light and in furtherance of the interests of policyholders generally, and that no policyholder involvement beyond what was provided was necessary or required.

275. Accordingly, the challenges to the DID's review and the limitations on policyholder participation do not support disapproval of the Proposed Transaction.

## CONCLUSIONS OF LAW

1. Under 18 *Del. C.* § 5003, the Commissioner has jurisdiction to review and approve the proposed acquisition of control of domestic insurers.

2. Specifically, it is the Commissioner's responsibility to protect policyholders in reviewing transactions such as the proposed acquisition. *See In the Matter of Proposed Affiliation of BCBSD, Inc.*, 2004 Del. Super. LEXIS 333, *53 (Oct. 4, 2004) ("[i]n Delaware, as in most states, the Insurance Commissioner is charged with the responsibility of providing [] scrutiny and assessing risk to Delaware policyholders by enforcing the laws and regulations with their best interests in mind.")

3. It is the Department's responsibility to determine if a Form A Application is complete.

4. The Form A Application submitted by Applicants is complete and satisfies the requirements of all applicable laws and regulations.

5.   Under 18 *Del. C.* § 5003(d), the Commissioner must approve an application for acquisition unless the Commissioner finds that:

    a.   After the change of control, the domestic insurer referred to in subsection (a) of this section would not be able to satisfy the requirements for the issuance of a license to write the line or lines of insurance for which it is presently licensed;

    b.   The effect of the merger or other acquisition of control would be substantially to lessen competition in insurance in this State or tend to create a monopoly therein. In applying the competitive standard in this paragraph:

        1. The informational requirements of § 5003A(c)(1) of this title and the standards of § 5003A(d)(2) of this title shall apply;

        2. The merger or other acquisition shall not be disapproved if the Commissioner finds that any of the situations meeting the criteria provided by § 5003A(d)(3) of this title exist; and

        3. The Commissioner may condition the approval of the merger or other acquisition on the removal of the basis of disapproval within a specified period of time;

    c.   The financial condition of any acquiring party is such as might jeopardize the financial stability of the insurer, or prejudice the interest of its policyholders;

    d.   The plans or proposals which the acquiring party has to liquidate the insurer, sell its assets or consolidate or merge it with any person, or to make any other material change in its business or corporate structure or management, are unfair and unreasonable to policyholders of the insurer and not in the public interest;

    e.   The competence, experience and integrity of those persons who would control the operation of the insurer are such that it would not be in the interest of policyholders of the insurer and of the public to permit the merger or other acquisition of control; or

    f.   The acquisition is likely to be hazardous or prejudicial to the insurance buying public.

6.   The inquiry under 18 *Del. C.* § 5003(d)(2) is a narrow one. The Commissioner must strictly apply the criteria set forth in this section and must approve the Proposed Transaction unless he determines that the transaction would implicate any of the

concerns in Section 5003(d)(2).  *In the Matter of Proposed Affiliation of BCBSD, Inc., supra* at *25.

7.  Policyholder consent is not required for the approval of an acquisition or change in control of a Delaware domestic insurer.  Order on Pre-Hearing Motions, ¶9(b) (noting Moving Policyholders have cited no statute, rule or case precedent requiring such consent).

8.  The public notice requirements of 29 *Del. C.* §§ 10122 and 10124 and 18 *Del. C.* § 323(f)(1) concerning the hearing in this matter were satisfied.

9.  None of the conditions justifying disapproval listed in 18 *Del. C.* § 5003(d) is present with respect to the proposed change in control of the Insurers.

10.  18 *Del. C.* § 5003(d)(3) provides that the DID may retain outside consultants to assist the DID in its review of a proposed acquisition of control of a domestic insurer.  The DID's retention of legal, actuarial, claims and reinsurance consultants was appropriate under 18 *Del. C.* § 5003(d)(3).

11.  Based on the documentary and testimonial evidence in the record in this proceeding, as referenced in the proposed Findings of Fact, the Form A Application filed by Applicants, with amendments, complies with the requirements of 18 *Del. C.* § 5003 and Delaware Department of Insurance Regulation 1801 § 9.0.

12.  Accordingly, approval by the Commissioner of the acquisition of control of the Insurers by Arrowpoint Capital is mandated under Delaware law pursuant to 18 *Del. C.* § 5003(d).  This conclusion is the result, with respect to each of the statutory bases in §5003(d)(1) for disapproving an acquisition, of a determination that the

preponderance of evidence indicates that the statutory basis for disapproval of the Proposed Transaction does not exist.

13.     In addition, the hearing process, including the opportunity of non-parties to submit pre-hearing applications, the disposition of pre-hearing applications and the receipt of non-party public comment, both written and oral, met any requirements of due process.

14.     The publication of the notices of the public hearing, status conferences and filings made in connection with this matter satisfied any requirements of due process.

15.     With respect to pre-hearing matters, parties and non-parties were given the opportunity by two separate Hearing Officers to make application for pre-hearing matters and non-party policyholders of the Insurers availed themselves of this opportunity and filed several applications for pre-hearing relief, such as motions to intervene as parties, motions for discovery, motions to continue the proceeding, motions for the Hearing Officer to accept or receive the Certifications or Declarations of consultants retained by the non-parties and a motion for the appointment of an independent actuary.  As part of this process, filing deadlines were extended to accommodate late submissions by non-parties.  Opportunities were also given for the filing of additional pre-hearing motions that raised new issues and additional motions, including a Joint Request for the Determination of Pre-Hearing Issues, were filed by non-parties related to this proceeding.  The pre-hearing process met any requirements of due process.

16.     The public hearing also met any requirements of due process.  The Commissioner was not required to permit non-parties to examine and cross-examine witnesses or

introduce evidence at the hearing. By statute, this right is reserved for parties and those persons who meet the criteria of 18 *Del. C.* § 5003(d)(2)  Those non-parties seeking the right to examine and cross-examine witnesses and introduce evidence at the hearing do not meet the criteria of 18 *Del. C.* § 5003(d)(2).

17.    The process afforded at the public hearings on November 21, 2006 and January 19, 2007, along with policyholders' ability to submit numerous and voluminous filings as public comment and the opportunity to make lengthy and detailed oral presentations at the hearing as public comment, satisfied any requirement of due process. *See LaFarge v. Cmwlth. of Pa., Ins. Dep't*, 735 A.2d 74, 78 (Pa. 1999) (notice and opportunity to comment in similar proceeding "were adequate to satisfy due process," and the "imposition of additional procedures such as sworn testimony, cross-examination, a full stenographic record, and opportunity to submit briefs would entail extensive delay [and] would not materially enhance the interests of [policyholders]").

18.    The question of whether policyholders having substantial claims, be they liquidated or contingent, should be granted party status was a significant one in the pre-hearing portion of this proceeding.  18 *Del. C.* § 5003(d) provides that the Commissioner may permit party status to any "other person whose interest may be affected thereby" in a Form A hearing.  While the motions of the various policyholders for party status were considered previously, it may be helpful to restate the conclusions of law stated in the disposition of those motions.

> The term "interest" as used in Section 5003(d)(2) is not defined by statute or case law, and is by no means self-defining.  It should therefore be construed in a manner consistent with the governing statutory objectives and regulatory framework.  All agree that the

protection of policyholders is the paramount objective of Delaware's body of insurance regulation. And with regard to the regulatory framework, it is clear that "[i]n Delaware, as in most states, the Insurance Commissioner is charged with the responsibility of providing [ ] scrutiny and assessing risk to Delaware policyholders by enforcing the laws and regulations with their best interests in mind." *In the Matter of Proposed Affiliation of BCBSD, Inc.*, 2004 Del. Super. LEXIS 333, *53 (Oct. 4, 2004). The protection of policyholders is thus the primary function of the Commissioner. The statutes do not place responsibility for protecting policyholders in the realm of private enforcement through litigation or an equivalent process. Therefore, in the absence of substantial evidence that the Commissioner – through his general investigative and supervisory powers, and through the conduct of this hearing process – is incapable of discharging his statutory obligation to review change of control transactions to determine whether they "prejudice the interest of [ ] policyholders" (Section 5003(d)(3)(c)), some distinct, substantial interest beyond that as a policyholder should be required as a basis for entitlement to party status in proceedings under Section 5003. However significant their interests as policyholders may be, none of the Moving Policyholders has articulated and demonstrated such a distinct "interest" of the sort that would justify their intervention as parties in this matter.

The DID provided substantial evidence in the hearing that it considered the interests of the policyholders to the full extent of its obligations under Chapter 50. The DID, as part of its review, used an independent outside actuary to "stress" the model to make a reasonable determination that approval of the Proposed Transaction would not endanger policyholders' interests and would have a reasonable chance to provide for the long term solvency of the Insurers post-closing.

19. Based on the foregoing, the acquisition of control of Royal Indemnity Company, Security Insurance Company of Hartford, and Royal Surplus Lines Insurance Company by Applicants Arrowpoint Capital Corp., Arrowpoint Capital LLC, John Tighe, Sean Beatty, and Dennis W. Cahill must be approved, subject to the

conditions recommended by the DID and referenced in paragraph 127 of the proposed Findings of Fact.

Dated: February 2, 2007

By:    Lawrence Hamermesh
       Hearing Officer

# Organizational Structure Before Acquisition



**Legend:**
- Holding Company
- US Operating Subsidiary
- Non-US Operation Subsidiary

Royal & Sun Alliance Insurance Group plc

RSA Overseas Holdings (No. 1)

RSA Overseas Holdings (No. 2)

UK
US

Arrowpoint General Partnership

Royal & SunAlliance USA Inc.

Royal Group, Inc.

Financial Structures Limited

Century Insurance Company (Bermuda) Ltd.



Blumberg No. 5119

EXHIBIT
5

# Organizational Structure Post Acquisition



Holding Company
US Operating Subsidiary
Non-US Operation Subsidiary

Arrowpoint Capital Corp.

Arrowpoint Capital LLC

90%

10%

Arrowpoint General Partnership

Royal & SunAlliance USA, Inc.

Royal Group, Inc.

Financial Structures Limited

Century Insurance Company (Bermuda) Ltd.



Blumberg No. 5119

EXHIBIT

6

<u>Purchase Agreement and Exhibits</u>

I.      <u>List of Documents</u>:

(Executed)              <u>Purchase Agreement</u> among Arrowpoint Capital Corp. and
                        Arrowpoint Capital LLC (collectively, the "Purchaser") and RSA
                        Overseas Holdings (No. 1) ("Irish Holdco 1") and RSA Overseas
                        Holdings (No. 2) ("Irish Holdco 2") (collectively, the "Seller") and
                        The Globe Insurance Company Limited (solely for purposes of
                        guaranteeing to Purchaser the payment of the Seller's
                        indemnification obligations under the Purchase Agreement),
                        pursuant to which the Purchaser will acquire from the Seller all
                        issued and outstanding partnership interests in Arrowpoint General
                        Partnership in consideration for the Purchaser's issuance to the
                        Seller of $300 million in principal amount of non-interest-bearing
                        subordinated notes with no maturity date.

Exhibit A               Form of non-interest-bearing <u>Subordinated Notes</u> to be issued by
(To be executed at      Purchaser in the amount of $270 million from Arrowpoint Capital
closing)                Corp. ("Holdco 1") and $30 million from Arrowpoint Capital LLC
                        ("Holdco 2"), to Seller for which no payments are expected to be
                        made until if and when Royal Indemnity Company and its insurer
                        affiliates (collectively, "Insurers") are permitted to pay dividends;
                        the notes also have no maturity date.

Exhibit B-1             <u>Assignment and Assumption Agreement</u> by and between Irish
(To be executed at      Holdco 1 as "Assignor" and Holdco 1 as "Assignee", under which
closing)                the Assignor will assign all of its rights, title and interest in
                        Arrowpoint General Partnership to Assignee.

Exhibit B-2             <u>Assignment and Assumption Agreement</u> by and between Irish
(To be executed at      Holdco 2 as "Assignor" and Holdco 2 as "Assignee," under which
closing)                the Assignor will assign all of its rights, title and interest in
                        Arrowpoint General Partnership to Assignee.

Exhibit C               None

Exhibit D               Form of <u>Representative Agreement Termination Notice</u> to be issued
(To be executed at      by Seller to its U.S. representatives to Arrowpoint General
closing)                Partnership, under which Seller will terminate the duties of these
                        representatives to Arrowpoint General Partnership, effective as of
                        the closing.

1

Blumberg No. 5119

EXHIBIT

7

| | |
|---|---|
| Exhibit E | Form of Purchaser Press Release issued shortly after execution of the Purchase Agreement |
| Exhibit F | Form of Seller Press Release issued shortly after execution of the Purchase Agreement |
| Exhibit G (To be executed at closing) | Form of <u>Transition Services Agreement</u> to be entered into by the Purchaser and the Sellers (or their respective appropriate affiliates to), to allow each party to continue providing certain intercompany administrative, information, technology and other support services on a transitional basis following closing. |
| Exhibit H (To be executed at closing) | Form of <u>Trademark License Agreement</u> between Royal & SunAlliance Insurance Group plc ("Royal U.K.") and various subsidiaries of Arrowpoint General Partnership relating to the use of the Royal & Sun Alliance name and logo in the United States post-closing. |
| Exhibit I (To be executed at closing) | Form of <u>Trademark Assignment</u> between Royal & SunAlliance USA, Inc. ("RSA USA"), Royal Indemnity Company ("RIC"), and Royal Group, Inc. ("RGI") as "Assignors," and Royal U.K. as "Assignee," under which Assignee may use Assignors' trademarks non-exclusively and without royalty in the United States. |
| Exhibit J (To be executed at closing) | Form of <u>ADC Amendment</u>, i.e., Amended and Restated Aggregate Excess of Loss Reinsurance Agreement by and between RIC and Royal & SunAlliance Insurance plc ("RAIC"), enhancing the terms of an existing adverse development cover ("ADC") whereby RAIC reinsures certain policy losses of RIC, by eliminating several termination rights of RAIC under the existing ADC, expressly providing for coverage of extra-contractual obligations, and, at the request of the Delaware Department of Insurance, requiring the forum for any dispute to be in the United States applying U.S. law, and requiring RIC to obtain the approval of the Delaware Department of Insurance before any commutation. |
| Exhibit K (To be executed at closing) | Form of <u>ADC Acknowledgment Letter</u> from RSAI to RIC acknowledging Royal RSAI's obligations under the ADC prior to closing. |
| Exhibit L (To be executed at closing) | Form of <u>Amended and Restated Parental Indemnification Agreement</u> between RIC and RSAI, whereby RSAI agrees to provide a letter of credit in support of certain third party reinsurance recoverables which otherwise would have been non-admitted for statutory accounting purposes. Under the existing Parental Indemnification Agreement, RSAI provides a letter of credit of up to $150 million to secure reinsurance recoverables from |

"unauthorized" reinsurers, which are, for the most part, reinsurers that are not licensed in Delaware. Under the Amended and Restated Parental Indemnification Agreement, from and after the second anniversary of the closing, in the event that the risk based capital ratio (the "RBC Ratio") of RIC as of such anniversary date and/or any subsequent anniversary date is greater than 300%, the dollar amount of the letter of credit required to be maintained for the coming fiscal year will be reduced by the maximum amount without causing the RBC Ratio to be less than 300%, and it will never be reduced by more than $50,000,000 per year.

| | |
|---|---|
| Exhibit M-1 (Executed) | Form of Post-1991 <u>Reverse Flow Reinsurance Agreement</u> between RIC and Royal & SunAlliance Reinsurance Limited ("Royal Re") reinsuring RIC with respect to business written by RIC and its U.S. affiliates on behalf of their U.K. affiliates. |
| Exhibit M-2 (Executed) | Form of Pre-1991 <u>Facultative Reinsurance Agreement</u> between RIC and Royal Re reinsuring RIC with respect to business written prior to 1991 by RIC and its U.S. affiliates on behalf of their U.K. affiliates. |
| Exhibit N (Executed) | Form of <u>Collateral Support Agreement</u> among RSAI, Royal Re and RIC, obligating RSAI to provide RIC with a letter-of-credit, subject to a $200 million cap, for certain obligations, including those of Royal Re under the two "reverse flow" reinsurance agreements (Exhibits M-1 and M-2 referenced above), and providing that any parent-owned foreign reinsurer of such "reverse flow" business is divested by its parent in the future, RSAI will be responsible for any shortfall in the reinsurance collateral posted by the divested company. |
| Exhibit O (To be executed at closing) | Form of <u>Cooperation Agreement</u> by and among each of RIC, Security Insurance Company of Hartford, Guaranty National Insurance Company, Royal Surplus Lines Insurance Company, Financial Structures Limited (each, a "U.S. Insurance Entity" and, collectively, the "U.S. Insurance Entities"), RSA USA, RGI (each of RSA USA and RGI, a "U.S. Non-Insurance Entity" and, collectively, the "U.S. Non-Insurance Entities" and, together with the U.S. Insurance Entities, each, a "U.S. Entity" and, collectively, the "U.S. Entities"), The Globe Insurance Company Limited ("Globe"), RSAI (each of Globe and RSAI, a "U.K. Insurance Entity" and, collectively, the "U.K. Insurance Entities"), Royal U.K., Royal Insurance Holdings plc ("Royal Holdings"), Royal International Insurance Holdings Limited ("Royal Holdings Limited") (each of Royal U.K., Royal Holdings and Royal Holdings Limited, a "U.K. Non-Insurance Entity" and, collectively, the "U.K. Non-Insurance Entities" and, together with the U.K. Insurance |

3

Entities, each, a "U.K. Entity" and, collectively, the "U.K. Entities"), pursuant to which: (i) U.S. Entities will indemnify U.K. Entities for certain losses and expenses arising from or relating to insurance policies written by the U.S. Insurance Entities; and (ii) the U.K. Entities will indemnify U.S. Entities and their affiliates for certain losses and expenses arising from or relating to insurance policies written by the U.K. Insurance Entities.

| | |
|---|---|
| Exhibit P<br>(To be executed at closing) | Form of <u>Information Platform Access Agreement</u>, relating to the use of computer hardware with respect to business previously written by RIC and its U.S. affiliates on behalf of their U.K. affiliates. |
| Exhibit Q<br>(Executed) | Form of <u>Managing General Agency Agreement</u> between Royal & SunAlliance Insurance Agency, Inc. ("RSAIA") and RIC, providing RIC certain managing general agent services with respect to business previously written by RIC and its U.S. affiliates on behalf of their U.K. affiliates. |
| Exhibit R<br>(Executed) | Form of <u>Claims Servicing Agreement</u> between RSAIA and RIC, providing RIC certain claims services with respect to business previously written by RIC and its U.S. affiliates on behalf of their U.K. affiliates. |
| Exhibit S<br>(Executed) | Form of <u>MGA (Services) Letter Agreement</u> between RSAIA and RIC, providing for the continuation of certain intercompany services for RSAIA on a transitional basis following closing. |
| Exhibit T<br>(To be executed at closing) | Form of <u>Domain Name Assignment</u> by and between RSA USA and RSAIA , as "Assignors," and Royal U.K. as "Assignee," providing for the assignment of various RSA USA domain names to Assignee. |

II.    Key Provisions of Significant Agreements

Purchase Agreement

*Key Provisions*

- The Seller will contribute to the Insurers $287.5 million immediately prior to the closing of the acquisition.

- RGI, the direct parent company of RIC, will be relieved of $279 million of debt.

- Royal U.K. will be required to cooperate with the Insurers, at Royal U.K.'s expense, to collect third party reinsurance obligations under third party reinsurance agreements obtained by Royal U.K. that have historically inured to the benefit of the insurers.

- Arrowpoint Capital Corp. agrees to appoint three independent directors to its board of directors.

- Limited representations and warranties (customary for a management buyout).

- Seller agrees to indemnify Purchaser for any losses arising out of failure to perform various covenants (e.g., to cause their affiliates to provide reasonable cooperation to Purchaser and its subsidiaries in pursuing reinsurance claims under applicable agreements; to refrain from taking any action which would limit the coverage of individuals who acted as directors and officers of the acquired entities (for the period in which the acquired entities were owned by the Seller) under any D&O policies maintained by the Seller; and to refrain from hiring as a consultant certain employees of Purchaser and the acquired entities).

- Purchaser agrees to indemnify the Seller for any losses arising out of failure to perform various covenants (e.g., to pay severance benefits to certain employees who suffer a termination within one year following the closing; to cause contributions to be made to the pension plan; and to appoint at least three independent directors for a period of four years following the closing).

Subordinated Notes

*Key Provisions*

- The Notes will not bear interest.

- The Notes do not have any maturity date.

- Noteholders are entitled to repayment of principal only if the Insurers are legally able to pay dividends.

## Cooperation Agreement

*Key Provisions*

- Royal U.K. and RSA USA and their and their respective U.K. and U.S. insurance company affiliates will agree that: (i) the Insurers will indemnify the U.K. insurers for losses on insurance policies written by the Insurers; and (ii) the U.K. insurers will indemnify the Insurers for losses on policies written by the U.K. insurers.

- Agreement provides indemnification for extra-contractual liabilities, except to the extent the extra-contractual liabilities were caused by a former foreign affiliate.

- Insurers and the U.K. insurers are required to cooperate with each other in the defense of any action.

## Amended and Restated Aggregate Excess of Loss Reinsurance Agreement

*Key Provisions*

- The amended and restated agreement clarifies that extra-contractual obligations are covered. This was not clear under the old agreement.

- Several of RSAI's termination rights under the existing agreement will be eliminated. For example, RSAI may no longer terminate (i) as a result of any declaration of insolvency of RIC, (ii) based on an adverse change or prospective adverse change affecting the prospects of RIC or its subsidiaries or holding company, or (iii) if any law or regulation would prevent the remittance of any balance of payments due to either party. In addition, RSAI's termination rights have been restricted as follows:

  - Previously, RSAI was permitted to terminate in the event that RIC were to receive funds from any third party, provided that termination of the agreement would not have a material adverse effect on RIC's statutory surplus. Under the amended agreement, RSAI may terminate in this instance only if termination would not have any effect (other than a positive effect) on RIC's statutory surplus.

  - Termination pursuant to mutual consent is now permitted only upon the approval of the Delaware Department of Insurance.

  - RSAI also agreed to waive certain termination rights it might have based on facts or circumstances pre-dating the amended and restated agreement.

6

## Amended and Restated Quota Share Reinsurance Agreement

*Key Provisions*

- Royal Re now reinsures certain losses relating to the "reverse flow" business written by the RIC insurance pool members on behalf of affiliates of RSAIG before, on, and after January 1, 1991.

- The reinsurance coverage provisions are being expanded to detail the scope of the business for which Royal Re is responsible. These coverage obligations were not fully documented in the existing agreement.

- Royal Re's right to terminate the agreement upon notice to RIC will be eliminated.

- The scope of policy-related expenses for which Royal Re is responsible has also been expanded.

## Pre-1991 Facultative Reinsurance Agreement

*Key Provisions*

- Royal Re will reinsure RIC with respect to "reverse flow" business written by members of the RIC insurance pool prior to January 1, 1991 and ceded to non-U.S. affiliates.

- If RIC can provide evidence that a particular pre-1991 risk was ceded to Royal Re, then the risk will be reinsured under the Pre-1991 Facultative Reinsurance Agreement.

- Limitation on rights of termination and other general provisions are similar to the Amended and Restated Quota Share Reinsurance Agreement described above.

## Amended and Restated Parental Indemnification Agreement

*Key Provisions*

- RSAI currently provides a letter of credit in support of certain unauthorized third party reinsurance recoverables.

- The amended and restated agreement clarifies that the letter of credit will also cover certain recoverables from reinsurers that in the future become unauthorized or unaccredited.

- The amended and restated agreement provides that in the event RIC's risk-based capital ratio exceeds 300%, the amount of the letter of credit may be reduced, but not by more than $50 million per year.

7

## Claims Servicing Agreement

*Key Provisions*

- RSAIA agrees to service claims relating to the "reverse flow" book of business of RIC and its affiliates.

- RSAIA's obligations include confirming coverage of claims in the event of a coverage dispute, processing claims, managing claims litigation, settling claims within specified ranges, handling subrogation and contribution claims and responding to inquiries by regulatory agencies and third parties.

- RSAIA's authority to settle certain large claims (i.e., casualty claims in excess of $1 million and property claims in excess of $5 million) is subject to the prior written approval of RIC.

## Managing General Agency Agreement

*Key Provisions*

- RSAIA is recognized as the managing general agent for the "reverse flow" book of business of RIC and its affiliates.

- RSAIA will not produce any new policies under the agreement.

- RSAIA may not waive any legal or contractual right of RIC.

- If the agreement terminates, RSAIA remains obligated to continue administering any policies outstanding until their expiration.

## Transition Services Agreement

*Key Provisions*

- RSA USA and Royal U.K. will provide each other certain administrative, information, technology and other support services on a transitional basis following closing.

- Servicer is reimbursed for its cost of performing services.

## Trademark License Agreement

*Key Provisions*

- Royal U.K. allows the U.S. business continued use in the United States of the Royal and Sun Alliance name for a transitional period following closing.

- Provides U.S. companies with right to continue use of Royal and Sun Alliance name while name changes are being effected.

8

THE INSURANCE DEPARTMENT OF THE STATE OF DELAWARE

IN THE MATTER OF:

| | |
|---|---|
| The Proposed Acquisition of Royal Indemnity Company, a Delaware domiciled property/casualty insurance company, Security Insurance Company of Hartford, a Delaware Domiciled property/casualty insurance company, Guaranty National Insurance Company, a Delaware domiciled property/casualty insurance Company, and Royal Surplus Lines Insurance Company, a Delaware domiciled property/casualty insurance company, by Arrowpoint Capital Corp., a Delaware Corporation, and Arrowpoint Capital, LLC, a Delaware limited liability company | ) ) ) ) ) ) ) ) ) ) ) ) )    Docket No. 313 |

## ORDER ON PRE-HEARING MOTIONS

1.      This proceeding involves a proposed transaction (the "Royal US Acquisition") in which Arrowpoint Capital Corp. and Arrowpoint Capital LLC (the "Applicants") would acquire the partnership interests in Arrowpoint General Partnership (the "Partnership"). The Partnership owns 100% of the common stock of Royal & SunAlliance USA, Inc. ("RSA USA"), which in turn indirectly owns 100% of the common stock of four Delaware domestic insurers (the "Insurers"), including Royal Indemnity Corporation ("Royal Indemnity"). As a result, the Royal US Acquisition requires the approval of the Commissioner of Insurance of the State of Delaware (the "Commissioner") pursuant to 18 *Del.C.* §5003 ("Section 5003").

2.      Current directors, officers and certain employees of RSA USA are the beneficial owners of the Applicants. The proposed Royal US Acquisition, in substance, would result in the transfer of ownership and control of the Insurers from The Royal & Sun Alliance Insurance Group plc ("RSA plc") to the Applicants.

3.      In proceedings in this matter prior to the appointment of the undersigned as Hearing Officer, various persons (identified collectively as "the Moving Policyholders") who assert significant claims or potential claims as holders of insurance policies issued by the Insurers submitted a variety of requests for pre-hearing relief. Specifically:

a.      The following Moving Policyholders seek to be accorded the status of formal parties to this proceeding (a number of these persons have also explicitly sought leave to take discovery, and such requests will be treated as ancillary to, and subsumed within, their applications for status as parties):  General Motors Corporation ("GM"); DaimlerChrysler Corporation ("DC"); The Student Loan Corporation ("SLC"); Federal-Mogul Corporation ("F-M"); MBIA Insurance Corporation ("MBIA"); Wells Fargo Bank, as trustee ("WF"); World

Trade Center Properties, LLC, Silverstein Properties Inc., Silverstein WTC Mgmgt. Co. LLC 2, 2 World Trade Center LLC, 4 World Trade Center LLC, and 5 World Trade Center LLC (collectively "WTC"); The Port Authority of New York and New Jersey and 1 World Trade Center LLC (collectively "Port Authority"); and Westfield WTC LLC, Westfield WTC Holding LLC, Westfield Corporation Inc. and Westfield America, Inc. (collectively "Westfield").

      b.     Several Moving Policyholders (GM, DC, SLC, MBIA, WF, Port Authority and Westfield) seek continuance of the hearing in this matter in order to permit discovery on matters asserted to be related to the issues in this proceeding. In particular, GM seeks a continuance of 120 days from the time of completion of the Form A filing in this matter, in significant part for the purpose of having this proceeding informed by the disposition of certain of the issues in its litigation against Royal Indemnity in the Circuit Court of Oakland County, Michigan (the "Michigan litigation").

      c.     WTC has also moved for the appointment of an independent actuary for the purpose of evaluating whether the Insurers have adequately reserved for the claims (pending and potential) against them. WTC has also sought leave to submit the Declaration of Prof. David F. Babbel and Hon. Robert E. Wilcox, MAAA (the "Babbel/Wilcox Declaration").

      4.     The Moving Policyholders have submitted an array of speaking motions and letter memoranda in support of their various applications, and the Applicants and the Delaware Department of Insurance ("DID") have responded in kind. Counsel for these participants submitted additional oral comments on the various applications at a two and a half hour telephonic pre-hearing status conference on December 14, 2006 (the "December 14 Status Conference").

      5.     The recitation of background and reasons for the determinations embodied in this Order is necessarily truncated and preliminary, and is not intended to set forth final determinations of either fact or law that will control the disposition of the matter upon final public hearing. As recited more formally below, however, and for the reasons recited briefly below, WTC's application for leave to submit the Babbel/Wilcox Declaration is granted, but the other applications of the Moving Policyholders are denied.

      6.     Not surprisingly in light of the sophistication of their counsel, the Moving Policyholders support their various motions with a superficially compelling array of legal authorities and appeals to practical and policy concerns. Their legal arguments in support of their motions for party status center on Section 5003(d)(2), specifically its provision that in connection with the public hearing on a matter such as this, "any person ... whose interest may be affected thereby shall have the right to present evidence, examine and cross-examine witnesses, and offer oral and written arguments and in connection therewith shall be entitled to conduct discovery proceedings in the same manner as is presently allowed in the Superior Court of this State." Because of their status as holders of policies issued by the Insurers (policies that involve upwards of hundreds of millions of dollars), the Moving Policyholders maintain that they have an "interest" that "may be affected" by this proceeding, and they therefore have a statutory right to "conduct discovery proceedings" and "present evidence, examine and cross-examine witnesses" as if this were an action pending in the Superior Court.

2

7.    This statutory argument does not adequately take into account competing statutory provisions and objectives:

a.    Section 5003(d)(2) also requires that the public hearing "be held within 30 days after the [Form A] is filed," and that the hearing occur upon as little as "7 days' notice to such other persons [other than "the person filing the statement"] as may be designated by the Commissioner." The statute does not clearly explain how the Commissioner could satisfy the 30-day hearing deadline and still afford persons with an "interest" in the matter the right to take discovery as under the Rules of the Superior Court. What is clear, however, is that Section 5003 contemplates a relatively expedited proceeding for action on applications for approval of a change of control of a Delaware domestic insurer. An expansive view of this sort of proceeding as an adversarial forum equivalent to ordinary civil litigation undermines that clear statutory policy of expedition. This consideration militates against allowing intervention in this proceeding on a basis that is more liberal than the standard generally applicable to intervention in civil actions in the Superior Court (*see* Superior Court Civil Rule 24(a)(2), denying intervention as of right if the applicant's interest is adequately represented by existing parties).

b.    The term "interest" as used in Section 5003(d)(2) is not defined by statute or case law, and is by no means self-defining. It should therefore be construed in a manner consistent with the governing statutory objectives and regulatory framework. All agree that the protection of policyholders is the paramount objective of Delaware's body of insurance regulation. And with regard to the regulatory framework, it is clear that "[i]n Delaware, as in most states, the Insurance Commissioner is charged with the responsibility of providing [ ] scrutiny and assessing risk to Delaware policyholders by enforcing the laws and regulations with their best interests in mind." *In the Matter of Proposed Affiliation of BCBSD, Inc.*, 2004 Del. Super. LEXIS 333, *53 (Oct. 4, 2004). The protection of policyholders is thus the primary function of the Commissioner. The statutes do not place responsibility for protecting policyholders in the realm of private enforcement through litigation or an equivalent process. Therefore, in the absence of substantial evidence that the Commissioner – through his general investigative and supervisory powers, and through the conduct of this hearing process – is incapable of discharging his statutory obligation to review change of control transactions to determine whether they "prejudice the interest of [ ] policyholders" (Section 5003(d)(3)(c)), some distinct, substantial interest beyond that as a policyholder should be required as a basis for entitlement to party status in proceedings under Section 5003. However significant their interests as policyholders may be, none of the Moving Policyholders has articulated and demonstrated such a distinct "interest" of the sort that would justify their intervention as parties in this matter.

8.    With regard to practical and policy concerns, however, the Moving Policyholders urge that the proposed Royal US Acquisition is a conflict transaction (in light of the equity interest of current management in the acquiring entities), and therefore requires regulatory oversight in a manner that cannot be, and is not being, applied by the DID in this matter. In essence, the Moving Policyholders maintain that regulatory oversight will be deficient as a matter of law in the absence of an adversarial process (involving discovery and cross-examination, as in litigation) or at least some independent alternative (such as the appointment of

an independent actuary) to test the adequacy of the proposed Royal US Acquisition from the perspective of protecting the Insurers' policyholders.

9.      The Moving Policyholders, however, have not demonstrated (at least at this point) that the Commissioner and this proceeding are incapable of protecting the policyholders' interests in the absence of their intervention and conduct of adversarial proceedings in this matter:

a.      Preliminarily, the Moving Policyholders have not demonstrated that the proposed Royal US Acquisition is tainted by unique or unusual conflicts of interest. In conflict transactions generally, the primary concern is that directors and officers will use their control to structure a transaction to favor themselves at the expense of their corporation and its stockholders. In view of that sort of concern, the party meriting protection here would be RSA plc, the seller in the transaction. There is no substantiated conflict, however, between RSA's directors and officers, on one hand, and the Insurers' policyholders, on the other: to the contrary, it is at least equally plausible that the directors and officers would be anxious to extract as much from RSA plc as possible in the proposed transaction for the benefit of the Insurers (and, indirectly, for the benefit of their policyholders), since the more financially secure the Insurers become under the transaction, the more profit and job security the directors and officers might be able to achieve in the long run. To be sure, WTC suggests that management of the Insurers (like any equity holder of a domestic insurer) will have an incentive to minimize payouts to policyholders, unmitigated by any countervailing reputational incentive to promote the writing of additional policies. While that suggested incentive may be one that should be taken into account in evaluating the proposed Royal US Acquisition at the public hearing in this matter, it is not one that is sufficiently concrete at this stage to require a determination that the DID is incapable of effectively representing policyholder interests in evaluating the proposed transaction (even without the proposed transaction, and while under the ultimate control of RSA plc, the Insurers already seem to have had no lack of zeal to minimize claims brought by GM, DC, MBIA and WTC).

b.      The Moving Policyholders question the efficacy of the DID's review of the proposed Royal US Acquisition, asserting that in evaluating the Insurers' financial condition and reserves, the DID has not directly contacted any of the Moving Policyholders to obtain their input in assessing the appropriate amounts to reserve on claims that they assert. The Moving Policyholders, however, point to nothing in any statute, rule or case precedent that requires that the DID's assessment of the Insurers' reserves must include an invitation to claimants to present evidence and argument concerning their respective claims.

c.      The Commissioner's powers with respect to this proceeding, moreover, by no means exhaust his authority to protect policyholder interests. GM expresses particular concern, for example, that the proposed Royal US Acquisition would grant "management insiders the opportunity to extract millions of dollars from the acquired companies to the detriment of the policyholders." (Docket #15 at 3). Even disregarding the limitations on distributions by the Insurers established in the proposed Royal US Acquisition, however, GM's stated concern is significantly addressed by statutes that would require the Insurers to give notice to the DID of proposals to declare and pay dividends to the Insurers' owners (*see* 18 *Del. C.* §5004(e),

§5005(b)), and that require the DID to periodically examine the financial condition of domestic insurers (*see* 18 *Del. C.* §§318 *et seq.*).

10.     Denial of the Moving Policyholders' applications for party status does not deny them a meaningful opportunity to call attention to their concerns about the proposed Royal US Acquisition. They have not squarely contended that such denial would unconstitutionally deprive them of due process of law, and any such contention would lack merit. *See LaFarge v. Cmwlth. of Pa., Ins. Dep't.*, 735 A.2d 74, 78 (Pa. 1999) (in proceeding on insurer's proposal to place asbestos and environmental liabilities in a separate operating entity, notice and opportunity to comment "were adequate to satisfy the requirements of due process," and the "imposition of additional procedures such as sworn testimony, cross-examination, a full stenographic record, and opportunity to submit briefs would entail extensive delay [and] would not materially enhance the interests of [policyholders]"). In this proceeding, the Moving Policyholders have had and will have significant opportunities to present their concerns. They have already submitted comments that will surely need to be addressed in connection with the public hearing in this matter. The Babbel/Wilcox Declaration, for example, raises a number of significant questions (*e.g.*, about the scope of and responsibility for unfunded pension obligations) that the Applicants and the DID should address in regard to the statutorily required evaluation of the effect of the proposed transaction on the Applicants' financial condition and the Insurers' financial stability. It can be expected that the Moving Policyholders will submit still more comments on the proposed transaction, and those comments should inform the outcome of this proceeding.

11.     The Moving Policyholders' requests for continuance become largely moot once it is determined that they will not have party status in this matter and therefore will not be entitled to conduct discovery. GM suggests an independent reason, however, why a continuance would be appropriate, so it is necessary to address that reason here. GM's suggestion is that the hearing in this matter should await the outcome of proceedings in the Michigan litigation, since the trial in that litigation, scheduled to begin in February 2007, could soon result in a trial court-level resolution of Royal Indemnity's liability to GM on substantial policy claims, and that the adequacy of the Insurers' reserves would become clearer with the benefit of such a resolution. There are at least two reasons, however, to reject this suggestion as a predicate for an extended continuance here. First, it is not a foregone conclusion that developments in the Michigan litigation will occur as promptly as GM expects: damages issues may be bifurcated and deferred, as Royal Indemnity is seeking, or proceedings may be delayed for any number of other reasons inherent in the litigation process. Second, and more importantly, the previously mentioned statutory policy of expedition counsels against even a limited stay of this administrative proceeding in favor of civil litigation pending elsewhere.

12.     With respect to WTC's application for the appointment of an independent actuary, the Applicants raise the threshold question of whether the Hearing Officer in a proceeding of this sort has the statutory authority to require such an appointment. WTC points out that in the proceeding involved in *LaFarge, supra*, the Pennsylvania Insurance Department engaged an independent actuary, and that under Section 5003(d)(3) the Commissioner may retain actuaries "not otherwise part of the Commissioner's staff as may be reasonably necessary to assist the Commissioner in reviewing the proposed acquisition of control." The question of the Hearing

Officer's authority to require the appointment of an independent actuary may be academic in any event, since WTC is surely correct in asserting, alternatively, that the Hearing Officer could at least recommend that the Commissioner appoint an independent actuary. For reasons previously set forth, however, the application for an order requiring or recommending the appointment of an independent actuary will be denied. Any lack of a report by such an actuary may be taken into account in evaluating the application for approval of the proposed Royal US Acquisition. In the meantime, however, there is no factual basis for a determination at this stage of the proceedings that the DID's evaluation to date suffers from some debilitating disqualification or inadequacy (see paragraph 7b, above).

13.     For similar reasons, it is inappropriate to enter any direction to the Applicants or to the DID with respect to the content of the Applicants' Form A filing in this matter. The determination of the completeness of that filing is the responsibility of the DID. Whether that filing is a sufficient basis for approval of the proposed Royal US Acquisition is a different question, one that is to be addressed at the public hearing in this proceeding.

**IN CONSIDERATION OF WHICH,**

A.     WTC's motion for leave to submit the Babbel/Wilcox Declaration is **granted**;

B.     The various motions for party status, for discovery, for continuance and for appointment of an independent actuary are **denied**;

C.     Notwithstanding such denial, the materials previously submitted by the Moving Policyholders, including the Babbel/Wilcox Declaration, will be considered as written comments on the proposed Royal US Acquisition, and such materials need not be resubmitted for purposes of such consideration, and the Moving Policyholders may submit additional written comment and argument in accordance with procedures to be established for the public hearing in this matter.

/s/ Lawrence A. Hamermesh
Prof. Lawrence A. Hamermesh
Hearing Officer

December 20, 2006

THE INSURANCE DEPARTMENT OF THE STATE OF DELAWARE

IN THE MATTER OF:

| | |
|---|---|
| The Proposed Acquisition of Royal Indemnity )<br>Company, a Delaware domiciled )<br>property/casualty insurance company, Security )<br>Insurance Company of Hartford, a Delaware )<br>Domiciled property/casualty insurance company, )<br>Guaranty National Insurance Company, a )<br>Delaware domiciled property/casualty insurance )<br>Company, and Royal Surplus Lines Insurance )<br>Company, a Delaware domiciled )<br>property/casualty insurance company, by )<br>Arrowpoint Capital Corp., a Delaware )<br>Corporation, and Arrowpoint Capital, LLC, a )<br>Delaware limited liability company ) | Docket No. 313 |

## ORDER ON SUPPLEMENTAL PRE-HEARING MOTIONS

Having considered the Royal Policyholders'[1] Joint Request for Determination of Pre-Hearing Issues (the "Joint Request"), the responses of the DID and the Applicants, and the Royal Policyholders' joint reply, and for the reasons set forth in the letter accompanying this Order,  it is **ORDERED**, this 16th day of January, 2007, that:

1.      The request for a ruling that the record in this matter remain open for at least two weeks after the end of the hearing is **denied**, without prejudice to a renewal of such a request at the conclusion of the Hearing.

2.      The request for a ruling that the 20-day period for exceptions, comments and arguments established in 29 *Del. C.* §10126 shall not be waived or shortened is **denied**.

3.      The request for leave to submit comments and objections on the Hearing Officer's proposed findings and conclusions prior to their submission to the Insurance Commissioner is **denied**, except that the Hearing Officer will recommend to the Commissioner that the Royal Policyholders be afforded the opportunity to submit such comments and objections to the Commissioner within one week after submission of such proposed findings and conclusions to the Commissioner.

4.      The request that the Hearing Officer recommend that the effectiveness of an order approving the Proposed Transaction be stayed until after the conclusion of any appeal

---

[1] As identified in the Royal Policyholders' Joint Request for Determination of Pre-Hearing Issues submitted in this matter on January 2, 2007, Docket No. 105.  Abbreviations used in this Order follow the terminology as used in the Order on Pre-Hearing Motions dated December 20, 2006.

proceedings is **denied**, without prejudice to renewal of such a request at the conclusion of the Hearing.

5.      The request for leave to present documentary evidence and witnesses, and cross-examine witnesses presented by the parties, at the hearing in this matter is **denied.**

 s/ Lawrence A. Hamermesh
Prof. Lawrence A. Hamermesh
Hearing Officer

January 16, 2007

 **Widener University**

*Prof. Lawrence A. Hamermesh*
*Ruby R. Vale Professor of Corporate and Business Law*

January 16, 2007

      *Re*:     In the Matter of the Proposed Acquisition of Royal Indemnity Company, etc.,
               Docket No. 313 before the Insurance Department of the State of Delaware

To:     Counsel for the Applicants, the Delaware Insurance Department, and the Moving
         Policyholders

Dear Counsel:

This letter accompanies and briefly explains the basis for my Order on Supplemental Pre-
Hearing Motions (*i.e.*, on the applications for relief set forth in the Royal Policyholders' Joint
Request for Determination of Pre-Hearing Issues dated January 2, 2007 (the "Joint Request")).

In my December 20, 2006 Order on Pre-Hearing Motions, I denied the Policyholders' requests
for treatment as parties in this matter. While that denial did in effect reject much of the relief
sought in the subsequent Joint Request, I do not view that Joint Request as an inappropriate
effort or "end run" to reargue matters already determined. To the contrary, I have attempted to
review each of the items of relief sought in the Joint Request to determine whether it would
promote the objectives of this proceeding. In the end, I have decided to deny each of the
requests for relief, but for reasons and in ways that merit some further elaboration.

1.     *Keeping the Record Open Post-Hearing*

The first item of relief sought in the Joint Request is that the record in this matter be kept open
for two weeks after the end of the Hearing. I cannot state with certainty at this time that there is
no possible circumstance that would justify such relief; events at the Hearing may suggest that
such relief would be appropriate to some extent, and I will therefore not definitively foreclose the
possibility of such relief.

4601 Concord Pike, Wilmington, Delaware 19803
t: (302) 477-2132   f: (302) 477-2257   email: lahamermesh@widener.edu

For now, however, there are several reasons for denying the Policyholders' advance request for such relief. First, I am mindful that the governing statute (18 *Del. C.* §5003(d)(2)) requires the Commissioner to rule on the application in this matter within 30 days after completion of the Hearing. Achieving that statutorily prescribed expedition would be significantly hampered by a prior determination to hold open the record after the Hearing for nearly half of the statutory period allowed for the Commissioner to make his determination. Second, the need for any such extension is at this point entirely abstract. At this point, there is simply conjecture on the part of the Policyholders that they "will be unable to prepare any response to specific evidence and arguments that the Department and the Applicant will present at or in connection with the hearing." Were this proceeding an adversary judicial proceeding, that possibility might well have counseled in favor of the requested relief. As I stated in my Order on Pre-Hearing Motions, however, I do not conceive of this matter as an adversary judicial proceeding in which the Policyholders are entitled to party status. As a general proposition, the governing statutes contemplate submission of evidence, argument and comment at the hearing. Having denied the Policyholders' applications for party status, I am not persuaded that they are required, by statute or otherwise, to be afforded advance notice of evidence to be adduced at the Hearing so that they can develop a reactive evidentiary presentation. As I explain below, in any event, I will recommend that the Policyholders be afforded at least some opportunity to react to my evaluation of the evidence, argument and comments submitted at the Hearing.

2.      *Submitting Comment on Proposed Findings and Conclusions*

The Joint Request seeks a ruling that the Policyholders should be allowed to comment on and present objections to the Hearing Officer's proposed findings and conclusions before those proposed findings and conclusions are submitted to the Commissioner. Were it not for the 30-day statutory deadline for the Commissioner to act, I might have appreciated and been benefited by the opportunity to review any fresh comments and objections the Policyholders might present with respect to my proposed findings and conclusions. Under the circumstances, however, that potential benefit to me cannot justify delay in communicating my proposed findings and conclusions to the Commissioner. That said, however, I do not accept the assertion that simply because they were denied formal party status, the Policyholders should therefore not have any opportunity whatsoever to present such comments and objections to my proposed findings and conclusions. I will therefore recommend to the Commissioner that he entertain such comments and objections, provided that they are submitted in a timely fashion, *i.e.*, within a week after I circulate the proposed findings and conclusions.

3.      *Prohibiting Shortening or Waiver of the Exceptions Deadline*

The Policyholders are concerned that the Commissioner, with the consent of the parties, will "quickly adopt [my] Proposed Findings and Conclusions," and the proposed transaction will

close, before they have an opportunity to present comments or objections. I do not believe that I can prohibit the Commissioner from acting as quickly as the Policyholders fear. I would hope, however, that the Commissioner would be receptive to my recommendation described in the previous paragraph. If he accepts that recommendation, the Policyholders will have a meaningful opportunity to comment and object.

4. *Recommending a Stay of an Approval Order*

I am uncertain at this point whether and to what extent I will make any proposed findings, conclusions or recommendations that bear on the merits of a stay of any order by the Commissioner approving the proposed transaction. I am quite certain at this point, however, that determining to make any such finding, conclusion or recommendation now would be premature and ill-advised.

5. *Presenting Documentary and Testimonial Evidence, and Cross-Examining Witnesses*

My previous ruling on requests for party status largely sets forth the basis for denying the Policyholders' renewed request to cross-examine witnesses and to present documentary evidence and witnesses. In particular, I have specifically rejected the Policyholders' assertion that denying them the opportunity to cross-examine witnesses at the Hearing will deprive them of any constitutionally protected right. Still, if I thought that the Policyholders were likely to have important and unique evidence bearing directly on the issues, I might have granted their renewed request to at least the limited extent of allowing them present some evidence of reasonably circumscribed scope. What I do not find in the Joint Request, however, is a specific articulation of factual matters to which the Policyholders have unique access. In the absence of such an articulation, I am not inclined to add an open-ended opportunity to present cumulative evidence when the Department of Insurance will presumably adduce evidence bearing on the statutory concerns for the protection of policyholder interests. By my previous acceptance of the Babbel/Wilcox Declaration, on the other hand, I communicated a receptivity to receiving written comments, from the Policyholders or other members of the public, that include pertinent legal and factual analysis.

Finally, I wish to request that the submissions made or to be made this week by the parties and the Policyholders in connection with the Hearing be transmitted to me in Word format.

Sincerely,

s/ Lawrence A. Hamermesh
Lawrence A. Hamermesh, Hearing Officer

[Message dated January 18, 2007]

Dear Counsel:

My December 20, 2006 Order Establishing Public Hearing Time and Procedures provided that "[t]he Hearing Officer may direct, prior to the hearing, that oral comment be limited in time or coordinated with other oral comments on the same subject." This message constitutes my direction, pursuant to that provision, regarding the timing and coordination of written comment.

I anticipate that there will be at least two, and as much as three, hours allotted to oral comment from persons other than parties. If used efficiently, I believe that this time will be sufficient, especially in light of the voluminous written submissions received yesterday and earlier in the proceeding. In the interest of maximizing the efficiency and usefulness of oral comments at tomorrow's hearing, I hereby direct as follows:

1. Comment on matters already determined (in rulings on applications for determination of pre-hearing issues) should be avoided. In this regard, I note that both General Motors and Chrysler, in their notices of intention to submit oral comment, identify such rulings as a subject of oral comment. I will consider such comment equivalent to an effort to reargue matters already decided, and out of order.

2. Persons submitting oral comment should avoid undue repetition of material in previous written submissions, either their own or those of other persons.

3. Persons submitting oral comment should avoid undue repetition of oral comments already made by previous speakers.

4. If counsel is to present public comment on behalf of a client, no more than two individual lawyers may present such comment on behalf of any one client or group of co-represented clients.

Having reviewed various written comments submitted yesterday and earlier, and having developed a preliminary sense of which comments more directly address the issues that I believe are important in this matter, I have formulated a preference in terms of the order of persons presenting comment. Therefore, it is my preference to hear from the following individuals, in the following order:

Marc Wolinsky

David Babbel

Robert Wilcox

Jonathan Terrell

Jonathan Knipe

Counsel for SLC

Counsel for DCC

Counsel for GM

I look forward to tomorrow's hearing, and appreciate your cooperation with this effort to streamline the process.

Sincerely,

Lawrence A. Hamermesh
Hearing Officer

# Docket 313
## Attendance Sign-in
### January 19, 2007

| Name | Affiliation | email address (optional) |
|------|-------------|--------------------------|
| JEREMY Rich | RSA UK | |
| Ann Merrill | PSA UK | |
| Ashate Wilcox | VITC | |
| Dennis Ballard | Wharton School | |
| J. Falkenbach | DETGA | JFC@deiga.com |
| JONATHAN TERRELL | VCIC, LLC FOR SCC | TERRELL@KCICLLC.com |
| Darryl Reese | Delaware Ins Agt | J1Reese@aol.com |

**Docket 313**
**Attendance Sign-in**
**January 19, 2007**

| Name | Affiliation | email address (optional) |
|------|-------------|--------------------------|
| THAD J. BEACEGIRDLE | DAIMLERCHRYSLER CORP. | tbracegirdle@reedsmith.com |
| DAVID E. WILKS | STUDENT LOAN CORP. DAIMLERCHRYSLER CORP. | dwilks@reedsmith.com |
| Katherine J Henry | General Motors Corp | henryka@dicksteinshapiro.com |
| KEVIN F. BRADY | PORT AUTHORITY NY-NT WESTFIELD | KBRADY@cbuh.com |
| Harding Drane | General Motors Corp | wdrane@potteranderson.com |
| Sean Brennecke | Frederval Mogul Corp. | Sbrennecke@bnf-law.com |
| Marc Wolinsky | Wachtell Lipton for Silverstein | mwolinsky@WLRK.com |

**Docket 313**
**Attendance Sign-in**
**January 19, 2007**

| Name | Affiliation | email address (optional) |
|---|---|---|
| Jonathan Knipe | Silberton Property | jknipe@silvprop.com |
| Michael Raibman | Reed Smith / Student Loan Corp | Mraibman@reedsmith.com |
| Douglas Mayer | Wachtell Lipton / WTC Properties | dkmayer@wlrk.com |
| Mark Fidelmann | CRA Int'l / WTC Properties | mfidilman@crai.com |
| Robert Bernstein | Kaye Scholer / Netbank FSB | rbernstein@kayescholer.com |
| Timothy Jay Houseal | Young, Conaway Stargatt + Taylor / WTC Properties / Netbank, MBIA | THouseal@YCST.com |
| Mark Chambers | RSA WC | |

**Docket 313**
**Attendance Sign-in**
**January 19, 2007**

| Name | Affiliation | email address (optional) |
|---|---|---|
| Robert J Sullivan | Skadden, Arps | RSULLIVA @ SKadden.co |
| David I Friedman | Skadden, Arps | DAVID. FRIEDMAN @ SKADDEN... |
| Ed Welch | " " | E WELCH @ Skadde.com |
| Bernhardt Nadell | Stroock | bnadell a stroock.com |
| Stephen D. Dargitz | Skadden, Arps | s dargitz @ skadden.com |
| Maria tripodis | Skadden arps | Mtripodc @skadden.com |

**Docket 313**
**Attendance Sign-in**
**January 19, 2007**

| Name | Affiliation | email address (optional) |
|---|---|---|
| George Cumber | RoSA UK | |
| John Tighe | Arrow Point | |
| Dennis Cahill | Arrowpoint Cahill | |
| | | |
| | | |
| | | |

**Docket 313**
**Attendance Sign-in**
**January 19, 2007**

| Name | Affiliation | email address (optional) |
| --- | --- | --- |
| Mike Rich | DoT/DOI | |
| Jim Black | DOI | |
| Jeff Miceli | DoI | |
| David Macsik | IMS | |
| Rylynn Brown | DoI | |
| John Tastey | DoI | |
| Michael Vild | DOI | |

**Docket 313**
**Attendance Sign-in**
**January 19, 2007**

| Name | Affiliation | email address (optional) |
|---|---|---|
| James MEENAN | ☒ ARROWPOINT | James_meenan@arrowpoint.co... |
| EDWARD J MUHL | ARROWPOINT | ESMUHL@AOL.com |
| André Lefebvre | ARROWPOINT | |
| Robert Lowdin | STROOCK & STROOCK & LAVAN LLP | Rlowdin@stroock.com |
| Gil Chandler | Arrowpoint | Gil_Chandler at RSH... 'Co... |
| GEORGE BERNSTEIN | BERNSTEIN LAW FIRM | GKBLAW@AOL.com |
| Daniel Kedde | Arrow Point | dan_kedde@rsausa.co... |
| Julie Fontaine | Arrowpoint | Julie_fontaine@arrow... |

**Docket 313**
**Attendance Sign-in**
**January 19, 2007**

| Name | Affiliation | email address (optional) |
|---|---|---|
| SEAN BEATTY | ARROWPOINT | |
| Regan Shulman | Strooclz | rshulman @ stroock.com |
| Shaguyl Scott | TXTDS COMPANY | shauyrscot@TMk.com |
| | | |
| | | |
| | | |
| | | |

**Docket 313**
**Attendance Sign-in**
**January 19, 2007**

| Name | Affiliation | email address (optional) |
| --- | --- | --- |
| John Tinsley | De. Ins, Dept | john.tinsley@state.de.u |
| Linda Sizemore | De Ins. Dept. | Linda.Sizemore@state.de.u |
| | | |
| | | |
| | | |
| | | |
| | | |

Docket 313
Attendance Sign-in
January 19, 2007

| Name | Affiliation | email address (optional) |
| --- | --- | --- |
| Stephen White | Delaware Insurance Dept | stue.white@state.de.u |
| David Lonchar | DELAWARE Ins Dpt | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

# THE INSURANCE DEPARTMENT OF THE STATE OF DELAWARE

IN THE MATTER OF: )
 )
The Proposed Acquisition of Royal )
Indemnity Company, a Delaware domiciled )
property/casualty insurance company, )
Security Insurance Company of Hartford, a )     Docket No. 313
Delaware domiciled property/casualty )
insurance company, Guaranty National )
Insurance Company, a Delaware domiciled )
property/casualty insurance Company, and )
Royal Surplus Lines Insurance Company, a )
Delaware-domiciled property/casualty )
insurance company by Arrowpoint Capital )
Corp., a Delaware Corporation, and )
Arrowpoint Capital, LLC, a Delaware limited )
liability company, John Tighe, Sean Beatty )
and Dennis W. Cahill

## EXHIBIT B

## CONDITIONS OF APPROVAL OF FINAL ORDER

1.     Closing of the transaction shall not occur before five business days

following the date of this FINAL ORDER;

2.     $287.5 million in cash must be received by Royal Indemnity Company at

or before closing of the transaction;

3.     No dividends and/or other distributions may be paid by the Insurers to the

acquirers without prior Department approval;

4.     Management compensation must be approved by the Department;

5.  Any changes to existing agreements with current affiliated entities must be approved by the Department;

6.  The sale or distribution of insurance subsidiary assets, not in the ordinary course of business, must be approved by the Department;

7.  Any changes to the existing letters of credit must be approved by the Department;

8.  Any arrangements to engage in administrative or management activities with third parties requires approval by the Department;

9.  After the transaction closes, any proposed commutations of existing aggregate excess of loss agreements to which the insurers are party must be on terms favorable to RIC;

10. The stock of the insurance companies may not be pledged without Department approval;

11. The applicants may not change the terms of the subordinated notes payable without Department approval;

12. Any proposed changes to the current business plan, including entering into new reinsurance arrangements requires prior Department approval;

13. Any changes to existing reinsurance agreements must be approved by the Department.

14.	The Companies will reimburse the Department for employment of a Department appointed Claims Monitor, who, will among other responsibilities, be available to receive and act upon Policyholder complaints.  Additionally, the Claims Monitor will, among other responsibilities, track indemnity reserve adequacy, monitor litigation management, review claims denials, monitor claims staffing levels, perform ongoing analysis and measurement of claims initiatives, monitor benchmark projected versus actual statistical data, identify and assess new exposures, and assess all extra contractual and bad faith claims. Additionally, the Claims Monitor will encourage and oversee the Companies good faith participation in alternative dispute resolution forums for disputed Policyholder claims.

15.	All applicable Royal UK affiliates shall not interpose the defense of lack of personal jurisdiction,  in any action commenced in Delaware Courts by Policyholders seeking to resolve claims arising from those policys;

16.	All applicable Royal UK affiliates shall consent to and not oppose the continued jurisdiction of the Delaware Department of Insurance, including with respect to the imposition and applicability of the State's unfair insurances practices statutes, with respect to policyholder obligations and obligations it has made as a part of this transaction;

17.  These conditions and the Final Order are subject to further orders, sanctions and proceedings as circumstances may require and are subject to further modification, amendment or supplementation and further review either sua sponte by the Commissioner or by motion of a Party;

18.  Applicants and Royal UK affiliates shall continue to be subject to the jurisdiction of the Delaware Department of Insurance for the purpose of implementing and enforcing the terms of the these conditions and this Final Order.

# EXHIBIT 2

**BEFORE THE INSURANCE COMMISSIONER**
**FOR THE STATE OF DELAWARE**

In the Matter of:                            )

                                            )

Arrowood Indemnity Company,       )      Docket No.  4633-2022

a Delaware Domestic Insurance Company   )

**<u>ORDER OF SUPERVISION BY CONSENT</u>**

**WHEREAS**, Arrowood Indemnity Company, (the "Company"), has consented to the imposition of an Order of Supervision pursuant to 18 *Del. C.* § 5942;

**WHEREAS**, the Honorable Trinidad Navarro, Insurance Commissioner for the State of Delaware (the "Commissioner"), has determined, and the Company has agreed, that grounds for supervision exist; and

**WHEREAS**, a formal hearing is not necessary due to the Company's consent to the Order of Supervision and the Company's waiver of formal service of process and a formal hearing.

**NOW, THEREFORE, IT IS HEREBY ORDERED**:

1.        The Company is hereby placed under supervision.

2.        The major departments of the Company shall report to designated representatives of the Delaware Department of Insurance ("Department") in accordance with certain reporting requirements of the Department; provided, however, that any emergent information having a material impact on the Company shall be reported to the Department immediately.  In addition:

        (a)      no less than monthly, or more frequently as requested by the Department, the Company's Chief Executive Officer and/or Chief Financial Officer must update the Department with regard to all material developments concerning the

Company's current and projected financial condition, all material contractual commitments, and all pending legal actions and related disputes;

(b)     at the request of the Department from time to time, the Company must provide projections of its risk-based capital and its projected net income, including under scenarios requested by the Department; and

(c)     the Conditions of Approval of Final Order set forth in Exhibit B to the Decision and Final Order in *The Matter of The Proposed Acquisition of Royal Indemnity Company, et al. by Arrowpoint Capital Corp., et al.*, dated February 20, 2007 (the "Final Order") shall remain in full force and effect.  If any of the provisions set forth in the Final Order conflict with this Supervision Order, the provisions of this Supervision Order shall govern.

3.     Beginning immediately upon the entry of this Order of Supervision, and continuing on an ongoing basis thereafter, the Company shall submit to the Department as promptly as possible all information which the Department determines, in its sole discretion, to be necessary to carry out its supervision of the Company.  Said requested information includes, but is not limited to, all documents relating to the Company's current financial condition and future business plans.  All such information shall be provided in a secure manner as designated by the Department so as to afford maximum security and confidentiality protection to the supplied information.  The Department and Company agree that they shall endeavor to protect the confidentiality of the provided information to the maximum extent possible.

4.     The Company shall timely file its Annual Statement as of December 31, 2021 signed by appropriate officers and directors of the Company.  Said Annual Statement shall be filed as soon as possible, and in no event later than March 1, 2022.

5.      Within 10 days of the date of this Order, the Company shall submit to the Department an amended RBC Plan.

6.      Within 10 days of the date of this Order, the Company shall submit to the Department a detailed report of projection of future cashflows.

7.      The Company shall submit to the Department a detailed expense reduction plan within 14 days from the date of this Order.

8.      The Department may require an audit by independent, third-party auditors, monitors, as well as any oversight professionals needed in the Department's sole discretion during the term of this Supervision Order.

9.      All expenses related to the Department's supervision of the Company shall be borne by the Company.

10.     Pursuant to 18 *Del. C.* § 5942(b), the Company shall not do any of the following acts, during the period of supervision, without the prior written approval of the Commissioner or the Department's designated representative:

(a)     Commit to engage or participate in any transaction outside of the ordinary course of business;

(b)     Make transfers, payments, exchange of assets or debts, or any other transactions with an entity which is a parent, subsidiary, affiliate or any other entity related to the Company, whether by common ownership and control or otherwise, including any affiliate of any parent, subsidiary or affiliate except for, ordinary course payments under interaffiliate agreements or interaffiliate reinsurance agreements previously approved by the Department;

(c)     Make any payments, incur any debts, obligations or liabilities in excess of the amount or amounts otherwise requiring Department approval;

(d)     Alter the composition or compensation of the present Board of Directors and Executive Officers of the Company.  In the event of a resignation of any members of the present Board of Directors or Executive Officers, the Company shall submit to the Department an exit report within 48 hours of notice of the resignation;

(e)     Engage in new business;

(f)     Lend any of its funds (other than investments in fixed income securities in the normal course of investment management);

(g)     Invest any of its funds in a manner that deviates from the business and investment plan on file with the Department;

(h)     Enter into any new reinsurance contract or treaty;

(i)     Commute, novate, amend or otherwise change any existing reinsurance contract or treaty;

(j)     Amend, change or lapse any liability insurance policies currently in place covering directors, officers or employees and any and all policies of insurance on which the Company, its assets, interests, directors, officers or employees are covered or subject;

(k)     Declare or pay any dividend of the Company or in any way distribute assets to shareholders outside the normal course of business;

(k)     Merge or consolidate with another company;

(l)     Execute, promise, contract for or negotiate guarantees or undertakings for the benefit of an affiliate or vendor which results in an actual or contingent exposure of the Company's assets;

(m)     Enter into, terminate, contract for, or modify intra-company management and service contracts or cost-sharing arrangements anticipated to be in excess of $50,000;

(n)     Enter into any contracts which, in the judgment of the Company's management, would materially affect the financial condition of the Company; or

(o)     Increase the amount of any special deposit, security, or collateral account, posted with, on behalf of, restricted by, or held, by any third party, including insureds, pools, or any other entity that may have claim to, or otherwise demand transfer of assets of the Company. This shall not prevent the Company from substituting assets of equal value in the normal course of business in any special deposit, security, or collateral account in existence as of the effective date of this Order.

11.     Nothing set forth hereinabove relieves the Company from its past, present or future obligations to report to, or make filings with, the Department in accordance with Delaware law or to otherwise comply with Delaware law.

12.     Pursuant to 18 *Del. C. § 5942(c)*, in the event that any person shall violate this Order of Supervision, and, as a result, the net worth of the Company shall be reduced or the Company shall otherwise suffer loss, said person shall become personally liable to the Company for the amount of any such reduction or loss.

13.     The Company shall remain in Supervision for a period of 90 days or until this Order is terminated, modified or extended as follows:

(a)     until such time as the Company makes the following showings to the Department:

i.     that the Company will achieve a Company Action Level Risk Based Capital Level of 200% commencing after the date of this Order and as calculated to the satisfaction of the Department; and

ii.     that the Company will maintain a Company Action Level Risk Based Capital Level of 200% for a satisfactory period thereafter; or

(b)     until such time as the Commissioner otherwise determines that Supervision is no longer necessary.

14.     The Commissioner is authorized to enter a further Order of Supervision and/or take any and all actions necessary and appropriate pursuant to 18 *Del. C.* Chapter 59.

**SO ORDERED** this 25th day of February, 2022

_____

The Honorable Trinidad Navarro
Insurance Commissioner For the State of Delaware

# EXHIBIT 3

| From: | Law, Timothy P. |
|---|---|
| To: | Jesse Bair |
| Cc: | Tim Burns; Berringer, John B. |
| Subject: | RE: DRVC v. Arrowood |
| Date: | Friday, May 12, 2023 3:26:07 PM |

Jesse,

We have considered your request, but we cannot consent. While attendance at depositions is not specifically addressed in the stipulation, it seems to fall outside the scope of the Committee's rights as an intervener established in the stipulation. It is most analogous to this provision: "The Committee shall not be served or otherwise provided with written or document discovery exchanged between the Diocese and Arrowood." It is less analogous to this provision: "[T]he Committee shall be served with all documents filed in this litigation and shall have the right to participate in all conferences and respond to all filings." The line drawn in the stipulation seems to be between discovery and court proceedings/filings. Attending depositions falls on the discovery side of the line. We recognize that you cite a case allowing an intervener a right fully to monitor the proceedings (including "sitting in" at depositions, and reviewing material produced in discovery). *In re Adelphia Commc'ns Corp.,* 285 B.R. 848, 850–51 (Bankr. S.D.N.Y. 2002). Here, the stipulation clearly states that the Committee does not have the right to review material produced in discovery. Similarly, we think "sitting in" at depositions is out of bounds.

Tim

**Timothy P. Law**
+1 215 241 1262
tlaw@reedsmith.com
Reed Smith LLP
Three Logan Square
Suite 3100
1717 Arch Street
Philadelphia, PA 19103
+1 215 851 8100
Fax +1 215 851 1420

**From:** Jesse Bair <jbair@burnsbair.com>
**Sent:** Friday, May 12, 2023 2:15 PM
**To:** Law, Timothy P. <TLaw@ReedSmith.com>
**Cc:** Tim Burns <tburns@burnsbair.com>; Berringer, John B. <JBerringer@ReedSmith.com>
**Subject:** DRVC v. Arrowood

EXTERNAL E-MAIL - From jbair@burnsbair.com

Tim—
It was nice speaking with you yesterday.

Further to our call, I write to confirm whether the Diocese has any objection to the Committee attending via Zoom the upcoming depositions in the Arrowood district court action. As I mentioned, the current Order reinstating the Committee as a party states that the Committee "shall not be served or otherwise provided with written or document discovery exchanged between the Diocese and Arrowood," but it does not in any way limit the Committee's ability to attend depositions. We believe that attending depositions (in addition to being permitted under the current Order) is also squarely within the universe of rights afforded to intervening Committees under SDNY case law. *E.g., In re Adelphia Commc'ns Corp.,* 285 B.R. 848, 850–51 (Bankr. S.D.N.Y. 2002) ("[T]he intervenors should have the rights in this adversary proceeding generally corresponding to those that they have under section 1109(b) in the umbrella cases—i.e., that they may 'raise and may appear and be heard on any issue....' The Court further believes that such intervenors should have the right fully to monitor the proceedings (including 'sitting in' at depositions, and reviewing material produced in discovery)…").

We also believe that, in light of the significantly narrower scope of discovery now at issue in the Arrowood district court action (which is limited to the duty to defend issue and does not include Arrowood's expected or intended defense), there should not be any confidentiality concerns with the Committee attending the depositions. Indeed, Arrowood itself filed the entirety of the Chapin deposition on PACER, thus undercutting any argument that Arrowood might raise about the necessity of shielding deposition information from the Committee.

Related to the above, you mentioned that the Krista Ammirati deposition is currently scheduled for May 23. Could you please let us know what time that deposition will begin and when the James Wallace deposition will occur? And, of course, if there are any other depositions scheduled, we would like the details for those as well. Thanks in advance for the assistance.

Best,

Jesse
Jesse Bair
Burns | Bair
10 E. Doty Street, Suite 600
Madison, WI 53703
608.286.2840
jbair@burnsbair.com

* * *

This E-mail, along with any attachments, is considered confidential and may well be legally privileged. If you have received it in error, you are on notice of its status. Please notify us immediately by reply e-mail and then delete this message from your system. Please do not copy it or use it for any purposes, or disclose its contents to any other person. Thank you for your cooperation.

Disclaimer Version RS.US.201.407.01