PACHULSKI STANG ZIEHL & JONES LLP
James I. Stang, Esq. (admitted *pro hac vice*)
Iain A. W. Nasatir, Esq.
Karen B. Dine, Esq.
Brittany M. Michael, Esq.
780 Third Avenue, 36th Floor
New York, New York 10017
Telephone:     (212) 561-7700
Facsimile:       (212) 561-7777
Email:            jstang@pszjlaw.com
                      inasatir@pszjlaw.com
                      kdine@pszjlaw.com
                      bmichael@pszjlaw.com

and

BURNS BAIR LLP
Timothy W. Burns, Esq. (admitted *pro hac vice*)
Jesse J. Bair, Esq. (admitted *pro hac vice*)
10 E. Doty St., Suite 600
Madison, WI 53703-3392
Telephone: (608) 286-2808
Email:  tburns@burnsbair.com
Email:  jbair@burnsbair.com
*Counsel and Special Insurance Counsel for the Official Committee*
*of Unsecured Creditors of The Roman Catholic Diocese*
*of Rockville Centre, New York*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>THE ROMAN CATHOLIC DIOCESE OF ROCKVILLE CENTRE, NEW YORK,[1]<br><br>                      Debtor. | Chapter 11<br><br>Case No. 20-12345 (MG) |

---

[1] The Debtor in this chapter 11 case is The Roman Catholic Diocese of Rockville Centre, New York, the last four digits of its federal tax identification number are 7437, and its mailing address is P.O. Box 9023, Rockville Centre, NY 11571-9023.

# THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS' REPLY IN SUPPORT OF MOTION FOR AN ORDER GRANTING LEAVE, STANDING, AND AUTHORITY TO PROSECUTE A CAUSE OF ACTION ON BEHALF OF THE DEBTOR AND ITS ESTATE

The Official Committee of Unsecured Creditors (the "Committee") of The Roman Catholic Diocese of Rockville Centre, New York (the "Diocese" or the "Debtor"), by and through its undersigned counsel, hereby replies (the "Reply") in support of its Motion for entry of an order authorizing the Committee to prosecute a claim and/or cause of action on behalf of the Debtor and its estate (the "Motion") against the Allianz Insurers and LMI ( "LMI" and the "Allianz Insurers" are collectively referred to herein as the "Insurers"). In support of this Reply, the Committee respectfully states as follows:

## PRELIMINARY STATEMENT

1. Through its Motion, the Committee seeks to protect the interests of its constituents, the survivors of childhood sexual abuse, from the pitfalls that have occurred in other diocesan bankruptcies when a diocese and certain insurers have entered into settlements without committee support.

2. In their Objections, both the Debtor and the Insurers mischaracterize the Committee's Motion. The Committee does not seek to prevent other parties from "talking," (Debtor Objection at 1–2), or otherwise seek to "dictat[e] which parties can mediate with each other and what topics they can discuss during the mediation." (Insurer Objection at 2). Far from it. The Diocese, Insurers, and Committee should all continue negotiating. What the Committee does request, however, is that the Diocese and Insurers obtain Committee consent before entering into any settlement agreement.

3. The Committee's concern isn't hypothetical or speculative. The Insurers have entered into non-consensual insurance settlements before—and they won't give the Committee

1

any assurances that they won't do so again in this case. Such assurances, of course, would obviate the need for the Committee's Motion.

4.   Nor is it a sufficient safeguard, as the Debtor contends, for the Committee to merely object to an insurance settlement as part of the 9019 process after it has been memorialized. (Debtor Objection at 3). The harm is already done at that point. In *Rochester,* the debtor/insurer settlements were never approved by the Court, yet CNA (the lone non-settling insurer), continues to argue that the diocese's purported breach of the earlier settlement agreements creates a "massive administrative claim" against the estate. (Rochester Bankruptcy Case, Doc. No. 1896 at 3). Indeed, in its proposed Plan of Reorganization, part of the value CNA contends it is contributing is the release of its administrative claim. (*Id.,* Doc. No. 2214 at 28). Likewise, in *Camden*, the insurers also continue to pursue their purported administrative claims based on an alleged breach of an earlier debtor/insurer settlement agreement. (*See* Camden Bankruptcy Case, Doc No. 3336 at 45–46). The mere ability of insurers to raise arguments based on alleged breaches of non-consensual, unapproved insurance settlements frustrates the ability of committees to maximize insurance recoveries on behalf of the sexual abuse survivors.[2]

5.   The Committee is perfectly capable of settling with the Insurers, if the Insurers are willing to contribute a reasonable sum. But, in order for that to be possible in this case, it is essential that Committee approval be sought before any insurance deal is reached.

---

[2] For reasons similar to those stated earlier, the Committee does not dispute that the Debtor has the authority to negotiate and potentially settle with the Insurers if such a settlement is in the best interests of the estate. (Debtor Objection at 2-3). But, such a settlement will never be in the best interests of the estate if the survivor constituency does not support it because any Plan incorporating third-party releases will not be confirmable if it does not have overwhelming survivor support and the alleged breach of such an agreement could give rise to potential damages claims against the estate. Again, the Committee is not seeking to prohibit the Diocese from negotiating with the Insurers. It simply seeks confirmation that the Debtor and the Insurers will not finalize any settlement without Committee approval.

6. As explained herein, and for the reasons outlined in the Committee's Motion, neither of the Objections has merit, and the Court should grant the Committee leave to commence and prosecute the Cause of Action on behalf of the Debtor's estate.

**ARGUMENT**

I. **The Derivative Claim is Colorable**

   A. *The Committee's Motion Does Not Undermine the Mediation or Otherwise Invade the Mediation Privilege*

7. The Insurers devote six pages of their Objection to describing how the Committee's Motion purportedly "invades the mediation privilege and interferes with the mediation process." (Insurer Objection at 8–14). The Committee's Motion does no such thing, and the Insurers' "undermine the mediation" argument is a strawman.

8. As noted above, the Committee does not seek to block discussions or to compel disclosure of what discussions are taking place. The Committee is simply seeking to stop the Insurers from doing what insurers have done in at least two other recent diocesan bankruptcies—*i.e.*, entering a deal without the Committee's consent that harms the estate by giving the insurers arguments to scuttle any eventual debtor/committee Plan in a way that they do not currently have.

9. This Court has explained that any Plan incorporating third-party releases would "need to receive overwhelming support from Creditors." (July 18, 2023 Hearing Tr. 9:7–10). Every diocesan Plan the Committee is aware of has incorporated third-party releases—including the Diocese's proposed Plan in this case. Any insurer-diocese agreement that incorporates third-party releases is destined to fail if it doesn't have survivor support. The Insurers are aware of the requirement for "overwhelming support" of the survivors.

10. Entering into an agreement that does not have "overwhelming support" of the survivors, despite the requirement that any Plan incorporating third-party releases have such

3

support, is, itself, deceptive and misleading conduct on the part of the Insurers under New York General Business Law Section 349 ("Section 349") because they are entering into an agreement that they know cannot be approved.

11. In other words, the agreement purports to resolve liabilities, but it will end up not doing so unless the survivors approve it. If they don't, the agreement is a nullity, but unfortunately, it is an exploding nullity that actively harms the estate and the sexual abuse survivors.

12. Because entering into such a non-consensual settlement is, standing alone, misleading and deceptive under Section 349, the Committee does not need to rely on any mediation communications or other conduct to state its claim. The Insurers' mediation-related arguments should therefore be rejected.

### B. *The Proposed Cause of Action is Ripe*

13. The Insurers also assert that the Committee's Cause of Action is not ripe, (Insurer Objection at 14–15), but that position is mistaken.

14. Courts, of course, have the power to adjudicate claims, even though future harm may be uncertain. *Make the Rd. New York v. Pompeo*, 475 F. Supp. 3d 232, 268 (S.D.N.Y. 2020) ("Plaintiffs, however, need only show 'a *threat* of irreparable harm, not that irreparable harm already ha[s] occurred.'") (emphasis in original) (internal citations omitted); *Roman Cath. Archdiocese of New York v. Sebelius*, 907 F. Supp. 2d 310, 329 (E.D.N.Y. 2012) ("'[T]he present impact of a future, though uncertain harm may establish injury for standing purposes.'") (internal citations omitted);[3] *Carey v. Klutznick*, 637 F.2d 834, 837 (2d Cir. 1980) ("Although the irreparable injury that the appellees sought to avert was a 'possibility,' every irreparable injury is merely a possibility until it is actual and can no longer be averted.").

---

[3] As described in the *Archdiocese of New York v. Sebelius* case, "[r]ipeness analysis is similar to standing analysis." 907 F. Supp. 2d at 333.

15. Here, insurers have already entered into debtor/insurer agreements in the *Rochester* and *Camden* cases that have harmed those estates and hindered the ability to confirm consensual, debtor/committee Plans. The Committee has asked the Insurers to give their assurances that they will not enter into similar agreements here. To date, however, the Insurers have declined to provide that assurance.

16. Given this past conduct—and the Insurers' refusal to confirm that they will not enter into similar agreements here—the Committee needs to be able to protect the estate, and, ultimately, the sexual abuse survivors, from the same harm that has been inflicted on other estates and other survivors in different bankruptcies. The Committee cannot simply stand by and allow that harm to occur. The Insurers' ripeness argument should therefore be denied. *Cf. Walker v. Azar*, 480 F. Supp. 3d 417, 426 (E.D.N.Y. 2020) ("'[P]ast wrongs are evidence bearing on whether there is a real and immediate threat of repeated injury.'") (internal citations omitted).[4]

**II. The Proposed Complaint Adequately Pleads a Claim under Section 349**

17. To state a claim under Section 349, a plaintiff must allege that the challenged act or conduct is (1) consumer-oriented; (2) materially misleading; and (3) that plaintiff suffered injury as a result of the allegedly deceptive act or practice. *Nick's Garage, Inc. v. Progressive Casualty Ins. Co.*, 875 F.3d 107, 124 (2d Cir. 2017). The Insurers contend that the proposed Complaint fails to meet the first and third prongs. The Insurers' arguments, however, miss the mark.

---

[4] *See also id.* ("Plaintiffs have experienced discrimination from healthcare providers in the past, and their medical conditions will require them either to interact with at least some of those same medical providers in the future, or to delay or forego treatment. The Court concludes that this 'Catch-22' is sufficiently concrete to constitute an injury in fact."); *see also Miller v. Syracuse Univ.*, No. 5:21-cv-1073, 2023 WL 2572937, at *11 (N.D.N.Y. Mar. 20, 2023) ("[T]he standing analysis for Plaintiff's requested injunction—which seeks to prevent future data breaches—depends on whether Plaintiff has sufficiently alleged that he is 'realistically threatened by a repetition of' another data breach of Defendant's systems . . . . Given the[] allegations, the Court finds that Plaintiff has sufficiently alleged that he is realistically threatened by another data breach of Defendant's systems, and thus has standing to pursue his requested injunctive relief.").

18. First, the Complaint alleges "consumer-oriented" conduct. Although the Insurers attempt to paint the Cause of Action as a "private contract dispute," (Insurer Objection at 16), the allegations of the proposed Complaint tell a different story:

> The Insurers' deceptive acts and practices are consumer oriented. The Insurers' conduct affects the interests of the Diocese and the many hundreds of Survivors, in addition to survivors of sexual abuse with CVA claims in other actions. The Insurers' conduct also thwarts the considerable public interest in New York in fair resolution of the CVA claims.
>
> The Insurers' conduct is also consumer oriented because the Insurers sold similar policies to other consumers, including other Dioceses, within the state of New York that insure CVA claims. <u>The Insurers' conduct has a broad impact on consumers at large, including other New York dioceses in bankruptcy and sexual abuse survivors in those bankruptcies.</u>
>
> In addition, <u>the Insurers' conduct is consumer oriented because it is designed to thwart clearly articulated New York public policy designed to protect the intended beneficiaries of insurance policies sold throughout the state, including sexual abuse survivors.</u>

Compl., ¶¶ 63–65 (emphasis added).

19. In addition, the Cause of Action impacts matters of considerable public interest in New York, including whether entering into an insurance settlement without Committee approval meets the standards for insurer conduct required by the New York State Department of Financial Services ("DFS") in its Circular No. 11. *See Securitron Magnalock Corp. v. Schnabolk*, 65 F.3d 256, 264 (2d Cir. 1995) ("It is clear that 'the gravamen of the complaint must be consumer injury or harm to the public interest.' *<u>The critical question, then, is whether the matter affects the public interest in New York</u>*, not whether the suit is brought by a consumer or a competitor.") (emphasis added) (internal citations omitted).

20. Although the Insurers contend that their actions fall "entirely in line" with the Circular Letter's recommendations for insurer conduct when handling CVA claims, (Insurer Objection at 18), that is a factual question that speaks to whether their conduct is "deceptive"—an

6

issue the insurers have not challenged as part of their objection—not whether their conduct is "consumer oriented."

21. Simply put, whether an insurer can enter into such a settlement without Committee approval is an issue that has a broad impact on consumers at large, including other New York dioceses in bankruptcy and sexual abuse survivors in those bankruptcies. *See* Compl., ¶¶ 63–65. The conduct alleged is thus "consumer-oriented" and the Committee has adequately pled the first prong of a Section 349 claim.

22. Second, the Complaint adequately alleges an injury to the estate. As described above in response to the Insurers' "ripeness" argument, the Committee has alleged that (1) insurers in other diocesan bankruptcies have entered into settlement agreements without committee approval (Compl., ¶¶ 12, 48); (2) the debtor/insurer agreements have caused harm to the estate, the committee, and the sexual abuse survivors in those cases (*id.*, ¶¶ 12–13, 46, 48, 62); and (3) the Insurers will not provide any assurances that such a settlement agreement won't be entered in this case as well (*id.*, ¶ 10).

23. These allegations establish at least the "*threat* of irreparable harm," *Make the Rd. New York*, 475 F. Supp. 3d at 268 (emphasis in original) (internal citations omitted), which is sufficient to justify the injunctive relief sought in the Complaint. The Complaint therefore adequately pleads the third prong of a Section 349 claim and the Insures' failure to state a claim argument should be rejected.[5]

---

[5] The Insurers also argue that no private right of action exists under New York Insurance Law Section 2601. (Insurer Objection at 19). The Complaint, however, does not assert a claim under Section 2601. Instead, the Complaint references Section 2601 as providing further support for the proposed Section 349 claim. New York courts have recognized that, "[a]s a general matter, a violation of section 2601 may constitute a violation of section 349." *Quincy Mut. Fire Ins. Co. v. New York Cent. Mut. Fire Ins. Co.*, 89 F. Supp. 3d 291, 314 (N.D.N.Y. 2014); *see also Riordan v. Nationwide Mut. Fire Ins. Co.*, 756 F. Supp. 732, 739 (S.D.N.Y. 1990) ("[A] policy and practice of violating New York Insurance Law § 2601 and the rules

### III. The *Rochester* and *Camden* Cases Support the Relief Sought by the Committee

24. The *Rochester* and *Camden* cases demonstrate the very real harm that debtor/insurer settlements can cause to an estate. The Insurers try to turn these cases on their head by pointing to the fact that (1) certain insurers <u>defeated</u> (at least for now) confirmation of a debtor/committee plan in Camden; and (2) that LMI and Interstate (but <u>not</u> CNA, the largest insurer—who is sill vigorously objecting to Plan confirmation on the basis of the purportedly breached insurance settlement) eventually reached a settlement in Rochester. (Insurer Objection at 21–22). But, these facts underscore the harm caused by debtor/insurer settlements—they don't minimize them.

25. First, in *Camden*, the insurers raised the very types of arguments in opposition to Plan confirmation that the Committee seeks to prevent the Insurers from obtaining here; for instance, the argument about purported administrative claims. *See* Camden Bankruptcy Case, Doc. No. 3336 at 38–39 ("The Insurers further object to confirmation on the grounds that the Plan is not feasible because the Debtor lacks the funding to pay the full amount of their potential Administrative Claims[.]").[6] The fact that the court denied confirmation of the debtor/committee plan only underscores the importance of the estate not giving the Insurers an opportunity to argue that the Insurers have rights that they otherwise do not have.

26. Moreover, the *Camden* court did not whitewash the insurers' conduct in that case. Although it denied confirmation of the debtor/committee plan, the court also denied the insurer-

---

promulgated thereunder . . . , if proven, constitutes a 'deceptive business practice' sufficient to satisfy the requirements of Section 349."). The Insurers' arguments about Section 2601 are therefore misplaced.

[6] *See also id.* at 42 ("The Administrative Claims are for an unspecific amount, but the Insurers argue the claims total at least $2.4 million and could be as much as $123.5 million.").

supported 9019 motion, (*id.*, Doc. No. 3335 at 30), and expressed skepticism that the Insurers would ultimately prevail on their administrative claims, (*Id.,* Doc. No. 3336 at 43–44).[7]

27. In *Rochester*, the largest insurer, CNA, is vigorously objecting to confirmation of the debtor/committee Plan—in large part based on the purported breach of the earlier debtor/insurer settlement agreements.[8] Although the committee, through much time and effort, did eventually reach settlement with LMI and Interstate, the prior debtor/insurer settlements still frustrate the committee's and diocese's ability to confirm a plan, in part based on rights CNA claims it obtained from the earlier settlements.[9]

28. While the Committee and Insurers could quibble over minor details regarding those cases, the upshot is clear—debtor/insurer settlement agreements pose great risk for the estate and the Committee should be permitted to stop them here.

---

[7] *Id.* ("The Insurers argue that, because the Insurance Settlement contains no specific language about the Debtor's fiduciary obligations, the Debtor should be barred from fulfilling those obligations even if another deal is proposed which would increase the value of the estate. Adopting such reasoning would essentially permit a debtor to contract away its fiduciary obligations. As such, and without making any determination as to the Insurers Adversary Claim at this time, this argument does not persuade the Court that the Plan is not feasible.").

[8] *See, e.g.,* Rochester Bankruptcy Case, Doc. No. 1896 at 3–4 ("Debtor's bait and switch with respect to the Insurance Settlements is not a proper exercise of business judgment because, among other things, it exposes Debtor and its estate to a massive administrative claim that must be paid in full, in cash, before any plan that is compliant with the terms of the RSA could go into effect. The Insurers' administrative claim likely forecloses any finding of feasibility, a prerequisite to plan confirmation, and establishes that any plan seeking to implement the RSA likely will not meet the good-faith requirement of Bankruptcy Code § 1129(a)(3), another reason any such plan could not be confirmed.").

[9] Rochester Bankruptcy Case, Doc. No. 2196 at 3 ("Although the Diocese may have agreed with other insurers to modify their previous settlement agreements, potentially making the Rule 9019 Motion moot as to those insurers, those other parties' agreements do not moot the motion as to Continental. Nor does Continental's forthcoming plan moot the Rule 9019 motion: while the Continental plan will constitute a settlement offer that survivors can choose to accept if they wish, the plan will reserve all of Continental's rights to enforce its settlement agreement with the Diocese. This includes pursuing breach claims if the Continental plan is not confirmed.").

## IV. The Debtor Unjustifiably Refused to Bring the Cause of Action

29. Lastly, the Insurers and Debtor argue that the Debtor did not unjustifiably refuse to bring the claim because the Committee has not shown that the litigation would be a "sensible expenditure of estate resources that will not impair reorganization." (Debtor Objection at 4; *see also* Insurer Objection at 23–25). That objection should be overruled.

30. First, the Insurers have no standing to raise the argument.[10] Second, all the Committee must do is provide "comfort" that their litigation is a sensible endeavor. *Id.*[11] The Committee has met that low bar here. As described above, the consequences of entering into a debtor/insurer settlement are severe for the estate. Compared to the costs that would be incurred to undo a debtor/insurer settlement (*see generally* discussion of *Rochester* and *Camden* cases), the cost of the proposed litigation will almost certainly be magnitudes less.

31. That is especially true with this Motion because the Insurers and Debtor could moot the need for the Motion at any time if they simply agreed not to enter into an insurance settlement without Committee approval.

32. Based on the foregoing, the Court should enter an order granting the Committee leave, standing, and authority to commence and prosecute the Cause of Action on behalf of the Debtor's estate.

---

[10] [T]he Court must be mindful of the purposes for its inquiry. It is not for the protection of defendants sued or to be sued by a committee on behalf of an estate, whose defenses can be fully and fairly considered in the plenary litigation to be prosecuted—just as they would if the defendants had been sued by a debtor (or a nondebtor) directly. Rather, the purpose of the bankruptcy court's gatekeeper role is to protect the *estate,* to ensure that the litigation reasonably can be expected to be a sensible expenditure of estate resources, and will not impair reorganization.

*In re Adelphia Commc'ns Corp.,* 330 B.R. 364, 386 (Bankr. S.D.N.Y. 2005).

[11] *See also id.* ("That means, as a practical matter, providing the Court with a predicate for concluding that the claims will, if proven, provide a basis for recovery, and that the proposed litigation will not be a hopeless fling.").

Dated: September 22, 2023  PACHULSKI STANG ZIEHL & JONES LLP

*/s/ James I. Stang*
James I. Stang, Esq.
Iain A. W. Nasatir, Esq.
Karen Dine, Esq.
Brittany M. Michael, Esq.
780 Third Avenue, 36th Floor
New York, NY 10017-2024
Telephone: 212/561-7700
Facsimile: 212/561-7777
jstang@pszjlaw.com
inasatir@pszjlaw.com
kdine@pszjlaw.com
bmichael@pszjlaw.com

*Counsel for the Official Committee of Unsecured Creditors*

BURNS BAIR LLP

*/s/ Timothy W. Burns*
Timothy W. Burns, Esq. (admitted *pro hac vice*)
Jesse J. Bair, Esq. (admitted *pro hac vice*)
10 E. Doty St., Suite 600
Madison, WI 53703-3392
Telephone: (608) 286-2808
Email: tburns@burnsbair.com
Email: jbair@burnsbair.com

*Special Insurance Counsel to the Official Committee of Unsecured Creditors*