**Hearing Date and Time:  December 19, 2023 at 2:00 p.m. (Prevailing Eastern Time)**
**Objection Date and Time:  December 8, 2023 at 4 p.m. (Prevailing Eastern Time)**

PACHULSKI STANG ZIEHL & JONES LLP
James I. Stang, Esq. (admitted *pro hac vice*)
Iain A. W. Nasatir, Esq.
Karen B. Dine, Esq.
Brittany M. Michael, Esq.
780 Third Avenue, 36th Floor
New York, New York 10017
Telephone:    (212) 561-7700
Facsimile:    (212) 561-7777
Email:        jstang@pszjlaw.com
              inasatir@pszjlaw.com
              kdine@pszjlaw.com
              bmichael@pszjlaw.com

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br>THE ROMAN CATHOLIC DIOCESE OF<br>ROCKVILLE CENTRE, NEW YORK,<br>Debtor. | Chapter 11<br>Case No. 20-12345 (MG) |

**CORRECTED MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS PURSUANT TO SECTIONS 105, 305 AND 362 OF THE BANKRUPTCY
CODE TO PERMIT PROCEEDING WITH CERTAIN STATE COURT ACTIONS AND
<u>TEMPORARY SUSPENSION OF THE CHAPTER 11 CASE</u>**

The Official Committee of Unsecured Creditors (the "Committee") of The Roman Catholic Diocese of Rockville Centre, New York (the "Diocese" or the "Debtor") in the above-captioned case (the "Bankruptcy Case"), through its undersigned counsel, hereby moves pursuant to sections 305(a), 362(d) and 105(a) of the Bankruptcy Code for entry of an order, substantially in the form of Exhibit A hereto permitting the Committee to select four to six claimants to be identified as state court plaintiffs (the "CVA Test Plaintiffs") to pursue their respective cases filed under the New York Child Victim's Act ("CVA") pending against the Diocese and/or any related parties[1] in state court (the "Test Cases"). The Committee further moves the Court to temporarily suspend this Bankruptcy Case to limit the costs and administrative burden on the Diocese while the Test Cases proceed and, hopefully, lead to productive negotiation for a consensual resolution. In support of this Motion, the Committee respectfully represents:

## PRELIMINARY STATEMENT

1.  On October 19, 2023, the Debtor filed a letter[2] in which it purported to describe its "best and final" proposal (the "Diocese Proposal") to resolve this Bankruptcy Case. The Diocese asserts that the Diocese, the parishes and other non-debtor affiliates (the "Diocesan Enterprise") seeking releases have "dug as deep as possible," pointing to the Diocese's monthly operating reports and filed financial information. The Diocesan Enterprise also suggests that it is offering more than the "market rate" for rape, oral sex, and other forms of child sexual abuse.

---

[1] Once the Test Cases are identified, in accordance with the Stipulation and Agreed Order Extending the Termination Date of the Preliminary Injunction Staying Continued Prosecution of Certain Lawsuits [Docket No. 157] (as amended and modified, the "Stipulated Standstill Order"), the Committee will provide a notice to the Diocese of withdrawal of its consent to continuation of the preliminary injunction staying the prosecution of the non-debtor affiliates that are defendants in the Test Cases. To the extent that this Court grants relief from the automatic stay pursuant to section 362(a) of the Bankruptcy Code (the "Automatic Stay"), the Committee submits that there is no basis for a preliminary injunction to stay those same actions with respect to any non-debtor defendants.

[2] Letter of Corinne Ball dated October 19, 2023 [Docket No. 2590] (the "Ball Letter").

4892-1943-4638.11 18491.002

The Diocese's reference to what has been paid in other Diocesan cases is of no moment in evaluating the Diocese's exposure in *this* Bankruptcy Case.

2.      The Committee and its professionals have the benefit of non-public financial information and strongly disagree with any assertion that the Diocesan Enterprise has dug deeply. The Diocesan Enterprise's protestations of lack of funds ignore the myriad of potential resources available to the Diocesan Enterprise.[3] For example, the eight New York bishops, including Bishop Barres, are the sole members of the Mother Cabrini Health Foundation ("Cabrini Foundation")[4] that, according to its audited financial statements for 2021, had over $4 billion dollars in assets.[5] A central purpose of the Cabrini Foundation is to make grants "to improve the health and wellbeing of vulnerable New Yorkers."[6]  The sexual abuse survivors indisputably constitute "vulnerable New Yorkers."

3.       Moreover, as the Court is well aware, the Diocesan Enterprise has adamantly refused to disclose the individual assets of its parishes and other related entities for which it wants a release. The Diocesan Enterprise has only allowed the Committee's professionals to see

---

[3] Conveniently, the Ball Letter justifies the Diocese Proposal by pointing to the financial information publicly provided. The public information does not include information about the assets, including cash and investments of parishes, or of the Cemetery Corporation, the Diocese's pension fund, Mission Assistance Corporation or other entities in the Diocesan Enterprise. The Committee is not at liberty to provide information on those assets that would paint a more complete picture of the ability of the Diocesan Enterprise to properly compensate survivors while maintaining its mission.

[4] The Cabrini Foundation was created in 2018 with proceeds from the sale of New York State Catholic Health Plan, Inc. ("NYSCHP"), a New York not for profit corporation (of which the Debtor's Bishop was and remains a member) of substantially all of its assets to Centene Corporation ("Centene"). *See* Verified Petition ("Petition") filed by NYSCHP with the Attorney General. A copy of the Petition, without the voluminous exhibits, is attached as **Exhibit A** to the Declaration of Karen B. Dine ("Dine Dec.") filed concurrently herewith. NYSCHP is a member organization and its membership, by its by-laws, is limited to the eight Diocesan Bishops of the State and Ecclesiastical Province of New York; those being New York, Albany, Brooklyn, Buffalo, Ogdensburg, Rochester, Rockville Centre and Syracuse. The assets of NYSCHP consisted primarily of a health insurance plan known as Fidelis Care New York ("Fidelis"). The sale was for a gross purchase price of $3.75 billion. *Id.* at ¶4. From the purchase price approximately $3.2 billion was used to create and fund the Cabrini Foundation. *Id*. at ¶ 139.

[5] https://cabrinihealth.org/wp-content/uploads/2023/01/2021-Audied-Financials-KPMG.pdf

[6] *See* https://cabrinihealth.org/about/

4892-1943-4638.11 18491.002

that financial data (to the extent it has even been provided), and the professionals have concluded

these third parties are not offering fair consideration for the releases they seek for themselves and

others.

4.    Given, the Diocesan Enterprise continues to refuse to make a reasonable financial

contribution based on its full financial picture to resolve this Bankruptcy Case, the Test Cases

will demonstrate to the Parties the Diocesan Enterprise's true exposure and should assist the

parties in reaching a consensual plan.[7]  Judge Steinman recently acknowledged as much when he

told the parties in the released cases that he wants to start trial on four cases where "notice

evidence" is not disputed – it would be a waste of time and resources to pick Test Cases where

the parties would need to conduct significant discovery in order to determine whether "notice

evidence" exists, and risk any of the Test Cases being dismissed on summary judgment.

5.    Additionally, the Debtor has not settled with any of the Insurers[8] (all of whom

vehemently contest coverage under reservations of rights) while the Diocese has made

---

[7] In New York, legislation was proposed and could be revived to establish a permanent statute of limitations
window for childhood sexual abuse.  *See New York State Senate Assembly Bill A618A*
https://www.nysenate.gov/legislation/bills/2021/A618

[8] "Insurers" means all of the Diocese's insurers, including (1) Arrowood Indemnity Company ("Arrowood") (2)
Evanston Insurance Company, successor by merger to Associated International Insurance Company ("Evanston");
(3) Lexington Insurance Company ("Lexington"); (4) Interstate Fire & Casualty Company, Fireman's Fund
Insurance Company, and National Surety Corporation (collectively, the "Allianz Insurers"); (5) Ecclesia Assurance
Company ("Ecclesia"); and (6) Certain Underwriters at Lloyd's, London subscribing various Insurance Policies;
Ancon Insurance Co. (UK) Ltd.; Assicurazioni Generali T.S.; Dominion Insurance Co. Ltd.; Catalina Worthing
Insurance Ltd f/k/a HFPI (as Part VII transferee of Excess Insurance Co. Ltd. and London & Edinburgh Insurance
Co. Ltd. as successor to London & Edinburgh General Insurance Co. Ltd.); River Thames Insurance Company
Limited (as the legal successor to Unionamerica Insurance Company Limited, which was itself the legal successor
to: (i) St. Paul Reinsurance Company Limited (formerly known as Mercury Reinsurance Company (UK) Limited
and St. Paul Fire & Marine Insurance Company (UK) Limited) and (ii) certain business of St. Paul Travelers
Insurance Company Limited (formerly known as St. Katherine Insurance Company Limited, St. Katherine Insurance
Company Public Limited Company and St Paul International Insurance Company Limited); Riverstone Insurance
(UK) Limited (as successor in interest to Terra Nova Insurance Ltd.); Harper Insurance Ltd. (formerly known as
Turegum Insurance Company); and Sompo Japan Nipponkoa Insurance Company of Europe Limited (formerly
known as Yasuda) (collectively, "LMI").

declarations of the magnitude of insurance that will be available to survivors.[9]  In so doing, the

Diocese speculates about the value of the claims without being informed by actual, current

verdicts set by Nassau County jurors.[10]  The insurers and Committee disagree with the Diocese's

evaluations but are equally uninformed by actual jury  verdicts.  Therefore, the Test Cases will

inform the Parties and the Insurers of the insurers' realistic exposure, which in turn, will

facilitate negotiations because the parties and the insurers will have a realistic assessment  of

actual values set by Nassau County jurors.[11]

6.    The Test Cases will also allow the parties to test certain threshold coverage

positions of the Insurers.  Plaintiffs in the Test Cases can make an offer to settle their claim

within the applicable policy limits.  The Insurer(s) whose policy should cover that claim will

have to decide whether to accept the offer and pay their limits.  If the Insurer rejects the offer

based on one or more coverage positions, then the case will proceed to trial in state court.  If the

Insurer's refusal to pay the offer was in "bad faith," under New York law the Insurer may have

to pay the entirety of the jury's verdict, even if the verdict is in excess of the Insurer's policy

limits.  The Insurer may also have to pay the attorney's fees and costs of its insureds who were

forced to go to trial because it refused to pay the policy limits offer, including the Diocese's fees

and costs, and the Insurer may be liable for additional damages suffered by its insureds as a

result of having to go to trial.  Whereas mediation has allowed the Insurers to hide behind their

coverage positions, the Test Cases will force the Insurers to take specific positions as to the facts

---

[9] *See Disclosure Statement for Plan of Reorganization Proposed by The Roman Catholic Diocese of Rockville Centre, New York* [Docket No. 1615] at 6, 7,

[10] For example, the Diocese's valuations stand in stark contrast *to Carrie Atchison and Christopher Paige v. Matthew Maiello et al* Index No. 03-011141, wherein in 2007 a Nassau County jury awarded 11.45 million dollars to two persons sexually abused by a music minister in Diocese parish.

[11] Because of the stay imposed by the liquidation order relating to Arrowood, none of the Test Cases will be Arrowood cases.

4892-1943-4638.11 18491.002

of specific cases. If they take unreasonable positions, New York law may require them to pay for it. This framework is the definition of "insurance neutral" as the Insurers will be required to do what they would be required to do if this Bankruptcy Case had never been filed.

7.      The Committee agrees with this Court's suggestion that proceeding with a limited number of cases will help the parties properly gauge their risk if the Bankruptcy Case is dismissed without engaging in another exercise that further delays justice while the Diocese continues to spend tens of millions on professionals rather than survivors.

8.      By this Motion, the Committee is requesting the ability to pursue the Test Cases in New York state court while the Bankruptcy Case is suspended so that there is limited administrative expense in the Bankruptcy Case and to focus expense, time and energy on finding a path to consensual resolution. The Test Cases should only go forward in New York state court and the Debtor and other defendants in the Test Cases should agree not to waste unnecessary time and money by seeking removal or transfer of venue to federal court.[12]  As the Honorable Gary R. Brown found:

> Critics of the law have long decried unimaginable delays and costs that can arise from excessive litigative wrangling. Such waits can range from the intolerable to the unconscionable. The matters discussed herein fall squarely into the latter category.

---

[12] As this Court well knows, the Diocese has delayed the state court proceedings against the non-Diocese defendants through a process of seeking removal of the individual cases and seeking a blanket removal to the U.S. District Court for the Southern District of New York. *See Joint Petition to Fix Venue for Claims Related to The Roman Catholic Diocese of Rockville Centre's Bankruptcy Under 28 U.S.C. §§ 157(B)(5) and 1334(B)* currently pending in the United States District Court for the Southern District of New York, Civ. Action No. 23 Civ. 5751. Notably, the Diocese itself has been active in the state court cases where the preliminary injunction was terminated notwithstanding that the only cases that were to go forward were cases that did not name the Diocese. *See* the *Order Denying the Debtor's Motion for a Preliminary Injunction Under Bankruptcy Code Sections 362 and 105(a)* (Adv. Proc. No. 20-01226, Docket No. 203, the "Preliminary Injunction Order")). Jones Day justifies this involvement based on two cases that name non-separately incorporated defendants such that the Diocese is actually the defendant in those cases. *See* Email of Eric P. Stephens to James I Stang dated August 28, 2023 (the "Stephens Email"). The Stephens Email is attached as **Exhibit C** to the Dine Declaration. They do so even though, to the extent those cases are against the Diocese, they are currently subject to the Automatic Stay.

4892-1943-4638.11 18491.002

Somehow, the parties responsible for the wholesale removal of hundreds of cases from state court to this district while simultaneously seeking their transfer to the Southern District seem to lack the moral standing to raise concerns about "whipsawing the parties and the state court about the location of this action."[13]

9.      Additionally, the Test Cases should be permitted to go forward only on the following conditions:

- Activity in the Bankruptcy Case should be suspended and limited to only that which is expressly required, such as the filing of Monthly Operating Reports, and such consultation of Estate professionals with their respective clients as necessary to monitor and assess the progress and outcome of the Test Cases and engage in any further negotiation or mediation towards a consensual plan, including negotiation with Insurers.

- The Debtor may also continue to make payments consistent with the first-day orders and other orders in this Bankruptcy Case permitting certain payments to be made to continue to maintain the Diocese's Estate. The Debtor may also make any payments required by statute, including of payment of fees to the United States Trustee.

- Any proceedings or actions relating to the Insurers, except for Arrowood (while its liquidation stay is in effect), should continue, including, but not limited to, the pending District Court actions against the Insurers, and the investigation and pursuit of the apparent breach of the bar date order by the Interstate Insurers.[14]

- To the extent a party desires to engage in an action or pursue a matter in the Bankruptcy Case not identified above, such party should be required to file a brief letter with the Bankruptcy Court succinctly describing the action to be taken or matter to be pursued, and parties should be provided with at least 3 business days to file a responsive letter as to whether such action or matter should go forward in light of the suspension.

10.     The Committee submits that proceeding forward with Test Cases under these conditions will advance this Bankruptcy Case.

---

[13] *In Re:  Child Victims Act Cases Removed from State Court*, Civil Action No. 23-502 (GRB) and related cases, Memorandum of Decision and Order of August 10, 2023.

[14] The fees and expenses related to the matter with the Interstate Insurers will be paid by the Interstate Insurers. *See Response to the Official Committee of Unsecured Creditors' Motion For Entry of an Order Pursuant to Bankruptcy Rule 2004 Authorizing Examination of Witnesses and the Production of Documents* [Docket No. 2576] at ¶ 8.

4892-1943-4638.11 18491.002

## JURISDICTION AND VENUE

11.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and

1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

12.      Venue of this proceeding and this Motion is proper in this District pursuant to 28

U.S.C. §§ 1408 and 1409.

13.      The statutory predicates for the relief requested herein are sections 105(a), 305,

and 362(d) of the Bankruptcy Code.

## RELEVANT FACTS

### A.  Facts Relating to the Bankruptcy Case

14.      On October 1, 2020, the Diocese commenced the Bankruptcy Case. The Diocese

is authorized to continue to operate its business and remain in possession of its properties as a

debtor in possession pursuant to section 1107(a) and 1108 of the Bankruptcy Code. No trustee or

examiner has been appointed in this Case.

15.      On October 16, 2020, the United States Trustee for Region 2 appointed the

Committee pursuant to section 1102 of the Bankruptcy Code. The Committee consists of nine

individuals who hold claims against the Diocese, including eight individuals who were sexually

abused as minors by perpetrators for whom the Diocese was responsible and one representative

of a minor with a civil rights claim against the Diocese.  *See Notice of Appointment of Official*

*Committee of Unsecured Creditors* [Docket No. 71].

16.      Since approximately October of 2021, the Diocese, the Committee, the parishes,

and the insurers have engaged in mediation in an effort to consensually resolve this Bankruptcy

Case. *See Order Appointing a Mediator* [Docket 794] (appointing Paul Van Osselaer as

mediator).

8

17.     On March 27, 2023, the Committee filed a motion to dismiss the Bankruptcy Case [Docket No. 1912] (the "Dismissal Motion") on the basis that the Diocese was incurring substantial or continuing loss to or diminution of the estate and there was an absence of a reasonable likelihood of rehabilitation for the Diocese.

18.     On July 18, 2023, the Bankruptcy Court denied the Dismissal Motion without prejudice. *Order Denying the Motion of the Official Committee of Unsecured Creditors to Dismiss the Chapter 11 Case Without Prejudice* [Docket No. 2329] (the "Denial Order").  In paragraph 3 of the Denial Order, this Court ordered that the Diocese "shall file an amended plan of reorganization and disclosure statement, or at minimum, a term sheet for a plan that is supported by both the Debtor and the Committee, by October 31, 2023."

19.     Following the denial of the Motion to Dismiss, the Diocese, the Committee, the parishes and other parties continued mediation in an effort to meet the Bankruptcy Court's October 31 deadline.

20.     On October 18, 2023, Mr. Van Osselaer filed a status report stating that no agreement had been reached among the parties to the mediation, and that he and co-mediator, Magistrate Judge Sarah Cave, consider the mediation "concluded."   *Mediator's Status Report* [Docket No. 2589].

21.     The Diocese did not file a consensual plan of reorganization or a term sheet for such a plan on or before October 31, 2023.

22.     Arrowood was placed in liquidation on November 7, 2023.  The Liquidation Order[15] stays any actions against Arrowood and its assets for the time being.

---

[15] A copy of the order of liquidation for Arrowood (the "Liquidation Order") is attached as **Exhibit C** to the Dine Declaration.

4892-1943-4638.11 18491.002

### B.    The Test Cases

23.    The Committee is in the process of identifying appropriate test cases.  The Test Cases should be cases with strong liability and notice evidence that should be capable of surviving a motion to dismiss so that the key issues can move forward to a jury trial and an eventual judgment.  Potentially high-value cases will better inform the parties and the Insurers of the Diocesan Enterprise's and the Insurer's true exposure than low-value or dismissed cases.  While the Committee recognizes that there is a spectrum of cases, the Committee submits that testing cases that the Committee and state court counsel view as strong is critical for ensuring that the cases move forward to judgment and properly demonstrate to all side the potential value of these cases.  At a recent status conference, Justice Steinman concurred in this view.

24.    Given the Diocesan Enterprise and its Insurers have repeatedly questioned the value of these 600 claims, it is worth noting that the Committee and the survivors have not been allowed to pursue any discovery regarding "notice evidence."  While the Debtor has produced records to the Committee, the Court has repeatedly heard testimony that a Catholic diocese's records rarely contain unequivocal "notice" evidence – where a record explicitly states "we are transferring Father to a new parish because he was sexually molesting children at his current assignment."  Instead, the records usually allow experienced counsel to identify red flags for additional investigation in discovery, which in turns leads to the admissible notice evidence.  For example, the records may show that a priest was transferred to a new parish outside of the normal time for such transfers, or the records may include a written note that requests the Bishop "take action to address Father's scandalous behavior at his parish."  While they rarely start their cases with notice evidence, the Court has heard that experienced counsel is able to uncover notice evidence in discovery in the vast majority of cases.  The foregoing is not saber rattling,

4892-1943-4638.11 18491.002

but explains why the Committee proposes Test Cases so the Debtor and its Insurers, and even the

Committee, can fully appreciate the jury value of claims with notice evidence.  While the

Diocesan Enterprise may succeed in dismissing some small portion of claims in state court for

lack of notice evidence,  it will never succeed in dismissing the majority of claims so long as the

survivors are given a fair opportunity to pursue discovery, which is the harsh reality the Diocesan

Enterprise and its Insurers are facing if this bankruptcy is dismissed.

25.    The Test Cases will be aimed at establishing the exposure of the solvent Insurers

and the Diocesan Enterprise.  Thus, some Test Cases will involve abuse that took place during

years in which solvent Insurers sold policies with high policy limits.  These cases are intended to

make clear to the solvent Insurers the exposure that they face if they do not settle.  Other Test

Cases will involve periods in which the Diocesan Enterprise was underinsured and are intended

to inform the parties of the Diocesan Enterprise's true exposure, which will in turn inform them

how much, if any, the Diocesan Enterprise should increase its contribution (which the

Committee contends is woefully insufficient).

26.    A critical component of evaluating potential test cases will be the ability of the

Test Case Plaintiffs to review the CVA files produced relevant to those plaintiffs.  The

Committee has requested that the Debtor de-classify the CVA files to enable this critical and

case-advancing access.[16]  To the extent that the Debtor does not agree, the Committee will seek

relief from the existing protective order [Docket No. 320] (the "CVA Protective Order") so that

there can be a review of the relevant files for the existing evidence.

---

[16] A copy of an email from Brittany Michael to Eric Stephens requesting the de-designation of document is attached
as **Exhibit D** to the Dine Declaration.

## ARGUMENT

### I.    Cause Exists to Permit the Test Cases to be Determined in State Court

27.    Litigation of the Test Cases will help the parties understand the scope of the sexual abuse liability of the Diocesan Enterprise and the Insurers. The Court needs to grant limited relief from the automatic stay in order to permit the CVA Test Plaintiffs to pursue their respective actions, including, if necessary, to add the Diocese as a defendant to such action and obtain monetary judgments on sexual abuse claims against the Diocese in state court.[17] The Bankruptcy Court has the power, *sua sponte*, to grant such limited relief from the stay with respect to the Test Cases, without further motion practice or hearing.  *See, e.g. Swift v. Belluci (In re Bellucci)*, 119 B.R. 763, 779 (Bankr. E.D. Cal. 1990) ("The second sentence of section 105(a) is a rule of construction that, when applied to section 362(d), compels the conclusion that a bankruptcy court can lift the automatic stay *sua sponte*.")

28.    In *Belluci*, the debtor had filed bankruptcy during the pendency of an appeal of a state court judgment that had been entered against him. The judgment creditor had filed a proof of claim as well as a non-dischargeability action to which the debtor objected. In connection with the claim objection dispute, the bankruptcy court had lifted the automatic stay *sua sponte* to permit resolution of the pending appeal. The debtor objected, arguing that the bankruptcy court had exceeded its authority.  The bankruptcy court determined that section 105(a) expressly granted the court authority to lift the stay *sua sponte*. The court made the findings a court would normally make in lifting the stay. *Id.; see also M&T Capital & Leasing Corp. v. Athens Inc.,* 2023 U.S. Dist. LEXIS 56153, *6 n.2 (D. Conn. March 31, 2023) (finding court had authority

---

[17] Importantly, the plaintiffs' right to enforce any judgments against the Diocese will be subject to further order of this Court.

*sua sponte* to extend the automatic stay); *Garcia v. Sklar (In re Sklar)*, 626 B.R. 750, 763

(Bankr. S.D.N.Y. 2021) (holding that "[w]hen necessary, a court is obliged to raise the issue of

the application of the automatic stay *sua sponte*."); *In re Laventhol & Horwath*, 139 B.R. 109,

116 n.6. (S.D.N.Y. 1992) (citing *Belluci* and finding that "[i]n light of the 1986 amendment to 11

U.S.C. § 105(a) … the Bankruptcy Court could *sua sponte* modify the automatic stay").

29.    Bankruptcy Code section 362(d)(1) requires the court to grant relief from the

automatic stay "for cause, including lack of adequate protection of an interest in property of such

party in interest."  11 U.S.C. § 362(d)(1). "Cause" has no clear definition and must be

determined on a case-by-case basis.  *In re Sonnax Indus.*, 907 F.2d 1280, 1285 (2d Cir. 1990); *In

re Project Orange Assocs., LLC*, 432 B.R. 89, 103 (Bankr. S.D.N.Y. 2010); *In re Touloumis*, 170

B.R. 825, 828 (Bankr. S.D.N.Y. 1994).  The legislative history of section 362(d)(1) provides:

> The lack of adequate protection of an interest in the property of the
> party requesting relief from the automatic stay is one cause for relief,
> but it is not the only cause.  As noted above, a desire to permit an
> action to proceed to completion in another tribunal may provide
> another cause.  Other causes might include any lack of any
> connection with or interference with the pending bankruptcy case.

H.R. Rep. No. 95-595, 95th Cong., 1st Sess., 343-344 (1977); S.Rep. No. 95–989, 95th Cong.,

2d Sess. 52-53 (1978) (emphasis added); *see also Sonnax Indus.*, 907 F.2d at 1285–86.

30.    Bankruptcy courts have discretion in determining whether lifting the automatic

stay is appropriate.  *Sonnax*, 907 F.2d at 1286. The Second Circuit identified a non-exhaustive

list of twelve factors for bankruptcy courts to utilize in making such a determination:

(1) whether relief would result in a partial or complete resolution of the issues;

(2) lack of any connection with or interference with the bankruptcy case;

(3) whether the other proceeding involves the debtor as a fiduciary;

(4) whether a specialized tribunal with the necessary expertise has been
 established to hear the cause of action;

(5) whether the debtor's insurer has assumed full responsibility for defending it;

(6) whether the action primarily involves third parties;

(7) whether litigation in another forum would prejudice the interests of other creditors;

(8) whether the judgment claim arising from the other action is subject to equitable subordination;

(9) whether movant's success in the other proceeding would result in a judicial lien avoidable by the debtor;

(10) the interests of judicial economy and the expeditious and economical resolution of litigation;

(11) whether the parties are ready for trial in the other proceeding; and

(12) impact of the stay on the parties and the balance of harms.

*Id.* The Second Circuit does not require consideration of each factor nor must the factors be given equal weight. *Id.* (considering only four factors); *see also Burger Boys, Inc. v. S. St. Seaport Ltd. P'ship,* 183 B.R. 682, 688 (S.D.N.Y. 1994).

31. Here, cause exists to permit the Test Cases to be litigated in State Court, both including and independent of the *Sonnax* factors.[18]  First, the requested relief is necessary to definitively resolve the amount of the solvent Insurers' and the Diocesan Enterprise's liability (including its underinsured exposure) for sexual abuse claims, an important data point for facilitating resolution to the benefit of all creditors.  Second, the balance of harms for the parties and society weighs in favor of granting stay relief. Finally, New York state courts are the appropriate forum for litigating the sexual abuse claims and judicial efficiency is served by trying the Test Cases there.

---

[18] The following *Sonnax* factors do not apply to the Motion:  (3) whether the other proceeding involves the debtor as a fiduciary; (6) whether the action primarily involves third parties; (8) whether the judgment claim arising from the other action is subject to equitable subordination; (9) whether movant's success in the other proceeding would result in a judicial lien avoidable by the debtor.

20-12345-mg    Doc 2677    Filed 11/20/23    Entered 11/20/23 17:46:58    Main Document
Pg 15 of 32



**A.    Pursuing the Test Cases Will Clarify the Value of Sexual Abuse Claims — a Key Issue of this Bankruptcy—Without Prejudicing Other Creditors (Sonnax Factors 1, 2, and 7)**

32.    A key issue in this Bankruptcy Case is how much the Diocesan Enterprise and its Insurers must pay to compensate survivors. The parties strongly disagree with one another largely because they disagree on how much a Long Island jury will award a child sexual abuse victim.  Without actual verdicts, the parties and the Insurers engage in self-serving speculation over what a jury would award.  Bickering over self-serving, speculative verdicts is getting the parties nowhere.   The Diocesan Enterprise argues the Committee is exaggerating potential damage awards and verdicts.  The Committee argues the Insurers and Diocesan Enterprise are minimizing the damages that a jury will award sexual abuse survivors in Long Island and, as a result, minimizing what an appropriate settlement contribution should be for the abuse claims.[19] Allowing the Test Cases to go forward will resolve the question of value and clarify the risks of not reaching a consensual resolution for all parties. Notably, the ultimate question of damages is intertwined with decisions that the trial court will likely make as litigation progresses, such as discovery disputes, applicable legal standards, motions to dismiss, motions for summary judgment, motions in limine and jury instructions. Decisions on these issues will inform the parties as they are made by the trial court.  Therefore, while "connected to the bankruptcy," pursuing the Test Cases "will not interfere with the bankruptcy case." *In re PG&E Corp.*, No. 19-30088-DM, 2019 Bankr. LEXIS 2593, at *5-7 (Bankr. N.D. Cal. Aug. 16, 2019) (holding that state court litigation "may proceed on a parallel track" to the bankruptcy case). To the contrary, pursuing the Test Cases will aid resolution of this Bankruptcy Case. If nothing else, allowing test

---

[19] The Committee acknowledges that settlements are typically less than the amount of a jury verdict.  However, it is clear that jury verdict amounts inform all parties about an appropriate settlement amount.

15

4892-1943-4638.11 18491.002

cases to go forward will force the parties to face the reality of what a Long Island jury will actually award.  That alone will motivate the parties to strive harder to reach a consensual plan.

33.    Test cases are a generally accepted method for resolving complex actions and, in particular, multiple-plaintiff tort actions like this Bankruptcy Case. *See Cty. of Suffolk v. Amerada Hess Corp. (In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.)*, Nos. 1:00-1898, 2007 U.S. Dist. LEXIS 45543 at \*4-5 (S.D.N.Y. June 15, 2007). Test cases are "generally accepted models for resolving local mass torts" and facilitate settlement discussions "based upon the results of the test cases." Manual for Complex Litigation § 20.313. Test cases allow the parties to resolve "a handful of crucial issues on which the litigation primarily turns," the resolution of which "often facilitates settlement of remaining claims." *In re MTBE Prods.*, 2007 U.S. Dist. LEXIS 45543 at \*6-7; Manual for Complex Litigation § 20.132 (Test trial "may otherwise promote settlement in the remaining actions").

34.    Moreover, the interests of other creditors and the estate would be furthered, not prejudiced, by granting stay relief because it is necessary to determine the amount of liability for sexual abuse claims to move mediation forward.  Allowing the Test Cases to proceed will further creditors' interests by educating the parties on monetary damages likely to be awarded to similar sexual abuse claims. Importantly, the plaintiffs in the Test Cases will proceed to trial only to fix the amount of their claims.   *See In re Mildred Deli Grocery, Inc.*, No. 18-10077 (MG), 2018 Bankr. LEXIS 546, at \*11–13 (Bankr. S.D.N.Y. Feb. 28, 2018) (holding that stay relief does not prejudice other creditors' interests if only sought to determine the *amount* of the claim); *Carter v. Larkham (In re Larkham)*, 31 B.R. 273, 276 (Bankr. D. Vt. 1983) ("Where neither prejudice to the bankruptcy estate nor interference with the bankruptcy proceeding is demonstrated, the desire

4892-1943-4638.11 18491.002

of a stayed party to proceed in another forum is sufficient cause to warrant lifting the automatic
stay.").

35.     Finally, the Test Cases will not interfere with the day-to-day operations of the
Diocese; nor will they be an *undue* burden on the Diocese's management and personnel.  First,
any continuing activity in the Bankruptcy Case will be limited as described above so that the
Diocese will not be distracted from its reorganization efforts.  This Bankruptcy Case has been
pending for three years and the only meaningful claims awaiting resolution are the sexual abuse
claims.  The Bankruptcy Case is on the brink of dismissal and, other than attempting to negotiate
a resolution and pursue the Insurers, no meaningful work should be required.

36.     Additionally, the Diocese claims it has already gathered and produced to the
Committee all of the documents discoverable in the CVA state court actions.  *See Stipulation
and Order Pursuant to 11 U.S.C. § 105(A) Staying Continued Prosecution of Certain Lawsuits*
[Adv. Pro. 20-01226, Docket No. 59, Schedule 4] (The Diocese agreed to produce to the
Committee "all documents that would otherwise be produced to plaintiffs in the underlying CVA
Actions")*.*  Mr. Stephens of Jones Day testified before this Court that the production of those
documents to the Committee was complete.  *See* Transcript of April 19, 2023 Hearing at 200:15-
202:18, 207:25-209:24.[20]  Thus, if such statements were accurate, the discovery burden on the
Diocese as it relates to the Test Cases should be very limited.  In any event, the discovery burden
of the Test Cases will be far less than the discovery burden on the Diocese if the Bankruptcy
Case is dismissed and all of the CVA state court actions move forward.

37.     When a claim "will have to be liquidated either in state court or the bankruptcy
court . . . [i]t is unreasonable to presume" that litigation of the state law claims in state court

---

[20] Copies of relevant portions of the transcript of the hearing held on April 19, 2023 are attached as **Exhibit E** to the
Dine Declaration.

instead of bankruptcy court "would subject the debtor's estate to a greater expense." *In re Rabin*, 53 B.R. 529, 531–32 (Bankr. D.N.J. 1985).

38.     Any "distraction issue" is a red herring because this bankruptcy case is entirely about resolution of the sexual abuse claims. Mediation is at an impasse, and the Diocese will not be able to fashion a reorganization strategy for a confirmable plan until it stops minimizing the amount the Diocesan Enterprise needs to commit to settle the sexual abuse claims. The costs would be similar in either forum. A judgment by the state court will lessen administrative expenses by providing a path to resolution of the case while the majority of activities in the Bankruptcy Case are suspended. The automatic stay should be lifted because the Test Cases will not interfere with the Chapter 11 Case. Rather, they are vital to its resolution.

**B.     The Interests of Child Sexual Abuse Survivors and Society At-Large Weigh Heavily in Favor of Granting Relief (Sonnax Factor 12)**

39.     The balance of harm tips decidedly in favor of moving forward with the Test Cases. The Test Cases present a unique balance of harm from both societal and personal perspectives that favor relief from the stay. As the U.S. Supreme Court has explained, the "sexual abuse of a child is a most serious crime and an act repugnant to the moral instincts of a decent people." *Ashcroft v. Free Speech Coal*, 535 U.S. 234, 244-45 (2002).[21] Specific to the childhood sexual abuse context, "there can be no real dispute that the controversy over the misconduct of priests, as well as the Church's responsibility for the misconduct and its alleged cover-up, is a public controversy." *New Life Center, Inc. v. Fessio*, 229 F.3d 1143, (4th Cir. 2000). As the New Jersey Supreme Court has explained, "the sexual abuse of children not only

---

[21] *See Coy. v. Iowa*, 487 U.S. 1012, 1022 (1988) ("Child abuse is a problem of disturbing proportions in today's society."); *Fortin v. Roman Catholic Bishop of Portland*, 871 A.2d 1208, 1230 (Me. 2005) ("In matters concerning the protection of children from physical and sexual abuse, societal interests are at their zenith."); *J.S. v. R.T.H.*, 714 A.2d 924, 931 (N.J. 1998) (noting "the enormous public interest in protecting society from the threat of potential molestation, rape, or murder of women and children.").

traumatizes the victims, but also exacts a heavy toll on society." *J.S. v. R.T.H.*, 714 A.2d at 932–33. As numerous courts have explained, "apart from the substantial personal trauma caused to the victims of such crimes, sexual crimes against children exact heavy social costs as well." *Doe v. Poritz*, 662 A.2d 367, 375 (N.J. 1995); *Owens v. State*, 724 A.2d 43, 53 (Md. 1999); *U.S. v. Banks*, 556 F.3d 967, 989 (9th Cir. 2009) (emphasis added).

40.    The New York legislature, by passing the CVA, recognized the *public* importance of compensation for survivors of child sexual abuse and accountability for perpetrators and the institutions that protected them. Unfortunately, the Diocese filed for bankruptcy during the open window for accountability.

**C.    The Debtor's Insurers Ultimately Have Responsibility for Defending the State Court Actions (Sonnax Factor 5)**

41.    All of the claims in the Test Cases will allege abuse during time periods covered by the solvent Insurers. Therefore the Insurers will have an obligation to pay the defense costs and indemnify the claims subject to certain limitations, including self-insured retentions and applicable limits of liability. The ultimate source of funding defense costs is important because "the existence of insurance adequate to cover the costs of suit" is a relevant factor in considering the "financial impact of lifting the stay." *In re Krank*, 84 B.R. 372, 375 (Bankr. E.D. Pa. 1988). "The rationale for granting relief from the automatic stay for this purpose is that the prejudice to the debtor, who may suffer modest or even no adverse financial consequences but may only have to expend some time and effort in cooperating with his insurer in the defense of the litigation, is outweighed by the prejudice to the creditor whose ability to prosecute the action and reach the insurance benefits may be undermined by the aging of evidence, loss of witnesses, and crowded court dockets." *In re Glunk*, 342 B.R. 717, 740 (Bankr. E.D. Pa. 2006) (internal cites and quotations omitted).

D.      **New York State Court is the Appropriate Forum for Sexual Abuse Claims, and Relief Furthers the Interests of Judicial Economy and the Expeditious and Economical Determination of Litigation for the Parties (Sonnax Factors 4, 10 and 11)**

42.      The Test Cases involve matters of purely state law.  Even though state court is a "court of general jurisdiction rather than a specialized tribunal," bankruptcy courts have found this factor weighs in favor of lifting the automatic stay when the action involves state law and the state court has greater familiarity with that law.  *In re 950 Meat & Grocery Corp.*, 617 B.R. 224, 229 (Bankr. S.D.N.Y. 2020); *PG&E*, 2019 Bankr. LEXIS 2593, at \*5–6; *Partee v. White (In re White), 2004 Bankr. LEXIS 478* (Bankr. D. Colo. Mar. 12, 2004).  In addition, as a matter of comity, state courts have a particularized interest in determining disputes and issues within their jurisdiction.  *Id.*; s*ee also Walsh v. Brush (In re Walsh)*, 79 B.R. 28, 29 (D. Nev. 1987) ("This case includes only state law claims.  Therefore, the state court is particularly well suited to handle the issues raised."); *Allen Cty Bank & Tr. Co. v. Valvmatic Int'l Corp.*, 51 B.R. 578, 582 (N.D. Ind. 1985) ("The state court has expertise in the resolution of this type of case, presenting state law questions and is better able to adjudicate this action.").

43.      Additionally, "[a] clear congressional policy exists to give state law claimants a right to have claims heard in state court."  *In re Castlerock Props.,* 781 F.2d 159, 163 (9th Cir. 1986); *see also Project Orange*, 432 B.R. at 103; *Murray Indus., Inc. v. Aristech Chem. Corp. (In re Murray Indus., Inc.)*, 121 B.R. 635, 636 (Bankr. M.D. Fla. 1990); S. Rep. No. 989, 95th Cong., 2d Sess. 50, *reprinted in* 1978 U.S. Code Cong. & Admin. News 5780, 5836 ("[I]t will often be more appropriate to permit proceedings to continue in their place of origin, when no great prejudice to the bankruptcy estate would result, in order to leave the parties to their chosen forum and to relieve the bankruptcy court from any duties that may be handled elsewhere.").  A grant of relief from stay in favor of a state court action is proper if "only state law is involved,"

the state court is "the more appropriate forum" and "the result reached [by the state court] will

more likely be consistent with other state law decisions." *O'Rourke v. Cairns*, 129 B.R. 87, 91

(E.D. La. 1991) (citing, as examples, *Gorse v. Long Neck, Ltd.*, 107 B.R. 479, 483 (D. Del.

1989); *Cook v. Griffin*, 102 B.R. 875, 877 (N.D. Ga. 1989)).

       44.     Here, although state courts are courts of general jurisdiction, certain state court

judges have developed specialized knowledge for addressing cases under the CVA.  Prior to the

legislation's effective date, New York state courts implemented new procedures for the efficient

and expedient handling of claims revived under the CVA, including: the assignment of all CVA

cases to "dedicated part(s) of Supreme Court in each Judicial District"; mandated training in

"subjects related to sexual assault and the sexual abuse of minors" for these justices, judicial

hearing officers, referees, and ADR neutrals overseeing CVA cases; and a recommended pre-

trial schedule for each CVA case.  NY CLS Unif Rules, Civil Cts § 202.72 (1)–(3).  The

schedule proposes an accelerated timetable at every phase of the cases: one year to complete

discovery, ninety days to file dispositive motions after the completion of discovery, and trial

within sixty days of note of issue or decision on dispositive motions.  *Id.*  Thus, the judges

assigned to the CVA cases have received special training related to the actions and have been

designated as specialized parts of the Supreme Court for handling such cases.  Further, given the

significant number of lawsuits filed under the CVA over the past year and half, those designated

judges are also now highly familiar with the relevant legal issues likely to arise in the Test Cases.

       45.     Moreover, the Bankruptcy Court cannot preside over a trial of the plaintiffs'

personal injury claims.  *See* 28 U.S.C. § 157(b)(5); 28 U.S.C. § 157(b)(2)(B) (core proceedings

do not include the "liquidation or estimation of contingent or unliquidated personal injury tort or

wrongful death claims against the estate for purposes of distribution in a case under title 11").

The trial and adjudication of the plaintiffs' claims in the Test Cases must occur in another court, therefore judicial economy will be not served by keeping the automatic stay in place. *Packerland Packing Co. v. Griffith Brokerage Co. (In re Kemble)*, 776 F.2d 802 (9th Cir. 1985); *Barber v. Arnott (In re Arnott)*, 512 B.R. 744, 754-55 (Bankr. S.D.N.Y. 2014) (granting relief from stay when complete resolution of personal injury action could not be adjudicated in bankruptcy court); *see also In re Castlerock Properties*, 781 F.2d at 163 (affirming court's decision to lift stay for abstention reasons, finding that state claims and imminent trial justified the decision).  Courts have lifted the stay for "cause" to permit claims in the bankruptcy case to be liquidated through prosecution and completion of pending prepetition non-bankruptcy actions. *Murray v. On-Line Business Systems, Inc. (In re Revco D.S., Inc.)*, 99 B.R. 768 (Bankr. N.D. Ohio 1989); and *May v. Wheeler Group, Inc. (In re Wheeler Group, Inc.)*, 75 B.R. 200 (Bankr. S.D. Ohio 1987).  It would be far more efficient for the Test Cases to be adjudicated by the state court.

46.    Finally, the expertise of the state court as well as the mandate for fast-tracked adjudication means the parties should be able to complete discovery and move to trial efficiently. 2019 N.Y. Laws 11, 2019 N.Y. SB 2440 ("The chief administrator of the courts shall promulgate rules for the timely adjudication of revived actions. . . ."); *see also PG&E*, 2019 Bankr. LEXIS 2593, at *6 (ruling that the factors weigh in favor of relief from stay when the plaintiffs qualify for priority adjudication in state court).  The plaintiffs submitted detailed proofs of claim disclosing details of their sexual abuse.  The Diocese has already gathered and produced to the Committee the documents relating to the CVA claims.  As such, the parties should be able to move through discovery regarding notice issues efficiently.

4892-1943-4638.11 18491.002

47.     New York state court is the appropriate forum for the Test Cases, given its specialization in state law generally and CVA claims specifically, considering the bankruptcy court cannot adjudicate the Test Cases, and based on the preference for state law matters to be resolved in state court.  Further, while they are not ready for trial, the survivors filed the state court actions.  Conversely, because the Test Cases cannot be determined by the bankruptcy court, no judicial economy is served by not permitting the Test Cases to move forward.  The fourth, tenth, and eleventh *Sonnax* factors therefore all weigh in favor of granting relief from stay permitting the Test Cases to proceed in state court.

## II.  Suspension of the Bankruptcy Case

48.     Section 305(a)(1) of the Bankruptcy Code permits the Court, "after notice and a hearing," to "suspend all proceedings in a case under this title, at any time if—(1) the interests of creditors and the debtor would be better served by such dismissal or suspension."  Suspension of chapter 11 case is considered an "extraordinary remedy" and the movant bears the burden of proving that "the interests of the debtor and its creditors would benefit from . . . suspension of proceedings under § 305(a)(1)."[22]  *In re Monitor Single Lift I, Ltd.*, 381 B.R. 455, 462–63 (Bankr. S.D.N.Y. 2008) (citations omitted).  The decision to suspend a chapter 11 case is made on a case-by-case basis. *Monitor Single Lift*, 381 B.R. at 464.

49.     The relief afforded by section 305 "is extremely broad; the court may either dismiss the case or, in the alternative, suspend all proceedings within the case . . . . As explained [by Collier on Bankruptcy]: if 'a party . . . seeks suspension of all proceedings within a case,

---

[22] Although the decision to suspend a case is generally made in the context of a two-party dispute and involuntary bankruptcy proceedings, "nowhere in the text of § 305(a)(1) or in its legislative history did Congress specifically limit the basis for a § 305(a)(1) motion to involuntary cases commenced by creditors to gain leverage in out-of-court negotiations." *Monitor Single Lift*, 381 B.R. at 463. In fact, the *Monitor Single Lift* court noted that "[t]he legislative history's reference to this fact-pattern only as an 'example' of a basis for abstaining under § 305(a)(1) validates this broader view of § 305(a)(1)'s application." *Id.*

section 305(a) should be invoked.'" *Graham v. Yoder Mach. Sales (In re Weldon F. Stump & Co.)*, 373 B.R. 823, 826 n.1 (Bankr. N.D. Ohio 2007) (citing 2 Collier on Bankruptcy P 305.01 [1] (15th ed. rev. 2005)).  "Based on the case law and the purpose of § 305, . . . the contours of suspension may be fashioned by a bankruptcy court to fit the needs of the case." *In re Picacho Hills Util. Co., Inc.*, Case No. 13-10742 TL7, 2017 WL 1067754, at *6 (Bankr. D.N.M. Mar. 21, 2017) (citing, inter alia, *In re Compania de Alimentos Fargo*, 376 B.R. 427, 440 (Bankr. S.D.N.Y. 2007) (implying in dicta that a section 305 suspension may not terminate section 362's automatic stay)); *In re Gabriel Techs. Corp.*, 2013 WL 5550391, at *6 (Bankr. N.D. Cal. Oct. 7, 2013) (excepting from section 305 suspension a hearing already scheduled for later in the month, requests for employment of professionals under section 327 or 328 of the Bankruptcy Code, the basic administrative responsibilities, and other unforeseen circumstances that require court intervention); *In re Modell's Sporting Goods Inc.*, Case No. 20-14179 (Bankr. D.N.J. Mar. 11, 2020) [Docket Nos.166, 294, 371] (continuing the payment of certain expenses, including rent and insurance, administration of lease rejection procedures, and other matters that may require court intervention during the suspension period).

50.    Additionally, under section 105(a) of the Bankruptcy Code, the Bankruptcy Court has "inherent authority to control disposition of the causes on its docket with economy of time and effort for itself, for counsel and for litigants."  *Thielmann v. MF Glob. Holdings Ltd (In re MF Glob. Holdings Ltd.)*, 464 B.R. 619, 623 (Bankr. S.D.N.Y. 2012) (internal citations and quotations omitted).

51.    In considering whether to suspend a case pursuant to section 305, courts consider various factors.  *See, e.g., In re Wythe Berry Fee Owner LLC*, No. 22-11340 (MG), 2023 Bankr. LEXIS 308, at *34 (Bankr. S.D.N.Y. Feb. 6, 2023) (citing *Monitor Single Lift* factors and finding

that "[a] court's determination whether to abstain and dismiss pursuant to section 305(a)(1) is a fact-intensive inquiry that entails consideration of the totality of the circumstances.") *In re Zais Inv. Grade Ltd. VII*, 455 B.R. 839, 846 (Bankr. D.N.J. 2011) (citing *Monitor Single Lift* factors addressing two-party disputes); *In re MicroBilt Corp.*, 484 B.R. 56, 66 (Bankr. D.N.J. 2012) (considering abstention under 28 U.S.C. § 1334(d) and 11 U.S.C. § 305(a), citing a different set of factors addressing two-party disputes, and abstaining from adjudicating certain claims as in the best interests of the parties and the court).  Regardless of the factors courts consider, "[a]s noted in the statute, the overriding considerations are, of course, the interests of creditors and the debtor[s]." *In re Gabriel Techs. Corp.*, Case No. 13- 30341, 2013 Bankr. LEXIS 4228, at *13 (Bankr. N.D. Cal. Oct. 7, 2013) (citing the Monitor Single Lift factors).

52.    Where parties disagree as to whether suspension is in the best interests of all parties, the "court does not count votes to decide the issue but weighs the competing interests of the various creditor constituencies and the Debtor, and then appl[ies] the applicable factors to the peculiar circumstances of an[] individual case, exercise[ing] its sound discretion to make a decision for or against suspension." *Id.* at *13-14 (suspending a chapter 11 case in light of the fact that "the overwhelming interests of creditors generally support[ed]" suspension and in spite of the fact that a litigation counterparty was "oppose[d] any disposition under § 305").

53.    Although suspension is an "extraordinary remedy," approval of the suspension in the manner proposed here is appropriate as it is in the best interests of the Diocese and its creditors.  *See* 11 U.S.C. § 305.  The suspension will enable the Diocese to temporarily halt the continuation of this Bankruptcy Case except for the activities expressly described above, with the continued imposition of the automatic stay (except for the Test Cases) until the Diocese or Committee seek to terminate the suspension and to take further action in the Bankruptcy Case on

4892-1943-4638.11 18491.002

not less than 14 days' notice to the other party, or to the extent that the Committee and Diocese agree to a termination of the suspension, they may submit a joint form of order on presentment. As in *Milestone Educ. Inst.*, the suspension will preserve the Diocese's estate and "increase the amount of money available to distribute to [the debtor's] creditors," by limiting the continued incurrence of professional fees and other administrative expenses in the Bankruptcy Case.

### No Prior Request

54.     No prior request for the relief sought in this Motion has been made to this or any other Court.

### Notice

55.     Notice of this Motion has been provided in accordance with the procedures of the Case Management Order.  The Committee respectfully submits that no further notice is required.

WHEREFORE the Committee respectfully requests entry of an order substantially in the form of Exhibit A hereto granting the relief requested and such other and further relief as the Court may deem just and appropriate.

4892-1943-4638.11 18491.002

Dated:    November 20, 2023                 PACHULSKI STANG ZIEHL & JONES LLP


                                            /s/ Brittany M. Michael
                                            James I. Stang, Esq.
                                            Ilan D. Scharf, Esq.
                                            Iain Nasatir, Esq.
                                            Karen Dine, Esq.
                                            Brittany M. Michael, Esq.
                                            780 Third Avenue, 36th Floor
                                            New York, NY  10017-2024
                                            Telephone: 212/561-7700
                                            Facsimile: 212/561-7777
                                            jstang@pszjlaw.com


                                            *Counsel for the Official Committee of Unsecured Creditors*

                                            BURNS BAIR LLP


                                            /s/  Timothy W. Burns
                                            Timothy W. Burns, Esq. (admitted *pro hac vice*)
                                            Jesse J. Bair, Esq. (admitted *pro hac vice*)
                                            10 E. Doty St., Suite 600
                                            Madison, WI 53703-3392
                                            Telephone: (608) 286-2808
                                            Email:  tburns@burnsbair.com
                                            Email:  jbair@burnsbair.com

                                            *Special Insurance Counsel to the Official Committee of
                                            Unsecured Creditors*

27

# Exhibit A

PACHULSKI STANG ZIEHL & JONES LLP
James I. Stang (admitted *pro hac vice*)
Iain A. W. Nasatir (admitted *pro hac vice*)
Karen B. Dine
Brittany M. Michael
780 Third Avenue, 34th Floor
New York, NY 10017
Tel: (212) 561-7700; Fax: (212) 561-7777
Email:    jstang@pszjlaw.com
              inasatir@pszjlaw.com
              kdine@pszjlaw.com
              bmichael@pszjlaw.com

*Counsel for the Official Committee*
*of Unsecured Creditors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br>THE ROMAN CATHOLIC DIOCESE OF<br>ROCKVILLE CENTRE, NEW YORK,<br>Debtor. | Chapter 11<br>Case No. 20-12345 (MG) |

**[PROPOSED] ORDER GRANTING MOTION OF THE OFFICIAL COMMITTEE OF**
**UNSECURED CREDITORS PURSUANT TO SECTIONS 105, 305 AND 362 OF THE**
**BANKRUPTCY CODE  TO PERMIT PROCEEDING WITH CERTAIN STATE COURT**
**ACTIONS AND TEMPORARY SUSPENSION OF THE CHAPTER 11 CASE**

Upon consideration of the Motion of the Official Committee of Unsecured Creditors (the

"Committee") pursuant to Sections 105, 305 and 362 of the Bankruptcy Code for a Procedure for

Proceeding with Six State Court Actions (the "Test Cases") and Temporary Suspension of the

Chapter 11 Case [Docket No. __] (the "Motion");[1] and upon a hearing have been held before the

Court on November 28, 2023 (the "Hearing") to consider the relief requested in the Motion; and

appearances of all interested  parties having been noted on the record of the Hearing; and upon

---

[1] Capitalized terms used and not otherwise defined herein have the meaning ascribed thereto in the Motion.

all of the proceedings had before this Court (including any testimony or other evidence proffered or adduced at the Hearing); and it appearing that this matter is a core proceeding pursuant to 28 U.S.C. § 157(b); and this Court having determined that the relief requested in the Motion is in the best interest of the Debtor, its estate, its creditors, and other parties-in-interest; and it appearing that proper and adequate notice of the Motion has been given under the circumstances and that no other or further notice is necessary; and after due deliberation thereon; and good and sufficient cause appearing therefor,

**NOW, THEREFORE, IT IS HEREBY FOUND THAT**:

1.      The Court has jurisdiction over the matters raised in the Motion pursuant to 28 U.S.C. §§ 157 and 1334,consideration of the Motion and the relief requested in the Motion is a core proceeding under to 28 U.S.C. § 157(b), and venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409;

2.      The statutory predicates for relief are 11 U.S.C. §§ 105(a), 305(a) and 362(d);

3.      Proper, timely, adequate, and sufficient notice of the Motion has been provided in accordance with §§102(1) and 105 of the Bankruptcy Code and Bankruptcy Rule 2002, which notice adequately described the nature of the relief requested in the Motion and which notice was good, sufficient, and appropriate under the particular circumstances, and no other or further notice of the Motion or of the entry of this Order, is required;

4.      A reasonable opportunity to object or be heard with respect to the Motion and the relief requested has been afforded to all interested persons and entities, including: (i) the Office of the United States Trustee; (ii) the Diocese; and (iii) all creditors and interested parties that have filed a request for service of papers under Bankruptcy Rule 2002;

5.      Cause exists pursuant to section 362(d) of the Bankruptcy Code to grant relief

from the Automatic Stay to permit the Test Cases to proceed in New York state court based on

the factors set forth in *Sonnax Indus.*, 907 F.2d 1280, 1285 (2d Cir. 1990);

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED**,

6.      The Motion is GRANTED;

7.      All objections to the Motion or the relief requested therein, if any, that have not

been withdrawn, waived, or settled, and all reservations of rights included therein, are overruled;

8.      The plaintiffs in the respective Test Cases, once selected, may proceed to

prosecute their respective cases in state court;

9.      Pursuant to section 305(a)(1), the Bankruptcy Case is suspended except for the

following activities:

- Fulfilling obligations of the Debtor expressly required by the Bankruptcy Code and Rules, including the filing of Monthly Operating Reports and payment of statutory fees;

- Consulting of Estate professionals with their respective clients as necessary to monitor and assess the progress and outcome of the Test Cases and engage in any further negotiation or mediation towards a consensual plan;

- Filing and consideration of fee applications by Estate professionals in accordance with the Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Retained Professionals [Docket No. 129];

- Making payments consistent with the first day orders and other orders in this Bankruptcy Case permitting certain payments to be made to continue to maintain the Diocese's Estate;

- Continuing prosecution of the proceedings related to the Insurers, except for Arrowood, now pending in U.S. District Court for the Southern District of New York;

- Continuing prosecution of discovery and any other court action relating to the issue of the disclosure by the Interstate Insurers of the providing of

confidential information from the proofs of claim to parties not authorized
to receive such information; and

- To the extent a party desires to engage in an action in or pursue a matter in
the Bankruptcy Case not identified above, such party shall file a letter with
the Bankruptcy Court describing the action to be taken or matter to be
pursued and any other party in interest shall have 3 business days to file a
responsive letter as to whether such action or matter should go forward in
light of the suspension.

10.    The Debtor or Committee may seek to terminate the suspension and to take

further action in the Bankruptcy Case on not less than 14 days' notice to the other party, or to the

extent that the Committee and Debtor agree to a termination of the suspension of the Bankruptcy

Case, they may submit a joint form of order on presentment to this Court.

11.    This Court shall retain jurisdiction to hear and determine all matters arising from

the implementation of this Order.


Dated: _____ __, 2023
        New York, New York

                                        _____
                                        Hon. Martin Glenn
                                        United States Bankruptcy Judge