**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

In re:

THE ROMAN CATHOLIC DIOCESE OF
ROCKVILLE CENTRE, NEW YORK,
                              Debtor.

Chapter 11

Case No. 20-12345 (SCC)

## DECLARATION OF KAREN B. DINE, ESQ.

Pursuant to 28 U.S.C. § 1746, I, Karen B. Dine, hereby submit this declaration (the "Declaration") under penalty of perjury:

1.     I am of counsel at the law firm of Pachulski Stang Ziehl & Jones LLP ("PSZJ") with an office at 780 Third Avenue, 36th Floor, New York, NY 10017.  I am duly admitted to practice law in the United States District Courts for the Southern and Eastern Districts of New York.

2.     Unless otherwise stated in this Declaration, I have personal knowledge of the facts set forth herein.  If called as a witness, I would testify as to those facts.

3.     The Court has approved PSZJ's employment as counsel to the Official Committee of Unsecured Creditors (the "Committee") in The Roman Catholic Diocese of Rockville Centre, New York (the "Diocese" or the "Debtor") in the above-captioned case (the "Case"). *See* Docket No. 163.

4.     I submit this Declaration in support of the *Motion of the Official Committee of Unsecured Creditors Pursuant to Sections 105, 305 and 362 of the Bankruptcy Code to Permit Proceeding with Certain State Court Actions and Temporary Suspension of the* Chapter 11 Case (the "Test Case Motion"), filed concurrently herewith.

5.      Attached hereto at **Exhibit A** is a copy (without exhibits) of the Verified Petition filed by New York State Catholic Health Plan, Inc. ("NYSCHP") with the Attorney General of the State of New York regarding the sale of substantially all of NYSCHP's assets to Centene Corporation.

6.      Attached hereto at **Exhibit B** is a true and correct copy of the August 28, 2023 email from Eric Stephens of Jones Day to James Stang of PSZJ.

7.      Attached hereto at **Exhibit C** is a true and correct copy of the Liquidation and Injunction Order with Bar Date regarding Arrowood Indemnity Corporation in the Court of Chancery of the State of Delaware.

8.      Attached hereto at **Exhibit D** is a true and correct copy of the email dated November 16, 2023 from Brittany Michael of PSZJ to Eric Stephens and Todd Geremia of Jones Day.

9.      Attached hereto as **Exhibit E** is a true and correct copy of relevant portions of the transcript of the hearing held before the Bankruptcy Court on April 19, 2023.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.  I executed this Declaration on November 20, 2023 at New York, New York.

*/s/Karen B. Dine*
Karen B. Dine, Esq.

# Exhibit A

ATTORNEY GENERAL OF THE STATE OF NEW YORK
COUNTY OF QUEENS

----------------------------------------------------X
In the Matter of the Application of                    :

NEW YORK STATE CATHOLIC HEALTH          VERIFIED PETITION
PLAN, INC.                                             :

For Approval to Sell Substantially All of
the Assets pursuant to Sections 510 and 511-a          OAG No. 2017-3144-NYC
of the Not-for-Profit Corporation Law of the
State of New York                                      :
----------------------------------------------------X

TO: OFFICE OF THE ATTORNEY GENERAL
    28 Liberty Street, 19th Floor
    New York, NY 10005

          Petitioner, New York State Catholic Health Plan, Inc. d/b/a Fidelis Care New York

("Petitioner"), by Rev. Patrick J. Frawley, Chief Executive Officer of the Petitioner, makes this

Petition pursuant to Sections 510 and 511-a of the New York Not-for-Profit Corporation Law

and herein respectfully sets forth as follows:

## INTRODUCTION

          1.      On September 12, 2017, Petitioner and Centene Corporation (together with its

subsidiaries, "Centene") entered into an Asset Purchase Agreement providing for the sale of

substantially all of Petitioner's assets to Centene, subject to regulatory approval (the

"Transaction"). A copy of the Asset Purchase Agreement is attached hereto as Exhibit 1. Prior

to the closing of the Transaction (the "Closing"), the parties will enter into an amendment to the

Asset Purchase Agreement (the "APA Amendment"), a form of which is attached hereto as

Exhibit 2. The Asset Purchase Agreement, as amended by the APA Amendment, is referred to

in this Petition as the "Purchase Agreement."

          2.      The Transaction presents a historic opportunity for the State of New York to

improve the health and well-being of its poor, disadvantaged, disabled, elderly and infirm

residents. Upon approval of the Transaction, Centene, the nation's largest Medicaid managed

care organization, will bring its financial resources and innovative technology to New York State. At the same time, the Transaction will result in the establishment of the Mother Cabrini Health Foundation, Inc. (the "Foundation"), the largest charitable foundation to be focused exclusively on New York State's residents. With over $3 billion in assets, the Foundation will have the potential to transform the lives of New York's most vulnerable populations for generations to come.

3.      As this Petition details, the Transaction satisfies both prongs of the statutory standard for approval set forth in Section 511-a(c) of the New York Not-for-Profit Corporation Law ("N-PCL").

4.      First, the consideration and the terms of the Transaction are fair and reasonable to Petitioner, evidenced in particular by the $3.75 billion purchase price paid by Centene, which exceeds the appraised fair-market value of the assets being sold.

5.      Second, the Transaction will substantially promote the purposes of Petitioner and the interests of its corporate members, the eight Diocesan Bishops of the State and Ecclesiastical Province of New York (the "Members"). The Transaction will result in the establishment of the Foundation, a multi-billion dollar grantmaking foundation, which will significantly advance the interests and longstanding commitment of Petitioner and its Members to support the health and wellness of the poor and disadvantaged. Additionally, the Transaction will promote Petitioner's purposes by improving access to affordable quality healthcare and healthcare related services throughout the state. Through Centene, Petitioner's 1.7 million enrollees will benefit from the support, investment and innovation to be provided by Centene, the nation's largest private insurer to low-income populations and state-sponsored insurance programs.

6.      In addition to satisfying both prongs of the statutory standard, the Transaction will have the capacity to transform New York's healthcare landscape. Over the course of the last several years, the State's Medicaid program has been expanding beyond purely fee-for-service health coverage to include a focus on enhanced quality of care, preventive health, and incentivized value based payment reform, which includes health plan and provider innovative collaborations and a further concentration on addressing the social determinants of health ("Social Determinants of Health"). The Transaction will further these objectives by supporting

initiatives centered on coordinated medical, mental and behavioral health care, potentially avoidable hospitalizations, substance abuse prevention and treatment, nutrition, education, safe and affordable housing, the integration of community based organizations, and other Social Determinants of Health. In so doing, the Transaction will promote healthier living, strengthen families and communities, and reduce healthcare expenditures throughout New York State, particularly Medicaid expenditures.

7.      Accordingly, Petitioner requests that the Office of the New York State Attorney General (the "Attorney General") approve the Transaction pursuant to Sections 510 and 511-a of the N-PCL, on the terms set forth in the Purchase Agreement.

## OVERVIEW OF SELLER

8.      Petitioner was incorporated as a Type-B not-for-profit corporation on May 13, 1993. Petitioner initially operated as the "Catholic Health Services Plan of Brooklyn and Queens, Inc.," serving the poor and medically underserved of Brooklyn and Queens under the auspices of the Catholic Medical Center of Brooklyn and Queens, Inc. and the Diocese of Brooklyn. In 1996, the eight bishops of the Catholic Dioceses, led by John Cardinal O'Connor, obtained regulatory approval to extend Petitioner's license to operate across New York State and change the name of Petitioner to the "New York State Catholic Health Plan, Inc." Petitioner has operated since 1993 under the assumed name "Fidelis Care" and since 1996 under the assumed name "Fidelis Care New York."

9.      A copy of Petitioner's current Restated Certificate of Incorporation, Petitioner's original Certificate of Incorporation and all amendments thereto are attached to this Verified Petition as Exhibit 3. A copy of Petitioner's current Amended and Restated By-Laws ("By-Laws") is attached hereto as Exhibit 4. A copy of Petitioner's Certificates of Assumed Name and all amendments thereto is attached to this Verified Petition as Exhibit 5.

10.      Petitioner is a membership organization. Pursuant to Section 2.01 of Petitioner's By-Laws, the membership of Petitioner is limited to the eight Diocesan Bishops of the State and Ecclesiastical Province of New York (the "Members" or the "Membership"): New York, Albany, Brooklyn, Buffalo, Ogdensburg, Rochester, Rockville Centre and Syracuse.

11.    Pursuant to Section 5.03 of the By-Laws, the Archbishop of New York is the President of the Membership. At present, Timothy Cardinal Dolan, Archbishop of New York, is the President of the Membership. Other Members include: Most Rev. John O. Barres, Bishop of Rockville Centre; Most Rev. Robert J. Cunningham, Bishop of Syracuse; Most Rev. Nicholas DiMarzio, Bishop of Brooklyn; Most Rev. Terry R. LaValley, Bishop of Ogdensburg; Most Rev. Richard J. Malone, Bishop of Buffalo; Most Rev. Salvatore R. Matano, Bishop of Rochester; and Most Rev. Edward B. Scharfenberger, Bishop of Albany.

12.    Petitioner's Members elect the Board of Directors (the "Board"), which, under Section 6.01 of the By-Laws, consists of twenty directors. Presently, there are nineteen directors and one vacancy. A list of the individuals serving as directors and their home addresses is set forth in Exhibit 6.

13.    With the exception of the President of the Membership (Archbishop of New York, *ex officio*), the Members also elect the officers of the Corporation (the "Officers"), which include a Chairperson, a Vice-Chairperson, a Secretary, a Treasurer and a President/Chief Executive Officer. A list of the individuals serving as Officers and their home addresses is set forth in Exhibit 7.

14.    Pursuant to Section 1.02 of the By-Laws, Petitioner is required to adhere at all times to the Ethical and Religious Directives for Catholic Health Services published by the United States Conference of Catholic Bishops (the "Ethical and Religious Directives").[1]

15.    The By-Laws exclusively reserve certain powers for the Members, including the power to:

---

[1] The Ethical and Religious Directives are a body of medical and moral principles that relate to various aspects of health care, including, for example, care for the poor, uninsured, underinsured, children, unborn, single parents, elderly, those with incurable diseases and chemical dependencies, racial minorities, immigrants and refugees; the promotion of medical research, equal opportunity for employment in the Catholic health care institution's workplace; pastoral care appropriate to the needs of the patient; mutual respect between patient and physician; free and informed consent; psychological and spiritual support to victims of sexual assault; family planning; advance directives and elderly care; partnerships and collaborations with other health care providers, consistent with the foregoing moral teachings. *See* Ethical and Religious Directives at pp. 11-13, 15-17, 19-22, 25-28, 30-33, 36-37 (available at http://www.usccb.org/issues-and-action/human-life-and-dignity/health-care/upload/Ethical-Religious-Directives-Catholic-Health-Care-Services-fifth-edition-2009.pdf).

a)      Definitively interpret the Ethical and Religious Directives that apply
to Petitioner's activities;

b)      Approve the philosophy and mission statement under which
Petitioner operates;

c)      Require that Petitioner operate in conformity with the Members-
approved philosophy and mission statement; and

d)      Amend Petitioner's Certificate of Incorporation and its By-Laws.

16.     In accordance with Paragraph 6(c) of Petitioner's Certificate of Incorporation, the
Members are responsible for approving the "sale of all, or substantially all, of its assets."

17.     Petitioner has two direct wholly-owned subsidiaries – Rego Park Office Tower,
LLC, a New York limited liability company, and Salus Administrative Services, Inc., a New
York business corporation ("Salus"), as well as one indirect wholly-owned subsidiary, Salus
IPA, LLC ("Salus IPA").

18.     Petitioner's present organizational structure is as follows:



19.     Rego Park Office Tower, LLC holds title to the building housing Petitioner's principal corporate offices, which is located at 95-25 Queens Boulevard, Rego Park, NY 11374.

20.     Salus and Salus IPA provide utilization review and pharmacy benefit management and network services in support of Petitioner's prescription drug program.  Salus also leases employees from Petitioner to provide pharmacy benefit management services.  Salus IPA contracts with CVS/Caremark, on behalf of Petitioner, to make CVS/Caremark's pharmacy network available to Petitioner's enrollees, employees and employee dependents.  A copy of the Salus IPA – Caremark IPA Agreement is attached hereto as Exhibit 8.  Pursuant to a Management Services Agreement between Salus, Petitioner and CVS/Caremark dated January 1, 2007, as amended January 1, 2009 and attached hereto as Exhibit 9, CVS/Caremark provides claims processing, credentialing and reporting services on Petitioner's behalf.

21.     Petitioner has office locations in New York City, Albany, Syracuse, Rochester and Buffalo, two satellite offices in Suffern and Poughkeepsie and approximately twenty community offices throughout the State.

22.     Petitioner is recognized as a five-star plan in the New York State Department of Health's 2018 Managed Care Regional Consumer Guides for Medicaid and Child Health Plus.

23.     A copy of Petitioner's audited consolidated financial statements for the years ended December 31, 2017 and 2016 and independent auditor's report is attached hereto as Exhibit 10.  The consolidated financial statements include a description of Petitioner's debts and liabilities, none of which are secured.

## PETITIONER'S CHARITABLE PURPOSES AND ACTIVITIES

24.     The Catholic Dioceses of the State of New York formed Petitioner in order to advance the Catholic Church's historic charitable commitment to assisting the poor, underserved and most vulnerable within the Catholic tradition of healthcare.

25.     Petitioner's mission statement, which was adopted in 1997 and is attached as Exhibit 11, guides this charitable commitment:

> *In imitation of the compassionate and healing Christ, consistent with the tradition of Catholic healthcare and maintaining the highest moral and ethical standards, we, at Fidelis Care New York, strive:*
>
> - *To promote health through quality, accessible care and services for all;*
>
> - *To join in partnership with health professionals to assist them in their healing work;*
>
> - *To act as a facilitator to build linkages and systems for the coordination of care and services among healthcare, behavioral and social services, as well as educators and religious leaders, to address the spiritual, emotional and physical needs of those we serve;*
>
> - *To advocate for a health policy that accords true dignity and respect for all human persons, especially the poor and underserved.*

26.     Initially, Petitioner applied for and was recognized by the Internal Revenue Service as a tax-exempt social welfare organization within the meaning of Section 501(c)(4) of the Internal Revenue Code of 1986, as amended (the "Code"). Seeking to broaden its charitable services to the poor and medically underserved, Petitioner sought tax-exemption status as a charitable organization under section 501(c)(3) of the Code to allow the Corporation to accept donations and make grants in support of its mission. On March 9, 1998, the Internal Revenue Service recognized Petitioner as a tax-exempt, public charity within the meaning of Section 501(c)(3) of the Code, retroactive to October 24, 1997. Petitioner's Internal Revenue Service 501(c)(3) Determination Letter is attached hereto as <u>Exhibit 12</u>.

27.     Petitioner's Restated Certificate of Incorporation states that its charitable purposes include:

> To own, operate and maintain a special purpose comprehensive health services plan or plans and all services required or appropriate for the provision of comprehensive health services, as defined in Section 4401(3) of the Public Health Law, to an enrolled population substantially comprised of beneficiaries of the Medical Assistance Program.

28.     Section 4401(3) of the Public Health Law defines "comprehensive health services" to mean:

> [A]ll those health services which an enrolled population might require in order to be maintained in good health, and shall include, but shall not be limited to, physician services (including consultant and referral services), in-patient and out-patient hospital services, diagnostic laboratory and therapeutic and diagnostic radiologic services, and emergency and preventive health services. Such term may be further defined by agreement with enrolled populations providing additional benefits necessary, desirable or appropriate to meet their health care needs.

29.     In furtherance of its charitable purposes, Petitioner (i) offers a variety of New York State-sponsored insurance products through its comprehensive health services plan, and (ii) provides a broad range of charitable grants to fund services "required or appropriate" for the provision of comprehensive health services across New York State, particularly to address the Social Determinants of Health (the "Grant Program").

**Comprehensive Health Services Plan**

30.     Since 1993 Petitioner has been certified by the New York State Department of Health under Article 44 of the Public Health Law to offer a comprehensive health services plan to eligible enrollees as a prepaid health service plan (PHSP) focusing primarily on health care coverage and services for the low-income population. Currently, Petitioner serves more than 1.7 million enrollees in all sixty-two New York counties, making it the largest New York State Medicaid managed care plan. In operating the plan, Petitioner's mission is to ensure that every New York State resident, regardless of income, age, religion, gender, or ethnic background, has access to quality, affordable health coverage, provided with dignity and respect.

31.     Petitioner currently offers the following health insurance products within its comprehensive health services plan:

     a)  **Child Health Plus** is a New York State-sponsored program which provides free or low-cost comprehensive coverage to children under the age of 19, varying based on income status.

b) **Medicaid Managed Care** is a New York State-sponsored program offered for children and adults who meet certain income, resource, age and/or disability requirements.

c) **Essential Plan** is a New York State-sponsored program for lower-income people who either don't qualify Medicaid or are low-income legal immigrants.

d) **Individual Coverage, which includes Qualified Health Plans** (platinum, gold, silver, bronze), are designed for New York State residents who purchase their own coverage in the commercial market, either through the health exchange or "off exchange."

e) **HealthierLife (HARP)** is a managed care product providing physical health, mental health and substance use services in an integrated way for adults with significant behavioral health needs.

f) **Medicare Advantage, Dual Advantage and Medicaid Advantage Plus** offer enhanced benefits for those who are eligible for Medicare because of age or disability, or who are eligible for both Medicare and Medicaid based on age, disability and income. It allows dual-eligibles who meet eligibility criteria to enroll in the same health plan for most of their Medicare and Medicaid benefits.

g) **Fidelis Care at Home** is a managed long term care (MLTC) product for Medicaid eligible people who need long term care and home and community based services.

32. Petitioner provides enrollees access to an extensive, high quality network of approximately 70,000 providers. See Exhibit 13 for a statewide map detailing the provider network. While Petitioner generally has an open network philosophy in which providers can join the network irrespective of other plan affiliations, Petitioner ensures a high standard of care by conducting a thorough, detailed credentialing process, requiring every physician network provider be re-credentialed every three years. At the same time, for its New York State of Health exchange products, Petitioner utilizes a network that is similar to its Medicaid network.

**Grants to Address Social Determinants of Health**

33.     Petitioner's charitable activities have grown in tandem with the state's Medicaid program.  Over the past decade, New York State, through the Medicaid Redesign Team and the Delivery System Reform Incentive Program, in conjunction with the federal government, has expanded Medicaid Managed Care to cover a larger special needs population and to provide expansive health care services which contemplate "total population health"— services which are provided to, and coordinated with, housing, education and other support services to address the Social Determinants of Health.

34.     Through its Grant Program, Petitioner has ventured into broader concepts of health, particularly the Social Determinants of Health, which has allowed Petitioner to further the preventive care component of its charitable purposes.  Petitioner has provided millions of dollars in charitable grants and contributions for health in local communities and provider-based locations.

35.     The Transaction will enable Petitioner to substantially expand the Grant Program through its establishment of the Foundation.  As detailed herein, at the Closing, the proceeds from the Transaction net of Closing expenses, together with Petitioner's other assets, will be distributed to the Foundation to fund its charitable grantmaking activities.

36.     The following are examples of preventive care programs Petitioner has recently supported with its Grant Program, which will serve as a framework for future grantmaking by the Foundation:

a)  **Supporting Preventative Health, Nutrition & Fitness.**  Petitioner has made a variety of grants to improve the health, nutrition and fitness of low-income populations, including:

- $60,000 grant in May 2016 to support the "*Healthy for Life*" program in Buffalo, New York, which is focused on training teachers in the areas of health, nutrition and fitness, particularly in low-income schools;

10

- $10,000 grant to the Charles B. Wang Community Health Center in New York City, a health center whose mission is to provide residents with quality, comprehensive and culturally effective primary healthcare, regardless of ability to pay. The grant was made in September 2017 for the purchase of blood pressure monitors;

- $10,000 grant to the Albany-based Whitney M. Young, Jr. Health Center in December 2017 for the *"Seal a Smile"* program, which provides school-based dental hygiene for children from low-income households;

- $69,000 grant to St. Joseph's Home, a nursing home in Ogdensburg, New York, to manage behavioral impact from dementia and mental illness for low income elderly;

- $100,000 in grants to the Albany-based Maternity & Early Childhood Foundation in 2017 and 2018 to provide access to healthcare for low income pregnant women, parenting teens and young parents as well as provide essential supplies such as diapers, formula and cribs for infants;

- $7,500 grant to Morris Heights Health Center in September 2017 to purchase equipment to enable the early detection and prevention of diabetes;

- $90,000 grant to the Superintendent of Catholic Schools, Roman Catholic Diocese of Brooklyn in May 2015 to support *"Obesity in Today's Society: A Call to Action for Students in Grades K-8- Using the Fine Arts to Develop Physical Education Skills"* which addresses obesity through wellness and fitness;

- $5,000 grant in April 2017 to Columbia Memorial Hospital, which services Columbia and Greene counties and northern Dutchess County, to support the purchase of new equipment to properly distribute asthma medication to children. The grant also provides support for education to

parents on the importance of proper medical and the technique to administer the medication in the most efficient way possible;

- $20,000 grant in January 2018 to the University of Buffalo School of Dental Medicine to sponsor their *"Give Kids a Smile Day"* event, which is designed to reach about 600 uninsured children who do not have a dentist; and

- $5,000 grant in April 2018 to Ezras Choilim Health Center in Kiryas Joel, New York, which serves as a safety net provider for the entire Southeast portion of Orange County.  The goal of the grant is to enable the Center to launch a pro-vaccine educational hotline.

b) **Improving Health and Wellness in Rural and Underserved Areas**. Petitioner funds a number of initiatives to enhance low-income New Yorkers' access to healthcare in rural areas, such as the following:

- $31,750 in grants to Cortland Chenango Rural Services in 2016 and 2017 to help local residents with medical services focusing on formal counseling, transportation to appointments, dental needs, eye examinations, attaining prescription medication and assistance with office visits;

- $200,500 grant in April 2017 to Catholic Charities of the Dioceses of Ogdensburg for *"Healthy Families/Healthy Communities,"* to provide access to counseling/casework services for low-income individuals.  The goals of the services included increasing parental competency, reducing abuse and neglect, and decreasing depression in individuals; and

- $200,000 in grants between 2009 and 2017 to Catholic Charities of Wayne County for the *"La Casa"* program, which provides transitional housing and support services for migrant workers and their families.

16279288.1
228680-10001

12

c) **Strengthening Immigrant Health**. Petitioner makes grants to a variety of programs to address immigrant health needs such as:

- $400,000 grant in April 2017 to Catholic Migration Services in Brooklyn for the *"Parish Outreach and Health Education Program,"* which assists immigrants with access to healthcare and provides legal services to immigrants navigating housing and immigration status issues;

- $60,000 grant in May 2017 to the Dioceses of Buffalo Catholic Schools for their *"Healthy Minds/Healthy Lives Program,"* which focuses on three health-related concerns for at-risk vulnerable students, especially newly arrived immigrants and refugees:

  o Healthy choices and active fitness for school aged children;

  o Conflict resolution program for school aged children; and

  o English language and acculturation services to immigrant populations and their families.

- $90,000 grant in May 2016 for *"Con Unidad Juan Diego,"* which works to improve the education, health and wellbeing of the children of the Latino immigrant community in East Harlem. The program offers workshops on healthy living; academic assistance with volunteer tutors and mentors; English as a Second Language classes; a computer literacy class; and other workshops.

- $15,000 grant in March 2017 to Catholic Charities of Tompkins/Tioga for their *"Refugee &Tioga Outreach Center,"* which provides emergency assistance for refugees.

d) **Reducing Emergency Room Visits**. Petitioner makes grants to reduce unnecessary emergency room visits, a key statewide goal in addressing Social Determinants of Health and reducing health care expenditures. For example, Petitioner has provided nearly $350,000 in grants between 2012 and 2014 to fund the *"Health Care*

*Solutions to Emergency Room Dependence*" initiative run by Catholic Charities of
Brooklyn and Queens.  This innovative program brings together a consortium of health
care providers, community based organizations and Catholic Charities to educate the
community on alternatives to visiting the emergency room for basic health care needs.  It
is designed to improve individuals' health, free-up emergency room resources for their
intended services and help contain hospital costs.

 e) **Providing Housing and Food Assistance**.  Petitioner has made numerous
grants to improve the health and well-being of vulnerable populations in need of food,
safe housing and other assistance, including such grants as:

- $44,000 grant to the Food Bank of Western New York in
  December 2017 to expand their "*School Pantry Program*." This
  program focuses on high school-aged children who serve as the
  primary or sole caretaker of their younger siblings or cousins or
  who have a parent/guardian that is unable to obtain food due to a
  disability, unpredictable work schedule or lack of transportation;

- $72,500 in grants between 2013 and 2017 to Catholic Charities of
  the Finger Lakes for the "*Geneva Community Lunch Program,*"
  which provides warm, nutritious meals each day to low-income
  residents;

- $44,000 grant to the Regional Food Bank of Northeastern New
  York in December 2017 to expand its "*BackPack Program,*"
  which provides chronically hungry children with backpacks full of
  food each week;

- $30,000 in grants to Catholic Charities of Livingston County
  between 2014 and 2015 for the "*Faith in Action Program,*" which
  helps the elderly and disabled continue to live at home safely and
  independently; and

▪ $15,000 grant to Catholic Charities of Steuben County in March
2017 for the "*Turning Point Financial/Housing Stability Support
Program,*" which provides emergency assistance to help
individuals and families maintain financial and housing stability,
or to pay for heat, food, or electricity.

f) **Providing Youth Counseling and Services**.  Petitioner supports numerous
youth initiatives, including:

▪ $10,000 grant in December 2017 to Westhab Inc. in Yonkers, New York
to support the *"Dayspring Youth Program,"* a free after-school program in
the neighborhood;

▪ $45,000 in grants from 2013 to 2017 Catholic Charities of Livingston
County's "*Hope Youth Mentoring Program,*" which pairs at-risk youths
between the ages of 6 and 14 with adult mentors to promote positive
healthy environments and foster caring relationship;

▪ $411,000 grant in May 2017 to the Catholic Charities of the Diocese of
Buffalo and the Diocesan Foundation to support the "*In-School Social
Work Program,*" which works to enhance student success by providing
counseling and comprehensive character development, skill-building
activities for students through short-term individual sessions and small
groups and classroom presentations.  Consultation services are also
available for parents, teachers and principals, as well as staff development
for teachers and principals to expand strategies and interventions for
strengthening student character;

▪ $5,000 grant in December 2017 to Astor Services for Children and
Families which provides children's mental health services, child welfare
services and early childhood development programs to children and
families in New York State's Mid-Hudson Valley region and the Bronx.

16279288.1
228680-10001

15

The primary goal is to keep children with behavioral health needs at home with their families and in their regular schools whenever possible;

- $55,000 grant in May 2017 to Diocese of Rockville Centre Catholic Schools to fund the development of prevention strategies to reduce social anxiety of young people related to cyber-bullying; and

- $12,000 grant in December 2017 to Staten Island based Seamen's Society for Children and Families to support *"My Hero and Me,"* a 8-week interactive fatherhood program that focuses on the relationship male role models have with their children in order to build stronger families and strengthen communities.

## OVERVIEW OF CENTENE

37.    Based in St. Louis, Missouri, Centene is a diversified, multi-national healthcare enterprise that provides a portfolio of services to government sponsored and commercial healthcare programs which, like Petitioner's services, focus on under-insured and uninsured individuals.  More than 80% of Centene enrollees nationwide receive benefits provided under Medicaid, Medicare and Affordable Care Act health care exchanges.

38.    Centene's core business is providing cost efficient quality healthcare coverage to underserved communities.  Petitioner was recently ranked #19 on Fortune Magazine's "Change the World List," acknowledging companies that do well by doing good.  Centene has achieved this goal by focusing on the whole health of its enrollees and by operating locally.

39.    Centene has developed substantial expertise in serving the needs of populations through the following programs, which improve the health for low-income individuals and families:

- TANF (Temporary Assistance for Needy Families)

- Medicaid Expansion

- CHIP (Children's Health Insurance Program)

- ABD (Aged, Blind and Disabled)

- Long-Term Services and Supports

- Dual Demonstrations

- Intellectually/Developmentally Disabled

- Foster Care

- Correctional Health Care

- Medicare Special Needs Plan

- Medicare Advantage

- Health Insurance Marketplaces

- Commercial Insurance

40.    In addition, through Centene's family of approximately forty specialty companies, Centene provides additional healthcare benefits in the areas of behavioral and specialty therapies, pharmacy benefits management, life and health management, primary care solutions for complex populations, managed vision care, dental benefits, telehealth nursing and health education. A list of Centene's managed care organizations and specialty companies is attached hereto as Exhibit 14.

41.    Centene operates managed care organizations in twenty-three states outside of New York, with approximately 33,700 employees serving approximately 12.8 million enrollees. It had annual revenue of approximately $40.6 billion in 2016 and $48.4 billion in 2017.

42.    To date, Centene has maintained a limited footprint inside the State of New York, providing health care services in five areas. First, Centene contracts with the Community Health Independent Provider Association to provide management consultation services and technical support to a consortium of ten Federally Qualified Health Centers serving approximately 500,000 individuals. Second, Centene provides technology and care coordination services to the Alliance for Integrated Care of New York, a partnership of approximately 150 providers serving 5,000 individuals with intellectual and developmental disabilities (IDD) and Medicare enrollees. Third, Centene contracts with Excellus, an independent Blue Cross Blue Shield health plan, to provide medical management services for approximately 200,000 Medicaid enrollees in upstate New York. Fourth, Centene's subsidiary specialty pharmacy, Acaria, is physically located in New York and holds a pharmacy license under the New York State Department of Health.

Finally, Centene's subsidiary, Envolve PeopleCare, provides employee assistance programs, pharmacy benefit management and nurse advice lines to approximately 400,000 lives under employer contracts with approximately twenty-five corporations.

43.    A key aspect of Centene's acquisition and operating strategy focuses on preserving local operation of its managed care organizations. Each of Centene's twenty-three managed care organizations is headquartered within the state in which it conducts business, maintains locally-based management personnel and utilizes state-specific branding. For example, Centene's Ohio-based managed care organization is named Buckeye Health Plan, while in Florida, Centene's locally managed subsidiary is named Sunshine Health.

44.    Moreover, each of Centene's managed care organizations is overseen by a board of directors that emphasizes local participation and oversight. By way of an example, Centene's largest previous acquisition, Health Net, acquired in March, 2016, has local management and a local board of directors.

45.    Centene's decentralized structure allows it to maintain and grow jobs locally and foster a high level of community input and involvement in the delivery of healthcare services, while leveraging Centene's scale and data analytics to improve health outcomes and reduce costs. It also allows state government partners to communicate directly with local managers, fostering ongoing relationships.

46.    As discussed below, following the Closing, Centene will follow this same model in New York and allow for local control of operations by maintaining Petitioner's current management, operations and location of its headquarters, in Rego Park, Queens.

## SELECTION OF CENTENE AS PURCHASER

47.    Recognizing the potential adverse impact of anticipated federal healthcare regulatory changes, the significant investment in technology and analytics required in the years ahead and the increasing competition from larger, better capitalized for-profit insurers entering the New York managed care and insurance market, in 2016 Petitioner began exploring strategic options for its future.

48.     Petitioner spent approximately one year carefully assessing its operations, resources and the overall future viability of its business lines and considered various strategic options, including potential operational diversification strategies, geographical expansion outside of New York, joint ventures or monetization.

49.     After exploring the options, the Board determined that a sale of Petitioner's insurance operations would be in the best interest of Petitioner and its Members.  Selling substantially all of Petitioner's assets would (i) result in a stronger health plan with greater access to capital and more sophisticated technology and (ii) fund a substantial grantmaking program for the benefit of enrollees and the broader New York population, furthering Petitioner's mission and legacy.

50.     Accordingly, in 2016, in consultation with its financial advisor, Citigroup Global Markets, Inc. ("Citigroup"), the Board authorized Petitioner's executive management team to explore a potential sale of Petitioner's operations.  Soon thereafter, Petitioner, with the assistance of Citigroup, initiated an auction process in which nine prospective purchasers, five for-profit organizations and four not-for-profit organizations, were identified and invited to submit offers for the acquisition of substantially all of Petitioner's assets.

51.     Two bids were received during the first phase of the auction.  Each such bidder was a large, national, publicly traded for-profit insurer.  Although invited to participate in the auction, Centene did not initially submit a bid.  The two bids that were received were presented to the Board in December 2016 and then to the Members, at a meeting of the Members in February 2017.  The Board and Members agreed to continue the second phase of negotiations with both bidders.

52.     Ultimately, neither negotiation led to an agreement.  Following the expiration of the contractually agreed-upon exclusivity periods, Centene contacted Petitioner with an offer for the purchase of substantially all of Petitioner's assets, which was superior to the earlier bids Petitioner received.  Petitioner and Centene commenced deal negotiations in July 2017.

53.     Centene's offer appealed to Petitioner for a number of reasons.  In addition to its superior price, Centene demonstrated the strongest commitment to preserving and strengthening

Petitioner's products and services as well as maintaining Petitioner's employees, provider network and overall geographical presence across the state, including in rural areas. Centene and Petitioner also share the same mission of promoting health through high quality, accessible care and services for all, as well as advocating for health policy that accords true dignity and respect for all people, especially the underserved. Additionally, Centene's offer appealed to Petitioner because following an acquisition, Centene maintains the local identity, branding, operations and infrastructure of the acquired plans.

54.    After intensive negotiations and extensive deliberation by the Board and the Members, Petitioner decided to enter into the Purchase Agreement.

## THE PURCHASE AGREEMENT

55.    The Purchase Agreement provides for the sale of substantially all of Petitioner's assets for the purchase price of $3,750,000,000 and assumed liabilities as described below.

56.    As evidenced by the key terms of the Purchase Agreement, the Transaction is structured to ensure a seamless transition for Petitioner's enrollees, providers and employees, ensuring that Petitioner's products, services and provider network remain intact.

### Purchased Assets and Excluded Assets

57.    With limited exceptions described below, Centene is acquiring all of Petitioner's assets pursuant to the Purchase Agreement (the "Purchased Assets"). The Purchased Assets include, in particular, the following:

    a)   Provider contracts, rights with respect to Petitioner's enrollees and goodwill relating to the provision of health care services under the following federal and state insurance programs:

        1.  New York State Medicaid, Medicaid Advantage and Medicaid Advantage Plus;

2.  Medicare Advantage and Medicare Dual Advantage (together, "Medicare"), subject to the Medicare Reinsurance Agreement described below;

3.  Individual commercial business, including enrollees in Qualified Health Plans as part of the New York State of Health (New York's state-based exchange program), subject to the QHP Reinsurance Agreement described below;

4.  Child Health Plus Program;

5.  Managed Long Term Care Program; and

6.  Essential Plan.

b)  All cash, other than Excess Cash, as defined below;

c)  All accounts or notes receivable;

d)  Intellectual property (other than the Petitioner's legal name, New York State Catholic Health Plan, Inc. (the "Corporate Name"), including the "FIDELIS" trademark and derivations thereof;

e)  Information technology;

f)  Certain assumed contracts;

g)  All furniture, fixtures, equipment, supplies and other tangible personal property other than religious artifacts;

h)  Permits, to the extent transferrable under the law;

i)  All stock of Salus Administrative Services, Inc., and membership interests of Salus IPA LLC, wholly-owned subsidiaries of Petitioner;

j)  Certain real property leases; and

k)   All other goodwill, going concern and other similar intangibles relating to the assets being purchased.

58.    Centene is not acquiring the following assets of Petitioner (the "Excluded Assets"):

a)   Excess Cash, as defined below;

b)   Membership interests in Petitioner's wholly-owned subsidiary, Rego Park Office Tower LLC, and any assets, properties, rights and claims of Rego Park Office Tower LLC, including Petitioner's headquarters;

c)   Right, title and interest in and to the Petitioner's Corporate Name;

d)   Attorney-client privileged communications relating to the Transaction;

e)   Rights and claims under the Purchase Agreement;

f)   Tax refunds or claims;

g)   Certain employee plans and trusts, insurance contracts, segregated accounts or other funding vehicles maintained in connection with such plans;

h)   Certain excluded contracts;

i)   Religious artifacts;

j)   Certain reserves relating to Excluded Liabilities, as defined below; and

k)   Certain books and records.

59.    With respect to the Purchased Assets and the Excluded Assets, the Purchase Agreement provides as follows:

a)   Excess Cash is defined under the Purchase Agreement as the amount, if any, by which the Total Adjusted Net Assets (equal to the consolidated total net assets of Petitioner – other than that which would constitute Excluded Assets or Excluded Liabilities – minus the consolidated non-admitted assets of Petitioner) exceeds the

Minimal Capital Amount (equal to the amount of Purchased Assets sufficient to cause the acquired operations to have an authorized control level risk-based capital ratio immediately following the Closing equal to 350%). The Excess Cash amount is anticipated to be at least $750 million.

b) As discussed below, certain of the Purchased Assets will not be transferred to Centene at the Closing. In particular, the Medicare plans and the individual products (including Qualified Health Plans) will be transitioned to Centene on a staggered basis following the Closing.

c) Centene will assume Petitioner's obligations as lessee under its lease with Rego Park Office Tower LLC for Petitioner's Rego Park headquarters location. Centene has committed to the Attorney General that it will remain headquartered at the Rego Park location for at least three years following the Closing and that it will not seek a modification or early termination of the lease (see Undertaking described in detail herein).

d) Petitioner will grant Centene a license to use the Corporate Name solely to the extent required in connection with the performance of Centene's obligations under the Medicare Reinsurance Agreement and the QHP Reinsurance Agreement described below.

**Assumed Liabilities and Excluded Liabilities**

60.    Centene is assuming all of Petitioner's liabilities (the "Assumed Liabilities"), except for those liabilities relating to or arising from (i) Transaction-related expenses and liabilities; (ii) taxes; (iii) term loans and indebtedness relating to the term loans; (iv) pre-Closing employee-related liabilities; (v) liabilities relating to the Excluded Assets; (vi) breaches of assigned contracts prior to the Closing; (vii) intercompany payables; and (viii) broker or finder fees (together with clauses (i) through (vii), the "Excluded Liabilities").

**Purchase Price & Form of Consideration**

61.    The fair market value of the Purchased Assets was appraised by Navigant Consulting, Inc. ("Navigant"), an independent professional appraisal firm retained by Purchaser.

A copy of Navigant's opinion letter included with their appraisal report which sets forth the valuation range is attached hereto as Exhibit 15.

62.     As explained in Navigant's supplemental letter dated March 7, 2018, attached hereto as Exhibit 16 (the "Navigant Letter"), Navigant utilized the discounted cash flow method under the "income approach" as the valuation methodology. This method evaluates the fair market value of a business on a going concern "enterprise value" basis by calculating the projected cash flow to be generated over time, discounted to present value. Navigant corroborated the valuation under the discounted cash flow method by evaluating the fair market value of the business under the "market approach," which compares the business being valued to similar peer or comparable companies.

63.     In an affidavit, dated May 7, 2018, which is attached as Exhibit 17, Rev. Patrick J. Frawley affirms that the facts as laid out in the Navigant appraisal with respect to Petitioner are true and accurate in all material respects.

64.     The Navigant appraisal was the only appraisal commissioned by Petitioner in contemplation of the sale of substantially all of its assets since Petitioner began exploring strategic options for its future in 2016.

65.     At their September 7, 2017 meeting, the Board was provided with a fairness opinion by Citigroup Global Markets Inc. attached hereto as Exhibit 18. In addition, Citigroup Global Markets Inc. made a presentation to Petitioner's Board on September 8, 2017. Excerpts of the presentation are attached as Exhibit 19.

66.     The consideration to be received by Petitioner for the Purchased Assets from Centene is $3,750,000,000 plus Assumed Liabilities (the "Purchase Price").

67.     The Purchase Price is subject to positive or negative adjustments based on the difference between the working capital estimated at Closing and the working capital as calculated one year post-Closing pursuant to the methodology attached as Exhibit O to the Purchase Agreement. In addition, the Purchase Price is subject to positive or negative adjustment based on the difference between the estimated enrollment volume each of Petitioner's business segments and the actual enrollment volume following the Closing. Specifically, such

adjustment will be calculated by multiplying (a) the difference in the number of enrollees between September 30, 2017 and specified dates following the Closing within the applicable business segment(s) by (b) the per-enrollee purchase price applicable to such business segment, as set forth on Exhibit P to the Asset Purchase Agreement.

68.     The foregoing adjustments to the Purchase Price are anticipated to be *de minimis* relative to the Purchase Price.

69.     Centene has the option to pay up to $500,000,000 (approximately 13.3%) of the Purchase Price at Closing in the form of Centene's common stock (the "Permitted Stock Consideration").

70.     If Centene elects to pay any portion of the Purchase Price in stock up to the Permitted Stock Consideration, the first $375,000,000 in Permitted Stock Consideration must be used to fund the required $375,000,000 indemnification escrow account from which indemnity claims may be paid.

71.     Additionally, the Permitted Stock Consideration used to fund the indemnification escrow must be converted into cash within one year following the Closing such that, upon release of the escrow account at the end of the indemnification period, Petitioner will receive $375,000,000 in cash, subject to any reductions for indemnification claims.  The indemnification period expires on the later of (i) twelve months following the Closing, or (ii) thirty days after Centene receives its audited financial statements for the fiscal year ending on December 31, 2018, up to eighteen months following the Closing.

72.     Additionally, the balance of the remaining $500,000,000 that may be paid in the form of Permitted Stock Consideration (i.e. $125,000,000) would be issued to Petitioner at Closing.  However, this stock will be fully registered common stock and therefore can be liquidated into cash within one (1) to two (2) business days following the Closing.

## Transition of Certain Products

73.     Enrollees in Petitioner's individual commercial market products (including Qualified Health Plans) and Medicare products (Medicare Advantage, Medicare Advantage D-

SNP, Medicare Advantage Plus, and Medicaid Advantage Plus) will not be immediately transitioned to Centene.

74.     The enrollees in the individual commercial market products (including Qualified Health Plans) will be transitioned during the next annual open enrollment period.  Since the Transaction will be approved between open enrollment period for these enrollees, it is anticipated that these insured lives will need to wait until the next open enrollment period (for 2019 coverage) in order to be transferred or to select another health plan.  Of the approximately 1.7 million current enrollees, approximately 98,000 are enrolled in the individual market. Although the Purchase Agreement initially provided that the Essential Plan enrollees would remain with Petitioner through the end of 2018 along with the enrollees of the individual products, as part of the APA Amendment, Petitioner and Centene agreed to transfer the approximately 165,000 Essential Plan lives at Closing.

75.     During the time between Closing and the date of transfer, an existing Centene subsidiary company, Hallmark Life Insurance Company, an Arizona-domiciled insurance company and wholly owned subsidiary of Centene ("Hallmark"), will reinsure all of the financial liabilities relating to Petitioner's individual products (including Qualified Health Plans) products in accordance with a reinsurance agreement (the "QHP Reinsurance Agreement"), the form of which is attached hereto as Exhibit 20.

76.     With regard to those enrolled in the Medicare products, the novation or assignment of their Medicare contracts is subject to approval by the Centers for Medicare & Medicaid Services ("CMS") as described herein.  As that approval process will unlikely align with the Closing of the Transaction, these enrollees will also need to remain with Petitioner for a certain period of time.  The parties anticipate that the Medicare contracts will be fully novated or assigned to Centene prior to January 1, 2020.  There are approximately 65,000 enrollees enrolled in these Medicare products.

77.     Accordingly, during the time between Closing and the date of novation, Hallmark will reinsure all of the financial liabilities relating to the Petitioner's Medicare business in accordance with a Medicare Reinsurance Agreement, the form of which is attached hereto as Exhibit 21 (the "Medicare Reinsurance Agreement").

78.     All of Hallmark's obligations under the QHP Reinsurance Agreement and the Medicare Reinsurance Agreement will be guaranteed by Centene pursuant to a Guarantee Agreement, the form of which is attached hereto as Exhibit 22 (the "Guarantee Agreement"). Upon the completion of the migration to Centene, it is anticipated that Hallmark will exit the market.

79.     Subject to the Department of Health approval described herein, Petitioner will enter into a management agreement with Centene Management Company, LLC, a Wisconsin limited liability company and a wholly owned subsidiary of Centene ("CMC"), Centene Company of New York, LLC, a New York limited liability company and a wholly owned subsidiary of Centene ("CCNY"), and Salus, pursuant to which CMC, CCNY and Salus would assume responsibility for the operations of the Petitioner's individual commercial products and Medicare products until those products are transitioned to Centene (the "Management Agreement"). A copy of the current form of Management Agreement is attached hereto as Exhibit 23.

80.     In furtherance of the foregoing, the parties entered into the APA Amendment to effectuate the following changes: (a) accelerate the transfer of the Essential Plan business, which was originally going to transition on or about December 31, 2018, to instead transfer it upon the closing of Transaction; (b) reflect that the Medicaid Advantage Business and the Medicaid Advantage Plus Business would be subject to the Medicare Reinsurance Agreement and transfer the businesses contemporaneously with the Medicare Business; (c) reflect that the business to be reinsured under the Medicare Reinsurance Agreement and the QHP Reinsurance Agreement would be administered under the Management Agreement by CMC, CCNY and Salus; and (d) attach updated forms of Reinsurance Agreements, Guarantee Agreement and Management Agreement to the Purchase Agreement.

**Closing Conditions**

81.     The principal conditions that must be satisfied prior to Closing in order for both parties to close the Transaction include:

a)      Filing any required materials pursuant to the Hart-Scott-Rodino Act and waiting for the termination or expiration of any applicable waiting period (or extensions);

b)      Receipt of all necessary regulatory approvals (i.e., the New York State Office of the Attorney General and/or the New York State Supreme Court, the New York State Department of Health, the New York State Department of Financial Services and Centers for Medicare and Medicaid Services);

c)      The successful novation or assignment of Petitioner's contracts for its business lines (other than those relating to Medicare and the Petitioner's individual products (including Qualified Health Plans) products to Centene and the receipt of all approvals, consents and waivers required in connection with such assignments; and

d)      Receipt of all approvals, consents or waivers required in connection with the Medicare Reinsurance Agreement and the QHP Reinsurance Agreement.

82.      The principal conditions that must be satisfied prior to Closing in order for Centene to close the Transaction include, among others:

a)      The absence of any "Material Adverse Effect," which includes any event, change, effect, development, state of facts, condition, circumstance or occurrence that, individually or in the aggregate, results or could be reasonably be expected to result in a materially adverse to the Petitioner's operations, with certain exceptions.

b)      The absence of certain conditions imposed by regulatory authorities in connection with the Transaction.

c)      Receipt of all third-party consents, approvals and authorizations required to be obtained pursuant to the Purchase Agreement.

83.      The principal conditions that must be satisfied prior to Closing in order for Petitioner to close the Transaction include, among others:

a)      Petitioner shall have received all required governmental approvals to enable the Foundation to operate in all material respects in furtherance of healthcare and

healthcare related purposes set forth on Exhibit S of the Purchase Agreement, including those which address the Social Determinants of Health, such as healthcare, nutrition, substance abuse, behavioral health, home and community-based services, early intervention, education and literacy, affordable quality housing, employment and care for the elderly (the "Applicable Purposes").

b)    The absence of certain conditions imposed by regulatory authorities in connection with the Transaction.

## Post-Closing Covenants

84.    The Purchase Agreement requires the parties to satisfy certain obligations post-Closing. These include standard post-Closing obligations such as indemnification for breaches of representations and warranties and other breaches of contract as well as the following obligations:

a)  Petitioner and its Members are subject to non-compete restrictive covenants for a period of five years following the Closing (the "Non-Compete"). The Non-Compete covers the geographical area of the State of New York and prohibits Petitioner and its Members from directly or indirectly engaging in, facilitating, or owning any interest in (with limited exceptions[2]) any other business that engages in, the operation of any healthcare insurance or managed health care business that competes with the business conducted by Petitioner immediately prior to the Closing. Prior to the Closing, as described herein, the Foundation with enter into a Payment and Limited Joinder Agreement with Petitioner and Centene under which the Foundation will agree to become bound by the Non-Compete covenants. However, it is not anticipated that this restriction will have any practical application to Petitioner or the Foundation as neither the Petitioner nor the Foundation anticipates engaging in any of the activities prohibited by the Non-Compete. Additionally, the Non-Compete includes an express carve-out for the

---

[2] The following is permitted under the Purchase Agreement: (i) acquiring any business that engages in Restricted Business where the revenues from such Restricted Business constitute less than five percent (5%) of its total revenues and (ii) acquiring or holding bonds of up to five percent (5%) of the outstanding shares of any class or series of equity securities of any entity if such bonds or equity securities are publicly traded.

Archdiocese of New York's continued operation of the ArchCare Continuing Care Community, as such business is conducted immediately prior to the Closing.

b)   As described above, pursuant to the QHP Reinsurance Agreement and the Medicare Reinsurance Agreement, Centene will reinsure all of the financial liabilities relating to the Petitioner's individual products (including Qualified Health Plans) and Medicare products until such time that the applicable contracts with CMS and the Department of Health can be novated or assigned to Centene.

c)   For a period of one year following the Closing, to the extent permitted by applicable law and government authorities, Purchaser must use commercially reasonable efforts to comply with the protocols and policies developed by Petitioner relating to the Ethical and Religious Directives.

d)   Purchaser is required to offer employment to all of Petitioner's employees (subject to standard background checks) and must retain such employees for a period of one year following the Closing.  During this one year period, Purchaser can only terminate such employees for cause or due to the occurrence of any material adverse change to the business.

85.   While the Purchase Agreement contemplates that the parties will enter into a transition services agreement for certain administrative services for a limited period of time after the Closing, the parties now believe that such an agreement will be unnecessary.

## NEW FIDELIS CARE STRUCTURE

86.   Centene has formed New York Quality Healthcare Corporation, a wholly-owned subsidiary, to operate the businesses acquired from Petitioner following the Closing.  To ensure a seamless transition, Centene will acquire the name "Fidelis Care" as part of the Transaction and New York Quality Healthcare Corporation will continue to operate the health care enterprise under that name (New York Quality Healthcare Corporation is referred to herein as "New Fidelis Care").

87.    The current executive management team of Petitioner will continue managing the business for New Fidelis Care. New Fidelis Care's headquarters will continue to operate from its present home in Queens.

88.    New Fidelis Care will be governed by a board of directors, which is expected, within one year of Closing, to be comprised of seven individuals. The board will represent a broad cross-section of New York State's medical community and will include management of the New Fidelis Care business. It is anticipated that Centene will also create a standing subcommittee to represent the interests of New Fidelis Care's enrollees. The chairperson of this subcommittee will hold an ex-officio seat on the New Fidelis Care board of directors.

89.    As described herein, for a period of three years following the Closing of the Transaction, Centene has committed to appoint one individual to the Board of Directors of New Fidelis to advocate for the interests of the Medicaid enrollees of New Fidelis and the implementation of the recommendations contained in the report of the independent expert, such board member to be mutually agreeable to both Centene and the Attorney General

90.    In conjunction with its formation and authorization to operate as a managed care organization, it is contemplated that New Fidelis Care, subject to Department of Health approval, will enter into a management agreement with CMC and CCNY. A copy of the current form of management agreement is attached as Exhibit 24.

91.    Pursuant to the management agreement, New Fidelis Care will, in compliance with all applicable statutes and regulations, delegate to CMC and CCNY the authority to manage, on behalf of New Fidelis Care, certain day-to-day business operations and affairs of New Fidelis Care, including IT support, data analytics, medical management services, legal support and employee benefits services.

92.    The proposed form of the management agreement was included with the Certification Application for the Department of Health's review and approval. New Fidelis Care, CMC and CCNY will utilize Petitioner's current staff and policies and procedures, including but not limited to, service delivery and provider network, quality assurance systems and practices, utilization review, claims management, grievance practices and member services

93.     Because Centene's integrated healthcare model effectively will provide a complete array of government-sponsored healthcare services throughout New York State, including among others behavior health support, pharmacy benefit management and managed long term care services, Centene does not anticipated utilizing its specialty companies in contractual relationships with New Fidelis Care in the foreseeable future. The exception to this status quo is the possible introduction of Acaria Health, Centene's specialty pharmacy company, into the New York market. Acaria Health is currently licensed and operational in New York State.

94.     Presently, Petitioner contracts with CVS Pharmacy for specialty pharmacy services. It is feasible that New Fidelis Care may choose to competitively bid specialty pharmacy services in the future and that Acaria Pharmacy may compete with other providers to become the best quality service at a competitive price.

95.     Additionally, Centene is committed to compliance and payment integrity. Centene's payment integrity efforts include prepayment review, retrospective data mining, overpayment recovery, on-site auditing, participation in state and federal fraud taskforces and a Special Investigation Unit.

## NEW FIDELIS CARE OPERATIONS

96.     Centene recognizes Petitioner's valued role as a leading statewide employer with a large, highly skilled and engaged workforce. As noted below, the terms of the Transaction provide continuity of employment to the entire workforce, which both Centene and Petitioner view as vital to the historical and future success of the business.

97.     Additionally, Centene's decentralized, local approach for care will preserve Petitioner's corporate presence in New York as the anchor of Centene's multi-line healthcare business in New York. Post-Closing, Petitioner's business will continue to be headquartered in Rego Park, Queens and will continue operations throughout the state, including Albany, Buffalo, Rochester and Syracuse. Its regional offices, satellite locations, community locations and kiosk locations will continue operating as before. The current executive management team of Petitioner, including Petitioner's seven top executives, will continue to manage the business.

98.    As a result of the Transaction, Petitioner will be able leverage Centene's national infrastructure of support functions, including finance, information systems and claims processing, to create scale and efficiencies and improve health outcomes in connection with the integration of the assets acquired in the Transaction.

**Enrollees**

99.    From the outset of negotiations, Petitioner has focused on ensuring uninterrupted access to Petitioner's products and services.  To that end, the offerings of New Fidelis Care, post-Closing, will closely mirror the product offerings that enrollees now experience.  In particular, New Fidelis Care will continue to offer the full spectrum of Medicaid products, including HARP, SSI and CHIP, managed long term care, Essential Plan and Qualified Health Plans to exchange enrollees and Medicare Advantage plans to Medicare eligible customers.

100.    In addition to receiving their high quality coverage from current offerings, under the Centene umbrella, enrollees will also have access to a range of new programs.  For example, Centene's MemberConnections program provides cell phones to high risk enrollees who do not have safe, reliable access to a cell phone.  Enrollees with ConnectionPlus phones have significantly higher HEDIS (Healthcare Effectiveness Data and Information Set) rates for adult access to care and various cancer screenings.  Another program, CentAccount, provides financial rewards to enrollees who embrace healthy behaviors.  Centene research showed that adult enrollees who earned the "annual well visit reward" were 34% less likely to visit the emergency room.

101.    Enrollees will also have access to Centene programs that address high-risk pregnancies and substance usage during pregnancy; these programs have dramatically reduced pre-natal and post-natal care expenses, while improving mother and child health outcomes.  For example, StartSmart promotes education and communication between pregnant enrollees and their case managers to ensure a healthy pregnancy and first year of life for their babies.  The program has resulted in a significant decrease in low birth weight deliveries and their attendant costs.

102.    Likewise, Centene-initiated programs to address living with sickle cell anemia, opioid management and prescriber/pharmacy lock-ins lead to significantly better outcomes, while appropriately managing a state's pharmaceutical expenditures.

103.    In the area of pharmacy management, Centene's family of managed care companies strive to provide enrollees with the right medication at the earliest opportunity. In New York, New Fidelis Care will continue to administer its pharmaceutical formularies in accordance with the program requirements of the New York State Department of Health and the Centers for Medicare and Medicaid Services for each of New Fidelis Care's products. New Fidelis Care's pharmaceutical step therapy management and speedy response times will provide enrollees with the prescriptions they require, while appropriately emphasizing provider directives above cost considerations.

## Provider Network

104.    The Petitioner's existing provider network will remain virtually intact. Presently, Petitioner's contracts with its providers include an assignment of the contract by Petitioner, either upon notice to providers or with the provider's consent (which generally cannot be unreasonably withheld). The process of assigning each of Petitioner's provider contracts to New Fidelis Care (subject to the approval of the Transaction) is nearly completed and, thus far, virtually no provider has objected to the assignment. It is anticipated that by Closing Petitioner's entire current network will transition to New Fidelis Care, with only *de minimis* exceptions.

105.    Centene is committed to value based care and the proposition that doctors should be rewarded for good health outcomes. Centene is a national leader in innovative, value-based payment models. In notable value-based purchasing markets, such as California, Florida and Texas, 70% of current Centene enrollees are covered by a value-based purchasing model. In California, more than 80% of Centene enrollees are covered by Level II contracts, in which providers share both upside and downside risk.

106.    Regarding the prompt payment of providers, Centene's claims turn-around time for payment of providers is approximately eight days and is among the best in the industry.

**Employees**

107.    Petitioner and Centene recognize that Petitioner's current employees, which total nearly 4,300, and the unparalleled personalized service they provide, are Petitioner's most valuable asset.  As part of the Transaction, Centene has committed to make offers of continued employment to all of Petitioner's current employees.  Compensation paid to employees of New Fidelis Care will be at least equal to their past compensation and retirement benefit packages earned as part of their prior employment at Petitioner.   Under the Centene platform, New Fidelis Care will create exciting opportunities for Petitioner's current employees, who will join a large and diverse organization that will retain the unique qualities and culture that have driven Petitioner's success.  Employees will also have the potential for career growth and advancement throughout Centene.

108.    In addition, given the importance of retaining the Petitioner's executive team, Centene has agreed to make offers of employment to the executive team as well as certain incentive payments to such executives to ensure a smooth transition of the business to New Fidelis Care, the continued success of the business into the future, and continuity of care for its enrollees.  Going forward, compensation and benefits for such executives will be commensurate with similarly situated executives within Centene and across the insurance industry.

109.    None of Petitioner's executives will receive any severance or retention payments from Petitioner or its assets as a result of the Transaction.  While the terms of the executives' current employment agreements would have entitled them to such payments, each agreed to waive these payments in their entirety prior to execution of the Purchase Agreement.

## CENTENE'S COMMITMENTS TO NEW YORK

110.    As a result of the Transaction, enrollees and communities across the state will benefit from Centene's entry into the New York marketplace.

**Commitment to Bring Innovative Technology to New York**

111.    With Centene's technology and data analytics, New Fidelis Care will be able to accelerate meaningful innovations to the services it will provide to Petitioner's current enrollees.

Centene has already developed the data mining and analytic tools with which Petitioner's current IT systems will interface in order to provide superior, cost-effective health outcomes.

112.    Centene annually invests more than $1 billion per year in technology-based products, services and support. The goal of this investment is to provide enrollees with high quality healthcare at appropriate cost on behalf of its government partners. Centene accomplishes this through diligent case management. Highly trained physicians, nurses and case managers work with enrollees and providers to conduct individual health management. Proprietary IT solutions assist case managers in providing enrollees with appropriate levels of care at the earliest point in the care continuum.

113.    Examples of Centene's technologies include the following:

    a)  TruCare$^{TM}$ Centene's integrated care management platform provides health risk assessments, tracks allergies and organizes administrative and clinical information regarding patients;

    b)  Centilligence$^{TM}$ uses predictive modeling and analytics to translate data into meaningful action on behalf of its enrollees; and

    c)  Interpreta$^{TM}$ provides real-time clinical and genomic analysis to streamline work flows, prevent disease, customize care and circumvent adverse events.

114.    In one example of Centene's successful application of data analytics, Centene has effectively used analytic platforms driven by machine learning algorithms to identify enrollees for intervention to address opioid addiction.

115.    Case managers strive to remain in regular contact with enrollees through Centene's locally staffed member services call centers, 24 hour/7 day per week nurse advice lines and community health worker program. These case managers provide access to wellness instruction through a wide variety of high-touch programs, including Centene's Health Reminder Program (mailings and call campaigns), community health fairs, Start Smart Baby Showers, interactive member portal and mobile applications and CentAccount™ (Centene's healthy rewards financial incentive program), among many others.

116.    The combination of Centene's technology and expert medical management also allows Centene to provide enrollees with state-of-the-art care management and disease management services.  Technology provides tools for care managers to quickly close care gaps within provider panels.  An array of disease management programs give real-time insight into the treatment of conditions such as asthma, chronic obstructive pulmonary disease, congestive heart failure, coronary heart disease, diabetes and smoking cessation.

117.    Technology also provides case managers with new levels of insight into discharge and transition of care programs.  Case managers remain in close contact with on-sight hospital discharge planning staff at high volume facilities to monitor the care and progress of in-patient enrollees.  Post-discharge, case managers maintain telephone contacts within three to seven days to monitor a member's progress and conduct face-to-face follow up with enrollees at high risk for readmission.

**Commitment to Healthcare Exchanges**

118.    Centene brings to New York its deep commitment to federal and state healthcare exchanges at a time when many other providers have distanced themselves.  Today, Centene is the nation's largest provider of services through the exchanges, insuring approximately 1,000,000 enrollees in fourteen states.

119.    Importantly, Centene has gained a national reputation for entering difficult exchange markets exited by other insurance carriers.  In the past two years, Centene has entered otherwise "bare markets" (no insurer on the exchange) in Missouri, Arizona, Kansas and Nevada, often serving as a region's sole healthcare provider.  Centene has worked closely with state governmental partners to provide insurance in counties in danger of being designated as "bare counties."

120.    Centene will participate in the New York State of Health exchange marketplace, serving Petitioner's Essential Plan and Qualified Health Plan enrollees and supporting the state's health exchange mission into the future.

## Commitment to Managed Long Term Care

121.    Centene will bring to New York its significant expertise in providing long term support services to state partners and will participate in New York State's Managed Long Term Care (MLTC) program.  Currently, Centene provides MLTC/Long Terms Services and Support (LTSS) coverage in Arizona, California, Florida, Illinois, Kansas, Ohio and Texas.  Additionally, Centene is contracted to begin providing such services in Pennsylvania in 2018.

122.    Centene believes a highly-trained and appropriately compensated workforce is critical to providing MLTC services to enrollees.  Consequently, Centene has developed strong partnerships with Service Employees International Union (SEIU), a mainstay in the home healthcare field, to incentivize and train a caring and competent workforce.  In states such as Illinois and California, Centene has supported SEIU's local training programs to train healthcare workers for these demanding jobs.  Currently, Centene is working with SEIU in Pennsylvania to develop even more advanced programs.  Specifically, Centene is partnering to create an advanced home health aide pilot program, leveraging the knowledge and skills of the most experienced home health workers across a community.

123.    Additionally, Centene is a national leader in transitioning enrollees from nursing facilities back to the communities in which they live.  Since 2013, Centene has transitioned nearly 8,000 enrollees from nursing homes back into the community in the states of Florida, Illinois, Kansas, Ohio, Texas and California.

124.    Centene has recently opened a dialogue with SEIU Local 1199 in New York to explore ways to ensure MLTC workers are appropriately trained and incentivized to provide quality care across rural and urban New York State.

## Centene Undertaking

125.    At the request of the Attorney General, Centene has agreed to enter into an undertaking (the "Undertaking"), pursuant to which Centene is making specific commitments to the Attorney General concerning the maintenance of Petitioner's current product offerings following the Closing, the appointment of a enrollee-advocate to serve on New Fidelis Care's

board, and certain other matters. A form of the Undertaking is attached as <u>Exhibit 25</u>. In the Undertaking, Centene has agreed to cause New Fidelis Care to, among other things:

    a)  offer through the end of calendar year 2021 a substantially identical selection of Medicaid, Medicare and New York State of Health Exchange health plans in the same geographical areas as were offered by Petitioner immediately prior to the closing of the Transaction;

    b)  offer all existing hospital, medical and pharmacy providers to Petitioner the opportunity to transfer to New Fidelis Care upon the closing of the Transaction on the exact same terms and conditions (including reimbursement rates) as such providers had with Fidelis Care prior to the closing of the Transaction for the remainder of the calendar year 2018;

    c)  offer all existing hospital, medical and pharmacy providers to Petitioner the opportunity to participate in the New Fidelis Care provider network during calendar years 2019 through 2021 on substantially similar terms and conditions as such providers had with Petitioner as of the Closing date of the Transaction, subject to Department of Health regulations in place at the time of contracting;

    d)  retain an independent expert, selected by the Attorney General, to produce a report of recommendations to the Board of Directors of New Fidelis Care for its consideration following the Closing, which recommendations are intended to address the potential impact, if any, of the Transaction on the Medicaid membership of Petitioner (the report will be produced for three years after the Closing);

    e)  for a period of three years following the Closing of the Transaction, to appoint one individual to the Board of Directors of New Fidelis to advocate for the interests of the Medicaid enrollees of New Fidelis and the implementation of the recommendations contained in the report of the independent expert, such board member to be mutually agreeable to both Centene and the Attorney General;

    f)  not limit the whistleblower rights of any of its New York-based employees, vendors or consultants before any state or federal law enforcement or regulatory body in

any agreements regarding employment or separation from employment entered into by Centene or its affiliates or implement any policies or procedures that would limit such rights;

g)  maintain New Fidelis' headquarters at Petitioner's current headquarters location in Rego Park, Queens  for at least three years, under Petitioner's current lease arrangement; and

h)  make annual reports to the Attorney General regarding the foregoing through the year 2021.

## REGULATORY APPROVAL PROCESS

126.    In addition to the Attorney General's approval, certain other State and Federal regulatory approvals are required for aspects of the Transaction.  Petitioner will provide a copy of this Verified Petition to the New York State Department of Health, the New York State Department of Financial Services and such other agencies as directed by the Attorney General.

### New York State Department of Health

127.    On October 23, 2017, Petitioner and Centene filed a "change of control" application with the Department of Health pursuant to Article 44 of the New York Public Health Law. The application requested approval of the sale of Petitioner's assets and liabilities to New Fidelis Care (New York Quality Healthcare Corporation).

128.    On April 20, 2018, the Department of Health approved the application subject to the conditions set forth therein.  It also approved the transfer of the Transaction proceeds and all assets of Petitioner to the Foundation following the Closing to enable the Foundation to conduct it charitable grantmaking activities as described herein.

129.    Attached as Exhibit 26 is (i) the approval letter of the Department of Health dated April 20, 2018 and (ii) an agreement by Petitioner, dated April 19, 2018, in which it agreed to the conditions for Department of Health approval.  Attached as Exhibit 27 is a letter from the Superintendent of the Department of Financial Services to the Commissioner of the Department of Health providing support for the Transaction.

130.    In addition, on April 20, 2018, the Department of Health approved New Fidelis Care's application to operate Medicaid, Child Health Plus, Health and Recovery Plan (HARP), and Managed Long-Term Care (MLTC) (excluding Medicare lines of business) programs in all 62 counties and issued New Fidelis Care a Certificate of Authority reflecting such approval. The Certificate of Authority also includes the Essential Plan in specified counties and, effective January 1, 2019, the Qualified Health Plan. Attached as <u>Exhibit 28</u> is (i) the approval letter of the Department of Health dated April 20, 2018; (ii) the Certificate of Authority issued to New Fidelis Care; and (iii) an agreement by Centene, dated April 18, 2018, in which it agreed to the conditions for Department of Health approval.

131.    In addition, Department of Health approval is pending for the Management Agreement described above and attached as Exhibit 23 hereto.

**<u>New York State Department of Financial Services</u>**

132.    The Department of Financial Services' approval of Hallmark's application to become a licensed insurer in New York is also required in order for Hallmark to provide reinsurance under these agreements. On April 18, 2018 Department of Financial Services approved the license subject to the conditions set forth therein. Attached as <u>Exhibit 29</u> is a copy of Department of Financial Services approval and a copy of the license, which is effective April 20, 2018.

133.    Approval by the Department of Financial Services for the Medicare Reinsurance Agreement and QHP Reinsurance Agreement is pending.

**<u>Centers for Medicare and Medicaid Services ("CMS")</u>**

134.    The novation of Petitioner's existing Medicare contract and business to New York Quality Healthcare Corp. is subject to approval by CMS. Prior to such novation, New York Quality Healthcare Corp. must apply to become an eligible organization to provide such Medicare coverage. The approval of eligible organizations by CMS are permitted only during certain limited time periods over the year (beginning in June of the calendar year). Once approval to be an eligible entity is granted, then a request will be made for approval of the novation of the Medicare contract. Thus, this process will likely not be completed until 2019.

135.    Petitioner notified CMS of the transaction on October 4, 2017 and recently spoke with CMS to update them on the transaction and discuss the timeline for the novation. In advance of the Closing of the transaction, Petitioner will submit to CMS a notice of a delegation of management functions to a Centene affiliate.

**Hart-Scott-Rodino Anti-Trust Review**

136.    The Transaction was subject to antitrust review under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended (the "HSR Act"). Centene and Petitioner each filed a pre-merger notification under the HSR Act with the United States Department of Justice and the United States Federal Trade Commission on September 18, 2017. Early termination of the waiting period under the HSR Act (which would otherwise have expired on October 18, 2017) was granted on September 29, 2017, as reflected in the letter attached hereto as Exhibit 30, with no action taken.

## AGREEMENT WITH GOVERNOR'S OFFICE

137.    Following the execution of the Purchase Agreement, the State asserted its intent to enact legislation aimed at regulating transactions such as the Transaction. Through the legislation, the State asserted a right to substantially all of the Transaction proceeds, as well as a significant portion of Petitioner's cash and investments on its balance sheet, which post-Closing is projected to be approximately $4.6 billion. Petitioner strongly disputed the State's position, asserting that the State had no right or interest in or to any portion of the Transaction proceeds or any of its assets.

138.    Although Petitioner had strong legal arguments challenging the State's position, it ultimately determined that it was in the best interests of Petitioner and its Members, as well as the poor and underserved populations of New York State, to settle and resolve the dispute.

139.    On March 30, 2018, the Petitioner and the State agreed on a framework for settlement that would result in an approximately $3.2 billion foundation while at the same time providing a monetary contribution to the State. As part of the settlement, Petitioner agreed that it would make a payment of $1 billion (the "Initial Fidelis Payment") to the State within 30 days of the Closing and that an additional payment of $400 million would be made to the State within 18

months of the Initial Fidelis Payment. Finally, Petitioner agreed to provide an additional $100 million, which could be paid in the form of two equal $50 million charitable grants, the first made in 2021 and the second made in 2022. Attached as Exhibit 31 is the letter dated March 30, 2018 from Petitioner to Mr. Robert Mujica, director of the New York State Division of the Budget, outlining the settlement framework.

140.    Centene also entered into a Memorandum of Understanding, whereby it agreed to contribute to the State $340 million payable in five equal installments over five years. New York State will also receive from Centene at least $160 million in additional taxes and fees as a result of Centene's operation as a for-profit health insurer in New York State. Attached as Exhibit 32 is Centene's Memorandum of Understanding dated March 30, 2018.

## ORGANIZATIONAL STRUCTURE FOLLOWING THE CLOSING

141.    Following the Closing, Petitioner's current governance structure will remain intact. Members will continue to have the same reserved powers they currently hold, including the power to appoint directors and officers of Petitioner and the power to ensure compliance with the Ethical and Religious Directives.

142.    Additionally, following the Closing, Petitioner's Certificate of Incorporation and By-Laws will remain as currently in effect, except that Petitioner's Board of Directors will likely be reduced in size to reflect the narrower scope of Petitioner's services post-Closing.

143.    Petitioner, however, has determined that it is in its and the Members' best interest to separate the insurance/managed care business that will temporarily remain with Petitioner (i.e. individual and Medicare products) from the grantmaking program to be carried out post-Closing.

144.    Accordingly, following the Closing, Petitioner – the New York State Catholic Health Plan, Inc. – will maintain the individual and Medicare contracts until they are transitioned to Centene. The Foundation – the Mother Cabrini Health Foundation, Inc. – a separate New York charitable corporation with identical Members as Petitioner, will serve as the grantmaking foundation following the Closing.

145.     Several factors contributed to this decision.  First, the remaining managed care products will be subject to regulatory oversight and requirements that apply solely to managed care organizations and not charitable grantmaking foundations.  Second, a  managed care plan's business requires different governance, management, compliance and oversight functions than a charitable grantmaking foundation.  Third, the regulatory restrictions that would apply upon the final transfer of Petitioner's remaining business to Centene could interfere with planned charitable grantmaking activities and potentially encumber a substantial amount of charitable assets intended for grants.  Fourth, segregating the insurance business from the grantmaking activities insulates the assets intended to help New York's poor and needy from competing interests.

146.     The organizational structure of Petitioner and the Foundation is depicted below:



147.     To enable the Foundation to carry out its activities, at or immediately following the Closing Petitioner will transfer the proceeds of the Transaction, net of Closing expenses, and all of Petitioner's remaining assets to the Foundation.  In addition, the Petitioner's rights and obligations with respect to the $375,000,000 indemnification escrow will be assigned to the Foundation at Closing.

148.     Exhibit 33 provides a statement of the sources and uses of the Transaction proceeds and the assets of Petitioner to be transferred to the Foundation.

149.     In contemplation of the transfer of assets to the Foundation, Petitioner, Centene and the Foundation will enter into a Payment and Limited Joinder Agreement (the "Payment and

Joinder Agreement"), pursuant to which the Foundation will agree to pay on behalf of Petitioner certain of Petitioner's payment obligations that are determined to be owed by Petitioner under the Purchase Agreement.[3]  In addition, the Foundation agrees to comply with certain provisions of the Purchase Agreement as if the Foundation had originally been named a party to the Purchase Agreement.[4]  Attached hereto as Exhibit 34, is a form of the Payment and Joinder Agreement.

## MOTHER CABRINI HEALTH FOUNDATION, INC.

150.    The Foundation will be the largest foundation focusing exclusively on the health and well-being of poor, underserved and disadvantaged New York residents.

151.    The Foundation's certificate of incorporation and the proposed by-laws are attached hereto as Exhibit 35 and Exhibit 36, respectively.  The Foundation will apply for and obtain tax-exempt status under section 501(c)(3) of the Internal Revenue Code.

152.    Consistent with Petitioner's current charitable purposes and grantmaking program, the Foundation anticipates making up to $150 million in grants annually to improve the health and well-being of vulnerable New Yorkers, bolster the health outcomes of targeted communities, and bridge gaps in services that address the health and wellness needs of low-income communities and families throughout the State.

153.    Importantly, the Foundation will use its assets to create greater access to care, services and other support for New Yorkers.  It will drive better care for marginalized communities and will provide flexible support for new and innovative approaches that enhance health and wellness across New York State as reflected in its proposed mission statement attached hereto as Exhibit 37.

---

[3]  Applicable provisions of Purchase Agreement: Sections 2.07(d) and (e) (Determination of Enrollment Purchase Price Adjustment), Sections 2.08(d),(e) &(f) (Determination of Working Capital Purchase Price Adjustment), Section 2.10 (Third Party Consents), Section 6.08(d) (Governmental Approvals and Consents), Section 6.18 (Transfer Taxes), Section 6.19 (Health Insurance Provider Fees), Section 6.21 (Apportioned Obligations), Section 6.25 (Subsidiary Tax Matters), Section 6.26(b) (Insurance) and Section 8.02 (Indemnification by Seller).

[4]  Applicable provisions of Purchase Agreement: Section 6.06 (Confidentiality), Section 6.07 (Non-competition; Non-solicitation), Section 6.13 (Reconciliation) and Section 6.19 (Non-disparagement).

154.    Moreover, the Foundation has the potential to become a national model for addressing the Social Determinants of Health, from dense urban areas with tremendous population diversity to low-population rural areas across the State.

155.    Consistent with Petitioner, which has operated since its inception in accordance with the Ethical and Religious Directives for Catholic Health Care Services, the Foundation will adhere to the tenets and teachings of the Roman Catholic Faith as reflected in the doctrines and directives published by the United States Conference of Catholic Bishops.  Accordingly, following the Closing, the Foundation will adhere to the Ethical and Religious Directives and other applicable guidelines promulgated by the Conference of Catholic Bishops, to the extent they relate to the activity in question.

156.    In accordance with these directives, no person will be discriminated against based on race, sex, age, religion, national origin or disability.  Attached as <u>Exhibit 38</u> is the Foundation's proposed non-discrimination policy.

**Foundation Governance**

157.    The Foundation's Board of Directors is expected to consist of twenty directors (the "Foundation Board"), and will be comprised of experts in the fields of health, social welfare, finance and philanthropy.  Attached as <u>Exhibit 39,</u> is the initial list of individuals who have agreed, upon Member approval, to serve on the Board.

158.    It is expected that the Foundation Board will meet at least twice a year, but more frequently during the launch phase in order to properly oversee the evolution of the Foundation's activities.

159.    The Foundation Board will establish committees in compliance with the New York State Not-for-Profit Corporation Law and consistent with established best practices for foundation governance.  It is anticipated that the Board will establish an Executive Committee, a Finance Committee, an Investment Committee, an Audit Committee, a Grants Committee and a Regional Grants Committee.  These Committees will assist the Foundation Board in providing oversight of the  Foundation's finances and the management of its investment portfolio, developing a grantmaking strategy, determining the Foundation's priorities, establishing and

maintaining grantee relations and developing collaborations. Attached as Exhibit 40 is the proposed list of the initial members of the Investment and Audit Committees, subject to Member approval.

160.    The Foundation will adopt a conflict of interest policy in compliance with N-PCL §715 (the "Conflict of Interest Policy," proposed policy attached as Exhibit 41). While it is not anticipated that any related party (as defined in N-PCL § 102) of Petitioner or Centene will have any direct or indirect grantee, governance or financial relationship with the Foundation, to avoid the appearance of any conflict of interest or personal benefit, no present employee of Petitioner or Centene will be compensated as an employee, officer or director of the Foundation for a period of at least three years from Closing. Additionally, while none are presently expected, the Foundation will address any related party transactions (as defined in N-PCL §102) in accordance with the procedures set forth in the Conflict of Interest Policy and N-PCL §715.

161.    The Foundation's investment portfolio will be overseen by the Investment Committee in accordance with the Foundation's investment policy (proposed policy attached as Exhibit 42).

**Operations and Organization**

162.    To ensure the Foundation is ready to commence its operations following the Closing, Petitioner has been actively working with a leading philanthropic advisory firm, Rockefeller Philanthropy Advisors, to develop an operations plan based on benchmark data of staffing and operations for similar foundations (e.g., size, geographic scope, grantmaking approach, public purpose and origin).

163.    It is anticipated that the Foundation will make several key hires focusing on asset management, financial, compliance and program functions, including a Chief Executive Officer, a Chief Operating Officer, a Chief Investment Officer and Vice President of Programing.



164.    The Chief Operating Officer will oversee Finance, Human Resources, facilities, grants management, communications, risk management functions and hires. The Chief Investment Officer will oversee internal/external investment advisors and managers. The Vice President of Programming will oversee the build-out of grants and philanthropic programs, as discussed further below.

165.    A more detailed description of the key executive positions is attached hereto as Exhibit 43.

166.    Initial benchmarking data from comparable sized foundations indicate program staff levels ranging from 30 in the initial years to 100 full-time equivalents if the Foundation moves towards funding more complex programs such as competitive research prizes. The Foundation plans to hire program staff with expertise in health and wellness needs of local and regional underserved populations, and programs that align with these needs

167.    The Foundation's Board will approve an annual operating plan and budget for the Foundation. A proposed initial budget for the Foundation is attached as Exhibit 44 (the "Initial Budget"). The Initial Budget is based on data from peer foundations of a similar asset size and which grant on a similar scale.

168.    The compensation and benefits set forth in the first year of the Initial Budget includes consultants to assist with program and operating functions until staff are hired. This will allow the Foundation to conduct open, transparent searches to obtain professional and experienced talent to fulfill crucial functions to achieve mission. Other positions included are standard functions required for operations.

**Grantmaking**

169.    Upon recognition of its tax-exemption, the Foundation anticipates making annual grants of up to $150 million to improve the health and well-being of New York's poor, underserved and disadvantaged residents.  While maintaining the highest moral and ethical standards informed by the Catholic faith and guided by the tenets and teachings of the Roman Catholic Faith, the Foundation's grantmaking program will support two core objectives in furtherance of its charitable purposes:  (i) promoting access to quality and affordable healthcare and healthcare related services, including by supporting initiatives that address the Social Determinants of Health; and (ii) addressing unmet healthcare and healthcare related needs (including Social Determinants of Health).

170.    The Foundation's grantmaking program will be modeled on best practices and guided by New York State's health needs, which includes analyses of the approaches of major health foundations and other philanthropic organizations across the country.  These best practices include for example: (i) developing approaches informed by research and community input, (ii) targeting resources toward programs with proven or promising results, (iii) serving high-need or disadvantaged populations, (iv) standardizing grantmaking processes and reporting; and (v) hiring staff with experience in healthcare grantmaking and knowledge of local community needs.  Foundation's programs and operations will be transparent, responsive and respectful of applicants, and proactive on diversity, equity and inclusion.

171.    To assist the Foundation in developing and implementing its grantmaking program, the Foundation plans to partner with health and social welfare experts to help identify funding priorities and grant initiatives.  It will seek input from key stakeholders, including by establishing advisory committees to supplement the expertise on the Foundation Board.  These committees may focus on urban, rural, immigrant health issues, or on particular health disparities or inequalities.

172.    The Foundation will also be informed by the ongoing programs and initiatives sponsored by New York State government, and will aim to work collaboratively with State agencies to further joint goals.  For example, the experience gained and research gathered from the Department of Health's "First 1000 Days on Medicaid Initiative," Governor Cuomo's

"Health Across All Policies" initiative, and Attorney General Schneiderman's Community Overdose Prevention (COP) program will help guide Petitioner's activities.

173.    Work has already begun towards implementing these strategic goals. Rockefeller Philanthropy Advisors is conducting a needs and gap analysis around purposes consistent with New York State's Medicaid program, including, but not limited, Social Determinants of Health in New York, such as housing, wellness needs, nutrition, health education and safety.  Through its analysis, Rockefeller Philanthropy Advisors has helped identify priority funding areas upon which the Foundation may immediately focus on once it is operational, such as:

a)    Enhancing access to affordable quality healthcare and healthcare related services, by reducing barriers to care, developing a healthcare workforce in rural areas and increasing health insurance enrollment;

b)    Addressing mental health and substance abuse issues through the treatment of opioid addiction, improving access to supportive housing and supporting education and awareness programs;

c)    Improving the overall health of communities, through a focus on improving neighborhood safety and air/water quality and increasing access to housing;

d)    Encouraging healthy behaviors, through nutrition, exercise, health-centric education and increasing access to recreation and healthy, beneficial food;

e)    Caring for aging populations, by supporting aging in place and promoting both independence and community connection;

f)    Addressing early infant and child health care, which will focus on promoting health in the first 1,000 days of life, in addition to providing support for abused and neglected children; and

g) More broadly, addressing the unmet healthcare and healthcare related needs (including Social Determinants of Health) of communities across New York State, in each case consistent with the Catholic values that have historically guided Petitioner.

174.   The foregoing major funding areas align with New York State public health funding priorities for serving disadvantaged populations and meeting their health and wellness needs.

175.   Rockefeller Philanthropy Advisors has assisted in developing a draft grantmaking strategy for the Foundation grounded in best practices of philanthropy and consistent with the Petitioner's current Grant Program.  In addition, Rockefeller Philanthropy Advisors has prepared draft program guidelines that outline grant criteria and eligibility standards for potential grantees. The guidelines specify reporting requirements on grantee progress through interim and final reports to Foundation.   A draft of the grantmaking strategy and guidelines is included in the Foundation's Grant Program Guide, a draft of which is attached hereto as Exhibit 45.

176.   The Foundation will not make any grants prior to receipt of its Internal Revenue Service determination letter recognizing its tax-exempt status.  Until that time, the Foundation will hold the Transaction proceeds in a segregated fund, to be used exclusively for administrative and operational start-up costs.

## THE TRANSACTION MEETS THE SECTION 511-A STANDARDS FOR APPROVAL

177.   Section 511-a(c) of the N-PCL states that a petition for the sale of substantially all of a corporation's assets should be approved where: (a) the consideration and the terms of the transaction are fair and reasonable to the corporation and (b) the purpose of the corporation or the interest of its members will be promoted by the sale.  The proposed Transaction meets both prongs of this test.

178.   The Transaction is fair, reasonable and beneficial to Petitioner, to Petitioner's current enrollees and to the broader New York community.  It involves fair consideration, assurance of continued healthcare in all sixty-two New York counties by one of the nation's

leading insurers and the creation of an expanded grantmaking program by Petitioner, dedicated to advancing healthcare for all poor, disadvantaged or underserved New Yorkers.

**The Terms of the Transaction are Fair and Reasonable**

179.    With respect to the first prong, in reaching their respective conclusions that the Purchase Price is fair and reasonable, Petitioner's Board of Directors and Members took into consideration, and relied upon, the independent Appraisal, as well as the information and knowledge obtained through a robust auction process involving highly-qualified potential and actual bidders and extensive arm's length negotiations with several bidders over the course of the past year.

180.    The terms of the Transaction were negotiated at arm's length with the assistance of independent legal counsel and financial advisors and are set forth in detail in the Purchase Agreement, whereby Petitioner agreed to sell to Centene substantially all of its assets.  As evidenced by the key terms of the Purchase Agreement and the Undertaking, Petitioner and Centene have a central objective: to facilitate a seamless transition before, during and after the Closing so that all of Petitioner's current enrollees will continue to have excellent health care coverage under Centene's leadership.

181.    Accordingly, in evaluating whether the consideration and the terms of the Transaction are fair and reasonable, Petitioner had the benefit of comparing three independent bona fide bids from sophisticated, financially qualified prospective purchasers for the acquisition of Petitioner's assets.  The terms of the Transaction are superior to the other two bids Petitioner received and the Purchase Price is greater than both (i) the high end of the range of the Appraisal and (ii) the purchase price offered by the other bidders in the auction.  Consequently, Petitioner hereby respectfully submits that the consideration and terms of the Transaction are fair and reasonable.

## The Sale Promotes the Purposes of Petitioner and the Interests of its Members

182.    With respect to the second prong of Section 511-a(c), the proposed Transaction promotes the mission and purposes of the Petitioner.

183.    The Transaction promotes the interests of the approximately 1.7 million individuals insured by Petitioner.  Through the Transaction, these individuals will have the support, investment and innovation provided by the nation's largest private insurer to vulnerable populations and government-sponsored insurance programs.  With Centene's scale, expertise and resources, New Fidelis Care will further enhance the well-being of these enrollees and improve the overall healthcare experience for both enrollees and providers for years to come.

184.    Further, under Section 511-a(c), it is unquestionable that the Transaction will promote the interests not only of Petitioner, but also of Petitioner's Members, the Diocesan Bishops of the State and Ecclesiastical Province of New York.  The Transaction will substantially advance the Members' historic charitable commitment to assisting the poor, underserved and most vulnerable within the Catholic tradition of healthcare, which is the very reason the Members had originally formed Petitioner.

185.    Finally, Petitioner's enrollees and the broader New York community at-large will reap the substantial benefits from this Transaction.  The Transaction will create a groundbreaking foundation, unlike any other in New York, dedicated to bolstering the health and wellness of Petitioner's enrollees and other vulnerable populations across New York State.  The Transaction provides New York with a historic opportunity to (i) improve access to affordable quality healthcare and healthcare related services and (ii) address the Social Determinants of Health and the unmet healthcare and healthcare related needs of New York's communities.

## APPROVAL OF TRANSACTION

186.    Petitioner convened a Special Meeting of the Board of Directors on September 7, 2017 for the purpose of considering the proposed Transaction involving the sale of substantially all of Petitioner's assets to Centene; specifically, whether to approve the Transaction and the latest version of the Purchase Agreement and to make a recommendation to the Members to approve the Transaction and the Purchase Agreement.  Written notice of the Special Meeting

was issued to the directors on September 2, 2017. Prior to the meeting, the most recent draft of the Purchase Agreement between Petitioner and Centene was distributed to the Board.

187.    The September 7, 2017 meeting took place at Petitioner's Rego Park offices. Eighteen directors participated (fourteen by telephone; four were present in person). Quorum for the meeting was satisfied.

188.    Of the eighteen Directors present, one was non-voting. In addition, certain executive staff, representatives of Citigroup, and outside counsel to Petitioner, were present.

189.    Citigroup made a presentation to the Board on the Transaction, including:

    a)    An overview of Transaction process;

    b)    A comprehensive review of Centene;

    c)    A description of the Transaction and its key terms; and

    d)    A financial summary

190.    A fairness opinion from Citigroup and a copy of the Appraisal report prepared by Navigant were distributed to the Board. Lastly, outside counsel made a presentation addressing various legal issues associated with the Transaction and the Purchase Agreement.

191.    Of the seventeen voting directors, fifteen were present for the vote (two directors left the meeting prior to the vote for other obligations). The fifteen voting directors unanimously voted to approve the Purchase Agreement. A copy of the September 7, 2017 minutes and resolutions approving the Transaction and the Purchase Agreement and recommending approval of the same to the Members, as certified by the Secretary, is attached hereto as Exhibit 46.

192.    Subsequent to September 7, 2017, Petitioner and Centene engaged in additional negotiations with respect to the Purchase Agreement. Accordingly, Petitioner convened a Special Meeting of the Board on September 12, 2017 for the purpose of ratifying the changes made to the Purchase Agreement. Written Notice of the Special Meeting was issued to the directors on September 12, 2017. The meeting took place via teleconference. Sixteen of nineteen directors participated, of which one was non-voting. Quorum for the meeting was

satisfied.  In addition, certain executive staff, representatives of Citigroup and outside counsel were present. During this September 12, 2017 meeting, outside counsel provided a presentation of the changes that had been made to the Purchase Agreement since the September 7, 2017 meeting.  The fifteen voting directors present voted to approve the Transaction and Purchase Agreement, as modified.  A copy of the September 12, 2017 minutes and resolutions approving the Transaction and the Purchase Agreement and recommending approval of the same to the Members, as certified by the Secretary, is attached hereto as Exhibit 47.

193.    Since each of these Board meetings was called on less than the 10 business days' notice as required pursuant to Section 8.04 of the By-Laws, Waivers of Notice were obtained from every director for each meeting.  A copy of the Waivers for each Board meeting is attached hereto as Exhibit 48.

194.    The Board then submitted their recommendation to the Petitioner's Members for approval.  The eight Members met telephonically on September 12, 2017 at a meeting duly called and voted unanimously to approve the Transaction.  A certified copy of the minutes is attached hereto as Exhibit 49.

195.    On April 4, 2018, Petitioner's Members met telephonically, at a meeting duly called, to discuss a variety of items, including the payment to the State described above, the reorganization of the Petitioner into two entities, the formation of the Foundation and the decision to transfer Petitioner's assets to the Foundation post-Closing.   The eight Members voted unanimously to approve these matters.  A certified copy of meeting minutes is attached hereto as Exhibit 50.

196.    On May 3, 2018, the Board met telephonically to discuss the status of the Transaction and approve the APA Amendment and Payment and Joinder Agreement, and authorize the transfer of assets and Transaction proceeds post-Closing to the Foundation.  Quorum for the meeting was satisfied.  The fifteen voting directors present at the meeting unanimously voted to approve the resolutions attached hereto as Exhibit 51.

197.    Since this Board meetings was called on less than the 10 business days' notice as required pursuant to Section 8.04 of the By-Laws, Waivers of Notice were obtained from every

director for the meeting.  A copy of the Waivers for each Board meeting is attached hereto as Exhibit 52.

## ADDITIONAL PROVISIONS

198.    The Foundation, as set forth in an agreement, the form of which is attached as Exhibit 53, agrees to provide the Attorney General with annual CHAR 500 reports as well as independently audited financial statements pursuant to Article 7-A of the Executive Law and Section 8-1.4 of the Estates, Powers and Trusts Law.

199.    Petitioner acknowledges that the Attorney General's office plans to submit the Verified Petition for public comment prior to Attorney General approval of the Transaction.

200.    Other than the offers of continued employment to be made by Centene as part of the Transaction as described above, no director, officer or key employee of Petitioner, will benefit financially or otherwise, either directly or indirectly, as a result of the Transaction. Additionally, no director, officer, or key employee of Petitioner has any relationship with a person or has any related party that will benefit financially or otherwise, either directly or indirectly, as a result of the Transaction.  Other than the annual company-wide three percent (3%) salary adjustment implemented each April, there have been no other increases in compensation for any key employees listed in the Form 990s since the last compensation review which took place in April 2017.  Petitioner does not offer any compensation which does not result in Form 990 reporting.

201.    No prior application for relief of this nature has been made by the Petitioner to the Attorney General or a court.

202.    The Petitioner is not insolvent, nor will it become insolvent as a result of the proposed Transaction, and no dissolution of Petitioner is contemplated.

203.    No persons or entities have raised, nor have a reasonable basis to raise, any objections to the proposed Transaction.

204.    No Vatican or other hierarchical approval of the Transaction is required.

205.    There is no pending litigation relating to the Transaction.

206.    The Transaction has been approved by all required government and regulatory agencies.

*[Remainder of Page is Intentionally Blank]*

WHEREFORE, Petitioner requests that the Attorney General approve the Asset Sale Agreement and the Transaction contemplated thereunder, including the sale of all or substantially all of the Petitioner's assets by New York State Catholic Health Plan, Inc. d/b/a Fidelis Care, a not-for-profit corporation pursuant to the Not-for-Profit Corporation Law Sections 510 and 511-a.

IN WITNESS WHEREFORE, the Petitioner has caused this Petition to be executed this seventh (7th) day of May, 2018 by

> NEW YORK STATE CATHOLIC
> HEALTH PLAN, INC.
>
> By: _Patrick J Frawley_
> Name: Rev. Patrick J. Frawley
> Title: Chief Executive Officer
>
>
> Filed and Submitted By:
>
> Jason R. Lilien, Esq.
> Loeb & Loeb LLP
> 345 Park Avenue
> New York, NY 10154

Verification

STATE OF NEW YORK          )
                           ) ss:
COUNTY OF QUEENS           )

Rev. Patrick J. Frawley, being duly sworn, deposes and says:

I am the Chief Executive Officer of New York State Catholic Health Plan, the corporation named in the above Petition, and make this verification at the direction of its Board of Trustees.  I have read the forgoing Petition and know the contents thereof to be true of my own knowledge, except those matters that are stated on information and belief and as to those matters I believe them to be true.

Rev. Patrick J. Frawley, Chief Executive Officer

Sworn to before me this
7th day of May, 2018

Notary Public

SANDRA RESHEF
NOTARY PUBLIC-STATE OF NEW YORK
No. 01RE6329033
Qualified in Queens County
My Commission Expires August 10, 2019

# Exhibit B

| | |
|---|---|
| **From:** | Stephens, Eric P. |
| **To:** | James Stang; Ball, Corinne |
| **Cc:** | Rosenblum, Benjamin; Butler, Andrew M.; Karen B. Dine; Brittany M. Michael; Geremia, Todd R. |
| **Subject:** | RE: Diocese of Rockville Centre |
| **Date:** | Monday, August 28, 2023 11:04:10 PM |

Jim, your email is not correct.

Two of the cases where the Committee sought to lift the PI and that have now been remanded to state court are against non-separately incorporated defendants. Those cases are:

Anonymous MWM v. St. Pius X Preparatory Seminary, Index No. 900289/2021
ARK457 Doe v. Holy Family et al, Index No. 900094/2021

As reflected in the notices of appearance in those cases, Jones Day represents Defendants: The Roman Catholic Diocese of Rockville Centre, New York f/d/b/a St. Pius X Preparatory Seminary and The Roman Catholic Diocese of Rockville Centre, New York f/d/b/a Holy Family Diocesan High School, respectively.

As is reflected in the state court records, we have been appearing before Judge Steinman on behalf of those defendants in those cases. As you probably know, Judge Steinman has been conferencing all of the remanded cases together.

As you should also know from the extensive briefing, factual development, and argument in connection with the preliminary injunction, it is all parties' (and, per a conference held earlier today, Judge Steinman's) expectation that the Diocese will be a significant source of document discovery in nearly all of the remanded cases. It should therefore come as no surprise to anyone that Judge Steinman has asked the Diocese and its counsel to take the lead on document related issues like a standard protective order in the cases where the Diocese is a defendant and those where it is not.

Of course, as we have already previewed with Judge Steinman in writing and during today's conference, in order to protect estate resources in the remanded cases where the Diocese is not a party, we will be seeking to have plaintiffs defray the costs, including reasonable attorneys fees, of any Diocese document productions pursuant to CPLR 3122(d) ("The reasonable production expenses of a non-party witness shall be defrayed by the party seeking discovery.")

Now that you have the facts, I hope that addresses any concern you might have.

Eric P. Stephens (bio)
**JONES DAY® - One Firm Worldwide℠**
250 Vesey Street
New York, NY 10281
Phone: (212) 326-3916
Fax: (212) 755-7306
epstephens@jonesday.com

**From:** James Stang <jstang@pszjlaw.com>
**Sent:** Monday, August 28, 2023 5:29 PM
**To:** Ball, Corinne <cball@JonesDay.com>
**Cc:** Rosenblum, Benjamin <brosenblum@JonesDay.com>; Butler, Andrew M.
<abutler@jonesday.com>; Karen B. Dine <kdine@pszjlaw.com>; Brittany M. Michael
<bmichael@pszjlaw.com>; Geremia, Todd R. <trgeremia@JonesDay.com>; Stephens, Eric P.
<epstephens@jonesday.com>
**Subject:** Diocese of Rockville Centre


Corinne,

We understand that Jones Day has been appearing in front of Judge Steinman. Who is
Jones Day representing in the state court proceedings in which the Diocese is not a
defendant and to whom is Jones Day billing its time?

Jim

Sent from my iPhone
***This e-mail (including any attachments) may contain information that is private,
confidential, or protected by attorney-client or other privilege. If you received this e-mail in
error, please delete it from your system without copying it and notify sender by reply e-mail,
so that our records can be corrected.***

# Exhibit C

GRANTED WITH MODIFICATIONS

EFiled: Nov 08 2023 01:53PM EST
Transaction ID 69470
Case No. 2023-1126-LWW

**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | |
|---|---|
| STATE OF DELAWARE ex rel. | ) |
| THE HONORABLE TRINIDAD | ) |
| NAVARRO, Insurance Commissioner | ) |
| of the State of Delaware, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) C.A. No. _____ |
| | ) |
| ARROWOOD INDEMNITY COMPANY, | ) |
| a Delaware Domestic Property & Casualty | ) |
| Insurance Company, | ) |
| | ) |
| Defendant. | ) |

## LIQUIDATION AND INJUNCTION ORDER WITH BAR DATE

WHEREAS, the Honorable Trinidad Navarro, Insurance Commissioner of the State

of Delaware (the "Commissioner"), has filed a verified complaint (the "Complaint") and

Motion seeking the entry of a Liquidation and Injunction Order with Bar Date (the

"Motion") concerning Arrowood Indemnity Company ("Arrowood"), pursuant to 18 *Del.

C.* § 5901, *et seq.*;

WHEREAS, the Receiver has provided the Court with evidence sufficient to support

the conclusion that Arrowood is insolvent, in an unsound condition, a condition that

renders its further transaction of insurance presently or prospectively hazardous to its

policyholders, and has consented to the entry of a Liquidation and Injunction Order with

Bar Date through a majority of the directors of the corporation;

WHEREAS, this Court finds that sufficient cause exists for the liquidation of Arrowood, pursuant to 18 *Del. C.* §§ 5905 and 5906 and for the entry of a Liquidation and Injunction Order with Bar Date ("Liquidation Order") concerning Arrowood; and

WHEREAS, a formal hearing on the Commissioner's Motion is not necessary due to Arrowood's consent to the relief requested by the Motion and Arrowood's waiver of formal service of process and a formal hearing on the Motion;

NOW, THEREFORE, THE COURT FINDS AND ORDERS AS FOLLOWS:

1.    The verified Complaint, including the exhibits thereto, contain sufficient evidence to support the conclusion that Arrowood is insolvent, in an unsound condition, and a condition that renders its further transaction of insurance presently or prospectively hazardous to its policyholders.  Because Arrowood has not contested the Complaint or the Motion and has consented to entry of the Liquidation Order, the allegations of the Complaint are deemed admitted as against Arrowood for purposes of this proceeding.

2.    These allegations are also supported by the exhibits to the Complaint filed contemporaneously with the Motion.

3.    As a separate and independent basis for entry of the Liquidation Order, evidence that all of the directors of Arrowood to the entry of the Liquidation Order has been attached to the Complaint and submitted in support of the Motion.

4.    Given the determination set forth above, a formal hearing on the Motion is

2

not necessary.

5.    Consequently, it is hereby declared that: Arrowood is insolvent, in an unsound condition, and in a condition that renders its further transaction of insurance presently or prospectively hazardous to its policyholders.  Therefore, sufficient cause exists for the liquidation of Arrowood pursuant to 18 *Del. C.* §§ 5905, 5906, and 18 *Del. C.* ch. 59 and for the entry of a Liquidation Order concerning Arrowood.

6.    Pursuant to 18 *Del. C.* § 5913(a), the Commissioner and his successors in office are hereby appointed as the receiver (hereinafter the "Receiver") of Arrowood.

7.    Pursuant to 18 *Del. C.* §§ 5911 and 5913, the Receiver shall forthwith take exclusive possession and control of the property of Arrowood, liquidate its business, and deal with Arrowood's property and business in the name of the Receiver or in the name of Arrowood.  Further, the Receiver shall be vested with all right, title, and interest in, of, and to the property of Arrowood including, without limitation, all of Arrowood's assets, contracts, rights of action, books, records, bank accounts, certificates of deposits, collateral securing obligations to, or for the benefit of, Arrowood or any trustee, bailee, or any agent acting for or on behalf of Arrowood (collectively, the "Trustees"), securities or other funds, and all real or personal property of any nature of Arrowood including, without limitation, furniture, equipment, fixtures, and office supplies, wherever located, and including such property of Arrowood or collateral securing obligations to, or for the benefit of, Arrowood or any Trustee thereof that may be discovered hereafter, and all proceeds of or accessions

3

to any of the foregoing, wherever located, in the possession, custody, or control of Arrowood or any Trustee therefore (collectively, the "Assets").

8.      The Receiver may, at his election, change to his own name as Receiver, the name of any of Arrowood's accounts, funds, or other Assets held with any bank, savings and loan association, or other financial institution, and may withdraw such funds, accounts, and other Assets from such institutions or take any other action necessary for the proper conduct of this liquidation.

9.      The Receiver is further authorized to take such actions as the nature of this cause and interests of the policyholders, creditors, and stockholder of Arrowood and the public may require in accordance with 18 *Del. C.* ch. 59.

10.     The Receiver is hereby authorized to deal with the Assets, business, and affairs of Arrowood including, without limitation, the right to sue, defend, and continue to prosecute suits or actions already commenced by or for Arrowood, or for the benefit of Arrowood's policyholders, creditors, and shareholders in the courts, tribunals, agencies, or arbitration panels for this State and other states and jurisdictions in his name as Receiver of Arrowood, or in the name of Arrowood.

11.     The Receiver is hereby authorized to continue to make payments for medical expenses and indemnity for workers compensation claimants and for medical expenses and wage/income loss for motor vehicle claimants, and for medical expense and wage/income loss payments under similar programs, including but not limited to the Federal Black Lung

4

program, until such time as the claims files are transferred to the applicable guaranty association and the guaranty association begins making payments to the claimant.

12.      The Receiver is hereby vested with the right, title, and interest in and to all funds recoverable under treaties and agreements of reinsurance heretofore entered into by Arrowood as the ceding insurer or as the assuming insurer, and all reinsurance companies involved with Arrowood are enjoined and restrained from making any settlements with any claimant or policyholder of Arrowood other than with the express written consent of the Commissioner as Receiver, except as permitted by cut-through agreements or endorsements which were issued to the policyholder, which were properly executed before the date of this Order, which comply in all respects with 18 *Del. C.* § 914, as amended by 72 Del. Laws c. 405, and which were approved by the Delaware Insurance Department if such approval was required.  The amounts recoverable by the Receiver from any reinsurer of Arrowood shall not be reduced or diminished as a result of this receivership proceeding or by reason of any partial payment or distribution on a reinsured policy, contract, or claim, and each such reinsurer of Arrowood is hereby enjoined and restrained from terminating, canceling, failing to extend or renew, or reducing or changing coverage under any reinsurance policy, reinsurance contract, or letter of credit.  The Receiver may terminate or rescind any reinsurance policy or contract that is contrary to the best interests of the receivership.

13.      All persons or entities (other than the Receiver or persons acting on behalf of

Arrowood with the consent of the Receiver) that have in their possession or control Assets

or possible Assets and/or have notice of these proceedings or of this Order are hereby

enjoined and restrained from transacting any business of, or on behalf of, Arrowood or

selling, transferring, destroying, wasting, encumbering, or disposing of any of the Assets,

without the prior written permission of the Receiver or until further Order of this Court.

This prohibition includes, without limitation, Assets or possible Assets pertaining to any

business transaction between Arrowood and any of said parties.  No actions concerning,

involving, or relating to such Assets or possible Assets may be taken by any of the aforesaid

persons or entities enumerated herein, without the express written consent of the Receiver,

or until further Order of this Court.

14.    All persons or entities having notice of these proceedings or of the Liquidation

Order are hereby enjoined and restrained from exercising or relying upon any contractual

right which would permit such third party or parties from withholding, failing to pay,

setting-off or netting, except pursuant to 18 *Del. C.* § 5927, or taking similar action with

respect to any obligations owed to Arrowood.

15.    All persons or entities having notice of these proceedings or of the Liquidation

Order are hereby enjoined and restrained from commutating, terminating, accelerating or

modifying any policy of insurance, agreement of reinsurance, or other contract or

agreement, or asserting a default or event of default or otherwise exercising, asserting or

relying upon any other right or remedy, based upon: (1) the filing of the Complaint for Entry

6

of Liquidation and Injunction Order with Bar Date, (2) the entry of this Liquidation Order,

(3) the unsound or hazardous condition of Arrowood, (4) the impairment or insolvency of

Arrowood; or (5) the facts and circumstances set forth in the Complaint for Entry of

Liquidation and Injunction Order with Bar Date, without the prior written permission of

the Receiver or until further Order of this Court.

16.     Except as otherwise indicated elsewhere in this Order or except as excluded

by express written notice provided by the Receiver, all persons or entities holding Assets or

possible Assets of, or on behalf of, Arrowood shall file with the Receiver within ten (10)

calendar days of the entry of this Order an accounting of those Assets and possible Assets,

regardless of whether such persons or entities dispute the Receiver's entitlement to such

Assets.

17.     Except as otherwise indicated elsewhere in this Order or except as excluded

by express written notice provided by the Receiver, all persons or entities holding Assets or

possible Assets of, or on behalf of, Arrowood, shall within ten (10) calendar days of the entry

of this Order turn those Assets or possible Assets over to the Receiver, regardless of whether

such persons or entities dispute the Receiver's entitlement to such Assets or possible Assets.

18.     All persons and entities that have notice of these proceedings or of this Order

are hereby prohibited from instituting or further prosecuting any action at law or in equity

or in other proceedings against Arrowood, the Receiver, the Deputy Receiver(s), or the

Designees in connection with their duties as such, or from obtaining preferences, judgments,

7

attachments, or other like liens or encumbrances, or foreclosing upon or making any levy against Arrowood or the Assets, or exercising any right adverse to the right of Arrowood to or in the Assets, or in any way interfering with the Receiver, the Deputy Receiver(s), or the Designees either in their possession and control of the Assets or in the discharge of their duties hereunder.

19.    All persons and entities are hereby enjoined and restrained from asserting any claim against the Commissioner as Receiver of Arrowood, the Deputy Receiver(s), or the Designees in connection with their duties as such, or against the Assets, except insofar as such claims are brought in the liquidation proceedings of Arrowood and in a manner otherwise compliant with this Order.

20.    All persons or entities that have notice of these proceedings or of this Order are hereby enjoined and restrained from instituting or further prosecuting any action at law or in equity, or proceeding with any pretrial conference, trial, application for judgment, or proceedings on judgment or settlements and such action at law, in equity, special, or other proceedings in which Arrowood is obligated to defend a party insured or any other person it is legally obligated to defend by virtue of its insurance contract for a period of 180 days from the date hereof.  Notwithstanding the foregoing injunction, at any time during the 180-day period, the Receiver may at his discretion, when he deems it appropriate and in the best interest of the Arrowood estate, its policyholders or creditors, consent to allow any such proceeding or proceedings so enjoined to proceed.

8

21.    All insurance policies, surety bonds, and contracts of insurance  issued by Arrowood, whether issued in the State of Delaware or elsewhere, in effect as of the date of this Liquidation Order shall only continue in force until the earlier of the following events:  (i) the stated expiration or termination date and time of the insurance policy, surety bond, or contract of insurance; (ii) the effective date and time of a replacement insurance policy, surety bond, or contract of insurance of the same type issued by another insurer regardless of whether the coverage is identical coverage; (iii) the effective date and time that the Arrowood insurance policy, surety bond, or contract of insurance obligation is transferred to another insurer or entity authorized by law to assume such obligation; or (iv) the cancellation and termination for all purposes of the insurance policy, surety bond, or contract of insurance at 12:01 a.m. on the thirtieth (30th) calendar day from the date of this Order pursuant to Paragraph 22 below.

22.    Except for those insurance policies, surety bonds, or contracts of insurance which expire or are cancelled, terminated, or transferred earlier as set forth in Paragraph 21(i) through (iii) above, all insurance policies, surety bonds, or contracts of insurance issued by Arrowood, whether issued in the State of Delaware or elsewhere, in effect as of the date of this Liquidation Order, are hereby cancelled and terminated for all purposes as of 12:01 a.m. on the thirtieth (30th) calendar day following the date of this Liquidation Order.  For purposes of this paragraph, even if the thirtieth (30th) calendar day following the date of this Liquidation Order is a Saturday, Sunday, or holiday, the insurance policy,

9

surety bond, or contract of insurance shall be cancelled and terminated as of 12:01 a.m.

on the thirtieth (30th) calendar day following the date of this Liquidation Order.  The

Receiver shall notify promptly all policyholders, principals, or obligees as applicable of

such policy, surety bond, or contract cancellation and termination by United States first

class mail at the last known address of such policyholders, principals or obliges.

23.    Pursuant to 18 *Del. C.* § 5924, the rights and liabilities of Arrowood and of

its creditors, policyholders, principals, obligees, claimants, stockholders, members,

subscribers, and all other persons interested in its estate shall, unless otherwise directed

by the Court, be fixed as of the date of this Liquidation Order, subject to the provisions

of Chapter 59 of Title 18 of the Delaware Code with respect to the rights of claimants

holding contingent claims.

24.    ANY AND ALL CLAIMS NOT FILED WITH THE RECEIVER ON OR

BEFORE THE CLOSE OF BUSINESS ON **JANUARY 15, 2025** (THE "BAR DATE") SHALL

BE BARRED FROM CLASSES II THROUGH VI AS THOSE CLASSES ARE DEFINED IN

18 *DEL. C.* §§ 5918(e)(2) THROUGH (e)(6) AND SHALL NOT RECEIVE ANY

DISTRIBUTIONS FROM THE GENERAL ASSETS OF THE ESTATE OF ARROWOOD

UNLESS AND UNTIL ASSETS BECOME AVAILABLE FOR A DISTRIBUTION TO

CLASS VII CLAIMANTS AS DEFINED IN 18 *DEL. C.* § 5918(e)(7).  THIS BAR DATE

SHALL SUPERSEDE ANY APPLICABLE STATUTES OF LIMITATIONS OR OTHER

STATUTORY OR CONTRACTUAL TIME LIMITS WHICH HAVE NOT YET EXPIRED

WHETHER ARISING UNDER DELAWARE LAW, UNDER THE APPLICABLE LAWS OF ANY OTHER JURISDICTION, OR UNDER A CONTRACT WITH ARROWOOD BUT SHALL ONLY APPLY TO CLAIMS AGAINST ARROWOOD IN THE LIQUIDATION PROCEEDINGS AND DOES NOT APPLY TO, AND EXCLUDES, CLAIMS BROUGHT BY ARROWOOD.  ALL CLAIMANTS SHALL ATTACH TO SUCH PROOF OF CLAIM DOCUMENTATION SUFFICIENT TO SUPPORT SUCH CLAIM.   FOR NON-CONTINGENT CLAIMS, THE FILED CLAIMS SHALL NOT BE REQUIRED TO BE LIQUIDATED AND ABSOLUTE ON OR BEFORE THE BAR DATE SET FORTH HEREIN.

25.     CONTINGENT AND UNLIQUIDATED CLAIMS THAT ARE PROPERLY FILED WITH THE RECEIVER IN ACCORDANCE WITH THIS ORDER SHALL ONLY BE ELIGIBLE TO SHARE IN A DISTRIBUTION OF THE ASSETS OF ARROWOOD IN ACCORDANCE WITH 18 *DEL. C.* § 5928.

26.     Within sixty (60) calendar days after the date of this Order, or as soon as possible after an interested party or potential creditor subsequently becomes known to the Receiver, the Receiver shall serve a copy of this Liquidation Order, a Notice of Liquidation substantially in the form appended to the Motion as Exhibit C, a Proof of Claim Form substantially in the form appended to the Motion as Exhibit D, and the Instructions for the Proof of Claim Form substantially in the form appended to the Motion as Exhibit E, on all interested parties, all known potential creditors, all current and former

11

stockholders of Arrowood, all former Board members of the Arrowood, its third party adjusters, its managing general underwriters, its brokers, its agents, its reinsurer(s), and any reinsurance intermediaries, all other known vendors, all state insurance guaranty associations providing coverage for the lines of business written by Arrowood, and all State Insurance Commissioners by United States first class mail, postage prepaid, provided that in the Receiver's discretion such notice may be mailed instead by United States first class certified mail, return receipt requested, or other United States mail providing proof of mailing, to such interested party or potential creditor's last known address in the company's files.

27.     Within thirty (30) calendar days after the date of this Order, the Receiver shall also publish this Liquidation Order, the Notice of Liquidation, Proof of Claim Form, and the Instructions to the Proof of Claim Form on the Delaware Department of Insurance website at the link referred to in Exhibit "E" to the Motion.

28.     Pursuant to the provisions of 18 *Del. C.* §§ 5904(b) and 5928(c), no judgment against Arrowood and/or one or more of its insureds taken after the date of this Liquidation Order shall be considered in the liquidation proceedings as evidence of liability or of the amount of damages, and no judgment against Arrowood and/or one or more of its insureds taken by default or by collusion prior to the effective date of the Liquidation Order shall be considered as conclusive evidence in the liquidation proceedings, either of the liability of Arrowood and/or one or more of its insureds to such

12

person or entity upon such cause of action or of the amount of damages to which such person or entity is therein entitled.

29.    The Receiver shall submit claim Recommendation Reports to the Court within a reasonable time after the Receiver's investigation concerning all claims submitted by a particular claimant has been completed.

30.    The Receiver will file reports of receipts and disbursements with the Court on an annual basis in a form consistent with past practice in receiverships.

31.    The filing or recording of this Order or a certified copy hereof with the Register in Chancery and with the recorder of deeds of the jurisdiction in which Arrowood's corporate and administrative offices are located or, in the case of real estate or other recorded property interests, with the recorder of deeds of the jurisdictions where the property is located, shall impart the same notice as would be imparted by a deed, bill of sale, or other evidence of title duly filed or recorded with that recorder of deeds.  Without limiting the foregoing, the filing of this Order with the Register in Chancery also constitutes notice to all sureties and fidelity bondholders of Arrowood of all potential claims against Arrowood under such policies and shall constitute the perfection of a lien in favor of Arrowood under the Uniform Commercial Code or any like Federal or state law, regulation, or order dealing with the priority of claims.

32.    The Receiver is hereby authorized to transfer some or all of Arrowood's Assets and liabilities to a separate affiliate or subsidiary for the overall benefit of

Arrowood's policyholders, creditors, and shareholders, subject to approval by this Court.

33.     The Receiver may, in his discretion, reject any executory contract to which Arrowood is a party.

34.     The Receiver may, in his discretion, appoint one or more consultants or other persons to serve as Deputy Receiver to assist the Receiver in accomplishing the directives of this Order.  The Deputy Receiver(s) shall serve at the pleasure of the Receiver and, subject to the approval of the Receiver, shall be entitled to exercise all of the powers and authorities vested in the Receiver pursuant to this Order and applicable law.

35.     The Receiver may employ or continue to employ and fix the compensation of such deputies, counsel, clerks, employees, accountants, actuaries, consultants, assistants and other personnel (collectively, the "Designees") as considered necessary, and all compensation and expenses of the Receiver, the Deputy Receiver(s) and the Designees and of taking possession of Arrowood and conducting this proceeding shall be paid out of the funds and assets of Arrowood as administrative expenses.  The Receiver may also retain those of Arrowood's current management personnel and other employees as Designees as he in his discretion determines would facilitate the liquidation of Arrowood.  All such Designees shall be deemed to have agreed to submit disputes concerning their rights, obligations, and compensation in their capacity as Designees to this Court.

36.     The Receiver, the Deputy Receiver(s), and the Designees (collectively, the "Indemnitees") shall have no personal liability for their acts or omissions in connection with

14

their duties, provided that such acts or omissions are or were undertaken in good faith and

without willful misconduct, gross negligence, or criminal intent.  All expenses, costs, and

attorneys' fees incurred by the Indemnitees in connection with any lawsuit brought against

them in their representative capacities shall be subject to the approval of the Receiver, except

that in the event that the Receiver is the Indemnitee, this Court's approval shall be required,

and such expenses, costs, and attorneys' fees shall be exclusively paid out of the funds and

assets of Arrowood.  The Indemnitees in their capacities as such shall not be deemed to be

employees of the State of Delaware.

37.    Hereafter the caption of this cause and all pleadings in this matter shall read

as:


"IN THE MATTER OF THE LIQUIDATION
OF ARROWOOD INDEMNITY COMPANY."


38.    This Court shall retain jurisdiction in this cause for the purpose of granting

such other and further relief as this cause, the interests of the policyholders, creditors,

stockholder of Arrowood, and the public may require.  The Receiver, or any interested party

upon notice to the Receiver, may at any time make application for such other and further

relief as either sees fit.

SO ORDERED this _____ day of _____, 2023.


_____
Vice Chancellor

This document constitutes a ruling of the court and should be treated as such.

| | |
|---|---|
| **Court:** | DE Court of Chancery Civil Action |
| **Judge:** | Lori W. Will |
| **File & Serve Transaction ID:** | 71343102 |
| **Current Date:** | Nov 08, 2023 |
| **Case Number:** | 2023-1126-LWW |
| **Case Name:** | State of Delaware ex rel. The Honorable Trinidad Navarro v. Arrowood Indemnity Company |
| **Court Authorizer:** | Lori W. Will |

**Court Authorizer Comments:**

As set forth in the stipulation at docket entry 8, the relief sought in the motion and the facts supporting the motion are uncontested. The directors of the defendant have agreed to the relief sought in this liquidation order. Accordingly, the order is granted as unopposed.

**/s/ Judge Lori W. Will**

# Exhibit D

| | |
|---|---|
| **From:** | Brittany M. Michael |
| **To:** | Stephens, Eric P.; Geremia, Todd R. |
| **Cc:** | James Stang; Karen B. Dine |
| **Subject:** | DRVC: Dispute Notice under Protective Order |
| **Date:** | Thursday, November 16, 2023 7:51:31 PM |

Eric and Todd,

This email is sent in accordance with the Confidentiality Agreement and Protective Order Between the Debtor and Official Committee of Unsecured Creditors (Docket No. 320) (the "Protective Order").  Capitalized terms used and not otherwise defined are as defined in the Protective Order.

In accordance with paragraph 3 of the Protective Order, the Committee disputes the designation of the CVA Claim Documents, as produced to the Committee, as Confidential Information and requests that such documents no longer be designated as Confidential Information.  Please let us know as soon as possible, but no later than 10 business days following this request, whether you agree that the CVA Claim Documents are no longer designated Confidential Information.

Many thanks,
Brittany


**Brittany M. Michael**
Pachulski Stang Ziehl & Jones LLP
Tel: 212.561.7700 | Cell: 310.488.8144
bmichael@pszjlaw.com
V-Card | Bio

Los Angeles | San Francisco | Wilmington, DE | New York | Houston

# Exhibit E

Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 20-12345-mg

4    Adv. Case No. 20-01226-mg

5    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

6    In the Matter of:

7

8    THE ROMAN CATHOLIC DIOCESE OF ROCKVILLE CENTRE, NEW YORK,

9

10           Debtor.

11   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

12   THE ROMAN CATHOLIC DIOCESE OF ROCKVILLE CENTRE, NEW YORK,

13              Plaintiff,

14         v.

15   ARK 320 DEO, et al.,

16              Defendants.

17   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

18

19              United States Bankruptcy Court

20              One Bowling Green

21              New York, NY  10004

22

23              April 19, 2023

24              9:00 AM

25

Page 2

1    B E F O R E :

2    HON MARTIN GLENN

3    U.S. BANKRUPTCY JUDGE

4

5    ECRO:    KEVIN SU & F. FERGUSON

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 3

1   HEARING re Adversary proceeding: 20-01226-m  The Roman

2   Catholic Diocese of Rockville Centre, Nev. ARK 320 DOE,

3   et al.

4   Hybrid Hearing RE: Motion For Preliminary Injunction Under

5   Sections 362 And I 05(A) Of The Bankruptcy  Code. (related

6   document(s)167, 168, 126 to 135, 147, 148, 157, 158, 161 to

7   177, 179 to 192)The Parties anticipate that an evidentiary

8   hearing on the Motion will be set for two days on April 19

9   and April 20, 2023, with an extra day reserved on April 21,

10  2023. The evidentiary hearing will start at 9:00 AM (EST)

11  each day. Unless the Court determines otherwise, the hearing

12  will be conducted as a hybrid hearing and the parties and

13  witnesses may appear in person or by Zoom.

14

15

16

17

18

19

20

21

22

23

24

25   Transcribed by:  Sonya Ledanski Hyde

Page 4

```
 1   A P P E A R A N C E S :

 2

 3   JONES DAY LLP

 4        Attorneys for the Debtor

 5        51 Louisiana Avenue

 6        Washington, DC 20001

 7

 8   BY:  CHRIS DIPOMPEO

 9

10   PACHULSKI STANG ZIEHL & JONES LLP

11        Attorneys for Official Committee of Unsecured Creditors

12        780 Third Avenue, 34th Floor

13        New York, NY 10017

14

15   BY:  KENNETH H. BROWN

16        IAIN A.W. NASATIR

17        GAIL S. GREENWOOD

18

19   ALSO PRESENT TELEPHONICALLY:

20   CHARLES J. ADAMS

21   JASON P. AMALA

22   JEFFREY R. ANDERSON

23   JESSE BAIR

24   CORINNA BALL

25   KENNETH H. BROWN
```

Page 5

1    JOHN BUCHEIT

2    ANDREW BUTLER

3    LA ASIA S. CANTY

4    JOHN DALY

5    JENNIFER L. DEL MEDICO

6    CHRISTOPHER DIPOMPEO

7    KAREN B. DINE

8    TODD GEREMIA

9    GAIL S. GREENWOOD

10   JOSHUA T. HOYT

11   ANN V. KRAMER

12   MICHELLE MCMAHON

13   STUART S. MERMELSTEIN

14   MIKE MISKELL

15   JAMES MOFFITT

16   CHARLES MOORE

17   KAREN MORIARTY

18   NURLAN ORUJLU

19   KENNETH F. PORTER

20   WILLIAM P. QUARANTA

21   BENJANMIN ROSENBLUM

22   ANDREW SILVERSHEIN

23   THOMAS R. SLOME

24   ERIK SORENSEN

25   JAMES I. STANG

Page 6

```
 1   ERIC PETER STEPHENS

 2   PATRICK STONEKING

 3   CATALINA SUGAYAN

 4   CHRISTOPHER A. ZEPF

 5   BRIAN R. DAVEY

 6   KAREN MORIARTY

 7   MALLORY C. ALLEN

 8   GEORGE CALHOUN

 9   EMILY CHARLTON

10   ANGELA CIPOLLA

11   SYDNEY E. CODD

12   MITCHELL GARABEDIAN

13   TRUSHA GOFFE

14   UDAY GORREPATI

15   WILLIAM C. HEUER

16   JAMES N. HULME

17   BRITTANY MITCHELL MICHAEL

18   SIOBHAIN PATRICIA MINAROVICH

19   JOHN G. REFIOR

20   CHELSIE WARNER

21   MATTHEW WILLIAMS

22   CHARLIE B. D'ESTRIES

23   ELIZABETH CATE

24   ARIELLE FELDSHON

25   CHARLOTTE ACHELAIS SCHERER
```

Page 196

1                    MR. STEPHENS:  Thank you, Your Honor.

2                    MS. DEL MEDICO:  I am going to hand Mr. Stephens a

3       copy of his direct.

4                    THE COURT:  Please.  Thank you.

5                    MS. DEL MEDICO:  And it's at 180 in the binder.

6                    THE WITNESS:  Thank you.

7                    MS. DEL MEDICO:  You're welcome.

8                       DIRECT EXAMINATION OF ERIC STEPHENS

9       BY MS. DEL MEDICO:

10      Q    Good afternoon, Mr. Stephens.

11      A    Good afternoon.

12      Q    Mr. Stephens, how long have you been acting as counsel

13      for the Debtor?

14      A    Since either January or February of 2019.

15      Q    And my question was imprecise.  How long have you been

16      representing the Diocese?

17      A    Yes.  So my involvement with the Diocese began in

18      January or February of 2019, right around the time that the

19      Child Victims Act was being signed into law.

20      Q    And what type of work did you do for the Diocese during

21      that time, January 2019 up until the time of this

22      bankruptcy?

23      A    So I helped assemble and lead the state court

24      litigation team that was responsible for appearing in and

25      defending on behalf of the Diocese all of the Child Victims

Page 197

1   Act complaints that were filed against the Diocese across

2   the state.

3   Q    And these were complaints where the Diocese was a named

4   defendant, is that right?

5   A    That's correct.

6   Q    And could you tell a little bit -- describe a little

7   bit more of the tasks that you did with respect to discovery

8   in those actions.

9   A    Sure.  So just for the Court's reference, roughly 90

10  percent of the cases against the Diocese were filed in

11  Nassau and Suffolk counties.  The rubric that the State has

12  put in place for the CVA actions is to appoint regional

13  parts for the CVA actions.  And so the cases in Nassau and

14  Suffolk have been appointed to a single regional part that

15  was originally presided over by Justice Jaeger, now being

16  presided over by Justice Steinman.  That was where the bulk

17  of the diocesan cases were.

18      And so among the first tasks we undertook as litigation

19  counsel was to make an effort to impose some order and some

20  structure.  And we filed motions seeking to consolidate and

21  coordinate cases against the Diocese in Judge Jaeger's part.

22      That motion was denied in part and granted in part.

23  And so the individual cases did not end up coordinated or

24  consolidated.  There was no coordinated or consolidated

25  docket.  But the court did approve some uniform discovery

Page 198

1    requests that were proposed by a liaison counsel of

2    plaintiffs as well as a liaison counsel of defendants who

3    were in those cases.

4        My memory is that around about 50 or 60 prepetition

5    cases got to the point where those uniform discovery

6    requests were exchanged and responded to.  The Diocese had

7    begun making document productions in response to those

8    uniform requests, but some significant discovery disputes

9    arose, particularly around the scope of discovery and the

10   permissible scope of discovery.  And those issues were being

11   briefed not in any formal, consolidated way, but in a

12   loosely-coordinated way at the time of the bankruptcy.

13       Also pre-bankruptcy in those cases -- again, and I'm

14   talking about the 9th and 10th regional district.  The

15   Diocese had filed motions to dismiss in a similar number of

16   cases.  Again, those motions were all individually-briefed,

17   individually decided.  The Diocese I believe had received

18   decisions in about 40 of those cases, some of which then

19   resulted in appeals to the Second Department, one of which

20   resulted in a complete dismissal, but largely paired the

21   claims back to the types of negligence claims that Mr.

22   DiPompeo and Mr. Brown addressed in their opening.

23            And then just so I don't leave it out, the other

24   ten percent of the -- roughly ten percent of the cases were

25   assigned or filed in the New York City regional part.  Those

Page 199

1   have not made any material progress because the city --

2   there was a regional part for all five boroughs.

3   Prepetition, they had taken longer, frankly, to come up with

4   liaison counsel, pattern discovery requests, and a form

5   protective order.  And so by the time of the diocesan

6   bankruptcies, I don't believe there was even final approval

7   in the city cases.  And so those cases had not even

8   progressed to the extent that the Nassau and Suffolk cases

9   had progressed.

10          THE COURT:  During the opening statements this

11  morning, I asked questions about discovery on the notice

12  issue, which is not directly involved here.  But can you

13  tell me what documents or information the Diocese produced

14  before the bankruptcy with respect to notice issues?

15          THE WITNESS:  Sure.  So in the -- in response to

16  the pattern of discovery requests that I referenced and in

17  those roughly 50 or 60 cases, the Diocese provided

18  interrogatory responses in response to interrogatories

19  directed at that specific abuser.  In response to those

20  interrogatories, the Diocese provided information about that

21  individual's assignment history, including other individuals

22  who the Diocese was able to determine from personnel records

23  worked alongside.  So other potential witnesses, for

24  example.

25          The diocese then also produced the underlying

Page 200

1    documents.  So there were what our client would refer to as

2    priest cards, which then list the assignment history for

3    that individual priest.  The diocese also produced parish

4    cards, which is sort of the inverse of a priest card, which

5    is a list of assignment history within the parish.  But the

6    diocese had not begun its production of personnel files.  So

7    it was -- my recollection on the evidence or the documents

8    that would have been produced on the notice-type issue would

9    have been those interrogatory responses and then the

10   underlying priest and parish cards.

11            THE COURT:  And then after the Chapter 11 case was

12   filed, did the diocese produce to the Committee further

13   information regarding -- I'll broadly categorize it as the

14   notice issue?

15            THE WITNESS:  Yes, yes.  And so in connection with

16   the stipulation that was discussed earlier this morning, the

17   Diocese, in connection with the Chapter 11, has produced to

18   the Committee the complete personnel file of every

19   individual who has been accused of abuse by either a CVA

20   plaintiff or a claimant with a POC to the extent that those

21   are different.  There were, however, a number of individual

22   accused for whom the Diocese did not have a file.

23            THE COURT:  I referenced -- and I didn't bring a

24   copy of the document out, but in the grand jury report that

25   was done, there were references -- I don't know whether it

Page 201

```
1    used the term secret files.  I think it did.  Was an effort

2    made to determine whether the Diocese had any files other

3    than these cards, other than personnel files that related to

4    issues of alleged abuse by priests or other employees of

5    parishes or the Diocese?

6              THE WITNESS:  Sure.  So if you'll allow me, I'll

7    give you a two-part answer.

8              THE COURT:  Please.

9              THE WITNESS:  Our client doesn't use the term

10   secret files.  That's not our nomenclature --

11             THE COURT:  And I don't mean --

12             THE WITNESS:  No, no.  And -- no, but I also want

13   to make sure that I'm clearly addressing the Court's

14   question.

15             However, it is correct that personnel files are

16   divided into parts.  And there is what our client would

17   refer to as a confidential portion of the personnel files

18   that would include the type of notice evidence that Your

19   Honor has asked about.  And those -- the complete personnel

20   file, including those portions, have bene produced in

21   connection with the Chapter 11.

22             With respect to your question about other types of

23   files, the Diocese production in this matter also includes

24   files from the Office of Child Protection.  So that includes

25   policies, procedures, those sorts of records as well.
```

```
 1              THE COURT:  Okay.  Thanks very much.  Go ahead

 2      with your question.

 3      BY MS. DEL MEDICO:

 4      Q    Mr. Stephens, how -- you mentioned the documents that

 5      were produced in this bankruptcy.  Over what period of time

 6      were those documents produced?

 7      A    I believe we sent a letter to the Committee talking

 8      about substantial completion in July of 2022.  So roughly 18

 9      months.  Well, excuse me.  It took us some time to get a

10      protective order in place.  So 18 months is probably the

11      right ball park, but...

12      Q    And you -- are you familiar with the state court

13      litigations in which the Diocese is not named as a

14      defendant?

15      A    I am familiar with the complaints that have been filed

16      in those cases.

17      Q    And was there any activity with respect to discovery in

18      any of those cases prior to the bankruptcy?

19      A    No, no.  And those cases had not been filed.  And then

20      once they were filed, they were immediately stayed.

21      Q    Okay.  Mr. Stephens, if the Diocese isn't a defendant

22      in those cases, why would there be any burden on the Diocese

23      in connection with those cases?

24      A    To the extent that those cases go forward, the Diocese

25      is in possession of the documents that I've just described
```

Page 203

1    for Your Honor.  And this was an issue prepetition as well.

2    Based on the contentions in the state court, it's my

3    understanding that the Diocese is largely, at least as the

4    parishes would argue, the exclusive source, for example,

5    personnel files and the like.  And so my understanding is

6    there will be a tremendous third-party discovery burden just

7    to gather the basic evidence.  My understanding from my

8    review of the complaints in the post-petition cases is those

9    allegations cannot be adjudicated in any meaningful way

10   without the records of the Diocese.

11           THE COURT:  Was there a document depository,

12   physical and electronic, that was created with respect to

13   the documents that were gathered?

14           THE WITNESS:  So all of the documents that we have

15   produced to the Committee we have provided electronically.

16   Our collection efforts included physical files which were

17   then digitized.

18   BY MS. DEL MEDICO:

19   Q    Couldn't you just give all those documents to the state

20   court claimants?

21   A    No, no.  In my view, no.  And this was among the

22   discovery issues that was teed up before the bankruptcy on

23   the scope of discovery.  And I apologize.  There are a

24   number of points I would like to make.  I think there's a

25   confidentiality concern, and then I think there's also a

Page 204

1    practical concern.  So certainly from a confidentiality

2    perspective, in this case there was a court order redaction

3    protocol that was in place to protect survivors based on a

4    concern that the records would reflect the names of

5    survivors who are claimants in these matters and in the CVA

6    and also those who are not.  And so there was a concern

7    about outing people who weren't even involved in this

8    process.  So we agreed to a redaction protocol which we then

9    modified for mediation.

10       In order to produce these records in state courts, one,

11   there are no -- there's no agreed redaction protocol in

12   state court and there's no protective orders in place in any

13   of those cases.  And so those issues will have to be sorted

14   out.  But even then, it will need to be a case-by-case,

15   plaintiff-by-plaintiff redaction effort so that we are not

16   outing one survivor to another.  So there is a threshold --

17            THE COURT:  You haven't reviewed documents related

18   to 226 cases, the number.  Is that an insurmountable task?

19   I mean, this is not thousands of cases.  This is not 30,000

20   asbestos cases.  This is hundreds.

21            THE WITNESS:  So certainly, Your Honor, it's not

22   an insurmountable task.  It's been done.  It will have to be

23   redone at the expense and at the time and individually

24   certainty.  And that's just from a survivor perspective.

25   And then there would also be the additional burden --

Page 205

1              THE COURT:  If a protective order of the same

2     basic terms was agreed to in state court as what was put in

3     place here, why would that additional -- including

4     redactions and all that.  I mean, all of the secret cases,

5     the names are redacted.

6              THE WITNESS:  That's right.  That's right.  But in

7     these cases, in order, for example, to litigate the notice

8     issues -- let's say you have the Smith case.

9              THE COURT:  Sure.  I understand.  If there was

10    alleged abuse before, there was the name of somebody who was

11    allegedly abused.

12             THE WITNESS:  Precisely.  So I guess the Smith

13    case would require different redactions than the Robinson

14    case would require different, than the Stephens case I think

15    is the --

16             THE COURT:  But we're talking about 226 cases or

17    thereabouts.  Right?  We're not talking about thousands.

18    We're talking about a finite number of -- what's the volume

19    of documents?

20             THE WITNESS:  So the total volume of documents

21    produced in a Chapter 11 to date is about 3 million pages.

22             THE COURT:  No, just -- there's a lot of financial

23    information.  And I want to drill down to abuse claims.

24             THE WITNESS:  I would want to look that number up

25    so I could answer the Court with precision.  But I agree

1   that overall number includes a lot of financial information

2   in this case.

3           THE COURT:  Overwhelmingly.  Overwhelmingly.

4           THE WITNESS:  So it's some subset of that.

5           THE COURT:  How big is a typical personnel file?

6   How many pages?

7           THE WITNESS:  I couldn't give a rule of thumb.

8   Some are very thin and some are more substantial.

9           THE COURT:  Go ahead.

10  BY MS. DEL MEDICO:

11  Q    And, Mr. Stephens, during your work as a lawyer for the

12  Diocese, are there individuals at the Diocese who you have

13  worked with on a consistent basis?

14  A    Yes, yes.  So certainly from taking direction from the

15  Diocese in the state court litigations, that comes from the

16  chief counsel and operating officer, Mr. Renker.  Certainly

17  on the risk and claim type issues I've worked very closely

18  with Bill Chapin.  On the financial issues, I've worked very

19  closely with Tom Doodian and his staff.  And then on the

20  document issues, I've also -- on the collection and

21  digitization efforts, I've worked very closely with the

22  chancellor of the Diocese, Sister Maryanne Fitzgerald.  The

23  Diocese also has an archivist by the name of Krista Ammirati

24  who has worked very closely with us.  And then as the

25  allegations and discovery on child protection have come in,

Page 207

```
 1    I've also worked very closely with the head of child

 2    protection, Mary McMahon.

 3              MS. DEL MEDICO:  Your Honor, we would like to

 4    introduce into evidence or submit into evidence the direct

 5    testimony of Mr. Stephens.

 6              THE COURT:  All right.  Does it have any docket

 7    number?

 8              MS. DEL MEDICO:  180.

 9              THE COURT:  Okay.  Any objection?

10              MR. BROWN:  Same as the other two, Your Honor.

11              THE COURT:  All right.  It's admitted into

12    evidence subject to any later objections that the Court has

13    to address.

14              MS. DEL MEDICO:  And we would like to tender the

15    witness over to -- for cross-examination.

16              THE COURT:  Great.  Thank you.  Cross-examination.

17                 CROSS-EXAMINATION OF ERIC STEPHENS

18    BY MR. BROWN:

19    Q    Good morning, Mr. Stephens -- or afternoon, Mr.

20    Stephens.  Afternoon.  Okay.

21         So Diocese has produced and collected millions of pages

22    of information to the Committee during the bankruptcy,

23    right?

24    A    Yes.

25    Q    And those productions included all documents that would
```

Page 208

1    otherwise be produced to the plaintiffs in the underlying

2    CVA actions, correct?

3    A    Yes.

4    Q    And in your view, did anything other than privileged

5    documents get withheld?

6    A    No, I'm not aware of anything that was withheld other

7    than on the grounds of privilege.

8    Q    And the documents included insurance policies,

9    financial information, and financial statements?

10   A    Yes.

11   Q    And the Diocese produced the files of all the alleged

12   abusers' disciplinary records, laicization documents, and

13   confidential --

14            THE COURT:  What's that?

15            MR. BROWN:  Pardon me?

16            THE COURT:  What is that?

17   BY MR. BROWN:

18   Q    What are laicization documents?

19   A    My understanding is documents related to laicization,

20   rejoining the laypeople, so leaving the religious life.  But

21   to answer the broader question, yes, all of those records

22   were collected and produced.

23   Q    Confidential or secret files consisting of portions of

24   the personnel files that were maintained by the bishop,

25   those were also produced, correct?

Page 209

```
 1    A    The confidential portions of the personnel files were

 2    collected and produced.  That's correct.

 3    Q    And if there was a file for an alleged abuser, it was

 4    produced, correct?

 5    A    That's correct.

 6    Q    And the Diocese also produced very detailed financial

 7    information, including the financial information of certain

 8    of its affiliates and parishes, correct?

 9    A    Correct.

10    A    The -- in the adversarial with Arrow Wood, special

11    insurance counsel is leading that effort.  I have certainly

12    assisted them in their discovery efforts.  I'm not sure I

13    would -- I certainly didn't have the same leadership role

14    that I have had --

15    Q    Okay.

16    A    -- in the Chapter 11 or the state board actions.

17    Q    Is it correct to say that if the -- I think we're now

18    at 223 if I'm -- of the 223 state court actions to which the

19    Diocese is not a party, if those actions are allowed to

20    proceed, there are no other categories of documents that

21    you're aware of that remain to be collected in connection

22    with those actions?

23    A    That's correct.  I'm not aware of additional documents

24    that would need to be collected.

25    Q    Okay.  Mr. Moore testified that if the state court
```

Page 210

1    actions go forward, that the Diocese would be required to

2    collect additional financial information regarding the

3    parishes.  Do you recall that testimony?

4    A    I heard that testimony.

5    Q    Okay.  In connection with the stipulation to extend the

6    injunction, I think it's Exhibit P, and it's a -- I think

7    you testified to it, and at Paragraph 10 of your direct

8    testimony you reference the exhibit which -- it's

9    Plaintiff's Exhibit P for today and also Docket 59 in the

10   adversary proceeding.  And your testimony is in return for

11   the Committee's agreement to extend the preliminary

12   injunction, the Diocese agreed to produce documents that

13   would otherwise be produced to the Plaintiffs in the

14   underlying CDA actions.  Non-controversial, right?  I just

15   -- everything was produced.

16           THE COURT:  You have to answer audibly.

17           THE WITNESS:  I wasn't sure I had the question

18   yet, but --

19   BY MR. BROWN:

20   Q    No, no.  You know, I'm just getting -- staying

21   background for --

22           THE COURT:  Well, it sounded like a question.  And

23   if it's a question, it needs an audible answer.

24           MR. BROWN:  Okay.

25           THE COURT:  If it's not a question --

Page 211

```
 1            MR. BROWN:  Not a question yet.

 2            THE COURT:  Okay.

 3            MR. BROWN:  Okay?

 4   BY MR. BROWN:

 5   A    Good.  I didn't think there was one.  I was nodding

 6   along with you.

 7   Q    Okay.

 8   A    I was reading along with you.

 9   Q    So the parish -- was the parish financial information

10   produced in connection with the stipulation?

11   A    My recollection of the parish productions in this case

12   is that they were made in connection with the mediation, and

13   then also in response to various discovery disputes about

14   parish information that came up along the way that are

15   reflected on the docket.  My -- I would put financial

16   information largely to the side given my understanding, for

17   example, of the limitations on the financial discovery

18   that's available in state court prior to a judgment.

19   Q    Right.  That's what I'm getting at.  Do you recall that

20   there were significant limitations on the production of

21   financial information regarding the parishes at the

22   insistence of the parishes because of their position that

23   there were limitations on the production of financial

24   information prejudgment in state court litigation?

25   A    Yes, I remember that issue coming up --
```

1    Q    Okay.

2    A    -- in this case a number of times.

3    Q    So it's correct that the parishes have previously taken

4    the position that you don't get our financial information en

5    masse prejudgment.

6    A    I think that's a fair description of the --

7    Q    Okay.

8    A    -- early 2004 discovery disputes.

9    Q    Okay.

10   A    Or at least of the issue.  The issue.

11   Q    So it's your understanding of the parish's position

12   that the parish financial information doesn't need to be

13   produced until and unless there's a judgment.

14   A    I can't speak for the parishes.  I can only, you know,

15   speak to their positions as reflected in those discovery

16   disputes.

17   Q    And that is the position that they took in the

18   discovery disputes, correct?

19   A    I'd have to go back to their pleadings, but among the

20   basis for their objections to that discovery, I do believe

21   that was one.

22   Q    Okay.  Thank you.  So looking at Paragraph 34 of your

23   written testimony, Mr. Stephens, you testify pursuant to an

24   order of the Regional CDA Part for the Ninth and Tenth

25   Judicial Districts Nassau and Suffolk Counties, the Diocese

Page 213

1    and its co-Defendants were subject to standardized discovery

2    requests in connection with the pre-petition state court

3    actions --

4    A    I see that testimony.

5    Q    -- pending in those judicial districts.  Okay.  So

6    you're referring to a case management order entered by Judge

7    Jager in November of 2019, are you?

8    A    It was certainly a Judge Jager order.  That timing

9    sounds roughly correct.

10          MR. BROWN:  Could we put up Plaintiff's Rebuttal

11   Exhibit AA?

12   BY MR. BROWN:

13   Q    And if I could approach you, Mr. Stephens.

14   A    Thank you.

15   Q    I believe this is the case management order.  Oh, yeah.

16   Mr. Stephens, can I ask is this the order that you're

17   referring to in Paragraph 34?

18   A    Yes, and it's also the order that I was describing to

19   His Honor earlier today.

20   Q    Okay.  And this, we'll call it the Case Management

21   Order for purposes of this testimony, it was entered to

22   achieve coordination of the state court actions and to avoid

23   undue burdens of the litigation.  I think that's what the

24   language of the order says.

25   A    I'm -- I see words to that effect under Heading 2,

1    Objectives of --

2    Q    Yeah.

3    A    -- This Order.

4    Q    Yeah.  And did the Diocese seek and obtain this order

5    in the state court actions?

6    A    Yes.  This order was entered in response to a motion

7    that was brought by the Diocese.

8    Q    Okay.  And this order only applies to cases to which

9    the Diocese is a party, correct?

10   A    Yes.  Yeah.  By its terms at the top there, it is only

11   applicable where the Diocese of Rockville Center --

12   Q    Okay.

13   A    -- is a named party Defendant.  I would also add it's

14   only applicable in this regional part.

15   Q    Okay.

16   A    So for example, it does not apply in the New York City

17   Regional Part that I described earlier.

18   Q    And no such order has been entered with respect to any

19   of the 223 cases to which the Diocese is not a party because

20   those cases have been stayed, correct?

21   A    That's my understanding.  That's correct.

22   Q    Okay, but you're not aware of any reason why a similar

23   order couldn't be issued with respect to those cases in the

24   courts in which they're pending, are you?

25   A    Well, this order came about on the motion of the

Page 215

```
 1   Diocese and was granted over the objection of a number of

 2   Plaintiff's counsel.  So I don't know -- in the 220 cases

 3   where the Diocese is not a party, I don't know that there's

 4   a Defendant with the will, the resources, or the motivation

 5   to try to bring about a similar order.  And our experience,

 6   at least with this order, was that the Plaintiff's counsel

 7   resisted it.  So if you're asking do I -- you know, what do

 8   I know about the likelihood of an order like this in the 228

 9   or the 223, I don't expect a similar order.  This was

10   something that my client had to fight for in order to get

11   entered.

12   Q    Okay.  Okay.  So you've also stated that the Diocese

13   was the repository for the overwhelming majority of

14   documents relevant to the state court actions.

15   A    Yes.

16   Q    And that includes the personnel files, the assignment

17   cards for the abusers, which were produced to the Committee

18   during the bankruptcy, correct?

19   A    Yes, those are among the categories of documents.

20   Q    And the Diocese maintains centralized files for all

21   abusers, right?

22   A    The Diocese has personnel files, but there are a number

23   of accused, for example, who are not diocesan.  So no, I

24   would not agree that the Diocese maintains centralized

25   abuser files.  That --
```