**Hearing Date and Time: February 12 at 12:00 p.m. (Prevailing Eastern Time)**
**Objection Date and Time: February 7 at 5 p.m. (Prevailing Eastern Time)**

PACHULSKI STANG ZIEHL & JONES LLP
James I. Stang, Esq. (admitted *pro hac vice*)
Iain A. W. Nasatir, Esq.
Karen B. Dine, Esq.
Brittany M. Michael, Esq.
780 Third Avenue, 36th Floor
New York, New York 10017
Telephone:     (212) 561-7700
Facsimile:     (212) 561-7777
Email:         jstang@pszjlaw.com
               inasatir@pszjlaw.com
               kdine@pszjlaw.com
               bmichael@pszjlaw.com

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br>THE ROMAN CATHOLIC DIOCESE OF<br>ROCKVILLE CENTRE, NEW YORK,<br>Debtor. | Chapter 11<br>Case No. 20-12345 (MG) |

**MOTION FOR FURTHER DISCLOSURE AND RESPONSE TO DECLARATION OF**
**ERIC P. STEPHENS**

The Official Committee of Unsecured Creditors (the "Committee") of The Roman Catholic

Diocese of Rockville Centre, New York (the "Diocese" or the "Debtor") in the above-captioned

case (the "Case"), through its undersigned counsel, submits this motion (the "Motion") for an order

requiring further disclosure and discovery related to the Diocese's document review and

production process and responding to the Declaration of Eric Stephens [Docket No. 2836] (the

"Stephens Declaration"). The Committee requests the relief outlined at the end of the Motion (the

"Investigation Relief") to enlighten the Committee and the Court as to the depth of the deficiencies

with the Diocese's production of CVA documents to the Committee.

1.   **The Diocese's Multiple Representations Regarding the Completeness of Its Productions**

Frequent issues with discovery in this Case resulted in an off-the-record chambers conference with Judge Chapman in the April 2022.[1]  As a result of that conference, the Diocese agreed to "complete its responses to the Committee's Requests" "no later than May 31, 2022."[2]

At the hearing on the Diocese's motion for a preliminary injunction in April 2023, the Diocese and its professionals repeatedly reasserted the completeness of the production of CVA documents. Specifically, Mr. Stephens testified that "the Diocese, in connection with the Chapter 11, has produced to the Committee *the complete* personnel file of *every* individual who has been accused of abuse by either a CVA plaintiff or a claimant with a POC to the extent that those are different. There were, however, a number of individual accused for whom the Diocese did not have a file."[3] Mr. Stephens further clarified, upon the Court's questions regarding the Diocese's secret files, that "the complete personnel file, including those portions, have bene [sic] produced in connection with the Chapter 11."[4] Finally, in response to questioning by the Committee, Mr. Stephens confirmed that he was not "aware of anything that was withheld other than on the grounds of privilege"[5] and that "all the alleged abusers' disciplinary records, laicization documents, and confidential [documents] were collected and produced."[6]  Finally, Mr. Stephens

---

[1] Committee Letter to the Court dated March 28, 2022 [Docket No. 1043] ("The completeness of the Diocese's responses are suspect.").

[2] Stipulation and Order dated April 11, 2022 [Docket No. 1067].

[3] Transcript of April 19, 2023 Hearing, attached as Exhibit C, at 200:16-22 (emphasis added); *see also Id.* 13:8-9 ("Last July, just after the diocese finished its final production of CVA merits materials. . . ."); *id.* at 31:10-12 ("But I know from talking to Mr. Stephens we believe we produced every file, every personnel file.").

[4] *Id.* at 201:19-21.

[5] *Id.* at 208:6-7.

[6] *Id.* at 208: 11-22.

**Hearing Date and Time:  February 12 at 12:00 p.m. (Prevailing Eastern Time)**
**Objection Date and Time:  February 7 at 5 p.m. (Prevailing Eastern Time)**

stated that he was "not aware of additional documents that would need to be collected" if the state court actions proceeded.[7]

In conjunction with the Eighth Omnibus Objection, the Diocese represented that "[t]here is not otherwise any supported allegation or indication that the Diocese was aware, prior to the alleged abuse, that the alleged perpetrator was likely to engage in such conduct."[8]  At a hearing subsequent to the Court's decision on the Eighth Omnibus Objection, certain claimants' counsel raised concerns about the completeness of the potential notice documents previously produced, and therefore likely relied on for the Diocese's representations in the Eighth Omnibus Objection. In response to such concerns, Mr. Stephens protested against the need for any additional searches, stating "what I don't want this to turn into is an extensive frolic and detour into additional collections and requests when the parties have been operating from a place where for a year now, you know, we've understood that these records are complete. So clearly, the 10-day process that I've proposed, or that the debtor is proposing, you know, would need to, you know, would not accommodate, you know, frankly a do-over of what was years' long, you know, collection, review, and production process."[9]

Ultimately, the Court instructed the Diocese to certify "on the scope of the search that's been made."[10]  Only once instructed to make such a certification—and not prior to the Diocese's numerous, previous, adamant representations that all relevant files had been produced with no need for additional searches—did the Diocese locate in one day seven files that it had previously

---

[7] *Id.* at 209 17 – 24; *see also id.* at 216:19 – 21 ("But to the extent that the name of the accused showed up in the diocesan personnel files, it was produced.").
[8] *The Debtor's Eighth Omnibus Claims Objections* [Docket No. 1730-1] p. 13 of 32; *see also The Debtor's Thirteenth Omnibus Claim Objections* [Docket No. 2149].
[9] Transcript of May 16, 2023 Hearing, attached as Exhibit D, 45:6 – 14.
[10] *Id.* 50:21 – 22.

not located in the "years long collection, review, and production process."[11]  Additionally, the

Diocese located two files that, although previously located and added to counsels' electronic

database, had neither been produced nor reviewed prior to any of those repeated representations.

In total, the Diocese reviewed less than 75% of the files relevant to the objection (twenty-four

out of thirty-three) before attesting to the lack of notice evidence.  The Committee remains

unaware what percentage of the Diocese's other files are missing despite numerous

representations of the completeness of the Diocese's productions.

## 2.    The Unproduced Files Were Not Hidden or Missing

Attached as Exhibit B is a true and correct copy of the transcript of a deposition of the

Diocese's archivist taken in a state court matter. The Stephens Declaration and archivist's

testimony tell two very different stories.  The Diocese's archivist outlines a very simple process

for obtaining files related to an alleged perpetrator from the Diocese's archive:

1.    All personnel files are organized by the name of the former employee.[12]

2.    To locate a file, the archivist need only search her database for the name.[13]

3.    In a matter of minutes, the archivist can retrieve a file based on location
      indicated in her database.[14]

According to the archivist's testimony, it is also clear that absent finding a file by name, there is

no other way to locate relevant documents amidst the five rooms of files that she manages.[15]  The

process described by the archivist is binary: either she locates a file based on the name she is

provided or she does not.  There is no grey area in which archivist could conduct a "follow up

---

[11] Stephens Declaration, paras. 26 – 28.
[12] *See* Ex. B, Transcript of Deposition of Diocese Archivist, at 15:1–16:20; 22:3–9.
[13] *Id.*
[14] *Id.*
[15] *Id.*

search[] for personnel files"[16] and find something different than she found for a previous search. Thus, here, archivist was either (1) previously asked for the file and found it based on the perpetrator's name and such file was subsequently withheld or (2) she was only asked for the file on or after May 31, 2023. The archivist testimony does not indicate an alternative scenario.

But the Stephens Declaration tells a very different story. The declaration glosses over the process actually undertaken by the Diocese to collect the relevant documents, stating broadly that Mr. Stephens and his team at Jones Day worked with the Diocese "including its Chancery, General Counsel's office, Office of Child Protection, Risk Department, and Archives" to gather the relevant documents.[17] Mr. Stephens does not, however, certify that his team asked the archivist for every perpetrator's file during the initial almost two years of productions.   And the archivist's

The archivist's testimony makes clear that any search for personnel-related documents should have required her to search the archive for each Alleged Abuser's (defined below) name.

The Stephens Declaration then proceeds to only vaguely describe how additional documents were discovered. First, Mr. Stephens carefully choses his language, noting that his team merely "searched the Debtor's electronic database" in making its representation to the Court that "[t]here is not otherwise any supported allegation or indication that the Diocese was aware, prior to the alleged abuse, that the alleged perpetrator was likely to engage in such conduct."[18]  Such a process and the ability to make such a representation relies on his team having sufficiently built the electronic database with all relevant documents, which was clearly not the case.

---

[16] Stephens Decl., at para. 25.
[17] *Id.* at para. 6.
[18] *Id.* at paras. 26 – 27.

**Hearing Date and Time:  February 12 at 12:00 p.m. (Prevailing Eastern Time)**
**Objection Date and Time:  February 7 at 5 p.m. (Prevailing Eastern Time)**

After over two years of prolonged discovery with the Committee, after multiple representations of the completeness of its document production, after taking the extraordinary step of objecting to claims – which not only cost time and money but caused significant emotional turmoil for the survivors subjected to the process  – and after representing to the Court that it had reviewed all relevant documents, only when the Diocese was being asked to certify the completeness of its efforts does it appear that the Diocese took the simple step of asking the archivist to locate the relevant files using the name of the perpetrator.

### 3.  The Diocese's Continued Failure to Notify of and Produce the "Newly Discovered" Documents

Rather than immediately notifying the Court and the parties that, despite earlier statements, additional documents had been discovered, the Diocese attempted to avoid drawing attention to its misrepresentations.  Contrary to its assertion that the Diocese "disclosed that additional files had been located," the Diocese's June 2023 letter only states that it would "include *any*" additional files in its production.[19] Nothing in the letter states that the Diocese had found previously undisclosed entire files for almost one-third of the at-issue perpetrators. Nothing in the letter even confirms that a single additional document had *actually* been found, only the possibility that additional documents *might be* included, hidden amongst the entire dump the Diocese intended to provide to the claimants' counsel.

Further, while the Diocese tries to hide behind the stagnation of their discussions with claimants' counsel as an excuse for its failure to admit to the existence and extent of the additional files, that does not account for why the Diocese made no efforts to alert the Committee that it had found files it had previously represented to the Committee did not exist. Nor did the

---

[19] *Id.* Ex. A, pg 15 of 36, fn. 2 (emphasis added).

**Hearing Date and Time:  February 12 at 12:00 p.m. (Prevailing Eastern Time)**
**Objection Date and Time:  February 7 at 5 p.m. (Prevailing Eastern Time)**

Diocese apparently replicate the steps that miraculously turned up these additional files for the other perpetrators for which it had previously attested to having produced all relevant files. In fact, when the Committee heard of the production of files in state court that had not previously been produced in the bankruptcy, the Debtor denied the existence of such documents. In an email from Mr. Stephens dated December 18, 2023, Mr. Stephens stated: "To be clear, we have not identified any CVA documents that are to be produced in the state court litigations that were not previously produced to the Committee. Indeed, our review in connection with the state court subpoenas is only a few days old since subpoenas were being served until December 8. Of course, if we do identify truly 'new' CVA documents, we'll provide them to the Committee along with an explanation for why they were not previously identified as CVA documents."[20]  The Committee has still not received the newly discovered documents (despite now repeated requests) nor has it received an "explanation for why they were not previously identified as CVA documents."

Finally, the Diocese took no steps to alert the Court to the changed circumstances that impacted its representations on which the Court relied on in ruling on the Eighth Omnibus Objection.  The Diocese has also remained silent on whether additional, previously unperformed diligence may impact its assertions in other omnibus objections regarding the Diocese's historic relationship to other entities and any agreements regarding liabilities with the Diocese of Brooklyn at the Diocese's creation.[21]

---

[20] A true and correct copy of the email from Mr. Stephens to Ms. Dine on December 18, 2023 is attached as Exhibit E.

[21] *See The Debtor's Fifth Omnibus Objection* [Docket No. 1655]; *Declaration of Thomas G. Renker* [Docket No. 1656]; *The Debtor's Sixth Omnibus Claim Objections* [Docket No. 1677]; *Declaration of Thomas G. Renker* [Docket No. 1678]; *The Debtor's Ninth Omnibus Objection to Claims that Pre-Date the Existence of the Debtor as a Religious Corporation* [Docket No. 1744]; *Declaration of Thomas G. Renker in Support of Debtor's Ninth Omnibus Claims Objection* [Docket No. 2029]; *Debtor's Sixteenth Omnibus Objection to Claims Previously Disallowed, With Leave to Amend, Pursuant to Order on Debtor's Sixth Omnibus Objection to Claims* [Docket No. 2372].

**Hearing Date and Time:  February 12 at 12:00 p.m. (Prevailing Eastern Time)**
**Objection Date and Time:  February 7 at 5 p.m. (Prevailing Eastern Time)**

The Stephens Declaration does not satisfy concerns about the Diocese's due diligence and productions and raises more questions than it answers. The Committee therefore requests a Court order, substantially similar to the one attached as Exhibit A, requiring:

1. A representation, or representations if such statements must come from different qualified individuals, to the below facts, including the factual basis for why the Diocese believes the declarant has personal knowledge and a sufficient foundation to attest to the matters in their declaration. Specifically, the Diocese must represent that:

   - The Diocese has now produced all records in its possession regarding every individual alleged in a proof of claim filed in this Chapter 11, regardless of whether that claim has been subsequently disallowed, to have committed abuse (the "Alleged Abusers") and has identified any withheld or redacted records on a privilege log;

   - The Diocese has now produced all records in its possession that may indicate that an Alleged Abuser abused a child;

   - The Diocese has reviewed the production for each Alleged Abuser and certifies that no other documents relating to that individual were ever in its possession. To the extent that there is any correspondence, employment information, memoranda, or other records that are not within the production, the Diocese shall so state, including its position on why it believes such documents are missing;

   - Either (i) the production of documents in the Diocese's possession, custody, or control related to the Alleged Abusers is complete; or (ii) there are no documents in the Diocese's possession, custody, or control that related to a given Alleged Abuser;

   - The Diocese has reviewed all documents relevant to the creation of the Diocese and communications between the Diocese of Brooklyn and Rockville Centre in the 1950s and 1960s and certifies that no documents relating to the creation of the Diocese or any agreements among the two dioceses during that time period exist. To the extent that there are any correspondence, memoranda, or other records that exist but are not in the Diocese possession, custody, or control, the Diocese shall so state, including its position on why it believes such documents are missing;

   - Either (i) the production of documents in the Diocese's possession, custody, or control related to the creation of the Diocese and agreements between the Diocese of Brooklyn and the Diocese of Rockville Centre is complete; or (ii) there are no documents in the Diocese's possession, custody, or

**Hearing Date and Time: February 12 at 12:00 p.m. (Prevailing Eastern Time)**
**Objection Date and Time: February 7 at 5 p.m. (Prevailing Eastern Time)**

control that relate to the creation of the Diocese and agreements between the Diocese of Brooklyn and the Diocese of Rockville Centre; and

- Any potential destruction or loss of documents in the past twenty years.

2. A declaration *detailing* the below, including the factual basis for why the Diocese believes the declarant has personal knowledge and a sufficient foundation to attest to the matters in their declaration. For the avoidance of doubt, the declaration should be as specific as possible.

- The process that was followed to collect and electronically scan documents in connection with CVA documents, including from whom documents were collected, the search parameters and instructions given to those custodians, and the dates such requests were made.

- The process that was followed to collect and electronically scan documents in connection with the creation of the Diocese and agreements between the Diocese of Brooklyn and the Diocese of Rockville Centre, including from whom documents were collected, the search parameters and instructions given to those custodians, and the dates such requests were made.

- All documents relied on in Mr. Renker's declarations[22] regarding the Diocese's relationship to non-debtor entities and any efforts Mr. Renker undertook to understand the historic relationship between the Diocese and the relevant entity at the time of the abuse as opposed to during his tenure at the Diocese.

- The physical locations that have been searched for information regarding each Alleged Abuser and other CVA records in connection with the Chapter 11, including the locations identified in the index, inventory or similar record utilized by the Diocese and the date(s) searched.

- The physical locations that have *not* been searched for information regarding each Alleged Abuser and other potential CVA documents.

3. The immediate production of the following:

- The archivist's log of access to the documents in the archive;[23]

- The archivist's database, in native format;[24]

---

[22] *Declaration of Thomas G. Renker* [Docket No. 1656]; *Declaration of Thomas G. Renker* [Docket No. 1678].
[23] *See* Ex. B, at 27:6-12, 48:13-21.
[24] *Id.*, at 13: 11-23.

**Hearing Date and Time:  February 12 at 12:00 p.m. (Prevailing Eastern Time)**
**Objection Date and Time:  February 7 at 5 p.m. (Prevailing Eastern Time)**

- Any other index, inventory or similar record maintained by the Diocese, including, but not limited to the Chancellor's office and the Bishop's office regarding potential CVA documents;

- All additional CVA documents not previously produced to the Committee;

- All email communications with the archivist requesting the search of files for productions in this bankruptcy or the underlying state court actions; and

- The file of the parish, school, camp or other related entity at which any allegations of abuse occurred.[25]

4. The deposition of the Diocese's archivist and chancellor.

## CONCLUSION

In addition to the cost to the Debtor's estate, the Diocese's claims objections had a significant human toll.  Despite the Diocese's portrayal of claims in this case as a data point on a graph, each objected to claimant is a human-being who no party disputes suffered horrific atrocities in his or her childhood. Before an individual is told that he or she was the Diocese's one free sexual abuse pass before the Diocese had a legal obligation to protect future children from that specific individual, the Diocese should have been absolutely certain that its representation of the facts was accurate.  Instead, the Diocese's cavalier approach to discovery and the claims objections has potentially caused unnecessary additional trauma to individuals who have already suffered extreme harm.  The Committee therefore respectfully requests the ability to fully understand the degree of litigation gamesmanship that occurred here in order to seek relief appropriate to attempt to recompense survivors, as fully remedying the emotional damage is impossible, the harm caused.

---

[25] *Id.*, at 30:24-25.

**Hearing Date and Time:  February 12 at 12:00 p.m. (Prevailing Eastern Time)**
**Objection Date and Time:  February 7 at 5 p.m. (Prevailing Eastern Time)**

Dated:    February 2, 2024                PACHULSKI STANG ZIEHL & JONES LLP


*/s/ Karen B. Dine*
James I. Stang, Esq.
Iain Nasatir, Esq.
Karen B. Dine, Esq.
Brittany M. Michael, Esq.
780 Third Avenue, 36th Floor
New York, NY  10017-2024
Telephone: 212/561-7700
Facsimile: 212/561-7777
jstang@pszjlaw.com


*Counsel for the Official Committee of Unsecured Creditors*

**EXHIBIT A**

PACHULSKI STANG ZIEHL & JONES LLP
James I. Stang, Esq. (admitted *pro hac vice*)
Iain A. W. Nasatir, Esq.
Karen B. Dine, Esq.
Brittany M. Michael, Esq.
780 Third Avenue, 36th Floor
New York, New York 10017
Telephone:    (212) 561-7700
Facsimile:    (212) 561-7777
Email:        jstang@pszjlaw.com
              inasatir@pszjlaw.com
              kdine@pszjlaw.com
              bmichael@pszjlaw.com

*Counsel for the Official Committee*
*of Unsecured Creditors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br>THE ROMAN CATHOLIC DIOCESE OF<br>ROCKVILLE CENTRE, NEW YORK,<br>Debtor. | Chapter 11<br>Case No. 20-12345 (MG) |

**[PROPOSED] ORDER GRANTING MOTION OF THE OFFICIAL COMMITTEE OF**
**UNSECURED CREDITORS FOR FURTHER DISCLOSURE**

4884-1841-0914.1 18491.002

Upon consideration of the *Motion of the Official Committee of Unsecured Creditors for Further Disclosure* [Docket No. ___] (the "<u>Motion</u>"),[26] filed by the Official Committee of Unsecured Creditors (the "<u>Committee</u>") pursuant to Sections 105 of the Bankruptcy Code, for further disclosure and discovery related to the Diocese's document review and production process and upon a hearing having been held before the Court on _____, 2024 (the "<u>Hearing</u>") to consider the relief requested in the Motion; and appearances of all interested parties having been noted on the record of the Hearing; and upon all of the proceedings had before this Court; and it appearing that this matter is a core proceeding pursuant to 28 U.S.C. § 157(b); and this Court having determined that the relief requested in the Motion is in the best interest of the Debtor, its estate, its creditors, and other parties-in-interest; and it appearing that proper and adequate notice of the Motion has been given under the circumstances and that no other or further notice is necessary; and after due deliberation thereon; and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED**,

1.      The Motion is GRANTED;

2.      All objections to the Motion or the relief requested therein, if any, that have not been withdrawn, waived, or settled, and all reservations of rights included therein, are overruled;

3.      Within ten (10) days of entry of this Order, the Diocese must file a representation, or representations if such statements must come from different qualified individuals, to the below facts, including the factual basis for why the Diocese believes the declarant has personal knowledge and a sufficient foundation to attest to the matters in their declaration. Specifically, the Diocese must represent that:

   a) The Diocese has now produced all records in its possession regarding every individual alleged in a proof of claim filed in this Chapter 11,

---

[26] Capitalized terms used and not otherwise defined herein have the meaning ascribed thereto in the Motion.

regardless of whether that claim has been subsequently disallowed, to have committed abuse (the "<u>Alleged Abusers</u>") and has identified any withheld or redacted records on a privilege log;

b)   The Diocese has now produced all records in its possession that may indicate that an Alleged Abuser abused a child;

c)   The Diocese has reviewed the production for each Alleged Abuser and certifies that no other documents relating to that individual were ever in its possession. To the extent that there is any correspondence, employment information, memoranda, or other records that are not within the production, the Diocese shall so state, including its position on why it believes such documents are missing;

d)   Either (i) the production of documents in the Diocese's possession, custody, or control related to the Alleged Abusers is complete; or (ii) there are no documents in the Diocese's possession, custody, or control that related to a given Alleged Abuser;

e)   The Diocese has reviewed all documents relevant to the creation of the Diocese and communications between the Diocese of Brooklyn and Rockville Centre in the 1950s and 1960s and certifies that no documents relating to the creation of the Diocese or any agreements among the two dioceses during that time period exist. To the extent that there are any correspondence, memoranda, or other records that exist but are not in the Diocese possession, custody, or control, the Diocese shall so state, including its position on why it believes such documents are missing;

f)   Either (i) the production of documents in the Diocese's possession, custody, or control related to the creation of the Diocese and agreements between the Diocese of Brooklyn and the Diocese of Rockville Centre is complete; or (ii) there are no documents in the Diocese's possession, custody, or control that relate to the creation of the Diocese and agreements between the Diocese of Brooklyn and the Diocese of Rockville Centre; and

g)   Any potential destruction or loss of documents in the past twenty years.

4.       Within ten (10) days of entry of this Order, the Diocese must file a declaration *detailing* the below, including the factual basis for why the Diocese believes the declarant has personal knowledge and a sufficient foundation to attest to the matters in their declaration. For the avoidance of doubt, the declaration should be as specific as possible.

3

a) The process that was followed to collect and electronically scan documents in connection with CVA documents, including from whom documents were collected, the search parameters and instructions given to those custodians, and the dates such requests were made.

b) The process that was followed to collect and electronically scan documents in connection with the creation of the Diocese and agreements between the Diocese of Brooklyn and the Diocese of Rockville Centre, including from whom documents were collected, the search parameters and instructions given to those custodians, and the dates such requests were made.

c) All documents relied on in Mr. Renker's declarations[27] regarding the Diocese's relationship to non-debtor entities and any efforts Mr. Renker undertook to understand the historic relationship between the Diocese and the relevant entity at the time of the abuse as opposed to during his tenure at the Diocese.

d) The physical locations that have been searched for information regarding each Alleged Abuser and other CVA records in connection with the Chapter 11, including the locations identified in the index, inventory or similar record utilized by the Diocese and the date(s) searched.

e) The physical locations that have *not* been searched for information regarding each Alleged Abuser and other potential CVA documents.

5.      Within ten (10) days of entry of this Order, the Diocese must produce the below

materials to the Committee.

a) The archivist's log of access to the documents in the archive;[28]

b) The archivist's database, in native format;[29]

c) Any other index, inventory or similar record maintained by the Diocese, including, but not limited to the Chancellor's office and the Bishop's office regarding potential CVA documents;

d) All additional CVA documents not previously produced to the Committee;

e) All email communications with the archivist requesting the search of files for productions in this bankruptcy or the underlying state court actions; and

---

[27] *Declaration of Thomas G. Renker* [Docket No. 1656]; *Declaration of Thomas G. Renker* [Docket No. 1678].
[28] *See* Ex. B, at 27:6-12, 48:13-21.
[29] *Id.*, at 13: 11-23.

4

      f)   The file of the parish, school, camp or other related entity at which any allegations of abuse occurred.[30]

6.      This Court shall retain jurisdiction to hear and determine all matters arising from

the implementation of this Order.

Dated: _____ \_\_, 2024
      New York, New York

                           _____

                           Hon. Martin Glenn
                           United States Bankruptcy Judge

---

[30] *Id.*, at 30:24-25.

4884-1841-0914.1 18491.002

# EXHIBIT B

January 8, 2024

SUPREME COURT OF THE STATE OF NEW YORK

COUNTY OF NASSAU

------------------------------------------------X

ARK457 DOE,

                         Plaintiff,

         -against-

HOLY FAMILY a/k/a/ HOLY FAMILY DIOCESAN HIGH

SCHOOL; and DOES 1-5 whose identities are unknown

to Plaintiff,

                         Defendants.

Index No. 900094/2021

------------------------------------------------X

                         100 Merrick Road

                         Rockville Centre, New York

                         January 8, 2024

                         10:02 a.m.

     EXAMINATION BEFORE TRIAL of KRISTA AMMIRATI,
the Defendant for Holy Family in the
above-entitled action, held at the above time and
place, taken before Randi Horowitz, a Stenotype
Reporter and Notary Public of the State of New
York, pursuant to Notice and stipulations between
counsel.

```
(1)
(2)      A P P E A R A N C E S :
(3)
(4)      JEFF ANDERSON & ASSOCIATES
              Attorneys for Plaintiff
(5)                  55 West 39th Street, 11th Floor
                     New York, New York 10018
(6)
         BY:  PATRICK STONEKING, ESQ.
(7)
(8)      PATRICK F. ADAMS PC
              Attorneys for Defendants
(9)                  3500 Sunrise Highway - Suite 300
                     Great Rive, New York 11739
(10)
         BY:  ERIC STEPHENS, ESQ.
(11)
(12)     ALSO PRESENT:
         ALEXIS REDD, ESQ.
(13)     JEFF ANDERSON & ASSOCIATES.
(14)
(15)
(16)
(17)
(18)
(19)
(20)
(21)
(22)
(23)
(24)
(25)
```

```
(1)
(2)                    STIPULATIONS
(3)        IT IS HEREBY STIPULATED AND AGREED by and
(4)    between (among) counsel for the respective parties
(5)    hereto, that;
(6)
(7)        All rights provided by the C.P.L.R.,
(8)    including the right to object to any question,
(9)    except as to form, or to move to strike any
(10)   testimony at this (these) examination(s), are
(11)   reserved, and, in addition, the failure to object
(12)   to any question or to move to strike any testimony
(13)   at this (these) examination(s) shall not be a bar
(14)   or waiver to make such motion at, and is reserved
(15)   for the trial of this action;
(16)
(17)       IT IS FURTHER STIPULATED AND AGREED by and
(18)   between (among) counsel for the respective parties
(19)   hereto, that this (these) examination(s) may be
(20)   sworn to by the witness(es) being examined, before
(21)   a Notary Public other than the Notary Public
(22)   before whom this (these) examination(s) was (were)
(23)   begun; but the failure to do so, or to return the
(24)   original of this (these) examination(s) to
(25)   counsel, shall not be deemed a waiver of the
```

(1)

(2)    rights provided by Rules 3116 and 3117 of the

(3)    C.P.L.R., and shall be controlled thereby;

(4)

(5)        IT IS FURTHER STIPULATED AND AGREED by and

(6)    between (among) counsel for the respective parties

(7)    hereto, that this (these) examination(s) may be

(8)    utilized for all purposes as provided by the

(9)    C.P.L.R.;

(10)

(11)        IT IS FURTHER STIPULATED AND AGREED by and

(12)    between (among) counsel for the respective parties

(13)    hereto, that the filing and certification of the

(14)    original of this (these) examination(s) shall be

(15)    and the same hereby are waived;

(16)

(17)        IT IS FURTHER STIPULATED AND AGREED by and

(18)    between (among) counsel for the respective parties

(19)    hereto, that all rights provided by the C.P.L.R.,

(20)    and Part 221 of the Uniform Rules for the Conduct

(21)    of Depositions, including the right to object to

(22)    any question, except as to form, or to move to

(23)    strike any testimony at this examination is

(24)    reserved; and in addition, the failure to object

(25)    to any question or to move to strike any testimony

```
(1)

(2)    at this examination shall not be a bar or waiver

(3)    to make such motion at, and is reserved to, the

(4)    trial of this action;

(5)

(6)         IT IS FURTHER STIPULATED AND AGREED by and

(7)    between (among) counsel for the respective parties

(8)    hereto, that a copy of the within examination(s)

(9)    shall be furnished to counsel representing the

(10)   witness(es) testifying, without charge.

(11)

(12)

(13)

(14)

(15)

(16)

(17)

(18)

(19)

(20)

(21)

(22)

(23)

(24)

(25)
```

(1)

(2)   K R I S T A    A M M I R A T I, the Defendant

(3)   herein, having first been duly sworn by Randi

(4)   Horowitz, a Notary Public herein, was examined and

(5)   testified as follows:

(6)   **EXAMINATION BY MR. STONEKING:**

(7)       Q.      State your name for the record,

(8)   please.

(9)       **A.      Krista Ammirati.**

(10)      Q.      State your address, please.

(11)      **A.      440 West Neck Road, Huntington, New**

(12)  **York 11743.**

(13)      Q.      Good morning.

(14)      **A.      Hi.**

(15)      Q.      Have you ever taken a deposition

(16)  before?

(17)      **A.      I have.**

(18)      Q.      Okay.

(19)              How many times?

(20)      **A.      Once.**

(21)      Q.      Are you pretty comfortable with the

(22)  proceeding?

(23)      **A.      You can go over whatever you need to.**

(24)      Q.      Okay.

(25)              My name is Pat Stoneking, I represent

```
(1)                    K. AMMIRATI
(2)    the plaintiff in this case.  With me is attorney,
(3)    Alexis Redd.  I will be asking you questions
(4)    today.
(5)            If there is anything that you don't
(6)    understand, let me know and I will rephrase for
(7)    you.
(8)        A.      Mm-hmm.
(9)        Q.      You just need to answer verbally.
(10)       A.      Sorry, yes.
(11)       Q.      If that is a yes or no -- I'm not
(12)   trying to be rude.  I just need a clean record.
(13)       A.      Okay.
(14)       Q.      We have to make sure that we don't
(15)   talk over each other because we have a Court
(16)   Reporter here who is taking down everything we
(17)   say.  So wait for me to finish my questions, I'll
(18)   wait for you to finish your answers and it'll go
(19)   much more smoothly that way, okay?
(20)       A.      Okay.
(21)       Q.      If you need a break, let me know.
(22)   The only thing is if there's a question pending, I
(23)   may ask you to finish the question before we take
(24)   the break.  I don't expect this to be very long.
(25)            Is that okay with you?
```

```
(1)                    K. AMMIRATI

(2)        A.        Yes.

(3)        Q.        Okay.

(4)                   That is about -- what did you review

(5)   prior to coming here today in preparation for

(6)   this?

(7)        A.        I had a meeting with Eric, he had

(8)   sent me a PDF of a file that I opened, looked at

(9)   the first couple of pages and stopped looking at

(10)  it.

(11)       Q.        Was that PDF about 198 pages or so?

(12)       A.        Yes.

(13)                 MR. STONEKING:  I'm going to

(14)             have this marked as Plaintiff's

(15)             Exhibit 1.

(16)                     (The DOCUMENT was hereby

(17)             marked as Plaintiff's Exhibit 1 for

(18)             identification, as of this date.)

(19)       Q.        Can you take a look at this, please?

(20)       A.        Okay.

(21)       Q.        You looked at the top couple of

(22)  pages, which is Plaintiff's Exhibit 1 is marked

(23)  1DRVC 9000942021, and it's marked from pages 1 to

(24)  198 I believe.

(25)                 Is that the document that you are
```

```
(1)                    K. AMMIRATI

(2)   talking about that you referred?

(3)        A.        Yes, I only looked at the first

(4)   couple of pages.

(5)        Q.        Okay.

(6)             Is Exhibit 1 -- can I fairly call

(7)   that Exhibit 1 Michael Palagonia's employment

(8)   file, is that what is in there?

(9)        A.        Yes.

(10)       Q.        Is there anything else beside

(11)  Mr. Palagonia's employment file?

(12)       A.        I would have to look closer at it,

(13)  but -- should I look closer at it?

(14)       Q.        I would like you to.

(15)       A.        Okay.

(16)             I will.

(17)       Q.        And also, it's also two sided.

(18)       A.        Oh, from what I can see, this is

(19)  everything that would be in a teacher's personnel

(20)  file.

(21)             It did look like they were some legal

(22)  documents in there that I haven't seen before.  I

(23)  don't know why they would be in his personal file.

(24)       Q.        That is what I'm going to get into

(25)  those with you.  In there is some complaints,
```

(1)                    K. AMMIRATI

(2)    legal filings and things like that.

(3)                    Were those documents in

(4)    Mr. Palagonia's employment file?

(5)        A.        I don't remember specifically.

(6)        Q.        Okay.

(7)                    There's a complaint in this case that

(8)    is, which is in the back of that about 13 pages in

(9)    about the Ark 457 case.

(10)                   Was that in the employment file that

(11)   you saw and retrieved?

(12)       A.        I didn't see what was in his file.

(13)   When I was asked to retrieve it, I searched for

(14)   the name in my database and things that comes up

(15)   with the name I pull.  I don't look in the files,

(16)   and I send them to whoever asked for them.

(17)       Q.        Okay.

(18)                   So we will put this aside for a

(19)   little bit and go more into the fundamentals of

(20)   your role is, who you are.

(21)                   So you're the archivist for the

(22)   Diocese of Rockville Centre?

(23)       A.        Yes.

(24)       Q.        How long have you been in that role?

(25)       A.        It'll be nine years in April.

(1)                    **K. AMMIRATI**

(2)        Q.        Do you know who did the role before

(3)    you?

(4)        **A.        Her name was Jean Lynch.**

(5)        Q.        Do you know how to spell Jean?

(6)        **A.        J-E-A-N.**

(7)        Q.        Do you know where she is now?

(8)        **A.        No.**

(9)        Q.        Do you know how long she was in that

(10)   role prior to you?

(11)       **A.        The archive was started in the early**

(12)   **'90s, and she retired in 2014, so --**

(13)       Q.        So you're saying that position was

(14)   created in the early '90s?

(15)       **A.        Yes.**

(16)       Q.        So she was the only one that did it

(17)   prior to you?

(18)       **A.        Yes.**

(19)       Q.        What is the role of archivist within

(20)   the Diocese of Rockville Centre?

(21)       **A.        I collect records, keep them in the**

(22)   **archive, add the files to the database, and when**

(23)   **people ask for something for me the retrieve**

(24)   **something, I find it and provide it to them.**

(25)       Q.        Who else has access to the archives?

```
(1)                    K. AMMIRATI
(2)      A.       I'm the only one who would retrieve
(3)  files.  The chancellor has a key and the
(4)  maintenance staff have a key, but they don't go in
(5)  there without my permission.
(6)      Q.       The chancellor doesn't go in there
(7)  without your permission?
(8)      A.       I mean, she could technically, but
(9)  she doesn't.
(10)     Q.       Who is the chancellor?
(11)     A.       Sister Mary Anne Fitzgerald.
(12)     Q.       And you gave an address when we
(13)  started the deposition in Huntington, is that the
(14)  location of the archives?
(15)     A.       Yes.
(16)     Q.       Is there anything else at that
(17)  location?
(18)     A.       That building is the seminary of the
(19)  Immaculate Conception, the seminary where it's a
(20)  prest school essentially.  The building is now
(21)  used for meetings, retreats and things like that.
(22)     Q.       Is there anybody else that has access
(23)  to the archives besides you, the chancellor and
(24)  the maintenance staff?
(25)     A.       No.
```

**K. AMMIRATI**

(1)

(2)    Q.    And it's held under a lock and key?

(3)    **A.    Yes.**

(4)    Q.    When you say access, we are talking

(5)    about paper documents?

(6)    **A.    Yes.**

(7)    Q.    Like, a big room full of rows and

(8)    rows of shelves?

(9)    **A.    Yes, it's five rooms with rows of**

(10)    **shelving and all of the documents are in boxes.**

(11)    Q.    And you have an index that tells you

(12)    where in those boxes certain things are?

(13)    **A.    A database, yes.**

(14)    Q.    And the database is electric?

(15)    **A.    Yes.**

(16)    Q.    You could do a search for certain

(17)    names that would tell you which names to retrieve,

(18)    and then you'd go into the boxes, retrieve them

(19)    from the boxes wherever they are located?

(20)    **A.    Yes.**

(21)    Q.    Do you know what the name of the

(22)    software is?

(23)    **A.    Microsoft Access.**

(24)    Q.    Do you know who programs the access

(25)    program that you use?  Is it something that

(1)                    K. AMMIRATI

(2)  someone bought or someone in the house built?

(3)        **A.        I know Jean set it up, and I have**

(4)  **added to it.**

(5)        Q.        What is your background prior to

(6)  working with the Diocese, what did you do before

(7)  that?

(8)        **A.        Before this, I worked at Bed, Bath**

(9)  **and Beyond.  I have a history degree.  It was**

(10) **always my intention to work in an archive or a**

(11) **museum.  I worked at Bed, Bath and Beyond for**

(12) **three years.**

(13)       Q.        Did you work for Bed, Bath and Beyond

(14) in an archivist, recordkeeping sort of role?

(15)       **A.        Sort of.  I did stock replenishment**

(16) **and warehouse management, organization, so it was**

(17) **the same type of keeping everything organized in**

(18) **its spot, that sort of thing.**

(19)       Q.        Okay.

(20)                  Who codes the documents that -- for

(21) the purpose of the index, when things are filed in

(22) the archives, who would determine whether a name

(23) is on there or like, to find it electrically?

(24)       **A.        I do.  Whatever is in the box is what**

(25) **a description of it goes in the database.**

(1)                    **K. AMMIRATI**

(2)        Q.        Is the description in the database

(3)    what is searched for a name?

(4)        **A.        Yes.**

(5)        Q.        Okay.

(6)                So if someone in your position

(7)    doesn't put the person's name, that is not going

(8)    to come up on a hit for a search?

(9)        **A.        No, but in the case of a personnel**

(10)    **file, it would be their name, and for a legal**

(11)    **document it would be the case name.**

(12)            **So as long as their name is in the**

(13)    **case name, it would come up.**

(14)        Q.        Okay.

(15)                Do you keep a scanned version of

(16)    everything electrically?

(17)        **A.        No.**

(18)        Q.        So in this particular case, you were

(19)    asked to find documents on Mr. Palagonia, and you

(20)    searched for his name?

(21)                **MR. STEPHENS:  And you can**

(22)                **answer the questions in general.**

(23)                **Just don't tell Mr. Stoneking, and I**

(24)                **don't think he is asking about any**

(25)                **specific conversations with lawyers.**

(1)                    **K. AMMIRATI**

(2)        Q.        Okay.

(3)               I'm less concerned about who is doing

(4)    the asking and more what you are doing looking for

(5)    documents in this case to find what it was in

(6)    Exhibit 1 that you recognized.

(7)               You did a search in your index for

(8)    Mr. Palagonia, it came up with a list of hits; is

(9)    that right?

(10)       **A.        Yes.**

(11)       Q.        And those hits were located in one

(12)   box, several boxes?

(13)       **A.        I don't remember specifically.**

(14)       Q.        It could have been both?

(15)       **A.        Yes.**

(16)       Q.        And you went and retrieved all of the

(17)   documents from their source and determined that?

(18)       **A.        Yes.**

(19)       Q.        How long did that search take?

(20)       **A.        A few minutes.**

(21)       Q.        Do you have the ability to search for

(22)   Holy Family documents in a similar way?

(23)       **A.        Yes.**

(24)       Q.        If I were to ask you to find a list

(25)   of other teachers who were working at Holy Family

[Page 17]
January 8, 2024

(1)                        K. AMMIRATI

(2)    is 1984 and '85, would be able to generate a list

(3)    like that?

(4)        A.        No.

(5)        Q.        Why not?

(6)        A.        **They were not filed that way.  When**

(7)    **the Education Department sends me the files of the**

(8)    **terminated teachers, it's just as they are**

(9)    **terminated, it's not by school.**

(10)       Q.        Okay.

(11)                 You mentioned the Education

(12)   Department.  You're here referencing the

(13)   Department of Education, which is a different

(14)   entity within the Diocese of Rockville Centre?

(15)       A.        **Yes.**

(16)       Q.        You do all of the recordkeeping for

(17)   the Department of Education too?

(18)                   **MR. STEPHENS:  Objection.  You**

(19)                 **can answer.**

(20)       A.        **Some, I do keep the teacher file, the**

(21)   **personnel files indefinitely, so I keep those**

(22)   **other documents that that department generates.**

(23)   **They may keep it in their own office, but I know I**

(24)   **get the teacher's files.**

(25)       Q.        So is it the case for current

(1)                    K. AMMIRATI

(2)    Department of Education files, the archive is kept

(3)    with you?

(4)        A.        **Terminated files, yes.**

(5)        Q.        Assumed the teacher is let go.

(6)        A.        **Let go, fired or dies, yes.**

(7)        Q.        So active teachers within the

(8)    Department of Education, you don't have those

(9)    personal files on record yet?

(10)       A.        **Right.**

(11)       Q.        But you will when they're fired?

(12)       A.        **Yes.**

(13)               **MR. STEPHENS:  Objection.**

(14)               **MR. STONEKING:  To what?**

(15)               **MR. STEPHENS:  To fired.**

(16)       Q.        Okay.

(17)               Are there other records that are

(18)    within the Diocese archives in addition to teacher

(19)    employment files?

(20)       A.        **Yes.**

(21)       Q.        Do you keep records for every priest,

(22)    for example?

(23)       A.        **Terminated priest.**

(24)       Q.        Now, explain that to me.  You said

(25)    you do not maintain the files while they are in

```
(1)                    K. AMMIRATI

(2)    service?

(3)         A.       Those files are kept at the

(4)    chancellor's office.  If they are active, it's

(5)    with the chancellors office.  Once they are

(6)    either, died or laicized or just no longer working

(7)    in the Diocese, their file comes to me.

(8)         Q.       So the chancellor's office; is that

(9)    located here in Rockville Centre?

(10)        A.       Yes.

(11)        Q.       On the campus of Saint Marys?

(12)        A.       Mercy Hospital.

(13)        Q.       Okay.

(14)                 That's true?

(15)        A.       Yes.

(16)        Q.       Is that also where the bishop sits in

(17)   the same office?

(18)        A.       Yes.

(19)        Q.       Do you have access to the

(20)   chancellor's files that she maintains here in

(21)   Rockville Centre?

(22)        A.       Yes.

(23)        Q.       Do you ever use them for time to time

(24)   in the course of your job?

(25)        A.       I do not.
```

```
(1)                    K. AMMIRATI
(2)      Q.       Are there other people that have
(3)   access to her files other than yourself?
(4)      A.       The secretaries in the office do.
(5)      Q.       How many secretaries are there in the
(6)   office?
(7)      A.       Two.
(8)      Q.       What are their names?
(9)      A.       Rosa White and Debbie Devoe.
(10)     Q.       Are there secretaries that you have
(11)  in Huntington?
(12)     A.       No.
(13)     Q.       Is it just you in the archives all
(14)  alone, no one else works with you?
(15)     A.       Yes.
(16)     Q.       Can you explain to me what the makeup
(17)  is of the five rooms in the archives?
(18)     A.       How do you mean?
(19)     Q.       What are the five different rooms
(20)  like, how are they different with each other?
(21)     A.       They are not very different.  They
(22)  are rows of shelves.  Three of the rooms have
(23)  mobile shelvings.  One room has static shelving,
(24)  one room also has my office and my desk and
(25)  computer.
```

```
(1)                    K. AMMIRATI

(2)            All of the boxes are numbered, but

(3)     there is no other markings on the outside of them.

(4)        Q.      Do any of the rooms have any

(5)     different roles?  For lack of a better words like,

(6)     are all of the priest files in a certain room?

(7)        A.      No.

(8)        Q.      Is everything indexed one to 10

(9)     million?

(10)       A.      Yes.

(11)       Q.      Okay.

(12)               How many documents are in the

(13)    archive?

(14)       A.      There is about 3000 boxes.

(15)       Q.      Do you remember the search that you

(16)    did in this case?

(17)       A.      Not specifically.

(18)       Q.      Is it fair to say all of the

(19)    documents that you produced for Mr. Palagonia's

(20)    employment file are kept in the ordinary course of

(21)    business?

(22)       A.      Yes.

(23)       Q.      But as you sit here today, you don't

(24)    remember whether those legal documents came from

(25)    his employment file or came from somewhere else?
```

(1)                    K. AMMIRATI

(2)        **A.        Correct.**

(3)        Q.        And you don't know whether or not you

(4)    actually produced or came up with those document?

(5)        **A.        I would have been the only one that**

(6)    **would have pulled these files.**

(7)        Q.        By these files, you mean the

(8)    employment files or the legal documents?

(9)        **A.        Either.**

(10)       Q.        So is it fair to say that all of

(11)   Exhibit 1 is held in the ordinary course of

(12)   business?

(13)       **A.        Yes.**

(14)       Q.        And Exhibit 1, all of those documents

(15)   are authentic, and with the exception of

(16)   redaction, they were provided or the way they are

(17)   in your archives?

(18)       **A.        They looked like they would be, yes.**

(19)       Q.        Okay.

(20)                 When did you retrieve the documents

(21)   in Exhibit 1?

(22)       **A.        I don't remember.**

(23)       Q.        Did you have any estimation?  Was it

(24)   within the last several months or years?

(25)       **A.        I really don't remember.**

**K. AMMIRATI**

(1)

(2)    Q.      Is there any way that you can tell me

(3)  if you look back in your search history?

(4)    **A.      I would have to look in my e-mails.**

(5)    Q.      So one of the documents that is in

(6)  there references the complaint in this case.

(7)  Would you have filed that complaint somewhere in

(8)  the archives yourself?

(9)    **A.      If it's as old as the date I can see**

(10)  **right here in 1984, I would not have filed this.**

(11)    Q.      It's from 2019 though.  If that

(12)  document is in the archives, the complaint in this

(13)  case, which is at the end of Exhibit 1, would you

(14)  have filed it somewhere in the archives?

(15)    **A.      I guess so.**

(16)    Q.      Did it come from the archives?

(17)            **MR. STEPHENS:  Do you think we**

(18)            **can take a momentary break?**

(19)                **(A discussion was held off the**

(20)            **record.)**

(21)            **MR. STONEKING:  Back on the**

(22)            **record.**

(23)    Q.      So we just had a discussion off the

(24)  record, and when it comes to the complaint in this

(25)  case, I believe you told me it would be a little

(1)                    K. AMMIRATI
(2)    bit too new to be sent to you, correct?
(3)        **A.        Correct.**
(4)        Q.        And that document that was prepared
(5)    and filed in 2019 was probably from the legal
(6)    department's office?
(7)        **A.        That would be my best guess.**
(8)                    **MR. STONEKING:  Thank you.**
(9)                    **I would put in a request for the**
(10)               **date of the search for the employment**
(11)               **file.**
(12)       Q.        And you would be able to come up with
(13)   a document that shows that pretty quickly,
(14)   wouldn't you?
(15)       **A.        Yes.**
(16)       Q.        Okay.
(17)                  Does the bishop have access to the
(18)   archives?
(19)       **A.        Technically, yes, but he doesn't have**
(20)   **a key.  He would need either me or the chancellor**
(21)   **to let him in.**
(22)       Q.        If a document is removed from the
(23)   archives, is there a record of that?
(24)       **A.        Yes.**
(25)       Q.        How is that recorded?

```
(1)                    K. AMMIRATI
(2)        A.        Depends on what is happening to it.
(3)   If someone is, quote on quote, borrowing it,
(4)   asking for something within their own department,
(5)   I would just I have a log.
(6)                    They would get it, take it for
(7)   however long they needed it, give it back to me or
(8)   keep it indefinitely.  I'd make a note of that
(9)   too.
(10)       Q.        Has anybody taken documents and kept
(11)  them indefinitely?
(12)       A.        Yes.
(13)       Q.        Under what circumstances?
(14)       A.        They are using them.  Again, they are
(15)  redoing their own filing systems and they have
(16)  more room, so they're keeping their documents
(17)  closer or there have been priest files that have
(18)  been taken from the archives and are now in the
(19)  chancellor's office.
(20)       Q.        When you talk about the rule of
(21)  priest files and take to the chancery, is that
(22)  while you have been the archivist?
(23)       A.        Yes.
(24)       Q.        Did you pull those documents for
(25)  whoever took them to the chancery?
```

```
(1)                    K. AMMIRATI

(2)      A.       Yes.

(3)      Q.       And you recorded which documents left

(4)   your archive and went to the chancery?

(5)      A.       Yes.

(6)      Q.       As far as the description of the

(7)   documents that are moved, is that recorded

(8)   somewhere or is that the same system that you

(9)   would use to find them in the first place, the

(10)  indexes?

(11)     A.       It would just be their name.

(12)     Q.       The person of the person that took

(13)  them?  Tell me what you mean.

(14)     A.       The -- you mean, the name of the file

(15)  or the name of the person that took them?

(16)     Q.       However you can best explain it to

(17)  me.

(18)     A.       If someone asks for a file that they

(19)  are going to keep, I would find whatever document

(20)  it is and give it to them, make a note that the

(21)  file is now moved elsewhere, make a note of where

(22)  it is now.  I wouldn't necessarily put the name of

(23)  the person that took them, maybe the department

(24)  that has it now.

(25)     Q.       Or the contents of the file itself
```

(1)                    K. AMMIRATI

(2)    that just the file is moved?

(3)        A.      If it's a personnel file, it would

(4)    just be their name.  If I need more of a

(5)    description of the file, I would put that too.

(6)        Q.      And you keep that in your log?

(7)        A.      Yes.

(8)        Q.      Is there any information in your log,

(9)    other than those types of transactions with

(10)   documents moving?

(11)       A.      It's a lot specifically for documents

(12)   out of the archive out and back into.

(13)       Q.      But you don't question -- if somebody

(14)   comes to you and has authority to move the

(15)   documents, you don't question them and say why are

(16)   you doing this or anything like that?

(17)       A.      As long as they were documents within

(18)   their department, they have full access to

(19)   whatever they need.

(20)       Q.      So just so I'm clear, what are the

(21)   departments with this Diocese?

(22)       A.      It's any of the Diocese department.

(23)   The chancellors office, the bishop's office,

(24)   priest, personnel, education, finance, legal.

(25)       Q.      Gotcha.

```
(1)                    K. AMMIRATI
(2)            Does it have to be the head of the
(3)    department or anyone from the department can
(4)    access them?
(5)        A.      Anybody from the department.
(6)        Q.      So anybody from legal can access any
(7)    of the archives to legal documents?
(8)        A.      Yes.
(9)        Q.      You would just record it in the log
(10)   that they accessed and you gave it the them, and
(11)   record it when they brought it back?
(12)       A.      Correct.
(13)       Q.      So there are some legal documents in
(14)   Exhibit 1 that are older.  They are from 1985.
(15)   There are some documents related to a court case
(16)   involving Mr. Palagonia.
(17)           Do you remember if that was within
(18)   the material that you found in his employment
(19)   file?
(20)       A.      I don't remember.
(21)       Q.      Would something from 1985 in a court
(22)   case, that old be in teacher's employment file?
(23)       A.      It could be or it could be in a box
(24)   from legal department.
(25)       Q.      Do you know anything about the legal
```

(1)                      K. AMMIRATI

(2)   department or any other department's record

(3)   keeping practice or how long they maintain files

(4)   like tat?

(5)        A.       **No, not specifically.**

(6)        Q.       How long -- do you keep documents in

(7)   the Diocese and the archive indefinitely?

(8)        A.       **Some, yes.**

(9)        Q.       What sort of documents get maintained

(10)  indefinitely?

(11)       A.       **I would have to look specifically at**

(12)  **our retention schedule, but I know personnel files**

(13)  **are kept indefinitely.**

(14)       Q.       And that applies to any document

(15)  within the personnel file?

(16)       A.       **Yes.**

(17)       Q.       Okay.

(18)                 Are there any documents that you

(19)  would expect to see for a teacher like Michael

(20)  Palagonia in his employment file that are not

(21)  maintained?  That's a terrible question.  I'm

(22)  going to start over.

(23)                 When I go through Exhibit 1, there

(24)  is, you know, no real payroll information or

(25)  anything like that.  Is that the sort of thing

(1)                    K. AMMIRATI

(2)    that is not held in an employment file in the

(3)    archives?

(4)         A.        Correct.

(5)         Q.        Okay.

(6)                   I started to ask you about the

(7)    documents held at the chancellors office, and you

(8)    said you had access to those.  Can you explain to

(9)    me how the documents are maintained at the

(10)   chancellor's office?

(11)        A.        What kind of documents?

(12)        Q.        Does the chancellor have a similar

(13)   set up with a room full of boxes?

(14)        A.        They have file cabinets.

(15)        Q.        How many?

(16)        A.        20, maybe more.

(17)        Q.        Do you have access to those documents

(18)   because you work within?

(19)        A.        The chancellors office.

(20)        Q.        Yes?

(21)        A.        Yes.

(22)        Q.        What type of documents are in those

(23)   file cabinets?

(24)        A.        Priest personnel files, and then

(25)   files that pertain to the individual parishes.

(1)                         **K. AMMIRATI**

(2)        Q.        Can you explain that?  What does that

(3)    mean, what documents are those?

(4)        **A.        For the parishes?**

(5)        Q.        Yeah.

(6)        **A.        Reports like, financial reports,**

(7)    **spiritual reports, any kind of -- any time anybody**

(8)    **sends a letter to the bishop's office or a**

(9)    **chancellor's office about the parish, those would**

(10)   **go in there.**

(11)           **If a priest from a different Diocese**

(12)   **is coming here to perform a wedding or baptism, a**

(13)   **letter of good standing, that would also go with**

(14)   **the parish.**

(15)       Q.        Is it fair to say the parishes don't

(16)   keep their own records?

(17)               **MR. STEPHENS:  Objection.  You**

(18)               **can answer.**

(19)       **A.        I'm sure they do.**

(20)       Q.        But eventually, parish documents end

(21)   up with the archives; is that fair?

(22)       **A.        No.**

(23)       Q.        What sorts or documents don't end up

(24)   at the archives from the parish?

(25)               **MR. STEPHENS:  Objection.**

```
(1)                    K. AMMIRATI

(2)          Documents she doesn't know about or

(3)          doesn't have?

(4)              MR. STONEKING:  Yeah.

(5)              MR. STEPHENS:  You can answer if

(6)          that is an answerable question.

(7)      A.      I don't get records from the

(8)  parishes.

(9)      Q.      Okay.

(10)             Just work with me through this.  I'm

(11) not trying to be difficult, but I just want to

(12) make sure that I understand it.

(13)             If there is a fair amount of

(14) correspondence that goes between a bishop and a

(15) priest; is that fair to say?

(16)     A.      Sure.

(17)     Q.      Have you seen the letters that they

(18) send back and forth through the year, Merry

(19) Christmas, how are you doing, checking in sort of

(20) things?

(21)     A.      Sure.

(22)     Q.      Does the bishop maintain those type

(23) of correspondences?

(24)     A.      They would go in the priest file, so

(25) I guess it's the chancellors office that keeps it
```

(1)                    **K. AMMIRATI**

(2)    **as opposed to the bishops office.**

(3)        Q.        Whatever happens to the letter on the

(4)    priests end?  You never see it or it's kept a file

(5)    for that priest on his behalf?

(6)        **A.        No.**

(7)        Q.        Okay.

(8)                   In a case like Mr. Palagonia with the

(9)    school as a laid teacher, the archives doesn't get

(10)   anything until the teacher is terminated, the

(11)   entire file goes to the archive and held together

(12)   in one place?

(13)       **A.        Correct.**

(14)       Q.        As apart of your searchs, did you

(15)   ever do any type of reviews for relevance or

(16)   looking at documents that say I don't think this

(17)   is responsive to the search that I'm doing; is

(18)   that fair of your analysis?

(19)       **A.        Yes.**

(20)       Q.        Do you remember if you did that type

(21)   of analysis here?

(22)       **A.        I don't remember specifically.**

(23)       Q.        I'm sorry if we covered this a little

(24)   bit, can you explain what your process would have

(25)   been to find the Michael Palagonia file in Exhibit

K. AMMIRATI

(1)

(2)      1?

(3)      A.      I would search for his name in the

(4)  database and I'd pulled anything that came up in

(5)  the case of the personnel file, especially with a

(6)  name as uncommon as Palagonia, I would have pulled

(7)  everything, and then sent everything to whomever

(8)  asked for it.

(9)      Q.      Perfect.

(10)              We talked a little bit about the

(11)  Department of Education.  If you do a search

(12)  within the Department of Education files, is that

(13)  different from a search within the Diocese files?

(14)      A.      Not really.

(15)      Q.      Do you have student records in the

(16)  record?

(17)      A.      Very, very few.

(18)      Q.      Which ones do you have?

(19)      A.      There are -- the oldest files that I

(20)  have, at one time the archive was going to keep

(21)  students record but it become overwhelming very

(22)  quickly, so it's maybe only 20 boxes from the '50s

(23)  and '60s.

(24)      Q.      The Department of Education was

(25)  created in the mid to late '80s I believe; is that

(1)                    K. AMMIRATI

(2)    your understanding?

(3)         A.        I don't know.

(4)         Q.        But it wouldn't be true for me to say

(5)    all of the student records prior to the formation

(6)    of Department of Education, that would be

(7)    incorrect?

(8)         A.        Correct.

(9)         Q.        So it was an effort keep track of

(10)   those type of documents for a while, and gave up

(11)   very quickly?

(12)        A.        The student records are kept now at

(13)   the school or at the parish that the school is

(14)   connected to.

(15)        Q.        So Holy Family is no longer an

(16)   operation, right?

(17)        A.        This is the high school?

(18)        Q.        Yeah.

(19)        A.        Yes.

(20)        Q.        Do you know where those records are

(21)   kept?

(22)        A.        That school, if I'm not mistaken,

(23)   that school became Saint Anthony's High School.

(24)   The record are still in that building or should be

(25)   still in that building, so someone who graduated

(1)                    **K. AMMIRATI**

(2)    **from Holy Family High School would call Saint**

(3)    **Anthony's High School for their transcript if they**

(4)    **needed it.**

(5)        Q.       If I were looking for yearbooks or

(6)    rosters with teachers who were working in 1984,

(7)    would I go there for that as well?

(8)        **A.       Yes or the Department of Education.**

(9)        Q.       Does the Department of Education have

(10)   documents other than what you maintain in the

(11)   archives?

(12)       **A.       I would guess yes.  I don't know**

(13)   **specifically.**

(14)       Q.       If Mr. Palagonia was in a yearbook

(15)   and it was within the archives, would it have come

(16)   up on one of your hits?

(17)       **A.       Yes.**

(18)       Q.       So are you confident that you have no

(19)   yearbooks from Holy Family at the time that he was

(20)   teaching there?

(21)       **A.       Yes.**

(22)       Q.       I'm a little curious about the

(23)   indexes and how your search gets populated for the

(24)   results, and I think you said you're the one who

(25)   codes the document for the description of what it

(1)                    K. AMMIRATI

(2)    is; is that right?

(3)        **A.        Yes.**

(4)        Q.        Would a likely coding for

(5)    Mr. Palagonia's employment file be Michael

(6)    Palagonia employment file or something like that?

(7)        **A.        It would be his name, yes.**

(8)        Q.        Okay.

(9)                So just literally Michael Palagonia

(10)   would come up as Michael Palagonia, and you would

(11)   go to the box?

(12)       **A.        Yes or Palagonia, Michael, but his**

(13)   **name, yes.**

(14)       Q.        Okay.

(15)                Is that true for documents that

(16)   pertain to more than one person?  How do you deal

(17)   with that?

(18)       **A.        What do you mean?**

(19)       Q.        If there is documents that pertain to

(20)   Holy Family, you know, in general, you don't OCR

(21)   your documents, right?

(22)       **A.        No, I don't know what that means.**

(23)       Q.        You don't scan them and have them

(24)   read by a computer?

(25)       **A.        No, it's not that advance.**

(1)                    **K. AMMIRATI**

(2)        Q.        Your entire ability to search depends

(3)    on what you enter into the index?

(4)        **A.        Yes, and I always am as descriptive**

(5)    **as I can be when I put things in the database.**

(6)        Q.        Do you know if you have descriptions

(7)    that are several sentences long in the database?

(8)        **A.        Sometimes, yes.**

(9)        Q.        If I'm looking for an employment file

(10)   that would include concerns over a teacher

(11)   sexually abusing a student, you wouldn't be able

(12)   to search for that sort of term in your archive?

(13)       **A.        No.**

(14)       Q.        I would have to give you the name of

(15)   the teacher, pull the employment file.  That is

(16)   the only way that you'd be able to find documents

(17)   that covers other teachers who were accused of

(18)   allegations of sexual abuse of a student.  Right?

(19)       **A.        Right.**

(20)                   **MR. STEPHENS:  I'm sorry, Pat.**

(21)               **I think you meant sexual allegations**

(22)               **done to a student, right?**

(23)                   **MR. STONEKING:  I did.  Thank**

(24)               **you for the clarification.**

(25)       Q.        As part of either this litigation or

(1)                    K. AMMIRATI

(2)    any recent litigation involving allegations of

(3)    child and sexual abuse, have you personally gone

(4)    into any of the documents in the archives and done

(5)    that level of review of the documents to see if a

(6)    certain individual had child and sexual abuse

(7)    allegations?

(8)        A.      No.

(9)        Q.      Did you look to see if any documents

(10)   were previously removed from Michael Palagonia's

(11)   file?

(12)       A.      I wouldn't know if they had been.

(13)       Q.      Did Ms. Lynch keep a similar log to

(14)   you where she recorded whether documents came or

(15)   left from the archives?

(16)       A.      I don't know.

(17)       Q.      You don't know if she had a log, did

(18)   I get that right?

(19)       A.      Yeah.

(20)       Q.      So when she stopped working there,

(21)   she didn't leave anything behind stating this is

(22)   the log of where documents came and went during

(23)   her time here?

(24)       A.      Not that I saw.

(25)       Q.      Did you have any communications with

(1)                    K. AMMIRATI

(2)    her after when you started the role?

(3)         A.      No.

(4)         Q.      Why is that?

(5)         A.      **She -- I believe she retired in**

(6)    **December.  I wasn't hired until April, so she was**

(7)    **just gone.  She left notes about the processes of**

(8)    **the archives and how to use the database, but that**

(9)    **was it.  I never spoke or met her.**

(10)        Q.      What sort of improvements did you

(11)   make to the database or since?

(12)        A.      **To the database?**

(13)        Q.      Yeah.

(14)        A.      **I've kept it the way she had it.**

(15)        Q.      Does a Diocese maintain records

(16)   outside of the archive from the records that are

(17)   kept in other facilities or with other entities?

(18)        A.      **They keep records within their own**

(19)   **department, and I do believe there is another**

(20)   **facility.  I don't remember where it is, but I've**

(21)   **never seen it.  I've heard rumors that there is**

(22)   **this another building that has documents.**

(23)        Q.      Do you know where these rumors

(24)   originated from?

(25)        A.      **Sister Mary Anne has mentioned it.**

(1)                    **K. AMMIRATI**

(2)      Q.      Do you know where the building is?

(3)      **A.      It might be in Roosevelt.  I can't**

(4)  **remember.  I just know that nothing is indexed.**

(5)  **It's just boxes.  I'm not even sure what**

(6)  **department the boxes belong to.**

(7)      Q.      Is it maybe just storage or something

(8)  like that or does it have its own purpose?

(9)      **A.      It is storage, but again, I don't**

(10)  **know when it was started or who even has access to**

(11)  **it anymore.**

(12)      Q.      Is it fair to say that Sister Mary

(13)  Anne would have more information about those

(14)  rumors and this facility?

(15)      **A.      Yes.**

(16)      Q.      You have never been to the facility

(17)  in Roosevelt or transmitted any documents from

(18)  there?

(19)      **A.      No.**

(20)      Q.      And don't know who works there for

(21)  sure?

(22)      **A.      Right.**

(23)      Q.      Or who has access to it?

(24)      **A.      Right.**

(25)      Q.      Okay.

(1)                    K. AMMIRATI

(2)              There is a term that comes up in my

(3)     context of priest cases called secret files.

(4)              Have you ever heard of that term,

(5)     secret files?

(6)        **A.        Yes.**

(7)        Q.        Is that a term that you use at the

(8)     Diocese as an archivist?

(9)        **A.        Yes.**

(10)       Q.        Where are the secret files kept?

(11)       **A.        Those are kept at the chancery.**

(12)       Q.        There are no secret files that were

(13)    pertained to a laid employee like Mr. Palagonia;

(14)    is that right?

(15)       **A.        Right.**

(16)       Q.        The secret files, are those related

(17)    only to priests?

(18)       **A.        Yes, maybe deacon as well.**

(19)       Q.        What is maintained in the secret

(20)    files?

(21)       **A.        I don't know specifically.  Anything**

(22)    **wrong that they have done.**

(23)       Q.        Have you ever seen a secret file?

(24)       **A.        I haven't looked in one, but I have**

(25)    **seen the physical file folders.**

(1)                    **K. AMMIRATI**

(2)        Q.       Do you know if those are kept in a

(3)    different file cabinet in the chancellors office?

(4)        **A.       They are.**

(5)        Q.       So there would be a priest file, and

(6)    then the same priest would have a secret file in a

(7)    different file cabinet within the chancellors

(8)    office?

(9)        **A.       Correct.**

(10)       Q.       Are there documents kept along with

(11)   the secret files that pertain to the Diocese

(12)   practices when it comes to childhood sexual abuse

(13)   as a whole, like, is there anything that any file

(14)   that covers like, policies and procedures or

(15)   things related to child and sexual abuse all

(16)   together?

(17)       **A.       I don't know.**

(18)       Q.       Okay.

(19)                If someone were to say that no

(20)   teacher at Holy Family was accused of having

(21)   sexual relationship with a student

(22)   inappropriately, you wouldn't be able to say that

(23)   without going through every single teacher

(24)   employment file?

(25)                **MR. STEPHENS:   Objection.**

(1)                          **K. AMMIRATI**

(2)         **A.        I guess.**

(3)         Q.        Because you can't search for that

(4)   sort of allegation within your system; is that

(5)   fair?

(6)         **A.        Yes.**

(7)         Q.        The principal of the school at Holy

(8)   Family at that time was Father James Kelly as a

(9)   priest.  I'll just tell you that.  Would Father

(10)  Kelly's priest file contain documents that he has

(11)  pertaining to overseeing Holy Family School?

(12)        **A.        I don't know.**

(13)        Q.        As apart of this case, did you review

(14)  Father Kelly's priest file?

(15)        **A.        No.**

(16)        Q.        How long would it take you to pull

(17)  Father Kelly's priest file?

(18)        **A.        If I have it at the archives, it**

(19)  **would be quick.**

(20)        Q.        Minutes?

(21)        **A.        Yes.**

(22)        Q.        There has been previous searches of

(23)  the archives for these priest files as part of the

(24)  bankruptcy case and as part of these other similar

(25)  litigation cases; is that right?

```
(1)                    K. AMMIRATI
(2)        A.       Yes.
(3)        Q.       Have you pulled priest files of
(4)  priests who are not accused of abuse like, Father
(5)  Kelly, it's never been touched?
(6)                 MR. STEPHENS:  Objection.
(7)        A.       I don't know.
(8)        Q.       Did you personally pull priest files
(9)  for the litigation?
(10)       A.       I've pulled priest files when I'm
(11) asked to.  I don't know what they were
(12) specifically used for.
(13)       Q.       In the last three years, have you
(14) pulled more priest files then normal?
(15)       A.       Yes.
(16)       Q.       Do you have personnel files for
(17) employees like, Sister Mary Anne in the archives?
(18)       A.       She is an active employee, so no.
(19)       Q.       Where are active employee files kept?
(20)       A.       HR.
(21)       Q.       Then when they are discharged, HR
(22) will send the file to you?
(23)       A.       They have in the past.  They haven't
(24) recently.
(25)       Q.       Do you know why?
```

(1)                    K. AMMIRATI

(2)        A.      No.

(3)        Q.      What do you mean by recently?

(4)        A.      **I actually don't know if I ever**

(5)    **received personnel files from HR since I've been**

(6)    **in this job, but I know there are ones that were**

(7)    **there when I already got here.**

(8)        Q.      So HR may have its own policy, and

(9)    one that is to send the file to you?

(10)       A.      **That could be it.**

(11)       Q.      Is the archives -- I've never been to

(12)   the seminary.  Is it one building, is it a group

(13)   of buildings like a campus?

(14)       A.      **It's one big building.**

(15)       Q.      And you are in there?

(16)       A.      **Yes.**

(17)       Q.      Are you in the basement?

(18)       A.      **It's the ground floor.  I'm not under**

(19)   **ground.**

(20)       Q.      It's not an active seminary anymore;

(21)   is that right?

(22)       A.      **It's not active as a seminary, but**

(23)   **there are things going on in the building like**

(24)   **retreats, meetings and things like that.**

(25)       Q.      We talked about departments and

(1)                    K. AMMIRATI

(2)    access.  You as the archivist have access to the

(3)    documents in the legal department?

(4)         A.        No.

(5)         Q.        You described it as an office of

(6)    priest affairs?

(7)         A.        **Clergy personnel, is that what you**

(8)    **mean.**

(9)         Q.        Is that its own department?

(10)        A.        **Yes.**

(11)        Q.        Do you have access to those document?

(12)        A.        **They would be the same priest files**

(13)    **that are under the chancellors office.**

(14)        Q.        So that office doesn't maintain its

(15)    own files, they just use the archives to get their

(16)    own documents; is that fair?

(17)        A.        **Yes.**

(18)        Q.        Then you have access to their

(19)    documents because they are archives files?

(20)        A.        **Yes.**

(21)        Q.        Do you know if you searched for

(22)    Mr. Palagonia's file prior to 2023?

(23)        A.        **I don't know specifically.**

(24)        Q.        Have there been vendors that have

(25)    been coming in and scanning documents out of the

(1)                      K. AMMIRATI

(2)    archives?

(3)         A.      Yes.

(4)         Q.      Are you working for those vendors?

(5)         A.      Not currently.

(6)         Q.      In the last couple of years though,

(7)    you did?

(8)         A.      Yes.

(9)         Q.      Did the vendors literally come to the

(10)   archives and do scans of documents?

(11)        A.      They have done that, and also taken

(12)   files to scan off site.

(13)        Q.      And you've kept track of what they

(14)   took?

(15)        A.      Yes.

(16)        Q.      And you've kept track of it coming

(17)   back in and put it in your log?

(18)        A.      Yes.

(19)        Q.      Would you be able to see if a

(20)   vendor's accessed Mr. Palagonia's file and when?

(21)        A.      Yes.

(22)             MR. STONEKING:  I'm going to

(23)             request for that information, a log

(24)             of vendor access for Mr. Palagonia's

(25)             file.

(1)                    **K. AMMIRATI**

(2)        Q.        Do you know who the vendor was or was

(3)    there several?

(4)        **A.        It's one company.  I don't remember**

(5)    **the name of the company.**

(6)        Q.        It's fair to say that you didn't give

(7)    any vendors instructions or what they could or

(8)    could not look, they had instructions from

(9)    elsewhere; is that true?

(10)       **A.        Right.  I would assume they scanned**

(11)   **everything they took.**

(12)       Q.        Why would you assume that?  Is that

(13)   just all they did, came and took files, scanned it

(14)   and gave it back to you?

(15)       **A.        Yes.**

(16)       Q.        Did they do the scanning on site with

(17)   you in your office?

(18)       **A.        At one point, yes.**

(19)       Q.        What was that point?

(20)       **A.        They were -- it was only about the**

(21)   **box of files, and they were priest files, so they**

(22)   **couldn't remove them from the archives.**

(23)              **They set up a computer and a scanner**

(24)   **and over the day and a half, two days, someone**

(25)   **came and scanned all of those documents there.**

(1)                    **K. AMMIRATI**

(2)        Q.        Was there an attorney from elsewhere

(3)    over seeing any of this?

(4)        **A.        No.**

(5)        Q.        During COVID, you were the archivist

(6)    the whole time, right?

(7)        **A.        Right.**

(8)        Q.        Did you have difficulty and

(9)    challenges accessing this during COVID?

(10)       **A.        No.**

(11)       Q.        Did you go into work every day during

(12)   COVID because you don't have anyone else or you

(13)   worked from Holy?

(14)       **A.        I worked from Holy.**

(15)       Q.        How did you work from Holy?

(16)       **A.        A lot of what I do is waiting to be**

(17)   **asked to find something, so I would get asked a**

(18)   **question, I would go in and fill the request.**

(19)       Q.        How many requests do you get in a

(20)   normal day?

(21)       **A.        A day, one or two.  It's been less**

(22)   **since COVID.**

(23)       Q.        Oh, really?

(24)       **A.        Yes.**

(25)       Q.        Why do you think that is?

(1)                    K. AMMIRATI

(2)        **A.        I think people are working a little**

(3)    **slower.  Things aren't as urgent, so I can wait**

(4)    **until I have more requests so that's it's, you**

(5)    **know, a day of fulfilling requests instead of**

(6)    **having to go in for one thing.**

(7)        Q.        Is there anybody covering for you now

(8)    or you're going to return to a bunch of unanswered

(9)    e-mails?

(10)       **A.        I'll return to a bunch of e-mails.**

(11)       Q.        Okay.

(12)                  The way that the files are indexed,

(13)   and specifically Mr. Palagonia's file, if you were

(14)   to look in the box where you found Mr. Palagonia's

(15)   file, what would be the documents nearby

(16)   physically in that box with it?

(17)       **A.        Other teacher files, which are**

(18)   **alphabetically close to his name.**

(19)       Q.        So not necessarily Holy Family, but

(20)   other teachers within the system?

(21)       **A.        Correct.**

(22)       Q.        Alphabetically with the last name?

(23)       **A.        Correct.**

(24)       Q.        That might be like, a Mr. P who

(25)   worked at, you know, Saint Agnes back in the '60 s

[Page 52]
January 8, 2024

(1)                    K. AMMIRATI

(2)    or something like that?

(3)         **A.        Correct.**

(4)         Q.        Would you have any idea of how to

(5)    find a list of teaches that were at Holy Family at

(6)    a certain time?

(7)         **A.        Not from the archives.**

(8)         Q.        Who would you have to ask?

(9)         **A.        I would ask the Department of**

(10)   **Education.**

(11)        Q.        Is that the sort of e-mail that you

(12)   get from time to time that someone needs a list of

(13)   teachers from a certain school, and you'd be like,

(14)   you don't know how to would find that, call the

(15)   Department of Education?

(16)        **A.        Yes.**

(17)        Q.        But -- and I want to be clear.  It

(18)   seems like of you're holding the DOE stuff too,

(19)   but it's just a select population of documents

(20)   that go to you from the DOE?

(21)        **A.        Yeah, I only have what people give**

(22)   **me.**

(23)        Q.        Mm-hmm.

(24)                  Are you familiar with what the DOE

(25)   has for it's own record?

```
(1)                   K. AMMIRATI

(2)       A.        No.

(3)       Q.        You have never been other there?

(4)       A.        No.

(5)       Q.        Where is it?

(6)       A.        I believe it's at Holy Trinity High

(7)    School in Hicksville.  After the building in

(8)    Rockville Centre sold, all of the departments

(9)    scattered.  I'm not sure.

(10)      Q.        Okay.

(11)                I just want to say, if they are at

(12)   Holy Trinity, it's something that they moved there

(13)   after they sold the chancellor building?

(14)      A.        I believe so.

(15)      Q.        Do you know who is your counter part

(16)   sort of person that you would call at the DOE to

(17)   make a request like that?

(18)      A.        I would just pick one of the

(19)   secretaries.  I don't have anyone specific.

(20)      Q.        Has there ever been any occasions

(21)   where anybody has told you to remove or destroy a

(22)   document without you recording what happened to

(23)   that document?

(24)      A.        No.

(25)      Q.        So as far as -- I guess you can't say
```

[Page 54]
January 8, 2024

(1)                     K. AMMIRATI

(2)    what Sister Mary Anne may or may have not done,

(3)    but as far as instances where you've accessed

(4)    files and they've gone somewhere else from the

(5)    time that you worked there, every document is

(6)    counted for in your log?

(7)        A.      Yes.

(8)        Q.      Does Sister Mary Anne keep a similar

(9)    log?

(10)       A.      I don't know.

(11)       Q.      Are there any occasions that you are

(12)   aware of that Sister Mary Anne has removed

(13)   documents from the database or the archives?

(14)       A.      Not that I'm at ware of.

(15)       Q.      Are you aware of the bishops

(16)   recordkeeping, does he have file cabinets like

(17)   Sister Mary Anne?

(18)       A.      I don't know.

(19)       Q.      Have you ever been in the bishop's

(20)   office?

(21)       A.      No.

(22)       Q.      Are any files maintained with the

(23)   Vatican?

(24)       A.      I don't know.

(25)       Q.      Are you aware of any situations where

(1)                    K. AMMIRATI

(2)    documents have been sent to the Vatican?

(3)        A.        No.

(4)        Q.        Would you have been alerted to that

(5)    if documents did go to the Vatican?

(6)        A.        No, if someone asked me for

(7)    something, I'd give it to him.  What they did with

(8)    it after, I have no idea.  They don't tell me.

(9)        Q.        But you would have a document of it

(10)    going to them in the first place?

(11)        A.        Yes.

(12)        Q.        Is your log computerized?

(13)        A.        No.

(14)        Q.        It's all written down in the log?

(15)        A.        Yes.

(16)        Q.        How many pages?

(17)        A.        It's a binder.  I don't know how many

(18)    pages specifically, and I may have some typed

(19)    pages.

(20)        Q.        When you make entries in your log,

(21)    does it say who is taking something like, someone

(22)    came to me and took a certain file on a certain

(23)    date, and then you have a similar entry that they

(24)    brought it back?  How do you describe everything?

(25)        A.        The department and the person who

(1)                    **K. AMMIRATI**

(2)  **requested it, the description of the files, the**

(3)  **box that it came from, the day they requested it,**

(4)  **the day they received it and the day it came back**

(5)  **to the archive.**

(6)       Q.        So you do have a description of what

(7)  they took, even if it's maybe just a name of the

(8)  file or something like that?

(9)       **A.        Yes.**

(10)      Q.        Do people make requests for

(11) individual documents, do you have individual

(12) documents in any way within the archive?

(13)      **A.        Not really.**

(14)      Q.        Everything is grouped in some sort of

(15) fashion?

(16)      **A.        Yes.**

(17)      Q.        Okay.

(18)                 What other types of files like,

(19) pertains to a school, would the archive have in

(20) addition to employment teacher files?

(21)      **A.        There may be some correspondence,**

(22) **different reports or self studies.  There might be**

(23) **some financial records or grants or applications.**

(24) **That's all can I remember specifically.**

(25)      Q.        So if you did like a Holy Family

(1)                    K. AMMIRATI

(2)    search, you would come up with that those types of

(3)    documents?

(4)        A.        I would, but I believe that when I

(5)    looked for something from Holy Family recently,

(6)    maybe in the course of this, there was a note in

(7)    the database that because the closure of Holy

(8)    Family proceeded the founding's of the archives,

(9)    those files never came to the archives, and are

(10)   being held elsewhere.

(11)       Q.        You don't know where though?

(12)       A.        I don't remember specifically.

(13)       Q.        Can you describe that note?  Did that

(14)   come up on your database screen?

(15)       A.        Yes.

(16)       Q.        Would you be able to find what that

(17)   note says and communicate it to Mr. Stephens?

(18)       A.        Yes.

(19)               MR. STONEKING:  I'll put in a

(20)               request for the contents of that

(21)               alert.

(22)       Q.        But that -- you probably did a Holy

(23)   Family search, probably gave you a note that

(24)   because of the dates involved, it's somewhere

(25)   else.  You just don't remember where it said?

(1)                         K. AMMIRATI

(2)        A.        Correct.

(3)        Q.        Did it likely say another location?

(4)        A.        I believe it did.

(5)        Q.        Do you think it was Holy Trinity?

(6)        A.        It's possible.  I do think it was

(7)   another school.  I just don't remember which one

(8)   it was.

(9)        Q.        Do you know anything about the Saint

(10)  Agnes Cathedral School and how does that fit in?

(11)  There's a reference to Mr. Palagonia's file in the

(12)  lawsuit involving Saint Agnes Cathedral School,

(13)  and I know you may not know if those lawsuits

(14)  papers with in this file or not, we'll find out

(15)  later, but did you have -- if Saint Agnes had a

(16)  separate employment file for Mr. Palagonia, would

(17)  you have access to that too?

(18)       A.        Yes.

(19)       Q.        Would that been all together with the

(20)  Holy Family employment file?

(21)       A.        As far as I know, he should have one

(22)  employment file no matter where he was teaching.

(23)  It would have followed him to whatever schools he

(24)  was at, and it'd come to me when he was

(25)  terminated.

(1)                    **K. AMMIRATI**

(2)         Q.        So he did -- he started at Holy

(3)   Family for a long period of time, and then at

(4)   Saint Agnes, and then he was terminated, but

(5)   you're saying the employment record for Saint

(6)   Agnes and Holy Family should be together in the

(7)   same binder?

(8)         **A.        To the best of any knowledge.**

(9)         Q.        And it would have been produced in

(10)  this search?

(11)        **A.        Yes.**

(12)        Q.        There is a different level of file

(13)  that is contained within Holy Family file, and

(14)  there's very little from Saint Agnes, why he got

(15)  hired or anything like that.

(16)              Beyond the lawsuit, you wouldn't know

(17)  where other similar employment reviews and things

(18)  like that would be held from his time at Saint

(19)  Agnes if they were not in here?

(20)        **A.        I don't know.**

(21)        Q.        And you don't know what sort of

(22)  search you'd have to do to find that?

(23)        **A.        No.**

(24)        Q.        As far as your recordkeeping in the

(25)  Diocese in recordkeeping, is there nothing that

(1)                  K. AMMIRATI

(2)   would indicate that those documents were destroyed

(3)   or put somewhere else for any reason?

(4)        A.      No.

(5)               MR. STONEKING:  All right.

(6)               As far as this case goes, I have

(7)               no further questions.  I may see you

(8)               some time down the road with a group

(9)               of other people like me.

(10)              I appreciate your time coming in

(11)              here.  Thank you.

(12)              MR. STEPHENS:  Just before we go

(13)              off the record -- thank you for your

(14)              time.  I just have one last question.

(15)  EXAMINATION BY MR. STEPHENS:

(16)       Q.      In your time as the archivist for the

(17)  Diocese of Rockville Centre, has any material from

(18)  the archives been destroyed?

(19)       A.      No.

(20)              MR. STEPHENS:  I don't have any

(21)              other questions.

(22)              MR. STONEKING:  Let me ask

(23)              something about this then.

(24)  EXAMINATION BY MR. STONEKING:

(25)       Q.      You wouldn't know if material was

```
(1)                    K. AMMIRATI

(2)   taken and not return was destroyed, right?

(3)      A.        I guess.

(4)      Q.        And there been has material that has

(5)   taken and not returned?

(6)      A.        But it's been kept at Diocesan

(7)   department.

(8)      Q.        But if they destroyed it there, you

(9)   wouldn't know, would you?

(10)     A.        No, I would not.

(11)              MR. STONEKING:  Okay.

(12)              Nothing further.

(13)                  (Whereupon, the proceedings

(14)              were concluded at 11:10 a.m.)

(15)

(16)              _____

                      KRISTA AMMIRATI

(17)

(18)   Subscribed and sworn to

(19)   before me this _____

(20)   day of _____, 2024.

(21)

(22)   _____

            NOTARY PUBLIC

(23)

(24)

(25)
```

(1)

(2)                          I N D E X

(3)     WITNESS              EXAMINATION BY          PAGE

(4)     KRISTA AMMIRATI      PATRICK STONEKING       7/60
                             ERIC STEPHENS           60

(5)

(6)
                             REQUESTS

(7)

        DESCRIPTION                                  PAGE

(8)
        DATE OF SEARCH FOR FILE OF EMPLOYMENT        24

(9)     VENDOR'S ACCESS OF PALAGONIA'S FILE LOG      48
        CONTENTS OF ALERT                            57

(10)

(11)

(12)

(13)

(14)

(15)

(16)

(17)

(18)

(19)

(20)

(21)

(22)

(23)

(24)

(25)

January 8, 2024

```
(1)
(2)                      I N D E X
(3)
                         EXHIBIT
(4)
      NUMBER              DESCRIPTION              PAGE
(5)
      1                   DOCUMENTS                 8
(6)
(7)
(8)
(9)
(10)
(11)
(12)
(13)
(14)
(15)
(16)
(17)
(18)
(19)
(20)
(21)
(22)
(23)
(24)
(25)
```

(1)

(2)                        CERTIFICATION

(3)    STATE OF NEW YORK    )

(4)    COUNTY OF SUFFOLK    )

(5)

(6)              I, Randi Horowitz, a stenotype

(7)    reporter and Notary Public within and for the

(8)    State of New York, do hereby certify that:

(9)

(10)                  KRISTA AMMIRATI

(11)

(12)              The witness whose

(13)    Examination Before Trial is hereinbefore set

(14)    forth, was first duly sworn by me, and that such

(15)    Examination Before Trial is a true and accurate

(16)    record of the testimony given by said witness; and

(17)    I further certify that I am not related to any of

(18)    the parties of this action by blood or marriage

(19)    and that I am in no way interested in the outcome

(20)    of this matter.

(21)

(22)              IN WITNESS WHEREOF, I have

(23)    hereunto set my hand this 21st of January, 2024.

(24)

                        _____

(25)                         RANDI HOROWITZ

January 8, 2024

(1)   **ERRATA SHEET FOR: KRISTA AMMIRATI**

(2)        KRISTA AMMIRATI, being duly sworn, deposes and
         says: I have reviewed the transcript of my
         proceeding taken on 01/08/2024. The following

(3)      changes are necessary to correct my testimony.

(4)   _____

(5)   PAGE LINE      CHANGE                 REASON

(6)   ----|----|---------------------|--------------

(7)   ----|----|---------------------|--------------

(8)   ----|----|---------------------|--------------

(9)   ----|----|---------------------|--------------

(10)  ----|----|---------------------|--------------

(11)  ----|----|---------------------|--------------

(12)  ----|----|---------------------|--------------

(13)  ----|----|---------------------|--------------

(14)  ----|----|---------------------|--------------

(15)  ----|----|---------------------|--------------

(16)  ----|----|---------------------|--------------

(17)  ----|----|---------------------|--------------

(18)  ----|----|---------------------|--------------

(19)  ----|----|---------------------|--------------

(20)  ----|----|---------------------|--------------

(21)  ----|----|---------------------|--------------

(22)  ----|----|---------------------|--------------

(23)        Witness Signature:_____

      Subscribed and sworn to, before me

(24)  this ___ day of _____, 20 ___.

      _____      _____

(25)  (NOTARY PUBLIC)            MY COMMISSION EXPIRES

January 8, 2024

[Page 66]

| A | | | | |
|---|---|---|---|---|
| **a.m (2)** | 18:7 19:4 | 13:1 14:1 | **Anthony's (2)** | 10:21 11:19 |
| 1:14 61:14 | 45:18,19 | 15:1 16:1 | 35:23 36:3 | 14:14 25:22 |
| **a/k/a/ (1)** | 46:20,22 | 17:1 18:1 | **anybody (7)** | 42:8 47:2 |
| 1:7 | **ADAMS (1)** | 19:1 20:1 | 12:22 25:10 | 50:5 60:16 |
| **ability (2)** | 2:8 | 21:1 22:1 | 28:5,6 31:7 | **Ark (1)** |
| 16:21 38:2 | **add (1)** | 23:1 24:1 | 51:7 53:21 | 10:9 |
| **able (7)** | 11:22 | 25:1 26:1 | **anymore (2)** | **ARK457 (1)** |
| 17:2 24:12 | **added (1)** | 27:1 28:1 | 41:11 46:20 | 1:4 |
| 38:11,16 | 14:4 | 29:1 30:1 | **apart (2)** | **aside (1)** |
| 43:22 48:19 | **addition (4)** | 31:1 32:1 | 33:14 44:13 | 10:18 |
| 57:16 | 3:11 4:24 | 33:1 34:1 | **applications ...** | **asked (8)** |
| **above-entitle...** | 18:18 56:20 | 35:1 36:1 | 56:23 | 10:13,16 15:19 |
| 1:19 | **address (2)** | 37:1 38:1 | **applies (1)** | 34:8 45:11 |
| **abuse (6)** | 6:10 12:12 | 39:1 40:1 | 29:14 | 50:17,17 55:6 |
| 38:18 39:3,6 | **advance (1)** | 41:1 42:1 | **appreciate (1)** | **asking (4)** |
| 43:12,15 45:4 | 37:25 | 43:1 44:1 | 60:10 | 7:3 15:24 16:4 |
| **abusing (1)** | **affairs (1)** | 45:1 46:1 | **April (2)** | 25:4 |
| 38:11 | 47:6 | 47:1 48:1 | 10:25 40:6 | **asks (1)** |
| **access (22)** | **against- (1)** | 49:1 50:1 | **archive (15)** | 26:18 |
| 11:25 12:22 | 1:6 | 51:1 52:1 | 11:11,22 14:10 | **ASSOCIAT...** |
| 13:4,23,24 | **Agnes (8)** | 53:1 54:1 | 18:2 21:13 | 2:4,13 |
| 19:19 20:3 | 51:25 58:10,12 | 55:1 56:1 | 26:4 27:12 | **assume (2)** |
| 24:17 27:18 | 58:15 59:4,6 | 57:1 58:1 | 29:7 33:11 | 49:10,12 |
| 28:4,6 30:8 | 59:14,19 | 59:1 60:1 | 34:20 38:12 | **Assumed (1)** |
| 30:17 41:10 | **AGREED (6)** | 61:1,16 62:4 | 40:16 56:5,12 | 18:5 |
| 41:23 47:2,2 | 3:3,17 4:5,11 | 64:10 65:1,1 | 56:19 | **attorney (2)** |
| 47:11,18 | 4:17 5:6 | **amount (1)** | **archives (39)** | 7:2 50:2 |
| 48:24 58:17 | **alert (2)** | 32:13 | 11:25 12:14,23 | **Attorneys (2)** |
| 62:9 | 57:21 62:9 | **analysis (2)** | 14:22 18:18 | 2:4,8 |
| **accessed (3)** | **alerted (1)** | 33:18,21 | 20:13,17 | **authentic (1)** |
| 28:10 48:20 | 55:4 | **ANDERSON...** | 22:17 23:8,12 | 22:15 |
| 54:3 | **Alexis (2)** | 2:4,13 | 23:14,16 | **authority (1)** |
| **accessing (1)** | 2:12 7:3 | **Anne (8)** | 24:18,23 | 27:14 |
| 50:9 | **allegation (1)** | 12:11 40:25 | 25:18 28:7 | **aware (3)** |
| **accurate (1)** | 44:4 | 41:13 45:17 | 30:3 31:21,24 | 54:12,15,25 |
| 64:15 | **allegations (4)** | 54:2,8,12,17 | 33:9 36:11,15 | |
| **accused (3)** | 38:18,21 39:2 | **answer (5)** | 39:4,15 40:8 | B |
| 38:17 43:20 | 39:7 | 7:9 15:22 | 44:18,23 | **back (12)** |
| 45:4 | **alphabeticall...** | 17:19 31:18 | 45:17 46:11 | 10:8 23:3,21 |
| **action (4)** | 51:18,22 | 32:5 | 47:15,19 48:2 | 25:7 27:12 |
| 1:19 3:15 5:4 | **Ammirati (62)** | **answerable (1)** | 48:10 49:22 | 28:11 32:18 |
| 64:18 | 1:17 6:9 7:1 | 32:6 | 52:7 54:13 | 48:17 49:14 |
| **active (6)** | 8:1 9:1 10:1 | **answers (1)** | 57:8,9 60:18 | 51:25 55:24 |
| | 11:1 12:1 | 7:18 | **archivist (8)** | 56:4 |

January 8, 2024

[Page 67]

background ...
14:5
bankruptcy (...
44:24
baptism (1)
31:12
bar (2)
3:13 5:2
basement (1)
46:17
Bath (3)
14:8,11,13
Bed (3)
14:8,11,13
begun (1)
3:23
behalf (1)
33:5
believe (9)
8:24 23:25
 34:25 40:5,19
 53:6,14 57:4
 58:4
belong (1)
41:6
best (3)
24:7 26:16
 59:8
better (1)
21:5
Beyond (4)
14:9,11,13
 59:16
big (2)
13:7 46:14
binder (2)
55:17 59:7
bishop (4)
19:16 24:17
 32:14,22
bishop's (3)
27:23 31:8
 54:19
bishops (2)

bit (4)
10:19 24:2
 33:24 34:10
blood (1)
64:18
borrowing (1)
25:3
bought (1)
14:2
box (8)
14:24 16:12
 28:23 37:11
 49:21 51:14
 51:16 56:3
boxes (11)
13:10,12,18,19
 16:12 21:2,14
 30:13 34:22
 41:5,6
break (3)
7:21,24 23:18
brought (2)
28:11 55:24
building (11)
12:18,20 35:24
 35:25 40:22
 41:2 46:12,14
 46:23 53:7,13
buildings (1)
46:13
built (1)
14:2
bunch (2)
51:8,10
business (2)
21:21 22:12

**C**

C (1)
2:2
C.P.L.R (4)
3:7 4:3,9,19
cabinet (2)

43:3,7
cabinets (3)
30:14,23 54:16
call (4)
9:6 36:2 52:14
 53:16
called (1)
42:3
campus (2)
19:11 46:13
case (20)
7:2 10:7,9 15:9
 15:11,13,18
 16:5 17:25
 21:16 23:6,13
 23:25 28:15
 28:22 33:8
 34:5 44:13,24
 60:6
cases (2)
42:3 44:25
Cathedral (2)
58:10,12
Centre (8)
1:12 10:22
 11:20 17:14
 19:9,21 53:8
 60:17
certain (8)
13:12,16 21:6
 39:6 52:6,13
 55:22,22
certification ...
4:13 64:2
certify (2)
64:8,17
challenges (1)
50:9
chancellor (7)
12:3,6,10,23
 24:20 30:12
 53:13
chancellor's ...
19:4,8,20

25:19 30:10
 31:9
chancellors (8)
19:5 27:23
 30:7,19 32:25
 43:3,7 47:13
chancery (4)
25:21,25 26:4
 42:11
CHANGE (1)
65:5
changes (1)
65:3
charge (1)
5:10
checking (1)
32:19
child (3)
39:3,6 43:15
childhood (1)
43:12
Christmas (1)
32:19
circumstanc...
25:13
clarification ...
38:24
clean (1)
7:12
clear (2)
27:20 52:17
Clergy (1)
47:7
close (1)
51:18
closer (3)
9:12,13 25:17
closure (1)
57:7
codes (2)
14:20 36:25
coding (1)
37:4
collect (1)

11:21
come (10)
15:8,13 23:16
 24:12 36:15
 37:10 48:9
 57:2,14 58:24
comes (6)
10:14 19:7
 23:24 27:14
 42:2 43:12
comfortable ...
6:21
coming (5)
8:5 31:12
 47:25 48:16
 60:10
COMMISSI...
65:25
communicat...
57:17
communicati...
39:25
company (2)
49:4,5
complaint (5)
10:7 23:6,7,12
 23:24
complaints (1)
9:25
computer (3)
20:25 37:24
 49:23
computerize...
55:12
Conception (1)
12:19
concerned (1)
16:3
concerns (1)
38:10
concluded (1)
61:14
Conduct (1)
4:20

January 8, 2024

[Page 68]

confident (1)
36:18
connected (1)
35:14
contain (1)
44:10
contained (1)
59:13
contents (3)
26:25 57:20
62:9
context (1)
42:3
controlled (1)
4:3
conversation...
15:25
copy (1)
5:8
correct (13)
22:2 24:2,3
28:12 30:4
33:13 35:8
43:9 51:21,23
52:3 58:2
65:3
corresponde...
32:14 56:21
corresponde...
32:23
counsel (9)
1:23 3:4,18,25
4:6,12,18 5:7
5:9
counted (1)
54:6
counter (1)
53:15
COUNTY (2)
1:2 64:4
couple (4)
8:9,21 9:4 48:6
course (4)
19:24 21:20

22:11 57:6
court (4)
1:2 7:15 28:15
28:21
covered (1)
33:23
covering (1)
51:7
covers (2)
38:17 43:14
COVID (4)
50:5,9,12,22
created (2)
11:14 34:25
curious (1)
36:22
current (1)
17:25
currently (1)
48:5

————————
D

D (2)
62:2 63:2
database (15)
10:14 11:22
13:13,14
14:25 15:2
34:4 38:5,7
40:8,11,12
54:13 57:7,14
date (5)
8:18 23:9
24:10 55:23
62:8
dates (1)
57:24
day (10)
49:24 50:11,20
50:21 51:5
56:3,4,4
61:20 65:24
days (1)
49:24

deacon (1)
42:18
deal (1)
37:16
Debbie (1)
20:9
December (1)
40:6
deemed (1)
3:25
Defendant (2)
1:18 6:2
Defendants (2)
1:9 2:8
degree (1)
14:9
department (...
17:7,12,13,17
17:22 18:2,8
25:4 26:23
27:18,22 28:3
28:3,5,24
29:2 34:11,12
34:24 35:6
36:8,9 40:19
41:6 47:3,9
52:9,15 55:25
61:7
department'...
24:6 29:2
departments...
27:21 46:25
53:8
depends (2)
25:2 38:2
deposes (1)
65:1
deposition (2)
6:15 12:13
Depositions (1)
4:21
describe (2)
55:24 57:13
described (1)

47:5
description (9)
14:25 15:2
26:6 27:5
36:25 56:2,6
62:7 63:4
descriptions ...
38:6
descriptive (1)
38:4
desk (1)
20:24
destroy (1)
53:21
destroyed (4)
60:2,18 61:2,8
determine (1)
14:22
determined (1)
16:17
Devoe (1)
20:9
died (1)
19:6
dies (1)
18:6
different (11)
17:13 20:19,20
20:21 21:5
31:11 34:13
43:3,7 56:22
59:12
difficult (1)
32:11
difficulty (1)
50:8
Diocesan (2)
1:7 61:6
Diocese (16)
10:22 11:20
14:6 17:14
18:18 19:7
27:21,22 29:7
31:11 34:13

40:15 42:8
43:11 59:25
60:17
discharged (1)
45:21
discussion (2)
23:19,23
document (16)
8:16,25 15:11
22:4 23:12
24:4,13,22
26:19 29:14
36:25 47:11
53:22,23 54:5
55:9
documents (...
9:22 10:3 13:5
13:10 14:20
15:19 16:5,17
16:22 17:22
21:12,19,24
22:8,14,20
23:5 25:10,16
25:24 26:3,7
27:10,11,15
27:17 28:7,13
28:15 29:6,9
29:18 30:7,9
30:11,17,22
31:3,20,23
32:2 33:16
35:10 36:10
37:15,19,21
38:16 39:4,5
39:9,14,22
40:22 41:17
43:10 44:10
47:3,16,19,25
48:10 49:25
51:15 52:19
54:13 55:2,5
56:11,12 57:3
60:2 63:5
DOE (5)

January 8, 2024

[Page 69]

1:4 52:18,20
52:24 53:16
**doing (5)**
16:3,4 27:16
32:19 33:17
**duly (3)**
6:3 64:14 65:1

———————

**E**

**E (4)**
2:2,2 62:2 63:2
**e-mail (1)**
52:11
**e-mails (3)**
23:4 51:9,10
**early (2)**
11:11,14
**education (15)**
17:7,11,13,17
18:2,8 27:24
34:11,12,24
35:6 36:8,9
52:10,15
**effort (1)**
35:9
**either (4)**
19:6 22:9
24:20 38:25
**electric (1)**
13:14
**electrically (2)**
14:23 15:16
**employee (3)**
42:13 45:18,19
**employees (1)**
45:17
**employment ...**
9:7,11 10:4,10
18:19 21:20
21:25 22:8
24:10 28:18
28:22 29:20
30:2 37:5,6
38:9,15 43:24

56:20 58:16
58:20,22 59:5
59:17 62:8
**enter (1)**
38:3
**entire (2)**
33:11 38:2
**entities (1)**
40:17
**entity (1)**
17:14
**entries (1)**
55:20
**entry (1)**
55:23
**Eric (3)**
2:10 8:7 62:4
**ERRATA (1)**
65:1
**especially (1)**
34:5
**ESQ (3)**
2:6,10,12
**essentially (1)**
12:20
**estimation (1)**
22:23
**eventually (1)**
31:20
**examination ...**
1:17 4:23 5:2
6:6 60:15,24
62:3 64:13,15
**examination(...**
3:10,13,19,22
3:24 4:7,14
5:8
**examined (2)**
3:20 6:4
**example (1)**
18:22
**exception (1)**
22:15
**Exhibit (14)**

8:15,17,22 9:6
9:7 16:6
22:11,14,21
23:13 28:14
29:23 33:25
63:3
**expect (2)**
7:24 29:19
**EXPIRES (1)**
65:25
**explain (6)**
18:24 20:16
26:16 30:8
31:2 33:24

———————

**F**

**F (1)**
2:8
**facilities (1)**
40:17
**facility (3)**
40:20 41:14,16
**failure (3)**
3:11,23 4:24
**fair (11)**
21:18 22:10
31:15,21
32:13,15
33:18 41:12
44:5 47:16
49:6
**fairly (1)**
9:6
**familiar (1)**
52:24
**Family (22)**
1:7,7,18 16:22
16:25 35:15
36:2,19 37:20
43:20 44:8,11
51:19 52:5
56:25 57:5,8
57:23 58:20
59:3,6,13

**far (6)**
26:6 53:25
54:3 58:21
59:24 60:6
**fashion (1)**
56:15
**Father (5)**
44:8,9,14,17
45:4
**file (68)**
8:8 9:8,11,20
9:23 10:4,10
10:12 15:10
17:20 19:7
21:20,25
24:11 26:14
26:18,21,25
27:2,3,5
28:19,22
29:15,20 30:2
30:14,23
32:24 33:4,11
33:25 34:5
37:5,6 38:9
38:15 39:11
42:23,25 43:3
43:5,6,7,13
43:24 44:10
44:14,17
45:22 46:9
47:22 48:20
48:25 51:13
51:15 54:16
55:22 56:8
58:11,14,16
58:20,22
59:12,13 62:8
62:9
**filed (6)**
14:21 17:6
23:7,10,14
24:5
**files (57)**
10:15 11:22

12:3 17:7,21
17:24 18:2,4
18:9,19,25
19:3,20 20:3
21:6 22:6,7,8
25:17,21 29:3
29:12 30:24
30:25 34:12
34:13,19 42:3
42:5,10,12,16
42:20 43:11
44:23 45:3,8
45:10,14,16
45:19 46:5
47:12,15,19
48:12 49:13
49:21,21
51:12,17 54:4
54:22 56:2,18
56:20 57:9
**filing (2)**
4:13 25:15
**filings (1)**
10:2
**fill (1)**
50:18
**finance (1)**
27:24
**financial (2)**
31:6 56:23
**find (15)**
11:24 14:23
15:19 16:5,24
26:9,19 33:25
38:16 50:17
52:5,14 57:16
58:14 59:22
**finish (3)**
7:17,18,23
**fired (3)**
18:6,11,15
**first (6)**
6:3 8:9 9:3
26:9 55:10

January 8, 2024

[Page 70]

64:14
**fit (1)**
58:10
**Fitzgerald (1)**
12:11
**five (3)**
13:9 20:17,19
**floor (2)**
2:5 46:18
**folders (1)**
42:25
**followed (1)**
58:23
**following (1)**
65:2
**follows (1)**
6:5
**form (2)**
3:9 4:22
**formation (1)**
35:5
**forth (2)**
32:18 64:14
**found (2)**
28:18 51:14
**founding's (1)**
57:8
**fulfilling (1)**
51:5
**full (3)**
13:7 27:18
30:13
**fundamental...**
10:19
**furnished (1)**
5:9
**further (8)**
3:17 4:5,11,17
5:6 60:7
61:12 64:17

**G**
**general (2)**
15:22 37:20

**generate (1)**
17:2
**generates (1)**
17:22
**give (6)**
25:7 26:20
38:14 49:6
52:21 55:7
**given (1)**
64:16
**go (20)**
6:23 7:18
10:19 12:4,6
13:18 18:5,6
29:23 31:10
31:13 32:24
36:7 37:11
50:11,18 51:6
52:20 55:5
60:12
**goes (4)**
14:25 32:14
33:11 60:6
**going (11)**
8:13 9:24 15:7
26:19 29:22
34:20 43:23
46:23 48:22
51:8 55:10
**good (2)**
6:13 31:13
**Gotcha (1)**
27:25
**graduated (1)**
35:25
**grants (1)**
56:23
**Great (1)**
2:9
**ground (2)**
46:18,19
**group (2)**
46:12 60:8
**grouped (1)**

56:14
**guess (7)**
23:15 24:7
32:25 36:12
44:2 53:25
61:3

**H**
**half (1)**
49:24
**hand (1)**
64:23
**happened (1)**
53:22
**happening (1)**
25:2
**happens (1)**
33:3
**head (1)**
28:2
**heard (2)**
40:21 42:4
**held (9)**
1:19 13:2
22:11 23:19
30:2,7 33:11
57:10 59:18
**hereinbefore...**
64:13
**hereto (6)**
3:5,19 4:7,13
4:19 5:8
**hereunto (1)**
64:23
**Hi (1)**
6:14
**Hicksville (1)**
53:7
**high (6)**
1:7 35:17,23
36:2,3 53:6
**Highway (1)**
2:9
**hired (2)**

40:6 59:15
**history (2)**
14:9 23:3
**hit (1)**
15:8
**hits (3)**
16:8,11 36:16
**holding (1)**
52:18
**Holy (28)**
1:7,7,18 16:22
16:25 35:15
36:2,19 37:20
43:20 44:7,11
50:13,14,15
51:19 52:5
53:6,12 56:25
57:5,7,22
58:5,20 59:2
59:6,13
**Horowitz (4)**
1:20 6:4 64:6
64:25
**Hospital (1)**
19:12
**house (1)**
14:2
**HR (4)**
45:20,21 46:5
46:8
**Huntington (3)**
6:11 12:13
20:11

**I**
**idea (2)**
52:4 55:8
**identificatio...**
8:18
**identities (1)**
1:7
**Immaculate ...**
12:19
**improvemen...**

40:10
**inappropriat...**
43:22
**include (1)**
38:10
**including (2)**
3:8 4:21
**incorrect (1)**
35:7
**indefinitely (6)**
17:21 25:8,11
29:7,10,13
**index (5)**
1:10 13:11
14:21 16:7
38:3
**indexed (3)**
21:8 41:4
51:12
**indexes (2)**
26:10 36:23
**indicate (1)**
60:2
**individual (4)**
30:25 39:6
56:11,11
**information ...**
27:8 29:24
41:13 48:23
**instances (1)**
54:3
**instructions ...**
49:7,8
**intention (1)**
14:10
**interested (1)**
64:19
**involved (1)**
57:24
**involving (3)**
28:16 39:2
58:12
**it'd (1)**
58:24

Lexitas Court Reporting
800-678-0166

January 8, 2024

[Page 71]

**it'll (2)**
7:18 10:25

---

**J**

**J-E-A-N (1)**
11:6
**James (1)**
44:8
**January (2)**
1:13 64:23
**Jean (3)**
11:4,5 14:3
**JEFF (2)**
2:4,13
**job (2)**
19:24 46:6

---

**K**

**K (56)**
6:2 7:1 8:1 9:1
10:1 11:1
12:1 13:1
14:1 15:1
16:1 17:1
18:1 19:1
20:1 21:1
22:1 23:1
24:1 25:1
26:1 27:1
28:1 29:1
30:1 31:1
32:1 33:1
34:1 35:1
36:1 37:1
38:1 39:1
40:1 41:1
42:1 43:1
44:1 45:1
46:1 47:1
48:1 49:1
50:1 51:1
52:1 53:1
54:1 55:1
56:1 57:1
58:1 59:1

**60:1 61:1**
**keep (16)**
11:21 15:15
17:20,21,23
18:21 25:8
26:19 27:6
29:6 31:16
34:20 35:9
39:13 40:18
54:8
**keeping (3)**
14:17 25:16
29:3
**keeps (1)**
32:25
**Kelly (2)**
44:8 45:5
**Kelly's (3)**
44:10,14,17
**kept (18)**
18:2 19:3
21:20 25:10
29:13 33:4
35:12,21
40:14,17
42:10,11 43:2
43:10 45:19
48:13,16 61:6
**key (4)**
12:3,4 13:2
24:20
**kind (2)**
30:11 31:7
**know (60)**
7:6,21 9:23
11:2,5,7,9
13:21,24 14:3
17:23 22:3
28:25 29:12
29:24 32:2
35:3,20 36:12
37:20,22 38:6
39:12,16,17
40:23 41:2,4

41:10,20
42:21 43:2,17
44:12 45:7,11
45:25 46:4,6
47:21,23 49:2
51:5,25 52:14
53:15 54:10
54:18,24
55:17 57:11
58:9,13,13,21
59:16,20,21
60:25 61:9
**knowledge (1)**
59:8
**Krista (7)**
1:17 6:9 61:16
62:4 64:10
65:1,1

---

**L**

**lack (1)**
21:5
**laicized (1)**
19:6
**laid (2)**
33:9 42:13
**late (1)**
34:25
**lawsuit (2)**
58:12 59:16
**lawsuits (1)**
58:13
**lawyers (1)**
15:25
**leave (1)**
39:21
**left (3)**
26:3 39:15
40:7
**legal (13)**
9:21 10:2
15:10 21:24
22:8 24:5
27:24 28:6,7

28:13,24,25
47:3
**letter (3)**
31:8,13 33:3
**letters (1)**
32:17
**level (2)**
39:5 59:12
**LINE (1)**
65:5
**list (5)**
16:8,24 17:2
52:5,12
**literally (2)**
37:9 48:9
**litigation (4)**
38:25 39:2
44:25 45:9
**little (7)**
10:19 23:25
33:23 34:10
36:22 51:2
59:14
**located (3)**
13:19 16:11
19:9
**location (3)**
12:14,17 58:3
**lock (1)**
13:2
**log (15)**
25:5 27:6,8
28:9 39:13,17
39:22 48:17
48:23 54:6,9
55:12,14,20
62:9
**long (12)**
7:24 10:24
11:9 15:12
16:19 25:7
27:17 29:3,6
38:7 44:16
59:3

**longer (2)**
19:6 35:15
**look (11)**
8:19 9:12,13
9:21 10:15
23:3,4 29:11
39:9 49:8
51:14
**looked (6)**
8:8,21 9:3
22:18 42:24
57:5
**looking (5)**
8:9 16:4 33:16
36:5 38:9
**lot (2)**
27:11 50:16
**Lynch (2)**
11:4 39:13

---

**M**

**M (2)**
6:2,2
**maintain (6)**
18:25 29:3
32:22 36:10
40:15 47:14
**maintained (5)**
29:9,21 30:9
42:19 54:22
**maintains (1)**
19:20
**maintenance...**
12:4,24
**makeup (1)**
20:16
**management...**
14:16
**marked (4)**
8:14,17,22,23
**markings (1)**
21:3
**marriage (1)**
64:18

**Mary (8)**
12:11 40:25
41:12 45:17
54:2,8,12,17
**Marys (1)**
19:11
**material (4)**
28:18 60:17,25
61:4
**matter (2)**
58:22 64:20
**mean (9)**
12:8 20:18
22:7 26:13,14
31:3 37:18
46:3 47:8
**means (1)**
37:22
**meant (1)**
38:21
**meeting (1)**
8:7
**meetings (2)**
12:21 46:24
**mentioned (2)**
17:11 40:25
**Mercy (1)**
19:12
**Merrick (1)**
1:12
**Merry (1)**
32:18
**met (1)**
40:9
**Michael (8)**
9:7 29:19
33:25 37:5,9
37:10,12
39:10
**Microsoft (1)**
13:23
**mid (1)**
34:25
**million (1)**

21:9
**minutes (2)**
16:20 44:20
**mistaken (1)**
35:22
**Mm-hmm (2)**
7:8 52:23
**mobile (1)**
20:23
**momentary (1)**
23:18
**months (1)**
22:24
**morning (1)**
6:13
**motion (2)**
3:14 5:3
**move (5)**
3:9,12 4:22,25
27:14
**moved (4)**
26:7,21 27:2
53:12
**moving (1)**
27:10
**museum (1)**
14:11

—————
**N**
—————
**N (3)**
2:2 62:2 63:2
**name (28)**
6:7,25 10:14
10:15 11:4
13:21 14:22
15:3,7,10,11
15:12,13,20
26:11,14,15
26:22 27:4
34:3,6 37:7
37:13 38:14
49:5 51:18,22
56:7
**names (3)**

13:17,17 20:8
**NASSAU (1)**
1:2
**nearby (1)**
51:15
**necessarily (2)**
26:22 51:19
**necessary (1)**
65:3
**Neck (1)**
6:11
**need (7)**
6:23 7:9,12,21
24:20 27:4,19
**needed (2)**
25:7 36:4
**needs (1)**
52:12
**never (8)**
33:4 40:9,21
41:16 45:5
46:11 53:3
57:9
**new (10)**
1:2,12,21 2:5,5
2:9 6:11 24:2
64:3,8
**nine (1)**
10:25
**normal (2)**
45:14 50:20
**Notary (7)**
1:21 3:21,21
6:4 61:22
64:7 65:25
**note (7)**
25:8 26:20,21
57:6,13,17,23
**notes (1)**
40:7
**Notice (1)**
1:22
**NUMBER (1)**
63:4

**numbered (1)**
21:2

—————
**O**
—————
**object (4)**
3:8,11 4:21,24
**Objection (6)**
17:18 18:13
31:17,25
43:25 45:6
**occasions (2)**
53:20 54:11
**OCR (1)**
37:20
**office (26)**
17:23 19:4,5,8
19:17 20:4,6
20:24 24:6
25:19 27:23
27:23 30:7,10
30:19 31:8,9
32:25 33:2
43:3,8 47:5
47:13,14
49:17 54:20
**Oh (2)**
9:18 50:23
**okay (34)**
6:18,24 7:13
7:19,20,25
8:3,20 9:5,15
10:6,17 14:19
15:5,14 16:2
17:10 18:16
19:13 21:11
22:19 24:16
29:17 30:5
32:9 33:7
37:8,14 41:25
43:18 51:11
53:10 56:17
61:11
**old (2)**
23:9 28:22

**older (1)**
28:14
**oldest (1)**
34:19
**Once (2)**
6:20 19:5
**ones (2)**
34:18 46:6
**opened (1)**
8:8
**operation (1)**
35:16
**opposed (1)**
33:2
**ordinary (2)**
21:20 22:11
**organization...**
14:16
**organized (1)**
14:17
**original (2)**
3:24 4:14
**originated (1)**
40:24
**outcome (1)**
64:19
**outside (2)**
21:3 40:16
**overseeing (1)**
44:11
**overwhelmin...**
34:21

—————
**P**
—————
**P (3)**
2:2,2 51:24
**PAGE (4)**
62:3,7 63:4
65:5
**pages (9)**
8:9,11,22,23
9:4 10:8
55:16,18,19
**Palagonia (14)**

January 8, 2024

[Page 73]

15:19 16:8
28:16 29:20
33:8,25 34:6
36:14 37:6,9
37:10,12
42:13 58:16
**Palagonia's (...**
9:7,11 10:4
21:19 37:5
39:10 47:22
48:20,24
51:13,14
58:11 62:9
**paper (1)**
13:5
**papers (1)**
58:14
**parish (5)**
31:9,14,20,24
35:13
**parishes (4)**
30:25 31:4,15
32:8
**part (5)**
4:20 38:25
44:23,24
53:15
**particular (1)**
15:18
**parties (7)**
3:4,18 4:6,12
4:18 5:7
64:18
**Pat (2)**
6:25 38:20
**PATRICK (3)**
2:6,8 62:4
**payroll (1)**
29:24
**PC (1)**
2:8
**PDF (2)**
8:8,11
**pending (1)**

7:22
**people (6)**
11:23 20:2
51:2 52:21
56:10 60:9
**Perfect (1)**
34:9
**perform (1)**
31:12
**period (1)**
59:3
**permission (2)**
12:5,7
**person (7)**
26:12,12,15,23
37:16 53:16
55:25
**person's (1)**
15:7
**personal (2)**
9:23 18:9
**personally (2)**
39:3 45:8
**personnel (12)**
9:19 15:9
17:21 27:3,24
29:12,15
30:24 34:5
45:16 46:5
47:7
**pertain (4)**
30:25 37:16,19
43:11
**pertained (1)**
42:13
**pertaining (1)**
44:11
**pertains (1)**
56:19
**physical (1)**
42:25
**physically (1)**
51:16
**pick (1)**

53:18
**place (4)**
1:20 26:9
33:12 55:10
**plaintiff (4)**
1:5,8 2:4 7:2
**Plaintiff's (3)**
8:14,17,22
**please (3)**
6:8,10 8:19
**point (2)**
49:18,19
**policies (1)**
43:14
**policy (1)**
46:8
**populated (1)**
36:23
**population (1)**
52:19
**position (2)**
11:13 15:6
**possible (1)**
58:6
**practice (1)**
29:3
**practices (1)**
43:12
**preparation ...**
8:5
**prepared (1)**
24:4
**PRESENT (1)**
2:12
**prest (1)**
12:20
**pretty (2)**
6:21 24:13
**previous (1)**
44:22
**previously (1)**
39:10
**priest (26)**
18:21,23 21:6

25:17,21
27:24 30:24
31:11 32:15
32:24 33:5
42:3 43:5,6
44:9,10,14,17
44:23 45:3,8
45:10,14 47:6
47:12 49:21
**priests (3)**
33:4 42:17
45:4
**principal (1)**
44:7
**prior (6)**
8:5 11:10,17
14:5 35:5
47:22
**probably (3)**
24:5 57:22,23
**procedures (1)**
43:14
**proceeded (1)**
57:8
**proceeding (2)**
6:22 65:2
**proceedings ...**
61:13
**process (1)**
33:24
**processes (1)**
40:7
**produced (3)**
21:19 22:4
59:9
**program (1)**
13:25
**programs (1)**
13:24
**provide (1)**
11:24
**provided (5)**
3:7 4:2,8,19
22:16

**Public (7)**
1:21 3:21,21
6:4 61:22
64:7 65:25
**pull (5)**
10:15 25:24
38:15 44:16
45:8
**pulled (6)**
22:6 34:4,6
45:3,10,14
**purpose (2)**
14:21 41:8
**purposes (1)**
4:8
**pursuant (1)**
1:22
**put (9)**
10:18 15:7
24:9 26:22
27:5 38:5
48:17 57:19
60:3

---
**Q**

**question (12)**
3:8,12 4:22,25
7:22,23 27:13
27:15 29:21
32:6 50:18
60:14
**questions (5)**
7:3,17 15:22
60:7,21
**quick (1)**
44:19
**quickly (3)**
24:13 34:22
35:11
**quote (2)**
25:3,3

---
**R**

**R (3)**
2:2 6:2,2

January 8, 2024

[Page 74]

**Randi (4)**
1:20 6:3 64:6
64:25
**read (1)**
37:24
**real (1)**
29:24
**really (4)**
22:25 34:14
50:23 56:13
**reason (2)**
60:3 65:5
**received (2)**
46:5 56:4
**recognized (1)**
16:6
**record (17)**
6:7 7:12 18:9
23:20,22,24
24:23 28:9,11
29:2 34:16,21
35:24 52:25
59:5 60:13
64:16
**recorded (4)**
24:25 26:3,7
39:14
**recording (1)**
53:22
**recordkeepi...**
14:14 17:16
54:16 59:24
59:25
**records (13)**
11:21 18:17,21
31:16 32:7
34:15 35:5,12
35:20 40:15
40:16,18
56:23
**redaction (1)**
22:16
**Redd (2)**
2:12 7:3

**redoing (1)**
25:15
**reference (1)**
58:11
**references (1)**
23:6
**referencing (1)**
17:12
**referred (1)**
9:2
**related (4)**
28:15 42:16
43:15 64:17
**relationship ...**
43:21
**relevance (1)**
33:15
**remember (17)**
10:5 16:13
21:15,24
22:22,25
28:17,20
33:20,22
40:20 41:4
49:4 56:24
57:12,25 58:7
**remove (2)**
49:22 53:21
**removed (3)**
24:22 39:10
54:12
**rephrase (1)**
7:6
**replenishme...**
14:15
**reporter (3)**
1:21 7:16 64:7
**reports (4)**
31:6,6,7 56:22
**represent (1)**
6:25
**representing...**
5:9
**request (5)**

24:9 48:23
50:18 53:17
57:20
**requested (2)**
56:2,3
**requests (5)**
50:19 51:4,5
56:10 62:6
**reserved (4)**
3:11,14 4:24
5:3
**respective (6)**
3:4,18 4:6,12
4:18 5:7
**responsive (1)**
33:17
**results (1)**
36:24
**retention (1)**
29:12
**retired (2)**
11:12 40:5
**retreats (2)**
12:21 46:24
**retrieve (6)**
10:13 11:23
12:2 13:17,18
22:20
**retrieved (2)**
10:11 16:16
**return (4)**
3:23 51:8,10
61:2
**returned (1)**
61:5
**review (3)**
8:4 39:5 44:13
**reviewed (1)**
65:2
**reviews (2)**
33:15 59:17
**right (23)**
3:8 4:21 16:9
18:10 23:10

35:16 37:2,21
38:18,19,22
39:18 41:22
41:24 42:14
42:15 44:25
46:21 49:10
50:6,7 60:5
61:2
**rights (3)**
3:7 4:2,19
**Rive (1)**
2:9
**road (3)**
1:12 6:11 60:8
**Rockville (8)**
1:12 10:22
11:20 17:14
19:9,21 53:8
60:17
**role (7)**
10:20,24 11:2
11:10,19
14:14 40:2
**roles (1)**
21:5
**room (6)**
13:7 20:23,24
21:6 25:16
30:13
**rooms (5)**
13:9 20:17,19
20:22 21:4
**Roosevelt (2)**
41:3,17
**Rosa (1)**
20:9
**rosters (1)**
36:6
**rows (4)**
13:7,8,9 20:22
**rude (1)**
7:12
**rule (1)**
25:20

**Rules (2)**
4:2,20
**rumors (3)**
40:21,23 41:14

_____
S
_____

**s (3)**
2:2 6:2 51:25
**Saint (11)**
19:11 35:23
36:2 51:25
58:9,12,15
59:4,5,14,18
**saw (2)**
10:11 39:24
**saying (2)**
11:13 59:5
**says (2)**
57:17 65:2
**scan (2)**
37:23 48:12
**scanned (4)**
15:15 49:10,13
49:25
**scanner (1)**
49:23
**scanning (2)**
47:25 49:16
**scans (1)**
48:10
**scattered (1)**
53:9
**schedule (1)**
29:12
**school (20)**
1:7 12:20 17:9
33:9 35:13,13
35:17,22,23
35:23 36:2,3
44:7,11 52:13
53:7 56:19
58:7,10,12
**schools (1)**
58:23

January 8, 2024

screen (1)
57:14
search (21)
13:16 15:8
16:7,19,21
21:15 23:3
24:10 33:17
34:3,11,13
36:23 38:2,12
44:3 57:2,23
59:10,22 62:8
searched (4)
10:13 15:3,20
47:21
searches (1)
44:22
searchs (1)
33:14
secret (9)
42:3,5,10,12
42:16,19,23
43:6,11
secretaries (4)
20:4,5,10
53:19
see (7)
9:18 10:12
23:9 29:19
33:4 39:5,9
48:19 60:7
seeing (1)
50:3
seen (5)
9:22 32:17
40:21 42:23
42:25
select (1)
52:19
self (1)
56:22
seminary (5)
12:18,19 46:12
46:20,22
send (4)

10:16 32:18
45:22 46:9
sends (2)
17:7 31:8
sent (4)
8:8 24:2 34:7
55:2
sentences (1)
38:7
separate (1)
58:16
service (1)
19:2
set (5)
14:3 30:13
49:23 64:13
64:23
sexual (7)
38:18,21 39:3
39:6 43:12,15
43:21
sexually (1)
38:11
SHEET (1)
65:1
shelves (2)
13:8 20:22
shelving (2)
13:10 20:23
shelvings (1)
20:23
shows (1)
24:13
sided (1)
9:17
Signature (1)
65:23
similar (7)
16:22 30:12
39:13 44:24
54:8 55:23
59:17
single (1)
43:23

Sister (8)
12:11 40:25
41:12 45:17
54:2,8,12,17
sit (1)
21:23
site (2)
48:12 49:16
sits (1)
19:16
situations (1)
54:25
slower (1)
51:3
smoothly (1)
7:19
software (1)
13:22
sold (2)
53:8,13
somebody (1)
27:13
sorry (3)
7:10 33:23
38:20
sort (13)
14:14,15,18
29:9,25 32:19
38:12 40:10
44:4 52:11
53:16 56:14
59:21
sorts (1)
31:23
source (1)
16:17
specific (2)
15:25 53:19
specifically (...
10:5 16:13
21:17 27:11
29:5,11 33:22
36:13 42:21
45:12 47:23

51:13 55:18
56:24 57:12
spell (1)
11:5
spiritual (1)
31:7
spoke (1)
40:9
spot (1)
14:18
staff (2)
12:4,24
standing (1)
31:13
start (1)
29:22
started (6)
11:11 12:13
30:6 40:2
41:10 59:2
State (6)
1:2,21 6:7,10
64:3,8
static (1)
20:23
stating (1)
39:21
stenotype (2)
1:20 64:6
Stephens (17)
2:10 15:21
17:18 18:13
18:15 23:17
31:17,25 32:5
38:20 43:25
45:6 57:17
60:12,15,20
62:4
STIPULAT...
3:3,17 4:5,11
4:17 5:6
stipulations (...
1:22 3:2
stock (1)

14:15
Stoneking (17)
2:6 6:6,25 8:13
15:23 18:14
23:21 24:8
32:4 38:23
48:22 57:19
60:5,22,24
61:11 62:4
stopped (2)
8:9 39:20
storage (2)
41:7,9
Street (1)
2:5
strike (4)
3:9,12 4:23,25
student (7)
34:15 35:5,12
38:11,18,22
43:21
students (1)
34:21
studies (1)
56:22
stuff (1)
52:18
Subscribed (2)
61:18 65:23
SUFFOLK (1)
64:4
Suite (1)
2:9
Sunrise (1)
2:9
SUPREME (1)
1:2
sure (8)
7:14 31:19
32:12,16,21
41:5,21 53:9
sworn (6)
3:20 6:3 61:18
64:14 65:1,23

January 8, 2024

[Page 76]

**system (3)**
26:8 44:4
51:20
**systems (1)**
25:15

---

**T**

**T (2)**
6:2,2
**take (7)**
7:23 8:19
16:19 23:18
25:6,21 44:16
**taken (8)**
1:20 6:15
25:10,18
48:11 61:2,5
65:2
**talk (2)**
7:15 25:20
**talked (2)**
34:10 46:25
**talking (2)**
9:2 13:4
**tat (1)**
29:4
**teacher (12)**
17:20 18:5,18
29:19 33:9,10
38:10,15
43:20,23
51:17 56:20
**teacher's (3)**
9:19 17:24
28:22
**teachers (7)**
16:25 17:8
18:7 36:6
38:17 51:20
52:13
**teaches (1)**
52:5
**teaching (2)**
36:20 58:22

**technically (2)**
12:8 24:19
**tell (6)**
13:17 15:23
23:2 26:13
44:9 55:8
**tells (1)**
13:11
**term (4)**
38:12 42:2,4,7
**terminated (7)**
17:8,9 18:4,23
33:10 58:25
59:4
**terrible (1)**
29:21
**testified (1)**
6:5
**testifying (1)**
5:10
**testimony (6)**
3:10,12 4:23
4:25 64:16
65:3
**thank (4)**
24:8 38:23
60:11,13
**thing (4)**
7:22 14:18
29:25 51:6
**things (12)**
10:2,14 12:21
13:12 14:21
32:20 38:5
43:15 46:23
46:24 51:3
59:17
**think (9)**
15:24 23:17
33:16 36:24
38:21 50:25
51:2 58:5,6
**three (3)**
14:12 20:22

45:13
**time (19)**
1:19 19:23,23
31:7 34:20
36:19 39:23
44:8 50:6
52:6,12,12
54:5 59:3,18
60:8,10,14,16
**times (1)**
6:19
**today (3)**
7:4 8:5 21:23
**told (2)**
23:25 53:21
**top (1)**
8:21
**touched (1)**
45:5
**track (3)**
35:9 48:13,16
**transactions ...**
27:9
**transcript (2)**
36:3 65:2
**transmitted (...**
41:17
**trial (5)**
1:17 3:15 5:4
64:13,15
**Trinity (3)**
53:6,12 58:5
**true (5)**
19:14 35:4
37:15 49:9
64:15
**trying (2)**
7:12 32:11
**two (4)**
9:17 20:7
49:24 50:21
**type (6)**
14:17 30:22
32:22 33:15

33:20 35:10
**typed (1)**
55:18
**types (3)**
27:9 56:18
57:2

---

**U**

**unanswered ...**
51:8
**uncommon (1)**
34:6
**understand (2)**
7:6 32:12
**understandi...**
35:2
**Uniform (1)**
4:20
**unknown (1)**
1:7
**urgent (1)**
51:3
**use (6)**
13:25 19:23
26:9 40:8
42:7 47:15
**utilized (1)**
4:8

---

**V**

**Vatican (3)**
54:23 55:2,5
**vendor (2)**
48:24 49:2
**vendor's (2)**
48:20 62:9
**vendors (4)**
47:24 48:4,9
49:7
**verbally (1)**
7:9
**version (1)**
15:15

---

**W**

**wait (3)**
7:17,18 51:3
**waiting (1)**
50:16
**waived (1)**
4:15
**waiver (3)**
3:14,25 5:2
**want (3)**
32:11 52:17
53:11
**ware (1)**
54:14
**warehouse (1)**
14:16
**wasn't (1)**
40:6
**way (10)**
7:19 16:22
17:6 22:16
23:2 38:16
40:14 51:12
56:12 64:19
**we'll (1)**
58:14
**wedding (1)**
31:12
**went (3)**
16:16 26:4
39:22
**West (2)**
2:5 6:11
**WHEREOF ...**
64:22
**White (1)**
20:9
**witness (5)**
62:3 64:12,16
64:22 65:23
**witness(es) (2)**
3:20 5:10
**words (1)**
21:5
**work (6)**

January 8, 2024

[Page 77]

14:10,13
30:18 32:10
50:11,15
**worked (6)**
14:8,11 50:13
50:14 51:25
54:5
**working (7)**
14:6 16:25
19:6 36:6
39:20 48:4
51:2
**works (2)**
20:14 41:20
**wouldn't (9)**
24:14 26:22
35:4 38:11
39:12 43:22
59:16 60:25
61:9
**written (1)**
55:14
**wrong (1)**
42:22

**X**

**X (4)**
1:3,11 62:2
63:2

**Y**

**Yeah (6)**
31:5 32:4
35:18 39:19
40:13 52:21
**year (1)**
32:18
**yearbook (1)**
36:14
**yearbooks (2)**
36:5,19
**years (5)**
10:25 14:12
22:24 45:13
48:6

**York (9)**
1:2,12,22 2:5,5
2:9 6:12 64:3
64:8

**Z**

**0**

**01/08/2024 (1)**
65:2

**1**

**1 (15)**
8:15,17,22,23
9:6,7 16:6
22:11,14,21
23:13 28:14
29:23 34:2
63:5
**1-5 (1)**
1:7
**10 (1)**
21:8
**10:02 (1)**
1:14
**100 (1)**
1:12
**10018 (1)**
2:5
**11:10 (1)**
61:14
**11739 (1)**
2:9
**11743 (1)**
6:12
**11th (1)**
2:5
**13 (1)**
10:8
**198 (2)**
8:11,24
**1984 (3)**
17:2 23:10
36:6
**1985 (2)**

28:14,21
**1DRVC (1)**
8:23

**2**

**20 (3)**
30:16 34:22
65:24
**2014 (1)**
11:12
**2019 (2)**
23:11 24:5
**2023 (1)**
47:22
**2024 (3)**
1:13 61:20
64:23
**21st (1)**
64:23
**221 (1)**
4:20
**24 (1)**
62:8

**3**

**300 (1)**
2:9
**3000 (1)**
21:14
**3116 (1)**
4:2
**3117 (1)**
4:2
**3500 (1)**
2:9
**39th (1)**
2:5

**4**

**440 (1)**
6:11
**457 (1)**
10:9
**48 (1)**
62:9

**5**

**50s (1)**
34:22
**55 (1)**
2:5
**57 (1)**
62:9

**6**

**60 (2)**
51:25 62:4
**60s (1)**
34:23

**7**

**7/60 (1)**
62:4

**8**

**8 (2)**
1:13 63:5
**80s (1)**
34:25
**85 (1)**
17:2

**9**

**900094/2021 ...**
1:10
**9000942021 (...**
8:23
**90s (2)**
11:12,14

**EXHIBIT C**

Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 20-12345-mg

4    Adv. Case No. 20-01226-mg

5    - - - - - - - - - - - - - - - - - - - - - - - - - - x

6    In the Matter of:

7

8    THE ROMAN CATHOLIC DIOCESE OF ROCKVILLE CENTRE, NEW YORK,

9

10          Debtor.

11    - - - - - - - - - - - - - - - - - - - - - - - - - - x

12    THE ROMAN CATHOLIC DIOCESE OF ROCKVILLE CENTRE, NEW YORK,

13               Plaintiff,

14          v.

15    ARK 320 DEO, et al.,

16               Defendants.

17    - - - - - - - - - - - - - - - - - - - - - - - - - - x

18

19               United States Bankruptcy Court

20               One Bowling Green

21               New York, NY  10004

22

23               April 19, 2023

24               9:00 AM

25

```
1   B E F O R E :

2   HON MARTIN GLENN

3   U.S. BANKRUPTCY JUDGE

4

5   ECRO:   KEVIN SU & F. FERGUSON

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 3

1    HEARING re Adversary proceeding: 20-01226-m  The Roman

2    Catholic Diocese of Rockville Centre, Nev. ARK 320 DOE,

3    et al.

4    Hybrid Hearing RE: Motion For Preliminary Injunction Under

5    Sections 362 And I 05(A) Of The Bankruptcy  Code. (related

6    document(s)167, 168, 126 to 135, 147, 148, 157, 158, 161 to

7    177, 179 to 192)The Parties anticipate that an evidentiary

8    hearing on the Motion will be set for two days on April 19

9    and April 20, 2023, with an extra day reserved on April 21,

10   2023. The evidentiary hearing will start at 9:00 AM (EST)

11   each day. Unless the Court determines otherwise, the hearing

12   will be conducted as a hybrid hearing and the parties and

13   witnesses may appear in person or by Zoom.

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Sonya Ledanski Hyde

Page 4

1   A P P E A R A N C E S :

2

3   JONES DAY LLP

4        Attorneys for the Debtor

5        51 Louisiana Avenue

6        Washington, DC 20001

7

8   BY:  CHRIS DIPOMPEO

9

10  PACHULSKI STANG ZIEHL & JONES LLP

11       Attorneys for Official Committee of Unsecured Creditors

12       780 Third Avenue, 34th Floor

13       New York, NY 10017

14

15  BY:  KENNETH H. BROWN

16       IAIN A.W. NASATIR

17       GAIL S. GREENWOOD

18

19  ALSO PRESENT TELEPHONICALLY:

20  CHARLES J. ADAMS

21  JASON P. AMALA

22  JEFFREY R. ANDERSON

23  JESSE BAIR

24  CORINNA BALL

25  KENNETH H. BROWN

Page 5

1   JOHN BUCHEIT

2   ANDREW BUTLER

3   LA ASIA S. CANTY

4   JOHN DALY

5   JENNIFER L. DEL MEDICO

6   CHRISTOPHER DIPOMPEO

7   KAREN B. DINE

8   TODD GEREMIA

9   GAIL S. GREENWOOD

10  JOSHUA T. HOYT

11  ANN V. KRAMER

12  MICHELLE MCMAHON

13  STUART S. MERMELSTEIN

14  MIKE MISKELL

15  JAMES MOFFITT

16  CHARLES MOORE

17  KAREN MORIARTY

18  NURLAN ORUJLU

19  KENNETH F. PORTER

20  WILLIAM P. QUARANTA

21  BENJANMIN ROSENBLUM

22  ANDREW SILVERSHEIN

23  THOMAS R. SLOME

24  ERIK SORENSEN

25  JAMES I. STANG

1    ERIC PETER STEPHENS

2    PATRICK STONEKING

3    CATALINA SUGAYAN

4    CHRISTOPHER A. ZEPF

5    BRIAN R. DAVEY

6    KAREN MORIARTY

7    MALLORY C. ALLEN

8    GEORGE CALHOUN

9    EMILY CHARLTON

10   ANGELA CIPOLLA

11   SYDNEY E. CODD

12   MITCHELL GARABEDIAN

13   TRUSHA GOFFE

14   UDAY GORREPATI

15   WILLIAM C. HEUER

16   JAMES N. HULME

17   BRITTANY MITCHELL MICHAEL

18   SIOBHAIN PATRICIA MINAROVICH

19   JOHN G. REFIOR

20   CHELSIE WARNER

21   MATTHEW WILLIAMS

22   CHARLIE B. D'ESTRIES

23   ELIZABETH CATE

24   ARIELLE FELDSHON

25   CHARLOTTE ACHELAIS SCHERER

Page 7

1                          INDEX

2

3    WITNESSES:           DIRECT:    CROSS:    REDIRECT: RECROSS:

4    KENNETH F. PORTER    94         98

5    CHARLES MOORE        149        153       184       191

6    ERIC P. STEPHENS     196        207/256

7

8    EXHIBITS:                                          PAGE:

9    Insurance policies                                 10

10   Rebuttal Exhibit AA                                264

11   Rebuttal Exhibit BB                                265

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 8

1                P R O C E E D I N G S

2              THE COURT:  Please be seated.  All right, good

3       morning, everybody.  Do you wish to begin with short opening

4       statements?  I read everything, okay, but I'll permit each

5       side to make short opening statements.

6              MR. DIPOMPEO:  Sure, we'd be happy to, Your Honor.

7              THE COURT:  I'm sorry?

8              MR. DIPOMPEO:  We'd be happy to, Your Honor.

9              THE COURT:  Go ahead.

10             MR. DIPOMPEO:  And -- Christopher DiPompeo, Jones

11      Day for the Debtor.  Your Honor, we're here on --

12             THE COURT:  I'm having a little trouble.  You have

13      to speak up.

14             MR. DIPOMPEO:  I'm sorry.

15             THE COURT:  Your last name is?

16             MR. DIPOMPEO:  DiPompeo, with a D.

17             THE COURT:  Yeah.  Go ahead.  Go ahead.

18             MR. DIPOMPEO:  I'll try to speak up, Your Honor.

19      We're here on the Debtors' motion for a preliminary

20      injunction under Sections 362(a) and 105(a) of the

21      Bankruptcy Code to enjoin state court litigation filed

22      against the Debtor and particularly against related parties

23      under the New York's Child Victims Act.  The diocese would

24      be presenting legal argument as well as the testimony of

25      three witnesses.

Page 9

```
 1              Before we get started, Your Honor, just a piece of
 2     housekeeping.  The -- I'd like to move, to the extent it's
 3     not already in evidence, all of the Debtors' exhibits listed
 4     on the joint pretrial order, with the exception of the
 5     Kenneth Porter declarations, to which there's an exhibit.
 6     We've confirmed with the Committee, we don't intend to move
 7     the declaration itself into evidence.  We do intend to move
 8     the exhibits which are the insurance policies --
 9              THE COURT:  Okay.  Response?
10              MR. BROWN:  No objection.
11              THE COURT:  Yeah.  Just want to tell me your name.
12     You're a new face to me.
13              MR. BROWN:  I'm sorry, Your Honor.  I'm Ken Brown
14     from Pachulski firm.
15              THE COURT:  Thanks, Mr. Brown.
16              MR. BROWN:  And we'll introduce ourselves as well.
17              THE COURT:  Well, why don't you do that now?
18              MR. NASATIR:  Iaian Nasatir, Your Honor, Pachulski
19     Stang.
20              THE COURT:  Good.
21              MS. GREENWOOD:  Gail Greenwood, also Pachulski
22     Stang.
23              THE COURT:  Thank you very much.  Okay.  All
24     right, hearing no objection, the exhibits are in evidence
25     and we'll deal with the -- what about the insurance policies
```

Page 10

1    that are attached to the Porter declaration?

2              MR. NASATIR:  We're fine with admitting them, Your

3    Honor.

4              THE COURT:  All right, so they'll be admitted into

5    evidence as well.

6              (Insurance policies entered into evidence)

7              MR. DIPOMPEO:  Thank you, Your Honor.

8              THE COURT:  What I would ask is to make sure --

9    you could do this after the evidentiary hearing is over.

10   Just give me  a separate exhibit list showing what -- that

11   they're each admitted in evidence, okay?

12             MR. DIPOMPEO:  We'll easily be able to give you

13   something that's stipulated.

14             THE COURT:  That's fine.  Okay.  Thanks.  All

15   right, go ahead.

16             MR. DIPOMPEO:  Your Honor, I have some binders to

17   hand up.

18             THE COURT:  I got a lot of binders here.  Is this

19   something different than --

20             MR. DIPOMPEO:  They're just slides, Your Honor.

21             THE COURT:  Okay.

22             MR. DIPOMPEO:  May I approach?

23             THE COURT:  Yes, please.  Thank you.  Have you

24   shared the slides in advance with --

25             MR. DIPOMPEO:  We have not.  We have not shared

Page 11

1    them in advance.

2            THE COURT:  You know, I guess you raised -- my

3    basic view about slides is they should have been exchanged

4    before the hearing.

5            MR. DIPOMPEO:  Yes, Your Honor.

6            THE COURT:  They're demonstrative purposes of

7    argument and not in evidence.  Let's proceed.

8            MR. DIPOMPEO:  I apologize, Your Honor.

9            Okay, thank you, Your Honor.  First, I thought it

10   would be helpful to start with just a word about how we got

11   here, and I don't mean to belabor the point, but we filed

12   preliminary injunction on the first day of the case.  At the

13   time, there were a little over 200 state court actions that

14   were pending against the Debtor and certain DRVC related

15   parties as the briefs call them.

16           The related parties are typically coinsureds under

17   the diocese program.  Often they're parishes or affiliates.

18   Sometimes they are nonaffiliated entities that are covered

19   by insurance.  Prior to the petition date, essentially all

20   of the CVA actions named both the diocese and the related

21   parties as defendants.  Believer there were only five

22   prepetition lawsuits that didn't name the diocese and we'll

23   take a look at some of those cases in a bit, but generally

24   the complaints allege joint and several liability between

25   the diocese and the parish, based on theories of negligence,

Page 12

```
 1    negligent supervision, and negligent hiring and assignment
 2    of the individual perpetrators.
 3              Because of the nature of the allegations and the
 4    relationship between the DRVC related parties and the
 5    Debtor, the DRVC always took an active role in litigating
 6    those cases.  You're going to hear testimony today from two
 7    of the Debtor's professionals who were involved with this
 8    before the petition date and they'll talk about their
 9    observations of those -- of that litigation.
10              Ultimately, the state court litigation led the
11    Debtor to file for bankruptcy to because it could not
12    continue to litigate these cases piecemeal in state courts.
13    At the same time, the Debtor sought to stay litigation
14    against the parties because again, given the relationship of
15    --
16              THE COURT:  Did any of the prepetition actions go
17    to judgment?
18              MR. DIPOMPEO:  I don't believe any of them did,
19    no.  Many went past the answer stage into discovery.  None
20    got to judgment.  And the goal has always been to coordinate
21    and come with -- come up with a consensual Chapter 11 plan
22    that globally resolves all claims in a way that's equitable
23    for all survivors and allows the Debtor to continue its
24    charitable mission going forward, and that was always the
25    goal of the preliminary injunction.
```

Page 13

1              Now, the Committee initially opposed the

2    preliminary injunction but ultimately agreed to it

3    consensually in exchange for discoveries that would have

4    been provided in CVA actions and so on January 22nd, 2021,

5    Judge Chapman entered the preliminary injunction.  The

6    original order is Docket 59 of the adversary proceeding.

7              Since that time, the PI has been extended several

8    times.  Last July, just after the diocese finished its final

9    production of CVA merits materials, the Committee indicated

10   it would no longer support a continued PI.  Now at that

11   time, Your Honor had just taken over the case.  The case was

12   at a critical phase.  It was just starting mediation.  We

13   didn't think it was appropriate to shift focus to state

14   court litigation, so we moved for a contested preliminary

15   injunction.

16             Ultimately, after a conference with Your Honor and

17   per the negotiations, we agreed to another consensual

18   extension which went to January 13th.  At that point, the

19   Committee again expressed an unwillingness to extend.  That

20   ultimately put in motion where we are today.  And we'll

21   discuss this more as we go along, but the diocese's

22   overarching point is that we're at an important point in the

23   restructuring process.

24             Mediation is about to resume with Judge Cave.

25   That's expected to last until May 31st or so.  We don't

Page 14

1    believe it's the time to shift focus to state court

2    litigation where the focus will necessarily be on

3    establishing liability rather than establishing value and

4    allocation.  That's why we're seeking a time limited four

5    month extension of the stay to permit the mediation process

6    to play out.

7            We're not seeking an indefinite stay of the cases

8    and there may be a time when the PI is no longer necessary

9    or justified.  We just don't think that is today.  Think the

10   parties should be able to finish the mediation process

11   before resuming state court litigation.

12           Now, I think it would be helpful to spend a little

13   bit of time looking at the state court actions themselves

14   just to see what they look like.  There are 490 state court

15   actions that are currently subject to the PI.  At this

16   point, the Committee is only challenging the continued PI

17   with respect to 228 state court actions.  Those are actions

18   that either don't name the Debtor or implicate Ecclesia

19   Insurance coverage.

20           We actually on further review, have identified

21   five of those cases that we no longer believe should be

22   subject to the PI and we conferred with the Committee and

23   have removed those from the list.  We filed a letter this

24   morning with Your Honor --

25           THE COURT:  I didn't see that.

Page 15

1           MR. DIPOMPEO:  That's okay.

2           THE COURT:  Why did you conclude with respect to

3    these five additional ones that you don't want them to be

4    subject to the stay?

5           MR. DIPOMPEO:  So there were 17 cases of the 228

6    that did not have a corresponding proof of claim.  So we

7    reviewed those.  We were able to identify proofs of claim

8    for 12 of those cases.  Five of them were not, we could not

9    find a proof of claim so we concluded that because there's

10   no proof of claim, there's no claim against the estate and

11   there's no potential for impact on shared insurance.  It

12   wasn't necessary to stay those.

13          As you'll see in the letter and I have an

14   unredacted copy I'd like to hand up the Court --

15          THE COURT:  Sure.  Thank you.

16          MR. DIPOMPEO:  You'll see on the letter also it

17   lists the proofs of claim with respect to the other 12

18   cases, just to fill out the record.  So we're down to 223

19   contested state court actions.  Let's take a closer look.

20   Can we go full screen on this?  Is that possible?

21          THE COURT:  What pages of the slide?

22          MR. DIPOMPEO:  This should be Page 1 after the

23   cover page.

24          THE COURT:  Okay.  I have it in front of me.

25          MR. DIPOMPEO:  It's okay.  Let's go on to the next

Page 16

```
 1    slide.  This is a preview of coming attractions on the left

 2    side.  All of these alleged abuse occurring before 1986.

 3    That's when the Ecclesia program kicked in.  None of the

 4    cases named the diocese as a defendant and all but one of

 5    the cases are related to a proof of claim.

 6              I had mentioned earlier, they're all -- in

 7    reality, there's actually one case that there's no proof of

 8    claim, but it was a prepetition case that was scheduled and

 9    so it's functionally the same.  There's a claim against the

10    estate with respect to every one of the contested cases.

11              THE COURT:  Ask you this.  Are any of these 223

12    subject to any of the omnibus claim objections that have

13    been filed?

14              MR. DIPOMPEO:  That is a good question that I'm

15    not --

16              THE COURT:  I just -- you know, we just issued

17    another opinion this morning with respect to the fifth

18    omnibus objection, sustaining the objections, but that just

19    got filed within the last half hour or so.

20              MR. DIPOMPEO:  We will have to do a little work to

21    reconcile, but we will do that, Your Honor.

22              MR. BROWN:  Your Honor, I believe that they are.

23              THE COURT:  So we have a clear record, each time

24    one of you speaks, you need to identify your name.

25              MR. BROWN:  Your Honor, this is Ken Brown for the
```

Page 17

1    Committee and in answer to your question, although as I sit

2    here I cannot identify which ones of the 23 -- 223 are

3    subject to claims objections, it's my understanding that

4    some of them are and I'm sure that we can identify them for

5    you.

6            THE COURT:  Okay.  That's fine.  Thanks, Mr.

7    Brown.

8            MR. DIPOMPEO:  Thank you, Mr. Brown.  So as I

9    said, they're all subject to a proof of claim, some may be

10   subject to objections, but that's not a coincidence.  It's

11   really because of the nature of the CVA actions and the type

12   of liability that's alleged against the parishes and the

13   diocese.  That's why as I mentioned, generally all CVA cases

14   before bankruptcy named the diocese as a defendant.

15           Let's pull up next slide.  This is ECF No. 169, DX

16   1.  It's in evidence.  It's a Rule 1006 summary of CVA

17   complaints that are subject to the PI.  It contains a number

18   of very important information.  CVA number.  There's an

19   entry for related proofs of claim, list of the causes of

20   action are in there, a summary of the dates of alleged

21   abuse, notation about the insurance policies potentially

22   implicated.

23           We put this together and stipulated with the

24   Committee so the Court wouldn't have to review everything.

25   This is all the information the Court needs.  But I think

1   what I'd like to do, which would be helpful to understand

2   just the nature of these claims is to look at the case

3   that's right in the middle of that chart.  It's --

4           THE COURT:  Not anymore.

5           MR. DIPOMPEO:  Yeah, not anymore.  It's in your

6   binder.

7           THE COURT:  Okay.

8           MR. DIPOMPEO:  I think we're going to pull out the

9   actual case and it actually should be in the back folder of

10  your binder.  It CVA Index No. 9058 of 2020.

11          (Counsel conferring)

12          MR. DIPOMPEO:  So this is that is -- it was a case

13  filed against the diocese and against parishes.  It's not

14  part of the 223 cases.  This is a prepetition case.

15          THE COURT:  Okay.

16          MR. DIPOMPEO:  But it's -- it will help --

17          THE COURT:  Let me just -- it's ion the binder.

18          MR. DIPOMPEO:  It's in the back of the binder.

19          THE COURT:  Okay.  Give me -- because there's a

20  bunch of (indiscernible) in the back.  Let me just see if I

21  can find it.  Okay, I've got it.

22          MR. DIPOMPEO:  Okay.  So I thought it would be

23  helpful to look through this, just to see the nature of the

24  kind of complaints that are alleged when the diocese is

25  involved in the case.  Let's go to Paragraph 6.  As you can

Page 19

1    see, Paragraph 6 identifies the diocese as a defendant.

2    Paragraph 8.  Let's go to Paragraph 8.  Diocese --

3    "(indiscernible) several programs that seek out the

4    participation of children.  The diocese through its

5    officials has complete control over these activities and

6    programs involving children.  Diocese has the power to

7    appoint, train, and supervise, monitor, move, terminate

8    every person working with children within the diocese."

9           Paragraph 9 identifies the parish of the

10   defendant.  You'll notice Paragraph 9 does not actually make

11   the same kind of allegations about power to appoint, train,

12   supervise that are made against the diocese.  Paragraph 10

13   then alleged --

14          THE COURT:  Just so I'm clear, this involves the

15   diocese, not one of the non-debtors operated by religious

16   order?

17          MR. DIPOMPEO:  Exactly.  This involves the diocese

18   and a parish.

19          THE COURT:  Okay.

20          MR. DIPOMPEO:  And again, we're just trying to

21   illustrate what the cases look like --

22          THE COURT:  Sure.

23          MR. DiPOMPEO: -- when the diocese is involved.

24   Paragraph 10 alleges that the parish was and continues to be

25   under the direct authority, control, and province of

Page 20

1    defendant diocese and the bishop of the diocese and at all

2    times material, defendant St. Dominic's and diocese owned,

3    operated and managed, maintained control of the school.

4             Moving down to Paragraph 14, this is the

5    individual perpetrator.  All times material, Father Huneke

6    was Roman Catholic cleric employed by the diocese and St.

7    Dominic, so they're together in the allegations.  There's no

8    distinction between the diocese and the parish with respect

9    to that, and that's what you'll see as we keep going through

10   this and we look at the claims.

11            There's no individualized claims of allegations

12   against the parish.  The allegations are always against the

13   parish and diocese together, and so let's go to the first --

14            THE COURT:  And the priest.

15            MR. DIPOMPEO:  And -- well, actually, no.

16            THE COURT:  No?

17            MR. DIPOMPEO:  Generally, the claims of

18   negligence, negligent supervision are just against the

19   diocese and the parish.  There are intentional tort claims

20   in some but not all the cases against the individuals.  So

21   let's go to the actual claims.

22            The first count is for negligence and this is

23   typical.  You'll see in the chart that most, all -- think

24   actually all -- it is all -- cases allege some form of

25   negligence against the parish or the diocese.  And again,

Page 21

```
 1   you can see it's against all defendants.  So defendants had

 2   a duty arising from this special relationship.  Each

 3   defendant owed a duty of care.

 4           Paragraph 26, count two is -- we can go to count

 5   two.  It's for negligent supervision and training.  Again,

 6   you'll see the same thing.  The allegations are always

 7   against both defendants.  There's not a distinction between

 8   the two in terms of this.  We can go to Paragraph 43 just to

 9   speed this up.  "At all times material, Father Huneke was

10   employed by defendants and under each defendant's direct

11   supervision and control."

12           And we could keep going through this, but I think

13   the point has been made.  There's just -- they're always

14   together.  So let's take this down.  Let's go to now

15   Committee Exhibit B which is ECF 173.  This is the list of

16   the 228 which is now 223 cases that the Committee filed.

17   Again, it's the same summary.  It's just been redacted down

18   to the actual cases that are contested.  So all of these

19   cases now, none of these cases actually name the diocese, so

20   all of these cases are solely against third parties.

21           THE COURT:  These filed before or after the

22   Chapter 11 petition?

23           MR. DIPOMPEO:  All but five of these were filed

24   after, which normally would not be surprising.  Obviously,

25   the automatic stay normally would prohibit a claim against
```

Page 22

1    the Debtor.  One thing that's interesting here is that the

2    PI order in Paragraph 5 has always allowed for CVA actions

3    to be commenced after the petition date.  It lifts the stay

4    to allow the cases to be filed.

5              THE COURT:  But not to prosecute.

6              MR. DIPOMPEO:  Not to prosecute.  Exactly.

7              Okay, so again, let's -- same information from the

8    charts.  We've already seen the bigger chart.  This is the

9    focus chart.  Again, let's look at the case right in the

10   middle.  It's 900148/2021.  This is one of the 223 cases for

11   which a PI is contested.  We'll pull it up in a second.

12   It's also in your binder.  And this, it's from the same

13   counsel.  We thought that'd be helpful just to clarify.

14             THE COURT:  Who is the counsel?

15             MR. DIPOMPEO:  It's the Anderson -- Anderson firm,

16   I believe.  Just to be able to compare apples to apples, we

17   thought that would be helpful.  We'll look at another case

18   with another counsel in just a second.  But as you can see,

19   the complaint looks very similar.  So we can go to Paragraph

20   5.  Actually didn't point this out in the earlier complaint,

21   but Paragraph 5 is interesting and maybe more interesting

22   when it's a claim against -- where the diocese is not

23   involved, because Paragraph 5 does say whenever a reference

24   is made to a defendant, the reference also includes that

25   defendant's affiliates and others.

Page 23

1           So it's just a notable thing, because then we turn

2     to Paragraph 8, you see here, even though the diocese is not

3     a defendant in this case, there's still an allegation of

4     control.  "At all material times, defendant St. Brigid was

5     under the direct authority, control, and province of the d

6     diocese."  Again, the diocese is front and center even in

7     this complaint.

8           Let's go to Paragraph 10.  You see the same thing.

9     This is the second defendant.  There's two parishes kind of

10    merged at one point, but it's the same thing that's alleged

11    here.  "The Carle Place Chapel remained under the direct

12    authority, control, and province of the diocese."

13          Let's go down to the negligence count.  It's the

14    first count.  So again, same thing.  This looks very

15    familiar.  Defendants had a duty arising.  Defendants owed

16    plaintiff a duty of reasonable care.  It's the same

17    allegations that were made in the prior complaint.  The only

18    difference now is that because the diocese is not a

19    defendant, it's not names there, but it's --

20          THE COURT:  Ask -- does the complaint contain

21    allegations about notice?  This is a subject of one of the

22    omnibus objections.  The argument is that applicable New

23    York State law, there's no vicarious liability if it's a

24    negligent supervision, hiring, et cetera, that is the issue

25    about was there prior notice to the diocese or parish that

Page 24

1     the alleged abuser had been subject to an abuse claim.

2             MR. DIPOMPEO:  So generally they do.  I would have

3     to look more closely.  I would not be surprised if this one

4     does, but notice foreseeability is always alleged because

5     it's an issue.

6             THE COURT:  -- the state court -- the state law

7     cause of action.

8             MR. DIPOMPEO:  Exactly.  And it's an interesting

9     point, too, because the, you know, notice is going to be a

10    central issue in these cases from both sides, both on the

11    plaintiff side and the defense side, because plaintiffs

12    would want to prove notice to be able to prove the violation

13    of the duty of care, particularly the parish though will

14    often point to the diocese and say they may have had notice

15    because they have all the files for the perpetrator.

16            We didn't have the files.  We were just assigned

17    the individual and so we didn't have notice.  And so there's

18    -- when these cases were litigated before, there was kind of

19    a mutual finger pointing.  We actually have a chart which

20    will show some of that as we go.  But notice is --

21            THE COURT:  Was there an answer to this complaint?

22            MR. DIPOMPEO:  Not to this one because this was a

23    post-petition case.  We have a chart of answers which we'll

24    get to.

25            THE COURT:  Okay.

1              MR. DIPOMPEO:  We'll look at some of those.  Okay.

2     Anyway, I think we can move on from some of this.  Let's

3     just look at count two real quick.  It's the same count as

4     before.  It's negligent.  Negligent training and

5     supervision.  Same kind of allegations.  And then count

6     three, let's look at that.

7              THE COURT:  I'm just curious.  It doesn't directly

8     relate to what is before me now, but in the independent

9     review process that existed before, was notice an issue that

10    was addressed in those matters before the -- Ken Feinberg

11    and his colleague?

12             MR. DIPOMPEO:  Allow my colleague, Todd Geremia.

13             THE COURT:  Mr. Geremia.

14             MR. GEREMIA:  Your Honor, was the question, was --

15    were issues like notice addressed before the --

16             THE COURT:  Just -- yeah, just identify yourself.

17             MR. GEREMIA:  Sorry.  Todd Geremia from Jones Day

18    for the Debtor. Thank you, Judge.

19             THE COURT:  Yes.

20             MR. GEREMIA:  Was your question whether issues

21    like notice, were they -- were those addressed before the

22    IRCP?

23             THE COURT:  Yes.

24             MR. GEREMIA:  Generally, no.  The focus before the

25    IRCP was the credibility of the accusation with respect to

Page 26

1    the alleged abuse.

2              THE COURT:  Okay, thank you.

3              MR. DIPOMPEO:  Okay, let's look at -- let's look

4    at one more complaint.  This one is CVA Index No.

5    400094/2021.  This one is actually -- was exhibit, was in

6    the exhibits to the Committee's objection, was in Exhibit C,

7    so this is a case that the Committee has identified as

8    representative.  Probably be helpful to look at that one as

9    well.  There's a few notable things about this case.  Let's

10   go to Paragraph 6.  And this, by the way, is from a

11   different counsel.

12             I don't remember exactly the counsel for this

13   case, but it's not the Anderson firm.  But again, you see

14   the same kind of allegation that whenever reference is made

15   to the defendant entity, it includes the affiliates, again,

16   arguably implicating the diocese through that.

17             Let's go to Paragraph 22.  This actually goes to

18   your question about notice and foreseeability.  There's an

19   allegation.  Again, this is a complaint that's one of the

20   223.  It's not against the diocese and yet here we have in

21   Paragraph 22 an allegation that the pattern of practice of

22   intentionally refusing or failing to disclose identities and

23   locations of sexually inappropriate or abusive clerics has

24   been practiced by the diocese continues through the current

25   day.

Page 27

1          THE COURT:  So I just -- I take it there was no

2     discovery in state court in this action?

3          MR. DIPOMPEO:  That's correct.  This was also a

4     post-petition case that has been stayed.

5          THE COURT:  You know, in any of the prepetition

6     state court actions, was there discovery regarding documents

7     or records that the diocese or the parish had with respect

8     to history of abuse claims regarding the alleged abuser?

9          MR. PHILLIPS:  So my understanding and Mr.

10    Stephens will testify, can answer that question directly

11    later, but I'll give you my understanding is that there was

12    discovery in some of the prepetition cases, but it did not -

13    - I don't believe it went to the merits.  I think the

14    initial discovery was written discovery and then financial

15    discovery of the diocese, general practices.  Mr. Geremia

16    may be coming up here to correct me on that.  Okay, he's

17    not.

18          But Mr. Stephens will be able to answer that.

19    Now, once we entered into Chapter 11 process as a condition

20    of the consensual PI, the diocese did agree to provide all

21    merits discovery to the Committee and has done that, so --

22          THE COURT:  So I last week was searching the

23    docket and I saw -- most of what I saw discovery requests

24    and responses -- well, I didn't see the responses, I mean,

25    but most of the discovery requests were of financial

Page 28

1    information and I didn't come across discovery requests that

2    address the issues of any documents relating to the notice

3    issue, short handing (indiscernible), but I think you all

4    understand what I'm talking about.

5            MR. DIPOMPEO:  We do.  Now, are you referring to

6    the discovery in the Chapter 11 case or --

7            THE COURT:  Well, that's why I looked at the

8    docket only in the Chapter 11 case, but I was particularly

9    interested in whether -- particularly because there wasn't

10   discovery in the state court actions, at least the post --

11   certainly the post-petition ones, whether there was

12   discovery during the Chapter 11 case that focused on the

13   issues of notice of, you know, any records that were kept.

14           Certainly, you know, if -- well, I looked at the

15   grand jury report, for example, which is many years ago.  It

16   suggested that there were -- I'll use this term, but I'm not

17   -- I don't mean to be -- secret files that -- of alleged

18   abuse.  I don't know whether there in fact were or were not.

19   But I guess my question was, was there discovery during the

20   course of the Chapter 11 case that would have required the

21   diocese to produce whatever records, previously secret or

22   otherwise, showing a history of alleged abuse by any priests

23   or others who have been accused of being abusers.

24           MR. DIPOMPEO:  So the answer is yes, there was.

25   It may not show up in the docket, because it was generally

Page 29

1    handled through informal requests.

2              THE COURT:  I -- that's what -- I actually looked

3    on the docket, but I couldn't find anything in the docket.

4    Mr. Brown, do you --

5              MR. BROWN:  Yeah, if -- I'm sorry to interrupt and

6    I -- it was only by way of trying to be additive and perhaps

7    clarify something for the Court.  I'm being told to say my

8    name.

9              THE COURT:  I said your name.  Go ahead.

10             MR. BROWN:  Ken Brown.  So in the Chapter 11 case,

11   and this would not show up on the docket, the document is in

12   evidence.  It's one of the stipulations between the

13   Committee and the Debtor pursuant to which this injunction

14   was continued nine times. One of those nine times somewhere

15   in the middle, a condition of the stipulation was that the

16   diocese produce -- and I think the language -- Gail, do you

17   have the language?

18             The language of the stipulation is the document --

19   that the diocese would produce all documents relevant to the

20   CVA litigation.  And so that's a very broad request.  I

21   believe it was complied with and the Debtor has said it was,

22   so we have no reason to believe it's not.  But I can't say

23   specifically that I have looked and seen whether or not

24   there were notice related discovery there.  But the

25   assumption is that during the course of the Chapter 11 case,

Page 30

```
 1    all documents relevant to the CVA were produced to the

 2    Committee.

 3                THE COURT:  Okay.

 4                MR. BROWN:  It's Exhibit P is the original PI

 5    order.  It's docket 59.  At the end of that, there's an

 6    appendix and it says the condition which Mr. Brown just

 7    mentioned, which is the diocese agrees to produce all the

 8    documents that would have been produced in CVA actions.

 9                THE COURT:  Yeah, that's fine.  We can come back

10    to that.  I mean, you know, there may have been lots of

11    discussions that went on between counsel about what was

12    intended by the scope of that request and agreement to

13    produce.  My particular interest was -- on this question is

14    whether there was a diligent search made for any documents

15    from the diocese relating to the issue of notice.

16                You know, I certainly noted that the grand jury

17    reportedly suggested there were secret files.  Whether there

18    were or were not is -- and I'm not asking about that.  It's

19    -- but it was understood by the diocese and its counsel that

20    it was required and did produce any documents that related

21    to the issue of notice.  So it would be if Father X was the

22    subject of an abuse claim, any records that would show

23    whether there had been issues raised with the diocese

24    before, before that alleged abuse involving the same priest,

25    for example.  And I couldn't -- that's what I couldn't tell
```

Page 31

1    from, you know -- nothing drilled down to the issue I'm

2    asking about.

3              MR. BROWN:  It's not something the --

4              THE COURT:  Mr. Brown, go ahead.

5              MR. BROWN:  -- the Committee drilled down on, so

6    we don't know the answer.

7              THE COURT:  Okay.  Go ahead.  So on.  I don't --

8              MR. DIPOMPEO:  It's okay.  It's a good question,

9    and in fact, I would invite you to ask Mr. Stephens that

10   question because he actually led the process.  But I know

11   from talking to Mr. Stephens we believe we produced every

12   file, every personnel file.

13             THE COURT:  All right, go ahead.

14             MR. DIPOMPEO:  Okay.  We're on Paragraph 22.

15   Again, the focus is on the diocese.  Let's go to 37,

16   Paragraph 37.  Again, it's the nature of the Catholic

17   church, pressured plaintiff not to report, so there's again

18   an emphasis on the diocese and the broader process.  But

19   let's get down to the causes of action.  Again, the first is

20   negligence.  It's the same kind of cause of action.  Again,

21   this is a case just against the parish so the diocese is not

22   named as a defendant, but it's the same sort of allegation,

23   the theory being --

24             THE COURT:  On this specific point, is there a

25   proof of claim against the diocese involving this specific

Page 32

1    alleged abuse?

2            MR. DIPOMPEO:  There is, there is.  For every one

3    and of the 223.  Yep. And that's the underlying point. There

4    is --  what happened in all of these cases is there is an

5    alleged incident or a series of incidents of sexual abuse.

6    There's often claims against the individual perpetrator but

7    not always.  There are always claims against the related

8    party and the diocese for negligence, negligent supervision,

9    negligence training, but their role -- roles in allowing

10   this to potentially happen.

11           So, you know, what should we take away from all

12   this?  And you can put this down.

13           We don't think the liability of the parishes and

14   the liability of the diocese can be separately litigated.

15   They're bound up with each other.  There may be factual

16   differences, but the underlying conduct is always the same,

17   the legal theories are always the same, and ultimately,

18   because of the overlap of legal theories underlying facts,

19   the diocese is going to have to involved in the defense.

20           THE COURT:  But you -- I think you said this

21   already.  These complaints allege joint and several

22   liability.

23           MR. DIPOMPEO:  Correct.

24           THE COURT:  And so, you know, when I faced this

25   issue before in other cases, I mean, you've argued in your

Page 33

1    pleadings about necessary parties, joint and several

2    liability.  The laws is, it's not necessary parties.  I

3    mean, it can go forward against some but not all defendants,

4    correct?

5              MR. DIPOMPEO:  That's correct, yes.  There are

6    rules of apportionment, potentially, that could be

7    implicated.

8              THE COURT:  Ultimately there might be.  That's

9    true.

10             MR. DIPOMPEO:  But it's true that there could be

11   joint and several liability.  Now, if a joint and several

12   judgment were entered against the parish, obviously the

13   result would be a claim for contribution --

14             THE COURT:  I understand.  I understand.  But you

15   know, if the survivor recovers a judgment against the non-

16   debtor and it's joint and several liability, if the judgment

17   is satisfied, the -- let's assume that the parish is solvent

18   or insurance covers, whatever.  The judgment is satisfied in

19   full.

20             The parish asserts a claim for contribution and/or

21   indemnity against the diocese and if that claim is allowed

22   and the diocese is insolvent, meaning its assets -- you

23   know, its liabilities exceed its assets, those claims are

24   paid in bankruptcy dollars, meaning a pro rata distribution

25   among the same class of creditors.

Page 34

```
 1            So the abuse survivor can recover 100 cents, but

 2    the parish on its claim for contribution and/or indemnity

 3    recovers only what creditors -- assuming that that claim is

 4    ultimately allowed -- recovers only, let's just

 5    hypothetically say 50 percent.  The survivor recovers

 6    everything that he or she is entitled to, but the parish

 7    recovers only whatever claims in that class recovered.

 8    Correct?

 9            MR. DIPOMPEO:  I think the -- yes.  I think the

10    complicating factor, though, is insurance.  So in this

11    scenario, the parish potentially got reimbursed from

12    insurance and when seeking contribution, it's not clear to

13    me that the diocese could recover the insurance proceeds

14    that the parish group would've been paid.

15            THE COURT:  Well, if -- that was one of, you know,

16    I asked this question when we had a phone hearing the other

17    day, was about single satisfaction rule.  And I'm interested

18    in that as well.  I mean, some of this really kind of ties

19    together.  I don't know what -- if the survivor recovers 100

20    percent of its claim, then the issue is going to be whether

21    there's an indemnification or contribution claim.  If the

22    insurance has paid it in full and the insurance covers the

23    diocese as well, there may be nothing separately to recover

24    from the diocese.

25            MR. DIPOMPEO:  It's possible.  I do also want to
```

Page 35

```
 1    say, though, that it's in that scenario, I think from an

 2    economic perspective, it's easy to see how the diocese would

 3    be neutral.  You're substituting one claim for the other,

 4    substituting the parish's indemnity claim for the

 5    plaintiff's.

 6              THE COURT:  One may get paid in full and the other

 7    not.

 8              MR. DIPOMPEO:  Right.  However, I do think it's

 9    important to note that in that scenario, the diocese would

10    have lost merits-based defenses that it could have asserted

11    in the underlying case.  And so --

12              THE COURT:  Maybe, maybe not.  I don't know.  If

13    the diocese believes that it has defenses, I don't --

14    nothing that I read in any of the briefs convinces me that

15    they'll lose them if the parish, you know, if its claim is -

16    - if the claim of the abuser survived, is paid in full and

17    if the parish then asserts a contribution claim in the

18    bankruptcy case.

19              It's -- why is it -- what -- I didn't see caselaw

20    that says that the diocese loses the ability to assert

21    whatever defenses it may have.  It may have defenses.  It

22    may not have defenses.  I don't know.

23              MR. DIPOMPEO:  Well, that -- I think --

24              THE COURT:  There's not vicarious liability.  I

25    mean -- at least my reading of the caselaw, New York caselaw
```

Page 36

1    is there is not vicarious liability.  There has to be -- you

2    know, it would have to be shown not just that a parish was

3    negligent, but the diocese was negligent, otherwise --

4    because there's  -- I am wrong?  I mean, I've been digging

5    into this New York State caselaw on this.  There's not

6    vicarious liability.

7              MR. BROWN:  You just stole my oral argument.

8              MR. DIPOMPEO:  There is certainly not vicarious

9    liability.

10             THE COURT:  Well, we didn't identify Mr. Brown,

11   but that's okay.  The record should reflect that Mr. Brown

12   said I stole his argument.

13             MR. DIPOMPEO:  There's certainly not vicarious

14   liability with respect to individual perpetrator up the

15   chain.

16             THE COURT:  Is there vicarious liability for the

17   diocese where a contribution claim is asserted?

18             MR. DIPOMPEO:  So the issue is that the --

19             THE COURT:  The claim is for negligence, negligent

20   supervision, negligent hiring, but maybe I missed the case

21   that says it's vicarious liability for the diocese.

22             MR. DIPOMPEO:  I think issue, the reason these

23   allegations have control often show up in these complaints

24   is because the plaintiffs will ultimately want to impute the

25   knowledge of the diocese down to the parishes and impute

Page 37

1    knowledge of the parishes up to the diocese.  Now that is

2    something we would resist.

3              THE COURT:  I'm sure you would contest that.

4              MR. DIPOMPEO:  Right.

5              THE COURT:  (indiscernible) -- go ahead.

6              MR. DIPOMPEO:  But the point is that I think at

7    this stage, we need to take the allegations and particularly

8    when we're talking about Section 105, we're looking for --

9              THE COURT:  Allegations are not what give rise to

10   an ultimate allowance of a claim.

11             MR. DIPOMPEO:  That's certainly true.

12             THE COURT:  There's got to be proof.

13             MR. DIPOMPEO:  That's certainly true.  But I think

14   if the 105 injunction --

15             THE COURT:  Proof and the applicable -- these are

16   issues of state law and so I'd have to look at the

17   applicable principles of New York State law with respect to

18   any claim for indemnification or contribution.  And I --

19   none of the cases I've read so far suggested that because as

20   I understand it, there's no written indemnity agreement with

21   the parishes, so it would be common law, indemnity or

22   contribution.  You -- I'm right about --

23             MR. DIPOMPEO:  That's correct.  Yes.  Yes.  I

24   think we go -- I think we end up with issues of res

25   judicata, but my broader point is I think at this stage

Page 38

1    we're looking for risks and I think Your Honor's decision in

2    1031 Tax Group case shows that when we're looking at a

3    Section 105 injunction --

4              THE COURT:  You've missed something.  I granted a

5    90-day stay, injunction for 90 days subject to possible

6    extension.  Not reflected in the opinion is the history of

7    what happened.  That 90-day injunction was consensually

8    extended until there was a global settlement.  But I only --

9    I made clear, I only granted a 90-day injunction.

10             We're now almost three years into this case and

11   you know, last week I wrote an opinion in Silicon Valley

12   Bank Financial Group, SVB Financial Group and I granted a

13   120 day preliminary injunction.

14             Not reflected in the opinion was something I said

15   on the record during the hearing.  I grant -- I'm granting

16   this, you know -- I hadn't ruled yet but I said, if I grant

17   this requested relief, don't come back and ask for the 121st

18   day.  Okay.  They're for limited periods of time.

19             MR. DIPOMPEO:  Absolutely, Your Honor.  And I --

20   we recognize that completely and I do want to emphasize that

21   we're also looking for a -- I realize the stay has been in

22   place consensually for a very long time.  And that just is

23   where we are.  And we also recognize the stay is not going

24   to last forever, was not meant to last forever.  But we

25   think we're at an reflection point now where the mediation

Page 39

1    process is about to play out over the next month and a half.

2            And so what we're asking for is a limited period

3    of time on a nonconsensual basis, and it may be that we

4    don't come back and ask for the 121st day because your order

5    says, don't ask for the 121st day.  But we think that four

6    months to allow the mediation process to play out and either

7    move toward confirmation --

8            THE COURT:  I mean, the -- as I understand --

9    look, I didn't see the orders that got entered by the

10   District Court with respect to Magistrate Judge Cave.  But

11   in my communications with both the Committee and the

12   Debtors' counsel regarding the appointment of a magistrate

13   judge as the mediator, I ask that you seek to agree on a

14   date by which the magistrate judge would no longer be the

15   mediator, unless she approved and that was May 31st.

16           MR. DIPOMPEO:  Thirty-first.  Yes.

17           THE COURT:  So you know, as I understand it,

18   Magistrate Judge Cave is committed to be a co-mediator

19   through May 31st, and beyond that will be some -- you know,

20   I mean, she'll decide whether to extend it but she has no

21   obligation to remain as the co-mediator beyond May 31st.

22   So, that's not four months, that's not however long out that

23   you're asking for.  It's a very short period of time and I

24   guess the only -- certainly in colloquy with counsel, I get

25   very different views about whether the mediation is making

Page 40

1    progress, but there's no reason to go -- we're not going to

2    go into that now.

3            Yes, I hope that, you know, over the month of May,

4    substantial progress will be made and move this case off of

5    where it is now, which is not a good place.

6            MR. DIPOMPEO:  You're right, Your Honor, and we'll

7    move on in a second, but I agree completely that the next 45

8    days or so between now and May 31st is -- I mean, from our

9    perspective, a very critical time.  We have the mediator at

10   that time.  I think we should be focused on mediation and we

11   are just concerned that if tomorrow the stay were lifted,

12   and we had to scramble to figure out how to help defend 200

13   cases in state court that would just necessarily divert

14   attention.

15           You know, the four month request was the request

16   made in July.  We think that's an appropriate time to allow

17   the mediation process to play out and either move towards

18   confirmation or get things organized to attempt to resolve

19   the state court litigation in the coordinate fashion.

20           THE COURT:  Well, it -- I'm not saying it is, but

21   it might be appropriate if I were to rule that no

22   preliminary injunction will remain in place but have the

23   effective date of an order as June one subject to, you know,

24   an application to extend it beyond that, if the, you know,

25   if Magistrate Judge Cave reported, yes, we're making real

Page 41

```
1    progress.  I don't think any of you, if you really thought

2    there was real progress being made in the mediation --

3              MR. DIPOMPEO:  Wouldn't be here.

4              THE COURT:  -- I don't think any of you would be

5    saying no, we want to go spend our resources on litigating.

6    Okay.  The question is, is real progress being made.  And so

7    I mean, that's not -- I'm not, I haven't decided this yet.

8    There are strong arguments made on both sides about the

9    injunction.  But if I were to decide there should be no

10   preliminary injunction going forward, the effective date of

11   that order might be June 1 subject to further extension, you

12   know.

13             I would much rather you all get this resolved in

14   mediation than spending your resources litigating it.

15   That's why I raised in the telephone hearing earlier, I

16   didn't -- I don't look, not looking for a response now on

17   the motion to dismiss, which is now scheduled for May 16th,

18   whether that should be put off until after, you know, June

19   1st after -- you know, spend your time figuring out how to

20   solve this case rather than litigating these issues.  I

21   don't want an answer on that now.  Go ahead.

22             MR. BROWN:  Just, Your Honor --

23             THE COURT:  Mr. Brown.

24             MR. BROWN:  --  I think that we --

25             THE COURT:  Mr. Brown, just name yourself, Mr.
```

Page 42

1      Brown.

2                MR. BROWN:  Pardon me?

3                THE COURT:  Your name.

4                MR. BROWN:  Ken Brown.  I apologize.  I do think

5      that we owe you a response to the question on whether the

6      preliminary -- the motion to dismiss is going to be put off,

7      and we will address that at the appropriate time --

8                THE COURT:  I don't need an answer now.  go ahead.

9                MR. DIPOMPEO:  Okay.  Thank you, Your Honor.

10               THE COURT:  I kind of got diverted on a bunch of

11     issues here.

12               MR. DIPOMPEO:  That's okay.  We're here to answer

13     your questions.  And -- okay.  So the upshot of this is even

14     with the diocese not the named defendant, it's always -- its

15     conduct is always at issue; 223 state court actions with

16     related proof of claim which is necessarily going to have to

17     be litigated in parallel and we're setting up dueling

18     litigation which will just require the diocese to be

19     involved in the defense, even if it's not a defendant.

20               Let's move on.  Let's move on.  So I think we'll

21     shift gears to legal argument here.  We think a preliminary

22     injunction is justified for two reasons.  One is, we think,

23     Section 362(a), both (a)(1) and (a)(3) of the Bankruptcy

24     Code, likely automatically stays all the cases anyway, but

25     even if not, if there are some cases that fall outside of

Page 43

1    that or some defendants that fall outside of that,

2    preliminary injunction under Section 105 is appropriate.

3              THE COURT:  Let me suggest this.  I'll let you go

4    forward with this argument.  I've read everything.  My

5    clerks and I have spent a lot of time analyzing the law and

6    I'm not ruling at this point.  This would be more

7    appropriate at a closing argument, it seems to me, when the

8    facts are in, what you think.  But if you want to go ahead

9    with it now, fine.  But I understand the law.

10             MR. DIPOMPEO:  Okay.  We can put it off until

11   later.  It's no problem at all.  Let me just jump forward

12   and we may just --

13             THE COURT:  I see you've got slides that deal with

14   the insurance policy.  That's a different -- that's a

15   factual issue.

16             MR. DIPOMPEO:  Let's jump ahead to the insurance.

17   Let's go to the slide with respect to the insurance buckets.

18   Here we go.  So the Debtors' insurance program is on the

19   screen.  You'll hear testimony today from Mr. Porter about

20   the program, the policies.  The underlying policies are all

21   in evidence.  And the insurance coverage applicable to the

22   223 cases generally falls under two buckets.  It's Royal 137

23   cases there, and London, there's 99 cases there.  There's

24   also the Ecclesia policies.  Again, those are not subject to

25   the contested stay here.

Page 44

```
 1              So let's go on. So Courts generally -- and know

 2     this --

 3              THE COURT:  Are there claims that overlap?  In

 4     other words, that involve where alleged abuse was --

 5              MR. DIPOMPEO:  There are.

 6              THE COURT:  -- repeated and more than one policy

 7     potentially is called on to respond?

 8              MR. DIPOMPEO:  There are.  We have numbers.

 9              THE COURT:  Okay. That's fine.

10              MR. DIPOMPEO:  Your Honor knows this, but -- well,

11     actually, this may be a closing argument point, too, but

12     I'll preview it here.

13              It was well established in case in caselaw that

14     policies themselves are property of the estate.  There's

15     always a question as to whether the proceeds of those

16     policies are property of the estate.  There's --

17              THE COURT:  I've addressed that issue in D&O

18     cases.

19              MR. DIPOMPEO:  Exactly.  Now, the Court has always

20     focused on aggregate limits there because you're dealing

21     with a separate claim, D&O claim versus the aggregate.  Boy

22     Scouts decision in the bankruptcy court is helpful in that

23     the Boy Scouts opinion look at a situation like ours, where

24     there's not an aggregate limit there are per occurrence

25     limits and you have liability asserted against the Debtor
```

Page 45

```
 1    and the third party, and what Boy Scouts says is that

 2    because of these per occurrence limits, and because of the

 3    fact that the allegations allege a single occurrence, that

 4    is sufficient to make policies with per occurrence limits

 5    property of the estate, too, because there's a limit that

 6    would be depleted if paid to one joint and several

 7    tortfeasor and not available to the Debtor.

 8              THE COURT:  That's one of the reasons I asked the

 9    question about a single satisfaction before.  You know, if

10    an abuse survivor got a million-dollar judgment against the

11    parish, does the survivor have a separate claim against the

12    diocese for something above the million dollars?  It didn't

13    seem to me they did and if they don't and if it's satisfied,

14    the single satisfaction rule comes into play, so I'm not

15    sure how the per occurrence limit would -- it would have

16    been paid.

17              There wouldn't be an issue of a claim exceeding

18    the per -- you know, per occurrence limits of the parish,

19    per occurrence limits for the diocese.  But if the

20    occurrence was the million dollars and the judgment was

21    satisfied either from insurance or from assets of the

22    parish, now does the per -- how does this argument about the

23    per -- excuse me, per occurrence limit come into play for

24    the diocese?

25              MR. DIPOMPEO:  I think there's two ways.  One
```

Page 46

1    would be, the plaintiff may not agree that the million

2    dollars is the appropriate damages.  It's possible they

3    asked for more and the jury gave something less.

4             THE COURT:  I'm sorry, say --

5             MR. DIPOMPEO:  The plaintiff in the state court

6    action may not agree that a million is the appropriate level

7    of damages.  And so they may seek to relitigate that.  Now,

8    we would of course assert collateral estoppel and preclusion

9    from that judgment, but that's an uncertain question as to

10   whether that would be applied, so there could potentially be

11   an effort to recover more.

12            THE COURT:  It's certainly not -- this is not a

13   slam dunk issue for you.  That's why I asked the question on

14   the phone a few days ago about single satisfaction.  It may

15   be that the survivor has different theories of liability for

16   parish or school or the diocese, but the survivor has to

17   prove up his or her damages.  And it may be that those

18   damages are recoverable on a variety of theories, but what's

19   the law?  That's why I asked -- that was a question.  I'm

20   not prepared.  I don't know what the answer is.

21            MR. DIPOMPEO:  So I think the second reason would

22   be because of the apportionment rules under New York, state

23   law.  It's Article 16 of the CPLR.  And so in this

24   situation, with this million-dollar judgment against the

25   parish, that could potentially have been -- maybe the

Page 47

1    damages were $4 million but the jury determined that the

2    parish was 25 percent liable so it issued a judgment for a

3    million dollars against the parish.  Parish then goes and

4    collects that from insurance or the insurance pays the

5    plaintiff directly.

6            THE COURT:  Let's assume that there was no stay

7    and the jury returned a $4 million verdict.  I don't know

8    what was the -- I don't know what the per occurrence limits

9    were in the different policy years.

10           MR. DIPOMPEO:  It varies.  At the low end it's

11   $150,000.  At the high end, it's $45 million.

12           THE COURT:  Okay.  All right.  So let's assume

13   that the jury returns a verdict in excess of the per

14   occurrence limit and allocates -- you know, the judgment

15   says that the -- obviously the diocese is not in the trial,

16   but says that the judgment against the parish is for $1

17   million of the four, total $4 million, 25 percent of the

18   total.

19           That -- I mean, in the absence of the bankruptcy,

20   you know, the insurance would respond up to the per

21   occurrence limit and the balance would be left to the

22   judgment debtors.  So I don't see, if the jury determined 25

23   percent fault for the parish with joint and several

24   liability, how much gets paid by the parish when it's the

25   only -- I assume only pays the million dollars.

Page 48

1           MR. DIPOMPEO:  Well, if it's joint and several, so

2      there's no apportionment, then --

3           THE COURT:  Okay, but you were positing the case

4      where the jury has determined percentage of fault.

5           MR. DIPOMPEO:  Yes.  So in that situation --

6           THE COURT:  If it hasn't, you know, if the jury

7      says joint and several liability, $4 million and there's a

8      $1 million per occurrence limit, insurance that's going to

9      respond, the first response to the million, and there's

10     three million that's not covered.

11          MR. DIPOMPEO:  That's right, which would be the

12     responsibility of the parish and we should deal with these

13     separately, because I think --

14          THE COURT:  Okay, go ahead.

15          MR. DIPOMPEO:  So just to focus on that one for a

16     second.  Be a million dollars against the parish, $3 million

17     from insurance, $3 million from the parish's other assets to

18     the extent it has it.  Parish would then assert a

19     contribution claim against the diocese and say we're only 25

20     percent at fault or whatever it would be.  If the insurance

21     has already been paid to the parish, it's not clear that the

22     diocese would be able to recover any of that amount.

23          THE COURT:  But that would be true if there was no

24     stay, if you weren't a Debtor and insurance -- you know, if

25     the jury had allocated fault and the parish was 25 percent

Page 49

1    liable, it recovers a million dollars from the parish and,

2    you know, the diocese winds up with a $3 million judgment

3    against it.  If -- so I mean, there's a difference between

4    the joint and several liability and a fault based system.

5              MR. DIPOMPEO:  It's true and I think the issue

6    comes up with respect to the timing break here because

7    there's -- potentially could be litigation against the

8    parish while the litigation against the diocese and the

9    proof of claim process is playing out.  So there's the

10   difference of timing and actually the harder case is the

11   apportionment case, so let's just focus on Royal, for

12   example.  There's many years in the Royal policies where

13   there's a $300,000 per occurrence limit.

14             Now, to be fair, those are the lowest.  There's

15   150 and 300.  Those were some of the lowest.  It gets higher

16   as you go later in time, but for sake of illustration, let's

17   look at the 300.  So $4 million judgment and the jury says

18   the parish is 25 percent responsible.  The non-present

19   parties are 75 percent responsible.  The parish now is

20   responsible to pay a million dollars and only a million

21   dollars.

22             And so we turn to the insurance company and say

23   300,000 of that, I need to be reimbursed to be able to pay

24   my share of this judgment.  $300,000 of insurance money

25   would go to the plaintiff, $700,000 of parish money would go

Page 50

1    to the plaintiff.

2           Later in the proof of claim process, we'd be here

3    and the claim -- the plaintiff would say, well, I already --

4    I have a $4 million judgment.  A million was paid by the

5    parish because they were 25 percent at fault.  The diocese

6    is 75 percent at fault, or whatever they would say, and so

7    we want to collect the other $3 million from the diocese.

8           THE COURT:  There's be a question of whether there

9    is preclusive effect from a judgment, an action when the

10   diocese was not a party.

11          MR. DIPOMPEO:  There would absolutely be a

12   question.  And it's be a question on 200 cases the Court

13   would have to resolve, 200 proofs of claim.  But I think the

14   point is, let's just say it is for -- let's just say it is

15   because it makes the illustration easier.  At that point,

16   there's a $3 million allowed claim against the diocese, but

17   the diocese no longer has access to that $300,000 of

18   insurance because it was already paid to the parish to

19   satisfy its million dollars.  And so that's the situation

20   that we're concerned about with respect to these per

21   occurrence limits.

22          THE COURT:  All right.  Go ahead.

23          MR. DIPOMPEO:  Okay, let's move on and look at

24   some of the facts here with respect to these -- here is

25   actually the chart of per occurrence limits.  As you can

Page 51

1    see, it starts out --

2            THE COURT:  And it shows the years. I see that.

3            MR. DIPOMPEO:  It shows the years, yeah.  It's

4    just an illustration.

5            Okay, real policies with no aggregate limits.

6    This is the first bucket.  It's 1950 --

7            THE COURT:  Are you going to cover how much of the

8    premiums were paid by the parish and how much by the -- is

9    that in your charts?

10           MR. DIPOMPEO:  It's not in my charts.  I do have

11   estimate of that, to respond to the Court's question.  Happy

12   to --

13           THE COURT:  Go ahead.  Go ahead with your

14   presentation.

15           MR. DIPOMPEO:  Okay.  We'll come back to this at

16   the end of the insurance material.  So first is the Royal

17   policies with no aggregate limits.  It's 1957 to 1970.

18   Provides coverage to both Debtor and non-debtor parties.

19   They're very -- they're low limits on the primary policies.

20   As the years go on, the umbrella policies kick in and there

21   are higher limits, two to four, but they're still not

22   enormous limits.  There is coverage for defense costs

23   outside of the policy limits.  So it's not -- doesn't

24   deplete limits.  There are 64 cases in this bucket and I

25   believe those are all exclusively within --

Page 52

1          THE COURT:  May I ask this question?  Prepetition,

2    were the relevant insurers, depending on the policy years

3    involved, responding for defense costs?

4          MR. DIPOMPEO:  I believe the -- maybe we should

5    fact check on this, but I believe the Royal Arrowood company

6    was paying the defense costs.  I believe that the London

7    insurers were not because they ultimately regard that as

8    part of the ultimate net loss.

9          THE COURT:  I'm sorry, I couldn't hear that.

10          THE COURT:  I don't believe the London insurers

11    were because I think that they regard this as part of the

12    ultimate net loss and so they'll pay at the end when there's

13    a full damage.  Okay.

14          Okay, so let's move on.  So the first bucket is

15    Royal policies with no aggregate limits.  The second is

16    Royal with aggregate limits.  They're actually policies from

17    1970 to 1976 that you have aggregate limits.  That's our

18    only aggregate limit bucket in the insurance world until you

19    get to 1986 and after with Ecclesia, but here the aggregate

20    limits are fairly low.  It's $4 million to $12 million.  And

21    so you don't have even the question the Court was just

22    asking which is what do you do with respect to a per

23    occurrence limit.

24          Any judgment that's paid is going to deplete the

25    $4 million to $12 million aggregate limit and so for the 73

Page 53

1   cases that fall into that bucket, and there are some

2   overlapping, any amounts paid for those cases is going to

3   deplete money available to everybody else.  That's 73 cases

4   that we think at a minimum should probably still be subject

5   to automatic stay.  Those -- these cases are all shaded in

6   gray in the stipulated chart at ECF 173 which is, believe,

7   Committee Exhibit B, so you can quickly identify what they

8   are.

9           Okay.  One more point on Royal.  So I've mentioned

10  defense costs are paid outside policy limits, but there is

11  actually a practical limit on the ability to recover defense

12  costs and that's that Arrowood's financial statements which

13  are in the record -- it's DX-9 -- note that the Delaware

14  Department of Insurance, that there is recognized financial

15  distress of Arrowwood, the risk-based capital ratios befall

16  the statutory levels, below the statuary level and the

17  Department of Insurance could seek to put Arrowood in

18  rehabilitation any time.

19          And so we regard that as a practical limitation

20  that has -- if defense costs are being paid on the state

21  court actions as they go out, while there is no aggregate

22  limit and the defense costs would be outside of the policy

23  limits themselves, they're taking from a limited pot of

24  money at Arrowwood.

25          THE COURT:  Are these same insurers, the insurers

Page 54

1    in many of the other diocese insolvency proceedings around

2    the country?

3            MR. DIPOMPEO:  Yes.  Yes, they are.  Yeah.  Okay,

4    let's move on to the London policies, slightly different

5    facts here.  It's 1976 to 1986.  They also provide coverage

6    to the Debtor and the related parties.  There's per

7    occurrence limits.  There's no aggregate limits.  Per

8    occurrence limits range from $5 million to $45 million,

9    depending on the policy period.  We saw the chart.

10           Here, defense costs do delete policy limits.  So

11   as the defense costs are incurred, it depletes the insurance

12   available on the same claim, the same occurrence for others.

13   There's 99 cases in this bucket.  Seventy are exclusively in

14   London years and then there's 29 that overlap with later

15   Royal years, the Royal aggregate policies.  One thing that I

16   think is -- well --

17           THE COURT:  And you said the London policies have

18   not been responding for defense costs?

19           MR. DIPOMPEO:  They've been crediting defense

20   costs, but they've not been paying defense costs.  So let's

21   just --

22           THE COURT:  Is that an issue that's being

23   litigated in the coverage cases in the District Court?

24           MR. NASATIR:  Excuse me, Your Honor.  Iain

25   Nasatir, Pachulski Stang. The LMI policies don't have any

Page 55

1    obligation to pay defense costs.  They don't have a duty to

2    defend.  They have a duty to reimburse defense costs and as

3    Mr. DiPompeo said, they do not do that until there is an

4    ultimate net loss, be it a settlement or judgment at which

5    time they reimburse for defense costs.

6              THE COURT:  Is that an issue that's being

7    litigated in any of the coverage cases pending in the

8    District Court as to whether they have an obligation to

9    respond with respect to defense costs?

10             MR. NASATIR:  Yes, Your Honor.  I mean, in this

11   case, the diocese has maintained that they want to be paid

12   for defense costs and LMI said, my policy says I don't have

13   to do that.  I hate to be on the side of arguing the

14   insurer's position, but I --

15             THE COURT:  I just always wanted to know whether

16   this issue was -- is one of the issues that's --

17             MR. NASATIR:  LMI in its answer denied any

18   obligation to reimburse until the end of the case.

19             THE COURT:  Okay.  Thank you.

20             MR. DIPOMPEO:  We agree.  Okay, so let's just sum

21   up here, just a summary of what we've gone over.  Aggregate

22   limits in the Royal aggregate years, per occurrence limits

23   in the other cases.  London defense costs do deplete limits,

24   Royal, the don't deplete limits under the policies, but

25   given Arrowood's financial state we think that there's a

Page 56

1    practical limitation there and so therefore we think because

2    all of these are limited that they are property of the

3    estate.

4            Okay, let's move on to Section 105.  This --

5    again, we can come back to this at closing.  We don't need

6    to go over it now.  We think there's jurisdiction here.  We

7    think it's pretty clear.  We think under the Second

8    Circuit's opinions there just has to be a risk of

9    intertwinement of the cases.  We think there clearly is.

10   We've seen that, so we can move on from there.  I'm

11   certainly happy to address this at closing -- necessary.

12           THE COURT:  I think it would be more appropriate

13   to address it at closing.  Okay?

14           MR. DIPOMPEO:  Okay, so moving on to the merits of

15   Section 105.  This -- couple of preliminary points which

16   we'll come back to at closing.  We think the Court has ruled

17   in 1031 Tax Group and you don't have to consider the Rule 65

18   factors.  We don't think it really matters.  We think and we

19   say in our briefs we think we meet any standard, but there's

20   least the threshold question of that, which we can address

21   later.  But turning to some of the factual issues, the

22   factors that the Court looks at in Section 105 -- let's to

23   go the prior slide.  There it is, right at the bottom of the

24   screen here.  "Threatened the Debtor's insurance coverage,

25   increased indemnification liability result in inconsistent

1    judgments."

2            THE COURT:  I really am familiar with the

3    arguments you're making.

4            MR. DIPOMPEO:  Okay, great.  Then I will --

5            THE COURT:  It would be most helpful when we get

6    to closing when you specifically relate it to the facts.

7            MR. DIPOMPEO:  Okay.  Happy to move on.  We talked

8    about shared insurance already.  We've actually talked

9    already about increasing indemnification risk and you'll

10   hear testimony today about that as well.  One thing I'd to

11   highlight when we talk about indemnification because you'll

12   see this come up, are the charts, so let's go forward to the

13   chart slides.  Skip over all this.  Here we go.  So, this is

14   in evidence.  It's helpful for the Court to see.  This was,

15   these two charts were attached as Exhibit A and Exhibit B to

16   Mr. Stephens' testimony.  You'll hear from Mr. Stephens

17   today.  That's DX-13, DX-14.

18           These are Rule 1006 summaries of the complaints --

19           THE COURT:  Yeah (indiscernible).

20           MR. DIPOMPEO:  Okay.  And the answers which we

21   mentioned before.  Okay, piecemeal litigation.  We think

22   we've talked about that as well.  Collateral estoppel, res

23   judicata.  Again, the cases are all overlapping.

24           The last point, I think just to preview some

25   factual issues that are going to come up is burden and

Page 58

1    distraction.  I think that's actually what most of the

2    testimony today is going to go to.  And so you'll hear from

3    Mr. Stephens and from Mr. Moore about their observations of

4    the diocese's efforts --

5             THE COURT:  You know, the problem I have with this

6    argument about distraction, it was largely the basis for the

7    SVB Financial Group preliminary injunction that I approved

8    last week or the week before, but it focused on the fact

9    that the case was a couple of weeks old and that the efforts

10   had to be entire -- couldn't have the distraction, needed

11   the complete focus on moving the case forward, coming up

12   with an exit strategy.  And I granted 120 day preliminary

13   injunction.

14            In 1031, I granted a 90 day stay that consensually

15   the parties agreed that they were making progress and

16   ultimately settled, but I have a real problem with the

17   notion that three years into a case when, you know, your

18   colleagues have all said that the diocese is committed to

19   compensating the abuse survivors who are entitled to be

20   compensated and they're the ones who have really suffered by

21   a complete freeze on their efforts to litigate their claims

22   -- litigate or settle their claims.

23            And that's what's really bothering me, okay, that

24   you know, the effect of an injunction is to insulate the

25   non-debtors from having to resolve the claims of the abuse

Page 59

1    survivors.  And I think the diocese acknowledged that can't

2    last forever.  You know, I'm not resolving any legal issues.

3    You've got arguments about why you think the automatic stay

4    applies.  I think that's a real stretch and I think the

5    issue is more whether 105 and the caselaw that's developed

6    about it this far into this case can further justify having

7    the abuse survivors be the one who are most impacted because

8    they can't prove up and recover for their claims.  That's

9    the thing that's bothering me the most.

10           MR. DIPOMPEO:  Absolutely understood, Your Honor,

11   and we'll certainly address that today in the proof and I

12   think we can wrap up here very quickly here, because I --

13   while I recognize we are two years in and there is a great

14   burden borne by the parties who can't pursue litigation at

15   this time, it's been consensual this whole time.  This is

16   our first -- but I understand --

17           THE COURT:  Well, it's not exactly your first.  I

18   mean, you made the motion when the Committee said no, we

19   won't agree to extend the preliminary injunction.  You made

20   the motion.  You all said you wanted a hearing like right

21   away and I said, no, my schedule is such, there will be a

22   hearing somewhere down -- it wasn't like a year away, it was

23   a couple of months away.  And then you consensually agreed

24   to continue.  Okay.  Now they're saying no more.  Okay.

25   That's essentially what I'm seeing.  It wasn't -- they said

Page 60

```
 1    no.  You filed your motion.  A hearing was scheduled and

 2    then, if you'll excuse my words for this, you all came to

 3    your senses and continued to try a little longer.  Okay.

 4    And you know, and now you wanted a judicial co-mediator.

 5    You've got a judicial co-mediator at least through May 31st.

 6              MR. DIPOMPEO:  Right, and that's all I meant to

 7    say is we think we are still at a critical point.  It's

 8    different from the start of the case for sure.  We don't

 9    think the PI should last forever, but we think the next 45

10    days in particular and some period of time after that, to be

11    able to figure out where we're going are really important to

12    finish the mediation process, see where things are.  And so

13    that's why we're asking for limited relief in that form.

14              THE COURT:  It's a possibility that whether the

15    motion to dismiss is heard on May 16th or hopefully sometime

16    after, you know, in June or something, you may not have a --

17    there may not be any issue about, you know, preliminary

18    injunctions.  There won't be a case.

19              MR. DIPOMPEO:  Which is why we think the next 45

20    days is just a critical period.

21              THE COURT:  You say 45 days, but I -- you know,

22    Magistrate Judge Cave, er clock runs out unless she agrees

23    to extend it, on May 31.

24              MR. DIPOMPEO:  Right, which is roughly 45 --

25              THE COURT:  Okay.
```

Page 61

1          MR. DIPOMPEO:  I may be off by a few days.

2          THE COURT:  All right.

3          MR. DIPOMPEO:  Anyway, that's all I meant to say.

4     Just one very final point.  We said this in our reply brief

5     at the end.  You know, we're also very concerned about what

6     litigation in 200 separate state courts will look like and

7     so --

8          THE COURT:  Well, it isn't 200 state courts.  As I

9     -- you'll correct me.  I'm not on top of this.  I thought

10    there was only one judge in Nassau County who has all of the

11    sex abuse cases.  You know, I don't know what the plan is,

12    whether that judge is only going to handle them through

13    pretrial and then they're going to be farmed out to

14    different trial judges, but there are not going to be 200

15    trials in any time --

16         MR. DIPOMPEO:  No time soon.  It is true that this

17    goes to one judge.  Ninety percent of the cases go to one

18    judge.  There's 10 percent I think go to New York but it's -

19    - you're exactly right.  In any event, we mentioned this in

20    our reply, but we think some period of time to allow the

21    District Court to consider one 57(b)(5) motion, should we

22    make it, could also be justified.  But the ultimate point

23    which I'll leave with is that we just think we're at a

24    critical time.  The case should -- realizing I forgot to

25    give you the percentages of the insurance, as I'm talking,

Page 62

1    so I will do that -- but my final point before going into

2    that is that we just think we're at a critical time

3    particularly in the next 45 to 60 days.

4              So Your Honor asked yesterday about yesterday

5    about percentage of insurance premiums billed.  We've done

6    some work.  These are -- there are some caveats to this, but

7    this is the best we could do.  We -- the estimate for 2023.

8    So again, this is under the Ecclesia program.  We don't know

9    what the historical would be, is 83 percent is paid by

10   parishes, 16 percent is paid by affiliates, 1 percent is

11   paid by the DRVC.  In 2015, the amount billed was 85 percent

12   parishes, 14 percent affiliates, 1 percent DRVC.

13             A couple of caveats.  That's the amounts that are

14   billed.  I don't think every amount that billed is

15   ultimately collected.  I think we're around 90 percent

16   collections.  Again, these are Ecclesia numbers.  We don't

17   actually know what the amounts were for the Royal or London,

18   so the legacy years.

19             We think premiums in 2023 were about $16 million.

20   So the DRVC is probably paying roughly $160,000.  The

21   average participant is probably paying about 80, so the

22   diocese probably pays about two times what the average

23   participant would be.  There's just a lot more non-diocesan

24   participants who pay.

25             THE COURT:  It would be helpful to me, because

Page 63

1    obviously this is an issue I previewed an interest in, is if

2    it's possible -- I don't know whether the Committee has

3    taken any discovery or gotten the information on who pays

4    the -- who's paid the premiums.  It would be helpful if

5    you're all able to agree on a stipulated exhibit, even if

6    it's not for -- you know, even if it's approximate for the

7    years that are involved in the abuse claims that have been

8    asserted against the diocese.

9              Because I mean, the -- look, it should be obvious

10   why I asked the question.  It was not addressed in any of

11   the briefs.  You're arguing that an injunction should be

12   issued because the proceeds of the insurance are jeopardized

13   by ongoing state court litigation and, you know, none of the

14   -- in the -- my experience as a litigator before I became a

15   bankruptcy judge, and in the cases I've had since, it's

16   usually been D&O, E&O claims, all of the premiums were paid

17   by the Debtor.  Here, that's not true.

18             Here, the overwhelmingly large percentage of the

19   premiums for this insurance are paid by the parishes and

20   other affiliates and the -- you know, you all can address

21   this in your closing arguments.  The notion that the

22   parishes should be prevented from -- if the litigation goes

23   forward, should be prevented from recovering defense --

24   because of defense costs or judgments or settlements, the

25   parishes who pay the overwhelming amount of the premiums

Page 64

1    shouldn't be permitted to recover because the diocese has an

2    interest in -- yeah, you have an interest in the policies.

3              That's why I asked the question.  It would be

4    helpful to me if I had an exhibit, if it can't be agreed

5    upon, if you have a witness who can testify or put in the --

6    it's not in the next two days, something, you know. A

7    declaration that supports the work that you've done.  I'm

8    surprised that you've come here not having precise figures

9    for who paid for what.  That's why I asked the question.

10             MR. DIPOMPEO:  We appreciate it.  We will

11   certainly work to put that together.

12             MR. BROWN:  Your Honor, if I -- Ken Brown again.

13   I completely understand your concerns.  I just, since we

14   have not, this has not been an issue for which there's been

15   any discovery, I have a little bit of indigestion

16   stipulating.  Certainly we're not going to object to the

17   admission of a declaration that says what it says --

18             THE COURT:  Or the stipulation can say exactly

19   what you just said so far.  Just so that -- you see if you

20   can work it out.  Otherwise, the Debtor can put forward an

21   exhibit and we'll see how we deal with it.  You can put all

22   the caveats you want about it and --

23             MR. BROWN:  Well --

24             THE COURT:  You haven't had discovery, and

25   therefore subject to dispute.  But at least what I've heard

Page 65

1    so far is an acknowledgement by the Debtor that a very, very

2    large percentage, varying by policy year or insurer, were

3    paid by the parishes or affiliates and not from the Debtor,

4    so okay.  But (indiscernible).

5            MR. DIPOMPEO:  That's all I have.  Thank you, Your

6    Honor.

7            THE COURT:  Okay.  Thanks very much.  Mr. Brown,

8    are you going to do an opening?

9            MR. BROWN:  I am going to do an opening.

10           THE COURT:  Go ahead.  It's 10:20.

11           MR. BROWN:  You want to take a break or --

12           THE COURT:  I'm ready to go, but if you want a

13   break, I'm happy to do it.

14           MR. BROWN:  You know, I wouldn't mind a five-

15   minute bathroom break.

16           THE COURT:  There's never been a five-minute break

17   in the history of this courtroom, so we're taking a ten-

18   minute break.

19           MR. BROWN:  Takes five minutes to walk --

20           THE COURT:  Yeah, it does.

21           (Recess)

22           THE COURT:  All right.  Court's back in session.

23   Mr. Brown, are you going to give an opening?

24           MR. BROWN:  Yes, thank you, Your Honor.

25           THE COURT:  Let's wait a minute.  Let's --

Page 66

1            MR. BROWN:  I will --

2            THE COURT:  It's hard in a 10-minute recess to be

3      able to do it.  That's why I said -- I can remember saying

4      we're going to have a five-minute recess and --

5            MR. BROWN:  Right.

6            THE COURT:  -- it's just not possible.  Even 10

7      minutes is stretching it.  All right.  Go ahead, Mr. Brown.

8            MR. BROWN:  Thank you, Your Honor, and good

9      morning.  And thank you for being here today and hearing us

10     all out on this.  I'm not going to put up any demonstratives

11     and I'm not going to impose upon you the burden of -- the

12     mind-numbing burden of going through each of these

13     complaints and answers and counterclaims and the State Court

14     actions that were filed pre-petition and those that are

15     post-petition.  And hopefully, I can convince you that

16     that's -- they don't matter.  I mean, and here's why.

17           Those complaints and the answers, they say what

18     they say.  And the complaints that were filed post-petition

19     don't name the Diocese.  And the complaints that were filed

20     pre-petition do, and we've got in evidence, you know, a

21     bunch of charts that split that up for you.

22           The issue that the Diocese is focusing on, and I

23     think it comes under the prong of, oh, we're going to -- we

24     will suffer irreparable harm if you don't enter this

25     injunction today because collateral estoppel, res judicata,

Page 67

1    inconsistent judgments, indemnity contribution.

2           Putting aside whether those are actual risks, and

3    I think there is beyond substantial doubt about that,

4    whatever risks there are not needed and they are not

5    something that they are going -- that this injunction that

6    they're seeking, whether it's 45 days or whether it's 120

7    days is going to prevent.

8           And it's the standard in this District for an

9    injunction in a bankruptcy case, and as set forth in the

10   Calpine decision cited in our briefs, 365 B.R. 401, 410, the

11   threat to the reorganization process has to be imminent and

12   substantial.  And imminence is what's critical here.

13          And Judge Lafferty went through this in detail in

14   a very recent decision he issued in the Northern District in

15   the Mariner case, which is also cited in our briefs.  And he

16   talked a great deal about imminence.  And not all the courts

17   in the Northern District or in the Ninth Circuit are kooks.

18   They really aren't.  And it's a very --

19          THE COURT:  I happen to know Judge Lafferty very

20   well --

21          MR. BROWN:  He's a very smart guy --

22          THE COURT:  -- and I have great respect for him.

23          MR. BROWN:  Sits on the bat, and -- pardon me?

24          THE COURT:  I have great respect for Judge

25   Lafferty.

Page 68

1              MR. BROWN:  As do I.  And I think his decision

2      talking about the concept of imminent harm is applicable

3      here, because he specifically relates it to that -- what

4      were really were issues of preclusion in that case and says,

5      and says, you know what, litigation takes a long time.  It

6      moves at a glacial pace we all know about.

7              And there just aren't going to be any judgements

8      in these State Court cases -- this is what Judge Lafferty

9      says -- in these State Court -- in the State Court

10     litigation that are going to be protected by the injunction

11     I'm being asked to issue.

12             And the same is true here.  Whether it's 45 days -

13     - which I think some people were bandying about -- which was

14     being bandied about, is maybe we don't need 120 days; we

15     just need to get past this next mediation, or whether it's

16     120 days -- I think that's out through August some time

17     that's being asked for, that's not going to give any

18     protection against the harm of res judicata, collateral

19     estoppel, and form of preclusion, indemnity contribution,

20     none of that.

21             I mean, so what's the purpose?  It's purely

22     leverage shifting because it's not to protect against any

23     harm that they've identified.  It's purely to just say, let

24     us keep this --

25             THE COURT:  I mean, with all due respect, this

Page 69

1   whole -- well, I want to be fair.  You're each trying to

2   gain leverage over the other, but --

3           MR. BROWN:  Well, I mean, I would say that -- I'm

4   not going to disagree with that.  This is about where the

5   lever is in negotiations.  But they're the ones who have the

6   burden.  They're the ones who've got to make the case.

7   They're the ones who have to prove imminent irreparable

8   harm.  Otherwise, they are not entitled to the leverage

9   they're asking for.

10          And by coming here to you and asking for it

11  without any particularized proof of imminent harm, let alone

12  burden, I mean, I think it's notable, Your honor, that there

13  is not a single person in this courtroom here, not a single

14  one, nor is there any direct testimony offered from any

15  diocesan personnel on burden on how they're going to be

16  distracted by State Court litigation in cases with -- in

17  which they are not named.

18          How is that going to distract them from the

19  reorganization effort?  How much time is it going to require

20  from them?  How much time is it going to take away from

21  their reorganization duties?  Where is that?  They won't put

22  them in front of you to be cross-examined on that point.

23  They won't put them in front of you to be cross-examined on

24  the issue of, even, impairment.  Is it going to in any way

25  impair or preclude the reorganization efforts?

Page 70

1              All you get is you're going to -- you know, you

2      can see from direct testimony is Mr. Stevens saying, well, I

3      worked on pre-petition, these cases pre-petition, which were

4      against the Diocese, by the way, and Mr. Moore as well, who

5      will say, yes, and I worked on pre-petition cases which were

6      against the Diocese.  And based on my experience in those

7      cases, yes, there were diocesan personnel who had to be

8      involved and had to do work in connection with those -- with

9      that litigation against the Diocese.

10             THE COURT:  But is -- I had this issue in the SVB

11     Financial Group preliminary injunction hearing.  The two

12     FINRA arbitrations are against the non-debtor SVB

13     Securities, an indirectly wholly owned subsidiary of the

14     Debtor.

15             And essentially, the argument which I accepted at

16     the early stage of that case was that the general counsel of

17     the parent company was going to have to be personally

18     involved in the imminent arbitrations.  They were scheduled

19     for next month.

20             And I agreed, essentially, that they had made --

21     it was also the arguments, ultimately, about that they

22     agreed to indemnify the non-debtors against liability.  So

23     it would have an impact.

24             But you know, the fact that Mr. Renker would have

25     to -- if those State Court actions go forward would, and

Page 71

1    maybe others in the Diocese would be personally involved in

2    it, I accept that as true.

3              MR. BROWN:  So what --

4              THE COURT:  But what does that get me?

5              MR. BROWN:  Exactly.

6              THE COURT:  Well, they say it would get me to the

7    point where I should grant the preliminary injunction.  So,

8    I don't -- I accept that the Diocese -- the evidence in good

9    faith shows that the Diocese would of necessity be involved

10   in the State Court litigation against the parishes if it

11   goes forward.  The question is, okay --

12             MR. BROWN:  To the extent

13             THE COURT:  What's the conclusion

14             MR. BROWN:  -- irreparable --

15             THE COURT:  What's the legal conclusion that comes

16   from those facts?

17             MR. BROWN:  And they -- yes, it would have to

18   cause imminent and irreparable and substantial harm.  And

19   that is not -- there's no evidence of the Court that the

20   harm would have to be to the reorganization effort.  There

21   is simply no particularized evidence before this court that

22   that's the case.  When does it follow from the other.  I

23   mean, you know, there's not even testimony that says -- by

24   Mr. Renker or Dudin or, you know, any of those guys that

25   "Well, yeah, we might have to get up earlier and go to bed

Page 72

1    late if we have to do both."  They don't even say that.

2              THE COURT:  I think you're being unfair in that

3    characterization.  I don't doubt that Mr. Renker and

4    probably others from the Diocese would be heavily involved

5    if one of those cases goes to trial.  But again, I'm not

6    sure where that gets --

7              MR. BROWN:  But what I'm -- the key here, though,

8    is the linkage between whatever they're going to have to do

9    and what it takes away from whatever the near-term

10   reorganization efforts are, and that linkage is not made by

11   any evidence before this court.  So, again, I would say that

12   when you talk about -- when you look at this from the

13   standpoint of eminent harm that would be remedied by a 45-

14   day or a 120-day injunction, there simply is no risk of

15   collateral estoppel res judicata, inconsistent judgements.

16   During the span, the timeframe of the injunction aside --

17             THE COURT:  No, I understand.  Let me ask you

18   this.  You don't have to answer it now; you can confer with

19   your colleagues about it.  Do you object to continuing a

20   preliminary injunction until June 1?  Because subject to

21   possible extension beyond -- I mean, you've just gotten a

22   judicial co-mediator.  Magistrate Judge Sarah Cave is on

23   board at least until May 31, subject to her concluding that,

24   you know, progress is being made, whatever.  You don't have

25   to answer me now if you don't want to, I mean, but I --

Page 73

1    that's one question I have.  The result -- it could be that

2    I grant the debtor's request for preliminary injunction and

3    it's longer than you want, but I asked the question before

4    about, you know, the result might be that I deny the

5    preliminary injunction, except keep it in place until June

6    1, so that you all can focus on what needs to be focused on,

7    finding a resolution to this case.

8            MR. BROWN:  Your Honor, obviously, I'm not the guy

9    that's going to decide that, but the only thing I --

10            THE COURT:  Oh, why not?  I'm teasing.

11            MR. BROWN:  But everybody heard you on Zoom, the

12   deciders.  The only thing I would say is that's another

13   thing that's not linked here by any evidence, and that is

14   that these state court actions, which are nowhere right now

15   -- I mean, there's no discovery.  Answers haven't even been

16   filed.  Nothing has been done.  They have -- complaints have

17   been filed.  Nada else has been done.

18            THE COURT:  I --

19            MR. BROWN:  So, there is no linkage between the

20   notion that, okay, the State -- if you took the State away

21   today, it would have no impact.  Or certainly this -- well.

22   Both logic and common sense say, and the absence of evidence

23   to the contrary say that that doesn't – it's not going to

24   impact the mediation --

25            THE COURT:  Mr. Brown, I remember doing a lot of

1    work as a practicing lawyer about figuring out what was

2    going to go into the answer, what defenses they're going to

3    serve.  It's not like you just file -- you know, somebody

4    scribbles on a piece of paper and files an answer and you

5    just think about the next steps.  I would accept -- I don't

6    need proof on this point.  I litigated for 34 years.  It

7    just -- if the stay were lifted today, there would be a lot

8    of work that's required.

9              MR. BROWN:  But by the Parish's lawyers.

10             THE COURT:  Well, and I'm prepared to accept that

11   it would be that the Diocese lawyers would be involved as

12   well, but I'm not sure whether -- that didn't get me to the

13   -- well, I don't know where it gets me.  We'll see at the

14   end of this.

15             MR. BROWN:  I just want to point out that we just

16   saw a bunch of charts and there's a bunch of evidence

17   already before the Court with respect to the prepetition

18   answers -- complaints and answers, and they're all -- they

19   say the same thing.  These are -- they are largely

20   standardized.

21             THE COURT:  Look, I --

22             MR. BROWN:  So, anyway, I will move on.  I think -

23   - you said in your comments, I think, with respect to Mr. --

24   I'm sorry.

25             MR. DIPOMPEO:  DiPompeo.

```
 1                MR. BROWN:  DiPompeo's opening that you thought

 2      the application of the automatic stay was a stretch.

 3                THE COURT:  I do.

 4                MR. BROWN:  And I think that's true and I think

 5      you're being kind, but I just don't think there's a

 6      conceivable way you get there to say these State Court

 7      actions that don't name the Diocese are subject to the

 8      automatic --

 9                THE COURT:  Well, I think even in the ones that do

10      name the Diocese, you know, there's some briefing on this

11      issue.  Are they necessary parties?  I'm not going to

12      comment on what I think the answer to that is, but that's

13      been addressed.  Even if they -- the Diocese has been named,

14      I have on multiple occasions over the years as a bankruptcy

15      judge faced the issue whether an action in state or federal

16      District Court should go forward against the non-debtors,

17      and the answer generally has been yes, more than is required

18      than just having a debtor named as a defendant.  It may -- I

19      mean, there is briefing on this issue.  Are they a necessary

20      party, and there's a state statute on this that suggests

21      they're not, but I'm not deciding the issue today.

22                MR. BROWN:  So, I -- should I -- I'm happy to say

23      a couple comments on why the State --

24                THE COURT:  You'll get a chance to argue the law

25      in closing, so --
```

1            MR. BROWN:  Okay.  I'm going to spare everyone,

2    then, at this point.  I think just a couple of brief words

3    about putting aside the eminence issue, the issue of "Is

4    there even a risk?", a measurable or -- I think it has to be

5    a substantial risk of preclusion.  And we all know Diocese

6    isn't a party to these lawsuits, so I think the presumption

7    is --

8            THE COURT:  Well, let me ask you -- so, assume

9    that comparative fault applies, whether there's an argument

10   it does or doesn't.  Just assume for the purposes of my

11   question comparative fault applies.  The jury determines in

12   one of the cases damages of $4 million; the Parish is 25

13   percent at fault.  Is the 75 percent -- there were only two

14   defendant -- if there were only two, obviously the Diocese

15   is not a defendant -- is there a conclusive effect of a jury

16   determination that --

17           MR. BROWN:  No.

18           THE COURT:  -- the Parish is only 25 percent at

19   fault?

20           MR. BROWN:  I have an -- my unequivocal answer is

21   no, and I will first -- I'll first --

22           THE COURT:  You'll get a chance to argue further

23   on the law when we do closing, but I'll let you briefly talk

24   about it.

25           MR. BROWN:  So, there -- on the issue of

Page 77

1   comparative fault, I guess first principles would be, how is

2   it that a State Court, to which -- in an action to which the

3   Diocese is not a party, could impose liability or a finding

4   or a ruling on the Diocese that would be binding --

5              THE COURT:  The jury has said --

6              MR. BROWN:  Where the stay is in place?

7              THE COURT:  The jury has said that this abuse

8   survivor's damages are $4 million, and it concludes that the

9   Parish is 25 percent at fault.  That's the state of the

10  findings.  The trial court enters judgement against the

11  Parish for a million dollars.

12             MR. BROWN:  And it doesn't matter whether the

13  judge is the finder of fact or the jury is.  I mean, I don't

14  think that -- that doesn't impact the determination of

15  whether a finding or a determination by the finder of fact

16  is preclusive.  I mean, if you've got the automatic stay in

17  place and you've got an entity that's not a party, somebody,

18  whether it's the Parish, has got to come to into this court

19  on their proof of claim --

20             THE COURT:  Let me just say -- if this bankruptcy

21  case goes forward --

22             MR. BROWN:  Well, that's --

23             THE COURT:  Wait, stop.  Let me ask my question.

24             MR. BROWN:  Sorry.

25             THE COURT:  I assume that this bankruptcy case is

Page 78

1    not dismissed.  It goes forward.

2              MR. BROWN:  Yes.

3              THE COURT:  It hasn't been resolved with a

4    confirmed plan.  A jury returns a verdict -- a $4 million

5    verdict for Survivor No. 1 and determines that the Parish is

6    25 percent at fault.  You agree that in the claims

7    resolution process in this court that the Diocese is not

8    bound by the trial court verdict on comparative fault.  The

9    Diocese is not bound by what may seem implicit that there

10   was $3 million attributable to the Diocese. You agree

11   they're not bound by that.

12             MR. BROWN:  I believe that to be the case, Your

13   Honor.

14             THE COURT:  Okay.

15             MR. BROWN:  Yes, and --

16             THE COURT:  So -- more than you believe it, you

17   agree that the committee will not argue that the jury

18   determination on this comparative fault finding has any

19   preclusive effect in the claims allowance process in this

20   court.  Correct?

21             MR. BROWN:  Yes.

22             THE COURT:  Okay, go ahead.

23             MR. BROWN:  Somebody may get very angry at me for

24   saying that, but that's what I believe.

25             THE COURT:  Okay.  Well, it's not just what you

Page 79

```
 1    believe.  You agree on behalf of the committee --

 2              MR. BROWN:  Yes.

 3              THE COURT:  That the committee will not assert in

 4    this court --

 5              MR. BROWN:  Yes.

 6              THE COURT:  That the Diocese -- that that jury

 7    verdict has any preclusive effect on the Diocese's defenses

 8    with claim resolution --

 9              MR. BROWN:  We can't have it both ways, Your

10    Honor.  We can't --

11              THE COURT:  I'm just -- I'll only get -- you're

12    the committee's representative who's arguing, and you agree

13    that the committee will not assert that there's preclusive

14    effect from that jury determination on comparative fault.

15              MR. BROWN:  Yes.

16              THE COURT:  Okay.

17              MR. BROWN:  And you know, the other part of that

18    that I want to emphasize at the risk of repeating myself,

19    but this is in a different context.  When you're talking

20    about indemnity and contribution, and I think you alluded to

21    this in terms of, you know, if the bankruptcy case is still

22    pending -- so, keep in mind all the Parish and affiliated

23    entity claims for indemnity and contribution have been

24    disallowed by Your Honor as contingent claims.  They are

25    subject to revival if and when they become non-contingent.
```

Page 80

1            THE COURT:  You stipulated to that, I think.

2            MR. BROWN:  Well, it's a stipulated order.

3            THE COURT:  Yeah.

4            MR. BROWN:  Yeah.  And so, let's unpack for a

5    moment what that means under the eminence heading, right?

6    Which really in this case means that "if ever" heading,

7    because right now, the claims are disallowed, so there would

8    have to be a judgement in the State Court actions.  I mean,

9    you could quibble about whether that's --

10            THE COURT:  Well, it -- I mean, the real issue is,

11   what happens when there's a settlement?

12            MR. BROWN:  Well, there is no determination,

13   though, in a settlement on comparative fault.  Nothing is

14   binding then.  You have no issues with indemnity

15   contribution or inconsistent judgements or collateral

16   estoppel.  It's only -- that's the issue here.  It's only a

17   risk way off in the future with who you -- is it a year?

18   It's more than a year, but who knows when?  Two years?  I

19   don't know, but it's a long way off, certainly way outside

20   the 120 days.

21            THE COURT:  That's why everyone in your

22   constituency should be focused on coming up with a

23   consensual plan, because the result -- I don't want to sound

24   like a broken record --

25            MR. BROWN:  From your lips to God's ears, Your

Page 81

1    Honor.  Right?  I mean, yeah, if we can get there.

2          THE COURT:  Let's not invoke the name of God in

3    this proceeding, okay?

4          MR. BROWN:  Pardon me.  But let me -- let me just

5    finish this thought, though, which is, so what has to happen

6    for there to be a contribution or indemnity risk?  You've

7    got to have a judgement, right, whenever that happens,

8    outside the 45 or 120-day period.  Then, that judgement has

9    to happen, assuming this case is still pending, before --

10   before there is a plan of confirmation and a discharge for

11   the debtor.  If the judgement doesn't occur before that, the

12   debt is discharged, because right now all those claims are

13   disallowed.  So, I think I'm analyzing that correctly.  And

14   if that is so, not only don't we have eminence -- imminence

15   in terms of the risks here, but we don't really even have a

16   -- the most likely scenario is we're never going to get

17   there.  If there is a plan and the debtor gets a discharge,

18   that stuff is never going to come back to this court for a

19   determination on the Diocese contribution indemnity claims.

20   Same with any, you know, inconsistent judgements.

21         So, I guess the point I want to make on that is

22   that, well, yes, you know, I'm not challenging Your Honor's

23   ability to keep a stay in place for a period of time to

24   allow the mediation to take place, but I would question

25   whether that should be done, certainly if you are going to

Page 82

1  go through a traditional factor analysis here, which is, do

2  you have an eminent and substantial harm here by allowing

3  these things to go forward in terms of how that might affect

4  the mediation?  I would argue you don't, that that prong

5  doesn't exist, and you know, I think we've well briefed and

6  you made earlier comments about the harm to the survivors

7  here of preventing them now for -- you know, we're going to

8  get three years in, and they're dying and the ones that

9  aren't dying are getting sick and old.  So, I would just

10  question whether you should do it, if -- outside of a

11  stipulation and outside of the committee and the survivor

12  constituencies saying here, you know, affirmatively, "Yeah,

13  we think…"

14        THE COURT:  Are you challenging my jurisdiction to

15  do that?  I'm not saying that as a provocative question,

16  because you've addressed jurisdiction.

17        MR. BROWN:  I've addressed subject matter

18  jurisdiction, and I mean, I think -- so, here's -- let's

19  turn to that just momentarily.

20        THE COURT:  Because I thought that -- I'm not

21  ruling on it, but I thought that you got the real stretch on

22  this issue about subject matter jurisdiction.

23        MR. BROWN:  I took it up.  I did, and I think

24  certainly I'll be the first one to acknowledge the issue of

25  "Can you?".  I think subject matter jurisdiction is "Can

Page 83

1    you?"

2              THE COURT:  Yes.

3              MR. BROWN:  "Can you enjoin?"  That's a much

4    easier question and a much lower bar than "Should you?"  The

5    "Should you?" is -- are the factors there, and that's where

6    the eminence comes in.

7              THE COURT:  I agree with that.

8              MR. BROWN:  Can you?  Well, I don't think a case -

9    - I don't think there's -- I don't think the Diocese has met

10   their burden on each of these cases.

11             THE COURT:  I mean, I have to decide subject

12   matter jurisdiction whether you -- whether they raise it,

13   you raise it or not, I've got to conclude that I have

14   subject matter jurisdiction.  It's been briefed by both

15   sides.  I'm not deciding the issue.  I think the Diocese has

16   a much stronger argument on subject matter jurisdiction.  I

17   think the battleground is the exercise of discretion on

18   those factors that should be applied.

19             MR. BROWN:  So, I don't disagree with a single

20   thing you just said.  I think it is a much easier question

21   to answer, but I don't think it's easy and I don't think it

22   should be assumed, and let me just briefly comment on that.

23   Okay, so the standard is we're -- there's no dispute that

24   we're not talking about arising in or arising under.  You

25   have to have related to jurisdiction over each case that

Page 84

1    you're going to enjoin.  That has not been seriously

2    contested.  And so, the question is, does each and every one

3    of these 230 -- 223 cases that are issued today -- will they

4    have a conceivable impact on the distributions that are

5    going to be made, on how much the debtor distributes in this

6    case?  And I think that there are arguments, there are

7    serious arguments with respect to the Royal and the London

8    arguments, debtor arguments with cases covered under the

9    Royal policies that they don't.  Because just -- again, keep

10   in mind here, too, we've offered up.  What we're seeking

11   here today is just permission to go forward or to have the

12   stay lifted to proceed to judgement, not to execute on

13   judgement, right?  That's all we're talking about.

14          The preceding to judgement -- all that's at issue

15   is defense costs.  Under the Royal policies, they're not

16   wasting, so the exhaustion of defense costs doesn't have an

17   impact on the estate.  It's not estate-depleting.  It

18   doesn't impact the debtor's insurance rights.  We already

19   know that there are no written indemnity agreements, right?

20   We're also saying that we're not going to execute on any

21   judgements, so the policy or the actual coverage portion of

22   the policy is not at stake.  So, again, we'd have to go and

23   look closely at, is there really a risk --

24          THE COURT:  That's not the issue -- the issue is

25   different as to Arrowood, though, right?

Page 85

1           MR. BROWN:   Pardon me?

2           THE COURT:   The issues would be different as to

3      Arrowwood because of its precarious financial --

4           MR. BROWN:   Well, I mean, I think that you'd have

5      to consider whether or not that is really -- has it been

6      proved that they're going to run out of money such that

7      there isn't going to be enough for them to pay whatever

8      their obligations are?  And I don't think there's proof of

9      that.  So, the question on the Royal policies is, where is

10     the conceivable impact on the estate?  And you know, so if

11     it's not the insurance, then I think everybody's on real

12     thin ice on conceivable impact, because then you have to

13     say, "Well, there's real res judicata collateral estoppel

14     risk."  I could explain to you why there isn't if you're

15     interested, but the one case they -- they're not parties so

16     they have to show privity.  The Diocese and the Parishes

17     would have to be in privity.  One case cited in all the

18     papers that have been submitted on privity, and you know,

19     that's the (indiscernible) case.  I -- anyway, it's a case I

20     -- the bottom line, it's a case where -- three-lawyer law

21     firm.  One lawyer departs and then gets in a kerfuffle with

22     an ex-client about some of his rights under an agreement,

23     and he sues the ex-clients -- or actually, the ex-clients

24     sue him and they say, "We don't owe you the money because

25     the agreement's an ethical violation."  They then seek to

Page 86

```
1    bring in the other two lawyers, and they contest that and

2    say, "We don't want to be part of the lawsuit," and they win

3    the motion to not be part of the lawsuit because it's late

4    in the game.

5              And they're on notice; they know everything that's

6    happening, but -- and then the clients actually sue the

7    other two lawyers under the same agreement and say, "Yeah,

8    same with you.  This agreement is void.  It violates ethical

9    standards under New York law, so we don't owe you the money

10   under it," and they -- the two lawyers say, "Well, let's

11   stay that until there is a determination made in the first

12   action with our ex-partner."  And everybody agrees to that.

13   Well, the ex-partner loses, right?  Loses at trial, loses on

14   appeal, and then the two lawyers who tried to get out of the

15   first litigation, to which they were originally parties --

16             THE COURT:  They're going to say, "We're not bound

17   by what happened in the first one."

18             MR. BROWN:  Said, "We're not bound."  That's the

19   lawsuit that they rely on for privity.

20             THE COURT:  Okay.  Let's relay the legal arguments

21   for closing.

22             MR. BROWN:  Okay.  I mean, I just wanted -- the

23   point is there is no risk of collateral estoppel or res

24   judicata because the Diocese is not a party and it's not in

25   privity, and there is nothing --
```

1          THE COURT:  Let me just be clear.  You agree that

2     the committee will not argue at any point in this Chapter 11

3     case that the Parishes are in privity with the Diocese.

4          MR. BROWN:  Okay, so is anybody hollering that I

5     shouldn't agree?

6          MR. NASATIR:  Yeah, that's -- we're hollering.

7     Don't agree.

8          MR. BROWN:  Don't agree?

9          THE COURT:  Yeah, that's what -- that's exactly

10    what I thought.  You know, the committee may well argue in

11    response to claim objections, in response to allowance or

12    disallowance of claims, that the Parishes and the Diocese

13    are in privity.  And your colleague has said, "No, don't

14    agree."

15          MR. BROWN:  Okay.  Well, then, I won't.

16          THE COURT:  And now I got the other side mad that

17    I asked the question and let you off the hook.  I want to be

18    fair to both sides about it.

19          MR. BROWN:  So, there are those -- the issue was

20    raised for the first time in the reply brief, which is

21    "Don't do anything until we have a chance…" -- I think the

22    way they characterized it was "We the Diocese need a chance.

23    Keep the objection in place to allow us to move the District

24    Court to transfer all these cases…"

25          THE COURT:  They want to remove all of the actions

Page 88

```
 1    --

 2              MR. BROWN:  Out of State Court and into the

 3    District Court.  I mean, maybe I'm missing something, but I

 4    just --

 5              THE COURT:  No, I mean, this --

 6              MR. BROWN:  I'm perplexed.

 7              THE COURT:  I don't know why.

 8              MR. BROWN:  You don't know why?

 9              THE COURT:  I don't know why.  I mean, they've

10    asked for the -- they've raised the issue.  I didn't go back

11    to look whether there'd been stipulations along the way

12    extending their time to remove.  I assume -- maybe somebody

13    from the debtor's side can tell me.  Have there been

14    stipulated orders extending the debtor's time to remove

15    actions from State Court?

16              MR. DIPOMPEO:  There have been, and in fact, the

17    debtors are not parties in some of these cases, but the

18    preliminary injunction order was...

19              MR. BROWN:  Let's make sure we understand.

20              THE COURT:  Because under the rules, there's a

21    deadline for removing actions and it can be extended and

22    usually is.

23              MR. BROWN:  Okay.  So, I'm going to unpack this a

24    little more for you, Your Honor.  We're not talking about

25    removal.
```

Page 89

1                THE COURT:  Again, the legal arguments say for --

2      I understand they -- I'm sure you will strenuously -- if

3      they -- if we get to this point and they want to remove the

4      actions in which they're named as a -- were named as a

5      defendant, you'll oppose it, they'll support it, and we'll

6      deal with it then.

7                MR. BROWN:  Okay.  Iain, did you have any --

8                THE COURT:  Go ahead.

9                MR. BROWN:  Iain is going to deal with the

10     insurance issues.  Was there anything you wanted to say with

11     respect to insurance that was covered in the other?

12               MR. NASATIR:  Yes, Your Honor.

13               THE COURT:  Just identify your name again.

14               MR. NASATIR:  Yes.  Iain Nasatir, Pachulski Stang.

15               THE COURT:  Yes.

16               MR. NASATIR:  I have one answer to your many

17     hypotheticals that I want -- I think I can clear up one

18     point, at least.  So, your example where Parish is 50-50

19     with the Diocese and with the finding by State Court, and

20     then you have concern that the Parish would take 100 percent

21     because they were joint and severally liable, and then go

22     back again the Parish and there would be no insurance --

23               THE COURT:  Go back against the Diocese.

24               MR. NASATIR:  Diocese, excuse me.  Yes, sir.  So,

25     my answer to you is that in the Royal policies -- Royal and

Page 90

1    Arrowwood are the same, just so we're clear, right?  Just

2    Arrowwood took on the obligation.  So, in those policies and

3    in the London policies, there are provisions, as there

4    commonly are in these CGL policies, that the subrogation

5    rights of the assured -- that's what they call it in

6    England, anyway -- the assured are assigned to the insurer

7    after they pay.  So, there is not -- the hypothetical won't

8    work, because the Parishes won't have any rights to go back

9    after the Diocese.

10            THE COURT:  No, it'll be the insurers that --

11            MR. NASATIR:  It will be the insurers if they do

12   it.

13            THE COURT:  Yes, I know.  I fully understand that.

14            MR. NASATIR:  Okay.  Okay, I was going to say --

15            THE COURT:  The point is that somebody is going to

16   come after the Diocese for some amount.  It's either the

17   Parish or it's the insurer.

18            MR. NASATIR:  Well, I'm not sure the insurer could

19   come after them for something that they covered them for.

20            THE COURT:  I know.

21            MR. NASATIR:  It would be something that was -- it

22   would be the accusation that --

23            THE COURT:  It's not an insurable risk.

24            MR. NASATIR:  Precisely.  It's not an insured

25   risk, so they have to consider making a case for non-

Page 91

1    coverage.

2              THE COURT:  But the claims against the Diocese are

3    negligence, negligent hiring, negligent supervision.  Those

4    claims are not intentional torts --

5              MR. NASATIR:  No, they're not, so they wouldn't be

6    covered.

7              THE COURT:  -- for which coverage, if there were

8    determination of an intentional fault, it wouldn't be -- you

9    know, it's a public policy violation.  You can't insure

10   intentional fraud.

11             MR. NASATIR:  Right, so the circumstance would

12   have to be that the insurer would pay the 100 percent of the

13   Parish's liability because it was jointly and severally

14   liable.  Turns around and says, "The Diocese's actions here

15   were uninsurable.  I'm going after them."  That's the only

16   context in which that would come up.  I just wanted to

17   clarify.

18             THE COURT:  All right, thank you.

19             MR. NASATIR:  And I can cite you to the --

20             THE COURT:  No, it's okay.

21             MR. NASATIR:  Thank you, Your Honor.

22             THE COURT:  Thank you.

23             MR. BROWN:  Your Honor, there was one other thing.

24   I think you asked me a question as I was trying to address

25   your initial question about subject matter jurisdiction

Page 92

1    related to subject matter jurisdiction.  I covered why I

2    think there are some challenges in your analysis with

3    respect to the cases covered by the Royal policies.  I think

4    there are also challenges on the London policies that have

5    the extraordinarily high per-occurrence limits, because

6    again, we're talking the world of conceivable, and what does

7    conceivable mean where you have an aggregate limit of $100

8    million?  Is there a conceivable way that litigation against

9    the Parishes would ever impact the Diocese coverage when you

10   have that kind of -- that level of coverage?

11            THE COURT:  I understand your argument.

12            MR. BROWN:  Yeah.  So, $100 million -- there's not

13   -- I  mean, anything is possible, but in real world, no,

14   that's not conceivable.

15            THE COURT:  All right.  You're done?

16            MR. BROWN:  Pardon?

17            THE COURT:  You're done?

18            MR. BROWN:  Reserving everything for closing.

19            THE COURT:  Yes, yes, yes.  Let's call the first

20   witness.

21            MR. DIPOMPEO:  Thank you, Your Honor.  We do.  So,

22   I thought I would move the three directs into evidence, and

23   then the Committee can (indiscernible) can cross whichever

24   witnesses it chooses?

25            THE COURT:  I don't know whether you've discussed

Page 93

1    this.  I mean, ordinarily what I do in this circumstance is

2    you call the witness.  The witness is sworn.  You offer the

3    written direct as the witness' direct testimony.  If there

4    are some brief background questions you want to ask that

5    aren't covered, I let you do that.  And then you tender the

6    witness for cross-examination and do a redirect.

7              MR. DIPOMPEO:  I see.

8              THE COURT:  I would prefer we do it -- unless you

9    worked this out with Mr. Brown ahead of time.

10             MR. BROWN:  Absolutely not, Your Honor.  My

11   assumption was that -- and I think we've agreed upon in two

12   separate orders -- that the direct testimony was coming in

13   written and that we would have a right to cross.

14             THE COURT:  Well, then you had objections that

15   were --

16             MR. BROWN:  So I object to the proposal.  I think

17   that what you are saying is your normal practice is what we

18   fully expected.  I think it's what we agree to and it's

19   what's --

20             THE COURT:  Let's just -- call your witness.

21   He'll be sworn.  Again, if you have some -- just some short

22   background that you want to do, that's fine.  And then you

23   tender the witness for cross-examination.

24             MR. DIPOMPEO:  Allow me to turn the podium over to

25   Ms. Del Medico.

Page 94

```
 1                 THE COURT:  Okay.

 2                 MR. DEL MEDICO:  Your Honor, the Diocese would

 3      like --

 4                 THE COURT:  Just identify your --

 5                 MS. DEL MEDICO:  My name -- sorry.  Jennifer Del

 6      Medico for the Debtor, Your Honor.  The Diocese calls

 7      Kenneth Porter to the stand, please.

 8                 THE COURT:  Okay.  Mr. Porter, come on up.  If you

 9      would raise your right hand, you'll be sworn.

10                 CLERK:  Do you solemnly swear or affirm that the

11      testimony you are about to give this Court will be the

12      truth, the whole truth, and nothing but the truth?

13                 MR. PORTER:  I do.

14                 THE COURT:  All right.  Please have a seat.

15                 MR. PORTER:  Thank you, Your Honor.

16                 THE COURT:  And there should be water in the

17      pitcher and there are cups there.  You can take one --

18                 MR. PORTER:  Super.

19                 THE COURT:  -- if you want.

20                 MR. PORTER:  Thank you very much.

21                 THE COURT:  Go ahead, Ms. Del Medico.

22                 MS. DEL MEDICO:  Thank you.

23                   DIRECT EXAMINATION OF KENNETH F. PORTER

24      BY MS. DEL MEDICO:

25      Q    Good morning, Mr. Porter.  Mr. Porter, could you tell -
```

Page 95

```
 1    - are you employed?

 2    A    Yes.

 3    Q    And could you tell us who are you employed by?

 4    A    Heffernan Insurance Brokers.

 5    Q    Okay.  And could you describe -- what is your title

 6    there?

 7    A    Vice President.

 8    Q    And have you -- can tell us a little bit about your

 9    experience with respect to working with the Diocese?

10    A    Specifically Rockville Centre?

11    Q    Yes, please.

12    A    Okay, sure.  I've been engaged by the Diocese since

13    2006 to assist them with the design and implementation of

14    their insurance program.

15    Q    And what responsibilities have you had in connection

16    with that work?

17    A    All matters of consulting and advisory services ranging

18    from the structure that the program would take.  The limits

19    of coverage that would be provided.  The self-insured

20    retentions that would be retained.  The breadth of coverage,

21    the coverage forms themselves, placement of insurance and

22    excess insurance and reinsurance.  Assisting them with -- to

23    a lesser degree, assisting them with claims administration.

24    Q    You mentioned that you began your work for the Diocese

25    of Rockville Centre in 2006.  There were policies in place
```

Page 96

1    before that time, insurance policies that that the Diocese

2    had.  Correct?

3    A    Yes.

4    Q    And do you have any personal knowledge about those

5    policies that predated your involvement with the Diocese?

6    A    Any knowledge from my review of those policies.

7    Q    Okay.

8              MS. DEL MEDICO:  Your Honor, we'd like to move the

9    direct written testimony of Mr. Porter into evidence.

10             THE COURT:  Any objections?

11             MR. BROWN:  No, Your Honor.

12             THE COURT:  All right.  The direct testimony --

13             MR. BROWN:  Oh, hold on.  We did have some

14   objections that we filed, which we are reserving.  And we

15   have -- there has been objections and then there was omnibus

16   response.  So we --

17             THE COURT:  So, what --

18             MR. BROWN:  It's not that we don't have no

19   objections but will deal with the issues of foundation and

20   hearsay and expert testimony during the cross-examination.

21             THE COURT:  So, the Court's ruling -- and I'm

22   aware, I've read the objections.  The objections are

23   overruled without prejudice.  I want to hear the cross-

24   examination and any redirect examination.  Otherwise, I'll

25   give the direct testimony such weight as I believe it is

Page 97

1    entitled to receive.

2          Obviously, there's no jury.  Hearsay objections

3    always raise the issues about for what purpose is the

4    testimony being offered.  There may be -- assuming there

5    might be a valid hearsay objection that may be non-hearsay

6    purposes that wind up being relevant.  So I'm overruling

7    without prejudice admitting in evidence the direct testimony

8    of Mr. Porter.  It's not going to preclude you from arguing

9    --

10         MR. BROWN:  That's all I was --

11         THE COURT:  Okay.

12         MR. BROWN:  That's what I was going to suggest --

13         THE COURT:  Absolutely.

14         MR. BROWN:  -- was that we wait and see --

15         THE COURT:  That's fine.

16         MR. BROWN:  -- what comes out in cross and then

17   you can address hearsay --

18         THE COURT:  Okay.  All right.  Go ahead.  Well,

19   you're tendering the witness for cross-examination?

20         MS. DEL MEDICO:  Yes.  Tendering witness for

21   cross-examination.

22         THE COURT:  All right.  Before you start, just

23   give me a second to get my computer open here.  What is the

24   ECF docket number of Mr. Porter's testimony?

25         MR. NASATIR:  181.

Page 98

1           THE COURT:  It's going to take me another minute.

2           MR. NASATIR:  That's fine.

3           THE COURT:  Okay.  I'm sorry for the delay.  Go

4    ahead.

5           MR. NASATIR:  No problem.  Thank you, Your Honor.

6    Iain Nasatir, Pachulski Stang.

7              CROSS-EXAMINATION OF KENNETH F. PORTER

8    BY MR. NASATIR:

9    Q    Good morning, Mr. Porter.

10   A    Good morning.

11   Q    Do you have a witness binder up there in front of you?

12   A    I do not.

13   Q    Okay.

14          MR. NASATIR:  To the extent we need it, if I can

15   approach the witness and provide him with --

16          THE COURT:  Sure.  Do you want to give it to him

17   now, or not?

18          MR. NASATIR:  I'm not sure I'm going to need it.

19          THE COURT:  Go ahead.

20          MR. NASATIR:  Just a piece of paper with --

21          THE COURT:  Go ahead.

22          MR. NASATIR:  Thank you.

23          THE COURT:  And I operate on the principle that

24   you're all experienced lawyers.  You do not have to ask for

25   permission each time you want to approach the witness to

Page 99

1    show him something.  If opposing counsel wants to come up

2    because the questions are -- you know, they can come up as

3    well if need be.  So you don't need to ask permission each

4    time you need to approach a witness.  Okay?

5              MR. NASATIR:  Thank you, Your Honor.  Appreciate

6    the courtesy.  Otherwise, I would have --

7              THE COURT:  All right.

8              MR. NASATIR:  -- been asking.

9    BY MR. NASATIR:

10   Q    Okay.  Mr. Porter, do you recall you were deposed on

11   March 9th of this year?

12   A    Yes.

13   Q    And one of the subjects of that examination was your

14   declaration that you had submitted prior to the declaration

15   you submitted in direct testimony, right?

16   A    Yes.

17   Q    Okay.  And that prior declaration was drafted with your

18   assistance and review, correct?

19   A    Correct.

20   Q    Okay.  And you were assisted in that by counsel, right?

21   A    I was.

22   Q    Now, your latest declaration, the subject of your

23   direct testimony, that's almost identical as to your prior

24   declaration, right?

25   A    It is.

1    Q    Okay.  And the same drafting process as the prior

2    declaration?

3    A    In what manner?

4    Q    Again, it was prepared with your assistance and the

5    counsel assisted you with it?

6    A    Yes.

7    Q    Was there any -- did you rely on any new information in

8    that -- in your -- to create your correct testimony?

9    A    No.

10   Q    And in your preparation for today, did you learn any

11   new information?

12   A    No.

13   Q    Now, one of the services that your company provides is

14   claim advocacy.  Is that right?

15   A    Yes.

16   Q    And that -- you described that as assisting clients

17   with perfecting their claims submissions with insurance

18   companies?

19   A    Yes.

20   Q    And if a claim is denied, you evaluate the basis and

21   consider counter arguments for coverage?

22   A    Correct.

23   Q    Do you understand if there are any coverage denials in

24   this case?

25   A    I don't know.

Page 101

```
 1   Q     So you didn't engage in any such evaluations today?

 2   A     Not in this case, no.

 3   Q     You have three insurance institute designations, right?

 4   A     I do.

 5   Q     But none of them are associated with claims or claims

 6   management?

 7   A     Not specifically.

 8   Q     And so you did not conduct -- you are not qualified to

 9   conduct an analysis of where the CDA claims fell in

10   coverage?  You couldn't evaluate where the CDA plans fell in

11   coverage, could you?

12   A     I could, I think.

13   Q     Did you?

14   A     No.

15   Q     And did you evaluate how much insurance was available

16   to satisfy any of the CDA -- each CDA claim?

17   A     No.

18   Q     Now, Paragraph 4 of your direct testimony declaration

19   you said, "Although there are differences between the policy

20   programs which I outline below, as a general matter, there

21   is a risk that every dollar out of the insurance proceeds

22   that goes to defense costs is a dollar that cannot be

23   awarded to victims of abuse."  Do you recall saying that?

24   A     Was it defense costs specifically?

25   Q     Yes.
```

Page 102

```
 1    A    Okay.

 2    Q    When you say there is a risk --

 3            THE COURT:  Does he have a copy of his direct

 4    testimony?  I think if you're going to ask him about things

 5    that are in his direct testimony --

 6            MR. NASATIR:  That's fair enough.

 7            THE COURT:  -- I want to be sure that the witness

 8    has a copy of it in front of him.

 9            MR. NASATIR:  I will...

10            THE WITNESS:  Thank you.  Great.

11            THE COURT:  And your last question was about

12    Paragraph 4, which is --

13            MR. NASATIR:  Paragraph 4, correct?

14            THE COURT:  -- on page 4 of 14.

15    BY MR. NASATIR:

16    Q    So this risk that every dollar for defense costs is a

17    dollar that could have been given to award -- excuse me --

18    to victims of abuse, did you quantify that percentage of

19    risk?

20    A    No.

21    Q    So you don't -- you don't have an opinion on whether

22    it's really small or really big?

23    A    I do not.

24    Q    So, now I'd like you to look at the coverage chart.  It

25    is attached as Exhibit A, the last page of Exhibit A to the
```

Page 103

1    stipulated coverage chart.

2              MR. NASATIR:  And I don't know if we can put that

3    up on the screen?  If it's any assistance, Your Honor, it

4    looks like that.

5              THE COURT:  Maybe...  Was this in your opening

6    slide deck?

7              MR. NASATIR:  I think it was in their opening --

8              THE COURT:  Yeah.

9              MR. NASATIR:  This page was not though.  It should

10   be PX-1, I think.

11   BY MR. NASATIR:

12   Q    Have you seen this before?

13             THE COURT:  It's in DX-1?  Excuse me.

14             MR. BROWN:  It looks like it's Exhibit A.

15             THE COURT:  Exhibit A of DX-1.

16             MR. BROWN:  I think that's committee.  It is DX-1

17   open in front of me.

18             MR. NASATIR:  It's also Committee Exhibit A.

19             THE COURT:  Okay.  You agree it's attached to DX-

20   1?

21             MR. NASATIR:  Yes.

22             THE COURT:  Okay.  Just so -- that's what I have

23   open in front me I'm looking at.

24             MR. NASATIR:  And this may be a pointless

25   exercise, unless the witness says he's seen it before.

Page 104

```
 1    BY MR. NASATIR:

 2    Q    Sir, have you seen this before?

 3    A    I have not.

 4              MR. NASATIR:  And then I'm going to ask if we

 5    could put up the coverage chart that you had admitted into

 6    evidence in the -- Yeah, the bar chart, yeah.  This chart

 7    that we're going to put up here is actually an exhibit to

 8    Mr. Porter's first day declaration.  And it was -- the

 9    exhibits were moved into evidence the beginning of today by

10    the Diocese.

11              THE COURT:  Okay.

12              MR. NASATIR:  And if you're looking for -- it kind

13    of looks like that.  I apologize, Your Honor.  I was not

14    expecting that this Court had not received what we -- was

15    agreed upon, the summary of our coverage.  So I'm going back

16    to what he attached to his declaration in the first days.

17              THE COURT:  Okay.

18              MR. NASATIR:  I know you don't.

19              THE COURT:  Just so long as we have a clear record

20    of what it that you're -- by exhibit number or ECF number.

21    So, as I understand it, this is ECF 169-1.  You're supposed

22    to put up on the screen is...

23              MR. NASATIR:  Well, no.  What I'm talking about,

24    Your Honor, which -- and I don't know if it has a different

25    number --
```

Page 105

```
1              THE COURT:  Look at the screen over there.  Is

2    that what you're showing?

3              MR. NASATIR:  No.  I'm looking -- because the

4    witness has not seen that before --

5              THE COURT:  Okay.

6              MR. NASATIR:  -- I'm looking for a copy of

7    something he has seen before.

8              THE COURT:  Okay.

9              MS. DEL MEDICO:  (indiscernible).

10             MR. NASATIR:  Yeah, that's (indiscernible).

11             MS. DEL MEDICO:  It's also Debtors' Exhibit 12.

12             MR. NASATIR:  Yeah, let's just see if it's --

13   yes, it is.  Right there.  It's right there.  It's Debtors'

14   Exhibit U, Your Honor, we put up.  It's possible that it's

15   not got the colors.

16             MS. DEL MEDICO:  It's Debtors' 12 over here.

17             MR. NASATIR:  It's also Debtors' 12.

18             THE COURT:  Debtors' Exhibit 12?

19             MS. DEL MEDICO:  Well, I'm just saying, if we're

20   looking.

21             MR. NASATIR:  Yes.

22             THE COURT:  Okay.  I don't think so.

23             MS. DEL MEDICO:  It's attached at the back.

24             THE COURT:  Debtors' Exhibit 12 is giant --

25             MR. BROWN:  It's at the beginning of the
```

Page 106

1    declaration, of course, right, from --

2              MS. DEL MEDICO:  From October 1st --

3              THE COURT:  Okay.

4              MR. BROWN:  Docket 6 -- it's right at the

5    beginning of Docket 6.  The Porter declaration filed early

6    on.

7              THE COURT:  In this adversary proceeding?

8              MR. BROWN:  In the ADV, yes.

9              THE COURT:  You mean --

10             MR. BROWN:  Docket 6 of the ADV.  We're

11   unfortunately crashing on the computer pulling it up.

12             MR. NASATIR:  So, Your Honor has this in front of

13   him?

14             THE COURT:  Just a second.  Yes, I do.

15             MR. NASATIR:  Okay.  I'm going to --

16             THE COURT:  Yes, go ahead.

17             MR. NASATIR:  -- give this to the witness?

18             THE COURT:  All right.

19             MR. NASATIR:  He --

20             THE COURT:  So that we're clear --

21             THE WITNESS:  Thank you.

22             THE COURT:  -- the witness is being shown --

23             MR. NASATIR:  The witness is being --

24             THE COURT:  -- is Docket Number 6-1, Page --

25   insurance coverage chart.  It's Exhibit A, the insurance

Page 107

1    coverage chart, Page 2 of 2.  You hear?

2            MS. DEL MEDICO:  Right.  But Your Honor, that's

3    part of a larger document.  It's an attachment to the

4    declaration.

5            THE COURT:  That one I opened.

6            MR. NASATIR:  I think our exhibit we eliminated.

7            THE COURT:  This is -- it's Part 2 of ECF 6, which

8    is Mr. Porter's declaration in support of the preliminary

9    injunction.  On ECF it shows up as Exhibit A, Insurance

10   Coverage Chart, which is Exhibit A.  That's the second page

11   of that.

12           MR. NASATIR:  You are correct.

13           THE COURT:  Go ahead.  I just want to make sure we

14   have a clear record about what is being shown.

15           MR. NASATIR:  Sure.

16           THE COURT:  Okay, go ahead.

17           MR. NASATIR:  And again, I apologize, Your Honor.

18   I had not anticipated --

19           THE COURT:  It's -- go ahead.  Go ahead.

20   BY MR. NASATIR:

21   Q    So, is a chart that you're familiar with, right, Mr.

22   Porter?

23   A    It is.

24   Q    Okay.  And what does the blue signify?

25   A    Royal policies.

Page 108

```
 1   Q    And for our purposes, can we agree that Arrowwood and
 2   Royal are to be used interchangeably in terms of coverage of
 3   policies issued here that are in blue?
 4   A    Yes.
 5   Q    Now, I think this came out of your post-direct direct,
 6   but you didn't place the Arrowwood policies, right?
 7   A    I did not.
 8   Q    And your firm didn't, either.
 9   A    No.
10   Q    But you are familiar with the policies.
11   A    I am.
12   Q    And they cover 1956 through 1976, correct?
13   A    Correct.
14           THE COURT:  Just so we're clear for the record,
15   this chart is now being displayed on the screens in the
16   courtroom, on the large screens in the courtroom as well.
17           MR. NASATIR:  Thank you.  I didn't -- hadn't
18   noticed that.
19   BY MR. NASATIR:
20   Q    And so, the blue chart -- looking at the blue chart
21   only right now, the bottom layer of it -- those are the
22   primary policies that Royal issued to the Diocese, right?
23   A    Correct.
24   Q    And where there are -- there's blue above that line.
25   Those are the umbrella policies, right?
```

Page 109

1    A    Correct.

2    Q    And would you agree with me that each of those

3    Arrowwood policies have limits that are not affected by the

4    payment defense costs?

5    A    I would agree.

6    Q    So, every dollar that Arrowwood pays out in defense

7    costs could never be a dollar that would go into the

8    (indiscernible) award for survivors of abuse.

9    A    True, subject to their financial ability to pay.

10   Q    We'll come to their financial ability, but excluding

11   their financial ability, that defense cost payment could

12   never have gone under the policy to an award for the

13   survivors.

14   A    That's correct.

15   Q    So, when you say there is a risk of every dollar out of

16   the insurance proceeds that goes to defense costs is a

17   dollar that cannot be awarded to the victims of abuse,

18   that's not true of the Arrowwood policies, is it?

19   A    It is not.

20   Q    And you say -- in that same sentence, you say as a

21   general matter -- would you agree with me that there is far

22   more blue Arrowwood policies in this coverage chart than

23   there are other codes, at least at the primary level?

24   A    There are more bars, yes.

25   Q    So as a general matter, defense costs are not going to

Page 110

1   be part of any award for survivors, right?

2   A    It would depend on the actual -- it's a state court

3   matter.

4            THE COURT:  (indiscernible) what you've just said

5   -- the Arrowwood policies, Royal/Arrowwood policies, covered

6   policy years from the end of 1956 through 1976.  Is that

7   correct?

8            MR. PORTER:  It is.

9            THE COURT:  Go ahead (indiscernible)

10  BY MR. NASATIR:

11  Q    Okay.  So, you suggested that -- or I think the Diocese

12  has suggested that you support the concept that Arrowwood

13  has limited funds available to pay claims or defense costs.

14  A    That's correct.

15  Q    And you said in your deposition that Arrowwood is in

16  receivership.  Do you recall that?

17  A    In receivership or under some sort of financial

18  oversight, yes.

19  Q    You did say "Or has been taken over by a special

20  purpose company with limited resources."

21  A    Yes.

22  Q    (indiscernible) and Arrowwood, right?

23  A    That's right.

24  Q    So, I'd like to bring up the Arrowwood 2022 annual

25  statement.

Page 111

```
 1              THE COURT:  What exhibit?

 2              MR. NASATIR:  (indiscernible) -- Exhibit E, Your

 3     Honor.

 4              THE COURT:  Do you have the exhibit on your

 5     screen?

 6              MR. PORTER:  I think it's coming up.

 7              THE COURT:  Okay.

 8              MR. PORTER:  It's coming up, I think.  Thank you.

 9              THE COURT:  I have Exhibit (indiscernible)

10              MR. NASATIR:  You have it?

11              THE COURT:  I do.

12     BY MR. NASATIR:

13     Q    My first question is, Mr. Porter, are you familiar with

14     the 2022 annual report that Arrowwood filed?

15     A    Not specifically, no.

16     Q    I'm going to read you the statement found on Page 14.1

17     and 2, (indiscernible) statement.

18              THE COURT:  Wait.  If you want to ask him a

19     question about the exhibit, you need to put the exhibit in

20     front of him, and he needs to -- you know, if he wants to

21     look at something other than the specific paragraph that

22     you're referring him to, he needs to be able to do that.  So

23     --

24              MR. NASATIR:  I will show him --

25              THE COURT:  Where you -- you know, on the screen
```

Page 112

1    you've got a portion of a larger document.  I just want to

2    be sure that the witness has the full exhibit in front of

3    him.

4              MR. NASATIR:  If we could get a clipboard, it'll

5    be easier for us to work with (indiscernible)

6              UNKNOWN:  Is that 101 pages?

7              THE COURT:  I don't have a lot of clips, but

8    here's a clip.

9              MR. NASATIR:  Sorry, but thank you.

10             THE COURT:  You may deplete my supply up here, but

11   here's a clip that'll fit on that.

12             MR. NASATIR:  You are welcome to look at the

13   entire exhibit --

14             THE COURT:  Thank you.

15             MR. NASATIR:  (indiscernible)

16             THE COURT:  Tell me what page you're going to

17   (indiscernible)

18             MR. NASATIR:  14.1, which is after Page 11.

19             THE COURT:  Okay.  It's "Notes to Financial

20   Statement".

21             MR. NASATIR:  Yes.

22             THE COURT:  Page 14.1.

23             MR. NASATIR:  Right.  I'm going to read the

24   paragraph about going concern.

25             THE COURT:  Are you familiar with this document,

Page 113

 1   Mr. Porter?

 2           MR. PORTER:  I've -- this is the second time I've

 3   seen it, yes.

 4           THE COURT:  Okay.

 5           MR. PORTER:  Thank you.

 6           THE COURT:  Go ahead.

 7           MR. NASATIR:  Thank you, Your Honor.

 8   BY MR. NASATIR:

 9   Q    So, what Arrowwood says about its financial situation

10   is as follows under Going Concern:  "Based on the company's

11   evaluation, the company has sufficient liquidity to continue

12   as a going return -- going concern, as defined in SSAP No.

13   1, Disclosures of accounting policies, risks, and other

14   uncertainties and other disclosures.  However, as of

15   December 31, 2022, the company's risk case capital, RBC

16   ratio, which is the ratio of the company's total adjusted

17   capital to authorize control level capital, has fallen below

18   its RBC-mandatory level.  As the mandatory control level,

19   the Delaware Department of Insurance, DOI, is mandated to

20   place the company under its control except where, as is the

21   case with the company, such company is a property and

22   casualty insurance company that is no longer writing new

23   business and is running off existing liabilities.

24           Under these circumstances, the Commissioner has

25   the discretion to continue to allow the runoff of the

Page 114

1    company; nevertheless, the DOI could seek to place the

2    company in a formal proceeding, i.e., rehabilitation or

3    liquidation, at any time based on the company's financial

4    condition."  Have I read that accurately?

5              THE COURT:  Well, you actually got one thing

6    wrong, but he's got it in front of him.  I think you

7    inverted the order of two words.  It's not going to make a

8    difference.  Go ahead.  You asked if you read it accurately;

9    I don't think so, but --

10   BY MR. NASATIR:

11   Q    Does this refresh your recollection in any way as to

12   whether -- or change your view as to whether Arrowwood is in

13   receivership?

14   A    My comment about receivership was about financial

15   impairment.  I don't know that I --

16   Q    You didn't mean it as a technical term.

17   A    Not as a technical term.

18             THE COURT:  Can I ask you this question?  Is it --

19   is Royal/Arrowwood continuing -- is it writing new business?

20             MR. PORTER:  It is not, no.

21             MR. NASATIR:  That is the nature of a runoff

22   company.

23             THE COURT:  I understand that.

24   BY MR. NASATIR:

25   Q    Are you familiar with the firm ACIC?

Page 115

1    A      No.

2    Q      Do you disagree that this statement in the annual

3    report indicates that Arrowwood can meet its financial

4    obligations for at least the next twelve months?

5    A      That's what the report would suggest, yes.

6    Q      And do you have any understanding as to whether the

7    company has $768 million in cash and invested assets?

8    A      Are you asking the question whether I know that?

9    Q      Yes, whether you know.

10   A      Is it in the report?

11   Q      Yes.

12   A      Where in the report is that?

13   Q      I'm just asking if you know.  I don't --

14   A      Oh, okay.  No.  Not offhand, no.

15   Q      So, if the preliminary injunction is not granted and

16   cases went along and defense costs were incurred, wouldn't

17   that be a good thing because Arrowwood currently has the

18   funds to pay those defense costs?

19          THE COURT:  How many other cases anywhere in the

20   country involving Dioceses are going forward that -- for

21   which Arrowwood's reserves can be called on?  Is Arrowwood -

22   -

23          MR. NASATIR:  I can tell you --

24          THE COURT:  I thought that Arrowwood not only

25   insured this Diocese but many Diocese.

1           MR. NASATIR:  Your Honor, I can tell you that

2     (indiscernible) to the Archdiocese of Santa Fe that they

3     have confirmed the plan about -- I don't know, a couple

4     months ago, and that plan had a settlement with Arrowwood in

5     which they contributed millions of dollars to the settlement

6     (indiscernible)

7           THE COURT:  Yeah, but I -- there are -- I don't

8     know whether Arrowwood wrote insurance for other than

9     Catholic Diocese.  I don't know what its book of business

10    consisted of.  You put up a report that says how much their

11    cash reserves were at a date, but how is this witness

12    supposed to know what all of the insured's claims, other

13    than this Diocese or parishes that are covered by it, and

14    what's -- how many hands are pulling on that pot of money?

15    Do you know?  I mean, is it in the document?

16          MR. NASATIR:  Well, I would submit, Your Honor,

17    that the document says that it's a going concern for the

18    next twelve months.

19          THE COURT:  Yes, but --

20          MR. NASATIR:  And Mr. Porter -- Mr. Porter is --

21          THE COURT:  Mr. Porter, do you know how many

22    claims have been made against Arrowwood not involving the

23    Diocese of Rockville Centre or parishes within it?

24          MR. PORTER:  I don't know.

25          MR. NASATIR:  The people who do the financial

Page 117

1    accounting, the actuaries and those people, have to assess

2    whether they can pay the claims going forward.  I'm not

3    asking Mr. Porter to adopt the idea that the company is

4    solid beyond a year --

5            THE COURT:  Okay, you're using this document --

6    what's the --

7            MR. NASATIR:  The purpose of my use -- the use of

8    this document, Your Honor, is to rebut Mr. Porter's view

9    that there is a practical and the Diocese view that this is

10   a practical aggregate.

11           THE COURT:  Okay, go ahead.  Just go ahead, then.

12   BY MR. NASATIR:

13   A    I don't know what went into the analysis of their

14   liabilities, but if they were estimated on the basis of the

15   stay of the state court actions, bringing those forward

16   could potentially change the analysis.

17   Q    (indiscernible) reserve for a -- the insurance company

18   reserves claims it's aware of, right?

19   A    They do, but the idea of liquidity and the next -- the

20   obligations that'll be payable for the next twelve months --

21   if they're estimating those on the basis of current claims,

22   active claims, that's one number.  If it's current claims,

23   active claims, plus now new claims, that could put a greater

24   stress -- would put a greater stress on their cash

25   obligations over the next twelve months.

1    Q    You don't know whether this report takes that into

2    account or not.

3    A    I don't know.

4    Q    One last point.  In your declaration at Footnote 4, you

5    note that Arrowwood -- you note that some insurance company

6    has denied claims.

7    A    Yes.

8            THE COURT:  I don't understand your question.

9            MR. NASATIR:  Part of the direct testimony of Mr.

10   Porter is that a company has denied claims to date based on

11   the policy arguments.

12           MS. DEL MEDICO:  Can you direct us to where you're

13   --

14           MR. NASATIR:  Footnote 4.

15           MS. DEL MEDICO:  Okay.  Page 3?

16           MR. NASATIR:  Footnote 4.

17   BY MR. NASATIR:

18   Q    And do you recall that, sir?  Footnote 4.

19   A    I see that, yes.

20   Q    Do you know whether that refers to Arrowwood?

21   A    I believe it -- I believe it did, yes.

22   Q    So, to the extent that Arrowwood is denying claims

23   based on the coverage defense it has, there are no defense

24   dollars coming out of Arrowwood anyway which would not --

25   which could go to anywhere else, right?  At least for those

Page 119

1    claims.

2              THE COURT:  Just so we have a clear record, when

3    you refer to Footnote 4, you're talking about Footnote 4 on

4    Page 4 of Mr. Porter's direct testimony?

5              MR. NASATIR:  Yes, that's it, Your Honor.

6              THE COURT:  Okay, that's fine.  I just wanted --

7    again, I just want to make sure we have a clear record of

8    what --

9              MR. NASATIR:  Thank you.

10             THE COURT:  Okay, go ahead.

11   BY MR. NASATIR:

12   Q    Going back to Exhibit U, Your Honor.  That's it.  Now,

13   we're still talking about your testimony that there is a

14   risk that every dollar out of the insurance proceeds is --

15   that goes towards defense costs is a dollar that cannot be

16   awarded to victims of abuse.  Let's turn to what I've heard

17   described as "the Bishop's program".  Are you familiar with

18   that phrase?

19   A    I am, yes.

20   Q    What is the Bishop's program?

21   A    It's a proprietary liability program created by Arthur

22   J. Gallagher called the Bishop's program for churches.

23   Q    And looking at the first green line above the white

24   line, what is that specific excess program?

25             THE COURT:  Let me just -- the charts on the

Page 120

1    screen are in color.  The charts in the exhibit binders are

2    not.

3              MR. NASATIR:  Okay.  I was using it for ease of --

4              THE COURT:  I understand.  Again, I'm looking for

5    clarity of record, because the exhibit binders don't have

6    the color chart.  They have a black and white chart, so I

7    want to be sure that they're -- I see them on the screen; I

8    understand that.

9              MR. NASATIR:  I will read what's in the black and

10   white chart so that we identify --

11             THE COURT:  Fine.  Go ahead.  That's fine.

12   BY MR. NASATIR:

13   Q    So, if you can follow -- in the color chart, it's

14   green.  If it's not colored, it's the "specific excess

15   program".  And my question is, what carrier is in the

16   specific excess program?

17   A    It's a mix of insurers.

18   Q    I'm sorry?

19   A    It's a mix.  Mix of insurers.

20   Q    But those insurers, all of them -- they have no duty to

21   defend, correct?

22   A    Correct.

23   Q    And they just reimburse defense costs, right?

24   A    And damages.

25   Q    And damages.

Page 121

```
 1    A    Yes.

 2    Q    And you said -- and (indiscernible) -- in your

 3    declaration, at Paragraph 16, Docket 181, you said, "Under

 4    the London policies, defense costs are generally considered

 5    part of the ultimate net loss.  That means incurring

 6    reimbursable defense costs depletes available policy

 7    proceeds."  Did I read that correctly?

 8    A    I don't have that in front of me, but it sounds right.

 9    Q    It sounds right to you.

10    A    It does.  Yeah.

11              MS. DEL MEDICO:  Where are you reading?

12              THE COURT:  This is from his direct testimony.

13              MS. DEL MEDICO:  Okay, you said 16?

14              THE COURT:  Paragraph 16.  It was a verbatim read

15    of what's in Paragraph 16.

16              MS. DEL MEDICO:  Do you have it?

17              MR. PORTER:  I don't have that in front of me.

18              THE COURT:  I thought somebody put his direct --

19              MR. NASATIR:  I gave you your declaration

20    (indiscernible)

21              THE COURT:  It's in your declaration, which was

22    given to you.

23              MR. PORTER:  Okay.

24              THE COURT:  It's Paragraph 16, which is -- which

25    is Page 7 --
```

Page 122

```
 1            MR. PORTER:  Okay, thank you.

 2            THE COURT:  -- of your direct testimony.

 3            MR. PORTER:  Okay.  Okay, my document is not

 4   reading the same, I don't think.

 5            MR. NASATIR:  I'm sorry, would you repeat

 6   yourself?

 7            MR. PORTER:  I -- my document's not reading the

 8   same, I don't think.  What I have here is a -- looks like my

 9   direct testimony.  Okay.

10            MR. NASATIR:  That's what I'm talking about.

11            MR. PORTER:  Yeah.  And you're saying --

12            MR. NASATIR:  Paragraph 16.

13            MR. PORTER:  Okay.  Okay.  Thank you.

14   BY MR. NASATIR:

15   Q    So, it is your testimony that the insurers will not

16   wait to be presented with the (indiscernible) net loss but

17   will reimburse defense costs over the course of the claim.

18   Is that right?

19   A    They can, yes, if they're willing.

20   Q    Well, are you aware that the London insurers have said

21   that they will not pay until they're presented with an

22   alternate loss in their litigation?

23   A    I don't know.

24            MS. DEL MEDICO:  Objection.

25            THE COURT:  Overruled.  He's answered.
```

Page 123

```
 1                  MR. NASATIR:  I didn't hear the answer.

 2    BY MR. NASATIR:

 3    A     I don't know.

 4    Q     You don't.  Would you agree with me that the policy

 5    language does not provide for payment during the course of

 6    the claim of defense costs?

 7    A     I don't know.  I don't know whether there's language to

 8    that effect or not.

 9    Q     You said that it's custom and practice for the insurer

10    to pay defense costs over the course of the claim in these

11    policies.

12    A     Yeah.  Yes, I did.

13    Q     Okay.  Is that based on your personal knowledge of this

14    program?

15    A     Personal knowledge of the Bishop's program, yes.

16    Q     So in other words, this is -- this course of conduct

17    that you're testifying to happened after you came on board

18    in 2007.

19    A     With respect -- yes, but with respect to -- I don't

20    know -- not with respect to Rockville Centre particularly,

21    but my experience with Diocesan organizations and that

22    program generally.

23    Q     All right.  So, I'm strictly talking about Rockville

24    Centre.

25    A     Okay.
```

Page 124

1   Q    All right.  So, you haven't seen that happen in the

2   Rockville Centre CDA cases, right?

3   A    I have not.

4            THE COURT:  Do you know one way or the other

5   whether it's happened in the Rockville Centre cases where

6   the -- this is the London insurers -- whether they're

7   responding to pay defense costs during the course of the

8   case.

9            MR. PORTER:  They are not.  I don't believe they

10  are.

11           THE COURT:  Okay.

12           MR. PORTER:  No.

13           MR. NASATIR:  Thank you.  And Your Honor, to the

14  extent that Mr. Porter is relying on the experience of other

15  programs, I think that I would object to that testimony.

16           THE COURT:  Overruled.  You can ask him

17  specifically, "Are they paying the defense costs in the

18  Rockville Centre case?"

19           MR. NASATIR:  Yeah, I asked him that.  He said he

20  didn't know.

21           THE COURT:  And the answer is you don't know?

22  Were they --

23           MR. PORTER:  I don't know.

24           THE COURT:  Okay.

25           MR. PORTER:  I don't know.

Page 125

```
 1    BY MR. NASATIR:

 2    Q    You would agree with me that if the London insurers had

 3    taken the position that they're not going to pay defense

 4    costs over the course of the claim that there is no defense

 5    dollars going into anyone's pocket that could have gone into

 6    awards for the survivors, right?

 7              THE COURT:  I don't understand that question.

 8    BY MR. NASATIR:

 9    Q    Mr. Porter, you would agree if LMI is -- if the London

10    insurers are not paying defense costs, there's no question

11    that any defense costs can't have gone to the survivors

12    instead if they're not paying.

13              THE COURT:  I'm sorry, but that doesn't make any

14    sense to me.

15              MR. NASATIR:  I'm going to his statement that --

16    Mr. Porter's statement that every dollar in defense costs is

17    a dollar that could have gone to the survivors.  And I'm

18    saying in this instance if London Market Insurers aren't

19    paying, there's nothing that could have gone to the

20    survivors.

21              THE COURT:  Is there -- to your knowledge, is

22    there a priority payments provision in the policy as to

23    whether defense costs are satisfied before liability to

24    abusers -- abused -- you know, those who have been abused?

25              MR. PORTER:  In my experience, dollars are paid
```

Page 126

```
 1    accrued as they become -- as they're presented, sort of in

 2    time order.  So, the defense expenses that are being

 3    incurred are being accrued as a liability payable in the

 4    future.

 5                THE COURT:  To your knowledge, in any of the

 6    Diocese cases --

 7                MR. PORTER:  Yeah.

 8                THE COURT:  Because you're involved in not only

 9    Rockville Centre.

10                MR. PORTER:  Others as well.

11                THE COURT:  Okay.

12                MR. PORTER:  Yeah.

13                THE COURT:  Has this issue of coverage amounts

14    being exhausted arose where some of it is defense costs and

15    some of it is the liability to abuse survivors?

16                MR. PORTER:  It is a practical matter that defense

17    costs precede the settlement amounts --

18                THE COURT:  They're not being paid; I don't know.

19    I mean, is there something -- what are you relying on as to

20    the order in which they're -- if the insurers aren't paying

21    the defense costs and you get -- there's a judgment.

22                MR. PORTER:  Right.

23                THE COURT:  And the amount of the judgment and

24    defense costs exceed the policy limits --

25                MR. PORTER:  Yes.
```

Page 127

1          THE COURT:  Do you know of cases in which insurers

2    have resolved which to pay first?  I'm asking for your

3    experience.

4          MR. PORTER:  Yeah.  My experience is that they're

5    going to pay in the order in which those costs were

6    incurred.

7          THE COURT:  Do you know that that has actually

8    happened, where the policy limits have been exhausted for

9    both defense and settlements or judgements and they've made

10   a decision in which the order -- which they'll pay, because

11   they haven't paid during the course of the case.

12         MR. PORTER:  Right, and --

13         THE COURT:  And you know that that has happened?

14         MR. PORTER:  I believe that to be my experience,

15   that they're paying --

16         THE COURT:  Give me the specific of a case where

17   that's happened.

18         MR. PORTER:  Well, let me clear on what I'm

19   saying.  So, as the expenses -- as defense expenses are

20   incurred, Day One, Day Two, Day Three, those amounts

21   accumulate.

22         THE COURT:  But are not paid.

23         MR. PORTER:  Not paid, but accumulate as a

24   liability payable to the insured.  Let's just say they wait

25   until the very end, right?  The bucket has been filled up

Page 128

1    with defense expense amounts, and at the point where -- to

2    say the limits are exhausted, it would be at that point the

3    reimbursement would be payable, would be due.

4              THE COURT:  They pay at the point when it's been

5    exhausted even if the underlying -- if there's no judgement?

6    If the costs are fully -- policy amounts are used.  They've

7    accrued defense costs up to the policy amounts.

8              MR. PORTER:  Right.

9              THE COURT:  They pay then whether there's any

10   finality or not?

11             MR. PORTER:  If it's a covered claim, yes.

12   They'll pay.

13             THE COURT:  And you know that that's happened?

14             MR. PORTER:  I --

15             THE COURT:  Do you?

16             MR. PORTER:  I believe that --

17             THE COURT:  Not "maybe".  I'm asking specifics.

18             MR. PORTER:  I --

19             THE COURT:  Because you're going to tell me which

20   case.

21             MR. PORTER:  Yeah.  It's just the mechanics of the

22   policy.

23             THE COURT:  I'm asking you a specific question.

24             MR. PORTER:  Yes.

25             THE COURT:  You said that's how it works, and I

Page 129

1    want you to tell me, when has that happened?  I don't want

2    to know "Maybe.  That's how they might treat it."

3              MR. PORTER:  Right.

4              THE COURT:  Do you know that that's actually

5    happened in fact, and if so, tell me the case.

6              MR. PORTER:  I can't --

7              THE COURT:  Who was the insured --

8              MR. PORTER:  Right.  I don't have those particular

9    --

10             THE COURT:  Okay, so you don't know.

11             MR. PORTER:  I believe I know, but I don't have

12   the specifics of any case to provide you, Your Honor.

13             THE COURT:  You can't tell me the case.  You think

14   it's happened, but you don't know when, who, any of that.

15   Or you're not prepared to tell me?

16             MR. PORTER:  I'm relying on the language of the

17   policy (indiscernible)

18             THE COURT:  I want -- that's not my question.  I

19   see the language of policies.

20             MR. PORTER:  Okay.

21             THE COURT:  You said that when the defense costs

22   have been -- when the policy amounts have been exhausted,

23   they pay, even if the case -- underlying case isn't done.

24             MR. PORTER:  Okay.

25             THE COURT:  I asked, when did that happen?

Page 130

1          MR. PORTER:  I don't have that.

2          THE COURT:  You don't know.

3          MR. PORTER:  I don't know.

4          THE COURT:  I asked if there's a judgement and

5    defense costs that exceed the amounts of the policy limits -

6    - I asked you how it would be allocated or in what order it

7    would be paid.  You don't -- you can't tell me a specific

8    case where that's happened.  Am I correct?

9          MR. PORTER:  That's correct.

10         THE COURT:  Go ahead.  Don't fence with me.

11         MR. NASATIR:  Thank you, Your Honor.  I'm going to

12   move to a slightly different topic --

13         THE COURT:  Go ahead.

14   BY MR. NASATIR:

15   Q    Which is the limits on the London program.  Would you

16   agree to me that -- with me that from 1980 to 1985, there's

17   an average of $50 million in limits?

18   A    Yes, that's what the chart suggests.

19   Q    And you --

20         THE COURT:  That's for primary and excess.

21         MR. NASATIR:  Primary and excess, yes.

22   BY MR. NASATIR:

23   Q    So, if you -- 5 million -- sorry, 50 million for five

24   years is 2.5 billion, right?  By my math --

25   A    If that's the math, yes.

Page 131

1   Q   And the -- and this is on a per-claim basis, right?

2   A   Per-occurrence basis.

3   Q   Occurrence, excuse me.

4   A   Yeah.

5   Q   Thank you.  Now, there's something called a "self-

6   insured retention aggregate limit".  Are you familiar with

7   that?

8   A   I am.

9   Q   This aggregate limit is not about the aggregating the

10   limits of liability; it's about aggregating the obligation

11   to pay the self-insured retention.  Is that right?

12   A   That's right.

13   Q   There are two different uses of the word "aggregate".

14   A   Yes.

15   Q   And with respect to the SIR aggregate and the specific

16   excess program, is it correct to say initially without

17   putting numbers on it the Diocese has to pay the self-

18   insured retention and when it caps out at a certain point,

19   it becomes the London Insurers obligation, and when that

20   caps out it goes back to the Diocese.  Is that right?

21   A   Generally, that would be true, yes.

22         THE COURT:  But self-insured retention under these

23   policies --

24         MR. PORTER:  Yes.

25         THE COURT:  Is the Diocese or the parish or both -

Page 132

1    - at the start today, we heard that a large percentage of

2    the premiums were paid by the parishes, and I'm asking that

3    with respect -- how does it work with respect to the self-

4    insured retention?

5              MR. PORTER:  I don't know for sure.  I can speak

6    generally, but not for sure.

7    BY MR. NASATIR:

8    Q    But for the insurer's responsibility for the self-

9    insured retentions, they would be paying out the defense

10   costs.  Do you understand that that amount is roughly

11   $500,000 a year for the first seven years of the Bishop's

12   program?

13   A    I do not -- I was not aware of that, no.

14   Q    So, you're generally not aware at what point the self-

15   insured retention kicks in as an obligation of the insurer

16   and when it reverts back to the Diocese.

17   A    That's right.

18   Q    But in order to understand the impact of any claim

19   going forward and whether the London Insurer was responsible

20   for it, you would have to know exactly where in that SIR

21   aggregate risk program you were to know whose obligation it

22   was going to be.

23   A    That's right.

24   Q    And you've not done any of that type of analysis,

25   right?

Page 133

```
 1    A    I have not.

 2              MR. NASATIR:  Your Honor, the next topic I'm going

 3    to cover is concerning the shared insurance and the first-

 4    come-first-served topic.  I just want to make the point that

 5    currently we are asking for permission -- we're asking for

 6    the stay not to be imposed or the injunction not to be

 7    placed upon us to allow the state court cases to go forward

 8    to collect -- and that defense costs be paid.  The issue of

 9    income -- the issue of shared insurance only comes up upon

10    execution on a judgement or settlement.  I don't -- I'm

11    prepared to go forward with my examination with Mr. Porter

12    on that, but it is depending on how Your Honor --

13              THE COURT:  I don't know what relief I'll grant.

14    Just go for it.

15              MR. NASATIR:  Okay, thank you.

16              THE COURT:  Ask the question.

17              MR. NASATIR:  Thank you.

18    BY MR. NASATIR:

19    Q    Now, you raised some concerns in your direct

20    examination declaration about shared insurance, right?

21    A    Yes.

22    Q    Okay.  And is it fair to say that your concern is that

23    insurance will be paid out in a first-come-first-served

24    basis?

25    A    Yes.
```

```
1    Q    Well, let's -- let me ask you this.  You would agree

2    with me that was a concern -- that is not a concern where

3    the carriers denied coverage, right?

4    A    Correct.

5    Q    Do you know how many coverage actions are currently

6    going on which involve the Diocese insurance policies?

7    A    Only from what I've heard today.

8    Q    Only from what you heard today?

9    A    Yeah.

10   Q    To the extent any carrier is engaged in a coverage --

11   declaratory relief coverage action, in order for first-come-

12   first-served to be an issue, they would have to drop all

13   their coverage defenses, right?

14   A    Had they denied outright, or they'd reserved their

15   rights?

16   Q    Either way, before they pay, they're going to have to

17   agree to pay.

18   A    Agreed.  Yes.

19   Q    Now, have you ever witnessed a situation where an

20   insurer of the Diocese and/or the parishes settled with one

21   of those two, but not the other?

22          THE COURT:  I don't -- ask it again, please.  I

23   just -- I had trouble following.

24   BY MR. NASATIR:

25   Q    Have you witnessed a situation where both the Diocese
```

Page 135

1    and a parish are codefendants and the matter has been

2    resolved by the insurer by getting a release for one

3    defendant but not for the other?

4    A    I have not experienced that.

5    Q    So, as a practical matter, most typically you've

6    observed the insurer when it settles gets releases from all

7    its assureds, right?

8    A    I don't -- I suppose it's one or the other.  I don't

9    know.

10   Q    You would agree with me that if the insurer does get

11   releases from both -- from all its -- for all its assureds

12   that there is no issue of first-come-first-served.

13   A    If the -- I would agree on that particular example,

14   yes.

15   Q    Now, you nonetheless believe that Arrowwood would pay

16   on a first-come-first-served basis, assuming it isn't

17   denying the claim and it is paying.

18   A    Absolutely.

19   Q    Now, would you agree with me that there is no policy

20   provision in the Arrowwood policies that require the carrier

21   to pay on a first-come-first-served basis?

22   A    Arrowwood has a duty to defend, and therefore must meet

23   those policy obligations as the obligations become due.

24   Q    Right, but if you have -- let me ask it a different

25   way.  There is no provision in the policy that says "We have

Page 136

1    to pay the first person that tenders a settlement or a

2    judgement."

3    A    There's nothing in the policy that says that.

4    Q    And have you ever seen an application -- strike that.

5    You're not aware of any case law, insurance case law in New

6    York, that creates a first-come-first-served rule, are you?

7              MS. DEL MEDICO:  Objection.

8              THE COURT:  Sustained.

9    BY MR. NASATIR:

10   Q    You would agree with me that if a survivor asserts

11   they've been abused by a priest or a perpetrator over

12   multiple years, there would be multiple per-occurrence

13   limits available in coverage, right?

14   A    Yes.

15   Q    So, we're not just talking about one tower.  We're

16   talking, depending on the claim, about several towers,

17   right?

18   A    Right.

19   Q    Can you look at Paragraph 22 of your direct testimony?

20   Let me know when you're there.

21   A    I'm there, thank you.

22   Q    Now, you say -- you're saying here that if a parish and

23   a CVA plaintiff have settled for $200,000 during the --

24             THE COURT:  Which paragraph are you looking at?

25             MR. NASATIR:  Twenty-two.

Page 137

```
 1              THE COURT:  I'm looking at Paragraph 22.  It just
 2     says "Attached hereto as Exhibit B."
 3              MR. NASATIR:  Is this -- are you looking at 181?
 4              THE COURT:  I'm looking at 180 -- ECF Docket No.
 5     181.
 6              MR. NASATIR:  (indiscernible) 181.  Yes.
 7              THE COURT:  All right, I've got it now.  Go ahead.
 8     I have it opened up.  Go ahead.  I had the wrong docket.
 9     BY MR. NASATIR:
10     Q    So, I'm going to start with the hypothetical that you
11     testified to here again.  You're saying that if a parish and
12     a CVA plaintiff settle for $200,000 during the London
13     Insurer years and the London Insurer did not get a release
14     from the CVA plaintiff, that the Diocese would have no
15     insurance proceeds available.  Is that right?  That's what
16     you said.
17              MS. DEL MEDICO:  I don't see -- objection.  I
18     don't see those words.
19              THE COURT:  I don't either.  Sustained.
20              MR. NASATIR:  I will read it.  I was paraphrasing
21     it.
22              THE COURT:  Okay.
23              MS. DEL MEDICO:  (indiscernible)
24              MR. NASATIR:  I can't see that.
25     BY MR. NASATIR:
```

Page 138

1    Q    Starting at Paragraph 22, "Thus, even while the

2    automatic stay bars litigation against the DRVC, if a CVA

3    plaintiff succeeded in establishing liability against a

4    parish for sexual abuse occurring during the London program

5    policy periods, the parish would be able to draw insurance

6    policy proceeds to cover the loss."  Okay?  And now I'm

7    going to read your -- the hypothetical you provided here.

8    "If, for example, the parish…"

9              THE COURT:  "For example, if."  You didn't read it

10   correctly.

11   BY MR. NASATIR:

12   Q    I guess I'm getting dyslexia in my later years.  Let me

13   try this again.  "For example, if the parish's liability for

14   the claim was $200,000, the parish would be responsible for

15   a $100,000 self-insured retention (SIR) but may be entitled

16   to have some or all of the SIR reimbursed from the proceeds

17   -- the insurance proceeds of that year's aggregate

18   agreement.  The parish would also be entitled to

19   indemnification of the $100,000 under the specific excess

20   agreement for the amount exceeding the SIR.  Importantly,

21   once the insured -- once the insurance company has paid its

22   share of the covered loss to the parish, it will have no

23   further obligation regarding that occurrence and as a

24   result, if the DRVC later attempts to settle with that CVA

25   plaintiff in its Chapter 11 case, no insurance policy

Page 139

1    proceeds would be available under the aggregate agreement

2    and the proceeds paid to the parish under the specific

3    excess agreement would also not be available to the DRVC."

4        I hope I read that correctly.  My question, sir, is if

5    somebody did come after the Diocese in that hypothetical,

6    there would be the remaining amounts of insurance available

7    to pay that claim, right?  On the occurrence basis.

8    A    Are we speaking about the specific --

9    Q    Yes.

10   A    -- aggregate, or the --

11   Q    No, we're not talking about the aggregate.  I'm just

12   saying, one -- I'm asking you, isn't it true that the upper

13   towers of insurance would be available to the Diocese in the

14   event that there was a settlement with the parish that

15   exhausted the first layer of insurance?

16             MS. DEL MEDICO:  Objection.

17             THE COURT:  Overruled.

18   BY MR. NASATIR:

19   A    I would have to look at the policies again, but I'm

20   just not recalling what the excess would do over top of

21   those primary layers.  Would they -- would a gap emerge?

22             THE COURT:  I don't understand what you mean by --

23   I understand "gap" because I've had to litigate this before,

24   but there's primary; there's excess.  There are multiple

25   insured parties.

Page 140

1           MR. PORTER:  Yes.

2           THE COURT:  If the primary is exhausted with a

3    judgement against one of the co-insureds, I think really the

4    question goes to whether the excess is available to the

5    second insured.  That's essentially what you're asking.

6           MR. NASATIR:  Exactly.

7           MR. PORTER:  And it's the question also, does it

8    drop down to be immediately over the SIR, or is this

9    additional gap -- SIR gap --

10          THE COURT:  Assuming --

11          MR. NASATIR:   (indiscernible)

12          THE COURT:  The self-insured retention is

13   exhausted.  The primary is exhausted.  Does the second

14   insured have a claim against -- to recover against the

15   excess?  That's what we're really trying to find out.

16          MR. NASATIR:  Exactly.  Thank you.

17          MR. PORTER:  Presumably in excess of the SIR and

18   potentially in excess of the exhausted primary limit.

19          THE COURT:  Yes, the second of the co-insureds can

20   claim against the excess insurance.

21          MR. PORTER:  Yes.

22   BY MR. NASATIR:

23   Q    And in the event that happened, that scenario occurred,

24   there would be no SIR for the second insured to pay, right?

25   A    I don't -- well, it depends on whether it's the same

Page 141

1    occurrence, treated as the same occurrence or not.

2    Q    Well, if -- in the example, there's one occurrence and

3    that's -- it's not a new occurrence.  We only get to the

4    question of excess if it's the same occurrence, right?

5              THE COURT:  If it's a different occurrence, then

6    the policy limit -- that policy --

7              MR. NASATIR:  The new policy limit.  It all starts

8    over again.

9              THE COURT:  The policy limit starts all over

10   again.

11             MR. PORTER:  Right.

12             THE COURT:  This is an issue if it's the same

13   occurrence --

14             MR. PORTER:  Yeah.

15             THE COURT:  And the primary and the self-insured

16   retention is exhausted by one of the co-insureds --

17             MR. PORTER:  Yeah.

18             THE COURT:  Does the other co-insured then able to

19   claim against the excess?  That's the issue, right?

20             MR. PORTER:  Right.

21             MR. NASATIR:  That's the exact issue.

22             MR. PORTER:  Right.

23             THE COURT:  And your answer is yes, they can.

24             MR. PORTER:  They can.

25   BY MR. NASATIR:

Page 142

1    Q    Then my next question was, in that scenario, isn't it

2    true that the second insurer would not have to pay the self-

3    insured retention?

4    A    If treated as the same occurrence, yes.

5    Q    And we've established that the self-insured retention,

6    to the extent it's the insurer's responsibility, was -- for

7    several years was an aggregate of $500,000.

8    A    Right.

9    Q    Just to finish up here, Mr. Porter, your firm

10   represents the Philadelphia Archdiocese?

11   A    It does.

12   Q    Baltimore?

13   A    Yes.

14   Q    Newark?

15   A    Yes.

16   Q    Manchester?

17   A    Yes.

18   Q    Richmond?

19   A    Yes.

20   Q    Camden?

21   A    Yes.

22   Q    Metuchen?

23   A    Yes.

24   Q    Virgin Islands?

25   A    Yes.

Page 143

1    Q    And then, Rockville Centre.

2    A    And --

3    Q    By my math, that's ten diocese representations.  Have I

4    left anyone out?

5    A    There are others, but those are the ones I'm directly

6    involved in.

7    Q    And of those ten, at least five of them are facing CVA

8    claims under New York or New Jersey, right?

9    A    New York or New Jersey, yeah.

10   Q    And are the insurance programs in those five similar in

11   nature?  Let me rephrase that.  Do they have Bishop's

12   programs?

13   A    Many of them do, yes.

14   Q    So, your testimony here could be applicable --

15           THE COURT:  Let's leave the testimony just to this

16   case.  He's not testifying about other cases.

17           MR. NASATIR:  That's fine, Your Honor.  I have no

18   further questions.

19           THE COURT:  Thank you very much.  Redirect?

20           MS. DEL MEDICO:  No redirect, Your Honor.

21           THE COURT:  Thank you.  You're excused.  Thank you

22   very much.

23           MR. PORTER:  Thank you.

24           THE COURT:  All right, it's 21 minutes after

25   12:00.  Let's take our lunch recess now.  Who is the next

Page 144

1    witness?

2              MR. GEREMIA:  The next witness is Charles Moore,

3    Your Honor.

4              MR. NASATIR:  Excuse me, Your Honor.  Just --

5    could we get Exhibit U admitted into evidence if there's no

6    objection?

7              MR. BROWN:  I think (indiscernible) everything's

8    going to come in at the --

9              MR. NASATIR:  At the end?

10             MR. BROWN:  We'll do a stipulation at the end.

11             MR. NASATIR:  Okay.

12             MR. BROWN:  There's not --

13             THE COURT:  Well, let's deal with it now, okay?

14   Make a specific offer of -- by letters, maybe.  If it's a

15   range, fine.  Let's get -- I like -- you know, if there's

16   agreement in particular, let's have the record clear now

17   about which exhibits are in evidence for each side, okay?

18             MS. GREENWOOD:  Good afternoon, Your Honor.  Gail

19   Greenwood for Pachulski Stang.

20             THE COURT:  Okay.

21             MS. GREENWOOD:  We move to have Exhibits A through

22   Q admitted into evidence as well as U, Y, and Z.  And I

23   believe that -- setting aside U for the moment, Exhibits A

24   through Q, Y, and Z have been -- the parties have admitted

25   that they are admissible (indiscernible) pretrial

Page 145

1    stipulations provided to Your Honor, and --

2              THE COURT:  The parties have consented to

3    admitting A through Q, Y, and Z in the pretrial stipulation.

4              MS. GREENWOOD:  Much better said, thank you.

5              THE COURT:  Okay.

6              MR. BROWN:  And the only thing we're withdrawing,

7    Your Honor, from what's on the stipulation -- Exhibit R was

8    the joinders, which were objected to.  That's the joinders

9    and the motion to dismiss.  They were objected to as

10   hearsay.  We are taking them out of the mix.

11             THE COURT:  Okay.

12             MS. GREENWOOD:  And Your Honor, I believe that we

13   provided the Court with electronic copies of these that are

14   in color, but to the extent that exhibits have been provided

15   that are black and white, we'll switch out any that are

16   necessary --

17             THE COURT:  That's fine.  If they're -- if I have

18   them electronically, that's fine for this purpose, okay?  I

19   just -- I want to be sure that when, you know, there's

20   witness testimony I'm looking at binders (indiscernible) I'm

21   looking at screen with color, but -- so it's clear, okay?

22   What about Exhibit U?

23             MS. GREENWOOD:  Do you want to address Exhibit U?

24   We would move to --

25             MR. NASATIR:  Yes.

Page 146

```
 1              MS. GREENWOOD:  To admit Exhibit U pursuant to the

 2     -- pursuant to the testimony by Mr. Porter this afternoon

 3     and the questioning by Mr. Nasatir.

 4              THE COURT:  Okay.

 5              MS. GREENWOOD:  In particular --

 6              THE COURT:  Hold on.  Are there any objections to

 7     the Court admitting in evidence Exhibit -- Defendant's

 8     Exhibit -- yeah, Defendant's Exhibit U?

 9              MR. DIPOMPEO:  Christopher DiPompeo of the debtor,

10     Your Honor.  No objections.

11              THE COURT:  All right.  So, Exhibit U is in as

12     well, okay.  So, A through Q, U, Y, and Z have been offered.

13     There's been no objection as to any of them.  They're all in

14     evidence.

15              MS. GREENWOOD:  Yes, and we reserve for additional

16     rebuttal exhibits to the extent necessary --

17              THE COURT:  Okay, and -- and we covered all of

18     your exhibits?

19              MR. DIPOMPEO:  Yes, Your Honor.  I believe all of

20     our exhibits have been admitted.

21              THE COURT:  Okay.  So, we're good, then.  Let's

22     take our lunch break.  I don't know how long you want for

23     lunch.  I mean, we can go 1:30 or 2 o'clock.  Tell me what

24     you want.

25              MR. GEREMIA:  1:30's good.
```

Page 147

1              THE COURT:  Is that okay?  1:30?  We'll resume at

2       1:30.  Let's just talk about -- are you going to finish the

3       evidence today?

4              MR. GEREMIA:  I believe we can, yes.

5              THE COURT:  Okay.  Here's -- we can go no later

6       than 5:25, okay?  Assuming we finish the evidence, my

7       thought is tomorrow we'll have closing arguments.  Okay?  Is

8       there any disagreement with that plan?

9              MR. GEREMIA:  No.  No, Your Honor.

10             THE COURT:  Okay.  Well, let's try and see if we

11      can accomplish that.  Hopefully, we can finish the evidence

12      today and you can all think about -- even if we finish the

13      evidence early, we'd still do closings tomorrow so you can

14      organize your thoughts and stuff like that.  Okay?

15             MR. GEREMIA:  May I clarify one thing, Your Honor?

16             THE COURT:  Yeah, sure.

17             MR. GEREMIA:  You asked me before about the IRCP.

18             THE COURT:  Yes.

19             MR. GEREMIA:  And whether in connection with that

20      process notice was addressed.

21             THE COURT:  Yes.

22             MR. GEREMIA:  I just wanted to make sure that I

23      clarified.  The notice defense, in the sense that we've

24      spoken about it with the objections; that is, did the

25      Diocese know beforehand that this abuser was -- person was

Page 148

1    likely to abuse?  That was not adjudicated or addressed by

2    the IRCP.  Your Honor may be familiar with the IRCP

3    protocol.  One of the several factors that the

4    administrators looked at was whether after the abuse, did

5    the person contemporaneously notify somebody?  So, there was

6    that --

7               THE COURT:  Yes.

8               MR. GEREMIA:  That different --

9               THE COURT:  No, I just -- what I was trying -- I

10   thought that it was the case that the ICRP did not reject

11   claims because the Diocese or parishes did not have notice

12   of a -- you know, the alleged abuser's propensity or prior

13   bad acts.  And you're saying --

14              MR. GEREMIA:  That's correct.

15              THE COURT:  -- that that's true.  The issue of

16   whether -- and it's in the form itself.  "Did you tell

17   anybody about it?"

18              MR. GEREMIA:  Yes.

19              THE COURT:  Was something that was considered by

20   the IRCP.

21              MR. GEREMIA:  Right.

22              THE COURT:  Okay, fair.  All right, see you this

23   afternoon.  See you at 1:30.  Thanks very much.  Again --

24              (Recess)

25              THE COURT:  All right.  Thanks very much.  We're

1    back after our short lunch break.  We're ready to go forward

2    with the second witness.

3              MR. GEREMIA:  Good afternoon, Your Honor.  Todd

4    Geremia for the Diocese.  The Diocese calls as its next

5    witness Charles Moore.

6              THE COURT:  Mr. Moore?

7              CLERK:  Please raise your right hand.  Do you

8    solemnly swear or affirm that the testimony you are about to

9    give this Court will be the truth, the whole truth, and

10   nothing but the truth?

11             MR. MOORE:  I do.

12             THE COURT:  Please have a seat.  And there's water

13   there if you need water.

14             MR. MOORE:  Thank you.

15             THE COURT:  Mr. Geremia?

16              DIRECT EXAMINATION OF CHARLES MOORE

17   BY MR. GEREMIA:

18   Q    Good afternoon, Mr. Moore.

19   A    Good afternoon.

20   Q    Could you please tell the Court your name and position?

21   A    Charles Moore.  I am a managing director with Alvarez &

22   Marsal.

23   Q    Has Alvarez & Marsal been engaged by the Diocese of

24   Rockville Centre?

25   A    Yes.

Page 150

1    Q    Since approximately when?

2    A    We began work in January of 2019.

3    Q    Have you personally worked with the Diocese since

4    January of 2019?

5    A    Yes, I have.

6    Q    And to do what?

7    A    We were initially engaged by the Diocese to do a couple

8    of items.  The first was to assist the Diocese with

9    improving its financial operations, but then also to assist

10   with evaluation of strategic alternatives, especially as it

11   relates to passage of the Child Victims Act.

12   Q    Is it fair to say that you are the principal

13   restructuring advisor for the Diocese?

14   A    Yes.  I lead the team for Alvarez & Marsal.

15   Q    Can you describe generally what work you personally did

16   for the Diocese before the Diocese filed the Chapter 11

17   cases?

18   A    I've worked very closely with the Diocese since I got

19   involved.  Specifically I interact with Tom Doodian, who is

20   the chief financial officer for the Diocese and his team,

21   along with Mr. Tom Renker, who is the chief operating

22   officer, and general counsel, Bill Chapin, for insurance,

23   Father Eric Fasano, who is the Vicar General, the Bishop,

24   and a variety of other people in essentially going back to

25   the original items.  Initially it was to get our arms around

Page 151

1    the operations of the Diocese.  The Diocese was facing a

2    number of issues that was causing its financial performance

3    to deteriorate.  So figuring out ways to improve that and

4    then also working with that team that I indicated,

5    especially as lawsuits started to be passed under the CVA,

6    or filed I should say, under the CVA to address and evaluate

7    different scenarios.

8    Q    Did your duties shift after the Diocese filed the

9    Chapter 11 petition in this case?

10   A    Yes.  Once the Diocese filed on October 1st of 2020, we

11   moved into a role of supporting the Chapter 11 process.

12   That includes all of the bankruptcy administrative items,

13   but also working with the Unsecured Creditors' Committee on

14   diligence-related items and then also throughout the process

15   assisting with different items that the Diocese was

16   pursuing.  Sale of assets as an example.

17            THE COURT:  Could you estimate what percentage of

18   your professional time is taken up on representing the

19   Diocese?

20            THE WITNESS:  Your Honor, that has varied.  Around

21   the time of the filing, it would have been probably as high

22   as 25 hours a week.  Once the case stabilized, and

23   especially after a lot of the diligence was completed, my

24   time definitely went down.  So in the last I would say 15

25   months or so, it's been much less.  There are some weeks,

Page 152

1  recently as an example, where it would be much higher.

2          THE COURT:  Me too.

3          THE WITNESS:  Yes, I'm sure.  Other than those

4  select weeks, I would say it's maybe five to ten hours a

5  week.

6          THE COURT:  Okay.  Thanks very much.  Go ahead.

7  BY MR. GEREMIA:

8  Q    Mr. Moore did you execute a declaration in the Diocese

9  Chapter 11 case on the first day of filing, October 1, 2020?

10  A    Yes.  That's referred to as the first day declaration.

11  Yes.

12  Q    And did you also execute two declarations in connection

13  with this motion for a preliminary injunction in the

14  adversary proceeding?

15  A    Yes.

16  Q    And did you execute a written direct testimony on April

17  6th, 2023?

18  A    In this matter, yes.

19  Q    I'm going to hand that to you now, Mr. Moore.

20  A    Thank you.

21          THE COURT:  And I have that on the screen.

22  BY MR. GEREMIA:

23  Q    Is that a copy of your written direct testimony dated

24  April 6th, 2023?

25  A    It is.

Page 153

1    Q    And you signed that testimony, correct?

2    A    I did.

3         MR. GEREMIA:  I tender the witness for cross-

4    examination, Judge.

5         THE COURT:  You are offering that in evidence.  Is

6    it already admitted?

7         MR. GEREMIA:  I'm sorry.  Yeah.  We are -- yes, we

8    move the direct testimony of Mr. Moore into evidence.

9         THE COURT:  Any objection?

10        MR. BROWN:  There's not any objections.  We've

11   already stated on the same terms as we did with

12   (indiscernible).

13        THE COURT:  It's admitted in evidence and subject

14   to -- I'll give it what weight it's deserved or consider

15   your objections from here on.  Okay?  Good.  All right.

16   Cross-examination.

17              CROSS-EXAMINATION OF CHARLES MOORE

18   BY MR. BROWN:

19   Q    Good afternoon, Mr. Moore.

20   A    Hello, Mr. Brown.

21   Q    How are you?

22   A    I am well, thank you.

23        THE COURT:  He said who you are, but you didn't.

24        MR. BROWN:  I think I'm batting a thousand on that

25   today.

Page 154

1              THE COURT:  You could do it now.

2     BY MR. BROWN:

3     Q    Ken Brown for the Committee.  Mr. Moore, I'm going to

4     ask you some questions about the direct testimony that I

5     think you've been given a copy of.

6          How did you prepare that testimony?

7     A    An initial draft was prepared by Jones Day.  I went

8     through that draft, made edits, and then I signed it.

9     Q    Since you went through that exercise and executed your

10    direct testimony, have you learned anything further that's

11    relevant to that direct testimony that's not contained

12    within it?

13    A    As part of preparation of the expert report that I

14    submitted in motion to dismiss on Monday, I spent a little

15    bit more time on the cases themselves.  Other than that, no.

16    Q    So I would like to focus your attention on Paragraph 3

17    of your direct testimony.  And just so we're all kind of

18    level setting, you stated historically any claims alleging

19    liability for sexual abuse or related misconduct against the

20    DVRC, alleged perpetrators, the individual defendants in the

21    parishes that effectuate the DVRC's mission or the various

22    affiliated organizations of the DVRC have, with very limited

23    exception, been litigated and administered by the DVRC in

24    close connection with the DVRC parties, this approach is due

25    to the relationship between the DVRC and the DVRC-related

Page 155

1   parties, and the fact that many of the key allegations made

2   by the Claimants in such cases are substantially directed at

3   DVRC.  I'm not asking you a question, I just wanted to

4   refresh you that that was your testimony.

5        And when I -- as we did in your deposition, Mr. Moore,

6   I'm going to refer to the cases that are the subject of

7   today's motion and hearing as the state court actions, or

8   the SCAs.  And you'll understand what I'm referring to?

9   A    Yes.

10  Q    Okay.  So you haven't reviewed any of the pleadings

11  filed in the state court actions against the Diocese, have

12  you?

13  A    Correct, I have not.

14  Q    And that includes you have not reviewed any of the

15  complaints, answers, cross-complaints, any of that stuff,

16  have you?

17  A    Correct, I have not.

18  Q    And you don't know how many of the state court actions

19  name the Diocese versus how many don't name the Diocese, do

20  you?

21  A    That's an area based on my expert report reviewing case

22  listings.  I am more familiar with the number that have

23  named the Diocese and that have not named the Diocese.

24  Q    But at the time you submitted this direct testimony and

25  the time I took your deposition, you didn't know that

Page 156

1    information, correct?

2    A    That is correct.

3    Q    And you're not familiar with any of the claims the

4    Plaintiffs have alleged against the non-debtors in the cases

5    where the Diocese is not party to the litigation, are you?

6    A    Correct.

7    Q    And your knowledge overall of the state court actions

8    and the role that diocesan personnel have played in those

9    state court actions is limited to the activities you

10   observed during the year and a half prior to the time the

11   bankruptcy petition was filed, correct?

12   A    That's correct.

13   Q    So you don't have any experience in terms of your own

14   observation of the work that is required of diocesan

15   personnel in connection with state court actions to which it

16   is not a party, do you?

17   A    There haven't been any activities, correct.

18   Q    The answer to my question is you don't have any

19   knowledge of that, correct?

20   A    That's correct.

21   Q    And just generally, is it correct to say that the

22   lawsuits that were filed prepetition named the Diocese and

23   the parishes and other DRVC-related parties and the lawsuits

24   that were filed post-petition did not name the Diocese.

25   A    That's generally true.

Page 157

1    Q    And all of your work is in observing the work that was

2    required of diocesan personnel was from the pre-petition

3    period.

4    A    Yes.

5    Q    Okay.  So the activities -- all the activities you

6    observed were in cases that had been filed against the

7    Diocese, correct?

8    A    Yes.

9    Q    And you don't have any direct knowledge, do you, of the

10   extent to which diocesan personnel would be required to

11   administer cases to which the Diocese is not a party, do

12   you?

13   A    I don't think anyone knows that.  I don't know that.

14   Q    And in the cases where the Diocese is not a defendant,

15   you don't know what allegations have been directed against

16   the Diocese, do you?

17   A    I don't.

18          THE COURT:  Have you reviewed proofs of claim that

19   have been filed in the bankruptcy case?

20          THE WITNESS:  Not detailed proofs of claim, Your

21   Honor.  I have reviewed the claims register and I have

22   reviewed the detail that makes up what are referred to as

23   the tort claims in the claims register.

24          THE COURT:  Many of the proofs of claim attach

25   state court pleadings to them.  Have you reviewed those?

Page 158

1           THE WITNESS:  I have not.

2           THE COURT:  Go ahead, Mr. Brown.

3    BY MR. BROWN:

4    Q    Now, turning to Paragraph 4 of your direct testimony,

5    you testify, "My personal experience is consistent with this

6    historical practice.  I've been working with the DVRC since

7    early 2019.  As a result, there were over a year-and-a-half

8    where I was active with the DVRC prior to the bankruptcy

9    filing and observed firsthand some of the activities that

10   were involved in responding to the state court actions,

11   especially as Child Victims Act cases started to be filed in

12   August of 2019.  As a result, I had visibility on a

13   prepetition basis to the amount of time and attention key

14   DRVC personnel, including legal, financial, and risk

15   management departments devoted to matters related to the

16   state court actions."

17        And again, just emphasizing that the visibility you had

18   was to only cases where DVRC was a defendant, correct?

19   A    Yes.  Mr. Brown, just to clarify, you continue to say

20   DVRC.  I know you're referring to DRVC.  Just to clarify.

21   Thank you.

22   Q    DRVC.  And you don't know how time was delegated among

23   the employees within each of those departments, legal,

24   financial, risk management, who was carrying out the various

25   tasks, do you?

Page 159

1    A    Could you just clarify when you say how time was

2    allocated?  Amongst what?

3    Q    Yes.  So when -- your testimony was that I had

4    visibility on a prepetition basis to the amount of time and

5    attention key DVRC personnel, including legal, financial,

6    and risk management --

7            THE COURT:  DRVC, but that's okay.

8            MR. BROWN:  Pardon?

9            THE COURT:  DRVC.

10           MR. BROWN:  Did I say it right that time?

11   BY MR. BROWN:

12   Q    "I had visibility on a prepetition basis to the amount

13   of time and attention key DRVC personnel, including legal,

14   financial, and risk management departments devoted to

15   matters related to the state court actions."  So my question

16   is, do you know how time was delegated among personnel in

17   each of those three departments?

18   A    I'm not sure that I still follow the question, but I

19   had visibility to how much the legal department was

20   spending.  I had visibility to how much time financial

21   people were spending, and then also insurance or risk.

22   Q    Did you have visibility into how the tasks were

23   allocated among employees in each department?

24   A    Well, it was fairly logical in terms of the legal

25   department were dealing with legal items in terms of filings

Page 160

1    and responses.  Insurance was dealing with giving

2    notification to carriers, and then the financial side was

3    dealing with some responses to discovery.

4              THE COURT:  How large were these departments?

5              THE WITNESS:  Your Honor, there's actually a

6    little bit of an explanation on that.  During our work, we

7    did a number of head count reductions.  And so the legal

8    department as an example experienced some head count

9    reduction.  I believe right now the legal department is

10   three people.  The financial department has experienced some

11   reductions as well.  Those were voluntary.  That department,

12   five people or so.  Five to six.  And insurance or risk is

13   one person.

14             THE COURT:  What do the risk management people do?

15             THE WITNESS:  There are two aspects.  There is the

16   current coverage.  And when we talk about coverage, that

17   covers not only the Diocese, but the parishes and other

18   entities.  So they are arranging coverage, renewing

19   policies, and maintaining insurance.  But then there is also

20   the aspect related to the historical aspect for these cases.

21   And that involves, number one, ensuring that proper

22   notification has been given.  But also there is litigation

23   that was initiated against the insurers.  And they're very

24   heavily -- or the person is very heavily involved in that as

25   well.

Page 161

1                  THE COURT:  Thank you.  Go ahead.

2      BY MR. BROWN:

3      Q    So what I'm trying to get at -- and I want to refresh

4      your recollection from reading from your deposition

5      transcript.  Your answer was to a question about how tasks

6      were allocated within a department.  And I'm reading from

7      Page 120 of your deposition transcript.  And here is your

8      answer.  "When I say personnel at a minimum, I am referring

9      to Mr. Renker and Mr. Doodian and Mr. Chapin when I talk

10     about these three departments.  But I do try to make clear

11     here that I don't have visibility to how they delegate some

12     of their responsibilities.  I do know that there are people

13     in their departments that were working on these activities

14     as well, but I don't interact with those people directly."

15                 MR. GEREMIA:  Your Honor, could I ask that Mr.

16     Brown provide a copy of the deposition transcript?

17                 MR. BROWN:  Certainly.

18                 THE COURT:  Yes.

19                 MR. BROWN:  This is a binder of your deposition

20     with respect to (indiscernible).

21                 THE COURT:  And we're looking at Page 120.

22                 MR. BROWN:  We're looking at Page 120 of your

23     deposition.

24                 THE COURT:  And for context, you should feel free

25     to flip back a couple of pages and forward a couple of pages

Page 162

```
 1   so you can see the context (indiscernible).

 2   BY MR. BROWN:

 3   Q    Okay.  So I was reading from your answer at the top of

 4   Page 120.

 5   A    Yes.

 6   Q    Does that refresh your recollection about what

 7   visibility you had into the individuals within each

 8   department?

 9   A    It actually helps clarify the question that you were

10   asking.  I wasn't sure if you were asking -- it sounded like

11   you were asking about how tasks were allocated between

12   finance, legal, and risk.  Now I understand you are asking

13   about within the finance department.  And that is correct,

14   as I stated within my deposition how as an example Tom

15   Doodian allocated activities within his department for

16   people to fulfill tasks, I don't have visibility to that.

17   Q    Okay.  And that would be true with Mr. Doodian and Mr.

18   Chapin as well, correct, in their departments.

19   A    I just referred to Mr. Doodian.  But it would be

20   consistent with Mr. Renker and Mr. Chapin if he was using

21   someone as well.

22   Q    So you don't have an understanding of the extent to

23   which they may be able to get help from other people within

24   their departments to fulfill whatever duties they may have

25   in connection with the state court actions, do you?
```

Page 163

```
 1    A     Could you restate that question, please?

 2          THE COURT:  You've lost me.

 3          MR. BROWN:  I'm sorry.

 4    BY MR. BROWN:

 5    Q     You don't have any information -- you don't have any

 6    knowledge concerning the extent to which, for example, Mr.

 7    Doodian has the ability to get assistance from people within

 8    his department to deal with whatever obligations he may have

 9    in the state court actions, do you?

10    A     I do have visibility to it because I see him do it.

11    How he decides how to allocate tasks, I don't know on what

12    basis he allocates tasks.

13    Q     And you don't know how Mr. Renker would allocate tasks

14    relating to the state court actions within his department

15    either, do you?

16    A     Correct.

17    Q     And you don't know how Mr. Chapin would even be?

18    A     That's correct.

19    Q     Okay.  Turning to Paragraph 5.  "Consistent with past

20    practice and my experience, if the Court were to allow

21    Plaintiffs to proceed with the state court actions, the DRVC

22    will need to play multiple roles in these cases, including

23    providing information and records that the DRVC maintains.

24    Further, because my understanding is that the DRVC believes

25    there may be insurance, res judicata, or other consequences
```

Page 164

1   to the DRVC of the cases proceeding, the DRVC would need to

2   be very actively involved in the litigation from at least

3   the monitoring standpoint."

4        With respect to that testimony, Mr. Moore, do you --

5   you don't have any information as to what documents the

6   Diocese would have to produce in discovery, in connection

7   with discovery, in actions which it's not named, do you?

8   A    Well, under the shared services agreements that exist

9   with about half the parishes, the Diocese maintains all of

10  the parishes' financial information.  So if anything

11  financial is required to be produced, the Diocese would have

12  to produce that on behalf of the parish.

13  Q    Do you have any understanding of the extent to which

14  the Diocese has already collected all the documents relevant

15  to the state court actions?

16  A    There is very limited information that has been

17  produced during the Chapter 11 proceeding regarding parish

18  financial information.  So that would have to be compiled

19  anew.

20  Q    Did you have -- do you have an understanding that all

21  of the documents related to the state court actions have

22  already been collected by the Diocese and produced to the

23  Committee?

24  A    I don't have visibility to everything that was required

25  to be produced under the state court actions.  I do have

Page 165

```
1   visibility to a subset of that information that relates to

2   financial information that was provided on a prepetition

3   basis.  I do have visibility to a slightly larger population

4   of information that was produced to the Committee during the

5   Chapter 11 proceeding, but not everything that was produced

6   to the Committee.

7   Q    Do you have any information that would -- well, okay,

8   understood.

9        You're not familiar with what documents have already

10  been produced in connection with the state court actions,

11  are you?

12  A    Not a hundred percent.  But the financial-oriented

13  documents, yes, I am familiar with that.

14  Q    Beyond the financial organization documents, you don't

15  have knowledge with respect to the documents that have

16  already been collected and produced related to the state

17  court actions, do you?

18  A    That's correct.

19            THE COURT:  Let me ask you this.  You say in that

20  paragraph five that because my understanding of this is that

21  the DRVC believes there may be insurance res judicata or

22  other consequences to the DRVC of the cases preceding.

23  What's the basis of your understanding and what are you

24  referring to when you're talking about other consequences?

25            THE WITNESS:  Your Honor, as it relates to my
```

Page 166

1  understanding that the DRVC believes these issues, they are

2  based specifically on conversations with Mr. Renker as well

3  as Mr. Chapin.

4          THE COURT:  And what are these other consequences

5  unnamed that you refer to?

6          THE WITNESS:  There are a few different legal

7  items.  And I'm not an attorney and I'm not taking a

8  position --

9          THE COURT:  But you say you have an understanding

10 about the consequences.

11         THE WITNESS:  Yes.

12         THE COURT:  And somebody has told you something.

13         THE WITNESS:  Yeah.  The four --

14         THE COURT:  And you opened the door to what that

15 is.

16         THE WITNESS:  Yes.  The four items that are

17 commonly cited in -- well, res judicata, collateral estoppel

18 --

19         THE COURT:  I didn't ask about those.  But I

20 understand.  Other consequences isn't defined.

21         THE WITNESS:  I was referring to the other legal

22 issues.  Indemnification, contribution.  Yeah.

23         THE COURT:  Okay.  Go ahead, Mr. Brown.

24         MR. BROWN:  I'm going to follow up on that in a

25 moment, Your Honor.  But I had questions --

Page 167

1          THE COURT:  You can or not.  I just had a

2     question, and I asked it.

3     BY MR. BROWN:

4     Q    You don't know if the Diocese has any additional

5     documents that it would be required to collect and produce

6     if the state court actions to which it is not a party are

7     allowed to proceed, do you?

8     A    It would be highly unlikely --

9     Q    I just asked you if you have personal knowledge one way

10    or the other.  Not what you think a likelihood is.

11    A    Could you restate your question, please?

12    Q    You don't know if the Diocese has any additional

13    documents that it would be required to collect and produce

14    if the state court actions to which the Diocese is not a

15    party are allowed to proceed, do you?

16    A    If you are asking me to speculate on what the discovery

17    requirements may be, you are correct.  I don't know.

18    Because I don't know what the discovery would be.

19    Q    And you can't testify whether the diocese is in

20    possession of responsive documents to any state court action

21    to which it is not a party, can you?

22    A    As I indicated, the Diocese maintains the books and

23    records for about half the parishes.

24    Q    Now, do you remember in your deposition when I asked

25    you the nature -- when I asked you how you had an

Page 168

1    understanding regarding the risks of res judicata,

2    collateral estoppel, indemnification, and contribution,

3    where that understanding came from?

4    A    Yes.  I believe I responded from counsel.

5    Q    Yes.  And did you just tell Judge Glenn that they came

6    from conversations with Mr. Doodian and Renker?

7    A    No, from Mr. Renker and Mr. Chapin.

8    Q    Mr. Renker and Mr. Chapin, okay.

9    A    Mr. Renker is the general counsel of the diocese.

10   Q    Okay.

11   A    What I did not say to Your Honor is also conversations

12   with Jones Day as counsel as well.

13   Q    Okay.  And do you remember in your deposition when I

14   asked you about your understanding of the risks of Res

15   Judicata, collateral estoppel, indemnification, and

16   contribution, when I asked you about your understanding as

17   it was attained from counsel, you were instructed not to

18   answer any questions about your conversations with counsel.

19   A    I recall that, yes.

20   Q    And you recall you followed those instructions and

21   wouldn't answer any of the questions I had about that?

22   A    Yes.

23   Q    So is it true that -- isn't it true that you have no

24   independent understanding of the risks of res judicata,

25   collateral estoppel, indemnification, and contribution other

Page 169

1    than what you know from what your lawyers have -- from what

2    the diocese lawyers have told you?

3    A    Correct.  I have no personal view on those items.

4    Q    Okay.  Turning to Paragraph 7 of your direct testimony,

5    Mr. Moore.  "Litigating state court actions during the

6    pendency of this Chapter 11 case, even if they only proceed

7    against other defendants, such as the DRVC related parties,

8    who are the individual defendants, will be extremely

9    burdensome on the DRVC, disrupt the administration and

10   expeditious reorganization of the DRVC, and reduce the

11   estate's assets to the detriment of all creditors."

12        So just to confirm, your understanding of the basis for

13   your belief that the litigation of actions that do not name

14   the diocese would be extremely burdensome on the DVRC.

15   That's from the experience you had and your involvement in

16   the litigation of the state court actions where the Diocese

17   was named as a party, correct?

18   A    As well as the diligence activities of the Committee

19   during the Chapter 11 case.

20   Q    Did the diligence and activity of the Committee during

21   the Chapter 11 case have anything to do with the prosecution

22   of state court actions in the post-petition period?

23   A    Many of the items that the Committee sought during the

24   Chapter 11 case related to financial information.  And that

25   would highly likely be part of any discovery in state court

Page 170

1    actions as well.  That's why I referred to that --

2    Q    that information has already been collected and

3    produced, correct?

4    A    That information has been collected and produced

5    related to the Diocese.  It has not been collected and

6    produced related to the parishes.

7    Q    Okay.

8              THE COURT:  Were you involved in collecting and

9    producing any of the financial information relating to the

10   parishes that has been provided in connection with the

11   mediations?

12             THE WITNESS:  Yes, I was.  The information -- I'm

13   just a little unclear, Your Honor, as it relates to

14   mediation, confidentiality.

15             THE COURT:  I'm not asking about who said what to

16   whom in the mediation, but what's been -- the information

17   that's been provided to me is that in connection with the

18   mediations that the Diocese and parishes produced financial

19   information.  And that's not a secret from me.  That's been

20   stated on the record.  And so that's my question to you.

21             THE WITNESS:  I was involved in that.  The level

22   of information produced related to the parish financials was

23   significantly less information than what the Diocese has

24   produced related to its financials as part of the Chapter

25   11.  That's the distinction I was making.

Page 171

1                    THE COURT:  Go ahead, Mr. Brown.

2       BY MR. BROWN:

3       Q     Paragraph 8, again.  I'm going to read it so we have a

4       level set on it.  "Although I was not involved with the

5       litigation of individual cases before the petition date, I

6       observed the total amount of activity that went into

7       managing the litigation of the approximately 200 prepetition

8       cases and the overall activity level was significant.  For

9       example, in connection with the prepetition state court

10      actions, the DRVC's general counsel and chief operating

11      officer, Thomas Renker, was required to review, analyze, and

12      approve settlement strategies and expenses.  And the DRVC's

13      director of insurance and risk management, William Chapin,

14      devoted substantial amounts of time to insurance, noticing,

15      and coverage matters related to the prepetition state court

16      actions."

17           So, again, I just want to confirm, all of those

18      observations you make in Paragraph 8 related only to

19      prepetition cases where the Diocese was not a party,

20      correct?

21      A     Yes.

22      Q     And you don't have any knowledge of whether the claims

23      noticing work that Mr. Chapin has or doesn't have to do has

24      already been completed, do you?

25      A     I don't.

Page 172

1    Q    And you don't have any knowledge as to whether or not

2    any diocesan personnel would be required to be involved in

3    the approval of settlements in actions to which they are not

4    a party, do you?

5    A    I don't.

6    Q    And you're not aware either, are you, that any diocesan

7    personnel would be involved in the parish's litigation or

8    defense strategy with respect to actions to which the

9    Diocese is not a party, are you?

10   A    I'm not aware of how that would work.

11   Q    Okay.  Turning to Paragraph 10 or your written

12   testimony, Mr. Moore.  "If the state court actions are

13   allowed to resume, however, these individuals would be

14   forced to reallocate time away from the Chapter 11 process.

15   Mr. Renker would need to closely monitor these cases and

16   coordinate with the defendants as it relates to litigation

17   strategies at a minimum.  To the extent any litigation

18   decisions or settlements affecting the DRVC were proposed,

19   it would be Mr. Renker who would need to review, analyze,

20   and make those decisions.  Similarly, Mr. Chapin would be

21   required to coordinate insurance matters based on the shared

22   programs with the parish schools and the DRVC affiliates.

23   This would be an important and complicated undertaking.  Mr.

24   Chapin would have to closely monitor the claims being made

25   on these 200-plus state court actions, the amounts left on

Page 173

1    the various claims, self-insured retentions, and help to

2    resolve any coverage issues that may arise."

3         So you don't have any knowledge one way or the other

4    about whether Mr. Renker could handle what his duties are

5    that you say they are in connection with the state court

6    action as well as his duties in connection with the

7    restructuring, do you?

8    A    I am quite confident that he can handle the

9    responsibilities.  I'm concerned about the time commitment.

10   Q    And do you have any information that would indicate

11   that he couldn't handle both?

12   A    Yes, because of how hard he's working right now.  And

13   that's while no state court actions are proceeding.  So to

14   the extent based on his belief that he needs to monitor

15   these items, that's going to be an added activity.

16   Q    And you don't know whether or not Mr. Renker has other

17   people though that can help him fulfill whatever obligations

18   he may have in connection with the state court actions, do

19   you?

20   A    As I indicated, I know his department is very lean.

21   Q    You didn't answer my question, Mr. Moore.

22   A    Could you restate the question, please?

23   Q    I asked you whether or not there was -- whether you had

24   any knowledge about whether Mr. Renker had anybody else he

25   could delegate duties in connection with the state court

Page 174

1    actions, do you?

2    A    Correct, I do not.

3    Q    Okay.  Now, when I asked you just a moment ago about

4    whether or not either one way or the other whether Mr.

5    Renker could handle both his obligations with respect to the

6    state court actions and the restructuring.  You said you

7    believe that he might not be able to, correct?

8    A    He may not have the time to do both, yes.

9    Q    I would like you to turn to Page 105 of your

10   deposition, please.  And if you could look down to about the

11   middle of the page to the question that starts at Line 9.

12   Question, okay -- I think I threw in an extra okay there.

13   The question is, "Do you have any knowledge one way or the

14   other whether Mr. Renker has the capacity to fulfill his

15   obligations and duties with respect to the restructuring and

16   to complete whatever tasks he's responsible for in

17   connection with the state court actions?"

18        Your answer, "No."

19        So you testified to me differently in your deposition

20   than you're testifying here to me today, would you agree?

21   A    No.  Because the word capacity could mean a couple of

22   different things.  What I've indicated here is that I have

23   no concerns at all that Mr. Renker would not be able to

24   carry out both the activities.  He is a very capable

25   individual.  What I am concerned about is his time capacity.

Page 175

1    And that is something that I've indicated here as well as

2    what I indicated here.

3    Q    I'm not -- I'm sorry, I'm not understanding the

4    distinction.  Does he have the capacity to do both?  Do you

5    have any knowledge one way or the other whether he has the

6    capacity to do both fulfill his duties with respect to the

7    state court actions to which the Diocese is not a party and

8    to fulfill his obligations with the restructuring?  In his

9    deposition, you said no, you had no information one way or

10   the other on that.  Is your answer any different here today?

11   A    Mr. Brown, I just want to clarify.  When you used the

12   word capacity in the deposition, it was fairly clear that

13   you were referring to time capacity.  The way that you asked

14   a question here, I believe you may have used the word

15   capable of doing that.  And that's where I distinguish.

16   Q    Well, let me ask it another way.  I just read your

17   testimony, your no answer to my question in your deposition.

18   Are you still -- is that still your answer or do you want to

19   change the answer you gave in the deposition?

20   A    I think I've answered the same in both places, here and

21   in the deposition, that I don't have visibility to whether

22   he has other people that he can delegate to that would

23   address the time concern.

24            THE COURT:  Does visibility mean the same thing as

25   --

1           MR. BROWN:  Do you know one way or the other -- go

2     ahead.

3           THE COURT:  Does visibility that you've used now

4     have the same meaning as knowledge in Line 9?

5           THE WITNESS:  It does, Your Honor.

6     BY MR. BROWN:

7     Q    It does?

8     A    Yes.

9     Q    So isn't it true, Mr. Moore, that you have no knowledge

10    one way or the other whether Mr. Renker has the capacity to

11    fulfill his obligations and duties with respect to the

12    restructuring and to complete whatever tasks he is

13    responsible for in connection with the state court actions?

14    A    It is true.

15    Q    Thank you.  And isn't it true, Mr. Renker, that you

16    don't know whether --

17          THE COURT:  It's not Mr. Renker.  Could you -- you

18    said isn't it true, Mr. Renker.

19    BY MR. BROWN:

20    Q    Excuse me.  Isn't it true, Mr. Moore, that you don't

21    know whether there are other individuals at the Diocese who

22    can perform the tasks that have been allocated to Mr. Renker

23    in connection with the restructuring?

24    A    I don't know.

25    Q    And isn't it true that you don't know whether there are

Page 177

1    other individuals at the Diocese who can perform the tasks

2    that may have been allocated to Mr. Renker in connection

3    with the state court actions?

4    A    I don't know.

5    Q    And isn't it true that you don't know whether Mr.

6    Chapin can fulfill both his obligations in connection with

7    the state court actions and the restructuring?

8    A    That's true.

9    Q    And isn't it true that to your knowledge, Mr. Chapin

10   doesn't devote all his time to the restructuring?

11   A    That's correct.

12   Q    And isn't it true that you don't know what actual

13   diocesan personnel would be required to deal with the state

14   court actions to which it is not a party if it was allowed

15   to proceed?

16   A    Well, I know that the individuals we've been talking

17   about will have to be involved given their roles.  Whether

18   they could delegate some activities to someone else in their

19   departments, that's what we've been talking about here and

20   in my deposition.  And I don't have knowledge of that.

21   Q    Now, I may have garbled the question I meant to ask.

22   You don't know what diocesan personnel would actually be

23   required to do, what tasks they would actually be required

24   to do if state court actions were allowed to proceed, do

25   you?

Page 178

1    A     I don't know what each diocesan employee would have to

2    do what, correct.

3    Q     Turning to Paragraph 12 of your written testimony.

4    "Finally, if the state court actions are allowed to resume,

5    Mr. Renker, Mr. Chapin, Mr. Doodian, and other key DRVC

6    personnel may be called to testify as witnesses or be

7    required to sign off on written discovery requests, document

8    requests, or other discovery matters directed to the DRVC.

9    This would necessarily distract these individuals from their

10   primary focus of running the day-to-day for the DRVC and

11   helping manage the Chapter 11 process."

12        Now, isn't it true that your understanding of witnesses

13   who may be called to trial in the state court actions is

14   based on your discussions with counsel?

15   A     Yes, along with my general knowledge of litigation.

16   Q     Do you recall in your deposition when I asked about

17   your understanding of the witnesses who might be called in

18   the state court actions you told me that it was based on

19   your conversations with counsel?

20   A     I do.  I'm just distinguishing, as I just indicated, I

21   have general knowledge of litigation and witness -- types of

22   witnesses that might be called.

23   Q     But you do have -- to the extent you have knowledge of

24   who will be called as a witness in the state court action,

25   you got that information from counsel, correct?

1   A    Yes.

2   Q    And do you recall that when I asked you what those

3   conversations were, you were instructed not to answer those

4   questions?

5   A    Yes.

6   Q    And do you recall following those instructions?

7   A    Yes.

8   Q    And isn't it true that you have no knowledge of when

9   any diocesan personnel might be called as witnesses in state

10  court actions to which it is not a party?

11  A    That's correct.

12  Q    And you have no knowledge of what if any future

13  discovery requests will be made that will require their

14  attention, do you?

15  A    Correct.

16  Q    And at this point in time -- well, strike that.  You

17  don't have any knowledge, do you, whether or not Mr. Doodian

18  can handle both his anticipated duties associated with the

19  state court actions if they are allowed to proceed and his

20  duties in connection with the restructuring, do you?

21  A    Only based on the concern that I cited before.  Same as

22  Mr. Renker and Chapin.

23  Q    And you don't know whether or not there are other

24  individuals who could take on some of the responsibilities

25  of Mr. Renker, Chapin, or Doodian in connection with the

Page 180

1    state court actions, do you?

2    A    Correct.

3    Q    And you don't know how Mr. Renker, Chapin, or Doodian

4    delegate their responsibilities within their departments, do

5    you?

6    A    Correct.

7    Q    Turning to Paragraph 15, Mr. Moore.  "Accordingly, the

8    success of the DRVC's reorganization efforts will in part be

9    dependent on the time and efforts that its key personnel are

10   able to extent for its ensuring a successful reorganization.

11   The DRVC's continued ability to focus its efforts on the

12   reorganization process will maximize the value of the DRVC's

13   estate to the benefit of all creditors.  On the other hand,

14   the DRVC's reorganization efforts and its estate will suffer

15   real and substantial harm to the detriment of all creditors

16   if the DRVC's key personnel are required to actively

17   participate in the state court actions instead of

18   concentrating their efforts on the bankruptcy case."

19        It's true, isn't it, that you do not have full

20   visibility into how these key personnel allocate their time

21   on restructuring efforts, do you?

22   A    I have pretty good visibility to how much time we're

23   spending on the reorganization.

24   Q    But you can't state what they would be required to do

25   if the state court actions go forward, can you?

Page 181

1    A    Correct.

2    Q    Finally, I'm turning now to Paragraph 16 of your

3    written testimony.  "Finally, should the state court actions

4    be allowed to continue even only as against other defendants

5    such as the DRVC-related parties and the individual

6    defendants, my understanding is that the DRVC believes and

7    its estate could face potential contribution,

8    indemnification, collateral estoppel, and/or res judicata

9    issues with respect to the DRVC-related parties, which would

10   effectively compel the DRVC to monitor and participate in

11   the numerous trials of the state court actions.  Relatedly,

12   if the DRVC faces potential contribution and indemnification

13   obligations from the DRVC-related parties or the DRVC-

14   related parties use limited insurance proceeds, pay any

15   monetary awards to the plaintiffs in the state court

16   actions, or if any defense costs are incurred and paid from

17   limited insurance proceeds in connection with the state

18   court action, such events will consume assets of the estate

19   to the detriment of other creditors in the Chapter 11

20   reorganization."

21        So again, I think we went through this in connection

22   with other testimony earlier in your written direct.  But

23   your understanding, again, of these potential risks of

24   contribution comes from conversations with your attorneys,

25   correct?

Page 182

1    A    Yes.

2    Q    Your understanding of the potential risks from

3    indemnity comes from your attorneys, right?  Or from the

4    Diocese's attorneys, right?

5    A    Yes.

6    Q    Same thing for collateral estoppel?

7    A    Yes.

8    Q    And same thing for res judicata, correct?

9    A    Yes.

10   Q    Independently of what your lawyers told you, you have

11   no understanding of any of those risks, do you?

12   A    Correct.  I am not taking a position on any of the

13   risks of those items.

14   Q    And when I asked you about the nature of those

15   conversations where you were apprised of those risks by the

16   Diocese attorneys, do you remember that you were instructed

17   not to answer any of those questions?

18   A    In my deposition, correct.

19   Q    Correct, yeah.  And do you remember that you followed

20   those instructions?

21   A    Yes.

22   Q    And it's true also isn't it, Mr. Moore, that you have

23   no understanding what if any insurance proceeds will be

24   exhausted if the state court actions are allowed to proceed,

25   do you?

Page 183

1   A     Correct.

2   Q     And you don't know whether a monetary award against a

3   DRVC-related party could have any effect on the Diocese if

4   the award is not collected from shared insurance, do you?

5   A     Could you state that question again, please?

6   Q     If they -- strike that.  I am withdrawing the question.

7   At the present time, Mr. Moore, you don't have any knowledge

8   of the extent of diocesan involvement in cases where its

9   named as a defendant versus cases where it's not, do you?

10  A     There hasn't been any activity in cases where the

11  Diocese is not named.

12  Q     So the answer to my question is you don't have any

13  knowledge on that, do you?

14  A     I know that there's been no activity.

15  Q     Well, I want you to answer my question.  And my

16  question was you don't have any knowledge, do you, to the

17  extent to which diocesan involvement -- you don't have any

18  knowledge --

19            THE COURT:  Strike that.  Start your question

20  again.

21  BY MR. BROWN:

22  Q     Mr. Moore, isn't it true that you don't know the extent

23  of diocesan involvement in cases where it is a named

24  defendant versus cases where it is not?

25  A     Are you talking at the present time, Mr. Brown, or in

Page 184

1    the future?

2    Q    I'm talking as you sit here today.

3    A    I know that -- I do have knowledge.  I know that

4    there's no activity that has gone on because the cases have

5    been subject to the stay.

6    Q    So you don't have any knowledge of the extent of

7    diocesan -- of the extent of diocesan involvement that would

8    be required in state court actions to which it is not a

9    party, correct?

10   A    Correct, as it relates to the future.

11   Q    And that's all there is, right, as to those actions?

12   Because there hasn't been activity to date, correct?

13   A    Correct.  And that's why I was distinguishing in my

14   answer.

15            THE COURT:  Ask your next question.

16            MR. BROWN:  No further questions.

17            THE COURT:  Thank you very much.  Redirect?

18              REDIRECT EXAMINATION OF CHARLES MOORE

19   BY MR. GEREMIA:

20   Q    Mr. Moore, do you --

21            THE COURT:  You have to identify yourself.

22            MR. GEREMIA:  Sorry.  Todd Geremia for the

23   Diocese.

24   BY MR. GEREMIA:

25   Q    Do you know the types of administrative tasks that the

Page 185

1    Diocese management team would be undertaking in connection

2    with state court actions where the Diocese is not a named

3    defendant if those cases were to proceed?

4    A    I would expect because of the administrative services

5    agreements that are in place, that the Diocese would have to

6    undertake a significant amount of activity as it relates to

7    financial and related information because the Diocese

8    maintains that information for about half of the parishes,

9    about 66 parishes.

10        In addition to that, the Diocese does posses parish

11   financial information for all parishes.  And so I would

12   expect that there would be activities related to that

13   information as well, that plaintiffs would seek that

14   information.

15        And then as it relates to non-financial information,

16   whether that's insurance or personnel files, I don't have

17   visibility to any of that aspect.  But I know that that has

18   been an activity.

19             THE COURT:  What do you mean, you know it's been

20   an activity?

21             THE WITNESS:  I know that as part of the Chapter

22   11 process, especially part of this preliminary injunction,

23   that a significant amount of personnel files were provided

24   to the Committee.  I would expect similar activities would

25   occur under the state court actions even if the Diocese is

Page 186

1    not named.

2              THE COURT:  Personnel files of whom?

3              THE WITNESS:  Priests and other alleged abusers.

4    BY MR. GEREMIA:

5    Q    You've also testified, Mr. Moore, in your written

6    direct and in cross-examination about the roles that the

7    Diocese management undertake in connection with its

8    restructuring efforts.  Do you recall that?

9    A    Yes.

10   Q    And do you have firsthand familiarity with what the

11   diocese management does in connection with its restructuring

12   efforts?

13   A    I do.

14   Q    Does it make it more difficult in your view for the

15   diocese management to attend to tasks in connection with

16   restructuring when the diocese management team would also

17   have to attend to state court actions if those were to

18   proceed?

19   A    Yes.  As I've said a couple of times, the Diocese is a

20   very lean organization.  Any additional activity, I would be

21   concerned about.  Because they all work very hard as it is.

22   I am especially concerned about it because of where we stand

23   in the case right now.  I think that we are in a very

24   critical time period.

25             THE COURT:  Why is that?

Page 187

```
 1              THE WITNESS:  With the renewed efforts as it

 2     relates to the mediation as well as the need --

 3              THE COURT:  The mediation has been going on for

 4     quite a lengthy period of time, correct?

 5              THE WITNESS:  Yes.  I am hopeful that with the

 6     addition of the judicial, co-judicial mediator, that all

 7     parties are going to engage vigorously over the next six

 8     weeks.  And so I do believe --

 9              THE COURT:  But you don't have any projection

10     beyond the end of May, correct?

11              THE WITNESS:  Correct.

12              THE COURT:  Go ahead.

13     BY MR. GEREMIA:

14     Q    You testified -- could you turn with me to Page 104 of

15     your deposition?  Could you put Page 104 up on the screen as

16     well?

17          And you corrected Mr. Brown that in that line of

18     questioning, you were talking about the time commitment for

19     Mr. Renker.  Do you recall that?

20              THE COURT:  I'm sorry, you've lost me --

21              MR. BROWN:  Objection to this line of questioning.

22              THE COURT:  Well, I don't know about -- I didn't

23     understand the question.  So let's get a question that I

24     understand and then we'll see where --

25              MR. BROWN:  Where --
```

Page 188

```
 1              THE COURT:  Stop.
 2    BY MR. GEREMIA:
 3    Q    Do you recall that Mr. Brown was asking you about Mr.
 4    Renker's capacity to attend to the state court actions and
 5    the restructuring?
 6              MR. BROWN:  Objection, Your Honor.
 7              THE COURT:  Overruled.
 8    BY MR. GEREMIA:
 9    A    I do recall this questioning that begins on -- or the
10    end of Page 103 to the beginning of Page 104.
11    Q    I was actually orienting to the cross-examination line
12    of questioning.  Mr. Brown was asking you about Mr. Renker's
13    capacity to handle the state court actions and the
14    restructuring efforts.  And you drew a distinction between a
15    capacity with respect to his time and his ability to handle
16    those tasks.  Do you recall that?
17    A    Yes.
18    Q    And in your deposition, were you addressing your
19    knowledge of Mr. Renker's ability to handle as a matter of
20    time restructuring efforts and the state court actions?
21    A    Time, yes.
22    Q    And on Page 104, if you review that colloquy, the
23    questions there all concern allocations of time with respect
24    to various members of the Diocese management.  Is that
25    correct?
```

Page 189

1   A    Yes.

2   Q    And you said that you are concerned with respect to Mr.

3   Renker's ability to handle administration of the state court

4   actions and the restructuring efforts.  Do you recall that?

5   A    Yes.

6   Q    Can you elaborate on your concerns?

7   A    I know Mr. Renker works very hard right now, as I

8   indicated.  He is heavily involved in all aspects of the

9   Chapter 11 process.  I expect that that is going to

10  increase.  I hope actually that's going to increase.

11          THE COURT:  I do, too.

12  BY MR. GEREMIA:

13  A    Because of that, I am concerned already about that

14  increased Chapter 11 reorganization time if there was

15  additional time that was added on top of that, especially in

16  this critical time period as it relates to state court

17  actions.  I have concerns over how he would get all of that

18  done.

19  A    Do you similarly have concerns about Mr. Doodian, the

20  chief financial officer, whether he can handle duties with

21  respect to administration of the state court actions and

22  also the restructuring effort?

23  Q    Yes.

24  A    And can you elaborate on those concerns for the judge?

25  Q    Mr. Doodian has actually lost two key individuals in

Page 190

1   the last few months from his department.  His department is

2   stretched very thin.  I see this on a day-to-day basis.

3   Given what we -- and when I say we, Alvarez and Marsal, in

4   addition to Mr. Doodian's department went through in terms

5   of diligence through the Chapter 11 process.  If something

6   like that were to occur as it relates to the state court

7   actions, it would be very difficult to see how he could or

8   his department could accomplish all of that.

9   Q    I think you testified on cross-examination that Mr.

10  Doodian recently lost two individuals within his department.

11  A    Yes.

12  Q    Does that add to your concern?

13  A    Yes.

14          THE COURT:  Were they laid off or did they

15  voluntarily depart?

16          THE WITNESS:  They voluntarily departed.  And my

17  understanding is with both of them, it was because of

18  workload.

19          THE COURT:  Are they seeking to hire replacements?

20          THE WITNESS:  Yes.  Unfortunately, with these two

21  individuals, they had a lot of institutional knowledge that

22  allowed them to be very efficient in their activities.  And

23  we just haven't seen the efficiency gains yet with

24  replacements.

25          THE COURT:  People have been hired to replace the

Page 191

1    two who left?

2              THE WITNESS:  At least one.  And then there's been

3    a shuffling of some responsibilities.  But there's no doubt

4    that the department has been impacted.

5    BY MR. GEREMIA:

6    Q    Mr. Brown was also asking you some questions about Mr.

7    Chapin's department.  What's your understanding of Mr.

8    Chapin's department?  Who is in it?

9    A    I don't have visibility to whether there is anyone that

10   assists Mr. Chapin.  He has always been really a one man

11   show from my standpoint.  So if he has people behind the

12   scenes that he uses within the Diocese, I'm not aware of

13   them.

14   Q    So in your view, is Mr. Chapin's department already as

15   lean as it can be?

16   A    Yes.

17   Q    And do you have concerns about Mr. Chapin's ability to

18   handle administrative tasks connected to the restructuring

19   efforts if the state court actions were to proceed?

20   A    Yes.

21             MR. GEREMIA:  I have no further questions, Your

22   Honor.

23             THE COURT:  Thank you very much.  Any further

24   cross?

25             RECROSS-EXAMINATION OF CHARLES MOORE

Page 192

```
 1    BY MR. BROWN:

 2    Q    Mr. Moore, some parishes maintain their own financial

 3    information, do they not?

 4    A    That's correct.

 5    Q    And you don't have any idea how many actually do and

 6    how many actually don't, do you?

 7    A    I do know that now, yes.

 8    Q    You didn't know at the time of your deposition, but you

 9    do know now.  And what is it?

10    A    Approximately 66 parishes have administrative services

11    agreements in place that allow the Diocese to maintain the

12    books and records for those parishes.

13              THE COURT:  Allow or require?  I mean...

14              THE WITNESS:  They contract with the Diocese to

15    perform those services.

16    BY MR. BROWN:

17    Q    And do you know whether or not those administrative

18    services agreements are terminable at the option of the

19    Diocese?

20    A    That is a legal determination that I can't make.

21    Q    You are not familiar with the termination provisions

22    and you don't have -- those services agreements aren't in

23    evidence, are they?

24              MR. GEREMIA:  Your Honor, objection.  This is

25    beyond the scope of the redirect.
```

Page 193

```
 1              THE COURT:  Overruled.

 2    BY MR. BROWN:

 3    A    I don't have the full listing of what is in evidence.

 4    Q    And you can't testify that those administrative

 5    services agreements are not terminable by the Diocese at

 6    will, can you?

 7    A    I can't testify to that.

 8    Q    And you don't know if those administrative services

 9    agreements are going to be assumed in this case, do you?

10    A    I can't say that as we sit here today.

11    Q    But in any event, about 40 or some 66 percent of the

12    parishes you say rely on the diocese pursuant to these

13    services agreements.  The remainder do not.  They would

14    maintain their own insurance.  They have own financial

15    records, correct?

16    A    To clarify, it's actually 66 parishes, not 66 percent.

17    Q    I'm sorry, 66 parishes rely.  Out of how many?

18    A    135.

19    Q    Okay.  So the remainder --

20    A    About half.

21    Q    The remainder maintain their own financial information,

22    correct?

23    A    That's right.  The diocese, as I did indicate, the

24    diocese possesses financial information for all parish

25    though.
```

Page 194

1    Q    And beyond your view that the administrative services

2    agreements require the Diocese to maintain certain financial

3    records for the parishes, are there any other things in

4    those agreements that you understand would require the

5    Diocese to participate in parish discovery?

6    A    I do recall there is a specific paragraph in the

7    administrative services agreement that relates to release of

8    information, but that's related to confidentiality.  I don't

9    -- I am not aware of any other provisions in the contract

10   that relate to that.

11          MR. BROWN:  I don't have any further questions.

12          THE COURT:  Thank you very much.

13          MR. GEREMIA:  Just one brief follow-up, Your

14   Honor.

15          THE COURT:  Just identify yourself again.

16          MR. GEREMIA:  Todd Geremia for the Debtor.

17        FURTHER REDIRECT EXAMINATION OF CHARLES MOORE

18   BY MR. GEREMIA:

19   Q    Is it your understanding, Mr. Moore, that even with

20   respect to those parishes that the Diocese does not have a

21   bookkeeping and records arrangement, that the Diocese

22   maintains financial records for the parishes?

23   A    It possesses financial information for all parishes,

24   yes.

25   Q    And in your experience, would you expect that if

Page 195

1    litigation were to proceed as against the parishes, that

2    there would be discovery requests on the Diocese for that

3    information?

4    A     I would expect that.

5            MR. GEREMIA:  Nothing further.

6            THE COURT:  All right.  You are excused.  Thank

7    you very much for your testimony.

8            THE WITNESS:  Thank you, Your Honor.

9            THE COURT:  All right.  So one more witness?

10           MR. GEREMIA:  Yes we do, Your Honor.

11           THE COURT:  Let's take a ten-minute recess now and

12   then we'll go to the last witness.  Okay?

13           MR. GEREMIA:  Thank you.

14           (Recess)

15           THE COURT:  All right.  Court is back in session.

16   Would you like to call your next witness?

17           MS. DEL MEDICO:  Jennifer Del Medico for the

18   Debtor.  The Debtor calls Eric Stephens to the stand.

19           CLERK:  Raise your right hand.  Do you solemnly

20   swear or affirm that the testimony you are about to give

21   this Court will be the truth, the whole truth, and nothing

22   but the truth?

23           MR. STEPHENS:  I do.

24           THE COURT:  Please have a seat.  And there is

25   water there if you need it.

Page 196

1          MR. STEPHENS:  Thank you, Your Honor.

2          MS. DEL MEDICO:  I am going to hand Mr. Stephens a

3     copy of his direct.

4          THE COURT:  Please.  Thank you.

5          MS. DEL MEDICO:  And it's at 180 in the binder.

6          THE WITNESS:  Thank you.

7          MS. DEL MEDICO:  You're welcome.

8               DIRECT EXAMINATION OF ERIC STEPHENS

9     BY MS. DEL MEDICO:

10    Q    Good afternoon, Mr. Stephens.

11    A    Good afternoon.

12    Q    Mr. Stephens, how long have you been acting as counsel

13    for the Debtor?

14    A    Since either January or February of 2019.

15    Q    And my question was imprecise.  How long have you been

16    representing the Diocese?

17    A    Yes.  So my involvement with the Diocese began in

18    January or February of 2019, right around the time that the

19    Child Victims Act was being signed into law.

20    Q    And what type of work did you do for the Diocese during

21    that time, January 2019 up until the time of this

22    bankruptcy?

23    A    So I helped assemble and lead the state court

24    litigation team that was responsible for appearing in and

25    defending on behalf of the Diocese all of the Child Victims

Page 197

1   Act complaints that were filed against the Diocese across

2   the state.

3   Q    And these were complaints where the Diocese was a named

4   defendant, is that right?

5   A    That's correct.

6   Q    And could you tell a little bit -- describe a little

7   bit more of the tasks that you did with respect to discovery

8   in those actions.

9   A    Sure.  So just for the Court's reference, roughly 90

10  percent of the cases against the Diocese were filed in

11  Nassau and Suffolk counties.  The rubric that the State has

12  put in place for the CVA actions is to appoint regional

13  parts for the CVA actions.  And so the cases in Nassau and

14  Suffolk have been appointed to a single regional part that

15  was originally presided over by Justice Jaeger, now being

16  presided over by Justice Steinman.  That was where the bulk

17  of the diocesan cases were.

18      And so among the first tasks we undertook as litigation

19  counsel was to make an effort to impose some order and some

20  structure.  And we filed motions seeking to consolidate and

21  coordinate cases against the Diocese in Judge Jaeger's part.

22      That motion was denied in part and granted in part.

23  And so the individual cases did not end up coordinated or

24  consolidated.  There was no coordinated or consolidated

25  docket.  But the court did approve some uniform discovery

Page 198

1    requests that were proposed by a liaison counsel of

2    plaintiffs as well as a liaison counsel of defendants who

3    were in those cases.

4        My memory is that around about 50 or 60 prepetition

5    cases got to the point where those uniform discovery

6    requests were exchanged and responded to.  The Diocese had

7    begun making document productions in response to those

8    uniform requests, but some significant discovery disputes

9    arose, particularly around the scope of discovery and the

10   permissible scope of discovery.  And those issues were being

11   briefed not in any formal, consolidated way, but in a

12   loosely-coordinated way at the time of the bankruptcy.

13       Also pre-bankruptcy in those cases -- again, and I'm

14   talking about the 9th and 10th regional district.  The

15   Diocese had filed motions to dismiss in a similar number of

16   cases.  Again, those motions were all individually-briefed,

17   individually decided.  The Diocese I believe had received

18   decisions in about 40 of those cases, some of which then

19   resulted in appeals to the Second Department, one of which

20   resulted in a complete dismissal, but largely paired the

21   claims back to the types of negligence claims that Mr.

22   DiPompeo and Mr. Brown addressed in their opening.

23           And then just so I don't leave it out, the other

24   ten percent of the -- roughly ten percent of the cases were

25   assigned or filed in the New York City regional part.  Those

Page 199

```
 1    have not made any material progress because the city --
 2    there was a regional part for all five boroughs.
 3    Prepetition, they had taken longer, frankly, to come up with
 4    liaison counsel, pattern discovery requests, and a form
 5    protective order.  And so by the time of the diocesan
 6    bankruptcies, I don't believe there was even final approval
 7    in the city cases.  And so those cases had not even
 8    progressed to the extent that the Nassau and Suffolk cases
 9    had progressed.
10            THE COURT:  During the opening statements this
11    morning, I asked questions about discovery on the notice
12    issue, which is not directly involved here.  But can you
13    tell me what documents or information the Diocese produced
14    before the bankruptcy with respect to notice issues?
15            THE WITNESS:  Sure.  So in the -- in response to
16    the pattern of discovery requests that I referenced and in
17    those roughly 50 or 60 cases, the Diocese provided
18    interrogatory responses in response to interrogatories
19    directed at that specific abuser.  In response to those
20    interrogatories, the Diocese provided information about that
21    individual's assignment history, including other individuals
22    who the Diocese was able to determine from personnel records
23    worked alongside.  So other potential witnesses, for
24    example.
25            The diocese then also produced the underlying
```

1    documents.  So there were what our client would refer to as

2    priest cards, which then list the assignment history for

3    that individual priest.  The diocese also produced parish

4    cards, which is sort of the inverse of a priest card, which

5    is a list of assignment history within the parish.  But the

6    diocese had not begun its production of personnel files.  So

7    it was -- my recollection on the evidence or the documents

8    that would have been produced on the notice-type issue would

9    have been those interrogatory responses and then the

10   underlying priest and parish cards.

11              THE COURT:  And then after the Chapter 11 case was

12   filed, did the diocese produce to the Committee further

13   information regarding -- I'll broadly categorize it as the

14   notice issue?

15              THE WITNESS:  Yes, yes.  And so in connection with

16   the stipulation that was discussed earlier this morning, the

17   Diocese, in connection with the Chapter 11, has produced to

18   the Committee the complete personnel file of every

19   individual who has been accused of abuse by either a CVA

20   plaintiff or a claimant with a POC to the extent that those

21   are different.  There were, however, a number of individual

22   accused for whom the Diocese did not have a file.

23              THE COURT:  I referenced -- and I didn't bring a

24   copy of the document out, but in the grand jury report that

25   was done, there were references -- I don't know whether it

Page 201

1    used the term secret files.  I think it did.  Was an effort

2    made to determine whether the Diocese had any files other

3    than these cards, other than personnel files that related to

4    issues of alleged abuse by priests or other employees of

5    parishes or the Diocese?

6            THE WITNESS:  Sure.  So if you'll allow me, I'll

7    give you a two-part answer.

8            THE COURT:  Please.

9            THE WITNESS:  Our client doesn't use the term

10   secret files.  That's not our nomenclature --

11           THE COURT:  And I don't mean --

12           THE WITNESS:  No, no.  And -- no, but I also want

13   to make sure that I'm clearly addressing the Court's

14   question.

15           However, it is correct that personnel files are

16   divided into parts.  And there is what our client would

17   refer to as a confidential portion of the personnel files

18   that would include the type of notice evidence that Your

19   Honor has asked about.  And those -- the complete personnel

20   file, including those portions, have bene produced in

21   connection with the Chapter 11.

22           With respect to your question about other types of

23   files, the Diocese production in this matter also includes

24   files from the Office of Child Protection.  So that includes

25   policies, procedures, those sorts of records as well.

```
 1              THE COURT:  Okay.  Thanks very much.  Go ahead
 2    with your question.
 3    BY MS. DEL MEDICO:
 4    Q    Mr. Stephens, how -- you mentioned the documents that
 5    were produced in this bankruptcy.  Over what period of time
 6    were those documents produced?
 7    A    I believe we sent a letter to the Committee talking
 8    about substantial completion in July of 2022.  So roughly 18
 9    months.  Well, excuse me.  It took us some time to get a
10    protective order in place.  So 18 months is probably the
11    right ball park, but...
12    Q    And you -- are you familiar with the state court
13    litigations in which the Diocese is not named as a
14    defendant?
15    A    I am familiar with the complaints that have been filed
16    in those cases.
17    Q    And was there any activity with respect to discovery in
18    any of those cases prior to the bankruptcy?
19    A    No, no.  And those cases had not been filed.  And then
20    once they were filed, they were immediately stayed.
21    Q    Okay.  Mr. Stephens, if the Diocese isn't a defendant
22    in those cases, why would there be any burden on the Diocese
23    in connection with those cases?
24    A    To the extent that those cases go forward, the Diocese
25    is in possession of the documents that I've just described
```

Page 203

1   for Your Honor.  And this was an issue prepetition as well.

2   Based on the contentions in the state court, it's my

3   understanding that the Diocese is largely, at least as the

4   parishes would argue, the exclusive source, for example,

5   personnel files and the like.  And so my understanding is

6   there will be a tremendous third-party discovery burden just

7   to gather the basic evidence.  My understanding from my

8   review of the complaints in the post-petition cases is those

9   allegations cannot be adjudicated in any meaningful way

10  without the records of the Diocese.

11          THE COURT:  Was there a document depository,

12  physical and electronic, that was created with respect to

13  the documents that were gathered?

14          THE WITNESS:  So all of the documents that we have

15  produced to the Committee we have provided electronically.

16  Our collection efforts included physical files which were

17  then digitized.

18  BY MS. DEL MEDICO:

19  Q    Couldn't you just give all those documents to the state

20  court claimants?

21  A    No, no.  In my view, no.  And this was among the

22  discovery issues that was teed up before the bankruptcy on

23  the scope of discovery.  And I apologize.  There are a

24  number of points I would like to make.  I think there's a

25  confidentiality concern, and then I think there's also a

Page 204

```
 1    practical concern.  So certainly from a confidentiality

 2    perspective, in this case there was a court order redaction

 3    protocol that was in place to protect survivors based on a

 4    concern that the records would reflect the names of

 5    survivors who are claimants in these matters and in the CVA

 6    and also those who are not.  And so there was a concern

 7    about outing people who weren't even involved in this

 8    process.  So we agreed to a redaction protocol which we then

 9    modified for mediation.

10        In order to produce these records in state courts, one,

11    there are no -- there's no agreed redaction protocol in

12    state court and there's no protective orders in place in any

13    of those cases.  And so those issues will have to be sorted

14    out.  But even then, it will need to be a case-by-case,

15    plaintiff-by-plaintiff redaction effort so that we are not

16    outing one survivor to another.  So there is a threshold --

17            THE COURT:  You haven't reviewed documents related

18    to 226 cases, the number.  Is that an insurmountable task?

19    I mean, this is not thousands of cases.  This is not 30,000

20    asbestos cases.  This is hundreds.

21            THE WITNESS:  So certainly, Your Honor, it's not

22    an insurmountable task.  It's been done.  It will have to be

23    redone at the expense and at the time and individually

24    certainty.  And that's just from a survivor perspective.

25    And then there would also be the additional burden --
```

Page 205

1              THE COURT:  If a protective order of the same

2      basic terms was agreed to in state court as what was put in

3      place here, why would that additional -- including

4      redactions and all that.  I mean, all of the secret cases,

5      the names are redacted.

6              THE WITNESS:  That's right.  That's right.  But in

7      these cases, in order, for example, to litigate the notice

8      issues -- let's say you have the Smith case.

9              THE COURT:  Sure.  I understand.  If there was

10     alleged abuse before, there was the name of somebody who was

11     allegedly abused.

12             THE WITNESS:  Precisely.  So I guess the Smith

13     case would require different redactions than the Robinson

14     case would require different, than the Stephens case I think

15     is the --

16             THE COURT:  But we're talking about 226 cases or

17     thereabouts.  Right?  We're not talking about thousands.

18     We're talking about a finite number of -- what's the volume

19     of documents?

20             THE WITNESS:  So the total volume of documents

21     produced in a Chapter 11 to date is about 3 million pages.

22             THE COURT:  No, just -- there's a lot of financial

23     information.  And I want to drill down to abuse claims.

24             THE WITNESS:  I would want to look that number up

25     so I could answer the Court with precision.  But I agree

Page 206

```
 1   that overall number includes a lot of financial information

 2   in this case.

 3            THE COURT:  Overwhelmingly.  Overwhelmingly.

 4            THE WITNESS:  So it's some subset of that.

 5            THE COURT:  How big is a typical personnel file?

 6   How many pages?

 7            THE WITNESS:  I couldn't give a rule of thumb.

 8   Some are very thin and some are more substantial.

 9            THE COURT:  Go ahead.

10   BY MS. DEL MEDICO:

11   Q    And, Mr. Stephens, during your work as a lawyer for the

12   Diocese, are there individuals at the Diocese who you have

13   worked with on a consistent basis?

14   A    Yes, yes.  So certainly from taking direction from the

15   Diocese in the state court litigations, that comes from the

16   chief counsel and operating officer, Mr. Renker.  Certainly

17   on the risk and claim type issues I've worked very closely

18   with Bill Chapin.  On the financial issues, I've worked very

19   closely with Tom Doodian and his staff.  And then on the

20   document issues, I've also -- on the collection and

21   digitization efforts, I've worked very closely with the

22   chancellor of the Diocese, Sister Maryanne Fitzgerald.  The

23   Diocese also has an archivist by the name of Krista Ammirati

24   who has worked very closely with us.  And then as the

25   allegations and discovery on child protection have come in,
```

Page 207

1    I've also worked very closely with the head of child

2    protection, Mary McMahon.

3              MS. DEL MEDICO:  Your Honor, we would like to

4    introduce into evidence or submit into evidence the direct

5    testimony of Mr. Stephens.

6              THE COURT:  All right.  Does it have any docket

7    number?

8              MS. DEL MEDICO:  180.

9              THE COURT:  Okay.  Any objection?

10             MR. BROWN:  Same as the other two, Your Honor.

11             THE COURT:  All right.  It's admitted into

12   evidence subject to any later objections that the Court has

13   to address.

14             MS. DEL MEDICO:  And we would like to tender the

15   witness over to -- for cross-examination.

16             THE COURT:  Great.  Thank you.  Cross-examination.

17             CROSS-EXAMINATION OF ERIC STEPHENS

18   BY MR. BROWN:

19   Q    Good morning, Mr. Stephens -- or afternoon, Mr.

20   Stephens.  Afternoon.  Okay.

21        So Diocese has produced and collected millions of pages

22   of information to the Committee during the bankruptcy,

23   right?

24   A    Yes.

25   Q    And those productions included all documents that would

Page 208

1    otherwise be produced to the plaintiffs in the underlying

2    CVA actions, correct?

3    A    Yes.

4    Q    And in your view, did anything other than privileged

5    documents get withheld?

6    A    No, I'm not aware of anything that was withheld other

7    than on the grounds of privilege.

8    Q    And the documents included insurance policies,

9    financial information, and financial statements?

10    A    Yes.

11    Q    And the Diocese produced the files of all the alleged

12    abusers' disciplinary records, laicization documents, and

13    confidential --

14         THE COURT:  What's that?

15         MR. BROWN:  Pardon me?

16         THE COURT:  What is that?

17    BY MR. BROWN:

18    Q    What are laicization documents?

19    A    My understanding is documents related to laicization,

20    rejoining the laypeople, so leaving the religious life.  But

21    to answer the broader question, yes, all of those records

22    were collected and produced.

23    Q    Confidential or secret files consisting of portions of

24    the personnel files that were maintained by the bishop,

25    those were also produced, correct?

Page 209

1    A    The confidential portions of the personnel files were

2    collected and produced.  That's correct.

3    Q    And if there was a file for an alleged abuser, it was

4    produced, correct?

5    A    That's correct.

6    Q    And the Diocese also produced very detailed financial

7    information, including the financial information of certain

8    of its affiliates and parishes, correct?

9    A    Correct.

10   A    The -- in the adversarial with Arrow Wood, special

11   insurance counsel is leading that effort.  I have certainly

12   assisted them in their discovery efforts.  I'm not sure I

13   would -- I certainly didn't have the same leadership role

14   that I have had --

15   Q    Okay.

16   A    -- in the Chapter 11 or the state board actions.

17   Q    Is it correct to say that if the -- I think we're now

18   at 223 if I'm -- of the 223 state court actions to which the

19   Diocese is not a party, if those actions are allowed to

20   proceed, there are no other categories of documents that

21   you're aware of that remain to be collected in connection

22   with those actions?

23   A    That's correct.  I'm not aware of additional documents

24   that would need to be collected.

25   Q    Okay.  Mr. Moore testified that if the state court

Page 210

1    actions go forward, that the Diocese would be required to

2    collect additional financial information regarding the

3    parishes.  Do you recall that testimony?

4    A    I heard that testimony.

5    Q    Okay.  In connection with the stipulation to extend the

6    injunction, I think it's Exhibit P, and it's a -- I think

7    you testified to it, and at Paragraph 10 of your direct

8    testimony you reference the exhibit which -- it's

9    Plaintiff's Exhibit P for today and also Docket 59 in the

10   adversary proceeding.  And your testimony is in return for

11   the Committee's agreement to extend the preliminary

12   injunction, the Diocese agreed to produce documents that

13   would otherwise be produced to the Plaintiffs in the

14   underlying CDA actions.  Non-controversial, right?  I just

15   -- everything was produced.

16            THE COURT:  You have to answer audibly.

17            THE WITNESS:  I wasn't sure I had the question

18   yet, but --

19   BY MR. BROWN:

20   Q    No, no.  You know, I'm just getting -- staying

21   background for --

22            THE COURT:  Well, it sounded like a question.  And

23   if it's a question, it needs an audible answer.

24            MR. BROWN:  Okay.

25            THE COURT:  If it's not a question --

Page 211

1           MR. BROWN:  Not a question yet.

2           THE COURT:  Okay.

3           MR. BROWN:  Okay?

4    BY MR. BROWN:

5    A    Good.  I didn't think there was one.  I was nodding

6    along with you.

7    Q    Okay.

8    A    I was reading along with you.

9    Q    So the parish -- was the parish financial information

10   produced in connection with the stipulation?

11   A    My recollection of the parish productions in this case

12   is that they were made in connection with the mediation, and

13   then also in response to various discovery disputes about

14   parish information that came up along the way that are

15   reflected on the docket.  My -- I would put financial

16   information largely to the side given my understanding, for

17   example, of the limitations on the financial discovery

18   that's available in state court prior to a judgment.

19   Q    Right.  That's what I'm getting at.  Do you recall that

20   there were significant limitations on the production of

21   financial information regarding the parishes at the

22   insistence of the parishes because of their position that

23   there were limitations on the production of financial

24   information prejudgment in state court litigation?

25   A    Yes, I remember that issue coming up --

Page 212

1   Q     Okay.

2   A     -- in this case a number of times.

3   Q     So it's correct that the parishes have previously taken

4   the position that you don't get our financial information en

5   masse prejudgment.

6   A     I think that's a fair description of the --

7   Q     Okay.

8   A     -- early 2004 discovery disputes.

9   Q     Okay.

10  A     Or at least of the issue.  The issue.

11  Q     So it's your understanding of the parish's position

12  that the parish financial information doesn't need to be

13  produced until and unless there's a judgment.

14  A     I can't speak for the parishes.  I can only, you know,

15  speak to their positions as reflected in those discovery

16  disputes.

17  Q     And that is the position that they took in the

18  discovery disputes, correct?

19  A     I'd have to go back to their pleadings, but among the

20  basis for their objections to that discovery, I do believe

21  that was one.

22  Q     Okay.  Thank you.  So looking at Paragraph 34 of your

23  written testimony, Mr. Stephens, you testify pursuant to an

24  order of the Regional CDA Part for the Ninth and Tenth

25  Judicial Districts Nassau and Suffolk Counties, the Diocese

Page 213

1    and its co-Defendants were subject to standardized discovery

2    requests in connection with the pre-petition state court

3    actions --

4    A    I see that testimony.

5    Q    -- pending in those judicial districts.  Okay.  So

6    you're referring to a case management order entered by Judge

7    Jager in November of 2019, are you?

8    A    It was certainly a Judge Jager order.  That timing

9    sounds roughly correct.

10            MR. BROWN:  Could we put up Plaintiff's Rebuttal

11   Exhibit AA?

12   BY MR. BROWN:

13   Q    And if I could approach you, Mr. Stephens.

14   A    Thank you.

15   Q    I believe this is the case management order.  Oh, yeah.

16   Mr. Stephens, can I ask is this the order that you're

17   referring to in Paragraph 34?

18   A    Yes, and it's also the order that I was describing to

19   His Honor earlier today.

20   Q    Okay.  And this, we'll call it the Case Management

21   Order for purposes of this testimony, it was entered to

22   achieve coordination of the state court actions and to avoid

23   undue burdens of the litigation.  I think that's what the

24   language of the order says.

25   A    I'm -- I see words to that effect under Heading 2,

Page 214

1    Objectives of --

2    Q    Yeah.

3    A    -- This Order.

4    Q    Yeah.  And did the Diocese seek and obtain this order

5    in the state court actions?

6    A    Yes.  This order was entered in response to a motion

7    that was brought by the Diocese.

8    Q    Okay.  And this order only applies to cases to which

9    the Diocese is a party, correct?

10   A    Yes.  Yeah.  By its terms at the top there, it is only

11   applicable where the Diocese of Rockville Center --

12   Q    Okay.

13   A    -- is a named party Defendant.  I would also add it's

14   only applicable in this regional part.

15   Q    Okay.

16   A    So for example, it does not apply in the New York City

17   Regional Part that I described earlier.

18   Q    And no such order has been entered with respect to any

19   of the 223 cases to which the Diocese is not a party because

20   those cases have been stayed, correct?

21   A    That's my understanding.  That's correct.

22   Q    Okay, but you're not aware of any reason why a similar

23   order couldn't be issued with respect to those cases in the

24   courts in which they're pending, are you?

25   A    Well, this order came about on the motion of the

Page 215

1    Diocese and was granted over the objection of a number of

2    Plaintiff's counsel.  So I don't know -- in the 220 cases

3    where the Diocese is not a party, I don't know that there's

4    a Defendant with the will, the resources, or the motivation

5    to try to bring about a similar order.  And our experience,

6    at least with this order, was that the Plaintiff's counsel

7    resisted it.  So if you're asking do I -- you know, what do

8    I know about the likelihood of an order like this in the 228

9    or the 223, I don't expect a similar order.  This was

10   something that my client had to fight for in order to get

11   entered.

12   Q    Okay.  Okay.  So you've also stated that the Diocese

13   was the repository for the overwhelming majority of

14   documents relevant to the state court actions.

15   A    Yes.

16   Q    And that includes the personnel files, the assignment

17   cards for the abusers, which were produced to the Committee

18   during the bankruptcy, correct?

19   A    Yes, those are among the categories of documents.

20   Q    And the Diocese maintains centralized files for all

21   abusers, right?

22   A    The Diocese has personnel files, but there are a number

23   of accused, for example, who are not diocesan.  So no, I

24   would not agree that the Diocese maintains centralized

25   abuser files.  That --

Page 216

1    Q    That maintain centralized abuse files for all the

2    documents that it has regarding the Diocese, correct?

3    A    No, the -- sorry, your use of the frame abuse files,

4    there are personnel files.  There are personnel files.

5    There are policies and there are procedures.  I'm not aware

6    sort of as -- of abuse as a category of document.

7    Q    Okay.  Okay.

8              THE COURT:  Did the Diocese collect personnel

9    files for religious order priests who are accused of being

10   abusers in cases or on claims where the Diocese is also?

11             THE WITNESS:  So generally speaking, the Diocese

12   does not have order priest files, personnel files since they

13   were not diocesan personnel.

14             THE COURT:  Before or after the petition date, the

15   Diocese, your understanding is, didn't maintain personnel

16   files on religious order priests.

17             THE WITNESS:  That's right, and we didn't -- and

18   there's been no effort go and collect personnel files from

19   third parties.  But to the extent that the name of the

20   accused showed up in the diocesan personnel files, it was

21   produced.

22             THE COURT:  Okay.

23   BY MR. BROWN:

24   Q    I think you testified in your preliminary testimony

25   here today in response to questions of your counsel that

```
 1    there was standardized discovery that was propounded in the

 2    state court actions pre-petition.  Is that correct?

 3    A    That's right pursuant to the order that I believe

 4    you've marked as Rebuttal Exhibit AA.

 5    Q    Exhibit AA, yes.

 6    A    That's correct.

 7    Q    And you supervised the team that handled the Diocese

 8    responses to those standardized discovery requests, didn't

 9    you?

10    A    Yes.

11    Q    And do you recall in those discovery requests that the

12    Diocese stated that it didn't control parish priests and

13    other perpetrators of childhood sex abuse?

14    A    I do recall interrogatory responses with similar

15    language.

16    Q    And I'd like to hand you a copy of Exhibit N, which is

17    a collection of some of those discovery responses, and I'd

18    just like to walk through them.  And if we could put Exhibit

19    N up on the screen.

20            THE COURT:  Okay.  And I have my copy of Exhibit N

21    in front of me as well, but you can put it up on the screen.

22            MR. BROWN:  You do have a copy?

23            THE COURT:  I do.  I do, but you can put it up on

24    the screen.

25    BY MR. BROWN:
```

Page 218

1    A      Thank you.

2    Q    You're welcome.  Okay.  So if you could flip to -- at

3    the page number at the bottom --

4              THE COURT:  The actual page of the document.

5              MR. BROWN:  It's the page number at the bottom of

6    the document, 10430.3.

7              THE COURT:  The Bates number.

8              MR. BROWN:  Pardon me?

9              THE COURT:  The Bates numbers --

10             MR. BROWN:  Yeah, the Bates number.

11             THE COURT:  -- as opposed to the page.  Give me --

12   which one is it again?  Bates --

13             MR. BROWN:  It's Interrogatory Number 1.

14             THE COURT:  Give me the Bates page again.

15             MR. BROWN:  10430.3.

16             THE COURT:  Okay.

17   BY MR. BROWN:

18   Q    And this interrogatory just -- you know, it asks for

19   the Diocese to describe the employment and business

20   relationship between it and the individual listed below.

21   Here it's Father Charles Ribatu (ph).  And it says the --

22   see subject to objections, the Diocese states that Charles

23   Ribatu was a priest at the Diocese who served at a parish

24   from specified dates.  Agree?

25   A    I see that language, and that language is highlighted

Page 219

1    on my copy.

2    Q    Is highlighted, yes.  And again, if we could flip to

3    10430.10, which is Interrogatory Number 10, please describe

4    the relationship between you and any other named Defendant

5    regarding each individuals listed below who are identified

6    in the Plaintiff's complaint, including legal relationship,

7    financial relationship, and your relationship with regard to

8    supervising and controlling the individual.  General

9    objection's stated, and then if you flip the page, the

10   response, which again is highlighted at 104.3011, subject to

11   and without waiving those objections, the Diocese states

12   that holy family diocesan and high school is separately

13   incorporated from the Diocese and under New York State

14   Religious Corporation Law.  The Diocese Corporation, a

15   Special Act Corporation under New York law, does not and did

16   not have the ability to control Father Ribatu.  You see

17   that?

18   A    I see that.

19   Q    Is there any reason you have to believe that the answer

20   to that interrogatory is not correct?

21   A    No.  I believe the answer is correct.

22   Q    Okay.  And again at 10435, another set of

23   interrogatories -- standardized interrogatories relating to

24   another priest and another Defendant -- set of Defendants.

25   Same Interrogatory Number 1, this relates to a priest by the

Page 220

```
 1    name of Father John P. Halprin.  That's at 10435.3.  And

 2    then if you flip to 10435.10, Diocese response to the same

 3    standard interrogatory is subject to and without waiving

 4    objections, the Diocese states that the Church of St.

 5    Rosalee, a parish of the Diocese, is separately

 6    incorporated.  And any compensation of parish priests is the

 7    responsibility of the parishes and the Diocese as a special

 8    act corporation under New York law does not and did not have

 9    the ability to control Father Halprin.  Anything incorrect

10    about that?

11    A    Not to my knowledge.

12              THE COURT:  Were you involved in the drafting of

13    the answers to this (indiscernible)?

14              THE WITNESS:  I certainly supervised the team.

15    Whether I put fingers to keys on these specific responses, I

16    couldn't say, but my recollection was in looking at these

17    responses they were individualized.  There was an effort

18    made to, as I described, you know, provide -- earlier

19    provide the information in one about who worked.  And then

20    as I reviewed these responses, even the relationship to the

21    individual was investigated individually.  And the Diocese

22    provided what information it could.  And so for example, I'm

23    looking at Page 10350.10 where, again, we describe the

24    relationship, and also individuals at the Diocese to whom

25    this person reported.  So my recollection is there was an
```

Page 221

 1    individualized investigation to respond to each of these.  I

 2    supervised that effort.  I couldn't describe in any detail

 3    sort of the drafting that I either did or didn't do.

 4            THE COURT:  So what -- in the response to

 5    Interrogatory Number 10 with respect to Father John Halprin,

 6    in the highlighted portion of the answer where it says the

 7    Diocese Corporation Special Act Corporation of New York Law

 8    does not and did not have the ability to control Father

 9    Halprin, explain what the meaning of control is as used in

10    that response.  Maybe I should say that in the opinion I

11    issued this morning I found that the use of the word control

12    is a conclusory statement.  And so I'm trying to understand,

13    and that's with respect to claims that were filed.  And now

14    the word here is used in an interrogatory answer, and I'm

15    trying to understand what -- and you said you worked on

16    these, what was your understanding of the meaning of the

17    word control?  What did that mean?

18            THE WITNESS:  I apologize, Your Honor.  I wish I

19    had a better answer from three years ago.  In terms of the

20    specific facts and, you know, how we determined or chose to

21    use the word control in these responses, I -- sitting here

22    today, I apologize, I just don't know.

23            THE COURT:  So I think this is obviously a term,

24    the word control appears in multiple answers as to different

25    priests.  Did you and your colleagues, in deciding to use

Page 222

1    the word control, have the general understanding or intent

2    as to what was -- what did you intend to communicate in

3    saying that the Diocese did not have the ability to control

4    Father Halprin or another priest?

5            THE WITNESS:  I have no independent memory.  All I

6    can talk to is the words on the page.  And I do see, for

7    example, in the response that you have raised, clearly we

8    tried to delineate, for example, who compensation was paid

9    by.  In subsequent responses, we also talk about reporting

10   relationships.  But sitting here today, sort of the type of

11   control or the nature of the control that we had in mind

12   while we were compiling these, I don't have a memory.  I'm

13   sorry, Your Honor.

14           THE COURT:  Go ahead.

15           MR. BROWN:  Thank you, Your Honor.  I'm -- and

16   bear with me for a few more minutes.

17           THE COURT:  Sure.

18           MR. BROWN:  There's a couple more of these.

19           THE COURT:  Yeah.

20           MR. BROWN:  Because some of them relate -- the

21   ones I've asked about so far relate to the parish priests,

22   but there are others that relate to certain other diocesan

23   personnel but are higher up in the structure where the

24   Diocese took the same position.  And I just want to make

25   sure those get your attention as well.  So, in John Hagan's

Page 223

1    complaint, the interrogatories relating to his complaint

2    against the Diocese and --

3              THE COURT:  Is there a page I'm supposed to look

4    at?

5              MR. BROWN:  We're looking now at 10350.1.

6              THE COURT:  Okay.

7              MR. BROWN:  So again, if you now turn to 10350.3,

8    we get response to Interrogatory Number 1 where the Diocese

9    describes the relationship.  And it says -- and who the guy

10   is, the perpetrator.  And this is Monsignor Edward Melton.

11   I don't know a whole about the diocesan --

12             THE COURT:  I always pronounced it monsignor, but

13   that's --

14             MR. BROWN:  Pardon me?

15             THE COURT:  -- you know --

16             MR. BROWN:  Pardon?  I don't know a lot about the

17   diocesan structure, but I think a monsignor is higher up

18   than a priest.

19             THE COURT:  Monsignors, yes.

20             MR. BROWN:  And so we're talking about a monsignor

21   now.  And then if we flip to the answer to Interrogatory

22   Number 10, which is 10350.1, the Diocese states that

23   Monsignor Melton was papal chamberlain from 1959 to 1965.

24   The Diocese does not and did not have the ability to control

25   Monsignor Melton.  However, he did at times -- this one we

Page 224

1   get a little bit different language.  He did at times report

2   to the Diocese, but no control.

3            THE COURT:  Let's leave the chart as out, but I'd

4   like, you know, (indiscernible).  Go ahead.

5   BY MR. BROWN:

6   Q    So Mr. Stephens, what did you mean here when you said

7   that although the monsignor did report to the Diocese, the

8   Diocese didn't control the monsignor?

9   A    I didn't get -- I'd echo the comments that I made to

10  His Honor that, you know, as I look at these and it appears

11  to me to be an individualized response --

12  Q    Mm-hmm.

13  A    -- talking about issues of compensation reporting

14  lines, and then the use of that word control.  And in terms

15  of whether we were using control based on allegations in the

16  complaint that used the same word, as I said, I don't have a

17  specific recollection of --

18  Q    Okay.

19  A    -- of what that --

20  Q    Okay.

21           THE COURT:  I was wondering --

22  BY MR. BROWN:

23  A    -- what generated that.

24           THE COURT:  -- is it fair for me to criticize

25  claims that use the word control when the Diocese responded

Page 225

```
 1    to discovery by using the term control?  But that's a

 2    question to myself.  Go ahead.

 3              MR. BROWN:  I don't think it was directed at me.

 4              THE COURT:  No, it wasn't.  It was --

 5              MR. BROWN:  I'm not going to go there.

 6              THE COURT:  No.  Let's move --

 7              MR. BROWN:  I do point out, Your Honor, I mean

 8    that the interrogatories didn't ask specifically --

 9              THE COURT:  I know what they ask.  Go ahead.

10              MR. BROWN:  -- for control.

11              THE COURT:  Go ahead.

12              MR. BROWN:  All right.

13    BY MR. BROWN:

14    A    Sorry, Ken.  As I read the interrogatory, Part 3 of

15    that interrogatory, your relationship with regard to

16    supervising and controlling.  So I think the interrogatory

17    does use the word.

18    Q    Did they -- did it mention control?

19              THE COURT:  It does.  It says supervising and

20    control.

21              MR. BROWN:  Well, okay.  I apologize.

22              THE COURT:  And of course, the objection starts by

23    saying it improperly calls for a legal conclusion.

24    BY MR. BROWN:

25    Q    If we turn to the next set, which is for Richard
```

Page 226

1    Toldner, who is the Plaintiff, Interrogatory Number 1 is at

2    10377.3, and this relates to a perpetrator by the name of

3    Monsignor Alan Placa.  And again flipping to the response to

4    Interrogatory Number 10 at 10377.11, subject to objections,

5    the Diocese states that Monsignor Alan Placa was faculty

6    with the residents at St. Pius from January '74 to July '78.

7    The Diocese Corporation Special Act Corporation under New

8    York law does not and did not have the ability to control

9    Monsignor Placa.  However, he did at times report to the

10   diocesan bishop.  And we get the same pattern with respect

11   to one -- I think there's only one more here, but I do

12   stress these are standardized interrogatories, which were

13   propounded and responded to in hundreds of cases.

14   A    I don't think the -- I think that's -- I'm sorry, Ken.

15   Q    Oh, okay.

16   A    On the numbers, I don't think that's right.

17   Q    How many cases?

18   A    My recollection it was sort of 50 to 60.

19   Q    50 to 60.  Okay.  So this is a 10 percent sampling.  If

20   -- the next set is a Doe Plaintiff starting at 10452.  And

21   this again -- this one relates to a perpetrator who was a

22   deacon, Deacon William Mahoney.  And that's at 104.52.3, and

23   then the interrogatory response to Number 10 is at 104.52.10

24   where the Diocese says again Deacon Williams was not a

25   compensated employee for his work as a deacon, and the

1    Diocese did not control or have the ability to control him.

2    And again, did you have -- do you have any understanding

3    with respect to either Mr. Placa or Mr. Deacon what the

4    Diocese meant when it said it didn't control them?

5    A    I don't have a specific recollection of what that term

6    was meant to convey.

7    Q    Okay.

8    A    Clearly, control is an issue that's going to be

9    litigated in every one of these cases.

10    Q    Okay.  Paragraph 38, you testified in your direct

11    testimony, and we're, by the way done with -- you can toss

12    Exhibit M.  You testified Paragraph 38, Mr. Stevens, that

13    although the Diocese has gone to great lengths during the

14    Chapter 11 case to produce all of the relevant discovery.

15    With respect to the CDA claims, that discovery was made more

16    efficient because it was provided en masse to the Committee

17    in its capacity as an estate fiduciary.

18        And then going onto Paragraph 39, if the Diocese were

19    now required to reproduce evidence in 228 individual cases

20    in the state, it would have to negotiate protective orders,

21    cull through previously produced material, previously

22    produced discovery materials, separate out documents

23    relevant to individual cases, re-review documents to redact

24    personally identifying information of non-parties, and

25    produce targeted re-redacted subsets of documents in each

Page 228

1    specific case.  And again, you did testify to this to some

2    extent in your preliminary testimony here today, live

3    testimony.

4              MR. BROWN:  And Your Honor, I've explored some of

5    this, and I appreciate that.  And I'm going to try not to be

6    duplicative, but I did want to do some follow-up on some of

7    the questions and concerns that you had.

8              THE COURT:  At 10 minutes to 4 we're going to take

9    a short recess to switch ECRO operators.

10             MR. BROWN:  Sure thing.

11             THE COURT:  But let's continue --

12             MR. BROWN:  If I don't notice, just somebody

13   holler at me.

14             THE COURT:  I -- somebody will holler at you.

15   BY MR. BROWN:

16   A    I recall that.  I recall those exchanges.

17   Q    Yeah.  Okay.  So obviously the Diocese isn't a party to

18   any of these state court actions that are at issue today,

19   the 223.  So is your concern that it would be a party to

20   third-party discovery?  Like be subpoenaed?

21   A    Yes.  Yes.  I believe that's the case.  I don't believe

22   that those cases will be able to be adjudicated without --

23   Q    Uh-huh.

24   A    -- the evidence that the Diocese is -- has.

25   Q    And is -- again, the -- there's a large volume, in fact

Page 229

1    the great majority of the documents, certainly the financial

2    documents for example and insurance information, that would

3    be able to be produced en masse, wouldn't it?  I mean, let

4    me ask it another way.  Why couldn't a data room just be set

5    up for some of that -- for the Diocese and financial

6    information, any parish information the Diocese has, any

7    parish financial information, any insurance information.

8    That could be done, right?

9    A    Well, in effect pre-petition that was done, and the

10   motion -- the discovery motion practice that I described to

11   you earlier included Plaintiff's objection to the mass

12   production of insurance information.  And they came back

13   seeking to compel the Diocese to identify the specific

14   policies within the production that were applicable to the

15   claims alleged in the complaint.  So my understanding is

16   that that is not acceptable to state court counsel.

17   Q    I don't mean to be facetious --

18            THE COURT:  Let me ask you this.  The -- I don't

19   want to get in -- I'm not intending to get into what has

20   gone on in mediations, but the Diocese -- excuse me, that

21   the parishes have had counsel appear before me, one of them

22   represents 98 parishes.  You know, there are a handful.

23   Have the documents relating to parishes been made available

24   to the counsel who are representing the parishes in

25   connection with mediations for who would appear before me?

Page 230

1           THE WITNESS:  To the extent that the Debtor has

2      provided documents in connection with the mediation,

3      including the parish financial information, that has been

4      shared with the counsel for the -- the restructuring counsel

5      for the parishes.

6           THE COURT:  Have these personnel files for alleged

7      abusers within a parish been provided to counsel

8      representing the parishes?

9           THE WITNESS:  No.

10          THE COURT:  Go ahead.

11     BY MR. BROWN:

12     Q    And there's no reason, is there, that, for example

13     child protection information that has been produced to the

14     Committee could also not be produce en masse in the state

15     court litigation, is there?

16     A    I do -- yeah, I would include -- yes.  I think

17     financial insurance and policies and procedures, there are

18     categories of general information that would be appropriate

19     to produce in bulk.

20     Q    And --

21     A    Whether or not that would be acceptable to the state

22     court parties, I can't say.

23     Q    You don't know.

24     A    But that would certainly be the approach I would

25     recommend to my client to try and manage cost.

Page 231

```
 1    Q     And all the --

 2    A     And time.

 3    Q     -- document productions to the Committee in this case

 4    of the massive document productions that have taken place in

 5    this bankruptcy case to the Committee, that's all been done

 6    electronically, right?

 7    A     Yes.

 8    Q     And with respect to the documents that have been

 9    produced to the Committee, everything relevant to the CDA

10    actions, there have been privileged reviews and documents

11    that have been withheld from the Committee on the grounds of

12    privilege, correct?

13    A     That's correct.

14    Q     And Jones Day has already prepared all the privilege

15    logs relating to that, has it not?

16    A     The privilege logs have been prepared in connection

17    with those productions.  That's correct.

18    Q     And is -- are the documents that have been produced to

19    date to the Committee, which is all the CDA related

20    documents that the Diocese has, they're maintained in an

21    electronic database, correct?

22    A     Yes.

23    Q     And does Jones Day oversee this database?

24    A     It's at an outside vendor, but certainly we have access

25    and then, you know, we make productions to the Committee out
```

1   of the database.  We also provide information to the

2   insurers through the database.  But in terms of -- it

3   resides at a vendor, but we direct, you know, the vendor.

4   Q    Fair enough.

5            THE COURT:  Well, let me ask you.  So most

6   insurance policies require cooperation with the insurers,

7   and they frequently do ask for underlying documents that

8   they've produced subject to the confidentiality stipulation.

9   What has been provided to the insurers with respect to

10  personnel, anything related to the abusers?

11           THE WITNESS:  In connection with the mediation,

12  and this goes back to the discussion I had earlier about the

13  revised protective order, for example, in connection with

14  the mediation, the Committee -- or I should say counsel for

15  the Committee, counsel for the Debtor, and counsel for the

16  insurers are working from the same pool.  So the same

17  documents with the same Bates numbers on the abuse issues.

18           THE COURT:  There are four coverage actions

19  pending in the Southern District in the District Court.  In

20  connection with those actions, has the Diocese produced

21  documents to the insurers in those four cases?  And if so,

22  in what format?  When I say in what format, electronically?

23  Policies have a duty to cooperate, and they usually want to

24  see whatever you've got.

25           THE WITNESS:  And to date, what I'm aware of being

Page 233

 1    -- what I am aware of what's being shared is that the --

 2    what we would call the merits production that has been made

 3    to the Committee has been shared with counsel for all of the

 4    insureds.

 5            MR. BROWN:  Your Honor, is it the witching out

 6    yet?

 7            THE COURT:  Well, it's almost, so let's -- we'll

 8    break it until 4:00.

 9            MR. BROWN:  Okay.

10            THE COURT:  We'll just have the switchover of

11    ECROs --

12            MR. BROWN:  Okay.  Fair enough.

13            THE COURT:  -- now.  We'll take -- this will be

14    our last break.  Do you have an estimate?  I'm not --

15            MR. BROWN:  Yeah, I can give --

16            THE COURT:  -- holding you.  Do you have an

17    establish how much longer you're going to be?

18            MR. BROWN:  I think I should be able to finish in

19    an hour.

20            THE COURT:  Okay.  All right.  Okay.  Then we're

21    in recess until 4:00.

22            (Recess)

23            AUTOMATED VOICE:  Recording in progress.

24            THE COURT:  Don't run.  Don't run.  All right.

25    The court is back in session.  Before we continue, I have a

Page 234

1    question for Committee counsel.  The testimony has been that

2    all of the personnel files, including the confidential

3    personnel files for all of the alleged abusers have been

4    produced to the Committee.  Do you agree with that?

5              MR. BROWN:  Yes.

6              THE COURT:  Okay.  And can you tell me whether

7    personnel files for alleged abusers have been provided --

8    whether the Committee has provided those documents to the

9    state court counsel representing alleged victim for the

10   abusers that were involved in that?

11             MR. BROWN:  I cannot, but I can get you an answer.

12             THE COURT:  Okay.

13             MR. BROWN:  Or we --

14             MS. GREENWOOD:  I believe the answer is no,

15   they've only been available to Committee under

16   confidentiality restrictions, and Karen would know.

17             MR. BROWN:  Karen Dine would know probably --

18             THE COURT:  Ms. Dine stepped out.

19             MR. BROWN:  -- but --

20             THE COURT:  Okay.

21             MR. BROWN:  And certainly, I can get you an answer

22   more definitively, but I don't know personally.

23             THE COURT:  Okay.  That's fine.  Do any of the

24   Debtors' counsel have a different response to that question?

25   Do you have -- Charlie, do you what that -- do you

Page 235

1    understand the question I was --

2            MR. ADAMS:  I do, and I unfortunately don't know

3    the answer to that question either.  Mr. Stephens --

4            THE COURT:  Well, I was going to ask Mr.

5    (Indiscernible) who has been preparing all the --

6            MAN 2:  Yeah, I --

7            THE COURT:  -- claim objections, including arguing

8    the notice one.

9            MAN 2:  I think the person who knows who knows

10   best is on the witness stand.

11           THE COURT:  Okay.  Mr. Stephens, do you know

12   whether the personnel files for the alleged abusers that

13   have been produced to the Committee, both the confidential

14   personnel files and the non-confidential personnel files,

15   whether those documents have been provided to the state

16   court counsel with respect to the -- whichever alleged

17   abuser, if it's not generally, but at least that with the

18   respective abuser?

19           THE WITNESS:  Yeah.  With apologies, I don't know.

20   I know we've made the productions, but ultimately --

21           THE COURT:  Do you know whether the protective

22   order that restricted the Committee from providing those

23   documents to anyone else, such as the state court counsel?

24           THE WITNESS:  My understanding of the protective

25   order and the designations on those documents is that they

Page 236

1    would be allowed to be shared with state court counsel to

2    Committee members.  I don't believe the -- I do not believe

3    that it would be a -- I believe the restriction would not

4    extend to all state court counsel to all Claimants.

5            THE COURT:  I don't -- well, let's see whether Ms.

6    Dine has a different --

7            MAN 3:  Are we live on Zoom?

8            THE COURT:  We are.

9            MAN 3:  Because somebody on the Zoom call may well

10   know.

11           MS. GREENWOOD:  Well, that was the response that

12   Eric just gave is consistent with the response that I

13   received, which is it's available to counsel for --

14           MR. BROWN:  For Committee members.

15           MS. GREENWOOD:  -- Committee members, but not a

16   broader audience.

17           THE COURT:  Okay.  All right.  Go ahead with your

18   questioning.

19           MR. BROWN:  And as a --

20           MS. MICHAEL:  Your Honor?

21           MR. BROWN:  Sorry.  As a factual matter whether

22   that's happened or not, I don't know.

23           THE COURT:  All right.  Somebody on Zoom wanted to

24   speak?

25           MS. MICHAEL:  Yes.  Apologies, Your Honor.  This

Page 237

```
 1    is Brittany Michael from Pachulski Strang Ziehl Jones on

 2    behalf of the Committee.

 3                THE COURT:  Yes.

 4                MS. MICHAEL:  One clarification in response to

 5    your question directly.  What Ms. Greenwood said is correct,

 6    but it is also my understanding you asked if the personnel

 7    files for the abusers at issue in the objections have been

 8    shared.

 9                THE COURT:  Yes.

10                MS. MICHAEL:  And it is my understanding that for

11    some of the objections there were no files that were

12    produced to the Committee regarding the noted at issue

13    abuser.

14                THE COURT:  And for some there were, and for some

15    there weren't.

16                MS. MICHAEL:  Right, but what Ms. Greenwood said

17    is correct in terms of the Committee's ability to -- or

18    inability to share those beyond the confidentiality

19    agreement.

20                THE COURT:  All right.  Thank you.  Thank you very

21    much.  Mr. Brown?

22                MR. BROWN:  May I proceed?

23                THE COURT:  Yes, please.

24                MR. BROWN:  Okay.

25    BY MR. BROWN:
```

Page 238

1    Q    Mr. Stephens, I'm going to ask some questions of you

2    regarding your testimony at Paragraph 41 of your written

3    direct, which states based on the Diocese heavy involvement

4    in the litigation of all pre-petition state court actions,

5    its key personnel would remain busy with case management and

6    supervision in any resumed state court actions despite the

7    fact that the document collection process is over.  That

8    would be true even if only the cases that do not name the

9    Diocese as a Defendant were to move forward.  While as a

10   general proposition, fewer cases take less time to manage.

11   Based on my experience and the fact that the Diocese key

12   personnel are in senior management positions, the amount of

13   time they would spend on oversight on a subset of state

14   court actions would not be reduced on a one-to-one basis.

15   By key personnel, who are you referring to in that

16   paragraph?

17   A    The individuals that immediately come to mind are the

18   Diocese general counsel and Chief Operating Officer Tom

19   Renker, the Diocese Director of Insurance and Risk

20   Management William or Bill Chapin, and the Diocese Chief

21   Financial Officer Tom Dutian.

22   Q    Tom Duty.  Okay.  Renker, Dutian -- so it's Renker,

23   Dutian, and Chapin?  Yeah?

24   A    Yes.  Yes.  And in my written direct, I provide some

25   further detail --

Page 239

1    Q     Okay.

2    A     -- in Paragraphs 42, 43, and 44.

3    Q     Okay.  So from your personal observations of these

4    individuals, it's true that you don't know what actual tasks

5    any of them engaged in with respect to the state court

6    actions pre-petition, do you?

7    A     On a task-by-task basis, that's correct.  I mean, it's

8    clear to me from minor actions with them that they have been

9    doing the work to achieve the goals, but how they organize

10   themselves in their pursuit of those, that's right.

11   Q     And for example, you never observed Mr. Renker in the

12   performance of his day-to-day duties in connection with the

13   state court actions pre-petition, did you?

14   A     No, that's right.  I do not sit with Tom Renker as he

15   does his job, but from his direction of me, it's clear to me

16   that he's done it.

17   Q     And all of your observational knowledge of what those

18   individuals were doing in the state court litigation was

19   based on pre-petition work they did in cases that included

20   the Diocese as a party, correct?

21   A     I would make -- I would offer just a few

22   clarifications.  I would say that that's largely true.

23   However, for example, I do know that Mr. Chapin, for

24   example, continued to send notices with respect to post-

25   petition complaints.  And so I observed him in carrying out

Page 240

1    that piece of his duties.  And similarly, I know that, you

2    know, Mr. Renker was aware of the filing of the complaints

3    often because he was the individual who received the

4    complaints.  So there were responsibilities that they had in

5    connection with post-petition complaints that I'm aware of,

6    but --

7              THE COURT:  Yeah, you've noticed of the insurers

8    for one.

9              THE WITNESS:  Precisely.  And that's work that I

10   observed being done, but the bulk if my experience and the

11   thrust I agree.  You know, the foundation for my expectation

12   is pre-petition activity, but there is -- there has been

13   post-petition activity that I have observed.

14   BY MR. BROWN:

15   Q    And that's true for all this, the key personnel that

16   you're referring to, correct?

17   A    Yes.

18   Q    Okay.  With respect to time spent by diocesan personnel

19   collecting and producing documents during the bankruptcy

20   proceedings, you don't have any knowledge whether their time

21   spent on those tasks impaired their ability to perform their

22   other duties in connection with the reorganization, do you?

23   A    No.  No, that's right.  Beyond, you know, what they

24   spent time on, one thing they did not spend on another, I

25   don't have any details on that.

Page 241

1    Q     With respect to Paragraph 42 of your written testimony,

2    you are talking -- are you -- well, specifically the Diocese

3    general counsel and Chief Operating Officer Tom Renker will

4    have to direct and supervise the Diocese responses to

5    request for documents, written discovery, and deposition

6    notices.  He will have to review filings in order to monitor

7    and manage the risk of prejudice to the Debtor posed by the

8    state court actions.

9         In my role as outside counsel of the Diocese in the

10   state court actions, I know that Mr. Renker performed these

11   duties in connection with pre-petition state court actions,

12   and he will be responsible for those duties in connection

13   with any resumed state court actions.  You can't identify

14   any state court actions to which the Diocese is not a party

15   that would require Mr. Renker to review all the filings and

16   legal documentation, could you?

17   A     Since those cases are on pause, that's correct.  If 223

18   cases resume, in my mind it is a certainty that there will

19   be cases.  I don't think it's -- I don't think it should be

20   controversial that flicking the on-switch back on, on 223

21   state court cases will result in additional work by the

22   general counsel of the Diocese.

23             THE COURT:  Well, let me ask you what documents

24   relating to state court actions in which the Diocese is not

25   named, what documents relating to the alleged abuse or other

Page 242

1   information that's in the possession of the Diocese and not

2   in the possession of the parish?

3            THE WITNESS:  So the largest category that I'm

4   aware of, Your Honor, is the personnel files.  So the

5   personnel files are aware to the extent that allegations or

6   complaints have been made or noted in the file or the

7   correspondence underlying those complaints.  And so it's my

8   understanding that to the extent the Diocese has a file for

9   an alleged abuser in any one of those cases, those files

10  will have to be -- those files will be sought and have to be

11  produced --

12           THE COURT:  Are you talking --

13           THE WITNESS:  -- in the state court actions.

14           THE COURT:  -- about parishes that don't have

15  copies of the personnel files to -- for priests who were

16  working in a particular parish?

17           THE WITNESS:  That is my understanding, and that

18  is among the issues that was teed up in the state court

19  motion to compel that I described earlier that was then

20  placed on pause due to the filing of the bankruptcy.

21  BY MR. BROWN:

22  Q    So those personnel files are all collected and

23  presumably in one place, correct?

24  A    As I described to His Honor earlier, that's correct.

25  They've all been collected.  And I realized that I only gave

Page 243

```
1    -- I promised His Honor a two-part answer to the question

2    of, you know, couldn't we just turn those over.  And I said

3    -- and I gave him the first half, which was the third

4    action, the privacy issues.  There's also the logistical

5    issue of determining -- because there are no -- you know, as

6    we discussed earlier in my testimony, because there is no

7    pattern discovery in these cases that would come off pause,

8    there will also be an individualized effort in each case

9    that the Diocese received third-party discovery, and those

10   requests would have to be reviewed.

11        The documents within the production that admittedly

12   have been collected, those that are responsive to those

13   specific requests in the 228 will have to be identified as

14   responsive to the specific requests that were served in that

15   case.  Then you have the redaction issue.  And so I think I

16   recall from a prior appearance that His Honor shares an

17   engineering background with me.  And so while I don't think

18   it's an exponential issue, I do think it's geometric.  I

19   think it is -- you know, the complexity is multiplied by the

20   specific documents, the specific cases, the specific

21   requests, and then the confidentiality in each case.

22        So I'm not here testifying that there are -- in every

23   case there's going to be 223 different sets of redactions on

24   each document, but there are going to be documents that have

25   to be determined to be responsive in some cases, not others.
```

Page 244

1    There will be some documents that are responsive in multiple

2    cases.  Each situation is going to have to be addressed

3    individually and will place an enormous burden on the Debtor

4    to respond to that volume of third-party discovery.

5                THE COURT:  I'm clearly not trying to give an

6    answer to the question, but I -- it may be, I'm not making

7    any rulings, that if -- for example, if the injunction were

8    not continued against the parishes, that doesn't mean that

9    the automatic stay does not apply to discovery from the

10   Diocese, nor does it mean that the stay wouldn't be modified

11   to permit discovery subject to various time limitations.

12               MR. BROWN:  I think another way of saying that,

13   Your Honor, is certainly within your -- the scope of what

14   you could do is say I'm lifting the -- I'm not going to

15   continue the injunction, but I'm going to be a gatekeeper of

16   discovery against the Diocese.

17               THE COURT:  I -- that's not an issue for today.  I

18   have at least one opinion in the case of FHFA, Federal

19   Housing Finance Authority, v. -- it came up in the

20   Residential Capital case, which I presided over.  FHFA, a

21   government-sponsored enterprise, had an action pending in

22   the Southern District Court against a group of Defendants,

23   including investment banks, the parent of ResCap Allied

24   Financial and others, and sought discovery from ResCap.

25               And I started the opinion by saying a very old

Page 245

1    statement in an old Supreme Court case.  The public has a

2    right to every man's evidence, but that doesn't mean that

3    there's unconstrained discovery from the Debtor.  And I

4    won't go into the parameters of it, but you should -- it --

5    so the fact that the Diocese might have to provide discovery

6    to state court counsel proceeding against parishes doesn't

7    mean that the Court would not regulate the time, place,

8    circumstances, and even who pays.  All of those were issues

9    addressed in the FHA -- FHFA opinion that I authored.  I'd

10   leave it at that for now.  So -- but on this point though, I

11   mean, it cuts both ways for --

12             MR. BROWN:  Understood, Your Honor.

13             THE COURT:  -- you.

14             MR. BROWN:  Understood.  And not a thing you said

15   do I take issue with.

16             THE COURT:  Okay.  But go ahead with your

17   questioning.

18   BY MR. BROWN:

19   Q    Mr. Stephens, in your testimony, I -- it's a little bit

20   stale now.  My memory doesn't last very long, but I think

21   you said since there isn't any kind of coordination order in

22   the state court litigation -- state court actions in which

23   the Diocese is not a party, that a number of things will

24   follow.  But I just want to make sure we all understand.

25   You testified earlier you don't think, based on your prior

Page 246

1  experience in getting the order in the cases where the

2  Diocese was a party, you don't think or you think it might

3  be difficult to get a coordination order, but you don't

4  really know, do you?

5      You're speculating that the parishes and state court

6  counsel and the presiding courts in those actions will not

7  ultimately come up with some type of consolidation order and

8  to streamline discovery and manage things.  You don't know.

9  That's speculation, isn't it, Mr. Stephens?

10 A    Well, what I know is that the same state court counsel

11 who filed the complaints and then objected to the Diocese

12 efforts to consolidate and coordinate are the same state

13 court counsel who continue to file complaints.  And so I'm

14 not aware of any facts that would suggest to me that they

15 would take a different approach.  Those are the facts.  I'm

16 also not aware of any individual or even a group of parishes

17 making that sort of motion.

18 Q    Well, the --

19 A    So those are the facts --

20 Q    The --

21 A    -- the facts that I have are that the only two people

22 that are left if the Diocese is out of this, one didn't make

23 the motion.  The other opposed.  So the only thing I

24 conclude from the facts that I have is that that seems very

25 unlikely.

Page 247

```
 1              THE COURT:  To all of you, you should not assume

 2     that it means that it's open season on discovery from the

 3     Diocese if the state court actions are permitted to go

 4     forward against non-debtors.

 5              MR. BROWN:  I'll leave it at that.  I think that

 6     will suffice for me.

 7     BY MR. BROWN:

 8     Q    With respect to Paragraph 43 of your testimony,

 9     similarly the Diocese Director of Insurance and Risk

10     Management William Chapin will have to direct and supervise

11     insurance noticing and coverage matters relating to any

12     resumed state court actions involving co-insureds under the

13     diocesan shared insurance program.

14              THE COURT:  They've already given notices of the

15     cases, right?

16              MR. BROWN:  I'm sorry.  What did you say, Your

17     Honor?

18              THE COURT:  You already gave notice to the

19     insurers.

20              MR. BROWN:  That's what -- exactly.

21              THE WITNESS:  That's my understanding.

22              MR. BROWN:  All notice has been given, hasn't it?

23              THE COURT:  Yes.  He just said that's his

24     understanding.

25              MR. BROWN:  Yeah.  Okay.
```

Page 248

1    BY MR. BROWN:

2    Q    So nothing remains to be done in that context, does it?

3    A    Well, the Diocese administers the insurance program and

4    the insurers, in my involvement in the cases, is they expect

5    updates.  They expect to receive pleadings.  They need to be

6    addressed if there are settlement discussions to be had.  So

7    while the -- you know, my understanding is that there -- my

8    expectation is there would be ongoing work there.

9    Q    But all the claims with respect to the SC, the state

10   court actions, have been tendered to the insurers already,

11   correct?

12   A    My understanding is those notices have gone out.

13   Q    And you don't know whether or not there any continuing

14   reporting obligations to insurers once a claim is tendered,

15   do you?

16   A    I'm not an insurance coverage lawyer, so I don't know

17   one way or the other.

18   Q    And you're not aware of any additional insurance

19   documentation that would need to be collected if the state

20   court actions were permitted to proceed, are you?

21   A    That's correct.

22   Q    And you don't know -- you don't have any knowledge as

23   to whether or not Mr. Dutian would be required to prepare

24   any additional financial information if the state court

25   actions are allowed to proceed, do you?

Page 249

1   A    To the extent that there were requests for financial

2   information, it's Mr. Dutian and his team that would be

3   responsible for leading the response.

4            THE COURT:  Do the parishes compensate the Diocese

5   where there is a services agreement to the financial and

6   accounting services?

7            THE WITNESS:  My understanding is that there is a

8   fee associated with the services, and that the services are

9   selected from a menu.  But as to the precise details or the

10  -- even the magnitude of the fee, I don't know, Your Honor.

11           THE COURT:  But your understanding is that where

12  there is a services agreement pursuant to a schedule, the

13  parish is to compensate the Diocese for performing those

14  services.

15           THE WITNESS:  That's my understanding.

16  BY MR. BROWN:

17  Q    Okay.  So Mr. Stephens, I want to ask you about

18  Exhibits A and Exhibit B to your written direct testimony.

19           MR. BROWN:  And is it possible to put up Exhibit A

20  to Mr. Stephens' testimony first?  And then we'll go to

21  Exhibit B.  Okay.  So --

22  BY MR. BROWN:

23  A    I see it on the screen, and I have it in the book in

24  front of me.

25  Q    Okay.

Page 250

```
 1                    MR. BROWN:  Your Honor, do you have --

 2                    THE COURT:  I have it on --

 3                    MR. BROWN:  Great.

 4                    THE COURT:  I have it on my screen.

 5      BY MR. BROWN:

 6      Q    Okay.  So Exhibit A summarizing your testimony is a

 7      summary of specified paragraphs from complaints in the 220

 8      some state court actions to which the Diocese is not a party

 9      that you contend state some type of diocesan involvement

10      notwithstanding the fact that it's not named a party.  Is

11      that in sum and substance what Exhibit A is?

12      A    Yes.  The right-most column of this chart is meant to

13      reflect just the text of allegations involving allegations

14      of what we phrased as diocesan involvement --

15      Q    Okay.

16      A    -- within the complaint.

17                    THE COURT:  When did you prepare Exhibit A?  I

18      assume you had others who did it.

19                    THE WITNESS:  Sure.  So there was a team of

20      associates that were working under my direction and

21      supervision.  I'm sure it will not surprise the Court to

22      know that we had existing work product on this issue prior

23      to my written direct.  However, in the course of preparing

24      for my deposition and then recognizing Your Honor's rules

25      about written direct, we then formalized this.
```

Page 251

1          And I believe we've done this correctly.  The

2     order in which these cases are presented, this should be the

3     same order in our stipulated chart of 228.  So the first

4     line in this chart should be the same in order to allow, you

5     know, the reader, whether it's the Court or anybody here, to

6     identify what we believe are the relevant allegations of

7     diocesan involvement and then tie that to the parties' --

8          THE COURT:  And it appears --

9          THE WITNESS:  -- stipulated chart.

10          THE COURT:  It appears to be an index number order

11     to (indiscernible).  I'm glancing through the first bunch of

12     them.

13          THE WITNESS:  That was certainly the intent.  I

14     don't know that our software on the original chart did a

15     perfect sorting job.  So this is meant to reflect what's I

16     believe at Docket 169.  But yes, it's also roughly index

17     order but only by first number, not chronologically.

18          MR. BROWN:  Okay.

19          THE COURT:  More than the first number.

20          THE WITNESS:  Yes.  No, what I meant -- what I was

21     referring to there was the New York index numbers end with a

22     slash and then the year.

23          THE COURT:  Yes.

24          THE WITNESS:  And so a pure sort of numerical

25     index number REPORTER: rt is not necessarily a chronological

Page 252

```
 1    sort.  That's all.

 2    BY MR. BROWN:

 3    Q    Okay.  Now, Exhibit B of your written testimony --

 4              MR. BROWN:  And if we could put that up on the

 5    screen.

 6    BY MR. BROWN:

 7    Q    Exhibit B relates to a whole different subset of

 8    complaints, does it not?

 9    A    Exhibit B summarizes pre-petition answers.  That's

10    right.

11    Q    Okay.

12    A    And so these are answers to complaints that involve the

13    Diocese.  And so they are not the complaints.  They are not

14    answers, you know, to the 228 or the 223 complaints --

15    Q    Yeah, so there's not a single --

16    A    -- that we've been discussing.

17    Q    -- complaint listed on Exhibit B that is one of the 223

18    cases that are at issue today, correct?

19    A    Well, there are no complaints on Exhibit B that are

20    answers, but those answers --

21    Q    I'm sorry.  There's not a single pleading, whether it's

22    an answer or a counterclaim, listed on Exhibit B that

23    relates to a complaint filed in any of the 223 cases that

24    are at issue today, correct?

25    A    That's right.  There are no answers in those cases to
```

Page 253

1    summarize would be another way to say that.

2    Q    So these are summaries of both answers and

3    counterclaims that were filed by certain of the non-Debtor

4    Defendants, correct?

5    A    That's right.  In --

6    Q    In pre-petition actions that name the Diocese.

7    A    That was exactly the clarification I was going to add.

8    Q    Okay.  So do you know -- can you make a distinction

9    between which of these line items are from answers and which

10   of these line items are from actual counterclaims?

11   A    So they -- what we set out to do was refer the reader

12   to the specific paragraph or heading where these could be

13   found.  So if you look at the -- if you look at Line 1, for

14   example, on my Exhibit B, Docket number 180-2, we indicate

15   the heading that the language comes from is under the

16   heading of an affirmative defense.

17   Q    I got it.

18   A    If you look at the next line, you'll see it's in the

19   answer, and then we cite the paragraph.  And so that was

20   meant to be the roadmap from the section of the pleading

21   where that language was quoted.

22   Q    Okay.  So let me just see if I...  But I guess the

23   question is some of these pleadings are answers and

24   counterclaims, right?  And if it was an answer -- this

25   doesn't make any distinction.  For example, Line Item 1.  If

Page 254

1   Line Item 1 was an answer and a counterclaim, the

2   description would just say answer, correct?

3   A    That's right.  To the -- that's right.  To the extent

4   that the answering party styled it an answer or an answer in

5   counterclaims or an answer in affirmative defense, that

6   information is not reflected here.

7   Q    Okay.  So we can't tell from looking at this chart the

8   extent to which any of these allegations by the non-Debtor

9   Defendants were actually made in an answer versus made in a

10  counterclaim, correct?

11  A    I'm not aware of separate pleadings in any of these

12  cases for answers and counterclaims.  To the extent that

13  distinction was made that I'm aware of, it would've been

14  within a heading within the pleading.

15  Q    It would've been the name of the document.  Some say

16  answers, and they -- so these would be set forth in

17  affirmative defenses for example?  Some of them?

18  A    Certainly Line 1.  That's right.  That one --

19  Q    Yeah.

20  A    -- just from the chart appears to have been styled as

21  an affirmative defense.  You know, with Number -- with Line

22  2 here, whether the answer that's reflected here in Line 2

23  at Paragraphs 28 and 29, you know, 28 refers to the

24  collateral source rule as reflected in CPLR 4545.  And then

25  our Paragraph 29 talks about the allocation and

Page 255

1    apportionment rules under CPLR Article 16.  You know,

2    whether that pleading styled those as affirmative defenses

3    or crossclaims or both, that I can't tell from this chart.

4    Q   So we'd have to go in and look to the actually

5    underlying documents if we wanted to know that.

6    A   To the extent that that was a distinction that someone

7    was interested in --

8    Q   Wanted to make, right.  Okay.

9    A   -- they would go to the underlying pleading.  That's

10   correct.

11   Q   And then turning the Paragraph 52 --

12   A   So are we going to Line 52 in Exhibit B --

13   Q   I'm sorry.  We're --

14   A   -- or are we going back to the written --

15   Q   -- moving to Paragraph 52 of your --

16           THE COURT:  Of the direct testimony.

17   BY MR. BROWN:

18   Q   -- direct testimony, and we are departing from Exhibit

19   B.

20   A   Thank you.

21   Q   Too much information.  And I think this is just a typo,

22   but I want to make sure.  Based on my review of the

23   complaints, all but six of the 228 state court actions

24   contested by the Committee were filed before the petition

25   date.  You meant to say after, correct?

Page 256

1    A    Reading that, yes.  That --

2    Q    Okay.

3    A    -- that is -- that has to be a typo.  That's correct.

4    Q    Okay.

5          MR. BROWN:  Okay, Your Honor.  I don't have

6    further questions --

7          THE COURT:  Okay.

8          MR. BROWN:  -- on this cross-examination.

9          THE COURT:  Thank you very much.

10         MR. BROWN:  Reserve my rights on recross.

11         THE COURT:  Redirect.  I'm just making sure you

12   introduce yourself again --

13         MS. DEL MEDICO:  I'm going to.

14         THE COURT:  -- for the record.

15         MS. DEL MEDICO:  Jennifer Del Medico, Jones Day

16   for the Debtor.

17              CROSS-EXAMINATION OF ERIC STEPHENS

18   BY MS. DEL MEDICO:

19   Q    Mr. Stephens, you were asked some questions about

20   Paragraph 43 of your direct testimony about the duties of

21   the Diocese Director of Insurance and Risk Management

22   William Chapin.  Do you see that?

23   A    I do, and I recall that --

24   Q    Do you recall that?

25   A    -- exchange.

Page 257

```
1    Q    Sorry.  And do you recall your testimony that Mr.

2    Chapin had that the insurers had already been noticed

3    regarding state court actions?  Do you recall that?

4    A    Yes.

5    Q    And with respect to any state court actions, Mr. Chapin

6    would also have other responsibilities, correct?

7    A    Correct.

8    Q    And what would those responsibilities be?

9    A    As the risk manager, he would certainly -- he is likely

10   a source of third-party discovery to the extent that that is

11   allowed.  He would then also have the monitoring and

12   reporting obligations that I described.

13   Q    Would he have monitoring obligations regarding -- with

14   respect to the SIRs with respect to insurance?

15   A    Yes, that would be part of his administration of the

16   overall insurance program.

17   Q    Would he be responsible for fielding questions about

18   PSIP or the other -- PSIP?

19           THE COURT:  I'm sorry.  I couldn't hear your

20   question completed.

21           MS. DEL MEDICO:  Sorry.  Let me restate that.

22   BY MS. DEL MEDICO:

23   Q    Would he have responsibility for fielding any questions

24   about, for example, about PSIP or --

25   A    Sure.
```

Page 258

1    Q     -- other insurance (indiscernible)?

2    A     Sure.  So you know, PSIP is the -- when I talk about

3    the -- administering the program, I apologize.  I should

4    break down administering the program, but yes.  So for

5    example, you know, as Mr. Porter and Mr. Moore described,

6    you know, making sure that the insurance was in place,

7    monitoring the SIRs to the extent that proceeds are coming

8    in and being disbursed, all of that falls under his

9    responsibility for the entire program and all of the co-

10   insureds.

11   Q     Mr. Stephens, do you have Exhibit -- the Committee's

12   Exhibit R?  Do you have that available to you up there?

13   A     I don't.  And my recollection was the Committee Exhibit

14   --

15   Q     The -- in the binders.

16   A     -- Committee Exhibit R was the joinders?

17   Q     Yeah.  Do you have that?

18   A     I don't know that anybody has shown it to me yet.

19   Q     Okay.

20   A     Give me one sec.  I have a big stack here.  Hang on.

21           MS. DEL MEDICO:  Okay.  Okay.  And --

22           THE COURT:  Well, let him -- if you want him to

23   look for it, he'll look for it.  Don't ask another question

24   until he finds it, okay?

25           MS. DEL MEDICO:  Makes sense.

Page 259

```
 1              MAN 4:  Yeah, let us locate it as well.

 2              MR. BROWN:  Okay.  Hang on.

 3    BY MS. DEL MEDICO:

 4    A    Yes, okay.  Among the binders here I have the Committee

 5    Exhibit Binder.  I have located Exhibit R.

 6              MS. DEL MEDICO:  Have you all located it?  Okay.

 7    BY MS. DEL MEDICO:

 8    Q    Mr. Stephens, I'd like you -- unfortunately, the

 9    exhibit doesn't have consecutive page numbers on it, but I'd

10    like you to start from the back of the exhibit and go to

11    Page --

12              THE COURT:  Use the ECF docket number and --

13              MS. DEL MEDICO:  Oh, yes.  Okay.

14              THE COURT:  -- then page of...

15    BY MS. DEL MEDICO:

16    Q    I would like you to go to ECF Page --

17              THE COURT:  First the docket number and then --

18    because here are multiple ECF --

19              MS. DEL MEDICO:  I see.  1975.

20              MR. BROWN:  Your Honor, just --

21    BY MS. DEL MEDICO:

22    A    Okay.  I'm -- I have that document.

23              MR. BROWN:  I have an objection to the extent that

24    I didn't -- this isn't part of his direct.  It's not part of

25    my cross.
```

Page 260

```
 1                    THE COURT:  Overruled.

 2    BY MS. DEL MEDICO:

 3    Q    Okay.  Mr. Stephens, do you see a signature block on

 4    that -- on this document on Page 3?

 5    A    I see the signature block of the -- if I'm looking in

 6    the right place, of the Merson firm.

 7    Q    Okay.  And do you know who Jordan Merson is?

 8    A    I do.

 9    Q    And who is Mr. Merson?

10    A    He's one of the state court counsel that we were

11    litigating with pre-petition.  And I understand that he is

12    now counsel to a number of individual Claimants in this

13    bankruptcy action.

14    Q    Okay.  And do you see on the page before that that the

15    title of this --

16                    THE COURT:  Page 2 of 3.

17    BY MS. DEL MEDICO:

18    Q    Page 2 of 3, the title is Joinder and Motion of the

19    Official Committee of Unsecured --

20                    THE COURT:  Page 1 of 3 is the joinder --

21                    MS. DEL MEDICO:  1 of 3.

22                    THE COURT:  -- is the title.

23    BY MS. DEL MEDICO:

24    Q    -- the title Joinder and Motion of the Official

25    Committee of Unsecured Creditors to Dismiss Chapter 11 Case.
```

Page 261

1    Do you see that?

2    A    I do.

3    Q    Okay.  And do you see -- if you -- sorry to make you

4    turn the page again, but if you turn the page again to the

5    page where the signature block is, do you know Mr. Merson --

6    do you know about how many cases he has in the state court

7    cases that we're talking about today?

8    A    My recollection is it was on the order of 10 to 20.

9    Q    Okay.  And I'd like to direct your attention to the

10   second to last paragraph above the signature block there.

11   And it says once the bankruptcy is dismissed, the courts on

12   Long Island have had similar cases trial-ready in as little

13   as 90 days.  Do you see that?

14   A    I do.

15   Q    And do you have any reason to believe sitting here

16   today that Mr. Merson wouldn't try to get one of his cases

17   trial ready in 90 days?

18   A    No, I don't have any facts about what he will and won't

19   do.

20   Q    And if a case is trial ready in 90 days, would that be

21   a significant burden on the Diocese?

22   A    To try and respond in order to allow the parties to get

23   one of these cases ready in 90 days would be a significant

24   burden.

25   Q    And if other Plaintiff's counsel also took the same

Page 262

1    approach and tried to get a case trial-ready in 90 days,

2    would that be an additional burden on the Diocese?

3              THE COURT:  How many judges are trying cases in

4    Long Island in Nassau County?  One.

5              MS. DEL MEDICO:  But there's --

6              THE COURT:  You expect the judge to try 10 cases

7    in one week?

8              MS. DEL MEDICO:  Mr. -- may I --

9              THE COURT:  No, I'm serious about this.

10             MS. DEL MEDICO:  I'm serious too, but may I ask a

11   question?

12             THE COURT:  I'll sustain my own objection to this

13   question.

14             MS. DEL MEDICO:  Okay.

15   BY MS. DEL MEDICO:

16   Q    There's -- is there work, Mr. Stephens, that goes into

17   getting a case trial-ready --

18   A    Yes.

19   Q    -- before it goes to trial?

20   A    Yes.

21   Q    And would doing that work in 90 days be a significant

22   burden on the Diocese?

23             THE COURT:  Well, he may dream of --

24   BY MS. DEL MEDICO:

25   A    Yes.

```
 1              THE COURT:  -- getting his case to trial in 90

 2      days, but the state court judge may have something to say

 3      about that.  And there are a whole line of cases behind it.

 4              MS. DEL MEDICO:  Understood.

 5              THE COURT:  Move on.

 6              MS. DEL MEDICO:  Okay.  That's all we have, Your

 7      Honor.

 8              THE COURT:  Thank you very much.  Any cross?

 9              MR. BROWN:  She exceeded the scope of direct and

10      cross, but so be it.  Thank you, Your Honor.

11              THE COURT:  Okay.  It's 4:42 according to my

12      watch.  Are there any housekeeping details we should take

13      care of?

14              MR. BROWN:  I'm going to -- there may be something

15      that somebody on the Zoom call from the Pachulski firm wants

16      to deal with or possibly Jones Day, but not from me.

17              THE COURT:  Okay.

18              WOMAN 1:  I'd just like to make certain that we

19      have Exhibit AA in --

20              THE COURT:  Oh.

21              WOMAN 1:  -- admitted, that that was one that

22      presented at the meeting.

23              MR. BROWN:  Exhibit AA was the case management

24      order.  We introduced it as a rebuttal exhibit.  Any

25      objections?
```

Page 264

```
1            MR. DIPOMPEO:  No objections, Your Honor..

2            THE COURT:  All right.  It's admitted.

3            (Rebuttal Exhibit AA admitted into evidence)

4            MR. BROWN:  Oh.

5            THE COURT:  Go ahead.

6            MR. BROWN:  And you know there was another exhibit

7    that I think we wanted to have introduced as a rebuttal

8    exhibit, but not for purposes of any examination for

9    purposes of (indiscernible).

10            THE COURT:  I should have said this.  Does the

11   Plaintiff rest?  It's not a trick question.

12            MR. DIPOMPEO:  Yes, I'm sorry, Your Honor.  Yes.

13   The Debtor rests.  Christopher Dipompeo --

14            THE COURT:  Okay.

15            MR. DIPOMPEO:  -- Jones Day.

16            THE COURT:  Does the Defendant rest?

17            MR. BROWN:  Except for offering in evidence the

18   disclosure statement as Exhibit BB.

19            WOMAN 3:  That would be the Debtor's disclosure

20   statement.

21            MR. BROWN:  The Debtor's disclosure statement as

22   Exhibit BB.

23            THE COURT:  What's the relevance of the disclosure

24   statement?

25            MR. BROWN:  The relevance is rebuttal to the
```

Page 265

1    burden issue.  Because --

2                THE COURT:  I don't follow.

3                MR. BROWN:  There is a recitation in it about the

4    four law firms and four other professional firms that the

5    Debtor has retained to assist it in its restructuring

6    efforts, and it mitigates burden.  Because they've got a lot

7    of people.  They got an army of highly paid professionals --

8                THE COURT:  Are there any objections to --

9                MR. BROWN:  -- working on the (indiscernible).

10               THE COURT:  -- offer of Exhibit BB?

11               MR. DIPOMPEO:  No objections, Your Honor.

12               THE COURT:  Then it's admitted.

13               (Rebuttal Exhibit BB admitted into evidence)

14               MR. BROWN:  For what it's worth.

15               THE COURT:  For what it's worth.  Okay.  So both

16   sides have rested.  The exhibits are in evidence.  Certainly

17   can make your argument about whether any portions of the

18   direct testimony should be stricken.  Those rights are

19   reserved.  More may go to the weight of what should be given

20   to it.  How long do each of you believe you want for closing

21   arguments?  So really we start -- it's Plaintiff, Defendant,

22   reply.  So give me the aggregate time, and then I'll let you

23   reserve a portion of that total time for your rebuttal.

24               MR. DIPOMPEO:  Sure.  So I think as an estimate,

25   Your Honor -- Christopher Dipompeo for the Debtor.  I would

Page 266

```
 1   think an hour --

 2              THE COURT:  Okay.

 3              MR. DIPOMPEO:  -- would be sufficient.

 4              THE COURT:  Total?

 5              MR. DIPOMPEO:  Total.

 6              THE COURT:  Okay.  And you would reserve how much

 7   of that for --

 8              MR. DIPOMPEO:  Ten minutes, Your Honor.

 9              THE COURT:  Okay.  All right.

10              MR. BROWN:  We'll go with that.

11              THE COURT:  Total of an hour.  Okay.

12              MR. BROWN:  Hour.

13              THE COURT:  With those estimates, I know I

14   scheduled the trial for 9 a.m., but if you're both willing

15   to -- now I ask questions, so I -- you know, that may

16   stretch it out a little bit.  We could -- if you wanted, we

17   could either start at 9 or at 10.  I schedule trials for 9

18   because I want to make sure, if need be, we have a full

19   trial day.  It would be my expectation to finish by lunch.

20              MR. BROWN:  I think 10 would be my preference,

21   Your Honor.

22              MR. NASATIR:  Your Honor, Ian Nasatir.  The West

23   Coast people would be probably grateful if you made it at

24   10.

25              THE COURT:  I love the fact that you have West
```

Page 267

1    Coast people, but that's not guiding me.

2              MR. DIPOMPEO:  We have no objection to that, Your

3    Honor.

4              THE COURT:  All right.  So we'll start at 10.

5              MR. BROWN:  Your Honor, and the one hour, is that

6    with or without time --

7              THE COURT:  Well, we'll see.

8              MR. BROWN:  -- for your questions.

9              THE COURT:  We'll see.  We'll see.

10             MR. GEREMIA:  One housekeeping issue, Your Honor.

11             THE COURT:  Identify yourself for the record.

12             MR. GEREMIA:  Todd Geremia for Jones Day for the

13   Debtor.  I don't know whether Your Honor's aware, but

14   Magistrate Judge Cave has set a scheduling call on Friday,

15   which we will all attend.  Yesterday Mr. Cornfeld -- we hard

16   Your Honor's encouragement at the last proceeding, called my

17   partner Eric Stephens.  And the Committee has agreed to

18   adjourn the motion to dismiss, and we have agreed to discuss

19   any future scheduling --

20             THE COURT:  Okay.

21             MR. GEREMIA:  -- at a later date for the date of

22   the hearing.

23             THE COURT:  I'm glad to hear that.  Obviously I

24   wasn't ordering it.  I wanted you to discuss it.  I'm glad

25   that you agreed on that.  I would -- you know, I've had one

Page 268

1    telephone conversation with Magistrate Judge Cave.  We have

2    not discussed the merits of the action in any way.  Just so

3    it's clear, I do not get involved in -- I don't want to know

4    what goes on in mediation, and we just had a very pleasant

5    conversation.  I was glad she was onboard.

6              I entered this notice of -- you know, judicial

7    notice document that kept going in the record.  That was

8    really the -- most of what was discussed.  And so if she has

9    questions, Your Honor, wanting access to documents or

10   something, she can talk to one of my law clerks and get

11   those documents, but that's (indiscernible).

12             MR. GEREMIA:  And we thank Your Honor for all the

13   work behind the scenes and phone calls.  We also understand

14   that the work that's at issue with the objections.

15             THE COURT:  Could you get serious about this --

16             MR. GEREMIA:  Thank you.

17             THE COURT:  -- mediation and get this case solved?

18             MR. GEREMIA:  We will.

19             THE COURT:  Okay.

20             MR. GEREMIA:  We are.

21             THE COURT:  I'll see you tomorrow morning at

22   10:00.

23             MR. GEREMIA:  Thank you, Judge.

24             THE COURT:  Thank you for --

25             MR. BROWN:  Thank you, Your Honor.

Page 269

1          MS. DINE:  Your Honor, just one note?

2          THE COURT:  I'm sorry.  Go ahead.

3          MS. DINE:  Your Honor --

4          THE COURT:  Excuse me for standing.  It's because

5     my back's bothering me.

6          MS. DINE:  No, no, no.  Karen Dine from Pachulski

7     Stang Ziehl and Jones on behalf of the Committee.  I rise in

8     the Committee's capacity as a coordinator of the claims

9     objection issues.  And we noted that today there were many

10    questions, and there was some testimony that went to issues

11    of notice and all.  And we would just respectfully request

12    on behalf of the state court lawyers representing Claimants

13    that to the extent that such testimony is influencing Your

14    Honor's decisions on those objections, particularly in a way

15    that may be negative to the Claimants, that those state

16    court counsel be offered an opportunity to respond.

17         THE COURT:  I understand your position.  Obviously

18    -- maybe my question had something to do with some of the

19    pending claim objections.  Maybe not.  Ms. Dine, the last I

20    heard on the subject of notice, potentially would bear on

21    notice is that the personnel files, which have been produced

22    to the Committee, have not been produced to the state court

23    counsel.  Is that correct?

24         MS. DINE:  That is correct, but the only counsel

25    that would've had access to those files would be state court

Page 270

1    counsel.  But the clients on the --

2            THE COURT:  Who represent Committee members.

3            MS. DINE:  -- Committee members but not otherwise

4    generally available.

5            THE COURT:  Okay.

6            MS. DINE:  Thank you, Your Honor.

7            THE COURT:  It's a little more clearer.  Thank you

8    very much.  I'll see you all tomorrow morning.

9            MR. BROWN:  Thank you, Judge.

10           (Whereupon these proceedings were concluded at

11    4:49 PM)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 271

1                          C E R T I F I C A T I O N

2

3          I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6    *[signature: Sonya M. Ledanski Hyde]*

7

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  April 21, 2023

[& - 179]                                                                 Page 1

| & | | | |
|---|---|---|---|

**&**   2:5 4:10
149:21,23
150:14

**0**

**05**   3:5

**1**

**1**   15:22 17:16
41:11 42:23
47:16 48:8
62:10,12 72:20
73:6 78:5
103:10,13,15
103:16,20
113:13 152:9
218:13 219:25
223:8 226:1
253:13,25
254:1,18
260:20,21
263:18,21
**10**   7:9 19:12,24
23:8 61:18
66:2,6 172:11
210:7 219:3
221:5 223:22
226:4,19,23
228:8 261:8
262:6 266:17
266:20,24
267:4
**100**   34:1,19
89:20 91:12
92:7,12
**100,000**   138:15
138:19

**10004**   1:21
**10017**   4:13
**1006**   17:16
57:18
**101**   112:6
**103**   188:10
**1031**   38:2
56:17 58:14
**10350.1**   223:22
**10350.1.**   223:5
**10350.10**
220:23
**10350.3**   223:7
**10377.11**   226:4
**10377.3**   226:2
**104**   187:14,15
188:10,22
**104.3011**
219:10
**104.52.10**
226:23
**104.52.3**
226:22
**10430.10**   219:3
**10430.3.**   218:6
218:15
**10435**   219:22
**10435.10**   220:2
**10435.3.**   220:1
**10452**   226:20
**105**   8:20 37:8
37:14 38:3
43:2 56:4,15
56:22 59:5
174:9
**10:00**   268:22

**10:20**   65:10
**10th**   198:14
**11**   12:21 21:22
27:19 28:6,8
28:12,20 29:10
29:25 87:2
112:18 138:25
150:16 151:9
151:11 152:9
164:17 165:5
169:6,19,21,24
170:25 172:14
178:11 181:19
185:22 189:9
189:14 190:5
200:11,17
201:21 205:21
209:16 227:14
260:25
**11501**   271:23
**12**   15:8,17
52:20,25
105:11,16,17
105:18,24
178:3
**120**   38:13
58:12 67:6
68:14,16 72:14
80:20 81:8
161:7,21,22
162:4
**12151**   271:6
**121st**   38:17
39:4,5
**126**   3:6
**12:00**   143:25

**13**   57:17
**135**   3:6 193:18
**137**   43:22
**13th**   13:18
**14**   20:4 57:17
62:12 102:14
**14.1**   111:16
112:18
**14.1.**   112:22
**147**   3:6
**148**   3:6
**149**   7:5
**15**   151:24
180:7
**150**   49:15
**150,000**   47:11
**153**   7:5
**157**   3:6
**158**   3:6
**16**   46:23 62:10
62:19 121:3,13
121:14,15,24
122:12 181:2
255:1
**160,000**   62:20
**161**   3:6
**168**   3:6
**169**   17:15
251:16
**169-1**   104:21
**16th**   41:17
60:15
**17**   15:5
**173**   21:15 53:6
**177**   3:7
**179**   3:7

**18**  202:8,10
**180**  137:4
   196:5 207:8
**180-2**  253:14
**181**  97:25
   121:3 137:3,5
   137:6
**184**  7:5
**19**  1:23 3:8
**191**  7:5
**192**  3:7
**1950**  51:6
**1956**  108:12
   110:6
**1957**  51:17
**1959**  223:23
**196**  7:6
**1965**  223:23
**1970**  51:17
   52:17
**1975**  259:19
**1976**  52:17
   54:5 108:12
   110:6
**1980**  130:16
**1985**  130:16
**1986**  16:2
   52:19 54:5
**1:30**  146:23
   147:1,2 148:23
**1:30's**  146:25
**1st**  41:19 106:2
   151:10

**2**

**2**  107:1,1,7
   111:17 146:23
   213:25 235:6,9

254:22,22
   260:16,18
**2.5**  130:24
**20**  3:9 261:8
**20-01226**  1:4
   3:1
**20-12345**  1:3
**200**  11:13
   40:12 50:12,13
   61:6,8,14
   171:7 172:25
**200,000**  136:23
   137:12 138:14
**20001**  4:6
**2004**  212:8
**2006**  95:13,25
**2007**  123:18
**2015**  62:11
**2019**  150:2,4
   158:7,12
   196:14,18,21
   213:7
**2020**  18:10
   151:10 152:9
**2021**  13:4
**2022**  110:24
   111:14 113:15
   202:8
**2023**  1:23 3:9
   3:10 62:7,19
   152:17,24
   271:25
**207/256**  7:6
**21**  3:9 143:24
   271:25
**22**  26:17,21
   31:14 136:19

137:1 138:1
**220**  215:2
   250:7
**223**  15:18
   16:11 17:2
   18:14 21:16
   22:10 26:20
   32:3 42:15
   43:22 84:3
   209:18,18
   214:19 215:9
   228:19 241:17
   241:20 243:23
   252:14,17,23
**226**  204:18
   205:16
**228**  14:17 15:5
   21:16 215:8
   227:19 243:13
   251:3 252:14
   255:23
**22nd**  13:4
**23**  17:2
**230**  84:3
**25**  47:2,17,22
   48:19,25 49:18
   50:5 76:12,18
   77:9 78:6
   151:22
**26**  21:4
**264**  7:10
**265**  7:11
**28**  254:23,23
**29**  54:14
   254:23,25

**3**

**3**  42:23 48:16
   48:17 49:2
   50:7,16 78:10
   118:15 154:16
   205:21 225:14
   236:7,9 260:4
   260:16,18,20
   260:21 264:19
**30,000**  204:19
**300**  49:15,17
   271:22
**300,000**  49:13
   49:23,24 50:17
**31**  60:23 72:23
   113:15
**31st**  13:25
   39:15,19,21
   40:8 60:5
**320**  1:15 3:2
**330**  271:21
**34**  74:6 212:22
   213:17
**34th**  4:12
**362**  3:5 8:20
   42:23
**365**  67:10
**37**  31:15,16
**38**  227:10,12
**39**  227:18

**4**

**4**  47:1,7,17
   48:7 49:17
   50:4 52:20,25
   76:12 77:8
   78:4 101:18

[4 - abuse]                                                                 Page 3

102:12,13,14
118:4,14,16,18
119:3,3,4
158:4 228:8
259:1
**40**   193:11
198:18
**400094/2021**
26:5
**401**   67:10
**41**   238:2
**410**   67:10
**42**   239:2 241:1
**43**   21:8 239:2
247:8 256:20
**44**   239:2
**45**   40:7 47:11
54:8 60:9,19
60:21,24 62:3
67:6 68:12
72:13 81:8
**4545**   254:24
**490**   14:14
**4:00**   233:8,21
**4:42**   263:11
**4:49**   270:11

**5**

**5**   22:2,20,21,23
54:8 61:21
130:23 163:19
**50**   34:5 130:17
130:23 198:4
199:17 226:18
226:19
**50-50**   89:18
**500,000**   132:11
142:7

**51**   4:5
**52**   255:11,12
255:15
**57**   61:21
**59**   13:6 30:5
210:9
**5:25**   147:6

**6**

**6**   18:25 19:1
26:10 106:4,5
106:10 107:7
**6-1**   106:24
**60**   62:3 198:4
199:17 226:18
226:19
**64**   51:24
**65**   56:17
**66**   185:9
192:10 193:11
193:16,16,17
**6th**   152:17,24

**7**

**7**   121:25 169:4
**700,000**   49:25
**73**   52:25 53:3
**75**   49:19 50:6
76:13
**768**   115:7
**780**   4:12

**8**

**8**   19:2,2 23:2
171:3,18
**80**   62:21
**83**   62:9
**85**   62:11

**9**

**9**   19:9,10 53:13
174:11 176:4
266:14,17,17
**90**   38:5,5,7,9
58:14 62:15
197:9 261:13
261:17,20,23
262:1,21 263:1
**900148/2021**
22:10
**9058**   18:10
**94**   7:4
**98**   7:4 229:22
**99**   43:23 54:13
**9:00**   1:24 3:10
**9th**   99:11
198:14

**a**

**a.m.**   266:14
**a.w.**   4:16
**aa**   7:10 213:11
217:4,5 263:19
263:23 264:3
**ability**   35:20
53:11 81:23
109:9,10,11
163:7 180:11
188:15,19
189:3 191:17
219:16 220:9
221:8 222:3
223:24 226:8
227:1 237:17
240:21

**able**   10:12
14:10 15:7
22:16 24:12
27:18 48:22
49:23 60:11
63:5 66:3
111:22 138:5
141:18 162:23
174:7,23
180:10 199:22
228:22 229:3
233:18
**above**   45:12
108:24 119:23
261:10
**absence**   47:19
73:22
**absolutely**
38:19 50:11
59:10 93:10
97:13 135:18
**abuse**   16:2
17:21 24:1
26:1 27:8
28:18,22 30:22
30:24 32:1,5
34:1 44:4
45:10 58:19,25
59:7 61:11
63:7 77:7
101:23 102:18
109:8,17
119:16 126:15
138:4 148:1,4
154:19 200:19
201:4 205:10
205:23 216:1,3

[abuse - activity]                                                    Page 4

| | | | |
|---|---|---|---|
| 216:6 217:13 | **accrued** 126:1 | 244:21 260:13 | 185:25 186:17 |
| 232:17 241:25 | 126:3 128:7 | 268:2 | 188:4,13,20 |
| **abused** 125:24 | **accumulate** | **actions** 11:13 | 189:4,17,21 |
| 125:24 136:11 | 127:21,23 | 11:20 12:16 | 190:7 191:19 |
| 205:11 | **accurate** 271:4 | 13:4 14:13,15 | 197:8,12,13 |
| **abuser** 24:1 | **accurately** | 14:17,17 15:19 | 208:2 209:16 |
| 27:8 35:16 | 114:4,8 | 17:11 22:2 | 209:18,19,22 |
| 147:25 199:19 | **accusation** | 27:6 28:10 | 210:1,14 213:3 |
| 209:3 215:25 | 25:25 90:22 | 30:8 42:15 | 213:22 214:5 |
| 235:17,18 | **accused** 28:23 | 53:21 66:14 | 215:14 217:2 |
| 237:13 242:9 | 200:19,22 | 70:25 73:14 | 228:18 231:10 |
| **abuser's** | 215:23 216:9 | 75:7 80:8 | 232:18,20 |
| 148:12 | 216:20 | 87:25 88:15,21 | 238:4,6,14 |
| **abusers** 28:23 | **achelais** 6:25 | 89:4 91:14 | 239:6,8,13 |
| 125:24 186:3 | **achieve** 213:22 | 117:15 134:5 | 241:8,10,11,13 |
| 215:17,21 | 239:9 | 155:7,11,18 | 241:14,24 |
| 216:10 230:7 | **acic** 114:25 | 156:7,9,15 | 242:13 245:22 |
| 232:10 234:3,7 | **acknowledge** | 158:10,16 | 246:6 247:3,12 |
| 234:10 235:12 | 82:24 | 159:15 162:25 | 248:10,20,25 |
| 237:7 | **acknowledged** | 163:9,14,21 | 250:8 253:6 |
| **abusers'** | 59:1 | 164:7,15,21,25 | 255:23 257:3,5 |
| 208:12 | **acknowledge...** | 165:10,17 | **active** 12:5 |
| **abusive** 26:23 | 65:1 | 167:6,14 169:5 | 117:22,23 |
| **accept** 71:2,8 | **act** 8:23 150:11 | 169:13,16,22 | 158:8 |
| 74:5,10 | 158:11 196:19 | 170:1 171:10 | **actively** 164:2 |
| **acceptable** | 197:1 219:15 | 171:16 172:3,8 | 180:16 |
| 229:16 230:21 | 220:8 221:7 | 172:12,25 | **activities** 19:5 |
| **accepted** 70:15 | 226:7 | 173:13,18 | 156:9,17 157:5 |
| **access** 50:17 | **acting** 196:12 | 174:1,6,17 | 157:5 158:9 |
| 231:24 268:9 | **action** 17:20 | 175:7 176:13 | 161:13 162:15 |
| 269:25 | 24:7 27:2 | 177:3,7,14,24 | 169:18 174:24 |
| **accomplish** | 31:19,20 46:6 | 178:4,13,18 | 177:18 185:12 |
| 147:11 190:8 | 50:9 75:15 | 179:10,19 | 185:24 190:22 |
| **account** 118:2 | 77:2 86:12 | 180:1,17,25 | **activity** 169:20 |
| **accounting** | 134:11 167:20 | 181:3,11,16 | 171:6,8 173:15 |
| 113:13 117:1 | 173:6 178:24 | 182:24 184:8 | 183:10,14 |
| 249:6 | 181:18 243:4 | 184:11 185:2 | 184:4,12 185:6 |

185:18,20
186:20 202:17
240:12,13
**acts** 148:13
**actual** 18:9
20:21 21:18
67:2 84:21
110:2 177:12
218:4 239:4
253:10
**actually** 14:20
16:7 18:9
19:10 20:15,24
21:19 22:20
24:19 26:5,17
29:2 31:10
44:11 49:10
50:25 52:16
53:11 57:8
58:1 62:17
85:23 86:6
104:7 114:5
127:7 129:4
160:5 162:9
177:22,23
188:11 189:10
189:25 192:5,6
193:16 254:9
255:4
**actuaries** 117:1
**adams** 4:20
235:2
**add** 190:12
214:13 253:7
**added** 173:15
189:15

**addition**
185:10 187:6
190:4
**additional** 15:3
140:9 146:15
167:4,12
186:20 189:15
204:25 205:3
209:23 210:2
241:21 248:18
248:24 262:2
**additive** 29:6
**address** 28:2
42:7 56:11,13
56:20 59:11
63:20 91:24
97:17 145:23
151:6 175:23
207:13
**addressed**
25:10,15,21
44:17 63:10
75:13 82:16,17
147:20 148:1
198:22 244:2
245:9 248:6
**addressing**
188:18 201:13
**adjourn**
267:18
**adjudicated**
148:1 203:9
228:22
**adjusted**
113:16
**administer**
157:11

**administered**
154:23
**administering**
258:3,4
**administers**
248:3
**administration**
95:23 169:9
189:3,21
257:15
**administrative**
151:12 184:25
185:4 191:18
192:10,17
193:4,8 194:1
194:7
**administrators**
148:4
**admissible**
144:25
**admission**
64:17
**admit** 146:1
**admitted** 10:4
10:11 104:5
144:5,22,24
146:20 153:6
153:13 207:11
263:21 264:2,3
265:12,13
**admittedly**
243:11
**admitting** 10:2
97:7 145:3
146:7
**adopt** 117:3

**adv** 1:4 106:8
106:10
**advance** 10:24
11:1
**adversarial**
209:10
**adversary** 3:1
13:6 106:7
152:14 210:10
**advisor** 150:13
**advisory** 95:17
**advocacy**
100:14
**affect** 82:3
**affected** 109:3
**affecting**
172:18
**affiliated** 79:22
154:22
**affiliates** 11:17
22:25 26:15
62:10,12 63:20
65:3 172:22
209:8
**affirm** 94:10
149:8 195:20
**affirmative**
253:16 254:5
254:17,21
255:2
**affirmatively**
82:12
**afternoon**
144:18 146:2
148:23 149:3
149:18,19
153:19 196:10

[afternoon - allow]                                                                                      Page 6

196:11 207:19
207:20
**aggregate**
44:20,21,24
51:5,17 52:15
52:16,17,18,19
52:25 53:21
54:7,15 55:21
55:22 92:7
117:10 131:6,9
131:13,15
132:21 138:17
139:1,10,11
142:7 265:22
**aggregating**
131:9,10
**ago**   28:15
46:14 116:4
174:3 221:19
**agree**   27:20
39:13 40:7
46:1,6 55:20
59:19 63:5
78:6,10,17
79:1,12 83:7
87:1,5,7,8,14
93:18 103:19
108:1 109:2,5
109:21 123:4
125:2,9 130:16
134:1,17
135:10,13,19
136:10 174:20
205:25 215:24
218:24 234:4
240:11

**agreed**   13:2,17
58:15 59:23
64:4 70:20,22
93:11 104:15
134:18 204:8
204:11 205:2
210:12 267:17
267:18,25
**agreement**
30:12 37:20
85:22 86:7,8
138:18,20
139:1,3 144:16
194:7 210:11
237:19 249:5
249:12
**agreement's**
85:25
**agreements**
84:19 164:8
185:5 192:11
192:18,22
193:5,9,13
194:2,4
**agrees**   30:7
60:22 86:12
**ahead**   8:9,17
8:17 10:15
29:9 31:4,7,13
37:5 41:21
42:8 43:8,16
48:14 50:22
51:13,13 65:10
66:7 78:22
89:8 93:9
94:21 97:18
98:4,19,21

106:16 107:13
107:16,19,19
110:9 113:6
114:8 117:11
117:11 119:10
120:11 130:10
130:13 137:7,8
152:6 158:2
161:1 166:23
171:1 176:2
187:12 202:1
206:9 222:14
224:4 225:2,9
225:11 230:10
236:17 245:16
264:5 269:2
**al**   1:15 3:3
**alan**   226:3,5
**allegation**   23:3
26:14,19,21
31:22
**allegations**
12:3 19:11
20:7,11,12
21:6 23:17,21
25:5 36:23
37:7,9 45:3
155:1 157:15
203:9 206:25
224:15 242:5
250:13,13
251:6 254:8
**allege**   11:24
20:24 32:21
45:3
**alleged**   16:2
17:12,20 18:24

19:13 23:10
24:1,4 26:1
27:8 28:17,22
30:24 32:1,5
44:4 148:12
154:20 156:4
186:3 201:4
205:10 208:11
209:3 229:15
230:6 234:3,7
234:9 235:12
235:16 241:25
242:9
**allegedly**
205:11
**alleges**   19:24
**alleging**   154:18
**allen**   6:7
**allied**   244:23
**allocate**   163:11
163:13 180:20
**allocated**   48:25
130:6 159:2,23
161:6 162:11
162:15 176:22
177:2
**allocates**   47:14
163:12
**allocation**   14:4
254:25
**allocations**
188:23
**allow**   22:4
25:12 39:6
40:16 61:20
81:24 87:23
93:24 113:25

[allow - applicable]

133:7 163:20
192:11,13
201:6 251:4
261:22
**allowance**
37:10 78:19
87:11
**allowed** 22:2
33:21 34:4
50:16 167:7,15
172:13 177:14
177:24 178:4
179:19 181:4
182:24 190:22
209:19 236:1
248:25 257:11
**allowing** 32:9
82:2
**allows** 12:23
**alluded** 79:20
**alongside**
199:23
**alternate**
122:22
**alternatives**
150:10
**alvarez** 149:21
149:23 150:14
190:3
**amala** 4:21
**ammirati**
206:23
**amount** 48:22
62:11,14 63:25
90:16 126:23
132:10 138:20
158:13 159:4

159:12 171:6
185:6,23
238:12
**amounts** 53:2
62:13,17
126:13,17
127:20 128:1,6
128:7 129:22
130:5 139:6
171:14 172:25
**analysis** 82:1
92:2 101:9
117:13,16
132:24
**analyze** 171:11
172:19
**analyzing** 43:5
81:13
**anderson** 4:22
22:15,15 26:13
**andrew** 5:2,22
**anew** 164:19
**angela** 6:10
**angry** 78:23
**ann** 5:11
**annual** 110:24
111:14 115:2
**answer** 12:19
17:1 24:21
27:10,18 28:24
31:6 41:21
42:8,12 46:20
55:17 72:18,25
74:2,4 75:12
75:17 76:20
83:21 89:16,25
123:1 124:21

141:23 156:18
161:5,8 162:3
168:18,21
173:21 174:18
175:10,17,18
175:19 179:3
182:17 183:12
183:15 184:14
201:7 205:25
208:21 210:16
210:23 219:19
219:21 221:6
221:14,19
223:21 234:11
234:14,21
235:3 243:1
244:6 252:22
253:19,24
254:1,2,4,4,5,9
254:22
**answered**
122:25 175:20
**answering**
254:4
**answers** 24:23
57:20 66:13,17
73:15 74:18,18
155:15 220:13
221:24 252:9
252:12,14,20
252:20,25
253:2,9,23
254:12,16
**anticipate** 3:7
**anticipated**
107:18 179:18

**anybody** 87:4
148:17 173:24
251:5 258:18
**anymore** 18:4
18:5
**anyone's** 125:5
**anyway** 25:2
42:24 61:3
74:22 85:19
90:6 118:24
**apologies**
235:19 236:25
**apologize** 11:2
42:4 104:13
107:17 203:23
221:18,22
225:21 258:3
**appeal** 86:14
**appeals** 198:19
**appear** 3:13
229:21,25
**appearance**
243:16
**appearing**
196:24
**appears** 221:24
224:10 251:8
251:10 254:20
**appendix** 30:6
**apples** 22:16
22:16
**applicable**
23:22 37:15,17
43:21 68:2
143:14 214:11
214:14 229:14

[application - asking]                                                              Page 8

**application**
40:24 75:2
136:4
**applied** 46:10
83:18
**applies** 59:4
76:9,11 214:8
**apply** 214:16
244:9
**appoint** 19:7
19:11 197:12
**appointed**
197:14
**appointment**
39:12
**apportionment**
33:6 46:22
48:2 49:11
255:1
**appreciate**
64:10 99:5
228:5
**apprised**
182:15
**approach**
10:22 98:15,25
99:4 154:24
213:13 230:24
246:15 262:1
**appropriate**
13:13 40:16,21
42:7 43:2,7
46:2,6 56:12
230:18
**approval** 172:3
199:6

**approve**
171:12 197:25
**approved**
39:15 58:7
**approximate**
63:6
**approximately**
150:1 171:7
192:10
**april** 1:23 3:8,9
3:9 152:16,24
271:25
**arbitrations**
70:12,18
**archdiocese**
116:2 142:10
**archivist**
206:23
**area** 155:21
**aren't** 67:18
82:9 125:18
126:20 192:22
**arguably** 26:16
**argue** 75:24
76:22 78:17
82:4 87:2,10
203:4
**argued** 32:25
**arguing** 55:13
63:11 79:12
97:8 235:7
**argument** 8:24
11:7 23:22
36:7,12 42:21
43:4,7 44:11
45:22 58:6
70:15 76:9

83:16 92:11
265:17
**arguments**
41:8 57:3 59:3
63:21 70:21
84:6,7,8,8
86:20 89:1
100:21 118:11
147:7 265:21
**arielle** 6:24
**arising** 21:2
23:15 83:24,24
**ark** 1:15 3:2
**arms** 150:25
**army** 265:7
**arose** 126:14
198:9
**arrangement**
194:21
**arranging**
160:18
**arrow** 209:10
**arrowood** 52:5
53:17 84:25
**arroowood's**
53:12 55:25
**arrowwood**
53:15,24 85:3
90:1,2 108:1,6
109:3,6,18,22
110:5,5,12,15
110:22,24
111:14 113:9
114:12,19
115:3,17,21,24
116:4,8,22
118:5,20,22,24

135:15,20,22
**arrowwood's**
115:21
**arthur** 119:21
**article** 46:23
255:1
**asbestos**
204:20
**asia** 5:3
**aside** 67:2
72:16 76:3
144:23
**asked** 34:16
45:8 46:3,13
46:19 62:4
63:10 64:3,9
68:11,17 73:3
87:17 88:10
91:24 114:8
124:19 129:25
130:4,6 147:17
167:2,9,24,25
168:14,16
173:23 174:3
175:13 178:16
179:2 182:14
199:11 201:19
222:21 237:6
256:19
**asking** 30:18
31:2 39:2,23
52:22 60:13
69:9,10 99:8
115:8,13 117:3
127:2 128:17
128:23 132:2
133:5,5 139:12

140:5 155:3
162:10,10,11
162:12 167:16
170:15 188:3
188:12 191:6
215:7
**asks** 218:18
**aspect** 160:20
160:20 185:17
**aspects** 160:15
189:8
**assemble**
196:23
**assert** 35:20
46:8 48:18
79:3,13
**asserted** 35:10
36:17 44:25
63:8
**asserts** 33:20
35:17 136:10
**assess** 117:1
**assets** 33:22,23
45:21 48:17
115:7 151:16
169:11 181:18
**assigned** 24:16
90:6 198:25
**assignment**
12:1 199:21
200:2,5 215:16
**assist** 95:13
150:8,9 265:5
**assistance**
99:18 100:4
103:3 163:7

**assisted** 99:20
100:5 209:12
**assisting** 95:22
95:23 100:16
151:15
**assists** 191:10
**associated**
101:5 179:18
249:8
**associates**
250:20
**assume** 33:17
47:6,12,25
76:8,10 77:25
88:12 247:1
250:18
**assumed** 83:22
193:9
**assuming** 34:3
81:9 97:4
135:16 140:10
147:6
**assumption**
29:25 93:11
**assured** 90:5,6
**assureds** 135:7
135:11
**attach** 157:24
**attached** 10:1
57:15 102:25
103:19 104:16
105:23 137:2
**attachment**
107:3
**attained**
168:17

**attempt** 40:18
**attempts**
138:24
**attend** 186:15
186:17 188:4
267:15
**attention** 40:14
154:16 158:13
159:5,13
179:14 222:25
261:9
**attorney** 166:7
**attorneys** 4:4
4:11 181:24
182:3,4,16
**attractions**
16:1
**attributable**
78:10
**audible** 210:23
**audibly** 210:16
**audience**
236:16
**august** 68:16
158:12
**authored** 245:9
**authority**
19:25 23:5,12
244:19
**authorize**
113:17
**automated**
233:23
**automatic**
21:25 53:5
59:3 75:2,8
77:16 138:2

244:9
**automatically**
42:24
**available** 45:7
53:3 54:12
101:15 110:13
121:6 136:13
137:15 139:1,3
139:6,13 140:4
211:18 229:23
234:15 236:13
258:12 270:4
**avenue** 4:5,12
**average** 62:21
62:22 130:17
**avoid** 213:22
**award** 102:17
109:8,12 110:1
183:2,4
**awarded**
101:23 109:17
119:16
**awards** 125:6
181:15
**aware** 96:22
117:18 122:20
132:13,14
136:5 172:6,10
191:12 194:9
208:6 209:21
209:23 214:22
216:5 232:25
233:1 240:2,5
242:4,5 246:14
246:16 248:18
254:11,13
267:13

| **b** | **bandied** 68:14 | 203:2 204:3 | 106:5 188:10 |
|---|---|---|---|
| **b** 2:1 5:7 6:22 | **bandying** | 224:15 238:3 | **begins** 188:9 |
| 21:15 53:7 | 68:13 | 238:11 239:19 | **begun** 198:7 |
| 57:15 61:21 | **bank** 38:12 | 245:25 255:22 | 200:6 |
| 137:2 249:18 | **bankruptcies** | **basic** 11:3 | **behalf** 79:1 |
| 249:21 252:3,7 | 199:6 | 203:7 205:2 | 164:12 196:25 |
| 252:9,17,19,22 | **bankruptcy** | **basis** 39:3 58:6 | 237:2 269:7,12 |
| 253:14 255:12 | 1:1,19 2:3 3:5 | 100:20 117:14 | **belabor** 11:11 |
| 255:19 | 8:21 12:11 | 117:21 131:1,2 | **belief** 169:13 |
| **b.r.** 67:10 | 17:14 33:24 | 133:24 135:16 | 173:14 |
| **back** 18:9,18 | 35:18 42:23 | 135:21 139:7 | **believe** 12:18 |
| 18:20 30:9 | 44:22 47:19 | 158:13 159:4 | 14:1,21 16:22 |
| 38:17 39:4 | 63:15 67:9 | 159:12 163:12 | 22:16 27:13 |
| 51:15 56:5,16 | 75:14 77:20,25 | 165:3,23 | 29:21,22 31:11 |
| 65:22 81:18 | 79:21 151:12 | 169:12 190:2 | 51:25 52:4,5,6 |
| 88:10 89:22,23 | 156:11 157:19 | 206:13 212:20 | 52:10 53:6 |
| 90:8 104:15 | 158:8 180:18 | 238:14 239:7 | 78:12,16,24 |
| 105:23 119:12 | 196:22 198:12 | **bat** 67:23 | 79:1 96:25 |
| 131:20 132:16 | 198:13 199:14 | **bates** 218:7,9 | 118:21,21 |
| 149:1 150:24 | 202:5,18 | 218:10,12,14 | 124:9 127:14 |
| 161:25 195:15 | 203:22 207:22 | 232:17 | 128:16 129:11 |
| 198:21 212:19 | 215:18 231:5 | **bathroom** | 135:15 144:23 |
| 229:12 232:12 | 240:19 242:20 | 65:15 | 145:12 146:19 |
| 233:25 241:20 | 260:13 261:11 | **batting** 153:24 | 147:4 160:9 |
| 255:14 259:10 | **banks** 244:23 | **battleground** | 168:4 174:7 |
| **background** | **bar** 83:4 104:6 | 83:17 | 175:14 187:8 |
| 93:4,22 210:21 | **bars** 109:24 | **bb** 7:11 264:18 | 198:17 199:6 |
| 243:17 | 138:2 | 264:22 265:10 | 202:7 212:20 |
| **back's** 269:5 | **based** 11:25 | 265:13 | 213:15 217:3 |
| **bad** 148:13 | 35:10 49:4 | **bear** 222:16 | 219:19,21 |
| **bair** 4:23 | 53:15 70:6 | 269:20 | 228:21,21 |
| **balance** 47:21 | 113:10 114:3 | **bed** 71:25 | 234:14 236:2,2 |
| **ball** 4:24 | 118:10,23 | **befall** 53:15 | 236:3 251:1,6 |
| 202:11 | 123:13 155:21 | **began** 95:24 | 251:16 261:15 |
| **baltimore** | 166:2 172:21 | 150:2 196:17 | 265:20 |
| 142:12 | 173:14 178:14 | **beginning** | **believer** 11:21 |
|  | 178:18 179:21 | 104:9 105:25 |  |

[believes - brown]                                                    Page 11

**believes** 35:13
163:24 165:21
166:1 181:6
**bene** 201:20
**benefit** 180:13
**benjanmin**
5:21
**best** 62:7
235:10
**better** 145:4
221:19
**beyond** 39:19
39:21 40:24
67:3 72:21
117:4 165:14
187:10 192:25
194:1 237:18
240:23
**big** 102:22
206:5 258:20
**bigger** 22:8
**bill** 150:22
206:18 238:20
**billed** 62:5,11
62:14,14
**billion** 130:24
**binder** 18:6,10
18:17,18 22:12
98:11 161:19
196:5 259:5
**binders** 10:16
10:18 120:1,5
145:20 258:15
259:4
**binding** 77:4
80:14

**bishop** 20:1
150:23 208:24
226:10
**bishop's**
119:17,20,22
123:15 132:11
143:11
**bit** 11:23 14:13
64:15 95:8
154:15 160:6
197:6,7 224:1
245:19 266:16
**black** 120:6,9
145:15
**block** 260:3,5
261:5,10
**blue** 107:24
108:3,20,20,24
109:22
**board** 72:23
123:17 209:16
**book** 116:9
249:23
**bookkeeping**
194:21
**books** 167:22
192:12
**borne** 59:14
**boroughs**
199:2
**bothering**
58:23 59:9
269:5
**bottom** 56:23
85:20 108:21
218:3,5

**bound** 32:15
78:8,9,11
86:16,18
**bowling** 1:20
**boy** 44:21,23
45:1
**breadth** 95:20
**break** 49:6
65:11,13,15,16
65:18 146:22
149:1 233:8,14
258:4
**brian** 6:5
**brief** 61:4 76:2
87:20 93:4
194:13
**briefed** 82:5
83:14 198:11
198:16
**briefing** 75:10
75:19
**briefly** 76:23
83:22
**briefs** 11:15
35:14 56:19
63:11 67:10,15
**brigid** 23:4
**bring** 86:1
110:24 200:23
215:5
**bringing**
117:15
**brittany** 6:17
237:1
**broad** 29:20
**broader** 31:18
37:25 208:21

236:16
**broadly** 200:13
**broken** 80:24
**brokers** 95:4
**brought** 214:7
**brown** 4:15,25
9:10,13,13,15
9:16 16:22,25
16:25 17:7,8
29:4,5,10,10
30:4,6 31:3,4,5
36:7,10,11
41:22,23,24,25
42:1,2,4,4
64:12,12,23
65:7,9,11,14
65:19,23,24
66:1,5,7,8
67:21,23 68:1
69:3 71:3,5,12
71:14,17 72:7
73:8,11,19,25
74:9,15,22
75:1,4,22 76:1
76:17,20,25
77:6,12,22,24
78:2,12,15,21
78:23 79:2,5,9
79:15,17 80:2
80:4,12,25
81:4 82:17,23
83:3,8,19 85:1
85:4 86:18,22
87:4,8,15,19
88:2,6,8,19,23
89:7,9 91:23
92:12,16,18

93:9,10,16
96:11,13,18
97:10,12,14,16
103:14,16
105:25 106:4,8
106:10 144:7
144:10,12
145:6 153:10
153:18,20,24
154:2,3 158:2
158:3,19 159:8
159:10,11
161:2,16,17,19
161:22 162:2
163:3,4 166:23
166:24 167:3
171:1,2 175:11
176:1,6,19
183:21,25
184:16 187:17
187:21,25
188:3,6,12
191:6 192:1,16
193:2 194:11
198:22 207:10
207:18 208:15
208:17 210:19
210:24 211:1,3
211:4 213:10
213:12 216:23
217:22,25
218:5,8,10,13
218:15,17
222:15,18,20
223:5,7,14,16
223:20 224:5
224:22 225:3,5

225:7,10,12,13
225:21,24
228:4,10,12,15
230:11 233:5,9
233:12,15,18
234:5,11,13,17
234:19,21
236:14,19,21
237:21,22,24
237:25 240:14
242:21 244:12
245:12,14,18
247:5,7,16,20
247:22,25
248:1 249:16
249:19,22
250:1,3,5
251:18 252:2,4
252:6 255:17
256:5,8,10
259:2,20,23
263:9,14,23
264:4,6,17,21
264:25 265:3,9
265:14 266:10
266:12,20
267:5,8 268:25
270:9
**bucheit**  5:1
**bucket**  51:6,24
52:14,18 53:1
54:13 127:25
**buckets**  43:17
43:22
**bulk**  197:16
230:19 240:10

**bunch**  18:20
42:10 66:21
74:16,16
251:11
**burden**  57:25
59:14 66:11,12
69:6,12,15
83:10 202:22
203:6 204:25
244:3 261:21
261:24 262:2
262:22 265:1,6
**burdens**
213:23
**burdensome**
169:9,14
**business**
113:23 114:19
116:9 218:19
**busy**  238:5
**butler**  5:2

### c

**c**  4:1 6:7,15 8:1
26:6 271:1,1
**calhoun**  6:8
**call**  11:15 90:5
92:19 93:2,20
195:16 213:20
233:2 236:9
263:15 267:14
**called**  44:7
115:21 119:22
131:5 178:6,13
178:17,22,24
179:9 267:16
**calls**  94:6
149:4 195:18

225:23 268:13
**calpine**  67:10
**camden**  142:20
**canty**  5:3
**can't**  167:19
180:24 192:20
193:4,7,10
212:14 230:22
241:13 254:7
255:3
**capable**  174:24
175:15
**capacity**
174:14,21,25
175:4,6,12,13
176:10 188:4
188:13,15
227:17 269:8
**capital**  53:15
113:15,17,17
244:20
**caps**  131:18,20
**card**  200:4
**cards**  200:2,4
200:10 201:3
215:17
**care**  21:3 23:16
24:13 263:13
**carle**  23:11
**carrier**  120:15
134:10 135:20
**carriers**  134:3
160:2
**carry**  174:24
**carrying**
158:24 239:25

**case**   1:3,4
11:12 13:11,11
16:7,8 18:2,9
18:12,14,25
22:9,17 23:3
24:23 26:7,9
26:13 27:4
28:6,8,12,20
29:10,25 31:21
35:11,18 36:20
38:2,10 40:4
41:20 44:13
48:3 49:10,11
55:11,18 58:9
58:11,17 59:6
60:8,18 61:24
67:9,15 68:4
69:6 70:16
71:22 73:7
77:21,25 78:12
79:21 80:6
81:9 83:8,25
84:6 85:15,17
85:19,19,20
87:3 90:25
100:24 101:2
113:15,21
124:8,18
127:11,16
128:20 129:5
129:12,13,23
129:23 130:8
136:5,5 138:25
143:16 148:10
151:9,22 152:9
155:21 157:19
169:6,19,21,24

180:18 186:23
193:9 200:11
204:2,14,14
205:8,13,14,14
206:2 211:11
212:2 213:6,15
213:20 227:14
228:1,21 231:3
231:5 238:5
243:8,15,21,23
244:18,20
245:1 260:25
261:20 262:1
262:17 263:1
263:23 268:17
**caselaw**   35:19
35:25,25 36:5
44:13 59:5
**cases**   11:23
12:6,12 14:7
14:21 15:5,8
15:18 16:4,5
16:10 17:13
18:14 19:21
20:20,24 21:16
21:18,19,19,20
22:4,10 24:10
24:18 27:12
32:4,25 37:19
40:13 42:24,25
43:22,23,23
44:18 50:12
51:24 53:1,2,3
53:5 54:13,23
55:7,23 56:9
57:23 61:11,17
63:15 68:8

69:16 70:3,5,7
72:5 76:12
83:10 84:3,8
87:24 88:17
92:3 115:16,19
124:2,5 126:6
127:1 133:7
143:16 150:17
154:15 155:2,6
156:4 157:6,11
157:14 158:11
158:18 160:20
163:22 164:1
165:22 171:5,8
171:19 172:15
183:8,9,10,23
183:24 184:4
185:3 197:10
197:13,17,21
197:23 198:3,5
198:13,16,18
198:24 199:7,7
199:8,17
202:16,18,19
202:22,23,24
203:8 204:13
204:18,19,20
205:4,7,16
214:8,19,20,23
215:2 216:10
226:13,17
227:9,19,23
228:22 232:21
238:8,10
239:19 241:17
241:18,19,21
242:9 243:7,20

243:25 244:2
246:1 247:15
248:4 251:2
252:18,23,25
254:12 261:6,7
261:12,16,23
262:3,6 263:3
**cash**   115:7
116:11 117:24
**casualty**
113:22
**catalina**   6:3
**cate**   6:23
**categories**
209:20 215:19
230:18
**categorize**
200:13
**category**   216:6
242:3
**catholic**   1:8,12
3:2 20:6 31:16
116:9
**cause**   24:7
31:20 71:18
**causes**   17:19
31:19
**causing**   151:2
**cave**   13:24
39:10,18 40:25
60:22 72:22
267:14 268:1
**caveats**   62:6,13
64:22
**cda**   101:9,10
101:16,16
124:2 210:14

212:24 227:15 231:9,19
**center** 23:6 214:11
**central** 24:10
**centralized** 215:20,24 216:1
**centre** 1:8,12 3:2 95:10,25 116:23 123:20 123:24 124:2,5 124:18 126:9 143:1 149:24
**cents** 34:1
**certain** 11:14 131:18 194:2 209:7 222:22 253:3 263:18
**certainly** 28:11 28:14 30:16 36:8,13 37:11 37:13 39:24 46:12 56:11 59:11 64:11,16 73:21 80:19 81:25 82:24 161:17 204:1 204:21 206:14 206:16 209:11 209:13 213:8 220:14 229:1 230:24 231:24 234:21 244:13 251:13 254:18 257:9 265:16

**certainty** 204:24 241:18
**certified** 271:3
**cetera** 23:24
**cgl** 90:4
**chain** 36:15
**challenges** 92:2 92:4
**challenging** 14:16 81:22 82:14
**chamberlain** 223:23
**chance** 75:24 76:22 87:21,22
**chancellor** 206:22
**change** 114:12 117:16 175:19
**chapel** 23:11
**chapin** 150:22 161:9 162:18 162:20 163:17 166:3 168:7,8 171:13,23 172:20,24 177:6,9 178:5 179:22,25 180:3 191:10 206:18 238:20 238:23 239:23 247:10 256:22 257:2,5
**chapin's** 191:7 191:8,14,17
**chapman** 13:5

**chapter** 12:21 21:22 27:19 28:6,8,12,20 29:10,25 87:2 138:25 150:16 151:9,11 152:9 164:17 165:5 169:6,19,21,24 170:24 172:14 178:11 181:19 185:21 189:9 189:14 190:5 200:11,17 201:21 205:21 209:16 227:14 260:25
**characterizat...** 72:3
**characterized** 87:22
**charitable** 12:24
**charles** 4:20 5:16 7:5 144:2 149:5,16,21 153:17 184:18 191:25 194:17 218:21,22
**charlie** 6:22 234:25
**charlotte** 6:25
**charlton** 6:9
**chart** 18:3 20:23 22:8,9 24:19,23 50:25 53:6 54:9 57:13 102:24

103:1 104:5,6 104:6 106:25 107:1,10,21 108:15,20,20 109:22 120:6,6 120:10,13 130:18 224:3 250:12 251:3,4 251:9,14 254:7 254:20 255:3
**charts** 22:8 51:9,10 57:12 57:15 66:21 74:16 119:25 120:1
**check** 52:5
**chelsie** 6:20
**chief** 150:20,21 171:10 189:20 206:16 238:18 238:20 241:3
**child** 8:23 150:11 158:11 196:19,25 201:24 206:25 207:1 230:13
**childhood** 217:13
**children** 19:4,6 19:8
**chooses** 92:24
**chose** 221:20
**chris** 4:8
**christopher** 5:6 6:4 8:10 146:9 264:13 265:25

chronological
  251:25
chronologica...
  251:17
church  31:17
  220:4
churches
  119:22
cipolla  6:10
circuit  67:17
circuit's  56:8
circumstance
  91:11 93:1
circumstances
  113:24 245:8
cite  91:19
  253:19
cited  67:10,15
  85:17 166:17
  179:21
city  198:25
  199:1,7 214:16
claim  15:6,7,9
  15:10,10,17
  16:5,8,9,12
  17:9,19 21:25
  22:22 24:1
  30:22 31:25
  33:13,20,21
  34:2,3,20,21
  35:3,4,15,16
  35:17 36:17,19
  37:10,18 42:16
  44:21,21 45:11
  45:17 48:19
  49:9 50:2,3,13
  50:16 54:12

77:19 79:8
87:11 100:14
100:20 101:16
122:17 123:6
123:10 125:4
128:11 131:1
132:18 135:17
136:16 138:14
139:7 140:14
140:20 141:19
157:18,20,24
206:17 235:7
248:14 269:19
claimant
  200:20
claimants
  155:2 203:20
  204:5 236:4
  260:12 269:12
  269:15
claims  12:22
  17:3 18:2
  20:10,11,17,19
  20:21 27:8
  32:6,7 33:23
  34:7 44:3
  58:21,22,25
  59:8 63:7,16
  78:6,19 79:23
  79:24 80:7
  81:12,19 87:12
  91:2,4 95:23
  100:17 101:5,5
  101:9 110:13
  116:12,22
  117:2,18,21,22
  117:22,23,23

118:6,10,22
119:1 143:8
148:11 154:18
156:3 157:21
157:23,23
171:22 172:24
173:1 198:21
198:21 205:23
216:10 221:13
224:25 227:15
229:15 248:9
269:8
clarification
  237:4 253:7
clarifications
  239:22
clarified
  147:23
clarify  22:13
  29:7 91:17
  147:15 158:19
  158:20 159:1
  162:9 175:11
  193:16
clarity  120:5
class  33:25
  34:7
clear  16:23
  19:14 34:12
  38:9 48:21
  56:7 87:1
  89:17 90:1
  104:19 106:20
  107:14 108:14
  119:2,7 127:18
  144:16 145:21
  161:10 175:12

239:8,15 268:3
clearer  270:7
clearly  56:9
  201:13 222:7
  227:8 244:5
cleric  20:6
clerics  26:23
clerk  94:10
  149:7 195:19
clerks  43:5
  268:10
client  85:22
  200:1 201:9,16
  215:10 230:25
clients  85:23
  85:23 86:6
  100:16 270:1
clip  112:8,11
clipboard
  112:4
clips  112:7
clock  60:22
close  154:24
closely  24:3
  84:23 150:18
  172:15,24
  206:17,19,21
  206:24 207:1
closer  15:19
closing  43:7
  44:11 56:5,11
  56:13,16 57:6
  63:21 75:25
  76:23 86:21
  92:18 147:7
  265:20

closings   147:13
coast   266:23
  267:1
codd   6:11
code   3:5 8:21
  42:24
codefendants
  135:1
codes   109:23
coincidence
  17:10
coinsureds
  11:16
collateral   46:8
  57:22 66:25
  68:18 72:15
  80:15 85:13
  86:23 166:17
  168:2,15,25
  181:8 182:6
  254:24
colleague
  25:11,12 87:13
colleagues
  58:18 72:19
  221:25
collect   50:7
  133:8 167:5,13
  210:2 216:8,18
collected   62:15
  164:14,22
  165:16 170:2,4
  170:5 183:4
  207:21 208:22
  209:2,21,24
  242:22,25
  243:12 248:19

collecting
  170:8 240:19
collection
  203:16 206:20
  217:17 238:7
collections
  62:16
collects   47:4
colloquy   39:24
  188:22
color   120:1,6
  120:13 145:14
  145:21
colored   120:14
colors   105:15
column   250:12
come   12:21,21
  28:1 30:9
  38:17 39:4
  45:23 51:15
  56:5,16 57:12
  57:25 64:8
  77:18 81:18
  90:16,19 91:16
  94:8 99:1,2
  109:10 133:4
  133:23 134:11
  135:12,16,21
  136:6 139:5
  144:8 199:3
  206:25 238:17
  243:7 246:7
comes   45:14
  49:6 66:23
  71:15 83:6
  97:16 133:9
  181:24 182:3

206:15 253:15
coming   16:1
  27:16 58:11
  69:10 80:22
  93:12 111:6,8
  118:24 211:25
  258:7
commenced
  22:3
comment
  75:12 83:22
  114:14
comments
  74:23 75:23
  82:6 224:9
commissioner
  113:24
commitment
  173:9 187:18
committed
  39:18 58:18
committee
  4:11 9:6 13:1,9
  13:19 14:16,22
  17:1,24 21:15
  21:16 26:7
  27:21 29:13
  30:2 31:5
  39:11 53:7
  59:18 63:2
  78:17 79:1,3
  79:13 82:11
  87:2,10 92:23
  103:16,18
  151:13 154:3
  164:23 165:4,6
  169:18,20,23

185:24 200:12
  200:18 202:7
  203:15 207:22
  215:17 227:16
  230:14 231:3,5
  231:9,11,19,25
  232:14,15
  233:3 234:1,4
  234:8,15
  235:13,22
  236:2,14,15
  237:2,12
  255:24 258:13
  258:16 259:4
  260:19,25
  267:17 269:7
  269:22 270:2,3
committee's
  26:6 79:12
committee's
  210:11 237:17
  258:11 269:8
common   37:21
  73:22
commonly
  90:4 166:17
communicate
  222:2
communicati...
  39:11
companies
  100:18
company   49:22
  52:5 70:17
  100:13 110:20
  113:11,20,21
  113:21,22

114:1,2,22
115:7 117:3,17
118:5,10
138:21
**company's**
113:10,15,16
114:3
**comparative**
76:9,11 77:1
78:8,18 79:14
80:13
**compare**  22:16
**compel**  181:10
229:13 242:19
**compensate**
249:4,13
**compensated**
58:20 226:25
**compensating**
58:19
**compensation**
220:6 222:8
224:13
**compiled**
164:18
**compiling**
222:12
**complaint**
22:19,20 23:7
23:17,20 24:21
26:4,19 219:6
223:1,1 224:16
229:15 250:16
252:17,23
**complaints**
11:24 17:17
18:24 32:21

36:23 57:18
66:13,17,18,19
73:16 74:18
155:15,15
197:1,3 202:15
203:8 239:25
240:2,4,5
242:6,7 246:11
246:13 250:7
252:8,12,13,14
252:19 255:23
**complete**  19:5
58:11,21
174:16 176:12
198:20 200:18
201:19
**completed**
151:23 171:24
257:20
**completely**
38:20 40:7
64:13
**completion**
202:8
**complexity**
243:19
**complicated**
172:23
**complicating**
34:10
**complied**  29:21
**computer**
97:23 106:11
**conceivable**
75:6 84:4
85:10,12 92:6
92:7,8,14

**concentrating**
180:18
**concept**  68:2
110:12
**concern**  89:20
112:24 113:10
113:12 116:17
133:22 134:2,2
175:23 179:21
188:23 190:12
203:25 204:1,4
204:6 228:19
**concerned**
40:11 50:20
61:5 173:9
174:25 186:21
186:22 189:2
189:13
**concerning**
133:3 163:6
**concerns**  64:13
133:19 174:23
189:6,17,19,24
191:17 228:7
**conclude**  15:2
83:13 246:24
**concluded**  15:9
270:10
**concludes**  77:8
**concluding**
72:23
**conclusion**
71:13,15
225:23
**conclusive**
76:15

**conclusory**
221:12
**condition**
27:19 29:15
30:6 114:4
**conduct**  32:16
42:15 101:8,9
123:16
**conducted**  3:12
**confer**  72:18
**conference**
13:16
**conferred**
14:22
**conferring**
18:11
**confident**
173:8
**confidential**
201:17 208:13
208:23 209:1
234:2 235:13
235:14
**confidentiality**
170:14 194:8
203:25 204:1
232:8 234:16
237:18 243:21
**confirm**  169:12
171:17
**confirmation**
39:7 40:18
81:10
**confirmed**  9:6
78:4 116:3
**connected**
191:18

**connection**
70:8 95:15
147:19 152:12
154:24 156:15
162:25 164:6
165:10 170:10
170:17 171:9
173:5,6,18,25
174:17 176:13
176:23 177:2,6
179:20,25
181:17,21
185:1 186:7,11
186:15 200:15
200:17 201:21
202:23 209:21
210:5 211:10
211:12 213:2
229:25 230:2
231:16 232:11
232:13,20
239:12 240:5
240:22 241:11
241:12
**consecutive**
259:9
**consensual**
12:21 13:17
27:20 59:15
80:23
**consensually**
13:3 38:7,22
58:14 59:23
**consented**
145:2
**consequences**
163:25 165:22

165:24 166:4
166:10,20
**consider**   56:17
61:21 85:5
90:25 100:21
153:14
**considered**
121:4 148:19
**consisted**
116:10
**consistent**
158:5 162:20
163:19 206:13
236:12
**consisting**
208:23
**consolidate**
197:20 246:12
**consolidated**
197:24,24
198:11
**consolidation**
246:7
**constituencies**
82:12
**constituency**
80:22
**consulting**
95:17
**consume**
181:18
**contain**   23:20
**contained**
154:11
**contains**   17:17
**contemporan...**
148:5

**contend**   250:9
**contentions**
203:2
**contest**   37:3
86:1
**contested**
13:14 15:19
16:10 21:18
22:11 43:25
84:2 255:24
**context**   79:19
91:16 161:24
162:1 248:2
**contingent**
79:24,25
**continue**   12:12
12:23 59:24
113:11,25
158:19 181:4
228:11 233:25
244:15 246:13
**continued**
13:10 14:16
29:14 60:3
180:11 239:24
244:8
**continues**
19:24 26:24
**continuing**
72:19 114:19
248:13
**contract**
192:14 194:9
**contrary**   73:23
**contributed**
116:5

**contribution**
33:13,20 34:2
34:12,21 35:17
36:17 37:18,22
48:19 67:1
68:19 79:20,23
80:15 81:6,19
166:22 168:2
168:16,25
181:7,12,24
**control**   19:5,25
20:3 21:11
23:4,5,12
36:23 113:17
113:18,20
217:12 219:16
220:9 221:8,9
221:11,17,21
221:24 222:1,3
222:11,11
223:24 224:2,8
224:14,15,25
225:1,10,18,20
226:8 227:1,1
227:4,8
**controlling**
219:8 225:16
**controversial**
210:14 241:20
**conversation**
268:1,5
**conversations**
166:2 168:6,11
168:18 178:19
179:3 181:24
182:15

[convey - counsel]                                                    Page 19

| | | | |
|---|---|---|---|
| **convey** 227:6 | **correct** 27:3,16 | 212:18 213:9 | 110:13 115:16 |
| **convince** 66:15 | 32:23 33:4,5 | 214:9,20,21 | 115:18 119:15 |
| **convinces** | 34:8 37:23 | 215:18 216:2 | 120:23 121:4,6 |
| 35:14 | 61:9 78:20 | 217:2,6 219:20 | 122:17 123:6 |
| **cooperate** | 96:2 99:18,19 | 219:21 231:12 | 123:10 124:7 |
| 232:23 | 100:8,22 | 231:13,17,21 | 124:17 125:4 |
| **cooperation** | 102:13 107:12 | 237:5,17 239:7 | 125:10,11,16 |
| 232:6 | 108:12,13,23 | 239:20 240:16 | 125:23 126:14 |
| **coordinate** | 109:1,14 110:7 | 241:17 242:23 | 126:17,21,24 |
| 12:20 40:19 | 110:14 120:21 | 242:24 248:11 | 127:5 128:6,7 |
| 172:16,21 | 120:22 130:8,9 | 248:21 252:18 | 129:21 130:5 |
| 197:21 246:12 | 131:16 134:4 | 252:24 253:4 | 132:10 133:8 |
| **coordinated** | 148:14 153:1 | 254:2,10 | 181:16 |
| 197:23,24 | 155:13,17 | 255:10,25 | **couldn't** |
| 198:12 | 156:1,2,6,11 | 256:3 257:6,7 | 173:11 203:19 |
| **coordination** | 156:12,17,19 | 269:23,24 | 206:7 214:23 |
| 213:22 245:21 | 156:20,21 | **corrected** | 220:16 221:2 |
| 246:3 | 157:7 158:18 | 187:17 | 229:4 243:2 |
| **coordinator** | 162:13,18 | **correctly** 81:13 | 257:19 |
| 269:8 | 163:16,18 | 121:7 138:10 | **counsel** 18:11 |
| **copies** 145:13 | 165:18 167:17 | 139:4 251:1 | 22:13,14,18 |
| 242:15 | 169:3,17 170:3 | **corresponde...** | 26:11,12 30:11 |
| **copy** 15:14 | 171:20 174:2,7 | 242:7 | 30:19 39:12,24 |
| 102:3,8 105:6 | 177:11 178:2 | **corresponding** | 70:16 99:1,20 |
| 152:23 154:5 | 178:25 179:11 | 15:6 | 100:5 150:22 |
| 161:16 196:3 | 179:15 180:2,6 | **cost** 109:11 | 168:4,9,12,17 |
| 200:24 217:16 | 181:1,25 182:8 | 230:25 | 168:18 171:10 |
| 217:20,22 | 182:12,18,19 | **costs** 51:22 | 178:14,19,25 |
| 219:1 | 183:1 184:9,10 | 52:3,6 53:10 | 196:12 197:19 |
| **corinna** 4:24 | 184:12,13 | 53:12,20,22 | 198:1,2 199:4 |
| **cornfeld** | 187:4,10,11 | 54:10,11,18,20 | 206:16 209:11 |
| 267:15 | 188:25 192:4 | 54:20 55:1,2,5 | 215:2,6 216:25 |
| **corporation** | 193:15,22 | 55:9,12,23 | 229:16,21,24 |
| 219:14,14,15 | 197:5 201:15 | 63:24 84:15,16 | 230:4,4,7 |
| 220:8 221:7,7 | 208:2,25 209:2 | 101:22,24 | 232:14,15,15 |
| 226:7,7 | 209:4,5,8,9,17 | 102:16 109:4,7 | 233:3 234:1,9 |
| | 209:23 212:3 | 109:16,25 | 234:24 235:16 |

[counsel - court]                                                    Page 20

235:23 236:1,4
236:13 238:18
241:3,9,22
245:6 246:6,10
246:13 260:10
260:12 261:25
269:16,23,24
270:1
**count**  20:22
21:4,4 23:13
23:14 25:3,3,5
160:7,8
**counter**  100:21
**counterclaim**
252:22 254:1
254:10
**counterclaims**
66:13 253:3,10
253:24 254:5
254:12
**counties**
197:11 212:25
**country**  54:2
115:20 271:21
**county**  61:10
262:4
**couple**  56:15
58:9 59:23
62:13 75:23
76:2 116:3
150:7 161:25
161:25 174:21
186:19 222:18
**course**  28:20
29:25 46:8
106:1 122:17
123:5,10,16

124:7 125:4
127:11 225:22
250:23
**court**  1:1,19
3:11 8:2,7,9,12
8:15,17,21 9:9
9:11,15,17,20
9:23 10:4,8,14
10:18,21,23
11:2,6,13
12:10,16 13:14
14:1,11,13,14
14:17,25 15:2
15:14,15,19,21
15:24 16:11,16
16:23 17:6,24
17:25 18:4,7
18:15,17,19
19:14,19,22
20:14,16 21:21
22:5,14 23:20
24:6,6,21,25
25:7,13,16,19
25:23 26:2
27:1,2,5,6,22
28:7,10 29:2,7
29:9 30:3,9
31:4,7,13,24
32:20,24 33:8
33:14 34:15
35:6,12,24
36:10,16,19
37:3,5,9,12,15
38:4 39:8,10
39:17 40:13,19
40:20 41:4,23
41:25 42:3,8

42:10,15 43:3
43:13 44:3,6,9
44:17,19,22
45:8 46:4,5,12
47:6,12 48:3,6
48:14,23 50:8
50:12,22 51:2
51:7,13 52:1,9
52:10,21 53:21
53:25 54:17,22
54:23 55:6,8
55:15,19 56:12
56:16,22 57:2
57:5,14,19
58:5 59:17
60:14,21,25
61:2,8,21
62:25 63:13
64:18,24 65:7
65:10,12,16,20
65:22,25 66:2
66:6,13 67:19
67:22,24 68:8
68:9,9,25
69:16 70:10,25
71:4,6,10,13
71:15,19,21
72:2,11,17
73:10,14,18,25
74:10,17,21
75:3,6,9,16,24
76:8,18,22
77:2,5,7,10,18
77:20,23,25
78:3,7,8,14,16
78:20,22,25
79:3,4,6,11,16

80:1,3,8,10,21
81:2,18 82:14
82:20 83:2,7
83:11 84:24
85:2 86:16,20
87:1,9,16,24
87:25 88:2,3,5
88:7,9,15,20
89:1,8,13,15
89:19,23 90:10
90:13,15,20,23
91:2,7,18,20
91:22 92:11,15
92:17,19,25
93:8,14,20
94:1,4,8,11,14
94:16,19,21
96:10,12,17,21
97:11,13,15,18
97:22 98:1,3
98:16,19,21,23
99:7 102:3,7
102:11,14
103:5,8,13,15
103:19,22
104:11,14,17
104:19 105:1,5
105:8,18,22,24
106:3,7,9,14
106:16,18,20
106:22,24
107:5,7,13,16
107:19 108:14
110:2,4,9
111:1,4,7,9,11
111:18,25
112:7,10,14,16

[court - court]

| | | | |
|---|---|---|---|
| 112:19,22,25 | 144:20 145:2,5 | 179:10,19 | 218:4,7,9,11 |
| 113:4,6 114:5 | 145:11,13,17 | 180:1,17,25 | 218:14,16 |
| 114:18,23 | 146:4,6,7,11 | 181:3,11,15,18 | 220:12 221:4 |
| 115:19,24 | 146:17,21 | 182:24 183:19 | 221:23 222:14 |
| 116:7,19,21 | 147:1,5,10,16 | 184:8,15,17,21 | 222:17,19 |
| 117:5,11,15 | 147:18,21 | 185:2,19,25 | 223:3,6,12,15 |
| 118:8 119:2,6 | 148:7,9,15,19 | 186:2,17,25 | 223:19 224:3 |
| 119:10,25 | 148:22,25 | 187:3,9,12,20 | 224:21,24 |
| 120:4,11 | 149:6,9,12,15 | 187:22 188:1,4 | 225:4,6,9,11 |
| 121:12,14,18 | 149:20 151:17 | 188:7,13,20 | 225:19,22 |
| 121:21,24 | 152:2,6,21 | 189:3,11,16,21 | 228:8,11,14,18 |
| 122:2,25 124:4 | 153:5,9,13,23 | 190:6,14,19,25 | 229:16,18 |
| 124:11,16,21 | 154:1 155:7,11 | 191:19,23 | 230:6,10,15,22 |
| 124:24 125:7 | 155:18 156:7,9 | 192:13 193:1 | 232:5,18,19 |
| 125:13,21 | 156:15 157:18 | 194:12,15 | 233:7,10,13,16 |
| 126:5,8,11,13 | 157:24,25 | 195:6,9,11,15 | 233:20,24,25 |
| 126:18,23 | 158:2,10,16 | 195:15,21,24 | 234:6,9,12,18 |
| 127:1,7,13,16 | 159:7,9,15 | 196:4,23 | 234:20,23 |
| 127:22 128:4,9 | 160:4,14 161:1 | 197:25 199:10 | 235:4,7,11,16 |
| 128:13,15,17 | 161:18,21,24 | 200:11,23 | 235:21,23 |
| 128:19,23,25 | 162:25 163:2,9 | 201:8,11 202:1 | 236:1,4,5,8,17 |
| 129:4,7,10,13 | 163:14,20,21 | 202:12 203:2 | 236:23 237:3,9 |
| 129:18,21,25 | 164:15,21,25 | 203:11,20 | 237:14,20,23 |
| 130:2,4,10,13 | 165:10,17,19 | 204:2,12,17 | 238:4,6,14 |
| 130:20 131:22 | 166:4,9,12,14 | 205:1,2,9,16 | 239:5,13,18 |
| 131:25 133:7 | 166:19,23 | 205:22,25 | 240:7 241:8,10 |
| 133:13,16 | 167:1,6,14,20 | 206:3,5,9,15 | 241:11,13,14 |
| 134:22 136:8 | 169:5,16,22,25 | 207:6,9,11,12 | 241:21,23,24 |
| 136:24 137:1,4 | 170:8,15 171:1 | 207:16 208:14 | 242:12,13,14 |
| 137:7,19,22 | 171:9,15 | 208:16 209:18 | 242:18 244:5 |
| 138:9 139:17 | 172:12,25 | 209:25 210:16 | 244:17,22 |
| 139:22 140:2 | 173:5,13,18,25 | 210:22,25 | 245:1,6,7,13 |
| 140:10,12,19 | 174:6,17 175:7 | 211:2,18,24 | 245:16,22,22 |
| 141:5,9,12,15 | 175:24 176:3 | 213:2,22 214:5 | 246:5,10,13 |
| 141:18,23 | 176:13,17 | 215:14 216:8 | 247:1,3,12,14 |
| 143:15,19,21 | 177:3,7,14,24 | 216:14,22 | 247:18,23 |
| 143:24 144:13 | 178:4,13,18,24 | 217:2,20,23 | 248:10,20,24 |

249:4,11 250:2
250:4,8,17,21
251:5,8,10,19
251:23 255:16
255:23 256:7,9
256:11,14
257:3,5,19
258:22 259:12
259:14,17
260:1,10,16,20
260:22 261:6
262:3,6,9,12
262:23 263:1,2
263:5,8,11,17
263:20 264:2,5
264:10,14,16
264:23 265:2,8
265:10,12,15
266:2,4,6,9,11
266:13,25
267:4,7,9,11
267:20,23
268:15,17,19
268:21,24
269:2,4,12,16
269:17,22,25
270:2,5,7
**court's** 51:11
65:22 96:21
**courtesy** 99:6
**courtroom**
65:17 69:13
108:16,16
**courts** 12:12
44:1 61:6,8
67:16 204:10
214:24 246:6

261:11
**court's** 197:9
201:13
**cover** 15:23
51:7 108:12
133:3 138:6
**coverage** 14:19
43:21 51:18,22
54:5,23 55:7
56:24 84:21
91:1,7 92:9,10
95:19,20,21
100:21,23
101:10,11
102:24 103:1
104:5,15
106:25 107:1
107:10 108:2
109:22 118:23
126:13 134:3,5
134:10,11,13
136:13 160:16
160:16,18
171:15 173:2
232:18 247:11
248:16
**covered** 11:18
48:10 84:8
89:11 90:19
91:6 92:1,3
93:5 110:5
116:13 128:11
138:22 146:17
**covers** 33:18
34:22 160:17
**cplr** 46:23
254:24 255:1

**crashing**
106:11
**create** 100:8
**created** 119:21
203:12
**creates** 136:6
**credibility**
25:25
**crediting** 54:19
**creditors** 4:11
33:25 34:3
169:11 180:13
180:15 181:19
260:25
**creditors'**
151:13
**critical** 13:12
40:9 60:7,20
61:24 62:2
67:12 186:24
189:16
**criticize** 224:24
**cross** 7:3 69:22
69:23 92:23
93:6,13,23
96:20,23 97:16
97:19,21 98:7
153:3,16,17
155:15 186:6
188:11 190:9
191:24 207:15
207:16,17
256:8,17
259:25 263:8
263:10
**crossclaims**
255:3

**cull** 227:21
**cups** 94:17
**curious** 25:7
**current** 26:24
117:21,22
160:16
**currently**
14:15 115:17
133:5 134:5
**custom** 123:9
**cuts** 245:11
**cva** 11:20 13:4
13:9 17:11,13
17:16,18 18:10
22:2 26:4
29:20 30:1,8
136:23 137:12
137:14 138:2
138:24 143:7
151:5,6 197:12
197:13 200:19
204:5 208:2

**d**

**d** 8:1,16 23:5
**d&o** 44:17,21
63:16
**d'estries** 6:22
**daly** 5:4
**damage** 52:13
**damages** 46:2
46:7,17,18
47:1 76:12
77:8 120:24,25
**data** 229:4
**database**
231:21,23
232:1,2

[date - defendants]                                                    Page 23

| | | | |
|---|---|---|---|
| **date**  11:19 12:8 | 261:17,20,23 | 267:13 | 99:24 100:2 |
| 22:3 39:14 | 262:1,21 263:2 | **debtor's**  12:7 | 101:18 104:8 |
| 40:23 41:10 | **dc**  4:6 | 56:24 73:2 | 104:16 106:1,5 |
| 116:11 118:10 | **deacon**  226:22 | 84:18 88:13,14 | 107:4,8 118:4 |
| 171:5 184:12 | 226:22,24,25 | 264:19,21 | 121:3,19,21 |
| 205:21 216:14 | 227:3 | **debtors**  8:19 | 133:20 152:8 |
| 231:19 232:25 | **deadline**  88:21 | 9:3 19:15 | 152:10 |
| 255:25 267:21 | **deal**  9:25 43:13 | 39:12 43:18 | **declarations** |
| 267:21 271:25 | 48:12 64:21 | 47:22 58:25 | 9:5 152:12 |
| **dated**  152:23 | 67:16 89:6,9 | 70:22 75:16 | **declaratory** |
| **dates**  17:20 | 96:19 144:13 | 88:17 105:11 | 134:11 |
| 218:24 | 163:8 177:13 | 105:13,16,17 | **defend**  40:12 |
| **davey**  6:5 | 263:16 | 105:18,24 | 55:2 120:21 |
| **day**  3:9,11 4:3 | **dealing**  44:20 | 156:4 247:4 | 135:22 |
| 8:11 11:12 | 159:25 160:1,3 | **debtors'** | **defendant**  16:4 |
| 25:17 26:25 | **debt**  81:12 | 234:24 | 17:14 19:1,10 |
| 34:17 38:5,7,9 | **debtor**  1:10 4:4 | **december** | 20:1,2 21:3 |
| 38:13,18 39:4 | 8:11,22 11:14 | 113:15 | 22:24 23:3,4,9 |
| 39:5 58:12,14 | 12:5,11,13,23 | **decide**  39:20 | 23:19 26:15 |
| 72:14,14 81:8 | 14:18 22:1 | 41:9 73:9 | 31:22 42:14,19 |
| 104:8 127:20 | 25:18 29:13,21 | 83:11 | 75:18 76:14,15 |
| 127:20,20 | 33:16 44:25 | **decided**  41:7 | 89:5 135:3 |
| 152:9,10 154:7 | 45:7 48:24 | 198:17 | 157:14 158:18 |
| 168:12 178:10 | 51:18,18 54:6 | **deciders**  73:12 | 183:9,24 185:3 |
| 178:10 190:2,2 | 63:17 64:20 | **decides**  163:11 | 197:4 202:14 |
| 231:14,23 | 65:1,3 70:12 | **deciding**  75:21 | 202:21 214:13 |
| 239:12,12 | 70:14 75:18 | 83:15 221:25 | 215:4 219:4,24 |
| 256:15 263:16 | 81:11,17 84:5 | **decision**  38:1 | 238:9 264:16 |
| 264:15 266:19 | 84:8 94:6 | 44:22 67:10,14 | 265:21 |
| 267:12 | 146:9 194:16 | 68:1 127:10 | **defendant's** |
| **days**  3:8 38:5 | 195:18,18 | **decisions** | 21:10 22:25 |
| 40:8 46:14 | 196:13 230:1 | 172:18,20 | 146:7,8 |
| 60:10,20,21 | 232:15 241:7 | 198:18 269:14 | **defendants** |
| 61:1 62:3 64:6 | 244:3 245:3 | **deck**  103:6 | 1:16 11:21 |
| 67:6,7 68:12 | 253:3 254:8 | **declaration**  9:7 | 21:1,1,7,10 |
| 68:14,16 80:20 | 256:16 264:13 | 10:1 64:7,17 | 23:15,15 33:3 |
| 104:16 261:13 | 265:5,25 | 99:14,14,17,22 | 43:1 154:20 |

169:7,8 172:16
181:4,6 198:2
213:1 219:24
244:22 253:4
254:9
**defending**
196:25
**defense** 24:11
32:19 42:19
51:22 52:3,6
53:10,11,20,22
54:10,11,18,19
54:20 55:1,2,5
55:9,12,23
63:23,24 84:15
84:16 101:22
101:24 102:16
109:4,6,11,16
109:25 110:13
115:16,18
118:23,23
119:15 120:23
121:4,6 122:17
123:6,10 124:7
124:17 125:3,4
125:10,11,16
125:23 126:2
126:14,16,21
126:24 127:9
127:19 128:1,7
129:21 130:5
132:9 133:8
147:23 172:8
181:16 253:16
254:5,21
**defenses** 35:10
35:13,21,21,22

74:2 79:7
134:13 254:17
255:2
**defined** 113:12
166:20
**definitely**
151:24
**definitively**
234:22
**degree** 95:23
**del** 5:5 93:25
94:2,5,5,21,22
94:24 96:8
97:20 105:9,11
105:16,19,23
106:2 107:2
118:12,15
121:11,13,16
122:24 136:7
137:17,23
139:16 143:20
195:17,17
196:2,5,7,9
202:3 203:18
206:10 207:3,8
207:14 256:13
256:15,15,18
257:21,22
258:21,25
259:3,6,7,13
259:15,19,21
260:2,17,21,23
262:5,8,10,14
262:15,24
263:4,6
**delaware** 53:13
113:19

**delay** 98:3
**delegate**
161:11 173:25
175:22 177:18
180:4
**delegated**
158:22 159:16
**delete** 54:10
**delineate** 222:8
**demonstrative**
11:6
**demonstratives**
66:10
**denials** 100:23
**denied** 55:17
100:20 118:6
118:10 134:3
134:14 197:22
**deny** 73:4
**denying** 118:22
135:17
**deo** 1:15
**depart** 190:15
**departed**
190:16
**departing**
255:18
**department**
53:14,17
113:19 159:19
159:23,25
160:8,9,10,11
161:6 162:8,13
162:15 163:8
163:14 173:20
190:1,1,4,8,10
191:4,7,8,14

198:19
**departments**
158:15,23
159:14,17
160:4 161:10
161:13 162:18
162:24 177:19
180:4
**departs** 85:21
**depend** 110:2
**dependent**
180:9
**depending**
52:2 54:9
133:12 136:16
**depends**
140:25
**deplete** 51:24
52:24 53:3
55:23,24
112:10
**depleted** 45:6
**depletes** 54:11
121:6
**depleting**
84:17
**deposed** 99:10
**deposition**
110:15 155:5
155:25 161:4,7
161:16,19,23
162:14 167:24
168:13 174:10
174:19 175:9
175:12,17,19
175:21 177:20
178:16 182:18

187:15 188:18
192:8 241:5
250:24
**depository**
203:11
**describe**  95:5
150:15 197:6
218:19 219:3
220:23 221:2
**described**
100:16 119:17
202:25 214:17
220:18 229:10
242:19,24
257:12 258:5
**describes**
223:9
**describing**
213:18
**description**
212:6 254:2
**deserved**
153:14
**design**  95:13
**designations**
101:3 235:25
**despite**  238:6
**detail**  67:13
157:22 221:2
238:25
**detailed**  157:20
209:6
**details**  240:25
249:9 263:12
**deteriorate**
151:3

**determination**
76:16 77:14,15
78:18 79:14
80:12 81:19
86:11 91:8
192:20
**determine**
199:22 201:2
**determined**
47:1,22 48:4
221:20 243:25
**determines**
3:11 76:11
78:5
**determining**
243:5
**detriment**
169:11 180:15
181:19
**developed**  59:5
**devote**  177:10
**devoted**  158:15
159:14 171:14
**didn't**  74:12
88:10 108:6,8
108:17 114:16
123:1 124:20
138:9 153:23
155:25 166:19
173:21 187:22
192:8 200:23
209:13 211:5
216:15,17
217:8,12 221:3
224:8,9 225:8
227:4 246:22
259:24

**difference**
23:18 49:3,10
114:8
**differences**
32:16 101:19
**different**  10:19
26:11 39:25
43:14 46:15
47:9 54:4 60:8
61:14 79:19
84:25 85:2
104:24 130:12
131:13 135:24
141:5 148:8
151:7,15 166:6
174:22 175:10
200:21 205:13
205:14 221:24
224:1 234:24
236:6 243:23
246:15 252:7
**differently**
174:19
**difficult**  186:14
190:7 246:3
**digging**  36:4
**digitization**
206:21
**digitized**
203:17
**diligence**
151:14,23
169:18,20
190:5
**diligent**  30:14
**dine**  5:7 234:17
234:18 236:6

269:1,3,6,6,19
269:24 270:3,6
**diocesan**  62:23
69:15 70:7
123:21 156:8
156:14 157:2
157:10 172:2,6
177:13,22
178:1 179:9
183:8,17,23
184:7,7 197:17
199:5 215:23
216:13,20
219:12 222:22
223:11,17
226:10 240:18
247:13 250:9
250:14 251:7
**diocese**  1:8,12
3:2 8:23 11:17
11:20,22,25
13:8 16:4
17:13,14 18:13
18:24 19:1,2,4
19:6,8,12,15
19:17,23 20:1
20:1,2,6,8,13
20:19,25 21:19
22:22 23:2,6,6
23:12,18,25
24:14 26:16,20
26:24 27:7,15
27:20 28:21
29:16,19 30:7
30:15,19,23
31:15,18,21,25
32:8,14,19

[diocese - dipompeo]                                                    Page 26

| | | | |
|---|---|---|---|
| 33:21,22 34:13 | 149:4,4,23 | 202:21,22,24 | 262:2,22 |
| 34:23,24 35:2 | 150:3,7,8,13 | 203:3,10 | **diocese's** 13:21 |
| 35:9,13,20 | 150:16,16,18 | 206:12,12,15 | 58:4 79:7 |
| 36:3,17,21,25 | 150:20 151:1,1 | 206:22,23 | 91:14 |
| 37:1 42:14,18 | 151:8,10,15,19 | 207:21 208:11 | **dioceses** |
| 45:12,19,24 | 152:8 155:11 | 209:6,19 210:1 | 115:20 |
| 46:16 47:15 | 155:19,19,23 | 210:12 212:25 | **diocese's** 182:4 |
| 48:19,22 49:2 | 155:23 156:5 | 214:4,7,9,11 | **dipompeo** 4:8 |
| 49:8 50:5,7,10 | 156:22,24 | 214:19 215:1,3 | 5:6 8:6,8,10,10 |
| 50:16,17 54:1 | 157:7,11,14,16 | 215:12,20,22 | 8:14,16,16,18 |
| 55:11 58:18 | 160:17 164:6,9 | 215:24 216:2,8 | 10:7,12,16,20 |
| 59:1 62:22 | 164:11,14,22 | 216:10,11,15 | 10:22,25 11:2 |
| 63:8 64:1 | 167:4,12,14,19 | 217:7,12 | 11:8 12:18 |
| 66:19,22 70:4 | 167:22 168:9 | 218:19,22,23 | 15:1,5,16,22 |
| 70:6,9 71:1,8,9 | 169:2,14,16 | 219:11,13,14 | 15:25 16:14,20 |
| 72:4 74:11 | 170:5,18,23 | 220:2,4,5,7,21 | 17:8 18:5,8,12 |
| 75:7,10,13 | 171:19 172:9 | 220:24 221:7 | 18:16,18,22 |
| 76:5,14 77:3,4 | 175:7 176:21 | 222:3,24 223:2 | 19:17,20,23 |
| 78:7,9,10 79:6 | 177:1 182:16 | 223:8,22,24 | 20:15,17 21:23 |
| 81:19 83:9,15 | 183:3,11 | 224:2,7,8,25 | 22:6,15 24:2,8 |
| 85:16 86:24 | 184:23 185:1,2 | 226:5,7,24 | 24:22 25:1,12 |
| 87:3,12,22 | 185:5,7,10,25 | 227:1,4,13,18 | 26:3 27:3 28:5 |
| 89:19,23,24 | 186:7,11,15,16 | 228:17,24 | 28:24 31:8,14 |
| 90:9,16 91:2 | 186:19 188:24 | 229:5,6,13,20 | 32:2,23 33:5 |
| 92:9 94:2,6 | 191:12 192:11 | 231:20 232:20 | 33:10 34:9,25 |
| 95:9,12,24 | 192:14,19 | 238:3,9,11,18 | 35:8,23 36:8 |
| 96:1,5 104:10 | 193:5,12,23,24 | 238:19,20 | 36:13,18,22 |
| 108:22 110:11 | 194:2,5,20,21 | 239:20 241:2,4 | 37:4,6,11,13 |
| 115:25,25 | 195:2 196:16 | 241:9,14,22,24 | 37:23 38:19 |
| 116:9,13,23 | 196:17,20,25 | 242:1,8 243:9 | 39:16 40:6 |
| 117:9 126:6 | 197:1,3,10,21 | 244:10,16 | 41:3 42:9,12 |
| 131:17,20,25 | 198:6,15,17 | 245:5,23 246:2 | 43:10,16 44:5 |
| 132:16 134:6 | 199:13,17,20 | 246:11,22 | 44:8,10,19 |
| 134:20,25 | 199:22,25 | 247:3,9 248:3 | 45:25 46:5,21 |
| 137:14 139:5 | 200:3,6,12,17 | 249:4,13 250:8 | 47:10 48:1,5 |
| 139:13 143:3 | 200:22 201:2,5 | 252:13 253:6 | 48:11,15 49:5 |
| 147:25 148:11 | 201:23 202:13 | 256:21 261:21 | 50:11,23 51:3 |

51:10,15 52:4
54:3,19 55:3
55:20 56:14
57:4,7,20
59:10 60:6,19
60:24 61:1,3
61:16 64:10
65:5 74:25,25
88:16 92:21
93:7,24 146:9
146:9,19
198:22 264:1
264:12,13,15
265:11,24,25
266:3,5,8
267:2

**dipompeo's**
75:1

**direct** 7:3
19:25 21:10
23:5,11 69:14
70:2 93:3,3,12
94:23 96:9,12
96:25 97:7
99:15,23
101:18 102:3,5
108:5,5 118:9
118:12 119:4
121:12,18
122:2,9 133:19
136:19 149:16
152:16,23
153:8 154:4,10
154:11,17
155:24 157:9
158:4 169:4
181:22 186:6

196:3,8 207:4
210:7 227:10
232:3 238:3,24
241:4 247:10
249:18 250:23
250:25 255:16
255:18 256:20
259:24 261:9
263:9 265:18

**directed** 155:2
157:15 178:8
199:19 225:3

**direction**
206:14 239:15
250:20

**directly** 25:7
27:10 47:5
143:5 161:14
199:12 237:5

**director**
149:21 171:13
238:19 247:9
256:21

**directs** 92:22

**disagree** 69:4
83:19 115:2

**disagreement**
147:8

**disallowance**
87:12

**disallowed**
79:24 80:7
81:13

**disbursed**
258:8

**discharge**
81:10,17

**discharged**
81:12

**disciplinary**
208:12

**disclose** 26:22

**disclosure**
264:18,19,21
264:23

**disclosures**
113:13,14

**discoveries**
13:3

**discovery**
12:19 27:2,6
27:12,14,14,15
27:21,23,25
28:1,6,10,12
28:19 29:24
63:3 64:15,24
73:15 160:3
164:6,7 167:16
167:18 169:25
178:7,8 179:13
194:5 195:2
197:7,25 198:5
198:8,9,10
199:4,11,16
202:17 203:6
203:22,23
206:25 209:12
211:13,17
212:8,15,18,20
213:1 217:1,8
217:11,17
225:1 227:14
227:15,22
228:20 229:10

241:5 243:7,9
244:4,9,11,16
244:24 245:3,5
246:8 247:2
257:10

**discretion**
83:17 113:25

**discuss** 13:21
267:18,24

**discussed**
92:25 200:16
243:6 268:2,8

**discussing**
252:16

**discussion**
232:12

**discussions**
30:11 178:14
248:6

**dismiss** 41:17
42:6 60:15
145:9 154:14
198:15 260:25
267:18

**dismissal**
198:20

**dismissed** 78:1
261:11

**displayed**
108:15

**dispute** 64:25
83:23

**disputes** 198:8
211:13 212:8
212:16,18

**disrupt** 169:9

**distinction**
20:8 21:7
170:25 175:4
188:14 253:8
253:25 254:13
255:6

**distinguish**
175:15

**distinguishing**
178:20 184:13

**distract** 69:18
178:9

**distracted**
69:16

**distraction**
58:1,6,10

**distress** 53:15

**distributes**
84:5

**distribution**
33:24

**distributions**
84:4

**district** 1:2
39:10 54:23
55:8 61:21
67:8,14,17
75:16 87:23
88:3 198:14
232:19,19
244:22

**districts**
212:25 213:5

**divert** 40:13

**diverted** 42:10

**divided** 201:16

**docket** 13:6
27:23 28:8,25
29:3,3,11 30:5
97:24 106:4,5
106:10,24
121:3 137:4,8
197:25 207:6
210:9 211:15
251:16 253:14
259:12,17

**document** 3:6
29:11,18 107:3
112:1,25
116:15,17
117:5,8 122:3
178:7 198:7
200:24 203:11
206:20 216:6
218:4,6 231:3
231:4 238:7
243:24 254:15
259:22 260:4
268:7

**document's**
122:7

**documentation**
241:16 248:19

**documents**
27:6 28:2
29:19 30:1,8
30:14,20 164:5
164:14,21
165:9,13,14,15
167:5,13,20
199:13 200:1,7
202:4,6,25
203:13,14,19

204:17 205:19
205:20 207:25
208:5,8,12,18
208:19 209:20
209:23 210:12
215:14,19
216:2 227:22
227:23,25
229:1,2,23
230:2 231:8,10
231:18,20
232:7,17,21
234:8 235:15
235:23,25
240:19 241:5
241:23,25
243:11,20,24
244:1 255:5
268:9,11

**doe** 3:2 226:20

**doesn't** 73:23
76:10 77:12,14
81:11 82:5
84:16,18
125:13 171:23
177:10 201:9
212:12 244:8
245:2,6,20
253:25 259:9

**doi** 113:19
114:1

**doing** 73:25
175:15 239:9
239:18 262:21

**dollar** 45:10
46:24 101:21
101:22 102:16

102:17 109:6,7
109:15,17
119:14,15
125:16,17

**dollars** 33:24
45:12,20 46:2
47:3,25 48:16
49:1,20,21
50:19 77:11
116:5 118:24
125:5,25

**dominic** 20:7

**dominic's** 20:2

**don't** 68:14
72:1,3,18,24
72:25 74:5,13
75:5,7 77:13
80:19,23 81:14
81:15 82:4
83:8,9,9,19,21
83:21 84:9
85:8,24 86:2,9
87:7,8,13,21
88:7,8,9
104:18 112:7
114:9,15
115:13 116:3,7
116:9,24
117:13 118:3,8
120:5 121:8,17
122:4,8,23
123:3,4,7,7,19
124:9,21,23,25
125:7 126:18
129:1,8,10,11
129:14 130:1,2
130:3,7,10

132:5 133:10
133:13 134:22
135:8,8 137:17
137:18,19
139:22 140:25
146:22 155:18
155:19 156:13
156:18 157:9
157:13,13,15
157:17 158:22
161:11,14
162:16,22
163:5,5,11,13
163:17 164:5
164:24 165:14
167:4,12,17,18
171:22,25
172:1,5 173:3
173:16 175:21
176:16,20,24
176:25 177:4,5
177:12,20,22
178:1 179:17
179:23 180:3
183:2,7,12,16
183:17,22
184:6 185:16
187:9,22 191:9
192:5,6,22
193:3,8 194:8
194:11 198:23
199:6 200:25
201:11 212:4
215:9 222:12
224:16 225:3
226:16 227:5
228:12,21

229:17,18
233:24,24
236:2,5 240:20
240:25 241:19
241:19 242:14
243:17 245:25
246:2,3 248:13
248:22 256:5
258:13,23
261:18 265:2
268:3
**doodian**
150:19 161:9
162:15,17,19
163:7 168:6
178:5 179:17
179:25 180:3
189:19,25
190:10 206:19
**doodian's**
190:4
**door** 166:14
**doubt** 67:3
72:3 191:3
**draft** 154:7,8
**drafted** 99:17
**drafting** 100:1
220:12 221:3
**draw** 138:5
**dream** 262:23
**drew** 188:14
**drill** 205:23
**drilled** 31:1,5
**drop** 134:12
140:8
**drvc** 11:14
12:4,5 62:11

62:12,20 138:2
138:24 139:3
156:23 158:14
158:20,22
159:7,9,13
163:21,23,24
164:1,1 165:21
165:22 166:1
169:7,9,10
172:18,22
178:5,8,10
181:5,6,9,10
181:12,13,13
183:3
**drvc's** 171:10
171:12 180:8
180:11,12,14
180:16
**dudin** 71:24
**due** 68:25
128:3 135:23
154:24 242:20
**dueling** 42:17
**dunk** 46:13
**duplicative**
228:6
**dutian** 238:21
238:22,23
248:23 249:2
**duties** 69:21
151:8 162:24
173:4,6,25
174:15 175:6
176:11 179:18
179:20 189:20
239:12 240:1
240:22 241:11

241:12 256:20
**duty** 21:2,3
23:15,16 24:13
55:1,2 120:20
135:22 232:23
238:22
**dvrc** 154:20,22
154:23,24,25
154:25 155:3
158:6,8,18,20
159:5 169:14
**dvrc's** 154:21
**dx** 17:15 53:13
57:17,17
103:13,15,16
103:19
**dying** 82:8,9
**dyslexia**
138:12

---

**e**

**e** 2:1,1 4:1,1
6:11 8:1,1
111:2 271:1
**e&o** 63:16
**earlier** 16:6
22:20 41:15
71:25 82:6
181:22 200:16
213:19 214:17
220:18 229:11
232:12 242:19
242:24 243:6
245:25
**early** 70:16
106:5 147:13
158:7 212:8

ears  80:25
ease  120:3
easier  50:15
  83:4,20 112:5
easily  10:12
easy  35:2 83:21
ecclesia  14:18
  16:3 43:24
  52:19 62:8,16
ecf  17:15 21:15
  53:6 97:24
  104:20,21
  107:7,9 137:4
  259:12,16,18
echo  224:9
economic  35:2
ecro  2:5 228:9
ecros  233:11
edits  154:8
edward  223:10
effect  50:9
  58:24 76:15
  78:19 79:7,14
  123:8 183:3
  213:25 229:9
effective  40:23
  41:10
effectively
  181:10
effectuate
  154:21
efficiency
  190:23
efficient
  190:22 227:16
effort  46:11
  69:19 71:20

189:22 197:19
201:1 204:15
209:11 216:18
220:17 221:2
243:8
efforts  58:4,9
  58:21 69:25
  72:10 180:8,9
  180:11,14,18
  180:21 186:8
  186:12 187:1
  188:14,20
  189:4 191:19
  203:16 206:21
  209:12 246:12
  265:6
either  14:18
  39:6 40:17
  45:21 90:16
  108:8 134:16
  137:19 163:15
  172:6 174:4
  196:14 200:19
  221:3 227:3
  235:3 266:17
elaborate
  189:6,24
electronic
  145:13 203:12
  231:21
electronically
  145:18 203:15
  231:6 232:22
eliminated
  107:6
elizabeth  6:23

emerge  139:21
emily  6:9
eminence  76:3
  80:5 81:14
  83:6
eminent  72:13
  82:2
emphasis
  31:18
emphasize
  38:20 79:18
emphasizing
  158:17
employed  20:6
  21:10 95:1,3
employee
  178:1 226:25
employees
  158:23 159:23
  201:4
employment
  218:19
en  212:4
  227:16 229:3
  230:14
encouragem...
  267:16
engage  101:1
  187:7
engaged  95:12
  134:10 149:23
  150:7 239:5
engineering
  243:17
england  90:6
enjoin  8:21
  83:3 84:1

enormous
  51:22 244:3
ensuring
  160:21 180:10
enter  66:24
entered  10:6
  13:5 27:19
  33:12 39:9
  213:6,21 214:6
  214:18 215:11
  268:6
enterprise
  244:21
enters  77:10
entire  58:10
  112:13 258:9
entities  11:18
  160:18
entitled  34:6
  58:19 69:8
  97:1 138:15,18
entity  26:15
  77:17 79:23
entry  17:19
equitable
  12:22
er  60:22
eric  6:1 7:6
  150:23 195:18
  196:8 207:17
  236:12 256:17
  267:17
erik  5:24
especially
  150:10 151:5
  151:23 158:11
  185:22 186:22

189:15
**essentially**
11:19 59:25
70:15,20 140:5
150:24
**est** 3:10
**establish**
233:17
**established**
44:13 142:5
**establishing**
14:3,3 138:3
**estate** 15:10
16:10 44:14,16
45:5 56:3
84:17,17 85:10
180:13,14
181:7,18
227:17
**estate's** 169:11
**estimate** 51:11
62:7 151:17
233:14 265:24
**estimated**
117:14
**estimates**
266:13
**estimating**
117:21
**estoppel** 46:8
57:22 66:25
68:19 72:15
80:16 85:13
86:23 166:17
168:2,15,25
181:8 182:6

**et** 1:15 3:3
23:24
**ethical** 85:25
86:8
**evaluate**
100:20 101:10
101:15 151:6
**evaluation**
113:11 150:10
**evaluations**
101:1
**event** 61:19
139:14 140:23
193:11
**events** 181:18
**everybody** 8:3
53:3 73:11
86:12
**everybody's**
85:11
**everything's**
144:7
**evidence** 9:3,7
9:24 10:5,6,11
11:7 17:16
29:12 43:21
57:14 66:20
71:8,19,21
72:11 73:13,22
74:16 92:22
96:9 97:7
104:6,9 144:5
144:17,22
146:7,14 147:3
147:6,11,13
153:5,8,13
192:23 193:3

200:7 201:18
203:7 207:4,4
207:12 227:19
228:24 245:2
264:3,17
265:13,16
**evidentiary** 3:7
3:10 10:9
**ex** 85:22,23,23
86:12,13
**exact** 141:21
**exactly** 19:17
22:6 24:8
26:12 44:19
59:17 61:19
64:18 71:5
87:9 132:20
140:6,16
247:20 253:7
**examination**
93:6,23 94:23
96:20,24,24
97:19,21 98:7
99:13 133:11
133:20 149:16
153:4,16,17
184:18 186:6
188:11 190:9
191:25 194:17
196:8 207:15
207:16,17
256:8,17 264:8
**examined**
69:22,23
**example** 28:15
30:25 49:12
89:18 135:13

138:8,9,13
141:2 151:16
152:1 160:8
162:14 163:6
171:9 199:24
203:4 205:7
211:17 214:16
215:23 220:22
222:7,8 229:2
230:12 232:13
239:11,23,24
244:7 253:14
253:25 254:17
257:24 258:5
**exceed** 33:23
126:24 130:5
**exceeded** 263:9
**exceeding**
45:17 138:20
**except** 73:5
113:20 264:17
**exception** 9:4
154:23
**excess** 47:13
95:22 119:24
120:14,16
130:20,21
131:16 138:19
139:3,20,24
140:4,15,17,18
140:20 141:4
141:19
**exchange** 13:3
256:25
**exchanged**
11:3 198:6

exchanges
  228:16
excluding
  109:10
exclusive  203:4
exclusively
  51:25 54:13
excuse  45:23
  54:24 60:2
  89:24 102:17
  103:13 131:3
  144:4 176:20
  202:9 229:20
  269:4
excused  143:21
  195:6
execute  84:12
  84:20 152:8,12
  152:16
executed  154:9
execution
  133:10
exercise  83:17
  103:25 154:9
exhausted
  126:14 127:8
  128:2,5 129:22
  139:15 140:2
  140:13,13,18
  141:16 182:24
exhaustion
  84:16
exhibit  7:10,11
  9:5 10:10
  21:15 26:5,6
  30:4 53:7
  57:15,15 63:5

64:4,21 102:25
102:25 103:14
103:15,18
104:7,20
105:11,14,18
105:24 106:25
107:6,9,10
111:1,2,4,9,19
111:19 112:2
112:13 119:12
120:1,5 137:2
144:5 145:7,22
145:23 146:1,7
146:8,8,11
210:6,8,9
213:11 217:4,5
217:16,18,20
227:12 249:18
249:19,21
250:6,11,17
252:3,7,9,17
252:19,22
253:14 255:12
255:18 258:11
258:12,13,16
259:5,5,9,10
263:19,23,24
264:3,6,8,18
264:22 265:10
265:13
exhibits  7:8 9:3
9:8,24 26:6
104:9 144:17
144:21,23
145:14 146:16
146:18,20
249:18 265:16

exist  82:5
  164:8
existed  25:9
existing  113:23
  250:22
exit  58:12
expect  185:4
  185:12,24
  189:9 194:25
  195:4 215:9
  248:4,5 262:6
expectation
  240:11 248:8
  266:19
expected  13:25
  93:18
expecting
  104:14
expeditious
  169:10
expense  128:1
  204:23
expenses  126:2
  127:19,19
  171:12
experience
  63:14 70:6
  95:9 123:21
  124:14 125:25
  127:3,4,14
  156:13 158:5
  163:20 169:15
  194:25 215:5
  238:11 240:10
  246:1
experienced
  98:24 135:4

160:8,10
expert  96:20
  154:13 155:21
explain  85:14
  221:9
explanation
  160:6
explored  228:4
exponential
  243:18
expressed
  13:19
extend  13:19
  39:20 40:24
  59:19 60:23
  210:5,11 236:4
extended  13:7
  38:8 88:21
extending
  88:12,14
extension
  13:18 14:5
  38:6 41:11
  72:21
extent  9:2
  48:18 71:12
  98:14 118:22
  124:14 134:10
  142:6 145:14
  146:16 157:10
  162:22 163:6
  164:13 172:17
  173:14 178:23
  180:10 183:8
  183:17,22
  184:6,7 199:8
  200:20 202:24

[extent - files]                                                                    Page 33

216:19 228:2
230:1 242:5,8
249:1 254:3,8
254:12 255:6
257:10 258:7
259:23 269:13
**extra** 3:9
174:12
**extraordinarily**
92:5
**extremely**
169:8,14

**f**

**f** 2:1,5 5:19 7:4
94:23 98:7
271:1
**face** 9:12 181:7
**faced** 32:24
75:15
**faces** 181:12
**facetious**
229:17
**facing** 143:7
151:1
**fact** 28:18 31:9
45:3 52:5 58:8
70:24 77:13,15
88:16 129:5
155:1 228:25
238:7,11 245:5
250:10 266:25
**factor** 34:10
82:1
**factors** 56:18
56:22 83:5,18
148:3

**facts** 32:18
43:8 50:24
54:5 57:6
71:16 221:20
246:14,15,19
246:21,24
261:18
**factual** 32:15
43:15 56:21
57:25 236:21
**faculty** 226:5
**failing** 26:22
**fair** 49:14 69:1
87:18 102:6
133:22 148:22
150:12 212:6
224:24 232:4
233:12
**fairly** 52:20
159:24 175:12
**faith** 71:9
**fall** 42:25 43:1
53:1
**fallen** 113:17
**falls** 43:22
258:8
**familiar** 23:15
57:2 107:21
108:10 111:13
112:25 114:25
119:17 131:6
148:2 155:22
156:3 165:9,13
192:21 202:12
202:15
**familiarity**
186:10

**family** 219:12
**far** 37:19 59:6
64:19 65:1
109:21 222:21
**farmed** 61:13
**fasano** 150:23
**fashion** 40:19
**father** 20:5
21:9 30:21
150:23 218:21
219:16 220:1,9
221:5,8 222:4
**fault** 47:23
48:4,20,25
49:4 50:5,6
76:9,11,13,19
77:1,9 78:6,8
78:18 79:14
80:13 91:8
**fe** 116:2
**february**
196:14,18
**federal** 75:15
244:18
**fee** 249:8,10
**feel** 161:24
**feinberg** 25:10
**feldshon** 6:24
**fell** 101:9,10
**fence** 130:10
**ferguson** 2:5
**fewer** 238:10
**fha** 245:9
**fhfa** 244:18,20
245:9
**fiduciary**
227:17

**fielding** 257:17
257:23
**fifth** 16:17
**fight** 215:10
**figure** 40:12
60:11
**figures** 64:8
**figuring** 41:19
74:1 151:3
**file** 12:11 31:12
31:12 74:3
200:18,22
201:20 206:5
209:3 242:6,8
246:13
**filed** 8:21
11:11 14:23
16:13,19 18:13
21:16,21,23
22:4 60:1
66:14,18,19
73:16,17 96:13
106:5 111:14
150:16 151:6,8
151:10 155:11
156:11,22,24
157:6,19
158:11 197:1
197:10,20
198:15,25
200:12 202:15
202:19,20
221:13 246:11
252:23 253:3
255:24
**files** 24:15,16
28:17 30:17

[files - focus]                                                        Page 34

74:4 185:16,23
186:2 200:6
201:1,2,3,10
201:15,17,23
201:24 203:5
203:16 208:11
208:23,24
209:1 215:16
215:20,22,25
216:1,3,4,4,9
216:12,12,16
216:18,20
230:6 234:2,3
234:7 235:12
235:14,14
237:7,11 242:4
242:5,9,10,15
242:22 269:21
269:25
**filing** 151:21
152:9 158:9
240:2 242:20
**filings** 159:25
241:6,15
**fill** 15:18
**filled** 127:25
**final** 13:8 61:4
62:1 199:6
**finality** 128:10
**finally** 178:4
181:2,3
**finance** 162:12
162:13 244:19
**financial** 27:14
27:25 38:12,12
53:12,14 55:25
58:7 70:11

85:3 109:9,10
109:11 110:17
112:19 113:9
114:3,14 115:3
116:25 150:9
150:20 151:2
158:14,24
159:5,14,20
160:2,10
164:10,11,18
165:2,12,14
169:24 170:9
170:18 185:7
185:11,15
189:20 192:2
193:14,21,24
194:2,22,23
205:22 206:1
206:18 208:9,9
209:6,7 210:2
211:9,15,17,21
211:23 212:4
212:12 219:7
229:1,5,7
230:3,17
238:21 244:24
248:24 249:1,5
**financials**
170:22,24
**find** 15:9 18:21
29:3 140:15
**finder** 77:13,15
**finding** 73:7
77:3,15 78:18
89:19
**findings** 77:10

**finds** 258:24
**fine** 10:2,14
17:6 30:9 43:9
44:9 93:22
97:15 98:2
119:6 120:11
120:11 143:17
144:15 145:17
145:18 234:23
**finger** 24:19
**fingers** 220:15
**finish** 14:10
60:12 81:5
142:9 147:2,6
147:11,12
233:18 266:19
**finished** 13:8
**finite** 205:18
**finra** 70:12
**firm** 9:14
22:15 26:13
85:21 108:8
114:25 142:9
260:6 263:15
**firms** 265:4,4
**first** 11:9,12
20:13,22 23:14
31:19 39:16
48:9 51:6,16
52:14 59:16,17
76:21,21 77:1
82:24 86:11,15
86:17 87:20
92:19 104:8,16
111:13 119:23
127:2 132:11
133:3,4,23,23

134:11,12
135:12,12,16
135:16,21,21
136:1,6,6
139:15 150:8
152:9,10
197:18 243:3
249:20 251:3
251:11,17,19
259:17
**firsthand**
158:9 186:10
**fit** 112:11
**fitzgerald**
206:22
**five** 11:21
14:21 15:3,8
21:23 65:14,16
65:19 66:4
130:23 143:7
143:10 152:4
160:12,12
165:20 199:2
**flicking** 241:20
**flip** 161:25
218:2 219:2,9
220:2 223:21
**flipping** 226:3
**floor** 4:12
**focus** 13:13
14:1,2 22:9
25:24 31:15
48:15 49:11
58:11 73:6
154:16 178:10
180:11

focused 28:12
40:10 44:20
58:8 73:6
80:22
focusing 66:22
folder 18:9
follow 71:22
120:13 159:18
166:24 194:13
228:6 245:24
265:2
followed
168:20 182:19
following
134:23 179:6
follows 113:10
footnote 118:4
118:14,16,18
119:3,3
forced 172:14
foregoing
271:3
foreseeability
24:4 26:18
forever 38:24
38:24 59:2
60:9
forgot 61:24
form 20:24
60:13 68:19
148:16 199:4
formal 114:2
198:11
formalized
250:25
format 232:22
232:22

forms 95:21
forth 67:9
254:16
forward 12:24
33:3 41:10
43:4,11 57:12
58:11 63:23
64:20 70:25
71:11 75:16
77:21 78:1
82:3 84:11
115:20 117:2
117:15 132:19
133:7,11 149:1
161:25 180:25
202:24 210:1
238:9 247:4
found 111:16
221:11 253:13
foundation
96:19 240:11
four 14:4 39:5
39:22 40:15
47:17 51:21
166:13,16
232:18,21
265:4,4
frame 216:3
frankly 199:3
fraud 91:10
free 161:24
freeze 58:21
frequently
232:7
friday 267:14
front 15:24
23:6 69:22,23

98:11 102:8
103:17,23
106:12 111:20
112:2 114:6
121:8,17
217:21 249:24
fulfill 162:16
162:24 173:17
174:14 175:6,8
176:11 177:6
full 15:20
33:19 34:22
35:6,16 52:13
112:2 180:19
193:3 266:18
fully 90:13
93:18 128:6
functionally
16:9
funds 110:13
115:18
further 14:20
41:11 59:6
76:22 138:23
143:18 154:10
163:24 184:16
191:21,23
194:11,17
195:5 200:12
238:25 256:6
future 80:17
126:4 179:12
184:1,10
267:19

**g**

g 6:19 8:1
gail 4:17 5:9
9:21 29:16
144:18
gain 69:2
gains 190:23
gallagher
119:22
game 86:4
gap 139:21,23
140:9,9
garabedian
6:12
garbled 177:21
gatekeeper
244:15
gather 203:7
gathered
203:13
gears 42:21
general 27:15
70:16 101:20
109:21,25
150:22,23
168:9 171:10
178:15,21
219:8 222:1
230:18 238:10
238:18 241:3
241:22
generally
11:23 17:13
20:17 24:2
25:24 28:25
43:22 44:1
75:17 121:4

[generally - going]                                                Page 36

123:22 131:21
132:6,14
150:15 156:21
156:25 216:11
235:17 270:4
**generated**
224:23
**geometric**
243:18
**george**  6:8
**geremia**  5:8
25:12,13,14,17
25:17,20,24
27:15 144:2
146:25 147:4,9
147:15,17,19
147:22 148:8
148:14,18,21
149:3,4,15,17
152:7,22 153:3
153:7 161:15
184:19,22,22
184:24 186:4
187:13 188:2,8
189:12 191:5
191:21 192:24
194:13,16,16
194:18 195:5
195:10,13
267:10,12,12
267:21 268:12
268:16,18,20
268:23
**getting**  82:9
135:2 138:12
210:20 211:19
246:1 262:17

263:1
**giant**  105:24
**give**  10:10,12
18:19 27:11
37:9 61:25
65:23 68:17
94:11 96:25
97:23 98:16
106:17 127:16
149:9 153:14
195:20 201:7
203:19 206:7
218:11,14
233:15 244:5
258:20 265:22
**given**  12:14
55:25 102:17
121:22 154:5
160:22 177:17
190:3 211:16
247:14,22
265:19
**giving**  160:1
**glacial**  68:6
**glad**  267:23,24
268:5
**glancing**
251:11
**glenn**  2:2 168:5
**global**  38:8
**globally**  12:22
**go**  8:9,17,17
10:15 12:16
13:21 15:20,25
18:25 19:2
20:13,21 21:4
21:8,14 22:19

23:8,13 24:20
26:10,17 29:9
31:4,7,13,15
33:3 37:5,24
40:1,2 41:5,21
42:8 43:3,8,17
43:18 44:1
48:14 49:16,25
49:25 50:22
51:13,13,20
53:21 56:6,23
57:12,13 58:2
61:17,18 65:10
65:12 66:7
70:25 71:25
74:2 75:16
78:22 82:1,3
84:11,22 88:10
89:8,21,23
90:8 94:21
97:18 98:3,19
98:21 106:16
107:13,16,19
107:19 109:7
110:9 113:6
114:8 117:11
117:11 118:25
119:10 120:11
130:10,13
133:7,11,14
137:7,8 146:23
147:5 149:1
152:6 158:2
161:1 166:23
171:1 176:1
180:25 187:12
195:12 202:1

202:24 206:9
210:1 212:19
216:18 222:14
224:4 225:2,5
225:9,11
230:10 236:17
245:4,16 247:3
249:20 255:4,9
259:10,16
264:5 265:19
266:10 269:2
**goal**  12:20,25
**goals**  239:9
**god**  81:2
**god's**  80:25
**goes**  26:17 47:3
61:17 63:22
71:11 72:5
77:21 78:1
101:22 109:16
119:15 131:20
140:4 232:12
262:16,19
268:4
**goffe**  6:13
**going**  12:6,24
18:8 20:9
21:12 24:9
32:19 34:20
38:23 40:1
41:10 42:6,16
48:8 51:7
52:24 53:2
57:25 58:2
60:11 61:12,13
61:14 62:1
64:16 65:8,9

65:23 66:4,10
66:11,12,23
67:5,7 68:7,10
68:17 69:4,15
69:18,19,20,24
70:1,17 72:8
73:9,23 74:2,2
75:11 76:1
81:16,18,25
82:7 84:1,5,20
85:6,7 86:16
88:23 89:9
90:14,15 91:15
97:8,12 98:1
98:18 102:4
104:4,7,15
106:15 109:25
111:16 112:16
112:23,24
113:10,12,12
114:7 115:20
116:17 117:2
119:12 125:3,5
125:15 127:5
128:19 130:11
132:19,22
133:2 134:6,16
137:10 138:7
144:8 147:2
150:24 152:19
154:3 155:6
166:24 171:3
173:15 187:3,7
189:9,10 193:9
196:2 225:5
227:8,18 228:5
228:8 233:17

235:4 238:1
243:23,24
244:2,14,15
253:7 255:12
255:14 256:13
263:14 268:7
**good**   8:2 9:20
16:14 31:8
40:5 66:8 71:8
94:25 98:9,10
115:17 144:18
146:21,25
149:3,18,19
153:15,19
180:22 196:10
196:11 207:19
211:5
**gorrepati**   6:14
**gotten**   63:3
72:21
**government**
244:21
**grand**   28:15
30:16 200:24
**grant**   38:15,16
71:7 73:2
133:13
**granted**   38:4,9
38:12 58:12,14
115:15 197:22
215:1
**granting**   38:15
**grateful**   266:23
**gray**   53:6
**great**   57:4
59:13 67:16,22
67:24 102:10

207:16 227:13
229:1 250:3
**greater**   117:23
117:24
**green**   1:20
119:23 120:14
**greenwood**
4:17 5:9 9:21
9:21 144:18,19
144:21 145:4
145:12,23
146:1,5,15
234:14 236:11
236:15 237:5
237:16
**grounds**   208:7
231:11
**group**   34:14
38:2,12,12
56:17 58:7
70:11 244:22
246:16
**guess**   11:2
28:19 39:24
77:1 81:21
138:12 205:12
253:22
**guiding**   267:1
**guy**   67:21 73:8
223:9
**guys**   71:24

**h**

**h**   4:15,25
**hadn't**   108:17
**hagan's**   222:25
**half**   16:19 39:1
156:10 158:7

164:9 167:23
185:8 193:20
243:3
**halprin**   220:1
220:9 221:5,9
222:4
**hand**   10:17
15:14 94:9
149:7 152:19
180:13 195:19
196:2 217:16
**handful**   229:22
**handing**   28:3
**handle**   61:12
173:4,8,11
174:5 179:18
188:13,15,19
189:3,20
191:18
**handled**   29:1
217:7
**hands**   116:14
**hang**   258:20
259:2
**happen**   32:10
67:19 81:5,9
124:1 129:25
**happened**   32:4
38:7 86:17
123:17 124:5
127:8,13,17
128:13 129:1,5
129:14 130:8
140:23 236:22
**happening**
86:6

[happens - honor]                                                Page 38

**happens** 80:11
81:7
**happy** 8:6,8
51:11 56:11
57:7 65:13
75:22
**hard** 66:2
173:12 186:21
189:7 267:15
**harder** 49:10
**harm** 66:24
68:2,18,23
69:8,11 71:18
71:20 72:13
82:2,6 180:15
**hasn't** 78:3
183:10 184:12
247:22
**hate** 55:13
**haven't** 73:15
124:1 127:11
155:10 156:17
190:23 204:17
**he'll** 93:21
**head** 160:7,8
207:1
**heading** 80:5,6
213:25 253:12
253:15,16
254:14
**hear** 12:6
43:19 52:9
57:10,16 58:2
96:23 107:1
123:1 257:19
267:23

**heard** 60:15
64:25 73:11
119:16 132:1
134:7,8 210:4
269:20
**hearing** 3:1,4,8
3:10,11,12
9:24 10:9 11:4
34:16 38:15
41:15 59:20,22
60:1 66:9
70:11 155:7
267:22
**hearsay** 96:20
97:2,5,5,17
145:10
**heavily** 72:4
160:24,24
189:8
**heavy** 238:3
**heffernan** 95:4
**hello** 153:20
**help** 18:16
40:12 162:23
173:1,17
**helped** 196:23
**helpful** 11:10
14:12 18:1,23
22:13,17 26:8
44:22 57:5,14
62:25 63:4
64:4
**helping** 178:11
**helps** 162:9
**hereto** 137:2
**heuer** 6:15

**he'll** 258:23
**he's** 173:12
174:16 239:16
260:10
**high** 47:11
92:5 151:21
219:12
**higher** 49:15
51:21 152:1
222:23 223:17
**highlight** 57:11
**highlighted**
218:25 219:2
219:10 221:6
**highly** 167:8
169:25 265:7
**hire** 190:19
**hired** 190:25
**hiring** 12:1
23:24 36:20
91:3
**historical** 62:9
158:6 160:20
**historically**
154:18
**history** 27:8
28:22 38:6
65:17 199:21
200:2,5
**hmm** 224:12
**hold** 96:13
146:6
**holding** 233:16
**holler** 228:13
228:14
**hollering** 87:4
87:6

**holy** 219:12
**hon** 2:2
**honor** 8:6,8,11
8:18 9:1,13,18
10:3,7,16,20
11:5,8,9 13:11
13:16 14:24
16:21,22,25
25:14 38:19
40:6 41:22
42:9 44:10
54:24 55:10
59:10 62:4
64:12 65:6,24
66:8 69:12
73:8 78:13
79:10,24 81:1
88:24 89:12
91:21,23 92:21
93:10 94:2,6
94:15 96:8,11
98:5 99:5
103:3 104:13
104:24 105:14
106:12 107:2
107:17 111:3
113:7 116:1,16
117:8 119:5,12
124:13 129:12
130:11 133:2
133:12 143:17
143:20 144:3,4
144:18 145:1,7
145:12 146:10
146:19 147:9
147:15 148:2
149:3 151:20

157:21 160:5
161:15 165:25
166:25 168:11
170:13 176:5
188:6 191:22
192:24 194:14
195:8,10 196:1
201:19 203:1
204:21 207:3
207:10 213:19
221:18 222:13
222:15 224:10
225:7 228:4
233:5 236:20
236:25 242:4
242:24 243:1
243:16 244:13
245:12 247:17
249:10 250:1
256:5 259:20
263:7,10 264:1
264:12 265:11
265:25 266:8
266:21,22
267:3,5,10
268:9,12,25
269:1,3 270:6
**honor's** 38:1
81:22
**honor's** 250:24
267:13,16
269:14
**hook** 87:17
**hope** 40:3
139:4 189:10
**hopeful** 187:5

**hopefully**
60:15 66:15
147:11
**hour** 16:19
233:19 266:1
266:11,12
267:5
**hours** 151:22
152:4
**housekeeping**
9:2 263:12
267:10
**housing** 244:19
**hoyt** 5:10
**huh** 228:23
**hulme** 6:16
**hundred**
165:12
**hundreds**
204:20 226:13
**huneke** 20:5
21:9
**hybrid** 3:4,12
**hyde** 3:25
271:3,8
**hypothetical**
90:7 137:10
138:7 139:5
**hypothetically**
34:5
**hypotheticals**
89:17

**i**

**i.e.** 114:2
**iaian** 9:18
**iain** 4:16 54:24
89:7,9,14 98:6

**ian** 266:22
**ice** 85:12
**icrp** 148:10
**idea** 117:3,19
192:5
**identical** 99:23
**identified**
14:20 26:7
68:23 219:5
243:13
**identifies** 19:1
19:9
**identify** 15:7
16:24 17:2,4
25:16 36:10
53:7 89:13
94:4 120:10
184:21 194:15
229:13 241:13
251:6 267:11
**identifying**
227:24
**identities** 26:22
**illustrate** 19:21
**illustration**
49:16 50:15
51:4
**immediately**
140:8 202:20
238:17
**imminence**
67:12,16 81:14
**imminent**
67:11 68:2
69:7,11 70:18
71:18

**impact** 15:11
70:23 73:21,24
77:14 84:4,17
84:18 85:10,12
92:9 132:18
**impacted** 59:7
191:4
**impair** 69:25
**impaired**
240:21
**impairment**
69:24 114:15
**implementati...**
95:13
**implicate**
14:18
**implicated**
17:22 33:7
**implicating**
26:16
**implicit** 78:9
**important**
13:22 17:18
35:9 60:11
172:23
**importantly**
138:20
**impose** 66:11
77:3 197:19
**imposed** 133:6
**imprecise**
196:15
**improperly**
225:23
**improve** 151:3
**improving**
150:9

[impute - information]                                        Page 40

**impute** 36:24
  36:25
**inability**
  237:18
**inappropriate**
  26:23
**incident** 32:5
**incidents** 32:5
**include** 201:18
  230:16
**included**
  203:16 207:25
  208:8 229:11
  239:19
**includes** 22:24
  26:15 151:12
  155:14 201:23
  201:24 206:1
  215:16
**including**
  158:14 159:5
  159:13 163:22
  199:21 201:20
  205:3 209:7
  219:6 230:3
  234:2 235:7
  244:23
**income** 133:9
**inconsistent**
  56:25 67:1
  72:15 80:15
  81:20
**incorporated**
  219:13 220:6
**incorrect** 220:9
**increase**
  189:10,10

**increased**
  56:25 189:14
**increasing** 57:9
**incurred** 54:11
  115:16 126:3
  127:6,20
  181:16
**incurring**
  121:5
**indefinite** 14:7
**indemnificat...**
  34:21 37:18
  56:25 57:9,11
  138:19 166:22
  168:2,15,25
  181:8,12
**indemnify**
  70:22
**indemnity**
  33:21 34:2
  35:4 37:20,21
  67:1 68:19
  79:20,23 80:14
  81:6,19 84:19
  182:3
**independent**
  25:8 168:24
  222:5
**independently**
  182:10
**index** 7:1 18:10
  26:4 251:10,16
  251:21,25
**indicate** 173:10
  193:23 253:14
**indicated** 13:9
  151:4 167:22

  173:20 174:22
  175:1,2 178:20
  189:8
**indicates** 115:3
**indigestion**
  64:15
**indirectly**
  70:13
**indiscernible**
  18:20 19:3
  28:3 37:5
  57:19 65:4
  85:19 92:23
  105:9,10 109:8
  110:4,9,22
  111:2,9,17
  112:5,15,17
  116:2,6 117:17
  121:2,20
  122:16 129:17
  137:6,23
  140:11 144:7
  144:25 145:20
  153:12 161:20
  162:1 220:13
  224:4 235:5
  251:11 258:1
  264:9 265:9
  268:11
**individual** 12:2
  20:5 24:17
  32:6 36:14
  154:20 169:8
  171:5 174:25
  181:5 197:23
  200:3,19,21
  218:20 219:8

  220:21 227:19
  227:23 240:3
  246:16 260:12
**individualized**
  20:11 220:17
  221:1 224:11
  243:8
**individually**
  198:16,17
  204:23 220:21
  244:3
**individuals**
  20:20 162:7
  172:13 176:21
  177:1,16 178:9
  179:24 189:25
  190:10,21
  199:21 206:12
  219:5 220:24
  238:17 239:4
  239:18
**individual's**
  199:21
**influencing**
  269:13
**informal** 29:1
**information**
  17:18,25 22:7
  28:1 63:3
  100:7,11 156:1
  163:5,23 164:5
  164:10,16,18
  165:1,2,4,7
  169:24 170:2,4
  170:9,12,16,19
  170:22,23
  173:10 175:9

[information - insurers]                                                    Page 41

| | | | |
|---|---|---|---|
| 178:25 185:7,8 | 70:11 71:7 | 47:4,4,20 48:8 | 256:21 257:14 |
| 185:11,13,14 | 72:14,16,20 | 48:17,20,24 | 257:16 258:1,6 |
| 185:15 192:3 | 73:2,5 88:18 | 49:22,24 50:18 | **insure**  91:9 |
| 193:21,24 | 107:9 115:15 | 51:16 52:18 | **insured**  90:24 |
| 194:8,23 195:3 | 133:6 152:13 | 53:14,17 54:11 | 95:19 115:25 |
| 199:13,20 | 185:22 210:6 | 56:24 57:8 | 127:24 129:7 |
| 200:13 205:23 | 210:12 244:7 | 61:25 62:5 | 131:6,11,18,22 |
| 206:1 207:22 | 244:15 | 63:12,19 84:18 | 132:4,9,15 |
| 208:9 209:7,7 | **injunctions** | 85:11 89:10,11 | 138:15,21 |
| 210:2 211:9,14 | 60:18 | 89:22 95:4,14 | 139:25 140:5 |
| 211:16,21,24 | **insistence** | 95:21,22 96:1 | 140:12,14,24 |
| 212:4,12 | 211:22 | 100:17 101:3 | 141:15,18 |
| 220:19,22 | **insolvency** | 101:15,21 | 142:3,5 173:1 |
| 227:24 229:2,6 | 54:1 | 106:25,25 | **insured's** |
| 229:6,7,7,12 | **insolvent**  33:22 | 107:9 109:16 | 116:12 |
| 230:3,13,18 | **instance** | 113:19,22 | **insureds**  140:3 |
| 232:1 242:1 | 125:18 | 116:8 117:17 | 140:19 141:16 |
| 248:24 249:2 | **institute**  101:3 | 118:5 119:14 | 233:4 247:12 |
| 254:6 255:21 | **institutional** | 133:3,9,20,23 | 258:10 |
| **initial**  27:14 | 190:21 | 134:6 136:5 | **insurer**  65:2 |
| 91:25 154:7 | **instructed** | 137:15 138:5 | 90:6,17,18 |
| **initially**  13:1 | 168:17 179:3 | 138:17,21,25 | 91:12 123:9 |
| 131:16 150:7 | 182:16 | 139:6,13,15 | 132:15,19 |
| 150:25 | **instructions** | 140:20 143:10 | 134:20 135:2,6 |
| **initiated** | 168:20 179:6 | 150:22 159:21 | 135:10 137:13 |
| 160:23 | 182:20 | 160:1,12,19 | 137:13 142:2 |
| **injunction**  3:4 | **insulate**  58:24 | 163:25 165:21 | **insurer's**  55:14 |
| 8:20 11:12 | **insurable** | 171:13,14 | 132:8 142:6 |
| 12:25 13:2,5 | 90:23 | 172:21 181:14 | **insurers**  52:2,7 |
| 13:15 29:13 | **insurance**  7:9 | 181:17 182:23 | 52:10 53:25,25 |
| 37:14 38:3,5,7 | 9:8,25 10:6 | 183:4 185:16 | 90:10,11 |
| 38:9,13 40:22 | 11:19 14:19 | 193:14 208:8 | 120:17,19,20 |
| 41:9,10 42:22 | 15:11 17:21 | 209:11 229:2,7 | 122:15,20 |
| 43:2 58:7,13 | 33:18 34:10,12 | 229:12 230:17 | 124:6 125:2,10 |
| 58:24 59:19 | 34:13,22,22 | 232:6 238:19 | 125:18 126:20 |
| 63:11 66:25 | 43:14,16,17,18 | 247:9,11,13 | 127:1 131:19 |
| 67:5,9 68:10 | 43:21 45:21 | 248:3,16,18 | 160:23 232:2,6 |

232:9,16,21
240:7 247:19
248:4,10,14
257:2
**insurmounta...**
204:18,22
**intend** 9:6,7
222:2
**intended** 30:12
**intending**
229:19
**intent** 222:1
251:13
**intentional**
20:19 91:4,8
91:10
**intentionally**
26:22
**interact** 150:19
161:14
**interchangea...**
108:2
**interest** 30:13
63:1 64:2,2
**interested** 28:9
34:17 85:15
255:7
**interesting**
22:1,21,21
24:8
**interrogatories**
199:18,20
219:23,23
223:1 225:8
226:12
**interrogatory**
199:18 200:9

217:14 218:13
218:18 219:3
219:20,25
220:3 221:5,14
223:8,21
225:14,15,16
226:1,4,23
**interrupt** 29:5
**intertwinement**
56:9
**introduce** 9:16
207:4 256:12
**introduced**
263:24 264:7
**inverse** 200:4
**inverted** 114:7
**invested** 115:7
**investigated**
220:21
**investigation**
221:1
**investment**
244:23
**invite** 31:9
**invoke** 81:2
**involve** 44:4
134:6 252:12
**involved** 12:7
18:25 19:23
22:23 32:19
42:19 52:3
63:7 70:8,18
71:1,9 72:4
74:11 126:8
143:6 150:19
158:10 160:24
164:2 170:8,21

171:4 172:2,7
177:17 189:8
199:12 204:7
220:12 234:10
268:3
**involvement**
96:5 169:15
183:8,17,23
184:7 196:17
238:3 248:4
250:9,14 251:7
**involves** 19:14
19:17 160:21
**involving** 19:6
30:24 31:25
115:20 116:22
247:12 250:13
**ion** 18:17
**ircp** 25:22,25
147:17 148:2,2
148:20
**irreparable**
66:24 69:7
71:14,18
**island** 261:12
262:4
**islands** 142:24
**isn't** 76:6 85:7
85:14 129:23
135:16 139:12
142:1 166:20
168:23 176:9
176:15,18,20
176:25 177:5,9
177:12 178:12
179:8 180:19
182:22 183:22

202:21 228:17
245:21 246:9
259:24
**issue** 23:24
24:5,10 25:9
28:3 30:15,21
31:1 32:25
34:20 36:18,22
42:15 43:15
44:17 45:17
46:13 49:5
54:22 55:6,16
59:5 60:17
63:1 64:14
66:22 68:11
69:24 70:10
75:11,15,19,21
76:3,3,25
80:10,16 82:22
82:24 83:15
84:14,24,24
87:19 88:10
126:13 133:8,9
134:12 135:12
141:12,19,21
148:15 199:12
200:8,14 203:1
211:25 212:10
212:10 227:8
228:18 237:7
237:12 243:5
243:15,18
244:17 245:15
250:22 252:18
252:24 265:1
267:10 268:14

**issued**  16:16
47:2 63:12
67:14 84:3
108:3,22
214:23 221:11
**issues**  25:15,20
28:2,13 30:23
37:16,24 41:20
42:11 55:16
56:21 57:25
59:2 68:4
80:14 85:2
89:10 96:19
97:3 151:2
166:1,22 173:2
181:9 198:10
199:14 201:4
203:22 204:13
205:8 206:17
206:18,20
224:13 232:17
242:18 243:4
245:8 269:9,10
**it'll**  90:10
112:4
**item**  253:25
254:1
**items**  150:8,25
151:12,14,15
159:25 166:7
166:16 169:3
169:23 173:15
182:13 253:9
253:10
**it's**  73:23 80:2
105:12 151:25
152:4 153:13

153:14 164:7
176:17 180:19
182:22 183:9
185:19 193:16
196:5 203:2
204:21,22
206:4 207:11
210:6,6,8,23
210:25 212:3
212:11 213:18
214:13 218:5
218:13,21
231:24 233:7
235:17 236:13
238:22 239:4,7
239:15 241:19
242:7 243:18
245:19 247:2
249:2 250:10
251:5,16
252:21 253:18
259:24 263:11
264:2,11
265:12,14,15
265:21 269:4
270:7
**i'd**  212:19
217:16,17
224:3,9 245:9
259:8,9 261:9
263:18
**i'll**  153:14
200:13 201:6
247:5 262:12
265:22 268:21
270:8

**i'm**  105:19
152:3,19 153:7
153:24 154:3
155:3,6,8
159:18 161:3,6
163:3 166:7,7
166:24 170:12
170:15 171:3
172:10 173:9
175:3,3,3
178:20 181:2
184:2 187:20
191:12 193:17
198:13 201:13
208:6 209:18
209:23 210:20
211:19 213:25
216:5 220:22
221:12,14
222:12,15
223:3 225:5
226:14 228:5
229:19 232:25
233:14 238:1
240:5 242:3
243:22 244:5,6
244:14,14,15
246:13,15
247:16 248:16
250:21 251:11
252:21 254:11
254:13 255:13
256:11,13
257:19 259:22
260:5 262:9,10
263:14 264:12
267:23,24

269:2
**i've**  150:18
158:6 174:22
175:1,20
186:19 202:25
206:17,18,20
206:21 207:1
222:21 228:4
267:25

**j**

**j**  4:20 119:22
**jaeger**  197:15
**jaeger's**  197:21
**jager**  213:7,8
**james**  5:15,25
6:16
**january**  13:4
13:18 150:2,4
196:14,18,21
226:6
**jason**  4:21
**jeffrey**  4:22
**jennifer**  5:5
94:5 195:17
256:15
**jeopardized**
63:12
**jersey**  143:8,9
**jesse**  4:23
**job**  239:15
251:15
**john**  5:1,4 6:19
220:1 221:5
222:25
**joinder**  260:18
260:20,24

**joinders**  145:8
  145:8 258:16
**joint**  9:4 11:24
  32:21 33:1,11
  33:11,16 45:6
  47:23 48:1,7
  49:4 89:21
**jointly**  91:13
**jones**  4:3,10
  8:10 25:17
  154:7 168:12
  231:14,23
  237:1 256:15
  263:16 264:15
  267:12 269:7
**jordan**  260:7
**joshua**  5:10
**judge**  2:3 13:5
  13:24 25:18
  39:10,13,14,18
  40:25 60:22
  61:10,12,17,18
  63:15 67:13,19
  67:24 68:8
  72:22 75:15
  77:13 153:4
  168:5 189:24
  197:21 213:6,8
  262:6 263:2
  267:14 268:1
  268:23 270:9
**judgement**
  77:10 80:8
  81:7,8,11
  84:12,13,14
  128:5 130:4
  133:10 136:2

  140:3
**judgements**
  68:7 72:15
  80:15 81:20
  84:21 127:9
**judges**  61:14
  262:3
**judgment**
  12:17,20 33:12
  33:15,16,18
  45:10,20 46:9
  46:24 47:2,14
  47:16,22 49:2
  49:17,24 50:4
  50:9 52:24
  55:4 126:21,23
  211:18 212:13
**judgments**
  57:1 63:24
  67:1
**judicata**  37:25
  57:23 66:25
  68:18 72:15
  85:13 86:24
  163:25 165:21
  166:17 168:1
  168:15,24
  181:8 182:8
**judicial**  60:4,5
  72:22 187:6,6
  212:25 213:5
  268:6
**july**  13:8 40:16
  202:8 226:6
**jump**  43:11,16
**june**  40:23
  41:11,18 60:16

  72:20 73:5
**jurisdiction**
  56:6 82:14,16
  82:18,22,25
  83:12,14,16,25
  91:25 92:1
**jury**  28:15
  30:16 46:3
  47:1,7,13,22
  48:4,6,25
  49:17 76:11,15
  77:5,7,13 78:4
  78:17 79:6,14
  97:2 200:24
**justice**  197:15
  197:16
**justified**  14:9
  42:22 61:22
**justify**  59:6

## k

**karen**  5:7,17
  6:6 234:16,17
  269:6
**keep**  20:9
  21:12 68:24
  73:5 79:22
  81:23 84:9
  87:23
**ken**  9:13 16:25
  25:10 29:10
  42:4 64:12
  154:3 225:14
  226:14
**kenneth**  4:15
  4:25 5:19 7:4
  9:5 94:7,23
  98:7

  **kept**  28:13
  268:7
**kerfuffle**  85:21
**kevin**  2:5
**key**  72:7 155:1
  158:13 159:5
  159:13 178:5
  180:9,16,20
  189:25 238:5
  238:11,15
  240:15
**keys**  220:15
**kick**  51:20
**kicked**  16:3
**kicks**  132:15
**kind**  18:24
  19:11 23:9
  24:18 25:5
  26:14 31:20
  34:18 42:10
  75:5 92:10
  104:12 154:17
  245:21
**know**  11:2
  16:16 24:9
  27:5 28:13,14
  28:18 30:10,16
  31:1,6,10
  32:11,24 33:15
  33:23 34:15,19
  35:12,15,22
  36:2 38:11,16
  39:17,19 40:3
  40:15,23,24
  41:12,18,19
  44:1 45:9,18
  46:20 47:7,8

**[know - law]** Page 45

47:14,20 48:6
48:24 49:2
55:15 58:5,17
58:24 59:2
60:4,16,17,21
61:5,11,11
62:8,17 63:2,6
63:13,20 64:6
65:14 66:20
67:19 68:5,6
70:1,24 71:23
71:24 72:24
73:4 74:3,13
75:10 76:5
79:17,21 80:19
81:20,22 82:5
82:7,12 84:19
85:10,18 86:5
87:10 88:7,8,9
90:13,20 91:9
92:25 99:2
100:25 103:2
104:18,24
111:20,25
114:15 115:8,9
115:13 116:3,8
116:9,12,15,21
116:24 117:13
118:1,3,20
122:23 123:3,7
123:7,20 124:4
124:20,21,23
124:25 125:24
126:18 127:1,7
127:13 128:13
129:2,4,10,11
129:14 130:2,3

132:5,20,21
133:13 134:5
135:9 136:20
144:15 145:19
146:22 147:25
148:12 155:18
155:25 157:13
157:15 158:20
158:22 159:16
161:12 163:11
163:13,17
167:4,12,17,18
169:1 173:16
173:20 176:1
176:16,21,24
176:25 177:4,5
177:12,16,22
178:1 179:23
180:3 183:2,14
183:22 184:3,3
184:25 185:17
185:19,21
187:22 189:7
192:7,8,9,17
193:8 200:25
210:20 212:14
215:2,3,7,8
218:18 220:18
221:20,22
223:11,15,16
224:4,10 225:9
229:22 230:23
231:25 232:3
234:16,17,22
235:2,11,19,20
235:21 236:10
236:22 239:4

239:23 240:1,2
240:11,23
241:10 243:2,5
243:19 246:4,8
246:10 248:7
248:13,16,22
249:10 250:22
251:5,14
252:14 253:8
254:21,23
255:1,5 258:2
258:5,6,18
260:7 261:5,6
264:6 266:13
266:15 267:13
267:25 268:3,6
**knowledge**
36:25 37:1
96:4,6 123:13
123:15 125:21
126:5 156:7,19
157:9 163:6
165:15 167:9
171:22 172:1
173:3,24
174:13 175:5
176:4,9 177:9
177:20 178:15
178:21,23
179:8,12,17
183:7,13,16,18
184:3,6 188:19
190:21 220:11
239:17 240:20
248:22
**knows** 44:10
80:18 157:13

235:9,9
**kooks** 67:17
**kramer** 5:11
**krista** 206:23

**l**

**l** 5:5
**l67** 3:6
**la** 5:3
**lafferty** 67:13
67:19,25 68:8
**laicization**
208:12,18,19
**laid** 190:14
**language** 29:16
29:17,18 123:5
123:7 129:16
129:19 213:24
217:15 218:25
218:25 224:1
253:15,21
**large** 63:18
65:2 108:16
132:1 160:4
228:25
**largely** 58:6
74:19 198:20
203:3 211:16
239:22
**larger** 107:3
112:1 165:3
**largest** 242:3
**late** 72:1 86:3
**latest** 99:22
**law** 23:23 24:6
37:16,17,21
43:5,9 46:19
46:23 75:24

76:23 85:20
86:9 136:5,5
196:19 219:14
219:15 220:8
221:7 226:8
265:4 268:10
**laws** 33:2
**lawsuit** 86:2,3
86:19
**lawsuits** 11:22
76:6 151:5
156:22,23
**lawyer** 74:1
85:20,21
206:11 248:16
**lawyers** 74:9
74:11 86:1,7
86:10,14 98:24
169:1,2 182:10
269:12
**layer** 108:21
139:15
**layers** 139:21
**laypeople**
208:20
**lead** 150:14
196:23
**leadership**
209:13
**leading** 209:11
249:3
**lean** 173:20
186:20 191:15
**learn** 100:10
**learned** 154:10
**leave** 61:23
143:15 198:23

224:3 245:10
247:5
**leaving** 208:20
**led** 12:10 31:10
**ledanski** 3:25
271:3,8
**left** 16:1 47:21
143:4 172:25
191:1 246:22
**legacy** 62:18
**legal** 8:24
32:17,18 42:21
59:2 71:15
86:20 89:1
158:14,23
159:5,13,19,24
159:25 160:7,9
162:12 166:6
166:21 192:20
219:6 225:23
241:16 271:20
**lengths** 227:13
**lengthy** 187:4
**lesser** 95:23
**letter** 14:23
15:13,16 202:7
**letters** 144:14
**let's** 105:12
187:23 195:11
205:8 224:3
225:6 228:11
233:7 236:5
**level** 46:6
53:16 92:10
109:23 113:17
113:18,18
154:18 170:21

171:4,8
**levels** 53:16
**lever** 69:5
**leverage** 68:22
69:2,8
**liabilities** 33:23
113:23 117:14
**liability** 11:24
14:3 17:12
23:23 32:13,14
32:22 33:2,11
33:16 35:24
36:1,6,9,14,16
36:21 44:25
46:15 47:24
48:7 49:4
56:25 70:22
77:3 91:13
119:21 125:23
126:3,15
127:24 131:10
138:3,13
154:19
**liable** 47:2 49:1
89:21 91:14
**liaison** 198:1,2
199:4
**life** 208:20
**lifted** 40:11
74:7 84:12
**lifting** 244:14
**lifts** 22:3
**likelihood**
167:10 215:8
**likely** 42:24
81:16 148:1
169:25 257:9

**limit** 44:24
45:5,15,23
47:14,21 48:2
49:13 52:18,23
52:25 53:11,22
92:7 131:6,9
140:18 141:6,7
141:9
**limitation**
53:19 56:1
**limitations**
211:17,20,23
244:11
**limited** 14:4
38:18 39:2
53:23 56:2
60:13 110:13
110:20 154:22
156:9 164:16
181:14,17
**limits** 44:20,25
45:2,4,18,19
47:8 50:21,25
51:5,17,19,21
51:22,23,24
52:15,16,17,20
53:10,23 54:7
54:7,8,10
55:22,22,23,24
92:5 95:18
109:3 126:24
127:8 128:2
130:5,15,17
131:10 136:13
**line** 85:20
108:24 119:23
119:24 174:11

176:4 187:17
187:21 188:11
251:4 253:9,10
253:13,18,25
254:1,18,21,22
255:12 263:3
**lines** 224:14
**linkage** 72:8,10
73:19
**linked** 73:13
**lips** 80:25
**liquidation**
114:3
**liquidity**
113:11 117:19
**list** 10:10 14:23
17:19 21:15
200:2,5
**listed** 9:3
218:20 219:5
252:17,22
**listing** 193:3
**listings** 155:22
**lists** 15:17
**litigate** 12:12
58:21,22
139:23 205:7
**litigated** 24:18
32:14 42:17
54:23 55:7
74:6 154:23
227:9
**litigating** 12:5
41:5,14,20
169:5 260:11
**litigation** 8:21
12:9,10,13

13:14 14:2,11
29:20 40:19
42:18 49:7,8
57:21 59:14
61:6 63:13,22
68:5,10 69:16
70:9 71:10
86:15 92:8
122:22 138:2
156:5 160:22
164:2 169:13
169:16 171:5,7
172:7,16,17
178:15,21
195:1 196:24
197:18 211:24
213:23 230:15
238:4 239:18
245:22
**litigations**
202:13 206:15
**litigator** 63:14
**little** 8:12
11:13 14:12
16:20 60:3
64:15 88:24
95:8 154:14
160:6 170:13
197:6,6 224:1
245:19 261:12
266:16 270:7
**live** 228:2
236:7
**llp** 4:3,10
**lmi** 54:25
55:12,17 125:9

**locate** 259:1
**located** 259:5,6
**locations** 26:23
**logic** 73:22
**logical** 159:24
**logistical** 243:4
**logs** 231:15,16
**london** 43:23
52:6,10 54:4
54:14,17 55:23
62:17 84:7
90:3 92:4
121:4 122:20
124:6 125:2,9
125:18 130:15
131:19 132:19
137:12,13
138:4
**long** 38:22
39:22 68:5
80:19 104:19
146:22 196:12
196:15 245:20
261:12 262:4
265:20
**longer** 13:10
14:8,21 39:14
50:17 60:3
73:3 113:22
199:3 233:17
**look** 11:23
14:14 15:19
18:2,23 19:21
20:10 22:9,17
24:3 25:1,3,6
26:3,3,8 37:16
39:9 41:16

44:23 49:17
50:23 61:6
63:9 72:12
74:21 84:23
88:11 102:24
105:1 111:21
112:12 136:19
139:19 174:10
205:24 223:3
224:10 253:13
253:13,18
255:4 258:23
258:23
**looked** 28:7,14
29:2,23 148:4
**looking** 14:13
37:8 38:1,2,21
41:16 103:23
104:12 105:3,6
105:20 108:20
119:23 120:4
136:24 137:1,3
137:4 145:20
145:21 161:21
161:22 212:22
220:16,23
223:5 254:7
260:5
**looks** 22:19
23:14 56:22
103:4,14
104:13 122:8
**loosely** 198:12
**lose** 35:15
**loses** 35:20
86:13,13,13

**loss** 52:8,12 55:4 121:5 122:16,22 138:6,22

**lost** 35:10 163:2 187:20 189:25 190:10

**lot** 10:18 43:5 62:23 73:25 74:7 112:7 151:23 190:21 205:22 206:1 223:16 265:6

**lots** 30:10

**louisiana** 4:5

**love** 266:25

**low** 47:10 51:19 52:20

**lower** 83:4

**lowest** 49:14 49:15

**lunch** 143:25 146:22,23 149:1 266:19

**m**

**m** 3:1 227:12

**mad** 87:16

**made** 19:12 21:13 22:24 23:17 26:14 30:14 38:9 40:4,16 41:2,6 41:8 59:18,19 70:20 72:10,24 82:6 84:5 86:11 116:22 127:9 154:8

155:1 172:24 179:13 199:1 201:2 211:12 220:18 224:9 227:15 229:23 233:2 235:20 242:6 254:9,9 254:13 266:23

**magistrate** 39:10,12,14,18 40:25 60:22 72:22 267:14 268:1

**magnitude** 249:10

**mahoney** 226:22

**maintain** 192:2 192:11 193:14 193:21 194:2 216:1,15

**maintained** 20:3 55:11 208:24 231:20

**maintaining** 160:19

**maintains** 163:23 164:9 167:22 185:8 194:22 215:20 215:24

**majority** 215:13 229:1

**make** 8:5 10:8 19:10 45:4 61:22 69:6 81:21 88:19

107:13 114:7 119:7 125:13 133:4 144:14 147:22 161:10 171:18 172:20 186:14 192:20 197:19 201:13 203:24 222:24 231:25 239:21 245:24 246:22 253:8,25 255:8 255:22 261:3 263:18 265:17 266:18

**makes** 50:15 157:22 258:25

**making** 39:25 40:25 57:3 58:15 90:25 170:25 198:7 244:6 246:17 256:11 258:6

**mallory** 6:7

**man** 191:10 235:6,9 236:7 236:9 259:1

**manage** 178:11 230:25 238:10 241:7 246:8

**managed** 20:3

**management** 101:6 158:15 158:24 159:6 159:14 160:14 171:13 185:1 186:7,11,15,16 188:24 213:6

213:15,20 238:5,12,20 247:10 256:21 263:23

**manager** 257:9

**managing** 149:21 171:7

**manchester** 142:16

**mandated** 113:19

**mandatory** 113:18,18

**manner** 100:3

**man's** 245:2

**march** 99:11

**mariner** 67:15

**marked** 217:4

**market** 125:18

**marsal** 149:22 149:23 150:14 190:3

**martin** 2:2

**mary** 207:2

**maryanne** 206:22

**mass** 229:11

**masse** 212:5 227:16 229:3 230:14

**massive** 231:4

**material** 20:2,5 21:9 23:4 51:16 199:1 227:21

**materials** 13:9 227:22

[math - metuchen]                                                                    Page 49

**math** 130:24
   130:25 143:3
**matter** 1:6
   66:16 77:12
   82:17,22,25
   83:12,14,16
   91:25 92:1
   101:20 109:21
   109:25 110:3
   126:16 135:1,5
   152:18 188:19
   201:23 236:21
**matters** 25:10
   56:18 95:17
   158:15 159:15
   171:15 172:21
   178:8 204:5
   247:11
**matthew** 6:21
**maximize**
   180:12
**mcmahon** 5:12
   207:2
**mean** 11:11
   27:24 28:17
   30:10 32:25
   33:3 34:18
   35:25 36:4
   39:8,20 40:8
   41:7 47:19
   49:3 55:10
   59:18 63:9
   66:16 68:21,25
   69:3,12 71:23
   72:21,25 73:15
   75:19 77:13,16
   80:8,10 81:1

82:18 83:11
85:4 86:22
88:3,5,9 92:7
92:13 93:1
106:9 114:16
116:15 126:19
139:22 146:23
174:21 175:24
185:19 192:13
201:11 204:19
205:4 221:17
224:6 225:7
229:3,17 239:7
244:8,10 245:2
245:7,11
**meaning** 33:22
   33:24 176:4
   221:9,16
**meaningful**
   203:9
**means** 80:5,6
   121:5 247:2
**meant** 38:24
   60:6 61:3
   177:21 227:4,6
   250:12 251:15
   251:20 253:20
   255:25
**measurable**
   76:4
**mechanics**
   128:21
**mediation**
   13:12,24 14:5
   14:10 38:25
   39:6,25 40:10
   40:17 41:2,14

60:12 68:15
73:24 81:24
82:4 170:14,16
187:2,3 204:9
211:12 230:2
232:11,14
268:4,17
**mediations**
   170:11,18
   229:20,25
**mediator** 39:13
   39:15,18,21
   40:9 60:4,5
   72:22 187:6
**medico** 5:5
   93:25 94:2,5,6
   94:21,22,24
   96:8 97:20
   105:9,11,16,19
   105:23 106:2
   107:2 118:12
   118:15 121:11
   121:13,16
   122:24 136:7
   137:17,23
   139:16 143:20
   195:17,17
   196:2,5,7,9
   202:3 203:18
   206:10 207:3,8
   207:14 256:13
   256:15,15,18
   257:21,22
   258:21,25
   259:3,6,7,13
   259:15,19,21
   260:2,17,21,23

262:5,8,10,14
262:15,24
263:4,6
**meet** 56:19
   115:3 135:22
**meeting** 263:22
**melton** 223:10
   223:23,25
**members**
   188:24 236:2
   236:14,15
   270:2,3
**memory** 198:4
   222:5,12
   245:20
**mention**
   225:18
**mentioned**
   16:6 17:13
   30:7 53:9
   57:21 61:19
   95:24 202:4
**menu** 249:9
**merged** 23:10
**merits** 13:9
   27:13,21 35:10
   56:14 233:2
   268:2
**mermelstein**
   5:13
**merson** 260:6
   260:7,9 261:5
   261:16
**met** 83:9
**metuchen**
   142:22

**[mg - move]**                                                                 Page 50

**mg**  1:3,4
**michael**  6:17
    236:20,25
    237:1,4,10,16
**michelle**  5:12
**middle**  18:3
    22:10 29:15
    174:11
**mike**  5:14
**million**  45:10
    45:12,20 46:1
    46:6,24 47:1,3
    47:7,11,17,17
    47:25 48:7,8,9
    48:10,16,16,17
    49:1,2,17,20
    49:20 50:4,4,7
    50:16,19 52:20
    52:20,25,25
    54:8,8 62:19
    76:12 77:8,11
    78:4,10 92:8
    92:12 115:7
    130:17,23,23
    205:21
**millions**  116:5
    207:21
**minarovich**
    6:18
**mind**  65:14
    66:12 79:22
    84:10 222:11
    238:17 241:18
**mineola**  271:23
**minimum**  53:4
    161:8 172:17

**minor**  239:8
**minute**  65:15
    65:16,18,25
    66:2,4 98:1
    195:11
**minutes**  65:19
    66:7 143:24
    222:16 228:8
    266:8
**misconduct**
    154:19
**miskell**  5:14
**missed**  36:20
    38:4
**missing**  88:3
**mission**  12:24
    154:21
**mitchell**  6:12
    6:17
**mitigates**  265:6
**mix**  120:17,19
    120:19 145:10
**mm**  224:12
**modified**  204:9
    244:10
**moffitt**  5:15
**moment**  80:5
    144:23 166:25
    174:3
**momentarily**
    82:19
**monday**
    154:14
**monetary**
    181:15 183:2
**money**  49:24
    49:25 53:3,24

85:6,24 86:9
    116:14
**monitor**  19:7
    172:15,24
    173:14 181:10
    241:6
**monitoring**
    164:3 257:11
    257:13 258:7
**monsignor**
    223:10,12,17
    223:20,23,25
    224:7,8 226:3
    226:5,9
**monsignors**
    223:19
**month**  14:5
    39:1 40:3,15
    70:19
**months**  39:6
    39:22 59:23
    115:4 116:4,18
    117:20,25
    151:25 190:1
    202:9,10
**moore**  5:16 7:5
    58:3 70:4
    144:2 149:5,6
    149:11,14,16
    149:18,21
    152:8,19 153:8
    153:17,19
    154:3 155:5
    164:4 169:5
    172:12 173:21
    176:9,20 180:7
    182:22 183:7

183:22 184:18
    184:20 186:5
    191:25 192:2
    194:17,19
    209:25 258:5
**moriarty**  5:17
    6:6
**morning**  8:3
    14:24 16:17
    66:9 94:25
    98:9,10 199:11
    200:16 207:19
    221:11 268:21
    270:8
**motion**  3:4,8
    8:19 13:20
    41:17 42:6
    59:18,20 60:1
    60:15 61:21
    86:3 145:9
    152:13 154:14
    155:7 197:22
    214:6,25
    229:10,10
    242:19 246:17
    246:23 260:18
    260:24 267:18
**motions**  197:20
    198:15,16
**motivation**
    215:4
**move**  9:2,6,7
    19:7 25:2 39:7
    40:4,7,17
    42:20,20 50:23
    52:14 54:4
    56:4,10 57:7

74:22 87:23
92:22 96:8
130:12 144:21
145:24 153:8
225:6 238:9
263:5
**moved**   13:14
104:9 151:11
**moves**   68:6
**moving**   20:4
56:14 58:11
255:15
**multiple**   75:14
136:12,12
139:24 163:22
221:24 244:1
259:18
**multiplied**
243:19
**mutual**   24:19

**n**

**n**   4:1 6:16 8:1
217:16,19,20
271:1
**nada**   73:17
**name**   8:15 9:11
11:22 14:18
16:24 21:19
29:8,9 41:25
42:3 66:19
75:7,10 81:2
89:13 94:5
149:20 155:19
155:19 156:24
169:13 205:10
206:23 216:19
220:1 226:2

238:8 253:6
254:15
**named**   11:20
16:4 17:14
31:22 42:14
69:17 75:13,18
89:4,4 155:23
155:23 156:22
164:7 169:17
183:9,11,23
185:2 186:1
197:3 202:13
214:13 219:4
241:25 250:10
**names**   23:19
204:4 205:5
**nasatir**   4:16
9:18,18 10:2
54:24,25 55:10
55:17 87:6
89:12,14,14,16
89:24 90:11,14
90:18,21,24
91:5,11,19,21
97:25 98:2,5,6
98:8,14,18,20
98:22 99:5,8,9
102:6,9,13,15
103:2,7,9,11
103:18,21,24
104:1,4,12,18
104:23 105:3,6
105:10,12,17
105:21 106:12
106:15,17,19
106:23 107:6
107:12,15,17

107:20 108:17
108:19 110:10
111:2,10,12,24
112:4,9,12,15
112:18,21,23
113:7,8 114:10
114:21,24
115:23 116:1
116:16,20,25
117:7,12 118:9
118:14,16,17
119:5,9,11
120:3,9,12
121:19 122:5
122:10,12,14
123:1,2 124:13
124:19 125:1,8
125:15 130:11
130:14,21,22
132:7 133:2,15
133:17,18
134:24 136:9
136:25 137:3,6
137:9,20,24,25
138:11 139:18
140:6,11,16,22
141:7,21,25
143:17 144:4,9
144:11 145:25
146:3 266:22
266:22
**nassau**   61:10
197:11,13
199:8 212:25
262:4
**nature**   12:3
17:11 18:2,23

31:16 114:21
143:11 167:25
182:14 222:11
**near**   72:9
**necessarily**
14:2 40:13
42:16 178:9
251:25
**necessary**   14:8
15:12 33:1,2
56:11 75:11,19
145:16 146:16
**necessity**   71:9
**need**   16:24
37:7 42:8
49:23 56:5
68:14,15 74:6
87:22 98:14,18
99:3,3,4
111:19 149:13
163:22 164:1
172:15,19
187:2 195:25
204:14 209:24
212:12 248:5
248:19 266:18
**needed**   58:10
67:4
**needs**   17:25
73:6 111:20,22
173:14 210:23
**negative**
269:15
**negligence**
11:25 20:18,22
20:25 23:13
31:20 32:8,9

[negligence - objected]                                            Page 52

| | | | |
|---|---|---|---|
| 36:19 91:3 | **newark** 142:14 | **notice** 19:10 | 160:7,21 |
| 198:21 | **nine** 29:14,14 | 23:21,25 24:4 | 198:15 200:21 |
| **negligent** 12:1 | **ninety** 61:17 | 24:9,12,14,17 | 203:24 204:18 |
| 12:1 20:18 | **ninth** 67:17 | 24:20 25:9,15 | 205:18,24 |
| 21:5 23:24 | 212:24 | 25:21 26:18 | 206:1 207:7 |
| 25:4,4 32:8 | **nodding** 211:5 | 28:2,13 29:24 | 212:2 215:1,22 |
| 36:3,3,19,20 | **nomenclature** | 30:15,21 86:5 | 218:3,5,7,10 |
| 91:3,3 | 201:10 | 147:20,23 | 218:13 219:3 |
| **negotiate** | **non** 19:15 | 148:11 199:11 | 219:25 221:5 |
| 227:20 | 33:15 49:18 | 199:14 200:8 | 223:8,22 226:1 |
| **negotiations** | 51:18 58:25 | 200:14 201:18 | 226:4,23 |
| 13:17 69:5 | 62:23 70:12,22 | 205:7 228:12 | 245:23 251:10 |
| **net** 52:8,12 | 75:16 79:25 | 235:8 247:18 | 251:17,19,25 |
| 55:4 121:5 | 90:25 97:5 | 247:22 268:6,7 | 253:14 254:21 |
| 122:16 | 156:4 185:15 | 269:11,20,21 | 259:12,17 |
| **neutral** 35:3 | 210:14 227:24 | **noticed** 108:18 | 260:12 |
| **nev** 3:2 | 235:14 247:4 | 240:7 257:2 | **numbers** 44:8 |
| **never** 65:16 | 253:3 254:8 | **notices** 239:24 | 62:16 131:17 |
| 81:16,18 109:7 | **nonaffiliated** | 241:6 247:14 | 218:9 226:16 |
| 109:12 239:11 | 11:18 | 248:12 | 232:17 251:21 |
| **nevertheless** | **nonconsensual** | **noticing** | 259:9 |
| 114:1 | 39:3 | 171:14,23 | **numbing** 66:12 |
| **new** 1:2,8,12 | **normal** 93:17 | 247:11 | **numerical** |
| 1:21 4:13 8:23 | **normally** 21:24 | **notification** | 251:24 |
| 9:12 23:22 | 21:25 | 160:2,22 | **numerous** |
| 35:25 36:5 | **northern** 67:14 | **notify** 148:5 | 181:11 |
| 37:17 46:22 | 67:17 | **notion** 58:17 | **nurlan** 5:18 |
| 61:18 86:9 | **notable** 23:1 | 63:21 73:20 | **ny** 1:21 4:13 |
| 100:7,11 | 26:9 69:12 | **notwithstand...** | 271:23 |
| 113:22 114:19 | **notation** 17:21 | 250:10 | |
| 117:23 136:5 | **note** 35:9 53:13 | **november** | **o** |
| 141:3,7 143:8 | 118:5,5 269:1 | 213:7 | **o** 2:1 8:1 271:1 |
| 143:8,9,9 | **noted** 30:16 | **number** 17:17 | **o'clock** 146:23 |
| 198:25 214:16 | 237:12 242:6 | 17:18 97:24 | **object** 64:16 |
| 219:13,15 | 269:9 | 104:20,20,25 | 72:19 93:16 |
| 220:8 221:7 | **notes** 112:19 | 106:24 117:22 | 124:15 |
| 226:7 251:21 | | 151:2 155:22 | **objected** 145:8 |
| | | | 145:9 246:11 |

**[objection - okay]**                                                    Page 53

| | | | |
|---|---|---|---|
| **objection** 9:10 | 131:10,19 | **occur** 81:11 | **official** 4:11 |
| 9:24 16:18 | 132:15,21 | 185:25 190:6 | 260:19,24 |
| 26:6 87:23 | 138:23 | **occurred** | **officials** 19:5 |
| 97:5 122:24 | **obligations** | 140:23 | **oh** 66:23 73:10 |
| 136:7 137:17 | 85:8 115:4 | **occurrence** | 96:13 115:14 |
| 139:16 144:6 | 117:20,25 | 44:24 45:2,3,4 | 213:15 226:15 |
| 146:13 153:9 | 135:23,23 | 45:15,18,19,20 | 259:13 263:20 |
| 187:21 188:6 | 163:8 173:17 | 45:23 47:8,14 | 264:4 |
| 192:24 207:9 | 174:5,15 175:8 | 47:21 48:8 | **okay** 8:4 9:9,23 |
| 215:1 225:22 | 176:11 177:6 | 49:13 50:21,25 | 10:11,14,21 |
| 229:11 259:23 | 181:13 248:14 | 52:23 54:7,8 | 11:9 15:1,24 |
| 262:12 267:2 | 257:12,13 | 54:12 55:22 | 15:25 17:6 |
| 269:9 | **observation** | 92:5 131:2,3 | 18:7,15,19,21 |
| **objections** | 156:14 | 136:12 138:23 | 18:22 19:19 |
| 16:12,18 17:3 | **observational** | 139:7 141:1,1 | 22:7 24:25 |
| 17:10 23:22 | 239:17 | 141:2,3,4,5,13 | 25:1 26:2,3 |
| 87:11 93:14 | **observations** | 142:4 | 27:16 30:3 |
| 96:10,14,15,19 | 12:9 58:3 | **occurring** 16:2 | 31:7,8,14 |
| 96:22,22 97:2 | 171:18 239:3 | 138:4 | 36:11 38:18 |
| 146:6,10 | **observed** 135:6 | **october** 106:2 | 41:6 42:9,12 |
| 147:24 153:10 | 156:10 157:6 | 151:10 152:9 | 42:13 43:10 |
| 153:15 207:12 | 158:9 171:6 | **offer** 93:2 | 44:9 47:12 |
| 212:20 218:22 | 239:11,25 | 144:14 239:21 | 48:3,14 50:23 |
| 219:11 220:4 | 240:10,13 | 265:10 | 51:5,15 52:13 |
| 226:4 235:7 | **observing** | **offered** 69:14 | 52:14 53:9 |
| 237:7,11 | 157:1 | 84:10 97:4 | 54:3 55:19,20 |
| 263:25 264:1 | **obtain** 214:4 | 146:12 269:16 | 56:4,13,14 |
| 265:8,11 | **obvious** 63:9 | **offering** 153:5 | 57:4,7,20,21 |
| 268:14 269:14 | **obviously** | 264:17 | 58:23 59:24,24 |
| 269:19 | 21:24 33:12 | **offhand** 115:14 | 60:3,25 65:4,7 |
| **objection's** | 47:15 63:1 | **office** 201:24 | 71:11 73:20 |
| 219:9 | 73:8 76:14 | **officer** 150:20 | 76:1 78:14,22 |
| **objectives** | 97:2 221:23 | 150:22 171:11 | 78:25 79:16 |
| 214:1 | 228:17 267:23 | 189:20 206:16 | 81:3 83:23 |
| **obligation** | 269:17 | 238:18,21 | 86:20,22 87:4 |
| 39:21 55:1,8 | **occasions** | 241:3 | 87:15 88:23 |
| 55:18 90:2 | 75:14 | | 89:7 90:14,14 |

[okay - order]                                                    Page 54

91:20 94:1,8
95:5,12 96:7
97:11,18 98:3
98:13 99:4,10
99:17,20 100:1
102:1 103:19
103:22 104:11
104:17 105:5,8
105:22 106:3
106:15 107:16
107:24 110:11
111:7 112:19
113:4 115:14
117:5,11
118:15 119:6
119:10 120:3
121:13,23
122:1,3,3,9,13
122:13 123:13
123:25 124:11
124:24 126:11
129:10,20,24
133:15,22
137:22 138:6
144:11,13,17
144:20 145:5
145:11,18,21
146:4,12,17,21
147:1,5,6,7,10
147:14 148:22
152:6 153:15
155:10 157:5
159:7 162:3,17
163:19 165:7
166:23 168:8
168:10,13
169:4 170:7

172:11 174:3
174:12,12
193:19 195:12
202:1,21 207:9
207:20 209:15
209:25 210:5
210:24 211:2,3
211:7 212:1,7
212:9,22 213:5
213:20 214:8
214:12,15,22
215:12,12
216:7,7,22
217:20 218:2
218:16 219:22
223:6 224:18
224:20 225:21
226:15,19
227:7,10
228:17 233:9
233:12,20,20
234:6,12,20,23
235:11 236:17
237:24 238:22
239:1,3 240:18
245:16 247:25
249:17,21,25
250:6,15
251:18 252:3
252:11 253:8
253:22 254:7
255:8 256:2,4
256:5,7 258:19
258:21,21,24
259:2,4,6,13
259:22 260:3,7
260:14 261:3,9

262:14 263:6
263:11,17
264:14 265:15
266:2,6,9,11
267:20 268:19
270:5
**old**   58:9 82:9
244:25 245:1
271:21
**omnibus**   16:12
16:18 23:22
96:15
**onboard**   268:5
**once**   27:19
138:21,21
151:10,22
202:20 248:14
261:11
**ones**   15:3 17:2
28:11 58:20
69:5,6,7 75:9
82:8 143:5
222:21
**ongoing**   63:13
248:8
**open**   97:23
103:17,23
247:2
**opened**   107:5
137:8 166:14
**opening**   8:3,5
65:8,9,23 75:1
103:5,7 198:22
199:10
**operate**   98:23
**operated**   19:15
20:3

**operating**
150:21 171:10
206:16 238:18
241:3
**operations**
150:9 151:1
**operators**
228:9
**opinion**   16:17
38:6,11,14
44:23 102:21
221:10 244:18
244:25 245:9
**opinions**   56:8
**opportunity**
269:16
**oppose**   89:5
**opposed**   13:1
218:11 246:23
**opposing**   99:1
**option**   192:18
**oral**   36:7
**order**   9:4 13:6
19:16 22:2
30:5 39:4
40:23 41:11
80:2 88:18
114:7 126:2,20
127:5,10 130:6
132:18 134:11
197:19 199:5
202:10 204:2
204:10 205:1,7
212:24 213:6,8
213:15,16,18
213:21,24
214:3,4,6,8,18

[order - paragraph]                                                    Page 55

214:23,25
215:5,6,8,9,10
216:9,12,16
217:3 232:13
235:22,25
241:6 245:21
246:1,3,7
251:2,3,4,10
251:17 261:8
261:22 263:24
**ordering**
267:24
**orders** 39:9
88:14 93:12
204:12 227:20
**ordinarily** 93:1
**organization**
165:14 186:20
**organizations**
123:21 154:22
**organize**
147:14 239:9
**organized**
40:18
**oriented**
165:12
**orienting**
188:11
**original** 13:6
30:4 150:25
251:14
**originally**
86:15 197:15
**orujlu** 5:18
**outing** 204:7
204:16

**outline** 101:20
**outright**
134:14
**outside** 42:25
43:1 51:23
53:10,22 80:19
81:8 82:10,11
231:24 241:9
**overall** 156:7
171:8 206:1
257:16
**overarching**
13:22
**overlap** 32:18
44:3 54:14
**overlapping**
53:2 57:23
**overruled**
96:23 122:25
124:16 139:17
188:7 193:1
260:1
**overruling**
97:6
**oversee** 231:23
**oversight**
110:18 238:13
**overwhelming**
63:25 215:13
**overwhelmin...**
63:18 206:3,3
**owe** 42:5 85:24
86:9
**owed** 21:3
23:15
**own** 156:13
192:2 193:14

193:14,21
262:12
**owned** 20:2
70:13

**p**

**p** 4:1,1,21 5:20
7:6 8:1 30:4
210:6,9 220:1
**pace** 68:6
**pachulski** 4:10
9:14,18,21
54:25 89:14
98:6 144:19
237:1 263:15
269:6
**page** 7:8 15:22
15:23 102:14
102:25 103:9
106:24 107:1
107:10 111:16
112:16,18,22
118:15 119:4
121:25 161:7
161:21,22
162:4 174:9,11
187:14,15
188:10,10,22
218:3,4,5,11
218:14 219:9
220:23 222:6
223:3 259:9,11
259:14,16
260:4,14,16,18
260:20 261:4,4
261:5
**pages** 15:21
112:6 161:25

161:25 205:21
206:6 207:21
**paid** 33:24
34:14,22 35:6
35:16 45:6,16
47:24 48:21
50:4,18 51:8
52:24 53:2,10
53:20 55:11
62:9,10,11
63:4,16,19
64:9 65:3
125:25 126:18
127:11,22,23
130:7 132:2
133:8,23
138:21 139:2
181:16 222:8
265:7
**paired** 198:20
**papal** 223:23
**paper** 74:4
98:20
**papers** 85:18
**paragraph**
18:25 19:1,2,2
19:9,10,12,24
20:4 21:4,8
22:2,19,21,23
23:2,8 26:10
26:17,21 31:14
31:16 101:18
102:12,13
111:21 112:24
121:3,14,15,24
122:12 136:19
136:24 137:1

[paragraph - parties]                                                      Page 56

| | | | |
|---|---|---|---|
| 138:1 154:16 | 34:11,14 35:15 | 63:22,25 65:3 | 198:25 199:2 |
| 158:4 163:19 | 35:17 36:2 | 71:10 85:16 | 201:7 212:24 |
| 165:20 169:4 | 45:11,18,22 | 87:3,12 90:8 | 214:14,17 |
| 171:3,18 | 46:16,25 47:2 | 92:9 116:13,23 | 225:14 243:1 |
| 172:11 178:3 | 47:3,3,16,23 | 132:2 134:20 | 257:15 259:24 |
| 180:7 181:2 | 47:24 48:12,16 | 148:11 154:21 | 259:24 |
| 194:6 210:7 | 48:18,21,25 | 156:23 160:17 | **participant** |
| 212:22 213:17 | 49:1,8,18,19 | 164:9 167:23 | 62:21,23 |
| 227:10,12,18 | 49:25 50:5,18 | 170:6,10,18 | **participants** |
| 238:2,16 241:1 | 51:8 76:12,18 | 185:8,9,11 | 62:24 |
| 247:8 253:12 | 77:9,11,18 | 192:2,10,12 | **participate** |
| 253:19 254:25 | 78:5 79:22 | 193:12,16,17 | 180:17 181:10 |
| 255:11,15 | 89:18,20,22 | 194:3,20,22,23 | 194:5 |
| 256:20 261:10 | 90:17 131:25 | 195:1 201:5 | **participation** |
| **paragraphs** | 135:1 136:22 | 203:4 209:8 | 19:4 |
| 239:2 250:7 | 137:11 138:4,5 | 210:3 211:21 | **particular** |
| 254:23 | 138:8,14,18,22 | 211:22 212:3 | 30:13 60:10 |
| **parallel**  42:17 | 139:2,14 | 212:14 220:7 | 129:8 135:13 |
| **parameters** | 164:12,17 | 229:21,22,23 | 144:16 146:5 |
| 245:4 | 170:22 172:22 | 229:24 230:5,8 | 242:16 |
| **paraphrasing** | 185:10 193:24 | 242:14 244:8 | **particularized** |
| 137:20 | 194:5 200:3,5 | 245:6 246:5,16 | 69:11 71:21 |
| **pardon**  42:2 | 200:10 211:9,9 | 249:4 | **particularly** |
| 67:23 81:4 | 211:11,14 | **parishes'** | 8:22 24:13 |
| 85:1 92:16 | 212:12 217:12 | 164:10 | 28:8,9 37:7 |
| 159:8 208:15 | 218:23 220:5,6 | **parish's**  172:7 | 62:3 123:20 |
| 218:8 223:14 | 222:21 229:6,7 | 212:11 | 198:9 269:14 |
| 223:16 | 230:3,7 242:2 | **park**  202:11 | **parties**  3:7,12 |
| **parent**  70:17 | 242:16 249:13 | **part**  18:14 52:8 | 8:22 11:15,16 |
| 244:23 | **parish's**  35:4 | 52:11 79:17 | 11:21 12:4,14 |
| **parish**  11:25 | 48:17 74:9 | 86:2,3 107:3,7 | 14:10 21:20 |
| 19:9,18,24 | 91:13 138:13 | 110:1 118:9 | 33:1,2 49:19 |
| 20:8,12,13,19 | **parishes**  11:17 | 121:5 154:13 | 51:18 54:6 |
| 20:25 23:25 | 17:12 18:13 | 169:25 170:24 | 58:15 59:14 |
| 24:13 27:7 | 23:9 32:13 | 180:8 185:21 | 75:11 85:15 |
| 31:21 33:12,17 | 36:25 37:1,21 | 185:22 197:14 | 86:15 88:17 |
| 33:20 34:2,6 | 62:10,12 63:19 | 197:21,22,22 | 139:25 144:24 |

[parties - perpetrator]                                                           Page 57

| | | | |
|---|---|---|---|
| 145:2 154:24 | **patrick** 6:2 | **pays** 47:4,25 | 63:18 65:2 |
| 155:1 156:23 | **pattern** 26:21 | 62:22 63:3 | 102:18 132:1 |
| 169:7 181:5,9 | 199:4,16 | 109:6 245:8 | 151:17 |
| 181:13,14 | 226:10 243:7 | **pendency** | **percentages** |
| 187:7 216:19 | **pause** 241:17 | 169:6 | 61:25 |
| 227:24 230:22 | 242:20 243:7 | **pending** 11:14 | **perfect** 251:15 |
| 261:22 | **pay** 49:20,23 | 55:7 79:22 | **perfecting** |
| **parties'** 251:7 | 52:12 55:1 | 81:9 213:5 | 100:17 |
| **partner** 86:12 | 62:24 63:25 | 214:24 232:19 | **perform** |
| 86:13 267:17 | 85:7 90:7 | 244:21 269:19 | 176:22 177:1 |
| **parts** 197:13 | 91:12 109:9 | **people** 68:13 | 192:15 240:21 |
| 201:16 | 110:13 115:18 | 116:25 117:1 | **performance** |
| **party** 32:8 45:1 | 117:2 122:21 | 150:24 159:21 | 151:2 239:12 |
| 50:10 75:20 | 123:10 124:7 | 160:10,12,14 | **performed** |
| 76:6 77:3,17 | 125:3 127:2,5 | 161:12,14 | 241:10 |
| 86:24 156:5,16 | 127:10 128:4,9 | 162:16,23 | **performing** |
| 157:11 167:6 | 128:12 129:23 | 163:7 173:17 | 249:13 |
| 167:15,21 | 131:11,17 | 175:22 190:25 | **period** 39:2,23 |
| 169:17 171:19 | 134:16,17 | 191:11 204:7 | 54:9 60:10,20 |
| 172:4,9 175:7 | 135:15,21 | 246:21 265:7 | 61:20 81:8,23 |
| 177:14 179:10 | 136:1 139:7 | 266:23 267:1 | 157:3 169:22 |
| 183:3 184:9 | 140:24 142:2 | **percent** 34:5 | 186:24 187:4 |
| 203:6 209:19 | 181:14 | 34:20 47:2,17 | 189:16 202:5 |
| 214:9,13,19 | **payable** 117:20 | 47:23 48:20,25 | **periods** 38:18 |
| 215:3 228:17 | 126:3 127:24 | 49:18,19 50:5 | 138:5 |
| 228:19,20 | 128:3 | 50:6 61:17,18 | **permissible** |
| 239:20 241:14 | **paying** 52:6 | 62:9,10,10,11 | 198:10 |
| 243:9 244:4 | 54:20 62:20,21 | 62:12,12,15 | **permission** |
| 245:23 246:2 | 124:17 125:10 | 76:13,13,18 | 84:11 98:25 |
| 250:8,10 254:4 | 125:12,19 | 77:9 78:6 | 99:3 133:5 |
| 257:10 | 126:20 127:15 | 89:20 91:12 | **permit** 8:4 |
| **passage** 150:11 | 132:9 135:17 | 165:12 193:11 | 14:5 244:11 |
| **passed** 151:5 | **payment** 109:4 | 193:16 197:10 | **permitted** 64:1 |
| **past** 12:19 | 109:11 123:5 | 198:24,24 | 247:3 248:20 |
| 68:15 163:19 | **payments** | 226:19 | **perpetrator** |
| **patricia** 6:18 | 125:22 | **percentage** | 20:5 24:15 |
| | | 48:4 62:5 | 32:6 36:14 |

136:11 223:10
226:2,21
**perpetrators**
12:2 154:20
217:13
**perplexed**  88:6
**person**  3:13
19:8 69:13
136:1 147:25
148:5 160:13
160:24 220:25
235:9
**personal**  96:4
123:13,15
158:5 167:9
169:3 239:3
**personally**
70:17 71:1
150:3,15
227:24 234:22
**personnel**
31:12 69:15
70:7 156:8,15
157:2,10
158:14 159:5
159:13,16
161:8 172:2,7
177:13,22
178:6 179:9
180:9,16,20
185:16,23
186:2 199:22
200:6,18 201:3
201:15,17,19
203:5 206:5
208:24 209:1
215:16,22

216:4,4,8,12
216:13,15,18
216:20 222:23
230:6 232:10
234:2,3,7
235:12,14,14
237:6 238:5,12
238:15 240:15
240:18 242:4,5
242:15,22
269:21
**perspective**
35:2 40:9
204:2,24
**peter**  6:1
**petition**  11:19
12:8 21:22
22:3 24:23
27:4 28:11
66:14,15,18,20
70:3,3,5 151:9
156:11,24
157:2 169:22
171:5 203:8
213:2 216:14
217:2 229:9
238:4 239:6,13
239:19,25
240:5,12,13
241:11 252:9
253:6 255:24
260:11
**ph**  218:21
**phase**  13:12
**philadelphia**
142:10

**phillips**  27:9
**phone**  34:16
46:14 268:13
**phrase**  119:18
**phrased**
250:14
**physical**
203:12,16
**pi**  13:7,10 14:8
14:15,16,22
17:17 22:2,11
27:20 30:4
60:9
**piece**  9:1 74:4
98:20 240:1
**piecemeal**
12:12 57:21
**pitcher**  94:17
**pius**  226:6
**placa**  226:3,5,9
227:3
**place**  23:11
38:22 40:5,22
73:5 77:6,17
81:23,24 87:23
95:25 108:6
113:20 114:1
185:5 192:11
197:12 202:10
204:3,12 205:3
231:4 242:23
244:3 245:7
258:6 260:6
**placed**  133:7
242:20
**placement**
95:21

**places**  175:20
**plaintiff**  1:13
23:16 24:11
31:17 46:1,5
47:5 49:25
50:1,3 136:23
137:12,14
138:3,25
200:20 204:15
204:15 226:1
226:20 264:11
265:21
**plaintiff's**  35:5
**plaintiffs**  24:11
36:24 156:4
163:21 181:15
185:13 198:2
208:1 210:13
**plaintiff's**
210:9 213:10
215:2,6 219:6
229:11 261:25
**plan**  12:21
61:11 78:4
80:23 81:10,17
116:3,4 147:8
**plans**  101:10
**play**  14:6 39:1
39:6 40:17
45:14,23
163:22
**played**  156:8
**playing**  49:9
**pleading**
252:21 253:20
254:14 255:2,9

**pleadings** 33:1
155:10 157:25
212:19 248:5
253:23 254:11
**pleasant** 268:4
**please** 8:2
10:23 94:7,14
95:11 134:22
149:7,12,20
163:1 167:11
173:22 174:10
183:5 195:24
196:4 201:8
219:3 237:23
**plus** 117:23
172:25
**pm** 270:11
**poc** 200:20
**pocket** 125:5
**podium** 93:24
**point** 11:11
13:18,22,22
14:16 21:13
22:20 23:10
24:9,14 31:24
32:3 37:6,25
38:25 43:6
44:11 50:14,15
53:9 57:24
60:7 61:4,22
62:1 69:22
71:7 74:6,15
76:2 81:21
86:23 87:2
89:3,18 90:15
118:4 128:1,2
128:4 131:18

132:14 133:4
179:16 198:5
225:7 245:10
**pointing** 24:19
**pointless**
103:24
**points** 56:15
203:24
**policies** 7:9 9:8
9:25 10:6
17:21 43:20,20
43:24 44:14,16
45:4 49:12
51:5,17,19,20
52:15,16 54:4
54:15,17,25
55:24 64:2
84:9,15 85:9
89:25 90:2,3,4
92:3,4 95:25
96:1,5,6
107:25 108:3,6
108:10,22,25
109:3,18,22
110:5,5 113:13
121:4 123:11
129:19 131:23
134:6 135:20
139:19 160:19
201:25 208:8
216:5 229:14
230:17 232:6
232:23
**policy** 43:14
44:6 47:9
51:23 52:2
53:10,22 54:9

54:10 55:12
65:2 84:21,22
91:9 101:19
109:12 110:6
118:11 121:6
123:4 125:22
126:24 127:8
128:6,7,22
129:17,22
130:5 135:19
135:23,25
136:3 138:5,6
138:25 141:6,6
141:7,9
**pool** 232:16
**population**
165:3
**porter** 5:19 7:4
9:5 10:1 43:19
94:7,8,13,15
94:18,20,23,25
94:25 96:9
97:8 98:7,9
99:10 106:5
107:22 110:8
111:6,8,13
113:1,2,5
114:20 116:20
116:20,21,24
117:3 118:10
121:17,23
122:1,3,7,11
122:13 124:9
124:12,14,23
124:25 125:9
125:25 126:7
126:10,12,16

126:22,25
127:4,12,14,18
127:23 128:8
128:11,14,16
128:18,21,24
129:3,6,8,11
129:16,20,24
130:1,3,9
131:24 132:5
133:11 140:1,7
140:17,21
141:11,14,17
141:20,22,24
142:9 143:23
146:2 258:5
**porter's** 97:24
104:8 107:8
117:8 119:4
125:16
**portion** 84:21
112:1 201:17
221:6 265:23
**portions**
201:20 208:23
209:1 265:17
**posed** 241:7
**positing** 48:3
**position** 55:14
125:3 149:20
166:8 182:12
211:22 212:4
212:11,17
222:24 269:17
**positions**
212:15 238:12
**posses** 185:10

[possesses - pretty]                                                Page 60

**possesses**
193:24 194:23
**possession**
167:20 202:25
242:1,2
**possibility**
60:14
**possible**  15:20
34:25 38:5
46:2 63:2 66:6
72:21 92:13
105:14 249:19
**possibly**
263:16
**post**  24:23 27:4
28:10,11 66:15
66:18 108:5
156:24 169:22
203:8 239:24
240:5,13
**pot**  53:23
116:14
**potential**  15:11
181:7,12,23
182:2 199:23
**potentially**
17:21 32:10
33:6 34:11
44:7 46:10,25
49:7 117:16
140:18 269:20
**power**  19:6,11
**practical**  53:11
53:19 56:1
117:9,10
126:16 135:5
204:1

**practice**  26:21
93:17 123:9
158:6 163:20
229:10
**practiced**
26:24
**practices**  27:15
**practicing**  74:1
**pre**  66:14,20
70:3,3,5 157:2
198:13 213:2
217:2 229:9
238:4 239:6,13
239:19 240:12
241:11 252:9
253:6 260:11
**precarious**
85:3
**precede**  126:17
**preceding**
84:14 165:22
**precise**  64:8
249:9
**precisely**  90:24
205:12 240:9
**precision**
205:25
**preclude**  69:25
97:8
**preclusion**
46:8 68:4,19
76:5
**preclusive**  50:9
77:16 78:19
79:7,13
**predated**  96:5

**prefer**  93:8
**preference**
266:20
**prejudgment**
211:24 212:5
**prejudice**
96:23 97:7
241:7
**preliminary**
3:4 8:19 11:12
12:25 13:2,5
13:14 38:13
40:22 41:10
42:6,21 43:2
56:15 58:7,12
59:19 60:17
70:11 71:7
72:20 73:2,5
88:18 107:8
115:15 152:13
185:22 210:11
216:24 228:2
**premiums**  51:8
62:5,19 63:4
63:16,19,25
132:2
**preparation**
100:10 154:13
**prepare**  154:6
248:23 250:17
**prepared**
46:20 74:10
100:4 129:15
133:11 154:7
231:14,16
**preparing**
235:5 250:23

**prepetition**
11:22 12:16
16:8 18:14
27:5,12 52:1
74:17 156:22
158:13 159:4
159:12 165:2
171:7,9,15,19
198:4 199:3
203:1
**present**  4:19
49:18 183:7,25
**presentation**
51:14
**presented**
122:16,21
126:1 251:2
263:22
**presenting**
8:24
**presided**
197:15,16
244:20
**president**  95:7
**presiding**
246:6
**pressured**
31:17
**presumably**
140:17 242:23
**presumption**
76:6
**pretrial**  9:4
61:13 144:25
145:3
**pretty**  56:7
180:22

[prevent - productions]

Page 61

**prevent** 67:7
**prevented**
63:22,23
**preventing**
82:7
**preview** 16:1
44:12 57:24
**previewed** 63:1
**previously**
28:21 212:3
227:21,21
**priest** 20:14
30:24 136:11
200:2,3,4,10
216:12 218:23
219:24,25
222:4 223:18
**priests** 28:22
186:3 201:4
216:9,16
217:12 220:6
221:25 222:21
242:15
**primary** 51:19
108:22 109:23
130:20,21
139:21,24
140:2,13,18
141:15 178:10
**principal**
150:12
**principle** 98:23
**principles**
37:17 77:1
**prior** 11:19
23:17,25 56:23
99:14,17,23

100:1 148:12
156:10 158:8
202:18 211:18
243:16 245:25
250:22
**priority** 125:22
**privacy** 243:4
**privilege** 208:7
231:12,14,16
**privileged**
208:4 231:10
**privity** 85:16
85:17,18 86:19
86:25 87:3,13
**pro** 33:24
**probably** 26:8
53:4 62:20,21
62:22 72:4
151:21 202:10
234:17 266:23
**problem** 43:11
58:5,16 98:5
**procedures**
201:25 216:5
230:17
**proceed** 11:7
84:12 163:21
167:7,15 169:6
177:15,24
179:19 182:24
185:3 186:18
191:19 195:1
209:20 237:22
248:20,25
**proceeding** 3:1
13:6 81:3
106:7 114:2

152:14 164:1
164:17 165:5
173:13 210:10
245:6 267:16
**proceedings**
54:1 240:20
270:10 271:4
**proceeds** 34:13
44:15 63:12
101:21 109:16
119:14 121:7
137:15 138:6
138:16,17
139:1,2 181:14
181:17 182:23
258:7
**process** 13:23
14:5,10 25:9
27:19 31:10,18
39:1,6 40:17
49:9 50:2
60:12 67:11
78:7,19 100:1
147:20 151:11
151:14 172:14
178:11 180:12
185:22 189:9
190:5 204:8
238:7
**produce** 28:21
29:16,19 30:7
30:13,20 164:6
164:12 167:5
167:13 200:12
204:10 210:12
227:14,25
230:14,19

**produced** 30:1
30:8 31:11
164:11,17,22
164:25 165:4,5
165:10,16
170:3,4,6,18
170:22,24
199:13,25
200:3,8,17
201:20 202:5,6
203:15 205:21
207:21 208:1
208:11,22,25
209:2,4,6
210:13,15
211:10 212:13
215:17 216:21
227:21,22
229:3 230:13
231:9,18 232:8
232:20 234:4
235:13 237:12
242:11 269:21
269:22
**producing**
170:9 240:19
**product** 250:22
**production**
13:9 200:6
201:23 211:20
211:23 229:12
229:14 233:2
243:11
**productions**
198:7 207:25
211:11 231:3,4
231:17,25

235:20
**professional**
151:18 265:4
**professionals**
12:7 265:7
**program**  11:17
16:3 43:18,20
62:8 95:14,18
119:17,20,21
119:22,24
120:15,16
123:14,15,22
130:15 131:16
132:12,21
138:4 247:13
248:3 257:16
258:3,4,9
**programs**  19:3
19:6 101:20
124:15 143:10
143:12 172:22
**progress**  40:1
40:4 41:1,2,6
58:15 72:24
199:1 233:23
**progressed**
199:8,9
**prohibit**  21:25
**projection**
187:9
**promised**
243:1
**prong**  66:23
82:4
**pronounced**
223:12

**proof**  15:6,9,10
16:5,7 17:9
31:25 37:12,15
42:16 49:9
50:2 59:11
69:11 74:6
77:19 85:8
**proofs**  15:7,17
17:19 50:13
157:18,20,24
**propensity**
148:12
**proper**  160:21
**property**  44:14
44:16 45:5
56:2 113:21
**proposal**  93:16
**proposed**
172:18 198:1
**proposition**
238:10
**propounded**
217:1 226:13
**proprietary**
119:21
**prosecute**  22:5
22:6
**prosecution**
169:21
**protect**  68:22
204:3
**protected**
68:10
**protection**
68:18 201:24
206:25 207:2
230:13

**protective**
199:5 202:10
204:12 205:1
227:20 232:13
235:21,24
**protocol**  148:3
204:3,8,11
**prove**  24:12,12
46:17 59:8
69:7
**proved**  85:6
**provide**  27:20
54:5 98:15
123:5 129:12
161:16 220:18
220:19 232:1
238:24 245:5
**provided**  13:4
95:19 138:7
145:1,13,14
165:2 170:10
170:17 185:23
199:17,20
203:15 220:22
227:16 230:2,7
232:9 234:7,8
235:15
**provides**  51:18
100:13
**providing**
163:23 235:22
**province**  19:25
23:5,12
**provision**
125:22 135:20
135:25

**provisions**  90:3
192:21 194:9
**provocative**
82:15
**psip**  257:18,18
257:24 258:2
**public**  91:9
245:1
**pull**  17:15 18:8
22:11
**pulling**  106:11
116:14
**pure**  251:24
**purely**  68:21
68:23
**purpose**  68:21
97:3 110:20
117:7 145:18
**purposes**  11:6
76:10 97:6
108:1 213:21
264:8,9
**pursuant**  29:13
146:1,2 193:12
212:23 217:3
249:12
**pursue**  59:14
**pursuing**
151:16
**pursuit**  239:10
**put**  13:20
17:23 32:12
41:18 42:6
43:10 53:17
64:5,11,20,21
66:10 69:21,23
103:2 104:5,7

[put - really]                                                                 Page 63

104:22 105:14
111:19 116:10
117:23,24
121:18 187:15
197:12 205:2
211:15 213:10
217:18,21,23
220:15 249:19
252:4
**putting**  67:2
76:3 131:17
**px**  103:10

**q**

**qualified**  101:8
**quantify**
102:18
**quaranta**  5:20
**question**  16:14
17:1 25:14,20
26:18 27:10
28:19 30:13
31:8,10 34:16
41:6 42:5
44:15 45:9
46:9,13,19
50:8,12,12
51:11 52:1,21
56:20 63:10
64:3,9 71:11
73:1,3 76:11
77:23 81:24
82:10,15 83:4
83:20 84:2
85:9 87:17
91:24,25
102:11 111:13
111:19 114:18

115:8 118:8
120:15 125:7
125:10 128:23
129:18 133:16
139:4 140:4,7
141:4 142:1
155:3 156:18
159:15,18
161:5 162:9
163:1 167:2,11
170:20 173:21
173:22 174:11
174:12,13
175:14,17
177:21 183:5,6
183:12,15,16
183:19 184:15
187:23,23
196:15 201:14
201:22 202:2
208:21 210:17
210:22,23,25
211:1 225:2
234:1,24 235:1
235:3 237:5
243:1 244:6
253:23 257:20
258:23 262:11
262:13 264:11
269:18
**questioning**
146:3 187:18
187:21 188:9
188:12 236:18
245:17
**questions**
42:13 93:4

99:2 143:18
154:4 166:25
168:18,21
179:4 182:17
184:16 188:23
191:6,21
194:11 199:11
216:25 228:7
238:1 256:6,19
257:17,23
266:15 267:8
268:9 269:10
**quibble**  80:9
**quick**  25:3
**quickly**  53:7
59:12
**quite**  173:8
187:4
**quoted**  253:21

**r**

**r**  2:1 4:1,22
5:23 6:5 8:1
145:7 258:12
258:16 259:5
271:1
**raise**  83:12,13
94:9 97:3
149:7 195:19
**raised**  11:2
30:23 41:15
87:20 88:10
133:19 222:7
**range**  54:8
144:15
**ranging**  95:17
**rata**  33:24

**rather**  14:3
41:13,20
**ratio**  113:16,16
**ratios**  53:15
**rbc**  113:15,18
**read**  8:4 35:14
37:19 43:4
96:22 111:16
112:23 114:4,8
120:9 121:7,14
137:20 138:7,9
139:4 171:3
175:16 225:14
**reader**  251:5
253:11
**reading**  35:25
121:11 122:4,7
161:4,6 162:3
211:8 256:1
**ready**  65:12
149:1 261:12
261:17,20,23
262:1,17
**real**  25:3 40:25
41:2,6 51:5
58:16 59:4
80:10 82:21
85:11,13 92:13
180:15
**reality**  16:7
**realize**  38:21
**realized**  242:25
**realizing**  61:24
**reallocate**
172:14
**really**  17:11
34:18 41:1

56:18 57:2
58:20,23 60:11
67:18 68:4
80:6 81:15
84:23 85:5
102:22,22
140:3,15
191:10 246:4
265:21 268:8
**reason** 29:22
36:22 40:1
46:21 214:22
219:19 230:12
261:15
**reasonable**
23:16
**reasons** 42:22
45:8
**rebut** 117:8
**rebuttal** 7:10
7:11 146:16
213:10 217:4
263:24 264:3,7
264:25 265:13
265:23
**recall** 99:10
101:23 110:16
118:18 168:19
168:20 178:16
179:2,6 186:8
187:19 188:3,9
188:16 189:4
194:6 210:3
211:19 217:11
217:14 228:16
228:16 243:16
256:23,24

257:1,3
**recalling**
139:20
**receive** 97:1
248:5
**received**
104:14 198:17
236:13 240:3
243:9
**receivership**
110:16,17
114:13,14
**recent** 67:14
**recently** 152:1
190:10
**recess** 65:21
66:2,4 143:25
148:24 195:11
195:14 228:9
233:21,22
**recitation**
265:3
**recognize**
38:20,23 59:13
**recognized**
53:14
**recognizing**
250:24
**recollection**
114:11 161:4
162:6 200:7
211:11 220:16
220:25 224:17
226:18 227:5
258:13 261:8
**recommend**
230:25

**reconcile** 16:21
**record** 15:18
16:23 36:11
38:15 53:13
80:24 104:19
107:14 108:14
119:2,7 120:5
144:16 170:20
256:14 267:11
268:7 271:4
**recording**
233:23
**records** 27:7
28:13,21 30:22
163:23 167:23
192:12 193:15
194:3,21,22
199:22 201:25
203:10 204:4
204:10 208:12
208:21
**recover** 34:1
34:13,23 46:11
48:22 53:11
59:8 64:1
140:14
**recoverable**
46:18
**recovered** 34:7
**recovering**
63:23
**recovers** 33:15
34:3,4,5,7,19
49:1
**recross** 7:3
191:25 256:10

**redact** 227:23
**redacted** 21:17
205:5 227:25
**redaction**
204:2,8,11,15
243:15
**redactions**
205:4,13
243:23
**redirect** 7:3
93:6 96:24
143:19,20
184:17,18
192:25 194:17
256:11
**redone** 204:23
**reduce** 169:10
**reduced**
238:14
**reduction**
160:9
**reductions**
160:7,11
**refer** 119:3
155:6 166:5
200:1 201:17
253:11
**reference**
22:23,24 26:14
197:9 210:8
**referenced**
199:16 200:23
**references**
200:25
**referred**
152:10 157:22
162:19 170:1

referring   28:5
  111:22 155:8
  158:20 161:8
  165:24 166:21
  175:13 213:6
  213:17 238:15
  240:16 251:21
refers   118:20
  254:23
refior   6:19
reflect   36:11
  204:4 250:13
  251:15
reflected   38:6
  38:14 211:15
  212:15 254:6
  254:22,24
reflection
  38:25
refresh   114:11
  155:4 161:3
  162:6
refusing   26:22
regard   52:7,11
  53:19 219:7
  225:15
regarding   27:6
  27:8 39:12
  138:23 164:17
  168:1 200:13
  210:2 211:21
  216:2 219:5
  237:12 238:2
  257:3,13
regional
  197:12,14
  198:14,25

199:2 212:24
  214:14,17
register   157:21
  157:23
regulate   245:7
rehabilitation
  53:18 114:2
reimbursable
  121:6
reimburse   55:2
  55:5,18 120:23
  122:17
reimbursed
  34:11 49:23
  138:16
reimbursement
  128:3
reinsurance
  95:22
reject   148:10
rejoining
  208:20
relate   25:8
  57:6 194:10
  222:20,21,22
related   3:5
  8:22 11:14,16
  11:20 12:4
  16:5 17:19
  29:24 30:20
  32:7 42:16
  54:6 83:25
  92:1 151:14
  154:19,25
  156:23 158:15
  159:15 160:20
  164:21 165:16

169:7,24 170:5
  170:6,22,24
  171:15,18
  181:5,9,13,14
  183:3 185:7,12
  194:8 201:3
  204:17 208:19
  231:19 232:10
relatedly
  181:11
relates   68:3
  150:11 165:1
  165:25 170:13
  172:16 184:10
  185:6,15 187:2
  189:16 190:6
  194:7 219:25
  226:2,21 252:7
  252:23
relating   28:2
  30:15 163:14
  170:9 219:23
  223:1 229:23
  231:15 241:24
  241:25 247:11
relationship
  12:4,14 21:2
  154:25 218:20
  219:4,6,7,7
  220:20,24
  223:9 225:15
relationships
  222:10
relay   86:20
release   135:2
  137:13 194:7

releases   135:6
  135:11
relevance
  264:23,25
relevant   29:19
  30:1 52:2 97:6
  154:11 164:14
  215:14 227:14
  227:23 231:9
  251:6
relief   38:17
  60:13 133:13
  134:11
religious   19:15
  208:20 216:9
  216:16 219:14
relitigate   46:7
rely   86:19
  100:7 193:12
  193:17
relying   124:14
  126:19 129:16
remain   39:21
  40:22 209:21
  238:5
remainder
  193:13,19,21
remained
  23:11
remaining
  139:6
remains   248:2
remedied
  72:13
remember
  26:12 66:3
  73:25 167:24

168:13 182:16
182:19 211:25
**removal** 88:25
**remove** 87:25
88:12,14 89:3
**removed** 14:23
**removing**
88:21
**renewed** 187:1
**renewing**
160:18
**renker** 70:24
71:24 72:3
150:21 161:9
162:20 163:13
166:2 168:6,7
168:8,9 171:11
172:15,19
173:4,16,24
174:5,14,23
176:10,15,17
176:18,22
177:2 178:5
179:22,25
180:3 187:19
189:7 206:16
238:19,22,22
239:11,14
240:2 241:3,10
241:15
**renker's** 188:4
188:12,19
189:3
**reorganization**
67:11 69:19,21
69:25 71:20
72:10 169:10

180:8,10,12,14
180:23 181:20
189:14 240:22
**repeat** 122:5
**repeated** 44:6
**repeating**
79:18
**rephrase**
143:11
**replace** 190:25
**replacements**
190:19,24
**reply** 61:4,20
87:20 265:22
**report** 28:15
31:17 111:14
115:3,5,10,12
116:10 118:1
154:13 155:21
200:24 224:1,7
226:9
**reported** 40:25
220:25
**reportedly**
30:17
**reporter**
251:25
**reporting**
222:9 224:13
248:14 257:12
**repository**
215:13
**represent**
270:2
**representations**
143:3

**representative**
26:8 79:12
**representing**
151:18 196:16
229:24 230:8
234:9 269:12
**represents**
142:10 229:22
**reproduce**
227:19
**request** 29:20
30:12 40:15,15
73:2 241:5
269:11
**requested**
38:17
**requests** 27:23
27:25 28:1
29:1 178:7,8
179:13 195:2
198:1,6,8
199:4,16 213:2
217:8,11
243:10,13,14
243:21 249:1
**require** 42:18
69:19 135:20
179:13 192:13
194:2,4 205:13
205:14 232:6
241:15
**required** 28:20
30:20 74:8
75:17 156:14
157:2,10
164:11,24
167:5,13

171:11 172:2
172:21 177:13
177:23,23
178:7 180:16
180:24 184:8
210:1 227:19
248:23
**requirements**
167:17
**res** 37:24 57:22
66:25 68:18
72:15 85:13
86:23 163:25
165:21 166:17
168:1,14,24
181:8 182:8
**rescap** 244:23
244:24
**reserve** 117:17
146:15 256:10
265:23 266:6
**reserved** 3:9
134:14 265:19
**reserves**
115:21 116:11
117:18
**reserving**
92:18 96:14
**residential**
244:20
**residents** 226:6
**resides** 232:3
**resist** 37:2
**resisted** 215:7
**resolution** 73:7
78:7 79:8

**[resolve - return]**                                                    Page 67

**resolve**  40:18
50:13 58:25
173:2
**resolved**  41:13
78:3 127:2
135:2
**resolves**  12:22
**resolving**  59:2
**resources**  41:5
41:14 110:20
215:4
**respect**  14:17
15:2,17 16:10
16:17 20:8
25:25 27:7
36:14 37:17
39:10 43:17
49:6 50:20,24
52:22 55:9
67:22,24 68:25
74:17,23 84:7
89:11 92:3
95:9 123:19,19
123:20 131:15
132:3,3 161:20
164:4 165:15
172:8 174:5,15
175:6 176:11
181:9 188:15
188:23 189:2
189:21 194:20
197:7 199:14
201:22 202:17
203:12 214:18
214:23 221:5
221:13 226:10
227:3,15 231:8

232:9 235:16
239:5,24
240:18 241:1
247:8 248:9
257:5,14,14
**respectfully**
269:11
**respective**
235:18
**respond**  44:7
47:20 48:9
51:11 55:9
221:1 244:4
261:22 269:16
**responded**
168:4 198:6
224:25 226:13
**responding**
52:3 54:18
124:7 158:10
**response**  9:9
41:16 42:5
48:9 87:11,11
96:16 198:7
199:15,18,19
211:13 214:6
216:25 219:10
220:2 221:4,10
222:7 223:8
224:11 226:3
226:23 234:24
236:11,12
237:4 249:3
**responses**
27:24,24 160:1
160:3 199:18
200:9 217:8,14

217:17 220:15
220:17,20
221:21 222:9
241:4
**responsibilities**
95:15 161:12
173:9 179:24
180:4 191:3
240:4 257:6,8
**responsibility**
48:12 132:8
142:6 220:7
257:23 258:9
**responsible**
49:18,19,20
132:19 138:14
174:16 176:13
196:24 241:12
249:3 257:17
**responsive**
167:20 243:12
243:14,25
244:1
**rest**  264:11,16
**restate**  163:1
167:11 173:22
257:21
**rested**  265:16
**restricted**
235:22
**restriction**
236:3
**restrictions**
234:16
**restructuring**
13:23 150:13
173:7 174:6,15

175:8 176:12
176:23 177:7
177:10 179:20
180:21 186:8
186:11,16
188:5,14,20
189:4,22
191:18 230:4
265:5
**rests**  264:13
**result**  33:13
56:25 73:1,4
80:23 138:24
158:7,12
241:21
**resulted**
198:19,20
**resume**  13:24
147:1 172:13
178:4 241:18
**resumed**  238:6
241:13 247:12
**resuming**
14:11
**retained**  95:20
265:5
**retention**  131:6
131:11,18,22
132:4,15
138:15 140:12
141:16 142:3,5
**retentions**
95:20 132:9
173:1
**return**  113:12
210:10

| | | | |
|---|---|---|---|
| **returned** 47:7 | 81:12 84:13,19 | 184:11 186:23 | 119:14 132:21 |
| **returns** 47:13 | 84:25 86:13 | 189:7 193:23 | 158:14,24 |
| 78:4 | 90:1 91:11,18 | 195:6,9,15,19 | 159:6,14,21 |
| **reverts** 132:16 | 92:15 93:13 | 196:18 197:4 | 160:12,14 |
| **review** 14:20 | 94:9,14 96:12 | 202:11 205:6,6 | 162:12 171:13 |
| 17:24 25:9 | 97:18,22 99:7 | 205:17 207:6 | 206:17 238:19 |
| 96:6 99:18 | 99:15,20,24 | 207:11,23 | 241:7 247:9 |
| 171:11 172:19 | 100:14 101:3 | 210:14 211:19 | 256:21 257:9 |
| 188:22 203:8 | 105:13,13 | 215:21 216:17 | **risks** 38:1 67:2 |
| 227:23 241:6 | 106:1,4,18 | 217:3 225:12 | 67:4 81:15 |
| 241:15 255:22 | 107:2,21 108:6 | 226:16 229:8 | 113:13 168:1 |
| **reviewed** 15:7 | 108:21,22,25 | 231:6 233:20 | 168:14,24 |
| 155:10,14 | 110:1,22,23 | 233:24 236:17 | 181:23 182:2 |
| 157:18,21,22 | 112:23 117:18 | 236:23 237:16 | 182:11,13,15 |
| 157:25 204:17 | 118:25 120:23 | 237:20 239:10 | **road** 271:21 |
| 220:20 243:10 | 121:8,9 122:18 | 239:14 240:23 | **roadmap** |
| **reviewing** | 123:23 124:1,2 | 245:2 247:15 | 253:20 |
| 155:21 | 125:6 126:22 | 250:12 252:10 | **robinson** |
| **reviews** 231:10 | 127:12,25 | 252:25 253:5 | 205:13 |
| **revised** 232:13 | 128:8 129:3,8 | 253:24 254:3,3 | **rockville** 1:8 |
| **revival** 79:25 | 130:24 131:1 | 254:18 255:8 | 1:12 3:2 95:10 |
| **ribatu** 218:21 | 131:11,12,20 | 260:6 264:2 | 95:25 116:23 |
| 218:23 219:16 | 132:17,23,25 | 266:9 267:4 | 123:20,23 |
| **richard** 225:25 | 133:20 134:3 | **rights** 84:18 | 124:2,5,18 |
| **richmond** | 134:13 135:7 | 85:22 90:5,8 | 126:9 143:1 |
| 142:18 | 135:24 136:13 | 134:15 256:10 | 149:24 214:11 |
| **right** 8:2 9:24 | 136:17,18 | 265:18 | **role** 12:5 32:9 |
| 10:4,15 18:3 | 137:7,15 139:7 | **rise** 37:9 269:7 | 151:11 156:8 |
| 22:9 31:13 | 140:24 141:4 | **risk** 53:15 56:8 | 209:13 241:9 |
| 35:8 37:4,22 | 141:11,19,20 | 57:9 72:14 | **roles** 32:9 |
| 40:6 47:12 | 141:22 142:8 | 76:4,5 79:18 | 163:22 177:17 |
| 48:11 50:22 | 143:8,24 | 80:17 81:6 | 186:6 |
| 56:23 59:20 | 146:11 148:21 | 84:23 85:14 | **roman** 1:8,12 |
| 60:6,24 61:2 | 148:22,25 | 86:23 90:23,25 | 3:1 20:6 |
| 61:19 65:22 | 149:7 153:15 | 101:21 102:2 | **room** 229:4 |
| 66:5,7 73:14 | 159:10 160:9 | 102:16,19 | **rosalee** 220:5 |
| 80:5,7 81:1,7 | 173:12 182:3,4 | 109:15 113:15 | |

rosenblum 5:21

roughly 60:24 62:20 132:10 197:9 198:24 199:17 202:8 213:9 251:16

royal 43:22 49:11,12 51:16 52:5,15,16 53:9 54:15,15 55:22,24 62:17 84:7,9,15 85:9 89:25,25 92:3 107:25 108:2 108:22 110:5 114:19

rt 251:25

rubric 197:11

rule 17:16 34:17 40:21 45:14 56:17 57:18 136:6 206:7 254:24

ruled 38:16 56:16

rules 33:6 46:22 88:20 250:24 255:1

ruling 43:6 77:4 82:21 96:21

rulings 244:7

run 85:6 233:24,24

running 113:23 178:10

runoff 113:25 114:21

runs 60:22

**s**

s 3:6 4:1,17 5:3 5:9,13 8:1

sake 49:16

sale 151:16

sampling 226:19

santa 116:2

sarah 72:22

satisfaction 34:17 45:9,14 46:14

satisfied 33:17 33:18 45:13,21 125:23

satisfy 50:19 101:16

saw 27:23,23 54:9 74:16

saying 40:20 41:5 59:24 66:3 70:2 78:24 82:12,15 84:20 93:17 101:23 105:19 122:11 125:18 127:19 136:22 137:11 139:12 148:13 222:3 225:23 244:12 244:25

says 30:6 35:20 36:21 39:5 45:1 47:15,16

48:7 49:17 55:12 64:17,17 68:4,5,9 71:23 91:14 103:25 113:9 116:10 116:17 135:25 136:3 137:2 213:24 218:21 221:6 223:9 225:19 226:24 261:11

sc 248:9

scas 155:8

scenario 34:11 35:1,9 81:16 140:23 142:1

scenarios 151:7

scenes 191:12 268:13

schedule 59:21 249:12 266:17

scheduled 16:8 41:17 60:1 70:18 266:14

scheduling 267:14,19

scherer 6:25

school 20:3 46:16 219:12

schools 172:22

scope 30:12 192:25 198:9 198:10 203:23 244:13 263:9

scouts 44:22,23 45:1

scramble 40:12

screen 15:20 43:19 56:24 103:3 104:22 105:1 111:5,25 120:1,7 145:21 152:21 187:15 217:19,21,24 249:23 250:4 252:5

screens 108:15 108:16

scribbles 74:4

search 30:14

searching 27:22

season 247:2

seat 94:14 149:12 195:24

seated 8:2

sec 258:20

second 22:11 22:18 23:9 40:7 46:21 48:16 52:15 56:7 97:23 106:14 107:10 113:2 140:5,13 140:19,24 142:2 149:2 198:19 261:10

secret 28:17,21 30:17 170:19 201:1,10 205:4 208:23

section 37:8 38:3 42:23

43:2 56:4,15
56:22 253:20
**sections** 3:5
8:20
**securities**
70:13
**see** 14:14,25
15:13,16 18:20
18:23 19:1
20:9,23 21:1,6
22:18 23:2,8
26:13 27:24
35:2,19 39:9
43:13 47:22
51:1,2 57:12
57:14 60:12
64:19,21 70:2
74:13 93:7
97:14 105:12
118:19 120:7
129:19 137:17
137:18,24
147:10 148:22
148:23 162:1
163:10 187:24
190:2,7 213:4
213:25 218:22
218:25 219:16
219:18 222:6
232:24 236:5
249:23 253:18
253:22 256:22
259:19 260:3,5
260:14 261:1,3
261:13 267:7,9
267:9 268:21
270:8

**seeing** 59:25
**seek** 19:3 39:13
46:7 53:17
85:25 114:1
185:13 214:4
**seeking** 14:4,7
34:12 67:6
84:10 190:19
197:20 229:13
**seem** 45:13
78:9
**seems** 43:7
246:24
**seen** 22:8 29:23
56:10 103:12
103:25 104:2
105:4,7 113:3
124:1 136:4
190:23
**select** 152:4
**selected** 249:9
**self** 95:19
131:5,11,17,22
132:3,8,14
138:15 140:12
141:15 142:2,5
173:1
**send** 239:24
**senior** 238:12
**sense** 73:22
125:14 147:23
258:25
**senses** 60:3
**sent** 202:7
**sentence**
109:20

**separate** 10:10
44:21 45:11
61:6 93:12
227:22 254:11
**separately**
32:14 34:23
48:13 219:12
220:5
**series** 32:5
**serious** 84:7
262:9,10
268:15
**seriously** 84:1
**serve** 74:3
**served** 133:4
133:23 134:12
135:12,16,21
136:6 218:23
243:14
**services** 95:17
100:13 164:8
185:4 192:10
192:15,18,22
193:5,8,13
194:1,7 249:5
249:6,8,8,12
249:14
**session** 65:22
195:15 233:25
**set** 3:8 67:9
171:4 219:22
219:24 225:25
226:20 229:4
253:11 254:16
267:14
**sets** 243:23

**setting** 42:17
144:23 154:18
**settle** 58:22
137:12 138:24
**settled** 58:16
134:20 136:23
**settlement** 38:8
55:4 80:11,13
116:4,5 126:17
133:10 136:1
139:14 171:12
248:6
**settlements**
63:24 127:9
172:3,18
**settles** 135:6
**seven** 132:11
**seventy** 54:13
**several** 11:24
13:7 19:3
32:21 33:1,11
33:11,16 45:6
47:23 48:1,7
49:4 136:16
142:7 148:3
**severally** 89:21
91:13
**sex** 61:11
217:13
**sexual** 32:5
138:4 154:19
**sexually** 26:23
**shaded** 53:5
**share** 49:24
138:22 237:18
**shared** 10:24
10:25 15:11

57:8 133:3,9
133:20 164:8
172:21 183:4
230:4 233:1,3
236:1 237:8
247:13
**shares** 243:16
**she'll** 39:20
**shift** 13:13
14:1 42:21
151:8
**shifting** 68:22
**short** 8:3,5
28:3 39:23
93:21 149:1
228:9
**shouldn't** 87:5
**show** 24:20
28:25 29:11
30:22 36:23
85:16 99:1
111:24 191:11
**showed** 216:20
**showing** 10:10
28:22 105:2
**shown** 36:2
106:22 107:14
258:18
**shows** 38:2
51:2,3 71:9
107:9
**shuffling** 191:3
**sick** 82:9
**side** 8:5 16:2
24:11,11 55:13
87:16 88:13
144:17 160:2

211:16
**sides** 24:10
41:8 83:15
87:18 265:16
**sign** 178:7
**signature**
260:3,5 261:5
261:10 271:6
**signed** 153:1
154:8 196:19
**significant**
171:8 185:6,23
198:8 211:20
261:21,23
262:21
**significantly**
170:23
**signify** 107:24
**silicon** 38:11
**silvershein**
5:22
**similar** 22:19
143:10 185:24
198:15 214:22
215:5,9 217:14
261:12
**similarly**
172:20 189:19
240:1 247:9
**simply** 71:21
72:14
**single** 34:17
45:3,9,14
46:14 69:13,13
83:19 197:14
252:15,21

**siobhain** 6:18
**sir** 89:24 104:2
118:18 131:15
132:20 138:15
138:16,20
139:4 140:8,9
140:17,24
**sirs** 257:14
258:7
**sister** 206:22
**sit** 17:1 184:2
193:10 239:14
**sits** 67:23
**sitting** 221:21
222:10 261:15
**situation** 44:23
46:24 48:5
50:19 113:9
134:19,25
244:2
**six** 160:12
187:7 255:23
**skip** 57:13
**slam** 46:13
**slash** 251:22
**slide** 15:21
16:1 17:15
43:17 56:23
103:6
**slides** 10:20,24
11:3 43:13
57:13
**slightly** 54:4
130:12 165:3
**slome** 5:23
**small** 102:22

**smart** 67:21
**smith** 205:8,12
**software**
251:14
**solely** 21:20
**solemnly** 94:10
149:8 195:19
**solid** 117:4
**solutions**
271:20
**solve** 41:20
**solved** 268:17
**solvent** 33:17
**somebody** 74:3
77:17 78:23
88:12 90:15
121:18 139:5
148:5 166:12
205:10 228:12
228:14 236:9
236:23 263:15
**sonya** 3:25
271:3,8
**soon** 61:16
**sorensen** 5:24
**sorry** 8:7,14
9:13 25:17
29:5 46:4 52:9
74:24 77:24
94:5 98:3
112:9 120:18
122:5 125:13
130:23 153:7
163:3 175:3
184:22 187:20
193:17 216:3
222:13 225:14

226:14 236:21
247:16 252:21
255:13 257:1
257:19,21
261:3 264:12
269:2
**sort** 31:22
110:17 126:1
200:4 216:6
221:3 222:10
226:18 246:17
251:24 252:1
**sorted** 204:13
**sorting** 251:15
**sorts** 201:25
**sought** 12:13
169:23 242:10
244:24
**sound** 80:23
**sounded**
162:10 210:22
**sounds** 121:8,9
213:9
**source** 203:4
254:24 257:10
**southern** 1:2
232:19 244:22
**span** 72:16
**spare** 76:1
**speak** 8:13,18
132:5 212:14
212:15 236:24
**speaking** 139:8
216:11
**speaks** 16:24
**special** 21:2
110:19 209:10

219:15 220:7
221:7 226:7
**specific** 31:24
31:25 111:21
119:24 120:14
120:16 127:16
128:23 130:7
131:15 138:19
139:2,8 144:14
194:6 199:19
220:15 221:20
224:17 227:5
228:1 229:13
243:13,14,20
243:20,20
253:12
**specifically**
29:23 57:6
68:3 95:10
101:7,24
111:15 124:17
150:19 166:2
225:8 241:2
**specifics**
128:17 129:12
**specified**
218:24 250:7
**speculate**
167:16
**speculating**
246:5
**speculation**
246:9
**speed** 21:9
**spend** 14:12
41:5,19 238:13
240:24

**spending** 41:14
159:20,21
180:23
**spent** 43:5
154:14 240:18
240:21,24
**split** 66:21
**spoken** 147:24
**sponsored**
244:21
**ssap** 113:12
**st** 20:2,6 23:4
220:4 226:6
**stabilized**
151:22
**stack** 258:20
**staff** 206:19
**stage** 12:19
37:7,25 70:16
**stake** 84:22
**stale** 245:20
**stand** 94:7
186:22 195:18
235:10
**standard** 56:19
67:8 83:23
220:3
**standardized**
74:20 213:1
217:1,8 219:23
226:12
**standards** 86:9
**standing** 269:4
**standpoint**
72:13 164:3
191:11

**stang** 4:10 5:25
9:19,22 54:25
89:14 98:6
144:19 269:7
**start** 3:10
11:10 60:8
97:22 132:1
137:10 183:19
259:10 265:21
266:17 267:4
**started** 9:1
151:5 158:11
244:25
**starting** 13:12
138:1 226:20
**starts** 51:1
141:7,9 174:11
225:22
**state** 8:21
11:13 12:10,12
13:13 14:1,11
14:13,14,17
15:19 23:23
24:6,6 27:2,6
28:10 36:5
37:16,17 40:13
40:19 42:15
46:5,22 53:20
55:25 61:6,8
63:13 66:13
68:8,9,9 69:16
70:25 71:10
73:14,20,20
75:6,15,20,23
77:2,9 80:8
88:2,15 89:19
110:2 117:15

[state - streamline]                                      Page 73

| | | | |
|---|---|---|---|
| 133:7 155:7,11 | 230:14,21 | **statute** 75:20 | 259:8 260:3 |
| 155:18 156:7,9 | 234:9 235:15 | **statutory** 53:16 | 262:16 267:17 |
| 156:15 157:25 | 235:23 236:1,4 | **stay** 12:13 14:5 | **stephens'** |
| 158:10,16 | 238:4,6,13 | 14:7 15:4,12 | 249:20 |
| 159:15 162:25 | 239:5,13,18 | 21:25 22:3 | **stepped** 234:18 |
| 163:9,14,21 | 241:8,10,11,13 | 38:5,21,23 | **steps** 74:5 |
| 164:15,21,25 | 241:14,21,24 | 40:11 43:25 | **stevens** 70:2 |
| 165:10,16 | 242:13,18 | 47:6 48:24 | 227:12 |
| 167:6,14,20 | 245:6,22,22 | 53:5 58:14 | **stipulated** |
| 169:5,16,22,25 | 246:5,10,12 | 59:3 74:7 75:2 | 10:13 17:23 |
| 171:9,15 | 247:3,12 248:9 | 77:6,16 81:23 | 53:6 63:5 80:1 |
| 172:12,25 | 248:19,24 | 84:12 86:11 | 80:2 88:14 |
| 173:5,13,18,25 | 250:8,9 255:23 | 117:15 133:6 | 103:1 251:3,9 |
| 174:6,17 175:7 | 257:3,5 260:10 | 138:2 184:5 | **stipulating** |
| 176:13 177:3,7 | 261:6 263:2 | 244:9,10 | 64:16 |
| 177:13,24 | 269:12,15,22 | **stayed** 27:4 | **stipulation** |
| 178:4,13,18,24 | 269:25 | 202:20 214:20 | 29:15,18 64:18 |
| 179:9,19 180:1 | **stated** 153:11 | **staying** 210:20 | 82:11 144:10 |
| 180:17,24,25 | 154:18 162:14 | **stays** 42:24 | 145:3,7 200:16 |
| 181:3,11,15,17 | 170:20 215:12 | **steinman** | 210:5 211:10 |
| 182:24 183:5 | 217:12 219:9 | 197:16 | 232:8 |
| 184:8 185:2,25 | **statement** | **stephens** 6:1 | **stipulations** |
| 186:17 188:4 | 110:25 111:16 | 7:6 27:10,18 | 29:12 88:11 |
| 188:13,20 | 111:17 112:20 | 31:9,11 57:16 | 145:1 |
| 189:3,16,21 | 115:2 125:15 | 57:16 58:3 | **stole** 36:7,12 |
| 190:6 191:19 | 125:16 221:12 | 195:18,23 | **stoneking** 6:2 |
| 196:23 197:2 | 245:1 264:18 | 196:1,2,8,10 | **stop** 77:23 |
| 197:11 202:12 | 264:20,21,24 | 196:12 202:4 | 188:1 |
| 203:2,19 | **statements** 8:4 | 202:21 205:14 | **strang** 237:1 |
| 204:10,12 | 8:5 53:12 | 206:11 207:5 | **strategic** |
| 205:2 206:15 | 199:10 208:9 | 207:17,19,20 | 150:10 |
| 209:16,18,25 | **states** 1:1,19 | 212:23 213:13 | **strategies** |
| 211:18,24 | 218:22 219:11 | 213:16 224:6 | 171:12 172:17 |
| 213:2,22 214:5 | 220:4 223:22 | 235:3,11 238:1 | **strategy** 58:12 |
| 215:14 217:2 | 226:5 238:3 | 245:19 246:9 | 172:8 |
| 219:13 227:20 | **statuary** 53:16 | 249:17 256:17 | **streamline** |
| 228:18 229:16 | | 256:19 258:11 | 246:8 |

strenuously
  89:2
stress  117:24
  117:24 226:12
stretch  59:4
  75:2 82:21
  266:16
stretched
  190:2
stretching  66:7
stricken
  265:18
strictly  123:23
strike  136:4
  179:16 183:6
  183:19
strong  41:8
stronger  83:16
structure
  95:18 197:20
  222:23 223:17
stuart  5:13
stuff  81:18
  147:14 155:15
styled  254:4,20
  255:2
su  2:5
subject  14:15
  14:22 15:4
  16:12 17:3,9
  17:10,17 23:21
  24:1 30:22
  38:5 40:23
  41:11 43:24
  53:4 64:25
  72:20,23 75:7
  79:25 82:17,22

82:25 83:11,14
83:16 91:25
92:1 99:22
109:9 153:13
155:6 184:5
207:12 213:1
218:22 219:10
220:3 226:4
232:8 244:11
269:20
subjects  99:13
submissions
  100:17
submit  116:16
  207:4
submitted
  85:18 99:14,15
  154:14 155:24
subpoenaed
  228:20
subrogation
  90:4
subsequent
  222:9
subset  165:1
  206:4 238:13
  252:7
subsets  227:25
subsidiary
  70:13
substance
  250:11
substantial
  40:4 67:3,12
  71:18 76:5
  82:2 171:14
  180:15 202:8

206:8
substantially
  155:2
substituting
  35:3,4
succeeded
  138:3
success  180:8
successful
  180:10
sue  85:24 86:6
sues  85:23
suffer  66:24
  180:14
suffered  58:20
suffice  247:6
sufficient  45:4
  113:11 266:3
suffolk  197:11
  197:14 199:8
  212:25
sugayan  6:3
suggest  43:3
  97:12 115:5
  246:14
suggested
  28:16 30:17
  37:19 110:11
  110:12
suggests  75:20
  130:18
suite  271:22
sum  55:20
  250:11
summaries
  57:18 253:2

summarize
  253:1
summarizes
  252:9
summarizing
  250:6
summary
  17:16,20 21:17
  55:21 104:15
  250:7
super  94:18
supervise  19:7
  19:12 241:4
  247:10
supervised
  217:7 220:14
  221:2
supervising
  219:8 225:16
  225:19
supervision
  12:1 20:18
  21:5,11 23:24
  25:5 32:8
  36:20 91:3
  238:6 250:21
supply  112:10
support  13:10
  89:5 107:8
  110:12
supporting
  151:11
supports  64:7
suppose  135:8
supposed
  104:21 116:12
  223:3

[supreme - tell]                                                              Page 75

supreme  245:1
sure   8:6 10:8
    15:15 17:4
    19:22 37:3
    45:15 60:8
    72:6 74:12
    88:19 89:2
    90:18 95:12
    98:16,18 102:7
    107:13,15
    112:2 119:7
    120:7 132:5,6
    145:19 147:16
    147:22 152:3
    159:18 162:10
    197:9 199:15
    201:6,13 205:9
    209:12 210:17
    222:17,25
    228:10 245:24
    250:19,21
    255:22 256:11
    257:25 258:2,6
    265:24 266:18
surprise
    250:21
surprised   24:3
    64:8
surprising
    21:24
survived   35:16
survivor   33:15
    34:1,5,19
    45:10,11 46:15
    46:16 78:5
    82:11 136:10
    204:16,24

survivor's   77:8
survivors
    12:23 58:19
    59:1,7 82:6
    109:8,13 110:1
    125:6,11,17,20
    126:15 204:3,5
sustain   262:12
sustained
    136:8 137:19
sustaining
    16:18
svb   38:12 58:7
    70:10,12
swear   94:10
    149:8 195:20
switch   145:15
    228:9 241:20
switchover
    233:10
sworn   93:2,21
    94:9
sydney   6:11
system   49:4

                t

t   5:10 271:1,1
take   11:23
    15:19 21:14
    27:1 32:11
    37:7 65:11
    69:20 81:24
    89:20 94:17
    95:18 98:1
    143:25 146:22
    179:24 195:11
    228:8 233:13
    238:10 245:15

    246:15 263:12
taken   13:11
    63:3 110:19
    125:3 151:18
    199:3 212:3
    231:4
takes   65:19
    68:5 72:9
    118:1
talk   12:8 57:11
    72:12 76:23
    147:2 160:16
    161:9 222:6,9
    258:2 268:10
talked   57:7,8
    57:22 67:16
talking   28:4
    31:11 37:8
    61:25 68:2
    79:19 83:24
    84:13 88:24
    92:6 104:23
    119:3,13
    122:10 123:23
    136:15,16
    139:11 165:24
    177:16,19
    183:25 184:2
    187:18 198:14
    202:7 205:16
    205:17,18
    223:20 224:13
    241:2 242:12
    261:7
talks   254:25
targeted
    227:25

task   204:18,22
    239:7,7
tasks   158:25
    159:22 161:5
    162:11,16
    163:11,12,13
    174:16 176:12
    176:22 177:1
    177:23 184:25
    186:15 188:16
    191:18 197:7
    197:18 239:4
    240:21
tax   38:2 56:17
team   150:14,20
    151:4 185:1
    186:16 196:24
    217:7 220:14
    249:2 250:19
teasing   73:10
technical
    114:16,17
teed   203:22
    242:18
telephone
    41:15 268:1
telephonically
    4:19
tell   9:11 30:25
    88:13 94:25
    95:3,8 112:16
    115:23 116:1
    128:19 129:1,5
    129:13,15
    130:7 146:23
    148:16 149:20
    168:5 197:6

**[tell - that's]**                                                              Page 76

| | | | |
|---|---|---|---|
| 199:13 234:6 | 227:12 245:25 | 227:11 228:2,3 | 207:16 212:22 |
| 254:7 255:3 | **testify** 27:10 | 234:1 238:2 | 213:14 218:1 |
| **ten** 65:17 143:3 | 64:5 158:5 | 241:1 243:6 | 222:15 237:20 |
| 143:7 152:4 | 167:19 178:6 | 245:19 247:8 | 237:20 255:20 |
| 195:11 198:24 | 193:4,7 212:23 | 249:18,20 | 256:9 263:8,10 |
| 198:24 266:8 | 228:1 | 250:6 252:3 | 268:12,16,23 |
| **tender** 93:5,23 | **testifying** | 255:16,18 | 268:24,25 |
| 153:3 207:14 | 123:17 143:16 | 256:20 257:1 | 270:6,7,9 |
| **tendered** | 174:20 243:22 | 265:18 269:10 | **thanks** 9:15 |
| 248:10,14 | **testimony** 8:24 | 269:13 | 10:14 17:6 |
| **tendering** | 12:6 43:19 | **text** 250:13 | 65:7 148:23,25 |
| 97:19,20 | 57:10,16 58:2 | **thank** 9:23 | 152:6 202:1 |
| **tenders** 136:1 | 69:14 70:2 | 10:7,23 11:9 | **that'd** 22:13 |
| **tenth** 212:24 | 71:23 93:3,12 | 15:15 17:8 | **that's** 73:1,9 |
| **term** 28:16 | 94:11 96:9,12 | 25:18 26:2 | 73:12,13 74:8 |
| 72:9 114:16,17 | 96:20,25 97:4 | 42:9 55:19 | 75:12 77:17 |
| 201:1,9 221:23 | 97:7,24 99:15 | 65:5,24 66:8,9 | 80:9,16 84:14 |
| 225:1 227:5 | 99:23 100:8 | 91:18,21,22 | 85:19 86:5 |
| **terminable** | 101:18 102:4,5 | 92:21 94:15,20 | 87:9,9 90:5 |
| 192:18 193:5 | 118:9 119:4,13 | 94:22 98:5,22 | 92:14 102:6 |
| **terminate** 19:7 | 121:12 122:2,9 | 99:5 102:10 | 128:13 129:4 |
| **termination** | 122:15 124:15 | 106:21 108:17 | 130:25 141:3 |
| 192:21 | 136:19 143:14 | 111:8 112:9,14 | 152:10 154:10 |
| **terms** 21:8 | 143:15 145:20 | 113:5,7 119:9 | 154:11 155:21 |
| 79:21 81:15 | 146:2 149:8 | 122:1,13 | 156:12,20,25 |
| 82:3 108:2 | 152:16,23 | 124:13 130:11 | 159:7 163:18 |
| 153:11 156:13 | 153:1,8 154:4 | 131:5 133:15 | 165:18 169:15 |
| 159:24,25 | 154:6,10,11,17 | 133:17 136:21 | 170:1,17,19,19 |
| 190:4 205:2 | 155:4,24 158:4 | 140:16 143:19 | 170:20,25 |
| 214:10 221:19 | 159:3 164:4 | 143:21,21,23 | 173:13,15 |
| 224:14 232:2 | 169:4 172:12 | 145:4 149:14 | 175:15 177:8 |
| 237:17 | 175:17 178:3 | 152:20 153:22 | 177:11,19 |
| **testified** 137:11 | 181:3,22 195:7 | 158:21 161:1 | 179:11 184:11 |
| 174:19 186:5 | 195:20 207:5 | 176:15 184:17 | 184:13 185:16 |
| 187:14 190:9 | 210:3,4,8,10 | 191:23 194:12 | 189:10 192:4 |
| 209:25 210:7 | 212:23 213:4 | 195:6,8,13 | 193:23 194:8 |
| 216:24 227:10 | 213:21 216:24 | 196:1,4,6 | 197:5 201:10 |

| | | | |
|---|---|---|---|
| 204:24 205:6,6 | 230:12 243:4 | 36:22 37:6,13 | 111:6,8 114:6 |
| 209:2,5 211:18 | 243:23 245:3 | 37:24,24,25 | 114:9 122:4,8 |
| 211:19 212:6 | 252:15,21 | 38:1,25 39:5 | 124:15 129:13 |
| 213:23 214:21 | 262:5,16 | 40:10,16 41:1 | 140:3 144:7 |
| 216:17 217:3 | **they're**  160:23 | 41:4,24 42:4 | 147:12 153:24 |
| 220:1 221:13 | 214:24 231:20 | 42:20,21,22 | 154:5 157:13 |
| 223:13 225:1 | **they've**  88:9,10 | 43:8 45:25 | 167:10 174:12 |
| 226:14,16,22 | 127:9 128:6 | 46:21 48:13 | 175:20 181:21 |
| 227:8 228:21 | 136:11 232:8 | 49:5 50:13 | 186:23 190:9 |
| 231:5 234:23 | 234:15 242:25 | 52:11 53:4 | 201:1 203:24 |
| 236:22 239:10 | 247:14 265:6 | 54:16 55:25 | 203:25 205:14 |
| 239:14,22 | **thin**  85:12 | 56:1,6,7,7,9,12 | 209:17 210:6,6 |
| 240:9,15,23 | 190:2 206:8 | 56:16,18,18,19 | 211:5 212:6 |
| 241:17 242:1 | **thing**  21:6 22:1 | 57:21,24 58:1 | 213:23 216:24 |
| 244:17 246:9 | 23:1,8,10,14 | 59:1,3,4,4,12 | 221:23 223:17 |
| 247:20,21,23 | 54:15 57:10 | 60:7,9,9,19 | 225:3,16 |
| 249:15 252:1,9 | 59:9 73:9,12 | 61:18,20,23 | 226:11,14,14 |
| 252:25 253:5 | 73:13 74:19 | 62:2,14,15,19 | 226:16 230:16 |
| 254:3,3,18,22 | 83:20 91:23 | 66:23 67:3 | 233:18 235:9 |
| 255:9 263:6 | 114:5 115:17 | 68:1,13,16 | 241:19,19 |
| 267:1 268:11 | 145:6 147:15 | 69:12 72:2 | 243:15,17,18 |
| 268:14 | 175:24 182:6,8 | 74:5,22,23 | 243:19 244:12 |
| **theories**  11:25 | 228:10 240:24 | 75:4,4,5,9,12 | 245:20,25 |
| 32:17,18 46:15 | 245:14 246:23 | 76:2,4,6 77:14 | 246:2,2 247:5 |
| 46:18 | **things**  26:9 | 79:20 80:1 | 255:21 264:7 |
| **theory**  31:23 | 40:18 60:12 | 81:13 82:5,13 | 265:24 266:1 |
| **thereabouts** | 82:3 102:4 | 82:18,23,25 | 266:20 |
| 205:17 | 174:22 194:3 | 83:8,9,9,15,17 | **third**  4:12 |
| **there's**  149:12 | 245:23 246:8 | 83:20,21,21 | 21:20 45:1 |
| 153:10 160:5 | **think**  13:13 | 84:6 85:4,8,11 | 203:6 216:19 |
| 183:14 184:4 | 14:9,9,12 | 87:21 89:17 | 228:20 243:3,9 |
| 191:2,3 203:24 | 17:25 18:8 | 91:24 92:2,3 | 244:4 257:10 |
| 203:25 204:11 | 20:23 21:12 | 93:11,16,18 | **thirty**  39:16 |
| 204:12 205:22 | 25:2 27:13 | 101:12 102:4 | **thomas**  5:23 |
| 212:13 215:3 | 28:3 29:16 | 103:7,10,16 | 171:11 |
| 216:18 222:18 | 32:13,20 34:9 | 105:22 107:6 | **thought**  11:9 |
| 226:11 228:25 | 34:9 35:1,8,23 | 108:5 110:11 | 18:22 22:13,17 |

| | | | |
|---|---|---|---|
| 41:1 61:9 75:1 | 60:10 61:15,16 | **times** 13:8 20:2 | 34:19 64:11 |
| 81:5 82:20,21 | 61:20,24 62:2 | 20:5 21:9 23:4 | **told** 29:7 |
| 87:10 92:22 | 68:5,16 69:19 | 29:14,14 62:22 | 166:12 169:2 |
| 115:24 121:18 | 69:20 81:23 | 186:19 212:2 | 178:18 182:10 |
| 147:7 148:10 | 87:20 88:12,14 | 223:25 224:1 | **toldner** 226:1 |
| **thoughts** | 93:9 96:1 | 226:9 | **tom** 150:19,21 |
| 147:14 | 98:25 99:4 | **timing** 49:6,10 | 162:14 206:19 |
| **thousand** | 113:2 114:3 | 213:8 | 238:18,21,22 |
| 153:24 | 126:2 151:18 | **title** 95:5 | 239:14 241:3 |
| **thousands** | 151:21,24 | 260:15,18,22 | **tomorrow** |
| 204:19 205:17 | 154:15 155:24 | 260:24 | 40:11 147:7,13 |
| **threat** 67:11 | 155:25 156:10 | **today** 12:6 | 268:21 270:8 |
| **threatened** | 158:13,22 | 13:20 14:9 | **took** 12:5 |
| 56:24 | 159:1,4,10,13 | 43:19 57:10,17 | 73:20 82:23 |
| **three** 8:25 25:6 | 159:16,20 | 58:2 59:11 | 90:2 155:25 |
| 38:10 48:10 | 171:14 172:14 | 66:9,25 73:21 | 202:9 212:17 |
| 58:17 82:8 | 173:9 174:8,25 | 74:7 75:21 | 222:24 261:25 |
| 85:20 92:22 | 175:13,23 | 84:3,11 100:10 | **top** 61:9 |
| 101:3 127:20 | 177:10 179:16 | 101:1 104:9 | 139:20 162:3 |
| 159:17 160:10 | 180:9,20,22 | 132:1 134:7,8 | 189:15 214:10 |
| 161:10 221:19 | 183:7,25 | 147:3,12 | **topic** 130:12 |
| **threshold** | 186:24 187:4 | 153:25 174:20 | 133:2,4 |
| 56:20 204:16 | 187:18 188:15 | 175:10 184:2 | **tort** 20:19 |
| **threw** 174:12 | 188:20,21,23 | 193:10 210:9 | 157:23 |
| **thrust** 240:11 | 189:14,15,16 | 213:19 216:25 | **tortfeasor** 45:7 |
| **thumb** 206:7 | 192:8 196:18 | 221:22 222:10 | **torts** 91:4 |
| **tie** 251:7 | 196:21,21 | 228:2,18 | **toss** 227:11 |
| **ties** 34:18 | 198:12 199:5 | 244:17 252:18 | **total** 47:17,18 |
| **time** 11:13 | 202:5,9 204:23 | 252:24 261:7 | 113:16 171:6 |
| 12:13 13:7,11 | 231:2 238:10 | 261:16 269:9 | 205:20 265:23 |
| 14:1,4,8,13 | 238:13 240:18 | **today's** 155:7 | 266:4,5,11 |
| 16:23 38:18,22 | 240:20,24 | **todd** 5:8 25:12 | **toward** 39:7 |
| 39:3,23 40:9 | 244:11 245:7 | 25:17 149:3 | **towards** 40:17 |
| 40:10,16 41:19 | 265:22,23 | 184:22 194:16 | 119:15 |
| 42:7 43:5 | 267:6 | 267:12 | **tower** 136:15 |
| 49:16 53:18 | **timeframe** | **together** 17:23 | **towers** 136:16 |
| 55:5 59:15,15 | 72:16 | 20:7,13 21:14 | 139:13 |

**traditional**
82:1
**train** 19:7,11
**training** 21:5
25:4 32:9
**transcribed**
3:25
**transcript**
161:5,7,16
271:4
**transfer** 87:24
**treat** 129:2
**treated** 141:1
142:4
**tremendous**
203:6
**trial** 47:15
61:14 72:5
77:10 78:8
86:13 178:13
261:12,17,20
262:1,17,19
263:1 266:14
266:19
**trials** 61:15
181:11 266:17
**trick** 264:11
**tried** 86:14
222:8 262:1
**trouble** 8:12
134:23
**true** 33:9,10
37:11,13 48:23
49:5 61:16
63:17 68:12
71:2 75:4
109:9,18

131:21 139:12
142:2 148:15
156:25 162:17
168:23,23
176:9,14,15,18
176:20,25
177:5,8,9,12
178:12 179:8
180:19 182:22
183:22 238:8
239:4,22
240:15 271:4
**trusha** 6:13
**truth** 94:12,12
94:12 149:9,9
149:10 195:21
195:21,22
**try** 8:18 60:3
138:13 147:10
161:10 215:5
228:5 230:25
261:16,22
262:6
**trying** 19:20
29:6 69:1
91:24 140:15
148:9 161:3
221:12,15
244:5 262:3
**turn** 23:1
49:22 82:19
93:24 119:16
174:9 187:14
223:7 225:25
243:2 261:4,4
**turning** 56:21
158:4 163:19

169:4 172:11
178:3 180:7
181:2 255:11
**turns** 91:14
**twelve** 115:4
116:18 117:20
117:25
**twenty** 136:25
**two** 3:8 12:6
21:4,5,8 23:9
25:3 42:22
43:22 45:25
51:21 57:15
59:13 62:22
64:6 70:11
76:13,14 80:18
86:1,7,10,14
93:11 114:7
127:20 131:13
134:21 136:25
152:12 160:15
189:25 190:10
190:20 191:1
201:7 207:10
243:1 246:21
**type** 17:11
132:24 196:20
200:8 201:18
206:17 222:10
246:7 250:9
**types** 178:21
184:25 198:21
201:22
**typical** 20:23
206:5
**typically** 11:16
135:5

**typo** 255:21
256:3

**u**

**u** 105:14
119:12 144:5
144:22,23
145:22,23
146:1,8,11,12
**u.s.** 2:3
**uday** 6:14
**uh** 228:23
**ultimate** 37:10
52:8,12 55:4
61:22 121:5
**ultimately**
12:10 13:2,16
13:20 32:17
33:8 34:4
36:24 52:7
58:16 62:15
70:21 235:20
246:7
**umbrella** 51:20
108:25
**uncertain** 46:9
**uncertainties**
113:14
**unclear** 170:13
**unconstrained**
245:3
**under** 3:4 8:20
8:23 11:16
19:25 21:10
23:5,11 43:2
43:22 46:22
55:24 56:7
62:8 66:23

80:5 83:24
84:8,15 85:22
86:7,9,10
88:20 109:12
110:17 113:10
113:20,24
121:3 131:22
138:19 139:1,2
143:8 151:5,6
164:8,25
185:25 213:25
219:13,15
220:8 226:7
234:15 247:12
250:20 253:15
255:1 258:8
**underlying**
32:3,16,18
35:11 43:20
128:5 129:23
199:25 200:10
208:1 210:14
232:7 242:7
255:5,9
**understand**
18:1 28:4
33:14,14 37:20
39:8,17 43:9
59:16 64:13
72:17 88:19
89:2 90:13
92:11 100:23
104:21 114:23
118:8 120:4,8
125:7 132:10
132:18 139:22
139:23 155:8

162:12 166:20
187:23,24
194:4 205:9
221:12,15
235:1 245:24
260:11 268:13
269:17
**understanding**
17:3 27:9,11
115:6 162:22
163:24 164:13
164:20 165:20
165:23 166:1,9
168:1,3,14,16
168:24 169:12
175:3 178:12
178:17 181:6
181:23 182:2
182:11,23
190:17 191:7
194:19 203:3,5
203:7 208:19
211:16 212:11
214:21 216:15
221:16 222:1
227:2 229:15
235:24 237:6
237:10 242:8
242:17 247:21
247:24 248:7
248:12 249:7
249:11,15
**understood**
30:19 59:10
165:8 245:12
245:14 263:4

**undertake**
185:6 186:7
**undertaking**
172:23 185:1
**undertook**
197:18
**undue** 213:23
**unequivocal**
76:20
**unfair** 72:2
**unfortunately**
106:11 190:20
235:2 259:8
**uniform**
197:25 198:5,8
**uninsurable**
91:15
**united** 1:1,19
**unknown**
112:6
**unnamed**
166:5
**unpack** 80:4
88:23
**unredacted**
15:14
**unsecured** 4:11
151:13 260:19
260:25
**unwillingness**
13:19
**updates** 248:5
**upper** 139:12
**upshot** 42:13
**use** 28:16
117:7,7 181:14
201:9 216:3

221:11,21,25
224:14,25
225:17 259:12
**used** 108:2
128:6 175:11
175:14 176:3
201:1 221:9,14
224:16
**uses** 131:13
191:12
**using** 117:5
120:3 162:20
224:15 225:1
**usually** 63:16
88:22 232:23

**v**

**v** 1:14 5:11
244:19
**valid** 97:5
**valley** 38:11
**value** 14:3
180:12
**varied** 151:20
**varies** 47:10
**variety** 46:18
150:24
**various** 154:21
158:24 173:1
188:24 211:13
244:11
**varying** 65:2
**vendor** 231:24
232:3,3
**verbatim**
121:14
**verdict** 47:7,13
78:4,5,8 79:7

**veritext** 271:20
**versus** 44:21
  155:19 183:9
  183:24 254:9
**vicar** 150:23
**vicarious** 23:23
  35:24 36:1,6,8
  36:13,16,21
**vice** 95:7
**victim** 234:9
**victims** 8:23
  101:23 102:18
  109:17 119:16
  150:11 158:11
  196:19,25
**view** 11:3
  114:12 117:8,9
  169:3 186:14
  191:14 194:1
  203:21 208:4
**views** 39:25
**vigorously**
  187:7
**violates** 86:8
**violation** 24:12
  85:25 91:9
**virgin** 142:24
**visibility**
  158:12,17
  159:4,12,19,20
  159:22 161:11
  162:7,16
  163:10 164:24
  165:1,3 175:21
  175:24 176:3
  180:20,22
  185:17 191:9

**voice** 233:23
**void** 86:8
**volume** 205:18
  205:20 228:25
  244:4
**voluntarily**
  190:15,16
**voluntary**
  160:11

**w**

**wait** 65:25
  77:23 97:14
  111:18 122:16
  127:24
**waiving** 219:11
  220:3
**walk** 65:19
  217:18
**want** 9:11 15:3
  24:12 34:25
  36:24 38:20
  41:5,21 43:8
  50:7 55:11
  64:22 65:11,12
  69:1 72:25
  73:3 74:15
  79:18 80:23
  81:21 86:2
  87:17,25 89:3
  89:17 93:4,22
  94:19 96:23
  98:16,25 102:7
  107:13 111:18
  112:1 119:7
  120:7 129:1,1
  129:18 133:4
  145:19,23

  146:22,24
  161:3 171:17
  175:11,18
  183:15 201:12
  205:23,24
  222:24 228:6
  229:19 232:23
  245:24 249:17
  255:22 258:22
  265:20 266:18
  268:3
**wanted** 55:15
  59:20 60:4
  86:22 89:10
  91:16 119:6
  147:22 155:3
  236:23 255:5,8
  264:7 266:16
  267:24
**wanting** 268:9
**wants** 99:1
  111:20 263:15
**warner** 6:20
**washington** 4:6
**wasn't** 162:10
  210:17 225:4
  267:24
**wasting** 84:16
**watch** 263:12
**water** 94:16
  149:12,13
  195:25
**way** 12:22
  26:10 29:6
  69:24 70:4
  75:6 80:17,19
  80:19 87:22

  88:11 92:8
  114:11 124:4
  134:16 135:25
  167:9 173:3
  174:4,13 175:5
  175:9,13,16
  176:1,10
  198:11,12
  203:9 211:14
  227:11 229:4
  244:12 248:17
  253:1 268:2
  269:14
**ways** 45:25
  79:9 151:3
  245:11
**we've** 9:6 22:8
  55:21 56:10
  57:8,22 62:5
  66:20 82:5
  84:10 93:11
  142:5 147:23
**week** 27:22
  38:11 58:8,8
  151:22 152:5
  262:7
**weeks** 58:9
  151:25 152:4
  187:8
**weight** 96:25
  153:14 265:19
**welcome**
  112:12 196:7
  218:2
**went** 12:19
  13:18 27:13
  30:11 67:13

[went - worked]                                                                Page 82

| | | | |
|---|---|---|---|
| 115:16 117:13 | **who've** 69:6 | 170:21 176:5 | **wood** 209:10 |
| 151:24 154:7,9 | **wholly** 70:13 | 178:21,24 | **word** 11:10 |
| 171:6 181:21 | **william** 5:20 | 185:21 186:3 | 131:13 174:21 |
| 190:4 269:10 | 6:15 171:13 | 187:1,5,11 | 175:12,14 |
| **weren't** 204:7 | 226:22 238:20 | 190:16,20 | 221:11,14,17 |
| 237:15 | 247:10 256:22 | 191:2 192:14 | 221:21,24 |
| **west** 266:22,25 | **williams** 6:21 | 195:8,9,12,16 | 222:1 224:14 |
| **we'd** 255:4 | 226:24 | 196:6 199:15 | 224:16,25 |
| **we'll** 187:24 | **willing** 122:19 | 200:15 201:6,9 | 225:17 |
| 195:12 213:20 | 266:14 | 201:12 203:14 | **words** 44:4 |
| 233:7,10,13 | **win** 86:2 | 204:21 205:6 | 60:2 76:2 |
| 249:20 266:10 | **wind** 97:6 | 205:12,20,24 | 114:7 123:16 |
| 267:4,7,9,9 | **winds** 49:2 | 206:4,7 207:15 | 137:18 213:25 |
| **we're** 105:19 | **wish** 8:3 | 210:17 216:11 | 222:6 |
| 148:25 149:1 | 221:18 | 216:17 220:14 | **work** 16:20 |
| 154:17 161:21 | **witching** 233:5 | 221:18 222:5 | 62:6 64:7,11 |
| 161:22 180:22 | **withdrawing** | 230:1,9 232:11 | 64:20 70:8 |
| 205:16,17,18 | 145:6 183:6 | 232:25 235:10 | 74:1,8 90:8 |
| 209:17 223:5 | **withheld** 208:5 | 235:19,24 | 95:16,24 112:5 |
| 223:20 227:11 | 208:6 231:11 | 240:9 242:3,13 | 132:3 150:2,15 |
| 228:8 233:20 | **witness** 64:5 | 242:17 247:21 | 156:14 157:1,1 |
| 255:13 261:7 | 92:20 93:2,2,3 | 249:7,15 | 160:6 171:23 |
| **we've** 153:10 | 93:6,20,23 | 250:19 251:9 | 172:10 186:21 |
| 177:16,19 | 97:19,20 98:11 | 251:13,20,24 | 196:20 206:11 |
| 235:20 251:1 | 98:15,25 99:4 | **witnessed** | 226:25 239:9 |
| 252:16 | 102:7,10 | 134:19,25 | 239:19 240:9 |
| **what's** 165:23 | 103:25 105:4 | **witnesses** 3:13 | 241:21 248:8 |
| 170:16 191:7 | 106:17,21,22 | 7:3 8:25 92:24 | 250:22 262:16 |
| 205:18 208:14 | 106:23 112:2 | 178:6,12,17,22 | 262:21 268:13 |
| 233:1 251:15 | 116:11 144:1,2 | 179:9 199:23 | 268:14 |
| 264:23 | 145:20 149:2,5 | **woman** 263:18 | **worked** 70:3,5 |
| **whichever** | 151:20 152:3 | 263:21 264:19 | 93:9 150:3,18 |
| 92:23 235:16 | 153:3 157:20 | **wondering** | 199:23 206:13 |
| **white** 119:23 | 158:1 160:5,15 | 224:21 | 206:17,18,21 |
| 120:6,10 | 165:25 166:6 | **won't** 245:4 | 206:24 207:1 |
| 145:15 | 166:11,13,16 | 261:18 | 220:19 221:15 |
| | 166:21 170:12 | | |

**[working - '78]**                                                          **Page 83**

**working**  19:8
95:9 151:4,13
158:6 161:13
173:12 232:16
242:16 250:20
265:9
**workload**
190:18
**works**  128:25
189:7
**world**  52:18
92:6,13
**worth**  265:14
265:15
**would've**  34:14
**wouldn't**  91:5
91:8 115:16
168:21 229:3
244:10 261:16
**would've**
254:13,15
269:25
**wrap**  59:12
**writing**  113:22
114:19
**written**  27:14
37:20 84:19
93:3,13 96:9
152:16,23
172:11 178:3,7
181:3,22 186:5
212:23 238:2
238:24 241:1,5
249:18 250:23
250:25 252:3
255:14

**wrong**  36:4
114:6 137:8
**wrote**  38:11
116:8

| **x** |
|---|

**x**  1:5,11,17
30:21

| **y** |
|---|

**y**  144:22,24
145:3 146:12
**yeah**  8:17 9:11
18:5 25:16
29:5 30:9 51:3
54:3 57:19
64:2 65:20
71:25 80:3,4
81:1 82:12
86:7 87:6,9
92:12 103:8
104:6,6 105:10
105:12 116:7
121:10 122:11
123:12 124:19
126:7,12 127:4
128:21 131:4
134:9 141:14
141:17 143:9
146:8 147:16
153:7 166:13
166:22 182:19
213:15 214:2,4
214:10 218:10
222:19 228:17
230:16 233:15
235:6,19
238:23 240:7

247:25 252:15
254:19 258:17
259:1
**year**  59:22
65:2 80:17,18
99:11 117:4
132:11 156:10
158:7 251:22
**year's**  138:17
**years**  28:15
38:10 47:9
49:12 51:2,3
51:20 52:2
54:14,15 55:22
58:17 59:13
62:18 63:7
74:6 75:14
80:18 82:8
110:6 130:24
132:11 136:12
137:13 138:12
142:7 221:19
**yep**  32:3
**yesterday**  62:4
62:4 267:15
**york**  1:2,8,12
1:21 4:13
23:23 35:25
36:5 37:17
46:22 61:18
86:9 136:6
143:8,9 198:25
214:16 219:13
219:15 220:8
221:7 226:8
251:21

**york's**  8:23
**you'll**  155:8
201:6 253:18
**you're**  156:3
158:20 165:9
165:24 172:6
174:20 196:7
209:21 213:6
213:16 214:22
215:7 218:2
233:17 240:16
246:5 248:18
266:14
**you've**  72:21
77:16,17 81:6
82:16 110:4
112:1 132:24
154:5 163:2
176:3 186:5
187:20 215:12
217:4 232:24
240:7

| **z** |
|---|

**z**  144:22,24
145:3 146:12
**zepf**  6:4
**ziehl**  4:10
237:1 269:7
**zoom**  3:13
73:11 236:7,9
236:23 263:15

| **,** |
|---|

**'74**  226:6
**'78**  226:6

**EXHIBIT D**

Page 1

1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   Case No. 20-12345-mg

4   - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5   In the Matter of:

6

7   THE ROMAN CATHOLIC DIOCESE OF ROCKVILLE CENTRE, NEW YORK,

8

9            Debtor.

10   - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11

12                  United States Bankruptcy Court

13                  One Bowling Green

14                  New York, NY   10004

15

16                  May 16, 2023

17                  2:01 PM

18

19

20

21   B E F O R E :

22   HON MARTIN GLENN

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO:   JONATHAN

Page 2

1    HEARING re Status Conference Using Zoom for Government Re:

2    Debtor's Eighth Omnibus Claim Objections: Claim(s)

3    Number: 90355, 90231, 90264, 90208, 90209, 90317, 90327,

4    90330, 90345, 90349, 90391, 90472, 90512, 90514,

5    90517, 30035, 90174, 90495, 90100, 90181, 90544, 90542,

6    90020, 90053, 90075, 90392, 90244, 90245, 90324,

7    90090. (Doc# 1730, 1731, 1774, 1856 to 1858, 1860, 1861,

8    1863 to 1871, 1872, 1874, 1911, 1984, 1987, 2062,

9    2063, 2086, 2093)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Sonya Ledanski Hyde

Page 3

```
 1    A P P E A R A N C E S :

 2

 3    JONES DAY LLP

 4         Attorneys for the Debtor and Debtor-in-Possession

 5         250 Vesey Street

 6         New York, NY, 10281

 7

 8    BY:  TODD GEREMIA

 9         ERIC PETER STEPHENS

10

11    PACHULSKI STANG ZIEHL & JONES LLP

12         Attorneys for Official Committee Of Unsecured Creditors

13         780 Third Avenue, 34th Floor

14         New York, NY 10017

15

16    BY:  BRITTANY MICHAEL

17         KAREN B. DINE

18         JAMES STANG

19

20    PAUL MONES, P.C.

21         Attorneys for CLAIMANT/SEX ABSUE VICTIMS

22         13101 Washinton Blvd.

23         Los Angeles, CA 90066

24

25    BY:  PAUL MONES
```

Page 4

```
 1    WESTERMAN BALL, et al.

 2          Attorneys for Parishes

 3          1201 RXR Plaza

 4          Uniondale, NY 11556

 5

 6    BY:  WILLIAM HEUER

 7

 8    JEFF ANDERSON & ASSOCIATES

 9          Attorneys for Certain Survivors

10          363 7th Avenue, 12th Floor

11          New York, NY 10001

12

13    BY:  PAT STONEKING

14          JEFF ANDERSON

15

16    CULLEN & DYKMAN LLP

17          Attorneys for Certain Parishes

18          One Battery Park Plaza, 34th Floor

19          New York, NY 10004

20

21    BY:  MICHELLE MCMAHON

22

23

24

25
```

Page 5

```
 1   WORLOW LAW

 2        Attorneys for Claimant 90544

 3        615 Willow Street

 4        North Little Rock, AR 72114

 5

 6   BY:  JACOB WORLOW

 7

 8   PFAU COCHRAN VERTETIS AMALA PLLC

 9        Attorneys for PCVA and Marsh Law Survivors

10        403 Columbia Street, Suite 500

11        Seattle, WA 98104

12

13   BY:  JASON P. AMALA

14

15   ROBERT E. GERBER, Pro Se

16

17

18

19

20

21

22

23

24

25
```

1                     P R O C E E D I N G S

2              CLERK:  All right.  Starting the calendar for May

3     16th, 2023, the 2 PM hearing.  I'm calling the Roman

4     Catholic Diocese of Rockville Center, New York, Case Number

5     20-12345.  Mr. Geremia, if we could start with you, if you

6     could give your appearance.

7              MR. GEREMIA:  Sure.  Good afternoon, Miss

8     Anderson, Todd Geremia of Jones Day for the debtor, the

9     Diocese of Rockville Center.

10             CLERK:  All right.  Thank you.  Are your co-

11    counsel going to be joining as well?

12             MR. GEREMIA:  I expect Eric Stephens to be

13    joining.

14             CLERK:  All right.  Thank you.  Mr. Gerber.

15             MR. GERBER:  Yes, Robert Gerber, a future claims

16    representative appearing on my own behalf.  I may or may not

17    be speaking today.  I doubt if I will unless the need

18    arises.

19             CLERK:  Okay.  Thank you for giving your

20    appearance.  All right, you can pause the recording for now.

21             (Pause)

22             CLERK:  Yes.  Miss Michael, if you could give your

23    appearance, please.

24             MS. MICHAEL:  Hi, good afternoon.  This is

25    Brittany Michael from Pachulski Stang Ziehl and Jones, on

Page 7

1    behalf of the committee of unsecured creditors.

2             CLERK:  All right.  Is anyone else going to be

3    joining on behalf of the committee?

4             MS. MICHAEL:  Karen Dine and Jim Stang may be

5    joining, but I will be speaking on behalf of the committee

6    to the extent necessary.

7             CLERK:  Thank you.  You could pause the recording.

8             (Pause)

9             CLERK:  All right.  For the parties that have

10   joined if you have not given your appearance and you are

11   speaking this morning -- pardon me, this afternoon, please

12   unmute one at a time and give your appearance.

13            MR. MONES:  Paul Mones, M O N E S for Claimants

14   90324 and 90245.  Thank you.

15            CLERK:  Okay.  Thank you.  Mr. Heuer, are you

16   giving your appearances for this afternoon?

17            MR. HEUER:  Yes, good afternoon, Your Honor.

18   William Heuer of Westerman Ball for a number of parishes in

19   the case.  Thank you.

20            CLERK:  Thank you.  Are there any additional

21   parties that would like to make their appearance?  Okay.

22   All right.  You can pause the recording for now.

23            (Pause)

24            CLERK:  Mr. Stoneking, are you going to be noting

25   your appearance for this afternoon?

Page 8

1          MR. STONEKING:  Yes, Pat Stoneking, Jeff Anderson

2     and Associates.

3          CLERK:  All right.  Thank you.  Mr. Stephens.

4          MR. STEPHENS:  Good afternoon, Eric Stephens with

5     Jones Day on behalf of the debtor.

6          CLERK:  All right.  Thank you.  Mr. Anderson.  All

7     right.  Mr. Anderson, if you could unmute and give your

8     appearance, please.

9          MR. ANDERSON:  This is Jeff Anderson appearing on

10    behalf of certain survivors.

11         CLERK:  Okay.  Thank you.  Am I missing anyone?

12    Ms. McMahon.

13         MS. MCMAHON:  Yes.  Hello.  Michelle McMahon from

14    Cullen and Dykman on behalf of certain of the parishes.

15         CLERK:  Okay.  Thank you.

16         MS. MCMAHON:  Thank you.

17         CLERK:  Any additional appearances at this time?

18    All right.  For the parties that have joined, if anyone is

19    speaking on the record this afternoon, please unmute your

20    line and give your appearances.

21         MR. HEUER:  Yeah, Deanna, it's Bill Heuer, I noted

22    my appearance but I do not expect it to speak.

23         CLERK:  That's fine.  Thank you, Bill.

24         MR. WORLOW:  Ma'am, I'm not sure if you heard me,

25    but this is Jacob Worlow appearing for Claimant 90544.

Page 9

```
 1              CLERK:  I did not.  Thank you for confirming.

 2      Thank you for your appearance.  Are there any additional

 3      parties that are making their appearance?  All right, for

 4      the parties that have joined, is anyone speaking on the

 5      record this afternoon?  If so, please unmute your line and

 6      give your appearance.  Yes, Karen.  Would you like to note

 7      your appearance?

 8              MS. DINE:  Yes, Karen Dine, Pachulski Stang Ziehl

 9      and Jones on behalf of the committee.

10              CLERK:  All right.  Thank you.  For the other

11      parties that have joined, if anyone's speaking on the record

12      this afternoon, please unmute your line one at a time and

13      give your appearance for the record.  Okay.  Is Jason Amala

14      on the line?

15              MS. MICHAEL:  He should be coming.  I can, I can

16      see if he has any problems with the link.

17              CLERK:  Yes, please do so.  Thank you.  All right.

18      Mr. Stan, are you noting your appearance for this

19      afternoon's hearing?

20              MR. STANG:  Yes, please.

21              CLERK:  Yes.  All right.  So James Stang is here

22      on behalf of the committee.  Any additional parties that

23      have joined that need to make their appearance and have not

24      done so at this time?  Mr. Amala, I see I admitted you.

25              MR. AMALA:  Thank you.  I apologize.  I will save
```

Page 10

1    you the explanation.  Thank you.  Sorry.

2             CLERK:  Okay.  Your appearance is noted, Mr.

3    Amala.  Are we waiting on anyone else?  Any parties?

4    Debtors counsel, creditors counsel?  All right.  Judge,

5    would you like to begin?

6             THE COURT:  Yes, good afternoon, everyone.  So I

7    scheduled this conference after issuing the opinion and then

8    entering an order on the eighth omnibus objection.  Because,

9    you know, as I said in the opinion, I'm certainly not

10   inclined to open up broad discovery, but let me, let me

11   express what my concerns were and are and then hear what

12   people have to say.

13            So at Page 7 of the opinion, when I talked, I said

14   here, the debtors state that proofs of claim at issue on the

15   objection, alleged abuse by an individual where the claim

16   meets all of the following criteria.  And then there were

17   five bullet points.  And, yes, so the second bullet point,

18   "The accused perpetrator is not on the list of perpetrators

19   for whom the district has paid an award to a claimant

20   through the debtor's independent reconciliation and

21   compensation program or as to whom there has been an adverse

22   determination before the Diocesan Review Board, the list of

23   accused clergy and with a web address."

24            And then in the next bullet point, I say, "The

25   accused perpetrator is not on a list of accused abusers

Page 11

1   compiled by the official committee of unsecured creditors in

2   this case.  To supplement the diocese list, the UCC asserts

3   that the individuals on its list have been accused of

4   committing sexual abuse and either allegations against them

5   have been found credible or sexual abuse lawsuits have been

6   filed against them."  So when I -- obviously, this came from

7   the debtors' explanation of what was and what wasn't covered

8   by the omnibus subjection.  And, you know, my concern is --

9   and then later in the opinion, I think in a footnote, I

10  asked a question at a hearing, unrelated to the eighth

11  omnibus objection, about who had the so-called private

12  personnel files.  And I think what the gist of which that I

13  was told was, it was produced to the committee but not to

14  all of the counsel or the abuse survivors unless they

15  happened to be representing somebody on the committee.

16          And I was concerned about gaps.  So I know, I

17  don't know whether it was -- which one of the individual

18  plaintiff's counsel, whether it was you, Mr. Amala, who

19  talked about secret files, secret personnel files that were

20  never shared.  And I'm, it seemed to me that what you refer

21  to as secret files were the confidential personnel files

22  that the debtor has referred to.  And I'll ask, you know,

23  whether the debtors counselor can confirm that.  But let,

24  let me, let me go on.  So it seemed to me on the second

25  bullet point, well, what if the accused perpetrator never

Page 12

```
 1    had a determination before the Diocesan Review Board?  In

 2    that case, you know, there's no adverse determination.  So

 3    those could be included in these proofs of claim, these

 4    contested claims.  So that's one factual question I have.

 5              And then, of course, the next bullet point that

 6    dealt with the committee's list.  And I, you know, I've

 7    looked online.  I've seen the list from both the diocese and

 8    from the creditors committee and I'm not sure, you know,

 9    what's excluded from that.  And obviously, I've -- for many

10    of the claims involved in this eighth omni objection, I

11    sustained the objections with leave to amend and I'm not

12    opening things up to broad discovery, but I think that, you

13    know, I single out of Mr. Amala's clients or Mr. Mones'

14    clients, you know, were they -- were the accused abusers

15    ever the subject of any allegation or information to the

16    diocese, whether they acted on it or not?  I guess if they

17    had acted on it is one thing.  But what if there was no

18    determination?  Let me ask, you know, Mr. Geremia, what was

19    covered and what was not covered in these omnibus, in this

20    round of omnibus objections?

21              MR. GEREMIA:  In a shorthand, Judge, as to those

22    two bullets, these are just the point was that we were

23    addressing accused abusers that weren't known to the

24    dioceses or the committee.  You know they weren't on our

25    list of accused abusers.  They weren't on the committee's
```

Page 13

```
 1    list of accused abusers, you know, thereby making it in our

 2    view the less likely that the diocese would have any notice

 3    that they were, had the propensity to engage in abuse.

 4              THE COURT:  So when you, when you say they were

 5    not on your list of accused abusers, I read what you

 6    provided as saying, they were not accused abusers as to

 7    which a claim had been paid or as to whom there had been an

 8    adverse determination before the Diocesan Review Board.  I

 9    don't know whether there was, you know, whether it never got

10    that far, whether yes, there was information about Priest X,

11    but it never resulted in a determination by the Diocesan

12    Review Board or they found it unsubstantiated, but

13    nevertheless, the records indicate there were allegations

14    against them.

15              MR. GEREMIA:  Yeah, I know that the person would

16    not appear on our list if -- well, they would only appear on

17    our list if an award was paid or there was an adverse

18    determination before the DRB.  This was a list that at the

19    very beginning of the case -- my partner Eric Stephens may

20    be able to inform the Court better -- but there was a

21    dialogue with the committee with respect to how and when and

22    where this list would be displayed.  And then the committee,

23    as Your Honor is aware, you know, manifested its list as

24    well.  So this was something that was, that was preexisting

25    these objections and was established at the beginning of the
```

Page 14

1    case.

2            THE COURT:  But let me ask you this, can you

3    provide evidence under oath from people who can demonstrate

4    they would have knowledge of this, that there never was an

5    allegation made against a priest who was alleged to have

6    abused, you know, one of Mr. Mones' or Mr. Amala's clients?

7    In other words, it may well be that yeah, they had some, the

8    confidential personnel folder indicated yeah, there were

9    some allegations made, but they were never substantiated.

10   But if, in fact, there were allegations made about

11   particular priests but no adverse determination made against

12   them, I think it would be particularly relevant to the

13   claimant's counsel to know that.  And I kept studying the

14   limitations.  I'm not accusing you of anything improper

15   about it.  But when I looked at how you defined those

16   creditors as to which you were carrying objections forward

17   or not, I couldn't be sure that there hadn't been

18   allegations made against the particular priest.  It didn't

19   result in an adverse determination.  There hadn't been any

20   prior state court litigation filed against them.  Let me

21   stop there.

22            MR. GEREMIA:  Yeah, I don't right now know the

23   answers to that because the criteria is just about, you

24   know, as I said, is were they on our list?  Were they on

25   committee's list?  I do know that we were prepared to

Page 15

1    discuss with Your Honor the documents that we are, that we

2    have searched and are prepared to produce and any such

3    allegations would be reflected in those documents.  In some

4    cases, for example, I don't think there are any in this, in

5    this set of claims that meet this, but there are, you know,

6    in the abuse, alleged abuse may have happened in 1978 and in

7    the file, when the CVA claim is filed, there's a report of

8    the allegation of abuse, you know, some 30 years later or

9    something like that.  So the allegations of abuse are

10   reflected in the personnel files and the documents that we

11   searched and are prepared to produce in response to Your

12   Honor's order.  And in that respect, you know, claimants

13   will have that information once it is produced.

14           THE COURT:  Okay.  I sort of put on, I mean, this

15   is, this is what led me to schedule this hearing.  Well, let

16   me, let me turn to the plaintiffs.  I'll give you a chance

17   again, Mr. Geremia, to speak to it.  And I know you all

18   agreed on an order in which you were going to speak and

19   that's fine with me.  So who is going to speak first?

20           MR. STONEKING:  That would that be me, Pat

21   Stoneking, Your Honor.  Thank you.

22           THE COURT:  Okay.  Thanks, Mr. Stoneking.

23           MR. STONEKING:  And just in response to what Mr.

24   Geremia has said, our main concern, I do represent a

25   committee member.  My committee member is being one of the

Page 16

1    claimants being objected to here.  So in response to what

2    Mr. Geremia had just said, I would have major concerns in

3    this Court believing that allegations of abuse would be in

4    the files that they're going to produce.  They are -- in

5    just speaking for this one particular committee member, the

6    production relating to him amounts to one index card and

7    he's a diocesan priest that served in the diocese for many

8    years, was transferred.  That's not a, that's not a

9    realistic production for if you're saying that they handed

10   over his employment file, secret file, whatever, it's just

11   not it.  So you would expect to have significant

12   correspondence with the bishop every single time he changed

13   assignments, which he did.  And there would be regular check

14   ins with the bishop and especially back when he was

15   operating, all this was done by mail.  So you do see that

16   from time to time, but none of that is in the, in the

17   production.  So to the extent that the Court would expect

18   that sort of information to be produced as a part of opening

19   this up to everybody, I think, I think the Court would be

20   disappointed.

21            THE COURT:  What's your understanding of where

22   that correspondence would be filed, if at all?

23            MR. STONEKING:  It should be with the diocese and

24   it opens up questions about why it's not there.  And there

25   would be, if you were to ask me what sort of discovery that

Page 17

1    I would do on behalf of this client, it would be, where is

2    the file?  What happened to it?  Why was it, why was it

3    destroyed, if it was destroyed?  And when?  So there should

4    be a significant file there.  It hasn't been produced and I

5    don't know why.

6           THE COURT:  Do you know the history for -- take

7    the one example you're giving for example, do you know when

8    the priest was assigned or reassigned?  How many times, et

9    cetera?

10          MR. STONEKING:  Yeah.  He had an initial period of

11   three years in a parish.  He was moved to Corpus Christi

12   School where the period of abuse took place.  And he was, he

13   was moved three years after that into military service where

14   he completed the rest of his career in military service.  So

15   there are questions to be drawn from that history and you

16   would expect some sort of documentation explaining why that

17   happened.  But none of that exists beyond the index card.

18          THE COURT:  Okay.  Anything else you want to add

19   at this point?

20          MR. STONEKING:  No, it just that's not an isolated

21   case either.  I would just say that that's common among

22   several of these objected to claims.  There's a lack of file

23   which I don't think necessarily proves a lack of notice or

24   that there wasn't any notice.  It's just suspicious that

25   there's no file.

Page 18

1              THE COURT:  All right.  I don't know who, Mr.

2    Mones or Mr. Amala, which of you were going to speak next?

3              MR. AMALA:  Good afternoon, Your Honor.  Jason

4    Amala.  I was going to go second.  So, Your Honor, the file

5    for Claimant 90100 is I'd say the other end of the spectrum

6    from what Mr. Stoneking just described, but it too raises

7    issues.  And before I talk about that file, I think the

8    Court has zeroed in on the exact issue, which is I do not

9    believe there has been a representation under oath by the

10   diocese that someone, who either has personal knowledge or

11   has acquired a sufficient foundation to swear under oath,

12   has reviewed these files and has confirmed that there has

13   not been an allegation involving each of these priests.  I'm

14   pretty sure that that has not happened.

15             I do not recall how this diocese has defined the

16   term "credibly accused."  I believe that other diocese have

17   defined that term to require at least two people have

18   accused a priest, credibly accused a priest of abuse and

19   then that is what allows them to be put on the list.

20             So back to the Court's question, I do not believe

21   anyone has represented from the diocese under oath with

22   personal knowledge or sufficient foundation that there have

23   not been allegations of abuse.  Or, I should be really clear

24   too, or not just allegations of abuse, but a priest who has

25   not admitted at some point that they abused children or that

Page 19

1    they were sent to, for example, sexual deviancy treatment

2    for abusing children.  So I just want to answer the Court's

3    question on that.  Turning --

4              THE COURT:  Just elaborate.  Just come back.  I

5    want to be sure, I understand you entirely.

6              MR. AMALA:  Sure.

7              THE COURT:  Just cover that point again.

8              MR. AMALA:  So, so the Court asked the question,

9    Can someone from the diocese represent under oath that each

10   of these priests has not been the subject of I'll say

11   allegations of child sexual abuse?  And that's a very fair

12   question because I don't think that has happened.  I'm

13   virtually positive that that has not been represented to the

14   Court.  The distinction I was trying to draw is there are

15   also priests who have been the subject -- who go to sexual

16   deviancy treatment, I'm going to talk about the priest in

17   our case in a second, who go to sexual deviancy treatment

18   usually later when they -- in the mid-eighties once they

19   finally started to deal with this issue, a lot of these

20   priests who were caught or who they reviewed the records and

21   figured out, gosh, we have someone who has a problem here,

22   they were sent to sexual deviancy treatment.  And in the

23   course of that treatment, they admit to having molested

24   children.  So that's the distinction I'm drawing.  There may

25   have been complaints by someone saying this priest abused me

Page 20

1    or you could have files where the priest was never

2    complained about.  But they later admit, yeah, I was abusing

3    children.  That's the distinction I'm trying to draw here.

4            THE COURT:  Let me -- other than what I read in

5    the press or saw it in the movies or something, you know,

6    sexual abuse of adults or children by members of the clergy

7    were something I only heard about from a distance.  Okay?

8    So I've sort of been doing this deep dive into the issues

9    that this raises.  And I have to say when I worked on this

10   opinion on the eighth omnibus objection and really started

11   digging in, and I know you've appealed and all that, but at

12   least what I understood the law in New York to be about

13   notice, I will admit it came as something of a surprise to

14   me in that New York, I view it as quite protective of

15   determination of liability against the diocese because of

16   acts of a priest.  So I think this came up at one of the

17   hearings -- I don't remember it's on an omnibus hearing or

18   otherwise.  You know say what you want about the independent

19   review proceeding, and I know that's you're appealing,

20   somebody's appealing that, what I what I ruled, but as I

21   understand it, knowledge of an abuser's prior history was

22   not a required criteria for compensation.  The questions

23   asked were, Did you report the abuse to you, to someone

24   else?  And I understand why that question was asked.  But it

25   did not set out as a separate criteria.  And I dare say, I

Page 21

1    don't, I don't know this for sure, it could well be that

2    survivors did receive compensation even though there had

3    been no prior notice of predisposition of a priest's sexual

4    abuse.  But that was the independent review process.  That's

5    not New York law.  New York law was, it was something of an

6    eyeopener to me and I spent a lot of time reading cases.

7    Okay.

8              So you know, I say this all now because you say

9    that in the course of sexual deviancy treatment, a priest

10   may have admitted to having abused children, but that

11   wouldn't automatically result in liability for the diocese.

12   It would still raise the issues of what was their notice of

13   a predisposition?  I don't.  You live with these cases all

14   the time.  And I'm not, I'm not fully familiar with the

15   terminology in all of them, but I think the point I'm trying

16   to communicate is I don't, I don't know whether if, you

17   know, unless the priest admitted to sexual abuse of children

18   and say that, you know, Monsignor So-and-So knew about this

19   before, before I abused this particular child.  Just saying

20   that someone admitted that yes, I abused children is not

21   enough under New York law.  You may disagree with that, but

22   that's the way I read the cases.

23             MR. AMALA:  Your Honor, we had a colloquy at one

24   point where I'm definitely afraid of speaking over you.  So

25   my long pause is making sure.

Page 22

1          THE COURT:  I can see your lips moving a little

2     bit.  You got the floor.

3          MR. AMALA:  Okay.  So, Your Honor, today was about

4     discovery.  I will, since the Court raised it, the Poly Prep

5     decision that you cited, I just want to flag for the Court's

6     attention since you raised this issue.  It cites the case

7     called Diamond Jewels versus Lewis.  It's 2019 WL 5896224 at

8     23.  And I just want to flag that for the Court because the

9     Poly Prep case does acknowledge that in New York, you don't

10    always need notice of the particular offender if it's a

11    situation where you have a special relationship with the

12    child.  There's a lot of focus on when you have a special

13    relationship with the perpetrator, with the employee.  But

14    there's an entirely separate body of law that New York Law

15    acknowledges when you're talking about a special

16    relationship with the child.

17          In Poly Prep.  The court actually acknowledges

18    that you don't always need actual notice about the

19    individual perpetrator.  But then went on to say in that

20    case, the plaintiff had not quote -- that the plaintiff

21    "failed to allege facts demonstrating that the danger and

22    risk of harm was foreseeable to the defendant."  So in that

23    case, our view is that that was an insufficient pleading by

24    the plaintiff.  If the plaintiff in Poly Prep had said this

25    school had a long history of knowing that its teachers were

Page 23

1   molesting children and failed to do anything in response,

2   that would be sufficient.  I believe Poly Prep would have

3   upheld that and said that's sufficient.

4        So, Your Honor, today is not the day to have that

5   discussion.  I appreciate the Court's decision.  I'm not

6   here to try to reargue that.  But since you raised it, I do

7   think in New York we have the Novak decision where the court

8   acknowledges that it's not just the setting of a school.

9   That entire body of law, I hate it when people plead, with

10  all respect to my colleagues, when they plead in loco

11  parentis because you hit it on the head.  That's not a cause

12  of action.  That's not a duty.  The duty comes from having a

13  special relationship with the child and that's, that's in

14  their statement of torts.  That's black letter law across

15  the country.  When you have a special relationship with the

16  child, not the employer, the child, you have to take

17  reasonable steps to protect that child from foreseeable

18  harm, not just known harm but foreseeable harm.  Which in

19  this context, when you have a diocese that has this long

20  history of knowing that it has this problem, you need to

21  take that -- that raises the question of what were you doing

22  to protect children from that harm regardless of what you

23  knew about an individual priest?  So today's a discovery

24  conference, Your Honor, but I feel like since you raised it,

25  I needed to address it.

Page 24

1            THE COURT:  You get to argue that to the district

2    court.

3            MR. AMALA:  I appreciate that, Your Honor, and I

4    appreciate it. Since you raised it, I felt I needed to

5    respond just so you never said, why didn't you raise this

6    when we were talking about it?

7            THE COURT:  No, just come back to this point about

8    -- you're the one who said, you know, sexual deviance

9    treatment and in the course of the treatment, the priest

10   admits having abused children.  So let's assume that that's

11   what, that's the state of facts.  Under New York law,

12   doesn't it matter whether the diocese knew about it before

13   the first time, before the alleged victim, the victim, your

14   client was abused?

15           MR. AMALA:  Your Honor, thank you for bringing us

16   back to that question.  The reason I raised that is Mr.

17   Stoneking and I and the Court in its opinion, talked about

18   these transfers of priests that happened outside of the five

19   years, that that's a sign that something's going on.  In my

20   experience, when you see a sexual deviancy report that maybe

21   comes out in the nineties or the two thousands.  One of the

22   things that it educates us on is the priest may say, yeah, I

23   abused kids back when I was at the parish of Saint John of

24   God.  That was a place I was abusing kids.  And if we go

25   back and talk to the people at parish of Saint John or

Page 25

1     parish of Saint John of God, lo and behold, we find out

2     that, yep, that's why he was transferred.  That's why it was

3     outside the five years because lo and behold, yeah, he was

4     abusing kids.  Someone found out about it; someone

5     complained about it.  The pastor was freaked out about it

6     and the guy is gone.  So it helps inform the area of

7     inquiry.  And when the court was looking back to the

8     standard for Twombly, what are the factual allegations here?

9     What would be the evidence we would look at to say, I think

10    it's pretty probable that we're going to find out that this

11    diocese knew back at the parish of Saint John of God would

12    be the priest saying, yeah, I was molesting kids back then.

13    Or, yeah, I was molesting kids because generally, if he's

14    molesting kids, especially if he's transferred to outside of

15    those five years, that's usually what you're going to find.

16         And that's why if you were alluding to the movie

17    Spotlight, Your Honor, right, that's one of the moments in

18    the movie Spotlight where they look at the Catholic

19    directories and go, gosh, look at these, take these leave of

20    absences.  Look at these, right, the trend.  Sure.  And

21    that's generally what we find too, which the Court noted in

22    its opinion.

23         So those sexual deviancy treatment records, if

24    you're looking for indicia that you're going to find notice

25    that knew or should have known, those sexual deviancy

Page 26

1    treatment records for us usually go, that's where I want to

2    look.  That's where I'm going to find it and more often than

3    not, we find it.

4            THE COURT:  So where have you -- obviously, before

5    you got into bankruptcy court, you're litigating these in

6    state court, which, I think as my opinion acknowledged is in

7    different pleading standards, cases would move to discovery,

8    where were there, where did you find records of sexual

9    deviancy treatment?

10           MR. AMALA:  In the possession of the dioceses.

11   And then, Your Honor, you asked at the beginning of the

12   conference, you noted that we talked about secret files or

13   confidential files.

14           THE COURT:  Right.

15           MR. AMALA:  For whatever it's worth, Your Honor,

16   the reason we use the term "secret," I believe that's the

17   Latin translation of the law that says what the files are

18   called.  So we're not trying to use cheap rhetoric.  It's

19   just what the files are literally called under the church's

20   own doctrine.

21           So putting that aside, those treatment records are

22   usually, in my experience, are in the possession of the

23   diocese.  And if I may, Your Honor, just talking about the

24   file for our claimant, those at the issue of the objection,

25   that file does show this priest, he's assigned to the parish

Page 27

```
1    of Saint John of God in '61.  He's then transferred in '63,

2    just two years later so outside of the five years.  He's

3    then, in 1970, thinking about laicization, he starts seeing

4    a psychiatrist.  He's terminated from that assignment,

5    petitions for laicization.  His assignment is revoked.  Then

6    they put him back into service and I won't go through all

7    the correspondence, but this is a very troubled individual

8    and I will eventually get to -- and I'll give the Court the

9    Bates number, Bates Number 35525.  This priest, in February

10   of 1989, makes the slightest reference to having received

11   treatment at a facility called Saint Luke's.  Those of us

12   who've done a lot of work in this area know that Saint

13   Luke's was one of the few places in the country where the

14   Catholic church would send its priests for sexual deviancy

15   treatment.  It was one of the main spots on the east coast.

16   That's where you went.  If you were molesting kids, that's

17   where they send you.

18          So, I've got a priest here who's transferred

19   outside of the five years and who eventually is talking

20   about getting treatment at Saint Luke's.  What I don't have,

21   I don't have the file, the treatment file that I would

22   expect to have.  I don't have updates.  Normally there is

23   correspondence when a priest is sent to Saint Luke's.

24   There's almost always correspondence between the bishop or

25   the archbishop and the treatment center about the priest.
```

Page 28

1    I'm sending Father So-and-So to you.  Please keep me

2    updated.  They go back and forth and eventually they'll say,

3    Okay, we're sending him back to you.  As time went on.

4    They'd say, of course, he can't be around kids, right?  A

5    lot of times it's still in code.  My favorite, not favorite

6    is I think I mentioned this before is, you know, we've

7    realized with our priests who tempted the virtue of the

8    young that you got to be careful where you assign them.  So

9    the letters aren't always directly saying, hey, he's here

10   for abusing kids, keep him away from kids.  But that

11   correspondence, Your Honor, is missing from this file.  I

12   don't, maybe a privileged log has been produced and I missed

13   it.  I have not seen it.  So I don't have a privileged log

14   telling me what they've withheld.  I don't know if they have

15   these records.  Normally, those records would be in the

16   secret file because that's where they're supposed to be

17   kept.  I don't have those records.

18          THE COURT:  Let me, let me ask you this.  I have

19   enough trouble keeping track of names, and keeping track of

20   claim numbers is even more difficult for me.  Okay?  So the

21   specific, what was the result with respect to the claimant

22   that you just described?  Did I dismiss it with prejudice?

23   Dismiss it with leave to amend?  What, what did I do.

24          MR. AMALA:  It's Claimant 90100, and, Your Honor,

25   you sustained the objection with the right to amend.

Page 29

1           THE COURT:  Amend.  So I mean if you're pleading,

2    if you amend the claim with respect to 90100, I see it.  You

3    know I got the schedule one in front of me.  It's Number 24

4    on the list.  And you allege everything that you just

5    described to me.  I'm not ruling on something in the

6    abstract, but I find it hard in those circumstances to think

7    that the result is going to be dismissal with prejudice.  It

8    does efficiently allege the claim.  I mean what you're

9    describing to me, and I did review these claims, is that's

10   not in there.  Maybe you think, you know, it was unnecessary

11   for it to be in there.  But you've described a set of facts

12   that would I think satisfy a Iqbal, Twombly standard for

13   stating a claim.  I don't know whether the debtor -- on what

14   basis it would object to, you know, seek to expunge the

15   claim that did that.  I mean I don't -- look, I sort of felt

16   a dilemma here.  Okay?  I said this often enough, you know,

17   the foresee question didn't call for any of this stuff.

18   Okay?  And yet the standard by which a proof of claim should

19   be judged as the pleading standard and I said in the -- I

20   just thought it was unfair to apply that here because you

21   didn't have to do that when you filed the claim.  Okay?  You

22   did what they asked.  So now you got to go back and you'll

23   amend the claim.  And if the debtor moves to expunge it

24   again, I'll rule on it.

25           I'm not going to apologize for following the law,

```
 1    what I understand the law to require in order to state a

 2    viable claim.  Okay?  If what you described to me -- now

 3    you're singling out one that may be the strongest one you

 4    have.  I don't know, I'm not suggesting it is or it isn't --

 5    but I'd be somewhat surprised if the diocese objects to that

 6    claim or like you describe a long history and do you know

 7    exactly who said what to whom about him?  No.  But, you

 8    know, it seems to me that you've, the argument will be --

 9    your argument will be, you've raised reasonable credible

10    inferences that a proper claim with the required notice has

11    been asserted.  I don't know, you know, the debtors' lawyers

12    may well come back and say no, it's not because of this list

13    of reasons.  Okay.  I'm not, I'm not ruling on specific ones

14    now, other than to say that all of what you laid out sounds

15    very persuasive just with me listening, but that's not in

16    the proof of claim that I reviewed.  Nor do I think it had

17    to be, but it does now.  Okay?  Are there other examples you

18    want to give?  I'm not, I don't want you to go through each

19    one of your clients, you know, most -- we're only on the

20    eighth omnibus objection and I only disallowed one, 90542,

21    because they didn't respond.

22              MR. AMALA:  Your Honor -- I'm sorry.

23              THE COURT:  The long list is subject to amendment.

24    Go ahead, Mr. Amala, I'm sorry.

25              MR. AMALA:  I'm sorry, Your Honor.
```

Page 31

1                THE COURT:  No, go ahead.

2                MR. AMALA:  No, we only had one claim that was

3       subject to the objection.

4                THE COURT:  Okay.

5                MR. AMALA:  The reason, Your Honor, the reason I

6       offered that was not being critical of the Court's decision

7       in the least.

8                THE COURT:  You can be.  I don't, I don't have

9       thick skin about people criticizing my decision.  You're

10      going to do that on appeal.  That's fine.  Don't be

11      sensitive about that.

12               MR. AMALA:  It's not that, Your Honor.  What I

13      mean is I was given that explanation.  I appreciate what you

14      said.  Thank you, Your Honor.  But I, what I was trying to

15      offer that for is examples of the Court I thought had asked

16      for this conference and started this conference by asking

17      the question of the diocese, can someone represent that they

18      have personal knowledge?  Has someone looked at this file,

19      actually looked at this file and said, for example, that

20      that -- and I want to be clear, Your Honor.  I then to agree

21      with you, of course, and I hope that the Court would

22      overrule another objection if I lay out what I just did.

23      But I think what's important to note is, does the diocese

24      have the sexual deviancy treatment file?  Did someone review

25      it?  Does that sexual deviancy treatment file have this

Page 32

1    priest admitting in 1989 that he was molesting children?

2    Does he admit that he was molesting parish children, the

3    parish of Saint John of God, so that someone on the diocese

4    end who's looking at this, because I don't have it, goes,

5    boy, we shouldn't object to this claim and represent to the

6    Court that there was no notice because boy, it sure looks

7    like this guy was transferred because he was molesting kids.

8    Has anyone done that analysis?  Has anyone looked at that

9    file?  Does the file exist, the sexual deviancy treatment?

10   So I was trying to give that as example to the Court's

11   question to the diocese because one would hope before the

12   diocese makes this objection that they go in and someone's

13   looked at the file that I don't have and has said, get rid

14   of that guy.  There's no way he's ever going to find notice

15   that's clean as a whistle.

16          THE COURT:  May I ask you this?  In any of your

17   state court cases, did you ask for and did any of the

18   dioceses, because this is not the only one that you're

19   representing clients in front, produce a sexual deviancy

20   treatment file?

21          MR. AMALA:  Yes, that was the subject of the

22   appellate decision in the Harmon versus the Diocese of

23   Albany case that we prevailed on last year at the appellate

24   level.  So that's controlling law in New York with the

25   Diocese of Albany decision in Harmon.  And then we also have

1    one that with a case, it's Myda (ph).  I can provide it to

2    the Court and the counsel.  It is at the state court level.

3    It's on appeal now involving the Diocese of Brooklyn where

4    Justice -- well, it's both, Justices Love and Tish ruled

5    that we are entitled to the sexual deviancy treatment

6    records in that case because they're in the possession of

7    the diocese.  The Diocese of Brooklyn has appealed that.

8    So, absolutely, Your Honor.

9             THE COURT:  All right.  Is that a term of art that

10   if I permitted you, if I directed the diocese to produce

11   sexual deviancy treatment files, is that a term commonly

12   understood in the sexual abuse cases?

13            MR. AMALA:  It generally is, Your Honor, but I

14   would -- someone corrected me.  I used to say "throw caution

15   to the wind" and then someone said you're using the term

16   wrong.  So whatever the term would be, I guess I would

17   caution Your Honor, I believe a lot of us who do this work

18   understand what that -- that is a term of art.  I think the

19   concern though, Your Honor, is the files may be about sexual

20   deviancy treatment, but the priest is sent just for

21   treatment to Saint Luke's.  I think all of us have then as

22   colloquially, however you say the word --

23            THE COURT:  You've assumed that that's for sexual

24   deviancy treatment.

25            MR. AMALA:  I think that's generally true.  A lot

Page 34

1    of the other lawyers, on both sides on this call, can

2    correct me.  But I just want to say, Your Honor, if Your

3    Honor says produce sexual deviancy treatment records, that

4    may not be sufficiently inclusive because there may be

5    records that don't say the word "sexual deviancy treatment"

6    or specifically say we're giving him treatment for

7    pedophilia.  But in the records it's, you can tell what

8    they're talking about.

9           THE COURT:  Okay.  I'll come back to you and let's

10   -- unless there's another point you want to make now.

11          MR. AMALA:  I'll stop where I hope I'm ahead, but

12   I don't know if I am.  Thank you, Your Honor.

13          THE COURT:  Well, I don't know yet either.  Mr.

14   Mones.

15          MR. MONES:  Good morning, Your Honor.  Just as a

16   quick follow up to your question you asked, Mr. Amala.

17   We've obtained prior to the CVA from area dioceses, the

18   files involving sexual deviancy, just for the Court's

19   information.  So, basically --

20          THE COURT:  Let me just stop you.

21          MR. MONES:  Yes, sir.

22          THE COURT:  What were those files called when you

23   say "files involving sexual deviancy"?

24          MR. MONES:  Well, they -- actually not to correct

25   Mr. Amala, they weren't called sexual deviancy files.  They

1     were just contained in the priest's personnel file that they

2     sent this person for treatment to Pennsylvania to Saint John

3     Vianney.  And this was a Rockville -- this was a priest

4     working in Rockville Center who was attached to an order

5     that was in Brooklyn.  So both the Diocese of Rockville

6     Center and the Diocese of Brooklyn were sued.  This is a

7     2014 case.  And we received the progress notes from Saint

8     John Vianney as part of the full priest personnel file that

9     we requested because we made an omnibus request for all

10    treatment records, et cetera.  And so we received that

11    document from both dioceses.

12          THE COURT:  And is it your experience in these

13    cases that the diocese -- if a greased within the diocese

14    had been sent for sexual deviancy treatment that the diocese

15    would have -- and generalize it, so I'm not limiting it to

16    the Diocese of Rocket Center -- a diocese would have a copy

17    of treatment records for alleged abusers?

18          MR. MONES:  Yeah, I mean I believe Mr. Stoneking

19    addressed this as well.  Specifically, being sent to Saint

20    Luke's or being sent to the Servants of the Paracletes and

21    other treatment institutions, Saint John Vianney, it's a

22    condition of employment.  And so the diocese pays for the

23    treatment.  That's not free.  The diocese pays for the

24    treatment and the diocese has a specific point person who

25    receives daily progress report -- not daily, strike that --

Page 36

```
 1    who receives regular progress reports from the treatment

 2    center to find out when the priest is available to come back

 3    and whether or not that priest, depending upon the timing

 4    we're talking about, should come back into service and be

 5    around children or should come back and service and be in a

 6    hospital for adults, et cetera.  But there's no doubt in my

 7    mind that every diocese that sends -- and this is all my

 8    experience over decades I've been doing these cases -- that

 9    they always have this, that the, that there is a file in --

10    that part of the file is this treatment record that is

11    maintained.  And it's only also because they say it's a

12    condition of employment, which tends to be the way in which

13    plaintiffs can get copies of these records because it is a

14    condition of employment under New York law and we would have

15    access to it.  But it's not that the priest goes on his own

16    and says I need treatment and then the priest keeps the

17    file.  That's not the way it works.

18                THE COURT:  Okay.  Anything you want to add now?

19                MR. MONES:  Excuse me, Your Honor?

20                THE COURT:  Is there anything you wish to add?

21                MR. MONES:  Oh, yeah, I do want to add.  I have a

22    couple of couple of things if I could please.  Thank you for

23    the time.

24                I understand that the Court is not going to grant

25    extensive discovery, so if I would request from the Court
```

1   for 90324 and 90245 the altar servers, list of the altar

2   servers and the priests that served alongside the two

3   alleged perpetrators in this case, that would be our

4   request.  I don't know if the Court is going to grant it in

5   the sense that it is -- the Court seemed to indicate that

6   it's going to be extremely circumspect in its granting of

7   discovery in this case.

8           THE COURT:  I expect to be extremely circumspect.

9           MR. MONES:  Okay.  Secondly, I just want to say

10  following up on one of our cases, in the Alan Rimmer, who

11  was 90245, he is the priest, there was, we only had two

12  pages  in the personnel file.  There was nothing else.  He

13  was a priest from England and we at least, just for fairness

14  purposes, should have the diocese request if there is a file

15  there from the Diocese in England where Father Rimmer came

16  from because he was in the United States for about a month

17  at the time this happened.  And our client, otherwise, does

18  not have the benefit of these other documents, very similar

19  to what Mr. Stoneking said in terms of his client.  So we

20  would make that request.

21          I would say now, Your Honor, based upon reviewing

22  90234, we found a letter -- and I was going to request more

23  information, but I don't think I need to now -- we found a

24  letter in the file and this goes to the issue that the Court

25  was asking, how do you determine credibility?  This is a

Page 38

1   Father Nielsen, just if I can indulge a Court for about 20

2   seconds, just less than that to read from --

3           THE COURT:  You're going to use more than 20

4   seconds asking to indulge, but go ahead.  Just tell me.

5           MR. MONES:  Okay, Your Honor.  This is a letter

6   from a parishioner.

7           "I really hoped that Father Nielsen would be

8   transferred this year.  But when he was not, I decide to

9   speak to him about it and how he and I could possibly help

10  each other communicate a little better than we had in the

11  past.  I also wanted to tell him that there are people in

12  this parish who are hurting and need to be ministered to and

13  that he is oblivious to it all.  The kindest rationalization

14  that I've heard is that Father Nielsen does not relate to

15  adults.  I have a problem with that and I imagine you do

16  too."

17          That, for me, is the kind of code language that

18  has been used by both parishioners even, but clearly by the

19  diocese for individuals who have a predilection to being

20  around children more than adults.  And I would say, Your

21  Honor, and I -- and this letter has to be read in pari

22  materia, I believe, with the findings of the grand jury in

23  2003.  I raised this last time we spoke.  What's unique

24  about the grand jury report, we can make all these

25  allegations about cover up, et cetera.  You can even make

Page 39

1    those allegations, you know they are just allegations in

2    Boston or in most of the other diocese.  But where there's a

3    finding from a duly appointed a grand jury and it finds that

4    the diocese ignored quote -- this is Page 172 -- "ignored

5    credible complaints about the sexually abusive behavior of

6    priests and they failed to act on obvious warning signs of

7    sexual abuse, including instances where they were aware

8    priests had children in their private rooms in the rectory

9    overnight, et cetera."  Then when we read those two

10   together, it seems to me and we will, of course, put this in

11   our - because the Court did grant us to amend -- we will put

12   this in our amended claim.  But we believe there is clearly

13   the evidence that there was something going on here with

14   Father Nielsen.

15        For some reason, the diocese still objected to

16   this.  I don't know how they could have read this paragraph

17   and still went ahead with the objection, but they did and we

18   will address it in our amended claim.  But that's basically

19   the issues I wanted to present to the Court.  I appreciate

20   the time.

21        THE COURT:  Thanks very much, Mr. Mones.  Mr.

22   Geremia, the -- go ahead and respond and then I'll ask

23   questions.  I'll let you respond first.

24        MR. GEREMIA:  Sure.  First of all, we, the

25   committee and the counsel representing committee members,

Page 40

1    has had all of the personnel files --

2              THE COURT:  Nope, nope, nope.  Well, you told me

3    at a hearing, I believe it was you, perhaps it was Mr.

4    Stephens that the files were produced to the committee.  And

5    if a committee member happened to be represented by counsel,

6    then he would have gotten it.  But you did not produce the

7    personnel files to each counsel.  Maybe I, maybe I

8    misunderstood what I was told.  That's one of the reasons I

9    wanted to have this here.  I wanted to be sure that each

10   counsel for a claimant has had access to whatever files were

11   produced to the committee.  It wasn't clear to me that they

12   did.

13             MR. GEREMIA:  Why don't I ask my partner Eric

14   Stephens to address that.  My point is to address, you know,

15   Mr. Stoneking and Mr. Amala were talking documents produced

16   to them and in some respects, alluding to purported

17   shortcomings in the production.  This is the first we are

18   ever hearing of that.

19             THE COURT:  Well, we're hearing about it now.

20   It's now, most of them have gotten leave to amend.

21             MR. GEREMIA:  Yeah.

22             THE COURT:  And when I wrote the opinion, I felt

23   it was important to have this conference today.  You know,

24   as I said, I sort of analogized that the federal rules have

25   sort of taken the -- decisions applying to the federal rules

Page 41

1   have sort of said, who's the party likely to be in

2   possession of the information?  I mean if the information is

3   exclusively in the possession of the defendant, you may ease

4   the burden placed on the plaintiff in their pleading.

5   That's sort of what was motivating my thinking.  My opinion

6   said what it said.  Okay.  That wasn't exactly it.  So let

7   me come back to one of the things that Mr. Amala and I were

8   discussing and that is, I'm not opening -- while I'm not

9   opening this up to broad discovery, it does seem to me that

10  the diocese, which is in possession of whatever files it

11  has, should be a person with personal knowledge or

12  sufficient foundation established that they searched the

13  records, whether it's just a personnel, if it's just the

14  personnel card, but if it happens that there's a separate

15  sexual deviancy treatment file, has somebody searched that?

16  I mean I want to be satisfied that the diocese for each of

17  the accused abusers where notices are issued, the diocese

18  has searched its files and a person with sufficient personal

19  knowledge, they conducted a search and says, we've searched

20  the files.  There are no records either sexual deviancy

21  treatment files, I don't have all the labels here, relating

22  to the alleged abuser.

23         And so if it was Mr. Amala's client, you would

24  provide Mr. Amala with -- or Mr. Stoneking or Mr. Mones with

25  respect to their client.  I'm not saying plaintiffs' lawyers

Page 42

1   get to see every personal file of every priest.  Okay?

2   You've looked for, Mr. Amala has got one client in these

3   claims that we're dealing with, one or more declarations

4   that say the files, including any sexual deviancy treatment

5   files, personnel files, correspondence files, have been

6   examined and no records showing any allegations of sexual

7   abuse by the priest have been located.  I mean that, you

8   know, Mr. Amala thinks that's not been done.  Is that true?

9   Maybe it's never been required.  I understand your position

10  is, you know, they have the burden of pleading and they do,

11  but we're talking about information that would be uniquely

12  in the possession of the diocese.

13          MR. GEREMIA:  Right.  And what we have done, and

14  Eric can fill in details is, you know, produced to the

15  committee.  We are prepared to produce to counsel for each

16  individual claimant at issue on these objections the entire

17  personnel file for that accused abuser, which is derived

18  from more than one source, including the confidential/secret

19  files where Mr. Amala said he would expect any evidence of

20  treatment records to be contained.  I mean we have to

21  litigate these claims, not claims in other parts throughout

22  the country where they found this.  If those records are to

23  be in the personnel files, that's where they will be.  And

24  each claimant will get that personnel file.  We have also

25  done a search.  Mr. Stephens has headed up this effort

Page 43

1   across the entire document database of production, more than

2   700,000 documents, and we have searched on the individual

3   accused abusers for these claims.  And we are prepared to

4   sort through that information from the vendor and produce to

5   each individual claimant every document that has hit on that

6   search.  So claimant, each claimant's counsel will have all

7   of the documents that relate to this accused abuser and then

8   can amend their claims if they see as warranted.  Eric, I

9   don't know if you have anything to add to the production

10  that we have done or are prepared to do?

11          MR. STEPHENS:  Your Honor, Eric Stephens with

12  Jones Day.  Todd, Mr. Geremia has described the proposal

13  that we had intended to make to Your Honor was, you know, we

14  have obviously this document database.  I testified at some

15  length about it.  You had questions for me, the committee

16  had questions.

17          THE COURT:  And I think some of the plaintiffs'

18  lawyers got upset that it wasn't a hearing where they

19  attended.  Anyway, go ahead.

20          MR. STEPHENS:  What we have done, what we have

21  done in anticipation of today's conversation is we have run

22  searches for the names of the accused at issue in the

23  objections that have been given leave to amend.  And what we

24  had, what we would had intended to propose to Your Honor

25  today was that subject to a privilege review and filtering

Page 44

1    out mishits and those sorts of things, that to the

2    individual counsel for each individual claimant, we would

3    produce to them the nonprivileged search hits.  In terms of

4    logistics, we thought we could manage that process, you

5    know, probably sometime in the next 10 days.

6         The other, the other administrative issue that we

7    wanted to raise with Your Honor, if this is to be the path

8    forward, is that there are individual claimant counsel who

9    are not parties to the Protective Order.  And so we would

10   need to address that.  That's not an issue for the state

11   court counsel who you've heard from today, who are committee

12   members.

13        I would just, I do also want to emphasize to the

14   Court, our understanding is that the collection and the

15   productions to date, which were completed May 31st, 2022,

16   were complete.  And you heard testimony about that at the

17   April 19th hearing.  And I've looked back as I wanted to

18   make sure that I wasn't misremembering, but you then also

19   asked committee counsel for their understanding of the

20   completeness of the production.  And so I'm looking at Page

21   233 of the April 19th, 2023, hearing in this matter.  We

22   just come back from a break and the question from the Court

23   was, "Before we continue, I have a question for committee

24   counsel.  The testimony has been that all of the personnel

25   files, including the confidential personnel files for all of

Page 45

1    the alleged abusers, have been produced to the committee.

2    Do you agree with that?"  Mr. Brown's response for the

3    committee was yes.

4             So what I, you know, while we came prepared today

5    to make that offer and we think that's a sensible way to

6    proceed, I now have concerns that what I don't want this to

7    turn into is an extensive frolic and detour into additional

8    collections and requests when the parties have been

9    operating from a place where for a year now, you know, we've

10   understood that these records are complete.  So clearly, the

11   10-day process that I've proposed, or that the debtor is

12   proposing, you know, would need to, you know, would not

13   accommodate, you know, frankly a do-over of what was years'

14   long, you know, collection, review, and production process.

15            MS. MICHAEL:  Your Honor, Brittany Michaels,

16   Pachulski Stang Ziehl and Jones on behalf of the committee.

17   May I just correct the record there slightly?  What we

18   stated at the hearing that Mr. Stephens referred to was that

19   we agreed that the debtor had represented to us that they

20   have produced all of the personnel files.  We never agreed

21   that we had all the personnel files.  That's not something

22   that we would have the information to be able to agree to.

23   All we have ever said is that the debtor has repeatedly

24   represented to us that they had produced all the personnel

25   files.  We have never made any statements about the

Page 46

1    completeness or otherwise agreed that those records contain

2    everything that they should.

3            THE COURT:  Let me, let me come back and I don't

4    know, Mr. Stephens or Mr. Geremia -- and I'm not saying I'm

5    requiring this, but I'm not saying I'm not going to either -

6    - but so Mr. Amala has said there's been no representation

7    under oath by someone with sufficient knowledge that the

8    files, all the files have been reviewed, and confirming that

9    there have been no allegations against the alleged priest

10   abuser.  I mean, look --

11           MR. GEREMIA:  One of the criteria we had for this,

12   Your Honor, the first bullet point from Page 7 you read is

13   that for this round of objections, the accused perpetrator

14   was accused in only one proof of claim.  And that's after an

15   extensive process by which these plaintiffs' counsels

16   advertised the bankruptcy and advertised the opportunity to

17   submit a claim.  So these are not alleged repeat abusers.

18   They're alleged people, whether it be once --

19           THE COURT:  Whether it be a repeat abuser or a

20   one-time abuser, the one-time abuser doesn't get a free pass

21   and the diocese doesn't get a free pass --

22           MR. GEREMIA:  Understood.

23           THE COURT:  -- if it had prior knowledge of

24   predisposition, predilection, I don't know what the exact

25   term is, so, yeah, I'm happy there's only that from this

Page 47

1    collection, there's no more than one abuse claim.  But here

2    is -- we're not going to get this fully resolved today, but

3    hopefully we are -- I want Mr. Stephens, Mr. Geremia to

4    confer with Mr. Stoneking, Mr. Amala, Mr. Mones, and include

5    Ms. Michael or someone else on behalf of the committee in

6    this discussion.  And, you know, I'm trying to take notes as

7    all the lawyers are talking, but I don't think I've ever

8    gotten a clear response as to whether the Diocese of

9    Rockville Center kept in a file or files, whatever that file

10   may be called, any sexual deviancy treatment records.  You

11   know what, what the plaintiff's counsel is suggesting is

12   there should be one.  The diocese pays for the treatment, if

13   some -- if a priest is sent to such treatment, that there

14   are a number of specific locations that sort of seem to

15   specialize in sexual deviancy treatment.  And I don't want

16   any of you, I don't want to have egg on your faces when it

17   turns out that well, there was this piece of paper.  It did

18   show that Priest X had been referred on one occasion or two

19   occasions.  You know, I don't know.  Let me ask you, Mr.

20   Geremia, does the diocese maintain in a file or in multiple

21   personnel files, any sexual deviancy treatment records?

22            MR. GEREMIA:  I don't know the answer to that

23   sitting right now.  I don't know if Eric does.  And if not,

24   we will find out the answer for you.

25            THE COURT:  Okay.

Page 48

1           MR. STEPHENS:  And Your Honor, this is Eric

2     Stephens for the debtor.  We will confirm, but my

3     understanding is that they are not, they would not be

4     separately kept.  My expectation is consistent with what Mr.

5     Mones described, was that they would be part of the

6     personnel file for this client.  And, you know, from Mr.

7     Mones' description, it sounds like documents of that type

8     were in the file that he mentioned, which to me suggests

9     that at least he and I have the same understanding.

10          THE COURT:  Look, I'm not entering an order or

11    ruling today.  I'm directing that you confer and see if you

12    can come to an agreement.  I appreciate that the diocese

13    being prepared today to say what they're ready to produce or

14    within 10 days will produce.  I want you to have this

15    dialogue.  It may be that you can't agree on everything.  I

16    don't agree that I'm going to somehow open this up to

17    depositions and discovery of other priests or parish

18    employees or officials asked about, you know, to take

19    depositions and well, did you have any idea that so-and-so

20    was spending too much time with children?  Okay.  You know,

21    look, I'm Jewish, reasonably active, sure.  I've had a rabbi

22    who is best in dealing with children than he is with senior

23    citizens, which I consider myself to be.  Okay.  He just is.

24    He's not abusing any children.  I'm absolutely certain of

25    it, but he's absolutely great with the kids.  Okay?  So the

Page 49

```
 1    fact -- you may say history shows the priests who are

 2    spending too much time with children is a sign, I'm not

 3    ready to buy, I'm not buying into that.  Okay?  That's not

 4    going to be the basis for opening up broad discovery.  You

 5    know I had a rabbi in the past.  The one thing he was the

 6    worst at was dealing with elderly congregants who were sick

 7    and making hospital visits.  He was great for lots of

 8    others.  So it's not all great at the same thing.  Okay?

 9           MR. MONES:  Your Honor, may I --

10           THE COURT:  Go ahead, Mr. Mones.

11           MR. MONES:  May I interject just for one second?

12           THE COURT:  Sure, go ahead.

13           MR. MONES:  I know as being a Jew as well, the

14    difference between rabbis who like kids and also rabbis

15    actually out there who abuse children.  But I will tell you

16    the line that concerned me was not that he was close to

17    children and, you know, we'll plead this and the Court will

18    decide what it's going to decide, but the kindest rationale

19    is he doesn't relate to adults, I have a problem with that.

20    I imagine you do too.  That's not saying, I'm sure you would

21    not say about this rabbi that you have that well, in writing

22    to if there was a complaint about him, that you would have a

23    problem that it was a problem that he doesn't relate to

24    adults.  He may have a better relationship with children

25    than adults, but I think there's a lot of nuance in these
```

Page 50

1    cases, Your Honor, that Mr. Amala and Mr. Stoneking alluded

2    to, over the years we have, you know, traversed through this

3    underbelly of American Society and learned that within,

4    there are certain buzzwords --

5             THE COURT:  Okay.  There isn't going to be

6    discovery because of buzzwords.  Okay?  I'm just telling you

7    right now.

8             MR. MONES:  Well, we'll just have go with what

9    Your Honor will decide.

10            THE COURT:  This will be a meet and confer.  If I

11   need to schedule another hearing because you can't come to a

12   complete agreement, we will.  I want for those claims that

13   have been, you know, where I sustained the objection with

14   leave to amend on information that's the possession of the

15   diocese, the claimants' lawyers should have that information

16   before they have to plead again.  Okay?

17            I think, you know, Mr. Geremia, much of what

18   you're proposing to do sounds fine to me, okay?  But the

19   devil is going to be in the details.  But I do and then I

20   will come back to this point because I have required this in

21   other cases, and that is going to be a certification on the

22   scope of the search that's been made.  I think that's

23   required.  Well, I'm requiring it.  Okay?  I don't have any

24   doubt, Mr. Geremia, that you and your colleagues that I have

25   the greatest respect for, are going to absolutely fulfill

Page 51

```
 1    the professional responsibility of lawyers who represent

 2    defendants in cases in discovery, okay, and, you know, it

 3    may be more, I don't know who's doing the search.  It may be

 4    more appropriate, it's got to be whether it's the general

 5    counsel of the diocese or whoever, but there's going to be a

 6    certification, an appropriate certification.  Okay?

 7              MR. GEREMIA:  That will be fine, Your Honor.  We

 8    won't have an issue with that.  As I think Your Honor knows,

 9    Mr. Stephens testified to this.  These documents were

10    produced pursuant to court order.  So we were, you know, we

11    did it in accordance with the court order, followed the

12    court order.  But we'll do a certification that will not be

13    an issue.

14              THE COURT:  That's fine.

15              MR. GEREMIA:  We are to confer with the three

16    counsels you mentioned then regarding the scope of the

17    document production?

18              THE COURT:  And include somebody from committee

19    counsel in the discussion as well.

20              MR. AMALA:  Your Honor --

21              MR. GEREMIA:  Okay.  We will do that.

22              THE COURT:  Who, who wanted to be heard?  Was that

23    Mr. Amala or was that somebody else?

24              MR. AMALA:  Yes, Your Honor, Jason Amala.

25              THE COURT:  Go ahead.
```

1          MR. AMALA:  Just I'm sure this came up before, but

2     the diocese likely employs an archivist who should be very,

3     very familiar with how these records are kept.

4          THE COURT:  Do me a favor, raise it with the Jones

5     Day folks.  And if you can't get to an agreement, we'll have

6     another hearing about it.  I'm not going to let this linger

7     on very long, but I do want, okay, the best thing is not

8     negotiating over the phone with me, who doesn't know what's

9     in these documents?  Okay?

10          MR. AMALA:  Your Honor, where I was going with

11     that was not trying to bicker right now.  The one question I

12     just wanted to ask, the privilege log, I don't know if

13     that's been produced and while we've got, I just want to

14     make sure we've got that because Mr. Stephens referred to

15     producing non-privileged documents, which, of course, begs

16     the question of what's being held on privilege.  So I just,

17     I just want to make sure we'll get that or that we can have

18     that, Your Honor.  That's why I'm raising it with you.  I

19     don't remember the contours of what you said we can have and

20     can't have.  So is that something we can have?

21          MR. GEREMIA:  We'll address that when we talk --

22          THE COURT:  You you need to, you need to address

23     where this is going from here.  Okay?  Anything else for

24     today?

25          MR. AMALA:  Thank you, Your Honor.

Page 53

1          MR. GEREMIA:  Not from the debtor, Your Honor,

2    thank you.

3          THE COURT:  Okay.  You know the clock is ticking

4    on the month of May when the mediation is supposed to be

5    going on.  I hope that's going on.  So we'll leave it at

6    that.

7          MR. GEREMIA:  It is.

8          THE COURT:  Okay.  We're adjourned.  Thank you

9    very much.

10          (Whereupon these proceedings were concluded at

11    3:09 PM)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 54

1                 C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4     transcript is a true and accurate record of the proceedings.

5

6     *Sonya M. Ledanski Hyde*

7

8     Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20     Veritext Legal Solutions

21     330 Old Country Road

22     Suite 300

23     Mineola, NY 11501

24

25     Date:  May 17, 2023

[& - abuse]

Page 1

| & | | | |
|---|---|---|---|
| **&**   3:11 4:8,16 | **1987**   2:8 | **4** | **90324**   2:6 7:14 |
| **1** | **1989**   27:10 | **403**   5:10 | 37:1 |
| **10**   44:5 45:11 | 32:1 | **5** | **90327**   2:3 |
| 48:14 | **19th**   44:17,21 | **500**   5:10 | **90330**   2:4 |
| **10001**   4:11 | **2** | **5896224**   22:7 | **90345**   2:4 |
| **10004**   1:14 | **2**   6:3 | **6** | **90349**   2:4 |
| 4:19 | **20**   38:1,3 | **61**   27:1 | **90355**   2:3 |
| **10017**   3:14 | **20-12345**   1:3 | **615**   5:3 | **90391**   2:4 |
| **10281**   3:6 | 6:5 | **63**   27:1 | **90392**   2:6 |
| **11501**   54:23 | **2003**   38:23 | **7** | **90472**   2:4 |
| **11556**   4:4 | **2014**   35:7 | **7**   10:13 46:12 | **90495**   2:5 |
| **1201**   4:3 | **2019**   22:7 | **700,000**   43:2 | **90512**   2:4 |
| **12151**   54:6 | **2022**   44:15 | **72114**   5:4 | **90514**   2:4 |
| **12th**   4:10 | **2023**   1:16 6:3 | **780**   3:13 | **90517**   2:5 |
| **13101**   3:22 | 44:21 54:25 | **7th**   4:10 | **90542**   2:5 |
| **16**   1:16 | **2062**   2:8 | **9** | 30:20 |
| **16th**   6:3 | **2063**   2:9 | **90020**   2:6 | **90544**   2:5 5:2 |
| **17**   54:25 | **2086**   2:9 | **90053**   2:6 | 8:25 |
| **172**   39:4 | **2093**   2:9 | **90066**   3:23 | **98104**   5:11 |
| **1730**   2:7 | **23**   22:8 | **90075**   2:6 | a |
| **1731**   2:7 | **233**   44:21 | **90090**   2:7 | **able**   13:20 |
| **1774**   2:7 | **24**   29:3 | **90100**   2:5 18:5 | 45:22 |
| **1856**   2:7 | **250**   3:5 | 28:24 29:2 | **absences**   25:20 |
| **1858**   2:7 | **2:01**   1:17 | **90174**   2:5 | **absolutely**   33:8 |
| **1860**   2:7 | **3** | **90181**   2:5 | 48:24,25 50:25 |
| **1861**   2:7 | **30**   15:8 | **90208**   2:3 | **abstract**   29:6 |
| **1863**   2:8 | **300**   54:22 | **90209**   2:3 | **absue**   3:21 |
| **1871**   2:8 | **30035**   2:5 | **90231**   2:3 | **abuse**   10:15 |
| **1872**   2:8 | **31st**   44:15 | **90234**   37:22 | 11:4,5,14 13:3 |
| **1874**   2:8 | **330**   54:21 | **90244**   2:6 | 15:6,6,8,9 16:3 |
| **1911**   2:8 | **34th**   3:13 4:18 | **90245**   2:6 7:14 | 17:12 18:18,23 |
| **1970**   27:3 | **35525**   27:9 | 37:1,11 | 18:24 19:11 |
| **1978**   15:6 | **363**   4:10 | **90264**   2:3 | 20:6,23 21:4 |
| **1984**   2:8 | **3:09**   53:11 | **90317**   2:3 | 21:17 33:12 |
| | | | 39:7 42:7 47:1 |
| | | | 49:15 |

abused  14:6
  18:25 19:25
  21:10,19,20
  24:10,14,23
abuser  41:22
  42:17 43:7
  46:10,19,20,20
abuser's  20:21
abusers  10:25
  12:14,23,25
  13:1,5,6 35:17
  41:17 43:3
  45:1 46:17
abusing  19:2
  20:2 24:24
  25:4 28:10
  48:24
abusive  39:5
access  36:15
  40:10
accommodate
  45:13
accordance
  51:11
accurate  54:4
accused  10:18
  10:23,25,25
  11:3,25 12:14
  12:23,25 13:1
  13:5,6 18:16
  18:18,18 41:17
  42:17 43:3,7
  43:22 46:13,14
accusing  14:14
acknowledge
  22:9

acknowledged
  26:6
acknowledges
  22:15,17 23:8
acquired  18:11
act  39:6
acted  12:16,17
action  23:12
active  48:21
acts  20:16
actual  22:18
actually  22:17
  31:19 34:24
  49:15
add  17:18
  36:18,20,21
  43:9
additional  7:20
  8:17 9:2,22
  45:7
address  10:23
  23:25 39:18
  40:14,14 44:10
  52:21,22
addressed
  35:19
addressing
  12:23
adjourned
  53:8
administrative
  44:6
admit  19:23
  20:2,13 32:2
admits  24:10
admitted  9:24
  18:25 21:10,17

21:20
admitting  32:1
adults  20:6
  36:6 38:15,20
  49:19,24,25
adverse  10:21
  12:2 13:8,17
  14:11,19
advertised
  46:16,16
afraid  21:24
afternoon  6:7
  6:24 7:11,16
  7:17,25 8:4,19
  9:5,12 10:6
  18:3
afternoon's
  9:19
agree  31:20
  45:2,22 48:15
  48:16
agreed  15:18
  45:19,20 46:1
agreement
  48:12 50:12
  52:5
ahead  30:24
  31:1 34:11
  38:4 39:17,22
  43:19 49:10,12
  51:25
al  4:1
alan  37:10
albany  32:23
  32:25
allegation
  12:15 14:5

15:8 18:13
allegations
  11:4 13:13
  14:9,10,18
  15:3,9 16:3
  18:23,24 19:11
  25:8 38:25
  39:1,1 42:6
  46:9
allege  22:21
  29:4,8
alleged  10:15
  14:5 15:6
  24:13 35:17
  37:3 41:22
  45:1 46:9,17
  46:18
allows  18:19
alluded  50:1
alluding  25:16
  40:16
alongside  37:2
altar  37:1,1
amala  5:8,13
  9:13,24,25
  10:3 11:18
  18:2,3,4 19:6,8
  21:23 22:3
  24:3,15 26:10
  26:15 28:24
  30:22,24,25
  31:2,5,12
  32:21 33:13,25
  34:11,16,25
  40:15 41:7,24
  42:2,8,19 46:6
  47:4 50:1

[amala - believe]                                                          Page 3

| | | | b |
|---|---|---|---|

51:20,23,24,24
52:1,10,25
**amala's** 12:13
14:6 41:23
**amend** 12:11
28:23,25 29:1
29:2,23 39:11
40:20 43:8,23
50:14
**amended** 39:12
39:18
**amendment**
30:23
**american** 50:3
**amounts** 16:6
**analogized**
40:24
**analysis** 32:8
**anderson** 4:8
4:14 6:8 8:1,6
8:7,9,9
**angeles** 3:23
**answer** 19:2
47:22,24
**answers** 14:23
**anticipation**
43:21
**anyone's** 9:11
**anyway** 43:19
**apologize** 9:25
29:25
**appeal** 31:10
33:3
**appealed** 20:11
33:7
**appealing**
20:19,20

**appear** 13:16
13:16
**appearance**
6:6,20,23 7:10
7:12,21,25 8:8
8:22 9:2,3,6,7
9:13,18,23
10:2
**appearances**
7:16 8:17,20
**appearing** 6:16
8:9,25
**appellate** 32:22
32:23
**apply** 29:20
**applying** 40:25
**appointed** 39:3
**appreciate**
23:5 24:3,4
31:13 39:19
48:12
**appropriate**
51:4,6
**april** 44:17,21
**ar** 5:4
**archbishop**
27:25
**archivist** 52:2
**area** 25:6
27:12 34:17
**argue** 24:1
**argument** 30:8
30:9
**arises** 6:18
**art** 33:9,18
**aside** 26:21

**asked** 11:10
19:8 20:23,24
26:11 29:22
31:15 34:16
44:19 48:18
**asking** 31:16
37:25 38:4
**asserted** 30:11
**asserts** 11:2
**assign** 28:8
**assigned** 17:8
26:25
**assignment**
27:4,5
**assignments**
16:13
**associates** 4:8
8:2
**assume** 24:10
**assumed** 33:23
**attached** 35:4
**attended** 43:19
**attention** 22:6
**attorneys** 3:4
3:12,21 4:2,9
4:17 5:2,9
**automatically**
21:11
**available** 36:2
**avenue** 3:13
4:10
**award** 10:19
13:17
**aware** 13:23
39:7

**b** 1:21 3:17
**back** 16:14
18:20 19:4
24:7,16,23,25
25:7,11,12
27:6 28:2,3
29:22 30:12
34:9 36:2,4,5
41:7 44:17,22
46:3 50:20
**ball** 4:1 7:18
**bankruptcy**
1:1,12,23 26:5
46:16
**based** 37:21
**basically** 34:19
39:18
**basis** 29:14
49:4
**bates** 27:9,9
**battery** 4:18
**beginning**
13:19,25 26:11
**begs** 52:15
**behalf** 6:16 7:1
7:3,5 8:5,10,14
9:9,22 17:1
45:16 47:5
**behavior** 39:5
**behold** 25:1,3
**believe** 18:9,16
18:20 23:2
26:16 33:17
35:18 38:22
39:12 40:3

[believing - clear]                                    Page 4

believing  16:3
benefit  37:18
best  48:22 52:7
better  13:20
  38:10 49:24
beyond  17:17
bicker  52:11
bill  8:21,23
bishop  16:12
  16:14 27:24
bit  22:2
black  23:14
blvd  3:22
board  10:22
  12:1 13:8,12
body  22:14
  23:9
boston  39:2
bowling  1:13
boy  32:5,6
break  44:22
bringing  24:15
brittany  3:16
  6:25 45:15
broad  10:10
  12:12 41:9
  49:4
brooklyn  33:3
  33:7 35:5,6
brown's  45:2
bullet  10:17,17
  10:24 11:25
  12:5 46:12
bullets  12:22
burden  41:4
  42:10

buy  49:3
buying  49:3
buzzwords
  50:4,6

c

c  3:1 6:1 54:1,1
ca  3:23
calendar  6:2
call  29:17 34:1
called  11:11
  22:7 26:18,19
  27:11 34:22,25
  47:10
calling  6:3
card  16:6
  17:17 41:14
career  17:14
careful  28:8
carrying  14:16
case  1:3 6:4
  7:19 11:2 12:2
  13:19 14:1
  17:21 19:17
  22:6,9,20,23
  32:23 33:1,6
  35:7 37:3,7
cases  15:4 21:6
  21:13,22 26:7
  32:17 33:12
  35:13 36:8
  37:10 50:1,21
  51:2
catholic  1:7 6:4
  25:18 27:14
caught  19:20
cause  23:11

caution  33:14
  33:17
center  6:4,9
  27:25 35:4,6
  35:16 36:2
  47:9
centre  1:7
certain  4:9,17
  8:10,14 48:24
  50:4
certainly  10:9
certification
  50:21 51:6,6
  51:12
certified  54:3
cetera  17:9
  35:10 36:6
  38:25 39:9
chance  15:16
changed  16:12
cheap  26:18
check  16:13
child  19:11
  21:19 22:12,16
  23:13,16,16,17
children  18:25
  19:2,24 20:3,6
  21:10,17,20
  23:1,22 24:10
  32:1,2 36:5
  38:20 39:8
  48:20,22,24
  49:2,15,17,24
christi  17:11
church  27:14
church's  26:19

circumspect
  37:6,8
circumstances
  29:6
cited  22:5
cites  22:6
citizens  48:23
claim  2:2,2
  10:14,15 12:3
  13:7 15:7
  28:20 29:2,8
  29:13,15,18,21
  29:23 30:2,6
  30:10,16 31:2
  32:5 39:12,18
  46:14,17 47:1
claimant  3:21
  5:2 8:25 10:19
  18:5 26:24
  28:21,24 40:10
  42:16,24 43:5
  43:6 44:2,8
claimant's
  14:13 43:6
claimants  7:13
  15:12 16:1
  50:15
claims  6:15
  12:4,10 15:5
  17:22 29:9
  42:3,21,21
  43:3,8 50:12
clean  32:15
clear  18:23
  31:20 40:11
  47:8

clearly  38:18
39:12 45:10
clergy  10:23
20:6
clerk  6:2,10,14
6:19,22 7:2,7,9
7:15,20,24 8:3
8:6,11,15,17
8:23 9:1,10,17
9:21 10:2
client  17:1
24:14 37:17,19
41:23,25 42:2
48:6
clients  12:13
12:14 14:6
30:19 32:19
clock  53:3
close  49:16
coast  27:15
cochran  5:8
code  28:5
38:17
colleagues
23:10 50:24
collection
44:14 45:14
47:1
collections
45:8
colloquially
33:22
colloquy  21:23
columbia  5:10
come  19:4 24:7
30:12 34:9
36:2,4,5 41:7

44:22 46:3
48:12 50:11,20
comes  23:12
24:21
coming  9:15
committee
3:12 7:1,3,5
9:9,22 11:1,13
11:15 12:8,24
13:21,22 15:25
15:25 16:5
39:25,25 40:4
40:5,11 42:15
43:15 44:11,19
44:23 45:1,3
45:16 47:5
51:18
committee's
12:6,25 14:25
committing
11:4
common  17:21
commonly
33:11
communicate
21:16 38:10
compensation
10:21 20:22
21:2
compiled  11:1
complained
20:2 25:5
complaint
49:22
complaints
19:25 39:5

complete  44:16
45:10 50:12
completed
17:14 44:15
completeness
44:20 46:1
concern  11:8
15:24 33:19
concerned
11:16 49:16
concerns  10:11
16:2 45:6
concluded
53:10
condition
35:22 36:12,14
conducted
41:19
confer  47:4
48:11 50:10
51:15
conference  2:1
10:7 23:24
26:12 31:16,16
40:23
confidential
11:21 14:8
26:13 42:18
44:25
confirm  11:23
48:2
confirmed
18:12
confirming  9:1
46:8
congregants
49:6

consider  48:23
consistent  48:4
contain  46:1
contained  35:1
42:20
contested  12:4
context  23:19
continue  44:23
contours  52:19
controlling
32:24
conversation
43:21
copies  36:13
copy  35:16
corpus  17:11
correct  34:2,24
45:17
corrected
33:14
corresponde...
16:12,22 27:7
27:23,24 28:11
42:5
counsel  6:11
10:4,4 11:14
11:18 14:13
33:2 39:25
40:5,7,10
42:15 43:6
44:2,8,11,19
44:24 47:11
51:5,19
counselor
11:23
counsels  46:15
51:16

[country - deviancy]                                                      Page 6

**country**  23:15
  27:13 42:22
  54:21
**couple**  36:22
  36:22
**course**  12:5
  19:23 21:9
  24:9 28:4
  31:21 39:10
  52:15
**court**  1:1,12
  10:6 13:4,20
  14:2,20 15:14
  15:22 16:3,17
  16:19,21 17:6
  17:18 18:1,8
  19:4,7,8,14
  20:4 22:1,4,8
  22:17 23:7
  24:1,2,7,17
  25:7,21 26:4,5
  26:6,14 27:8
  28:18 29:1
  30:23 31:1,4,8
  31:15,21 32:6
  32:16,17 33:2
  33:2,9,23 34:9
  34:13,20,22
  35:12 36:18,20
  36:24,25 37:4
  37:5,8,24 38:1
  38:3 39:11,19
  39:21 40:2,19
  40:22 43:17
  44:11,14,22
  46:3,19,23
  47:25 48:10

  49:10,12,17
  50:5,10 51:10
  51:11,12,14,18
  51:22,25 52:4
  52:22 53:3,8
**court's**  18:20
  19:2 22:5 23:5
  31:6 32:10
  34:18
**cover**  19:7
  38:25
**covered**  11:7
  12:19,19
**credibility**
  37:25
**credible**  11:5
  30:9 39:5
**credibly**  18:16
  18:18
**creditors**  3:12
  7:1 10:4 11:1
  12:8 14:16
**criteria**  10:16
  14:23 20:22,25
  46:11
**critical**  31:6
**criticizing**  31:9
**cullen**  4:16
  8:14
**cva**  15:7 34:17

          **d**

**d**  6:1
**daily**  35:25,25
**danger**  22:21
**dare**  20:25
**database**  43:1
  43:14

**date**  44:15
  54:25
**day**  3:3 6:8 8:5
  23:4 43:12
  45:11 52:5
**days**  44:5
  48:14
**deal**  19:19
**dealing**  42:3
  48:22 49:6
**dealt**  12:6
**deanna**  8:21
**debtor**  1:9 3:4
  3:4 6:8 8:5
  11:22 29:13,23
  45:11,19,23
  48:2 53:1
**debtor's**  2:2
  10:20
**debtors**  10:4
  10:14 11:7,23
  30:11
**decades**  36:8
**decide**  38:8
  49:18,18 50:9
**decision**  22:5
  23:5,7 31:6,9
  32:22,25
**decisions**  40:25
**declarations**
  42:3
**deep**  20:8
**defendant**
  22:22 41:3
**defendants**
  51:2

**defined**  14:15
  18:15,17
**definitely**
  21:24
**demonstrate**
  14:3
**demonstrating**
  22:21
**depending**
  36:3
**depositions**
  48:17,19
**derived**  42:17
**describe**  30:6
**described**  18:6
  28:22 29:5,11
  30:2 43:12
  48:5
**describing**
  29:9
**description**
  48:7
**destroyed**  17:3
  17:3
**details**  42:14
  50:19
**determination**
  10:22 12:1,2
  12:18 13:8,11
  13:18 14:11,19
  20:15
**determine**
  37:25
**detour**  45:7
**deviance**  24:8
**deviancy**  19:1
  19:16,17,22

| | | | e |
|---|---|---|---|

21:9 24:20
25:23,25 26:9
27:14 31:24,25
32:9,19 33:5
33:11,20,24
34:3,5,18,23
34:25 35:14
41:15,20 42:4
47:10,15,21
**devil** 50:19
**dialogue** 13:21
48:15
**diamond** 22:7
**difference**
49:14
**different** 26:7
**difficult** 28:20
**digging** 20:11
**dilemma** 29:16
**dine** 3:17 7:4
9:8,8
**diocesan** 10:22
12:1 13:8,11
16:7
**diocese** 1:7 6:4
6:9 11:2 12:7
12:16 13:2
16:7,23 18:10
18:15,16,21
19:9 20:15
21:11 23:19
24:12 25:11
26:23 30:5
31:17,23 32:3
32:11,12,22,25
33:3,7,7,10
35:5,6,13,13

35:14,16,16,22
35:23,24 36:7
37:14,15 38:19
39:2,4,15
41:10,16,17
42:12 46:21
47:8,12,20
48:12 50:15
51:5 52:2
**dioceses** 12:24
26:10 32:18
34:17 35:11
**directed** 33:10
**directing** 48:11
**directly** 28:9
**directories**
25:19
**disagree** 21:21
**disallowed**
30:20
**disappointed**
16:20
**discovery**
10:10 12:12
16:25 22:4
23:23 26:7
36:25 37:7
41:9 48:17
49:4 50:6 51:2
**discuss** 15:1
**discussing** 41:8
**discussion** 23:5
47:6 51:19
**dismiss** 28:22
28:23
**dismissal** 29:7

**displayed**
13:22
**distance** 20:7
**distinction**
19:14,24 20:3
**district** 1:2
10:19 24:1
**dive** 20:8
**doc** 2:7
**doctrine** 26:20
**document**
35:11 43:1,5
43:14 51:17
**documentation**
17:16
**documents**
15:1,3,10
37:18 40:15
43:2,7 48:7
51:9 52:9,15
**doing** 20:8
23:21 36:8
51:3
**doubt** 6:17
36:6 50:24
**draw** 19:14
20:3
**drawing** 19:24
**drawn** 17:15
**drb** 13:18
**duly** 39:3
**duty** 23:12,12
**dykman** 4:16
8:14

**e** 1:21,21 3:1,1
5:15 6:1,1 7:13
54:1
**ease** 41:3
**east** 27:15
**ecro** 1:25
**educates** 24:22
**efficiently** 29:8
**effort** 42:25
**egg** 47:16
**eighth** 2:2 10:8
11:10 12:10
20:10 30:20
**eighties** 19:18
**either** 11:4
17:21 18:10
34:13 41:20
46:5
**elaborate** 19:4
**elderly** 49:6
**emphasize**
44:13
**employee**
22:13
**employees**
48:18
**employer**
23:16
**employment**
16:10 35:22
36:12,14
**employs** 52:2
**engage** 13:3
**england** 37:13
37:15

entering   10:8
48:10
entire   23:9
42:16 43:1
entirely   19:5
22:14
entitled   33:5
eric   3:9 6:12
8:4 13:19
40:13 42:14
43:8,11 47:23
48:1
especially
16:14 25:14
established
13:25 41:12
et   4:1 17:8
35:10 36:6
38:25 39:9
eventually   27:8
27:19 28:2
everybody
16:19
evidence   14:3
25:9 39:13
42:19
exact   18:8
46:24
exactly   30:7
41:6
examined   42:6
example   15:4
17:7,7 19:1
31:19 32:10
examples
30:17 31:15

excluded   12:9
exclusively
41:3
excuse   36:19
exist   32:9
exists   17:17
expect   6:12
8:22 16:11,17
17:16 27:22
37:8 42:19
expectation
48:4
experience
24:20 26:22
35:12 36:8
explaining
17:16
explanation
10:1 11:7
31:13
express   10:11
expunge   29:14
29:23
extensive   36:25
45:7 46:15
extent   7:6
16:17
extremely   37:6
37:8
eyeopener   21:6

**f**

f   1:21 54:1
faces   47:16
facility   27:11
fact   14:10 49:1
facts   22:21
24:11 29:11

factual   12:4
25:8
failed   22:21
23:1 39:6
fair   19:11
fairness   37:13
familiar   21:14
52:3
far   13:10
father   28:1
37:15 38:1,7
38:14 39:14
favor   52:4
favorite   28:5,5
february   27:9
federal   40:24
40:25
feel   23:24
felt   24:4 29:15
40:22
figured   19:21
file   15:7 16:10
16:10 17:2,4
17:22,25 18:4
18:7 26:24,25
27:21,21 28:11
28:16 31:18,19
31:24,25 32:9
32:9,13,20
35:1,8 36:9,10
36:17 37:12,14
37:24 41:15
42:1,17,24
47:9,9,20 48:6
48:8
filed   11:6
14:20 15:7

16:22 29:21
files   11:12,19
11:19,21,21
15:10 16:4
18:12 20:1
26:12,13,17,19
33:11,19 34:18
34:22,23,25
40:1,4,7,10
41:10,18,20,21
42:4,5,5,5,19
42:23 44:25,25
45:20,21,25
46:8,8 47:9,21
fill   42:14
filtering   43:25
finally   19:19
find   25:1,10,15
25:21,24 26:2
26:3,8 29:6
32:14 36:2
47:24
finding   39:3
findings   38:22
finds   39:3
fine   8:23 15:19
31:10 50:18
51:7,14
first   15:19
24:13 39:23,24
40:17 46:12
five   10:17
24:18 25:3,15
27:2,19
flag   22:5,8
floor   3:13 4:10
4:18 22:2

[focus - hearing]

**focus** 22:12
**folder** 14:8
**folks** 52:5
**follow** 34:16
**followed** 51:11
**following**
  10:16 29:25
  37:10
**footnote** 11:9
**foregoing** 54:3
**foresee** 29:17
**foreseeable**
  22:22 23:17,18
**forth** 28:2
**forward** 14:16
  44:8
**found** 11:5
  13:12 25:4
  37:22,23 42:22
**foundation**
  18:11,22 41:12
**frankly** 45:13
**freaked** 25:5
**free** 35:23
  46:20,21
**frolic** 45:7
**front** 29:3
  32:19
**fulfill** 50:25
**full** 35:8
**fully** 21:14
  47:2
**future** 6:15

**g**

**g** 6:1
**gaps** 11:16

**general** 51:4
**generalize**
  35:15
**generally**
  25:13,21 33:13
  33:25
**gerber** 5:15
  6:14,15,15
**geremia** 3:8
  6:5,7,8,12
  12:18,21 13:15
  14:22 15:17,24
  16:2 39:22,24
  40:13,21 42:13
  43:12 46:4,11
  46:22 47:3,20
  47:22 50:17,24
  51:7,15,21
  52:21 53:1,7
**getting** 27:20
**gist** 11:12
**give** 6:6,22
  7:12 8:7,20 9:6
  9:13 15:16
  27:8 30:18
  32:10
**given** 7:10
  31:13 43:23
**giving** 6:19
  7:16 17:7 34:6
**glenn** 1:22
**go** 11:24 18:4
  19:15,17 24:24
  25:19 26:1
  27:6 28:2
  29:22 30:18,24
  31:1 32:12

38:4 39:22
  43:19 49:10,12
  50:8 51:25
**god** 24:24 25:1
  25:11 27:1
  32:3
**goes** 32:4 36:15
  37:24
**going** 6:11 7:2
  7:24 15:18,19
  16:4 18:2,4
  19:16 24:19
  25:10,15,24
  26:2 29:7,25
  31:10 32:14
  36:24 37:4,6
  37:22 38:3
  39:13 46:5
  47:2 48:16
  49:4,18 50:5
  50:19,21,25
  51:5 52:6,10
  52:23 53:5,5
**good** 6:7,24
  7:17 8:4 10:6
  18:3 34:15
**gosh** 19:21
  25:19
**gotten** 40:6,20
  47:8
**government**
  2:1
**grand** 38:22,24
  39:3
**grant** 36:24
  37:4 39:11

**granting** 37:6
**greased** 35:13
**great** 48:25
  49:7,8
**greatest** 50:25
**green** 1:13
**guess** 12:16
  33:16
**guy** 25:6 32:7
  32:14

**h**

**handed** 16:9
**happened**
  11:15 15:6
  17:2,17 18:14
  19:12 24:18
  37:17 40:5
**happens** 41:14
**happy** 46:25
**hard** 29:6
**harm** 22:22
  23:18,18,18,22
**harmon** 32:22
  32:25
**hate** 23:9
**head** 23:11
**headed** 42:25
**hear** 10:11
**heard** 8:24
  20:7 38:14
  44:11,16 51:22
**hearing** 2:1 6:3
  9:19 11:10
  15:15 20:17
  40:3,18,19
  43:18 44:17,21
  45:18 50:11

52:6
hearings 20:17
held 52:16
hello 8:13
help 38:9
helps 25:6
heuer 4:6 7:15
  7:17,18 8:21
  8:21
hey 28:9
hi 6:24
history 17:6,15
  20:21 22:25
  23:20 30:6
  49:1
hit 23:11 43:5
hits 44:3
hon 1:22
honor 7:17
  13:23 15:1,21
  18:3,4 21:23
  22:3 23:4,24
  24:3,15 25:17
  26:11,15,23
  28:11,24 30:22
  30:25 31:5,12
  31:14,20 33:8
  33:13,17,19
  34:2,3,12,15
  36:19 37:21
  38:5,21 43:11
  43:13,24 44:7
  45:15 46:12
  48:1 49:9 50:1
  50:9 51:7,8,20
  51:24 52:10,18
  52:25 53:1

honor's 15:12
hope 31:21
  32:11 34:11
  53:5
hoped 38:7
hopefully 47:3
hospital 36:6
  49:7
hurting 38:12
hyde 2:25 54:3
  54:8

**i**

idea 48:19
ignored 39:4,4
imagine 38:15
  49:20
important
  31:23 40:23
improper
  14:14
inclined 10:10
include 47:4
  51:18
included 12:3
including 39:7
  42:4,18 44:25
inclusive 34:4
independent
  10:20 20:18
  21:4
index 16:6
  17:17
indicate 13:13
  37:5
indicated 14:8
indicia 25:24

individual
  10:15 11:17
  22:19 23:23
  27:7 42:16
  43:2,5 44:2,2,8
individuals
  11:3 38:19
indulge 38:1,4
inferences
  30:10
inform 13:20
  25:6
information
  12:15 13:10
  15:13 16:18
  34:19 37:23
  41:2,2 42:11
  43:4 45:22
  50:14,15
initial 17:10
inquiry 25:7
ins 16:14
instances 39:7
institutions
  35:21
insufficient
  22:23
intended 43:13
  43:24
interject 49:11
involved 12:10
involving
  18:13 33:3
  34:18,23
iqbal 29:12
isolated 17:20

issue 10:14
  18:8 19:19
  22:6 26:24
  37:24 42:16
  43:22 44:6,10
  51:8,13
issued 41:17
issues 18:7
  20:8 21:12
  39:19
issuing 10:7

**j**

jacob 5:6 8:25
james 3:18
  9:21
jason 5:13 9:13
  18:3 51:24
jeff 4:8,14 8:1
  8:9
jew 49:13
jewels 22:7
jewish 48:21
jim 7:4
john 24:23,25
  25:1,11 27:1
  32:3 35:2,8,21
joined 7:10
  8:18 9:4,11,23
joining 6:11,13
  7:3,5
jonathan 1:25
jones 3:3,11
  6:8,25 8:5 9:9
  43:12 45:16
  52:4
judge 1:23
  10:4 12:21

**judged** 29:19
**jury** 38:22,24
  39:3
**justice** 33:4
**justices** 33:4

**k**

**karen** 3:17 7:4
  9:6,8
**keep** 28:1,10
**keeping** 28:19
  28:19
**keeps** 36:16
**kept** 14:13
  28:17 47:9
  48:4 52:3
**kids** 24:23,24
  25:4,12,13,14
  27:16 28:4,10
  28:10 32:7
  48:25 49:14
**kind** 38:17
**kindest** 38:13
  49:18
**knew** 21:18
  23:23 24:12
  25:11,25
**know** 10:9 11:8
  11:16,17,22
  12:2,6,8,13,14
  12:18,24 13:1
  13:9,9,15,23
  14:6,13,22,24
  14:25 15:5,8
  15:12,17 17:5
  17:6,7 18:1
  20:5,11,18,19
  21:1,8,16,17

21:18 24:8
27:12 28:6,14
29:3,10,13,14
29:16 30:4,6,8
30:11,11,19
34:12,13 37:4
39:1,16 40:14
40:23 42:8,10
42:14 43:9,13
44:5 45:4,9,12
45:12,13,14
46:4,24 47:6
47:11,19,19,22
47:23 48:6,18
48:20 49:5,13
49:17 50:2,13
50:17 51:2,3
51:10 52:8,12
53:3
**knowing** 22:25
  23:20
**knowledge**
  14:4 18:10,22
  20:21 31:18
  41:11,19 46:7
  46:23
**known** 12:23
  23:18 25:25
**knows** 51:8

**l**

**labels** 41:21
**lack** 17:22,23
**laicization** 27:3
  27:5
**laid** 30:14
**language** 38:17

**latin** 26:17
**law** 5:1,9 20:12
  21:5,5,21
  22:14,14 23:9
  23:14 24:11
  26:17 29:25
  30:1 32:24
  36:14
**lawsuits** 11:5
**lawyers** 30:11
  34:1 41:25
  43:18 47:7
  50:15 51:1
**lay** 31:22
**learned** 50:3
**leave** 12:11
  25:19 28:23
  40:20 43:23
  50:14 53:5
**led** 15:15
**ledanski** 2:25
  54:3,8
**legal** 54:20
**length** 43:15
**letter** 23:14
  37:22,24 38:5
  38:21
**letters** 28:9
**level** 32:24
  33:2
**lewis** 22:7
**liability** 20:15
  21:11
**likely** 13:2 41:1
  52:2
**limitations**
  14:14

**limiting** 35:15
**line** 8:20 9:5,12
  9:14 49:16
**linger** 52:6
**link** 9:16
**lips** 22:1
**list** 10:18,22,25
  11:2,3 12:6,7
  12:25 13:1,5
  13:16,17,18,22
  13:23 14:24,25
  18:19 29:4
  30:12,23 37:1
**listening** 30:15
**literally** 26:19
**litigate** 42:21
**litigating** 26:5
**litigation** 14:20
**little** 5:4 22:1
  38:10
**live** 21:13
**llp** 3:3,11 4:16
**lo** 25:1,3
**located** 42:7
**locations** 47:14
**loco** 23:10
**log** 28:12,13
  52:12
**logistics** 44:4
**long** 21:25
  22:25 23:19
  30:6,23 45:14
  52:7
**look** 25:9,18,19
  25:20 26:2
  29:15 46:10
  48:10,21

**looked** 12:7
14:15 31:18,19
32:8,13 42:2
44:17
**looking** 25:7
25:24 32:4
44:20
**looks** 32:6
**los** 3:23
**lot** 19:19 21:6
22:12 27:12
28:5 33:17,25
49:25
**lots** 49:7
**love** 33:4
**luke's** 27:11,13
27:20,23 33:21
35:20

**m**

**m** 7:13
**ma'am** 8:24
**made** 14:5,9,10
14:11,18 35:9
45:25 50:22
**mail** 16:15
**main** 15:24
27:15
**maintain** 47:20
**maintained**
36:11
**major** 16:2
**make** 7:21 9:23
34:10 37:20
38:24,25 43:13
44:18 45:5
52:14,17

**makes** 27:10
32:12
**making** 9:3
13:1 21:25
49:7
**manage** 44:4
**manifested**
13:23
**marsh** 5:9
**martin** 1:22
**materia** 38:22
**matter** 1:5
24:12 44:21
**mcmahon** 4:21
8:12,13,13,16
**mean** 15:14
29:1,8,15
31:13 35:18
41:2,16 42:7
42:20 46:10
**mediation** 53:4
**meet** 15:5
50:10
**meets** 10:16
**member** 15:25
15:25 16:5
40:5
**members** 20:6
39:25 44:12
**mentioned**
28:6 48:8
51:16
**mg** 1:3
**michael** 3:16
6:22,24,25 7:4
9:15 45:15
47:5

**michaels** 45:15
**michelle** 4:21
8:13
**mid** 19:18
**military** 17:13
17:14
**mind** 36:7
**mineola** 54:23
**ministered**
38:12
**mishits** 44:1
**misremembe...**
44:18
**missed** 28:12
**missing** 8:11
28:11
**misunderstood**
40:8
**molested** 19:23
**molesting** 23:1
25:12,13,14
27:16 32:1,2,7
**moments** 25:17
**mones** 3:20,25
7:13,13 12:13
14:6 18:2
34:14,15,21,24
35:18 36:19,21
37:9 38:5
39:21 41:24
47:4 48:5,7
49:9,10,11,13
50:8
**monsignor**
21:18
**month** 37:16
53:4

**morning** 7:11
34:15
**motivating**
41:5
**move** 26:7
**moved** 17:11
17:13
**moves** 29:23
**movie** 25:16,18
**movies** 20:5
**moving** 22:1
**multiple** 47:20
**myda** 33:1

**n**

**n** 3:1 6:1 7:13
54:1
**names** 28:19
43:22
**necessarily**
17:23
**necessary** 7:6
**need** 6:17 9:23
22:10,18 23:20
36:16 37:23
38:12 44:10
45:12 50:11
52:22,22
**needed** 23:25
24:4
**negotiating**
52:8
**never** 11:20,25
13:9,11 14:4,9
20:1 24:5 42:9
45:20,25
**nevertheless**
13:13

**[new - paracletes]**                                                      Page 13

**new**  1:2,7,14
 3:6,14 4:11,19
 6:4 20:12,14
 21:5,5,21 22:9
 22:14 23:7
 24:11 32:24
 36:14
**nielsen**  38:1,7
 38:14 39:14
**nineties**  24:21
**non**  52:15
**nonprivileged**
 44:3
**nope**  40:2,2,2
**normally**  27:22
 28:15
**north**  5:4
**note**  9:6 31:23
**noted**  8:21
 10:2 25:21
 26:12
**notes**  35:7 47:6
**notice**  13:2
 17:23,24 20:13
 21:3,12 22:10
 22:18 25:24
 30:10 32:6,14
**notices**  41:17
**noting**  7:24
 9:18
**novak**  23:7
**nuance**  49:25
**number**  2:3
 6:4 7:18 27:9,9
 29:3 47:14
**numbers**  28:20

**ny**  1:14 3:6,14
 4:4,11,19
 54:23

**o**

**o**  1:21 6:1 7:13
 54:1
**oath**  14:3 18:9
 18:11,21 19:9
 46:7
**object**  29:14
 32:5
**objected**  16:1
 17:22 39:15
**objection**  10:8
 10:15 11:11
 12:10 20:10
 26:24 28:25
 30:20 31:3,22
 32:12 39:17
 50:13
**objections**  2:2
 12:11,20 13:25
 14:16 42:16
 43:23 46:13
**objects**  30:5
**oblivious**  38:13
**obtained**  34:17
**obvious**  39:6
**obviously**  11:6
 12:9 26:4
 43:14
**occasion**  47:18
**occasions**
 47:19
**offender**  22:10
**offer**  31:15
 45:5

**offered**  31:6
**official**  3:12
 11:1
**officials**  48:18
**oh**  36:21
**okay**  6:19 7:15
 7:21 8:11,15
 9:13 10:2
 15:14,22 17:18
 20:7 21:7 22:3
 28:3,20 29:16
 29:18,21 30:2
 30:13,17 31:4
 34:9 36:18
 37:9 38:5 41:6
 42:1 47:25
 48:20,23,25
 49:3,8 50:5,6
 50:16,18,23
 51:2,6,21 52:7
 52:9,23 53:3,8
**old**  54:21
**omni**  12:10
**omnibus**  2:2
 10:8 11:8,11
 12:19,20 20:10
 20:17 30:20
 35:9
**once**  15:13
 19:18 46:18
**ones**  30:13
**online**  12:7
**open**  10:10
 48:16
**opening**  12:12
 16:18 41:8,9
 49:4

**opens**  16:24
**operating**
 16:15 45:9
**opinion**  10:7,9
 10:13 11:9
 20:10 24:17
 25:22 26:6
 40:22 41:5
**opportunity**
 46:16
**order**  10:8
 15:12,18 30:2
 35:4 44:9
 48:10 51:10,11
 51:12
**outside**  24:18
 25:3,14 27:2
 27:19
**overnight**  39:9
**overrule**  31:22
**own**  6:16 26:20
 36:15

**p**

**p**  3:1,1 5:13 6:1
**p.c.**  3:20
**pachulski**  3:11
 6:25 9:8 45:16
**page**  10:13
 39:4 44:20
 46:12
**pages**  37:12
**paid**  10:19
 13:7,17
**paper**  47:17
**paracletes**
 35:20

paragraph
  39:16
pardon  7:11
parentis  23:11
pari  38:21
parish  17:11
  24:23,25 25:1
  25:11 26:25
  32:2,3 38:12
  48:17
parishes  4:2,17
  7:18 8:14
parishioner
  38:6
parishioners
  38:18
park  4:18
part  16:18 35:8
  36:10 48:5
particular
  14:11,18 16:5
  21:19 22:10
particularly
  14:12
parties  7:9,21
  8:18 9:3,4,11
  9:22 10:3 44:9
  45:8
partner  13:19
  40:13
parts  42:21
party  41:1
pass  46:20,21
past  38:11 49:5
pastor  25:5
pat  4:13 8:1
  15:20

path  44:7
paul  3:20,25
  7:13
pause  6:20,21
  7:7,8,22,23
  21:25
pays  35:22,23
  47:12
pcva  5:9
pedophilia
  34:7
pennsylvania
  35:2
people  10:12
  14:3 18:17
  23:9 24:25
  31:9 38:11
  46:18
period  17:10
  17:12
permitted
  33:10
perpetrator
  10:18,25 11:25
  22:13,19 46:13
perpetrators
  10:18 37:3
person  13:15
  35:2,24 41:11
  41:18
personal  18:10
  18:22 31:18
  41:11,18 42:1
personnel
  11:12,19,21
  14:8 15:10
  35:1,8 37:12

40:1,7 41:13
  41:14 42:5,17
  42:23,24 44:24
  44:25 45:20,21
  45:24 47:21
  48:6
persuasive
  30:15
peter  3:9
petitions  27:5
pfau  5:8
ph  33:1
phone  52:8
piece  47:17
place  17:12
  24:24 45:9
placed  41:4
places  27:13
plaintiff  22:20
  22:20,24,24
  41:4
plaintiff's
  11:18 47:11
plaintiffs  15:16
  36:13 41:25
  43:17 46:15
plaza  4:3,18
plead  23:9,10
  49:17 50:16
pleading  22:23
  26:7 29:1,19
  41:4 42:10
please  6:23
  7:11 8:8,19 9:5
  9:12,17,20
  28:1 36:22

pllc  5:8
pm  1:17 6:3
  53:11
point  10:17,24
  11:25 12:5,22
  17:19 18:25
  19:7 21:15,24
  24:7 34:10
  35:24 40:14
  46:12 50:20
points  10:17
poly  22:4,9,17
  22:24 23:2
position  42:9
positive  19:13
possession  3:4
  26:10,22 33:6
  41:2,3,10
  42:12 50:14
possibly  38:9
predilection
  38:19 46:24
predisposition
  21:3,13 46:24
preexisting
  13:24
prejudice
  28:22 29:7
prep  22:4,9,17
  22:24 23:2
prepared
  14:25 15:2,11
  42:15 43:3,10
  45:4 48:13
present  39:19
press  20:5

**pretty** 18:14 25:10
**prevailed** 32:23
**priest** 13:10 14:5,18 16:7 17:8 18:18,18 18:24 19:16,25 20:1,16 21:9 21:17 23:23 24:9,22 25:12 26:25 27:9,18 27:23,25 32:1 33:20 35:3,8 36:2,3,15,16 37:11,13 42:1 42:7 46:9 47:13,18
**priest's** 21:3 35:1
**priests** 14:11 18:13 19:10,15 19:20 24:18 27:14 28:7 37:2 39:6,8 48:17 49:1
**prior** 14:20 20:21 21:3 34:17 46:23
**private** 11:11 39:8
**privilege** 43:25 52:12,16
**privileged** 28:12,13 52:15
**pro** 5:15

**probable** 25:10
**probably** 44:5
**problem** 19:21 23:20 38:15 49:19,23,23
**problems** 9:16
**proceed** 45:6
**proceeding** 20:19
**proceedings** 53:10 54:4
**process** 21:4 44:4 45:11,14 46:15
**produce** 15:2 15:11 16:4 32:19 33:10 34:3 40:6 42:15 43:4 44:3 48:13,14
**produced** 11:13 15:13 16:18 17:4 28:12 40:4,11 40:15 42:14 45:1,20,24 51:10 52:13
**producing** 52:15
**production** 16:6,9,17 40:17 43:1,9 44:20 45:14 51:17
**productions** 44:15

**professional** 51:1
**program** 10:21
**progress** 35:7 35:25 36:1
**proof** 29:18 30:16 46:14
**proofs** 10:14 12:3
**propensity** 13:3
**proper** 30:10
**proposal** 43:12
**propose** 43:24
**proposed** 45:11
**proposing** 45:12 50:18
**protect** 23:17 23:22
**protective** 20:14 44:9
**proves** 17:23
**provide** 14:3 33:1 41:24
**provided** 13:6
**psychiatrist** 27:4
**purported** 40:16
**purposes** 37:14
**pursuant** 51:10
**put** 15:14 18:19 27:6 39:10,11
**putting** 26:21

| **q** |
| --- |

**question** 11:10 12:4 18:20 19:3,8,12 20:24 23:21 24:16 29:17 31:17 32:11 34:16 44:22,23 52:11,16
**questions** 16:24 17:15 20:22 39:23 43:15,16
**quick** 34:16
**quite** 20:14
**quote** 22:20 39:4

| **r** |
| --- |

**r** 1:21 3:1 6:1 54:1
**rabbi** 48:21 49:5,21
**rabbis** 49:14 49:14
**raise** 21:12 24:5 44:7 52:4
**raised** 22:4,6 23:6,24 24:4 24:16 30:9 38:23
**raises** 18:6 20:9 23:21
**raising** 52:18
**rationale** 49:18
**rationalization** 38:13

**read**  13:5 20:4
  21:22 38:2,21
  39:9,16 46:12
**reading**  21:6
**ready**  48:13
  49:3
**realistic**  16:9
**realized**  28:7
**really**  18:23
  20:10 38:7
**reargue**  23:6
**reason**  24:16
  26:16 31:5,5
  39:15
**reasonable**
  23:17 30:9
**reasonably**
  48:21
**reasons**  30:13
  40:8
**reassigned**
  17:8
**recall**  18:15
**receive**  21:2
**received**  27:10
  35:7,10
**receives**  35:25
  36:1
**reconciliation**
  10:20
**record**  8:19 9:5
  9:11,13 36:10
  45:17 54:4
**recording**  6:20
  7:7,22
**records**  13:13
  19:20 25:23

  26:1,8,21
  28:15,15,17
  33:6 34:3,5,7
  35:10,17 36:13
  41:13,20 42:6
  42:20,22 45:10
  46:1 47:10,21
  52:3
**rectory**  39:8
**refer**  11:20
**reference**
  27:10
**referred**  11:22
  45:18 47:18
  52:14
**reflected**  15:3
  15:10
**regarding**
  51:16
**regardless**
  23:22
**regular**  16:13
  36:1
**relate**  38:14
  43:7 49:19,23
**relating**  16:6
  41:21
**relationship**
  22:11,13,16
  23:13,15 49:24
**relevant**  14:12
**remember**
  20:17 52:19
**repeat**  46:17
  46:19
**repeatedly**
  45:23

**report**  15:7
  20:23 24:20
  35:25 38:24
**reports**  36:1
**represent**
  15:24 19:9
  31:17 32:5
  51:1
**representation**
  18:9 46:6
**representative**
  6:16
**represented**
  18:21 19:13
  40:5 45:19,24
**representing**
  11:15 32:19
  39:25
**request**  35:9
  36:25 37:4,14
  37:20,22
**requested**  35:9
**requests**  45:8
**require**  18:17
  30:1
**required**  20:22
  30:10 42:9
  50:20,23
**requiring**  46:5
  50:23
**resolved**  47:2
**respect**  13:21
  15:12 23:10
  28:21 29:2
  41:25 50:25
**respects**  40:16

**respond**  24:5
  30:21 39:22,23
**response**  15:11
  15:23 16:1
  23:1 45:2 47:8
**responsibility**
  51:1
**rest**  17:14
**result**  14:19
  21:11 28:21
  29:7
**resulted**  13:11
**review**  10:22
  12:1 13:8,12
  20:19 21:4
  29:9 31:24
  43:25 45:14
**reviewed**  18:12
  19:20 30:16
  46:8
**reviewing**
  37:21
**revoked**  27:5
**rhetoric**  26:18
**rid**  32:13
**right**  6:2,10,14
  6:20 7:2,9,22
  8:3,6,7,18 9:3
  9:10,17,21
  10:4 14:22
  18:1 25:17,20
  26:14 28:4,25
  33:9 42:13
  47:23 50:7
  52:11
**rimmer**  37:10
  37:15

risk  22:22
road  54:21
robert  5:15
    6:15
rock  5:4
rocket  35:16
rockville  1:7
    6:4,9 35:3,4,5
    47:9
roman  1:7 6:3
rooms  39:8
round  12:20
    46:13
rule  29:24
ruled  20:20
    33:4
rules  40:24,25
ruling  29:5
    30:13 48:11
run  43:21
rxr  4:3

**s**

s  2:2 3:1 6:1
    7:13
saint  24:23,25
    25:1,11 27:1
    27:11,12,20,23
    32:3 33:21
    35:2,7,19,21
satisfied  41:16
satisfy  29:12
save  9:25
saw  20:5
saying  13:6
    16:9 19:25
    21:19 25:12
    28:9 41:25

46:4,5 49:20
says  26:17 34:3
    36:16 41:19
schedule  15:15
    29:3 50:11
scheduled  10:7
school  17:12
    22:25 23:8
scope  50:22
    51:16
se  5:15
search  41:19
    42:25 43:6
    44:3 50:22
    51:3
searched  15:2
    15:11 41:12,15
    41:18,19 43:2
searches  43:22
seattle  5:11
second  10:17
    11:24 18:4
    19:17 49:11
secondly  37:9
seconds  38:2,4
secret  11:19,19
    11:21 16:10
    26:12,16 28:16
    42:18
see  9:16,24
    16:15 22:1
    24:20 29:2
    42:1 43:8
    48:11
seeing  27:3
seek  29:14

seem  41:9
    47:14
seemed  11:20
    11:24 37:5
seems  30:8
    39:10
seen  12:7 28:13
send  27:14,17
sending  28:1,3
sends  36:7
senior  48:22
sense  37:5
sensible  45:5
sensitive  31:11
sent  19:1,22
    27:23 33:20
    35:2,14,19,20
    47:13
separate  20:25
    22:14 41:14
separately  48:4
servants  35:20
served  16:7
    37:2
servers  37:1,2
service  17:13
    17:14 27:6
    36:4,5
set  15:5 20:25
    29:11
setting  23:8
several  17:22
sex  3:21
sexual  11:4,5
    19:1,11,15,17
    19:22 20:6
    21:3,9,17 24:8

24:20 25:23,25
    26:8 27:14
    31:24,25 32:9
    32:19 33:5,11
    33:12,19,23
    34:3,5,18,23
    34:25 35:14
    39:7 41:15,20
    42:4,6 47:10
    47:15,21
sexually  39:5
shared  11:20
shortcomings
    40:17
shorthand
    12:21
show  26:25
    47:18
showing  42:6
shows  49:1
sick  49:6
sides  34:1
sign  24:19 49:2
signature  54:6
significant
    16:11 17:4
signs  39:6
similar  37:18
single  12:13
    16:12
singling  30:3
sir  34:21
sitting  47:23
situation  22:11
skin  31:9
slightest  27:10

slightly  45:17
society  50:3
solutions  54:20
somebody
    11:15 41:15
    51:18,23
somebody's
    20:20
someone's
    32:12
something's
    24:19
somewhat  30:5
sonya  2:25
    54:3,8
sorry  10:1
    30:22,24,25
sort  15:14
    16:18,25 17:16
    20:8 29:15
    40:24,25 41:1
    41:5 43:4
    47:14
sorts  44:1
sounds  30:14
    48:7 50:18
source  42:18
southern  1:2
speak  8:22
    15:17,18,19
    18:2 38:9
speaking  6:17
    7:5,11 8:19 9:4
    9:11 16:5
    21:24
special  22:11
    22:12,15 23:13

23:15
specialize
    47:15
specific  28:21
    30:13 35:24
    47:14
specifically
    34:6 35:19
spectrum  18:5
spending  48:20
    49:2
spent  21:6
spoke  38:23
spotlight  25:17
    25:18
spots  27:15
stan  9:18
standard  25:8
    29:12,18,19
standards  26:7
stang  3:11,18
    6:25 7:4 9:8,20
    9:21 45:16
start  6:5
started  19:19
    20:10 31:16
starting  6:2
starts  27:3
state  10:14
    14:20 24:11
    26:6 30:1
    32:17 33:2
    44:10
stated  45:18
statement
    23:14

statements
    45:25
states  1:1,12
    37:16
stating  29:13
status  2:1
stephens  3:9
    6:12 8:3,4,4
    13:19 40:4,14
    42:25 43:11,11
    43:20 45:18
    46:4 47:3 48:1
    48:2 51:9
    52:14
steps  23:17
stoneking  4:13
    7:24 8:1,1
    15:20,21,22,23
    16:23 17:10,20
    18:6 24:17
    35:18 37:19
    40:15 41:24
    47:4 50:1
stop  14:21
    34:11,20
street  3:5 5:3
    5:10
strike  35:25
strongest  30:3
studying  14:13
stuff  29:17
subject  12:15
    19:10,15 30:23
    31:3 32:21
    43:25
subjection  11:8

submit  46:17
substantiated
    14:9
sued  35:6
sufficient
    18:11,22 23:2
    23:3 41:12,18
    46:7
sufficiently
    34:4
suggesting
    30:4 47:11
suggests  48:8
suite  5:10
    54:22
supplement
    11:2
supposed
    28:16 53:4
sure  6:7 8:24
    12:8 14:17
    18:14 19:5,6
    21:1,25 25:20
    32:6 39:24
    40:9 44:18
    48:21 49:12,20
    52:1,14,17
surprise  20:13
surprised  30:5
survivors  4:9
    5:9 8:10 11:14
    21:2
suspicious
    17:24
sustained
    12:11 28:25
    50:13

[swear - trying]                                                          Page 19

**swear** 18:11

**t**

**t** 54:1,1
**take** 17:6 23:16
  23:21 25:19
  47:6 48:18
**taken** 40:25
**talk** 18:7 19:16
  24:25 52:21
**talked** 10:13
  11:19 24:17
  26:12
**talking** 22:15
  24:6 26:23
  27:19 34:8
  36:4 40:15
  42:11 47:7
**teachers** 22:25
**tell** 34:7 38:4
  38:11 49:15
**telling** 28:14
  50:6
**tempted** 28:7
**tends** 36:12
**term** 18:16,17
  26:16 33:9,11
  33:15,16,18
  46:25
**terminated**
  27:4
**terminology**
  21:15
**terms** 37:19
  44:3
**testified** 43:14
  51:9

**testimony**
  44:16,24
**thank** 6:10,14
  6:19 7:7,14,15
  7:19,20 8:3,6
  8:11,15,16,23
  9:1,2,10,17,25
  10:1 15:21
  24:15 31:14
  34:12 36:22
  52:25 53:2,8
**thanks** 15:22
  39:21
**thick** 31:9
**thing** 12:17
  49:5,8 52:7
**things** 12:12
  24:22 36:22
  41:7 44:1
**think** 11:9,12
  12:12 14:12
  15:4 16:19,19
  17:23 18:7
  19:12 20:16
  21:15 23:7
  25:9 26:6 28:6
  29:6,10,12
  30:16 31:23
  33:18,21,25
  37:23 43:17
  45:5 47:7
  49:25 50:17,22
  51:8
**thinking** 27:3
  41:5
**thinks** 42:8

**third** 3:13
**thought** 29:20
  31:15 44:4
**thousands**
  24:21
**three** 17:11,13
  51:15
**throw** 33:14
**ticking** 53:3
**time** 7:12 8:17
  9:12,24 16:12
  16:16,16 21:6
  21:14 24:13
  28:3 36:23
  37:17 38:23
  39:20 46:20,20
  48:20 49:2
**times** 17:8 28:5
**timing** 36:3
**tish** 33:4
**today** 6:17
  22:3 23:4
  40:23 43:25
  44:11 45:4
  47:2 48:11,13
  52:24
**today's** 23:23
  43:21
**todd** 3:8 6:8
  43:12
**together** 39:10
**told** 11:13 40:2
  40:8
**took** 17:12
**torts** 23:14
**track** 28:19,19

**transcribed**
  2:25
**transcript** 54:4
**transferred**
  16:8 25:2,14
  27:1,18 32:7
  38:8
**transfers** 24:18
**translation**
  26:17
**traversed** 50:2
**treatment** 19:1
  19:16,17,22,23
  21:9 24:9,9
  25:23 26:1,9
  26:21 27:11,15
  27:20,21,25
  31:24,25 32:9
  32:20 33:5,11
  33:20,21,24
  34:3,5,6 35:2
  35:10,14,17,21
  35:23,24 36:1
  36:10,16 41:15
  41:21 42:4,20
  47:10,12,13,15
  47:21
**trend** 25:20
**trouble** 28:19
**troubled** 27:7
**true** 33:25 42:8
  54:4
**try** 23:6
**trying** 19:14
  20:3 21:15
  26:18 31:14
  32:10 47:6

52:11
**turn** 15:16
45:7
**turning** 19:3
**turns** 47:17
**two** 12:22
18:17 24:21
27:2 37:2,11
39:9 47:18
**twombly** 25:8
29:12
**type** 48:7

**u**

**u.s.** 1:23
**ucc** 11:2
**under** 14:3
18:9,11,21
19:9 21:21
24:11 26:19
36:14 46:7
**underbelly**
50:3
**understand**
19:5 20:21,24
30:1 33:18
36:24 42:9
**understanding**
16:21 44:14,19
48:3,9
**understood**
20:12 33:12
45:10 46:22
**unfair** 29:20
**uniondale** 4:4
**unique** 38:23
**uniquely** 42:11

**united** 1:1,12
37:16
**unmute** 7:12
8:7,19 9:5,12
**unnecessary**
29:10
**unrelated**
11:10
**unsecured** 3:12
7:1 11:1
**unsubstantiat...**
13:12
**updated** 28:2
**updates** 27:22
**upheld** 23:3
**upset** 43:18
**use** 26:16,18
38:3
**used** 33:14
38:18
**using** 2:1 33:15
**usually** 19:18
25:15 26:1,22

**v**

**vendor** 43:4
**veritext** 54:20
**versus** 22:7
32:22
**vertetis** 5:8
**vesey** 3:5
**viable** 30:2
**vianney** 35:3,8
35:21
**victim** 24:13
24:13
**victims** 3:21

**view** 13:2
20:14 22:23
**virtually** 19:13
**virtue** 28:7
**visits** 49:7

**w**

**wa** 5:11
**waiting** 10:3
**want** 17:18
19:2,5 20:18
22:5,8 26:1
30:18,18 31:20
34:2,10 36:18
36:21 37:9
41:16 44:13
45:6 47:3,15
47:16 48:14
50:12 52:7,13
52:17
**wanted** 38:11
39:19 40:9,9
44:7,17 51:22
52:12
**warning** 39:6
**warranted**
43:8
**washinton** 3:22
**way** 21:22
32:14 36:12,17
45:5
**we've** 28:6
34:17 41:19
45:9 52:13,14
**web** 10:23
**went** 22:19
27:16 28:3
39:17

**westerman** 4:1
7:18
**whistle** 32:15
**who've** 27:12
**william** 4:6
7:18
**willow** 5:3
**wind** 33:15
**wish** 36:20
**withheld** 28:14
**wl** 22:7
**word** 33:22
34:5
**words** 14:7
**work** 27:12
33:17
**worked** 20:9
**working** 35:4
**works** 36:17
**worlow** 5:1,6
8:24,25
**worst** 49:6
**worth** 26:15
**writing** 49:21
**wrong** 33:16
**wrote** 40:22

**x**

**x** 1:4,10 13:10
47:18

**y**

**yeah** 8:21
13:15 14:7,8
14:22 17:10
20:2 24:22
25:3,12,13
35:18 36:21

**[yeah - zoom]**                                                                    Page 21

40:21 46:25
**year**   32:23
38:8 45:9
**years**   15:8 16:8
17:11,13 24:19
25:3,15 27:2,2
27:19 45:13
50:2
**yep**   25:2
**york**   1:2,7,14
3:6,14 4:11,19
6:4 20:12,14
21:5,5,21 22:9
22:14 23:7
24:11 32:24
36:14
**young**   28:8

**z**

**zeroed**   18:8
**ziehl**   3:11 6:25
9:8 45:16
**zoom**   2:1

**EXHIBIT E**

## Karen B. Dine

| | |
|---|---|
| **From:** | Stephens, Eric P. <epstephens@jonesday.com> |
| **Sent:** | Monday, December 18, 2023 12:46 PM |
| **To:** | Karen B. Dine; Geremia, Todd R.; Ball, Corinne; Rosenblum, Benjamin; Butler, Andrew M. |
| **Cc:** | James Stang; Gail S. Greenwood |
| **Subject:** | RE:  In re Roman Catholic Diocese of Rockville Centre, New York, Case No. 20-12345 (Bankr. S.D.N.Y.) - informal conference request |

Karen, please give me a call if you have a minute. I'm free until 1 PM. I can also speak tomorrow morning.

The comment you're referring to in your letter to relates to the redaction issue we previously discussed with you during the Wednesday call two weeks ago. I.e. there are documents that were produced in mediation that require additional redactions that will be produced in litigation for the first time in the state court actions. I explained to the state court on Friday what those additional redactions will be.

To be clear, we have not identified any CVA documents that are to be produced in the state court litigations that were not previously produced to the Committee. Indeed, our review in connection with the state court subpoenas is only a few days old since subpoenas were being served until December 8. Of course, if we do identify truly "new" CVA documents, we'll provide them to the Committee along with an explanation for why they were not previously identified as CVA documents.

Eric P. Stephens (bio)
**JONES DAY® - One Firm Worldwide℠**
250 Vesey Street
New York, NY 10281
Phone: (212) 326-3916
Fax: (212) 755-7306
epstephens@jonesday.com

---

**From:** Karen B. Dine <kdine@pszjlaw.com>
**Sent:** Monday, December 18, 2023 12:37 PM
**To:** Stephens, Eric P. <epstephens@jonesday.com>; Geremia, Todd R. <trgeremia@JonesDay.com>; Ball, Corinne <cball@JonesDay.com>; Rosenblum, Benjamin <brosenblum@JonesDay.com>; Butler, Andrew M. <abutler@jonesday.com>
**Cc:** James Stang <jstang@pszjlaw.com>; Gail S. Greenwood <ggreenwood@pszjlaw.com>
**Subject:** FW: In re Roman Catholic Diocese of Rockville Centre, New York, Case No. 20-12345 (Bankr. S.D.N.Y.) - informal conference request

Further to our request to the Court, please let us know if you are available to meet and confer on this issue this afternoon or tomorrow in advance of the hearing.  Regards, Karen

---

**From:** Karen B. Dine
**Sent:** Monday, December 18, 2023 12:32 PM
**To:** mg.chambers@nysb.uscourts.gov
**Cc:** Ball, Corinne <cball@JonesDay.com>; Rosenblum, Benjamin <brosenblum@JonesDay.com>; Geremia, Todd R. <trgeremia@JonesDay.com>; Butler, Andrew M. <abutler@jonesday.com>; James Stang <jstang@pszjlaw.com>; Stephens, Eric P. <epstephens@jonesday.com>

**Subject:** In re Roman Catholic Diocese of Rockville Centre, New York, Case No. 20-12345 (Bankr. S.D.N.Y.) - informal conference request

To the Chambers of Judge Glenn,

Please see the attached letter requesting an informal conference pursuant to Chambers' Rule concerning Discovery Disputes. I note that as this issue was brought to the attention of the Committee on Friday afternoon, and the Committee has not had an opportunity to meet and confer with the Debtor with respect to the issue.   Committee counsel is prepared to make itself available to the Debtor's counsel to meet and confer with respect to this issue in advance of the hearing tomorrow.  The Committee is sending this request to your Honor now since the parties are scheduled to be before your Honor on other matters tomorrow.

Respectfully submitted,

**Karen B. Dine**
Pachulski Stang Ziehl & Jones LLP
Direct Dial: 212.561.7731
Tel: 212.561.7700 | Cell: 917.279.7047 | Fax: 212.561.7777
KDine@pszjlaw.com
vCard | Bio



Los Angeles | San Francisco | Wilmington, DE | New York | Houston

***This e-mail (including any attachments) may contain information that is private, confidential, or protected by attorney-client or other privilege. If you received this e-mail in error, please delete it from your system without copying it and notify sender by reply e-mail, so that our records can be corrected.***