JONES DAY
Corinne Ball
Todd Geremia
Benjamin Rosenblum
Andrew Butler
250 Vesey Street
New York, New York  10281
Telephone:     (212) 326-3939
Facsimile:     (212) 755-7306

*Counsel for the Debtor
and Debtor in Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| In re: | : | Chapter 11 |
|  | : |  |
| THE ROMAN CATHOLIC DIOCESE OF | : | Case No. 20-12345 (MG) |
| ROCKVILLE CENTRE, NEW YORK,[1] | : |  |
|  | : |  |
| Debtor. | : |  |

**NOTICE OF FILING OF THE DEBTOR'S
APPROVED FIFTH AMENDED DISCLOSURE STATEMENT**

**PLEASE TAKE NOTICE** that on November 27, 2023, the above-captioned debtor and debtor-in-possession (the "Debtor") filed its *First Amended Chapter 11 Plan of Reorganization* [Docket No. 2695] (the "Plan") and its *Disclosure Statement for First Amended Plan of Reorganization* [Docket No. 2696] (the "Disclosure Statement").

**PLEASE TAKE FURTHER NOTICE** that the Debtor filed its *Modified First Amended Plan of Reorganization and Modified Disclosure Statement* on December 22, 2023 [Docket No. 2755].

**PLEASE TAKE FURTHER NOTICE** that the Debtor filed its *Second Modified First Amended Plan of Reorganization and Second Modified Disclosure Statement* on January 12, 2024 [Docket No. 2818].

---

[1]    The Debtor in this chapter 11 case is The Roman Catholic Diocese of Rockville Centre, New York, the last four digits of its federal tax identification number are 7437, and its mailing address is P.O. Box 9023, Rockville Centre, NY 11571-9023.

**PLEASE TAKE FURTHER NOTICE** that the Debtor filed its *Third Modified First Amended Plan of Reorganization and Third Modified Disclosure Statement* on January 29, 2024 [Docket No. 2855].

**PLEASE TAKE FURTHER NOTICE** that the Debtor filed its *Fourth Modified Disclosure Statement* on February 6, 2024 [Docket No. 2885].

**PLEASE TAKE FURTHER NOTICE** that the Debtor filed its *Fifth Modified Disclosure Statement* on February 13, 2024 [Docket No. 2910].

**PLEASE TAKE FURTHER NOTICE** that on February 15, 2024, the Court approved the Debtor's *Fifth Modified Disclosure Statement for the Fourth Modified First Amended Plan of Reorganization* attached hereto as **Exhibit A**.

Dated: February 16, 2024
      New York, New York

Respectfully submitted,

*/s/ Corinne Ball*
Corinne Ball
Todd Geremia
Benjamin Rosenblum
Andrew Butler
JONES DAY
250 Vesey Street
New York, NY 10281-1047
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306
Email:  cball@jonesday.com
       trgeremia@jonesday.com
       brosenblum@jonesday.com
       abutler@jonesday.com

*Counsel for the Debtor*
*and Debtor in Possession*

## **EXHIBIT A**

Fifth Modified Disclosure Statement

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x
                                   :

In re:                             :     Chapter 11
                                   :

The Roman Catholic Diocese of Rockville   :     Case No. 20-12345 (MG)
Centre, New York,[1]                :
                    Debtor.    :
                                   :
-------------------------------------------------------------x

## FIFTH MODIFIED DISCLOSURE STATEMENT FOR FOURTH MODIFIED FIRST AMENDED PLAN OF REORGANIZATION PROPOSED BY THE ROMAN CATHOLIC DIOCESE OF ROCKVILLE CENTRE, NEW YORK

Corinne Ball
Todd Geremia
Benjamin Rosenblum
Andrew Butler
JONES DAY
250 Vesey Street
New York, NY 10281-1047
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306
Email:  cball@jonesday.com
       brosenblum@jonesday.com
       tgeremia@jonesday.com
       abutler@jonesday.com

*Counsel for the Debtor and*
*Debtor in Possession*

Dated:  February 16, 2024
       New York, New York

---

[1]     The Debtor in this chapter 11 case is The Roman Catholic Diocese of Rockville Centre, New York, the last four digits of its federal tax identification number are 7437, and its mailing address is P.O. Box 9023, Rockville Centre, NY 11571-9023.

---

**IMPORTANT INFORMATION FOR YOU TO READ**

---

**THE DEADLINE TO VOTE ON THE PLAN IS MARCH 22, 2024 AT 5:00 P.M. PREVAILING EASTERN TIME (THE "VOTING DEADLINE").**

**FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE *ACTUALLY RECEIVED* BY EPIQ CORPORATE RESTRUCTURING, LLC (THE "VOTING AGENT") BEFORE THE VOTING DEADLINE AS DESCRIBED HEREIN.**

**PLEASE BE ADVISED THAT ARTICLE XI OF THE PLAN CONTAINS RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS. YOU SHOULD REVIEW AND CONSIDER THE PLAN CAREFULLY BECAUSE YOUR RIGHTS MAY BE AFFECTED THEREUNDER.**

_____

The Roman Catholic Diocese of Rockville Center, New York, as debtor and debtor in possession (the "Debtor"), is providing you with the information in this Disclosure Statement because you may be a creditor entitled to vote on the Debtor's First Amended Chapter 11 Plan of Reorganization.[2]

_____

The Debtor believes that the Plan is in the best interests of creditors and other stakeholders. All creditors entitled to vote thereon are urged to vote in favor of the Plan. A summary of the voting instructions is set forth in this Disclosure Statement and in the Disclosure Statement Order. More detailed instructions are contained on the ballots distributed to the creditors entitled to vote on the Plan. To be counted, your ballot must be duly completed, executed and actually received by the Voting Agent by 5:00 p.m., prevailing Eastern time, on March 22, 2024, unless extended by the Debtor.

_____

The effectiveness of the proposed Plan is subject to material conditions precedent, some of which may not be satisfied or waived. See Plan, Article X.B and C. There is no assurance that these conditions will be satisfied or waived.

_____

This Disclosure Statement and any accompanying letters are the only documents to be used in connection with the solicitation of votes on the Plan. Subject to the statutory obligations of the Official Committee to provide access to information to creditors, no person is authorized in connection with the Plan or the solicitation of acceptances of the Plan to give any information or to make any representation other than as contained in this Disclosure Statement and the exhibits attached hereto or incorporated by reference or referred to herein. If given or made, such information or representation may not be relied upon as having been authorized by the Debtor. Although the Debtor will make available to creditors entitled to vote on the Plan such additional information as may be required by applicable law prior to the Voting Deadline, the delivery of this Disclosure Statement will not under any circumstances imply that the information herein is correct as of any time after the date hereof.

_____

**ALL CREDITORS ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ AND CAREFULLY CONSIDER THIS ENTIRE DISCLOSURE STATEMENT, INCLUDING THE PLAN ATTACHED AS EXHIBIT 1 AND THE RISK FACTORS DESCRIBED UNDER ARTICLE XIII HEREIN, PRIOR TO SUBMITTING BALLOTS IN RESPONSE TO THIS SOLICITATION.**

---

[2]     Except as otherwise provided herein, capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the First Amended Chapter 11 Plan of Reorganization for The Roman Catholic Diocese of Rockville Centre, New York (as amended, supplemented and modified from time to time, the "Plan"), attached hereto as Exhibit 1.

_____

The summaries of the Plan and other documents contained in this Disclosure Statement are qualified in their entirety by reference to the Plan itself, the exhibits to it (the "Confirmation Exhibits") and documents described therein as filed prior to approval of this Disclosure Statement or subsequently as Plan Supplement materials. In the event that any inconsistency or conflict exists between this Disclosure Statement and the Plan, the terms of the Plan will control. Except as otherwise indicated, the Debtor will file all Confirmation Exhibits with the Bankruptcy Court and make them available for review at the Debtor's document website located online at https://dm.epiq11.com/case/drvc/dockets (the "Document Website") no later than seven calendar days before the objection deadline for the Confirmation Hearing to the extent not filed earlier; *provided*, *however*, that (a) exhibits relating to the assumption and rejection of Executory Contracts and Unexpired Leases under the Plan will be filed no later than seven calendar days prior to the Voting Deadline and (b) other key exhibits to the Plan will be either (i) included in any solicitation materials distributed to holders of Claims in Classes entitled to vote to accept or reject the Plan or (ii) filed as part of the Plan Supplement no later than seven calendar days prior to the objection deadline for the Confirmation Hearing.

This Disclosure Statement contains, among other things, descriptions and summaries of provisions of the Plan being proposed by the Debtor. The Debtor reserves the right to modify the Plan consistent with section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019.

The statements contained in this Disclosure Statement are made only as of the date of this Disclosure Statement, and there can be no assurance that the statements contained herein will be correct at any time after this date. The information contained in this Disclosure Statement, including information regarding the history, operations, and financial information of the Debtor, is included for purposes of soliciting acceptances of the Plan, but, as to contested matters and adversary proceedings, is not to be construed as admissions or stipulations, but rather as statements made in settlement negotiations as part of the Debtor's attempt to settle and resolve its liabilities pursuant to the Plan. This Disclosure Statement will not be admissible in any non-bankruptcy proceeding, nor will it be construed to be conclusive advice on the legal effects of the Plan as to holders of Claims against either the Debtor or the Reorganized Debtor. Except where specifically noted, the financial information contained in this Disclosure Statement and in its exhibits has not been audited by a certified public accountant and has not been prepared in accordance with generally accepted accounting principles in the United States.

_____

## FORWARD-LOOKING STATEMENTS

This Disclosure Statement contains forward-looking statements based primarily on the current expectations of the Debtor and projections about future events and financial trends affecting the financial condition of the Debtor's organization and assets. The words "believe," "may," "estimate," "continue," "anticipate," "intend," "expect" and similar expressions identify these forward-looking statements. These forward-looking statements are subject to a number of risks, uncertainties and assumptions, including those described below under the caption "Plan-Related Risk Factors" in Article XIII. In light of these risks and uncertainties, the forward-looking events and circumstances discussed in this Disclosure Statement may not occur, and actual results could differ materially from those anticipated in the forward-looking statements. The Debtor does not undertake any obligation to update or revise publicly any forward-looking statements, whether as a result of new information, future events or otherwise.

## QUESTIONS AND ADDITIONAL INFORMATION

**If you would like to obtain copies of this Disclosure Statement, the Plan or any of the documents attached hereto or referenced herein, or have questions about the solicitation and voting process or the Debtor's Chapter 11 Case generally, please contact Epiq, the Voting Agent, by either (i) visiting the Document Website at https://dm.epiq11.com/drvc or (ii) calling (888) 490-0633.**

**TABLE OF ANNEXES & EXHIBITS**

ANNEX 1        Overview Of Debtor's Organization

ANNEX 2        The Chapter 11 Case


\* \* \*

EXHIBIT 1        Plan of Reorganization Proposed by Debtor and Debtor in Possession

EXHIBIT 2        Liquidation Analysis

EXHIBIT 3        Prospective Financial Information

EXHIBIT 4        Coverage Chart

EXHIBIT 5        Financial and Real Estate Disclosures

EXHIBIT 6        Claim List

EXHIBIT 7        Omnibus Claim Objection Summary

## EXECUTIVE SUMMARY

The best and final offer of the Diocese is in this Plan and Disclosure Statement. Under the Plan, the Diocese and certain affiliates described below are providing $200,000,000[3] to pay creditors, including all Abuse Claims, in exchange for releases. Abuse Claims that allege injury in whole or in part before October 1, 1976 are in Class 4. Abuse Claims that allege injury after October 1, 1976 are in Class 5. If there are not enough creditor votes with respect to both Class 4 and Class 5 to accept the Plan under section 1126 of the Bankruptcy Code, the Diocese will ask the Bankruptcy Court to dismiss this chapter 11 case. Through their vote, holders of Abuse Claims have the power to choose to either accept this Plan or to know that the Diocese will move to dismiss this bankruptcy case.

The Diocese does not want this bankruptcy case to be dismissed. The Diocese believes that dismissal of this case is not in the interest of the Diocese, the parishes, faithful parishioners and all those on Long Island that are impacted by the charitable and religious missions of the debtor. The Diocese also strongly believes that dismissal of this case will be even worse for claimants. So that claimants may make an informed choice on that issue, the Diocese wishes to make clear, in plain terms, what it proposes for resolution of this case.

A summary of the Diocese's final offer, as reflected in the Plan, is below. More detailed treatment is provided in this Disclosure Statement.

### *Term of Proposed Chapter 11 Plan*

- The Plan is funded as follows:

  - $150 million paid on the Effective Date;
  - $25 million on the first anniversary of the Effective Date;
  - $12.5 million on the second anniversary of the Effective Date; and
  - $12.5 million on the third anniversary of the Effective Date.

- The non-debtor parties receiving releases are referred to as Covered Parties and are the following entities:

  - Parishes within the Diocese of Rockville Centre, including Parish schools and regional schools;
  - Diocese of Rockville Centre Department of Education (including the two Diocesan high schools);
  - Catholic Charities of Long Island;
  - Catholic Youth Organization;
  - Catholic Cemeteries (and the related permanent maintenance trust);
  - The Seminary of the Immaculate Conception; and
  - Ecclesia Assurance Company, the Diocese's wholly-owned captive insurance company.

- The Diocese and the Covered Parties are contributing their valuable insurance rights and cash. The sources of cash funding are as follows:

  - $78.1 million from or on behalf of Parishes (note: *all* Parishes within the Diocese are contributing to this amount)
  - $7 million from Catholic Charities
  - $10 million from Catholic Cemeteries
  - $35 million loan from Catholic Cemeteries accruing interest and secured by assets of the Diocese
  - $32.9 million from the Diocese
  - $16 million from the Seminary
  - $15 million from Ecclesia (on account of its insurance policies)
  - $3.5 million from the Diocese of Rockville Centre Department of Education (including the two Diocesan high schools)
  - approximately $2.5 million fee rebate from Pachulski, Stang, Ziehl & Jones LLP

---

[3] $2.5 million is coming from fees paid to Pachulski Stang Ziehl & Jones LLP.

- The $78.1 million contributed from or on behalf of Parishes includes the following approximate ranges of parish contributions:

    - **31 Parishes with 0 Cases:** $8,000 to $1,868,000 (average of $335,000, median $203,000)

    - **52 Parishes with 1-2 Cases:** $83,000 to $2,203,000 (average of $680,000, median $556,000)

    - **53 Parishes with 3+ Cases:** $84,000 to $4,370,000 (average of $610,000, median $478,000)

    - **All Parishes:** $8,000 to $4,370,000 (average of $574,000; median $404,000)

- Under the Plan, consistent with the Covered Parties' obligation to maintain insurance coverage, litigation of disputed claims will continue, including disputing CVA actions associated with a disputed or disallowed claim[4] or CVA actions against Covered Parties that do not have an associated proof of claim. These disputed claims are Contested Abuse Claims that will have to be resolved through a court of competent jurisdiction. All other Abuse Claims are Settling Abuse Claims by default unless they elect to be a Contested Abuse Claim. Whether an Abuse Claim is either a Contested Abuse Claim or Settling Abuse Claim is indicated on Exhibit 6.. Further details regarding the Debtor's omnibus claim objections can be found on Exhibit 7.

- The Offer in the Plan has several major elements for every holder of an allowed Abuse Claim (other than a Future Abuse Claim):

    - $50,000 Minimum Consideration for a proof of claim, and an additional $50,000 Minimum Consideration for a CVA action against a Covered Party, which is payable on the Effective Date for Settling Abuse Claims and upon allowance for Contested Abuse Claims.

    - For Class 4 Abuse Claims, there is a right to pursue additional recoveries, exclusive of punitive damages, from the Arrowood Trust. Likewise, for Class 5 Claims, there is a right to pursue additional recoveries, exclusive of punitive damages, from the General Settlement Trust. Within each of the Trusts, the right to additional recoveries for Settling Abuse Claims is subject to the Trust Distributions Procedures with distributions made over time.

    - Settling Abuse Claims. Holders of Settling Abuse Claims that seek additional recoveries from the relevant Trust must provide a detailed submission for review by the relevant Trustee, as further described herein and in the Trust Distribution Procedures. In summary, the applicable Trustee will review the submission in light of two sets of criteria: one regarding liability and severity of the abuse factors and the other addressing impact on the claimant. This review will result in a point award, which will determine an eligible claimant's share of the Trust, subject to adjustments.

    - Upon the claimant's election and payment of a fee, the applicable Trust will also provide for review by an independent neutral drawn from a panel of retired judges, as well as ultimately permitting such claimant to resort to a court of competent jurisdiction.

    - Contested Abuse Claims. The right to additional recoveries for Contested Abuse Claims is subject to allowance or resolution through a court of competent jurisdiction, with distributions to be made only when all Contested Abuse Claims (including Indirect Abuse Claims asserted by Insurers) in the relevant Trust are disallowed or resolved. These claims will be contested by the Diocese as the initial Litigation Administrator, with expenses funded by the Contested Claim Subfund of the

---

[4] If a claim objection to a Contested Abuse Claim is pending, the claim objection will be resolved prior to any litigation proceeding against the Debtor with respect to such alleged Abuse in any other court of competent jurisdiction. CVA actions against Covered Parties that do not name the Debtor may go forward.

relevant trust. The Litigation Administrator has discretion to settle Contested Abuse Claims. The assets available to Contested Abuse Claims are described below.

- Holders of Allowed Contested Abuse Claims will be entitled to the relevant Minimum Consideration upon allowance and will participate *pro rata* with other Contested Abuse Claims in the funds remaining, if any, in the Contested Abuse Subfund of the relevant Trust only after resolution of all Contested Abuse Claims.

- The Trustees have the obligation to maintain insurance coverage, as well as pursue and maximize insurance recoveries for the relevant Trust and facilitate distributions to holders of Settling Abuse Claims and allowed Contested Abuse Claims. The Trustees also have the authority to settle with insurers globally or individually. In summary, the Plan and Trust Documents provide as follows:

  ▪ The Arrowood Trustee has the obligation to seek reimbursement of costs, expenses, and otherwise for the Arrowood Trust as well as pursue recoveries for Class 4 Claims, recognizing that, with respect to the New York Property/Casualty Security Fund, there is a statutory limit for each Class 4 Claim equal to the lesser of Arrowood Coverage limits or $1 million per claim per policy period.

  ▪ The General Settlement Trustee has the obligation to seek reimbursement of costs, expenses, and otherwise facilitate and maximize insurance recoveries for Class 5 Claims.

  ▪ The Settling Abuse Claim structure permits enhanced recoveries from insurance recoveries to holders of Settling Abuse Claims pursuing the Independent Review Process or litigating their claims.

  ▪ The Contested Abuse Claim structure, including the role of the Litigation Administrator, is intended to assure that the insureds are meeting their obligations to the insurers and thereby preserving values for Settling Abuse Claims and allowed Contested Abuse Claims.

- The $200 million contribution from the Diocese and the Covered Parties will be used to pay creditors:

  - Allowed Administrative Expense Claims (estimated to be approximately $16 million through the end of February 2024);
  - Allowed Priority Tax Claims (estimated to be $0);
  - Allowed Priority Claims (estimated to be $0);
  - Allowed Secured Claims (estimated to be $0);
  - GUC Plan Distribution, including Allowed Convenience Class Claims (estimated to be approximately $4 million); and
  - Cure Amounts (estimated to be $0).

- The Diocese is also setting aside approximately $9.9 million for the payment of Future Abuse Claims, which by their nature are unknowable and are limited to an individual that may hold an Abuse Claim based on sexual abuse that occurred prior to the Petition Date, but who, as of the Bar Date for Abuse Claims, had not filed a proof of claim against the Debtor and who has a valid legal excuse for not doing so. To the extent that those funds are not used for Future Abuse Claims within 5 years, they will revert to the Diocese and not holders of Abuse Claims.

- The amounts ultimately paid to holders of Abuse Claims will be net of the payments described above. Such reductions result in approximately $170 million (instead of $200 million) being made available for payment to holders of Abuse Claims (excluding Future Claims), which payments, less certain expenses of the Trusts, will be made to holders of such claims first via the Minimum Consideration Payments and second via the Trusts for ultimate distribution to holders of Abuse Claims. All amounts listed herein are estimates and are subject to change or material revision.

3

- Recoveries for holders of Abuse Claims will vary, as they generally do in cases of this nature, and will be dependent upon numerous factors including: severity, duration, frequency, age, evidence and the availability of insurance coverage.

- **Effective Date Funding**

  - Effective Date Payment:

    - $150,000,000 to be allocated on the Effective Date, less administrative claims and general unsecured claims (estimated at $20,000,000), Ecclesia funding earmarked for Class 5 Abuse Claims (estimated at $15,000,000), and Future Claims funding equal to 6% of monies available to creditors net of administrative expenses, distributions for general unsecured claims, and Ecclesia Contribution (estimated at $6,900,000).

    - Thus, $108.1 million will then be shared by the Class 4 and 5 Abuse Claims on the Effective Date.

      - 59% allocable to Class 4 and the Arrowood Settlement Trust (i.e., Arrowood Settlement Trust Share). Assuming there are no additional elections, 20% of Class 4 Abuse Claims are Contested Abuse Claims and that is the Contested Claim Subfund Share of the Arrowood Trust Assets.

      - 41% allocable to Class 5 and the General Settlement Trust (i.e., the General Settlement Trust Share). Assuming there are no additional elections, 21% of Class 5 Abuse Claims are Contested Abuse Claims and that is the Contested Claim Subfund Share of the General Settlement Trust Assets.

  - First Anniversary Payment: $25,000,000 less 6% ($1,500,000) to Future Claim Subfund.

  - Second and Third Anniversary Payments: $12,500,000 each, less 6% ($750,000) to Future Claim Subfund.

  - Illustrative Total Funds Flow:



## ILLUSTRATIVE TOTAL FUNDS FLOW*

*Assumes no elections to Litigating Abuse Claims and no additional Abuse Claims are expunged or withdrawn prior to the Effective Date.
**The illustrative total funds flow does not reflect the value of any insurance assets included in the Trusts.
***Amounts recoverable by Abuse Claimants from the Subfunds may be reduced on account of litigation costs or other necessary Trust expenses.

4

As noted, if the offer is not accepted by at least two-thirds of voting holders of Abuse Claims, the Debtor will file a motion seeking dismissal of the chapter 11 case. If the Plan is accepted by at least two-thirds of holders of Abuse Claims but is not confirmed for other reasons, including because the requisite voting thresholds for third party releases are not satisfied, the Debtor will determine at that point how to proceed.

**THE CHOICE – VOTE FOR THE OFFER IN THE PLAN OR RISK DISMISSAL**

- The Debtor's Plan presents holders of Abuse Claims with a choice: accept the offer contained in the Plan or the Diocese will seek to dismiss its chapter 11 case.

- Accepting the offer contained in the Plan will result in holders of Abuse Claims receiving the significant minimum consideration payments described herein, with the opportunity to seek significant additional amounts through the Trusts.

- Dismissal of this chapter 11 case will put holders of Abuse Claims in the position of competing against one another to pursue recoveries from the Debtor and other Covered Parties (including the parishes) in New York state court.

  ▪ Holders of Abuse Claims that have not yet filed a CVA complaint in New York state court will need to do so promptly, and there are threshold questions regarding whether any such complaint is timely or is barred by the statute of limitations.

  ▪ Even if newly-filed complaints are timely, such complaints will be last in line to progress towards trial.

  ▪ Among complaints that have already been filed, all Class 4 Claims that allege abuse during Arrowood coverage years are stayed, meaning that holders of Class 5 Claims may proceed to trial first.

  ▪ The financial profile of the various Covered Parties that are defendants in the CVA complaints in New York state court varies greatly, as described on Exhibit 5 hereto.

  ▪ If the chapter 11 case is dismissed and a plaintiff's CVA litigation proceeds in state court, there is also a risk that the Diocese will be held primarily responsible for any damages, and limited or no relief will be available against parishes or other related-party co-defendants.  Specifically, the parishes and other related parties that have answered CVA complaints in state court have generally all asserted defenses or counterclaims alleging that the Diocese is responsible for any damages because of its role in the selection and assignment of priests and other personnel.  Indeed, many of the CVA complaints themselves allege that the Diocese is principally responsible for the plaintiff's injuries, asserting that the Diocese controls the parishes, that the Diocese selected priests and other personnel, and that the Diocese failed to disclose to the parishes any risks of sexual abuse. Summaries of these allegations, defenses, and counterclaims have been filed as Exhibits A and B to the Direct Testimony of Eric P. Stephens [ECF No. 184] *The Roman Catholic Diocese of Rockville Centre, New York v. ARK320 DOE, et al.*, Adv. Proc. No. 20-01226 (Bankr. S.D.N.Y.).  Among other things, the co-defendants' answers generally assert that the co-defendant's liability is limited by CPLR Article 16 because the Diocese is more than 50% at fault for the plaintiff's injuries.  This Article 16 defense, if successful, could limit the co-defendant's liability for non-economic damages (e.g., pain and suffering) to the proportion, if any, of its individual fault.  *See* N.Y. C.P.L.R. § 1601.  In that event, the remainder of the plaintiff's non-economic damages would have to be recovered, if at all, from the Diocese.  As a result, if these or other defenses or counterclaims are successful, parishes and other related-party co-defendants may be able to significantly limit and/or eliminate their liability to CVA plaintiffs, and the plaintiffs' primary source of recovery may be against the limited assets of the Diocese.

- As a consequence of these factors, the viability of recoveries for holders of Abuse Claims in a dismissal of this chapter 11 case is variable and highly uncertain.

- For example, if a holder of an Abuse Claim proceeds to trial quickly, such complaint is against defendants with substantial financial resources, and such trial results in a favorable jury verdict for the holder of the Abuse Claim, such holder of an Abuse Claim may thus receive substantial recoveries. Indeed, it is even possible those recoveries may be in excess of what is available under the Plan. The Debtor, however, does not believe that a race-to-the-courthouse favors creditors. Many holders of Abuse Claims that do not have favorable trial results, or who proceed to trial against defendants without substantial financial resources, or who are at the back of the line to go to trial, or who have Arrowood claims, may receive *nothing* in a dismissal. For these claimants, which may be the vast majority of holders of Abuse Claims, the Plan presents a recovery that is larger, more certain, and will be received sooner than the uncertainty and delay associated with litigation. Moreover, there is no assurance that any such litigation will ever get to trial, given alternatives available to Covered Party defendants.

- The Diocese has consistently maintained that a global, consensual resolution of this chapter 11 case is the best way to fairly and equitably compensate claimants. An alternative here, dismissal of this bankruptcy case, is not in the interest of the Diocese, the parishes, faithful parishioners and all those on Long Island that are impacted by the charitable and religious missions of the debtor. The Diocese also strongly believes that dismissal of this case will be even worse for claimants. But if claimants vote to reject the Plan by the Voting Deadline in sufficient numbers to reject either class of holders of Abuse Claims, the Diocese will seek to dismiss the chapter 11 case pursuant to section 1112(b) of the Bankruptcy Code.

**RISK FACTORS**

Although (i) the Debtor and the Seminary shall be jointly and severally liable for the $16 million Seminary contribution, and (ii) the Parishes shall be jointly and severally liable for all other amounts due after the Effective Date, no collateral secures the payments and no interest shall be paid on amounts due after the Effective date. This means such payments are subject to unsecured credit risk. If such amounts are not paid, the Trustees will have to take action to collect from the Diocese and Parishes. Additionally, because the payments are not accruing interest, the present value of such payments is less. It is possible that the expenses incurred in continuing to contest Contested Abuse Claims may consume all the funds in the Contested Claim Subfund for the relevant trust. But such expenses will not erode the Settling Claim Subfund of the relevant trust or impact the payment of Minimum Consideration Payments.

In order for the Plan to be confirmed with these releases, the Debtor must obtain the "overwhelming support" of holders of Abuse Claims, which, at a minimum, is 75%. *See In re Purdue Pharma L.P.*, 69 F.4th 45, 78-79 (2d Cir. 2023, *cert. granted sub nom. Harrington v. Purdue Pharma L.P.*, No. (23A87), 2023 WL 5116031 (Aug. 10, 2023).

All parishes are making contributions to the Trusts in exchange for releases under the Plan. If this chapter 11 case is dismissed, or in the event of continued litigation, parishes may file for bankruptcy. If parishes become insolvent or otherwise seek relief in a bankruptcy court, that could interfere with, delay, complicate, or prevent recovery of judgements against such parishes.

A thorough discussion of other risk factors relevant to the Plan is included herein at Article XIII, and the Debtor refers holders of Abuse Claims to Article XIII hereof to review all the risk factors described. In particular, holders of Abuse Claims should note that the Plan does not include an insurance settlement (other than with respect to Ecclesia), and insurance companies may, accordingly, object to the Plan. As in any chapter 11 case of this nature, the Debtor also cannot guarantee that amounts contributed to the Trusts through the Plan will exceed the expenses required to operate such Trusts.

## ABUSE CLAIM INFORMATION ROADMAP

1. Holders of Abuse Claims should begin by locating their claim number (either by Proof of Claim number or CVA Index Number). If a holder of an Abuse Claim does not know its Proof of Claim number, they should contact the claims agent by either (i) visiting the Document Website at https://dm.epiq11.com/drvc or (ii) calling (888) 490-0633. If a holder of an Abuse Claim does not know its CVA Index Number, they should ask their counsel.

2. Once the Proof of Claim number or CVA Index Number has been located, a claimant may review the Claim List attached hereto as Exhibit 6. The Claim List includes the class, subclass (Contested or settling), voting status, the amount of minimum consideration the holder of the claim is or may be entitled to, their counsel, the co-defendants implicated, and whether the co-defendants are Covered Parties and released or not.

3. If the co-defendants are Covered Parties, they are listed as released, and certain historical financial information for such entities is attached hereto as Exhibit 5, as well as number of CVA cases pending against such entity. A list of parish real estate holdings is also attached hereto as Exhibit 5.

4. Using this information, a holder of an Abuse Claim can determine the following:

   a. Information about their claim, including whether it is eligible to vote, whether it is a Settling Abuse Claim and is eligible for minimum considerations on the Effective Date or is a Contested Abuse Claim and is eligible for minimum consideration only upon resolution of the objection or litigation, what class it is in, and to the extent that there is a CVA Action, whether there are co-defendants, and whether those co-defendants are released.

   b. Information about any co-defendant that is a Covered Party and released, including its litigation profile, historical financial information and real estate holdings for parish co-defendants.

## COMMITTEE POSITION

The Committee opposes the Plan and recommends that holders of Abuse Claims vote to reject the Plan because it is not in the best interests of holders of Abuse Claims as the Dioceses and the Covered Parties receiving releases are not contributing sufficient funds to equitably and fairly compensate holders of Abuse Claims. The Committee also believes that the Plan will lead to inequitable and disparate treatment of holders of Abuse Claims, including that holders of Abuse Claims with more severe claims may receive a smaller percentage of recovery than holders of Abuse Claims with less severe claims. Additionally, the Committee believes that the Minimum Consideration Payments are unnecessary and will reduce recoveries to holders of Abuse Claims by potentially diverting tens of millions of dollars from the $197,500,000[5] being contributed by the Diocese and the Covered Parties to payment of litigation expenses. The Committee opposes the Minimum Consideration Payments because the Committee believes that these payments are a factor in pursuing Contested Abuse Claims and thereby diverting funds to pay professionals instead of holders of Abuse Claims. Including an estimate of the cost of litigating the Abuse Claims of $250,000 applied to the approximately 130 Contested Abuse Claims designated by the Diocese (Contested Abuse Claims also include additional claims beyond the 130) results in expenses of $32.5 million that will not be paid to Abuse Claimants. Thus, after the deductions noted above and only those trust expenses relating to Contested Abuse Claims, only $137.5 million of the $200 million would be paid to Abuse Claimants. The Committee believes that all Abuse Claims should be reviewed through trust distribution procedures and determined and paid in accordance with those procedures. $137.5 million results in recoveries of approximately $275,000 if there are 500 claims and $243,362 if there are 565 claims.

The Committee also believes that there are numerous provisions of the Plan and related TDP and Trust Agreements that limit the recovery to holders of Abuse Claims and result in unfair and potentially disparate treatment of holders of Abuse Claims. Finally, the Plan contains no provisions to enhance its policies and procedures for the

---

[5] The Committee contends that the $2.5 million reduction from Pachulski Stang Ziehl & Jones LLP's fees is being contributed by Pachulski Stang Ziehl & Jones LLP, not the Debtor.

protection of children nor does it contain any non-monetary provisions that address the conduct of the Diocese and Covered Parties relating to the sexual abuse of children that would facilitate the healing and resolution of the horrendous abuse perpetrated against the holders of Abuse Claims. A letter from the Committee setting forth its objections to the Plan is included in the Solicitation Package.

Although the Committee believes that the insurers have substantial exposure for the Abuse Claims, none of the Diocese's third-party insurers have agreed to indemnify the Diocese against the Abuse Claims and all of the Diocese's third-party insurers are vehemently disputing their coverage obligations for those claims.

There are also risks associated with the insurance recovery. For example, the Insurance Assignment contemplated by the Plan may not be approved by the Bankruptcy Court. The Insurance Assignment is intended to facilitate the recovery of Insurance Proceeds by the Trusts. Although the Debtor believes that the Insurance Assignment is effective and allowable under applicable law, it is possible that one or more insurers may object to the Insurance Assignment as not being insurance neutral. If the bankruptcy court does not approve the Insurance Assignment, it would defeat a key element of the Plan. As currently drafted, the Plan does not contain a provision stating that if the Insurance Assignment is not approved, the Reorganized Debtor will pursue the insurance claims as directed by the relevant Trustees. The Plan currently includes only a limited savings clause that provides that Co-Insured Parties will pursue the insurance claims for the benefit of the applicable Trust if their insurance rights are not transferred, but says nothing about the Reorganized Debtor or its rights.

In addition, even if the Insurance Assignment is approved, it is possible that the Non-Settling Insurers could still defeat recovery of the Insurance Proceeds if they prevailed on one or more of their coverage defenses.

Under the terms of the Plan, the Covered Parties will be granted releases and a channeling injunction regarding any claims, including Abuse Claims. If the Plan is confirmed, holders of Abuse Claims will not be able to pursue any Covered Party directly for any Abuse Claim.

In order for the Plan to be confirmed with these releases, the Debtor must obtain the "overwhelming support" of holders of Abuse Claims, which, at a minimum, is 75%. *See In re Purdue Pharma L.P.*, 69 F.4th 45, 78-79 (2d Cir. 2023, *cert. granted sub nom. Harrington v. Purdue Pharma L.P.*, No. (23A87), 2023 WL 5116031 (Aug. 10, 2023). According to the Second Circuit Court of Appeals in *Purdue*, the parties granting such third-party releases must be receiving "fair payment of enjoined claims" from the Covered Parties. *Purdue*, 69 F.4th at 79.

The Committee does not believe that the Covered Parties are providing fair compensation for the releases. Exhibit 5 demonstrates that the Parishes have over $200 million in cash and liquid assets before taking into account the substantial real estate owned by such Parishes. While the Debtor and the Parishes do not provide valuation information for most of their real estate, the Committee believes that the real estate belonging to the Parishes has significant value that could be available to compensate holders of Abuse Claims. Reviewing public information of the Parish real estate indicates that such real estate has a total assessed value of $57,381,625 and with a market value of over a billion dollars. *See* Declaration of Patrick Stoneking in Support of the Survivors' Joinder in Support of the Motion of the Official Committee of Unsecured Creditors for Entry of an Order Pursuant to Bankruptcy Rule 2004 Directing Debtor to Produce Parish Information [Docket No. 581]. Collectively the Parishes are only contributing $78.1 million in cash (over three years) notwithstanding their substantial assets and potential liability for hundreds of claims relating to childhood sexual abuse.

Additionally, the Cemetery Corporation and Cemetery Trust are only contributing $10 million in cash to resolve claims against them resulting from the alleged fraudulent transfer of hundreds of millions of dollars to the Cemetery Corporation and Cemetery Trust. While the Cemetery Trust is making a loan to the Diocese that will be used to fund the Settlement Trusts, the Diocese is securing that loan with its interests in Ecclesia as well as a second lien on the FCC licenses. Thus, the Diocese is monetizing its own assets through this loan and attempting to portray it as a contribution by the Cemetery Trust that justifies the settlement. The Committee believes that the Cemetery Trust Corporation and the Cemetery Trust should be making a far larger contribution to resolve the claims against them. In the Committee Plan, the Committee proposed a settlement of those claims for $80 million.

## I.      INTRODUCTION

The Roman Catholic Diocese of Rockville Centre, New York, as debtor and debtor in possession (the "Debtor") submits this Disclosure Statement pursuant to section 1125 of title 11 of the United States Code (the "Bankruptcy Code") in connection with the solicitation of acceptances of the Chapter 11 Plan of Reorganization for The Roman Catholic Diocese of Rockville Centre, New York (as amended, supplemented and modified from time to time, the "Plan"). A copy of the Plan is attached hereto as Exhibit 1.

This Disclosure Statement sets forth certain information regarding the Debtor's prepetition operating and financial history, the events leading up to the commencement of the Chapter 11 Case, significant events that have occurred during the Chapter 11 Case and the anticipated organization and operations of the Reorganized Debtor if the Plan is confirmed and becomes effective.  This Disclosure Statement also describes terms and provisions of the Plan, including certain effects of confirmation of the Plan, certain risk factors, certain alternatives to the Plan and the manner in which distributions will be made under the Plan.  The Confirmation process and the voting procedures that holders of Claims entitled to vote on the Plan must follow for their votes to be counted are also discussed herein.

The Debtor is the proponent of the Plan and believes that the Plan is the best means to efficiently and effectively pave the way for the Debtor's emergence from bankruptcy.

Except as otherwise provided herein, capitalized terms not otherwise defined in this Disclosure Statement have the meanings ascribed to them in the Plan.

On February 15, 2024, the Bankruptcy Court entered an order approving this Disclosure Statement as containing "adequate information," i.e., information of a kind and in sufficient detail to enable a hypothetical reasonable investor typical of the holders of Claims to make an informed judgment about the Plan.  THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT CONSTITUTES NEITHER A GUARANTY OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN NOR AN ENDORSEMENT OF THE MERITS OF THE PLAN BY THE BANKRUPTCY COURT.

### A.      Material Terms of the Plan

As discussed in more detail in Articles III and IV below, the Plan includes the Debtor's proposed resolution of a number of complex Claims.  The distributions contemplated by the Plan reflect the impact of the Debtor's proposed resolution of such claims.  The Debtor believes that absent such resolution, this bankruptcy case will be dismissed, resulting in extensive and expensive litigation to the detriment of the Debtor's Estate and all stakeholders.

THE DEBTOR BELIEVES THAT THE IMPLEMENTATION OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTOR, ITS CREDITORS AND ITS OTHER STAKEHOLDERS. FOR ALL OF THE REASONS DESCRIBED IN THIS DISCLOSURE STATEMENT, THE DEBTOR URGES YOU TO RETURN YOUR BALLOT ACCEPTING THE PLAN BY THE VOTING DEADLINE (I.E., THE DATE BY WHICH YOUR BALLOT MUST BE ACTUALLY RECEIVED), WHICH IS MARCH 22, 2024 AT 5:00 P.M. (ET).

As set forth in further detail below, the material terms of the Plan are as follows:

| Treatment of Claims | As further detailed in the Plan, the Plan contemplates the following treatment of Claims: |
|---|---|
| | • Priority Claims – each Allowed Priority Claim shall receive (i) payment in cash in an amount equal to such Allowed Priority Claim; or (ii) satisfaction of such Allowed Priority Claim in any other manner that renders the Allowed Priority Claim Unimpaired, including treatment in a manner consistent with section 1124. |
| | • Secured Claims – each Allowed Secured Claim shall receive: (i) cash in an amount equal to the Allowed amount of such Claim, including |

|  | the payment of any interest required to be paid under section 506(b) of the Bankruptcy Code; (ii) satisfaction of such Secured Claim in any other manner that renders the Allowed Secured Claim Unimpaired, including treatment in a manner consistent with section 1124; or (iii) return of the applicable collateral on the Effective Date. |
|---|---|
|  | • <u>General Unsecured Claims</u> – each Allowed General Unsecured Claim shall receive such holder's Pro Rata share of the GUC Plan Distribution, subject to the holder's ability to elect Convenience Claim treatment on account of the Allowed General Unsecured Claim. |
|  | • <u>Arrowood Abuse Claims</u> – each holder of an Arrowood Abuse Claim shall receive: (i) such distributions as provided in the Trust Documents with respect to the Settling Claim Subfund in the Arrowood Fund as it pertains to Class 4.a. if such claim is a Settling Abuse Claim; or (ii) such distributions as provided in the Trust Documents with respect to the Contested Claim Subfund in the Arrowood Fund as it pertains to Class 4.b. if such claim is an Allowed Contested Abuse Claim. |
|  | • <u>London and Ecclesia Abuse Claims</u> – each holder of a London and Ecclesia Abuse Claim shall receive: (i) such distributions as provided in the Trust Documents with respect to the Settling Claim Subfund in the General Fund as it pertains to Class 5.a. if such claim is a Settling Abuse Claim; or (ii) such distributions as provided in the Trust Documents with respect to the Contested Claim Subfund in the General Fund as it pertains to Class 5.b. if such claim is an Allowed Contested Abuse Claim. |
|  | • <u>Convenience Claims</u> – each Allowed Convenience Claim shall receive cash in an amount equal to 100% of such holder's Allowed Convenience Claim. |
|  | • <u>Lay Pension Claims</u> – the Debtor will assume its participation in the Lay Pension Plan, and will continue to meet its obligations under the Lay Pension Plan as they become due. The Debtor will not make any payment with respect to any Lay Pension Claim filed in this Chapter 11 Case. |
|  | • <u>Priest Pension Claims</u> – the Debtor will assume its participation in the Priest Pension Plan and will continue to meet its obligations under the Priest Pension Plan as they become due. The Debtor will not make any payment with respect to any Priest Pension Claim filed in this Chapter 11 Case. |
| **Means of Implementation** | On the Effective Date, the Arrowood Settlement Trust and the General Settlement Trust will be established for the benefit of holders of Abuse Claims. The Arrowood Settlement Trust and the General Settlement Trust shall be administered and implemented by the Trustees as provided in the Trust Documents. Specifically, the Arrowood Settlement Trust and the General Settlement Trust shall, without limitation: (1) assume liability for all Abuse Claims; and (2) hold and administer the Trust Assets of the Arrowood Settlement Trust and the General Settlement Trust, liquidate the Abuse Claims, and make Trust Distributions to holders of Abuse Claims from the Trust Assets of the Arrowood Settlement Trust and the General Settlement Trust. |

|  | |
|---|---|
|  | On the Effective Date and thereafter, the Trust Assets shall be allocated between the Arrowood Settlement Trust and General Settlement Trust. Each of the Arrowood Settlement Trust and the General Settlement Trust shall have a Settling Claim Subfund and a Contested Claim Subfund.<br><br>The Arrowood Settlement Trust and the General Settlement Trust shall, as applicable, administer, process, settle, resolve, liquidate, satisfy, and make Trust Distributions from the Trust Assets of the Arrowood Settlement Trust and the General Settlement Trust on account of Abuse Claims in such a way that the holders of Abuse Claims are treated equitably and in a substantially similar manner, subject to the applicable terms of the Plan Documents and the Trust Documents. From and after the Effective Date, the Abuse Claims shall be channeled to the Arrowood Settlement Trust and the General Settlement Trust pursuant to the Channeling Injunction set forth in Article XI of the Plan and may be asserted only and exclusively against the Arrowood Settlement Trust and the General Settlement Trust. |
| **Releases** | The Plan provides for certain releases by the Debtor and holders of Abuse Claims for the benefit of the Covered Parties. |
| **Exculpation** | The Plan provides certain customary exculpation provisions, which include a full exculpation from liability in favor of the Debtor, the Future Claims Representative, the Official Committee members, and any mediator or special mediator and with respect to the Debtor, the Reorganized Debtor, the Future Claims Representative and any mediator or special mediator, all current and former affiliates, and such Entities' and such Entities' current and former affiliates' current and former subsidiaries, officers, directors, managers, principals, trustees, members, partners, employees, volunteers, agents, advisors, advisory board members, advisory committee members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives and other professionals.<br><br>For the avoidance of doubt, while the Plan provides exculpation for Official Committee members, it does not provide exculpation for Official Committee professionals or for counsel representing Official Committee members.<br><br>Counsel representing Official Committee members have not filed disclosure statements pursuant to Federal Rule of Bankruptcy Procedure 2019 in this case. As such, the Debtor is not seeking exculpation for such professionals at this time.<br><br>The professionals for the Official Committee and counsel representing members of the Official Committee reserve their rights to seek exculpation. |

B.    **Minimum Consideration Payments**

The Diocese is seeking to compensate claimants as soon as possible. In furtherance of that goal, if the Plan is confirmed, on the Effective Date or as soon as practicable thereafter, or with respect to a Contested Abuse Claim promptly upon such Claim becoming an Allowed Claim, the Debtor or the Reorganized Debtor, as applicable, shall distribute:

     i.     $50,000 to each holder of an Abuse Claim (other than an Indirect Abuse Claim) that has filed a proof of claim against the Debtor that has not been withdrawn, disallowed, or expunged by Final Order of the Bankruptcy Court, and

     ii.    $50,000 to each plaintiff in a CVA Action that includes (as of both the Bar Date and the Effective Date) a Co-Insured Party as a defendant in such CVA Action.

For the avoidance of doubt, no holder of an Abuse Claim shall be eligible to receive more than $100,000, in the aggregate, as Minimum Consideration Payments, and no holder of an Indirect Abuse Claim or a Future Abuse Claim are eligible to receive Minimum Consideration Payments. Notwithstanding anything herein to the contrary, no payment shall be made under the above clause (i) or (ii) to the holder of a Contested Abuse Claim unless and until such Contested Abuse Claim becomes an Allowed Claim (a) with respect to the payment set forth in clause (i) above, against the Debtor, and (b) with respect to the payment set forth in clause (ii) above, against a Co-Insured Party. Upon Disallowance of a Contested Abuse Claim, the Minimum Consideration Payment related to such Contested Abuse Claim shall be transferred to the applicable Trust for the benefit of the Contested Claim Subfund.

The Minimum Consideration Payments represent a *minimum payment* as set forth above and in the Plan and holders of Abuse Claims may also recover from Trust Assets in accordance with the Trust Distribution Procedures and the Plan. Therefore, the amounts due to holders of Abuse Claims are a function of both the Minimum Consideration Payment and the right of holders of Abuse Claims to seek additional amounts pursuant to the Trust Distribution Procedures. However, pursuant to the Trust Distribution Procedures, a determination could be made that a Settling Abuse Claim is not entitled to any further distribution from the applicable Trust. Receipt of the Minimum Consideration Payments by a holder of a Settling Abuse Claim does not mean that such Settling Abuse Claim has an Allowed Claim against either Trust. Once paid to a claimant, however, Minimum Consideration Payments are not refundable.

### C.     Trust Structure and Trust Distribution Procedures

#### *Trust Structure*

There are two Trusts: the Arrowood Settlement Trust and the General Settlement Trust. The Arrowood Settlement Trust (Class 4) has 370 Abuse Claims within the Arrowood Coverage Period which are 59% of Abuse Claims. *See* Plan, Art. I.A.11. The General Settlement Trust has 260 Abuse Claims falling within the LMI, Allianz, and Ecclesia coverage periods, which are 41% of Abuse Claims. *See* Plan, Art. I.A.65.

#### *Arrowood Settlement Trust*

The Arrowood Settlement Trust consists of the Contested Claim Subfund and Settling Claim Subfund. The assets of the Arrowood Trust are allocable between the Settling Claim Subfund and the Contested Claim Subfund in accordance with the shares established on the Effective Date based upon the proportion of the Class 4 Settling Abuse Claims to the total number of Class 4 Abuse Claims, currently estimated at 80%. The Arrowood Settlement Trust will allocate all expenses of its Subfunds in accordance with each Subfund's Share, with the intent that each Subfund shall bear its own fees, costs and expenses. *See Arrowood Settlement Trust Agreement*, Art. 3.1.c; Plan, Art. IV.C.4. Payments from recoveries from New York Property/Casualty Security Fund are paid to the Arrowood Trust to be shared between the Settling Claim Subfund and the Contested Claim Subfund in accordance with the shares established on the Effective Date, *see* Plan, Art. IV.C.1.a; Disclosure Statement, Art. III.A, or as otherwise determined by the Trustee in accordance with the Trust Agreement and the consents required therein.

#### *General Settlement Trust*

The General Settlement Trust consists of the Contested Claim Subfund, Settling Claim Subfund, and Future Claims Subfund. The assets of the General Settlement Trust, excluding Insurance Rights and the Future Claim Subfund, will be allocated between the Contested Claim Subfund and the Settling Claim Subfund in accordance with the shares established on the Effective Date based upon the property of Class 5 Settling Abuse Claim to the total number of Class 5 Abuse Claims, currently estimated at 79%. The General Settlement will allocate all expenses of its Subfunds in accordance with each Subfund's Share, with the intent that each Subfund shall bear its own fees, costs

and expenses. General Settlement Trust Agreement, Art. 3.1.c, Art. IV.C.4. The Future Claim Subfund will be charged for its own expenses. *See* General Settlement Trust Agreement, Art. 3.1.d. Recoveries from Class 5 Insurers are paid to the General Settlement Trust to be shared between the Settling Claim Subfund and the Contested Claim Subfund in accordance with the shares established on the Effective Date, *see* Plan, Art. IV.C.1.b, or as otherwise determined by the Trustee in accordance with the Trust Agreement and the consents required therein.

*Straddle Allocation True-Up*

The General Settlement Trustee transfers Trust Assets from the General Settlement Trust to the Arrowood Settlement Trust equal to the value of the Diocese and the Co-Insured Parties' Insurance Rights for Abuse occurring on or after October 1, 1976. Plan, Art. IV.C.3.; Disclosure Statement Art. III.A.3.c.

*Contested Abuse Claim / Settling Abuse Claim Election*

All Abuse Claims shall be considered Settling Abuse Claims by default, unless (i) the holder of the Abuse Claim elects on a properly completed, timely submitted ballot to be treated as a Contested Abuse Claim, or (ii) the Debtor has filed an objection to such Abuse Claim prior to February 22, 2024, that has not been withdrawn or settled prior to the Voting Deadline. Electing to be treated as a Contested Abuse Claim has no impact on a claimant's right to vote on the Plan.

As further described below, a Settling Abuse Claim, after receiving its Minimum Consideration Payment, may seek further compensation from the applicable Trust by submitting its Abuse Claim through the Trust Distribution Procedures. To the extent that the holder of a Settling Abuse Claim also has an existing CVA Action against a Covered Party, the claims of such holder against the Covered Party will be channeled to the applicable Trust, and any entitlement to a recovery based on the Abuse Claim against such Covered Party shall be determined through the Trust Distribution Procedures. For the avoidance of doubt, such Settling Abuse Claim will not be entitled to pursue a separate claim against such Covered Party regardless of whether a CVA Action against such Covered Party is currently pending.

If the holder of a Settling Abuse Claim elects to be treated as a Contested Abuse Claim, such holder of an Abuse Claim will not be entitled to receive the Minimum Consideration Payment on the Effective Date but will only be eligible to receive such Minimum Consideration Payment if such holder's Abuse Claim is ultimately Allowed. As a Contested Abuse Claim, the holder of such Abuse Claim will continue its litigation against the Litigation Administrator, which is at least initially the Diocese or its designee. To the extent a holder of a Contested Abuse Claim has an existing CVA Action against both the Debtor and a Covered Party, the litigation of the CVA Action will only go forward after resolution of any claim objection filed by the Debtor. The Allowance of a claim against a Covered Party in a CVA Action shall be determined through continuation of the CVA Action in state court subject to the right of the Litigation Administrator to seek to move or remove such CVA Action to federal court and the rights of the holder of the Contested Abuse Claim to oppose such removal and seek remand. The rights of the Litigation Administrator and of the holder of the Contested Abuse Claim are reserved and will be subject to the rules of the applicable court. The applicable Trustee shall administer each Contested Abuse Claim that becomes an Allowed Contested Abuse Claim in accordance with the Plan and Trust Distribution Procedures and shall make distributions to such Allowed Contested Abuse Claims on a pro rata basis from the funds remaining, if any, in the Contested Claim Subfund of the applicable Trust after resolution of all Contested Abuse Claims with respect to such Trust. To the extent that such Contested Abuse Claim is subject to the Arrowood Settlement Trust, the ability of the holder of such Abuse Claim or the Litigation Administrator to continue the CVA Action may be limited by the operation of the Arrowood Insolvency Proceedings. The resolution of such CVA Actions may be materially delayed by the operation of the Arrowood insolvency proceedings.

If Allowed, a Litigating Abuse Claim will be entitled to receive the applicable Minimum Consideration Payment. An Allowed Contested Abuse Claim will not be entitled to receive any distribution from the applicable Trust until **ALL** of the Contested Abuse Claims with respect to such Trust are finally resolved. Distributions from the applicable Trust will be such Allowed Contested Abuse Claim's pro rata share of the amounts remaining, if any, in the applicable Contested Claim Subfund of the applicable Trust after payment of all expenses related to such Contested Claim Subfund.

Pending Allowance of such Contested Abuse Claims, the minimum consideration payment corresponding to such claims shall be reserved. If any such Contested Abuse Claim is not Allowed, the corresponding minimum consideration reserved for such Contested Abuse Claim shall be paid into the applicable Trust for the benefit of the Contested Claim Subfund.

All expenses arising out of the defense of the Contested Abuse Claims in the applicable Contested Claim Subfund will be deducted from the contribution to the Contested Claim Subfund. The Debtor cannot guarantee that the amounts available to pay Contested Abuse Claims in the applicable Contested Claim Subfund will exceed the expenses incurred on account of defending such claims.

Contested Abuse Claims will receive no distribution from the applicable Contested Claim Subfund until all Contested Abuse Claims have been fully resolved. The Debtor cannot predict how many Contested Abuse Claims there will be until after the Voting Deadline and when the resolution of all such Contested Abuse Claims will be complete. There is risk of additional delay in completion of the resolution of Contested Abuse Claims in the Arrowood Settlement Trust. There is also a risk that the expenses of litigating the Contested Abuse Claims in either or both Settlement Trusts may exceed the amount of funds in the applicable Subfund for such Trust.

While this risk exists, the Debtor does not believe that it is likely that the expenses associated with the Contested Abuse Claims will exceed the amount of funds in the applicable Subfund for such Trust. First, because most Contested Abuse Claims have already been determined to be facially defective, the Debtor believes the expense associated with disputing such claims is less than litigating other sorts of abuse claims. Second, the expense associated with disputing most of the Contested Abuse Claims has largely already been incurred. One-hundred and ten or approximately 85% of the Contested Abuse Claims have been dismissed by the Bankruptcy Court—fifty-one of which with leave to amend and fifty-nine of which dismissed with prejudice. For those dismissed with leave to amend, the Debtor has completed the collection of documents.[6] For those dismissed with prejudice, the Debtor anticipates that all appeals either are or will be fully briefed before the District Court prior to the Effective Date. Thus, a significant amount of the expense associated with such claims has already been incurred or will be incurred prior to the Effective Date. Further details regarding the Debtor's omnibus claim objections can be found on Exhibit 7. Finally, twenty of the Contested Abuse Claims represent civil lawsuits where the plaintiff never filed a Proof of Claim against the Debtor. Based on the Debtor's review, many of those lawsuits are facially defective (for example, the Debtor is holding IRCP releases for three of those suits and two more of those suits are released pursuant to the terms of the BSA plan). Further, four of the lawsuits do not name a Covered Party other than the Debtor, and as a result, the Debtor believes such suits will be dismissed, or at best, share in the Future Abuse Subfund. In addition to these Contested Abuse Claims, seven other entities, certain individuals and certain insurance companies have asserted Indirect Abuse Claims which are also considered Contested Abuse Claims and, to the extent Allowed, will share in the applicable Trust's Contested Claim Subfund. The expenses of litigating all Contested Abuse Claims, including Indirect Abuse Claims are paid from the applicable Trust's Contested Claim Subfund.

### *Trust Distribution Procedures*

All Abuse Claims against Covered Parties will be channeled to the applicable Trust. If the holder of an Abuse Claim asserted against a Covered Party in a CVA Action is a Settling Abuse Claim, then any Abuse Claim asserted by the holder of such Settling Abuse Claim against the Covered Party will be resolved through the Trust Distribution Procedures.

The Trust Distribution Procedures provide procedures for evaluating and providing distributions to Settling Abuse Claims, and have limited application to Contested Abuse Claims.

*Settling Abuse Claims*

---

[6] The Committee has moved before the Bankruptcy Court requesting an investigation into whether the collection of such documents is, in fact, complete. *See Motion of the Official Committee of Unsecured Creditors for Entry of an Order Requiring Further Disclosure and Discovery Related to the Diocese's Document Review and Production Process and Responding to the Declaration of Eric Stephens* [Docket No. 2880].

Settling Abuse Claims that have not been disallowed or expunged pursuant to an order from the Bankruptcy Court will be submitted for review and potential valuation by the Trustee. The applicable Trustee will evaluate each submission using the evaluation factors set forth in the TDP, which includes criteria regarding the nature of the abuse and the impact of the abuse.

The applicable Trustee may, after considering the criteria set forth in the TDP, determine that a holder of a claim should not receive an award. The holder of the Abuse Claim may seek reconsideration of the no award determination. Pursuant to the criteria, the applicable Trustee shall determine the point award and the proposed value for such Abuse Claim and provide written notice to the holder. The point value will be determined by dividing (a) the total dollars in the amount funded to the applicable Settling Claim Subfund of the applicable Trust for the relevant Abuse Claims by (b) the total of points among the individual Abuse Claims. For example, if there are 50 claimants holding Settling Abuse Claims, as applicable, awarded 10,000 points with a total Settling Claim Subfund of $2 million, each point would be valued at $200. The holder of the Abuse Claim may request that the point award be reconsidered.

Following a point award, the TDP allow a Settling Abuse Claimant to pursue an Independent Review Option by a neutral retired judge, which is discussed below. A claimant may be entitled to a claim enhancement if insurance settlement is achieved after the completion of the Independent Review Option or during the pendency of, or following, litigation against the Trust. For more details, *see* Disclosure Statement, Art. III.B.

The process set forth herein for Settling Abuse Claims shall apply with respect to Future Abuse Claims, except that the holder of a Future Abuse Claim may not seek the Independent Review Option. Further the Future Claim Subfund assigns a dollar figure to points, whereas the Settling Claim Subfund uses points to determine such claimant's share of the overall Trust assets.

*Independent Review Option*

Holders of a Settling Abuse Claim, other than Future Abuse Claims, shall have the opportunity to have an independent, neutral third party (selected from a panel of retired judges with tort experience maintained by the Settlement Trust) (a "Neutral") make a settlement recommendation to the claimant and applicable Trustee seeking to replicate, to the extent possible, the amount a reasonable jury might award for the Abuse Claim, taking into account the relative shares of fault that may be attributed to any parties potentially responsible for the Abuse Claim under applicable law and applying the same standard of proof that would apply under applicable law.

Any recommendation determined by the Neutral, if accepted by the claimant and the applicable Trustee, shall be the amount of the Abuse Claim against (i) the Debtor and/or (ii) the other Covered Parties. If there is an accepted recommendation, the holder of the Abuse Claim must assign its Abuse Claim against any Covered Party and all other rights and claims arising out of its Abuse Claim to the appropriate Trust as a condition to receiving the Accepted Settlement Recommendation, and the Trusts shall have the right and power to assert and/or resolve any such Claims assigned to it consistent with the Plan. In making its determination, the Neutral will consider and apply any defense that would otherwise be available in the tort system.

The costs associated with the independent review shall be paid by the claimant and not the Trusts, including the cost of any deposition and mental health exam and the valuation by the Neutral. Such obligation shall be offset by the administrative fee of $2,500, which is due at the time of the election for Independent Review Option. A further additional administrative fee in the amount of $2,500 shall be due immediately prior to the Neutral's review. These fees may be waived by the Trustees in appropriate cases.

If the Neutral's recommendation is rejected, the holder of such Abuse Claim may serve a notice on the Trustee and any applicable Insurer that such claimant has elected to continue an existing lawsuit or proceeding against the appropriate Trust to determine the amount of the Abuse Claim in any court or courts of competent jurisdiction.

To the extent the applicable Trustee enters into a settlement agreement with any Insurer that covers an Abuse Claim after the Neutral has made a Settlement Recommendation with respect to such Abuse Claim, then the holder of such Abuse Claim shall receive a point enhancement to his or her point allocation, which shall be payable only from the proceeds of the applicable trust insurance settlement. The size of the enhancements range from 1.5 times their allocated points to 4 times their allocated points and are described in the TDP. The claim enhancements are independent of one another and are not intended to be cumulative. Each Trustee shall reserve sufficient amounts in

the applicable Settling Claim Subfund to fund such enhanced payments before distribution of trust insurance settlement proceeds to such Settling Claim Subfund.

*Contested Abuse Claims*

No distribution shall be made to the holder of a Contested Abuse Claim unless and until such Contested Abuse Claim becomes an Allowed Claim. For purposes of any Contested Abuse Claim against a Covered Party that is not the Debtor, the term "Allowed" for purposes of the Plan shall mean a Litigation Award entered by a court of competent jurisdiction or pursuant to an agreement between the holder of such Contested Abuse Claim and the Litigation Administrator. No distributions will be made from either Trust to holders of Allowed Contested Abuse Claims until all Contested Abuse Claims in such Trust are fully resolved. The applicable Trustee shall administer each Contested Abuse Claim that becomes an Allowed Contested Abuse Claim in accordance with the Plan on a *pro rata* basis with respect to the Contested Claim Subfund of the applicable Trust.

To the extent that the holder of a Contested Abuse Claim asserts a claim against the Debtor in the bankruptcy case and the Debtor has objected to such claim, such claim against the Debtor will be determined by the Bankruptcy Court (including any court to which the decision may be appealed). Any CVA Action against both the Debtor and a Covered Party asserted by such holder of a Contested Abuse Claim will be stayed until determination of the claim objection to the Abuse Claim with respect to the Diocese. The allowance of a claim against a Covered Party in a CVA Action shall be determined through continuation of the CVA Action in state court subject to the right of the Litigation Administrator to seek to remove such CVA Action to federal court and the rights of the holder of the Litigating Abuse Claim to oppose such removal and seek remand. The rights of the Litigation Administrator and of the holder of the Contested Abuse Claim are reserved and will be subject to the rules of the applicable court. The applicable Trustee shall administer each Contested Abuse Claim that becomes an Allowed Contested Abuse Claim in accordance with the Plan and shall make distributions to such Allowed Contested Abuse Claim on a *pro rata* basis from the funds remaining, if any, in the Contested Claim Subfund of the applicable Trust after resolution of all Contested Abuse Claims with respect to such Trust. To the extent that such Contested Abuse Claim is subject to the Arrowood Settlement Trust, the ability of the holder of such Abuse Claim or the Litigation Administrator to continue the CVA Action may be limited by the operation of the Arrowood Insolvency Proceedings. The resolution of such CVA Actions may be materially delayed by the operation of the Arrowood Insolvency Proceedings.

To the extent that the holder of an Abuse Claim has asserted a claim against a Covered Party in a CVA Action but has not filed an action or a proof of claim against the Debtor, such CVA Action will be treated as a Contested Abuse Claim. The allowance of a claim against a Covered Party in a CVA Action shall be determined through continuation of the CVA Action in state court subject to the right of the Litigation Administrator to seek to remove such CVA Action to federal court and the rights of the holder of the Contested Abuse Claim to oppose such removal and seek remand. The rights of the Litigation Administrator and of the holder of the Contested Abuse Claim are reserved and will be subject to the rules of the applicable court. The applicable Trustee shall administer each Contested Abuse Claim that becomes an Allowed Contested Abuse Claim in accordance with the Plan on a *pro rata* basis with respect to the Contested Claim Subfund of the applicable Trust.

*Trustee Authority*

The Trustee of each Trust has the authority to enter into settlements with its relevant  Insurers, provided however that any Insurer Settlement that affects one or more Settling Abuse Claims and one or more Contested Abuse Claims is subject to the consent procedures set forth in the Trust Agreement, which require the consent of the majority of the Trust Advisory Committee members or the support of one member of the Trust Advisory Committee and the approval of the Bankruptcy Court.

The Trustee has the authority to enter into a settlement that causes an entity that is a co-defendant in a CVA Action that is otherwise not a Covered Party as of the Effective Date to become a Covered Party; provided that such entity makes an Additional Covered Party Substantial Contribution and releases any Indirect Abuse Claim against the Estate, the Debtor or other Covered Parties; provided further that such contribution amount is acceptable to a majority of the Trust Advisory Committee or Bankruptcy Court approval is obtained under Bankruptcy Rule 9019 on notice to affected parties.

**D.    The Settlement Contributions are Fair and Equitable in Comparison with Precedent Cases**

The total contribution from the Debtor, Parishes, other Co-Insured Parties and other ministry members (including the Debtor's captive insurer) has a value of $200 million.  *Importantly, such amounts do not include the value of the Debtor's substantial rights against and with respect to third-party insurance companies.*

Under the Plan, the Debtor is retaining cash for post-emergence working capital in the amount of approximately $16 million.  The working capital amount is not expected to be deducted from the $200 million contribution, assuming that the Debtor's plan confirmation timeline is not materially extended.  The Debtor is also retaining an interest in its captive insurer, a communications studio, certain FCC licenses, and three parcels of real property upon which parishes operate.  The valuations of the Debtor's real property are as follows: (i) real property located at 1200 Glenn Curtiss Boulevard, Unionville, NY 11553, valued at $2.4 million as of October 12, 2018; (ii) real property located at Manorville, District: 200, Section: 461, Block: 1, Lot: 3.3, valued at $110,000 as of January 25, 2017; and (iii) real property located at Yaphank (Ridge), District: 326, Block: 3, Lot: 2, valued at $240,000 as of January 25, 2017. The Debtor has received an appraisal that values its FCC licenses at $82.5 million, although the Debtor's sale process has so far been unsuccessful. As a consequence, the Debtor is uncertain as to the market value of such FCC licenses.  If the Plan is approved, the Debtor will assume the four EBS Long-Term *De Facto* Lease Agreements (the "FCC Leases") with WBSY Licensing, LLC, an affiliate of T-Mobile US, Inc., (the "Spectrum Lessee"), subject to any other rights the Debtor may have in respect of such FCC Leases (including assignment of the FCC Leases under section 365 of the Bankruptcy Code).  The Plan does not contemplate rejection of the FCC Leases. Similarly, the market value of the Diocese's captive insurer is unknown at this time but according to Ecclesia's financial statements it has retained earnings of approximately $34 million and equity of approximately $37 million. The Debtor does not believe it has any other material, unrestricted assets.  In addition, as the Debtor's investments are now depleted, and the Debtor will not have material spectrum rental payments to rely upon as recurring revenues, the Debtor post-emergence will rely almost entirely upon revenue derived from Ministry Members and donations from the Catholic faithful.

The Debtor believes that the $200 million settlement contribution compares favorably to recoveries under other Diocesan bankruptcy plans.

Approximately 750 Abuse Claims, including claims filed pursuant to the Adult Survivors Act, were filed in this Chapter 11 Case.  The Debtor objected to approximately 230 Abuse Claims, and approximately 186 Abuse Claims were disallowed with prejudice and expunged pursuant to rulings by the Bankruptcy Court or withdrawn. Additionally, approximately 51 Abuse Claims were disallowed with leave to amend, approximately 46 Abuse Claims have appealed the Bankruptcy Court order disallowing their claim, and approximately 10 claim objections were denied by the Bankruptcy Court.  Approximately 12 duplicative Abuse Claims remain on the claims register.

Notwithstanding these objections and rulings by the Bankruptcy Court, the Debtor believes that a number of Abuse Claims remain on the claims register that are subject to disallowance as a matter of law.  These categories include, without limitation, duplicative claims and claims alleging abuse concerning entities that are not affiliated with the Debtor, among others.  In addition, the Debtor believes that there are substantial additional claims that fail as a matter of law, including claims where the Debtor lacked notice as a matter of law.  The above is not meant to be an exhaustive list of categories of claims that fail as a matter of law, and the Debtor expressly reserves all objections, arguments and defenses with respect to the allowance of all claims.

In sum, when discounting for claims disallowed with leave to amend and acknowledging that there are a number of claims remaining on the claims register that are subject to disallowance as a matter of law, it is the Debtor's position that there are approximately 500 facially valid Abuse Claims remaining on the claims register. However, even if the Debtor does not prevail on any additional claim objections and only 186 claims are disallowed or withdrawn, the number of remaining Abuse Claims is 565.

For illustrative purposes only, and without waiving any objections, arguments or defenses with respect to any claim, if there are 500 allowed claims, the Debtor estimates that the average per claim recovery for sexual abuse claimants is approximately $340,200 per claim *without accounting for the value of the Debtor's substantial rights against third-party insurance companies*.  If there are 565 allowed claims, the Debtor estimates that the average per claim recovery for sexual abuse claimants is approximately $301,061 per claim *without accounting for the value of the Debtor's substantial rights against third-party insurance companies*. Recoveries for holders of Abuse Claims

17

will vary, as they generally do in cases of this nature, and will be dependent upon numerous factors including: severity, duration, frequency, age, evidence and the availability of insurance coverage. Further, the per claim average recoveries above are approximate and do not account for Trust expenses. It is the Debtor's position that per claim recoveries here compare very favorably to other diocesan chapter 11 cases. Furthermore, the proposed Minimum Consideration Payments of either $50,000 or $100,000 per eligible claimant will result in distributions to claimants on a timetable that is faster than many other comparable cases.

A discussion of the Debtor's insurance program is contained in Article II.C.5 hereof. While the current value of the Debtor's third-party insurance rights is unliquidated, the Debtor believes that such insurance rights have substantial value. The Debtor's belief that such insurance rights have substantial value, and the inclusion of insurance rights as a substantial asset for consideration in this Disclosure Statement, is based on the Debtor's own analysis of the claims and insurance policies. The Debtor has also considered the insurers' good faith participation in mediation and the Committee's position regarding insurance rights. Exhibit 4 of this Disclosure Statement contains an Insurance Coverage Chart that indicates that there is substantial coverage available to pay Abuse Claims.

The Debtor believes that the Official Committee agrees that the Debtor's insurance rights have substantial value. While the Official Committee has not disclosed its valuation of insurance in this case, the press has reported that counsel for the Official Committee has described the Debtor's insurance rights as providing "hundreds of millions" of dollars of value. *See Clergy Abuse Survivors Propose $450 Million Payout from Rockville Centre Diocese*, NEWSDAY (Jan. 19, 2023) (reporting that "hundreds of millions more would come from other church insurance companies, Stang said"). This view is consistent with the positions taken by the Official Committee in this case. *See, e.g.,* Dec. 19, 2023 Hr'g Tr. at 60:20 [Docket 2753] (representing Official Committee's assertion that a *single claim* had "occurrence coverage limits of $359 million").

While the insurance assets are not free from risk, the Debtor believes that the non-insurance settlement contribution, coupled with the insurance rights contribution, brings both the aggregate and per-claim recovery well in excess of any other Diocesan chapter 11 plan in history. The above discussion is for illustrative purposes only. Individual claimant recoveries may be higher or lower than average per claim recoveries.

The Debtor urges all parties entitled to vote to accept the Plan.

**E.        Parties Entitled to Vote on the Plan**

Under the provisions of the Bankruptcy Code, not all parties in interest are entitled to vote on a chapter 11 plan. Creditors whose claims are not impaired by a plan are deemed to accept the plan under section 1126(f) of the Bankruptcy Code and are not entitled to vote. In addition, creditors whose claims are impaired by the plan and will receive no distribution under the plan are also not entitled to vote because they are deemed to have rejected the plan under section 1126(g) of the Bankruptcy Code.

The following table sets forth which Classes are entitled to vote on the Plan and which are not, and sets forth the estimated recovery and/or the impairment status for each of the separate Classes of Claims provided for in the Plan:

| Class(es) | Designation | Impairment | Estimated Recovery | Entitled to Vote |
|---|---|---|---|---|
| 1 | Priority Claims | Unimpaired | 100% | Not Entitled to Vote |
| 2 | Secured Claims | Unimpaired | 100% | Not Entitled to Vote |
| 3 | General Unsecured Claims | Impaired | 100% | Entitled to Vote |
| 4 | Arrowood Abuse Claims | Impaired | TBD | Entitled to Vote |
| 5 | London and Ecclesia Abuse Claims | Impaired | TBD | Entitled to Vote |
| 6 | Convenience Claims | Impaired | 100% | Entitled to Vote |
| 7 | Lay Pension Claims | Unimpaired | 100% | Not Entitled to Vote |
| 8 | Priest Pension Claims | Unimpaired | 100% | Not Entitled to Vote |

The Bankruptcy Code defines "acceptance" of a plan by a class of claims as acceptance by creditors in that class that hold at least two-thirds in dollar amount and more than one-half in number of the claims actually voted to accept or reject the plan. Your vote on the Plan is important. The Bankruptcy Code requires as a condition to confirmation of a plan of reorganization that each class that is impaired and entitled to vote under a plan votes to accept such plan, unless the plan is being confirmed under the "cramdown" provisions of section 1129(b) of the Bankruptcy Code. Section 1129(b) permits confirmation of a plan of reorganization, notwithstanding the non-acceptance of the plan by one or more impaired classes of claims, so long as at least one impaired class of claims or interests votes to accept a proposed plan. Under that section, a plan may be confirmed by a bankruptcy court if it does not "discriminate unfairly" and is "fair and equitable" with respect to each non-accepting class. For a detailed description of the Classes of Claims and their treatment under the Plan, see Article IV.

### F.     Solicitation Package

The package of materials (the "Solicitation Package") will be sent to attorneys for represented holders of Claims entitled to vote on the Plan. For those holders of a Claims that are unrepresented, the Solicitation Package will be sent directly to holders of Claims entitled to vote on the Plan. The Solicitation Package will contain:

1.     a cover letter describing the contents of the Solicitation Package;

2.     a copy of the notice of the Confirmation Hearing (the "Confirmation Hearing Notice");

3.     a copy of the Disclosure Statement together with the exhibits thereto, including the Plan, that have been filed with the Bankruptcy Court before the date of the mailing;

4.     the Disclosure Statement Order;

5.     a letter from the Official Committee;

6.     for holders of Claims in voting Classes an appropriate form of Ballot, instructions on how to complete the Ballot and a Ballot return envelope and such other materials as the Bankruptcy Court may direct;

7.     the Trust Distribution Procedures;

8.     each Trust Agreement; and

9.     the Solicitation Procedures.

In addition to the service procedures outlined above (and to accommodate creditors who wish to review exhibits not included in the Solicitation Packages in the event of paper service): the Plan, the Disclosure Statement

and, once they are filed, all exhibits to both documents will be made available online at no charge at the Document Website (https://dm.epiq11.com/case/drvc/dockets).

### G.        Voting Procedures, Ballots and Voting Deadline

If you are entitled to vote to accept or reject the Plan, a Ballot(s) has been enclosed in your Solicitation Package for the purpose of voting on the Plan. Please vote and return your Ballot(s) to, if by first-class mail, Diocese of Rockville Centre c/o Epiq Ballot Processing Center, P.O. Box 4422, Beaverton, OR 97076-4422, or if by hand delivery or overnight courier, Diocese of Rockville Centre c/o Epiq Ballot Processing Center, P.O. 10300 SW Allen Blvd., Beaverton, OR 97005. If you wish to submit your vote electronically, you may follow the instructions on your Ballot for completing your Ballot through the electronic Ballot submission platform on the Voting Agent's website (the "E-Ballot Platform") available at https://dm.epiq11.com/drvc. The E-Ballot Platform is the sole manner in which the Voting Agent will accept Ballots via electronic transmission. Ballots submitted by facsimile or email or other electronic means will not be counted. Holders of Claims that submit a Ballot via the E-Ballot Platform should **not** also submit a paper Ballot. Ballots should **not** be sent directly to the Debtor, the Official Committee, or their agents (other than the Voting Agent).

After carefully reviewing (1) the Plan, (2) this Disclosure Statement, (3) the order entered by the Bankruptcy Court (Docket No. 2918) (the "Disclosure Statement Order") that, among other things, established the voting procedures, scheduled a Confirmation Hearing and set the voting deadline and the deadline for objecting to Confirmation of the Plan and (4) the detailed instructions accompanying your Ballot, please indicate on your Ballot your vote to accept or reject the Plan. In order for your vote to be counted, you must complete and sign your original Ballot (copies will not be accepted) and return it to the appropriate recipient so that it is actually received by the Voting Deadline by the Voting Agent. For the avoidance of doubt, a Ballot that is properly submitted electronically via the E-Ballot Platform on the Voting Agent's website shall be deemed to contain an original signature.

Each Ballot has been coded to reflect the Class of Claims it represents. Accordingly, in voting to accept or reject the Plan, you must use only the coded Ballot or Ballots sent to you with this Disclosure Statement.

If you (1) hold Claims in more than one voting Class, or (2) hold multiple Claims within one Class, you may receive more than one Ballot.

All Ballots, in order to be counted, must be properly completed in accordance with the voting instructions on the Ballot and **actually received** no later than the Voting Deadline (i.e., March 22, 2024 at 5:00 p.m. (prevailing Eastern time)) by the Voting Agent via regular mail at the following address: Diocese of Rockville Centre c/o Epiq Ballot Processing Center, PO Box 4422, Beaverton, OR 97076-4422, via overnight courier or hand delivery at the following address: Diocese of Rockville Centre c/o Epiq Ballot Processing Center, PO Box 4422, Beaverton, OR 97005-4422, or via the E-Ballot Platform available on the Voting Agent's website at https://dm.epiq11.com/drvc. No Ballots may be submitted by electronic mail, and any Ballots submitted by electronic mail will not be accepted by the Voting Agent. Ballots should **not** be sent directly to the Debtor.

Any Ballot completed and submitted by an attorney, fiduciary, or representative on behalf of a person or entity that holds a Claim in a voting Class will not be accepted by the Voting Agent unless the following are submitted with the Ballot: (i) a copy of a valid power of attorney that provides the attorney with the authority to act on behalf of the holder of a Claim; and (ii) certifications by the attorney who completes and submits the Ballot, under penalty of perjury pursuant to 28 U.S.C. § 1746, that: (a) the holder of the Claim whose vote to accept or reject the Plan is reflected on the Ballot is represented by the attorney; (b) the attorney completing the Ballot has the authority under a power of attorney / applicable law to vote to accept or reject the Plan (in addition to making the other elections under the Ballot) on behalf of the holder's Claim for which a vote is cast on the Ballot; (c) the attorney completed the Ballot in accordance with the power granted to him or her under a power of attorney; and (d) that the attorney completing the Ballot has submitted to the Voting Agent a copy of a valid power of attorney that provides the attorney with authority to act on behalf of the person or entity that holds such Claim.

If a holder of a Claim delivers to the Voting Agent more than one timely, properly completed Ballot with respect to such Claim prior to the Voting Deadline, the Ballot that will be counted for purposes of determining whether sufficient acceptances required to confirm the Plan have been received will be the timely, properly completed Ballot determined by the Voting Agent to have been received last from such holder with respect to such Claim.

If you are a holder of a Claim who is entitled to vote on the Plan as set forth in the Disclosure Statement Order and did not receive a Ballot, received a damaged Ballot or lost your Ballot, or if you have any questions concerning the Disclosure Statement, the Plan, the Ballot or the procedures for voting on the Plan, please contact the Voting Agent (1) by telephone (a) for U.S. callers toll-free at (888) 490-0633 and (b) for international callers at +1 (503) 520-4459, (2) by e-mail at RCDRockvilleInfo@epiqglobal.com or (3) in writing at Diocese of Rockville Centre c/o Epiq Ballot Processing Center, PO Box 4422, Beaverton, OR 97076-4422.

FOR FURTHER INFORMATION AND INSTRUCTIONS ON VOTING TO ACCEPT OR REJECT THE PLAN, SEE ARTICLE VIII HEREOF.

Before voting on the Plan, each holder of a Claim in Classes 3, 4, 5 and 6 should read, in its entirety, this Disclosure Statement, the Plan, the Disclosure Statement Order, the Confirmation Hearing Notice and the instructions accompanying the Ballots. These documents contain important information concerning how Claims are classified for voting purposes and how votes will be tabulated. Holders of Claims entitled to vote are also encouraged to review the relevant provisions of the Bankruptcy Code and Bankruptcy Rules and/or consult their own attorney.

**H.    Confirmation Exhibits**

The Debtor will file copies of all Confirmation Exhibits with the Bankruptcy Court no later than seven calendar days before the objection deadline for the Confirmation Hearing to the extent not filed earlier; *provided, however*, that other exhibits to the Plan will be either (a) included in any solicitation materials distributed to holders of Claims in Classes entitled to vote to accept or reject the Plan or (b) filed as part of the Plan Supplement no later than seven calendar days prior to the objection deadline for the Confirmation Hearing. All Confirmation Exhibits will be made available on the Document Website once they are filed. The Debtor reserves the right, in accordance with the terms of the Plan, to modify, amend, supplement, restate or withdraw any of the Confirmation Exhibits after they are filed and will promptly make such changes available on the Document Website.

**I.    Confirmation Hearing and Deadline for Objections to Confirmation**

The Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on whether the Debtor has fulfilled the confirmation requirements of section 1129 of the Bankruptcy Code. The Confirmation Hearing has been scheduled for **May 9, 2024, at 10:00 a.m.**, prevailing Eastern time, before the Honorable Chief Judge Martin Glenn, United States Bankruptcy Judge for the Southern District of New York, in a courtroom to be determined at the United States Bankruptcy Court for the Southern District of New York, located at One Bowling Green, New York, NY 10004. Parties wishing to appear at the Hearing via Zoom for Government, whether making a "live" or "listen only" appearance before the Court, must make an electronic appearance through the Court's website at https://ecf.nysb.uscourts.gov/cgi-bin/nysbAppearances.pl on or before May 8, 2024, at 4:00 p.m. (prevailing Eastern Time). After the deadline for parties to make electronic appearances has passed, parties who have made their electronic appearance through the Court's website will receive an invitation from the Court with a Zoom link that will allow them to attend the Hearing. Requests to receive a Zoom link should not be emailed to the Court, and the Court will not respond to late requests that are submitted on the day of the hearing. Further information on the use of Zoom for Government can be found at the Court's website at https://www.nysb.uscourts.gov/zoom-video-hearing-guide. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice.

Any objection to Confirmation must (1) be in writing, (2) state the name and address of the objecting party and the nature of the Claim of such party and (3) state with particularity the basis and nature of such objection. Any such objections must be filed and served upon the persons designated in the Confirmation Hearing Notice in the manner and by the deadline described therein.

**J.    Parish Financial Disclosures**

The Diocese made certain parish financial data available to the Official Committee's advisors in this Chapter 11 Case pursuant to the *Stipulation and Agreed Order Extending the Termination Date of the Preliminary Injunction Staying Continued Prosecution of Certain Lawsuits* [Adv. Pro. Case No. 20-01226, Docket No. 157] (the "Stipulation and Agreed Order"). Under the Stipulation and Agreed Order, the parish annual summary financial reports and the information therein is not permitted to be shared with anyone other than the Committee Professionals designated in

the Stipulation and Agreed Order, including any other counsel or other professional, Committee member, or claimant, except as set forth specifically in the Stipulation and Agreed Order.

As provided in the Stipulation and Agreed Order, the Committee Professionals (as defined in the Stipulation and Agreed Order) were permitted to prepare aggregated summaries of the individual parish information, provided that such summaries do not disclose any individual parish's (or subset(s) of such parish's) financial information and provide only aggregated information of all the Parishes as a whole. The only groupings of information that qualified as aggregate parish financial information under the Stipulation and Agreed Order were aggregations based on individual line items from the parish annual summary financial reports. The Committee Professionals were permitted to share the aggregate parish information with members of the Official Committee and their individual state court counsel on the express condition that such information may be used only in the ongoing mediation in the Diocese's bankruptcy case and for no other purpose at any time.

In furtherance of its efforts to provide disclosures to holders of Abuse Claims as they evaluate the Plan, parishes have authorized the Diocese to include certain parish financial data as part of this Disclosure Statement in Exhibit 5.

### K.    Amendments

Subject to the limitations contained in the Plan, the Debtor reserves the right to modify the Plan as to material terms and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan. Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in the Plan, the Debtor expressly reserves its rights to alter, amend, or modify materially the Plan with respect to the Debtor one or more times including after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.

For the avoidance of doubt, such modification(s) may include a settlement pursuant to Bankruptcy Rule 9019 to resolve any unresolved controversies, including but not limited to those described in this Disclosure Statement. Any such modification or supplement shall be considered a modification of the Plan and shall be made in accordance with Article XIII.B of the Plan.

If the Bankruptcy Court finds, after a hearing on notice to the parties in interest in the Chapter 11 Cases, that the proposed modification does not materially and adversely change the treatment of the Claim of any holder thereof who has not accepted in writing the proposed modification, the Bankruptcy Court may deem the Plan to be accepted by all holders of Claims who have previously accepted the Plan. Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan occurring after the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

For the avoidance of doubt, any and all rights of holders of Claims against the Debtor are expressly reserved under Bankruptcy Rule 3019 and any other applicable provisions under the Bankruptcy Rules, Local Rules of the Bankruptcy Court, or Bankruptcy Code.

## II.    SOURCES OF FUNDING AND RECOVERIES UNDER THE PLAN

### A.    Funding as a Condition to the Effective Date

It is a condition of the Effective Date that the $150 million in funding has been contributed and is available. The Plan will not become effective unless the funding is available, the Minimum Consideration Payments are paid, General Unsecured Creditors and administrative expenses are provided for as set forth in the Plan, and the two Trusts, including the Future Claim Subfund, are funded.  Among other things, in addition to the performance of the Parishes, Catholic Charities and the Diocese, the satisfaction of this condition requires approval of the settlement

with the Cemetery Corporation and Cemetery Trust, approval of the settlement with the Department of Education and a closing of the Exit Financing.

>    1.    **The Proposed Settlement with Cemetery Corporation and Cemetery Trust**

Catholic Cemeteries of the Roman Catholic Diocese of Rockville Centre, Inc. ("Cemetery Corporation"), a New York corporation, owns three and operates four Diocesan cemeteries located on Long Island (collectively, the "Cemeteries"): Cemetery of the Holy Rood in Westbury, New York; Holy Sepulchre Cemetery in Coram, New York; Queen of All Saints Cemetery in Central Islip, New York; and the Queen of Peace Cemetery in Old Westbury, New York. Cemetery Corporation operates the Cemeteries together with Diocese Rockville Centre Catholic Cemetery Permanent Maintenance Trust ("Cemetery Trust"), a New York permanent maintenance trust. Cemetery Corporation and Cemetery Trust each has its own board and audited financial statements.

Cemetery Corporation and Cemetery Trust together provide for the burial of the faithful according to the Catholic tradition. They also have the obligation to provide "perpetual care." Such obligation is central to the operating structure of Catholic cemeteries and is part of the contractual arrangements for every interment. Funds from every interment are set aside for a permanent maintenance fund to be held, invested, and used to provide perpetual care.

Until September 1, 2017, the cemetery operations were managed as a division of the Diocese and the permanent maintenance trust was also held by the Diocese, and on that date the Diocese transferred the operations, certain of the assets (including certain cemeteries) and all of the liabilities of Cemetery Division to Cemetery Corporation and Cemetery Trust (the "Cemetery Transaction"). Specifically, under the Cemetery Transaction: (a) Cemetery Corporation assumed all obligations to provide perpetual care for the deceased; (b) the Diocese retained $47.6 million of the amount previously segregated in the Cemetery Division; and (c) Cemetery Corporation purchased the Queen of Peace Cemetery in Old Westbury, New York for its appraised value of $15.3 million. In addition, the Diocese retained the $7.5 million payment it received from the Village of Old Westbury in settlement of its litigation with the Village to operate and put into service the Queen of Peace Cemetery. The Official Committee has filed a complaint against the Cemetery Corporation in the action titled *The Official Committee of Unsecured Creditors v. Catholic Cemeteries of the Roman Catholic Diocese of Rockville Centre, Inc.*, Adv. Pro. No. 23-01121 (MG), seeking turnover of certain assets transferred by the Debtor to the Cemetery Division in 2017 and additional relief.

The Debtor has proposed a settlement to the Cemetery Corporation and the Cemetery Trust, by which the Cemetery Corporation will contribute $10 million to the Debtor's plan of reorganization and the Cemetery Trust will lend $35 million to the Debtor at an interest rate of four percent over a thirty year term in exchange for settling the avoidance actions and releasing the Cemetery Corporation and Cemetery Trust from future liability. The terms of the Cemetery Trust loan would be the following:

Principal: $35 million, non-recourse loan

Term: 30-year amortization period using traditional mortgage-style amortization

Rate: 4%

Collateral: 100% of equity in Ecclesia and silent second lien on the spectrum special purpose vehicle; provided, however, that once the outstanding loan balance is reduced to $25 million, the second lien on the spectrum special purpose vehicle shall be released.

The Committee does not believe that the loan from the Cemetery Trust should be considered a "contribution" by the Cemetery Trust justifying the settlement of causes of action against the Cemetery Trust, and the amounts need to be repaid meaning that the Debtor needs to maintain the assets and cash flow necessary to repay the loan rather than contributing those funds to pay Abuse Claims.

Neither Catholic Cemeteries nor the Cemetery Trust have accepted this proposal. If the proposal is not accepted and the chapter 11 case is dismissed, any estate claims for alleged fraudulent transfers against Catholic Cemeteries or the Cemetery Trust would revert to creditors.

2.        **The Proposed Settlement with the Department of Education**

The Department of Education, Diocese of Rockville Centre (the "Department of Education") currently owns and operates the two Diocesan high schools, Holy Trinity and St. John the Baptist. The Department of Education also supervises and helps manage the many Parish and regional Catholic elementary schools, but it does not own or operate the Parish or regional schools. The Department of Education does not oversee the two Parish High Schools. The teachers in the high schools are unionized and their employment is governed by a collective bargaining agreement.

As of September 1, 2017, the Diocese transferred the operations, real estate assets and related liabilities of three Diocesan high schools—Holy Trinity, St. John the Baptist and Bishop McGann-Mercy—to the Department of Education. The Debtor also allegedly transferred cash and investments to the Department of Education. In the deeds providing for the transfer of the real estate from the Debtor to the Department of Education, the Diocese retained reversionary interests in the event the properties were no longer used as schools. In summer 2018, Bishop McGann-Mercy was shut down. In May 2020, the McGann-Mercy property was sold to Peconic Bay Medical Center Foundation for $14 million. The Diocese received the proceeds from the sale.

The Official Committee received derivative standing to pursue potential avoidance claims related to these transfers by the Debtor to the Department of Education, and the parties reached a settlement.  In addition to the potential avoidance actions, the Department of Education has been named in four complaints in state court alleging liability stemming from sexual abuse. At the times of the abuse alleged in those complaints, the Department of Education neither owned nor operated the Diocesan high schools at which the abuse allegedly occurred. The Debtor owned and operated them.

The Debtor is proposing to settle the Abuse Claims asserted against the Department of Education and the avoidance actions on the following terms: (1) the Department of Education shall contribute $3,500,000 to the settlement trust or other fund created pursuant to the plan of reorganization; and (2) the Department of Education shall receive releases of (a) claims by the Committee and the bankruptcy estate of the Diocese, (b) all sexual abuse, other physical abuse, bullying, and civil rights claims, (c) any sexual abuse, other physical abuse, bullying and civil rights claims by way of contribution/indemnity claims against the Department of Education, (d) the benefits of the discharge injunction and channeling injunction contained in the plan of reorganization, and (e) any other benefits under the plan of reorganization for non-debtor affiliates of the Diocese which settle the claims of the Diocese against them. For the purposes of the releases, the Department of Education shall include St. John the Baptist Diocesan High School, Holy Trinity Diocesan High School, their predecessors, successors, assigns, subsidiaries, affiliates, current and former officers, directors, principals, equity holders, trustees, members, partners, managers, officials, advisory board members, advisory committee members, members of any special committee of the Board, employees, agents, volunteers, attorneys, financial advisors, accountants, investment bankers, consultants, representatives, their respective heirs, executors, estates and nominees, as applicable; provided, however, that any perpetrator of sexual abuse or other physical abuse or bullying that forms the basis for a claim against the Department of Education, St. John the Baptist Diocesan High School or Holy Trinity Diocesan High School who is an individual shall not receive any release or the benefit of any injunction described herein. The settlement is conditioned upon confirmation of the Plan and the Debtor satisfying the standards of Bankruptcy Rule 9019 for the approval of settlements.

3.        **The Exit Financing**

The Debtor believes that it may be able to implement an exit loan on the following indicative terms:

Principal Amount:  $30 million (less fees and expenses)

Interest Rate:  8.65%

Term:  20 years from exit

Collateral:  FCC License cashflows and related assets

24

One potential structure for such loan involves: (a) the Debtor transferring the FCC Licenses (and assuming and assigning the FCC Leases) to a special purpose vehicle and (b) using the special purpose vehicle's equity, as well as certain of the cashflows associated the FCC Leases, as collateral for such loan. The terms of the financing described above remain subject to change, and the effectuation of the financing described above remains subject to various contingencies, such as (a) a rating that is acceptable to any applicable potential lender; (b) market fluctuations; (c) finalization of loan documentation; and (d) the occurrence of the Effective Date. The documentation concerning any such loan would be included in a supplement to the Debtor's chapter 11 plan. The following provisions, which pertain to any such potential financing, are set forth in the Plan.

Upon entry of the Confirmation Order, the Debtor and Reorganized Debtor (as applicable) shall be authorized to execute and deliver, and to consummate the transactions contemplated by or permitted under, the Exit Facility Documents (including any asset transfers contemplated thereby) in all respects without further notice to or order of the Bankruptcy Court, act or action under applicable Law, regulation, order or rule or the vote, consent, authorization or approval of any person or entity, subject to such modifications as the Debtor or Reorganized Debtor (as applicable) may deem to be necessary to consummate the Exit Facility Documents. Confirmation of the Plan shall be deemed approval of the Exit Facility and Exit Facility Documents, including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, obligations and guarantees to be incurred and fees paid in connection therewith. On the Effective Date, the Exit Facility shall constitute legal, valid, binding and authorized indebtedness and obligations of the Reorganized Debtor, enforceable in accordance with its terms and such indebtedness and obligations (and the transactions effectuated to implement the Exit Financing) shall not be and shall not be deemed to be, enjoined or subject to discharge, impairment, release or avoidance under the Plan, the Confirmation Order or on account of the confirmation or consummation of the Plan.

On the Effective Date, all the liens and security interests granted in accordance with the Exit Facility Documents shall be legal, valid, binding upon the Reorganized Debtor, enforceable in accordance with their respective terms, and no obligation, payment, transfer or grant of security under the Exit Facility Documents shall be stayed, restrained, voidable, or recoverable under the Bankruptcy Code or under any applicable law or subject to any defense, reduction, recoupment, setoff or counterclaim. Such liens and security interests shall be deemed automatically perfected on the Effective Date without the need for the taking of any further filing, recordation, approval, consent or other action, and such liens and security interests shall not be enjoined or subject to discharge, impairment, release, avoidance, recharacterization or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy law.

On the Effective Date, the Reorganized Debtor and the Exit Facility Lender shall be authorized to make all filings and recordings, obtain all governmental approvals and consents, and take any other actions necessary to establish and perfect such liens and security interest under the provisions of the applicable state, federal, or other law (whether domestic or foreign) that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfections shall occur automatically by virtue of the entry of the Confirmation Order and any such filings, recordings, approvals, and consents shall not be required), and the Reorganized Debtor shall thereafter cooperate to make all other findings and recordings that otherwise would be necessary under applicable law to give notice of such liens and security interests to third parties.

### B.      Post Effective Date Funding.

The Seminary Sale. It is expected that the closing of the Seminary sale will provide $16 million of the $25 million due on the first anniversary of the Effective Date.

On October 6, 2023, the Committee filed a *Motion Pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure for Entry of an Order Approving a Settlement Agreement and Release Between the Seminary, the Committee, and the Diocese* [Docket No. 2548]. Through this motion, the Committee proposed settlement of the estate's alleged causes of action against the Seminary.

The terms of the proposed settlement are as follows: (1) the Seminary would sell approximately 200.3 acres of the Seminary property, while retaining the main Seminary building and approximately 16 acres of the Seminary property associated with the Seminary's operations, (2) New York State would purchase approximately 180.3 acres of undeveloped Seminary acreage for use as a nature preserve for $18.03 million, while the Village of Lloyd Harbor

would purchase the remaining approximately 20 acres for $2 million, (3) upon closing of the Seminary property sale, the Seminary shall pay 80% of the sale proceeds to the abuse claims trust created in connection with a confirmed plan of reorganization for the Diocese in the Bankruptcy Case, or if the Bankruptcy Case is dismissed, to the Diocese, and (4) upon payment of the settlement amount, the Diocese and the Committee shall release the Seminary from the adversary claims arising out of the Seminary transfer.

The Bankruptcy Court approved the Committee's settlement motion on October 25, 2023 [Docket No. 2612].

If the Seminary sale does not close, the Seminary and the Diocese are jointly liable for the $16 million due on the first anniversary of the Effective Date.

Remaining Post Effective Date Funding. The remaining $34 million of post-Effective Date funding represents the joint and several obligation of the Parishes. Each Parish is jointly liable for the entire amount when due.

### C.    Insurance Coverage for Abuse Claims

### 4.    Overview of Debtor's Insurance Coverage

The extent of the Debtor's insurance coverage for Abuse Claims is set forth on Exhibit 4. A more detailed description follows.

The Debtor has acted to identify and preserve insurance policies in effect when abuse allegedly occurred, including, at various points, primary and excess insurance policies. In the period leading up to the effective date of the CVA, the Debtor expended substantial effort to pull together insurance policies and secondary evidence of insurance coverage from the late 1950s to the present. Due to the passage of time and the disposal of documents in the ordinary course of business, several documents regarding coverage were no longer available in the files. Accordingly, among other measures, the Debtor engaged insurance coverage counsel at Reed Smith to assist the Debtor in finding relevant insurance policies covering what are in many cases decades-old claims. Among the sources searched in connection with this effort were court dockets for litigation between the Debtor and Royal Insurance Company in the early 1990s, which is how the Debtor was able to uncover pertinent insurance policies issued by this carrier from approximately 1960 to 1976.

On February 19, 2019, the Debtor sent notice to its various insurers of all reported Abuse Claims that had been time-barred prior to the CVA's effective date. The Debtor has continued to provide notice of all additional reported claims since the original notices. In addition, the Debtor has provided notice to its various insurers of all cases commenced on or after August 14, 2019 (as well as two cases commenced previously and stayed until that date). For claims alleging abuse during the Royal Period, the Debtor has requested that Royal honor its obligation to reimburse the Debtor's defense costs. The Debtor similarly has invoked its rights and requested that the London Market Insurers honor their obligation to reimburse the Debtor's defense costs for claims alleging abuse during the period from October 1, 1976 to October 22, 1986, to the extent that the applicable self-insured retention has been met.

Because the Debtor and certain insurers had not reached a resolution of certain disputes as of the Petition Date, the Debtor filed an adversary proceeding in this case against certain of the Debtor's insurers seeking, among other things, a declaratory judgment with respect to the Debtor's rights and the insurers' obligations under such insurance policies for the benefit of the abuse survivors. The coverage cases are ongoing and insurers have raised certain defenses to coverage. The Debtor believes that there is substantial value in the insurance policies that it purchased over many decades. These assets are an important resource to further the Debtor's goals of compensating and reconciling with abuse survivors.

The Debtor maintained and maintains a broad insurance program to insure its many activities. Specifically, the Debtor purchased and continues to purchase commercial general liability ("CGL") primary, umbrella, and excess liability insurance policies to protect itself and various other entities from a myriad of risks. These CGL policies provided and continue to provide substantial insurance coverage, including under the older policies, for claims arising out of sexual abuse or sexual misconduct.

The CGL policies provide coverage to the DRVC and the incorporated parishes, schools, and other Roman Catholic entities within the Debtor's territory (the "Debtor Related Parties"). As "Named Insureds," the Debtor Related Parties have the same rights as the Debtor to the limits of liability under those insurance policies. Thus, the limits of liability are "shared" between the Debtor and the Debtor Related Parties. Importantly, these shared insurance policy proceeds are paid on a first-come-first-served basis, meaning that once the insurance company has satisfied its obligation on a per-claim or aggregate basis for one insured, the insurance policy proceeds will not be available to other insureds.

From inception to the present, the Debtor purchased insurance policies from different insurance companies. These insurance policies can be broken down into three groups: the Royal years (from inception to 1976); the London Program years (from 1976 to 1986); and the Ecclesia years (from 1986 to the present).

### 5. The Royal Policies (inception to 1976)

From its creation until 1976, the Debtor purchased both primary and excess or umbrella insurance coverage (as relevant, the "Royal Primary Policies" and the "Royal Umbrella Policies") from Royal Indemnity Insurance and Royal Globe Insurance Company (collectively now known as Arrowood Indemnity Company, "Royal" and its affiliates). The Royal Policies cover both the Debtor and the Debtor Related Parties.

The Royal Primary Policies provide the first layer of insurance coverage for the Debtor and the Debtor Related Parties. These insurance policies do not have aggregate limits of liability, but they do have per-occurrence limits of liability. These per occurrence policy limits range from $150,000 to $300,000, depending on the policy period. This means that the Royal Primary Policies cover the first $150,000 to $300,000 of liability, for as many claims as may be asserted for any injury occurring during the policy period. The Royal Primary Policies also provide for an unlimited payment of defense costs for each claim, as long as the Royal Primary Policies' limits of liability have not been exhausted for any particular claim. Until 1964, the Royal Primary Policies were the Debtor's only insurance coverage—there are no Royal Umbrella Policies before that date. Thus, for example, if a parish or another insured settles a claim for the policy limit, the Debtor would be left with no insurance coverage remaining for that particular claim, either for the ongoing defense or for any settlement or judgment against the Debtor.

From 1964 to 1976, Royal also provided the Debtor with excess or umbrella insurance coverage. The Royal Umbrella Policies cover liability that exceeds the limits of liability for the Royal Primary Policies. From June 4, 1964 to June 4, 1966, the Royal Umbrella Policies had a $2 million per-occurrence limit of liability with no aggregate limit of liability per policy period. From June 4, 1966 to June 4, 1970, the per-occurrence limits were $4 million, apparently with no aggregate limit of liability per policy period. From June 4, 1970 to October 1, 1973, the Royal Umbrella Policies had per-occurrence and likely aggregate limits of liability of $4 million per policy period. And from October 1, 1973 through March 1, 1975, the Royal Umbrella Policies had per occurrence and likely aggregate limits of $7 million per policy period. Finally, from March 1, 1975 through October 1, 1976, the Royal Umbrella Policies had per-occurrence and likely aggregate limits of $12 million per policy period. For any Royal Umbrella Policy determined to have an aggregate limit of liability, once certain amounts equal to the aggregate limit of liability are paid pursuant to the terms of that Royal Umbrella Policy, that particular insurance policy would be exhausted and no additional amounts will be covered by that insurance policy.

On November 8, 2023, an insolvency proceeding was commenced against Arrowood as the successor to Royal in Delaware and an injunction against the commencement or continuance of an action against Arrowood or an insured claiming coverage by Arrowood was entered. On January 5, 2024, a petition for an ancillary proceeding was filed in New York by the Superintendent of the Financial Services Department, which is responsible as a guarantor of New York insureds to the lesser of coverage limits per claim or $1 million per claim per policy period. The Superintendent also seeks a further injunction against Arrowood or an insured claiming coverage by Arrowood for an additional 180 days upon order of the court approving the ancillary proceeding.

### 6. The London Program Policies (1976 to 1986)

From 1976 until 1986, the Debtor purchased insurance coverage (the "London Policies") from a syndicate of insurance companies known as the London Market Insurers (the "London Insurers"), with additional excess insurance coverage provided by various other insurers, including Interstate Fire & Casualty Company (collectively with the London Insurers, the "London Program"). Like the Royal Policies, all of the London Policies also cover both the

Debtor and the Debtor Related Parties, and the insurance policy proceeds are shared between all co-insureds. Under the London Policies, the insureds are required to cover the first $100,000 of liability per occurrence, an amount referred to as the "Self-Insured Retention" ("SIR"). From there, the London Policies provide an initial layer of insurance coverage containing two insuring agreements—an "Aggregate Agreement" and a "Specific Excess Agreement." The London Policies also include a first layer of excess insurance policies (the "Interstate Policies") which were in effect from October 1, 1978 to September 1, 1985[7] and second layer excess insurance policies (the "London Excess Policies").

The Aggregate Agreement is designed to reimburse the insureds for SIR payments above a prescribed SIR aggregate amount. This SIR aggregate amount was $1.2 million beginning with the first London Program insurance policy in 1976, and was incrementally increased to $4.5 million with the last policy ending in 1986. Once the insureds have made the applicable aggregate amount of SIR payments, the London Insurers are responsible for any additional SIR payments during that policy year up to a stated aggregate limit (ranging between approximately $500,000 and $1 million in later years). Any SIR payments above these limits would again be the responsibility of the insureds. The remaining unpaid limits of the Aggregate Excess portion of the LMI coverage from 1976 through 1986 totals approximately $4.6 million. The remaining unpaid LMI Aggregate Excess limits on an annual basis are as follows:

- 10/1/1976-77: $106,214.00
- 10/1/1977-78: $500,000.00
- 10/1/1978-79: $500,000.00
- 10/1/1979-80: 500,000.00
- 10/1/1980-81: $500,000.00
- 10/1/1981-82: $418,547.00
- 10/1/1982-9/1/83: $1,000,000.00
- 9/1/1983-84: $117,402.00
- 9/1/1984-85: Exhausted
- 9/1/1985-86: $1,000,000.00

The Specific Excess Agreement provides coverage for losses that exceed the SIR of $100,000, up to a specified per-occurrence limit. The Specific Excess Agreement contained per-occurrence limits of mostly $200,000, meaning that after the SIR was satisfied for a claim (either by the insureds or under the Aggregate Agreement), the Specific Excess Agreement required the London Insurers to cover the next $100,000 of liability for that occurrence. Significantly, there is no aggregate limit of liability under the Specific Excess Agreement. As a result, the London Insurers continue to be liable for their share of all covered losses over $100,000, including for claims alleging injuries during a London Market policy period that have been recently asserted under the CVA. Under the London Policies, defense costs are generally considered part of the ultimate net loss. This means that incurring reimbursable defense costs depletes the available policy proceeds. To cover losses beyond the amounts covered by the Specific Excess Agreement, the Debtor also purchased first layer excess insurance policies as part of the London Program. The first layer of excess coverage generally covered the difference between $200,000 and $5 million for each occurrence, with no aggregate limit of liability, and was provided by Interstate and other insurance companies. The second layer excess insurance policies covered per-occurrence liability above $5 million, up to a per-occurrence limit of liability of $5 million to $45 million, depending on the policy period. Typically, neither layer of insurance coverage included an aggregate limit of liability, meaning that those insurance companies still retain liability for new claims alleging injury during a London Program policy period, up to their share of the per-occurrence limits of liability.

Thus, even while the automatic stay bars litigation against the Debtor, if a CVA plaintiff succeeded in establishing liability against a Parish for sexual abuse occurring during the London Program policy periods, the Parish would be able to draw insurance policy proceeds to cover the loss. For example, if the Parish's liability for the claim was $200,000, the Parish would be responsible for a $100,000 SIR, but may be entitled to have some or all of the SIR reimbursed from the insurance proceeds of that year's Aggregate Agreement. The Parish would also be entitled to indemnification of $100,000 under the Specific Excess Agreement for the amount of the loss exceeding the SIR. Importantly, once the insurance company has paid its share of the covered loss to the Parish, it will have no further

---

[7] The Interstate Policies were also in effect for the period September 1, 1985 to September 1, 1986, but Interstate asserts that those policies include provisions which bar coverage for claims against an insured arising out of any sexual or physical abuse or molestation that occurred during the policy period.

obligation regarding that occurrence. As a result, if the Debtor later attempted to settle with that CVA plaintiff in its chapter 11 case, no insurance policy proceeds would be available under the Aggregate Agreement, and the proceeds paid to the Parish under the Specific Excess Agreement would also not be available to the Debtor.

7.    **The Ecclesia Policies**

Ecclesia Assurance Company ("<u>Ecclesia</u>") is the sole provider of insurance for the Debtor and the Debtor Related Parties for alleged sexual abuse that occurred after August 31, 1986. Ecclesia is a captive property and casualty insurance company that provides insurance to the Debtor. It is a separate corporation that is wholly owned by the Debtor. Ecclesia was incorporated in New York in December 2003. The company is a licensed insurer and reinsurer. It is also subject to the supervision of the New York State Department of Financial Services.

The sexual abuse liability insurance coverage provided by Ecclesia is subject to per claim limits of $750,000 in excess of self-insured retentions (or deductibles) of $250,000 per claim and an aggregate limit of liability for Abuse Claims of (i) $15 million for claims made before October 31, 2020 based on alleged incidents that occurred on or after September 1, 1986 and prior to October 31, 2019 and (ii) $7.5 million for claims made, and for claims based on alleged incidents that occurred, on or after October 31, 2019.

The available coverage for non-abuse General Unsecured Claims under the Ecclesia policies is not altered by the Plan.

As with the Royal Policies and the London Program Policies, the Debtor Related Parties are co-insureds with the Debtor and the insurance policy proceeds are shared among all the insureds. Thus, if litigation were allowed to continue to judgment against a Parish, notwithstanding that the litigation has been automatically stayed against the Debtor, the Parish would be able to recover proceeds from the Ecclesia insurance policies, and those insurance proceeds would not be available to the Debtor to fund a judgment or settlement of claims. Indeed, because the Ecclesia insurance policies include aggregate limits of liability, a dollar of insurance recovery paid to a Parish is a dollar less insurance recovery available to the Debtor for any covered claims during that policy period, not simply for the particular claim.

## III.    THE TRUSTS AND TRUST DISTRIBUTION PROCEDURES

THE FOLLOWING SUMMARY HIGHLIGHTS CERTAIN OF THE SUBSTANTIVE PROVISIONS OF THE PLAN, AND IS NOT, NOR IS IT INTENDED TO BE, A COMPLETE DESCRIPTION OR A SUBSTITUTE FOR A FULL AND COMPLETE REVIEW OF THE PLAN.  THE DEBTOR URGES ALL HOLDERS OF CLAIMS TO READ AND STUDY CAREFULLY THE PLAN, A COPY OF WHICH IS ATTACHED HERETO AS <u>EXHIBIT 1</u>.

A.    **The Arrowood Settlement Trust and the General Settlement Trust**

1.    **Trust Establishment**

The Arrowood Settlement Trust and the General Settlement Trust shall be established on the Effective Date. The Arrowood Settlement Trust and the General Settlement Trust shall be administered and implemented by the Arrowood Settlement Trustee and the General Settlement Trustee as provided in the Trust Documents. Specifically, the Arrowood Settlement Trust and the General Settlement Trust shall, without limitation: (1) assume liability for all Abuse Claims; and (2) hold and administer the Trust Assets, liquidate the Abuse Claims, and make Trust Distributions to holders of Abuse Claims from the Trust Assets.

Certain Arrowood claims might qualify for payment from the New York Property/Casualty Insurance Security Fund, which is administered by the New York Liquidation Bureau. The New York Liquidation Bureau is to pay any shortfall in claims issued by Arrowood, subject to certain statutory limits. The Debtor has created a separate trust for abuse claims covered by Arrowood policies to secure the highest recovery possible for Arrowood claimants

and to ensure that any insurance proceeds provided by the New York Liquidation Bureau are solely allocated to Arrowood claimants.

The Arrowood Settlement Trust and the General Settlement Trust shall, as applicable, administer, process, settle, resolve, liquidate, satisfy, and make Trust Distributions from the Trust Assets on account of Abuse Claims in such a way that the holders of Abuse Claims are treated equitably and in a substantially similar manner, subject to the applicable terms of the Plan Documents and the Trust Documents. From and after the Effective Date, the Abuse Claims shall be channeled to the Arrowood Settlement Trust and the General Settlement Trust pursuant to the Channeling Injunction set forth in Article XI of the Plan and may be asserted only and exclusively against the Arrowood Settlement Trust and the General Settlement Trust.

All Abuse Claims shall be considered Settling Abuse Claims unless (a) the holder of the Abuse Claim elects on a properly completed, timely submitted Ballot (as defined in the Solicitation Procedures) to be treated as a Contested Abuse Claim, or (b) the Debtor has filed an objection to such Abuse Claim prior to February 22, 2024, that has not been withdrawn or settled prior to the Voting Deadline.

A schedule listing the Abuse Claims is attached hereto as Exhibit 6. Since the Debtor's plan of reorganization allocates Abuse Claims into two trusts, holders of Abuse Claims may receive different distributions, depending on many factors, including but not limited to the nature of their claim, whether they are a Contested Abuse Claim or a Settling Abuse Claim, and which trust their respective claim is allocated to.

2.      **Transfer of Assets to the Trusts**

On the Effective Date, the Trust Assets shall automatically and without further act or deed be transferred to, vested in, and assumed by the Arrowood Settlement Trust and the General Settlement Trust. Notwithstanding anything herein to the contrary, no monies, choses in action, and/or assets comprising the Trust Assets that are transferred, granted, assigned, or otherwise delivered to the Arrowood Settlement Trust or the General Settlement Trust shall be used for any purpose other than in accordance with the Plan and the Trust Documents, including the payment or administration of Abuse Claims as set forth in the Trust Documents.

3.      **Settlement Trusts and Subfunds**

   a.      *Settlement Trusts*

On the Effective Date and thereafter as Trust Assets are received by the Arrowood Settlement Trust and the General Settlement Trust, each Trustee shall allocate such Trust Assets among the Trusts in accordance with the Trust Documents as follows:

   i.      **Arrowood Settlement Trust**.  The Arrowood Settlement Trust shall receive all Insurance Rights relating to Abuse that is alleged to have occurred before October 1, 1976 to the Arrowood Settlement Trust.  The Arrowood Settlement Trust shall receive the Trust Assets (other than the Insurance Rights, including the Ecclesia Contribution, and amounts allocated to the Future Claim Subfund) in a proportion equal to the Arrowood Settlement Trust Share to the Arrowood Settlement Trust.

   ii.     **General Settlement Trust**.  The General Settlement Trust shall receive all Insurance Rights, including the Ecclesia Contribution, relating to Abuse that is alleged to have occurred on or after October 1, 1976 to the General Settlement Trust.  The General Settlement Trust shall receive the Trust Assets (other than the Insurance Rights, including the Ecclesia Contribution, and amounts allocated to the Future Claim Subfund) in a proportion equal to the General Settlement Trust Share to the General Settlement Trust.  The General Settlement Trust shall also receive, for the benefit of the Future Claim Subfund, cash in an amount equal to six percent (6%) of the sum of (A) the Trust Assets (other than Insurance

Rights, including the Ecclesia Contribution), and (B) the aggregate possible Minimum Consideration Payments.

For the avoidance of doubt, the Trust Assets received by the Trusts shall be, in the aggregate, $200 million (including the Ecclesia Contribution) and the other Insurance Rights, less the sum of (i) the aggregate amount of all Allowed Administrative Expenses, Allowed Priority Tax Claims, Allowed Priority Claims, Allowed Convenience Class Claims, and Allowed Secured Claims, (ii) the GUC Plan Distribution, (iii) the Cure Amounts and (iv) the aggregate amount of the Minimum Consideration Payments. The Trust Assets (other than the Insurance Rights) are allocated to the Arrowood Settlement Trust and the General Settlement Trust based on the number of claimants allocated to each trust.

   *b.*  *Settlement Trusts – Subfunds*

Within each of the Arrowood Settlement Trust and the General Settlement Trust, each such trustee shall allocate the Trust Assets in such trust between the Contested Claim Subfund for such trust and the Settling Claim Subfund for such trust in accordance with the Trust Documents as follows:

    i.  **Arrowood Settlement Trust**. With respect to the Arrowood Settlement Trust, the Arrowood Settlement Trustee shall allocate (I) to the Contested Claim Subfund (A) the Insurance Rights received by the Arrowood Settlement Trust that are associated with any Contested Abuse Claim in Class 4 and (B) the product of the Trust Assets received by the Arrowood Settlement Trust (other than Insurance Rights) and the Contested Claim Subfund Share and (II) to the Settling Claim Subfund (A) all other Insurance Rights allocated to the Arrowood Settlement Trust and (B) the product of the Trust Assets received by the Arrowood Settlement Trust (other than Insurance Rights) and the Settling Claim Subfund Share.

    ii.  **General Settlement Trust**. With respect to the General Settlement Trust, the General Settlement Trustee shall allocate (I) to the Contested Claim Subfund (A) the Insurance Rights received by the General Settlement Trust that are associated with any Contested Abuse Claim in Class 5 and (B) the product of the Trust Assets received by the General Settlement Trust (other than Insurance Rights) and the Contested Claim Subfund Share, (II) to the Settling Claim Subfund (A) all other Insurance Rights allocated to the General Settlement Trust and (B) the product of the Trust Assets received by the General Settlement Trust (other than Insurance Rights) and the Settling Claim Subfund Share, and (III) to the Future Claim Subfund, cash in an amount equal to six percent (6%) of the sum of (A) the Trust Assets (other than Insurance Rights, including the Ecclesia Contribution), and (B) the aggregate possible Minimum Consideration Payments.

   *c.*  *Straddle Allocation*

On the Effective Date and from time to time thereafter, the General Settlement Trustee shall transfer Trust Assets from the General Settlement Trust to the Arrowood Settlement Trust in an amount equal to the value of the Debtor and the Co-Insured Parties' Insurance Rights for alleged Abuse occurring on or after October 1, 1976 by holders of Arrowood Claims. The Arrowood Settlement Trustee and the General Settlement Trustee shall negotiate in good faith to determine such value and the timing of such transfers. If the Arrowood Settlement Trustee and the General Settlement Trustee cannot reach mutual agreement with respect to such value or timing, the Arrowood Settlement Trustee and the General Settlement Trustee may seek an order of the Bankruptcy Court estimating such value. The Arrowood Settlement Trustee shall allocate such transfers between the Contested Claim Subfund and the Settling Claim Subfund in accordance with the Arrowood Settlement Trust Agreement.

d.    *Allocation of Expenses Among Subfunds*

Each Trustee shall allocate all Trust Expenses to the fullest extent identifiable to each appropriate subfund, with the intent that each subfund shall bear its own fees, costs and expenses. To the extent a Trust Expense cannot be allocated to a particular subfund, such Trust Expense shall be allocated based on the Contested Claim Subfund Share and the Settling Claim Subfund Share. Each Trustee's allocation of Trust Expenses shall be binding absent manifest error. For the avoidance of doubt, the fees, costs and expenses of the Litigation Administrator (in its capacity as such) shall be reimbursed solely from Contested Claim Subfunds and, to the fullest extent identifiable, to the applicable Contested Claim Subfund for which such expense relates.

All Trust Operating Expenses shall be payable out of the Trust Assets. Each Trustee shall allocate all Trust Expenses to the fullest extent identifiable to each appropriate subfund, with the intent that each subfund shall bear its own fees, costs and expenses. Trust Expenses will depend on numerous factors including: the number of Abuse Claims assigned to each Trust, how many Abuse Claims elect to be Contested Abuse Claims, the compensation of Trust Professionals, and the time and expense required to obtain the Insurance Proceeds including litigation expenses related thereto. Some of these expenses may be indemnified or reimbursed from applicable insurance policies.

4.    **Trust Agreements**

The Arrowood Settlement Trust Agreement and the General Settlement Trust Agreement are each between the Debtor and the relevant Trustee and govern each Trust. The Arrowood Settlement Trust Agreement and the General Settlement Trust Agreement are each dated as of the Effective Date.

5.    **Trustees**

On the Confirmation Date, the Bankruptcy Court shall appoint the Arrowood Settlement Trustee and the General Settlement Trustee to serve in accordance with, and who shall have the functions and rights provided in, the Arrowood Settlement Trust Agreement and the General Settlement Trust Agreement. Any successor Trustees shall be appointed in accordance with the terms of the Arrowood Settlement Trust Agreement or the General Settlement Trust Agreement, as applicable. For purposes of the Trustees performing their duties and fulfilling their obligations under the Trusts and the Plan, the Trusts and the Trustees shall be deemed to be "parties in interest" within the meaning of section 1109(b) of the Bankruptcy Code. The Trustees shall each be the "administrator" of their respective Trusts as such term is used in Treas. Reg. Section 1.468B-2(k)(3).

LMI, Interstate, Associated International Insurance Company, and Lexington Insurance Company contend that the General Settlement Trustee's duties require it to both (i) vigorously defend claims, and (ii) act only in the interests of the General Settlement Trust's beneficiaries, each as required by New York law, and that the performance of either duty would violate the other duty. LMI, Interstate, Associated International Insurance Company, and Lexington Insurance Company further contend that if the General Settlement Trustee were to not vigorously defend the Abuse Claims, LMI, Interstate, Associated International Insurance Company, and Lexington Insurance Company would be excused from indemnifying the General Settlement Trust, which would reduce recoveries for the London and Ecclesia claimants.

6.    **Trust Advisory Committee**

The Arrowood Settlement Trust Agreement and the General Settlement Trust Agreement provide for the establishment of the Trust Advisory Committee to serve as an advisory committee to such Trusts representing the interests of holders of Abuse Claims. The Trust Advisory Committee members shall have the functions, duties and rights provided in the Settlement Trust Agreement. Each Trust Advisory Committee member shall serve in accordance with the terms and conditions of the Settlement Trust Agreement. The Trust Advisory Committee shall have the functions and rights provided for in the Arrowood Settlement Trust Agreement and the General Settlement Trust Agreement.

The Arrowood Settlement Trust Agreement and the General Settlement Trust Agreement provide that the Trustee of each such Trust shall consult with the Trust Advisory Committee on matters pertaining to the administration of the Arrowood Settlement Trust and the General Settlement Trust and must obtain the consent of the Trust Advisory

Committee as set forth in the Trust Documents. The Arrowood Settlement Trustee and the General Settlement Trustee shall meet with the Trust Advisory Committee no less frequently than quarterly. The Trust Advisory Committee shall receive reasonable compensation for their services from the Arrowood Settlement Trust and the General Settlement Trust and may utilize counsel and other professionals as reasonably necessary to assist in the performance of its duties, and the Trust Advisory Committee and their professionals shall be entitled to reasonable reimbursement of expenses by the Arrowood Settlement Trust and the General Settlement Trust, subject to compliance with an agreed-upon budget that shall be set forth in the Arrowood Settlement Trust Agreement and the General Settlement Trust Agreement.

7.      **Professional Retention and Compensation of Trustees**

The Trustees shall be entitled to compensation as provided for in the Arrowood Settlement Trust Agreement and the General Settlement Trust Agreement. The Trustees may retain and reasonably compensate, without Bankruptcy Court approval, counsel and other professionals as reasonably necessary to assist in the duties of the Trustees subject to the terms of the Arrowood Settlement Trust Agreement and the General Settlement Trust Agreement. All fees and expenses incurred in connection with the foregoing shall be payable from each Trust, as applicable, as provided for in the Arrowood Settlement Trust Agreement and the General Settlement Trust Agreement.

8.      **Future Claimants Representative**

The amount allocated to the Future Claim Subfund is cash in an amount equal to six percent (6%) of the sum of (A) the Trust Assets (other than Insurance Rights, including the Ecclesia Contribution), and (B) the aggregate possible Minimum Consideration Payments. The Debtor estimates this amount is equal to approximately $9.9 million. This amount is intended to represent the same percentage amount as the agreement reached between the Official Committee and the Future Claimant's Representative embodied in the Official Committee's filed plan of reorganization. *See First Amended Chapter 11 Plan of Reorganization Proposed by the Official Committee of Unsecured Creditors* [Docket No. 1643] at Section 7.3.2. Any amounts allocated to the Future Claim Subfund not paid to future claimants shall be returned to the Reorganized Debtor.

The General Settlement Trust Agreement provides for the continuation of the Future Claimants' Representative to serve as an advisor to the Future Claim Subfund representing the interests of holders of Future Abuse Claims. The Future Claimants' Representative shall have the functions and rights set forth in the General Settlement Trust Agreement. The General Settlement Trustee shall consult with the Future Claimants' Representative on matters pertaining to the administration of the Future Claim Subfund and must obtain the consent of the Future Claimants' Representative as set forth in the General Settlement Trust Agreement and the Trust Distribution Procedures. The General Settlement Trustee shall meet with the Future Claimants' Representative no less frequently than quarterly. The Future Claimants' Representative shall receive reasonable compensation for his services from the Future Claim Subfund and may utilize counsel and other professionals as reasonably necessary to assist in the performance of his or her duties, and the Future Claimants' Representative and his professionals shall be entitled to reasonable reimbursement of expenses from the Future Claim Subfund, subject to compliance with an agreed-upon budget that shall be set forth in the General Settlement Trust Agreement.

The Committee does not agree that the approximately $9.9 million amount is appropriate in light of the limited definition of Future Abuse Claims and the fact that any monies not used revert to the Diocese and not to holders of Abuse Claims. The Committee's proposal of 6% in the Committee Plan was based on a different plan construct and was not final. The Committee believes that holders of Abuse Claims should view this as a nearly $10 million dollar deduction from the amount being paid to holders of Abuse Claims.

9.      **Settling and Non-Settling Insurance Companies**

The Settling Insurance Companies shall consist of (a) Ecclesia and (b) any other Insurer that enters into a settlement, sale or other transaction with the Debtor, the Estate, or any successor thereto, that is approved pursuant to the Confirmation Order or separate order of the Bankruptcy Court, including any settlement, compromise, buyback or similar agreement concerning an Insurance Policy (the "Settling Insurers").

10.     **Insurance Assignment and Other Insurance Policies**

*a.*     As of the Effective Date, the Covered Parties shall irrevocably transfer, grant, and assign to the Arrowood Settlement Trust and the General Settlement Trust, and the Arrowood Settlement Trust and the General Settlement Trust shall receive and accept, any and all of the Insurance Rights. This Insurance Rights Transfer is made to the Arrowood Settlement Trust and the General Settlement Trust for the benefit of Entities that have a Claim for compensation for damages against the Covered Parties on account of Settling Abuse Claims;

*b.*     the Insurance Rights Transfer is made free and clear of all Claims, Liens, Encumbrances, or Causes of Action of any nature whatsoever, except available limits of liability for coverage of certain types of claims under one or more of the Insurance Policies that may have been reduced by certain prepetition payments made by an Insurer under any of the Insurance Policies;

*c.*     the Arrowood Settlement Trust and the General Settlement Trust shall be solely responsible for satisfying, to the extent required under applicable law, any premiums, deductibles, self-insured retentions, and fronting obligations arising in any way out of any and all Abuse Claims;[8]

*d.*     the Arrowood Settlement Trust and the General Settlement Trust shall comply with any notice obligations required under the Insurance Policies and applicable law;

*e.*     the Insurance Rights Transfer is made to the maximum extent possible under applicable law;

*f.*     the Insurance Rights Transfer is absolute and does not require any further action by the Covered Parties, the Arrowood Settlement Trust and the General Settlement Trust, the Bankruptcy Court, or any other Entity;

*g.*     the Insurance Rights Transfer is not an assignment of any insurance policy itself and shall be valid and enforceable in accordance with the terms of any Insurance Policy, in each case notwithstanding any anti-assignment provision in or incorporated into any Insurance Policy; and

*h.*     the Insurance Rights Transfer shall be governed by, and construed in accordance with, the Bankruptcy Code and the laws of the state of New York, without regard to its conflict of law principles.

For the avoidance of doubt, the Insurance Rights Transfer shall not, and shall not be deemed to, transfer, grant, or assign to the Arrowood Settlement Trust or the General Settlement Trust any insurance rights of the Debtor or the Covered Parties that pertain to any Insured Non-Abuse Claims.  Nor shall the Insurance Rights Transfer violate or be deemed to violate any cooperation clause of any Insurance Policy. The insurance rights of the Debtor or the Covered Parties that pertain to Insured Non-Abuse Claims are expressly reserved for the Debtor, the Reorganized

---

[8] To the best of the Debtor's knowledge, there are no premium, deductible, or fronting obligations that would need to be paid by the Trusts in relation to the Abuse Claims. Under the Arrowood insurance policies, there are no self-insured retentions. For the LMI insurance policies, there is a $100,000 self-insured retention for "ultimate net loss each and every loss and/or occurrence" in the specific excess coverage. The Trusts may need to retain reserves to satisfy the $100,000 self-insured retention depending on applicable law, and that amount may depend on the number and value of the claims within the LMI coverage. Some amounts within the self-insured retention layers are covered by the Aggregate Agreement in the LMI insurance policies. Ecclesia is contributing its full limits in excess of the $250,000 self-insured retentions for Abuse Claims.

Debtor, or the Covered Party, as applicable, and the Plan Documents shall not, and shall not be deemed to, transfer, grant, or assign such rights to the Arrowood Settlement Trust or the General Settlement Trust. Upon the Insurance Rights Transfer, the Trusts shall have whatever obligations, if any, that exist under the Insurance Policies under applicable law. Moreover, for the avoidance of doubt, the insurance rights of any Entity that is not a Covered Party are expressly reserved for such Entity (including any rights of any director, manager, officer or employee of the Debtor or any Covered Party under the D&O Liability Insurance Policies), and the Plan Documents shall not, and shall not be deemed to, transfer, grant, or assign such rights to the Trusts.

It is LMI, Interstate, Associated International Insurance Company, and Lexington Insurance Company's position that the Insurance Rights Transfer does not comply with the Bankruptcy Code. Because LMI, Interstate, Associated International Insurance Company, and Lexington Insurance Company contend that that Insurance Rights Transfer does not comply with the Bankruptcy Code, they also contend that the Plan is not confirmable.

If a Co-Insured Party is unable to transfer its rights, titles, privileges, interests, claims, demands or entitlements, as of the Effective Date, to any proceeds, payments, benefits, Causes of Action, choses in action, defense, or indemnity, now existing or hereafter arising, accrued or unaccrued, liquidated or unliquidated, matured or unmatured, disputed or undisputed, fixed or contingent, arising under or attributable to the Insurance Rights, then the Co-Insured Party shall, at the sole cost and expense of the applicable Trust: (a) take such actions reasonably requested by the Trustee to pursue any of the Insurance Rights for the benefit of the applicable Trust; and (b) promptly transfer to the applicable Trust any amounts recovered under or on account of any of the Insurance Rights; provided, however, that while any such amounts are held by or under the control of any Co-Insured Party, such amounts shall be held for the benefit of the applicable Trust.

The LMI policies in force from 1976 through 1986 are structured with self-insured retentions. It is LMI's position that the Debtor has failed to cooperate as required by the LMI policies and that LMI has no duty to incur or reimburse defense expenses in connection with the Abuse Claims unless and until the underlying claim is resolved and coverage for that claim has been determined. *See LMI Answer to Amended Complaint and Affirmative Defenses*, No. 21-CV-00071, [Docket No. 109], Fifth Affirmative Defense, 15. The solvent excess insurers in the 1976 through 1986 period are also defendants in adversary proceedings and have asserted various defenses to coverage, including breaches of cooperation obligations. *See LMI Answer to Amended Complaint and Affirmative Defenses*, No. 21-CV-00071, Docket No. 109, Ninth Affirmative Defense, 18; *see also Lexington Answer to Amended Complaint and Affirmative Defenses*, No. 21-CV-00071, [Docket No. 108], Thirty-Second Affirmative Defense, 21 (incorporating LMI's defenses); *Evanston's Answer and Affirmative Defenses to Adversary Complaint*, No. 20-01227, [Docket No. 53], Twentieth Affirmative Defense, 16; *Interstate Fire & Casualty's Answer to Adversary Complaint*, No. 20-01227, Docket No. 56, Twenty-Fourth Affirmative Defense, 18.

The trustee for each of the Arrowood Settlement Trust and the General Settlement Trust shall, in the case of any settlement, compromise, buyback or similar agreement concerning an Insurance Policy allocated to such Trust that covers or potentially covers one or more Settling Abuse Claims and one or more Contested Abuse Claims, be empowered to settle, compromise or enter into such agreement with respect to such Insurance Policy so long as either (a) such settlement, compromise or agreement does not impact the Insurance Rights allocated to a holder of a Contested Abuse Claim or (b) the Arrowood Settlement Trust and/or the General Settlement Trust, as applicable, transfers to the applicable Contested Claim Subfund an amount equal to (i) the product of the Contested Claim Subfund Share and the cash proceeds received by such trust from the settlement, compromise or agreement, or (ii) such other amount determined by the Bankruptcy Court after notice and opportunity to be heard.

LMI, Interstate, Associated International Insurance Company, and Lexington Insurance Company contend that the Debtor is required to utilize a service organization as a condition precedent to coverage. Absent the use of a service organization, LMI, Interstate, Associated International Insurance Company, and Lexington Insurance Company contend that the obligation to provide coverage to the Debtor or the General Settlement Trust is not triggered.

LMI, Interstate, Associated International Insurance Company, and Lexington Insurance Company contend that the Debtor has material obligations that must be performed as conditions to coverage under the applicable policies, including notice, cooperation, access to books and records, association in the defense of claims, participation in the settlement of claims, and protecting subrogation and contribution claims. Absent such performance, the General Settlement Trust may have no coverage under the LMI, Interstate, Associated International Insurance Company, or Lexington Insurance Company policies.

11.    **Discharge of Obligations and Liabilities**

The transfer to, vesting in, and assumption by the Arrowood Settlement Trust and the General Settlement Trust of the Trust Assets as contemplated by the Plan shall, as of the Effective Date, discharge all obligations and liabilities of and bar any recovery or action against the Covered Parties for or in respect of all Abuse Claims (and the Confirmation Order shall provide for such discharge).  The Arrowood Settlement Trust and the General Settlement Trust shall, as of the Effective Date, assume sole and exclusive responsibility and liability for all Abuse Claims against the Covered Parties, and such Claims shall be paid by the Arrowood Settlement Trust and the General Settlement Trust from the Trust Assets or as otherwise directed in the Trust Documents.

12.    **Channeling Injunction**

Pursuant to section 105(a) of the Bankruptcy Code, the Plan and the Confirmation Order shall permanently and forever stay, restrain, or enjoin any Entity from taking any actions against any Covered Party for the purpose of, directly or indirectly, collecting, recovering or receiving payment of, on or with respect to any Abuse Claim, all of which shall be channeled to the Arrowood Settlement Trust and the General Settlement Trust for resolution as set forth in the Arrowood Settlement Trust Agreement and the General Settlement Trust Agreement and the related Trust Distribution Procedures.

13.    **Transfer and Assignment of Causes of Action, Claims, and Defenses**

The transfer to, vesting in, and assumption by the Arrowood Settlement Trust and the General Settlement Trust of the Trust Assets as contemplated by the Plan shall, as of the Effective Date, discharge all obligations and liabilities of and bar any recovery or action for and in respect of any Abuse Claims against (a) the Debtor and the Reorganized Debtor, as applicable; (b) the Parishes; (c) any other Co-Insured Party; (d) all Settling Insurers, (e) each Settling IAC Affiliate, (f) such other Entity that is a co-defendant in a CVA Action that becomes a Covered Party pursuant to Article V.S of the Plan, and (g) with respect to each of the foregoing Entities in clauses (a) through (f), such Entities' predecessors, successors, assigns, subsidiaries, affiliates, current and former officers, directors, principals, equity holders, trustees, members, partners, managers, officials, advisory board members, advisory committee members, employees, agents, volunteers, attorneys, financial advisors, accountants, investment bankers, consultants, representatives, and other professionals, and such Entities' respective heirs, executors, Estate, and nominees, as applicable (the "Covered Parties"). The Arrowood Settlement Trust and the General Settlement Trust shall, as of the Effective Date, assume sole and exclusive responsibility and liability for all Abuse Claims against the Covered Parties, and such Claims shall be paid by the Arrowood Settlement Trust and the General Settlement Trust from the Trust Assets or as otherwise directed in the Trust Documents.

14.    **Litigation Administrator**

The Arrowood Settlement Trust Agreement and the General Settlement Trust Agreement provide for the Litigation Administrator to administer the defense of the Contested Abuse Claims.  Pursuant to the terms of the Plan, the Litigation Administrator is the Diocese.  Thus the Diocese will remain directly in control of litigation of the Contested Abuse Claims, including the selection of counsel. The Litigation Administrator shall have the functions and rights set forth in the Arrowood Settlement Trust Agreement and the General Settlement Trust Agreement. The Arrowood Settlement Trustee and the General Settlement Trustee shall consult with the Litigation Administrator on matters pertaining to the administration of the Arrowood Settlement Trust and the General Settlement Trust solely with respect to Contested Abuse Claims and must obtain the consent of the Litigation Administrator as set forth in the Arrowood Settlement Trust Agreement and the General Settlement Trust Agreement and the Trust Distribution Procedures. The Arrowood Settlement Trustee and the General Settlement Trustee shall meet with the Litigation Administrator no less frequently than quarterly. The Litigation Administrator may utilize counsel and other professionals as reasonably necessary to assist in the performance of its duties, and the Litigation Administrator and its professionals shall be entitled to reasonable reimbursement of expenses by the Arrowood Settlement Trust and the General Settlement Trust.

15.     **Investments**

All monies held in the Arrowood Settlement Trust and the General Settlement Trust shall be invested, subject to the investment limitations and provisions enumerated in the Arrowood Settlement Trust Agreement and the General Settlement Trust Agreement and shall not  be limited to the types of investments described in section 345 of the Bankruptcy Code.

16.     **Excess Assets**

On each of the Arrowood Settlement Trust Termination Date and the General Settlement Trust Termination Date, after the payment of all Abuse Claims that are entitled to a Trust Distribution from each Trust and all Trust Expenses have been provided for, and the liquidation of all assets then held by each Trust, any remaining value in the Trusts shall be distributed to the Reorganized Debtor.

17.     **Expenses**

The Arrowood Settlement Trust and the General Settlement Trust shall pay all Trust Expenses, including all costs of administration, from each Trust, as provided for in the relevant Arrowood Settlement Trust Agreement and the General Settlement Trust Agreement.

18.     **No Liability in Connection with the Arrowood Settlement Trust or the General Settlement Trust**

The Covered Parties shall not have or incur any liability to, or be subject to any right of action by, any Entity for any act, omission, transaction, event, or other circumstance in connection with or related to the Future Claimants' Representative, the Arrowood Settlement Trust, the General Settlement Trust, the Arrowood Settlement Trustee, the General Settlement Trustee, or the Trust Documents, including the administration of Abuse Claims and the distribution of property by the Arrowood Settlement Trust or the General Settlement Trust, or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence related or relating to the foregoing.

19.     **Institution and Maintenance of Other Legal Proceedings**

As of the Effective Date, the Arrowood Settlement Trust and the General Settlement Trust shall be empowered to initiate, prosecute, defend, and resolve all legal actions and other proceedings related to any asset, liability, or responsibility of such Trusts. The Arrowood Settlement Trust and the General Settlement Trust shall be empowered to initiate, prosecute, defend, and resolve all such actions in the name of the Debtor if deemed necessary or appropriate by either Trustee. The Arrowood Settlement Trust and the General Settlement Trust shall be responsible for the payment of all damages, awards, judgments, settlements, expenses, costs, fees, and other charges incurred subsequent to the Effective Date arising from, relating to, or associated with any legal action or other proceeding brought pursuant to Article IV.U of the Plan and shall pay or reimburse all deductibles, retrospective premium adjustments, fronting obligations or other charges which may arise from the receipt of the Insurance Proceeds by the Arrowood Settlement Trust or the General Settlement Trust. For the avoidance of doubt, the Arrowood Settlement Trust and the General Settlement Trust, pursuant to section 1123(b)(3)(B) of the Bankruptcy Code and applicable State law, is appointed as the successor-in-interest to, and representative, of the Debtor and its Estate for the retention, enforcement, settlement, or adjustment of all Abuse Claims.

20.     **Treatment of the Trusts for U.S. Federal Income Tax Purposes**

The Arrowood Settlement Trust and the General Settlement Trust shall each be a "qualified settlement fund" within the meaning of Treasury Regulation section 1.468B-1. The Arrowood Settlement Trust and the General Settlement Trust shall file (or cause to be filed) statements, returns, or disclosures relating to each Trust that are required by any Governmental Unit. The Arrowood Settlement Trustee and the General Settlement Trustee shall be responsible for the payment of any taxes imposed on the Arrowood Settlement Trust and the General Settlement Trust or the Trust Assets, including estimated and annual U.S. federal income taxes in accordance with the terms of the Arrowood Settlement Trust Agreement or the General Settlement Trust Agreement. The Arrowood Settlement

Trustee and the General Settlement Trustee may request an expedited determination of taxes on such Trusts under section 505(b) of the Bankruptcy Code for all returns filed for, or on behalf of, such Trusts for all taxable periods through the dissolution of such Trusts.

### B.    Trust Distribution Procedures

Pursuant to the Plan and the Solicitation Procedures, each holder of an Abuse Claim is either a Contested Abuse Claim or a Settling Abuse Claim. For the avoidance of doubt, any Abuse Claim that is (a) filed against a Covered Party, but that has not timely filed an Abuse Proof of Claim against the Debtor, or (b) an Indirect Abuse Claim shall, in each case, be a Contested Abuse Claim. The following addresses Settling Abuse Claims.

### 1.    Trust Claim Submissions

The Debtor shall submit the Proofs of Claim for all Settling Abuse Claims that have not been disallowed or expunged pursuant to an order from the Bankruptcy Court for review and potential valuation by the Trustee pursuant to the requirements set forth herein (each, a "<u>Trust Claim Submission</u>" and each Abuse Claim so submitted a "<u>Submitted Abuse Claim</u>").

Holders of (i) Settling Abuse Claims; and (ii) provided the Future Claimants' Representative has made the Future Claimant Settlement Election, the Future Abuse Claims that are filed within five (5) years of the Effective Date, may make a Trust Claim Submission so that their Abuse Claim is a Submitted Abuse Claim. In order to properly make a Trust Claim Submission, each submitting holder of a Settling Abuse Claim or Future Abuse Claim, as applicable, must (i) complete under oath a questionnaire to be developed by the Trustee and such signature and oath must be of the Abuse Claimant individually (or of an executor); (ii) produce all records and documents in his or her possession, custody or control related to the Abuse Claim, including all documents pertaining to all settlements, awards, or contributions already received or that are expected to be received from a Covered Party or other sources; and (iii) execute an agreement to be provided or made available by the Trusts with the questionnaire (1) to produce any further records and documents in his or her possession, custody or control related to the Abuse Claim reasonably requested by the Trustee, (2) consent to and agree to cooperate in any examinations requested by the Trustee (including by healthcare professionals selected by the Trustee (a "<u>Trustee Reviewer Interview</u>"); and (3) consent to and agree to cooperate in a written and/or oral examination under oath if requested to do so by the Trustee. The questionnaire, at a minimum, will require Abuse Claimants to confirm his/her name, date of birth, home address, dates of abuse, frequency of abuse, and level of abuse. The date on which an Abuse Claimant submits (i), (ii) and (iii) above to the appropriate Trust shall be the "<u>Trust Claim Submission Date</u>."

The Trustees will keep information provided by the Abuse Claimant confidential, provided that the Trusts may disclose information, documents, or other materials (i) reasonably necessary in the Trustees' judgment to preserve, obtain, litigate, resolve, or settle insurance coverage, or to comply with an applicable obligation under an Insurance Policy, indemnity, or settlement agreement, or to pursue any other claims transferred or assigned to the Trusts by the holder of the Abuse Claim or operation of the Plan; (ii) subject to the consent of an Abuse Claimant or with redactions or other mechanism to preserve the confidentiality of an Abuse Claimant, where the submission contains non-privileged information that is relevant to the Allowance or value of another Abuse Claimant's Claim; and (iii) notwithstanding anything otherwise provided herein, the Trustees may share information and materials with each other to the extent reasonably necessary to ensure that each valid, timely submitted Abuse Claim is submitted to the appropriate Trust.

No recovery will be provided to an Abuse Claimant that does not timely submit a questionnaire. The Abuse Claimant's breach or failure to comply with the terms of his or her agreement made in connection with his or her Trust Claim Submission shall be grounds for disallowance or significant reduction of his or her Abuse Claim. To complete the evaluation of each Abuse Claim submitted through a Trust Claim Submission (each a "<u>Submitted Abuse Claim</u>"), the applicable Trustee also may, but is not required to, obtain additional evidence from the Abuse Claimant or from other parties and shall consider supplemental information timely provided by the Abuse Claimant.)

The applicable Trustee shall consider the evidence that was submitted in connection with each Trust Claim Submission and the Abuse Proof of Claim Form. Before making an Initial Determination, the applicable Trustee may request additional documentation concerning an Abuse Claim. The applicable Trustee's deadline to issue the Initial

Determination (defined below) shall be extended if such request for additional information is made of an Abuse Claimant.

No later than 30 days after the Effective Date (the "Document Submission Deadline"), the Diocese, the other Covered Parties, and the Insurers may, but are not required to, provide the Trustee and the relevant Abuse Claimant, and his or her counsel, with documents that might assist the Trustee in determining whether to allow an Abuse Claim.

No later than 30 days after the Document Submission Deadline (such date being the "Abuse Claim Supplement Deadline"), Abuse Claimants shall be permitted to supplement their Abuse Claim by providing the applicable Trustee with a supplement to their Trust Claim Submission, not to exceed 5 typed pages, single sided, double spaced with 12-point font addressing the Evaluation Factors and any other issue bearing on the evaluation of the Abuse Claim.

The Trustee's review as to each Abuse Claimant shall be the final review for each Submitted Abuse Claim, subject only to reconsideration by the Trustee in accordance with the TDP.

**Initial Determination.**

The applicable Trustee will evaluate each timely Trust Claim Submission and other information timely submitted, using the Evaluation Factors to determine (the "Initial Determination") (i) whether the Abuse Claim should be awarded zero (0) points and precluded from a distribution under the TDP ("No Award Claims") and, if not, (ii) the amount of points to be assigned to the Abuse Claim entitled to an award; ***provided, however, for the avoidance of doubt,*** the Trustees shall not be required to review any Trust Claim Submission, evidence, or other documentation that is submitted by a holder of an Abuse Claim that has been Disallowed or expunged pursuant to an order of the Bankruptcy Court (or another court of competent jurisdiction).

The applicable Trustee will provide written notice to each Abuse Claimant or his or her counsel of whether the Abuse Claim is a No Award Claim or of the valuation of the Abuse Claim (the "Initial Claims Review Determination Letter").

**Criteria and Evaluation Factors.**

Each Abuse Claim will be evaluated by the applicable Trustee using the below Initial Criteria, General Criteria, and Evaluation Factors:

(i)     Initial Criteria: The applicable Trustee shall first evaluate each Submitted Abuse Claim to determine whether:

(1)     the Abuse Claimant's Trust Claim Submission is substantially and substantively completed and signed under penalty of perjury;

(2)     the Abuse Claim (other than a Future Abuse Claim) was timely submitted prior to the Bar Date;

(3)     the Abuse Claim that is a Future Abuse Claim is not barred by an applicable statute of limitations;

(4)     the Submitted Abuse Claim is duplicative of another Submitted Abuse Claim; and

(5)     the Submitted Abuse Claim had not previously been resolved by litigation, an order from the Bankruptcy Court (or other court of competent jurisdiction) and/or settlement (including Claims that were released through the Independent Reconciliation and Compensation Program).

If any of these criteria are not met after such notice and opportunity as the applicable Trustee deems appropriate to permit any defects in the Submitted Abuse Claim to be corrected, then the Submitted Abuse Claim shall be a No Award Claim; *provided, for the avoidance of doubt,* that under no circumstance will the holder of (1) an Abuse Claim that has been Disallowed or expunged and/or (2) an Abuse Claim that was released through the Independent Reconciliation and Compensation Program, be eligible to receive a distribution under the TDP.

**(ii)**    General Criteria: To the extent a Submitted Abuse Claim is not disallowed based on the Initial Evaluation, then the applicable Trustee will evaluate the following factors to determine if the evidence related to the Submitted Abuse Claim is credible and demonstrates, by a preponderance of the evidence, that the Submitted Abuse Claim is entitled to a recovery and should be awarded a distribution (the "General Criteria"):

(1)    Alleged Abuse. The Abuse Claimant has identified alleged acts of Abuse that he or she suffered;

(2)    Alleged Abuser Identification. The Abuse Claimant has either:

a.    identified an alleged abuser (e.g., by the full name or last name); or

b.    provided specific information about the alleged abuser such that the applicable Trustee can make a reasonable determination that the alleged abuser was an employee, agent or volunteer of a Covered Party;

(3)    Covered Party Liability. The Abuse Claimant has provided information showing that a Protected Party may bear legal responsibility;

(4)    Date and Age. The Abuse Claimant has either: (i) identified the date of the alleged abuse and/or his or her age at the time of the alleged Abuse, or (ii) provided additional facts sufficient for the applicable Trustee to determine the date of the alleged Abuse and age of the Abuse Claimant at the time of such alleged Abuse; and

(5)    Location of Abuse. The Abuse Claimant has identified the venue or location of the alleged Abuse.

If the applicable Trustee determines that these criteria are not satisfied such that a Submitted Abuse Claim is credible, then the Submitted Abuse Claim shall be a No Award Claim.

**(iii)**    Evaluation Factors: If the applicable Trustee determines that the criteria in each of the preceding subsections (i) and (ii) are satisfied such that an Abuse Claim is credible, the applicable Trustee will evaluate the following factors (the "Evaluation Factors") to value such Abuse Claim. Each Claim considered using the Evaluation Factors will be scored on a scale of up to 100:

(1) Nature of the Sexual Abuse:

a.        Duration;

b.        Frequency/number of instances;

40

      c.      Degree of intrusiveness into the Abuse Claimant's body (*e.g.* clothed/unclothed, masturbation by or of perpetrator, oral penetration, anal penetration, vaginal penetration);

      d.      Level or severity of force/violence/coercion/threats;

      e.      Control of environment (*e.g.* boarding school, orphanage, trip under supervision of perpetrator, day school, employment relationship with Perpetrator of the Debtor);

      f.      Number of Perpetrators of the Debtor that abused the Claimant;

      g.      Physical pain suffered;

      h.      Grooming; and/or

      i.      Additional factors that may be provided by the Abuse Claimant.

(2) Impact of Abuse:

      j.      School behavior problems;

      k.      School academic problems;

      l.      Getting into legal trouble as a minor;

      m.      Loss of faith;

      n.      Damage to family relationships/ interpersonal difficulties;

      o.      Mental health symptoms, including: Depression; Suicide Attempt and suicidal ideation; Anxiety; Substance abuse; Sexual acting out; Runaway; Flashbacks; and/or Nightmares;

      p.      Adult and current functioning: Criminal record as an adult; Underemployment/unemployment; Relationship problems; Substance abuse;

      q.      The risk of the foregoing factors affecting the Abuse Claimant in the future based on the Abuse Claimant's age at the present time; and/or

      r.      Additional factors that may be provided by the Abuse Claimant.

The applicable Trustee shall be entitled to adjust point distributions for a particular Abuse Claimant downward to account for an Abuse Claimant's prior, or potential future, recovery on account of the Abuse from another entity (provided such entity is not a Covered Party), including, for example, if such Abuse Claimant has, or may, recover against a religious order, the Boy Scouts of America or other entity.

41

**Abuse Claim Awards.**

With respect to Submitted Abuse Claims (other than No Award Claims where the Trustee has determined that no points shall be awarded) pursuant to the Initial Criteria and the General Criteria above, the applicable Trustee shall utilize the TDP to determine the proposed value for such Abuse Claim (the "Proposed Claim Amount"), and provide written notice of the Proposed Claim Amount to the Abuse Claimant (a "Proposed Claim Amount Notice").

The Trustees shall send each Abuse Claimant a Notice of No Distribution, if applicable, or a Proposed Claim Amount Notice. Each Proposed Claim Amount Notice shall notify the Abuse Claimant of the monetary distribution regarding the Abuse Claimant's Abuse Claim, which distribution may be greater or smaller than the actual distribution to be received based on reserves established by the Trustees and the outcome of any reconsideration of Abuse Claims. The Trustee shall mail this preliminary determination to the Abuse Claimant's counsel of record, or in the case of unrepresented parties, to the last address based on the Abuse Claimant's Trust Claim Submission.

Subject to any adjustment if an Abuse Claimant exercises the Independent Review Option or based on the reconsideration process, the applicable Trustee's determination shall be final.

An Abuse Claimant may request the point award with respect to his or her Abuse Claim to be reconsidered by the applicable Trustee. The Abuse Claimant shall not have a right to any other appeal (except that an Abuse Claimant may exercise the Independent Review Option) of the applicable Trustee's point award. The Abuse Claimant may request reconsideration of the applicable Trustee's point award by delivering a written request for reconsideration to the applicable Trustee within 10 calendar days after mailing of the Notice of No Distribution or the Proposed Claim Amount Notice, as applicable. The applicable Trustee shall have sole discretion to determine how to respond to the request for reconsideration. The applicable Trustee's determination of such request for reconsideration shall be final and not subject to any further reconsideration (other than the Independent Review Option).

2.      **Independent Review Process**

Each Abuse Claimant may elect the Independent Review Option with respect to his or her Abuse Claim.  But, with respect to claims where only an Ecclesia Insurance Policy applies, the Abuse Claimant cannot receive any claim enhancements, and it is not anticipated that such an Abuse Claimant would seek to pursue the Independent Review Option.

Holders of a Settling Abuse Claim, other than Future Abuse Claims, shall have the opportunity to have an independent, neutral third party (selected from a panel of retired judges with tort experience maintained by the Settlement Trust) (a "Neutral") make a settlement recommendation (the "Settlement Recommendation") to the Abuse Claimant and applicable Trustee seeking to replicate to the extent possible the amount a reasonable jury might award for the Abuse Claim, taking into account the relative shares of fault that may be attributed to any parties potentially responsible for the Abuse Claim under applicable law and applying the same standard of proof that would apply under applicable law (the "Independent Review Option").

Abuse Claimants shall have until thirty (30) days following the receipt of the Initial Claims Review Determination Letter, or, if applicable, the conclusion of the reconsideration process, to participate in the Independent Review Option.

The Settlement Recommendation determined by the Neutral, if accepted by the Abuse Claimant and the applicable Trustee (an "Accepted Settlement Recommendation"), shall be the amount of the Abuse Claim against (i) the Debtor and/or (ii) the other Covered Parties.  If there is an Accepted Settlement Recommendation, the holder of the Abuse Claim must assign its Abuse Claim against any Covered Party and all other rights and claims arising out of its Abuse Claim to the appropriate Trust as a condition to receiving the Accepted Settlement Recommendation, and the Trusts shall have the right and power to assert and/or resolve any such Claims assigned to it consistent with the Plan.

If either the Abuse Claimant or the Trustee rejects the Neutral's recommendation as to the amount of an Abuse Claim that is subject to the Independent Review Option (a "Recommendation Rejection"), such party shall serve a notice on the other party and any applicable Insurer stating that it has rejected the Settlement Recommendation.

The costs associated with the independent review shall be deducted from, and shall reduce any distributions made by the Trust to the Abuse Claimant, including the cost of any deposition and mental health exam and the valuation by the Neutral. Such reduction shall be offset by the administrative fee paid by the Abuse Claimant. Recovery of the administrative fee or the costs incurred by the Trust may be sought from any Insurer subject to the applicable terms and conditions of any Insurance Policy, to the extent such costs constitute reasonable and necessary costs payable under an applicable non-settled Insurance Policy, and the Trusts may reimburse the Abuse Claimant for the administrative fee paid or waive the deduction from the Abuse Claimant's distribution to the extent that the non-settled Insurance Policy reimburses the applicable Trust for such amounts. If the cost to the Trustees of processing the Independent Review Option is less than the administrative fees charged, the Trustees shall reimburse the unused balance to the Abuse Claimant. Notwithstanding the foregoing, if an Abuse Claimant holds a No Award Claim, all costs associated with the independent review shall be paid in advance by the Abuse Claimant and not the Trusts.

To obtain a Settlement Recommendation, each Abuse Claimant who proceeds through the Independent Review shall provide the following:

(a) Abuse Proof of Claim signed and dated by the Abuse Claimant, with completion of all applicable fields, including the substantive narrative of the Abuse and damages (to be completed at the time of submission to the Neutral or after the completion of discovery).

(b) Payment to the applicable Trust of an administrative fee in the amount of $2,500 at the time of the election for Independent Review Option and a further additional administrative fee in the amount of $2,500 immediately prior to the Neutral's review.  The Trustees shall have the authority to waive the initial fee in appropriate cases, based on the circumstances of the Abuse Claimant. Any Abuse Claimant that elects not to proceed with the Neutral's review after the opportunity to pursue discovery shall not be required to pay the second $2,500 and shall not be precluded from pursuing their claim under the TDP (as if no election to pursue an Independent Review Option had been made).

(c) Confirmation that the Abuse Claimant participated in Diocese or Covered Party related activities.

(d) Evidence that the perpetrator was an employee, agent or volunteer of the Debtor or a Covered Party and that at least one Covered Party was negligent or is otherwise liable on account of such Abuse Claim.

(e) Abuse Claimant shall be subject to a single sworn interview, mental health examination or supplemental signed and dated interrogatory responses at the discretion of the Neutral or upon the reasonable request of an Insurer.

In making its determination, the Neutral will consider and apply any defense that would otherwise be available in the tort system.

**Insurer Participation / Insurance Neutrality.**

(a) The Trusts will provide prompt notice to any potentially responsible Insurer(s) ("Responsible Insurers") of any Abuse Claim for which the Abuse Claimant has elected the Independent Review Option.

(b) Any Responsible Insurer shall be given a reasonable opportunity to participate in the Independent Review. Any Responsible Insurer who chooses to participate may review and comment on the Neutral's evaluation, including attending any interview or deposition. Any Responsible Insurer may raise and present any potentially applicable defenses to the Abuse Claim to the Neutral, at their own expense. Such defenses must be considered and evaluated, as reasonably appropriate, by the Neutral.

43

(c)  Upon the applicable Trustee's receipt of the Settlement Recommendation from the Neutral, the applicable Trustee shall provide notice and seek consent from any applicable Responsible Insurer.

(d)  If the applicable Trustee determines that the Settlement Recommendation is reasonable and the Responsible Insurer refuses to pay all or a portion of the Accepted Settlement Recommendation for which it is responsible, then the Trustee may exercise any and all rights available to it, if any, under applicable law, and the Trustee expressly reserves any and all rights against the Responsible Insurer, including but not limited to agreeing to the Settlement Recommendation and pursuing the Responsible Insurer for any available remedy including, but not limited to breach of contract and bad-faith.  The Trusts shall have the right to pursue the Accepted Settlement Recommendation through any appropriate legal mechanisms.

(e)  The Responsible Insurer shall have all rights under the Insurance Policy and applicable law.

3.  **Election to Continue Litigation / Claim Enhancements[9]**

**Continuing Litigation.**

Within thirty (30) days of a Recommendation Rejection under section 4.4, the holder of a Settling Abuse Claim, other than a Future Claim, may, at its election, serve a notice (a "Restart Notice") on the Trustee and any applicable Insurer that such Abuse Claimant has elected to continue an existing lawsuit or proceeding against the appropriate Trust to obtain the amount of the Abuse Claim in any court or courts of competent jurisdiction.   If such Abuse Claimant fails to serve a Restart Notice within thirty (30) days of a Recommendation Rejection, such Abuse Claimant shall be barred from continuing such existing lawsuit or proceeding with litigation.  The failure to serve a Restart Notice shall not impact such Abuse Claimant's point allocation.

Promptly following the service of a Restart Notice, the Trustee and the Abuse Claimant shall meet and confer to discuss restarting litigation (subject to any applicable stay that may be imposed by another insolvency proceeding or otherwise), the process of substituting the Trustee as a defendant in such litigation, scheduling and minimizing forum disputes (including avoiding parallel proceedings against different Covered Parties in different fora); provided, however, for the avoidance of doubt, all parties' rights with respect to scheduling and the appropriate forum for such litigation is fully reserved.

Any litigation, including a CVA Action continued or contested matter initiated, following a Restart Notice shall be governed by the applicable rules of the applicable court or courts of competent jurisdiction.  For the avoidance of doubt, upon receipt of a Restart Notice, the Trustee may object to any Abuse Proof of Claim filed by such Abuse Claimant.  Nothing herein shall be construed to alter or amend 28 U.S.C. § 157.

Any Insurer's rights under its Insurance Policy or otherwise with respect to any such litigation are fully reserved.

**Litigation Claim Enhancements.**

To the extent the applicable Trustee enters into a settlement agreement (such settlement, a "Trust Insurance Settlement") with any Insurer that covers a Settling Abuse Claim (the policy or policies that cover such Settling Abuse Claim(s) are a "Target Policy"), such Abuse Claimants shall receive a point enhancement (the "Claim Enhancement") to his or her point allocation. For the avoidance of doubt, with respect to claims where only an Ecclesia Insurance Policy applies, the Abuse Claimant cannot receive any claim enhancements. The Claim Enhancement shall be payable only from the proceeds of the applicable Trust Insurance Settlement (for the avoidance of doubt, from the applicable Settling Claim Subfund).  The Claim Enhancements are independent of one another and are not intended to be cumulative.  Each Trustee shall reserve sufficient amounts in the applicable Settling Claim Subfund to fund such enhanced payments before distribution of Trust Insurance Settlement proceeds to the Settling Claim Subfund.  For the

---

[9] For the avoidance of doubt, these provisions do not apply to Contested Abuse Claims but only to Settling Abuse Claims.

avoidance of doubt, nothing herein shall alter, increase or decrease any Subfund's allocation of Insurance Rights as set forth in the Plan.

Claim Enhancements shall be applied as follows:

a.  An Abuse Claimant shall receive an enhancement of 1.5 times their allocated points if the Trust Insurance Settlement for a Neutral has made a Settlement Recommendation with respect to the Abuse Claim, provided that the Settlement Recommendation is greater than $0, and such Abuse Claimant has timely served a Restart Notice in accordance with Section 6.1 of the Trust Distribution Procedures.

b.  An Abuse Claimant shall receive an enhancement of 2 times their allocated points if the relevant Trust negotiates a Trust Insurance Settlement for a Target Policy if the Trust Insurance Settlement is entered into after a post-Effective Date deposition of the Abuse Claimant by opposing counsel has occurred but before commencement of a trial in such Abuse Claimant's case.

c.  An Abuse Claimant shall receive an enhancement of 3 times their allocated points if the relevant Trust negotiates a Trust Insurance Settlement for a Target Policy if the Trust Insurance Settlement is entered into on or after the first day of a trial in such Abuse Claimant's case.

d.  An Abuse Claimant shall receive an enhancement of 3.5 times their Allocated Payment if the relevant Trust negotiates a Trust Insurance Settlement for a Target Policy and if the Trust Insurance Settlement is entered into after a final judgment or verdict determining that the Diocese and/or any Covered Party is/are liable to an Abuse Claimant because of such Abuse Claimant's Abuse Claim is entered in favor of the Abuse Claimant in such litigation.

e.  An Abuse Claimant shall receive an enhancement of 4 times their allocated points if the relevant Trust negotiates a Trust Insurance Settlement for a Target Policy and if the Trust Insurance Settlement is entered into after a final, nonappealable judgment or verdict determining that the Diocese and/or any Covered Party is/are liable to an Abuse Claimant because of such Abuse Claimant's Abuse Claim (a "Litigation Award") is entered in favor of the Abuse Claimant in such litigation.

4.  **TDP Illustrations**

After complying with the claim submission process, the holder of a Settling Abuse Claim will be awarded points by the Trustee. The point award will entitle the holder of a Settling Abuse Claim to a share of the assets in the Settling Claim Subfund of the Trust. The value of that share may change over time, based on increases or decreases in the value of the Settling Claim Subfund. The holder of a Settling Abuse Claim may stop there. Or, the holder of the Settling Abuse Claim has the option to proceed to the Independent Review Option where a Neutral will make a Settlement Recommendation in the form of a dollar figure. The parties then must determine whether to accept that Settlement Recommendation.

By way of illustration, if a holder of a Settling Abuse Claim is awarded 50 points by the Trustee and the Neutral subsequently makes a Settlement Recommendation of $100,000 for the Settling Abuse Claim, the holder of the Settling Abuse Claim and the Trustee must then each decide whether to accept the Settlement Recommendation or reject it. If both the holder of the Settling Abuse Claim and the Trustee accept the Settlement Recommendation, it becomes an Accepted Settlement Recommendation. In this hypothetical, the holder of the Settling Abuse Claim will become entitled to the $100,000 from the Trust, but the holder of the Settling Abuse Claim's 50 points will be returned to the Trust. In that case, the holder of the Settling Abuse Claim is not entitled to any further adjustments or enhancements if they and the Trustee have both accepted the Settlement Recommendation of $100,000.

45

In contrast, if the holder of a Settling Abuse Claim rejects the recommendation and the Trustee accepts, the recommendation is rejected.  Likewise, if the holder of the Settling Abuse Claim accepts and the Trustee rejects, the recommendation is rejected.  For a rejected Settlement Recommendation, the holder of the Settling Abuse Claim retains his or her points.  Following a rejected Settlement Recommendation, the holder of the Settling Abuse Claim must then determine whether to continue litigating, as set forth above.

While the Trustee is empowered to accept Settlement Recommendations without insurer approval, the TDP provide that the Responsible Insurers shall have all rights under the Insurance Policy and applicable law.  As a result, whether the Trustee accepts a Settlement Recommendation may depend significantly on the amount of the Settlement Recommendation and the applicable insurer or insurers' positions with respect to the Settlement Recommendation.  For example, if an insurer has agreed to satisfy the Settlement Recommendation, the Trustee may determine it is appropriate to the accept the Settlement Recommendation.  In contrast, if the insurer is unwilling to agree to pay the Settlement Recommendation or unwilling to pay a significant enough portion thereof, the Trustee may determine that it would be inappropriate to accept the Settlement Recommendation.  As a result, the Debtor does not anticipate that the Independent Review Option will be used by claimants that solely have Abuse Claims implicating the Ecclesia insurance policy periods as the Trustee is unlikely to agree to a Settlement Recommendation for such claims.

If a Settlement Recommendation is rejected (provided it is a recommendation of greater than zero dollars), then the holder of a Settling Abuse Claim is entitled to a claim enhancement—*i.e.*, an increase in their point award—if there is an eventual insurance settlement of a policy covering the same period when the abuse alleged by the Settling Abuse Claim occurred. These claim enhancements increase as a claimant progresses through litigation, as set forth in more detail above. A Settling Abuse Claim, however, can only receive a claim enhancement if there is an eventual settlement with an insurer covering such Settling Abuse Claim's policy.  Otherwise, the Settling Abuse Claim does not receive an increase in their point award.  Nor is there any means for a Settling Abuse Claim to be entitled to a fixed dollar amount (as opposed to a point award) other than through an Accepted Settlement Recommendation in the Independent Review Process.[10]

With respect to Arrowood Settlement Trust, the TDP work the same as with the General Settlement Trust.  The Arrowood liquidation and ancillary receivership proceedings may impact the timing of a holder of an Abuse Claim's ability to litigate in state court.  However, the Southern District of New York has held that the Arrowood liquidation stay does not enjoin the continuation of claim objection appeals in federal court.  *See In re The Roman Catholic Diocese of Rockville Centre, New York*, Case No. 23-CV-9210 (S.D.N.Y.) (Docket No. 9).  The ultimate impact of the Arrowood stay on claimant recoveries is as-of-yet undetermined, particularly as the ancillary receiver in New York has not yet been formally appointed. However, the petition for an ancillary receivership seeks a 180-day stay on insureds' and claimants' actions that involve Arrowood policies. The petition also requests a claims bar date of January 15, 2025. Until the petition is granted, the New York Property/Casualty Security Fund will not take any action with respect to Arrowood claims.

## IV.    CLASSIFICATION AND TREATMENT OF CLAIMS

All Claims, except Administrative Claims and Priority Tax Claims, are placed in the Classes set forth below.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims, as described in Article III of the Plan, are not classified in the Plan.  A Claim is classified in a particular Class only to the extent that the Claim qualifies within the description of that Class and is classified in other Classes to the extent that any remainder of the Claim qualifies within the description of such other Classes.

If the Plan is confirmed by the Bankruptcy Court, unless a holder of an Allowed Claim consents to different treatment, each Allowed Claim in a particular Class will receive the same treatment as the other Allowed Claims in such Class, whether or not the holder of such Claim voted to accept the Plan.  Such treatment will be in exchange for and in full satisfaction, release and discharge, of the holder's respective Claims against or Interests in a Debtor, except as otherwise provided in the Plan.  Moreover, upon Confirmation, the Plan will be binding on all holders of Claims regardless of whether such holders voted to accept the Plan.

---

[10] For the avoidance of doubt, with respect to claims where only an Ecclesia Insurance Policy applies, the Abuse Claimant cannot receive any claim enhancements.

A.    **Unclassified Claims**

1.    **Administrative Claims**

a.    ***Administrative Claims in General***

Except to the extent that a holder of an Allowed Administrative Expense Claim agrees to less favorable treatment with respect to such Allowed Administrative Expense Claim, each holder of an Allowed Administrative Expense Claim shall receive, on account of and in full and complete settlement, release and discharge of, and in exchange for, such Claim, payment of cash in an amount equal to such Allowed Administrative Expense Claim on or as soon as reasonably practicable after the later of: (a) the Effective Date; (b) the first Business Day after the date that is thirty (30) calendar days after the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim; (c) such other date(s) as such holder and the Debtor or the Reorganized Debtor shall have agreed; or (d) such other date ordered by the Bankruptcy Court; provided, however, that Allowed Administrative Expense Claims that arise in the ordinary course of the Debtor' operations during the Chapter 11 Case may be paid by the Debtor or the Reorganized Debtor in the ordinary course of business and in accordance with the terms and conditions of the particular agreements governing such obligations, course of dealing, course of operations, or customary practice.

b.    ***Statutory Fees***

On or before the Effective Date, Administrative Expense Claims for fees payable pursuant to 28 U.S.C. § 1930 will be paid in Cash equal to the amount of such Administrative Expense Claims.  All fees payable pursuant to 28 U.S.C. § 1930 after the Effective Date will be paid by the Reorganized Debtor in accordance therewith until the earlier of the conversion or dismissal of the applicable Chapter 11 Case under section 1112 of the Bankruptcy Code or the closing of the applicable Chapter 11 Case pursuant to section 350(a) of the Bankruptcy Code.

c.    ***Ordinary Course Postpetition Administrative Liabilities***

Administrative Claims based on liabilities incurred by the Debtor in the ordinary course of its business, including Administrative Claims arising from or with respect to the sale of goods or provision of services on or after the Petition Date, Administrative Claims of governmental units for Taxes, and Administrative Claims arising under Executory Contracts and Unexpired Leases, will be paid by the Reorganized Debtor, pursuant to the terms and conditions of the particular transaction giving rise to those Administrative Claims, without further action by the holders of such Administrative Claims or further approval by the Bankruptcy Court.  Holders of the foregoing Claims will not be required to File or serve any request for payment of such Administrative Claims.

d.    ***Professional Compensation***

Professionals or other Entities asserting a fee Claim for services rendered before the Effective Date must File and serve on the Reorganized Debtor and such other Entities who are designated by the Bankruptcy Rules, the Confirmation Order, or other order of the Bankruptcy Court an application for final allowance of such Fee Claim no later than sixty (60) days after the Effective Date; *provided*, *however*, that any party who may receive compensation or reimbursement of expenses pursuant to the *Order (I) Authorizing the Retention and Payment,* Nunc Pro Tunc *to the Petition Date, of Professionals Utilized by the Debtor in the Ordinary Course of Business and (II) Granting Certain Related Relief* [Docket No. 127] (the "Ordinary Course Professionals Order") may continue to receive such compensation and reimbursement of expenses for services rendered before the Effective Date pursuant to the Ordinary Course Professionals Order without further Bankruptcy Court review or approval (except as provided in the Ordinary Course Professionals Order).  Objections to any fee Claim must be filed and served on the Reorganized Debtor and the requesting party no later than ninety (90) days after the Effective Date.  To the extent necessary, the Confirmation Order will amend and supersede any previously entered order of the Bankruptcy Court regarding the payment of fee Claims.

e.    ***Post-Effective Date Professionals' Fees and Expenses***

Except as otherwise specifically provided in the Plan, on and after the Effective Date, the Reorganized Debtor will, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy

Court, pay in cash the reasonable and documented fees and expenses of the Professionals or other fees and expenses incurred by the Reorganized Debtor on or after the Effective Date, in each case, related to implementation and consummation of the Plan. Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code or any order of the Bankruptcy Court entered before the Effective Date governing the retention of, or compensation for services rendered by, Professionals after the Effective Date will terminate, and the Reorganized Debtor may employ or pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

### 2. Priority Tax Claims

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to less favorable treatment, each holder of an Allowed Priority Tax Claim shall receive on account of and in full and complete settlement, release and discharge of, and in exchange for, such Allowed Priority Tax Claim, at the sole option of the Debtor or the Reorganized Debtor, as applicable: cash in an amount equal to such Allowed Priority Tax Claim on, or as soon thereafter as is reasonably practicable, the later of (a) the Effective Date, to the extent such Claim is an Allowed Priority Tax Claim on the Effective Date; (b) the first Business Day after the date that is thirty calendar days after the date such Priority Tax Claim becomes an Allowed Priority Tax Claim; and (c) the date such Allowed Priority Tax Claim is due and payable in the ordinary course as such obligation becomes due; provided, however, that the Debtor reserves the right to prepay all or a portion of any such amounts at any time under this option without penalty or premium; or (2) regular installment payments in cash of a total value, as of the Effective Date of the Plan, equal to the Allowed amount of such Claim over a period ending not later than five years after the Petition Date.

### B. Classified Claims

### 1. General

Pursuant to sections 1122 and 1123 of the Bankruptcy Code, Claims are classified for voting and distribution as set forth in the Plan. A Claim will be deemed classified in a particular Class only to the extent that it qualifies within the description of that Class and will be deemed classified in a different Class to the extent that any remainder of such Claim qualifies within the description of such other Class. Holders of Allowed Claims will be entitled to share in the recovery provided for the applicable Class of Claim against the Debtor based upon the full Allowed amount of the Claim. Notwithstanding the foregoing, and except as otherwise specifically provided for in the Plan, the Confirmation Order or other order of the Bankruptcy Court, or required by applicable bankruptcy law, in no event will the aggregate value of all property received or retained under the Plan on account of an Allowed Claim exceed 100% of the underlying Allowed Claim.

Section 1129(a)(10) of the Bankruptcy Code will be satisfied for the purposes of Confirmation by acceptance of the Plan by an Impaired Class of Claims; *provided*, *however*, that in the event no holder of a Claim with respect to a specific Class for the Debtor timely submits a Ballot in compliance with the Disclosure Statement Order indicating acceptance or rejection of the Plan, such Class will be deemed to have accepted the Plan. The Debtor may seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims, other than Class 4 and Class 5.

### 2. Identification of Classes of Claims Against the Debtor

The following table designates the Classes of Claims against the Debtor and specifies which Classes are (a) Impaired or Unimpaired by the Plan, (b) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code or (c) deemed to accept or reject the Plan.

| Class | Designation | Impairment | Entitled to Vote |
|-------|-------------|------------|------------------|
| 1 | Priority Claims | Unimpaired | Not Entitled to Vote |
| 2 | Secured Claims | Unimpaired | Not Entitled to Vote |
| 3 | General Unsecured Claims | Impaired | Entitled to Vote |
| 4 | Arrowood Abuse Claims | Impaired | Entitled to Vote |
| 5 | London and Ecclesia Abuse Claims | Impaired | Entitled to Vote |
| 6 | Convenience Claims | Impaired | Entitled to Vote |

| 7 | Lay Pension Claims | Unimpaired | Not Entitled to Vote |
| 8 | Priest Pension Claims | Unimpaired | Not Entitled to Vote |

### 3. Treatment of Claims

#### a. *Priority Claims*

Except to the extent that a holder of an Allowed Priority Claim agrees to less favorable treatment of such Claim, in exchange for full and final satisfaction of such Allowed Priority Claim, at the sole option of the Reorganized Debtor: (i) each such holder shall receive payment in cash in an amount equal to such Allowed Priority Claim, payable on or as soon as reasonably practicable after the last to occur of (x) the Effective Date, (y) the date on which such Priority Claim becomes an Allowed Priority Claim, and (z) the date on which the holder of such Allowed Priority Claim and the Debtor or Reorganized Debtor, as applicable, shall otherwise agree in writing; or (ii) satisfaction of such Allowed Priority Claim in any other manner that renders the Allowed Priority Claim Unimpaired, including treatment in a manner consistent with section 1124(1) or (2).

#### b. *Secured Claims*

Except to the extent that a holder of an Allowed Secured Claim agrees to less favorable treatment of such Claim, in exchange for full and final satisfaction of such Allowed Secured Claim, each holder of an Allowed Secured Claim will receive, at the sole option of the Reorganized Debtor: (i) cash in an amount equal to the Allowed amount of such Claim, including the payment of any interest required to be paid under section 506(b) of the Bankruptcy Code, payable on or as soon as reasonably practicable after the last to occur of (x) the Effective Date, (y) the date on which such Secured Claim becomes an Allowed Secured Claim, and (z) the date on which the holder of such Allowed Secured Claim and the Debtor or Reorganized Debtor, as applicable, shall otherwise agree in writing; (ii) satisfaction of such Secured Claim in any other manner that renders the Allowed Secured Claim Unimpaired, including treatment in a manner consistent with section 1124(1) or (2); or (iii) return of the applicable collateral on the Effective Date or as soon as reasonably practicable thereafter in satisfaction of the Allowed amount of such Secured Claim.

#### c. *General Unsecured Claims*

Except to the extent that a holder of an Allowed General Unsecured Claim agrees to less favorable treatment of such Claim, in exchange for full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed General Unsecured Claim, each holder thereof shall, subject to the holder's ability to elect Convenience Claim treatment on account of the Allowed General Unsecured Claim, receive such holder's Pro Rata share of the GUC Plan Distribution.

#### d. *Arrowood Abuse Claims*

Except to the extent that a holder of an Arrowood Abuse Claim agrees to less favorable treatment of such Claim, in exchange for full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Arrowood Abuse Claim, each holder thereof shall receive (i) if such Claim is a Settling Abuse Claim, such distributions as and to the extent provided in the Trust Documents with respect to the Settling Claim Subfund in the Arrowood Fund as it pertains to such Class 4.a., or (ii) if such Claim is an Allowed Contested Abuse Claim, such Trust Distributions as and to the extent provided in the Trust Documents with respect to the Contested Claim Subfund in the Arrowood Fund as it pertains to such Class 4.b.

#### e. *London and Ecclesia Claims*

Except to the extent that a holder of a London and Ecclesia Claim agrees to less favorable treatment of such Claim, in exchange for full and final satisfaction, settlement, release, and discharge of, and in exchange for, each London and Ecclesia Claim, each holder thereof shall receive (i) if such Claim is a Settling Abuse Claim, such distributions as and to the extent provided in the Trust Documents with respect to the Settling Claim Subfund in the General Fund as it pertains to such Class 5.a., or (ii) if such Claim is an Allowed Contested Abuse Claim, such Trust Distributions with respect to the Contested Claim Subfund in the General Fund as and to the extent provided in the Trust Documents as it pertains to such Class 5.b.

f.    *Convenience Claims*

In exchange for full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Convenience Claim, each holder thereof shall receive cash in an amount equal to 100% of such holder's Allowed Convenience Claim.

g.    *Lay Pension Claims*

The Debtor will assume its participation in the Lay Pension Plan, and will continue to meet its obligations under the Lay Pension Plan as they become due. The Debtor will not make any payment with respect to any Lay Pension Claim filed in this Chapter 11 Case.

h.    *Priest Pension Claims*

The Debtor will assume its participation in the Priest Pension Plan, and will continue to meet its obligations under the Priest Pension Plan as they become due. The Debtor will not make any payment with respect to any Priest Pension Claim filed in this Chapter 11 Case.

4.    **Subclasses of Abuse Claims**

a.    *Subclassification of Classes 4-5.*

Each of Class 4 (Arrowood Abuse Claims) and Class 5 (London and Ecclesia Claims) will be divided into two subclasses for purposes of allowance, liquidation, and payment: (1) Settling Abuse Claims, and (2) Contested Abuse Claims. Each holder of an Abuse Claim shall be treated as a Settling Abuse Claim in Class 4 and Class 5, as applicable, unless such holder affirmatively elects to be treated as a Contested Abuse Claim in accordance with the Disclosure Statement Order; provided, however, a holder of an Abuse Claim that the Debtor has filed an objection to such Abuse Claim and such objection has not been withdrawn or settled prior to the Voting Deadline shall be treated as a Contested Abuse Claim in Class 4 and Class 5, as applicable. An election to be treated as a Contested Abuse Claim or Settling Abuse Claim, as applicable, shall be irrevocable, absent the written consent of the Debtor or Reorganized Debtor, as applicable. If the holder of an Abuse Claim elects to be treated as a Contested Abuse Claim, the abuse claimant will be permitted to continue litigating against the Trust, which litigation will be administered by the Litigation Administrator. All expenses arising out of the defense of the Contested Abuse Claims in the applicable Contested Claim Subfund will be deducted from the contribution to the Contested Claim Subfund. An abuse claimant's voluntary election to be treated as a Contested Abuse Claim shall not impact a Claimants right to vote on the Plan.

b.    *Future Abuse Claims Subclassification*

The Future Claimants' Representative shall be entitled to elect by written notice filed on the docket on or prior to the Voting Deadline that all, but not less than all, of holders of Future Abuse Claims be treated as holders of Settling Abuse Claims. Absent such an election by the Future Claimants' Representative, Future Abuse Claims shall be treated as Contested Abuse Claims.

Except to the extent that a holder of a Future Abuse Claim agrees to less favorable treatment of such Claim, in exchange for full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Future Abuse Claim, each holder thereof shall receive (i) if the Future Claimants' Representative has elected to treat the holders of Future Claims as Settling Abuse Claims, such distributions as and to the extent provided in the Trust Documents with respect to the Future Claim Subfund as it pertains to Settling Abuse Claims, or (ii) if the Future Claimants' Representative has not elected to treat the holders of Future Claims as Settling Abuse Claims, such distributions as and to the extent provided in the Trust Documents with respect to the Future Claim Subfund as it pertains to Contested Abuse Claims. All Future Abuse Claims, regardless of when the alleged incidents in the Future Abuse Claim occurred, will be channeled to the Future Claim Subfund.

c.    *Channeling Injunction for Abuse Claims*

Each holder of an Abuse Claim, whether a Settling Abuse Claim or a Contested Abuse Claim, shall have his or her Claim permanently channeled to the Arrowood Settlement Trust or the General Settlement Trust, as applicable, and such Claim shall thereafter be asserted exclusively against such Trust and resolved in accordance with the terms, provisions, and procedures of the Trust Documents as it pertains to such Abuse Claim's Class and Subclass.  Holders of Abuse Claims are enjoined from prosecuting any outstanding, or filing any future, litigation, Claims, or Causes of Action arising out of or related to such Abuse Claims against any of the Covered Parties or Insurers and may not proceed in any manner against any such Entities in any forum whatsoever, including any state, federal, or non-U.S. court or any administrative or arbitral forum, and are required to pursue their Abuse Claims solely against the Arrowood Settlement Trust and the General Settlement Trust as provided in the Trust Documents with respect to such Abuse Claim's Class and Subclass.

If a holder of an Abuse Claim has its Proof of Claim disallowed by order of the Bankruptcy Court, but still maintains a CVA Action against a Covered Party, the holder of such Abuse Claim may, notwithstanding the disallowance of its Proof of Claim by the Bankruptcy Court, pursue a distribution from the Arrowood Settlement Trust or the General Settlement Trust, as applicable, on account of such CVA Claim against a Covered Party, as a Contested Abuse Claim. Because it is a Contested Abuse Claim, such holder of a CVA Claim will not be able to receive a distribution from either Trust until all of the Contested Abuse Claims in the respective Contested Claim Subfund are resolved. Additionally, all of the expenses of litigation of the Litigation Administrator with respect to the Contested Abuse Claims are paid from the applicable Trust's Contested Claim Subfund before any distributions to holders of Allowed Contested Abuse Claims. There is a risk that such expenses will reduce the amount in such Trust's Contested Claim Subfund, and there is a risk that there will be no funds available to satisfy Allowed Contested Abuse Claims.

### C.    Special Provision Governing Unimpaired Claims

Except as otherwise provided in the Plan, nothing under the Plan will affect the Debtor's or the Reorganized Debtor's rights regarding any Unimpaired Claim, including all rights regarding legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claim.

### D.    Insurance

Notwithstanding anything to the contrary in the Plan, if any Allowed Insured Non-Abuse Claim is covered by an insurance policy, such Claim will first be paid from proceeds of such insurance policy, with the balance, if any, treated in accordance with the provisions of the Plan governing the Class applicable to such Claim.

### E.    Withholding and Reporting Requirements

#### 1.    Withholding Rights

Each Disbursing Agent shall comply with all applicable withholding and reporting requirements imposed on it by any federal, state, or local taxing authority, including but not limited to U.S. federal backup withholding, and all Plan Distribution and all related agreements shall be subject to any such withholding or reporting requirements. Notwithstanding any provision in the Plan to the contrary, each Disbursing Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the Distribution to generate sufficient funds to pay applicable withholding taxes, withholding Distributions pending receipt of information necessary to facilitate such Distributions or establishing any other mechanisms such Disbursing Agent believes are reasonable and appropriate.  Any amounts withheld pursuant to the preceding sentence shall be deemed to have been distributed to and received by the applicable recipient for all purposes of the Plan. Notwithstanding the foregoing, each holder of an Allowed Claim or any other Entity that receives a Plan Distribution shall have responsibility for any taxes imposed by any Governmental Unit, including income, withholding, and other taxes, on account of such Plan Distribution. Each Disbursing Agent shall have the right, but not the obligation, to not make a Plan Distribution until such holder has made arrangements satisfactory to such Disbursing Agent for payment of any such tax obligations.  Such Disbursing Agent shall have the right to allocate all Distributions in compliance with applicable wage garnishments, alimony, child support and other spousal awards, liens and encumbrances.

Notwithstanding any provision of the Plan, each Entity receiving a Distribution pursuant to the Plan will have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed on it by any governmental unit on account of such Distribution, including income, withholding and other tax obligations.

        2.    **Forms**

Any Entity entitled to receive any property as a Plan Distribution shall, upon request, deliver to the applicable Disbursing Agent an appropriate Form W-9 or (if the payee is not a United States person) Form W-8. If such request is made by the applicable Disbursing Agent and the holder fails to comply before the earlier of (a) the date that is 180 days after the request is made and (b) the date that is 180 days after the date of distribution, the amount of such Plan Distribution shall irrevocably revert to the Reorganized Debtor and any Claim in respect of such Plan Distribution shall be discharged and forever barred from assertion against the Reorganized Debtor or its respective property.

## V.    TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### A.    Assumption and Rejection of Executory Contracts and Unexpired Leases

On the Effective Date, all Executory Contracts and Unexpired Leases shall be deemed assumed by the Reorganized Debtor as of the Effective Date without the need for any further notice to or action, order, or approval of the Bankruptcy Court under sections 365 and 1123 of the Bankruptcy Code, except for Executory Contracts or Unexpired Leases (1) that are identified on the Rejected Contracts Schedule; (2) that previously expired or terminated pursuant to their terms; (3) that the Debtor has previously assumed or rejected pursuant to a Final Order of the Bankruptcy Court; (4) that are the subject of a motion to reject that remains pending as of the Confirmation Date; (5) that have been deemed rejected pursuant to the provisions of section 365(d)(4); or (6) as to which the effective date of rejection will occur (or is requested by the Debtor to occur) after the Confirmation Date.

Entry of the Confirmation Order shall constitute an order of the Bankruptcy Court approving the assumption or rejection, as applicable, of Executory Contracts or Unexpired Leases as set forth in the Plan or the Rejected Contracts Schedule, pursuant to sections 365 and 1123 of the Bankruptcy Code. Except as otherwise set forth herein, the assumption or rejection of Executory Contracts and Unexpired Leases pursuant to the Plan shall be effective as of the Effective Date. Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or a Final Order of the Bankruptcy Court shall re-vest in and be fully enforceable by the Reorganized Debtor in accordance with its terms, except as such terms may have been modified by the provisions of the Plan, the Bankruptcy Code or any Final Order of the Bankruptcy Court authorizing and providing for its assumption. Any motions to assume Executory Contracts or Unexpired Leases pending on the Confirmation Date shall be subject to approval by a Final Order on or after the Confirmation Date but may be withdrawn, settled, or otherwise prosecuted by the Reorganized Debtor.

To the maximum extent permitted by law, to the extent that any provision in any Executory Contract or Unexpired Lease assumed pursuant to the Plan restricts or prevents, purports to restrict or prevent, or is breached or deemed breached by the commencement of the case, the Debtor's financial condition, the assumption of such Executory Contract or Unexpired Lease (including any "change of control" provision), then such provision shall be deemed unenforceable such that the non-Debtor party thereto shall not be able to terminate, restrict, or modify such Executory Contract or Unexpired Lease, or to exercise any other default-related rights with respect thereto, in each case, based upon the commencement of the Chapter 11 Case, the Debtor's financial condition or the assumption of such Executory Contract or Unexpired Lease.

LMI, Interstate, Associated International Insurance Company, and Lexington Insurance Company contend that their policies are executory, that the Debtor must assume the policies, and that the General Settlement Trust must provide adequate assurance of future performance of the Debtor's obligations under the policies before any interest under the policies can be assigned. Because the Plan does not provide for such assumption and assignment, LMI, Interstate, Associated International Insurance Company, and Lexington Insurance Company further contend that the Plan cannot be confirmed. The Debtor disagrees with these contentions.

B.     **Rejection Damages Claims.**

Unless required to be filed earlier pursuant to the Bar Date Order or another Final Order of the Bankruptcy Court, all Proofs of Claim for Rejection Damages Claims, if any, must be filed within thirty (30) days after the effective date of such rejection. **Any Rejection Damages Claim that is not timely filed shall be automatically Disallowed, forever barred from assertion, and unenforceable against the Debtor or the Reorganized Debtor, the Estate, or their property without the need for any objection by the Reorganized Debtor or further notice to, or action, order, or approval of the Bankruptcy Court, and any such Rejection Damages Claim shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Proof of Claim to the contrary.** All Allowed Rejection Damages Claims shall be classified as Allowed General Unsecured Claims and treated in accordance with Article III.B.3 of the Plan.

C.     **Cure of Defaults for Assumed Executory Contracts and Unexpired Leases**

Not later than the date of filing of the Plan Supplement, the Debtor shall provide notices of proposed Cure Amounts to the counterparties to the Executory Contracts and Unexpired Leases proposed to be assumed under the Plan, which shall include a description of the procedures for objecting to the Cure Amount, the ability of the Debtor to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or any other matter pertaining to assumption.

Unless otherwise agreed in writing by the parties to the applicable Executory Contract or Unexpired Lease, any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or related Cure Amount must be filed, served, and actually received by the counsel to the Debtor within ten (10) days of the service of assumption and proposed Cure Amount, or such shorter period as agreed to by the parties or authorized by the Bankruptcy Court. Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption or Cure Amount shall be deemed to have assented to such assumption and Cure Amount and shall be forever barred, estopped, and enjoined from contesting the Debtor' assumption of the applicable Executory Contract or Unexpired Lease and from requesting payment of a Cure Amount that differs from the amounts paid or proposed to be paid by the Debtor or the Reorganized Debtor, in each case without the need for any objection by the Debtor or the Reorganized Debtor or any further notice to or action, order, or approval of the Bankruptcy Court. The Reorganized Debtor may settle any Cure Amount without any further notice to or action, order, or approval of the Bankruptcy Court.

The Debtor or the Reorganized Debtor, as applicable, shall pay undisputed Cure Amounts, if any, on the Effective Date or as soon as reasonably practicable thereafter, or on such other terms as the parties may agree. If there is any dispute regarding the Cure Amount, the ability of the Debtor to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or any other matter pertaining to assumption, then the Debtor or the Reorganized Debtor, as applicable, shall pay the applicable Cure Amount as reasonably practicable after entry of a Final Order resolving such dispute and approving such assumption, or as may otherwise be agreed upon by the Debtor or the Reorganized Debtor, as applicable, and the counterparty to the Executory Contract or Unexpired Lease.

D.     **Contracts and Leases Entered Into After the Petition Date**

Contracts and leases entered into after the Petition Date by the Debtor, including any Executory Contracts and Unexpired Leases assumed by the Debtor, will be performed by the Debtor or Reorganized Debtor thereto in the ordinary course of its operations. Accordingly, such contracts and leases (including any assumed Executory Contract and Unexpired Leases) shall survive and remain unaffected by entry of the Confirmation Order.

E.     **Compensation and Benefit Programs**

Other than those Compensation and Benefits Programs assumed by the Debtor prior to entry of the Confirmation Order, all of the Compensation and Benefits Programs entered into before the Petition Date and not since terminated shall be deemed to be, and shall be treated as though they are, Executory Contracts under the Plan and deemed assumed under sections 365 and 1123 of the Bankruptcy Code, and the Debtor's and Reorganized Debtor's obligations under the Compensation and Benefits Programs survive and remain unaffected by entry of the

Confirmation Order and be fulfilled in the ordinary course of the Debtor's and Reorganized Debtor's operations. Compensation and Benefits Programs assumed by the Debtor prior to entry of the Confirmation Order shall continue to be fulfilled in the ordinary course of the Debtor's non-profit operations from and after the date of any order of the Bankruptcy Court authorizing the assumption of such Compensation and Benefits Program.

   F.  **Workers' Compensation Program**

   As of the Effective Date, the Debtor and the Reorganized Debtor shall continue to honor their obligations under: (a) all applicable workers' compensation laws; and (b) the Workers' Compensation Program. All Proofs of Claims on account of the Workers' Compensation Program shall be deemed withdrawn automatically and without any further notice to or action, order, or approval of the Bankruptcy Court; provided, however, that nothing in the Plan shall limit, diminish, or otherwise alter the Debtor's or Reorganized Debtor's defenses, Causes of Action, or other rights under applicable non-bankruptcy law with respect to the Workers' Compensation Programs; provided further, however, that nothing herein shall be deemed to impose any obligations on the Debtor or their insurers in addition to what is provided for under the terms of the Workers' Compensation Programs and applicable state law.

   G.  **Protective Self-Insurance Program**

   As of the Effective Date, the Debtor and the Reorganized Debtor shall continue to honor Claims of Ministry Members on account of PSIP Insurance Obligations. All Proofs of Claims filed by Ministry Members on account of PSIP Insurance Obligations shall be deemed withdrawn automatically and without any further notice to or action, order, or approval of the Bankruptcy Court; provided, however, that nothing in the Plan shall limit, diminish, or otherwise alter the Debtor's or Reorganized Debtor's defenses, Causes of Action, or other rights under applicable non-bankruptcy law with respect to the PSIP Insurance Obligations; provided further, however, that nothing herein shall be deemed to impose any obligations on the Debtor or their insurers in addition to what is provided for under the terms of the Debtor's PSIP program and applicable state law; provided further, however, for the avoidance of doubt, nothing in the foregoing shall be construed to require the Debtor and Reorganized Debtor to continue to honor Abuse Claims.

   H.  **Gift Annuity Program**

   As of the Effective Date, the Debtor and the Reorganized Debtor shall continue to honor their obligations under their Gift Annuity Agreements. All Proofs of Claims on account of Gift Annuity Agreements shall be deemed withdrawn automatically and without any further notice to or action, order, or approval of the Bankruptcy Court; provided, however, that nothing in the Plan shall limit, diminish, or otherwise alter the Debtor's or Reorganized Debtor's defenses, Causes of Action, or other rights under applicable non-bankruptcy law with respect to the Gift Annuity Agreements; provided further, however, that nothing herein shall be deemed to impose any obligations on the Debtor in addition to what is provided for under the terms of the Gift Annuity Agreements and applicable state law.

   I.  **Indemnification Obligations**

   Notwithstanding anything in the Plan to the contrary, each Indemnification Obligation shall be assumed by the Debtor effective as of the Effective Date, pursuant to sections 365 and 1123 of the Bankruptcy Code or otherwise. Each Indemnification Obligation shall remain in full force and effect, shall not be modified, reduced, discharged, impaired, or otherwise affected in any way, and shall survive Unimpaired and unaffected, irrespective of when such obligation arose. For the avoidance of doubt, Article VI.I of the Plan affects only the obligations of the Debtor and Reorganized Debtor with respect to any Indemnification Obligations owed to or for the benefit of past and present directors, officers, employees, attorneys, accountants, and other professionals and agents of the Debtor, and shall have no effect on nor in any way discharge or reduce, in whole or in part, any obligation of any other Entity owed to or for the benefit of such directors, officers, employees, attorneys, accountants, and other professionals and agents of the Debtor.

   All Proofs of Claim filed on account of an Indemnification Obligation owed to or for the benefit of past and present directors, officers, employees, attorneys, accountants, investment bankers, and other professionals and agents of the Debtor shall be deemed satisfied and expunged from the claims register as of the Effective Date as such

Indemnification Obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to the Plan, without any further notice to or action, order, or approval of the Bankruptcy Court.

### J.    Modifications, Amendments, Supplements, Restatements, or Other Agreements

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless the Debtor rejects or repudiates any of the foregoing agreements. Modifications, amendments, and supplements to, or restatements of, prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtor during the Chapter 11 Case shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

### K.    Reservation of Rights

Neither the exclusion nor inclusion of any contract or lease in the Plan Supplement, nor anything contained in the Plan, nor the Debtor's delivery of a notice of proposed assumption and proposed cure amount to applicable contract and lease counterparties will constitute an admission by the Debtor that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that the Reorganized Debtor has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtor or Reorganized Debtor, as applicable, will have 30 days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

## VI.    EXIT FINANCING

As noted elsewhere in this Disclosure Statement, the Debtor has been exploring potential financing structures where cashflows generated by the FCC Licenses leases, and other assets related thereto, could serve as loan collateral. The Debtor believes that it may be able to implement an exit loan on the following indicative terms:

- Principal Amount:  $30 million (less fees and expenses)

- Interest Rate:  8.65%

- Term:  20 years

- Collateral:  FCC License cashflows and related assets

One potential structure for such loan involves:  (a) the Debtor transferring the FCC Licenses (and assuming and assigning the FCC Leases) to a special purpose vehicle and (b) using the special purpose vehicle's equity, as well as certain of the cashflows associated the FCC Leases, as collateral for such loan. The terms of the financing described above remain subject to change, and the effectuation of the financing described above remains subject to various contingencies, such as (a) a rating that is acceptable to any applicable potential lender; (b) market fluctuations; (c) finalization of loan documentation; and (d) the occurrence of the Effective Date.  The documentation concerning any such loan would be included in a supplement to the Debtor's chapter 11 plan.  The following provisions, which pertain to any such potential financing, are set forth in the Plan.

Upon entry of the Confirmation Order, the Debtor and Reorganized Debtor (as applicable) shall be authorized to execute and deliver, and to consummate the transactions contemplated by or permitted under, the Exit Facility Documents (including any asset transfers contemplated thereby) in all respects without further notice to or order of the Bankruptcy Court, act or action under applicable Law, regulation, order or rule or the vote, consent, authorization or approval of any person or entity, subject to such modifications as the Debtor or Reorganized Debtor (as applicable) may deem to be necessary to consummate the Exit Facility Documents. Confirmation of the Plan shall be deemed approval of the Exit Facility and Exit Facility Documents, including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, obligations and guarantees to be incurred and fees paid in connection therewith. On the Effective Date, the Exit Facility shall constitute legal, valid, binding and authorized indebtedness and obligations of the Reorganized Debtor, enforceable in accordance with its terms and such indebtedness and obligations (and the transactions effectuated to implement the Exit Financing) shall not be and shall not be deemed to be, enjoined or subject to discharge, impairment, release or avoidance under the Plan, the Confirmation Order or on account of the confirmation or consummation of the Plan.

On the Effective Date, all the liens and security interests granted in accordance with the Exit Facility Documents shall be legal, valid, binding upon the Reorganized Debtor, enforceable in accordance with their respective terms, and no obligation, payment, transfer or grant of security under the Exit Facility Documents shall be stayed, restrained, voidable, or recoverable under the Bankruptcy Code or under any applicable law or subject to any defense, reduction, recoupment, setoff or counterclaim. Such liens and security interests shall be deemed automatically perfected on the Effective Date without the need for the taking of any further filing, recordation, approval, consent or other action, and such liens and security interests shall not be enjoined or subject to discharge, impairment, release, avoidance, recharacterization or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy law.

On the Effective Date, the Reorganized Debtor and the Exit Facility Lender shall be authorized to make all filings and recordings, obtain all governmental approvals and consents, and take any other actions necessary to establish and perfect such liens and security interest under the provisions of the applicable state, federal, or other law (whether domestic or foreign) that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfections shall occur automatically by virtue of the entry of the Confirmation Order and any such filings, recordings, approvals, and consents shall not be required), and the Reorganized Debtor shall thereafter cooperate to make all other findings and recordings that otherwise would be necessary under applicable law to give notice of such liens and security interests to third parties.

## VII.    CONFIRMATION AND CONSUMMATION OF PLAN

### A.    Conditions Precedent to Confirmation of the Plan

Confirmation of the Plan shall not occur unless all of the following conditions precedent have been satisfied:

1.    the Confirmation Order is in form and substance acceptable to the Debtor;

2.    the Confirmation Order shall approve and implement the Channeling Injunction set forth in Article XI.D of the Plan; and

3.    the Plan Documents shall be in form and substance acceptable to the Debtor.

### B.    Conditions Precedent to the Occurrence of the Effective Date

The Effective Date shall not occur unless all of the following conditions precedent have been satisfied, unless waived in accordance with Article X.C of the Plan:

1.  the Confirmation Order, in form and substance acceptable to the Debtor, shall have been entered by the Bankruptcy Court and shall have become a Final Order;

2.  the Trust Agreements and the Trust Distribution Procedures shall have become effective in accordance with the terms of the Plan;

3.  the Trust shall have been established and funded in accordance with the Plan;

4.  the Debtor shall have obtained all authorizations, consents, certifications, approvals, rulings, opinions or other documents that are necessary to implement and effectuate the Plan, including any and all canonical approvals; all actions, documents, and agreements necessary to implement and effectuate the Plan shall have been effected or executed; and

5.  the Debtor shall have filed a notice of occurrence of the Effective Date.

**C.      Waiver of Conditions to the Effective Date**

Except for the condition precedent set forth in Article X.B.1 of the Plan, each of the conditions precedent to the occurrence of the Effective Date set forth in Article X.B of the Plan may be waived in whole or in part by the Debtor without notice to or leave or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan. The failure to satisfy any condition precedent to the Confirmation Date or satisfy or waive any condition precedent to the Effective Date may be asserted by the Debtor regardless of the circumstances giving rise to the failure of such condition to be satisfied.

**D.      Effect of Nonoccurrence of Conditions to the Effective Date**

If the Confirmation Order is vacated or the Effective Date does not occur within 180 days after entry of the Confirmation Order (subject to extension by the Debtor in its sole discretion), the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall (1) constitute a waiver or release of any Causes of Action by or Claims against the Debtor; (2) prejudice in any manner the rights of the Debtor, any holders of a Claim or any other Entity; (3) constitute an admission, acknowledgment, offer, or undertaking by the Debtor, any holders, or any other Entity in any respect; or (4) be used by the Debtor or any other Entity as evidence (or in any other way) in any litigation, including with respect to the strengths and weaknesses of positions, arguments or claims of any of the parties to such litigation.

**E.      Retention of Jurisdiction by the Bankruptcy Court**

Until the Chapter 11 Case is closed, the Bankruptcy Court shall retain jurisdiction over all matters arising out of, and related to, the Chapter 11 Case and the Plan pursuant to, and for the purposes of, sections 105(c) and 1142 of the Bankruptcy Code to the fullest extent permitted by law, including the jurisdiction necessary to ensure that the purposes and the intent of the Plan are carried out. Following the Confirmation Date, the administration of the Chapter 11 Case will continue until the Chapter 11 Case is closed by a Final Order of the Bankruptcy Court. The Bankruptcy Court shall also retain jurisdiction for the purpose of classification of any Claims and the re-examination of Claims (including Abuse Claims) that have been Allowed for purposes of voting, and the determination of such objections as may be filed with the Bankruptcy Court with respect to any Claims. The failure by the Debtor to object to, or examine, any Claim for the purposes of voting, shall not be deemed a waiver of the rights of the Debtor, the Reorganized Debtor, or the Arrowood Settlement Trust or the General Settlement Trust to object to or re-examine such Claim in whole or part.

In addition to the foregoing, the Bankruptcy Court shall retain jurisdiction for each of the specific purposes enumerated in Article XII.B of the Plan after the Confirmation Date. Notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain jurisdiction over all matters arising out of, and related to, the Chapter 11 Case and the Plan pursuant to, and for the purposes of, sections 105(c) and 1142 of the Bankruptcy Code and to the fullest extent permitted by law, including the following purposes:

1.      to modify the Plan after the Confirmation Date pursuant to the provisions of the Bankruptcy Code and the Bankruptcy Rules;

2.      to correct any defect, cure any omission, reconcile any inconsistency or make any other necessary changes or modifications in or to the Plan, the Trust Documents or the Confirmation Order as may be necessary to carry out the purposes and intent of the Plan, including the adjustment of the date(s) of performance in the Plan in the event the Effective Date does not occur as provided herein so that the intended effect of the Plan may be substantially realized thereby;

3.      to enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason or in any respect modified, stayed, reversed, revoked or vacated, or if distributions pursuant to the Plan or the Trust Documents are enjoined or stayed;

4.      to hear and determine all applications for compensation of Professionals and reimbursement of expenses under sections 328, 330, 331 and/or 503(b) of the Bankruptcy Code;

5.      to hear and determine any Causes of Action arising during the period from the Petition Date to the Effective Date, or in any way related to the Plan or the transactions contemplated hereby, against the Debtor, the Reorganized Debtor, the Arrowood Settlement Trust, the General Settlement Trust, the Arrowood Settlement Trustee, the General Settlement Trustee, the Litigation Administrator, the Official Committee, or the Future Claimants' Representative and their respective officers, directors, employees, members, attorneys, accountants, financial advisors, representatives and agents;

6.      to determine any and all motions, including motions pending as of the Confirmation Date, for the rejection, assumption or assumption and assignment of Executory Contracts or Unexpired Leases and the Allowance of any Claims resulting therefrom;

7.      to hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code;

8.      to determine such other matters and for such other purposes as may be provided in the Confirmation Order;

9.      to determine any and all motions, adversary proceedings, contested or litigated matters, and any other matters and grant or deny any applications involving the Debtor that may be pending on the Effective Date (which jurisdiction shall be non-exclusive as to any such non-core matters);

10.     to determine the Allowance and/or Disallowance of any Claims against the Debtor or its Estate, including any objections to any such Claims and the compromise and settlement of any Claim against the Debtor or its Estate;

11.     to determine all questions and disputes regarding title to the assets of the Debtor or its Estate or the Trust Assets;

12.     to ensure that Plan Distributions to holders of Allowed Claims and that Trust Distributions to holders of Abuse Claims are accomplished pursuant to the provisions of the Plan and adjudicate any and all disputes relating to distributions under the Plan or the Trust Documents;

13.     to construe, enforce and resolve all questions and disputes relating to employment agreements existing or approved by the Bankruptcy Court at or before the Confirmation Date;

14.     to hear and determine the Insurance Actions and to determine all questions and issues arising thereunder. Notwithstanding anything herein to the contrary, however, such retention of jurisdiction by the Bankruptcy Court in Article XII.B.14 of the Plan shall not be deemed to be (a) retention of exclusive jurisdiction with respect to any matter described in Article XII.B.14 of the Plan; rather, any court other than the Bankruptcy Court that has jurisdiction over any matter described in Article XII.B.14 of the Plan shall have the right to exercise such jurisdiction, and (b) nothing in Article XII.B.14 of the Plan shall be construed to alter the orders of withdrawal of the reference to the bankruptcy court entered in the Insurance Actions;

15.     to hear and determine any matters related to the Arrowood Settlement Trust's or the General Settlement Trust's indemnification obligations under Article IV of the Plan and the Trust Documents;

16.     to hear and determine any other matters related hereto, including the implementation and enforcement of all orders entered by the Bankruptcy Court in the Chapter 11 Case;

17.     to enter in aid of implementation of the Plan such orders as are necessary, including orders in aid of the implementation and enforcement of the releases, the Channeling Injunction, and the other injunctions described herein;

18.     to enter and implement such orders as may be necessary or appropriate if any aspect of the Plan, the Arrowood Settlement Trust, the General Settlement Trust, or the Confirmation Order is, for any reason or in any respect, determined by a court to be inconsistent with, to violate, or to be insufficient to satisfy any of the terms, conditions, or other duties associated with any Insurance Policies; provided, however, that (a) such orders shall not impair the Insurer Coverage Defenses or the rights, claims or defenses, if any, of any Insurer that are set forth or provided for in the Plan, the Plan Documents, the Confirmation Order, or any other orders entered in the Chapter 11 Case and (b) the rights of all interested parties, including any Insurer, are reserved to oppose or object to any such motion or order seeking such relief; and

19.     to enter a Final Order or decree concluding or closing the Chapter 11 Cases.

## VIII.    VOTING REQUIREMENTS

The Disclosure Statement Order entered by the Bankruptcy Court approved certain procedures for the Debtor's solicitation of votes to approve the Plan, including setting the deadline for voting, which holders of Claims are eligible to receive Ballots to vote on the Plan, and certain other voting procedures.

THE DISCLOSURE STATEMENT ORDER IS HEREBY INCORPORATED BY REFERENCE AS THOUGH FULLY SET FORTH HEREIN. YOU SHOULD READ THE DISCLOSURE STATEMENT ORDER, THE CONFIRMATION HEARING NOTICE, AND THE INSTRUCTIONS ATTACHED TO YOUR BALLOT IN CONNECTION WITH THIS ARTICLE, AS THEY SET FORTH IN DETAIL, AMONG OTHER THINGS, PROCEDURES GOVERNING VOTING DEADLINES AND OBJECTION DEADLINES.

If you have any questions about the procedure for voting your Claim or the Solicitation Package you received, or if you wish to obtain a paper copy of the Plan, this Disclosure Statement or any Exhibits to such documents, please contact Epiq, the Voting Agent, by either (i) visiting the Document Website at https://dm.epiq11.com/case/drvc/dockets or (ii) calling (888) 490-0633.

### A.        Voting Deadline

This Disclosure Statement and the appropriate Ballot(s) are being distributed to all holders of Claims that are entitled to vote on the Plan.  In order to facilitate vote tabulation, there is a separate Ballot designated for each impaired voting Class; however, the term "Ballot" is used without intended reference to the Ballot of any specific Class of Claims.

IN ACCORDANCE WITH THE DISCLOSURE STATEMENT ORDER, IN ORDER TO BE CONSIDERED FOR PURPOSES OF ACCEPTING OR REJECTING THE PLAN, ALL BALLOTS MUST BE RECEIVED BY THE VOTING AGENT NO LATER THAN **5:00 P.M. (PREVAILING EASTERN TIME) ON MARCH 22, 2024**, THE VOTING DEADLINE. ONLY THOSE BALLOTS ACTUALLY RECEIVED BY THE VOTING AGENT BEFORE THE VOTING DEADLINE WILL BE COUNTED AS EITHER ACCEPTING OR REJECTING THE PLAN. FOR DETAILED VOTING INSTRUCTIONS, SEE THE DISCLOSURE STATEMENT ORDER.

### B.        Holders of Claims Entitled to Vote

Under section 1124 of the Bankruptcy Code, a class of claims is deemed to be "impaired" under a plan unless (1) the plan leaves unaltered the legal, equitable and contractual rights to which such claim or equity interest entitles the holder thereof; or (2) notwithstanding any legal right to an accelerated payment of such claim, the plan (a) cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy), (b) reinstates the maturity of such claim or equity interest as it existed before the default, (c) compensates the holder of such claim or equity interest for any damages resulting from such holder's reasonable reliance on such legal right to an accelerated payment and (d) does not otherwise alter the legal, equitable or contractual rights to which such claim or equity interest entitles the holder of such claim or equity interest.

In general, a holder of a claim may vote to accept or reject a plan if (1) the claim is "allowed," which means generally that it is not disputed, contingent or unliquidated, and (2) the claim is impaired by a plan.  However, if the holder of an impaired claim will not receive any distribution under the plan on account of such claim or equity interest, the Bankruptcy Code deems such holder to have rejected the plan and provides that the holder of such claim is not entitled to vote on the plan.  If the claim is not impaired, the Bankruptcy Code conclusively presumes that the holder of such claim has accepted the plan and provides that the holder is not entitled to vote on the plan.

Except as otherwise provided in the Disclosure Statement Order, the holder of a Claim against the Debtor that is "impaired" under the Plan is entitled to vote to accept or reject the Plan if (1) the Plan provides a distribution in respect of such Claim; and (2) the Claim has been scheduled by the Debtor (and is not scheduled as disputed, contingent, or unliquidated), the holder of such Claim has timely filed a Proof of Claim or a Proof of Claim was deemed timely filed by an order of the Bankruptcy Court prior to the Voting Deadline.

**AS SET FORTH IN THE CONFIRMATION HEARING NOTICE AND IN THE DISCLOSURE STATEMENT ORDER, (A) HOLDERS OF ABUSE CLAIMS THAT ARE THE SUBJECT OF AN OBJECTION, (B) HOLDERS OF ABUSE CLAIMS THAT THE BANKRUPTCY COURT DISALLOWED WITH LEAVE TO AMEND THAT HAVE NOT BEEN AMENDED, AND (C) HOLDERS OF ABUSE CLAIMS THAT THE BANKRUPTCY COURT DISALLOWED, THE DISALLOWANCE OF WHICH IS SUBJECT TO AN APPEAL IN A COURT OF COMPETENT JURISDICTION MUST FILE MOTIONS TO HAVE THEIR CLAIMS TEMPORARILY ALLOWED FOR VOTING PURPOSES ON OR BEFORE MARCH 22, 2024.**

A vote on the Plan may be disregarded if the Bankruptcy Court determines, pursuant to section 1126(e) of the Bankruptcy Code, that it was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.  The Disclosure Statement Order also sets forth assumptions and procedures for determining the amount of Claims that each creditor is entitled to vote in this Chapter 11 Case and how votes will be counted under various scenarios.

C.      **Vote Required for Acceptance by a Class**

A Class of Claims will have accepted the Plan if it is accepted by at least two-thirds (⅔) in amount and more than one-half (½) in number of the Allowed Claims in such Class that have voted on the Plan in accordance with the Disclosure Statement Order.

## IX.     CONFIRMATION OF THE PLAN

The Bankruptcy Code requires the Bankruptcy Court, after notice, to conduct a hearing at which it will hear objections (if any) and determine whether to confirm the Plan.  At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan only if all of the requirements of section 1129 of the Bankruptcy Code described below are met.

The Confirmation Hearing has been scheduled to begin on May 9, 2024, at **10:00 a.m.** prevailing Eastern time before the Honorable Martin Glenn, Chief United States Bankruptcy Judge for the Southern District of New York, in a courtroom to be determined at the United States Bankruptcy Court for the Southern District of New York, located at One Bowling Green, New York, New York 10004. Parties wishing to appear at the Hearing via Zoom for Government, whether making a "live" or "listen only" appearance before the Court, must make an electronic appearance through the Court's website at https://ecf.nysb.uscourts.gov/cgi-bin/nysbAppearances.pl on or before May 8, 2024, at 4:00 p.m. (prevailing Eastern Time).  After the deadline for parties to make electronic appearances has passed, parties who have made their electronic appearance through the Court's website will receive an invitation from the Court with a Zoom link that will allow them to attend the Hearing.  Requests to receive a Zoom link should not be emailed to the Court, and the Court will not respond to late requests that are submitted on the day of the hearing. Further information on the use of Zoom for Government can be found at the Court's website at https://www.nysb.uscourts.gov/zoom-video-hearing-guide. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice, except for an announcement of the adjourned date made at the Confirmation Hearing.

A.      **Deadline to Object to Confirmation**

Objections, if any, to the Confirmation of the Plan must:  (1) be in writing; (2) state the name and address of the objecting party and the nature of the Claim of such party; (3) state with particularity the basis and nature of any objection; and (4) be filed with the Bankruptcy Court, and served on the following parties so that they are received no later than 4:00 p.m., prevailing Eastern time, on April 24, 2024:

- counsel to the Debtor, Jones Day, 250 Vesey Street, New York, New York 10281 (Corrine Ball, Esq., Todd Geremia, Esq., Benjamin Rosenblum, Esq., Andrew Butler, Esq.);

- the Office of the United States Trustee, Southern District of New York, 201 Varick Street, Suite 1006, New York, NY 10014 (Attn: Greg Zipes, Esq.);

- counsel to the Official Committee, Pachulski Stang Ziehl & Jones LLP, 780 Third Avenue, 34th Floor, New York, New York 10017 (Attn: Ilan D. Scharf, Esq., Karen B. Dine, Esq., Brittany M. Michael, Esq.), Pachulski Stang Ziehl & Jones LLP, 10100 Santa Monica Boulevard, 13th Floor, Los Angeles, California 90067 (Attn: James I. Stang, Esq.);

- all other parties in interest that have filed requests for notice pursuant to Bankruptcy Rule 2002 in this Chapter 11 Case.

B.      **Requirements for Confirmation of the Plan**

Among the requirements for Confirmation of the Plan are that the Plan (1) is accepted by all impaired Classes of Claims or, if rejected by an impaired Class, that the Plan "does not discriminate unfairly" and is "fair and equitable" as to such Class; (2) is feasible; (3) is in the "best interests" of creditors that are impaired under the Plan; and (4) all transfers of property under the plan comply with applicable nonprofit law.  In addition, in order to approve third-party releases, which are an essential condition of the Plan, a plan must also satisfy the applicable standards established by the Second Circuit Court of Appeals.

1.      **Requirements of Section 1129(a) of the Bankruptcy Code**

A moneyed, business or commercial corporation or trust must satisfy the following requirements pursuant to section 1129(a) of the Bankruptcy Code before the Bankruptcy Court may confirm its reorganization plan:

- The plan complies with the applicable provisions of the Bankruptcy Code.

- The proponent(s) of the plan complies with the applicable provisions of the Bankruptcy Code.

- The plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or to be made by the proponent, by the debtor, or by a person issuing securities or acquiring property under a plan, for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the Bankruptcy Court as reasonable.

- The proponent(s) of a plan has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the debtor, an affiliate of the debtor participating in a joint plan with the debtor or a successor to the debtor under the plan, and the appointment to, or continuance in, such office of such individual must be consistent with the interests of creditors and equity security holders and with public policy.

- The proponent(s) of a plan has disclosed the identity of any insider (as defined in section 101 of the Bankruptcy Code) that will be employed or retained by the reorganized debtor, and the nature of any compensation for such insider.

- Any governmental regulatory commission with jurisdiction, after confirmation of the plan, over the rates of the debtor has approved any rate change provided for in the plan, or such rate change is expressly conditioned on such approval.

- With respect to each impaired class of claims—

  o each holder of a claim of such class (a) has accepted the plan; or (b) will receive or retain under the plan on account of such claim property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code on such date; or

  o if section 1111(b)(2) of the Bankruptcy Code applies to the claims of such class, each holder of a claim of such class will receive or retain under the plan on account of such claim, property of a value, as of the effective date of the plan, that is not less than the value of such holder's interest in the estate's interest in the property that secures such claims.

- With respect to each class of claims or interests, such class has (a) accepted the plan; or (b) such class is not impaired under the plan (subject to the "cramdown" provisions discussed below; see "Confirmation of the Plan — Requirements of Section 1129(b) of the Bankruptcy Code").

- Except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the plan provides that:

  o with respect to a claim of a kind specified in sections 507(a)(2) or 507(a)(3) of the Bankruptcy Code, on the effective date of the plan, the holder of the claim will receive on account of such claim cash equal to the allowed amount of such claim, unless such holder consents to a different treatment;

  o with respect to a class of claim of the kind specified in sections 507(a)(1), 507(a)(4), 507(a)(5), 507(a)(6), or 507(a)(7) of the Bankruptcy Code, each holder of a claim of such class will receive (a) if such class has accepted the plan, deferred cash payments of a value,

on the effective date of the plan, equal to the allowed amount of such claim; or (b) if such class has not accepted the plan, cash on the effective date of the plan equal to the allowed amount of such claim, unless such holder consents to a different treatment;

- o with respect to a claim of a kind specified in section 507(a)(8) of the Bankruptcy Code, unless the holder of such a claim consents to a different treatment, the holder of such claim will receive on account of such claim, regular installment payments in cash, of a total value, as of the effective date of the plan, equal to the allowed amount of such claim over a period ending not later than 5 years after the date of the order for relief under section 301, 302, or 303 of the Bankruptcy Code and in a manner not less favorable than the most favored nonpriority unsecured claim provided for by the plan (other than cash payments made to a class of creditors under section 1122(b) of the Bankruptcy Code); and

- o with respect to a secured claim which would otherwise meet the description of an unsecured claim of a governmental unit under section 507(a)(8) of the Bankruptcy Code, but for the secured status of that claim, the holder of that claim will receive on account of that claim, cash payments, in the same manner and over the same period, as prescribed in the immediately preceding bullet points above.

- • If a class of claims is impaired under the plan, at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider (as defined in section 101 of the Bankruptcy Code).

- • Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

- • All fees payable under 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the hearing on confirmation of the plan, have been paid or the plan provides for the payment of all such fees on the effective date of the plan.

- • The plan provides for the continuation after its effective date of payment of all retiree benefits, as that term is defined in section 1114 of the Bankruptcy Code, at the level established pursuant to subsection (e)(1)(B) or (g) of section 1114 of the Bankruptcy Code, at any time prior to confirmation of the plan, for the duration of the period the debtor has obligated itself to provide such benefits.

The Debtor believes that the Plan meets all the applicable requirements of section 1129(a) of the Bankruptcy Code other than those pertaining to voting, which has not yet taken place.

The Committee believes that Contested Abuse Claims that are allowed are not receiving fair and equitable treatment within the meaning of the Bankruptcy Code as the holders of such Contested Abuse Claims may receive substantially less than similarly situated Abuse Claims in the same settlement trust.

The Committee also believes that there is a material risk that holders of Abuse Claims will receive disparate treatment based on the fact that the allocation for the Settlement Trusts is being done on a per claim basis rather than taking into account the severity of the claims assigned to each Settlement Trust. Thus, even without accounting for the separate insurance applicable to each Trust, the holders of similar claims – or claims of the same point value – may receive substantially different recoveries based on the allocation of the Diocesan contribution to the respective Trusts.

2.    **Best Interests of Creditors**

Section 1112(c) of the Bankruptcy Code provides that non-profit Entities, such as the Debtor, cannot have their chapter 11 cases converted into chapter 7 cases involuntarily. For a non-profit debtor, therefore, a liquidation under chapter 7 of the Bankruptcy Code is a path that can be chosen only by the debtor. Because the Debtor's chapter 11 case could not be involuntarily converted to a chapter 7 liquidation, the Debtor may arguably not be required to satisfy the requirements of section 1129(a)(7) in connection with Confirmation of the Plan. Nevertheless, the Debtor is submitting a liquidation analysis attached hereto as Exhibit 2.

The liquidation analysis does not include either in the recoveries under the Plan or the recoveries in a hypothetical chapter 7 case what is available from the parishes and does not provide an analysis of any restrictions or limitations on parish real estate or other assets.

With respect to the liquidation analysis, the Official Committee's position is that the Lay Pension Plan and the Priest Pension Plan have material surplus assets, not deficits, and that there would be no amounts owed on account of pensions in a chapter 7 liquidation.

### 3.    Feasibility

The Debtor believes that the Reorganized Debtor will be able to perform its obligations under the Plan and continue to operate its organization without further financial reorganization or liquidation.  In connection with Confirmation of the Plan, the Bankruptcy Court must determine that the Plan is feasible in accordance with section 1129(a)(11) of the Bankruptcy Code (which section requires that the Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor).  To support the Debtor's belief that the Plan is feasible, the Debtor has prepared the projections for the Reorganized Debtor, as set forth in Exhibit 3 to this Disclosure Statement.

### 4.    Requirements of Section 1129(b) of the Bankruptcy Code

The Bankruptcy Code permits confirmation of a plan even if it is not accepted by all impaired classes, as long as (a) the plan otherwise satisfies the requirements for confirmation, (b) at least one impaired class of claims has accepted the plan without taking into consideration the votes of any insiders in such class and (c) the plan is "fair and equitable" and does not "discriminate unfairly" as to any impaired class that has not accepted the plan.  These so-called "cramdown" provisions are set forth in section 1129(b) of the Bankruptcy Code.

*"Fair and Equitable"*

The Bankruptcy Code establishes different "cramdown" tests for determining whether a plan is "fair and equitable" to dissenting impaired classes of secured creditors, unsecured creditors and equity interest holders as follows:

- Secured Creditors.  A plan is fair and equitable to a class of secured claims that rejects the plan if the plan provides:  (a) that each holder of a secured claim included in the rejecting class (i) retains the liens securing its claim to the extent of the allowed amount of such claim, whether the property subject to those liens is retained by the debtor or transferred to another entity, and (ii) receives on account of its secured claim deferred cash payments having a present value, as of the effective date of the plan, at least equal to such holder's interest in the estate's interest in such property; (b) that each holder of a secured claim included in the rejecting class realizes the "indubitable equivalent" of its allowed secured claim; or (c) for the sale, subject to section 363(k) of the Bankruptcy Code, of any property that is subject to the liens securing the claims included in the rejecting class, free and clear of such liens with such liens to attach to the proceeds of the sale, and the treatment of such liens on proceeds in accordance with clause (i) or (ii) of this paragraph.

- Unsecured Creditors.  A plan is fair and equitable as to a class of unsecured claims that rejects the plan if the plan provides that:  (a) each holder of a claim included in the rejecting class receives or retains under the plan property of a value, as of the effective date of the plan, equal to the amount of its allowed claim; or (b) the holders of claims and interests that are junior to the claims of the rejecting class will not receive or retain any property under the plan on account of such junior claims or interests.

The Debtor believes the Plan is fair and equitable as to unsecured creditors because no holders of Claims junior to such parties are receiving any distributions under the Plan on account of such claims or interests.  The Debtor does not have any secured creditors that are impaired under the Plan and, therefore, confirmation will not contemplate the non-consensual Confirmation of the Plan with respect to any such secured creditors.

*"Unfair Discrimination"*

A plan of reorganization does not "discriminate unfairly" if a dissenting class is treated substantially equally with respect to other classes similarly situated, and no class receives more than it is legally entitled to receive for its claims or interests. The Debtor carefully designed the Plan to ensure recoveries on account of Claims in a particular Class against the Debtor did not result in unfair discrimination among similarly situated Classes. The Debtor does not believe that the Plan discriminates unfairly against any impaired Class of Claims.

The Debtor believes that, if necessary, the Plan and the treatment of all Classes of Claims under the Plan satisfy the foregoing requirements for, "cramdown," or non-consensual Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code. Because the Plan does not seek to cram down Class 4 or Class 5, section 1129(b) of the Bankruptcy Code is not applicable with respect to such Classes.

The Committee believes that as a result of the separate Settlement Trusts and the treatment of Contested Abuse Claims, that there is discrimination and disparate treatment of Abuse Claims in different Classes and well as within the same Class. Holders of Abuse Claims with similar claims may receive materially different recovery depending on their Class. Additionally, because of the Minimum Consideration Payments, holders of Abuse Claims with more severe claims (higher point values) could receive a lower percentage of recovery than those with less severe claims (lower point values).

     5.       Third Party Releases

When evaluating whether third-party releases are permissible, courts evaluate seven factors outlined in *Purdue*, which are: (1) whether there is an identity of interests between the debtor(s) and released third parties, (2) whether claims against the debtor and nondebtor are factually and legally intertwined, (3) whether the scope of the releases is appropriate, (4) whether the releases are essential to the reorganization, (5) whether the non-debtor contributed substantial assets to the reorganization, (6) whether the impacted class of creditors "overwhelmingly" voted in support of the plan with the releases, and (7) whether the plan provides for the fair payment of enjoined claims. *See In re Purdue Pharma L.P.*, 69 F.4th 45, 78-79 (2d Cir. 2023), *cert. granted sub nom. Harrington v. Purdue Pharma L.P.*, No. (23A87), 2023 WL 5116031 (Aug. 10, 2023). The Debtor believes that the seven factors outlined in *Purdue* will justify authorization of the third party releases contained in the Plan. However, there can be no assurance that creditors will support the Plan, or will support the Plan in requisite number, to approve the third party releases, which are an essential condition to the Plan.

## X.    MEANS OF IMPLEMENTATION OF THE PLAN

     **A.**      **Effects of Confirmation of the Plan**

         1.      **Continued Corporate Existence and Vesting of Assets in the Reorganized Debtor**

The Debtor shall continue to exist on and after the Effective Date, with all of the powers of such Entity under applicable law, including pursuant to the *Act to Incorporate the Roman Catholic Diocese of Rockville Centre, New York*, other formation, organizational and governance documents immediately prior to the Effective Date, and nonprofit law.

Except as otherwise explicitly provided in the Plan, on the Effective Date, pursuant to sections 1141(b) and 1141(c) of the Bankruptcy Code, all property comprising the Estate, other than the DRVC Trust Contributions, and any and all property of the Debtor shall vest in the Reorganized Debtor free and clear of all Liens, Claims, interests, charges, other Encumbrances and liabilities of any kind, including successor liability Claims; provided, however, the foregoing shall not be construed to authorize the Reorganized Debtor to use property in contravention of any legally enforceable restrictions requiring the use or disposition of such assets for a particular donative purpose or to use property that is held in a fiduciary capacity other than in accordance with such fiduciary obligations. On and after the Effective Date, the Reorganized Debtor may continue its operations and may use, acquire, or dispose of property, and compromise or settle any Claims, or Causes of Action without supervision or approval of the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules.

2.        **Sources of Cash for Plan Distributions and Trust Distributions**

The Debtor or the Reorganized Debtor, as applicable, shall fund Plan Distributions using cash on hand and the Arrowood Settlement Trust and the General Settlement Trust shall fund distributions from Trust Assets in accordance with the Trust Documents.

3.        **Corporate Governance, Directors and Officers, Employment-Related Agreements and Compensation Programs; Other Agreements**

a.        *Certificates of Incorporation and Bylaws*

Other than with respect to the *Act to Incorporate the Roman Catholic Diocese of Rockville Centre, New York*, the Reorganized Debtor shall enter into such agreements and amend its formation, organizational and/or governance documents, including its bylaws and rules and regulations, as applicable, to the extent necessary to implement the terms and provisions of the Plan. After the Effective Date, the Reorganized Debtor may amend and restate its organizational documents, and the Reorganized Debtor may file its bylaws, rules and regulations, or such other applicable organizational and/or governance documents, as applicable, and other constituent documents as permitted by applicable laws.

b.        *Directors and Officers of the Reorganized Debtor*

In accordance with § 1129(a)(5) of the Bankruptcy Code, the identities and affiliations of the persons proposed to serve as the members and trustees of the Reorganized Debtor and the persons proposed to serve as officers of the Reorganized Debtor on and after the Effective Date are set forth on Exhibit C to the Plan.

c.        *Employment-Related Agreements and Compensation Programs*

Except as otherwise provided in the Plan, as of the Effective Date, the Reorganized Debtor will have authority to:   (i) maintain, reinstate, amend or revise existing employment, retirement, welfare, incentive, severance, indemnification and other agreements with its active and retired directors, officers and employees, subject to the terms and conditions of any such agreement and applicable non-bankruptcy law; and (ii) enter into new employment, retirement, welfare, incentive, severance, indemnification and other agreements for active and retired employees.

From and after the Effective Date, the Reorganized Debtor will continue to administer and pay the Claims arising before the Petition Date under the Debtor's workers' compensation programs in accordance with their prepetition practices and procedures.

4.        **Preservation of Rights of Action**

In accordance with section 1123(b)(3) of the Bankruptcy Code, notwithstanding anything else in the Plan to the contrary but subject to Article XI.G.1 of the Plan and the Insurance Rights Transfer, all Causes of Action that the Debtor may hold against any Entity shall vest in the Reorganized Debtor on the Effective Date. Thereafter, subject to Article XI.G.1 of the Plan, the Reorganized Debtor shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, whether arising before or after the Petition Date, and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court. No Entity may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any specific Cause of Action as any indication that the Debtor or Reorganized Debtor, as applicable, will not pursue any and all available Causes of Action. The Debtor or Reorganized Debtor, as applicable, expressly reserves all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches, shall apply to any Cause of Action upon, after, or as a consequence of entry of the Confirmation Order or the occurrence of the Effective Date.

     5.       **Reinstatement and Continuation of Insurance Policies**

Notwithstanding anything herein to the contrary, the Reorganized Debtor shall be deemed to have assumed all of the Debtor's D&O Liability Insurance Policies pursuant to section 365(a) of the Bankruptcy Code, effective as of the Effective Date. Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Reorganized Debtor foregoing assumption of the unexpired D&O Liability Insurance Policies.

On the Effective Date, the Debtor's insurance policies in existence as of the Effective Date shall continue in accordance with their terms and, to the extent applicable, shall be deemed assumed by the Reorganized Debtor pursuant to section 365 of the Bankruptcy Code and Article V of the Plan. Nothing in the Plan shall affect, impair, or prejudice the rights of the insurance carriers, the insureds, or the Reorganized Debtor under the insurance policies in any manner, and such insurance carriers, the insureds, and Reorganized Debtor shall retain all rights and defenses under such insurance policies, subject to the Insurance Rights Transfer and Ecclesia Settlement.

     6.       **Release of Liens**

Upon the payment in full in cash of a Secured Claim, any Lien securing a Secured Claim that is paid in full in cash shall be deemed released, and the holder of such Secured Claim shall be authorized and directed to release any collateral or other property of the Debtor (including any cash collateral) held by such holder and to take such actions as may be requested by the Reorganized Debtor, to evidence the release of such Lien, including the execution, delivery and filing or recording of such releases as may be requested by the Reorganized Debtor.

     7.       **Effectuating Documents; Further Transactions**

On and after the Effective Date, the Reorganized Debtor is authorized to and may issue, execute, deliver, file, or record such contracts, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of the Plan.

     8.       **Dissolution of Official Committee**

Upon the Effective Date, the current and former members of the Official Committee and any other committee appointed pursuant to section 1102 of the Bankruptcy Code in the Chapter 11 case, and their respective officers, employees, counsel, advisors and agents, will be released and discharged of and from all further authority, duties, responsibilities and obligations related to and arising from and in connection with the Chapter 11 Case; *provided, however*, that following the Effective Date the Official Committee will continue in existence and have standing and a right to be heard for the limited purpose of pursuing applications for professional compensation. Following the completion of the Official Committee's remaining duties set forth above, the Official Committee will be dissolved, and the retention or employment of the Official Committee's respective attorneys, accountants and other agents will terminate.

**B.**      **Provisions Governing Distributions on Account of Allowed Claims and Procedures for Resolving Disputed Claims**

     1.       **Distributions on Account of Allowed Claims**

        *a.*       ***Distributions for Allowed Claims as of the Effective Date***

Except with respect to Trust Distributions on account of Abuse Claims and payment of Trust Expenses, which shall be made in accordance with the terms of the applicable Trust Documents, the Reorganized Debtor shall make all distributions to the appropriate holders of Allowed Claims in accordance with the terms of the Plan.

Except as otherwise provided in the Plan, any Plan Distributions shall be made on the Effective Date or as otherwise determined in accordance with the Plan, including the treatment provisions of Article III of the Plan, or as soon as practicable thereafter; provided, however, that the Reorganized Debtor shall from time to time determine subsequent distribution dates to the extent they determine them to be appropriate; provided further, however, that the Reorganized Debtor reserve its right to seek Bankruptcy Court approval of procedures and mechanisms for Plan

Distributions.

Except as provided in Article VII of the Plan, no holder of an Allowed Claim shall receive, on account of such Allowed Claim, Plan Distributions in excess of the Allowed amount of such Claim.

b.     ***Distribution Record Date***

The Debtor or the Reorganized Debtor, as applicable, shall have no obligation to recognize any transfer, sale or assignment of Claims occurring after the close of business on the Distribution Record Date. With respect to payment of any Cure Amounts or assumption disputes, neither the Debtor nor the Reorganized Debtor shall have any obligation to recognize or deal with any party other than the non-Debtor party to the applicable Executory Contract or Unexpired Lease as of the close of business on the Distribution Record Date, even if such non-Debtor party has sold, assigned, or otherwise transferred its Claim for a Cure Amount.

c.     ***No Postpetition Interest on Claims***

Except as otherwise provided in the Plan, the Confirmation Order, or another order of the Bankruptcy Court or required by the Bankruptcy Code (including postpetition interest in accordance with sections 506(b) and 726(a)(5) of the Bankruptcy Code), interest shall not accrue or be paid on any Claims on or after the Petition Date; provided, however, that if interest is payable pursuant to the preceding sentence, interest shall accrue at the federal judgment rate pursuant to 28 U.S.C. § 1961 on a non-compounded basis from the date the obligation underlying the Claim becomes due and is not timely paid through the date of payment.

d.     ***Non-Negotiated Plan Distributions***

If any Plan Distribution to a holder of an Allowed Claim is not negotiated for a period of 180 days after the Plan Distribution, then such Plan Distribution shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and re-vest in the Reorganized Debtor. After such date, all non-negotiated property or interests in property shall revert to the Reorganized Debtor automatically and without the need for any notice to or further order of the Bankruptcy Court (notwithstanding any applicable non-bankruptcy escheatment, abandoned, or unclaimed property laws to the contrary), and the right, title, and interest of any holder to such property or interest in property shall be discharged and forever barred.

e.     ***Minimum Cash Distributions***

The Reorganized Debtor shall not be required to make any Plan Distribution of cash less than fifty dollars ($50) to any holder of an Allowed Claim; provided, however, that if any Plan Distribution is not made pursuant to Article VII.I of the Plan, such distribution shall be added to any subsequent Plan Distribution to be made on behalf of the holder's Allowed Claim.

f.     ***Allocation of Plan Distributions Between Principal and Interest***

Except as otherwise required by law (as reasonably determined by the Reorganized Debtor), Plan Distributions with respect to an Allowed Claim shall be allocated first to the principal portion of such Allowed Claim (as determined for United States federal income tax purposes) and, thereafter, to the remaining portion of such Allowed Claim, if any.

g.     ***Allowed Claims Paid by Third Parties***

To the extent a holder receives a distribution from the Arrowood Settlement Trust, the General Settlement Trust, or Plan Distribution on account of an Allowed Claim and also receives payment from a party other than the Debtor or the Reorganized Debtor on account of such Allowed Claim, such holder shall, within thirty (30) days of receipt thereof, repay or return the distribution or the Plan Distribution to the Arrowood Settlement Trustee or the General Settlement Trustee or Reorganized Debtor, as applicable, to the extent the holder's total recovery on account of such Allowed Claim from the third party and under the Plan exceeds the amount of the Allowed Claim as of the date of any such Plan Distribution.

## 2.    Procedures for Resolving Disputed Claims

### a.    Objections to Claims

The Reorganized Debtor shall be entitled to object to all Administrative Expense Claims, Priority Tax Claims, Priority Claims, Secured Claims, and General Unsecured Claims. The Arrowood Settlement Trustee and the General Settlement Trustee shall exclusively be entitled to administer and resolve Settling Abuse Claims in accordance with the Trust Distribution Procedures. The Litigation Administrator shall exclusively be entitled to defend and object to all Contested Abuse Claims in accordance with the Trust Documents. After the Effective Date, the Litigation Administrator shall have and retain any and all rights and defenses that the Debtor or any Covered Party had with respect to any Claim to which it may object or otherwise contest. After the Effective Date, the Reorganized Debtor shall have and retain any and all rights and defenses that the Debtor had with respect to any Claim to which it may object or otherwise contest. The Reorganized Debtor and Litigation Administrator shall serve and file any objection to a Proof of Claim on or before the Claims Objection Deadline; provided, however, that the Arrowood Settlement Trustee and the General Settlement Trustee shall administer the Settling Abuse Claims on a timeline determined by such Trustees, in consultation with the Trust Advisory Committee, subject to approval by the Bankruptcy Court. The expiration of the Claims Objection Deadline shall not limit or affect the Debtor's or Reorganized Debtor's rights to dispute Claims asserted in the ordinary course of business other than through a Proof of Claim.

### b.    Resolution of Disputed Administrative Expenses and Disputed Non-Settling Abuse Claims

On and after the Effective Date, (a) the Reorganized Debtor shall have the authority to prosecute and withdraw objections to, compromise, settle, or otherwise resolve Administrative Expense Claims (other than with respect to Professional Fee Claims), Priority Tax Claims, Priority Claims, Secured Claims and General Unsecured Claims, and (b) the Litigation Administrator shall have authority, subject to the right of any Insurer to raise any Insurer Coverage Defense in response to a demand by the Litigation Administrator that such Insurer handle, defend, or pay any such Abuse Claim, to prosecute and withdraw objections to, compromise, settle, or otherwise resolve Contested Abuse Claims, in the case of each of (a) and (b), without approval of the Bankruptcy Court. For the avoidance of doubt, only the Arrowood Settlement Trustee and the General Settlement Trustee shall have the authority to administer and resolve Settling Abuse Claims in accordance with the Arrowood Settlement Trust Agreement and the General Settlement Trust Agreement and the Trust Distribution Procedures.

### c.    Payments and Distributions With Respect to Disputed Claims

Notwithstanding anything in the Plan to the contrary, if any portion of a Claim is a Disputed Claim, no distribution (including a Trust Distribution on account of a Contested Abuse Claim under the Trust Documents) or Plan Distribution shall be made on account of such Claim unless and until (and to the extent that) such Disputed Claim becomes an Allowed Claim.

After such time as a Disputed Claim becomes, in whole or in part, an Allowed Claim, the holder thereof shall (i) if an Allowed Contested Abuse Claim, be entitled to such Trust Distribution from the Arrowood Settlement Trust or the General Settlement Trust in accordance with the Trust Documents, or (ii) if an Allowed Claim, other than an Allowed Contested Abuse Claim, a Plan Distribution to which such holder is then entitled as provided in the Plan, without interest, as provided in Article VII.I of the Plan. Such Plan Distributions shall be made as soon as practicable after the date that the order or judgment of the Bankruptcy Court Allowing such Disputed Claim (or portion thereof) becomes a Final Order or, with respect to a Trust Distribution on account of an Allowed Contested Abuse Claim, in accordance with the Trust Documents.

### d.    Estimation of Claims

The Debtor or the Reorganized Debtor, with respect to contingent, unliquidated, and/or Disputed Administrative Expense Claims, Priority Tax Claims, Priority Claims, Secured Claims, and General Unsecured Claims, may at any time request that the Bankruptcy Court estimate any such contingent, unliquidated, or Disputed Claim or Class of Claims pursuant to section 502(c) of the Bankruptcy Code or otherwise, including to establish a reserve for Plan Distribution purposes, regardless of whether the Debtor, the Reorganized Debtor, or any other Entity

had previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection. The Bankruptcy Court will retain jurisdiction to estimate any Claim or Class of Claims at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any contingent, unliquidated, or Disputed Claim or Class of Claims, the amount so estimated shall constitute either the Allowed amount of such Claim or Class of Claims, or a maximum limitation on such Claim or Class of Claims, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on the amount of such Claim or Class of Claims, the Debtor or the Reorganized Debtor, as applicable, may pursue supplementary proceedings to object to the allowance of such Claims; provided, however, that such limitation shall not apply to Claims requested by the Debtor to be estimated for voting purposes only.

<em>e.</em> <strong><em>Interest</em></strong>

To the extent that a Disputed Claim becomes an Allowed Claim after the Effective Date, the holder of such Claim shall not be entitled to any interest that accrued thereon from and after the Effective Date, except as provided in Article VII.E of the Plan.

<em>f.</em> <strong><em>Insured Non-Abuse Claims</em></strong>

To the extent that an Insurer satisfies an Insured Non-Abuse Claim in whole or in part (based on either a settlement or judgment), then immediately upon such satisfaction, the portion of such Claim so satisfied may be expunged without an objection to such Claim having to be filed and without any further notice to or action, order or approval of the Court.

## XI.    DISCHARGE, INJUNCTIONS, AND RELEASES

### A.    Discharge

#### 1.    Discharge of the Debtor

Except as expressly provided in the Plan or the Confirmation Order, all consideration distributed under the Plan, and the Debtor's contribution of the DRVC Trust Contribution, shall be in exchange for, and in complete satisfaction, settlement, discharge, termination and release of, all Claims of any nature whatsoever against or in the Debtor or any of its assets or properties based upon any act, omission, transaction, occurrence, or other activity of any nature that occurred prior to the Effective Date, and, as of the Effective Date, the Debtor shall be deemed discharged and released, and each holder of a Claim and any successor, assign, and affiliate of such holder shall be deemed to have forever waived, discharged and released the Debtor, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, rights and liabilities, and all debts of the kind specified in section 502 of the Bankruptcy Code, based upon any act, omission, transaction, occurrence, or other activity of any nature that occurred prior to the Effective Date, in each case whether or not (a) a Proof of Claim based upon such debt is filed or deemed filed under section 501 of the Bankruptcy Code, (b) a Claim based upon such debt is Allowed under section 502 of the Bankruptcy Code, (c) a Claim based upon such debt is or has been Disallowed by order of the Bankruptcy Court, or (d) the holder of a Claim based upon such debt is deemed to have accepted the Plan.

### B.    Injunctions

#### 1.    Pre-Confirmation Injunctions and Stays

Unless otherwise provided herein, the Confirmation Order, or in a Final Order of the Bankruptcy Court, all injunctions or stays arising under or entered during the Chapter 11 Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

2.        **Channeling Injunction**

a.        *Terms.*

To preserve and promote the settlements contemplated by and provided for in the Plan and to supplement, where necessary, the injunctive effect of the discharge as provided in sections 1141 and 524 of the Bankruptcy Code and as described in Article XI of the Plan, pursuant to the exercise of the equitable jurisdiction and power of the Bankruptcy Court under section 105(a) of the Bankruptcy Code, all Entities that have held or asserted, currently hold or assert, or that may in the future hold or assert, any Abuse Claim against the Covered Parties, or any of them, shall be permanently and forever stayed, restrained and enjoined from taking any action for the purpose of directly or indirectly collecting, recovering, or receiving payments, satisfaction, or recovery from any Covered Party or any Insurers with respect to any such Abuse Claim, including:

i.    commencing, conducting, or continuing, in any manner, whether directly or indirectly, any suit, action, or other proceeding of any kind in any forum with respect to any such Abuse Claim against any Covered Party or any property or interest in property of any Covered Party;

ii.   enforcing, levying, attaching, collecting or otherwise recovering, by any manner or means, either directly or indirectly, any judgment, award, decree, or other order against any Covered Party or any property or interest in property of any Covered Party with respect to any such Abuse Claim;

iii.  creating, perfecting, or enforcing in any manner, whether directly or indirectly, any Lien or Encumbrance of any kind against any Covered Party or any property or interest in property of any Covered Party with respect to any such Abuse Claim;

iv.   asserting or accomplishing any setoff, right of subrogation, indemnity, contribution, or recoupment of any kind, whether directly or indirectly, against any obligation due to any Covered Party or any property or interest in property of any Covered Party with respect to any such Abuse Claim; and

v.    taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan Documents with respect to any such Abuse Claim.

b.        *Reservations.*

Notwithstanding anything to the contrary in Article XI.D of the Plan, the Channeling Injunction shall not enjoin:

i.    the right of any Entity to the treatment afforded to such Entity under the Plan, including the rights of holders of Abuse Claims to assert such Abuse Claims in accordance with the Trust Documents solely against the Arrowood Settlement Trust or the General Settlement Trust; the right of any Entity to assert any Claim for payment of Trust Expenses solely against the Arrowood Settlement Trust or the General Settlement Trust;

ii.   the Arrowood Settlement Trust or the General Settlement Trust from enforcing rights under the Trust Documents;

iii.  the rights of the Arrowood Settlement Trust, the General Settlement Trust, the Co-Insured Parties and the Reorganized Debtor (to the extent permitted or required under the Plan) to prosecute any action against the Insurers, other than the Settling Insurers, based on or arising from the Insurance Policies or otherwise; or

71

   iv. the rights of the Co-Insured Parties with respect to Co-Insured Claims against, or with respect to, the Arrowood Settlement Trust and the General Settlement Trust.

  3. **Discharge Injunction**

   As of the Effective Date, except as expressly provided in the Plan or the Confirmation Order, all holders of Claims of any nature whatsoever against or in the Debtor or any of its assets or properties based upon any act, omission, transaction, occurrence, or other activity of any nature that occurred prior to the Effective Date shall be precluded and permanently enjoined from prosecuting or asserting any such discharged Claim against the Debtor or the Reorganized Debtor or the property of the Debtor or the Reorganized Debtor. In accordance with the foregoing, except as expressly provided in the Plan or the Confirmation Order, the Confirmation Order shall be a judicial determination of discharge or termination of all Claims, and other debts and liabilities against or in the Debtor pursuant to sections 105, 524 and 1141 of the Bankruptcy Code, and such discharge shall void any judgment obtained against the Debtor at any time to the extent such judgment relates to a discharged Claim.

  4. **Injunction Against Interference With the Plan**

   Upon entry of the Confirmation Order, all holders of Claims shall be precluded and enjoined from taking any actions to interfere with the implementation and consummation of the Plan.

  5. **Injunction Related to Releases.**

   As of the Effective Date, all holders of Claims that are the subject of Article XI.G.2 of the Plan are, and shall be, expressly, conclusively, absolutely, unconditionally, irrevocably, and forever stayed, restrained, prohibited, barred and enjoined from taking any of the following actions against any Covered Party or its property or successors or assigns on account of or based on the subject matter of such Claims, whether directly or indirectly, derivatively or otherwise: (a) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding (including any judicial, arbitral, administrative or other proceeding) in any forum; (b) enforcing, attaching (including, without limitation, any prejudgment attachment), collecting, or in any way seeking to recover any judgment, award, decree, or other order; (c) creating, perfecting or in any way enforcing in any matter, directly or indirectly, any Lien or Encumbrance; and/or (d) setting off, seeking reimbursement or contributions from, or subrogation against, or otherwise recouping in any manner, directly or indirectly, any amount against any liability or obligation that is discharged under Article XI.C of the Plan or released under Article XI.G.2 of the Plan.

  6. **Injunction Related to Exculpation.**

   As of the Effective Date, all holders of Claims that are the subject of Article XI.H of the Plan are, and shall be, expressly, conclusively, absolutely, unconditionally, irrevocably, and forever stayed, restrained, prohibited, barred and enjoined from taking any of the following actions against any Exculpated Party and, solely to the extent provided by section 1125(e) of the Bankruptcy Code, any Entity described in Section 1125(e) or its or their property or successors or assigns on account of or based on the subject matter of such Claims, whether directly or indirectly, derivatively or otherwise: (a) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding (including any judicial, arbitral, administrative or other proceeding) in any forum; (b) enforcing, attaching (including any prejudgment attachment), collecting, or in any way seeking to recover any judgment, award, decree, or other order; (c) creating, perfecting or in any way enforcing in any matter, directly or indirectly, any Lien or Encumbrance; and/or (d) setting off, seeking reimbursement or contributions from, or subrogation against, or otherwise recouping in any manner, directly or indirectly, any amount against any liability or obligation that is discharged under Article XI.C of the Plan or released under Article XI.H of the Plan.

**C.**  **Releases**

  1. **Releases by Debtor**

   As of the Effective Date, except for the rights that remain in effect from and after the Effective Date to enforce the Plan and the Confirmation Order, pursuant to section 1123(b) of the Bankruptcy Code, for good and

valuable consideration, the adequacy of which is hereby confirmed, including the service of the Covered Parties to facilitate and implement the reorganization of the Debtor, as an integral component of the Plan, the Debtor, the Reorganized Debtor, and the Estate shall, and shall be deemed to, expressly, conclusively, absolutely, unconditionally, irrevocably, and forever release and discharge each and all of the Covered Parties of and from any and all Causes of Action (including Avoidance Actions), any and all other Claims, obligations, rights, demands, suits, judgments, damages, debts, remedies, losses and liabilities of any nature whatsoever (including any derivative claims or Causes of Action asserted or that may be asserted on behalf of the Debtor, the Reorganized Debtor, or the Estate), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, contract, tort or otherwise, based on or relating to, or in any manner arising from, in whole or in part, any act, omission, transaction, event, or other circumstance taking place or existing on or before the Effective Date (including before the Petition Date) in connection with or related to the Debtor, the Reorganized Debtor, the Estate, their respective assets and properties, the Chapter 11 Case, the Plan Documents, and any related agreements, instruments, and other documents created or entered into before or during the Chapter 11 Case, the pursuit of entry of the Confirmation Order, the administration and implementation of the Plan, including the distribution of property under the Plan, or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to the foregoing. Notwithstanding anything to the contrary in the foregoing, the releases set forth in Article XI.G.1 of the Plan shall not be construed as (a) releasing any Covered Party from Causes of Action arising from an act or omission that is judicially determined by a Final Order to have constituted actual fraud or willful misconduct on the part of such Covered Party, (b) releasing any IAC Claims or (c) releasing any post-Effective Date obligations of any Entity under the Plan or any document, instrument, or agreement executed to implement the Plan or reinstated under the Plan.

2.        **Releases by Holders of Abuse Claims**

As of the Effective Date, except for the rights that remain in effect from and after the Effective Date to enforce the Plan and the Confirmation Order, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, including the service of the Covered Parties to facilitate and implement the reorganization of the Debtor, as an integral component of the Plan, and except as otherwise expressly provided in the Plan or the Confirmation Order, to the maximum extent permitted under applicable law, as such law may be extended subsequent to the Effective Date, all holders of Abuse Claims (including Settling Abuse Claims, Contested Abuse Claims and Future Abuse Claims), shall, and shall be deemed to, expressly, conclusively, absolutely, unconditionally, irrevocably, and forever discharge and release each and all of the Covered Parties and their respective property and successors and assigns of and from all Abuse Claims and any and all Claims and Causes of Action whatsoever, whether known or unknown, asserted or unasserted, derivative or direct, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, whether for tort, fraud, contract, veil piercing or alter-ego theories of liability, successor liability, contribution, indemnification, joint liability, or otherwise, arising from or related in any way to such Abuse Claims.

**D.        Exculpation**

Effective as of the Effective Date, to the fullest extent permissible under applicable law and without affecting or limiting either the Releases by the Debtor or the Releases by Holders of Abuse Claims, and except as otherwise specifically provided in the Plan or the Confirmation Order, no Exculpated Party shall have or incur liability for, and each Exculpated Party hereby is exculpated from any claim or Cause of Action related to, any act or omission in connection with, relating to, or arising out of the negotiation, solicitation, confirmation, execution, or implementation (to the extent on or prior to the Effective Date) of, as applicable, the Chapter 11 Case, the Plan Documents, the pursuit of entry of the Confirmation Order, the administration and implementation of the Plan, including the distribution of property under the Plan, or any other related agreement, or any restructuring transaction, contract, instrument, release, or other agreement or document created or entered into during the Chapter 11 case in connection with the Chapter 11 Case, or upon any other act or omission, transaction, agreement, event, or other occurrence related or relating to the foregoing; provided, however, that this Article XI.H shall not apply to release (a) obligations under the Plan or any contracts, instruments, releases, agreements, and documents delivered, reinstated or assumed under the Plan, (b) any Claims or Causes of Action arising from or related to an act or omission that is judicially determined by a Final Order to have constituted actual fraud or willful misconduct on the part of the Exculpated Party, or (c) any Claims or Causes of Action against the Debtor or the Reorganized Debtor that are reinstated under the Plan or otherwise survive the Effective Date.

**E.**        **Reservation of Rights.**

No provision of this Article XI shall be deemed or construed to satisfy, discharge, release or enjoin claims by the Arrowood Settlement Trust or the General Settlement Trust, the Reorganized Debtor, or (subject to Article IV) any other Entity, as the case may be, against (1) the Arrowood Settlement Trust or the General Settlement Trust for payment of Abuse Claims in accordance with the Trust Distribution Procedures, or (2) the Arrowood Settlement Trust or the General Settlement Trust for the payment of Trust Expenses in accordance with the Trust Documents.

**F.**        **Disallowed Claims.**

On and after the Effective Date, the Debtor and the Reorganized Debtor shall be fully and finally discharged of any and all liability or obligation on any and all Disallowed Claims, and any order Disallowing a Claim that is not a Final Order as of the Effective Date solely because of an Entity's right to move for reconsideration of such Order pursuant to section 502 of the Bankruptcy Code or Bankruptcy Rule 3008 shall nevertheless become and be deemed to be a Final Order on the Effective Date. The Confirmation Order, except as otherwise provided herein, shall constitute an order Disallowing all Claims (other than Settling Abuse Claims) to the extent such Claims are not allowable under any provision of section 502 of the Bankruptcy Code, including time-barred Claims, and Claims for unmatured interest.

## XII.    VALUATION AND FINANCIAL PROJECTIONS

As further discussed below, the Debtor believes the Plan meets the feasibility requirement set forth in section 1129(a)(11) of the Bankruptcy Code, as Confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the Reorganized Debtor.

In connection with developing the Plan, and for purposes of determining whether the Plan satisfies feasibility standards, the Debtor's management has, through the development of financial projections for the fiscal years 2024 through 2028 as attached hereto as Exhibit 3 (the "Financial Projections"), analyzed the Reorganized Debtor's ability to meet their obligations under the Plan and to maintain sufficient liquidity and capital resources to continue to operate. The Debtor believes that the Reorganized Debtor will have sufficient liquidity to fund obligations as they arise, thereby maintaining value.    Accordingly, the Debtor believes the Plan satisfies the feasibility requirement of section 1129(a)(11) of the Bankruptcy Code.  The Debtor prepared the Financial Projections in good faith, based upon estimates and assumptions made by the Debtor's management.

The Financial Projections assume that the Plan will be consummated in accordance with its terms and that all transactions contemplated by the Plan will be consummated by the assumed Effective Date.  Any significant delay in the assumed Effective Date of the Plan may have a significant negative impact on the operations and financial performance of the Debtor, including, but not limited to, an increased risk of inability to meet revenue forecasts and higher reorganization expenses.  Additionally, the estimates and assumptions in the Financial Projections, while considered reasonable by management, may not be realized, and are inherently subject to uncertainties and contingencies, especially given the Debtor's dependence on Donation Revenues.  They also are based on factors such as, general business, economic, competitive, regulatory, market, and financial conditions, all of which are difficult to predict and generally beyond the Debtor's control.  Because future events and circumstances may well differ from those assumed and unanticipated events or circumstances may occur, the Debtor expects that the actual and projected results will differ and the actual results may be materially different from those reflected in the Financial Projections.  No representations can be made as to the accuracy of the Financial Projections or the Reorganized Debtor's ability to achieve the projected results.  Therefore, the Financial Projections may not be relied upon as a guaranty or other assurance of the actual results that will occur.  The inclusion of the Financial Projections should not be regarded as an indication that the Debtor considered or considers the Financial Projections to reliably predict future performance. The Financial Projections are subjective in many respects, and thus are susceptible to interpretations and periodic revisions based on actual experience and recent developments.  The Debtor does not intend to update or otherwise revise the Financial Projections to reflect the occurrence of future events, even in the event that assumptions underlying the Financial Projections are not borne out.  The Financial Projections should be read in conjunction with the assumptions and qualifications set forth herein.

## XIII.    PLAN-RELATED RISK FACTORS

The implementation of the Plan is subject to a number of material risks, including those described below. Prior to voting on the Plan, each party entitled to vote should carefully consider these risks, as well as all of the information contained in this Disclosure Statement, including the exhibits hereto. If any of these risks occur, the Debtor may not be able to operate as currently planned, and its financial condition and operating results could be materially harmed. In addition to the risks set forth below, risks and uncertainties not presently known to the Debtor, or risks that the Debtor currently consider immaterial, may also impair its business, financial condition, cash flows and results of operations.

### A.    Certain Bankruptcy Considerations

1.    **If the Plan is not confirmed or consummated, or the reorganization is delayed, distributions to holders of Claims could be materially reduced**

If the Plan is not confirmed or consummated, there can be no assurance that the Chapter 11 Case will continue rather than be dismissed or voluntarily converted to a chapter 7 liquidation case by the Debtor, or that any alternative plan of reorganization would be on terms as favorable to holders of Claims as the terms of the Plan. The Diocese intends to seek dismissal of the chapter 11 case if both classes of Abuse Claims do not vote to accept the Plan. Certain parties in interest may file objections to the Plan in an effort to persuade the Bankruptcy Court that the Debtor has not satisfied the confirmation requirements under sections 1129(a) and (b) of the Bankruptcy Code. Even if (a) no objections are filed, and (b) all impaired Classes of Claims accept or are deemed to have accepted the Plan, the Bankruptcy Court, which can exercise substantial discretion, may determine that the Plan does not meet the requirements for confirmation under sections 1129(a) and (b) of the Bankruptcy Code. Section 1129(a) of the Bankruptcy Code requires, among other things, a demonstration that the Confirmation of the Plan will not be followed by liquidation or need for further financial reorganization of the Debtor, except as contemplated by the Plan.

Although the Debtor believes that the Plan will meet the requirements for confirmation, there can be no assurance that the Bankruptcy Court will reach the same conclusion. If the Bankruptcy Court determines that the Plan violates section 1129 of the Bankruptcy Code in any manner, including, among other things, to the extent applicable, the cramdown requirements under section 1129(b) of the Bankruptcy Code, the Debtor has reserved the right to amend the Plan in such a manner so as to satisfy the requirements of section 1129 of the Bankruptcy Code.

2.    **The Plan may not be consummated if the conditions to Effectiveness of the Plan are not satisfied**

Articles X.A and X.B of the Plan provide for certain conditions that must be satisfied (or waived) prior to the Confirmation Date and for certain other conditions that must be satisfied (or waived) prior to the Effective Date. Many of the conditions are outside of the control of the Debtor. There can be no assurance that any or all of the conditions in the Plan will be satisfied (or waived). Accordingly, even if the Plan is confirmed by the Bankruptcy Court, there can be no assurance that the Plan will be consummated and the restructuring completed. If the Plan is not consummated, there can be no assurance that any new chapter 11 plan would be as favorable to holders of Claims as the current Plan. Such an outcome may materially reduce distributions to holders of Claims. See Articles X.A and B to this Disclosure Statement for a description of the conditions to the Confirmation and effectiveness of the Plan, respectively.

3.    **If current estimates of Allowed Claims prove inaccurate, the Debtor's financial condition could be materially and adversely affected**

The estimates of Allowed Claims in this Disclosure Statement are based on the Debtor's review of the Proofs of Claim filed in this Chapter 11 Case and the Debtor's books and records, as well as the results of objections to Claims prosecuted to completion to date. Upon the completion of further analyses of the Proofs of Claim, the completion of Claims litigation and related matters, the total amount of Claims that ultimately become Allowed Claims in the Chapter 11 Case may differ from the Debtor's estimates, and such difference could be material. For example, the amount of any Disputed Claim that ultimately is allowed may be significantly more or less than the estimated

amount of such Claim. If estimates of such Claims are inaccurate, it may materially and adversely affect the Debtor's financial condition.

4. **The Amount that holders of Allowed Claims and Abuse Claims Will Recover May Not Be Certain**

The Debtor cannot determine with any certainty at this time the number or amount of Claims that will ultimately be Allowed or entitled to distribution under the Arrowood Settlement Trust and the General Settlement Trust, and thus the projected recoveries disclosed in this Disclosure Statement are highly speculative. A large amount of Allowed Claims may materially and adversely affect, among other things, the recoveries to holders of Allowed Claims under the Plan. Likewise, a large amount of Abuse Claims entitled to a distribution under the Arrowood Settlement Trust or the General Settlement Trust may materially and adversely affect, among other things, the recoveries to holders of Abuse Claims under the Plan. Some holders are not entitled to any recovery pursuant to the terms of the Plan, and, depending on the accuracy of the Debtor's various assumptions, even those holders entitled to a recovery under the terms of the Plan may ultimately receive no recovery.

The Debtor cannot know with certainty, at this time, the number or amount of Claims in the Voting Class that will ultimately be Allowed or receive distributions pursuant to the Trust Distribution Procedures. Accordingly, because certain Claims under the Plan will be paid *pro rata*, the Debtor cannot state with certainty what recoveries will be available to holders of Claims in the Voting Class.

5. **Alternative Plans of Reorganization Might Be Proposed**

In a chapter 11 reorganization, the debtor has the initial exclusive right to propose a plan of reorganization and solicit acceptances thereof. That period has expired, and the Bankruptcy Code permits other parties in interest to propose a plan of reorganization once the exclusive period expires. Should other parties propose a plan, there can be no assurance that the alternative plan will provide for as favorable a recovery to claim holders.

However, if both classes of Abuse Claims do not vote to accept the Plan, the Diocese will seek to dismiss its chapter 11 Case pursuant to section 1112(b) of the Bankruptcy Code shortly after filing the Voting Tabulation.

6. **There Might Be a Non-Consensual Confirmation**

In the event that any impaired class of claims does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponent's request if at least one impaired class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the Bankruptcy Court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting class, to the extent such provisions are applicable to a nonprofit. The Debtor believes that the Plan satisfies these requirements and the Debtor may request such nonconsensual Confirmation in accordance with section 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion. In addition, the pursuit of nonconsensual Confirmation of the Plan may result in, among other things, increased expenses and the expiration of any commitment to provide support for the Plan, financially or otherwise.

Moreover, if both classes of Abuse Claims do not vote to accept the Plan, the Diocese will seek to dismiss its chapter 11 Case pursuant to section 1112(b) of the Bankruptcy Code shortly after filing the Voting Tabulation.

7. **There Might be Objections to the Plan's Classification of Claims**

Under the Bankruptcy Code, a claim can only be placed into a class with other substantially similar claims and interests. Parties in interest may object to the grouping of certain classes by asserting that certain claims or interests are not substantially similar and should not be grouped together, or that substantially similar claims or interests were improperly sorted into separate classes. The Debtor believes that all claims are reasonably grouped into proper classes, although there can be no assurances that the Bankruptcy Court will agree with this assessment.

8.    **The Debtor May Object to a Claim's Classification or Amount**

The Debtor reserves the right, unless specified otherwise in the Plan, to raise objections to the classifications and amounts of claims provided for in the Plan. If the Debtor objects to a claim, the projections provided for in this Disclosure Statement may not be representative of the share the claim holder will recover.

9.    **The Plan May Not Be Confirmed If The Supreme Court Determines That Bankruptcy Courts Lack Authority to Grant Nonconsensual Third Party Releases or If The Requisite Support For Such Releases Is Lacking**

The Second Circuit recently re-affirmed that bankruptcy courts have statutory authority to enter non-consensual third-party releases of claims, finding such authority under both Section 105(a) and 1123(b)(6) of the Bankruptcy Code. *Purdue*, 69 F.4th at 72–75. The Second Circuit's decision in *Purdue* was timely appealed, and the Supreme Court granted certiorari with respect to the issue of "[w]hether the Bankruptcy Code authorizes a court to approve, as part of a plan of reorganization under Chapter 11 of the Bankruptcy Code, a release that extinguishes claims held by nondebtors against nondebtor third parties, without the claimants' consent." *Harrington v. Purdue Pharma L.P.*, No. (23A87), 2023 WL 5116031 (Aug. 10, 2023). Notwithstanding the grant of certiorari by the Supreme Court, the Second Circuit's opinion in *Purdue* remains binding precedent on the Bankruptcy Court for the Southern District of New York unless and until it is reversed, overruled, vacated, or otherwise modified by the Supreme Court. However, there are no assurances how the Supreme Court may rule in the *Purdue* case. Furthermore, there can be no assurances that the nonconsensual third party releases provided for in the Plan will remain available after the Supreme Court's ruling in *Purdue*.

If the third-party releases contained in the Plan are not allowed, either because the thresholds under the Second Circuit's decision are not satisfied, or because the Supreme Court limits or eliminates the availability of third party releases in this context, the Plan may not be confirmed.

11.    **Confirmation of the Plan May be Delayed or Denied by the District Court**

The Debtor's position is that the Bankruptcy Court has constitutional authority to confirm the Plan. If it is determined that the bankruptcy court lacks constitutional authority to finally approve of the releases, and, therefore, the bankruptcy court's decision is construed as setting forth its proposed findings of fact and conclusions of law for the district court's de novo review, confirmation of the Plan may be delayed or denied by the District Court.

12.    **Insurance Companies May Object to the Plan**

Non-settling Insurance companies will likely assert objections to any plan, including to a transfer of insurance rights to a claimant trust. While such transfers have long been permitted in New York, insurers will likely object on these grounds and press appeals in the face of lower court decisions supporting these transfers. Non-settling insurance companies (and perhaps the Arrowood receivers) will likely also assert that the settlement of claims as reflected in the Plan of Reorganization, including most importantly, the Trust Distribution Procedures (the "TDP"), does not fairly consider their interests and that the Diocese's failure to obtain their consent before seeking confirmation of the Plan is a violation of the terms of the insurance policies. This defense would survive confirmation of the Plan and could be asserted in subsequent litigation with the non-settling insurers.

Assigning the claims previously objected to by the Diocese to a Contested Claim Subfund puts all parties in the best position to defeat insurer claims that the Diocese has violated its duty to mount a vigorous defense. Failure to do so could lead the insurers to deny coverage for any amounts paid to such claimants. Any other Plan provisions that the insurers believe puts them in a worse position than they would have been in had the Plan not been confirmed will likely be attacked by the insurance companies.

Non-settling insurance companies will also assert the right to object to plan provisions that do not affect their financial interests. The U.S. Supreme Court will be hearing a case shortly which may expand insurance company rights beyond those accorded to them in this jurisdiction. *See Truck Ins. Exch. v. Kaiser Gypsum Co.*, 144 S. Ct. 325 (2023) (granting certiorari to decide whether an insurer with financial responsibility for a bankruptcy claim is a "party in interest" that may object to a plan of reorganization under Chapter 11 of the Bankruptcy Code).

B.    **Risks Relating to the Debtor's Operation and Finances and General Economic Risk Factors**

1.    **Litigation in the Ordinary Course of Business May Adversely Affect the Debtor's Operations**

The Debtor will be subject to various claims and legal actions arising in the ordinary course of its operations. The Debtor is not able to predict the nature and extent of any such claims and actions and cannot guarantee that the ultimate resolution of such claims and actions will not have a material adverse effect on the Debtor's financial condition, cash flows and results of operations.

2.    **A Pandemic Might Impact the Debtor's Operations and Donation Revenues**

Since early 2020, the Debtor has faced challenges stemming from the COVID-19 pandemic. It remains unclear how the COVID-19 pandemic, or other pandemics, may continue to affect the Debtor's operations and Donation Revenues in future months and years. Unforeseen pandemic developments could impact the financial projections for the Debtor discussed in this Disclosure Statement.

3.    **Risks Involving the Ability of the Debtor to Fund the Delayed Contributions**

Of the $200 million contribution, $50 million is due after the Effective Date of the Plan:  $25 million is due on the first anniversary of the Effective Date, $12.5 million is due on the second anniversary of the Effective Date, and $12.5 million is due on the third anniversary of the Effective Date.  The Debtor and the Seminary are jointly and severally liable for the $16 million Seminary contribution on the first anniversary of the Effective Date, and the Parishes are jointly and severally liable for the remaining $34 million. No collateral secures the payments and no interest shall be paid on amounts due after the Effective Date. This means such payments are subject to unsecured credit risk.

4.    **Risks Regarding the Debtor's Historical Insurance Programs**

*London Program*

All London Program insurers asserted dozens of defenses to providing coverage for claims well before the Plan was proposed.  Those defenses concern alleged violations of conditions contained in the insurance policies, most notably the Diocese's "duty of cooperation," as well as exclusions that the insurers contend are applicable to the SA claims. See, *LMI Answer to Amended Complaint and Affirmative Defenses*, No. 21-CV-00071, Dkt. No. 109; *Lexington Answer to Amended Complaint and Affirmative Defenses*, No. 21-CV-00071, Dkt. No. 108; *Evanston's Answer and Affirmative Defenses to Adversary Complaint*, No. 20-01227, Dkt. No. 53; *Interstate Fire & Casualty's Answer to Adversary Complaint*, No. 20-01227, Dkt. No. 56.

The London Program policies sit above a $100,000 self-insured retention ("SIR"), which applies to each and every claim and in each and every policy period.  Under the terms of the London Program, the Diocese is responsible to investigate and defend against claims that fall within the London Program years. The costs of defense and investigation use up the SIR.

All London Program insurers assert that they have no duty to defend any of the Abuse Claims; instead, it is the duty of the Diocese to defend against non-meritorious claims.  This duty, they contend, continues after the SIR is exhausted.  Failure of the Diocese to put up a vigorous defense, the insurers assert, is a violation of the terms of the policies and eliminates those insurers' duty to pay such claims.  After the SIR is used up, the costs of defense use up the limits of the London Program policies.

All London Program insurers assert that certain of the Abuse Claims are excluded from coverage because they allege that the Diocese "expected or intended" to cause harm to holders of Abuse Claims. In particular, the London Program insurers assert that claims arising from the misconduct of "repeat offenders" are excluded because the Diocese was (or should have been) on notice of the risks of further misconduct and injuries.  The insurers will likely use the record that claimants make in asserting their claims in the tort system to challenge coverage. On the other hand, in cases arising from a single instance of abuse by a perpetrator, the insurers would likely assert that the

78

Diocese has no liability under applicable New York law, because it had no notice of the risk of allowing the person to continue in service, and therefore should not pay any amount in settlement of that claim.

Under New York law, which applies to the SA claims under the Diocese's policies, punitive damage awards are excluded from insurance coverage.

For claims alleging abuse only in the 1976-77 and 1977-78 policy periods, recovery may be limited only to the first layer London Program limits because the next layer of coverage was issued by a now insolvent insurer. The London Program limit for 1976-77 was $100,000 and for the 1977-78 policy period was $200,000. For claims triggering the 1978 to 1985 policy periods, there are ample solvent excess insurance limits, ranging from $25M to $100M above the LMI limits and the SIR. For claims triggering only the 1985-86 policy period, recovery is limited to $100,000 because the higher layers of coverage contain exclusions applicable to SA claims.

After confirmation and formation of the General Settlement Trust, the Trust will have to continue to fight with the London Program insurers concerning their defenses and to seek to recover under the London Program policies. While the Diocese contests those defenses, it cannot guarantee that it or the Trust will succeed in defeating them. Resolution of these insurance coverage actions could take years and will be costly.

*Arrowood Liquidation and Ancillary Receivership*

All Abuse Claims when the alleged abuse took place between 1957 and 1976 are subject to stays requested by both the Delaware liquidator and the New York Ancillary Receiver charged with responding to claims that fall within the scope of New York's Property/Casualty Security Fund. Those stays may be extended at the request of either New York's or Delaware's receivers.

The bar date for submitting claims to the liquidation proceeding in Delaware is January 15, 2025. Upon the Effective Date, the Trustee for the Arrowood Settlement Trust will inherit responsibility for making any further filings in connection with the Delaware liquidator and the New York Ancillary Receiver.

Unlike the London Program, the Arrowood policies contain a "duty to defend." Although the Arrowood policies also contain a duty to cooperate, that duty is to cooperate in the defense that Arrowood is providing. The costs of defending claims in the Arrowood years do not use up the limits of the policies.

The New York Property/Casualty Security Fund will limit recoveries to $1 million or the policy limits, whichever is lower. These limits may apply on a per claim basis or may apply separately per policy period for each claim. Any recoveries above the New York limits would have to come from the Delaware liquidation, depending upon available funds, if any. The availability of such recoveries is uncertain and depends on the amount of assets that the Delaware Receiver can collect to pay policyholder claims and on the number and severity of other policyholders' claims, including policyholder claims by guaranty funds like New York who stand in the shoes of those they paid. The Ancillary receivership petition indicates the New York Property/Casualty Security Fund anticipates 3,000 liability claims to be filed because of Arrowood's insolvency. The timing and ability of the New York Property/Casualty Security Fund to pay these claims, including the claims from the Diocese, is uncertain.

# XIV.    CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF CONSUMMATION OF THE PLAN

## A.    General

The following discussion is a summary of certain U.S. federal income tax consequences of the Plan and is for general information purposes only. This summary should not be relied upon for purposes of determining the specific tax consequences of the Plan with respect to a particular holder of a Claim. This discussion does not purport to be a complete analysis or listing of all potential tax considerations.

This discussion is based on existing provisions of the Internal Revenue Code of 1986, as amended (the "Code"), existing and proposed Treasury Regulations promulgated thereunder, and current administrative rulings and court decisions. Legislative, judicial, or administrative changes or interpretations enacted or promulgated after the date hereof could alter or modify the analyses set forth below with respect to the U.S. federal income tax consequences

of the Plan. Any such changes or interpretations may be retroactive and could significantly affect the U.S. federal income tax consequences of the Plan.

Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below. No ruling has been requested or obtained from the IRS with respect to any tax aspects of the Plan and no opinion of counsel has been sought or obtained with respect thereto. The discussion below is not binding upon the IRS or any court. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein. No representations or assurances are being made to the holders of Claims or Interests with respect to the U.S. federal income tax consequences described herein. Except as specifically set forth below, this discussion addresses only holders of Claims or Interests that are "United States persons" (within the meaning of Section 7701(a)(30) of the Code).

This summary addresses certain U.S. federal income tax consequences only to holders of Claims that are entitled to vote (i.e., holders of Abuse Claims in Classes 4 and 5, holders of General Unsecured Claims in Class 3, and holders of Convenience Claims in Class 6) and it does not address the U.S. federal income tax consequences to the Debtor or to holders of Claims that are not entitled to vote on the Plan.

ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM. ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL AND NON-U.S. TAX CONSEQUENCES OF THE PLAN.

### B.    The Arrowood Settlement Trust and the General Settlement Trust

On the Confirmation Date, the Arrowood Settlement Trust and the General Settlement Trust shall be established in accordance with the Trust Documents. The Arrowood Settlement Trust and the General Settlement Trust are intended to qualify as a "qualified settlement fund" ("QSF") pursuant to Treasury Regulation section 1.468B-1. The Debtor is the "transferor" within the meaning of Treasury Regulation Section 1.468B-1(d)(1). Each of the Trustees shall be classified as the "administrator" within the meaning of Treasury Regulation Section 1.468B-2(k)(3). The Trust Documents, including the Arrowood Settlement Trust Agreement and the General Settlement Trust Agreement, are incorporated herein by reference.

### C.    Holders of Claims

The federal income tax consequences to a holder of a Claim receiving, or entitled to receive, a distribution in partial or total satisfaction of a Claim may depend on a number of factors, including the nature of the Claim, the claimants' method of accounting, and their own particular tax situation. Because each claimant's tax situation differs, claimants should consult their own tax advisors to determine how the Plan affects them for federal, state and local tax purposes, based on their particular tax situations.

Among other things, the federal income tax consequences of a distribution to a claimant may depend initially on the nature of the original transaction pursuant to which the Claim arose. For example, a distribution in repayment of the principal amount of a loan is generally not included in the claimant's gross income. A distribution to a holder of an Abuse Claim may not be taxable as it may be considered compensation for personal injuries. The federal income tax consequences of a distribution to a claimant may also depend on whether the item to which the distribution relates has previously been included in the claimant's gross income or has previously been subject to a loss or bad debt deduction. For example, if a distribution is made in satisfaction of a receivable acquired in the ordinary course of the claimant's trade or business, and the claimant had previously included the amount of such receivable distribution in his or her gross income under his or her method of accounting, and had not previously claimed a loss or bad debt deduction for that amount, the receipt of the distribution should not result in additional income to the claimant but may, as discussed below, result in a loss.

Conversely, if the claimant had previously claimed a loss or bad debt deduction with respect to the item previously included in income, the claimant generally would be required to include the amount of the distribution in income when received.

A claimant receiving a distribution in satisfaction of his or her Claim generally may recognize taxable income or loss measured by the difference between (i) the amount of Cash and the fair market value (if any) of the property received and (ii) its adjusted tax basis in the Claim. For this purpose, the adjusted tax basis may include amounts previously included in income (less any bad debt or loss deduction) with respect to that item. This income or loss may be ordinary income or loss if the distribution is in satisfaction of accounts or notes receivable acquired in the ordinary course of the claimant's trade or business for the performance of services or for the sale of goods or merchandise. In addition, if a claimant had claimed an ordinary bad debt deduction for the worthlessness of his or her Claim in whole or in part in a prior taxable year, any income realized by the claimant as a result of receiving a distribution may be taxed as ordinary income to the extent of the ordinary deduction previously claimed. Generally, the income or loss will be capital gain or loss if the Claim is a capital asset in the claimant's hands.

Subject to the qualifications and limitations set forth above:

1.    A holder of a General Unsecured Claim in Class 3 or a Convenience Claim in Class 6 generally will recognize gain or loss measured by the difference between (i) the amount of the cash and the fair market value (if any) of the property received and (ii) its adjusted tax basis in the General Unsecured Claim or Convenience Claim, respectively.

2.    The U.S. federal income tax treatment of an Abuse Claim in Classes 4 or 5 will depend on several factors, including the nature of the Abuse that forms the basis for the relevant Claim. As a result, certain holders of Abuse Claims in Classes 4 or 5 generally will recognize gain or loss measured by the difference between (i) the amount of the cash and the fair market value (if any) of the property received and (ii) their adjusted tax basis in the Abuse Claim, while other holders will not be required to include the amount of such cash or the value of such property in their gross income for U.S. federal income tax purposes if, for example, their recovery is considered compensation for personal injury. Holders of Claims are urged to consult their tax advisors concerning the tax consequences of the Plan.

### D.    Holders of Claims that are Non-United States Persons

Holders of Claims that are not "United States persons" (within the meaning of Section 7701(a)(30) of the Code) generally will not be subject to U.S. federal income tax with respect to property (including Cash) received in exchange for such Claims, unless (i) such holder is engaged in a trade or business in the United States to which income, gain or loss from the exchange is "effectively connected" for U.S. federal income tax purposes, or (ii) if such holder is an individual, such holder is present in the United States for 183 days or more during the taxable year of the exchange and certain other requirements are met.

## XV.    RECOMMENDATION AND CONCLUSION

The Debtor believes that the confirmation and consummation of the Plan is preferable to all other alternatives. Consequently, the Debtor urges all parties entitled to vote to accept the Plan and to evidence their acceptance by duly completing and returning their Ballots so that they will be received on or before the Voting Deadline.

Dated: February 16, 2024

Respectfully submitted,

The Roman Catholic Diocese of Rockville Centre, New York

By: */s/ John O. Barres*
       Name:   Most Rev. John O. Barres
       Title:     Bishop

81

**<u>ANNEX 1</u>**

**(OVERVIEW OF DEBTOR'S ORGANIZATION)**

## ANNEX 1 - OVERVIEW OF DEBTOR'S ORGANIZATION

**A.      The Debtor's Organization and Corporate Structure**

There are around 1.3 billion baptized Catholics worldwide, of whom around 70 million reside in the United States. As a general matter, the Catholic community is composed of the ordained clergy (i.e., bishops, priests and deacons) and the laity. The Catholic Church operates through dioceses, each working within a specific geography, under the leadership of archbishops or bishops responsible to the Holy See in the Vatican. In turn a diocese provides administrative functions to, supports, and serves, among others: (i) local churches, known as parishes, and parish schools; and (ii) other charitable, educational, and religious-service affiliates that are critical to the ministry of the Church within that diocese and that are supported and often administered by the diocese.

1.      **The Diocese, Parishes, and Affiliates**

*a.      The Diocese*

The Diocese of Rockville Centre is the seat of the Roman Catholic Church on Long Island. It was established by the Vatican in 1957 from territory that was formerly part of the Diocese of Brooklyn, and it has been under the leadership of Bishop John O. Barres since February 2017. The State of New York established the Debtor as a religious corporation in 1958. The Debtor is one of eight Catholic dioceses in New York, including the Archdiocese of New York. The Debtor's total Catholic population is approximately 1.4 million, roughly half of Long Island's total population of 3.0 million. The Debtor is the eighth largest diocese in the United States when measured by the number of baptized Catholics. Within the geographic territory of the Debtor on Long Island, there are 135 parishes, 39 schools, and the fourteen Diocese Affiliates (each, a "Ministry Member," and collectively, the "Ministry Members," or the "Ministry"). Through the Ministry, the Debtor furthers its mission and serves the faithful and those in need in communities across Long Island.

Having sold the Debtor's chancery building in order to maximize value for the benefit of the estate, the Debtor's administrative offices have been relocated during the pendency of the Chapter 11 Case, and the Diocese has leased replacement space for its administrative offices in various locations.

None of the Ministry Members have sought relief under chapter 11 or are debtors herein.

*b.      The Parishes*

There are 135 parishes in the Debtor's geographic area of Suffolk and Nassau counties (each a "Parish Corporation" or "Parish," and collectively, the "Parish Corporations" or "Parishes"). There are approximately 509 priests (active and retired), 667 religious women, 54 religious brothers, and 273 permanent deacons. Parishes are the epicenter of the Church's mission, and play a central role in the lives of Catholics by administering key aspects of the Catholic Faith, including: baptism, education, communion, Mass, confirmation, marriage, and bereavement, including last rites, funeral services and grief support. In this way, a parish is the critical connection of the Church to the faithful, from the beginning of life to the end. The Debtor's Parishes are separate religious corporations, formed under Article 5 of the New York's Religious Corporations Law. Under the Religious Corporations Law, the trustees of each Parish Corporation are the Diocese's bishop and vicar-general, the Parish pastor and two laypersons from the Parish.

*c.      The Diocese Affiliates*

The Debtor has fourteen primary charitable, educational and other religious-service affiliates (each such organization, a "Diocese Affiliate"). Generally, each of these affiliates is a separate, not-for-profit charitable member corporation that has its own board, governance, and audited financial statements. Each has a role in furthering the ministry of the Church and serving the Parishes and the communities of Long Island. There may be additional Catholic Faith-based entities that provide charitable, educational and other religious services on Long Island that are not affiliated with the Diocese.

The fourteen Diocese Affiliates are: Catholic Charities of the Diocese of Rockville Centre; Catholic Community Foundation of Long Island, Inc.; Unitas Investment Fund, Inc.; Mission Assistance Corporation; Catholic

Cemeteries of the Roman Catholic Diocese of Rockville Centre, Inc.; Diocese Rockville Centre Catholic Cemetery Permanent Maintenance Trust; Department of Education, Diocese of Rockville Centre; Tomorrow's Hope Foundation, Inc.; Seminary of the Immaculate Conception; Catholic Faith Network; Catholic Press Association of the Diocese of Rockville Centre, Inc.; Diocesan Service, Inc.; Ecclesia Assurance Company; and Society for the Propagation of Faith. The Diocese provides administrative support to many of the Diocese Affiliates pursuant to administrative services agreements. Each Diocese Affiliate is discussed in greater detail in Section A.3 below.

2.    **Diocese Support of Ministry: Administrative Support for Insurance, Health, Welfare and Retirement Programs**

To support the Ministry, the Debtor provides administrative support for and participates in plans providing retirement, health and welfare benefits for clergy and lay persons employed by the Debtor and by Ministry Members. The plans for employee and clergy benefits are the Diocese of Rockville Centre 403(b) Employee Retirement Plan, the Diocese of Rockville Centre Health and Welfare Benefits Program, the Diocese of Rockville Centre Pension Plan, the Diocese of Rockville Centre Qualified Retirement Plan for Diocesan Priests and the Diocese of Rockville Centre Health Care and Other Assistance Plan for Retired and Disabled Diocesan Priests (collectively, the "Benefit Plans"). The Benefit Plans are each funded by separate trusts[11] for the benefit of their participants.  The insurance program maintained for the insurance needs of the Diocese and Ministry Members is the Protected Self Insurance Program of the Diocese of Rockville Centre (the "Protected Self Insurance Program" and collectively with the Benefit Plans, the "Benefit and Insurance Plans").

Each of the Benefit and Insurance Plans is primarily funded by its participating Ministry Members other than the Debtor, with the Debtor contributing a modest portion of annual funding for its own employees and insurance needs as an entity. Participating Ministry Members make contributions to the Benefit and Insurance Plans on behalf of their employees in the case of the Benefit Plans and on behalf of themselves in the case of the Protected Self Insurance Program. The Debtor provides administrative services to the Benefit and Insurance Plans and receives reimbursement for the costs incurred by the Debtor to administer these arrangements. The Debtor acts as contribution agent for the Benefit Plans, collecting contributions from all participants and remitting them to the plan trusts or paying plan-specific administrative expenses. The premiums or Benefit Plan contributions paid by the Ministry Members assure coverage and benefit Ministry Members and employees of Ministry Members.

3.    **Diocese Affiliates and the Ministry**

The Debtor provides centralized human resources, accounting, and financial management services to certain Diocese Affiliates in support of their religious, educational and charitable missions. The Debtor historically has also made significant financial contributions to several of its affiliates. However, even prior to the financial challenges imposed by the recent pandemic, these contributions have been eliminated or significantly curtailed in light of the Debtor's declining financial health, the causes of which are described in Sections B and C below.

*a.    Catholic Charities*

Catholic Charities of the Diocese of Rockville Centre ("Catholic Charities") is a non-profit organization with three affiliated corporations: Catholic Charities Support Corporation, which holds the organization's investments and certain real property; Regina Maternity Services Corporation, which provides services to pregnant women, mothers and infants; and Catholic Charities Health Systems of the Diocese of Rockville Centre, Inc. Catholic Charities also administers Cleary Deaf Child Center, Inc. (the "Cleary Center"), which is an organization that runs a school for children who are deaf. To support the charitable mission of the Church, Catholic Charities' mission is broad, addressing social issues ranging from homelessness, foster care, chemical dependence and food insecurity to mental health, HIV/AIDS support and family and senior services. Many of the charitable services delivered by Catholic Charities are the only services reasonably accessible and effective in the communities served by the Diocese, offering help and creating hope for self-reliance for Catholics and non-Catholics alike, whether resident, immigrant, or temporarily present.

---

[11] The 403(b) Employees' Retirement Plan is funded by custodial accounts and annuity contracts held by an insurance company, which are in the nature of trusts, but not technically trusts.  For ease of reference, these funding vehicles will be referred to herein as "trusts" along with the other trusts funding plans.

Since its inception, Catholic Charities has had its own independent board of trustees and has been responsible for its own financials. It participates in the Benefit and Insurance Plans. The trustees of Catholic Charities also direct its investments. Catholic Charities leases space from Ministry Members. Catholic Charities is donor dependent and relies upon such donations and contracts under various government programs to provide its services.

*b.*        ***Catholic Community Foundation of Long Island***

Catholic Community Foundation of Long Island, Inc. (the "Catholic Foundation"), incorporated on March 1, 2016, is a New York, non-profit corporation established to develop financial resources to support the Debtor, the apostolic activities of the Church and the charitable mission locally and across the globe. The Catholic Foundation had its own board and audited financial statements.  The Catholic Foundation is no longer in operation.

*c.*        ***Unitas***

Unitas Investment Fund, Inc. ("Unitas") is a separately incorporated, non-regulated investment fund organized for the purpose of offering the Debtor and Ministry Members the opportunity, but not the obligation, to invest in harmony with the teachings of the Church. Unitas serves as a non-profit fund manager for investments of the Diocese and other Ministry Members, to the extent any Ministry Member chooses to participate. Certain of the Diocese Affiliates and the Benefit and Insurance Plans administered by the Debtor participate in Unitas.

Unitas has its own board and audited financial statements. Unitas does not have employees. The Debtor provides administrative support to Unitas, and Unitas reimburses the Debtor for the cost of that support. Unitas charges investor-participants investment fees, fees for general expenses and what is known as a "mission fee." A mission fee is a performance fee charged as a percentage of assets in periods generating investment returns above a certain threshold. Mission fees are remitted to the Mission Assistance Corporation, discussed below.

Investments with Unitas are reflected on the financial statements of Unitas and on the separate financial statements of the Diocese and each other investor-participant. There are approximately 104 investor-participants in Unitas, each of which has its own separate account and receives its own separate account statements. Each investor-participant has an individual account agreement with Unitas, executed upon account opening, and has control over the extent and timing of its participation in Unitas (i.e., the decision to invest and to withdraw funds remains within the sole discretion of the investor-participant). Each investor-participant in Unitas is forbidden from assigning or transferring any part of its interest in Unitas.

*d.*        ***Mission Assistance Corporation***

Mission Assistance Corporation ("MAC") is a New York, non-profit corporation that primarily provides loans to Parishes in need. Interest rates on the loans it offers to Parishes are generally below market. MAC also offers loan forgiveness and grants to Parishes that, without such assistance, would be unable to fulfill the mission of the Church. Funds are earmarked for short-term bridge financing and capital improvement projects, especially in aging Parish buildings.  MAC has its own board and audited financial statements.

*e.*        ***Cemetery Corporation and Cemetery Trust***

Catholic Cemeteries of the Roman Catholic Diocese of Rockville Centre, Inc. ("Cemetery Corporation"), a New York corporation, owns three and operates four Diocesan cemeteries located on Long Island (collectively, the "Cemeteries"): Cemetery of the Holy Rood in Westbury, New York; Holy Sepulchre Cemetery in Coram, New York; Queen of All Saints Cemetery in Central Islip, New York; and the Queen of Peace Cemetery in Old Westbury, New York.  Cemetery Corporation operates the Cemeteries together with Diocese Rockville Centre Catholic Cemetery Permanent Maintenance Trust ("Cemetery Trust"), a New York permanent maintenance trust. Cemetery Corporation and Cemetery Trust each has its own board and audited financial statements.

Cemetery Corporation and Cemetery Trust together provide for the burial of the faithful according to the Catholic tradition. They also have the obligation to provide "perpetual care." Such obligation is central to the operating

structure of Catholic cemeteries and is part of the contractual arrangements for every interment. Funds from every interment are set aside for a permanent maintenance fund to be held, invested, and used to provide perpetual care.

The current organizational structure of Cemetery Corporation and Cemetery Trust arose out of the need to fulfill the Debtor's canonical obligations to provide for Catholic burial of the deceased. Prior to September 1, 2017, three of the Debtor's four Cemeteries (i.e., excluding the Queen of Peace Cemetery in Old Westbury, New York) and their associated permanent maintenance fund were administered as a self-contained operation within the Diocese ("Cemetery Division"). Since at least 2014, Cemetery Division had at all times segregated its funds from those of the Debtor and had at all times maintained separate accounts and financial statements. Cemetery Division held and invested such segregated funds, and also bore the related obligation to provide perpetual care for the deceased. The Official Committee disputes the Debtor's characterization of the purpose for the organizational structure of Cemetery Corporation and Cemetery Trust. In pending litigation against these entities, the Committee contends that the Debtor transferred cemetery assets and operations to Cemetery Corporation and Cemetery Trust in order to intentionally defraud, hinder or delay recovery by holders of Abuse Claims and in anticipation of the passage of CVA legislation.

The Diocese engaged outside consultants to assess the financial needs of the Cemeteries and to identify means to optimize their operation. Based on those studies, the consultants determined that the Cemetery Division would be more appropriately structured as an independent corporation and permanent maintenance trust. The consultants also determined through those studies that the cash reasonably necessary for the Cemeteries to discharge their perpetual care obligation did not require the full amount of the cash held in Cemetery Division and its permanent maintenance fund.

Accordingly, on September 1, 2017, the Debtor transferred the operations, certain of the assets (including certain cemeteries) and all of the liabilities of Cemetery Division to Cemetery Corporation and Cemetery Trust (the "Cemetery Transaction"). Specifically, under the Cemetery Transaction: (a) Cemetery Corporation assumed, and the Diocese was relieved of, all obligations to provide perpetual care for the deceased; (b) the Diocese retained $47.6 million of the amount previously segregated in the Cemetery Division; and (c) Cemetery Corporation purchased the Queen of Peace Cemetery in Old Westbury, New York for its appraised value of $15.3 million. In addition, the Diocese retained the $7.5 million payment it received from the Village of Old Westbury in settlement of its litigation with the Village to operate and put into service the Queen of Peace Cemetery. The Official Committee has filed a complaint against the Cemetery Corporation in the action titled *The Official Committee of Unsecured Creditors v. Catholic Cemeteries of the Roman Catholic Diocese of Rockville Centre, Inc.*, [Adv. Pro. No. 23-01121 (MG)], seeking turnover of certain assets transferred by the Debtor to the Cemetery Division in 2017 and additional relief.

Historically, the Cemetery Division generated an operating surplus. In each of the fiscal years 2014 through 2017 prior to the Cemetery Transaction, Cemetery Division provided approximately $3.25 million annually to the Debtor. Since the Cemetery Transaction, Cemetery Corporation and Cemetery Trust have not provided financial support to the Debtor. Cemetery Corporation, like Cemetery Division before it, participates in the Benefit and Insurance Plans. Cemetery Trust relies upon Unitas for the investment of its permanent maintenance funds.

The Debtor has proposed a settlement to the Cemetery Corporation and the Cemetery Trust, by which the Cemetery Corporation will contribute $10 million to the Debtor's plan of reorganization and the Cemetery Trust will lend $35 million to the Debtor at an interest rate of four percent over a thirty year term in exchange for settling the avoidance actions and releasing the Cemetery Corporation and Cemetery Trust from future liability. The terms of the Cemetery Trust loan would be the following:

**Principal**: $35 million, non-recourse loan.

**Term**: 30-year amortization period using traditional mortgage-style amortization.

**Rate**: 4%.

**Collateral**: 100% of equity in Ecclesia and silent second lien on the spectrum special purpose vehicle; provided, however, that once the outstanding loan balance is reduced to $25 million, the second lien on the spectrum special purpose vehicle shall be released.

The Committee does not believe that the loan from the Cemetery Trust should be considered a "contribution" by the Cemetery Trust justifying the settlement of causes of action against the Cemetery Trust, meaning that the Debtor needs to maintain the assets and cash flow necessary to repay the loan rather than contributing those funds to pay Abuse Claims.

Neither Catholic Cemeteries nor the Cemetery Trust have accepted this proposal. If the proposal is not accepted and the chapter 11 case is dismissed, any estate claims for alleged fraudulent transfers against Catholic Cemeteries or the Cemetery Trust would revert to creditors. For additional information concerning the Cemetery Transaction, see Article II.C of Annex 2.

### f.    *Department of Education*

The Department of Education, Diocese of Rockville Centre (the "Department of Education") owns, supervises and manages the two Diocesan high schools, Holy Trinity and St. John the Baptist. The Department of Education also supervises and helps manage the many Parish and regional Catholic elementary schools, but it does not own or operate the Parish or regional schools. The Department of Education does not oversee the two Parish High Schools. The teachers in the high schools are unionized and their employment is governed by a collective bargaining agreement.

The Department of Education was incorporated by the Regents of the University of the State of New York on April 26, 1974. Its primary purpose is to provide educational and financial support to the Parish and Diocesan schools operating within the Debtor's geographic territory. The Department of Education also manages relationships, grants, subsidies and funding with the State of New York and the federal government on behalf of all the Parish and Diocesan schools. The Department of Education has its own board and audited financial statements. The Debtor provides administrative support to the Department of Education in exchange for reimbursement of costs pursuant to an administrative services agreement.

As of September 1, 2017, the Debtor transferred the operations, real estate assets and related liabilities of three Diocesan high schools—Holy Trinity, St. John the Baptist and Bishop McGann-Mercy—to the Department of Education. The Debtor also allegedly transferred cash and investments to the Department of Education. In the deeds providing for the transfer of the real estate from the Debtor to the Department of Education, the Diocese retained reversionary interests in the event the properties were no longer used as schools. In summer 2018, Bishop McGann-Mercy was shut down. In May 2020, the McGann-Mercy property was sold to Peconic Bay Medical Center Foundation for $14 million. The Diocese received the proceeds from the sale.

The Official Committee received derivative standing to pursue potential avoidance claims related to these transfers by the Debtor to the Department of Education, and the parties reached a settlement.  In addition to the potential avoidance actions, the Department of Education has been named in four complaints in state court alleging liability stemming from sexual abuse.

The Debtor is proposing to settle the Abuse Claims asserted against the Department of Education and the avoidance actions on the following terms: (1) the Department of Education shall contribute $3,500,000 to the settlement trust or other fund created pursuant to the plan of reorganization; and (2) the Department of Education shall receive releases of (a) claims by the Committee and the bankruptcy estate of the Diocese, (b) all sexual abuse, other physical abuse, bullying, and civil rights claims, (c) any sexual abuse, other physical abuse, bullying and civil rights claims by way of contribution/indemnity claims against the Department of Education, (d) the benefits of the discharge injunction and channeling injunction contained in the plan of reorganization, and (e) any other benefits under the plan of reorganization for non-debtor affiliates of the Diocese which settle the claims of the Diocese against them. For the purposes of the releases, the Department of Education shall include St. John the Baptist Diocesan High School, Holy Trinity Diocesan High School, their predecessors, successors, assigns, subsidiaries, affiliates, current and former officers, directors, principals, equity holders, trustees, members, partners, managers, officials, advisory board members, advisory committee members, members of any special committee of the Board, employees, agents, volunteers, attorneys, financial advisors, accountants, investment bankers, consultants, representatives, their respective heirs, executors, estates and nominees, as applicable; *provided, however*, that any perpetrator of sexual abuse or other physical abuse or bullying that forms the basis for a claim against the Department of Education, St. John the Baptist Diocesan High School or Holy Trinity Diocesan High School who is an individual shall not receive

any release or the benefit of any injunction described herein. The settlement is conditioned upon confirmation of the Plan and the Debtor satisfying the standards of Bankruptcy Rule 9019 for the approval of settlements.

Consistent with past practice, the audit and financial reporting for the two operational schools remains separate from the audit and financial reporting for the Department of Education in order to provide transparency regarding the operations and financial standing of the high schools. The financial statements of Bishop McGann-Mercy were consolidated with those of the Department of Education on July 1, 2018.

For additional information concerning the transfer of the Diocesan high schools, see Article II.C of Annex 2.

g.    ***Tomorrow's Hope Foundation II***

Tomorrow's Hope Foundation, Inc. II ("THF") is a non-profit corporation whose mission is to ensure the excellence and continuance of Catholic education on Long Island. It provides support through student scholarships and program funding. THF has its own board and audited financial statements. THF solicits and receives direct donations to enable it to grant scholarships. For the 2022-2023 school year, THF paid roughly $2.5 million for student scholarships directly to schools.

h.    ***Seminary of the Immaculate Conception***

The Seminary of the Immaculate Conception of the Diocese of Rockville Centre (the "Seminary") is an institution of formation in the Catholic Faith, originally established by the Diocese of Brooklyn in 1930 as an institution of higher learning for the purpose of training men for the priesthood. The Diocese of Brooklyn transferred the Seminary to the Debtor when the Debtor was formed out of territory that was formerly within of the Diocese of Brooklyn. The Seminary is a religious, non-profit corporation ("Seminary Corporation"). The Seminary has an independent Board of Governors, and Seminary Corporation has its own board and audited financial statements.

On November 10, 2011, the Debtor, the Archdiocese of New York and the Diocese of Brooklyn created an interim Inter-Diocesan Partnership with a view towards establishing a single program for priestly formation for their three dioceses located at St. Joseph's Seminary in Dunwoodie, New York. Since 2014, the Debtor, the Diocese of Brooklyn and the Archdiocese of New York have jointly conducted seminary programs for the ongoing formation of priests and deacons for the three dioceses at Saint Joseph's Seminary, under the control and authority of the cardinal and two bishops of the three dioceses. Since the consolidation, the Seminary has conducted or overseen the conduct of retreats, education and similar programs at its facilities.

The Seminary has substantial real estate assets in Huntington, New York, consisting of more than 220 acres on the north shore of Lloyd's Neck. It is also the burial site for the bishops of the Debtor. In January 2017, the Debtor transferred the Seminary's land and buildings to Seminary Corporation in order to align title with the organization and operations of the Seminary. The expenses of maintaining the Seminary have historically exceeded the revenue it generates from its various events, retreats and conferences. Since the commencement of the Chapter 11 Case, the Debtor has not provided funding to the Seminary, and the Seminary has independently continued its operations.

For additional information concerning the transfer of the Seminary and settlement of potential claims, see Article II.C of Annex 2.

i.    ***Catholic Faith Network***

The Catholic Faith Network ("CFN") is the single largest outreach effort of the Diocese on Long Island, reaching 1.5 million homes via television broadcasts. The broadcasts include live religious services, devotional programs, Catholic education, and youth programs. CFN is incorporated as a non-profit New York Educational Corporation, and was formerly known as Telecare of the Diocese of Rockville Centre. CFN has its own Board of Trustees and audited financial statements.

CFN's operations center on education broadband service spectrum licenses held by the Debtor. The Debtor and CFN are party to lease agreements leasing use of certain portions of this spectrum to third parties. The Debtor retains CFN pursuant to a services agreement to create and broadcast programming over the spectrum. In consideration for these services, the Debtor and CFN's services agreement provides that the Debtor will perform certain

administrative services for CFN, provide rent-free operating space to CFN, and share a portion of the spectrum lease revenues with CFN. CFN has separate agreements to provide programming services to third parties.

*j.*        ***Catholic Press Association***

Catholic Press Association of the Diocese of Rockville Centre, Inc. ("Catholic Press") is a non-profit corporation that, until Spring 2022, published the monthly magazine of the Debtor, The Long Island Catholic, and a Spanish-language newspaper, Fe Fuerza Vida. Catholic Press has its own board and audited financial statements. During the pendency of the Chapter 11 Case, Long Island Catholic and Fe Fuerza Vida were discontinued.

*k.*        ***Diocesan Service and Ecclesia Assurance Company***

Diocesan Service, Inc. ("Diocesan Service") is an insurance broker that helps the Debtor and related organizations purchase insurance coverage. It is a 501(c)(3) corporation with common stock held by a nonprofit trust for which the Bishop of the Debtor is the sole trustee. As of August 31, 2019, Diocesan Service had minimal revenues and expenses.

Ecclesia Assurance Company ("Ecclesia") is a captive property and casualty insurance company that provides insurance to the Debtor and other Ministry Members. It is a separate corporation that is wholly owned by the Debtor. Ecclesia was incorporated in New York in December 2003. The company is a licensed insurer and reinsurer. It is subject to the supervision of the New York State Department of Financial Services, which monitors it closely and has approval rights over any major action, such as the issuance of dividends. Ecclesia has its own board and its own audited financial statements. Upon its founding, Ecclesia began purchasing historical coverage dating back to September 1, 1986, and Ecclesia has provided insurance to the Debtor and the Ministry Members ever since. The sexual abuse liability coverage provided by Ecclesia is subject to self- insured retentions (or deductibles) of $250,000 per occurrence and an aggregate coverage limit for Abuse Claims of (i) $15 million for claims made before October 31, 2020 based on alleged incidents that occurred on or after September 1, 1986 and prior to October 31, 2019 and (ii) $7.5 million for claims made, and based on alleged incidents that occurred on or after October 31, 2019.

Ecclesia works closely with the Protected Self Insurance Program (as hereinafter defined), which historically insured the $250,000 self-insured retention layer, assessed and collected premiums and paid deductibles on all Ecclesia policies. However, effective November 1, 2019, the Diocese's insurance regime underwent certain changes that reduce the role of the Protected Self Insurance Program. First, the Protected Self Insurance Program ceased to provide the $250,000 self-insured retention layer. Following this change, only historical liabilities remain with the Protected Self Insurance Program. Second, Ecclesia began to provide first-dollar coverage for various types of insurance policies including, difference in conditions, general liability, directors and officers liability, employment practices liability, professional liability, and medical professional liability. Third, Ecclesia began to provide property, boiler, and crime coverage after a $5,000 deductible per incident.

In calendar year 2022, Ecclesia received income from insurance premiums, net after reinsurance, of $7.3 million, and returns on invested premiums of $-4.0 million. In calendar year 2022, Ecclesia ended the year with a $2.2 million net income.

Pursuant to a statutory formula, the Debtor may request ordinary dividends from Ecclesia. Special dividends may also be requested but are subject to regulatory approval, as are any material changes to the entity. To the extent any special dividends are paid, they correspondingly reduce Ecclesia's ability to pay ordinary dividends.

The Committee believes that by using the Ecclesia surplus as collateral for a loan from the Cemetery Trust, the Diocese is effectively monetizing its asset for contribution and then using that same asset effectively to justify settling with the Cemetery Trust and treating the loan from the Cemetery Trust as if it is actually a "contribution" by the Cemetery Trust.  The Committee therefore does not believe the loan from the Cemetery Trust should be considered a contribution by the Cemetery Trust.

Prior to this chapter 11 case, the Debtor, in consultation with its advisors, explored a loss portfolio transfer for Ecclesia. The Debtor determined that the loss portfolio transfer was not a viable option. The alternative of liquidating Ecclesia was also explored, but the highly regulated environment would prevent any distributions on equity for many years.

*l.*        ***Society for the Propagation of Faith and Mission Office***

The Society for the Propagation of Faith, Diocese of Rockville Centre (the "<u>Society</u>") and the Mission Office (which is part of the Debtor) are administered together. They both provide support for Catholic missionaries. The Society and Mission Office have their own board and audited financial statements consolidated with one another. The Society is a member of a national organization of the same name.

**B.        The Debtor's Finances and Operations**

    1.        **Indebtedness, Revenue Sources, and Assets**

*a.*        ***Indebtedness***

The Debtor has no indebtedness for borrowed money.

*b.*        ***Revenue***

The Debtor's recurring revenues are limited and largely dependent on donors and parishioners. The Debtor's recurring revenues are: (i) revenue for administrative services provided to Ministry Members; (ii) the Debtor's Chaplaincy program, (iii) program income, and (iv) revenues from the Debtor's sublease to third parties of a portion of the spectrum in its educational broadcast license (collectively, the "<u>Recurring Revenues</u>"). In addition, the Diocese receives a share of weekly offertory made by the faithful at every Parish, in addition to other bequests and donor-directed gifts (the "<u>Donation Revenues</u>").

Other than revenue with respect to spectrum and administrative services revenue, there are no other Recurring Revenues. Prior to the Petition Date, the Debtor also received recurring revenue in the form of investment earnings. After the Petition Date, the Debtors has not realized material investment income.

The Debtor's future depends on the Debtor's ability to raise Donation Revenues from the faithful. The Debtor depends on these revenues to continue its mission of ministering to the faithful and providing charity to those in need. In turn, the faithful make donations in anticipation of the Debtor continuing its mission. The Debtor uses these revenues to provide ongoing, ordinary-course administrative support and services to the Parishes, their schools and the affiliated charitable, educational and service organizations.

*c.*        ***Catholic Ministries Appeal***

Separate from the principal pastoral and temporal functions of the Debtor is the Catholic Ministries Appeal (the "<u>CMA</u>"), an annual campaign to support particular charitable, religious and educational missions undertaken by the Debtor and entities that are sponsored by and/or affiliated with the Debtor. CMA donations collected in a given calendar year are designated for use in the following calendar year. For the CMA and other non-offertory donations, the Debtor asks its donors to provide these revenues to fund areas of particular importance to the mission of the Church. These areas of particular importance include the provision of religious education for thousands of students on Long Island; affordable and safe housing for seniors, veterans and adults with mental and physical disabilities; food programs for seniors, low-income families and women and their children; foster care; youth, campus and young adult ministries; priests', deacons' and lay leaders' education and formation; faith formation, including baptismal preparation, pre-Cana marriage preparation and Rite of Christian Initiation of Adults programs; hospital ministry to those who are ill and their families; prison ministry; substance abuse services and day treatment programs; and Catholic Diversity initiatives (collectively, the "<u>CMA Missions</u>"). In order to incentivize participation in the CMA, any Parish that raises more than its fundraising goal set by the Debtor in that year's campaign is eligible for a refund from the CMA from the excess amount.

CMA donations are made into a separate bank account and, for the most part, remain in that account until the following calendar year. Throughout each calendar year, funds from the previous year's CMA are disbursed from this account in one of four ways: (i) through transfers to the Debtor to support its engagement in CMA Missions; (ii) as direct contributions to Diocesan Affiliates that engage in CMA Missions; (iii) through transfers to the Debtor to fund the administrative support it provides such Diocesan Affiliates; and (iv) as refunds to Parishes that raised funds in

excess of their goal amount for that year's CMA. Typically, contributions to Catholic Charities of the Diocese of Rockville Centre, a Diocese Affiliate, occur prior to the end of the CMA campaign year. In addition, some refunds to Parishes occur prior to the end of the campaign year based on collections. Funds raised in a given calendar year's CMA are generally disbursed in the following calendar year. The CMA has no endowment. Since at least 2014, the Debtor's expenditures in support of CMA Missions exceeded or were equal to the CMA funds released to the Debtor. Distributions of CMA funds to the Diocese to cover expenses for a given fiscal period have been less than or equal to the amounts spent by the CMA-funded departments during each such period.

2.     **Benefit and Insurance Plans**

*a.*     *The Priests' Pension and Benefits Plans*

The Diocese of Rockville Centre Qualified Retirement Plan for Diocesan Priests (the "Priests' Pension Plan") is a defined benefit retirement plan that provides for the basic income needs of priests in old age as well as certain housing benefits for these priests. The Priests' Pension Plan is tax-qualified under section 401(a) of the Internal Revenue Code (the "Tax Code") and maintains a separate trust that is tax-qualified under section 501(a) of the Tax Code. All priests incardinated in the Debtor or on official assignment within the Debtor are eligible to participate in the Priests' Pension Plan. Priests are eligible to receive benefits under the plan after reaching age 72 and having at least 10 years of service to the Diocese. Retirement from service must be approved by the Bishop. The plan also provides benefits for priests who become disabled prior to the normal age of retirement. As of January 1, 2023, the Priests' Pension Plan had a market value of assets of $43.5 million, actuarial value of assets of $48.5 million, and actuarial value of liabilities of $41.5 million. Contributions to the Priests' Pension Plan totaled $1.9 million in calendar year 2022. The Debtor funded $381,000 or 15.7% of such contributions. Ministry Members with priests in their service contributed the remaining 84.3%.

The Diocese of Rockville Centre Health Care and Other Assistance Plan for Retired and Disabled Diocesan Priests (the "Priests' Benefits Plan") is a separate plan to provide for health benefits and other assistance to retired and disabled priests. The Priests' Benefits Plan is funded with a separate trust that provides benefits including, but not limited to, medical, dental, life insurance, automobile insurance, supplemental disability, housing and annual retreat and education reimbursement. Diocesan priests are eligible to receive benefits in the Priests' Benefits Plan if they are eligible to receive benefits under the Priests' Pension Plan or otherwise have permission from the Bishop. As of January 1, 2023, the Priests' Benefits Plan had a market value of assets of $55 million. actuarial value of assets of $61.2 million, and actuarial value of liabilities of $78.6 million. Contributions to the Priests' Benefits Plan in calendar year 2022 totaled $1.5 million. The Debtor funded $172,000 or 10.1% of such contributions. Ministry Members with priests in their service contributed the remaining 89.9%.

Both the Priests' Pension Plan and the Priests' Benefits Plan are governed by the Priests' Sickness, Disability and Retirement Board, a committee of active and senior priests incardinated within the Debtor.

*b.*     *Employees' Pension Plan and 403(b) Employee's Retirement Plan*

The Diocese of Rockville Centre Pension Plan (the "Employees' Pension Plan"), a separate trust, is a Tax Code section 401(a) tax-qualified, defined benefit retirement plan for lay employees of the Debtor as an employer, Ministry Members and Catholic Health Services. Catholic Health Services, an integrated health system on Long Island, is not a Ministry Member and does not receive administrative support from the Debtor other than through its participation in certain Benefit Plans. Catholic Health Services has the most participating employees and accounts for the majority of contributions to the Employees' Pension Plan. The Employees' Pension Plan is governed by the Lay Pension Committee, whose members are senior leaders of the various employer groups that are participating employers in the plan. As of January 1, 2023, the Employees' Pension Plan had a market value of assets of $2,123 million, actuarial value of assets of $2,320 million, and actuarial value of liabilities of $2,226 million.

In 2015, the Employees' Pension Plan froze accruals for employees with under 30 years of service and who are not employed by Catholic Health Services. For those employees, the Employees' Pension Plan was replaced by the Diocese of Rockville Centre 403(b) Employees' Retirement Plan (the "403(b) Employees' Retirement Plan"). The 403(b) Employees' Retirement Plan is a Tax Code section 403(b) tax-qualified, defined contribution retirement plan for employees of the Diocese and the Ministry Members. The 403(b) plan is open to employees of the Diocese and

20-12345-mg    Doc 2928    Filed 02/16/24    Entered 02/16/24 14:19:10    Main Document
Pg 99 of 298

Ministry Members. Contributions to the 403(b) Employees' Retirement Plan are held in various annuity contracts and custodial accounts in the plan's name. The standard employer contribution is 3% with an additional 1% match of employee contributions. The employer contribution and match are provided by the employee's employer, either the Diocese or a Ministry Member. The Diocese has 110 participating employees. There are another 2,124 participating employees of the Ministry Members. The 403(b) Employees' Retirement Plan is governed by the 403(b) Plan Committee, whose members are senior leaders of the various employer groups that are participating employers in the plan. Contributions from 2015 onward have been held in annuity contracts and custodial accounts with Mutual of America. Contributions from earlier years were made to T. Rowe Price, Trans America and other institutions.

In response to the financial impact of the COVID-19 pandemic, the 403(b) Plan Committee temporarily suspended all employer contributions to the 403(b) Employees' Retirement Plan for all participating employers for covered services performed by employees from April 1, 2020 through June 30, 2020. During calendar year 2021, contributions to the Employees' Pension Plan were $87.5 million. The Debtor funded $611,000 or 0.7% of such contributions. The remainder of the contributions were made by other participating employers and employees. During the same year, contributions to the 403(b) Employees' Retirement Plan totaled $10.3 million. The Diocese funded $324,000 or 3.1% of such contributions. The remainder of the contributions were made by other participating employers and employees.

Contrary to the assertions made by the Diocese in its Liquidation Analysis, the Committee believes that the Priests' Pension Plan and the Employees' Pension Plan are substantially over-funded. The Committee's view is that there are potentially several hundred million dollars in surplus pension plan assets, a portion of which the Debtor can feasible and legally access and make available to holders of Abuse Claims.

<em>c.</em>   <strong>Employees' Benefits Program</strong>

The Diocese of Rockville Centre Health and Welfare Benefits Program (the "<u>Employees' Benefits Program</u>") provides medical coverage, dental coverage, life insurance, disability insurance and similar welfare benefits for employees of the Diocese and of the Ministry Members (including predominantly active lay employees but also active priests). Employees who are regularly scheduled to work 28 or more hours per week may participate in the Employees' Benefits Program.

The Employees' Benefits Program is governed by the Diocesan Health Plan Committee, whose members are senior leaders of the various employer groups that are participating employers in the plan. The Debtor administers certain financial activities for the Employees' Benefits Program, including assessing and directing premiums to the program's trust and arranging for the program trust to fund a segregated medical operating account used by Empire Blue Cross as plan insurance administrator to pay benefits. The program's medical and dental benefits are self-insured by its participating employers, and the plan purchases stop-loss coverage for catastrophic claims over certain limits. Contributions from 166 different employers and employees totaled $43 million in fiscal year 2019, ended August 31, 2019. The Debtor contributed $1.9 million or 4.6% of the total annual contribution. Premiums contributed from employees and participating employers, as well as reimbursements from insurance companies for expenditures over the individual stop-loss cap, are held in trust for the plan. This trust is tax-exempt under section 501(c)(3) of the Tax Code.

<em>d.</em>   <strong><em>The Protected Self Insurance Program</em></strong>

The Protected Self Insurance Program is a program to provide insurance coverage and risk management services to the Debtor and Ministry Members. The program currently secures coverage for the following categories of insurance: (i) workers' compensation, (ii) property, (iii) boiler and machinery; (iv) general liability, (v) automobile liability and physical damage; (vi) crime; (vii) directors' and officers' liability; (viii) employment practices liability; (ix) employee benefits liability; (x) professional liability; (xi) medical professional liability; (xii) sexual abuse liability; (xiii) fiduciary liability; (xiv) student accident; and (xv) cyber. Protected Self Insurance Program has its own board and audited financial statements.

The Protected Self Insurance Program historically provided for the self-indemnification of property, casualty, automobile and other losses of the Debtor and Ministry Members. However, as described above, the Protected Self Insurance Program transitioned in 2019 to purchasing first-dollar coverage from Ecclesia for these losses. The program also covered workers' compensation on a self-insured basis until 2012, when, in response to a change in New York

Annex 1 - 11

law, the Debtor arranged for third-party coverage for itself and the Ministry Members and placed its self-insurance program for workers' compensation into runoff. The Debtor maintains a security deposit of approximately $7.5 million in cash with the New York State Workers' Compensation Board for the benefit of the employees of the Ministry.

The Protected Self Insurance Program has funded expenses relating to the Independent Reconciliation and Compensation Program, described in detail below, (i) the care for those who suffered clergy sexual abuse, (ii) the Diocesan Child Protection Policy, (iii) the annual expenses of audits by StoneBridge Business Partners, an outside expert, of the Diocese and Ministry Members to ensure compliance with the Charter for the Protection of Children and Young People established by the U.S. Conference of Catholic Bishops (the "Charter"); and (iv) investigations, including responding to the Attorney General inquiries. The Protected Self Insurance Program is funded by assessments on Ministry Members and the Debtor, which are used to fund the insurance coverage purchased by the program and other program expenses. As part of its oversight, the Debtor supports risk-reduction efforts at Ministry Members. Third-party administrators administer claims settlement and make recommendations on reserves for historical liabilities that remain with the Protected Self Insurance Program. In fiscal year 2021, ended August 31, 2021, program revenues amounted to $15.2 million. Of those revenues, $15.1 million were sourced from assessments to Ministry Members, with the remaining $0.7 million derived from investment income realized by the Protected Self Insurance Program. The Debtor funded $227,000, or 1.5%, of such assessment.

### C.    The Clergy Sex Abuse Crisis and the Debtor's Response

#### 1.    Independent Reconciliation and Compensation Program

The Debtor adopted and announced the Independent Reconciliation and Compensation Program (the "IRCP") on October 16, 2017. The IRCP, which remained open until shortly before the Petition Date, was directed at individual reconciliation and compensation based on the independent review by and judgement of nationally recognized fund administrators (the "Administrators") in other multiple-victim situations.

The protocols of the IRCP defined the process by which claims were to be evaluated and eligible claimants compensated. In general, claims as to the actual occurrence and extent of sexual abuse, if any, were accepted or rejected based on the weight and credibility of the evidence, as determined independently by the Administrators. Compensation decisions were made according to a number of factors, including the nature, extent and frequency of the abuse, again as determined solely by the Administrators.

The Debtor pledged to honor the resolutions reached by the IRCP. In contrast, an abuse claimant was not bound by an Administrator's eligibility and compensation determination unless the claimant chose to accept the compensation awarded. Abuse survivors were eligible to participate in the IRCP regardless of when their alleged abuse occurred. Participation in the IRCP was completely voluntary, and participation did not affect any rights of the abuse survivor unless and until he or she accepted compensation and signed a release. In addition, the Debtor has committed to all participants in the IRCP that their claims and associated information will remain confidential without regard to whether a resolution is reached. The participants, however, remain free to disclose or discuss their claim and/or the compensation determination of their own claim.

As a condition of accepting the compensation offer determined by the Administrators, abuse survivors under the IRCP were required to sign a release. The release states that the abuse survivor waives all claims or potential claims of sexual abuse against the Debtor and any related entities. Before signing releases, all abuse survivors were required to consult with an attorney selected by the abuse survivor, or, if requested by the abuse survivor, an attorney provided by the Administrators free of charge.

As of September 29, 2020, 445 abuse claimants filed claims and a total of about 350 of them accepted compensation totaling approximately $62 million, with about 25 claims still being processed as of the Petition Date and 18 outstanding determinations. The Debtor paid compensation to every claimant who was deemed eligible by the Administrators and who accepted the compensation offered and submitted a signed release prior to the Petition Date.

#### 2.    The Child Victim's Act

On February 14, 2019, New York Governor Andrew Cuomo signed New York Senate Bill S.2440, known as the Child Victims Act (the "CVA"), into law. The CVA extended the statute of limitations under which certain

criminal and civil actions arising out of the sexual abuse of minors may be brought. The CVA also revived certain previously time-barred causes of action.

Specifically, the CVA amended the statute of limitations for bringing civil actions against any party whose intentional or negligent acts or omissions are alleged to have resulted in the commission of child sexual offenses. The CVA required that such actions be commenced on or before the plaintiff reached the age of 55. The CVA also revived all civil actions that alleged child sexual offenses that were time-barred as of February 14, 2019, the date the bill was signed into law. The CVA originally provided that revived actions may be commenced during the twelve-month period that ran from six months after the CVA's effective date (i.e., August 14, 2019) to eighteen months after the CVA's effective date (i.e., August 14, 2020). On August 3, 2020, Governor Cuomo signed New York Senate Bill S.7082 into law, which extended the window for bringing revived actions by one additional year (i.e., until August 14, 2021). As of the Petition Date, there were a total of 223 CVA cases filed against the Diocese, with 194 filed in the Ninth and Tenth Judicial Districts, 28 in the New York City CVA regional court, and one case removed to federal district court. In many of these cases, the plaintiffs sought to proceed anonymously.  After the Petition Date, additional cases were filed against the Diocese and/or Parishes.

3.      **The Adult Survivor's Act**

On May 24, 2022, New York Governor Kathy Hochul signed the Adult Survivors Act (S.66A/A.648A) (the "ASA").  While the CVA had revived certain claims based on allegations of sexual abuse of a minor, the ASA revived claims resulting from sexual offenses against individuals that occurred when the person was 18 years of age or older and allowed such persons to sue on account of such claims, regardless of prior limitations periods.  Like the CVA, the ASA opened a lookback window for individuals to bring suit on account of such revived claims—specifically, the ASA allows individuals to commence claims, not earlier than six months after (November 24, 2022), and not later than one year and six month after (November 24, 2023), the effective date of the ASA (May 24, 2022).  N.Y. C.P.L.R. 214-g (McKinney).

**ANNEX 2**

**(THE CHAPTER 11 CASE)**

## ANNEX 2 – THE CHAPTER 11 CASE

I.    **THE CHAPTER 11 CASE**

    A.    **Voluntary Petition**

On October 1, 2020 (the "<u>Petition Date</u>"), the Debtor commenced this case by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

The Debtor has continued, and will continue until the Effective Date, to manage its properties as debtor-in-possession, subject to the supervision of the Bankruptcy Court and in accordance with the provisions of the Bankruptcy Code. An immediate effect of the filing of the Chapter 11 Case was the imposition of the automatic stay under section 362 of the Bankruptcy Code, which, with limited exceptions, enjoined the commencement or continuation of: (1) all collection efforts by creditors; (2) enforcement of liens against any assets of the Debtor; and (3) litigation against the Debtor.

    B.    **First Day Relief**

On the Petition Date, the Debtor filed a number of motions and other pleadings (the "<u>First Day Motions</u>"), the most significant of which are described below. The First Day Motions were proposed to ensure the Debtor's orderly transition into chapter 11.

The First Day Motions included:

- *Motion for Interim and Final Orders Authorizing Continued Insurance Programs* [Docket No. 10];

- *Motion for Adequate Insurance With Respect to Utility Providers* [Docket No. 8];

- *Motion for Notice and Case Management Procedures* [Docket No. 11];

- *Motion for Interim Compensation* [Docket No. 9];

- *Motion for Continued Use of Cash Management System* [Docket No. 7];

- *Motion for Pastoral Care* [Docket No. 6];

- *Employee Wages Motion* [Docket No. 5];

- *Motion for Special Noticing and Confidentiality Procedures* [Docket No. 4];

- *Notice of Motion for Preliminary Injunction Under Sections 362 and 105(a) of the Bankruptcy Code* [Docket No. 2]; and

- *Motion for Retention of Professionals in the Ordinary Course of Business* [Motion No. 12].

The First Day Motions were granted with certain adjustments or modifications to accommodate the concerns of the Bankruptcy Court, the United States Trustee for the Southern District of New York (the "<u>U.S. Trustee</u>") and other parties in interest.

    C.    **Retention of Advisors for the Debtor**

Soon after the commencement of the Chapter 11 Case, the Debtor obtained Bankruptcy Court approval of the retention of (1) Jones Day as the Debtor's primary bankruptcy counsel; (2) Alvarez & Marsal as the Debtor's restructuring advisor; (3) Reed Smith as the Debtor's special insurance counsel; (4) Sitrick & Co. as the Debtor's corporate communications consultant; (5) Standard Valuation Services as the Debtor's real estate appraiser; (6) Forchelli Deegan Terrana LLP as the Debtor's special real estate counsel; (7) Nixon Peabody LLP as Special Counsel; and (8) Jefferies LLC as the Debtor's investment banker. These applications were granted on November 4, 2020

[Docket Nos. 132, 131, 128, 130], December 10, 2020 [Docket No. 252], January 4, 2022 [Docket No. 944], and November 2, 2022 [Docket No. 1401], with certain adjustments or modifications to accommodate the concerns of the Bankruptcy Court, the U.S. Trustee, the Official Committee, and other parties in interest.  The Debtor has also retained experts pursuant to the *Order Authorizing the Retention of Experts* [Docket No. 783].

### D.        The Official Committee

On October 16, 2020, the U.S. Trustee appointed the Official Committee in this Chapter 11 Case pursuant to section 1102 of the Bankruptcy Code.

The Official Committee consists of the following members:  (1) John Daly; (2) Richard Tollner; (3) Keith Lizzi; (5) Charles d'Estries; (6) John Refior; (7) Patricia Romano; (8) Ursula Moore, as guardian for minor children; (8) Michael Miskell; and (9) John Shields.

Since its appointment, the Official Committee has been actively involved with the Debtor in overseeing the administration of the Chapter 11 Case as a fiduciary for all unsecured creditors of the Debtor in this Chapter 11 Case, and has consulted with the Debtor on various matters relevant to the Chapter 11 Case.  The Debtor has also discussed its business operations with the Official Committee and their advisors and has negotiated with the Official Committee regarding actions and transactions outside of the ordinary course of business.  The Official Committee has participated actively in reviewing the Debtor's business operations, operating performance and business plan.

The Official Committee has retained (1) Pachulski Stang Ziehl & Jones LLP as bankruptcy counsel; (2) Berkeley Research Group, LLC as financial advisor; (3) Burns Bowen Bair LLP as special insurance counsel; (4) Ruskin Moscou Faltischek, P.C. as special real estate counsel; (5) Kinsella Media, LLC as an expert consultant; (6) Jon R. Conte, Ph.D. as an expert consultant, and (7) Lerman Senter PLLC as Special FCC Counsel. These applications were respectively granted on November 17, 2020; December 9, 2020; August 9, 2021; and November 21, 2022 [Docket Nos. 163, 247, 246, 667, 248, 249, and 1446].  The Official Committee has also retained several experts pursuant to the *Order Authorizing the Retention of Experts* [Docket No. 783].

### E.        Further Motions in the Chapter 11 Case

#### 1.        Exclusivity

During the first 120 days of a Chapter 11 reorganization, the Debtor retains the exclusive right to submit a plan of reorganization and solicit votes for the plan. The exclusive period may be extended by the court for periods not to exceed eighteen months in total. The Debtor has sought and been granted four such extensions [Docket Nos. 316, 509, 751, and 907].

On March 30, 2022, the Court entered the *Stipulation and Order Approving Standstill Agreement* [Docket No. 1049] (the "Standstill Agreement"). Under the Standstill Agreement, the Debtor agreed not to file or solicit a plan of reorganization during the Standstill Period (as defined in the Standstill Agreement), which was a period starting on April 1, 2022, and ending on the date the Debtor or the Official Committee sent a notice of termination by e-mail to all of the other parties to the Standstill Agreement. The Official Committee and the Claimants (as defined in the Standstill Agreement) agreed not to file or solicit a plan of reorganization during the Standstill Period, or for 45 days thereafter.

The Official Committee sent a notice of termination of the Standstill Agreement on November 29, 2022 [Docket No. 1485] and the Standstill Agreement terminated by its terms on January 13, 2023.

#### 2.        Removal

On December 7, 2020 the Debtor filed a motion to extend the period within which the Debtor could remove actions pursuant to 28 U.S.C. § 1452 and Bankruptcy Rule 9027. [Docket No. 238]. Section 1452 permits the removal of civil action claims that are related to a bankruptcy case and Rule 9027 creates the time period within which notices of removal must be filed. The Debtor requested an extension of this period to provide it with additional time to determine whether to remove certain pending civil action claims related to its Chapter 11 proceedings. The court entered orders approving this extension, and the Debtor's subsequent requests for additional extensions, on December

18, 2020 [Docket No. 267], April 13, 2021 [Docket No. 452], August 18, 2021 [Docket No. 687], December 9, 2021 [Docket No. 906], April 13, 2022 [Docket No. 1069], August 10, 2022 [Docket No. 1263], November 30, 2022 [Docket No. 1487], March 30, 2023 [Docket No. 1962], and July 13, 2023 [Docket No. 2299].

### 3.    Unexpired Leases of Nonresidential Real Property

A debtor must assume or reject unexpired leases of nonresidential real property by the earlier of (a) 120 days from the date of the petition, or (b) the date on which the court confirms the plan of reorganization, at which time a debtor will be considered to have rejected the leases. A debtor, upon a showing of cause, may request that the court extend the time period in which the debtor must make the decision by a period of 90 days. In the present case, the Debtor has sought and been granted various such extensions [Docket Nos. 310, 451, 688, 905, 1070, 1261, 1489, 1961, and 2298] with respect to certain leases.

### 4.    CHS 9019 Settlement

On August 14, 2023, the Debtor filed its *Motion, Pursuant to Bankruptcy Rule 9019, Seeking Entry of an Order Approving the Settlement Between the Debtor and Catholic Health System of Long Island, Inc.* [Docket No. 2385]. As described in the motion, the Diocese and CHS reached an agreement, as set forth in the Settlement Term Sheet described in the motion, which simplifies the parties' arrangement with respect to payment for legacy workers' compensation claims and benefits both parties. The motion sought court approval of the Debtor's entry into the Settlement Term Sheet, whereby the Diocese would transfer all of its obligations for pre-January 1, 2012 workers' compensation claims, including legacy workers' compensation obligations that did not originate from CHS operations, to CHS. In exchange for CHS agreeing to assume these obligations, the Diocese will transfer to CHS the exclusive right to receive the entirety of the $7.6 million deposit currently held by the New York State Workers' Compensation Board. Generally, although CHS could petition to have a portion of the deposit released prior to the payment of all claims, the full deposit will become available when the entirety of the legacy workers' compensation claims have been paid, which is expected to occur many years in the future. The Diocese will receive all interest earned and payable on the deposit for the first 5 years following the effectiveness of the settlement, and CHS will receive all interest earned and payable on the deposit thereafter.

The Bankruptcy Court granted the motion on September 8, 2023 [Docket No. 2472]. The Debtor entered into the transaction authorized by the Bankruptcy Court in January 2024.

### F.    Mediation

On October 20, 2021, the Bankruptcy Court entered an order appointing Paul J. Van Osselaer as mediator for a mediation between the Debtor, the insurers of the debtor, and the Official Committee. *Order Appointing a Mediator* [Docket No. 794]. The Bankruptcy Court's order authorized the Debtor to pay the expenses and fees of the mediator.

On November 15, 2022, the Debtor requested the appointment of an additional judicial co-mediator. The Committee opposed the request. On January 10, 2023, the Committee sent a letter that stated, among other things, it would "pursue the litigation path," and on January 13, 2023, the Committee declared its determination that the Mediation is at a standstill.

On April 17, 2023, the Bankruptcy Court entered the *Judicial Notice re Appointment of Mediator* [Docket No. 2018] "tak[ing] judicial notice of the appointment of United States Magistrate Judge Sarah L. Cave as the mediator in the four declaratory judgment actions pending in the Southern District of New York under the cases numbered 20cv11011, 21cv71, 21cv7706, and 21cv9304." The Bankruptcy Court's order continued: "The Court expects that Magistrate Judge Cave will function as a co-mediator, with Paul Van Osselaer, for purposes of global settlement discussions implicating those actions and this Bankruptcy case."

On October 18, 2023, following additional mediation sessions, the co-mediators filed a *Mediator's Status Report* [Docket No. 2589] indicating that the mediation was concluded and that "[r]egretfully, no agreement has been reached as of today's date." The co-mediators stated that they "believe that no such agreement is likely before the Court's deadline and believe further that, absent a substantial movement in the positions of the Committee or the Debtor, those parties have reached an impasse in their efforts to have a consensual plan."

Following the mediator's report, the Diocese, parishes, and affiliated parties made their best and final offer to claimants outside of mediation in the amount of $200 million in cash, in addition to the parties' substantial third-party insurance assets. *See Letter to the Honorable Chief Judge Glenn Regarding Case Status* [Docket No. 2590]. The Committee does not believe this offer represents fair and equitable compensation for holders of Abuse Claims and should be rejected by holders of Abuse Claims.

### G.    Bar Dates and Claims Process

#### 1.    Sexual Abuse Bar Date and General Bar Date

On October 9, 2020, the Debtor filed Schedules identifying the assets and liabilities of its Estates [Docket No. 57]. The Debtor updated the Schedules with amendments on January 8, 2021 [Docket No. 299] and February 11, 2022 [Docket No. 977]. In addition, pursuant to an order dated January 27, 2021 (as thereafter amended, the "Bar Date Order"), the Bankruptcy Court established the following bar dates for the filing of Proofs of Claim in this Chapter 11 Case:

    i.          the general bar date (the "General Bar Date") for all General Claims, except as noted below, of March 30, 2021 at 5:00 p.m. (prevailing Eastern Time);

    ii.         a bar date for individuals holding Abuse Claims against the Debtor of August 14, 2021 at 5:00 p.m. (prevailing Eastern Time);

    iii.       a bar date for Claims amended or supplemented by the Debtor's amended Schedules on or before the later of (a) the General Bar Date; and (b) 5:00 p.m. (prevailing Eastern Time) on the date that is thirty (30) days after the date on which the Debtor provides notice of unfiled schedules or an amendment or supplement to the schedules (the "Amended Schedules Bar Date"); and

    iv.       a bar date for any Claims arising from or relating to the rejection of executory contracts or unexpired leases on or before the later of (a) the General Bar Date and (b) 5:00 PM (prevailing Eastern Time) on the date that is thirty (30) days after the entry of the order authorizing the rejection (the "Rejection Bar Date").

The Debtor provided notice of the bar dates above as required by the Bar Date Order. To date, Proofs of Claim for 183 General Unsecured Claims have been filed against the Debtor, totaling approximately $2.039 billion, and 750 Abuse Claims have been filed against the Debtor.

#### 2.    Supplemental Bar Date

On May 24, 2022, New York Governor Kathy Hochul signed the Adult Survivors Act (S.66A/A.648A). While the CVA had revived certain claims based on allegations of sexual abuse of a minor, the ASA revived claims resulting from sexual offenses against individuals that occurred when the person was 18 years of age or older and allowed such persons to sue on account of such claims, regardless of prior limitations periods. Like the CVA, the ASA opened a lookback window for individuals to bring suit on account of such revived claims—specifically, the ASA allows individuals to commence claims, not earlier than six months after (November 24, 2022), and not later than one year and six month after (November 24, 2023), the effective date of the ASA (May 24, 2022). N.Y. C.P.L.R. 214-g (McKinney).

As a consequence, the Debtor sought to provide persons who had their claims revived by the ASA a supplemental period of time to file proofs of claim in this chapter 11 case. To be clear, the Debtor acknowledged that the Bar Date Order established August 14, 2021 as the bar date for Abuse Claims. The term "Sexual Abuse Claim" expressly included, among other things, claims—including contingent, unliquidated and disputed claims—involving a "nonconsenting adult and another adult."

The Committee opposed creating a supplemental period that would allow Adult Survivors additional time to file claims against the Debtor because it believed that such an amendment was unnecessary. Nonetheless, the Debtor

believed that the right course of action in this chapter 11 case was to provide ASA claimants an additional opportunity to file a proof of claim in the Debtor's bankruptcy case.

On July 21, 2022, the Debtor filed the *Motion of the Debtor for an Order Establishing a Supplemental Deadline for Filing Certain Proofs of Claim and Granting Related Relief* [Docket No. 1219] seeking a supplemental bar date for ASA claims of September 28, 2022 at 5:00 p.m. (prevailing Eastern Time). The future claims representative filed a statement in support [Docket No. 1227] and the Official Committee filed an objection [Docket No. 1232]. The Court ultimately granted the motion over the Committee's objection and established the Supplemental Bar Date for ASA claims as October 10, 2022 at 5:00 p.m. (prevailing Eastern Time) (the "Supplemental Bar Date").

### 3. Bar Date Amendments

On August 8, 2021, the Debtor filed *Debtor's Motion For Entry of an Order Amending the Bar Date Order* [Docket No. 698], requesting an amended Bar Date Order so as to clarify the Debtor's ability to make sexual abuse proofs of claim available to the District Attorneys for Nassau County and Suffolk County.

The Committee opposed the Debtor's ability to make sexual abuse proofs of claim available to the District Attorneys for Nassau County and Suffolk County because of concerns for the privacy of the information of survivors of childhood sexual abuse and the risk that information from the proofs of claim could potentially be shared with the person accused of the abuse. After the Debtor held negotiations with the Committee regarding the contents of the proposed order, the Debtor was able to resolve the Official Committee's objections and the Bankruptcy Court granted the motion on November 2, 2021 by entering the *Amended Order Establishing Deadlines for Filing Proofs of Claim and Approving the Form and Manner of Notice Thereof* [Docket No. 813].

The Debtor additionally filed *Debtor's Motion For Entry of an Order Further Amending the Bar Date Order* on October 21, 2021 [Docket No. 796], seeking permission to (a) use the information in the Sexual Abuse proofs of Claim to pursue further investigations against clergy, (b) provide certain law enforcement agencies with redacted Sexual Abuse proofs of Claim, (c) provide other dioceses and affiliates with anonymous information to use in child protection efforts, and (d) provide insurance administrators with access to the Proofs of Claim. The Official Committee subsequently filed *The Official Committee of Unsecured Creditors' Limited Preliminary Objection to the Debtor's Motion for Entry of an Order Further Amending the Bar Date Order* on November 3, 2021 [Docket No. 823]. The Official Committee objected to further amending the Bar Date Order. Following negotiations, the Debtor and the Official Committee resolved the Official Committee's objection and, on November 17, 2021, the Bankruptcy Court entered the *Order Further Amending the Bar Date Order* [Docket No. 867].

### 4. Claim Objections

On August 3, 2021, the Debtor filed notice of two claim objections, *Notice of Debtor's First Omnibus Objection to Certain (I) Amended Claims and (II) Duplicate Claims* [Docket No. 658], and *Notice of Debtor's Second Omnibus Objection to Certain Satisfied Claims and/or Scheduled Amounts* [Docket No. 659]. The Debtor sought to, respectively, (a) disallow, expunge, or reassign claims that had been replaced or duplicated, and (b) designate certain claims as having already been satisfied. The Bankruptcy Court granted both motions on September 20, 2021 [Docket Nos. 744, 745].

### 5. Omnibus Claim Objection Procedures and Claim Settlement Procedures

On November 21, 2022, the Debtor filed a *Motion for an Order (I) Approving Claim Objection Procedures, (II) Approving Claim Settlement Procedures and (III) Granting Related Relief* [Docket No. 1469]. The Official Committee filed its *Objection to Debtor's Motion for an Order (I) Approving Claim Objection Procedures, (II) Approving Claim Settlement Procedures and (III) Granting Related Relief* [Docket No. 1510].

The Committee opposed the Debtor filing claim objection on account of claims that the Debtor alleged were improper claims on the basis that such claims should be resolved, as has been done in other Diocesan cases, through trust distribution procedures as part of a confirmed plan. The Committee believes that the use of trust distribution procedures for the resolution of those Abuse Claims would have been far less expensive than the Debtor's objecting to and litigating those claims.

The Committee also opposed the Debtor's request to establish claim settlement procedures.

The Court approved the omnibus claim objection procedures on January 10, 2023 [Docket No. 1554] and reserved judgment on the claim settlement procedures. Pursuant to such claim objection procedures, the Debtor has filed fourteen additional omnibus claim objections [Docket Nos. 1645, 1646, 1655, 1677, 1683, 1730, 1744, 1754, 2117, 2118, 2149, 2150, 2151, 2372].

On February 28, 2023, the Official Committee filed its *Notice of Committee's First Omnibus Objection to Proofs of Claim* [Docket No. 1718]. The Official Committee sought to disallow and/or expunge claims by the parishes for (1) indemnification, reimbursement and contribution against the Debtor; (2) continued insurance coverage or "some other payment or benefit" under the Debtor's Protected Self Insurance Program; (3) any amounts paid or property transferred to the Debtor and is held in trust for the parish; and (4) a property interest and right to repayment in amounts paid under Protected Self Insurance Program. The Committee's omnibus claim objection was granted solely with respect to certain claims, and is without prejudice to the later allowance of certain claims, including pursuant to 11 U.S.C. §§ 502(e)(2), 502(j), and 509(a) upon an appropriate showing on notice by the Parishes [Docket No. 2004].

6.    **Motion for Entry of an Order Appointing a Legal Representative for Future Claimants**

The Debtor filed a motion to appoint a future claims representative for future sexual abuse claimants, *Debtor's Motion for Entry of an Order Appointing a Legal Representative for Future Claimants*, on September 30, 2021 [Docket No. 764]. The Bankruptcy Court affirmed the Debtor's motion on October 27, 2021, with the *Order Appointing a Legal Representative for Future Claimants* [Docket No. 799]. The future claimants representative obtained Bankruptcy Court approval of the retention of Hon. Michael A. Hogan (ret.) as his financial advisor and Joseph Hage Aaronson LLC as counsel.

H.    **Sale and Financing Process for Spectrum Assets**

The Debtor owns four Federal Communication Commission licenses with call signs KNZ65, KNZ67, KNZ68, and WHR845 (the "FCC Licenses"). The Debtor works with its affiliate CFN to reach 1.5 million homes via television broadcasts, which is the single largest outreach effort of the Diocese on Long Island. The broadcasts include live religious services, devotional programs, Catholic education, and youth programs. On April 27, 2020, the U.S. Federal Communications Commission determined that it would no longer conditions the spectrum licenses on continued educational broadcasting. *See* Transforming the 2.5 GHz Band, 84 Fed. Reg. 57343 (Oct. 25, 2019); *see also* Transforming the 2.5 GHz Band, WT Docket No. 18-120, Report and Order, 34 FCC Rcd 5446, 5489-90, paras. 117, 124 (2019). In June of 2022, the Debtor received an unsolicited offer from a third party proposing to acquire the Debtor's four FCC Licenses. Upon receipt of this unsolicited proposal, the Debtor began developing a process for maximizing the value of such FCC Licenses, in addition to other assets, such as four cell towers owned by the Debtors (the "Cell Towers") and contracts related to the foregoing, for the benefit of all of the Debtor's stakeholders.

The Debtor's first step in this process was seeking to engage with this third-party to better understand the details of this proposal. Nevertheless, the Debtor's ability to engage with this third-party was complicated by certain contracts relating to these assets — specifically, the FCC Leases. In particular, the FCC Leases contain multiple provisions that directly interfered with the Debtor's ability to monetize the assets for the benefit of all stakeholders — e.g., (a) a confidentiality provision, which purports to prevent the Debtor from sharing a copy of the Leases without counterparty consent; (b) an anti-assignment provision, which purports to prevent the Debtor from assigning its interests in the Leases without counterparty consent; (c) a "no-shop" or "exclusivity" provision, which purports to forbid the Debtor from selling certain of the assets without counterparty consent; and (d) a "right of first refusal," which purports to give the counterparty the ability to forgo participation in any sale process relating to certain assets, and yet step in at the last minute to acquire such assets.

On October 12, 2022, the Debtor filed the *Motion of the Debtor for Entry of Orders (I)(A) Approving Bidding Procedures for the Sale of the Debtor's Assets, (B) Authorizing the Debtor to Enter Into One or More Stalking Horse Purchase Agreements and to Provide Bid Protections Thereunder, (C) Scheduling an Auction and Approving the Form and Manner of Notice Thereof, (D) Approving Assumption and Assignment Procedures and (E) Scheduling a Sale Hearing and Approving the Form and Manner of Notice Thereof; (II)(A) Approving the Sale of the Debtor's Assets*

*Free and Clear of Liens, Claims, Interests and Encumbrances and (B) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases; and (III) Granting Related Relief* [Docket No. 1355] (the "Bid Procedures Motion"). The Bid Procedures Motion requested that the Court approve the Bidding Procedures (as defined in the Bid Procedures Motion) and order that the restrictive provisions in the leases were invalid under Section 365(f)(1) of the Bankruptcy Code. A response was filed by the Official Committee [Docket No. 1416], and an objection was filed by WBSY Licensing, LLC [Docket No. 1414]. The Court granted the motion on November 22, 2022 [Docket No. 1471]. The Court entered an order approving the Bidding Procedures on November 22, 2022 [Docket No. 1471]. On May 3, 2023, the Court entered an order approving the proposed sale of the Debtors' Cell Towers, and related assets, to SWIF II Investment Co. Towers II, LLC [Docket No. 2072]. The Debtors filed a notice of closing of the Cell Tower sale on June 5, 2023 [Docket No. 2133]. The Debtors have not yet selected a successful bidder for the FCC License assets, and the sale process in respect of such assets remains ongoing.

The Debtor has also explored potential financing structures where cashflows generated by the FCC Licenses leases, and other assets related thereto, could serve as loan collateral. On January 19, 2023, the Court entered an order modifying the terms of Jefferies' engagement to include services relating to potential financings [Docket No. 1583]. Since the entry of such order, the Debtor has been exploring opportunities to implement such financings, and potential lenders have been conducting diligence in respect thereof.

The Debtor believes that it may be able to implement a loan on the following indicative terms:

- Principal Amount: $30 million (less fees and expenses)

- Interest Rate: 8.65% (subject to change)

- Term: 20 years

- Collateral: FCC Leases cashflows and related assets

The terms of the financing described above remain subject to change, and the effectuation of the financing described above remains subject to various contingencies, such as (a) a rating that is acceptable to any applicable potential lender; (b) market fluctuations; (c) finalization of loan documentation; and (d) the occurrence of the Effective Date. The documentation concerning any such loan would be included in a supplement to the Debtor's chapter 11 plan. Any such financing would be effectuated consistent with the Debtor's powers and abilities under the Bankruptcy Code.

The Committee questions the need for expensive third-party financing. The Committee believes that the Debtor has several non-debtor affiliates that have the assets for making such a loan to the Debtor on substantially better terms.

## II.    POSTPETITION LITIGATION AND CONTESTED MATTERS

### A.    Insurance Coverage for Abuse Claims

On October 1, 2020, the Debtor brought an Adversary Proceeding Complaint against its insurers[12] (the "Insurers") for declaratory judgement and breach of contract in regards to the Insurer's coverage of the abuse claims [Docket No. 1] (the "Insurance Adversary Proceeding"). The breach of contract claim regarded insurance coverage of claims settled under the Debtor's Independent Reconciliation and Compensation Program, discussed in Section C.1

---

[12] The Insurers, individually: Arrowood Indemnity Company; Lloyd's, London; Allianz International Ltd.; Ancon Insurance Co. (UK) Ltd.; Assicurazioni Generali T.S.; British National Insurance Co. Ltd.; CX Reinsurance Co. Ltd.; Allianz Global Corporate & Specialty (France); Dominion Insurance Co. Ltd.; Excess Insurance Co. Ltd.; Lexington Insurance Co.; London & Edinburgh General Insurance Co. Ltd.; Sovereign Marine & General Insurance Co. Ltd.; St. Katherine Insurance Co. Ltd.; Storebrand Insurance Ltd.; Taisho Marine & Fire (UK) Ltd.; Terra Nova Insurance Co. Ltd.; Tokio Marine & Fire (UK) Ltd.; Turegum Insurance Co. Ltd.; Unionamerica Insurance Co. Ltd.; Yasuda Fire & Marine (UK) Ltd; Allianz Underwriters Insurance Company; Associated International Insurance Company; Colonial Penn Insurance Company; Fireman's Fund Insurance Company; Interstate Fire & Casualty Company; and National Surety Corporation.

of Annex 1. The Debtor sought declaratory judgement on its rights under the policies it holds with each of the Insurers. The Debtor included its known insurance policies as exhibits to its complaint in the Insurance Adversary Proceeding.

On November 20, 2020 the Official Committee filed a motion to intervene in the adversary proceeding, *Motion to Intervene in Adversary Proceeding No. 20-1227 and Official Committee of Unsecured Creditors Motion to Intervene in Adversary Proceeding Number 20-01227*, asserting that it had similar interests of the Debtor as well as conflicts of interest with the Debtor in regards to insurance coverage of the abuse claims [Docket. No. 13]. The Debtor consented to the Official Committee's right to intervene, but several of the insurance companies did not consent and filed objections to the Official Committee's motion to intervene [Docket Nos. 28, 27, 25, 24, and 22]. After a hearing, the Bankruptcy Court granted the Official Committee's motion to intervene on December 10, 2020. [Docket No. 38].

The Insurance Adversary Proceeding against the Insurers had been referred to the Bankruptcy Court for the Southern District of New York by the District Court for the Southern District Court of New York pursuant to 28 U.S.C. § 157, which permits a district court to refer a case to the proper bankruptcy court when the case arises under the Bankruptcy Code or is a core proceeding of the bankruptcy case. Once the Bankruptcy Court granted the Committee's motion to intervene, the Insurers filed several motions seeking withdrawal of the reference to the Bankruptcy Court [Docket Nos. 57, 55, 54, 49, 64, 93, and 95]. These motions have been granted, and the Insurance Adversary Proceeding is now before different District Court judges in the United State District Court for the Southern District of New York: (a) Case No. 20-CV-11011 (JLR); (b) Case No. 21-CV-71 (JPC); (c) Case No. 21-CV-7706 (AKH); and (d) Case No. 21-CV-9304 (JLR).

On November 7, 2023, the Insurance Commissioner of the State of Delaware petitioned the Delaware Court of Chancery for an order of liquidation with respect to Arrowood Indemnity Company, which was granted on November 8, 2023. Arrowood is responsible as successor in interest with respect to insurance policies issued by Royal Insurance Company, Royal Indemnity Company and Royal Globe Insurance Company, and is required to meet all of the insurance policy obligations of those companies. The Delaware Insurance Commissioner's petition states that Arrowood has a negative surplus of approximately $17 million, driven by a $25 million increase in reserves for certain coverage lines. Arrowood's board of directors unanimously consented to the liquidation. Pursuant to the liquidation order, all persons or entities that have notice of the proceedings or of the order are hereby enjoined and restrained from instituting or further prosecuting any action at law or in equity, or proceeding with any pretrial conference, trial, application for judgment, or proceedings on judgment or settlements and such action at law, in equity, special, or other proceedings in which Arrowood is obligated to defend a party insured or any other person it is legally obligated to defend by virtue of its insurance contract for a period of 180 days.

In light of the liquidation order, on November 17, 2023, the District Court for the Southern District of New York entered an order staying the Insurance Adversary Proceeding against Arrowood Indemnity Company. Case No. 20-CV-11011 (JLR) [Docket No. 176].

On January 5, 2024, the Superintendent of Financial Services of the State of New York filed a petition with the Supreme Court of the State of New York to appoint the Superintendent as an ancillary receiver of Arrowood.

Upon confirmation of the Plan, the Trusts, as applicable, are expected to have access to two sources of funds in light of the Delaware Chancery Court's *Liquidation and Injunction Order with Bar Date of Arrowood Indemnity Company* as modified and dated November 8, 2023 and the petition to the Supreme Court of the State of New York to appoint the Superintendent as an ancillary receiver: (1) the Arrowood liquidation, which is under the supervision of the Insurance Commissioner of Delaware (and his successors) as the appointed receiver of Arrowood; and (2) the New York Property/Casualty Security Fund administered by the New York Liquidation Bureau, which is part of the New York State Department of Financial Services. The New York Property/Casualty Security Fund would be expected to pay covered claims within the limits of the Arrowood insurance policies up to its statutory limits of $1 million, which may apply on a per claim basis or may apply separately per policy for each claim, with any remainder to be sought from the Arrowood liquidation. Such payments on the Debtor's claims would be expected to reduce the recovery of the Debtor against the Arrowood liquidation. The Arrowood liquidation is not expected to have assets to pay all liabilities in full; therefore, distributions would be expected to be *pro rata* with other policyholder-level priority claims. The timing for payments from the NY Property/Casualty Security Fund and the Arrowood liquidation are uncertain.

B.        **Preliminary Injunction**

On October 1, 2020, the Debtor filed a complaint, *Notice of Motion For Preliminary Injunction Under Sections 362 and 105(a) of the Bankruptcy Code* seeking a declaratory judgment on certain state court actions against the Debtor, and a notice of motion for preliminary injunction under sections 362 and 105(a) of the Bankruptcy Code, requesting an extension of the stay to enjoin abuse claimants seeking to hold the non-debtor parishes and other non-debtor entities liable in state court from continuing their actions [Case No. 10-01226, Adv. Pro. Docket No. 2]. The Debtor noted that to permit these suits to continue against the Debtor's co-insureds would jeopardize the estate and cause irreparable harm to the Debtor's chances of a successful reorganization. On October 23, 2020, the Official Committee filed a motion, *The Official Committee of Unsecured Creditors Objection to Debtor's Motion For a Preliminary Injunction Under Sections 362 and 105(a) of the Bankruptcy Code*, objecting to the Debtor's motion for preliminary injunctions. The Official Committee objected on the grounds that continuance of the lawsuits would not deplete the estate or impede the Debtor's ability to successfully reorganize. [Adv. Pro. Docket No. 17].

The Debtor and the Official Committee entered into discussions regarding the preliminary injunction of the abuse claims pending in state court. The parties agreed on an initial preliminary injunction extending until December 10, 2020, during which time the parties agreed to negotiate the possibility of a long-term stay on the state court actions. The Bankruptcy Court approved the initial preliminary injunction [Adv. Pro. Docket No. 36]. The Bankruptcy Court subsequently approved consecutive extensions of the injunction until December 21, 2020 [Adv. Pro. Docket No. 44], January 14, 2021 [Adv. Pro. Docket No. 46], January 21, 2021 [Adv. Pro. Docket No. 53], March 31, 2021 [Adv. Pro. Docket No. 59], June 14, 2021 [Adv. Pro. Docket No. 68], September 14, 2021 [Adv. Pro. Docket No. 88], December 13, 2021 [Adv. Pro. Docket No. 98], March 13, 2022 [Adv. Pro. Docket No. 105], and June 11, 2022 [Adv. Pro. Docket No. 110].

In July 2022, the Official Committee did not support a further extension of the preliminary injunction, and the Debtor filed a renewed *Notice of Motion for Preliminary Injunction Under Sections 362 and 105(a) of the Bankruptcy Code* [Adv. Pro. Docket No. 126]. Following the Debtor's renewed motion, the Official Committee agreed to an extension of the preliminary injunction until October 28, 2022 [Adv. Pro. Docket No. 138]. Then, following the Diocese and the parish's consent to the provision of year-end parish annual summary financial reports for years 2018-2022 that were in the possession of the Diocese to the Official Committee, the Official Committee agreed to a further extension of the preliminary injunction to January 13, 2023 [Adv. Pro. Docket No. 157].

On January 13, 2023, the Committee determined that the mediation was at a standstill and withdrew its consent to the preliminary injunction. As a result, the Debtor sought an extension of the preliminary injunction over the Committee's opposition. The Court heard the dispute in April 2023 and the preliminary injunction remained in effect pending the Court's ruling. On June 1, 2023, the Court denied the Debtor's renewed motion [Adv. Pro. Docket Nos. 202, 203]. Currently, there are approximately 188 cases in New York state court, with approximately 177 of those now in front of Hon. Leonard D. Steinman. Of the 177 cases before Hon. Steinman, approximately 118 of these cases are stayed due to the Order by the Delaware Court of Chancery in the Arrowood liquidation proceedings. And of those unstayed cases before Hon. Steinman, approximately 43 of them are subject to a discovery order, but none have completed discovery.

On July 5, 2023, Judge Glenn lifted the injunction for a sub-set of 228 cases to which the Debtor was not a named defendant (the "Unstayed Cases") finding:

On the other side of the scale is the harm to the Survivors. For every day the injunction lasts, they are not only prevented from pursuing recovery on their claims, but their ability to prove their underlying case is weakened. For many Survivors, allowing time to pass means that they simply may not be able to recover either because the evidence for their case is lost, or because they themselves do not live long enough to press their claims. Importantly, these are claims they would be entitled to bring, if not for the stay in this case. It is clear that these harms to the Survivors become more significant with each passing day in this case, and in the past thirty months have eclipsed what

is now a much more incidental—and certainly less consequential—harm for the Debtor, in having a limited role in participating in litigation against non-debtors.[13]

Following the Preliminary Injunction Opinion, the Debtor and the defendants in 224 of the cases filed a joint petition under section 157(b)(5) in the United States District Court for the Southern District of New York to transfer abuse-related cases against the Debtor parishes to the Southern District. The day after the 157(b)(5) motion was filed, the clerk's office automatically transferred the case to the bankruptcy court citing the Court's standing order of reference. In response to the referral, the Debtor sent a letter to the Chief Judge Swain in her capacity as chair of the assignment committee, informing her that 157(b)(5) obligates a *district court* and not a *bankruptcy court* to decide whether to fix venue in the bankruptcy-home court. In response, the Court withdrew the referral and returned the case to Judge Schofield for a determination on the merits. At this juncture, however, the Committee requested an opportunity to object to the withdrawal of reference. The Court thus ordered briefing on the Committee's motion for reconsideration, which remains pending before Judge Schofield. Given the preliminary question of whether Judge Schofield or the bankruptcy court will decide the motion in the first instance remains pending, the court has yet to order merits briefing on the 157(b)(5) motion itself. On November 16, 2023, Judge Schofield ordered the parties to submit a joint report on the status of the bankruptcy proceeding, which the parties submitted on November 22, 2023. On January 11, 2024, Judge Schofield ordered the parties to submit a joint report on the status of the bankruptcy proceeding, which the parties submitted on January 18, 2024.

If Judge Schofield grants the 157(b)(5) motion, all of the cases listed within the 157(b)(5) motion—including cases pending in state court of federal fora other than the Southern District—will be transferred to the Southern District for all further proceedings.

The Debtor and the defendants in the Unstayed Actions also removed the Unstayed Actions from state court to federal court. To date, eleven different Eastern District of New York Court Judges have remanded 167 cases that were removed from state courts in Queens, Nassau, and Suffolk Counties.

### C.    Independent Advisory Committee

#### 1.    Formation and Investigation

In May of 2019, the Debtor appointed an independent committee (the "Independent Advisory Committee") to review certain transactions between the Debtor and the Diocese Affiliates outside the ordinary course of administration and support that the Debtor provides to the Diocese Affiliates. Specifically, the Independent Advisory Committee was charged with reviewing all such transactions in excess of $2.5 million that occurred on or after January 1, 2014 (the "Affiliate Transactions"). Because the Affiliate Transactions took place between affiliates, they are subject to a conflict analysis. The Debtor delegated to the Independent Advisory Committee the authority to determine whether there are colorable claims related to any given Affiliate Transaction and, if so, to pursue recovery and resolution on behalf of the Debtor.

The Independent Advisory Committee consisted of three members, each with a strong reputation and well-recognized experience in bankruptcy, investigations and restructuring. The members of the Independent Advisory Committee were: (1) Arthur J. Gonzalez, formerly Chief Judge of the U.S. Bankruptcy Court for the Southern District of New York and currently Senior Fellow at New York University School of Law and a member of the Financial Oversight and Management Board for Puerto Rico; (2) Melanie L. Cyganowski, formerly Chief Judge of the U.S. Bankruptcy Court for the Eastern District of New York and currently a partner at Otterbourg, P.C. in New York; and (3) Harrison J. Goldin, a Senior Managing Director at Goldin Associates, LLC, formerly the Comptroller for the City of New York. Mr. Gonzalez chaired the Independent Advisory Committee.

The members of the Independent Advisory Committee were compensated on a monthly, fixed-fee basis for their services, but with an hourly or per diem amount for extraordinary services, such as days in mediation, testimony, depositions or preparation for the same. The monthly fixed fees were $25,000 to the chair and $20,000 to the two other members.

---

[13] *Roman Catholic Diocese of Rockville Centre, New York v. Ark320 Doe (In re Roman Catholic Diocese of Rockville Centre, New York)*, 651 B.R. 622, 666 (Bankr. S.D.N.Y. 2023) (the "Preliminary Injunction Opinion").

The Independent Advisory Committee and its advisors had access to over 220,000 documents, consisting of Debtor records, such as minutes, financial statements, reports and other materials prepared for the Debtor's Finance Council. Such documentation included emails relevant to Affiliate Transactions of key Debtor personnel, including the current and former bishops, the Chief Operating Officer, the Chief Financial Officer, the Director of Communications, and others. The Independent Advisory Committee had access to the Debtor's personnel and their full cooperation.

### 2.    The Transfers

The Independent Advisory Committee had identified the following four Affiliate Transactions for its review:

(1)    the September 2017 transfer by the Diocese of (a) the real property, assets, and operations of (i) Holy Rood Cemetery, Westbury, NY, (ii) Holy Sepulchre Cemetery, Coram, NY; (iii) Queen of All Saints Cemetery, Central Islip, NY; and (iv) real property intended to be used as a cemetery in Old Westbury, NY to the newly-created CemCo, (b) $40 million (of which approximately $15.3 million CemCo returned to the Diocese for the transfer of Cemeteries' real property) to CemCo, and (c) the transfer of approximately $65 million by the Diocese to the Diocees of Rockville Centre Catholic Cemetery Permanent Maintenance Trust;

(2)    the January 2017 transfer of the real property parcel located in Huntington, New York, that was formerly used as a Seminary by the Diocese, to Seminary Corporation;

(3)    the September 2017 transfer of assets, operations and liabilities of three Diocesan high schools (Bishop McGann-Mercy, Holy Trinity, and St. John the Baptist) to the Department of Education; and

(4)    the 2018 transfer of $3 million to the Catholic Foundation.

### 3.    Litigation with Respect to the IAC's Proposed Professionals

On October 12, 2020, the Debtor filed a motion to employ Otterbourg P.C. as counsel to the Independent Advisory Committee and to employ Goldin, A Teneo Company as financial advisor to the Independent Advisory Committee [Docket No. 60]. The Independent Advisory Committee hired Otterbourg and Goldin to assist in evaluating the Affiliate Transactions and, when necessary, pursuing further action in regards to colorable claims related to the Affiliate Transactions. On October 28, 2020, the Official Committee filed an objection to the order permitting the Independent Advisory Committee to hire professionals, stating that the Official Committee, and not the Independent Advisory Committee, had the authority to review the Affiliate Transactions and pursue any related colorable claims [Docket 103]. The Debtor filed a reply to the Official Committee's objection on November 11, 2020, defending the Independent Advisory Committee's authority to hire professionals to resolve claims with relating to the Affiliate Transactions [Docket 150]. The Official Committee filed a sur-reply on November 16, 2020, maintaining its objection to the Independent Advisory Committee's retention of professionals [Docket 159].

### 4.    Derivative Standing of the Committee

On March 5, 2021, by court order, the Debtor and the Official Committee entered into a joint stipulation and order (the "Joint Stipulation"), in which they agreed to a resolution of the contentions with respect to the Independent Advisory Committee's hiring of professionals [Docket No. 392]. Pursuant to the order, the Official Committee was granted derivative standing to evaluate the Affiliate Transactions and pursue action on any colorable claims. Accordingly, the Debtor provided the Official Committee with the Independent Advisory Committee Report, including its appendices, exhibits, and the documents on which it was based.

Arthur J. Gonzales was appointed as the special mediator between the Official Committee and the Debtor in regards to the examination of the Affiliate Transactions and the pursuit of colorable claims.

5.      **Tolling Agreements**

On September 27, 2022 and from time to time thereafter, the Official Committee entered into separate stipulated tolling agreements with (i) The Seminary of the Immaculate Conception of the Diocese of Rockville Centre, (ii) Catholic Cemeteries of the Roman Catholic Diocese of Rockville Centre, Inc., and (iii) The Department of Education, Diocese of Rockville Centre. The stipulated tolling agreements each extend any statute of repose, statute of limitations, limitation or laches period, or other provision, whether jurisdictional or otherwise, that requires, mandates, or establishes any deadline for the commencement or filing of any matter, proceeding or other action with respect to claims against each of such entities.  [Docket Nos. 1320-22, 2074-2076, 2379 and 2387].  Prior to expiration of the tolling agreement, the Official Committee commenced an adversary case against Catholic Cemeteries of the Roman Catholic Diocese of Rockville Centre, Inc.  [Adv. Pro. No. 23-01121 (MG)].  The defendant has answered the adversary complaint and the case remains ongoing.  The Official Committee has prepared a complaint seeking turnover of property to the Debtor's estate from the Department of Education, which is being held in abeyance pursuant to the tolling agreement.  The "Termination Date" for the tolling agreement with The Department of Education, Diocese of Rockville Centre is currently scheduled to occur on March 31, 2024. [Docket No. 2741].

6.      **Seminary Settlement**

On October 6, 2023, the Committee filed a *Motion Pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure for Entry of an Order Approving a Settlement Agreement and Release Between the Seminary, the Committee, and the Diocese* [Docket No. 2548]. Through this motion, the Committee proposed settlement of the estate's alleged causes of action against the Seminary.

The terms of the proposed settlement are as follows: (1) the Seminary would sell approximately 200.3 acres of the Seminary property, while retaining the main Seminary building and approximately 16 acres of the Seminary property associated with the Seminary's operations, (2) New York State would purchase approximately 180.3 acres of undeveloped Seminary acreage for use as a nature preserve for $18.03 million, while the Village of Lloyd harbor would purchase the remaining approximately 20 acres for $2 million, (3) upon closing of the Seminary property sale, the Seminary shall pay 80% of the sale proceeds to the abuse claims trust created in connection with a confirmed plan of reorganization for the Diocese in the Bankruptcy Case, or if the Bankruptcy Case is dismissed, to the Diocese, and (4) upon payment of the settlement amount, the Diocese and the Committee shall release the Seminary from the adversary claims arising out of the Seminary transfer.

The Bankruptcy Court approved the Committee's settlement motion on October 25, 2023 [Docket No. 2612].

7.      **Department of Education Settlement**

The Debtor is proposing to settle the potential avoidance actions, Abuse Claims and other tort claims against the Department of Education on the following terms: (1) the Department of Education shall contribute $3,500,000 to the settlement trust or other fund created pursuant to the plan of reorganization; and (2) the Department of Education shall receive releases of (a) claims by the Committee and the bankruptcy estate of the Diocese, (b) all sexual abuse, other physical abuse, bullying, and civil rights claims, (c) any sexual abuse, other physical abuse, bullying and civil rights claims by way of contribution/indemnity claims against the Department of Education, (d) the benefits of the discharge injunction and channeling injunction contained in the plan of reorganization, and (e) any other benefits under the plan of reorganization for non-debtor affiliates of the Diocese which settle the claims of the Diocese against them. For the purposes of the releases, the Department of Education shall include St. John the Baptist Diocesan High School, Holy Trinity Diocesan High School, their predecessors, successors, assigns, subsidiaries, affiliates, current and former officers, directors, principals, equity holders, trustees, members, partners, managers, officials, advisory board members, advisory committee members, members of any special committee of the Board, employees, agents, volunteers, attorneys, financial advisors, accountants, investment bankers, consultants, representatives, their respective heirs, executors, estates and nominees, as applicable; provided, however, that any perpetrator of sexual abuse or other physical abuse or bullying that forms the basis for a claim against the Department of Education, St. John the Baptist Diocesan High School or Holy Trinity Diocesan High School who is an individual shall not receive any release or the benefit of any injunction described herein. The settlement is conditioned upon the confirmation of the Plan. Existing CVA claims against the Department of Education remain outstanding as of the date of this Disclosure Statement.

8.        **Litigation Against the Cemetery Corporation and the Cemetery Trust**

The Official Committee commenced an adversary case against Catholic Cemeteries of the Roman Catholic Diocese of Rockville Centre, Inc.  [Adv. Pro. No. 23-01121 (MG)].  The defendant has answered the adversary complaint and the case remains pending.

The Independent Advisory Committee determined that colorable claims existed with respect to the Cemetery Corporation and the Cemetery trust.  The Debtor is seeking to settle with the Cemetery Corporation and the Cemetery Trust. If the Debtor's offer is accepted, Cemetery Corporation will contribute $10 million to the Debtor's plan of reorganization and the Cemetery Trust will lend $35 million to the Debtor at an interest rate of four percent over a thirty year term in exchange for settling the avoidance actions and releasing the Cemetery Corporation and Cemetery Trust from future liability. The terms of the Cemetery Trust loan would be the following:

> **Principal**: $35 million, non-recourse loan.

> **Term**: 30-year amortization period using traditional mortgage-style amortization.

> **Rate**: 4%.

> **Collateral**: 100% of equity in Ecclesia and silent second lien on the spectrum special purpose vehicle; provided, however, that once the outstanding loan balance is reduced to $25 million, the second lien on the spectrum special purpose vehicle shall be released.

If the Debtor's proposed settlement with the Cemetery Corporation and the Cemetery Trust is accepted by such parties, the Bankruptcy Court will evaluate whether such settlement should be approved under the standards required by the Bankruptcy Code, including section 1123(b)(3) and Federal Rule of Bankruptcy Procedure 9019.  The factors the Court will consider when deciding whether to approve the settlement are (1) the balance between the litigation's possibility of success and the settlement's future benefits; (2) the likelihood of complex and protracted litigation, "with its attendant expense, inconvenience, and delay," including the difficulty in collecting on the judgment; (3) "the paramount interests of the creditors," including each affected class's relative benefits "and the degree to which creditors either do not object to or affirmatively support the proposed settlement"; (4) whether other parties in interest support the settlement; (5) the "competency and experience of counsel" supporting, and "[t]he experience and knowledge of the bankruptcy court judge" reviewing, the settlement; (6) "the nature and breadth of releases to be obtained by officers and directors"; and (7) "the extent to which the settlement is the product of arm's length bargaining."  *Motorola Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452, 462 (2d Cir. 2007) (citations omitted).

The adversary complaint filed by the Committee alleges constructively fraudulent transfer and intentionally fraudulent transfer under sections 544 and 550 of the Bankruptcy Code and unjust enrichment under New York law against the Cemetery Corporation and Cemetery Trust and seeks to avoid and recover "(a) the real and personal properties and business operations of four cemeteries to CemCo, (b) $40 million cash and investment assets to CemCo, and (c) approximately $65 million of investment assets to the Cemetery Trust.  Complaint, Adv. Pro. No. 23-01121 (MG), at ¶ 3.

If the litigation is not consensually resolved, the Debtor anticipates that the Cemetery Corporation and Cemetery Trust are likely to dispute the underlying elements of the causes of action contained in the adversary complaint and raise various affirmative defenses or other arguments.  For example, the Debtor anticipates that the defendants may assert: (a) that the amounts transferred to the defendants were insufficient to meet the obligations assumed by the defendants to maintain the cemeteries and graves therein in perpetuity and were not fraudulent, (b) that cemeteries are exempt from execution under section 450 of New York's Real Property law and, as exempt property, are not an asset capable of being fraudulently transferred under New York fraudulent transfer law, (c) that time-barred claims are not "probable liabilities" under controlling law and as a result the transferor was not insolvent on the date of the transfer, (d) that amounts transferred are held in trust and for religious and charitable purposes, (e) that the transferees acted in good faith and have a defense based on, and to the extent of, the assumption of the obligations to maintain the cemeteries and the graves therein in perpetuity, and (f) that the transfers are not subject to avoidance based on the Religious Freedom Restoration Act or the First Amendment to the U.S. Constitution.  The

Debtor believes that certain of these defenses may raise complicated issues of fact or law that may be time-consuming and expensive to resolve.

In addition, to the extent the Cemetery Corporation is unable to honor its permanent maintenance obligations, claimants may seek to hold the Debtor responsible for any obligations entered into prior to the transfer of the obligations to the Cemetery Corporation, arguing that any assumption of liability by the Cemetery Corporation was not a novation under state law.  This could result in substantial additional expense and claims against the estate.

The Debtor believes that the proposed settlement is in the best interests of the estate and satisfies the applicable Bankruptcy Rule 9019 standards.

The Committee opposes the proposed settlement with the Cemetery Corporation and the Cemetery Trust. The Committee believes that the Cemetery Trust Corporation and the Cemetery Trust should be making a far larger contribution to resolve the claims against them.

9.      **Settling IAC Affiliate Contributions**

The Catholic Cemeteries Of The Roman Catholic Diocese Of Rockville Centre, Inc., a New York Not-For-Profit Corporation, the Diocese of Rockville Centre Catholic Cemetery Permanent Maintenance Trust, The Seminary of the Immaculate Conception of the Diocese of Rockville Centre, and The Department of Education, Diocese of Rockville Centre shall become Settling IAC Affiliates under the Plan by providing consideration for:

   i.    a contribution to the Trusts in an amount to be agreed to between the Settling IAC Affiliate and the Diocese as a component of the Trust Assets and/or the Co-Insured Party Cash Contribution with respect to The Catholic Cemeteries Of The Roman Catholic Diocese Of Rockville Centre, Inc., a New York Not-For-Profit Corporation, the Diocese of Rockville Centre Catholic Cemetery Permanent Maintenance Trust, and The Department of Education, Diocese of Rockville Centre, and

   ii.   the Seminary Contribution with respect to The Seminary of the Immaculate Conception of the Diocese of Rockville Centre.

The Settling IAC Affiliate Contributions described in this Section II.C.9 are intended to summarize the descriptions provided in Sections II.C.6, 7, and 8.

D.      **Motion to Dismiss**

The Committee filed its *Motion of the Official Committee of Unsecured Creditors to Dismiss Chapter 11 Case* [Docket No. 1912] on March 27, 2023. The Diocese and the Future Claims Representative filed objections to the Committee's motion [Docket Nos. 2196, 2199]. The Court held an evidentiary hearing on July 10 and 11, 2023, where the parties presented their evidence and cross-examined each other's witnesses.

The Bankruptcy Court issued its *Order Denying the Motion of the Official Committee of Unsecured Creditors to Dismiss the Chapter 11 Case Without Prejudice* [Docket No. 2329] on July 18, 2023. As part of its order denying the Committee's motion, the Bankruptcy Court noted that "the Debtor has only withstood the Motion to Dismiss here at this time because it took the position that it would be able to propose such a plan within a reasonable amount of time." *Id.* at 7. Relatedly, the Bankruptcy Court ordered the Debtor to "file an amended plan of reorganization and disclosure statement, or at minimum, a term sheet for a plan that is supported by both the Debtor and the Committee, by October 31, 2023." *Id.* at 8.

Following the mediator's report filed on the docket of this Chapter 11 Case, and in connection with the Bankruptcy Court order requiring the Debtor to file an amended plan of reorganization or term sheet by October 31, 2023, the Diocese filed its *Letter to the Honorable Chief Judge Glenn Regarding Case Status* [Docket No. 2590] on October 19, 2023.  Through the letter, the Diocese, parishes, and affiliated parties made their best and final offer to claimants outside of mediation in the amount of $200 million in cash, in addition to the parties' substantial third-party insurance assets.  Despite the passage of the October 31, 2023 date, the Committee has not at this time renewed its motion to dismiss the chapter 11 case.

The Committee, elaborating on an idea expressed by the Bankruptcy Court, suggested a process to enable "test cases" to go forward in State Court (along with a suspension of the bankruptcy proceedings to limit the continued administrative costs of the estate) as a path to make all of the parties, including the Covered Parties and the Insurers more realistic about their potential exposure and risks. *See Corrected Motion of the Official Committee of Unsecured Creditors Pursuant to Sections 105, 305 and 362 of the Bankruptcy Code to Permit Proceeding with Certain State Court Actions and Temporary Suspension of the Chapter 11 Case* [Docket No. 2677]. Though the Bankruptcy Court denied the Committee's motion, approximately 44 of the Unstayed Actions are ongoing before Justice Steinman in Nassau County Supreme Court and may soon be trial-ready. *See Order Denying Motion of the Official Committee of Unsecured Creditors Pursuant to Sections 105, 305 and 362 of the Bankruptcy Code to Permit Proceeding with Certain State Court Actions and Temporary Suspension of the Chapter 11 Case* [Docket No. 2744]. The Committee believes that the continued pursuit of cases in state court is the best path for there to be a consensual resolution of this Bankruptcy Case.

**<u>EXHIBIT 1</u>**

Fourth Modified First Amended Plan

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| The Roman Catholic Diocese of Rockville | : | Case No. 20-12345 (MG) |
| Centre, New York,[1] | : | |
| | : | |
| Debtor. | : | |
| | : | |

# FOURTH MODIFIED FIRST AMENDED
## CHAPTER 11 PLAN OF REORGANIZATION FOR THE ROMAN
## CATHOLIC DIOCESE OF ROCKVILLE CENTRE, NEW YORK

Corinne Ball
Todd Geremia
Benjamin Rosenblum
Andrew Butler
JONES DAY
250 Vesey Street
New York, NY 10281-1047
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306
Email:  cball@jonesday.com
          brosenblum@jonesday.com
          tgeremia@jonesday.com
          abutler@jonesday.com

*Counsel for the Debtor and Debtor in Possession*

Dated:      February 16, 2024
            New York, New York

---

[1]    The Debtor in this chapter 11 case is The Roman Catholic Diocese of Rockville Centre, New York, the last four digits of its federal tax identification number are 7437, and its mailing address is P.O. Box 9023, Rockville Centre, NY 11571-9023.

# TABLE OF CONTENTS

**Page**

ARTICLE I DEFINITIONS AND RULES OF INTERPRETATION ........................................................ 1

ARTICLE II ADMINISTRATIVE EXPENSE AND PRIORITY CLAIMS ........................................... 18

ARTICLE III CLASSIFICATION AND TREATMENT OF CLAIMS .................................................. 20

ARTICLE IV SETTLEMENT TRUSTS .............................................................................................. 25

ARTICLE V MEANS FOR IMPLEMENTATION OF THE PLAN ...................................................... 35

ARTICLE VI EXECUTORY CONTRACTS AND UNEXPIRED LEASES ......................................... 41

ARTICLE VII DISTRIBUTIONS ........................................................................................................ 45

ARTICLE VIII DISPUTED CLAIMS ................................................................................................. 49

ARTICLE IX EXIT FINANCING ....................................................................................................... 51

ARTICLE X CONFIRMATION AND CONSUMMATION OF PLAN ................................................ 52

ARTICLE XI EFFECT OF PLAN CONFIRMATION ........................................................................ 53

ARTICLE XII RETENTION OF JURISDICTION ............................................................................... 59

ARTICLE XIII MISCELLANEOUS PROVISIONS ........................................................................... 62

# EXHIBITS

Exhibit A     Parishes
Exhibit B     Reorganized Debtor's Members and Senior Management
Exhibit C     Known Insurance Policies
Exhibit D     Known Insurers

The Roman Catholic Diocese of Rockville Centre, New York (the "Debtor"), the debtor and debtor in possession in the above-captioned chapter 11 case, hereby proposes this plan of reorganization pursuant to section 1121(a) of the Bankruptcy Code. The Debtor is the proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code. Reference is made to the Disclosure Statement, distributed contemporaneously with the Plan, for a discussion of the Debtor's history, results of operations, historical financial information, projections and properties and for a summary and analysis of the Plan. Other agreements and documents supplement the Plan and have been or will be filed with the Bankruptcy Court. These supplemental agreements and documents are referenced in the Plan and the Disclosure Statement and will be made available for review as set forth herein.

## ARTICLE I

## DEFINITIONS AND RULES OF INTERPRETATION

A.    <u>Definitions.</u> The following terms used herein shall have the meanings set forth below:

1.    "<u>Abuse</u>" means sexual conduct or misconduct, sexual abuse or molestation, sexual exploitation, indecent assault and/or battery, rape, pedophilia, ephebophilia, sexually related psychological or emotional harm, humiliation, anguish, shock, sickness, disease, disability, dysfunction, or intimidation, any other sexual misconduct or injury, contacts or interactions of a sexual nature, including the use of photography, video, or digital media, or other physical abuse or bullying without regard to whether such physical abuse or bullying is of a sexual nature, between a child and an adult, between a child and another child, or between a non- consenting adult and another adult, in each instance without regard to whether such activity involved explicit force, whether such activity involved genital or other physical contact, and whether there is or was any associated physical, psychological, or emotional harm to the child or non-consenting adult.

2.    "<u>Abuse Claim</u>" means a Claim against any Covered Party that is attributable to, arises from, is based upon, relates to, or results from, in whole or in part, directly, indirectly, or derivatively, Abuse that occurred prior to the Petition Date, including any such Claim that seeks monetary damages or other relief, under any theory of law or equity whatsoever, including vicarious liability, *respondeat superior*, conspiracy, fraud, including fraud in the inducement, any negligence-based or employment-based theory, including negligent hiring, supervision, retention or misrepresentation, any other theory based on misrepresentation, concealment, or unfair practice, public or private nuisance, or any other theory, including any theory based on public policy or any act or failure to act by any Covered Party or any other Entity for whom any Covered Party is alleged to be responsible. For the avoidance of doubt, "Abuse Claim" includes (i) any Settling Abuse Claim, (ii) any Contested Abuse Claim, (iii) any Future Abuse Claim, (iv) any Indirect Abuse Claim, (v) any claim or cause of action described in the Child Victims Act (L. 2019 c.11), (vi) any claim or cause of action described in the Adult Survivors Act (S.66A/A.648A), and (vii) any Claim that is attributable to, arises from, is based upon, relates to, or results from Abuse that, as of the Petition Date, is barred by any applicable statute of limitations. Neither this definition nor the use of this definition in the Plan Documents or any filing in the Chapter 11 Case shall constitute a waiver of any defense that would otherwise be available under applicable law to the Debtor, the Reorganized Debtor, any Covered Party, the Trusts or any other Entity.

1

3.      "<u>Additional Covered Party Substantial Contribution</u>" means a contribution to the Estate made by a Covered Party that becomes a Covered Party Pursuant to Article V.S of the Plan in an amount, and of a nature, either (a) mutually agreed to among such Covered Party, the Debtor and the Committee to be a "substantial contribution," or (b) mutually agreed to by such Covered Party and the Debtor and determined by the Bankruptcy Court to constitute a "substantial contribution" after notice and a hearing on no less than 21-days' notice.

4.      "<u>Administrative Expense Claim</u>" means any right to payment from the Debtor that constitutes a cost or expense of administration incurred during the Chapter 11 Case of the kind specified under 503(b) of the Bankruptcy Code and entitled to priority under sections 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred during the period from the Petition Date to and including the Effective Date of preserving the Estate and continuing operations of the Debtor; (b) Professional Fee Claims; (c) all fees due and payable pursuant to section 1930(a)(6) of title 28 of the United States Code; and (d) any claim entitled to priority pursuant to section 364(c) of the Bankruptcy Code.

5.      "<u>Administrative Expense Claims Bar Date</u>" means the deadline for filing requests for payment of Administrative Expense Claims, which: (a) with respect to Administrative Expense Claims, other than a Professional Fee Claim or a Claim for fees due and payable pursuant to section 1930(a)(6) of title 28 of the United States Code, shall be thirty (30) days after the Effective Date; and (b) with respect to Professional Fee Claims, shall be forty-five (45) days after the Effective Date.

6.      "<u>Allowed</u>" means:

a.      with respect to any Claim that is asserted to constitute an Administrative Expense Claim: (i) a Claim that represents an actual and necessary expense of preserving the Estate or operating the organization of the Debtor, to the extent such Claim is determined by the Debtor to constitute an Administrative Expense; (ii) other than with respect to a Professional Fee Claim, a Claim that is Disputed by the Debtor, which Claim is allowed in whole or in part by a Final Order of the Bankruptcy Court to the extent that such allowed portion is determined by a Final Order to constitute a cost or expense of administration under sections 503(b) and 507(a)(1) of the Bankruptcy Code; or (iii) a Professional Fee Claim, to the extent allowed by a Final Order of the Bankruptcy Court.

b.      with respect to any Priority Tax Claim, Priority Claim, Secured Claim, Contested Abuse Claim or General Unsecured Claim, or any portion of any of the foregoing, a Claim that is: (i) not listed in the Schedules as disputed, contingent or unliquidated and with respect to which no contrary or superseding Proof of Claim has been filed, and that has not been paid pursuant to an order of this Court prior to the Effective Date; (ii) evidenced by a Proof of Claim filed on or before the applicable Bar Date and is not listed in the Schedules as disputed, contingent or unliquidated, and as to which no objection

2

has been filed on or before the Claims Objection Deadline; (iii) not the subject of an objection to allowance that (A) was filed on or before the Claims Objection Deadline and (B) has not been settled, waived, withdrawn or denied pursuant to a Final Order; or (iv) is expressly allowed (x) pursuant to a Final Order, (y) (I) pursuant to an agreement between the holder of such Claim and the Debtor or the Reorganized Debtor, as applicable or (II) with respect to a Contested Abuse Claim, pursuant to an agreement between the holder of such Claim and the Litigation Administrator, or (z) pursuant to the terms of the Plan.  For the avoidance of doubt, a Claim evidenced by a Proof of Claim filed after the applicable Bar Date shall not be Allowed for any purposes whatsoever absent entry of a Final Order expressly allowing such late-filed Claim.

c.    with respect to any Settling Abuse Claim, the term "Allowed" shall not apply.

7.    "Arrowood Abuse Claim" means an Abuse Claim where any Abuse is alleged to have occurred before October 1, 1976.  For purposes of the foregoing, if the Abuse Claim includes any Abuse that is alleged to have occurred before October 1, 1976 and on or after October 1, 1976, the Abuse Claim shall be considered an Arrowood Abuse Claim.

8.    "Arrowood Settlement Trust" means the trust organized under the laws of the state of New York and established under Article IV for the purposes set forth therein, including assuming liability for all Arrowood Abuse Claims, holding and administering the relevant Trust Assets, liquidating the Arrowood Abuse Claims, and making Trust Distributions to holders of Arrowood Abuse Claims from the relevant Trust Assets.

9.    "Arrowood Settlement Trustee" means the individual to be identified in the Plan Supplement, who shall be appointed by the Bankruptcy Court, and who shall act as the initial trustee of the Arrowood Settlement Trust pursuant to the terms of the Trust Documents, and any successor trustee appointed in accordance with the Arrowood Settlement Trust Agreement.

10.    "Arrowood Settlement Trust Agreement" means the agreement between the Debtor and the Arrowood Settlement Trustee governing the Arrowood Settlement Trust, dated as of the Effective Date, to be filed with the Plan Supplement.

11.    "Arrowood Settlement Trust Share" means, with respect to the Arrowood Settlement Trust, as of the Effective Date, the quotient of (a) the number of Abuse Claims (excluding Indirect Abuse Claims) with rights against the Arrowood Settlement Trust, divided by (b) the sum of (i) the number of Abuse Claims (excluding Indirect Abuse Claims) with rights against the Arrowood Settlement Trust plus (ii) the number of Abuse Claims (excluding Indirect Abuse Claims) with rights against the General Settlement Trust.  For purposes of the foregoing, (a) Arrowood Abuse Claims shall have rights against the Arrowood Settlement Trust, and (b) London and Ecclesia Abuse Claims shall have rights against the General Settlement Trust.

3

12.     "Arrowood Settlement Trust Termination Date" means the date on which the Arrowood Settlement Trust is terminated as determined pursuant to the terms of the Arrowood Settlement Trust Agreement.

13.     "Bankruptcy Code" means title 11 of the United States Code, as now in effect or hereafter amended, as applicable to this Chapter 11 Case.

14.     "Bankruptcy Court" means the United States Bankruptcy Court for the Southern District of New York or such other court having jurisdiction over the Chapter 11 Case.

15.     "Bankruptcy Rules" means, collectively, the Federal Rules of Bankruptcy Procedure and the local rules of the Bankruptcy Court, as now in effect or hereafter amended.

16.     "Bar Date" means, as to a particular Claim, the deadline for filing a Proof of Claim as to such Claim, as established by the Bar Date Order.

17.     "Bar Date Order" means, collectively, (a) that certain *Order Establishing Deadlines for Filing Proofs of Claim and Approving the Form and Manner and Notice Thereof* (Docket No. 333), as thereafter amended, (b) that certain *Order Establishing a Supplemental Deadline for Filing Certain Proofs of Claim and Approving the Form and Manner of Notice Thereof* (Docket No. 1262), and (c) any other Final Orders of the Bankruptcy Court establishing deadlines for the filing of Proofs of Claim and other claims filing procedures and requirements.

18.     "Business Day" means any day, other than a Saturday, Sunday or "legal holiday" as such term is defined in Bankruptcy Rule 9006(a).

19.     "Cause of Action" means any action, class action, Claim, cross-claim, third-party claim, cause of action, controversy, demand, right, Lien, indemnity, contribution, guaranty, suit, obligation, liability, debt, damage, judgment, account, defense, remedy, offset, power, privilege, license, and franchise of any kind or character whatsoever, known or unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, foreseen or unforeseen, direct or indirect, choate or inchoate, secured or unsecured, assertable directly or derivatively (including under alter ego theories), whether arising before, on, or after the Petition Date, in contract or in tort, at law or in equity, or pursuant to any other theory of law. Causes of Action also include: (a) all rights of setoff, counterclaim, or recoupment and any Claim for breach of contract or for breaches of duties imposed by law or in equity; (b) the right to object to or otherwise contest Claims; (c) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (d) any claim under any local, state, federal or foreign law, including any fraudulent transfer or similar claim.  For the avoidance of doubt, Causes of Action also includes any Claim under Chapter 5 of the Bankruptcy Code or under similar or related local, state, federal, or foreign statutes or common law, including preference, fraudulent transfer and conveyance laws or other voidable transfer laws.

20.     "Channeling Injunction" means the permanent injunction provided for in Article XI.D with respect to Abuse Claims to be issued pursuant to the Confirmation Order.

4

21.      "Chapter 11 Case" means the case filed by the Debtor under chapter 11 of the Bankruptcy Code.

22.      "Claims Objection Deadline" means the deadline for filing an objection to any Claim, including any Claim for damages arising from or relating to the Debtor's rejection of any Executory Contract or Unexpired Lease, which deadline shall be 180 days after the Effective Date, subject to any extensions approved by an order of the Bankruptcy Court; provided, however, that the Claims Objection Deadline shall not apply to any Claim filed after the applicable Bar Date; provided further, however, that the Claims Objection Deadline shall not apply to Settling Abuse Claims, which shall be administered on a timeline determined by each of the Trustees, in consultation with the Future Claimants' Representative and the Trust Advisory Committee, subject to Bankruptcy Court approval.

23.      "Class" means each category of holders of Claims as set forth in Article III pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.

24.      "Compensation and Benefits Programs" means all employment agreements and policies, and all employment, compensation, and benefit plans, policies, savings plans, retirement plans, deferred compensation plans, supplemental executive retirement plans, healthcare plans, disability plans, severance benefit agreements, plans or policies, incentive plans, life and accidental death and dismemberment insurance plans, and programs of the Debtor, and all amendments and modifications thereto, applicable to the Debtor's employees, former employees, retirees, and non-employee directors.

25.      "Confirmation Date" means, subject to the occurrence of the conditions in Article X.A hereof, the date on which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Case within the meaning of Bankruptcy Rules 5003 and 9021.

26.      "Confirmation Hearing" means the hearing(s) held by the Bankruptcy Court under section 1128 of the Bankruptcy Code at which the Debtor seek entry of the Confirmation Order.

27.      "Confirmation Order" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

28.      "Contested Abuse Claim" means each Abuse Claim on account of which (a) the holder has elected on his, her or its Ballot (as defined by the Voting Procedures) to be treated as a Contested Abuse Claim, (b) the Debtor has filed an objection to such Abuse Claim prior to February 22, 2024, that has not been withdrawn or settled prior to the Voting Deadline, (c) any Abuse Claim filed against a Covered Party when the holder of such Abuse Claim has not timely filed, or does not have, an Abuse Proof of Claim against the Debtor, or (d) any Indirect Abuse Claim.

29.      "Contested Claim Subfund" means, with respect to each of the Arrowood Settlement Trust and the General Settlement Trust, a subfund created for the benefit of Contested Abuse Claims with rights against such Trust. For purposes of the foregoing, (a) Arrowood Abuse

Claims shall have rights against the Arrowood Settlement Trust, and (b) London and Ecclesia Abuse Claims shall have rights against the General Settlement Trust.

30.      "Contested Claim Subfund Share" means, with respect to each of the Arrowood Settlement Trust and the General Settlement Trust, as of the Effective Date, the quotient of (a) the number of Contested Abuse Claims (excluding Indirect Abuse Claims) with rights against such trust, divided by (b) the sum of (i) the number of Settling Abuse Claims (excluding Indirect Abuse Claims) with rights against such trust plus (ii) the number of Contested Abuse Claims (excluding Indirect Abuse Claims) with rights against such trust.  For purposes of the foregoing, (a) Arrowood Abuse Claims shall have rights against the Arrowood Settlement Trust, and (b) London and Ecclesia Abuse Claims shall have rights against the General Settlement Trust.

31.      "Convenience Claim" means any Claim that would otherwise be a General Unsecured Claim that is Allowed in an amount of $30,000 or less; provided that a holder of a General Unsecured Claim that is Allowed in an amount greater than $30,000 may irrevocably elect, as evidenced on the Ballot (as defined in the Voting Procedures) timely and validly submitted by such holder (or other writing acceptable to the Debtors), to have such Claim irrevocably reduced to $30,000 and treated as a Convenience Claim (upon Allowance) for purposes of the Plan, in full and final satisfaction of such Claim; provided further that a General Unsecured Claim may not be subdivided into multiple Convenience Claims.

32.      "Coverage Adversary Case" means any and all adversary cases commenced by the Debtor against an Insurer, including, without limitation, the following cases (1) pending in the United States Bankruptcy Court for the Southern District of New York: Adv. Pro. Case No. 20-01227 (MG), and (2) pending in the United States District Court for the Southern District of New York: (a) Case No. 20-CV-11011 (JLR); (b) Case No. 21-CV-71 (JPC); (c) Case No. 21-CV-7706 (AKH); and (d) Case No. 21-CV-9304 (JLR).

33.      "Covered Party" means, collectively, the following Entities: (a) the Debtor and the Reorganized Debtor, as applicable; (b) the Parishes; (c) any other Co-Insured Party; (d) all Settling Insurers, (e) the Settling IAC Affiliates, (f) such other Entity that is a co-defendant in a CVA Action that becomes a Covered Party pursuant to Article V.S of the Plan, and (g) with respect to each of the foregoing Entities in clauses (a) through (f), such Entities' predecessors, successors, assigns, subsidiaries, affiliates, current and former officers, directors, principals, equity holders, trustees, members, partners, managers, officials, advisory board members, advisory committee members, employees, agents, volunteers, attorneys, financial advisors, accountants, investment bankers, consultants, representatives, and other professionals, and such Entities' respective heirs, executors, Estate, and nominees, including Parish schools and regional schools, as applicable; provided, however, that any perpetrator of Abuse that forms the basis for an Abuse Claim that is an individual is not and shall not be a Covered Party.

34.      "Co-Insured Claim" means any Indirect Abuse Claim by a Co-Insured Party against an Insurer and any and all rights a Co-Insured Party may have with respect to an Insurance Policy issued by an Insurer.

35.      "Co-Insured Party" means Parishes, Catholic Charities of Long Island, Catholic Youth Organization, Department of Education of the Diocese of Rockville Centre, Holy

Trinity Diocesan High School, St. John the Baptist Diocesan High School, The Seminary of the Immaculate Conception of the Diocese of Rockville Centre, Catholic Cemeteries of the Roman Catholic Diocese of Rockville Centre, Inc., and the Diocese of Rockville Centre Catholic Cemetery Permanent Maintenance Trust.

36.     "Co-Insured Party Cash Contribution" means $133.6 million, payable in accordance with the Plan and the Trust Asset Payment Schedule.

37.     "Co-Insured Party Contribution" means, collectively, (a) the Insurance Rights Transfer, and (b) the Co-Insured Party Cash Contribution.

38.     "Cure Amount" means all amounts, including an amount of $0.00, required to cure any monetary default under any Executory Contract or Unexpired Lease (or such lesser amount as may be agreed upon by the non-Debtor party to an Executory Contract or Unexpired Lease) that is to be assumed by the Debtor pursuant to sections 365 or 1123 of the Bankruptcy Code.

39.     "CVA Actions" means the "CVA Actions" (as defined in the *Stipulation and Order Pursuant to 11 U.S.C. § 105(a) Staying Continued Prosecution of Certain Lawsuits* [Adv. Pro. Docket No. 59], as amended).

40.     "D&O Liability Insurance Policies" means all directors and officers/executive liability insurance policies (including extension of coverage of any policy beyond the end of the policy period) issued to or providing insurance coverage at any time to any of the Debtors' directors, officers, managers or authorized agents, in their respective capacities as such, for alleged Wrongful Acts (as defined in such policies) or similar triggering acts, and all agreements, documents or instruments relating thereto.

41.     "Disallowed" means, as to any Administrative Expense Claim, Priority Tax Claim, Priority Claim, Secured Claim, Contested Abuse Claim, or General Unsecured Claim, any such Claim (or portion thereof) that has been disallowed, denied, dismissed, or overruled pursuant to the Plan or a Final Order of the Bankruptcy Court or any other court of competent jurisdiction. "Disallowance" and "Disallowing" shall have correlative meanings. With respect to any Settling Abuse Claim, the term "Disallowed" shall not apply.

42.     "Disbursing Agent" means the Reorganized Debtor or each of the Trustees, or their respective designees.

43.     "Disclosure Statement" means the disclosure statement for the Plan, including all exhibits and schedules thereto, as the same may be amended, supplemented or otherwise modified from time to time, as approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code.

44.     "Disclosure Statement Order" means one or more orders entered by the Bankruptcy Court (a) finding that the Disclosure Statement (including any amendment, supplement, or modification thereto) contains adequate information pursuant to section 1125 of the Bankruptcy Code; and (b) authorizing solicitation of the Plan.

7

45.     "<u>Disputed</u>" means, as to any Administrative Expense Claim, Priority Tax Claim, Priority Claim, Secured Claim, Contested Abuse Claim, or General Unsecured Claim, any such Claim (or portion thereof) (a) that is neither an Allowed Claim nor a Disallowed Claim, (b) that is listed on the Schedules as "disputed," or (c) for which a Proof of Claim has been timely filed or a written request for payment has been made to the extent that any party in interest has interposed a timely objection, motion to estimate or challenge to such Claim, which objection, motion to estimate or challenge has not been withdrawn or determined pursuant to a Final Order.

46.     "<u>Distribution Record Date</u>" means the record date for purposes of making Plan Distributions on account of Allowed Claims, which date shall be the Effective Date; provided, however, the Distribution Record Date shall not pertain to Abuse Claims, which shall be governed by the Trust Documents in all respects.

47.     "<u>DRVC Trust Contributions</u>" means (a) the Debtor's portion of the Insurance Rights Transfer, and (b) (I) $32.9 million plus (II) unrestricted cash at the Effective Date less $16 million, less (III) the sum of (i) the aggregate amount of all unpaid Allowed Administrative Expenses, Allowed Priority Tax Claims, Allowed Priority Claims, Allowed Convenience Class Claims, and Allowed Secured Claims, (ii) the GUC Plan Distribution, and (iii) the Cure Amounts.

48.     "<u>Ecclesia</u>" means Ecclesia Assurance Company.

49.     "<u>Ecclesia Contribution</u>" means a contribution by Ecclesia in the amount of $15,000,000 to the Trust Assets.

50.     "<u>Ecclesia Settlement</u>" means the settlement, compromise, transfers and treatment provided in Article V.O.

51.     "<u>Effective Date</u>" means, and shall occur on, the Business Day on which each of the conditions precedent to the effectiveness of the Plan set forth in Article X.B has been satisfied or waived in accordance with the terms thereof.

52.     "<u>Encumbrance</u>" means, with respect to any property (whether real or personal, tangible or intangible), any mortgage, Lien, pledge, charge, security interest, assignment, or encumbrance of any kind or nature in respect of such property, including any conditional sale or other title retention agreement, any security agreement, and the filing of, or agreement to give, any financing statement under the Uniform Commercial Code or comparable law of any jurisdiction, to secure payment of a debt or performance of an obligation.

53.     "<u>Estate</u>" means the estate created under section 541 of the Bankruptcy Code upon the commencement of the Chapter 11 Case.

54.     "<u>Exculpated Parties</u>" means, collectively, the following Entities, in each case in its or their capacity as such: (a) the Debtor; (b) [reserved]; (c) the Future Claims Representative; (d) any mediator or special mediator appointed in the Chapter 11 Case; (e) each member of the Official Committee; and (f) with respect to the foregoing Entities in clauses (a) through (d), such Entities' current and former affiliates, and such Entities' current and former

8

affiliates' current and former subsidiaries, officers, directors, managers, principals, trustees, members, partners, employees, volunteers, agents, advisors, advisory board members, advisory committee members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives and other professionals.

55.    "<u>Executory Contract</u>" means any executory contract to which the Debtor is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

56.    "<u>Exit Facility</u>" means a new loan facility, if any, to be provided by the Exit Facility Lender to the Reorganized Debtor on the Effective Date.

57.    "<u>Exit Facility Documents</u>" means, collectively, the Exit Facility Loan Agreement, and all other agreements, documents, and instruments implementing, evidencing or securing the Exit Facility, to be delivered or entered into in connection therewith (including any guarantee agreements, pledge and collateral agreements, special purpose vehicle agreements, asset transfer agreements, intercreditor agreements, subordination agreements, fee letters, and other security documents).

58.    "<u>Exit Facility Loan Agreement</u>" means that loan agreement in respect of the Exit Facility to be entered into by the Reorganized Debtor, as borrower, and the Exit Facility Lender on the Effective Date.

59.    "<u>Exit Facility Lender</u>" means [●] as lender party to the Exit Facility Loan Agreement.

60.    "<u>Final Order</u>" means an order or judgment of the Bankruptcy Court (or other court of competent jurisdiction) that has not been reversed, vacated or stayed and as to which (a) the time to appeal, petition for *certiorari* or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for *certiorari* or other proceedings for a new trial, reargument or rehearing shall then be pending, or (b) if an appeal, writ of *certiorari*, new trial, reargument or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court (or other court of competent jurisdiction) shall have been affirmed by the highest court to which such order was appealed, or *certiorari* shall have been denied or a new trial, reargument or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for *certiorari* or move for a new trial, reargument or rehearing shall have expired; <u>provided</u>, <u>however</u>, that the possibility that a motion pursuant to section 502(j) or 1144 of the Bankruptcy Code or under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed with respect to such order shall not cause such order to not be a Final Order.

61.    "<u>Future Abuse Claim</u>" means an Abuse Claim held by a Future Claimant (as defined in the Order Appointing a Legal Representative for Future Claimants (Docket No. 799)).

62.    "<u>Future Claim Subfund</u>" means a subfund created pursuant to the General Settlement Trust Agreement for the benefit of Future Abuse Claims.

9

63.    "Future Claimants' Representative" means Robert E. Gerber, the legal representative to be appointed by the Bankruptcy Court pursuant to the *Order Appointing a Legal Representative for Future Claimants* (Docket No. 799), any successor legal representative appointed by the Bankruptcy Court, or, on and after the Effective Date, any successor legal representative appointed in accordance with the General Settlement Trust Agreement.

64.    "Future Claimant Settlement Election" means the exercise by the Future Claimants' Representative of its entitlement to elect by written notice filed on the docket on or prior to the Voting Deadline that all, but not less than all, of holders of Future Abuse Claims be treated as holders of Settling Abuse Claims, as contemplated by Article III.C.2.

65.    "General Settlement Trust" means a trust created pursuant to the General Trust Agreement for the benefit of London and Ecclesia Abuse Claims.

66.    "General Settlement Trustee" means the individual to be identified in the Plan Supplement, who shall be appointed by the Bankruptcy Court, and who shall act as the initial trustee of the General Settlement Trust pursuant to the terms of the Trust Documents, and any successor trustee appointed in accordance with the General Settlement Trust Agreement.

67.    "General Settlement Trust Agreement" means the trust organized under the laws of the state of New York and established under Article IV for the purposes set forth therein, including assuming liability for all London and Ecclesia Abuse Claims, holding and administering the relevant Trust Assets, liquidating the London and Ecclesia Abuse Claims, and making Trust Distributions to holders of London and Ecclesia Abuse Claims from the relevant Trust Assets.

68.    "General Settlement Trust Share" means, with respect to the General Settlement Trust, as of the Effective Date, the quotient of (a) the number of Abuse Claims (excluding Indirect Abuse Claims) with rights against the General Settlement Trust, divided by (b) the sum of (i) the number of Abuse Claims (excluding Indirect Abuse Claims) with rights against the General Settlement Trust plus (ii) the number of Abuse Claims (excluding Indirect Abuse Claims) with rights against the Arrowood Settlement Trust.  For purposes of the foregoing, (a) Arrowood Abuse Claims shall have rights against the Arrowood Settlement Trust, and (b) London and Ecclesia Abuse Claims shall have rights against the General Settlement Trust.

69.    "General Settlement Trust Termination Date" means the date on which the General Settlement Trust is terminated as determined pursuant to the terms of the General Settlement Trust Agreement.

70.    "General Unsecured Claim" means any Claim against the Debtor that is not an Administrative Expense Claim, a Priority Tax Claim, a Priority Claim, a Secured Claim, a Lay Pension Claim, a Priest Pension Claim, a Convenience Claim or an Abuse Claim.

71.    "Gift Annuity Agreement" means a "Gift Annuity agreement" (as defined in the *Order (I) Authorizing the Debtor to Continue Its Gift Annuity Program and Pay and Honor Obligations Related Thereto and (II) Granting Related Relief* (Docket No. 254)).

20-12345-mg    Doc 2928    Filed 02/16/24    Entered 02/16/24 14:19:10    Main Document
Pg 131 of 298

72.    "GUC Plan Distribution" means $4.0 million, less amounts paid on account of Convenience Claims.

73.    "IAC Claims" means any and all actions for which the Official Committee has been granted standing pursuant to the *Joint Stipulation And Order Concerning The Independent Advisory Committee And The Investigation And Pursuit Of Certain Claims* (Docket No. 512).

74.    "Impaired" means "impaired" within the meaning of section 1124 of the Bankruptcy Code. "Impair" and "impairment" shall have correlative meanings.

75.    "Indemnification Obligations" means the Debtor's indemnification obligations in place as of the Effective Date, whether in the bylaws, limited liability company agreements, or other organizational or formation documents, board resolutions, management or indemnification agreements, employment or other contracts, or otherwise, for the past and present directors, officers, employees, attorneys, accountants, investment bankers, and other professionals and agents who provided services to the Debtor before, on, or after the Petition Date.

76.    "Indirect Abuse Claim" means any Claim for contribution, indemnity, reimbursement, or subrogation, whether contractual or implied by law (as those terms are defined by the applicable non-bankruptcy law of the relevant jurisdiction) that is attributable to, arises from, is based upon, relates to, or results from, an Abuse Claim, and any other derivative or indirect Abuse Claim of any kind whatsoever, whether in the nature of or sounding in contract, tort, warranty or any other theory of law or equity whatsoever.

77.    "Insurance Action" means any claim, cause of action, or right of the Debtor or any Covered Party, under the laws of any jurisdiction, against any Insurer, arising from or related to: (a) the refusal of any Insurer to compromise and settle any Abuse Claim under or pursuant to any Insurance Policy; (b) the interpretation or enforcement of the terms of any Insurance Policy with respect to any Abuse Claim; (c) any conduct of any Insurer constituting "bad faith" or other wrongful conduct under applicable law; or (d) any Coverage Adversary Case.

78.    "Insurance Policy" means any insurance policy or other agreement for the provision of insurance in effect at any time before the Effective Date naming any of the Debtor as an insured or otherwise affording the Debtor rights, benefits, indemnity or insurance coverage upon which any claim has been or may be made with respect to any Abuse Claim. Notwithstanding the foregoing, "Insurance Policy" shall not include any D&O Liability Insurance Policies. For the avoidance of doubt, the term "Insurance Policy" shall, include, without limitation, those insurance policies listed on Exhibit C.

79.    "Insurance Proceeds" means any proceeds available or capable of being recovered under any Insurance Policy with respect to Abuse Claims by Covered Parties that have Insurance Rights to any Insurance Policy, including, without limitation, any defense costs incurred by the Covered Parties.

80.    "Insurance Rights" means any and all rights, titles, privileges, interests, claims, demands, or entitlements of Covered Parties that are the subject of the Insurance Rights

11

Transfer of any Insurance Proceeds, payments, benefits, Causes of Action, choses in action, defenses or indemnities arising under or attributable to any and all Insurance Policies, now existing or hereafter arising, accrued or unaccrued, liquidated or unliquidated, matured or unmatured, disputed or undisputed, fixed or contingent, with respect to Abuse Claims. Insurance Rights shall include Insurance Actions.

81.    "Insurance Rights Transfer" means the transfer, assignment, and vesting of Insurance Rights described in Article IV.G.

82.    "Insured Non-Abuse Claim" means any Claim or portion of a Claim that is not an Abuse Claim and is or is asserted to be insured under any insurance policy (including any Insurance Policy) that benefits the Debtor.

83.    "Insurer" means any insurance company or other Entity that has issued any Insurance Policy, or any such company's or Entity's successors or assign (including any liquidator, liquidation bureau, guaranty association, or security fund). For the avoidance of doubt, the term "Insurer" shall, include, without limitation, those Entities listed on Exhibit D.

84.    "Insurer Coverage Defense" means all rights and defenses at law or in equity that any Insurer may have under any Insurance Policy or applicable law to a claim seeking insurance coverage relating to an Abuse Claim.

85.    "Lay Pension Claim" means any Claim against the Debtor arising under the Lay Pension Plan.

86.    "Lay Pension Plan" means the Diocese of Rockville Centre Lay Pension Plan, a noncontributory defined benefit plan, adopted and generally effective January 1, 2003, as thereafter amended.

87.    "Litigation Administrator" means the Reorganized Debtor or its designee, who shall act as the initial litigation administrator of the applicable Trust pursuant to the terms of the Trust Documents, and any successor administrator appointed in accordance with the Trust Documents.

88.    "London and Ecclesia Abuse Claim" means an Abuse Claim where the Abuse is only alleged to have occurred on or after October 1, 1976. For purposes of the foregoing, if the Abuse Claim includes any Abuse that is alleged to have occurred before October 1, 1976 and on or after October 1, 1976, the Abuse Claim shall be considered an Arrowood Abuse Claim.

89.    "Minimum Consideration Payments" means those amounts paid on the Effective Date or that may be paid thereafter pursuant to Article VII.B hereof to holders of Abuse Claims.

90.    "Ministry Members" means "Ministry Members" (as defined in the *Final Order Authorizing The Debtor To Continue Its Insurance Programs And Pay Related Obligations* (Docket No. 165)).

12

91.    "Official Committee" means any official committee of holders of Claims appointed by the Office of the United States Trustee for the Southern District of New York in the Chapter 11 Case under section 1102(a) of the Bankruptcy Code which official committee's constituents include, in whole or in part, holders of Abuse Claims.

92.    "Parish" means each Entity listed on Exhibit A.

93.    "Petition Date" means October 1, 2020.

94.    "Plan" means this plan of reorganization under chapter 11 of the Bankruptcy Code, including the Plan Supplement and any other supplements and any schedules, exhibits or annexes hereto, either in its present form or as it may be altered, amended, modified, or supplemented from time to time in accordance with the Bankruptcy Code and the Bankruptcy Rules.

95.    "Plan Distribution" means a payment or distribution to holders of Allowed Claims or other eligible Entity under the Plan. Plan Distributions shall not include distributions to holders of Abuse Claims, which the Trustees shall make in accordance with the applicable Trust Documents.

96.    "Plan Documents" means, collectively, (a) the Plan; (b) the Disclosure Statement; (c) the Disclosure Statement Order; (d) each of the documents comprising the Plan Supplement; (e) the Confirmation Order; (f) the Arrowood Settlement Trust Agreement and General Settlement Trust Agreement; (g) the Trust Distribution Procedures; and (h) any other document necessary to implement the Plan.

97.    "Plan Supplement" means the compilation of documents and forms of documents, agreements, schedules, exhibits, and annexes to the Plan, which the Debtor shall file no later than seven (7) days before the deadline established by the Bankruptcy Court for filing objections to confirmation or such later date as may be approved by the Bankruptcy Court on notice to parties in interest, including the following: (a) the Arrowood Settlement Trust Agreement and General Settlement Trust Agreement, (b) the identity of the initial Trustees, (c) the initial members of the Trust Advisory Committee, (d) the Trust Distribution Procedures, and (e) the Rejected Contracts Schedule.

98.    "Priest Pension Claim" means any Claim against the Debtor arising under the Priest Pension Plan.

99.    "Priest Pension Plan" means the Diocese of Rockville Centre Qualified Retirement Plan for Diocesan Priests, a noncontributory defined benefit plan, established effective January 1, 2004, as thereafter amended.

100.    "Priority Claim" means any Claim against the Debtor that is entitled to priority in right of payment under section 507(a) of the Bankruptcy Code, other than an Administrative Expense Claim or a Priority Tax Claim.

101.    "Priority Tax Claim" means any Claim of a Governmental Unit against the Debtor that is entitled to priority in payment under section 507(a)(8) of the Bankruptcy Code.

102.    "Pro Rata" means the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims in that Class.

103.    "Professional" means any Entity retained by the Debtor or a statutory committee, if any, pursuant to a Final Order of the Bankruptcy Court entered under sections 327, 328, 363 and/or 1103 of the Bankruptcy Code.

104.    "Professional Fee Claim" means any Claim of a Professional for allowance and award by the Bankruptcy Court of compensation for services rendered and/or reimbursement of costs or expenses incurred in the Chapter 11 Case for the period from the Petition Date to and including the Effective Date under sections 328, 330, 331 and/or 503(b) of the Bankruptcy Code.

105.    "PSIP Insurance Obligations" means "Insurance Obligations" (as defined in the *Final Order Authorizing The Debtor To Continue Its Insurance Programs And Pay Related Obligations* (Docket No. 165)).  For the avoidance of doubt, PSIP Insurance Obligations shall not include any Claim that is an Abuse Claim.

106.    "PSZJ Fee Discount" means the fee rebate promised by the law firm of Pachulski Stang Ziehl & Jones LLP in the *The Official Committee Of Unsecured Creditors' Application To Retain And Employ  Pachulski Stang Ziehl & Jones LLP As Counsel Effective As Of October 16, 2020* (Docket No. 133), together with interest at the rate set forth in NY CPLR 5004, in each case, accruing from the date payment was received by Pachulski Stang Ziehl & Jones LLP on account of fees invoiced to the Estate until the date such amounts were deposited in Pachulski Stang Ziehl & Jones LLP's IOLTA account.

107.    "Rejected Contracts Schedule" means the schedule of Executory Contracts and Unexpired Leases to be rejected by the Debtor under the Plan, which schedule shall be included in the Plan Supplement.

108.    "Rejection Damages Claim" means a Claim for damages alleged to arise from the rejection of an Executory Contract or Unexpired Lease pursuant to section 365 of the Bankruptcy Code.

109.    "Reorganized Debtor" means the Debtor, as reorganized pursuant to and under the Plan, or any successor thereto by merger, consolidation, conversion or otherwise, on or after the Effective Date, after giving effect to the transactions implementing the Plan.

110.    "Schedules" means the schedules of assets and liabilities and the statement of financial affairs filed by the Debtor with the Bankruptcy Court pursuant to sections 521 and 1106(a)(2) of the Bankruptcy Code and Bankruptcy Rule 1007, as such schedules and statements may be amended or supplemented from time to time prior to the Effective Date.

111.    "Secured" means, with respect to any Claim, a Claim to the extent (a) secured by a Lien on property of the Debtor's Estate (i) as set forth in the Plan, (ii) as agreed to by

14

the holder of such Claim and the Debtor, or (iii) as determined by a Final Order in accordance with section 506(a) of the Bankruptcy Code or (b) subject to any setoff right of the holder of such Claim under section 553 of the Bankruptcy Code, but, with respect to both of the foregoing clauses (a) and (b), only to the extent of the value of the interest of such holder in the Estate's interest in the property securing such Claim or the amount subject to setoff, as applicable.

112.    "Seminary Contribution" means the Settlement Amount (as defined in the *Order Approving Settlement Agreement And Release Between The Seminary Of The Immaculate Conception Of The Diocese Of Rockville Centre, The Official Committee Of Unsecured Creditors, And The Roman Catholic Diocese Of Rockville Centre, New York* (Docket No. 2612).

113.    "Settlement Contributions" means (i) any consideration provided by a Settling Insurer pursuant to a settlement, sale or other transaction with the Debtor, the Estate, or any successor thereto, that is approved pursuant to the Confirmation Order or separate order of the Bankruptcy Court, including any settlement, compromise, buyback or similar agreement concerning an Insurance Policy, (ii) the Co-Insured Party Contribution, (iii) the Seminary Contribution, and (iv) any Additional Covered Party Substantial Contribution.

114.    "Settling Abuse Claim" means an Abuse Claim that is not a Contested Abuse Claim.

115.    "Settling Claim Subfund" means, with respect to each of the Arrowood Settlement Trust and the General Settlement Trust, a subfund created for the benefit of Settling Abuse Claims with rights against such Trust.  For purposes of the foregoing, (a) Arrowood Abuse Claims shall have rights against the Arrowood Settlement Trust, and (b) London and Ecclesia Abuse Claims shall have rights against the General Settlement Trust.

116.    "Settling Claim Subfund Share" means, with respect to each of the Arrowood Settlement Trust and the General Settlement Trust, as of the Effective Date, the quotient of (a) the number of Settling Abuse Claims (excluding Indirect Abuse Claims) with rights against such trust, divided by (b) the sum of (i) the number of Settling Abuse Claims (excluding Indirect Abuse Claims) with rights against such trust plus (ii) the number of Contested Abuse Claims (excluding Indirect Abuse Claims) with rights against such trust.  For purposes of the foregoing, (a) Arrowood Abuse Claims shall have rights against the Arrowood Settlement Trust, and (b) London and Ecclesia Abuse Claims shall have rights against the General Settlement Trust.

117.    "Settling IAC Affiliate" means each Affiliate (as defined in the *Joint Stipulation And Order Concerning The Independent Advisory Committee And The Investigation And Pursuit Of Certain Claims* (Docket No. 512)) except for The Catholic Foundation of Long Island, Inc.

118.    "Settling Insurer" means (a) Ecclesia and (b) any other Insurer that enters into a settlement, sale or other transaction with the Debtor, the Estate, or any successor thereto, that is approved pursuant to the Confirmation Order or separate order of the Bankruptcy Court, including any settlement, compromise, buyback or similar agreement concerning an Insurance Policy.

15

119.    "Trust" shall mean each of the Arrowood Settlement Trust and the General Settlement Trust.

120.    "Trustees" shall mean each of the Arrowood Settlement Trustee and the General Settlement Trustee, each acting pursuant to the terms of their respective Trust Documents.

121.    "Trust Advisory Committee" means the Trusts advisory committee established pursuant to the terms of the Plan and the Arrowood Settlement Trust Agreement and General Settlement Trust Agreement. The initial members of the Trust Advisory Committee shall be identified in the Plan Supplement.

122.    "Trust Assets" means, collectively, the DRVC Trust Contributions, the Settlement Contributions (including the Ecclesia Contribution), and the PSZJ Fee Discount, less an amount equal to the aggregate Minimum Consideration Payments.

123.    "Trust Asset Payment Schedule" means, with respect to the Trust Assets, amounts shall be contributed to the Arrowood Settlement Trust and the General Settlement Trust pursuant to the following schedule: (i) the Seminary Contribution and $9 million of the Co-Insured Party Cash Contribution shall be contributed to the Trusts within one year of the Effective Date, (ii) $12.5 million of the Co-Insured Party Cash Contribution shall be contributed to the Trusts within two years of the Effective Date, (iii) $12.5 million of the Co-Insured Party Cash Contribution shall be contributed to the Trusts within three years of the Effective Date and (iv) all other Trust Assets shall be contributed to the Trusts on the Effective Date. With respect to amounts due after the Effective Date, (x) the Debtor and The Seminary of the Immaculate Conception of the Diocese of Rockville Centre shall be jointly and severally liable for the Seminary Contribution, and (y) the Parishes shall be jointly and severally liable for all other amounts due after the Effective Date.

124.    "Trust Distribution" means any initial or periodic payment or transfer of consideration to holders of Abuse Claims made in accordance with the applicable Trust Documents.

125.    "Trust Distribution Procedures" means the Trust Distribution Procedures (as defined and used in each of the Arrowood Settlement Trust Agreement and the General Trust Agreement), to be filed with the Plan Supplement.

126.    "Trust Documents" means, collectively, (a) the Arrowood Settlement Trust Agreement, (b) the General Settlement Trust Agreement, (c) the Trust Distribution Procedures, and (d) any other agreements, instruments and documents governing the establishment and administration of the Trusts, which shall be materially consistent with the terms of the Plan, as the same may be amended or modified from time to time in accordance with the terms thereof.

127.    "Trust Expenses" means (a) any and all costs, expenses, fees, taxes, disbursements, debts, or obligations incurred for the administration of the Trusts, pursuant to the agreement governing each Trust, including indemnification, reimbursement or other obligations in Article IV of the Plan, and (b) all pastoral care obligations, in each case, to be paid by the Arrowood Settlement Trust and the General Settlement Trust as provided therein.

128.    "Unexpired Lease" means a lease to which the Debtor is a party, including any and all pre- and post-petition amendments thereto, that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

129.    "Unimpaired" means any Claim that is not Impaired.

130.    "Voting Agent" means Epiq Corporate Restructuring, LLC, in its capacity as voting agent, and any successor thereto.

131.    "Voting Deadline" means the date by which all Entities entitled to vote on the Plan must vote to accept or reject the Plan.

132.    "Voting Procedures" means those certain procedures that are approved by the Bankruptcy Court for soliciting and tabulating the votes to accept or reject the Plan cast by holders of Claims against the Debtor entitled to vote on the Plan.

133.    "Workers' Compensation Program" means the written contracts, agreements, agreements of indemnity, self-insured bonds, policies, programs, and plans for workers' compensation and workers' compensation insurance issued to or entered into at any time by the Debtor.

B.    Interpretation; Other Capitalized Terms; Rules of Construction.

For purposes of the Plan, unless otherwise provided herein: (1) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, will include both the singular and the plural; (2) unless otherwise provided in the Plan, any reference in the Plan to a contract, instrument, release, or other agreement or document being in a particular form or on particular terms and conditions means that such document will be substantially in such form or substantially on such terms and conditions; (3) any reference in the Plan to an existing document, schedule or exhibit filed or to be filed means such document, schedule or exhibit, as it may have been or may be amended, modified, or supplemented pursuant to the Plan; (4) any reference to an Entity as a holder of a Claim includes that Entity's successors and assigns; (5) unless otherwise stated, all references in the Plan to Articles or Sections are references to Articles or Sections of the Plan, as the same may be amended, waived or modified from time to time in accordance with the terms hereof; (6) the words "herein," "hereof," "hereto," "hereunder" and other words of similar import refer to the Plan as a whole and not to any particular Article, Section, or clause contained in the Plan; (7) the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation and shall be deemed to be followed by the words "without limitation;" (8) subject to the provisions of any contract, certificate of incorporation, by-law, instrument, release, or other agreement or document entered into in connection with the Plan, the rights and obligations arising pursuant to the Plan shall be governed by, and construed and enforced in accordance with the applicable federal law, including the Bankruptcy Code and Bankruptcy Rules; (9) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; (10) any immaterial effectuating provisions may be interpreted by the Reorganized Debtor in such a manner that is consistent with the overall purpose and intent of the Plan all without further notice to or action, order, or approval

17

of the Bankruptcy Court or any other Entity; (11) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; and (12) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply.

> C.    Controlling Document.

In the event of any conflict between the terms and provisions in the Plan (without reference to the Plan Supplement), on the one hand, and the terms and provisions in the Disclosure Statement, the Plan Supplement, any other instrument or document created or executed pursuant to the Plan, or any order (other than the Confirmation Order) referenced in the Plan (or any exhibits, schedules, appendices, supplements, or amendments to any of the foregoing), on the other hand, the Plan (without reference to the Plan Supplement) shall govern and control; provided, however, that in the event of a conflict between Confirmation Order, on the one hand, and any of the other Plan Documents, on the other hand, the Confirmation Order shall govern and control in all respects.

# ARTICLE II

## ADMINISTRATIVE EXPENSE AND PRIORITY CLAIMS

> A.    Administrative Expense Claims.

>> 1.    *Administrative Expense Claims Bar Date.*

Except as provided for herein or in any order of the Bankruptcy Court, and subject to section 503(b)(1)(D) of the Bankruptcy Code, holders of Administrative Expense Claims, other than a Professional Fee Claim or a Claim for fees due and payable pursuant to section 1930(a)(6) of title 28 of the United States Code, must file and serve on the Debtor requests for the payment of such Claims not previously Allowed by a Final Order in accordance with the procedures specified in the Confirmation Order, on or before the Administrative Expense Claims Bar Date, or such Claims shall be automatically Disallowed, forever barred from assertion, and unenforceable against the Debtor or the Reorganized Debtor, the Estate, or their property without the need for any objection by the Reorganized Debtor or further notice to, or action, order, or approval of the Bankruptcy Court, and any such Claims shall be deemed fully satisfied, released, and discharged.

>> 2.    *Administrative Expense Claims Generally.*

Except to the extent that a holder of an Allowed Administrative Expense Claim agrees to less favorable treatment with respect to such Allowed Administrative Expense Claim, each holder of an Allowed Administrative Expense Claim shall receive, on account of and in full and complete settlement, release and discharge of, and in exchange for, such Claim, payment of cash in an amount equal to such Allowed Administrative Expense Claim on or as soon as reasonably practicable after the later of: (a) the Effective Date; (b) the first Business Day after the date that is thirty (30) calendar days after the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim; (c) such other date(s) as such holder and the Debtor or the Reorganized Debtor shall have agreed; or (d) such other date ordered by the Bankruptcy Court;

18

provided, however, that Allowed Administrative Expense Claims that arise in the ordinary course of the Debtor' operations during the Chapter 11 Case may be paid by the Debtor or the Reorganized Debtor in the ordinary course of business and in accordance with the terms and conditions of the particular agreements governing such obligations, course of dealing, course of operations, or customary practice.

3.    *Professional Fee Claims.*

All Professionals or other Entities requesting the final allowance and payment of compensation and/or reimbursement of expenses pursuant to sections 328, 330, 331 and/or 503(b) for services rendered during the period from the Petition Date to and including the Effective Date shall file and serve final applications for allowance and payment of Professional Fee Claims on counsel to the Debtor and the Office of the United States Trustee for the Southern District of New York no later than the first Business Day that is forty-five (45) days after the Effective Date. Objections to any Professional Fee Claim must be filed and served on the Reorganized Debtor and the applicable Professional within twenty-one (21) calendar days after the filing of the final fee application that relates to the Professional Fee Claim (unless otherwise agreed by the Debtor or the Reorganized Debtor, as applicable, and the Professional requesting allowance and payment of a Professional Fee Claim).

Allowed Professional Fee Claims shall be paid in full, in cash, in such amounts as are Allowed by the Bankruptcy Court on or as soon as reasonably practicable after the later of: (a) the date upon which an order relating to any such Allowed Professional Fee Claim is entered; and (b) such other date(s) as the holders of the Allowed Professional Fee Claim and the Debtor or the Reorganized Debtor, as applicable, shall have agreed.

The Reorganized Debtor is authorized to pay compensation for services rendered or reimbursement of expenses incurred by its Professionals after the Effective Date in the ordinary course and without the need for Bankruptcy Court approval.

B.    Priority Tax Claims.

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to less favorable treatment, each holder of an Allowed Priority Tax Claim shall receive on account of and in full and complete settlement, release and discharge of, and in exchange for, such Allowed Priority Tax Claim, at the sole option of the Debtor or the Reorganized Debtor, as applicable:  (1) cash in an amount equal to such Allowed Priority Tax Claim on, or as soon thereafter as is reasonably practicable, the later of (a) the Effective Date, to the extent such Claim is an Allowed Priority Tax Claim on the Effective Date; (b) the first Business Day after the date that is thirty (30) calendar days after the date such Priority Tax Claim becomes an Allowed Priority Tax Claim; and (c) the date such Allowed Priority Tax Claim is due and payable in the ordinary course as such obligation becomes due; provided, however, that the Debtor reserve the right to prepay all or a portion of any such amounts at any time under this option without penalty or premium; or (2) regular installment payments in cash of a total value, as of the Effective Date of the Plan, equal to the Allowed amount of such Claim over a period ending not later than five years after the Petition Date.

## ARTICLE III

## CLASSIFICATION AND TREATMENT OF CLAIMS

A.    <u>Classification of Claims.</u>

1.    *Classification in General.*

A Claim is placed into a particular Class for all purposes, including voting, confirmation, and distribution under the Plan and under sections 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim is placed in a particular Class only to the extent that such Claim is Allowed in that Class (if applicable) and has not been satisfied, released, or otherwise settled prior to the Effective Date.

2.    *Summary of Classification.*

The following table designates the Classes of Claims against the Debtor and specifies which of those Classes are (a) Impaired or Unimpaired by the Plan; (b) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code; or (c) presumed to accept or deemed to reject the Plan. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims have not been classified.

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| 1 | Priority Claims | Unimpaired | Presumed to Accept; Not Entitled to Vote |
| 2 | Secured Claims | Unimpaired | Presumed to Accept; Not Entitled to Vote |
| 3 | General Unsecured Claims | Impaired | Entitled to Vote |
| 4 | Arrowood Abuse Claims | Impaired | Entitled to Vote |
| 5 | London and Ecclesia Abuse Claims | Impaired | Entitled to Vote |
| 6 | Convenience Claims | Impaired | Entitled to Vote |
| 7 | Lay Pension Claims | Unimpaired | Presumed to Accept; Not Entitled to Vote |
| 8 | Priest Pension Claims | Unimpaired | Presumed to Accept; Not Entitled to Vote |

B.    <u>Treatment of Claims.</u>

1.    *Class 1 – Priority Claims.*

a.    <u>Classification</u>: Class 1 consists of all Priority Claims.

b.    <u>Treatment</u>: Except to the extent that a holder of an Allowed Priority Claim agrees to less favorable treatment of such Claim, in exchange for full and final satisfaction of such Allowed Priority Claim, at the sole option of the Reorganized Debtor: (i) each such holder shall receive payment in cash in an amount equal to such Allowed Priority Claim, payable on or as soon as reasonably practicable after the last to occur of (x) the Effective Date, (y) the date on which such Priority Claim becomes an Allowed Priority Claim, and (z) the date on which the holder of such Allowed Priority Claim and the Debtor or Reorganized Debtor, as applicable, shall otherwise agree in writing; or (ii) satisfaction of such Allowed Priority Claim in any other

20

manner that renders the Allowed Priority Claim Unimpaired, including treatment in a manner consistent with section 1124(1) or (2).

c.   <u>Voting</u>: Class 1 is Unimpaired, and each holder of an Priority Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Priority Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to Priority Claims.

2.   *Class 2 – Secured Claims.*

a.   <u>Classification</u>: Class 2 consists of all Secured Claims. To the extent that Secured Claims are Secured by different collateral or different interests in the same collateral, such Claims shall be treated as separate subclasses of Class 2 for purposes of voting to accept or reject the Plan and receiving Plan Distributions under the Plan.

b.   <u>Treatment</u>: Except to the extent that a holder of an Allowed Secured Claim agrees to less favorable treatment of such Claim, in exchange for full and final satisfaction of such Allowed Secured Claim, each holder of an Allowed Secured Claim will receive, at the sole option of the Reorganized Debtor: (i) cash in an amount equal to the Allowed amount of such Claim, including the payment of any interest required to be paid under section 506(b) of the Bankruptcy Code, payable on or as soon as reasonably practicable after the last to occur of (x) the Effective Date, (y) the date on which such Secured Claim becomes an Allowed Secured Claim, and (z) the date on which the holder of such Allowed Secured Claim and the Debtor or Reorganized Debtor, as applicable, shall otherwise agree in writing; (ii) satisfaction of such Secured Claim in any other manner that renders the Allowed Secured Claim Unimpaired, including treatment in a manner consistent with section 1124(1) or (2); or (iii) return of the applicable collateral on the Effective Date or as soon as reasonably practicable thereafter in satisfaction of the Allowed amount of such Secured Claim.

c.   <u>Voting</u>: Class 2 is Unimpaired, and each holder of a Secured Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Secured Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to Secured Claims.

3.   *Class 3 – General Unsecured Claims.*

a.      <u>Classification</u>: Class 3 consists of all General Unsecured Claims.

b.      <u>Treatment</u>: Except to the extent that a holder of an Allowed General Unsecured Claim agrees to less favorable treatment of such Claim, in exchange for full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed General Unsecured Claim, each holder thereof shall, subject to the holder's ability to elect Convenience Claim treatment on account of the Allowed General Unsecured Claim, receive such holder's Pro Rata share of the GUC Plan Distribution.

c.      <u>Voting</u>: Class 3 is Impaired, and each holder of a General Unsecured Claim is entitled to vote to accept or reject the Plan.

4.      *Class 4 – Arrowood Abuse Claims.*

a.      <u>Classification</u>: Class 4 consists of all Arrowood Abuse Claims.

b.      <u>Treatment</u>:  Except to the extent that a holder of an Arrowood Abuse Claim agrees to less favorable treatment of such Claim, in exchange for full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Arrowood Abuse Claim, each holder thereof shall receive (i) if such Claim is a Settling Abuse Claim, such distributions as and to the extent provided in the Trust Documents with respect to the Settling Claim Subfund in the Arrowood Settlement Trust as it pertains to such Class 4.a., or (ii) if such Claim is an Allowed Contested Abuse Claim, such Trust Distributions as and to the extent provided in the Trust Documents with respect to the Contested Claim Subfund in the Arrowood Settlement Trust as it pertains to such Class 4.b.

Each Arrowood Abuse Claim shall be treated as either a Settling Abuse Claim or a Contested Abuse Claim in accordance with Article III.C of the Plan.

c.      <u>Voting</u>: Class 4 is Impaired, and each holder of an Arrowood Abuse Claim is entitled to vote to accept or reject the Plan.

5.      *Class 5 – London and Ecclesia Abuse Claims*

a.      <u>Classification</u>: Class 5 consists of all London and Ecclesia Abuse Claims.

b.      <u>Treatment</u>:  Except to the extent that a holder of a London and Ecclesia Abuse Claim agrees to less favorable treatment of such Claim, in exchange for full and final satisfaction, settlement, release, and discharge of, and in exchange for, each London and Ecclesia

22

Abuse Claim, each holder thereof shall receive (i) if such Claim is a Settling Abuse Claim, such distributions as and to the extent provided in the Trust Documents with respect to the Settling Claim Subfund in the General Settlement Trust as it pertains to such Class 5.a., or (ii) if such Claim is an Allowed Contested Abuse Claim, such Trust Distributions as and to the extent provided in the Trust Documents with respect to the Contested Claim Subfund in the General Settlement Trust as it pertains to such Class 5.b.

Each London and Ecclesia Abuse Claim shall be treated as either a Settling Abuse Claim or a Contested Abuse Claim in accordance with Article III.C of the Plan.

c.    <u>Voting</u>:  Class 5 is Impaired, and each holder of a London and Ecclesia Abuse Claim is entitled to vote to accept or reject the Plan.

6.    *Class 6 – Convenience Claim*

a.    <u>Classification</u>: Class 6 consists of all Convenience Claims.

b.    <u>Treatment</u>:  In exchange for full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Convenience Claim, each holder thereof shall receive cash in an amount equal to 100% of such holder's Allowed Convenience Claim.

c.    <u>Voting</u>:  Class 6 is Impaired, and each holder of a Convenience Claim is entitled to vote to accept or reject the Plan.

7.    *Class 7 – Lay Pension Claims.*

a.    <u>Classification</u>: Class 7 consists of all Lay Pension Claims.

b.    <u>Treatment</u>:  The Debtor will assume its participation in the Lay Pension Plan, and will continue to meet its obligations under the Lay Pension Plan as they become due. The Debtor will not make any payment with respect to any Lay Pension Claim filed in this Chapter 11 Case.

c.    <u>Voting</u>: Class 7 is Unimpaired, and each holder of a Lay Pension Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Lay Pension Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to Lay Pension Claims.

8.    *Class 8 – Priest Pension Claims.*

23

    a.    <u>Classification</u>: Class 8 consists of all Priest Pension Claims.

    b.    <u>Treatment</u>:  The Debtor will assume its participation in the Priest Pension Plan, and will continue to meet its obligations under the Priest Pension Plan as they become due. The Debtor will not make any payment with respect to any Priest Pension Claim filed in this Chapter 11 Case.

    c.    <u>Voting</u>: Class 8 is Unimpaired, and each holder of a Priest Pension Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Priest Pension Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to Priest Pension Claims.

C.    <u>Subclasses of Abuse Claims</u>

1.    *Subclassification of Classes 4-5.*

Each of Class 4 (Arrowood Abuse Claims) and Class 5 (London and Ecclesia Abuse Claims) will be divided into two subclasses for purposes of allowance, liquidation, and payment: (1) Settling Abuse Claims, and (2) Contested Abuse Claims.  Each holder of an Abuse Claim shall be treated as a Settling Abuse Claim in Class 4 and Class 5, as applicable, unless such holder affirmatively elects to be treated as a Contested Abuse Claim in accordance with the Disclosure Statement Order; provided, however, a holder of an Abuse Claim that the Debtor has filed an objection to such Abuse Claim and such objection has not been withdrawn or settled prior to the Voting Deadline shall be treated as a Contested Abuse Claim in Class 4 or Class 5 as applicable. An election to be treated as a Contested Abuse Claim or Settling Abuse Claim, as applicable, shall be irrevocable, absent the written consent of the Debtor or Reorganized Debtor, as applicable.

2.    *Future Abuse Claims Subclassification.*

The Future Claimants' Representative shall be entitled to elect by written notice filed on the docket on or prior to the Voting Deadline that all, but not less than all, of holders of Future Abuse Claims be treated as holders of Settling Abuse Claims.  Absent such an election by the Future Claimants' Representative, Future Abuse Claims shall be treated as Contested Abuse Claims.

Except to the extent that a holder of a Future Abuse Claim agrees to less favorable treatment of such Claim, in exchange for full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Future Abuse Claim, each holder thereof shall receive (i) if the Future Claimants' Representative has elected to treat the holders of Future Claims as Settling Abuse Claims, such distributions as and to the extent provided in the Trust Documents with respect to the Future Claim Subfund as it pertains to Settling Abuse Claims, or (ii) if the Future Claimants' Representative has not elected to treat the holders of Future Claims as Settling Abuse Claims, such distributions as and to the extent provided in the Trust Documents with respect to the Future Claim Subfund as it pertains to Contested Abuse Claims.

3.    *Channeling Injunction for Abuse Claims*

Pursuant to the Channeling Injunction set forth in Article XI, each holder of an Abuse Claim, whether a Settling Abuse Claim or a Contested Abuse Claim, shall have his or her Claim permanently channeled to the Trusts, and such Claim shall thereafter be asserted exclusively against the Trusts and resolved in accordance with the terms, provisions, and procedures of the Trust Documents as it pertains to such Abuse Claim's Class and Subclass. Holders of Abuse Claims are enjoined from prosecuting any outstanding, or filing any future, litigation, Claims, or Causes of Action arising out of or related to such Abuse Claims against any of the Covered Parties or Insurers and may not proceed in any manner against any such Entities in any forum whatsoever, including any state, federal, or non-U.S. court or any administrative or arbitral forum, and are required to pursue their Abuse Claims solely against the Trusts as provided in the Trust Documents with respect to such Abuse Claim's Class and Subclass.

D.    Elimination of Vacant Classes.

Any Class of Claims that does not have a holder of an Allowed Claim or a Claim temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing will be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

# ARTICLE IV

# SETTLEMENT TRUSTS

A.    Establishment and Purpose of the Trusts.

Each of the Trusts shall be established on the Effective Date. The Trusts shall be administered and implemented by each respective Trustee as provided in the Trust Documents. Specifically, the Arrowood Settlement Trust and the General Settlement Trust shall, without limitation: (1) assume liability for all Abuse Claims; and (2) hold and administer the Trust Assets of each Trust when they are contributed pursuant to the Trust Asset Payment Schedule, liquidate the Abuse Claims, and make Trust Distributions to holders of Abuse Claims from the Trust Assets of each Trust.

Each Trust shall, as applicable, administer, process, settle, resolve, liquidate, satisfy, and make Trust Distributions from the Trust Assets of each Trust on account of Abuse Claims in such a way that the holders of Abuse Claims are treated equitably and in a substantially similar manner, subject to the applicable terms of the Plan Documents and the Trust Documents. From and after the Effective Date, the Abuse Claims shall be channeled to the Trusts pursuant to the Channeling Injunction set forth in Article XI and may be asserted only and exclusively against the Trusts.

B.    Receipt of Trust Assets.

The Trust Assets shall, automatically and without further act or deed, be transferred to, vested in, and assumed by the Trusts pursuant to the dates provided for in the Trust Asset Payment

25

Schedule. Notwithstanding anything herein to the contrary, no monies, choses in action, and/or assets comprising the Trust Assets that are transferred, granted, assigned, or otherwise delivered to the Trusts shall be used for any purpose other than in accordance with the Plan and the Trust Documents, including the payment or administration of Abuse Claims as set forth in the Trust Documents.

    C.    <u>Settlement Trust - Funds and Subfunds</u>

    1.    *Settlement Trusts*

On the Effective Date and thereafter as Trust Assets are received by the Trusts, each Trustee shall allocate such Trust Assets among the Trusts in accordance with the Trust Documents as follows:

    a.    **Arrowood Settlement Trust**.  The Arrowood Settlement Trust shall receive all Insurance Rights relating to Abuse that is alleged to have occurred before October 1, 1976.  The Arrowood Settlement Trust shall receive the Trust Assets (other than the Insurance Rights, including the Ecclesia Contribution, and amounts allocated to the Future Claim Subfund) in a proportion equal to the Arrowood Settlement Trust Share to the Arrowood Settlement Trust.

    b.    **General Settlement Trust**.  The General Settlement Trust shall receive all Insurance Rights, including the Ecclesia Contribution, relating to Abuse that is alleged to have occurred on or after October 1, 1976.  The General Settlement Trust shall receive the Trust Assets (other than the Insurance Rights, including the Ecclesia Contribution, and amounts allocated to the Future Claim Subfund) in a proportion equal to the General Settlement Trust Share to the General Settlement Trust.  The General Settlement Trust shall also receive, for the benefit of the Future Claim Subfund, cash in an amount equal to six percent (6%) of the sum of (A) the Trust Assets (other than Insurance Rights, including the Ecclesia Contribution), and (B) the aggregate possible Minimum Consideration Payments.

For the avoidance of doubt, the Trust Assets received by the Trusts shall be, in the aggregate, $200 million (including the Ecclesia Contribution) plus the Insurance Rights, less the sum of (i) the aggregate amount of all Allowed Administrative Expenses, Allowed Priority Tax Claims, Allowed Priority Claims, Allowed Convenience Class Claims, and Allowed Secured Claims, (ii) the GUC Plan Distribution, (iii) the Cure Amounts and (iv) the aggregate amount of the Minimum Consideration Payments.

    2.    *Settlement Trusts - Subfunds*

Within each of the Arrowood Settlement Trust and the General Settlement Trust, each such trustee shall allocate the Trust Assets in such trust between the Contested Abuse Claim Subfund for such trust and the Settling Abuse Claim Subfund for such trust in accordance with the Trust

26

Documents as follows:

    a.    **Arrowood Settlement Trust**.  With respect to the Arrowood Settlement Trust, the Arrowood Settlement Trustee shall allocate (I) to the Contested Abuse Claim Subfund (A) the Insurance Rights received by the Arrowood Settlement Trust that are associated with any Contested Abuse Claim in Class 4 and (B) the product of the Trust Assets received by the Arrowood Settlement Trust (other than Insurance Rights) and the Contested Claim Subfund Share and (II) to the Settling Claim Subfund (A) all other Insurance Rights allocated to the Arrowood Settlement Trust and (B) the product of the Trust Assets received by the Arrowood Settlement Trust (other than Insurance Rights) and the Settling Claim Subfund Share.

    b.    **General Settlement Trust**.  With respect to the General Settlement Trust, the General Settlement Trustee shall allocate (I) to the Contested Abuse Claim Subfund (A) the Insurance Rights received by the General Settlement Trust that are associated with any Contested Abuse Claim in Class 5 and (B) the product of the Trust Assets received by the General Settlement Trust (other than Insurance Rights) and the Contested Claim Subfund Share, (II) to the Settling Claim Subfund (A) all other Insurance Rights allocated to the General Settlement Trust and (B) the product of the Trust Assets received by the General Settlement Trust (other than Insurance Rights) and the Settling Claim Subfund Share, and (III) to the Future Claim Subfund, cash in an amount equal to six percent (6%) of the sum of (A) the Trust Assets (other than Insurance Rights, including the Ecclesia Contribution), and (B) the Minimum Consideration Payments.

    3.    *Straddle Allocation*

On the Effective Date and from time to time thereafter, the General Settlement Trustee shall transfer Trust Assets from the General Settlement Trust to the Arrowood Settlement Trust in an amount equal to the value of the Debtor and the Co-Insured Parties' Insurance Rights for alleged Abuse occurring on or after October 1, 1976 by holders of Arrowood Claims.  The Arrowood Settlement Trustee and the General Settlement Trustee shall negotiate in good faith to determine such value and the timing of such transfers.  If the Arrowood Settlement Trustee and the General Settlement Trustee cannot reach mutual agreement with respect to such value or timing, the Arrowood Settlement Trustee and the General Settlement Trustee may seek an order of the Bankruptcy Court estimating such value.  The Arrowood Settlement Trustee shall allocate such transfers between Contested Claim Subfund and the Settling Claim Subfund in accordance with the Arrowood Settlement Trust Agreement.

    4.    *Allocation of Expenses Among Subfunds*

All Trust Expenses shall be payable out of the Trust Assets.  Each Trustee shall allocate all

27

Trust Expenses to the fullest extent identifiable to each appropriate subfund, with the intent that each subfund shall bear its own fees, costs and expenses. Trust Expenses will depend on numerous factors including: the number of Abuse Claims assigned to each Trust, how many Abuse Claims elect to be Contested Abuse Claims, the compensation of Trust Professionals, and the time and expense required to obtain the Insurance Proceeds including litigation expenses related thereto. Some of these expenses may be indemnified or reimbursed from applicable insurance policies.

To the extent a Trust Expense cannot be allocated to a particular subfund, such Trust Expense shall be allocated based on the Contested Claim Subfund Share and the Settling Claim Subfund Share. Each Trustee's allocation of Trust Expenses shall be binding absent manifest error. For the avoidance of doubt, the fees, costs and expenses of the Litigation Administrator (in its capacity as such) shall be reimbursed solely from Contested Claim Subfunds and, to the fullest extent identifiable, to the applicable Contested Claim Subfund for which such expense relates.

D.      The Trust Distribution Procedures.

On the Effective Date, each Trustee shall implement the Trust Distribution Procedures in accordance with the terms of each agreement governing the Trusts. From and after the Effective Date, each Trustee shall have the authority to administer, amend, supplement, or modify the Trust Distribution Procedures in accordance with the terms thereof and the Arrowood Settlement Trust Agreement and General Settlement Trust Agreement, as applicable. From and after the Effective Date, each Trust shall liquidate and make Trust Distributions to holders of Abuse Claims or Future Claims in accordance with the Trust Documents.

E.      Discharge of Liabilities to Holders of Abuse Claims.

The transfer to, vesting in and assumption by the Trusts of the Trust Assets as contemplated by the Plan shall, as of the Effective Date, discharge all obligations and liabilities of and bar any recovery or action against the Covered Parties for or in respect of all Abuse Claims (and the Confirmation Order shall provide for such discharge). The Trusts shall, as of the Effective Date, assume sole and exclusive responsibility and liability for all Abuse Claims against the Covered Parties, and such Claims shall be paid by the Trusts from the Trust Assets of the applicable Trust or as otherwise directed in the Trust Documents.

F.      Imposition of Channeling Injunction.

From and after the Effective Date, all Abuse Claims shall be subject to the Channeling Injunction pursuant to section 105(a) of the Bankruptcy Code and the provisions of the Plan and the Confirmation Order. From and after the Effective Date, the Covered Parties shall not have any obligation with respect to any liability of any nature or description arising out of, relating to, or in connection with any Abuse Claims.

G.      Insurance Rights Transfer.

In furtherance of the purpose of the Arrowood Settlement Trust and the General Settlement Trust:

28

1. as of the Effective Date, the Covered Parties (other than the Settling Insurers) shall irrevocably transfer, grant, and assign to the Arrowood Settlement Trust and the General Settlement Trust, and the Arrowood Settlement Trust and the General Settlement Trust shall receive and accept, any and all of the Insurance Rights. This Insurance Rights Transfer is made to each of the Arrowood Settlement Trust and the General Settlement Trust for the benefit of Entities that have a Claim for compensation for damages against the Covered Parties on account of Abuse Claims;

2. the Insurance Rights Transfer is made free and clear of all Claims, Liens, Encumbrances, or Causes of Action of any nature whatsoever, except available limits of liability for coverage of certain types of claims under one or more of the Insurance Policies that may have been reduced by certain prepetition payments made by an Insurer under any of the Insurance Policies;

3. the Arrowood Settlement Trust and the General Settlement Trust shall be solely responsible for satisfying, to the extent required under applicable law, any premiums, deductibles, self-insured retentions, and fronting obligations arising in any way out of any and all Abuse Claims;

4. the Arrowood Settlement Trust and the General Settlement Trust shall each comply with any and all notice obligations required under the Insurance Policies and applicable law pertaining to Abuse Claims;

5. the Insurance Rights Transfer is made to the maximum extent possible under applicable law;

6. the Insurance Rights Transfer is absolute and does not require any further action by the Covered Parties, the Settlement Trust, the Bankruptcy Court, or any other Entity;

7. the Insurance Rights Transfer is not an assignment of any insurance policy itself and shall be valid and enforceable in accordance with the terms of any Insurance Policy, in each case notwithstanding any anti-assignment provision in or incorporated into any Insurance Policy; and

8. the Insurance Rights Transfer shall be governed by, and construed in accordance with, the Bankruptcy Code and the laws of the state of New York, without regard to its conflict of law principles.

For the avoidance of doubt, the Insurance Rights Transfer that is the subject of this Article IV.G shall not, and shall not be deemed to, transfer, grant, or assign to the Arrowood Settlement Trust or the General Settlement Trust any insurance rights of the Covered Parties that pertain to any Insured Non-Abuse Claims. Nor shall the Insurance Rights Transfer violate or be deemed to violate any cooperation clause of any Insurance Policy. The insurance rights of the Covered Parties that pertain to Insured Non-Abuse Claims are expressly reserved for each Covered Party, as applicable, and the Plan Documents shall not, and shall not be deemed to, transfer, grant, or assign such rights to the Arrowood Settlement Trust or the General Settlement Trust. Upon the Insurance Rights Transfer, the Trusts shall have whatever obligations, if any, that exist under the Insurance

Policies under applicable law. Moreover, for the avoidance of doubt, the insurance rights of any Entity that is not a Covered Party are expressly reserved for such Entity (including any rights of any director, manager, officer or employee of the Debtor or any Covered Party under the D&O Liability Insurance Policies), and the Plan Documents shall not, and shall not be deemed to, transfer, grant, or assign such rights to the Arrowood Settlement Trust or the General Settlement Trust.

The trustee for each of the Arrowood Settlement Trust and the General Settlement Trust shall, in the case of any settlement, compromise, buyback or similar agreement concerning an Insurance Policy allocated to such Trust that covers or potentially covers one or more Settling Abuse Claims and one or more Contested Abuse Claims, be empowered to settle, compromise or enter into such agreement with respect to such Insurance Policy so long as either (a) such settlement, compromise or agreement does not impact the Insurance Rights allocated to a holder of a Contested Abuse Claim or (b) the Arrowood Settlement Trust and/or the General Settlement Trust, as applicable, transfers to the applicable Contested Abuse Claim Subfund an amount equal to (i) the product of the Contested Claim Subfund Share and the cash proceeds received by such trust from the settlement, compromise or agreement, or (ii) such other amount determined by the Bankruptcy Court after notice and opportunity to be heard.

H.    Trust Indemnification Obligations.

The Arrowood Settlement Trust and the General Settlement Trust shall indemnify and hold each of the Covered Parties harmless from and against any and all Abuse Claims, as well as indemnify and reimburse such parties for all fees, costs and expenses related to Abuse Claims (including such fees, costs and expenses incurred in connection with discovery), to the extent set forth in the Trust Documents.

In connection with the indemnification that must be provided by the Arrowood Settlement Trust and the General Settlement Trust, each Covered Party has the express right to:

1.    appoint defense counsel of its choosing, subject to consent by the relevant Trust regarding the hourly rates to be charged, such consent not to be unreasonably withheld;

2.    manage the defense of any such Claim subject to appropriate updates being provided to the Settlement Trust, but the relevant Trust shall not control the defense of the Covered Party to any such Claim;

3.    settle or otherwise resolve any Claim that is subject to indemnification by the relevant Trust, provided that notice of any such settlement or resolution is provided to such Trust, but such Trust is not required to consent to any such settlement or resolution; and

4.    proceed to trial and verdict with respect to any Claim that is subject to indemnification by the relevant Trust, subject to the consent and approval by such Trust to proceed to trial and verdict.

I.     Investment Guidelines.

All monies held in the Trusts shall be invested, subject to the investment limitations and provisions enumerated in the agreement governing such Trust and shall not be limited to the types of investments described in section 345 of the Bankruptcy Code.

J.     Excess Assets in Trusts.

On each of the Arrowood Settlement Trust Termination Date and the General Settlement Trust Termination Date, after the payment of all Abuse Claims that are entitled to a Trust Distribution from such Trust and all Trust Expenses have been provided for, and the liquidation of all assets then held by such Trust, all remaining value in such Trusts shall be distributed to the Reorganized Debtor.

K.     Trust Expenses.

Each Trust shall pay all Trust Expenses, including all costs of administration, from each Trust, as provided for in the Trust Documents.

L.     Settlement Trustee.

On the Confirmation Date, the Bankruptcy Court shall appoint the Trustees to serve in accordance with, and who shall have the functions and rights provided in, the Trust Documents. Any successor Trustee shall be appointed in accordance with the terms of the Trust Documents. For purposes of any Trustee performing his or her duties and fulfilling his or her obligations under the relevant Trust and the Plan, the Trust and the Trustee shall be deemed to be "parties in interest" within the meaning of section 1109(b) of the Bankruptcy Code. The Trustees shall each be the "administrator" of each of the Trusts as such term is used in Treas. Reg. Section 1.468B-2(k)(3).

M.     Compensation of Trustees and Retention of Professionals.

The Trustees shall be entitled to compensation as provided for in the Trust Documents. The Trustees may retain and reasonably compensate, without Bankruptcy Court approval, counsel and other professionals as reasonably necessary to assist in the duties of the Trustees subject to the terms of the Trust Documents. All fees and expenses incurred in connection with the foregoing shall be payable from the Trusts, as provided for in the Trust Documents.

N.     Future Claimants' Representative.

The General Settlement Trust Agreement shall provide for the continuation of the Future Claimants' Representative to serve as an advisor to the Future Claim Subfund representing the interests of holders of Future Abuse Claims. The Future Claimants' Representative shall have the functions and rights set forth in the General Settlement Trust Agreement. The General Settlement Trustee shall consult with the Future Claimants' Representative on matters pertaining to the administration of the Future Claim Subfund and must obtain the consent of the Future Claimants' Representative as set forth in the General Settlement Trust Agreement and the Trust Distribution Procedures. The General Settlement Trustee shall meet with the Future Claimants' Representative

31

no less frequently than quarterly. The Future Claimants' Representative shall receive reasonable compensation for his services from the Future Claim Subfund and may utilize counsel and other professionals as reasonably necessary to assist in the performance of his or her duties, and the Future Claimants' Representative and his professionals shall be entitled to reasonable reimbursement of expenses from the Future Claim Subfund, subject to compliance with an agreed-upon budget that shall be set forth in the General Settlement Trust Agreement.

      O.     Trust Advisory Committee.

The Arrowood Settlement Trust Agreement and the General Settlement Trust Agreement shall provide for the establishment of the Trust Advisory Committee to serve as an advisory committee to such Trusts representing the interests of holders of Abuse Claims. The Trust Advisory Committee shall have the functions and rights provided for in the Arrowood Settlement Trust Agreement and the General Settlement Trust Agreement. The initial Trust Advisory Committee shall consist of three members. The Arrowood Settlement Trust Agreement and the General Settlement Trust Agreement shall provide that the Trustee of each such Trust shall consult with the Trust Advisory Committee on matters pertaining to the administration of the Arrowood Settlement Trust and the General Settlement Trust and must obtain the consent of the Trust Advisory Committee as set forth in the Trust Documents. The Arrowood Settlement Trustee and the General Settlement Trustee shall meet with the Trust Advisory Committee no less frequently than quarterly. The Trust Advisory Committee shall receive reasonable compensation for their services from the Settlement Trust and may utilize counsel and other professionals as reasonably necessary to assist in the performance of its duties, and the Trust Advisory Committee and their professionals shall be entitled to reasonable reimbursement of expenses by the Arrowood Settlement Trust and the General Settlement Trust, subject to compliance with an agreed-upon budget that shall be set forth in the Arrowood Settlement Trust Agreement and the General Settlement Trust Agreement.

      P.     Litigation Administrator

The Arrowood Settlement Trust Agreement and the General Settlement Trust Agreement shall provide for the Litigation Administrator to administer the defense of the Contested Abuse Claims. The Litigation Administrator shall have the functions and rights set forth in the Arrowood Settlement Trust Agreement and the General Settlement Trust Agreement. The Arrowood Settlement Trustee and the General Settlement Trustee shall consult with the Litigation Administrator on matters pertaining to the administration of the Arrowood Settlement Trust and the General Settlement Trust solely with respect to Contested Abuse Claims and must obtain the consent of the Litigation Administrator as set forth in the Arrowood Settlement Trust Agreement and the General Settlement Trust Agreement and the Trust Distribution Procedures. The Arrowood Settlement Trustee and the General Settlement Trustee shall meet with the Litigation Administrator no less frequently than quarterly. The Litigation Administrator may utilize counsel and other professionals as reasonably necessary to assist in the performance of its duties, and the Litigation Administrator and its professionals shall be entitled to reasonable reimbursement of expenses by the Arrowood Settlement Trust and the General Settlement Trust.

Q.    Modification of Trust Documents; Consent Rights of the Reorganized Debtor.

The Trust Documents may not be amended or modified without the consent of the Reorganized Debtor. The Reorganized Debtor shall also have consent rights with respect to any successor Trustee and Trust Advisory Committee members. Notwithstanding any of the foregoing, the Indemnification Obligations of the Trusts described in this Article IV may not be amended or modified without the consent of the Covered Party that is otherwise entitled to indemnification pursuant to those provisions.

R.    Cooperation; Transfer of Insurance-Related Materials.

On the Effective Date or as soon as reasonably practicable thereafter, the Debtor shall transfer and assign, or cause to be transferred and assigned, to the Arrowood Settlement Trustee and the General Settlement Trustee (1) copies of all Insurance Policies, and (2) any other information reasonably necessary to operate the Arrowood Settlement Trust and the General Settlement Trust and preserve, secure, or obtain the benefit of the Insurance Rights. If at any time after the Effective Date, any of the Reorganized Debtor or the other Covered Parties discover the existence of an Insurance Policy or evidence of the existence of an Insurance Policy that provides or may provide coverage for Abuse Claims, the Entity discovering such policy or evidence of the existence of such policy shall promptly inform the Settlement Trustee. The Arrowood Settlement Trust and the General Settlement Trust shall reimburse the Reorganized Debtor for all reasonable costs and expenses incurred by Covered Parties in connection with (a) the transfers and assignments that are the subject of this Article IV.R, (b) any cooperation provided by the Reorganized Debtor to the Arrowood Settlement Trust and the General Settlement Trust at the request of such Trust, and (c) any litigation initiated, or prosecuted, by the Arrowood Settlement Trust and the General Settlement Trust against the Insurers.

The transfer or assignment of information, which may include privileged information, to the Arrowood Settlement Trustee or the General Settlement Trustee in accordance with this Article IV.R shall not result in the destruction or waiver of any applicable privileges pertaining to privileged information. Further, with respect to any privileges: (a) they are transferred to or contributed for the sole purpose of enabling such Trustee to perform his or her duties to administer the Settlement Trust and for no other reason, (b) they are vested solely in the Litigation Administrator and Settlement Trustee and not in the Settlement Trust, the Future Claimants' Representative, the Trust Advisory Committee or any other Entity, committee or subcomponent of the Settlement Trust, or any other Entity (including counsel and other professionals) who has been engaged by, represents or has represented any holder of an Abuse Claim, (c) they shall be preserved and not waived, and (d) no privileged information shall be publicly disclosed by the Litigation Administrator, any Trustee or any Trust or communicated to any Entity not entitled to receive such information or in a manner that would diminish the protected status of any such information. Notwithstanding the foregoing, nothing herein shall preclude any Trustee or Litigation Administrator from providing information received pursuant to this section to any Insurer as necessary to preserve, secure, or obtain the benefit of the Insurance Rights.

S.    No Liability.

The Covered Parties shall not have or incur any liability to, or be subject to any right of

action by, any Entity for any act, omission, transaction, event, or other circumstance in connection with or related to the Future Claimants' Representative, the Arrowood Settlement Trust or the General Settlement Trust, the Trustees, or the Trust Documents, including the administration of Abuse Claims and the distribution of property by the Arrowood Settlement Trust or the General Settlement Trust, or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence related or relating to the foregoing.

T.    U.S. Federal Income Tax Treatment of Trusts.

The Trusts shall each be a "qualified settlement fund" within the meaning of Treasury Regulation section 1.468B-1. The Trusts shall file (or cause to be filed) statements, returns, or disclosures relating to the Trusts that are required by any Governmental Unit. The Trustees shall be responsible for the payment of any taxes imposed on the Trusts or the Trust Assets of the Trusts, including estimated and annual U.S. federal income taxes in accordance with the terms of the Trust Documents. The Trustees may request an expedited determination of taxes on such Trusts under section 505(b) of the Bankruptcy Code for all returns filed for, or on behalf of, such Trusts for all taxable periods through the dissolution of such Trust.

U.    Institution and Maintenance of Legal and Other Proceedings.

As of the Effective Date, the Trusts shall be empowered to initiate, prosecute, defend, and resolve all legal actions and other proceedings related to any asset, liability, or responsibility of the Trusts. The Trusts shall be empowered to initiate, prosecute, defend, and resolve all such actions in the name of the Debtor if deemed necessary or appropriate by the Trustees; provided, however, that any settlements or other resolutions of such actions must be approved by the Bankruptcy Court. The Trusts shall each be responsible for the payment of all damages, awards, judgments, settlements, expenses, costs, fees, and other charges incurred subsequent to the Effective Date arising from, relating to, or associated with any legal action or other proceeding brought pursuant to this Article IV.U and shall pay or reimburse all deductibles, retrospective premium adjustments, fronting obligations or other charges which may arise from the receipt of the Insurance Proceeds by such Trusts. For the avoidance of doubt, the Trusts, pursuant to section 1123(b)(3)(B) of the Bankruptcy Code and applicable State law, are appointed as the successors-in-interest to, and representatives, of the Debtor and its Estate for the retention, enforcement, settlement, or adjustment of all Abuse Claims.

V.    Medicare Reimbursement and Reporting Obligations.

The Trusts shall register as a "Responsible Reporting Entity" under the reporting provisions of section 111 of Medicare, Medicaid, and SCHIP Extension Act of 2007. The Trusts shall timely submit all reports required under Medicare, Medicaid and SCHIP Extension Act of 2007 because of any claims settled, resolved, paid, or otherwise liquidated by the Trusts. Each Trust, as a Responsible Reporting Entity, shall follow all applicable guidance published by the Centers for Medicare & Medicaid Services of the United States Department of Health and Human Services and/or any other agency or successor entity charged with responsibility for tracking, assessing, or receiving reports made under Medicare, Medicaid and SCHIP Extension Act of 2007 to determine whether, and, if so, how, to report to such agency or agencies under Medicare, Medicaid and SCHIP Extension Act of 2007. For Abuse Claims that occurred after December 5,

34

1980, before remitting funds to any person on account of an Abuse Claim (other than an Indirect Abuse Claim), the relevant Trustee shall obtain (i) a certification that said person (or such person's authorized representative) has provided or will provide for the payment and/or resolution of any obligations owing or potentially owing under 42 U.S.C. § 1395y(b), or any related rules, regulations, or guidance, in connection with, or relating to, such Abuse Claim, and (ii) an agreement that such person indemnify such Trust for any such obligations. The failure by one or more holders of Abuse Claims to follow these provisions shall not delay or impair the payment by the relevant Trust to any other holder of an Abuse Claim following these provisions.

Nothing in this Article IV.V shall imply, or constitute an admission, that the Debtor, Reorganized Debtor, any Covered Party or any Settling Insurer are "applicable plans" within the meaning of Medicare, Medicaid and SCHIP Extension Act of 2007, or that they have any legal obligation to report any actions undertaken by the Trusts or contributions to the Trusts under Medicare, Medicaid and SCHIP Extension Act of 2007 or any other statute or regulation.

## ARTICLE V

## MEANS FOR IMPLEMENTATION OF THE PLAN

A.    General Settlement of Claims.

As discussed further in the Disclosure Statement and as otherwise provided herein, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of Claims and controversies relating to the contractual, legal, and subordination rights that holders of Claims might have with respect to any Claim under the Plan.  Distributions made to holders of Claims in any Class are intended to be final.

B.    Sources of Consideration for Distributions.

The Debtor or the Reorganized Debtor, as applicable, shall fund Plan Distributions and the Trusts shall fund distributions from Trust Assets in accordance with the Trust Documents.

C.    Organizational Documents.

Other than with respect to the *Act to Incorporate the Roman Catholic Diocese of Rockville Centre, New York*, the Reorganized Debtor shall enter into such agreements and amend its formation, organizational and/or governance documents, including its bylaws and rules and regulations,  as applicable, to the extent necessary to implement the terms and provisions of the Plan. After the Effective Date, the Reorganized Debtor may amend and restate its organizational documents, and the Reorganized Debtor may file its bylaws, rules and regulations, or such other applicable organizational and/or governance documents, as applicable, and other constituent documents as permitted by applicable laws.

D.    Reorganized Debtor's Members and Senior Management.

In accordance with § 1129(a)(5) of the Bankruptcy Code, the identities and affiliations of the persons proposed to serve as the members and trustees of the Reorganized Debtor and the persons proposed to serve as officers of the Reorganized Debtor on and after the Effective Date are set forth on Exhibit B.

E.    Due Authorization.

Upon the Effective Date, all actions contemplated by the Plan shall be deemed authorized, approved, and, to the extent taken prior to the Effective Date, ratified in all respects without any requirement of further action by members, creditors, directors, or managers of the Debtor, the Reorganized Debtor, or any other Entity.

F.    Continued Legal Existence.

The Debtor shall continue to exist on and after the Effective Date, with all of the powers of such Entity under applicable law, including pursuant to the *Act to Incorporate the Roman Catholic Diocese of Rockville Centre, New York,* other formation, organizational and governance documents immediately prior to the Effective Date, and nonprofit law.

G.    Vesting of Assets in the Reorganized Debtor.

Except as otherwise explicitly provided in the Plan, on the Effective Date, pursuant to sections 1141(b) and 1141(c) of the Bankruptcy Code, all property comprising the Estate, other than the DRVC Trust Contributions, and any and all property of the Debtor shall vest in the Reorganized Debtor free and clear of all Liens, Claims, interests, charges, other Encumbrances and liabilities of any kind, including successor liability Claims; provided, however, the foregoing shall not be construed to authorize the Reorganized Debtor to use property in contravention of any legally enforceable restrictions requiring the use or disposition of such assets for a particular donative purpose or to use property that is held in a fiduciary capacity other than in accordance with such fiduciary obligations.  On and after the Effective Date, the Reorganized Debtor may continue its operations and may use, acquire, or dispose of property, and compromise or settle any Claims, or Causes of Action without supervision or approval of the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules.

H.    Cancellation of Indebtedness.

Notwithstanding the foregoing, any provision in any document, instrument, lease, or other agreement that causes or effectuates, or purports to cause or effectuate, a default, termination, waiver, or other forfeiture of, or by, the Debtor as a result of the cancellations, terminations, satisfaction, releases, or discharges provided for in the Plan shall be deemed null and void and shall be of no force or effect. Nothing contained herein shall be deemed to cancel, terminate, release, or discharge the obligation of the Debtor or any of its counterparties under any executory contract or lease to the extent such executory contract or lease has been assumed by the Debtor pursuant to a Final Order of the Bankruptcy Court or hereunder.

I.    Cancellation of Liens.

Except as otherwise specifically provided herein, upon the payment in full in cash of a Secured Claim, any Lien securing a Secured Claim that is paid in full in cash shall be deemed released, and the holder of such Secured Claim shall be authorized and directed to release any collateral or other property of the Debtor (including any cash collateral) held by such holder and to take such actions as may be requested by the Reorganized Debtor, to evidence the release of such Lien, including the execution, delivery and filing or recording of such releases as may be requested by the Reorganized Debtor.

J.    Preservation of Causes of Action.

In accordance with section 1123(b)(3) of the Bankruptcy Code, notwithstanding anything else herein to the contrary but subject to Article XI.G.1 and the Insurance Rights Transfer, all Causes of Action that the Debtor may hold against any Entity shall vest in the Reorganized Debtor on the Effective Date. Thereafter, subject to Article XI.G.1, the Reorganized Debtor shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, whether arising before or after the Petition Date, and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court. No Entity may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any specific Cause of Action as any indication that the Debtor or Reorganized Debtor, as applicable, will not pursue any and all available Causes of Action. The Debtor or Reorganized Debtor, as applicable, expressly reserves all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan, and, therefore, no preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches, shall apply to any Cause of Action of the Debtor or the Reorganized Debtor, as applicable, upon, after, or as a consequence of entry of the Confirmation Order or the occurrence of the Effective Date.

K.    Setoffs and Recoupment.

The Debtor or the Reorganized Debtor, as applicable, may, but shall not be required to, set off or recoup against any Claim, and any distribution to be made on account of such Claim (including Plan Distribution), any and all claims, rights, and Causes of Action of any nature whatsoever that the Debtor or the Reorganized Debtor, as applicable, may have against the holder of such Claim pursuant to the Bankruptcy Code or applicable non-bankruptcy law; provided, however, that the failure to do so shall not constitute a waiver or release by the Debtor or the Reorganized Debtor, as applicable, or the successors or assigns of any of the Debtor or the Reorganized Debtor of any claims, rights, or Causes of Action that the Debtor or the Reorganized Debtor or the successors or assigns of the Debtor or Reorganized Debtor may possess against the holder of such Claim.

L.    Exemption from Certain Transfer Taxes and Recording Fees.

To the maximum extent permitted pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant to the Plan shall not be subject to any document recording tax,

37

stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, sale or use tax, mortgage recording tax, or other similar tax or governmental assessment, and, upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and are allowed to accept for filing and recordation any of the foregoing instruments or other documents pursuant to such transfers of property without the payment of any such tax, recordation fee, or governmental assessment.

M.    Directors and Officers Insurance Policies.

Notwithstanding anything herein to the contrary, the Reorganized Debtor shall be deemed to have assumed all of the Debtor's D&O Liability Insurance Policies pursuant to section 365(a) of the Bankruptcy Code, effective as of the Effective Date. Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Reorganized Debtor foregoing assumption of the unexpired D&O Liability Insurance Policies.

N.    Other Insurance Policies.

On the Effective Date, the Debtor's insurance policies in existence as of the Effective Date shall continue in accordance with their terms and, to the extent applicable, shall be deemed assumed by the Reorganized Debtor pursuant to section 365 of the Bankruptcy Code and this Article V. Nothing in the Plan shall affect, impair, or prejudice the rights of the insurance carriers, the insureds, or the Reorganized Debtor under the insurance policies in any manner, and such insurance carriers, the insureds, and Reorganized Debtor shall retain all rights and defenses under such insurance policies, subject to the Insurance Rights Transfer and Ecclesia Settlement.

O.    Settlement with Ecclesia.

On the Effective Date, the Debtor shall sell, pursuant to section 363(f) of the Bankruptcy Code, the Insurance Policies issued by Ecclesia to Ecclesia free and clear of all Liens, Claims, interests, charges, other Encumbrances and liabilities of any kind and, in exchange for the sale, complete and final satisfaction, settlement, and discharge of Ecclesia's obligations relating to Abuse Claims, and the releases, and other benefits provided to Ecclesia under the Plan, Ecclesia shall contribute the Ecclesia Contribution to the Trust Assets for the benefit of holders of London and Ecclesia Abuse Claims. For the avoidance of doubt, other than with respect to Ecclesia's obligations relating to Abuse Claims, all of the Debtor's, the Estate's and the Covered Parties' policies, agreements, rights with respect to, and Causes of Action against or concerning, Ecclesia or an insurance policy or agreement issued by Ecclesia shall be fully reserved. Notwithstanding anything else herein to the contrary, but subject to the sale, settlement and release of the Covered Parties' rights against Ecclesia with respect to Abuse Claims, all of the Debtor's or the Estate's policies, agreements, rights with respect to, and Causes of Action against or concerning, Ecclesia or an insurance policy or agreement issued by Ecclesia and, subject to the Ecclesia Contribution, all of the Debtor's or the Estate's right, title and interest in and to any and all shares and ownership interests in or of Ecclesia shall, pursuant to sections 1141(b) and 1141(c) of the Bankruptcy Code, vest in the Reorganized Debtor free and clear of all Liens, Claims, interests, charges, other Encumbrances and liabilities of any kind, including successor liability Claims. For the avoidance of doubt, other than with respect to the Ecclesia Contribution, no Trust or Co-Insured Party shall

38

have any Claim or Cause of Action against Ecclesia, nor shall any holder of an Abuse Claim, including an Indirect Abuse Claim, have any Claim or Cause of Action on account of an Abuse Claim against Ecclesia.

 P. <u>Insurance Neutrality.</u>

 Unless otherwise expressly agreed to by an Insurer in writing, nothing in the Plan, the Plan Documents or the Confirmation Order shall alter, supplement, change, decrease or modify the terms (including conditions, limitations and/or exclusions) of the Insurance Policies; provided that, notwithstanding anything in the foregoing to the contrary, the enforceability and applicability of the terms (including conditions, limitations and/or exclusions) of the Insurance Policies and thus the rights or obligations of any of the Insurance Companies, the Debtor, the Reorganized Debtor, the Trusts, and the Covered Parties arising out of or under any Insurance Policy whether before or after the Effective Date, are subject to the Bankruptcy Code and applicable law (including any actions or obligations of the Debtor thereunder), the terms of the Plan and the Plan Documents, the Confirmation Order (including the findings contained therein or issued in conjunction therewith) and, to the extent the Insurance Companies have or had adequate notice from any source, any other ruling made or order entered by the Bankruptcy Court whether prior to or after the Confirmation Date. For the avoidance of doubt, nothing contained in the Plan, the Plan Documents or the Confirmation Order shall operate to require any Insurance Company to pay under any Insurance Policy the liability of any Person that was not an insured prior to the Petition Date.

 Q. <u>Co-Insured Party Contribution</u>

 On the Effective Date and thereafter in accordance with the Trust Asset Payment Schedule, the Co-Insured Parties shall contribute to the Estate the Co-Insured Party Contribution.

 If a Co-Insured Party is unable to transfer its rights, titles, privileges, interests, claims, demands or entitlements, as of the Effective Date, to any proceeds, payments, benefits, Causes of Action, choses in action, defense, or indemnity, now existing or hereafter arising, accrued or unaccrued, liquidated or unliquidated, matured or unmatured, disputed or undisputed, fixed or contingent, arising under or attributable to the Insurance Rights, then the Co-Insured Party shall, at the sole cost and expense of the applicable Trust: (a) take such actions reasonably requested by the Trustee to pursue any of the Insurance Rights for the benefit of the applicable Trust; and (b) promptly transfer to the applicable Trust any amounts recovered under or on account of any of the Insurance Rights; provided, however, that while any such amounts are held by or under the control of any Co-Insured Party, such amounts shall be held for the benefit of the applicable Trust.

 R. <u>Settling IAC Affiliate Contributions</u>

 The Catholic Cemeteries Of The Roman Catholic Diocese Of Rockville Centre, Inc., a New York Not-For-Profit Corporation, the Diocese of Rockville Centre Catholic Cemetery Permanent Maintenance Trust, The Seminary of the Immaculate Conception of the Diocese of Rockville Centre, and The Department of Education, Diocese of Rockville Centre shall become Settling IAC Affiliates pursuant to this Article V.R of the Plan by providing consideration for (i) a contribution to the Trusts in an amount to be agreed to between the Settling IAC Affiliate and

the Diocese as a component of the Trust Assets and/or the Co-Insured Party Cash Contribution with respect to The Catholic Cemeteries Of The Roman Catholic Diocese Of Rockville Centre, Inc., a New York Not-For-Profit Corporation, the Diocese of Rockville Centre Catholic Cemetery Permanent Maintenance Trust, and The Department of Education, Diocese of Rockville Centre, and (ii) the Seminary Contribution with respect to The Seminary of the Immaculate Conception of the Diocese of Rockville Centre.

S.    Additional Covered Party

An Entity that is a co-defendant in a CVA Action and that is not otherwise a Covered Party may become a Covered Party pursuant to this Article V.S of the Plan by, in exchange for and conditioned upon such Entity's treatment as a Covered Party hereunder, including the releases and injunctions set forth in this Plan and the Confirmation Order, such Entity (a) makes an Additional Covered Party Substantial Contribution to the Estate, (b) releases any Indirect Abuse Claim held by such Covered Party against the Estate and (c) releases any Indirect Abuse Claim related to the Debtor against the Covered Parties.

T.    Judgment Reduction

In connection to any action by the Trusts to enforce Claims regarding an Insurance Policy issued by an Insurer that is not a Settling Insurer, if any Insurer obtains a final judicial determination or final binding arbitration award that it would be entitled to obtain a sum certain from a Settling Insurer because of a claim for contribution, subrogation, indemnification, or other similar claim against a Settling Insurer for such Settling Insurer's alleged share or equitable share, or to enforce subrogation rights, if any, of the defense and/or indemnity obligation of such Settling Insurer for any Claims released or resolved under any settlement agreement with a Settling Insurer, the Debtor, the Trustees or other Co-Insured Party, as applicable, shall be deemed to have reduced its judgment or Claim against, or settlement with, such other Insurer to the extent necessary to satisfy such contribution, subrogation, indemnification, or other claims against such Settling Insurer.  To make sure such a reduction is accomplished, such Settling Insurer shall be entitled to assert this Article V.T as a defense to any action against it brought by any other Insurer for any such portion of the judgment or Claim and shall be entitled to request that the court or appropriate tribunal issue such orders as are necessary to effectuate the reduction to protect such Settling Insurer and the Covered Parties under a settlement agreement with a Settling Insurer from any liability for the judgment or Claim.   If an Insurer that is not a Settling Insurer asserts that it has a Claim for contribution, indemnity, subrogation, or similar relief against a Settling Insurer, such Claim may be asserted as a defense against the Trusts, Debtor or other Co-Insured Party in any litigation of a Claim under an Insurance Policy (and the Trusts, Debtor or other Co-Insured Party may assert the legal and equitable rights of such Settling Insurer in response thereto); and to the extent such a Claim is found to be valid by the court presiding over such action, the liability of such Insurer that is not a Settling Insurer to the Trusts, the Debtor or other Co-Insured Party shall be reduced dollar for dollar by the amount so determined.

U.    PSZJ Fee Discount Contribution

On the Effective Date, Pachulski Stang Ziehl & Jones LLP shall contribute the PSZJ Fee Discount to the Trust Assets.

40

## ARTICLE VI

## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.    <u>Assumption of Executory Contracts and Unexpired Leases.</u>

On the Effective Date, all Executory Contracts and Unexpired Leases shall be deemed assumed by the Reorganized Debtor as of the Effective Date without the need for any further notice to or action, order, or approval of the Bankruptcy Court under sections 365 and 1123 of the Bankruptcy Code, except for Executory Contracts or Unexpired Leases (1) that are identified on the Rejected Contracts Schedule; (2) that previously expired or terminated pursuant to their terms; (3) that the Debtor has previously assumed or rejected pursuant to a Final Order of the Bankruptcy Court; (4) that are the subject of a motion to reject that remains pending as of the Confirmation Date; (5) that have been deemed rejected pursuant to the provisions of section 365(d)(4), or (6) as to which the effective date of rejection will occur (or is requested by the Debtor to occur) after the Confirmation Date.

Entry of the Confirmation Order shall constitute an order of the Bankruptcy Court approving the assumption or rejection, as applicable, of Executory Contracts or Unexpired Leases as set forth in the Plan or the Rejected Contracts Schedule, pursuant to sections 365 and 1123 of the Bankruptcy Code. Except as otherwise set forth herein, the assumption or rejection of Executory Contracts and Unexpired Leases pursuant to the Plan shall be effective as of the Effective Date. Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or a Final Order of the Bankruptcy Court shall re-vest in and be fully enforceable by the Reorganized Debtor in accordance with its terms, except as such terms may have been modified by the provisions of the Plan, the Bankruptcy Code or any Final Order of the Bankruptcy Court authorizing and providing for its assumption. Any motions to assume Executory Contracts or Unexpired Leases pending on the Confirmation Date shall be subject to approval by a Final Order on or after the Confirmation Date but may be withdrawn, settled, or otherwise prosecuted by the Reorganized Debtor.

To the maximum extent permitted by law, to the extent that any provision in any Executory Contract or Unexpired Lease assumed pursuant to the Plan restricts or prevents, purports to restrict or prevent, or is breached or deemed breached by the commencement of the case, the Debtor's financial condition, the assumption of such Executory Contract or Unexpired Lease (including any "change of control" provision), then such provision shall be deemed unenforceable such that the non-Debtor party thereto shall not be able to terminate, restrict, or modify such Executory Contract or Unexpired Lease, or to exercise any other default-related rights with respect thereto, in each case, based upon the commencement of the Chapter 11 Case, the Debtor's financial condition or the assumption of such Executory Contract or Unexpired Lease.

B.    <u>Rejection Damages Claims.</u>

Unless required to be filed earlier pursuant to the Bar Date Order or another Final Order of the Bankruptcy Court, all Proofs of Claim for Rejection Damages Claims, if any, must be filed within thirty (30) days after the effective date of such rejection. **Any Rejection Damages Claim that is not timely filed shall be automatically Disallowed, forever barred from assertion, and**

unenforceable against the Debtor or the Reorganized Debtor, the Estate, or their property without the need for any objection by the Reorganized Debtor or further notice to, or action, order, or approval of the Bankruptcy Court, and any such Rejection Damages Claim shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Proof of Claim to the contrary. All Allowed Rejection Damages Claims shall be classified as Allowed General Unsecured Claims and treated in accordance with Article III.B.3.

C.    Cure of Defaults under Executory Contracts and Unexpired Leases.

Not later than the date of filing of the Plan Supplement, the Debtor shall provide notices of proposed Cure Amounts to the counterparties to the Executory Contracts and Unexpired Leases proposed to be assumed under the Plan, which shall include a description of the procedures for objecting to the Cure Amount, the ability of the Debtor to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or any other matter pertaining to assumption.

Unless otherwise agreed in writing by the parties to the applicable Executory Contract or Unexpired Lease, **any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or related Cure Amount must be filed, served, and actually received by the counsel to the Debtor within ten (10) days of the service of assumption and proposed Cure Amount, or such shorter period as agreed to by the parties or authorized by the Bankruptcy Court.** Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption or Cure Amount shall be deemed to have assented to such assumption and Cure Amount and shall be forever barred, estopped, and enjoined from contesting the Debtor' assumption of the applicable Executory Contract or Unexpired Lease and from requesting payment of a Cure Amount that differs from the amounts paid or proposed to be paid by the Debtor or the Reorganized Debtor, in each case without the need for any objection by the Debtor or the Reorganized Debtor or any further notice to or action, order, or approval of the Bankruptcy Court. The Reorganized Debtor may settle any Cure Amount without any further notice to or action, order, or approval of the Bankruptcy Court.

The Debtor or the Reorganized Debtor, as applicable, shall pay undisputed Cure Amounts, if any, on the Effective Date or as soon as reasonably practicable thereafter, or on such other terms as the parties may agree. If there is any dispute regarding the Cure Amount, the ability of the Debtor to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or any other matter pertaining to assumption, then the Debtor or the Reorganized Debtor, as applicable, shall pay the applicable Cure Amount as soon as reasonably practicable after entry of a Final Order resolving such dispute and approving such assumption, or as may otherwise be agreed upon by the Debtor or the Reorganized Debtor, as applicable, and the counterparty to the Executory Contract or Unexpired Lease. The payment of Cure Amounts required by section 365(b)(1) of the Bankruptcy Code following the entry of a Final Order resolving the dispute and approving the assumption and shall not prevent or delay implementation of the Plan or the occurrence of the Effective Date.

The Debtor' assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise and payment of the applicable Cure Amount shall result in the full release and

satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption. **Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed in the Chapter 11 Case, including pursuant to the Confirmation Order, shall be deemed Disallowed and expunged as of the later of (1) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such assumption, (2) the effective date of such assumption or (3) the Effective Date, in each case without the need for any objection by the Debtor or the Reorganized Debtor or any further notice to or action, order, or approval of the Bankruptcy Court.**

D.    Contracts and Leases Entered into After the Petition Date.

Contracts and leases entered into after the Petition Date by the Debtor, including any Executory Contracts and Unexpired Leases assumed by the Debtor, will be performed by the Debtor or Reorganized Debtor thereto in the ordinary course of its operations. Accordingly, such contracts and leases (including any assumed Executory Contract and Unexpired Leases) shall survive and remain unaffected by entry of the Confirmation Order.

E.    Compensation and Benefits Programs.

Other than those Compensation and Benefits Programs assumed by the Debtor prior to entry of the Confirmation Order, all of the Compensation and Benefits Programs entered into before the Petition Date and not since terminated shall be deemed to be, and shall be treated as though they are, Executory Contracts under the Plan and deemed assumed under sections 365 and 1123 of the Bankruptcy Code, and the Debtor's and Reorganized Debtor's obligations under the Compensation and Benefits Programs survive and remain unaffected by entry of the Confirmation Order and be fulfilled in the ordinary course of the Debtor's and Reorganized Debtor's operations. Compensation and Benefits Programs assumed by the Debtor prior to  entry of the Confirmation Order shall continue to be fulfilled in the ordinary course of the Debtor's non-profit operations from and after the date of any order of the Bankruptcy Court authorizing the assumption of such Compensation and Benefits Program.

F.    Workers' Compensation Program.

As of the Effective Date, the Debtor and the Reorganized Debtor shall continue to honor their obligations under: (a) all applicable workers' compensation laws; and (b) the Workers' Compensation Program. All Proofs of Claims on account of the Workers' Compensation Program shall be deemed withdrawn automatically and without any further notice to or action, order, or approval of the Bankruptcy Court; provided, however, that nothing in the Plan shall limit, diminish, or otherwise alter the Debtor's or Reorganized Debtor's defenses, Causes of Action, or other rights under applicable non-bankruptcy law with respect to the Workers' Compensation Programs; provided further, however, that nothing herein shall be deemed to impose any obligations on the Debtor or their insurers in addition to what is provided for under the terms of the Workers' Compensation Programs and applicable state law.

G.      Protective Self-Insurance Program.

As of the Effective Date, the Debtor and the Reorganized Debtor shall continue to honor Claims of Ministry Members on account of PSIP Insurance Obligations. All Proofs of Claims filed by Ministry Members on account of PSIP Insurance Obligations shall be deemed withdrawn automatically and without any further notice to or action, order, or approval of the Bankruptcy Court; provided, however, that nothing in the Plan shall limit, diminish, or otherwise alter the Debtor's or Reorganized Debtor's defenses, Causes of Action, or other rights under applicable non-bankruptcy law with respect to the PSIP Insurance Obligations; provided further, however, that nothing herein shall be deemed to impose any obligations on the Debtor or their insurers in addition to what is provided for under the terms of the Debtor's PSIP program and applicable state law; provided further, however, for the avoidance of doubt, nothing in this Article VI.G shall be construed to require the Debtor and Reorganized Debtor to continue to honor Abuse Claims.

H.      Gift Annuity Program.

As of the Effective Date, the Debtor and the Reorganized Debtor shall continue to honor their obligations under their Gift Annuity Agreements. All Proofs of Claims on account of Gift Annuity Agreements shall be deemed withdrawn automatically and without any further notice to or action, order, or approval of the Bankruptcy Court; provided, however, that nothing in the Plan shall limit, diminish, or otherwise alter the Debtor's or Reorganized Debtor's defenses, Causes of Action, or other rights under applicable non-bankruptcy law with respect to the Gift Annuity Agreements; provided further, however, that nothing herein shall be deemed to impose any obligations on the Debtor in addition to what is provided for under the terms of the Gift Annuity Agreements and applicable state law.

I.      Indemnification Obligations.

Notwithstanding anything herein to the contrary, each Indemnification Obligation shall be assumed by the Debtor effective as of the Effective Date, pursuant to sections 365 and 1123 of the Bankruptcy Code or otherwise. Each Indemnification Obligation shall remain in full force and effect, shall not be modified, reduced, discharged, impaired, or otherwise affected in any way, and shall survive Unimpaired and unaffected, irrespective of when such obligation arose. For the avoidance of doubt, this Article VI.I affects only the obligations of the Debtor and Reorganized Debtor with respect to any Indemnification Obligations owed to or for the benefit of past and present directors, officers, employees, attorneys, accountants, and other professionals and agents of the Debtor, and shall have no effect on nor in any way discharge or reduce, in whole or in part, any obligation of any other Entity owed to or for the benefit of such directors, officers, employees, attorneys, accountants, and other professionals and agents of the Debtor.

All Proofs of Claim filed on account of an Indemnification Obligation owed to or for the benefit of past and present directors, officers, employees, attorneys, accountants, investment bankers, and other professionals and agents of the Debtor shall be deemed satisfied and expunged from the claims register as of the Effective Date as such Indemnification Obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to the Plan, without any further notice to or action, order, or approval of the Bankruptcy Court.

44

J.      Modifications, Amendments, Supplements, Restatements, or Other Agreements.

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless the Debtor rejects or repudiates any of the foregoing agreements. Modifications, amendments, and supplements to, or restatements of, prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtor during the Chapter 11 Case shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

K.      Reservation of Rights.

Nothing contained in the Plan or the Plan Supplement shall constitute an admission by the Debtor that a contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder. If there is a dispute as of the Confirmation Date regarding whether a contract or lease is or was executory or unexpired at the time of assumption, the Debtor, or, after the Effective Date, the Reorganized Debtor, shall have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease, including by rejecting such contract or lease *nunc pro tunc* to the Confirmation Date.

## ARTICLE VII

## DISTRIBUTIONS

A.      Distributions Generally.

Except with respect to Trust Distributions on account of Abuse Claims and payment of Trust Expenses, which shall be made in accordance with the terms of the applicable Trust Documents, the Reorganized Debtor shall make all distributions to the appropriate holders of Allowed Claims in accordance with the terms of the Plan, including this Article VII.

B.      Minimum Consideration Payments.

On the Effective Date or as soon as practicable thereafter, or with respect to a Contested Abuse Claim promptly upon such Claim becoming an Allowed Claim, the Debtor or the Reorganized Debtor, as applicable, shall distribute: (i) $50,000 to each holder of an Abuse Claim (other than an Indirect Abuse Claim) that has filed a proof of claim against the Debtor that has not been withdrawn, disallowed, or expunged by Final Order of the Bankruptcy Court, and (ii) $50,000 to each plaintiff in a CVA Action that includes (as of both the Bar Date and the Effective Date) a Co-Insured Party as a defendant in such CVA Action. For the avoidance of doubt, (a) no holder of an Abuse Claim shall be eligible to receive more than $100,000, in the aggregate, as Minimum Consideration Payments, and (b) no holder of an Indirect Abuse Claim or a Future Abuse Claim are eligible to receive Minimum Consideration Payments.  Notwithstanding anything in this paragraph to the contrary, no payment shall be made under the above clause (i) or clause (ii) to the

45

holder of a Contested Abuse Claim unless and until such Contested Abuse Claim becomes an Allowed Claim (a) with respect to the payment set forth in clause (i) above, against the Debtor, and (b) with respect to the payment set forth in clause (ii) above, against a Co-Insured Party. Upon Disallowance of a Contested Abuse Claim, the Minimum Consideration Payment related to such Contested Abuse Claim shall be transferred to the applicable Trust for the benefit of the Contested Claim Subfund.

C.      Distribution Record Date.

The Debtor or the Reorganized Debtor, as applicable, shall have no obligation to recognize any transfer, sale or assignment of Claims occurring after the close of business on the Distribution Record Date. With respect to payment of any Cure Amounts or assumption disputes, neither the Debtor nor the Reorganized Debtor shall have any obligation to recognize or deal with any party other than the non-Debtor party to the applicable Executory Contract or Unexpired Lease as of the close of business on the Distribution Record Date, even if such non-Debtor party has sold, assigned, or otherwise transferred its Claim for a Cure Amount.

D.      Date of Plan Distributions.

Except as otherwise provided in the Plan, any Plan Distributions shall be made on the Effective Date or as otherwise determined in accordance with the Plan, including the treatment provisions of Article III, or as soon as practicable thereafter; provided, however, that the Reorganized Debtor shall from time to time determine subsequent distribution dates to the extent they determine them to be appropriate; provided further, however, that the Reorganized Debtor reserve its right to seek Bankruptcy Court approval of procedures and mechanisms for Plan Distributions.

E.      No Postpetition Interest on Claims.

Except as otherwise provided in the Plan, the Confirmation Order, or another order of the Bankruptcy Court or required by the Bankruptcy Code (including postpetition interest in accordance with sections 506(b) and 726(a)(5) of the Bankruptcy Code), interest shall not accrue or be paid on any Claims on or after the Petition Date; provided, however, that if interest is payable pursuant to the preceding sentence, interest shall accrue at the federal judgment rate pursuant to 28 U.S.C. § 1961 on a non-compounded basis from the date the obligation underlying the Claim becomes due and is not timely paid through the date of payment.

F.      Undeliverable and Non-Negotiated Plan Distributions.

1.      *Undeliverable Plan Distributions*.

If any Plan Distribution to a holder of an Allowed Claim is returned to the Reorganized Debtor as undeliverable, no further Plan Distributions shall be made to such holder unless and until the Reorganized Debtor is notified in writing of such holder's then-current address or other necessary information for delivery, at which time such previously undeliverable Plan Distribution shall be made to such holder within ninety (90) days of receipt of such holder's then-current address or other necessary information; provided, however, that any such undeliverable Plan

46

Distribution shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of 180 days after the date of the initial attempted Plan Distribution. After such date, all unclaimed property or interests in property shall revert to the Reorganized Debtor automatically and without the need for any notice to or further order of the Bankruptcy Court (notwithstanding any applicable non-bankruptcy escheatment, abandoned, or unclaimed property laws to the contrary), and the right, title, and interest of any holder to such property or interest in property shall be discharged and forever barred.

2.   <em>Non-Negotiated Plan Distributions</em>.

If any Plan Distribution to a holder of an Allowed Claim is not negotiated for a period of 180 days after the Plan Distribution, then such Plan Distribution shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and re-vest in the Reorganized Debtor. After such date, all non-negotiated property or interests in property shall revert to the Reorganized Debtor automatically and without the need for any notice to or further order of the Bankruptcy Court (notwithstanding any applicable non-bankruptcy escheatment, abandoned, or unclaimed property laws to the contrary), and the right, title, and interest of any holder to such property or interest in property shall be discharged and forever barred.

G.   <u>Manner of Payment under the Plan.</u>

Except as otherwise specifically provided in the Plan, at the option of the Reorganized Debtor, any cash payment to be made hereunder may be made by a check or wire transfer or as otherwise required or provided in applicable agreements or customary practices of the Reorganized Debtor.

H.   <u>Satisfaction of Claims.</u>

Except as otherwise specifically provided in the Plan, any Plan Distributions and deliveries to be made on account of Allowed Claims under the Plan shall be in complete and final satisfaction, settlement, and discharge of and exchange for such Allowed Claims.

I.   <u>Minimum Cash Distributions.</u>

The Reorganized Debtor shall not be required to make any Plan Distribution of cash less than fifty dollars ($50) to any holder of an Allowed Claim; <u>provided</u>, <u>however</u>, that if any Plan Distribution is not made pursuant to this Article VII.I, such distribution shall be added to any subsequent Plan Distribution to be made on behalf of the holder's Allowed Claim.

J.   <u>Allocation of Plan Distributions Between Principal and Interest.</u>

Except as otherwise required by law (as reasonably determined by the Reorganized Debtor), Plan Distributions with respect to an Allowed Claim shall be allocated first to the principal portion of such Allowed Claim (as determined for United States federal income tax purposes) and, thereafter, to the remaining portion of such Allowed Claim, if any.

47

K.     <u>No Plan Distribution in Excess of Amount of Allowed Claim.</u>

Except as provided in Article VII.D, no holder of an Allowed Claim shall receive, on account of such Allowed Claim, Plan Distributions in excess of the Allowed amount of such Claim.

L.     <u>Withholding and Reporting Requirements.</u>

1.     *Withholding Rights*.

Each Disbursing Agent shall comply with all applicable withholding and reporting requirements imposed on it by any federal, state, or local taxing authority, including but not limited to U.S. federal backup withholding, and all Plan Distribution and all related agreements shall be subject to any such withholding or reporting requirements. Notwithstanding any provision in the Plan to the contrary, each Disbursing Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the Distribution to generate sufficient funds to pay applicable withholding taxes, withholding Distributions pending receipt of information necessary to facilitate such Distributions or establishing any other mechanisms such Disbursing Agent believes are reasonable and appropriate. Any amounts withheld pursuant to the preceding sentence shall be deemed to have been distributed to and received by the applicable recipient for all purposes of the Plan. Notwithstanding the foregoing, each holder of an Allowed Claim or any other Entity that receives a Plan Distribution shall have responsibility for any taxes imposed by any Governmental Unit, including income, withholding, and other taxes, on account of such Plan Distribution. Each Disbursing Agent shall have the right, but not the obligation, to not make a Plan Distribution until such holder has made arrangements satisfactory to such Disbursing Agent for payment of any such tax obligations. Such Disbursing Agent shall have the right to allocate all Distributions in compliance with applicable wage garnishments, alimony, child support and other spousal awards, liens and encumbrances.

Notwithstanding any provision of the Plan, each Entity receiving a Distribution pursuant to the Plan will have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed on it by any governmental unit on account of such Distribution, including income, withholding and other tax obligations.

2.     *Forms*.

Any Entity entitled to receive any property as a Plan Distribution shall, upon request, deliver to the applicable Disbursing Agent an appropriate Form W-9 or (if the payee is not a United States person) Form W-8. If such request is made by the applicable Disbursing Agent and the holder fails to comply before the earlier of (a) the date that is 180 days after the request is made and (b) the date that is 180 days after the date of distribution, the amount of such Plan Distribution shall irrevocably revert to the Reorganized Debtor and any Claim in respect of such Plan Distribution shall be discharged and forever barred from assertion against the Reorganized Debtor or its respective property.

48

M.    <u>Allowed Claims Paid by Third Parties.</u>

To the extent a holder receives a distribution from a Trust or Plan Distribution on account of an Allowed Claim and also receives payment from a party other than the Debtor or the Reorganized Debtor on account of such Allowed Claim, such holder shall, within thirty (30) days of receipt thereof, repay or return the distribution or the Plan Distribution to the relevant Trustee or Reorganized Debtor, as applicable, to the extent the holder's total recovery on account of such Allowed Claim from the third party and under the Plan exceeds the amount of the Allowed Claim as of the date of any such Plan Distribution.

**ARTICLE VIII**

**DISPUTED CLAIMS**

A.    <u>Objections to Claims.</u>

The Reorganized Debtor shall be entitled to object to all Administrative Expense Claims, Priority Tax Claims, Priority Claims, Secured Claims, and General Unsecured Claims. The Arrowood Settlement Trustee and the General Settlement Trustee shall exclusively be entitled to administer and resolve Settling Abuse Claims in accordance with the Trust Distribution Procedures.  The Litigation Administrator shall exclusively be entitled to defend and object to all Contested Abuse Claims in accordance with the Trust Documents. After the Effective Date, the Litigation Administrator shall have and retain any and all rights and defenses that the Debtor or any Covered Party had with respect to any Claim to which it may object or otherwise contest. After the Effective Date, the Reorganized Debtor shall have and retain any and all rights and defenses that the Debtor had with respect to any Claim to which it may object or otherwise contest. The Reorganized Debtor and Litigation Administrator shall serve and file any objection to a Proof of Claim on or before the Claims Objection Deadline; <u>provided</u>, <u>however</u>, that the Arrowood Settlement Trustee and the General Settlement Trustee shall administer the Settling Abuse Claims on a timeline determined by such Trustees, in consultation with the Trust Advisory Committee, subject to approval by the Bankruptcy Court. The expiration of the Claims Objection Deadline shall not limit or affect the Debtor's or Reorganized Debtor's rights to dispute Claims asserted in the ordinary course of business other than through a Proof of Claim.

B.    <u>Resolution of Disputed Administrative Expenses and Disputed Non-Settling Abuse Claims.</u>

On and after the Effective Date, (a) the Reorganized Debtor shall have the authority to prosecute and withdraw objections to, compromise, settle, or otherwise resolve Administrative Expense Claims (other than with respect to Professional Fee Claims), Priority Tax Claims, Priority Claims,  Secured Claims and General Unsecured Claims, and (b) the Litigation Administrator shall have authority, subject to the right of any Insurer to raise any Insurer Coverage Defense in response to a demand by the Litigation Administrator that such Insurer handle, defend, or pay any such Abuse Claim, to prosecute and withdraw objections to, compromise, settle, or otherwise resolve Contested Abuse Claims, in the case of each of (a) and (b), without approval of the Bankruptcy Court. For the avoidance of doubt, only the Arrowood Settlement Trustee and the General Settlement Trustee shall have the authority to administer and resolve Settling Abuse Claims in

49

accordance with the Arrowood Settlement Trust Agreement, the General Settlement Trust Agreement and the Trust Distribution Procedures.

      C.      <u>Resolution of Settling Abuse Claims.</u>

Settling Abuse Claims shall be resolved in accordance with the Trust Documents, subject to the provisions of Article IV and subject to the right of any Insurer to raise any Insurer Coverage Defense in response to a demand by the Arrowood Settlement Trust or the General Settlement Trust that such Insurer handle, defend, or pay any such Abuse Claim.

      D.      <u>Payments and Distributions with Respect to Disputed Claims.</u>

Notwithstanding anything herein to the contrary, if any portion of a Claim is a Disputed Claim, no distribution (including a Trust Distribution on account of a Contested Abuse Claim under the Trust Documents) or Plan Distribution shall be made on account of such Claim unless and until (and to the extent that) such Disputed Claim becomes an Allowed Claim.

      E.      <u>Distributions After Allowance.</u>

After such time as a Disputed Claim becomes, in whole or in part, an Allowed Claim, the holder thereof shall (i) if an Allowed Contested Abuse Claim, be entitled to such Trust Distribution from the Arrowood Settlement Trust or the General Settlement Trust, as relevant, in accordance with the Trust Documents, or (ii) if an Allowed Claim, other than an Allowed Contested Abuse Claim, a Plan Distribution to which such holder is then entitled as provided in the Plan, without interest, as provided in Article VII.H. Such Plan Distributions shall be made as soon as practicable after the date that the order or judgment of the Bankruptcy Court Allowing such Disputed Claim (or portion thereof) becomes a Final Order or, with respect to a Trust Distribution on account of an Allowed Contested Abuse Claim, in accordance with the Trust Documents.

      F.      <u>Estimation of Claims.</u>

The Debtor or the Reorganized Debtor, with respect to contingent, unliquidated, and/or Disputed Administrative Expense Claims, Priority Tax Claims, Priority Claims, Secured Claims, and General Unsecured Claims, may at any time request that the Bankruptcy Court estimate any such contingent, unliquidated, or Disputed Claim or Class of Claims pursuant to section 502(c) of the Bankruptcy Code or otherwise, including to establish a reserve for Plan Distribution purposes, regardless of whether the Debtor, the Reorganized Debtor, or any other Entity had previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection. The Bankruptcy Court will retain jurisdiction to estimate any Claim or Class of Claims at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any contingent, unliquidated, or Disputed Claim or Class of Claims, the amount so estimated shall constitute either the Allowed amount of such Claim or Class of Claims, or a maximum limitation on such Claim or Class of Claims, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on the amount of such Claim or Class of Claims, the Debtor or the Reorganized Debtor, as applicable, may pursue supplementary proceedings to object to the allowance of such Claims; <u>provided</u>, <u>however</u>, that such limitation shall not apply to Claims

requested by the Debtor to be estimated for voting purposes only.

G.    Claims Resolution Procedures Cumulative.

All of the objection, estimation, and resolution procedures in the Plan are intended to be cumulative and not exclusive of one another. Claims may be estimated and subsequently settled, compromised, withdrawn, or resolved in accordance with the Plan without further notice or Bankruptcy Court approval.

H.    Interest.

To the extent that a Disputed Claim becomes an Allowed Claim after the Effective Date, the holder of such Claim shall not be entitled to any interest that accrued thereon from and after the Effective Date, except as provided in Article VII.D.

I.    Insured Non-Abuse Claims.

To the extent that an Insurer satisfies an Insured Non-Abuse Claim in whole or in part (based on either a settlement or judgment), then immediately upon such satisfaction, the portion of such Claim so satisfied may be expunged without an objection to such Claim having to be filed and without any further notice to or action, order or approval of the Court.

## ARTICLE IX

## EXIT FINANCING

Upon entry of the Confirmation Order, the Debtor and Reorganized Debtor (as applicable) shall be authorized to execute and deliver, and to consummate the transactions contemplated by or permitted under, the Exit Facility Documents (including any asset transfers contemplated thereby) in all respects without further notice to or order of the Bankruptcy Court, act or action under applicable Law, regulation, order or rule or the vote, consent, authorization or approval of any person or entity, subject to such modifications as the Debtor or Reorganized Debtor (as applicable) may deem to be necessary to consummate the Exit Facility Documents. Confirmation of the Plan shall be deemed approval of the Exit Facility and Exit Facility Documents, including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, obligations and guarantees to be incurred and fees paid in connection therewith. On the Effective Date, the Exit Facility shall constitute legal, valid, binding and authorized indebtedness and obligations of the Reorganized Debtor, enforceable in accordance with its terms and such indebtedness and obligations (and the transactions effectuated to implement the Exit Financing) shall not be and shall not be deemed to be, enjoined or subject to discharge, impairment, release or avoidance under the Plan, the Confirmation Order or on account of the confirmation or consummation of the Plan.

On the Effective Date, all the liens and security interests granted in accordance with the Exit Facility Documents shall be legal, valid, binding upon the Reorganized Debtor, enforceable in accordance with their respective terms, and no obligation, payment, transfer or grant of security under the Exit Facility Documents shall be stayed, restrained, voidable, or recoverable under the

Bankruptcy Code or under any applicable law or subject to any defense, reduction, recoupment, setoff or counterclaim. Such liens and security interests shall be deemed automatically perfected on the Effective Date without the need for the taking of any further filing, recordation, approval, consent or other action, and such liens and security interests shall not be enjoined or subject to discharge, impairment, release, avoidance, recharacterization or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy law.

On the Effective Date, the Reorganized Debtor and the Exit Facility Lender shall be authorized to make all filings and recordings, obtain all governmental approvals and consents, and take any other actions necessary to establish and perfect such liens and security interest under the provisions of the applicable state, federal, or other law (whether domestic or foreign) that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfections shall occur automatically by virtue of the entry of the Confirmation Order and any such filings, recordings, approvals, and consents shall not be required), and the Reorganized Debtor shall thereafter cooperate to make all other findings and recordings that otherwise would be necessary under applicable law to give notice of such liens and security interests to third parties.

## ARTICLE X

## CONFIRMATION AND CONSUMMATION OF PLAN

A.    Conditions Precedent to Confirmation.

Confirmation of the Plan shall not occur unless all of the following conditions precedent have been satisfied:

1.    the Confirmation Order is in form and substance acceptable to the Debtor;

2.    the Confirmation Order shall approve and implement the Channeling Injunction set forth in Article XI.D; and

3.    the Plan Documents shall be in form and substance acceptable to the Debtor.

B.    Conditions Precedent to the Effective Date.

The Effective Date shall not occur unless all of the following conditions precedent have been satisfied, unless waived in accordance with Article X.C:

1.    the Confirmation Order, in form and substance acceptable to the Debtor, shall have been entered by the Bankruptcy Court and shall have become a Final Order;

2.    the Arrowood Settlement Trust Agreement and the General Settlement Trust Agreement and the Trust Distribution Procedures shall have become effective in accordance with the terms of the Plan;

3.    the Trust shall have been established and funded with those amounts contemplated to be funded on the Effective Date in accordance with the Plan;

52

4.       the Debtor shall have obtained all authorizations, consents, certifications, approvals, rulings, opinions or other documents that are necessary to implement and effectuate the Plan, including any and all canonical approvals; all actions, documents, and agreements necessary to implement and effectuate the Plan shall have been effected or executed; and

5.       the Debtor shall have filed a notice of occurrence of the Effective Date.

C.       <u>Waiver of Conditions Precedent to the Effective Date.</u>

Except for the condition precedent set forth in Article X.B.1, each of the conditions precedent to the occurrence of the Effective Date set forth in Article X.B may be waived in whole or in part by the Debtor without notice to or leave or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan. The failure to satisfy any condition precedent to the Confirmation Date or satisfy or waive any condition precedent to the Effective Date may be asserted by the Debtor regardless of the circumstances giving rise to the failure of such condition to be satisfied.

D.       <u>*Vacatur* of Confirmation Order; Non-Occurrence of Effective Date.</u>

If the Confirmation Order is vacated or the Effective Date does not occur within 180 days after entry of the Confirmation Order (subject to extension by the Debtor in its sole discretion), the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall (1) constitute a waiver or release of any Causes of Action by or Claims against the Debtor; (2) prejudice in any manner the rights of the Debtor, any holders of a Claim or any other Entity; (3) constitute an admission, acknowledgment, offer, or undertaking by the Debtor, any holders, or any other Entity in any respect; or (4) be used by the Debtor or any other Entity as evidence (or in any other way) in any litigation, including with respect to the strengths and weaknesses of positions, arguments or claims of any of the parties to such litigation.

# ARTICLE XI

# EFFECT OF PLAN CONFIRMATION

A.       <u>Binding Effect.</u>

As of the Effective Date, all provisions of the Plan, including all agreements, instruments and other documents filed in connection with the Plan by the Debtor or the Reorganized Debtor, and the Trust Documents, shall be binding upon the Debtor, the Estate, the Reorganized Debtor, the Insurers, all holders of Claims against the Debtor, all holders of Abuse Claims, each such holder's respective successors and assigns, and all other Entities that are affected in any manner by the Plan, regardless of whether the Claim of such holder is Impaired under the Plan and whether such holder has accepted the Plan. Except as otherwise expressly provided in the Plan, all agreements, instruments and other documents filed in connection with the Plan shall be given full force and effect and shall bind all Entities referred to therein on and after the Effective Date, whether or not such agreements are actually issued, delivered or recorded on or after the Effective Date and whether or not such Entities have actually executed such agreement.

B.    Pre-Confirmation Injunctions and Stays.

Unless otherwise provided herein, the Confirmation Order, or in a Final Order of the Bankruptcy Court, all injunctions or stays arising under or entered during the Chapter 11 Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

C.    Discharge.

1.    *Discharge of the Debtor.*

Except as expressly provided in the Plan or the Confirmation Order, all consideration distributed under the Plan, and the Debtor's contribution of the DRVC Trust Contribution, shall be in exchange for, and in complete satisfaction, settlement, discharge, termination and release of, all Claims of any nature whatsoever against or in the Debtor or any of its assets or properties based upon any act, omission, transaction, occurrence, or other activity of any nature that occurred prior to the Effective Date, and, as of the Effective Date, the Debtor shall be deemed discharged and released, and each holder of a Claim and any successor, assign, and affiliate of such holder shall be deemed to have forever waived, discharged and released the Debtor, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, rights and liabilities, and all debts of the kind specified in section 502 of the Bankruptcy Code, based upon any act, omission, transaction, occurrence, or other activity of any nature that occurred prior to the Effective Date, in each case whether or not (a) a Proof of Claim based upon such debt is filed or deemed filed under section 501 of the Bankruptcy Code, (b) a Claim based upon such debt is Allowed under section 502 of the Bankruptcy Code, (c) a Claim based upon such debt is or has been Disallowed by order of the Bankruptcy Court, or (d) the holder of a Claim based upon such debt is deemed to have accepted the Plan.

2.    *Discharge Injunction.*

As of the Effective Date, except as expressly provided in the Plan or the Confirmation Order, all holders of Claims of any nature whatsoever against or in the Debtor or any of its assets or properties based upon any act, omission, transaction, occurrence, or other activity of any nature that occurred prior to the Effective Date shall be precluded and permanently enjoined from prosecuting or asserting any such discharged Claim against the Debtor or the Reorganized Debtor or the property of the Debtor or the Reorganized Debtor. In accordance with the foregoing, except as expressly provided in the Plan or the Confirmation Order, the Confirmation Order shall be a judicial determination of discharge or termination of all Claims, and other debts and liabilities against or in the Debtor pursuant to sections 105, 524 and 1141 of the Bankruptcy Code, and such discharge shall void any judgment obtained against the Debtor at any time to the extent such judgment relates to a discharged Claim.

D.    Channeling Injunction.

1.    *Terms.*

54

To preserve and promote the settlements contemplated by and provided for in the Plan and to supplement, where necessary, the injunctive effect of the discharge as provided in sections 1141 and 524 of the Bankruptcy Code and as described in this Article XI, pursuant to the exercise of the equitable jurisdiction and power of the Bankruptcy Court under section 105(a) of the Bankruptcy Code, all Entities that have held or asserted, currently hold or assert, or that may in the future hold or assert, any Abuse Claim against the Covered Parties, or any of them, shall be permanently and forever stayed, restrained and enjoined from taking any action for the purpose of directly or indirectly collecting, recovering, or receiving payments, satisfaction, or recovery from any Covered Party or any Insurers with respect to any such Abuse Claim, including:

a.    commencing, conducting, or continuing, in any manner, whether directly or indirectly, any suit, action, or other proceeding of any kind in any forum with respect to any such Abuse Claim against any Covered Party or any property or interest in property of any Covered Party;

b.    enforcing, levying, attaching, collecting or otherwise recovering, by any manner or means, either directly or indirectly, any judgment, award, decree, or other order against any Covered Party or any property or interest in property of any Covered Party with respect to any such Abuse Claim;

c.    creating, perfecting, or enforcing in any manner, whether directly or indirectly, any Lien or Encumbrance of any kind against any Covered Party or any property or interest in property of any Covered Party with respect to any such Abuse Claim;

d.    asserting or accomplishing any setoff, right of subrogation, indemnity, contribution, or recoupment of any kind, whether directly or indirectly, against any obligation due to any Covered Party or any property or interest in property of any Covered Party with respect to any such Abuse Claim; and

e.    taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan Documents with respect to any such Abuse Claim.

2.    *Reservations*.

Notwithstanding anything to the contrary in this Article XI.D, the Channeling Injunction shall not enjoin:

a.    the right of any Entity to the treatment afforded to such Entity under the Plan, including the rights of holders of Abuse Claims to assert such Abuse Claims in accordance with the Trust Documents solely against the Arrowood Settlement Trust or the General Settlement Trust;

55

b.     the right of any Entity to assert any Claim for payment of Trust Expenses solely against the Arrowood Settlement Trust or the General Settlement Trust;

c.     the Arrowood Settlement Trust or the General Settlement Trust from enforcing rights under the Trust Documents;

d.     the rights of the Arrowood Settlement Trust or the General Settlement Trust, the Co-Insured Parties and the Reorganized Debtor (to the extent permitted or required under the Plan) to prosecute any Claims, including Insurance Actions, against the Insurers, other than the Settling Insurers, based on or arising from the Insurance Policies or otherwise; or

e.     the rights of the Co-Insured Parties with respect to Co-Insured Claims against, or with respect to, the Arrowood Settlement Trust and the General Settlement Trust.

E.     <u>Provisions Relating to Channeling Injunctions.</u>

     1.     *Modifications*.

There can be no modification, dissolution, or termination of the Channeling Injunction, which shall be a permanent injunction.

     2.     *Non-Limitation*.

Nothing in the Plan or the Trust Documents shall or shall be construed in any way to limit the scope, enforceability, or effectiveness of the Channeling Injunction or the assumption by the Arrowood Settlement Trust or the General Settlement Trust of all liability with respect to the Abuse Claims.

     3.     *Bankruptcy Rule 3016 Compliance*.

The Debtor's compliance with the requirements of Bankruptcy Rule 3016 shall not constitute or be deemed to constitute an admission that the Plan provides for an injunction against conduct not otherwise enjoined under the Bankruptcy Code.

     4.     *No Duplicative Recovery*.

In no event shall any holder of an Abuse Claim be entitled to receive any payment, reimbursement, or restitution from any Covered Party under any theory of liability for the same loss, damage, or other Claim that is reimbursed by the Arrowood Settlement Trust or the General Settlement Trust or is otherwise based on the same events, facts, matters, or circumstances that gave rise to the applicable Abuse Claim.

56

F.    Injunction Against Interference with Plan.

Upon entry of the Confirmation Order, all holders of Claims shall be precluded and enjoined from taking any actions to interfere with the implementation and consummation of the Plan.

G.    Releases.

1.    *Releases by the Debtor.*

As of the Effective Date, except for the rights that remain in effect from and after the Effective Date to enforce the Plan and the Confirmation Order, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, including the service of the Covered Parties to facilitate and implement the reorganization of the Debtor, as an integral component of the Plan, the Debtor, the Reorganized Debtor, and the Estate shall, and shall be deemed to, expressly, conclusively, absolutely, unconditionally, irrevocably, and forever release and discharge each and all of the Covered Parties of and from any and all Causes of Action (including Avoidance Actions), any and all other Claims, obligations, rights, demands, suits, judgments, damages, debts, remedies, losses and liabilities of any nature whatsoever (including any derivative claims or Causes of Action asserted or that may be asserted on behalf of the Debtor, the Reorganized Debtor, or the Estate), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, contract, tort or otherwise, based on or relating to, or in any manner arising from, in whole or in part, any act, omission, transaction, event, or other circumstance taking place or existing on or before the Effective Date (including before the Petition Date) in connection with or related to the Debtor, the Reorganized Debtor, the Estate, their respective assets and properties, the Chapter 11 Case, the Plan Documents, and any related agreements, instruments, and other documents created or entered into before or during the Chapter 11 Case, the pursuit of entry of the Confirmation Order, the administration and implementation of the Plan, including the distribution of property under the Plan, or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to the foregoing. Notwithstanding anything to the contrary in the foregoing, the releases set forth in this Article XI.G.1 shall not be construed as releasing any post-Effective Date obligations of any Entity under the Plan or any document, instrument, or agreement executed to implement the Plan or reinstated under the Plan.

2.    *Releases by Holders of Abuse Claims.*

As of the Effective Date, except for the rights that remain in effect from and after the Effective Date to enforce the Plan and the Confirmation Order, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, including the service of the Covered Parties to facilitate and implement the reorganization of the Debtor, as an integral component of the Plan, and except as otherwise expressly provided in the Plan or the Confirmation Order, to the maximum extent permitted under applicable law, as such law may be extended subsequent to the Effective Date, all holders of Abuse Claims (including Settling Abuse Claims, Contested Abuse Claims and Future Abuse Claims), shall, and shall be deemed to, expressly, conclusively, absolutely, unconditionally, irrevocably,

57

and forever discharge and release each and all of the Covered Parties and their respective property and successors and assigns of and from all Abuse Claims and any and all Claims and Causes of Action whatsoever, whether known or unknown, asserted or unasserted, derivative or direct, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, whether for tort, fraud, contract, veil piercing or alter-ego theories of liability, successor liability, contribution, indemnification, joint liability, or otherwise, arising from or related in any way to such Abuse Claims.

       H.    <u>Exculpation.</u>

Effective as of the Effective Date, to the fullest extent permissible under applicable law and without affecting or limiting either the Releases by the Debtor or the Releases by Holders of Abuse Claims, and except as otherwise specifically provided in the Plan or the Confirmation Order, no Exculpated Party shall have or incur liability for, and each Exculpated Party hereby is exculpated from any claim or Cause of Action related to, any act or omission in connection with, relating to, or arising out of the negotiation, solicitation, confirmation, execution, or implementation (to the extent on or prior to the Effective Date) of, as applicable, the Chapter 11 Case, the Plan Documents, the pursuit of entry of the Confirmation Order, the administration and implementation of the Plan, including the distribution of property under the Plan, or any other related agreement, or any restructuring transaction, contract, instrument, release, or other agreement or document created or entered into during the Chapter 11 case in connection with the Chapter 11 Case, or upon any other act or omission, transaction, agreement, event, or other occurrence related or relating to the foregoing; <u>provided</u>, <u>however</u>, that this Article XI.H shall not apply to release (a) obligations under the Plan or any contracts, instruments, releases, agreements, and documents delivered, reinstated or assumed under the Plan, (b) any Claims or Causes of Action arising from or related to an act or omission that is judicially determined by a Final Order to have constituted actual fraud or willful misconduct on the part of the Exculpated Party, or (c) any Claims or Causes of Action against the Debtor or the Reorganized Debtor that are reinstated under the Plan or otherwise survive the Effective Date.

       I.    <u>Injunctions Related to Releases and Exculpation.</u>

       1.    *Injunction Related to Releases*.

As of the Effective Date, all holders of Claims that are the subject of Article XI.G.2 are, and shall be, expressly, conclusively, absolutely, unconditionally, irrevocably, and forever stayed, restrained, prohibited, barred and enjoined from taking any of the following actions against any Covered Party or its property or successors or assigns on account of or based on the subject matter of such Claims, whether directly or indirectly, derivatively or otherwise: (a) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding (including any judicial, arbitral, administrative or other proceeding) in any forum; (b) enforcing, attaching (including, without limitation, any prejudgment attachment), collecting, or in any way seeking to recover any judgment, award, decree, or other order; (c) creating, perfecting or in any way enforcing in any matter, directly or indirectly, any Lien or Encumbrance; and/or (d) setting off, seeking reimbursement or contributions from, or subrogation against, or otherwise recouping in any manner, directly or indirectly, any amount against any liability or obligation that is discharged under Article XI.C or released under Article XI.G.2.

2.      *Injunction Related to Exculpation.*

As of the Effective Date, all holders of Claims that are the subject of Article XI.H are, and shall be, expressly, conclusively, absolutely, unconditionally, irrevocably, and forever stayed, restrained, prohibited, barred and enjoined from taking any of the following actions against any Exculpated Party and, solely to the extent provided by section 1125(e) of the Bankruptcy Code, any Entity described in section 1125(e) or its or their property or successors or assigns on account of or based on the subject matter of such Claims, whether directly or indirectly, derivatively or otherwise: (a) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding (including any judicial, arbitral, administrative or other proceeding) in any forum; (b) enforcing, attaching (including any prejudgment attachment), collecting, or in any way seeking to recover any judgment, award, decree, or other order; (c) creating, perfecting or in any way enforcing in any matter, directly or indirectly, any Lien or Encumbrance; and/or (d) setting off, seeking reimbursement or contributions from, or subrogation against, or otherwise recouping in any manner, directly or indirectly, any amount against any liability or obligation that is discharged under Article XI.C or released under Article XI.H.

J.      <u>Reservation of Rights.</u>

No provision of this Article XI shall be deemed or construed to satisfy, discharge, release or enjoin claims by the Arrowood Settlement Trust or the General Settlement Trust, the Reorganized Debtor, or (subject to Article IV) any other Entity, as the case may be, against (1) the Arrowood Settlement Trust or the General Settlement Trust for payment of Abuse Claims in accordance with the Trust Distribution Procedures, or (2) the Arrowood Settlement Trust or the General Settlement Trust for the payment of Trust Expenses in accordance with the Trust Documents.

K.      <u>Disallowed Claims.</u>

On and after the Effective Date, the Debtor and the Reorganized Debtor shall be fully and finally discharged of any and all liability or obligation on any and all Disallowed Claims, and any order Disallowing a Claim that is not a Final Order as of the Effective Date solely because of an Entity's right to move for reconsideration of such Order pursuant to section 502 of the Bankruptcy Code or Bankruptcy Rule 3008 shall nevertheless become and be deemed to be a Final Order on the Effective Date. The Confirmation Order, except as otherwise provided herein, shall constitute an order Disallowing all Claims (other than Settling Abuse Claims) to the extent such Claims are not allowable under any provision of section 502 of the Bankruptcy Code, including time-barred Claims, and Claims for unmatured interest.

# ARTICLE XII

# RETENTION OF JURISDICTION

A.      <u>General Retention.</u>

Until the Chapter 11 Case is closed, the Bankruptcy Court shall retain jurisdiction over all matters arising out of, and related to, the Chapter 11 Case and the Plan pursuant to, and for the

purposes of, sections 105(c) and 1142 of the Bankruptcy Code to the fullest extent permitted by law, including the jurisdiction necessary to ensure that the purposes and the intent of the Plan are carried out. Following the Confirmation Date, the administration of the Chapter 11 Case will continue until the Chapter 11 Case is closed by a Final Order of the Bankruptcy Court. The Bankruptcy Court shall also retain jurisdiction for the purpose of classification of any Claims and the re-examination of Claims (including Abuse Claims) that have been Allowed for purposes of voting, and the determination of such objections as may be filed with the Bankruptcy Court with respect to any Claims. The failure by the Debtor to object to, or examine, any Claim for the purposes of voting, shall not be deemed a waiver of the rights of the Debtor, the Reorganized Debtor, the Arrowood Settlement Trust or the General Settlement Trust to object to or re-examine such Claim in whole or part.

      B.    <u>Specific Purposes.</u>

In addition to the foregoing, the Bankruptcy Court shall retain jurisdiction for each of the specific purposes enumerated in this Article XII.B after the Confirmation Date. Notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain jurisdiction over all matters arising out of, and related to, the Chapter 11 Case and the Plan pursuant to, and for the purposes of, sections 105(c) and 1142 of the Bankruptcy Code and to the fullest extent permitted by law, including the following purposes:

      1.    to modify the Plan after the Confirmation Date pursuant to the provisions of the Bankruptcy Code and the Bankruptcy Rules;

      2.    to correct any defect, cure any omission, reconcile any inconsistency or make any other necessary changes or modifications in or to the Plan, the Trust Documents or the Confirmation Order as may be necessary to carry out the purposes and intent of the Plan, including the adjustment of the date(s) of performance in the Plan in the event the Effective Date does not occur as provided herein so that the intended effect of the Plan may be substantially realized thereby;

      3.    to enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason or in any respect modified, stayed, reversed, revoked or vacated, or if distributions pursuant to the Plan or the Trust Documents are enjoined or stayed;

      4.    to hear and determine all applications for compensation of Professionals and reimbursement of expenses under sections 328, 330, 331 and/or 503(b) of the Bankruptcy Code;

      5.    to hear and determine any Causes of Action arising during the period from the Petition Date to the Effective Date, or in any way related to the Plan or the transactions contemplated hereby, against the Debtor, the Reorganized Debtor, the Trusts, the Trustees, the Litigation Administrator, the Official Committee, or the Future Claimants' Representative and their respective officers, directors, employees, members, attorneys, accountants, financial advisors, representatives and agents;

6.     to determine any and all motions, including motions pending as of the Confirmation Date, for the rejection, assumption or assumption and assignment of Executory Contracts or Unexpired Leases and the Allowance of any Claims resulting therefrom;

7.     to hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code;

8.     to determine such other matters and for such other purposes as may be provided in the Confirmation Order;

9.     to determine any and all motions, adversary proceedings, contested or litigated matters, and any other matters and grant or deny any applications involving the Debtor that may be pending on the Effective Date (which jurisdiction shall be non-exclusive as to any such non-core matters);

10.     to determine the Allowance and/or Disallowance of any Claims against the Debtor or its Estate, including any objections to any such Claims and the compromise and settlement of any Claim against the Debtor or its Estate;

11.     to determine all questions and disputes regarding title to the assets of the Debtor or its Estate or the Trust Assets;

12.     to ensure that Plan Distributions to holders of Allowed Claims and that Trust Distributions to holders of Abuse Claims are accomplished pursuant to the provisions of the Plan and adjudicate any and all disputes relating to distributions under the Plan or the Trust Documents;

13.     to construe, enforce and resolve all questions and disputes relating to employment agreements existing or approved by the Bankruptcy Court at or before the Confirmation Date;

14.     to hear and determine the Insurance Actions and to determine all questions and issues arising thereunder and to hear and determine the amount, if any, of any judgment reduction under Article V.T. Notwithstanding anything herein to the contrary, however, such retention of jurisdiction by the Bankruptcy Court in this Article XII.B.14 shall not be deemed to be (a) a retention of exclusive jurisdiction with respect to any matter described in this Article XII.B.14; rather, any court other than the Bankruptcy Court that has jurisdiction over any matter described in this Article XII.B.14 shall have the right to exercise such jurisdiction, and (b) nothing in this Article XII.B.14 shall be construed to alter the orders of withdrawal of the reference to the bankruptcy court entered in the Insurance Actions;

15.     to hear and determine any matters related to the indemnification obligations of the Trusts under Article IV and the Trust Documents;

16.     to hear and determine any other matters related hereto, including the implementation and enforcement of all orders entered by the Bankruptcy Court in the Chapter 11 Case;

17.    to enter in aid of implementation of the Plan such orders as are necessary, including orders in aid of the implementation and enforcement of the releases, the Channeling Injunction, and the other injunctions described herein;

18.    to enter and implement such orders as may be necessary or appropriate if any aspect of the Plan, the Trusts, or the Confirmation Order is, for any reason or in any respect, determined by a court to be inconsistent with, to violate, or to be insufficient to satisfy any of the terms, conditions, or other duties associated with any Insurance Policies; provided, however, that (a) such orders shall not impair the Insurer Coverage Defenses or the rights, claims or defenses, if any, of any Insurer that are set forth or provided for in the Plan, the Plan Documents, the Confirmation Order, or any other orders entered in the Chapter 11 Case and (b) the rights of all interested parties, including any Insurer, are reserved to oppose or object to any such motion or order seeking such relief; and

19.    to enter a Final Order or decree concluding or closing the Chapter 11 Cases.

## ARTICLE XIII

## MISCELLANEOUS PROVISIONS

A.    <u>Substantial Consummation of the Plan.</u>

On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

B.    <u>Amendment or Modification of the Plan.</u>

1.    *Plan Modifications*.

The Debtor reserves the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan prior to the entry of the Confirmation Order, including amendments or modifications to satisfy section 1129(b) of the Bankruptcy Code, and after entry of the Confirmation Order, the Debtor may, upon order of the Court, amend, modify or supplement the Plan in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law, in each case without additional disclosure pursuant to section 1125 of the Bankruptcy Code. In addition, after the Confirmation Date, so long as such action does not materially and adversely affect the treatment of holders of Allowed Claims pursuant to the Plan, the Debtor may remedy any defect or omission or reconcile any inconsistencies in the Plan or the Confirmation Order with respect to such matters as may be necessary to carry out the purposes or effects of the Plan, and any holder of a Claim that has accepted the Plan shall be deemed to have accepted the Plan as amended, modified, or supplemented.

2.    *Other Amendments*.

Before the Effective Date, the Debtor may make appropriate technical adjustments and modifications to the Plan and the documents contained in the Plan Supplement without further order or approval of the Bankruptcy Court.

62

C.     <u>Effectuating Documents and Further Transactions.</u>

Each of the officers, managers, or members of the Debtor or the Reorganized Debtor or the Trustees are authorized to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

D.     <u>Successors and Assigns.</u>

The rights, benefits and obligations of any Entity named or referred to in the Plan or the Confirmation Order shall be binding on, and shall inure to the benefit of, any heir, executor, guardian, agent, representative, administrator, successor, or permitted assign, if any, of each such Entity.

E.     <u>Revocation or Withdrawal of Plan.</u>

The Debtor reserves the right to revoke or withdraw the Plan prior to the Effective Date. If the Plan has been revoked or withdrawn prior to the Effective Date, or if the Confirmation Date or the occurrence of the Effective Date does not occur, then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount any Claim or Class of Claims), assumption of executory contracts or unexpired leases affected by the Plan, and any document or agreement executed pursuant to the Plan, including the Trust Documents, shall be deemed null and void; and (3) nothing contained in the Plan shall (i) constitute a waiver or release of any Claim by or against, or any Interest in, the Debtor or any other Entity; (ii) prejudice in any manner the rights of the Debtor or any other Entity; or (iii) constitute an admission of any sort by the Debtor or any other Entity.

F.     <u>The Official Committee and the Future Claimants' Representative.</u>

Except as set forth below, the Official Committee and the Future Claimants' Representative shall continue in existence until the Effective Date.  After the Effective Date, the rights, duties and responsibilities of the Future Claimants' Representative shall be as set forth in the General Settlement Trust Agreement. On the Effective Date, the Official Committee shall dissolve and, as of the Effective Date, each member (including each officer, director, employee, or agent thereof) of the Official Committee and each Professional retained by the Official Committee shall be released and discharged from all rights, duties, responsibilities, and obligations arising from, or related to, the Debtor, its membership on the Official Committee, the Plan, or the Chapter 11 Case, except with respect to any matters concerning any Professional Fee Claims held or asserted by any Professional retained by the Official Committee. For the avoidance of doubt, neither the Debtor nor the Reorganized Debtor shall have any obligation to pay any fees or expenses of any Professional retained by the Official Committee, or the Future Claimants' Representative that are earned or incurred on or after the Effective Date. Nor shall the Debtor  or the Reorganized Debtor have any obligation to pay fees or expenses of any Professional retained by the Official Committee, or the Future Claimants' Representative that are earned or incurred before the Effective Date to the extent such fees or expenses (or any portion thereof) qualify as Trust Expenses, in which case such fees and expenses (or the applicable portion thereof) shall be paid by the applicable Trust in accordance with the Trust Documents.

63

G.     Non-Severability of Plan Provisions.

If, before the entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtor, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is (1) valid and enforceable pursuant to its terms, (2) integral to the Plan and may not be deleted or modified without the consent of the Debtor or the Reorganized Debtor (as the case may be), and (3) nonseverable and mutually dependent.

H.     Governing Law.

Except to the extent that the Bankruptcy Code or other federal law is applicable, the rights, duties, and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to the principles of conflict of laws thereof.

I.     Immediate Binding Effect.

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), 7062, or otherwise, upon the occurrence of the Effective Date, the terms of the Plan (including the Plan Supplement) shall be immediately effective and enforceable and deemed binding upon and inure to the benefit of the Debtor, the holders of Claims, the Covered Parties, and each of their respective successors and assigns, including the Reorganized Debtor.

J.     Computation of Time.

In computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

K.     Exhibits to Plan.

All exhibits, schedules, supplements, and appendices to the Plan (including the Plan Supplement) are incorporated into and are a part of the Plan as if set forth in full herein.

L.     Notices.

All notices, requests, and demands to or upon the Debtor or the Reorganized Debtor to be effective shall be in writing (including by email transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered, addressed as follows:

1.      If to the Debtor or the Reorganized Debtor, to:

Corinne Ball
Todd Geremia
Benjamin Rosenblum
Andrew Butler
JONES DAY
250 Vesey Street
New York, NY 10281-1047
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306
Email:              cball@jonesday.com
                        trgeremia@jonesday.com
                        brosenblum@jonesday.com
                        abutler@jonesday.com


[*Remainder of Page Intentionally Blank*]

After the Effective Date, the Reorganized Debtor is authorized to send a notice to any Entity providing that, to continue to receive documents filed in the Chapter 11 Case pursuant to Bankruptcy Rule 2002, such Entity must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002. After the Effective Date, the Reorganized Debtor are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to such Entities who have filed such renewed requests.

Dated:  February 16, 2024

The Roman Catholic Diocese of Rockville Centre, New York

By: */s/ John O. Barres*
    Name:   Most Rev. John O. Barres
    Title:    Bishop

**<u>Exhibit A - Plan</u>**

The Roman Catholic Diocese of Rockville Centre, New York – Parishes

1. St. Christopher, Baldwin
2. Our Holy Redeemer, Freeport
3. St. Joseph, Garden City
4. Our Lady of Loretto, Hempstead
5. St. Ladislaus R.C. Church, Hempstead
6. St. Agnes, Rockville Centre
7. Queen of the Most Holy Rosary, Roosevelt
8. St. Martha, Uniondale
9. St. Thomas the Apostle, West Hempstead
10. St. Aloysius, Great Neck
11. St. Mary, Manhasset
12. Our Lady of Fatima, Manorhaven
13. Corpus Christi, Mineola
14. Holy Spirit, New Hyde Park
15. Notre Dame, New Hyde Park
16. St. Pater of Alcantara, Port Washington
17. St. Aidan, Williston Park
18. St. Gertrude, Bayville
19. St. Patrick, Glen Cove
20. St. Rocco, Glen Cove
21. St. Hyacinth, Glen Head
22. St. Paul the Apostle, Brookville
23. St. Dominic, Oyster Bay
24. St. Mary, Roslyn
25. St. Boniface Martyr, Sea Cliff
26. St. Edward the Confessor, Syosset
27. Holy Name of Jesus, Woodbury
28. St. Boniface, Elmont
29. Our Lady of Victory, Floral Park
30. St. Hedwig, Floral Park
31. St. Catherine of Sienna, Franklin Square
32. St. Anne, Garden City
33. Our Lady of Peace, Lynbrook
34. Our Lady of Lourdes, Malverne
35. Blessed Sacrament, Valley Stream
36. Holy Name of Mary, Valley Stream
37. St. Joachim, Cedarhurst
38. St. Raymond, East Rockaway
39. St. Joseph, Hewlett

40.   Our Lady of Good Counsel, Inwood
41.   Sacred Heart, Island Park
42.   St. Ignatius Martyr, Long Beach
43.   St. Mary of the Isle, Long Beach
44.   St. Anthony, Oceanside
45.   Our Lady Miraculous Medal, Point Lookout
46.   St. Barnabas the Apostle, Bellmore
47.   St. Rose of Lima, Massapequa
48.   Our Lady of Lourdes, Massapequa Park
49.   Cure' of Ars, Merrick
50.   Sacred Heart, North Merrick
51.   Maria Regina, Seaford
52.   St. William the Abbot, Seaford
53.   St. Frances de Chantal, Wantagh
54.   St. Martin of Tours, Bethpage
55.   Our Lady of Hope, Carle Place
56.   St. Raphael, East Meadow
57.   St. Kilian, Farmingdale
58.   Holy Family, Hicksville
59.   Our Lady of Mercy, Hicksville
60.   St. Ignatius Loyola, Hicksville
61.   St. Bernard, Levittown
62.   St. Pius X, Plainview
63.   St. James, Seaford
64.   St. Brigid, Westbury
65.   Our Lady of Queen of Martyr, Centerport
66.   Christ the King, Commack
67.   St. Matthew, Dix Hills
68.   St. Anthony of Padua, East Northport
69.   St. Francis of Assisi, Greenlawn
70.   St. Patrick, Huntington
71.   St. Hugh of Lincoln, Huntington Station
72.   St. Joseph, Kings Park
73.   St. Elizabeth of Hungary, Melville
74.   St. Philip Neri, Northport
75.   St. Martin of Tours, Amityville
76.   St. Joseph, Babylon
77.   Our Lady of the Assumption, Copiague
78.   SS. Cyril & Methodius, Deer Park
79.   Our Lady of Perpetual Help, Lindenhurst
80.   Our Lady of Grace, West Babylon
81.   Our Lady of Lourdes, West Islip

82.  Our Lady of Miraculous Medal, Wyandanch
83.  St. Patrick, Bay Shore
84.  St. John Nepomucene, Bohemia
85.  St. Anne, Brentwood
86.  St. Luke, Brentwood
87.  St. John of God, Central Islip
88.  St. Mary, East Islip
89.  St. Peter the Apostle, Islip Terrace
90.  St. Lawrence the Martyr, Sayville
91.  Assumption of the BVM, Centereach
92.  St. Thomas More, Hauppauge
93.  Holy Cross, Nesconset
94.  St. Elizabeth Ann Seton, L. Ronkonkoma
95.  St. Joseph, Ronkonkoma
96.  SS. Philip & James, St. James
97.  St. James, Setauket
98.  St. Patrick, Smithtown
99.  St. Frances Cabrini, Coram
100. Infant Jesus, Port Jefferson
101. St. Gerard Majella, Port Jefferson Station
102. St. Anthony of Padua, Rocky Point
103. St. Margaret of Scotland, Selden
104. St. Mark, Shoreham
105. St. Louis de Montfort, Sound Beach
106. St. John the Baptist, Wading River
107. Mary Immaculate, Bellport
108. Our Lady of the Snow, Blue Point
109. St. John the Evangelist, Center Moriches
110. St. Joseph the Worker, East Patchogue
111. Resurrection, Farmingville
112. Good Shepherd, Holbrook
113. St. Jude, Mastic Beach
114. St. Sylvester, Medford
115. Our Lady of Mount Carmel, Patchogue
116. St. Francis de Sales, Patchogue
117. Queen Most Holy Rosary, Bridgehampton
118. Our Lady of Ostrabrama, Cutchogue
119. Sacred Heart, Cutchogue
120. Most Holy Trinity, East Hampton
121. St. Agnes, Greenport
122. St. Rosalie, Hampton Bays
123. SS. Peter & Paul, Manorville
124. St. Therese of Lisieux, Montauk
125. St. John the Evangelist, Riverhead
126. St. Isidore, Riverhead
127. St. Andrew, Sag Harbor
128. Our Lady of the Isle, Shelter Island Heights

129. Our Lady of Poland, Southampton
130. Sacred Hearts of Jesus & Mary, Southampton
131. St. Patrick, Southold
132. Immaculate Conception, Westhampton Beach
133. Our Lady of the Magnificent Catholic Church
134. Our Lady Star of the Sea
135. Church of the Most Precious Blood
136. St. Vincent de Paul

**<u>Exhibit B - Plan</u>**

The Roman Catholic Diocese of Rockville Centre, New York
Reorganized Debtor's Members and Senior Management

| Name: | Title: | Affiliations: |
|---|---|---|
| Most Rev. John O. Barres | Bishop, Diocese of Rockville Centre | - Corporate Member of the Mother Cabrini Health Foundation<br><br>- Board of Directors of Catholic University of America<br><br>- Board of Directors of the National Catholic Bioethics Center<br><br>- Board of Trustees of the Basilica of the National Shrine of the Immaculate Conception<br><br>- Board of Trustees of Saint Joseph's Seminary<br><br>- By statute the Bishop, Vicar General and Chancellor are the trustees of the Debtor. These individuals hold various other affiliations with Ministry Members by virtue of their office. |
| Rev. Eric Fasano | Vicar General and Moderator of the Curia | - By statute the Bishop, Vicar General and Chancellor are the trustees of the Debtor. These individuals hold various other affiliations with Ministry Members by virtue of their office. |

| Name: | Title: | Affiliations: |
|---|---|---|
| Sr. Maryanne Fitzgerald, SC | Chancellor | - By statute the Bishop, Vicar General and Chancellor are the trustees of the Debtor. These individuals hold various other affiliations with Ministry Members by virtue of their office.<br><br>- Member of the Board of Trustees of Catholic Charities Housing Corporation |
| Thomas Renker | Chief Operating Officer and General Counsel | None. |
| Thomas Doodian | Chief Financial Officer - Director of Finance | - President of Unitas Investment Fund, Inc.<br><br>- Board of Directors of Department of Education, Diocese of Rockville Centre<br><br>- Member of Tomorrow's Hope Foundation II, Inc.<br><br>- Vice President of Ecclesia Assurance Company |
| Allison Cannon | Chief Human Resources Officer | None. |

**Exhibit C - Plan**

## Diocese of Rockville Centre
## General Liability Insurance Policies Covering the Diocese

| Incept | Expire | Insurer | Policy Number |
|--------|--------|---------|---------------|
| 4/6/1956 | 10/1/1957 | Royal Indemnity Co. | RLG 050000 |
| 10/1/1957 | 10/1/1958 | Royal Indemnity Co. | RLG 055000 |
| 10/1/1958 | 10/1/1959 | Royal Indemnity Co. | RLG 059700 |
| 10/1/1959 | 10/1/1960 | Royal Indemnity Co. | RLG 001059 |
| 10/1/1960 | 10/1/1961 | Royal Indemnity Co. | RLG001060 |
| 10/1/1961 | 10/1/1962 | Royal Indemnity Co. | RLG001061 |
| 10/1/1962 | 10/1/1963 | Royal Indemnity Co. | RLG001062 |
| 10/1/1963 | 10/1/1964 | Royal Indemnity Co. | RLG001063 |
| 6/4/1964 | 6/4/1965 | Royal Indemnity Co. | RLX100035 |
| 10/1/1964 | 10/1/1965 | Royal Indemnity Co. | RLG001064 |
| 10/1/1965 | 10/1/1966 | Royal Indemnity Co. | RLG001065 |
| 10/1/1966 | 10/1/1967 | Royal Indemnity Co. | RLG604826 |
| 6/4/1967 | 6/4/1968 | Royal Indemnity Co. | RLA100629 |
| 10/1/1967 | 10/1/1968 | Royal Indemnity Co. | RTG604827 |
| 10/1/1968 | 10/1/1969 | Royal Indemnity Co. | RTG604828 |
| 10/1/1969 | 10/1/1970 | Royal Indemnity Co. | RTG604829 |
| 6/4/1970 | 10/1/1971 | Royal Indemnity Co. | RLA101501 |
| 10/1/1970 | 10/1/1971 | Royal Indemnity Co. | RTG604820 |
| 10/1/1971 | 10/1/1972 | Royal Indemnity Co. | RTG604821 |
| 10/1/1971 | 10/2/1972 | Royal Indemnity Co. | RLA101877 |
| 10/1/1972 | 10/1/1973 | Royal Globe Ins. Co. | PTG604822 |
| 10/1/1972 | 10/1/1973 | Royal Globe Ins. Co. | PLA102188 |
| 10/1/1973 | 10/1/1974 | Royal Globe Ins. Co. | PTG604823 |
| 10/1/1973 | 10/1/1974 | Royal Globe Ins. Co. | PLA102553 |
| 10/1/1974 | 10/1/1975 | Royal Globe Ins. Co. | PTG604824 |
| 10/1/1974 | 10/1/1975 | Royal Globe Ins. Co. | PTQ302591 |
| 10/1/1975 | 10/1/1976 | Royal Globe Ins. Co. | PTG604825 |
| 10/1/1975 | 10/1/1976 | Royal Globe Ins. Co. | PTQ306461 |
| 9/30/1976 | 10/1/1977 | Underwriters at Lloyds, London | SL3161 |
| 10/1/1976 | 10/1/1977 | Centennial Ins. Co. | 291-68-71-16 |
| 10/1/1976 | 10/1/1977 | Underwriters at Lloyds, London | SL3152 |
| 10/1/1976 | 10/1/1977 | London Market Insurers | SLC5163 |
| 10/1/1976 | 10/1/1977 | Midland Ins. Co. | UL388732 |
| 10/1/1976 | 10/1/1977 | Underwriters at Lloyds, London | MW23017 |
| 10/1/1976 | 10/1/1977 | London Market Insurers | SLC5172 |
| 10/1/1976 | 10/1/1977 | Underwriters at Lloyds, London | SL3162 |
| 10/1/1976 | 10/1/1977 | London Market Insurers | SLC5173 |
| 1/18/1978 | 10/1/1978 | Underwriters at Lloyds, London | SL3311 |

| Incept | Expire | Insurer | Policy Number |
|---|---|---|---|
| 1/18/1978 | 10/1/1978 | London Market Insurers | SLC5334 |
| 1/18/1978 | 10/1/1978 | Midland Ins. Co. | UL390749 |
| 1/18/1978 | 10/1/1978 | Associated International Ins. Co. | AEL050530 |
| 1/18/1978 | 10/1/1978 | Underwriters at Lloyds, London | SL3294 |
| 1/18/1978 | 10/1/1978 | London Market Insurers | SLC5330 |
| 10/1/1978 | 10/1/1979 | Interstate Fire & Casualty Co. | 183-152625 |
| 10/1/1978 | 10/1/1979 | Underwriters at Lloyds, London | SL3445 |
| 10/1/1978 | 10/1/1979 | London Market Insurers | SLC5462 |
| 10/1/1978 | 10/1/1979 | Underwriters at Lloyds, London | SL3452 |
| 10/1/1978 | 10/1/1979 | London Market Insurers | SLC5469 |
| 10/1/1978 | 10/1/1979 | Underwriters at Lloyds, London | SL3463 |
| 10/1/1978 | 10/1/1979 | London Market Insurers | SLC5480 |
| 10/1/1979 | 10/1/1980 | Centennial Ins. Co. | 291-69-65-01 |
| 10/1/1979 | 10/1/1980 | Underwriters at Lloyds, London | SL3574 |
| 10/1/1979 | 10/1/1980 | London Market Insurers | SLC5630 |
| 10/1/1979 | 10/1/1980 | Underwriters at Lloyds, London | SL3606 |
| 10/1/1979 | 10/1/1980 | London Market Insurers | SLC5656 |
| 10/1/1979 | 10/1/1980 | Interstate Fire & Casualty Co. | 183-152625-1 |
| 10/1/1979 | 10/1/1980 | Underwriters at Lloyds, London | SL3607 |
| 10/1/1979 | 10/1/1980 | London Market Insurers | SLC5657 |
| 10/1/1979 | 10/1/1980 | Underwriters at Lloyds, London | SL3608 |
| 10/1/1979 | 10/1/1980 | London Market Insurers | SLC5658 |
| 10/1/1980 | 10/1/1981 | Underwriters at Lloyds, London | SL3725 |
| 10/1/1980 | 10/1/1981 | London Market Insurers | SLC5746 |
| 10/1/1980 | 10/1/1981 | Underwriters at Lloyds, London | SL3726 |
| 10/1/1980 | 10/1/1981 | London Market Insurers | SLC5747 |
| 10/1/1980 | 10/1/1981 | Underwriters at Lloyds, London | SL3731 |
| 10/1/1980 | 10/1/1981 | London Market Insurers | SLC5754 |
| 10/1/1981 | 10/1/1982 | Interstate Fire & Casualty Co. | 183-152625-2 |
| 10/1/1981 | 10/1/1982 | Underwriters at Lloyds, London | SL3887 |
| 10/1/1981 | 10/1/1982 | London Market Insurers | SLC5894 |
| 10/1/1981 | 10/1/1982 | Underwriters at Lloyds, London | SL3888 |
| 10/1/1981 | 10/1/1982 | London Market Insurers | SLC5895 |
| 10/1/1982 | 9/1/1983 | Centennial Ins. Co. | 291-71-14-76 |
| 10/1/1982 | 9/1/1983 | Underwriters at Lloyds, London | SL4063 |
| 10/1/1982 | 9/1/1983 | London Market Insurers | SLC6043 |
| 10/1/1982 | 9/1/1983 | Interstate Fire & Casualty Co. | 83-0169764 |
| 10/1/1982 | 9/1/1983 | Underwriters at Lloyds, London | SL4065 |
| 10/1/1982 | 9/1/1983 | London Market Insurers | SLC6045 |
| 10/1/1982 | 9/1/1983 | Underwriters at Lloyds, London | SL4066 |
| 10/1/1982 | 9/1/1983 | London Market Insurers | SLC6046 |

| Incept | Expire | Insurer | Policy Number |
|---|---|---|---|
| 10/1/1982 | 9/1/1983 | Fireman's Fund Ins. Co. | XLX1395363 |
| 9/1/1983 | 9/1/1984 | Interstate Fire & Casualty Co. | 83-0170072 |
| 9/1/1983 | 9/1/1984 | London Market Insurers | ICO4082 |
| 9/1/1983 | 9/1/1984 | Underwriters at Lloyds, London | ISL3125 |
| 9/1/1983 | 9/1/1984 | London Market Insurers | ICO4073 |
| 9/1/1983 | 9/1/1984 | Underwriters at Lloyds, London | ISL3114 |
| 9/1/1983 | 9/1/1984 | Fireman's Fund Ins. Co. | XLX1395219 |
| 9/1/1984 | 9/1/1985 | Interstate Fire & Casualty Co. | 83-183-0170072 |
| 9/1/1984 | 9/1/1985 | London Market Insurers | ICO5133 |
| 9/1/1984 | 9/1/1985 | Underwriters at Lloyds, London | ISL3289 |
| 2/19/1985 | 9/1/1985 | London Market Insurers | ICO5162 |
| 2/19/1985 | 9/1/1985 | Underwriters at Lloyds, London | ISL3322 |
| 9/1/1985 | 9/1/1986 | London Market Insurers | ICO5239 |
| 9/1/1985 | 9/1/1986 | Underwriters at Lloyds, London | ISL3401 |
| 10/15/1985 | 10/22/1986 | Allianz Underwriters Ins. Co. | AXL5206661 |
| 10/15/1985 | 10/22/1986 | London Market Insurers | ICO5326 |
| 10/15/1985 | 10/22/1986 | Underwriters at Lloyds, London | ISL3482 |
| 11/1/2018 | 10/31/2019 | Ecclesia Assurance Co. | PKG-2018-1 |
| 11/1/2018 | 10/31/2019 | Ecclesia Assurance Co. | EX-SA-2018-1 |

**<u>Exhibit D - Plan</u>**

**Diocese of Rockville Centre**
**General Liability Insurers**

Allianz International Ltd. (Scheme Closed)
Allianz Underwriters Ins. Co.
Ancon Ins. Co. (UK) Ltd. (nka Chevanstall Ltd.)
Assicurazioni Generali T.S.
Associated International Ins. Co.
Bellefonte Ins. Co. (In Liquidation)
British National Life Ins. Society Ltd. (nka British National Ins. Co. Ltd.)
C.N.A. Re of London Ltd. (nka Kx Re)
Centennial Ins. Co. (In Liquidation)
Co d'Assurances Maritimes et Terresteres (1982-85:  Scheme Closed)
Co d'Assurances Maritimes et Terresteres (pre-1982:  nka Allianz Global)
Dominion Ins. Co. Ltd.
Ecclesia Assurance Co.
Excess Ins. Co. Ltd.
Fireman's Fund Ins. Co.
Folksam Int'l (UK) Ltd. (Scheme Closed)
Heddington Ins. Co. (UK) Ltd. (Scheme Closed)
Interstate Fire & Casualty Co.
Mentor Ins. (UK) (Scheme Closed)
Midland Ins. Co. (In Liquidation)
North Atlantic Ins. Ltd. (Scheme Closed)
Pine Top Ins. Co. (Receivership Closed)
Royal Globe Ins. Co. (nka Arrowood Ins. Co.)
Royal Indemnity Co. (nka Arrowood Ins. Co.)
Sovereign Marine & General (Scheme Closed)
Sphere Drake Ins. PLC (Scheme Closed)
St Katherine Ins. Co. Ltd. (nka Unionamerica Ins. Co. Ltd.)
Storebrand Ins. Ltd. (Scheme Closed)
Stronghold Ins. Ltd. (In Scheme)
Taisho Marine & Fire (UK) Ltd. (Scheme Closed)
Terra Nova Ins. Co. Ltd. (nka Riverstone Ins. UK Ltd.)
Tokio Marine & Fire (UK) Ltd. (Scheme Closed)
Turegum Ins. Co. Ltd.
Underwriters at Lloyds, London
Unionamerica Ins. Co. Ltd.
Yasuda Fire & Marine (UK) Ltd. (nka Sompo Japan Ins. Inc.)

## **EXHIBIT 2 - Disclosure Statement**

Liquidation Analysis

**Exhibit 2**

**Liquidation Analysis[1]**

This hypothetical liquidation analysis (this "Liquidation Analysis") is based on certain estimates and assumptions that the Debtor has developed, with the assistance of its advisors, and which the Debtor considers to be reasonable under the circumstances of the Chapter 11 Case. These estimates and assumptions are inherently subject to significant economic, operational, legal, and other uncertainties and contingencies that are outside of the Debtor's control. Accordingly, the Debtor cannot provide any assurance that the values reflected in this Liquidation Analysis would be realized if the Debtor were, in fact, to undergo the liquidation discussed herein, and actual results in the event of a liquidation could vary materially from this Liquidation Analysis.

In summary, the Liquidation Analysis estimates that a maximum of approximately $46 million would be available to general unsecured creditors of which approximately $15 million to $43 million would be available to Abuse Claims depending on the amount of Allowed Abuse Claims. The value of the Debtor's Plan for the purposes of this Liquidation Analysis has been adjusted downward to approximately $97 million based on excluding the contributions from entities other than the Debtor, but does include the value the Debtor expects to recover from avoidance actions. As described below, this Liquidation Analysis does not account for any recovery from insurance proceeds under either a plan of reorganization or under a chapter 7 liquidation.

| Class | Claims / Equity Interests | Projected Midpoint Amount of Claims | | Projected Amount of Recovery Under the Plan (Low/ High Claims) | Projected Midpoint Recovery % Under the Plan (Low/ High Claims) | Projected Midpoint Recovery % Under Liquidation | | | Pass / Fail |
|---|---|---|---|---|---|---|---|---|---|
| | | Low Abuse Claims | High Abuse Claims | | | Low Abuse Claims | Midpoint | High Abuse Claims | |
| 1 | Priority Claims | $ 16,527,248 | $ 16,527,248 | $ 16,527,248 | 100.0% | 100.0% | 100.0% | 100.0% | PASS |
| 2 | Secured Claims | - | - | - | 100.0% | NA | NA | NA | PASS |
| 3 | General Unsecured Claims | 38,136,495 | 38,136,495 | $11,429,134 / $5,923,097 | 30.0% / 15.5% | 14.1% | 10.5% | 6.9% | PASS |
| 4 | Abuse Claims | 200,000,000 | 450,000,000 | $59,938,041 / $69,890,893 | 30.0% / 15.5% | 14.1% | 10.5% | 6.9% | PASS |
| 5 | Convenience Claims ($30k) | 275,118 | 275,118 | 275,118 | 100.0% | 14.1% | 10.5% | 6.9% | PASS |
| 6 | Lay Pension Claims | 30,800,000 | 30,800,000 | $9,230,458 / $4,783,643 | 30.0% / 15.5% | 14.1% | 10.5% | 6.9% | PASS |
| 7 | Priest Pension Claims | - | - | - | 0.0% | NA | NA | NA | PASS |
| | **TOTAL** | $ 285,738,862 | $ 535,738,862 | $97,400,000 / $97,400,000 | 34.1% / 18.2% | 19.6% | 14.8% | 9.9% | |

## 1)    Introduction

The Debtor, with the assistance of its legal and financial advisors, has prepared this Liquidation Analysis in connection with the Plan and the Disclosure Statement.

The Debtor submits this Liquidation Analysis in connection with the Disclosure Statement. The Debtor believes it will be helpful to holders of Claims as they evaluate their proposed treatment under the Plan. This Liquidation Analysis shall not be construed as or deemed to constitute a waiver or admission of any kind.

The Liquidation Analysis permits holders of Impaired Claims to evaluate whether they will receive or retain value under the Plan on account of their Claims as of the Effective Date, which is

---

[1] All capitalized terms not otherwise defined herein shall have the meanings ascribed to them the Plan or Disclosure Statement, as applicable.

assumed to be February 29, 2024, that is not less than the amount that such holder would receive if the Debtor were liquidated under chapter 7 of the Bankruptcy Code. To calculate the probable distribution to holders of Claims in each Impaired Class if the Debtor was liquidated under chapter 7, the Liquidation Analysis:

i)      estimates the cash proceeds (the "Liquidation Proceeds") that a chapter 7 trustee (the "Trustee") would generate if the Chapter 11 Case were converted to a case under chapter 7 on the Effective Date and the assets of the Debtor's Estate were liquidated;

ii)     determines the distribution each holder of a Claim would receive from the Liquidation Proceeds under the statutory priority scheme that applies in a case under chapter 7; and

iii)    compares each holder's distribution from the Liquidation Proceeds to the distribution such creditor would receive under the Plan if it were confirmed and consummated.

As noted above, this Liquidation Analysis shall not be construed as or deemed to constitute a waiver or admission of any kind. The Debtor reserves all rights to oppose the applicability of the best interests test in this Chapter 11 Case.

## 2)    Liquidation Analysis of Debtor

### i)    Process and Assumption Overview

All of the assets of the Diocese were identified, including tangible assets such as property, plant, and equipment, as well as other assets such as the hospital recoverable and amounts due from other entities. The value of each asset was then adjusted for (i) expected changes in the balance of the asset between August 31, 2023 (the date of the most recently fiscal year end) and February 29, 2024 (the "Liquidation Date") and (ii) any impact to the asset that may render it fully or partially unavailable for sale (e.g., restricted cash is removed from the cash balance used to determine the liquidation value of cash available to pay unsecured creditors in a liquidation). The liquidation value of each asset was estimated using high, medium and low scenarios. The liquidation value is the amount of proceeds that may be generated in the event of a sale or liquidation of the asset. Given the circumstances of a sale in this scenario, the assumption is made that the respective asset values will be less than the market values of the assets if sold in the ordinary course due to timing and constraints on the ability to market or negotiate the sale.

The outstanding amount of any secured debt associated with that asset is then deducted from the liquidation value of each asset. This determines the remaining amount of proceeds that could be utilized from the sale of the asset. Estimated Chapter 11 administrative claims as of the Liquidation Date are then subtracted from the net proceeds available after payment of secured debt. The costs associated with the liquidation process, such as Chapter 7 trustee expenses, wind down expenses, claims processing costs, litigation costs, and broker fees were estimated. The estimated costs are deducted from the total liquidation value to determine the potential net proceeds available for distribution to creditors who are successful in pursuing claims against the Debtor.

The Debtor has assumed that the liquidation would occur over an approximately nine-month time period. This assumption is consistent with assumptions utilized for hypothetical liquidations analyses in other chapter 11 cases. In the Debtor's view, nine months is the minimum time period

that would be required to complete the sale of substantially all of the Debtor's unrestricted assets,[2] monetize and collect receivables and other unrestricted assets of the Debtor, and administer and wind-down the estates. Except as otherwise noted herein, the Liquidation Analysis is based upon the Debtor's unaudited pro forma consolidated balance sheet as of February 29, 2024, and those values are assumed to be representative of the Debtor's assets and liabilities as of the Liquidation Date unless otherwise noted. Any projected balance sheet amounts presented in this Liquidation Analysis are intended to be a proxy for actual balances on the Liquidation Date (the "Liquidation Balances"). In addition, this Liquidation Analysis incorporates certain adjustments to account for the effects of the chapter 7 liquidation process, including costs of winding down the Debtor's estate, employee-related costs, and professional and Trustee fees.

It is assumed that, on the Liquidation Date, the Bankruptcy Court would appoint the Trustee, who would sell the unrestricted assets of the Debtor's bankruptcy estates and distribute the Liquidation Proceeds, net of liquidation-related costs, to creditors in accordance with the statutory priority scheme provided for under section 726 of the Bankruptcy Code. To maximize recoveries in an expedited process, this Liquidation Analysis assumes that the Trustee's initial step would be to develop a liquidation plan to generate Liquidation Proceeds from the sale of the Debtor's unrestricted assets for distribution to creditors. This Liquidation Analysis assumes the appointed Trustee will retain legal and financial advisors and real estate and other brokers to assist in the liquidation.

This Liquidation Analysis assumes that a Trustee would immediately begin the wind-down process following a conversion to chapter 7, with limited employee and operating costs continuing during the liquidation process. The Debtor's unrestricted assets would be marketed on an accelerated timeline, and asset sales would generally occur within the nine-month wind-down period. Asset values in the liquidation process are assumed to be driven by, among other factors:

- the accelerated time frame in which the assets are marketed and sold;

- the loss of key personnel;

- negative public sentiment and damage to the Debtor's brand; and

- the general forced nature of the sale.

The cessation of operations in a liquidation would likely trigger certain Claims that otherwise would not exist under a Plan absent a liquidation. Examples of these kinds of Claims include, without limitation, potential employee Claims (such as severance or WARN Act Claims) and executory contract and unexpired lease rejection damages Claims. The amounts of these Claims could be material and certain of these Claims could be entitled to administrative or priority payment status under the relevant provisions of the Bankruptcy Code. Administrative and priority Claims would be paid in full from the Liquidation Proceeds before the balance of such proceeds would be made available to holders of allowed general unsecured Claims. Estimates of certain of these potential additional Claims have been included in the Liquidation Analysis.

---

[2] For purposes of this Exhibit 2, a "restricted" asset is an asset that is subject to enforceable use restrictions under applicable law or an asset that the Debtor holds in a fiduciary capacity for the sole benefit of donors, their intended beneficiaries, or members of the public who have entrusted the Debtor to carry out its respective charitable missions. The Bankruptcy Code recognizes and enforces these state-law restrictions in bankruptcy cases of charitable non-profit corporations under sections 363(d)(1) and 541(d) of the Bankruptcy Code.

Except as described below with respect to avoidance actions, no recovery or related litigation costs have been attributed to any potential preference actions. The Debtor believes that the vast majority of the payments made to creditors in the 90 days preceding the chapter 11 proceedings (including one year for insiders) were in the ordinary course of business and when weighed against, among other issues, the cost of such litigation, the uncertainty of the outcome thereof and anticipated disputes regarding these matters, the outcome of such litigation is unlikely to affect materially the outcome of the Liquidation Analysis. Additionally, this analysis does not include estimates for tax consequences, either federal or state, that may be triggered upon the liquidation and sale of assets; these tax consequences could be material. Finally, the Liquidation Analysis assumes that there will not be any proceeds from the Debtor's directors and officers liability insurance available to satisfy creditors generally because the Debtor is unaware of any legally viable causes of action that could be asserted on behalf of the general creditor body that would recover from the Debtor's directors and officers liability insurance. A substantial amount of the Debtor's assets are subject to valid and enforceable donor-imposed restrictions on use or disposition of such assets. Under applicable law, restricted assets do not constitute property of the estate and would not be available to creditors in a chapter 7 liquidation.[3] The Liquidation Analysis excludes the value of those assets in calculating the gross Liquidation Proceeds unless specifically noted. Moreover, certain of the Debtor's properties may be less marketable due to disputes over their classification as being restricted or unrestricted, limitations on their use including requirements to be used in the same manner, or restrictions on commercial development.

In addition, certain other factors could materially diminish the Liquidation Proceeds due to the nature of the Debtor's status as a non-profit entity. The Debtor will be required to comply with the applicable non-bankruptcy law that governs non-profit entities in connection with the disposition of its assets. These obligations vary among jurisdictions, but can require, *inter alia*, consent from a state's attorney general or other governmental authorities. State attorneys general may intervene or, depending upon state law, be compelled to intervene, in a chapter 7 liquidation to ensure that the intent of donors is carried out and that the restricted donations are not distributed to creditors.[4] The costs that attend these potential disputes and related delays and uncertainty regarding the same are not factored into this Liquidation Analysis and could reasonably be expected to negatively impact the Liquidation Proceeds.

Approximately 751 Abuse Claims were filed against the Debtor in the Chapter 11 Case. The Debtor has procured commercial general liability policies from multiple insurers since the 1950s to protect themselves from losses including Abuse Claims. This Liquidation Analysis does not account for any recovery from insurance proceeds (irrespective of whether an insured Claim relates to Abuse) on the basis that recoveries from such proceeds are assumed to be materially the same or greater under a plan of reorganization that provides for a global resolution of Abuse Claims than

---

[3] See *Matter of Friends for Long Island's Heritage*, 80 A.D.3d 223 (N.Y. 2d Dep't 2010) (holding that in the operation of a non-profit organization, "assets held for a specific use may not be used for another purpose" and recognizing that "New York's long-standing policy honoring donors' restrictions on the use of the property they donate has greater weight than the claims of creditors" when a non-profit corporation dissolves).

[4] *In re Application of Bd. Of Trustees of Huntington Free Library and Reading Room*, No. 01-2599, 2002 WL 123502, at *2 (S.D.N.Y. Jan. 30, 2002) (observing that the Attorney General of the State of New York was cited in the petition as a necessary party to the action "because by law, the NYAG must represent the interests of the people of the state of New York in proceedings involving charitable trusts") (citing N.Y. Estates, Powers, and Trusts Law § 8-1.1(f) ("The attorney general shall represent the beneficiaries of such dispositions for religious, charitable, educational or benevolent purposes and it shall be his duty to enforce the rights of such beneficiaries by appropriate proceedings in the courts.")).

4

under a chapter 7 liquidation.[5] In addition, the Liquidation Analysis does not account for any potential recovery from other entities, as potential co-liable parties under the Abuse Claims, on the basis that recoveries from such proceeds are assumed to be materially the same or greater under a plan of reorganization that provides for a global resolution of Abuse Claims as compared to a chapter 7 liquidation.

### ii)   Distribution of Net Proceeds to Claimants

Any available net proceeds would be allocated to holders of Claims in accordance with the priority scheme of section 726 of the Bankruptcy Code:

- Liquidation Adjustments / Super Priority Claims – includes estimated fees paid to the U.S. Trustee and Clerk of the Bankruptcy Court, wind-down costs and certain Professional Fees and broker fees;

- Secured Claims – includes workers' compensation claims;

- Chapter 11 Administrative and Priority Claims – includes estimated Claims held by creditors for post-petition accounts payable, post-petition accrued expenses including professional fees, taxes, employee obligations, Claims arising under section 503(b)(9) of the Bankruptcy Code, and Unsecured Claims entitled to priority under section 507 of the Bankruptcy Code; and

- General Unsecured Claims – includes prepetition trade Claims, other types of prepetition liabilities, and Abuse Claims.

Under the absolute priority rule, no junior creditor would receive any distributions until all senior creditors are paid in full. The assumed distributions to creditors as reflected in the Liquidation Analysis are estimated in accordance with the absolute priority rule.

### iii)   Conclusion

This Liquidation Analysis was prepared before the completion of the reconciliation and allowance process for Claims against the Debtor, and so the Debtor has not had an opportunity to fully evaluate Claims against the Debtor or to adjudicate such Claims before the Bankruptcy Court. Accordingly, the amount of the final Allowed Claims against the Debtor's estates may differ from the estimated Claim amounts used in this Liquidation Analysis. Additionally, asset values discussed herein may be different than amounts referred to in the Plan,which presumes the reorganization of the Debtor's assets and liabilities under chapter 11 of the Bankruptcy Code.

The Debtor determined, as summarized in the following analysis, upon the Effective Date, the Plan will provide all creditors with a recovery (if any) that is not less than what they would otherwise receive pursuant to a liquidation of the Debtor under chapter 7 of the Bankruptcy Code, and thus the Plan satisfies the requirement of 1129(a)(7) of the Bankruptcy Code, if the Bankruptcy Court determines that such requirement is applicable to a non-profit Debtor in chapter 11.

The following Liquidation Analysis should be reviewed with the accompanying notes.

---

[5] The Debtor believes the value of its insurance policies will be maximized under the Plan, in part because the other entities are additional or named insureds under many of the policies.

iv)    **Liquidation Analysis Detail**

*Liquidation Proceeds*

A.    Cash and Cash Equivalents – Represents Cash and Cash equivalents of the Debtor as of the Liquidation Date based on the Debtor's most recent financial projections which are included in Exhibit 3, segregated between restricted and unrestricted balances. Except for the proceeds of the 50 N. Park sale, restricted cash balances generally reflect donor-imposed restrictions on use and disposition and accordingly such amounts are excluded from the Liquidation Proceeds (restricted cash at PSIP includes the $7.5mm deposited with the State of New York on account of the Debtor's workers' compensation liabilities). The Debtor estimates a 100% recovery on the unrestricted cash balances and the proceeds of the 50 N. Park sale.

B.    Investments – Represents investments of the Debtor as of the Liquidation Date based on the Debtor's most recent financial projections, segregated between restricted and unrestricted. Restricted investment balances reflect donor-imposed restrictions on use and disposition and accordingly such amounts are excluded from the Liquidation Proceeds. The Debtor estimates a 100% recovery on unrestricted investments.

C.    Accounts Receivable – Accounts receivable are comprised of invoiced and accrued third party receivables, including receivables from the parishes, and other non-trade receivables. Accounts Receivable is presented based on the Debtor's most recent financial statements and is adjusted for amounts assumed to be uncollectable which include (i) amounts owed to the Diocese by parishes (e.g. Cathedraticum and insurance premiums), (ii) restricted accounts receivable (e.g. Non-School Assessments), and (iii) reimbursements owed to the Diocese by reinsurers and Catholic Health Services for claims to be paid by the Diocese in the future. Certain of the above Accounts Receivable do not have a contractual basis. Estimated recovery percentages for the adjusted balance of accounts receivable are between approximately 25% and 50% based on the estimated amount an arm's length purchaser or a collections firm would pay for such Accounts Receivable.

D.    Contributions Receivable – Contributions receivable reflect unconditional donor pledges at face value. As the pledges are both donor-restricted and highly unlikely to be enforceable in a liquidation they are valued at zero. Additional pledges not reflected in the financial statements are conditional and thus could not be collected in a liquidation.

E.    Prepaid Expenses – Primarily comprised of insurance premiums, professional fees, and deferred expenses. Prepaids are presented based on the Debtor's most recent financial statements. Prepaid insurance recoveries are estimated to be $0 based on the minimum earned premium included in the Diocese's insurance agreements with third party insurers. Prepaid professional fees are assumed to be recovered 100% and applied against administrative professional fee claims in a liquidation scenario. Deferred expenses are recovered at 0% of current financial statement balances given that they will be significantly depleted by the time a liquidation is completed.

F.     Due from Other Entity – Interfund receivables are comprised of amounts due to/from primarily the Diocese's pension plan, medical plan, PSIP, Propagation of the Faith and other restricted funds. Due from balances not related to intra-Debtor balances are assumed to be recovered at 50%. Amounts owed from one Debtor fund to another Debtor fund are consolidated and eliminated within this Liquidation Analysis.

G.     Property, Plant & Equipment (net) – The remaining balance of land, building, and equipment, which primarily includes furniture, fixtures, capital and project improvements, and software and computers is estimated to be materially consistent with the Debtor's most recent financial statements. Pro forma balances are presented net of depreciation and amortization. Total property, plant & equipment recoveries range from 50% to 70% of pro forma values.

H.     Spectrum Assets – the FCC Licenses and Other Assets (as described in Docket 1537, the "Spectrum Assets") contain contractual limitations on sale, but are assumed to be valued at $15 million to $25 million in a chapter 7 liquidation.

I.     Insurance Proceeds (related to Abuse Claims) – the value of insurance assets is yet to be determined, and while there may be substantial additional cost to pursue insurance, along with the potential for erosion of limits with respect to defense costs that would not otherwise be incurred, the value of Insurance Proceeds is assumed to be approximately equal in a liquidation to the value realized under a chapter 11 plan of reorganization.

J.     Insurance Reimbursable – the liquidation analysis assumes that the vast majority of the value of the Insurance Reimbursable is dedicated to the statutory obligations under the workers compensation program and, as such, would not result in net proceeds available to other creditors.

K.     Hospital Receivable on Unpaid Losses – the liquidation analysis assumes that the vast majority of the value of the Hospital Receivable on Unpaid Losses is dedicated to the statutory obligations under the workers compensation program and, as such, would not result in net proceeds available to other creditors.

L.     Other Assets – Other assets are primarily comprised of lease assets recorded to comply with accounting standards ($3.0 million) (which are assumed to have no value in a liquidation) and property held for future parish sites ($847,000) which are valued at cost. On a weighted average basis, the Other Assets are assumed to be recovered at 80% ($1.0 million) which reflects the cost of the property held for future parish sites and de minimis value recovered from other assets with a book value of approximately $440,000.

     i.     Ecclesia – There is uncertainty with respect to monetization of Ecclesia in a chapter 11 plan and in a liquidation scenario. While there is the prospect for a dividend through a consensual chapter 11 plan of reorganization, there is no clear path to monetization in a liquidation except for perhaps through a loss portfolio transfer to a third party. The monetizable value of Ecclesia is assumed to be approximately equal in a liquidation as under a confirmed chapter 11 plan of reorganization.

7

M.    Summer Parish and CFN Studio – these assets, some of which were added to the Debtor's schedules of assets in July 2021, represent assets used by other entities but which remain in the name of the Diocese. The assumed value of these assets is based on an estimate provided by the Official Committee of Unsecured Creditors and the assumed realized value is between 50 - 70% in a liquidation scenario.

N.    Other Litigation Assets – Settlements have been reached with the Seminary and the Department of Education in satisfaction of the fraudulent transfer claims against them. A fraudulent transfer claim against the Cemeteries remains outstanding and could be pursued in a liquidation. The Seminary and Department of Education settlement value are assumed to be recovered at 100% in a liquidation while the value of the Cemeteries claim is valued between $0 and $10 million.

### *Liquidation Costs*

O.    Operational Wind Down Expenses – Represents an estimate of the costs of operations incurred during a liquidation. Wind down costs primarily include payroll and related expenses, costs to maintain facilities, general liability and other Insurance Policies, and other base operating expenses. Operating expenses are assumed to reduce significantly during a liquidation to between 25% and 35% of projected monthly costs in a going concern scenario.

P.    Chapter 7 Trustee Fees – Assumed to be 3% of gross liquidation proceeds or between $1.8 million to $2.4 million.

Q.    Trustee's Professional Fees – Assumed to be 3.5% of gross liquidation proceeds or between $2.1 million to $2.9 million.

R.    Litigation Costs – Assumes $7.5 million to $15 million of cost associated with an alternative dispute resolution process undertaken to expedite the review and adjudication of Abuse Claims in order to preserve and efficiently distribute estate assets. This does not account for litigation, or risk to insurance assets, related to such a process.

S.    Broker Fees – Include the estimated cost to market and dispose of substantially all of the Debtor's land, building, equipment, and saleable financial assets. In the Liquidation Analysis, broker fees are estimated to be approximately 5.0% of gross Liquidation Proceeds from these asset classes.

### *Claims*

A.    <u>Secured Claims</u>

- New York State Workers' Comp Claims – Claims related to workers' compensation are secured by a $7.5 million deposit with New York State. To the extent the Debtor is unable to pay workers' compensation obligations, the deposit with New York State would serve as a source of recoveries on such claims which are unliquidated.

- Secured Claims are expected to recover 100%.

B.  <u>Administrative and Priority Expenses</u> – comprised of expenses incurred during the post-petition period prior to the Liquidation Date.

- The Liquidation Analysis assumes that there are employee-related costs which are estimated to be $4.3 million as of the Liquidation Date, comprised primarily of accrued employee benefit costs and severance / WARN Act obligations. Full-time salaried employees are assumed to be paid current immediately prior to the Liquidation Date.

- Post-Petition Professional Fees as of the Liquidation Date are estimated to be $8.4 million. Post-Petition Trade Claims are estimated to be $0.6 million as of the Liquidation Date based on Debtor's most recent financial projections.

- Other Administrative Claims of $3.2 million relate to accrued expenses, lease obligations, and funds held for others.

- Administrative Expenses are expected to recover 100%.

C.  <u>General Unsecured Claims</u>

- The below chart reflects the aggregation of Liquidation Analyses of the Debtor.

- The Liquidation Analysis estimates that there will be between $18 million and $46 million of proceeds available to satisfy General Unsecured Claims.

- General Unsecured Claims are assumed to include estimated Abuse Claims, employee-related Claims, loss and loss adjustment payable, insurance reimbursements payable, asset retirement obligations, contract rejection Claims, and pre-petition trade payables and accrued liabilities.

- Abuse Claims are estimated to be between $200 million and $450 million and the Liquidation Analysis presents Abuse Claim recoveries under both a high ($450 million) and low ($200 million) assumption. The range used in this Liquidation Analysis is merely an estimate of the Debtor's aggregate liability, which could be significantly greater or lower depending upon, among other things, the accuracy and sufficiency of information provided by the Abuse Claimants on their Proof of Claim submissions. As applied to individual Abuse Claims, the Liquidation Analysis provides an estimate of the percent-on-the-dollar recovery that individual claimants would receive in a hypothetical liquidation. However, the value of any particular individual claim that this percentage applies to is highly dependent on the facts and circumstances of the individual claim. All rights to challenge the valuation of Abuse Claims are reserved, and no party shall be found to have made or deemed to have made an admission with respect to the valuation of Abuse Claims as a result of this Liquidation Analysis.

- Contract rejection Claims are estimated to be $0.3 million related to existing lease obligations.

- Pension Claims are assumed to result from the Debtor's termination of its liability or withdrawal from the Lay Pension Plan. Based on analysis completed by the Debtor's actuarial advisors, the Debtor further assumes that it will be liable for the full termination/withdrawal liability of pastoral participants in the Lay Pension Plan (approximately $30.8 million). It is assumed that any withdrawal or termination liability associated with the Debtor's pension obligations would share in recoveries with other creditors.

- General Unsecured Claims recover between 4% and 9% in the Debtor Liquidation Analysis based on high Abuse Claims ($450 million) and between 8% and 19% based on low Abuse Claims ($200 million).

## *Summary Liquidation Analysis*

| Assets | Assumptions Paragraph | Book Value at 8/31/2023 | Adj. to Book Value | Pro Forma Value at 2/29/24 | Estimated Recovery (%) Low | Mid | High | Estimated Recovery ($000) Low | Mid | High |
|---|---|---|---|---|---|---|---|---|---|---|
| Cash and Cash Equivalents | A | $ 35,431,096 | $ (18,031,951) | $ 17,399,145 | 100.0% | 100.0% | 100.0% | $ 17,399,145 | $ 17,399,145 | $ 17,399,145 |
| Cash and Cash Equivalents - Restricted | A | 33,989,009 | (28,597,213) | 5,391,796 | 100.0% | 100.0% | 100.0% | 5,391,796 | 5,391,796 | 5,391,796 |
| Investments | B | 4,152 | | 4,152 | 100.0% | 100.0% | 100.0% | 4,152 | 4,152 | 4,152 |
| Investments - Restricted | B | 1,304,551 | (1,304,551) | - | - | - | - | - | - | - |
| Accounts Receivable | C | 2,211,726 | (2,158,711) | 53,015 | 25.0% | 37.5% | 50.0% | 13,254 | 19,881 | 26,508 |
| Accounts Receivable - Restricted | C | 873,004 | (873,004) | - | - | - | - | - | - | - |
| Contributions Receivable | D | 811,000 | (811,000) | - | - | - | - | - | - | - |
| Prepaid Expenses | E | 7,165,806 | (6,396,868) | 768,938 | 100.0% | 100.0% | 100.0% | 768,938 | 768,938 | 768,938 |
| Due from Other Entity | F | 499,705 | (103,442) | 396,263 | 50.0% | 50.0% | 50.0% | 198,131 | 198,131 | 198,131 |
| Property, Plant & Equipment (net) | G | 633,565 | (356,604) | 276,961 | 50.0% | 60.0% | 70.0% | 138,480 | 166,176 | 193,872 |
| Spectrum Assets | H | - | - | - | NA | NA | NA | 15,000,000 | 20,000,000 | 25,000,000 |
| Insurance Proceeds (Abuse Claims) - TBD | I | - | - | - | NA | NA | NA | - | - | - |
| Insurance Reimbursable | J | 37,147,616 | (37,147,616) | - | - | - | - | - | - | - |
| Hospital Receivable | K | 28,367,054 | (28,367,054) | - | - | - | - | - | - | - |
| Other Assets Administrative Offices | L | 4,254,520 | (2,972,947) | 1,281,573 | 80.0% | 80.0% | 80.0% | 1,025,258 | 1,025,258 | 1,025,258 |
| Summer Parish and CFN Studio | M | - | 3,000,000 | 3,000,000 | 50.0% | 60.0% | 70.0% | 1,500,000 | 1,800,000 | 2,100,000 |
| Other Litigation Assets | N | - | 29,500,000 | 29,500,000 | 66.1% | 83.1% | 100.0% | 19,500,000 | 24,500,000 | 29,500,000 |
| **Total Gross Liquidation Proceeds** | | $ 152,692,805 | $ (94,620,961) | $ 58,071,843 | 104.9% | 122.7% | 140.5% | $ 60,939,156 | $ 71,273,479 | $ 81,607,802 |
| **(-) Less Liquidation Deductions** | | | | | | | | | | |
| (-) Operational Wind Down Expense | O | | | | | | | $ (6,300,000) | $ (5,400,000) | $ (4,500,000) |
| (-) Chapter 7 Trustee Fee | P | | | | | | | (1,828,175) | (2,138,204) | (2,448,234) |
| (-) Trustee's Professional Fees | Q | | | | | | | (2,132,870) | (2,494,572) | (2,856,273) |
| (-) Incremental Litigation Costs | R | | | | | | | (15,000,000) | (10,000,000) | (7,500,000) |
| (-) Broker Fees | S | | | | | | | (893,756) | (1,160,472) | (1,427,188) |
| **Total Liquidation Costs** | | | | | | | | $ (26,154,801) | $ (21,193,248) | $ (18,731,696) |
| **Total Net Liquidation Proceeds ex-Insurance** | | | | | | | | $ 34,784,355 | $ 50,080,230 | $ 62,876,106 |

| | Estimated Claims Pool | Estimated Recovery (%) Low | Mid | High | Estimated Recovery ($000) Low | Mid | High |
|---|---|---|---|---|---|---|---|
| **Secured Claims** | | | | | | | |
| New York State - Workers' Comp | | 100% | 100% | 100% | - | - | - |
| **Total Secured Claims** | $ - | NA | NA | NA | $ - | $ - | $ - |
| **Proceeds Available After Secured Claims** | | | | | $ 34,784,355 | $ 50,080,230 | $ 62,876,106 |
| **Administrative / Priority Claims** | | | | | | | |
| Employee Related Claims | 4,311,707 | 100% | 100% | 100% | 4,311,707 | 4,311,707 | 4,311,707 |
| Professional Fees | 8,394,059 | 100% | 100% | 100% | 8,394,059 | 8,394,059 | 8,394,059 |
| Post-Petition Trade Claims | 613,273 | 100% | 100% | 100% | 613,273 | 613,273 | 613,273 |
| Funds Held for Others | 270,082 | 100% | 100% | 100% | 270,082 | 270,082 | 270,082 |
| Other Administrative Claims | 2,938,128 | 100% | 100% | 100% | 2,938,128 | 2,938,128 | 2,938,128 |
| **Total Administrative / Priority Claims** | $ 16,527,248 | 100% | 100% | 100% | $ 16,527,248 | $ 16,527,248 | $ 16,527,248 |
| **Proceeds Available for General Unsecured Claims** | | | | | $ 18,257,106 | $ 33,552,982 | $ 46,348,858 |
| **General Unsecured Claims (High)** | | | | | | | |
| Trade Payables and Accrued Expenses | 217,227 | 4% | 7% | 9% | 8,120 | 14,923 | 20,614 |
| Employee Related Claims | 399,605 | 4% | 7% | 9% | 14,937 | 27,452 | 37,921 |
| Other Claims | 6,701,214 | 4% | 7% | 9% | 250,495 | 460,361 | 635,926 |
| Abuse Claims | 450,000,000 | 4% | 7% | 9% | 16,821,258 | 30,914,175 | 42,703,706 |
| Lease Rejection Damages | 293,568 | 4% | 7% | 9% | 10,974 | 20,168 | 27,859 |
| Pension Claims | 30,800,000 | 4% | 7% | 9% | 1,151,322 | 2,115,904 | 2,922,831 |
| **Total General Unsecured Claims (High)** | $ 488,411,613 | 4% | 7% | 9% | $ 18,257,106 | $ 33,552,982 | $ 46,348,858 |
| **Proceeds Available After General Unsecured Claims** | | | | | $ - | $ - | $ - |
| **General Unsecured Claims (Low)** | | | | | | | |
| Trade Payables and Accrued Expenses | 217,227 | 8% | 14% | 19% | 16,635 | 30,572 | 42,230 |
| Employee Related Claims | 399,605 | 8% | 14% | 19% | 30,601 | 56,239 | 77,686 |
| Other Claims | 6,701,214 | 8% | 14% | 19% | 513,166 | 943,099 | 1,302,762 |
| Abuse Claims | 200,000,000 | 8% | 14% | 19% | 15,315,618 | 28,147,104 | 38,881,376 |
| Lease Rejection Damages | 293,568 | 8% | 14% | 19% | 22,481 | 41,315 | 57,072 |
| Pension Claims | 30,800,000 | 8% | 14% | 19% | 2,358,605 | 4,334,654 | 5,987,732 |
| **Total General Unsecured Claims (Low)** | $ 238,411,613 | 8% | 14% | 19% | $ 18,257,106 | $ 33,552,982 | $ 46,348,858 |
| **Proceeds Available After General Unsecured Claims** | | | | | $ - | $ - | $ - |

Note: Asset recovery percentages are based on asset proceeds recovered divided by pro forma asset balances Claims recoveries are based on the low, mid, and high ranges of estimated recoveries.

**<u>EXHIBIT 3 - Disclosure Statement</u>**

Prospective Financial Information

**The Roman Catholic Diocese of Rockville Centre, New York**
**Exhibit 3**
**Financial Projections[1]**

## Overview / Basis of Projections

The Debtor believes that the Plan meets the feasibility requirement set forth in section 1129(a)(11) of the Bankruptcy Code (*see* Article XI.B.3 of the Disclosure Statement), as Confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the Debtor or any successors under the Plan. In connection with the development of the Plan and to determine whether the Plan satisfies the feasibility standard, the Debtor analyzed its ability to satisfy its financial obligations while maintaining sufficient liquidity and capital resources.

The Debtor prepared a business plan including the projections contained herein (the "Financial Projections") with the assistance of the Debtor's advisors. The Debtor's management team developed and refined the business plan and prepared the cash flow projections for the fiscal years ending August 31, 2024, through August 31, 2028.

Although the Financial Projections represent the Debtor's commercially reasonable estimates and good faith judgment (for which the Debtor's management team believes it has a reasonable basis) of the cash flows of the Debtor, the Financial Projections are only estimates and actual results may vary considerably from the Financial Projections. Consequently, the Financial Projections should not be regarded as a representation by the Debtor, the Debtor's advisors, or any other person that the projected cash flows of the Debtor will be achieved. The Financial Projections are based on forecasts that may be significantly impacted by, among other factors, changes in mass attendance within the geographic area of the Debtor, donation levels, demand for the Debtor's programming and services, changes in terms with material suppliers and vendors, and overall economic conditions. Consequently, the estimates and assumptions underlying the Financial Projections are inherently uncertain and are subject to material operational, economic, and other uncertainties.

The Financial Projections have been prepared by management, with the assistance of its advisors, using methodologies that are generally consistent with those applied in the Debtor's historical financial statements. The Financial Projections were not, however, prepared with a view toward compliance with guidelines established by the American Institute of Certified Public Accountants, or the Financial Accounting Standards Board. The Financial Projections have not been examined or compiled by independent accountants.

The Financial Projections should be read in conjunction with the significant assumptions, qualifications and notes set forth below, as well as the assumptions, qualifications and explanations set forth in the Disclosure Statement. *See* Article XV of the Disclosure Statement – Plan Related Risk Factors.

THE FINANCIAL PROJECTIONS CONTAIN CERTAIN STATEMENTS THAT ARE "FORWARD-LOOKING" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995. THESE STATEMENTS ARE SUBJECT TO A NUMBER OF ASSUMPTIONS, RISKS AND UNCERTAINTIES, MANY OF WHICH ARE BEYOND THE CONTROL OF THE DEBTOR, INCLUDING THE IMPLEMENTATION OF THE PLAN, MAINTAINING GOOD

---

[1] All capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Plan or Disclosure Statement, as applicable.

EMPLOYEE, PARISHIONER, AND DONOR RELATIONS, EXISTING AND FUTURE GOVERNMENTAL REGULATIONS AND ACTIONS OF GOVERNMENT BODIES, NATURAL DISASTERS AND UNUSUAL WEATHER CONDITIONS, ACTS OF TERRORISM OR WAR, ORGANIZATIONAL-SPECIFIC RISK FACTORS (AS DETAILED IN ARTICLE XV OF THE DISCLOSURE STATEMENT ENTITLED "PLAN RELATED RISK FACTORS"), AND OTHER CONDITIONS. HOLDERS OF CLAIMS ARE CAUTIONED THAT THE FORWARD-LOOKING STATEMENTS SPEAK AS OF THE DATE MADE AND ARE NOT GUARANTEES OF FUTURE PERFORMANCE. ACTUAL RESULTS OR DEVELOPMENTS MAY DIFFER MATERIALLY FROM THE EXPECTATIONS EXPRESSED OR IMPLIED IN THE FORWARD-LOOKING STATEMENTS, AND THE DEBTOR UNDERTAKES NO OBLIGATION TO UPDATE ANY SUCH STATEMENTS.

THE FINANCIAL PROJECTIONS, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ARE NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS WHICH, THOUGH CONSIDERED REASONABLE BY THE DEBTOR, MAY NOT BE REALIZED AND ARE INHERENTLY SUBJECT TO SIGNIFICANT OPERATIONAL, ECONOMIC, REGULATORY AND FINANCIAL UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE DEBTOR'S CONTROL AND WILL BE BEYOND THE REORGANIZED DEBTOR'S CONTROL. THE DEBTOR CAUTIONS THAT NO REPRESENTATIONS CAN BE MADE OR ARE MADE AS TO THE ACCURACY OF THE FINANCIAL PROJECTIONS OR THE REORGANIZED DEBTOR'S ABILITY TO ACHIEVE THE PROJECTED RESULTS. SOME ASSUMPTIONS INEVITABLY WILL BE INACCURATE. MOREOVER, EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THE DEBTOR PREPARED THESE FINANCIAL PROJECTIONS MAY BE DIFFERENT FROM THOSE ASSUMED, OR, ALTERNATIVELY MAY HAVE BEEN UNANTICIPATED, AND THUS THE OCCURRENCE OF THESE EVENTS MAY AFFECT FINANCIAL RESULTS IN A MATERIALLY ADVERSE OR MATERIALLY BENEFICIAL MANNER. EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR DISCLOSURE STATEMENT, THE DEBTOR AND THE REORGANIZED DEBTOR, AS APPLICABLE, DO NOT INTEND AND UNDERTAKE NO OBLIGATION TO UPDATE OR OTHERWISE REVISE THE FINANCIAL PROJECTIONS TO REFLECT EVENTS OR CIRCUMSTANCES EXISTING OR ARISING AFTER THE DATE THE DISCLOSURE STATEMENT IS INITIALLY FILED OR TO REFLECT THE OCCURRENCE OF UNANTICIPATED EVENTS. THEREFORE, THE FINANCIAL PROJECTIONS MAY NOT BE RELIED UPON AS A GUARANTY OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR. IN DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, HOLDERS OF CLAIMS MUST MAKE THEIR OWN DETERMINATIONS AS TO THE REASONABLENESS OF SUCH ASSUMPTIONS AND THE RELIABILITY OF THE FINANCIAL PROJECTIONS AND SHOULD CONSULT WITH THEIR OWN ADVISORS.

**THE DEBTOR BELIEVES THAT THE CONFIRMATION AND CONSUMMATION OF THE PLAN ARE NOT LIKELY TO BE FOLLOWED BY THE LIQUIDATION OR FURTHER REORGANIZATION OF THE REORGANIZED DEBTOR. ACCORDINGLY, THE DEBTOR BELIEVES THAT THE PLAN SATISFIES THE FEASIBILITY REQUIREMENT OF SECTION 1129(A)(11) OF THE BANKRUPTCY CODE.**

## Accounting Policies

The Financial Projections have been prepared using consistent methodologies to those applied in the Debtor's historical financial statements.

Upon emergence from chapter 11, the Reorganized Debtor will implement "fresh start" reporting pursuant to Statement of Position 90-7, "Financial Reporting by Entities in Reorganization Under the Bankruptcy Code," as codified in Accounting Standards Codification ("ASC") Topic 852, "Reorganization." The main principles of fresh start reporting require that the value of the emerging entity be allocated to all the entity's assets in conformity with the procedures specified by Statement of Financial Accounting Standards ("SFAS") No. 141R, "Business Combinations," as codified in ASC Topic 805, "Business Combinations," and any portion of the value that cannot be attributed to specific tangible or identifiable intangible assets of the emerging entity is required to be reported as goodwill.

### Assumptions and Methodologies to the Financial Projections

#### General Assumptions

The Financial Projections take into account the assumptions noted below, as well as the current environment in which the Debtor operates, including many economic and financial forces that are beyond the control of the Debtor. The Debtor is a not-for-profit entity and shares a common religious mission with 135 parishes and various related affiliates. Economic growth or slowdowns on a national or regional basis may impact the Debtor's and the Reorganized Debtor's revenues and expenses. In addition, general trends, and changes within the market for youth and adult programming and the ability of the Reorganized Debtor and parishes to raise donations to support its programming and operations may impact performance.

- **Plan and Effective Date:** The Financial Projections assume that the Plan will be consummated in accordance with its terms and that all transactions contemplated by the Plan will be consummated on or about February 29, 2024, and that the Reorganized Debtor will continue to conduct operations substantially similar to its current operations.

- **Forecast Period:** The Debtor prepared the Financial Projections based on, among other things, the anticipated future financial condition and results of operations of the Reorganized Debtor and the terms of the Plan. The Debtor prepared consolidated Financial Projections for the fiscal years ending August 31, 2024, through August 31, 2028.

- **Settlement Trust Contribution:** The Financial Projections assume the Debtor contributes to the Trusts on the Effective Date: (a) the Debtor's portion of the Insurance Rights Transfer, and (b) (I) $32.9 million plus (II) unrestricted cash at the Effective Date less $16 million, less (III) the sum of (i) the aggregate amount of all unpaid Allowed Administrative Expenses, Allowed Priority Tax Claims, Allowed Priority Claims, Allowed Convenience Class Claims, and Allowed Secured Claims, (ii) the GUC Plan Distribution, and (iii) the Cure Amounts.

**Administrative Offices Receipts Assumptions**

A. <u>Parish Assessments</u> – includes a semi-annual assessment as a percentage of parish collections which is paid monthly to the Debtor. Forecast assumes no growth in 2024, 5% contraction in 2025, and 2% annual growth thereafter with a collection rate of 92%.

B. <u>Release of Restricted Funds from CMA</u> – Consists of a release of restricted funds collected as part of the Catholic Ministries Appeal to reimburse the Debtor's Administrative Offices for costs incurred by certain CMA-funded departments. The forecast assumes transfers from CMA are sufficient to fund 100% of the costs incurred by the CMA-funded departments (assumed to grow at approximately 11% in 2024, 1% in 2025 and 3.8% annually thereafter).

C. <u>Spectrum and Other Lease Income</u> – Consists of contractual revenue associated with leases of spectrum and cellular towers to third-party telecommunications providers. Expected to grow by approximately 2.5% per year based on existing contracts (excluding one-time true-up in 2023 which impacted the nominal growth rate from 2023 to 2024)

D. <u>Departmental, Chaplaincy & Program Income</u> – Consists of (a) fees paid to the Debtor by participants in a wide variety of diocesan programs such as Pre-Cana, Tribunal, Diaconate Formation, and Prison Ministry, (b) fees paid to the diocese by hospitals and prisons for chaplaincy services, and (c) fees paid by parishes to the Debtor for the provision of administrative services, such as finance, accounting, human resources, information technology, and payroll. Assumes approximately 11% contraction in 2024, flat in 2025, and 1.5% annual growth from 2026-2028.

E. <u>Donations and Other Receipts</u> – 2023 includes $13.2 million of proceeds from cell tower sale. In 2024 and beyond, projections include (a) a $600,000 annual contribution from Catholic Health Services ("<u>CHS</u>"), (b) a $2 million annual dividend from Ecclesia Assurance Corporation in 2H 2025 and beyond, (c) $100,000 of bequests and donations, and (e) other receipts such as parish loan repayments and priest life insurance proceeds.

F. <u>Administrative Services</u> – Consists of service fees paid by third parties for administrative services provided by the Debtor such as accounting, finance, human resources, information technology, payroll, etc. This revenue is separate from the revenue the Debtor earns for providing similar services to parishes, which is part of the Departmental, Chaplaincy & Program Income described above. Assumed to increase 1% in 2024, approximately 7% per year in 2025-2026 and 4% in 2027-2028.

G. <u>Investment Income</u> – Consists of interest income earned on money market account balances. Assumed to decline over the forecast period as cash is depleted.

H. <u>Release of Restricted Funds</u> – Consists of the release of restricted funds to unrestricted funds (excluding those collected via the Catholic Ministries Appeal) as expenses are incurred meeting the donor restrictions. Assumes annual releases of restricted funds consistent with prior years.

**Administrative Offices Operating Disbursement Assumptions**

I. <u>Payroll & Benefits</u> – Represents employee costs which are driven by headcount and inflation assumptions. Assumes 3% annual wage increases (excluding 2024 which reflect no lay employee wage increases) and 3% annual benefits inflation from 2025-2028 (excludes health insurance premiums which are assumed to increase by 10% annually).

The Financial Projections include approximately $1 million contributed into the pension plans and 403(b) plans on behalf of the Debtor's employees each year. Depending on performance of the pension plan, the Debtor may not be required to make the entire contribution to the pension. If lower pension contributions are made, cash would increase from what is currently projected. Conversely, if greater contributions are required, cash would decrease from what is currently projected.

Note that the Debtor processes certain benefits for parish employees and employees of other entities. These amounts are not reflected in the projections as they are passed through.

J. <u>Canon 1271 and Catholic Group Assessments</u> – Assumes $200,000 of annual assessments paid to the Holy See post-emergence and approximately $450,000 of annual assessments paid to the US Conference of Catholic Bishops and the NY Conference of Catholic Bishops both pre- and post-emergence.

K. <u>Tuition & Student Expenses</u> – Consists of tuition, room & board and other schooling related expenses for undergraduates, priests, and seminarians. Assumes ~10% growth per year, in line with university tuition and student related expenses nationally.

L. <u>Rent, Facilities & Utilities</u> – Consists of office rental expense, facilities, and utilities costs. Assumed to increase approximately 2% per year.

M. <u>PSIP and NYSIF Insurance</u> – Consist of property and casualty and workers' compensation insurance costs incurred by the Debtor. Assumed to grow at 2% per year over the forecast period.

N. <u>Professional Fees & Service Providers</u> – Consists of ordinary course professional fees including those associated with investigations of allegations of abuse. Professional fees assumed to decline in 2024 as existing abuse-related investigations are completed and then grow at 2% annually.

O. <u>Other Accounts Payable</u> – Consists of ordinary course operating costs such as food, auto, postage, printing, seminars, events, books, computers, furniture / equipment, office supplies, etc. Assumed to grow at approximately 2% per year.

P. <u>Catholic Faith Network</u> – Consists of monthly payments of approximately $59,000 per month through August 2023 and $109,000 beginning in September 2023 pursuant to the Debtor's contract with Catholic Faith Network and the cell tower sale order. Such payments are assumed to be eliminated post-emergence.

Q. <u>Catholic Charities</u> – Consists of annual $750,000 contribution to Catholic Charities of the Diocese of Rockville Centre.

R. <u>Sacred Heart Institute</u> – Consists of contractual payments pursuant to a tri-party agreement to fund the operations of Sacred Heart Institute for the formation of priests and deacons. The operations are funded by the Archdiocese of NY, the Diocese of Brooklyn and the Debtor. Assumes costs remain flat throughout the projection period.

**Administrative Offices Non-Operating Disbursement Assumptions**

S. <u>Chapter 11 Professional Fees</u> – Consists of costs associated with the retained professionals in this chapter 11 case on a post-emergence basis.

T. <u>Spectrum Loan Draw / (Repayments)</u> – Consists of $30 million loan to the Debtor supported by spectrum lease payments and the associated principal amortization payments.

U. <u>Other Loan Draw / (Repayments)</u> – Consists of $35 million loan to the Debtor supported by dividends from Ecclesia and the associated principal amortization payments. 2024 includes the initial loan proceeds of $35 million.

V. <u>PSIP Loan Draw / (Repayments)</u> – Consists of $10 million inter-fund loan from PSIP to the Administrative Offices of the Debtor.

W. <u>Ecclesia Special Dividend</u> – Consists of special dividend sought by the Debtor (subject to regulatory approval), the proceeds of which are to be used to pay down the loan to the Debtor. This is not included in the cash flow as it will be passed through to pay down the $35 million loan supported by dividends from Ecclesia.

X. <u>Plan Disbursements from Unrestricted</u> – Consists of (a) the Debtor's portion of the Insurance Rights Transfer, and (b) (I) $32.9 million plus (II) unrestricted cash at the Effective Date less $16 million, less (III) the sum of (i) the aggregate amount of all unpaid Allowed Administrative Expenses, Allowed Priority Tax Claims, Allowed Priority Claims, Allowed Convenience Class Claims, and Allowed Secured Claims, (ii) the GUC Plan Distribution, and (iii) the Cure Amounts. Payments are assumed to occur in FY 2024.

Note: the Chancery Building Proceeds are assumed to be paid out of restricted funds and therefore are not included in the cash flow above which projects unrestricted cash balances.

## Administrative Offices Projected Cash Flows

The following table summarizes the Cash Flow Forecast for the Administrative Offices.  This Cash Flow Forecast should be reviewed with the accompanying notes.

| $ in thousands | Notes | Actual FY 2023 | Forecast FY 2024 | Forecast FY 2025 | Forecast FY 2026 | Forecast FY 2027 | Forecast FY 2028 |
|---|---|---|---|---|---|---|---|
| **Cash Inflows** | | | | | | | |
| Parish Assessments | A | 9,642.0 | 9,635.0 | 9,195.4 | 9,379.3 | 9,566.9 | 9,758.2 |
| Transfers from CMA | B | 5,336.2 | 5,923.1 | 5,964.6 | 6,191.2 | 6,426.5 | 6,670.7 |
| Spectrum and Other Lease Income | C | 3,664.7 | 3,398.4 | 3,478.3 | 3,560.1 | 3,643.8 | 3,729.4 |
| Departmental, Chaplaincy & Program Income | D | 2,783.6 | 2,480.1 | 2,478.6 | 2,513.5 | 2,549.0 | 2,585.0 |
| Donations and Other Receipts (incl 2023 Tower Sale) | E | 14,170.1 | 1,277.0 | 1,482.0 | 2,649.3 | 2,649.9 | 2,650.5 |
| Administrative Services Income, net | F | 3,827.5 | 3,859.9 | 4,142.8 | 4,447.5 | 4,618.4 | 4,798.2 |
| Investment Income (Loss) and other | G | 562.4 | 501.3 | 366.5 | 317.8 | 251.3 | 162.4 |
| Release of Restricted Funds | H | 392.7 | 225.7 | 225.7 | 225.7 | 225.7 | 225.7 |
| **Total Cash Inflows** | | **40,379.3** | **27,300.6** | **27,333.8** | **29,284.4** | **29,931.4** | **30,580.1** |
| **Cash Outflows** | | | | | | | |
| _Operating Disbursements_ | | | | | | | |
| Payroll and Benefits | I | (15,928.5) | (16,054.7) | (17,082.7) | (17,924.4) | (18,558.5) | (19,228.7) |
| Canon 1271 and Catholic Group Assessments | J | (426.3) | (654.9) | (654.9) | (654.9) | (654.9) | (654.9) |
| Tuition and Student-Related Expenses | K | (613.1) | (679.0) | (746.8) | (821.5) | (903.7) | (994.1) |
| Rent, Facilities and Utilities | L | (1,003.4) | (1,025.4) | (1,045.9) | (1,066.8) | (1,088.2) | (1,109.9) |
| PSIP and NYSIF Insurance | M | (291.9) | (295.2) | (301.1) | (307.2) | (313.3) | (319.6) |
| Professional Fees & Service Providers | N | (2,160.6) | (2,205.4) | (2,251.5) | (2,276.6) | (2,322.5) | (2,369.4) |
| Other Accounts Payable | O | (717.2) | (700.8) | (723.1) | (731.9) | (748.7) | (765.8) |
| Total Operating Disbursements | | (21,140.9) | (21,615.4) | (22,806.0) | (23,783.3) | (24,589.8) | (25,442.4) |
| _Other Mission Related Disbursements_ | | | | | | | |
| Catholic Faith Network | P | (1,000.3) | - | - | - | - | - |
| Catholic Charities | Q | (750.0) | (750.0) | (750.0) | (750.0) | (750.0) | (750.0) |
| Sacred Heart Institute | R | (105.0) | (105.0) | (105.0) | (105.0) | (105.0) | (105.0) |
| Total Mission Related Fees | | (1,855.3) | (855.0) | (855.0) | (855.0) | (855.0) | (855.0) |
| **Total Operating Cash Flows** | | **17,383.1** | **4,830.2** | **3,672.8** | **4,646.1** | **4,486.6** | **4,282.7** |
| _Non-Operating Cash Flows_ | | | | | | | |
| Chapter 11 and Other Professional Fees | S | (35,293.5) | (20,698.5) | - | - | - | - |
| Spectrum Loan Funding and Debt Service | T | - | 28,678.1 | (2,643.8) | (3,028.4) | (3,412.9) | (3,412.9) |
| Other Loan Funding and Debt Service | U | - | 33,934.1 | (2,131.8) | (2,131.8) | (2,131.8) | (2,131.8) |
| PSIP Loan Draw / (Repayments) | V | - | 10,000.0 | - | - | - | - |
| Ecclesia Special Dividend | W | - | - | - | - | - | - |
| Plan Disbursements from Unrestricted | X | - | (65,000.0) | - | - | - | - |
| Total Non-Operating Cash Flows | | (35,293.5) | (13,086.3) | (4,775.6) | (5,160.2) | (5,544.8) | (5,544.8) |
| **Total Unrestricted Cash Inflows/(Outflows)** | | **(17,910.4)** | **(8,256.2)** | **(1,102.9)** | **(514.1)** | **(1,058.1)** | **(1,262.1)** |
| **Beginning Unrestricted Cash/Investments Balance** | | $ 31,393.9 | $ 15,546.1 | $ 9,317.3 | $ 7,360.0 | $ 5,928.7 | $ 3,952.2 |
| Cash Flow from Unrestricted Activity | | (17,910.4) | (8,256.2) | (1,102.9) | (514.1) | (1,058.1) | (1,262.1) |
| Change in Float and Timing Differences | | 2,062.7 | 2,027.3 | (854.4) | (917.1) | (918.4) | (908.5) |
| **Ending Unrestricted Cash/Investments Balance** | | $ 15,546.1 | $ 9,317.3 | $ 7,360.0 | $ 5,928.7 | $ 3,952.2 | $ 1,781.6 |

## Description of Protected Self Insurance Program ("PSIP") Projected Cash Flows

### PSIP Receipts Assumptions

Y. <u>Premiums</u> – Consists of property and casualty premiums paid by parishes and other entities within the Diocese to the Debtor. Assumes a 7% decline in premium receipts 2024 (due to lower premiums owed to reinsurers), flat in 2025 and 4% annual growth thereafter.

Z. <u>Other Income</u> – Consists of workers' compensation bond interest and interest earned on excess cash invested in money market accounts. Assumes variable money market interest income averaging $500,000 annually, $300,000 of interest on the workers' compensation bond (payable to PSIP 5 years after the effective date of entry into settlement documentation with CHS), and $5,000 of other income in 2024 and beyond.

AA.    <u>Insurance Recoveries</u> – Consists of payments from third-party insurers through whom the Debtor has procured reinsurance. Such payments are typically paid as reimbursements for claims already paid by the Debtor, but are paid in advance in certain circumstances. Assumes 3% annual growth in recoveries in 2024 and beyond.

BB.    <u>Administrative Services Income</u> – Represents receipts related to administrative services provided by PSIP on behalf of third parties prior to filing for Chapter 11. Assumes approximately 3% growth in 2024 and 2% annual growth in 2025 and beyond.

### PSIP Operating Disbursement Assumptions

CC.    <u>Payroll & Benefits</u> – Consists of salary and benefit payments to individuals working in the Debtor's risk management function. Assumes 3% annual wage growth and 10% annual increase in medical benefits costs in 2024 and beyond.

DD.    <u>Claims Expense</u> – Consists of claims payments made by the diocese against claims from other entities within the diocese and/or their employees. Assumes a 15% decline in 2024 and a 7.5% increase in 2025 associated with the implementation of the CHS settlement and a change in policy to align claims payments with receipt of reinsurance funds (where possible pursuant to insurance policies). Assumes approximately 3.5% annual growth in claims expense thereafter. Claims expense is net of amounts payable by CHS based on upon the settlement with CHS regarding workers' compensation claims which was approved by the Court.

EE.    <u>Insurance Premiums</u> – Consists of payments by the Debtor to third-party insurers to reinsure the risks underwritten by PSIP. Assumes a 7% decline in 2024, flat in 2025 and 2% growth thereafter.

FF.    <u>Other Insurance Costs</u> – Consists of worker's compensation assessments, broker fees, adjuster fees, actuary costs, and insurance software licenses. Assumes 2.0% annual growth in Other Insurance Costs in 2024 and beyond.

GG.    <u>Legal Fees</u> – Consists of ordinary course legal fees related to the administration of PSIP. Assumes 2.5% annual increase in legal fees in 2024 and beyond.

HH.   <u>Pastoral Care</u> – Consists of payments made by the Debtor for psychological counseling, therapy, and related treatment for victims of abuse. Assumes these costs are paid by the Trusts post-emergence.

II.   <u>Other Expenses</u> – Consists of other ordinary course operating expenses incurred by PSIP. Assumed to grow at 2% annually in 2024 and beyond.

JJ.   <u>Chapter 11 Professional Fees</u> – Consists of costs associated with the retained professionals in this chapter 11 case on a post-emergence basis.

KK.   <u>Funds Held for Others</u> – Consists of $1.6 million of cash owed to CHS from reinsurance recoveries which flows through the Debtor.

LL.   <u>Funding Provided to Admin Offices</u> – Consists of $10 million inter-fund loan from PSIP to the Administrative Offices of the Debtor.

## PSIP Projected Cash Flows

The following table summarizes the Cash Flow Forecast for PSIP.  This Cash Flow Forecast should be reviewed with the accompanying notes.

| $ in thousands | Notes | Actual FY 2023 | Forecast FY 2024 | Forecast FY 2025 | Forecast FY 2026 | Forecast FY 2027 | Forecast FY 2028 |
|---|---|---|---|---|---|---|---|
| **Cash Inflows** | | | | | | | |
| Premiums from Parishes | Y | 16,848.4 | 15,670.7 | 15,670.7 | 16,297.6 | 16,949.5 | 17,627.4 |
| Other Income | Z | 897.2 | 924.0 | 870.1 | 834.8 | 781.7 | 728.6 |
| Insurance Recoveries | AA | 3,562.4 | 3,669.3 | 3,779.4 | 3,892.8 | 4,009.5 | 4,129.8 |
| Administrative services income, net | BB | 120.8 | 124.8 | 127.3 | 129.9 | 132.5 | 135.1 |
| **Total Cash Inflows** | | **21,428.8** | **20,388.9** | **20,447.6** | **21,154.9** | **21,873.2** | **22,621.0** |
| **Cash Outflows** | | | | | | | |
| <u>Operating Disbursements</u> | | | | | | | |
| Payroll and Benefits | CC | (924.9) | (974.2) | (1,022.9) | (1,074.1) | (1,127.8) | (1,184.2) |
| Claims Expense | DD | (3,952.7) | (3,361.5) | (3,618.0) | (3,743.4) | (3,872.6) | (4,005.7) |
| Insurance Premiums | EE | (16,544.5) | (15,389.5) | (15,393.6) | (15,701.5) | (16,015.5) | (16,335.8) |
| Other Insurance Costs | FF | (248.1) | (253.1) | (258.1) | (263.3) | (268.6) | (273.9) |
| Legal Fees | GG | (320.2) | (328.2) | (336.5) | (344.9) | (353.5) | (362.3) |
| Pastoral Care | HH | (278.0) | (139.0) | - | - | - | - |
| Other Expenses | II | (361.6) | (541.7) | (552.5) | (563.5) | (574.7) | (586.2) |
| Total Operating Disbursements | | (22,630.0) | (20,987.2) | (21,181.6) | (21,690.6) | (22,212.7) | (22,748.2) |
| **Total Operating Cash Flows** | | **(1,201.2)** | **(598.3)** | **(734.0)** | **(535.7)** | **(339.5)** | **(127.2)** |
| <u>Non-Operating Cash Flows</u> | | | | | | | |
| Chapter 11 Professional fees | JJ | (3,110.5) | (1,200.0) | - | - | - | - |
| Funds Held for Others | KK | 1,636.3 | - | - | - | - | - |
| Funding Provided to Admin Offices | LL | - | (10,000.0) | - | - | - | - |
| Total Non-Operating Cash Flows | | (1,474.2) | (11,200.0) | - | - | - | - |
| **Total Cash Inflows/(Outflows)** | | **(2,675.3)** | **(11,798.3)** | **(734.0)** | **(535.7)** | **(339.5)** | **(127.2)** |
| **Beginning Cash Balance** | | $ 24,361.7 | $ 21,686.4 | $ 9,888.1 | $ 9,154.1 | $ 8,618.4 | $ 8,278.9 |
| Change in Cash | | (2,675.3) | (11,798.3) | (734.0) | (535.7) | (339.5) | (127.2) |
| **Ending Cash Balance** | | $ 21,686.4 | $ 9,888.1 | $ 9,154.1 | $ 8,618.4 | $ 8,278.9 | $ 8,151.7 |

11

## <u>EXHIBIT 4 - Disclosure Statement</u>

Coverage Chart

# Roman Catholic Diocese of Rockville Centre
## Insurance Policies from 1956 to 1986



## **EXHIBIT 5 - Disclosure Statement**

Amended Aggregate Financial and Real Estate Disclosures

**Diocese of Rockville Centre - Parish Financials**
**Fiscal Year Ended August 31, 2022**

| Parish Name | Location | Number of Lawsuits | Unrestricted Cash | Restricted Cash | Unitas | Other Investments | Other Assets | Total Assets | Total Liabilities | Net Operating Surplus / (Deficit) | Net Surplus / (Deficit) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Balance Sheet Metrics | | | | | | | Income Statement Metrics | |
| St. Christopher | Baldwin | 5 | 1,054,399 | 3 | – | – | 10,000 | 1,064,402 | 743,269 | 270,315 | 249,445 |
| St. Gertrude | Bayville | – | 250,294 | 142,437 | – | – | 14,524 | 407,255 | 122,997 | (37,579) | (129,673) |
| St. Barnabas the Apostle | Bellmore | 11 | 1,699,636 | 10,856 | 1,044,972 | – | 15,560 | 2,771,024 | 581,780 | 17,931 | (144,585) |
| St. Martin of Tours | Bethpage | 3 | 700,414 | – | 323,993 | – | 3,965 | 1,028,372 | 197,244 | (27,456) | (133,624) |
| St. Joachim | Cedarhurst | – | 189,627 | – | 4,540,866 | – | – | 4,730,493 | 44,414 | (306,559) | (855,491) |
| St. Raphael | East Meadow | 7 | 2,968,481 | – | 124,015 | – | 16,861 | 3,109,357 | 148,760 | 67,694 | 133,672 |
| St. Boniface | Elmont | 1 | 572,350 | 217,879 | – | – | 24,440 | 814,669 | 50,313 | (196,585) | (129,687) |
| St. Vincent De Paul | Elmont | 1 | 2,480,985 | (0) | – | – | – | 2,480,985 | 13,483 | (52,993) | 2,427,249 |
| St. Kilian | Farmingdale | 3 | 478,060 | 1,845,634 | – | – | 14,428 | 2,338,122 | 755,030 | (419,198) | (755,837) |
| St. Hedwig | Floral Park | 2 | 177,827 | – | 87,297 | – | 9,150 | 274,274 | 106,903 | 291,692 | 100,916 |
| Our Lady of Victory | Floral Park | 4 | 1,316,019 | – | 1,542,182 | – | – | 2,858,201 | 57,484 | 114,898 | 94,246 |
| St. Catherine of Sienna | Franklin Square | 8 | 591,311 | 16,760 | 172,208 | – | 172,570 | 952,849 | 594,716 | 485,376 | 446,632 |
| Our Holy Redeemer | Freeport | 4 | 513,183 | – | 588,709 | 35,232 | 132,315 | 1,269,440 | 547,077 | (335,604) | 179,470 |
| St. Joseph | Garden City | 1 | 467,594 | – | 3,022,255 | (190,160) | 2,469,235 | 5,768,924 | 268,655 | (64,386) | (682,413) |
| St. Hyacinth | Glen Head | 1 | 88,342 | – | 95,870 | – | – | 184,212 | 489,024 | (67,237) | (168,988) |
| St. Patrick | Glen Cove | 2 | 672,298 | – | – | – | 14,738 | 687,036 | 620,532 | 303,262 | 152,692 |
| Church of St. Rocco | Glen Cove | 1 | 457,813 | – | 795,949 | – | – | 1,253,762 | 38,109 | 122,403 | 72,728 |
| St. Aloysius | Great Neck | 1 | 505,580 | – | 7,071,547 | – | 4,786 | 7,581,914 | 33,972 | (414,399) | (1,280,419) |
| St. Ladislaus | Hempstead | 2 | 515,399 | – | 48,314 | – | 7,407 | 571,120 | 703,044 | (82,206) | (1,381,484) |
| Our Lady of Loretto | Hempstead | 2 | 467,215 | – | – | – | 22,081 | 489,296 | 235,641 | 498,045 | 187,212 |
| St. Joseph | Hewlett | 5 | 35,309 | – | 254,173 | – | 276,328 | 565,810 | 873,410 | (132,017) | (262,983) |
| Holy Family | Hicksville | 8 | 1,344,276 | 24,041 | 100,732 | 23,805 | 28,099 | 1,520,954 | 151,249 | 34,367 | (278,797) |
| St. Ignatius Loyola | Hicksville | 3 | 553,314 | – | – | – | 17,074 | 570,388 | 70,067 | 72,807 | 49,979 |
| Our Lady of Mercy | Hicksville | 2 | 348,478 | – | – | – | 12,705 | 361,183 | 1,480,715 | 15,399 | 15,522 |
| Our Lady of Good Counsel | Inwood | 2 | 135,639 | – | – | – | 138,946 | 274,585 | 778,224 | 145,551 | 139,941 |
| Sacred Heart | Island Park | 1 | 1,176,340 | – | – | – | – | 1,176,340 | 6,484 | 134,839 | 22,982 |
| St. Bernard | Levittown | 5 | 983,548 | 862,350 | 19,045 | 35,874 | 269,628 | 2,170,445 | 677,908 | (200,081) | (431,952) |
| St. Ignatius Martyr | Long Beach | 1 | 994,906 | – | – | – | – | 994,906 | 8,198 | 215,547 | 213,890 |
| St. Mary of the Isle | Long Beach | 1 | 135,966 | – | 1,531,571 | (0) | 177,742 | 1,845,280 | 10,015 | 359,260 | 218,583 |
| Our Lady of Peace | Lynbrook | 4 | 645,373 | – | 979,101 | 4,299 | 6,585 | 1,635,358 | 67,747 | (153,271) | (241,031) |
| St. Raymond | East Rockaway | 8 | 835,817 | – | – | – | 30,357 | 666,175 | 54,212 | 24,540 | 104,751 |
| Our Lady of Lourdes | Malverne | 2 | 275,579 | 332,082 | 290,739 | – | 1,344 | 899,743 | (12,284) | (30,870) | (58,559) |
| St. Mary | Manhasset | 10 | 2,007,409 | – | 551,560 | 8,701,562 | – | 11,260,532 | 472,424 | 1,539,046 | (186,623) |
| Our Lady of Fatima | Manorhaven | 2 | 293,452 | 0 | 226,101 | 1,020,733 | (3,048) | 1,537,238 | 24,265 | 35,519 | (153,216) |
| St. Rose of Lima | Massapequa | 5 | 3,092,661 | – | 15,965 | 549,904 | 77,061 | 3,735,591 | 727,977 | (77,264) | (116,648) |
| Our Lady of Lourdes | Massapequa Park | 1 | 400,108 | – | – | 776,928 | – | 1,177,036 | 100,629 | (185,930) | (319,829) |
| Cure of Ars | Merrick | – | 439,775 | 831,653 | – | – | 43,059 | 1,314,487 | 192,486 | 47,757 | 262,084 |
| Corpus Christi | Mineola | 2 | 325,437 | – | 6,291,583 | – | 3,207 | 6,620,226 | 59,879 | (104,804) | (1,272,707) |
| Holy Spirit | New Hyde Park | 3 | 770,816 | – | 1,490,669 | – | 1,835 | 2,263,320 | 17,823 | 116,305 | (116,641) |
| Notre Dame | New Hyde Park | 2 | 1,123,328 | – | – | 4,647,486 | 233,970 | 6,004,784 | 295,127 | 390,768 | (49,396) |
| Sacred Heart | North Merrick | 3 | 592,641 | – | – | – | 7,965 | 600,605 | 1,240,488 | 198,805 | 112,876 |
| Blessed Sacrament | Valley Stream | 2 | 719,001 | (663) | – | – | 4,632 | 722,970 | 85,975 | 118,108 | 123,281 |
| St. Anthony | Oceanside | 1 | 507,423 | – | 736,122 | – | – | 1,243,544 | 208,302 | 99,041 | 13,779 |
| St. Dominic | Oyster Bay | 11 | 1,414,048 | – | 893,136 | (0) | 7,852 | 2,315,035 | 585,643 | 12,093 | 51,617 |
| St.Pius X | Plainview | 3 | 1,373,206 | – | – | 721,037 | 20,308 | 2,114,551 | 87,736 | 210,470 | 712,186 |
| Our Lady of Miraculous Medal | Point Lookout | – | 474,869 | 9,985 | 462,250 | – | – | 947,104 | 5,621 | 118,134 | 53,938 |
| St. Peter of Alcantara | Port Washington | – | 301,806 | 142,991 | 3,658,558 | 1,874,711 | 10,345 | 5,988,411 | 149,187 | (37,710) | (667,651) |
| St. Agnes Cathedral | Rockville Centre | 13 | 695,884 | – | 779,576 | – | 83,666 | 1,559,126 | 644,683 | (227,247) | (518,539) |
| Queen of Most Holy Rosary | Roosevelt | 4 | 1,198,057 | 198,809 | – | – | 99,126 | 1,495,991 | 330,678 | 156,093 | 48,941 |
| St. Mary | Roslyn | 1 | 642,256 | 417 | – | – | 7,475 | 650,148 | 30,712 | (110,527) | (129,069) |
| St. Boniface Martyr | Sea Cliff | 1 | 475,744 | – | 160,116 | – | (300) | 635,560 | 73,914 | 91,212 | 57,710 |
| St. James | Seaford | 7 | 1,456,616 | – | – | 484,283 | (0) | 1,940,899 | 173,155 | 24,224 | (23,367) |
| Maria Regina | Seaford | 2 | 801,762 | – | 993,755 | 3,457,014 | – | 5,252,531 | (14,412) | (172,835) | (915,416) |
| St. William the Abbot | Seaford | 2 | 170,263 | (0) | 4,868,602 | – | 57,916 | 5,096,781 | 113,498 | (262,363) | (1,310,094) |
| St. Anne | Garden City | 2 | 1,875,171 | 11,072 | – | – | 622,089 | 2,508,332 | 711,598 | 396,279 | (1,010,805) |
| St. Edward Confessor | Syosset | 0 | 1,189,873 | 375,897 | – | – | 26,347 | 1,592,117 | 537,885 | (38,829) | (84,189) |
| St. Martha | Uniondale | 4 | 1,904,015 | – | – | – | 17,017 | 1,921,032 | 18,168 | 190,316 | 184,796 |
| Holy Name of Mary | Valley Stream | 5 | 737,394 | – | 148,138 | – | 6,976 | 892,509 | 78,993 | (285,601) | (283,461) |
| St. Frances De Chantal | Wantagh | – | 50,694 | 304,231 | 260,955 | – | – | 615,880 | 386,038 | (89,768) | (36,593) |
| St. Brigid | Westbury | 7 | 716,152 | – | 13,491 | 2,283,687 | 44,165 | 3,057,495 | 178,101 | 50,607 | (638,692) |
| St. Thomas the Apostle | West Hempstead | 3 | 421,807 | – | 161,400 | 79,024 | – | 662,231 | (77,607) | (36,587) | (253,778) |
| St. Aidan | Williston Park | 6 | 174,805 | – | 3,134,113 | (0) | 424,625 | 3,733,543 | 488,681 | (283,285) | (761,301) |
| St. Paul the Apostle | Brookville | 1 | 405,905 | 606,328 | – | 1,287,848 | 325,123 | 2,625,204 | 358,993 | 15,451 | (69,208) |
| Holy Name of Jesus | Woodbury | – | 1,346,852 | 1 | – | – | (1,525) | 1,345,328 | 10,811 | (37,623) | (48,649) |
| Our Lady of Hope | Carle Place | 1 | 482,489 | – | 255,733 | – | – | 738,222 | 83,579 | 6,990 | (9,065) |
| St. Martin of Tours | Amityville | 4 | 981,126 | 86,070 | 143,454 | 193,820 | 7,904 | 1,412,374 | 98,394 | 80,127 | 37,932 |
| St. Joseph | Babylon | 12 | 664,893 | 328,217 | 211,458 | – | 39,693 | 1,244,261 | 543,750 | (121,985) | (340,166) |
| St. Patrick | Bay Shore | 2 | 677,876 | – | 1,296,110 | 1,881,899 | 449,451 | 4,305,336 | 551,542 | 231,042 | 61,287 |
| Mary Immaculate | Bellport | 1 | 605,389 | 49,993 | – | – | 7,739 | 663,121 | 53,124 | 121,013 | 123,053 |
| Our Lady of the Snow | Blue Point | – | 383,223 | – | 567,204 | – | 0 | 950,427 | 26,547 | 57,195 | (19,045) |
| St. John Nepomucene | Bohemia | 3 | 530,809 | – | 259,179 | – | 17,745 | 807,733 | 137,248 | (65,734) | (83,683) |
| St. Anne | Brentwood | 3 | 785,405 | – | 327,577 | – | 8,846 | 1,121,828 | 77,777 | 169,731 | 106,311 |
| Queen of Most Holy Rosary | Bridgehampton | – | 577,781 | 24,999 | 0 | (0) | 4,327 | 607,107 | 4,308 | 62,964 | (0,294) |
| Assumption of the Blessed Virgin Mary | Centereach | – | 105,136 | 1 | – | 673,069 | 36,091 | 814,297 | 51,161 | (25,934) | (45,292) |
| St. John the Evangelist | Center Moriches | 1 | 846,822 | – | – | – | (0) | 846,822 | 35,430 | 42,798 | 106,213 |
| Our Lady of Queen of Martyrs | Centerport | 4 | 394,230 | 272,905 | 2,277 | 314,555 | 81,119 | 1,065,086 | 78,834 | (67,705) | (70,325) |
| St. John of God | Central Islip | 6 | 165,230 | 0 | – | – | – | 165,230 | 87,611 | (44,659) | 74,564 |
| Christ the King | Commack | 2 | 713,928 | – | 1,009,514 | – | 11,757 | 1,735,199 | 421,597 | 209,556 | (60,564) |
| Our Lady of the Assumption | Copiague | – | 320,575 | 676,982 | – | – | 68,852 | 1,066,409 | 106,970 | (57,069) | (1,662,736) |
| St. Frances Cabrini | Coram | 2 | 460,221 | – | 406,826 | 222,468 | 4,283 | 1,093,798 | 14,812 | 211,330 | 9,234 |
| Our Lady of Ostrabrama | Cutchogue | – | 435,826 | – | – | – | (1,725) | 434,101 | 3,256 | 7,003 | (31,012) |
| Sacred Heart | Cutchogue | 1 | 1,943,433 | – | 818,258 | – | (1,472) | 2,760,219 | 25,697 | (70,866) | (145,211) |
| SS Cyril and Methodius | Deer Park | 4 | 196,808 | – | – | – | 52,136 | 248,944 | (141,824) | 45,348 | 44,214 |
| Most Holy Trinity | East Hampton | – | 607,128 | – | 2,240,014 | – | 2,037,191 | 4,884,333 | 37,003 | (305,617) | (960,270) |
| St. Mary | East Islip | 5 | 792,009 | 3 | – | – | 52,009 | 844,021 | 173,975 | 13,954 | (7,059) |
| St. Anthony of Padua | East Northport | 3 | 552,982 | – | – | – | – | 552,982 | 303,511 | 136,692 | 101,552 |
| St. Joseph the Worker | East Patchogue | – | 144,787 | – | – | – | 6,458 | 151,245 | 456,531 | (69,955) | (105,437) |
| St. Agnes | Greenport | – | 911,938 | – | – | – | – | 911,938 | 35,650 | 82,267 | 8,242 |
| St. Rosalie | Hampton Bays | 3 | 529,998 | – | 820,669 | 5,406,346 | 962 | 6,757,974 | 24,927 | (446,252) | (1,062,496) |
| Good Shepherd | Holbrook | 5 | 461,299 | – | 1,130,790 | – | – | 1,592,089 | 69,020 | 109,934 | (54,329) |
| St. Patrick | Huntington | 5 | 415,690 | – | 3,208,018 | – | 10,105 | 3,633,813 | 1,041,593 | (12,814) | (895,075) |
| St. Hugh of Lincoln | Huntington Station | 23 | 1,639,763 | – | 279,835 | 102,366 | 15,753 | 2,037,718 | 88,386 | 433,696 | 376,903 |
| St. Joseph | Kings Park | 9 | 176,728 | 35,000 | – | 1,579,959 | 99,665 | 1,891,353 | 82,109 | (72,400) | (122,227) |
| Our Lady Of Perpetual Help | Lindenhurst | 7 | 210,063 | – | 0 | – | 2,969 | 213,032 | 891,549 | (170,781) | (127,985) |
| St. Jude | Mastic Beach | 1 | 2,070,188 | 93,011 | – | – | – | 2,163,199 | 48,472 | 236,092 | 198,120 |
| SS Peter and Paul | Manorville | – | 412,435 | 0 | 183,463 | – | – | 595,898 | 2,827 | 63,423 | 33,473 |
| St. Sylvester | Medford | 2 | 215,263 | 51,684 | – | 260,375 | 3,964 | 531,286 | 782,489 | (35,807) | (20,538) |
| St. Therese of Lisieux | Montauk | 2 | 2,137,676 | – | – | – | 118 | 2,137,794 | 27,361 | 1,074,111 | 933,595 |
| St. Philip Neri | Northport | 7 | 663,001 | 3,091 | 87,650 | – | 8,428 | 762,170 | 88,965 | 162,936 | 96,389 |
| Our Lady of the Magnificat Mission | Ocean Beach | – | 69,804 | – | – | – | – | 69,804 | 0 | – | – |
| St. Francis De Sales | Patchogue | 2 | 187,203 | – | – | – | – | 187,203 | 54,333 | (3,869) | (2,274) |
| Our Lady of Mount Carmel | Patchogue | 2 | 499,790 | – | – | – | 6,129 | 505,919 | 1,418,539 | 40,033 | 40,150 |
| Infant Jesus | Port Jefferson | 7 | 2,604,846 | (78) | – | – | – | 2,604,768 | 115,453 | (27,488) | (20,853) |
| St. Isidore | Riverhead | 1 | 830,679 | 2 | 714,216 | – | 92,070 | 1,636,967 | 113,641 | (53,158) | (89,031) |
| St. John the Evangelist | Riverhead | 3 | 178,062 | (3) | 207,718 | – | 7,060 | 392,838 | 26,703 | 72,020 | (12,634) |
| St. Anthony of Padua | Rocky Point | 3 | 779,050 | – | 205,712 | – | 21,644 | 1,006,406 | 49,238 | (36,781) | (37,481) |
| St. Joseph | Ronkonkoma | 2 | 301,407 | – | – | – | 15,760 | 317,167 | 5,313,147 | (222,127) | (217,218) |
| St. Andrew | Sag Harbor | 2 | 4,910,554 | – | (0) | – | 7,162 | 4,917,716 | 8,178 | 32,507 | 49,978 |
| SS Philip and James | Saint James | 4 | 1,291,446 | (1) | 1,161,472 | – | 27,325 | 2,480,242 | 216,612 | 110,896 | (71,124) |
| St. Lawrence the Martyr | Sayville | 6 | 1,171,325 | 11,085 | 345,953 | – | 27,671 | 1,556,235 | 77,560 | 199,276 | 131,531 |
| St. Margaret of Scotland | Selden | 3 | 750,726 | – | – | 1,290,121 | 6,173 | 2,047,020 | 79,936 | (98,836) | (195,991) |

**Diocese of Rockville Centre - Parish Financials**
**Fiscal Year Ended August 31, 2022**

| Parish Name | Location | Number of Lawsuits | Unrestricted Cash | Restricted Cash | Unitas | Other Investments | Other Assets | Total Assets | Total Liabilities | Net Operating Surplus / (Deficit) | Net Surplus / (Deficit) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Balance Sheet Metrics | | | | Income Statement Metrics | |
| St. James | Setauket | – | 649,982 | 456,019 | 232,930 | – | 207,360 | 1,546,291 | 262,139 | (146,803) | 87,932 |
| Our Lady of the Isle | Shelter Island Heights | – | 254,647 | – | – | 1,059,053 | 5,256 | 1,318,956 | 23,423 | 80,176 | (118,720) |
| St. Mark | Shoreham | – | 355,426 | (271) | – | – | 2,821 | 357,977 | 873,807 | 18,285 | 129,985 |
| St. Patrick | Smithtown | 11 | 972,917 | – | 122,309 | – | – | 1,095,226 | 175,051 | (35,222) | (122,822) |
| St. Louis de Montfort | Sound Beach | – | 560,577 | (1) | 629,877 | – | 21,456 | 1,211,909 | 69,507 | 10,847 | (114,060) |
| Our Lady of Poland | Southampton | – | 993,209 | 150,877 | – | 800 | 200 | 1,145,086 | 11,089 | 7,197 | 6,733 |
| Sacred Hearts of Jesus and Mary | Southampton | 1 | 2,541,236 | 409,812 | 520,232 | (0) | 75,090 | 3,546,369 | 33,399 | 288,786 | 362,293 |
| St. Patrick | Southold | – | 230,211 | – | 0 | – | 5,476 | 235,687 | 486,563 | (10,238) | (15,267) |
| St. John the Baptist | Wading River | – | 945,083 | – | 77 | – | – | 945,160 | 1,054,549 | 120,313 | 189,644 |
| Immaculate Conception | Westhampton Beach | 1 | 327,153 | – | 59,545 | 1,083,284 | (305) | 1,469,677 | 25,663 | 33,682 | (233,679) |
| Our Lady of Lourdes | West Islip | 3 | 2,170,046 | – | 3,836,839 | – | 9,760 | 6,016,645 | 127,166 | 270,957 | (124,606) |
| Our Lady of the Miraculous Medal | Wyandanch | – | 255,665 | – | – | – | 18,568 | 274,233 | 569,811 | (125,648) | (110,275) |
| Our Lady of Grace | West Babylon | 2 | 291,440 | 0 | 582,236 | – | 50,037 | 923,713 | 180,000 | (380,843) | (443,150) |
| St. Peter the Apostle | Islip Terrace | – | 145,497 | 15,601 | (0) | – | (4) | 161,094 | 8,900 | (6,036) | (10,434) |
| St. Elizabeth | Melville | 1 | 1,145,964 | – | 416,305 | – | 14,390 | 1,576,659 | 32,426 | 22,154 | (265,488) |
| St. Luke | Brentwood | 5 | 675,565 | – | – | – | 5,753 | 681,318 | 64,133 | 231,753 | 173,291 |
| St. Matthew | Dix Hills | 2 | 624,973 | 16,253 | 280,777 | 1,587,994 | 242 | 2,510,238 | 200,242 | (217,716) | (543,319) |
| St. Francis of Assisi | Greenlawn | 5 | 161,307 | 2 | 587,789 | – | 17,446 | 766,543 | 62,583 | (51,619) | (331,486) |
| St. Thomas More | Hauppauge | 1 | 804,464 | – | 85,091 | 897,759 | (96,772) | 1,690,543 | 179,565 | (72,470) | (151,543) |
| St. Gerard Majella | Port Jefferson Station | 1 | 375,302 | – | – | 619 | 501,861 | 877,782 | 1,556,259 | (83,261) | (983,539) |
| Church of the Resurrection | Farmingville | – | 401,267 | 23,007 | 4,969 | 102,992 | 7,985 | 540,219 | 51,812 | 109,312 | 79,164 |
| Church of the Holy Cross | Nesconset | – | 539,201 | – | – | 110,127 | 321 | 649,649 | 43,840 | 78,276 | 17,034 |
| Church of St. Elizabeth Ann Seton | Lake Ronkonkoma | – | 119,995 | – | 894,869 | – | 22,707 | 1,037,572 | 80,078 | (25,069) | (165,856) |
| Our Lady Star of the Sea | Saltaire | – | 26,349 | – | 332,888 | – | – | 359,237 | 375 | (12,812) | (12,812) |
| Most Precious Blood | Davis Park | – | 44,181 | – | 46,893 | – | – | 91,074 | – | 3,074 | 11,274 |
| **Total Parishes** | | **390** | **103,929,296** | **8,637,023** | **71,996,555** | **42,560,872** | **10,075,964** | **237,199,710** | **38,876,139** | **4,734,296** | **(16,004,877)** |
| Parishes with 0 CVA Cases | | – | 12,543,839 | 2,778,512 | 14,056,014 | 3,820,752 | 2,509,744 | 35,708,861 | 5,171,701 | (397,427) | (4,157,714) |
| Parishes with 1-2 CVA Cases | | 78 | 44,014,848 | 2,163,766 | 36,501,504 | 18,224,368 | 5,301,661 | 106,206,146 | 13,470,841 | 3,360,953 | (6,653,037) |
| Parishes with 3+ CVA Cases | | 312 | 47,370,609 | 3,694,745 | 21,439,038 | 20,515,753 | 2,264,558 | 95,284,704 | 20,233,596 | 1,770,770 | (5,194,127) |
| **Total Parishes** | | **390** | **103,929,296** | **8,637,023** | **71,996,555** | **42,560,872** | **10,075,964** | **237,199,710** | **38,876,139** | **4,734,296** | **(16,004,877)** |

**Diocese of Rockville Centre - Parish Financials**
**Fiscal Year Ended August 31, 2021**

| Parish Name | Location | Number of Lawsuits | Unrestricted Cash | Restricted Cash | Unitas | Other Investments | Other Assets | Total Assets | Total Liabilities | Net Operating Surplus / (Deficit) | Net Surplus / (Deficit) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Balance Sheet Metrics | | | | | | | Income Statement Metrics | |
| St. Christopher | Baldwin | 5 | 396,665 | 3 | – | – | 13,805 | 410,472 | 338,785 | 365,320 | 360,614 |
| St. Gertrude | Bayville | – | 386,239 | 142,437 | – | – | 13,929 | 542,605 | 128,675 | (54,873) | (108,559) |
| St. Barnabas the Apostle | Bellmore | 11 | 1,693,442 | 10,856 | 1,119,655 | – | 11,359 | 2,835,312 | 501,483 | 157,082 | 128,025 |
| St. Martin of Tours | Bethpage | 3 | 744,872 | – | 352,675 | – | 4,364 | 1,101,910 | 137,159 | 63,263 | 110,729 |
| St. Joachim | Cedarhurst | – | 33,460 | – | 5,636,866 | – | 261 | 5,670,587 | 129,017 | (292,215) | 691,562 |
| St. Raphael | East Meadow | 7 | 2,929,296 | – | 124,741 | – | (12,792) | 3,041,244 | 214,319 | 12,615 | (65,181) |
| St. Boniface | Elmont | 1 | 718,273 | 217,879 | – | – | 12,620 | 948,773 | 54,729 | (64,069) | (8,732) |
| St. Vincent De Paul | Elmont | 1 | 96,125 | (0) | – | – | 27,279 | 123,404 | 83,151 | (81,811) | (121,611) |
| St. Kilian | Farmingdale | 3 | 2,955,360 | – | – | – | 3,750 | 2,959,110 | 620,180 | (284,502) | 1,923,633 |
| St. Hedwig | Floral Park | 2 | 40,425 | – | 96,879 | – | 7,226 | 144,530 | 78,075 | 126,156 | 8,679 |
| Our Lady of Victory | Floral Park | 4 | 191,477 | 1,019,469 | 1,551,216 | – | – | 2,762,161 | 55,690 | 305,104 | 276,858 |
| St. Catherine of Sienna | Franklin Square | 8 | 629,991 | 16,760 | 173,217 | – | 70,547 | 890,516 | 979,015 | 625,129 | 523,324 |
| Our Holy Redeemer | Freeport | 4 | (378,426) | 613,981 | 925,953 | 38,462 | 125,971 | 1,325,941 | 783,048 | (96,352) | 129,700 |
| St. Joseph | Garden City | 1 | 475,393 | – | 5,849,190 | – | 65,317 | 6,389,899 | 207,217 | 249,791 | 924,237 |
| St. Hyacinth | Glen Head | 1 | 91,204 | – | 205,990 | – | – | 297,194 | 433,050 | 22,162 | (175,473) |
| St. Patrick | Glen Cove | 2 | 557,429 | – | – | – | 16,791 | 574,220 | 660,408 | 228,466 | 117,832 |
| Church of St. Rocco | Glen Cove | 1 | 334,773 | – | 837,155 | – | – | 1,171,928 | 29,004 | 175,685 | 167,537 |
| St. Aloysius | Great Neck | 1 | 566,539 | – | 8,295,963 | – | – | 8,862,501 | 34,141 | (252,901) | 1,167,471 |
| St. Ladislaus | Hempstead | 2 | 206,223 | – | 1,095,063 | – | 7,985 | 1,309,271 | 59,711 | (30,109) | (28,615) |
| Our Lady of Loretto | Hempstead | 2 | 348,392 | – | – | – | 4,777 | 353,168 | 286,726 | 329,141 | 322,541 |
| St. Joseph | Hewlett | 5 | 68,808 | – | 282,377 | – | 330,851 | 682,035 | 726,652 | (90,549) | (32,140) |
| Holy Family | Hicksville | 8 | 1,605,992 | 24,041 | 112,614 | 23,805 | 30,252 | 1,796,704 | 148,202 | 378,717 | 348,802 |
| St. Ignatius Loyola | Hicksville | 3 | 519,794 | – | – | – | 43,207 | 563,001 | 112,659 | 84,309 | 62,894 |
| Our Lady of Mercy | Hicksville | 2 | 274,500 | – | – | – | 18,322 | 292,822 | 1,427,876 | (4,835) | (4,477) |
| Our Lady of Good Counsel | Inwood | 2 | 49,104 | – | – | – | 82,630 | 131,734 | 775,314 | (103,396) | (127,260) |
| Sacred Heart | Island Park | 1 | 1,146,998 | – | – | – | – | 1,146,998 | 124 | 36,236 | 10,247 |
| St. Bernard | Levittown | 5 | 1,244,539 | 850,000 | 19,173 | 38,429 | 463,255 | 2,615,396 | 690,907 | (43,946) | 105,765 |
| St. Ignatius Martyr | Long Beach | 1 | 908,941 | – | – | – | 16,481 | 925,422 | 152,603 | (40,485) | (27,706) |
| St. Mary of the Isle | Long Beach | 1 | (589,230) | 970,137 | 1,315,053 | (0) | 91,812 | 1,787,772 | 171,090 | 99,218 | 324,935 |
| Our Lady of Peace | Lynbrook | 4 | 889,324 | – | 1,069,348 | 4,299 | (0) | 1,962,971 | 154,329 | 338,297 | 496,175 |
| St. Raymond | East Rockaway | 8 | 526,296 | 0 | – | – | 130,735 | 657,031 | 149,820 | 111,947 | 108,418 |
| Our Lady of Lourdes | Malverne | 2 | 347,828 | 332,082 | 349,112 | – | 8,783 | 1,037,804 | 67,218 | 16,310 | (53,614) |
| St. Mary | Manhasset | 10 | 1,429,325 | – | 554,791 | 9,453,462 | 7,091 | 11,444,670 | 469,939 | (129,726) | 1,237,748 |
| Our Lady of Fatima | Manorhaven | 2 | 332,155 | 0 | 252,800 | 1,166,911 | – | 1,751,867 | 85,678 | 66,450 | 195,017 |
| St. Rose of Lima | Massapequa | 5 | 2,302,646 | 756,382 | 16,058 | 569,630 | 31,526 | 3,676,242 | 551,980 | 268,334 | 291,868 |
| Our Lady of Lourdes | Massapequa Park | 1 | 507,429 | – | – | 944,565 | – | 1,451,994 | 55,758 | (130,659) | (218,242) |
| Cure of Ars | Merrick | – | (504,690) | 1,519,030 | – | – | 33,939 | 1,048,279 | 188,362 | 173,787 | 374,327 |
| Corpus Christi | Mineola | 2 | 521,679 | – | 7,375,381 | – | 488 | 7,897,548 | 64,494 | (41,344) | (89,910) |
| Holy Spirit | New Hyde Park | 3 | 717,629 | – | 1,667,120 | – | 520 | 2,385,269 | 23,131 | 141,678 | 402,078 |
| Notre Dame | New Hyde Park | 2 | 1,347,537 | – | – | 4,631,996 | (46,187) | 5,933,346 | 174,293 | 17,869 | 791,779 |
| Sacred Heart | North Merrick | 3 | 506,340 | – | – | – | 7,917 | 514,257 | 1,267,016 | 247,577 | 253,791 |
| Blessed Sacrament | Valley Stream | 2 | 597,399 | (663) | – | – | 3,532 | 600,268 | 86,554 | 95,557 | 100,184 |
| St. Anthony | Oceanside | 1 | 635,845 | – | 622,495 | – | – | 1,258,340 | 236,877 | 247,660 | 345,685 |
| St. Dominic | Oyster Bay | 11 | 1,342,407 | – | 946,726 | (0) | 312,488 | 2,601,620 | 923,845 | 220,901 | 1,344,150 |
| St.Pius X | Plainview | 3 | 691,403 | – | – | 708,984 | 13,170 | 1,413,757 | 99,128 | 202,252 | 208,516 |
| Our Lady of Miraculous Medal | Point Lookout | – | 303,036 | 128,795 | 515,503 | – | 946 | 948,280 | 60,735 | 58,455 | 153,502 |
| St. Peter of Alcantara | Port Washington | – | 253,951 | 142,991 | 3,996,043 | 2,133,403 | 5,000 | 6,531,387 | 24,512 | (140,926) | 544,417 |
| St. Agnes Cathedral | Rockville Centre | 13 | 627,451 | 151,945 | 1,155,216 | – | 85,190 | 2,019,802 | 586,820 | 250,903 | (111,828) |
| Queen of Most Holy Rosary | Roosevelt | 4 | 952,965 | 198,809 | – | – | 291,746 | 1,443,520 | 327,148 | 201,203 | 252,985 |
| St. Mary | Roslyn | 1 | 951,174 | (203,311) | – | – | 53,500 | 801,363 | 52,659 | (30,194) | (32,633) |
| St. Boniface Martyr | Sea Cliff | 1 | 436,621 | – | 161,176 | – | (480) | 597,317 | 93,381 | 38,272 | 10,404 |
| St. James | Seaford | 7 | 2,087,199 | – | – | – | (0) | 2,087,199 | 296,088 | 1,275,916 | 1,259,609 |
| Maria Regina | Seaford | 2 | 918,322 | – | 1,042,255 | 4,171,017 | – | 6,131,594 | (50,765) | (305,078) | 102,732 |
| St. William the Abbot | Seaford | 2 | (6,319) | (0) | 6,333,317 | – | 89,191 | 6,416,189 | 122,812 | (681,290) | (931,156) |
| St. Anne | Garden City | 2 | 207,152 | 3,266,747 | 263,707 | – | 769,025 | 4,506,631 | 1,699,092 | 152,637 | (1,112,918) |
| St. Edward Confessor | Syosset | 0 | 1,196,206 | 375,897 | – | – | 23,958 | 1,596,061 | 457,640 | 182,340 | 42,374 |
| St. Martha | Uniondale | 4 | 1,783,198 | – | – | – | – | 1,783,198 | 65,130 | 260,322 | 217,727 |
| Holy Name of Mary | Valley Stream | 5 | 949,877 | – | 249,782 | – | 11,202 | 1,210,861 | 113,885 | (192,829) | (185,288) |
| St. Frances De Chantal | Wantagh | – | 71,084 | 304,231 | 269,134 | – | 31,874 | 676,323 | 409,888 | 27,221 | 42,375 |
| St. Brigid | Westbury | 7 | (2,775,415) | 3,468,007 | 13,570 | 3,058,207 | 34,854 | 3,799,223 | 281,137 | 81,031 | 441,389 |
| St. Thomas the Apostle | West Hempstead | 3 | 561,653 | – | 162,345 | 154,661 | – | 878,659 | (114,957) | (105,048) | (28,413) |
| St. Aidan | Williston Park | 6 | 317,085 | – | 3,504,940 | (0) | 410,017 | 4,232,041 | 225,878 | 540,696 | 1,017,100 |
| St. Paul the Apostle | Brookville | 1 | 463,400 | 606,328 | 996,118 | 371,048 | 416,333 | 2,853,222 | 517,803 | 151,289 | 287,859 |
| Holy Name of Jesus | Woodbury | – | 1,419,594 | 1 | – | – | 580 | 1,420,174 | 37,008 | (35,639) | (14,495) |
| Our Lady of Hope | Carle Place | 1 | 246,764 | 223,129 | 257,231 | – | – | 727,124 | 63,416 | 26,163 | (10,236) |
| St. Martin of Tours | Amityville | 4 | 878,659 | 86,070 | 144,294 | 226,910 | 13,075 | 1,349,008 | 72,960 | 131,682 | 242,377 |
| St. Joseph | Babylon | 12 | 1,017,207 | 328,217 | 224,175 | – | 30,046 | 1,599,645 | 558,968 | 230,164 | (53,949) |
| St. Patrick | Bay Shore | 2 | 638,340 | – | 1,303,703 | 1,935,044 | 426,021 | 4,303,107 | 610,600 | (6,479) | (38,175) |
| Mary Immaculate | Bellport | 1 | 483,605 | 49,993 | – | – | 9,473 | 543,071 | 56,127 | 63,084 | 71,467 |
| Our Lady of the Snow | Blue Point | – | 394,855 | – | 598,256 | – | (2,059) | 991,052 | 48,127 | (1,324) | 88,670 |
| St. John Nepomucene | Bohemia | 3 | 554,980 | – | 277,983 | – | 22,920 | 855,883 | 101,715 | 81,120 | 113,675 |
| St. Anne | Brentwood | 3 | 655,868 | – | 359,493 | – | 6,555 | 1,021,916 | 84,176 | 219,383 | 176,454 |
| Queen of Most Holy Rosary | Bridgehampton | – | 522,148 | 24,999 | 0 | (0) | 1,556 | 548,703 | 7,958 | 86,357 | 64,212 |
| Assumption of the Blessed Virgin Mary | Centereach | – | 59,288 | 1 | – | 761,233 | 36,649 | 857,171 | 48,743 | (2,384) | 110,804 |
| St. John the Evangelist | Center Moriches | 1 | 868,124 | – | – | – | (0) | 868,124 | 162,945 | (104,437) | (99,637) |
| Our Lady Queen of Martyrs | Centerport | 4 | 570,195 | 272,905 | 2,290 | 329,075 | 45,300 | 1,219,765 | 163,188 | 793 | (5,728) |
| St. John of God | Central Islip | 6 | 157,834 | 0 | – | – | – | 157,834 | 154,780 | (55,687) | (59,611) |
| Christ the King | Commack | 2 | 769,219 | – | 1,121,531 | – | 11,757 | 1,902,507 | 528,342 | (30,876) | 110,696 |
| Our Lady of the Assumption | Copiague | – | 43,792 | 2,590,982 | – | – | 4,375 | 2,639,149 | 86,239 | (148,402) | 2,159,729 |
| St. Frances Cabrini | Coram | 2 | 367,565 | – | 448,342 | 267,475 | – | 1,083,382 | 13,630 | 132,999 | 227,387 |
| Our Lady of Ostrabrama | Cutchogue | – | 463,979 | – | – | – | (246) | 463,733 | 1,876 | (29,955) | 88,534 |
| Sacred Heart | Cutchogue | 1 | 2,085,643 | – | 823,051 | – | (4,296) | 2,904,398 | 24,665 | (37,345) | (630,671) |
| SS Cyril and Methodius | Deer Park | 4 | 386,328 | – | – | – | 1,763 | 388,091 | 41,537 | 232,011 | 184,641 |
| Most Holy Trinity | East Hampton | – | 1,107,353 | – | 2,482,574 | – | 2,241,441 | 5,831,368 | 23,568 | 938,973 | 1,347,532 |
| St. Mary | East Islip | 5 | 692,645 | 3 | – | – | 144,242 | 836,890 | 159,785 | 367,668 | 278,719 |
| St. Anthony of Padua | East Northport | 3 | 434,665 | – | – | – | – | 434,665 | 286,746 | (149,295) | (142,891) |
| St. Joseph the Worker | East Patchogue | – | 284,622 | – | – | – | 11,867 | 296,489 | 496,338 | (146,154) | (72,100) |
| St. Agnes | Greenport | – | 888,076 | – | – | – | 5,281 | 893,357 | 25,311 | 29,084 | 44,950 |
| St. Rosalie | Hampton Bays | 3 | 636,182 | – | 917,812 | 6,275,823 | 3,762 | 7,833,579 | 38,036 | (332,025) | 720,281 |
| Good Shepherd | Holbrook | 5 | 369,683 | – | 1,250,686 | – | 1,000 | 1,621,369 | 63,370 | 7,790 | 140,330 |
| St. Patrick | Huntington | 5 | 1,019,935 | – | 3,553,380 | – | 17,168 | 4,590,483 | 1,103,188 | (165,529) | 15,383 |
| St. Hugh of Lincoln | Huntington Station | 23 | 1,368,292 | – | 281,475 | 112,600 | 15,689 | 1,778,056 | 205,627 | 274,655 | 380,638 |
| St. Joseph | Kings Park | 9 | 236,614 | 35,000 | – | 1,638,423 | 36,730 | 1,946,767 | 55,298 | 141,637 | 73,386 |
| Our Lady Of Perpetual Help | Lindenhurst | 7 | 324,075 | – | 0 | – | (0) | 324,075 | 874,606 | 35,069 | 106,080 |
| St. Jude | Mastic Beach | 1 | 1,987,756 | (26,274) | – | – | – | 1,961,482 | 44,875 | 117,762 | (119,286) |
| SS Peter and Paul | Manorville | – | 351,023 | 0 | 201,002 | – | – | 552,025 | 2,427 | 103,879 | 100,850 |
| St. Sylvester | Medford | 2 | 157,681 | 51,684 | – | 260,246 | 13,864 | 483,475 | 714,140 | (14,607) | 13,023 |
| St. Therese of Lisieux | Montauk | 2 | 1,185,211 | – | – | – | – | 1,185,211 | 8,373 | 128,639 | 88,343 |
| St. Philip Neri | Northport | 7 | 666,893 | 13,251 | 88,163 | – | 17,250 | 785,557 | 208,151 | 88,252 | 49,001 |
| Our Lady of the Magnificat Mission | Ocean Beach | – | 69,804 | – | – | – | – | 69,804 | 0 | 26,042 | 26,042 |
| St. Francis De Sales | Patchogue | 2 | 181,438 | – | – | – | 1,675 | 183,113 | 47,969 | (12,560) | 191,213 |
| Our Lady of Mount Carmel | Patchogue | 2 | 432,841 | – | – | – | 10,266 | 443,107 | 1,395,877 | (13,815) | (13,631) |
| Infant Jesus | Port Jefferson | 7 | 2,661,224 | (78) | – | 14,756 | (5,902) | 2,670,000 | 165,734 | 230,123 | 159,562 |
| St. Isidore | Riverhead | 1 | 891,628 | 2 | 792,839 | – | 38,722 | 1,722,191 | 118,934 | 77,388 | 477,394 |
| St. John the Evangelist | Riverhead | 3 | 180,108 | (3) | 222,452 | – | 4,196 | 406,754 | 27,985 | 82,477 | 64,274 |
| Our Lady of Assumption | Rocky Point | 3 | 815,769 | – | 206,917 | – | 16,153 | 1,038,839 | 44,190 | 159,431 | 212,778 |
| St. Joseph | Ronkonkoma | 6 | 324,354 | – | – | – | 9,274 | 333,629 | 5,112,389 | (54,784) | (0) |
| St. Andrew | Sag Harbor | 2 | 4,866,927 | – | (0) | – | 9,907 | 4,876,834 | 17,274 | 110,324 | 116,223 |
| SS Philip and James | Saint James | 4 | 1,133,828 | (1) | 1,305,299 | – | 21,015 | 2,460,141 | 125,387 | 280,617 | 464,369 |
| St. Lawrence the Martyr | Sayville | 4 | 1,021,011 | 11,085 | 378,797 | – | 22,499 | 1,433,393 | 89,647 | 195,327 | 270,208 |
| St. Margaret of Scotland | Selden | 3 | 790,223 | – | – | 1,475,096 | 68,527 | 2,333,847 | 179,772 | 67,061 | 36,500 |

**Diocese of Rockville Centre - Parish Financials**
**Fiscal Year Ended August 31, 2021**

| Parish Name | Location | Number of Lawsuits | Balance Sheet Metrics | | | | | | | | Income Statement Metrics | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Unrestricted Cash | Restricted Cash | Unitas | Other Investments | Other Assets | Total Assets | Total Liabilities | Net Operating Surplus / (Deficit) | Net Surplus / (Deficit) |
| St. James | Setauket | – | 549,058 | 456,019 | 236,305 | – | 464,571 | 1,705,953 | 509,733 | 17,083 | (186,642) |
| Our Lady of the Isle | Shelter Island Heights | – | 219,943 | – | – | 1,221,020 | 1,956 | 1,442,919 | 28,666 | 33,822 | 215,653 |
| St. Mark | Shoreham | – | 320,864 | (271) | – | – | 2,821 | 323,414 | 969,230 | 31,655 | 162,273 |
| St. Patrick | Smithtown | 11 | 986,813 | (1) | 123,026 | – | – | 1,109,839 | 66,842 | (53,275) | (79,922) |
| St. Louis de Montfort | Sound Beach | – | 689,735 | (1) | 599,119 | – | 29,836 | 1,318,689 | 62,227 | 180,033 | 304,383 |
| Our Lady of Poland | Southampton | – | 1,001,456 | 150,877 | – | 800 | – | 1,153,133 | 25,869 | 15,479 | 32,690 |
| Sacred Hearts of Jesus and Mary | Southampton | 1 | 2,204,855 | 409,812 | 522,490 | (0) | 63,191 | 3,200,347 | 49,670 | 177,222 | 456,780 |
| St. Patrick | Southold | – | 184,959 | – | 0 | – | 3,963 | 188,922 | 424,531 | (24,542) | (6,177) |
| St. John the Baptist | Wading River | – | 832,723 | – | 77 | – | – | 832,800 | 1,131,833 | 193,976 | 277,667 |
| Immaculate Conception | Westhampton Beach | 1 | 347,312 | – | 63,794 | 1,319,312 | (390) | 1,730,028 | 52,336 | (22,133) | 230,498 |
| Our Lady of Lourdes | West Islip | 3 | 1,909,576 | – | 4,250,569 | – | 2,250 | 6,162,395 | 148,310 | 56,965 | 660,918 |
| Our Lady of the Miraculous Medal | Wyandanch | – | 284,370 | – | – | – | 5,216 | 289,586 | 474,889 | (88,696) | (79,794) |
| Our Lady of Grace | West Babylon | 2 | 658,565 | 0 | 644,544 | – | 46,038 | 1,349,147 | 162,284 | 170,465 | 232,659 |
| St. Peter the Apostle | Islip Terrace | – | 150,497 | 15,601 | (0) | – | (4) | 166,094 | 3,467 | 90,307 | 90,461 |
| St. Elizabeth | Melville | 1 | 1,513,781 | – | 462,499 | – | 15,385 | 1,991,665 | 181,944 | (34,066) | 21,485 |
| St. Luke | Brentwood | 5 | 471,080 | – | – | – | – | 471,080 | 27,186 | 122,907 | 86,307 |
| St. Matthew | Dix Hills | 2 | 607,548 | 198,241 | 311,932 | 1,832,934 | 40,471 | 2,991,125 | 137,810 | 100,704 | 376,910 |
| St. Francis of Assisi | Greenlawn | 5 | 216,017 | 2 | 893,348 | – | 8,016 | 1,117,382 | 81,936 | 15,319 | 16,147 |
| St. Thomas More | Hauppauge | 1 | 859,227 | – | 442,497 | 631,385 | (81,172) | 1,851,937 | 189,416 | 25,475 | (49,742) |
| St. Gerard Majella | Port Jefferson Station | 1 | 1,205,874 | – | – | – | 700,878 | 1,906,752 | 1,601,690 | (34,634) | (552,589) |
| Church of the Resurrection | Farmingville | – | 333,269 | 23,007 | 4,998 | 101,025 | 750 | 463,048 | 53,805 | 80,776 | 65,174 |
| Church of the Holy Cross | Nesconset | – | 511,274 | – | 107,369 | – | 1,777 | 620,420 | 31,644 | 87,638 | 27,718 |
| Church of St. Elizabeth Ann Seton | Lake Ronkonkoma | – | 172,148 | – | 981,253 | – | 40,048 | 1,193,449 | 70,099 | 14,595 | 145,022 |
| | | | | | | | | | | | |
| **Total Parishes** | | **390** | **93,630,580** | **19,827,086** | **86,396,280** | **45,857,273** | **8,849,910** | **254,561,129** | **40,753,419** | **9,740,603** | **24,655,761** |
| | | | | | | | | | | | |
| Parishes with 0 CVA Cases | | – | 11,397,908 | 5,498,699 | 15,628,498 | 4,217,480 | 2,936,328 | 39,678,912 | 5,504,778 | 1,224,028 | 6,690,790 |
| Parishes with 1-2 CVA Cases | | 78 | 38,941,220 | 6,471,682 | 46,536,676 | 19,007,024 | 3,040,950 | 113,997,551 | 14,609,210 | 1,441,079 | 3,709,763 |
| Parishes with 3+ CVA Cases | | 312 | 43,291,452 | 7,856,705 | 24,231,107 | 22,632,769 | 2,872,632 | 100,884,666 | 20,639,432 | 7,075,495 | 14,255,208 |
| **Total Parishes** | | **390** | **93,630,580** | **19,827,086** | **86,396,280** | **45,857,273** | **8,849,910** | **254,561,129** | **40,753,419** | **9,740,603** | **24,655,761** |

**Diocese of Rockville Centre - Parish Financials**
**Fiscal Year Ended August 31, 2020**

| Parish Name | Location | Number of Lawsuits | Balance Sheet Metrics | | | | | | | Income Statement Metrics | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | Unrestricted Cash | Restricted Cash | Unitas | Other Investments | Other Assets | Total Assets | Total Liabilities | Net Operating Surplus / (Deficit) | Net Surplus / (Deficit) |
| St. Christopher | Baldwin | 5 | 261,385 | 17,622 | – | – | 11,345 | 290,352 | 579,278 | 215,347 | 225,672 |
| St. Gertrude | Bayville | – | 331,172 | 266,441 | – | – | 3,259 | 600,872 | 78,383 | (102,304) | (318,855) |
| St. Barnabas the Apostle | Bellmore | 11 | 1,505,040 | 109,486 | 1,000,003 | – | 13,185 | 2,627,714 | 421,911 | 151,274 | 64,899 |
| St. Martin of Tours | Bethpage | 3 | 684,621 | – | 305,142 | – | 50,537 | 1,040,300 | 186,277 | 23,966 | 59,954 |
| St. Joachim | Cedarhurst | – | 110,387 | – | 4,743,710 | – | 261 | 4,854,358 | 4,351 | (92,202) | 389,411 |
| St. Raphael | East Meadow | 7 | 2,976,172 | – | 124,393 | – | (2,606) | 3,097,958 | 205,852 | 108,987 | 174,615 |
| St. Boniface | Elmont | 1 | 806,482 | 173,784 | – | – | 3,031 | 983,296 | 80,521 | (180,282) | (86,961) |
| St. Vincent De Paul | Elmont | 1 | 166,425 | 17,115 | – | – | 12,573 | 196,112 | 34,249 | (72,889) | (113,876) |
| St. Kilian | Farmingdale | 3 | 716,809 | – | – | – | 200,979 | 917,787 | 502,491 | (457,611) | (369,890) |
| St. Hedwig | Floral Park | 2 | 44,890 | – | 80,847 | – | 1,797 | 127,534 | 69,758 | (51,018) | (110,543) |
| Our Lady of Victory | Floral Park | 4 | 401,222 | 1,016,581 | 1,546,822 | – | 0 | 2,964,625 | 535,013 | 244,212 | 216,564 |
| St. Catherine of Sienna | Franklin Square | 8 | 531,494 | 0 | 172,727 | – | 3,715 | 707,936 | 1,319,758 | 315,159 | 201,403 |
| Our Holy Redeemer | Freeport | 4 | 722,674 | 484,281 | 514,100 | – | 134,204 | 1,855,259 | 1,442,067 | (149,365) | 616,520 |
| St. Joseph | Garden City | 1 | 471,338 | – | 5,021,637 | – | 75,520 | 5,568,495 | 310,050 | 167,467 | 546,429 |
| St. Hyacinth | Glen Head | 1 | 309,599 | – | 172,471 | – | – | 482,070 | 442,453 | (96,058) | (129,946) |
| St. Patrick | Glen Cove | 2 | 382,409 | – | – | – | – | 382,409 | 586,429 | 89,516 | (65,807) |
| Church of St. Rocco | Glen Cove | 1 | 295,509 | – | 834,122 | – | – | 1,129,631 | 79,227 | (169,976) | (262,228) |
| St. Aloysius | Great Neck | 1 | 685,702 | – | 6,992,428 | – | 13,250 | 7,691,380 | 30,491 | (166,991) | 363,849 |
| St. Ladislaus | Hempstead | 2 | 245,154 | – | 1,182,425 | – | 3,677 | 1,431,255 | 153,080 | 5,426 | (646,036) |
| Our Lady of Loretto | Hempstead | 2 | 146,907 | – | – | – | (11) | 146,896 | 402,994 | (28,595) | (97,455) |
| St. Joseph | Hewlett | 5 | 23,342 | – | 352,270 | – | 203,036 | 578,648 | 591,124 | 15,387 | (39,928) |
| Holy Family | Hicksville | 8 | 1,393,113 | 25,041 | 91,412 | 23,805 | 5,626 | 1,538,997 | 239,297 | 110,508 | 116,016 |
| St. Ignatius Loyola | Hicksville | 3 | 444,170 | – | – | – | 80,724 | 524,894 | 137,446 | 155,364 | 674,731 |
| Our Lady of Mercy | Hicksville | 2 | 199,431 | – | – | – | 100 | 199,531 | 1,330,107 | (522,095) | (521,754) |
| Our Lady of Good Counsel | Inwood | 2 | 140,468 | – | – | – | 1,701 | 142,168 | 658,487 | (11,238) | (21,363) |
| Sacred Heart | Island Park | 1 | 1,197,943 | – | – | – | – | 1,197,943 | 61,316 | 40,726 | 2,251 |
| St. Bernard | Levittown | 5 | 1,332,751 | 700,000 | 19,117 | 30,000 | 703,576 | 2,785,444 | 966,721 | 92,721 | 362,108 |
| St. Ignatius Martyr | Long Beach | 1 | 857,545 | – | – | – | 15,510 | 873,055 | 72,531 | 93,255 | 35,702 |
| St. Mary of the Isle | Long Beach | 1 | 304,193 | – | 1,089,337 | (0) | 56,360 | 1,449,890 | 158,143 | 57,934 | 169,246 |
| Our Lady of Peace | Lynbrook | 4 | 577,201 | – | 914,226 | 4,299 | 1,050 | 1,496,777 | 184,310 | (7,154) | (18,400) |
| St. Raymond | East Rockaway | 8 | 593,133 | 0 | – | – | – | 593,133 | 194,340 | (88,994) | (182,281) |
| Our Lady of Lourdes | Malverne | 2 | 455,725 | 332,081 | 308,238 | – | 15,022 | 1,111,066 | 86,866 | 856,013 | 585,454 |
| St. Mary | Manhasset | 10 | 2,238,341 | – | 553,220 | 7,454,157 | 1,077 | 10,246,795 | 509,811 | 200,339 | 1,189,658 |
| Our Lady of Fatima | Manorhaven | 2 | 273,000 | 0 | 205,157 | 1,028,727 | 1,020 | 1,509,220 | 38,047 | 50,381 | 153,212 |
| St. Rose of Lima | Massapequa | 5 | 1,712,429 | 756,382 | 16,013 | 551,199 | 32,644 | 3,068,666 | 236,273 | 408,869 | 430,883 |
| Our Lady of Lourdes | Massapequa Park | 1 | 740,367 | – | – | 894,139 | – | 1,634,506 | 20,028 | 215,992 | 45,074 |
| Cure of Ars | Merrick | – | (195,961) | 934,746 | – | – | 40,784 | 779,569 | 293,979 | (1,890) | 140,111 |
| Corpus Christi | Mineola | 2 | 534,288 | – | 7,458,018 | – | 56,957 | 8,049,264 | 126,299 | (24,194) | 196,632 |
| Holy Spirit | New Hyde Park | 3 | 688,153 | – | 1,352,221 | – | 2,918 | 2,043,291 | 83,231 | 130,634 | 250,526 |
| Notre Dame | New Hyde Park | 2 | 387,523 | – | – | 4,507,775 | – | 4,895,298 | (71,976) | 437,316 | 185,775 |
| Sacred Heart | North Merrick | 3 | 358,343 | – | – | – | 6,279 | 364,623 | 1,371,172 | (10,857) | (127,614) |
| Blessed Sacrament | Valley Stream | 2 | 468,537 | (663) | – | – | 5,560 | 473,434 | 59,904 | 137,586 | 148,773 |
| St. Anthony | Oceanside | 1 | 425,178 | – | 401,017 | – | – | 826,196 | 150,418 | 74,037 | 103,912 |
| St. Dominic | Oyster Bay | 11 | 1,564,421 | – | – | (0) | 357,837 | 1,922,258 | 1,588,632 | 263,198 | 457,743 |
| St.Pius X | Plainview | 3 | 1,030,271 | – | – | 207,543 | 422 | 1,238,236 | 132,123 | 409,261 | 262,456 |
| Our Lady of Miraculous Medal | Point Lookout | – | 313,539 | 9,985 | 420,565 | – | (615) | 743,474 | 9,430 | (74,809) | (34,692) |
| St. Peter of Alcantara | Port Washington | – | 214,530 | 28,535 | 3,547,923 | 1,718,187 | 31,785 | 5,540,961 | (421,497) | 285,160 | 706,883 |
| St. Agnes Cathedral | Rockville Centre | 13 | 1,336,008 | 175,264 | 1,187,947 | – | 72,121 | 2,771,339 | 1,226,529 | 130,035 | 79,232 |
| Queen of Most Holy Rosary | Roosevelt | 4 | 791,128 | 102,827 | – | – | 532,860 | 1,426,815 | 563,427 | 115,714 | 30,337 |
| St. Mary | Roslyn | 1 | 1,057,909 | (170,678) | – | – | 16,129 | 903,361 | 122,223 | (67,738) | (204,557) |
| St. Boniface Martyr | Sea Cliff | 1 | 416,618 | (8,126) | 160,720 | – | – | 569,212 | 75,681 | 16,725 | (8,126) |
| St. James | Seaford | 7 | 774,812 | – | – | – | 900 | 775,712 | 244,210 | (41,094) | (396,503) |
| Maria Regina | Seaford | 2 | 1,307,557 | – | 1,038,570 | 3,812,365 | 5,000 | 6,163,492 | 83,865 | 157,390 | 588,677 |
| St. William the Abbot | Seaford | 2 | 274,039 | (0) | 6,920,457 | – | 73,611 | 7,268,107 | 43,575 | 8,243 | (1,866,011) |
| St. Anne | Garden City | 2 | 102,449 | 4,339,746 | 262,960 | – | 1,397,915 | 6,103,070 | 2,182,613 | (193,254) | (337,841) |
| St. Edward Confessor | Syosset | 0 | 1,093,615 | 349,618 | – | – | 11,333 | 1,454,566 | 358,519 | 41,893 | 45,883 |
| St. Martha | Uniondale | 4 | 1,567,560 | – | – | – | – | 1,567,560 | 67,219 | 86,474 | 94,073 |
| Holy Name of Mary | Valley Stream | 5 | 1,022,882 | – | 348,882 | – | 11,379 | 1,383,143 | 100,879 | (172,508) | (158,517) |
| St. Frances De Chantal | Wantagh | – | (3,841) | 329,730 | 268,251 | – | 62,500 | 656,649 | 432,588 | 17,190 | 25,508 |
| St. Brigid | Westbury | 7 | (2,269,151) | 3,037,230 | 13,531 | 2,493,697 | 26,376 | 3,301,683 | 224,986 | (179,363) | (67,512) |
| St. Thomas the Apostle | West Hempstead | 3 | 705,848 | – | 161,886 | 153,063 | – | 1,020,797 | (1,232) | (106,411) | 236,231 |
| St. Aidan | Williston Park | 6 | 315,446 | – | 2,843,166 | (0) | 18,179 | 3,176,790 | 187,728 | 348,982 | 447,808 |
| St. Paul the Apostle | Brookville | 1 | 473,946 | 399,260 | 895,334 | 371,144 | 890,199 | 3,029,882 | 982,322 | (81,940) | (232,494) |
| Holy Name of Jesus | Woodbury | – | 1,444,784 | 1 | – | – | (188) | 1,444,596 | 46,935 | (47,761) | (73,093) |
| Our Lady of Hope | Carle Place | 1 | 288,132 | 264,430 | 256,502 | – | 2,000 | 791,064 | 117,120 | (8,883) | 264,561 |
| St. Martin of Tours | Amityville | 4 | 751,297 | 15,790 | 143,886 | 187,522 | 6,385 | 1,164,879 | 131,208 | (58,380) | (23,091) |
| St. Joseph | Babylon | 12 | 813,013 | 328,217 | 207,839 | – | 170,886 | 1,519,955 | 425,329 | 104,990 | 80,949 |
| St. Patrick | Bay Shore | 2 | 517,043 | – | 1,300,010 | 1,928,858 | 447,330 | 4,193,242 | 460,569 | 114,725 | 151,150 |
| Mary Immaculate | Bellport | 1 | 417,897 | 49,998 | – | – | 3,812 | 471,706 | 56,229 | 37,827 | 54,291 |
| Our Lady of the Snow | Blue Point | – | 378,203 | – | 508,355 | – | 236 | 886,794 | 32,539 | 203,024 | 99,024 |
| St. John Nepomucene | Bohemia | 3 | 471,015 | – | 246,128 | – | 1,470 | 718,613 | 78,120 | 78,739 | 96,755 |
| St. Anne | Brentwood | 3 | 503,469 | – | 306,361 | – | 4,182 | 814,012 | 52,726 | 72,262 | 47,159 |
| Queen of Most Holy Rosary | Bridgehampton | – | 407,261 | 73,250 | 0 | (0) | – | 480,511 | 3,978 | (35,984) | (40,972) |
| Assumption of the Blessed Virgin Mary | Centereach | – | 94,017 | 1 | – | 638,680 | 46,906 | 779,604 | 81,980 | 23,257 | 159,173 |
| St. John the Evangelist | Center Moriches | 1 | 943,631 | – | – | – | (0) | 943,631 | 138,815 | (184,362) | (187,288) |
| Our Lady Queen of Martyrs | Centerport | 4 | 462,437 | 285,950 | 2,284 | 340,947 | 2,632 | 1,094,250 | 31,945 | 71,974 | 99,093 |
| St. John of God | Central Islip | 6 | 144,120 | 0 | – | – | 6,641 | 150,761 | 88,095 | (25,642) | (23,778) |
| Christ the King | Commack | 2 | 863,528 | – | 934,017 | – | – | 1,797,544 | 534,075 | (126,260) | (210,345) |
| Our Lady of the Assumption | Copiague | – | 317,821 | 255,149 | – | – | 12,392 | 585,362 | 192,181 | (25,416) | 227,236 |
| St. Frances Cabrini | Coram | 2 | 257,964 | – | 383,522 | 228,705 | – | 870,192 | 27,827 | 155,626 | 162,505 |
| Our Lady of Ostrabrama | Cutchogue | – | 378,884 | – | – | – | – | 378,884 | 5,561 | (32,104) | (18,596) |
| Sacred Heart | Cutchogue | 1 | 611,917 | 2,109,151 | 820,720 | – | (11,329) | 3,530,459 | 20,029 | 19,101 | 535,043 |
| SS Cyril and Methodius | Deer Park | 4 | 266,405 | – | – | – | (3,626) | 262,779 | 100,866 | 65,941 | 47,606 |
| Most Holy Trinity | East Hampton | – | 586,264 | – | 2,084,435 | – | 1,867,331 | 4,538,030 | 77,762 | (72,368) | 71,465 |
| St. Mary | East Islip | 5 | 306,438 | 194,443 | – | – | 35,151 | 535,032 | 226,646 | 229,232 | 176,683 |
| St. Anthony of Padua | East Northport | 3 | 464,133 | – | – | – | – | 464,133 | 173,323 | (29,437) | (70,217) |
| St. Joseph the Worker | East Patchogue | – | 158,513 | – | – | – | 22,500 | 181,013 | 308,762 | (33,026) | (42,165) |
| St. Agnes | Greenport | – | 847,562 | – | – | – | 1,526 | 849,088 | 20,992 | 239,849 | 245,945 |
| St. Rosalie | Hampton Bays | 3 | 840,020 | – | 744,448 | 5,509,506 | 6,782 | 7,100,735 | 25,473 | 227,789 | 451,458 |
| Good Shepherd | Holbrook | 5 | 451,891 | – | 1,050,353 | – | 1,000 | 1,503,244 | 68,775 | 19,439 | 107,412 |
| St. Patrick | Huntington | 5 | 1,017,794 | – | 3,626,319 | – | 5,410 | 4,649,523 | 1,177,611 | 141,649 | 75,654 |
| St. Hugh of Lincoln | Huntington Station | 23 | 1,059,332 | – | 280,678 | 48,110 | 7,668 | 1,395,788 | 204,197 | 136,088 | 140,206 |
| St. Joseph | Kings Park | 9 | 301,068 | 35,000 | – | 1,572,293 | 18,928 | 1,927,288 | 99,208 | (124,702) | (139,530) |
| Our Lady Of Perpetual Help | Lindenhurst | 7 | 276,445 | (12,732) | 0 | – | (19,686) | 244,027 | 900,638 | (26,070) | 66,708 |
| St. Jude | Mastic Beach | 1 | 1,729,732 | 346,126 | – | – | – | 2,075,859 | 39,966 | 170,433 | (216,762) |
| SS Peter and Paul | Manorville | – | 283,538 | 0 | 169,985 | – | – | 453,523 | 4,775 | 118,863 | 133,786 |
| St. Sylvester | Medford | 2 | 167,843 | 57,089 | – | 200,241 | (896) | 424,277 | 667,965 | (17,061) | 30,190 |
| St. Therese of Lisieux | Montauk | 2 | 1,145,447 | – | – | – | – | 1,145,447 | 56,952 | 66,661 | 64,681 |
| St. Philip Neri | Northport | 7 | 489,138 | 12,453 | 87,914 | – | 3,412 | 592,917 | 65,176 | 110,132 | (4,831) |
| Our Lady of the Magnificat Mission | Ocean Beach | – | 43,751 | – | – | – | – | 43,751 | 0 | 8,291 | 8,316 |
| St. Francis De Sales | Patchogue | 2 | 177,890 | – | – | – | 350 | 178,240 | 234,354 | 31,537 | 41,968 |
| Our Lady of Mount Carmel | Patchogue | 2 | 389,352 | – | – | – | 2,040 | 391,392 | 1,330,530 | (17,867) | (10,784) |
| Infant Jesus | Port Jefferson | 7 | 2,634,774 | (78) | – | – | – | 2,634,696 | 154,090 | 488,738 | 477,006 |
| St. Isidore | Riverhead | 1 | 260,902 | 287,237 | 652,928 | – | 31,352 | 1,232,418 | 97,455 | 81,507 | 159,031 |
| St. John the Evangelist | Riverhead | 3 | 310,471 | 33,070 | (3) | – | 2,000 | 345,538 | 31,544 | 260,829 | 213,263 |
| Our Lady of Assumption | Rocky Point | 3 | 817,295 | – | 206,331 | – | – | 1,023,626 | 52,255 | (125,186) | (104,884) |
| St. Joseph | Ronkonkoma | 6 | 344,715 | – | – | – | 3,327 | 348,042 | 5,128,482 | (45,602) | (2,435,548) |
| St. Andrew | Sag Harbor | 2 | 4,754,248 | – | (0) | – | 1,716 | 4,755,964 | 12,679 | (3,526) | 199,760 |
| SS Philip and James | Saint James | 6 | 802,096 | (1) | 1,127,009 | – | 101,395 | 2,030,499 | 160,614 | 200,324 | 324,016 |
| St. Lawrence the Martyr | Sayville | 4 | 804,691 | 11,085 | 324,184 | – | 23,567 | 1,163,527 | 53,990 | 288,723 | 287,697 |
| St. Margaret of Scotland | Selden | 3 | 1,056,820 | 1,363 | 1,134,332 | – | 8,994 | 2,201,509 | 74,933 | (85,168) | (239,819) |

**Diocese of Rockville Centre - Parish Financials**
**Fiscal Year Ended August 31, 2020**

| Parish Name | Location | Number of Lawsuits | Balance Sheet Metrics | | | | | | | Income Statement Metrics | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Unrestricted Cash | Restricted Cash | Unitas | Other Investments | Other Assets | Total Assets | Total Liabilities | Net Operating Surplus / (Deficit) | Net Surplus / (Deficit) |
| St. James | Setauket | – | 1,160,448 | – | 245,048 | – | 662,559 | 2,068,055 | 685,193 | (44,715) | (111,931) |
| Our Lady of the Isle | Shelter Island Heights | – | 940,207 | – | – | 271,457 | 3,361 | 1,215,025 | 16,425 | 41,030 | 82,306 |
| St. Mark | Shoreham | – | 220,337 | (271) | – | – | 546 | 220,613 | 1,028,701 | (108,253) | (127,711) |
| St. Patrick | Smithtown | 11 | 1,075,264 | (1) | 120,766 | – | – | 1,196,030 | 73,111 | (39,333) | (116,373) |
| St. Louis de Montfort | Sound Beach | – | 508,619 | (1) | 498,949 | – | 24,610 | 1,032,177 | 80,098 | 78,713 | 115,735 |
| Our Lady of Poland | Southampton | – | 979,593 | 140,877 | – | 800 | – | 1,121,270 | 26,696 | 105,556 | 143,467 |
| Sacred Hearts of Jesus and Mary | Southampton | 1 | 1,474,921 | 639,242 | 521,010 | (0) | 84,013 | 2,719,186 | 25,289 | 166,652 | 209,345 |
| St. Patrick | Southold | – | 147,165 | – | 0 | – | 3,126 | 150,292 | 379,723 | (64,565) | (71,050) |
| St. John the Baptist | Wading River | – | 598,982 | – | 77 | – | – | 599,059 | 1,175,759 | 57,260 | (3,114) |
| Immaculate Conception | Westhampton Beach | 1 | 196,241 | – | 207,158 | 1,062,449 | – | 1,465,848 | 18,654 | (49,869) | 153,828 |
| Our Lady of Lourdes | West Islip | 3 | 1,913,537 | – | 3,558,789 | – | – | 5,472,326 | 119,159 | 208,615 | 790,080 |
| Our Lady of the Miraculous Medal | Wyandanch | – | 292,958 | – | – | – | – | 292,958 | 398,467 | (115,154) | (88,232) |
| Our Lady of Grace | West Babylon | 2 | 267,068 | 0 | 741,835 | – | 4,289 | 1,013,192 | 58,987 | (193,515) | (141,432) |
| St. Peter the Apostle | Islip Terrace | – | 61,504 | 15,601 | (0) | – | (4) | 77,101 | 4,935 | 12,856 | 337 |
| St. Elizabeth | Melville | 1 | 1,557,242 | – | 385,171 | – | 13,559 | 1,955,972 | 167,736 | (221,544) | (185,702) |
| St. Luke | Brentwood | 5 | 369,929 | – | – | – | (1,154) | 368,775 | 11,188 | 2,043 | (48,534) |
| St. Matthew | Dix Hills | 2 | 601,905 | 162,463 | 259,779 | 1,503,677 | 55,612 | 2,583,436 | 107,030 | (75,768) | (220,439) |
| St. Francis of Assisi | Greenlawn | 5 | 166,501 | 2 | 890,818 | – | 9,770 | 1,067,090 | 47,791 | 66,070 | 83,474 |
| St. Thomas More | Hauppauge | 1 | 1,002,625 | – | 364,192 | 626,006 | (73,092) | 1,919,731 | 207,468 | 21,400 | (5,178) |
| St. Gerard Majella | Port Jefferson Station | 1 | 1,595,280 | 256,970 | – | – | 958,561 | 2,810,811 | 1,953,160 | (86,713) | (1,260,406) |
| Church of the Resurrection | Farmingville | – | 346,345 | 21,148 | 4,984 | – | 2,000 | 374,476 | 30,407 | 10,842 | 4,579 |
| Church of the Holy Cross | Nesconset | – | 477,230 | – | 107,065 | – | 1,581 | 585,876 | 24,818 | 141,134 | 98,265 |
| Church of St. Elizabeth Ann Seton | Lake Ronkonkoma | – | 203,672 | – | 854,248 | – | 1,002 | 1,058,922 | 80,594 | (5,196) | (122,398) |
| **Total Parishes** | | **390** | **87,987,086** | **19,069,323** | **77,745,355** | **38,503,683** | **9,826,503** | **233,131,949** | **43,980,001** | **5,677,226** | **4,813,027** |
| Parishes with 0 CVA Cases | | – | 11,647,483 | 2,075,202 | 13,453,594 | 2,629,124 | 2,787,458 | 32,592,861 | 5,109,517 | 487,278 | 1,598,737 |
| Parishes with 1-2 CVA Cases | | 78 | 36,437,234 | 9,606,207 | 43,409,369 | 17,298,419 | 4,184,564 | 110,935,794 | 15,257,216 | 785,182 | (1,418,846) |
| Parishes with 3+ CVA Cases | | 312 | 39,902,369 | 7,387,914 | 20,882,391 | 18,576,140 | 2,854,480 | 89,603,294 | 23,613,268 | 4,404,766 | 4,633,136 |
| **Total Parishes** | | **390** | **87,987,086** | **19,069,323** | **77,745,355** | **38,503,683** | **9,826,503** | **233,131,949** | **43,980,001** | **5,677,226** | **4,813,027** |

**Diocese of Rockville Centre - Parish Financials**
**Fiscal Year Ended August 31, 2019**

| Parish Name | Location | Number of Lawsuits | Balance Sheet Metrics | | | | | | | Income Statement Metrics | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Unrestricted Cash | Restricted Cash | Unitas | Other Investments | Other Assets | Total Assets | Total Liabilities | Net Operating Surplus / (Deficit) | Net Surplus / (Deficit) |
| St. Christopher | Baldwin | 5 | (55,661) | 17,622 | – | – | 30,376 | (7,662) | 506,936 | (261,126) | (236,175) |
| St. Gertrude | Bayville | – | 413,386 | 503,326 | – | – | 2,213 | 918,925 | 77,581 | (59,662) | 245,776 |
| St. Barnabas the Apostle | Bellmore | 11 | 1,546,888 | 133,359 | 931,747 | – | – | 2,611,993 | 471,089 | 142,737 | 15,267 |
| St. Martin of Tours | Bethpage | 3 | 642,415 | – | 280,021 | – | 150,537 | 1,072,972 | 278,903 | 26,271 | 20,386 |
| St. Joachim | Cedarhurst | – | 145,889 | – | 4,338,456 | – | 2,897 | 4,487,243 | 26,646 | (195,990) | (188,714) |
| St. Raphael | East Meadow | 7 | 2,824,464 | – | 125,537 | 20,000 | (8,421) | 2,961,580 | 244,089 | 193,997 | 184,551 |
| St. Boniface | Elmont | 1 | 836,215 | 225,889 | – | – | 4,646 | 1,066,749 | 77,013 | (80,395) | 28,601 |
| St. Vincent De Paul | Elmont | 1 | 260,468 | 17,115 | – | – | 16,449 | 294,031 | 18,292 | (36,880) | (55,666) |
| St. Kilian | Farmingdale | 3 | 700,947 | – | – | – | 276,065 | 977,012 | 191,826 | 105,001 | 363,749 |
| St. Hedwig | Floral Park | 2 | 42,506 | – | 156,118 | – | – | 198,624 | 30,304 | 44,797 | (19,083) |
| Our Lady of Victory | Floral Park | 4 | (264,780) | 1,000,679 | 1,522,626 | – | 0 | 2,258,525 | 45,476 | 191,878 | 88,202 |
| St. Catherine of Sienna | Franklin Square | 8 | 689,852 | 0 | 21,547 | – | 15,165 | 726,564 | 1,539,789 | 263,064 | 44,947 |
| Our Holy Redeemer | Freeport | 4 | 236,752 | (132,239) | 456,030 | – | 132,296 | 692,839 | 896,166 | (13,256) | 44,302 |
| St. Joseph | Garden City | 1 | 295,355 | – | 4,603,444 | – | 53,838 | 4,952,637 | 240,621 | (41,104) | (94,619) |
| St. Hyacinth | Glen Head | 1 | 237,801 | – | 210,192 | – | – | 447,993 | 278,430 | (46,168) | (47,961) |
| St. Patrick | Glen Cove | 2 | 462,680 | – | – | – | 1,000 | 463,680 | 601,893 | 227,461 | 109,551 |
| Church of St. Rocco | Glen Cove | 1 | 546,962 | – | 803,909 | – | – | 1,350,871 | 38,239 | 149,018 | 172,129 |
| St. Aloysius | Great Neck | 1 | 510,040 | – | 6,802,447 | – | – | 7,312,487 | 15,448 | (353,518) | (556,531) |
| St. Ladislaus | Hempstead | 2 | 443,853 | – | 1,563,529 | – | 48,225 | 2,055,607 | 131,395 | 49,381 | (14,634) |
| Our Lady of Loretto | Hempstead | 2 | 101,032 | – | – | – | 7,334 | 108,365 | 267,009 | 239,186 | 298,273 |
| St. Joseph | Hewlett | 5 | (2,669) | – | 322,347 | – | 193,645 | 513,323 | 485,871 | (115,145) | (140,727) |
| Holy Family | Hicksville | 8 | 1,311,887 | 26,801 | 81,123 | 23,805 | 117,464 | 1,561,079 | 377,395 | 129,525 | 88,876 |
| St. Ignatius Loyola | Hicksville | 3 | 326,756 | – | – | – | 90,138 | 416,894 | 704,177 | (17,435) | 514,010 |
| Our Lady of Mercy | Hicksville | 2 | 135,523 | – | – | – | (99) | 135,424 | 744,246 | (419,913) | (404,402) |
| Our Lady of Good Counsel | Inwood | 2 | 27,933 | – | – | – | 26,996 | 54,928 | 549,884 | (178,054) | (186,101) |
| Sacred Heart | Island Park | 1 | 1,134,460 | – | – | – | – | 1,134,460 | 84 | (4,682) | (18,115) |
| St. Bernard | Levittown | 5 | 1,091,558 | 375,000 | 19,227 | 24,295 | 951,363 | 2,461,443 | 1,004,828 | (130,753) | 185,120 |
| St. Ignatius Martyr | Long Beach | 1 | 405,275 | – | 428,253 | – | 15,042 | 848,570 | 83,747 | (30,917) | (60,904) |
| St. Mary of the Isle | Long Beach | 1 | 170,433 | – | 978,025 | (0) | 46,791 | 1,195,249 | 72,747 | 79,965 | 97,468 |
| Our Lady of Peace | Lynbrook | 4 | 650,581 | – | 778,803 | 4,299 | 11,177 | 1,444,861 | 113,993 | 361,877 | 358,097 |
| St. Raymond | East Rockaway | 8 | 710,271 | 66,736 | – | – | 51,480 | 828,487 | 247,412 | (168,806) | (160,472) |
| Our Lady of Lourdes | Malverne | 2 | (192,836) | 332,081 | 332,081 | – | 6,426 | 477,752 | 39,005 | (44,668) | (66,331) |
| St. Mary | Manhasset | 10 | 4,999,428 | – | 544,565 | 5,047,248 | 577,911 | 11,169,202 | 2,621,877 | 129,383 | (56,581) |
| Our Lady of Fatima | Manorhaven | 2 | 183,001 | 0 | 235,200 | 940,699 | 200 | 1,359,100 | 41,140 | (49,173) | (18,764) |
| St. Rose of Lima | Massapequa | 5 | 1,897,416 | 606,382 | 15,762 | 476,224 | 79,429 | 3,075,214 | 673,702 | 155,609 | 160,984 |
| Our Lady of Lourdes | Massapequa Park | 1 | 698,030 | – | – | 917,618 | – | 1,615,648 | 46,244 | (107,119) | (183,107) |
| Cure of Ars | Merrick | – | (322,278) | 794,635 | – | – | 28,176 | 500,533 | 155,054 | 10,691 | 208,926 |
| Corpus Christi | Mineola | 2 | 254,219 | – | 7,579,082 | – | 6,323 | 7,839,624 | 113,291 | (97,935) | (40,719) |
| Holy Spirit | New Hyde Park | 3 | 541,130 | – | 1,199,480 | – | 3,350 | 1,743,960 | 34,426 | 94,673 | 83,099 |
| Notre Dame | New Hyde Park | 2 | 430,877 | – | – | 4,467,549 | 11,500 | 4,909,926 | 128,427 | 146,906 | 127,931 |
| Sacred Heart | North Merrick | 3 | 464,254 | – | – | – | 9,044 | 473,298 | 1,352,233 | (32,918) | (27,912) |
| Blessed Sacrament | Valley Stream | 2 | 360,174 | (663) | – | – | 2,081 | 361,593 | 96,835 | (18,625) | (82,600) |
| St. Anthony | Oceanside | 1 | 521,939 | – | 355,720 | – | 0 | 877,659 | 305,793 | 242,836 | 243,942 |
| St. Dominic | Oyster Bay | 11 | 400,816 | 185,750 | – | (0) | 712,955 | 1,299,520 | 1,423,637 | (2,478,695) | (1,999,613) |
| St.Pius X | Plainview | 3 | 833,091 | 72,237 | – | 203,756 | 51,560 | 1,160,644 | 316,987 | 220,431 | 210,596 |
| Our Lady of Miraculous Medal | Point Lookout | – | 402,810 | 9,985 | 374,330 | – | 590 | 787,714 | 18,978 | 74,253 | 76,122 |
| St. Peter of Alcantara | Port Washington | – | 405,995 | – | 3,271,258 | 1,561,260 | 18,053 | 5,256,566 | 992 | (11,881) | 103,303 |
| St. Agnes Cathedral | Rockville Centre | 13 | 1,130,996 | (165,819) | 873,706 | – | 118,148 | 1,957,032 | 491,454 | 56,994 | 111,772 |
| Queen of Most Holy Rosary | Roosevelt | 4 | 791,856 | 88,241 | – | – | 962,592 | 1,842,689 | 1,009,638 | 187,319 | 258,759 |
| St. Mary | Roslyn | 1 | 1,064,898 | – | – | – | 4,324 | 1,069,222 | 83,705 | 44,540 | 33,701 |
| St. Boniface Martyr | Sea Cliff | 1 | 369,606 | – | 158,205 | – | – | 527,811 | 26,153 | 42,351 | (60,917) |
| St. James | Seaford | 7 | 1,106,760 | – | – | – | 1,020 | 1,107,780 | 179,775 | 37,977 | 17,572 |
| Maria Regina | Seaford | 2 | 1,302,336 | – | 1,002,252 | 3,427,024 | – | 5,731,612 | 240,662 | 60,395 | 34,174 |
| St. William the Abbot | Seaford | 2 | 377,876 | (0) | 8,758,486 | – | 111,264 | 9,247,625 | 157,082 | (92,447) | (581,353) |
| St. Anne | Garden City | 2 | 1,157,703 | 3,050,109 | 257,786 | – | 2,158,010 | 6,623,608 | 2,365,310 | 79,283 | 1,056,594 |
| St. Edward Confessor | Syosset | 0 | 957,504 | 325,134 | – | – | 20,209 | 1,302,847 | 252,683 | 19,399 | (29,423) |
| St. Martha | Uniondale | 4 | 1,419,956 | – | – | – | 1,384 | 1,421,340 | 15,072 | 153,325 | 105,189 |
| Holy Name of Mary | Valley Stream | 5 | 947,972 | – | 738,313 | – | 23,099 | 1,709,384 | 268,603 | (156,813) | (140,814) |
| St. Frances De Chantal | Wantagh | – | (50,143) | 304,231 | 260,931 | – | 145,500 | 660,519 | 461,967 | 5,199 | 3,831 |
| St. Brigid | Westbury | 7 | (1,975,186) | 2,846,281 | 13,320 | 2,332,167 | 174,404 | 3,390,986 | 246,777 | 105,450 | 78,255 |
| St. Thomas the Apostle | West Hempstead | 3 | 329,857 | – | 151,465 | 152,232 | 199,645 | 833,199 | 47,401 | (174,083) | (255,291) |
| St. Aidan | Williston Park | 6 | 462,810 | – | 2,522,155 | (0) | 44,085 | 3,029,050 | 487,796 | (174,935) | (278,835) |
| St. Paul the Apostle | Brookville | 1 | 615,182 | 500,947 | 835,417 | 367,746 | 1,104,256 | 3,423,548 | 1,143,494 | 96 | (1,280,966) |
| Holy Name of Jesus | Woodbury | – | 181,988 | 1 | – | 1,326,871 | (16,373) | 1,492,487 | 21,733 | (38,535) | (44,325) |
| Our Lady of Hope | Carle Place | 1 | 276,063 | – | 252,490 | – | 8,422 | 536,975 | 127,592 | 54,083 | 57,609 |
| St. Martin of Tours | Amityville | 4 | 780,415 | 55,991 | 141,635 | 152,847 | (356) | 1,130,532 | 73,770 | 47,554 | 70,812 |
| St. Joseph | Babylon | 12 | 525,397 | 336,967 | 196,583 | 212,681 | 189,511 | 1,461,139 | 447,402 | 65,173 | 24,854 |
| St. Patrick | Bay Shore | 2 | 500,139 | – | 1,279,675 | 1,881,056 | 432,925 | 4,093,794 | 514,262 | 86,377 | 228,193 |
| Mary Immaculate | Bellport | 1 | 369,685 | 49,998 | – | – | 4,852 | 424,534 | 63,348 | (1,215) | 62,473 |
| Our Lady of the Snow | Blue Point | – | 396,579 | – | 485,107 | – | 0 | 881,687 | 126,456 | 106,315 | 126,554 |
| St. John Nepomucene | Bohemia | 3 | 392,271 | – | 228,916 | – | 17,946 | 639,133 | 95,395 | (22,930) | (18,589) |
| St. Anne | Brentwood | 3 | 528,998 | – | 278,780 | – | 1,007 | 808,785 | 94,658 | 56,307 | 25,796 |
| Queen of Most Holy Rosary | Bridgehampton | – | 449,177 | 73,250 | 0 | (0) | – | 522,427 | 4,922 | 20,301 | 35,449 |
| Assumption of the Blessed Virgin Mary | Centereach | – | 42,741 | 1 | – | 524,612 | 102,155 | 669,509 | 131,058 | (130,765) | (348,005) |
| St. John the Evangelist | Center Moriches | 1 | 1,026,997 | – | 11,488 | – | (0) | 1,038,485 | 46,381 | 111,219 | 19,201 |
| Our Lady Queen of Martyrs | Centerport | 4 | 111,715 | 612,945 | 2,248 | 336,238 | 25,683 | 1,088,829 | 125,617 | (7,175) | 25,067 |
| St. John of God | Central Islip | 6 | 163,768 | 0 | – | – | 14,253 | 178,021 | 91,578 | (38,803) | (34,930) |
| Christ the King | Commack | 2 | 822,682 | – | 838,799 | – | 121,879 | 1,783,360 | 309,546 | (56,140) | (65,794) |
| Our Lady of the Assumption | Copiague | – | 282,126 | – | – | – | 3,302 | 285,428 | 119,483 | 35,842 | (55,661) |
| St. Frances Cabrini | Coram | 2 | 232,600 | – | 348,542 | 201,233 | 3,000 | 785,374 | 105,515 | (28,580) | (9,714) |
| Our Lady of Ostrabrama | Cutchogue | – | 395,580 | – | – | – | – | 395,580 | 3,661 | 6,279 | 66,434 |
| Sacred Heart | Cutchogue | 1 | 2,201,009 | – | 807,882 | – | (8,851) | 3,000,040 | 24,679 | (101,585) | 1,466,903 |
| SS Cyril and Methodius | Deer Park | 4 | 117,233 | – | – | – | 202 | 117,435 | 3,128 | (64,096) | (186,131) |
| Most Holy Trinity | East Hampton | – | 263,859 | – | 2,411,027 | – | 1,750,115 | 4,425,001 | 36,198 | (126,039) | (186,474) |
| St. Mary | East Islip | 5 | 448,516 | 3 | – | – | 42,934 | 491,453 | 269,750 | 90,930 | 116,700 |
| St. Anthony of Padua | East Northport | 3 | 400,334 | – | – | – | – | 400,334 | 39,307 | 59,373 | (57,833) |
| St. Joseph the Worker | East Patchogue | – | 190,196 | – | – | – | 32,217 | 222,413 | 307,997 | 1,269 | 17,822 |
| St. Agnes | Greenport | – | 599,921 | – | – | – | 748 | 600,669 | 23,518 | 251,120 | 252,513 |
| St. Rosalie | Hampton Bays | 3 | 502,341 | – | 660,359 | 5,564,169 | 2,278 | 6,729,147 | 105,343 | (328,340) | (178,901) |
| Good Shepherd | Holbrook | 5 | 468,672 | – | 947,870 | – | 242,920 | 1,659,462 | 332,405 | 5,037 | (59,880) |
| St. Patrick | Huntington | 5 | 1,206,230 | – | 3,234,638 | – | (95,183) | 4,345,685 | 949,427 | 38,125 | (217,016) |
| St. Hugh of Lincoln | Huntington Station | 23 | 826,140 | – | 276,287 | 48,395 | 8,675 | 1,159,497 | 108,112 | 201,783 | 144,888 |
| St. Joseph | Kings Park | 9 | 770,848 | (0) | – | 1,295,457 | 51,023 | 2,117,327 | 159,715 | 59,996 | (67,144) |
| Our Lady Of Perpetual Help | Lindenhurst | 7 | 180,311 | – | 0 | – | (4,994) | 175,318 | 898,637 | (126,936) | (83,435) |
| St. Jude | Mastic Beach | 1 | 1,549,432 | 754,843 | – | – | – | 2,304,275 | 51,621 | 138,288 | 42,471 |
| SS Peter and Paul | Manorville | – | 130,694 | 42,000 | 154,410 | – | – | 327,104 | 17,141 | 92,211 | 544 |
| St. Sylvester | Medford | 2 | 122,359 | – | – | 199,440 | 4,042 | 325,841 | 599,719 | (109,513) | (106,147) |
| St. Therese of Lisieux | Montauk | 2 | 1,061,843 | – | – | – | – | 1,061,843 | 15,034 | (96,838) | (228,729) |
| St. Philip Neri | Northport | 7 | 522,895 | 14,782 | 86,538 | – | 15,701 | 639,916 | 107,344 | 204,328 | 185,638 |
| Our Lady of the Magnificat Mission | Ocean Beach | – | 40,647 | – | – | – | 25 | 40,672 | 5,237 | 22,582 | (44,031) |
| St. Francis De Sales | Patchogue | 2 | 147,063 | – | – | – | 2,250 | 149,313 | 247,386 | 21,515 | 22,349 |
| Our Lady of Mount Carmel | Patchogue | 2 | 400,084 | – | – | – | 5,169 | 405,253 | 1,933,607 | (17,740) | (122,283) |
| Infant Jesus | Port Jefferson | 7 | 2,043,132 | (78) | – | – | 9,608 | 2,052,662 | 173,062 | 169,230 | 142,381 |
| St. Isidore | Riverhead | 1 | 208,708 | 262,870 | 584,312 | – | 11,581 | 1,067,471 | 91,539 | (24,882) | (100,268) |
| St. John the Evangelist | Riverhead | 3 | 55,477 | 66,402 | (3) | – | 34,149 | 156,026 | 55,294 | 31,246 | 10,361 |
| St. Isidore | Rocky Point | 3 | 825,837 | – | 331,955 | – | 19,023 | 1,176,815 | 100,560 | (16,505) | 3,397 |
| St. Joseph | Ronkonkoma | 6 | 148,667 | – | – | – | 967 | 149,634 | 2,494,525 | (178,977) | (366,708) |
| St. Andrew | Sag Harbor | 2 | 1,131,586 | – | 3,421,016 | – | 3,809 | 4,556,411 | 12,886 | (38,257) | (60,262) |
| SS Philip and James | Saint James | 6 | 542,959 | (1) | 1,084,585 | – | 132,074 | 1,759,657 | 213,788 | 98,199 | 49,577 |
| St. Lawrence the Martyr | Sayville | 4 | 664,117 | 11,085 | 295,701 | – | 8,056 | 978,960 | 157,120 | (73,169) | (109,720) |
| St. Margaret of Scotland | Selden | 3 | 1,966,005 | 1,363 | – | 514,818 | 5,000 | 2,487,186 | 120,791 | 99,891 | 119,573 |

**Diocese of Rockville Centre - Parish Financials**
**Fiscal Year Ended August 31, 2019**

| Parish Name | Location | Number of Lawsuits | Balance Sheet Metrics | | | | | | | Income Statement Metrics | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Unrestricted Cash | Restricted Cash | Unitas | Other Investments | Other Assets | Total Assets | Total Liabilities | Net Operating Surplus / (Deficit) | Net Surplus / (Deficit) |
| St. James | Setauket | – | 1,156,012 | – | 401,124 | – | 20,789 | 1,577,925 | 83,132 | (27,441) | (10,671) |
| Our Lady of the Isle | Shelter Island Heights | – | 426,393 | – | 485,582 | 231,210 | 2,159 | 1,145,344 | 29,050 | 36,120 | 53,211 |
| St. Mark | Shoreham | – | 44,270 | (271) | – | – | (592) | 43,408 | 723,785 | (71,911) | (140,669) |
| St. Patrick | Smithtown | 11 | 1,193,514 | – | 120,759 | – | – | 1,314,273 | 74,981 | 142,323 | 20,344 |
| St. Louis de Montfort | Sound Beach | – | 440,915 | (1) | 448,084 | – | 35,394 | 924,392 | 88,048 | 34,040 | (67,159) |
| Our Lady of Poland | Southampton | – | 844,091 | 115,878 | – | 800 | – | 960,769 | 9,662 | 5,646 | 18,713 |
| Sacred Hearts of Jesus and Mary | Southampton | 1 | 1,359,996 | 585,033 | 512,860 | (0) | 65,739 | 2,523,629 | 39,076 | 44,663 | (42,915) |
| St. Patrick | Southold | – | 106,167 | – | 0 | – | – | 106,168 | 264,549 | (16,982) | (16,963) |
| St. John the Baptist | Wading River | – | 523,186 | – | 77 | – | 4,316 | 527,579 | 1,101,165 | 126,312 | 91,578 |
| Immaculate Conception | Westhampton Beach | 1 | 212,850 | – | 188,843 | 913,395 | 12,966 | 1,328,053 | 34,687 | (19,687) | 10,133 |
| Our Lady of Lourdes | West Islip | 3 | 1,790,506 | – | 3,205,884 | – | 2,100 | 4,998,490 | 435,403 | 169,527 | 335,306 |
| Our Lady of the Miraculous Medal | Wyandanch | – | 288,193 | – | – | – | 9,355 | 297,548 | 314,825 | (88,481) | (65,590) |
| Our Lady of Grace | West Babylon | 2 | 167,711 | 0 | 983,172 | – | 15,726 | 1,166,609 | 70,972 | (23,374) | (40,843) |
| St. Peter the Apostle | Islip Terrace | – | 62,423 | 15,601 | (0) | – | 447 | 78,471 | 6,642 | (423) | (1,547) |
| St. Elizabeth | Melville | 1 | 1,703,510 | – | 345,905 | – | 6,280 | 2,055,695 | 81,757 | (184,716) | 21,914 |
| St. Luke | Brentwood | 5 | 413,743 | 2,500 | – | – | 1,643 | 417,885 | 11,765 | 112,235 | 111,584 |
| St. Matthew | Dix Hills | 2 | 941,043 | 242,399 | 948,440 | 671,017 | 714 | 2,803,613 | 106,768 | 279,517 | 312,479 |
| St. Francis of Assisi | Greenlawn | 5 | 155,828 | 4,674 | 876,883 | – | 11,084 | 1,048,468 | 112,643 | 35,090 | 23,963 |
| St. Thomas More | Hauppauge | 1 | 1,077,920 | – | 897,915 | – | (59,772) | 1,916,063 | 198,622 | 110,460 | 407,326 |
| St. Gerard Majella | Port Jefferson Station | 1 | 759,720 | 1,517,376 | (99,231) | – | 1,260,715 | 3,438,580 | 1,320,523 | (21,595) | 78,926 |
| Church of the Resurrection | Farmingville | – | 335,687 | 22,504 | 4,906 | – | 11,544 | 374,640 | 35,150 | 39,328 | 44,485 |
| Church of the Holy Cross | Nesconset | – | 409,804 | – | 105,390 | – | – | 515,194 | 52,402 | 31,771 | 5,681 |
| Church of St. Elizabeth Ann Seton | Lake Ronkonkoma | – | 130,691 | – | 1,078,311 | – | 8,645 | 1,217,646 | 116,920 | (89,588) | (112,659) |

| **Total Parishes** | | 390 | 80,227,366 | 15,971,937 | 82,768,636 | 34,040,209 | 13,403,152 | 226,411,299 | 42,072,556 | (324,258) | 307,373 |
| Parishes with 0 CVA Cases | | – | 8,736,999 | 1,881,140 | 13,818,993 | 3,644,752 | 2,161,675 | 30,243,560 | 4,358,952 | 41,812 | 68,474 |
| Parishes with 1-2 CVA Cases | | 78 | 33,740,553 | 7,864,495 | 49,588,136 | 14,501,594 | 5,543,359 | 111,238,138 | 14,140,892 | 215,435 | 808,069 |
| Parishes with 3+ CVA Cases | | 312 | 37,749,814 | 6,226,302 | 19,361,507 | 15,893,863 | 5,698,117 | 84,929,602 | 23,572,712 | (581,506) | (569,170) |
| **Total Parishes** | | 390 | 80,227,366 | 15,971,937 | 82,768,636 | 34,040,209 | 13,403,152 | 226,411,299 | 42,072,556 | (324,258) | 307,373 |

**Diocese of Rockville Centre - Parish Financials**
**Fiscal Year Ended August 31, 2018**

| Parish Name | Location | Number of Lawsuits | Unrestricted Cash | Restricted Cash | Unitas | Other Investments | Other Assets | Total Assets | Total Liabilities | Net Operating Surplus / (Deficit) | Net Surplus / (Deficit) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | **Balance Sheet Metrics** | | | | **Income Statement Metrics** | |
| St. Christopher | Baldwin | 5 | 72,833 | 28,725 | – | – | 19,847 | 121,405 | 399,829 | (181,122) | (120,654) |
| St. Gertrude | Bayville | – | 513,732 | 140,042 | – | – | 7,088 | 660,862 | 65,293 | 22,396 | 44,948 |
| St. Barnabas the Apostle | Bellmore | 11 | 1,427,243 | 216,889 | 916,736 | – | 3,852 | 2,564,720 | 439,083 | 186,944 | (210,897) |
| St. Martin of Tours | Bethpage | 3 | 650,709 | – | 275,195 | – | 285,703 | 1,211,606 | 437,923 | 110,431 | 97,364 |
| St. Joachim | Cedarhurst | – | 62,840 | – | 4,708,302 | – | 8,348 | 4,779,490 | 130,180 | (159,567) | 190,254 |
| St. Raphael | East Meadow | 7 | 2,611,888 | – | 121,922 | – | 6,776 | 2,740,586 | 207,646 | 203,539 | 137,267 |
| St. Boniface | Elmont | 1 | 826,313 | 183,863 | – | – | 9,373 | 1,019,549 | 58,414 | (56,071) | 61,594 |
| St. Vincent De Paul | Elmont | 1 | 352,277 | 17,115 | – | – | 5,923 | 375,315 | 43,909 | (38,011) | (73,852) |
| St. Kilian | Farmingdale | 3 | 639,698 | – | – | – | (24,580) | 615,118 | 193,681 | (220,969) | (213,953) |
| St. Hedwig | Floral Park | 2 | 25,762 | – | 182,986 | – | 2,231 | 210,979 | 23,576 | (46,767) | (135,417) |
| Our Lady of Victory | Floral Park | 4 | (159,729) | 911,976 | 1,421,328 | – | 0 | 2,173,574 | 48,727 | 250,839 | 115,828 |
| St. Catherine of Sienna | Franklin Square | 8 | 535,074 | 0 | 21,026 | – | 1,606 | 557,707 | 1,415,878 | (35,786) | (30,043) |
| Our Holy Redeemer | Freeport | 4 | 115,820 | – | 456,133 | – | 132,238 | 704,191 | 951,820 | (37,058) | (6,443) |
| St. Joseph | Garden City | 1 | 479,088 | – | 4,729,984 | – | 344,251 | 5,553,324 | 746,688 | 39,171 | (40,433) |
| St. Hyacinth | Glen Head | 1 | 191,890 | – | 206,987 | – | (5,100) | 393,777 | 176,253 | (29,101) | (48,958) |
| St. Patrick | Glen Cove | 2 | 438,286 | – | – | – | 250 | 438,536 | 686,300 | 222,514 | 95,252 |
| Church of St. Rocco | Glen Cove | 1 | 306,039 | – | 869,072 | – | 8,545 | 1,183,656 | 43,153 | (27,928) | (77,447) |
| St. Aloysius | Great Neck | 1 | 106,901 | – | 7,764,589 | – | – | 7,871,490 | 17,919 | (76,482) | 410,563 |
| St. Ladislaus | Hempstead | 2 | 397,523 | – | 1,560,506 | – | 64,315 | 2,022,344 | 83,498 | 90,956 | 153,044 |
| Our Lady of Loretto | Hempstead | 2 | 45,415 | – | – | – | 187 | 45,602 | 502,519 | 106,124 | 22,076 |
| St. Joseph | Hewlett | 5 | 6,057 | – | 316,885 | – | 176,674 | 499,615 | 331,436 | (50,847) | (33,269) |
| Holy Family | Hicksville | 8 | 1,183,026 | 50,000 | 357 | 23,805 | 105,426 | 1,362,613 | 267,805 | 156,749 | 150,277 |
| St. Ignatius Loyola | Hicksville | 3 | 492,319 | – | – | – | 381,886 | 874,205 | 1,675,498 | (33,971) | 420,186 |
| Our Lady of Mercy | Hicksville | 2 | 309,976 | – | – | – | (6,647) | 303,329 | 507,748 | (112,535) | (112,998) |
| Our Lady of Good Counsel | Inwood | 2 | 12,565 | – | – | – | 61,828 | 74,393 | 383,248 | (227,993) | (234,020) |
| Sacred Heart | Island Park | 1 | 1,152,575 | – | – | – | – | 1,152,575 | 84 | (16,361) | (15,137) |
| St. Bernard | Levittown | 5 | 1,290,380 | – | 18,326 | 19,277 | 1,104,720 | 2,432,703 | 1,161,444 | (73,394) | 205,677 |
| St. Ignatius Martyr | Long Beach | 1 | 453,976 | – | 417,915 | – | 2,678 | 874,569 | 48,842 | 288,705 | 258,242 |
| St. Mary of the Isle | Long Beach | 1 | 181,274 | – | 910,522 | (0) | 14,238 | 1,106,034 | 81,000 | 66,035 | 111,371 |
| Our Lady of Peace | Lynbrook | 4 | 327,245 | – | 732,275 | 4,299 | 4,355 | 1,068,174 | 95,403 | 80,074 | 374,274 |
| St. Raymond | East Rockaway | 8 | 791,643 | – | – | – | 3,000 | 794,643 | 53,097 | (43,645) | (37,885) |
| Our Lady of Lourdes | Malverne | 2 | (17,633) | 347,681 | 350,562 | – | 7,513 | 688,122 | 183,044 | (215,415) | (289,049) |
| St. Mary | Manhasset | 10 | 5,477,574 | – | 531,420 | 4,999,265 | 176,189 | 11,184,449 | 2,580,543 | 347,281 | 873,091 |
| Our Lady of Fatima | Manorhaven | 2 | 192,365 | 0 | 235,239 | 925,049 | – | 1,352,654 | 15,934 | (86,996) | (182,897) |
| St. Rose of Lima | Massapequa | 5 | 1,912,649 | 456,380 | 15,382 | 454,576 | 105,810 | 2,944,796 | 704,269 | 196,620 | (68,367) |
| Our Lady of Lourdes | Massapequa Park | 1 | 796,636 | – | – | 983,345 | 77,112 | 1,857,093 | 104,582 | (79,897) | 7,832 |
| Cure of Ars | Merrick | – | (151,774) | 585,709 | – | – | 447 | 434,382 | 297,829 | 73,932 | 585,709 |
| Corpus Christi | Mineola | 2 | 1,132,332 | – | 6,725,929 | – | 3,897 | 7,862,158 | 95,106 | (66,368) | (129,557) |
| Holy Spirit | New Hyde Park | 3 | 460,250 | – | 1,199,751 | – | 6,189 | 1,666,190 | 39,754 | 174,020 | 256,513 |
| Notre Dame | New Hyde Park | 2 | 983,520 | – | – | 3,873,257 | 5,750 | 4,862,527 | 208,959 | 16,745 | (21,802) |
| Sacred Heart | North Merrick | 3 | 546,544 | – | – | – | – | 546,544 | 1,397,568 | 15,779 | (6,315) |
| Blessed Sacrament | Valley Stream | 2 | 408,940 | 39,979 | – | – | 14,291 | 463,210 | 115,853 | (69,793) | (95,110) |
| St. Anthony | Oceanside | 1 | 263,127 | – | 355,801 | – | – | 618,928 | 291,004 | 99,775 | 201,097 |
| St. Dominic | Oyster Bay | 11 | 2,115,788 | 185,750 | – | (0) | 1,165,181 | 3,466,719 | 1,591,222 | (1,230,434) | 1,267,260 |
| St.Pius X | Plainview | 3 | 754,668 | – | – | – | 39,696 | 794,364 | 161,303 | 149,490 | 152,139 |
| Our Lady of Miraculous Medal | Point Lookout | – | 317,006 | 22,485 | 374,101 | – | 249 | 713,842 | 21,227 | 38,725 | 94,721 |
| St. Peter of Alcantara | Port Washington | – | 564,568 | – | 3,150,413 | 1,446,040 | 42,313 | 5,203,334 | 51,063 | 150,835 | 419,767 |
| St. Agnes Cathedral | Rockville Centre | 13 | 570,557 | 151,932 | 864,656 | – | 294,048 | 1,881,192 | 527,386 | (91,046) | 133,750 |
| Queen of Most Holy Rosary | Roosevelt | 4 | 620,941 | – | – | – | 20,730 | 641,672 | 67,379 | 222,728 | 202,018 |
| St. Mary | Roslyn | 1 | 861,706 | – | – | – | 203,003 | 1,064,709 | 112,893 | 100,257 | 52,609 |
| St. Boniface Martyr | Sea Cliff | 1 | 388,211 | 62,871 | 152,354 | – | – | 603,435 | 40,861 | 78,435 | 15,037 |
| St. James | Seaford | 7 | 1,053,486 | – | – | – | 11,616 | 1,065,102 | 154,669 | (24,201) | (361,547) |
| Maria Regina | Seaford | 2 | 1,114,660 | – | 938,898 | 3,526,865 | – | 5,580,423 | 123,647 | 177,386 | 9,005 |
| St. William the Abbot | Seaford | 2 | 409,169 | (0) | 9,398,062 | – | 116,556 | 9,923,786 | 251,891 | 30,355 | 197,924 |
| St. Anne | Garden City | 2 | 293,459 | 2,828,059 | 252,441 | – | 32,493 | 3,406,452 | 204,748 | 40,925 | (111,856) |
| St. Edward Confessor | Syosset | 0 | 774,262 | 346,610 | – | – | 13,488 | 1,134,361 | 54,775 | 86,736 | 51,688 |
| St. Martha | Uniondale | 4 | 1,341,374 | – | – | – | 2,713 | 1,344,087 | 43,008 | 176,952 | 127,143 |
| Holy Name of Mary | Valley Stream | 5 | 882,696 | – | 720,490 | – | 83,843 | 1,687,029 | 105,434 | (99,082) | (82,479) |
| St. Frances De Chantal | Wantagh | – | (68,455) | 304,231 | 248,526 | – | 309,900 | 794,202 | 599,480 | 14,723 | 66,606 |
| St. Brigid | Westbury | 7 | (2,272,089) | 2,935,958 | 12,998 | 2,459,066 | 448,287 | 3,584,220 | 518,266 | (29,644) | (198,690) |
| St. Thomas the Apostle | West Hempstead | 3 | 501,881 | – | 151,465 | 299,168 | 193,740 | 1,146,254 | 105,165 | (386,753) | (448,775) |
| St. Aidan | Williston Park | 6 | 676,942 | – | 2,522,691 | (0) | 49,911 | 3,249,545 | 429,455 | 91,453 | 204,637 |
| St. Paul the Apostle | Brookville | 1 | 740,033 | 475,462 | 2,142,576 | 360,606 | 1,242,242 | 4,960,919 | 1,399,899 | 1,364 | 455,859 |
| Holy Name of Jesus | Woodbury | – | 237,651 | 1 | – | 1,326,871 | (16,308) | 1,548,215 | 33,136 | (63,226) | 52,622 |
| Our Lady of Hope | Carle Place | 1 | 210,476 | – | 246,395 | – | 5,382 | 462,253 | 110,479 | 23,376 | 29,321 |
| St. Martin of Tours | Amityville | 4 | 670,287 | 29,204 | 138,216 | 148,598 | – | 986,305 | 355 | 41,010 | 84,789 |
| St. Joseph | Babylon | 12 | 121,478 | 336,967 | 115,420 | 697,844 | 169,616 | 1,441,325 | 452,502 | 111,548 | 93,778 |
| St. Patrick | Bay Shore | 2 | 463,633 | – | 1,246,986 | 1,813,122 | 451,837 | 3,975,579 | 624,240 | 55,112 | 89,353 |
| Mary Immaculate | Bellport | 1 | 356,922 | – | – | – | 6,725 | 363,647 | 64,934 | 21,941 | 20,189 |
| Our Lady of the Snow | Blue Point | – | 253,874 | – | 466,079 | – | 0 | 719,953 | 91,277 | 49,713 | 104,646 |
| St. John Nepomucene | Bohemia | 3 | 428,119 | – | 225,581 | – | – | 653,700 | 91,373 | 43,731 | 55,382 |
| St. Anne | Brentwood | 3 | 508,962 | – | 274,215 | – | – | 783,177 | 94,846 | 95,962 | 4,951 |
| Queen of Most Holy Rosary | Bridgehampton | – | 439,915 | 53,167 | 0 | (0) | – | 493,082 | 11,026 | 54,174 | 46,257 |
| Assumption of the Blessed Virgin Mary | Centereach | – | 41,345 | 21,362 | – | 856,734 | 207,633 | 1,127,074 | 240,618 | (106,383) | (80,609) |
| St. John the Evangelist | Center Moriches | 1 | 728,158 | – | 332,087 | – | 5,606 | 1,065,851 | 92,948 | 89,432 | 4,788 |
| Our Lady Queen of Martyrs | Centerport | 4 | 81,528 | 615,689 | 2,119 | 337,199 | – | 1,036,535 | 98,390 | (17,378) | (2,710) |
| St. John of God | Central Islip | 6 | 197,704 | 0 | – | – | 21,495 | 219,200 | 97,826 | 2,412 | 3,109 |
| Christ the King | Commack | 2 | 937,874 | – | 826,209 | – | 1,533 | 1,765,616 | 226,007 | 35,003 | 94,539 |
| Our Lady of the Assumption | Copiague | – | 317,366 | – | – | – | – | 317,366 | 95,760 | (32,735) | 32,744 |
| St. Frances Cabrini | Coram | 2 | 49,330 | – | 503,422 | 198,741 | 3,000 | 754,493 | 64,920 | (70,573) | (59,330) |
| Our Lady of Ostrabrama | Cutchogue | – | 328,023 | – | – | – | (1,165) | 326,858 | 1,373 | 17,843 | 10,950 |
| Sacred Heart | Cutchogue | 1 | 742,825 | – | 788,380 | – | (8,029) | 1,523,176 | 14,718 | (24,926) | (105,794) |
| SS Cyril and Methodius | Deer Park | 4 | 352,595 | – | – | – | (2,864) | 349,731 | 49,293 | 17,512 | 4,279 |
| Most Holy Trinity | East Hampton | – | 192,301 | – | 2,690,154 | – | 1,759,011 | 4,641,466 | 66,189 | (78,450) | 148,489 |
| St. Mary | East Islip | 5 | 35,961 | 277,799 | – | – | 64,168 | 377,928 | 272,925 | 6,054 | 165,298 |
| St. Anthony of Padua | East Northport | 3 | 458,733 | – | – | – | – | 458,733 | 39,873 | 48,151 | (184,762) |
| St. Joseph the Worker | East Patchogue | – | 115,046 | – | 59,580 | – | 22,500 | 197,126 | 300,532 | (35,370) | (29,070) |
| St. Agnes | Greenport | – | 342,537 | – | – | – | 1,242 | 343,779 | 19,141 | 123,959 | 145,344 |
| St. Rosalie | Hampton Bays | 3 | 405,210 | – | 660,508 | 5,759,684 | 1,100 | 6,826,502 | 23,797 | (25,861) | 228,676 |
| Good Shepherd | Holbrook | 5 | 533,498 | – | 933,164 | – | 457,757 | 1,924,419 | 537,393 | 16,882 | 98,512 |
| St. Patrick | Huntington | 5 | 1,305,926 | – | 3,152,254 | – | (4,248) | 4,453,933 | 840,958 | 59,831 | (159,700) |
| St. Hugh of Lincoln | Huntington Station | 23 | 720,038 | – | 269,617 | 48,222 | 3,312 | 1,041,189 | 134,692 | (27,139) | 280,585 |
| St. Joseph | Kings Park | 9 | 746,727 | 59,060 | – | 1,266,966 | 9,000 | 2,081,753 | 90,997 | 48,393 | (98,633) |
| Our Lady Of Perpetual Help | Lindenhurst | 7 | 279,705 | – | 0 | – | (7,371) | 272,335 | 912,219 | (71,854) | 3,998 |
| St. Jude | Mastic Beach | 1 | 1,387,797 | 874,006 | – | – | – | 2,261,803 | 51,619 | (95,340) | (41,717) |
| SS Peter and Paul | Manorville | – | 113,362 | 61,796 | 153,550 | – | 61,920 | 390,628 | 76,210 | (13,644) | (147,156) |
| St. Sylvester | Medford | 2 | 135,256 | – | – | 199,340 | 16,428 | 351,024 | 518,755 | (84,630) | (112,939) |
| St. Therese of Lisieux | Montauk | 2 | 1,297,636 | – | – | – | – | 1,297,636 | 22,099 | 990,989 | 937,375 |
| St. Philip Neri | Northport | 7 | 342,227 | 23,716 | 84,449 | – | 8,660 | 459,052 | 112,118 | 53,950 | 3,012 |
| Our Lady of the Magnificat Mission | Ocean Beach | – | 145,839 | – | – | – | – | 145,839 | 66,373 | 28,146 | 9,078 |
| St. Francis De Sales | Patchogue | 2 | 160,000 | – | – | – | – | 160,000 | 280,422 | 18,270 | 71,045 |
| Our Lady of Mount Carmel | Patchogue | 2 | 454,255 | – | – | – | 3,498 | 457,753 | 1,263,824 | 24,995 | (15,168) |
| Infant Jesus | Port Jefferson | 7 | 145,839 | – | – | – | – | 145,839 | 96,122 | 91,919 | 127,755 |
| St. Isidore | Riverhead | 1 | 200,470 | 382,060 | 583,178 | – | 30,943 | 1,196,652 | 120,459 | 62,930 | 154,631 |
| St. John the Evangelist | Riverhead | 3 | 20,471 | 92,713 | (3) | – | 141,538 | 254,719 | 164,348 | (32,270) | (9,656) |
| Our Lady of Assumption | Rocky Point | 3 | 987,052 | – | 333,785 | – | 117,591 | 1,438,428 | 365,571 | (44,358) | (32,678) |
| St. Joseph | Ronkonkoma | 6 | 219,735 | – | – | – | 8,538 | 228,273 | 2,006,455 | (99,350) | (152,285) |
| St. Andrew | Sag Harbor | 2 | 1,188,166 | – | 3,420,224 | – | 1,182 | 4,609,572 | 5,785 | 9,923 | 284,453 |
| SS Philip and James | Saint James | 6 | 395,630 | 95,582 | 1,185,522 | – | 200,582 | 1,877,316 | 360,024 | 82,566 | 18,316 |
| St. Lawrence the Martyr | Sayville | 4 | 484,333 | 11,691 | 291,553 | – | 38,108 | 825,684 | 113,561 | 42,043 | 41,638 |
| St. Margaret of Scotland | Selden | 3 | 2,308,466 | 1,363 | – | – | – | 2,309,829 | 63,007 | 1,933,733 | 2,217,486 |

**Diocese of Rockville Centre - Parish Financials**
**Fiscal Year Ended August 31, 2018**

| Parish Name | Location | Number of Lawsuits | Unrestricted Cash | Restricted Cash | Unitas | Other Investments | Other Assets | Total Assets | Total Liabilities | Net Operating Surplus / (Deficit) | Net Surplus / (Deficit) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| St. James | Setauket | – | 1,191,407 | – | 391,934 | – | 2,000 | 1,585,341 | 79,877 | (57,235) | (249,192) |
| Our Lady of the Isle | Shelter Island Heights | – | 867,762 | – | – | 217,292 | 2,500 | 1,087,554 | 24,471 | 446,735 | 453,607 |
| St. Mark | Shoreham | – | 127,611 | – | – | – | (592) | 127,019 | 666,727 | (60,297) | (60,188) |
| St. Patrick | Smithtown | 11 | 1,150,308 | – | 117,843 | – | 15,995 | 1,284,146 | 65,198 | 169,265 | (69,771) |
| St. Louis de Montfort | Sound Beach | – | 530,887 | 10,470 | 441,358 | – | 15,457 | 998,172 | 94,669 | 73,255 | 25,156 |
| Our Lady of Poland | Southampton | – | 826,278 | 126,252 | – | 800 | – | 953,330 | 20,936 | 10,431 | 39,348 |
| Sacred Hearts of Jesus and Mary | Southampton | 1 | 1,614,707 | 401,839 | 500,479 | (0) | 35,063 | 2,552,088 | 24,621 | (5) | 298,418 |
| St. Patrick | Southold | – | 93,677 | – | 0 | – | – | 93,678 | 235,096 | (121,490) | (121,454) |
| St. John the Baptist | Wading River | – | 376,202 | – | 77 | – | 4,316 | 380,595 | 1,045,759 | 160,016 | 118,638 |
| Immaculate Conception | Westhampton Beach | 1 | 207,691 | – | 185,716 | 924,533 | 6,420 | 1,324,360 | 41,126 | (3,649) | (78,132) |
| Our Lady of Lourdes | West Islip | 3 | 1,520,574 | – | 3,156,733 | – | 11,900 | 4,689,207 | 461,426 | 231,353 | 476,546 |
| Our Lady of the Miraculous Medal | Wyandanch | – | 301,367 | – | – | – | 1,721 | 303,088 | 254,775 | 54,731 | 54,153 |
| Our Lady of Grace | West Babylon | 2 | 325,421 | 0 | 890,698 | – | 20,861 | 1,236,980 | 100,501 | 121,019 | 102,780 |
| St. Peter the Apostle | Islip Terrace | – | 79,127 | – | (0) | – | (779) | 78,348 | 4,972 | 14,641 | (15,910) |
| St. Elizabeth | Melville | 1 | 1,676,455 | – | 340,713 | – | 9,775 | 2,026,943 | 74,919 | (7,834) | 495,858 |
| St. Luke | Brentwood | 5 | 301,608 | 2,500 | – | – | 2,919 | 307,027 | 12,491 | 135,622 | 69,128 |
| St. Matthew | Dix Hills | 2 | 787,685 | 225,500 | 934,204 | 658,767 | 21,317 | 2,627,473 | 243,107 | 178,826 | 290,254 |
| St. Francis of Assisi | Greenlawn | 5 | (226,792) | 369,824 | 855,715 | – | 60,492 | 1,059,239 | 147,376 | 19,894 | (303,845) |
| St. Thomas More | Hauppauge | 1 | 644,549 | – | 894,778 | – | (47,992) | 1,491,335 | 181,220 | 41,420 | (122,470) |
| St. Gerard Majella | Port Jefferson Station | 1 | 666,439 | 1,438,450 | – | – | 1,015 | 2,105,904 | 66,773 | (15,131) | (257,584) |
| Church of the Resurrection | Farmingville | – | 302,577 | 19,611 | 4,787 | – | 9,592 | 336,567 | 41,562 | 21,238 | 12,421 |
| Church of the Holy Cross | Nesconset | – | 252,914 | – | 263,474 | – | – | 516,388 | 59,277 | 247,418 | 97,298 |
| Church of St. Elizabeth Ann Seton | Lake Ronkonkoma | – | 125,627 | – | 1,180,122 | – | 2,625 | 1,308,374 | 94,989 | (108,969) | (56,330) |

| **Total Parishes** | | **390** | **77,585,310** | **15,822,339** | **85,116,074** | **33,829,329** | **11,342,813** | **223,695,865** | **39,664,735** | **6,237,134** | **11,124,369** |

| Parishes with 0 CVA Cases | | – | 8,840,612 | 1,345,126 | 14,132,458 | 3,847,736 | 2,440,020 | 30,605,951 | 4,789,818 | 874,632 | 1,992,847 |
| Parishes with 1-2 CVA Cases | | 78 | 31,685,434 | 7,624,858 | 52,044,624 | 13,463,624 | 2,794,882 | 107,613,422 | 11,324,250 | 4,148,598 | 5,583,990 |
| Parishes with 3+ CVA Cases | | 312 | 37,059,264 | 6,852,355 | 18,938,992 | 16,517,968 | 6,107,912 | 85,476,492 | 23,550,667 | 1,213,905 | 3,547,533 |
| **Total Parishes** | | **390** | **77,585,310** | **15,822,339** | **85,116,074** | **33,829,329** | **11,342,813** | **223,695,865** | **39,664,735** | **6,237,134** | **11,124,369** |

**Diocese of Rockville Centre - Other Covered Party Financials**
**Fiscal Year Ended August 31, 2022**

| Parish Name | Location | Number of Lawsuits | Balance Sheet Metrics | | | | | | | Income Statement Metrics | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Unrestricted Cash | Restricted Cash | Unitas | Other Investments | Other Assets | Total Assets | Total Liabilities | Net Operating Surplus / (Deficit) | Net Surplus / (Deficit) |
| Diocese of Rockville Centre Department of Education[1] | | 4 | 1,138,850 | 157,374 | 113,298 | – | 287,306 | 1,696,828 | 11,140,268 | (631,856) | (631,856) |
| Holy Trinity High School | | | 190,422 | 738,146 | 5,854,637 | – | 2,808,099 | 9,591,304 | 3,778,280 | (3,119,401) | (3,119,401) |
| St. John the Baptist High School | | | 3,760,266 | 888,415 | 14,132,507 | – | 4,516,009 | 23,297,197 | 6,046,959 | (1,954,707) | (1,954,707) |
| Catholic Charities of Long Island | | 4 | 3,506,389 | 716,343 | – | 23,237,327 | 23,742,454 | 51,202,513 | 8,962,732 | (1,787,840) | (2,929,530) |
| Catholic Youth Organization | | 1 | 998,151 | – | – | – | 152,435 | 1,150,586 | 203,345 | 959 | 959 |
| Catholic Cemeteries | | – | 7,425,586 | – | – | 5,641,899 | 75,410,135 | 88,477,620 | 4,035,895 | (1,040,022) | 1,574,357 |
| Cemetery Permanent Maintenance Trust | | – | – | – | – | 80,698,093 | 10,577 | 80,708,670 | – | 4,282,045 | (13,259,597) |
| Seminary of the Immaculate Conception | | – | 38,891 | 9,397 | 742,982 | – | 1,064,408 | 1,855,678 | 6,933,147 | (554,105) | (595,123) |
| Ecclesia Assurance Company | | – | 39,995,946 | – | – | 25,407,293 | 7,733,078 | 73,136,317 | 35,972,821 | 2,223,952 | 2,223,952 |

(1) Additional lawsuits name Holy Trinity High School or St. John the Baptist High School as defendants when such high schools were divisions of the Debtor at the time of the alleged abuse.

**Diocese of Rockville Centre - Other Covered Party Financials**
**Fiscal Year Ended August 31, 2021**

| Parish Name | Location | Number of Lawsuits | Balance Sheet Metrics | | | | | | | Income Statement Metrics | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Unrestricted Cash | Restricted Cash | Unitas | Other Investments | Other Assets | Total Assets | Total Liabilities | Net Operating Surplus / (Deficit) | Net Surplus / (Deficit) |
| Diocese of Rockville Centre Department of Education[1] | | 4 | 850,808 | 332,782 | 113,962 | – | 262,772 | 1,560,324 | 10,371,908 | (426,219) | (426,219) |
| Holy Trinity High School | | | 431,683 | 636,026 | 8,400,321 | – | 3,035,710 | 12,503,740 | 3,571,315 | (178,011) | (178,011) |
| St. John the Baptist High School | | | 5,287,279 | 1,017,938 | 14,215,234 | – | 4,633,799 | 25,154,250 | 5,949,305 | 757,521 | 757,521 |
| Catholic Charities of Long Island | | 4 | 9,156,110 | 703,551 | – | 20,852,538 | 22,637,568 | 53,349,767 | 8,077,212 | 7,431,733 | 10,100,344 |
| Catholic Youth Organization | | 1 | 846,901 | – | – | – | 220,055 | 1,066,956 | 77,796 | (48,733) | 37,314 |
| Catholic Cemeteries | | – | 10,186,873 | – | – | 13,744,156 | 64,304,096 | 88,235,125 | 5,119,807 | (433,243) | 2,157,662 |
| Cemetery Permanent Maintenance Trust | | – | – | – | – | 93,726,372 | – | 93,726,372 | 6,055 | 3,529,029 | 13,720,714 |
| Seminary of the Immaculate Conception | | – | 379,859 | 4,284 | 836,014 | – | 960,603 | 2,180,760 | 6,663,106 | (298,375) | (745,949) |
| Ecclesia Assurance Company | | – | 34,076,606 | – | – | 28,970,684 | 4,739,162 | 67,786,452 | 32,846,908 | 5,635,737 | 5,635,737 |

(1) Additional lawsuits name Holy Trinity High School or St. John the Baptist High School as defendants when such high schools were divisions of the Debtor at the time of the alleged abuse.

**Diocese of Rockville Centre - Other Covered Party Financials**
**Fiscal Year Ended August 31, 2020**

| Parish Name | Location | Number of Lawsuits | Balance Sheet Metrics | | | | | | | Income Statement Metrics | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Unrestricted Cash | Restricted Cash | Unitas | Other Investments | Other Assets | Total Assets | Total Liabilities | Net Operating Surplus / (Deficit) | Net Surplus / (Deficit) |
| Diocese of Rockville Centre Department of Education[1] | | 4 | 9,756,933 | 1,359,378 | 21,906,723 | – | 9,532,099 | 42,555,133 | 23,382,638 | (2,696,420) | (2,696,420) |
| Holy Trinity High School | | | 2,624,634 | 616,049 | 7,618,112 | – | 3,312,330 | 14,171,125 | 5,060,689 | (1,139,304) | (1,139,304) |
| St. John the Baptist High School | | | 6,386,292 | 437,918 | 14,174,972 | – | 5,628,583 | 26,627,765 | 8,180,341 | (862,978) | (862,978) |
| Catholic Charities of Long Island | | 4 | 8,276,862 | 806,876 | – | 19,457,191 | 20,841,262 | 49,382,191 | 14,209,980 | 125,501 | 206,080 |
| Catholic Youth Organization | | 1 | No audit in 2020 due to COVID | | | | | | | | |
| Catholic Cemeteries | | – | 6,621,039 | – | – | 25,373,479 | 51,374,817 | 83,369,335 | 2,399,913 | 2,431,512 | 3,522,857 |
| Cemetery Permanent Maintenance Trust | | – | – | – | – | 79,987,556 | 281 | 79,987,837 | – | 4,461,301 | 10,329,387 |
| Seminary of the Immaculate Conception | | – | 58,436 | 3,108 | 1,590,586 | – | 1,071,557 | 2,723,687 | 6,460,084 | (1,775,492) | (511,344) |
| Ecclesia Assurance Company | | – | 30,050,186 | – | – | 27,132,440 | 5,365,599 | 62,548,225 | 33,244,418 | (774,445) | (774,445) |

(1) Additional lawsuits name Holy Trinity High School or St. John the Baptist High School as defendants when such high schools were divisions of the Debtor at the time of the alleged abuse.

**Diocese of Rockville Centre - Other Covered Party Financials**
**Fiscal Year Ended August 31, 2019**

| Parish Name | Location | Number of Lawsuits | Balance Sheet Metrics | | | | | | | Income Statement Metrics | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Unrestricted Cash | Restricted Cash | Unitas | Other Investments | Other Assets | Total Assets | Total Liabilities | Net Operating Surplus / (Deficit) | Net Surplus / (Deficit) |
| Diocese of Rockville Centre Department of Education[1] | | 4 | 499,700 | 60,000 | 111,861 | – | 4,382,552 | 5,054,113 | 12,745,340 | (261,555) | (261,555) |
| Holy Trinity High School | | | 127,223 | 613,349 | 10,180,942 | – | 3,716,134 | 14,637,648 | 4,387,908 | (1,201,083) | (1,201,083) |
| St. John the Baptist High School | | | 2,354,398 | 432,941 | 17,092,138 | – | 5,941,021 | 25,820,498 | 6,510,096 | 3,595,505 | 3,595,505 |
| Catholic Charities of Long Island | | 4 | 3,002,451 | 619,708 | – | 18,515,155 | (7,285,725) | 14,851,589 | 8,709,749 | 473,163 | 3,333,617 |
| Catholic Youth Organization | | 1 | 973,293 | – | – | – | 114,747 | 1,088,040 | 59,707 | 57,060 | 57,060 |
| Catholic Cemeteries | | – | 5,318,189 | – | – | 23,328,806 | 49,242,800 | 77,889,795 | 1,051,194 | (170,398) | 1,460,620 |
| Cemetery Permanent Maintenance Trust | | – | – | – | – | 70,322,224 | – | 70,322,224 | 55,810 | 3,128,910 | (624,552) |
| Seminary of the Immaculate Conception | | – | 46,908 | 5,500 | 1,539,696 | – | 1,186,236 | 2,778,340 | 6,003,393 | (1,548,670) | (423,917) |
| Ecclesia Assurance Company | | – | 18,814,044 | – | – | 24,629,593 | 11,483,190 | 54,926,827 | 24,848,575 | 739,473 | 739,473 |

(1) Additional lawsuits name Holy Trinity High School or St. John the Baptist High School as defendants when such high schools were divisions of the Debtor at the time of the alleged abuse.

**Diocese of Rockville Centre - Other Covered Party Financials**
**Fiscal Year Ended August 31, 2018**

| Parish Name | Location | Number of Lawsuits | Unrestricted Cash | Restricted Cash | Unitas | Other Investments | Other Assets | Total Assets | Total Liabilities | Net Operating Surplus / (Deficit) | Net Surplus / (Deficit) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | **Balance Sheet Metrics** | | | | | | | **Income Statement Metrics** | |
| Diocese of Rockville Centre Department of Education[1] | | 4 | 48,444 | – | 109,161 | – | 4,640,097 | 4,797,702 | 12,227,374 | (7,743,796) | (7,743,796) |
| Holy Trinity High School | | | 1,987,039 | 248,872 | 9,964,181 | – | 2,942,822 | 15,142,914 | 3,633,365 | 421,495 | 421,495 |
| St. John the Baptist High School | | | 730,508 | 439,043 | 12,770,964 | – | 7,052,697 | 20,993,212 | 4,750,444 | 271,618 | 271,618 |
| Catholic Charities of Long Island | | 4 | 1,902,242 | 609,214 | – | 16,287,382 | 22,719,368 | 41,518,206 | 9,885,692 | (751,574) | (2,069,978) |
| Catholic Youth Organization | | 1 | 921,085 | – | – | – | 99,784 | 1,020,869 | 54,024 | (53,203) | (53,203) |
| Catholic Cemeteries | | – | 5,297,855 | – | – | 22,721,341 | 49,786,399 | 77,805,595 | 9,103,967 | 1,645,822 | 68,350,905 |
| Cemetery Permanent Maintenance Trust | | – | – | – | – | 70,876,358 | 106,334 | 70,982,692 | – | 3,065,110 | 71,333,415 |
| Seminary of the Immaculate Conception | | – | 47,294 | 4,276 | 1,538,097 | – | 1,281,637 | 2,871,304 | 5,668,421 | (1,397,587) | 212,284 |
| Ecclesia Assurance Company | | – | 13,629,077 | – | – | 22,045,796 | 8,442,663 | 44,117,536 | 14,778,757 | 2,146,270 | 2,146,270 |

(1) Additional lawsuits name Holy Trinity High School or St. John the Baptist High School as defendants when such high schools were divisions of the Debtor at the time of the alleged abuse.

**Diocese of Rockville Centre - Parish and Regional School Financials**
**Fiscal Year Ended August 31, 2022**

| Name | Cash | Unitas Investments | Other Investments | Other Assets | Total Assets | Total Liabilities | Net Operating Surplu/(Deficit) | Net Surplus/(Deficit) |
|---|---|---|---|---|---|---|---|---|
| **Open Parish Elementary Schools** | | | | | | | | |
| Holy Angels Regional | 714,874 | – | – | 1,481,644 | 2,196,518 | 490,661 | (169,523) | (169,440) |
| O/L Of The Hamptons Regional | 2,385,794 | – | – | 6,251,304 | 8,637,098 | 285,285 | 1,676 | 76,163 |
| Trinity Regional | 2,343,264 | 969,498 | – | 172,266 | 3,485,028 | 704,845 | 394,021 | 389,284 |
| Long Beach Catholic Regional | 531,788 | (0) | 458,665 | 1,526,409 | 2,516,861 | 616,391 | (170,483) | (249,801) |
| St Elizabeth Ann Seton Regional | 1,517,723 | – | – | 198,180 | 1,715,903 | 648,522 | 279,621 | 230,407 |
| O/L Queen Of Apostles Regional | 756,004 | – | – | 79,385 | 835,389 | 192,529 | 10,552 | 10,602 |
| St. Brigid School Regional | 556,370 | 39,196 | 42 | 181,605 | 777,213 | 617,513 | (87,998) | (145,189) |
| St. John Paul II Regional School | 971,800 | – | – | 427,251 | 1,399,051 | 172,858 | 52,798 | (30,132) |
| Our Lady of Guadalupe | 188,092 | – | – | 401,734 | 589,826 | 342,934 | 241,763 | 151,338 |
| Our Lady Of Victory | 1,062,757 | 531,618 | – | – | 1,594,375 | 739,100 | (60,305) | (275,698) |
| St. Joseph | 2,142,486 | 669,324 | 0 | 106,831 | 2,918,642 | 1,093,946 | 572,541 | 419,207 |
| Holy Family | 320,704 | – | – | (38,621) | 282,083 | 310,264 | (176,341) | (176,209) |
| Our Lady Of Peace | 335,151 | – | – | 35,499 | 370,651 | 165,128 | (2,541) | (2,541) |
| St. Mary | 896,515 | – | 2,681,112 | 11,293 | 3,588,920 | 1,317,955 | (49,078) | (908,636) |
| St. Rose Of Lima | 1,126,549 | – | 117,448 | 72,958 | 1,316,955 | 432,840 | (325,568) | (325,051) |
| Our Lady Of Lourdes | 39,784 | – | – | – | 39,784 | 148,319 | – | – |
| Notre Dame | 955,702 | – | – | (185,429) | 770,273 | 348,496 | (475,580) | (478,965) |
| St. Dominic | 300,073 | – | – | 35,791 | 335,864 | 964,876 | (16,856) | (17,756) |
| St. Peter Of Alcantara | 82,944 | 378,760 | 0 | (461,707) | (2) | (0) | – | – |
| St. Agnes Cathedral | 1,829,176 | 5,844,522 | – | – | 7,673,698 | 1,263,333 | (370,676) | (383,880) |
| Maria Regina | 307,415 | 135,660 | – | (253,654) | 189,421 | 454,254 | (395,153) | (403,781) |
| St. William The Abbott | 104,920 | 174,701 | – | – | 279,622 | 273,428 | 62,215 | (28,329) |
| St. Anne | 545,180 | – | – | 46,599 | 591,779 | 1,116,181 | (82,501) | (110,680) |
| St. Edward Confessor | 287,808 | – | – | 33,610 | 321,418 | 199,228 | 28,101 | 28,101 |
| Holy Name Of Mary | 177,858 | 47,040 | – | 21,901 | 246,799 | 252,043 | 3,728 | 3,531 |
| St. Aidan | 363,310 | 1,217 | – | 87,193 | 451,721 | 291,989 | 36,288 | 26,131 |
| St. Martin Of Tours | 459,071 | – | – | 1,893 | 460,964 | 287,767 | (215,543) | (215,540) |
| St. Patrick | 810,751 | 1,421,545 | 1,479,367 | (49,789) | 3,661,875 | 926,519 | 105,825 | (56,840) |
| St. Mary | 1,727,688 | – | – | 5,081 | 1,732,769 | 926,155 | (397,498) | (394,150) |
| St. Patrick | 246,496 | – | – | 465,247 | 711,742 | 2,370,824 | (302,076) | (483,518) |
| Ss Philip And James | 829,143 | – | – | 15,511 | 844,654 | 375,450 | 122,266 | (19,040) |
| St. Patrick | 925,512 | – | – | 55,000 | 980,512 | 752,706 | 36,771 | 548 |
| **Subtotal Open Parish Elem. Schools** | **25,842,704** | **10,213,082** | **4,736,634** | **10,724,984** | **51,517,405** | **19,082,337** | **(1,349,555)** | **(3,539,863)** |
| | | | | | | | | |
| **Open Parish High Schools** | | | | | | | | |
| St. Mary High | 1,666,377 | – | 1,128,482 | 21,347 | 2,816,206 | 2,547,541 | (1,829,943) | (2,345,608) |
| St. Dominic High | 351,359 | – | – | 197,357 | 548,715 | 2,244,448 | 152,711 | 97,265 |
| **Subtotal Open Parish High Schools** | **2,017,736** | **–** | **1,128,482** | **218,704** | **3,364,922** | **4,791,990** | **(1,677,232)** | **(2,248,343)** |
| | | | | | | | | |
| **Closed Parish Elementary Schools** | | | | | | | | |
| Our Lady Of Providence Regional | 407,925 | – | – | 32,030 | 439,955 | 429,458 | – | – |
| Stella Maris Regional | 52,896 | – | 10,000 | 265,818 | 328,714 | 999,204 | – | – |
| Prince Of Peace Regional | 112,636 | – | – | – | 112,636 | – | – | – |
| All Saints Regional | 44,009 | 0 | – | 143,329 | 187,338 | 143,422 | (19,980) | (19,980) |
| St John Baptist De La Salle Regional | 360,162 | – | – | 84,256 | 444,418 | 52,614 | – | – |
| Holy Family Regional | 240,797 | 96,374 | – | 147,967 | 485,138 | 750 | (277,774) | (278,313) |
| Our Lady Of Wisdom Regional | 243,355 | – | – | 31,046 | 274,401 | 1,419 | – | – |
| Our Lady Of Mercy Regional | 52,646 | – | – | 60,698 | 113,343 | (450) | – | – |
| St. Christopher | 364,193 | 1 | – | (339,609) | 24,585 | 24,583 | – | – |
| St. Catherine Of Sienna | 833 | – | – | – | 833 | 833 | – | – |
| St. Ignatius Loyola | (3) | – | – | – | (3) | (2) | – | – |
| Our Lady Of Mercy | 33,020 | – | – | 107,876 | 140,896 | 86,547 | – | – |
| St. Raymond | 289,588 | – | – | 1 | 289,589 | 138,790 | – | – |
| Our Lady Of Lourdes | 631,336 | – | – | 37,573 | 668,908 | 457,273 | (177,537) | (177,236) |
| Corpus Christi | 95,630 | – | – | – | 95,630 | 95,632 | – | – |
| Sacred Heart | 74,845 | – | – | – | 74,845 | 74,845 | – | – |
| Blessed Sacrament | 31,945 | – | – | – | 31,945 | 31,945 | – | – |
| St. Thomas The Apostle | 13,930 | – | – | (25,034) | (11,104) | 18,698 | – | – |
| Ss Cyril And Methodius | 163,530 | – | – | 47,003 | 210,533 | 36,724 | 120,771 | 120,771 |
| Our Lady Of Perpetual Help | 912 | – | – | – | 912 | 290,538 | – | – |
| St. Isidore | 3,421 | 0 | – | 0 | 3,422 | (1) | – | – |
| St. Joseph | 6,960 | – | – | – | 6,960 | 2,542,195 | – | – |
| Our Lady Of Lourdes | – | – | – | (1) | (1) | (1) | – | – |
| **Subtotal Closed Parish Elem. School** | **3,224,566** | **96,375** | **10,000** | **592,952** | **3,923,892** | **5,425,012** | **(354,520)** | **(354,758)** |

**Diocese of Rockville Centre - Parish and RegionalSchool Financials**
**Fiscal Year Ended August 31, 2021**

| Name | Cash | Unitas Investments | Other Investments | Other Assets | Total Assets | Total Liabilities | Net Operating Surplu/(Deficit) | Net Surplus/(Deficit) |
|---|---|---|---|---|---|---|---|---|
| **Open Parish Elementary Schools** | | | | | | | | |
| Holy Angels Regional | 800,477 | – | – | 1,358,648 | 2,159,125 | 283,828 | (101,109) | (98,656) |
| O/L Of The Hamptons Regional | 2,172,793 | – | – | 6,451,895 | 8,624,688 | 349,038 | 16,875 | 88,645 |
| Trinity Regional | 1,923,334 | 975,177 | – | 169,431 | 3,067,942 | 677,042 | 609,918 | 616,946 |
| Long Beach Catholic Regional | 704,139 | (0) | 537,985 | 1,480,581 | 2,722,705 | 572,434 | 42,265 | 112,945 |
| St Elizabeth Ann Seton Regional | 1,309,562 | – | – | 239,228 | 1,548,791 | 711,816 | 94,116 | 94,202 |
| O/L Queen Of Apostles Regional | 748,126 | – | – | 101,123 | 849,249 | 216,990 | 268,996 | 269,200 |
| St. Brigid School Regional | 683,322 | 39,425 | 1,144 | 186,162 | 910,053 | 605,164 | 6,724 | (707) |
| St. John Paul II Regional School | 1,050,024 | – | – | 366,833 | 1,416,857 | 160,532 | 602,679 | 602,756 |
| Our Lady of Guadalupe | 117,085 | – | – | 66,993 | 184,078 | 88,524 | 95,554 | 95,554 |
| Our Lady Of Victory | 1,186,533 | 534,732 | – | – | 1,721,266 | 590,292 | 7,711 | 9,822 |
| St. Joseph | 1,678,300 | 745,352 | 0 | 26,854 | 2,450,506 | 1,045,017 | 633,769 | 613,436 |
| Holy Family | 374,512 | – | – | 21,813 | 396,326 | 248,298 | 22,264 | 22,538 |
| Our Lady Of Peace | 380,919 | – | – | 25,003 | 405,921 | 197,857 | 10,878 | 10,878 |
| St. Mary | 567,676 | – | 4,198,418 | – | 4,766,094 | 1,586,494 | (653,185) | 214,384 |
| St. Rose Of Lima | 1,433,322 | – | 122,018 | 74,451 | 1,629,791 | 420,626 | (5,950) | 131 |
| Our Lady Of Lourdes | 39,784 | – | – | – | 39,784 | 148,319 | – | – |
| Notre Dame | 1,212,546 | – | – | (9,218) | 1,203,328 | 302,586 | 6,977 | 6,942 |
| St. Dominic | 369,909 | – | – | 36,672 | 406,581 | 1,017,837 | 92,867 | 106,586 |
| St. Peter Of Alcantara | 82,944 | 378,760 | 0 | (461,707) | (2) | (0) | – | – |
| St. Agnes Cathedral | 1,906,338 | 6,157,130 | – | – | 8,063,468 | 1,269,223 | 932,330 | 875,972 |
| Maria Regina | 553,439 | 332,424 | – | (294,074) | 591,789 | 452,841 | (2,246) | 1 |
| St. William The Abbott | 16,773 | 175,725 | – | 25,000 | 217,498 | 182,975 | (184,485) | (332,662) |
| St. Anne | 658,614 | – | – | 128,621 | 787,235 | 1,200,957 | (203,078) | (214,879) |
| St. Edward Confessor | 411,908 | – | – | (141,828) | 270,080 | 175,991 | 37,088 | 37,088 |
| Holy Name Of Mary | 146,584 | 47,316 | – | 47,522 | 241,422 | 250,197 | 12,197 | (8,775) |
| St. Aidan | 493,888 | 1,224 | – | (97,784) | 397,328 | 263,726 | 35,813 | 35,816 |
| St. Martin Of Tours | 598,547 | – | – | 58,963 | 657,510 | 268,773 | (9,236) | (9,182) |
| St. Patrick | 1,207,909 | 1,490,087 | 1,518,502 | (11,745) | 4,204,753 | 1,412,558 | (104,877) | (3,753) |
| St. Mary | 2,255,167 | – | – | 2,040 | 2,257,207 | 1,056,443 | 247,735 | 252,481 |
| St. Patrick | 331,363 | – | – | 466,251 | 797,614 | 1,973,178 | (519,515) | (954,159) |
| Ss Philip And James | 738,671 | – | – | 54,376 | 793,047 | 304,803 | 279,738 | 206,339 |
| St. Patrick | 1,154,627 | – | – | 55,348 | 1,209,975 | 982,717 | (210,498) | (228,075) |
| **Subtotal Open Parish Elem. Schools** | **27,309,136** | **10,877,353** | **6,378,068** | **10,427,451** | **54,992,008** | **19,017,077** | **2,062,316** | **2,421,814** |
| | | | | | | | | |
| **Open Parish High Schools** | | | | | | | | |
| St. Mary High | 1,892,121 | – | 2,847,573 | 10,169 | 4,749,862 | 2,135,589 | (1,204,496) | (777,889) |
| St. Dominic High | 721,796 | – | – | 201,422 | 923,218 | 2,716,216 | 197,988 | 144,399 |
| **Subtotal Open Parish High Schools** | **2,613,916** | **–** | **2,847,573** | **211,591** | **5,673,080** | **4,851,805** | **(1,006,508)** | **(633,490)** |
| | | | | | | | | |
| **Closed Parish Elementary Schools** | | | | | | | | |
| Our Lady Of Providence Regional | 407,925 | – | – | 32,030 | 439,955 | 429,458 | (155,631) | (155,394) |
| Stella Maris Regional | 52,896 | – | 10,000 | 265,818 | 328,714 | 999,204 | – | – |
| Prince Of Peace Regional | 112,636 | – | – | – | 112,636 | – | – | – |
| All Saints Regional | 52,253 | 0 | – | 241,700 | 293,953 | 230,057 | 105,636 | 105,636 |
| St John Baptist De La Salle Regional | 360,162 | – | – | 84,256 | 444,418 | 52,614 | – | – |
| Holy Family Regional | 253,697 | 96,938 | – | 416,721 | 767,356 | 4,655 | (291,133) | (288,159) |
| Our Lady Of Wisdom Regional | 243,355 | – | – | 31,046 | 274,401 | 1,419 | (10,131) | (10,131) |
| Our Lady Of Mercy Regional | 52,646 | – | – | 60,698 | 113,343 | (450) | – | – |
| St. Christopher | 847,819 | 1 | – | (573,956) | 273,864 | 273,861 | 32,540 | (9,466) |
| St. Catherine Of Sienna | 833 | – | – | – | 833 | 831 | – | – |
| St. Ignatius Loyola | (3) | – | – | – | (3) | (2) | – | – |
| Our Lady Of Mercy | 33,020 | – | – | 107,876 | 140,896 | 86,547 | 333 | 348 |
| St. Raymond | 289,588 | – | – | 1 | 289,589 | 138,790 | 193,396 | 193,760 |
| Our Lady Of Lourdes | 706,392 | – | – | 1,379 | 707,771 | 318,899 | 8,530 | (2,639) |
| Corpus Christi | 95,630 | – | – | – | 95,630 | 95,632 | – | – |
| Sacred Heart | 74,845 | – | – | – | 74,845 | 74,845 | – | – |
| Blessed Sacrament | 31,945 | – | – | – | 31,945 | 31,945 | – | – |
| St. Thomas The Apostle | 25,326 | – | – | – | 25,326 | 55,128 | 196,469 | 196,505 |
| Ss Cyril And Methodius | 131,812 | – | – | 72,892 | 204,704 | 151,666 | (97,178) | (97,158) |
| Our Lady Of Perpetual Help | 912 | – | – | – | 912 | 290,538 | – | – |
| St. Isidore | 3,421 | 0 | – | 0 | 3,422 | (1) | (46) | (46) |
| St. Joseph | 6,960 | – | – | – | 6,960 | 2,542,195 | – | – |
| Our Lady Of Lourdes | – | – | – | (1) | (1) | (1) | – | – |
| **Subtotal Closed Parish Elem. School** | **3,784,069** | **96,939** | **10,000** | **740,459** | **4,631,467** | **5,777,829** | **(17,214)** | **(66,744)** |

**Diocese of Rockville Centre - Parish and RegionalSchool Financials**
**Fiscal Year Ended August 31, 2020**

| Name | Cash | Unitas Investments | Other Investments | Other Assets | Total Assets | Total Liabilities | Net Operating Surplu/(Deficit) | Net Surplus/(Deficit) |
|---|---|---|---|---|---|---|---|---|
| **Open Parish Elementary Schools** | | | | | | | | |
| Holy Angels Regional | 897,410 | – | – | 1,290,369 | 2,187,779 | 213,826 | (101,422) | (98,334) |
| O/L Of The Hamptons Regional | 1,810,933 | – | – | 6,745,875 | 8,556,808 | 369,803 | 620,054 | 687,564 |
| Trinity Regional | 1,734,356 | 972,416 | – | 75,794 | 2,782,566 | 1,008,612 | (66,590) | (48,434) |
| Long Beach Catholic Regional | 557,558 | (0) | 467,306 | 1,535,611 | 2,560,475 | 523,148 | (171,090) | (126,749) |
| St Elizabeth Ann Seton Regional | 1,213,466 | – | – | 283,037 | 1,496,503 | 753,731 | (250,718) | (250,519) |
| O/L Queen Of Apostles Regional | 637,599 | – | – | 90,917 | 728,515 | 365,456 | 107,450 | 107,673 |
| St. Brigid School Regional | 700,305 | 39,314 | – | 187,261 | 926,880 | 621,284 | 138,228 | 139,598 |
| St. John Paul II Regional School | 434,771 | – | – | 430,313 | 865,084 | 211,515 | 162,650 | 162,687 |
| Our Lady Of Victory | 1,067,994 | 533,218 | – | – | 1,601,212 | 480,061 | 283,515 | 101,906 |
| St. Joseph | 1,208,851 | 335,042 | 0 | 170,329 | 1,714,223 | 922,170 | 279,960 | 69,472 |
| Holy Family | 186,259 | – | – | 155,522 | 341,781 | 216,291 | 57,266 | 57,535 |
| Our Lady Of Peace | 354,515 | – | – | 17,993 | 372,508 | 175,322 | 160,657 | 160,657 |
| St. Mary | 677,518 | – | 3,319,560 | 118,005 | 4,115,083 | 1,149,866 | (99,238) | 232,669 |
| St. Rose Of Lima | 1,529,641 | – | 120,872 | (43,750) | 1,606,763 | 397,728 | 111,143 | 132,981 |
| Our Lady Of Lourdes | 39,784 | – | – | – | 39,784 | 148,319 | – | – |
| Notre Dame | 1,390,453 | – | – | (169,571) | 1,220,882 | 327,082 | 221,086 | 223,754 |
| St. Dominic | 376,365 | – | – | 48,138 | 424,502 | 1,142,345 | (125,746) | 88,707 |
| St. Peter Of Alcantara | 274,116 | 390,989 | 0 | (665,108) | (2) | (0) | (346,574) | (305,394) |
| St. Agnes Cathedral | 1,511,273 | 5,591,783 | – | – | 7,103,056 | 1,184,783 | 271,449 | 31,155 |
| Maria Regina | 118,895 | 382,979 | – | (75,000) | 426,874 | 287,927 | 2,119 | 17,829 |
| St. William The Abbott | 356,102 | 203,213 | – | – | 559,315 | 192,130 | 342,497 | 334,329 |
| St. Anne | 717,890 | – | – | 29,043 | 746,933 | 945,776 | (26,112) | (31,911) |
| St. Edward Confessor | 376,243 | – | – | (131,491) | 244,752 | 187,751 | 27,152 | 27,152 |
| Holy Name Of Mary | 109,627 | 47,181 | – | 65,334 | 222,143 | 222,143 | (774) | – |
| St. Aidan | 681,210 | 1,221 | – | (366,721) | 315,710 | 217,924 | 54,490 | 55,895 |
| St. Martin Of Tours | 529,882 | – | – | 98,380 | 628,262 | 230,343 | 113,425 | 85,276 |
| St. Patrick | 853,548 | 1,381,253 | 1,512,376 | (1,068) | 3,746,110 | 950,161 | 517,627 | 591,155 |
| St. Mary | 1,728,082 | – | – | 0 | 1,728,082 | 779,799 | 76,708 | (88,360) |
| St. Patrick | 641,065 | – | – | 1,022,319 | 1,663,384 | 1,884,789 | 146,675 | 0 |
| Ss Philip And James | 515,367 | – | – | 7,823 | 523,190 | 241,285 | 184,318 | 184,254 |
| St. Patrick | 1,136,476 | – | – | 81,735 | 1,218,211 | 762,878 | (185,938) | (216,093) |
| **Subtotal Open Parish Elem. Schools** | **24,367,553** | **9,878,609** | **5,420,115** | **11,001,089** | **50,667,366** | **17,114,249** | **2,504,266** | **2,326,454** |
| | | | | | | | | |
| **Open Parish High Schools** | | | | | | | | |
| St. Mary High | 1,905,740 | – | 3,818,421 | 11,078 | 5,735,239 | 2,343,077 | (792,324) | (558,455) |
| St. Dominic High | 1,145,970 | – | – | 147,721 | 1,293,692 | 3,231,089 | (476,520) | 166,049 |
| **Subtotal Open Parish High Schools** | **3,051,710** | **–** | **3,818,421** | **158,800** | **7,028,930** | **5,574,166** | **(1,268,844)** | **(392,406)** |
| | | | | | | | | |
| **Closed Parish Elementary Schools** | | | | | | | | |
| Our Lady Of Providence Regional | 452,744 | – | – | 44,683 | 497,427 | 331,537 | 136,240 | 137,189 |
| Stella Maris Regional | 52,896 | – | 10,000 | 265,818 | 328,714 | 999,204 | – | – |
| Prince Of Peace Regional | 112,636 | – | – | – | 112,636 | – | – | – |
| All Saints Regional | 35,149 | 0 | – | 196,168 | 231,317 | 273,057 | 395,781 | 395,781 |
| St John Baptist De La Salle Regional | 360,162 | – | – | 84,256 | 444,418 | 52,614 | – | – |
| Holy Family Regional | 644,700 | 96,664 | – | 430,878 | 1,172,242 | 121,382 | (242,084) | (234,993) |
| Our Lady Of Wisdom Regional | 286,064 | – | – | 95,271 | 381,335 | 98,222 | (32,834) | (30,667) |
| Our Lady Of Mercy Regional | 52,646 | – | – | 60,698 | 113,343 | (450) | (2,019) | (1,903) |
| St. Christopher | 407,491 | 79,315 | – | (24,584) | 462,222 | 452,754 | 10,706 | – |
| St. Catherine Of Sienna | 833 | – | – | – | 833 | 831 | – | – |
| St. Ignatius Loyola | (3) | – | – | – | (3) | (2) | – | – |
| Our Lady Of Mercy | 35,842 | – | – | 107,876 | 143,718 | 89,716 | 169,257 | 167,405 |
| St. Raymond | 235,821 | – | – | 1 | 235,823 | 278,783 | (43,084) | (42,961) |
| Our Lady Of Lourdes | 629,192 | – | – | 20,680 | 649,872 | 258,361 | 408,078 | 378,868 |
| Corpus Christi | 95,630 | – | – | – | 95,630 | 95,632 | – | – |
| Sacred Heart | 74,845 | – | – | – | 74,845 | 74,845 | – | – |
| Blessed Sacrament | 31,945 | – | – | – | 31,945 | 31,945 | – | – |
| St. Thomas The Apostle | 81,434 | – | – | (73,904) | 7,530 | 233,837 | (96) | – |
| Ss Cyril And Methodius | 269,334 | – | – | 83,266 | 352,600 | 202,404 | 48,543 | 48,561 |
| Our Lady Of Perpetual Help | 912 | – | – | – | 912 | 290,538 | – | – |
| St. Isidore | 3,467 | 0 | – | 0 | 3,467 | (1) | (2,006) | (2,006) |
| St. Joseph | 6,960 | – | – | – | 6,960 | 2,542,195 | – | – |
| Our Lady Of Lourdes | – | – | – | (1) | (1) | (1) | – | (540,700) |
| **Subtotal Closed Parish Elem. School** | **3,870,699** | **175,979** | **10,000** | **1,291,107** | **5,347,785** | **6,427,403** | **846,482** | **274,574** |

**Diocese of Rockville Centre - Parish and RegionalSchool Financials**
**Fiscal Year Ended August 31, 2019**

| Name | Cash | Unitas Investments | Other Investments | Other Assets | Total Assets | Total Liabilities | Net Operating Surplu/(Deficit) | Net Surplus/(Deficit) |
|---|---|---|---|---|---|---|---|---|
| **Open Parish Elementary Schools** | | | | | | | | |
| Holy Angels Regional | 1,035,151 | – | – | 1,306,637 | 2,341,788 | 269,501 | (40,653) | (37,845) |
| O/L Of The Hamptons Regional | 914,062 | – | – | 6,854,964 | 7,769,026 | 269,585 | 177,404 | 241,239 |
| Trinity Regional | 1,389,952 | 957,204 | – | 109,590 | 2,456,745 | 634,358 | (300,945) | (275,073) |
| Long Beach Catholic Regional | 186,573 | (0) | 505,667 | 1,701,364 | 2,393,604 | 229,528 | (48,565) | (28,662) |
| St Elizabeth Ann Seton Regional | 1,111,093 | – | – | 267,736 | 1,378,829 | 385,537 | (119,302) | (122,662) |
| O/L Queen Of Apostles Regional | 314,600 | – | – | 97,568 | 412,168 | 156,781 | (159,781) | (159,567) |
| St. Brigid School Regional | 771,304 | 38,699 | – | 231,069 | 1,041,072 | 875,073 | (82,170) | (80,310) |
| St. John Paul II Regional School | 255,599 | – | – | 430,015 | 685,614 | 194,732 | 9,448 | (79,728) |
| Our Lady Of Victory | 1,040,689 | 524,877 | – | – | 1,565,566 | 546,322 | 218,463 | 198,759 |
| St. Joseph | 976,499 | 258,728 | 0 | 107,014 | 1,342,242 | 619,661 | 171,021 | 136,433 |
| Holy Family | 178,106 | – | – | 237,823 | 415,929 | 347,975 | (144,761) | (165,197) |
| Our Lady Of Peace | 157,359 | – | – | 53,333 | 210,692 | 174,163 | 23,760 | – |
| St. Mary | 620,524 | – | 2,741,580 | 676,164 | 4,038,268 | 1,305,720 | 0 | (175,895) |
| St. Rose Of Lima | 1,349,656 | – | 117,404 | 66,090 | 1,533,150 | 457,096 | (26,154) | (61,541) |
| Our Lady Of Lourdes | 39,784 | – | – | – | 39,784 | 148,319 | – | – |
| Notre Dame | 1,083,207 | – | – | – | 1,083,207 | 413,161 | 6,821 | (30,740) |
| St. Dominic | 141,462 | – | – | 49,453 | 190,915 | 997,464 | 81,193 | 41,180 |
| St. Peter Of Alcantara | 668,406 | 351,130 | 0 | (327,424) | 692,113 | 386,720 | (71,843) | (102,337) |
| St. Agnes Cathedral | 1,672,687 | 5,443,528 | – | – | 7,116,215 | 1,229,097 | 276,968 | 227,764 |
| Maria Regina | 157,085 | 381,945 | – | – | 539,030 | 417,912 | (95,323) | (91,726) |
| St. William The Abbott | 129,081 | 200,035 | – | 10,000 | 339,116 | 306,259 | 100,642 | 70,632 |
| St. Anne | 1,187,028 | – | – | 89,378 | 1,276,406 | 1,443,338 | (46,014) | (46,543) |
| St. Edward Confessor | 351,287 | – | – | (80,848) | 270,439 | 240,590 | 1,211 | 1,270 |
| Holy Name Of Mary | 45,293 | 46,443 | – | 155,201 | 246,938 | 246,938 | (22,213) | (21,013) |
| St. Aidan | 327,584 | 1,202 | – | 68,421 | 397,207 | 355,316 | 15,396 | 17,243 |
| St. Martin Of Tours | 561,589 | – | – | 29,395 | 590,984 | 278,341 | (63,356) | (89,501) |
| St. Patrick | 660,127 | 1,115,213 | 1,479,589 | 4,649 | 3,259,578 | 1,054,785 | 652,580 | 743,549 |
| St. Mary | 1,977,425 | – | – | 1,983 | 1,979,408 | 942,765 | 117,440 | 126,806 |
| St. Patrick | 884,599 | – | – | 670,630 | 1,555,229 | 1,776,634 | 18,192 | 1 |
| Ss Philip And James | 327,513 | – | – | 8,084 | 335,597 | 237,946 | 15,900 | 1,464 |
| St. Patrick | 1,619,029 | – | – | 57,571 | 1,676,600 | 1,005,174 | 133,725 | 58,763 |
| **Subtotal Open Parish Elem. Schools** | **22,134,351** | **9,319,003** | **4,844,241** | **12,875,860** | **49,173,455** | **17,946,791** | **799,085** | **296,763** |
| | | | | | | | | |
| **Open Parish High Schools** | | | | | | | | |
| St. Mary High | 2,696,452 | – | 3,262,423 | 1,651,682 | 7,610,557 | 3,659,939 | (647,948) | (873,204) |
| St. Dominic High | 832,372 | – | – | 195,234 | 1,027,606 | 3,131,053 | 333,797 | 265,495 |
| **Subtotal Open Parish High Schools** | **3,528,824** | **–** | **3,262,423** | **1,846,915** | **8,638,163** | **6,790,992** | **(314,152)** | **(607,709)** |
| | | | | | | | | |
| **Closed Parish Elementary Schools** | | | | | | | | |
| Our Lady Of Providence Regional | 321,423 | – | – | 32,652 | 354,075 | 325,374 | (160,738) | (158,479) |
| Stella Maris Regional | 52,896 | – | 10,000 | 265,818 | 328,714 | 999,204 | – | – |
| Prince Of Peace Regional | 112,636 | – | – | – | 112,636 | – | 2,533 | 2,533 |
| All Saints Regional | 142,816 | 0 | – | 256,996 | 399,812 | 837,332 | (223,026) | (222,895) |
| St John Baptist De La Salle Regional | 360,162 | – | – | 84,256 | 444,418 | 52,614 | – | – |
| Holy Family Regional | 1,055,747 | 95,152 | – | 273,544 | 1,424,443 | 138,590 | (768,256) | (760,916) |
| Our Lady Of Wisdom Regional | 463,402 | – | – | 69,193 | 532,595 | 218,815 | 3,136 | 6,556 |
| Our Lady Of Mercy Regional | 54,549 | – | – | 60,698 | 115,246 | (450) | (18,793) | (18,460) |
| St. Christopher | 76,047 | 107,964 | – | 272,610 | 456,621 | 447,153 | 9,353 | – |
| St. Catherine Of Sienna | 833 | – | – | – | 833 | 831 | – | – |
| St. Ignatius Loyola | (3) | – | – | – | (3) | (2) | – | – |
| Our Lady Of Mercy | 14,459 | – | – | 108,876 | 123,335 | 236,738 | (40,817) | (50,921) |
| St. Raymond | 81,506 | – | – | 86,302 | 167,808 | 167,808 | (277) | – |
| Our Lady Of Lourdes | 326,452 | – | – | (82,484) | 243,969 | 231,326 | (3) | (11,459) |
| Corpus Christi | 95,630 | – | – | – | 95,630 | 95,632 | – | – |
| Sacred Heart | 74,845 | – | – | – | 74,845 | 74,845 | – | – |
| Blessed Sacrament | 31,945 | – | – | – | 31,945 | 31,945 | – | – |
| St. Thomas The Apostle | 158,314 | – | – | 4,610 | 162,924 | 389,231 | 29,662 | (2) |
| Ss Cyril And Methodius | 211,044 | – | – | 110,005 | 321,049 | 219,414 | (14,814) | (29,771) |
| Our Lady Of Perpetual Help | 912 | – | – | – | 912 | 290,538 | – | – |
| St. Isidore | 5,473 | 0 | – | 0 | 5,473 | (1) | (34,085) | (34,085) |
| St. Joseph | 6,960 | – | – | – | 6,960 | 2,542,195 | (151,618) | (179,434) |
| Our Lady Of Lourdes | 243,547 | – | – | 297,152 | 540,699 | (1) | (165,988) | (165,897) |
| **Subtotal Closed Parish Elem. School** | **3,891,594** | **203,116** | **10,000** | **1,840,228** | **5,944,938** | **7,299,130** | **(1,533,731)** | **(1,623,230)** |

**Diocese of Rockville Centre - Parish and Regional School Financials**
**Fiscal Year Ended August 31, 2018**

| Name | Cash | Unitas Investments | Other Investments | Other Assets | Total Assets | Total Liabilities | Net Operating Surplu/(Deficit) | Net Surplus/(Deficit) |
|---|---|---|---|---|---|---|---|---|
| **Open Parish Elementary Schools** | | | | | | | | |
| Holy Angels Regional | 1,321,299 | – | – | 1,069,319 | 2,390,618 | 280,486 | (72) | 2,822 |
| O/L Of The Hamptons Regional | 1,287,908 | – | – | 6,249,318 | 7,537,226 | 279,024 | 25,116 | 64,456 |
| Trinity Regional | 1,712,716 | 934,098 | – | 141,293 | 2,788,106 | 690,646 | (250,824) | (233,820) |
| Long Beach Catholic Regional | 159,725 | (0) | 710,770 | 1,807,047 | 2,677,541 | 484,802 | (329,799) | (280,753) |
| St Elizabeth Ann Seton Regional | 1,304,602 | – | – | 262,169 | 1,566,770 | 450,817 | (44,914) | (44,643) |
| O/L Queen Of Apostles Regional | 393,455 | – | – | 190,451 | 583,907 | 168,953 | 4,349 | 4,539 |
| St. Brigid School Regional | 961,736 | 37,764 | 1,470 | 243,486 | 1,244,456 | 998,148 | (53,276) | (49,886) |
| St. John Paul II Regional School | 444,238 | – | – | 241,694 | 685,932 | 115,322 | 596,431 | 570,610 |
| Our Lady Of Victory | 806,818 | 512,206 | – | – | 1,319,024 | 498,539 | 229,847 | 80,793 |
| St. Joseph | 837,558 | 206,962 | 0 | 141,573 | 1,186,094 | 599,946 | 327,825 | 175,119 |
| Holy Family | 483,511 | – | – | 116,167 | 599,678 | 366,527 | 3,135 | – |
| Our Lady Of Peace | 244,493 | – | – | 16,206 | 260,699 | 224,170 | (202,044) | (218,080) |
| St. Mary | 827,346 | – | 2,777,910 | 639,620 | 4,244,876 | 1,336,433 | 185,935 | 410,233 |
| St. Rose Of Lima | 1,432,168 | – | 112,305 | 68,274 | 1,612,747 | 475,152 | 20,847 | 16,473 |
| Our Lady Of Lourdes | 39,784 | – | – | – | 39,784 | 148,319 | – | – |
| Notre Dame | 937,242 | – | 127,337 | 100,458 | 1,165,037 | 464,251 | (56) | (106,130) |
| St. Dominic | 6,518 | – | – | 26,644 | 33,162 | 880,892 | 92,761 | 85,485 |
| St. Peter Of Alcantara | 760,970 | 345,859 | 529 | (292,181) | 815,178 | 407,448 | (114,786) | (82,488) |
| St. Agnes Cathedral | 1,722,015 | 5,210,433 | – | 6,932,448 | 1,273,094 | 535,423 | 527,797 | |
| Maria Regina | 314,467 | 354,955 | – | (54,464) | 614,958 | 402,114 | 7,611 | – |
| St. William The Abbott | 101,532 | 207,018 | – | 35,000 | 343,551 | 381,326 | (82,075) | (79,366) |
| St. Anne | 1,281,976 | – | – | 101,617 | 1,383,593 | 1,503,982 | (82,532) | (120,401) |
| St. Edward Confessor | 566,892 | – | – | (282,027) | 284,865 | 256,287 | 12,132 | 12,258 |
| Holy Name Of Mary | 130,185 | 45,322 | – | 63,256 | 238,764 | 217,751 | (55,655) | (54,969) |
| St. Aidan | 386,871 | 1,173 | – | 18,764 | 406,808 | 382,161 | (6,375) | (3,810) |
| St. Martin Of Tours | 798,922 | – | – | (44,126) | 754,796 | 352,652 | (173) | (162) |
| St. Patrick | 555,931 | 573,888 | 1,430,278 | 112,503 | 2,672,600 | 1,211,356 | (93,728) | (59,048) |
| St. Mary | 1,802,235 | – | – | 0 | 1,802,235 | 892,398 | 232,070 | 226,616 |
| St. Patrick | 1,265,209 | – | – | 435,666 | 1,700,875 | 1,922,281 | 11,647 | – |
| Ss Philip And James | 288,050 | – | – | 2,005 | 290,055 | 193,868 | (33,285) | (43,483) |
| St. Patrick | 1,657,153 | – | – | 51,661 | 1,708,814 | 1,096,151 | 43,747 | (111,991) |
| **Subtotal Open Parish Elem. Schools** | 24,833,527 | 8,429,678 | 5,160,600 | 11,461,392 | 49,885,197 | 18,955,295 | 979,282 | 688,171 |
| | | | | | | | | |
| **Open Parish High Schools** | | | | | | | | |
| St. Mary High | 3,765,353 | – | 3,320,082 | 1,480,581 | 8,566,016 | 3,742,195 | 32,738 | 250,863 |
| St. Dominic High | 233,003 | – | – | 201,787 | 434,789 | 2,803,731 | (205,196) | (258,852) |
| **Subtotal Open Parish High Schools** | 3,998,356 | – | 3,320,082 | 1,682,368 | 9,000,805 | 6,545,926 | (172,459) | (7,989) |
| | | | | | | | | |
| **Closed Parish Elementary Schools** | | | | | | | | |
| Our Lady Of Providence Regional | 414,723 | – | – | 53,718 | 468,441 | 281,261 | 27,933 | 28,884 |
| Stella Maris Regional | 52,896 | – | 10,000 | 265,818 | 328,714 | 999,204 | – | – |
| Prince Of Peace Regional | 110,103 | – | – | – | 110,103 | – | 9,686 | 9,686 |
| All Saints Regional | 85,365 | 7,065 | – | 284,336 | 376,766 | 591,391 | 71,531 | 66,253 |
| St John Baptist De La Salle Regional | 360,162 | – | – | 84,256 | 444,418 | 52,614 | – | – |
| Holy Family Regional | 1,524,166 | 92,855 | – | 624,340 | 2,241,361 | 194,592 | (81,752) | (76,894) |
| Our Lady Of Wisdom Regional | 479,260 | – | – | 65,857 | 545,117 | 237,893 | 78,445 | 80,228 |
| Our Lady Of Mercy Regional | 129,993 | – | – | 60,698 | 190,690 | 56,534 | 9,575 | (15,683) |
| St. Christopher | 105,423 | 105,358 | – | 203,902 | 414,683 | 405,215 | 7,407 | (2) |
| St. Catherine Of Sienna | 833 | – | – | – | 833 | 831 | – | – |
| St. Ignatius Loyola | (3) | – | – | – | (3) | (2) | – | – |
| Our Lady Of Mercy | 3,400 | – | – | 127,981 | 131,381 | 193,863 | (255,589) | (268,520) |
| St. Raymond | 193,455 | – | – | (19,242) | 174,214 | 174,214 | (307) | – |
| Our Lady Of Lourdes | 279,760 | – | – | (585) | 279,175 | 255,073 | 11,417 | – |
| Corpus Christi | 95,630 | – | – | – | 95,630 | 95,632 | – | – |
| Sacred Heart | 74,845 | – | – | – | 74,845 | 74,845 | – | – |
| Blessed Sacrament | 31,945 | – | – | – | 31,945 | 31,945 | – | – |
| St. Thomas The Apostle | 101,076 | – | – | 24,255 | 125,331 | 351,636 | 24,815 | 197 |
| Ss Cyril And Methodius | 178,320 | – | – | 164,136 | 342,456 | 211,050 | (126,561) | (126,493) |
| Our Lady Of Perpetual Help | 912 | – | – | – | 912 | 290,538 | – | – |
| St. Isidore | 146,558 | 0 | – | 0 | 146,558 | 106,999 | (14,054) | (31,564) |
| St. Joseph | 58,390 | – | – | 6,410 | 64,800 | 2,420,601 | (162,280) | (168,278) |
| Our Lady Of Lourdes | 425,529 | – | – | 309,584 | 735,113 | 28,516 | 111,676 | 111,779 |
| **Subtotal Closed Parish Elem. School** | 4,852,741 | 205,278 | 10,000 | 2,255,464 | 7,323,483 | 7,054,444 | (288,059) | (390,407) |

**List of Properties**

Please see footnotes

| Account | Structure Name | Structure Type | Street | City | State | Zip | County | Floor Area |
|---|---|---|---|---|---|---|---|---|
| Assumption of the Blessed Virgin Mary | Church | Church | 20 Chestnut Street | Centereach | NY | 11720 | Suffolk | 17,902 |
| Assumption of the Blessed Virgin Mary | Parish Center | Hall | 21 Chestnut Street | Centereach | NY | 11720 | Suffolk | 26,032 |
| Assumption of the Blessed Virgin Mary | Rectory | Rectory | 21 Chestnut Street | Centereach | NY | 11720 | Suffolk | 5,998 |
| Blessed Sacrament RC Church | Church | Church | 201 North Central Avenue | Valley Stream | NY | 11580 | Nassau | 24,482 |
| Blessed Sacrament RC Church | School | School | 201 North Central Avenue | Valley Stream | NY | 11580 | Nassau | 21,348 |
| Blessed Sacrament RC Church | CCD Building | Building | 201 North Central Avenue | Valley Stream | NY | 11580 | Nassau | 12,546 |
| Blessed Sacrament RC Church | Rectory | Rectory | 201 North Central Avenue | Valley Stream | NY | 11580 | Nassau | 11,739 |
| Blessed Sacrament RC Church | Walsh Hall | Office | 201 North Central Avenue | Valley Stream | NY | 11580 | Nassau | 9,541 |
| Blessed Sacrament RC Church | Garage | Garage | 201 North Central Avenue | Valley Stream | NY | 11580 | Nassau | 240 |
| Catholic Charities Outpatient Clinic | Building | Office | 155 Indian Head Road | Commack | NY | 11725 | Suffolk | |
| Catholic Charities / Holy Spirit Convent | Building | Office | 301 Smithtown Boulevard | Nesconset | NY | 11767 | Suffolk | |
| Catholic Charities Health Systems of the Diocese of Rockville Centre, Inc. | Office | Office | 333 North Main Street | Freeport | NY | 11520 | Nassau | |
| Catholic Charities New York Services to At-Risk-Youth (NYSARY) | Dwelling | Dwelling | 147 Schleigel Boulevard | Amityville | NY | 11701 | Suffolk | |
| Catholic Charities Mental Health Clinic, Medford | Building | Office | 1727 North Ocean Avenue | Medford | NY | 11763 | Suffolk | |
| Catholic Charities Chemical Dependence Service Hampton Bays | Building | Office | 31 East Montauk Highway | Hampton Bays | NY | 11946 | Suffolk | |
| Catholic Charities Mental Health Clinic, Bayshore | Building | Office | 21 4th Avenue | Bay Shore | NY | 11706 | Suffolk | |
| Catholic Charities Immigrant Services/Refugee Resettlement | Office | Office | 143 Schleigel Boulevard | Amityville | NY | 11701 | Suffolk | |
| Catholic Charities of the Diocese of Rockville Centre DBA Catholic Charities of Long Island | Building | Office | 90 Cherry Lane | Hicksville | NY | 11801 | Nassau | |
| Christ the King Church | Building | Building | 2 Indian Head Road | Commack | NY | 11725 | Suffolk | 31,990 |
| Christ the King Church | Church | Church | 2 Indian Head Road | Commack | NY | 11725 | Suffolk | 12,624 |
| Christ the King Church | Convent | Convent | 2 Indian Head Road | Commack | NY | 11725 | Suffolk | 12,019 |
| Christ the King Church | Pastoral Center & Rectory | Rectory | 2 Indian Head Road | Commack | NY | 11725 | Suffolk | 11,881 |
| Church of St. Rocco | Church | Church | 18 Third Street | Glen Cove | NY | 11542 | Nassau | 19,201 |
| Church of St. Rocco | Parish Center | Parish Center | 18 Third Street | Glen Cove | NY | 11542 | Nassau | 16,016 |
| Church of St. Rocco | Rectory (Old Convent) | Rectory | 18 Third Street | Glen Cove | NY | 11542 | Nassau | 6,881 |
| Church of St. Rocco | Momma'S House (Old Rectory) | Dwelling | 18 Third Street | Glen Cove | NY | 11542 | Nassau | 6,144 |
| Church of St. Rocco | Shop | Building | 18 Third Street | Glen Cove | NY | 11542 | Nassau | 1,480 |
| Church of St. Rocco | Garage | Garage | 18 Third Street | Glen Cove | NY | 11542 | Nassau | 528 |
| Church of St. Rocco | Storage Shed | Shed | 18 Third Street | Glen Cove | NY | 11542 | Nassau | 96 |
| Church of the Holy Cross | Church | Church | 95 Old Nichols Road | Nesconset | NY | 11767 | Suffolk | 18,591 |
| Church of the Holy Cross | Rectory | Rectory | 85 Old Nichols Road | Nesconset | NY | 11767 | Suffolk | 4,656 |
| Church of the Holy Cross | Shed | Shed | 95 Old Nichols Road | Nesconset | NY | 11767 | Suffolk | 100 |
| Church of the Immaculate Conception | Parish Center | Hall | 18 Ocame St. | Westhampton Beach | NY | 11978 | Suffolk | 20,488 |
| Church of the Immaculate Conception | Rectory/House | Rectory | 580 Main St | Westhampton Beach | NY | 11978 | Suffolk | 8,756 |
| Church of the Immaculate Conception | Shed | Shed | 580 Main St | Westhampton Beach | NY | 11978 | Suffolk | 1,200 |
| Church of the Immaculate Conception | Garage | Garage | 580 Main St | Westhampton Beach | NY | 11978 | Suffolk | 756 |
| Church of the Immaculate Conception | Our Lady'S Hall | Hall | 580 Main St & Franklin Ave | Westhampton Beach | NY | 11978 | Suffolk | 3,429 |
| Church of the Immaculate Conception | Church Of The Immaculate Conception | Church | 580 Main Street | Westhampton Beach | NY | 11978 | Suffolk | 4,673 |
| Church of the Resurrection | Church | Church | 50 Granny Rd | Farmingville | NY | 11738 | Suffolk | 6,264 |
| Church of the Resurrection | Garage | Garage | 50 Granny Rd | Farmingville | NY | 11738 | Suffolk | 140 |
| Church of the Resurrection | Outreach | Building | 50 Granny Road | Farmingville | NY | 11738 | Suffolk | |
| Corpus Christi Church | Religious Education & Youth Center | Building | 120 Searing Avenue | Mineola | NY | 11501 | Nassau | 20,510 |
| Corpus Christi Church | Church | Church | 155 Garfield Avenue | Mineola | NY | 11501 | Nassau | 23,038 |
| Corpus Christi Church | Rectory | Rectory | 155 Garfield Avenue | Mineola | NY | 11501 | Nassau | 10,623 |
| Cure of Ars Church | Parish Center | Parish Center | 2323 Merrick Avenue | Merrick | NY | 11566 | Nassau | 33,103 |

**List of Properties**
Please see footnotes

| Account | Structure Name | Structure Type | Street | City | State | Zip | County | Floor Area |
|---|---|---|---|---|---|---|---|---|
| Cure of Ars Church | Church | Church | 2323 Merrick Avenue | Merrick | NY | 11566 | Nassau | 9,639 |
| Cure of Ars Church | Rectory | Rectory | 2323 Merrick Avenue | Merrick | NY | 11566 | Nassau | 12,970 |
| Cure of Ars Church | Storage Building | Building | 2323 Merrick Avenue | Merrick | NY | 11566 | Nassau | 520 |
| Department of Education, Diocese of Rockville Ce | | Building | 128 Cherry Lane | Hicksville | NY | 11801 | Nassau | |
| Good Shepherd Church | Church | Church | 1370 Grundy Avenue | Holbrook | NY | 11741 | Suffolk | 12,770 |
| Good Shepherd Church | Rectory | Rectory | 1370 Grundy Avenue | Holbrook | NY | 11741 | Suffolk | 8,853 |
| Holy Family Church | Church | Church | 17 Fordham Avenue | Hicksville | NY | 11801 | Nassau | 13,069 |
| Holy Family Church | Convent | Convent | 17 Fordham Avenue | Hicksville | NY | 11801 | Nassau | 12,112 |
| Holy Family Church | Rectory | Rectory | 17 Fordham Avenue | Hicksville | NY | 11801 | Nassau | 5,809 |
| Holy Family Church | O'Dea Center | Office | 17 Fordham Avenue | Hicksville | NY | 11801 | Nassau | 3,822 |
| Holy Family Church - School | School | School | 17 Fordham Avenue | Hicksville | NY | 11801 | Nassau | 57,040 |
| Holy Name of Jesus Church | Church | Church | 690 Woodbury Road | Woodbury | NY | 11797 | Nassau | 25,012 |
| Holy Name of Jesus Church | Rectory | Rectory | 690 Woodbury Road | Woodbury | NY | 11797 | Nassau | 6,067 |
| Holy Name of Mary Church | Church | Church | 55 East Jamaica Avenue | Valley Stream | NY | 11580 | Nassau | 21,512 |
| Holy Name of Mary Church | Convent | Convent | 55 East Jamaica Avenue | Valley Stream | NY | 11580 | Nassau | 17,601 |
| Holy Name of Mary Church | Rectory | Rectory | 55 East Jamaica Avenue | Valley Stream | NY | 11580 | Nassau | 8,892 |
| Holy Name of Mary Church | Outreach House | Building | 55 East Jamaica Avenue | Valley Stream | NY | 11580 | Nassau | 3,125 |
| Holy Name of Mary Church | Rectory Garage | Garage | 55 East Jamaica Avenue | Valley Stream | NY | 11580 | Nassau | 1,428 |
| Holy Name of Mary Church | Convent Garage | Garage | 55 East Jamaica Avenue | Valley Stream | NY | 11580 | Nassau | 506 |
| Holy Name of Mary Church - School | School | School | 55 East Jamaica Avenue | Valley Stream | NY | 11580 | Nassau | 50,180 |
| Holy Spirit Church | Parish Center - Rectory | Office | 16 South 6th Street | New Hyde Park | NY | 11040 | Nassau | 18,564 |
| Holy Spirit Church | Convent | Convent | 16 South 6th Street | New Hyde Park | NY | 11040 | Nassau | 5,544 |
| Holy Spirit Church | Garage | Garage | 16 South 6th Street | New Hyde Park | NY | 11040 | Nassau | 2,100 |
| Holy Spirit Church | Shed-Garage | Shed | 16 South 6th Street | New Hyde Park | NY | 11040 | Nassau | 160 |
| Holy Spirit Church | Shed-Garage | Shed | 16 South 6th Street | New Hyde Park | NY | 11040 | Nassau | 160 |
| Holy Spirit Church | Church - School | Church | 500 Jericho Tpke. | New Hyde Park | NY | 11040 | Nassau | 61,347 |
| Infant Jesus Church | Church | Church | 110 Myrtle Avenue | Port Jefferson | NY | 11777 | Suffolk | 7,708 |
| Infant Jesus Church | Convent | Convent | 110 Myrtle Avenue | Port Jefferson | NY | 11777 | Suffolk | 13,762 |
| Infant Jesus Church | Rectory | Rectory | 110 Myrtle Avenue | Port Jefferson | NY | 11777 | Suffolk | 7,901 |
| Infant Jesus Church | School | School | 114 Myrtle Avenue | Port Jefferson | NY | 11777 | Suffolk | |
| Maria Regina Church | Church | Church | 3945 Jerusalem Avenue | Seaford | NY | 11783 | Nassau | 13,210 |
| Maria Regina Church | Pastoral Center | Hall | 3945 Jerusalem Avenue | Seaford | NY | 11783 | Nassau | 12,276 |
| Maria Regina Church | Rectory | Rectory | 3945 Jerusalem Avenue | Seaford | NY | 11783 | Nassau | 10,365 |
| Maria Regina Church - School | School | School | 4045 Jerusalem Ave | Seaford | NY | 11783 | Nassau | 54,077 |
| Mary Immaculate Church | Multipurpose | Building | 16 Brown Lane | Bellport | NY | 11706 | Suffolk | 15,736 |
| Mary Immaculate Church | Rectory | Rectory | 16 Brown Lane | Bellport | NY | 11706 | Suffolk | 4,075 |
| Mary Immaculate Church | Church | Church | 16 Brown Lane | Bellport | NY | 11706 | Suffolk | 3,500 |
| Mary Immaculate Church | Cottage | Building | 16 Brown Lane | Bellport | NY | 11706 | Suffolk | 900 |
| Mary Immaculate Church | Garage #1 | Garage | 16 Brown Lane | Bellport | NY | 11706 | Suffolk | 1,790 |
| Mary Immaculate Church | Garage #2 | Garage | 16 Brown Lane | Bellport | NY | 11706 | Suffolk | 400 |
| Most Holy Trinity R.C.C. I | School | School | 57 Buell Lane | East Hampton | NY | 11937 | Suffolk | 14,503 |
| Most Holy Trinity R.C.C. I | Parish Center | Hall | 57 Buell Lane | East Hampton | NY | 11937 | Suffolk | 8,629 |
| Most Holy Trinity R.C.C. I | Church | Church | 57 Buell Lane | East Hampton | NY | 11937 | Suffolk | 3,440 |
| Most Holy Trinity R.C.C. I | Rectory | Rectory | 57 Buell Lane | East Hampton | NY | 11937 | Suffolk | 4,945 |
| Most Holy Trinity R.C.C. I | Convent (Parish Offices) | Convent | 57 Buell Lane | East Hampton | NY | 11937 | Suffolk | 2,984 |
| Most Holy Trinity R.C.C. I | Barn | Building | 57 Buell Lane | East Hampton | NY | 11937 | Suffolk | 2,332 |
| Most Holy Trinity R.C.C. I | Garage | Garage | 57 Buell Lane | East Hampton | NY | 11937 | Suffolk | 400 |
| Most Holy Trinity R.C.C. I | Garage | Garage | 57 Buell Lane | East Hampton | NY | 11937 | Suffolk | 250 |
| Most Precious Blood Mission | Church | Church | 4 Dune Walk | Davis Park | NY | 11772 | Suffolk | |
| Most Precious Blood Mission | Rectory | Rectory | 10 Spindrift Walk | Davis Park | NY | 11772 | Suffolk | |
| Notre Dame Church | Church | Church | 45 Mayfair Road | New Hyde Park | NY | 11040 | Nassau | 12,051 |
| Notre Dame Church | Convent | Convent | 45 Mayfair Road | New Hyde Park | NY | 11040 | Nassau | 15,136 |

**List of Properties**
Please see footnotes

| Account | Structure Name | Structure Type | Street | City | State | Zip | County | Floor Area |
|---|---|---|---|---|---|---|---|---|
| Notre Dame Church | Rectory | Rectory | 45 Mayfair Road | New Hyde Park | NY | 11040 | Nassau | 11,326 |
| Notre Dame Church | #1 Aberdeen Road | Building | 45 Mayfair Road | New Hyde Park | NY | 11040 | Nassau | 3,273 |
| Notre Dame Church | Garage | Garage | 45 Mayfair Road | New Hyde Park | NY | 11040 | Nassau | 840 |
| Notre Dame Church | Grotto | Building | 45 Mayfair Road | New Hyde Park | NY | 11040 | Nassau | 613 |
| Notre Dame Church - School | School | School | 45 Mayfair Road | New Hyde Park | NY | 11040 | Nassau | 52,701 |
| Our Holy Redeemer Church | School | School | 87 Pine Street | Freeport | NY | 11520 | Nassau | 54,594 |
| Our Holy Redeemer Church | Church | Church | 37 South Ocean Avenue | Freeport | NY | 11520 | Nassau | 24,930 |
| Our Holy Redeemer Church | Convent | Church | 95 Pine Street | Freeport | NY | 11520 | Nassau | 13,678 |
| Our Holy Redeemer Church | Rectory | Rectory | 37 South Ocean Avenue | Freeport | NY | 11520 | Nassau | 9,888 |
| Our Holy Redeemer Church | Rectory Garage | Garage | 37 South Ocean Avenue | Freeport | NY | 11520 | Nassau | 1,419 |
| Our Holy Redeemer Church | Convent Garage | Garage | 37 South Ocean Avenue | Freeport | NY | 11520 | Nassau | 516 |
| Our Lady of Assumption Church | Rectory | Rectory | 1 Malloy Street | Copiague | NY | 11726 | Suffolk | 5,248 |
| Our Lady of Assumption Church | Outreach Center | Office | 1 Malloy Street | Copiague | NY | 11726 | Suffolk | 3,640 |
| Our Lady of Assumption Church | Garage 2 | Garage | 1 Malloy Street | Copiague | NY | 11726 | Suffolk | 1,178 |
| Our Lady of Assumption Church | Garage | Garage | 1 Malloy Street | Copiague | NY | 11726 | Suffolk | 506 |
| Our Lady of Assumption Church | Church | Church | 1 Molloy Street | Copiague | NY | 11726 | Suffolk | 9,408 |
| Our Lady of Assumption Church - School | School | School | 1 Malloy Street | Copiague | NY | 11726 | Suffolk | 18,296 |
| Our Lady of Fatima Church | Shed | Shed | 6 Cototnwood Road | Port Washington | NY | 11050 | Nassau | 230 |
| Our Lady of Fatima Church | Church | Church | 6 Cottonwood Road | Port Washington | NY | 11050 | Nassau | 6,096 |
| Our Lady of Fatima Church | Parish Hall | Hall | 6 Cottonwood Road | Port Washington | NY | 11050 | Nassau | 3,032 |
| Our Lady of Fatima Church | Rectory | Rectory | 6 Cottonwood Road | Port Washington | NY | 11050 | Nassau | 2,430 |
| Our Lady of Fatima Church | Convent/Offices | Convent | 6 Cottonwood Road | Port Washington | NY | 11050 | Nassau | 1,446 |
| Our Lady of Good Counsel Church | Convent | Convent | 100 Henry Street | Inwood | NY | 11696 | Nassau | 5,255 |
| Our Lady of Good Counsel Church | Church | Church | 68 Wanser Avenue | Inwood | NY | 11696 | Nassau | 12,830 |
| Our Lady of Good Counsel Church | Rectory | Rectory | 68 Wanser Avenue | Inwood | NY | 11696 | Nassau | 6,874 |
| Our Lady of Good Counsel Church | School | School | 90 Henry Street | Inwood | NY | 11696 | Nassau | 26,283 |
| Our Lady of Good Counsel Mission | Church | Church | 14300 Main Rd. | Cutchogue | NY | 11952 | Suffolk | |
| Our Lady of Grace Church | Church | Church | 666 Albin Avenue | West Babylon | NY | 11704 | Suffolk | 25,110 |
| Our Lady of Grace Church | Parish Center | Parish Center | 666 Albin Avenue | West Babylon | NY | 11704 | Suffolk | 45,317 |
| Our Lady of Grace Church | Convent | Convent | 666 Albin Avenue | West Babylon | NY | 11704 | Suffolk | 13,383 |
| Our Lady of Grace Church | Rectory | Rectory | 666 Albin Avenue | West Babylon | NY | 11704 | Suffolk | 4,985 |
| Our Lady of Grace Church | Shed | Shed | 666 Albin Avenue | West Babylon | NY | 11704 | Suffolk | 400 |
| Our Lady of Grace Church | Housing Facility- Christa House | Dwelling | 720 Albin Avenue | West Babylon | NY | 11704 | Suffolk | 15,000 |
| Our Lady of Hope Church | Church | Church | 534 Broadway | Carle Place | NY | 11514 | Nassau | 14,218 |
| Our Lady of Hope Church | Rectory | Rectory | 52 Boyd Drive | Westbury | NY | 11590 | Nassau | 2,750 |
| Our Lady of Loretto Church | Church | Church | 104 Greenwich Street | Hempstead | NY | 11550 | Nassau | 22,468 |
| Our Lady of Loretto Church | School | School | 120 Greenwich Street | Hempstead | NY | 11550 | Nassau | 22,321 |
| Our Lady of Loretto Church | Outreach And Chapel | Church | 115 Greenwich Street | Hempstead | NY | 11550 | Nassau | 9,478 |
| Our Lady of Loretto Church | Rectory | Rectory | 104 Greenwich Street | Hempstead | NY | 11550 | Nassau | 10,552 |
| Our Lady of Loretto Church | Patty's Place House | Convent | 124 Greenwich Street | Hempstead | NY | 11550 | Nassau | 8,337 |
| Our Lady of Loretto Church | Large Garage | Garage | 104 Greenwich Street | Hempstead | NY | 11550 | Nassau | 1,368 |
| Our Lady of Loretto Church | Small Garage | Garage | 120 Greenwich Street | Hempstead | NY | 11550 | Nassau | 576 |
| Our Lady of Lourdes Church | Church | Church | 65 Wright Avenue | Malverne | NY | 11565 | Nassau | 9,840 |
| Our Lady of Lourdes Church | Rectory | Rectory | 65 Wright Avenue | Malverne | NY | 11565 | Nassau | 7,786 |
| Our Lady of Lourdes Church | Parish Center | Parish Center | 65 Wright Avenue | Malverne | NY | 11565 | Nassau | 5,547 |
| Our Lady of Lourdes Church | Garage At Rectory | Garage | 65 Wright Avenue | Malverne | NY | 11565 | Nassau | 1,679 |
| Our Lady of Lourdes Church | Garage/Maintenance Shed | Garage | 65 Wright Avenue | Malverne | NY | 11565 | Nassau | 665 |
| Our Lady of Lourdes Church | Garage At Priest Residence | Garage | 65 Wright Avenue | Malverne | NY | 11565 | Nassau | 320 |
| Our Lady of Lourdes Church | Rectory-Garage | Rectory | 855 Carmans Road | Massapequa Park | NY | 11762 | Nassau | 10,816 |
| Our Lady of Lourdes Church | School | School | 855 Carmans Road | Massapequa Park | NY | 11762 | Nassau | 45,603 |
| Our Lady of Lourdes Church | Church | Church | 855 Carmans Road | Massapequa Park | NY | 11762 | Nassau | 16,613 |
| Our Lady of Lourdes Church | Convent | Convent | 855 Carmens Road | Massapequa Park | NY | 11762 | Nassau | 10,700 |

**List of Properties**

Please see footnotes

| Account | Structure Name | Structure Type | Street | City | State | Zip | County | Floor Area |
|---|---|---|---|---|---|---|---|---|
| Our Lady of Lourdes Church | Garage | Garage | 855 Carmens Road | Massapequa Park | NY | 11762 | Nassau | 1,380 |
| Our Lady of Lourdes Church | Parish Center | Parish Center | 455 Hunter Ave | West Islip | NY | 11795 | Suffolk | 6,468 |
| Our Lady of Lourdes Church | School | School | 455 Hunter Ave | West Islip | NY | 11795 | Suffolk | 32,621 |
| Our Lady of Lourdes Church | Church | Church | 455 Hunter Avenue | West Islip | NY | 11795 | Suffolk | 66,127 |
| Our Lady of Lourdes Church | Convent | Convent | 455 Hunter Avenue | West Islip | NY | 11795 | Suffolk | 14,969 |
| Our Lady of Lourdes Church | Rectory | Rectory | 455 Hunter Avenue | West Islip | NY | 11795 | Suffolk | 10,085 |
| Our Lady of Lourdes Church | Garage | Garage | 455 Hunter Avenue | West Islip | NY | 11795 | Suffolk | 1,440 |
| Our Lady of Lourdes Church - School | School | School | 78 Park Blvd | Malverne | NY | 11565 | Nassau | 34,444 |
| Our Lady of Mercy Church | Church | Church | 500 S. Oyster Bay Road | Hicksville | NY | 11801 | Nassau | 18,741 |
| Our Lady of Mercy Church | Convent | Convent | 500 S. Oyster Bay Road | Hicksville | NY | 11801 | Nassau | 12,372 |
| Our Lady of Mercy Church | Rectory | Rectory | 500 S. Oyster Bay Road | Hicksville | NY | 11801 | Nassau | 9,325 |
| Our Lady of Mercy Church | Pastoral Center | Hall | 500 S. Oyster Bay Road | Hicksville | NY | 11801 | Nassau | 3,336 |
| Our Lady of Mercy Church | Garage | Garage | 500 S. Oyster Bay Road | Hicksville | NY | 11801 | Nassau | 1,404 |
| Our Lady of Mercy Church - School | School & Hall | School | 500 S. Oyster Bay Road | Hicksville | NY | 11801 | Nassau | 54,478 |
| Our Lady of Miraculous Medal Church | Church | Church | 75 Parkside Dr. | Point Lookout | NY | 11569 | Nassau | 5,044 |
| Our Lady of Miraculous Medal Church | Parish Hall | Recreation / Senior Center | 75 Parkside Drive | Point Lookout | NY | 11569 | Nassau | 14,310 |
| Our Lady of Miraculous Medal Church | Rectory | Rectory | 75 Parkside Drive | Point Lookout | NY | 11569 | Nassau | 7,013 |
| Our Lady of Miraculous Medal Church | Garage | Garage | 75 Parkside Drive | Point Lookout | NY | 11569 | Nassau | 923 |
| Our Lady of Miraculous Medal Church | Outdoor Shrine | Gazebo | 75 Parkside Drive | Point Lookout | NY | 11569 | Nassau | 531 |
| Our Lady of Mount Carmel Church | Church | Church | 495 North Ocean Avenue | Patchogue | NY | 11772 | Suffolk | 29,204 |
| Our Lady of Mount Carmel Church | Parish Center | Parish Center | 495 North Ocean Avenue | Patchogue | NY | 11772 | Suffolk | 12,298 |
| Our Lady of Mount Carmel Church | Rectory | Rectory | 495 North Ocean Avenue | Patchogue | NY | 11772 | Suffolk | 12,663 |
| Our Lady of Ostrabrama Church | Church | Church | 3000 Depot Lane | Cutchogue | NY | 11935 | Suffolk | 9,756 |
| Our Lady of Ostrabrama Church | Rectory | Rectory | 3000 Depot Lane | Cutchogue | NY | 11935 | Suffolk | 6,542 |
| Our Lady of Ostrabrama Church | Garage | Garage | 3000 Depot Lane | Cutchogue | NY | 11935 | Suffolk | 768 |
| Our Lady of Ostrabrama Church | Storage Building | Shed | 3000 Depot Lane | Cutchogue | NY | 11935 | Suffolk | 252 |
| Our Lady of Peace Church | Church | Church | 25 Fowler Avenue | Lynbrook | NY | 11563 | Nassau | 6,356 |
| Our Lady of Peace Church | Rectory | Rectory | 25 Fowler Avenue | Lynbrook | NY | 11563 | Nassau | 7,504 |
| Our Lady of Peace Church | Convent | Convent | 25 Fowler Avenue | Lynbrook | NY | 11563 | Nassau | 3,669 |
| Our Lady of Peace Church | Parish Center/Residence | Office | 25 Fowler Avenue | Lynbrook | NY | 11563 | Nassau | 3,089 |
| Our Lady of Peace Church | Garage #1 | Garage | 25 Fowler Avenue | Lynbrook | NY | 11563 | Nassau | 960 |
| Our Lady of Peace Church | Convent Garage | Garage | 25 Fowler Avenue | Lynbrook | NY | 11563 | Nassau | 1,032 |
| Our Lady of Peace Church | Garage #2 | Garage | 25 Fowler Avenue | Lynbrook | NY | 11563 | Nassau | 494 |
| Our Lady of Peace Church | Garage #3 | Garage | 25 Fowler Avenue | Lynbrook | NY | 11563 | Nassau | 280 |
| Our Lady of Peace Church - School | School | School | 25 Fowler Avenue | Lynbrook | NY | 11563 | Nassau | 35,630 |
| Our Lady of Perpetual Help | School | School | 210 South Wellwood Avenue | Lindenhurst | NY | 11757 | Suffolk | 44,379 |
| Our Lady of Perpetual Help | Church | Church | 210 South Wellwood Avenue | Lindenhurst | NY | 11757 | Suffolk | 17,377 |
| Our Lady of Perpetual Help | Convent | Convent | 260 South Wellwood Avenue | Lindenhurst | NY | 11757 | Suffolk | 15,432 |
| Our Lady of Perpetual Help | Rectory | Rectory | 210 South Wellwood Avenue | Lindenhurst | NY | 11757 | Suffolk | 11,921 |
| Our Lady of Poland Church | Church | Church | 35 Maple Street | Southampton | NY | 11968 | Suffolk | 6,278 |
| Our Lady of Poland Church | Rectory | Rectory | 35 Maple Street | Southampton | NY | 11968 | Suffolk | 4,330 |
| Our Lady of Poland Church | Convent | Convent | 35 Maple Street | Southampton | NY | 11968 | Suffolk | 3,391 |
| Our Lady of Poland Church | Garage | Garage | 35 Maple Street | Southampton | NY | 11968 | Suffolk | 330 |
| Our Lady of Poland Church | Garage | Garage | 35 Maple Street | Southampton | NY | 11968 | Suffolk | 783 |
| Our Lady of Poland Church | Garage | Garage | 35 Maple Street | Southampton | NY | 11968 | Suffolk | 440 |
| Our Lady of Poland Church | School | School | 160 North Main Street | Southampton | NY | 11968 | Suffolk | |
| Our Lady of Poland Church | Cottage | Building | 51 Maple Street | Southampton | NY | 11968 | Suffolk | 1,110 |
| Our Lady of the Isle Church I | Rectory | Rectory | 5 Prospect Avenue | Shelter Island Heights | NY | 11965 | Suffolk | 2,205 |
| Our Lady of the Isle Church I | Pastoral House | Dwelling | 5 Prospect Avenue | Shelter Island Heights | NY | 11965 | Suffolk | 940 |
| Our Lady of the Isle Church I | Garage | Garage | 5 Prospect Avenue | Shelter Island Heights | NY | 11965 | Suffolk | 264 |
| Our Lady of the Isle Church I | Garage | Garage | 5 Prospect Avenue | Shelter Island Heights | NY | 11965 | Suffolk | 200 |
| Our Lady of the Isle Church I | Vacant Parcel | Land | 5 St. Johns Street | Shelter Island Heights | NY | 11965 | Suffolk | 47,916 |

**List of Properties**

Please see footnotes

| Account | Structure Name | Structure Type | Street | City | State | Zip | County | Floor Area |
|---|---|---|---|---|---|---|---|---|
| Our Lady of the Isle Church ⌐ | Church | Church | 7 Prospect Avenue | Shelter Island Heights | NY | 11965 | Suffolk | 4,132 |
| Our Lady of the Magnificant Mission | Church | Church | 36 Bungalow Ln | Ocean Beach | NY | 11770 | Suffolk | |
| Our Lady of the Magnificant Mission | Rectory | Rectory | 36 Bungalow Ln | Ocean Beach | NY | 11770 | Suffolk | |
| Our Lady of the Magnificant Mission | Storage Shed | Shed | 36 Bungalow Ln | Ocean Beach | NY | 11770 | Suffolk | |
| Our Lady of the Miraculous Medal Church | Parish Hall | Hall | 1434 Straight Path | Wyandanch | NY | 11798 | Suffolk | 10,107 |
| Our Lady of the Miraculous Medal Church | Rectory | Rectory | 1434 Straight Path | Wyandanch | NY | 11798 | Suffolk | 7,542 |
| Our Lady of the Miraculous Medal Church | Church | Church | 1434 Straight Path | Wyandanch | NY | 11798 | Suffolk | 5,014 |
| Our Lady of the Miraculous Medal Church | Opening Word | Building | 1434 Straight Path | Wyandanch | NY | 11798 | Suffolk | 960 |
| Our Lady of the Miraculous Medal Church | Garage | Garage | 1434 Straight Path | Wyandanch | NY | 11798 | Suffolk | 143 |
| Our Lady of the Miraculous Medal Church | Residence | Dwelling | 24 Brooklyn Avenue | Wyandanch | NY | 11798 | Suffolk | 1,720 |
| Our Lady of the Miraculous Medal Church | Residence | Dwelling | 4 South 22Nd Street | Wyandanch | NY | 11798 | Suffolk | 1,952 |
| Our Lady of the Snow Church | Church/Auditorium | Auditorium | 175 Blue Point Avenue | Blue Point | NY | 11715 | Suffolk | 11,362 |
| Our Lady of the Snow Church | Church | Church | 175 Blue Point Avenue | Blue Point | NY | 11715 | Suffolk | 6,716 |
| Our Lady of the Snow Church | Rectory | Rectory | 175 Blue Point Avenue | Blue Point | NY | 11715 | Suffolk | 4,415 |
| Our Lady of the Snow Church | Cottage | Building | 175 Blue Point Avenue | Blue Point | NY | 11715 | Suffolk | 3,522 |
| Our Lady of the Snow Church | Garage | Garage | 175 Blue Point Avenue | Blue Point | NY | 11715 | Suffolk | 600 |
| Our Lady of Victory Church | Rectory | Rectory | 2 Floral Parkway | Floral Park | NY | 11001 | Nassau | 10,437 |
| Our Lady of Victory Church | Parish Center | Parish Center | 2 Floral Parkway | Floral Park | NY | 11001 | Nassau | 9,228 |
| Our Lady of Victory Church | Residence | Dwelling | 2 Floral Parkway | Floral Park | NY | 11001 | Nassau | 3,652 |
| Our Lady of Victory Church | Garage | Garage | 2 Floral Parkway | Floral Park | NY | 11001 | Nassau | 400 |
| Our Lady of Victory Church | Church | Church | 2 Floral Pkwy | Floral Park | NY | 11001 | Nassau | 11,134 |
| Our Lady of Victory Church - School | School | School | 2 Floral Parkway | Floral Park | NY | 11001 | Nassau | 51,252 |
| Our Lady Queen of Martyrs | Rectory | Rectory | Prospect & Mill Dam Rds. | Centerport | NY | 11721 | Suffolk | 4,711 |
| Our Lady Queen of Martyrs | Church | Church | Prospect And Mill Dam Roads | Centerport | NY | 11721 | Suffolk | 17,102 |
| Our Lady Queen of Martyrs | Parish Center | Hall | Prospect And Mill Dam Roads | Centerport | NY | 11721 | Suffolk | 2,882 |
| Our Lady Queen of Martyrs | Apartment And Garage | Garage | Prospect And Mill Dam Roads | Centerport | NY | 11721 | Suffolk | 1,575 |
| Our Lady Star of the Sea Mission | Church | Church | 210 Pilot Walk | Saltaire | NY | 11706 | Suffolk | 3,860 |
| Our Lady Star of the Sea Mission | Rectory | Rectory | 210 Pilot Walk | Saltaire | NY | 11706 | Suffolk | 1,579 |
| Queen of Most Holy Rosary Church | Parish Center | Parish Center | 2350 Montauk Highway | Bridgehampton | NY | 11932 | Suffolk | 4,645 |
| Queen of Most Holy Rosary Church | Church | Church | 2350 Montauk Highway | Bridgehampton | NY | 11932 | Suffolk | 5,572 |
| Queen of Most Holy Rosary Church | Rectory | Rectory | 2350 Montauk Highway | Bridgehampton | NY | 11932 | Suffolk | 4,297 |
| Queen of Most Holy Rosary Church | Garage | Garage | 2350 Montauk Highway | Bridgehampton | NY | 11932 | Suffolk | 400 |
| Queen of Most Holy Rosary Church | Office/Social Ministry | Office | 196 West Centennial Avenue | Roosevelt | NY | 11575 | Nassau | 31,999 |
| Queen of Most Holy Rosary Church | Church | Church | 196 West Centennial Avenue | Roosevelt | NY | 11575 | Nassau | 16,167 |
| Queen of Most Holy Rosary Church | Rectory | Rectory | 196 West Centennial Avenue | Roosevelt | NY | 11575 | Nassau | 10,682 |
| Queen of Most Holy Rosary Church | Meals On Wheels | Office | 196 West Centennial Avenue | Roosevelt | NY | 11575 | Nassau | 9,480 |
| Rc Church of St. Cyril and Methodius | Church | Church | 125 Half Hollow Road | Deer Park | NY | 11729 | Suffolk | 29,112 |
| Rc Church of St. Cyril and Methodius | Parish Center | Parish Center | 125 Half Hollow Road | Deer Park | NY | 11729 | Suffolk | 11,952 |
| Rc Church of St. Cyril and Methodius | Rectory | Rectory | 125 Half Hollow Road | Deer Park | NY | 11729 | Suffolk | 9,396 |
| Rc Church of St. Cyril and Methodius | Garage | Garage | 125 Half Hollow Road | Deer Park | NY | 11729 | Suffolk | 1,220 |
| Rc Church of St. Cyril and Methodius - School | School | School | 125 Half Hollow Road | Deer Park | NY | 11729 | Suffolk | 48,989 |
| Rc Church of the Sacred Heart | School | School | 1921 Old Mill Road | North Merrick | NY | 11566 | Nassau | 68,862 |
| Rc Church of the Sacred Heart | Convent & Garage | Convent | 1921 Old Mill Road | North Merrick | NY | 11566 | Nassau | 11,108 |
| Rc Church of the Sacred Heart | Pastoral Center | Office | 1921 Old Mill Road | North Merrick | NY | 11566 | Nassau | 6,359 |
| Rc Church of the Sacred Heart | Residence | Rectory | 1921 Old Mill Road | North Merrick | NY | 11566 | Nassau | 3,680 |
| Rc Church of the Sacred Heart | New Church | Church | 730 Merrick Avenue | North Merrick | NY | 11566 | Nassau | |
| Sacred Heart Church ⌐ | Parish Rectory - Mattituck | Rectory | 100 Reeve Avenue | Cutchogue | NY | 11952 | Suffolk | 2,016 |
| Sacred Heart Church ⌐ | School | School | 27685 Main Road | Cutchogue | NY | 11935 | Suffolk | 12,776 |
| Sacred Heart Church ⌐ | Church | Church | 27700 Main Road | Cutchogue | NY | 11935 | Suffolk | 3,461 |
| Sacred Heart Church ⌐ | Parish Hall | Hall | 27700 Main Road | Cutchogue | NY | 11935 | Suffolk | 3,000 |
| Sacred Heart Church ⌐ | Rectory | Rectory | 27905 Main Road | Cutchogue | NY | 11935 | Suffolk | 6,790 |
| Sacred Heart Church ⌐ | Maintenance & Garage | Garage | 27905 Main Road | Cutchogue | NY | 11935 | Suffolk | 1,122 |

**List of Properties**
Please see footnotes

| Account | Structure Name | Structure Type | Street | City | State | Zip | County | Floor Area |
|---|---|---|---|---|---|---|---|---|
| Sacred Heart Church | Parish Hall | Hall | 282 Long Beach Road | Island Park | NY | 11558 | Nassau | 17,219 |
| Sacred Heart Church | Church | Church | 282 Long Beach Road | Island Park | NY | 11558 | Nassau | 3,490 |
| Sacred Heart Church | Rectory | RECTORY | 282 Long Beach Road | Island Park | NY | 11558 | Nassau | 4,035 |
| Sacred Heart Church | Garage | Garage | 282 Long Beach Road | Island Park | NY | 11558 | Nassau | 312 |
| Sacred Hearts of Jesus and Mary Church 1 | School | School | 168 Hill Street | Southampton | NY | 11968 | Suffolk | 34,631 |
| Sacred Hearts of Jesus and Mary Church 1 | Church | Church | 168 Hill Street | Southampton | NY | 11968 | Suffolk | 10,018 |
| Sacred Hearts of Jesus and Mary Church 1 | Cemetery | Cemetery | 210 County Road 39A | Southampton | NY | 11968 | Suffolk | |
| Sacred Hearts of Jesus and Mary Church 1 | Rectory | Rectory | 168 Hill Street | Southampton | NY | 11968 | Suffolk | 10,672 |
| Sacred Hearts of Jesus and Mary Church 1 | Garage | Garage | 168 Hill Street | Southampton | NY | 11968 | Suffolk | 1,824 |
| Saint Dominic RC Church | Church | Church | 93 Anstice Street | Oyster Bay | NY | 11771 | Nassau | 24,240 |
| Saint Dominic RC Church | Chapel | Church | 93 Anstice Street | Oyster Bay | NY | 11771 | Nassau | 10,812 |
| Saint Dominic RC Church | Sports Center | Gymnasium | 93 Anstice Street | Oyster Bay | NY | 11771 | Nassau | 20,411 |
| Saint Dominic RC Church | Convent | Convent | 93 Anstice Street | Oyster Bay | NY | 11771 | Nassau | 17,808 |
| Saint Dominic RC Church | Rectory | Rectory | 93 Anstice Street | Oyster Bay | NY | 11771 | Nassau | 8,905 |
| Saint Dominic RC Church | Parish Office | Parish Office | 93 Anstice Street | Oyster Bay | NY | 11771 | Nassau | 4,656 |
| Saint Dominic RC Church | Residence And Garage | Garage | 93 Anstice Street | Oyster Bay | NY | 11771 | Nassau | 4,760 |
| Saint Dominic RC Church | Garage | Garage | 93 Anstice Street | Oyster Bay | NY | 11771 | Nassau | 380 |
| Saint Joachim RC Church | Church | Church | 614 Central Avenue | Cedarhurst | NY | 11516 | Nassau | 10,628 |
| Saint Joachim RC Church | Rectory | Rectory | 614 Central Avenue | Cedarhurst | NY | 11516 | Nassau | 5,182 |
| Saint Joachim RC Church | Rectory Garage | Garage | 614 Central Avenue | Cedarhurst | NY | 11516 | Nassau | 1,116 |
| Seminary of the Immaculate Conception | Building | Building | 440 West Neck Road | Huntington | NY | 11743 | Suffolk | |
| Seminary of the Immaculate Conception | School | School | 440 West Neck Road | Huntington | NY | 11743 | Suffolk | |
| SS Peter and Paul Church | Church | Church | 781 Wading River Road | Manorville | NY | 11792 | Suffolk | 5,129 |
| SS Peter and Paul Church | Rectory | Rectory | 781 Wading River Road | Manorville | NY | 11792 | Suffolk | 4,802 |
| SS Peter and Paul Church | Shed & Gazebo | Shed | 781 Wading River Road | Manorville | NY | 11792 | Suffolk | 96 |
| SS Philip and James Church | Church | Church | 454 North Country Road | St. James | NY | 11780 | Suffolk | 24,880 |
| SS Philip and James Church | Old Church | Hall | 454 North Country Road | St. James | NY | 11780 | Suffolk | 4,146 |
| SS Philip and James Church | Rectory Offices | Office | 454 North Country Road | St. James | NY | 11780 | Suffolk | 4,650 |
| SS Philip and James Church | Rectory | Rectory | 454 North Country Road | St. James | NY | 11780 | Suffolk | 6,980 |
| SS Philip and James Church | Garage | Garage | 454 North Country Road | St. James | NY | 11780 | Suffolk | 1,106 |
| SS Philip and James Church - School | School | School | 359 Clinton Avenue | Saint James | NY | 11780 | Suffolk | 15,169 |
| SS Philip and James Church - School | Old School | School | 454 North Country Road | Saint James | NY | 11780 | Suffolk | 4,616 |
| SS Philip and James Church - School | Rectory | Rectory | 1 Carrow Place | Saint James | NY | 11780 | Suffolk | |
| SS Philip and James Church - School | Portable Classroom | School | 454 North Country Road | Saint James | NY | 11780 | Suffolk | 1,650 |
| St. Agnes Cathedral | Church | Church | 20 Quealy Place | Rockville Centre | NY | 11570 | Nassau | 23,551 |
| St. Agnes Cathedral | Parish Center & Gym | Gymnasium | 20 Quealy Place | Rockville Centre | NY | 11570 | Nassau | 50,132 |
| St. Agnes Cathedral | Business Administration Office | Office | 20 Quealy Place | Rockville Centre | NY | 11570 | Nassau | 32,482 |
| St. Agnes Cathedral | Rectory And Garage | Garage | 20 Quealy Place | Rockville Centre | NY | 11570 | Nassau | 31,809 |
| St. Agnes Cathedral | Modular Unit | Building | 20 Quealy Place | Rockville Centre | NY | 11570 | Nassau | 540 |
| St. Agnes Cathedral - School | Elementary School | School | 20 Quealy Place | Rockville Centre | NY | 11570 | Nassau | 70,642 |
| St. Agnes R.C.C. 1 | School | School | 523 Front Street | Greenport | NY | 11944 | Suffolk | 22,750 |
| St. Agnes R.C.C. 1 | Church | Church | 523 Front Street | Greenport | NY | 11944 | Suffolk | 4,842 |
| St. Agnes R.C.C. 1 | Rectory | Rectory | 523 Front Street | Greenport | NY | 11944 | Suffolk | 3,713 |
| St. Agnes R.C.C. 1 | Garage | Garage | 523 Front Street | Greenport | NY | 11944 | Suffolk | 880 |
| St. Aidan Church | Residence 2 | Dwelling | 42 Bermingham Place | Williston Park | NY | 11596 | Nassau | 2,800 |
| St. Aidan Church | Garage 2 | Garage | 42 Bermingham Place | Williston Park | NY | 11596 | Nassau | 380 |
| St. Aidan Church | Church | Church | 505 Willis Avenue | Williston Park | NY | 11596 | Nassau | 15,277 |
| St. Aidan Church | Convent | Convent | 505 Willis Avenue | Williston Park | NY | 11596 | Nassau | 15,414 |
| St. Aidan Church | Gym | Gymnasium | 505 Willis Avenue | Williston Park | NY | 11596 | Nassau | 7,176 |
| St. Aidan Church | Rectory | Rectory | 505 Willis Avenue | Williston Park | NY | 11596 | Nassau | 9,272 |
| St. Aidan Church | Parish Center | Office | 505 Willis Avenue | Williston Park | NY | 11596 | Nassau | 6,580 |
| St. Aidan Church | Residence 1 | Dwelling | 505 Willis Avenue | Williston Park | NY | 11596 | Nassau | 1,864 |

**List of Properties**

Please see footnotes

| Account | Structure Name | Structure Type | Street | City | State | Zip | County | Floor Area |
|---|---|---|---|---|---|---|---|---|
| St. Aidan Church | Rectory Garage | Garage | 505 Willis Avenue | Williston Park | NY | 11596 | Nassau | 714 |
| St. Aidan Church | Garage 1 | Garage | 505 Willis Avenue | Williston Park | NY | 11596 | Nassau | 396 |
| St. Aidan Church - School | East Campus (Upper School) | School | 505 Willis Avenue | Williston Park | NY | 11596 | Nassau | 29,845 |
| St. Aidan Church - School | West Campus | School | 505 Willis Avenue | Williston Park | NY | 11596 | Nassau | 28,098 |
| St. Aloysius Church | Church | Church | 592 Middle Neck Road | Great Neck | NY | 11023 | Nassau | 14,656 |
| St. Aloysius Church | Convent | Convent | 592 Middle Neck Road | Great Neck | NY | 11023 | Nassau | 8,616 |
| St. Aloysius Church | Rectory | Rectory | 592 Middle Neck Road | Great Neck | NY | 11023 | Nassau | 6,746 |
| St. Aloysius Church | Garage | Garage | 592 Middle Neck Road | Great Neck | NY | 11023 | Nassau | 935 |
| St. Aloysius Church - School | School | School | 592 Middle Neck Road | Great Neck | NY | 11023 | Nassau | 34,727 |
| St. Andrew's R.C.C. 1 | Church | Church | 122 Division Street | Sag Harbor | NY | 11963 | Suffolk | 5,658 |
| St. Andrew's R.C.C. 1 | Rectory | Rectory | 122 Division Street | Sag Harbor | NY | 11963 | Suffolk | 6,413 |
| St. Andrew's R.C.C. 1 | Parish Center | Parish Center | 122 Division Street | Sag Harbor | NY | 11963 | Suffolk | 4,912 |
| St. Andrew's R.C.C. 1 | Garage | Garage | 122 Division Street | Sag Harbor | NY | 11963 | Suffolk | 736 |
| St. Andrew's R.C.C. 1 | Cemetery Storage | Shed | Brick Kiln Road | Sag Harbor | NY | 11963 | Suffolk | 273 |
| St. Anne Church | St Francis Ministry Center | Building | 26 Fairmount Boulevard | Garden City | NY | 11530 | Nassau | 10,756 |
| St. Anne Church | Church | Church | 35 Dartmouth Street | Garden City | NY | 11530 | Nassau | 29,400 |
| St. Anne Church | Rectory | Rectory | 35 Dartmouth Street | Garden City | NY | 11530 | Nassau | 8,920 |
| St. Anne Church - School | School | School | 25 Dartmouth Street | Garden City | NY | 11530 | Nassau | 39,120 |
| St. Anne's R.C.C. | Church | Church | 88 Second Avenue | Brentwood | NY | 11717 | Suffolk | 32,204 |
| St. Anne's R.C.C. | St. Anne's Hall | Hall | 96 2nd Avenue | Brentwood | NY | 11717 | Suffolk | 2,914 |
| St. Anne's R.C.C. | Convent | Parish Office | 88 Second Avenue | Brentwood | NY | 11717 | Suffolk | 15,670 |
| St. Anne's R.C.C. | Rectory | Rectory | 88 Second Avenue | Brentwood | NY | 11717 | Suffolk | 8,592 |
| St. Anthony Church | Parish Center | Parish Center | 110 Anchor Avenue | Oceanside | NY | 11572 | Nassau | 40,370 |
| St. Anthony Church | Tabor Retreat Center & Convent | Convent | 110 Anchor Avenue | Oceanside | NY | 11572 | Nassau | 16,692 |
| St. Anthony Church | Rectory | Rectory | 110 Anchor Avenue | Oceanside | NY | 11572 | Nassau | 7,734 |
| St. Anthony Church | Chapel | Church | 110 Anchor Avenue | Oceanside | NY | 11572 | Nassau | 4,574 |
| St. Anthony Church | Convent | Convent | 110 Anchor Avenue | Oceanside | NY | 11572 | Nassau | 2,380 |
| St. Anthony Church | Barn | Shed | 110 Anchor Avenue | Oceanside | NY | 11572 | Nassau | 1,536 |
| St. Anthony Church | Garage At Rectory | Garage | 110 Anchor Avenue | Oceanside | NY | 11572 | Nassau | 661 |
| St. Anthony Church | Festival Storage Shed | Shed | 110 Anchor Avenue | Oceanside | NY | 11572 | Nassau | 560 |
| St. Anthony Church | Shed At Church | Shed | 110 Anchor Avenue | Oceanside | NY | 11572 | Nassau | 64 |
| St. Anthony Church | Candle Shed | Shed | 110 Anchor Avenue | Oceanside | NY | 11572 | Nassau | 126 |
| St. Anthony Church | Athletics Shed | Shed | 110 Anchor Avenue | Oceanside | NY | 11572 | Nassau | 120 |
| St. Anthony Church | Storage Shed | Shed | 110 Anchor Avenue | Oceanside | NY | 11572 | Nassau | 90 |
| St. Anthony Church | Church | Church | 110 Anchor Drive | Oceanside | NY | 11572 | Nassau | 8,756 |
| St. Anthony of Padua R.C.C. | Church | Church | 20 Cheshire Place | East Northport | NY | 11731 | Suffolk | 28,100 |
| St. Anthony of Padua R.C.C. | Rectory | Rectory | 20 Cheshire Place | East Northport | NY | 11731 | Suffolk | 11,195 |
| St. Anthony of Padua R.C.C. | Convent | Convent | 20 Cheshire Place | East Northport | NY | 11731 | Suffolk | 10,012 |
| St. Anthony of Padua R.C.C. | Garage 2 | Garage | 20 Cheshire Place | East Northport | NY | 11731 | Suffolk | 720 |
| St. Anthony of Padua R.C.C. | School | School | 20 Cheshire Place | East Northport | NY | 11731 | Suffolk | |
| St. Anthony of Padua R.C.C. | Garage | Garage | 20 Cheshire Place | East Northport | NY | 11731 | Suffolk | 480 |
| St. Anthony of Padua R.C.C. | Church - Parish Center | Church | 614 Route 25A | Rocky Point | NY | 11778 | Suffolk | 29,520 |
| St. Anthony of Padua R.C.C. | Rectory | Rectory | 614 Route 25A | Rocky Point | NY | 11778 | Suffolk | 4,523 |
| St. Anthony of Padua R.C.C. | Convent | Convent | 614 Route 25A | Rocky Point | NY | 11778 | Suffolk | 1,944 |
| St. Anthony of Padua R.C.C. | Garage | Garage | 614 Route 25A | Rocky Point | NY | 11778 | Suffolk | 728 |
| St. Anthony of Padua R.C.C. | Concession Stand | Shed | 614 Route 25A | Rocky Point | NY | 11778 | Suffolk | 200 |
| St. Anthony of Padua R.C.C. | Metal Storage Shed | Shed | 614 Route 25A | Rocky Point | NY | 11778 | Suffolk | 120 |
| St. Barnabas the Apostle Church | Church | Church | 2320 Bedford Avenue | Bellmore | NY | 11710 | Nassau | 21,442 |
| St. Barnabas the Apostle Church | Convent | Convent | 2320 Bedford Avenue S | Bellmore | NY | 11710 | Nassau | 15,061 |
| St. Barnabas the Apostle Church | Rectory | Rectory | 2320 Bedford Avenue S | Bellmore | NY | 11710 | Nassau | 14,446 |
| St. Barnabas the Apostle Church | School | School | 2431 Washington Avenue | Bellmore | NY | 11710 | Nassau | 54,000 |
| St. Bernard Church | School | School | 3100 Hempstead Tpke. | Levittown | NY | 11756 | Nassau | 54,160 |

**List of Properties**
Please see footnotes

| Account | Structure Name | Structure Type | Street | City | State | Zip | County | Floor Area |
|---|---|---|---|---|---|---|---|---|
| St. Bernard Church | Church | Church | 3100 Hempstead Tpke. | Levittown | NY | 11756 | Nassau | 10,379 |
| St. Bernard Church | Convent | Convent | 3100 Hempstead Tpke. | Levittown | NY | 11756 | Nassau | 11,737 |
| St. Bernard Church | Rectory | Rectory | 3100 Hempstead Tpke. | Levittown | NY | 11756 | Nassau | 7,264 |
| St. Bernard Church | Parish Center | Hall | 3100 Hempstead Tpke. | Levittown | NY | 11756 | Nassau | 3,696 |
| St. Bernard Church | Clairvoux House (Old Convent) | Office | 3100 Hempstead Tpke. | Levittown | NY | 11756 | Nassau | 5,364 |
| St. Bernard Church | Convent Garage | Garage | 3100 Hempstead Tpke. | Levittown | NY | 11756 | Nassau | 576 |
| St. Bernard Church | Garage | Garage | 3100 Hempstead Tpke. | Levittown | NY | 11756 | Nassau | 1,344 |
| St. Boniface Martyr Church | School | School | 145 Glen Avenue | Sea Cliff | NY | 11579 | Nassau | 37,779 |
| St. Boniface Martyr Church | Church | Church | 145 Glen Avenue | Sea Cliff | NY | 11579 | Nassau | 14,448 |
| St. Boniface Martyr Church | Parish Offices (Old Convent) | Parish Office | 145 Glen Avenue | Sea Cliff | NY | 11579 | Nassau | 8,826 |
| St. Boniface Martyr Church | Rectory | Rectory | 145 Glen Avenue | Sea Cliff | NY | 11579 | Nassau | 4,400 |
| St. Boniface Martyr Church | Garage | Garage | 145 Glen Avenue | Sea Cliff | NY | 11579 | Nassau | 874 |
| St. Boniface Martyr Church | Garage | Garage | 145 Glen Avenue | Sea Cliff | NY | 11579 | Nassau | 1,227 |
| St. Boniface Roman Catholic Church I | School | School | 621 Elmont Road | Elmont | NY | 11003 | Nassau | 51,832 |
| St. Boniface Roman Catholic Church I | Church | Church | 631 Elmont Road | Elmont | NY | 11003 | Nassau | 34,744 |
| St. Boniface Roman Catholic Church I | Rectory | Rectory | 631 Elmont Road | Elmont | NY | 11003 | Nassau | 12,819 |
| St. Boniface Roman Catholic Church I | Convent | Convent | 631 Elmont Road | Elmont | NY | 11003 | Nassau | 11,556 |
| St. Boniface Roman Catholic Church I | Garage | Garage | 631 Elmont Road | Elmont | NY | 11003 | Nassau | 816 |
| St. Brigid Church | Police Building | Building | 231 St. Brigids Lane | Westbury | NY | 11590 | Nassau | 18,656 |
| St. Brigid Church | Church | Church | 75 Post Avenue | Westbury | NY | 11590 | Nassau | 11,422 |
| St. Brigid Church | Rectory | Rectory | 75 Post Avenue | Westbury | NY | 11590 | Nassau | 7,529 |
| St. Brigid Church | Parish Center | Parish Center | 75 Post Avenue | Westbury | NY | 11590 | Nassau | 6,623 |
| St. Brigid Church | Garage | Garage | 75 Post Avenue | Westbury | NY | 11590 | Nassau | 1,452 |
| St. Brigid Church | Gazebo | Building | 75 Post Avenue | Westbury | NY | 11590 | Nassau | 173 |
| St. Brigid Church | St. Anthony'S Hall | Hall | 85 Post Avenue | Westbury | NY | 11590 | Nassau | |
| St. Brigid Church | School | School | 101 Maple Avenue | Westbury | NY | 11590 | Nassau | |
| St. Catherine of Sienna Church | School | School | 33 New Hyde Park Road | Franklin Square | NY | 11010 | Nassau | 47,330 |
| St. Catherine of Sienna Church | Sienna Center Parish Hall | Hall | 33 New Hyde Park Road | Franklin Square | NY | 11010 | Nassau | 21,886 |
| St. Catherine of Sienna Church | Church | Church | 33 New Hyde Park Road | Franklin Square | NY | 11010 | Nassau | 8,262 |
| St. Catherine of Sienna Church | Convent | Convent | 33 New Hyde Park Road | Franklin Square | NY | 11010 | Nassau | 16,113 |
| St. Catherine of Sienna Church | Rectory | Rectory | 33 New Hyde Park Road | Franklin Square | NY | 11010 | Nassau | 7,094 |
| St. Catherine of Sienna Church | Portable Classrooms | School | 33 New Hyde Park Road | Franklin Square | NY | 11010 | Nassau | 1,876 |
| St. Catherine of Sienna Church | Shed | Shed | 33 New Hyde Park Road | Franklin Square | NY | 11010 | Nassau | 336 |
| St. Christopher RC Church | Church | Church | 11 Gale Avenue | Baldwin | NY | 11510 | Nassau | 28,616 |
| St. Christopher RC Church | Convent | Convent | 11 Gale Avenue | Baldwin | NY | 11510 | Nassau | 9,297 |
| St. Christopher RC Church | Rectory | Rectory | 11 Gale Avenue | Baldwin | NY | 11510 | Nassau | 6,987 |
| St. Christopher RC Church | Garage & Shed | Garage | 11 Gale Avenue | Baldwin | NY | 11510 | Nassau | 792 |
| St. Christopher RC Church - School | School | School | 11 Gale Avenue | Baldwin | NY | 11510 | Nassau | 68,314 |
| St. Dominic Parish High School | Old High School #2 | School | 110 Anstice Street | Oyster Bay | NY | 11771 | Nassau | 33,216 |
| St. Dominic Parish High School | Old High School | School | 110 Anstice Street | Oyster Bay | NY | 11771 | Nassau | 23,028 |
| St. Dominic Parish High School | Elementary School | School | 35 School Street | Oyster Bay | NY | 11771 | Nassau | 31,536 |
| St. Edward the Confessor Church | New Church | Church | 205 Jackson Avenue | Syosset | NY | 11791 | Nassau | 12,603 |
| St. Edward the Confessor Church | Auditorium | Auditorium | 205 Jackson Avenue | Syosset | NY | 11791 | Nassau | 8,162 |
| St. Edward the Confessor Church | Meeting Room | Building | 205 Jackson Avenue | Syosset | NY | 11791 | Nassau | 4,692 |
| St. Edward the Confessor Church | Rectory | Rectory | 205 Jackson Avenue | Syosset | NY | 11791 | Nassau | 5,244 |
| St. Edward the Confessor Church | Garage/Office | Garage | 205 Jackson Avenue | Syosset | NY | 11791 | Nassau | 1,188 |
| St. Edward the Confessor Church - School | School | School | 205 Jackson Avenue | Syosset | NY | 11791 | Nassau | 46,881 |
| St. Elizabeth Ann Seton Church | St Elizabeth Ann Seton | Building | 59 Frances Blvd | Lake Ronkonkoma | NY | 11742 | Suffolk | 2,279 |
| St. Elizabeth Ann Seton Church | Church | Church | 800 Portion Road | Lake Ronkonkoma | NY | 11779 | Suffolk | 18,720 |
| St. Elizabeth Rcc | Spiritual Life Center | Building | 167 Wolf Hill Road | Melville | NY | 11747 | Suffolk | 9,539 |
| St. Elizabeth Rcc | Garage | Garage | 167 Wolf Hill Road | Melville | NY | 11747 | Suffolk | 720 |
| St. Elizabeth Rcc | Parish Center | Parish Center | 175 Wolf Hill Road | Melville | NY | 11747 | Suffolk | 39,848 |

**List of Properties**
Please see footnotes

| Account | Structure Name | Structure Type | Street | City | State | Zip | County | Floor Area |
|---|---|---|---|---|---|---|---|---|
| St. Elizabeth Rcc | Church | Church | 175 Wolf Hill Road | Melville | NY | 11747 | Suffolk | 24,220 |
| St. Elizabeth Rcc | Rectory | Rectory | 181 Wolf Hill Road | Melville | NY | 11747 | Suffolk | 6,624 |
| St. Elizabeth Rcc | Rectory Garage | Garage | 181 Wolf Hill Road | Melville | NY | 11747 | Suffolk | 1,680 |
| St. Frances Cabrini R.C.C. | Parish Center | Hall | 134 Middle Country Road | Coram | NY | 11727 | Suffolk | 12,445 |
| St. Frances Cabrini R.C.C. | Church | Church | 134 Middle Country Road | Coram | NY | 11727 | Suffolk | 5,881 |
| St. Frances Cabrini R.C.C. | Rectory | Rectory | 134 Middle Country Road | Coram | NY | 11727 | Suffolk | 4,031 |
| St. Frances Cabrini R.C.C. | Old Rectory | Rectory | 134 Middle Country Road | Coram | NY | 11727 | Suffolk | 944 |
| St. Frances Cabrini R.C.C. | Garage | Garage | 134 Middle Country Road | Coram | NY | 11727 | Suffolk | 880 |
| St. Frances de Chantal Church | School | School | 1309 Wantagh Avenue | Wantagh | NY | 11793 | Nassau | 44,613 |
| St. Frances de Chantal Church | Church | Church | 1309 Wantagh Avenue | Wantagh | NY | 11793 | Nassau | 11,697 |
| St. Frances de Chantal Church | Convent And Pastoral Center | Convent | 1309 Wantagh Avenue | Wantagh | NY | 11793 | Nassau | 9,857 |
| St. Frances de Chantal Church | Rectory | Rectory | 1309 Wantagh Avenue | Wantagh | NY | 11783 | Nassau | 8,424 |
| St. Frances de Chantal Church | Hawthorne House | Dwelling | 1309 Wantagh Avenue | Wantagh | NY | 11793 | Nassau | 2,482 |
| St. Francis de Sales Church | Parish Hall | School | 7 Amity Street | Patchogue | NY | 11772 | Suffolk | 14,768 |
| St. Francis de Sales Church | Church | Church | 7 Amity Street | Patchogue | NY | 11772 | Suffolk | 4,569 |
| St. Francis de Sales Church | Convent | Office | 7 Amity Street | Patchogue | NY | 11772 | Suffolk | 8,100 |
| St. Francis de Sales Church | Rectory | Rectory | 7 Amity Street | Patchogue | NY | 11772 | Suffolk | 5,045 |
| St. Francis de Sales Church | Kindergarten | School | 7 Amity Street | Patchogue | NY | 11772 | Suffolk | 1,550 |
| St. Francis de Sales Church | Garage #1 | Garage | 7 Amity Street | Patchogue | NY | 11772 | Suffolk | 864 |
| St. Francis de Sales Church | Garage #2 | Garage | 7 Amity Street | Patchogue | NY | 11772 | Suffolk | 864 |
| St. Francis de Sales Church | School | School | 1 Division Street | Patchogue | NY | 11772 | Suffolk | |
| St. Francis of Assisi Church | Church | Church | 29 Northgate Dr. | Greenlawn | NY | 11740 | Suffolk | 21,924 |
| St. Francis of Assisi Church | Garage | Garage | 29 Northgate Drive | Greenlawn | NY | 11740 | Suffolk | 1,020 |
| St. Francis of Assisi Church | Rectory | Rectory | 29 Northgate Drive | Greenlawn | NY | 11740 | Suffolk | 6,577 |
| St. Gerard Majella R.C.C. | Church/Parish Center | Church | 300 Terryville Rd | Port Jefferson Station | NY | 11776 | Suffolk | 18,489 |
| St. Gerard Majella R.C.C. | Rectory | Rectory | 65 Nadine Lane | Port Jefferson Station | NY | 11776 | Suffolk | |
| St. Gerard Majella R.C.C. | Dwelling | Dwelling | 316 Terryville Rd. | Port Jefferson Station | NY | 11776 | Suffolk | |
| St. Gerard Majella R.C.C. | Barn | Building | 316 Terryville Rd. | Port Jefferson Station | NY | 11776 | Suffolk | |
| St. Gertrude Church | Parish Center | Hall | 28 School Street | Bayville | NY | 11709 | Nassau | 20,928 |
| St. Gertrude Church | Church | Church | 28 School Street | Bayville | NY | 11709 | Nassau | 8,928 |
| St. Gertrude Church | Rectory | Rectory | 28 School Street | Bayville | NY | 11709 | Nassau | 6,577 |
| St. Gertrude Church | Parish Garage | Garage | 28 School Street | Bayville | NY | 11709 | Nassau | 400 |
| St. Gertrude Church | Shed | Shed | 28 School Street | Bayville | NY | 11709 | Nassau | 520 |
| St. Hedwig Church | Parish Hall | Hall | 1 Depan Avenue | Floral Park | NY | 11001 | Nassau | 18,123 |
| St. Hedwig Church | Church | Church | 1 Depan Avenue | Floral Park | NY | 11001 | Nassau | 4,620 |
| St. Hedwig Church | Rectory | Rectory | 1 Depan Avenue | Floral Park | NY | 11001 | Nassau | 8,854 |
| St. Hugh of Lincoln Church | Parish Center | Parish Center | 21 East 9Th Street | Huntington Station | NY | 11746 | Suffolk | 64,075 |
| St. Hugh of Lincoln Church | Church | Church | 21 East 9Th Street | Huntington Station | NY | 11746 | Suffolk | 16,391 |
| St. Hugh of Lincoln Church | Convent | Convent | 21 East 9Th Street | Huntington Station | NY | 11746 | Suffolk | 9,655 |
| St. Hugh of Lincoln Church | Rectory | Rectory | 21 East 9Th Street | Huntington Station | NY | 11746 | Suffolk | 9,417 |
| St. Ignatius Loyola Church | School #1 | School | 129 Broadway | Hicksville | NY | 11801 | Nassau | 51,723 |
| St. Ignatius Loyola Church | School #2 And Tunnel | School | 129 Broadway | Hicksville | NY | 11801 | Nassau | 22,620 |
| St. Ignatius Loyola Church | Convent | Convent | 129 Broadway | Hicksville | NY | 11801 | Nassau | 16,120 |
| St. Ignatius Loyola Church | Church | Church | 129 Broadway | Hicksville | NY | 11801 | Nassau | 13,263 |
| St. Ignatius Loyola Church | Rectory | Rectory | 129 Broadway | Hicksville | NY | 11801 | Nassau | 5,895 |
| St. Ignatius Loyola Church | Garage | Garage | 129 Broadway | Hicksville | NY | 11801 | Nassau | 1,430 |
| St. Ignatius Martyr Church | Convent and Adoration Chapel | Convent | 715 W. Penn Street | Long Beach | NY | 11561 | Nassau | 10,937 |
| St. Ignatius Martyr Church | Church | Church | 721 West Broadway | Long Beach | NY | 11561 | Nassau | 13,693 |
| St. Ignatius Martyr Church | Rectory | Rectory | 721 West Broadway | Long Beach | NY | 11561 | Nassau | 10,505 |
| St. Ignatius Martyr Church | Religious Education | Office | 721 West Broadway | Long Beach | NY | 11561 | Nassau | 2,800 |
| St. Ignatius Martyr Church | Shed | Shed | 721 West Broadway | Long Beach | NY | 11561 | Nassau | 400 |
| St. Ignatius Martyr Church | House - 750 West Penn St | Ministry Offices | 750 West Penn Street | Long Beach | NY | 11561 | Nassau | 1,500 |

**List of Properties**
Please see footnotes

| Account | Structure Name | Structure Type | Street | City | State | Zip | County | Floor Area |
|---|---|---|---|---|---|---|---|---|
| St. Ignatius Martyr Church | School | School | 735 West Broadway | Long Beach | NY | 11562 | Nassau | |
| St. Isidore Church † | Storage Building | Building | 515 Marcy Street | Riverhead | NY | 11901 | Suffolk | 280 |
| St. Isidore Church † | Garage | Garage | 515 Marcy Street | Riverhead | NY | 11901 | Suffolk | 468 |
| St. Isidore Church † | Church | Church | 622 Pulaski Street | Riverhead | NY | 11901 | Suffolk | 13,482 |
| St. Isidore Church † | Rectory | Rectory | 622 Pulaski Street | Riverhead | NY | 11901 | Suffolk | 8,802 |
| St. Isidore Church † | School & Convent | School & Convent | 515 Marcy Street | Riverhead | NY | 11901 | Suffolk | |
| St. Isidore Church † | Garage | Garage | 622 Pulaski Street | Riverhead | NY | 11901 | Suffolk | 920 |
| St. James Church † | Church | Church | 429 Route 25A | Setauket | NY | 11733 | Suffolk | 20,318 |
| St. James Church † | Parish Center | Parish Center | 429 Route 25A | Setauket | NY | 11733 | Suffolk | 17,143 |
| St. James Church † | Rectory | Rectory | 429 Route 25A | Setauket | NY | 11733 | Suffolk | 7,213 |
| St. James Church † | Garage | Garage | 429 Route 25A | Setauket | NY | 11733 | Suffolk | 935 |
| St. James Church † | Shed | Shed | 429 Route 25A | Setauket | NY | 11733 | Suffolk | 120 |
| St. John Baptist Church | Church | Church | 1488 N. Country Road | Wading River | NY | 11792 | Suffolk | 7,200 |
| St. John Baptist Church | Parish Hall | Office | 1488 North Country Road | Wading River | NY | 11792 | Suffolk | 12,896 |
| St. John Baptist Church | Rectory | Rectory | 1488 North Country Road | Wading River | NY | 11792 | Suffolk | 4,324 |
| St. John Baptist Church | Garage | Garage | 1488 North Country Road | Wading River | NY | 11792 | Suffolk | 740 |
| St. John Baptist Church | Storage | Shed | 1488 North Country Road | Wading River | NY | 11792 | Suffolk | 744 |
| St. John Evangelist R.C.C. | Church | Church | 25 South Ocean Avenue | Center Moriches | NY | 11934 | Suffolk | 22,704 |
| St. John Evangelist R.C.C. | Barn | Building | 25 South Ocean Avenue | Center Moriches | NY | 11934 | Suffolk | 3,583 |
| St. John Evangelist R.C.C. | Convent | Convent | 25 South Ocean Avenue | Center Moriches | NY | 11934 | Suffolk | 6,574 |
| St. John Evangelist R.C.C. | Rectory | Rectory | 25 South Ocean Avenue | Center Moriches | NY | 11934 | Suffolk | 4,625 |
| St. John Evangelist R.C.C. | Thrift Shop | Building | 25 South Ocean Avenue | Center Moriches | NY | 11934 | Suffolk | 1,008 |
| St. John Evangelist R.C.C. | Saint Vincent Depaul | Building | 25 South Ocean Avenue | Center Moriches | NY | 11934 | Suffolk | 1,040 |
| St. John Evangelist R.C.C. | Rectory Garage | Garage | 25 South Ocean Avenue | Center Moriches | NY | 11934 | Suffolk | 2,140 |
| St. John Evangelist R.C.C. | School | School | 2 St. John Place | Center Moriches | NY | 11934 | Suffolk | |
| St. John Nepomucene Church † | Church | Church | 1140 Locust Avenue | Bohemia | NY | 11716 | Suffolk | 18,978 |
| St. John Nepomucene Church † | School (Parish Center) | School | 1140 Locust Avenue | Bohemia | NY | 11716 | Suffolk | 31,460 |
| St. John Nepomucene Church † | Rectory | Rectory | 1140 Locust Avenue | Bohemia | NY | 11716 | Suffolk | 4,644 |
| St. John Nepomucene Church † | Little Church | Church | 1140 Locust Avenue | Bohemia | NY | 11716 | Suffolk | 1,656 |
| St. John Nepomucene Church † | Convent | Convent | 1140 Locust Avenue | Bohemia | NY | 11716 | Suffolk | 2,682 |
| St. John Nepomucene Church † | Shop & Garage | Garage | 1140 Locust Avenue | Bohemia | NY | 11716 | Suffolk | 1,268 |
| St. John Nepomucene Church † | Garage | Garage | 1140 Locust Avenue | Bohemia | NY | 11716 | Suffolk | 240 |
| St. John of God Church † | Church | Church | 84 Carleton Avenue | Central Islip | NY | 11722 | Suffolk | 5,630 |
| St. John of God Church † | School | School | 82 Carleton Avenue | Central Islip | NY | 11722 | Suffolk | |
| St. John of God Church † | Convent | Convent | 84 Carleton Avenue | Central Islip | NY | 11722 | Suffolk | 8,294 |
| St. John of God Church † | Priests Residence | Rectory | 84 Carleton Avenue | Central Islip | NY | 11722 | Suffolk | 4,488 |
| St. John of God Church † | Computer Room | School | 84 Carleton Avenue | Central Islip | NY | 11722 | Suffolk | 1,440 |
| St. John of God Church † | Garage | Garage | 84 Carleton Avenue | Central Islip | NY | 11722 | Suffolk | 1,120 |
| St. John the Baptist Diocesan High School | School | School | 1170 Montauk Highway | West Islip | NY | 11795 | Suffolk | |
| St. John the Evangelist Church † | School | School | 546 St. John's Place | Riverhead | NY | 11901 | Suffolk | 27,502 |
| St. John the Evangelist Church † | Church | Church | 546 St. John's Place | Riverhead | NY | 11901 | Suffolk | 8,900 |
| St. John the Evangelist Church † | Rectory | Rectory | 546 St. John's Place | Riverhead | NY | 11901 | Suffolk | 6,717 |
| St. Joseph Church † | Church | Church | 39 North Carll Avenue | Babylon | NY | 11702 | Suffolk | 8,883 |
| St. Joseph Church † | Convent | Convent | 39 North Carll Avenue | Babylon | NY | 11702 | Suffolk | 17,169 |
| St. Joseph Church † | Rectory | Rectory | 39 North Carll Avenue | Babylon | NY | 11702 | Suffolk | 16,243 |
| St. Joseph Church † | Virdone Residence | Dwelling | 39 North Carll Avenue | Babylon | NY | 11702 | Suffolk | 8,339 |
| St. Joseph Church † | Garage | Garage | 39 North Carll Avenue | Babylon | NY | 11702 | Suffolk | 1,416 |
| St. Joseph Church | Church | Church | 130 Fifth Street | Garden City | NY | 11530 | Nassau | 16,497 |
| St. Joseph Church | Convent | Church | 120 Fifth Street | Garden City | NY | 11530 | Nassau | 13,768 |
| St. Joseph Church | Rectory | Rectory | 130 Fifth Street | Garden City | NY | 11530 | Nassau | 10,674 |
| St. Joseph Church | Garage | Garage | 130 Fifth Street | Garden City | NY | 11530 | Nassau | 875 |
| St. Joseph Church | School | School | 1346 Broadway | Hewlett | NY | 11557 | Nassau | 34,737 |

**List of Properties**
Please see footnotes

| Account | Structure Name | Structure Type | Street | City | State | Zip | County | Floor Area |
|---|---|---|---|---|---|---|---|---|
| St. Joseph Church | Church | Church | 1346 Broadway | Hewlett | NY | 11557 | Nassau | 15,990 |
| St. Joseph Church | Rectory | Rectory | 1346 Broadway | Hewlett | NY | 11557 | Nassau | 5,666 |
| St. Joseph Church | Convent | Convent | 1346 Broadway | Hewlett | NY | 11557 | Nassau | 4,579 |
| St. Joseph Church | Garage | Garage | 1346 Broadway | Hewlett | NY | 11557 | Nassau | 1,080 |
| St. Joseph Church | School | School | 59 Church Street | Kings Park | NY | 11754 | Suffolk | 59,016 |
| St. Joseph Church | Church | Church | 59 Church Street | Kings Park | NY | 11754 | Suffolk | 10,025 |
| St. Joseph Church | Parish Center | Dwelling / Office | 59 Church Street | Kings Park | NY | 11754 | Suffolk | 11,454 |
| St. Joseph Church | Rectory | Rectory | 59 Church Street | Kings Park | NY | 11754 | Suffolk | 8,061 |
| St. Joseph Church | Garage #3 | Garage | 59 Church Street | Kings Park | NY | 11754 | Suffolk | 2,880 |
| St. Joseph Church | Garage #2 | Garage | 59 Church Street | Kings Park | NY | 11754 | Suffolk | 1,040 |
| St. Joseph Church | Garage #1 | Garage | 59 Church Street | Kings Park | NY | 11754 | Suffolk | 1,040 |
| St. Joseph Church | Church | Church | 45 Church Street | Ronkonkoma | NY | 11779 | Suffolk | 32,354 |
| St. Joseph Church | Upper School | School | 25 Church Street | Ronkonkoma | NY | 11779 | Suffolk | 18,005 |
| St. Joseph Church | Lower School | School | 25 Church Street | Ronkonkoma | NY | 11779 | Suffolk | 13,438 |
| St. Joseph Church | Rectory | Rectory | 45 Church Street | Ronkonkoma | NY | 11779 | Suffolk | 10,041 |
| St. Joseph Church | Parish Outreach | Office | 2855 Pond Road | Ronkonkoma | NY | 11779 | Suffolk | 2,872 |
| St. Joseph Church - School | School | School | 39 North Carll Avenue | Babylon | NY | 11702 | Suffolk | 67,682 |
| St. Joseph Church - School | Old School | School | 450 Franklin Avenue | Garden City | NY | 11530 | Nassau | 31,428 |
| St. Joseph Church - School | School | School | 450 Franklin Avenue | Garden City | NY | 11530 | Nassau | 22,175 |
| St. Joseph the Worker R.C.C. | Church | Church | 510 Narrangansett | East Patchogue | NY | 11772 | Suffolk | 14,504 |
| St. Joseph the Worker R.C.C. | Offices & Classrooms | School | 510 Narrangansett | East Patchogue | NY | 11772 | Suffolk | 10,662 |
| St. Joseph the Worker R.C.C. | Friary | Rectory | 510 Narrangansett | East Patchogue | NY | 11772 | Suffolk | 6,880 |
| St. Joseph the Worker R.C.C. | Garage #2 | Garage | 510 Narrangansett | East Patchogue | NY | 11772 | Suffolk | 576 |
| St. Joseph the Worker R.C.C. | Garage #1 | Garage | 510 Narrangansett | East Patchogue | NY | 11772 | Suffolk | 704 |
| St. Jude Church | Parish Hall | Hall | 89 Overlook Drive | Mastic Beach | NY | 11951 | Suffolk | 14,897 |
| St. Jude Church | New Church | Church | 89 Overlook Drive | Mastic Beach | NY | 11951 | Suffolk | 8,904 |
| St. Jude Church | Rectory | Rectory | 89 Overlook Drive | Mastic Beach | NY | 11951 | Suffolk | 10,094 |
| St. Jude Church | Little Church | Church | 89 Overlook Drive | Mastic Beach | NY | 11951 | Suffolk | 2,944 |
| St. Jude Church | Outreach Center | Building | 89 Overlook Drive | Mastic Beach | NY | 11951 | Suffolk | 4,230 |
| St. Jude Church | Grotto | Building | 89 Overlook Drive | Mastic Beach | NY | 11951 | Suffolk | 450 |
| St. Jude Church | Storage Sheds | Shed | 89 Overlook Drive | Mastic Beach | NY | 11951 | Suffolk | 272 |
| St. Kilian Roman Catholic Church | Church | Church | 485 Conklin Street | Farmingdale | NY | 11735 | Nassau | 23,248 |
| St. Kilian Roman Catholic Church | Rectory | Rectory | 485 Conklin Street | Farmingdale | NY | 11735 | Nassau | 15,589 |
| St. Kilian Roman Catholic Church | School | School | 50 Cherry Street | Farmingdale | NY | 11735 | Nassau | 35,000 |
| St. Kilian Roman Catholic Church | Outreach | Building | 140 Elizabeth Street | Farmingdale | NY | 11735 | Nassau | 3,644 |
| St. Kilian Roman Catholic Church | Youth Building | Building | 485 Conklin Street | Farmingdale | NY | 11735 | Nassau | 2,124 |
| St. Ladislaus Church | School | School | 18 Richardson Place | Hempstead | NY | 11550 | Nassau | 35,151 |
| St. Ladislaus Church | Church | Church | 18 Richardson Place | Hempstead | NY | 11550 | Nassau | 14,840 |
| St. Ladislaus Church | Office Building | Office | 18 Richardson Place | Hempstead | NY | 11550 | Nassau | 9,415 |
| St. Ladislaus Church | Rectory | Rectory | 18 Richardson Place | Hempstead | NY | 11550 | Nassau | 8,081 |
| St. Ladislaus Church | Garage | Garage | 18 Richardson Place | Hempstead | NY | 11550 | Nassau | 1,490 |
| St. Lawrence the Martyr Church 1 | Rectory | Rectory | 27 Handsome Ave | Sayville | NY | 11782 | Suffolk | 5,304 |
| St. Lawrence the Martyr Church 1 | Book And Thrift Shop | Office | 27 Handsome Ave | Sayville | NY | 11782 | Suffolk | 1,100 |
| St. Lawrence the Martyr Church 1 | Garage and Pantry Storage | Garage | 27 Handsome Ave | Sayville | NY | 11782 | Suffolk | 1,675 |
| St. Lawrence the Martyr Church 1 | Rectory Garage | Garage | 27 Handsome Ave | Sayville | NY | 11782 | Suffolk | 280 |
| St. Lawrence the Martyr Church 1 | School | School | 212 West Main St. | Sayville | NY | 11782 | Suffolk | |
| St. Lawrence the Martyr Church 1 | Bethany Center | Parish Center | 240 West Main St. | Sayville | NY | 11782 | Suffolk | |
| St. Lawrence the Martyr Church 1 | Church | Church | 240 West Main St. | Sayville | NY | 11782 | Suffolk | 16,153 |
| St. Lawrence the Martyr Church 1 | School | School | 200 Main Street | Sayville | NY | 11781 | Suffolk | |
| St. Louis De Monfort Church | Church | Church | 75 New York Avenue | Sound Beach | NY | 11789 | Suffolk | 19,966 |
| St. Louis De Monfort Church | Parish Center | Hall | 75 New York Avenue | Sound Beach | NY | 11789 | Suffolk | 13,008 |
| St. Louis De Monfort Church | Rectory | Rectory | 75 New York Avenue | Sound Beach | NY | 11789 | Suffolk | 11,431 |

**List of Properties**

Please see footnotes

| Account | Structure Name | Structure Type | Street | City | State | Zip | County | Floor Area |
|---|---|---|---|---|---|---|---|---|
| St. Lukes R.C.C. | Church | Church | 266 Wicks Road | Brentwood | NY | 11717 | Suffolk | 32,348 |
| St. Lukes R.C.C. | Rectory | Rectory | 266 Wicks Road | Brentwood | NY | 11717 | Suffolk | 9,952 |
| St. Margaret of Scotland Church | Residence | Dwelling | 69 College Road | Selden | NY | 11784 | Suffolk | 3,536 |
| St. Margaret of Scotland Church | Church | Church | 81 College Road | Selden | NY | 11784 | Suffolk | 23,524 |
| St. Margaret of Scotland Church | Rectory | Rectory | 81 College Road | Selden | NY | 11784 | Suffolk | 10,016 |
| St. Margaret of Scotland Church | Work Shop | Building | 81 College Road | Selden | NY | 11784 | Suffolk | 884 |
| St. Margaret of Scotland Church | Thrift Shop | Building | 81 College Road | Selden | NY | 11784 | Suffolk | 432 |
| St. Margaret of Scotland Church | Concesssion Stand | Building | 81 College Road | Selden | NY | 11784 | Suffolk | 96 |
| St. Margaret of Scotland Church | Shed | Shed | 81 College Road | Selden | NY | 11784 | Suffolk | 120 |
| St. Mark Church | Church | Church | 105 Randall Road | Shoreham | NY | 11786 | Suffolk | 11,449 |
| St. Mark Church | Parish Center | Parish Center | 105 Randall Road | Shoreham | NY | 11786 | Suffolk | 11,149 |
| St. Mark Church | Rectory | Rectory | 105 Randall Road | Shoreham | NY | 11786 | Suffolk | 4,561 |
| St. Mark Church | Sheds | Shed | 105 Randall Road | Shoreham | NY | 11786 | Suffolk | 888 |
| St. Mark Church | Garage | Garage | 105 Randall Road | Shoreham | NY | 11786 | Suffolk | 660 |
| St. Martha Church | Church | Church | 546 Greengrove Avenue | Uniondale | NY | 11553 | Nassau | 16,420 |
| St. Martha Church | Parish Center | Dwelling | 546 Greengrove Avenue | Uniondale | NY | 11553 | Nassau | 18,771 |
| St. Martha Church | Rectory | Rectory | 546 Greengrove Avenue | Uniondale | NY | 11553 | Nassau | 6,072 |
| St. Martha Church | Maintenance Building | Warehouse | 546 Greengrove Avenue | Uniondale | NY | 11553 | Nassau | 1,728 |
| St. Martha Church | Rectory Garage #1 | Garage | 546 Greengrove Avenue | Uniondale | NY | 11553 | Nassau | 462 |
| St. Martha Church | Rectory Garage #2 | Garage | 546 Greengrove Avenue | Uniondale | NY | 11553 | Nassau | 380 |
| St. Martin of Tours Church | Church | Church | 37 Union Avenue | Amityville | NY | 11701 | Suffolk | 19,596 |
| St. Martin of Tours Church | Parish Center | Parish Center | 37 Union Avenue | Amityville | NY | 11701 | Suffolk | 22,780 |
| St. Martin of Tours Church | Convent | Convent | 37 Union Avenue | Amityville | NY | 11701 | Suffolk | 9,506 |
| St. Martin of Tours Church | Rectory | Rectory | 37 Union Avenue | Amityville | NY | 11701 | Suffolk | 8,748 |
| St. Martin of Tours Church | Garage | Garage | 37 Union Avenue | Amityville | NY | 11701 | Suffolk | 1,144 |
| St. Martin of Tours Church | School | School | 40 Seaman Avenue | Bethpage | NY | 11714 | Nassau | 42,668 |
| St. Martin of Tours Church | Church | Church | 40 Seaman Avenue | Bethpage | NY | 11714 | Nassau | 20,082 |
| St. Martin of Tours Church | Rectory | Rectory | 40 Seaman Avenue | Bethpage | NY | 11714 | Nassau | 5,232 |
| St. Martin of Tours Church | Convent #1 And Offices | Convent | 40 Seaman Avenue | Bethpage | NY | 11714 | Nassau | 4,559 |
| St. Martin of Tours Church | Parish Hall | Hall | 40 Seaman Avenue | Bethpage | NY | 11714 | Nassau | 3,170 |
| St. Martin of Tours Church | Rectory Garage | Garage | 40 Seaman Avenue | Bethpage | NY | 11714 | Nassau | 382 |
| St. Martin of Tours Church - School | School | School | 37 Union Avenue | Amityville | NY | 11701 | Suffolk | 31,841 |
| St. Mary Church | Church | Church | 110 Bryant Avenue | Roslyn | NY | 11576 | Nassau | 9,452 |
| St. Mary Church | Rectory | Rectory | 110 Bryant Avenue | Roslyn | NY | 11576 | Nassau | 5,846 |
| St. Mary Church | Garage | Garage | 110 Bryant Avenue | Roslyn | NY | 11576 | Nassau | 736 |
| St. Mary Church | Storage | Shed | 110 Bryant Avenue | Roslyn | NY | 11576 | Nassau | 660 |
| St. Mary Church | School | School | 440 Round Hill Road | Roslyn | NY | 11576 | Nassau | 33,645 |
| St. Mary Church | Convent | Convent | 450 Roundhill Road | Roslyn | NY | 11576 | Nassau | 12,573 |
| St. Mary of the Isle Church | Church | Church | 315 E. Walnut Street | Long Beach | NY | 11561 | Nassau | 5,540 |
| St. Mary of the Isle Church | Parish Hall, Gym and Outreach Offices | Hall | 315 East Walnut Street | Long Beach | NY | 11561 | Nassau | 11,129 |
| St. Mary of the Isle Church | Rectory and Ministry Offices | Rectory | 315 East Walnut Street | Long Beach | NY | 11561 | Nassau | 11,337 |
| St. Mary R.C.C. | Church | Church | 24 Harrison Avenue | East Islip | NY | 11730 | Suffolk | 10,531 |
| St. Mary R.C.C. | Rectory | Rectory | 20 Harrison Avenue | East Islip | NY | 11730 | Suffolk | 12,463 |
| St. Mary R.C.C. | Parish Hall | Hall | 24 Harrison Avenue | East Islip | NY | 11730 | Suffolk | 9,990 |
| St. Mary R.C.C. | White House | Building | 24 Harrison Avenue | East Islip | NY | 11730 | Suffolk | 4,188 |
| St. Mary R.C.C. | Parish Social Ministry | Building | 24 Harrison Avenue | East Islip | NY | 11730 | Suffolk | 2,922 |
| St. Mary R.C.C. | Shed | Shed | 24 Harrison Avenue | East Islip | NY | 11730 | Suffolk | 192 |
| St. Mary School | School | School | 16 Harrison Avenue | East Islip | NY | 11730 | Suffolk | 50,028 |
| St. Mary's Parish High School | Marist Hall And Gym | Gymnasium | 1300 Northern Boulevard | Manhasset | NY | 11030 | Nassau | 57,442 |
| St. Mary's Parish High School | School Addition | School | 1300 Northern Boulevard | Manhasset | NY | 11030 | Nassau | 32,829 |
| St. Mary's Parish High School | School | School | 1300 Northern Boulevard | Manhasset | NY | 11030 | Nassau | 33,993 |
| St. Mary's Roman Catholic Church | Facilities Garage | Garage | 1300 Northern Blvd | Manhasset | NY | 11030 | Nassau | 600 |

**List of Properties**
Please see footnotes

| Account | Structure Name | Structure Type | Street | City | State | Zip | County | Floor Area |
|---|---|---|---|---|---|---|---|---|
| St. Mary's Roman Catholic Church | Immaculata Hall | Building | 1300 Northern Boulevard | Manhasset | NY | 11030 | Nassau | 49,117 |
| St. Mary's Roman Catholic Church | Church | Church | 1300 Northern Boulevard | Manhasset | NY | 11030 | Nassau | 24,262 |
| St. Mary's Roman Catholic Church | Convent | Convent | 1300 Northern Boulevard | Manhasset | NY | 11030 | Nassau | 17,955 |
| St. Mary's Roman Catholic Church | Rectory | Rectory | 1300 Northern Boulevard | Manhasset | NY | 11030 | Nassau | 9,214 |
| St. Mary's Roman Catholic Church | Maintenance Building | Building | 1300 Northern Boulevard | Manhasset | NY | 11030 | Nassau | 684 |
| St. Mary's Roman Catholic Church | Rectory Garage | Garage | 1300 Northern Boulevard | Manhasset | NY | 11030 | Nassau | 480 |
| St. Mary's Roman Catholic Church | Storage Shed | Shed | 1300 Northern Boulevard | Manhasset | NY | 11030 | Nassau | 200 |
| St. Matthew Church | Church | Church | 35 North Service Road | Dix Hills | NY | 11746 | Suffolk | 17,272 |
| St. Matthew Church | Parish Center | Parish Center | 35 North Service Road | Dix Hills | NY | 11746 | Suffolk | 22,857 |
| St. Matthew Church | Rectory | Rectory | 35 North Service Road | Dix Hills | NY | 11746 | Suffolk | 7,863 |
| St. Matthew Church | Garage | Garage | 35 North Service Road | Dix Hills | NY | 11746 | Suffolk | 1,718 |
| St. Patrick Church † | Church | Church | 9 North Clinton Avenue | Bay Shore | NY | 11706 | Suffolk | 11,748 |
| St. Patrick Church † | Monsignor Purick Hall | Hall | 9 North Clinton Avenue | Bay Shore | NY | 11706 | Suffolk | 23,976 |
| St. Patrick Church † | Rectory | Rectory | 9 North Clinton Avenue | Bay Shore | NY | 11706 | Suffolk | 13,033 |
| St. Patrick Church † | Convent | Convent | 9 North Clinton Avenue | Bay Shore | NY | 11706 | Suffolk | 10,187 |
| St. Patrick Church † | Msgr Coffey Cntr & Bethany House | Dwelling | 9 North Clinton Avenue | Bay Shore | NY | 11706 | Suffolk | 6,917 |
| St. Patrick Church † | Carriage House | Garage | 9 North Clinton Avenue | Bay Shore | NY | 11706 | Suffolk | 2,256 |
| St. Patrick Church † | Bethany Garage | Garage | 9 North Clinton Avenue | Bay Shore | NY | 11706 | Suffolk | 576 |
| St. Patrick Church † | School | School | 12 Pearsall Ave | Glen Cove | NY | 11542 | Nassau | 45,156 |
| St. Patrick Church † | Church | Church | 235 Glen Street | Glen Cove | NY | 11542 | Nassau | 16,002 |
| St. Patrick Church † | Parish Hall | Hall | 235 Glen Street | Glen Cove | NY | 11542 | Nassau | 26,050 |
| St. Patrick Church † | Convent/Parish Offices | Convent | 235 Glen Street | Glen Cove | NY | 11542 | Nassau | 15,570 |
| St. Patrick Church † | Rectory | Rectory | 235 Glen Street | Glen Cove | NY | 11542 | Nassau | 8,020 |
| St. Patrick Church † | Garage | Garage | 235 Glen Street | Glen Cove | NY | 11542 | Nassau | 798 |
| St. Patrick Church † | Church | Church | 52125 Main Road | Southold | NY | 11971 | Suffolk | 10,940 |
| St. Patrick Church † | Rectory | Rectory | 52125 Main Road | Southold | NY | 11971 | Suffolk | 5,854 |
| St. Patrick Church † | Garage | Garage | 52125 Main Road | Southold | NY | 11971 | Suffolk | 776 |
| St. Patrick Church - School † | School | School | 9 North Clinton Avenue | Bay Shore | NY | 11706 | Suffolk | 38,392 |
| St. Patrick Church - School † | School Garage | Garage | 9 North Clinton Avenue | Bay Shore | NY | 11706 | Suffolk | 624 |
| St. Patrick R.C.C. † | Church | Church | 280 East Main St | Smithtown | NY | 11787 | Suffolk | 13,757 |
| St. Patrick R.C.C. † | Rectory | Rectory | 280 East Main St | Smithtown | NY | 11787 | Suffolk | 6,248 |
| St. Patrick R.C.C. † | Parish Center | Convent | 280 East Main St | Smithtown | NY | 11787 | Suffolk | 10,212 |
| St. Patrick R.C.C. † | Garage | Garage | 280 East Main St | Smithtown | NY | 11787 | Suffolk | 1,518 |
| St. Patrick R.C.C. † | Maintenance Garage | Garage | 280 East Main St | Smithtown | NY | 11787 | Suffolk | 400 |
| St. Patrick R.C.C. † | Soccer Building | Building | 280 East Main St | Smithtown | NY | 11787 | Suffolk | 224 |
| St. Patrick R.C.C. - School † | School | School | 280 East Main St | Smithtown | NY | 11787 | Suffolk | 56,750 |
| St. Patrick Roman Catholic Church † | Church | Church | 400 Main Street | Huntington | NY | 11743 | Suffolk | 36,576 |
| St. Patrick Roman Catholic Church † | Rectory | Rectory | 400 Main Street | Huntington | NY | 11743 | Suffolk | 9,652 |
| St. Patrick Roman Catholic Church † | Parish Offices | Parish Office | 400 Main Street | Huntington | NY | 11743 | Suffolk | 4,598 |
| St. Patrick Roman Catholic Church † | Rectory Garage | Garage | 400 Main Street | Huntington | NY | 11743 | Suffolk | 1,170 |
| St. Patrick Roman Catholic Church † | Cemetery Office Building | Building | 45 Huntington Road | Huntington | NY | 11743 | Suffolk | 2,150 |
| St. Patrick Roman Catholic Church - School † | School | School | 360 Main Street | Huntington | NY | 11743 | Suffolk | 69,456 |
| St. Patrick Roman Catholic Church - School † | Junior High | School | 360 Main Street | Huntington | NY | 11743 | Suffolk | 8,385 |
| St. Patrick Roman Catholic Church - School † | Pre Kindergarten | School | 360 Main Street | Huntington | NY | 11743 | Suffolk | 1,682 |
| St. Paul the Apostle Church | Church | Church | 2534 Cedar Swamp Road | Brookville | NY | 11545 | Nassau | 28,904 |
| St. Paul the Apostle Church | Rectory | Rectory | 2534 Cedar Swamp Road | Brookville | NY | 11545 | Nassau | 8,150 |
| St. Paul the Apostle Church | Cottage | Dwelling | 2534 Cedar Swamp Road | Brookville | NY | 11545 | Nassau | 1,316 |
| St. Paul the Apostle Church | Barn - Garage | Warehouse | 2534 Cedar Swamp Road | Brookville | NY | 11545 | Nassau | 748 |
| St. Paul the Apostle Church | Garage | Garage | 2534 Cedar Swamp Road | Brookville | NY | 11545 | Nassau | 528 |
| St. Peter of Alcantara Church | Convent | Convent | 1327 Port Washington Boulevard | Port Washington | NY | 11050 | Nassau | 17,593 |
| St. Peter of Alcantara Church | Church | Church | 1327 Port Washington Boulevard | Port Washington | NY | 11050 | Nassau | 8,240 |
| St. Peter of Alcantara Church | Rectory | Rectory | 1327 Port Washington Boulevard | Port Washington | NY | 11050 | Nassau | 7,680 |

**List of Properties**

Please see footnotes

| Account | Structure Name | Structure Type | Street | City | State | Zip | County | Floor Area |
|---|---|---|---|---|---|---|---|---|
| St. Peter of Alcantara Church | Thrift Store | Building | 1327 Port Washington Boulevard | Port Washington | NY | 11050 | Nassau | 5,204 |
| St. Peter of Alcantara Church | Garage | Garage | 1327 Port Washington Boulevard | Port Washington | NY | 11050 | Nassau | 840 |
| St. Peter of Alcantara Church - School | New School | School | 1327 Port Washington Boulevard | Port Washington | NY | 11050 | Nassau | 28,218 |
| St. Peter of Alcantara Church - School | Old School | School | 1327 Port Washington Boulevard | Port Washington | NY | 11050 | Nassau | 33,356 |
| St. Peter the Apostle | Church | Church | 286 Main Street | East Hampton | NY | 11930 | Suffolk | 4,796 |
| St. Peter the Apostle Church | Church | Church | 70 Rockaway Street | Islip Terrace | NY | 11752 | Suffolk | 20,460 |
| St. Peter the Apostle Church | Convent | Convent | 92 Valley Stream Street | Islip Terrace | NY | 11752 | Suffolk | 3,865 |
| St. Peter the Apostle Church | Center Garage | Garage | 92 Valley Stream Street | Islip Terrace | NY | 11752 | Suffolk | 576 |
| St. Peter the Apostle Church | Rectory | Rectory | 94 Valley Stream Street | Islip Terrace | NY | 11752 | Suffolk | 4,505 |
| St. Peter the Apostle Church | Rectory Garage | Garage | 94 Valley Stream Street | Islip Terrace | NY | 11752 | Suffolk | 576 |
| St. Philip Neri Church Ⅰ | Parish Center | Parish Center | 15 Prospect Avenue | Northport | NY | 11768 | Suffolk | 15,106 |
| St. Philip Neri Church Ⅰ | Church | Church | 344 Main Street | Northport | NY | 11768 | Suffolk | 14,872 |
| St. Philip Neri Church Ⅰ | Rectory | Rectory | 344 Main Street | Northport | NY | 11768 | Suffolk | 5,896 |
| St. Philip Neri Church Ⅰ | Rectory Garage | Garage | 344 Main Street | Northport | NY | 11768 | Suffolk | 800 |
| St. Philip Neri Church Ⅰ | Convent | Convent | 360 Main Street | Northport | NY | 11768 | Suffolk | 9,465 |
| St. Philip Neri Church Ⅰ | School | School | 364 Main Street | Northport | NY | 11768 | Suffolk | |
| St. Philip Neri Church Ⅰ | School Garage | Garage | 364 Main Street | Northport | NY | 11768 | Suffolk | 600 |
| St. Pius X Church | School/Rectory | School | 1 St. Pius Court | Plainview | NY | 11803 | Nassau | 40,657 |
| St. Pius X Church | Church | Church | 1 St. Pius Court | Plainview | NY | 11803 | Nassau | 4,676 |
| St. Pius X Church | Shed | Shed | 1 St. Pius Court | Plainview | NY | 11803 | Nassau | 720 |
| St. Raphael Church | School | School | 600 Newbridge Road | East Meadow | NY | 11554 | Nassau | 50,347 |
| St. Raphael Church | New Church | Church | 600 Newbridge Road | East Meadow | NY | 11554 | Nassau | 29,460 |
| St. Raphael Church | Convent | Convent | 600 Newbridge Road | East Meadow | NY | 11554 | Nassau | 13,027 |
| St. Raphael Church | Rectory | Rectory | 600 Newbridge Road | East Meadow | NY | 11554 | Nassau | 9,990 |
| St. Raphael Church | Garage | Garage | 600 Newbridge Road | East Meadow | NY | 11554 | Nassau | 1,464 |
| St. Raymond Church | Church | Church | 263 Atlantic Avenue | East Rockaway | NY | 11518 | Nassau | 13,400 |
| St. Raymond Church | Convent | Convent | 263 Atlantic Avenue | East Rockaway | NY | 11518 | Nassau | 11,480 |
| St. Raymond Church | Rectory | Rectory | 263 Atlantic Avenue | East Rockaway | NY | 11518 | Nassau | 12,207 |
| St. Raymond Church | Dwelling | Dwelling | 263 Atlantic Avenue | East Rockaway | NY | 11518 | Nassau | 2,645 |
| St. Raymond Church | Convent Garage | Convent | 263 Atlantic Avenue | East Rockaway | NY | 11518 | Nassau | 576 |
| St. Raymond Church | Dwelling Garage | Dwelling | 263 Atlantic Avenue | East Rockaway | NY | 11518 | Nassau | 400 |
| St. Raymond Church - School | Old School | School | 263 Atlantic Avenue | East Rockaway | NY | 11518 | Nassau | 36,689 |
| St. Raymond Church - School | New School | School | 263 Atlantic Avenue | East Rockaway | NY | 11518 | Nassau | 19,005 |
| St. Rosalie Church | Mission - Church | Church | 109 Walnut | East Quogue | NY | 11942 | Suffolk | 4,712 |
| St. Rosalie Church | Old Church Hall Community Center | Hall | 31 East Montauk Hgwy. | Hampton Bays | NY | 11946 | Suffolk | 21,140 |
| St. Rosalie Church | Church | Church | 31 East Montauk Hgwy. | Hampton Bays | NY | 11946 | Suffolk | 12,068 |
| St. Rosalie Church | Rectory | Rectory | 31 East Montauk Hgwy. | Hampton Bays | NY | 11946 | Suffolk | 6,053 |
| St. Rosalie Church | Parish Center | Office | 31 East Montauk Hgwy. | Hampton Bays | NY | 11946 | Suffolk | 13,884 |
| St. Rose of Lima Church | Church | Church | 2 Bayview Avenue | Massapequa | NY | 11758 | Nassau | 18,831 |
| St. Rose of Lima Church | Rectory | Rectory | 2 Bayview Avenue | Massapequa | NY | 11758 | Nassau | 16,272 |
| St. Rose of Lima Church | Convent-Parish Center | Convent / Parish Center | 2 Bayview Avenue | Massapequa | NY | 11758 | Nassau | 10,120 |
| St. Rose of Lima Church | Shop | Building | 2 Bayview Avenue | Massapequa | NY | 11758 | Nassau | 756 |
| St. Rose of Lima Church - School | School | School | 2 Bayview Avenue | Massapequa | NY | 11758 | Nassau | 40,497 |
| St. Sylvester Church | Church | Church | 68 Ohio Avenue | Medford | NY | 11763 | Suffolk | 11,262 |
| St. Sylvester Church | Parish Center | Hall | 68 Ohio Street | Medford | NY | 11763 | Suffolk | 20,862 |
| St. Sylvester Church | Rectory | Rectory | 68 Ohio Street | Medford | NY | 11763 | Suffolk | 7,233 |
| St. Sylvester Church | Convent | Convent | 68 Ohio Street | Medford | NY | 11763 | Suffolk | 2,448 |
| St. Sylvester Church | Clare House | Office | 68 Ohio Street | Medford | NY | 11763 | Suffolk | 2,548 |
| St. Sylvester Church | Thrift Shop | Warehouse | 68 Ohio Street | Medford | NY | 11763 | Suffolk | 1,120 |
| St. Sylvester Church | Garage | Garage | 68 Ohio Street | Medford | NY | 11763 | Suffolk | 1,158 |
| St. Therese of Lisieux Church | Rectory | Rectory | 55 South Etna Avenue | Montauk | NY | 11954 | Suffolk | 3,013 |
| St. Therese of Lisieux Church | Convent | Convent | 55 South Etna Avenue | Montauk | NY | 11954 | Suffolk | 2,493 |

**List of Properties**
Please see footnotes

| Account | Structure Name | Structure Type | Street | City | State | Zip | County | Floor Area |
|---|---|---|---|---|---|---|---|---|
| St. Therese of Lisieux Church | Garage | Garage | 55 South Etna Avenue | Montauk | NY | 11954 | Suffolk | 364 |
| St. Therese of Lisieux Church - School | Parish Center | School | 55 South Etna Avenue | Montauk | NY | 11954 | Suffolk | 18,192 |
| St. Therese of Lisieux Church | Church | Church | 55 South Etna Avenue | Montauk | NY | 11954 | Suffolk | |
| St. Thomas More Church | Church/Hall | Church / Hall | 115 Kings Road | Hauppauge | NY | 11787 | Suffolk | 27,808 |
| St. Thomas More Church | Rectory | Rectory | 115 Kings Road | Hauppauge | NY | 11787 | Suffolk | 4,310 |
| St. Thomas More Church | Outreach Center | Building | 115 Kings Road | Hauppauge | NY | 11787 | Suffolk | 2,540 |
| St. Thomas the Apostle Church | Church | Church | 24 Westminister Road | West Hempstead | NY | 11552 | Nassau | 16,288 |
| St. Thomas the Apostle Church | Rectory | Rectory | 24 Westminister Road | West Hempstead | NY | 11552 | Nassau | 10,084 |
| St. Thomas the Apostle Church | Chapel | Chapel | Hempstead Avenue | West Hempstead | NY | 11552 | Nassau | |
| St. Thomas the Apostle Church - School | School | School | 24 Westminister Road | West Hempstead | NY | 11552 | Nassau | 50,532 |
| St. William the Abbot Church | Church | Church | 2000 Jackson Avenue | Seaford | NY | 11783 | Nassau | 21,929 |
| St. William the Abbot Church | Convent/Offices | Convent | 2000 Jackson Avenue | Seaford | NY | 11783 | Nassau | 14,772 |
| St. William the Abbot Church | Rectory | Rectory | 2000 Jackson Avenue | Seaford | NY | 11783 | Nassau | 7,684 |
| St. William the Abbot Church | Garage | Garage | 2000 Jackson Avenue | Seaford | NY | 11783 | Nassau | 2,342 |
| St. William the Abbot Church - School | School | School | 2000 Jackson Avenue | Seaford | NY | 11783 | Nassau | 62,664 |
| The Roman Catholic Church of St. Hyacinth | School | School | 319 Cedar Swamp Road | Glen Head | NY | 11545 | Nassau | 33,405 |
| The Roman Catholic Church of St. Hyacinth | Church | Church | 319 Cedar Swamp Road | Glen Head | NY | 11545 | Nassau | 11,992 |
| The Roman Catholic Church of St. Hyacinth | Rectory | Rectory | 319 Cedar Swamp Road | Glen Head | NY | 11545 | Nassau | 14,542 |
| The Roman Catholic Church of St. James | Parish Center | Hall | 80 Hicksville Road | Seaford | NY | 11783 | Nassau | 68,790 |
| The Roman Catholic Church of St. James | Church | Church | 80 Hicksville Road | Seaford | NY | 11783 | Nassau | 10,248 |
| The Roman Catholic Church of St. James | Rectory | Rectory | 80 Hicksville Road | Seaford | NY | 11783 | Nassau | 8,448 |
| The Roman Catholic Church of St. James | Convent | Convent | 80 Hicksville Road | Seaford | NY | 11783 | Nassau | 5,516 |
| The Roman Catholic Church of St. James | Garage | Garage | 80 Hicksville Road | Seaford | NY | 11783 | Nassau | 336 |

Notes:

Street addresses may be office/notice addresses as opposed to physical building address.

Account field not necessarily the legal name of the entity.

† Indicates parishes with cemeteries

The value of parish real estate may be highly variable and subject to contingencies, including deed restrictions, and tax changes in connection with sales, among other things. As a result, the Diocese does not have a reliable method with which to ascribe values to parish real estate. The Diocese understands that parishes do not maintain book values for their real estate. The Diocese has requested that the parishes provide appraisals, if any, in connection with this disclosure. In response, the Diocese has received two appraisals from parishes:

One is for "North Side of Pearsall Avenue, East of Glen Street Glen Cove, New York 11542." The valuation is dated April 20, 2023, and is for $10,500,000. The Diocese understands that this appraisal is subject to certain rezoning contingencies.

The second is for "260 South Wellwood Avenue (Convent), Lindenhurst, New York 11757." The valuation is dated April 11, 2020, and is for $3,125,000 based on the proposed use as an office building or $1,450,000 as the building exists.

The Diocese also understands that the Committee ascribes significant value to the parishes' real estate holdings. Certain state court counsel that represents claimants in this case have filed information publicly on the docket with respect to parish real estate value. See Declaration of Patrick Stoneking in Support of the Survivors' Joinder in Support of the Motion of the Official Committee of Unsecured Creditors for Entry of an Order Pursuant to Bankruptcy Rule 2004 Directing Debtor to Produce Parish Information [Docket No. 581]. In such filing, Mr. Stoneking takes the position that the total assessed value of the 135 parishes and missions was $57,381,625 and that such real estate has a market value of $1,346,062,192.

## **EXHIBIT 6 - Disclosure Statement**

Claim List

**Diocese of Rockville Centre - Disclosure Statement Exhibit 6**

| CVA or Proof of Claim Number (See Notes) | Counsel | Eligible to Vote | Class | Subfund | Eligible Minimum Consideration Amount | Released Co-Defendant(s) | Non-Released Co-Defendant(s) |
|---|---|---|---|---|---|---|---|
| 30000 | Alonso Krangle LLP | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $50,000.00 | | |
| 400091/2021; 900170/2020 | Andreozzi & Foote | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | ST. BERNARD'S ROMAN CATHOLIC CHURCH | HOLY GHOST FATHERS A/K/A CONGREGATION OF THE HOLY SPIRIT A/K/A PROVINCE OF THE UNITED STATES D/B/A HOLY GHOST FATHERS OF IRELAND F/K/A CONGREGATION OF THE HOLY GHOST AND OF THE IMMACULATE HEART OF MARY |
| 900010/2021 | Andreozzi & Foote | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $100,000.00 | SAINT PIUS X ROMAN CATHOLIC CHURCH | |
| 611337/2021 | Andreozzi & Foote | N | Class 4 - Arrowood | Contested Subfund | $100,000.00 | SAINT MARY CHURCH; SAINT MARY SCHOOL | |
| 30017 | Andrews & Thornton | Y | Class 4 - Arrowood | Settling Subfund | $50,000.00 | | |
| 30019 | Andrews & Thornton | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $50,000.00 | | |
| 520779/2021 | ASK LLP | N | Class 4 - Arrowood | Contested Subfund | $50,000.00 | ST. AGNES CATHEDRAL | THEODORE ROOSEVELT COUNCIL |
| 900054/2021 | Aylstock, Witkin, Kreis & Overholtz, PLLC | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $50,000.00 | SAINT RAYMOND OF PENYAFORT ROMAN CATHOLIC CHURCH (DISCONTINUED) | COUNTY OF NASSAU; NASSAU COUNTY CORRECTIONAL CENTER |
| 90123 | Aylstock, Witkin, Kreis & Overholtz, PLLC | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $50,000.00 | | |
| 900269/2021 | Bonina & Bonina, P.C. | Y | Class 4 - Arrowood | Settling Subfund | $50,000.00 | MARIA REGINA DIOCESAN HIGH SCHOOL (THE DEBTOR) | CONGREGATION OF THE SISTERS SERVANTS OF THE IMMACULATE HEART OF MARY, SCRANTON, PENNSYLVANIA |
| 20001 | Bonina & Bonina, P.C. | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $50,000.00 | | |
| 20003 | Bonina & Bonina, P.C. | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $50,000.00 | | |
| 615122/2021 | Bonina & Bonina, P.C. | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | SAINT JOSEPH ROMAN CATHOLIC CHURCH, | |
| 900262/2021 | Bonina & Bonina, P.C. | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | SAINT RAYMOND OF PENYAFORT ROMAN CATHOLIC CHURCH; SAINT RAYMOND SCHOOL | |
| 520225/2021 | Bonina & Bonina, P.C. | N | Class 4 - Arrowood | Contested Subfund | $100,000.00 | SAINT JOHN NEPOMUCENE CHURCH. | |
| 600873/2020 | Buttafuoco & Associates, PLLC | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $100,000.00 | INFANT JESUS ROMAN CATHOLIC CHURCH | |
| 20101 | Buzin Law, P.C. | N | Class 4 - Arrowood | Contested Subfund | $50,000.00 | | |
| 20106 | Buzin Law, P.C. | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $50,000.00 | | |
| 30022 | Colter Legal PLLC | N | N/A | No Distribution | $0.00 | | |
| 615903/2019 | Dell & Dean PLLC | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | SAINT MARTHA ROMAN CATHOLIC CHURCH | SISTERS OF SAINT JOSEPH |
| 900032/2019 | Dell & Dean PLLC | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $100,000.00 | SAINT MARY'S HIGH SCHOOL | |
| 900036/2019 | Dell & Dean PLLC | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $100,000.00 | SAINT MARY'S HIGH SCHOOL | |
| 20-00233 (N.D.N.Y.) | DeSimone & Associates, LLC | N | N/A | No Distribution | $0.00 | | |
| 518726/2019 | DeSimone & Associates, LLC | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $100,000.00 | THE ROMAN CATHOLIC CHURCH OF SAINT AIDEN; SAINT AIDEN SCHOOL | EDUCATION PLUS, CORP., HERRICKS UNION FREE SCHOOL DISTRICT |
| 520003/2021 | Eisenberg & Baum LLP | N | Class 5 - LMI / Ecclesia | Contested Subfund | $50,000.00 | ST. ROCCO ROMAN CATHOLIC CHURCH | ROMAN CATHOLIC DIOCESE OF BROOKLYN |
| 900174/2020 | Eisenberg & Baum LLP | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | SAINT BONIFACE MARTYR CHURCH AND SCHOOL | |
| 20088 | Eisenberg, Rothweiler, Winkler, Eisenberg & Jeck, P.C. | Y | Class 4 - Arrowood | Settling Subfund | $50,000.00 | | |

Diocese of Rockville Centre - Disclosure Statement Exhibit 6

| CVA or Proof of Claim Number (See Notes) | Counsel | Eligible to Vote | Class | Subfund | Eligible Minimum Consideration Amount | Released Co-Defendant(s) | Non-Released Co-Defendant(s) |
|---|---|---|---|---|---|---|---|
| 20090 | Eisenberg, Rothweiler, Winkler, Eisenberg & Jeck, P.C. | Y | Class 4 - Arrowood | Settling Subfund | $50,000.00 | | |
| 20091 | Eisenberg, Rothweiler, Winkler, Eisenberg & Jeck, P.C. | Y | Class 4 - Arrowood | Settling Subfund | $50,000.00 | | |
| 20089/90502 | Eisenberg, Rothweiler, Winkler, Eisenberg & Jeck, P.C. | N | N/A | No Distribution | $0.00 | | |
| 40015 | Fallon & Stuart | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $50,000.00 | | |
| 950229/2020 | Gair Gair Conason Rubinowitz Bloom Hershenhorn Steigman & Mackauf | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $50,000.00 | | MARIANIST PROVINCE OF MERIBAH; MARINA TRENTACOSTE; KELLENBERG MEMORIAL HIGH SCHOOL |
| 900016/2021 | Gair Gair Conason Rubinowitz Bloom Hershenhorn Steigman & Mackauf | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $100,000.00 | SAINT KILIAN ROMAN CATHOLIC CHURCH | |
| 900095/2020 | Gair Gair Conason Rubinowitz Bloom Hershenhorn Steigman & Mackauf | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $100,000.00 | CHURCH OF THE BLESSED SACRAMENT; BLESSED SACRAMENT ELEMENTARY SCHOOL | |
| 900217/2021 | Gair Gair Conason Rubinowitz Bloom Hershenhorn Steigman & Mackauf | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $100,000.00 | SAINT ANTHONY OF PADUA; SAINT ANTHONY OF PADUA SCHOOL | CHAMINADE HIGH SCHOOL |
| 20086 | Gill Law Group | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $50,000.00 | | |
| 614922/2021 | Hach Rose Schirripa & Cheverie, LLP | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $100,000.00 | SAINT ANTHONY OF PADUA ROMAN CATHOLIC CHURCH; SAINT PHILIP NERI CATHOLIC CHURCH; TRINITY REGIONAL SCHOOL | |
| 950167/2019 | Hach Rose Schirripa & Cheverie, LLP | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | SAINT JOSEPH'S ROMAN CATHOLIC CHURCH | |
| 30021 | Hailig Branigan | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $50,000.00 | | |
| 900031/2019 | Hamburger, Maxson, Yaffe & Martingale, LLP | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $100,000.00 | CHURCH OF SAINT ANTHONY OF PADUA; CHURCH OF THE GOOD SHEPHERD; CHURCH OF SAINT ANNE; NOTRE DAME CHURCH | |
| 615333/2021 | Harnick and Harnick P.C. | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | SAINT JOSEPH ROMAN CATHOLIC CHURCH | |
| 30013 | Heilig Branigan LLP | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $50,000.00 | | |
| 900048/2021; 900174/2021 | Herman Law Firm | Y | Class 4 - Arrowood | Settling Subfund | $50,000.00 | SAINT ROSE OF LIMA ROMAN CATHOLIC CHURCH; SAINT ROSE OF LIMA SCHOOL (PARTIALLY DISCONTINUED) | SISTERS OF THE ORDER OF SAINT DOMINIC; MASSAPEQUA UNION FREE SCHOOL DISTRICT |
| 513591/2020 | Herman Law Firm | N | Class 5 - LMI / Ecclesia | Contested Subfund | $50,000.00 | ST. JOSEPH'S PARISH | DIOCESE OF BROOKLYN; FRANCISCAN SISTERS OF THE POOR |
| 514631/2021 | Herman Law Firm | N | Class 4 - Arrowood | Contested Subfund | $50,000.00 | CHURCH OF THE BLESSED SACRAMENT | ROMAN CATHOLIC DIOCESE OF BROOKLYN |
| 507305/2021 | Herman Law Firm | N | Class 5 - LMI / Ecclesia | Contested Subfund | $50,000.00 | | CITY OF NEW YORK; DIOCESE OF BROOKLYN; LITTLE FLOWER CHILDREN AND FAMILY SERVICES OF NEW YORK F/K/A LITTLE FLOWER CHILDREN'S SERVICES; AND DOES 1-10 |

**Diocese of Rockville Centre - Disclosure Statement Exhibit 6**

| CVA or Proof of Claim Number (See Notes) | Counsel | Eligible to Vote | Class | Subfund | Eligible Minimum Consideration Amount | Released Co-Defendant(s) | Non-Released Co-Defendant(s) |
|---|---|---|---|---|---|---|---|
| 400262/2021 | Herman Law Firm | N | Class 5 - LMI / Ecclesia | Contested Subfund | $50,000.00 | | CHRISTIAN BROTHERS CONFERENCE A/K/A LA SALLE RELAN; LA SALLE MILITARY ACADEMY; AND DOES 1-10 |
| 614918/2021 | Herman Law Firm | N | Class 5 - LMI / Ecclesia | Contested Subfund | $50,000.00 | CATHOLIC CHARITIES OF LONG ISLAND | SUFFOLK COUNTY |
| 614751/2021 | Herman Law Firm | N | Class 4 - Arrowood | Contested Subfund | $50,000.00 | SAINT ANTHONY OF PADUA ROMAN CATHOLIC CHURCH | |
| 519928/2021 | Herman Law Firm | Y | Class 4 - Arrowood | Settling Subfund | $50,000.00 | | CITY OF NEW YORK; ROMAN CATHOLIC DIOCESE OF BROOKLYN; LITTLE FLOWER CHILDREN AND FAMILY SERVICES OF NEW YORK F/K/A LITTLE FLOWER CHILDREN'S SERVICES |
| 520714/2021 | Herman Law Firm | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $50,000.00 | | FRANCISCAN BROTHERS, INC.; FRANCISCAN FRIARS-HOLY NAME PROVINCE |
| 609467/2021 | Herman Law Firm | N | Class 5 - LMI / Ecclesia | Contested Subfund | $50,000.00 | | SUFFOLK COUNTY, DIOCESE OF BROOKLYN, LITTLE FLOWER CHILDREN AND FAMILY SERVICES OF NEW YORK F/K/A LITTLE FLOWER CHILDREN'S SERVICES, AND DOES 1-10 |
| 900152/2020 | Herman Law Firm | N | Class 4 - Arrowood | Contested Subfund | $50,000.00 | SAINT LUKE'S ROMAN CATHOLIC CHURCH | |
| 512125/2020 | Herman Law Firm | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | SAINT JOSEPH'S PARISH | ROMAN CATHOLIC DIOCESE OF BROOKLYN |
| 522308/2019 | Herman Law Firm | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | OUR LADY OF PERPETUAL HELP ROMAN CATHOLIC CHURCH; OUR LADY OF PERPETUAL HELP SCHOOL | |
| 610036/2021 | Herman Law Firm | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | SAINT FRANCIS OF ASSISI ROMAN CATHOLIC CHURCH | |
| 610228/2021 | Herman Law Firm | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | CHURCH OF SAINT PATRICK | |
| 610237/2021 | Herman Law Firm | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | SAINT JOSEPH'S; SAINT JOSEPH'S CATHOLIC SCHOOL | |
| 610244/2021 | Herman Law Firm | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | SAINT JOHN NEPOMUCENE CHURCH; SAINT JOHN NEPOMUCENE SCHOOL | |
| 900040/2020 | Herman Law Firm | N | Class 5 - LMI / Ecclesia | Contested Subfund | $50,000.00 | | |
| 610245/2021 | Herman Law Firm | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | SAINT JOSEPH ROMAN CATHOLIC CHURCH | FRANCISCAN BROTHERS OF BROOKLYN |
| 610406/2021 | Herman Law Firm | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $100,000.00 | OUR LADY OF MOUNT CARMEL ROMAN CATHOLIC CHURCH | |
| 610846/2021 | Herman Law Firm | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | SAINT PATRICK'S CHURCH | |
| 610849/2021 | Herman Law Firm | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $100,000.00 | OUR LADY OF LOURDES CATHOLIC CHURCH | |
| 611047/2021 | Herman Law Firm | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | SAINT PATRICK'S ROMAN CATHOLIC CHURCH; SAINT PATRICK'S SCHOOL | SISTERS OF ST. JOSEPH |

**Diocese of Rockville Centre - Disclosure Statement Exhibit 6**

| CVA or Proof of Claim Number (See Notes) | Counsel | Eligible to Vote | Class | Subfund | Eligible Minimum Consideration Amount | Released Co-Defendant(s) | Non-Released Co-Defendant(s) |
|---|---|---|---|---|---|---|---|
| 612686/2021 | Herman Law Firm | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $100,000.00 | SAINT PATRICK'S ROMAN CATHOLIC CHURCH; SAINT PATRICK'S SCHOOL | |
| 613730/2021 | Herman Law Firm | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $100,000.00 | SAINT JOHN THE EVANGELIST ROMAN CATHOLIC PARISH; SAINT JOHN THE EVANGELIST SCHOOL | |
| 613957/2021 | Herman Law Firm | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $100,000.00 | ST. LUKE'S ROMAN CATHOLIC CHURCH | |
| 614442/2021 | Herman Law Firm | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | SAINT MARTIN OF TOURS ROMAN CATHOLIC CHURCH | |
| 614752/2021 | Herman Law Firm | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $100,000.00 | SAINT LUKE'S PARISH | |
| 900002/2020 | Herman Law Firm | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | OUR LADY OF GRACE ROMAN CATHOLIC CHURCH | |
| 900006/2020 | Herman Law Firm | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | SAINT JOSEPH'S PARISH | |
| 900022/2020 | Herman Law Firm | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | SAINT MARGARET OF SCTOLAND CHURCH | |
| 900029/2019 | Herman Law Firm | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | SAINT BERNARD'S ROMAN CATHOLIC CHURCH | |
| 900034/2021 | Herman Law Firm | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $100,000.00 | HOLY FAMILY ROMAN CATHOLIC CHURCH | |
| 900035/2019 | Herman Law Firm | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | SAINT JOSEPH'S PARISH OLD ROMAN CATHOLIC CURCH | |
| 900035/2021 | Herman Law Firm | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | QUEEN OF THE MOST HOLY ROSARY ROMAN CATHOLIC CHURCH | |
| 900036/2021 | Herman Law Firm | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | QUEEN OF THE MOST HOLY ROSARY ROMAN CATHOLIC CHURCH | |
| 900037/2021 | Herman Law Firm | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $100,000.00 | SAINT HUGH OF LINCOLN ROMAN CATHOLIC CHURCH | |
| 900173/2020 | Herman Law Firm | Y | Class 4 - Arrowood | Settling Subfund | $50,000.00 | | CAMP MALLOY |
| 900040/2021 | Herman Law Firm | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $100,000.00 | SAINT MARY'S ROMAN CATHOLIC CHURCH | USA NORTHEAST PROVINCE OF THE SOCIETY OF JESUS, INC.; THE NEW YORK PROVINCE OF THE SOCIETY OF JESUS; SAITN IGNATIUS RETREAT HOUSE |
| 900041/2021 | Herman Law Firm | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $100,000.00 | HOLY NAME OF MARY ROMAN CATHOLIC CHURCH | |
| 90229 | Herman Law Firm | Y | Class 4 - Arrowood | Settling Subfund | $50,000.00 | | |
| 90270 | Herman Law Firm | Y | Class 4 - Arrowood | Settling Subfund | $50,000.00 | | |
| 90412 | Herman Law Firm | Y | Class 4 - Arrowood | Settling Subfund | $50,000.00 | | |
| 90510 | Herman Law Firm | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $50,000.00 | | |
| 90593 | Herman Law Firm | N | Class 5 - LMI / Ecclesia | Contested Subfund | $50,000.00 | | |
| 90595 | Herman Law Firm | N | Class 4 - Arrowood | Contested Subfund | $50,000.00 | | |
| 90597 | Herman Law Firm | N | Class 4 - Arrowood | Contested Subfund | $50,000.00 | | |
| 90228 | Herman Law Firm | N | N/A | No Distribution | $0.00 | | |
| 526614/2019 | Herman Law Firm | N | N/A | No Distribution | $0.00 | | ROMAN CATHOLIC DIOCESE OF BROOKLYN |
| 900041/2019 | Herman Law Firm | N | N/A | No Distribution | $0.00 | | |

### Diocese of Rockville Centre - Disclosure Statement Exhibit 6

| CVA or Proof of Claim Number (See Notes) | Counsel | Eligible to Vote | Class | Subfund | Eligible Minimum Consideration Amount | Released Co-Defendant(s) | Non-Released Co-Defendant(s) |
|---|---|---|---|---|---|---|---|
| 900202/2021 | Herman Law Firm | N | N/A | No Distribution | $0.00 | SAINT ANTHONY OF PADUA ROMAN CATHOLIC CHURCH (DISCONTINUED) | |
| 900246/2021 | Herman Law Firm | N | N/A | No Distribution | $0.00 | SAINT AGNES ROMAN CATHOLIC CATHEDRAL (DISCONTINUED) | |
| 900042/2021 | Herman Law Firm | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | SAINT IGNATIUS LOYOLA ROMAN CATHOLIC CHURCH | |
| 900043/2020 | Herman Law Firm | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | SAINT LUKE'S ROMAN CATHOLIC CHURCH | |
| 900044/2020 | Herman Law Firm | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | SAINT HUGH OF LINCOLN ROMAN CATHOLIC CHURCH | |
| 900044/2021 | Herman Law Firm | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | SAINT MARTHA ROMAN CATHOLIC CHURCH | |
| 900047/2021 | Herman Law Firm | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | THE CATHEDRAL OF ST. AGNES | |
| 900055/2021 | Herman Law Firm | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | SAINT AGNES CATHEDRAL; SAINT MARTHA ROMANC CATHOLIC CHURCH; SAINT MARY'S CHURCH | |
| 900058/2021 | Herman Law Firm | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $100,000.00 | HOLY FAMILY ROMAN CATHOLIC CHURCH; HOLY FAMILY SCHOOL | |
| 900060/2021 | Herman Law Firm | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | SAINT CATHERINE OF SIENNA ROMAN CATHOLIC | |
| 900061/2021 | Herman Law Firm | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $100,000.00 | SAINT RAYMOND'S CHURCH; ST. RAYMOND'S CATHOLIC SCHOOL | |
| 900064/2021 | Herman Law Firm | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | SAINT JOSEPH'S ROMAN CATHOLIC CHURCH | |
| 900081/2021 | Herman Law Firm | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | SAINT BERNARD'S ROMAN CATHOLIC CHURCH | |
| 900102/2021 | Herman Law Firm | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | SAINT BERNARD'S ROMAN CATHOLIC CHURCH | |
| 900105/2021 | Herman Law Firm | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | SAINT PAUL THE APOSTLE CHURCH | CLARETIAN MISSIONARIES USA-CANADA PROVINCE |
| 900119/2020 | Herman Law Firm | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | SAINT JOSEPH'S CHURCH | |
| 900141/2021 | Herman Law Firm | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $100,000.00 | OUR LADY OF LOURDES ROMAN CATHOLIC CHURCH; OUR LADY OF VICTORY PARISH | |
| 900153/2020 | Herman Law Firm | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $100,000.00 | SAINT HUGH OF LINCOLN ROMAN CATHOLIC CHURCH | |
| 900212/2021 | Herman Law Firm | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | CHURCH OF SAINT AIDAN; SAINT AIDAN SCHOOL | FRANCISCAN BROTHERS OF BROOKLYN; SISTERS OF CHARITY OF HALIFAX NOVA SCOTIA |
| 900353/2021 | Herman Law Firm | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | OUR LADY OF MERCY ROMAN CATHOLIC CHURCH | |
| 610938/2021 | Herman Law Firm | N | Class 4 - Arrowood | Contested Subfund | $100,000.00 | SAINT JOSEPH ROMAN CATHOLIC CHURCH | FRANCISCAN BROTHERS OF BROOKLYN |
| 900105/2020 | Herman Law Firm | N | Class 4 - Arrowood | Contested Subfund | $100,000.00 | SACRED HEART ROMAN CATHOLIC CHURCH | |

**Diocese of Rockville Centre - Disclosure Statement Exhibit 6**

| CVA or Proof of Claim Number (See Notes) | Counsel | Eligible to Vote | Class | Subfund | Eligible Minimum Consideration Amount | Released Co-Defendant(s) | Non-Released Co-Defendant(s) |
|---|---|---|---|---|---|---|---|
| 900160/2021 | Herman Law Firm | N | Class 5 - LMI / Ecclesia | Contested Subfund | $100,000.00 | QUEEN OF THE MOST HOLY ROSARY ROMAN CATHOLIC CHURCH; QUEEN OF THE MOST HOLY ROSARY SCHOOL | SISTERS OF SAINT DOMINIC OF AMITYVILLE; SISTERS OF SAINT DOMINIC OF BLAUFELT, NEW YORK, |
| 20014 | Horowitz Law | Y | Class 4 - Arrowood | Settling Subfund | $50,000.00 | | |
| 20022 | Horowitz Law | Y | Class 4 - Arrowood | Settling Subfund | $50,000.00 | | |
| 20027 | Horowitz Law | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $50,000.00 | | |
| 20030 | Horowitz Law | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $50,000.00 | | |
| 20035 | Horowitz Law | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $50,000.00 | | |
| 20036 | Horowitz Law | Y | Class 4 - Arrowood | Settling Subfund | $50,000.00 | | |
| 20038 | Horowitz Law | N | Class 4 - Arrowood | Contested Subfund | $50,000.00 | | |
| 20047 | Horowitz Law | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $50,000.00 | | |
| 20052 | Horowitz Law | Y | Class 4 - Arrowood | Settling Subfund | $50,000.00 | | |
| 20053 | Horowitz Law | Y | Class 4 - Arrowood | Settling Subfund | $50,000.00 | | |
| 20056 | Horowitz Law | Y | Class 4 - Arrowood | Settling Subfund | $50,000.00 | | |
| 20057 | Horowitz Law | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $50,000.00 | | |
| 20058 | Horowitz Law | Y | Class 4 - Arrowood | Settling Subfund | $50,000.00 | | |
| 20059 | Horowitz Law | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $50,000.00 | | |
| 20075 | Horowitz Law | Y | Class 4 - Arrowood | Settling Subfund | $50,000.00 | | |
| 40006 | Horowitz Law | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $50,000.00 | | |
| 90292 | Horowitz Law | Y | Class 4 - Arrowood | Settling Subfund | $50,000.00 | | |
| 90415 | Horowitz Law | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $50,000.00 | | |
| 90523 | Horowitz Law | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $50,000.00 | | |
| 90529 | Horowitz Law | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $50,000.00 | | |
| 90530 | Horowitz Law | Y | Class 4 - Arrowood | Settling Subfund | $50,000.00 | | |
| 90531 | Horowitz Law | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $50,000.00 | | |
| 90532 | Horowitz Law | Y | Class 4 - Arrowood | Settling Subfund | $50,000.00 | | |
| 90533 | Horowitz Law | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $50,000.00 | | |
| 615134/2021 | Hurley McKenna & Mertz, P.C. | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | SAINT JOHN THE EVANGELIST ROMAN CATHOLIC CHURCH; ROMAN CATHOLIC CHURCH OF SAINT JOHN THE EVANGELIST; SAINT ANTHONY OF PADUA ROMAN CATHOLIC CHURCH | |
| 616239/2021 | Ian Kaufman Law | N | N/A | No Distribution | $0.00 | | MARYHAVEN CENTER OF HOPE, INC., CATHOLIC HEALTH SERVICES OF LONG ISLAND, DAVID WOODS AND NICHOLAS MANATRO (DISMISSED) |
| 900003/2020; 900225/2021 | James, Vernon & Weeks; Noaker Law Firm, LLC | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $100,000.00 | ROMAN CATHOLIC CHURCH OF THE SACRED HEART | |
| 614747/2021 | Janet Janet & Suggs, LLC | N | N/A | No Distribution | $0.00 | ST. JOHN THE BAPTIST DIOCESAN HIGH SCHOOL (DISCONTINUED) | |
| 900046/2019 | Janet Janet & Suggs, LLC | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | GOOD SHEPHERD ROMAN CATHOLIC CHURCH | |
| 900086/2020 | Janet Janet & Suggs, LLC | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $100,000.00 | SAINT PATRICK'S ROMAN CATHOLIC CHURCH; SAINT PATRICK SCHOOL | |
| 900017/2019 | Jeff Anderson & Associates PA | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $50,000.00 | HOLY TRINITY DIOCESAN HIGH SCHOOL | |
| 900076/2020 | Jeff Anderson & Associates PA | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $50,000.00 | HOLY TRINITY DIOCESAN HIGH | |

**Diocese of Rockville Centre - Disclosure Statement Exhibit 6**

| CVA or Proof of Claim Number (See Notes) | Counsel | Eligible to Vote | Class | Subfund | Eligible Minimum Consideration Amount | Released Co-Defendant(s) | Non-Released Co-Defendant(s) |
|---|---|---|---|---|---|---|---|
| 900095/2021 | Jeff Anderson & Associates PA | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $50,000.00 | HOLY TRINITY DIOCESAN HIGH SCHOOL | |
| 900147/2021 | Jeff Anderson & Associates PA | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $50,000.00 | MARIA REGINA DIOCESAN HIGH SCHOOL | SISTERS OF THE ORDER OF SAINT DOMINIC; SISTERS OF THE CROSS AND PASSION; SISTERS, SERVANTS OF THE IMMACULATE HEART OF MARY |
| 900363/2021 | Jeff Anderson & Associates PA | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $50,000.00 | HOLY TRINITY DIOCESAN HIGH SCHOOL | |
| 514064/2021 | Jeff Anderson & Associates PA | N | Class 5 - LMI / Ecclesia | Contested Subfund | $50,000.00 | SAINT DOMINIC'S ROMAN CATHOLIC CHURCH | ROMAN CATHOLIC DIOCESE OF BROOKLYN |
| 518563/2021 | Jeff Anderson & Associates PA | N | Class 4 - Arrowood | Contested Subfund | $50,000.00 | SAINT RAYMOND'S CHURCH | ROMAN CATHOLIC DIOCESE OF BROOKLYN |
| 519751/2021 | Jeff Anderson & Associates PA | N | Class 4 - Arrowood | Contested Subfund | $50,000.00 | SACRED HEART | ROMAN CATHOLIC DIOCESE OF BROOKLYN |
| 900012/2019 | Jeff Anderson & Associates PA | N | Class 4 - Arrowood | Contested Subfund | $50,000.00 | SAINTS PHILIP AND JAMES ROMAN CATHOLIC CHURCH | |
| 900017/2021 | Jeff Anderson & Associates PA | N | Class 5 - LMI / Ecclesia | Contested Subfund | $50,000.00 | ST. MARY'S COLLEGE PREPARATORY HIGH SCHOOL | MARIST BROTHERS OF THE SCHOOLS, PROVINCE OF THE UNITED STATES OF AMERICA |
| 512967/2020 | Jeff Anderson & Associates PA | N | Class 4 - Arrowood | Contested Subfund | $50,000.00 | | FRANCISCAN BROTHERS OF BROOKLYN; SAINT FRANCIS PREPARATORY SCHOOL; ROMAN CATHOLIC DIOCESE OF BROOKLYN |
| 512971/2020 | Jeff Anderson & Associates PA | N | Class 4 - Arrowood | Contested Subfund | $50,000.00 | | FRANCISCAN BROTHERS OF BROOKLYN; BISHOP FORD HIGH SCHOOL; ROMAN CATHOLIC DIOCESE OF BROOKLYN |
| 513632/2020 | Jeff Anderson & Associates PA | N | Class 4 - Arrowood | Contested Subfund | $50,000.00 | | BROTHERS OF THE SACRED HEART; ROMAN CATHOLIC DIOCESE OF BROOKLYN; COINDRE HALL |
| 900058/2020 | Jeff Anderson & Associates PA | N | Class 4 - Arrowood | Contested Subfund | $50,000.00 | SAINT DOMINIC CHURCH | |
| 515616/2021 | Jeff Anderson & Associates PA | N | Class 4 - Arrowood | Contested Subfund | $50,000.00 | | FRANCISCAN BROTHERS OF BROOKLYN; ROMAN CATHOLIC DIOCESE OF BROOKLYN; BK - SAINT FRANCIS XAVIER |
| 515746/2020 | Jeff Anderson & Associates PA | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $50,000.00 | | FRANCISCAN BROTHERS OF BROOKLYN; THE FRANCISCAN BROTHERS GENERALATE; FRANCISCAN BROTHERS, INC.; MOUNT ALVERNIA, INC. |
| 517890/2019 | Jeff Anderson & Associates PA | N | Class 4 - Arrowood | Contested Subfund | $50,000.00 | | FRANCISCAN BROTHERS OF BROOKLYN; BISHOP FORD HIGH SCHOOL; ROMAN CATHOLIC DIOCESE OF BROOKLYN |
| 900094/2021 | Jeff Anderson & Associates PA | N | Class 5 - LMI / Ecclesia | Contested Subfund | $50,000.00 | HOLY FAMILY DIOCESAN HIGH SCHOOL | |
| 900144/2021 | Jeff Anderson & Associates PA | N | Class 4 - Arrowood | Contested Subfund | $50,000.00 | SAINT JOHN THE BAPTIST DIOCESAN HIGH SCHOOL | |

**Diocese of Rockville Centre - Disclosure Statement Exhibit 6**

| CVA or Proof of Claim Number (See Notes) | Counsel | Eligible to Vote | Class | Subfund | Eligible Minimum Consideration Amount | Released Co-Defendant(s) | Non-Released Co-Defendant(s) |
|---|---|---|---|---|---|---|---|
| 519755/2021 | Jeff Anderson & Associates PA | Y | Class 4 - Arrowood | Settling Subfund | $50,000.00 | | SISTERS OF THE HOLY FAMILY OF NAZARETH; ROMAN CATHOLIC DIOCESE OF BROOKLYN; LITTLE FLOWER CHILDREN AND FAMILY SERVICES OF NEW YORK |
| 519794/2019 | Jeff Anderson & Associates PA | N | Class 4 - Arrowood | Contested Subfund | $50,000.00 | | FRANCISCAN BROTHERS OF BROOKLYN; ROMAN CATHOLIC DIOCESE OF BROOKLYN; BK - SAINT BRIGID'S |
| 519801/2019 | Jeff Anderson & Associates PA | N | Class 4 - Arrowood | Contested Subfund | $50,000.00 | | FRANCISCAN BROTHERS OF BROOKLYN; BISHOP FORD HIGH SCHOOL; ROMAN CATHOLIC DIOCESE OF BROOKLYN |
| 520096/2021 | Jeff Anderson & Associates PA | N | Class 4 - Arrowood | Contested Subfund | $50,000.00 | | SAINT FRANCIS XAVIER; FRANCISCAN BROTHERS OF BROOKLYN; SISTERS OF SAINT JOSEPH; SAINT FRANCIS XAVIER CATHOLIC ACADEMY; ROMAN CATHOLIC DIOCESE OF BROOKLYN |
| 520168/2021 | Jeff Anderson & Associates PA | N | Class 5 - LMI / Ecclesia | Contested Subfund | $50,000.00 | | SAINT TERESA OF AVILA; CO-CATHEDRAL OF SAINT JOSEPH; FRANCISCAN BROTHERS OF BROOKLYN; NAZARETH REGIONAL HIGH SCHOOL; ROMAN CATHOLIC DIOCESE OF BROOKLYN |
| 520489/2021 | Jeff Anderson & Associates PA | N | Class 5 - LMI / Ecclesia | Contested Subfund | $50,000.00 | | FRANCISCAN BROTHERS OF BROOKLYN; SAINT FRANCIS PREPARATORY SCHOOL (QUEENS); ROMAN CATHOLIC DIOCESE OF BROOKLYN |
| 900011/2019 | Jeff Anderson & Associates PA | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $50,000.00 | | SOCIETY OF MARY (MARIANISTS); CHAMINADE HIGH SCHOOL |
| 950946/2021 | Jeff Anderson & Associates PA | N | Class 4 - Arrowood | Contested Subfund | $50,000.00 | ST. PHILIP NERI CHURCH | SUFFOLK COUNTY COUNCIL INC., BOY SCOUTS OF AMERICA |
| 900014/2019 | Jeff Anderson & Associates PA | Y | Class 4 - Arrowood | Settling Subfund | $50,000.00 | | FRANCISCAN BROTHERS OF BROOKLYN; CAMP ALVERNIA |
| 900116/2020 | Jeff Anderson & Associates PA | N | Class 5 - LMI / Ecclesia | Contested Subfund | $50,000.00 | OUR HOLY REDEEMER ROMAN CATHOLIC CHURCH | THEODORE ROOSEVELT COUNCIL, INC., BOY SCOUTS OF AMERICA |
| 900052/2020 | Jeff Anderson & Associates PA | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $50,000.00 | | SOCIETY OF MARY (MARIANISTS); CHAMINADE HIGH SCHOOL |
| 514079/2021 | Jeff Anderson & Associates PA | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | SAINT DOMINIC'S ROMAN CATHOLIC CHURCH | ROMAN CATHOLIC DIOCESE OF BROOKLYN |
| 600406/2015 | Jeff Anderson & Associates PA | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $100,000.00 | SAINT FRANCIS OF ASSISI ROMAN CATHOLIC CHURCH | |
| 602850/2016 | Jeff Anderson & Associates PA | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $100,000.00 | SAINT FRANCIS OF ASSISI PARISH | |
| 900010/2019 | Jeff Anderson & Associates PA | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $100,000.00 | SAINT HUGH OF LINCOLN ROMAN CATHOLIC CHURCH | |

**Diocese of Rockville Centre - Disclosure Statement Exhibit 6**

| CVA or Proof of Claim Number (See Notes) | Counsel | Eligible to Vote | Class | Subfund | Eligible Minimum Consideration Amount | Released Co-Defendant(s) | Non-Released Co-Defendant(s) |
|---|---|---|---|---|---|---|---|
| 900013/2019 | Jeff Anderson & Associates PA | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $100,000.00 | OUR LADY OF FATIMA | |
| 900015/2019 | Jeff Anderson & Associates PA | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | SAINT JOHN OF GOD | |
| 900016/2019 | Jeff Anderson & Associates PA | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | HOLY FAMILY CHURCH | |
| 900019/2019 | Jeff Anderson & Associates PA | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | SAINT ROSALIE'S CHURCH | |
| 900020/2019 | Jeff Anderson & Associates PA | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | SAINT ANNE'S ROMAN CATHOLIC CHURC | |
| 900021/2019 | Jeff Anderson & Associates PA | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | SAINT JOSEPH'S PARISH | |
| 900022/2019 | Jeff Anderson & Associates PA | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $100,000.00 | SAINT IGNATIUS LOYOLA ROMAN CATHOLIC CHURCH | |
| 900024/2019 | Jeff Anderson & Associates PA | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | OUR LADY QUEEN OF MARTYRS | |
| 900025/2019 | Jeff Anderson & Associates PA | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | SAINT AGNES ROMAN CATHOLIC CATHEDRAL | SISTERS OF THE ORDER OF SAINT DOMINIC |
| 900027/2019 | Jeff Anderson & Associates PA | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | SAINT BARNABUS APOSTLE | CAPUCHIN FATHERS; SAINT FRANCIS RETREAT HOUSE; SAINT JOHN'S HOSPITAL |
| 900069/2020 | Jeff Anderson & Associates PA | N | Class 4 - Arrowood | Contested Subfund | $50,000.00 | | SISTERS OF MERCY OF THE AMERICAS; ST. MARY OF THE ANGELS HOME; MERCYFIRST |
| 900028/2019 | Jeff Anderson & Associates PA | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | SAINT JOHN OF GOD PARISH | |
| 900050/2020 | Jeff Anderson & Associates PA | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $100,000.00 | SAINT RAYMOND OF PENYAFORT | SOCIETY OF MARY (MARIANISTS); KELLENBERG MEMORIAL HIGH SCHOOL |
| 900051/2020 | Jeff Anderson & Associates PA | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | SAINT HUGH OF LINCOLN ROMAN CATHOLIC CHURCH | |
| 900053/2020 | Jeff Anderson & Associates PA | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | SAINT HUGH OF LINCOLN ROMAN CATHOLIC CHURCH | |
| 900075/2020 | Jeff Anderson & Associates PA | Y | Class 4 - Arrowood | Settling Subfund | $50,000.00 | | CAPUCHIN FATHERS; SAINT CONRAD FRIARY; SAINT ANN'S FRIARY |
| 900054/2020 | Jeff Anderson & Associates PA | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | SAINT HUGH OF LINCOLN ROMAN CATHOLIC CHURCH | |
| 900056/2020 | Jeff Anderson & Associates PA | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | SAINT HUGH OF LINCOLN ROMAN CATHOLIC CHURCH | |
| 900057/2020 | Jeff Anderson & Associates PA | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $100,000.00 | SAINT JOSEPH ROMAN CATHOLIC CHURCH | |
| 900059/2020 | Jeff Anderson & Associates PA | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | SAINT ELIZABETH; SAINT PATRICK; SAINT LUKE | |
| 900060/2020 | Jeff Anderson & Associates PA | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | SAINTS PHILIP AND JAMES ROMAN CATHOLIC CHURCH | FRANCISCAN BROTHERS OF BROOKLYN |
| 900061/2020 | Jeff Anderson & Associates PA | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $100,000.00 | SAINT ROSALIE'S CHURCH | |
| 900062/2020 | Jeff Anderson & Associates PA | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | OUR LADY OF PEACE | |
| 900063/2020 | Jeff Anderson & Associates PA | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | SAINTS PHILIP AND JAMES ROMAN CATHOLIC CHURCH | |
| 900064/2020 | Jeff Anderson & Associates PA | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $100,000.00 | SAINT BARNABUS APOSTLE | |
| 900065/2020 | Jeff Anderson & Associates PA | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | SAINT ANTHONY OF PADUA ROMAN CATHOLIC CHURCH | |

Diocese of Rockville Centre - Disclosure Statement Exhibit 6

| CVA or Proof of Claim Number (See Notes) | Counsel | Eligible to Vote | Class | Subfund | Eligible Minimum Consideration Amount | Released Co-Defendant(s) | Non-Released Co-Defendant(s) |
|---|---|---|---|---|---|---|---|
| 900066/2020 | Jeff Anderson & Associates PA | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $100,000.00 | SAINT JOHN THE EVANGELIST | |
| 900067/2020 | Jeff Anderson & Associates PA | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | HOLY SPIRIT | |
| 900068/2020 | Jeff Anderson & Associates PA | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $100,000.00 | HOLY FAMILY ROMAN CATHOLIC CHURCH | |
| 900070/2020 | Jeff Anderson & Associates PA | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | SAINT MARTIN OF TOURS | |
| 900071/2020 | Jeff Anderson & Associates PA | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | SAINTS PHILIP AND JAMES ROMAN CATHOLIC CHURCH | |
| 900072/2020 | Jeff Anderson & Associates PA | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | ST. PHILIP NERI; ST. SYLVESTER | |
| 900073/2020 | Jeff Anderson & Associates PA | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $100,000.00 | SAINT PATRICK'S ROMAN CATHOLIC CHURCH | FRANCISCAN BROTHERS OF BROOKLYN; SAINT ANTHONY HIGH SCHOOL |
| 900077/2020 | Jeff Anderson & Associates PA | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $100,000.00 | SAINT RAYMOND | |
| 900120/2020 | Jeff Anderson & Associates PA | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $50,000.00 | | SOCIETY OF MARY (MARIANISTS); KELLENBERG MEMORIAL HIGH SCHOOL |
| 900078/2020 | Jeff Anderson & Associates PA | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $100,000.00 | OUR LADY OF LOURDES | |
| 900079/2020 | Jeff Anderson & Associates PA | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $100,000.00 | SAINT PATRICK'S ROMAN CATHOLIC CHURCH | |
| 900086/2021 | Jeff Anderson & Associates PA | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | SAINT ANTHONY OF PADUA | SISTERS OF ST. JOSEPH |
| 900127/2020 | Jeff Anderson & Associates PA | N | Class 4 - Arrowood | Contested Subfund | $50,000.00 | | SISTERS OF MERCY OF THE AMERICAS; ROMAN CATHOLIC DIOCESE OF BROOKLYN; ST. MARY OF THE ANGELS HOME; MERCYFIRST |
| 900087/2021 | Jeff Anderson & Associates PA | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | SAINT AIDAN'S CHURCH | FRANCISCAN BROTHERS OF BROOKLYN |
| 900129/2020 | Jeff Anderson & Associates PA | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $50,000.00 | | FRANCISCAN BROTHERS OF BROOKLYN; SAINT ANTHONY'S HIGH SCHOOL |
| 900088/2021 | Jeff Anderson & Associates PA | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | HOLY SPIRIT | |
| 900089/2021 | Jeff Anderson & Associates PA | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | SAINT AGNES CATHEDRAL | |
| 900090/2021 | Jeff Anderson & Associates PA | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $100,000.00 | SAINT THOMAS THE APOSTLE | |
| 900131/2021 | Jeff Anderson & Associates PA | Y | Class 4 - Arrowood | Settling Subfund | $50,000.00 | | FRANCISCAN BROTHERS OF BROOKLYN; CAMP ALVERNIA |
| 900091/2021 | Jeff Anderson & Associates PA | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $100,000.00 | SAINT BARNABUS APOSTLE | |
| 900093/2021 | Jeff Anderson & Associates PA | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | SAINT FRANCIS OF ASSISI ROMAN CATHOLIC CHURCH | |
| 900097/2021 | Jeff Anderson & Associates PA | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | SAINT JOSEPH'S PARISH; SAINT JOSEPH SCHOOL | FRANCISCAN BROTHERS OF BROOKLYN |
| 900109/2020 | Jeff Anderson & Associates PA | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | OUR HOLY REDEEMER ROMAN CATHOLIC CHURCH | |
| 900111/2020 | Jeff Anderson & Associates PA | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $100,000.00 | SAINT CATHERINE OF SIENNA | |
| 900112/2020 | Jeff Anderson & Associates PA | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | HOLY FAMILY ROMAN CATHOLIC CHURCH | |
| 900117/2020 | Jeff Anderson & Associates PA | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | SAINT BARNABAS APOSTLE | |
| 900118/2020 | Jeff Anderson & Associates PA | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | SAINT BONIFACE ROMAN CATHOLIC CHURCH | |
| 900121/2020 | Jeff Anderson & Associates PA | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | OUR LADY OF PEACE | |

**Diocese of Rockville Centre - Disclosure Statement Exhibit 6**

| CVA or Proof of Claim Number (See Notes) | Counsel | Eligible to Vote | Class | Subfund | Eligible Minimum Consideration Amount | Released Co-Defendant(s) | Non-Released Co-Defendant(s) |
|---|---|---|---|---|---|---|---|
| 900122/2020; 900163/2021 | Jeff Anderson & Associates PA | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | SAINT DOMINIC ROMAN CATHOLIC CHURCH | ROMAN CATHOLIC DIOCESE OF BROOKLYN |
| 900126/2020 | Jeff Anderson & Associates PA | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $100,000.00 | SAINT BRIGID; SAINT JAMES ROMAN CATHOLIC CHURCH; SAINT JAMES PARISH | |
| 900128/2020 | Jeff Anderson & Associates PA | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | SAINT RAPHAEL ROMAN CATHOLIC CHURCH | |
| 900129/2021 | Jeff Anderson & Associates PA | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $100,000.00 | SAINT LUKE | |
| 900130/2020 | Jeff Anderson & Associates PA | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | SAINT PATRICK'S ROMAN CATHOLIC CHURCH | |
| 900130/2021 | Jeff Anderson & Associates PA | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | SAINT DOMINIC'S ROMAN CATHOLIC CHURCH | |
| 900133/2021 | Jeff Anderson & Associates PA | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $100,000.00 | SAINT HUGH OF LINCOLN ROMAN CATHOLIC CHURCH | |
| 900134/2020 | Jeff Anderson & Associates PA | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | SAINT JOSEPH'S ROMAN CATHOLIC CHURCH | |
| 900134/2021; 900191/2021 | Jeff Anderson & Associates PA | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | OUR LADY OF FATIMA ROMAN CATHOLIC CHURCH | THEODORE ROOSEVELT COUNCIL, INC.; BOY SCOUTS OF AMERICA |
| 900135/2020 | Jeff Anderson & Associates PA | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $100,000.00 | SAINT PATRICK'S ROMAN CATHOLIC CHURCH | |
| 900136/2020 | Jeff Anderson & Associates PA | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $100,000.00 | SAINT MARY'S ROMAN CATHOLIC CHURCH | MARIST BROTHERS |
| 900138/2020 | Jeff Anderson & Associates PA | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $100,000.00 | SAINT JAMES ROMAN CATHOLIC CHURCH | |
| 900139/2020 | Jeff Anderson & Associates PA | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $100,000.00 | SAINT ANNE | SOCIETY OF MARY (MARIANISTS); CHAMINADE HIGH SCHOOL |
| 900145/2021 | Jeff Anderson & Associates PA | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | SAINT RAPHAEL ROMAN CATHOLIC CHURCH | |
| 900179/2021 | Jeff Anderson & Associates PA | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | SAINTS CYRIL AND METHODIUS | |
| 900259/2021; 900055/2020 | Jeff Anderson & Associates PA | N | Class 4 - Arrowood | Contested Subfund | $50,000.00 | | LA SALLE MILITARY ACADEMY; BROTHERS OF THE CHRISTIAN SCHOOLS DISTRICT OF EASTERN NORTH AMERICA |
| 900133/2020; 900260/2021 | Jeff Anderson & Associates PA | N | Class 4 - Arrowood | Contested Subfund | $50,000.00 | | BROTHERS OF THE CHRISTIAN SCHOOLS DISTRICT OF EASTERN NORTH AMERICA; LA SALLE MILITARY ACADEMY |
| 900261/2021; 900115/2020 | Jeff Anderson & Associates PA | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $50,000.00 | | LA SALLE MILITARY ACADEMY; BROTHERS OF THE CHRISTIAN SCHOOLS DISTRICT OF EASTERN NORTH AMERICA. |
| 900180/2021 | Jeff Anderson & Associates PA | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | OUR LADY OF PERPETUAL HELP; SAINT JAMES | |
| 900181/2021 | Jeff Anderson & Associates PA | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $100,000.00 | SAINT ANTHONY OF PADUA; GOOD SHEPHERD | |
| 900182/2021 | Jeff Anderson & Associates PA | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | OUR LADY OF VICTORY | |
| 900183/2021 | Jeff Anderson & Associates PA | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | SAINT ALOYSIUS | MONTFORD MISSIONARIES UNITED STATES PROVINCE |
| 900190/2021 | Jeff Anderson & Associates PA | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $100,000.00 | SAINT PATRICK | |
| 900195/2021 | Jeff Anderson & Associates PA | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | SAINT HUGH OF LINCOLN ROMAN CATHOLIC CHURCH | |

**Diocese of Rockville Centre - Disclosure Statement Exhibit 6**

| CVA or Proof of Claim Number (See Notes) | Counsel | Eligible to Vote | Class | Subfund | Eligible Minimum Consideration Amount | Released Co-Defendant(s) | Non-Released Co-Defendant(s) |
|---|---|---|---|---|---|---|---|
| 900211/2021 | Jeff Anderson & Associates PA | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $100,000.00 | SAINT CHRISTOPHER'S PARISH | |
| 900220/2021 | Jeff Anderson & Associates PA | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | MARY IMMACULATE; | |
| 900221/2021 | Jeff Anderson & Associates PA | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | INFANT JESUS ROMAN CATHOLIC CHURCH | FRANCISCAN BROTHERS OF BROOKLYN |
| 900222/2021 | Jeff Anderson & Associates PA | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $100,000.00 | SAINT THOMAS THE APOSTLE | |
| 900229/2021 | Jeff Anderson & Associates PA | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | OUR LADY OF LORETTO PARISH | SISTERS OF CHARITY OF THE BLESSED VIRGIN MARY |
| 900230/2021 | Jeff Anderson & Associates PA | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | SAINT RAPHAEL ROMAN CATHOLIC CHURCH | |
| 900074/2020 | Jeff Anderson & Associates PA | N | Class 4 - Arrowood | Contested Subfund | $100,000.00 | OUR LADY OF VICTORY; SACRED HEARTS OF JESUS AND MARY | |
| 90401 | Jeff Anderson & Associates PA | Y | Class 4 - Arrowood | Settling Subfund | $50,000.00 | | |
| 520706/2021 | Jeff Anderson & Associates PA | N | Class 4 - Arrowood | Contested Subfund | $50,000.00 | | FRANCISCAN BROTHERS OF BROOKLYN; SAINT FRANCIS PREPARATORY SCHOOL (QUEENS); ROMAN CATHOLIC DIOCESE OF BROOKLYN |
| 900092/2021 | Jeff Anderson & Associates PA | N | Class 5 - LMI / Ecclesia | Contested Subfund | $100,000.00 | SAINT ROSE OF LIMA | |
| 900116/2021 | Jeff Anderson & Associates PA | N | N/A | No Distribution | $0.00 | | THEODORE ROOSEVELT COUNCIL, INC.; BOY SCOUTS OF AMERICA; BALDWIN UNION FREE SCHOOL DISTRICT; DOES 1-5 |
| 900232/2021 | Jeff Anderson & Associates PA | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $100,000.00 | SAINT ANNE | |
| 900235/2021 | Jeff Anderson & Associates PA | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $100,000.00 | SAINT BRIGID | |
| 900096/2021 | Jeff Anderson & Associates PA | N | Class 5 - LMI / Ecclesia | Contested Subfund | $100,000.00 | SAINT CHRISTOPHER'S PARISH; CATHOLIC CHARITIES | |
| 900107/2020 | Jeff Anderson & Associates PA | N | Class 4 - Arrowood | Contested Subfund | $100,000.00 | SAINT RAPHAEL ROMAN CATHOLIC CHURCH | |
| 900264/2021; 900113/2020 | Jeff Anderson & Associates PA | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | CATHOLIC CHARITIES OF THE DIOCESE OF ROCKVILLE CENTRE | CATHOLIC BIG BROTHERS OF LONG ISLAND; BIG BROTHERS BIG SISTERS OF AMERICA; BIG BROTHERS BIG SISTERS ASSOCIATION OF NEW YORK STATE, INC.; BIG BROTHERS & SISTERS OF NASSAU COUNTY, INC |
| 900271/2021 | Jeff Anderson & Associates PA | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $100,000.00 | SAINT HUGH OF LINCOLN ROMAN CATHOLIC CHURCH | |
| 900286/2021; 610249/2021 | Jeff Anderson & Associates PA | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $100,000.00 | ST. JOHN OF GOD | |
| 900301/2021 | Jeff Anderson & Associates PA | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $100,000.00 | OUR LADY OF LOURDES | |
| 900313/2021 | Jeff Anderson & Associates PA | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | SAINT HEDWIG'S ROMAN CATHOLIC CHURCH | |
| 900344/2021 | Jeff Anderson & Associates PA | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | OUR LADY OF LOURDES; SAINT LAWRENCE OF THE MARTYR; SAINT PIUS X PREPARATORY SEMINARY; CATHOLIC YOUTH ORGANIZATION | MARYDALE DAY CAMP |
| 900345/2021 | Jeff Anderson & Associates PA | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | SAINT JOHN OF GOD | |
| 900362/2021 | Jeff Anderson & Associates PA | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | SAINT JOHN OF GOD PARISH | |

**Diocese of Rockville Centre - Disclosure Statement Exhibit 6**

| CVA or Proof of Claim Number (See Notes) | Counsel | Eligible to Vote | Class | Subfund | Eligible Minimum Consideration Amount | Released Co-Defendant(s) | Non-Released Co-Defendant(s) |
|---|---|---|---|---|---|---|---|
| 900369/2021 | Jeff Anderson & Associates PA | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $100,000.00 | SAINT JAMES | |
| 900377/2021 | Jeff Anderson & Associates PA | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | SAINT AIDEN'S CHURCH | |
| 900388/2021 | Jeff Anderson & Associates PA | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | SAINT MARY'S ROMAN CATHOLIC CHURCH | CONGREGATION OF THE HOLY SPIRIT |
| 900132/2020 | Jeff Anderson & Associates PA | N | Class 4 - Arrowood | Contested Subfund | $100,000.00 | CORPUS CHRISTI PARISH | |
| 900132/2021 | Jeff Anderson & Associates PA | N | Class 5 - LMI / Ecclesia | Contested Subfund | $100,000.00 | SAINT MARY'S ROMAN CATHOLIC CHURCH | MARIST BROTHERS |
| 900148/2021 | Jeff Anderson & Associates PA | N | Class 4 - Arrowood | Contested Subfund | $100,000.00 | SAINT BRIGID; CHURCH OF OUR LADY OF HOPE | |
| 900149/2021 | Jeff Anderson & Associates PA | N | Class 5 - LMI / Ecclesia | Contested Subfund | $100,000.00 | SAINT DOMINIC'S ROMAN CATHOLIC CHURCH | |
| 900150/2021 | Jeff Anderson & Associates PA | N | Class 4 - Arrowood | Contested Subfund | $100,000.00 | SAINT BERNARD'S ROMAN CATHOLIC CHURCH | |
| 900184/2021 | Jeff Anderson & Associates PA | N | Class 5 - LMI / Ecclesia | Contested Subfund | $100,000.00 | SAINT PATRICK'S | |
| 900210/2021 | Jeff Anderson & Associates PA | N | Class 5 - LMI / Ecclesia | Contested Subfund | $100,000.00 | SAINT MARY'S ROMAN CATHOLIC CHURCH; SAINT DOMINIC'S | |
| 900275/2021 | Jeff Anderson & Associates PA | N | Class 5 - LMI / Ecclesia | Contested Subfund | $100,000.00 | SAINT GERARD MAJELLA | |
| 900277/2021 | Jeff Anderson & Associates PA | N | Class 4 - Arrowood | Contested Subfund | $100,000.00 | SAINT CATHERINE OF SIENNA | |
| 900312/2021 | Jeff Anderson & Associates PA | N | Class 5 - LMI / Ecclesia | Contested Subfund | $100,000.00 | IMMACULATE CONCEPTION | |
| 900314/2021 | Jeff Anderson & Associates PA | N | Class 4 - Arrowood | Contested Subfund | $100,000.00 | SAINT JOSEPH'S | |
| 900364/2021 | Jeff Anderson & Associates PA | N | Class 5 - LMI / Ecclesia | Contested Subfund | $100,000.00 | SAINT ANNE'S ROMAN CATHOLIC CHURC | |
| 950245/2020 | Joshua W. Skillman Esq. P.C. | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | SAINT KILIAN ROMAN CATHOLIC CHURCH; SAINT JOHN BAPTIST DE LASALLE REGIONAL SCHOOL, AS SUCCESOR TO ST. KILIAN PARISH SCHOOL | |
| 20046 | Justice Law Collaborative, LLC | Y | Class 4 - Arrowood | Settling Subfund | $50,000.00 | | |
| 900006/2021 | Kazerouni Law Group, APC; Law Offices of Todd M. Friedman | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | SAINT ROSE OF LIMA ROMAN CATHOLIC CHURCH | |
| 900007/2021 | Kazerouni Law Group, APC; Law Offices of Todd M. Friedman | N | Class 4 - Arrowood | Contested Subfund | $100,000.00 | OUR LADY OF GOOD COUNSEL CHURCH | |
| 900008/2021 | Kazerouni Law Group, APC; Law Offices of Todd M. Friedman | N | Class 4 - Arrowood | Contested Subfund | $100,000.00 | SAINT CHRISTOPHER'S PARISH | |
| 950685/2020 | Kelner and Kelner | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $100,000.00 | SAINT MARY'S ROMAN CATHOLIC CHURCH | DOMINICAN FRIARS OF THE PROVINCE OF SAINT JOSEPH; ROMAN CATHOLIC DIOCESE OF PROVIDENCE |
| 90098 | Ketterer Browne & Associates, LLC | Y | Class 4 - Arrowood | Settling Subfund | $50,000.00 | | |
| 90099 | Ketterer Browne & Associates, LLC | Y | Class 4 - Arrowood | Settling Subfund | $50,000.00 | | |
| 90526 | Ketterer Browne & Associates, LLC | N | N/A | No Distribution | $0.00 | | |
| 90570 | Ketterer Browne & Associates, LLC | N | N/A | No Distribution | $0.00 | | |
| 900311/2021 | Laffey, Bucci, Kent LLP | N | Class 4 - Arrowood | Contested Subfund | $50,000.00 | | DISCONTINUED AGAINST ALL DEFENDANTS |
| 20017 | Law Office of Darren Wolf | Y | Class 4 - Arrowood | Settling Subfund | $50,000.00 | | |
| 900047/2020 | Law Office of Michael G. Dowd; Sweeney, Reich & Bolz, LLP | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $50,000.00 | HOLY TRINITY DIOCESAN HIGH SCHOOL | |
| 900048/2019 | Law Office of Michael G. Dowd; Sweeney, Reich & Bolz, LLP | Y | Class 4 - Arrowood | Settling Subfund | $50,000.00 | HOLY TRINITY DIOCESAN HIGH SCHOOL | |
| 900094/2020 | Law Office of Michael G. Dowd; Sweeney, Reich & Bolz, LLP | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $50,000.00 | SAINT JOHN THE BAPTIST DIOCESAN HIGH SCHOOL | |

**Diocese of Rockville Centre - Disclosure Statement Exhibit 6**

| CVA or Proof of Claim Number (See Notes) | Counsel | Eligible to Vote | Class | Subfund | Eligible Minimum Consideration Amount | Released Co-Defendant(s) | Non-Released Co-Defendant(s) |
|---|---|---|---|---|---|---|---|
| 506559/2020 | Law Office of Michael G. Dowd; Sweeney, Reich & Bolz, LLP | Y | Class 4 - Arrowood | Settling Subfund | $50,000.00 | | FRANCISCAN BROTHERS OF BROOKLYN; ROMAN CATHOLIC DIOCESE OF BROOKLYN; MOUNT ALVERNIA, INC. |
| 606370/2021 | Law Office of Michael G. Dowd; Sweeney, Reich & Bolz, LLP | N | Class 4 - Arrowood | Contested Subfund | $50,000.00 | | BROTHERS OF THE CHRISTIAN SCHOOLS DISTRICT OF EASTERN NORTH AMERICA |
| 610847/2021 | Law Office of Michael G. Dowd; Sweeney, Reich & Bolz, LLP | N | Class 4 - Arrowood | Contested Subfund | $50,000.00 | | BROTHERS OF THE CHRISTIAN SCHOOLS DISTRICT OF EASTERN NORTH AMERICA |
| 900046/2020 | Law Office of Michael G. Dowd; Sweeney, Reich & Bolz, LLP | N | Class 4 - Arrowood | Contested Subfund | $50,000.00 | | SISTERS OF THE SACRED HEART OF MARY; CORMARIA RETREAT CENTER, INC. |
| 606441/2021 | Law Office of Michael G. Dowd; Sweeney, Reich & Bolz, LLP | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | SAINT HUGH OF LINCOLN ROMAN CATHOLIC CHURCH | |
| 612520/2021 | Law Office of Michael G. Dowd; Sweeney, Reich & Bolz, LLP | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | SAINT PHILIP NERO ROMAN CATHOLIC PARISH CHURCH; TRINITY REGIONAL SCHOOL | SISTERS OF SAINT JOSEPH |
| 613879/2018 | Law Office of Michael G. Dowd; Sweeney, Reich & Bolz, LLP | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $100,000.00 | OUR LADY OF MOUNT CARMEL ROMAN CATHOLIC CHURCH | |
| 615422/2021 | Law Office of Michael G. Dowd; Sweeney, Reich & Bolz, LLP | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $100,000.00 | SAINT PATRICK'S ROMAN CATHOLIC PARISH | |
| 900004/2019 | Law Office of Michael G. Dowd; Sweeney, Reich & Bolz, LLP | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | HOLY FAMILY ROMAN CATHOLIC CHURCH; HOLY TRINITY DIOCESAN HIGH SCHOOL | |
| 900005/2019 | Law Office of Michael G. Dowd; Sweeney, Reich & Bolz, LLP | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | SAINT HUGH OF LINCOLN ROMAN CATHOLIC CHURCH | |
| 900008/2019 | Law Office of Michael G. Dowd; Sweeney, Reich & Bolz, LLP | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | SAINT PHILIP NERI ROMAN CATHOLIC CHURCH | |
| 900015/2021; 616007/2019 | Law Office of Michael G. Dowd; Sweeney, Reich & Bolz, LLP | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $100,000.00 | SAINT EDWARD THE CONFESSOR ROMAN CATHOLIC PARISH CHURCH, SAINT CATHERINE OF SIENNA ROMAN CATHOLIC PARISH CHURCH, OUR LADY OF FATIMA ROMAN CATHOLIC PARISH CHURCH | |
| 900024/2021 | Law Office of Michael G. Dowd; Sweeney, Reich & Bolz, LLP | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | ROMAN CATHOLIC PARISH OF SAINT AGNES CATHEDRAL | |
| 900029/2021 | Law Office of Michael G. Dowd; Sweeney, Reich & Bolz, LLP | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | OUR LADY OF MERCY ROMAN CATHOLIC CHURCH | |
| 900039/2019 | Law Office of Michael G. Dowd; Sweeney, Reich & Bolz, LLP | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | SAINT HUGH OF LINCOLN ROMAN CATHOLIC CHURCH | |
| 900042/2019 | Law Office of Michael G. Dowd; Sweeney, Reich & Bolz, LLP | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $100,000.00 | SAINT MARY ROMAN CATHOLIC CHURCH | |
| 900045/2020 | Law Office of Michael G. Dowd; Sweeney, Reich & Bolz, LLP | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $100,000.00 | SAINTS PHILIP AND JAMES ROMAN CATHOLIC CHURCH | |

Diocese of Rockville Centre - Disclosure Statement Exhibit 6

| CVA or Proof of Claim Number (See Notes) | Counsel | Eligible to Vote | Class | Subfund | Eligible Minimum Consideration Amount | Released Co-Defendant(s) | Non-Released Co-Defendant(s) |
|---|---|---|---|---|---|---|---|
| 900048/2020 | Law Office of Michael G. Dowd; Sweeney, Reich & Bolz, LLP | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | SAINT HEDWIG'S ROMAN CATHOLIC CHURCH | |
| 900080/2020 | Law Office of Michael G. Dowd; Sweeney, Reich & Bolz, LLP | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | SAINT HUGH OF LINCOLN ROMAN CATHOLIC CHURCH | |
| 900099/2020 | Law Office of Michael G. Dowd; Sweeney, Reich & Bolz, LLP | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | SAINT AGNES CATHEDRAL | |
| 900125/2021 | Law Office of Michael G. Dowd; Sweeney, Reich & Bolz, LLP | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | SAINT BARNABAS THE APOSTLE ROMAN CATHOLIC CHURCH | CAPUCHIN FRANCISCANS TERTIARY PROVINCE OF ST. MARCY NY, INC. |
| 900127/2021 | Law Office of Michael G. Dowd; Sweeney, Reich & Bolz, LLP | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | SAINT BARNABAS THE APOSTLE ROMAN CATHOLIC CHURCH | CAPUCHIN FRANCISCANS TERTIARY PROVINCE OF ST. MARCY NY, INC. |
| 900078/2021 | Law Office of Michael G. Dowd; Sweeney, Reich & Bolz, LLP | N | Class 5 - LMI / Ecclesia | Contested Subfund | $100,000.00 | SAINT IGNATIUS MARTYR ROMAN CATHOLIC PARISH; LONG BEACH CATHOLIC REGIONAL SCHOOL | |
| 900084/2020 | Law Office of Michael G. Dowd; Sweeney, Reich & Bolz, LLP | N | Class 4 - Arrowood | Contested Subfund | $100,000.00 | SAINT THERESE OF LIXIEUX ROMAN CATHOLIC PARISH CURCH | |
| 20015 | Law Office of Michael J. Alber, P.C. | N | N/A | No Distribution | $0.00 | | |
| 609115/2020 | Law Offices of Betti & Associates | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | OUR LADY OF PERPETUAL HELP ROMAN CATHOLIC CHURCH; OUR LADY OF PERPETUAL HELP ROMAN CATHOLIC SCHOOL | |
| 620497/2019 | Law Offices of Betti & Associates | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | SAINT JOSEPH ROMAN CATHOLIC CHURCH; SAINT JOSEPH CATHOLIC SCHOOL | FRANCISCAN BROTHERS OF BROOKLYN; SAINT ANTHONY'S HIGH SCHOOL |
| 90407 | Law Offices of Chad A. Bowers | Y | Class 4 - Arrowood | Settling Subfund | $50,000.00 | | |
| 900011/2021 | Law Offices of Joseph B. Strassman | Y | Class 4 - Arrowood | Settling Subfund | $50,000.00 | | ST. FRANCIS HOSPITAL |
| 609397/2019 | Law Offices of Joseph B. Strassman | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $100,000.00 | MARIA REGINA ROMAN CATHOLIC CHURCH | |
| 900004/2020 | Law Offices of Mitchell Garabedian | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $50,000.00 | HOLY TRINITY DIOCESAN HIGH SCHOOL | |
| 527922/2019 | Law Offices of Mitchell Garabedian | N | Class 4 - Arrowood | Contested Subfund | $50,000.00 | ROMAN CATHOLIC CHURCH OF OUR LADY OF PEACE AT LYNBROOK | ROMAN CATHOLIC DIOCESE OF BROOKLYN |
| 517533/2020 | Law Offices of Mitchell Garabedian | Y | Class 4 - Arrowood | Settling Subfund | $50,000.00 | | FRANCISCAN BROTHERS OF BROOKLYN; THE FRANCISCAN BROTHERS GENERALATE; FRANCISCAN BROTHERS, INC.; ST. ANTHONY'S HIGH SCHOOL |
| 519862/2019 | Law Offices of Mitchell Garabedian | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $50,000.00 | | FRANCISCAN BROTHERS OF BROOKLYN; THE FRANCISCAN BROTHERS GENERALATE; FRANCISCAN BROTHERS, INC.; SAINT ANTHONY'S HIGH SCHOOL; MOUNT ALVERNIA, INC. |
| 506103/2020 | Law Offices of Mitchell Garabedian | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | THE ROMAN CATHOLIC CHURCH OF SAINT MARGARET OF SCOTLAND | ROMAN CATHOLIC DIOCESE OF BROOKLYN |
| 605941/2020 | Law Offices of Mitchell Garabedian | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | SAINT JAMES ROMAN CATHOLIC CHURCH | |

Diocese of Rockville Centre - Disclosure Statement Exhibit 6

| CVA or Proof of Claim Number (See Notes) | Counsel | Eligible to Vote | Class | Subfund | Eligible Minimum Consideration Amount | Released Co-Defendant(s) | Non-Released Co-Defendant(s) |
|---|---|---|---|---|---|---|---|
| 606672/2020 | Law Offices of Mitchell Garabedian | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | THE ROMAN CATHOLIC CHURCH OF SAINT MARGARET OF SCTOLAND; THE ROMAN CATHOLIC CHURCH OF OUR LADY QUEEN OF MARTYRS | |
| 606674/2020 | Law Offices of Mitchell Garabedian | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | THE ROMAN CATHOLIC CHURCH OF OUR LADY QUEEN OF MARTYRS;   THE ROMAN CATHOLIC CHURCH OF SAINT JOSEPH, KINGS PARK, NY | |
| 608381/2020 | Law Offices of Mitchell Garabedian | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $100,000.00 | SAINT MARTIN OF TOURS ROMAN CATHOUC CHURCH | |
| 611155/2019 | Law Offices of Mitchell Garabedian | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | THE ROMAN CATHOLIC CHURCH OF SAINT FRANCIS OF ASSISI | |
| 614160/2020 | Law Offices of Mitchell Garabedian | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | SAINT HUGH OF LINCOLN ROMAN CATHOLIC CHURCH | |
| 618005/2020 | Law Offices of Mitchell Garabedian | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | SAINT DOMINIC'S ROMAN CATHOLIC CHURCH AT OYSTER BAY | |
| 624824/2019 | Law Offices of Mitchell Garabedian | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | THE ROMAN CATHOLIC CHURCH OF SAINT ROSE OF LIMA; THE ROMAN CATHOLIC CHURCH OF CHRIST THE KING | |
| 900001/2021 | Law Offices of Mitchell Garabedian | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | SAINT PATRICK'S ROMAN CATHOLIC CHURCH | |
| 518025/2020 | Law Offices of Mitchell Garabedian | N | N/A | No Distribution | $0.00 | | THE PROVINCE OF THE UNITED STATES OF THE BROTHERS OF THE SACRED HEART, INC.; ROMAN CATHOLIC DIOCESE OF BROOKLYN |
| 950169/2019 | Law Offices of Mitchell Garabedian | N | N/A | No Distribution | $0.00 | | THE NEW YORK PROVINCE OF THE SOCIETY OF JESUS; U.S.A. NORTHEAST PROVINCE OF THE JESUIT FATHERS AND BROTHERS; THE USA NORTHEAST PROVINCE OF THE SOCIETY OF JESUS, INC.; SAINT IGNATIUS RETREAT HOUSE, INC. |
| 900010/2020 | Law Offices of Mitchell Garabedian | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $100,000.00 | SAINT HUGH OF LINCOLN ROMAN CATHOLIC CHURCH | |
| 900050/2019 | Law Offices of Mitchell Garabedian | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | CATHOLIC CHARITIES OF THE DIOCESE OF ROCKVILLE CENTRE | |
| 900051/2019 | Law Offices of Mitchell Garabedian | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | SAINT AGNES' ROMAN CATHOLIC CHURCH | |
| 900052/2019 | Law Offices of Mitchell Garabedian | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | SAINT AGNES' ROMAN CATHOLIC CHURCH | |
| 900053/2019 | Law Offices of Mitchell Garabedian | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | CATHOLIC CHARITIES OF THE DIOCESE OF ROCKVILLE CENTRE | |

**Diocese of Rockville Centre - Disclosure Statement Exhibit 6**

| CVA or Proof of Claim Number (See Notes) | Counsel | Eligible to Vote | Class | Subfund | Eligible Minimum Consideration Amount | Released Co-Defendant(s) | Non-Released Co-Defendant(s) |
|---|---|---|---|---|---|---|---|
| 900054/2019 | Law Offices of Mitchell Garabedian | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | SAINT AGNES' ROMAN CATHOLIC CHURCH | |
| 900075/2021 | Law Offices of Mitchell Garabedian | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $100,000.00 | SAINT BRIGID ROMAN CATHOLIC CHURCH | |
| 900171/2020 | Law Offices of Mitchell Garabedian | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $100,000.00 | SAINT CATHERINE OF SIENNA ROMAN CATHOLIC CHURCH | |
| 900172/2020 | Law Offices of Mitchell Garabedian | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $100,000.00 | SAINT CATHERINE OF SIENNA ROMAN CATHOLIC CHURCH | |
| 610600/2020 | Law offices of Ronald J. Kim, PC | N | Class 5 - LMI / Ecclesia | Contested Subfund | $50,000.00 | ST. PHILIP NERI PARISH | SUFFOLK COUNTY COUNCIL, INC.; BOY SCOUTS OF AMERICA |
| 900168/2020 | Leeds Brown Law, P.C. | N | Class 5 - LMI / Ecclesia | Contested Subfund | $50,000.00 | ST. PHILIP NERI CHURCH | |
| 90150 | Levy Konigsberg LLP | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $50,000.00 | | |
| 90158 | Levy Konigsberg LLP | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $50,000.00 | | |
| 90160 | Levy Konigsberg LLP | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $50,000.00 | | |
| 90173 | Levy Konigsberg LLP | Y | Class 4 - Arrowood | Settling Subfund | $50,000.00 | | |
| 90174 | Levy Konigsberg LLP | N | Class 4 - Arrowood | Contested Subfund | $50,000.00 | | |
| 90184 | Levy Konigsberg LLP | Y | Class 4 - Arrowood | Settling Subfund | $50,000.00 | | |
| 90233 | Levy Konigsberg LLP | Y | Class 4 - Arrowood | Settling Subfund | $50,000.00 | | |
| 90259 | Levy Konigsberg LLP | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $50,000.00 | | |
| 90267 | Levy Konigsberg LLP | Y | Class 4 - Arrowood | Settling Subfund | $50,000.00 | | |
| 90291 | Levy Konigsberg LLP | Y | Class 4 - Arrowood | Settling Subfund | $50,000.00 | | |
| 90311 | Levy Konigsberg LLP | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $50,000.00 | | |
| 90314 | Levy Konigsberg LLP | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $50,000.00 | | |
| 90277/80000 | Levy Konigsberg LLP | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $50,000.00 | | |
| 900143/2020 | Levy Konigsberg LLP | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $100,000.00 | HOLY FAMILY CHURCH; HOLY FAMILY CATHOLIC SCHOOL | |
| 900145/2020 | Levy Konigsberg LLP | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | SAINT FRANCIS DE SALES PARISH; HOLY ANGELS REGIONAL SCHOOL F/K/A ST FRANCIS DE SALES CATHOLIC SCHOOL | |
| 951246/2021 | Mansell Law LLC | N | Class 5 - LMI / Ecclesia | Contested Subfund | $50,000.00 | SAINT JOSEPH ELEMENTARY SCHOOL | BOY SCOUTS OF AMERICA, GREATER NEW YORK COUNCIL |
| 900305/2021 | Marc J. Bern & Partners, LLP | N | Class 4 - Arrowood | Contested Subfund | $50,000.00 | | SUFFOLK COUNTY COUNCIL (404) BOY SCOUTS OF AMERICA |
| 900351/2021 | Marc J. Bern & Partners, LLP | N | Class 4 - Arrowood | Contested Subfund | $50,000.00 | | THEODORE ROOSEVELT COUNCIL (386) BOY SCOUTS OF AMERICA |
| 30034 | Mathew Toughy, Esq. | N | N/A | No Distribution | $0.00 | | |
| 900403/2021 | Mathews & Associates | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $50,000.00 | HOLY TRINITY HIGH SCHOOL | DOMINICAN SISTERS OF SPARKILL |
| 900357/2021 | Mathews & Associates | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $100,000.00 | SAINTS CYRIL AND METHODIUS; OUR LADY OF GUADALUPE CATHOLIC SCHOOL | SISTERS OF SAINT JOSEPH |
| 900358/2021 | Mathews & Associates | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $100,000.00 | HOLY FAMILY ROMAN CATHOLIC CHURCH; HOLY FAMILY SCHOOL | DOMINICAN SISTERS OF SPARKILL |
| 900380/2021 | Mathews & Associates | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $100,000.00 | INFANT JESUS ROMAN CATHOLIC CHURCH; INFANT JESUS GRAMMAR SCHOOL | DAUGHTERS OF WISDOM, UNITED STATES PROVINCE |

**Diocese of Rockville Centre - Disclosure Statement Exhibit 6**

| CVA or Proof of Claim Number (See Notes) | Counsel | Eligible to Vote | Class | Subfund | Eligible Minimum Consideration Amount | Released Co-Defendant(s) | Non-Released Co-Defendant(s) |
|---|---|---|---|---|---|---|---|
| 900383/2021 | Mathews & Associates | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | SAINT MARY'S ROMAN CATHOLIC CHURCH; SAINT MARY'S COLLEGE PREPARATORY HIGH SCHOOL | MARIST BROTHERS OF THE SCHOOL, INC. |
| 900384/2021 | Mathews & Associates | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | SAINT FRANCES CABRINI ROMAN CATHOLIC CHURCH | |
| 90465 | Mathews & Associates | N | N/A | No Distribution | $0.00 | | |
| 900387/2021 | Mathews & Associates | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | SAINT BRIGID'S ROMAN CATHOLIC CHURCH; OUR LADY OF HOPE REGIONAL SCHOOL | SISTERS OF NOTRE DAME DE NAMUR |
| 900390/2021 | Mathews & Associates | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $100,000.00 | SAINT JOSEPH ROMAN CATHOLIC CHURCH | CATHOLIC DAUGHTERS OF THE AMERICAS |
| 900391/2021 | Mathews & Associates | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | SAINT LUKE ROMAN CATHOLIC CHURCH | |
| 900394/2021 | Mathews & Associates | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | SAINT HUGH OF LINCOLN ROMAN CATHOLIC CHURCH | SISTERS OF SAINT DOMINIC OF AMITYVILLE |
| 900395/2021 | Mathews & Associates | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $100,000.00 | SAINT PATRICK'S ROMAN CATHOLIC CHURCH; SAINT PATRICK SCHOOL | SISTERS OF MERCY OF THE AMERICAS |
| 900396/2021 | Mathews & Associates | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $100,000.00 | SAINT LADISLAUS ROMAN CATHOLIC CHURCH | CONGREGATION OF SISTERS OF ST. FELIX OF CANTALICE THIRD ORDER REGULAR OF ST. FRANCIS OF ASSISI |
| 900397/2021 | Mathews & Associates | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | SAINT PATRICK'S ROMAN CATHOLIC CHURCH; SAINT PATRICK SCHOOL | SISTERS OF SAINT JOSEPH |
| 900401/2021 | Mathews & Associates | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $100,000.00 | CHURCH OF THE HOLY SPIRIT | SISTERS OF SAINT DOMINIC OF AMITYVILLE |
| 900374/2021 | Mathews & Associates | N | Class 4 - Arrowood | Contested Subfund | $100,000.00 | OUR LADY OF PERPETUAL HELP ROMAN CATHOLIC CHURCH | |
| 900381/2021 | Mathews & Associates | N | Class 4 - Arrowood | Contested Subfund | $100,000.00 | SAINT MARTIN OF TOURS ROMAN CATHOLIC CHURCH | |
| 900385/2021 | Mathews & Associates | N | Class 5 - LMI / Ecclesia | Contested Subfund | $100,000.00 | SAINT ANNE'S ROMAN CATHOLIC CHURCH | |
| 900386/2021 | Mathews & Associates | N | Class 4 - Arrowood | Contested Subfund | $100,000.00 | SAINT THOMAS MORE ROMAN CATHOLIC CHURCH | |
| 900398/2021 | Mathews & Associates | N | Class 5 - LMI / Ecclesia | Contested Subfund | $100,000.00 | SAINT THERESE OF LIXIEUX ROMAN CATHOLIC PARISH CURCH | |
| 900402/2021 | Mathews & Associates | N | Class 5 - LMI / Ecclesia | Contested Subfund | $100,000.00 | SAINT WILLIAM THE ABBOT ROMAN CATHOLIC CHURCH; SAINT WILLIAM THE ABBOTT ROMAN CATHOLIC SCHOOL | URSULINE SISTERS OF TILDONK |
| 900001/2019 | Merson Law, PLLC | Y | Class 4 - Arrowood | Settling Subfund | $50,000.00 | SAINT PIUS X PREPARATORY SEMINARY | |
| 900029/2020 | Merson Law, PLLC | Y | Class 4 - Arrowood | Settling Subfund | $50,000.00 | SAINT PIUS X PREPARATORY SEMINARY | |

**Diocese of Rockville Centre - Disclosure Statement Exhibit 6**

| CVA or Proof of Claim Number (See Notes) | Counsel | Eligible to Vote | Class | Subfund | Eligible Minimum Consideration Amount | Released Co-Defendant(s) | Non-Released Co-Defendant(s) |
|---|---|---|---|---|---|---|---|
| 900037/2019 | Merson Law, PLLC | Y | Class 4 - Arrowood | Settling Subfund | $50,000.00 | SAINT PIUS X PREPARATORY SEMINARY | |
| 615133/2021 | Merson Law, PLLC | N | Class 4 - Arrowood | Contested Subfund | $50,000.00 | ST. ELIZABETH CHURCH | SUFFOLK COUNTY COUNCIL, BOY SCOUTS OF AMERICA |
| 513885/2020 | Merson Law, PLLC | Y | Class 4 - Arrowood | Settling Subfund | $50,000.00 | | FRANCISCAN BROTHERS OF BROOKLYN; SAINT ANTHONY'S HIGH SCHOOL |
| 518595/2021 | Merson Law, PLLC | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $50,000.00 | | FRANCISCAN BROTHERS OF BROOKLYN; SAINT ANTHONY'S HIGH SCHOOL |
| 519191/2019 | Merson Law, PLLC | Y | Class 4 - Arrowood | Settling Subfund | $50,000.00 | | FRANCISCAN BROTHERS OF BROOKLYN; SAINT ANTHONY'S HIGH SCHOOL; ROMAN CATHOLIC DIOCESE OF BROOKLYN |
| 519459/2021 | Merson Law, PLLC | Y | Class 4 - Arrowood | Settling Subfund | $50,000.00 | | FRANCISCAN BROTHERS OF BROOKLYN; SAINT ANTHONY'S HIGH SCHOOL |
| 900030/2019 | Merson Law, PLLC | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $50,000.00 | | GOOD SAMARITAN HOSPITAL |
| 900149/2020 | Merson Law, PLLC | N | Class 5 - LMI / Ecclesia | Contested Subfund | $50,000.00 | | SISTERS OF MERCY; SAINT MARY OF THE ANGELS HOME |
| 900213/2021 | Merson Law, PLLC | Y | Class 4 - Arrowood | Settling Subfund | $50,000.00 | | MERCY MEDICAL CENTER AND CATHOLIC HEALTH SERVICES OF LONG ISLAND |
| 518736/2021 | Merson Law, PLLC | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | CHURCH OF SAINT AIDAN | FRANCISCAN BROTHERS OF BROOKLYN |
| 950002/2019 | Merson Law, PLLC | N | Class 4 - Arrowood | Contested Subfund | $50,000.00 | | CHAMINADE HIGH SCHOOL |
| 950002/2019 | Merson Law, PLLC | N | Class 4 - Arrowood | Contested Subfund | $50,000.00 | | CHAMINADE HIGH SCHOOL |
| 90565 | Merson Law, PLLC | N | Class 5 - LMI / Ecclesia | Contested Subfund | $50,000.00 | | |
| 90433 | Merson Law, PLLC | N | N/A | No Distribution | $0.00 | | |
| 90434 | Merson Law, PLLC | N | N/A | No Distribution | $0.00 | | |
| 90448 | Merson Law, PLLC | N | N/A | No Distribution | $0.00 | | |
| 900003/2019 | Merson Law, PLLC | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $100,000.00 | SAINT MARTIN OF TOURS CHURCH | |
| 900138/2021 | Merson Law, PLLC | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | SAINT DOMINIC ROMAN CATHOLIC CHURCH; SAINT DOMINIC ELEMENTARY SCHOOL | |
| 900159/2021 | Merson Law, PLLC | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $100,000.00 | OUR LADY QUEEN OF MARTYRS CATHOLIC CHURCH | |
| 900204/2021 | Merson Law, PLLC | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | SAINT MARTIN OF TOURS; SAINT MARTIN OF TOURS SCHOOL | |
| 900303/2021 | Merson Law, PLLC | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | SAINT JOSEPH'S CHURCH | |
| 900121/2021 | Meyerson & Levine, LLP | N | N/A | No Distribution | $0.00 | | |
| 970001/2021 | No Counsel | N | Class 5 - LMI / Ecclesia | Contested Subfund | $50,000.00 | OUR LADY OF GOOD COUNSEL R.C. CHURCH | THE HOLY SEE, ARCHDIOCESE OF NEW YORK; REV. RAYMOND C. DAVID, PASTOR OUR LADY OF GOOD COUNSEL R.C. CHURCH; REV. GERARD J. GEOFRERER, PRIEST, OUR LADY OF GOOD COUNSEL R.C. CHURCH; NASSAU COUNTY REPUBLICAN PARTY; DEAN SKELOS; AND ALPHONSE D'AMATO |

**Diocese of Rockville Centre - Disclosure Statement Exhibit 6**

| CVA or Proof of Claim Number (See Notes) | Counsel | Eligible to Vote | Class | Subfund | Eligible Minimum Consideration Amount | Released Co-Defendant(s) | Non-Released Co-Defendant(s) |
|---|---|---|---|---|---|---|---|
| 20009 | No Counsel | N | N/A | No Distribution | $0.00 | | |
| 20011 | No Counsel | N | N/A | No Distribution | $0.00 | | |
| 20034 | No Counsel | N | N/A | No Distribution | $0.00 | | |
| 20051 | No Counsel | N | N/A | No Distribution | $0.00 | | |
| 20054 | No Counsel | N | N/A | No Distribution | $0.00 | | |
| 20055 | No Counsel | N | N/A | No Distribution | $0.00 | | |
| 20064 | No Counsel | N | N/A | No Distribution | $0.00 | | |
| 20066 | No Counsel | N | N/A | No Distribution | $0.00 | | |
| 20070 | No Counsel | N | N/A | No Distribution | $0.00 | | |
| 20073 | No Counsel | N | N/A | No Distribution | $0.00 | | |
| 20083 | No Counsel | N | N/A | No Distribution | $0.00 | | |
| 20084 | No Counsel | N | N/A | No Distribution | $0.00 | | |
| 20100 | No Counsel | N | N/A | No Distribution | $0.00 | | |
| 30003 | No Counsel | N | N/A | No Distribution | $0.00 | | |
| 30004 | No Counsel | N | N/A | No Distribution | $0.00 | | |
| 30005 | No Counsel | N | N/A | No Distribution | $0.00 | | |
| 30010 | No Counsel | N | N/A | No Distribution | $0.00 | | |
| 30011 | No Counsel | N | N/A | No Distribution | $0.00 | | |
| 30012 | No Counsel | N | N/A | No Distribution | $0.00 | | |
| 30016 | No Counsel | N | N/A | No Distribution | $0.00 | | |
| 30025 | No Counsel | N | N/A | No Distribution | $0.00 | | |
| 30030 | No Counsel | N | N/A | No Distribution | $0.00 | | |
| 20004 | No Counsel | Y | Class 4 - Arrowood | Settling Subfund | $50,000.00 | | |
| 20008 | No Counsel | Y | Class 4 - Arrowood | Settling Subfund | $50,000.00 | | |
| 20010 | No Counsel | Y | Class 4 - Arrowood | Settling Subfund | $50,000.00 | | |
| 30036 | No Counsel | N | N/A | No Distribution | $0.00 | | |
| 20013 | No Counsel | Y | Class 4 - Arrowood | Settling Subfund | $50,000.00 | | |
| 30039 | No Counsel | N | N/A | No Distribution | $0.00 | | |
| 40004 | No Counsel | N | N/A | No Distribution | $0.00 | | |
| 20060 | No Counsel | Y | Class 4 - Arrowood | Settling Subfund | $50,000.00 | | |
| 20062 | No Counsel | Y | Class 4 - Arrowood | Settling Subfund | $50,000.00 | | |
| 20074 | No Counsel | Y | Class 4 - Arrowood | Settling Subfund | $50,000.00 | | |
| 20076 | No Counsel | N | Class 4 - Arrowood | Contested Subfund | $50,000.00 | | |
| 20077 | No Counsel | Y | Class 4 - Arrowood | Settling Subfund | $50,000.00 | | |
| 20079 | No Counsel | Y | Class 4 - Arrowood | Settling Subfund | $50,000.00 | | |
| 20094 | No Counsel | Y | Class 4 - Arrowood | Settling Subfund | $50,000.00 | | |
| 30007 | No Counsel | Y | Class 4 - Arrowood | Settling Subfund | $50,000.00 | | |
| 30008 | No Counsel | Y | Class 4 - Arrowood | Settling Subfund | $50,000.00 | | |
| 30009 | No Counsel | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $50,000.00 | | |
| 30020 | No Counsel | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $50,000.00 | | |
| 30023 | No Counsel | Y | Class 4 - Arrowood | Settling Subfund | $50,000.00 | | |
| 30024 | No Counsel | Y | Class 4 - Arrowood | Settling Subfund | $50,000.00 | | |
| 30027 | No Counsel | Y | Class 4 - Arrowood | Settling Subfund | $50,000.00 | | |
| 30038 | No Counsel | Y | Class 4 - Arrowood | Settling Subfund | $50,000.00 | | |
| 40001 | No Counsel | Y | Class 4 - Arrowood | Settling Subfund | $50,000.00 | | |
| 40002 | No Counsel | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $50,000.00 | | |
| 40005 | No Counsel | Y | Class 4 - Arrowood | Settling Subfund | $50,000.00 | | |
| 40007 | No Counsel | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $50,000.00 | | |
| 40009 | No Counsel | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $50,000.00 | | |
| 40010 | No Counsel | Y | TBD | Settling Subfund | $50,000.00 | | |
| 40011 | No Counsel | Y | Class 4 - Arrowood | Settling Subfund | $50,000.00 | | |
| 40013 | No Counsel | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $50,000.00 | | |
| 50000 | No Counsel | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $50,000.00 | | |
| 50001 | No Counsel | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $50,000.00 | | |
| 50003 | No Counsel | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $50,000.00 | | |
| 20006/40003 | No Counsel | Y | Class 4 - Arrowood | Settling Subfund | $50,000.00 | | |
| 900289/2021 | Noaker Law Firm, LLC | Y | Class 4 - Arrowood | Settling Subfund | $50,000.00 | SAINT PIUS X PREPARATORY SEMINARY | |

**Diocese of Rockville Centre - Disclosure Statement Exhibit 6**

| CVA or Proof of Claim Number (See Notes) | Counsel | Eligible to Vote | Class | Subfund | Eligible Minimum Consideration Amount | Released Co-Defendant(s) | Non-Released Co-Defendant(s) |
|---|---|---|---|---|---|---|---|
| 900011/2020 | Noaker Law Firm, LLC | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | CORPUS CHRISTI ROMAN CATHOLIC CHURCH | |
| 900012/2020 | Noaker Law Firm, LLC | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $100,000.00 | SAINT CATHERINE OF SIENA ROMAN CATHOLIC CHURCH | |
| 900013/2020 | Noaker Law Firm, LLC | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $100,000.00 | ROMAN CATHOLIC CHURCH OF THE SACRED HEART | |
| 900014/2020 | Noaker Law Firm, LLC | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $100,000.00 | HOLY TRINITY DIOCESAN HIGH SCHOOL; DEPARTMENT OF EDUCATION | |
| 900015/2020 | Noaker Law Firm, LLC | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | HOLY TRINITY DIOCESAN HIGH SCHOOL; DEPARTMENT OF EDUCATION | |
| 900018/2020 | Noaker Law Firm, LLC | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $100,000.00 | HOLY TRINITY DIOCESAN HIGH SCHOOL; DEPARTMENT OF EDUCATION | |
| 900165/2020 | Noaker Law Firm, LLC | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $100,000.00 | SACRED HEART CHURCH | |
| 900187/2021 | Noaker Law Firm, LLC | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | SAINT DOMINIC CATHOLIC CHURCH, | |
| 508122/2021 | Noaker Law Firm, LLC | N | Class 5 - LMI / Ecclesia | Contested Subfund | $100,000.00 | SAINT DOMINIC CATHOLIC CHURCH | ROMAN CATHOLIC DIOCESE OF BROOKLYN |
| 20087 | Nye, Stirling, Hale & Miller LLP | Y | Class 4 - Arrowood | Settling Subfund | $50,000.00 | | |
| 900040/2019 | Parker Waichman LLP | N | Class 4 - Arrowood | Contested Subfund | $50,000.00 | ST. AGNES ROMAN CATHOLIC CATHEDRAL; ST. AGNES CATHEDRAL SCHOOL | |
| 512319/2020 | Pfau Cochran Vertetis Amala PLLC/Marsh Law Firm | N | Class 4 - Arrowood | Contested Subfund | $50,000.00 | SAINT AGNES' CATHEDRAL; PARISH OF ST. AGNES CATHEDRAL CHURCH AND SCHOOL | SISTERS OF SAINT DOMINIC OF AMITYVILLE;ROMAN CATHOLIC DIOCESE OF BROOKLYN |
| 900070/2019 | Pfau Cochran Vertetis Amala PLLC/Marsh Law Firm | N | N/A | No Distribution | $0.00 | HOLY TRINITY HIGH SCHOOL | |
| 900033/2020 | Pfau Cochran Vertetis Amala PLLC/Marsh Law Firm | N | Class 5 - LMI / Ecclesia | Contested Subfund | $50,000.00 | OUR HOLY REDEEMER ROMAN CATHOLIC CHURCH; OUR HOLY REDEEMER SCHOOL | ARCHER STREET SCHOOL; FREEPORT UNION FREE SCHOOL DISTRICT; THEODORE ROOSEVELT COUNCIL, INC., BOY SCOUTS OF AMERICA; NASSAU COUNTY COUNCIL |
| 513586/2020 | Pfau Cochran Vertetis Amala PLLC/Marsh Law Firm | Y | Class 4 - Arrowood | Settling Subfund | $50,000.00 | | ROMAN CATHOLIC DIOCESE OF BROOKLYN; CAMP ALVERNIA |
| 513592/2020 | Pfau Cochran Vertetis Amala PLLC/Marsh Law Firm | Y | Class 4 - Arrowood | Settling Subfund | $50,000.00 | | FRANCISCAN BROTHERS OF BROOKLYN; ROMAN CATHOLIC DIOCESE OF BROOKLYN; CAMP ALVERNIA |
| 900006/2019 | Pfau Cochran Vertetis Amala PLLC/Marsh Law Firm | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | SAINT PATRICK'S PARISH; SAINT PATRICK'S PARISH AND SCHOOL | |
| 900007/2019 | Pfau Cochran Vertetis Amala PLLC/Marsh Law Firm | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | SAINTS PHILIP AND JAMES CHURCH | |
| 900030/2020 | Pfau Cochran Vertetis Amala PLLC/Marsh Law Firm | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | SAINT JOSEPH ROMAN CATHOLIC CHURCH; SAINT JOSEPH ROMAN CATHOLIC CHURCH AND SCHOOL | SISTERS OF MERCY OF THE AMERICAS |

**Diocese of Rockville Centre - Disclosure Statement Exhibit 6**

| CVA or Proof of Claim Number (See Notes) | Counsel | Eligible to Vote | Class | Subfund | Eligible Minimum Consideration Amount | Released Co-Defendant(s) | Non-Released Co-Defendant(s) |
|---|---|---|---|---|---|---|---|
| 900032/2020 | Pfau Cochran Vertetis Amala PLLC/Marsh Law Firm | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | OUR LADY OF LORETTO PARISH; OUR LADY OF LORETTO PARISH AND SCHOOL | SISTERS OF CHARITY OF THE BLESSED VIRGIN MARY |
| 900068/2019 | Pfau Cochran Vertetis Amala PLLC/Marsh Law Firm | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | GOOD SHEPHERD PARISH AND CHURCH; SAINT JOSEPH'S PARISH AND CHURCH | |
| 900069/2019 | Pfau Cochran Vertetis Amala PLLC/Marsh Law Firm | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | SAINT BARNABAS PARISH AND CHURCH | |
| 900071/2019; 900156/2020 | Pfau Cochran Vertetis Amala PLLC/Marsh Law Firm | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $100,000.00 | SAINT HYACINTH PARISH; ALL SAINT'S REGIONAL CATHOLIC SCHOOL | SISTERS OF NOTRE DAME; SISTERS OF THE SACRED HEART |
| 900072/2019 | Pfau Cochran Vertetis Amala PLLC/Marsh Law Firm | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | SAINT ANDREW'S PARISH; ST. ANDREW'S PARISH AND ELEMENTARY SCHOOL | |
| 900073/2019 | Pfau Cochran Vertetis Amala PLLC/Marsh Law Firm | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | OUR LADY OF LORETTO PARISH; OUR LADY OF LORETTO PARISH AND SCHOOL | SISTERS OF CHARITY OF THE BLESSED VIRGIN MARY |
| 900073/2021 | Pfau Cochran Vertetis Amala PLLC/Marsh Law Firm | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | SAINT HUGH OF LINCOLN ROMAN CATHOLIC CHURCH | |
| 900101/2020 | Pfau Cochran Vertetis Amala PLLC/Marsh Law Firm | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | GOOD SHEPHERD PARISH AND CHURCH | |
| 900102/2020 | Pfau Cochran Vertetis Amala PLLC/Marsh Law Firm | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $100,000.00 | SAINT AIDAN CHURCH; SAINT AIDAN CHURCH AND SCHOOL | SISTERS OF CHARITY OF HALIFAX; FRANCISCAN MISSIONARIES OF MARY; FRANCISCAN BROTHERS; DOMINICAN SISTERS OF AMITYVILLE |
| 900103/2020 | Pfau Cochran Vertetis Amala PLLC/Marsh Law Firm | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | SAINT ANDREW ROMAN CATHOLIC CHURCH; SAINT ANDREW ROMAN CATHOLIC CHURCH AND SCHOOL | SISTERS OF SACRED HEART OF MARY |
| 603159/2021; 614921/2021 | Pfau Cochran Vertetis Amala PLLC/Marsh Law Firm | N | Class 4 - Arrowood | Contested Subfund | $100,000.00 | SAINT ANNE'S ROMAN CATHOLIC CHURC | SUFFOLK COUNTY COUNCIL INC., BOY SCOUTS OF AMERICA; GRACE LUTHERAN CHURCH; AND THE LUTHERAN CHURCH-MISSOURI SYNOD |
| 900125/2020 | Pfau Cochran Vertetis Amala PLLC/Marsh Law Firm | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | SAINT JOSEPH PARISH AND CHURCH | |
| 900131/2020 | Pfau Cochran Vertetis Amala PLLC/Marsh Law Firm | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | SAINT BARNABAS THE APOSTLE CHURCH; SAINT BARNABAS THE APOSTLE CHURCH AND SCHOOL | SISTERS OF CHARITY |
| 607768/2020 | Pfau Cochran Vertetis Amala PLLC/Marsh Law Firm | N | Class 5 - LMI / Ecclesia | Contested Subfund | $100,000.00 | SAINT MARY ROMAN CATHOLIC CHURCH | SUFFOLK COUNTY COUNCIL, INC., BOY SCOUTS OF AMERICA |
| 900294/2021 | Pfau Cochran Vertetis Amala PLLC/Marsh Law Firm | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $100,000.00 | SAINT FRANCIS DE SALES CATHOLIC CHURCH, | |

**Diocese of Rockville Centre - Disclosure Statement Exhibit 6**

| CVA or Proof of Claim Number (See Notes) | Counsel | Eligible to Vote | Class | Subfund | Eligible Minimum Consideration Amount | Released Co-Defendant(s) | Non-Released Co-Defendant(s) |
|---|---|---|---|---|---|---|---|
| 950535/2020 | Pfau Cochran Vertetis Amala PLLC/Marsh Law Firm | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $100,000.00 | SAINT LAWRENCE THE MARTYR ROMAN CATHOLIC CHURCH; SAINT LAWRENCE THE MARTY ROMAN CATHOLIC CHURCH AND SCHOOL | SCHOOL SISTERS OF NOTRE DAME; ORDER OF FRIARS MINOR CONVENTUAL; SAINT ANTHONY OF PADUA PROVINCE; SISTERS OF CHARITY OF SAINT VINCENT DE PAUL OF NEW YORK; ARCHDIOCESE OF NEW YORK; COVENANT HOUSE |
| 900031/2020 | Pfau Cochran Vertetis Amala PLLC/Marsh Law Firm | N | Class 5 - LMI / Ecclesia | Contested Subfund | $100,000.00 | SAINT JOSEPH ROMAN CATHOLIC CHURCH | |
| 900036/2020 | Pfau Cochran Vertetis Amala PLLC/Marsh Law Firm | N | Class 5 - LMI / Ecclesia | Contested Subfund | $100,000.00 | OUR HOLY REDEEMER ROMAN CATHOLIC CHURCH; OUR HOLY REDEEMER SCHOOL | ARCHER STREET SCHOOL; STEELE ELEMENTARY SCHOOL; FREEPORT UNION FREE SCHOOL DISTRICT; BALDWIN UNION FREE SCHOOL DISTRICT; THEODORE ROOSEVELT COUNCIL, INC., BOY SCOUTS OF AMERICA; NASSAU COUNTY COUNCIL |
| 900124/2020 | Pfau Cochran Vertetis Amala PLLC/Marsh Law Firm | N | Class 5 - LMI / Ecclesia | Contested Subfund | $100,000.00 | SAINT JOSEPH'S ROMAN CATHOLIC CHURCH; SAINT JOSEPH'S ROMAN CATHOLIC CHURCH AND SCHOOL | SISTERS OF MERCY OF THE AMERICAS |
| 900307/2021 | Phillips & Paolicelli, LLP | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $50,000.00 | HOLY TRINITY DIOCESAN HIGH SCHOOL | |
| 524748/2019; 614654/2021 | Phillips & Paolicelli, LLP | N | Class 4 - Arrowood | Contested Subfund | $50,000.00 | HOLY FAMILY DIOCESAN HIGH SCHOOL | ST. ANTHONY'S HIGH SCHOOL |
| 515579/2020 | Phillips & Paolicelli, LLP | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $50,000.00 | | FRANCISCAN BROTHERS OF BROOKLYN; ORDER OF FRIARS MINOR -- HOLY NAME PROVINCE; ROMAN CATHOLIC DIOCESE OF BROOKLYN; ROMAN CATHOLIC ARCHDIOCESE OF NEW YORK; CAMP ALVERNIA; MN - SAINT FRANCIS OF ASSISI ROMAN CATHOLIC CHURCH (MANHATTAN) |
| 510647/2021 | Phillips & Paolicelli, LLP | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | SAINT JOSEPH ROMAN CATHOLIC CHURCH; ST. JOSEPH CATHOLIC SCHOOL | FRANCISCAN BROTHERS OF BROOKLYN |
| 512833/2020 | Phillips & Paolicelli, LLP | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | SAINT JOSEPH ROMAN CATHOLIC CHURCH; SAINT JOSEPH CATHOLIC SCHOOL | FRANCISCAN BROTHERS OF BROOKLYN |
| 900081/2020 | Phillips & Paolicelli, LLP | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $100,000.00 | SAINT THOMAS THE APOSTLE PARISH; ST. THOMAS THE APOSTLE SCHOOL INC. | |
| 900110/2020 | Phillips & Paolicelli, LLP | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | ST. MARY'S ELEMENTARY SCHOOL | |
| 900389/2021 | Pollock Cohen LLP | N | Class 5 - LMI / Ecclesia | Contested Subfund | $100,000.00 | OUR LADY OF VICTORY PARISH; OUR LADY OF VICTORY PARISH ELEMENTARY SCHOOL | |

**Diocese of Rockville Centre - Disclosure Statement Exhibit 6**

| CVA or Proof of Claim Number (See Notes) | Counsel | Eligible to Vote | Class | Subfund | Eligible Minimum Consideration Amount | Released Co-Defendant(s) | Non-Released Co-Defendant(s) |
|---|---|---|---|---|---|---|---|
| 40012 | Rappaport, Glass, Levine & Zullo, LLP | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $50,000.00 | | |
| 90535 | Reich & Binstock LLP | N | N/A | No Distribution | $0.00 | | |
| 90541 | Reich & Binstock LLP | N | N/A | No Distribution | $0.00 | | |
| 90542 | Reich & Binstock LLP | N | N/A | No Distribution | $0.00 | | |
| 90534 | Reich & Binstock LLP | Y | Class 4 - Arrowood | Settling Subfund | $50,000.00 | | |
| 90536 | Reich & Binstock LLP | Y | Class 4 - Arrowood | Settling Subfund | $50,000.00 | | |
| 90537 | Reich & Binstock LLP | Y | Class 4 - Arrowood | Settling Subfund | $50,000.00 | | |
| 90538 | Reich & Binstock LLP | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $50,000.00 | | |
| 90539 | Reich & Binstock LLP | Y | Class 4 - Arrowood | Settling Subfund | $50,000.00 | | |
| 90545 | Reich & Binstock LLP | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $50,000.00 | | |
| 90546 | Reich & Binstock LLP | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $50,000.00 | | |
| 900172/2021 | Reich & Binstock LLP | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | SAINT JOSEPH'S ROMAN CATHOLIC CHURCH | |
| 900008/2020 | Rheingold Giuffra Ruffo & Plotkin LLP | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $100,000.00 | SAINT ANTHONY OF PADUA | |
| 900042/2020 | Rheingold Giuffra Ruffo & Plotkin LLP | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $100,000.00 | PARISH OF SAINT CHRISTOPHER | |
| 900122/2021 | Robins Kaplan LLP | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | OUR HOLY REDEEMER ROMAN CATHOLIC CHURCH | |
| 900166/2021 | Robins Kaplan LLP | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | SAINT RAYMOND PARISH | |
| 900196/2021 | Robins Kaplan LLP | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | OUR HOLY REDEEMER ROMAN CATHOLIC CHURCH | |
| 900002/2019 | Romano & Associates | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | SAINT HUGH OF LINCOLN ROMAN CATHOLIC CHURCH | |
| 90527 | Romanucci & Blandin, LLC | Y | Class 4 - Arrowood | Settling Subfund | $50,000.00 | | |
| 607467/2020 | Russo, Karl, Widmaier & Cordano, PLLC | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $100,000.00 | SAINT PATRICK PARISH | |
| 615542/2021 | Schroeder Law Office, PLLC | N | Class 4 - Arrowood | Contested Subfund | $50,000.00 | | SUFFOLK COUNTY COUNCIL, INC. AND METHODIST CHURCH NEW YORK CONFERENCE |
| 900348/2021 | Schroeder Law Office, PLLC | N | Class 4 - Arrowood | Contested Subfund | $50,000.00 | | THEODORE ROOSEVELT COUNCIL, INC., METHODIST NEW YORK CONFERENCE |
| 900069/2021 | Seeger Weiss LLP | Y | Class 4 - Arrowood | Settling Subfund | $50,000.00 | | FRANCISCAN BROTHERS OF BROOKLYN; SAINT ANTHONY'S HIGH SCHOOL |
| 90091 | Seeger Weiss LLP | Y | Class 4 - Arrowood | Settling Subfund | $50,000.00 | | |
| 614848/2021 | Seeger Weiss LLP | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $100,000.00 | INFANT JESUS ROMAN CATHOLIC CHURCH | |
| 900050/2021 | Seeger Weiss LLP | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | HOLY NAME OF MARY ROMANT CATHOLIC CHURCH IN VALLEY STREAM | |
| 900057/2021 | Seeger Weiss LLP | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $100,000.00 | SAINT MARY OF THE ISLE ROMAN CATHOLIC CHURCH | |
| 90575 | Shellist Lazarz Slobin LLP | Y | Class 4 - Arrowood | Settling Subfund | $50,000.00 | | |
| 900064/2019 | Silberstein, Awad & Miklos, P.C. | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | SAINT JOSEPH'S PARISH | |
| 614405/2021 | Slater Slater Schulman LLP | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $50,000.00 | OUR LADY OF PERPETUAL HELP ROMAN CATHOLIC CHURCH (TO BE DISCONTINUED) | |
| 900099/2021 | Slater Slater Schulman LLP | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $50,000.00 | HOLY TRINITY DIOCESAN HIGH SCHOOL | DOMINICAN CONVENT OF OUR LADY OF THE ROSARY |

**Diocese of Rockville Centre - Disclosure Statement Exhibit 6**

| CVA or Proof of Claim Number (See Notes) | Counsel | Eligible to Vote | Class | Subfund | Eligible Minimum Consideration Amount | Released Co-Defendant(s) | Non-Released Co-Defendant(s) |
|---|---|---|---|---|---|---|---|
| 900242/2021 | Slater Slater Schulman LLP | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $50,000.00 | HOLY TRINITY DIOCESAN HIGH SCHOOL | CONVENT OF THE SISTERS OF MERCY IN BROOKLYN; SISTERS OF MERCY OF THE AMERICAS OF THE MID-ATLANTIC COMMUNITY |
| 900104/2021 | Slater Slater Schulman LLP | N | Class 5 - LMI / Ecclesia | Contested Subfund | $50,000.00 | SAINT THOMAS THE APOSTLE PARISH | |
| 90035 | Slater Slater Schulman LLP | N | N/A | No Distribution | $0.00 | | |
| 90087 | Slater Slater Schulman LLP | N | N/A | No Distribution | $0.00 | | |
| 90166 | Slater Slater Schulman LLP | N | N/A | No Distribution | $0.00 | | |
| 90568 | Slater Slater Schulman LLP | N | N/A | No Distribution | $0.00 | | |
| 518896/2021 | Slater Slater Schulman LLP | N | N/A | No Distribution | $0.00 | | FRANCISCAN BROTHERS OF BROOKLYN, AND FRANCISCAN FRIARS- HOLY NAME PROVINCE (NY) |
| 613013/2021 | Slater Slater Schulman LLP | N | N/A | No Distribution | $0.00 | ST. ANTHONY OF PADUA (DISCONTINUED) | |
| 70043/2021E; 70274/2021E | Slater Slater Schulman LLP | N | N/A | No Distribution | $0.00 | | THE ROMAN CATHOLIC DIOCESE OF BROOKLYN, FRANCISCAN BROTHERS OF BROOKLYN, CAMP ALVERNIA AND FRIARS OF ASSUMPTION BVM PROVINCE, INC. |
| 400195/2021 | Slater Slater Schulman LLP | Y | Class 4 - Arrowood | Settling Subfund | $50,000.00 | | NEW YORK PROVINCE, SISTERS OF CHARITY, HALIFAX; SISTERS OF CHARITY (HALIFAX) SUPPORTING CORPORATION; SETON HALL HIGH SCHOOL |
| 452564/2020; 517428/2020 | Slater Slater Schulman LLP | N | Class 4 - Arrowood | Contested Subfund | $50,000.00 | | SISTERS OF MERCY OF THE AMERICAS; ROMAN CATHOLIC DIOCESE OF BROOKLYN; ST. MARY OF THE ANGELS HOME; CITY OF NEW YORK; NEW YORK CITY ADMINISTRATION FOR CHILDREN'S SERVICES; MERCYFIRST |
| 513534/2020 | Slater Slater Schulman LLP | N | Class 5 - LMI / Ecclesia | Contested Subfund | $50,000.00 | | SISTERS OF THE HOLY FAMILY OF NAZARETH USA; DIOCESE OF BROOKLYN; CATHOLIC CHARITIES NEIGHBORHOOD SERVICES; HEARTSHARE HUMAN SERVICES OF NEW YORK; CATHOLIC GUARDIAN SOCIETY OF THE DIOCESE OF BROOKLYN; CATHOLIC CHARITIES |
| 516410/2020 | Slater Slater Schulman LLP | N | Class 5 - LMI / Ecclesia | Contested Subfund | $50,000.00 | | SISTERS OF THE HOLY FAMILY OF NAZARETH USA; DIOCESE OF BROOKLYN; CATHOLIC CHARITIES NEIGHBORHOOD SERVICES; HEARTSHARE HUMAN SERVICES OF NEW YORK; CATHOLIC GUARDIAN SOCIETY OF THE DIOCESE OF BROOKLYN; CATHOLIC CHARITIES |

**Diocese of Rockville Centre - Disclosure Statement Exhibit 6**

| CVA or Proof of Claim Number (See Notes) | Counsel | Eligible to Vote | Class | Subfund | Eligible Minimum Consideration Amount | Released Co-Defendant(s) | Non-Released Co-Defendant(s) |
|---|---|---|---|---|---|---|---|
| 516480/2020 | Slater Slater Schulman LLP | N | Class 5 - LMI / Ecclesia | Contested Subfund | $50,000.00 | | ROMAN CATHOLIC DIOCESE OF BROOKLYN; LITTLE FLOWER CHILDREN AND FAMILY SERVICES OF NEW YORK; CITY OF NEW YORK; NEW YORK CITY ADMINISTRATION FOR CHILDREN'S SERVICES |
| 517139/2020 | Slater Slater Schulman LLP | N | Class 4 - Arrowood | Contested Subfund | $50,000.00 | | ROMAN CATHOLIC DIOCESE OF BROOKLYN; LITTLE FLOWER CHILDREN AND FAMILY SERVICES OF NEW YORK; NASSAU COUNTY, NASSAU COUNTY DEPARTMENT OF SOCIAL SERVICES |
| 517828/2021 | Slater Slater Schulman LLP | N | Class 4 - Arrowood | Contested Subfund | $50,000.00 | | SISTERS OF THE HOLY FAMILY OF NAZARETH |
| 520068/2021 | Slater Slater Schulman LLP | N | Class 5 - LMI / Ecclesia | Contested Subfund | $50,000.00 | | SISTERS OF THE HOLY FAMILY OF NAZARETH ; CITY OF NEW YORK, NEW YORK CITY ADMINISTRATION FOR CHILDREN'S SERVICES, NEW YORK CITY HUMAN RESOURCES ADMINISTRATION / DEPARTMENT OF SOCIAL SERVICES, DIOCESE OF BROOKLYN, CATHOLIC CHARITIES DIOCESE OF BROOKLYN, CATHOLIC CHARITIES NEIGHBORHOOD SERVICES, HEARTSHARE HUMAN SERVICES OF NEW YORK, CATHOLIC GUARDIAN SOCIETY OF THE DIOCESE OF BROOKLYN, AND LITTLE FLOWER CHILDREN AND FAMILY SERVICES OF NEWYORK |
| 400094/2021 | Slater Slater Schulman LLP | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $100,000.00 | SAINT MATTHEW ROMAN CATHOLIC CHURCH | |
| 520085/2021 | Slater Slater Schulman LLP | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $100,000.00 | HOLY NAME OF MARY ROMAN CATHOLIC CHURCH | NASSAU CHAPTER OF THE KNIGHTS OF COLUMBUS, INC., NASSAU CHARITIES, INC., NASSAU COUNTY CHAPTER OF THE KNIGHTS OF COLUMBUS INCORPORATED, NEW YORK STATE COUNCIL KNIGHTS OF COLUMBUS CHARITIES, INC., FR. THOMAS F.B. CARROLL COUNCIL 4566 OF THE KNIGHTS OF COLUMBUS, KNIGHTS OF COLUMBUS, KNIGHTS OF COLUMBUS CHARITIES, INC., KNIGHTS OF COLUMBUS CHARITIES USA, INC., KNIGHTS OF COLUMBUS CHARITABLE |
| 606396/2020 | Slater Slater Schulman LLP | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | CHURCH OF ST. ROSALIE | |

**Diocese of Rockville Centre - Disclosure Statement Exhibit 6**

| CVA or Proof of Claim Number (See Notes) | Counsel | Eligible to Vote | Class | Subfund | Eligible Minimum Consideration Amount | Released Co-Defendant(s) | Non-Released Co-Defendant(s) |
|---|---|---|---|---|---|---|---|
| 613012/2021 | Slater Slater Schulman LLP | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $100,000.00 | SAINT SYLVESTER ROMAN CATHOLIC CHURCH | |
| 613014/2021 | Slater Slater Schulman LLP | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | ST. FRANCES CABRINI CHURCH | |
| 613015/2021 | Slater Slater Schulman LLP | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | SAINT LAWRENCE THE MARTYR ROMAN CATHOLIC CHURCH | |
| 613336/2021 | Slater Slater Schulman LLP | N | Class 4 - Arrowood | Contested Subfund | $50,000.00 | | SISTERS OF THE HOLY FAMILY OF NAZARETH; COUNTY OF SUFFOLK, NEW YORK; DIOCESE OF BROOKLYN; LITTLE FLOWER CHILDREN AND FAMILY SERVICES OF NEW YORK |
| 613020/2021 | Slater Slater Schulman LLP | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $100,000.00 | SAINT HUGH OF LINCOLN | |
| 614399/2021 | Slater Slater Schulman LLP | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $50,000.00 | | MARYHAVEN CENTER OF HOPE, INC. AND THE DAUGHTERS OF WISDOM, INC. |
| 613213/2021 | Slater Slater Schulman LLP | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $100,000.00 | SAINTS CYRIL AND METHODIUS ROMAN CATHOLIC CHURCH; SAINTS CYRIL AND METHODIUS SCHOOL, OUR LADY OF GUADALUPE CATHOLIC SCHOOL | SISTERS OF SAINT JOSEPH |
| 613335/2021 | Slater Slater Schulman LLP | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | SAINT HUGH OF LINCOLN PARISH; SAINT HUGH OF LINCOLN SCHOOL; TRINITY REGIONAL SCHOOL | SISTERS OF THE ORDER OF SAINT DOMINIC |
| 613430/2021 | Slater Slater Schulman LLP | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $100,000.00 | SAINT PHILIP NERI CATHOLIC CHURCH | SISTERS OF THE ORDER OF SAINT DOMINIC |
| 614400/2021 | Slater Slater Schulman LLP | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $100,000.00 | CHURCH OF THE GOOD SHEPHERD | |
| 614401/2021 | Slater Slater Schulman LLP | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | SAINT PATRICK'S CHURCH OF SMITHTOWN | |
| 614402/2021; 614919/2021 | Slater Slater Schulman LLP | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | SAINT PHILIP NERI CHURCH; OUR LADY QUEEN OF MARTYRS CATHOLIC CHURCH; SAINT PHILIP NERI SCHOOL; TRINITY REGIONAL SCHOOL | SISTERS OF SAINT JOSEPH |
| 614403/2021 | Slater Slater Schulman LLP | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | OUR LADY OF PERPETUAL HELP ROMAN CATHOLIC CHURCH LINDENHURST | SISTERS OF THE ORDER OF SAINT DOMINIC |
| 614404/2021 | Slater Slater Schulman LLP | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $100,000.00 | SAINT JOSEPH ROMAN CATHOLIC CHURCH; ST. JOSEPH SCHOOL | ATLANTIC-MIDWEST PROVINCE OF THE SCOOL SISTERS OF NOTRE DAME |
| 614406/2021 | Slater Slater Schulman LLP | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | PARISH OF SAINT MARY; SAINT MARY SCHOOL | ATLANTIC-MIDWEST PROVINCE OF THE SCOOL SISTERS OF NOTRE DAME |
| 614526/2021 | Slater Slater Schulman LLP | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | SAINT JOSEPH'S PARISH | |
| 615121/2021 | Slater Slater Schulman LLP | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $100,000.00 | SAINT ISIDORE ROMAN CATHOLIC CHURCH; SAINT ISIDORE SCHOOL; SAINT JOHN PAUL II REGIONAL SCHOOL | SISTERS OF THE HOLY FAMILY OF NAZARETH-U.S.A.; SISTERS OF THE HOLY FAMILY OF NAZARETH |

**Diocese of Rockville Centre - Disclosure Statement Exhibit 6**

| CVA or Proof of Claim Number (See Notes) | Counsel | Eligible to Vote | Class | Subfund | Eligible Minimum Consideration Amount | Released Co-Defendant(s) | Non-Released Co-Defendant(s) |
|---|---|---|---|---|---|---|---|
| 615146/2021 | Slater Slater Schulman LLP | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $100,000.00 | SAINT AGNES ROMAN CATHOLIC CATHEDRAL; THE CATHEDRAL OF ST. AGNES, ST. AGNES CATHEDRAL SCHOOL | SISTERS OF THE ORDER OF SAINT DOMINIC |
| 617355/2019; 518289/2020 | Slater Slater Schulman LLP | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | SAINT JOSEPH ROMAN CATHOLIC CHURCH | FRANCISCAN BROTHERS OF BROOKLYN |
| 618528/2019 | Slater Slater Schulman LLP | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $100,000.00 | INFANT JESUS ROMAN CATHOLIC CHURCH | |
| 618528/2019 | Slater Slater Schulman LLP | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $100,000.00 | INFANT JESUS ROMAN CATHOLIC CHURCH | |
| 618528/2019 | Slater Slater Schulman LLP | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $100,000.00 | INFANT JESUS ROMAN CATHOLIC CHURCH | |
| 621553/2019 | Slater Slater Schulman LLP | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $50,000.00 | | SAINT ANTHONY'S HIGH SCHOOL |
| 618542/2019; 615522/2021 | Slater Slater Schulman LLP | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | THE ROMAN CATHOLIC CHURCH OF SAINTS CYRIL AND METHODIUS; SAINTS CYRIL AND METHODIUS SCHOOL | SISTERS OF ST. JOSEPH |
| 619881/2019; 615525/2021 | Slater Slater Schulman LLP | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | SAINT BARNABAS THE APOSTLE ROMANC CATHOLIC CHURCH; SAINT ELIZABETH ANN SETON REGIONAL SCHOOL; SAINT BARNABAS THE APOSTLE SCHOOL | NEW YORK PROVINCE, SISTERS OF CHARITY, HALIFAX, INC; THE SISTERS OF CHARITY OF SAINT VINCENT DE PAUL OF NEW YORK; SISTERS OF CHARITY FEDERATION, INC.; SISTERS OF CHARITY (HALIFAX) SUPPORTING CORPORATION |
| 900057/2019 | Slater Slater Schulman LLP | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $100,000.00 | SAINT MARTIN OF TOURS | |
| 900085/2020 | Slater Slater Schulman LLP | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | SAINT MATTHEW ROMAN CATHOLIC CHURCH | |
| 900087/2020 | Slater Slater Schulman LLP | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $100,000.00 | OUR LADY OF GRACE ROMAN CATHOLIC CHURCH | |
| 900103/2021 | Slater Slater Schulman LLP | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | NOTRE DAME PARISHNOTRE DAME CATHOLIC SCHOOL | SISTERS OF THE ORDER OF SAINT DOMINIC; FRANCISAN BROTHERS |
| 900110/2021 | Slater Slater Schulman LLP | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $100,000.00 | SAINT MARTHA ROMAN CATHOLIC CHURCH; SAINT MARTHA'S ELEMENTARY SCHOOL | |
| 900114/2020; 615528/2021 | Slater Slater Schulman LLP | N | Class 5 - LMI / Ecclesia | Contested Subfund | $50,000.00 | | BROTHERS OF THE CHRISTIAN SCHOOLS DISTRICT OF EASTERN NORTH AMERICA; LA SALLE MILITARY ACADEMY |
| 900113/2021 | Slater Slater Schulman LLP | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | SAINT RAPHAEL ROMAN CATHOLIC CHURCH | |
| 900126/2021 | Slater Slater Schulman LLP | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $100,000.00 | SAINT JAMES PARISH; SAINT JAMES PARISH SCHOOL | SISTERS OF THE HOLY CROSS AND PASSION |
| 900128/2021 | Slater Slater Schulman LLP | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | OUR LADY OF LOURDES; OUR LADY OF LOURDES SCHOOL | SISTERS OF THE ORDER OF SAINT DOMINIC |
| 900135/2021 | Slater Slater Schulman LLP | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | SAINT ROSE OF LIMA PARISH. | |
| 900136/2021 | Slater Slater Schulman LLP | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | NOTRE DAME PARISH; NOTRE DAME CATHOLIC SCHOOL | SISTERS OF THE ORDER OF SAINT DOMINIC; FRANCISCAN BROTHERS |

**Diocese of Rockville Centre - Disclosure Statement Exhibit 6**

| CVA or Proof of Claim Number (See Notes) | Counsel | Eligible to Vote | Class | Subfund | Eligible Minimum Consideration Amount | Released Co-Defendant(s) | Non-Released Co-Defendant(s) |
|---|---|---|---|---|---|---|---|
| 900045/2019; 900308/2021 | Slater Slater Schulman LLP | N | Class 5 - LMI / Ecclesia | Contested Subfund | $100,000.00 | QUEEN OF THE MOST HOLY ROSARY; QUEEN OF THE MOST HOLY ROSARY SCHOOL | DOMINICAN SISTERS OF THE THIRD ORDER OF ST. DOMINIC CONGREGATION OF THE HOLY CROSS |
| 900137/2020 | Slater Slater Schulman LLP | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | SAINT JUDE ROMAN CATHOLIC CHURCH | |
| 900123/2021 | Slater Slater Schulman LLP | N | Class 4 - Arrowood | Contested Subfund | $100,000.00 | SAINT RAYMOND OF PENYAFORT | SISTERS OF THE ORDER OF SAINT DOMINIC |
| 900142/2021 | Slater Slater Schulman LLP | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | ST. HUGH OF LINCOLN ROMAN CATHOLIC CHURCH | |
| 900169/2021 | Slater Slater Schulman LLP | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $100,000.00 | SAINT IGNATIUS OF LOYOLA ROMAN CATHOLIC CHURCH; SAINT IGNATIUS LOYOLA SCHOOL | SISTERS OF THE ORDER OF SAINT DOMINIC |
| 900170/2021 | Slater Slater Schulman LLP | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $100,000.00 | OUR HOLY REDEEMER ROMAN CATHOLIC CHURCH; OUR HOLY REDEEMER SCHOOL | SISTERS OF THE ORDER OF SAINT DOMINIC |
| 900137/2021 | Slater Slater Schulman LLP | N | Class 4 - Arrowood | Contested Subfund | $100,000.00 | SAINT BRIGID PARISH; ST. BRIGID/OUR LADY OF HOPE REGIONAL SCHOOL; ST. BRIGID SCHOOL | SCHOOL SISTERS OF NOTRE DAME IN THE STATE OF CONNECTICUT, NORTHEASTERN PROVINCE OF THE SCHOOL SISTERS OF NOTRE DAME IN THE STATE OF CONNECTICUT AND ATLANTIC-MIDWEST PROVINCE OF THE SCHOOL SISTERS OF NOTRE DAME, |
| 900171/2021 | Slater Slater Schulman LLP | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $100,000.00 | ST. CHRISTOPHER'S CHURCH; SAINT CHRISTOPHER SCHOOL | SISTERS OF SAINT JOSEPH |
| 900176/2021 | Slater Slater Schulman LLP | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $100,000.00 | SAINT WILLIAM THE ABBOT ROMAN CATHOLIC CHURCH | |
| 900177/2021; 900302/2021 | Slater Slater Schulman LLP | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | ST. PIUS X SCHOOL; ST. JOHN BAPTIST DE LA SALLE REGIONAL CATHOLIC SCHOOL | CONVENT OF THE SISTERS OF MERCY IN BROOKLYN; SISTERS OF MERCY OF THE AMERICAS OF THE MID-ATLANTIC COMMUNITY |
| 900178/2021 | Slater Slater Schulman LLP | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | SAINT BRIGID'S CATHOLIC CHURCH, ST. BRIGID; OUR LADY OF HOPE REGIONAL SCHOOL | ATLANTIC-MIDWEST PROVINCE OF THE SCOOL SISTERS OF NOTRE DAME |
| 900185/2021 | Slater Slater Schulman LLP | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $100,000.00 | SAINT CATHERINE OF SIENNA ROMAN CATHOLIC CHURCH | |
| 900189/2021; 615135/2021 | Slater Slater Schulman LLP | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | CHRIST THE KING ROMAN CATHOLIC CHURCH | |
| 900192/2021 | Slater Slater Schulman LLP | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | OUR LADY OF PEACE ROMAN CATHOLIC CHURCH; OUR LADY OF PEACE SCHOOL | CONVENT OF THE SISTERS OF MERCY IN BROOKLYN; SISTERS OF MERCY OF THE AMERICAS OF THE MID-ATLANTIC COMMUNITY |

**Diocese of Rockville Centre - Disclosure Statement Exhibit 6**

| CVA or Proof of Claim Number (See Notes) | Counsel | Eligible to Vote | Class | Subfund | Eligible Minimum Consideration Amount | Released Co-Defendant(s) | Non-Released Co-Defendant(s) |
|---|---|---|---|---|---|---|---|
| 900193/2021 | Slater Slater Schulman LLP | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $100,000.00 | SAINT MARY'S R.C. CHURCH AT MANHASSET IN QUEENS CO.; SAINT MARY'S COLLEGE PREPARATORY HIGH SCHOOL | MARIST BROTHERS OF THE SCHOOL, INC |
| 900168/2021 | Slater Slater Schulman LLP | N | Class 4 - Arrowood | Contested Subfund | $100,000.00 | SAINT JAMES PARISH | |
| 900198/2021 | Slater Slater Schulman LLP | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | SAINT BARNABAS THE APOSTLE ROMAN CATHOLIC PARISH; ST. BARNABAS SCHOOL; ST. ELIZABETH ANN SETON REGIONAL SCHOOL | NEW YORK PROVINCE, SISTERS OF CHARITY, HALIFAX; SISTERS OF CHARITY (HALIFAX) SUPPORTING CORPORATION |
| 900209/2021 | Slater Slater Schulman LLP | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | SAINT JOSEPH'S ROMAN CATHOLIC CHURCH; SAINT JOSEPH'S CATHOLIC SCHOOL | SISTERS OF SAINT JOSEPH |
| 900227/2021 | Slater Slater Schulman LLP | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | SAINT PATRICK'S CHURCH; ALL SAINTS REGIONAL CATHOLIC SCHOOL; SAINT PATRICK'S SCHOOL | ATLANTIC-MIDWEST PROVINCE OF THE SCOOL SISTERS OF NOTRE DAME |
| 900175/2021 | Slater Slater Schulman LLP | N | Class 5 - LMI / Ecclesia | Contested Subfund | $100,000.00 | SAINT AGNES ROMAN CATHOLIC CATHEDRAL; THE CATHEDRAL OF ST. AGNES, ST. AGNES CATHEDRAL SCHOOL | SISTERS OF THE ORDER OF SAINT DOMINIC |
| 900265/2021 | Slater Slater Schulman LLP | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | SAINT LADISLAUS ROMAN CATHOLIC PARISH; ST. LADISLAUS SCHOOL | CONGREGATION OF SISTERS OF ST. FELIX OF CANTALICE THIRD ORDER REGULAR OF ST. FRANCIS OF ASSISI; OUR LADY OF HOPE PROVINCE |
| 900309/2021; 900041/2020 | Slater Slater Schulman LLP | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | SAINT MARY'S ROMAN CATHOLIC CHURCH; SAINT MARY'S ELEMENTARY SCHOOL | CONGREGATION OF THE SISTERS SERVANTS OF THE IMMACULATE HEART OF MARY, SCRANTON, PENNSYLVANIA; CONVENT OF THE SISTERS, SERVANTS OF THE IMMACULATE HEART OF MARY |
| 900208/2021 | Slater Slater Schulman LLP | N | Class 5 - LMI / Ecclesia | Contested Subfund | $100,000.00 | OUR LADY OF VICTORY PARISH | SISTERS OF SAINT JOSEPH |

**Diocese of Rockville Centre - Disclosure Statement Exhibit 6**

| CVA or Proof of Claim Number (See Notes) | Counsel | Eligible to Vote | Class | Subfund | Eligible Minimum Consideration Amount | Released Co-Defendant(s) | Non-Released Co-Defendant(s) |
|---|---|---|---|---|---|---|---|
| 950304/2021; 520669/2021 | Slater Slater Schulman LLP | N | Class 5 - LMI / Ecclesia | Contested Subfund | $50,000.00 | | SISTERS OF THE HOLY FAMILY OF NAZARETH USA; CATHOLIC CHARITIES, DIOCESE OF BROOKLYN; CATHOLIC CHARITIES NEIGHBORHOOD SERVICES; HEARTSHARE HUMAN SERVICES OF NEW YORK; CATHOLIC GUARDIAN SOCIETY OF THE DIOCESE OF BROOKLYN; THE ROMAN CATHOLIC DIOCES OF BROOKLYN, CITY OF NEW YORK, NEW YORK CITY ADMINISTRATION FOR CHILDREN'S SERVICES F/K/A BUREAU OF CHILD WELFARE, AND LITTLE FLOWER CHILDREN AND FAMILY SERVICES OF NEW YORK |
| 951389/2021; 950642/2020 | Slater Slater Schulman LLP | N/A | N/A | No Distribution | $0.00 | | CITY OF NEW YORK, NEW YORK CITY ADMINISTRATION FOR CHILDREN'S SERVICES, PIUS XII YOUTH AND FAMILY SERVICES, INC., THE ROMAN CATHOLIC DIOCESE OF ROCKVILLE CENTRE, MARYHAVEN CENTER OF HOPE, INC, THE DAUGHTERS OF WISDOM, INC., CATHOLIC HEALTH SYSTEM OF LONG ISLAND, INC., CATHOLIC CHARITIES OF THE ARCHDIOCESE OF NEW YORK; CATHOLIC HOME BUREAU; CATHOLIC GUARDIAN SERVICES |
| 80003 | Slater Slater Schulman LLP | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $50,000.00 | | |
| 80007 | Slater Slater Schulman LLP | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $50,000.00 | | |
| 80008 | Slater Slater Schulman LLP | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $50,000.00 | | |
| 90027 | Slater Slater Schulman LLP | Y | Class 4 - Arrowood | Settling Subfund | $50,000.00 | | |
| 90030 | Slater Slater Schulman LLP | Y | Class 4 - Arrowood | Settling Subfund | $50,000.00 | | |
| 90052 | Slater Slater Schulman LLP | N | Class 5 - LMI / Ecclesia | Contested Subfund | $50,000.00 | | |
| 90079 | Slater Slater Schulman LLP | Y | Class 4 - Arrowood | Settling Subfund | $50,000.00 | | |
| 90086 | Slater Slater Schulman LLP | Y | Class 4 - Arrowood | Settling Subfund | $50,000.00 | | |
| 90089 | Slater Slater Schulman LLP | Y | Class 4 - Arrowood | Settling Subfund | $50,000.00 | | |
| 90096 | Slater Slater Schulman LLP | N | Class 4 - Arrowood | Contested Subfund | $50,000.00 | | |
| 90165 | Slater Slater Schulman LLP | Y | Class 4 - Arrowood | Settling Subfund | $50,000.00 | | |
| 90223 | Slater Slater Schulman LLP | Y | Class 4 - Arrowood | Settling Subfund | $50,000.00 | | |
| 90505 | Slater Slater Schulman LLP | Y | Class 4 - Arrowood | Settling Subfund | $50,000.00 | | |
| 90579 | Slater Slater Schulman LLP | N | Class 4 - Arrowood | Contested Subfund | $50,000.00 | | |
| 90580 | Slater Slater Schulman LLP | N | Class 5 - LMI / Ecclesia | Contested Subfund | $50,000.00 | | |
| 900245/2021 | Slater Slater Schulman LLP | N | Class 4 - Arrowood | Contested Subfund | $100,000.00 | SAINT ANTHONY'S ROMAN CATHOLIC CHURCH; SAINT ANTHONY'S SCHOOL | SISTERS OF SAINT DOMINIC OF BLAUVELT, NEW YORK |

**Diocese of Rockville Centre - Disclosure Statement Exhibit 6**

| CVA or Proof of Claim Number (See Notes) | Counsel | Eligible to Vote | Class | Subfund | Eligible Minimum Consideration Amount | Released Co-Defendant(s) | Non-Released Co-Defendant(s) |
|---|---|---|---|---|---|---|---|
| 900378/2021 | Slater Slater Schulman LLP | N | Class 4 - Arrowood | Contested Subfund | $100,000.00 | SAINT PIUS X ROMAN CATHOLIC CHURCH; ST. PIUS X SCHOOL | SISTERS OF MERCY; SISTERS OF MERCY OF THE AMERICAS MID-ATLANTIC COMMUNITY, INC., AND SISTERS OF MERCY OF THE AMERICAS, INC. |
| 20044 | Sullivain Papain Block McGrath Coffinas & Cannavo, P.C. | Y | Class 4 - Arrowood | Settling Subfund | $50,000.00 | | |
| 20067 | Sullivain Papain Block McGrath Coffinas & Cannavo, P.C. | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $50,000.00 | | |
| 900017/2020 | Sullivain Papain Block McGrath Coffinas & Cannavo, P.C. | N | Class 5 - LMI / Ecclesia | Contested Subfund | $100,000.00 | SAINT VINCENT DE PAUL PARISH | |
| 900298/2021 | The Bongiorno Law Firm, PLLC | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $100,000.00 | DEPARTMENT OF EDUCATION; HOLY TRINITY DIOCESAN HIGH SCHOOL | |
| 90458 | The L.H. Law Team P.C. | Y | Class 4 - Arrowood | Settling Subfund | $50,000.00 | | |
| 613853/2017 | The Licatesi Law Group, LLP | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $100,000.00 | SAINT KILIAN ROMAN CATHOLIC CHURCH | |
| 90134 | The Meneo Law Group | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $50,000.00 | | |
| 90394 | The Meneo Law Group | Y | Class 4 - Arrowood | Settling Subfund | $50,000.00 | | |
| 900366/2021 | The Russell Friedman Law Group, LLP | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | SAINT BRIGID CATHOLIC CHURCH | |
| 900393/2021 | The Russell Friedman Law Group, LLP | N | Class 4 - Arrowood | Contested Subfund | $50,000.00 | | |
| 900080/2021 | The Zalkin Law Firm, P.C. | N | Class 4 - Arrowood | Contested Subfund | $50,000.00 | SAINT CATHERINE OF SIENNA ROMAN CATHOLIC CHURCH | PROVINCE OF THE MOST SACRED HEART OF JESUS, THIRD ORDER REGULAR OF ST. FRANCIS OF PENANCE (D/B/A FRANCISCAN FRIARS OF THE THIRD ORDER REGULAR) |
| 951159/2021 | The Zalkin Law Firm, P.C. | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $100,000.00 | HOLY NAME OF MARY CATHOLIC SCHOOL | CATHOLIC GUARDIANS; CITY OF NEW YORK; NEW YORK OFFICE OF CHILDREN AND FAMILY SERVICES |
| 951160/2021 | The Zalkin Law Firm, P.C. | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $100,000.00 | HOLY NAME OF MARY CATHOLIC SCHOOL | CATHOLIC GUARDIANS; CITY OF NEW YORK; NEW YORK OFFICE OF CHILDREN AND FAMILY SERVICES |
| 900150/2020 | The Zalkin Law Firm, P.C. | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $100,000.00 | SAINT PATRICK ROMAN; SAINT PATRICK ROMAN CATHOLIC SCHOOL; CATHOLIC CHURCH | |
| 56671/2020 | Thomas Counselor at Law, LLC | Y | Class 4 - Arrowood | Settling Subfund | $50,000.00 | | CAPUCHIN FRANCISANS; CAPUCHIN FRANCISCAN TERTIARY PROVINCE OF SAINT MARY OF N.Y., INC.; CAPUCHIN FRIARS INTERNATIONAL, INC.; CAPUCHIN FRIARS OF NORTH AMERICA; PROVINCE OF SAINT MARY OF THE CAPUCHIN ORDER |
| 900079/2021 | Thomas Counselor at Law, LLC | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $100,000.00 | SAINT JOHN OF GOD ROMAN CATHOLIC CHURCH | |
| 90375 | Wagstaff Law Firm | Y | Class 4 - Arrowood | Settling Subfund | $50,000.00 | | |
| 613731/2021 | Weitz & Luxenberg, P.C. | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $100,000.00 | OUR LADY OF PERPETUAL HELP PARISH | |

**Diocese of Rockville Centre - Disclosure Statement Exhibit 6**

| CVA or Proof of Claim Number (See Notes) | Counsel | Eligible to Vote | Class | Subfund | Eligible Minimum Consideration Amount | Released Co-Defendant(s) | Non-Released Co-Defendant(s) |
|---|---|---|---|---|---|---|---|
| 614911/2021 | Weitz & Luxenberg, P.C. | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | SAINT JOHN THE EVANGELIST ROMAN CATHOLIC CHURCH | |
| 900112/2021 | Weitz & Luxenberg, P.C. | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | MARY REGINA PARISH; MARY REGINA SCHOOL | |
| 900139/2021 | Weitz & Luxenberg, P.C. | Y | Class 4 - Arrowood | Settling Subfund | $100,000.00 | SAINT RAPHAEL ROMAN CATHOLIC CHURCH | |
| 900146/2021 | Weitz & Luxenberg, P.C. | Y | Class 5 - LMI / Ecclesia | Settling Subfund | $100,000.00 | SAINT BARNABAS THE APOSTLE ROMAN CATHOLIC CHURCH; ST. ELIZABETH ANN SETON REGIONAL SCHOOL | |
| 90058 | Weitz & Luxenberg, P.C. | Y | Class 4 - Arrowood | Settling Subfund | $50,000.00 | | |
| 90090 | Weitz & Luxenberg, P.C. | Y | Class 4 - Arrowood | Settling Subfund | $50,000.00 | | |
| 90102 | Weitz & Luxenberg, P.C. | Y | Class 4 - Arrowood | Settling Subfund | $50,000.00 | | |
| 951198/2021 | Zuckerman Spaeder LLP | N | Class 5 - LMI / Ecclesia | Contested Subfund | $50,000.00 | ST. JOHN NEPOMUCENE ROMAN CATHOLIC CHURCH; STR. RAPHAEL PARISH | |

**Diocese of Rockville Centre - Disclosure Statement Exhibit 6**

| CVA or Proof of Claim Number (See Notes) | Counsel | Eligible to Vote | Class | Subfund | Eligible Minimum Consideration Amount | Released Co-Defendant(s) | Non-Released Co-Defendant(s) |
|---|---|---|---|---|---|---|---|

Notes:

Claims are listed by CVA Index Number or, where no CVA Index Number exists, by Proof of Claim Number.

Defendants listed herein do not include individual defendants or the Debtor.

Certain of the characterizations made with respect to claims listed herein regarding voting, eligibility for minimum consideration, or otherwise, are subject to change, including, without limitation, based on rulings by the Bankruptcy Court or other courts, and the Debtor reserves its rights to further supplement, amend, or modify this Exhibit at any time.

## **EXHIBIT 7 - Disclosure Statement**

Omnibus Claim Objection Summary

**Diocese of Rockville Centre - Disclosure Statement Exhibit 7**
**Omnibus Claims Objections for Contested Abuse Claims**

| Omnibus Claims Objection[1] | Basis of Objection | Ruling | Leave to re-file | Number of Contested Abuse Claims | Number of Contested Abuse Claims Against Covered Party (Other than the Debtor)[2] |
|---|---|---|---|---|---|
| 1st | Duplicate/Amended | Sustained with prejudice | N/A | 0 | 0 |
| 2nd | Satisfied Claims/Scheduled Amounts | Sustained with prejudice | N/A | 0 | 0 |
| 3rd | Duplicate/Amended | Sustained with prejudice | N/A | 0 | 0 |
| 4th | IRCP/Released | Sustained with prejudice | N/A | 3 | 3 |
| 5th | Outside DRVC/Brooklyn Claims | Sustained with prejudice | N/A | 10 | 0 |
| 6th, 16th | Not Controlled by DRVC | Sustained with prejudice | Deadline passed. | 31[3] | 0 |
| 7th | Duplicate/Amended | Sustained with prejudice | N/A | 0 | 0 |
| 8th | Notice | Sustained without prejudice | Yes, deadline not set. | 25 | 24 |
| 9th | Pre-Date DRVC | Sustained with prejudice | Deadline passed. | 6 | 6 |
| 10th | Released/IRCP | Sustained with prejudice | N/A | 1 | 1 |
| 11th | Released/BSA | Sustained with prejudice | Only if BSA plan reversed on appeal. | 5 | 5 |
| 12th | Late Claims | Sustained with prejudice | N/A | 2 | 0 |
| 13th | Notice | Sustained without prejudice | Yes, deadline not set. | 27 | 22 |
| 14th | Outside DRVC/Brooklyn Claims | Sustained with prejudice | N/A | 0 | 0 |
| 15th | Extraterritoriality/Time-Barred | Sustained with prejudice | N/A | 0 | 0 |
| N/A[4] | N/A | N/A | N/A | 20 | 16 |
| **Total** | | | | **130** | **77** |

---

[1] The orders sustaining the omnibus claims objections are found at:  [Docket No. 744] (first); [Docket No. 745] (second); [Docket No. 1832] (third); [Docket No. 1949] (fourth); [Docket No. 2024] (fifth); [Docket No. 2142] (sixth); [Docket No. 1929] (seventh); [Docket No. 2086] (eighth); [Docket No. 2138] (ninth); [Docket Nos. 1998, 2000] (tenth); [Docket No. 2335] (eleventh); [Docket No. 2336] (twelfth); [Docket Nos. 2352, 2504] (thirteenth); [Docket No. 2331] (fourteenth); [Docket No. 2339] (fifteenth); and [Docket No. 2541] (sixteenth).

[2] Sixty-one (61) of the Contested Abuse Claims include CVAs that name a Covered Party other than the Debtor as a co-defendant and correspond to proofs of claim that have been (i) disallowed by final order of the Bankruptcy Court, (ii) withdrawn, or (iii) disallowed with leave to amend.  Thirty-two (32) of such Contested Abuse Claims belong to Class 4 and twenty-nine (29) belong to Class 5.

[3] The thirty-one (31) Contested Abuse Claims disallowed with leave to amend under the sixth omnibus claims objection were re-filed and subsequently disallowed by final order of the Bankruptcy Court under the sixteenth omnibus claims objection.  [Docket Nos. 2142, 2541].  These Contested Abuse Claimants have appealed the order sustaining the sixteenth omnibus claims objection to the U.S. District Court for the Southern District of New York.  *See, e.g.*, [Docket No. 2555] (notice of appeal).

[4] Twenty (20) Contested Abuse Claims are CVAs without corresponding proofs of claim.