|                    |                         |
|--------------------|-------------------------|
| **Objection Deadline:** | **April 26, 2024, 4:00 p.m.** |
| **Hearing Date:**  | **May 9, 2024; 10:00 a.m.** |
| **Responding To:** | **ECF #3053**           |

ROBERT E. GERBER
*Legal Representative for Future Claimants*
Joseph Hage Aaronson LLC
800 Third Avenue, 30th Floor
New York, NY 10022
NYC Office (212) 407-1212
Cell (917) 747-0280

rgerber@jhany.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---

|  |  |  |
|---|---|---|
| | : | |
| | : | |
| In re: | : | Chapter 11 |
| | : | |
| THE ROMAN CATHOLIC DIOCESE OF | : | Case No. 20-12345 (MG) |
| ROCKVILLE CENTRE, NEW YORK,[1] | : | |
| | : | |
| Debtor. | : | |
| | : | |

---

### RESPONSE OF FUTURE CLAIMS REPRESENTATIVE TO DIOCESE MOTION TO DISMISS CASE

1. I am the Future Claims Representative in the chapter 11 case of Debtor, The Roman Catholic Diocese of Rockville Centre (the "**Diocese**"). I was appointed to act for those who have not yet been able to file claims in this case—though I have a shared interest in the welfare of those who have. I submit this response to the Debtor's April 12 motion (the "**Motion**"), under section 1112(b) of the Code (ECF #3053) (the "**Motion**"), to dismiss this case.

---

[1] The Debtor in this chapter 11 case is The Roman Catholic Diocese of Rockville Centre, New York; the last four digits of its federal tax identification number are 7437; and its mailing address is 50 North Park Avenue P.O. Box 9023, Rockville Centre, NY 11571-9023.

2. Like many—perhaps nearly all—of those in this case, I was heartbroken by the Motion. Consistent with my professional responsibility, I can't argue that the Motion's grounds wouldn't justify dismissal. But consistent with my fiduciary responsibility (and my deep interest in the welfare of Survivors), I can't stand mute while this case barrels on toward disaster.

3. I well understand the cash burn in the case. And I'd need to acknowledge that without a materially better Plan proposal from the Diocese and (perhaps especially) the Parishes, there would be no reasonable hope for a reorganization. I hardly find fault with creditors for having rejected the most recent Diocese Plan. Though I was heartbroken by the filing of the Motion (and with the Diocese having disclosed its intention to move to dismiss if its last Plan didn't get the votes, the Motion was foreseeable), I wasn't surprised by the vote outcome. If I were able to vote on the plan, I would have done likewise

4. And the creditor vote—the most lopsided plan vote for rejection, as best I can recall, that I've ever seen—tells me (and perhaps all of us) that without a materially better Plan proposal, the Debtor could not reorganize.

5. But if anyone has forgotten, I need to remind those of us in this case of what I said the last time dismissal of this case was proposed.[2]

6. When the Creditors Committee made its own motion for the same relief, back in June 2023, I spoke of the many reasons why dismissal of the case would have disastrous consequences. They remain as true now as they were then. My objection then was relatively brief, and I'll speak of those consequences even more briefly now. But as a reminder of them— if others need reminding—I note, once again:

---

[2]       My filing back then, ECF #2196, appears is attached, in full, as Exhibit A.

- If the Motion continues on its present course, all of the benefits of this chapter 11 case will be abandoned. After the dismissal of this case, Survivors will then have the need to get their recoveries, if at all, in plenary litigation elsewhere. Do we want to turn Survivor recoveries into a game of survival of the swiftest?

- Will there be more than a very few Survivors who come out of this well, other than the lucky Survivors who have lawsuits already pending, or who can bring them very quickly; for the presumably even smaller (and luckier) subset of them who can get quick trials; and for the possibly even smaller (and luckier still) subset of them who can reach any available insurance proceeds, or assets of the Diocese and Parishes, before they're all depleted?

- Do we want to run up even more legal expenses—this time not in bankruptcy, but in defending individual actions—which, once again, would better be spent on victim recoveries?

- Do we want to abandon the recovery of fraudulent transfers for the benefit of all, and to revert to piecemeal litigation against insurers to access available insurance proceeds?

7. The nearly four years invested in the case are a sunk cost. So are the tens of millions in professional fees expended on it. I get it. It should go without saying that these fees would have been far better expended in recoveries for Survivors. But those dual investments that were already made deserve more. They deserve—and require—a wakeup call, to the several other constituencies, but primarily the Diocese and the Parishes,[3] to take measures to ensure that all of

---

[3] I don't rule out the possibility that some of the Parishes have a greater ability to pay than others, and that many Parishes might be "land poor." Nor do I rule out the possibility that there's a mismatch between those Parishes with greater exposure as a consequence of earlier wrongful conduct and those with the financial resources to pay the resulting damages. But how, in good conscience, can we tolerate—out of decency to

that was not in vain.  If that were to happen, those responsible will have to live with that, just as they must live with the harm that was already done.

8.  Now, as back in June 2023, if one believes, as I do, that in managing a bankruptcy case, one should "Do No Harm," we must avoid the collateral damage to Survivors—and for that matter, the Parishes, if not also the Diocese itself—that would be the Motion's inevitable result.

9.  As of the date of this filing, we now have 21 days before the return date of the Motion. That's hardly a lengthy time, but it's nevertheless enough time to put this case back on a track toward sanity.  I'd urge the Diocese to abandon—or at least put on hold—this suicidal course, and to make a more realistic proposal that could lead to acceptance or real negotiation, and for the Creditors' Committee to then meet it halfway.

Dated:  New York, New York
      April **18,** 2024

                     */s/ Robert E. Gerber*
                     ROBERT E. GERBER
                     Legal Representative for Future Claimants
                     Joseph Hage Aaronson LLC
                     800 Third Avenue, 30th Floor
                     New York, NY  10022
                     NYC Office (212) 407-1212
                     Cell (917) 747-0280
                     rgerber@jhany.com

912475

---

Survivors and the less affluent Parishes—such inequitable results?  The answer, one might pause to consider, could be for the more comfortable Parishes to help out their less liquid brethren.

Exhibit A (Earlier June 2023 Objection)
Follows on Next Page

| | |
|---|---|
| **Objection Deadline:** | **June 26, 2023, 5:00 p.m.** |
| **Hearing Date:** | **July 10, 2023; 9:00 a.m.** |
| **Responding To:** | **ECF #1912** |

ROBERT E. GERBER
*Legal Representative for Future Claimants*
Joseph Hage Aaronson LLC
800 Third Avenue, 30th Floor
New York, NY 10022
NYC Office (212) 407-1212
Cell (917) 747-0280

rgerber@jhany.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| | : | |
| | : | |
| In re: | : | Chapter 11 |
| | : | |
| THE ROMAN CATHOLIC DIOCESE OF | : | Case No. 20-12345 (MG) |
| ROCKVILLE CENTRE, NEW YORK,[1] | : | |
| | : | |
| Debtor. | : | |
| | : | |

# OBJECTION OF FUTURE CLAIMS
## REPRESENTATIVE TO CREDITORS'
## COMMITTEE'S MOTION TO DISMISS CASE

---

[1]     The Debtor in this chapter 11 case is The Roman Catholic Diocese of Rockville Centre, New York; the last four digits of its federal tax identification number are 7437; and its mailing address is 50 North Park Avenue P.O. Box 9023, Rockville Centre, NY 11571-9023.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................................... ii

Preliminary Observation ................................................................................................2

Summary ........................................................................................................................3

     I.     Prejudice to Present and Future Victim Claimants ........................................5

          a.     Prejudice to Survivors.........................................................................6

          b.     Undercutting Centuries of Bankruptcy Policy....................................7

          c.     Focus on Facts, Equitable Considerations, and the Court's Exercise of Its Discretion; The Benefits of Bankruptcy in Mass Tort Cases ..............................8

     II.     Even Greater Prejudice to Future Claimants ...............................................12

Conclusion ...................................................................................................................12

i

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*In re Metromedia Fiber Network, Inc.*,
      416 F.3d 136 (2d Cir. 2005)............................................................................ 11 & n.16

*In re Murray*,
      543 B.R. 484 (Bankr. S.D.N.Y. 2016),
      *aff'd*, 565 B.R. 527 (S.D.N.Y. 2017),
      *aff'd*, 900 F.3d. 53 (2d Cir. 2018) ............................................ 7 nn.6-9, 8 & n.10

*In re Purdue Pharma L.P.*,
      69 F.4th 45 (2d Cir. 2023) ............................................................................ 11 & n.17

*Union Bank v. Wolas*,
      502 U.S. 151 (1991).................................................................................................8 n.10

*Wilk Auslander LLP v. Murray* (*In re Murray*),
      900 F.3d. 53 (2d Cir. 2018).................................................................................6 n.5, 7 n.6

## Rules & Statutes

11 U.S.C. § 1112(b)............................................................................................................1, 3

11 U.S.C. § 1112(b)(4).........................................................................................................3

## Other Authorities

Anthony J. Casey and Joshua C. Macey, *In Defense of Chapter 11 for Mass Torts*,
      90 U. Chi. L. Rev. 973 (May 2023).......................................... 9 nn.11-13, 11 n.15

Bruce H. Mann, Republic of Debtors: Bankruptcy in the Age of American Independence
      (2003) .................................................................................................... 7 n.7

Charles Jordan Tabb, *The History of the Bankruptcy Laws in the United States*,
      3 ABI L. Rev. 5 (Spring 1995) ...................................................................7 n.7

Charles Warren, Bankruptcy in United States History (1935)...........................................7 n.7

1 Collier on Bankruptcy (16th ed. 2015) .................................................................7 n.7, 8 n.10

David A. Skeel, Jr., DEBT'S DOMINION: A HISTORY OF BANKRUPTCY LAW IN
AMERICA (2001) .................................................................................................. 7 & nn.7-8

Hon. Joan Feeney, Hon. Michael Williamson and Michael Stepan, BANKRUPTCY LAW MANUAL
(5th ed. 2014) ................................................................................................7 n.7, 8 n.10

H.R. REP. NO. 595, 95th Cong., 1st Sess. 177–78 (1977) ........................................................8 n.10

John Adriance Bush, THE NATIONAL BANKRUPTCY ACT OF 1898, WITH NOTES,
PROCEDURES AND FORMS (1899) ..................................................................................7 n.7

**Objection Deadline:** **June 26, 2023, 5:00 p.m.**
**Hearing Date:** **July 10, 2023; 9:00 a.m.**
**Responding To:** **ECF #1912**

ROBERT E. GERBER
*Legal Representative for Future Claimants*
Joseph Hage Aaronson LLC
800 Third Avenue, 30th Floor
New York, NY  10022
NYC Office (212) 407-1212
Cell (917) 747-0280

rgerber@jhany.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| | : | |
| | : | |
| In re: | : | Chapter 11 |
| | : | |
| THE ROMAN CATHOLIC DIOCESE OF | : | Case No. 20-12345 (MG) |
| ROCKVILLE CENTRE, NEW YORK,[2] | : | |
| | : | |
| Debtor. | : | |
| | : | |

     1.  I am the Future Claims Representative in the chapter 11 case of Debtor, The Roman

Catholic Diocese of Rockville Centre (the "**Diocese**").  I was appointed to act for those who have

not yet been able to file claims in this case—though I have a shared interest in the welfare of

those who have.  I submit this filing as my objection, and memorandum of law in opposition, to

the motion of the Official Committee of Unsecured Creditors ("**Committee**"), under section

1112(b) of the Code (ECF #1912) (the "**Motion**"), to dismiss this case.

---

[2]    The Debtor in this chapter 11 case is The Roman Catholic Diocese of Rockville Centre, New York; the last
four digits of its federal tax identification number are 7437; and its mailing address is 50 North Park Avenue
P.O. Box 9023, Rockville Centre, NY 11571-9023.

### **Preliminary Observation**

2.  The Committee's frustration with the progress of this case—most notably, its plan negotiations—is understandable.  I have that frustration too.  Like the Creditors' Committee and the tort lawyers joining in the Motion, I think that the Diocese plan as filed is not confirmable.  I also think that this chapter 11 case has been too litigious.  And I also think that—especially if the Diocese and the Parishes want Third-Party Releases—they need to pay substantially more.

3.  But the lack of progress in reaching agreement on a confirmable plan; the litigiousness of this case; and the resulting expense of each of those things is a shared responsibility—a responsibility not just of the Diocese, but of the Creditors' Committee as well.  And sluggish progress in plan negotiations is hardly unique to this case.  Nor is the resulting expense occasioned by such.  Each rarely is attributable to one party alone.

4.  For that reason and a host of others—though in nearly all other respects, my sympathies remain with the Committee—I feel compelled to object to the Motion.  I think we should be wary of a cure that would make patients suffer even more.  As we all should recognize, the relief sought in the Motion would punish not just the Diocese; it would punish the Survivors—to whom I generally prefer to refer with a more descriptive "Victims"—as well. And granting the relief the Committee seeks would effectively make them victims all over again—this time, by abandoning the only reasonable mechanism to get them the recoveries they deserve, in anything close to the foreseeable future.

5.  As I see it, the Motion, at least in its effect, is an exercise in mutually assured destruction.  And if it is a mechanism to exert leverage, I fear it is too heavy-handed.  In my view, the consequences of granting the dismissal sought in the Motion would be extraordinarily prejudicial to all concerned—including, most significantly, the Survivors we all want to help.

2

## Summary

6.  I assume that the Diocese will address section 1112(b) and most, if not all, of the

relevant caselaw—and how the facts here fall far short of those necessary even to show cause for

dismissal under 1112(b)(4)(A)—the statutory provision upon which the Committee relies.

I likewise assume that the Diocese will also address the nonstatutory bases on which the

Committee asserts cause for dismissal; I think that after evidence is taken, the Court will find

that the asserted breaches of fiduciary obligations—based on seeking releases for parishes and

other affiliates in this case (which demonizes a normal practice, especially in mass tort cases, and

which undoubtedly will be a critical feature of any consensual plan), and on assertedly turning a

blind eye to voidable transfers (which to my understanding is not the case)—are not borne out by

the facts.

7.  So here I wish to address what may be additional matters, where things I learned over

the years, and the needs and concerns of my constituency, require special mention.

8.  For me and the constituency for whom I act, there are some particularly important

reasons why the Motion should be denied:

9.  ***First***, granting the Motion would be extraordinarily prejudicial to present and future

claimants alike.  If the Motion were granted, it would:

- Thwart goals engrained in the modern Bankruptcy Code and each of its

  predecessors—going as far back as English insolvency law before the founding of the

  Republic—aimed at the equality of treatment of creditors, and the avoidance of unfair

  advantages for those who are first to recover judgment;

- Materially delay Survivors' recoveries, and prejudice even more those who do not

  have presently acting tort lawyers;

3

- Leave hanging adrift those Survivors who have been looking to this case, and the Creditors' Committee here, to protect their interests;

- Result in a forfeiture of the many benefits of the Bankruptcy Code in addressing mass tort cases, including simplified mechanisms for recoveries, speedier recoveries, the avoidance of lengthy litigation in nonbankruptcy courts, and defense costs that would dissipate resources that could better be applied to victim recoveries;

- Result in competing fraudulent transfer avoidance actions—and raise the risk (if not also certainty) of unequal access by Survivors to fraudulent transfer action recoveries;

- Result in unfairness to insurers and those who might look to insurance alike—balkanizing available insurance recoveries, putting insurers in a crossfire, and raising the likelihood that insurance proceeds otherwise payable will be available only to a select few;

- Impair the ability to give insurers comfort that, once they contribute agreed-upon amounts toward Survivors' recoveries, they won't thereafter be asked to pay more; and, related to all of this,

- Frustrate months of diligent efforts by Paul Van Osselaer, a skilled mediator (and similar efforts by Magistrate Judge Sarah Cave, appointed as Co-Mediator in April of this year), in the insurance area and beyond.

In short, in numerous ways, dismissal would result in delays and incremental litigation costs, and make it impossible, or virtually so, to achieve consistency in outcomes and resulting recoveries—things we associate with fundamental fairness.  If one believes, as I do, that in managing a bankruptcy case, one should "Do No Harm," we must avoid the collateral damage to Victims that would be the Motion's result.

4

10.     *Second*, dismissal would be *even more* prejudicial to Future Claimants—who would have no alternative avenue for relief, and who now lack the ability to bring the lawsuits that the Committee and its tort lawyer constituents presumably envision as the alternative.

11.     By definition, Future Claimants are now unknown; cannot now sue; or both.  If the Motion is granted, they will be left without the recovery mechanisms this chapter 11 case would provide.  Future Claimants too (and perhaps especially) will be victims a second time.

12.     Thus, granting the relief the Committee seeks in its motion—even if the Motion is well intended—would be manifestly contrary to the interests of Survivors, known and unknown alike.

## I.

## Prejudice to Present and Future Victim Claimants

13.     I gather that the Committee and at least some of the tort lawyers who joined its Motion will continue to argue that more than 600 Victims[3] could have their cases tried more quickly in state court (and, impliedly, could recover judgments and collect on them) more quickly than they could recover from a trust created under a bankruptcy plan.  I consider that notion extraordinarily unlikely, if not absurd.[4]  But apart from that area of difference (assuming,

---

[3]     To my understanding, more than 700 Survivor claims were filed in this case.  A number of these were expunged after objections to them (some with leave to amend), but still leaving well in excess of 600 claims remaining—even without adding to their number those that could still be asserted with amendments to their claims.

[4]     I've heard that a judge who has been hearing Survivors' cases is highly regarded, and has managed the actions on his docket with skill.  Though I don't know him, I assume that to be true.  But pretrial management of cases (*e.g.*, by coordinated discovery, on issues capable of being addressed together) is one thing.  Accomplishing everything else necessary to achieve victims' recoveries is another.  Individual victims' other needs and concerns (*e.g.*, getting each victim's case to trial; securing a favorable verdict; and collecting on it), present different, and additional, challenges.  Victims deserve as few challenges to their recoveries as possible.  Assuming, as I am prepared to do, that at least one judge can manage pretrial matters affecting many cases with skill, there are obvious limits to the ability of that judge, and others, to timely solve all of the victims' other problems, especially with more than 600 victims with remaining claims in this chapter 11 case alone.

arguendo, that notion is sincerely believed), I have difficulty seeing how any reasonable person

could quarrel with any of the other points noted in the several bullets above.

14.    Nevertheless, in some respects I think it desirable to expand on them.  I think it

also is desirable to remind parties of a little bankruptcy history—which I picked up over the

years, and many others likely already know—and how the desired relief would undercut

centuries of bankruptcy policy.

*(a)    Prejudice to Survivors*

15.    If the Committee's motion is granted, the benefits of this chapter 11 case will be

abandoned.  Victims will then have the need to get their recoveries, if at all, in plenary litigation

elsewhere.

16.    Implicit in the Motion is the idea is that granting it would be beneficial for the

Victims.  For whom?  For the lucky Victims who have lawsuits already pending, or who can

bring them very quickly?  For the presumably even smaller (and luckier) subset of them who can

get quick trials?  For the possibly even smaller (and luckier still) subset of them who can reach

any available insurance proceeds, or assets of the Diocese and Parishes, before they're all

depleted?

17.    But what about everyone else?  Dismissal will no doubt prejudice the Diocese and

Parishes.  But more importantly,[5] dismissal will do likewise (and be even be worse) for the

---

[5]    As the Circuit has stated (in a different context), the interests of a debtor must be considered when
    determining whether cause exists to dismiss.  *See Wilk Auslander LLP v. Murray* (*In re Murray*), 900 F.3d.
    53, 63 n.7 (2d Cir. 2018) (also referred to, in n.6 below, as "**Murray-Circuit**").  But while acknowledging
    that my views could be skewed, in part, by the fact that I have fiduciary duties running to a subset of the
    Survivor community, I believe that in the context of a chapter 11 case, like this one, where many hundreds of
    victim creditors would be impacted by the Court's decision, the interests of Survivors deserve considerably
    greater weight than the Debtor Diocese's interests do.

6

unlucky victim creditors who do not have counsel that can timely bring or resurrect suits, get trial dates, and thereafter reach assets that those first in line have not already claimed.

18.     Dismissal would also result in the prejudice to Survivors in each of the respects noted in the bullet points in Paragraph 9 above, which I see no need to set out a second time.

*(b) Undercutting Centuries of Bankruptcy Policy*

19.     Those consequences are exactly of the kind that our bankruptcy system has historically tried to avoid.  The policies underlying our bankruptcy system, and its goals—which continue to this day—are instinctive to those of us in the bankruptcy community.  The were laid out, at some length, by the bankruptcy court in *In re Murray*,[6] and the historic materials the *Murray-Bankruptcy* court cited.[7]  Bankruptcy in modern U.S. law evolved from the insolvency law of 18th Century England; it started as a remedy, as between merchants, to address merchants' competing claims to debtors' assets.   As explained in *Murray-Bankruptcy* (citing David Skeel's *Debt's Dominion)*,[8] "[b]ankruptcy existed for hundreds of years before the introduction of the discharge, to achieve its original purpose of equality of treatment amongst competing creditors."[9]

---

[6]     *See In re Murray,* 543 B.R. 484, 486 (Bankr. S.D.N.Y. 2016) ("***Murray-Bankruptcy***"), *aff'd*, 565 B.R. 527 (S.D.N.Y. 2017) ("***Murray-District***"), *aff'd*, 900 F.3d. 53 (2d Cir. 2018) (***Murray-Circuit***).

[7]     See *Murray-Bankruptcy*, 543 B.R. at 494 & n.56 (citing John Adriance Bush, THE NATIONAL BANKRUPTCY ACT OF 1898, WITH NOTES, PROCEDURES AND FORMS (1899); Charles Warren, BANKRUPTCY IN UNITED STATES HISTORY (1935); Charles Jordan Tabb, *The History of the Bankruptcy Laws in the United States*, 3 ABI L. Rev. 5 (Spring 1995); David A. Skeel, Jr., DEBT'S DOMINION: A HISTORY OF BANKRUPTCY LAW IN AMERICA (2001) ("***Debt's Dominion***"); Bruce H. Mann, REPUBLIC OF DEBTORS: BANKRUPTCY IN THE AGE OF AMERICAN INDEPENDENCE (2003); Hon. Joan Feeney, Hon. Michael Williamson and Michael Stepan, BANKRUPTCY LAW MANUAL (5th ed. 2014) ("***Bankruptcy Law Manual***"); and 1 COLLIER ON BANKRUPTCY (16th ed. 2015) ("***Collier***") ¶ 20.01 et seq.

[8]     *See* n.7, just above.  As many already know, David Skeel is a highly regarded professor at the University of Pennsylvania Law School.

[9]     *Murray-Bankruptcy*, 543 B.R. at 496 n.60.

20.     And as stated (though for a different purpose, and in a different context) in

*Murray-Bankruptcy*:

> With participants in the bankruptcy system so often
> focusing solely on their own private needs and concerns,
> they often forget what the bankruptcy system was created
> to do. …  Bankruptcy is a collective remedy, with the
> original purpose—which continues to this day—to address
> the needs and concerns of creditors with competing
> demands to debtors' limited assets, and with the
> understandable desire that the debtor's assets not go to the
> swiftest, or the most aggressive, of them.[10]

21.     The last thing we want to do, then, is to take measures that would result in the

very harms that 300 years of Anglo-American bankruptcy law evolved to avoid.

**(c)     *Focus on Facts, Equitable Considerations,
and the Court's Exercise of Its Discretion;
The Benefits of Bankruptcy in Mass Tort
Cases***

22.     I assume the Diocese, in its discussion of the law applicable to the Motion, will

address the extent to which motions to dismiss a bankruptcy case turn heavily on case-by-case

individual facts; on equitable considerations; on the best interests of all parties; and on the

discretion of the Court.  So without speaking to those matters too, I wish to address an additional

major concern, which while overlapping with some of those, is of great importance.  It is the

---

[10]     *Id*. at 494-95 (footnotes deleted; emphasis in original).  *See also id.* at 495 n.57 ("In fact, bankruptcy in Anglo–American law began exclusively as a creditor's remedy for the orderly distribution of the debtor's assets.") (quoting *Bankruptcy Law Manual* § 14.1).

See also *1 Collier* ¶ 1.01[1], "Purposes of Bankruptcy" (In the bankruptcy process, "through orderly and centralized liquidation or through reorganization or rehabilitation, creditors of equal priority receive ratable and equitable distributions *designed to serve 'the prime bankruptcy policy of equality of distribution among creditors of the debtor.'"*) (emphasis added) (quoting *Union Bank v. Wolas*, 502 U.S. 151, 161 (1991), in turn quoting H.R. REP. NO. 595, 95th Cong., 1st Sess. 177–78 (1977)).

benefits of bankruptcy in mass tort cases—and why bankruptcy is a superior mechanism for

providing mass tort claimants relief.[11]

23.     Though the reasons for that can be broken down into a considerably larger

number of individual categories, they can be summarized by reference to two of them:

(1) the historic insolvency concerns discussed above (for example, avoiding races

to the courthouse; races in execution on judgments; and unequal access to debtor assets,

insurance proceeds, and other sources of recovery); and

(2) bankruptcy capabilities, and case management and plan implementation

mechanisms developed over the years, to deliver appropriate compensation to victims.

24.     Having already discussed the first of these, I turn to the second.  Wholly apart

from providing an alternative to overloaded state courts, long waits for trial dates, and

dramatically differing jury verdicts[12] (and, of course, races to the courthouse and to the grabbing

of assets, as previously discussed),[13] bankruptcy provides a variety of means to provide victims

with recoveries faster, and with more certainty, than sending victims back to plenary litigation.

---

[11]     For a considerably lengthier discussion of the superiority of bankruptcy as the means to provide victims relief in mass tort cases, *see* Anthony J. Casey and Joshua C. Macey, *In Defense of Chapter 11 for Mass Torts*, 90 U. CHI. L. REV. 973 (May 2023) ("***Casey & Macey***").

[12]     For example, Professors Casey and Macey observed that in cases tried in talc-related litigation against Johnson & Johnson, cases tried so far "have met with mixed success, with some resulting in no liability and others resulting in multibillion-dollar verdicts." *Id.* at 987.

[13]     Addressing concerns of the types discussed above (though more from fairness and economic perspectives, as contrasted to the historic ones I just discussed), Professors Casey and Macey observed:

> Mass tort cases present this exact collective action problem. When a firm is unable to pay all its tort claims, claimants who file early, or who find themselves before a sympathetic jury, or whose injuries happen to manifest quickly, may receive a large payout.  Late claimants risk being left with nothing if the firm's resources are depleted.  Further, the costs of a decentralized, lengthy resolution of mass torts claims over time can be large and value destructive for all stakeholders.

*Id.* at 977.

25.    These areas of bankruptcy superiority include:

- The ability to address issues involving many, similarly situated, victims in a coordinated, and binding, way—as, for example, the Court did with respect to claims by Survivors whose claims arose before the formation of the Diocese; or that should have been asserted against a different diocese; or that otherwise were asserted against the wrong entity;[14]

- The creation and funding of recovery trusts, akin to those in asbestos cases (with claims channeled to the trusts), from which victims can recover merely upon submission of forms and simplified documentation (reviewed by an appointed adjudicator), without the need to prove up an entire case;

- The ability, based on pre-negotiated protocols and objectively defined standards (or even recovery "grids," providing awards based on abuse type, severity of abuse, number of times abused, and similar factors), to deliver recoveries in consistent amounts—minimizing inadequate recoveries, on the one hand, and windfalls, on the other;

- The use (as in this case) of proofs of claim in greater than average detail—but with a showing far less than would be required in plenary litigation—providing, once again, a principled basis for awarding recoveries;

- The ability (because individual creditors' rights to recover on fraudulent transfers become vested in the estate upon a bankruptcy filing) to make fraudulent transfer recoveries available *for the benefit of all*—as compared and contrasted to individual

---

[14]    *See, e.g.*, ECF #2110 (opinion addressing claims for acts before the inception of the Diocese as a religious corporation in 1958).

fraudulent transfer avoidance and recovery actions, brought by those with the skill

and standing to bring them;

- The ability to have insurers post available insurance proceeds for the common good—

  again, *for the benefit of all*—without giving access to those proceeds to lucky litigants

  alone, and to give insurers comfort that once they contribute amounts justly due, they

  won't be subjected to multiple liability;

- The ability of debtors and others liable for abuse to save litigation costs, and to put

  their funds and other assets toward victim recoveries instead;[15] and

- The ability to issue Third-Party releases (assuming, of course, compliance with the

  requirements of *Metromedia*[16] and *Purdue*,[17] including—as particularly important

  factor in this context—enough consideration in exchange for the releases), providing

  the means to provide greater peace for the releasees, on the one hand, and to entice

  greater contributions from them toward recoveries for victims, on the other.[18]

26.     If this case is dismissed, these many benefits, and prospective benefits, will be

forfeited.

---

[15]    Professors Casey and Macey note the obvious—but important—reality that:

> Bankruptcy also reduces the administrative costs associated with resolving mass
> tort claims. This is a solution to another collective action problem.  Bringing all
> claims into a single tribunal will typically be less expensive for all claimants to
> proceed, as doing so reduces duplicative litigation costs and shrinks the total
> share allocated to lawyers and other professionals.

*Casey & Macey*, 90 U. Chi. L. Rev. at 1000.

[16]    *See In re Metromedia Fiber Network, Inc.*, 416 F.3d 136 (2d Cir. 2005).

[17]    *See In re Purdue Pharma L.P.*, 69 F.4th 45 (2d Cir. 2023).

[18]    This is of course important not just for Parishes and other Diocese affiliates.  If an insurer is being asked to
put in policy proceeds for the benefit of victims, and agrees, it is only fair that it have peace, by means of a
Third-Party Release, after having done so.

## II.

## Even Greater Prejudice to Future Claimants

27.     As bad as dismissal would be for the Victim community generally, it would be

even worse for Survivors who are also Future Claimants.  The apparent goal (and, in any event,

the consequence) of the Motion is to abandon the recovery mechanisms (and other benefits) the

Bankruptcy Code offers, and to leave Survivors to their own devices by plenary litigation—to

take place, if anywhere, elsewhere.  But even assuming (though such an assumption, in my view,

is quite an aggressive one) that each of the known Survivors filing the more than 600 claims still

remaining in this case could bring suit immediately, Future Claimants would not have that

luxury.

28.     How, one may ask, are Future Claimants to obtain any recoveries if the

Committee has its way?

29.     By definition, those with Future Claims were unable to file claims by either of the

Bar Dates applicable to their claims.  They couldn't then file lawsuits, either.  Unless the

disabilities, and/or circumstances preventing them from filing claims, evaporated between their

Bar Dates and now, they wouldn't be able to file (or refile, or continue) the lawsuits that other

Victim claimants, if the Motion is granted, would then need to file.  Future Claimants would

effectively be thrown under the bus.

## Conclusion

30.     I thus believe that the Committee's filing of the Motion was ill advised.  And

granting the Motion—as I very much hope the Court would not—would be ill advised as well.

Throwing more than 600 Survivors' claims into the state court system would—except, at best,

for the lucky subset of their number at the head of the line—result in no quicker recoveries for

Survivors, and in fact make their lot even worse.

12

31.    The Committee and the tort lawyers joining in the Motion are frustrated with the progress of this case.  I get it.  I am frustrated with that as well.[19]  But the answer is not by taking a course that would injure Survivors further, and effectively make Survivors' interests collateral damage.

32.    The answer is instead to employ the Court's bully pulpit to implore the two principal warring constituencies to get to a deal, and to cultivate the mediation efforts of Judge Cave and Mr. Van Osselaer to reach that end.

33.    If the Motion was filed to fire a shot across the Diocese bow, without any serious intention that the Motion be granted, it was a dangerous (and expensive) ploy.  If the Motion was filed with the genuine intent to get the desired relief—and the draconian consequences that would ensue if it were granted—that would be even worse.

34.    In either event, the Motion should be denied.

Dated: New York, New York
          June **26**, 2023

                                             */s/ Robert E. Gerber*
                                             ROBERT E. GERBER
                                             Legal Representative for Future Claimants
                                             Joseph Hage Aaronson LLC
                                             800 Third Avenue, 30th Floor
                                             New York, NY  10022
                                             NYC Office (212) 407-1212
                                             Cell (917) 747-0280
                                             rgerber@jhany.com

909113

---

[19]    I was saddened to hear that Survivors have died since this case was filed.  And I will be saddened even more if additional Survivors die before they get recoveries.  But that is not a problem that we can expect to go away if Survivors' claims hereafter must be heard in the state courts—since Survivors there too will foreseeably die while they wait on line to get their cases tried; strive to collect their judgments; or both.  I fear that if Survivors wind up in the state courts, the problem will then be even worse.

13