PACHULSKI STANG ZIEHL & JONES LLP
James I. Stang, Esq. (admitted *pro hac vice*)
Iain A. W. Nasatir, Esq.
Karen B. Dine, Esq.
Brittany M. Michael, Esq.
780 Third Avenue, 34th Floor
New York, New York 10017
Telephone:    (212) 561-7700
Facsimile:    (212) 561-7777
Email:         jstang@pszjlaw.com
               inasatir@pszjlaw.com
               kdine@pszjlaw.com
               bmichael@pszjlaw.com

# UNITED STATES BANKRUPTCY COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br>THE ROMAN CATHOLIC DIOCESE OF<br>ROCKVILLE CENTRE, NEW YORK,<br>          Debtor. | Chapter 11<br>Case No. 20-12345 (MG) |

## OBJECTION OF OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO
## DEBTORS' MOTION TO DISMISS CASE

# TABLE OF CONTENTS

**Page**

I. PRELIMINARY STATEMENT ............................................................................................1

II. RELEVANT FACTS ........................................................................................................6

    A.     The Bankruptcy Case ........................................................................................6

    B.     Committee Motion to Dismiss............................................................................7

    C.     The Diocese's Efforts to Delay the Unstayed State Court Cases ..........................8

    D.     The Diocese's Failed Attempt to Gain Support for Its Plan.................................9

    E.     The Progression of Cases in State Court Coincided with the Diocese's
           Changed Position on Dismissal ........................................................................10

    F.     The Trial Cases ...............................................................................................12

III. OBJECTION.................................................................................................................14

    A.     Legal Standard for Dismissal ...........................................................................14

    B.     There is No Cause to Dismiss the Bankruptcy under Section 1112(b)(1) ............16

           1.     The Professional Fees Will Be Increased by Dismissal .........................16

           2.     There is a Reasonable Prospect for Rehabilitation.................................18

    C.     Unusual Circumstances Exist Establishing That Dismissal Is Not in the
           Best Interests of Creditors under Section 1112(b)(2). ........................................20

    D.     The Motion to Dismiss is a Litigation Tactic and Should be Denied...................22

4889-7535-3497.21 18491.002

## TABLE OF AUTHORITIES

**Page**

## CASES

*In re 1031 Tax Grp., LLC,*
374 B.R. 78 (Bankr. S.D.N.Y. 2007).............................................................20

*In re BH S&B Holdings, LLC,*
439 B.R. 342 (Bankr. S.D.N.Y. 2010).........................................................15

*In re Child Victims Act Cases Removed from State Ct.,*
No. 23-5029, 2023 U.S. Dist. LEXIS 139687 (E.D.N.Y. Aug. 10, 2023) .......... 10, 14, 22

*In re Cont'l Holdings,*
170 B.R. 919 (Bankr, N.D.Ohio 1994)..........................................................16

*In re Franmar, Inc.,*
361 B.R. 170 (Bankr. D. Colo. 2006).............................................................20

*In re Hermanos Torres Perez, Inc.*
No. 09-5585, 2011 Bankr. LEXIS 4527 (Bankr. D.P.R. Nov. 21, 2011)........................20

*In re Hyperion Found., Inc.,*
No. 08-51288, 2009 Bankr. LEXIS 4647 (Bankr. S.D. Miss. Aug. 11, 2009)................21

*In re Kingbrook Dev. Corp.,*
261 B.R. 378 (Bankr. W.D.N.Y. 2001) ...................................................15, 20

*In re Loco Realty Corp.,*
No. 09-11785 (AJG), 2009 Bankr. LEXIS 1724, 2009 WL 2883050 (Bankr.
S.D.N.Y. June 25, 2009)...........................................................................15

*In re Roman Cath. Church of the Archdiocese of Santa Fe,*
No. 18-13027 (Bankr. D.N.M. Mar. 19, 2021).............................................19

*In re Roman Cath. Diocese of Rockville Ctr.,*
No. 1:23-cv-05751-LGS (S.D.N.Y. Mar. 13, 2024)........................................8

*In re Wilderness Crossings, LLC,*
440 B.R. 484 (Bankr. W.D. Mich. 2010)......................................................20

*Moore v. Cath. Health Sys. of Long Island, Inc.,*
Adv. No. 23-01141 (Bankr. S.D.N.Y. Jan. 16, 2024) ......................................3

*Off. Comm. Of Unsecured Creditors v. Cath. Cemeteries of the Roman Cath. Diocese of
Rockville Ctr., Inc.,*
Adv. No. 23-1121 (Bankr. S.D.N.Y. May, 26, 2023) ....................................18

ii

*Roman Cath. Diocese of Rockville Ctr. v. Ark320 Doe (In re Roman Cath. Diocese of Rockville Ctr.),*
651 B.R. 622 (Bankr. S.D.N.Y. June 1, 2023)............................................................3, 8

## **STATUTES**

11 U.S.C. § 1112(b)(1)...............................................................................................15

11 U.S.C. § 1112(b)(4)(A) .........................................................................................15

4889-7535-3497.21 18491.002

The Official Committee of Unsecured Creditors (the "Committee") of The Roman Catholic Diocese of Rockville Centre, New York (the "Diocese" or the "Debtor") in the above-captioned case (the "Bankruptcy Case"), through its undersigned counsel, objects (the "Objection") to the *Debtor's Motion for Entry of an Order Dismissing the Debtor's Chapter 11 Case* [Docket No. 3053] (the "Motion to Dismiss"). In support of this Objection,[1] the Committee respectfully represents:

## I. <u>PRELIMINARY STATEMENT</u>

1.      The Diocese does not meet its burden of demonstrating cause for dismissing the Bankruptcy Case. Dismissal at this juncture would substantially increase the continuing depletion of the estate. And now, unlike one year ago, there is a realistic prospect of rehabilitation and consensual resolution of this case. The Motion to Dismiss is the Debtor's latest litigation tactic to delay state court litigation and is entirely unsupported.

2.      Over a year ago, fed up with the Diocese's failure to make a reasonable offer to survivors, the survivors saw their only path to recovery as getting rid of the bankruptcy and so filed the Committee Dismissal Motion.[2] The Diocese opposed the Committee's Dismissal Motion asserting that there existed a path to reorganization. The Diocese argued that if the case was dismissed and survivors pursued litigation, "we'd be right back here" because the parishes and/or the Diocese would re-file for bankruptcy in a matter of months.[3] This Court denied the Committee's Dismissal Motion and set an October 31, 2023, deadline for the Diocese to file a

---

[1] Concurrently herewith, the Committee is filing the Declarations of Karen B. Dine (the "Dine Dec.") and of Charles D'Estries (the "D'Estries Dec.") in support of the Objection. Capitalized terms used and not otherwise defined herein have the meaning ascribed thereto in the Motion to Dismiss or the Disclosure Statement.

[2] On March 27, 2023, the Committee moved to dismiss the Bankruptcy Case [Docket No. 1912] (the "Committee Dismissal Motion").

[3] Dine Dec. Ex. A (9/26/2023 Hearing Tr.) at 43:1-13.

4889-7535-3497.21 18491.002

consensual plan or term sheet for a consensual plan. Unfortunately, the Diocese failed to timely

reach a deal with the Committee and spent millions of dollars attempting to scare survivors into

accepting a wholly inadequate proposal.

3.    Meanwhile, survivors accepted this Court's suggestion[4] and pursued a "test case"

process for certain of the Unstayed Cases—not only to move those cases forward, but to create a

path for all parties to reasonably assess their litigation risk and foster negotiations to a

consensual resolution.[5] Four state court actions (the "Trial Cases") are now moving forward to

trials.[6]

4.     In contrast to its position a year ago, the Committee, on behalf of survivors,

believes that progress among a limited number of state court actions will foster a consensual

resolution in this bankruptcy. The Diocese now seizes on dismissal as a strategy to avoid its and

the parishes' day of reckoning in state court.

5.    The Diocese filed the Motion to Dismiss *now* precisely because the Trial Cases

are proceeding apace, and it has no further ability in the bankruptcy case to manipulate

procedures to delay them. Instead of dismissal, the Court should maintain the case as a vehicle

for effectuating a settlement that will result from state court actions establishing the liability for

the abuse claims. The Committee has no doubt that the Diocese will use dismissal to try and

delay the Trial Cases. And, once that and other delay tactics in state court are exhausted, the

Diocese, as it has promised, will file for bankruptcy again.

---

[4] "Look, I tried to think … are there ways to sort of break the ice to move this case forward that has any hope of moving forward. I came up with the test case, bellwether case approach. Get some data points for what these cases are -- you know, what juries are going to value these cases." *Id.* Ex. B (12/19/23 Hearing Tr.) at 50:1-6.

[5] Motion of the Official Committee of Unsecured Creditors Pursuant to Sections 105, 305 and 362 of the Bankruptcy Code to Permit Proceeding with Certain State Court Actions and Temporary Suspension of the Chapter 11 Case. [Docket No. 2677] (the "Test Case Motion").

[6] Additionally, 32 other state court cases are actively continuing to proceed through discovery and trial preparation (the "State Court Actions").

4889-7535-3497.21 18491.002

6.     The Diocese's delay strategy is not a surprise. The Dismissal Motion is part of the Diocese's "continuing efforts" to prevent sexual abuse survivors from getting their day in state court without further delay, more than three years after the Diocese's bankruptcy filing.[7]

7.     The Diocese already demonstrated that it will make any effort to cause delay in the state court proceedings. The Diocese's actions following the denial of its preliminary injunction request[8]—after which the Diocese removed the Unstayed Cases to federal court[9] and filed the Transfer Petition seeking to have the Unstayed Cases moved to the Southern District of New York—demonstrate its pattern and practice. Only after a substantial number of those cases were remanded back to state court, and Justice Steinman began actively moving the Trial Cases forward, the Diocese again looked for another procedural maneuver to delay those actions and began threatening dismissal.

8.     In its Motion to Dismiss, the Diocese reasons that the overwhelming rejection of its Plan indicates support from survivors for dismissal. The Diocese goes so far as to say that the Diocese "joins [the survivors]" in asking for dismissal.[10] The Diocese's temerity in purporting to speak for the survivors has no basis. The survivors voted overwhelmingly to reject a callously inadequate plan. They were not voting on dismissal; the Court previously rejected the Diocese's asserted entitlement to an automatic dismissal. Thus, "a vote to reject the Plan was in no way a

---

[7] Memorandum Opinion and Order Granting Plaintiff's Motion to Remand the Case to the New York County Supreme Court at 6, *Moore v. Cath. Health Sys. of Long Island, Inc.,* Adv. No. 23-01141 (Bankr. S.D.N.Y. Jan. 16, 2024), Docket No. 21.

[8] Memorandum Opinion and Order Denying the Debtor's Motion for Preliminary Injunction, *Roman Cath. Diocese of Rockville Ctr. v. Ark320 Doe (In re Roman Cath. Diocese of Rockville Ctr.),* 651 B.R. 622 (Bankr. S.D.N.Y. June 1, 2023) (the "Preliminary Injunction Decision"). The Preliminary Injunction Decision denied the stay with respect to [228] state court actions that purportedly did not name the Diocese (the "Unstayed Cases").

[9] Although certain affiliates signed the removal notices, Jones Day invoices clearly demonstrate it was the Diocese who prepared and orchestrated the filings. *See* Summary of Jones Day's Ninth Interim Application for Allowance of Compensation for Services Rendered and Reimbursement of Actual and Necessary Expenses Incurred During Retention Period From June 1, 2023 to September 30, 2023, Docket No. 2647.

[10] Motion to Dismiss at 3.

vote supporting dismissal."[11]  The vote on the Plan proved only that survivors will not be bullied by the Diocese into accepting less than they deserve and less than what the Diocese and its affiliates seeking releases (the "Diocesan Enterprise") can and should pay.

9.     There is a road to a consensual reorganization.  That road requires the outcomes of the Trial Cases and the other state court actions that will establish responsibility for the abuse claims while maintaining the bankruptcy as a means for effectuating the resolution of the abuse claims.  The dismissal of the case is a wasteful detour that the Diocese has promised will lead everyone back to bankruptcy.  The Court should stay on the straight road and deny the Motion to Dismiss, allow the Trial Cases and any other cases that seek stay relief to go forward, and aggressively control its docket and professional fee applications to avoid diversions that result in unnecessary administrative expenses.

10.     Since the Bankruptcy Court suggested it, the Committee has consistently advocated the pursuit of certain cases—test cases—to break the impasse of negotiations.  The Committee is confident that survivors will obtain judgments sufficient to cause the Diocese to reconsider withholding millions of dollars held by the Diocesan Enterprise for alleged crucial activities.  The Diocese's concerted efforts to block state court litigation, including the Trial Cases, suggest that the Committee is correct.  But regardless of the Committee's perceptions, the continuation of the Trial Cases will help bring the parties to a more realistic view of their exposure or entitlement to monetary damages, leading to more meaningful settlement negotiations.[12]

---

[11] D'Estries Dec. ¶ 16.

[12] "I believe that moving forward with the Trial Cases will cause the parties (including the Committee, the Diocese, and Insurers) to reassess their positions and become more realistic about their risks thereby fostering an opportunity for settlement."  *Id.* ¶ 17.

4889-7535-3497.21 18491.002

11.     The Diocese's complaint about the cost of remaining in bankruptcy rings hollow given the over $100 million it has already wasted on specious litigation tactics, such as (a) pursuing a plan it knew was unacceptable based on the hundreds of hours spent preparing for and meeting with individual state court counsel in an attempt to sell the deal codified in the Plan, (b) removing and fighting remand of the Unstayed Cases, (c) reviewing and redacting documents already allegedly produced to the Committee, (d) objecting to claims still channeled under any plan, and (e) years of unnecessary fighting over providing affiliate financial information.

12.     Contrary to the Debtor's unsupported assertions, dismissing the case at this juncture actually exposes the Diocese to more litigation expense.  As this Court stated to the Debtor, "Your liquidity isn't going to be much improved if you're back fighting all these cases in state court."[13]  Dismissal merely shifts and augments the Diocese's financial bleeding as its attorneys shift from bankruptcy work to defending hundreds of cases in state court.

13.     This Court should reject the Diocese's self-serving and misplaced justifications for dismissal.  The Debtor should not be allowed to continue to wield this bankruptcy as a sword and a shield against survivors, further delaying survivors' pursuit of fair and equitable compensation for the horrific abuse they suffered decades ago.

14.     After three years, it is finally time for the Diocese to get serious about what it will take to emerge from this Bankruptcy Case.  There is a road forward, but only if the Diocese comes to the table in good faith with the Committee to reach a consensual plan that treats survivors fairly.  For the reasons set forth herein, the Motion to Dismiss should be denied.

---

[13] Dine Dec. Ex. C (11/1/23 Hearing Tr.) at 26:3-5.

4889-7535-3497.21 18491.002

## II.  RELEVANT FACTS

### A.    The Bankruptcy Case

15.    On October 1, 2020, the Diocese commenced the Bankruptcy Case.  The Diocese has continued to operate its business and remain in possession of its properties as a debtor in possession under section 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in this Case.

16.    The Diocese claimed that it chose the protection of the Bankruptcy Code "to ensure a fair and equitable outcome for everyone involved, including abuse survivors whose compensation settlements will be resolved by the courts," and to address "the increasingly heavy burden of litigation expenses" associated with these cases.[14]

17.    On October 16, 2020, the United States Trustee for Region 2 appointed the Committee under section 1102 of the Bankruptcy Code.  The Committee consists of nine individuals who hold claims against the Diocese, including eight individuals who were sexually abused as minors by perpetrators for whom the Diocese was responsible, and one representative of a minor with a civil rights claim against the Diocese.  *See* Notice of Appointment of Official Committee of Unsecured Creditors [Docket No. 71].

18.    Since approximately October 2021, the Diocese, the Committee, the parishes, and the insurers have engaged in mediation to consensually resolve this Bankruptcy Case.  *See* Order Appointing a Mediator [Docket No. 794] (appointing Paul Van Osselaer as mediator).

19.    On October 18, 2023, the Mediators filed a Status Report [Docket No. 2589] stating that the Mediators "believe that no such agreement is likely before the Court's [October

---

[14] Press Release, Cath. Diocese of Rockville Ctr., Diocese of Rockville Centre Files for Chapter 11 to Manage Legal Expenses and Facilitate Settlements with Abuse Survivors (Oct. 1, 2020), https://drvcreorganization.com/wp-content/uploads/2020/09/final_media_release_09_30_2020.pdf.

4889-7535-3497.21 18491.002

31, 2023] deadline and believe further that, absent a substantial movement in the positions of the Committee or the Debtor, those parties have reached an impasse in their efforts to have a consensual plan."

**B.    Committee Motion to Dismiss**

20.    On March 27, 2023, the Committee filed the Committee Dismissal Motion because the Diocesan Enterprise refused to negotiate a reasonable plan with fair compensation for survivors and the Diocese was incurring substantial or continuing loss to or diminution of the estate.  The Diocese opposed the Committee Dismissal Motion.

21.    On April 19, and April 20, 2023, the Bankruptcy Court held an evidentiary hearing on the Debtor's Motion for a Preliminary Injunction Under 11 U.S.C. §§ 362 and 105(a) [Adv. Pro. No. 20-01226, Docket Nos. 126 and 127] ("PI Motion").  On June 1, 2023, the Court issued an opinion and order denying the PI Motion and, consistent with the relief requested by the Committee, terminated any stay as to 228 CVA Actions (the "Unstayed Actions") in which the Debtor was not a named defendant.  *See Id.* Docket Nos. 202 and 203.

22.    On July 18, 2023, the Committee Dismissal Motion was denied without prejudice, with the Court ordering the Diocese to file an amended plan of reorganization or, at a minimum, a term sheet for a plan supported by both the Debtor and the Committee by October 31, 2023. *See* Docket No. 2329 ¶2.

23.    Following the denials of the Committee Dismissal Motion and the Debtor's PI Motion, the Diocese, the Committee, the parishes and other parties continued to mediate. Unfortunately, the parties were unable to reach an agreement and the Diocese failed to file a consensual plan of reorganization or a term sheet by the October 31 deadline.

4889-7535-3497.21 18491.002

**C.** **The Diocese's Efforts to Delay the Unstayed State Court Cases**

24.     Following the issuance of the Preliminary Injunction Decision, the Diocese removed the Unstayed Cases to federal court and filed a petition seeking transfer of the Unstayed Cases from state court to the Southern District of New York (the "District Court") (the "Transfer Petition").[15]  The purported premise of the Transfer Petition was the need for consistency between the adjudication of the Unstayed Cases and the Bankruptcy Case.[16]

25.     In light of this Court's previous finding on the question of "relatedness" between the Unstayed Cases and the Bankruptcy Case as it pertained to the PI Motion, the Diocese fought vehemently to keep the Transfer Petition out of this Court.[17]  On March 13, 2024, the District Court held that the Bankruptcy Court has "a better vantage point from which to evaluate, in the first instance, the merits of transferring the state court cases against the Debtor."[18]

26.     Though the Preliminary Injunction Decision did not lift the Automatic Stay regarding cases against the Diocese, the Diocese nonetheless took the lead in coordinating the removal efforts and the Transfer Petition.

---

[15] *See* Opinion and Order, *In re Roman Cath. Diocese of Rockville Ctr.*, No. 1:23-cv-05751-LGS (S.D.N.Y. Mar. 13, 2024), Docket No. 41 (the "Withdrawal Order").

[16] Memorandum of Law in Support of Joint Petition to Fix Venue for Claims Related to The Roman Catholic Diocese of Rockville Centre's Bankruptcy Under 28 U.S.C. §§ 157(b)(5) and 1334(b) at 11-14, *In re Roman Cath. Diocese of Rockville Ctr.*, No. 1:23-cv-05751-LGS (S.D.N.Y. July 5, 2023), Docket No. 2.

[17] *See* Ex Parte Letter Motion from C. Ball to Judge Laura Taylor Swain seeking to withdraw the reference, *In re Roman Cath. Diocese of Rockville Ctr.*, No. 1:23-cv-05751-LGS (S.D.N.Y. July 7, 2023), Docket No. 9 (seeking withdrawal of automatic reference to bankruptcy court on grounds that District Court was better suited to address personal injury matters) (the "Ex Parte Withdrawal Motion"); *see also* Memorandum of Law in Opposition to the Official Committee of Unsecured Creditors' Motion for Reconsideration of Order Withdrawing Reference of Petition to the Bankruptcy Court, *In re Roman Cath. Diocese of Rockville Ctr.*, No. 1:23-cv-05751-LGS (S.D.N.Y. Aug. 31, 2023), Docket No. 34 (opposing reconsideration of the *ex parte* granting of the Withdrawal Order).

[18] Withdrawal Order at 4.

4889-7535-3497.21 18491.002

**D.      The Diocese's Failed Attempt to Gain Support for Its Plan**

27.      After the Court instructed the parties to attempt to reach a consensual resolution in its denial of the Committee Motion to Dismiss, the Debtor instead attempted to circumvent the Committee and proceeded to engage in numerous meetings with state court counsel representing survivors (the "State Court Counsel") in an effort to build support for its position.

28.      On October 19, 2023, the Diocese filed a letter with the Court[19] attaching a proposed plan term sheet (the "Plan Proposal") that allegedly represented the Diocesan Enterprises "best and final" offer.  The Committee repeatedly informed the Debtor that it would not support a plan based on the Plan Proposal and that any such plan would not garner the requisite survivor support for confirmation.  The Debtor again attempted to circumvent the Committee by engaging directly with State Court Counsel.  The Committee is not aware of any State Court Counsel with a material number of clients agreeing to support the Plan following these meetings.  Nonetheless, the Diocese charged ahead with its Plan.

29.      On November 27, 2023, the Diocese filed its first amended plan and first amended disclosure statement, introducing the concept of the Diocese seeking dismissal of the Bankruptcy Case if the plan failed to get the necessary survivor votes.  *See* Docket Nos. 2695-96.[20]  On December 20, 2023, the Diocese filed exhibits to its plan and disclosure statement.  *See* Docket No. 2752.  On December 22, 2023, the Diocese filed modified versions of its plan and disclosure statement and a plan supplement consisting of proposed trust distribution procedures. *See* Docket Nos. 2754-55.  Following two hearings during which the Bankruptcy Court did not approve the Diocese's proposed disclosure statement and required substantial changes to the same, the Diocese filed its *Fourth Modified First Amended Chapter 11 Plan of Reorganization*

---

[19] Letter to the Honorable Chief Judge Glenn Regarding Case Status [Docket No. 2590].

[20] The first draft of the plan provided for automatic dismissal of the Bankruptcy Case.

4889-7535-3497.21 18491.002

*for The Roman Catholic Diocese of Rockville Centre, New York* [Docket No. 2908] (the "Plan")

and accompanying *Fifth Amended Disclosure Statement with Respect to the [Plan]* [Docket No.

2910] (the "Disclosure Statement").  By order dated February 15, 2024, the Bankruptcy Court

approved the Disclosure Statement and related procedures for solicitation of the Plan.[21]

30.     As foretold by the Committee and undoubtedly the majority of the state court

counsel that met with the Diocese, survivors resoundingly rejected the Diocese Plan.  According

to the Voting Declaration [Docket No. 3057] (the "Voting Declaration"), 88% of 414 voting

survivors voted to reject the Plan.[22]  The Diocese thus fell 62 percentage points short of the

minimum percentage required under *Purdue* to justify third party releases.

**E.     The Progression of Cases in State Court Coincided with the Diocese's Changed Position on Dismissal**

31.     On August 10, 2023, the first remand decision was entered sending cases back to

state court.[23]  Counsel for the Diocese began taking the *lead* role in state court on behalf of all

defendants in the Unstayed Cases.[24]  The Diocese justified charging the Estate for its efforts on

the fact that two of those cases named an entity that was a d/b/a for the Debtor and so was

effectively the Diocese.[25]  Immediately upon learning that cases that were effectively against the

---

[21] Order (I) Approving Disclosure Statement, (II) Approving Form and Manner of Service of Disclosure Statement Notice, (III) Establishing Procedures for Solicitation and Tabulation of Votes to Accept or Reject Plan of Reorganization, (IV) Approving Related Notice Procedures, and (V) Scheduling Hearing on Confirmation of Plan of Reorganization, or, in the Alternative, Dismissing the Debtor's Chapter 11 Case [Docket No. 2918].

[22] The survivors were divided into two separate classes, but the voting percentages were roughly the same in each of the two classes.  *See* Voting Declaration.  If provisional ballots are not included, the rejection rate would be 87%. *Id.*

[23] *In re Child Victims Act Cases Removed from State Ct.*, No. 23-5029, 2023 U.S. Dist. LEXIS 139687, at *14 (E.D.N.Y. Aug. 10, 2023).

[24] Such role was also directly contrary to the Preliminary Injunction Decision finding that "The Debtor otherwise fails to explain why its 'relationship' with the DRVC Related Parties would necessitate an in-depth involvement with cases brought solely against the DRVC Related Parties."  Preliminary Injunction Decision, 651 B.R. at 663.

[25] *See* Dine Dec. Ex. D (Correspondence between James Stang and Eric Stephens).  The Diocese did not raise this potential issue with the Committee or the Court in all of the litigation prior to the Preliminary Injunction Decision.

4889-7535-3497.21 18491.002

Debtor were unstayed, a plaintiff inquired whether the automatic stay still applied to the case.[26] The Diocese asserted that the automatic stay did not apply and chose to expend Estate resources by actively litigating those cases *and* continuing its *lead* role before Justice Steinman.

32.     Only after the Unstayed Cases began to be set for individual conferences, thus minimizing the Diocese's ability to act on behalf of all defendants, did the Diocese attempt to reverse its position on the d/b/a cases by asking the Committee to consent that such cases were "inadvertently listed" in the Preliminary Injunction Order.[27]  The Diocese requested such a stay only two days after representing in Justice Steinman's court that one of the relevant cases was "down the road now to getting litigated and it is not subject to the stay any longer, and the Diocese wants to proceed."[28]  The Committee rejected the stay request given that the Debtor had chosen to actively litigate and required plaintiffs to actively litigate those cases for several months.[29]

33.     In sum, over the course of a four-day period—November 27 – December 1—the Diocese to reversed its position on the application of the stay to the high school d/b/a cases due to the progression of the cases in state court and the Diocese first introduced its strategy of seeking dismissal of the Bankruptcy Case.

---

Within days of the decision, the Diocese's counsel was discussing the potential issue but, again, it was not raised with the Committee nor the Court.  *See* Summary of Jones Day's Ninth Interim Application for Allowance of Compensation for Services Rendered and Reimbursement of Actual and Necessary Expenses Incurred during Retention Period From June 1, 2023 to September 30, 2023 Ex. E, Docket No. 2647-5 at 21-22 of 168.  On June 8, 2023, Corinne Ball's entry included "Confer with Gugg (Jones Day) regarding high school cases and PI."  *Id.*  On June 9, 2023, Ms. Ball's entry included "Follow up regarding school cases with DiPompeo and Rosenblum (both Jones Day) and PI impact[]; follow up with Renker and Fasano (both DRVC) regarding same."  *Id.*

[26] Dine Dec. Ex. E (Correspondence between Leander James and Eric Stephens).

[27] *Id.* Ex. F (December 1, 2023 letter from Christopher DiPompeo to Gail Greenwood and Ken Brown).

[28] *Id.* Ex. G (Hearing Transcript at 2:10-3:10, *Ark457 Doe v. Holy Family*, No. 900094/21 (Nov. 29, 2023).

[29] *Id.* Ex. H (December 13, 2023 letter from Gail Greenwood to Christopher DiPompeo).

4889-7535-3497.21 18491.002

**F.    The Trial Cases**

34.    On November 20, 2023, the Committee filed the Test Case Motion.  The

Bankruptcy Court denied the Test Case Motion. [Docket No. 2744].

35.    However, in denying the Test Case Motion, the Court was clear that it supported

the test case approach[30] (which was the Court's suggestion) and clarified that Justice Steinman

should determine how to proceed with test cases.  The Court explained:

> But [Justice Steinman is] going to be the one to agree, okay, those are the
> four or the six cases that we'll try. Not me. I've tried to provide some
> general guidance and thoughts. I mean, I thought that the opposition that
> Jones Day filed missed the mark in a lot of respects. The notion that
> personal injury cases don't get tried as bellwether trials is not true.[31]

36.    Justice Steinman has now done just that.  The four cases selected by Justice

Steinman, the Trial Cases are:

- *P.S. v. Holy Family Roman Catholic Church*, Index No. 900034/2021

- *ARK452 Doe v. St. Rose of Lima*, Index No. 900092/2021

- *ARK457 Doe v. Holy Family*,[32] Index No. 900094/2021

- *Bilello v. Holy Trinity Diocesan High School*,[33] Index No. 900099/2021

37.    Certain motions regarding discovery from the Debtor are currently before Justice

Steinman, but in at least one case the Note of Issue will be filed no later than July 8, 2024,

certifying that discovery is over and the case is trial ready.

---

[30] "In denying Mr. Stang's motion, it is in no way intended to preclude if Justice Steinman has a proposal that he is going to make to counsel in the case…." *Id.* Ex. B (12/19/23 Hearing Tr.) at 77:10-12.

[31] *Id.* at 48:20-49:1.

[32] The Committee understands that Holy Family High School, which no longer exists, was never been separately incorporated and at the time of the abuse was owned and operated by the Diocese.

[33] The Committee understands that Holy Trinity High School has never been separately incorporated and at the time of the abuse was owned and operated by the Diocese (although it was subsequently transferred to the Department of Education).

38.     If the Court grants the Motion to Dismiss, the Committee expects the Diocese to use the dismissal to justify delay in the Trial Cases and in the other Unstayed Cases. For example, the Diocese is not a named party in the Unstayed Cases. If the Case is dismissed, then plaintiffs may seek to add the Diocese as a defendant in those cases, or claimants that did not previously file suit against the Diocese may file such actions once the Automatic Stay is lifted. The Diocese can be expected to argue, among other things, that adding the Diocese as a defendant means that those Unstayed Cases need to return to the beginning so that the Diocese can fully participate, including with respect to discovery. Additionally, the Diocese may argue to Justice Steinman that, due to the filing of new cases, the Diocese will need to divert resources to address those cases and so will need additional time both with respect to the Trial Cases and to the Unstayed Cases.

39.     Finally, two of the four Trial Cases are against schools that are d/b/as for the Debtor. Therefore, if the Diocese remains in bankruptcy, it cannot prevent their progression toward trial.[34] If, however, the bankruptcy is dismissed, the Diocese will regain the ability to use a new bankruptcy to stop the trials from occurring.[35]

40.     The Diocese's counsel openly stated that if the bankruptcy case is dismissed and cases proceed against the parishes and debtor, they will likely file bankruptcies for individual parishes and refile for the Debtor, resulting in numerous, fractured bankruptcy filings with all the time, expense and judicial resources multiple bankruptcies will entail.

---

[34] The only bankruptcy-related delay tactic available to the Diocese will be if St. Rose of Lima and Holy Family Roman Catholic Church determines to file for bankruptcy to stay the Trial Case against it.

[35] *See* Dine Dec. Ex. A (9/26/2023 Hearing Tr.) at 43:1-13.

### III. <u>OBJECTION</u>

41.　　"Chapter 11 is not a game to be used for sport against creditors for the benefit of insiders."[36]  The Diocese is using the Bankruptcy Case as a game to thwart the survivors.  *First*, it filed for bankruptcy to stay state court litigation against itself and its Diocesan-controlled parishes.  *Second*, it employed "alarming"[37] tactics to prolong the bankruptcy and to attempt to coerce the survivors into accepting an unacceptable plan that included non-consensual releases.  *Third*, it did everything it could to delay the Unstayed Cases against its diocesan-controlled parishes.  But now *fourth*, as certain of those Unstayed Cases have gained momentum, the Diocese seeks to dismiss its own bankruptcy case, having accomplished nothing towards the resolution of the survivor claims it said was the reason for the bankruptcy.  The Diocese now wishes to return to state court, where it can avoid the transparency of the bankruptcy process and use its tactics there to continue to delay any reckoning for the damage it caused.  *Finally*, when the Diocese eventually exhausts its ability to delay the state court cases, it will file for bankruptcy again, staying and stopping state court litigation again, in an endless, weary cycle of delay and expense for the sole purpose of avoiding its responsibility to survivors as they suffer, age and die.  This Court should not permit the Diocese to manipulate the bankruptcy process in this way, and the Diocese provides no legitimate basis for dismissal.

### A.　　<u>Legal Standard for Dismissal</u>

42.　　Under section 1112(b) of the Bankruptcy Code, upon a party in interest's motion, a court may only dismiss a chapter 11 case or convert it to chapter 7 if the movant demonstrates

---

[36] *See generally* M. Bienenstock, Bankruptcy Reorganization 2-4 (1987) (discussing "Equity Policy" and "Reorganization Policy").

[37] *In re Child Victims Act Cases Removed from State Ct.*, 2023 U.S. Dist. LEXIS 139687, at *11 n.12.

4889-7535-3497.21 18491.002

"cause" to do so.[38]  Cause includes "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation."[39]  If the Court determines there is cause to dismiss or convert, it must also: (i) decide whether dismissal, conversion, or the appointment of a trustee or examiner is in the best interests of creditors and the estate; and (ii) identify whether there are "unusual circumstances" that establish that dismissal or conversion is not in the best interests of creditors and the estate.[40]  Bankruptcy judges have wide discretion to determine whether cause exists to dismiss or convert a case under section 1112(b).[41]

43.     In *In re Kingbrook Dev. Corp.,* Judge Bucki denied a debtor's motion to dismiss where the debtor had failed to file a plan or disclosure statement and its secured creditor was in a position of advantage, having completed a foreclosure of the debtor's real property and proposed a reorganization plan.[42]  The debtor sought dismissal on the grounds that it no longer had real property and what amounted to a two-party dispute should be in state court.  The court rejected the debtor's arguments, stating: "In filing its voluntary petition for relief, the debtor obtained the protections of Chapter 11, but on condition of its acceptance of the restrictions and limitations of the bankruptcy process…  A dismissal of the bankruptcy case at this time would remove the various protections that the bankruptcy process has ordained for the benefit of creditors."[43]  In particular, a dismissal would eliminate avoidance actions and other causes of action held by the

---

[38] 11 U.S.C. § 1112(b)(1); *see also In re Kingbrook Dev. Corp.*, 261 B.R. 378, 379 (Bankr. W.D.N.Y. 2001) ("[T]his court may dismiss a Chapter 11 case only on motion and upon a showing of good cause."); *In re Loco Realty Corp.*, No. 09-11785 (AJG), 2009 Bankr. LEXIS 1724, 2009 WL 2883050, at *2 (Bankr. S.D.N.Y. June 25, 2009).

[39] 11 U.S.C. § 1112(b)(4)(A).

[40] 11 U.S.C. § 1112(b)(1), (b)(2)

[41] *In re BH S&B Holdings, LLC*, 439 B.R. 342, 346 (Bankr. S.D.N.Y. 2010).

[42] *Kingbrook Dev. Corp.*, 261 B.R. at 379.

[43] *Id.* at 379.

15

estate, as well as the ability of the bankruptcy court to assure a recovery for the benefit of creditors.[44]  Under such circumstances, where there was no affirmative consent by creditors regarding dismissal, the court refused to "deprive creditors of the bankruptcy protections and rights to which they are now entitled."[45]

44.     In deciding whether to grant a debtor's motion to dismiss its chapter 11 case, courts consider the interests of all of the creditors of the estate and have compared "the creditors' interests in bankruptcy with those they would have under state law."[46]  Where creditors' ability to pursue claims or collect on judgments would be delayed by dismissal, a debtor's motion to dismiss should be denied.[47]  Dismissal of a debtor's case is also prejudicial to creditors where the debtor may file another chapter 11 petition after dismissal.[48]

**B.     There is No Cause to Dismiss the Bankruptcy under Section 1112(b)(1)**

**1.     The Professional Fees Will Be Increased by Dismissal**

45.     The Diocese argues there is cause for dismissal because of "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation."[49]

46.     It is true that the Diocese has spent over $100 million in fees in this bankruptcy with little to show for it.  The Debtor will not be saving professional fees through dismissal.

---

[44] *Id.* at 379-80 ("[A] dismissal will have the effect of returning to the debtor any claim of lender liability, but with none of the bankruptcy safeguards to assure that its value will inure to the benefit of creditors.  Similarly, a dismissal may effectively eliminate any cause of action to avoid the transfer of assets.").

[45] *Id.* at 380.

[46] *In re Cont'l Holdings*, 170 B.R. 919, 927 (Bankr. N.D.Ohio 1994).

[47] *See id.* ("Should dismissal be granted, the DIP's unsecured creditors, who have been held at bay for approximately 18 months, would be required to pursue their claims against the DIP in state court," noting "this remedy may not now be speedy or adequate due to the delay experienced as a result of [the DIP's] petition.").

[48] *See id.* at 928 (dismissal would not protect creditors if DIP files another chapter 11 petition; motion to dismiss denied and conversion granted).

[49] Motion to Dismiss ¶ 10.

Rather it will expose itself to even more substantial professional fees by returning to state court to litigate hundreds of state court actions.

47.     Since the Preliminary Injunction Opinion, the Diocese has already spent over $4.3 million in professional fees defending the Unstayed Cases.  That number will increase exponentially if the Bankruptcy Case is dismissed and the other outstanding state court cases, except those that impact Arrowood coverage, move forward.

48.     Additionally, of the millions that the Debtor complains was spent on professional fees since the Committee Motion to Dismiss, much of that was spent on the Diocese's pursuit of its doomed Plan and on the Diocese's (re)production of CVA Documents after counsel repeatedly swore since July 2022 to having fully reviewed and produced all available CVA documents to the Committee.

49.     By contrast, if the Bankruptcy Case is not dismissed, there will not be such a substantial increase in expenditures.  The only continuing bankruptcy-related administrative expense would be for (i) settlement activity and negotiations towards a consensual resolution, and (ii) pursuit of the CemCo adversary proceeding which is a valuable asset of the Estate that, in the Committee's view, could increase amounts available to survivors by tens of millions of dollars.

50.     Finally, if the Bankruptcy Case is dismissed, the Diocese has stated it will likely end up right back in bankruptcy.  When asked about state court litigation versus a bankruptcy plan, Ms. Ball advised: "[F]ailure will surely result in such State Court counsel, many parishes, and the Diocese, being right back here next year. Indeed, it is more likely than not, that those parishes that I described, will have no choice, that we'll be here, that it will be months later. . . .

It just would be never ending, and we'd be right back here."[50]  It neither conserves estate nor judicial resources to allow the Diocese to exit this bankruptcy when it has guaranteed it will be back in bankruptcy again.  Such a refiling is a completely unnecessary drain and burden on the Court, particularly in light of pending adversary proceedings.[51]

### 2.      There is a Reasonable Prospect for Rehabilitation

51.    The Diocese declares that the Plan was its best and final offer.  The Diocesan Enterprise can do better.

52.    As an example, the Diocese Plan included a proposed settlement with the cemetery corporation the Diocese created on the eve of bankruptcy ("CemCo") and to which the Diocese fraudulently transferred $100s of millions of dollars of cash and property.[52]  The proposed settlement contemplated a mere $10 million dollar cash payment, and a $35 million loan from CemCo to the Diocese.  However, the proposed "loan" was to be secured by a pledge of the *Diocese*'s interest in the surplus of the *Diocese's* wholly-owned captive insurance company, Ecclesia.  If there is $35 million that can be realized from Ecclesia, the Debtor should contribute that value as the *Diocese*'s contribution.  CemCo itself should contribute significantly more than $10 million.  Based on its analysis of the transfers and CemCo's ability to pay, the

---

[50] Dine Dec. Ex. A (9/26/2023 Transcript), at 43:1-13.

[51] Assuming the Diocese does not attempt to start with a "clean slate" by choosing to re-file in the Eastern District of New York.

[52] By its complaint, the Committee alleges that the fair market value of the assets transferred to CemCo and the Cemetery Trust exceeds $200 million based, in part, on an independent valuation of the cemetery operations commissioned by the Diocese in June 2017, shortly before the transfers took place.  Prior to the transfers, the cemeteries generated approximately $25 million in annual revenue derived from operations and investment income. Complaint for Avoidance and Recovery of Fraudulent transfers and Recovery for Unjust Enrichment ¶¶ 25-26, *Off. Comm. Of Unsecured Creditors v. Cath. Cemeteries of the Roman Cath. Diocese of Rockville Ctr., Inc.*, Adv. No. 23-1121 (Bankr. S.D.N.Y. May, 26, 2023), Docket No. 1.

4889-7535-3497.21 18491.002

Committee set the minimum contribution from CemCo at $80 million in its proposed plan.[53] Just using the CemCo causes of action as an example, the Diocesan Enterprise could increase its plan proposal by $105 million.

53.     As another example, the Disclosure Statement revealed that the parishes have over $200 million in cash and investments, yet are only contributing $87.5 million in cash (a substantial portion of which will be provided over three years with no security or interest).  The parishes also own substantial real estate[54] that could be sold or used to secure a loan to satisfy its obligations to survivors and obtain a third-party release.[55]

54.     This list is not exhaustive, but illustrates why the Diocesan Enterprise can pay more.  It is not true that there is no prospect of rehabilitation simply because the Diocese Enterprise refuses to fairly compensate survivors from the Diocesan Enterprise's available assets.

55.     Remaining in bankruptcy while the Trial Cases and other Unstayed Cases move forward creates a road to educate the parties on realistic expectations and encourage settlement. A debtor cannot declare that it has no prospect of rehabilitation after benefitting from a three and half year stay of litigation simply because it simply declares an offer final.

---

[53] *See* First Amended Chapter 11 Plan of Reorganization Proposed by the Official Committee of Unsecured Creditors [Docket 1643] (the "Committee Plan").

[54] *See Survivors' Joinder in Support of the Motion of the Official Committee of Unsecured Creditors for Entry of an Order Pursuant to Bankruptcy Rule 2004 Directing Debtor to Produce Parish Information* [Docket 581].

[55] For example, the Archdiocese of Santa Fe sold more than 700 properties to fund its exit from Chapter 11.  *See* Debtor's Application to Employ and Compensate Auctioneer, and Motion to Sell Real Property at Auction Free and Clear of Liens and to Approve Bidding and Sale Procedures Ex. C, *In re Roman Cath. Church of the Archdiocese of Santa Fe*, No. 18-13027 (Bankr. D.N.M. Mar. 19, 2021), Docket No. 667.  The Archdiocese of Agaña transferred 70 properties to the settlement trust for liquidation.  *See* Fifth Amended Joint Chapter 11 Plan of Reorganization for the Archbishop of Agaña Ex. G, No. 19-00010, (D. Guam Sept. 28, 2022), Docket No. 1044.  Even dioceses that are still working to settle their cases are beginning to liquidate real estate. *See* Sean Mickey, Two dozen Buffalo Diocese properties could be listed for sale, WKBW, (Feb. 28, 2024, 6:41 PM), https://www.wkbw.com/news/local-news/two-dozen-buffalo-diocese-properties-for-sale; Stephanie Riegel, Archdiocese of New Orleans plans sales of vast real estate holdings to pay abuse claims, BishopAccountability.org (Sept. 1, 2023), https://www.bishop-accountability.org/2023/09/archdiocese-of-new-orleans-plans-sales-of-vast-real-estate-holdings-to-pay-abuse-claims/.

4889-7535-3497.21 18491.002

C. **Unusual Circumstances Exist Establishing That Dismissal Is Not in the Best Interests of Creditors under Section 1112(b)(2).**

56.     Even if the Court finds that "cause" exists to dismiss the Case, it has wide discretion to deny dismissal based on unusual circumstances.[56] Under section 1112(b)(2), the Court need not convert or dismiss a case if it identifies unusual circumstances establishing that dismissal is not in the best interests of creditors and the estate, and the party opposing dismissal demonstrates that (A) there is a reasonable likelihood that a plan will be confirmed within a reasonable period of time, (B) the grounds for dismissal is something other than continuing loss or diminution to the estate and the absence of a reasonable likelihood of rehabilitation, and there is reasonable justification for the act or omission constituting cause for dismissal and the act or omission will be cured within a reasonable period of time fixed by the court.

57.     A determination of unusual circumstances is fact intensive and contemplates facts not common to most chapter 11 cases. A proposed plan to pay creditors in full is an unusual circumstance sufficient to deny a motion to dismiss or convert until a date almost six months later pending the plan's confirmation. A debtor's adversary proceeding seeking $15 million is an unusual circumstance sufficient to defeat conversion.[57] The arrival of a new lender prepared to assist reorganization coupled with significant oppositions by creditors is an unusual circumstance that defeats a history of negative monthly income.[58] The absence of any support for dismissal by creditors is an unusual circumstance.[59] And unusual circumstances exist where allowing the

---

[56] *In re 1031 Tax Grp., LLC,* 374 B.R. 78, 93-94 (Bankr. S.D.N.Y. 2007).

[57] *In re Hermanos Torres Perez, Inc.,* No. 09-5585, 2011 Bankr. LEXIS 4527, at *17 (Bankr. D.P.R. Nov. 21, 2011) (even if the creditor could establish cause to convert, a pending adversary proceeding against the creditor was an unusual circumstance and the other elements of 1112(b)(2) were satisfied).

[58] *In re Wilderness Crossings, LLC,* 440 B.R. 484, 489-90 (Bankr. W.D. Mich. 2010).

[59] *In re Franmar, Inc.,* 361 B.R. 170, 180 (Bankr. D. Colo. 2006) ("[T]he court finds and specifies that unusual circumstances exit justifying no dismissal; to wit: none of the creditors in this case have joined the UST in this motion and dismissal serves neither them nor the Debtor."). *Cf. Kingbrook Dev. Corp., supra,* 261 at 380 (denying

debtor to "limp along" is preferable to creating chaos among nursing home residents and the community, and resolution of a pending adversary proceeding would enable the debtor to propose a confirmable plan.[60]

58.     Here, unusual circumstances support denial of dismissal to allow the Trial Cases to come to judgment.  These unusual circumstances derive from the fact that the Diocese is not a civil corporation that can be liquidated or an individual nonprofit that seeks reorganization for itself only.  The Diocese has 135 non-debtor parishes and affiliates that collectively own more assets and real property than the Debtor itself, many of which face substantial liabilities.  The Diocese seeks third-party releases in favor of the entire Diocesan Enterprise.  Yet, to date, the Diocesan Enterprise has refused to liquidate properties or meaningfully contribute to a plan for the benefit of survivors.  Unlike other debtors, including religious nonprofits, the Diocese seeks dismissal because it was unable to confirm a unilateral plan of its "best and final" offer on behalf of the Diocesan Enterprise and it faces no threat of liquidation.  Unlike other debtors, the continuing losses to the estate are a result of a failed take-it-or-leave-it strategy.  Dismissal at this time would reward the Diocese for its intransigence while causing further delays and disruption to the Trial Cases and all claims in the pending adversary proceedings – *i.e.*, insurance coverage actions and fraudulent transfer claims against CemCo.  Survivors oppose dismissal because it is not in their best interests and will only fuel the Diocese's strategy to delay no matter the cost.

59.     The Bankruptcy Case is a complex bankruptcy involving the Diocesan Enterprise and entities that are not directly before the Court.  There is a reasonable likelihood that a plan

---

debtor's motion to dismiss for cause, noting "Absent either the affirmative consent of all creditors to a dismissal or proof of full repayment of unsecured claims, this court is disinclined to deprive creditors of the bankruptcy protections and rights to which they are now entitled.").

[60] *In re Hyperion Found., Inc.,* No. 08-51288, 2009 Bankr. LEXIS 4647, at *20-25 (Bankr. S.D. Miss. Aug. 11, 2009) (UST failed to demonstrate cause and even if it had, unusual circumstances supported denial of dismissal subject to a timeline for the submission of reports and further actions).

4889-7535-3497.21 18491.002

could be confirmed if the Trial Cases proceed to judgment and the parties engage in continued settlement discussions within a time specified by the Court. The Diocese does not seek dismissal because of continuing losses or diminution of the estate without any likelihood of rehabilitation. Rather, the Motion to Dismiss is the Diocese' strategic effort to block state court litigation from proceeding and further delay the survivors' day in court. The Diocese's delay tactics can and should be prevented by denying the Motion to Dismiss. Accordingly, unusual circumstances exist under section 1112(b)(2), and for this additional reason, the Motion to Dismiss should be denied.

**D.**      **The Motion to Dismiss is a Litigation Tactic and Should be Denied**

60.      The Suffolk Grand Jury observed that the Diocese's policy is "to expend as little financial capital as possible to assist victims," to employ "[a]ggressive legal strategies . . . to defeat and discourage lawsuits even though Diocesan officials kn[o]w they [are] meritorious," and to portray "themselves as interested in the concerns of victims and [to] pretend[] to be acting for their benefit while they act[] only to protect the Diocese."[61] Twenty years later, the Diocese is still engaging in "dubious procedural devices" that are "unlawful" and "unfair," and "unconscionable" legal wrangling.[62] Such "alarming" procedural efforts are consistent with "the grand jury findings that the Diocese had historically engaged in "aggressive legal strategies . . . employed to defeat and discourage lawsuits."[63]

61.      The Diocese has not fulfilled its intention to "make sure all clergy sex abuse survivors are afforded just and equitable compensation" and "offer survivors some measure of

---

[61] Grand Jury Report, Suffolk County Supreme Court, Special Grand Jury, Term 1D, May 6, 2002, foreperson Rosanne Bonventre (Jan. 17, 2003) at 106, available at https://www.bishop-accountability.org/reports/2003_02_10_SuffolkGrandJury/Suffolk_Full_Report.pdf. .

[62] *In re Child Victims Act Cases Removed from State C t.*, 2023 U.S. Dist. LEXIS 139687, at *1, 14.

[63] *Id.* at *11 n.12.

healing from these horrific abuses."[64]  Instead it has used bankruptcy as a means for the Diocese to continue to pursue "aggressive legal strategies."  And now that it has failed to bully and pressure survivors in *this* bankruptcy, it seeks dismissal to gain additional delay tactics in state court before again returning to bankruptcy.

62.     The Diocese should not be allowed to further abuse the bankruptcy process by now simply declaring it is done negotiating and exiting bankruptcy just as state court cases are *finally* moving towards trial, while having spent over $100 million that could have otherwise been used to satisfy its obligations to survivors of childhood sexual abuse.

63.     It is time for the Court to close the door on the Diocese's tactics of avoidance and delay and require the Diocese to truly seek a fair resolution of this Case.  This Court should not give the Diocese an exit that further disadvantages survivors and rewards the Diocese for its long-game strategy of litigation, delay and bullying.  The Motion to Dismiss should be denied.

WHEREFORE the Committee respectfully requests entry of an order denying the Debtor's Motion to Dismiss, or, in the alternative, adjourning the Debtor's Motion to dismiss without date and setting a status conference with respect to the Bankruptcy Case in September of 2024, and granting such other and further relief as the Court may deem just and appropriate.

---

[64] Cath. News Serv., *Bishop John Barres Makes Difficult Decision to have Diocese of Rockville Centre File for Bankruptcy*, The Dialog, (Oct. 1, 2020, 3:10 PM), https://thedialog.org/national-news/bishop-john-barres-makes-difficult-decision-to-have-diocese-of-rockville-centre-file-for-bankruptcy/ ("Bishop Barres Bankruptcy Statement"). A copy of Bishop Barres Bankruptcy Statement is attached as Exhibit I to the Dine Dec.

Dated: April 26, 2024 PACHULSKI STANG ZIEHL & JONES LLP

*/s/ James I. Stang*
James I. Stang, Esq.
Iain Nasatir, Esq.
Karen Dine, Esq.
Brittany M. Michael, Esq.
780 Third Avenue, 34th Floor
New York, NY 10017-2024
Telephone: 212/561-7700
Facsimile: 212/561-7777
jstang@pszjlaw.com
inasatir@pszjlaw.com
kdine@pszjlaw.com
bmichael@pszjlaw.com

*Counsel for the Official Committee of Unsecured Creditors*

BURNS BAIR LLP

*/s/ Timothy W. Burns*
Timothy W. Burns, Esq. (admitted *pro hac vice*)
Jesse J. Bair, Esq. (admitted *pro hac vice*)
10 E. Doty St., Suite 600
Madison, WI 53703-3392
Telephone: (608) 286-2808
Email: tburns@burnsbair.com
Email: jbair@burnsbair.com

*Special Insurance Counsel to the Official Committee of Unsecured Creditors*

4889-7535-3497.21 18491.002