**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

In re:

THE ROMAN CATHOLIC DIOCESE OF
ROCKVILLE CENTRE, NEW YORK,

                                    Debtor.

**FOR PUBLICATION**

Chapter 11

Case No. 20-12345 (MG)

**MEMORANDUM OPINION GRANTING THE DEBTOR'S MOTION**
**FOR ENTRY OF AN ORDER PURSUANT TO SECTIONS 363 AND 105(A)**
**OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 9019 (A)**
**APPROVING THE SETTLEMENT AGREEMENTS, RELEASE AND BUYBACK WITH**
**CERTAIN INSURERS AND OTHER PARTIES, AND (B) GRANTING RELATED RELIEF**

*A P P E A R A N C E S :*

JONES DAY
*Attorneys for the Debtor and Debtor-in-Possession*
250 Vesey Street
New York, New York 10281
By:     Corinne Ball, Esq.
        Todd Geremia, Esq.
        Benjamin Rosenblum, Esq.
        Andrew Butler, Esq.

PACHULSKI STANG ZIEHL & JONES LLP
*Attorneys the Official Committee of Unsecured Creditors*
780 Third Avenue
34th Floor
New York, New York 10017
By:     James I. Stang, Esq.
        Brittany M. Michael, Esq.
        Karen B. Dine, Esq.

PARKER, HUDSON, RAINER & DOBBS LLP
*Attorneys for Interstate Fire and Casualty Company, National Surety Corporation, and*
*Fireman's Fund Insurance Company*
303 Peachtree Street, Suite 3600
Atlanta, Georgia 30308
By:     Harris B. Winsberg, Esq.
        Matthew M. Weiss, Esq,
        Matthew G. Roberts, Esq.

Two N. Riverside Plaza, Suite 1850
Chicago, Illinois 60606
By:    Todd C. Jacobs, Esq.
      John E. Bucheit, Esq.

WHITE AND WILLIAMS LLP
*Attorneys for Interstate Fire and Casualty Company, National Surety Corporation and Fireman's Fund Insurance Company*
810 Seventh Avenue, Suite 500
New York, New York 10019
By:    Siobhain P. Minarovich, Esq.

DUANE MORRIS LLP
*Attorneys for London Market Insurers*
865 S. Figueroa Street, Suite 3100
Los Angeles, California 90017
By:    Russell W. Roten, Esq.
      Jeff D. Kahane, Esq.
      Andrew Mina, Esq.
      Betty Luu, Esq.

CLYDE & CO US LLP
*Attorneys for London Market Insurers*
30 S. Wacker Drive, Suite 2600
Chicago, Illinois 60606
By:    Catalina J. Sugayan, Esq.
      James J. Moffitt, Esq.

UNITED STATES TRUSTEE
*Attorney for the United States Trustee for Region 2*
One Bowling Green
New York, New York 10004
By:    Greg M. Zipes, Esq.

**MARTIN GLENN**
**CHIEF UNITED STATES BANKRUPTCY JUDGE**

Pending before the Court is the motion ("Motion," ECF Doc. # 3358) of the Roman Catholic Diocese of Rockville Centre, New York (the "Debtor" or the "Diocese") that seeks entry of an order (i) approving the four separate Settlement, Release and Buyback Agreements (collectively, the "Settlement Agreements" and the settlement they reflect, the "Settlement") by and among the Debtor, certain additional assureds, including the Debtor's parishes, and (A)

Certain Underwriters at Lloyds and London Market Companies ("London Insurers"); (B)

Interstate Fire & Casualty Company, National Surety Corporation, and Fireman's Fund

Insurance Company (collectively, "Interstate"); (C) Evanston Insurance Company, as successor

to Associated International Insurance Company ("Evanston"); and (D) Lexington Insurance

Company ("Lexington") and AIU Insurance Company ("AIU") (collectively with the London

Insurers, Interstate, and Evanston, the "Settling Insurers"), and (ii) granting related relief,

pursuant to sections 363 and 105(a) of the Bankruptcy Code and Rule 9019 of the Federal Rules

of Bankruptcy Procedure (the "Bankruptcy Rules").[1]  The Debtor indicates that it is also

contemporaneously seeking authority to enter into the Settlement Agreements through which it

seeks to settle and sell its historical insurance policies with all its insurers other than Arrowood

Indemnity Company in liquidation ("Arrowood").  Annexed to the Motion are (i) a proposed

order granting the relief sought as Exhibit A (the "Sale Order"); (ii) copies of the four Settlement

Agreements as Exhibits B through E; (iii) a list of the general liability insurance policies

covering the Debtor as Exhibit F; and (iv) the notice of the Motion that was published in *The

New York Times* and *Newsday* as Exhibit G.

In support of the Motion, the Debtor filed the declaration of Jonathan Terrell (the "Terrell

Decl.," ECF Doc. # 3359)—the founder and President of KCIC, a consulting firm that provides

certain litigation and strategic consulting services to corporations and their legal counsel.

On November 8, 2024, the U.S. Trustee ("UST") filed an objection to the Motion (the

"UST Objection," ECF Doc. # 3379), arguing that the Court deny the Motion or, at a minimum,

adjourn the Motion to the hearing on confirmation.  (*See* UST Objection at 22 ("[T]he hearing on

---

[1]    Defined terms used but not defined herein shall have the meanings ascribed to them in the *Disclosure
Statement for Modified Plan of Reorganization Proposed by the Roman Catholic Diocese of Rockville Centre, New
York and Additional Debtors* (the "Disclosure Statement," ECF Doc. # 3375) and the Motion.  Additionally, unless
otherwise indicated herein, docket references shall refer to those in the main case.

the Motion should be adjourned to the time of confirmation to resolve overall issues relating to the insurance companies."); *id.* at 39 (requesting that the Court sustain the UST Objection and deny the Motion).)

In response, the Debtor filed a reply (the "Debtor Reply," ECF Doc. # 3398) on November 13, 2024, that includes, as Exhibit A, a comparison of relevant terms of various sale orders and, as Exhibits B and C, clean and redline copies of the proposed Sale Order, reflecting revisions the Debtor made. As support for the Debtor Reply, the Debtor also filed the declaration of Ann V. Kramer, a partner at Reed Smith LLP which serves as special insurance counsel for the Debtor (the "Kramer Declaration," ECF Doc. # 3399).

Other replies and joinders, as applicable, were also filed: (i) the joinder and reservation of rights of the official committee of unsecured creditors (the "Committee" and its joinder, the "Committee Joinder," ECF Doc. # 3394) to the Motion; (ii) reply and joinder of Interstate (the "Interstate Reply & Joinder," ECF Doc. # 3400) to the UST Objection and Debtor Reply, respectively; and (iii) the joinder of the London Insurers to the Debtor Reply (the "LMI Joinder," ECF Doc. # 3401). A hearing on the Motion was held on November 18, 2024.

For the reasons discussed, the Court **GRANTS** the Motion and **APPROVES** the Debtor's entry into the Settlement Agreements and related relief. A separate Order will be entered.

## I.    <u>BACKGROUND</u>

### A.  Relevant Case History

On October 1, 2020 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. (*See* ECF Doc. # 1.) On October 16, 2020, the UST appointed the Committee. (*See* ECF Doc. # 71.)

### B. The Debtor's Insurance Policies

The Debtor submits that it worked to identify and preserve insurance policies in effect when abuse allegedly occurred, including primary and excess insurance policies. (Motion ¶ 2.) In the period leading up to the effective date of the Child Victims Act (the "CVA"), the Debtor states that it "expended substantial effort to pull together insurance policies and secondary evidence of insurance coverage from the late 1950s to the present." (*Id.*) A timeline of the Debtor's insurance coverage can be broken down into three periods: (i) the Royal years (Inception–1976); (ii) the London Program years (1976–1986); and the Ecclesia years (1986–Present). (*Id.* ¶ 6.)

### 1. The Royal Policies

From its creation until 1976, the Debtor purchased both primary and excess or umbrella insurance coverage (as relevant, the "Royal Primary Policies" and the "Royal Umbrella Policies") from Royal Indemnity Insurance and Royal Globe Insurance Company (collectively now known as Arrowood, "Royal" and its affiliates). (*Id.* ¶ 7.) The Royal Policies cover both the Debtor and other insureds. (*Id.*)

On November 8, 2023, an insolvency proceeding was commenced against Arrowood as the successor to Royal in Delaware, and an injunction against the commencement or continuance of an action against Arrowood or an insured claiming coverage by Arrowood was entered. (*Id.* ¶ 8.) On January 5, 2024, a petition for an ancillary proceeding was filed in New York by the Superintendent of the Financial Services Department, which is responsible as a guarantor of New York insureds to the lesser of coverage limits per claim or $1 million per claim per policy period. (*Id.*) The Superintendent also sought a further injunction against actions insured by Arrowood for an additional 180 days upon order of the court approving the ancillary proceeding. (*Id.*) On September 27, 2024, the New York Supreme Court entered its *Decision and Order on the*

*Verified Petition and Order to Show Cause*, granting the relief sought by the Superintendent

("Ancillary Liquidation Decision and Order"). (*Id.*) Presently, the bar date for submitting

claims to the Arrowood liquidation proceeding in Delaware is January 15, 2025. (*Id.*)

### 2. The London Policies

From 1976 until 1986, the Debtor purchased insurance coverage (the "London Policies")

from a syndicate of insurers known as the London Insurers, with additional excess insurance

coverage provided by various other insurers, including Interstate, Evanston, and Lexington,

(collectively with the London Insurers, the "London Program"). (*Id.* ¶ 9.) All of the London

Program Policies cover the Debtor as well as other insured parties, and the insurance policy

proceeds are shared between all co-insureds. (*Id.*) The first-excess-layer London Policies

provide insurance coverage above a $100,000 per occurrence "Self-Insured Retention" ("SIR")

via two insuring agreements—an "Aggregate Agreement" and a "Specific Excess Agreement"—

both of which are described in greater detail in the Motion. (*Id.*; *see id.* ¶¶ 9–11.) To cover

losses beyond amounts covered by the Specific Excess Agreement, the Debtor also purchased

multiple additional layers of excess insurance policies as part of the London Program, including

second and third layers of excess coverage. (*Id.* ¶ 12.)

### 3. The Ecclesia Policies

Ecclesia Assurance Company ("Ecclesia") is the sole provider of insurance for the Debtor

and certain other co-insured parties for alleged sexual abuse that occurred after August 31, 1986.

(*Id.* ¶ 13.) Ecclesia, a licensed insurer and reinsurer incorporated in New York in 2003, is a

captive property and casualty insurance company that provides insurance to the Debtor and is a

separate corporation wholly owned by the Debtor. (*Id.*)

### C.  The Insurance Coverage Adversary Proceeding

On the Petition Date, the Debtor commenced an adversary proceeding against certain of

the Debtor's insurers seeking, among other things, a declaratory judgment with respect to the

Debtor's rights and the insurers' obligations under certain insurance policies for the benefit of

the abuse survivors.  (*Id.* ¶ 14.)  The Committee sought to intervene in the adversary proceeding,

which the Court ultimately approved (Adv. Pro. No. 20-01227, ECF Doc. # 38).  (*Id.* ¶ 15.)

Subsequently however, several motions to withdraw the reference to the Bankruptcy Court were

filed, all of which were granted.  (*Id.* ¶ 17.)  As a result, the adversary proceeding is now pending

as four separate proceedings in District Court—Case No. 20-CV-11011 (JLR) (the Royal action),

Case No. 21-CV-71 (JPC) (the LMI/Lexington action), Case No. 21-CV-7706 (AKH) (the

Allianz action), and Case No. 21-CV-9304 (JLR) (the Evanston action)—where insurers have

raised certain defenses to coverage.  (*Id.*)

The Debtor indicates that it brought claims for declaratory judgment and breach of

contract and sought insurance coverage for the abuse claims that had been brought against it

under the CVA and Adult Survivors Act.  (*Id.* ¶ 18.)  Specifically, the Debtor sought coverage

for all sums that the Debtor and other insureds would be legally obligated to pay through

judgments and settlements because of personal injury, including settlements or judgments based

on claims and lawsuits alleging sexual and physical abuse.  (*Id.*)  The Debtor has also sought

payment of its defense costs and expenses.  (*Id.*)

The Settling Insurers, disputing coverage, sought declaratory judgments seeking to

eliminate or limit their obligations to the Debtor for the abuse claims and asserted numerous

"legal and policy interpretation defenses to the Debtor's claims."  (*Id.* ¶ 19.)  Moreover, the

Settling Insurers also asserted a late-notice defense, claiming that the Debtor should have

provided notice to the Settling Insurers whenever the Debtor learned of an alleged act of abuse.
(*Id.*)

The Debtor indicates that, in certain instances, its insurance policy documentation is

incomplete due to the passage of time.  (*Id.*)  Moreover, resolution of issues, the Debtor submits,

is a "fact-intensive" exercise and can only be resolved on a claim-by-claim basis.  (*Id.*)  In

addition, there is also a dispute over the existence, timing, and extent of obligations of carriers in

the London Program regarding the reimbursement of defense costs and expenses.  (*Id.*)

### D.  Mediation Efforts and the Plan Process

The Debtor engaged in mediation during the pendency of its chapter 11 case.  On October

20, 2021, the Court entered an order (ECF Doc. # 794) appointing Paul J. Van Osselaer as

mediator for a mediation between the Debtor, the insurers of the Debtor, and the Committee.

(*Id.* ¶ 21.)  After U.S. Magistrate Judge Sarah L. Cave was appointed co-mediator in the four

insurance coverage actions pending in District Court, the Court entered an order (ECF Doc. #

2018) taking judicial notice of her appointment and stating that it expected Magistrate Judge

Cave and Mr. Osselaer would operate as co-mediators in the chapter 11 case.  (*Id.* ¶ 22.)

However, mediation concluded with no agreement reached, and the Debtor pushed ahead with its

plan confirmation efforts that ultimately proved unsuccessful.  (*Id.* ¶¶ 23–24.)  As a result, the

Debtor sought to dismiss its chapter 11 case.  (*Id.* ¶ 24.)

Instead of ruling on the Debtor's motion to dismiss, the Court continued the motion and

issued an order on May 28, 2024, appointing the Hon. Shelley C. Chapman (Ret.) and Paul A.

Finn, Esq. to serve as co-mediators.  (*Id.* ¶ 25.)  This time, mediation proved fruitful.  On

September 18, 2024, the Debtor and the Committee notified the Court that, along with certain

insurers, the terms of a global resolution were reached.  (*Id.* ¶ 26.)

### E.  The Settlement Agreements

Pursuant to the proposed Settlement Agreements, the Debtor's third-party insurers (other than Arrowood) will contribute, in the aggregate, over $85 million to a settlement trust for the benefit of abuse survivors.  (*Id.* ¶ 27.)  Together with other contributions, the settlement pool for claimants is more than $320 million.  (Debtor Reply ¶ 1.)  The Settlement Agreements also resolve the insurance adversary cases against all insurers, other than Arrowood, and remove such insurers as potential objectors to the Debtor's proposed chapter 11 plan of reorganization.  (*Id.* ¶ 27.)  A summary of the monetary terms of the Settlements is as follows:

| Summary of the Settlement Agreements | |
| --- | --- |
| Allianz Purchase Price | $59 million |
| LMI Purchase Price | $25 million |
| Evanston Purchase Price | $1 million |
| Lexington Purchase Price | $525,000 |
| Assets Purchased | "Purchased Property," as defined in each Settlement Agreement, which includes: (i)  historical insurance policies, as listed in each Settlement Agreement, and (ii) certain extra-contractual claims, as defined in each Settlement Agreement. |

(*Id.* ¶ 28.)  The Debtor clarifies that "Purchased Property" extends solely to the "extra-contractual claims" of the parties signing the Settlement Agreements and related releases. (Debtor Reply ¶ 17; *see id.*, Ex. B at 3, n.4.)

The Plan, the Debtor makes clear, is "not conditioned on the [S]ettlement [A]greements, but these [S]ettlement [A]greements *are* conditioned on confirmation of the Plan."  (*Id.* ¶ 1 (emphasis added); UST Objection at 39 (acknowledging that the Settlement Agreements "contain a condition precedent of having the Plan Confirmation Order entered").)

### F.  The Motion

The Debtor asserts that the proposed sale of its insurance policies to the Settling Insurers free and clear is an exercise of the Debtor's business judgment and should be approved.  In support, the Debtor states that the Settling Insurers will pay "significant consideration" in exchange for the policies, an amount arrived at through court-ordered mediation that was conducted in good faith and at arm's-length.  (Motion ¶ 33.)  The sale, which has the support of the Committee, will resolve the insurance coverage actions while providing funds to immediately pay creditors.  (*Id.*)  Additionally, the Debtor submits that it satisfies the requirements to sell the insurance policies free and clear of the interests of additional insureds, any claims of claimholders, or any other interests any party may assert.  (*Id.* ¶ 37.)

The Debtor further requests that the Court approve the Settling Insurer Supplemental Injunction as it is an integral part of the Debtor's resolution with the Settling Insurers.  (*Id.* ¶ 39.) Failure to do so, the Debtor asserts, would prevent the realization of a sizeable amount of sale proceeds for distributions to claimants.  (*Id.*)  Similarly, the Debtor also argues that the Court should approve a litigation bar on the pursuit of claims, arising from or related in any way to an Abuse Claim or any of the Settling Insurer policies, against the Settling Insurers.  (*Id.* ¶ 40.) Such a bar would ensure the fair and equitable treatment of all Claims and is a necessary component of the sale, the Settlement, and the Debtor's reorganization.  (*Id.*)  Again, however, the effectiveness of those terms is conditioned on confirmation of the Plan.

The Debtor also argues that certain injunctions in favor of the Settling Insurers—the "channeling injunction" and the "gatekeeper injunction"—represent what the Debtor believes is a sound exercise of its business judgment.  (*Id.* ¶ 41.)  As for the Settling Insurers themselves,

the Debtor argues that they are good-faith purchasers entitled to the full protections of section 363(m) of the Bankruptcy Code. (*Id.* ¶ 44.)

Aside from satisfying the applicable and relevant provisions of section 363, the Debtor argues that the Settlement Agreements, including the releases and other terms set forth therein, are well within the range of reasonableness and are the product of good faith and arm's-length negotiations. (*Id.* ¶ 50.) The Debtor believes that the relevant *Iridium* Factors (defined below) all weigh in favor of a determination that the Settlement is fair and equitable. (*Id.* ¶¶ 50–60.)

### G. The UST Objection

The UST opposes the Motion primarily on four grounds. *First*, the UST asserts that the proposed Sale Order predetermines issues that should more appropriately be addressed at plan confirmation and is, therefore, a *sub rosa* plan. (UST Objection 20–23.) Such issues include the imposition of nonconsensual non-debtor third-party releases and injunctions through, among other things, the release of the Additional Debtors who have not yet filed for bankruptcy (but intend to do so) and the "free and clear" sale of the Purchased Property. (*See id.* at 20.)

*Second*, the Debtor, the UST contends, is seeking to sell property that is not property of the estate, without the authorization of those holding an interest in such assets and, in certain instances, in direct contravention of the Court's order concerning the Disclosure Statement (the "Disclosure Statement Order," ECF Doc. # 3368). (*Id.* at 3, 24.) The UST identifies such property as "claims owned by third parties, including direct claims that creditor third parties may have against non-debtor third parties."[2] (*Id.* at 24.) In connection with this, the UST fixates on

---

[2]     Relatedly, the Plan provides that claimants must sign a general release agreement in order to receive settlement distribution. (*See* Disclosure Statement at 2.) The Debtor made clear, however, at the November 18 hearing that claimants who fail to sign such an agreement do ***not*** waive any direct claims they may hold against an individual insurer. Accordingly, the Debtor will revise the Sale Order to include language to make this point explicit.

the definition of "Purchased Property," which the UST notes is defined to include "Extra-Contractual Claims" that the Court has already suggested does not constitute estate property.  (*Id.* (citing Disclosure Statement Order at 16–17).)

   *Third*, the UST contends that the Plan and Sale Order contain impermissible nonconsensual release and injunction provisions in violation of the Supreme Court's ruling in *Harrington v. Purdue Pharma, L.P.*, 144 S. Ct. 2071 (2024), and applicable state law and fall outside the scope of section 363(f) of the Bankruptcy Code.  (*Id.* at 3, 25.)  The UST expresses concern that entry of the Sale Order would foreclose an opportunity for parties in interest to "meaningfully object to [certain] Plan provisions" that the Court has expressly reserved for confirmation as set forth in the Disclosure Statement Order.  (*Id.* at 26; *see also id.* at 26–30 (summarizing the UST's objections to third-party releases set forth in the Plan, including the channeling of claims to the Trust, the Settling Insurer Supplemental Injunction, the Gatekeeper Injunction, and the conditioning of distributions on the signing of a release).)  In other words, the UST argues, approval of the Motion would necessarily result in approval of certain terms of the Plan that the UST takes issue, which are discussed in the UST's objection to the Disclosure Statement.  (*Id.* at 26.)

   The UST further argues that any relief granted in the Sale Order must be limited to what the Debtor would be entitled to under section 363 as parties cannot evade *Purdue* and achieve through a section 363 sale what they could not through a plan.  (*Id.* at 30.)  Specifically, the UST highlights, among other things, the Sale Order's (i) "Supplemental Settling Insurer Injunction" provision; (ii) inclusion of "Extra-Contractual Claims" as part of the definition of "Purchased Property," which is not estate property; (iii) language that binds parties with Interests "whether

known or unknown" and "all persons and Entities receiving notice (or deemed to have received notice . . . )"; and (iv) the channeling and gatekeeper injunctions. (*Id.* at 30–35.)

*Fourth*, the Sale Order, the UST argues, contains a bar order that extends beyond the authority granted to this Court pursuant to section 363(f) to sell assets free and clear of claims and interests. (*Id.* at 3, 36.)

In addition to the foregoing, the UST also notes several "other deficiencies," all of which it believes should lead to a denial of the Motion and the relief sought. These deficiencies include, among other things, (i) a finding of good faith under section 363(m); (ii) the enjoining of any action in connection with the Purchased Property; (iii) the Court's retention of exclusive jurisdiction to enforce the Settlement Agreements independent of plan confirmation; (iv) language providing that the Confirmation Order cannot vary the terms of the Sale Order; and (v) the lack of clarity over the effect of denial of confirmation on the third-party release and injunction provisions in the Sale Order. (*Id.* at 35–36.) The UST also believes that, as a general matter, the Court lacks the authority to approve the Sale Order given its inclusion of injunctions. Injunctions, the UST states, may only be granted pursuant to an adversary proceeding in accordance with Bankruptcy Rule 7001(7).[3] (*Id.* at 37.)

As a final point, the UST contends that the Motion seeks relief that lacks any statutory basis and falls outside of the parameters of the Plan. (*Id.*) As support, the UST highlights the "disconnect between the Plan and Motion regarding 'direct action claims,'" which the Plan is silent on but, as defined in the Settlement Agreements, appear to "materially alter the rights of survivors with respect to these claims." (*Id.*) Such alleged "inconsistencies," the UST argues,

---

[3]    The UST also takes issue with the Sale Order's proposed waiver of the 14-day stay requirement set forth in Bankruptcy Rule 6004(h) and argues that it should not be permitted. (UST Objection at 37.) A waiver, it believes, would result in insufficient time to seek a stay pending appeal. (*Id.* at 38.) The Debtor indicates that it has struck the language from the Sale Order, rendering this objection moot. (Debtor Reply ¶ 27.)

13

"beget confusion" for those voting on the Plan.  (*Id.*)  Additionally, the UST notes that the Sale

Order only contains a condition precedent for the Plan to be confirmed as opposed to also going

effective.  (*Id.* at 39.)  As the Settlement Agreements are also effective on the date the Sale Order

becomes a final order, the releases contained therein could be "final" prior to confirmation.  (*Id.*)

### H.  The Debtor Reply

The Debtor requests that the Court overrule the UST Objection.  At the outset, the Debtor

rejects the UST's contention that the Sale Order is a *sub rosa* plan as it does not seek to dispose

of all the Debtor's assets, dictate the terms of the reorganization, or circumvent creditor's plan

rights.  (Debtor Reply ¶¶ 1, 3.)  Moreover, the effectiveness of the Settlement Agreements is

conditioned on the Court's confirmation of the Plan.  (*Id.* ¶ 1.)

The Debtor further maintains that the injunction provisions in the Settlement Agreement

are appropriate and are consistent with precedent; bankruptcy courts routinely approve sale

orders containing similar injunctive protections for purchasers, including the supplemental

injunctive provision.  (*Id.* ¶¶ 2, 9–10, 12 (citing to the sale orders in *General Motors* and

*Chrysler* as examples).)  Indeed, the Debtor asserts that the UST's attempts at extending the

Supreme Court's *Purdue* ruling, which addressed third-party releases solely in the plan

confirmation context, to sale orders is an "overreach."  (*Id.* ¶¶ 2, 11.)

In addition to the foregoing, the Debtor believes that the enjoined claims directly affect

the *res* of the Debtor's estate.  (*Id.* ¶ 14.)  Accordingly, the Debtor asserts that the Sale Order's

injunction is properly tailored and does not enjoin direct claims of creditors against non-debtor

insurers for the insurer's own alleged misconduct in compliance with the Second Circuit's ruling

in *Johns-Manville Corp. v. Chubb Indemnity Insurance Co. (In re Johns-Manville Corp.)*, 517

F.3d 62 (2d Cir. 2008).  (*Id.*)  Consistent with the Disclosure Statement, the Debtor indicates that

14

it has revised the proposed Sale Order to make clear that (i) the Settling Insurer Supplemental Injunction does not extend beyond the Court's jurisdiction and (ii) "Purchased Property" covers only the "extra-contractual claims" of the parties signing the Settlement Agreements and related releases. (*Id.* ¶¶ 15–17.) The Debtor acknowledges that the Plan will ask claimants to release claims beyond those enjoined in the Sale Order but notes that this was disclosed in the Disclosure Statement. (*Id.* ¶ 18.)

Finally, the Debtor argues that the UST's "miscellaneous complaints" all lack merit and misconstrue the language of the Plan and Settlement Agreements.[4] (*Id.* ¶¶ 19–31.) With respect to the UST's assertion that injunctions may only be sought via an adversary proceeding, the Debtor notes that courts have rejected this argument. (*Id.* ¶ 26.) Moreover, the Debtor clarifies that "direct action claims" are claims against insurance proceeds and, in any event, the Disclosure Statement has made clear to claimants the scope of the relevant injunctions in favor of the Settling Insurers in exchange for $85 million to fund the Trust. (*Id.* ¶¶ 28–29.) The UST's contention that Plan proponents are attempting to manipulate the voting process by separating the sale from the Plan is also meritless. (*Id.* ¶ 30.)

### I. Interstate Reply & Joinder[5]

Interstate, focusing solely on its Settlement Agreement (the "Interstate Agreement"), argues that the UST Objection should be overruled since it "advance[es] a fundamentally incorrect interpretation of the Interstate Agreement and the law applicable to it." (Interstate Reply & Joinder ¶ 10.)

---

[4]     In certain instances, the Debtor has modified the Sale Order to address certain of the UST's objections. (*See, e.g.*, Debtor Reply ¶¶ 21–22.)

[5]     In addition to the Interstate Reply & Joinder, both the Committee and London Insurers join in the Motion. (*See* Committee Joinder ¶ 1; LMI Joinder at 2.) The Committee further reserves its rights to challenge the analysis and assumptions contained therein to the extent they are used in conjunction with any other proceeding. (Committee Joinder ¶ 3.)

*First,* Interstate rejects the UST's contention that the Interstate Agreement provides for

the sale of claims owned by third parties—rather, it provides for the sale of Extra-Contractual

Claims of the Diocese Bound Parties only.[6]  (*Id.* ¶ 11.)  *Second*, Interstate further maintains that

*Purdue* does not bar the approval of the Settling Insurer Supplemental Injunction since *Purdue*

was determined within the context of plan confirmation and, therefore, does not apply to sale

orders.  (*Id.* ¶¶ 14–15.)  *Third*, an adversary proceeding is not necessary here since the Settling

Insurer Supplemental Injunction fits within the "statutory injunction" exception and may be

issued in the Sale Order.  (*Id.* ¶ 19.)

## II.   LEGAL STANDARD

### A.  Sale of a Debtor's Assets Outside the Ordinary Course

Section 363(b) of the Bankruptcy Code governs the sale of assets outside the ordinary

course of business.  Specifically, section 363(b)(1) of the Bankruptcy Code provides that "[t]he

trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of

business, property of the estate . . . ."  11 U.S.C. § 363(b)(1).  In accordance with Bankruptcy

Rule 6004(f)(1), sales of property outside of the ordinary course of business may be by private

sale or by public auction.  FED. R. BANKR. P. 6004(f)(1).

Although section 363 of the Bankruptcy Code does not specify a standard for

determining when it is appropriate for a court to authorize the use, sale, or lease of property of

the estate, bankruptcy courts routinely authorize sales of a debtor's assets so long as they can

articulate a sound business justification for doing so.  *See, e.g.*, *In re Chateaugay Corp.*, 973 F.2d

141, 144–45 (2d Cir. 1992) (affirming bankruptcy court's approval of asset sale under section

---

[6]        "Diocese Bound Parties" are comprised solely of (i) the Debtor and Additional Debtors; (ii) the
Reorganized Debtor and Reorganized Additional Debtors; (iii) the other Diocese Signatory Parties; and (iv) each of
their Related Persons to the extent permitted by law.  (Interstate Reply & Joinder ¶ 12.)

363(b) because good business reason supported the sale as delay in the sale of assets may diminish their value); *see also Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983) ("The rule we adopt requires that a judge determining a § 363(b) application expressly find from the evidence presented before him at the hearing a good business reason to grant such an application."); *In re Global Crossing Ltd.*, 295 B.R. 726, 743 (Bankr. S.D.N.Y. 2003) (holding that the standard for approval of a motion under section 363 is whether there is a "good business reason" to support the motion).

Courts have made clear that a debtor's business judgment is entitled to great deference. *See In re Borders Grp., Inc.*, 453 B.R. 477, 483 (Bankr. S.D.N.Y. 2011) ("Indeed, the trustee or DIP is entitled to great judicial deference in deciding which bid to accept as the best and highest bid on the sale of the Debtor's assets.") (citation and internal quotation marks omitted). Once a debtor articulates a sound business justification, there "is a presumption that in making a business decision the [decision maker] acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company." *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.),* 147 B.R. 650, 656 (S.D.N.Y. 1992), *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993) (citation omitted). "Courts should not generally interfere with business decisions absent a showing of 'bad faith, self-interest, or gross negligence.'" *Borders*, 453 B.R. at 482 (quoting *Integrated Res.*, 147 B.R. at 656).

A determination that there are sufficient business reasons to justify a particular sale depends on the facts and circumstances of each particular case. *See Lionel*, 722 F.2d at 1071–72. However, courts may consider, where relevant, factors such as: (1) the proportionate value of the asset to the estate as a whole; (2) the amount of time elapsed since the filing; (3) the likelihood of

17

proposing and confirming a plan in the near future; (4) the effect of the proposed sale on any

reorganization; (5) the sale price to be obtained with reference to any appraisals of the property;

(6) alternative uses of the property; and (7) whether the asset is increasing or decreasing in value.

*Id.* at 1071.

### B.  Sale "Free and Clear"

Section 363(f) of the Bankruptcy Code permits a debtor to sell property, under section

363(b) or (c), free and clear of any interest in such property of an entity other than the estate in

certain circumstances.  11 U.S.C. § 363(f).  Specifically, section 363(f) provides the following:

> The trustee may sell property under subsection (b) or (c) of this section free
> and clear of any interest in such property of an entity other than the estate,
> only if—
>
> > (1)  applicable nonbankruptcy law permits sale of such property free and
> > clear of such interest;
> >
> > (2)  such entity consents;
> >
> > (3)  such interest is a lien and the price at which such property is to be
> > sold is greater than the aggregate value of all liens on such property;
> >
> > (4)  such interest is in bona fide dispute; or
> >
> > (5)  such entity could be compelled, in a legal or equitable proceeding,
> > to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

Section 363(f) of the Bankruptcy Code is drafted in the disjunctive: approval of a

proposed sale of assets free and clear of interests requires only that one of the five requirements

be satisfied with respect to each such interest.  *See In re Elliot*, 94 B.R. 343, 345 (E.D. Pa. 1988)

(noting that section 363(f) is written in the disjunctive, authorizing a trustee or debtor-in-

possession to sell property of the estate free and clear of all liens "if any of the five conditions of

§ 363(f) are met . . .").

### C.  Protections to Good Faith Purchasers Under Section 363(m)

Section 363(m) of the Bankruptcy Code affords protection to a good faith purchaser in any interest in property purchased from an estate, whether the sale conducted is later reversed or modified on appeal.  Specifically, Bankruptcy Code section 363(m) provides as follows:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

It has been held that "[g]ood faith of a purchaser is shown by the integrity of his conduct during the course of the sale proceedings . . . .  A purchaser's good faith is lost by 'fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.'"  *Licensing by Paola, Inc. v. Sinatra (In re Gucci)*, 126 F.3d 380, 390 (2d Cir. 1997) (quoting *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978)).

Section 363(m) "furthers the policy of finality in bankruptcy sales" and "assists bankruptcy courts in maximizing the price for assets sold in such proceedings," *United States v. Salerno*, 932 F.2d 117, 123 (2d Cir. 1991), by providing that "good faith transfers of property will not be affected by the reversal or modification on appeal of an unstayed order, whether or not the transferee knew of the pendency of the appeal," *Allstate Ins. Co. v. Hughes*, 174 B.R. 884, 888 (S.D.N.Y. 1994).

### D.  Rule 9019 of the Federal Rules of Bankruptcy Procedure

Rule 9019(a) of the Bankruptcy Rules governs the approval of compromises and settlements, and provides as follows:

> On motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement.  Notice shall be given to creditors, the United States Trustee, the debtor, and indenture trustees as provided in Rule 2002 and to any other entity as the court may direct.

FED. R. BANKR. P. 9019(a).

While "settlements or compromises are favored in bankruptcy and, in fact, encouraged," a court must first determine that the proposed settlement "is fair and equitable and in the best interests of the estate."  *In re Chemtura Corp.*, 439 B.R. 561, 595 (Bankr. S.D.N.Y. 2010); *In re Drexel Burnham Lambert Grp., Inc.*, 134 B.R. 493, 496 (Bankr. S.D.N.Y. 1991) (internal quotation marks omitted) (citing *Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968)); *see also In re Lehman Bros. Holdings*, 435 B.R. 122, 134 (S.D.N.Y. 2010).

The Second Circuit has set forth seven interrelated factors (the "*Iridium* Factors") to be considered by a court in deciding whether to approve a compromise or settlement:

> (1) [T]he balance between the litigation's possibility of success and the settlement's future benefits;

> (2) the likelihood of complex and protracted litigation, "with its attendant expense, inconvenience, and delay," including the difficulty in collecting on the judgment;

> (3) "the paramount interests of the creditors," including each affected class's relative benefits "and the degree to which creditors either do not object to or affirmatively support the proposed settlement;"

> (4) whether other parties in interest support the settlement;

> (5) the "competency and experience of counsel" supporting, and "[t]he experience and knowledge of the bankruptcy court judge" reviewing, the settlement;

> (6) "the nature and breadth of releases to be obtained by officers and directors;" and

> (7) "the extent to which the settlement is the product of arm's length bargaining."

*Motorola, Inc. v. Off. Comm. Of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452, 462 (2d Cir. 2007) (citations omitted).

A court "need not conduct an independent investigation into the reasonableness of the settlement but must only canvass the issues and see whether the settlement falls below the lowest point in the range of reasonableness." *Chemtura*, 439 B.R. at 594 (internal quotation marks omitted) (quoting *In re W.T. Grant Co.*, 699 F.2d 599, 608 (2d Cir. 1983)).

In passing upon a proposed settlement, "the bankruptcy court does not substitute its judgment for that of the trustee." *Depo v. Chase Lincoln First Bank, N.A.*, 77 B.R. 381, 384 (N.D.N.Y. 1987), *aff'd sub nom. Depo v. Lincoln Bank*, 863 F.2d 45 (2d Cir. 1988) (citations omitted). Nonetheless, "while the 'approval of a settlement rests in the Court's sound discretion, the debtor's business judgment should not be ignored.'" *JPMorgan Chase Bank, N.A. v. Charter Commc'ns. Operating, LLC (In re Charter Commc'ns.)*, 419 B.R. 221, 252 (Bankr. S.D.N.Y. 2009) (quoting *In re Stone Barn Manhattan LLC*, 405 B.R. 68, 75 (Bankr. S.D.N.Y 2009)). In addition, the court may "give weight to the informed judgments of the trustee or debtor-in-possession and their counsel that a compromise is fair and equitable." *In re Kerner*, 599 B.R. 751, 756 (Bankr. S.D.N.Y. 2019) (quoting *Drexel Burnham*, 134 B.R. at 505).

### III.    <u>DISCUSSION</u>

#### A.  The Proposed Sale is Within the Debtor's Business Judgment

The Debtor has sufficiently established that the requirements of section 363(b) of the Bankruptcy Code have been satisfied. The proposed sale of insurance policies to the Settling Insurers pursuant to the Settlement Agreements will result in the payment of $85.525 million towards the funding of the Trust. This settlement amount, as noted, was the product of a court-ordered mediation that the Debtor submits was conducted in good faith and at arm's length. (*See*

Motion ¶ 33; Kramer Declaration ¶ 4 (indicating that the $85.525 million was arrived at through

bankruptcy court-ordered mediation).)  Notably, funds from the settlement amount will be

***immediately available*** to pay creditors who have waited far too long for compensation.  (Motion

¶ 33.)  At the same time, the Settlement will also resolve the highly contentious and costly

insurance coverage actions pending in District Court, which the Debtor has indicated involve

fact-intensive issues that will likely require resolution on a claim-by-claim basis.  (*Id.* ¶ 19.)

The Debtor entered chapter 11 over four years ago and, at times, the fate of its case was

uncertain.  The global resolution embodied in the Settlement puts plan confirmation within reach

and supports a finding that the proposed sale represents a sound exercise of the Debtor's business

judgment.

### B.  Buyback of Insurance Policies is Entitled to "Free and Clear" Protection

Section 363(f) of the Bankruptcy Code permits a debtor, in certain instances, to sell

property free and clear of third-party interests.  11 U.S.C. § 363(f).  Here, the Debtor submits

that any entities with a lien, claim, interest or encumbrance have consented in satisfaction of

sections 363(f)(1) and (f)(2) of the Bankruptcy Code.  (*Id.* ¶ 34.)  The Court notes that, in any

event, parties in interest have had an opportunity to object to the relief requested.  *See Borders*,

453 B.R. at 484 ("Under section 363(f)(2), a lienholder who receives notice of a sale but does not

object within the prescribed time period is deemed to consent to the proposed sale, and assets

thereafter may be sold free and clear of liens.")  Additionally, to the extent any such entity has

not consented, the Debtor indicates that it is the subject of a bona fide dispute or could be

compelled to accept a money satisfaction of such interest.  (Motion ¶ 34.)  Thus, the

contemplated sale of insurance policies is entitled to "free and clear" protections under section

363(f) of the Bankruptcy Code.

### C.  The Settling Insurers are Entitled to Protections Under Section 363(m)

The Settling Insurers are good faith purchasers entitled to the protections of section

363(m) of the Bankruptcy Code.  The mediation and other negotiations with the Settling Insurers

in connection with the Settlement Agreements were conducted in good faith and at arm's length.

(*See* Kramer Declaration ¶ 4.)  Moreover, the Settling Insurers are independent third parties with

no affiliation to the Debtor.  (*Id.* ¶ 3.)  The Settling Insurers, therefore, are entitled to good faith

protections contemplated under section 363(m).

### D.  The *Iridium* Factors Weigh in Favor of Approval

The Debtor submits that its entry into the Settlement Agreements, as products of good

faith and arm's-length negotiations, are well within the range of reasonableness.  (*See* Terrell

Declaration ¶¶ 30–33.)  The Court agrees and finds that each of the relevant *Iridium* Factors

weigh in favor of approval.[7]

> 1.  Balance Between the Litigation's Possibility of Success and the Settlement's
>     Future Benefits

The Settlement Agreements' future benefits are clear and evident—they provide an

immediate and certain resolution while avoiding further delay of distributions to creditors.  In the

pending insurance coverage actions, the Settling Insurers have asserted various defenses,

including with respect to the Debtor's alleged prior knowledge, lack of notice, and the timing

and extent of the Settling Insurers' obligations.  (*See* Motion ¶ 51.)  The Debtor further notes that

the method for allocating claims is also in dispute and, as already discussed, many of the issues

raised in the pending insurance coverage actions are fact-intensive and require claim-by-claim

---

[7]     As the Settlement Agreements do not contain releases for officers and directors, the sixth *Iridium* Factor
does not apply.

litigation.  (*Id.*)  In light of this, the Debtor believes that reaching a resolution through litigation

will take years.  (*Id.*)

The Settlement Agreements would preclude all of this, avoiding a reduction in funds

available for distribution, while also resulting in the transfer of $85.525 million to the Trust for

prompt distribution to creditors.  Accordingly, the Court concludes that the first *Iridium* Factor

weighs in favor of approval.

### 2.   The Likelihood of Complex and Protracted Litigation

Protracted and complex litigation is likely absent the Debtor's entry into the Settlement

Agreements.  The Debtor indicates that the cases against the Settling Insurers, which have been

pending for four years, are "far from trial ready."  (*Id.* ¶ 52.)  Recovery for indemnity would also

require resolution of the underlying CVA cases by either settlement or judgment, which would

add significant delays.  The Debtor states that, even if the claims are resolved and the coverage

actions decided by the District Court, the Debtor anticipates "years of appeals and millions of

dollars in additional fees."  (*Id.*)  Moreover, without the Settlement, the Settling Insurers are

likely to object to the Debtor's chapter 11 plan that would lead to further increased cost and

delay to the detriment of all parties.  Accordingly, the second *Iridium* Factor also weighs in favor

of approval.

### 3.   Paramount Interests of Creditors

The paramount interests of creditors are served here.  The Committee, which has worked

closely with state court counsel representing a super-majority of abuse survivors, supports the

Settlement.  Moreover, the Debtor believes that claimants "overwhelmingly support" the

Settlement whose proceeds, the Debtor notes, will ultimately benefit them.  (*Id.* ¶ 54.)  Thus, the

Court finds that the third *Iridium* Factor weighs in favor of approval as well.

### 4.  Support of Other Parties in Interest

The Settlement and the Debtor's entry into the Settlement Agreements embodying the same has the support of substantially all major stakeholders in this chapter 11 case.  Specifically, the Debtor, its parishes, the Committee, and all the Debtor's solvent third-party insurers are in favor of the Debtor entering into the Settlement Agreement.  Therefore, the fourth *Iridium* Factor supports approval.

### 5.  Competency and Experience of Counsel

Each of the Debtor, the Additional Debtors, the Committee, and the Settling Insurers are advised by both restructuring counsel and separate, specialized insurance counsel.  The competency of counsel has not been questioned by any party, and the Court has no reason to think otherwise.  Accordingly, the Court concludes that the sixth *Iridium* Factor weighs in favor of approval.

### 6.  Product of Arm's-Length Bargaining

Finally, as already discussed, the Settlement Agreements are the product of extensive, arm's-length negotiations and follow multiple rounds of mediation with experienced mediators.  The Court is satisfied that this *Iridium* Factor is met.

### E.  The Sale Order is Not a *Sub Rosa* Plan

The UST has asserted that the Court cannot approve the Motion as the Sale Order constitutes a *sub rosa* plan.  Generally, a trustee is prohibited from the use, sale or lease of estate property under section 363(b)(1) if it would amount to a *sub rosa* plan of reorganization. *Iridium*, 478 B.R. at 466.  "The reason *sub rosa* plans are prohibited is based on a fear that a debtor-in-possession will enter into transactions that will, in effect, 'short circuit the requirements of [C]hapter 11 for confirmation of a reorganization plan.'"  *Id.* (modifications in original) (citations omitted).  "Said another way, the doctrine prohibits efforts to 'restrict any

rights afforded to creditors in the [C]hapter 11 process, such as the right to vote on a proposed plan of reorganization in the manner they see fit.'" *In re Genesis Glob. Holdco, LLC*, 660 B.R. 439, 486 (Bankr. S.D.N.Y. 2024) (quoting *In re Tower Auto. Inc.*, 241 F.R.D. 162, 166 (S.D.N.Y. 2006)).

In determining whether a settlement agreement is a *sub rosa* plan, courts will consider a number of factors, including whether "(1) the agreement has the practical effect of dictating the debtor's reorganization; (2) the agreement infringes creditor voting rights on the debtor's reorganization; (3) the agreement disposes of large assets belonging to the debtor; and (4) the agreement forced creditors to waive their claims against the debtor." *Id.* (quoting *Topwater Exclusive Fund III, LLC v. SageCrest II, LLC (In re SageCrest II, LLC)*, 2011 WL 134893, at *11–12 (D. Conn. Jan. 14, 2011)).

Here, the Settlement Agreements to which the Sale Order pertains, while integral to the Plan, are only one of several components that comprise the Plan. As a means of implementation, the Plan contemplates the formation of the Trust on the Effective Date that will be funded with approximately $320 million in contributions for the purpose of addressing and paying nearly all Abuse Claims. Only $85.525 million of the $320 million will come from the Settling Insurers. The Settlement Agreements do not dictate plan distributions, dispose of all the Debtor's assets or circumvent voting. Indeed, a condition precedent to the effectiveness of the Settlement Agreements is confirmation of the plan, which itself is dependent on claimants voting to accept the Plan. The Settlement Agreements in this instance are a "step towards possible confirmation of a plan of reorganization and not an evasion of the plan confirmation process." *Iridium*, 478 B.R. at 467 (finding that a settlement agreement is not a *sub rosa* plan where a proper business justification for the settlement exists).

In light of the foregoing, the Court concludes that the Sale Order is not a *sub rosa* plan and **OVERRULES** the UST Objection in this respect.

### F.  An Adversary Proceeding is Not Required

The UST argues that the Court lacks authority to approve the Sale Order since the Sale Order "purports to enjoin[] creditors from asserting claims by incorporating the Supplemental Plan Injunction."  (UST Objection at 36–37.)  Rule 7001(7) of the Federal Rules of Bankruptcy Procedure provides that an adversary proceeding is necessary in order "to obtain an injunction or other equitable relief, except when a chapter 9, chapter 11, chapter 12, or chapter 13 plan provides for the relief."  FED. R. BANKR. P. 7001(7).  However, in this instance, the Debtor is seeking an injunction as part of a "free and clear" sale pursuant to section 363(f) of the Bankruptcy Code.  Courts routinely grant such relief without requiring the commencement of an adversary proceeding and doing so would require any section 363(f) sale to proceed via such a route, which past practice does not require.  *See In re Trans World Airlines, Inc.*, No. 01-0056 (PJW), 2001 WL 1820325, at *9 (Bankr. D. Del. Mar. 27, 2001) ("An adversary proceeding is not required for an order under § 363(f), even if the order includes injunctive relief necessary to effectuate the sale 'free and clear.'  If what the EEOC argues were true, all § 363(f) sales would have to proceed via an adversary proceeding—a procedure finding no support in the Bankruptcy Code or twenty plus years of reported decisions interpreting that Code.").  Notably, Rule 7001 itself does not contain any provision requiring an adversary proceeding to sell property of the estate free and clear of all liens.

Therefore, the Court is unpersuaded.  The UST Objection in this respect is also **OVERRULED**.[8]

---

[8]     To the extent not otherwise expressly addressed herein, the Court **OVERRULES** the balance of the UST Objection.

## IV.    <u>CONCLUSION</u>

For the reasons discussed, the Motion is **GRANTED**.  The Debtor's entry into the

Settlement Agreements is **APPROVED**.

**IT IS SO ORDERED.**

Dated:    November 18, 2024
          New York, New York

*Martin Glenn*
_____
MARTIN GLENN
Chief United States Bankruptcy Judge